**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: | |
| STREAM TV NETWORKS, INC., | CHAPTER 11 |
| Debtor, | CASE NO.: 23-10763 MDC |
| HAWK INVESTMENT HOLDINGS LTD., | |
| Movant, | |
| v. | |
| STREAM TV NETWORKS, INC., | |
| Debtor/Respondent. | |

**HAWK INVESTMENT HOLDINGS LTD.'S EMERGENCY MOTION FOR RELIEF**
**FROM THE AUTOMATIC STAY PURSUANT TO SECTION**
**362(d) OF THE BANKRUPTCY CODE**

Hawk Investment Holdings, Ltd. ("Hawk"), a creditor of Stream Network, Inc. (the "Debtor" or "Stream") in the above-captioned chapter 11 case, by and through its undersigned counsel, K&L Gates LLP, respectfully submits this memorandum of law in support of Hawk's motion for entry of an Order pursuant to 11 U.S.C. § 362(d), modifying the automatic stay for the purposes of allowing the Delaware Court of Chancery to proceed to a bench trial originally scheduled for March 23, 2023, and request for expedited consideration (the "Motion"). Hawk kindly requests that this Court schedule a hearing on the request for modification of the automatic stay on March 27, 2023.  In support of the Motion, Hawk respectfully submits as follows:

**INTRODUCTION**

Debtor has filed its bankruptcy petition, alongside the petition of Technovative Media, Inc. ("Technovative", together with Stream, the "Debtors") as part of a baseless gambit to avoid a trial in the Delaware Court of Chancery that was scheduled to proceed on March 23, 2023.  This is the

third time since 2021 that Stream has been in bankruptcy court, though this time it seeks a new forum after a Delaware bankruptcy judge dismissed the last two cases as having been brought in bad faith.  Hawk, Stream, and Technovative were days away from a trial in the Delaware Court of Chancery that would resolve myriad of issues, including the rights of the Secured Creditors (defined below) under Delaware state law. *See Hawk Investment Holdings Limited v. Stream TV Networks, Inc.*, C.A. No. 2022-0930-JTL (the "225 Action").  The Docket for the 225 Action is attached to the Declaration of Steven L. Caponi (the "Caponi Decl.") as Exhibit A.   Stream contends that the debts owed to the Secured Creditors are not outstanding and disputes the Secured Creditors' (defined below) rights under loan documents signed by the Debtors, all governed by Delaware state law.  In validly exercising certain of those rights, Hawk removed Mathu Rajan from his position as director of Technovative on October 17, 2022, and replaced Mr. Rajan with Shadron Stastney.

The parties' dispute over the proper directors of Technovative essentially paralyzed Technovative, which caused Hawk to initiate the 225 Action. A proceeding under 8 Del. C. § 225 is creature of Delaware state law; it is a summary proceeding specifically designed to resolve this dilemma and underlying issues in dispute with respect to the right to replace directors.  In the 225 Action, the Delaware Court of Chancery took possession of the *res*, Technovative, and appointed a Receiver to assume all of the duties of the Board of Directors of Technovative and to run its affairs until the Court resolves whether Mr. Stastney has been the validly appointed director of Technovative as of October 2022.

The Delaware Court of Chancery is intimately familiar with this dispute, and poised to rule in the 225 Action.  Discovery in the 225 Action has been completed—the parties had submitted a Pretrial Order and Opening Pre-Trial Briefs, and had agreed to have a trial on a paper record less than one week from today.  The case is all but complete, save for less than a day of argument and

the Court of Chancery's final ruling.  In the course of these Chapter 11 cases, this Court will face

the very same questions underlying the 225 Action regarding the nature of the Debtors' obligations

to the Secured Creditors under the Hawk Notes and the SLS Notes.  To re-start the arduous process

of fact finding and briefing at this juncture would be wasteful of the Court's time and the parties'

time and money.  Meanwhile, there are technology assets at risk and employees who need to be

compensated.  The most efficient path is to complete the last step of the 225 Action and then come

back to this Court to determine its effect on these Chapter 11 cases.  The Delaware Court of

Chancery has available dates on April 18th and April 20th for a one-day trial, should Hawk prevail

on this Motion, to serve that goal of judicial economy.

The very nature of the 225 Action and the Court of Chancery's prior rulings beg the

question of how Technovative's bankruptcy filing could be properly authorized, but that is not a

question for today.  Today the question is whether the Court should see through Mr. Rajan's gambit

to forum shop and restart a substantially completed proceeding before the Delaware Court of

Chancery through the use of a bankruptcy proceeding, and permit the parties to finish a months-

long process before a jurist intimately familiar with the parties and the underlying facts, sitting in

the proper court of the state whose law governs all of the applicable issues in that litigation.  Given

the nature of the dispute, and under the long-standing principals of judicial economy, the answer

should be "yes".

## **JURISDICTION**

The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This

matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G). Venue for this proceeding and

this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory

predicates for the relief requested in this Motion are 11 U.S.C. §§ 105, 362 (a) and (d).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

### The Secured Debt

Stream is a company that has been researching and developing a technology that would allow users to watch television in 3-D without the need for special glasses.  Stream created Technovative as a wholly-owned subsidiary that directly owns the operating subsidiaries carrying out that research and development. Stream is controlled by Mathu Rajan, and prior to the institution of the 225 Action, so was Technovative.

From 2014 to 2020, Hawk and Stream executed a series of promissory notes (the "Hawk Notes") which provided Stream with loans worth tens of millions of dollars to develop said technology.  With interest, the Hawk Notes are now valued in excess of $142,000,000.  In exchange for the funds advanced under the Hawk Notes and pursuant to several Security Agreements and Pledge Agreements, Stream granted Hawk security interests in what is defined under the operative documents as the "Collateral."  The Collateral is broadly defined to include substantially all of the assets of Stream.  A copy of the first Hawk Note, and accompanying Security Agreement and Pledge Agreement, are attached to the Caponi Decl. as Exhibit C.[2]

Stream also entered into a series of notes with SLS Holdings VI, LLC ("SLS" and, together with Hawk, the "Secured Creditors") between August 8, 2011 and May 29, 2012.  SLS loaned

---

[1] For a full factual recitation, Hawk refers the Court to the Verified and Amended Complaint for Declaratory Relief and Pursuant to 8 *Del. C. §* 225 attached as Exhibit B to the Caponi Decl. and incorporates the same herein by reference.  Capitalized terms used but not defined herein shall have the meanings given to them in the Amended Complaint.

[2] There are seventeen Hawk Notes, each accompanied by a separate Security Agreement and Pledge Agreement.  While there are minor differences between some of the terms of each Hawk Note, Security Agreement, and Pledge Agreement, none of those minor differences are germane to this Motion.  For that reason, Exhibit C, attached to the Caponi Decl., contains just one example of a Hawk Note, Security Agreement, and a Pledge Agreement.  If the Court wishes to receive all seventeen Hawk Notes and the supporting Security and Pledge Agreements, Hawk can provide them.

Stream funds in the aggregate principal amount of $6,000,000.00, pursuant to five promissory notes (collectively, as may have been amended from time to time, the "SLS Notes"). As of February 24, 2023, the total amount due and owing under the SLS Notes, including accrued interest, was approximately $14,383,523.06 (the "SLS Debt"). SLS and Stream also entered into Security Agreements and Pledge Agreement in connection with the SLS Notes as well. A copy of the SLS Notes are attached to the Caponi Decl. as Exhibit D.

In 2018, Stream was in need of a substantial monetary investment from an institutional investor in order to continue developing its technology, scale up operations, and start generating revenue. Stream, however, claimed that the size of its secured debt was scaring off new investors. For that reason, Hawk entered into a conversion agreement with Stream dated January 29, 2018 (the "Hawk Conversion Agreement") pursuant to which the parties agreed to terms by which Stream could convert the then-outstanding portion of the Hawk Debt into equity. A copy of the Hawk Conversion Agreement is attached to the Caponi Decl. as Exhibit E.

Stream must fulfill a number of requirements under the Hawk Conversion Agreement, which are among the items to be resolved by Vice Chancellor Laster in the Court of Chancery.

Stream has defaulted on the Hawk Notes and the SLS Notes. An Event of Default has clearly taken place under the Hawk Notes, the SLS Notes, Security Agreements and Pledge Agreements, as Stream defaulted on its payments under the Hawk Notes and the SLS Notes by no later than February 2020. In addition, Stream defaulted on the Hawk Notes and the SLS Notes by filing for bankruptcy on February 25, 2021, by consenting to an involuntary bankruptcy filed on May 23, 2021, and again by filing the above-captioned bankruptcy petition. Those defaults are outstanding and cannot be cured. As explained in detail below, the Court of Chancery has already ruled that the Debtors are estopped from re-litigating the propriety of the underlying debt as of November 10, 2021, and the existence of these defaults.

5

Upon an "Event of Default," the rights granted to Hawk as a secured creditor include, but are not limited to, the right to: (i) order Stream to assemble and marshal the Collateral in anticipation of an Article 9 Sale; (ii) sell the Collateral pursuant to an Article 9 Sale; and (iii) exercise Hawk's Proxy Rights with respect to the Pledged Interests in order to exert control over the Collateral by controlling various operating subsidiaries of Stream (collectively, the "Secured Creditor Rights").  As explained in detail below, Stream and Technovative are estopped from re-litigating the existence of the Secured Creditor Rights.

On June 11, 2022, both Hawk and SLS assigned the Hawk Notes and SLS Notes to SeeCubic. SeeCubic has issued senior secured promissory notes to various lenders under a Note Purchase Agreement, dated June 11, 2022 (the "SeeCubic Note Purchase Agreement"). *See* Caponi Decl., Ex. F. SeeCubic granted liens to secure such notes pursuant to a Guarantee and Collateral Agreement, dated as of the same day (the "SeeCubic Security Agreement"). *See* Caponi Decl., Ex. G. Hawk, as the primary holder of those notes, was also appointed as Collateral Agent on behalf of the lenders to hold and prosecute the liens securing the SeeCubic Notes.  Among the collateral granted to Hawk is SeeCubic's rights with respect to the Hawk Notes and the SLS Notes.  An Event of Default has occurred under the SeeCubic Note Purchase Agreement as a result of the Delaware Supreme Court's invalidation of the Omnibus Agreement in June 2022, as discussed below, giving Hawk the right to pursue SeeCubic's rights under the Hawk Notes and the SLS Notes in its own name or SeeCubic's. *See* SeeCubic Security Agreement, Caponi Decl., Ex. G.

**The Omnibus Agreement Litigation**

Upon the Events of Default under the Hawk Notes and SLS Notes, several parties in interest decided to pursue a "friendly foreclosure" on the Collateral.  In May 2020, Stream, its secured

creditors, and fifty-two of its stockholders[3] entered into the Omnibus Agreement.  In the Omnibus Agreement, the parties agreed that Stream would transfer all of its assets to a newly formed entity, SeeCubic, Inc. ("SeeCubic"), controlled by Stream's Secured Creditors.  In exchange, and upon the satisfaction of certain conditions, the Secured Creditors (*i.e.*, Hawk and SLS) agreed to extinguish their claims against Stream.  As part of the arrangement, Stream's minority stockholders received the right to exchange their shares in Stream for shares in SeeCubic, and Stream received the right to one million shares of SeeCubic common stock as well.  Stream's outside directors approved the Omnibus Agreement on behalf of Stream.  *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1025-26 (Del. Ch. 2020) (the "Chancery PI Opinion").

After the Omnibus Agreement was executed, Stream and its insiders—Mathu and Raja Rajan (the "Rajans")—reasserted control over Stream, and in September 2020, Stream filed suit against SeeCubic in the Delaware Court of Chancery.  *See In re Stream TV Networks, Inc., Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL (Del. Ch. 2020) (the "Omnibus Agreement Litigation").  The Rajans' goal in initiating the Omnibus Agreement Litigation was to invalidate the Omnibus Agreement by any means possible and to reclaim control of the Collateral.  That case was assigned to Vice Chancellor Laster.

As part of the ensuing protracted motion practice after discovery, both Stream and SeeCubic moved for preliminary injunctions, whereby Stream sought to prevent SeeCubic from taking any actions to enforce the Omnibus Agreement, and SeeCubic sought to compel Stream's

---

[3] These stockholders brought an action in the Delaware Court of Chancery in the spring of 2020 alleging, among other things, fraud and breach of fiduciary duty against Mathu Rajan and other Stream insiders. *See* Amended Verified Complaint, *Crawford v. Rajan*, No. 2020-0004-JTL (Dkt. 8, Mar. 25, 2020). That action was assigned to Vice Chancellor Laster and remains pending.

compliance therewith.  The Court considered both motions simultaneously and ultimately ruled in

SeeCubic's favor.  *See Chancery PI Opinion*, 250 A.3d at 1047.

In so ruling, the Court of Chancery made several specific findings regarding the debts

Stream owed its Secured Creditors.  These facts include that Stream "defaulted on more than $50

million in debt to its secured creditors, owed another $16 million to trade creditors, and could not

pay its bills as they came due."  *Id.* at 1020.  The Court of Chancery specifically found that

"Stream's secured creditors already held security interests in all of Stream's assets and had the

right to foreclose on those assets."  *Id.*  Further, the Court of Chancery expressly found that Hawk

was the "junior secured creditor," in whose favor "Stream pledged all of its assets as security for

the Hawk Notes," and that "Stream executed a security agreement in connection with the Hawk

Notes, which authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if

Stream defaulted."  *Id.* at 1023.  Finally, in considering whether Stream had converted the

obligations under the Hawk Notes (and its obligations to SLS) to equity as alleged by Stream, the

Court of Chancery ruled, "neither the Hawk Notes nor the SLS Notes ever converted into equity,

and the notes remain outstanding."  *Id.*

### The Voluntary Bankruptcy Action

Shortly after the Court of Chancery's ruling in the Chancery PI Opinion, SeeCubic moved

for summary judgment (the "SeeCubic Summary Judgment Motion") seeking in part to have the

preliminary injunction entered by the Court of Chancery converted into a permanent injunction.

On February 24, 2021, just two days before SeeCubic was set to file its reply brief on the SeeCubic

Summary Judgment Motion, Mathu Rajan put Stream into bankruptcy for the first time.  *See In re*

*Stream TV Networks, Inc.*, Case No. 21-10433-KBO (Del. Bankr. 2021) (the "Voluntary

Bankruptcy Action").  As discovery eventually made clear, Stream initiated the Voluntary

Bankruptcy Action to prevent the Court of Chancery from granting SeeCubic's Summary Judgment Motion.

In several pleadings, Stream acknowledged the existence of the Hawk Notes and its secured status. In a sworn declaration by Stream's President, Mathu Rajan, he stated that:

> [Stream's] junior secured creditor is Hawk Investment Holdings Limited ("Hawk"). Between 2014 and 2020, Hawk loaned more than £50 million to the Debtor, plus another $1.336 million, through a series of junior secured notes (the "Hawk Notes"). Subject to the security interest held by SLS, the Debtor pledged substantially all of its assets as security for the Hawk Notes. The Debtor executed a security agreement in connection with the Hawk Notes.

*See* Caponi Decl., Ex. H. Stream made the same representations to the bankruptcy court in its motion to approve post-petition debtor-in-possession financing. *See* Caponi Decl., Ex. I ¶ 15.

In May 2021, following expedited discovery, Judge Owens held a two-day trial on motions to dismiss the Voluntary Bankruptcy Case filed by SeeCubic, SLS, and the United States Trustee. After considering the evidence, Judge Owens dismissed the Voluntary Bankruptcy Case, finding that Stream's bankruptcy filing had no legitimate restructuring purpose, was not motivated by Stream's financial distress, and was ***not*** filed with "the hope of preserving [Stream's] business and maximizing its value for the benefit of its creditors and stakeholders." Transcript of Judge's Ruling at 13, *id.* (ECF No. 200, May 17, 2021) Caponi Decl., Ex. J. Instead, the court found that the bankruptcy filing was made in bad faith, for the purpose of directly evading the PI Order:

> [T]he weight of the evidence, including the timing of the filing days before the Chancery Court was to enter a mandatory injunction permanently enjoining [Stream] from laying claim to substantially all of Stream's assets, indicates that Mr. Rajan's primary purpose for filing this petition was to gain a tactical litigation advantage that is part of a continued pattern of effort to nullify, undermine, and/or interfere with the [O]mnibus [A]greement, vitiate the purpose and effect of the Chancery Court's [December 8, 2 020] order, and to maintain ownership and control over the assets of [Stream] for his own benefit.

*Id.* at 13-14.

As Judge Owens further found, "Stream did not come to this court as the honest but

unfortunate debtor to preserve and maximize value for its stakeholders." *Id.* at 15.  Rather, the

Voluntary Bankruptcy Action "was designed to stop SeeCubic and [Stream's] secured creditors

from fully implementing [the Omnibus Agreement], to unravel it, and to avoid the Chancery

Court's order. . . . I will not permit the bankruptcy process to be used in such a fashion . . . ." *Id.*

at 19; *see also id.* at 19-20 ("[T]o be clear, this case is being dismissed as a result of Stream's

attempt to interfere with the Chancery Court's order and the [O]mnibus [A]greement.").  Indeed,

Stream's and Mr. Rajan's scheme to misuse the bankruptcy court was so brazen that the court

declined to enter a stay of its dismissal order, holding that doing so would, "be me acting as

complicit in the bad faith filing." *Id.* at 22.[4]

### The Involuntary Bankruptcy Proceeding

With the Voluntary Bankruptcy Case dismissed, SeeCubic filed its reply brief in the

Omnibus Agreement Litigation in support of its motion for summary judgment on May 22, 2021.

The *very next day*, on May 23, 2021, three of Stream's unsecured creditors[5]—none of whom filed

objections to the motions to dismiss in the Voluntary Bankruptcy Action or made any request to

convert that action to Chapter 7—filed an involuntary bankruptcy petition as to Stream under

Chapter 7.  *In re Stream TV Networks, Inc.*, No. 21-10848-KBO (Bankr. D. Del.) (the "Involuntary

Bankruptcy Action").  SeeCubic and SLS, again with the support of the United States Trustee,

---

[4] The District Court affirmed dismissal of the Voluntary Bankruptcy Action on December 16, 2021.  Order, *In re Stream TV Networks, Inc.*, No. 21-cv-00723-RGA (D. Del.) (ECF No. 32, De. 16, 2021).

[5] The involuntary petition was filed by Jamuna Travels, Inc., Walsh CHB, Inc., and, Rembrandt 3D Holding Ltds. ("Rembrandt") (ECF No. 1, May 23, 2021 in Case No. 21-10848). It is suspicious, though not surprising, to see that one of the Chapter 7 petitioners, Rembrandt, appears to be coordinating its strategy with Stream once more. Rembrandt moved to intervene in the 225 Action, though the Court of Chancery denied that motion. *See* Caponi Decl., Ex. A (Dkt. 60). Rembrandt is also the only creditor listed for Technovative, a non-operating holding company, and was the only group not a party to the 225 Action that Stream notified of the emergency hearing held before this Court on Thursday, March 16, 2023, though Rembrandt was not implicated in the relief sought.

moved to dismiss.  Tellingly, Stream openly and enthusiastically aligned itself with the filing

unsecured creditors.  In particular, Stream objected to dismissal of the Involuntary Bankruptcy

Action, encouraging the court to convert the case into a second Chapter 11 matter on the basis of

the same purported plan of reorganization Judge Owens had rejected in the Voluntary Bankruptcy

Action.  Joinder and Objection of the Alleged Debtor, *id.* (ECF No. 27, June 8, 2021) Caponi Decl.,

Ex. K.[6]

On June 10, 2021, after hearing argument from SeeCubic, the United States Trustee,

Stream, and one of the filing unsecured creditors, the court dismissed the Involuntary Bankruptcy

Action *and* enjoined Stream from filing any further bankruptcies for 12 months.  Order, *id.* (ECF

No. 36, June 10, 2021.)  In so doing, the court did not mince words:

> [C]onsidering the totality of the facts and circumstances presented, including the
> arguments that were made by counsel present today and the pleadings submitted
> and the documents attached thereto, **it's clear to me that this proceeding was filed
> as another attempt by the parties to *circumvent my dismissal order*, gain some
> sort of litigation leverage over the secured lenders and the disputes in the
> Chancery Court, and essentially get another bite of the appl[e] to try and
> pursue the previously submitted plan and theories that are already considered
> and rejected** in the prior Chapter 11 proceeding.

Transcript of Hearing at 63-64, *id.* (ECF No. 37, June 11, 2021) (emphasis added).[7]

### The Omnibus Agreement Litigation Resumes

The Court of Chancery ultimately granted the SeeCubic Summary Judgment Motion as to

the validity of the Omnibus Agreement and request for an injunction.  *See Stream TV Networks,*

*Inc. v. SeeCubic, Inc.*, 2021 WL 4352732, at *2-3 (Del. Ch. Sep. 23, 2021) (the "Chancery

---

[6] SeeCubic's motion to dismiss described the unusual timing and circumstances of the filing of the
Chapter 7 petition which strongly suggested that Stream was complicit in its filing.  Emergency
Motion of SeeCubic, Inc. and SLS Holdings VI, LLC at 13-15, *id.* (ECF No. 5, May 27, 2021).

[7] The court added, "I thought I made myself clear when I dismissed the Chapter 11 case that I did
not expect to see another case until the Chancery Court action was completed and the transfers to
SeeCubic were accomplished.  The arguments today do not change my opinion."  *Id.* at 64-65.

Summary Judgment Order"). In the Chancery Summary Judgment Order, the Court of Chancery referred to and incorporated the factual findings from the Chancery PI Opinion. *See id.* at *1. Thereafter, the Court of Chancery entered the Chancery Summary Judgment Order as a final judgment pursuant to Court of Chancery Rule 54(b), permitting Stream to immediately appeal that order to the Delaware Supreme Court. *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 5240591 (Del. Ch. Nov. 10, 2021) (hereinafter, "Chancery SJ Final Order").

### The Omnibus Agreement is Invalidated

Once Stream's bad faith detours into bankruptcy in Delaware had concluded, Stream appealed the Chancery SJ Final Order. Stream's appeal alleged that the Court of Chancery erred in finding the Omnibus Agreement enforceable "because Stream's unambiguous certificate of incorporation [. . .] required the approval of Stream's Class B stockholders." *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 325 (Del. 2022) (hereafter "Stream Supreme Court Opinion"). On appeal, the Delaware Supreme Court overturned the Chancery Summary Judgment Order on the narrow legal issue that the Omnibus Agreement was invalid without the approval of Stream's Class B stockholders. Importantly, the factual conclusions in the Chancery PI Opinion and Chancery Summary Judgment Order were not overturned, and, in fact, were largely adopted by the Delaware Supreme Court. Specifically, the Delaware Supreme Court found that Hawk was a secured creditor of Stream, and that Stream had pledged "all of its assets" as security for the more than $50 million in notes that Hawk lent to Stream. *Stream Supreme Court Opinion*, 279 A.3d at 327. The Delaware Supreme Court further found that the Hawk Notes were executed in conjunction with security agreements that "authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted." *Id.*

On remand, the Delaware Court of Chancery ordered the parties to unwind the Omnibus Agreement, but affirmed that Hawk's Secured Creditor Rights were intact, stating "[t]he court

believes that the [] secured creditors' rights are strong and may well result in Stream having to transfer the Legacy Stream Assets back to SeeCubic in its capacity as Hawk's designee and agent." *In re Stream TV Networks, Inc. Omnibus Agreement Litig.*, No. 2020-0766-JTL, 2022 WL 4491925, at *4 (Del. Ch. Sept. 28, 2022).

**The 225 Action**

On October 17, 2022, Hawk issued a proxy notice to Technovative which exercised its Secured Creditor Rights in order to remove Mr. Rajan as director of Technovative and replace him with Mr. Shadron L. Stastney (the "Proxy Notice"). Hawk further issued a directive, pursuant to the same Secured Creditor Rights, that Stream marshal the Collateral (the "Marshaling Directive") to prepare for a sale in order to satisfy the outstanding indebtedness. Stream refused to comply with the Proxy Notice or the Marshaling Directive, claiming that Stream had converted the debt underlying the Hawk Notes into equity pursuant to a conversion agreement between the parties, and that Hawk no longer possessed the Secured Creditor Rights.

That same day, Hawk initiated the 225 Action. The 225 Action was assigned to Vice Chancellor Laster, who succinctly summarized the dispute as follows:

> This case is a Section 225 action that has been filed by a creditor that has or contends that it has the authority under certain credit agreements to vote all of the shares of a Delaware entity which is named as one of the defendants and goes by the name of Technovative Media, Inc. I'm going to call it the "Company."
>
> Hawk asserts that it has validly exercised its creditors' rights and appointed a gentleman named Shad Stastney as the sole director of the company. The complaint alleges that the company has rejected Hawk's position and maintains that a gentleman named Mathu Rajan is the sole director of the company. **That is precisely the type of dispute that Section 225 exists to resolve**.

October 20, 2022 Hearing Transcript, Caponi Decl., Ex. L (emphasis added).

In an Order dated October 20, 2022, Vice Chancellor Laster appointed a Receiver to run Technovative, and explained his rationale:

> A Section 225 proceeding is an *in rem* proceeding, because the Delaware corporation [Technovative] is a *res* over which this court can exercise jurisdiction…More precisely, when a Section 225 action seeks to adjudicate the status to director and officer positions at a Delaware corporation, the director and officer positions constitute a *res* over which this court can exercise *in rem* jurisdiction…This court takes jurisdiction over the *res* consisting of the director positions at [Technovative].

*Hawk Investment Holdings Limited v. Stream TV Networks, Inc., et al*, C.A. No. 2022-0930-JTL (Dkt. #10) (the "Status Quo Order"), Caponi Decl., Ex. M. The Status Quo Order stated that Technovative was to operate in the ordinary court of business, and that leave of court was required to take any action outside the ordinary course of business, including "filing a bankruptcy petition." The Status Quo Order appointed Ian Liston of Wilson Sonsini Goodrich & Rosati as Receiver of Technovative, and endowed the Receiver with "all of the power and authority afforded to the Board under Section 141 of the Delaware General Corporation Law . . . the appointment of the Receiver displaces the ability of the parties to cause the Company to take actions outside the ordinary course of business." Caponi Decl., Ex. M.

The purpose of a proceeding under 8 Del. C. § 225 "is to provide a quick method for review of the corporate election process to prevent a Delaware corporation from being immobilized by controversies about whether a given officer or director is properly holding office." *Box v. Box*, 697 A.2d 395, 398 (Del. 1997). For that reason, the Court of Chancery divided the 225 Action into two phases: the first phase would determine to what extent collateral estoppel had already narrowed the issues for trial and address Stream's contention that Hawk did not have standing to bring the 225 Action. The second phase would address any issues that were not precluded by collateral estoppel, such as whether Stream had converted the debt underlying the Hawk Notes.

During the pendency of the 225 Action Hawk and other investors in SeeCubic, via SeeCubic, have funded Technovative and its operating subsidiaries. SeeCubic provided Technovative with a promissory note and has thus far has provided approximately €3,000,000 in

funding. At present, the operating expenses of Technovative and its operating subsidiaries are approximately €750,000 per month. If Technovative had any realistic chance at obtaining funding from any source besides SeeCubic, neither it nor Stream asserted as much during the 225 Action.

### Phase One of the 225 Action

On November 29, 2022, the Court of Chancery issued its decision with respect to the Phase One issues. *See Hawk Inv. Holdings Ltd. v. Stream TV Networks, Inc.*, 2022 WL 17258460, at *2 (Del. Ch. Nov. 29, 2022) (the "Collateral Estoppel Opinion"). The Collateral Estoppel Opinion found that Stream was collaterally estopped from challenging the following findings: (i) the Notes are valid and binding obligations of Stream; (ii) Stream is in default under the Notes; (iii) Hawk may exercise the Secured Creditor Rights—including the Proxy Rights; (iv) as of November 10, 2021 the Notes had not been converted or satisfied; and (v) any conversion of the Notes must be supported by "new money" and the events occurring after November 10, 2021. *Id.* The Court of Chancery also found that Hawk had standing to bring the 225 Action both because Stream conceded it was a shareholder, which satisfied the standing requirements of 8 Del. C. § 225, and because Hawk had standing as Collateral Agent under the SeeCubic Note Purchase Agreement and the SeeCubic Security Agreement, and in the exercise of its rights thereunder, to bring an action to enforce the Secured Creditor Rights. *Id*. at *8-12.

### Phase Two of the 225 Action

In essence, the Collateral Estoppel Opinion proved Hawk's *prima facie* case in the 225 Action, and effectively limited Phase Two of the 225 Action to determining whether Stream had any affirmative defenses, which issue has formed the bulk of the parties' discovery and pleadings until the filing of the petition.

Additionally, in light of the finding in the Collateral Estoppel Opinion that Hawk had standing to bring an action to enforce the Secured Creditor Rights as a Collateral Agent for the

creditors of SeeCubic, Hawk moved to amend the complaint to assert the Secured Creditor Rights granted to SLS under the SLS Loan Documents. As another Secured Creditor, SLS had similarly contributed its notes to SeeCubic under the Assignment Agreement and the rights under the SLS Notes were also part of Hawk's collateral vis a vis SeeCubic. Although SLS and Stream had similarly entered into a conversion agreement, that agreement terminated, and the SLS Notes cannot be converted. *See* Chancery PI Opinion*, 250 A.3d at 1023.*

As laid out comprehensively in the parties' Stipulation and Pre-Trial Order in the 225 Action, the issues to be decided at trial at the conclusion of Phase Two included:

- Whether the October Shareholder Consent amended and restated the By-Laws, removed the directors of Technovative, and appointed Mr. Stastney as the sole director of Technovative?

- Whether Hawk is entitled to exercise the Secured Creditor Rights under the Hawk and SLS Notes, Security Agreements, and Pledge Agreements, including an Article 9 Sale of the Collateral?

- Whether Defendants have carried their burden of proof on their affirmative defense of conversion by showing that after November 2021 they complied with the requirements of the Conversion Agreement necessary to effectuate a conversion of the Hawk Notes?

Stipulation and Pre-Trial Order, Caponi Decl., Ex. N at 9-10.

Over a roughly three-month period in Phase Two, the parties engaged in extensive discovery, mainly focused on Stream's affirmative defense that it converted the debt underlying the Hawk Notes into equity. That discovery included obtaining thousands of documents from Hawk, SeeCubic, SLS, Stream, and various third parties. Both parties took multiple depositions, with the focus being on whether Stream could use hundreds of purported investments made

between 2018 and the present in order to effectuate a conversion under the Hawk Conversion Agreement.

In early February 2023, Stream claimed that it badly wanted to go to trial the following month. *See* Defendants' Opposition to Plaintiff's Motion for Leave to File Amended Complaint, Caponi Decl., Ex. O ("Stream opposes trial delay. As the Court has already ruled, the point of a Section 225 summary proceeding is to remove clouds upon the right to act for a Delaware corporation…Stream wants undisputed control of and title to Stream's property with a clear and final ruling of this Court in March 2023."). Stream more recently appears to have seen the writing on the wall, however, and began desperately seeking means by which to delay the inevitable. Later that same month, Stream filed a motion to postpone the March 23, 2023 trial date in the 225 Action, which the Court of Chancery denied. In so ruling, the Court of Chancery (as prompted by the Receiver) specifically noted the financial burden on Hawk to continue funding Technovative during the pendency of the case. *See* Caponi Decl., Ex. P ("The court finds more persuasive the points raised by Hawk and has placed particular reliance on the views expressed by the Receiver."). In keeping with its form, however, Stream refused to allow the Court of Chancery to hinder its plans.

As this Court is aware, the above-captioned bankruptcy case was initiated on March 15, 2023. By that point, the 225 Action was on the brink of a resolution. The parties had finished discovery, submitted a pre-trial order, submitted opening pre-trial briefs, and had agreed to proceed to a bench trial on a paper record. On March 16, 2023, the parties were scheduled to appear before

Vice Chancellor Laster for a pre-trial conference (the likely catalyst for this bankruptcy filing one day prior).[8]

Faced with the prospect of an imminent adverse proceeding in the 225 Action and having failed to postpone the trial with the Chancery Court's blessing, Stream and Technovative apparently began planning to stall the day of reckoning, and find a new ear to listen to their already-rejected arguments. Marc Dannenberg, acting on behalf of Stream, emailed Stream's other shareholders on March 11, 2023, four days before the Petition date, and stated:

> **[w]e are not getting a fair shake in Chancery**…Without saying too much to those who have not signed an NDA, Stream will be taking the necessary steps on Monday to protect all of our subsidiaries. Not our fault, but the fault of the greedy and stupid Shad and Hawk. This is not something we want to do but it is something we need to do for the sake of the assets of StreamTV.

> Caponi Decl., Ex. Q (emphasis added).

Stream thus admits that it filed for bankruptcy for no other reason other than to forum shop to find another court that would hopefully assist them in thwarting Stream's secured creditors. Once again, Stream is unhappy with the results in the Court of Chancery and is looking for a new judge – the definition of forum shopping. Instead of a legitimate, honest attempt at reorganization and an effort to pay creditors, the Debtors' bankruptcies represent another litigation tactic to gain leverage and delay their Secured Creditors, just as in the prior two bankruptcy cases dismissed by Judge Owens as bad faith filings.

---

[8] Contrary to Technovative's representations, there was no "sanctions hearing" scheduled for March 16th in the Delaware Court of Chancery. *See Hawk Investment Holdings v. Stream TV Networks, Inc. et al*, C.A. No. 2022-0930-JTL, Caponi Decl., Ex. A (Dkt. 191):

> The Receiver has informed me that the defendants have pursued an application with the bankruptcy court to enforce the stay as to the pretrial conference. That was an unnecessary burden on the bankruptcy judge, as I only intended to receive a status update from the parties and confirm that the trial would not go forward. Regardless, in light of the defendants' application, the pre-trial conference is cancelled.

## ARGUMENT

### A.      Legal Standard for Stay Relief from the Automatic Stay

Relief from the automatic stay of 11 U.S.C. § 362(a) is governed by 11 U.S.C. § 362(d),

which reads, in pertinent part:

> On request of a party in interest and after notice and a hearing, the
> court shall grant relief from the stay provided under the subsection
> (a) of this section, such as by terminating, annulling, modifying or
> conditioning such stay—(1) for cause, including the lack of
> adequate protection of an interest in property of such party in
> interest…

11 U.S.C. § 362(d).  Although Hawk bears the initial burden to show that "cause" exists, once a

*prima facie* case of "cause" is established, the Debtor (as the party opposing stay relief) has the

ultimate burden of disproving the existence of "cause" pursuant to Section 362(g) of the

Bankruptcy Code. *See In re Dupell*, 235 B.R. 783, 788 (Bankr. E.D. Pa. 1999)*; see also* 11 U.S.C.

§ 362(g) ("In any hearing under subsection (d) … of this section concerning relief from the stay

of an act under subsection (a) of this section—(1) the party requesting such relief has the burden

of proof on the issue of the debtor's equity in the property; and (2) the party opposing such relief

has the burden of proof on all other issues.").

"Cause" is not defined by the Bankruptcy Code. Consequently, a bankruptcy court must

decide what constitutes "cause" to lift the automatic stay on a case-by-case basis. *In re Wilson*,

116 F.3d 87, 90 (3d Cir. 1997)*; In re Schaffer*, 597 B.R. 777, 789 (Bankr. E.D. Pa.) (finding

"Cause,'. . . is an intentionally broad and flexible concept").

Bankruptcy courts have the authority to grant stay relief to creditors under section

362(d)(1) to enable litigation that is already pending in another forum to proceed, where stay relief

will allow disputed issues to be resolved efficiently and will not cause undue prejudice to the

debtor. *See*, *e.g., In re Chan,* 355 B.R. 494, 498 (Bankr. E.D. Pa. 2006); *In re Glunk*, 342 B.R.

717, 740 (Bankr. E.D. Pa. 2006). In determining whether to permit pending litigation involving the debtor to continue in a non-bankruptcy forum in a particular case, courts conduct a case-by-case inquiry and employ a totality of the circumstances test. *In re Chatkin*, 465 B.R. 54, 59 (Bankr. W.D. Pa. 2012), *citing In re Wilson,* 116 F.3d at 90.

Courts applying a totality of the circumstances analysis consider a number of factors to determine whether there is cause to grant a motion for relief from stay including, *inter alia,* (i) whether relief would result in a partial or complete resolution of the issues, (ii) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action (iii) the interests of judicial economy and the expeditious and economical resolution of litigation; (iv) whether the parties are ready for trial in the other proceedings; and (v) impact of the stay on other parties and the balance of the harms. *In re Chan,* 355 B.R. 494, 499-500 (Bankr. E.D. Pa. 2006) (looking to the *Sonnax* Factors for guidance); *In re Chatkin*, 465 B.R. 54, 60 (Bankr. W.D. Pa. 2012): *In re Schaffer*, 597 B.R. 777, 790 (Bankr. E.D. Pa.), aff'd sub nom. *Matter of Schaffer*, 606 B.R. 228 (E.D. Pa. 2019), aff'd sub nom. *In re Schaffer*, No. 19-3664, 2020 WL 2529371 (3d Cir. Jan. 24, 2020). Because of this flexible standard, "[t]he relevance and weight of the various overlapping factors outlined above will depend upon the circumstances of the particular bankruptcy case involved ... Ultimately, the pursuit of "equit[y]," "justice" and "comity" involves a thoughtful, complex assessment of what makes good sense in the totality of the circumstances." *Id*. at 500.

"The Court will consider these factors in the overall balance of harm inquiry, without handcuffing itself by ignoring other factors it deems relevant, or proceeding as if the decision is one that can be reduced to score-keeping or bean-counting." *Id*. (internal citations omitted). As set forth in further detail below, the balance of the hardships and totality of the circumstances heavily

weigh in favor of lifting the stay to allow Hawk to proceed with the 225 Action. Therefore, the stay should be modified to afford Hawk its requested relief.

### (i) Whether Relief Would Result in a Partial or Complete Resolution of the Issues

Allowing the trial in 225 Action to go forward will allow for a complete resolution of Delaware state law issues that will provide for clarity in these bankruptcy proceedings and will, in fact, benefit the Debtor and its creditors. Although the Debtors do not appear to list SeeCubic, Hawk or SLS as creditors, the Hawk Notes represent the Debtors' largest secured claims, and the SLS Notes have the first priority lien on the Debtors' assets. Allowing for a prompt determination of the Secured Creditors' claims against the Debtors through a trial in the 225 Action will allow for the Secured Creditors' status and total claim amounts to be determined under state law.

Those rulings would result in a complete resolution of issues surrounding (1) the amount and priority of the claims in respect of the Hawk Notes and the SLS Notes, (2) the validity of the liens securing the Hawk Notes and the SLS Notes, (3) the resolution of any current defense to the Hawk Notes and the SLS Notes, and (4) the requirements for any potential future conversion of the Hawk Notes— all critical to the resolution of these Chapter 11 cases. In fact, several issues relevant to the Chapter 11 case will not be able to proceed without determination of these rights, including potential DIP financing or the Debtors' use, sale or lease of Collateral during the case - which may include determinations regarding the adequate protection owed to the Secured Creditors for that use. Additionally, no plan of reorganization that this Court would reasonably expect to be confirmed under Section 1129 could be formulated by the Debtors without determining the amount of the Debtors' liability and the extent of the liens of the Secured Creditors.

In many cases, this type of dispute is already determined—the amounts and extent of the Secured Creditors' liens are evident and undisputed at the time of filing and listed on the Debtors'

petition.  But in other cases, there may be some type of dispute over the amount of the debt or the extent of the liens, but it has not been litigated or even asserted in any forum prior to the filing.  In those cases, it makes sense for the bankruptcy court to initiate and determine those disputes.  That is not the case here, where there is pending—and nearly completed—litigation on the very issue of the creditors' secured status.

Here, the Debtors are asking this Court to reopen and restart complex litigation regarding Delaware specific issues that will take many months to redo the work that has already been performed when the issues could be completely determined quickly and efficiently there, leaving this Court to proceed with the Chapter 11 issues at hand.  After the trial in the 225 Action, the litigation regarding Delaware state law issues will be complete.

### (ii) Whether a Specialized Tribunal with the Necessary Expertise has been Established to Hear the Cause of Action

The dispute between Hawk and the Debtor is a dispute arising under Delaware law related to: (1) whether the October Shareholder Consent amended and restated the By-Laws, removed the directors of Technovative, and appointed Mr. Stastney as the sole director of Technovative; (2) whether Hawk retains the Secured Creditor Rights; and (3) whether Defendants have carried their burden of proof on their affirmative defense of conversion by showing that after November 2021, they complied with the requirements of the Conversion Agreement necessary to effectuate a conversion of the Hawk Notes. The Delaware Court of Chancery is the appropriate tribunal to hear and resolve these issues.

As this Court has previously held, in Pennsylvania "questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation."  *In re Higgins*, 2019 WL 3959981, at *4 (Bankr. E.D.Pa. Aug, 20, 2019). "The internal affairs doctrine applies to those matters that pertain to the relationships among or between the corporation and its

22

officers, directors, and shareholders." *VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005). Under Section 225 of the DGCL, "the Court of Chancery may hear and determine the validity of any election, appointment, removal or resignation of any director or officer of any corporation, and the right of any person to hold or continue to hold such office." 8 *Del. C.* § 225.

Both Stream and Technovative are incorporated in Delaware, therefore, Delaware law applies to all matters pertaining to their directors and internal affairs. All of the Loan Documents and the Hawk and SLS Conversion Agreements signed by the Debtors specifically provide that Delaware is the governing law and appropriate forum and venue for any disputes. Under the statute itself, authority to resolve claims surrounding the validity of the election of directors to the board is specifically and exclusively provided to the Delaware Court of Chancery. *See Dillon v. Berg*, 347 F. Supp. 517, 520 (D. Del. 1972) (finding the appropriate forum for a § 225 action is the "Delaware Court of Chancery, which by statute is conferred with full powers to act in disputes of the kind raised here.").

Further, at least one other federal court asked to decide a Section 225 claim found no authority to support the federal court's jurisdiction over the claim as opposed to the Delaware Court of Chancery. *Cellucci v. O'Leary*, 2020 WL 977986, at *7 (S.D.N.Y. Feb. 28, 2020) ("This Court has not found any instance of a federal court, anywhere in the country, granting relief pursuant to Section 225 and Plaintiffs have not explained why this Court, rather than the Chancery Court, should determine who are the rightful officers and directors of [the Delaware entity."). This finding is not surprising, in light of the express text of 8 Del. C. § 225, which prescribes the Court of Chancery as the exclusive jurisdiction for such a proceeding. Delaware Court of Chancery is the "the country's dominant jurisdiction for corporate law" and "the nation's preeminent business

court". Randall S. Thomas et. al., *Delaware's Shifting Judicial Role in Business Governance*, 77 Bus. Law. 971 (2022).

Therefore, the Delaware Court of Chancery is a highly specialized tribunal designed to hear cases like the case at hand, and can properly adjudicate the causes of action.

### (iii) The Interests of Judicial Economy and the Expeditious and Economical Resolution of Litigation;

Judicial economy is a critical element in a court's decision of whether to lift the stay. "It is well settled that a basis for granting relief from the automatic stay for 'cause' exists when it is necessary to permit litigation to be concluded in another forum. *In re SCO Grp., Inc.*, 395 B.R. 852, 860 (Bankr. D. Del. 2007). In *In Re SCO Grp.,* when lifting the stay to permit litigation to be concluded in another forum, the court stated that "[o]f particular importance to the Court are the specialized knowledge that the District Court has developed in presiding over the Lawsuit for four years, the interests of judicial economy and the expeditious and economical resolution of litigation and, as stated earlier, the fact that the parties are ready for trial." *In re SCO Grp., Inc.*, 395 B.R. 852, 859-860 (Bankr. D. Del. 2007).

As emphasized in *In re Wilson,* the legislative history to section 362(d)(1) indeed expressly states that "it will often be more appropriate to permit proceedings to continue in their place of origin, where no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from duties that may be handled elsewhere." *In re Wilson*, 116 F.3d 87, 91 (3d Cir. 1997) (quoting S. Rep. No. 95-989, at 50 (1978), reprinted in U.S.C.C.A.N. 5787, 5836).

The delay of trial by another judicial authority that is unfamiliar with over three years of prior proceedings in the Delaware Court of Chancery is inconsistent with judicial economy and fairness to the parties themselves, who have already agreed to the forum for litigation. All of the

loan documents and conversion agreement signed by the Debtors are governed by Delaware law and agree to Delaware as the appropriate forum and venue for this dispute.  This is appropriate given the extensive experience of the Delaware Chancery Court with corporate issues as discussed above.

In addition, judicial economy favors resolution of the 225 Action in the Court of Chancery because it will result in the most expeditious resolution of the underlying issues, issues that will invariably come in front of this Court if not otherwise determined by the Court of Chancery. Because the 225 Action is a summary proceeding the case proceeded on an expedited schedule towards a fast resolution of the narrow issues raised. The already expedited case was merely a week away from trial and a resolution on the merits when Stream and Technovative filed for bankruptcy in this Court.

Further, it makes sense for issues of Delaware law to be resolved by a Delaware Court of Chancery as opposed to an out-of-state bankruptcy court.[9]   Indeed, the Delaware Court of Chancery, having dealt with the trial preparation on these issues for the last 6 months, is the forum with the greatest knowledge and expertise to determine these Delaware state law issues. *See In re Patriot*, 2006 Bankr. LEXIS 4133, *9 (Bankr. D.N.J. 2006) (finding the fact that the non-bankruptcy forum was more familiar with the issues in the case than the bankruptcy court to support granting stay relief).

Leaving adjudication of the issues to the Court of Chancery will allow this Court to devote its resources to the bankruptcy proceeding.  Otherwise, the Debtors will need to file a new adversary proceeding in this Court to challenge the Secured Creditors' Rights with a new discovery

---

[9] It is worth noting that Stream could have filed this bankruptcy proceeding in the United States District Court for the District Court of Delaware, but chose not to.  This is undoubtedly because it wanted to shop for a forum where it would not have to appear before Judge Owens a third time.

schedule and trial preparation, delaying any true reorganization (which is not a given in light of the prior bankruptcies) efforts for months.

### (iv) Whether the Parties are Ready for Trial in the Other Proceedings

Where the movant has already "prepared extensively" for trial and expended "significant time and resources" to do so, the delay and "fact that it will have to prepare again" as a result of the automatic stay will cause hardship to the movant. Where such a hardship is shown, relief from the stay is warranted. *See In re SCO*, 395 B.R. at 858-59. "The longer the trial is delayed, the more burdensome it is to both parties to prepare once again for trial." *Matter of Rexene Prod. Co.*, 141 B.R. 574, 577 (Bankr. D. Del. 1992).

In *In Re SCO Grp.*, the court noted:

> SCO has separate litigation counsel who had already completed its extensive trial preparation prior to the petition date. Thus, the trial preparation will not be burdensome to the Debtors. In addition, because this bankruptcy case was filed on the eve of trial, both parties have already spent all of the necessary time and resources in preparation. The longer the trial is delayed, the more burdensome it is to both parties to ready themselves again.

*Id.* at 858.

As this Court is aware, the above-captioned bankruptcy case was initiated on March 15, 2023. By that point, the 225 Action was on the brink of a resolution. The parties had finished discovery, submitted a pre-trial order, submitted opening pre-trial briefs, and had agreed to proceed to a trial on a paper record which was scheduled for March 23, 2023. On March 16, 2023, the parties were scheduled to appear before Vice Chancellor Laster for a pre-trial conference. The parties were not merely "ready for trial" when the Debtor petitioned for bankruptcy relief— and thereby benefited from the protective blanket of the automatic stay— rather, the parties were *merely days* away from trial.

To get to this late stage in the 225 Action, the parties have already incurred significant costs over the course of six months - including multiple depositions, producing and reviewing thousands of pages of document discovery, numerous hearings and rulings from the Court of Chancery and the finalization of pretrial briefing. All of which would need to be re-done were litigation on those issues to restart in this Court. These are precisely the kind of circumstances under which lifting the automatic stay for "cause" is appropriate. *See In re SCO*, 395 B.R. at 857.

**(v) Impact of the Stay on Other Parties and the Balance of the Harms.**

Where discovery is complete and the parties have fully prepared for trial, lifting the automatic stay does not impose a burden on the debtor. *Matter of Rexene Prod. Co*., 141 B.R. 574, 577 (Bankr. D. Del. 1992). In fact, where a "bankruptcy case was filed on the eve of trial," and "both parties have already spent all of the necessary time and resources in preparation," lifting the stay to continue the civil suit is not prejudicial to the Debtor. In re SCO, 395 B.R. at 858.

Further, allowing Hawk to proceed against the Debtor in the 225 Action will not prejudice the interests of other creditors or interfere with the bankruptcy case. *See, e.g.*, *In re Mid-Atl. Handling Sys., LLC*, 304 B.R. 111, 130 (Bankr. D.N.J. 2003) (finding that permitting state court action to proceed would not prejudice the debtor's creditors as "resolution of the issues before the state court must be addressed and damages, if any, fixed so that the extent of creditors' claims are known"). For the same reason, there will be no prejudice to the Debtor or the estate if the litigation is allowed to proceed. The 225 Action will resolve all issues surrounding the nature and extent of claims arising from the Hawk Notes and the SLS Notes. It will also crystallize and resolve any defense the Debtors may have thereto, making these claims known, and not otherwise altering any other party's rights in these cases. Nor is the purpose of the automatic stay violated if the requested relief is granted as the effect of a judgment would merely be to resolve the disputed nature of the Secured Creditors' claims. *See In re Bock Laundry Mach. Co.*, 37 B.R. 564, 567 (Bankr. N.D.

Ohio 1984) ("A lifting of the stay will only allow the [plaintiff-creditors] to establish the amount of a claim which has already been made against the estate. In this respect, a relief from the stay will not violate the purpose for which it was imposed.").

Instead, the prompt resolution of these issues actually benefits the Debtors and their Estates. To have the Debtors incur substantial additional legal fees that duplicate those already expended in the Delaware state court is not in the best interest of the Estate and its creditors. It is a drain on already limited resources and loss of critical time that is better spent maximizing the value of the Debtors' assets and preserving the value of the Debtors' Estate. It would also hamstring these Chapter 11 cases. As discussed above, while these issues remain unresolved no valid Chapter 11 reorganization efforts can proceed, and no determinations can be made as to potential debtor-in-possession financing or use of the Debtors' assets in the ordinary course of its business. And the lack of funding (either DIP financing or funding from the Secured Creditors) will damage the Debtors and jeopardize any possible recoveries for creditors of the Estates. During the duplicative litigation, the assets of the Debtors, the technology owned by the subsidiaries, will decline in value. Disruption to the operating entities will damage the value of the Collateral and ongoing business operations, including without limitation, potentially causing losses of critical employees and managers who understand and are marketing and developing the technology. The speed and efficiency of the Court of Chancery in resolving these questions is particularly valuable here where the Secured Creditors have been funding Technovative and its subsidiaries from the inception of the 225 Action to present and the value of the Estate should be preserved for all creditors.

B.      **Waiver of 14-Day Stay**

Based on the foregoing, Hawk requests that the Motion for Relief from Stay be granted, and that such relief granted includes a waiver of the fourteen (14)-day stay under Bankruptcy Rule 4001(a)(3) of any such order entered with respect to the Motion.

C.      **Request for an Expedited Hearing Pursuant to Local Rule 5070-1(g)**

In conformance with Local Rule 5070-1(g)(1) and (2), Hawk consulted via e-mail with Asher Block, Esq., and Rafael Zahralddin, proposed counsel for Debtors, and Kevin Callahan, Esq., and John Schanne, attorneys for the Office of the United States Trustee but was unable to reach an agreement with respect to scheduling an expedited hearing on the Motion. Mr. Block and Mr. Zahralddin have not provided their position on the requested relief. Mr. Callahan and Mr. Schanne have no objection to the request for expedited consideration.

Counsel for Hawk placed all of the parties on notice of this emergency motion during the Court's emergency hearing on March 16, 2023. At that time, all parties, as well as the Court, were aware of the upcoming bench trial scheduled for March 23, 2023 in the Delaware Court of Chancery.

In conformance with Local Rule 5070-1(g)(2)(A), expedited consideration of Hawk's Motion is necessary because the Delaware Court of Chancery has scheduled a bench trial scheduled for March 23, 2023, that is currently stayed, and it is imperative that this situation be addressed as expeditiously as possible. The case is ready for trial, fully briefed, and nothing further other than a one-day bench trial is needed. Furthermore, the Delaware Court of Chancery has availability on April 18th and April 20th for a potential one-day trial.  The Delaware Court of Chancery will resolve central issues that will allow this Chapter 11 case to move forward in a more expeditious manner. As stated above, many issues in this Chapter 11 case cannot be addressed

without a decision on these Delaware state law issues. Further delay will prejudice the debtor and

its creditors by not being able to address these critical issues.

In conformance with Local Rule 5070-1(g)(2)(d), Hawk provided Asher Block, Esq., Rafael

Zahralddin, Kevin Callahan, Esq., and John Schanne with notice of this Motion via email prior to

filing. Hawk also provided notice of this Motion to Chambers via telephone this morning Hawk will

also provide parties with copies of the Motion via e-mail as soon as it is filed.

For the foregoing reason, the undersigned respectfully requests that the Court conduct an

expedited hearing on the Motion on March 27, 2023.

## **<u>CONCLUSION</u>**

Accordingly, Hawk respectfully requests that the Court consider the Motion on an

expedited basis, and enters an Order pursuant to 11 U.S.C. § 362(d), granting Hawk relief from

the automatic stay.

Dated:  March 20, 2023                          **K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi, Esq. (No. 91881)
K&L Gates LLP
600 King Street, Suite 901
Wilmington, DE 19801
Telephone: (302) 416-7000
Facsimile: (302) 416-7020
Email: Steven.caponi@klgates.com


*/s/ Margaret R. Westbrook*
Margaret R. Westbrook, Esq.
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Telephone:  (704) 331-7400
Email:  margaret.westbrook@klgates.com


*/s/ Aaron S. Rothman*
Aaron S. Rothman, Esq.

K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Telephone:  (704) 331-7400
Email: aaron.rothman@klgates.com


*/s/ Jonathan N. Edel*
Jonathan N. Edel, Esq.
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Telephone:  (704) 331-7400
Email: jon.edel@klgates.com

*Attorneys for Hawk Investment Holdings Ltd.*