# **EXHIBIT C**

## PROMISSORY NOTE

**GBP £6,000,000.00 PRINCIPAL**                **ISSUE DATE means: March 26, 2014**

FOR VALUE RECEIVED, the undersigned, Stream TV Networks, Inc. (file number 4747282), a Delaware USA corporation, with principal offices at 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103 (the "**Company**"), hereby promises to pay to the order of Hawk Investment Holdings Limited (registered in Guernsey with registered number 44994), with its registered office at Newport House, 15 The Grange, St Peter Port, Guernsey GY1 2QL, Channel Islands (hereinafter, the "**Holder**"), to such account as the Holder of this Note may from time to time designate in writing, the principal sum specified above together with simple interest on the principal balance outstanding at a rate of two percent (2%) per month. All payments hereunder shall be made in lawful currency of the United Kingdom and in immediately available funds. Interest shall be calculated on the basis of the actual number of days elapsed on a daily basis and shall commence to accrue on the date hereof.

1.    Maturity Date. The Maturity Date is twelve (12) months from the Issue Date specified above but may be extended by prior written agreement of the Holder (the "**Maturity Date**"). In case of (i) the closing of a Qualified Financing, or (ii) an initial public offering of the Company's securities ("**IPO**"), the Maturity Date shall be accelerated to the completion date of the Qualified Financing or IPO (as the case may be) if maturity has not already occurred. For purposes of this Note, the term "**Qualified Financing**" means the sale and issuance by the Company of securities after the date of this Note primarily for equity financing purposes in which an aggregate of at least USD $25,000,000.00 worth of securities are issued and sold by the Company (not including the Company's current fundraising of 12% Convertible Loan Notes).

2.    Payments. The entire unpaid amount of this Note, together with all accrued, but unpaid, interest, shall be due and payable on the Maturity Date. If any amounts due under this Note are due on a day which is not a business day (being a day when banks are open for business in Philadelphia and Guernsey), then such amounts shall be due on the next following day which is a regular business day. All payments under this Note will be made to the account of Holder identified on Exhibit A hereto (as the same may be updated from time to time by the Holder upon written notice to the Company.

3.    Arrangement Fee. The Company shall pay to the Holder a non-refundable arrangement fee equal to GBP £600,000.00 (the "**Arrangement Fee**"), which Arrangement Fee is equal to ten percent (10%) of the initial principal amount of this Note but which Arrangement Fee shall not constitute a reduction of the initial principal amount of this Note.

4.    Administration and Legal Costs. The Company shall pay and shall indemnify the Holder from and against all losses, liabilities, costs, fees and other charges of whatsoever nature incurred by Holder in the negotiation, preparation, printing and execution of this Note, any security documents and any and all ancillary and/or related documents (but not including administration charges) (the "**Implementation Costs**"); provided that the total Implementation Costs shall not exceed GBP £35,000.00. The Company shall also pay and shall indemnify the Holder from and against all losses, liabilities, costs, fees and other charges of whatsoever nature

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

incurred by Holder in the enforcement of, or the preservation or exercise of any rights under this Note. Holder shall provide the Company a statement of the Implementation Costs on the Issue Date.

5. <u>Payment of Arrangement Fee and Implementation Costs</u>. On the Issue Date, (i) the Holder shall remit to the Company the initial principal amount of this Note, less the Arrangement Fee and less the Implementation Costs, and (ii) the Company shall be deemed to have paid the Arrangement Fee and the Implementation Costs to Holder upon receipt of the net amount set forth in clause (i) above provided always that such deduction of the Arrangement Fee and Implementation Costs shall not constitute a reduction of the initial principal amount of this Note.

6. <u>Interest Prepayment.</u> Interest (at the rate of two percent (2%) per month) for the term of this Note to the Maturity Date shall be prepaid on the Issue Date by the Holder deducting the amount of such interest from the initial principal amount of this Note that is remitted to the Company on the Issue Date provided always that such deduction of interest as source shall not constitute a reduction of the initial principal amount of this Note.

7. <u>Prepayment</u>. The Company may prepay any amount due under this Note at any time, without penalty or premium. In the case of prepayment of this Note in full, the Holder shall refund any amount of prepaid interest that exceeds the amount of interest that would have otherwise been payable hereunder through the date of prepayment.

8. <u>Warrants</u>. On the Issue Date, the Company shall provide Holder one million (1,000,000) warrants to purchase Class A Common Stock of the Company at a strike price of $3.50 per share in the form of warrant attached hereto as Exhibit C (the "**<u>Warrant</u>**").

9. <u>Representations and Warranties</u>. The Company represents and warrants to the Holder as follows:

9.1    the execution of this Note on behalf of the Company has been validly authorized and the obligations expressed as being assumed by the Company under this Note and under the Security Agreement constitute valid, legal and binding obligations of the Company enforceable against the Company in accordance with their terms;

9.2    there exists no Encumbrance (an "**<u>Encumbrance</u>**" being any mortgage, charge (whether fixed or floating), pledge, lien, hypothecation, assignment, trust arrangement, title retention (other than title retention arising in the ordinary course of trading as a result of a supplier's standard terms of business) or other right having the effect of constituting security) over the whole or any part of the undertaking or assets, present or future, (including uncalled capital) of the Company or any of its subsidiaries, except the liens and security interests under the Security Agreement or permitted by the Security Agreement and any liens or security interests disclosed in writing by the Company to the Holder on or prior to the date hereof, including, without limitation, the liens and security interests in favor of SLS Holdings VI LLC); and

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

9.3     all consents required by the Company from third parties in relation to the execution of this Note (including incurrence of the indebtedness evidenced hereby) and/or the Security Agreement have been received by the Company.

9.4     the Company (i) has sufficient authorized and unissued share capital to satisfy its obligations to issue Class A Common Stock of the Company to the Holder in accordance with the terms of the Warrant and (ii) covenants to maintain sufficient authorized and unissued share capital to satisfy its obligations to issue Class A Common Stock of the Company to the Holder in accordance with the terms of the Warrant

The representations and warranties set out in this Section 9 shall survive the execution of this Note and the incurrence of the indebtedness evidenced hereby.

10.     <u>Undertakings of the Company</u>.  The Company undertakes to the Holder that it will:

10.1    keep the Holder reasonably informed of the progress of the business of the Company and its subsidiaries and such information is, without prejudice to the generality of the foregoing, to include a quarterly summary of the Company's results of operations and new business in prospect;

10.2    furnish the Holder and/or procure that the Holder is furnished (i) with its relevant annual budgets and financial statements (including balance sheet, income statement and statement of cash flows); and (ii) to such extent (and in such reasonable form and detail) as it may from time to time reasonably require, with particulars of any matters concerned with and arising out of the activities of the Company and its subsidiaries.

11.     <u>Covenants</u>   The Company covenants that so long as any liability remains outstanding under this Note:

11.1    it will not, and will procure that none of its subsidiaries will, create or permit to subsist any Encumbrance over the whole or any part of its or their respective undertakings or assets, present or future, (including uncalled capital) except the Security Agreement or permitted by the Security Agreement; and

11.2    it will not sell, assign, transfer, part with possession of or dispose of in any manner (or purport to do so) all or any part of, or any interest in, any of its receivables or assets outside the ordinary course of business (except non-material expenditures in the ordinary course of the Company's business); or

11.3    create or grant (or purport to create or grant) any interest (other than any Encumbrance in the Security Agreement or permitted by the Security Agreement) in any of its assets in favor of a third party.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

12.    <u>Events of Default</u>.  This Note shall, at Holder's option, become immediately due and payable without notice or demand upon the occurrence of one or more of any of the following events (herein, collectively "<u>Events of Default</u>"):

(a)    Company shall fail to pay any principal when due; or

(b)    the Company shall (i) be dissolved, (ii) admit in writing its insolvency or its inability to discharge its obligations as they become due, (iii) adopt any resolution or take any other step in contemplation of bankruptcy, insolvency, receivership, liquidation, suspension or cessation of business or winding up of its affairs or in contemplation of any proceeding under any law for reorganization, debt adjustment, arrangement, composition, extension or debtor relief, (iv) make any assignment for the benefit of creditors or commit any act of bankruptcy; or

(c)    there shall be filed or brought against the Company and either (i) adjudicated adversely to it, or (ii) consented to or acquiesced in by it in any manner, or (iii) any petition in bankruptcy or any insolvency, receivership, trusteeship, reorganization, debt adjustment, arrangement, composition, extension, debtor relief, relief, dissolution, liquidation, winding up or any similar proceeding, or any proceeding in which its ability to discharge its obligations as they become due, or its ability or right to continue in business and in possession and management of its property as a going concern under the control of its shareholders, is in issue; or

(d)    the Company breaches any of the terms of this Note or the Company or any subsidiary of it breaches the terms of the Security Agreement or any other document constituting security or any other agreement between the Company and the Holder and such breach is not remedied to the satisfaction of the Holder within 10 days of the breach occurring; or

(e)    the Company and/or any subsidiary of it defaults in any other funding arrangement it is party to and such default is not remedied within the cure period set forth in the documents evidencing such funding arrangement; or

(f)    an encumbrancer takes possession of or a receiver, administrative receiver or administrator is appointed over any of the assets, property or undertaking of the Company and/or any subsidiaries of it; or

(g)    any transaction, dealing, sale or disposal the effect of which is that there is (i) a transfer of more than fifty percent (50%) of the outstanding capital stock of the Company to an unaffiliated third party, (ii) any merger, share exchange, consolidation or other reorganization or business combination of the Company or other event if immediately after such transaction persons who hold fifty percent (50%) or more of the voting capital stock of the surviving entity are not persons who held voting capital stock of the Company immediately prior to such transaction, and (iii) a transfer of the whole or a substantial part of the Company's business or assets (excluding any IPO); or

(h)    the admission of all or any of the ordinary share capital of the Company to NASDAQ or the admission of the same to, or the grant of permission by any like authority for the same to be traded on, any other equivalent or similar share market; or

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

(i)    this Note (and the indebtedness evidenced hereby) is or becomes illegal for any reason.

13.    <u>Rights and Remedies</u>.  Upon the occurrence of any Event of Default, and at any time thereafter, Holder shall have all of the rights and remedies provided herein and under applicable law, including, by written notice to the Company, declaration of the Company to be in default hereunder, whereupon, if the Holder so specifies in such notice, the Note shall become immediately due and payable without further demand, presentation or notice of any kind.

14.    <u>Conversion</u>.  Except as otherwise agreed to by the Company, no conversion rights are granted to the Holder.

15.    <u>Governing Law</u>.  This Note shall be governed by, and construed in accordance with, the laws of the State of Delaware.  Each of the parties hereto hereby consents to (i) the non-exclusive jurisdiction of the courts of the State of Delaware and any federal court sitting in Wilmington, Delaware, and (ii) service of process by mail in accordance with Section 5.5 of the Security Agreement.

16.    <u>Severability</u>.  In the event any one or more of the provisions contained in this Note shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Note and this Note shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

17.    <u>Secured Obligation</u>.  The obligations of the Company under this Note are secured by the assets of the Company pursuant to that Security Agreement dated as of the Issue Date between the Company and the Holder (the "**Security Agreement**").  In the event that a subsidiary of the Company comes into existence, the Company will promptly procure that each and every such subsidiary enters into such security for the benefit of the Holder as the Holder shall reasonably require.  The Holder's costs in relation to the provision of such security shall be borne by the Company.

18.    <u>No Oral Modifications or Waivers</u>.  This Note may not be changed orally, but only by an agreement in writing signed by the parties against whom enforcement of any waiver, change, modification or discharge is sought.

19.    <u>Assignment</u>.  Neither party shall assign or transfer its rights under this Note without the prior written consent of the other party, such consent not to be unreasonably withheld or delayed.

20.    <u>Headings</u>.  The headings in this Note are for convenience of reference only and shall not define or limit any terms or provisions hereof.

21.    <u>Notices</u>. Notices pursuant to this Note shall be sent pursuant to Exhibit B hereto.

[Signatures appear on following page.]

EAST\173528378.4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

IN WITNESS WHEREOF, the Company and Holder have duly executed this Note as of the day and year first above written.

**COMPANY:**

STREAM TV NETWORKS, INC.

By:_____

Name:  Raja Rajan

Title:    Chief Operating Officer

**HOLDER:**

THE COMMON SEAL of
**HAWK INVESTMENT HOLDINGS LIMITED**
was hereunto affixed on                    2014
in the presence of:

Director                              Secretary

EAST\73528378.4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

IN WITNESS WHEREOF, the Company and Holder have duly executed this Note as of the day and year first above written.

**COMPANY:**

STREAM TV NETWORKS, INC.

By:_____
Name:  Raja Rajan
Title:    Chief Operating Officer

**HOLDER:**

THE COMMON SEAL of
**HAWK INVESTMENT HOLDINGS LIMITED**
was hereunto affixed on : 25ᵗʰ March 2014
in the presence of:

Director                    Secretary



For and on behalf of
ARGONAUT (GUERNSEY) LIMITED

EAST\73528378.4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**Exhibit A to Note**

All payments under this Agreement to the Holder (Holder) shall be made to the following account:

| | |
|---|---|
| Bank: | Investec Bank (Channel Islands) Ltd. |
| Address: | P. O. Box 188 |
| | Glategny Court |
| | Glategny Esplanade |
| | St Peter Port |
| | Guernsey |
| | GY1 3LP |
| Swift Code: | GMGUGGSP |
| Sort Code: | 40-48-15 |
| Account Number: | 02106101 |
| Account Name: | Hawk Investment Holdings Limited |

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**Exhibit B to Note**

Each notice or other communication required to be given hereunder shall be:

In writing, delivered personally or sent by pre-paid first-class letter or courier; and

Sent to:

**the Holder at:**

Newport House, 15 The Grange, St Peter Port, Guernsey GY1 2QL

For the attention of: the Directors

**the Company at:**

Stream TV Networks, Inc.

2009 Chestnut Street, 3rd Floor

Philadelphia, PA 19103 USA

For the attention of:  Raja Rajan, Esquire

Or such other address as the parties may notify to each other by not less than five Business Days' notice.

**Any notice or other communication that the Company gives shall be deemed to have been received:**

If sent by fax, when received in legible form;

If given by hand, at the time of actual delivery; and

If posted or sent by courier, on the second Business Day after the day it was sent.

Notices sent by e-mail shall not be considered valid notices.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

**Exhibit C to Note**

**(Warrant Instrument)**

See attached.

EAST\73528378.4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## WARRANT

THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR QUALIFIED UNDER ANY STATE OR FOREIGN SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SHARES IS EFFECTIVE UNDER THE ACT AND IS QUALIFIED UNDER APPLICABLE STATE AND FOREIGN LAW OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND THE QUALIFICATION REQUIREMENTS UNDER APPLICABLE STATE AND FOREIGN LAW AND, IF THE COMPANY REQUESTS, AN OPINION SATISFACTORY TO THE COMPANY TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL.

Warrant Certificate No.: _____

Original Issue Date: _____

FOR VALUE RECEIVED, Stream TV Networks, Inc. (file number 4747282), a Delaware USA corporation (the "**Company**"), hereby certifies that Hawk Investment Holdings Limited (registered in Guernsey with registered number 44994), with its registered office at Newport House, 15 The Grange, St Peter Port, Guernsey GY1 2QL, Channel Islands, a Guernsey holding company, or its registered and permitted assigns (the "**Holder**"), is entitled to purchase from the Company One Million (1,000,000) duly authorized, validly issued, fully paid and nonassessable shares of Class A Common Stock at a purchase price per share of $3.50 (the "**Exercise Price**"), all subject to the terms and conditions set forth below in this Warrant. Certain capitalized terms used herein are defined in **Section 1** hereof.

1.   Definitions. As used in this Warrant, the following terms have the respective meanings set forth below:

"**Aggregate Exercise Price**" means an amount equal to the product of (a) the number of Warrant Shares in respect of which this Warrant is then being exercised pursuant to **Section 3** hereof, multiplied by (b) the Exercise Price in accordance with the terms of this Warrant.

"**Board**" means the board of directors of the Company.

"**Business Day**" means any day, except a Saturday, Sunday or legal holiday, on which banking institutions in New York City or Guernsey are authorized or obligated by law or executive order to close.

"**Class A Common Stock**" means the Class A Common Stock, par value $0.001 per share, of the Company, and any capital stock into which such Class A Common Stock shall have been converted, exchanged or reclassified following the date hereof.

"**Exercise Date**" means the date on which the conditions to such exercise as set forth in **Section 3** shall have been satisfied at or prior to 5:00 p.m., New York time, on a

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

Business Day, including, without limitation, the receipt by the Company of the Exercise Agreement, the Warrant and the Aggregate Exercise Price.

"**Liquidity Event**" means any liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary.

"**Liquidity Event Notice**" means a 20-day notice from the Company to the Holder of a proposed voluntary Liquidity Event.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, corporation, joint venture, trust, incorporated organization or government or department or agency thereof.

"**Warrant**" means this Warrant and all warrants issued upon division or combination of, or in substitution for, this Warrant.

"**Warrant Shares**" means the shares of Class A Common Stock purchasable upon exercise of this Warrant in accordance with the terms of this Warrant.

2.     Term of Warrant. The Holder of this Warrant may exercise this Warrant for all or part of the Warrant Shares purchasable hereunder during the period of five years commencing on the Original Issue Date (the "**Exercise Period**").

3.     Exercise of Warrant.

    (a)     **Exercise Procedure**. This Warrant may be exercised, in full or in part, at the option of the Holder, on any Business Day during the Exercise Period, for the Warrant Shares, upon:

        (i)     surrender of this Warrant to the Company at its then principal executive offices (or an indemnification undertaking with respect to this Warrant in the case of its loss, theft or destruction), together with an Exercise Agreement in the form attached hereto as **Exhibit A** (an "**Exercise Agreement**"), duly completed (including specifying the number of Warrant Shares to be purchased) and executed; and

        (ii)     payment to the Company of the Aggregate Exercise Price in accordance with **Section 3(b)**.

    (b)     **Payment of the Aggregate Exercise Price**. Payment of the Aggregate Exercise Price shall be made, at the option of the Holder, by either of the following methods:

        (i)     delivery to the Company of a certified or official bank check payable to the order of the Company or by wire transfer of immediately available funds to the following account of the Company: Citibank NA, 55 Parsonage Road, Edison, NJ 08837, Attn: Zakir Syed, VP and Manager, Branch #369, Tel +1 (732) 452-2345, Fax +1 (646) 308-6488, ABA Routing # 021272655, SWIFT CODE: CITI US33, Account# 759652653 (Stream TV Networks, Inc.) or otherwise to an alternative account designated in writing in advance by the Company, in the amount of such Aggregate Exercise Price; or

        (ii)     by instructing the Company to issue Warrant Shares then issuable upon exercise of all or any part of this Warrant on a net basis such that, without payment

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

of any cash consideration or other immediately available funds, the Holder shall surrender this Warrant in exchange for the number of Warrant Shares as is computed using the following formula:

X = Y (A - B) ÷ A

Where:

X = the number of Warrant Shares to be issued to the Holder.

Y = the total number of Warrant Shares for which the Holder has elected to exercise this Warrant pursuant to Section 3(a).

A = the fair market value of one Warrant Share as of the applicable Exercise Date; whereby for purposes of this section "fair market value" shall be defined as (i) the average of the closing sale prices of the Class A Common Stock for the five (5) trading days immediately prior to (but not including) the Exercise Date in the event that the Company's Class A Common Stock is traded on an exchange or is quoted on an over the counter market, or in the absence of a trading market for the Class A Common stock, then (ii) as the Holder and the Company agree, or in the absence of such an agreement, by arbitration in accordance with the rules then standing of the American Arbitration Association, before a single arbitrator to be chosen from a panel of persons qualified by education and training to pass on the matter to be decided

B = the Exercise Price in effect under this Warrant as of the applicable Exercise Date.

(c)    **Delivery of Stock Certificates.** Upon receipt by the Company of the Exercise Agreement, surrender of this Warrant and payment of the Aggregate Exercise Price (in accordance with **Section 3(b)** hereof), the Company shall, as promptly as practicable, and in any event within three (3) Business Days thereafter, execute (or cause to be executed) and deliver (or cause to be delivered) to the Holder a certificate or certificates representing the Warrant Shares issuable upon such exercise. The stock certificate or certificates so delivered shall be, to the extent possible, in such denomination or denominations as the exercising Holder shall reasonably request in the Exercise Agreement and shall be registered in the name of the Holder or, subject to compliance with **Section 4** below, such other Person's name as shall be designated in the Exercise Agreement. This Warrant shall be deemed to have been exercised and such certificate or certificates of Warrant Shares shall be deemed to have been issued, and the Holder or any other Person so designated to be named therein shall be deemed to have become a holder of record of such Warrant Shares for all purposes, as of the Exercise Date.

(d)    **Fractional Shares.** The Company shall not be required to issue a fractional Warrant Share upon exercise of any Warrant. As to any fraction of a Warrant Share that the Holder would otherwise be entitled to purchase upon such exercise, the Company shall pay to such Holder an amount in cash (by delivery of a certified or

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

official bank check or by wire transfer of immediately available funds) equal to the product of (i) such fraction multiplied by (ii) the Exercise Price of one Warrant Share on the Exercise Date.

(e)      **Valid Issuance of Warrant and Warrant Shares.** With respect to the exercise of this warrant, the Company hereby represents, covenants and agrees that:

(i)      This Warrant is duly authorized and validly issued.

(ii)     All Warrant Shares issuable upon the exercise of this Warrant pursuant to the terms hereof shall be, upon issuance, and the Company shall take all such actions as may be necessary or appropriate in order that such Warrant Shares are, validly issued, fully paid and non-assessable.

(f)      **Conditional Exercise.** Notwithstanding any other provision hereof, if an exercise of this Warrant is to be made in connection with a Liquidity Event, such exercise may at the election of the Holder be conditional upon the commencement of such Liquidity Event, in which case such exercise shall not be deemed to be effective until immediately prior to the commencement of such Liquidity Event.

(g)      **Reservation of Shares.** Immediately prior to the exercise of this Warrant, the Company shall reserve and keep available out of its authorized but unissued Class A Common Stock, solely for the purpose of issuance upon the exercise of this Warrant, the maximum number of Warrant Shares issuable upon the exercise of this Warrant, and the par value per Warrant Share shall at all times be less than or equal to the Exercise Price. The Company shall not increase the par value of any Warrant Shares receivable upon the exercise of this Warrant above the Exercise Price then in effect, and shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and non-assessable shares of Class A Common Stock upon the exercise of this Warrant.

(h)      **Adjustment of Exercise Price.** In the event of changes in the outstanding Class A Common Stock by reason of stock dividends, split-ups, recapitalizations, reclassifications, combinations or exchanges of shares, separations, reorganizations, liquidations, or the like, the number and class of shares available under the Warrant in the aggregate and the Exercise Price shall be correspondingly adjusted to give the Holder of the Warrant, on exercise for the same aggregate Exercise Price, the total number, class, and kind of shares as the Holder would have owned had the Warrant been exercised prior to the event and had the Holder continued to hold such shares until after the event requiring adjustment. The form of this Warrant need not be changed because of any adjustment in the number of Warrant Shares subject to this Warrant. Prompt notice of any adjustment made pursuant to this **Section 3(h)** shall be given to the Holder.

(i)      **Combination.** While this Warrant is outstanding, in the event of a Combination (as defined below), each Holder shall have the right to receive upon exercise of the Warrant the kind and amount of shares of capital stock or other securities or property which such Holder would have been entitled to receive upon or as a result of such Combination had such Warrant been exercised immediately prior to such event (subject to further adjustment in accordance with the terms hereof). Unless as a result of a Liquidity Event, the Company shall provide that the surviving or acquiring Person (the

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

"Successor Company") in such Combination will assume by written instrument the obligations under this Section 3(i) and the obligations to deliver to the Holder such shares of stock, securities or assets as, in accordance with the foregoing provisions, the Holder may be entitled to acquire. "Combination" means an event in which the Company consolidates with, mergers with or into, or sells all or substantially all of its assets to another Person, where "Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

(j)     **Market Stand-Off.**  Holder shall not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale in relation to, any Class A Common Stock (or other securities) of the Company held by Holder, for a period of time specified by the managing underwriter(s) acting at the relevant time (not to exceed one hundred eighty (180) days following the effective date of a registration statement of the Company filed under the Securities Act.  Holder agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or such managing underwriter(s) which are consistent with the foregoing or which are necessary to give further effect thereto.  In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to such Class A Common Stock (or other securities) until the end of such period.  As a pre-condition to any proposed transfer of this Warrant or any Class A Common Stock issued hereunder, any proposed transferee of the Holder (or any subsequent transferee of this Warrant or any such shares of Class A Common Stock) will be required to agree to the terms of this **Section 3(i)** and the Company may refuse to recognize or register and purported transfer that is not made in compliance with the terms hereof.

4.     Transfer of Warrant. This Warrant shall not be transferred (in whole or in part) without the prior written consent of the Company, which consent shall not be unreasonably withheld or delayed.

5.     Holder Not Deemed a Stockholder; Limitations on Liability. Except as otherwise specifically provided herein, prior to the issuance to the Holder of the Warrant Shares to which the Holder is then entitled to receive upon the due exercise of this Warrant, the Holder shall not be entitled to vote or receive dividends or be deemed the holder of shares of capital stock of the Company for any purpose by virtue of being the Holder of this Warrant alone, nor shall anything contained in this Warrant be construed to confer upon the Holder, as such, any of the rights of a stockholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

6.    Replacement on Loss; Division and Combination.

    (a)    **Replacement of Warrant on Loss**. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and upon delivery of an indemnity reasonably satisfactory to the Company and, in case of mutilation, upon surrender of such Warrant for cancellation to the Company, the Company, at the Holder's expense, shall execute and deliver to the Holder, in lieu hereof, a new Warrant in the same terms and exercisable for the same number of Warrant Shares as the Warrant so lost, stolen, mutilated or destroyed; provided, that, in the case of mutilation, no indemnity shall be required if this Warrant in identifiable form is surrendered to the Company for cancellation.

    (b)    **Division and Combination of Warrant**. Subject to compliance with the applicable provisions of this Warrant as to any transfer or other assignment which may be involved in such division or combination, this Warrant may at the sole option of the Holder be divided or, following any such division of this Warrant, subsequently combined with other Warrants, upon the surrender of this Warrant or Warrants to the Company at its then principal executive offices, together with a written notice specifying the names and denominations in which new Warrants are to be issued, signed by the respective Holders or their agents or attorneys. Subject to compliance with the applicable provisions of this Warrant as to any transfer or assignment which may be involved in such division or combination, the Company shall at the Company's expense execute and deliver a new Warrant or Warrants in exchange for the Warrant or Warrants so surrendered in accordance with such notice. Such new Warrant or Warrants shall be in the same terms to the surrendered Warrant or Warrants and shall be exercisable in the aggregate for the same number of Warrant Shares as the Warrant or Warrants so surrendered in accordance with such notice.

7.    Warrant Register. The Company shall keep and properly maintain at its principal executive offices books for the registration of the Warrant and any transfers thereof. The Company may deem and treat the Person in whose name the Warrant is registered on such register as the Holder thereof for all purposes, and the Company shall not be affected by any notice to the contrary, except any assignment, division, combination or other transfer of the Warrant effected in accordance with the provisions of this Warrant.

8.    Notices.

(a) All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing.

(b) The Company shall issue a Liquidity Event Notice to the Holder as soon as it becomes aware of any action or petition by any person or entity or otherwise to cause a Liquidity Event.

9.    Cumulative Remedies. Except to the extent expressly provided in **Section 5** to the contrary, the rights and remedies provided in this Warrant are cumulative and are not exclusive of, and are in addition to and not in substitution for, any other rights or remedies available at law, in equity or otherwise.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

10.     Equitable Relief. Each of the Company and the Holder acknowledges that a breach or threatened breach by such party of any of its obligations under this Warrant would give rise to irreparable harm to the other party hereto for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, the other party hereto shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction.

11.     Entire Agreement. This Warrant constitutes the sole and entire agreement of the parties to this Warrant with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Warrant and the Subscription Agreement, the statements in the body of this Warrant shall control.

12.     Successor and Assigns. This Warrant and the rights evidenced hereby shall be binding upon and shall inure to the benefit of the parties hereto and the successors of the Company and the successors and permitted assigns of the Holder. Such successors and/or permitted assigns of the Holder shall be deemed to be a Holder for all purposes hereunder.

13.     No Third-Party Beneficiaries. This Warrant is for the sole benefit of the Company and the Holder and their respective successors and, in the case of the Holder, permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Warrant.

14.     Headings. The headings in this Warrant are for reference only and shall not affect the interpretation of this Warrant.

15.     Amendment and Modification; Waiver. Except as otherwise provided herein, this Warrant may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by the Company or the Holder of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Warrant shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

16.     Severability. If any term or provision of this Warrant is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

affect any other term or provision of this Warrant or invalidate or render unenforceable such term or provision in any other jurisdiction.

17.     Governing Law. This Warrant shall be governed by and construed in accordance with the internal laws of the State of Delaware USA without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware USA or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware USA.

18.     Submission to Jurisdiction. Any legal suit, action or proceeding arising out of or based upon this Warrant or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of New York in each case located in the city of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by certified or registered mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

19.     Waiver of Jury Trial. Each party acknowledges and agrees that any controversy which may arise under this Warrant is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Warrant or the transactions contemplated hereby.

1.     No Strict Construction. This Warrant shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

[Signature appears on following page.]

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

IN WITNESS WHEREOF, the Company has duly executed this Warrant on the Original Issue Date.

STREAM TV NETWORKS, INC.

By: _____
Name: Raja Rajan
Title:  Chief Operating Officer

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## EXHIBIT A

### FORM OF EXERCISE AGREEMENT

TO: Stream TV Networks, Inc.

Attention: Legal.

     (1)    The undersigned hereby elects to purchase _____ shares of the Class A Common Stock of Stream TV Networks, Inc. (the "**Company**") pursuant to the terms of the attached Warrant, and tenders herewith payment of the Exercise Price in full, together with all applicable transfer taxes, if any.

     - OR -

     The undersigned hereby elects to purchase _____ shares of the Class A Common Stock of the Company pursuant to the terms of the net exercise provisions set forth in **Section 3(b)(ii)** of the attached Warrant, and shall tender payment of all applicable transfer taxes, if any.

     (2)    Please issue a certificate or certificates representing said shares of Class A Common Stock in the name of the undersigned or in such other name as is specified below:

_____

(Name)

_____

(Address)

     (3)    The undersigned represents that (i) the aforesaid shares of Class A Common Stock are being acquired for the account of the undersigned for investment and not with a view to, or for resale in connection with, the distribution thereof and that the undersigned has no present intention of distributing or reselling such shares; (ii) the undersigned is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision regarding its investment in the Company; (iii) the undersigned is experienced in making investments of this type and has such knowledge and background in financial and business matters that the undersigned is capable of evaluating the merits and risks of this investment and protecting the undersigned's own interests; (iv) the undersigned understands that the shares of Class A Common Stock issuable upon exercise of this Warrant have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), by reason of a specific exemption from the registration

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

provisions of the Securities Act, which exemption depends upon, among other things, the bona fide nature of the investment intent as expressed herein, and, because such securities have not been registered under the Securities Act, they must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available; (v) the undersigned is aware that the aforesaid shares of Class A Common Stock may not be sold pursuant to Rule 144 adopted under the Securities Act unless certain conditions are met and until the undersigned has held the shares for the number of years prescribed by Rule 144, that among the conditions for use of the Rule is the availability of current information to the public about the Company and the Company has not made such information available and has no present plans to do so; and (vi) the undersigned agrees not to make any disposition of all or any part of the aforesaid shares of Class A Common Stock unless and until there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with said registration statement, or the undersigned has provided the Company with an opinion of counsel satisfactory to the Company, stating that such registration is not required.

_____                          _____

(Date)                                              (Signature)


                                                    _____

                                                    (Print name)

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Security Agreement") is dated as of, March 26, 2014, by and between STREAM TV NETWORKS, INC (file number 4747282), a Delaware USA corporation ("Debtor"), and Hawk Investment Holdings Limited (registered in Guernsey with registered number 44994), with its registered office at Newport House, 15 The Grange, St Peter Port, Guernsey GY1 2QL, Channel Islands ("Hawk"), a Guernsey holding company.

### R E C I T A L S

WHEREAS, Hawk has made an investment (the "Investment") in a Senior Secured Note of Debtor having a principal amount of GBP £6,000,000 (six million Pounds Sterling) (the "Note"); and

WHEREAS, it is a condition precedent to Hawk making the Investment that Debtor execute and deliver to Hawk a security agreement in the form hereof;

NOW, THEREFORE, in consideration of the Recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtor hereby agrees with Hawk as follows:

### ARTICLE I
### DEFINITIONS

Capitalized terms not otherwise defined herein and defined in the UCC shall have, unless the context otherwise requires, the meanings set forth in the UCC as in effect on the date hereof (except that the term "document" shall only have the meaning set forth in the UCC for purposes of clause (d) of the definition of Collateral), the recitals and as follows:

1.1    Accounts.  "Accounts" shall mean all accounts, including without limitation all rights to payment for goods sold or services rendered that are not evidenced by instruments or chattel paper, whether or not earned by performance, and any associated rights thereto.

1.2    Collateral.  "Collateral" shall mean all personal properties and assets of Debtor, wherever located, whether tangible or intangible, and whether now owned or hereafter acquired or arising, including without limitation (in each case, (i) subject to liens in favor of SLS Holdings VI LLC ("SLS") by virtue of the Securities Purchase Agreements and (ii) except for those personal properties and assets of Debtor subject to senior security interests granted to equipment financing lenders through one or more Equipment Financing Agreements entered into after the date hereof):

(a)    all Inventory and documents relating to Inventory;

(b)    all Accounts and documents relating to Accounts;

(c)    all equipment, fixtures and other goods, including without limitation machinery, furniture, vehicles and trade fixtures;

QB\13977376.4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

(d)    all general intangibles (including without limitation payment intangibles, software, customer lists, sales records and other business records, contract rights, causes of action, and licenses, permits, franchises, patents, copyrights, trademarks, and goodwill of the business in which the trademark is used, trade names, or rights to any of the foregoing), promissory notes, contract rights, chattel paper, documents, letter-of-credit rights and instruments;

(e)    all motor vehicles;

(f)    (i) all deposit accounts and (ii) all cash and cash equivalents deposited with or delivered to Hawk from time to time and pledged as additional security for the Obligations;

(g)    all investment property;

(h)    all commercial tort claims; and

(i)    all additions and accessions to, all spare and repair parts, special tools, equipment and replacements for, and all supporting obligations, proceeds and products of, any and all of the foregoing assets described in Sections (a) through (h), inclusive, above.

1.3    Event of Default.    "Event of Default" shall have the meaning specified in the Note.

1.4    Securities Purchase Agreements.    "Securities Purchase Agreements" shall mean the Securities Purchase Agreements, Security Agreements and related documents dated August 8, 2011 and February 8, 2012, by and between SLS and the Debtor.

1.5    Equipment Financing Agreements.    "Equipment Financing Agreements" shall mean one or more agreements entered into after the date hereof by and among one or more equipment financing lenders ("EFLs") and the Debtor which would call for, among other protections, the grant of senior security interests to the EFLs over certain of the Debtor's assets.

1.6    Inventory.    "Inventory" shall mean all inventory, including without limitation all goods held for sale, lease or demonstration or to be furnished under contracts of service, goods leased to others, trade-ins and repossessions, raw materials, work in process and materials used or consumed in Debtor's business, including, without limitation, goods in transit, wheresoever located, whether now owned or hereafter acquired by Debtor, and shall include such property the sale or other disposition of which has given rise to Accounts and which has been returned to or repossessed or stopped in transit by Debtor.

1.7    Obligations.    "Obligations" shall mean Debtor's obligation to pay interest and principal on the Note and all costs arising under the Note as required by the terms thereof.

1.8    Person.    "Person" shall mean and include an individual, partnership, corporation, trust, unincorporated association and any unit, department or agency of government.

QB\13977376.4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

1.9    Security Agreement. "Security Agreement" shall mean this Security Agreement, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

1.10    Security Interest. "Security Interest" shall mean the security interest of Hawk in the Collateral granted by Debtor pursuant to this Security Agreement.

1.11    UCC. "UCC" shall mean the Uniform Commercial Code as adopted in the State of Delaware and in effect from time to time.

## ARTICLE II
## THE SECURITY INTEREST; REPRESENTATIONS AND WARRANTIES

2.1    The Security Interest. To secure the full and complete payment and performance when due (whether at stated maturity, by acceleration, or otherwise) of each of the Obligations, Debtor hereby grants to Hawk a security interest in all of Debtor's right, title and interest in and to the Collateral.

2.2    Representations and Warranties. Debtor hereby represents and warrants to Hawk that:

(a)    Debtor is a Delaware USA corporation and its exact legal name is set forth in the definition of "Debtor" in the introductory paragraph of this Security Agreement.

(b)    Debtor has good title to, or valid leasehold interest in, all of the Collateral and there are no liens on any of the Collateral except Permitted Liens (a "Permitted Lien" meaning (i) liens in favor of SLS pursuant to the Securities Purchase Agreements, (ii) liens for taxes not delinquent, and (iii) statutory landlord's, mechanic's, carrier's, workmen's, repairmen's or other similar statutory liens arising or incurred in the ordinary course of business for amounts which are not due and payable).

2.3    Authorization to File Financing Statements. Debtor covenants, and undertakes to Hawk, to file in any UCC jurisdiction any second priority initial financing statements and amendments thereto, in a form and substance reasonably acceptable to Debtor, that (a) indicate the Collateral (i) as all assets of Debtor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC or such other jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by Part 5 of Article 9 of the UCC for the sufficiency of filing office acceptance of any financing statement or amendment, including whether Debtor is an organization, the type of organization and any state or federal organization identification number issued to Debtor. Hawk shall have the right but not the obligation at any time to file such financing statements and amendments thereto and Debtor hereby irrevocably authorizes Hawk at any time and from time to time to file such financing statements and amendments thereto as contemplated above in order to protect Hawk's own interests under this Security Agreement and/or otherwise.

QB\13977376.4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

## ARTICLE III
## AGREEMENTS OF DEBTOR

From and after the date of this Security Agreement, and until all of the Obligations are paid in full, Debtor undertakes and covenants to:

3.1     <u>Maintenance of Security Interest</u>.

(a)     At the expense of Debtor, defend the Security Interest against any and all claims of any Person adverse to Hawk except for SLS solely via the Securities Purchase Agreements and any and all applicable EFLs through one or more Equipment Financing Agreements; and shall further take any such action and execute such financing statements and other documents as Hawk may (but without any obligation so to do) from time to time request to maintain the perfected status of the Security Interest.

(b)     At the expense of Debtor, ensure the attachment, perfection and second priority of, and the ability of Hawk to enforce its security interest in any and all of the Collateral including, without limitation, (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC, to the extent, if any, that Debtor's signature thereon is required therefor, (ii) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Hawk to enforce, its security interest in such Collateral, (iii) taking all actions required by any earlier versions of the UCC (to the extent applicable) or by other law, as applicable in any relevant UCC jurisdiction, or by other law as applicable in any foreign jurisdiction, and (iv) obtaining waivers from landlords where any of the tangible Collateral is located in form and substance reasonably satisfactory to Hawk. Debtor shall at its expense take any action reasonably requested by Hawk from time to time (but with no obligation on Hawk so to do) in relation to the contents of this Section 3.1(b).

3.2     <u>Insurance</u>. Keep the Collateral consisting of tangible personal property insured against loss or damage to the Collateral under a policy or policies covering such risks as are ordinarily insured against by similar businesses.

3.3     <u>Name; Legal Status</u>. (a) Without providing at least 30 days prior written notice to Hawk, Debtor will not change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, (b) if Debtor does not have an organizational identification number and later obtains one, Debtor shall forthwith notify Hawk of such organizational identification number, and (c) Debtor will not change its type of organization or jurisdiction of organization.

## ARTICLE IV
## RIGHTS AND REMEDIES

4.1     <u>Rights of Parties</u>. Upon the occurrence and during the continuance of an Event of Default, in addition to all the rights and remedies provided in the Note or in Article 9 of the UCC and any other applicable law, Hawk may (but is under no obligation so to do):

4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

(a)     require Debtor to assemble the Collateral at a place designated by Hawk, which is reasonably convenient to the parties; and

(b)     take physical possession of Inventory and other tangible Collateral and of Debtor's records pertaining to all Collateral that are necessary to properly administer and control the Collateral or the handling and collection of Collateral, and sell, lease or otherwise dispose of the Collateral in whole or in part, at public or private sale, on or off the premises of Debtor; and

(c)     collect any and all money due or to become due and enforce in Debtor's name all rights with respect to the Collateral; and

(d)     settle, adjust or compromise any dispute with respect to any Account; and

(e)     receive and open mail addressed to Debtor; and

(f)     on behalf of Debtor, endorse checks, notes, drafts, money orders, instruments or other evidences of payment.

4.2     <u>Power of Attorney</u>.  Upon the occurrence and during the continuance of an Event of Default, Debtor does hereby constitute and appoint Hawk as Debtor's true and lawful attorney with full power of substitution for Debtor in Debtor's name, place and stead for the purposes of performing any obligation of Debtor under this Security Agreement and taking any action and executing any instrument which Hawk may deem necessary or advisable to perform any obligation of Debtor under this Security Agreement, which appointment is irrevocable and coupled with an interest, and shall not terminate until the Obligations are paid in full.

4.3     <u>Right to Collect Accounts</u>.  Upon the occurrence and during the continuance of an Event of Default and without limiting Debtor's obligations under the Note:  (a) Debtor authorizes Hawk to notify any and all debtors on the Accounts to make payment directly to Hawk (or to such place as Hawk may direct); (b) Debtor agrees, on written notice from Hawk, to deliver to Hawk promptly upon receipt thereof, in the form in which received (together with all necessary endorsements), all payments received by Debtor on account of any Account; (c) Hawk may, at its option, apply all such payments against the Obligations or remit all or part of such payments to Debtor; and (d) Hawk may take any actions in accordance with <u>Section 4.6</u> of this Agreement.

4.4     <u>Reasonable Notice</u>.  Written notice, when required by law, given at least thirty (30) business days (counting the day of sending) before the date of a proposed disposition of the Collateral shall be reasonable notice.

4.5     <u>Limitation on Duties Regarding Collateral</u>.  The sole duty of Hawk with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as Hawk deals with similar property for its own account.  Neither Hawk nor any of its directors, officers, employees or agents, shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of Debtor or otherwise.

QB\13977376.4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

4.6     Lock Box; Collateral Account.  This Section 4.6 shall be effective only upon the occurrence and during the continuance of an Event of Default.  If Hawk so requests in writing, Debtor will direct each of its debtors on the Accounts to make payments due under the relevant Account or chattel paper directly to a special lock box to be under the control of Hawk.  Debtor hereby authorizes and directs Hawk to deposit into a special collateral account to be established and maintained by Hawk all checks, drafts and cash payments received in said lock box.  All deposits in said collateral account shall constitute proceeds of Collateral and shall not constitute payment of any Obligation until so applied.  At its option, Hawk may, at any time, apply finally collected funds on deposit in said collateral account to the payment of the Obligations, in the order of application selected in the sole discretion of Hawk, or permit Debtor to withdraw all or any part of the balance on deposit in said collateral account.  If a collateral account is so established, Debtor agrees that it will promptly deliver to Hawk, for deposit into said collateral account, all payments on Accounts and chattel paper received by it.  All such payments shall be delivered to Hawk in the form received (except for Debtor's endorsement where necessary).  Until so deposited, all payments on Accounts and chattel paper received by Debtor shall be held in trust by Debtor for and as the property of Hawk and shall not be commingled with any funds or property of Debtor.

4.7     Application of Proceeds.  Hawk shall apply the proceeds resulting from any sale or disposition of the Collateral in the following order:

(a)     to the reasonable costs of any sale or other disposition;

(b)     to the payment of the Obligations then due and owing in any order selected by Hawk; and

(c)     to Debtor.

4.8     Other Remedies.  No remedy herein conferred upon Hawk is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Security Agreement and the Note now or hereafter existing at law or in equity or by statute or otherwise.  No failure or delay on the part of Hawk in exercising any right or remedy hereunder shall operate as a waiver thereof nor shall any single or partial exercise of any right hereunder preclude other or further exercise thereof or the exercise of any other right or remedy.

## ARTICLE V
## MISCELLANEOUS

5.1     Assignability; Successors.  Debtor's rights and liabilities under this Security Agreement are not assignable or delegable, in whole or in part, without the prior written consent of Hawk.  The provisions of this Security Agreement shall inure to the benefit of and be binding upon the successors and assigns of the parties.

5.2     Survival.  All agreements, representations and warranties made in this Security Agreement or in any document delivered pursuant to this Security Agreement shall survive the execution and delivery of this Security Agreement, and the delivery of any such document.

QB\13977376.4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

5.3     Governing Law.  This Security Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware.  Each of the parties hereto hereby consents to (i) the non-exclusive jurisdiction of the courts of the State of Delaware and any federal court sitting in Wilmington, Delaware, and (ii) service of process by mail in accordance with Section 5.5 of this Security Agreement.

5.4     Execution; Headings.  This Security Agreement may be executed in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart.  In the event that any signature is delivered by facsimile or electronic transmission, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or electronic signature page were an original thereof.  The article and section headings in this Security Agreement are inserted for convenience of reference only and shall not constitute a part hereof.

5.5     Notices.  Any notice or other communication required or permitted to be delivered to any party under this Security Agreement shall be in writing and shall be deemed properly delivered, given and received when delivered (by hand, by certified mail, by courier or express delivery service or by facsimile or electronic transmission, provided that any notice delivered by electronic transmission shall also be sent by another means) to the address or facsimile number set forth beneath the name of such party on the signature page hereto (or to such other address or facsimile number as such party shall have specified in a written notice given to the other parties hereto).

5.6     Amendment; No Waiver; Cumulative Remedies.  No amendment of this Security Agreement shall be effective unless in writing and signed by Debtor and Hawk.  Hawk shall not by any act (except by a written instrument signed by Hawk), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Event of Default or in any breach of any of the terms and conditions hereof.  No failure to exercise, nor any delay in exercising, on the part of Hawk, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by Hawk of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Hawk would otherwise have on any future occasion.  The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

5.7     Severability.  Any provision of this Security Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Security Agreement in such jurisdiction or affecting the validity or enforceability of any provision in any other jurisdiction.

5.8     WAIVER OF RIGHT TO JURY TRIAL. HAWK AND DEBTOR ACKNOWLEDGE AND AGREE THAT ANY CONTROVERSY WHICH MAY ARISE

QB\13977376.4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

UNDER THIS SECURITY AGREEMENT WOULD BE BASED UPON DIFFICULT AND COMPLEX ISSUES AND, THEREFORE, THE PARTIES AGREE THAT ANY LAWSUIT ARISING OUT OF ANY SUCH CONTROVERSY SHALL BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

5.9    <u>Submission to Jurisdiction</u>. DEBTOR AGREES THAT ALL ACTIONS OR PROCEEDINGS IN ANY MANNER RELATING TO OR ARISING OUT OF THIS SECURITY AGREEMENT MAY BE BROUGHT ONLY IN COURTS OF THE STATE OF DELAWARE OR THE FEDERAL COURTS LOCATED IN DELAWARE AND DEBTOR CONSENTS TO THE JURISDICTION OF SUCH COURTS.  DEBTOR WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH COURT AND ANY RIGHT IT MAY HAVE NOW OR HEREAFTER HAVE TO CLAIM THAT ANY SUCH ACTION OR PROCEEDING IS IN AN INCONVENIENT COURT.

5.10    <u>Conflicts with SLS or Equipment Financing Agreements</u>. Notwithstanding anything specified or required in any provision of this Security Agreement, to the extent that there arises a conflict between any provision herein and any provision within the Securities Purchase Agreements, the provisions in the Securities Purchase Agreements shall prevail and supersede the conflicting provision herein.  Notwithstanding anything specified or required in any provision of this Security Agreement, to the extent that there arises a conflict between any provision herein and any provision within any of the Equipment Financing Agreements which may be entered into after the date hereof by and between one or more EFLs and the Debtor, the Equipment Financing Agreements' provisions shall prevail and supersede the conflicting provision herein.  Notwithstanding anything set forth herein to the contrary, the rights and remedies of Hawk set forth in this Security Agreement are subject to the terms and conditions of any Subordination and/or Intercreditor Agreement that Hawk, Debtor and any other creditor of Debtor may be a party.  Without limiting the foregoing, Hawk agrees that notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any liens or encumbrances on the property of Debtor hereunder and notwithstanding any provision of the Code or any other applicable law:  (i) any lien or encumbrance on the Collateral securing the obligations under the Securities Purchase Agreements or Equipment Financing Agreements, shall be senior and prior to any lien or encumbrances on the Collateral securing any Obligations, and (ii) any lien or encumbrance on the Collateral securing the Obligations now or hereafter held by or on behalf of Hawk shall be junior and subordinate to all liens and encumbrances on the Collateral securing the obligations under the Securities Purchase Agreements or Equipment Financing Agreements.

[SIGNATURE PAGE TO FOLLOW]

8

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

IN WITNESS WHEREOF, this Security Agreement has been executed as of the day and year first above written.

STREAM TV NETWORKS, INC

By:_____

Name: Raja Rajan

Title:   Chief Operating Officer

Address:  2009 Chestnut Street, 3rd Floor,
Philadelphia, PA 19103

HAWK INVESTMENT HOLDINGS LIMITED

By:_____

Name:

Title:

Address:  Newport House, 15 The Grange, St Peter
Port, Guernsey GY1 2QL, Channel Islands

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

IN WITNESS WHEREOF, this Security Agreement has been executed as of the day and year first above written.

STREAM TV NETWORKS, INC

By:_____

Name: Raja Rajan

Title:   Chief Operating Officer

Address:  2009 Chestnut Street, 3rd Floor,
Philadelphia, PA 19103

HAWK INVESTMENT HOLDINGS LIMITED

By:_____

Name:  ANTHONY D HOUT

Title:  DIRECTOR

Address:  Newport House, 15 The Grange, St Peter
Port, Guernsey GY1 2QT., Channel Islands

QB\13977376.4

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

*W*

# PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT (this "Agreement"), dated as of December *i 7*  , 2014, is made by and among STREAM TV NETWORKS, INC, a Delaware corporation ("Stream"), TECHNOVATIVE MEDIA, INC., a Delaware corporation ("TechnoVative Media"), ULTRA-D VENTURES, CV, a Commanditaire Vennootschap under the laws of The Netherlands, ULTRA-D COOPERATIVE, U.A., a Uitsluiting van Aansprakelijkheid under the laws of The Netherlands (each a "Pledgor"), and HAWK INVESTMENT HOLDINGS LIMITED ("Hawk"), a Guernsey holding company.

## RECITALS

WHEREAS, Pledgor is the legal and beneficial owner of the Pledged Interests (as hereinafter defined) hereby pledged by Pledgor.

WHEREAS, the Pledged Interests are subject to a first priority security interest in favor of SLS HOLDINGS VI, LLC, a Delaware limited liability company ("SLS").

WHEREAS, Hawk has made an investment in one or more Senior Secured Notes of Debtor (the "Notes").

WHEREAS, in order to secure the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of the Notes and to secure all of the Obligations (as hereinafter defined), the Pledgor has agreed to pledge to Hawk the Pledged Interests (as hereinafter defined), subject to the terms and conditions of this Agreement.

## AGREEMENTS

In consideration of the recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Pledgor hereby agrees with Hawk, as follows:

1.    Defined Terms.  All terms defined in the Uniform Commercial Code in effect from time to time in the State and used herein shall have the same definitions herein as specified therein; provided, however, if a term is defined in Article 9 of the Uniform Commercial Code of the State differently than in another Article of the Uniform Commercial Code of the State, the term has the meaning specified in Article 9.  As used herein, the following terms have the following meanings:

"Code" means the Uniform Commercial Code from time to time in effect in the State.

"Collateral" means the Pledged Interests.

"Event of Default" shall have the meaning specified in the Notes.

"Issuer" means each issuer of Pledged Interests listed on Schedule 1 hereto.

EAST\47934582.9

*W*

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

"Obligations" shall mean Stream's obligation to pay interest and principal on the Notes and all costs arising under the Notes as required by the terms thereof.

"Pledged Interests" means the membership interests, shares of capital stock or other equity interests listed on Schedule 1 hereto.

"Securities Purchase Agreements" shall mean the Securities Purchase Agreements, Security Agreements and related documents (including any Security Agreements and Pledge Agreements) dated August 8, 2011 and February 8, 2012, by and between SLS and Stream.

"State" means the State of Delaware.

2.    Pledge; Grant of Security Interest.  Each Pledgor hereby grants to Hawk a second priority security interest in the Collateral as security for the prompt and complete performance of all of the Obligations.  Pledgor covenants, and undertakes to Hawk, to file in any Uniform Commercial Code jurisdiction any second priority initial financing statements and amendments thereto, in a form and substance reasonably acceptable to Stream, related to the Pledged Interests.  Hawk shall have the right but not the obligation at any time to file such financing statements and amendments thereto and Pledgor hereby irrevocably authorizes Hawk at any time and from time to time to file such financing statements and amendments thereto as contemplated above in order to protect Hawk's own interests under this Agreement and/or otherwise.

3.    Release of Security Interest.  Upon the payment and performance of all of the Obligations in full, Hawk's security interest and rights in and to the Pledged Interests shall terminate and Hawk, at Stream's request, shall execute, as applicable, and deliver to, or for, Stream such lien releases, termination statements, discharges of security interests, and other similar discharge or release documents (and, if applicable, in notarized and/or recordable form) as reasonably requested by Stream in order to evidence the release of the security interests and liens created as security for the Obligations.

4.    Covenants.  Each Pledgor covenants and agrees with Hawk that, from and after the date of this Agreement until all of the Obligations have been paid and performed in full:

(a)    Without the prior written consent of Hawk, Pledgor shall not vote to enable, or take any other action to permit, an Issuer to sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Collateral.

(b)    At the expense of Pledgor, defend the security interest created hereby against any and all claims of any person adverse to Hawk except for SLS.  At the expense of Pledgor, ensure the attachment, perfection and second priority of, and the ability of Hawk to enforce its security interest in any and all of the Collateral.

(c)    At any time and from time to time, upon the written request of Hawk to Pledgor, and at its sole expense, Pledgor will promptly and duly execute and deliver such further instruments and documents and take such further actions as Hawk may reasonably request for the purposes of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted.

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

5.     Voting Rights. Unless an Event of Default shall have occurred and be continuing, and written notice that Hawk intends to exercise voting rights is given to Pledgor by Hawk (and subject to any rights of SLS), Pledgor shall be permitted to exercise all voting and related rights with respect to such Pledged Interests; provided, however, that no vote shall be cast or related right exercised or other action taken which, in the reasonable judgment of Hawk, would impair the Collateral or which would be inconsistent with or result in any violation of any provision of this Agreement.

6.     Rights of Hawk. If an Event of Default shall occur and be continuing, subject to the rights of SLS, Hawk shall have the right to have any or all shares of Pledged Interests registered in its name or the name of its nominee, and Hawk or its nominee may thereafter exercise all voting, related and other rights pertaining to such Pledged Interests at any meeting of members or shareholders of an Issuer or otherwise and  any and all rights of conversion, exchange, subscription and any other rights, privileges or options pertaining to such Pledged Interests as if it were the absolute owner thereof (including, without limitation: (a) the right to exchange at its discretion any and all of the Pledged Interests upon (i) the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate or limited liability company structure of an Issuer, or (ii) the exercise by Pledgor or Hawk of any right, privilege or option pertaining to such Pledged Interests, and (b) in connection therewith, the right to deposit and deliver any and all of such Pledged Interests with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as Hawk may determine).

7.     Remedies. If an Event of Default shall occur and be continuing, subject to the rights of SLS, Hawk may exercise, in addition to all other rights and remedies granted in this Agreement, all rights and remedies of a secured party under the Code as Hawk deems advisable. Without limiting the generality of the foregoing, Hawk (subject to the rights of SLS), without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon Pledgor, an Issuer, any obligor or any other person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, assign, give option or options to purchase or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, in the over-the-counter market, at any exchange, broker's board or office of Hawk or elsewhere upon such terms and conditions as it may deem advisable and at such prices as are commercially reasonable, for cash or on credit or for future delivery without assumption of any credit risk. Hawk (subject to the rights of SLS) shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in Pledgor, which right or equity is hereby waived or released. Hawk (subject to the rights of SLS) shall apply any Proceeds from time to time held by it and the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, to (i) the payment of the Obligations, and (ii) the surplus, if any, to Pledgor.

8.     Notices Any notice or other communication required or permitted to be delivered to any party under this Agreement shall be in writing and shall be deemed properly delivered, given and received when delivered (by hand, by certified mail, by courier or express delivery

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

service or by facsimile or electronic transmission, provided that any notice delivered by electronic transmission shall also be sent by another means) to the address or facsimile number set forth beneath the name of such party on the signature page hereto (or to such other address or facsimile number as such party shall have specified in a written notice given to the other parties hereto).

9.    Severability    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.    Amendments in Writing; No Waiver; Cumulative Remedies.    This Agreement represents the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings related to the subject matter hereof. No amendment of this Agreement shall be effective unless in writing and signed by each Pledgor and Hawk. No failure to exercise, nor any delay in exercising, on the part of Hawk, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by Hawk of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Hawk would otherwise have on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

11.    Section Headings.    The section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

12.    Successors and Assigns.    This Agreement shall be binding upon the successors and assigns of each Pledgor and shall inure to the benefit of Hawk and their successors and assigns.

13.    Governing Law.    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO ITS CONFLICTS OF LAW PROVISIONS.

14.    Consent to Jurisdiction and Venue.    All actions or proceedings brought against Pledgor with respect to this Agreement may be brought only in the state and federal courts sitting in New Castle County, Delaware and Pledgor consents to the jurisdiction of such courts. Pledgor waives any objection it may now or hereafter have to the venue of any such court and any right it may have now or hereafter have to claim that any such action or proceeding is in an inconvenient court.

15.    WAIVER OF RIGHT TO JURY TRIAL.    EACH PLEDGOR AND HAWK ACKNOWLEDGE AND AGREE THAT ANY CONTROVERSY WHICH MAY ARISE

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

UNDER THIS PLEDGE AGREEMENT WOULD BE BASED UPON DIFFICULT AND COMPLEX ISSUES AND, THEREFORE, PLEDGOR AND HAWK AGREE THAT ANY LAWSUIT ARISING OUT OF ANY SUCH CONTROVERSY SHALL BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

16.    <u>Conflicts with SLS Interest</u>.  Notwithstanding anything specified or required in any provision of this Agreement, to the extent that there arises a conflict between any provision herein and any provision within the Securities Purchase Agreements, the provisions in the Securities Purchase Agreements shall prevail and supersede the conflicting provision herein. Notwithstanding anything set forth herein to the contrary, the rights and remedies of Hawk set forth in this Agreement are subject to the terms and conditions of any Subordination and/or Intercreditor Agreement that Hawk, Pledgor and any other creditor of Pledgor may be a party. Without limiting the foregoing, Hawk agrees that notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any liens or encumbrances on the Collateral and notwithstanding any provision of the Code or any other applicable law:  (i) any lien or encumbrance on the Collateral securing the obligations under the Securities Purchase Agreements, shall be senior and prior to any lien or encumbrances on the Collateral securing any Obligations, and (ii) any lien or encumbrance on the Collateral securing the Obligations now or hereafter held by or on behalf of Hawk shall be junior and subordinate to all liens and encumbrances on the Collateral securing the obligations under the Securities Purchase Agreements.

[SIGNATURE PAGE TO FOLLOW]

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

IN WITNESS WHEREOF, the undersigned have caused this Pledge Agreement to be duly executed and delivered as of the date first above written.

**PLEDGORS:**

STREAM TV NETWORKS, INC

By: _Mathu Rajan_
    Mathu Rajan, President

ULTRA-D VENTURES, CV
By: Media Holdings Delaware, LLC, its general partner

By: _Mathu Rajan_
    Mathu Rajan, President

TECHNOVATIVE MEDIA, INC.

By: _Mathu Rajan_
    Mathu Rajan, President

ULTRA-D COOPERATIVE, U.A.

By: _____
    Raja Rajan, Director

**HAWK:**

HAWK INVESTMENT HOLDINGS LIMITED

By: _____
Name: Anthony Holt
Title: Director

EAST\47934582.9

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

SCHEDULE 1
TO PLEDGE AGREEMENT

DESCRIPTION OF PLEDGED INTERESTS

| Pledgor | Issuer | Class(es) of Interest | Certificate No(s). | No. of Shares Pledged or Percentage of Equity Pledged | Percentage of Issuer's Securities Pledged |
|---|---|---|---|---|---|
| Stream TV Networks, Inc | TechnoVative Media, Inc., a Delaware corporation | Common Stock | 01 | 1,000 | 100% |
| TechnoVative Media, Inc. | Media Holdings Delaware, LLC, a Delaware limited liability company | Membership Interest | 1 | 100% | 100% |
| Ultra-D Ventures, CV | Technology Holdings Delaware, LLC, a Delaware limited liability company | Membership Interest | 1 | 100% | 100% |
| TechnoVative Media, Inc. | Ultra-D Ventures, CV, a Commanditaire Vennootschap under the laws of The Netherlands | Partnership Interest | Not Applicable | 65% of the interests held by TechnoVative Media, Inc. | 65% of the interests held by TechnoVative Media, Inc. |
| Ultra-D Ventures, CV | Ultra-D Cooperative, U.A., a Uitsluiting van Aansprakelijkheid under the laws of The Netherlands | Cooperative Interests | Not Applicable | 65% | 65% |

EAST\47934582.9

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

| Pledgor | Issuer | Class(es) of Interest | Certificate No(s). | No. of Shares Pledged or Percentage of Equity Pledged | Percentage of Issuer's Securities Pledged |
|---|---|---|---|---|---|
| Ultra-D Cooperative, U.A | TechnoVative Ventures, BV, a Besloten vennootschap under the laws of the Netherlands | Share Capital | Not Applicable | 65% | 65% |
| Ultra-D Cooperative, U.A. | SeeCubic, BV, a Besloten vennootschap under the laws of the Netherlands | Share Capital | Not Applicable | 65% | 65% |

EAST\47934582.9



THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

ACKNOWLEDGMENT AND CONSENT

The undersigned is an Issuer referred to in the foregoing Pledge Agreement and hereby acknowledges receipt of a copy of the Pledge Agreement, made by Pledgor (as defined therein) in favor of Hawk (as defined therein) (as amended, supplemented or otherwise modified from time to time, the "Pledge Agreement"). The undersigned agrees for the benefit of Hawk that the undersigned will be bound by the terms of the Pledge Agreement and will comply with such terms insofar as such terms are applicable to the undersigned.

TECHNOLOGY HOLDINGS DELAWARE, LLC

By: _____
    Mathu Rajan, President

MEDIA HOLDINGS DELAWARE, LLC

By: _____
    Mathu Rajan, President

TECHNOVATIVE VENTURES, BV

By: _____
    Raja Rajan, Director

SEECUBIC, BV

By: _____
    Raja Rajan, Director

Acknowledgment and Consent to Pledge Agreement

THIS DOCUMENT IS A CONFIDENTIAL FILING.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.