# **EXHIBIT F**

*Execution Version*

**SEECUBIC, INC.**

**3.0% Senior Secured Notes due December 31, 2023**

_____

**Note Purchase Agreement**

_____

**Dated as of June 11, 2022**

# Table of Contents

**Page**

| | | |
|---|---|---|
| Section 1. | Authorization of Notes | 1 |
| Section 2. | Initial Issuance and Purchase of Notes | 1 |
| Section 3.1. | Issuance of Additional Exchange Notes | 1 |
| Section 3.2. | Issuance of New Notes | 2 |
| Section 4. | Conditions to Issuance of Notes | 2 |
| Section 4.1. | Conditions to Closing. | |
| Section 4.2. | Conditions to Issuance of Post-Closing Notes: | 3 |
| Section 5. | Representations and Warranties of the Company | 4 |
| Section 5.1. | Organization; Power and Authority | 4 |
| Section 5.2. | Solvency | 4 |
| Section 5.3. | Authorization, Etc. | 4 |
| Section 5.4. | Non-Violation | 4 |
| Section 5.5. | Title to Property | 5 |
| Section 5.6. | Existing Indebtedness; Restrictions on Indebtedness and Liens | 5 |
| Section 5.7. | Disclosure; No Material Adverse Effect | 6 |
| Section 5.8. | Capital Structure | 6 |
| Section 5.9. | Former Stream Subsidiaries | 6 |
| Section 5.10. | Taxes | 6 |
| Section 5.11. | Investment Company Act; Margin Regulations | 6 |
| Section 5.12. | Insurance | 6 |
| Section 6. | Post-Closing Items | 7 |
| Section 7. | Payment and Prepayment of the Notes | 7 |
| Section 7.1. | Maturity; Payment of Interest | 7 |
| Section 7.2. | Prepayments | 7 |
| Section 7.3. | Allocation of Partial Prepayments | 8 |
| Section 7.4. | Maturity; Surrender, Interest on Prepayments, Etc. | 8 |
| Section 7.5. | Payments Due on Non-Business Days | 8 |
| Section 7.6. | Conversion. | 8 |
| Section 8. | Affirmative Covenants | 14 |
| Section 8.1. | Existence, Etc. | 14 |
| Section 8.2. | Maintenance of Insurance | 14 |
| Section 8.3. | Compliance with Laws | 14 |
| Section 8.4. | Information | 14 |
| Section 8.5. | Further Assurances | 14 |
| Section 8.6. | Maintenance of Properties | 15 |
| Section 8.7. | Notices | 15 |
| Section 8.8. | Notices of Certain Events | 15 |
| Section 8.9. | Notices of Common Stock Issuances | 16 |
| Section 8.10. | Valid Issuance of Conversion Shares; Payment of Taxes | 16 |
| Section 9. | Negative Covenants | 16 |
| Section 9.1. | Merger, Consolidation, Etc. | 17 |
| Section 9.2. | Liens | 17 |
| Section 9.3. | Indebtedness | 18 |

| | | |
|---|---|---|
| Section 9.4. | Dispositions | 19 |
| Section 9.5. | Change in Nature of Business | 20 |
| Section 9.6. | Investments | 20 |
| Section 9.7. | Subordinated Indebtedness and Amendments to Subordinated Indebtedness Documents | 21 |
| Section 9.8. | Material Intellectual Property | 21 |
| Section 10. | Events of Default | 22 |
| Section 11. | Remedies on Default, Etc. | 23 |
| Section 11.1. | Acceleration | 23 |
| Section 11.2. | Other Remedies. | 23 |
| Section 11.3. | No Waivers or Election of Remedies, Expenses, Etc. | 24 |
| Section 12. | Guarantee and Collateral Matters | 24 |
| Section 12.1. | Guarantee and/or Collateral | 24 |
| Section 12.2. | Collateral Agent | 24 |
| Section 13. | Registration; Exchange; Substitution of Notes | 26 |
| Section 13.1. | Registration of Notes | 26 |
| Section 13.2. | Transfer and Exchange of Notes | 26 |
| Section 13.3. | Replacement of Notes | 26 |
| Section 13.4. | Company Consent to Transfer | 27 |
| Section 14. | Payments on Notes | 27 |
| Section 14.1. | Place of Payment | 27 |
| Section 14.2. | Payment by Wire Transfer | 27 |
| Section 14.3. | Withholding. | 27 |
| Section 15. | Survival of Representations and Warranties; Entire Agreement | 28 |
| Section 16. | Amendment and Waiver | 28 |
| Section 16.1. | Requirements | 28 |
| Section 16.2. | Binding Effect, Etc. | 29 |
| Section 17. | Notices | 29 |
| Section 18. | Joinder Agreement | 30 |
| Section 19. | Miscellaneous | 30 |
| Section 19.1. | Successors and Assigns | 30 |
| Section 19.2. | Accounting Terms | 31 |
| Section 19.3. | Severability | 32 |
| Section 19.4. | Construction, Etc. | 32 |
| Section 19.5. | Counterparts | 32 |
| Section 19.6. | Governing Law | 32 |
| Section 19.7. | Jurisdiction and Process; Waiver of Jury Trial | 33 |
| Section 19.8. | Independent Investigation | 33 |

904117.22-WILSR01A - MSW

Schedules

| | | |
|---|---|---|
| Schedule A | — | Defined Terms |
| Schedule 1 | | Form of Senior Secured Notes due December 31, 2023 |
| Schedule 5.8 | | Subsidiaries of the Company and Ownership of Subsidiary Equity |
| Schedule 5.9 | | Former Stream Subsidiaries |
| Schedule 6 | — | Post-Closing Items |
| Schedule 9.3 | — | Existing Indebtedness |
| Schedule 9.6 | — | Existing Investments |
| Purchaser Notice Schedule | | Purchaser Notice Information |
| Purchaser Schedule | — | Information Relating to Purchasers |
| Exhibit A | | Notice of Conversion Request |
| Exhibit B | | Conversion Notice |
| Exhibit C | | Assignments to Company |
| Exhibit D | | NPA Joinder Agreement |

904117.22-WILSR01A - MSW

**SEECUBIC, INC.**
**1732A Marsh Road Suite 124**
**Wilmington, Delaware 19810**

3.0% Senior Secured Notes due December 31, 2023

**Dated as of June 11, 2022**

To each of the Initial Purchasers (as defined below) and the other Purchasers (as defined below) from time to time party hereto:

Ladies and Gentlemen:

SEECUBIC, INC., a Delaware corporation (the "**Company**"), hereby agrees with each of the Purchasers as follows:

**Section 1.      Authorization of Notes**.  The Company has authorized the issuance and sale of 3.0% Senior Secured Notes due December 31, 2023 (collectively, the "**Notes**"), pursuant to the terms and conditions hereof and in an amount up to $117,875,781.64.  The payment of the principal of and interest on the Notes and the performance by the Company of its obligations under this Agreement will, pursuant to the Guarantee and Collateral Agreement (as defined below), be jointly and severally and unconditionally guaranteed by the Guarantors (as defined below) and secured by the Collateral (as defined below) of the Company and the other Grantors (as defined in the Guarantee and Collateral Agreement).  The Notes shall be substantially in the form set out in Schedule 1. Capitalized terms used but not otherwise defined in this Agreement are used herein as respectively defined in Schedule A, and the rules of construction set forth in Section 19.4 shall govern the interpretation of this Agreement.

**Section 2.      Initial Issuance and Purchase of Notes**.  The issuance of the Notes to be issued to each Initial Purchaser (as defined below) at the Closing referred to below ("**Closing Notes**") shall occur at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, New York 10001, at 10:00 a.m., New York time on June 11, 2022 (the "**Closing**").  Subject to the terms and conditions of this Agreement, including, without limitation, in consideration of SLS and Hawk entering into the Assignment Agreement and other advances or investments made by the Purchasers prior to the date hereof, the Company will issue and deliver Notes to each Initial Purchaser at the Closing and from time to time thereafter.  The initial principal amount of the Notes issued at the Closing to each Purchaser party hereto at the Closing (collectively, the "**Initial Purchasers**") is in the principal amount specified opposite such Initial Purchaser's name listed on Part A of the Purchaser Schedule.  Such Closing Notes may be delivered in electronic form, as further set forth in Section 19.5. The Purchasers' obligations hereunder are several and not joint obligations, and no Purchaser shall have any liability to any Person for the performance or non-performance of any obligation by any other Purchaser hereunder.  Upon the issuance of the Closing Notes, the advances and other investments of such Initial Purchaser set forth on Part A of the Purchaser Schedule shall be deemed discharged in full.

**Section 3.      Post-Closing Issuance of Notes.**

Section 3.1.      Issuance of Additional Exchange Notes.  Following the Closing, the Company will issue and deliver to each Purchaser listed on Part B of the Purchaser Schedule

(collectively, the "**Exchange Purchaser**") the Notes to such Exchange Purchaser in the form of a single Note dated the date of the date on which such Exchange Purchaser becomes a party hereto and registered in such Exchange Purchaser's name in consideration of other advances or investments made by such Exchange Purchaser, the outstanding amount of which, as of the date hereof, is set forth opposite such Exchange Purchaser's name on the Purchaser Schedule. The principal amount of such Exchange Purchaser's Note shall be equal to the amount set forth opposite such Exchange Purchaser's name on the Purchaser Schedule, plus, in the case of any such Exchange Purchaser identified therein as a "Legacy Purchaser" interest accruing on and after the date hereof to but excluding the date on which such Exchange Purchaser becomes a party hereto, at a rate per annum equal to the rate per annum applicable to such Exchange Purchaser's advances and other investments as of the date hereof, which rate is set forth opposite such Exchange Purchaser's name on Part B of the Purchaser Schedule; provided that, if an Exchange Purchaser does not execute and deliver an NPA Joinder Agreement within fifteen (15) days of the date hereof, such Exchange Purchaser will not be entitled to become a party hereto, and such Exchange Purchaser's existing investments and advances shall not be an obligation of the Company or the other Grantors and Guarantors party hereto. Such Notes may be delivered in electronic form, as further set forth in Section 19.5. Upon the issuance of an Exchange Note to an Exchange Purchaser, the advances and other investments of such Exchange Purchaser set forth on Part B of the Purchaser Schedule shall be deemed discharged in full.

Section 3.2.    Issuance of New Notes. Following the Closing, from time to time, the Company will issue and deliver to each Purchaser additional Notes, in each case, in consideration of other advances or investments made by such Purchaser in the Company from time to time pursuant to the Subscription Agreements (as defined below) (the "**Post-Closing Notes**"). Such Post-Closing Notes may be delivered in electronic form, as further set forth in Section 19.5.

**Section 4.    Conditions to Issuance of Notes.**

Section 4.1.    Conditions to Closing. The issuance and delivery of the Closing Notes and the Exchange Notes to the applicable Purchaser and each such Purchaser's obligations to purchase its Closing Notes and/or Exchange Notes shall be subject to the following:

(a)    **Executed Counterparts**. The Collateral Agent shall have received from each party hereto an executed counterpart of this Agreement signed on behalf of such party (or written evidence satisfactory to the Collateral Agent (which may include an electronic image scan of a signed signature page to this Agreement) that such party has signed a counterpart of this Agreement).

(b)    **Financial Statements**. The Collateral Agent shall have received copies of an unaudited consolidated balance sheet and a related statement of income of the Company and its Subsidiaries as of and for the fiscal year ending December 31, 2021, prepared in accordance with GAAP consistently applied.

(c)    **Assignment Agreement.** Substantially concurrently with the issuance of the Closing Notes, SLS and Hawk shall each deliver to the Company an executed counterpart of the Assignment Agreement.

(d)    **Guarantee and Collateral Agreement and Collateral**. Substantially concurrently with the issuance of the Closing Notes, the Company shall deliver to the Collateral Agent, for the benefit of each Purchaser, an executed counterpart of the Guarantee and Collateral Agreement, and the Company shall have delivered, or caused to be delivered, to the Collateral Agent any possessory collateral required to be delivered at the closing by the Guarantee and Collateral Agreement (in each case, except as set forth in Section 6).

2

    **(e)**    **Representations and Warrantie**s.  Each of the representations and warranties of the Company set forth in <u>Section 5</u> of this Agreement and in any other Note Documentation shall be true and correct.

    **(f)**    **No Default; No Material Adverse Effect; Omnibus Agreement.**

    (i)    The Company shall have performed and complied with all agreements and conditions contained in this Agreement required to be performed or complied with by it prior to or at the Closing.  Before and after giving effect to the issue and sale of the Closing Notes, no Default or Event of Default shall have occurred and be continuing.

    (ii)    Since December 31, 2021, there has not been a Material Adverse Effect, and no event or circumstance has occurred that could reasonably be expected to have a Material Adverse Effect.

    (iii)    The Omnibus Agreement and the Letter Agreement are in full force and effect;

    **(g)**    **Certificates**.

    (i)    The Company shall have delivered to the Collateral Agent an officer's certificate, certifying satisfaction of the conditions precedent specified in <u>Sections 4.1(e)</u> and <u>4.1</u>(f).

    (ii)    The Company shall have delivered to the Collateral Agent a certificate of its secretary or assistant secretary, dated the date of the Closing, certifying as to (i) the resolutions attached thereto and other corporate proceedings relating to the authorization, execution and delivery of the Closing Notes, this Agreement, the Assignment Agreement and the Guarantee and Collateral Agreement, as applicable, (ii) its organizational documents as then in effect, (iii) a customary certificate of incumbency and specimen signatures and (iv) a good standing certificate from its jurisdiction of incorporation or organization, as applicable.

    Section 4.2.    <u>**Conditions to Issuance of Post-Closing Notes**</u>.  The issuance of the Post-Closing Notes to a Purchaser and such Purchaser's obligations to purchase its Post-Closing Notes shall, unless waived by such Purchaser, be subject to the following at each issuance of Notes:

    **(a)**    **Representations and Warrantie**s.  Each of the representations and warranties of the Company set forth in <u>Section 5</u> of this Agreement and in any other Note Documentation shall be true and correct.

    **(b)**    **No Default; No Material Adverse Effect; Omnibus Agreement.**

    (i)    The Company shall have performed and complied with all agreements and conditions contained in this Agreement required to be performed or complied with by it prior to or at the Closing.  Before and after giving effect to the issue and sale of the Post-Closing Notes, no Default or Event of Default shall have occurred and be continuing.

    (ii)    Since December 31, 2021, there has not been a Material Adverse Effect, and no event or circumstance has occurred that could reasonably be expected to have a Material Adverse Effect.

    (iii)    The Omnibus Agreement and the Letter Agreement are in full force and effect.

3

**Section 5.**     **Representations and Warranties of the Company**.  The Company represents and warrants, on behalf of itself and each Guarantor, to each Purchaser that:

Section 5.1.     Organization; Power and Authority.  The Company and each Guarantor (i) is a corporation or limited liability company, as applicable, duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, and (ii) is duly qualified as a foreign corporation or limited liability company, as applicable, and is in good standing in each jurisdiction in which such qualification is required by law, other than, in the case of this clause (ii), those jurisdictions as to which the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  The Company has the corporate or other applicable organizational power and authority to own or hold under lease (or has other rights to use) the property and assets necessary and/or advisable to transact its business, to transact the business it transacts and proposes to transact, to execute and deliver this Agreement and the other Note Documentation and to perform the provisions hereof and thereof.

Section 5.2.     Solvency.  Immediately before and immediately after the consummation of the transaction hereby, (i) the fair saleable value of the Company's and the Guarantors' assets exceeds the amount that will be required to be paid on or in respect of the Company's and the Guarantors' debts and other liabilities (including contingent liabilities) as they mature, (ii) the Company's and the Guarantors' assets do not constitute unreasonably small capital to carry on its business as now conducted and as proposed to be conducted including its capital needs taking into account the particular capital requirements of the business conducted by the Company and the Guarantors, consolidated and projected capital requirements and capital availability thereof, and (iii) the current cash flow of the Company and the Guarantors, together with the proceeds the Company and the Guarantors would receive, were it to liquidate all of its assets, after taking into account all anticipated uses of the cash, would be sufficient to pay all amounts on or in respect of its debts and other liabilities (including contingent liabilities) when such amounts are required to be paid.  Neither the Company nor the Guarantors intends to incur debts beyond its ability to pay such debts and other liabilities (including contingent liabilities) as they mature (taking into account the timing and amounts of cash to be payable on or in respect of its debts and other liabilities (including contingent liabilities).  The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

Section 5.3.     Authorization, Etc.  This Agreement, the Guarantee and Collateral Agreement, the Notes and the other Note Documentation have been duly authorized by all necessary corporate action on the part of the Company and the Guarantors, and this Agreement, the Guarantee and Collateral Agreement, the Notes and the other Note Documentation constitute (or, when entered into, will constitute) legal, valid and binding obligations of the Company enforceable against the Company and the Guarantors in accordance with their respective terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 5.4.     Non-Violation.

**(a)**     Neither (i) the certificate of incorporation, by-laws or other organizational documents of the Company or any Guarantor, (ii) any provision of any existing mortgage, trust deed, contract, license, franchise, concession or agreement or any other contractual obligation by which the Company or any Guarantor or any of their respective property or assets is bound nor (iii) any law, regulation, judgment, injunction or other order or award of any judicial, administrative, governmental or other authority or of any arbitrator binding on the Company or any Guarantor conflicts or would conflict

4

with or be contravened in any respect by the execution and delivery of this Agreement or would conflict with or be contravened by the Company's or any Guarantor's performance or observance of any of the Note Documentation, except, in the case of clauses (ii) and (iii) above, for any such conflict or contravention that has not had, and could not (either individually or in the aggregate) reasonably be expected to have, a Material Adverse Effect.

**(b)** No consent, approval or authorization of, or registration, filing or declaration with, any Governmental Authority is required in connection with the execution, delivery or performance by the Company or any Guarantor of this Agreement or the Notes (in the case of the Company) or any other Note Documentation to which it is a party (including the Guarantee and Collateral Agreement).

**(c)** Neither the Company nor any of its Subsidiaries is (i) in violation of any order, judgment, decree or ruling of any court, any arbitrator of any kind or any Governmental Authority or (ii) in violation of any applicable law, ordinance, rule or regulation of any Governmental Authority, which violation would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**(d)** Neither the Company nor any Subsidiary of the Company, nor, to the knowledge of the Company and its Subsidiaries, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in a Designated Jurisdiction. The Company and its Subsidiaries have conducted their businesses in compliance in all material respects with all applicable Sanctions and have instituted and maintained policies and procedures designed to promote and achieve compliance with such Sanctions.

**(e)** The Company and its Subsidiaries and, to the knowledge of the Company and its Subsidiaries, their Affiliates, officers and directors have conducted their business in compliance in all material respects with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other applicable anti-corruption legislation in other jurisdictions and with all applicable Sanctions, and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws and Sanctions.

Section 5.5.    Title to Property. The Company and each Guarantor has good title to, and is the record and beneficial owner of, the Collateral pledged by it pursuant to the Guarantee and Collateral Agreement free and clear of all Liens other than Permitted Liens.

Section 5.6.    Existing Indebtedness; Restrictions on Indebtedness and Liens.

**(a)** The Company is not in default and no waiver of default is currently in effect, under any agreement governing any such Indebtedness and no event or condition exists with respect to any such Indebtedness that would permit (or that with notice or the lapse of time, or both, would permit) one or more Persons to cause such Indebtedness to become due and payable before its stated maturity or before its regularly scheduled dates of payment.

**(b)** The Company is not a party to, or otherwise subject to any provision contained in, any instrument evidencing Indebtedness of the Company, any agreement relating thereto or any other agreement (including its charter or any other organizational document) which would (i) prohibit the incurrence of Indebtedness hereunder or the granting of Liens on the Collateral pursuant to the

5

Guarantee and Collateral Agreement or (ii) result in the creation of any Liens on the Collateral (other than the Liens granted pursuant to the Guarantee and Collateral Agreement).

Section 5.7.    <u>Disclosure; No Material Adverse Effect</u>.  This Agreement, the financial statements of the Company, dated as of December 31, 2021, and the documents, certificates or other writings delivered to the Purchasers by or on behalf of the Company prior to the Closing taken as a whole, do not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not misleading in light of the circumstances under which they were made.  Since December 31, 2021, there has not been a Material Adverse Effect, and no event or circumstance has occurred that could reasonably be expected to have a Material Adverse Effect.  The Omnibus Agreement and the Letter Agreement are in full force and effect.

Section 5.8.    <u>Capital Structure</u>.  Schedule 5.8 sets forth a complete and correct list of all Subsidiaries of the Company, showing, as to each Subsidiary, whether each such Subsidiary is a corporation, limited or general partnership or limited liability company and the jurisdiction of organization of each such Subsidiary and, in the case of any Subsidiary which is a partnership or limited liability company, its general partners and managing members, respectively.  All of the outstanding shares of capital stock or other Equity Interests of each Subsidiary shown on Schedule 5.8 have been validly issued, are fully paid and non-assessable and are owned by the Company or a Subsidiary of the Company free and clear of any Lien other than Liens in favor of the Collateral Agent.  No Subsidiary of the Company is subject to any legal, regulatory, contractual or other restriction (other than customary limitations imposed by corporate law or similar statutes) restricting the ability of such Subsidiary to pay dividends out of profits or make any other similar distributions the Company or any of its Subsidiaries that owns outstanding shares of capital stock or other Equity Interests of such Subsidiary.

Section 5.9.    <u>Former Stream Subsidiaries</u>.  Schedule 5.9 sets forth a complete and correct list of all Former Stream Subsidiaries, showing, as to each Former Stream Subsidiary, whether each such Former Stream Subsidiary is a corporation, limited or general partnership or limited liability company and the jurisdiction of organization of each such Former Stream Subsidiary and, in the case of any Former Stream Subsidiary which is a partnership or limited liability company, its general partners and managing members, respectively.

Section 5.10.    <u>Taxes</u>.  The Company and its Subsidiaries have filed all material Tax returns that are required to have been filed in any jurisdiction, and have paid all Taxes shown to be due and payable on such returns and all other Taxes payable by them, to the extent such Taxes have become due and payable and before they have become delinquent, except (a) for any Taxes the amount, applicability or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which the Company or such Subsidiary, as the case may be, has established adequate reserves in accordance with GAAP or (b) to the extent the failure to do so would not have, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.11.    <u>Investment Company Act; Margin Regulations</u>.  Neither the Company nor any Subsidiary of the Company is required to register under, or is subject to regulation under, the Investment Company Act of 1940.  No part of the proceeds from the sale of the Notes hereunder will be used, directly or indirectly, for the purpose of buying or carrying any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System (12 CFR 221).

Section 5.12.    <u>Insurance</u>.  The Company and its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which they are engaged; all policies of insurance and any fidelity or surety bonds insuring the Company or its Subsidiaries or their respective businesses, assets, employees, officers

6

and directors are in full force and effect; the Company and its Subsidiaries are in compliance with the terms of such policies and instruments in all material respects; there are no claims by the Company or any of its Subsidiaries under any such policy or instrument as to which any insurance company is denying liability or defending under a reservation of rights clause; neither the Company nor any Subsidiary of the Company has been refused any insurance coverage sought or applied for; and neither the Company nor any Subsidiary of the Company has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect.

Section 6.    **Post-Closing Items**.  The Company agrees to deliver to the Collateral Agent the items set forth on Schedule 6 hereto within the timeframe set forth therein, in each case, in form and substance reasonably acceptable to Collateral Agent.

Section 7.    **Payment and Prepayment of the Notes**.

Section 7.1.    Maturity; Payment of Interest.

**(a)**    The entire unpaid principal balance of each Note shall be due and payable on the Maturity Date.

**(b)**    The Company shall pay interest (computed on the basis of a 360-day year of twelve 30-day months) on (i) the unpaid balance of each Note at the rate of 3.0% per annum (the "**Rate**") from the date hereof, which interest shall be payable on the Maturity Date or upon any earlier date on which the Obligations are required to be paid in full (or in connection with any prepayment to the extent set forth in the following Section 7.2), and (ii) to the extent not paid when due, any overdue amount (whether principal, interest or otherwise), the Rate on such overdue amounts shall automatically increase to the Default Rate and shall be payable on demand by any holder.

Section 7.2.    Prepayments.  The Company may, at its option, upon notice as provided below, prepay without premium or penalty at any time all or any portion of the amount outstanding under the Notes, plus all accrued and unpaid interest thereon, plus all other amounts, costs, expenses and liquidated damages, if any, due in respect of the Notes.  The Company will give the Collateral Agent and the holders of the notes not less than thirty (30) days' prior written notice (which notice may be provided through an electronic portal to which each Noteholder has access) of each optional prepayment under this Section 7.2 unless the Collateral Agent or the Required Purchasers agrees to a shorter time period (provided that such shorter time period shall be no fewer than ten (10) days' prior written notice, in which case, notwithstanding anything to the contrary in this Section 7.2, the holders of the Notes shall have until five (5) days' following the date of such notice to make an Equity Election (as defined below)).  Each such notice shall specify such date of such prepayment (which shall be a Business Day), the aggregate principal amount of the Notes to be prepaid on such date, the principal amount of each Note held by each holder to be prepaid (determined in accordance with Section 7.3), the interest to be paid on the prepayment date with respect to such principal amount being prepaid and any other amounts, costs, expenses or liquidated damages due.  Any notice delivered pursuant to this Section 7.2 may be conditioned upon the effectiveness of other credit facilities or the receipt of proceeds or the issuance of debt or the occurrence of any other transaction, in which case, such notice may be revoked if such condition is not satisfied on or prior to the contemplated prepayment by written notice to the Collateral Agent and the holders of the notes (which notice may be provided through an electronic portal to which each Noteholder has access).  A holder, may, at any time prior to the date that it is fifteen (15) days following the date of such notice, by written notice to the Company, elect to accept such prepayment or elect to convert such outstanding amounts to equity in accordance with Section 7.6 of this Agreement (an "**Equity Election**").  Any such conversion to equity shall occur date for prepayment set forth in such

notice and shall be for an amount of equity that includes the amount of the prepayment that would otherwise have been made plus accrued and unpaid interest thereon. If a holder does not provide an election during such fifteen (15)-day period, such holder shall be deemed to have accepted prepayment and declined such conversion option.

Section 7.3.    <u>Allocation of Partial Prepayments</u>. In the case of each partial prepayment offer with respect to the Notes pursuant to <u>Section 7.2</u>, the principal amount of the Notes that are subject to such prepayment offer shall be allocated among all of the Notes at the time outstanding in proportion, as nearly as practicable, to the respective unpaid principal amounts thereof not theretofore called for prepayment.

Section 7.4.    <u>Maturity; Surrender, Interest on Prepayments, Etc.</u> Each prepayment of Notes made pursuant to this <u>Section 7</u> shall be without premium or penalty and shall be accompanied by all accrued and unpaid interest in the amount so prepaid and any other amounts, costs, expenses or liquidated damages due. In the case of each such prepayment, the principal amount of each Note to be prepaid shall mature and become due and payable on the date fixed for such prepayment (subject to revocation or deferral in the case of a conditional notice of prepayment), together with interest on such principal amount accrued to such date. Any Note paid or prepaid in full shall be surrendered to the Company and cancelled and shall not be reissued, and no Note shall be issued in lieu of any prepaid principal amount of any Note.

Section 7.5.    <u>Payments Due on Non-Business Days</u>. Anything in the Note Documentation to the contrary notwithstanding, any payment under this Note that is due on a date that is not a Business Day shall be made on the next succeeding Business Day and shall include the additional days elapsed in the computation of interest payable on such next succeeding Business Day.

Section 7.6.    <u>Conversion</u>.

**(a)**    *Conversion*. At the option of any holder of a Note at any time prior to 5:00 p.m., New York City time on the date that is thirty (30) days prior to the Maturity Date, all or any portion of the principal amount outstanding under such Note (such principal amount or a portion thereof being converted, the "**Converted Amount**"), plus all accrued and unpaid interest on the Converted Amount (together, the "**Accrued Value**"), may be converted ("**Conversion**") into Common Stock (the "**Conversion Shares**") by surrendering such Note (or an indemnification undertaking with respect to such Note in the case of its loss, theft or destruction) to the Company at its then principal executive offices, together with a notice substantially in the form attached hereto as <u>Exhibit A</u> (a "**Notice of Conversion Request**"), duly completed (including the principal amount of such Note being converted) and executed.

The Conversion shall be effected at a conversion price per share (the "**Conversion Price**") initially equal to $1.50 (the "**Initial Conversion Price**"). The Conversion Price is subject to adjustment as provided in <u>Section 7.6(e)</u> through <u>Section 7.6(j)</u>.

In the event of any dispute as to the calculation of the number of Conversion Shares to be issued upon Conversion or the principal amount of the Notes that may be converted by a particular holder pursuant to this <u>Section 7.6(a)</u>, and the Company's calculations shall be binding on the parties hereto absent manifest error. To the extent not converted, the principal amount of the Notes will continue to accrue interest pursuant to <u>Section 7.1(b)</u> of this Agreement.

The Company shall not be required to issue a fractional Conversion Share upon Conversion of any Note by any holder. As to any fraction of a Conversion Share that such holder would otherwise be entitled to receive upon Conversion, the Company shall pay to such holder an amount in cash (by delivery of a

certified or official bank check or by wire transfer of immediately available funds) equal to the product of (I) such fraction multiplied by (II) the Fair Market Value of one Conversion Share on the Conversion Date.

Unless the whole principal amount of a Note has been converted, the Company shall, at the time of delivery of the certificate or certificates representing the Conversion Shares, deliver to the converting holder a new Note evidencing the unconverted principal amount of such Note.  Such new Note shall in all other respects be identical to the original Note.  The original Note shall be promptly cancelled.

        **(b)**    *Notice of Conversion*.  No later than five (5) Business Days after any Conversion, the Company shall deliver to each relevant holder the applicable Conversion Shares and a notice substantially in the form of <u>Exhibit B</u> hereto with respect to all Note(s) and/or all portions thereof, as applicable, converted by such holder in such Conversion.

        **(c)**    *Conditional Conversion*.  Notwithstanding any other provision hereof, if a Conversion of any portion of a Note is to be made in connection with a public offering or a sale of the Company (pursuant to a merger, sale of stock, or otherwise), such Conversion may at the election of the holder thereof be conditioned upon the consummation of such transaction, in which case such Conversion shall not be deemed to be effective until immediately prior to the consummation of such transaction.

        **(d)**    *Reservation of Shares*.  For as long as any Note is outstanding, the Company shall at all times reserve and keep available out of its authorized but unissued Common Stock or other securities constituting Conversion Shares, solely for the purpose of issuance upon Conversion, the maximum number of Conversion Shares issuable upon Conversion of the aggregate principal amount of the Notes outstanding, and the par value per Conversion Share shall at all times be less than or equal to the applicable Conversion Price.  The Company shall not increase the par value of any Conversion Shares receivable upon Conversion above the Conversion Price then in effect, and shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock upon Conversion.

        **(e)**    *Adjustment to Conversion Price*.  In order to prevent dilution of the conversion rights of the Note holders, the Conversion Price shall be subject to adjustment (an "**Adjustment**") from time to time as provided in this <u>Section 7.6</u> (in each case, after taking into consideration any prior adjustments pursuant to this <u>Section 7.6</u>); *provided* that there shall be no adjustment to the Conversion Price, as provided in this <u>Section 7.6</u>, unless and until such Adjustment, together with any previous Adjustments to the Conversion Price which would otherwise have resulted in an Adjustment were it not for this proviso, would require an increase or decrease of at least 1% of the Conversion Price at the time of such Adjustment, in which event such Adjustment and all such previous Adjustments shall immediately occur.

        **(f)**    *Adjustment to Conversion Price Upon Issuance of Common Stock*.  Except as provided in <u>Section 7.6(g)</u> and except in the case of an event described in either <u>Section 7.6(i)</u> or <u>Section 7.6(j)</u>, if the Company shall, at any time or from time to time after the date hereof, issue or sell, or in accordance with <u>Section 7.6(h)</u> is deemed to have issued or sold, any shares of Common Stock without consideration or for consideration per share less than the Conversion Price in effect immediately prior to such issuance or sale (or deemed issuance or sale), or for consideration less than the Fair Market Value of the Common Stock at the time of the issuance, then immediately upon such issuance or sale (or deemed issuance or sale), the Conversion Price in effect immediately prior to such issuance or sale (or deemed issuance or sale) shall be reduced (and in no event increased) to a Conversion Price equal to the quotient obtained by dividing:

9

(i)        the sum of (A) the product obtained by multiplying the Common Stock Deemed Outstanding immediately prior to such issuance or sale (or deemed issuance or sale) by the Conversion Price then in effect plus (B) the aggregate consideration, if any, received by the Company upon such issuance or sale (or deemed issuance or sale); by

(ii)       the sum of (A) the Common Stock Deemed Outstanding immediately prior to such issuance or sale (or deemed issuance or sale) plus (B) the aggregate number of shares of Common Stock issued or sold (or deemed issued or sold) by the Company in such issuance or sale (or deemed issuance or sale).

**(g)**        *Exceptions To Adjustment Upon Issuance of Common Stock.*  Anything herein to the contrary notwithstanding, there shall be no adjustment to the Conversion Price with respect to any Excluded Issuance.

**(h)**        *Effect of Certain Events on Adjustment to Conversion Price.*  For purposes of determining the adjusted Conversion Price under Section 7.6(f) hereof, the following shall be applicable:

(i)        Issuance of Options.  If the Company shall, at any time or from time to time after the date hereof, in any manner grant or sell (whether directly or by assumption in a merger or otherwise) any Options, whether or not such Options or the right to convert or exchange any Convertible Securities issuable upon the exercise of such Options are immediately exercisable, and the price per share (determined as provided in this paragraph and in Section 7.6(h)(v)) for which Common Stock is issuable upon the exercise of such Options or upon the conversion or exchange of Convertible Securities issuable upon the exercise of such Options is less than the Conversion Price in effect immediately prior to the time of the granting or sale of such Options, then the total maximum number of shares of Common Stock issuable upon the exercise of such Options or upon conversion or exchange of the total maximum amount of Convertible Securities issuable upon the exercise of such Options shall be deemed to have been issued as of the date of granting or sale of such Options (and thereafter shall be deemed to be outstanding for purposes of adjusting the Conversion Price under Section 7.6(f)), at a price per share equal to the quotient obtained by dividing (A) the sum (which sum shall constitute the applicable consideration received for purposes of Section 7.6(f)) of (x) the total amount, if any, received or receivable by the Company as consideration for the granting or sale of all such Options, plus (y) the minimum aggregate amount of additional consideration payable to the Company upon the exercise of all such Options, plus (z), in the case of such Options which relate to Convertible Securities, the minimum aggregate amount of additional consideration, if any, payable to the Company upon the issuance or sale of all such Convertible Securities and the conversion or exchange of all such Convertible Securities, by (B) the total maximum number of shares of Common Stock issuable upon the exercise of all such Options or upon the conversion or exchange of all Convertible Securities issuable upon the exercise of all such Options.  Except as otherwise provided in Section 7.6(h)(iii), no further adjustment of the Conversion Price shall be made upon the actual issuance of Common Stock or of Convertible Securities upon exercise of such Options or upon the actual issuance of Common Stock upon conversion or exchange of Convertible Securities issuable upon exercise of such Options.

(ii)       Issuance of Convertible Securities.  If the Company shall, at any time or from time to time after the date hereof, in any manner grant or sell (whether directly or by assumption in a merger or otherwise) any Convertible Securities, whether or not the right to convert or exchange any such Convertible Securities is immediately exercisable, and the price per share (determined as provided in this paragraph and in Section 7.6(h)(v)) for which Common Stock is

issuable upon the conversion or exchange of such Convertible Securities is less than the Conversion Price in effect immediately prior to the time of the granting or sale of such Convertible Securities, then the total maximum number of shares of Common Stock issuable upon conversion or exchange of the total maximum amount of such Convertible Securities shall be deemed to have been issued as of the date of granting or sale of such Convertible Securities (and thereafter shall be deemed to be outstanding for purposes of adjusting the Conversion Price pursuant to Section 7.6(f)), at a price per share equal to the quotient obtained by dividing (A) the sum (which sum shall constitute the applicable consideration received for purposes of Section 7.6(f)) of (x) the total amount, if any, received or receivable by the Company as consideration for the granting or sale of such Convertible Securities, plus (y) the minimum aggregate amount of additional consideration, if any, payable to the Company upon the conversion or exchange of all such Convertible Securities, by (B) the total maximum number of shares of Common Stock issuable upon the conversion or exchange of all such Convertible Securities.  Except as otherwise provided in Section 7.6(h)(iii), no further adjustment of the Conversion Price shall be made upon the actual issuance of Common Stock upon conversion or exchange of such Convertible Securities or the issue or sale of Convertible Securities upon exercise of any Options to purchase any such Convertible Securities for which adjustments of the Conversion Price have been made pursuant to the other provisions of this Section 7.6(h).

(iii)    Change in Terms of Options or Convertible Securities.  Upon any change in any of (A) the total amount received or receivable by the Company as consideration for the granting or sale of any Options or Convertible Securities referred to in Section 7.6(h)(i) or Section 7.6(h)(ii) hereof, (B) the minimum aggregate amount of additional consideration, if any, payable to the Company upon the exercise of any Options or upon the issuance, conversion or exchange of any Convertible Securities referred to in Section 7.6(h)(i) or Section 7.6(h)(ii) hereof, (C) the rate at which Convertible Securities referred to in Section 7.6(h)(i) or Section 7.6(h)(ii) hereof are convertible into or exchangeable for Common Stock, or (D) the maximum number of shares of Common Stock issuable in connection with any Options referred to in Section 7.6(h)(i) hereof or any Convertible Securities referred to in Section 7.6(h)(ii) hereof (in each case, other than in connection with an Excluded Issuance), then (whether or not the original issuance or sale of such Options or Convertible Securities resulted in an adjustment to the Conversion Price pursuant to this Section 7.6) the Conversion Price in effect at the time of such change shall be adjusted or readjusted, as applicable, to the Conversion Price which would have been in effect at such time pursuant to the provisions of this Section 7.6 had such Options or Convertible Securities still outstanding provided for such changed consideration, conversion rate or maximum number of shares, as the case may be, at the time initially granted, issued or sold, but only if as a result of such adjustment or readjustment the Conversion Price then in effect is reduced.

(iv)    Treatment of Expired or Terminated Options or Convertible Securities.  Upon the expiration or termination of any unexercised Option (or portion thereof) or any unconverted or unexchanged Convertible Security (or portion thereof) for which any adjustment (either upon its original issuance or upon a revision of its terms) was made pursuant to this Section 7.6 (including without limitation upon the redemption or purchase for consideration of all or any portion of such Option or Convertible Security by the Company), the Conversion Price then in effect hereunder shall forthwith be changed pursuant to the provisions of this Section 7.6 to the Conversion Price which would have been in effect at the time of such expiration or termination had such unexercised Option (or portion thereof) or unconverted or unexchanged Convertible Security (or portion thereof), to the extent outstanding immediately prior to such expiration or termination, never been issued.

(v)    <u>Calculation of Consideration Received.</u>  If the Company shall, at any time or from time to time after the date hereof, issue or sell, or is deemed to have issued or sold in accordance with <u>Section 7.6(h)</u>, any shares of Common Stock, Options or Convertible Securities: (A) for cash, the consideration received therefor shall be deemed to be the net amount received by the Company therefor; (B) for consideration other than cash, the amount of the consideration other than cash received by the Company shall be the fair value of such consideration, except where such consideration consists of marketable securities, in which case the amount of consideration received by the Company shall be the market price (as reflected on any securities exchange, quotation system or association or similar pricing system covering such security) for such securities as of the end of business on the date of receipt of such securities; (C) for no specifically allocated consideration in connection with an issuance or sale of other securities of the Company, together comprising one integrated transaction, the amount of the consideration therefor shall be deemed to be the fair value of such portion of the aggregate consideration received by the Company in such transaction as is attributable to such shares of Common Stock, Options or Convertible Securities, as the case may be, issued in such transaction; or (D) to the owners of the non-surviving entity in connection with any merger in which the Company is the surviving corporation, the amount of consideration therefor shall be deemed to be the fair value of such portion of the net assets and business of the non-surviving entity as is attributable to such shares of Common Stock, Options or Convertible Securities, as the case may be, issued to such owners.  The net amount of any cash consideration and the fair value of any consideration other than cash or marketable securities shall be determined in good faith by the Board

(vi)    <u>Record Date.</u>  For purposes of any adjustment to the Conversion Price or the number of Conversion Shares in accordance with this <u>Section 7.6</u>, in case the Company shall take a record of the holders of its Common Stock for the purpose of entitling them (A) to receive a dividend or other distribution payable in Common Stock, Options or Convertible Securities or (B) to subscribe for or purchase Common Stock, Options or Convertible Securities, then such record date shall be deemed to be the date of the issue or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be; *provided* that, if before the distribution to its holders of Common Stock the Company legally abandons its plan to pay or deliver such dividend, distribution, subscription or purchase rights, then thereafter no adjustment shall be required by the taking of such record and any such adjustment previously made in respect thereof shall be rescinded and annulled.

(vii)    <u>Treasury Shares.</u>  The number of shares of Common Stock outstanding at any given time shall not include shares owned or held by or for the account of the Company or any of its wholly-owned Subsidiaries, and the disposition of any such shares (other than the cancellation or retirement thereof or the transfer of such shares among the Company and its wholly-owned Subsidiaries) shall be considered an issue or sale of Common Stock for the purpose of this <u>Section 7.6</u>.

**(i)**    *Adjustment to Conversion Price and Conversion Shares Upon Dividend, Subdivision or Combination of Common Stock.*  If the Company shall, at any time or from time to time after the date hereof, (i) pay a dividend or make any other distribution upon the Common Stock or any other capital stock of the Company payable in shares of Common Stock or in Options or Convertible Securities, or (ii) subdivide (by any stock split, recapitalization or otherwise) its outstanding shares of Common Stock into a greater number of shares, the Conversion Price in effect immediately prior to any such dividend, distribution or subdivision shall be proportionately reduced.  If the Company at any time combines (by combination, reverse stock split or otherwise) its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior to such combination shall be

proportionately increased.  Any adjustment under this <u>Section 7.6(i)</u> shall become effective at the close of business on the date the dividend, subdivision or combination becomes effective.

(**j**)    *Adjustment to Conversion Price and Conversion Shares Upon Reorganization, Reclassification, Consolidation or Merger.*  In the event of any (i) capital reorganization of the Company, (ii) reclassification of the stock of the Company (other than a change in par value or from par value to no par value or from no par value to par value or as a result of a stock dividend or subdivision, split-up or combination of shares), (iii) consolidation or merger of the Company with or into another Person, (iv) sale of all or substantially all of the Company's assets to another Person or (v) other similar transaction (other than any such transaction covered by <u>Section 7.6(i)</u>), in each case which entitles the holders of Common Stock to receive (either directly or upon subsequent liquidation) stock, securities or assets with respect to or in exchange for Common Stock, each Note shall, immediately after such reorganization, reclassification, consolidation, merger, sale or similar transaction, remain outstanding and shall thereafter, in lieu of or in addition to (as the case may be) the number of Conversion Shares then issuable upon Conversion thereof, be convertible into the kind and number of shares of stock or other securities or assets of the Company or of the successor Person resulting from such transaction to which the holder of such Note would have been entitled upon such reorganization, reclassification, consolidation, merger, sale or similar transaction if such holder had converted such Note in full immediately prior to the time of such reorganization, reclassification, consolidation, merger, sale or similar transaction and acquired the applicable number of Conversion Shares then issuable hereunder as a result of such Conversion; and, in such case, appropriate adjustment (in form and substance satisfactory to such holder) shall be made with respect to the rights of each Note holder with respect thereto to insure that the provisions of this <u>Section 7.6</u> shall thereafter be applicable, as nearly as possible, to the rights of such holders in relation to any shares of stock, securities or assets thereafter acquirable upon Conversion of such Note (including, in the case of any consolidation, merger, sale or similar transaction in which the successor or purchasing Person is other than the Company, an immediate adjustment in the Conversion Price to the value per share for the Common Stock reflected by the terms of such consolidation, merger, sale or similar transaction, if the value so reflected is less than the Conversion Price in effect immediately prior to such consolidation, merger, sale or similar transaction).  The provisions of this <u>Section 7.6(j)</u> shall similarly apply to successive reorganizations, reclassifications, consolidations, mergers, sales or similar transactions.  The Company shall not effect any such reorganization, reclassification, consolidation, merger, sale or similar transaction unless, prior to the consummation thereof, the successor Person (if other than the Company) resulting from such reorganization, reclassification, consolidation, merger, sale or similar transaction, shall assume, by written instrument substantially similar in form and substance to this Agreement and the Notes and reasonably satisfactory to the Collateral Agent, the obligation to deliver to each Note holder such shares of stock, securities or assets, which, in accordance with the foregoing provisions, such holder shall be entitled to receive upon Conversion of each of its Notes.  With respect to any corporate event or other transaction contemplated by the provisions of this <u>Section 7.6(j)</u>, any Note holder shall have the right to elect prior to the consummation of such event or transaction, to give effect to the conversion rights contained in <u>Section 7.6(a)</u> instead of giving effect to the provisions contained in this <u>Section 7.6(j)</u> with respect to any of its Notes.

(**k**)    *Reserved*

(**l**)    *Certificate as to Adjustment.*

(i)    As promptly as reasonably practicable following any adjustment of the Conversion Price, but in any event not later than two (2) Business Days thereafter, the Company shall furnish to the Collateral Agent a certificate of an executive officer setting forth in reasonable detail such adjustment and the facts upon which it is based and certifying the calculation thereof.

(ii)    As promptly as reasonably practicable following the receipt by the Company of a written request by a Note holder, but in any event not later than three (3) Business Days thereafter, the Company shall furnish to the Collateral Agent a certificate of an executive officer certifying the Conversion Price then in effect and the type and amount of securities or assets then issuable upon Conversion.

(m)    *Purchase Rights*.  In addition to any adjustments pursuant to this Section 7.6 set forth above, if at any time the Company grants, issues or sells any shares of Common Stock, Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to all or substantially of the record holders of Common Stock (the "**Purchase Rights**"), then each holder of a Note shall be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the holder would have acquired if the holder had held the number of Conversion Shares acquirable upon complete Conversion of such Note immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.  Anything herein to the contrary notwithstanding, the holder shall not be entitled to the Purchase Rights granted herein with respect to any Excluded Issuance.

(n)    *Stockholders' Agreement*.  All Conversion Shares issuable upon Conversion are and shall become subject to, and have the benefit of, the Stockholders' Agreement, and each Note holder shall be required, for so long as such holder holds any Conversion Shares, to become and remain a party to the Stockholders' Agreement.

**Section 8.**    **Affirmative Covenants.**  The Company, on behalf of itself and each Guarantor, covenants that so long as any of the Notes are outstanding and until the Obligations are paid in full (other than contingent obligations not yet due and payable):

Section 8.1.    Existence, Etc.  Subject to Section 9.1, the Company and each Guarantor will at all times preserve and keep its corporate or other existence in full force and effect.

Section 8.2.    Maintenance of Insurance.  The Company and each Guarantor shall, and shall cause its respective Subsidiaries, to maintain or cause to be maintained, such insurance coverage with respect to liabilities, losses or damage in respect of the assets, properties and business of the Company and its Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses (as determined in good faith by the Company), in each case in such amounts, with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons.

Section 8.3.    Compliance with Laws.  The Company and each Guarantor shall comply, and shall cause its respective Subsidiaries to comply, with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority, except to the extent the failure of the Company or any of its Subsidiaries to comply could not reasonably be expected to have a Material Adverse Effect.

Section 8.4.    Information.  The Company and each Guarantor shall, and shall cause its respective Subsidiaries to, promptly deliver to the Collateral Agent any information reasonably requested regarding the business, financial or corporate affairs of the Company and its Subsidiaries, including any annual audited financial statements and unaudited quarterly financial statements that may be so requested by the Collateral Agent or the Required Purchasers.

Section 8.5.    Further Assurances.  The Company and each Guarantor shall, and shall cause its respective Subsidiaries to, execute any and all further guarantees and other documents, financing

14

statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law or the Guarantee and Collateral Agreement or that the Collateral Agent or the Required Purchasers may reasonably request and that are necessary or proper to carry out more effectively the purposes of the Note Documentation.

Section 8.6.    <u>Maintenance of Properties</u>.  The Company and each Guarantor shall, and shall cause its respective Subsidiaries to, (a) maintain, preserve and protect all of its properties and equipment necessary in the operation of its business, ordinary wear and tear, force majeure, casualty events and transactions not prohibited by this Agreement excepted, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) use the standard of care typical in the industry in the operation and maintenance of its facilities, taken as a whole.

Section 8.7.    <u>Notices</u>.  The Company shall deliver to the Collateral Agent promptly, and in any event within five (5) Business Days, after a Responsible Officer becoming aware of (or such later date as the Collateral Agent may agree), written notice of the existence of any (i) Default or Event of Default, (ii) event or circumstance that has had, or that would reasonably be expected to have, a Material Adverse Effect or (iii) any material litigation or proceedings that are instituted against the Company or its Subsidiaries or any of their respective assets or any litigation related to this Agreement, the other Note Documents or the transactions contemplated hereby, in each case, specifying the nature and period of existence thereof and what action the Company is taking or proposes to take with respect thereto.

Notwithstanding anything to the contrary in this <u>Section 8</u>, the Company shall not be required to provide any information pursuant to <u>Section 8.4</u>: (a) that would, or would reasonably be expected to, breach a confidentiality or similar obligation binding on the Company (other than under any agreement with an affiliate of the Company or any agreement entered into for purposes of avoiding such disclosure); (b) in respect of which disclosure is prohibited by any applicable law, rule or regulation or court order; or (c) that is subject to attorney-client privilege or similar privilege or constitutes attorney work product.

Section 8.8.    <u>Notices of Certain Events</u>.  In the event:

(a)    that the Company shall take a record of the holders of its Common Stock (or other capital stock or securities at the time issuable upon Conversion) for the purpose of entitling or enabling them to receive any dividend or other distribution, to vote at a meeting (or by written consent), to receive any right to subscribe for or purchase any shares of capital stock of any class or any other securities, or to receive any other security; or

(b)    of any capital reorganization of the Company, any reclassification of the Common Stock of the Company, any consolidation or merger of the Company with or into another Person, or sale of all or substantially all of the Company's assets to another Person; or

(c)    of the voluntary or involuntary dissolution, liquidation or winding-up of the Company;

then, and in each such case, the Company shall send or cause to be sent to the Collateral Agent at least twenty (20) days prior to the applicable record date or the applicable expected effective date, as the case may be, for the event, a written notice specifying, as the case may be, (A) the record date for such dividend, distribution, meeting or consent or other right or action, and a description of such dividend, distribution or other right or action to be taken at such meeting or by written consent, or (B) the effective

15

date on which such reorganization, reclassification, consolidation, merger, sale, dissolution, liquidation or winding-up is proposed to take place, and the date, if any is to be fixed, as of which the books of the Company shall close or a record shall be taken with respect to which the holders of record of Common Stock (or such other capital stock or securities at the time issuable upon Conversion) shall be entitled to exchange their shares of Common Stock (or such other capital stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, sale, dissolution, liquidation or winding-up, and the amount per share and character of such exchange applicable to the Conversion Shares.

Section 8.9.    Notices of Common Stock Issuances.  Whenever following the date hereof, the Company shall issue or sell, or in accordance with Section 7.6(h) is deemed to have issued or sold, any shares of Common Stock, the Company shall prepare a certificate signed by an executive officer setting forth, in reasonable detail, the number of shares issued or sold, or deemed issued or sold, the amount and the form of the consideration received by the Company and the method of computation of such amount and shall cause copies of such certificate to be mailed to the Collateral Agent at the address specified in Section 17 hereof.

Section 8.10.    Valid Issuance of Conversion Shares; Payment of Taxes.  With respect to Conversion, the Company hereby represents, covenants and agrees:

(a)    All Conversion Shares issuable upon Conversion of any Note pursuant to the terms hereof shall be, upon issuance, and the Company shall take all such actions as may be necessary or appropriate in order that such Conversion Shares are, validly issued, fully paid and non-assessable, issued without violation of any preemptive or similar rights of any stockholder of the Company and free and clear of all Taxes, liens and charges.

(b)    The Company shall take all such actions as may be necessary to ensure that all such Conversion Shares are issued without violation by the Company of any applicable law or governmental regulation or any applicable requirements of any domestic securities exchange, if any, upon which shares of Common Stock or other securities constituting Conversion Shares may be listed at the time of such Conversion (except for official notice of issuance which shall be immediately delivered by the Company upon each such issuance).

(c)    The Company shall use its best efforts to cause the Conversion Shares, immediately upon such Conversion, to be listed on any domestic securities exchange, if any, upon which shares of Common Stock or other securities constituting Conversion Shares are listed at the time of such Conversion.

(d)    The Company shall pay all expenses in connection with, and all stamp, transfer, or similar Taxes and other governmental charges that may be imposed with respect to, the issuance or delivery of Conversion Shares upon Conversion; provided that the Company shall not be required to pay any Tax or governmental charge that may be imposed with respect to any applicable withholding or the issuance or delivery of the Conversion Shares to any Person other than the holder of the Note being converted, and no such issuance or delivery shall be made unless and until the Person requesting such issuance has paid to the Company the amount of any such Tax, or has established to the satisfaction of the Company that such Tax has been paid.

Section 9.    Negative Covenants.  The Company, on behalf of itself and each Guarantor, covenants that so long as any of the Notes are outstanding and until the Obligations are paid in full (other than contingent obligations not yet due and payable):

16

Section 9.1.    <u>Merger, Consolidation, Etc.</u>  Neither the Company nor any Guarantor shall, nor permit any of their respective Subsidiaries to, wind up, liquidate or dissolve its affairs, sell all or substantially all of its assets or consummate a merger, amalgamation or consolidation, unless (a) in the case of any Subsidiary of the Company, such Subsidiary merges, amalgamates, liquidates or otherwise transfers its assets to another Subsidiary of the Company or the Company (*provided* that, if such transaction involves a Material IP Subsidiary, the surviving entity or transferee shall be a Material IP Subsidiary, a Guarantor or the Company) and (b) in the case of the Company, (x) the successor formed by a merger, amalgamation or consolidation or the survivor of a merger, amalgamation or consolidation or the Person that acquires by conveyance, transfer or lease all or substantially all of the assets of the Company as an entirety, as the case may be, shall be a solvent corporation or limited liability company organized and existing under the laws of the United States or any state thereof (or the District of Columbia), and such corporation or limited liability company shall have executed and delivered to the Collateral Agent its assumption of the due and punctual performance and observance of each covenant and condition of this Agreement and the Notes and (y) immediately before and immediately after giving effect to such transaction or each transaction in any such series of transactions, no Default or Event of Default shall have occurred and be continuing.

Section 9.2.    <u>Liens</u>.  Neither the Company nor any Guarantor shall, nor permit any of their respective Subsidiaries to, directly or indirectly create, incur, assume or permit to exist (upon the happening of a contingency or otherwise) any Lien on or with respect to any of its property or assets, whether now owned or held or hereafter acquired, or any income or profits therefrom, or assign or otherwise convey any right to receive income or profits, except the following (collectively, the "**Permitted Liens**"):

(a)    Liens arising under the Note Documentation;

(b)    [Reserved].

(c)    Liens for Taxes not yet due or which are being contested in good faith and by appropriate proceedings in the circumstances, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business (i) which are not overdue for a period of more than thirty (30) days or (ii) which are being contested in good faith and by appropriate proceedings in the circumstances, if, in the case of this clause (ii), adequate reserves with respect thereto are maintained on the books of the applicable Person to the extent required in accordance with GAAP;

(e)    easements, rights-of-way, restrictions and other similar encumbrances affecting real property and other minor defects or irregularities in title and other similar encumbrances including the reservations, limitations, provisos and conditions, which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property of the Company or materially interfere with the ordinary conduct of the business of the Company;

(f)    statutory rights of set-off arising in the ordinary course of business;

(g)    with respect to any real property, immaterial title defects or irregularities that do not, individually or in the aggregate, materially impair the use of such real property;

(h)    non-exclusive licenses of intellectual property entered into in the ordinary course of business;

**(i)**        exclusive licenses of immaterial intellectual property entered into in the ordinary course of business;

**(j)**        Liens on any cash earnest money deposits or other escrow arrangements made in connection with any letter of intent or purchase agreement; and

**(k)**        Liens securing Indebtedness incurred under Section 9.3(d).

Section 9.3.        Indebtedness.  Neither the Company nor any Guarantor shall, nor permit any of their respective Subsidiaries to, directly or indirectly create, incur, assume, guarantee, or otherwise become directly or indirectly liable with respect to any Indebtedness, except:

**(a)**        Indebtedness incurred pursuant to this Agreement and the Notes;

**(b)**        Indebtedness outstanding on the date hereof that is listed on Schedule 9.3 hereto and any refinancings, refundings, renewals or extensions thereof; *provided* that (x) the amount of such Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension, except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder and (y) no Person becomes an obligor with respect thereto that is not an obligor of such Indebtedness listed on Schedule 9.3 as of the date hereof;

**(c)**        Indebtedness between the Company and any of its Subsidiaries and Indebtedness among the Subsidiaries of the Company (so long as any such Indebtedness owing by the Company, any Guarantor or any Material IP Subsidiary is subordinated to the Obligations on terms reasonably satisfactory to the Collateral Agent);

**(d)**        capital lease obligations and purchase money indebtedness in an outstanding aggregate principal amount not to exceed $10,000,000 at any time;

**(e)**        unsecured Indebtedness evidenced by the Litigation Trust Promissory Note;

**(f)**        Indebtedness consisting of investments and/or advances by each Exchange Purchaser prior to the date hereof (including interest thereon accruing on or after the date hereof and prior to the date on which such Exchange Purchaser becomes a party hereto); provided that such Indebtedness owed to an Exchange Purchaser shall be automatically discharged upon such Exchange Purchaser becoming a party hereto;

**(g)**        to the extent constituting Indebtedness, obligations under (i) that certain subscription agreement amendment, dated as of March 22, 2022, by and between Puddles 2 Limited and the Company, (ii) that certain subscription agreement amendment, dated as of March 22, 2022, by and between Keith Marsden and the Company and/or (iii) any other subscription agreement entered into by the Company from time to time (collectively, the "**Subscription Agreement**"); *provided* that, the aggregate principal amount of Indebtedness permitted under this clause (g) pursuant to the Subscription Agreements shall not exceed $ 117,875,781.64, minus the principal amount of Notes issued in exchange for advances, contributions or other investments thereunder; and

**(h)**        other Indebtedness in an aggregate principal amount not to exceed $50,000,000.

Section 9.4.    <u>Dispositions</u>.  Neither the Company nor any Guarantor shall, nor permit any of their respective Subsidiaries to, make any Disposition, except each of the following shall be permitted:

**(a)**    (x) Dispositions of inventory in the ordinary course of business and of property no longer used or useful in the business or worn out, obsolete or surplus property, (y) the abandonment, allowance to lapse or other Disposition of intellectual property that is, in the reasonable business judgment of the Company, no longer used or useful in the business or economically practicable to maintain or (z) Dispositions of property by the Company or any of its Subsidiaries (including intellectual property) that is, in the reasonable business judgment of the Company, no longer used or useful in the business or economically practicable to maintain; *provided* that this <u>Section 9.4(a)</u> shall permit a Disposition of Equity Interests only to the extent all of the assets of the applicable Subsidiary are of the type otherwise described in this <u>Section 9.4(a)</u> or are transferred to the Company or a Subsidiary substantially concurrently with such transaction;

**(b)**    (x) leases, ground leases and subleases of real or personal property in the ordinary course of business and (y) licenses, sublicenses, covenants not to sue or assert, grants of immunity from suits, and other rights related to intellectual property otherwise permitted under <u>Section 9.2</u>;

**(c)**    transactions in compliance with <u>Section 9.1</u>;

**(d)**    Investments in compliance with <u>Section 9.6</u> and Liens in compliance with <u>Section 9.2</u>;

**(e)**    sale, discounts of or forgiveness of customer delinquent notes or accounts receivable in the ordinary course of business in connection with settlement, collection or compromise thereof (but not pursuant to any financing arrangement);

**(f)**    Dispositions of cash and Cash Equivalents (x) in the ordinary course of business or (y) to the Litigation Trust pursuant to Section 2(a) of the Settlement Agreement; provided that the aggregate amount of cash and Cash Equivalents that may be Disposed of pursuant to this sub-clause (y) shall not exceed $225,000;

**(g)**    Dispositions (i) to the Company or (ii) to any Subsidiary of the Company from another Subsidiary of the Company (*provided* that any Disposition by a Material IP Subsidiary must be to the Company, a Guarantor or another Material IP Subsidiary);

**(h)**    Dispositions of Equity Interests to qualify directors where required by applicable law or to satisfy other similar requirements of law with respect to the ownership of Equity Interests;

**(i)**    Dispositions of up to 1,000,000 shares of Class A Common Stock (as defined in the Omnibus Agreement) of the Company to the Litigation Trust pursuant to Section 2(c) of the Settlement Agreement;

**(j)**    any trade-in of equipment or other assets in exchange for other equipment or assets in the ordinary course of business;

19

(k)     Dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Company or any of its Subsidiaries;

(l)     to the extent constituting a Disposition, assignments by the Company to the Litigation Trust pursuant to Section 1 of the Settlement Agreement of all the direct claims and, to the fullest extent permitted under applicable law, all derivative claims against Mathu Rajan or Raja Rajan that the Company may have (including any and all direct causes of action acquired pursuant to transfers undertaken pursuant to the Omnibus Agreement, but excluding (1) any claims related to breach, conversion, or tortious interference related to the Omnibus Agreement and (ii) any derivative actions filed prior to April 30, 2021);

(m)    the voluntary termination of contracts;

(n)    non-exclusive licenses of intellectual property entered into in the ordinary course of business; and

(o)    exclusive licenses of immaterial intellectual property entered into in the ordinary course of business.

To the extent a number of Purchasers not less than the Required Purchasers waive the provisions of this Section 9.4 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 9.4, such Collateral shall be sold automatically free and clear of the Liens created by the Guarantee and Collateral Agreement and the Collateral Agent shall take all actions it reasonably deems appropriate (or as may be reasonably requested by the Company) in order to effect or evidence the foregoing (including the execution and delivery of appropriate UCC termination statements and such other instruments and releases as may be necessary and reasonably requested to evidence such release), so long as the Company shall have provided the Collateral Agent with such certifications or documents as the Collateral Agent shall reasonably request in order to demonstrate compliance with this Agreement.

Section 9.5.     Change in Nature of Business.  Neither the Company nor any Guarantor shall, nor permit any of their respective Subsidiaries to, engage in any material line of business substantially different from those lines of business currently conducted by the Company on the date hereof or any business substantially related or incidental or ancillary thereto.

Section 9.6.     Investments.  Neither the Company nor any Guarantor shall, nor permit any of their respective Subsidiaries to, purchase or otherwise acquire (including without limitation by way of share exchange) any part or amount of the Equity Interests or substantial portion of the assets of, or make any Investments in, any other Person (excluding purchases of Equity Interests and Investments made by the Company in any of its wholly-owned Subsidiaries) except:

(a)    the acquisition of Equity Interests, obligations, securities or other Investments received in settlement of debts (created in the ordinary course of business) owing to them;

(b)    Investments in cash and Cash Equivalents;

(c)    Investments existing on the date hereof and listed on Schedule 9.6; and

(d)    so long as no Event of Default has occurred and is continuing at the time of such Investment, other Investments not to exceed $5,000,000 at any time outstanding (with the amount

20

outstanding being equal to (i) the greater of the amount invested or the fair market value thereof at such time, minus (ii) distributions and other returns thereon up to the amount invested).

Section 9.7.    Subordinated Indebtedness and Amendments to Subordinated Indebtedness Documents.  Neither the Company nor any Guarantor shall, nor permit any of their respective Subsidiaries to, directly or indirectly voluntarily prepay, defease or in substance defease, purchase, redeem or retire any Subordinated Indebtedness or any Indebtedness from time to time outstanding under the Subordinated Indebtedness Documents, or otherwise directly or indirectly pay any portion of the amount outstanding under Subordinated Indebtedness, including any accrued and unpaid interest thereon; provided that the Company may make payments of interest in accordance with the Litigation Trust Promissory Note pursuant to Section 2(b) of the Settlement Agreement.  Furthermore, the Company will not (and will cause its Subsidiaries not to), amend the Subordinated Indebtedness Documents or any document, agreement or instrument evidencing any Indebtedness incurred pursuant to the Subordinated Indebtedness Documents (or any replacements, substitutions, extensions or renewals thereof) or pursuant to which such Indebtedness is issued if such amendment, modification or supplement provides for the following or which has any of the following effects:

(a)    increases the overall principal amount of any such Indebtedness or increases the amount of any single scheduled installment of principal or interest;

(b)    shortens or accelerates the date upon which any installment of principal or interest becomes due or adds any additional mandatory redemption provisions;

(c)    shortens the final maturity date of such Indebtedness or otherwise accelerates the amortization schedule with respect to such Indebtedness;

(d)    increases the rate of interest accruing on such Indebtedness;

(e)    provides for the payment of additional fees or increases existing fees;

(f)    amends or modifies any financial or negative covenant (or covenant which prohibits or restricts the Company or any Subsidiary from taking certain actions) in a manner which is more onerous or more restrictive in any material respect to the Company or such Subsidiary or which is otherwise materially adverse to the Company, any Subsidiary and/or the Purchasers or, in the case of any such covenant, which places material additional restrictions on the Company or such Subsidiary or which requires the Company or such Subsidiary to comply with more restrictive financial ratios or which requires the Company to better its financial performance, in each case from that set forth in the existing applicable covenants in the Subordinated Indebtedness Documents or the applicable covenants in this Agreement; or

(g)    amends, modifies or adds any affirmative covenant in a manner which (i) when taken as a whole, is materially adverse to the Company, any Subsidiary and/or the Purchasers or (ii) is more onerous than the existing applicable covenant in the Subordinated Indebtedness Documents or the applicable covenant in this Agreement.

Section 9.8.    Material Intellectual Property.  Notwithstanding anything to the contrary contained in this Agreement, (a) no Material Intellectual Property (or Equity Interests of any Material IP Subsidiary) shall be the subject of any Investment, other than as an Investment in the Company or a Guarantor, (b) no Material Intellectual Property (or Equity Interests of any Material IP Subsidiary) shall be the subject of any Disposition, other than a Disposition to the Company or a Guarantor; (c) the Company shall not permit any Lien to be granted on, or suffer to exist any Lien on, Material Intellectual

21

Property (or Equity Interests of any Material IP Subsidiary), other than the Permitted Liens described in Section 9.2(a), inchoate Liens arising as a matter of law under 9.2(c) or (d), 9.2(h) or 9.2(i).

**Section 10.** **Events of Default**. An "**Event of Default**" shall exist if any of the following conditions or events shall occur and be continuing:

**(a)** the Company defaults in the payment of any principal, interest or other amount on any Note when the same becomes due and payable, whether at maturity or at a date fixed for prepayment or by declaration or otherwise; or

**(b)** the Company defaults in the performance of or compliance with any term contained herein (other than those referred to in Section 10(a)) and such default is not remedied within thirty (30) days after the Company receiving written notice of such default from any Purchaser (any such written notice to be identified as a "notice of default" and to refer specifically to this Section 10(b)); or

**(c)** the Company or any of its Subsidiaries (i) is generally not paying, or admits in writing its inability to pay, its debts as they become due, (ii) files, or consents by answer or otherwise to the filing against it of, a petition for relief or reorganization or arrangement or any other petition in bankruptcy, for liquidation or to take advantage of any bankruptcy, insolvency, reorganization, moratorium or other similar law of any jurisdiction, (iii) makes an assignment for the benefit of its creditors, (iv) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property or (v) is adjudicated as insolvent or to be liquidated; or

**(d)** a court or other Governmental Authority of competent jurisdiction enters an order appointing, without consent by the Company or any of its Subsidiaries, a custodian, receiver, trustee or other officer with similar powers with respect to it or with respect to any substantial part of its property, or constituting an order for relief or approving a petition for relief or reorganization or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up or liquidation of the Company or any of its Subsidiaries or any such petition shall be filed against the Company or such Subsidiaries and such petition shall not be dismissed within sixty (60) days; or

**(e)** one or more final judgments or orders for the payment of money aggregating in excess of $10,000,000, including any such final order enforcing a binding arbitration decision, are rendered against the Company and which judgments are not, within sixty (60) days after entry thereof, bonded, discharged or stayed pending appeal, or are not discharged within sixty (60) days after the expiration of such stay; or

**(f)** (i) the Company or any of its Subsidiaries is in default (as principal or as guarantor or other surety) in the payment of any principal of or premium or interest on any Indebtedness that is outstanding in an aggregate principal amount of at least $10,000,000 (or its equivalent in the relevant currency of payment) beyond any period of grace provided with respect thereto, or (ii) the Company or any of its Subsidiaries is in default in the performance of or compliance with any term of any evidence of any Indebtedness in an aggregate outstanding principal amount of at least $10,000,000 (or its equivalent in the relevant currency of payment) or of any mortgage, indenture or other agreement relating thereto or any other condition exists, and as a consequence of such default or condition, such Indebtedness has become or has been declared due and payable before its stated maturity or before its regularly scheduled dates of payment; or

**(g)** any Note Documentation shall cease to be in full force and effect, the Company or any of its Subsidiaries or any Person acting on behalf of the Company or its Subsidiaries shall contest in any manner the validity, binding nature or enforceability of any Note Documentation, or the obligations of the Company or any of its Subsidiaries under any Note Documentation are not or cease to be legal, valid, binding and enforceable in accordance with the terms of such Note Documentation; or

**(h)** any Lien purported to be created under the Guarantee and Collateral Agreement shall cease to be, or shall be asserted by the Company or any of its Subsidiaries not to be, a valid and perfected Lien on any material portion of the Collateral, with the priority required by the Guarantee and Collateral Agreement, except (i) as a result of a Disposition of the applicable Collateral to a Person that is not the Company, any Domestic Subsidiary or any Material IP Subsidiary in a transaction permitted under this Agreement, (ii) as a result of the Collateral Agent's failure to maintain possession of any stock certificates, promissory notes, certificates of title or other instruments delivered to it under the Guarantee and Collateral Agreement or (iii) as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

**(i)** either the Omnibus Agreement or the Letter Agreement ceases to be in full force and effect, or there occurs the filing of any judgment or order (whether or not final) disputing or invalidating the Omnibus Agreement or the Letter Agreement; or

**(j)** the assertion after the date hereof by any party to the Omnibus Agreement or the Letter Agreement that such agreement is not in full force and effect or any provision thereof is invalid; or

**(k)** a Change of Control has occurred.

**Section 11.** **Remedies on Default, Etc.**

Section 11.1. Acceleration. (a) If an Event of Default with respect to the Company described in Section 10(c), (d) or (i) has occurred, all the Notes then outstanding shall automatically become immediately due and payable.

**(b)** If any Event of Default (other than an Event of Default referred to in clause (a) of this Section 11) has occurred and is continuing, the Collateral Agent may, and, at the written direction of the Required Purchasers shall, by notice or notices to the Company, declare all the Notes held by it or them to be immediately due and payable.

**(c)** Upon any Notes becoming due and payable under this Section 11.1, whether automatically or by declaration, such Notes will forthwith mature and the entire unpaid principal amount of such Notes, plus all accrued and unpaid interest thereon (including interest accrued thereon at the Default Rate) and all other amounts, costs, expenses and liquidated damages, if any, due in respect of the Notes, shall all be immediately due and payable, in each and every case without presentment, demand, protest or further notice, all of which are hereby waived.

Section 11.2. Other Remedies. If any Default or Event of Default has occurred and is continuing, and irrespective of whether any Notes have become or have been declared immediately due and payable under Section 11.1, the Collateral Agent may proceed to protect and enforce the rights of the Collateral Agent and the Purchasers by an action at law, suit in equity or other appropriate proceeding, whether for the specific performance of any agreement contained herein or in any Note, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power

23

granted hereby or thereby or by law or otherwise; *provided* that only the Collateral Agent shall be entitled to exercise remedies with respect to the Collateral pursuant to the Guarantee and Collateral Agreement.

Section 11.3.    <u>No Waivers or Election of Remedies, Expenses, Etc.</u>  No course of dealing and no delay on the part of the Collateral Agent in exercising any right, power or remedy shall operate as a waiver thereof or otherwise prejudice the Collateral Agent's rights, powers or remedies.  No right, power or remedy conferred by this Agreement or any Note upon the Collateral Agent or any Purchaser shall be exclusive of any other right, power or remedy referred to herein or therein or now or hereafter available at law, in equity, by statute or otherwise.  The Company will pay to the Collateral Agent on demand such further amount as shall be sufficient to cover all costs and expenses of such Purchaser incurred in any enforcement or collection under this <u>Section 11</u>, including reasonable and documented attorneys' fees, expenses and disbursements.

**Section 12.    <u>Guarantee and Collateral Matters</u>**.

Section 12.1.    <u>Guarantee and/or Collateral</u>.

(a)    At the time of the Closing, the Company shall grant to the Collateral Agent for the benefit of the Purchasers party hereto from time to time, a first priority security interest in the Collateral it owns or at any time hereafter acquires and all proceeds thereof by, among other things, executing and delivering the Guarantee and Collateral Agreement.

(b)    [Reserved].

(c)    Other than with respect to any Former Stream Subsidiaries, within thirty (30) days of the formation or acquisition of any Domestic Subsidiary of the Company, such Domestic Subsidiary shall (i) guarantee the full and complete payment and performance by the Company when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations by executing and delivering a Guarantee and Collateral Agreement Joinder Agreement, becoming a "Guarantor" thereunder and assuming the obligations and liabilities of a Guarantor hereunder and (ii) grant to the Collateral Agent for the benefit of the Purchasers party hereto from time to time a first priority security interest in the Collateral it owns or at any time thereafter acquires and all proceeds thereof, in each case, by executing and delivering a Guarantee and Collateral Agreement Joinder Agreement and becoming a "Grantor" thereunder (subclauses (c)(i)-(ii) together, the "**Guarantee and Collateral Requirement**"); and

(d)    In the event of, and within sixty (60) days of, a Satisfactory Delaware Supreme Court Decision, each Domestic Former Stream Subsidiary shall comply with the Guarantee and Collateral Requirement.

Notwithstanding the foregoing, no Foreign Subsidiary of the Company shall be required to comply with the Guarantee and Collateral Requirement to the extent that: (i) such compliance is expected to result in a material Tax or compliance cost, or (ii) the burden or cost of such compliance exceeds the practical benefit to the Purchasers afforded thereby, in the case of each of subclause (i) and (ii) as reasonably determined by the Company in good faith and consented to by the Collateral Agent (such consent not to be unreasonably withheld, conditioned or delayed).

Section 12.2.    <u>Collateral Agent</u>.

(a)    Each Purchaser hereby appoints Hawk to act on behalf of itself and the other the Purchasers as collateral agent (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**") under this Agreement and the Guarantee and Collateral Agreement and

to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the Guarantee and Collateral Agreement, and the Collateral Agent agrees to act as such.  In taking any action pursuant to the provisions of the Guarantee and Collateral Agreement, and in exercising any rights or remedies set forth therein, the Collateral Agent shall, in addition to its discretionary ability to act (or refrain from acting) hereunder, act (or refrain from acting) at the direction of the Required Purchasers, and any such actions taken (or refrained from being taken) at the direction of the Required Purchasers shall be binding upon all Purchasers.  Notwithstanding any provision to the contrary contained elsewhere in this Agreement and the Guarantee and Collateral Agreement, the duties of the Collateral Agent shall be ministerial and administrative in nature, and the Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein and in the Guarantee and Collateral Agreement, nor shall the Collateral Agent have or be deemed to have any trust or fiduciary relationship with any Purchaser, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement and the Guarantee and Collateral Agreement or otherwise exist against the Collateral Agent.

      **(b)**      Subject to the provisions of the Guarantee and Collateral Agreement, each Purchaser agrees that the Collateral Agent shall execute and deliver the Guarantee and Collateral Agreement and all agreements, powers of attorney, documents and instruments incidental thereto, and act in accordance with its terms.

      **(c)**      The Collateral Agent shall have no obligation whatsoever to the Purchasers to assure that the Collateral exists or is owned by the Company or is cared for, protected, or insured or has been encumbered, or that the Collateral Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, maintained or enforced or are entitled to any particular priority, or to determine whether all of the Company's property constituting Collateral has been properly and completely listed or delivered, as the case may be, or the genuineness, validity, marketability or sufficiency thereof or title thereto, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the rights, authorities, and powers granted or available to the Collateral Agent pursuant to this Agreement or the Guarantee and Collateral Agreement, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, the Collateral Agent shall have no other duty or liability whatsoever to the Purchasers as to any of the foregoing.

      **(d)**      Hawk may resign as Collateral Agent at any time by notice to each Purchaser and the Company, such resignation to be effective upon the acceptance by the Required Purchasers of a successor agent to such Collateral Agent's appointment as Collateral Agent or the acceptance by the Required Purchasers of the non-resigning Collateral Agent as the sole Collateral Agent. If no successor collateral agent is appointed prior to the intended effective date of the resignation of such Collateral Agent (as stated in the notice of resignation), in the event there is a non-resigning Collateral Agent, such non-resigning Collateral Agent shall continue as the sole Collateral Agent hereunder and, otherwise, such non-resigning Collateral Agent may appoint, after consulting with each Purchaser, a successor collateral agent.  Upon the acceptance of its appointment as successor collateral agent hereunder, such successor collateral agent shall succeed to all the rights, powers and duties of the resigning Collateral Agent, and the term "Collateral Agent" shall mean such successor collateral agent, and the resigning Collateral Agent's appointment, powers and duties as such Collateral Agent shall be terminated.  Promptly following the acceptance of the appointment of any successor Collateral Agent, the Company shall cause assignments of filings existing on the date of such assignment related to the Collateral to be filed or recorded sufficient to reflect the successor Collateral Agent, as secured party of record in accordance with applicable law related to each portion of the Collateral.  After the resigning Collateral Agent's resignation hereunder, the provisions of this <u>Section 12.2</u> shall continue to inure to its benefit and the resigning Collateral Agent shall not by reason of such resignation be deemed to be

25

released from liability as to any actions taken or omitted to be taken by it while it was a Collateral Agent under this Agreement.

### Section 13.    Registration; Exchange; Substitution of Notes.

Section 13.1.    Registration of Notes.  The Company will maintain, in electronic format or otherwise, at its principal place of business, a register of the names and addresses of the holder(s) of this Note and the principal amount (and stated interest) owing to each holder (the **"Register"**), and will update the Register to reflect any permitted assignments or transfers subsequent to the date hereof.  The Company will make payments of principal and interest as specified hereunder to the holder(s) named as such in the Register.  The holder(s) shall notify the Company in writing prior to any assignment, transfer or other disposition of this Note (or any portion hereof) or such holder(s)' rights or interests hereunder, with such written notice to be delivered to the Company not later than five (5) Business Days prior to any such assignment, transfer or disposition and which notice shall specify the principal amount hereunder that is the subject of such assignment, transfer or disposition.  Any assignment, transfer or other disposition of this Note (or any portion thereof) shall be effective only upon appropriate entries with respect thereto being made in the Register, which shall be made promptly upon receipt of such written notice.  Notwithstanding anything to the contrary herein, the entries in the Register shall be conclusive, absent manifest error; the Company and each holder shall treat the person whose name is recorded in the Register as the owner of its portion of the Note for all purposes of this Note, notwithstanding notice to the contrary; and the registered owner of this Note (or any portion hereof) as indicated on the Register shall be the party with the exclusive right to receive payment of any principal amount and accrued and unpaid interest thereon under this Note.  The Register shall be available for inspection by any holder, at any reasonable time and from time to time upon reasonable prior notice.  This provision is intended to constitute a "book entry system" within the meaning of Treasury Regulations section 5f.103-1(c)(1)(ii) and shall be interpreted consistently with such intent, and this provision shall be construed so that all Notes are at all times maintained in "registered form" within the meaning of section 163(f), 871(h)(2) and 881(c)(2) of the Code and any related Treasury Regulations (or any other relevant or successor provisions of the Code or of such Treasury Regulations).

Section 13.2.    Transfer and Exchange of Notes.  Upon surrender of any Note to the Company at the address and to the attention of the designated officer (all as specified in Section 17(a)(iii)), for registration of transfer or exchange (and in the case of a surrender for registration of transfer accompanied by a written instrument of transfer duly executed by the registered holder of such Note or such holder's attorney duly authorized in writing and accompanied by the relevant name, address and other information for notices of each transferee of such Note or part thereof), within ten (10) Business Days thereafter, the Company shall execute and deliver, at the Company's expense (except as provided below), one or more new Notes (as requested by the holder thereof) in exchange therefor, in an aggregate principal amount equal to the unpaid principal amount of the surrendered Note; provided that any Note shall be in a principal amount not less than the lesser of $1,000 or the unpaid principal amount of the surrendered Note.  Each such new Note shall be payable to such Person as such holder may request and shall be substantially in the form of Schedule 1.  Each such new Note shall be dated and bear interest from the date to which interest shall have been paid on the surrendered Note or dated the date of the surrendered Note if no interest shall have been paid thereon.  The Company may require payment of a sum sufficient to cover any stamp Tax or governmental charge imposed in respect of any such transfer of Notes.

Section 13.3.    Replacement of Notes.  Upon receipt by the Company at the address and to the attention of the designated officer (all as specified in Section 17(a)(iii)) of evidence reasonably satisfactory to it of the ownership of and the loss, theft, destruction or mutilation of any Note, and

26

**(a)** in the case of loss, theft or destruction, of indemnity reasonably satisfactory to it, or

**(b)** in the case of mutilation, upon surrender and cancellation thereof, within ten (10) Business Days thereafter, the Company at its own expense shall execute and deliver, in lieu thereof, a new Note, dated and bearing interest from the date to which interest shall have been paid on such lost, stolen, destroyed or mutilated Note or dated the date of such lost, stolen, destroyed or mutilated Note if no interest shall have been paid thereon.

Section 13.4.    <u>Company Consent to Transfer</u>.  Any transfers pursuant to this <u>Section 13</u> shall be subject to the limitations and consent requirements set forth in <u>Section 19.1</u>.

**Section 14.    <u>Payments on Notes</u>.**

Section 14.1.    <u>Place of Payment</u>.  Subject to <u>Section 14.2</u>, payments of principal, interest or other amount becoming due and payable on the Notes shall be made in Wilmington, Delaware at the principal office of the Company in such jurisdiction.  The Company may at any time, by notice to the Collateral Agent, change the place of payment of the Notes so long as such place of payment shall be either the principal office of the Company in the United States or the principal office of a bank or trust company in the United States.

Section 14.2.    <u>Payment by Wire Transfer</u>.  The Company will pay all sums becoming due on such Note for principal, interest and all other amounts becoming due hereunder by the method and at the account specified for such purpose below such Purchaser's name in Part C of the Purchaser Schedule or in the NPA Joinder Agreement pursuant to which such Purchaser becomes a party hereto, or by such other method or at such other address as such Purchaser shall have from time to time specified to the Company in writing for such purpose, without the presentation or surrender of such Note or the making of any notation thereon, except that upon written request of the Company made concurrently with or reasonably promptly after payment or prepayment in full of any Note, such Purchaser shall surrender such Note for cancellation, reasonably promptly after any such request, to the Company at its principal executive office or at the place of payment most recently designated by the Company pursuant to <u>Section 14.1</u>.  Prior to any sale or other Disposition of any Note held by a Purchaser, such Purchaser will, at its election, either endorse thereon the amount of principal paid thereon and the last date to which interest has been paid thereon or surrender such Note to the Company in exchange for a new Note or Notes pursuant to <u>Section 13.2</u>.

Section 14.3.    <u>Withholding</u>.

**(a)** To the extent required by law, each Purchaser hereto hereby authorizes the Company, any Guarantor, and any relevant agent of the Company or any Guarantor, as applicable (each, a "**Withholding Party**") to deduct or withhold any Taxes from any amount transferred under this Agreement.  The applicable Withholding Party shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with the applicable law.  Amounts so deducted or withheld, if any, shall be treated as paid to the applicable Purchaser(s) in respect of which such amounts were deducted or withheld.

**(b)** Each Purchaser will, with reasonable promptness, deliver to the Withholding Party properly completed and executed documentation prescribed by applicable law or reasonably requested by the Withholding Party certifying as to any entitlement of such Purchaser to an exemption from, or reduction in, withholding Tax with respect to any payments to be made to such Purchaser under this Agreement.  In addition, any Purchaser, if reasonably requested by a Withholding

27

Party, shall deliver such other documentation prescribed by applicable law or reasonably requested by a Withholding Party as will enable a Withholding Party to determine whether or not such Purchaser is subject to backup withholding or information reporting requirements.  Each such Purchaser shall, whenever a lapse in time or change in circumstances renders such documentation obsolete or inaccurate in any respect, deliver promptly and on or before the date such documentation expires, becomes obsolete or inaccurate to the Withholding Party updated or other appropriate documentation (including any new documentation reasonably requested by a Withholding Party) or promptly notify the Withholding Party in writing of its legal inability to do so.  Unless the Withholding Party has received forms or other documents satisfactory to it indicating that payments under this Agreement to or for a Purchaser are not subject to withholding Tax or are subject to such Tax at a rate reduced by an applicable tax treaty, the Withholding Party shall withhold amounts required to be withheld by applicable law from such payments at the applicable statutory rate.  Without limiting the foregoing:

> (i)        Each Purchaser shall deliver to the applicable Withholding Party on or before the date on which it becomes a party to this Agreement (and from time to time thereafter upon the reasonable request of a Withholding Party), duly completed copies of IRS Form W-8BEN, W-8BEN-E, W-8ECI, W-8IMY, W-8EXP or W-9, as may be applicable, together with any required attachments.

> (ii)       If a payment made to a Purchaser under this Agreement would be subject to U.S. federal withholding Tax imposed by FATCA (including those contained in sections 1471(b) or 1472(b) of the Code, as applicable) if such Purchaser were to fail to comply with the applicable reporting requirements of FATCA, such Purchaser shall deliver to the applicable Withholding Party at the time or times prescribed by applicable laws and at such time or times reasonably requested by the Withholding Party such documentation prescribed by applicable laws (including as prescribed by section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by a Withholding Party as may be necessary for a Withholding Party to comply with their obligations under FATCA, to determine whether such Purchaser has or has not complied with such Purchaser's obligations under FATCA and, if necessary, to determine the amount to deduct and withhold from such payment.

**Section 15.    Survival of Representations and Warranties; Entire Agreement**.  All representations and warranties contained herein shall survive the execution and delivery of this Agreement and the Notes, the purchase or transfer by any Purchaser of any Note or portion thereof or interest therein and the payment of any Note, and may be relied upon by any subsequent Purchaser of a Note, regardless of any investigation made at any time by or on behalf of such Purchaser or any other Purchaser.  This Agreement, the Notes, the Guarantee and Collateral Agreement and the other Notes Documents embody the entire agreement and understanding between each Purchaser and the Company and supersede all prior agreements and understandings relating to the subject matter hereof.  All statements contained in any certificate or other instrument delivered by or on behalf of the Company or any of its Subsidiaries pursuant to this Agreement shall be deemed representations and warranties of the Company under this Agreement.

**Section 16.    Amendment and Waiver**.

Section 16.1.    Requirements.

**(a)**        This Agreement, the Notes and the Guarantee and Collateral Agreement may be amended, restated, supplemented or otherwise modified, and the observance of any term hereof or of the Notes or the Guarantee and Collateral Agreement may be waived (either retroactively or prospectively), only with the written consent of the Company and the Required Purchasers, except that no amendment or

904117.22-WILSR01A - MSW

waiver may, without the written consent of each Purchaser, (i) reduce or delay, as applicable, the amount or time of any prepayment or payment of principal of, or reduce the rate or change the time of payment or method of computation of interest on (other than a waiver of default interest), the Notes, (ii) change the percentage of the principal amount of the Notes the Purchasers of which are required to consent to any amendment or waiver, or (iii) amend this <u>Section 16</u>.

      **(b)**     Notwithstanding the foregoing, (i) without the written consent of the Collateral Agent, none of this Agreement, the Notes or the Guarantee and Collateral Agreement may be amended, restated, supplemented or otherwise modified in any manner that would affect the rights or obligations of the Collateral Agent, and (ii) any provision of this Agreement, the Notes or the Guarantee and Collateral Agreement may be amended by an agreement in writing entered into by the Company and the Collateral Agent to cure any ambiguity, omission, defect or inconsistency so long as, in each case, the Purchasers shall have received at least five (5) Business Days' prior written notice thereof and the Collateral Agent shall not have received, within such five (5) Business Day period, a written notice from the Required Purchasers stating that the Required Purchasers object to such amendment.

      Section 16.2.   <u>Binding Effect, Etc.</u>  Any amendment or waiver consented to as provided in this <u>Section 16</u> or the Guarantee and Collateral Agreement applies equally to all Purchasers and is binding upon them and upon each future holder of any Note and upon the Company without regard to whether such Note has been marked to indicate such amendment or waiver.  No such amendment or waiver will extend to or affect any obligation, covenant, agreement, Default or Event of Default not expressly amended or waived or impair any right consequent thereon.  No course of dealing between the Company and any holder of a Note and no delay in exercising any rights hereunder or under any Note or the Guarantee and Collateral Agreement by any holder of a Note shall operate as a waiver of any rights of any holder of such Note.

     **Section 17.**   **<u>Notices</u>**.

      **(a)**     Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or electronic mail, as follows:

      (i)     if to the Collateral Agent:

     Hawk Investment Holdings Limited
     Newport House, 15 The Grange
     St. Peter Port, Guernsey, GG GY12QL
     Attention: Colin Maltby
     Email: <u>Colin@first-sentinel.com</u>

     with a copy to (which shall not constitute notice):

     Rosco Maunder
     Email: <u>r.maunder@albanytrustee.com</u>

      (ii)     if to any Purchaser, to such Purchaser at the address specified for such communications in the Purchaser Notice Schedule or in the NPA Joinder Agreement pursuant to which such Purchaser becomes a party hereto, and

904117.22-WILSR01A - MSW

(iii)     if to the Company or any Guarantor, to the Company at:

SEECUBIC, INC.
1732A Marsh Road Suite 124
Wilmington, Delaware 19810
Attention: Shad Stastney and Franklin Rodgers
Email: Shadron.stastney@seecubic.com; Franklin.rodgers@seecubic.com

with a copy to (which shall not constitute notice):

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10014
Attention: Tracey L. Chenoweth
Email: tracey.chenoweth@skadden.com

and

Skadden, Arps, Slate, Meagher & Flom LLP
920 North King Street
Attention: Faiz Ahmad
Email: faiz.ahmad@skadden.com;

or, in each case, at such other address as any party hereto shall notify the other parties hereto of (which, in the case of the Company, may be delivered to the Collateral Agent).

**(b)**     All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by facsimile shall be deemed to have been given when sent and when receipt has been confirmed by telephone or (iii) sent by electronic mail, shall be deemed to have been given upon sending unless a "failure to deliver" or similar notice (other than an "out of office" message) is received within sixty (60) minutes of sending; *provided* that if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient.  In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

**Section 18.**   **Joinder Agreement**.  Each Person that executes an NPA Joinder Agreement substantially in the form of <u>Annex I</u> hereto or such other form of joinder agreement as may be acceptable to the Collateral Agent as a "Joinder Party" shall become a Purchaser for all purposes of this Agreement upon execution and delivery by such Person of a NPA Joinder Agreement.

**Section 19.**   **Miscellaneous**.

Section 19.1.   <u>Successors and Assigns</u>.  All covenants and other agreements contained in this Agreement by or on behalf of any of the parties hereto bind and inure to the benefit of their respective successors and registered assigns whether so expressed or not, except that:

**(a)**     subject to <u>Section 9.1</u>, the Company may not assign or otherwise transfer any of its rights or Obligations hereunder or under the Notes without the prior written consent of each Purchaser, which written consent is not to be unreasonably withheld;

(b)        a Purchaser may assign or transfer any of its rights hereunder only upon satisfaction of each of the following conditions, unless waived by the Company in its sole discretion:

(i)        such transfer does not require the registration or qualification of the Notes pursuant to any applicable federal or state securities laws;

(ii)        such transfer does not result in violation of applicable laws;

(iii)        such transfer would not cause the Company to become, with respect to any employee benefit plan subject to Title I of ERISA, a "party-in-interest" (as defined in ERISA Section 3(14)) or a "disqualified person" (as defined in Code Section 4975(e)(2));

(iv)        such transfer would not, in the opinion of legal counsel to the Company, cause any portion of the assets of the Company to constitute assets of any employee benefit plan pursuant to Department of Labor Regulations Section 2510.3-101;

(v)        such transfer is not made to any Person who lacks the legal right, power or capacity to own the applicable Notes;

(vi)        such transfer does not cause the Company to become a reporting company under the Securities Exchange Act of 1934, as amended;

(vii)        such transfer does not subject the Company to regulation under the Investment Company Act of 1940, the Investment Advisors Act of 1940, or ERISA, each as amended;

(viii)        such transfer is not made to a Person that, in the good faith reasonable judgment of the Company, is an actual or potential competitor of the Company or otherwise adverse to the interests of the Company;

(ix)        if such transfer is to the Company, such transfer shall be made in accordance with Exhibit D and

(x)        (y) the Company receives written instruments of transfer that are in a form satisfactory to the Company, as determined in its good faith reasonable judgment (including such assignee's consent to be bound by this Agreement as an assignee) and (z) unless waived by the Company, an opinion of counsel, in form and substance reasonably satisfactory to the Company, that such transfer would not violate any federal securities laws or any state or provincial securities or "blue sky" laws (including any investor suitability standards) applicable to the Company or the applicable Notes or cause the Company to be required to register as an "Investment Company" under the U.S. Investment Company Act of 1940, as amended); and

(c)        nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto and their respective successors and assigns permitted hereby) any legal or equitable right, remedy or claim under or by reason of this Agreement.

Section 19.2.        Accounting Terms.  All accounting terms used herein which are not expressly defined in this Agreement have the meanings respectively given to them in accordance with GAAP; *provided* that, any capital lease that would have been deemed to be an operating lease prior to the adoption of ASC 842 or any similar or replacement accounting codification or pronouncement shall be treated as an operating lease and not a capital lease hereunder.  Except as otherwise specifically provided herein, all computations made pursuant to this Agreement shall be made in accordance with GAAP.

Section 19.3.    <u>Severability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

Section 19.4.    <u>Construction, Etc.</u>  Each covenant contained herein shall be construed (absent express provision to the contrary) as being independent of each other covenant contained herein, so that compliance with any one covenant shall not (absent such an express contrary provision) be deemed to excuse compliance with any other covenant.  Where any provision herein refers to action to be taken by any Person, or which such Person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such Person.  Defined terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any of the Note Documentation or any other agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein) and, for purposes of the Notes, shall also include any such notes issued in substitution therefor pursuant to <u>Section 13</u>, (b) subject to <u>Section 19.1</u>, any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Schedules and Exhibits shall be construed to refer to Sections of, and Schedules and Exhibits to, this Agreement, and (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.  For all purposes under the Note Documentation, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 19.5.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument.  Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic image (e.g., "PDF" or "TIF" via electronic email or DocuSign or similar electronic execution software) shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution", "signed", "signature", and words of like import in this Agreement or any other Note Documentation shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable requirement of law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 19.6.    <u>Governing Law</u>.  This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York

904117.22-WILSR01A - MSW

excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

Section 19.7.    Jurisdiction and Process; Waiver of Jury Trial.

(a)    The Company and each of its Subsidiaries irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, The City of New York, over any suit, action or proceeding arising out of or relating to this Agreement or the Notes.  To the fullest extent permitted by applicable law, the Company and each of its Subsidiaries irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any claim that it is not subject to the jurisdiction of any such court, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(b)    The Company and each of its Subsidiaries agrees, to the fullest extent permitted by applicable law, that a final judgment in any suit, action or proceeding of the nature referred to in Section 19.7(a) brought in any such court shall be conclusive and binding upon it subject to rights of appeal, as the case may be, and may be enforced in the courts of the United States of America or the State of New York (or any other courts to the jurisdiction of which it or any of its assets is or may be subject) by a suit upon such judgment.

(c)    The Company and each of its Subsidiaries consents to process being served by or on behalf of any holder of Notes in any suit, action or proceeding of the nature referred to in Section 19.7(a) by mailing a copy thereof by registered, certified priority or express mail (or any substantially similar form of mail), postage prepaid, return receipt or delivery confirmation requested, to it at its address specified in Section 17 or at such other address of which such holder shall then have been notified pursuant to said Section.  The Company and each of its Subsidiaries agrees that such service upon receipt (i) shall be deemed in every respect effective service of process upon it in any such suit, action or proceeding and (ii) shall, to the fullest extent permitted by applicable law, be taken and held to be valid personal service upon and personal delivery to it.  Notices hereunder shall be conclusively presumed received as evidenced by a delivery receipt furnished by the United States Postal Service or any reputable commercial delivery service.

(d)    Nothing in this Section 19.7 shall affect the right of any holder of a Note to serve process in any manner permitted by law, or limit any right that the holders of any of the Notes may have to bring proceedings against the Company in the courts of any appropriate jurisdiction or to enforce in any lawful manner a judgment obtained in one jurisdiction in any other jurisdiction.

(e)    **THE PARTIES HERETO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT TO THIS AGREEMENT, THE NOTES OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THEREWITH.**

Section 19.8.    Independent Investigation.  Each Purchaser represents to and agrees with each other Purchaser that it has made its own independent investigation of the condition (financial or otherwise), prospects and affairs of the Company and its Subsidiaries in connection with its purchase of the Notes hereunder, and has made and shall continue to make its own appraisal of the creditworthiness of the Company and its Subsidiaries.  No holder of Notes shall have any duty or responsibility to any other holder of Notes, either initially or on a continuing basis, to make any such investigation or appraisal or to provide any credit or other information with respect thereto.  No holder of Notes is acting as agent or in any other fiduciary capacity on behalf of any other holder of Notes.

904117.22-WILSR01A - MSW

[Remainder of Page Intentionally Left Blank]

904117.22-WILSR01A - MSW

If you are in agreement with the foregoing, please sign the form of agreement on a counterpart of this Agreement and return it to the Company, whereupon this Agreement shall become a binding agreement between you and the Company.

Very truly yours,

**SEECUBIC, INC.**, a Delaware corporation, as the Company

By: _____
    Name: Shad Stastney
    Title:  Chief Executive Officer

*[Signature Page to Note Purchase Agreement]*

This Agreement is hereby accepted and agreed
to as of the date hereof.

**SLS HOLDINGS VI, LLC**, a Delaware limited liability company,
as a Purchaser

By: _____
    Name:  Shad L. Stastney
    Title:  Managing Member

**HAWK INVESTMENT HOLDINGS LIMITED**, a Guernsey holding company,
as a Purchaser and as the Collateral Agent

By: _____

Name: FOR ALBANY DIRECTORS LIMITED

Title: DIRECTOR .

## Schedule A

## Defined Terms

As used herein, the following terms have the respective meanings set forth below or set forth in the Section hereof following such term:

"**Accrued Value**" is defined in Section 7.6(a).

"**Adjustment**" is defined in Section 7.6(e).

"**Affiliate**" means, at any time, and with respect to any Person, any other Person that at such time directly or indirectly through one or more intermediaries Controls, or is Controlled by, or is under common Control with, such first Person.  Unless the context otherwise clearly requires, any reference to an "Affiliate" is a reference to an Affiliate of the Company.

"**Agreement**" means this Note Purchase Agreement, including all Schedules and Exhibits attached to this Agreement.

"**Assignment Agreement**" means that certain Assignment of Enforcement Rights and Related Proceeds, dated as of the date hereof, by and among SLS, Hawk and the Company.

"**Board**" means the Board of Directors of the Company.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which commercial banks in New York City or Wilmington, Delaware are required or authorized to be closed.

"**Capital Lease**" means, at any time, a lease with respect to which the lessee is required concurrently to recognize the acquisition of an asset and the incurrence of a liability in accordance with GAAP.

"**Cash Equivalents**" means (i) Government Securities, (ii) any certificate of deposit maturing not more than 365 days after the date of acquisition issued by, or demand deposit or time deposit of, an Eligible Institution, (iii) commercial paper maturing not more than 365 days after the date of acquisition of an issuer (other than an Affiliate of the Company) with a rating, at the time as of which any investment therein is made, of "A-3" (or higher) according to S&P or "P-2" (or higher) according to Moody's or carrying an equivalent rating by a national recognized rating agency if both of the two named rating agencies cease publishing ratings of investments, (iv) any bankers acceptances or money market deposit accounts issued by an Eligible Institution, (v) any fund investing exclusively in investments of the types described in clauses (i) through (iv) above, and (vi) in the case of any Subsidiary formed or organized or having its principal place of business outside the United States, investments denominated in the currency of the jurisdiction in which such Subsidiary is formed or organized or has its principal place of business which are similar to the items specified in clauses (i) through (v) above (including, without limitation, any deposit with a bank that is a lender to any Subsidiary).

"**Change of Control**" means, at any time, the acquisition by any Person or Persons that are together a "group" within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act or any Person, including any group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act), of beneficial ownership (within the meaning of

Rule 13d-3 under the Exchange Act) of Equity Interests of the Company representing more than 50% of the total voting power of all of the outstanding voting stock of the Company.

"**Closing**" is defined in <u>Section 2</u>.

"**Closing Notes**" is defined in <u>Section 2</u>.

 "**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" has the meaning set forth in the Guarantee and Collateral Agreement.

"**Collateral Agent**" is defined in <u>Section 12.2(a)</u>.

"**Common Stock**" means the Company's common stock, par value $0.001 per share and any capital stock into which such common stock shall have been converted, exchanged or reclassified following the date hereof.

"**Common Stock Deemed Outstanding**" means, at any given time, the sum of (a) the number of shares of Common Stock actually outstanding at such time, plus (b) the number of shares of Common Stock issuable upon exercise of Options actually outstanding at such time, plus (c) the number of shares of Common Stock issuable upon conversion or exchange of Convertible Securities actually outstanding at such time (treating as actually outstanding any Convertible Securities issuable upon exercise of Options actually outstanding at such time), in each case, regardless of whether the Options or Convertible Securities are actually exercisable at such time; *provided* that Common Stock Deemed Outstanding at any given time shall not include shares owned or held by or for the account of the Company or any of its wholly-owned subsidiaries.

"**Company**" is defined in the first paragraph of this Agreement.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; and the terms "**Controlled**" and "**Controlling**" shall have meanings correlative to the foregoing.

"**Conversion**" is defined in <u>Section 7.6(a)</u>.

"**Conversion Date**" means, with respect to Conversion of a Note, the date on which the Conversion of such Note into Conversion Shares is effective.

"**Conversion Price**" is defined in <u>Section 7.6(a)</u>.

"**Conversion Shares**" is defined in <u>Section 7.6(a)</u>.

"**Converted Amount**" is defined in <u>Section 7.6(a)</u>.

"**Convertible Securities**" means any securities (directly or indirectly) convertible into or exchangeable for Common Stock, but excluding Options.

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, or any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

A-2

"**Default**" means an event or condition the occurrence or existence of which would, with the lapse of time or the giving of notice or both, become an Event of Default.

"**Default Rate**" means that rate of interest per annum that is 2% above the rate of interest stated in clause (a) of the first paragraph of the Notes.

"**Designated Jurisdiction**" means any country, region or territory to the extent that such country, region or territory is the subject of any comprehensive Sanctions.

"**Disposition**" or "**Dispose**" means (i) the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person, directly or indirectly, and whether voluntary or involuntary, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, (ii) the receipt by the Company of any cash insurance proceeds or condemnation award payable by reason of theft, loss, physical destruction or damage, taking, expropriation or similar event with respect to any of its property and (iii) the issuance or sale of Equity Interests, in the case of each of clauses (i), (ii) and (iii), whether in a single transaction or series of related transactions.

"**Domestic Former Stream Subsidiary**" means any Former Stream Subsidiary that is organized under the laws of the United States of America, any State thereof or the District of Columbia, other than any such Former Stream Subsidiary (a) that (i) owns Equity Interests in a "controlled foreign corporation" (as defined in Section 957(a) of the Code) (directly or indirectly through entities that are disregarded for U.S. federal income tax purposes) and (ii) holds no material assets other than Equity Interests in "controlled foreign corporation" (as defined in Section 957(a) of the Code) (or such disregarded entities referred to in clause (a) of this definition) or (b) is a subsidiary of a Foreign Former Domestic Stream Subsidiary.

"**Domestic Subsidiary**" means any Subsidiary of the Company organized under the laws of the United States of America, any State thereof or the District of Columbia, other than any such Subsidiary (a) that (i) owns Equity Interests in a "controlled foreign corporation" (as defined in Section 957(a) of the Code) (directly or indirectly through entities that are disregarded for U.S. federal income tax purposes) and (ii) holds no material assets other than Equity Interests in "controlled foreign corporation" (as defined in Section 957(a) of the Code) (or such disregarded entities referred to in clause (a) of this definition) or (b) is a Subsidiary of a Foreign Subsidiary.

"**Eligible Institution**" means a commercial banking institution that has combined capital and surplus not less than $100,000,000 or its equivalent in foreign currency, whose short-term debt is rated "A-3" or higher according to S&P or "P-2" or higher according to Moody's or carrying an equivalent rating by a nationally recognized agency if both of the two named rating agencies cease publishing ratings of investments.

"**Equity Election**" is defined in <u>Section 7.2</u>.

"**Equity Interests**" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other similar rights entitling the holder thereof to purchase or acquire any of the foregoing.

"**Event of Default**" is defined in <u>Section 10</u>.

A-3

"**Exchange Act**" means the Securities Exchange Act of 1934 and the rules and regulations of the SEC promulgated thereunder.

"**Exchange Purchaser**" is defined Section 3.1.

"**Excluded Issuances**" means any issuance or sale (or deemed issuance or sale in accordance with Section 7.6(i)) by the Company after the date hereof of: (a) shares of Common Stock issued upon Conversion of any Note or exercise of any Warrant; (b) shares of Common Stock (as such number of shares is equitably adjusted for subsequent stock splits, stock combinations, stock dividends and recapitalizations) issued directly or upon the exercise of Options to directors, officers, employees, or consultants of the Company in connection with their service as directors of the Company, their employment by the Company or their retention as consultants by the Company, in each case authorized by the Board and issued pursuant to the Company's equity incentive plan (including all such shares of Common Stock and Options outstanding prior to the date hereof); (c) shares of Common Stock issued upon the conversion or exercise of Options (other than Options covered by clause (b) above) or Convertible Securities issued prior to the date hereof, *provided* that such securities are not amended after the date hereof to increase the number of shares of Common Stock issuable thereunder or to lower the exercise or conversion price thereof; (d) shares of Common Stock, Options or Convertible Securities issued (i) to persons in connection with a joint venture, strategic alliance or other commercial relationship with such person (including persons that are customers, suppliers and strategic partners of the Company) relating to the operation of the Company's business and not for the primary purpose of raising equity capital, (ii) in connection with a transaction in which the Company, directly or indirectly, acquires another business or its tangible or intangible assets, or (iii) to lenders as equity kickers in connection with debt financings of the Company, in each case where such transactions have been approved by the Board; (e) shares of Common Stock in an offering for cash for the account of the Company that is underwritten on a firm commitment basis and is registered with the Securities and Exchange Commission under the Securities Act of 1933, as amended; or (f) shares of Common Stock, Options or Convertible Securities issued to the lessor or vendor in any office lease or equipment lease or similar equipment financing transaction in which the Company obtains the use of such office space or equipment for its business.

"**Excluded Stream Subsidiary**" means, at any time before a Satisfactory Delaware Supreme Court Decision, each Former Stream Subsidiary.

"**Fair Market Value**" means, as of any particular date: (a) the volume weighted average of the closing sales prices of the Common Stock for such day on all domestic securities exchanges on which the Common Stock may at the time be listed; (b) if there have been no sales of the Common Stock on any such exchange on any such day, the average of the highest bid and lowest asked prices for the Common Stock on all such exchanges at the end of such day; (c) if on any such day the Common Stock is not listed on a domestic securities exchange, the closing sales price of the Common Stock as quoted on the OTC Bulletin Board, the Pink OTC Markets or similar quotation system or association for such day; or (d) if there have been no sales of the Common Stock on the OTC Bulletin Board, the Pink OTC Markets or similar quotation system or association on such day, the average of the highest bid and lowest asked prices for the Common Stock quoted on the OTC Bulletin Board, the Pink OTC Markets or similar quotation system or association at the end of such day; in each case, averaged over twenty (20) consecutive Business Days ending on the Business Day immediately prior to the day on which "Fair Market Value" is being determined; *provided* that, if the Common Stock is listed on any domestic securities exchange, the term "Business Day" as used in this sentence means Business Days on which such exchange is open for trading. If at any time the Common Stock is not listed on any domestic securities exchange or quoted on the OTC Bulletin Board, the Pink OTC Markets or similar quotation system or association, the "Fair Market Value" of the Common Stock shall be the fair market value per share as determined jointly by the Board and the holder of the relevant Note; *provided* that, if the Board

A-4

and such holder are unable to agree on the fair market value per share of the Common Stock within a reasonable period of time (not to exceed three (3) Business Days from the Company's receipt of the relevant Notice of Conversion Request), such fair market value shall be determined by a nationally recognized investment banking, accounting or valuation firm engaged by the Company. The determination of such firm shall be final and conclusive.

"**FATCA**" means (a) sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), together with any current or future Treasury Regulations or other administrative guidance promulgated thereunder and any agreements entered into pursuant thereto, including any foreign financial institution agreement or intergovernmental agreement and any rules, legislation, practice or official guidance adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such sections of the Code.

"**Foreign Former Stream Subsidiary**" means a Former Stream Subsidiary that is not a Domestic Former Stream Subsidiary.

"**Foreign Subsidiary**" means a Subsidiary of the Company that is not a Domestic Subsidiary.

"**Former Stream Subsidiary**" means any current subsidiary of the Company that was previously an Affiliate of Stream TV.

"**GAAP**" means generally accepted accounting principles as in effect from time to time in the United States of America.

"**Government Securities**" means direct obligations of, or obligations guaranteed by, the United States of America, and the payment for which the United States pledges its full faith and credit.

"**Governmental Authority**" means

(a)     the government of

        (i)     the United States of America or any state or other political subdivision thereof, or

        (ii)    any other jurisdiction in which the Company conducts all or any part of its business, or which asserts jurisdiction over any properties of the Company, or

(b)     any entity exercising executive, legislative, judicial, regulatory or administrative functions of, or pertaining to, any such government; or

(c)     solely with respect to the definition of "Taxes," the definition of "FATCA," and Section 14.3, any other nation or government, any state or other political subdivision thereof, any other agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guarantee and Collateral Agreement Joinder Agreement**" means a joinder to the Guarantee and Collateral Agreement substantially in the form of Annex I to the Guarantee and Collateral Agreement.

"**Guarantee and Collateral Agreement**" means that certain Guarantee and Collateral Agreement, dated as of the date hereof, by the Company, each other Grantor and each Guarantor from time to time party thereto in favor of the Collateral Agent for the benefit of the Purchasers.

"**Guarantee and Collateral Requirement**" is defined in Section 12.1(c).

"**Guarantor**" means each Person that executes and delivers a Guarantee and Collateral Agreement Joinder Agreement as a "Guarantor".

"**Guaranty**" means, with respect to any Person, any obligation (except the endorsement in the ordinary course of business of negotiable instruments for deposit or collection) of such Person guaranteeing or in effect guaranteeing any indebtedness, dividend or other obligation of any other Person in any manner, whether directly or indirectly, including obligations incurred through an agreement, contingent or otherwise, by such Person:

(a)    to purchase such indebtedness or obligation or any property constituting security therefor;

(b)    to advance or supply funds (i) for the purchase or payment of such indebtedness or obligation, or (ii) to maintain any working capital or other balance sheet condition or any income statement condition of any other Person or otherwise to advance or make available funds for the purchase or payment of such indebtedness or obligation;

(c)    to lease properties or to purchase properties or services primarily for the purpose of assuring the owner of such indebtedness or obligation of the ability of any other Person to make payment of the indebtedness or obligation; or

(d)    otherwise to assure the owner of such indebtedness or obligation against loss in respect thereof.

In any computation of the indebtedness or other liabilities of the obligor under any Guaranty, the indebtedness or other obligations that are the subject of such Guaranty shall be assumed to be direct obligations of such obligor.

"**Hawk**" means Hawk Investment Holdings Limited, a Guernsey holding company.

"**Indebtedness**" with respect to any Person means, at any time, without duplication,

(a)    its liabilities for borrowed money;

(b)    its liabilities for the deferred purchase price of property acquired by such Person (excluding accounts payable arising in the ordinary course of business but including all liabilities created or arising under any conditional sale or other title retention agreement with respect to any such property);

(c)    (i) all liabilities appearing on its balance sheet in accordance with GAAP in respect of Capital Leases and (ii) all liabilities which would appear on its balance sheet in accordance with GAAP in respect of Synthetic Leases assuming such Synthetic Leases were accounted for as Capital Leases;

A-6

(d)     all liabilities for borrowed money secured by any Lien with respect to any property owned by such Person (whether or not it has assumed or otherwise become liable for such liabilities);

(e)     all its liabilities in respect of letters of credit or instruments serving a similar function issued or accepted for its account by banks and other financial institutions (whether or not representing obligations for borrowed money);

(f)     the aggregate Swap Termination Value of all Swap Contracts of such Person; and

(g)     any Guaranty of such Person with respect to liabilities of a type described in any of clauses (a) through (f) hereof.

Indebtedness of any Person shall include all obligations of such Person of the character described in clauses (a) through (g) to the extent such Person remains legally liable in respect thereof notwithstanding that any such obligation is deemed to be extinguished under GAAP.

"**Initial Conversion Price**" is defined in <u>Section 7.6(a)</u>.

"**Initial Purchasers**" is defined in Section 2.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by the Company or any of its subsidiaries of any Equity Interests, or other ownership interest in, any other Person, and (ii) any direct or indirect loan, advance or capital contribution by the Company or any of its subsidiaries to any other Person, including all indebtedness and accounts receivable due from that other Person that are not current assets and did not arise from sales to that other Person in the ordinary course of business.

"**IP Collateral**" has the meaning set forth in the Guarantee and Collateral Agreement.

"**Junior Lien Indebtedness**" means (i) any unsecured Indebtedness of the Company or any of its Subsidiaries or (ii) any Indebtedness of the Company or any of its Subsidiaries secured by a Lien on a junior basis to the Liens securing the Obligations.

"**Letter Agreement**" means that certain letter agreement, dated May 6, 2020, by and among SLS, Hawk and the "Investors" identified therein.

"**Lien**" means, with respect to any Person, any mortgage, lien, pledge, charge, security interest or other encumbrance, or any interest or title of any vendor, lessor, lender or other secured party to or of such Person under any conditional sale or other title retention agreement or Capital Lease, upon or with respect to any property or asset of such Person (including in the case of any Equity Interest, the granting of any option or agreement to sell) or any agreement to enter into any of the foregoing.

"**Litigation Trust**" means a litigation trust formed pursuant to the Settlement Agreement by Potter Anderson & Corroon LLP for the benefit of general unsecured creditors of Stream TV.

"**Litigation Trust Promissory Note**" means that certain unsecured promissory note, dated as June 1, 2022, executed by the Company in favor of the Litigation Trust, in an aggregate principal of $2,500,000.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, operations, affairs, financial condition, assets or properties of the Company and its Subsidiaries taken as a whole, (b)

A-7

the ability of the Company to perform its payment Obligations under this Agreement and the Notes, or (c) the validity or enforceability of this Agreement, the Notes or the Guarantee and Collateral Agreement (or the Liens granted to the Collateral Agent thereunder).

"**Material IP Subsidiary**" means (a) each Subsidiary of the Company that owns any Material Intellectual Property or (b) each Subsidiary of the Company that owns any equity interests in any Subsidiary referred to in clause (a); *provided* that any Person that becomes a Material IP Subsidiary after the date hereof shall, unless consented to by the Required Purchasers, be a Guarantor (subject, with respect to any Foreign Subsidiary of the Company, to the last paragraph of Section 12.1).

"**Material Intellectual Property**" mean intellectual property material to the business or operations of the Company and its Subsidiaries, when taken as a whole.

"**Maturity Date**" means December 31, 2023.

"**Moody's**" means Moody's Investor Services, Inc.

"**Note Documentation**" means, collectively, this Agreement, the Notes, the Guarantee and Collateral Agreement, each Guarantee and Collateral Agreement Joinder Agreement, each NPA Joinder Agreement and each other amendment, agreement or instrument delivered by the Company in accordance with such documentation.

"**Notes**" is defined in Section 1.

"**Notice of Conversion Request**" is defined in Section 7.6(a).

"**NPA Joinder Agreement**" means a joinder to the Note Purchase Agreement substantially in the form of Exhibit D.

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"**Obligations**" means all advances to, and debts, liabilities and obligations of, the Company arising under the Note Documentation, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Company or any of its Affiliates of any proceeding under any Debtor Relief Law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"**Options**" means any warrants or other rights or options to subscribe for or purchase Common Stock or Convertible Securities.

"**Omnibus Agreement**" means that certain omnibus agreement, dated as of May 6, 2020, by and among Stream TV, SLS, Hawk and the "Investors" identified therein.

"**OTC Bulletin Board**" means the Financial Industry Regulatory Authority OTC Bulletin Board electronic inter-dealer quotation system.

"**Permitted Liens**" is defined in Section 9.2.

"**Person**" means an individual, partnership, corporation, limited liability company, association, trust, unincorporated organization, business entity or Governmental Authority.

"**Pink OTC Markets**" means the OTC Markets Group Inc. electronic inter-dealer quotation system, including OTCQX, OTCQB and OTC Pink.

"**property**" or "**properties**" means, unless otherwise specifically limited, real or personal property of any kind, tangible or intangible, choate or inchoate.

"**Purchase Rights**" is defined in Section 7.6(m).

"**Purchaser**" or "**Purchasers**" means each of the purchasers that has executed and delivered this Agreement or an NPA Joinder Agreement to the Company and such Purchaser's successors and assigns (so long as any such assignment complies with Section 13.2), *provided, however,* that any Purchaser of a Note that ceases to be the registered holder or a beneficial owner of such Note as the result of a transfer thereof pursuant to Section 13.2 shall cease to be included within the meaning of "Purchaser" of such Note for the purposes of this Agreement upon such transfer.  Unless the context otherwise requires, references in this agreement to a "holder" or a "holder of Notes" shall be deemed to include the Purchasers that continue to be registered holders of the Notes.

"**Purchaser Notice Schedule**" means the Purchaser Notice Schedule to this Agreement listing the Purchasers of the Notes and including their respective notice information.

"**Purchaser Schedule**" means the Purchaser Schedule to this Agreement listing the Initial Purchasers and the Exchange Purchasers and their respective payment information.

"**Rate**" is defined in Section 7.1(b).

"**Register**" is defined in Section 13.1.

"**Required Purchasers**" means at any time on or after the Closing, the Purchasers holding at least 50% of the principal amount of the Notes at the time outstanding.

"**Responsible Officer**" means any senior financial officer, chief executive officer, president, vice president, secretary, treasurer, managing member and any other officer of the Company.  Any document delivered hereunder that is signed by a Responsible Officer shall be conclusively presumed to have been authorized by all necessary corporate and/or other action on the part of the Company and such Responsible Officer shall be conclusively presumed to have acted on behalf of the Company.

"**S&P**" means Standard & Poor's Ratings Group.

"**Sanctions**" means any sanction administered or enforced by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union, any European Union member state, Her Majesty's Treasury ("**HMT**") or other relevant sanctions authority.

"**Satisfactory Delaware Supreme Court Decision**" means a decision by the Delaware Supreme Court in the case captioned *Stream TV Networks, Inc., v. SeeCubic, Inc.*, No. 360, 2021 (Del.) that is satisfactory to the Company in its reasonable discretion for purposes of (i) the Domestic Former Stream Subsidiaries complying with the Collateral and Guaranty Requirement or (ii) no longer designating each Former Stream Subsidiary as an Excluded Stream Subsidiary.

"**Securities Act**" means the Securities Act of 1933 and the rules and regulations promulgated thereunder from time to time in effect.

"**SLS**" means SLS Holdings VI, LLC, a Delaware limited liability company.

"**Stockholders' Agreement**" means the Stockholders' Agreement made and entered into by and among the Company, SLS, Hawk, and any other stockholder of the Company who may thereafter become a signatory thereto, as the same may be amended, modified or replaced from time to time.

"**Stream TV**" means Stream TV Networks, Inc., a Delaware corporation.

"**Subordinated Indebtedness**" means (i) any Junior Lien Indebtedness or (ii) any Indebtedness of the Company or any Subsidiary the payment of which is subordinated to payment of the Obligations.

"**Subordinated Indebtedness Documents**" means any document, agreement or instrument evidencing any Subordinated Indebtedness or entered into in connection with any Subordinated Indebtedness.

"**Subsidiary**" means, as to any Person, any other Person in which such first Person or one or more of its Subsidiaries or such first Person and one or more of its Subsidiaries owns sufficient equity or voting interests to enable it or them (as a group) ordinarily, in the absence of contingencies, to elect a majority of the directors (or Persons performing similar functions) of such second Person, and any partnership or joint venture if more than a 50% interest in the profits or capital thereof is owned by such first Person or one or more of its Subsidiaries or such first Person and one or more of its Subsidiaries (unless such partnership or joint venture can and does ordinarily take major business actions without the prior approval of such Person or one or more of its Subsidiaries); *provided* that no Excluded Stream Subsidiary of the Company shall constitute a Subsidiary of the Company for purposes of the Note Documentation so long as it constitutes an Excluded Stream Subsidiary.

"**Swap Contract**" means (a) any and all interest rate swap transactions, basis swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward foreign exchange transactions, cap transactions, floor transactions, currency options, spot contracts or any other similar transactions or any of the foregoing (including any options to enter into any of the foregoing), and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc. or any International Foreign Exchange Master Agreement.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amounts(s) determined as the mark-to-market values(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts.

"**Synthetic Lease**" means, at any time, any lease (including leases that may be terminated by the lessee at any time) of any property (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for U.S. federal income tax purposes, other than any such lease under which such Person is the lessor.

"**Settlement Agreement**" means that certain settlement agreement, dated as of April 30, 2021, regarding the settlement between the Company and the Official Committee of Unsecured Creditors appointed in the Ch. 11 bankruptcy case *In re: Stream TV Networks, Inc.*, Case No. 21-10433.

"**Taxes**" means all present or future taxes, duties, levies, imposts, deductions, assessments or withholdings (including backup withholding), fees or other charges imposed by any Governmental Authority including interest, penalties or additions to tax applicable thereto.

"**United States Person**" has the meaning set forth in Section 7701(a)(30) of the Code.

"**Warrant**" means any warrant issued pursuant to the Securities Purchase Agreement, by and between the Company and each person that has entered into a joinder agreement, in the form attached as Exhibit A thereto.

"**Withholding Party**" is defined in Section 14.3(a).

[Remainder of Page Intentionally Left Blank]

904117.22-WILSR01A - MSW

**Schedule 1**

**Form of Note**

NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THIS NOTE OR ANY INTEREST OR PARTICIPATION THEREIN MAY BE MADE EXCEPT (A) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**") OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS AND, IN THE CASE OF THIS CLAUSE (B); *PROVIDED* THAT, IF THE COMPANY REQUESTS, THE COMPANY SHALL RECEIVE AN OPINION OF COUNSEL IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE COMPANY TO THE EFFECT THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT.

**SEECUBIC, INC.**

**3.0% Senior Secured Note Due December 31, 2023**

No. [_____]                                                                    **[Date], 202[_]**
$[_____]

For value received, the undersigned, **SEECUBIC, INC.** (herein called the "**Company**"), a corporation organized and existing under the laws of the State of Delaware, hereby promises to pay to [_____], or registered assigns, the principal sum of [_____] U.S. dollars (or so much thereof as shall not have been prepaid) on December 31, 2023 (the "**Maturity Date**"), with interest (computed on the basis of a 360-day year of twelve 30-day months) on the unpaid balance hereof at the rate of 3.0% per annum from the date hereof, payable on the Maturity Date, until the principal hereof shall have been paid in full.  In addition, the Company agrees to pay interest at the Default Rate, as provided in the Note Agreement referenced below.

Payments of principal of and interest on this Note are to be made in lawful money of the United States of America at the Wilmington, Delaware office of the Company or at such other place as the Company shall have designated by written notice to the holder of this Note as provided in the Note Agreement referred to below.

This Note is one of a series of Senior Secured Notes (herein called the "**Notes**") issued pursuant to the Note Purchase Agreement, dated as of June 11, 2022 (as from time to time amended, the "**Note Agreement**"), between the Company and the respective Purchasers named therein and is entitled to the benefits thereof.  Unless otherwise indicated, capitalized terms used in this Note shall have the respective meanings ascribed to such terms in the Note Agreement.

This Note is a registered Note and, as provided in the Note Agreement, upon surrender of this Note for registration of transfer accompanied by a written instrument of transfer duly executed, by the registered holder hereof or such holder's attorney duly authorized in writing, a new Note for a like principal amount will be issued to, and registered in the name of, the transferee.  Prior to due presentment for registration of transfer, the Company may treat the Person in whose name this Note is registered as the owner hereof for the purpose of receiving payment and for all other purposes, and the Company will not be affected by any notice to the contrary.

Any assignee of this Note, by acceptance hereof, covenants and agrees that it will be bound by the Note Agreement as if it were an initial Purchaser thereunder.

This Note is subject to optional prepayment or conversion, in whole or from time to time in part, at the times and on the terms specified in the Note Agreement.  The Company's Obligations under this Note and the Note Agreement are secured pursuant to the Guarantee and Collateral Agreement.

If an Event of Default occurs and is continuing, the principal of this Note may be declared or otherwise become due and payable in the manner, at the price and with the effect provided in the Note Agreement.

This Note shall be construed and enforced in accordance with, and the rights of the Company and the holder of this Note shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would permit the application of the laws of a jurisdiction other than such State.

**SEECUBIC, INC.**

By: _____
      Name:
      Title:

2

**Schedule 5.8**

**Subsidiaries**

| Legal Name | Jurisdiction of Organization | Type of Organization | General Partners and Managing Members (if applicable) |
|---|---|---|---|
| SeeCubic Limited | United Kingdom | Private Limited Company | N/A |
| SeeCubic India Private Limited | India | Private Limited Company | N/A |

**Schedule 5.9**

**Former Stream Subsidiaries**

| Legal Name | Jurisdiction of Organization | Type of Organization | General Partners and Managing Members (if applicable) |
|---|---|---|---|
| TechnoVative Media, Inc. | Delaware, USA | Corporation | N/A |
| Media Holdings Delaware, LLC | Delaware, USA | Limited Liability Company | N/A |
| Technology Holdings Delaware, LLC | Delaware, USA | Limited Liability Company | N/A |
| Ultra-D Ventures C.V. | Curacao | Limited Partnership | Media Holdings Delaware, LLC, as a general partner |
| Ultra-D Cooperatief U.A. | The Netherlands | Cooperative | N/A |
| SeeCubic B.V. | The Netherlands | Private Limited Company | N/A |
| Stream TV International B.V. | The Netherlands | Private Limited Company | N/A |
| Stream TV 3D Technology (Suzhou) Co., Ltd. | China | Limited Liability Company | N/A |

**Schedule 6**

**Post-Closing Items**

1.  Within thirty (30) days of Closing (or such later date that the Collateral Agent may agree in its reasonable discretion), the Company shall deliver to the Collateral Agent, on behalf of itself and the Guarantors, certificates of insurance (or such other evidence of insurance reasonably requested by the Collateral Agent) executed by the insurer or its duly authorized representative, together with any corresponding endorsements requested by the Collateral Agent, including endorsements naming the Collateral Agent as an additional insured or loss payee, as applicable, and demonstrating that the insurance policies required by Section 8.2 are in full force and effect.

2.  Within thirty (30) days of Closing (or such later date that the Collateral Agent may agree in its reasonable discretion), each Grantor shall deliver to the Collateral Agent the control agreements required to be delivered to the Collateral Agent pursuant to Section 5.6 of the Guarantee and Collateral Agreement for each account set forth on Schedule 5 of the Guarantee and Collateral Agreement.

## Schedule 9.3

## Existing Indebtedness

| Obligor(s) | Creditor | Final Maturity | Outstanding Principal Amount |
|---|---|---|---|
| SeeCubic, Inc. | ServCorp Madison LLC | 2/28/2023 | $84,000.00 |
| SeeCubic, Inc. | Nantong Xungetai Semiconductor Technology Co., LTD | 1/20/2023 | ¥583,000.00 |
| SeeCubic, Inc. | Ultra-D Ventures C.V. | 12/31/2022 | $23,560,602.55 |

**Schedule 9.6**

**Existing Investments**

1.  Direct and/or indirect investments by the Company in the ownership of the Former Stream Subsidiaries.

**Purchaser Notice Schedule**

**<u>Information Relating to Purchasers</u>**

[*Attached*]

**Purchaser Schedule**

[*Purchaser Schedule on file with the Collateral Agent*]

[Purchaser Schedule]

<u>EXHIBIT A</u>

**FORM OF NOTICE OF CONVERSION REQUEST**

Date of Notice: [_____], 202[_]

**TO: SEECUBIC, INC.**

**ATTENTION: LEGAL**

(1)     The undersigned hereby elects to convert US$[_] of the principal amount (together with the accrued and unpaid interest thereon) of that certain Senior Secured Note No. [_], issued on [_____], 202[_] (the "**Note**"), with an initial principal amount of US$[_] into Common Stock of SeeCubic, Inc. (the "**Company**") pursuant to <u>Section 7.6</u> of the Note Purchase Agreement dated as of June 11, 2022, by and between the Company and each purchaser from time to time party thereto (the "**Note Purchase Agreement**"), and tenders the Note herewith.  Capitalized terms used but not defined herein have their respective meanings assigned to them in the Note Purchase Agreement.

(2)     Please issue a certificate or certificates representing said shares of Common Stock in the name of the undersigned.

(3)     The undersigned represents that (i) the aforesaid shares of Common Stock are being acquired for the account of the undersigned for investment and not with a view to, or for resale in connection with, the distribution thereof and that the undersigned has no present intention of distributing or reselling such shares; (ii) the undersigned is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision regarding its investment in the Company; (iii) the undersigned is experienced in making investments of this type and has such knowledge and background in financial and business matters that the undersigned is capable of evaluating the merits and risks of this investment and protecting the undersigned's own interests; (iv) the undersigned understands that the shares of Common Stock issuable upon Conversion have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), by reason of a specific exemption from the registration provisions of the Securities Act, which exemption depends upon, among other things, the bona fide nature of the investment intent as expressed herein, and, because such securities have not been registered under the Securities Act, they must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available; (v) the undersigned is aware that the aforesaid shares of Common Stock may not be sold pursuant to Rule 144 adopted under the Securities Act unless certain conditions are met and until the undersigned has held the shares for the period of time prescribed by Rule 144, that among the conditions for use of Rule 144 is the availability of current information to the public about the Company and the Company has not made such information available and has no present plans to do so; and (vi) the undersigned agrees not to make any disposition of all or any part of the aforesaid shares of Common Stock to any Person, other than the Company or any of its Subsidiaries, unless and until there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with said registration statement, or the undersigned has provided the Company with an opinion of counsel reasonably satisfactory to the Company, stating that such registration is not required.

(4)     The undersigned acknowledges and agrees that all Conversion Shares issuable upon Conversion are and shall become subject to, and have the benefit of, the Stockholders' Agreement, and the holder shall be required, for so long as such holder holds any Conversion Shares, to become and remain a party to the Stockholders' Agreement.

_____

(Date)

_____

(Signature)

_____

(Print name)

Notice of Conversion Request

EXHIBIT B

**FORM OF NOTICE OF CONVERSION**

Date of Notice: [_]

TO: [_]
ATTENTION: [_]

SeeCubic, Inc., a Delaware corporation (the "**Company**"), hereby informs you that US$[_] of the Accrued Amount (which includes US$[_] of the principal amount) of that certain Senior Secured Note No. [_], issued on [_____], 202[_] (the "**Note**"), with an initial principal amount of US$[_] has been converted into Common Stock of the Company pursuant to the terms of that certain Note Purchase Agreement, dated as of June 11, 2022 (the "**Note Agreement**"), by and among the Company and the Purchasers party thereto.  Capitalized terms used but not defined herein have their respective meanings assigned to them in the Note Agreement.

**SeeCubic, Inc.**
1732A Marsh Road Suite 124
Wilmington, Delaware 19810


_____    _____
(Date)                                                     (Signature)

                                                           _____
                                                           (Printed name)

Notice of Conversion

## EXHIBIT C

## ASSIGNMENTS TO THE COMPANY

Any holder may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Notes to the Company on a non-pro rata basis through a "Dutch auction" process on terms agreed to between the Company and the Collateral Agent, which shall, in any event, be open to all Lenders on a *pro rata* basis and shall be subject to the following limitations:

(a)     the Company shall represent to the assigning holder as of the date of any such purchase, sale or assignment conducted through a Dutch auction, that as of the date of such purchase or assignment, it is not in possession of any material non-public information with respect to the Company and its Subsidiaries or any of their respective securities that has not been made available to the holders prior to such date and which could reasonably be expected to have a material effect upon, or otherwise be material, to a holders decision to assign its Note to the Company;

(b)     at the time of the notice of such Dutch auction and the applicable purchase or assignment, no Default or Event of Default shall have occurred and be continuing or would result therefrom; and

(c)     any Notes purchased by or assigned to the Company shall be automatically and permanently cancelled immediately upon acquisition by the Company unless prohibited by applicable law (in which case, the Company shall notify the Collateral Agent of the law prohibiting such cancellation, and such Notes shall be cancelled by the Company when no longer prohibited, and any non-cancelled Notes shall not be taken into account in determining any Required Lender or other vote hereunder).

<u>EXHIBIT D</u>

**FORM OF NPA JOINDER AGREEMENT**

[*Attached*]

NOTE PURCHASE AGREEMENT JOINDER AGREEMENT (this "Joinder Agreement"), dated as of [_____], 202[ ], made by _____ (the "**Joinder Party**"), in connection with the Note Purchase Agreement referred to below. All capitalized terms not defined herein shall have the meaning ascribed to them in the Note Purchase Agreement (as defined below), as applicable.

W I T N E S S E T H :

WHEREAS, there exists that Note Purchase Agreement, dated as of June 11, 2022 (as amended, restated, replaced, refinanced, supplemented, waived and/or otherwise modified from time to time, the "**Note Purchase Agreement**"), by and among SEECUBIC, INC., a Delaware corporation (the "Company"), the Collateral Agent and the Purchasers party thereto;

WHEREAS, the Joinder Party desires to become a party to the Note Purchase Agreement and assume all obligations and liabilities of a Purchaser thereunder; and

WHEREAS, the Joinder Party has agreed to execute and deliver this Joinder Agreement in order to become a party to the Note Purchase Agreement and to assume all obligations and liabilities of a Purchaser under the Note Purchase Agreement.

NOW, THEREFORE, IT IS AGREED:

1.    Joinder to Note Purchase Agreement.

(a)    The Joinder Party hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, such Joinder Party will be deemed to be a "Purchaser" and an "Exchange Purchaser" for all purposes of the Note Purchase Agreement, hereby becomes a party to the Note Purchase Agreement and shall have all of the obligations, liabilities and rights of a "Purchaser" and an "Exchange Purchaser" thereunder as if it had been an original party to the Note Purchase Agreement.

(b)    The Joinder Party hereby represents and warrants to the Company and to the Collateral Agent that (a) it has full power and authority to enter into this Joinder Agreement, in its capacity as Note Purchaser and (b) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Joinder Agreement.

2.    Appointment of Collateral Agent  The Joinder Party appoints Hawk Investment Holdings Limited, a Guernsey holding company, to act on behalf of itself as "Collateral Agent" under the Note Purchase Agreement and the Guarantee and Collateral Agreement and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of the Note Purchase Agreement and the Guarantee and Collateral Agreement.

3.    MISCELLANEOUS.   THIS JOINDER AGREEMENT SHALL BE SUBJECT TO SECTIONS 19.2 THROUGH 19.7 OF THE NOTE PURCHASE AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

4.    Electronic Signatures. This Joinder Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Joinder Agreement by telecopy or other electronic image (e.g., "PDF" or "TIF" via electronic email or DocuSign or similar electronic execution software) shall be effective as delivery of a manually executed counterpart of this Joinder Agreement. The

words "execution", "signed", "signature", and words of like import in this Joinder Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable requirement of law, including the Federal Electronic Signatures in Global and National Commerce Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed and delivered as of the date first above written.

[JOINDER PARTY], as a Purchaser under the Note Purchase Agreement

By: _____
    Name:
    Title: