# **<u>EXHIBIT G</u>**

*Execution Version*

**GUARANTEE AND COLLATERAL AGREEMENT**

**made by**

**SEECUBIC, INC.,**

**and**

**each other GRANTOR and GUARANTOR from time to time party hereto**

**in favor of**

**HAWK INVESTMENT HOLDINGS LIMITED,**
**as Collateral Agent,**

**dated as of June 11, 2022**

## TABLE OF CONTENTS

Page

SECTION 1. DEFINED TERMS .................................................................................................1
    1.1   Definitions .................................................................................................1
    1.2   Other Definitional Provisions .................................................................4
SECTION 2. GUARANTEE .......................................................................................................5
    2.1   Guarantee .................................................................................................5
    2.2   Right of Contribution .............................................................................5
    2.3   No Subrogation .......................................................................................6
    2.4   Amendments, etc. with respect to the Obligations ...............................6
    2.5   Guarantee Absolute and Unconditional .................................................7
    2.6   Reinstatement .........................................................................................7
    2.7   Payments .................................................................................................7
    2.8   Information ..............................................................................................8
SECTION 3. GRANT OF SECURITY INTEREST ...................................................................8
    3.1   Grant of Security Interests .....................................................................8
SECTION 4. REPRESENTATIONS AND WARRANTIES .....................................................9
    4.1   No Other Liens .......................................................................................9
    4.2   Names; Jurisdiction of Organization; Chief Executive Office ..............9
    4.3   Pledged Stock; Pledged Notes ...............................................................9
    4.4   Intellectual Property .............................................................................10
    4.5   Commercial Tort Claims ......................................................................10
    4.6   Investment Accounts ............................................................................10
    4.7   Inventory ..............................................................................................10
    4.8   Documents, Instruments and Chattel Paper .........................................10
SECTION 5. COVENANTS ......................................................................................................10
    5.1   Covenants in NPA .................................................................................10
    5.2   Investment Property ..............................................................................10
    5.3   Maintenance of Perfected Security Interest; Defense of Claims ..........11
    5.4   Commercial Tort Claims ......................................................................11
    5.5   Intellectual Property .............................................................................12
    5.6   Investment Accounts ............................................................................13
    5.7   Government Contracts ..........................................................................13
SECTION 6. REMEDIAL PROVISIONS ................................................................................13
    6.1   Certain Matters Relating to Receivables .............................................13
    6.2   Communications with the Grantors; each Grantor Remains Liable .....14
    6.3   Pledged Securities ................................................................................14
    6.4   Intellectual Property .............................................................................15
    6.5   Proceeds to be Turned Over To Collateral Agent ................................16
    6.6   Application of Proceeds ........................................................................16
    6.7   Code and Other Remedies ....................................................................16
    6.8   Private Sales ..........................................................................................16
    6.9   Deficiency .............................................................................................17
    6.10   Investment Accounts ............................................................................17

869792.11-LACSR02A - MSW

SECTION 7.    THE COLLATERAL AGENT ...........................................................................17
    7.1    Collateral Agent's Appointment as Attorney-in-Fact, etc. ...................................17
    7.2    Duty of Collateral Agent ...................................................................................19
    7.3    Authorization of Financing Statements; Control Agreements ..............................19
    7.4    Authority of Collateral Agent ............................................................................19
SECTION 8.    MISCELLANEOUS .....................................................................................20
    8.1    Amendments in Writing .....................................................................................20
    8.2    Notices ...............................................................................................................20
    8.3    No Waiver by Course of Conduct; Cumulative Remedies ...................................20
    8.4    Enforcement Expenses; Indemnification .............................................................20
    8.5    Successors and Assigns ......................................................................................20
    8.6    Counterparts .......................................................................................................20
    8.7    Severability ........................................................................................................21
    8.8    Section Headings ................................................................................................21
    8.9    Integration ..........................................................................................................21
    8.10    GOVERNING LAW ..........................................................................................21
    8.11    Submission To Jurisdiction; Waivers .................................................................21
    8.12    Additional Grantors ...........................................................................................22
    8.13    Releases .............................................................................................................22
    **8.14    WAIVER OF JURY TRIAL** ...........................................................................23

SCHEDULES

Schedule 1    Investment Property
Schedule 2    Legal Name and Jurisdictions of Organization
Schedule 3    Intellectual Property
Schedule 4    Commercial Tort Claims
Schedule 5    Investment Accounts

ANNEXES

Annex I    Guarantee and Collateral Agreement Joinder Agreement
Annex II    Grant of Security Interest – Copyrights
Annex III    Grant of Security Interest – Patents and Trademarks

869792.11-LACSR02A - MSW

## GUARANTEE AND COLLATERAL AGREEMENT

This GUARANTEE AND COLLATERAL AGREEMENT (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, this "Agreement"), dated as of June 11, 2022, made by SEECUBIC, INC., a Delaware corporation (the "Company"), and each other Grantor (as defined below) and each Guarantor (as defined below) from time to time party hereto, in favor of HAWK INVESTMENT HOLDINGS LIMITED, a Guernsey holding company, in its capacity as collateral agent for the Purchasers (as defined in the NPA referred to below) (in such capacity, together with its successors and permitted assigns in such capacity, the "Collateral Agent").

WHEREAS, pursuant to the Note Purchase Agreement, dated as of the date hereof (as amended, restated, replaced, refinanced, supplemented, waived and/or otherwise modified from time to time, the "NPA"; capitalized terms used but not defined herein shall have the meanings given to them in the NPA), by and among the Company, the Collateral Agent and the Purchasers (as defined below) party thereto from time to time, the Company has issued and will issue Notes (as defined in the NPA) to the Purchasers;

WHEREAS, it is a condition precedent to each Purchaser's (as defined in the NPA) obligation to purchase the Notes issued and delivered to such Purchaser by the Company from time to time pursuant to the NPA that the Company and each other Guarantor and Grantor shall have executed and delivered this agreement to the Collateral Agent for the benefit of the Collateral Agent and the Purchasers; and

WHEREAS, the Guarantors and Grantors (other than the Company) to be party hereto from time to time are affiliates of the Company and will derive substantial benefits from the Company's issuance and delivery of, and the Purchasers' purchase of, the Notes.

NOW, THEREFORE, to in consideration of the premises and to induce the Collateral Agent and the Purchasers to enter into the NPA and to induce the Purchasers' purchase of the Notes on the Closing Date and thereafter, the Company, the other Grantors and the other Guarantors to be party hereto from time to time hereby agree with the Collateral Agent, for the benefit of the Collateral Agent and the Purchasers, as follows:

SECTION 1.    DEFINED TERMS

    1.1    Definitions.

        (a)    The following terms are used herein as defined in Article 8 or 9 of the UCC: "Accession", "Account", "Account Debtor", "Certificated Security", "Chattel Paper", "Commercial Tort Claim", "Commodities Account", "Deposit Account", "Document", "Electronic Chattel Paper", "Equipment", "Fixture", "General Intangible", "Goods", "Instrument", "Inventory", "Letter-of-Credit Right", "Payment Intangibles", "Record", "Securities Account", "Security", "Supporting Obligations", "Tangible Chattel Paper" and "Uncertificated Securities".

        (b)    The following terms shall have the following meanings:

"Agreement" has the meaning as defined in the preamble hereto.

"Collateral" has the meaning provided to such term in Section 3.1.

"Collateral Account" means any collateral account established by the Collateral Agent as provided in Sections 6.1 or 6.5.

"Collateral Agent" has the meaning provided to such term in the preamble hereto; provided that, upon and following the resignation or removal of any Collateral Agent, unless and until a successor Collateral Agent is appointed in accordance with the terms hereof and the NPA, any reference to the Collateral Agent hereunder shall be deemed to be a reference to the non-removed and non-resigned Collateral Agent.

"Collateral Termination Date" has the meaning provided to such term in Section 8.13(a).

"Company" has the meaning provided to such term in the preamble hereto.

"Copyright Licenses" means all written agreements naming any Grantor as licensor or licensee, granting any right under any Copyright, including, without limitation, the grant of rights to exploit materials derived from any Copyright.

"Copyrights" means (i) all copyrights arising under the laws of the United States, multinational or foreign laws or otherwise, whether registered or unregistered and whether published or unpublished (including, without limitation, those listed in Schedule 3), all registrations thereof, and all applications for registration thereof, including, without limitation, all registrations and applications in the United States Copyright Office, and (ii) the right to obtain all renewals thereof.

"Excluded Deposit Account" means any Deposit Account the balance of which consists exclusively of (a) withheld income Taxes and federal, state, local and foreign employment Taxes in such amounts as are required in the reasonable judgment of any Grantor to be paid to the IRS or any other applicable governmental authority within the following three (3) months with respect to employees of any Grantor and/or (b) amounts used for payroll, payroll Taxes, escrow, trust or fiduciary purposes and other employee wage and benefit payments to or for any Grantor.

"Excluded Property" means (i) any lease, license or agreement or any property subject to a purchase money security interest or similar arrangement permitted under this Agreement to the extent that a grant of a security interest therein would violate or invalidate such lease, license or agreement or purchase money arrangement or create a right of termination in favor of any other party thereto after giving effect to Sections 9-406 through 9-409 of the UCC as in effect in any applicable jurisdiction or other applicable law, other than proceeds and receivables thereof, (ii) any trademark application filed in the US Patent and Trademark Office on the basis of the Company's or any Guarantor's "intent to use" such mark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, unless and until an Amendment to Allege Use or a Statement of Use under Sections 1(c) and 1(d) of said Act has been filed and accepted, (iii) any governmental licenses or state or local franchises, charters and authorizations, to the extent a security interest in any such license, franchise, charter or authorization is prohibited or restricted thereby after giving effect to the UCC and other applicable law, (iv) pledges and security interests prohibited or restricted (to the extent of such restriction) by applicable law (including any requirement to obtain the consent of any governmental authority) after giving effect to the UCC and any other applicable law, (v) pledges and security interests requiring (to the extent of such requirement) the consent of a third party, (vi) motor vehicles and other assets subject to certificates of title except to the extent perfection of a security interest therein may be accomplished by filing of financing statements in appropriate form in the applicable jurisdiction under the UCC, (vii) voting Equity Interests in any Foreign Subsidiary owned by the Company or any other Grantor in excess of 65% of the total issued and outstanding voting Equity Interests of such Foreign Subsidiary and/or to the extent granting a security interest therein would result in material adverse tax consequences to such Grantor and (viii) any Equity Interests in an Excluded Stream Subsidiary.

"Foreign Subsidiary" means any Subsidiary of the Company other than a Domestic Subsidiary.

"Grantors" means the Company and any other entity that may become party hereto as a Grantor pursuant to Section 8.12.

"Guarantors" means any entity that may become party hereto as a Guarantor pursuant to Section 8.12.

"Intellectual Property" means all intellectual property rights, whether arising under United States, multinational or foreign laws or otherwise, now existing or hereafter adopted, created or acquired, including, without limitation, Copyrights, Patents, Trademarks, domain names, and proprietary rights in technology, trade secrets, know-how and processes.

"Intellectual Property Licenses" means the collective reference to Copyright Licenses, Patent Licenses, and Trademark Licenses.

"Intercompany Note" means any promissory note evidencing loans made by any Grantor to the Company or any of the Company's Subsidiaries.

"Investment Accounts" means any and all Deposit Accounts, Securities Accounts and Commodities Accounts now owned or hereafter acquired by such Person, or in which such Person has or acquires any rights.

"Investment Property" means the collective reference to all "investment property" as such term is defined in Section 9-102(a)(49) of the UCC now owned or hereafter acquired by such Person or in which such Person has or acquires any rights and, in any event, shall mean and include, without limitation, (A) all "certificated securities", "uncertificated securities", "security entitlements", "commodity contracts", "commodity accounts" (as all such terms are defined in the UCC) and Securities Accounts of such Person; (B) any other securities, whether certificated or uncertificated, including, but not limited to, stocks, bonds, interests in limited liability companies, partnership interests, treasuries, certificates of deposit, and mutual fund shares; (C) all securities entitlements of such Person, including, but not limited to, the rights of such Person to any Investment Accounts and the financial assets held by a financial intermediary in such accounts and any free credit balance or other money owing by any financial intermediary with respect to such accounts; (D) all commodity contracts of such Person; and (E) all Investment Accounts (other than Deposit Accounts) of such Person, and shall in any event, include all Pledged Securities.

"IP-Related Rights" means (i) income, royalties, damages and payments now and hereafter due and/or payable under and with respect to Intellectual Property, including, without limitation, payments under all licenses thereof, (ii) the right to sue at law or in equity or otherwise recover for any past, present or future infringement, misappropriation or other violation of Intellectual Property, including the right to receive all proceeds and damages therefrom, and (iii) all goodwill and rights corresponding to Intellectual Property throughout the world in any and all media, whether now existing or hereafter developed.

"Issuers" means the collective reference to each issuer of a Pledged Security.

"Patent License" means all written agreements providing for the grant by or to any Grantor of any right to manufacture, use, sell or otherwise exploit any invention covered in whole or in part by a Patent.

"Patents" means (i) all letters patent of the United States, any other country or any political subdivision thereof, all reissues and extensions thereof, including, without limitation, any of the foregoing referred to in Schedule 3, (ii) all applications for letters patent of the United States, any other country or any political subdivision thereof, and all reissues, divisionals, continuations and continuations in part,

3

renewal applications and all renewals thereof, including, without limitation, any of the foregoing referred to in <u>Schedule 3</u> and (iii) all rights to obtain any reissues, reexaminations or extensions of the foregoing.

"<u>Pledged Notes</u>" means all promissory notes listed on <u>Schedule 1</u>, all Intercompany Notes at any time issued to any Grantor and all other promissory notes issued to or held by any Grantor (other than promissory notes issued in connection with extensions of trade credit by such Grantor in the ordinary course of business).

"<u>Pledged Securities</u>" means the collective reference to the Pledged Notes and the Pledged Stock.

"<u>Pledged Stock</u>" means the collective reference to (i) all shares of Equity Interests of each Grantor's direct Subsidiaries as listed on <u>Schedule 1</u> and (ii) any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Equity Interests of any Person that may be issued or granted to, or held by, such Grantor while this Agreement is in effect and that are required to become Collateral pursuant to Section 3.1; provided that in no case shall Pledged Stock include any Excluded Property.

"<u>Proceeds</u>" means all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Investment Property, collections thereon or distributions or payments with respect thereto.

"<u>Purchaser</u>" has the meaning given thereto in the NPA.

"<u>Receivable</u>" means any right to payment for goods sold or leased or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance (including, without limitation, any Account).

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>Trademark License</u>" means all written agreements providing for the grant by or to any Grantor of any right to use any Trademark.

"<u>Trademarks</u>" means (i) all United States and foreign trademarks, trade names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, now existing or hereafter adopted or acquired, all registrations thereof, and all applications for registration thereof, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or otherwise, all common-law rights related thereto, including, without limitation, any registrations and applications for registrations in respect of the foregoing referred to in <u>Schedule 3</u>, and all goodwill of the business connected with the use of or symbolized by any of the foregoing, and (ii) the right to obtain all renewals thereof.

"<u>UCC</u>" means the Uniform Commercial Code from time to time in effect in the State of New York; *provided* that, if by reason of any mandatory provisions of law, the perfection, the effect of perfection or non-perfection or priority of the security interests granted to the Collateral Agent pursuant to this Agreement are governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, then "<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of such perfection, effect of perfection or non-perfection or priority.

1.2     <u>Other Definitional Provisions</u>.

(a)     The words "hereof," "herein", "hereto" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any

4

particular provision of this Agreement, and Section and Schedule references are to this Agreement unless otherwise specified.

(b)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(c)    Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to the Collateral owned and pledged hereunder by such Grantor or the relevant part thereof.

SECTION 2.    GUARANTEE

2.1    Guarantee.

(a)    Each of the Guarantors hereby, jointly and severally, absolutely, unconditionally and irrevocably, guarantees to the Collateral Agent for the benefit of the Collateral Agent and the Purchasers and their respective permitted successors, indorsees, transferees and assigns, the prompt, and, subject to clause (d) below, full and complete payment and performance by the Company when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations.

(b)    Anything herein or in any other Note Documentation to the contrary notwithstanding, the maximum liability of each Guarantor hereunder shall not exceed the maximum amount which could be paid by such Guarantor without rendering this guarantee void or voidable as would otherwise be held or determined by a court of competent jurisdiction in any action or proceeding involving any Debtor Relief Law (after giving effect to the right of contribution established in Section 2.2) (the "Maximum Amount").

(c)    Each Guarantor agrees that the Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor on the date hereof under this Agreement without impairing the guarantee contained in this Section 2 or affecting the rights and remedies of the Collateral Agent or any Purchaser hereunder.

(d)    No payment made by the Company, any of the Guarantors, any other guarantor or any other Person or received or collected by the Collateral Agent or any Purchaser from the Company, any of the Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder which shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Obligations or any payment received or collected from such Guarantor in respect of the Obligations), remain liable for the Obligations up to the Maximum Amount of such Guarantor hereunder until the Collateral Termination Date.

2.2    Right of Contribution. Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment. Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 2.3. The provisions of this Section 2.2 shall in no respect limit the obligations and liabilities of any Guarantor to the Collateral Agent and the Purchasers, and each

5

Guarantor shall remain liable to the Collateral Agent and the Purchasers for the full amount guaranteed by such Guarantor hereunder.

2.3     No Subrogation.  Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by the Collateral Agent or any Purchaser, no Guarantor shall be entitled to be subrogated to any of the rights of the Collateral Agent or any Purchaser against the Company or any other Guarantor or any collateral security or guarantee or right of offset held by the Collateral Agent or any Purchaser for the payment of the Obligations, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from the Company or any other Guarantor, and such Guarantor shall not exercise any right or remedy with respect to such rights, in respect of payments made by such Guarantor hereunder, until the Collateral Termination Date.  If any amount shall be paid to any Guarantor on account of such subrogation rights at any time before the Collateral Termination Date, such amount shall be held by such Guarantor in trust for the Collateral Agent and the Purchasers, and shall, forthwith upon receipt (but in any event, within two (2) Business Days) by such Guarantor, be turned over to the Collateral Agent in the exact form received by such Guarantor (duly indorsed by such Guarantor to the Collateral Agent, if required), to be applied against the Obligations, to the extent required, and in accordance with the terms of the NPA.

2.4     Amendments, etc. with respect to the Obligations.  To the fullest extent permitted by applicable law, each Guarantor acknowledges and agrees that, until the Collateral Termination Date, no change in the nature or terms of the Obligations or any of the Note Documentation, or other agreements, instruments or contracts evidencing, related to or attendant with the Obligations (including any novation), including, without limitation, the taking of further security for the Obligations, shall discharge all or any part of the liabilities and obligations of such Guarantor pursuant to this guarantee, and each Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, any demand for payment of any of the Obligations made by the Collateral Agent or any Purchaser may be rescinded by the Collateral Agent or such Purchaser and any of the Obligations continued, and the Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Collateral Agent or any Purchaser, and the NPA and the other Note Documentation and any other documents executed and delivered in connection therewith may be, amended, modified, supplemented or terminated, in whole or in part, in accordance with the terms thereof, and any collateral security, guarantee or right of set-off at any time held by the Collateral Agent or any Purchaser for the payment of the Obligations may be sold, exchanged, waived, surrendered or released. Except for the obligation to use reasonable care with respect to any Collateral in its custody pursuant to the terms hereof, neither the Collateral Agent nor any Purchaser shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Obligations or for the guarantee contained in this Section 2 or any property subject thereto.  Without limiting the generality of the foregoing, each Guarantor agrees that until the Collateral Termination Date, such Guarantor's undertakings hereunder shall not be released, in whole or in part, by any action or thing which might, but for this paragraph, be deemed a legal or equitable discharge of a surety or guarantor, or by reason of any waiver, omission of the Purchasers, or any of them, or their failure to proceed promptly or otherwise, or by reason of any action taken or omitted by the Purchasers, or any of them, whether or not such action or failure to act varies or increases the risk of, or affects the rights or remedies of, such Guarantor or by reason of any further dealings between the Company, on the one hand, and any Purchaser, on the other hand, or any other guarantor or surety, and such Guarantor hereby expressly waives and surrenders any defense to its liability hereunder, or any right of counterclaim, cross-claim, or offset of any nature or description which it may have or may

6

exist based upon, and shall be deemed to have consented to, any of the foregoing acts, omissions, things, agreements or waivers.

2.5    <u>Guarantee Absolute and Unconditional</u>.  To the fullest extent permitted by applicable law, each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by the Collateral Agent or any Purchaser upon the guarantee contained in this Section 2 or acceptance of the guarantee contained in this Section 2; the Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this Section 2; and all dealings between the Company and any of the Guarantors, on the one hand, with respect to the Note Documentation and the Collateral Agent and the Purchasers, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this Section 2.  To the fullest extent permitted by applicable law, each Guarantor waives (other than a defense of the occurrence of the Collateral Termination Date) each of the following: diligence, presentment, protest, demand for payment and notice of default, dishonor, or nonpayment to or upon the Company or any of the Guarantors with respect to the Obligations; notice of acceptance of this Agreement, and all other defenses of a surety available by law but not otherwise mentioned.  Each Guarantor understands and agrees that the guarantee of such Guarantor contained in this Section 2, to the fullest extent permitted by applicable law, is a continuing, absolute, irrevocable and unconditional guarantee of payment and not of collection, without regard to (a) the validity or enforceability of the NPA or any other Note Documentation, any of the Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by the Collateral Agent or any Purchaser, (b) any defense, set-off or counterclaim which may at any time be available to or be asserted by the Company or any other Person against the Collateral Agent or any Purchaser, or (c) any other circumstance whatsoever (with or without notice to or knowledge of the Company or any Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of the Company from the Obligations, or of such Guarantor under the guarantee of such Guarantor contained in this Section 2, in bankruptcy or in any other instance (other than the occurrence of the Collateral Termination Date). When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, the Collateral Agent or any Purchaser may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against the Company, any other Guarantor or any other Person or against any collateral security or guarantee for the Company or any right of offset with respect thereto, and any failure or delay by the Collateral Agent or any Purchaser to make any such demand, to pursue such other rights or remedies, to exercise any right, power, or privilege, to collect any payments from the Company, any other Guarantor or any other Person, to realize upon any such collateral security or guarantee, or to exercise any such right of offset, or any release of the Company, any other Guarantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve any Guarantor of any obligation or liability hereunder, shall not act as a waiver of any rights or remedies of any Purchaser, shall not be construed as a course of dealing, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Collateral Agent or any Purchaser against any Guarantor.  For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

2.6    <u>Reinstatement</u>.  The guarantee contained in this Section 2 shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Collateral Agent or any Purchaser upon the commencement or institution of an insolvency proceeding or other proceeding under or pursuant to any Debtor Relief Law by or against the Company or any Guarantor, all as though such payments had not been made.

2.7    <u>Payments</u>.  Each Guarantor hereby guarantees that payments hereunder will be paid to the Collateral Agent at such account and/or location as it may from time to time notify the Company

7

(x) without set-off or counterclaim in Dollars and (y) free and clear of, and without deduction for, any Taxes on the same terms and to the same extent that payments by the Company are required to be made pursuant to the terms of Sections 7 and 14 of the NPA, applying the provisions of Sections 7 and 14 of the NPA to such Guarantor and the Collateral Agent mutatis mutandis.

2.8    Information.  Each Guarantor (a) assumes all responsibility for being and keeping itself informed of the financial condition and assets of the Company and its Subsidiaries, and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks that such Guarantor assumes and incurs hereunder, and (b) agrees that none of the Collateral Agent or the Purchasers will have any duty to advise such Guarantor of information known to it or any of them regarding such circumstances or risks.

SECTION 3.    GRANT OF SECURITY INTEREST

3.1    Grant of Security Interests.  Each Grantor hereby grants to the Collateral Agent, for the benefit of the Collateral Agent and the Purchasers, a continuing security interest in and Lien on all of the right, title and interest of such Grantor in all of the following property, whether now owned or at any time hereafter acquired or created by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "Collateral"), as collateral security for the prompt and complete payment in full and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations:

(a)    all Accounts;

(b)    all cash and cash equivalents;

(c)    all Chattel Paper (including Tangible Chattel Paper, Electronic Chattel Paper, or a hybrid thereof);

(d)    all Commercial Tort Claims set forth on Schedule 4 hereto;

(e)    all Deposit Accounts;

(f)    all Equipment;

(g)    all Fixtures;

(h)    all General Intangibles (including all contract rights);

(i)    all Goods;

(j)    all Instruments, including the Pledged Notes;

(k)    all Intellectual Property, the Intellectual Property Licenses and IP-Related Rights;

(l)    all Letter-of-Credit Rights;

(m)    all Inventory, including returned, rejected, or repossessed Inventory, rights of reclamation and stoppage in transit with respect to Inventory, and whether such Inventory is in the

8

constructive, actual or exclusive occupancy or possession of such Grantor or of a third party for such Grantor's benefit;

        (n)     all Investment Property;

        (o)     all Payment Intangibles;

        (p)     all books and records (including all of its Records evidencing its assets (including the Collateral)); and

        (q)     all Proceeds of the foregoing, (including any Proceeds from the sale or Disposition of any contract, any agreement, license or other General Intangible), Supporting Obligations and products of any of the Collateral and products of any and all of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, or warranty payable to such Grantor from time to time, together with any and all other collateral security and guarantees given by any Person with respect to any of the foregoing; <u>provided</u> that, notwithstanding any of the other provisions set forth in this Section 3.1, this Agreement shall not constitute a grant of a security interest in, and "Collateral" shall not include, any Excluded Property; <u>provided</u>, <u>however</u>, that Proceeds of Excluded Property that are not themselves Excluded Property shall constitute Collateral.

## SECTION 4.   <u>REPRESENTATIONS AND WARRANTIES</u>

To induce the Collateral Agent and the Purchasers to enter into the NPA and the Purchasers to purchase the Notes, each Guarantor and each Grantor, to the extent applicable to such Guarantor or Grantor, hereby represents and warrants to the Collateral Agent and each Purchaser, that:

        4.1    <u>No Other Liens</u>.  The Collateral Agent has a first priority security interest in and Lien on the Collateral subject to no Liens other than Permitted Liens.

        4.2    <u>Names; Jurisdiction of Organization; Chief Executive Office</u>.  As of the date hereof, each Grantor's full and correct legal name, jurisdiction of organization, type of organization, taxpayer identification number (if any) and chief executive office are specified on <u>Schedule 2</u>.

        4.3    <u>Pledged Stock; Pledged Notes</u>.

        (a)    As of the date hereof, <u>Schedule 1</u> sets forth (i) all of the Pledged Stock owned by each Grantor constituting Collateral, and such Pledged Stock constitutes the percentage of issued and outstanding shares of stock, membership interests or partnership interests, as applicable, indicated on such Schedule and (ii) all of the Pledged Notes constituting Collateral.  As of the date hereof, the shares of Pledged Stock pledged by each Grantor hereunder have been duly authorized, validly issued and are fully paid and non-assessable, to the extent such concepts are applicable, and all Pledged Notes and Pledged Stock consisting of Certificated Securities constituting Collateral have been delivered to the Collateral Agent.

        (b)    No consent of any Person including any other general or limited partner, any other member of a limited liability company or any other shareholder is necessary in connection with the creation, perfection or first priority status of the Collateral Agent's security interest in any Pledged Stock or the exercise by the Collateral Agent of the voting or other rights provided for in this Agreement or the exercise of remedies in respect thereof.

4.4     Intellectual Property.    Schedule 3 lists all registered or applied for Patents, Trademarks and Copyrights owned by each Grantor in its own name as of the date hereof.

4.5     Commercial Tort Claims.    Schedule 4 lists all Commercial Tort Claims in favor of any Grantor with an actual or reasonably expected individual value in excess of $500,000 as of the date hereof.

4.6     Investment Accounts.    Set forth on Schedule 5 is a listing, as of the date hereof, of each Grantor's Investment Accounts, including, with respect to each bank or securities intermediary (a) the name of such Person, (b) the account numbers of the Investment Accounts maintained with such Person, and (c) the type and purpose of such Investment Account.

4.7     Inventory.    As of the date hereof, no Inventory of any Grantor is held by a third party pursuant to consignment, warehouse or similar arrangement.

4.8     Documents, Instruments and Chattel Paper.    All Documents, Instruments and Chattel Paper describing, evidencing or constituting Collateral are, to each Grantor's knowledge, complete, valid, and genuine in all material respects.

SECTION 5.    COVENANTS

Each Guarantor and each Grantor covenants and agrees, to the extent applicable to such Guarantor or Grantor, that until the payment and satisfaction in full of all Obligations (other than contingent obligations not then due and payable):

5.1     Covenants in NPA.    In the case of each Guarantor or Grantor, to the extent applicable, such Guarantor or Grantor shall take, or shall refrain from taking, as the case may be, each action that is necessary to be taken or not taken, as the case may be, so that no Default or Event of Default is caused by the failure to take such action or to refrain from taking such action by such Guarantor or Grantor or any of its Subsidiaries.

5.2     Investment Property.

(a)     To the extent any Investment Property (x) constitutes interests in any limited liability company or limited partnership controlled now or in the future by any Grantor and (y) is a "Security" within the meaning of Article 8 of the UCC and is governed by Article 8 of the UCC, such interest shall be certificated or subject to a control agreement in favor of the Collateral Agent pursuant to Section 5.2(c). Each Grantor further acknowledges and agrees that with respect to any interest in any limited liability company or limited partnership controlled now or in the future by such Grantor and pledged hereunder that is not a "Security" within the meaning of Article 8 of the UCC, such Grantor shall notify the Collateral Agent promptly (and, in any event, within one (1) Business Day) following such election if such Grantor has elected to treat such interest as a "Security" within the meaning of Article 8 of the UCC, and if such interest is represented by a certificate, to promptly (but in any event no later than fifteen (15) Business Days thereafter (which fifteen (15) Business Day period shall be shortened to two (2) Business Days at any time that a Default exists (or, in each case, such later date as the Collateral Agent may agree in its discretion))) deliver such certificate with an appropriate transfer instrument in respect thereof endorsed in blank to the Collateral Agent pursuant to the terms hereof.

(b)     To the extent that any Investment Property is a Certificated Security or, except as provided in Section 5.2(a) above, an Instrument or is an Uncertificated Security that becomes a Certificated Security or Instrument, the applicable Grantor shall notify the Collateral Agent promptly (and,

in any event, within one (1) Business Day) thereafter and promptly (but in any event no later than fifteen (15) Business Days thereafter (which fifteen (15) Business Day period shall be shortened to two (2) Business Days at any time that a Default exists (or, in each case, such later date as the Collateral Agent may agree in its discretion))) deliver such certificates or Instruments evidencing such Pledged Securities to the Collateral Agent together with stock powers thereof, in each case endorsed in blank, reasonably satisfactory to the Collateral Agent.  To the extent that any Investment Property is an Uncertificated Security, the applicable Grantor shall obtain an agreement giving the Collateral Agent "control", within the meaning of Section 8-106 of the UCC, from each issuer of Uncertificated Securities within the applicable time limits set forth in the immediately preceding sentence (except as set forth in Section 6 of the NPA).  For purposes of Section 8-106 of the UCC, each Grantor that is an issuer of Uncertificated Securities included in the Collateral of any other Grantor hereunder hereby promptly agrees to comply, solely in connection with an enforcement action during the continuation of an Event of Default, with any "instruction" (defined within the meaning of Section 8-102 of the UCC) received by it from the Collateral Agent without further consent by such other Grantor.

(c)      If an Event of Default has occurred and is continuing, and if any Grantor shall, as a result of its ownership of any Investment Property, become entitled to receive or shall receive any sums paid upon or in respect of Investment Property upon the liquidation or dissolution of any Issuer (except any liquidation or dissolution of any Grantor in accordance with the NPA), such sums shall be paid over to the Collateral Agent upon the Collateral Agent's written request to be held by it hereunder as additional collateral security for the Obligations, and in case any property shall be distributed upon or with respect to the Investment Property during such period, pursuant to the recapitalization or reclassification of the capital of any Issuer or pursuant to the reorganization thereof, the property so distributed shall, unless otherwise subject to a perfected security interest in favor of the Collateral Agent, be delivered to the Collateral Agent to be held by it hereunder during such period as additional collateral security for the Obligations.  If any sums of money or property so paid or distributed in respect of Investment Property shall be received by any Grantor during such period, such Grantor shall, until such money or property is paid or delivered to the Collateral Agent, hold such money or property in trust for Collateral Agent for the benefit of the Purchasers as additional collateral security for the Obligations.

(d)      No Grantor will create, incur or permit to exist any Lien or option in favor of any of the Pledged Stock or Proceeds thereof, or any interest therein, except for the security interests created hereunder and Permitted Liens.

(e)      Notwithstanding anything to the foregoing contained herein, the provisions of this Section 5.2 shall not apply to any Excluded Property.

5.3      Maintenance of Perfected Security Interest; Defense of Claims.  Each Grantor agrees to make all filings under the UCC or other applicable law that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected (to the extent perfection of the security interest in such property is required by the terms hereof), first priority security interest (except for Permitted Liens) in the Collateral for its benefit and the benefit of the Purchasers. No Grantor shall change its legal name, jurisdiction of organization, type of organization, taxpayer identification number (if any) and/or chief executive office without giving the Collateral Agent at least ten (10) Business Days prior notice thereof (or such later date that the Collateral Agent may agree in its discretion).

5.4      Commercial Tort Claims.

If any Grantor obtains a Commercial Tort Claim in an amount exceeding $500,000 against any third party after the date hereof, then such Grantor shall notify in writing the Collateral Agent promptly

(and, in any event, within one (1) Business Day) thereafter upon incurring or otherwise obtaining such Commercial Tort Claim and, upon written request of the Collateral Agent, promptly (but in any event no later than fifteen (15) Business Days thereafter (which fifteen (15) Business Day period shall be shortened to two (2) Business Days at any time that a Default exists (or, in each case, such later date as the Collateral Agent may agree in its discretion))) (i) amend <u>Schedule 4</u> attached hereto, (ii) authorize the filing of additional or amendments to existing financing statements and (iii) do such other acts or things deemed reasonably necessary or desirable by the Collateral Agent to give the Collateral Agent a perfected first priority, security interest in any such Commercial Tort Claim.

5.5    <u>Intellectual Property</u>.

(a)    In order to facilitate filings with the United States Patent and Trademark Office and the United States Copyright Office, each Grantor shall execute and deliver to the Collateral Agent one or more Grants of Security Interest substantially in the form of <u>Annex II</u> and <u>Annex III</u> attached hereto, as applicable, and such other documentation as may be necessary and reasonably requested by the Collateral Agent, to evidence the Collateral Agent's Lien hereunder on such Grantor's United States registered or applied-for Patents, Trademarks, and Copyrights.  Notwithstanding anything contained herein to the contrary, the Grantors shall not have any obligation to perfect any security interest or Lien, or record any notice thereof, in any Intellectual Property included in the Collateral in any jurisdiction other than the United States of America.

(b)    Except as permitted under Section 9.4 of the NPA, each Grantor (either itself or through licensees) will (i) take reasonable steps to maintain the quality of services offered under each Trademark included in the Collateral, (ii) take reasonable steps to maintain each Trademark included in the Collateral in full force and effect, (iii) not adopt or use any mark which is confusingly similar or a colorable imitation of such Trademark unless the Collateral Agent, for the benefit of the Collateral Agent and the Purchasers, shall obtain a security interest in such mark pursuant to this Agreement, and (iv) not (and not authorize any licensee or sublicensee thereof to) knowingly do any act or knowingly omit to do any act whereby any Trademark included in the Collateral would become invalidated.

(c)    Except as permitted under Section 9.4 of the NPA, no Grantor will knowingly do any act, or knowingly omit to do any act, whereby any Patent included in the Collateral would become abandoned or dedicated to the public.

(d)    Except as permitted under Section 9.4 of the NPA, no Grantor will knowingly do any act, or knowingly omit to do any act, whereby any Copyright included in the Collateral would become abandoned or dedicated to the public.

(e)    Each Grantor will promptly (but in any event, within fifteen (15) Business Days, which period may be extended in the Collateral Agent's discretion) notify the Collateral Agent if it knows that any U.S. application or registration for any material Copyright, Patent or Trademark included in the Collateral has become abandoned or dedicated to the public, or of any material adverse determination that is final and not appealable (excluding routine office actions or other determinations in the ordinary course of prosecution before the United States Patent and Trademark Office or the United States Copyright Office or any foreign counterpart thereof) regarding such Grantor's ownership of any such material Copyright, Patent or Trademark or a Grantor's right to register the same or to keep and maintain the same.

(f)    If a Grantor, either by itself or through any agent, employee or designee, shall file an application for the registration of any Copyright, Patent or Trademark with the United States Copyright Office or the United States Patent and Trademark Office, such Grantor shall provide prompt written notice to the Collateral Agent of such filed applications.  Promptly upon written request of the

12

Collateral Agent, such Grantor shall execute and deliver a Grant of Security Interest substantially in the form of <u>Annex II</u> or <u>Annex III</u>, as applicable, and any and all other agreements, instruments, and documents as may be necessary that the Collateral Agent reasonably requests to evidence the Collateral Agent's security interest hereunder in any U.S. registered or applied-for Copyright, Patent or Trademark included in the Collateral.

(g)     Except as permitted under Section 9.4 of the NPA, such Grantor will take reasonable steps, including where appropriate, without limitation, in any proceeding before the United States Copyright Office and/or the United States Patent and Trademark Office, to maintain and pursue each application (and to attempt to obtain the relevant registration) and to maintain each registration of each of its material U.S. registered or applied-for Copyrights, Patents and Trademarks included in the Collateral, including where appropriate, without limitation, filing of applications for renewal, affidavits of use and affidavits of incontestability.

(h)     In the event that any material Copyright, Patent or Trademark included in the Collateral is infringed, misappropriated or diluted by a third party, such Grantor shall promptly determine an advisable and commercially reasonable course of action in response to such infringement, misappropriation or dilution, which may include to sue for infringement, misappropriation or dilution, to seek injunctive relief where appropriate and to recover any and all damages for such infringement, misappropriation or dilution, and take such other actions as such Grantor shall reasonably deem appropriate under the circumstances to protect such Copyright, Patent or Trademark.

5.6     <u>Investment Accounts</u>.  Except as set forth in the NPA, no Grantor will make, acquire, or permit to exist cash, cash equivalents, or amounts credited to Investment Accounts unless notice has been given to the Collateral Agent, and such Grantor and the applicable bank or securities intermediary have entered into an account control agreement with the Collateral Agent in form and substance reasonably acceptable to the Collateral Agent governing such deposits in order to perfect Collateral Agent's Liens in such Investment Accounts.

5.7     <u>Government Contracts</u>.  Subject to the terms of the NPA, if an Event of Default has occurred and is continuing, upon written notice from the Collateral Agent, with respect to any Accounts or Chattel Paper with the government of the United States, or any department, agency, public corporation, or other instrumentality thereof, each Grantor will comply with all required procedures within such Grantor's control for the effective collateral assignment to the Collateral Agent of all moneys due or to become due under such Accounts and Chattel Paper under the Federal Assignment of Claims Act of 1940 and any similar statutes or successor and take any other steps within such Grantor's control that are necessary to perfect the Collateral Agent's security interest, for the benefit of the Purchasers, in such Accounts and Chattel Paper (the "<u>Assignment Actions</u>").

SECTION 6.     <u>REMEDIAL PROVISIONS</u>

6.1     <u>Certain Matters Relating to Receivables</u>.

(a)     At any time during the continuance of an Event of Default, upon the Collateral Agent's reasonable written request and at the expense of the Company, each Grantor shall use its best efforts to cause independent public accountants or others satisfactory to the Collateral Agent to furnish to the Collateral Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the Receivables.

(b)     If an Event of Default has occurred and is continuing, the Collateral Agent may require at any time that any payments of Receivables, when collected by any Grantor, (i)  be forthwith

(and, in any event, within two (2) Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to the Collateral Agent if required, in a Collateral Account maintained under the sole dominion and control of the Collateral Agent, subject to withdrawal by the Collateral Agent for the account of the Collateral Agent and the Purchasers only as provided in Section 6.6 and (ii) until so turned over, be held by such Grantor in trust for the Collateral Agent and the Purchasers.  If an Event of Default has occurred and is continuing, the Collateral Agent may require at any time that each Grantor promptly deliver to the Collateral Agent bank account statements in respect of their respective Investment Accounts.

(c)    If an Event of Default has occurred and is continuing and promptly following the Collateral Agent's written request, each Grantor shall deliver to the Collateral Agent all documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables, including, without limitation, all orders, invoices and shipping receipts.

6.2    <u>Communications with the Grantors; each Grantor Remains Liable</u>.

(a)    If an Event of Default has occurred and is continuing, the Collateral Agent may, or the applicable Grantor shall upon the written request of the Collateral Agent, notify Account Debtors in writing on the Receivables that such Receivables have been assigned to the Collateral Agent for the benefit of the Collateral Agent and the Purchasers and direct such Account Debtor to make payments in respect of such Receivables directly to the Collateral Agent.  Once any such written notice has been given to any such Account Debtor or other Person obligated on the Collateral, such Grantor shall not give any contrary instructions to such Account Debtor or other Person without the Collateral Agent's prior written consent unless such Event of Default is no longer continuing.

(b)    Anything herein to the contrary notwithstanding, each Grantor shall remain liable under the Receivables (or any agreements giving rise thereto) to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto.  Neither the Collateral Agent nor any Purchaser shall have any obligation or liability under any Receivable (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by the Collateral Agent or any Purchaser of any payment relating thereto, nor shall the Collateral Agent or any Purchaser be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Receivable (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

6.3    <u>Pledged Securities</u>.

(a)    Unless an Event of Default shall have occurred and be continuing and until the Collateral Agent has exercised its rights pursuant to clause (b) below, each Grantor shall be permitted to receive all cash dividends and distributions paid in respect of the Pledged Stock and all payments made in respect of the Pledged Notes to the extent permitted in the NPA, and to exercise all voting and corporate or other organizational rights with respect to the Pledged Securities.

(b)    If an Event of Default shall occur and be continuing and upon written notice to the applicable Grantor, (i) the Collateral Agent shall have the right to receive any and all cash dividends, payments or other Proceeds paid in respect of the Pledged Securities and make application thereof to the Obligations as provided in Section 6.6 and all such dividends, payments and other proceeds shall be held in trust for the Collateral Agent until such time of receipt by the Collateral Agent and (ii) any or all of the Pledged Securities may be registered in the name of the Collateral Agent or its nominee at the discretion of

the Collateral Agent (whether or not such Pledged Securities have been so previously registered), and the Collateral Agent or its nominee may immediately exercise (x) all voting, corporate and other rights pertaining to such Pledged Securities at any meeting of shareholders of the relevant Issuer or Issuers or otherwise and (y) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Pledged Securities as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Pledged Securities upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any Issuer, or upon the exercise by any Grantor or the Collateral Agent of any right, privilege or option pertaining to such Pledged Securities, and in connection therewith, the right to deposit and deliver any and all of the Pledged Securities with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Collateral Agent may determine), all without liability except to account for property actually received by it, but the Collateral Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(c)     Each Grantor hereby authorizes and instructs each Issuer of any Pledged Securities pledged by such Grantor hereunder to comply with any instruction received by it from the Collateral Agent in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and such Grantor agrees that each Issuer shall be fully protected in so complying.

6.4     <u>Intellectual Property</u>.

(a)     Without limiting any rights of the Collateral Agent under the Note Documentation, solely for the purpose of enabling the Collateral Agent to exercise rights and remedies under this Article 6, if an Event of Default has occurred and is continuing, and the Collateral Agent is entitled to exercise such rights and remedies under applicable law and Section 12.2 of the NPA, each Grantor hereby grants to the Collateral Agent, to the extent permitted by law, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to such Grantor) to use, assign, license, sublicense or otherwise exploit any of the Intellectual Property now owned or hereafter acquired or created by such Grantor, wherever the same may be located; provided that (i) such license shall be subject to the rights of any licensee under a license granted prior to such Event of Default, and (ii) the quality of any products or services in connection with which any Trademarks included in the Collateral are used will not be materially inferior to the quality of such services or products provided by Grantor under such Trademarks immediately prior to such Event of Default (and Grantor shall have the right to inspect any such products and services to monitor compliance with such standard).

(b)     Notwithstanding anything contained herein to the contrary, but subject to the provisions of Section 9.4 of the NPA that limit the rights of the Grantors to dispose of their property but subject to the Collateral Agent's exercise of its rights and remedies under Section 6, the Grantors will be permitted to exploit, use, enjoy, protect, license, sublicense, assign, sell, dispose of or take other actions with respect to the Intellectual Property in the ordinary course of the business of the Grantors.   In furtherance of the foregoing, so long as no Event of Default shall have occurred and be continuing, the Collateral Agent shall from time to time, upon the request of the respective Grantor (through the Company), execute and deliver any instruments, certificates or other documents, in the form so reasonably requested, that such Grantor (through the Company) shall have certified are appropriate in its judgment to allow it to take any action permitted above (including relinquishment of the license provided pursuant to subsection (a) immediately above as to any specific Intellectual Property).

      6.5      <u>Proceeds to be Turned Over To Collateral Agent</u>.

If an Event of Default shall have occurred and be continuing, upon written notice from the Collateral Agent, all Proceeds constituting Collateral received by any Grantor consisting of cash, checks and other near-cash items shall be held by such Grantor in trust for the Collateral Agent and the Purchasers, and shall, promptly following receipt by such Grantor, be turned over to the Collateral Agent in the exact form received by such Grantor (duly indorsed by such Grantor to the Collateral Agent, if required). All Proceeds received by the Collateral Agent hereunder shall be held by the Collateral Agent in a Collateral Account maintained under its sole dominion and control. All Proceeds while held by the Collateral Agent in a Collateral Account (or by such Grantor in trust for the Collateral Agent and the Purchasers) shall continue to be held as collateral security for all of the Obligations and shall not constitute payment thereof until applied as provided in Section 6.6.

      6.6      <u>Application of Proceeds</u>. If an Event of Default shall have occurred and be continuing, the Collateral Agent shall apply all or any part of Proceeds constituting Collateral and any proceeds of the guarantee set forth in Section 2 in payment of the Obligations in accordance with Sections 7 and 14 of the NPA, and shall make any such application in accordance with the NPA, and only after such application and after the payment by the Collateral Agent of any other amount required by any requirement of law, return the surplus, if any, to the applicable Grantor.

      6.7      <u>Code and Other Remedies</u>. If an Event of Default shall have occurred and be continuing, the Collateral Agent, on behalf of itself and the Purchasers, may exercise, in addition to all other rights and remedies granted to them in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations, all rights and remedies of a secured party under the UCC or any other applicable law (including, but not limited to, levy of attachment, garnishment and the rights and remedies set forth under the UCC of the jurisdiction applicable to the affected Collateral). Without limiting the generality of the foregoing, if an Event of Default shall have occurred and be continuing, the Collateral Agent, without (to the extent permitted by law) demand of performance or other demand, presentment, protest, advertisement or notice of any kind  to or upon any Grantor (all and each of which demands, defenses, advertisements and notices are hereby waived to the extent permitted by law), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Collateral Agent or any Purchaser or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. The Collateral Agent and any Purchaser shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in the applicable Grantor, which right or equity is hereby waived and released. Each Grantor agrees, at the Collateral Agent's written request, if an Event of Default shall have occurred and be continuing, to assemble the Collateral and make it available to the Collateral Agent at places which the Collateral Agent shall reasonably select, whether at such Grantor's premises or elsewhere. The Collateral Agent shall apply the proceeds of any action taken by it pursuant to this Section 6.7 as provided in Section 6.6, and only after such application and after the payment by the Collateral Agent of any other amount required by any provision of law, including, without limitation, Section 9-615(a)(3) of the UCC, return the surplus, if any, to the applicable Grantor. If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least ten (10) days before such sale or other disposition.

      6.8      <u>Private Sales</u>. Each Grantor recognizes that the Collateral Agent may be unable to effect a public sale of any or all the Pledged Stock, by reason of certain prohibitions contained in the

Securities Act and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner. The Collateral Agent shall be under no obligation to delay a sale of any of the Pledged Stock for the period of time necessary to permit the Issuer thereof to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Issuer would agree to do so.

6.9     Deficiency. Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay its Obligations.

6.10    Investment Accounts. If an Event of Default has occurred and is continuing, the Collateral Agent may, in addition to other rights and remedies provided for herein, in the other Note Documentation, or otherwise available to it under applicable law and without the requirement of notice to or upon any Grantor or any other Person, with respect to such Grantor's Investment Accounts in which Collateral Agent's Liens are perfected by control under Section 9-104 of the UCC, to the extent the Obligations (other than contingent obligations not then due and payable) have been paid in full, instruct the bank maintaining such Investment Account for such Grantor to (i) pay the balance of such Investment Account to or for the benefit of Collateral Agent, (ii) transfer any cash in such Investment Account to or for the benefit of the Collateral Agent, or (iii) liquidate any financial assets in such Investment Account that are customarily sold on a recognized market, to the extent applicable, and transfer the cash proceeds thereof to or for the benefit of the Collateral Agent.

SECTION 7.    THE COLLATERAL AGENT

7.1     Collateral Agent's Appointment as Attorney-in-Fact, etc.

(a)     Each Grantor hereby irrevocably constitutes and appoints the Collateral Agent and any officer or agent thereof, with full power of substitution, effective upon and solely during the continuance of an Event of Default, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of this Agreement for the sole use and benefit of the Collateral Agent on behalf of the Purchasers, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement without notice except to the extent required hereunder, and, without limiting the generality of the foregoing, each Grantor hereby gives the Collateral Agent the power and right, on behalf of such Grantor, without notice to or assent by such Grantor, to do any or all of the following, to the extent applicable to such Grantor or the Collateral granted by it:

(i)     in the name of such Grantor or its own name, or otherwise, take possession of and indorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Receivable or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Collateral Agent for the purpose of collecting any and all such moneys due under any Receivable or with respect to any other Collateral whenever payable;

(ii)     in the case of any Intellectual Property, subject to Section 6.4(a), execute and deliver, and have recorded, any and all agreements, instruments,

documents and papers as the Collateral Agent may reasonably request to evidence and/or perfect its security interest in such Intellectual Property and the goodwill and general intangibles of such Grantor relating thereto or represented thereby;

(iii)   pay or discharge Taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or provide any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(iv)   execute, in connection with any sale provided for in Section 6.7 or 6.8, any indorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral;

(v)   (1)   direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Collateral Agent or as the Collateral Agent shall direct; (2)  ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral and to extend the time of payment with reference to the Collateral and to make any allowance and other adjustments with reference to the Collateral; (3)  sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (4)  commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (5)  defend any suit, action or proceeding brought against such Grantor with respect to any Collateral; (6)  settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Collateral Agent may deem appropriate; (7) assign any Copyright, Patent or Trademark included in the Collateral (along with any applicable goodwill of the business to which any such Trademark pertains) throughout the world for such term or terms, on such conditions, and in such manner, as the Collateral Agent shall in its discretion determine; and (8) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Collateral Agent were the absolute owner thereof for all purposes, and do, at the Collateral Agent's option and such Grantor's expense, at any time, or from time to time, all acts and things which the Collateral Agent deems necessary to protect, preserve or realize upon the its security interests therein and to effect the intent of this Agreement, all as fully and effectively as such Grantor might do;

(vi)   in accordance with the terms of Section 5.7, in the name of the applicable Grantor or its own name, with respect to any Accounts or Chattel Paper with the government of the United States, or any department, agency, public corporation, or other instrumentality thereof, take such actions as are necessary to comply with all required procedures for the effective collateral assignment to the Collateral Agent of all moneys due or to become due under such Accounts and Chattel Paper under the Federal Assignment of Claims Act of 1940 and take any other steps necessary to perfect the Collateral Agent's security interest, for the benefit of the Purchasers, in such Accounts and Chattel Paper; and

(vii)   obtain injunctive or other equitable relief to compel the applicable Grantor to complete all Assignment Actions.

18

(b)    If any Grantor fails to perform or comply with any of its agreements contained herein, the Collateral Agent, at its option and upon prior written notice to such Grantor, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement.

(c)    Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof during the continuance of an Event of Default in accordance hereof. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

7.2    <u>Duty of Collateral Agent</u>.

(a)    Beyond reasonable care in the custody thereof, the Collateral Agent shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.

(b)    The Collateral Agent shall be deemed to have exercised reasonable care in the custody of the Collateral of any Grantor in its possession if such Collateral is accorded treatment substantially equal to that which it accords its own property.  The Collateral Agent shall not be liable or responsible for any loss or damage to any of the Grantors' Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehouseman, carrier, forwarding agency, consignee or other agent or bailee selected by the Collateral Agent in good faith.

(c)    Neither the Collateral Agent nor any Purchaser shall be required to marshal any present or future Collateral for, or other assurance of payment of, the Obligations or to resort to such Collateral or other assurances of payment in any particular order.  All of the rights of the Collateral Agent hereunder and the Collateral Agent or any Purchaser in respect of such Collateral and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising.  To the extent that it lawfully may, each Grantor hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Collateral Agent's rights under this Agreement or under any other instrument creating or evidencing any of the Obligations and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefit of all such laws.

7.3    <u>Authorization of Financing Statements; Control Agreements</u>.  Pursuant to any applicable law, each Grantor authorizes the Collateral Agent to file or record financing statements and, solely during the continuation of an Event of Default, other filing or recording documents or instruments with respect to the Collateral, in each case without the signature of such Grantor in such form from time to time and in such offices as the Collateral Agent reasonably determines appropriate to perfect the security interests of the Collateral Agent (for the benefit of the Purchasers) under this Agreement in the United States. Each Grantor authorizes the Collateral Agent to describe the Collateral as set forth herein, or to use the collateral description "all of the assets of the Debtor, whether now owned or hereafter acquired or arising, and all proceeds thereof" or any similar phrase or description of similar meaning in any financing statements naming such Grantor as debtor.  Upon the request of the Collateral Agent, each Grantor shall provide the information required or requested to be included in any such financing statements, including such Grantors exact legal name and where such Grantor is "located" (as defined in the UCC).

7.4    <u>Authority of Collateral Agent</u>.  Each Grantor acknowledges that the rights and responsibilities of the Collateral Agent under this Agreement with respect to any action taken by the Collateral Agent or the exercise or non-exercise by the Collateral Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall,

as among the Collateral Agent and the Purchasers, be governed by the NPA, including, without limitation, Section 12.2(a) of the NPA, which section requires the Collateral Agent to act only at the direction of the Required Holders, and by such other Note Documentation with respect thereto as may exist from time to time among them, but, as between the Collateral Agent and the Grantors, the Collateral Agent shall be conclusively presumed to be acting as agent for the Purchasers with full and valid authority so to act or refrain from acting, and no Grantor shall be under any obligation, or entitlement, to make any inquiry respecting such authority.

SECTION 8.    MISCELLANEOUS

8.1    Amendments in Writing.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 10.01 of the NPA.

8.2    Notices.  Except as otherwise set forth herein, all notices, requests and demands to or upon (i) the Collateral Agent hereunder shall be effected in the manner and addressed to the notice address provided for in Section 17 of the NPA and (ii) any Guarantor or Grantor hereunder shall be sent to the Company in the manner and addressed to the notice address provided for in Section 17 of the NPA.

8.3    No Waiver by Course of Conduct; Cumulative Remedies.  Neither the Collateral Agent nor any Purchaser shall by any act (except by a written instrument pursuant to Section 8.1 above), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default.  No failure to exercise, nor any delay in exercising, on the part of the Collateral Agent or any Purchaser, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by the Collateral Agent or any Purchaser of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which the Collateral Agent or such Purchaser would otherwise have on any future occasion.  The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

8.4    Enforcement Expenses; Indemnification.  Each Grantor agrees to pay to the Collateral Agent and the Purchasers any amount as shall be sufficient to cover all costs and expenses of the Collateral Agent or such Purchaser (including attorney's costs and expenses) incurred in any enforcement or collection to the extent the Company would be required to do so pursuant to Section 11 of the NPA.

8.5    Successors and Assigns.  This Agreement shall be binding upon the successors and assigns of each Guarantor and Grantor and shall inure to the benefit of the Collateral Agent and the Purchasers and their successors and assigns; provided that no Guarantor or Grantor may assign, transfer or delegate any of its rights or obligations under this Agreement (it being understood that Dispositions and fundamental changes permitted under the NPA shall not be subject to this proviso).

8.6    Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic image (e.g., "PDF" or "TIF" via electronic email) shall be effective as delivery of a manually executed counterpart of this Agreement. The words "execution", "signed", "signature", and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable requirement of law, including

the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

8.7    <u>Severability</u>.    Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

8.8    <u>Section Headings</u>.    The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

8.9    <u>Integration</u>.    This Agreement and the other Note Documentation represent the agreement of the Guarantors, the Grantors, the Collateral Agent and the Purchasers with respect to the subject matter hereof and thereof.

8.10    <u>GOVERNING LAW</u>.

THIS AGREEMENT AND ANY CLAIMS, DISPUTES OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) ARISING OUT OF OR RELATED TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

8.11    <u>Submission To Jurisdiction; Waivers</u>.

(a)    EACH GUARANTOR AND GRANTOR IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE COLLATERAL AGENT, ANY PURCHASER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS RELATING HERETO, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING, OR ANY OTHER ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. NOTWITHSTANDING THE FOREGOING, EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT THE COLLATERAL AGENT OR ANY PURCHASER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER NOTE DOCUMENTATION AGAINST ANY GUARANTOR OR GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(b)    EACH GUARANTOR AND GRANTOR IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF

ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER NOTE DOCUMENTATION IN ANY COURT REFERRED TO IN SECTION 8.11(a) OF THIS AGREEMENT. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c)    EACH GUARANTOR AND GRANTOR IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 8.2. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(d)    TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, EACH PARTY HERETO AGREES THAT IT WILL NOT ASSERT, AND HEREBY WAIVES, ANY CLAIM AGAINST EACH OTHER, ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS AGREEMENT, ANY OTHER NOTE DOCUMENTATION OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY, THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, ANY LOAN OR LETTER OF CREDIT, OR THE USE OF THE PROCEEDS THEREOF.

8.12    <u>Additional Grantors</u>.  Each Subsidiary of the Company that (i) is required to become a party to this Agreement as a Guarantor and/or Grantor pursuant to Section 12.1(c) or (d) of the NPA or (ii) the Company elects to become a Guarantor and/or Grantor shall become a Guarantor and/or Grantor, as applicable, for all purposes of this Agreement upon execution and delivery by such Subsidiary of a Guarantee and Collateral Agreement Joinder Agreement substantially in the form of <u>Annex I</u> hereto or such other form of joinder agreement as may be acceptable to the Collateral Agent.

8.13    <u>Releases</u>.

(a)    This Agreement, including the guarantees provided in Section 2, shall terminate, and all Collateral and any other collateral security for the Obligations shall be released from any Lien created by this Agreement and the other Note Documentation, automatically at such time as all Obligations (other than contingent obligations not then due and payable) have been paid and satisfied in full (such date, the "<u>Collateral Termination Date</u>").

(b)    All Collateral and any other collateral security for the Obligations shall be released from any Lien created by this Agreement and the other Note Documentation (x) automatically (i) upon the sale or other Disposition of such Collateral pursuant to a transaction permitted under any Note Documentation or (ii) subject to Section 16.1 of the NPA, if approved, authorized or ratified in writing by the Required Holders, or (y) promptly following written notice to the Collateral Agent upon such Collateral becoming Excluded Property. If the aggregate fair market value of the portion of the Collateral so sold or otherwise transferred exceeds $500,000, the Company will promptly deliver to the Collateral Agent a notice of the consummation of such sale or other transfer, certifying that such sale was made in compliance with Section 9.4 of the NPA.

(c)    A Grantor or Guarantor shall be released from all Liens and obligations under this Agreement and the other Note Documentation automatically as a result of a transaction permitted under Sections 9.1 or 9.4 of the NPA, or upon payment in full of the Obligations (other than contingent obligations not then due and payable).

(d)       Substantially concurrently or promptly following any release of a Grantor, Guarantor, Collateral, and/or the termination of any Note Documentation, the Collateral Agent shall deliver to the Company all Collateral of such Grantor or Guarantor held by the Collateral Agent pursuant to the Note Documentation and, at the expense of the Company, the Collateral Agent shall promptly execute (to the extent applicable) and deliver to the Company for filing in each office in which any financing statement or other document or instrument relative to such Grantor or Guarantor, such Collateral, or such assets for which Liens have been granted by such Grantor or Guarantor in favor of the Collateral Agent, or any part thereof, has been filed, a termination statement under the UCC, or other agreement or document evidencing the release or termination of such Liens or such guarantee or other obligations, as applicable, releasing or evidencing the release and termination of such Liens, guarantee and obligations, and such other release documents as may be reasonably requested by the Company.

**8.14**    **WAIVER OF JURY TRIAL**.    **EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

[Signatures begin on following page.]

869792.11-LACSR02A - MSW

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

SEECUBIC, INC.,
a Delaware corporation, as the Company, and as a Grantor

By: _____
Name: Shad Stastney
Title:   Chief Executive Officer

*[Signature Page to Guarantee and Collateral Agreement]*

HAWK INVESTMENT HOLDINGS LIMITED,
a Guernsey holding company, as the Collateral Agent

By:
Name: FOR: ALBANY DIRECTORS LIMITED
Title: DIRECTOR

*[Signature Page to the Guarantee and Collateral Agreement]*

<u>Schedule 1</u>

DESCRIPTION OF PLEDGED SECURITIES

**<u>Pledged Stock</u>:**

| <u>Issuer</u> | <u>Grantor</u> | <u>Description of Equity Interests</u> (and number of outstanding units or shares, if applicable) | <u>Stock Certificate No.</u> | <u>% of Issued and Outstanding Equity Interests Owned by Grantor</u> | <u>% of Issued and Outstanding Voting Equity Interests Owned by Grantor and Pledged</u> |
|---|---|---|---|---|---|
| SeeCubic Limited | SeeCubic, Inc. | Membership Interest | N/A | 100% | 65% |
| SeeCubic India Private Limited | SeeCubic, Inc. | Membership Interest | N/A | 1% | 65% |

**<u>Pledged Notes</u>:**

N/A.

<u>Schedule 2</u>

LEGAL NAMES AND JURISDICTIONS OF ORGANIZATION

| **Legal Name** | **Jurisdiction of Organization** | **CEO Office** | **Type of Organization** |
|---|---|---|---|
| SeeCubic, Inc. | Delaware, USA | 1732A Marsh Road Suite 124 Wilmington, Delaware 19810 | Corporation |

<u>Schedule 3</u>

INTELLECTUAL PROPERTY

**Trademarks:**

| Country | Trademark | Application No. | Status | Registration No. | Registration Date | Owner Information |
|---------|-----------|-----------------|--------|------------------|-------------------|------------------|
| U.S. | SEECUBE | 86980686 | Registered | 5106635 | December 20, 2016 | SeeCubic, Inc. |
| U.S. | ULTRA-D | 86570747 | Registered | 4961393 | May 17, 2012 | SeeCubic, Inc. |
| U.S. | SEECUBE | 86691099 | Registered | 5486882 | June 5, 2018 | SeeCubic, Inc. |

**Copyrights:**

N/A.

**Patents:**

N/A.

**LICENSE ARRANGEMENTS AND AGREEMENTS:**

N/A.

Schedule 4

COMMERCIAL TORT CLAIMS

N/A.

<u>Schedule 5</u>

INVESTMENT ACCOUNTS

| Grantor | Country | Name of Institution | Type | Currency | Account # | Purpose |
|---|---|---|---|---|---|---|
| SeeCubic, Inc. | U.S. | BlueVine | Deposit Account | USD | 875102150500 | Checking |

Annex I to
Guarantee and Collateral Agreement

GUARANTEE AND COLLATERAL AGREEMENT JOINDER AGREEMENT (this "Joinder Agreement"), dated as of _____ __, 201_, made by _____ (the "Joinder Party"), in favor of HAWK INVESTMENT HOLDINGS LIMITED, a Guernsey holding company, as collateral agent for the Purchasers (as defined in the NPA referred to below) (in such capacity, together with its successors and permitted assigns in such capacity, the "Collateral Agent") in connection with the NPA referred to below.  All capitalized terms not defined herein shall have the meaning ascribed to them in the Guarantee and Collateral Agreement (as defined below), as applicable.

W I T N E S S E T H :

WHEREAS, there exists that Note Purchase Agreement, dated as of June 11, 2022 (as amended, restated, replaced, refinanced, supplemented, waived and/or otherwise modified from time to time, the "NPA"), by and among SEECUBIC, INC., a Delaware corporation (the "Company"), the Collateral Agent and the Purchasers party thereto;

WHEREAS, in connection with the NPA, the Company has, together with each other Grantor and each Guarantor from time to time party thereto, entered into the Guarantee and Collateral Agreement, dated as of June 11, 2022 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "Guarantee and Collateral Agreement") in favor of the Collateral Agent for the benefit of the Purchasers;

WHEREAS, the NPA requires the Joinder Party to, or the Company desires the Joinder Party to, become a party to the Guarantee and Collateral Agreement and assume all obligations and liabilities of a Guarantor thereunder;

WHEREAS, the NPA requires the Joinder Party to, or the Company desires the Joinder Party to, assume all obligations and liabilities of a Guarantor under the NPA; and

WHEREAS, the Joinder Party has agreed to execute and deliver this Joinder Agreement in order to become a party to the Guarantee and Collateral Agreement and to assume all obligations and liabilities of a Guarantor under the Guarantee and Collateral Agreement and under the NPA.

NOW, THEREFORE, IT IS AGREED:

1.      Guarantee and Collateral Agreement.  By executing and delivering this Joinder Agreement, the Joinder Party, as provided in Section 8.12 of the Guarantee and Collateral Agreement, hereby becomes a party to the Guarantee and Collateral Agreement as a Grantor and as a Guarantor thereunder with the same force and effect as if originally named therein as a Grantor and Guarantor and, without limiting the generality of the foregoing, hereby expressly assumes all obligations and liabilities of a Grantor and Guarantor thereunder.  The information set forth in Annex 1-A hereto is hereby added to the information set forth in the Schedules to the Guarantee and Collateral Agreement.  The Joinder Party hereby represents and warrants, to the extent applicable, solely with respect to itself, that each of the representations and warranties contained in Section 4 of the Guarantee and Collateral Agreement applicable to Grantors and /or Guarantors is true and correct in all material respects on and as of the date hereof (after giving effect to this Joinder Agreement) as if made on and as of such date except to the extent that any representation and warranty relates to an earlier date, in which case such representation and warranty shall be true and correct in all material respects as of such earlier date.

The Joinder Party hereby grants to the Collateral Agent, for the benefit of the Collateral Agent and the Purchasers, a continuing security interest in and Lien on all of the right, title and interest of the Joinder Party in the Collateral now owned or at any time hereafter acquired or created by such Joinder Party or in which such Joinder Party now has or at any time in the future may acquire any right, title or interest, as collateral security for the prompt and complete payment in full and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations. The Joinder Party authorizes the Collateral Agent to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral without the signature of such Joinder Party in such form from time to time and in such offices as the Collateral Agent reasonably determines appropriate to perfect the security interests of the Collateral Agent (for the benefit of the Purchasers) hereunder. The Joinder Party authorizes the Collateral Agent to use the collateral description "all personal property now existing or hereafter acquired or arising" or any similar phrase or description of similar meaning in any such financing statements.

2.    <u>NPA</u>.    By executing and delivering this Joinder Agreement, the Joinder Party hereby expressly assumes all obligations and liabilities of a Guarantor under the NPA.  The Joinder Party hereby represents and warrants, to the extent applicable, solely with respect to itself, that each of the representations and warranties contained in Section 5 of the NPA applicable to Guarantors is true and correct in all material respects on and as of the date hereof (after giving effect to this Joinder Agreement) as if made on and as of such date except to the extent that any representation and warranty relates to an earlier date, in which case such representation and warranty shall be true and correct in all material respects as of such earlier date.

3.    <u>MISCELLANEOUS</u>.    THIS JOINDER AGREEMENT SHALL BE SUBJECT TO SECTIONS 8.1, 8.4 – 8.11 AND 8.14 OF THE GUARANTEE AND COLLATERAL AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

4.    <u>Electronic Signatures</u>. This Joinder Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Joinder Agreement by telecopy or other electronic image (e.g., "PDF" or "TIF" via electronic email) shall be effective as delivery of a manually executed counterpart of this Joinder Agreement. The words "execution", "signed", "signature", and words of like import in this Joinder Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable requirement of law, including the Federal Electronic Signatures in Global and National Commerce Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed and delivered as of the date first above written.

[JOINDER PARTY], as a Grantor and as a Guarantor

By: _____
    Name:
    Title:

Annex I-A to
<u>Joinder Agreement</u>

<u>Supplement to Schedule 1</u>

<u>Supplement to Schedule 2</u>

<u>Supplement to Schedule 3</u>

<u>Supplement to Schedule 4</u>

<u>Supplement to Schedule 5</u>

Annex II to
Guarantee and Collateral Agreement

GRANT OF SECURITY INTEREST

COPYRIGHTS

THIS GRANT OF SECURITY INTEREST (this "Grant") dated as of [____], 202[_], is made by [GRANTOR], a _____ [limited liability company/limited liability partnership/corporation] (the "Grantor") in favor of HAWK INVESTMENT HOLDINGS LIMITED, a Guernsey holding company, as collateral agent for the Purchasers (as defined in the NPA referred to below) (in such capacity, together with its successors and permitted assigns in such capacity, the "Grantee"), for the benefit of the Grantee and the Purchasers, as collateral security for the prompt and complete payment in full and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations (as defined in the Guarantee and Collateral Agreement referred to below)

W I T N E S S E T H:

WHEREAS, in connection with Note Purchase Agreement, dated as of June 11, 2022 (as amended, restated, replaced, refinanced, supplemented, waived and/or otherwise modified from time to time, the "NPA"), by and among SEECUBIC, INC., a Delaware corporation (the "Company"), the Collateral Agent and the Purchasers party thereto, the Company has, together with each other Grantor and each Guarantor from time to time party thereto, entered the Guarantee and Collateral Agreement, dated as of June 11, 2022 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Guarantee and Collateral Agreement"), in favor of the Collateral Agent for the benefit of the Purchasers.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor hereby agrees as follows:

1. All initially capitalized terms used but not otherwise defined herein have the meanings given to them in the Guarantee and Collateral Agreement.

2. Each Grantor hereby grants to the Grantees a continuing first priority security interest in and Lien on all of the right, title and interest of the Grantor in all of the following property whether now owned or at any time hereafter acquired or created by the Grantor or in which the Grantor now has or at any time in the future may acquire any right, title or interest, as collateral security for the prompt and complete payment in full and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations: (i) all rights, title and interests of such Grantor in or to all United States Copyrights, including, without limitation, the Copyrights set forth on Schedule A attached hereto (collectively, the "Copyright Collateral"); (ii) all Proceeds of the Copyright Collateral; and (iii) all IP-Related Rights of the Copyright Collateral.

3. This Grant has been granted in conjunction with the security interest granted to the Grantee under the Guarantee and Collateral Agreement.  The rights and remedies of the Grantee with respect to the security interest granted herein are without prejudice to those set forth in the Guarantee and Collateral Agreement, all terms and provisions of which are incorporated herein by reference.  In the event that any provisions of this Grant are deemed to conflict with the Guarantee and Collateral Agreement, the provisions of the Guarantee and Collateral Agreement shall govern.

4.  This Grant may be executed in counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Grant by telecopy or other electronic image (e.g., "PDF" or "TIF" via electronic email) shall be effective as delivery of a manually executed counterpart of this Grant.

5.  The words "execution", "signed", "signature", and words of like import in this Grant or the Guarantee and Collateral Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable requirement of law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

6.  THIS GRANT SHALL BE SUBJECT TO SECTIONS 8.1, 8.4 – 8.11 AND 8.14 OF THE GUARANTEE AND COLLATERAL AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

[SIGNATURES ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the date referenced above.

[GRANTOR], as Grantor

By: _____

Name:

Title:

<u>SCHEDULE A</u>

## <u>COPYRIGHTS</u>

| <u>Copyright</u> | <u>Copyright Registration Number</u> | <u>Issue Date</u> |
|---|---|---|

Annex III to
<u>Guarantee and Collateral Agreement</u>

GRANT OF SECURITY INTEREST
<u>PATENTS AND TRADEMARKS</u>

THIS GRANT OF SECURITY INTEREST (this "<u>Grant</u>") dated as of [____], 202[_], is made by [GRANTOR], a _____ [limited liability company/limited liability partnership/corporation] (the "<u>Grantor</u>") in favor of HAWK INVESTMENT HOLDINGS LIMITED, a Guernsey holding company, as collateral agent for the Purchasers (as defined in the NPA referred to below) (in such capacity, together with its successors and permitted assigns in such capacity, the "<u>Grantee</u>"), for the benefit of the Grantee and the Purchasers, as collateral security for the prompt and complete payment in full and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations (as defined in the Guarantee and Collateral Agreement referred to below)

W I T N E S S E T H:

WHEREAS, in connection with Note Purchase Agreement, dated as of June 11, 2022 (as amended, restated, replaced, refinanced, supplemented, waived and/or otherwise modified from time to time, the "<u>NPA</u>"), by and among SEECUBIC, INC., a Delaware corporation (the "<u>Company</u>"), the Collateral Agent and the Purchasers party thereto, the Company has, together with each other Grantor and each Guarantor from time to time party thereto, entered into the Guarantee and Collateral Agreement, dated as of June 11, 2022 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "<u>Guarantee and Collateral Agreement</u>"), in favor of the Collateral Agent for the benefit of the Purchasers.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Grantor hereby agrees as follows:

1.  All initially capitalized terms used but not otherwise defined herein have the meanings given to them in the Guarantee and Collateral Agreement.

2.  Each Grantor hereby grants to the Grantees a continuing first priority security interest in and Lien on all of the right, title and interest of the Grantor in all of the following property whether now owned or at any time hereafter acquired or created by the Grantor or in which the Grantor now has or at any time in the future may acquire any right, title or interest, as collateral security for the prompt and complete payment in full and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations: (i) all rights, title and interests of such Grantor in or to all United States Trademarks including those set forth on <u>Schedule A</u> attached hereto (collectively, the "<u>Trademark Collateral</u>"); (ii) all rights, title and interests of such Grantor in or to all United States Patents including those set forth on <u>Schedule B</u> attached hereto (collectively, the "<u>Patent Collateral</u>"), (iii) all Proceeds of the Trademark Collateral and Patent Collateral, and (iv) all IP-Related Rights of the Trademark Collateral and Patent Collateral; provided, however, notwithstanding the foregoing, no Lien or security interest shall attach to any Excluded Property and the provisions of this Grant need not be satisfied with respect to Excluded Property; provided, further, that if and when any property shall cease to be Excluded Property, a Lien on and security in such property shall attach thereto.

3.  This Grant has been granted in conjunction with the security interest granted to the Grantee under the Guarantee and Collateral Agreement. The rights and remedies of the Grantee with respect to the security interest granted herein are without prejudice to those set forth in the Guarantee and Collateral Agreement, all terms and provisions of which are incorporated herein by reference. In

the event that any provisions of this Grant are deemed to conflict with the Guarantee and Collateral Agreement, the provisions of the Guarantee and Collateral Agreement shall govern.

4.  This Grant may be executed in counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Grant by telecopy or other electronic image (e.g., "PDF" or "TIF" via electronic email) shall be effective as delivery of a manually executed counterpart of this Grant.

5.  The words "execution", "signed", "signature", and words of like import in this Grant or the Guarantee and Collateral Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable requirement of law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

6.  THIS GRANT SHALL BE SUBJECT TO SECTIONS 8.1, 8.4 – 8.11 AND 8.14 OF THE GUARANTEE AND COLLATERAL AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

[SIGNATURES ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the undersigned have executed this Grant as of the date referenced above.

[GRANTOR], as Grantor

By:_____
    Name:
    Title:

<u>SCHEDULE A</u>

## <u>TRADEMARKS</u>

### <u>TRADEMARK APPLICATIONS</u>

SCHEDULE B

## ISSUED PATENTS

| Patent | Patent Number | Issue Date |
|--------|---------------|------------|

## PATENT APPLICATIONS

| Patent | Serial Number | Application Date |
|--------|---------------|------------------|