# EXHIBIT H

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| Stream TV Networks, Inc., | : | Case No. 21-10433 (KBO) |
| | : | |
| Debtor. | : | |
| | : | |

## DECLARATION OF MATHU RAJAN
## IN SUPPORT OF FIRST DAY MOTIONS

I, Mathu Rajan, hereby declare under penalty of perjury:

1.      I am the Chief Executive Officer of Stream TV Networks, Inc., (the "Debtor" or "Stream"), a Delaware corporation and the debtor and debtor-in-possession in the above-captioned chapter 11 case.  In this capacity, I am generally familiar with the Debtor's day-to-day operations, organization, financial affairs, and books and records.

2.      On February 24, 2021 (the "Petition Date"), the Debtor filed a voluntary petition with the Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").  The Debtor is planning to resume operating its organization and managing its property as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this chapter 11 case, and no official committees have been appointed or designated.

3.      To enable the Debtor to minimize the adverse effects of the commencement of this chapter 11 case, the Debtor has requested various types of relief in its "first day" motions and applications (each, a "First Day Motion" and collectively, the "First Day Motions").  The First Day Motions seek relief intended to allow the Debtor a smooth transition into chapter 11 and to best protect the Debtor's assets and estate, in order to enable the Debtor to maintain its current and

prospective business relations and to position the Debtor for a successful reorganization, thereby preserving and maximizing the value of the Debtor's estate.

4.      As the Debtor was not operating and was aware generally of the Delaware Bankruptcy Court's caseload and schedule, the determination was made not to seek relief in the days immediately following the filing of the voluntary petition.

5.      I am familiar with the contents of each First Day Motion (including the exhibits and schedules thereto), and I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value; (b) constitutes a critical element to achieving a successful reorganization of the Debtor; and (c) best serves the Debtor's estate and creditors' interests.

6.      If no substantial investments are made in support of the Debtor within 30 days after the petition date for this Chapter 11 Case, the Debtor intends to pursue a sale pursuant to 11 U.S.C. § 363 of the Bankruptcy Code in order to maximize the value of the Debtor for its creditors and other parties in interest. As of the date of this declaration, the Debtor has sufficient confidence in the prospective investors that it views a 363 sale as unlikely and unnecessary.

7.      Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by the Debtor's advisors.  I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

8.      Part I of this Declaration describes the Debtor's operations, its corporate and debt structure and the circumstances surrounding the commencement of this chapter 11 case.  Part II sets forth the relevant facts in support of each of the First Day Motions.

2

## I.    **BACKGROUND**

### A.    **Overview and Nature of the Debtor's Operations**

9.      Stream was founded in 2009 as a Philadelphia-based new media company created to develop technology allowing consumers to view 3D content without the need to wear glasses or goggles.

10.     Through its global engineering team, the Debtor developed breakthrough glasses-free 3D display technology it trademarked Ultra-D™.   Ultra-D is a proprietary combination of hardware and software that creates a natural, comfortable and immersive Glasses-Free 3D viewing experience. Resulting from years of research and development in the field of 3D optics, multi-view rendering and content development solutions, Ultra-D solves the two biggest limitations of the market's current 3D technology: the need to wear special glasses and the scarcity of 3D content.

11.     As a core technology, Ultra-D can be applied to panels of nearly any type and size and is compatible with touch screen features as well. This means that consumers can have a seamless experience with virtually any device – televisions, tablets, smartphones, portable game players, laptops, all-in-one computers and more.

12.     Concurrent with its engineering development activities, the Debtor engaged in a global business development effort to introduce Ultra-D to commercial and consumer brands interested in integrating the new technology into their various products.

13.     The Debtor solidified a strategic business relationship with BOE Technology Group Co., Ltd. ("BOE"), the world's largest manufacturer of video display panels, and on January 10, 2018 during the Consumer Electronics Show, the companies issued a press release announcing "joint cooperation to combine the high-resolution panels of BOE with Stream TV's award-winning Glasses-Free 3D technology." Over the course of 2018 and 2019, BOE introduced the Debtor to several of its significant customers.

3

14.     In March 2020, the Debtor secured a contract with Robert Bosch GmbH ("Bosch") for development of an Ultra-D instrument cluster for the automotive market. Subsequent negotiations began with Lenovo Group Limited ("Lenovo") for development of a consumer gaming 8K[1] laptop and with both Skyworth Group Co., Ltd. ("Skyworth") and Chunghwa Telecom for consumer 8K televisions.

15.     The Debtor's mission is to enable superior consumer media experiences by advancing the evolution of display technology from a flat 2D world to an immersive one made possible by 3D without glasses. Its Ultra-D technology has attracted the interest of top brands in many global markets and categories, and the Debtor seeks reorganization through chapter 11 to consummate deals with the customers it has spent years developing relationships with.

**B.      The Debtor's Corporate Structure**

16.     The corporate structure of the Debtor is as follows:

a.      Akshaya Holding, LLC ("Akshaya") and Mathu Rajan together own approximately 19.27 million shares of the Debtor Class B Voting Stock (or 71.5%) and 7.5 million shares of the Class A Common Stock of the Debtor (or approximately 8.8%), providing for an overall 56.4% voting control of the Debtor. Mathu Rajan is also the 40% owner of Akshaya.

b.      Investors and/or individuals other than Akshaya own approximately 7.69 million shares (or 28.5%) of the Class B Voting Shares of the Debtor and

---

[1] 8K is a newer type of screen panel which maximizes the number of pixels to achieve higher resolution. With a width of approximately 8,000 pixels and a height of approximately 4,000 pixels, 8 K displays offer four times the resolution of current 4K displays. Each pixel is a very small and tightly grouped triad of red, green and blue LEDs that can be lighted or dimmed to create the impression of a single colored "dot." When viewed as a whole, all 32 million pixel dots form patterns that the human eye perceives as images.

4

the remaining 78.1 million shares of Class A Common Stock of the Debtor (or 91.2%), providing for an overall total of 43.6% voting rights in the Debtor. No other investor or individual owns 25% or more of the Debtor's Class A Common Stock or Class B Voting Stock.

c.      The Rajan Family together owns 100% of Akshaya.   In particular, Mathu Rajan owns 40% of Akshaya's economic stock and has 100% of its voting control.

d.      The Debtor owns 100% of TechnoVative Media, Inc. USA ("TechnoVative USA").

e.      TechnoVative USA owns 100% of Media Holdings Delaware LLC (USA) ("Media Holdings").

f.      TechnoVative USA is also a 99.9% general partner in Ultra-D Ventures C.V. (Curacao) ("Ultra-D Ventures"); Media Holdings is a 0.1% limited partner in Ultra-D Ventures.

g.      Ultra-D Ventures owns 99.9% of Ultra-D Cooperatief U.A. (The Netherlands) ("Ultra-D Cooperatief"); Technology Holdings Delaware, LLC (USA) ("Technology Holdings") owns 0.1% of Ultra-D Cooperatief.

h.      Ultra-D Cooperatief owns 100% of Stream TV International B.V. (The Netherlands) ("Stream TV International") and 100% of SeeCubic B.V. (The Netherlands) ("SeeCubic").

i.      Stream TV International owns 100% of Stream TV International B.V. (Taiwan-Rep Office), 100% of Stream TV 3D Technology (Suzhou) Co., Ltd. (China), and Shanghai Ruishi Technology Co., Ltd. (China).

17.    Akshaya, TechnoVative USA, Media Holdings, Ultra-D Ventures, Ultra-D Cooperatief and Technology Holdings are holding companies.  SeeCubic and Stream TV International are operating companies.   The Debtor was an operating company until the Court of Chancery of the State of Delaware's (the "Chancery Court") ruling on December 8, 2020 (described in further detail below).  The Debtor's operations have been temporarily suspended, but the Debtor hopes to resume operations in the near-future.

18.    Stream TV International owns as operating subsidiaries 100% of Stream TV International B.V. (Taiwan-Rep Office), 100% of Stream TV 3D Technology (Suzhou) Co., Ltd. (China), and 100% of Shanghai Ruishi Technology Co., Ltd. (China).

19.    The full organizational chart representing the Corporate Structure of the Debtor is attached as **Exhibit A**.

20.    In addition to the above corporate structure, the two following companies are affiliated with Debtor and with Mathu Rajan.

    a.    MediaTainment, Inc. ("MediaTainment") is Delaware corporation formed by Mathu Rajan in 2009.  He has served as the only officer and director of the entity up through today.   MediaTainment originally served as the holding company for Stream as it raised early investor funds for Stream via the issuance of MediaTainment shares and warrants. In 2019, the shareholders of MediaTainment exchanged those shares and warrants in the entity issued to investors for Stream shares and warrants. MediaTainment no longer owns any shares or warrants in Stream.   Stream issued MediaTainment a note in 2010 in the amount of approximately $990,000 for the investor funds raised by MediaTainment and transferred to Stream.

6

The remaining unpaid balance on the note is reflected in the listing of the "Top 20" creditors filed in this case. Until recently, MediaTainment also provided accounting and banking services for Stream; other than these services performed for Stream, MediaTainment has not had any operations. These services have largely stopped since the Chancery Court's ruling on December 8, 2020 (described in further detail below).

b.    Visual Technology Innovations, Inc. ("VTI") is a Nevada corporation and was formed by Mathu Rajan in January 2021.  Mathu Rajan has served as the only officer and director of the entity up through today.  Mathu Rajan presently owns or controls approximately 11.5% of VTI but anticipates that that amount will exceed 98%. VTI intends to be an operating company with no present ties to Stream, although there could potentially be interaction between the two companies in the future, including a potential merger of the two entities.   VTI has hired employees that had previously been employed with the Debtor.

21.    The Debtor's capitalization as of December 31, 2020 is shown in the table below:

| Stream TV Networks, Inc. - capitalization table as of Dec 31, 2020 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | [1] | Class A Common Shares | | [5] | Class B Voting Shares | Total Votes | |
| Principals | [2] | 7,539,751 | 8.8% | | 19,271,416 | 200,253,911 | 56.4% |
| SLS | [3], [6] | 13,943,944 | 16.3% | | | 13,943,944 | 3.9% |
| Hawk | [6] | 2,837,308 | 3.3% | | 1,091,538 | 13,752,688 | 3.9% |
| Employees | [4] | | | | | | |
| All Others | | 61,322,600 | 71.6% | | 6,607,426 | 127,396,860 | 35.9% |
| | | | | | | | |
| Grand Total | | 85,643,603 | 100% | | 26,970,380 | 355,347,403 | 100% |

7

| | |
|---|---|
| (1) | Includes Series B Preferred Stock that is convertible into Class A Common Stock. Includes additional issuable shares to holders having certain protections wrt price dilution. |
| (2) | Includes beneficial ownership by Akshaya and Mathu Rajan's direct ownership in the Debtor. |
| (3) | Includes holdings by Shadron L. Stastney, a principal in SLS (as defined below). |
| (4) | Includes Stock Appreciation Rights issued to employees of the Debtor's Dutch subsidiary, SeeCubic. All options have not been issued. |
| (5) | Each Class B Voting Share has 10 votes and issued per the Second Amended and Restated Charter. |
| (6) | For purposes of this filing, the Hawk Notes (as defined below) and the SLS Notes (as defined below) are characterized as debt that has not been converted pursuant to the Hawk Conversion Agreement (as defined below) and the SLS Conversion Agreement (as defined below), respectively, although this characterization is disputed by the Debtor. The Debtor has issued conversion notices to Hawk (as defined below) and SLS (as defined below) and the conversion is at the discretion of the Debtor and the Debtor is seeking protection because of the lack of complete execution. |

22.     Moving forward, the Debtor intends to generate its revenues through:

a.     The license of its technology to the automotive industry through an existing contract with Bosch following completion of technology development to be paid by Bosch per contract.

b.     Sale of glasses-free 3D components to Google for its 65" special project. Initial development was completed during the course of 2020 and the Debtor expects initial orders of product to be placed by mid-2021.

c.     Sale of 65" displays for the commercial market monitors to the Debtor's existing customers, including Marvel Digital Limited and B-Back, Inc.

d.     Sale of Ultra-D-enabled components to global customers seeking to incorporate the Debtor's technology into their display products. The Debtor has established business relationships with and solicited interest from initial "anchor" customers: e.g., Skyworth seeks to develop an ultra-high-

8

definition 8K television, Chunghwa Telecom seeks to develop an ultra-high-definition 8K television, and Lenovo seeks to develop a gaming laptop. There are a number of additional customers for high-resolution PC monitors, laptops and tablets.

e.      Revenue share through a joint venture (the "<u>JV</u>") with AOTEX[2]. The JV intends to market Ultra-D products to global brands and distributors, as well as sell directly to consumers through its own brand.

f.      Provision of optical bonding services provided to global customers through its Chinese subsidiary with investment support from First Technology Development Pte Ltd. as a strategic partner.

g.      Provision of content services to customers seeking Ultra-D content creation or conversion of legacy 2D content into the Ultra-D format. Revenues may be generated on a consulting basis or via revenue share with the content owners.

h.      Revenue share with JoveAI Innovation, Inc. ("<u>JoveAI</u>") through a joint venture in which JoveAI will provide engineering services to develop semiconductor ASIC chips with the Debtor's Ultra-D algorithms inside for a low-cost component offering that can be made to the Debtor's customers, allowing for the sale of millions of units.

---

[2] Directed by entrepreneur Ali Hassan Osman and based in Beirut, the company offers management advisory services and makes investments primarily in the telecommunication, media, and technology sectors.  AOTEX conducts business within the Middle East, Africa, Europe, Emerging Asia, and Latin America, and anticipates entering into a joint venture agreement with Stream TV Networks for the purpose of exploring global distribution opportunities for Stream TV's Ultra-D TM technology.

9

C. **The Debtor's Debt Structure**

23.     Since 2009, the Debtor has raised approximately $150 million from third party investors. The investments have taken the forms of both debt and equity. The Debtor's senior secured creditor is SLS Holdings VI, LLC ("SLS"). Between 2011 and 2012, SLS loaned $6 million to the Debtor through a series of notes (the "SLS Insider Notes"). The Debtor pledged substantially all of its assets and the assets of its wholly owned subsidiaries as security for the SLS Insider Notes. The Debtor executed a security agreement in connection with the SLS Insider Notes.

24.     The Debtor's junior secured creditor is Hawk Investment Holdings Limited ("Hawk"). Between 2014 and 2020, Hawk loaned more than £50 million to the Debtor, plus another $1.336 million, through a series of junior secured notes (the "Hawk Notes"). Subject to the security interest held by SLS, the Debtor pledged substantially of its assets as security for the Hawk Notes. The Debtor executed a security agreement in connection with the Hawk Notes.

25.     During the early stages of productizing its Ultra-D solution, Stream engaged the engineering services of Intrinsyc Technologies Corporation of Canada ("Intrinsyc"). The companies worked closely together on multiple projects spanning several years at a cost of several million dollars. In October 2014, Intrinsyc made a loan in the amount of USD $1.5 million to Stream in exchange for Stream's commitment to place purchase orders with Intrinsyc for guaranteed future work. From 2015 to 2018, the maturity date of the debt was extended multiple times in exchange for Stream warrants. In May 2018, knowing that similar conversion agreements were being negotiated with SLS and Hawk, Intrinsyc executed a conversion agreement (the "Intrinsyc Conversion Agreement").

26.     In 2018, the Debtor entered into an agreement with Hawk which provided that the Hawk Notes would convert into equity if and when the Debtor raised additional equity capital (the "Hawk Conversion Agreement"). The Debtor and SLS contemporaneously entered into a parallel

10

agreement governing the SLS Insider Notes (the "<u>SLS Conversion Agreement</u>" and collectively with the Hawk Conversion Agreement and the Intrinsyc Conversion Agreement, the "<u>Conversion Agreements</u>"). For purposes of this filing, the Hawk Notes and the SLS Insider Notes are characterized as debt that has not yet been converted pursuant to the Conversion Agreements, although this characterization is disputed by the Debtor. Per the Conversion Agreements, conversion of debt to equity is at the discretion of the Debtor.

27.     The Debtor intends to restructure its debt through this Chapter 11 Case to a level that will allow the Debtor to sustain its operations for the long term.

**D.      Events Leading to the Commencement of the Chapter 11 Case**

**1.      Lender Reneges on Commitment to Convert Debt to Equity**

28.     In early 2018, prospective investors expressed concern about the amount of shareholder debt, and it became clear to the Debtor's management that executing debt-to-equity conversion agreements would be in the best interest of the company and all its shareholders. To facilitate new investment and growth of the company, the three primary holders of the company's debt (Hawk, SLS and Intrinsyc) signed Conversion Agreements, with such conversions to be made at the Debtor's discretion.

29.     More than 100 investors subsequently invested in the Debtor with those Conversion Agreements being factored into their investment decisions.

30.     In May 2018, one of the three debtholders, Intrinsyc, honored its Conversion Agreement and accepted equity in the Debtor.  The accrued value of the debt was $1,661,384 at the time of conversion. It was converted on May 2, 2018 to 415,346 common shares of Stream stock.

31.     In September 2018, Shadron L. Stastney ("<u>Stastney</u>"), principal of debtholder SLS, was appointed Vice Chairman of the Board of Directors of the Debtor to help guide the financial

11

and business direction of the company. As a senior board member, Stastney is a statutory insider for bankruptcy purposes and had knowledge of, and input into, the company's global operations.

32.    In December 2018, Stastney increased his involvement with the Debtor and his status as an insider when he was appointed Chief Financial Officer, with the mutual understanding that Stastney would help the Debtor raise additional capital, prepare the company for strategic investment from institutional partners, and prepare the company for a potential public offering or acquisition. Stastney became intimately aware of the Debtor's financial details and participated in financial planning but failed to secure any investment on the Debtor's behalf.

33.    Despite Stastney's failure to perform, the Debtor had one of its best fundraising years in 2019 through the efforts of its Chief Executive Officer, Mathu Rajan, raising more than $20 million in capital as it worked on development of low-cost Ultra-D components required to support the consumer device market.

34.    By early 2019, the Debtor had perfected its optical bonding process and was preparing to produce demonstrator samples for consumer brands interested in adopting Ultra-D into their product lines as soon as the low-cost Ultra-D components were completed. With its technology and business development plans ramping up, the Debtor began to seek large institutional investment and planned for simultaneous conversion of the SLS Insider and Hawk Notes per the Conversion Agreements.

35.    In May 2019, while still an insider, Stastney informed the Debtor's management that SLS would not convert its debt to equity, even though the Debtor believes there was no basis on which to refuse.  Stastney, during the Summer of 2019, attempted with some of the Debtor's shareholders to take control of the company and invalidate the SLS Conversion Agreement.

12

36.     These actions threatened the company's assets and operations. With inside knowledge of the company's financial operations, Stastney and others contacted certain of the Debtor's new investors and criticized them for having made a "bad decision" to support the existing Debtor management. Prospective investors were also contacted in an attempt to divert them from investing in the company.

37.     In September 2019, despite the ongoing efforts to disrupt its investment activities, the Debtor succeeded in securing the serious interest of an international fund for an investment in the amount of $10 million from a new, third-party investor.  The interest was largely due to advancement in the technology and Stream's contract with BOE.

38.     In August 2019, while serving in the capacities of both Vice Chairman of the Board of Directors and Chief Financial Officer, Stastney recommended that additional investment being made by Hawk in the form of debt be described in the loan documentation as an "amendment" to the outstanding Hawk Notes rather than a new note.  This amendment would later be used by Stastney to support his contention that the conversion obligation of SLS has been nullified.

39.     Stastney resigned as Vice Chairman of the Board and Chief Financial Officer on January 30, 2020 and offered to extend the due dates of the SLS Insider Notes to March 1, 2020, but only if the Debtor made a lump sum payment to him personally on or before February 7, 2020 in the amount of $202,500. He also offered to continue to extend the SLS Insider Notes, so long as he was paid his annual salary of $360,000 through December 31, 2021 (despite the relinquishing of his responsibilities toward the Debtor).  Stream paid an additional $28,987.76 to Stastney individually thereafter.

40.     After his formal exit from the Debtor, Stastney and his associates continued to contact the Debtor's prospective and existing investors in an effort to stop the flow of funds, thereby making it impossible for the Debtor to retire the SLS Insider Notes.

41.     Through the Spring of 2020, Stastney offered to extinguish the SLS Insider Notes in exchange for all of the Debtor's assets, but the Debtor declined because its management felt that such a concession would unfairly impact the Debtor's other investors.

42.     Stastney informed the Debtor's employees, investors, strategic partners and others that SLS would be issuing a Notice of Default to the Debtor on March 1, 2020 and would then immediately take possession of the Debtor's assets.  This created the false impression that the unpaid SLS Insider Notes would result in the immediate loss by the Debtor of its assets. By doing so, Stastney began removing employee support for the Debtor's management.

43.     Stastney's efforts to separate key employees from the Debtor is evidenced by a detailed written employment offer drafted and executed between Stastney and the Debtor's VP of Engineering, wherein Stastney promised employment to the VP with a to-be-determined future entity. This employment offer was signed while Stastney was still employed by the Debtor as Vice Chairman of the Board and Chief Financial Officer.

44.     After issuing a Notice of Default to the Debtor, SLS filed a complaint on March 23, 2020 in the Superior Court of the State of Delaware in and for New Castle County ("Superior Court") seeking to obtain (a) money damages on the alleged obligations due to SLS by the Debtor, and (b) replevin of collateral (see D(2) below).

45.     Despite SLS's request for expedited relief and an injunction, the Superior Court did not order the immediate transfer of the Debtor's assets to SLS.  Rather, the Superior Court set a trial date for June 7, 2021 in the matter. Faced with a 14-month delay in liquidating the amount

14

claimed due it and seizing control of the Debtor's assets, Stastney explored other ways to take possession of the Debtor's valuable technology and its customers.

46.     In late March and early April 2020, Stastney and the Debtor's VP of Engineering, who had signed a lucrative employment offer with Stastney's to-be-determined company, seized physical control of the Debtor's engineering computer servers in Silicon Valley from MotivIT, a third-party IT company managing the Debtor's IT infrastructure in the United States. To accomplish this, they represented to MotivIT that the SLS Superior Court filing was, in fact, a judgment from the Court whereby SLS had become the new legal owner of the assets. Based on this, the Debtor's VP of Engineering and Stastney not only seized control but also blocked the Debtor from accessing its own valuable equipment and computer code.  Once the Debtor realized what had happened, it filed a motion for preliminary injunction in the Delaware Court of Chancery (described in further detail below).

47.     The Debtor was in the process of converting the Hawk Notes according to the Hawk Conversion Agreement, but unknown to the Debtor, Stastney colluded with Hawk and certain other of the Debtor's shareholders to commence a hostile takeover of the Debtor.

48.     At Hawk's suggestion, the Debtor agreed to expand its Board of Directors in March 2020 and offered seats to individuals recommended by Hawk and certain other of the Debtor's investors. On May 4, 2020, these new directors proposed and passed a resolution to establish a debt-resolution committee with themselves solely authorized to negotiate on behalf of the Debtor. Two days later, on May 6, 2020, a lengthy debt resolution (the "Omnibus Agreement") was signed by the new directors, purporting to commit the Debtor to a resolution whereby all of its assets were to be transferred to SLS and Hawk.

15

49.     The Omnibus Agreement contains essentially identical settlement terms to the ones previously proposed by Stastney and rejected by the Debtor's management in the Spring of 2020. The Debtor's directors who signed the Omnibus Agreement had clear conflicts of interest as they would receive compensation and other benefits once Debtor's assets were transferred to Stastney's new company.  For example, some of the directors were offered positions in Seecubic, Inc. or entities affiliated with Alastair Crawford (an equity investor in Stream) and his investor group.

50.     Using the Omnibus Agreement as a foundation, SLS and Hawk pursued seizure of the Debtor's assets through their new business entity, SeeCubic, Inc. ("SeeCubic Delaware"), even though no Court had yet ruled on the validity of the Omnibus Agreement.  Upon learning of additional asset seizures, the Debtor filed its petition for a preliminary injunction in the Chancery Court on September 8, 2020 (see D(3) below). A week later, SeeCubic Delaware filed its petition to block the Debtor from using its own technology, its own name, and even from directing its own employees.

## 2.     Superior Court Litigation

51.     On March 23, 2020, SLS initiated an action (the "Complaint") against the Debtor and its subsidiaries Technovative USA, Technology Holdings, and Media Holdings in Superior Court, alleging that the Debtor had defaulted on certain loan documents, and seeking to obtain money damages on the alleged obligations due to SLS by the Debtor, and replevin of collateral. The Court initially set a trial date of June 7, 2021.

52.     At the request of SLS' counsel, a scheduling hearing was held on February 3, 2021 with the Honorable Mary Johnston of the Superior Court of the State of Delaware. SLS requested that the Court schedule a status conference at which SLS intended to request a suspension of the current Court schedule pending further developments in the Chancery Court proceeding.

53. The Court decided that the current schedule would not be suspended; rather, a trial date of January 17, 2022 was scheduled.

54. The Superior Court action provided an additional distraction to the Debtor's management and further burdened Stream with litigation expenses. And while the case is now set for trial in January, 2022, given the entry of the preliminary injunction by the Court of Chancery (as detailed below), it is unclear how the Debtor can defend the action.

### 3.    Chancery Court litigation

55. On September 8, 2020 and September 15, 2020, respectively, the Debtor and SeeCubic Delaware filed competing motions for preliminary injunctions in the Chancery Court regarding the validity of the Omnibus Agreement dated May 6, 2020 between the Debtor, its two secured creditors, and fifty-two of its stockholders (the "Equity Investors").

56. As set forth previously, prior to the Omnibus Agreement, the Debtor had developed the world's best glasses-free 3D technology and was making significant progress with customers and strategic partners. In 2018, the Debtor signed a joint marketing agreement with BOE, the largest display company in the world. In 2019, the Debtor engaged with Google and Bosch for specialty projects that went to contract in 2020. In 2020, the Debtor began negotiations with Lenovo, Skyworth and Chunghwa Telecom for development of consumer laptop and television prototypes.

57. The Omnibus Agreement is a proposed settlement that benefits the very investors responsible for creating the problem by failing to honor the Conversion Agreements. In 2018, at the request of certain of the Debtor's investors, three secured debtholders signed conversion agreements, with debt-to-equity conversion at the discretion of the Debtor on a pro rata basis relative to new investment funds secured by the Debtor.

17

58.     On December 8, 2020, the Chancery Court issued an Order and accompanying Opinion granting SeeCubic Delaware's motion for a preliminary injunction and denying the Debtor's motion for a preliminary injunction.   The Chancery Court Order is attached hereto as **Exhibit B**.  The Chancery Court Opinion is attached hereto as **Exhibit C**.  Pursuant to the Order, the Debtor and third-party defendants Mathu Rajan and Raja Rajan were preliminarily enjoined from taking actions to interfere with the Omnibus Agreement, as further outlined in the Order.

59.     When the Court of Chancery enforced creditor remedies for the holders of the SLS Insider Notes as a matter of State law, it did so only by enjoining the Debtor from, interfering with the exercise of those remedies.  The preliminary injunction did not effectuate the transfer of any assets from the Debtor to or on account of the Insider Creditor.  The Debtor retains title by physical possession of most of its business assets. The Preliminary Injunction had the practical effect of making it impossible for Stream to defend itself in the litigation, operate, continue to develop its product and fulfill its outstanding contracts with entities such as BOE and Google, and raise additional capital.  It intends to deal with its assets for the benefit of all creditors (and not just parties to the State Court litigation) and refinance in this proceeding and confirm a plan which treats all creditors fairly and equitably.

### 4.     Other Events and Factors Leading to Chapter 11

60.     The worldwide COVID-19 pandemic also had a devastatingly negative impact on the Debtor's business and its fundraising. The Debtor's 3D visual technology must be viewed in person to be fully and truly appreciated, and the inability of the Debtor to exhibit its transformative technology and products in person since March 2020 prevented it from generating critical investment and revenue from investors, strategic partners, and customers, in the global marketplace.

18

61.     The Debtor believes that it has a valuable business and that the Chapter 11 reorganization will allow the Debtor to preserve and maximize the value of the Debtor's estate.

**E.     Desired Outcomes for Chapter 11 Process**

62.     The Debtor intends to restructure its debt through this Chapter 11 Case so that its debt service is reduced to a level that will allow the Company to sustain its operations for the long term and has identified investors who are willing to invest in the Company once the Company files this Chapter 11 Case.

63.     The Debtor believes that the Chapter 11 filing is the path that will best allow it to secure the future of the Debtor.

64.     To that end, the Debtor seeks in the chapter 11 process to pursue a reorganization plan:

a.      The Debtor will resume operations as outlined in Section I(B)(21).

b.      The Debtor will take steps to collect outstanding receivables and other assets.

c.      Once operations have resumed, the Debtor plans to file a reorganization plan based, in part, on additional funding from VTI and from operations profits.

d.      Alternatively, if no substantial investments are made in support of the Debtor within 30 days after the petition date for this Chapter 11 Case, the Debtor intends to pursue a sale pursuant to 11 U.S.C. § 363 of the Bankruptcy Code in order to maximize the value of the Debtor for its creditors and other parties in interest. As of the date of this declaration, the Debtor has sufficient confidence in the prospective investors that it views a 363 sale as unlikely and unnecessary.

19

## II.    **MOTIONS FILED ON THE PETITION DATE**[3]

### A.    **Application of the Debtor Pursuant to Section 327(a) of the Bankruptcy Code for Authority to Employ Dilworth Paxson LLP as Counsel for the Debtor (the "Dilworth Retention Application")**

65.    By the Dilworth Retention Application, the Debtor seeks to retain Dilworth Paxson LLP ("Dilworth") as counsel pursuant to section 327(a) of the Bankruptcy Code because Dilworth has extensive experience and knowledge in the field of debtor's and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code.   Additionally, Dilworth possesses extensive expertise, experience, and knowledge practicing before bankruptcy courts in Delaware.

66.    In preparing for its representation of the Debtor in this case, Dilworth has become familiar with the Debtor's business and affairs and many of the potential legal issues which may arise in the context of this Chapter 11 Case.

67.    The Debtor believes that the employment of Dilworth is appropriate and necessary to enable the Debtor to faithfully execute its duties as Debtor and Debtor-in-possession, and to implement the restructuring and reorganization of the Debtor.   Accordingly, the Debtor believes that Dilworth is both well-qualified and uniquely able to represent the Debtor in the Chapter 11 Case in an efficient and timely manner.

68.    The Debtor does not seek an expedited hearing with respect to the Dilworth Retention Motion or other professional retention motions except its claims agent.

### B.    **Application of Debtor For An Order Authorizing Employment and Retention of Omni Agent Solutions As Claims and Noticing Agent ("Omni Agent Solutions Retention Application")**

---

[3] Capitalized terms not defined herein are ascribed the meaning given to them in their respective motions.

69.     By the Omni Agent Solutions Retention Application, the Debtor seeks authority to retain Omni Agent Solutions as claims and noticing agent.

70.     Omni Agent Solutions is a bankruptcy administrator that specializes in providing comprehensive chapter 11 administrative services, including noticing, claims processing, balloting and other related services critical to the effective administration of chapter 11 cases. Indeed, Omni Agent Solutions has developed efficient and cost-effective methods to handle properly the voluminous mailings associated with the noticing, claims processing and balloting portions of chapter 11 cases to ensure the orderly and fair treatment of creditors, equity security holders and all parties in interest.  Further, Omni Agent Solutions will work with the Clerk's Office to ensure that such methodology conforms with all of the Court's procedures, the Local Rules and the provisions of any orders entered by this Court.

71.     In determining which claims and noticing agent to retain, Dilworth obtained bids from Epiq, Prime Clerk, and Donlin Recano.  Dilworth chose Omni Agent Solutions because their bid was competitive with the other bidders, and because Omni Agent Solutions has substantial experience in matters of this size and complexity and has acted as the official notice, claims and solicitation agent in many large bankruptcy cases in this circuit and other circuits nationwide.

72.     Retention of Omni Agent Solutions will facilitate the efficient administration of this bankruptcy case and will relieve the Debtor and its counsel from devoting time and attention to noticing and related issues.  As a result, the Debtor will incur reduced counsel fees.

C.      **Motion of Stream TV Networks, Inc. for Entry of Order: (i) Authorizing it to Obtain Post-Petition Financing Pursuant to Sections 363 and 364 of the Bankruptcy Code, (ii) Authorizing it to Enter into the Support Agreement, and (iii) Granting Administrative Priority Claims to Lender Pursuant to Section 364 of Bankruptcy Code and Modifying the Automatic Stay to Implement the Terms of the Order (the "Funding Motion")**

73.     Knowing that the Debtor was in need of funds to fund its operations in bankruptcy,

21

the Debtor commenced discussions with VTI, regarding the need and possibilities for DIP financing.

74.     To facilitate operations of the Debtor and to preserve going concern value pending, VTI has offered to provide the Debtor with a loan facility requiring administrative priority treatment for funds advanced as set forth in the Support Agreement attached to the Funding Motion.

75.     Material provisions of the Support Agreement include the following:

a.     *Facility Amount*:  Total commitment of up to the amount of $1,000,000 unless otherwise increased by consent of the Payor in a signed writing (the "Payment Cap"). [Support Agreement, Section 2(a)(1), p. 5].  An initial sum of $200,000.00 in cash were proposed to be deposited into the Support Account of the Debtor on or before March 5, 2021, subject to mutual extension of this amount (the "**Initial Payment**") upon the request of the Payee from time to time in accordance with the requirements of Section 2(b) of the Support Agreement[4]. [Support Agreement, Section 2(a)(2), Support Obligations and Procedures, p. 5].

b.     *Interest Rates*:  Interest on each Payment shall accrue at the rate of six percent per annum  [Support Agreement, Section 2(e), Support Obligations and Procedures, p. 6].

c.     *Payment of Interest*: Interest shall be payable if and to the extent of cash proceeds generated from projects of the Payee. Otherwise interest will accrue until the repayment of the Payments as referenced in Section 2(f) of the Support Agreement.

d.     *Repayment of Loan*: The repayment to VTI of all the Payments plus any unpaid interest accrued thereon shall be pursuant to the Plan as approved by the Bankruptcy Court, or upon conversion or dismissal of the Bankruptcy Case [Support Agreement, Section 2(f), Support Obligations and Procedures, p. 6].

e.     *Carve-Outs*:  The administrative priority claims granted hereunder to VTI, and any post-petition claims or interests ranking *pari passu* with or junior in priority to such claims of VTI shall be subject to payment of the Carve-Outs.  As used herein, "Carve-Outs" shall mean (a) a payment of an additional retainer of $100,000 to counsel for the Debtor in the Bankruptcy Case; and (b) fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and to the Clerk of the Bankruptcy Court; provided, that nothing herein shall be deemed as a waiver of the rights of VTI to

---

[4] $100,000 of the initial sum was to be used to fund the retainer to the Debtor's law firm, Dilworth Paxson LLP.  Because the Debtor's bank account was not established, this $100,000 payment was made directly by VTI to Dilworth Paxson.

object to any requests for allowance of any fees or expenses [Support Agreement, Section 1, Definitions, page 4].

76.     This is an unsecured loan for which VTI is receiving six percent (6%) interest.  This loan does not involve securitization, priming liens or a roll up.

77.     The Debtor has reasonably determined that the Loan Facility offered by VTI provides terms most favorable to the Debtor and its estate.

78.     Approval of the Loan Facility will provide the Debtor with immediate and ongoing access to borrowing availability to pay its current, ongoing and anticipated operating expenses. Unless these expenses are paid, the Debtor will be forced to discontinue any efforts to operate, which would likely result in irreparable harm to its business and jeopardize the Debtor's ability to reorganize and maximize value for all interested parties.

79.     The credit provided under the Support Agreement will enable the Debtor to continue to operate and to preserve the value of the estate while the Debtor pursues its reorganization strategy.  The availability of credit under the Support Agreement will provide confidence to the Debtor's creditors that will enable and encourage them to continue their relationships with the Debtor.

80.     The Debtor's liquidity needs can be satisfied only if the Debtor is authorized to borrow under the Loan Facility and to use such proceeds to fund its operations.  VTI is willing to provide the Loan Facility in exchange for the grant of an administrative priority expense claim pursuant to section 364(b).

81.     The Debtor believes it would not be able to obtain post-petition financing or other financial accommodations from any alternative to VTI or on more favorable terms and conditions than those for which approval is sought herein.

82.     It is my understanding that the Debtor does not have many of the stringent requirements placed on a debtor in a more traditional DIP financing arrangement.

83.     The Debtor has been unable to procure the funding required to meet its ongoing operational needs absent granting the proposed administrative priority claims as set forth in the Support Agreement.  The Debtor submits that the circumstances of this case require the Debtor to obtain financing pursuant to section 364(b) and, accordingly, the Support Agreement reflects the exercise of its sound business judgment and is entirely fair.

Dated:  March 12, 2021                          **Stream TV Networks, Inc.**

                                    By:     _Mathu Rajan_
                                            _____
                                            Mathu Rajan
                                    Title:      Chief Executive Officer

24