# **EXHIBIT K**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Stream TV Networks, Inc., | Case No. 21-10848 (KBO) |
| Alleged Debtor. | **Re: Docket Nos. 5 & 22** |

### JOINDER AND OBJECTION OF THE ALLEGED DEBTOR TO THE EMERGENCY MOTION OF SEECUBIC, INC. AND SLS HOLDINGS VI, LLC FOR AN ORDER DISMISSING INVOLUNTARY CHAPTER 7 CASE

The above-captioned alleged debtor (the "**Debtor**") hereby files this joinder and objection in its own right (the "**Joinder**") to the *Objection of the Petitioning Creditors* [Docket No. 22] (the "**Creditors' Objection**") to the *Emergency Motion of Seecubic, Inc. and SLS Holdings VI, LLC for an Order Dismissing Involuntary Chapter 7 Case* [Docket No. 5] (the "**Motion to Dismiss**"). In further support of the Objection, the Debtor, respectfully represents:

### PRELIMINARY STATEMENT

1.       First and foremost, the Debtor apologizes to the Court and parties-in-interest in this case for lateness of this Objection.  Since the unfortunate dismissal of its original voluntary chapter 11 bankruptcy petition, the Debtor has worked diligently to rectify the issues raised by this Court. To further that end, after a thorough vetting process, yesterday the Debtor hired the undersigned as counsel. In addition, the Debtor has agreed to retain Howard Brownstein as Chief Restructuring Officer ("**CRO**"). But most importantly, the Debtor has come to this Court with a fully baked business plan, which includes a firm commitment for debtor in possession financing to fully fund the bankruptcy case. The Debtor understands and appreciates this Court's original concerns with its own voluntary petition; however, given its recent actions, the Debtor trusts that the Court will see the good faith nature of the Debtor, its intention to pay all parties in full, and successfully

restructure the Debtor, which is in the best interest of all of the Debtor's creditor constituencies and not just a select few.

2.      By way of this Joinder, the Debtor fully supports, and incorporates by reference, the arguments made in the Creditors' Objection. In normal circumstances, the Debtor would answer the involuntary petition by filing its own voluntary chapter 11 voluntary. However, given this Court's prior dismissal order, albeit without prejudice, the Debtor chose not to run afoul of this Court's directive in its prior ruling. However, to the extent that this Court overrules the Motion to Dismiss, the Debtor respectfully requests that it be afforded a short period to prepare and file its own voluntary chapter 11 petition and first day pleadings.

3.      As noted, the Debtor has developed a business plan, budget, and bankruptcy strategy that would pay all its creditors in full. Attached hereto as <u>Exhibit A</u> is the debtor in possession financing term sheet (the "**DIP Term Sheet**"), which contemplates full funding of the chapter 11 case, including milestones that require payment in full of all creditors and affords the DIP Lender the opportunity to convert its debt to equity only upon the effective date of a confirmed plan. Further, the Debtor is prepared to hire Howard Brownstein as CRO. Mr. Brownstein is not affiliated in any way with the Debtor and is known to this Court. Mr. Brownstein is prepared to immediately step in as CRO and provide the independent oversight of the Debtor that has been questioned in the past.

4.      While the Debtor is still at odds with the Chancery Court ruling that precipitated the first chapter 11 filing, that is not the driving factor of its current actions. The Debtor has heard this Court loud and clear. It comes before you now with independent leadership, a financing commitment, and a plan to pay all creditors in full. This course of action embodies a far better outcome for all creditor constituencies than the sale of substantially all assets that was

preliminarily sanctioned by the Chancery Court that only benefited select parties. As this Court is aware, the heart of the Bankruptcy Code is to provide a breathing spell and an honest opportunity to reorganize to distressed companies. That is all this Debtor asks for, some breathing room to proffer a plan of reorganization that will pay all creditors in full and not just a select few.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the above-captioned chapter 7 case (the "**Chapter 7 Case**") pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of the Chapter 7 Case is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

6.     On February 24, 2021, Stream TV Networks, Inc. filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). The case was captioned 21-10433-KBO (the "**Chapter 11 Case**").

7.     On May 17, 2021, the Court entered an order dismissing the Chapter 11 Case ("**Dismissal Order**").

8.     On May 21, 2021, Stream TV Networks, Inc. filed a *Notice of Appeal Under 28 U.S.C. § 158(a) and Statement of Election* [Case No. 21-10433-KBO; Docket No. 202] ("**Notice of Appeal**").

9.     On May 23, 2021, three creditors – Jamuna Travels, Inc., Walsh CHB, Inc. and Rembrandt 3D Holding Ltd. (together, the "**Petitioning Creditors**") filed an involuntary petition for relief under chapter 7 of the Bankruptcy Code, which initiated the above-captioned Chapter 7 Case.

10.      On May 27, 2021, SeeCubic, Inc. ("**SeeCubic**") and SLS Holdings VI, LLC

("**SLS**" and, together with SeeCubic the "**Movants**") filed the Motion to Dismiss. The Movants are secured creditors that this Court is familiar.

11.    On June 6, 2021, the Petitioning Creditors filed the Objection.

12.    After several informal discussions with the Debtor, the undersigned counsel was formally retained on June 7, 2021.

## STATUTORY PREDICATES

13.    The Debtor relies on sections 105 and 707 of the Bankruptcy Code in support of the Objection.

14.    Pursuant to Rule 9013-1(h) of the Local Rules, the Debtor consents to the entry of a final judgment or order with respect to the Motion to Dismiss and Objection, if it is determined that this Court would lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

## RELIEF REQUESTED

15.    The Debtor respectfully requests the Court deny the Motion to Dismiss and afford the Debtor an opportunity to file a voluntary chapter 11 bankruptcy petition and related first day pleadings. The Debtor desires to being a chapter 11 debtor in possession and has a business plan and financing commitment in place to accomplish that goal. This Court should allow the bankruptcy case to move forward and allow the Debtor an honest opportunity to reorganize under the provisions of the Bankruptcy Code. As reflected within the DIP Term Sheet, the Debtor has a commitment that will fully fund a chapter 11 case to benefit all creditors: not just the secured lenders and their select creditors via side agreements as contemplated by their sale transaction.

## BASIS FOR RELIEF

16.    First, the divestiture rule is inapplicable. Second, the equities of the pending

Chapter 7 Case weigh in favor of denying the Motion to Dismiss and allowing the Debtor to proceed as a chapter 11 debtor in possession, which will benefit all stakeholders, including the Movants and general unsecured creditors who will be paid in full. Third, even the Movants' myopic presentation of the procedural posture of the state court litigation, Omnibus Agreement, and prior Chapter 11 Case do not weigh in favor of dismissing the Chapter 7 Case to permit the Movants to skirt the equitable allocation of value and deny the estate its only value. Fourth, any request for relief from the automatic stay by the Movants – those insider parties with the strongest ability to manipulate the distressed Debtor at the expense of other stakeholders, especially general unsecured creditors – should be done by separate motion and discovery schedule as part of an organized chapter 11 process.

## I.    The Divestiture Rule Does Not Apply

17.    The divestiture rule does not apply and cannot prevent the Court from exercising plenary jurisdiction over the instant Chapter 7 Case. The entry of the Dismissal Order ended the Court's jurisdiction over the Chapter 11 Case and caused the chapter 11 bankruptcy estate to cease to exist. Although, the Debtor filed a Notice of Appeal, this filing does not resurrect the chapter 11 bankruptcy estate, nor does it resuscitate the Court's jurisdiction over the lifeless Chapter 11 Case. In fact, allowing the Debtor to move forward with respect to the current Chapter 7 Case would negate the necessity of the appeal and bring closure to the first filed case.

## II.    The Motion to Dismiss the Chapter 7 Case Must be Denied

18.    Bankruptcy is a collective proceeding that exists to benefit all creditors. *See In re Gulf Coast Oil Corp.,* 404 B.R. 407, 426 (Bankr. S.D. Tex. 2009) (noting, bankruptcy is "intended to benefit all creditors not just the secured lender"); *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.363, 373 (5th Cir. 1987), *aff'd sub nom. United Sav. Ass'n of Texas v. Timbers of Inwood*

*Forest Assocs., Ltd.*, 484 U.S. 365 (1988) (acknowledging the Bankruptcy Code benefits creditors and enhances the amounts recovered by all creditors of the chapter 11 debtor "by preserving going-concern values"). In fact, when a Delaware corporation is insolvent, its fiduciary duties shift to all creditors, and not just equity holders. Here, granting the Motion to Dismiss will result in an inequitable outcome – the Movants will succeed with their clever unauthorized sale transaction that strips the Debtor of all of its assets and value and leaves behind only select debts that the Movants chose not to take on while awarding other creditor constituencies who were fortunate enough to be part of side agreements with the Movants that were not initially disclosed as part of the ongoing litigation. Typically, only a sale under section 363 of the Bankruptcy Code allows a purchaser to assume and assign only certain debts while rejecting others. However, the Movants are attempting to do just that via the Omnibus Agreement and related side letters. The Movants are attempting to side step typical M&A principles by disguising their true intentions in side letters and agreements that were allegedly separate from the unauthorized sale transaction, all to the detriment of the Debtor and its creditor constituencies. Allowing the Movants to acquire substantially all of the Debtor's assets at not reasonably equivalent value while at the same time allowing the Movants to pick and choose their new equity holders and creditors from the Debtor's current equity holders and creditors, is unjust to the Debtor and its creditors and the Debtor should be afforded the breathing room provided for by the Bankruptcy Court to evaluate such a transaction and the interested parties that allegedly approved such transaction.

III.     **Movants Attempt to Extract More Value than Permitted Under the Bankruptcy Cde Using Subterfuge**

19.     <u>Not a Two-Party Dispute</u>: Contrary to the Movants' assertions, the issues underlying this involuntary petition are not simply a two-party dispute between the Debtor on one side and its secured creditors on the other. This is made abundantly clear by the fact that there are

numerous creditors and equity-holders of the debtor, including approximately $25 million of unsecured debt, who are not parties to the Omnibus Agreement and Letter Agreement and who have interests to protect through these proceedings. The pre-petition conduct by SLS and Hawk was not a simple foreclosure (current equity holders would not be entitled to new equity in a foreclosure no matter how you define the term foreclosure) by under-secured creditors seeking to recover what value they could from limited collateral. Instead, SLS and Hawk used the state court proceedings to generate a windfall to themselves and their preferred subset of the Debtor's investors by attempting to transfer an enterprise they themselves valued at over $330 million in satisfaction of secured debt totaling less than half that sum. The very purpose of chapter 7 proceedings in this Court is to ensure that <u>all</u> creditors are treated fairly and no one creditor or group of creditors is able to swoop in and strip all the value from a debtor while leaving other creditors holding the bag. The Debtor is prepared to right this wrong and pay all creditors, including the Movants, in full as evidenced by the DIP Term Sheet.

20.     In addition, this case involves a significant dispute over licensing rights held by the Debtor and whether such rights may be transferred or assigned. Even assuming *arguendo* the validity of the Omnibus and Letter Agreements, the pending litigation in the Delaware Court of Chancery has no bearing on particular assets of the Debtor. The Chancery Court, as a state court of limited jurisdiction, is not the appropriate forum to adjudicate what assets may or may not be transferred from the Debtor and what assets properly remain with the Debtor. Such an analysis, however, is precisely within the purview of this Court which is uniquely qualified to evaluate the extent of the Debtor's estate and who may properly make use of or assert claims against such estate. At the very least, the Debtor still owns valuable intellectual property rights and causes of action that would be assets of the bankruptcy estate.

21.     <u>Omnibus Agreement Specifically Contemplates Bankruptcy Proceedings</u>:
Although the Movants claim that the Petitioning Creditors and/or the Debtor are seeking to avoid
and undermine the Omnibus Agreement and the Chancery Court's preliminary opinion affirming
it by seeking the protection of the Bankruptcy Court, nothing could be further from the truth. In
fact, the very language of the Omnibus Agreement specifically recognizes the effect that
bankruptcy proceedings could have on the agreement. Section 2.1 of the Omnibus Agreement
provides:

> "<u>Representations and Warranties</u>. Each party hereto hereby
> represents and warrants to all of the other parties hereto as follows:
> . . . (c) This Agreement and each of the other documents
> contemplated hereby, to the extent a party thereto, has been duly
> executed and delivered by such party and constitutes the legal, valid
> and binding obligation of such party, enforceable against such party
> in accordance with its terms, subject to (i) the effects of bankruptcy,
> insolvency, fraudulent conveyance, reorganization, moratorium and
> other similar laws relating to or affecting creditors' rights generally
> and (ii) general equitable principles (whether considered in a
> proceeding in equity or at law)."

This Court need not consider whether the Debtor and its secured creditors could ever waive by
contract, or whether a state court could restrict by injunction, the Debtor's or its creditors' rights
to seek the protection of the Bankruptcy Code. The parties explicitly recognized in the Omnibus
Agreement that the transactions contemplated by the agreement were within the scope of the Code
and subject to its provisions. Neither the Petitioning Creditors by filing the involuntary petition
nor this Court by adjudicating such petition takes any action inconsistent with the Omnibus
Agreement or the preliminary opinion of the Chancery Court interpreting it.

22.     <u>Petitioning Creditors Are Not Parties to the Omnibus Agreement and Are Not</u>
<u>Bound by the Agreement or the Chancery Court Opinion</u>: Whatever effect the Omnibus Agreement
and the Chancery Court's preliminary opinion may have on the Debtor and its ability to file a

voluntary petition for bankruptcy relief, the Petitioning Creditors are not parties to the Omnibus

Agreement and are not subject to the Chancery Court opinion. The Omnibus Agreement is between

(i) Stream TV Networks, Inc.; (ii) SLS Holdings VI, LLC; (iii) Hawk Investment Holdings

Limited; and (iv) particular named investors of Stream listed on an Annex to the Agreement. The

Letter Agreement drafted in connection with the Omnibus Agreement is between (i) SLS Holdings

VI, LLC; (ii) Hawk Investment Holdings Limited; and (iii) those same named investors of Stream.

The Chancery Court's Order Granting Motion for Preliminary Injunction is "binding upon the

parties to this action [Stream TV Networks, Inc.; SeeCubic, Inc.; Mathu Rajan and Raja Rajan],

their officers, agents, servants, employees, and attorneys, and upon those persons in active concert

or participation with them who receive actual notice of the order."

23.     The Petitioning Creditors are not and have never been in active concert or

participation with the Debtor in connection with the Omnibus Agreement or any purported

attempts to interfere with it. Rather, the Petitioning Creditors are third parties who stand to suffer

(to Movant's benefit) if the transfers contemplated by the Omnibus Agreement are allowed to

occur without oversight or scrutiny. Once the Petitioning Creditors became aware of the efforts by

the secured creditors to claim all of the Debtor's assets for themselves, and after the Debtor's effort

to effectuate a reorganization or ensure an equitable liquidation was halted by the order dismissing

the chapter 11 case, the Petitioning Creditors turned to the involuntary chapter 7 process as a last

resort to protect their rights. There is no agreement, order, or other restriction which does or may

bar the Petitioning Creditors from doing so.

**IV.     Granting Relief from the Automatic Stay is Inappropriate**

24.     Similarly, granting relief from the automatic stay, without the need of full motion

practice and discovery, only inures to the benefit of the Movants at the extreme detriment of other

creditors and the Debtor. Any request for relief from the stay must be made as part of an organized
chapter 11 process with a fully briefed motion and discovery.

25.     In sum, the Debtor appreciates this Court's prior concerns; however, the Debtor,
with the advice of its professionals, has made a good faith effort to rectify any such concerns. If
the Motion to Dismiss is denied, the Debtor will demonstrate to this Court that it:

      a.   has a commitment that will fully fund a chapter 11 case;

      b.   has engaged new independent counsel;

      c.   has engaged a CRO;

      d.   has a business plan in place and related budget to accomplish the re-starting of business operations, bringing employees back from furlough, and operating in the ordinary course of business;

      e.   has the structure of a chapter 11 plan of reorganization that will pay all creditors, including the Movants and general unsecured creditors, in full; and

      f.   will comply with all provisions of the Bankruptcy Code and requirements of the Office of the United States Trustee.

All this Debtor needs is the breathing room and an honest opportunity to reorganize, which are
cornerstones
 of the Bankruptcy Code.

## RESERVATION OF RIGHTS

26.     The Debtor reserves all rights, including the right to make such other and further
argument in support of the relief requested in the Debtor's Objection to the Motion to Dismiss or
in response to any reply to the Debtor's Objection as may be appropriate.

## **CONCLUSION**

27.     The Debtor respectfully requests the Court deny the Motion to Dismiss and grant

such other and further relief as may be just and proper.

Dated: June 8, 2021                          Respectfully submitted,
      Wilmington, Delaware

**POLSINELLI PC**

 */s/ Christopher A. Ward*        
Christopher A. Ward (Del. Bar No. 3877)
Shanti M. Katona (Del. Bar No. 5352)
Brenna A. Dolphin (Del. Bar No. 5604)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
cward@polsinelli.com
skatona@polsinelli.com
bdolphin@polsinelli.com

*Counsel to Stream TV Networks, Inc.*

# EXHIBIT A

**VISUAL TECHNOLOGY
INNOVATIONS, INC.**

June 8, 2021

**VIA EMAIL**:

Mr. Mathu Rajan
Chief Executive Officer
Stream TV Networks, Inc.
2009 Chestnut Street, 3rd Floor
Philadelphia, PA 19103

Re: Senior DIP Credit Facility for Stream TV Networks, Inc.

Dear Mr. Rajan:

We refer to the involuntary petition for relief under Chapter 7 of the Bankruptcy Code filed by
some unsecured creditors against Stream TV Networks, Inc. ("**Stream TV**"), a Delaware
corporation, before the United States Bankruptcy Court for the District of Delaware. We also
refer to our discussions for a proposed super-priority debtor-in-possession term loan facility in an
aggregate amount of $200 million.

Visual Technology Innovations, Inc. ("**VTI**") is pleased to confirm its intention to commit up to
$200 million to Stream TV, on terms substantially similar to those detailed in the Term Sheet
summarized below and attached hereto as Exhibit A, with such changes as may be acceptable to
VTI. The terms and conditions offered and attached hereto address many of the issues discussed
by and between Stream TV and VTI since the involuntary bankruptcy proceeding was first filed
against Stream TV and are subject to Bankruptcy Court approval.

We look forward to working with you on this matter.

Very truly yours,

**Visual Technology Innovations, Inc.**


By: /s/ Daniel Rink

Name: Dan Rink

Title: Legal Counsel

# SENIOR DIP CREDIT FACILITY PROPOSAL
## SUMMARY

| | |
|---|---|
| Borrower: | Stream TV Networks, Inc. |
| Lender: | Visual Technology Innovations, Inc. |
| DIP Facility: | $200,000,000 Debtor-in-Possession term loan to be funded upon entry by the United States Bankruptcy Court for the District of Delaware of an acceptable Interim DIP Order. The Borrower will consent to a voluntary Chapter 11 bankruptcy case, obtain an acceptable Final DIP Order, and seek to confirm a Chapter 11 reorganization plan that is acceptable to the DIP Lender and Borrower. |
| | Each borrowing of the DIP Loans shall be in a minimum amount of $5,000,000 with the exception of the Initial Amount. |
| Initial Amount: | An initial amount of up to $500,000 will be borrowed from the Lender as soon as the DIP Facility is approved by the Bankruptcy Court, for the purpose of investigating any action, cause of action, proceeding, claim, allegation or objection with respect to the Company's Secured Debt, the Omnibus Agreement and the Letter Agreement, including breach of fiduciary duties, civil conspiracy, and fraud, among others causes of action. |
| Availability: | Funds will be available to Borrower according to the following proposed schedule:<br><br>• June 18, 2021:   $5,000,000<br>• July 02, 2021:  $45,000,000<br>• July 16, 2021:  $70,000,000<br>• July 30, 2021:  $68,000,000 |
| Purpose: | To finance (i) the costs associated with Borrower's Chapter 11 bankruptcy filing; (ii) the maintenance of Borrower's assets during the pendency of the bankruptcy; (iii) repayment of approximately $150,000,000 in secured debt; (iv) repayment of approximately $25,000,000 in general unsecured debt; (v) Borrower's operations during the pendency of the bankruptcy; and (vi) Borrower's exit from bankruptcy. |
| Maturity: | One hundred eighty (180) days from the date the Bankruptcy Court enters the Interim DIP Order. |
| Security: | The DIP Facility will be secured by a first priority and senior priming security interest under 11 U.S.C. Section 364(d) on all of |

the Borrower's pre-petition and post-petition assets and capital stock.

| | |
|---|---|
| Commitment Fee: | 2.0% of the Commitment (which may be in the form of OID), payable to the Lender from the first interim draw under the DIP Loan Documents. |
| Interest: | All amounts outstanding under the DIP Facility will bear interest at a rate of 12.0% per annum. During the continuance of an Event of Default, the loans and all other outstanding obligations will bear interest at an additional 2.0% per annum above the interest rate otherwise applicable. |
| Collateral Account: | DIP Loans shall be funded into a deposit account under the control of the Borrower (the "Collateral Account") and shall be immediately available to the Borrower.  Any disbursements from the Collateral Account shall be substantially in accordance with the Company's prepetition cash management system, the DIP Loan Documents, the Interim Order and the Final Order.  DIP Loans may be requested by the Borrower via a withdrawal notice ("Withdrawal Notice") on one Business Day's notice. |
| Conditions Precedent: | Closing shall be conditioned upon satisfaction of the following conditions customary to transactions of this type, or reasonably required by the Lender: |

1. An acceptable DIP Budget to fund the purposes defined above;

2. Appointment of a Chief Restructuring Officer by the Borrower;

3. All necessary consents and approvals to the financing shall have been obtained by both Lender and Borrower, including corporate resolutions;

4. Approval of an acceptable interim DIP Order by the Bankruptcy Court; and

5. Preparation, execution and delivery of definitive documentation satisfactory to the Lender, containing representations, covenants, events of default, expense reimbursement, and indemnification provisions customary for transactions of this size, type, and purpose.

| | |
|---|---|
| Option to Convert: | Lender shall have to option to convert its debt under the DIP Facility to equity in the Borrower at the price of $1 per share pursuant to the terms of a chapter 11 reorganization plan that eliminates pre-petition debt of the Borrower. |
| Operations: | Borrower's budgeted expenses for operations shall include allocation of expenses per project (as described more fully in the |

term sheet) in the approximate amounts set forth as follows:

- 8K Two-View Special Project: $8.9 million
- 4K Render-Only Screens: $2.8 million
- 8K Drive Train: $2.4 million
- Rendering ASIC: $2.55 million
- Bosch Project: $7.3 million

Expiration:                This letter shall expire on June 30, 2021 at 11:59pm Eastern time,
                           if prior to such date the Borrower has not accepted this letter by
                           returning a signed copy to the Lender.

**These terms and conditions are provided for proposal purposes only and do not represent a commitment to provide financing. Such commitment can only be made by a written commitment by an authorized officer of the Lender.**

## Exhibit A

**Visual Technology Innovations, Inc.**
**Proposed Senior DIP Credit Facility Term Sheet**

**for**
**Stream TV Networks, Inc.**

# STREAM TV NETWORKS, INC.

### SUMMARY OF TERMS AND CONDITIONS FOR DEBTOR-IN-POSSESSION FINANCING

*The following describes the terms of a debtor-in-possession financing ("**DIP Facility**") of Stream TV Networks, Inc., a Delaware corporation (the "**Company**" or "**Borrower**") during the pendency of the case that three of its unsecured creditors have filed before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") under chapter 7 (the "**Chapter 7 Case**") of the United States Bankruptcy Code (the "**Bankruptcy Code**"). The terms herein shall also apply to Company's reorganization under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**") in the event that the Company converts its Chapter 7 Case to a Chapter 11 Case or in the event that the Company's Chapter 11 appeal in Federal District Court is successful.*

*This term sheet ("Term Sheet") is non-binding and is intended for discussion purposes only and does not constitute a commitment to lend. The Lender's (as defined below) commitments and other obligations hereunder are subject to: (i) the preparation, execution and delivery of mutually acceptable loan documentation incorporating substantially the terms and conditions outlined in this Term Sheet; (ii) the accuracy and completeness of all representations that the Company makes to the Lender and all information that it furnishes to the Lender; and (iii) the Company's compliance with the terms and conditions contained in this Term Sheet, including, without limitation, the payment in full of all fees, expenses and other amounts payable hereunder. Except as expressly provided in any binding written agreement the parties may enter into in the future, with and upon approval of the Bankruptcy Court, no past, present or future action, course of conduct, or failure to act relating to the transactions or proposals referred to in this Term Sheet or relating to the negotiation of the terms of such transactions or proposals shall give rise to or serve as the basis for any obligation or other liability on the part of the Lender. The terms and conditions set forth herein are mutually dependent on each other, and the Lender shall not be obligated to extend credit unless agreement with the Borrower and approval by the Bankruptcy Court is obtained with respect to such terms and conditions as a whole.*

| | |
|---|---|
| **Borrower** <br> Bankruptcy Rule 4001(c)(1)(B) | Stream TV Networks, Inc., debtor in the Chapter 7 Case (the "**Company**" or "**Borrower**"). |
| **DIP Lender** <br> Bankruptcy Rule 4001(c)(1)(B) | Visual Technology Innovations, Inc. (the "**Lender**" or "**DIP Lender**"). |
| **Prepetition Facility** | The Lender and the Borrower are parties to that certain Support Agreement, dated as of February 26, 2021 (as amended, modified and supplemented from time to time, the "**Prepetition Facility**," and all instruments and documents executed at any time in connection with the Prepetition Facility, shall be referred to collectively as the "**Prepetition Facility Documents**"). |
| **DIP Facility/Use of Proceeds** <br> Fed. R. Bankr. P. 4001(c)(1)(B)(ii) | The DIP Facility shall comprise a multi-draw new money term loan in an aggregate amount of up to $200,000,000 (the "**DIP Loans**," and the commitment of the Lender to make the DIP Loans, the "**Commitment**"). The Lender on the Closing Date shall fund the Commitment under and in accordance with this Term Sheet. Each borrowing of the DIP Loans shall be in a minimum amount of $5,000,000, except in the case of the Initial Amount (defined below). <br><br> Subject to the terms and conditions herein, the proceeds of the DIP Loans will be used in accordance with the terms of the Budget (as defined below), including, without limitation to provide for payment of (i) fees and other expenses due and payable under the DIP Facility and/or the Interim |

|  | Order (as defined below), (ii) administration costs of the Chapter 11 Case, and administration, (iii) funds for payment to secured creditors, (iv) funds for payment of critical vendors and executory contracts counterparties, (v) balance of allowed unsecured creditors at time of the confirmation of the plan for those unsecured general creditors who opt into the plan, (vi) funds for preservation of equity for shareholders that opt into the plan, and (vii) other amounts in accordance with the Budget.

An initial amount of up to $500,000 will be borrowed from the Lender (the "**Initial Amount**") as a part of the DIP Loans as soon as the DIP Facility will be approved by the Bankruptcy Court. The Initial Amount may be used by the Company to investigate any action, cause of action, proceeding, claim, allegation or objection with respect to or related to: (i) the claims, liens, converted equity interest or security interests of the Secured Creditors, and (ii) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations related to the execution of the Omnibus Agreement and the Letter Agreement, including, the breach of fiduciary duties, civil conspiracy, fraud, among others causes of action. |
|---|---|
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(iii) | DIP Liens shall not encumber, and the DIP Collateral shall not include claims or causes of action arising under chapter 5 of the Bankruptcy Code (collectively, "**Avoidance Actions**"), including Avoidance Actions asserted with respect to the Debtor-Reserved Claims (provided that, subject to entry of the Final Order, the DIP Collateral shall include the proceeds of Avoidance Actions). |
| **Documentation** | Definitive financing documentation with respect to the DIP Loans satisfactory in form and substance to the Lender (as defined below) in its reasonable discretion and approved by the Bankruptcy Court (the "**DIP Loan Documents**") and delivered in executed form to the Borrower. |
| **Availability** | The DIP Loans shall be available to be drawn, subject to compliance with the terms, conditions and covenants described in the Interim Order and the DIP Loan Documents, and will be subject to the following schedule:<br><br>• June 18, 2021:   $5,000,000<br>• July 02, 2021:   $45,000,000<br>• July 16, 2021:   $70,000,000<br>• July 30, 2021:   $68,000,000 |
| **Budget/Collateral Account** | The 15-week statement of cash receipts and disbursements for the next 15 weeks of the Borrower, broken down by week, including the anticipated uses of the DIP Facility for such period ("**Initial Budget**") is attached as Exhibit 1 to the proposed Interim Order.

At the end of each week, the Borrower shall provide to the Lender an updated rolling 15-week projection for the subsequent 15-week period (which in each case must be satisfactory in the sole discretion of the Lender). Any amendments or modifications to the approved Initial Budget and each subsequent approved Budget, must be requested in writing by the |

Borrower and consented to in writing by the Lender. Each week the Borrower shall provide to the Lender a variance report, prepared and certified by the Borrower, comparing actual results to budgeted amounts for all categories appearing on the Budget, to be delivered to the Lender every Wednesday night for the week-ending Friday prior.

The DIP Loans shall be funded into a deposit account, which shall be under the control of the Borrower (the "**Collateral Account**"). The Collateral Account shall be one of the Company's existing operating or disbursement accounts, or a new account created for this particular purpose. Funds on deposit in the Collateral Account shall be immediately available to the Borrower. Any disbursements from the Collateral Account shall be substantially in accordance with the Company's prepetition cash management system, the DIP Loan Documents, the Interim Order and the Final Order. DIP Loans may be requested by the Borrower solely in accordance with the Budget, subject to Permitted Deviations, and the delivery of a withdrawal notice ("**Withdrawal Notice**"), on one Business Day's notice in the form attached to the DIP Agreements.

The Borrower shall deliver a Withdrawal Notice to the Lender in order to withdraw funds from the Collateral Account and: (a) such funds shall be used to pay line-itemed expenses in accordance with the Budget, subject to Permitted Deviations[1], (b) the amount of each withdrawal from the Collateral Account, when aggregated with all amounts previously withdrawn from the Collateral Account, shall not exceed the total amount set forth in the Budget (taking into account any Permitted Deviation), and (c) the Borrower shall have satisfied all conditions necessary for funds to be disbursed from the Collateral Account pursuant to the Interim Order, the Final Order and the DIP Loan Documents. The Lender shall have no obligation to monitor compliance with the above or with any provision of this Term Sheet by the Borrower, and shall rely on the Withdrawal Notice.

As used herein, "**Permitted Deviation**" means, at any time, that:

(a) the actual cumulative net cash flow of the Borrower through the end of the calendar week most recently ended prior to such time, without giving effect to any disbursement of the DIP Loans and after giving effect to the payment of all Allowed Professional Fees (such cumulative amount, the "**Cumulative Net Cash Flow**"), is not less than

(b) the Cumulative Net Cash Flow through the end of such calendar week as set forth in the Budget (such amount the "**Budgeted Net Cash Flow**"),

by more than 10% of the amount of such Budgeted Net Cash Flow, exclusive of the fees and expenses of the DIP Agent, DIP Lender, and the Prepetition Secured Parties.

---

[1] NTD: Measurement period and line-item comparison still under consideration by lender.

| | |
|---|---|
| | Upon acceleration of the DIP Loans, the funds available in the Collateral Account will be used to pay down the outstanding DIP Loans. |
| **Budgeted Projects** | Borrower's budgeted expenses for operations shall include allocation of expenses per project in the approximate amounts set forth as follows:<br><br>• 8K Two-View Special Project: $8.9 million to design a custom back light, chassis and program a mass production PCBA<br>• 4K Render-Only Screens: $2.8 million to manufacture 27"-32" monitors - including tooling for custom back light, chassis and content creation software. Also includes minor equipment upgrade for exiting equipment<br>• 8K Drive Train: $2.4 million toward optical design, custom back light and software support<br>• Rendering ASIC: $2.55 million for design, development and production costs for chips<br>• Bosch Project: $7.3 million for special project commissioned by Bosch to have automotive specific hardware kit with outsourced FPGA programming, hardware simulation tools and Grade B samples |
| **Priority and Liens/ Ranking/ Security/ Collateral**<br><br>Bankruptcy Rule4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | **Collateral**. "Collateral" shall mean any and all assets of the Borrower, unless otherwise agreed by the Lender.<br><br>**Priority/Collateral**. All obligations of the Borrower to the Lender and the Agent under the DIP Loan Documents, including all DIP Loans, shall, subject to the Carve-Out (as defined below), at all times:<br><br>(a) pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several superpriority administrative expense claim status in the Chapter 11 Case, which claims in respect of the DIP Facility shall be superior to all other claims;<br><br>(b) pursuant to Bankruptcy Code section 364(c)(2), have a first priority lien on all unencumbered assets of the Borrower (now or hereafter acquired and all proceeds thereof);<br><br>(c) pursuant to Bankruptcy Code section 364(c)(3), have a junior lien on all encumbered assets of the Borrower (now or hereafter acquired and all proceeds thereof);<br><br>(d) pursuant to Bankruptcy Code section 364(c)(2), have a first priority lien on cash in the Collateral Account (and all proceeds thereof);<br><br>(e) pursuant to Bankruptcy Code section 364(d), have a first priority priming lien on all assets of the Borrower (now or hereafter acquired and all proceeds thereof) that were subject to a lien securing the Prepetition Facility as of the petition date of the Chapter 7 Case (the "**Petition Date**").<br><br>It is understood and agreed that the priming liens described herein shall prime the liens securing any prior financing agreement or financing facility |

entered by Stream TV, but that the liens so created as described in clauses (c), (d) and (e) above shall be subject to "Permitted Liens" (as such term is defined under the Prepetition Facility) as of the Petition Date.

The liens to be granted by the Bankruptcy Court shall cover all property of the Borrower (now or hereafter acquired and all proceeds thereof), including property or assets that are not currently in its possession. Except until entry of the Final Order, the DIP Liens shall not attach to claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (the "**Avoidance Actions**"), and as otherwise agreed to by the Lender in its sole discretion.

As used in the DIP Order, the "**Carve Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court (including any noticing agent) and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iv) below); (iii) all reasonable fees and expenses up to $100,000 incurred by the Agent and its legal counsel ; (iv) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") accrued and incurred by persons or firms retained by the Borrower or the potential Committee pursuant to Sections 327, 328, or 1103 of the Bankruptcy Code (the "**Estate Professionals**") at any time before or on the first business day following delivery by the Borrower of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (v) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $250,000 incurred after the first business day following delivery by the Borrower of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (v) being the "**Post-Carve Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the Agent to the Borrower, its lead restructuring counsel, counsel to the Committee, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

All of the liens described herein with respect to the assets of the Borrower shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements.

Except to the extent expressly set forth in this Term Sheet, the Interim

| | |
|---|---|
| | Order and the Final Order shall contain provisions prohibiting the Borrower from incurring any indebtedness which (x) ranks *pari passu* with or senior to the loans under the DIP Facilities or (y) benefits from a first priority lien under Section 364 of the Bankruptcy Code. |
| **Adequate Protection** | The holders of the Existing Primed Secured Facilities, shall be granted the following protection (collectively, the "**Prepetition Secured Creditor Protection**"), pursuant to Sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise, of its pre-petition security interests for the consent of such Secured Creditor to the priming effectuated by the DIP Facility, consent to the use of its collateral (either in possession of the Prepetition Secured Creditor or in possession of Stream TV) (including the Company's cash collateral and other cash (such cash collectively, the "**Cash Collateral**")), consent to the transaction contemplated by the DIP Facility, and for the diminution in the value (each such diminution, a "**Diminution in Value**") of the prepetition security interests of such party, whether or not such Diminution in Value results from the sale, lease or use by the Borrower of the collateral securing the Existing Primed Secured Facilities (including, without limitation, Cash Collateral), the priming of the prepetition security interests of such lender or the stay of enforcement of any prepetition security interest arising from Section 362 of the Bankruptcy Code, or otherwise:

(a) <u>Adequate Protection Lien</u>. The Prepetition Secured Creditors (SLS Holdings VI, LLC and Hawk Investment Holdings Limited) shall be granted for their benefit and the benefit of the applicable secured creditors, effective and perfected as of the Interim Order Entry Date and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest in and lien on all assets of the Borrower (together, the "**Adequate Protection Liens**"), subject and subordinate only to (x) the Carve-Out, (y) the liens securing the DIP Facilities; provided that the Adequate Protection Liens shall only encumber the Avoidance Actions upon entry of the Final Order and (z) Permitted Liens.

(d) <u>Interest</u>. All obligations, including accrued but unpaid interest, under the Prepetition Secured Creditors Facilities owing by the Borrower thereunder and other fees owing by the Borrower thereunder shall continue to accrue interest (including interest on interest) at the default rate applicable on the Petition Date under the Prepetition Secured Creditors Facilities, and shall not be payable in cash except on the Maturity Date.

(e) <u>Payment of Professionals</u>. The Borrower shall provide for the payment of the Prepetition Secured Creditors professionals, in connection with the current Debtor-in-possession financing.

All intercompany liens of the Borrower and its subsidiaries, if any, will be contractually subordinated to the DIP Facilities and to the Adequate Protection on terms satisfactory to the Lender and consistent with the |

| | subordination terms set forth above.<br><br>Since DIP Loans may be used for the payment of the claims asserted by Secured Creditors, the payment of such claims will result in the extinguishment of their liens and pledges, thereby rendering unnecessary the adequate protection provided. |
|---|---|
| **DIP Closing Date** | The date on or after the Interim Order Entry Date on which the conditions precedent have been satisfied or waived by the Lender (the date of such closing, the "**DIP Closing Date**"), subject to satisfaction (or waiver by the Lender) of the applicable conditions precedent set forth herein, which date shall be no later than one business day after the Interim Order Entry Date. |
| **Maturity**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule4001-2(a)(ii | The DIP Loans shall be repaid in full, and the Commitment shall terminate on the earliest to occur (the "**Maturity Date**") of (i) October 31, 2021, (ii) one hundred eighty (180) days after the entry of the Interim DIP Order, unless the Bankruptcy Court enters a final order (the "**Final Order**") approving the DIP Facility in form and substance satisfactory to the Lender on or before such date, (iii) the date the Bankruptcy Court orders a conversion of the Chapter 11 Case to a Chapter 7 liquidation or the dismissal of the Chapter 11 Case, (iv) the date of the acceleration of the DIP Loans and the termination of the Commitment under the DIP Facility, (v) the closing of the Transaction (including the 363 Sale Transaction), and (vi) additional maturity events to be determined. |
| **Interest Rate/Default Interest Rate/Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The interest rate, default rate and fees are appended as <u>Annex I</u> hereto. |
| **Option to Convert** | Lender shall have the option to convert any debt under the DIP Facility to equity in the Borrower at the price of $1 per share pursuant to the terms of a chapter 11 reorganization plan that eliminates all pre-petition debt of the Borrower. |
| **Mandatory Prepayments** | The DIP Loans will be subject to customary mandatory prepayments to be included in the definitive DIP Loan Documents (including, without limitation, prepayments with the proceeds of incurrence of debt (other than under the DIP Facility), sales of assets and casualty events by the Company or the Project Companies). |
| **Optional Prepayments** | The DIP Loans may be permanently prepaid in full by the Borrower at any time subject to payment of a prepayment fee of one percent (1%) of the full amount of the DIP Loan; provided, however, that the Prepayment Fee shall not accrue, be earned or be paid in connection with the repayment of the DIP Loans from the proceeds of the Transaction whether under a sale order or confirmation order. |
| **Representations** | The DIP Facility shall contain representations and warranties as are customary or appropriate in the context of the proposed DIP Facility (including, without limitation, as to priority, collateral, Interim Order and |

| | Final Order, DIP Loan Documents, Budget and Use of Proceeds) or as otherwise required by the Lender. |
|---|---|
| **Covenants** | The DIP Loan Documents will contain information, affirmative and negative covenants to reflect customary debtor-in-possession financing provisions, this specific transaction, the Transaction Milestones, the current state of business operations of the plants operated by the Project Companies, and current market conditions), other customary or appropriate covenants in the context of the proposed DIP Facility (including, without limitation, as to the Budget and Permitted Deviation, the Transaction Milestones, and delivery of copies of pleadings, motions, etc. to be filed by the Borrower in the Chapter 7 or Chapter 11 Case) or as otherwise required by the Lender. |
| **Transaction Milestones** | Unless otherwise agreed to by the Borrower and the Lender, the Transaction will be consummated in accordance with the following milestones (collectively, the "**Transaction Milestones**"):<br><br>• on June 14, 2021, the Borrower shall file with the Bankruptcy Court a motion seeking entry of the Interim Order and the Final Order;<br><br>• on or before October 31, 2021 Bankruptcy Court approval of the U.S. Trustee's Chapter 7 plan or, alternatively, approval of Borrower's Chapter 11 reorganization plan;<br><br>• on or before October 31, 2021, payment of the Borrower's senior secured debt<br><br>• on or before October 31, 2021, payment of the Borrower's junior secured debt |
| **Budget Covenants** | Compliance with the Budget with actual results to be tested against such Budget on a rolling two-week, aggregate basis, subject to the Permitted Deviation. [2] |
| **Events of Default** | The DIP Loan Documents will contain Events of Default consistent with customary debtor-in-possession financing provisions, this specific transaction and current market conditions and other customary or appropriate Events of Defaults in the context of the proposed DIP Facility, including, without limitation:<br><br>(a) *Budget.* The proceeds of any DIP Loan shall have been expended in a manner, or a withdrawal from the Collateral Account shall be used for a purpose (in either case notwithstanding the delivery of a duly executed Withdrawal Request), which is not in accordance with the Budget (subject to the Permitted Deviation); or<br><br>(b) *Collateral Documents.* The Interim Order and the Final Order, as applicable, shall cease to create a valid and perfected lien with such priority required by this term sheet, subject to permitted liens, on a material portion of the Collateral purported to be covered thereby; or |

---

[2] NTD: Measurement period and line-item comparison still under consideration by lender.

(c) *Alternate Financing*. Any Credit Party shall file a motion in the Chapter 11 Case without the express written consent of Lender, to obtain additional financing from a party other than Lender under Section 364(d) of the Bankruptcy Code or to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code; or

(d) *Prepetition Claims*. Any Credit Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim other than (x) as provided for in the "first-day orders" and included in the Budget or (y) otherwise consented to by the Lender in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $1,000,000 in the aggregate or to permit other actions that would have a material adverse effect on the Borrower or its estate, or (iii) except with respect to the obligations under the Prepetition Facility as provided in the Interim Order and the Final Order, as applicable, approving any settlement or other stipulation not approved by the Lender and not included in the Budget with any secured creditor of any Credit Party providing for payments as adequate protection or otherwise to such secured creditor; or

(e) *Order With Respect to the Chapter 7 Case*. An order with respect to the Chapter 7 Case shall be entered by the Bankruptcy Court without the express prior written consent of the Lender (and with respect to any provisions that affect the rights or duties of the Agent, the Agent), (i) to revoke, reverse, stay, modify, supplement or amend any of the Interim Order and the Final Order, as applicable, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Borrower equal or superior to the priority of the Chapter 7 Case shall be entered by the Bankruptcy Court without the express prior written consent of the Borrower and the Lender in respect of the obligations (other than the Carve Out) or (iii) to grant or permit the grant of a lien on the Collateral (other than permitted liens); or

(f) *Application for Order by Third Party*.  An application for any of the orders described in clauses (f) through (i) above shall be made by a person other than the Borrower and such application is not contested by the Borrower in good faith or the relief requested is not withdrawn, dismissed or denied within 30 days after filing or any person obtains a final order under Section 506(c) of the Bankruptcy Code against the Lender or obtains a final order adverse to the Lender or any of their respective rights and remedies under the DIP Loan Documents or in the Collateral; or

(g) *Liens*.  (i) Any Credit Party shall attempt to invalidate, reduce or otherwise impair the liens or security interests of the the Lender,

claims or rights against such person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any lien or security interest created by Collateral Documents or the Bankruptcy Court Orders with respect to Collateral shall, for any reason, cease to be valid or (iii) any action is commenced by the Borrower which contests the validity, perfection or enforceability of any of the liens and security interests of the Lender created by any of the Interim Order, the Final Order, or the DIP Loan Documents; or

(h) *Invalidation of Claims*.  The Borrower shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Borrower) any other person's motion to, disallow in whole or in part (i) the Lender's claim in respect of the obligations or contest any material provision of any DIP Loan Document or (ii) the Prepetition Lender's claim in respect of the obligations or contest any material provision of any Prepetition Facility Document, or any material provision of any DIP Loan Document or any Prepetition Facility Document shall cease to be effective; or

(i) *Violation of Bankruptcy Court Orders/Amendment of Bankruptcy Court Orders*.  The violation of any term, provision or condition in the Interim Order or the Final Order.  The Interim Order or the Final Order is amended, supplemented, reversed, vacated or otherwise modified without the prior written consent of the Lender (and with respect to amendments, modifications or supplements that affect the rights or duties of the Agent, the Agent); or

(j) *Payments*. Any Credit Party or any of their affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered, an order approving a payment to any person that would be materially inconsistent with the treatment of any such Person under the Interim Order or the Final Order, as applicable, without the prior written consent of the Lender.

| | |
|---|---|
| **Remedies** | Immediately upon the occurrence and during the continuation of an Event of Default, the Lender shall, (i)(a) declare all obligations to be immediately due and payable, (b) declare the termination, reduction or restriction of any further Commitment, to the extent any such Commitment remains, and (c) terminate the DIP Facility as to any future liability or obligation of the Lender, but without affecting any of the obligations under the DIP Facility, the liens under the DIP Facility, or post-petition administrative superpriority claim status; and (ii) declare a termination, reduction or restriction on the ability of the Borrower to use any cash collateral derived solely from the proceeds of Collateral (any such declaration shall be made to the Borrower, the Committee (if applicable), the Trustee (if applicable) and the United States Trustee (if applicable).<br><br>Following five (5) days' notice of such Event of Default to the Borrower, |

| | the Committee, the Trustee, and the Office of the United States Trustee, unless such Event of Default is cured within such time or an order of the Bankruptcy Court is entered to the contrary, the Agent and the Lender shall have relief from the automatic stay to exercise remedies under the DIP Loan Documents.  The Borrower shall have the right to use Cash Collateral during such 5-day notice period, pending further order of the Bankruptcy Court. |
|---|---|
| **Release** | The Borrower will provide customary releases for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations related to or arising out of the DIP Loans (the "**Release**") to the Lender, its representatives, employees and advisors. |
| **Assignments and Participations** | The DIP Loan Documents shall include rights of assignment, subject solely to the Lender's consent (not to be unreasonably withheld or delayed), and participation rights. |
| **Indemnity** | Without prejudice to the provisions of the Supporting Agreement, the Borrower shall,  be obligated to indemnify and hold harmless the Lender, and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys and representatives from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, out-of-pocket fees and disbursements of counsel) in connection with any administration, investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or the transactions contemplated in this Term Sheet. |
| **Governing Law** | The DIP Loan Documents will provide that the Borrower will submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the State of Delaware; and shall waive any right to trial by jury.  Delaware law shall govern the DIP Loan Documents except to the extent preempted by federal bankruptcy laws. |
| **Fees and Expenses** | The Borrower shall pay the reasonable documented fees and expenses of the Prepetition Lender under the Prepetition Facility Documents and under the DIP Financing, including (i) legal counsel; (ii) any financial advisor and other expert(s); and (iii) any other reasonable costs and expenses of, or related to, the Transaction (collectively, the "**Fees and Expenses**").  Any such Fees and Expenses accrued as of the Maple Petition Date (as defined in the Interim Order) shall be paid by the Borrower from the Interim Amount. |

The preceding summary of proposed terms and conditions is not intended to be all-inclusive for purposes of the DIP Loan Documents and the Final Order.  Any terms and conditions that are not specifically addressed above would be subject to future negotiations between the parties and comprehensive documentation of the transaction that is acceptable to the Lender will have to be prepared and executed.

### Annex I

### Interest and Fees

| | |
|---|---|
| **Interest Rates**: | All amounts outstanding under the DIP Facility will bear interest at a rate of 12.0% *per annum.* |
| **Default Interest**: | During the continuance of an Event of Default, the loans and all other outstanding obligations will bear interest at an additional 2.0% *per annum* above the interest rate otherwise applicable. |
| **Upfront Fee**: | An amount equal to 2.0% of the Commitment (which may be in the form of OID), payable to the Lender, provided, that any fees shall be paid from the first interim draw under the DIP Loan Documents. |
| **Commitment Fee** | A commitment fee will accrue on the unused amount of the Commitments from and after the date of entry of the Final Order at a rate per annum equal to 0.50% and be payable monthly in arrears and upon termination of the Commitments. |
| **Nature of Fees**: | Non-refundable under all circumstances. |

Agreed and accepted by                                    Agreed and accepted by
Visual Technology Innovations, Inc.              Stream TV Networks, Inc.


_____          _____
Timothy McCarthy                                      Mathu Rajan
Director                                                       CEO