# **EXHIBIT L**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

HAWK INVESTMENT HOLDINGS LTD.,          :
                                        :
                Plaintiff,              :
                                        :
        v                               :   C. A. No.
                                        :   2022-0930-JTL
STREAM TV NETWORKS, INC., and           :
TECHNOVATIVE MEDIA INC.,                :
                                        :
                Defendants.             :


- - -


                Chancery Court Chambers
                Leonard L. Williams Justice Center
                500 North King Street
                Wilmington, Delaware
                Thursday, October 20, 2022
                11:00 a.m.


- - -


BEFORE:  HON. J. TRAVIS LASTER, Vice Chancellor


- - -


TELEPHONIC ORAL ARGUMENT AND RULINGS OF THE COURT ON
        PLAINTIFF'S MOTION TO EXPEDITE


--------------------------------------------------------
                CHANCERY COURT REPORTERS
            Leonard L. Williams Justice Center
            500 North King Street - Suite 11400
                Wilmington, Delaware 19801
                    (302) 255-0533

2

1  APPEARANCES:

2        STEVEN L. CAPONI, ESQ.
         MATTHEW B. GOELLER, ESQ.
3        K&L Gates LLP
             for Plaintiff
4
         ANDREW S. DUPRE, ESQ.
5        BRIAN R. LEMON, ESQ.
         McCarter & English, LLP
6            for Defendants

7  ALSO PRESENT:

8        BONNIE W. DAVID, ESQ.
         JENNESS E. PARKER, ESQ.
9        Skadden, Arps, Slate, Meagher & Flom LLP
             for SeeCubic B.V.        - - -
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1          THE COURT:  Good morning, everyone.

2  This is Travis Laster speaking.

3          Do we have a court reporter on?

4          THE COURT REPORTER:  Yes, Your Honor.

5          THE COURT:  Great.

6          Who from Delaware would like to speak

7  up on behalf of the plaintiff?  And tell me who's

8  going to present today.

9          ATTORNEY CAPONI:  Good -- I think it's

10  morning, Your Honor.  Steve Caponi from K&L Gates.

11  With me, Matt Goeller as well.  I will be presenting.

12          THE COURT:  Great.  Thank you.

13          Same question for the defendants.

14          ATTORNEY DUPRE:  Hello, Your Honor.

15  This is Andrew Dupre at McCarter & English.  Mr. Lemon

16  is in the room with me here on the phone.  I'll speak

17  today.

18          THE COURT:  Great.  Thank you so much.

19          All right.  So we're here today

20  because I've received your-all's submissions on the

21  motion to expedite.  I've also looked at Mr. Caponi's

22  correspondence about the issues involving payroll at

23  the Netherlands base subsidiary.  It seemed to me like

24  we needed to engage with this with relative

4

1   promptness.

2                 So, Mr. Caponi, why don't you go

3   first, update me on anything else you think I should

4   know, and tell me what you'd like.

5                 ATTORNEY CAPONI:  Your Honor, you're

6   obviously very familiar with -- more familiar than I

7   am with the history of this case and how we ended up

8   where we are today, so I won't belabor the point.

9                 The correspondence that I received

10  yesterday, the only thing I would add is that there

11  were an additional set of emails that were forwarded

12  this morning from Dutch counsel for the management of

13  the company back and forth with Mr. Rajan.  More of

14  the same, just Mr. Rajan demanding access to assets

15  and not addressing the payroll issue.

16                And the employees trying to explain

17  to -- as I understand the correspondence -- explain to

18  him that in the Netherlands it doesn't matter who the

19  director is -- sorry, who the shareholder is.  Until

20  you're listed on the Dutch registry as the director,

21  the current director is who the management is required

22  to listen to.  And they have no issue with Mr. Rajan

23  being the new director; they just point out that he's

24  not on the directory and that somewhat hamstrings

5

1   them.

2            So, other than that, that's the latest

3   factual update.  And I won't reargue what's in our

4   papers because I think it's pretty clear.  Unless the

5   Court has any questions.

6            THE COURT:  So not right now on the

7   motion to expedite.

8            Why don't we go to you, Mr. Dupre.

9            ATTORNEY DUPRE:  Yes, Your Honor.

10  It's turned into quite a bloodbath in multiple

11  jurisdictions since we were last all together.  The

12  payroll issue is -- in the view of the defendants in

13  this action, the plaintiffs in the other case.

14            The payroll issue is part of the

15  coordinated attack on the Stream entities in the

16  Netherlands.  So there's the most obvious fact of who

17  controlled SeeCubic B.V. for the last two years and

18  ran up a 500,000 euro payroll deficit with no payroll

19  reserves or tax reserves over the past two years.  It

20  clearly wasn't Stream.  We didn't have the entity.

21            So, mysteriously, the moment we show

22  up based on your orders last week, all of a sudden all

23  the money is gone and nothing has been reserved.  But

24  the employees still need to follow the directions of

6

1 Mr. Stastney, despite that he's enjoined from

2 interfering with Stream's recovery of these assets.

3 There is, in addition, an emergency

4 filing that I was forwarded, it was in Dutch,

5 yesterday, that effectively appears to be the Dutch

6 law equivalent of a 225.  It's Mr. Stastney trying to

7 seize control of the entity in the Netherlands.

8 SeeCubic B.V., Hawk, SeeCubic are also claimants on

9 that proceeding.  It's set for a Monday hearing in the

10 Netherlands, Your Honor.

11 I'm not thrilled to have to tell the

12 Court this, because I know it's going to be as

13 unwelcome as it sounds when it's coming out of my

14 mouth, but I'm going to have to file a TRO today for

15 an antisuit injunction on that.  It's a flat breach of

16 the duty to return the assets in the September 30th

17 order.

18 The other update that I have is Your

19 Honor ordered us to bond and we did bond.

20 THE COURT:  Yeah, I saw that.  And

21 thank you for doing that.  I appreciate it.

22 ATTORNEY DUPRE:  Yes.  So I just

23 wanted to -- we did our part is the colloquial way to

24 say that, as I always am.

1          We still don't have the lenses, the

2  websites, the bonding equipment, all the specific

3  stuff that's in your injunction orders.  We're still

4  asking for it.  And the defendant here's view is that

5  it's being wrongfully withheld from us because Hawk is

6  trying to ride in to the rescue of SeeCubic, which is

7  not what we understood you to be ordering.

8          So we've got a necessity to file an

9  antisuit TRO, which I will file as fast as I can

10  today.  And I'm sorry to burden you with it.  We just

11  don't seem to have any other choice because of the

12  Monday Amsterdam court filing.

13          We are bonded.  We still don't have

14  any of the assets.  And Hawk's motion to expedite is

15  wrongful because it was a litigation device to divest

16  Hawk of being the real party in interest here.  When

17  you make representations in the Court, you got to

18  stick with them.

19          So that's the main defense.  The rest

20  of it is evident on the papers, Your Honor.  I don't

21  feel like I need to rehash paper for you.

22          THE COURT:  Okay.

23          ATTORNEY CAPONI:  Your Honor?

24          THE COURT:  Mr. Caponi, do you want to

8

1  respond to the real party in interest issue?

2                    ATTORNEY CAPONI:  Hawk is the real

3  party in interest, Your Honor.  Whatever intercreditor

4  arrangements may exist are not the concern of the

5  borrower.  The borrower borrowed the money.  The

6  borrower signed the notes.  The borrower didn't repay

7  the money.  The borrower is in default.  Pay the money

8  or turn over the assets.

9                    This didn't like the government sends

10 you a check by mistake and you get to keep it.  MAC

11 machine kicks out money, you get to keep it.  You

12 don't get to take other people's money and walk into

13 the sunset, as Mr. Dupre says.

14                    THE COURT:  No, I get that.  It's

15 framed as a real party in interest issue.  I think you

16 could also view it as a standing issue.  And there is

17 some tension, I think, between the idea that SeeCubic

18 got the assignment of all of these rights, but now

19 it's you-all who are bringing this action.

20                    What is the current status as you

21 understand it of things?

22                    ATTORNEY CAPONI:  The current status,

23 Your Honor, is that the -- effectively the creditors

24 got together, including Hawk, and they contributed

9

1   economic value into SeeCubic, Inc., in order to be the

2   vehicle to which to do this restructuring.

3             But the holder of the debt remains

4   Hawk.  And Hawk is entitled to enforce this debt.  It

5   may have to coordinate with the other creditors, but

6   it never relinquished or transferred its position as

7   the secured creditor.  That's why -- I mean, that's

8   why we're pursuing this and not SLS or somebody else.

9             THE COURT:  Let's do this.  We're

10  going to phase this.  I'm going to give you my ruling

11  right now on the question of whether this action gets

12  expedited.  I'll tell you right now, it's going to be.

13            Once I give you my reasons for that, I

14  want to talk with counsel about the how fast question.

15            And then the third thing I want to

16  talk with counsel about is the interim *status quo*

17  issue.  We'll get to each of these in turn.  Let's

18  pause right now so that I can explain to you why I am

19  expediting this case.

20            This case is a Section 225 action that

21  has been filed by a creditor that has or contends that

22  it has the authority under certain credit agreements

23  to vote all of the shares of a Delaware entity which

24  is named as one of the defendants and goes by the name

1    of Technovative Media, Inc.  I'm going to call it the

2    "Company."

3                   Hawk asserts that it has validly

4    exercised its creditors' rights and appointed a

5    gentleman named Shad Stastney as the sole director of

6    the company.

7                   The complaint alleges that the company

8    has rejected Hawk's position and maintains that a

9    gentleman named Mathu Rajan is the sole director of

10   the company.

11                  That is precisely the type of dispute

12   that Section 225 exists to resolve.  Section 225 calls

13   for a summary proceeding, which is a term of art.  At

14   a minimum, summary proceeding means faster than

15   normal.  It can mean super expedited, but it certainly

16   means faster than normal.  So there's an expectation

17   that in a Section 225 proceeding we will go faster

18   than normal and that the case will be expedited.  All

19   of those principles apply here.

20                  In response to the motion to expedite,

21   the defendants have raised three main arguments.

22   First is the one that I was just discussing with

23   counsel, which is that Hawk is not the real party in

24   interest.  The contention is that Hawk assigned all of

1  its rights to an entity called SeeCubic, which was

2  essentially a joint action vehicle on the part of the

3  creditors initially to execute what's been talked

4  about as a friendly foreclosure but which is now

5  continuing as a litigant in another proceeding before

6  me.

7           The short answer is that this is not a

8  reason to deny expedition.  This is a reason for

9  discovery into what Hawk can do and whether it's the

10  proper party to bring this claim.  It may well be that

11  Hawk did assign its rights to SeeCubic.  It also may

12  well be that SeeCubic, in turn, gave instructions to

13  Hawk to pursue its rights on SeeCubic's behalf.  That

14  is something that has been told to me in a related

15  action.  We'll find out what the real situation is.

16           What is clear, I think, is that there

17  are two secured creditors on one side of the table;

18  there is a debtor on the other side of the table.  The

19  creditors and the debtors' controlling stockholders

20  are in a fight over the fate of the entities in

21  question.  One of those entities is Stream TV

22  Networks.  Another one of those entities is the

23  company.  The real issue is who is the proper director

24  of the company.  We'll figure out the assignment issue

1   as we go along.  But it's not a reason to deny

2   expedition.

3                The second reason that the defendants

4   have cited is the existence of other litigation

5   between the parties.  And they invoke the well-known

6   case of *McWane* to suggest that I should exercise

7   discretion to dismiss or stay the Section 225

8   proceeding in deference to these prior actions.

9                Summary proceedings in Delaware are

10  specialized things.  The *McWane* analysis applies, but

11  it applies in this setting with an additional overlay

12  of concern, namely, that the summary proceedings that

13  Delaware has established by statute in its entity laws

14  have particular purposes and are uniquely suited for

15  those purposes.  Delaware has a powerful public policy

16  interest in resolving these types of disputes.  Thus,

17  there are additional factors that have to be

18  considered in the *McWane* analysis and as an overlay to

19  the *McWane* analysis.

20                That doesn't mean that a Delaware

21  court will never defer to a competing action simply

22  because the Delaware proceeding is a summary statutory

23  proceeding.  But it does mean that the fact that there

24  is a Delaware statutory proceeding is a weight on the

13

1    scales as to how the Court exercises its deference.

2                    These are well-established principles.

3    Given the timing of this hearing, Mr. Caponi didn't

4    get to put in a reply and cite them.  But the short

5    answer is that this is easy stuff that we all know

6    about, that I certainly know about, that the lawyers

7    on the phone know about.  And if any interested reader

8    wants to see some examples, a couple are *Pulver v.*

9    *Stafford Holding* and *Choice Hotels International v.*

10   *Columbus-Hunt*.  There are many others.

11                   So how do I approach these other

12   actions?  The first is the foreclosure proceeding that

13   has been sitting over in Superior Court.  It started

14   before what was a major effort in front of me between

15   SeeCubic and Stream involving an omnibus agreement.

16   It is still there.  It is a possible vehicle.  But

17   it's not a vehicle like a Section 225 proceeding.  It

18   doesn't exist for the purpose of resolving the

19   question of who holds office as a director of a

20   Delaware entity.

21                   That is a critically important

22   question.  The board of directors of a Delaware

23   corporation exercises authority over the business and

24   affairs of the company.  We can't have corporations

1   not knowing who their directors are and being out in

2   the world bumping into things.  So the foreclosure

3   action, even though it is prior filed, is not an

4   action to which I defer.  It's not the same legal

5   issue.  It's not the proper vehicle.  It's really not

6   a viable forum for resolving the issue that we have to

7   resolve.

8               The second action is one pending in

9   federal court in the District of Delaware that Stream

10   filed on June 22, 2022, shortly after the Delaware

11   Supreme Court issued its ruling vacating this Court's

12   prior decision that had upheld the omnibus agreement.

13   And that decision essentially resulted in the parties

14   resuming their fights over who had the authority to do

15   what regarding Stream and its subsidiaries.

16               That's a plenary action.  It asserts

17   broadly that Hawk, which is the second secured

18   creditor, the second priority secured creditor, SLS,

19   which is the first priority secured creditor, and

20   their respective principals have done all kinds of bad

21   things over the years to sabotage Stream and to

22   conspire to take over Stream and to harm Stream.

23               And the general upshot of that is that

24   Hawk and SLS shouldn't have valid creditor rights at

15

1  all.  Instead, they should be held liable in damages

2  for all the wrongdoing that they have done to Stream.

3  So that's a big broad plenary action.

4            It's nominally first-filed because it

5  came in in July, whereas this proceeding is just now

6  starting.  It's first filed only in that technical

7  sense.  This is a situation where the parties have had

8  a lot of disputes in a lot of different courts.  The

9  foreclosure action being the first.  The main one

10  being the one in front of me in this Court involving

11  SeeCubic and Stream.  There was a brief detour into

12  Bankruptcy Court.  That bankruptcy action got

13  dismissed.  Since the Delaware Supreme Court's ruling,

14  a lot of stuff has been happening in front of me.  And

15  now we have this 225 action.

16            The federal court in Delaware is a

17  wonderful court.  They're clearly capable of resolving

18  this dispute.  There's no question about that.  They

19  can do it.  The issue is whether I should defer to

20  that dispute when what is at issue is the

21  determination of who is the director of a Delaware

22  corporation.

23            In my view, the answer to that is no.

24  This 225 action, as I indicated before, is targeted.

1   It's specialized.  It's designed to do exactly what we

2   need here, which is to determine who is the proper

3   director and comprises, as a result, the board of this

4   entity.

5              The argument is made that actually,

6   even though this is a tailored proceeding precisely

7   for this setting, that the Court of Chancery is not

8   capable of doing prompt and complete justice because

9   there's a need to look into, analyze, and figure out

10  the validity of the creditors' debt.

11             There's a couple different responses

12  to that.  The first one is potential preclusion, which

13  is based on the fact that there have been rulings that

14  have held that the debt was a valid obligation.  I

15  ruled on that in the *SeeCubic v. Stream* case.  That

16  went up to the Supreme Court.  That ruling was not

17  challenged on appeal.

18             It strikes me that at least one

19  straightforward answer -- and clearly I would want to

20  hear from the parties before issuing a ruling -- but

21  one straightforward answer is that that issue is done.

22  It is not an issue that requires a massive undertaking

23  and a lot of figuring out because it is an established

24  fact that the loans were valid.

17

1          The broader issue is whether

2  Section 225 can take care of these types of things.

3  The short answer is that it can.  You can litigate

4  related issues in a Section 225 proceeding as long as

5  they are sufficiently tied to the question at issue

6  under 225 here, the proper composition of the board of

7  directors.  If an issue is necessary to that

8  disposition, then the 225 proceeding can consider it.

9          Again, this is easy stuff.  I know

10  everyone knows it.  Mr. Caponi didn't get to have a

11  reply on this so he didn't get to cite the litany of

12  cases that stands for this proposition.  One that I

13  pulled up in literally 30 seconds of research is *Kahn*

14  *Brothers v. Fischbach*, 1988 WL 122517.  So this is not

15  new.  This is standard.

16          One of the things this Court routinely

17  adjudicates in 225 actions is the effectiveness of

18  agreements that give parties the right to appoint

19  directors or to vote on who the directors are, because

20  that's a critical issue in many 225 actions.  Usually

21  the issue involves a stockholder voting agreement;

22  less often it's the creditors agreement.  There's no

23  material distinction between those two settings.

24          So if, indeed, I have to figure out

CHANCERY COURT REPORTERS

18

1   whether this agreement is valid for purposes of the

2   225 action, I can and will.  Maybe that requires more

3   discovery than we ordinarily would have in a summary

4   proceeding.  But a summary proceeding doesn't

5   necessarily mean stripped-down, limited, basic

6   discovery.  It can mean that.  There's some summary

7   proceedings where we try to hold it to that.  And

8   certainly the Court exercises more control over

9   discovery in a summary proceeding than it would in a

10   plenary action.  But summary proceedings can decide

11   important issues.

12              Now, what this case isn't going to

13   decide is the damages question.  The only issue that

14   this Court ultimately will rule on in terms of the

15   validity of the creditors' agreements in this

16   Section 225 action would be the composition of the

17   board.

18              There are some declaratory judgment

19   that Mr. Caponi also seeks, and let's hold those off

20   for today because really we're just talking about

21   whether this needs to be expedited or not.

22              Even if one takes the narrowest

23   possible view and says this is only a Section 225

24   action and only about the composition of the board of

1  the company, it is still true that this Court can

2  adjudicate the validity of those debt agreements to

3  the extent they need adjudicating.

4              Then, the final argument that the

5  defendants make is that Hawk no longer has creditors'

6  rights because its debt was validly converted into

7  equity.

8              That's a merits issue.  We'll figure

9  that out.  We'll do it on an expedited basis.  That's

10  clearly an issue that is necessary to determining the

11  outcome of this case and who is the validly elected

12  director serving on the board of the company.  I'm

13  happy to hear about it.  It's not a reason for denying

14  expedition.  It's one of the issues that has to be

15  resolved on an expedited basis.

16              There's one more that the defendants

17  have identified, which is the argument that SeeCubic

18  has unclean hands because it's violated this Court's

19  orders.  That is the same type of issue.  It may well

20  be that there are unclean hands arguments.

21              My impression of the matter is that

22  both sides here are aggressive.  Both will push the

23  limits of what they can do in terms of and in the face

24  of a court order.  I fully expect there to be

20

1    arguments going back and forth on this subject.  And

2    so that's an issue that needs to be decided and will

3    be decided if, indeed, it has to be, on an expedited

4    basis.  It's not a reason for not doing this on an

5    expedited basis.

6                    So I'm going to schedule this.  I'm

7    going to expedite it.

8                    The next question is how fast do we

9    go?  I think what you've heard from me is that there's

10   going to be some real questions here, particularly if

11   the findings in the *SeeCubic* action aren't preclusive.

12   If the findings in the *SeeCubic* action are preclusive,

13   this action gets simpler pretty fast.

14                   I'm happy to talk today about the how

15   fast.  I'm also happy to let you-all confer about the

16   how fast.  Normally we would do these things -- we try

17   to do these things in 60 to 90 days, plus or minus.

18   If we really have to go breakneck, we can go

19   breakneck.  But it seems to me with the proper interim

20   relief, we can potentially have at least a nonsuicidal

21   schedule, even if it's one that imposes massive

22   burdens on counsel and the Court.

23                   So because I think interim relief will

24   play a role in how fast we have to go, let's talk

CHANCERY COURT REPORTERS

1    about interim relief first, and then let's talk about

2    the how fast question.

3                    I know I've been talking a long time,

4    I'm going to talk a little bit longer, and then I'm

5    going to ask you a question.

6                    When I look at what Hawk has filed and

7    the injunction that it has put up, that isn't the type

8    of interim relief that I would normally enter at the

9    start of a 225.  What would customarily enter at the

10   start of a 225 is a *status quo* order that would limit

11   the company in question to the operations in the

12   ordinary course and prevent either side from taking

13   action or causing the company to take action outside

14   of the ordinary course.  That, to me, is what I'm

15   inclined to do.

16                   Now, I have an additional caveat.  I

17   am also inclined to put in a receiver pendente lite.

18   Because, as I indicated, I think both of your clients

19   have strong interests in the outcome of this matter.

20   You have shown me in related proceedings how often

21   disputes arise.  So, in addition to putting in a

22   *status quo* order, I am inclined to put in a receiver

23   pendente lite whose job will be to make sure that

24   until we figure these things out the company only

22

1  operates in the ordinary course of business.

2              So what I want to hear from you-all

3  now -- and I'll start with Mr. Caponi and then I'll go

4  to Mr. Dupre -- is respond to the Court's proposal to

5  put in a *status quo* order limiting people to the

6  ordinary course of business with a receiver pendente

7  lite to oversee that pending the outcome of this

8  proceeding happening on some expedited basis.

9              Mr. Caponi, the ball is tossed to you.

10             ATTORNEY CAPONI:  Thank you, Your

11 Honor.  I would say the proposal the Court's thinking

12 makes sense.  I think if the Court were to put in an

13 ordinary course requirement, there would be

14 substantial disagreement.  There already is

15 substantial disagreement over what constitutes

16 ordinary course, and we'll most likely be in front of

17 Your Honor on a somewhat daily basis.

18             So having a neutral in charge making

19 the decisions as to what ordinary course is is

20 practically probably the best outcome.

21             I say all this without having spoken

22 to my client.  But living through this case a limited

23 period of time I've been through it and seeing what I

24 have since the Court's order well over 14 days ago, I

1  do know that there has been a lot of back and forth

2  about what ordinary course is, what the SeeCubic/Hawk

3  secured creditors view as ordinary.

4              As you heard Mr. Dupre earlier on the

5  phone, they want lenses and equipment, everything

6  upstreamed out of the operating entities into Stream

7  and elsewhere, which we would deem not ordinary

8  course.  I would think those types of issues will pop

9  up on a fairly regular basis.

10             So I will just stop there and say

11 that's my thought.

12             THE COURT:  No, you're channeling my

13 fear, and my fear is based on only the part of the

14 iceberg that I see.  I do suspect that there are

15 emails going back and forth and calls and

16 communications that are orders of magnitude larger

17 than the amount that you put in front of me.

18             Mr. Dupre, what are your thoughts on

19 this proposal?

20             ATTORNEY DUPRE:  So I might shock Your

21 Honor by saying I'm fine with it.  Stream's view is

22 you already enjoined us to only act in the ordinary

23 course, so I don't really feel like we're giving away

24 the store by agreeing to abide by an injunction that

1  we are already under.

2              We would have agreed to a special

3  master before, if you recall.  We put Vice Chancellor

4  Slights and Chancellor Chandler and John Mark

5  Zeberkiewicz on the table.  All Stream wants is the

6  ability to operate the Stream business in the ordinary

7  course as these disputes are worked out.

8              The thing that I have to ask you for

9  in a *status quo* context is the Hawk parties or the

10 creditor parties together, as Hawk doesn't actually

11 have the rights, but the creditor parties acting in

12 concert with each other are trying to rip the company

13 out of Stream's hands in the interim.

14             So our ask is we get to run the

15 company in the ordinary course of business while we do

16 this summary proceeding to stop suing us all over the

17 place in the Netherlands and elsewhere or inducing

18 other people to sue us.  We don't mind being

19 supervised.  Our intent is to run the business.

20             We're raising money for the business,

21 as we've always said.  That's the point.  So, you

22 know, I agree with Your Honor that the mandatory TRO

23 couldn't be granted as stated and that a *status quo*

24 order would be normal and appropriate.  We'd just like

1  that *status quo* order to reflect the rulings you

2  already made in the other case, which is Stream

3  controls the assets limited to the ordinary course of

4  business during the pendency of the disputes.

5                    THE COURT:  So let me just flesh this

6  out a little bit more to understand what this means as

7  a practical matter.  So my uninformed expectation, or

8  I should say less informed, marginally informed

9  relative to what I think is counsel's knowledge, is

10 the following:

11                    There are folks actually running the

12 day-to-day business, many of which are in the

13 Netherlands who, as long as they get paid, can

14 diligently go about pursuing ordinary course

15 activities.  Then, over top of that, there is the

16 larger strategic concepts that, on the one hand the

17 Rajan brothers have, versus on the other hand the

18 Hawk/Stastney group may have.

19                    And so my working assumption has been

20 that if I essentially freeze the strategic level until

21 we figure out in this proceeding who the strategic

22 vision should be coming from, that that will not

23 prevent the actual -- whatever you want to call

24 them -- mid level, live employees, the actual doers of

26

1   the actual business of the company from doing that

2   daily business of the company.

3           Is that a correct sense, or am I off

4   base?

5           And, Mr. Dupre, why don't you take the

6   first shot at answering that?

7           ATTORNEY DUPRE:  Unfortunately, Your

8   Honor, that fact deposit is wrong for the following

9   reasons.  Stream business is effectively to make TVs.

10   That's why we're fighting over this bonding equipment

11   and lenses that are the subject of your other order.

12   So you make TVs with the bonding equipment, you put

13   the lenses in there, you put the tech there.  You

14   deliver TVs to the customers and the customers pay for

15   them.  That's the business, sort of the core business

16   from Stream's perspective.

17           If we continue to be denied the

18   bonding equipment, the lenses, the people who put them

19   together to make the TVs, we cannot do the ordinary

20   business of Stream, which is to effectively make and

21   sell TVs on the status quo.

22           All that's happening is a bunch of

23   engineers are sitting in the Netherlands doing nothing

24   but running up payroll and no TVs are being delivered

27

1    to any customers.  Stream has customers who want TVs,

2    and the fight is about:  All right, well, we have the

3    equipment, we have the lenses, we have the code, and

4    we have the people.  Our business is to make TVs.  We

5    need to make TVs and deliver them to the customers

6    regardless of what the strategic, you know, merger

7    stuff is at the Delaware general corporations level.

8    And, legalistically, there's monetary claims back and

9    forth.

10                  If the business goes along and the

11   customers get their TVs and it results in monetary

12   claims or mitigation of damages, so be it.  It's a

13   simple matter of the ability to do the ordinary

14   business.  And without enforcement of the injunction

15   that you already made, Stream cannot do the ordinary

16   course of business on an interim level.

17                  The other thing that Stream does is

18   show people the technology so people want to buy more

19   TVs, basically.  Content, show them for-content deals

20   so that people are excited to put it in movie X or

21   sports event Y or whatever.  So they run around and

22   they show everybody and they sign up customers.  And

23   on the basis of that, those letters of interest or

24   other types of customer's contractual expressions, you

1  raise money from investors and then the problem goes

2  away.

3              That's kind of the point is you want

4  to get rid of the secured creditors with money that

5  you raise via recapitalization.

6              So, again, in the current state of

7  play, there's noncompliance.  And there's worldwide

8  fights to try to slow down compliance with what's

9  already been ordered in order to do this, to have the

10  summary proceeding go as fast as they humanly can, the

11  three-week version of the summary proceeding.  In

12  which case, Stream will never get the benefit of the

13  prior orders.

14              It will never be allowed to conduct

15  its business because it's going to be sued in the

16  Netherlands and denied the bonding equipment.  There's

17  going to be endless seriatim arguments about why it

18  can't be handed over, even though it was already

19  ordered to be handed over.

20              So there may be a way to do it, Your

21  Honor, but the current way of just trying to freeze

22  strategy and let going concern happen isn't working

23  because you've ordered the defendants to give us the

24  stuff to make the TVs and we still don't have the

1   stuff to make the TVs so we can't do the ordinary

2   course of business.

3              THE COURT:  So let's parse through

4   that.  There's some assumptions in there, or

5   assertions in there.

6              Let me suggest to you that there are

7   two different issues.  One is:  Is this company

8   capable of operating its core business in the ordinary

9   course pending the outcome of a *status quo* order, and

10  then in the sense of is the core business one that

11  can't function?  And then, the second question is:

12  What assets do you need to make that happen?

13             I'm not suggesting, nor did my

14  question intend to suggest, that I was deciding the

15  latter issue against you or somehow vitiating prior

16  orders or anything like that.

17             My question is really designed to ask:

18  How much involvement do the Rajans have to have in the

19  day-to-day operation of the business, or if I stick a

20  receiver pendente lite in to hold everybody to the

21  ordinary course of business and, at the same time, if

22  we've got to find ways to get you your bonding

23  equipment back so that you can actually make the TVs,

24  so be it, are there people at the company who can keep

1   the ship going in its basic direction while we figure

2   out the board-level question?

3                   ATTORNEY DUPRE:  I think the answer is

4   no, Your Honor.  And it's evidenced by what Mr. Caponi

5   has filed, informationally only, not that it's him,

6   but what we have is this bad Dutch employee problem.

7                   The defendants' view is that the --

8   all the money mysteriously disappeared and the

9   employees just happen to be suing at the same time

10  when these events are happening acting in concert with

11  the plaintiffs in this case.

12                  So there's sort of an implication

13  that, well, maybe the Netherlands can just do it.

14  That's not actually the case.  The manufacturing is

15  done in China and the parts are in Japan.  So

16  customarily Stream's management oversees that with

17  third parties and puts it all together.  It's not like

18  the stuff is built in the Netherlands.  Those are the

19  engineer and design teams.

20                  The engineer and design teams are

21  saying their payroll accounts have been looted, not

22  during Stream's period of ownership, and they don't

23  know who to take orders from.  And they can't take

24  orders from anybody apparently because there's no

31

1   money.

2            A receiver with just the Netherlands

3   couldn't do the business from either side.  For Stream

4   to do Stream's ordinary business, it basically just

5   needs the stuff in the other orders.  It happens in

6   Asia, not the Netherlands.

7            THE COURT:  Where are you getting the

8   idea that I was limiting my question to the

9   Netherlands?  I'm talking about the company,

10  Technovative.  Who are the humans who operate below

11  the Rajans?

12           ATTORNEY DUPRE:  The human beings?

13  There's a management team of Stream.

14           THE COURT:  That's who I want to talk

15  about.  Who are they?

16           ATTORNEY DUPRE:  There is a sales

17  manager-type guy.  His name is Bud Robinson.  There's

18  a manufacturing-type guy.  His name is Dan Knight.

19  There's administrative and customer-focusing people,

20  you know, sales representatives, those kind of guys.

21  There's eight or nine people, Your Honor.

22           THE COURT:  Okay.  So there is a

23  management team.  Yes?

24           ATTORNEY DUPRE:  Below Mathu Rajan,

32

1  yes.  There are other managers who have defined roles

2  who report to him.

3              THE COURT:  Okay.  And are these

4  people that have held their roles throughout the

5  SeeCubic interregnum, or are these people that are

6  newly hired since the return of the Rajans?

7              ATTORNEY DUPRE:  They are Stream

8  people who would have been frozen out during the

9  SeeCubic interregnum, Your Honor.  So they wouldn't

10 have been sitting there running the business during

11 that time because the SeeCubic people would have had

12 it.

13             THE COURT:  So during the time that

14 SeeCubic had control of the assets, they had

15 effectively their own management team in place that

16 was overseeing the operating subsidiaries?

17             ATTORNEY DUPRE:  That is correct.

18 They would have like a mirror image team of our team

19 with a chief creative officer and a sales director,

20 however titled, chief marketing officer.  They have

21 all similar roles that we would have, obviously.

22             THE COURT:  Let me ask you a

23 completely different question.  How fast do you think

24 this needs to go?

33

1              ATTORNEY DUPRE:  I think Your Honor
2    was right in your initial thing, which is it depends
3    who controls it in the interim, whether supervised or
4    not.
5              If we have it and we can make our
6    TVs -- that's what Stream actually wants, is to have
7    the thing and make its TVs while we're arguing with
8    everybody -- it seems like more a five- or six-month
9    summary proceeding than a 60- to 90-day one.  I'm not
10   trying to weasel out of it.  It's just that there's a
11   facial standing/real party in interest problem at the
12   front and then a lot of discoverable material back and
13   forth in the middle.
14             It looks to me like a little bigger
15   case than, hey, what does the third clause of this
16   voting rights agreement mean as a matter of law.
17             If we didn't have the stuff, we'd want
18   to go as fast as we could because we'll be killed off
19   if we are unable to make our TVs in the meantime.
20             THE COURT:  Okay.  In a world where
21   there was a management team and the management team
22   had all of the assets necessary to conduct the core
23   business as you've described it, is the core business
24   self-supporting or does it need external funding.

1          ATTORNEY DUPRE:  It depends how the

2     contracts are structured.  The customers pay for the

3     TVs, so we have adequate funding to start the

4     production lines.  And then the TVs themselves are

5     revenue generating.  So you get orders, you get money,

6     you build TVs, you get orders, you get money, you

7     build more TVs.

8          So Stream's belief is we have to use

9     the money we're raising now to get the production

10    lines restarted and deliver our first sets of orders.

11    But after that, the business sustains itself through

12    revenue.

13          THE COURT:  Tell me what you mean

14    about the money you're raising now.

15          ATTORNEY DUPRE:  Stream is going

16    around attempting to raise money from investors to

17    restart the business based on the prior court orders.

18    So normal equity raises, Your Honor, recapitalization.

19          THE COURT:  So this is common, is it

20    preferred?  What are you guys raising in the form of?

21          ATTORNEY DUPRE:  Common equity.

22          THE COURT:  And general magnitude of

23    the raise?

24          ATTORNEY DUPRE:  We are working to

1  close a $25 million deal, trying to beat November 1st,

2  Your Honor.

3              THE COURT:  And what percentage of the

4  outstanding would that be?  Well, first tell me what

5  percentage of the common and then, as I recall -- you

6  can confirm or disconfirm that -- well, just tell me

7  what percentage of the common.

8              ATTORNEY DUPRE:  I'm sorry, Your

9  Honor, I just don't know.  I can give you a

10 supplemental if you want it.  I just don't know the

11 answer.

12             THE COURT:  So my follow-on question

13 was it's not going to affect the Rajans' voting

14 control?

15             ATTORNEY DUPRE:  No, Your Honor.  The

16 whole setup of Stream is and has always been to

17 protect the founders' majority voting control.

18             THE COURT:  Okay.  If you don't get

19 the 25 million, can the company start up the

20 production lines and operate?

21             ATTORNEY DUPRE:  Oh, sure.  That's

22 much more than it needs.  It needs sub 5 million to do

23 its first set of TVs, which, as the papers and the

24 Court have shown and you've already ruled, Your Honor,

36

1   these guys have raised a lot of money over the years.

2   They're good at that.

3                 So it does not need the full amount of

4   fundraising that they're doing right now to start

5   everything.  They only need a couple million.

6                 THE COURT:  All right.  That's all

7   helpful.  Thank you.

8                 Mr. Caponi, how fast do you think this

9   needs to go.  And tell me -- give me two answers.  But

10  give me one answer where there's a world where you've

11  got *res judicata*.  Give me another answer where you

12  have to defend the legitimacy of your creditors'

13  agreements against challenges to their validity.

14                ATTORNEY CAPONI:  Your Honor, I think

15  my answer is the same on both.  Which is, this would

16  need to be done quickly.  I mean, I think five months

17  is crazy given the context and the history here.

18                So does it need to be done in 30 days?

19  No.  But I think as Your Honor pointed out, it's

20  something in the 90 day, maybe 120 at the most.  I

21  don't know -- it is established, even if it's not *res*

22  *judicata*, that the loan documents are signed, the

23  money was borrowed and wasn't repaid.

24                THE COURT:  I hear you.  I don't need

37

1   to hear the merits theory.

2              ATTORNEY CAPONI:  I'm not arguing,

3   Your Honor.  I'm just saying, like, I'm putting out

4   from my *prima facie* case, I figure it's in the can.

5   It's really what defenses are going to come at me.  I

6   don't know exactly what they are.  They've never been

7   specifically articulated.  I mean, they've been

8   alluded to.

9              So you're asking me how long do I

10   think it's going to take?  It comes down to the

11   creativity of Mr. Dupre.  I know he's going to argue

12   standing.  I know he's going to argue conversion.

13   Those things can get done in 60 days.  If he wants to

14   start throwing other things against the wall, I can't

15   control that.  But this really is a defense case more

16   than it is a plaintiff's case at this point because of

17   the history.  Even if *res judicata* doesn't establish.

18              THE COURT:  Let me ask some other

19   questions.

20              Again, like, my ideal is a world in

21   which the core business -- which can be as Mr. Dupre

22   had described it -- continues to run.  There are TVs

23   being made and sold.  And that is happening in the

24   background while you-all fight over who should have

38

1   control at the board level.

2               From your side of the matter, is that

3   something that can be achieved?

4               ATTORNEY CAPONI:  Yes, Your Honor.

5   And I'm going to try to be very practical here.  And,

6   again, I have not spoke with my client.  But here's

7   how I see the world, for what it's worth.

8               I do believe that if you were to put

9   in at the Technovative level -- which this Court in

10  the other matter sort of rightly concluded that that's

11  the inflexion point, that everything below that is

12  operational and above it is not.  If there was a

13  receiver at the Technovative level that is the

14  decision maker that makes sure that nothing crazy is

15  taking place and everything -- you know, day-to-day

16  business continues as it's supposed to, and if, for

17  example, the Rajans wanted to, as they did last week,

18  make a copy of all the source code and walk out the

19  door with it, there was someone my client could go to

20  and say that's not supposed to happen and that person

21  made the decision as the director, I think that

22  maintains the *status quo*.  It allows the lower-level

23  individuals to do their day-to-day job.  I think

24  that's a no-brainer.

1                    The question becomes -- I think Your

2        Honor also noted -- funding.  I don't know where

3        Mr. Dupre is getting -- this is operational.  They

4        don't sell TVs.  I know there's been filings in the

5        other case where the Court was informed that the

6        operating subsidiaries are funded on a debt basis on a

7        monthly basis.  They incur debts; money gets wired in.

8                    I think, as a practical matter, if I

9        was in the Court's chair, that's the question that it

10       puts to my client:  If I put a receiver in place, are

11       you willing to continue that funding mechanism to

12       preserve your capital for the next 90 days?

13                    If my client is willing to do that, on

14       a debt basis, the way it has been doing it, I think

15       that maintains the *status quo*, it preserves and

16       protects the lower level -- not lower level, the

17       quality of their work -- but the employees at the

18       operational level are not going to be able to do their

19       job and won't be sucked into the process where they've

20       been.  I think that maintains the *status quo*.

21                    I understand Mr. Dupre's client wants

22       to operate and do things with Stream and take it back

23       to where it was.  But they lost that right when they

24       defaulted on the debt.  So we're in a new reality

40

 1    which is the lenders have collateral, they have the

 2    right to preserve.

 3                    And I would like my client to be in

 4    control.  But if the Court is not inclined to do that,

 5    I think to have a neutral in place.  And if the Rajans

 6    want to fund the company on the same debt terms that

 7    my clients would, I don't think my clients would

 8    object to that.  And maybe they're the first dollars

 9    to get paid out when things are sold.  But I think

10    that's what the Court's focus should be.

11                    THE COURT:  On the funding side, I

12    think that makes sense, is that essentially it's like

13    a dip loan or something where it's going to have

14    similar priority in terms of first dollars out.

15                    I'm also not clear why a

16    noncontrolling equity issuant would be problematic to

17    your side.  I wonder why someone would invest.  But if

18    some amount of millions came into the company as

19    straight equity, is that problematic for your client?

20                    ATTORNEY CAPONI:  My understanding,

21    Your Honor, and certainly I have no insight into the

22    equity raise, is that the equity raises are taking

23    place at the Stream level, not at the Technovative or

24    subsidiary level.

41

1          If people want to invest in Stream on

2   an arbitrage play, God bless them.  They can raise the

3   money.  It won't impact anything down below.  But even

4   if the raise was intended to be at the Technovative

5   level, I honestly just do not know enough -- I think

6   Stream owns 100 percent of that, yeah.  So it would be

7   Stream selling off portions of its equity --

8          THE COURT:  No, no, I think you're

9   right that the raise happens at Stream.

10          ATTORNEY CAPONI:  We don't mind

11   whatever they do at that level.  If there's -- I think

12   the key is a receiver at the Technovative level to be

13   the board and to make sure that, like the warden,

14   everything runs according to the normal process.

15          THE COURT:  Let me interrupt you and

16   push you on another issue, which is the assets

17   question that Mr. Dupre has raised on several

18   occasions.

19          So let's think about this bonding

20   equipment.  We're going to have to figure this out.

21          And I don't know -- go ahead.

22          ATTORNEY CAPONI:  He's making it up.

23   My client did not loot any money out of the company.

24   This company has been operating on monthly debt for a

1    long period of time.  It's in the court records.  The

2    Rajans knew about that before they offered they wanted

3    to take over 18 days ago.

4              And the bonding equipment is something

5    that they asked for.  It's in a warehouse in China.

6    My client actually sent a letter.  All the equipment

7    and everything that they're looking for is assets of

8    the operating subsidiaries.  My client turned over --

9    or Your Honor's order removed my client from

10   controlling Technovative.  At that point, my client

11   said -- kept its mouth shut for 14 days.  And, in

12   fact, issued letters to the landlord in China saying,

13   we, SeeCubic, Inc., no longer run or control this.

14   Stream is the voice of authority.

15             Stream is trying to get the landlord

16   to take the equipment out of the subsidiary level up

17   to the Stream level.  They want to take the source

18   code from the operating level to the Stream level.

19   That's what's been taking place.  And people have been

20   resisting that.  Not my client, but the individual

21   employees in the Netherlands, for example, said, under

22   the law there, that they have an obligation.  You

23   know, you can't just allow ultimate shareholder to

24   come in and take what they want with a truck.  Like,

1   you have to preserve the business.  And their business

2   is the SeeCubic B.V.

3              So they've been resisting that on

4   their own accord.  That's why they hired their own

5   lawyers and they're not coordinating with me.

6              So as far as I understand, everything

7   that you need to do what this company does is squarely

8   in the control of the operating subsidiaries.  And my

9   client, if the receiver gets into place, will sign

10  whatever, please listen to them, not us.  And if

11  you're under a delusion or misimpression, you're

12  wrong, listen to this receiver.  I know my client -- I

13  don't even have to ask, I know my client will sign off

14  on anything along those lines.

15             THE COURT:  All right.  So if,

16  hypothetically, contrary to your expectations, the

17  bonding equipment is sitting in China and needs to be

18  released in some way to allow the Netherlands

19  subsidiary or whichever entity in the stack, maybe

20  it's Technovative itself, to use it to actually make

21  TVs as part of the core business, your answer would be

22  yes, I haven't been able to ask my client specifically

23  about this, but I have every expectation that my

24  client would say, yes, we're good with that, and they

44

1   can use it to make TVs.

2                    True statement or not true statement?

3                    ATTORNEY CAPONI:  Correct, Your Honor.

4   If the receiver or day-to-day people say we need this,

5   if my client has some ability to make it happen or

6   certain things are preventing it from making it

7   happen, we'll clear that up.  Absolutely.

8                    THE COURT:  We've been going for an

9   hour.  I unfortunately have to cut this short because

10  I have some other things coming up.

11                   So I'm going to tell you my current

12  plan is to do what I said I was inclined to do which

13  is to enter a *status quo* order and appoint a receiver

14  pendente lite to ensure that the company operates in

15  the ordinary course of business.  And by "company" I

16  mean Technovative.

17                   I'm happy to give you-all two minutes

18  each to say anything else you want to say.

19                   In terms of the schedule, it seems to

20  me that some phasing is appropriate.  We ought to have

21  some initial period of time, let's say 30 days-ish

22  where we deal with what I think of as primarily legal

23  arguments, but they may have some discovery associated

24  with them, like the "who's got the actual rights to do

1  this" argument, and the "is it preclusive or do we get

2  to relitigate the validity of the agreements"

3  argument.

4            If we're going to relitigate or

5  litigate the validity of the agreements, then we can

6  hit the second phase where we do that and that's going

7  to have to be probably more along the lines of at

8  least a three-month, if not four-month proceeding.  I

9  could see you-all doing it in the range of a month for

10  documents, a month for depositions, and then a month

11  for trial prep and trial.

12            So I think you could even get that

13  phase done in 90 days.  But I think we ought to have

14  an upfront phase where if Mr. Dupre needs some limited

15  discovery on who's got what rights under the

16  agreement, what is there besides the assignment

17  agreement, who knows, you ought to be able to crank

18  that out pretty fast.  And then let's figure out

19  whether we need to move beyond that.

20            I'm going to ask you-all to prepare in

21  the first instance a scheduling order that has some

22  types of phasing like that.

23            I'm going to put in place today a

24  *status quo* order limiting the company to the ordinary

46

1   course.  And I'm also going to put in a receiver

2   pendente lite, although I'm not sure I can get that

3   human actually in the seat today, but it will happen

4   soon.

5              Last two minutes.  Mr. Caponi, go.

6              ATTORNEY CAPONI:  I think that's a

7   perfectly sensible way to proceed, Your Honor.  I cede

8   the rest of my time.

9              THE COURT:  All right.

10             Three minutes and 45 seconds in total,

11  Mr. Dupre, go.

12             ATTORNEY DUPRE:  Let me only use 45,

13  Your Honor.  The creditors altogether, Stastney,

14  SeeCubic, and Hawk, have sued us in the Netherlands on

15  an equivalent of a 225 with a hearing on Monday.  So

16  the rocket docket.

17             Does your *status quo* allow that to

18  happen or are you freezing the *status quo* or do you

19  want my emergency anti-suit TRO motion today?

20             THE COURT:  So, look, I am freezing

21  things at the company parent level.  I would like that

22  to be enough.  I don't know what the Netherlands court

23  would do.  I don't like to interfere with other

24  courts.

1              It seems to me like what I'm doing

2    should protect everybody's interests, and that a

3    Netherlands court, if that were explained, would

4    understand that.  My read of the emails going back and

5    forth is that the Dutch folks just want to do their

6    jobs and were somewhat perplexed by the fighting

7    happening above them.  Maybe that's a wrong read.

8    Maybe those people really are Hawk/SeeCubic shills and

9    were just saying that.

10             But the short answer is I'm not going

11   to say right now Hawk, SLS, et al., don't go forward

12   with your motion.  I am going to exhort you-all to

13   stop proliferating litigation.  Grapple with this

14   here, let's figure this out, and then let's move

15   forward.

16             If you are unable to get that type of

17   comfort from your friend Mr. Caponi, then, yes,

18   Mr. Dupre, you would need to file your application for

19   anti-suit injunction.  I suggest you hold off until

20   tomorrow so that you can actually have some

21   discussions with Mr. Caponi.

22             Did you say that the hearing is

23   tomorrow or Monday?

24             ATTORNEY DUPRE:  The hearing is

48

1   Monday, Your Honor.

2                   ATTORNEY CAPONI:  Monday.

3                   THE COURT:  Why don't you hold off

4   until tomorrow so you can have some discussion with

5   Mr. Caponi.  If you guys can't figure out a way not to

6   open up another front, then you can go ahead and file

7   your motion tomorrow.

8                   Mr. Caponi, you know it's going to be

9   coming.  You're going to need to explain to me why we

10  need to open another front and why this is all

11  necessary, et cetera.

12                  And I will find some way to get on the

13  phone with you all.  I may even do it on the weekend,

14  frankly.  When I think about what I've got coming up,

15  tomorrow is a less attractive day for me than is

16  Sunday.  So we might actually do it Sunday afternoon.

17  And we might have to get a private court reporter so

18  we don't burden the good people of the Court of

19  Chancery unless they want to volunteer for the

20  hazardous duty.  But --

21                  ATTORNEY CAPONI:  Your Honor, just to

22  try to short-circuit this.  My understanding of the

23  proceeding in the Netherlands is limited to

24  Mr. Stastney has -- if you remove a director, they

1   have a right to plead why they shouldn't be removed.

2   And I'm not going to give away any state secrets here.

3   But it was a way to make sure we had some insight into

4   what's going on.

5            In light of the appointment of a

6   receiver at a high level, I personally don't see the

7   need for that anymore.  And I will lean on everyone I

8   can lean on -- and I would think Mr. Dupre and I

9   should be able to work that to where that becomes a

10  nonissue.  At least that's my expectation, if the

11  receiver is in place.

12           THE COURT:  I would be thrilled for

13  that to be the case.  And so let's leave it there for

14  now.

15           And if I have to get together with you

16  all on Sunday and -- are the Eagles playing Sunday?

17  Do they play Sunday or Monday?  They have a bye this

18  week.  So no one can claim any conflict because they

19  have to watch the Eagles game.  The afternoon of

20  Sunday should be fine for all of us if we have to do

21  it.

22           I do want you-all to figure this out.

23  I would hope you can figure this out.  Let's proceed

24  as I've indicated.  And then let's figure out a path

50

1  forward that tries to get some solutions for people.

2                    All right.  Thank you both for getting

3  on the phone.  I appreciate your time and your

4  arguments.  I know this was short notice.  I hope you

5  have a good rest of the day.

6                    Good-bye.

7                    COUNSEL:  Thank you, Your Honor.

8                    (Proceedings concluded at 12:11 p.m.)

9                         - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

51

1                              CERTIFICATE

2

3                     I, KAREN L. SIEDLECKI, Official Court

4    Reporter for the Court of Chancery of the State of

5    Delaware, Registered Diplomate Reporter, and Certified

6    Realtime Reporter, do hereby certify that the

7    foregoing pages numbered 3 through 50 contain a true

8    and correct transcription of the proceedings as

9    stenographically reported by me at the hearing in the

10   above cause before the Vice Chancellor of the State of

11   Delaware, on the date therein indicated, except for

12   the rulings at pages 9 through 20, which were revised

13   by the Vice Chancellor.

14                         IN WITNESS WHEREOF I have hereunto set

15   my hand at Wilmington this 25 day of October 2022.

16

17

18

19              /s/ Karen L. Siedlecki
20        ----------------------------
               Karen L. Siedlecki
21            Official Court Reporter
            Registered Diplomate Reporter
22          Certified Realtime Reporter

23

24