**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| In re: | : |
|  | : Chapter 11 |
| Stream TV Networks, Inc., | : |
|  | : Case No. 23-10763-mdc |
| Debtor. | : |
|  | : |

**DECLARATION OF MATHU RAJAN IN SUPPORT OF**
**STREAM TV NETWORKS, INC. AND TECHNOVATIVE MEDIA, INC. CHAPTER 11**
**PETITION, SUPPORTING EMERGENCY RELIEF, AND FIRST DAY MOTIONS**

I, Mathu Rajan, hereby declare under penalty of perjury:

1.       I am the Chief Executive Officer of Stream TV Networks, Inc., (the "Debtor" or

"Stream"), a Delaware corporation and the debtor and debtor-in-possession in the above-

captioned chapter 11 case.  In this capacity, I am generally familiar with the Debtor's current and

historical day-to-day operations, organization, financial affairs, and books and records.

2.       On March 15, 2023 (the "Petition Date"), the Debtor filed a voluntary petition

with the Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the

"Bankruptcy Code"). The Debtor is planning to resume operating its organization and managing

its property as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code. No request for the appointment of a trustee or examiner has been made in this chapter 11

case, and no official committees have been appointed or designated.

3.       To enable the Debtor to minimize the adverse effects of the commencement of

this chapter 11 case, the Debtor intends to request various types of relief in its "first day"

motions and applications (each, a "First Day Motion" and collectively, the "First Day Motions").

The First Day Motions seek relief intended to allow the Debtor a smooth transition into chapter

11 and to best protect the Debtor's assets and estate, in order to enable the Debtor to maintain its

current and prospective business relations, and to position the Debtor for a successful

reorganization, thereby preserving and maximizing the value of the Debtor's estate.

4.       Except as otherwise indicated, all facts set forth herein are based upon my

personal knowledge of the Debtor's operations and finances, information learned from my

review of relevant documents, and information supplied to me by the Debtor's advisors.  I am

authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I

could and would testify competently to the facts set forth herein.

5.       Part I of this Declaration describes the Debtor's operations, corporate structure,

and debt structure. Part II describes the circumstances surrounding the commencement of this

chapter 11 case, including the illegal and unethical actions and histories of its secured creditors

and the damages caused to the Debtor through the Delaware Chancery Court's improvident

injunction and subsequent failure to reverse its effects. Part III describes the desired outcome of

the chapter 11 process.

## I.      OVERVIEW OF THE DEBTOR

### A.      Debtor's Operations and Technology

6.       Stream was founded in 2009 as a Philadelphia-based new media company created

to develop technology allowing consumers to view 3D content without the need to wear glasses

or goggles.

7.       Through its global engineering team, the Debtor developed breakthrough glasses-

free 3D display technology it trademarked Ultra-D™ ("Ultra-D"). Ultra-D is a proprietary

combination of hardware and software that creates a natural, comfortable, and immersive

Glasses-Free 3D viewing experience. Resulting from years of research and development in the

field of 3D optics, multi-view rendering and content development solutions, Ultra-D solves the

two biggest limitations of the market's current 3D technology: the need to wear special glasses and the scarcity of 3D content.

8.      As a core technology, Ultra-D can be applied to panels of nearly any type and size and is compatible with touch screen features as well. This means that consumers can have a seamless experience with virtually any device – televisions, tablets, smartphones, portable game players, laptops, all-in-one computers and more.

9.      Ultra-D received numerous awards, including the Lumiere Award from the Advanced Imaging Society and multiple Innovation Awards from the Consumer Electronics Association.

10.      As of December 2022, the Debtor had been granted 128 patents in 13 patent families (Exhibit A). Held by one of the Debtor's subsidiary companies, this patent portfolio is a significant asset.

11.      The Debtor commissioned the manufacture of specialized optical bonding equipment (the "MPL"), which was installed at the facility of contract manufacturer Pegatron in Suzhou, China and achieved milestone efficiency with a 96% yield rate during production of 4,000 units of 65" glasses-free 3D advertising displays. The MPL is a critical asset of the Debtor and is shown in Exhibit B.

12.      Concurrent with its engineering development activities, the Debtor engaged in a global business development effort to introduce Ultra-D to commercial and consumer brands interested in integrating the new technology into their various products.

13.      The Debtor solidified a strategic business relationship with BOE Technology Group Co., Ltd. ("BOE"), the world's largest manufacturer of video display panels. The companies entered into a joint marketing agreement in August 2018 (Exhibit C) and, in

November 2018, held a joint press conference in Beijing where BOE expressed its intention to include Stream's technology on their entire series of product lines going forward. Over the course of 2018 and 2019, BOE introduced the Debtor to several of its significant customers.

14.     Ultra-D displays were installed in prominent locations to increase public awareness of the technology. Toyota's flagship store on the Champs-Élysées in Paris, France; Terminal 2 of the Taoyuan International Airport in Taipei, Taiwan; and the Härth restaurant at the Hilton hotel just outside Washington, DC were highlight installations.

15.     In September 2019, the Debtor was engaged by Google to develop prototypes for its yet-to-be-announced Project Starline (https://www.youtube.com/watch?v=Q13CishCKXY). Negotiations began in early 2020 for an initial order of 10,000 units, with the $20 million order being subject to satisfactory delivery and testing of Stream's prototypes.

16.     In March 2020, the Debtor secured a $3 million contract with Robert Bosch GmbH ("Bosch") for co-development of an Ultra-D instrument cluster for the automotive market (Exhibit D).

17.     Subsequent negotiations began with Lenovo Group Limited ("Lenovo") for development of an 8K-resolution consumer gaming laptop and with both Skyworth Group Co., Ltd. ("Skyworth") and Chunghwa Telecom ("Chunghwa") for 8K-resolution consumer televisions.

18.     By August 2020, the Debtor had sold all the 65" glasses-free 3D advertising displays that had been manufactured in its initial production runs. Its major customers included Marvel Digital Limited ("Marvel"), IQH3D, LLC ("IQH3D"), and BBack, Inc. ("BBack").

19.     Although there was considerable progress as described in ¶¶ 9-18 above, the Debtor's business has been significantly damaged by the actions of its secured creditors, an

improvident ruling by the Delaware Court of Chancery that was subsequently overturned by the Delaware Supreme Court, and the failure of the Chancery Court to enforce the return of the Debtor's assets nine months after the Delaware Supreme Court mandate.

20. Despite delays and legal hardships, the Debtor has maintained interest from top brands in many global markets and seeks reorganization through chapter 11 to consummate deals with the customers it has spent years courting. Lenovo, Skyworth, and Chunghwa remain interested in developing products that integrate the Ultra-D technology. Marvel, IQH3D, and BBack have all issued letters of intent to purchase additional Ultra-D products when available.

21. The Debtor estimates that its assets and market potential give the company a value in excess of $1.5 billion, based on customer interest and evaluations performed by industry analyst Richard Windsor. The value of these assets far exceed the amount of debt owed by Stream.

**B.    Debtor's Corporate Structure**

22. The corporate structure of the Debtor is as follows:

i.    Akshaya Holding, LLC ("Akshaya") and Mathu Rajan together own approximately 19.27 million shares of the Debtor Class B Voting Stock (or 71.5%) and 7.5 million shares of the Class A Common Stock of the Debtor (or approximately 8.8%), providing for an overall 56.4% voting control of the Debtor. Mathu Rajan is a 40% owner of Akshaya but has 100% voting control.

ii.    Investors and/or individuals other than Akshaya own approximately 7.69 million shares (or 28.5%) of the Class B Voting Shares of the Debtor and the remaining 78.1 million shares of Class A Common Stock of the Debtor (or 91.2%), providing for an overall total of 43.6% voting rights in the Debtor. No

other investor or individual owns 25% or more of the Debtor's Class A Common Stock or Class B Voting Stock.

iii.  The Rajan Family together owns 100% of Akshaya. In particular, Mathu Rajan owns 40% of Akshaya's economic stock and has 100% of its voting control.

iv.  The Debtor owns 100% of TechnoVative Media, Inc. USA ("TechnoVative USA").

v.  TechnoVative USA owns 100% of Media Holdings Delaware LLC (USA) ("Media Holdings").

vi.  TechnoVative USA is also a 99.9% general partner in Ultra-D Ventures C.V. (Curacao) ("Ultra-D Ventures"); Media Holdings is a 0.1% limited partner in Ultra-D Ventures.

vii.  Ultra-D Ventures owns 99.9% of Ultra-D Cooperatief U.A. (The Netherlands) ("Ultra-D Cooperatief"); Technology Holdings Delaware, LLC (USA) ("Technology Holdings") owns 0.1% of Ultra-D Cooperatief.

viii.  Ultra-D Cooperatief owns 100% of Stream TV International B.V. (The Netherlands) ("Stream TV International") and 100% of SeeCubic B.V. (The Netherlands) ("SCBV").

ix.  Stream TV International owns 100% of Stream TV International B.V. (Taiwan-Rep Office), 100% of Stream TV 3D Technology (Suzhou) Co., Ltd. (China), and 100% of Shanghai Ruishi Technology Co., Ltd. (China).

23.     Stream TV International and SCBV are operating companies. Stream[1], Akshaya, TechnoVative USA, Media Holdings, Ultra-D Ventures, Ultra-D Cooperatief, and Technology Holdings are holding companies.

24.     The full organizational chart representing the Corporate Structure of the Debtor is attached as Exhibit E.

**C.    Debtor's Debt Structure**

25.     Since 2009, the Debtor has raised approximately $150 million from third party investors. The investments have taken the forms of both debt and equity. The Debtor's senior secured creditor is SLS Holdings VI, LLC ("SLS"). Between 2011 and 2012, SLS loaned $6 million to the Debtor through a series of notes (the "SLS Insider Notes"). The Debtor pledged substantially all of its assets and the assets of its wholly owned subsidiaries as security for the SLS Insider Notes. The Debtor executed a security agreement in connection with the SLS Insider Notes.

26.     The Debtor's junior secured creditor is Hawk Investment Holdings Limited ("Hawk"). Between 2014 and 2020, Hawk loaned more than £50 million to the Debtor, plus another $1.336 million, through a series of junior secured notes (the "Hawk Notes"). Subject to the security interest held by SLS, the Debtor pledged substantially of its assets as security for the Hawk Notes. The Debtor executed a security agreement in connection with the Hawk Notes.

27.     During the early stages of productizing its Ultra-D solution, the Debtor engaged the engineering services of Intrinsyc Technologies Corporation of Canada ("Intrinsyc"). The companies worked closely together on multiple projects spanning several years at a cost of

---

[1] Debtor Stream TV Networks, Inc. was an active entity until an improvident injunction in the Chancery Court of Delaware stripped the company of its assets. Following a reversal of the injunction by the Delaware Supreme Court, Stream has regained legal title to its assets and intends to reorganize through chapter 11.

several million dollars. In October 2014, Intrinsyc made a loan in the amount of $1.5 million to Stream in exchange for Stream's commitment to place purchase orders with Intrinsyc for guaranteed future work. From 2015 to 2018, the maturity date of the debt was extended multiple times in exchange for Stream warrants. In May 2018, knowing that similar conversion agreements were being negotiated with SLS and Hawk, Intrinsyc executed a conversion agreement (the "Intrinsyc Conversion Agreement").

28.      In 2018, the Debtor entered into an agreement with Hawk which provided that the Hawk Notes would convert into equity if and when the Debtor raised additional equity capital (the "Hawk Conversion Agreement") (Exhibit F). The Debtor and SLS contemporaneously entered into a parallel agreement governing the SLS Insider Notes (the "SLS Conversion Agreement" (Exhibit G) and collectively with the Hawk Conversion Agreement and the Intrinsyc Conversion Agreement, the "Conversion Agreements"). For purposes of this filing, the Hawk Notes and the SLS Insider Notes are characterized as debt that has not yet been converted pursuant to the Conversion Agreements, although this characterization is disputed by the Debtor. Per the Conversion Agreements, conversion of debt to equity is at the discretion of the Debtor.

29.      **Pursuant to the Conversion Agreements, to be executed at the Debtor's sole discretion, Hawk and SLS should be equity, not debt**. The Debtor has served conversion notifications to Hawk on multiple occasions. Hawk has admitted that its Conversion Agreement is still active, its debt is convertible, and that the new capital raised by Stream required to trigger conversion is equal to the amount of the Actual Cash Received by Stream. Despite agreement between the parties on all these points, Hawk has failed to acknowledge the validity of the Debtor's conversion notices. The Debtor seeks to enforce debt-to-equity conversion through the chapter 11 process.

30.     Regardless of its debt structure, the Debtor is entitled to pay or convert its secured

debt, and Stream intends to restructure its debt through this Chapter 11 case to a level that will

allow it to sustain operations for the long term.

## II.    EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

### A.    The Debtor incurs secured debt from Lenders with histories of self-dealing, corporate raiding, and deceit

31.     In the early years of its operation, the Debtor accepted investment in the form of

secured debt from SLS and Hawk, whose principals had histories of unethical and illegal actions.

The Debtor was unaware of their histories at the time it entered into various lender agreements

with them. Certain facts became public later.

32.     On September 18, 2013, Shadron L. Stastney ("Stastney"), principal of debtholder

SLS, was ordered by the United States Securities and Exchange Commission ("SEC") to pay

nearly $3 million in disgorgement, penalties, and interest for willfully violating Sections 206(2)

and 206(3) of the Advisers Act[2]. The SEC determined that Stastney breached his fiduciary duty

by failing to disclose a material conflict of interest and engaging in an undisclosed principal

transaction with Vicis Capital, for whom he was the Chief Operating Officer and Head of

Research. In addition to the monetary penalty, Stastney was "(i) barred from association with any

investment adviser, broker, dealer, municipal securities dealer, or transfer agent, and (ii)

prohibited from serving or acting as an employee, officer, director, member of an advisory board,

investment adviser or depositor of, or principal underwriter for, a registered investment company

or affiliated person of such investment adviser, depositor, or principal underwriter." (Exhibit H).

---

[2] The SEC settlement is public record. *In the Matter of Shadron L. Stastney*, United States Security and Exchange Comm. Admin. File No. 3-15500, Release Nos. 3671, 30689 (Sep. 18, 2013), published at https://www.sec.gov/litigation/admin/2013/ia-3671.pdf.

33.      **Stastney is not a conventional lender.** In addition to the SEC violation, his checkered past includes several lawsuits alleging unethical and illegal corporate acts:

a.  Breach of fiduciary duty, *Hallal v. Vicis Cap. Master Fund Ltd., Shadron Stastney, et. al.* (Docket No.: 1:12-cv-10166) (D. Mass. Jan 27, 2012).

b.  Tortious interference; usurpation of corporate opportunity and civil conspiracy to usurp corporate opportunity; and breach of fiduciary duty, *QHP Financial Group, Inc. and QHP Group, Inc. v. Vicis Capital Master Fund, Shadron L. Stastney, et. al.* (Docket No. 12-CA- 06446) (Fla. Cir. Ct. Apr. 23, 2012).

c.  Breach of contract, breach of fiduciary duty, fraud in the inducement, and conspiracy, *Telestrata, LLC v. NetTalk.com, Inc., Shadron Stastney et al.* (Docket No: 1:14cv24137) (S.D. Fla. Nov 05, 2014).

See Exhibit I for details on these and other cases.

34.      **Arthur Leonard Robert Morton ("Morton"), principal of debtholder Hawk, is not a conventional lender either.** Like Stastney, he has a history of self-serving deceit that resulted in sanctions by the United Kingdom's Financial Conduct Authority ("FCA")[3] (Exhibit J). In December 2016, Morton was sanctioned for systematically lying to investigating authorities, inventing an agreement to purchase shares on trust, and providing a dishonestly back-dated Promissory Note which purported to acknowledge a fictitious transaction. Declaring that "Mr. Morton is someone who is not likely to comply with the Code," the Committee issued Morton a harsh 6-year "cold-shouldering" sanction[4] because he had been disciplined on three

---

[3] The Financial Conduct Authority "cold-shouldering" sanction against Morton is public record, published at https://www.thetakeoverpanel.org.uk/wp-content/uploads/2017/01/2017-1.pdf

[4] The sanction by the FCA means that no FCA-regulated entity can act for these individuals on any transaction subject to the Takeover Code.

previous occasions for breaches of the Code, including one public censure for attempting to conceal an obligation to make a Rule 9 mandatory offer. Barred from engaging in corporate takeover activities in the UK, Morton searched for new targets in the United States.

35.    Stastney and Morton formed SeeCubic, Inc. ("SeeCubic") as a Delaware corporation in 2020 to seize the Debtor's assets pursuant to the Omnibus Agreement described below. SeeCubic (at the direction of Stastney) and Hawk (at the direction of Morton) were held in contempt by the Delaware Court of Chancery in October 2022 for their orchestrated efforts to seize control of the Debtor's subsidiary, TechnoVative USA. In ¶ 3 of his October 3, 2022 Opinion, Vice Chancellor Laster wrote: "This decision holds that SeeCubic and Hawk engaged in contumacious conduct. Shad L. Stastney was the puppet master who pulled the strings. He controls SeeCubic and Technovative, and he also controls SLS Holdings VI, LLC ("SLS"), Stream's only secured creditor other than Hawk." (Exhibit K).

### B.    Lender Reneges on Commitment to Convert Debt to Equity

36.    In early 2018, prospective investors expressed concern about the amount of Stream's shareholder debt, and it became clear to the Debtor's management that executing debt-to-equity conversion agreements would be in the best interest of the company and all its shareholders. To facilitate new investment and growth of the company, the three primary holders of the company's debt (Hawk, SLS and Intrinsyc) signed Conversion Agreements, with such conversions to be made at the Debtor's discretion.

37.    More than 100 investors subsequently invested in the Debtor with those Conversion Agreements factored into their investment decisions.

38.    In May 2018, Intrinsyc honored its Conversion Agreement and accepted equity in the Debtor. The accrued value of the debt was $1,661,384 at the time of conversion. It was converted on May 2, 2018, to 415,346 common shares of Stream stock.

39.     In September 2018, Stastney was appointed Vice Chairman of the Board of

Directors of the Debtor to help guide the financial and business direction of the company. As a

senior board member with knowledge of and input into the company's global operations,

Stastney is a statutory insider for bankruptcy purposes.

40.     In December 2018, Stastney increased his involvement with the Debtor and his

status as an insider when he was appointed Chief Financial Officer, with the mutual

understanding that Stastney would help the Debtor raise additional capital, prepare the company

for strategic investment from institutional partners, and prepare the company for a potential

public offering or acquisition. Stastney became intimately aware of the Debtor's financial details

and participated in financial planning but failed to secure any investment on the Debtor's behalf.

41.     Despite Stastney's failure to perform, the Debtor had one of its best fundraising

years in 2019 through the efforts of its Chief Executive Officer, Mathu Rajan, raising more than

$20 million in capital as it worked on development of low-cost Ultra-D components required to

support the consumer device market.

42.     By early 2019, the Debtor had perfected its optical bonding process and was

preparing to produce demonstrator samples for consumer brands interested in adopting Ultra-D

into their product lines as soon as the low-cost Ultra-D components were completed. With its

technology and business development plans ramping up, the Debtor began to seek large

institutional investment and planned for simultaneous conversion of the SLS Insider Notes and

the Hawk Notes pursuant to the corresponding Conversion Agreements.

43.     In May 2019, while still an insider, Stastney informed the Debtor's management

that SLS would not convert its debt to equity, even though the Debtor believes there was no basis

on which to refuse. In the Summer of 2019, with the support of some of the Debtor's

shareholders, Stastney made a failed attempt to take control of the company and invalidate the

SLS Conversion Agreement.

44.     With inside knowledge of the company's financial operations, Stastney and others

contacted certain of the Debtor's new investors and criticized them for having made a "bad

decision" to support the existing Debtor management. Prospective investors were also contacted

in an attempt to dissuade them from investing in Stream.

### C.    Conspiracy by Stastney, Hawk and others to weaken and take over Stream

45.     In August 2019, while serving in the capacities of both Vice Chairman of the

Board of Directors and Chief Financial Officer, Stastney recommended that additional

investment being made by Hawk in the form of debt be described in the loan documentation as

an "amendment" to the outstanding Hawk Notes rather than a new note. This amendment would

later be used by Stastney to support his contention that the conversion obligation of SLS had

been nullified. Stream was unaware that the SLS Conversion Agreement was not identical to the

Hawk Conversion Agreement; Stastney had secretly included an extra clause saying that any

"amendment" to the Hawk Notes would nullify the SLS Conversion Agreement. Stastney created

a secret escape clause, then used his position as the Debtor's CFO to engineer an opportunity to

use it.

46.     Stastney resigned as Vice Chairman of the Board and Chief Financial Officer on

January 30, 2020, and offered to extend the due dates of the SLS Insider Notes to March 1, 2020,

but only if the Debtor made a lump sum payment to him personally on or before February 7,

2020 in the amount of $202,500. He also offered to continue to extend the SLS Insider Notes, so

long as he was paid his annual salary of $360,000 through December 31, 2021 (despite the

relinquishing of his responsibilities toward the Debtor). Stream paid an additional $28,987.76 to

Stastney individually thereafter. By accepting personal payments in exchange for extending the maturity dates of the SLS Insider Notes, Stastney further solidified himself as true Insider Debt.

47.     After his formal exit from the Debtor, Stastney and his associates continued to contact the Debtor's prospective and existing investors in an effort to stop the flow of funds, thereby making it impossible for the Debtor to retire the SLS Insider Notes.

48.     Through the Spring of 2020, Stastney offered to extinguish the SLS Insider Notes in exchange for all of the Debtor's assets, but the Debtor declined because its management felt that such a concession would unfairly impact the Debtor's other investors. The value of the Debtor was significantly more than the SLS secured debt, which totaled approximately $10.5 million with interest.

49.     Stastney informed the Debtor's employees, investors, strategic partners and others that SLS would be issuing a Notice of Default to the Debtor on March 1, 2020, and would then immediately take possession of the Debtor's assets. This created the false impression that the unpaid SLS Insider Notes would result in the immediate loss by the Debtor of its assets. By doing so, Stastney began removing employee support for the Debtor's management.

50.     Stastney's efforts to separate key employees from the Debtor is evidenced by a detailed written employment offer drafted and executed between Stastney and the Debtor's VP of Engineering, wherein Stastney promised employment to the VP with a to-be-determined future entity. This employment offer was signed while Stastney was still employed by the Debtor as Vice Chairman of the Board and Chief Financial Officer (Exhibit L).

51.     As part of his conspiracy with Stastney, and the first step in their planned hostile takeover of the Debtor, Morton suggested that the Debtor expand its Board of Directors to satisfy shareholder demand for greater managerial input. In March 2020, the Debtor offered

directorships to Frank Hodgson, Asaf Gola, Kevin Gollop, and Krzystof Kabacinski, unaware

that the latter three were acting as agents for the benefit of the secured creditors.

52.     As the Debtor worked to secure funding sufficient to satisfy the debt-to-equity

conversion requirements of the Conversion Agreements, Kabacinski worked to undermine such

investment. During critical negotiations with Beijing ToJoy Shared International Consulting Co.

("ToJoy") for a Strategic Cooperation Agreement in which ToJoy would provide $50 million in

funding (Exhibit M), Kabacinski interfered on behalf of Hawk, prompting the investment banker

representing ToJoy to send an urgent message to Mathu Rajan: "Kris sent a lot of negative

information and messages to our companies. Please let Kris stop that stupid behaviour!!!!"

(Exhibit N). ToJoy subsequently abandoned its proposed investment in the Debtor.

> **D.     Superior Court Litigation**

53.     After issuing a Notice of Default to the Debtor, SLS filed a complaint on March

23, 2020, in the Superior Court of the State of Delaware in and for New Castle County

("Superior Court") against the Debtor and its subsidiaries TechnoVative USA, Technology

Holdings, and Media Holdings. The complaint sought money damages on the Debtor's alleged

obligations due to SLS and replevin of collateral.

54.     Despite SLS's request for expedited relief and an injunction, the Superior Court

did not order the immediate transfer of the Debtor's assets to SLS. Rather, the Superior Court set

a trial date for June 7, 2021, 14 months later. Stastney would not be granted possession of the

Debtor's assets immediately as he had planned.

55.     In late March and early April 2020, Stastney and the Debtor's VP of Engineering,

who had signed a lucrative employment offer with Stastney's to-be-determined company, seized

physical control of the Debtor's engineering computer servers in Silicon Valley from MotivIT, a

third-party IT company managing the Debtor's IT infrastructure in the United States. To

accomplish this, they represented to MotivIT that the SLS Superior Court filing was, in fact, a

judgment from the Court whereby SLS had become the new legal owner of the assets. Based on

this deception, the Debtor's VP of Engineering and Stastney not only seized control but also

blocked the Debtor from accessing its own valuable equipment and computer code.

**E.      The Omnibus Agreement and seizure of the Debtor's assets by SeeCubic, Hawk, Stastney, and Morton**

56.      Faced with a 14-month delay in seizing control of the Debtor's assets through the

Superior Court, Stastney explored other ways to take possession of the Debtor's valuable

technology and its customers. He colluded with Morton and certain other of the Debtor's

shareholders to commence a hostile takeover of the Debtor.

57.      In a May 4, 2020 meeting of the Debtor's Board of Directors, Gola, Gollop, and

Kabacinski proposed and passed a resolution to establish a debt-resolution committee with Gola

and Gollop solely authorized to negotiate a settlement on the Debtor's behalf. Mathu Rajan and

Raja Rajan, the two founding directors, abstained but were outvoted by the three new directors.

Hodgson was not present during the vote, which was carefully planned by the other new

directors to coincide with his absence so that they'd have a majority.

58.      Two days later, on May 6, 2020, a lengthy debt resolution (the "Omnibus

Agreement") was signed by Gola and Gollop, purporting to commit the Debtor to a resolution

whereby all its assets would be transferred to SLS and Hawk (Exhibit O). The Omnibus

Agreement was a proposed settlement that benefitted the very investors responsible for creating

the problem by failing to honor the Conversion Agreements.

59.      Executed simultaneously with the Omnibus Agreement was a secret side letter

(the "Letter Agreement") in which the beneficiaries of the Omnibus Agreement detailed the

structure of their newco, SeeCubic (<u>Exhibit P</u>). The Letter Agreement was a critical component

of the settlement, stating: "the parties hereto wish to agree among themselves to certain

additional matters related to the Omnibus Agreement, and on which their execution of the

Omnibus Agreement is conditioned…" Also detailed in the Letter Agreement were equity

distributions for SLS, Hawk, and certain of the Debtor's investors who had supported the hostile

takeover. Despite the fact that no representative of the Debtor signed the Letter Agreement, it

required the Debtor to issue 48 million shares of Debtor's common stock: 40 million shares to

Hawk, 4 million shares to SLS, and 4 million shares to certain other investors. The Debtor never

issued such additional equity.

60.     The Debtor's directors who signed the Omnibus Agreement had clear conflicts of

interest as they would receive compensation and other benefits once the Debtor's assets were

transferred to Stastney's new company. The SeeCubic private placement memorandum used to

raise capital only six weeks after the Omnibus Agreement was executed lists all three

"independent" directors of the Debtor as having key roles at the company to whom they had

transferred all the assets: Kabacinski as CEO- Designate and Board Member-Designate, Gollop

as Board Member-Designate, and Gola as Board Member-Designate (<u>Exhibit Q</u> at p. 18).

61.     The Debtor immediately challenged the validity of the Omnibus Agreement, as it

violated a key clause of the company's charter, which required approval of the Class B

shareholders for any transaction that transferred all or substantially all of the company's assets

(<u>Exhibit R</u> at IV(D)(2)(d)). Within days of the attempted hostile takeover, the Debtor formally

removed new directors Gola, Gollop, and Kabacinski through a written resolution of the

stockholders in lieu of a meeting.

62.    Despite being removed from their directorships in May 2020, Gola and Gollop purported to represent the Debtor. On August 24, 2020, using the Debtor's letterhead, they signed a Delegation of Authority Letter which gave a third-party power of attorney to represent some of the Debtor's subsidiaries for the purpose of assuming the facility lease where the MPL was stored, taking possession MPL, and moving the equipment from the Debtor's reach (Exhibit S).

63.    Despite being removed from his directorship in May 2020, Kabacinski used the Debtor's letterhead and, claiming to be the Debtor's Director and "acting executive," made demands and threats to the Debtor's executive vice president, who also served as CEO of SCBV. The letter and following email correspondence contained slanderous accusations and threatened legal consequences (Exhibit T).

64.    Using the Omnibus Agreement as a foundation, SLS and Hawk began seizing the Debtor's assets through their new business entity, SeeCubic, even though no court had yet ruled on the validity of the Omnibus Agreement. On the title page of its June 2, 2020 private placement memorandum, SeeCubic declared itself "Owner of the brand Ultra-D."

65.    SeeCubic hired the Debtor's employees in the United Kingdom and directed them to change the registration of the London storage facility from the Debtor's name to the former employee's name as an individual. The former employee refused to grant access to the Debtor, holding all Ultra-D demonstrator units and other assets for the benefit of SeeCubic.

66.    Similarly, SeeCubic hired the Debtor's VP of Sales in America and directed him to refuse access by the Debtor to items vaulted in a New Jersey storage facility. Although the Debtor had been paying for the storage facility for several years, it had been registered in the

name of the Debtor's former employee personally, and thus he was able to deny access to the

Debtor and hold the assets for the benefit of SeeCubic.

67.    In July 2020, SeeCubic contacted Vistra B.V. ("Vistra"), the Netherlands

administration company serving as the obligatory Dutch director for the Debtor's three Dutch

subsidiaries. With the Omnibus Agreement as "proof" of its authority, SeeCubic convinced

Vistra to remove Mathu Rajan as Director A and replace him with Stastney. Fortunately, due to

Dutch law, Vistra was required to notify Mathu Rajan prior to his removal, and Debtor was able

to inform Vistra of the disputed nature of the Omnibus Agreement. Unsure what to believe and

wanting to avoid risk, Vistra resigned as director of all Debtor's Dutch subsidiaries.

### F.    **Chancery Court Litigation – The Preliminary Injunction Order**

68.    Upon learning of SeeCubic's ongoing actions to seize its assets, the Debtor filed a

petition for a preliminary injunction in the Chancery Court on September 8, 2020. A week later,

SeeCubic filed a petition to block the Debtor from using its own technology, its own name, and

even from directing its own employees.

69.    Following expedited discovery, the Chancery Court issued an Order (the "PI

Order") and accompanying Opinion (the "PI Opinion") on December 8, 2020, granting

SeeCubic's motion for a preliminary injunction and denying the Debtor's motion for a

preliminary injunction. The PI Order is attached hereto as Exhibit U and the PI Opinion is

attached hereto as Exhibit V. Pursuant to the PI Order, the Debtor and Debtor's CEO, Mathu

Rajan, as third-party defendant, were preliminarily enjoined from taking actions to interfere with

the Omnibus Agreement.

70.     The PI Order had the practical effect of making it impossible for Stream to defend itself in the Chancery Court litigation, continue to develop its product, fulfill outstanding contracts with entities such as BOE and Google, raise additional capital, or even operate at all.

### G.    Delaware Bankruptcy Court

71.     Pursuant to the PI Order in the Delaware Court of Chancery, Stastney/SLS and Hawk/Morton seized most of the Debtor's assets and transferred them to their new entity, SeeCubic. They did not, however, accept any of the Debtor's liabilities.

72.     Left with no assets, significant debt, and only a Delaware Supreme Court appeal to put its hopes in, the Debtor filed for chapter 11 protection in the District of Delaware and arranged initial debtor-in-possession financing for its planned reorganization.

73.     SeeCubic, SLS, Hawk, and Stastney filed motions to dismiss the bankruptcy, claiming that the Debtor had made a bad-faith filing in order to escape a state court ruling it disagreed with. The Debtor counterclaimed that the Omnibus Agreement was an executory contract since SeeCubic had failed to issue 1,000,000 shares of its common stock to the Debtor in exchange for the Debtor's assets, and that the Debtor had not yet transferred all of its assets, including the multi-million-dollar MPL bonding equipment.

74.     Despite the executory nature of the Omnibus Agreement, and despite the fact that the case in the Court of Chancery had only had a preliminary ruling, the Bankruptcy Court determined that the Omnibus Agreement was likely to be confirmed by the Chancery Court and thus dismissed the Debtor's petition for bankruptcy.

### H.    Seecubic, SLS and Hawk inflict more damage on the Debtor

75.     It didn't take long for Stastney to destroy what the Debtor had worked hard to build. The first casualty was the project for Google. Rather than handle the significant Silicon

Valley client with care to cultivate a longstanding customer relationship, Stastney's primary concern was making sure there was no contact between representatives of the Debtor and Google. He pressed Google to inform him of any such contact, and after consulting with its internal legal team, Google cancelled the Ultra-D project in February 2021, only two months after the project was removed from the Debtor's control. (Exhibit W)

76.     Shortly after killing the Google project, SeeCubic attempted to renegotiate the contract with Bosch, a move that displeased the German automotive supplier which had been honored with the 2020 Best of Innovation Award for In-Vehicle Entertainment & Safety by the Consumer Electronics Association for its presentation of the Debtor's prototype display. The deal with Bosch had already resulted in $250,000 paid to the Debtor, but following delivery of unsatisfactory prototype samples by SeeCubic in mid-2021, Bosch cancelled the project that the Debtor had worked for nearly a year to negotiate.

77.     Despite failing to generate any new business and managing to destroy two of the Debtor's running projects, SeeCubic expanded the engineering team at SCBV, more than doubling the overhead of the Netherlands subsidiary with salary raises and increased staffing. This overhead is now the burden of the Debtor, which had no input into hiring decisions that do not align with the Debtor's business plan.

78.     Worse still, under nearly two and a half years of SeeCubic management, the Ultra-D technology has not advanced. Electronics projects critical to consumer product integration were put on hold and newly designed high-resolution demonstrators received a poor response from customers, investors, and strategic partners. In December 2022, an executive of one of the top Hollywood 2D-to-3D conversion companies said, "The new SeeCubic display was total garbage. Not nearly as good as what Stream TV had back in 2019." Under SeeCubic

management, Ultra-D is no closer to mass market rollout than it was prior to the PI Order of December 2020. The Debtor must repair damage to the reputation of its Ultra-D technology.

### I.    Chancery Court Litigation – The Partial Summary Judgment

79.    On September 23, 2021, the Chancery Court issued a Partial Summary Judgment in which it declared the Omnibus Agreement to be valid and binding, making its preliminary findings of December 2020 final. Stastney touted the ruling to the Debtor's investors: "This means that all the assets formerly owned by StreamTV are now permanently the property of SeeCubic, Inc., as specified in the Omnibus Agreement of May 6, 2020.  This is exactly the full and final outcome we have sought, and allows us to move forward unfettered to build the business and advance the technology."

80.    On November 10, 2022, the Chancery Court issued a Partial Final Judgement under Rule 54(b) granting the Debtor's request so it could appeal the Summary Judgment (Exhibit X).

### J.    Delaware Supreme Court Appeal

81.    On December 21, 2021, the Debtor filed its appeal of the Chancery Court decision to the Delaware Supreme Court. Its primary legal argument was that its Third Amended and Restated Certificate of Incorporation specifically prohibited the transfer of the Debtor's assets without the approval of its Class B shareholders.

82.    On June 15, 2022, in a unanimous 5-0 *en banc* opinion, the Delaware Supreme Court declared that the Debtor's charter was unambiguous and that the unlawful Omnibus Agreement was void *ab initio* (Exhibit Y).

83.    On July 1, 2022, the Delaware Supreme Court issued a mandate (the "Mandate") that the PI Order was "hereby VACATED, REVERSED and REMANDED (Exhibit Z).

K.      **Chancery Court – Reversing the Improvident Injunction**

84.      The same day the Mandate was issued, the Debtor filed a Motion for Entry of

Final Order and Judgment Consistent with the Mandate. After suffering for two years from the

hostile takeover and improvident injunction, the Debtor simply wanted control and possession of

its assets once again so it could resume business.

85.      Despite the Delaware Supreme Court reversal, SeeCubic failed to return the

Debtor's assets. On July 5, 2022, SeeCubic filed Supplemental Counterclaims in an attempt to

block the assets from being returned to the Debtor.

86.      On July 31, 2022, SeeCubic informed the Debtor that it intended to take legal title

to the Debtor's assets pursuant to Article 9 of the UCC, enforcing creditor rights held by SLS.

Furthermore, SeeCubic intended to sell the Debtor's assets.

87.      On August 1, 2022, the Debtor requested a Temporary Restraining Order against

SeeCubic to prevent the sale of its assets.

88.      On August 9, 2022, nearly 8 weeks after the Delaware Supreme Court opinion,

the Chancery Court issued a TRO against SeeCubic. Vice Chancellor Laster specifically stated

his expectations: "SeeCubic will restore Stream's assets to Stream in accordance with the Rule

54(b) order. Once this has occurred, SeeCubic may seek to exercise any creditor's rights it

possesses against Stream. **SeeCubic must do so based on a status quo where Stream has title**

**to and possession of its assets, not a status quo in which SeeCubic acquired possession**

**based on a decision that the Delaware Supreme Court has held is erroneous**." (Exhibit AA).

89.      On August 10, 2022, the Chancery Court issued an Order Granting Partial Final

Judgment in favor of the Debtor. The order stated: "Pending transfer of the Assets from

SeeCubic to Stream, SeeCubic and all those acting in concert with it shall not use, impair,

encumber, or transfer the Assets, except as necessary to maintain the Assets in the ordinary course of business and preserve their value pending transfer to Stream." (Exhibit BB).

**L.    Chancery Court – Hawk seeks to enforce its creditor rights and seize control of Debtor's primary subsidiary by appointing Stastney as director**

90.    With their Omnibus Agreement scheme now dead and the SLS foreclosure action in Superior Court on indefinite hold, Stastney and Morton came up with a new gambit. Knowing that all the Debtor's assets were held in its primary subsidiary, TechnoVative USA, SeeCubic returned the shares of stock to the Debtor as mandated by the Chancery Court, then had Hawk take control minutes later via carefully coordinated legal and corporate documents. The October 3, 2020 maneuver was clearly an attempt to circumvent the TRO of the Chancery Court, which found SeeCubic, Hawk, and Stastney to be in contempt. Vice Chancellor Laster, however, gave the Debtor only 10 days to possess its assets before the secured creditors would be allowed to attack the Debtor again.

91.    On October 17, 2022, Hawk filed in Chancery Court, seeking an Order pursuant to 8 Del. C. § 225 ("Section 225") confirming that Hawk's purported removal of Mathu Rajan and appointment of Stastney constituted a validly elected board of directors of TechnoVative USA (Exhibit CC). With control of TechnoVative USA, Morton and Stastney would control Ultra-D.

92.    On October 20, 2022, the Chancery Court issued a Status Quo Order in which SeeCubic was allowed to retain possession of the Debtor's assets pending adjudication of the Section 225 action by Hawk. Further, the Court appointed Ian Liston of the firm Wilson, Sonsini, Goodrich & Rosati P.C. as *receiver pendante lite* (the "Receiver") to oversee the operations of TechnoVative USA (Exhibit DD). The Debtor has been forced to pay hundreds of thousands of dollars to the Receiver despite receiving no benefit at all.

93.     The Receiver has allowed SeeCubic to retain and even take possession of certain

Debtor assets even after issuance of the Chancery Court Status Quo Order. He has allowed

SeeCubic to use and demonstrate the Debtor's technology for its own benefit, even though the

Debtor has legal title to the Intellectual Property and has not given any license to SeeCubic that

would allow it to do so.

94.     SeeCubic, Hawk, SLS, Stastney, and Morton have abused the Chancery Court,

which has allowed them to unlawfully seize, retain, and use the Debtor's assets. The Debtor has

incurred millions of dollars in legal fees and suffered significantly greater damage by being

deprived of its assets. The irreparable harm has necessitated the Debtor and its primary

subsidiary, TechnoVative USA, seek chapter 11 relief.

### M.      Rembrandt Litigation and Settlement

95.     On January 6, 2017, Rembrandt 3D Holding Ltd. ("Rembrandt"), a Nevis

corporation, filed suit against the Debtor in the Supreme Court of New York, New York County,

later removing the case to the Southern District of New York (*Rembrandt 3D Holding Ltd v.*

*Stream TV Networks, Inc. et al.* (17-CV-882 RA SDNY). In that litigation, Rembrandt alleged

that some of its intellectual property had been incorporated into the Debtor's Ultra-D technology.

Certain Stream engineers had once worked with Rembrandt and Rembrandt alleged that those

engineers developed Stream's technology on ideas first conceived while at Rembrandt, which

was known as 3D Solutions at the time.

96.     On April 9, 2019, the Debtor settled its litigation with Rembrandt through

mediation held in the judge's chambers, with Stastney representing the Debtor as its Chief

Financial Officer and Director. Stastney signed the term sheet, which (i) acknowledged

Rembrandt's claim that at least some of Rembrandt's intellectual property was incorporated in

Stream's Ultra-D solution, (ii) **granted a license for Stream to use Rembrandt's IP as part of Stream's product offerings**, and (iii) offered Rembrandt compensation in the form of money, future Ultra-D products, and preferred distribution terms. As representative of the Debtor in the negotiation, and as the individual who signed the settlement term sheet, Stastney was intimately aware of Rembrandt's intellectual property claim and the necessity to have a license.

97.     Due to financial hardships faced by the Debtor in late 2019 and early 2020 as described above, it was unable to honor the cash payment terms of the April 2019 settlement. On April 20, 2020, Rembrandt sought to enforce the settlement, which had been memorialized only as a term sheet with handwritten notes and additions made in the judge's chambers.

98.     Rembrandt's motion to enforce was stayed when Stream filed for chapter 11 reorganization with the United States Bankruptcy Court of Delaware on February 24, 2021. The proposed reorganization included planned cooperation between Stream and Rembrandt, and the parties developed good communication and restored a good-faith relationship while Stream's bankruptcy was being challenged by SeeCubic, Stastney, and Hawk.

99.     On May 23, 2021, less than a week after the Bankruptcy Court dismissed Stream's petition, the Debtor resolved its remaining issues with Rembrandt and Mathu Rajan signed a long-form settlement agreement with terms nearly identical to the term sheet that Stastney had signed on behalf of the Debtor in 2019. Rembrandt remained aligned with the Debtor during Debtor's appeal to the Delaware Supreme Court and during the months immediately following, with the expectation that Stream would be granted possession of the assets it has lost through the improvident injunction.

100.    With the return of Stream's assets delayed month after month, Rembrandt sought to intervene in the Chancery Court but was denied.

101.    Rembrandt was forced to sit on the sidelines as Hawk attempted to seize control

of TechnoVative USA through its Section 225 action in October 2022. Rembrandt watched as

Stastney's new company SeeCubic brazenly used Rembrandt's technology without license or

payment (Stastney refused to engage Rembrandt in even a courtesy discussion though Stastney

had been personally involved in acknowledging Rembrandt IP being incorporated into Ultra-D).

When Hawk announced an intended UCC-9 sale of the Debtor's assets in complete disregard for

Rembrandt's IP, the situation reached a breaking point.

102.    On February 21, 2023, Rembrandt filed suit in the U.S. District Court for the

District of Delaware against parties using the Ultra-D technology without a Rembrandt license. It

sued TechnoVative USA, which was under the direction of the Chancery Court-appointed

Receiver, Hawk, and SeeCubic for trade secret violations and injunctive relief to prevent the sale

of Stream's assets (*Rembrandt 3D Holding Ltd v Technovative Media, Inc., Hawk Investment

Holdings Ltd. and SeeCubic, Inc*. ).

103.    Rembrandt disputes that anyone has the right to transfer the Debtor's assets, as all

Stream demonstrators, products and even the core Ultra-D technology itself contains Rembrandt

IP. The only entity authorized by Rembrandt to use the Ultra-D technology or sell Ultra-D

enabled products is the Debtor.

**N.      SeeCubic agrees, then fails to fulfill its promise, to finance SCBV pending
          Hawk's Section 225 case in Chancery Court**

104.    The Chancery Court Status Quo Order of October 20, 2022 prevented Stream

from making any board level changes to management and reinstalling its own director to SCBV.

As a consequence, SCBV employees refused to acknowledge the Debtor right to direct them.

SCBV was allowed to operate in the normal course of business under the direction of the

Receiver, who considered only the existing business of SCBV as previously directed by

SeeCubic under authority improperly obtained through the invalidated Omnibus Agreement.

105.    The Debtor was unable to direct or benefit from the activities of its SCBV

personnel. Additionally, the size of the Dutch engineering team had more than doubled under

SeeCubic control, and with salary raises, the total overhead had tripled since the time the Debtor

was forced to relinquish control in December 2020.

106.    The Debtor argued that it should not have to pay for an expanded team producing

unknown results that benefitted SeeCubic. SeeCubic agreed to fund SCBV operations via a

Promissory Note executed by SCBV which stipulated that SeeCubic would be reimbursed by

SCBV in the event that the Debtor prevailed in the Chancery Court 225 Action.

107.    The 3.5 million euro SeeCubic Promissory Note of November 14, 2022 was

intended to include transfer of funds to SCBV for payment of all SCBV expenses through the

end of March 2023 (Exhibit EE), thus covering the period up through and including the

Chancery Court ruling expected after the scheduled March 23, 2023 hearing.

108.    However, SeeCubic seems to have underestimated the expense of SCBV

operations and payroll, despite having controlled and funded the entity since December 2020.

Just prior to his resignation following this chapter 11 filing, the Receiver reported to the Debtor

that SCBV had approximately $1 million in payables owed and that SeeCubic was delinquent in

providing funds guaranteed by the promissory note.

109.    As a result of SeeCubic's failure to fully honor the terms of the promissory note,

SCBV now faces a critical cash flow situation in which it will default on payments to its own

creditors, payroll for its employees, and associated governmental taxes, social costs, and fees.

IV.    **DESIRED OUTCOMES FOR THE CHAPTER 11 PROCESS**

110.    The Debtor intends to restructure its debt through this Chapter 11 Case so that its debt service is reduced to a level that will allow the Company to sustain its operations for the long term and has identified investors who are willing to invest in the Company once the Company files this Chapter 11 Case.

111.    The Debtor believes that the Chapter 11 filing is the path that will best allow it to secure the future of the Debtor. To that end, the Debtor seeks in the chapter 11 process to pursue a reorganization plan that:

a.    Enforces the return of the Debtor's assets as mandated by the Delaware Supreme Court

b.    Enables the Debtor to resume operations and generate revenue through:

    i.    Sale of Ultra-D-enabled components to global customers seeking to incorporate the Debtor's technology into their display products. The Debtor has established business relationships with and solicited interest from initial "anchor" customers: e.g., Skyworth seeks to develop an ultra-high-definition 8K television, Chunghwa seeks to develop an ultra-high-definition 8K television, and Lenovo seeks to develop a gaming laptop. There are a number of additional customers for high-resolution PC monitors, laptops and tablets.

    ii.    Revenue share through a joint venture (the "JV") with AOTEX[5]. The JV intends to market Ultra-D products to global brands and

---

[5] Directed by entrepreneur Ali Hassan Osman and based in Beirut, the company offers management advisory services and makes investments primarily in the telecommunication, media, and technology sectors. AOTEX conducts business within the Middle East, Africa, Europe, Emerging Asia, and Latin America, and anticipates

distributors, as well as sell directly to consumers through its own

brand.

    iii.    Provision of optical bonding services provided to global customers

through its Chinese subsidiary with investment support from its

strategic partner.

    iv.    Provision of content services to customers seeking Ultra-D content

creation or conversion of legacy 2D content into the Ultra-D format.

Revenues may be generated on a consulting basis or via revenue share

with the content owners.

    v.    Revenue share with JoveAI Innovation, Inc. ("JoveAI") through a joint

venture in which JoveAI will provide engineering services to develop

semiconductor ASIC chips with the Debtor's Ultra-D algorithms

inside for a low-cost component offering that can be made to the

Debtor's customers, allowing for the sale of millions of units.

    c.  Provides the Debtor with a viable path forward to attract additional capital for

operations and expansion.

## V.    <u>CONCLUSION</u>

112.    The Debtor has been greatly harmed – financially and otherwise – by the illegal

and unethical actions of its secured creditors, an erroneous court ruling that was overturned but

not properly reversed, deprivation of its assets, imposition of a Receiver, and a mountain of legal

expenses from more than two years of litigation.

---

entering into a joint venture agreement with Stream TV Networks for the purpose of exploring global distribution
opportunities for Stream TV's Ultra-D ™ technology.

113.    Despite these hardships, the Debtor has maintained key customer relationships, developed a strategy for reorganization and debt conversion, and secured potential Debtor-in-Possession financing.

114.    For all the aforementioned reasons, the chapter 11 petitions, motions for emergency relief, and first day motions of Stream TV Networks, Inc. and TechnoVative Media, Inc. should be granted.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on March 28, 2023                    **Stream TV Networks, Inc.**

By:

                                Mathu Rajan

Title:       Chief Executive Officer