# EXHIBIT K

Chancery Court

October 3, 2022 Opinion

**EFiled: Oct 03 2022 02:38PM EDT**
**Transaction ID 68202938**
**Case No. 2020-0766-JTL**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE STREAM TV NETWORKS, INC. | ) | C.A. No. 2020-0766-JTL |
| OMNIBUS AGREEMENT LITIGATION | ) | |

## OPINION

Date Submitted: October 2, 2022
Date Decided: October 3, 2022

Steven P. Wood, Andrew S. Dupre, Brian R. Lemon, Sarah E. Delia, Stephanie H. Dallaire, Travis J. Ferguson, McCARTER & ENGLISH, LLP, Wilmington, Delaware; *Attorneys for Plaintiff and Counterclaim Defendant Stream TV Networks, Inc. and for Third-Party Defendants Mathu Rajan and Raja Rajan.*

Jenness E. Parker, Bonnie W. David, Lilianna Anh P. Townsend, Trevor T. Nielsen, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Eben P. Colby, Marley Ann Brumme, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Boston, Massachusetts; *Attorneys for Defendants and Counterclaim Plaintiff SeeCubic, Inc.*

Steven L. Caponi, K&L GATES LLP, Wilmington, Delaware; *Attorney for Interested Party Hawk Investment Holdings Ltd.*

**LASTER, V.C.**

Stream TV Networks, Inc. ("Stream") has filed a motion for emergency post-judgment relief (the "Emergency Motion"). Stream maintains that SeeCubic, Inc. and Hawk Investment Holdings Ltd. ("Hawk") acted in concert to transfer 100% of the equity of Technovative Media, Inc. ("Technovative"), comprising 1,000 shares of its common stock (the "Shares"), from SeeCubic to Hawk. The Emergency Motion contends that this conduct was contumacious because the court had made clear in a partial final judgment entered under Rule 54(b) (the "Partial Final Judgment") and in other rulings that SeeCubic was supposed to transfer its assets to Stream. Those rulings did not envision a choreographed transfer in which SeeCubic caused Technovative to list Stream as the owner of the Shares, while at the same time ensuring that Hawk could deploy its rights as a secured creditor to seize the Shares before Stream could react.

As a remedy, the Emergency Motion seeks an order canceling Hawk's ownership of the Shares and vesting ownership in Stream. Stream also seeks an injunction barring SeeCubic and anyone acting in concert with it from interfering with Stream's ownership of the Shares until further order of the court.

This decision holds that SeeCubic and Hawk engaged in contumacious conduct. Shad L. Stastney was the puppet master who pulled the strings. He controls SeeCubic and Technovative, and he also controls SLS Holdings VI, LLC ("SLS"), Stream's only secured creditor other than Hawk. Stastney caused SeeCubic to notify Hawk that the transfer was coming. To effectuate the transfer, Stastney gave instructions to SeeCubic's counsel to give instructions to himself (this time in his capacity as an officer and director of Technovative) to title the Shares in Stream's name. As planned, Hawk immediately asserted its rights to

the Shares, at which point Stastney transferred title to the Shares into Hawk's name. Stastney and SLS benefitted, because SLS's rights as a secured creditor are senior to Hawk's.

In what appears to be a remedy of first impression, the court cancels Hawk's purported ownership of the Shares and vests ownership in Stream. The court also grants injunctive relief barring SeeCubic, Hawk, and Stastney from interfering with Stream's ownership of the shares or the rights associated with them, but only for a period of ten days. At the end of ten days, the injunction will lift. At that point, SeeCubic, Hawk, and Stastney can exercise any rights they believes that they possess. Stream can respond as it sees fit.

## I.    FACTUAL BACKGROUND

There once was an agreement among Stream, SLS, Hawk, and fifty-two of Stream's stockholders (the "Omnibus Agreement"). In the Omnibus Agreement, Stream agreed to transfer all of its assets (the "Legacy Stream Assets") to a newly formed entity controlled by SLS and Hawk. In return, SLS and Hawk agreed to extinguish Stream's secured debt. SLS and Hawk subsequently formed SeeCubic as the entity contemplated by the Omnibus Agreement. As part of the deal, Stream's minority stockholders received the right to exchange their shares in Stream for shares in SeeCubic, and Stream received the right to one million shares of common stock in SeeCubic.

A committee of Stream's board of directors (the "Resolution Committee") negotiated and approved the Omnibus Agreement. When the Resolution Committee caused Stream to enter into the Omnibus Agreement, Stream was insolvent and failing. Stream had defaulted on its secured debt. Stream also carried more than $16 million in trade debt

2

and had fallen months behind on payments to customers and suppliers. Stream had even failed to make the payments necessary to maintain the patents on its technology, which were essential to its business. As the holders of debt secured by all of Stream's assets, SLS and Hawk had the power to take everything and leave Stream and its stockholders with nothing. By causing Stream to enter into the Omnibus Agreement, the Resolution Committee ensured that Stream and its stockholders got something.

Stream's controlling stockholders—the Rajan brothers—objected to the Omnibus Agreement. Using their stockholder-level power as the holders of Stream's super-voting Class B common stock, they reconstituted the board of directors and reasserted control over Stream. They immediately set about raising every challenge to the Omnibus Agreement that they could think of.

In September 2020, Stream filed this action, seeking a declaration that the Omnibus Agreement was invalid and an injunction against SeeCubic trying to enforce it. SeeCubic counterclaimed, seeking a declaration that the Omnibus Agreement was valid and an injunction against Stream trying to interfere with it.

In December 2020, the court ruled that it was reasonably probable that the Omnibus Agreement was a valid and enforceable agreement, and the court issued an injunction barring Stream from failing to comply with the agreement. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020) (the "Injunction Decision") (subsequent history omitted). After the issuance of the Injunction Decision, SeeCubic acquired the Legacy Stream Assets. In September 2021, the court granted a motion for summary

judgment and declared the Omnibus Agreement to be a valid agreement. The court entered a partial final judgment in favor of SeeCubic, and Stream appealed.

In June 2022, the Delaware Supreme Court declared that the Omnibus Agreement could not have become effective without the approval of the holders of a majority of the Class B common stock. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del. 2022). The high court remanded the case for further proceedings. The mandate issued on July 1. Dkt. 237 (the "Mandate").

On August 7, 2022, the court entered the Partial Final Judgment. Dkt. 266. That order held that in light of the Mandate, the Omnibus Agreement did not validly transfer legal title to any of the Legacy Stream Assets from Stream to SeeCubic. The court directed the parties to "cooperate to effectuate the Mandate, including by causing SeeCubic to transfer legal title to the [Legacy Stream Assets] from SeeCubic to Stream as expeditiously as possible." *Id.* ¶ 4 (the "Transfer Obligation").

When the court implemented the Partial Final Judgment, SeeCubic was making efforts to assert Hawk's rights as a secured creditor. SeeCubic argued that Hawk held a security interest in all of the Legacy Stream Assets and could levy on those assets to satisfy Stream's outstanding debt, which Hawk claimed exceeded £350 million. SeeCubic maintained that it would be a futile act to return the Legacy Stream Assets to Stream, only to have Hawk seize them again. And because SLS and Hawk had appointed SeeCubic as their designee for the purpose of exercising their creditors' rights, the Legacy Stream Assets would make a quick round trip from SeeCubic to Stream and back again.

4

SeeCubic advanced these arguments because the Partial Final Judgment enjoined SeeCubic and those acting in concert with it from taking any action to "use, impair, encumber, or transfer the Assets, except as necessary to maintain the Assets in the ordinary course of business and preserve their value pending transfer to Stream." *Id.* ¶ 5 (the "Post-Remand Injunction"). At a minimum, the Post-Remand Injunction created uncertainty as to whether SeeCubic and the secured creditors could exercise their creditors' rights.

In an effort to clarify maters, Hawk intervened and moved to modify the Post-Remand Injunction to confirm that the secured creditors could exercise their rights. Dkt. 274 (the "Modification Motion"). Stream filed a competing motion to enforce the Partial Final Judgment. Dkt. 297 (the "Motion to Enforce"). The latter motion asked the court to exercise its equitable powers and the explicit authority provided under Court of Chancery Rule 70(a) to cancel SeeCubic's ownership of the Shares and vest title in Stream. *Id.* at 3.

Seeking to induce a decisional sequence in which the court ruled on the Modification Motion first, SeeCubic did not respond to the Motion to Enforce. On September 27, 2022, the court entered an order stating: "The court intends to rule promptly on the Motion to Enforce, filed by Stream TV Networks, Inc. on September 9, 2022. As yet, no opposition to that motion has been filed. Given the nature of the motion, any opposition should have been filed by now. In any event, any opposition is due not later than noon on Friday, September 30, 2022." Dkt. 303.

On September 28, 2022, the court issued an opinion in which it denied the Modification Motion. Dkt. 306 (the "Modification Denial"). One of the factors the court considered in denying the Modification Motion was the relative ease with which SeeCubic

could achieve substantial compliance with the Transfer Obligation by causing SeeCubic to transfer the Shares to Stream. *Id.* at 7. The court also explained that Stream faced irreparable harm because unless it got back the Legacy Stream Assets, Stream would not be able to use the Legacy Stream Assets "to conduct business and make efforts to satisfy the claims of Hawk and Stream's other creditors." *Id.* at 8. The Modification Denial made clear that the secured creditors could not act in concert with SeeCubic to exercise their rights until after SeeCubic returned the Legacy Stream Assets to Stream.

At that point, the handwriting was on the wall. Unless SeeCubic advanced an exceptionally persuasive and as-yet unpresented argument in response to the Motion to Enforce, the court would order SeeCubic to transfer the Shares to Stream. And the court would not permit the secured creditors to act until Stream had enjoyed some opportunity to exercise the rights associated with the Shares and re-establish an approximation of the status quo that existed before the Injunction Decision.

Anticipating that outcome, SeeCubic and Hawk planned a series of coordinated acts in which SeeCubic would transfer the Shares to Stream in a manner that would enable Hawk to seize them by acting before Stream could respond. The Shares would end up in the hands of Hawk, just as SeeCubic and Hawk wanted.

As part of their plan, SeeCubic sent Hawk a letter dated September 29, 2022. Acting in its capacity as the designee of SLS and Hawk for the purpose of exercising their rights as secured creditors, SeeCubic made the following request:

> SeeCubic hereby request and directs that, upon receiving notice that the [Shares] have been registered in the name of [Stream], Hawk enforce remedies in respect of the Collateral pursuant to the Stream Security

6

Agreements and the Uniform Commercial Code, including without limitation, … having the [Shares] registered in the name of Hawk [and] voting the [Shares] as directed by SeeCubic.

Dkt. 316 Ex. A (the "September 29 Letter").

At 11:45 a.m. on September 30, 2022, SeeCubic informed the court that "this morning, SeeCubic caused Technovative to transfer title to the common stock of Technovative from SeeCubic to Stream." Dkt. 310 at 2. SeeCubic provided a copy of its stock ledger evidencing the transfer of the Shares from SeeCubic to Stream. *Id.* Ex. A. SeeCubic took the position that because it had taken this step, it had complied with the Transfer Obligation, and the Motion to Enforce was moot.

Twenty-three minutes later, in a letter attached to an email sent at 12:08 p.m., Hawk's counsel instructed Stastney, acting in his capacity as a director and officer of Technovative, to register the Shares in the name of Hawk. Dkt. 312 Ex. A. The letter consisted of two pages of dense legalese. *Id.* It could not have been drafted in the twenty-three minutes that elapsed between the filing of SeeCubic's letter to the court and the sending of the email. SeeCubic and Hawk plainly planned the sequence in advance, as demonstrated by the September 29 Letter.

In an email sent three minutes later, at 12:11 p.m., Stastney wrote: "Received and acknowledged, attached please find a copy of the updated official stock ledger of Technovative. We will await Hawk's further instructions." *Id.* Stastney could not have reviewed Hawk's letter, considered its implications, and updated Technovative's stock ledger in the three minutes that elapsed between the sending of Hawk's email and his response. Hawk and Stastney plainly planned the sequence in advance.

7

At 1:18 p.m. on September 30, 2022, Hawk informed the court that it had issued a "Proxy Notice" to a "Technovative officer/director demanding that Hawk be listed as the holder of record of all Technovative stock in the Technovative share registry." Dkt. 311 at 1. Hawk reported that the "officer/director" had complied with the request. Hawk also informed the court that it had acted by written consent as Technovative's sole stockholder to remove all of the existing directors of Technovative, amend the Technovative bylaws to reduce the number of directors, and elect Stastney as Technovative's sole director. Hawk stated that as a result of its exercise of those rights, Hawk had assumed control over Technovative and intended to proceed to exercise its remaining rights as a secured creditor, including proceeding with a sale pursuant to Article 9 of the Uniform Commercial Code. *Id.* at 2.

Hawk's written consent consisted of three pages of carefully drafted legalese. Dkt. 315 Ex. C. The consent attached a set of amended and restated bylaws for Technovative that consisted of fourteen pages of carefully drafted legalese. Hawk could not have drafted the written consent and bylaws, served them on Technovative, and then written the court in the sixty-seven minutes between Stastney's email response and counsel's letter. Hawk had the written consent and the bylaws ready to go, because everything had been stage managed in advance.

At 3:04 p.m. on September 30, 2022, Stream filed the Emergency Motion. Dkt. 312. Stream asserted that SeeCubic, Hawk, and Stastney acted in concert to effectuate a transfer of the Shares from SeeCubic to Hawk in a contumacious violation of the Partial Final Judgment and the Post-Remand Injunction. Stream maintained that the court plainly

8

contemplated that Stream would have control over the Shares for an interval measured in days rather than minutes. Stream explained that SeeCubic and Hawk necessarily acted in concert to orchestrate the sequence of events that occurred between 11:45 a.m. and 1:18 p.m.

As relief, the Emergency Motion seeks an order vesting ownership of the Shares in Stream. It also seeks an order enjoining SeeCubic and anyone acting in concert with SeeCubic, including Hawk and Stastney, from interfering with Stream's ownership of the Shares until further order of the court.

The court directed SeeCubic and Hawk to respond to the Emergency Motion within twenty-four hours, with their filings due on a Saturday. The court afforded Stream the opportunity to reply on Sunday. In the best tradition of this court, counsel complied.

SeeCubic reiterated that it sought to comply with the Partial Final Judgment by transferring the Shares. Dkt. 316. SeeCubic stressed that it had transferred the Shares to Stream and not to Hawk. SeeCubic acknowledged the September 29 Letter and its instruction that Hawk enforce its creditors' rights after receiving notice that the Shares had been transferred. To counsel's credit, SeeCubic did not try to hide the fact that it gave Hawk a heads up about what was coming so that Hawk could be prepared to exercise its rights before Stream could respond.[1]

---

[1] One suspects that there may have been more communications behind the scenes.

Hawk explained that it had "implemented a reasoned strategy to exercise its contractual rights as a secured creditor of Stream" and that it had "strived to ensure that it was in full compliance with the Court's various orders, instructions, and mandates." Dkt. 315 ¶ 1. Hawk stressed that it had always made clear its intention to exercise its rights as a secured creditor as soon as possible, so when the transfer of the Shares created the opportunity, Hawk acted. *Id.* ¶ 2. Hawk represented that it intended to file promptly a petition under Section 225 of the Delaware General Corporation Law, 8 *Del. C.* § 225, to resolve the validity of Hawk's exercise of its creditors' rights at the trial court level. *Id.* ¶ 3. Hawk represented that to the extent it had failed to comply with the court's orders, it would take whatever steps were necessary to remedy the situation, but asked that any ruling provide clear guidance as to when Hawk could exercise its contractual rights. *Id.* ¶ 4.

Hawk responsibly acknowledged that it "could have waited longer to exercise its rights" and given Stream an opportunity to act, but Hawk maintained that anything Stream did would breach its contractual obligations to the secured creditors, and Hawk saw no need to afford Stream an opportunity to engage in a contractual breach. *Id.* ¶ 23. According to Hawk, "[b]y acting swiftly, Hawk avoided the unnecessary step of Stream ignoring—without justification—Hawk's Proxy Rights." *Id.*

Hawk also commendably acknowledged that the court "may wish to maintain the status quo pending resolution of the anticipated Section 225 Action." *Id.* ¶ 25. Hawk offered to enter into "a voluntary status quo order that would preclude any actions that would encumber the [Legacy Stream Assets] pending resolution of the Section 225 Action." *Id.*

In its reply, Stream cast SeeCubic and Hawk as having engaged in "a scam that did not satisfy any of the actual written injunction obligations." Dkt. 317 ¶ 2.b. Stream stressed that that Hawk had asked to exercise its creditors' rights in the Modification Motion. Then, after the court issued the Modification Denial, SeeCubic and Hawk engineered a transaction that achieved the result Hawk had sought. *Id.*

Stream also suggested that the court had "misjudged the underlying morality narrative" and was viewing the secured creditors as "white hat entities," while presumably casting Stream's principals in the black hat roles. *Id.* ¶ 5 n.3. The court has not approached this case at any point with an eye towards making the good guys win and the bad guys lose. Rather, the court has sought to enforce the governing legal framework. Before the issuance of the Delaware Supreme Court's decision, the court viewed the Omnibus Agreement as providing that framework, and the court therefore sought to enforce it. It is true that Stream's principals did not enhance their credibility when they sought to evade the Injunction Decision and to create what this court previously described as "litigation chaos." *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 5816820, at *1 (Del. Ch. Dec. 8, 2021) (subsequent history omitted). Eventually, however, Stream ended up with its current counsel, pursued an appeal, and secured a reversal of this court's decision. Regardless of how a trial judge might regard the opposite substantive outcome, that is how the system is supposed to work.

Since the Delaware Supreme Court's decision, the court has sought to implement the Mandate while at the same time recognizing that the secured creditors possess what appear to be powerful rights. It is true that the court has not provided Stream with the

11

immediate relief it has demanded, but that is not because of any bias against Stream's principals or favoritism towards the secured creditors. The court rather has sought to navigate the difficulties that rescinding a transaction invariably presents while taking into account the implications of the secured creditors' rights.

## II.    LEGAL ANALYSIS

The Emergency Motion seeks to hold SeeCubic, Hawk, and Stastney in contempt. Courts have inherent authority to impose contempt sanctions as a means of enforcing their orders. *DiSabatino v. Salicete*, 671 A.3d 1344, 1348 (Del. 1996) ("Courts have 'an inherent contempt authority, . . . as a power necessary to the exercise of all others.'" (quoting *United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994))). The power "is essential to the administration of justice." *Id.* (quoting *Young v. United States ex rel. Vuitton et Fils, S.A.*, 481 U.S. 787, 795 (1987)). Court of Chancery Rule 70(a) codifies this court's inherent authority to enter contempt sanctions for noncompliance. The rule recognizes that the court may "adjudge [a] party in contempt" if the party "fails to comply within the time specified" with "a judgment direct[ing] a party to . . . perform any . . . specific act." Ct. Ch. R. 70(a).

To be held in contempt, a party must be bound by an order, have notice of it, and nevertheless violate it. *Arbitrium v. Johnston,* 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 2009). Notably, intent is not an element of an application to enforce an order by holding a party in contempt. "The moving party is not required to show that the violation was willful or intentional, but the intentional or willful nature of a contemnor's acts may be considered in determining the appropriate sanction." *Litterst v. Zenph Sound Innovations, Inc.*, 2013 WL 565137, at *3 (Del. Ch. Oct. 17, 2013) The contemnor must know about the order, but

it is not a defense for contemnor to claim that it did not intend to violate the order or that the contemnor misunderstood the order. *See Mother African Union First Colored Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church*, 1998 WL 892642, at *6 (Del. Ch. Dec. 11, 1998) ("Thus, if the respondents' actions are violative of this Court's Order, their state of mind is immaterial for purposes of contempt adjudication, but the intentional or willful nature of their acts may be considered in determining the appropriate sanction.").

Whether a party should be held in contempt is a discretionary matter for the Court. *Dickerson v. Castle*, 1991 WL 208467, at *3 (Del. Ch. Oct. 15, 1991). The violation "must not be a mere technical one, but must constitute a failure to obey the Court in a meaningful way." *Id.* at *4 (internal quotation omitted).

## A.    SeeCubic, Hawk, And Stastney Are In Contempt.

Through the Transfer Obligation, the Partial Final Judgment ordered SeeCubic to transfer the Legacy Stream Assets to Stream. SeeCubic, Hawk, and Stastney plainly knew about it.

Through the Post-Remand Injunction, the Partial Final Judgment ordered SeeCubic not to act in concert with any other parties for the purpose of using Legacy Stream Assets for any purpose outside of the ordinary course of business. SeeCubic, Hawk, and Stastney plainly knew about it. Indeed, they sought to modify it so that Hawk could enforce its rights as a secured creditor.

Rather than complying with the Transfer Obligation and the Post-Remand Injunction, SeeCubic, Hawk, and Stastney acted in concert to evade those obligations. For

13

months, SeeCubic failed to comply the Transfer Obligation. SeeCubic raised arguments about how difficult it was to comply. SeeCubic also advanced arguments about creditors' rights. It is now clear how easy it was for SeeCubic to comply. All it took was an updated stock ledger restoring title to the Shares to Stream.

Once it became clear that the court would order SeeCubic to transfer the Shares to Stream, SeeCubic, Hawk, and Stastney coordinated to ensure that the Shares would end up in Hawk's hands. The choreographed sequence of events took place during an extended lunch hour, starting at 11:45 a.m. and ending at 1:18 p.m. It was not possible for Hawk and Stastney to have taken the actions they did without advance notice, preparation, and an overarching plan.

Those actions violated the Transfer Obligation and the Post-Remand Injunction by ensuring that the Shares ended up with Hawk rather than Stream. The parties' actions in this case resemble the events in *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647 (Del. Ch. Nov. 17, 2014). There, an entity (Related Sub) entered into a stipulated order under which it committed to hold $11.8 million on behalf of another entity (Network) pending the outcome of an arbitration between the owners of Network. *Id.* at *6. One of the disputants (Samson) controlled Network. After the arbitral panel ruled against Samson, Related Sub could have released the funds to Network in a manner that would have enabled the prevailing party to assert its rights to all of the released funds. Instead, Related Sub coordinated with Samson so that he could immediately distribute the money to the investors in Network, including himself, before the prevailing party could assert its rights. Samson was thus able to wire $5.8 million to himself and a colleague that they otherwise could not

14

have received. The court held that the parties' coordinated conduct violated the stipulated order. *Id.* at \*37. SeeCubic, Hawk, and Stastney essentially did the same thing.

SeeCubic and Hawk have argued in response that their actions did not change the facts on the ground because Hawk is only the nominal holder of the Shares, with Stream remaining the equitable owner. They insist that Hawk only possesses title for the purposes of exercising its rights as a creditor, with actual title passing to the successful bidder in an Article 9 sale. Hawk points out that Stream will be able to participate in the sale and could be the successful bidder. Hawk also points out that Stream will be entitled to receive any proceeds from the sale to the extent they exceed the amount of the secured debt.

That is all true, but SeeCubic and Hawk's coordinated effort still changed the facts on the ground. The Partial Final Judgment envisioned Stream having the opportunity respond to the secured creditors with the benefit of the Legacy Stream Assets. Through their choreographed actions, SeeCubic, Hawk, and Stastney prevented Stream from ever having that chance.

## B.    The Remedy

As a remedy for the contumacious conduct, Stream seeks two forms of relief. First, Stream seeks an order divesting Hawk of its ownership of the Shares and vesting ownership in Stream. Second, Stream seeks an injunction barring SeeCubic and any party acting in conjunction with SeeCubic from interfering with Stream's ownership of the Shares pending further order of the Court.

"A trial judge has broad discretion to impose sanctions for failure to abide by its orders" but its "decision to impose sanctions must be just and reasonable." *In re*

15

*TransPerfect Glob., Inc.*, 2019 WL 5260362, at *13 (Del. Ch. Oct. 17, 2019) (internal quotations omitted) (quoting *Gallagher v. Long*, 940 A.2d 945 (Del. 2007) (TABLE) (citing *Lehman Cap. v. Lofland*, 906 A.2d 122, 131 (Del. 2006) (internal citations omitted)); *see also In re Rinehardt*, 575 A.2d 1079, 1082 (Del. 1990); *Rittenhouse Assocs. v. Frederic A. Potts & Co., Inc.*, 382 A.2d 235, 236 (Del. 1977). In selecting contempt sanctions, the court is "obligated to use the least possible power adequate to the end proposed." *TransPerfect*, 2019 WL 5260362, at *13.

A remedy for contempt may be either civil or criminal. A contempt remedy is civil in nature if it serves to coerce compliance with the order being violated or to remedy injury suffered by other parties as a result of the contumacious behavior. *Del. State Bar Ass'n v. Alexander*, 386 A.2d 652, 665 (Del. 1978). A contempt remedy is criminal in nature if it is punitive. *Id.* If the court seeks to impose a criminal sanction for contempt, then additional requirements apply. *Id.*

In this case, the sanctions that the court will impose seek only to remedy the non-compliance. Their only effect is to enforce the Partial Final Judgment in a manner that recreates the closest possible approximation of the state of affairs that existed in fall 2020, before the issuance of the Injunction Decision.

### 1.    The Ownership Remedy

The menu of remedies that a court has available to enforce its orders includes the ability to declare the ownership of property that is within the court's jurisdiction. Court of Chancery 70(a) states: "If real or personal property is within the jurisdiction of the Court, the Court in lieu of directing a conveyance thereof may enter a judgment divesting the title

of any party and vesting it in others and such judgment has the effect of a conveyance executed in due form of law." Ct. Ch. R. 70(a).

Shares of stock in a Delaware corporation are personal property within the jurisdiction of the Court. *See* 8 *Del. C.* §169. Technovative is a Delaware corporation. The Shares are therefore within the jurisdiction of the court.

The parties have not cited, and research has not revealed, a ruling in which the court has invoked its authority under Rule 70(a) to address the ownership of shares. That does not mean it has not happened. The form of relief is straightforward and could have been implemented in an unreported order.

In any event, the fact that a particular form of relief is unprecedented does not mean it is unwarranted or unavailable. "[W]here the circumstances of the case are such as to require the application of equitable principles, the fact that no precedent can be found in which relief may be granted under a similar state of facts is no reason for refusing relief." *Modern Dust Bag Co., Inc. v. Com. Tr. Co.*, 91 A.2d 469, 469 (Del. Ch. 1952). *"*Extraordinary facts will sometimes call for extraordinary remedies." *Cantor v. Fitzgerald*, 2001 WL 536911, *3 n.18 (Del. Ch. May 11, 2001). "[O]nce a right to relief in Chancery has been determined to exist, the powers of the Court are broad and the means flexible to shape and adjust the precise relief to be granted so as to enforce particular rights and liabilities legitimately connected with the subject matter of the action." *Wilmont Homes, Inc. v. Weiler*, 202 A.2d 576, 580 (Del. 1964) (citations omitted). Equity requires the court "to adapt the relief granted to the requirements of the case so as to give to the parties that to which they are entitled." *Id.*

Divesting Hawk of its purported ownership of the Shares is a fair and equitable result. It remedies the choreographed transfer of the Shares from SeeCubic to Hawk and achieves the outcome intended by the Partial Final Judgment. Accordingly, Hawk is divested of title to the Shares, which is vested in Stream.

As with the Partial Final Judgment itself, this ruling is without prejudice to the ability of Hawk and SLS to exercise their rights as secured creditors. They must exercise those rights, however, after Stream has had a fair opportunity to assert control over its assets. That reality leads the court to impose a further remedy.

### 2. The Injunctive Remedy

A court can enter injunctive relief to enforce its orders. The Transfer Obligation is an example of a mandatory injunction. The Post-Remand Injunction is an example of a prohibitive injunction. To ensure that parties fulfill the intent of the Partial Final Judgment, additional albeit limited injunctive relief is warranted.

The court's goal since the issuance of the Mandate has been to restore the parties as closely as possible to the state they occupied in fall 2020, before the issuance of the Injunction Decision. At that point, Stream owned the Legacy Stream Assets, including the Shares. The secured creditors were pursuing an action to foreclose on the Legacy Stream Assets in Delaware Superior Court, but they had not yet exercised any of their extra-judicial rights. To the extent that the secured creditors had sought then to exercise their extra-judicial rights, Stream would have owned the Legacy Stream Assets and potentially been in a position to resist. The creditors did not have Stastney as their man on the inside to carry out their demands.

18

The current situation therefore does not restore the status quo. By acting as they did, SeeCubic, Hawk, and Stastney took advantage of the privileged position that they held as a result of the Injunction Decision. In an effort to perpetuate that privileged position, they choreographed the events of September 30, 2022. But the Delaware Supreme Court has determined that the Injunction Decision was erroneous, so SeeCubic, Hawk, and Stastney never should have enjoyed the privileged position that they occupied, and they should not have been able to perpetuate that privileged position through a choreographed transfer of the Shares.

An injunction is necessary to restore a first approximation of status quo as it existed in fall 2020 and to create an environment in which Stream has the ability to take control over its assets and prepare to respond to the secured creditors' exercise of their rights. The question is how long that injunction should last.

Stream asks for an indefinite injunction that would endure until the court orders otherwise. Stream has not articulated grounds for an injunction of such duration. One might surmise that after being without the Legacy Stream Assets for eighteen months, Stream believes that it should have a lengthy period to get back on its feet before confronting its creditors.

The problem with that outcome is that in fall 2020, when the Injunction Decision issued, Stream was failing and had defaulted on its secured debt. Although SLS and Hawk had not yet exercised their extrajudicial rights, they had the ability to do so at any time.

The equities of the case warrant restoring Stream to the position it occupied in fall 2020. The equities do not warrant putting Stream in a substantially better position than it

was in back then. As a practical matter, Stream will be in a better position, because SeeCubic turned around what had been a failing business, and Stream is getting that business back. That near term outcome is unavoidable and is part of what will necessitate the adjudication of SeeCubic's claim for unjust enrichment, at least to the extent Stream retains its assets. Stream need not receive further benefits in terms of an indefinite stay from this court.

An injunction with a duration of ten days is sufficient. That result gives Stream ten more days than it had in fall 2020. Stream is therefore better off, but not appreciably so.

For a period of ten days, SeeCubic, Hawk, Stastney, and anyone acting in concert with them are enjoined from taking any action to interfere with Stream's ownership of the Shares. During that period, Stream may freely exercise the rights associated with the Shares. Once the eleventh day, the starting gun will fire, and SeeCubic, Hawk, and Stastney may pursue whatever rights they believe they have.

## III.    CONCLUSION

The Emergency Motion is granted in part. Title to the Shares is vested in Stream. For a period of ten days, SeeCubic, Hawk, Stastney, and anyone acting in conjunction with them are enjoined from interfering with Stream's ownership of the Shares or with Stream's exercise of rights associated with the Shares.

20