# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

REMBRANDT 3D HOLDING LTD,

        Plaintiff,

    v.

TECHNOVATIVE MEDIA, INC, HAWK
INVESTMENT HOLDINGS LTD., and
SEECUBIC, INC.,

        Defendants.

C.A. No. [_____]

**JURY TRIAL DEMANDED**

## COMPLAINT FOR INJUNCTIVE RELIEF
## AND MISAPPROPRIATION OF TRADE SECRETS

Plaintiff Rembrandt 3D Holding Ltd ("R3D"), by and through their counsel and for their

Complaint against Technovative Media, Inc. ("Technovative"), Hawk Investment Holdings Ltd.

("Hawk") and SeeCubic, Inc. ("SeeCubic") hereby alleges as follows:

### PARTIES

1.     Plaintiff is a corporation organized and existing under the laws of the Island of

Nevis with a registered address at Suites 5&6 Horsfords Business Centre, Long Point Road,

Nevis, West Indies.  Plaintiff is the owner of all of the assets of 3D Fusion Corp. ("3D Fusion"),

a Delaware corporation formed on March 26, 2007 with its principal office at 110 Wall Street in

New York City and its wholly owned Dutch subsidiaries 3D Fusion Holding B.V. ("3D Fusion

Holding") and 3D Fusion EU B.V. ("3D Fusion EU") in Eindhoven, Netherlands.

2.     Defendant Technovative is a Delaware corporation that is wholly owned by

Stream TV Networks Inc., and upon information and belief became Stream's technology asset

and I.P. depository.  Stream TV Networks Inc. ("Stream") is also a Delaware corporation and has

its principal offices at 2009 Chestnut Street, Philadelphia, PA 19103.  Upon information and

belief Mathu Rajan is the C.E.O. of Stream and his brother Raja Rajan is the C.O.O. and together they have held the majority voting control of Stream since its formation in 2010.

3.    Stream and the Rajans were defendants in litigation brought by the Plaintiff in the Southern District of New York.  (Ex. 1.)  The litigation resolved through a settlement agreement that licensed R3D's intellectual property to Stream (Ex. 2) which included the trade secrets, patent, and trademarks owned by R3D.  The trade secrets licensed to Stream in the license agreement.  (Ex. 2.)

4.    The trade secrets licensed by R3D to Stream are embedded in the technology Stream included in its products and are known to the engineers that used to work with 3DFusion, then Stream, and now SeeCubic.

5.    Upon information and belief, Technovative has access to R3D intellectual property that was licensed to Stream.  Technovative would only have rights to manufacture and/or distribute the Steam product for benefit of Stream and R3D only pursuant to the license agreement between Stream and R3D.  (Ex. 2.)  The 3D no glasses technology is owned by R3D and is the intellectual property subject matter of this Complaint, to which Technovative has no right to transfer or to use outside of Stream's control.

6.    Defendant Hawk is a corporation in the United Kingdom with offices at Newport House, 15 The Grange Street, Peter Port, Guernsey.  Per Hawk's own filings in the Delaware Court of Chancery, Hawk is an investor in Stream and is seeking to take control of Technovative. (No. 2022-0930-JTL – Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et al.)

7.    Defendant SeeCubic is a Delaware corporation with offices at 667 Madison Avenue, New York, NY, United States, 10055.  Per SeeCubic's own filings in the Delaware Court of Chancery, SeeCubic is in control of an investment originally made by SLS Holdings VI,

LLC in Stream and has both threatened to misappropriate Plaintiff's trade secrets and has actually misappropriated Plaintiff's technology.  (No. 2020-0766-JTL – In Re Stream TV Networks, Inc. Omnibus Agreement Litigation.)  For a review of the previous Delaware Omnibus litigation please see Vice Chancellor Laster's opinion "Factual Background."  (Exhibit 3.)

## JURISDICTION AND VENUE

8.     This Court has jurisdiction based on diversity pursuant to 28 U.S.C. 1332 whereas plaintiff is a Nevis corporation, Technovative and SeeCubic are Delaware corporations and Hawk is a UK corporation and damages exceed $75,000.

9.     This Court has personal jurisdiction over Technovative and SeeCubic as both corporations are incorporated in Delaware.

10.     The Court has personal jurisdiction over Hawk as it has appeared in Delaware state court and availed itself of Delaware law to effectuate the misappropriation of R3D's trade secrets in violation of Delaware Code Title 6, Subtitle ll, Chapter 20, which states that "actual or threatened misappropriate may be enjoined[]" and further alleged in greater detail below.

## INTRODUCTION

11.     R3D is the owner and developer of multiple patents and trade secrets which comprise the 3D no glasses technology discovered by its C.E.O. Mr. Stephen Blumenthal. Blumenthal's discoveries came while working with his licensed Royal Philips WOWvx 3D hardware and software tools in the design of his 3D Auto Stereoscopic Display (3DASD) LCD technology platform.

12.     Stream came to R3D's predecessor, 3DFusion, as an investor in 2010 and the relationship became adversarial when R3D filed suit against Stream in the Southern District of

New York Court in 2017.  After four years of litigation, R3D's lawsuit against Stream was resolved in their signing a May 23, 2021 Settlement Agreement (Ex. 2).

13.     Stream developed a WOWvx, 2D Plus Depth 3D, no glasses LCD 3DTV based on licensing rights from both the Royal Philips company of the Netherlands and Rembrandt 3D Holding Ltd.  It is the R3D trade secret technology licensed to Stream and branded as the Ultra-D 3DTV, that Hawk and SeeCubic are attempting to misappropriate and to own through the current Chancery litigation against Stream and Technovative.

14.     The R3D trade secrets range from the repurposing of Philips' software tools resulting in massive 3D image correction and optimization opportunities, to the utilization of a Philips optical lens array in a manner not envisioned by Philips and consequently when coupled with other trade secret improvements to the Philips WOWvx 3DASD platform, new heights in operational and performance standards are achieved.

15.     Hawk and Stream are presently engaged in litigation in the Delaware Court of Chancery, (No. 2022-0930-JTL – Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et al.) in Hawk's effort to gain control of Technovative.  Hawk has publicly stated that if it gains control of Technovative and R3D's 3D trade secret property, Hawk intends to sell the intellectual property held by Technovative which includes the R3D trade secrets.  (Ex. 4 at ¶¶ 22, 86, The Hawk Complaint) ("Thereafter, Hawk may 'sell, lease or otherwise dispose of the Collateral in whole or in part, at public or private sale, on or off the premises of [Stream],' including pursuant to an Article 9 Sale.".)

16.     Indeed, by Hawk's own admission in its court filings, Hawk has already begun the process of seeking sale of R3D's trade secrets and products that when used would be covered by R3D patents:

On October 10, 2022, Hawk formally engaged SSG Advisors, LLC ("SSG")  to act
as investment banker in connection with the Article 9 Sale. SSG commenced
an analysis of Stream's business and affairs related to the Collateral from publicly
available information or other information in Hawk's possession as a result of its
past relationships with Stream.

(Ex. 4 at ¶ 55.)

17.    Thus it appears that the primary purpose of the Hawk Complaint is to facilitate the

court's support for the transfer and sale of the Technovative assets, particularly those related to

3D no-glasses intellectual property.  However, upon information and belief, the only such

intellectual property owned by Technovative comes from its relationship with Stream, and the

intellectual property provided to Stream under its license with R3D.

18.    Stream licensed the R3D patents and trade secrets because as WOWvx

foundational discoveries their application was central to Stream's Ultra-D 3DTV's key 3D image

quality corrections, and optimizations.

19.    Both SeeCubic and Hawk had prior knowledge of the trade secret being

misappropriated.

20.    SeeCubic's C.E.O., Mr. Shadron Stastney, was active and the representative for

Stream in the settlement negotiations on April 12, 2019 and he signed the R3D Stream April 12,

2019 Settlement Term Sheet Agreement between Stream and R3D (Ex. 5).  The R3D Stream

April 12, 2019 Settlement Term Sheet Agreement included the list of R3D's trade secrets and

Mr. Stastney was fully aware of R3D's ownership of the trade secrets.  The former Stream

C.F.O., Shadron Stastney, formed SeeCubic and acquired rights of the former investors and

creditors of Stream.  SeeCubic sought to gain control of Stream's assets and an Omnibus

Agreement was executed that purported to transfer Stream's assets to SeeCubic, but litigation

was commenced in the Delaware Chancery Court and the Omnibus Agreement was later held to

be invalid (No. 2020-0766-JTL – In Re Stream TV Networks, Inc. Omnibus Agreement Litigation).

21.     Upon information and belief, Technovative as the wholly owned subsidiary of Stream and had and has access to R3D intellectual property that was licensed to Stream.  The R3D license granted to Stream states: "Either Party may sub-license their rights to other parties for the purpose of having products distributed by the Party." but no other sub-licensing is permitted.  (*See* Ex. 2 at ¶ 14.)

22.     Hawk does not have an assignment of the license (Ex. 2) indirectly or directly from R3D.  It is not entitled to transfer, convey, sell, dispose, or use the R3D technology without a license.  As a wholly owned subsidiary of Stream, Technovative would have a right to supply/distribute product for the benefit of Stream or R3D, under the terms of the license granted to Stream by R3D.  (*See* Ex. 2 at ¶ 14.)  However, Technovative has no rights to the technology independent of Stream and cannot sublicense the technology to Hawk or SeeCubic, nor would it have any right to use the technology for the benefit of any party other than R3D or Stream without authorization from R3D.

23.     Since Hawk has publicly stated that it seeks to take control of Technovative and sell R3D's assets (i.e., R3D's patents and trade secrets), R3D seeks to enjoin Technovative from transferring, conveying, selling, disposing or utilizing the technology to any party that does not have a license (including Hawk or any Hawk designee) and to further enjoin Hawk from selling, transferring, conveying, disposing or utilizing the technology without a license.

24.     SeeCubic C.E.O. Stastney stated, "Since the Court entered the Order Granting Preliminary Injunction on December 8, 2020, SeeCubic has raised and deployed in excess of $10 million in order to further develop the glasses-free 3-D technology first started by Stream."

However, "the glasses-free 3-D technology first started by Stream" included R3D's technology and was retroactively licensed to Stream through the settlement agreement. (Ex. 2).

25.    SeeCubic has also demonstrated R3D's technology at trade shows, representing that R3D's technology is its own. (*See* Exs. 4 & 5.) Further, SeeCubic provided a TV incorporating Plaintiff's patents and trade secrets to multiple entities, including one in Dubai, **(**Ex. 6) and upon information and belief, to an entity in Korea.

26.    SeeCubic has misrepresented and falsely stated that it ***owns*** and had the rights to R3D's intellectual property. Moreover, Plaintiff alleges that SeeCubic had been on notice since SeeCubic's Chief Executive Officer, Shadron L. Stastney, was Stream's previous Chief Financial Officer and Director and had signed the April 12, 2019 Settlement Agreement with R3D. It was in that capacity as Stream's Director and CFO that Mr. Stastney was authorized to represent Stream during the Southern District of New York's mediation proceedings ordered by Judge Abrams and instituted because of Stream's breach of its contractual obligations to 3DFusion (and as successor in interest, R3D) related to the 3D trade secret technology.

During those proceedings, Mr. Stastney had personal knowledge and played a key role in the negotiations and executed the Rembrandt 3D Settlement Term Sheet, during the mediation. This document was signed by all parties including Magistrate Parker on April 12, 2019, and is unequivocal proof of Stastney's comprehensive knowledge of the R3D ownership rights, which he was obligated to disclose to his investors, customers and the courts. These documents support Plaintiff's allegation that Stastney knew about R3D ownership rights while authorizing SeeCubic's development and commercial markets expansion,

27.    Following the Settlement Term Sheet Agreement of April 12, 2019 signing, Mr. Stastney and Stream Board Member Mr. Mark Coleman initiated a private mediation follow-up

conference to discuss extending the payment runway of the terms in the Settlement Agreement with the intent of maintaining the net present value of the settlement. A private meeting with counsel was held in July, 2019 resulting in an 'Extension' document being drafted. This document was never signed due to the removal of Mark Coleman and Leo Hindery Jr., Stream's board of directors. Negotiations ceased thereafter. Both of those directors, Mr. Coleman and Mr. Hindery Jr., are currently directors on the SeeCubic board, and as of at least 2019, were well aware of R3D's ownership of the intellectual property at issue.

28.    This Settlement Term Sheet Agreement of April 12, 2019 and the Definitive Settlement Agreement of May 23, 2021, which was signed by both Mathu and Raja Rajan as representative Officers of Stream and for themselves as individuals, provide a list of intellectual property licensed to Stream and specifically recites the trade secrets that are owned by R3D and licensed to Stream. Each of these trade secrets is included in the Stream products and technology that SeeCubic, Hawk, and Technovative are attempting to transfer without an assignment of the license from R3D to Stream or a direct license from R3D.

29.    These two Settlement Agreement documents are both clearly affirming market valuation of the R3D's ownership rights which were licensed for $5.8 million, and hundreds of millions in future profits, plus two million in warrants and other considerations. These substantial compensations were all agreed to in exchange for R3D licensing rights as per the Settlement Agreement documents, signed by Stastney and the Rajans. There can be no dispute that Stastney knew that he was trampling on R3D's ownership rights by authorizing SeeCubic's developmental and worldwide commercial market penetration expansion.

30.    Shad Stastney, SeeCubic's CEO, signed the initial Settlement Term Agreement on April 12, 2019 more than one year prior to the Omnibus Agreement, whichconfirms that Mr.

8

Stastney knew at the time of the signing of the Omnibus Agreement that Stream did not own the 3D no glasses technology, but merely had a license from R3D.  (Ex. 5.)

31.     Upon information and belief, Mr. Stastney understood that Stream needed a license because the 3DFusion technology was as foundational to their platform as was the Philips WOWvx License.

32.     Mr. Stastney had also ascertained the value of R3D's technology, and agreed to a settlement and license payment that was identical to final license terms.  Stream agreed to pay R3D $5,840,000 in cash, 2,000,000 warrants to purchase Stream stock, 100 4K TVs for no charge, 8 8K prototypes at no charge, and the right to purchase 3,015,000 8K 3DASD LCD units at cost for a total value of between $368,207,000 and $1,212,407,000.  (Ex. 2.)

33.     Mr. Stastney, thus, has been on notice since at least April 12, 2019 that subsequent efforts to develop and commercialize the technology by SeeCubic and Hawk without a license is unlawful, and a misappropriation of R3D's trade secrets.

34.     Further actions demonstrating SeeCubic's willful disregard of R3D's rights are found in the published court proceedings, post the Omnibus Agreement, in which SeeCubic states that their business is developing new products based on Stream's (R3D) technology and that the company has been turned around, and as the court notes is now 'robust'.  (Ex, 6 at 2-3.) ("Since the Court entered the Order Granting Preliminary Injunction on December 8, 2020 (Dkt. 111, the 'PI Order'), SeeCubic is thriving and has raised and deployed an excess of $10 million in order to further develop the glasses-free 3-D technology first started by Stream.  SeeCubic has purchased millions of dollars of equipment and inventory, doubled the size of its staff by (among other things) bringing back all the key members of the Ultra-D founding team from the Netherlands, who had left Stream when the Rajans were exercising control.  SeeCubic has also

9

reduced its debt by over 50%, and it is not in default on any debt." (internal quotations omitted)).[1]

36. SeeCubic has also demonstrated R3D's technology at trade shows, representing that R3D's technology is its own. (Exs. 7 & 8.) Further, SeeCubic provided a TV incorporating Plaintiff's patents and trade secrets to multiple entities, including one in Dubai (Ex. 9) and upon information and belief, to an entity in Korea.

36. Consequently, SeeCubic's activities to develop, commercialize and market the Ultra D 3D no glasses LCD platform technology, which they clearly state that they had acquired from Stream, was for developing the product and to make sales to customers, are all in direct violation of the R3D's ownership rights. SeeCubic could only engage in those efforts with a license. A license consistent with the one that SeeCubic's CEO had already negotiated and signed on behalf of Stream.

**FACTUAL BACKGROUND**

**THE PLAINTIFF AND ITS TECHNOLOGY**

37. Plaintiff Rembrandt is the successor-in-interest to 3DFusion, the original creator of the patents and trade secrets comprising the improved Philip's 3DASD technology (or glasses-free 3D autostereoscopic display technology). The relevant US patents include U.S. Patent Nos. 8,558,830, 9,681,114, and 9,521,390 (hereinafter, the '830, '114, and '390, patents, respectively). (Exs. 10-12.)

38. In February 2016, Mr. Stephen Blumenthal acquired all of the assets of 3DFusion, including the above-referenced patents and trade secrets comprising the 3D no glasses technology.

---

[1] Note that these are the very engineers that worked for the predecessor to R3D and SeeCubic who are stating it is further exploiting and misappropriating R3D's intellectual property.

39.     In December 2016, Mr. Blumenthal assigned all of 3DFusion's assets to Plaintiff.

40.     Mr. Blumenthal owns 100% of the outstanding shares of R3D and is the sole

officer.

41.     He is also the majority shareholder, President and CEO of Rembrandt 3D Corp.

("Rembrandt – Delaware"), a Delaware corporation.

42.     Mr. Blumenthal's work with glasses free 3D technology goes back many decades

and he founded 3DFusion and R3D and Rembrandt-Delaware to pursue the technology.

43.     In 2007 Philips offered to 3DFusion a 3DTV Glasses-Free 3D Auto-Stereoscopic

Display ("3DASD") solution known as the WOWvx Platform for displaying glasses free 3D

content and converting and generating 3D content from two-dimensional (2D) media content for

rendering on Philips's 3DASD monitors.  Philips invested 500 million dollars in the WOWvx

Platform because it is PC driven using mathematical algorithms to add depth and stereoscopic

information to 2D content (i.e., 2D+Depth) thereby creating 3DASD content.  It is proprietary

and exclusive to Philips via license access costing $100s of thousands annually.

44.     Philips licensed 23 other software 3D developers worldwide, of which 3DFusion

was one of three in the U.S.  3DFusion invested in the complete Philips no glasses 3D WOWvx,

2D Plus Depth math based, digitally driven LCD platform, and licensed the WOWvx BlueBox

Platform complete hardware, software and tools.  (*See* Ex. 13.)

45.     Only five other companies globally engaged the Philips technology developing

both hardware and software solutions.  3DFusion was the only Philips Licensee to engage optical

partners like Corning Glass for lenticular lenses development, and Purdue University for advance

LIDAR depth map image processing.

46.     The reason Philips invested over half a billion dollars in the technology and developed a complete A to Z workflow replacement for industrial, consumer, commercial, scientific and military video applications was because they knew that this digital algorithm technology would replace all 2D video imaging displays globally and would likely give birth to the first trillion-dollar enterprise.

47.     The Philips 3DSolutions corporate incubator's 3DASD solution suffered from significant image quality issues because the 3DASD content generated by the WOWvx Platform contained numerous artifacts such as ghosting and required weeks of manual post-processing to correct.

48.     Through extensive experimentation and research comprising more than 3,000 hours of 2D-to-3D-depth-map, rendering and rotoscoping, Mr. Blumenthal developed a novel and non-obvious methodology to correct the image quality issues in the 3DASD content generated by the Philips WOWvx Platform.

49.     The 3DFusion technology discovery found that two of the Philips tools which they considered 'constants' could be used 'dynamically' to adjust and 'dial in the 3D image.'. Blumenthal discovered that they were in fact variables providing an 'adjustability' solution to the major artifact issues plaguing the Philips 2D Plus Depth platform.

50.     Blumenthal's patented 'adjustability' solution cured the flawed half a billion dollar Philips technology and made it a marketable product.  Due to the Eindhoven's team inability to correct these flaws, (now SeeCubic's team, previously Stream's, originally 3DFusion's), Philips in 2009 shut down its 3DSolutions incubator, releasing the Eindhoven team, who 3DFusion immediately retained.

51.     Philips had solved all of the infrastructure issues of 3DASD commercialization, (except for Plaintiff's critical solution), so the segue from their R&D to consumer home, to all the scientific geo-spatially accurate, high value applications, is virtually seamless for all math based digital feed technologies, such as lidar, radar, MRI, x-ray to name a few.  Consequently, the Philips WOWvx platform with Plaintiff's technology has virtually unlimited value, and the Defendants know it—that's why they have been fighting so fiercely to acquire control.  What is perplexing is that Hawk and SeeCubic are seeking to acquire control from entities which possess the technology but don't own it.

52.     While 3DFusion had shared some the innovations it developed in patents, many other improvements were held as trade secrets and were only disclosed and developed under non-disclosure agreements with other parties.

53.     Philips, as a global licensing high tech company, had developed massive security and ownership safeguards into the WOWvx platform so that without direct license access to the components of the technology, no outside researcher, university developer or hacker could gain access to the hardware and software needed to fix their broken machine.  Without these licensed tools from Philips, it was not possible to correct the flaws and create a marketable product.

54.     Neither Stream nor SeeCubic had this license prior to 2011.  The 3DFusion patent filing and thus R3D's technology provided the 'adjustability' key, whose essential foundation components, opened the door for all future advancements.  Philips disbanded the failed 3DSolutions Eindhoven team prior to Blumenthal's discovery, proving it had no knowledge of Blumenthal's discovery prior to meeting and working with him.

55.     At Blumenthal's Eindhoven team departure dinner, their senior graphic artist made a toast, stating, "It took a tv repair guy from upstate New York to come and show us how

13

to fix our 3DTV. Thank you."  It was, amongst the Eindhoven team, an acknowledged fact that

Blumenthal's "magic" had saved their 3DTV.

56.     In a November 10, 2010 email from Dr. Bart Barenbrug, the head software

engineer for the Philips 3DSolutions Eindhoven team (for the 3DFusion team, for the Stream

team and for the current SeeCubic team,) stated the following in a correspondence with the

3DFusion C.E.O., Ilya Sorokin:

> Ilya,
>
> I did download all of them this morning and afternoon (US time).  I saw that in
> the ftp logs now, yesterday, but downloaded the proper one (if there's still time)
> or take an older version, if audio is needed (and it always help give more impact,
> imho). I made appropriate setting adjustments to maximize effects (Steve's
> magic). He's wizard at that for sure! and are ready to show them at the Bon Jovi
> event tomorrow.
>
> Great to hear that there was time.  Have a great show, and we'll talk afterward,
> Bart.

(Ex. 14.)

57.     The former Philips technical team, now the 3DFusion Eindhoven team, in January

2010, began working under the 3DFusion Dutch entity with Blumenthal for 15 months on 30

specific customer R&D projects developing and advancing Blumenthal's patented I.P.

58.     Mr. Blumenthal and 3DFusion developed trade secrets and filed for its own

patents far before Mr. Blumenthal ever met the Rajans.

59.     The first of 3 provisional patent filing dates is December 2008.

60.     In 2009, after Philips had shut down its 3DSolutions incubator, 3DSolutions'

senior management saw the 3DFusion solution.  Immediately the 3DSolutions senior

management group took Blumenthal's solution to Philips' senior management, who immediately

brought it to the attention of Philips' licensing division I.P.& S., recommending that 3DFusion

be given a full license to further develop the WOWvx platform.

61.   In April of 2010, after five months of negotiating with Philips Intellectual

Property and Standards division, (I.P. & S.), 3DFusion signed the first Philips Technology

license for their half a billion dollar investment in the 800 WOWvx, 2D Plus Depth patents,

tools, SDKs, and sublicensing rights.  (Ex. 15.)

## MEETING THE RAJANS AND STREAM

62.   In June of 2010, Mathu and Raja Rajan came to the 3DFusion NYC showroom to

view the 3DFusion Philips 3DASD unit.  Upon seeing the demonstration, they immediately

signed NDAs.  (Exhibit 16.)

63.   At the time of this original June 9, 2010 NDA between Stream and 3D Fusion,

(now owned by R3D), Stream had no technology of its own.

64.   In June of 2010, all rights were held by 3D Fusion and therefore all improvements

to that technology made after the June 9, 2010 NDA were owned by 3D Fusion.  The NDA

clearly states that all derivative improvements are owned by 3DFusion.

> 2.3.2 all inventions, improvements, copyrightable works and designs relating to business
> plans, marketing plans, technology, machines, methods, compositions, or products of
> Disclosing Party directly resulting from or relating to the Confidential Information and the
> right to market, use, license and franchise the Confidential Information or the ideas,
> concepts, methods or practices embodied therein shall be the exclusive property of the
> Disclosing Party, and Recipient has no right or title thereto.

(Ex. 16.)

65.   In June of 2010 the Rajans began negotiating a funding deal representing a 20-

million-dollar US cable industry investor, Mr. Leo Hindery, Jr., who currently sits on the

SeeCubic Board.  The original Stream and 3DFusion term sheet was negotiated for several

months and then signed on September 28, 2010 by the Rajans on behalf of Stream and as

individuals.  (Ex. 17.)  At that time all business plans, personnel, technology, trade secrets, key

methods and assets were disclosed to the Rajans under Due Diligence guidelines in preparation for the December 2010 funding.

66.     As part of the September 28, 2010 Term Sheet Due Diligence transfer, Walther Roelen, the managing director and salaried head of 3DFusion's Dutch BV and the Director of the Eindhoven team, came in contact with the Rajans and betrayed his fiduciary duty and orchestrated the transfer of key 3DFusion assets and conveyed the Eindhoven team to Stream TV Network in January of 2011.

67.     The Eindhoven team, having worked under Blumenthal's supervision and control for 15 months, had extensive knowledge of Blumenthal's innovations—both patented and protected as trade secrets for 3DFusion.  Eindhoven team employees, in violation of their NDAs and fiduciary duties, disclosed 3DFusion's technology, I.P. and trade secrets to Stream TV Networks, and later to SeeCubic.

68.     The original technology developed by Blumenthal and 3DFusion was disclosed to the Eindhoven team after they were terminated from the Philips 3DSolution corporate incubator due to their failure to discover Blumenthal's solution, which is the basis for the Stream improvements over the old Philips technology.  These advancements are integrated into all the Stream technology and products and are embedded in the Ultra-D 3DTV's user friendly On-Screen Display to provide customer remote control adjustability to the 3D image, among other functions.

69.     These events and agreements were the basis for the R3D lawsuit filed in January 2017 against Stream, Mathu Rajan, and Raja Rajan.

70.     3DFusion Corp. has since dissolved and all of its rights to intellectual property and technology have been assigned to R3D.

71.     Stephen Blumenthal is the sole shareholder and managing member of R3D.  R3D holds title to the intellectual property developed by Stephen Blumenthal and his former company 3DFusion Corp.

## PROCEDURAL BACKGROUND

72.     Plaintiff filed a complaint in the New York State Supreme Court in January 2017 against Stream TV Networks, Inc., Mathu Rajan, and Raja Rajan.

73.     Defendants removed the state action to the United States District Court for the Southern District of New York.

74.     R3D filed a first amended complaint.  (Ex. 1.)

## MEDIATION CONFERENCES AND THE SETTLEMENT TERM SHEET

75.     At the First Mediation Conference, held under Magistrate Judge Parker, Southern District of New York, on July 18, 2018, Plaintiff demonstrated its 3DASD original 3D technology using the original 3DFusion equipment that had been loaned to Stream in 2010. Stream had falsely claimed in a February 2011 Philadelphia newspaper article that the technology was theirs, while the laptop and media player being photographed in the article was all R3D or 3DFusion loaner equipment which they had refused to return.  (Ex. 18, Newspaper article.)

76.     After the First Mediation Conference, and for the following six months, the parties corresponded settlement terms via email and conducted several in-person settlement conferences at Stream offices in Philadelphia with Messrs. Blumenthal, Michaels, and Wallace representing the Plaintiff, and Mr. Raja Rajan representing the Defendants.

77.     The parties exchanged various redlined proposals and R3D continued to informally share additional evidence documenting the various trade secrets and prior

communications between the Eindhoven team and 3DFusion, verifying the R3D IP ownership.
At no time did Stream present any evidence to the contrary.

78.     On January 11, 2019, more than six months after the First Mediation Conference,
Magistrate Judge Parker ordered parties to attend a second settlement conference in person with
counsel on April 9, 2019 (the "Second Mediation Conference").  The parties negotiated the
various terms from the previously developed Redlined Term Sheet through Magistrate Parker.
Magistrate Parker had ordered that all parties with the authority to bind their respective
companies attend the Second Mediation Conference in person with counsel on April 9, 2019.
("The Second Mediation Conference".)  At this meeting the parties negotiated the various terms
from the previously developed Redlined Term Sheet through Magistrate Parker.

79.     By late afternoon, after the parties reached mutual agreement to the various
negotiated changes to the Redlined Term Sheet, Mr. Kronley, attorney for Stream, made hand-
written agreed modifications thereto; the parties, with Mr. Stastney representing Stream and Mr.
Blumenthal representing R3D, then indicated assent by mutually initialing the modified Redlined
Term Sheet; Magistrate Judge Parker then affixed her signature thereto (the "Settlement Term
Sheet" attached as Ex. 5).

80.     As part of these negotiations, a list of R3D Trade Secrets was developed and
included as an exhibit to the drafts of settlement term sheets, specifically, the parties had agreed
that the following list of R3D trade secrets were to be licensed to Stream as part of any

settlement and were included in the Second Mediation Conference Settlement Agreement,

---

**SCHEDULE A**

1. Knowhow and trade secrets related to methodology for:
a. efficiently converting, correcting and optim ng a 2D+Depth video for playback on a 3D
   autostereoscopic as     iated with the Phi  p  technology
b. utilizing the Philips 2d Switchable Lens technology for refractive and defractive lens switching
   for the creation of the 'lightfield' and 3d content artefact correction.
c. utilizing the On Screen Display functions of Borders and "Liveliness."
2. Trademarks
3. the patents asserted in Remb  andt's First Amended Complaint, and dismissed by the Court on
   March 28, 2018 (ECF No. 47)

---

81.     R3D, Stream, Mathu Rajan, and Raja Rajan via phone, attended the Second

Mediation Conference in Magistrate Parker's chambers, reached an initial Settlement Term Sheet

executed by Stream's CFO, Shadron Stastney (executing on behalf of Stream), on April 9, 2019,

and signed by Magistrate Parker and the parties.  Mr. Stastney is currently the CEO of SeeCubic.

82.     The Settlement Term Sheet executed by Mr. Stastney did not modify the list of

licensed trade secrets from prior drafts of the terms exchanged between counsel for the parties

with the immediate draft prior to the settlement conference having been draft by DLA Piper

(counsel for Stream working with Mr. Stastney) and the revisions during the conference were all

made by Mr. Kronley of DLA Piper, representing Stream and the Rajans.

83.     Eventually, R3D, Stream, Mathu Rajan, and Raja Rajan fully executed a

settlement agreement on May 23, 2021 that included the same list of R3D trade secrets used in

the previous Settlement Term Sheet.

84.     While capably represented by DLA Piper and under review and approval of

Magistrate Parker, R3D, Stream, Mathu Rajan, Raja Rajan, and Shadron Stastney all approved of

the list of trade secrets owned by R3D and licensed to Stream.

85.    Every TV sold by Stream incorporated the know-how and trade secrets and, but
for the license, infringed the patents referenced in the term sheet, so this settlement was and is
essential for Stream (or any assignee or successor) to continue selling product free of
infringement allegations.

86.    Given that Stream's intent is to operate as a manufacturer, R3D and Stream
designed a Non-Exclusive License which would support that strategy.  Therefore, Stream agreed
to pay R3D $5,840,000 in cash, 2,000,000 warrants to purchase Stream stock, 100 4K TVs for no
charge, 8 8K prototypes at no charge, and the right to purchase 3,015,000 8K 3DASD LCD units
at cost.  (Ex. 2.)

87.    R3D's SDNY case's final Settlement Agreement was signed by R3D, Stream,
Mathu Rajan, and Raja Rajan on May 23, 2021 ending the dispute and acknowledging R3D's
ownership rights to the technology and Stream's need for a license.

88.    Despite having knowledge of R3D's intellectual property rights and the trade
secret claims, neither Shadron Stastney nor SeeCubic ever provided R3D with notice of the
Omnibus Agreement or SeeCubic's attempts to transfer R3D's technology to its control.

89.    R3D became aware of Stream's Chapter 11 bankruptcy proceeding from public
notice.  Through its counsel, R3D sent an email to Stream's bankruptcy counsel (Ex. 19), the
counsel for creditors (Ex. 20), and the counsel for SeeCubic (Ex. 21) on April 20, 2021 to make
sure they each knew about R3D's ownership of the technology and to invite resolution.

90.    R3D also joined with other creditors to pursue an involuntary bankruptcy petition
for Stream and as part of its filings in support of the involuntary petition, R3D filed declarations
by Stephen Blumenthal (Ex. 22) and Christopher Michaels (Ex. 23).

91.     Prior to this filing, R3D has sent direct communications to counsel for both

SeeCubic, Hawk, and Technovative putting them on notice of R3D's rights, yet all three entities

continue pursue attempts to take possession of and use R3D's technology without a license.

## SUMMARY OF THE TRADE SECRETS – OVERVIEW OF THE EINDHOVEN TEAM AND 3DFUSION CONNECTION

92.     The trade secrets reflect a wide range of improvements developed by Mr.

Blumenthal and the 3DFusion team from 2007 to 2011.

93.     The 3DFusion Eindhoven team were required to sign NDAs for Philips I.P.& S.

on behalf of the 3DFusion EU B.V. as noted in the 3DFusion company meeting minutes, and on

behalf of 3DFusion USA.  It is clear that the Eindhoven team represented themselves as part of

the 3DFusion team with the authority to bind 3DFusion and 3DFusion EU B.V. to contracts.

94.     Walther Roelen was hired as 3DFusion EU B.V. C.E.O. in May of 2010.

Roelen's role as C.E.O. of 3DFusion EU, B.V. is verified by his bank account salaried payments,

Dutch Corporate documents, his emails stating his C.E.O. status, his signed NDA, and his email

confirming the 30 developmental projects in which he directed the team's activities during the

2010 15-month R&D cycle.

95.     Roelen was the primary individual to whom 3DFusion and the Eindhoven team

looked to for leadership, guidance and to exercise his fiduciary responsibility to protect

3DFusion's IP and trade secret discoveries.  Roelen betrayed this trust and actively engaged in

sabotaging 3DFusion EU's efforts by violating his ethical, technical, and fiduciary

responsibilities.

96.     During this time, the team generated approximately 2,000 pages of emails, 1,000

pages of documents, and spent 1,000s of hours working on content and sharing ideas and

advancements.  No attempt is made herein to explain all facets of each development, but rather to

provide a reasonable summary of the technology in question that was unique and proprietary to 3DFusion and now R3D.

### I. Relative Harm to Parties

<u>R3D</u>

97.    While negotiating the relative value of a fair settlement between R3D and Stream, both parties referenced the cost of obtaining a non-exclusive license to the underlying Philips technology and the cash component of the license was set at a similar value.

98.    Notably, the Philips technology was seriously flawed until Mr. Blumenthal applied his technical improvements.  Indeed, R3D had previous versions of the old Philips 3D sets and had provided demonstrations of how the Philips technology looked without R3D's technical improvements and the knowhow and trade secrets licensed to Stream.

99.    SeeCubic and Hawk are seeking to take R3D's technology without similar compensation for the license—indeed, SeeCubic has already claimed to ***own*** the technology despite the fact that R3D has only licensed the patents and trade secrets comprising the no glasses 3D technology.  The harm to R3D is (1) the destruction of its trade secrets, and (2) the use of said trade secrets and the patented technology without a license by SeeCubic and Hawk.

100.    R3D is free to license others and seek similar licenses.  However robust SeeCubic has become, they are not nearly as capable of a partner as Sony, Sharp, Samsung, LG, or any of the major LCD manufactures such that the value that R3D could expect from licensing its technology to other vendors is much higher.

101.    Further, R3D is actively seeking products for its own use, design collaborations to seek its own specification for particular and specialized applications.

102.    If Hawk or SeeCubic are allowed to transfer R3D's intellectual property without a license from R3D to other vendors, the damage to R3D will be irreparable and immediate and

will cut off R3D's ability to negotiate its own licenses and to control the specifications of glasses 3D products entering the marketplace. These damages cannot be fully addressed by monetary relief.

**Hawk**

103.    Hawk is not authorized to use R3D's technology and does not have a license to use R3D's knowhow, trade secrets, or patents.

104.    Hawk has threatened the sale of R3D's intellectual property, including its trade secrets (Ex. 4 at 17), which will cause irreparable harm to Plaintiff as once the trade secrets are disclosed any TV manufacturer or other receiving company could use them thereby destroying R3D's trade secrets.

**SeeCubic**

105.    SeeCubic is not authorized to use Plaintiff's technology and does not have a license to use Plaintiff's knowhow, trade secrets or patents.

106.    SeeCubic's threatened and actual misappropriation of Plaintiff's intellectual property, including its trade secrets, will cause and has caused substantial injury to Plaintiff.

**Technovative**

107.    Technovative is a wholly owned subsidiary of Stream, the latter of which possesses a license from R3D. Pursuant to the terms of the license, Technovative can only use R3D's technology to manufacture or distribute for the benefit of Stream and R3D. Upon information and belief, Hawk seeks to take control of Technovative for the purpose of selling intellectual property that includes R3D's technology—which Technovative does not own. Such a sale would cause irreparable harm to R3D as the dissemination of the trade secrets could never be contained or licensed.

## R3D'S CAUSES OF ACTION

## COUNT I-Injunction Against Hawk

108.    R3D incorporates by reference and realleges the preceding paragraphs 1 through 107 as if fully set forth herein.

109.    Delaware Code Title 6, Subtitle 11, Chapter 20, section 2002 states that "Actual or threatened misappropriation may be enjoined."

110.    Section 2001 defines misappropriation as "Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."

111.    Upon information and belief Hawk is aware that R3D owns its technology, that the technology is licensed to Stream, and that removing R3D's technology from Stream without a license from R3D would both cause Stream to breach its license with R3D and would be a misappropriation of R3D's trade secrets.

112.    Despite this actual notice of R3D's rights, Hawk has pursued actions to transfer control of R3D's technology outside of Stream to their own control and use.

113.    Hawk does not currently have a license from R3D.

114.    The potential misappropriation and breach of contract can be avoided if R3D's 3D No Glasses Technology does not leave Stream (or Technovative, if it has been assigned the license), or if the license agreement is assigned to the party taking possession of the technology along with the obligations under the license.

115.    The sale of R3D's assets would cause irreparable harm for which money damages would not adequately compensate R3D.  Plaintiff is therefore entitled to enjoin Hawk from selling, transferring, disposing, or assigning R3D's intellectual property to any party that does not possess a license.

## COUNT II-Injunction Against Technovative

116.    R3D incorporates by reference and realleges the preceding paragraphs 1 through 115 as if fully set forth herein.

117.    Pursuant to the Hawk lawsuit, Technovative may come under the control of Hawk which has publicly stated it then intends to have Technovative sell or transfer R3D's assets in derogation of R3D's rights.  Technovative is barred from such sale or transfer pursuant to the license agreement from R3D.  Such sale or transfer would irreparably harm R3D and money would not adequately compensate R3D.  R3D is entitled to enjoin Technovative from selling, transferring, disposing or otherwise assigning R3D's technology assets to any party unless that party has a license from R3D or assigned from Stream and fully complies with its terms.

## COUNT III-Actual Misappropriation by SeeCubic

118.    R3D incorporates by reference and realleges the preceding paragraphs 1 through 117 as if fully set forth herein.

119.    Indeed, SeeCubic brazenly markets R3D's Technology as its own: "SeeCubic is currently focused on working together with top-tier home and mobile device brands via strategic partnerships to deliver spectacular viewing experiences to all consumers.  We are bringing our technology to all popular device types we all use on a daily basis –televisions, mobile devices, computer screens, and even in-car displays." (Ex. 24.)

120.    Upon information and belief, SeeCubic has been using R3D's trade secrets for the purpose of advancing development of glasses-free 3D displays which constitutes a willing disclosure and misappropriation of R3D's trade secrets by SeeCubic.

121.    SeeCubic is managed by Shadron Stastney.  Mr. Stastney negotiated the license that Stream obtained to utilize the technology.  Mr. Stastney had actual knowledge of the misappropriation because he knew that Plaintiff owned the technology and that Stream needed a

license to possess and utilize it.  Nevertheless, Mr. Stastney has acted without a license.

Additionally, SeeCubic and Hawk were both apprised of R3D's rights in an email from its

attorney, Chris Michaels, Esq. on April 20, 2022.  (Emails attached as Exs. 25 & 26.)

122.    SeeCubic does not have, nor has it ever had, a license to utilize Plaintiff's

technology and its actual misappropriation has damaged Plaintiff.  Under no circumstance does

SeeCubic's or Hawk's control of Technovative provide SeeCubic with ownership of R3D's

technology.  R3D licensed its technology to Stream.  (Ex. 2.)

123.    Upon information and belief SeeCubic's attempts to share R3D's trade secrets

will result in the destruction of the trade secrets, and will cause significant harm to R3D.

### COUNT IV-Injunction Against SeeCubic

124.    R3D incorporates by reference and realleges the preceding paragraphs 1 through

123 as if fully set forth herein.

125.    In a letter dated August 2, 2022, Skadden Arps attorney, Jenness Parker, Esq.,

wrote to Vice Chancellor The Hon. J. Travis Laster stating that its client, SeeCubic, "SeeCubic is

exercising its right to possession of then collateral under Article 9 of the UCC and the security

documents.  It is also in the process of retaining an investment banker and will be pursuing a

public sale of the assets to satisfy the debt that Stream has failed to pay for well over two years

now." (Ex. 27.)

126.    SeeCubic's intent to sell Plaintiff's assets violates Delaware Code Title 6, Subtitle

11, Chapter 20, section 2002.

127.    SeeCubic has knowledge of Plaintiff's ownership rights and the sale of Plaintiff's

assets would cause irreparable harm to Plaintiff.

128.    SeeCubic does not have a license and has no right to possess, sell or transfer

R3D's 3D no glasses technology.  Its threat to do so should be enjoined.

26

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment for itself and against Defendants as follows:

A.  An adjudication that Defendants have misappropriated Plaintiff's trade secrets;

B.  An injunction against Defendants preventing the transfer of trade secrets licensed to Stream;

C.  A declaration that this case is exceptional under 35 U.S.C. § 285, and an award of Plaintiff's reasonable attorneys' fees, and

D.  An award to Plaintiff of such further relief at law or equity as the Court deems just and proper.


Dated:  February 21, 2023

*s/ Andrew DeMarco*
Andrew DeMarco, Esq. (DE No. 6736)
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251
ademarco@devlinlawfirm.com

*Attorneys for Plaintiff*
*Rembrandt 3D Holding Ltd*

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| REMBRANDT 3D HOLDING LTD | § | |
|     Plaintiff, | § | C.A. No. No. 17-CV-882 (RA) |
| v. | § | |
| STREAM TV NETWORKS, INC., | § | **First Amended Complaint** |
| MATHU RAJAN, and | § | |
| RAJA RAJAN | § | **1. Patent Infringement** |
|     Defendants. | § | **2. Breach of Contract** |
| | § | **3. Promissory Estoppel** |
| | | **4. Unjust Enrichment** |

**Jury Trial Demanded**

1

## FIRST AMENDED COMPLAINT

Plaintiff Rembrandt 3D Holding Ltd ("R3D" or "Plaintiff"), by and through their counsel and for their Complaint against Stream TV Networks, Inc. ("Stream"), Mathu Rajan, and Raja Rajan (collectively, "Defendants"), hereby allege as follows:

## PARTIES

1.      Plaintiff is a corporation organized and existing under the laws of the Island of Nevis with its principal office at 128 Bull Hill Road, Newfield, NY and a registered address at Suites 5 & 6 Horsfords Business Centre, Long Point Road, Charlestown, Nevis, West Indies.  Plaintiff is the owner of all or substantially all of the assets including all causes of actions of 3DFusion Corp. ("3DFusion"), a Delaware corporation formed on March 26, 2007 with its principal office at 110 Wall Street, New York, NY, and its wholly owned Dutch subsidiaries 3DFusion Holding B.V. ("3DFusion Holding") and 3DFusion EU B.V. ("3DFusion EU") in Eindhoven, Netherlands.

2.      Upon information and belief, Defendant Stream TV Networks, Inc. ("Stream") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2009 Chestnut Street, Philadelphia, PA 19103.

3.      Upon information and belief, Defendant Mathu Rajan is the Chief Executive Officer of Stream and a citizen of Pennsylvania.

4.      Upon information and belief, Defendant Raja Rajan is the General Counsel and Chief Operations Officer of Stream and a citizen of Pennsylvania.

2

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over R3D's claims for patent infringement under the patent laws of the United States, Title 35 of the United States Code, and 28 U.S.C. §§ 1331 and 1338(a), diversity jurisdiction under 28 U.S.C. §1332, and supplemental jurisdiction over state law claims alleged in this Complaint under 28 U.S.C. §1367.

6.      This Court has diversity jurisdiction under 28 U.S.C. §1332 because complete diversity of citizenship exists in the parties and the matter in controversy exceeds the sum or value of $75,000.00.

7.      This Court has personal jurisdiction over Defendant Stream because, among other reasons, Defendant Stream expressly consented to the jurisdiction of the state and federal courts located in the City of New York under an agreement with Plaintiff's predecessor-in-interest, 3DFusion, dated June 9, 2010.

8.      This Court has specific jurisdiction over Defendants Mathu Rajan and Raja Rajan under NYCPLR §302 (a)(1) because they transacted business within the State of New York, and the exercise of jurisdiction over Defendants Mathu Rajan and Raja Rajan would not offend traditional notions of fair play and substantial justice because of their numerous business trips and meetings at 3DFusion's New York City office as described in greater details below.

9.      Venue is proper in this District under 28 U.S.C. §§ 1391 (b)-(c) because

Defendants are subject to personal jurisdiction in this district.

## INTRODUCTION

10.      This is an action for (i) patent infringement relating to glasses-free 3D display

technology, also known as 3D autostereoscopic display (3DASD) technology, and (ii) breach

of express and/or implied contracts relating to merger/acquisition and unauthorized use of

confidential and proprietary information of Plaintiff's predecessor in interest, 3DFusion Corp.

("3DFusion"), a pioneer startup on 3DASD technology.  Plaintiff believes Defendants'

breach of express and/or implied contractual obligations through their misappropriation of

proprietary technology, expertise, and assets from 3DFusion, unjustly enriched Defendants

Stream TV Networks, Inc. ("Stream"), Mathu Rajan, and Raja Rajan.  Under the guise of a

proposed merger/acquisition, Stream, which had no assets or expertise in 3DASD

technology prior to its contractual relationships with 3DFusion, misappropriated 3DFusion's

confidential and proprietary information during the due diligence process, and thereby

avoided the risk, time, and expense of developing its own 3DASD technology.  Stream's

calculated and willful breach of promises and obligations unfairly benefitted Stream, which

became a market leader on 3DASD technology within a year of its notice of termination of

contractual relationship with 3DFusion, to the detriment of 3DFusion.

11.      3DFusion, a Delaware corporation with its principal office at 110 Wall St.,

New York, NY, was co-founded by Mr. Stephen Blumenthal ("Blumenthal") and Mr. Ilya

Sorokin ("Sorokin") in 2007, to create and sell 3D video content that can be viewed without

3D glasses.  Philips offered a Glasses-Free three-dimensional (3D) autostereoscopic

display ("3DASD") solution known as the WOWvx Platform for converting and generating 3D

content from two-dimensional (2D) media content for rendering on Philips's 3DASD

monitors.  The WOWvx Platform uses mathematical algorithms to add depth and

stereoscopic information to 2D content (i.e., 2D+Depth) thereby creating 3DASD content.

However, Philips's 3DASD solution suffered from significant image quality issues because

the 3DASD content generated by the WOWvx Platform contained numerous artifacts such

as ghosting and required weeks of manual post-processing to correct.   Nonetheless,

3DFusion licensed the WOWvx Platform from Philips.

12.     Through extensive experimentation and research comprising more than 3000

hours of 2D-to-3D-depth-map rotoscoping, Blumenthal developed a novel and non-obvious

methodology to correct the image quality issues or artifacts in the 3DASD content generated

by the Philips's WOWvx Platform.  Blumenthal assigned to 3DFusion ownership of his

solution to heretofore unsolved problems of Philips's incomplete 3DASD technology, and

filed a patent application in 2008 for the technical breakthrough, from which US patents

issued as described below.

5

**The Patents**

13.     Plaintiff is the owner by assignment of U.S. Patent No. 8,558,830 ("the '830

patent"), U.S. Patent No. 9,521,390 ("the '390 patent"), U.S. Patent No. 9,681,114 ("the '114

patent"), and other tangible and intangible assets of 3DFusion.

14.     The '830 patent is entitled "System and Method For Adaptive Scalable

Dynamic Conversion, Quality and Processing Optimization, Enhancement, Correction,

Mastering, And Other Advantageous Processing of Three Dimensional Media Content," filed

on December 18, 2009 claiming a priority date of December 18, 2008, and issued on

October 15, 2013.  A true and correct copy of the '830 patent is attached hereto as Exhibit

A.

15.     The '390 patent is entitled "System and Method For Adaptive Scalable

Dynamic Conversion, Quality and Processing Optimization, Enhancement, Correction,

Mastering, And Other Advantageous Processing of Three Dimensional Media Content," filed

on October 15, 2013 claiming a priority date of December 18, 2008, and issued on

December 13, 2016. A true and correct copy of the '390 patent is attached hereto as Exhibit

B.

16.     The '114 patent is entitled "System and Method For Adaptive Scalable

Dynamic Conversion, Quality and Processing Optimization, Enhancement, Correction,

Mastering, And Other Advantageous Processing of Three Dimensional Media Content," filed

on December 2, 2016 claiming a priority date of December 18, 2008, and to be issued on

June 17, 2017. It is a continuation of the '390 patent.  A copy of the '114 patent is attached hereto as Exhibit C.

17.     Display technologies for 3D content media have evolved from the earliest offerings requiring the audience to wear flimsy "glasses" having a different (red or blue) lens for each eye, to more advanced electronic "stereoscopic 3D" glasses equipped with remotely triggered liquid crystal display (LCD)-based lenses (acting as individually alternating "shutters"), which provided its wearers with an engaging and quality '3D experience," given properly prepared 3D content media and appropriate playback and display technologies.  However, this approach for providing a "3D experience" is quite cumbersome and very expensive to use and maintain, and has thus been of very limited commercial success, primarily being relegated to special entertainment venues, such as IMAX theaters and high-end amusement parks.  See 1:39-63 of U.S. Patent No. 8,558,830; 1:64-2:22 of U.S. Patent No. 9,521,390.

18.     At the time the inventions in U.S. Patent Nos. 8,558,830 ("the '830 patent"), 9,521,390 ("the '390 patent"), and 9,681,114 ("the '114 patent") were conceived, there were a number of companies that developed and offered flat panel displays of varying sizes capable of creating a virtual 3D experience for the viewer without the need for the viewer to wear electronic or other types glasses or similar devices.  However, the quality and impact of the 3D experience delivered by the available stand-alone 3D (SA-3D) solutions is lower

7

than that of conventional high-end glasses-based stereoscopic 3D offerings.  See 2:5-19 of the '830 patent; 2:31-46 of the '390 patent.

19.    To solve the aforementioned problems associated with glasses-free 3D systems, each of the '830 patent and the '390 patent discloses embodiments that "advantageously enable automatic, semi-automatic or user-controlled selective performance of 3D content processing and/or settings/parameter configuration at one or more components of the infrastructure (from 3D content capture, to 3D content processing (and/or 2D to 3D content conversion), and to 3D content media display), and in at least one embodiment thereof, the inventive system and method are capable of determining and implementing selective or optimal storage, transmittal, and application of 3D content processing/settings/parameter/profile configuration(s) prior to, or during, display of corresponding 3D content media to one or more viewers thereof."  See 3:49-60 of the '830 patent; 4:17-29 of the '390 patent.

## Background

20.    Upon information and belief, Koninklijke Philips Electronics N.V. ("Philips"), a Dutch corporation having its registered office in Eindhoven, Netherlands, through its wholly owned subsidiary, 3DSolutions ("3DSolutions"), began pursuing the concept of developing 3D glasses free television in the early 2000's, based on the 2D+Depth, 3D autostereoscopic mathematical encryption technology of the Heinrick Hertz Institute.

8

21.    Upon information and belief, Philips expended approximately a half a billion dollars for the development of glasses-free 3-dimensional television, otherwise known as 3D Auto Stereoscopic Display (3DASD) No Glasses television platform.

22.    In 2007, 3DFusion became a licensed vendor of Philips Electronics Nederland B.V. for converting 2D video content into 3D Autostereo Display ("3DASD") video content using Philips's tools and products including the WOWvx platform and "Blue Box" hardware and software.  3DFusion paid Philips approximately $7,000.00 per month for this license arrangement.

### Limitations of Philips's 3DASD Technology

23.    Philips made tremendous progress in the development of three dimensional glasses free (i.e. 3DASD) television; however, their products had some limitations and problems with artifacts, clarity and image quality.

24.    Blumenthal began converting, correcting and optimizing 2D videos into Philips's 3D formatted videos (i.e. 2D+Depth) for 3DASD displays using Phillips's 3DASD content generation tools including its WOWvx platform and the Bluebox.

25.    Blumenthal, through 3DFusion, was one of a very small group of vendors allowed to work with the Philips products and tools.

26.    At that point in the Philips development effort, Philips did not provide an efficient solution to the problem of artifacts in the converted 2D+Depth video created by the Philips tools, which would enable users to, for example, adjust, correct, or optimize different

9

*subsets* of 3D images of the video.  Rather, Philips tools could only provide fixed or preset

parameters for the entire video.

27.    Consequently, the 2D+Depth video (i.e., 3DTV No Glasses), as displayed on

the Philips 3DASD TV, demonstrated the same ghosting, eye strain, dizzying artifacts that

plagued the 3DTV with Glasses consumer market.

28.    At the same time that Philips was working on 3DASD television technology,

others in the industry working on this technology also experienced the same problems of

ghosting, eye strain, and dizzying artifacts.

29.    Philips's 2D to 3D conversion and playback process was a prohibitively

expensive, slow, complicated, and highly labor intensive effort to get to a usable 3DASD

video content.

### 3DFusion's Improved 3DASD Technology

30.    Over thousands of hours of creating 2D+Depth videos using Philips's tools

and products, Blumenthal recognized that certain subsets of images had to be adjusted to

achieve appropriate broadcast quality 3D images.  Blumenthal discovered a methodology

for efficiently converting, correcting and optimizing a 2D+Depth video that overcame the

problems of the preset manual process associated with the Philips tools. Blumenthal's

discovery was treated as a proprietary technology of 3DFusion, and which includes trade

secrets and patentable inventions.  Great efforts were taken to protect the proprietary

technology and to ensure nondisclosure of such technology.

10

31.     In 2008, Stephen Blumenthal filed a U.S. Provisional Patent Application and

in 2009 filed a regular utility U.S. Patent Application, which issued in October 2013 as the

'830 patent. The '830 patent and the later issued patents including the '390 patent sit at a

key junction of the Philips 3DASD hardware and software 2D+Depth platform and elevate

the flawed Philips platform to a previously unachievable standard for 3DTV broadcast

quality. This development enabled or otherwise positioned the Philips 3DTV to be utilized as

a seamless replacement for all 2D video commercial applications and markets. Moreover,

the techniques and advancements created by Blumenthal are applicable across the industry

where these issues have been plaguing the advancement of the technology.

## Philips Discontinued Its 3DASD Manufacturing and Support

32.     In August of 2009, Philips notified 3DFusion that it was in the process of

winding down its incubator 3DSolutions because it was unable to solve the aforementioned

3D image artifacts.  However 3DFusion could continue to use the previously licensed

hardware and software under its arrangement with 3DSolutions because Philips recognized

that 3DFusion, through its proprietary technology, could continue to advance Philips's

products and tools including the WOWvx platform.  .

33.     In or about September 2009, upon the shutdown of 3DSolutions, which

manufactured the 3DASD monitors and developer of the supporting software (e.g. the

WOWvx platform), Blumenthal, acting on behalf of 3DFusion, immediately contacted the

former 3DSolutions' key technology experts (the "Team") to join 3DFusion as part of an

effort to re-establish support for the WOWvx platform that had been provided by the now defunct 3DSolutions, and to engage the Team in Eindhoven, Netherlands, through a wholly owned Dutch subsidiary of 3DFusion. The Team included Walther Roelen ("Roelen") a former 3DSolutions 3DTV lens designer and Bart Barenbrug ("Barenbrug") a former 3DSolutions senior software engineer, both of whom are Dutch residents.

34.     For convenience sake, the Dutch subsidiary was named "C3D" prior to its corporate formation. The name "C3D" was later changed to "3DFusion EU" as indicated in an email dated March 15, 2010 from Walther Roelen.

35.     In or about September 2009, Blumenthal requested a number of documents from Barenbrug and Roelen relating to the software technology, manufacturing infrastructure, and real estate required for starting up the Dutch subsidiary. Towards that end, 3DFusion gave Roelen a power of attorney to execute the requisite legal documents for the contemplated transactions.

36.     Accordingly, Barenbrug, under Blumenthal's guidance and instructions, drafted confidential technical documents for purposes of identifying intellectual property critical for the contemplated license from Philips. Roelen also drafted documents for the startup infrastructure.

### 3DFusion Recruited Philips's 3DASD Technical Team

37.     In December 2009, Blumenthal arrived at Eindhoven, Netherlands to negotiate a license with Philips to manufacture the Philips WOWvx platform and to use the

800+ patents, and to upgrade the Philips products and tools.  At that time, Blumenthal also demonstrated 3DFusion's proprietary technology to the Team including Roelen and Barenbrug, all of whom orally agreed to keep 3DFusion's proprietary technology confidential.  After the demonstration, one of the members of the Team, Ms. Grazina Seskeciuite, stated that "it took two guys from New York to come to Philips to show us how to fix our TV."

38.     Later in this same month, 3DFusion engaged the Team, including Roelen and Barenbrug as independent contractors to support 3DFusion's efforts to restart manufacturing of Philips's 3DASD monitors and the WOWvx platform.

39.     In January 2010, Blumenthal and the Team commenced bi-weekly teleconferences for starting up the new Dutch subsidiary, with meeting minutes (the "Minutes") recorded by Ms. Ann-Marie van Ham, a member of the Team.  The meeting minutes show the various technical and administrative issues addressed by the Team including licensing issues with Philips and Blumenthal's proposed lens design for joint development with Corning Glass, all of which are deemed confidential and proprietary information of 3DFusion.  See, e.g., Minutes of February 17, 2010,

40.     Members of the Team understood the confidential nature of their relationship with 3DFusion, as illustrated by the Minutes, and by a series of emails in March 2010 between Roelen, van Ham, Seskeciutie and Blumenthal, reflecting their obligations to getting the 3DFusion NDA's signed by all Team members.  The signing of the NDA's was

13

completed by a number of Team members, according to Ms. van Ham, but the signed NDAs were not collected or returned to Blumenthal until October 2010.

41.    The Team acknowledged in numerous communications and as shown in the Minutes that they were working on behalf of 3DFusion to advance the 3DASD and the supporting software technology and marketability that Blumenthal had made possible through his breakthrough discoveries.

42.    As a result of 3DFusion's proprietary technology, 3DFusion received the endorsement of the former 3DSolutions' senior technical team, who presented 3DFusion to Philips's Intellectual Property and Standards Division, (IP&S) and persuaded IP&S to accept 3DFusion's license application for the Philips's intellectual property relating to the WOWvx platform.

## 3DFusion Licensed Philips's 3DASD Technology For Over $5M

43.    In December of 2009, 3DFusion entered into negotiations to acquire comprehensive archive of Philips's intellectual property for the 3DTV No Glasses/3DASD/2D+Depth technology platform. Blumenthal immediately entered into negotiations to license the $500 million dollar, Philips's 3DASD technology platform, which is referred to by the Defendant Stream TV as "video+depth".

44.    3DFusion was successful in formulating a deal with Philips giving 3DFusion the right to the nonexclusive use of Philips technology.

14

45.     In May 1, 2010, Philips and 3DFusion entered into a license agreement ("License Agreement") for the WOWvx platform and became the first developer to be granted unprecedented rights to, among other things, use, sell or offer to sell various licensed products and to make *derivative works* of the licensed software and to license and distribute licensed technology including Philips's 2D+Depth technology, 800 Approved 3DTV Patents, source code, and associated hardware and software platform. See Section 2 of the License Agreement, Exhibit D.

46.     Under the License Agreement, 3DFusion was obligated to pay (i) $5M for delivery of Philips's Know-How and Licensed Software, of which 50% was payable within 45 days of execution of the License Agreement, with the remaining 50% due in 2011 and (ii) a minimum royalty of 100,000 Euros per year. See Exhibit D, Section 4 of the License Agreement.

**3DFusion Sought Funding for the Dutch Team, the New Business Model and the Costly Philips License**

47.     Having secured Philips's intellectual property and key technology experts, 3DFusion proceeded to seek funding and/or financing for its expanded operations and liabilities required by the new business model.

48.     In June of 2010, Raja and Mathu Rajan, as officers of Stream TV were introduced (hereinafter collectively "the Rajans") to 3DFusion as potential investors.

15

49.    On June 9 of 2010, Raja Rajan and Mathu Rajan, principals of Stream TV
Networks, Inc., came to 3DFusion's offices at 110 Wall Street, New York, NY to view a
demonstration of 3DFusion's 3DASD technology.  Raja Rajan was the general counsel and
COO of Stream and his brother, Mathu Rajan, a technologist and the CEO of Stream.  Upon
information and belief, they were in communication with 3DSolutions, and had one of their
screens.  They were extremely frustrated with the 3D images as they were plagued with the
same artifacts and ghosting issues that were prevalent in all of the Philips 3DTV's.  When
they saw the 3D content on 3DFusion 3DASD display, which was identical to theirs, they
became instant believers.

50.    At the initial June 9, 2010 meeting, the Rajans stated that they had purchased
a Philips 3D TV platform and experienced the same 3D image quality failure as noted
above. Upon viewing the 3DFusion's improved 3DASD tools and content on the same
model of the Philips WOWvx platform that they owned, they became immediately convinced
of the significance of the 3DFusion solution to the Philips 3DASD problem.

51.    They indicated that the 3DFusion technology solved what was previously
believed to be an unsolvable problem, and that this development would therefore provide
them with a commercially viable 3D television product.

52.    Based on this demonstration, the Rajans became very excited and
immediately signed a Mutual Non-Disclosure and Confidentiality Agreement on June 9,
2010, and began equity funding negotiations, with the promise to provide $20 million in

funding. At this time, Stream, with no 3DASD technology of their own, was trying (as yet

unsuccessfully) to develop a marketable glasses free 3D product. They realized that 3D

Fusion's technology would make that possible.

53.    The Rajans, acting as agents for Stream executed Non-Disclosure

Agreements in June of 2010 (Exhibit E) and a MOU Term Sheet Agreement in September

of 2010 (Exhibit F). In reliance of these agreements, 3DFusion provided Stream with

information regarding all of the Confidential Information that had been developed by

Blumenthal and the Team, including both the pathway to automation of the 3D content

generation process, and the 3D playback optimization and correction process that had, prior

to Blumenthal's ground breaking work, been impossible to solve. Blumenthal also disclosed,

at Stream's insistence, relevant information about the Team and their roles and contact

information.

54.    Over the ensuing months, the parties, Blumenthal, the Rajans, Roelen, and

Barenbrug, under the leadership and supervision of Blumenthal, all worked collaboratively

towards the goal of pursuing glasses free 3D television technology.

55.    In June 2010, 3DFusion and Defendant Stream TV Networks, Inc. entered

into a Mutual Non-Disclosure and Confidentiality Agreement dated June 9, 2010 and an

Addendum to Agreement dated June 11, 2010 for purposes of due diligence investigation

and equity funding of 3DFusion (collectively referred to as the "Confidentiality Agreement")

(Exhibit E). Thereafter, over a period of about four months, Raja Rajan and Mathu Rajan,

17

Case 1:17-cv-09002-RA Document 69-1 Filed 04/08/23 Page 14 of 51 Desc
Case 1:17-cv-09002-RA Document 69-1 Filed 04/08/23 Page 14 of 51 Desc
Exhibit A    Page 47 of 409

on behalf of Stream and/or on their individual capacities, held about six (6) to ten (10) face-to-face meetings with Blumenthal and Sorokin, and upon information and belief, about nine (9) more meetings with Sorokin, at 3DFusion's New York City office (i.e., at 110 Wall St.) relating to 3DFusion's Confidential Information and potential financing for 3DFusion.

### 3DFusion Formed and Began Operation of Dutch Subsidiaries

56.     On September 17, 2010, 3D Fusion Corp. received registrations of two wholly owned Dutch subsidiaries. Specifically, 3DFusion Corp., the parent, owns 100% of 3D Fusion Holding B.V., a Dutch limited liability company, which in turn owns 100% of 3D Fusion EU B.V. a Dutch limited liability company (hereinafter collectively "the Corporate Entities"). In September Roelen was hired as the General Director (CEO) of the 3DFusion EU. BV., the Dutch subsidiary, and paid a Salary, with back pay to July 2010.  Once the Dutch BV was established employment contracts were initiated.

57.     3DFusion established and funded bank accounts for its Dutch subsidiaries 3DFusion Holding B.V. and 3DFusion EU B.V. W. Roelen withdrew certain funds from both of these bank accounts ostensibly for salary payments for the Team from about June 2010 through February 2011 including the period prior to his appointment as Director at 3D Fusion EU B.V in September 2010, even though Roelen was not an officer of 3DFusion Holding B.V.  Barenbrug attended various trade shows on behalf of 3D Fusion EU B.V. which paid for his trade shows related expenses and his equipment.

58.     In October 2010, under Roelen's directions, 3DFusion EU hired its first full

time employee, Ms. Grazina Seskeciuite, who was a graphic arts engineer and software

developer, who had worked closely with Barenbrug at the former 3DSolutions, Roelen as

the General Director with overall managerial responsibilities of the company, handled all

confidential documents, had approved the Team's employment contracts template and was

the Senior team organizer to whom the team looked to for guidance.

### 3DFusion Relied on Promises in a Term Sheet

59.     On September 28, 2010, after about 4 months of negotiations, a Term Sheet

(collectively, the "Term Sheet") was executed by Mathu Rajan (CEO of Stream) on behalf of

Stream and in his individual capacity, by Raja Rajan (General Counsel and COO of Stream)

in his individual capacity, by Sorokin on behalf of 3DFusion and in his individual capacity

and Blumenthal, in his individual capacity.  The Term Sheet memorialized their agreement

for a contemplated 20 million dollar equity funding transaction.  See Exhibit F.

60.     Upon information and belief, the Term Sheet was prepared and drafted by

Raja Rajan.

61.     The Term Sheet states:

> The Parties agree, in full consideration of the time and expense that
> shall be expended by each party, to be bound by the transaction
> outlined in this Agreement and attachments hereto (hereinafter, the
> "Transaction") *upon execution of definitive agreements* comprising
> customary terms and conditions including the material terms and

19

conditions in this Agreement and attachments thereto. (emphasis added)

62.    Notably, no definitive agreements, as contemplated by the Term Sheet, were executed by the parties.  Thus, by its terms, the Term Sheet is not a valid or enforceable contract.

63.    Pursuant to the "Capitalization Strategy" section thereof:

Stream intends to become an operating subsidiary of a holding company ("HoldCo") that may be newly-formed. It is understood that all the rights and obligations herein granted to Stream shall be fully assignable to and assumable by Holdco. It is intended that [3D]Fusion (or all its assets in a newly-formed entity) shall become a separate subsidiary of HoldCo jointly owned by HoldCo and the current owners of [3D]Fusion ("3D Sub"). [3D]Fusion shall have representation at HoldCo Board Level if the Strategic Option below is exercised.

Stream agrees that it will keep [3D]Fusion informed of the capitalization efforts as the process commences.

64.    Pursuant to "Ownership Structure" section thereof:

The 3D Sub shall commence with 100% of it being owned by Fusion Founders. HoldCo may provide funds to commence operations within the 3D Sub ("Start Up Funds") up to $5,000,000 in total. The Start Up funds may be in tranches if mutually agreed upon in writing when the Parties complete their financial projections.

Subsequently, HoldCo shall have the right at its discretion to contribute funds earmarked for growth in 3D Sub or any mutually agreed upon spin off company designed to commercialize an opportunity developed by 3D Sub ("Growth Funds").

65.    Pursuant to "Duration Restrictions" section thereof:

*The Parties agree that they shall fully cooperate with each other and provide best efforts in working towards a closing of the transaction described herein.*  For all the good and valuable consideration

20

Case 1:21-cv-09802-RA Document 69-1 Filed 04/08/23 Page 51 of 91 Case 23-1070, Document 69-1, Filed 04/03/23, 1524849, Page 51 of 91

Exhibit A    Page 50 of 409

described herein and the costs and expenses that have been and will
be incurred by each party, the Parties agree they shall not shop for or
seek any alternative financing or capitalization except for that which is
described herein *for a period of ninety days from completion of the
Closing Deliverables (defined below)and consent to the final Definitive
Agreements (mentioned above). If a closing has not occurred within
that time period then the obligations herein expire except for those
relating to confidentiality*. (emphasis added)

66.      Thus, the Term Sheet does not expire or terminate unless these conditions

are satisfied:  (1) completion of the Closing Deliverables and (2) consent to the final

Definitive Agreements.

67.      Thereafter, parties to the Term Sheet conducted due diligence and, as a

result, Stream, Mathu Rajan, and Raja Rajan gained valuable insight into the operations,

business plans, financial goals, trade secrets, technical know-how, patent applications,

licensed software and hardware from Philips, the confidential terms and conditions of the

Philips License Agreement, and the identities of the members of the Team (including

Roelen and Barenbrug) in Eindhoven, Netherlands, all of which constitute Confidential

Information of 3DFusion.

68.      On October 8, 2010, Blumenthal visited Stream's office in Philadelphia,

Pennsylvania during which meeting he answered questions from Raja Rajan and Mathu

Rajan and other employees of Stream (including Mr. Suby Joseph, the CFO of Stream)

about 3DFusion's business plans and startup strategy and demonstrated 3DFusion's

proprietary technology using 3DFusion's equipment loaded with 3DFusion's proprietary

software.  Blumenthal went through all aspects of the workflow, of conversion, of

21

optimization and correction of the artifacts in the 3DASD video content. Blumenthal also

explained how the lens design for the 3DASD monitors was critical to matching the content

to, and went over the 2d switchable technology. This meeting lasted about 9 hours and

Stream videotaped the entire 8-hour work session.  At the end of the meeting, Mathu Rajan

said to Blumenthal "Now I can do what you do.  What do I need you for?"

69.    On October 27, 2010, at a 3D Technology conference (i.e., the Kagan 3D

Technology Conference) at Waldorf Astoria hotel in New York City, Blumenthal was seated

on the same panel as Mr. Jeffrey Katzenberg of DreamWorks, Mr. John Landau of Lucas

Films, and other video pioneers discussing 3DASD technology.  After the panel discussion,

Mathu Rajan walked up to Blumenthal and Sorkin and said that he's not sure if Philips's and

3DFusion's technology is worthwhile.

## Stream and Rajans Deemed the Term Sheet Enforceable And Termination Is Effective Only Upon Execution of a Mutual Termination Agreement

70.    Even though the Term Sheet is not valid or effective as a contract by its

terms, 3DFusion justifiably relied on the promises made in the Term Sheet because the

parties deemed the promises in the Term Sheet enforceable or otherwise binding.

71.    Indeed, on or about January 5, 2011, 3DFusion received a "Termination

Agreement" dated January 5, 2011 and signed by Mathu Rajan on behalf of Stream and in

his individual capacity, and Raja Rajan in his individual capacity contending that the Term

Sheet is binding and that 3DFusion breached a clause in the Term Sheet.  See Exhibit F.

72.     The "Termination Agreement" contended that 3DFusion breached the Term
Sheet by "enter[ing] into a relationship with a third party whereby they have obtained capital
to further their business" "but any continuing express obligations that may exist under the
NDAs shall continue as provided in those documents."  See Section 1 of proposed
"Termination Agreement," Exhibit G.  The alleged breach referred to 3DFusion's borrowing
of $350K (the "Note") from a lender (the "Lender") to pay the Philips License fee due in
December 2010, which liability was expressly acknowledged in the Term Sheet.  3DFusion
would not have needed to borrow from a third party but for Stream's failure to "fully
cooperate" with 3DFusion and to use "best efforts" to complete the transaction
contemplated in the Term Sheet to provide the promised funding to 3DFusion to pay for
Philip's license fees and the Team's salaries.  Rather, Stream would require 3DFusion to
default on the Philips license and lose one of its valuable assets.

73.     The "Termination Agreement" proposed by Stream/Rajans further included a
mutual general release relating to "any oral or written discussion by each member of Parties
including but not limited to Prior Agreements."  See Section 3 of "Termination Agreement",
Exhibit G.

74.     In any event, neither Sorokin nor Blumenthal signed the "Termination
Agreement."

75.     3DFusion did not breach the Term Sheet because it timely provided the
"Closing Deliverables" to Stream.  On the other hand, Stream, Mathu Rajan, and Raja Rajan

have yet to discharge all of its contractual obligations in the Term Sheet including the
formation of HoldCo and the drafting of the Definitive Agreements referenced in the Term
Sheet.  Importantly, Stream, Mathu Rajan, and Raja Rajan did not "fully cooperate with each
other and provide best efforts in working towards a closing of the transaction described [in
the Term Sheet]."

76.     Plaintiff, as successor in interest of 3DFusion Corp., remains ready, willing,
and able to complete the transaction contemplated in the Term Sheet.

77.     In 2016, Blumenthal acquired all of the assets and interests including all
causes of action of 3DFusion and its subsidiaries and in 2017, Blumenthal assigned such
interests and causes of action to Rembrandt 3D Holding, Ltd, which is the plaintiff in this
action, and wholly owned by Blumenthal.

**Roelen's Betrayal and Conspiracy with Stream/Rajans**

78.     In or about the end of September 2010, Stream requested permission to
speak with the Team.  Roelen communicated 3DFusion's proprietary information to agents
or affiliates of Stream.

79.     Upon information and belief, Roelen and Stream's agents or affiliates
misused and/or misappropriated 3DFusion's proprietary information and conspired with to
the detriment of 3DFusion in breach of his fiduciary duties to 3DFusion.  Roelen, as the

Director of 3DFusion EU, had the overall responsibility of getting the Team to sign

employment contracts since June 2010.  Notwithstanding Bart Barenbrug, a key technical

team member, already approved his employment agreement in July 2010, Roelen continued

to stall the process by making up excuses to repeatedly revise his employment agreement

through November and December 2010.  As a result, 3DFusion never received any signed

employment agreement from the Team, and by the end of December 2010, the Team

notified 3DFusion that the Team will not execute the employment agreements.

80.     Upon information and belief, Raja Rajan and/or Mathu Rajan conspired with

Roelen to stall the due diligence process in violation of his promise to "fully cooperate with

each other and to provide best efforts in working towards a closing of the transactions

described" in the Term Sheet.  For example, on November 3, 2010, Raja Rajan emailed

Blumenthal and Sorokin requesting financial information that Stream already received in

August 2010 and acknowledged in the Term Sheet (dated September 28, 2010), and

employment contracts for Blumenthal and Sorokin that Stream already promised will draft to

incorporate terms specified in the Term Sheet.

81.     In any event, each of the Team members executed Non-Disclosure and Non-

Circumvention Agreements ("NDA") with 3DFusion on or about October 4-6, 2010.

82.     But Roelen inserted a clause in his NDA stating that the NDA "will be

terminated if on January first of 2011 there is no employment contract or other similar

agreement between any of the 3DFsuion [sic] companies and recipient."  Only one other

25

member of the Team, Mr. Hans Zuidema inserted a similar clause in his NDA.  Mr. Hans

Zuidema is presently, the Chief Technology Officer and General Manager of SeeCubic,

Stream's European subsidiary.

83.     Even though it was Roelen's responsibility to have the Team execute the

employment agreements since June 2010, Roelen failed to disclose to Sorokin or

Blumenthal why he and Zuidema alone require their NDAs to expire by the end of

December 2010, when the other team members did not.

84.     Soon after Roelen's and Zuidema's NDAs were terminated upon their

expiration dates, Stream emailed 3DFusion the proposed "Termination Agreement."

**Confidential Information**

85.     Blumenthal treated the License agreement with Philips and the information

acquired thereunder including, without limitation, derivative works as protected proprietary

and/or confidential information, which he had worked very hard to develop and only

disclosed the licensing terms and protected information on a need-to-know basis, and only

under protection of nondisclosure agreements.

86.     The research and development effort by Blumenthal and the Team produced

valuable confidential and proprietary information ("Confidential Information") including the

derivative works developed under the Philips Technology License trade secrets, patents

and patent applications, and copyrights, which became the essential technology

components for an improved and commercially marketable WOWvx platform.

26

87.    The Confidential Information was disclosed to Stream pursuant to the Confidentiality Agreement signed June 9, 2010 and June 11, 2010 and the Term Sheet signed September 28, 2010.

88.    Blumenthal through the 3DFusion corporate entities and the Team continued the process of developing bridge software programs (e.g. derivative works of the Philips licensed software) and technology that would allow for the Philips platform to be successfully commercialized with an automatic conversion process, and a playback optimization and correction process.

89.    The following documents further demonstrate that Roelen was working on behalf of 3D Fusion and that all technology developed was the property of 3D Fusion: Minutes of 3D Fusion team meetings such as, for example those dated January 26, 2010, February 3, 2010, February 10, 2010, February 17, 2010, February 24, 2010, March 13, 2010, March 18, March 25, April 7, April 14, April 21, April 28, May 12, June 2, June 9 show Walther Roelen at these meetings in which the business progress and technology work were discussed and Roelen had "action points" that he was responsible to accomplish.

90.    Email dated November 26, 2010 sent to Blumenthal from W. Roelen, with Barenbrug and Zuidema copies to which is attached a seventeen page memo listing thirty 3DFusion client projects, which had been transferred to 3DFusion EU from 3DFusion Corp. for the Team's development.

91.     Email dated October 4, 2010 from W. Roelen stating that he is the head of 3D Fusion EU. He signed the email as Walther Roelen, CEO.

92.     Under their NDAs Roelen and Barenbrug agree, among other things, that their obligations relating to Confidential Information shall survive termination and that the NDA shall be governed by the applicable laws of the State of New York, excluding its conflict of law provisions.

93.     Notably, under their NDAs, Roelen and Barenbrug agree that the use of Confidential Information in the manufacture of any products and the filing of any patent applications containing the Confidential Information without the prior express written authorization of 3DFusion are specifically prohibited.

94.     In addition to the Philips technology for which Blumenthal developed the bridge concepts, there were also lens design aspects of the 3D lenticular lens, which Blumenthal had been working on with Corning Incorporated based in Corning, New York, which were believed to be essential to the proper implementation of the product.

95.     In late August, 2010, Blumenthal set a meeting for him and Roelen to meet with Corning Glass scientist and technical team on September 3, 2010, at the Corning, N.Y. headquarters.

96.     Roelen arrived and stayed at a hotel in Trumansburg, NY from September 2 through September 4 during which period Blumenthal and Roelen discussed confidential

and proprietary information relating to 3DFusion and the formation and operation of the Dutch subsidiaries of 3DFusion.

97.    An objective of the September 3 meeting at Corning was to share 3DFusion Intellectual Property and Trade Secret concepts with Corning and to explore Corning's ability to make certain improvements in the 2D switchable lens design and manufacturing. During the course of this meeting Blumenthal and Corning disclosed substantial Confidential Information to Roelen.

98.    Upon and information and belief, subsequent to this meeting with Corning Glass, Roelen in violation of his agreement with and/or obligations owed to 3DFusion disclosed the Confidential Information to Stream who then utilized and /or incorporated the Confidential Information in their products and technology.

99.    At this meeting Corning required Blumenthal to sign a Nondisclosure agreement on behalf of 3D Fusion and its officers, employees and representatives, which inured to the benefit of 3D Fusion and Corning.

100.    At this meeting Roelen confirmed to Corning that he was the CEO of 3D Fusion EU, a wholly owned subsidiary of 3D Fusion.

101.    After this initial Corning Glass meeting, Roelen had subsequent meetings to discuss this technology after he terminated his employment with 3D Fusion EU without the knowledge of Blumenthal in violation of the NDAs that Roelen was subject to. Roelen's

subsequent meetings in Corning, NY were a necessary and purposeful activity specifically related to Roelen's breach of confidentiality obligations owed to 3D Fusion.

## Stream Had No Prior Knowledge or Expertise in 3DASD

102.    Upon information and belief, the Rajans individually and through corporate entities, were players in the Bollywood, India movie industry, and had no 3DASD technology of their own.

103.    Upon information and belief, Stream and the Rajans extracted the maximum amount of useful information and misappropriated Confidential Information from 3DFusion during the due diligence process including proprietary information obtained from the October 10, 2010 meeting in which Stream videotaped the Blumenthal's demonstration of 3DFusion's proprietary technology.

104.    While Stream and the Rajans conducted their due diligence process, W. Roelen continued to act as the CEO of 3DFusion EU.

105.    As a result of the due diligence process, Stream and Rajans gained valuable insight and knowledge of 3DFusion's proprietary and confidential information, which Defendant Stream used and continues to use in violation of the Confidentiality Agreement with 3DFusion.

106.    3DFusion placed their trust and confidence in Stream and Rajans by providing its proprietary equipment in order that they can demonstrate its proprietary technology to other potential investors.

Case 1:23-10709-1980 NbProc 69-1 ns File: 04/08/23 9:36 Entered 04/03/23 15:40 date ID es 9
Case 1:17-cv-09802-RA Document 76-2 Filed 00/23/14 Page 51 of 91
Exhibit A    Page 60 of 409

107.    Upon information and belief, Stream and Rajans used 3DFusion's proprietary equipment to attract and defraud investors by claiming the 3DFusion's technology as their own.  Stream refused to return 3DFusion's proprietary equipment until April 2011, more than three months after Raja Rajan sent 3DFusion the "Termination Agreement" dated January 5 2011.

### Discovery of Roelen's Betrayal, and Theft of 3DFusion's Proprietary Information By Stream and Rajans

108.    3DFusion subsequently learned that Director Roelen was acting to the detriment of 3DFusion EU and 3DFusion, in violation of his fiduciary and contractual duties to his employer 3DFusion and his confidentiality obligations under his NDA. Roelen understood that the information provided to him, or that was developed as derivative works of Philips's license technology, were all protected intellectual property and information of 3DFusion.

109.    Upon information and belief, Roelen accepted an employment offer directly from Stream soon after the expiration of his NDA with 3DFusion, i.e., in or about January 2011.

110.    Roelen continued to access and withdraw funds from 3DFusion Holding B.V. and 3DFusion EU B.V. until 3DFusion terminated his position of Director at 3DFusion EU B.V. in or about May 2011.

111.    In or about January 2012, to his dismay, Blumenthal learned for the first time that Stream, Rajans, and W. Roelen had benefited from their violation of their NDAs and breach of their fiduciary responsibilities and contractual obligations to 3DFusion. While attending the Consumer Electronics Show ("CES") at Las Vegas, Nevada in January 2012, Blumenthal observed W. Roelen working at Stream's exhibit booth and representing himself as an employee of Stream, along with other former members of the 3DFusion EU technical team. The technology exhibited by Stream, Rajans, and W. Roelen at the CES show belonged to 3DFusion.

112.    Upon information and belief, Walther Roelen is now the Technologist Strategist of SeeCubic B.V., the wholly owned Dutch subsidiary of Defendant Stream.

113.    In or about January 2014, Raja Rajan on behalf of Stream, offered to sell and sold a 3DASD monitor to Blumenthal, which incorporates 3DFusion's confidential and proprietary technology.

114.    Blumenthal also learned in or about 2017 that Roelen and Barenbrug filed a US patent application (Ser. No. 14/428,866) entitled "Depth Adjustment of an Image Overlay in a 3D Image" on March 17, 2015 claiming priority to a Dutch patent application (Ser. No. 2009616) with a filing date of Oct. 11, 2012, which applications disclose the Confidential Information in violation of their NDAs such as, for example, the border-blending and depth-smoothing functions or features described in at least paragraphs [0076], [0077], [0081], and

32

[0082] of the 14/428,866 application.  See Exhibit H, U.S. Patent Application Publication No. US 2015/0249817 A1.

115.    Upon information and belief, U.S. patent application 14/428,866 is owned by Stream's wholly owned subsidiary Ultra-D Coöperatief U.A. in Einhoven, Netherlands.

### 3DFusion – the Aftermath

116.    In 2011, after the Team ended its relationship with 3DFusion, Blumenthal continued to guide 3DFusion and developed a new 3DASD media player, a derivate work developed under the Philips license.  The 3DASD media player has been deployed and currently in commercial use.

117.    In January 2012, Blumenthal resigned from 3DFusion due to lack of funding.

118.    On Oct. 31, 2014, 3DFusion defaulted on the Note.

119.    In or about February 2016, Blumenthal purchased all of the assets, tangible and intangible, from the Lender.

120.    In or about December 2016, Blumenthal assigned all of the assets of 3DFusion to his newly formed holding company, Rembrandt 3D Holding, Ltd, i.e. the Plaintiff.

121.    With this action, Plaintiff seeks to vindicate its rights, prevent any further infringement of its patents, preclude any further misuse of its confidential, proprietary, and trade secret information, and obtain compensation for damages suffered by 3DFusion and for Defendants' unjust enrichment resulting from their unlawful conduct.

Case 1:23-cv-00800-UNA Document 1 Filed 04/08/23 Page 64 of 91 Desc
Case 1:21-cv-00302-RGA Document 69-1 Filed 04/03/23 Page 54 of 91 PageID #:...
Exhibit A    Page 63 of 409

## Count I
## Infringement of U.S. Patent No. 8,558,830
### (Against Stream)

122.    Plaintiff restates and realleges each of the allegations set forth above and incorporates them herein.

123.    Upon information and belief, Defendant Stream makes, uses, sells, and/or offers for sale in the United States products and/or services for a system and method for selectively performing 3D content processing and/or settings/parameter configuration at one or more components of the system from 3D content capture to 3D content media display, including, for example, Defendant's Ultra-D technology (http://www.ultra-d.com/technology/) and Ultra-D enabled Monitor (http://www.ultra-d.com/televisions-and-more/) (collectively referred herein as the "Ultra-D System").

124.    Defendant Stream discloses on its website (http://www.ultra-d.com/) that its "Ultra-D [system] is the only glasses-free 3D technology that delivers both a comfortable 'real life' viewing experience and content conversion capability."

125.    According to Defendant Stream's white paper (http://www.ultra-d.com/wp-content/uploads/sites/2/2014/06/Ultra-D-technology-white-paper_07062013.pdf), the "Ultra-D technology for 3D displays has been developed to result in a natural 3D perception, where glasses are no longer needed. The Ultra-D technology generates a light-field addressing human depth perception in a way close to seeing the real three-dimensional

34

world. The Ultra-D optical solution addresses two important depth cues; stereopsis and

(partial) motion parallax, resulting in a more natural 3D experience."

126.    SeeCubic, a subsidiary of Defendant Stream(http://www.seecubic.com/rdi-

center/) that "develops the hardware and services of the glasses-free 3D display technology

called Ultra-D," discloses that the Ultra-D "technology can be applied in flat panel displays

based products.  Ranging from small displays as 4 inch to the largest mass-produced

displays of 84 inch TVs. Components of the Ultra-D monitor and the seeCube™ convertor

box are shown in the sketch [ ]. Rendering board, optical stack and optical glue are the parts

produced by SeeCubic." (http://www.seecubic.com/technology/implementations/)

127.    The "sketch" shown on SeeCubic's webpage

(http://www.seecubic.com/technology/implementations/) shows that an Ultra-D Enabled

Monitor ("UDEM") includes the following components:  a power supply, an "Ultra-D

rendering board," an audio board, an "Ultra-D conversion board," and a "3-D Module"

comprising a "Tcon," a "2D open cell," and an "Ultra-D optical stack."

128.    Upon information and belief, Defendant Stream discloses that "Ultra-D

converts all content (even non-3D) in stunning detail, alleviating complaints of motion

sickness, limited viewing angles and the need to be in a 'sweet spot' to see images in 3D.

And Ultra-D puts viewers in control, with the ability to adjust 3D "pop" and depth to their

liking. A room full of people can simultaneously experience Ultra-D's vibrant no-glasses-

required 3D." (See http://www.ultra-d.com/)

129.    Upon information and belief, "[t]he Ultra-D Format includes a separate depth signal next to the regular video signal extended with meta-data.  Therefore, it is an 'image+depth-based' 3D format.  Main characteristics: [a] The format is built upon widely available video coding and distribution standards. Therefore, the format leverages standard content distribution infrastructure, both at the broadcaster and at the receiver end. Hence, investments in existing infrastructure are retained. [b] The format is independent of particular 3D optics and other display properties. In other words: the format is display-agnostic, which decouples the content from display characteristics and hardware generation. Therefore, the format is suitable for content creation, distribution and conversion at the end-user. [c] The format requires very limited additional bandwidth compared to regular 2D signals. Therefore, the Ultra-D format is suitable as distribution format against minimal additional cost. [d] The format enables adjusting of depth range by the end-user, so it is adaptable to personal preferences. [e] The format can be generated from many difference sources, so it facilitates use of legacy 2D video formats, '3D' stereoscopic formats, etc." (http://www.seecubic.com/technology/ultra-d-format/)

130.    Based on the Defendant Stream's above disclosures, the Ultra-D System is a data processing system for improving the efficiency, quality, viewing comfort and/or visual impact of a 3D experience capable of being provided to at least one viewer of a 3D content media comprising a plurality of content sections, in conjunction with the use of at least a

portion of a plurality of predetermined 3d content modification techniques as recited in Claim 1 of the '830 patent.

131.    Upon information and belief, Defendant Stream licenses its technology to a third party, IZON TV Technologies, LLC ("IZON") having an office at 2005 Tree Fork Ln Unit 109, Longwood, FL 32750.

132.    Defendant Stream publishes a press release on its website movebeyond3d.com disclosing "IZON a Florida-based display and content services provider, has been collaborating and working closely with Stream TV Networks to develop a superior visual experience for the commercial signage market and future products for consumers." (See press release at http://movebeyond3d.com/izon-tv-begins-pre-orders-for-glasses-free-3d-product-launch/)

133.    Upon information and belief, IZON sells commercial displays and mobile devices incorporating the Ultra-D technology through its e-commerce website.  (See, e.g., http://www.izontv.com/category-s/100.htm and http://www.izontv.com/category-s/101.htm)

134.    Upon information and belief, the Ultra-D technology incorporated in the UDEM or other display devices directly infringes at least Claim 1 of the '830 patent by performing all of the steps of the claimed method.

135.    Upon information and belief, the UDEM provides an on-screen-display (OSD) menu that allows an operator to identify a content section comprising a 3D media element and to select one or more 3D content modification techniques such as "3D Factor," "3D

Offset" and "Borders" tools for the operator to improve the 3D media element thereby meeting the limitations of step (a) of Claim 1.

136.    Upon information and belief, the UDEM OSD allows the operator to apply the selected 3D content modification technique to improve the 3D media element thereby meeting the limitations of step (b) of Claim 1.

137.    Upon information and belief, the UDEM OSD allows the operator to determine a setting for at least one parameter (e.g. 62%) of the selected 3D content modification technique ("Borders") optimal for the 3D media element in future application frames thereby meeting the limitations of step (c) of Claim 1.

138.    Upon information and belief, the UDEM OSD allows the operator to associate a reference to the selected 3D content modification technique (e.g. "Borders") and the determined setting (e.g. 62%) with the 3D media element in future application frames thereby meeting the limitations of step (d) of Claim 1.

139.    Upon information and belief, the UDEM OSD allows the operator to selectively repeat the above steps for an additional section of the 3D content media.

140.    Upon information and belief, the UDEM OSD allows the operator to view in real time results of the above steps and to: selectively cancel at least one result of at least one operation of the previously performed steps and/or selectively change at least one operation previously performed at the above steps to an alternate operation.

Case 1:23-cv-00109-JAO-RT Document 69-1 Filed 04/08/23 Page 84 of 91 Page ID Desc
Case 1:11-cv-00802-RA Document 26 Filed 04/03/23 Page 84 of 91
Exhibit A    Page 68 of 409

141.    Upon information and belief, the UDEM, after the above steps, generates a file configured for playback to a viewer and applies the selected 3D content modification technique to the 3D media element using the optimal parameter, and further configured to store for each 3D media element, the selected 3D content modification technique applied to each 3D media element and the associated reference to the future 3D content modification technique and the optimal parameter.  The UDEM performs this step by, for example, including a separate depth signal next to the regular video signal extended with meta-data.

142.    Upon information and belief, UDEM processes "all [media] content (even non-3D)."  Accordingly, it meets all of the limitations of Claims 2 - 5.  (See http://www.ultra-d.com/ and http://www.seecubic.com/technology/ultra-d-format/)

143.    Upon information and belief, the UDEM meets all of the limitations of Claim 6 by including an OSD that allows manual control of one or more steps of Claim 1 by an operator.

144.    Upon information and belief, Defendant Stream intended to induce patent infringement by third party vendors (e.g., IZON), customers and/or users of devices incorporating Ultra-D technology and had knowledge through Messrs. Mathu Rajan and Raja Rajan and other employees/officers of Defendant at least as early as of September 2010 that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement of the subject matter of the '830 patent as disclosed and claimed in its parent application filed in 2009.  Defendant Stream specifically

39

Case 1:23-cv-00802-RGA Document 69-1 Filed 04/08/23 Page 64 of 91 PageID #: 68
Case 1:17-cv-00802-RGA Document 1 Filed 06/23/17 Page 64 of 91
Exhibit A    Page 69 of 409

intended and was aware that the normal and customary use of the accused products (e.g. UDEMs offered for sale by IZON) would infringe the subject matter of the '830 patent as disclosed and claimed in its parent application filed in 2009. Defendant performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the subject matter of the '830 patent as disclosed and claimed in its parent application filed in 2009 and with the knowledge, that the induced acts would constitute infringement.

145.    Upon information and belief, Defendant Stream willfully infringed the '830 patent because it had knowledge of the subject matter of the '830 patent (as disclosed and claimed in its parent application filed in 2009) as early as 2010 and has continued to infringe the '830 patent to date. Defendant Stream's infringement constitutes egregious conduct because Defendant Stream engaged in infringing acts after terminating a confidential discussion to obtain a technology license in 2010 for the technology disclosed and claimed by the parent application of the '830 patent and misappropriating confidential and proprietary information received during the confidential discussion in 2010.

**Count II**
**Infringement of U.S. Patent No. 9,521,390**
**(Against Stream)**

146.    R3D restates and realleges each of the allegations set forth above and incorporates them herein.

40

147.    Upon information and belief, the Ultra-D technology incorporated in the UDEM or other display devices directly infringes at least Claim 1 of the '390 patent by performing all of the steps of the claimed method.

148.    Upon information and belief, the UDEM provides an on-screen-display (OSD) menu that allows an operator to identify a content section comprising a 3D media element and to select one or more 3D content modification techniques such as "3D Factor," "3D Offset" and "Borders" tools for the operator to improve the 3D media element thereby meeting the limitations of step (a) of Claim 1.

149.    Upon information and belief, the UDEM OSD allows the operator to apply the selected 3D content modification technique to improve the 3D media element thereby meeting the limitations of step (b) of Claim 1.

150.    Upon information and belief, the UDEM OSD allows the operator to determine a setting for at least one parameter (e.g. 62%) of the selected 3D content modification technique ("Borders") optimal for the 3D media element in future application frames thereby meeting the limitations of step (c) of Claim 1.

151.    Upon information and belief, the UDEM OSD allows the operator to associate a reference to the selected 3D content modification technique (e.g. "Borders") and the determined setting (e.g. 62%) with the 3D media element in future application frames thereby meeting the limitations of step (d) of Claim 1.

41

152.    Upon information and belief, the UDEM OSD allows the operator to

selectively repeat the above steps for an additional section of the 3D content media.

153.    Upon information and belief, the UDEM OSD allows the operator to view in

real time results of the above steps and to: selectively cancel at least one result of at least

one operation of the previously performed steps and/or selectively change at least one

operation previously performed at the above steps to an alternate operation.

154.    Upon information and belief, the UDEM, after the above steps, generates a

file configured for playback to a viewer and applies the selected 3D content modification

technique to the 3D media element using the optimal parameter, and further configured to

store for each 3D media element, the selected 3D content modification technique applied to

each 3D media element and the associated reference to the future 3D content modification

technique and the optimal parameter.  The UDEM performs this step by, for example,

including a separate depth signal next to the regular video signal extended with meta-data.

155.    Upon information and belief, UDEM processes "all [media] content (even non-

3D)."  Accordingly, it meets all of the limitations of Claims 2 - 5.  (See http://www.ultra-

d.com/ and http://www.seecubic.com/technology/ultra-d-format/)

156.    Upon information and belief, the UDEM meets all of the limitations of Claim 6

by including an OSD that allows manual control of one or more steps of Claim 1 by an

operator.

42

157.    Upon information and belief, Defendant Stream intended to induce patent
infringement by third party vendors (e.g., IZON), customers and/or users of devices
incorporating Ultra-D technology and had knowledge through Messrs. Mathu Rajan, Raja
Rajan and other employees/officers of Defendant at least as early as of September 2010
that the inducing acts would cause infringement or was willfully blind to the possibility that its
inducing acts would cause infringement of the subject matter of the '390 patent (as
disclosed and claimed in its parent application filed in 2009).  Defendant specifically
intended and was aware that the normal and customary use of the accused products (e.g.
UDEMs offered for sale by IZON) would infringe the subject matter of the '390 patent (as
disclosed and claimed in its parent application filed in 2009). Defendant performed the acts
that constitute induced infringement, and would induce actual infringement, with the
knowledge of the subject matter of the '390 patent (as disclosed and claimed in its parent
application filed in 2009) and with the knowledge, that the induced acts would constitute
infringement.

158.    Upon information and belief, Defendant Stream willfully infringed the '390
patent because it had knowledge of the subject matter of the '390 patent (as disclosed and
claimed in its parent application filed in 2009) as early as 2010 and has continued to infringe
the '390 patent to date.  Defendant Stream's infringement constitutes egregious conduct
because Defendant Stream engaged in infringing acts after terminating a confidential
discussion to obtain a technology license in 2010 for technology disclosed and claimed by

43

the parent application of the '390 patent and misappropriating confidential and proprietary

information received during the confidential discussion in 2010.

## Count III
## Infringement of U.S. Patent No. 9,681,114
### (Against Stream)

159.    R3D restates and realleges each of the allegations set forth above and

incorporates them herein.

160.    Upon information and belief, the Ultra-D technology incorporated in the

UDEM or other display devices directly infringes at least Claim 20 of the '114 patent by

performing all of the steps of the claimed method.

161.    Upon information and belief, the UDEM provides an on-screen-display (OSD)

menu that allows an operator to identify a content section comprising a 3D media element

and to select one or more 3D content modification techniques such as "3D Factor," "3D

Offset" and "Borders" tools for the operator to improve the 3D media element thereby

meeting the limitations of step (a) of Claim 20.

162.    Upon information and belief, the UDEM OSD allows the operator to apply the

selected 3D content modification technique to improve the 3D media element thereby

meeting the limitations of step (b) of Claim 20.

163.    Upon information and belief, the UDEM OSD allows the operator to determine

a setting for at least one parameter (e.g. 62%) of the selected 3D content modification

technique ("Borders") optimal for the 3D media element in future application frames thereby meeting the limitations of step (c) of Claim 20.

164.    Upon information and belief, the UDEM OSD allows the operator to associate a reference to the selected 3D content modification technique (e.g. "Borders") and the determined setting (e.g. 62%) with the 3D media element in future application frames thereby meeting the limitations of step (d) of Claim 20.

165.    Upon information and belief, the UDEM OSD allows the operator to selectively repeat the above steps for an additional section of the 3D content media.

166.    Upon information and belief, the UDEM OSD allows the operator to view in real time results of the above steps and to: selectively cancel at least one result of at least one operation of the previously performed steps and/or selectively change at least one operation previously performed at the above steps to an alternate operation.

167.    Upon information and belief, the UDEM, after the above steps, generates a file configured for playback to a viewer and applies the selected 3D content modification technique to the 3D media element using the optimal parameter, and further configured to store for each 3D media element, the selected 3D content modification technique applied to each 3D media element and the associated reference to the future 3D content modification technique and the optimal parameter.  The UDEM performs this step by, for example, including a separate depth signal next to the regular video signal extended with meta-data.

168.    Upon information and belief, UDEM processes "all [media] content (even non-3D)."  Accordingly, it meets all of the limitations of Claims 2 - 5.  (See http://www.ultra-d.com/ and http://www.seecubic.com/technology/ultra-d-format/)

169.    Upon information and belief, the UDEM meets all of the limitations of Claim 6 by including an OSD that allows manual control of one or more steps of Claim 20 by an operator.

170.    Upon information and belief, Defendant Stream intended to induce patent infringement by third party vendors (e.g., IZON), customers and/or users of devices incorporating Ultra-D technology and had knowledge through Messrs. Mathu Rajan, Raja Rajan and other employees/officers of Defendant at least as early as of September 2010 that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement of the subject matter of the '114 patent (as disclosed and claimed in its parent application filed in 2009).  Defendant specifically intended and was aware that the normal and customary use of the accused products (e.g. UDEMs offered for sale by IZON) would infringe the subject matter of the '114 patent (as disclosed and claimed in its parent application filed in 2009). Defendant performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the subject matter of the '114 patent (as disclosed and claimed in its parent application filed in 2009) and with the knowledge, that the induced acts would constitute infringement.

171.    Upon information and belief, Defendant Stream willfully infringed the '114 patent because it had knowledge of the subject matter of the '114 patent (as disclosed and claimed in its parent application filed in 2009) as early as 2010 and has continued to infringe the '114 patent to date.  Defendant Stream's infringement constitutes egregious conduct because Defendant Stream engaged in infringing acts after terminating a confidential discussion to obtain a technology license in 2010 for technology disclosed and claimed by the parent application of the '114 patent and misappropriating confidential and proprietary information received during the confidential discussion in 2010.

## Count IV
## Breach of Confidentiality Agreement
### (Against Stream)

172.    Plaintiff restates and realleges each of the allegations set forth above and incorporates them herein.

173.    Defendant Stream has breached and continues to breach the Confidentiality Agreement by offering to sell and/or selling 3DASD related products and services incorporating 3DFusion's confidential and proprietary information.

174.    Defendant Stream also breached the Confidentiality Agreement by disclosing 3DFusion's confidential and proprietary information in U.S. Patent Application Publication No. US 2015/0249817 A1 owned by Stream's wholly owned subsidiary Ultra-D Coöperatief U.A. (See Exhibit H)

175.    Defendant Stream's breach of the Confidentiality Agreement is willful.

47

176.    Plaintiff has been damaged as a consequence of Defendant Stream's breach of the Confidentiality Agreement in excess of $20 million, to be determined at trial.

## Count V
## Promissory Estoppel
### (Against All Defendants)

177.    Plaintiff restates and realleges each of the allegations set forth above and incorporates them herein.

178.    Defendants induced 3DFusion to disclose all of their confidential and proprietary information by promising 3DFusion certain funding as described in the Term Sheet.

179.    To its significant detriment, 3DFusion reasonably relied on Defendants' promises of funding as enforceable or binding as evidenced by Defendants' attempt to terminate the Term Sheet by requiring 3DFusion, Sorokin, and Blumenthal to sign the Termination Agreement.

180.    As a consequence of 3DFusion's reasonable reliance on Defendants' promises, 3DFusion has been damaged in an amount in excess of $20 million, to be determined at trial.

## Count VI
## Unjust Enrichment
### (Against All Defendants)

181.    Plaintiff restates and realleges each of the allegations set forth above and incorporates them herein.

48

182.    Defendants have been unjustly enriched by their misappropriation of 3DFusion's confidential and proprietary information and improper interference with 3DFusion's employment and economic relations with the Team in order to become a leader in 3DASD technology in less than year, without incurring the risks and costs of a startup, at the expense of 3DFusion.

183.    Defendants in equity and in good conscience should pay to Plaintiff as a result of Defendants' unjust enrichment an amount in excess of $20 million, to be determined at trial.

## DEMAND FOR TRIAL BY JURY

Plaintiff R3D demands a jury trial on all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff R3D prays for the following relief:

1.    A declaration that Defendant Stream has infringed and are infringing one or more claims of each of U.S. Patent Nos. 8,558,830; 9,521,390; and 9,681,114 patents, and are liable to R3D for infringement under 35 USC §271(a);

2.      A declaration that Defendant Stream's infringement of one or more claims of each of the '830, the '390, and the '114 patents has been willful;

3.      A declaration that Defendant Stream has induced others to infringe one or more claims of each of the '830, the '390, and the '114 patents under 35 USC §271(b);

4.      An order enjoining Defendant Stream from infringing one or more of claims of each of the '830, the '390, and the '114 patents;

5.      If a permanent injunction is not granted, a judicial determination of the conditions for future infringement such as a royalty bearing compulsory license or such other relief as the Court deems appropriate;

6.      An award of damages, including pre-judgment and post-judgment interest, in an amount adequate to compensate R3D for Defendant Stream's infringement of one or more claims of each of the'830 patent, the '390, and the '114 patents, and that the damages be trebled pursuant to 35 U.S.C. § 284;

7.      A finding that this case is exceptional and an award of attorneys' fees pursuant to 35 U.S.C. § 285;

8.      Award Plaintiff any and all damages sustained by 3DFusion, its predecessor-in-interest as a result of Stream's breach of Confidentiality Agreement described in Count IV;

50

Case 2:23-cv-00302-JLS Doc 69-1 Filed 04/08/23 Entered 04/08/23 15:14 Page 81 of 91 Desc
Case 1:17-cv-09002-RA Document 26-3 Filed 09/23/19 Page 54 of 91
Exhibit A   Page 80 of 409

9.      Award Plaintiff any and all damages sustained by 3DFusion, its precedessor-in-interest, as a result of Defendants' inequitable conduct described in Counts V and VI.

10.     A construct trust for the benefit of Plaintiff should be imposed on Defendants with regard to the confidential and proprietary information entrusted to Defendants by 3DFusion, in order to prevent unjust enrichment.

11.     An award of attorney's fees, costs, expenses, and disbursements; and

12.     Such other and further relief as the Court deems Plaintiff may be entitled to in law and equity.

Dated: June 23, 2017                    Respectfully submitted,
                                        /s/ Chi Eng
                                        Chi Eng
                                        New Jersey Bar No. 0055961 (admitted SDNY)
                                        chi@englawfirm.com
                                        ENG LAW FIRM
                                        One Gateway Center, Suite 2600
                                        Newark, NJ 07102
                                        Telephone: 646.770.2347
                                        Facsimile: 646.568.7231

                                        **Counsel for REMBRANDT 3D HOLDING LTD**

# EXHIBIT 2

EFiled: Nov 14 2022 05:40PM EST
Transaction ID 68385020
Case No. 2022-0930-JTL

# EXHIBIT 6

**THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE** (this "Agreement") is entered into as of May 23, 2021 (the "Effective Date"), by and among, **Stream TV Networks, Inc.**, a Delaware corporation (the "Company" or "Stream TV"), **Mathu Rajan** ("M. Rajan"), and **Raja Rajan** ("R. Rajan," and, together with the Company and M. Rajan, collectively, the "Company Parties"), on the one side, and **Rembrandt 3D Holding LTD**, a Nevis corporation ("Rembrandt") on the other side. Each of the Company Parties and Rembrandt are referred to herein collectively as the "Parties" and each as a "Party".

### BACKGROUND

Stream TV is a Philadelphia-based new media company created to serve a consumer market seeking enhanced entertainment and communications experiences through devices with unlimited accessibility and superior quality;

Rembrandt is the successor to 3DFusion Corp. ("3D Fusion");

On January 6, 2017, Rembrandt filed suit against the Company in the Supreme Court of New York, New York County, which the Company removed to the U.S. District Court for the Southern District of New York captioned Rembrandt 3D Holding LTD v. Stream TV Network, Inc., et al., No. 17 Civ. 00882 (RA) (KHP) (S.D.N.Y.) (the "Litigation");

This Agreement details a global settlement arrangement between Stream and Rembrandt, intended to settle all disputes between them, existing as of the effective date of May 23, 2021 ("Effective Date"). This Agreement is subject to the Protective Order (Docket No. 60) signed by the Parties in the Litigation.

Without admitting liability for any claim or damages, the Parties to this Agreement desire to settle the Litigation and agree to enter this Settlement Agreement and Mutual Release.

NOW THEREFORE, in consideration of the mutual promises, covenants, undertakings and agreements set forth herein, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Confidentiality: The Parties have executed a Protective Order in the Litigation (Docket No. 60) and the terms of the Protective Order shall cover this Agreement.

2. Costs and Expenses Each Party shall be responsible for its own costs and expenses in negotiating the terms of this Agreement.

3. Law: This Agreement shall be governed by the laws of Delaware, without regard to its conflict of law principles.

4. Commencement Commencement of this intended settlement shall be triggered upon the execution of this Agreement and the Warrant

Agreement (Exhibit A) (which is incorporated herein by reference) and the attached Stipulation Of Voluntary Dismissal Pursuant To F.R.C.P. 41(a)(1)(A)(ii) (Exhibit B) which will be executed immediately after execution of this Agreement.

5. General Release

a. Each of the Company Parties and their agents, respective insurance companies, third-party administrators, parents, subsidiaries, affiliates, owners, officers, directors, members, managers, general partners, limited partners, agents, employees, servants, assigns, predecessors, successors, shareholders, representatives, special servicers, related entities, and attorneys do hereby fully, knowingly, voluntarily, intentionally, unconditionally, and irrevocably waive, release, and forever discharge any and all claims, debts, demands, losses, actions, causes of actions, suits, costs, damages, expenses, accounts, covenants, contracts, controversies, agreements, promises, obligations, and liabilities whatsoever, both in law and in equity, in contract, tort or otherwise, all whether known or unknown, which they may have now, or ever may have, or have had, past, present, or future, against Rembrandt and its predecessors, successors, affiliates, subsidiaries, agents, officers, directors, members, managers, employees, owners and shareholders, relating to the conduct, facts or circumstances giving rise to the Litigation prior to the Effective Date.

b. Upon payment of all payments under Section 15. Consideration, each of Rembrandt and their agents, respective insurance companies, third-party administrators, parents, subsidiaries, affiliates, owners, officers, directors, members, managers, general partners, limited partners, agents, employees, servants, assigns, predecessors, successors, shareholders, representatives, special servicers, related entities, and attorneys agree to fully, knowingly, voluntarily, intentionally, unconditionally, and irrevocably waive, release, and forever discharge any and all claims, debts, demands, losses, actions, causes of actions, suits, costs, damages, expenses, accounts, covenants, contracts, controversies, agreements, promises obligations, and liabilities whatsoever, both in law and in equity, in contract, tort or otherwise, all whether known or unknown, which they may have now, or ever may have,

or have had, past, present, or future, against any of the Company Parties and their respective predecessors, successors, affiliates, subsidiaries, agents, officers, directors, employees, and shareholders (and, in the case of M. Rajan and R. Rajan, their respective heirs, personal representatives, executors, and administrators) relating to the conduct, facts or circumstances giving rise to the Litigation prior to the Effective Date.

6. Products

(a) Provision of 4K Units – Stream TV will ship to Rembrandt 100 of the following units: Display/Monitor Model: SC65D21Q-4K 65" Ultra-D Display (the "4K Units"). It is understood by the Parties that the 4K units will be provided "as is" and have no warranty or returnability available. Rembrandt will provide Stream TV with written notice ("Delivery Notice") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice. Stream will pay transportation and all importation costs of these units. Upon execution of this Agreement Stream TV will notify Rembrandt if it will not be able to deliver any of the 4K Units and $5,250.00 will be added to the consideration under Section 15. A. for each 4K Unit that Stream TV can not provide upon execution or Stream TV will agree to provide additional 8K prototype units as a replacement for the 4K units to be delivered at up to 10 units/month starting seven months after Prototype Commencement.

(b) High Resolution Units
(1) As Stream TV builds 8K resolution units, after the Agreements are mutually executed, Stream will provide Rembrandt with eight prototypes as follows:
i) the first unit within one month of the first prototype created by Stream TV of an 8K resolution unit after execution of this Agreement ("Prototype Commencement");
ii) 2 units on or before three months from Prototype Commencement;
iii) 2 units on or before four months from Prototype Commencement; and
iv) 3 units on or before six months from

Prototype Commencement.

Stream TV will warehouse such 4K and 8K units (for the 4K units and prototypes of the 8K) in facilities until shipping is requested by Rembrandt to a destination within the United States.  Rembrandt will provide Stream TV with written notice ("Delivery Notice of Prototypes") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice of Prototypes.  Stream TV will pay transportation and all importation costs of these units. The default is that the Delivery Notice of Prototypes is to the location of 128 Bull Hill Road, Newfield New York, 14867.

It is understood notwithstanding anything to the contrary Stream TV is not obligated to hold those samples for Rembrandt if the is a change to the default location Rembrandt is unwilling to ship the units within seven days of them being completed and in such case Stream TV may use those prototypes for any purpose thereafter without any obligation to Rembrandt.

(2) Standard Products - As Stream TV builds high-resolution based 3D technology products, it shall offer Rembrandt a right of first refusal to purchase At Cost, and otherwise at standard commercial terms, the minimums provided below. It is understood by both Parties that Stream TV is not required to change its business model which may or may not include completing finished units. If Rembrandt accepts the order and meet the financial and volume requirements required by Stream TV, then Rembrandt will retain this option. If Rembrandt does not exercise this option with a specific plan within seven (7) business days, then Stream TV can offer this inventory to other customers as needed. Rembrandt will have a minimum right of first refusal to purchase Standard Products At Cost on 63,000 units plus and 7,000 units/month on execution of this Agreement and then increasing by 1,000 units/month every three months thereafter until the end of term.

Such minimum right of first refusal is cumulative and if Stream TV is not in production or Rembrandt does not use such right within a given month it carries over to future months. Rembrandt may purchase additional units by paying standard commercial terms with most favored nation status on a per unit price basis and similar shipping terms.   At present the following products defined in the attached specification sheets provided by Stream TV on June 13, 2019 are Standard Products attached hereto as Exhibit B, which is incorporated herein by reference.)

(3) Title for each of the Units shall transfer to Rembrandt, and risk of loss will be assumed by Rembrandt, upon delivery of each such Unit.

(4) Tax Matters.  Rembrandt shall be solely responsible for any taxes chargeable to the purchaser of goods in connection with or arising out of the transfer of the Units. Stream TV shall be solely responsible for any taxes chargeable to the seller of goods in connection with or arising out of the transfer of the Units.

| | |
|---|---|
| 7.  OEM | Stream TV in good faith is not finishing products but will recommend to Rembrandt certain Original Equipment Manufacturers ("OEM") that Rembrandt may wish to utilize after it fully investigates the finished products capabilities under its specifications; however, the selection of OEM(s) is at Rembrandts discretion. In such case Stream TV will provide the 3D components directly to the OEM with Rembrandt's specifications. |
| | White Label - Rembrandt may brand product purchased from Stream TV with Rembrandt trademarks.  Rembrandt will not remove any patent number marking applied by Stream. |
| 8.  Term | The Term of the Agreement shall continue through December 31, 2030. |
| 9.  Rembrandt Grant of Rights | Rembrandt hereby grants a non-exclusive license to Stream TV to all Rembrandt Technologies listed in Schedule A to this |

Agreement for Rembrandt.

| | |
|---|---|
| 10. Stream Grant of Rights | Stream TV hereby grants Rembrandt a non-exclusive license to any existing Stream technologies that Stream TV has the right to license/sub-license solely to enable Rembrandt to distribute Products described herein.  Rembrandt shall obtain or reimburse Stream for Stream's Philips license as part of the At Cost price, as applicable. |
| 11. Field | The licensed field of use from Rembrandt to Stream TV is all applications

The licensed field of use from Stream TV to Rembrandt is all applications. |
| 12. Territory | All territories whether or not patents are issued or pending or licensed.  Sale to any distributor in any territory is permitted for the Field. |
| 13. Co-Marketing | Rembrandt and Stream TV shall work cooperatively to educate and co-market the benefit of the no glasses 3D technology and agree to not disparage the other Party.

Stream will be responsible for its own sales and marketing expenses and Rembrandt will be responsible for their own sales and marketing expenses. |
| 14. Sub-license | Either Party may sublicense their rights to other parties for the purpose of having products distributed by the Party. |
| 15. Consideration | In addition to the product provided as consideration and described above, Stream TV shall provide the following as consideration:<br>a) Upon execution of this Agreement, Stream TV agrees to pay to Rembrandt the lump sum of one million five hundred twenty eight thousand ($1,528,000) USD and is due immediately.<br>b) Stream TV is providing  warrants equal to X% of the outstanding stock in Stream TV after Stream TV has raised at least sixty million dollars in capital in excess of all outstanding debt and currently liabilities, with provision of a cashless exercise price at a $$Y value per warrant, pursuant to the attached Warrant Agreement (Exhibit A), which is incorporated herein by reference. |

{00843971.DOCX 1}

"X%" shall be equal to the 2,000,000/(the number of shares in Stream TV outstanding on April 9, 2019). "$Y value" shall be equal to (the book equity value of Stream TV at issuance)/(the number of shares in Stream TV outstanding at issuance)

c)  Stream TV will pay Rembrandt a monthly fee ("Monthly Payment") beginning with the execution of the Agreement for the full Term of this Agreement, according to the following schedule:
    a.  12 months @ $28,000/per month
    b.  12 months @ $32,000/per month
    c.  12 months @ $36,000/per month
    d.  79 months @ $40,000/per month
    The monthly payments shall be accelerated upon a merger, acquisition, or change of control. No acceleration by IPO.

**16. Payments**

Stream TV shall pay each Installment and Monthly Payment by wire transfer of immediately available funds to an account designated by Rembrandt in writing below, or otherwise designated by Rembrandt in writing and delivered to mathu@streamacquistiongroup.com:

Eng Law Firm, Attorney Trust Account [TD Bank A/C# 4327484509 ABA# 031201360].

**17. Representations and Warranties**

The Parties represent and warrant to one another that they will not bring a trade secret claim based upon any information that is the basis for the Litigation or was otherwise disclosed of learned during the pendency of the Litigation.

Stream TV represents and warrants that it has not revived and will not revive any abandoned patents or patent applications that were abandoned prior to the Effective Date.

Each of the Parties hereby represents and warrants to the others that, as of the Effective Date, (i) it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (ii) the execution, delivery, and performance of this Agreement have been duly authorized by all necessary corporate or company action on its behalf, (iii) this Agreement has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation enforceable against it in accordance with the terms

of this Agreement, (iv) each individual signing this Agreement in a representative capacity acknowledges and represents that he/she is duly authorized to execute this Agreement in such capacity in the name of, and on behalf of, the designated Party; and (v) the agreements and understandings identified herein constitute all of the agreements and understandings between and among the Parties with respect to the subject matter hereof.

18. Notices

Notices required by this Agreement shall be submitted either by any form of overnight courier or by hand delivery, and simultaneously by e-mail, as follows:

To Stream TV, Raja Rajan & Mathu Rajan:
Stream TV Networks, Inc
2009 Chestnut Street
3rd Floor
Philadelphia, PA 19103
Attention: General Counsel, Mathu and Raja Rajan individually

and

XXX

To Rembrandt:
128 Bull Hill Road
Newfield, New York  14867
Attention: Stephen Blumenthal
Email: Stephen3d@mac.com

and

Eng Law Firm
369 Lexington Ave., 2nd Floor
New York, New York  10017
Attention: Chi Eng
Email: chi@englawfirm.com

Brown & Michaels, PC
118 N. Tioga St, 4th Floor
Ithaca, NY 14850
Attention: Christopher Michaels
Email: michaels@bpmlegal.com

19. Advice of Counsel    Each Party has been represented by counsel of its own selection, has reviewed this Agreement, has had the terms of this Agreement explained by counsel, and understands the contents and effect of this Agreement. Each Party enters into this Agreement wholly upon each Party's own respective judgments, beliefs and knowledge of the matters set forth herein and on the advice of each Party's own respective attorneys.

20. Entire Agreement    It is expressly understood and agreed that this Agreement along with all of the following documents: 1) the Warrant Agreement; and 2) the Protective Order in the Litigation (Docket No. 60) constitutes the entire and complete understanding and agreement among the Parties hereto in regard to the subject matter of the dispute described above and the terms hereof, and supersedes and replaces all prior negotiations, agreements or understandings among the Parties, whether written or oral, concerning the subject matter of this Agreement. Each of the Parties acknowledges and represents that no other Party or agent or attorney of any other Party has made a promise, representation, or warranty whatsoever, express or implied, not contained herein concerning the subject matter of this Agreement. Each Party acknowledges and represents that it has not executed this Agreement in reliance upon any promise, representation, or warranty whatsoever that is not expressly set forth in this Agreement.

21. Severability    If any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, such provision shall be severable from all other provisions of this Agreement, and the validity, legality, and enforceability of the remaining provisions of this Agreement shall not be adversely affected or impaired,  and shall remain in full force and effect.

22. Binding Effect    This Agreement shall be binding on, and shall be enforceable against, and shall inure to the benefit of the Parties to this Agreement and their respective past and present officers, directors, affiliates, member firms, subsidiaries, parents, successors, shareholders, members, partners, general partners, limited partners, principals, participating principals, managing members or other agents, management personnel, attorneys, servants, employees, representatives of any other kind (and any officers, directors, members or shareholders of

any of the foregoing which are not natural persons), spouses, estates, executors, estate administrators, heirs, and assigns.

23. Waiver and Amendment

No provision of or rights under this Agreement may be waived or modified unless in writing and signed by the Party whose rights are thereby waived or modified. Waiver of any one provision herein shall not be deemed to be a waiver of any other provision herein (whether similar or not), nor shall such waiver constitute a continuing waiver unless otherwise expressly so provided. This Agreement may not be amended except through an instrument in writing signed by the Parties hereto.

24. Further Assurances

Each Party shall cooperate fully in the execution and delivery of this Agreement and shall take, or cause to be taken, such further action as may be reasonably necessary or appropriate to effectuate or facilitate the terms of this Agreement, including the execution and delivery of any further documents that may be necessary or appropriate for that purpose. Each Party further agrees to take no action, directly or indirectly, to avoid or circumvent, in whole or in part, the terms of this Agreement.

25. Costs

The Parties acknowledge that each Party is to bear its own costs, fees, and expenses, including attorneys' fees, incurred in connection with the dispute giving rise to this Agreement.

26. Dispute Resolution

In the event of a dispute arising from this Settlement Agreement, the parties agree to resolve such dispute in good faith within fifteen (15) business days of receipt of notice of such dispute. If the parties fail to resolve such dispute, the parties consent to initially seek mediation by the Court in the Litigation, which Court the parties also agree shall maintain jurisdiction over any dispute arising from this Agreement.

27. Right to Attorney's Fees in Case of Breach

In the event of any dispute or litigation arising out of or concerning this Agreement, the prevailing Party shall be entitled to an award against the non-prevailing Party of its reasonable attorney's fees and costs.

28. Headings

The various headings of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement.

{00843971.DOCX 1}

29. Counterparts and Transmission of Signatures

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Original signatures transmitted by electronic mail or facsimile shall be deemed to be original signatures. No Party shall be bound hereby unless and until all other Parties have executed this Agreement.

30. Authorized Signature

Each individual signing this Agreement in a representative capacity acknowledges and represents that he is duly authorized to execute this Agreement in such capacity in the name of, and on behalf of, the designated corporation, partnership, limited liability company, trust or other entity.

31. Joint Preparation

This Agreement shall be deemed to have been prepared jointly by the Parties, and any uncertainty or ambiguity existing herein shall not be interpreted against any Party by reason of its drafting of this Agreement, but shall be interpreted according to the application of the general rules of interpretation for arm's length agreements.

IN WITNESS WHEREOF, the Parties do hereby execute this Agreement by duly authorized representatives as of the Effective Date:

**Signed for and on behalf of Defendants:**          **Signed for and on behalf of Plaintiff:**

_____          _____

Signature                                        Signature
STREAM TV NETWORK, INC.,                         REMBRANDT 3D HOLDING LTD

By: Mathu Rajan, Chief Executive Officer         By: Stephen Blumenthal, President/CEO

Date: May 23, 2021                               Date: May 23, 2021


_____

Signature
Mathu Rajan, Individually

Date: May 23, 2021

_____

Signature
Raja Rajan, Individually

Date: May 23, 2021

SCHEDULE A

1. Know how and trade secrets related to methodology for:
   a. efficiently converting, correcting and optimizing a 2D+Depth video for playback on a 3D autostereoscopic associated with the Philips technology
   b. utilizing the Philips 2d Switchable Lens technology for refractive and defractive lens switching for the creation of the 'lightfield' and 3d content artefact correction.
   c. utilizing the On Screen Display functions of Borders and "Liveliness."
2. Trademarks
3. The patents asserted in Rembrandt's First Amended Complaint, and dismissed by the Court on March 28, 2018 (ECF No. 47)

Exhibit A


(Warrant Agreement)

# WARRANT

THIS WARRANT AND THE SECURITIES ISSUABLE UPON EXERCISE OF THIS WARRANT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR QUALIFIED UNDER ANY STATE OR FOREIGN SECURITIES LAWS AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED OR ASSIGNED UNLESS (I) A REGISTRATION STATEMENT COVERING SUCH SHARES IS EFFECTIVE UNDER THE ACT AND IS QUALIFIED UNDER APPLICABLE STATE AND FOREIGN LAW OR (II) THE TRANSACTION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE ACT AND THE QUALIFICATION REQUIREMENTS UNDER APPLICABLE STATE AND FOREIGN LAW AND, IF THE COMPANY REQUESTS, AN OPINION SATISFACTORY TO THE COMPANY TO SUCH EFFECT HAS BEEN RENDERED BY COUNSEL.

Warrant Certificate No.:

Original Issue Date:

FOR VALUE RECEIVED, Stream TV Networks, Inc., a Delaware USA corporation (the "**Company**"), hereby certifies that Rembrandt 3D Holdings, Ltd ("Rembrandt") is a Nevis corporation with an office at 128 Bull Hill Road, Newfield, New York 14867, or its registered and permitted assigns (the "**Holder**"), is entitled to purchase from the Company XXX (XXX) duly authorized, validly issued, fully paid and non-assessable shares of Common Stock at a purchase price per share of $YYY (the "**Exercise Price**"), all subject to the terms and conditions set forth below in this Warrant. Certain capitalized terms used herein are defined in **Section 1** hereof.

1. Definitions. As used in this Warrant, the following terms have the respective meanings set forth below:

"**Aggregate Exercise Price**" means an amount equal to the product of (a) the number of Warrant Shares in respect of which this Warrant is then being exercised pursuant to **Section 3** hereof, multiplied by (b) the Exercise Price in accordance with the terms of this Warrant.

"**Board**" means the board of directors of the Company. "**Business Day**" means any day, except a Saturday, Sunday or legal holiday, on which banking institutions in New York City are authorized or obligated by law or executive order to close.

"**Common Stock**" means the Class A Common Stock, par value $0.00001 per share, of the Company, and any capital stock into which such Common Stock shall have been converted, exchanged or reclassified following the date hereof.

"**Exercise Date**" means the date on which the conditions to such exercise as set forth in **Section 3** shall have been satisfied at or prior to 5:00 p.m., New York time, on a Business Day, including, without limitation, the receipt by the Company of the Exercise Agreement, the Warrant and the Aggregate Exercise Price.

"**IPO**" means the Company's first underwritten public offering of its Common Stock under the Securities Act.

"**Liquidity Event**" means any liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary, or an Initial Public Offering (IPO) or sale of the Company by either stock or assets that is at least a change of control transaction.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, corporation, joint venture, trust, incorporated organization or government or department or agency thereof.

"**Termination Date**" means the date the Warrant expires, unless exercised earlier as provided herein, and such date being 5:00 p.m., New York City time, on the twentieth (20th) anniversary of the date hereof.

"**Warrant**" means this Warrant and all warrants issued upon division or combination of, or in substitution for, this Warrant.

"**Warrant Shares**" means the shares of Common Stock purchasable upon exercise of this Warrant in accordance with the terms of this Warrant. 2. Term of Warrant. Subject to the terms and conditions hereof, the Holder may only exercise this Warrant, in whole or in part, for the Warrant Shares purchasable hereunder during the Exercise Period. The "**Exercise Period**" shall be from the Liquidity Event until the Termination Date. In the event that the Company is a party to a Liquidity Event or otherwise has knowledge thereof, the Company shall provide advance written notice thereof to Holder. 3. Exercise of Warrant.

(a) **Exercise Procedure**. This Warrant may be exercised, in whole or in part, at the option of the Holder, on any Business Day during the Exercise Period, for the Warrant Shares, upon:

(i) surrender of this Warrant to the Company at its then principal executive offices (or an indemnification undertaking with respect to this Warrant in the case of its loss, theft or destruction), together with an Exercise Agreement in the form attached hereto as **Exhibit A** (an "**Exercise Agreement**"), duly completed (including specifying the number of Warrant Shares to be purchased) and executed; and

(ii) payment to the Company of the Aggregate Exercise Price in accordance with **Section 3(b)**.

(b) **Payment of the Aggregate Exercise Price**. Payment of the Aggregate Exercise

Price shall be made, at the option of the Holder, by either of the following methods:

(i) delivery to the Company of a certified or official bank check payable to the order of the Company or by wire transfer of immediately available funds to the following account of the Company: HSBC Bank USA NA, 120 Broadway, New York NY 10271, USA, Fed ABA Routing # 021001088, SWIFT Code # MRMDUS 33, Account #221049207 (Stream TV Networks, Inc.) or otherwise to an alternative account designated in writing in advance by the Company, in the amount of such Aggregate Exercise Price; or

(ii) by instructing the Company to issue Warrant Shares then issuable upon exercise of all or any part of this Warrant on a net basis such that, without payment of any cash consideration or other immediately available funds, the Holder shall surrender this Warrant in exchange for the number of Warrant Shares as is computed using the following formula:

$$X = Y (A - B) \div A$$

Where
:

X = the number of Warrant Shares to be issued to the Holder.

Y = the total number of Warrant Shares for which the Holder has elected to exercise this Warrant pursuant to Section 3(a).

A = the fair market value of one Warrant Share as of the applicable Exercise Date; whereby for purposes of this section "fair market value" shall be defined as (i) the average of the closing sale prices of the Common Stock for the five (5) trading days immediately prior to (but not including) the Exercise Date in the event that the Company's Common Stock is traded on an exchange or is quoted on an over the counter market, or in the absence of a trading market for the Common Stock, then (ii) as the Holder and the Company agree, or in the absence of such an agreement, by arbitration in accordance with the rules then standing of the American Arbitration Association, before a single arbitrator to be chosen from a panel of persons qualified by education and training to pass on the matter to be decided

B = the Exercise Price in effect under this Warrant as of the applicable Exercise Date.

(c) **Delivery of Stock Certificates**. Upon receipt by the Company of the Exercise Agreement, surrender of this Warrant and payment of the Aggregate Exercise Price (in

accordance with **Section 3(b)** hereof), the Company shall, as promptly as practicable, and in any event within three (3) Business Days thereafter, execute (or cause to be executed) and deliver (or cause to be delivered) to the Holder a certificate or certificates representing the Warrant Shares issuable upon such exercise. The stock certificate or certificates so delivered shall be, to the extent possible, in such denomination or denominations as the exercising Holder shall reasonably request in the Exercise Agreement and shall be registered in the name of the Holder or, subject to compliance with **Section 4** below, such other Person's name as shall be designated in the Exercise Agreement. This Warrant shall be deemed to have been exercised and such certificate or certificates of Warrant Shares shall be deemed to have been issued, and the Holder or any other Person so designated to be named therein shall be deemed to have become a holder of record of such Warrant Shares for all purposes, as of the Exercise Date.

(d) **Fractional Shares**. The Company shall not be required to issue a fractional Warrant Share upon exercise of any Warrant. As to any fraction of a Warrant Share that the Holder would otherwise be entitled to purchase upon such exercise, the Company shall pay to such Holder an amount in cash (by delivery of a certified or official bank check or by wire transfer of immediately available funds) equal to the product of (i) such fraction multiplied by (ii) the Exercise Price of one Warrant Share on the Exercise Date.

(e) **Valid Issuance of Warrant and Warrant Shares**. With respect to the exercise of this warrant, the Company hereby represents, covenants and agrees that:

(i) This Warrant is duly authorized and validly issued. (ii) All Warrant Shares issuable upon the exercise of this Warrant pursuant to the terms hereof shall be, upon issuance, and the Company shall take all such actions as may be necessary or appropriate in order that such Warrant Shares are, validly issued, fully paid and non-assessable.

(f) **Conditional Exercise**. Notwithstanding any other provision hereof, if an exercise of this Warrant is to be made in connection with a Liquidity Event, such exercise may at the election of the Holder be conditioned upon the consummation of such Liquidity Event, in which case such exercise shall not be deemed to be effective until immediately prior to the consummation of such Liquidity Event.

(g) **Reservation of Shares**. Immediately prior to the exercise of this Warrant, the Company shall reserve and keep available out of its authorized but unissued Common Stock, solely for the purpose of issuance upon the exercise of this Warrant, the maximum number of Warrant Shares issuable upon the exercise of this Warrant, and the par value per Warrant Share shall at all times be less than or equal to the Exercise Price. The Company shall not increase the par value of any Warrant Shares receivable upon the exercise of this Warrant above the Exercise Price then in effect and shall take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid

and non-assessable shares of Common Stock upon the exercise of this Warrant.

(h) **Adjustment of Exercise Price.** In the event of changes in the outstanding Common Stock by reason of stock dividends, split-ups, recapitalizations, reclassifications, combinations or exchanges of shares, separations, reorganizations, liquidations, or the like, the number and class of shares available under the Warrant in the aggregate and the Exercise Price shall be correspondingly adjusted to give the Holder of the Warrant, on exercise for the same aggregate Exercise Price, the total number, class, and kind of shares as the Holder would have owned had the Warrant been exercised prior to the event and had the Holder continued to hold such shares until after the event requiring adjustment. The form of this Warrant need not be changed because of any adjustment in the number of Warrant Shares subject to this Warrant. Prompt notice of any adjustment made pursuant to this **Section 3(h)** shall be given to the Holder.

(i) **Combination.** While this Warrant is outstanding, in the event of a Combination (as defined below), each Holder shall have the right to receive upon exercise of the Warrant the kind and amount of shares of capital stock or other securities or property which such Holder would have been entitled to receive upon or as a result of such Combination had such Warrant been exercised immediately prior to such event (subject to further adjustment in accordance with the terms hereof). In the event of a Combination in which the Company is not the surviving entity, the Company shall provide that the surviving or acquiring Person (the "Successor Company") in such Combination will assume by written instrument the obligations under this Section 3(i) and the obligations to deliver to the Holder such shares of stock, securities or assets as, in accordance with the foregoing provisions, the Holder may be entitled to acquire. "Combination" means an event in which the Company consolidates with, mergers with or into, or sells all or substantially all of its assets to another Person, where "Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

(j) **Market Stand-Off**. Holder shall not sell, dispose of, transfer, make any short sale of, grant any option for the purchase of, or enter into any hedging or similar transaction with the same economic effect as a sale in relation to, any Common Stock (or other securities) of the Company held by Holder, for a period of time specified by the managing underwriter(s) (not to exceed one hundred eighty (180) days following the effective date of a registration statement of the Company filed under the Securities Act. Holder agrees to execute and deliver such other agreements as may be reasonably requested by the Company and/or the managing underwriter(s) which are consistent with the foregoing or which are necessary to give further effect thereto. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to such Common Stock (or other securities) until the end of such period. As a pre-condition

to any proposed transfer of this Warrant or any Common Stock issued hereunder, any proposed transferee of the Holder (or any subsequent transferee of this Warrant or any such shares of Common Stock) will be required to agree to the terms of this **Section 3(i)** and the Company may refuse to recognize or register and purported transfer that is not made in compliance with the terms hereof. 4. Transfer of Warrant. This Warrant shall not be transferred (in whole or in part) without the prior written consent of the Company, which consent shall not be unreasonably withheld.

5. Holder Not Deemed a Stockholder; Limitations on Liability. Except as otherwise specifically provided herein, prior to the issuance to the Holder of the Warrant Shares to which the Holder is then entitled to receive upon the due exercise of this Warrant, the Holder shall not be entitled to vote or receive dividends or be deemed the holder of shares of capital stock of the Company for any purpose by virtue of being the Holder of this Warrant alone, nor shall anything contained in this Warrant be construed to confer upon the Holder, as such, any of the rights of a stockholder of the Company or any right to vote, give or withhold consent to any corporate action (whether any reorganization, issue of stock, reclassification of stock, consolidation, merger, conveyance or otherwise), receive notice of meetings, receive dividends or subscription rights, or otherwise. In addition, nothing contained in this Warrant shall be construed as imposing any liabilities on the Holder to purchase any securities (upon exercise of this Warrant or otherwise) or as a stockholder of the Company, whether such liabilities are asserted by the Company or by creditors of the Company.

6. Replacement on Loss; Division and Combination.

(a) **Replacement of Warrant on Loss**. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and upon delivery of an indemnity reasonably satisfactory to the Company and, in case of mutilation, upon surrender of such Warrant for cancellation to the Company, the Company, at the Holder's expense, shall execute and deliver to the Holder, in lieu hereof, a new Warrant of like tenor and exercisable for the same number of Warrant Shares as the Warrant so lost, stolen, mutilated or destroyed; provided, that, in the case of mutilation, no indemnity shall be required if this Warrant in identifiable form is surrendered to the Company for cancellation.

(b) **Division and Combination of Warrant**. Subject to compliance with the applicable provisions of this Warrant as to any transfer or other assignment which may be involved in such division or combination, this Warrant may be divided or, following any such division of this Warrant, subsequently combined with other Warrants, upon the surrender of this Warrant or Warrants to the Company at its then principal executive offices, together with a written notice specifying the names and denominations in which new Warrants are to be issued, signed by the respective Holders or their agents or attorneys. Subject to compliance

with the applicable provisions of this Warrant as to any transfer or assignment which may be involved in such division or combination, the Company shall, at the Company's expense, execute and deliver a new Warrant or Warrants in exchange for the Warrant or Warrants so surrendered in accordance with such notice. Such new Warrant or Warrants shall be of like tenor to the surrendered Warrant or Warrants and shall be exercisable in the aggregate for the same number of Warrant Shares as the Warrant or Warrants so surrendered in accordance with such notice.

7. Warrant Register. The Company shall keep and properly maintain at its principal executive offices books for the registration of the Warrant and any transfers thereof. The Company may deem and treat the Person in whose name the Warrant is registered on such register as the Holder thereof for all purposes, and the Company shall not be affected by any notice to the contrary, except any assignment, division, combination or other transfer of the Warrant effected in accordance with the provisions of this Warrant.

8. Notices. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing.

9. Cumulative Remedies. The rights and remedies provided in this Warrant are cumulative and are not exclusive of, and are in addition to and not in substitution for, any other rights or remedies available at law, in equity or otherwise.

10. Equitable Relief. Each of the Company and the Holder acknowledges that a breach or threatened breach by such party of any of its obligations under this Warrant would give rise to irreparable harm to the other party hereto for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, the other party hereto shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction.

11. Entire Agreement. This Warrant constitutes the sole and entire agreement of the parties to this Warrant with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Warrant and the Subscription Agreement, the statements in the body of this Warrant shall control.

12. Successor and Assigns. This Warrant and the rights evidenced hereby shall be binding upon and shall inure to the benefit of the parties hereto and the successors of the Company and the successors and permitted assigns of the Holder. Such successors and/or permitted

assigns of the Holder shall be deemed to be a Holder for all purposes hereunder.

13. No Third-Party Beneficiaries. This Warrant is for the sole benefit of the Company and the Holder and their respective successors and, in the case of the Holder, permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Warrant.

14. Headings. The headings in this Warrant are for reference only and shall not affect the interpretation of this Warrant.

15. Amendment and Modification; Waiver. Except as otherwise provided herein, this Warrant may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by the Company or the Holder of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Warrant shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

16. Severability. If any term or provision of this Warrant is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Warrant or invalidate or render unenforceable such term or provision in any other jurisdiction.

17. Governing Law. This Warrant shall be governed by and construed in accordance with the internal laws of the State of Delaware USA without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware USA or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware USA.

18. Submission to Jurisdiction. Any legal suit, action or proceeding arising out of or based upon this Warrant or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Delaware in each case located in the city of Wilmington, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by certified or registered mail to such party's address

set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

19. Waiver of Jury Trial. Each party acknowledges and agrees that any controversy which may arise under this Warrant is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Warrant or the transactions contemplated hereby.

20. No Strict Construction. This Warrant shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

[Signature appears on following page.]

IN WITNESS WHEREOF, the Company has duly executed this Warrant on the Original
Issue Date.

STREAM TV NETWORKS,
INC.

By: _____

Name: Raja Rajan
Title: Chief Operating Officer

# EXHIBIT A

## FORM OF EXERCISE AGREEMENT

**TO: STREAM TV NETWORKS, INC.**

**ATTENTION:**
**LEGAL**

(1) The undersigned hereby elects to purchase _____ shares of the Common Stock of Stream TV Networks, Inc. (the "**Company**") pursuant to the terms of the attached Warrant, and tenders herewith payment of the Exercise Price in full, together with all applicable transfer taxes, if any.

- OR -

The undersigned hereby elects to purchase _____ shares of the Common Stock of the Company pursuant to the terms of the net exercise provisions set forth in **Section 3(b)(ii)** of the attached Warrant, and shall tender payment of all applicable transfer taxes, if any.

(2) Please issue a certificate or certificates representing said shares of Common Stock in the name of the undersigned or in such other name as is specified below:

_____

(Name)

_____

_____

(Address)

(3) The undersigned represents that (i) the aforesaid shares of Common Stock are being acquired for the account of the undersigned for investment and not with a view to, or for resale in connection with, the distribution thereof and that the undersigned has no present intention of distributing or reselling such shares; (ii) the undersigned is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision regarding its investment in the Company; (iii) the undersigned is experienced in making investments of this type and has such knowledge and background in financial and business matters that the undersigned is capable of evaluating the merits and risks of this investment and protecting the undersigned's own interests; (iv) the undersigned understands that the shares of Common Stock issuable upon exercise of this Warrant have not been registered under

the Securities Act of 1933, as amended (the "**Securities Act**"), by reason of a specific exemption from the registration provisions of the Securities Act, which exemption depends upon, among other things, the bona fide nature of the investment intent as expressed herein, and, because such securities have not been registered under the Securities Act, they must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available; (v) the undersigned is aware that the aforesaid shares of Common Stock may not be sold pursuant to Rule 144 adopted under the Securities Act unless certain conditions are met and until the undersigned has held the shares for the number of years prescribed by Rule 144, that among the conditions for use of the Rule is the availability of current information to the public about the Company and the Company has not made such information available and has no present plans to do so; and (vi) the undersigned agrees not to make any disposition of all or any part of the aforesaid shares of Common Stock unless and until there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with said registration statement, or the undersigned has provided the Company with an opinion of counsel satisfactory to the Company, stating that such registration is not required.


(Date) (Signature)


(Print name)

Exhibit B

(Standard Products)

**Exhibit B**

**(Standard Products)**

{00843971.DOCX 1}



# 65" 8KL. 16 Million Pixel
## Landscape Mode Ultra-D Display



We think the final customer will want these specs once they make it as final goods for the commercial industry.

| Feature | Description |
|---|---|
| **Panel Features: 2D mode\***  *From 2D Panel Spec | • 65" 16 Million Pixel TFT LCD with LED Backlight<br>• Landscape Mode Display<br>• Supports 4320 x 3840@60Hz<br>• Displays up to 10-bit 1.07 Billion Colors<br>• High Brightness up to 500cd/m2<br>• Ultra-High contrast ratio (4000:1) |
| **Panel Features: 3D mode** | • Proprietary Ultra-D 3D Optical System delivers a Seamless Viewing Experience<br>• Proprietary Rendering Module delivers Ultra-D converted content up to 3D Full UHD with High Brightness up to 350 nits<br>• Real Time Conversion technology enables playback of legacy content to Glasses Free 3D<br>• Horizontal 3D Viewing Angle:  90°<br>• Vertical 3D Viewing Angle:  40°<br>• User Adjustable Depth Control<br>• Software Switchable 2D/3D<br>• Optimum viewing distance 3 – 5 Meters |
| **HDMI Input**  **Resolutions, Framerates and Formats** | • HDMI 1.4 and 2.1 Compatible<br>• HDCP 1.4 and 2.1 Support<br>• 480p60, 576p50, 720p50, 720p60, 720p60 3DFP, 1080p24, 1080p60, 1080p24 3DFP, 480i60, 576i50, 1080i50, 1080i60, 4K30, 4K60, 8K60<br>• Supports 2D & 3D Stereo (Top/Bottom & Side by Side & Frame Packed) |
| **Wireless Connectivity** | • Wi-Fi 802.11ac, BT to Support NFC, RS232 |
| **Real Time Video Conversion (Via HDMI)** | • Manually configurable for 2D-as-2D, 2D to Ultra-D, and 3D Stereo to Ultra-D (Top/Bottom & Side by Side)<br>• Automatic detection of 3D S/S Frame Packed |
| **Content Playback** | • HDMI, USB, LAN or WiFi |
| **Event Logging** | • Playlist status<br>• Software update status<br>• Monitor/Display Status |
| **Remote Control** | • IR Based |
| **User interface** | • On Screen Key Guide |
| **Software Update** | • Software update via USB, Ethernet or Wi-Fi |
| **I/O** | • 2X USB, 3X HDMI 1.4a/2.1,<br>• 1X RJ45, RS232, 1X 3.5mm **Stereo** Audio O/P |
| **Status Indicators** | • Power Off/On/Sleep/Standby LED |
| **Device Interactive Support** | • CEC, Ethernet Control & Communications, RS232 Control |
| **Region Allocation:** | • China, NA, SA, EU, India, Mid East |
| **Power Requirements** | • 110~240V, Sleep Mode, Standby Mode |
| **Other** | • RoHs compliant |
| **Certifications** | • UL, C-UL, FCC, CE, CCC |
| **Warranty** | • 1-year commercial warranty |
| **Display Dimensions/Wt.** | • TBD |

(00843765.DOCX 1)65" 8KL Digital Signage Specification Sheet
Subject to Change

Thursday, June 13, 2019                                    Version  1



## Specifications [c]

| Feature | Description |
|---|---|
| Panel Features: 2D mode*<br>*From 2D Panel Spec | • Color Active Matrix TFT Module<br>• 4K (H:3840 x V:2160) 15.6" Display<br>• Component Depth: 8-Bit 16.7M Colors<br>• Pixel Arrangement: RGB Vertical Stripe<br>• Pixel Density:285 PPI<br>• Contrast Ratio: 1000:1<br>• Brightness: 300 nit |
| Ultra-D™ Module Features [a] | • Proprietary Ultra-D™ Glasses Free 3D Optical Stack<br>• Proprietary Ultra-D™ Glasses Free 3D Rendering<br>• Horizontal 3D Viewing Angle:  120°<br>• Vertical 3D Viewing Angle:  40°<br>• Optimum viewing distance 35mm to 42mm |
| Viewing Orientation | • Ultra-D™: Horizontal<br>• 2D Horizontal |
| Module Thickness | • |
| Module Input | • VESA eDP Interface |
| Module Power Draw | • ASIC:<br>• IP: |
| Region Allocation: | • |
| Certifications | • |
| Module Dimensions/Wt. | • |

(a) Ultra-D™ Feature
(b) Optional Ultra-D™ Feature
(c) Subject to Change



### 15.6" Ultra-D™ Glasses-Free 3D Display Module Brief

General Description:

The 15.6" Ultra-D™ Glasses-Free 3D Display Module incorporates a 15.6" 4K TFT Panel integrated with Stream TV Networks Ultra-D™ 3D Optical Stack and Proprietary Ultra-D™ 3D Rendering technology.

**Target Use Cases**

- Consumer Gaming Entertainment Product such as a Laptop or Mini PC
- Commercial Digital Signage Display for Kiosk or a Small Footprint Requirement

**Optimal Viewing**

- 35cm – 42cm

**Deliverable Implementations** [c]

- Optics & IP
  Optics: Display panel with StreamTV™ proprietary lens
  IP: TSMC (10 or 7 nm), or Hard Macro



# EXHIBIT 3

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE STREAM TV NETWORKS, INC.    )    C.A. No. 2020-0766-JTL
OMNIBUS AGREEMENT LITIGATION    )

## OPINION

Date Submitted: October 2, 2022
Date Decided: October 3, 2022

Steven P. Wood, Andrew S. Dupre, Brian R. Lemon, Sarah E. Delia, Stephanie H. Dallaire, Travis J. Ferguson, McCARTER & ENGLISH, LLP, Wilmington, Delaware; *Attorneys for Plaintiff and Counterclaim Defendant Stream TV Networks, Inc. and for Third-Party Defendants Mathu Rajan and Raja Rajan.*

Jenness E. Parker, Bonnie W. David, Lilianna Anh P. Townsend, Trevor T. Nielsen, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Eben P. Colby, Marley Ann Brumme, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Boston, Massachusetts; *Attorneys for Defendants and Counterclaim Plaintiff SeeCubic, Inc.*

Steven L. Caponi, K&L GATES LLP, Wilmington, Delaware; *Attorney for Interested Party Hawk Investment Holdings Ltd.*

**LASTER, V.C.**

Stream TV Networks, Inc. ("Stream") has filed a motion for emergency post-judgment relief (the "Emergency Motion"). Stream maintains that SeeCubic, Inc. and Hawk Investment Holdings Ltd. ("Hawk") acted in concert to transfer 100% of the equity of Technovative Media, Inc. ("Technovative"), comprising 1,000 shares of its common stock (the "Shares"), from SeeCubic to Hawk. The Emergency Motion contends that this conduct was contumacious because the court had made clear in a partial final judgment entered under Rule 54(b) (the "Partial Final Judgment") and in other rulings that SeeCubic was supposed to transfer its assets to Stream. Those rulings did not envision a choreographed transfer in which SeeCubic caused Technovative to list Stream as the owner of the Shares, while at the same time ensuring that Hawk could deploy its rights as a secured creditor to seize the Shares before Stream could react.

As a remedy, the Emergency Motion seeks an order canceling Hawk's ownership of the Shares and vesting ownership in Stream. Stream also seeks an injunction barring SeeCubic and anyone acting in concert with it from interfering with Stream's ownership of the Shares until further order of the court.

This decision holds that SeeCubic and Hawk engaged in contumacious conduct. Shad L. Stastney was the puppet master who pulled the strings. He controls SeeCubic and Technovative, and he also controls SLS Holdings VI, LLC ("SLS"), Stream's only secured creditor other than Hawk. Stastney caused SeeCubic to notify Hawk that the transfer was coming. To effectuate the transfer, Stastney gave instructions to SeeCubic's counsel to give instructions to himself (this time in his capacity as an officer and director of Technovative) to title the Shares in Stream's name. As planned, Hawk immediately asserted its rights to

the Shares, at which point Stastney transferred title to the Shares into Hawk's name. Stastney and SLS benefitted, because SLS's rights as a secured creditor are senior to Hawk's.

In what appears to be a remedy of first impression, the court cancels Hawk's purported ownership of the Shares and vests ownership in Stream. The court also grants injunctive relief barring SeeCubic, Hawk, and Stastney from interfering with Stream's ownership of the shares or the rights associated with them, but only for a period of ten days. At the end of ten days, the injunction will lift. At that point, SeeCubic, Hawk, and Stastney can exercise any rights they believes that they possess. Stream can respond as it sees fit.

## I.      FACTUAL BACKGROUND

There once was an agreement among Stream, SLS, Hawk, and fifty-two of Stream's stockholders (the "Omnibus Agreement"). In the Omnibus Agreement, Stream agreed to transfer all of its assets (the "Legacy Stream Assets") to a newly formed entity controlled by SLS and Hawk. In return, SLS and Hawk agreed to extinguish Stream's secured debt. SLS and Hawk subsequently formed SeeCubic as the entity contemplated by the Omnibus Agreement. As part of the deal, Stream's minority stockholders received the right to exchange their shares in Stream for shares in SeeCubic, and Stream received the right to one million shares of common stock in SeeCubic.

A committee of Stream's board of directors (the "Resolution Committee") negotiated and approved the Omnibus Agreement. When the Resolution Committee caused Stream to enter into the Omnibus Agreement, Stream was insolvent and failing. Stream had defaulted on its secured debt. Stream also carried more than $16 million in trade debt

2

and had fallen months behind on payments to customers and suppliers. Stream had even failed to make the payments necessary to maintain the patents on its technology, which were essential to its business. As the holders of debt secured by all of Stream's assets, SLS and Hawk had the power to take everything and leave Stream and its stockholders with nothing. By causing Stream to enter into the Omnibus Agreement, the Resolution Committee ensured that Stream and its stockholders got something.

Stream's controlling stockholders—the Rajan brothers—objected to the Omnibus Agreement. Using their stockholder-level power as the holders of Stream's super-voting Class B common stock, they reconstituted the board of directors and reasserted control over Stream. They immediately set about raising every challenge to the Omnibus Agreement that they could think of.

In September 2020, Stream filed this action, seeking a declaration that the Omnibus Agreement was invalid and an injunction against SeeCubic trying to enforce it. SeeCubic counterclaimed, seeking a declaration that the Omnibus Agreement was valid and an injunction against Stream trying to interfere with it.

In December 2020, the court ruled that it was reasonably probable that the Omnibus Agreement was a valid and enforceable agreement, and the court issued an injunction barring Stream from failing to comply with the agreement. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020) (the "Injunction Decision") (subsequent history omitted). After the issuance of the Injunction Decision, SeeCubic acquired the Legacy Stream Assets. In September 2021, the court granted a motion for summary

3

judgment and declared the Omnibus Agreement to be a valid agreement. The court entered a partial final judgment in favor of SeeCubic, and Stream appealed.

In June 2022, the Delaware Supreme Court declared that the Omnibus Agreement could not have become effective without the approval of the holders of a majority of the Class B common stock. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del. 2022). The high court remanded the case for further proceedings. The mandate issued on July 1. Dkt. 237 (the "Mandate").

On August 7, 2022, the court entered the Partial Final Judgment. Dkt. 266. That order held that in light of the Mandate, the Omnibus Agreement did not validly transfer legal title to any of the Legacy Stream Assets from Stream to SeeCubic. The court directed the parties to "cooperate to effectuate the Mandate, including by causing SeeCubic to transfer legal title to the [Legacy Stream Assets] from SeeCubic to Stream as expeditiously as possible." *Id.* ¶ 4 (the "Transfer Obligation").

When the court implemented the Partial Final Judgment, SeeCubic was making efforts to assert Hawk's rights as a secured creditor. SeeCubic argued that Hawk held a security interest in all of the Legacy Stream Assets and could levy on those assets to satisfy Stream's outstanding debt, which Hawk claimed exceeded £350 million. SeeCubic maintained that it would be a futile act to return the Legacy Stream Assets to Stream, only to have Hawk seize them again. And because SLS and Hawk had appointed SeeCubic as their designee for the purpose of exercising their creditors' rights, the Legacy Stream Assets would make a quick round trip from SeeCubic to Stream and back again.

SeeCubic advanced these arguments because the Partial Final Judgment enjoined SeeCubic and those acting in concert with it from taking any action to "use, impair, encumber, or transfer the Assets, except as necessary to maintain the Assets in the ordinary course of business and preserve their value pending transfer to Stream." *Id.* ¶ 5 (the "Post-Remand Injunction"). At a minimum, the Post-Remand Injunction created uncertainty as to whether SeeCubic and the secured creditors could exercise their creditors' rights.

In an effort to clarify maters, Hawk intervened and moved to modify the Post-Remand Injunction to confirm that the secured creditors could exercise their rights. Dkt. 274 (the "Modification Motion"). Stream filed a competing motion to enforce the Partial Final Judgment. Dkt. 297 (the "Motion to Enforce"). The latter motion asked the court to exercise its equitable powers and the explicit authority provided under Court of Chancery Rule 70(a) to cancel SeeCubic's ownership of the Shares and vest title in Stream. *Id.* at 3.

Seeking to induce a decisional sequence in which the court ruled on the Modification Motion first, SeeCubic did not respond to the Motion to Enforce. On September 27, 2022, the court entered an order stating: "The court intends to rule promptly on the Motion to Enforce, filed by Stream TV Networks, Inc. on September 9, 2022. As yet, no opposition to that motion has been filed. Given the nature of the motion, any opposition should have been filed by now. In any event, any opposition is due not later than noon on Friday, September 30, 2022." Dkt. 303.

On September 28, 2022, the court issued an opinion in which it denied the Modification Motion. Dkt. 306 (the "Modification Denial"). One of the factors the court considered in denying the Modification Motion was the relative ease with which SeeCubic

could achieve substantial compliance with the Transfer Obligation by causing SeeCubic to transfer the Shares to Stream. *Id.* at 7. The court also explained that Stream faced irreparable harm because unless it got back the Legacy Stream Assets, Stream would not be able to use the Legacy Stream Assets "to conduct business and make efforts to satisfy the claims of Hawk and Stream's other creditors." *Id.* at 8. The Modification Denial made clear that the secured creditors could not act in concert with SeeCubic to exercise their rights until after SeeCubic returned the Legacy Stream Assets to Stream.

At that point, the handwriting was on the wall. Unless SeeCubic advanced an exceptionally persuasive and as-yet unpresented argument in response to the Motion to Enforce, the court would order SeeCubic to transfer the Shares to Stream. And the court would not permit the secured creditors to act until Stream had enjoyed some opportunity to exercise the rights associated with the Shares and re-establish an approximation of the status quo that existed before the Injunction Decision.

Anticipating that outcome, SeeCubic and Hawk planned a series of coordinated acts in which SeeCubic would transfer the Shares to Stream in a manner that would enable Hawk to seize them by acting before Stream could respond. The Shares would end up in the hands of Hawk, just as SeeCubic and Hawk wanted.

As part of their plan, SeeCubic sent Hawk a letter dated September 29, 2022. Acting in its capacity as the designee of SLS and Hawk for the purpose of exercising their rights as secured creditors, SeeCubic made the following request:

> SeeCubic hereby request and directs that, upon receiving notice that the [Shares] have been registered in the name of [Stream], Hawk enforce remedies in respect of the Collateral pursuant to the Stream Security

6

Agreements and the Uniform Commercial Code, including without limitation, … having the [Shares] registered in the name of Hawk [and] voting the [Shares] as directed by SeeCubic.

Dkt. 316 Ex. A (the "September 29 Letter").

At 11:45 a.m. on September 30, 2022, SeeCubic informed the court that "this morning, SeeCubic caused Technovative to transfer title to the common stock of Technovative from SeeCubic to Stream." Dkt. 310 at 2. SeeCubic provided a copy of its stock ledger evidencing the transfer of the Shares from SeeCubic to Stream. *Id.* Ex. A. SeeCubic took the position that because it had taken this step, it had complied with the Transfer Obligation, and the Motion to Enforce was moot.

Twenty-three minutes later, in a letter attached to an email sent at 12:08 p.m., Hawk's counsel instructed Stastney, acting in his capacity as a director and officer of Technovative, to register the Shares in the name of Hawk. Dkt. 312 Ex. A. The letter consisted of two pages of dense legalese. *Id.* It could not have been drafted in the twenty-three minutes that elapsed between the filing of SeeCubic's letter to the court and the sending of the email. SeeCubic and Hawk plainly planned the sequence in advance, as demonstrated by the September 29 Letter.

In an email sent three minutes later, at 12:11 p.m., Stastney wrote: "Received and acknowledged, attached please find a copy of the updated official stock ledger of Technovative. We will await Hawk's further instructions." *Id.* Stastney could not have reviewed Hawk's letter, considered its implications, and updated Technovative's stock ledger in the three minutes that elapsed between the sending of Hawk's email and his response. Hawk and Stastney plainly planned the sequence in advance.

7

At 1:18 p.m. on September 30, 2022, Hawk informed the court that it had issued a "Proxy Notice" to a "Technovative officer/director demanding that Hawk be listed as the holder of record of all Technovative stock in the Technovative share registry." Dkt. 311 at 1. Hawk reported that the "officer/director" had complied with the request. Hawk also informed the court that it had acted by written consent as Technovative's sole stockholder to remove all of the existing directors of Technovative, amend the Technovative bylaws to reduce the number of directors, and elect Stastney as Technovative's sole director. Hawk stated that as a result of its exercise of those rights, Hawk had assumed control over Technovative and intended to proceed to exercise its remaining rights as a secured creditor, including proceeding with a sale pursuant to Article 9 of the Uniform Commercial Code. *Id.* at 2.

Hawk's written consent consisted of three pages of carefully drafted legalese. Dkt. 315 Ex. C. The consent attached a set of amended and restated bylaws for Technovative that consisted of fourteen pages of carefully drafted legalese. Hawk could not have drafted the written consent and bylaws, served them on Technovative, and then written the court in the sixty-seven minutes between Stastney's email response and counsel's letter. Hawk had the written consent and the bylaws ready to go, because everything had been stage managed in advance.

At 3:04 p.m. on September 30, 2022, Stream filed the Emergency Motion. Dkt. 312. Stream asserted that SeeCubic, Hawk, and Stastney acted in concert to effectuate a transfer of the Shares from SeeCubic to Hawk in a contumacious violation of the Partial Final Judgment and the Post-Remand Injunction. Stream maintained that the court plainly

8

contemplated that Stream would have control over the Shares for an interval measured in days rather than minutes. Stream explained that SeeCubic and Hawk necessarily acted in concert to orchestrate the sequence of events that occurred between 11:45 a.m. and 1:18 p.m.

As relief, the Emergency Motion seeks an order vesting ownership of the Shares in Stream. It also seeks an order enjoining SeeCubic and anyone acting in concert with SeeCubic, including Hawk and Stastney, from interfering with Stream's ownership of the Shares until further order of the court.

The court directed SeeCubic and Hawk to respond to the Emergency Motion within twenty-four hours, with their filings due on a Saturday. The court afforded Stream the opportunity to reply on Sunday. In the best tradition of this court, counsel complied.

SeeCubic reiterated that it sought to comply with the Partial Final Judgment by transferring the Shares. Dkt. 316. SeeCubic stressed that it had transferred the Shares to Stream and not to Hawk. SeeCubic acknowledged the September 29 Letter and its instruction that Hawk enforce its creditors' rights after receiving notice that the Shares had been transferred. To counsel's credit, SeeCubic did not try to hide the fact that it gave Hawk a heads up about what was coming so that Hawk could be prepared to exercise its rights before Stream could respond.[1]

---

[1] One suspects that there may have been more communications behind the scenes.

9

Hawk explained that it had "implemented a reasoned strategy to exercise its contractual rights as a secured creditor of Stream" and that it had "strived to ensure that it was in full compliance with the Court's various orders, instructions, and mandates." Dkt. 315 ¶ 1. Hawk stressed that it had always made clear its intention to exercise its rights as a secured creditor as soon as possible, so when the transfer of the Shares created the opportunity, Hawk acted. *Id.* ¶ 2. Hawk represented that it intended to file promptly a petition under Section 225 of the Delaware General Corporation Law, 8 *Del. C.* § 225, to resolve the validity of Hawk's exercise of its creditors' rights at the trial court level. *Id.* ¶ 3. Hawk represented that to the extent it had failed to comply with the court's orders, it would take whatever steps were necessary to remedy the situation, but asked that any ruling provide clear guidance as to when Hawk could exercise its contractual rights. *Id.* ¶ 4.

Hawk responsibly acknowledged that it "could have waited longer to exercise its rights" and given Stream an opportunity to act, but Hawk maintained that anything Stream did would breach its contractual obligations to the secured creditors, and Hawk saw no need to afford Stream an opportunity to engage in a contractual breach. *Id.* ¶ 23. According to Hawk, "[b]y acting swiftly, Hawk avoided the unnecessary step of Stream ignoring— without justification—Hawk's Proxy Rights." *Id.*

Hawk also commendably acknowledged that the court "may wish to maintain the status quo pending resolution of the anticipated Section 225 Action." *Id.* ¶ 25. Hawk offered to enter into "a voluntary status quo order that would preclude any actions that would encumber the [Legacy Stream Assets] pending resolution of the Section 225 Action." *Id.*

10

In its reply, Stream cast SeeCubic and Hawk as having engaged in "a scam that did not satisfy any of the actual written injunction obligations." Dkt. 317 ¶ 2.b. Stream stressed that that Hawk had asked to exercise its creditors' rights in the Modification Motion. Then, after the court issued the Modification Denial, SeeCubic and Hawk engineered a transaction that achieved the result Hawk had sought. *Id.*

Stream also suggested that the court had "misjudged the underlying morality narrative" and was viewing the secured creditors as "white hat entities," while presumably casting Stream's principals in the black hat roles. *Id.* ¶ 5 n.3. The court has not approached this case at any point with an eye towards making the good guys win and the bad guys lose. Rather, the court has sought to enforce the governing legal framework. Before the issuance of the Delaware Supreme Court's decision, the court viewed the Omnibus Agreement as providing that framework, and the court therefore sought to enforce it. It is true that Stream's principals did not enhance their credibility when they sought to evade the Injunction Decision and to create what this court previously described as "litigation chaos." *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 5816820, at *1 (Del. Ch. Dec. 8, 2021) (subsequent history omitted). Eventually, however, Stream ended up with its current counsel, pursued an appeal, and secured a reversal of this court's decision. Regardless of how a trial judge might regard the opposite substantive outcome, that is how the system is supposed to work.

Since the Delaware Supreme Court's decision, the court has sought to implement the Mandate while at the same time recognizing that the secured creditors possess what appear to be powerful rights. It is true that the court has not provided Stream with the

11

immediate relief it has demanded, but that is not because of any bias against Stream's principals or favoritism towards the secured creditors. The court rather has sought to navigate the difficulties that rescinding a transaction invariably presents while taking into account the implications of the secured creditors' rights.

## II.    LEGAL ANALYSIS

The Emergency Motion seeks to hold SeeCubic, Hawk, and Stastney in contempt. Courts have inherent authority to impose contempt sanctions as a means of enforcing their orders. *DiSabatino v. Salicete*, 671 A.3d 1344, 1348 (Del. 1996) ("Courts have 'an inherent contempt authority, . . . as a power necessary to the exercise of all others.'" (quoting *United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994))). The power "is essential to the administration of justice." *Id.* (quoting *Young v. United States ex rel. Vuitton et Fils, S.A.*, 481 U.S. 787, 795 (1987)). Court of Chancery Rule 70(a) codifies this court's inherent authority to enter contempt sanctions for noncompliance. The rule recognizes that the court may "adjudge [a] party in contempt" if the party "fails to comply within the time specified" with "a judgment direct[ing] a party to . . . perform any . . . specific act." Ct. Ch. R. 70(a).

To be held in contempt, a party must be bound by an order, have notice of it, and nevertheless violate it. *Arbitrium v. Johnston,* 1997 WL 589030, at *3 (Del. Ch. Sept. 17, 2009). Notably, intent is not an element of an application to enforce an order by holding a party in contempt. "The moving party is not required to show that the violation was willful or intentional, but the intentional or willful nature of a contemnor's acts may be considered in determining the appropriate sanction." *Litterst v. Zenph Sound Innovations, Inc.*, 2013 WL 565137, at *3 (Del. Ch. Oct. 17, 2013) The contemnor must know about the order, but

it is not a defense for contemnor to claim that it did not intend to violate the order or that the contemnor misunderstood the order. *See Mother African Union First Colored Methodist Protestant Church v. Conference of African Union First Colored Methodist Protestant Church*, 1998 WL 892642, at *6 (Del. Ch. Dec. 11, 1998) ("Thus, if the respondents' actions are violative of this Court's Order, their state of mind is immaterial for purposes of contempt adjudication, but the intentional or willful nature of their acts may be considered in determining the appropriate sanction.").

Whether a party should be held in contempt is a discretionary matter for the Court. *Dickerson v. Castle*, 1991 WL 208467, at *3 (Del. Ch. Oct. 15, 1991). The violation "must not be a mere technical one, but must constitute a failure to obey the Court in a meaningful way." *Id.* at *4 (internal quotation omitted).

## A.    SeeCubic, Hawk, And Stastney Are In Contempt.

Through the Transfer Obligation, the Partial Final Judgment ordered SeeCubic to transfer the Legacy Stream Assets to Stream. SeeCubic, Hawk, and Stastney plainly knew about it.

Through the Post-Remand Injunction, the Partial Final Judgment ordered SeeCubic not to act in concert with any other parties for the purpose of using Legacy Stream Assets for any purpose outside of the ordinary course of business. SeeCubic, Hawk, and Stastney plainly knew about it. Indeed, they sought to modify it so that Hawk could enforce its rights as a secured creditor.

Rather than complying with the Transfer Obligation and the Post-Remand Injunction, SeeCubic, Hawk, and Stastney acted in concert to evade those obligations. For

months, SeeCubic failed to comply the Transfer Obligation. SeeCubic raised arguments about how difficult it was to comply. SeeCubic also advanced arguments about creditors' rights. It is now clear how easy it was for SeeCubic to comply. All it took was an updated stock ledger restoring title to the Shares to Stream.

Once it became clear that the court would order SeeCubic to transfer the Shares to Stream, SeeCubic, Hawk, and Stastney coordinated to ensure that the Shares would end up in Hawk's hands. The choreographed sequence of events took place during an extended lunch hour, starting at 11:45 a.m. and ending at 1:18 p.m. It was not possible for Hawk and Stastney to have taken the actions they did without advance notice, preparation, and an overarching plan.

Those actions violated the Transfer Obligation and the Post-Remand Injunction by ensuring that the Shares ended up with Hawk rather than Stream. The parties' actions in this case resemble the events in *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647 (Del. Ch. Nov. 17, 2014). There, an entity (Related Sub) entered into a stipulated order under which it committed to hold $11.8 million on behalf of another entity (Network) pending the outcome of an arbitration between the owners of Network. *Id.* at *6. One of the disputants (Samson) controlled Network. After the arbitral panel ruled against Samson, Related Sub could have released the funds to Network in a manner that would have enabled the prevailing party to assert its rights to all of the released funds. Instead, Related Sub coordinated with Samson so that he could immediately distribute the money to the investors in Network, including himself, before the prevailing party could assert its rights. Samson was thus able to wire $5.8 million to himself and a colleague that they otherwise could not

14

have received. The court held that the parties' coordinated conduct violated the stipulated order. *Id.* at *37. SeeCubic, Hawk, and Stastney essentially did the same thing.

SeeCubic and Hawk have argued in response that their actions did not change the facts on the ground because Hawk is only the nominal holder of the Shares, with Stream remaining the equitable owner. They insist that Hawk only possesses title for the purposes of exercising its rights as a creditor, with actual title passing to the successful bidder in an Article 9 sale. Hawk points out that Stream will be able to participate in the sale and could be the successful bidder. Hawk also points out that Stream will be entitled to receive any proceeds from the sale to the extent they exceed the amount of the secured debt.

That is all true, but SeeCubic and Hawk's coordinated effort still changed the facts on the ground. The Partial Final Judgment envisioned Stream having the opportunity respond to the secured creditors with the benefit of the Legacy Stream Assets. Through their choreographed actions, SeeCubic, Hawk, and Stastney prevented Stream from ever having that chance.

## B.    The Remedy

As a remedy for the contumacious conduct, Stream seeks two forms of relief. First, Stream seeks an order divesting Hawk of its ownership of the Shares and vesting ownership in Stream. Second, Stream seeks an injunction barring SeeCubic and any party acting in conjunction with SeeCubic from interfering with Stream's ownership of the Shares pending further order of the Court.

"A trial judge has broad discretion to impose sanctions for failure to abide by its orders" but its "decision to impose sanctions must be just and reasonable." *In re*

*TransPerfect Glob., Inc.*, 2019 WL 5260362, at *13 (Del. Ch. Oct. 17, 2019) (internal quotations omitted) (quoting *Gallagher v. Long*, 940 A.2d 945 (Del. 2007) (TABLE) (citing *Lehman Cap. v. Lofland*, 906 A.2d 122, 131 (Del. 2006) (internal citations omitted)); *see also In re Rinehardt*, 575 A.2d 1079, 1082 (Del. 1990); *Rittenhouse Assocs. v. Frederic A. Potts & Co., Inc.*, 382 A.2d 235, 236 (Del. 1977). In selecting contempt sanctions, the court is "obligated to use the least possible power adequate to the end proposed." *TransPerfect*, 2019 WL 5260362, at *13.

A remedy for contempt may be either civil or criminal. A contempt remedy is civil in nature if it serves to coerce compliance with the order being violated or to remedy injury suffered by other parties as a result of the contumacious behavior. *Del. State Bar Ass'n v. Alexander*, 386 A.2d 652, 665 (Del. 1978). A contempt remedy is criminal in nature if it is punitive. *Id.* If the court seeks to impose a criminal sanction for contempt, then additional requirements apply. *Id.*

In this case, the sanctions that the court will impose seek only to remedy the non-compliance. Their only effect is to enforce the Partial Final Judgment in a manner that recreates the closest possible approximation of the state of affairs that existed in fall 2020, before the issuance of the Injunction Decision.

### 1.    The Ownership Remedy

The menu of remedies that a court has available to enforce its orders includes the ability to declare the ownership of property that is within the court's jurisdiction. Court of Chancery 70(a) states: "If real or personal property is within the jurisdiction of the Court, the Court in lieu of directing a conveyance thereof may enter a judgment divesting the title

of any party and vesting it in others and such judgment has the effect of a conveyance executed in due form of law." Ct. Ch. R. 70(a).

Shares of stock in a Delaware corporation are personal property within the jurisdiction of the Court. *See* 8 *Del. C.* §169. Technovative is a Delaware corporation. The Shares are therefore within the jurisdiction of the court.

The parties have not cited, and research has not revealed, a ruling in which the court has invoked its authority under Rule 70(a) to address the ownership of shares. That does not mean it has not happened. The form of relief is straightforward and could have been implemented in an unreported order.

In any event, the fact that a particular form of relief is unprecedented does not mean it is unwarranted or unavailable. "[W]here the circumstances of the case are such as to require the application of equitable principles, the fact that no precedent can be found in which relief may be granted under a similar state of facts is no reason for refusing relief." *Modern Dust Bag Co., Inc. v. Com. Tr. Co.*, 91 A.2d 469, 469 (Del. Ch. 1952). *"*Extraordinary facts will sometimes call for extraordinary remedies." *Cantor v. Fitzgerald*, 2001 WL 536911, *3 n.18 (Del. Ch. May 11, 2001). "[O]nce a right to relief in Chancery has been determined to exist, the powers of the Court are broad and the means flexible to shape and adjust the precise relief to be granted so as to enforce particular rights and liabilities legitimately connected with the subject matter of the action." *Wilmont Homes, Inc. v. Weiler*, 202 A.2d 576, 580 (Del. 1964) (citations omitted). Equity requires the court "to adapt the relief granted to the requirements of the case so as to give to the parties that to which they are entitled." *Id.*

17

Divesting Hawk of its purported ownership of the Shares is a fair and equitable result. It remedies the choreographed transfer of the Shares from SeeCubic to Hawk and achieves the outcome intended by the Partial Final Judgment. Accordingly, Hawk is divested of title to the Shares, which is vested in Stream.

As with the Partial Final Judgment itself, this ruling is without prejudice to the ability of Hawk and SLS to exercise their rights as secured creditors. They must exercise those rights, however, after Stream has had a fair opportunity to assert control over its assets. That reality leads the court to impose a further remedy.

### 2.      The Injunctive Remedy

A court can enter injunctive relief to enforce its orders. The Transfer Obligation is an example of a mandatory injunction. The Post-Remand Injunction is an example of a prohibitive injunction. To ensure that parties fulfill the intent of the Partial Final Judgment, additional albeit limited injunctive relief is warranted.

The court's goal since the issuance of the Mandate has been to restore the parties as closely as possible to the state they occupied in fall 2020, before the issuance of the Injunction Decision. At that point, Stream owned the Legacy Stream Assets, including the Shares. The secured creditors were pursuing an action to foreclose on the Legacy Stream Assets in Delaware Superior Court, but they had not yet exercised any of their extra-judicial rights. To the extent that the secured creditors had sought then to exercise their extra-judicial rights, Stream would have owned the Legacy Stream Assets and potentially been in a position to resist. The creditors did not have Stastney as their man on the inside to carry out their demands.

18

The current situation therefore does not restore the status quo. By acting as they did, SeeCubic, Hawk, and Stastney took advantage of the privileged position that they held as a result of the Injunction Decision. In an effort to perpetuate that privileged position, they choreographed the events of September 30, 2022. But the Delaware Supreme Court has determined that the Injunction Decision was erroneous, so SeeCubic, Hawk, and Stastney never should have enjoyed the privileged position that they occupied, and they should not have been able to perpetuate that privileged position through a choreographed transfer of the Shares.

An injunction is necessary to restore a first approximation of status quo as it existed in fall 2020 and to create an environment in which Stream has the ability to take control over its assets and prepare to respond to the secured creditors' exercise of their rights. The question is how long that injunction should last.

Stream asks for an indefinite injunction that would endure until the court orders otherwise. Stream has not articulated grounds for an injunction of such duration. One might surmise that after being without the Legacy Stream Assets for eighteen months, Stream believes that it should have a lengthy period to get back on its feet before confronting its creditors.

The problem with that outcome is that in fall 2020, when the Injunction Decision issued, Stream was failing and had defaulted on its secured debt. Although SLS and Hawk had not yet exercised their extrajudicial rights, they had the ability to do so at any time.

The equities of the case warrant restoring Stream to the position it occupied in fall 2020. The equities do not warrant putting Stream in a substantially better position than it

19

was in back then. As a practical matter, Stream will be in a better position, because SeeCubic turned around what had been a failing business, and Stream is getting that business back. That near term outcome is unavoidable and is part of what will necessitate the adjudication of SeeCubic's claim for unjust enrichment, at least to the extent Stream retains its assets. Stream need not receive further benefits in terms of an indefinite stay from this court.

An injunction with a duration of ten days is sufficient. That result gives Stream ten more days than it had in fall 2020. Stream is therefore better off, but not appreciably so.

For a period of ten days, SeeCubic, Hawk, Stastney, and anyone acting in concert with them are enjoined from taking any action to interfere with Stream's ownership of the Shares. During that period, Stream may freely exercise the rights associated with the Shares. Once the eleventh day, the starting gun will fire, and SeeCubic, Hawk, and Stastney may pursue whatever rights they believe they have.

### III.    CONCLUSION

The Emergency Motion is granted in part. Title to the Shares is vested in Stream. For a period of ten days, SeeCubic, Hawk, Stastney, and anyone acting in conjunction with them are enjoined from interfering with Stream's ownership of the Shares or with Stream's exercise of rights associated with the Shares.

# EXHIBIT 4

**EFiled: Oct 20 2022 04:42PM EDT**
**Transaction ID 68284086**
**Case No. 2022-0930-JTL**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

HAWK INVESTMENT HOLDINGS
LTD.,

        Plaintiff,

    v.

STREAM TV NETWORKS, INC. and
TECHNOVATIVE MEDIA INC.,

        Defendants.

C.A. No. 2022-0930-JTL

**PUBLIC VERSION FILED**
**OCTOBER 20, 2022**

## VERIFIED COMPLAINT FOR DECLARATORY RELIEF AND PURSUANT TO 8 *DEL. C.* § 225

Plaintiff Hawk Investment Holdings Limited ("Hawk" or "Plaintiff") by and through its undersigned counsel, brings this action for declaratory relief and pursuant to Section 225 of the General Corporation Law of the State of Delaware, 8 *Del. C.* § 225 ("Section 225").

### NATURE OF THE ACTION[1]

1.    Plaintiff brings this action against Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative" and, together with Stream, the "Defendants") having been adjudicated a secured creditor of Stream that possesses a wide array of secured creditor rights that may be invoked as a result of numerous uncured defaults by Stream and Stream's failure to meet its repayment

---

[1] Unless otherwise noted, capitalized terms have the meaning defined in the Fact Section of the Complaint.

obligations.  Through this action, Hawk seeks a declaration confirming Defendants must comply with and not obstruct Hawk's secured creditor rights, including, but not limited to, the Marshaling Right, the Proxy Right, and the right to conduct a sale of the Collateral pursuant to Article 9 of the Uniform Commercial Code ("Article 9 Sale").  Hawk further seeks an Order from this Court pursuant to Section 225 confirming Hawk's nominee constitutes the validly elected board of directors of Technovative.

2.     From 2014 to 2020, Hawk and Stream executed a series of Notes, which provided Stream with loans worth tens of millions of dollars, which with interest are now valued in excess of $142,000,000.  In exchange for the loans and pursuant to several Security Agreements and Pledge Agreements, Stream granted Hawk security interests in substantially all of its assets, which are defined under the operative documents as the "Collateral."

3.     Upon an "Event of Default" as defined in the Notes, the secured creditor rights granted to Hawk included, but were not limited to, the right to: (i) order Stream to assemble and marshal the Collateral in anticipation of an Article 9 Sale; (ii) sell the Collateral pursuant to an Article 9 Sale; and (iii) exercise Hawk's Proxy Rights with respect to the Pledged Interests in order to exert control over the Collateral by controlling various operating subsidiaries of Stream (collectively the "Secured Creditor Rights").

2

4.     To date, Stream has refused to—or been unable to—meet its repayment obligations under the Notes and has defaulted on the Notes for various independent reasons, which defaults cannot be cured.  Both the Court of Chancery and the Delaware Supreme Court have held that Hawk is a secured creditor and Stream is in default under the Notes.

5.     On October 17, 2022, Hawk validly exercised its Secured Creditor Rights by delivering a Proxy Notice to Technovative (the "October Proxy Notice"). Pursuant to the October Proxy Notice, Hawk instructed Technovative to update its share ledger/register (the "Register") to reflect that Hawk is the sole nominal shareholder of Technovative, with legal title remaining with Stream pending an Article 9 Sale.[2]

6.     Also on October 17, 2022, as sole nominal shareholder of Technovative, Hawk then delivered a Shareholder Consent to Technovative (the "October Shareholder Consent").  The October Shareholder Consent reconstituted the Technovative Board with Mr. Stastney as the sole director and validly amended and restated the Technovative by-laws (the "By-Laws").[3]

7.     Also on October 17, 2022, Hawk delivered to Defendants a letter (the "October Marshaling Directive") formally exercising its Marshaling Rights

---

[2] The October Proxy Notice is attached as **Exhibit A**.
[3] The October Shareholder Consent is attached as **Exhibit B**.

3

(defined below) and directing Defendants to marshal and turn over possession of the

Collateral to its designee SeeCubic, Inc. ("SeeCubic").[4]

8.     By enforcing its Secured Creditor Rights, Hawk intends to exercise its

Proxy Rights to vote the equity interests of Technovative (the "Technovative

Interests") in a manner that ensures Technovative faithfully supports the effort to

marshal and preserve Hawk's Collateral, as it prepares to conduct a commercially

reasonable Article 9 Sale.

9.     On October 17, 2022, despite the prior findings of the Delaware

Supreme Court and Court of Chancery, and having no valid justification for doing

so, Stream repudiated Hawk's status as a secured creditor and Defendant's

obligations to comply with Hawk's exercise of the Secured Creditor Rights,

including the October Marshaling Directive.  Defendants have also wrongfully

denied the validity of the October Proxy Notice, the October Shareholder Consent,

and that Mr. Stastney is the sole director of the Technovative board.  Stream and

Technovative refuse to update the Register pursuant to the October Proxy Notice

and assert that Mr. Mathu Rajan is the sole member of the Technovative board.

10.     As a result of Stream's judicially determined defaults and rejection of

its obligations under the Notes, Hawk is entitled to a declaration confirming Hawk

is a secured creditor, affirming Hawk's exercise of the Secured Creditor Rights and

---

[4] The October Marshaling Directive is attached as **Exhibit C**.

requiring Defendants to honor all of their contractual obligations under the Loan
Documents.

11.    Hawk is further entitled to an order pursuant to Section 225 that the
October Proxy Notice is valid, that Hawk is the sole nominal shareholder of record
of Technovative, that Technovative's board has been validly reconstituted with Mr.
Shadron Stastney as the sole director, and that the By-Laws were validly amended.

## PARTIES

12.    Plaintiff Hawk Investment Holdings Ltd. is a holding company
organized and existing under the laws of Guernsey with its registered office at
St. Peter Port, Guernsey, Channel Islands.  Plaintiff is both a shareholder and secured
creditor of Stream.

13.    Defendant, Stream TV Networks, Inc., is a Delaware corporation
founded in 2009 with a principal place of business in Philadelphia, Pennsylvania.
Stream is a holding company with its main assets being the equity in its direct and
indirect subsidiaries.

14.    Defendant Technovative Media Inc. is a Delaware corporation, and a
wholly-owned, direct subsidiary of Stream.  Technovative is an intermediate holding
company between Stream and several operating subsidiaries within the Stream
corporate family that hold a bulk of the Collateral (Technovative's direct and indirect
subsidiaries, collectively, the "Operating Subsidiaries").

5

## FACTS

### A.    Stream History and Capitalization

15.    Stream was founded in 2009 to pursue new technologies that would enhance users' entertainment experiences by allowing television and tablet manufacturers to convert two-dimensional devices into three-dimensional experiences without the need for specialized viewing glasses.

16.    Between March 26, 2014, and February 26, 2020, Hawk lent Stream funds in the aggregate principal amount of approximately £50,600,000.00, €183,601.19, and $1,152,757.14 pursuant to seventeen separate promissory notes (collectively, as may be amended from time to time, the "Notes").

17.    As of July 15, 2022, the total amount due and owing under the Notes, including accrued interest thereon, was approximately £125,389,667.03, €252,073.38, and $1,692,022.38.

18.    The material and relevant economic terms of each of the Notes are substantially similar.[5]  Section 12 or 13 of each Note defines an "Event of Default," in relevant part, as having occurred if: (a) Stream failed to pay any principal amount when due; (c) Stream filed for bankruptcy; (d) Stream breached any of the terms of

---

[5] The Notes are collectively attached as **Exhibit D**. Due to their similarity and for convenience, when citing a provision of any Note, this Complaint will merely cite to "Notes" with a reference to the relevant provision(s).

the Notes or Security Agreements (as defined below); and/or (e) one of Stream's

subsidiaries defaulted on and failed to cure any funding arrangement to which it is a

party.[6]

19.    Contemporaneously with the execution of each of the Notes, Stream

and Hawk executed a separate Security Agreement (collectively, as may have been

amended from time to time, the "Security Agreements"),[7] with each Security

Agreement dated on or about the same date as each related Note.

20.    The Security Agreements granted Hawk a security interest in Stream

collateral.    Specifically, the Security Agreements provide that "[Stream] hereby

grants to Hawk a security interest in all of [Stream]'s right, title and interest in and

to the Collateral."[8]

21.    As more fully set forth in section 1.2, each Security Agreement defines

"Collateral" to include, among other things, (a) Inventory, (b) Accounts,

(c) equipment/fixtures, (d) general intangibles, (e) deposit accounts, and

(f) investment property, including after-acquired property and additions and

---

[6] *See* Notes, at § 12/13(a), (c), (d), (e).

[7] The Security Agreements are collectively attached as **Exhibit E**.  The Security
Agreements include essentially identical operative provisions.  As such, and for
convenience, when citing a provision of any Security Agreement, this Complaint
will merely cite to "Security Agreements" with a reference to the relevant provision.

[8] *See* Security Agreements, § 2.1.

accretions to each of the foregoing.[9]  The Collateral is broadly defined in the Loan

Documents so as to include substantially all of the assets of Stream.

22.     Under the terms of the Security Agreements, upon the occurrence of an

Event of Default, Hawk is empowered to "require [Stream] to assemble the

Collateral at a place designated by Hawk, which is reasonably convenient for the

parties [and to] take physical possession of Inventory and other tangible Collateral

and of [Stream]'s records pertaining to all Collateral that are necessary to properly

administer and control the Collateral …." (the "Marshaling Right").[10]  Thereafter,

Hawk may "sell, lease or otherwise dispose of the Collateral in whole or in part, at

public or private sale, on or off the premises of [Stream]," including pursuant to an

Article 9 Sale.[11]

23.     The Security Agreements also appointed Hawk as Stream's "

---

[9] Security Agreements, § 1.2.

[10] Security Agreements, § 4.1(a), (b).

[11] Security Agreements, § 4.1(b).

██████████████████████████████████████████

██████████████████████████████ " (the "POA").[12]

24.    Hawk's security interests are properly perfected on the subject Collateral pursuant to timely filed and updated financing statements, the most recent continuation of which was filed as of February 20, 2020.

25.    With regard to most of the Notes, on or about the same date each of the Notes was executed, Hawk, on the one hand, and Stream and its direct and indirect subsidiaries Technovative, Ultra-D Ventures, CV ("Ultra-D Ventures"), and Ultra-D Coöperatief, U.A. ("Ultra-D Coop"), on the other, also executed a Pledge Agreement (collectively, as may have been amended from time to time, the "Pledge Agreements" and, together with the Notes and the Security Agreements, the "Loan Documents").[13]

26.    The Pledge Agreements pledge to Hawk the "Pledged Interests," which are defined as "the membership interests, shares of capital stock or other equity interests listed on Schedule 1 [t]hereto."[14]  Included on Schedule 1, listing the "Pledged Interests," were the Technovative Interests as pledged to Hawk by Stream,

---

[12] *See* Security Agreements, § 4.2.

[13] The Pledge Agreements are collectively attached as **Exhibit F**.  The Pledge Agreements include essentially identical operative provisions.  As such, and for convenience, when citing a provision of any Pledge Agreement herein, this Motion will merely cite to "Pledge Agreements" with a reference to the relevant provision.

[14] Pledge Agreements, §§ 1, 2.

as well as the interests of the Operating Subsidiaries, including Media Holdings Delaware, LLC ("MHD"), Ultra-Ventures, Technology Holdings Delaware, LLC ("THD"), Ultra-D Coop, Stream TV International B.V., and SeeCubic B.V.

27.    Each of the Pledge Agreements provides that upon the occurrence of an Event of Default, Hawk is authorized and empowered to have the Pledged Interests registered in its name and to vote such interests as if Hawk is the owner (the "Proxy Rights").  Specifically, Section 6 of the Pledge Agreements provides:  "Hawk shall have the right to have any or all shares of Pledged Interests registered in its name … and Hawk … may thereafter exercise all voting, related and other rights pertaining to such Pledged Interests at any meeting of members or shareholders of an Issuer or otherwise … as if it were the absolute owner thereof …."[15]

28.    Hawk filed UCC financing statements perfecting its interest in the Pledged Interests on March 17, 2020.

### B.    Stream's Business Struggles and Stream Defaults on the Notes

29.    Eleven years after its founding, Stream was still a pre-revenue, development-stage company, notwithstanding the millions of dollars in support provided by Hawk and other investors.  Stream did not yet have a product and, as a result, had no way to generate revenue.  Financially, Stream's principal means of survival has been its secured debt.

---

[15] Pledge Agreements, § 6.

30.     In early 2020, Stream owed approximately $16 million in trade debt to its customers and suppliers, in addition to the debt owed to secured creditors. Stream was also months behind on payments to vendors.

31.     Stream was in dire financial condition and even missed its payroll obligations on at least one occasion.  Stream would have missed its payroll obligations on other occasions if not for additional emergency capital infusions from Hawk, as well as a short-term loan from another investor.

32.     By no later than February 2020, an Event of Default occurred, after Stream failed to make payments under the Notes upon the expiration of each of their maturity dates, which maturity dates had been amended and extended multiple times previously under various amendments to the Notes.

33.     Stream also defaulted on the Notes by filing for bankruptcy on February 25, 2021 and by consenting to an involuntary bankruptcy filed on May 23, 2021.[16]  Although both bankruptcy cases were dismissed as having been filed in bad faith, such actions constituted Events of Default under the Notes.

34.     As of the date hereof, Stream is in default under the terms of the Loan Documents, which defaults remain outstanding and not subject to cure.

---

[16] *See In re Stream TV Networks, Inc.*, No. 21-10433 (KBO) (Bankr. D. Del. Feb. 24, 2021); *In re Stream TV Networks, Inc.*, No. 21-10848 (KBO) (Bankr. D. Del. May 23, 2021).

35.     On more than one occasion, the Delaware Supreme Court and/or the Court of Chancery have confirmed that Hawk is a secured creditor of Defendants, Stream is in default of its lending obligations, and Hawk has Secured Creditor Rights that "are strong and may well result in Stream having to transfer the [Collateral] back to SeeCubic in its capacity as Hawk's designee and agent."[17]

36.     Similarly, Stream's President, Mathu Rajan, stated in a sworn declaration in connection with the first Stream bankruptcy that Hawk had issued the Notes to Stream, and that Stream had pledged "substantially [all] of its assets as a security for the Hawk Notes."[18]

37.     As recently as October 12, 2022, Stream and the Rajans acknowledged the value of Hawk's secured debt was in excess of $138,000,000.

38.     Hawk's status as a secured creditor, the contours of its Secured Creditor Rights and Stream's status as a defaulted borrower have been judicially established and are not subject to challenge.  Additionally, Stream is estopped from disputing Hawk's status as a secured creditor and/or the existence of the Events of Defaults under the Loan Documents due to its prior judicial admissions.

---

[17] *See In re Stream TV Networks, Inc., Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL, 2022 WL 4491925, at *4 (Del. Ch. Sept. 28, 2022).

[18] *See* Declaration of Mathu Rajan in Support of First Day Motions, ¶ 24, *In re Stream TV Networks, Inc.*, No. 21-10433 (KBO) (Bankr. D. Del. Mar. 12, 2021), attached as **Exhibit G**.

### C.    The Omnibus Agreement and Related Litigation

39.    In response to Stream's precarious financial situation and the occurrence of the Events of Default, Stream, certain of its shareholders, and its secured creditors executed the "Omnibus Agreement" in May 2020.

40.    Under the Omnibus Agreement, the parties formed SeeCubic as a new entity into which all of the Collateral was deposited pursuant to a "friendly foreclosure" arrangement. The primary vehicle for transferring ownership of the Collateral to SeeCubic was a transfer of the Technovative Interests to SeeCubic.

41.    Extensive litigation over the validity of the Omnibus Agreement ensued including *In re Stream TV Networks, Inc. Omnibus Agreement Litigation* (the "Omnibus Agreement Litigation").[19]

42.    On June 15, 2022 in the Omnibus Agreement Litigation, the Supreme Court of Delaware found that execution of the Omnibus Agreement was not approved in accordance with Stream's governing documents and was ineffective. The Delaware Supreme Court issued a mandate to the Court of Chancery necessitating the rescission of the transactions occurring under the Omnibus Agreement, effectuating the return of the Collateral to Stream.

---

[19] *In re Stream TV Networks, Inc. Omnibus Agreement Litigation*, C.A. No. 2020-0766-JTL (Del. Ch. 2020) (hereinafter "*Omnibus Agreement Litig.*").

### D.    Hawk Seeks to Exercise Its Secured Creditor Rights

43.    Upon the Delaware Supreme Court's decision nullifying the Omnibus Agreement, Hawk began taking steps to secure the Collateral and pursue an Article 9 Sale for the benefit of all Stream creditors by exercising its Secured Creditor Rights.  Hawk worked to engage a reputable and well-known investment banker to conduct the Article 9 Sale process.

44.    In accordance with the Supreme Court's mandate, on August 10, 2022, the Court of Chancery held that the parties were to "caus[e] SeeCubic to transfer legal title to the [Collateral] from SeeCubic to Stream as expeditiously as possible."[20]

45.    Hawk sought an amendment to this ruling so it could continue to exercise its Secured Creditor Rights, which the Court of Chancery denied on September 28, 2022.  As part of this denial, the Court of Chancery informed the parties that it considered the most efficient route to effectuate the Supreme Court's mandate being the turnover of the Technovative Interests by SeeCubic to Stream, thereby turning over direct and indirect control of the Operating Subsidiaries and Collateral.

46.    On September 30, 2022, Hawk received notice that SeeCubic had transferred the Technovative Interests back to Stream by order of the Court of

---

[20] Order at ¶ 9, Dkt. No. 266, *Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL (Del. Ch. Aug. 10, 2022).

14

Chancery.  That same day, Hawk exercised its rights under the Pledge Agreements and issued a Proxy Notice (the "September Proxy Notice") to Technovative. Pursuant to the September Proxy Notice, Hawk instructed Technovative to update the Register to reflect that Hawk is the sole nominal shareholder of Technovative, with legal title residing with Stream.[21]

47.    Hawk sent the September Proxy Notice to Mr. Mathu Rajan, President of Stream, and Mr. Shadron Stastney, who, at that time, was Technovative's sole director and officer, in compliance with the provisions of the Pledge Agreements.

48.    Mr. Stastney then completed the registration of the Technovative Interests in accordance with Technovative's contractual obligations under the Pledge Agreements.

49.    Hawk subsequently executed and delivered to Technovative a Shareholder Consent (the "September Shareholder Consent").  The September Shareholder Consent amended and restated the By-Laws, removed all then-serving directors of Technovative, and appointed Mr. Stastney as the sole director.

**E.    The Court Grants an Emergency Motion Compelling Turnover of the Technovative Shares to Stream**

50.    On September 30, 2022, after Hawk transmitted the September Proxy Notice and September Shareholder Consent to Technovative and Stream, Stream

---

[21] *See* Pledge Agreements, § 6.

filed an "Emergency Motion for Post-Judgment Enforcement to Vest Shares of Technovative Media, Inc." (the "Emergency Motion") in the Court of Chancery.

51.    The Emergency Motion sought an order vesting all of the Technovative Interests in Stream, and enjoining Hawk from "interfering with [Stream]'s ownership of all shares of [Technovative] until further order of the Court."[22]

52.    The Court granted the Emergency Motion in part.[23]  Pursuant to the Emergency Order, the Court divested Hawk of the Technovative Interests, vested the title thereof in Stream, and ordered that Technovative was to update the Register to reflect the transfer of the Technovative Interests to Stream.

53.    The Emergency Order enjoined SeeCubic, Hawk, and Mr. Stastney "from taking any action that would interfere with either Stream's ownership of the [Technovative Interests] or Stream's exercise of rights associated with the [Technovative Interests]" (the "Injunction").[24]    The Court-ordered Injunction expired on Monday, October 17, 2022, at 9:00 a.m. (the "Injunction Deadline").

---

[22] *See* Emergency Motion for Post-Judgment Enforcement to Vest Shares of Technovative Media, Inc. at ¶ d, Dkt. No. 312, *Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL (Ch. Del. Sept. 30, 2022).  The Emergency Motion is attached as **Exhibit H**.

[23] *See* Order Regarding Emergency Motion to Enforce, Dkt. No. 318, *Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL (Ch. Del. Oct. 3, 2022). The Emergency Order is attached as **Exhibit I** (the "Emergency Order").

[24] *Id.* at ¶ 4.

16

### F.    The Injunction Period

54.    In compliance with the Injunction, Hawk ceased enforcement of its Secured Creditor Rights in any manner that could have interfered with Stream's ownership of the Collateral until expiration of the Injunction Deadline.

55.    On October 10, 2022, Hawk formally engaged SSG Advisors, LLC ("SSG") to act as investment banker in connection with the Article 9 Sale. SSG commenced an analysis of Stream's business and affairs related to the Collateral from publicly available information or other information in Hawk's possession as a result of its past relationships with Stream.  SSG was expressly directed—and, indeed, did not—take any actions that may have interfered with Stream's ownership and usage of the Collateral, including by disclosing to any third parties details regarding its engagement.

56.    With respect to Stream, upon information and belief, Defendants did not take any meaningful steps to raise funds to repay the secured debt or cure the Events of Default during the Injunction Period and have no intention of doing so. Instead, upon receipt of the Technovative Interests, Stream immediately began executing a plan to entrench itself as sole shareholder of Technovative and its subsidiaries and to interfere with Hawk's Secured Creditor Rights.

57.    Stream's intention to thwart Hawk's Secured Creditor Rights by any means necessary was laid bare in an October 12, 2022 e-mail from Jeff Shammah,[25] a business partner of the Rajans, to Hawk, who bluntly admitted and threatened:

Just to let you know, Stream TV has retaken control of the Netherlands, as well as a number of other assets, in the next few hours.  Stream is resuming operations.

*    *    *    *

If Hawk is attempting any type of legal action to take the Netherlands away from Stream, it is going to be a futile effort.  Stream is fully prepared, and already has counter-measures in place.  More importantly, Stream's plan is to bring you to the United States and do due diligence on you and Hawk.  You should be aware that in another venue, the litigation was successful where Alastair Crawford is now being forced to turn over all of his financial information.  This includes bank records, real estate information, family trust information, all of which will be subject to damages claims in the various venues.

58.    While many of the "counter-measures" are unknown to Hawk, Stream has disclosed that it has:

_____

[25] The October 12, 2022 email from Mr. Shammah is attached as **Exhibit J**.

18

a.    executed a written consent (the "Technovative Consent") as sole
shareholder of Technovative to remove all directors thereof from
their current positions and to name Mr. Mathu Rajan as sole
director and sole officer (as Chief Executive Officer) of
Technovative.[26]

b.    caused Technovative, as sole shareholder of MHD, to execute a
written consent for MHD (the "MHD Consent") to remove all
directors thereof from their current positions and to name Mr.
Mathu Rajan as sole director and sole officer (as Chief Executive
Officer) thereof.  Additionally, Stream caused MHD to resolve
that "no party may take any action whatsoever in the name of
Media Holdings Delaware LLC except for Mathu Rajan or
attorneys from McCarter & English LLP."[27]

c.    caused Technovative and MHD, as partners in Ultra-D Ventures,
to execute a resolution (the "Ultra-D Ventures Resolution") to
remove all directors thereof from their current positions and to
name Mr. Mathu Rajan as sole director thereof.  Additionally,
Stream caused Ultra-D Ventures to resolve that "no party may

---

[26] The Technovative Consent is attached as **Exhibit K**.
[27] The MHD Consent is attached as **Exhibit L**.

19

take any action whatsoever in the name of Ultra-D Coöperatief U.A. [sic] except for Mathu Rajan or attorneys from McCarter & English LLP."[28]

d.  caused Ultra-D Ventures, as sole shareholder of THD, to execute a consent (the "THD Consent") to remove all directors from their current positions and to name Mr. Mathu Rajan as sole director and sole officer (as Chief Executive Officer) thereof. Additionally, Stream caused THD to resolve that "no party may take any action whatsoever in the name of Technology Holdings Delaware LLC except for Mathu Rajan or attorneys from McCarter & English LLP."[29]

e.  caused Ultra-D Ventures (through its general partner MHD) and THD, as members of Ultra-D Coop, to execute a resolution (the "Ultra-D Coop Resolution") to remove all directors from their current positions and to name Mr. Mathu Rajan as sole director thereof.  Additionally, Stream caused Ultra-D Coop to resolve that "no party may take any action whatsoever in the name of

---

[28] The Ultra-D Ventures Resolution is attached as **Exhibit M**.  Hawk assumes the reference to "Ultra-D Coöperatief U.A." rather than "Ultra-D Ventures U.A." was merely an oversight during a hasty exercise of the copy-and-paste function.
[29] The THD Consent is attached as **Exhibit N**.

20

Ultra-D Coöperatief U.A. except for Mathu Rajan or attorneys from McCarter & English LLP."[30]

f.    caused Stream TV International B.V. and SeeCubic B.V. (via each entity's sole shareholder, Ultra-D Coop) to each issue letters (the "Meeting Letters") to their respective officers and directors providing notice of an "Extraordinary General Meeting" to conduct a vote on the removal of all existing directors and officers and to appoint Mr. Mathu Rajan as sole director and sole officer (as Chief Executive Officer) of each.[31]

59.    At least one other counter-measure has included harassing certain insiders of Hawk through the issuance of frivolous and legally deficient notices of deposition.[32]   Despite the target of the deposition notice residing outside of the United States, Stream and the Rajans have intentionally ignored all legal requirements to obtain proper service thereof, and instead have sent the notice to Hawk's counsel.

60.    Manifestly abusing the Injunction Period imposed by the Court of Chancery, Stream has taken advantage of Hawk's inability to assert its Secured

---

[30] The Ultra-D Coop Resolution is attached as **Exhibit O**.

[31] The Meeting Letters are attached as **Exhibit P** and **Exhibit Q**.

[32] *See* Stream TV Networks, Inc.'s Notice of Deposition of Arthur Leonard Robert Morton, Dkt. No. 321, *Omnibus Agreement Litig.*, No. 2020-0766-JTL (Ch. Del. Oct. 4, 2022), attached as **Exhibit R**.

Creditor Rights to disadvantage Hawk and repudiate Stream's obligations under the Loan Documents.

### G.    Hawk Exercises Its Secured Creditor Rights and Is Rebuffed

61.    As of the Injunction Deadline, Stream failed to satisfy its repayment obligations under the Notes or to otherwise cure its defaults.

62.    Stream remains in default under the Loan Documents, and Hawk is empowered by the Pledge Agreements to secure and preserve the value of the Collateral while pursuing an Article 9 Sale for the benefit of all Stream creditors.

63.    At 9:01 a.m. on October 17, 2022, Hawk issued the October Proxy Notice. Pursuant to the October Proxy Notice, Hawk instructed Technovative once again to update the Register to reflect that Hawk is the sole nominal shareholder of Technovative, with legal title residing with Stream.[33]

64.    Hawk sent the October Proxy Notice to Mr. Mathu Rajan, as both President of Stream as well as sole director and officer of Technovative, in compliance with the provisions of the Pledge Agreements.

65.    Also on October 17, 2022, Hawk delivered to Technovative the October Shareholder Consent, which amended and restated the By-Laws, removed all then-serving directors of Technovative, and appointed Mr. Stastney as the sole director of Technovative.

---

[33] *See* Pledge Agreements, § 6.

66.     Stream and Technovative refuse to update the Register and refuse to acknowledge Hawk's appointed Board.

67.     Also on October 17, 2022, Hawk sent the October Marshaling Directive to Stream directing Stream to comply with its obligations under the Loan Documents to marshal and deliver the Collateral to Hawk's designee SeeCubic pending the completion of an Article 9 Sale.

68.     Stream previously vowed in the Omnibus Agreement Litigation that it would not comply or acknowledge Hawk's debt or its Secured Creditor Rights. Specifically, Stream's Counsel stated: "[n]o, we are not going to have the bad guys who stole [Technovative] as board members. So, yes, obviously, we will change the board members out."[34]  Stream further disavowed the validity of Hawk's secured debt, the Secured Creditor Rights and Stream's defaults in the Omnibus Agreement Litigation.

69.     Counsel for Stream further disavowed Hawk's ability to exercise the Secured Creditor Rights, stating "[o]n the creditors' rights things, Hawk's creditor rights are terrible. They're being misrepresented to you. He is an anti-assignment

---

[34] *See* Transcript of September 21, 2022 Status Conference, at 57:1–4, *Omnibus Agreement Litig.*, C.A. 2020-0766-JTL (Del. Ch. Sept. 21, 2022), attached as **Exhibit S**.

guy who has got convertible debt instruments.  He's going to get killed on creditor litigation.  His claims are absolutely awful.  Awful, awful, awful."[35]

70.    Stream's counsel also confirmed his client is taking the position that even the existence of the outstanding obligations is questionable and could be easily eliminated through a unilateral conversion by Stream: "[a]nd these are -- these are super-good agreements by which you can convert Hawk even after default.  We could convert him right now."[36]

71.    Upon enforcement of its Secured Creditor Rights, Hawk intends to ensure Technovative faithfully coordinates and oversees the marshaling and preservation of Hawk's Collateral in preparation for an Article 9 Sale. The successful consummation of an Article 9 Sale is imperative to retaining the value of the Collateral for Hawk, as a secured creditor, as well as other investors in Stream, and it provides the most efficient and certain "off-ramp" for the disputes described above.

### H.    Hawk Is Entitled to Immediate Relief and Will Be Irreparably Harmed Absent Such Relief

72.    Pursuant to the Emergency Order, Hawk has acquiesced to Stream's control of the Technovative Interests and the Collateral for the last 14 days despite the existence of the Secured Creditor Rights.

---

[35] *Id.* at 24:7–13.
[36] *Id.* at 40:8–10.

73.     Stream and the Rajans previously controlled the Collateral for more than 10 years and oversaw the abject financial failure of the business during that time.   Stream's business was not viable prior to the execution of the Omnibus Agreement, which transferred the Collateral to SeeCubic in 2020.

74.     Since SeeCubic received the Collateral approximately two years ago, it turned the business into a valuable enterprise.   The Court of Chancery acknowledged SeeCubic had improved the financial condition of Stream when it noted that "[a]s a practical matter, Stream will be in a better position, because SeeCubic turned around what had been a failing business, and Stream is getting that business back,"[37] and required in its September 30, 2022 Order Regarding Motion for Mandatory Injunction that Stream post a bond in the amount of $1 million as a pre-condition to the return of assets from SeeCubic.[38]

75.     The Court entered the Emergency Order mandating the Injunction Period specifically to provide Stream with unfettered control of the Collateral so that Stream could seek to satisfy its lending obligations to its secured creditors by repaying the Notes.   Rather than use the Injunction Period for the purpose intended by the Court, Stream has instead engaged in a concerted effort to systematically

---

[37] Order Regarding Emergency Motion to Enforce Partial Final Judgment, Dkt. No. 318, *Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL (Ch. Del. Oct. 3, 2022).
[38] Order Regarding Motion for Mandatory Injunction at ¶ 12, Dkt. No. 308, *Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL (Ch. Del. Sept. 30, 2022), attached as **Exhibit T**.

violate and frustrate Hawk's Secured Creditor Rights during and after expiration of the Injunction Period. These improper acts include the disclosed and undisclosed "counter-measures."

76.    Any delay in ordering the return of the Technovative Interests from Stream to Hawk creates a significant risk the Collateral will deteriorate and/or disappear, as it did prior to execution of the Omnibus Agreement. This will irreparably damage Hawk's rights as a secured creditor and vitiate many of the Secured Creditor Rights Hawk is contractually entitled to exercise.

77.    There is also a risk the Rajans may siphon the Collateral out of Stream. The Rajans have been willing to take every step possible to retain control over the Collateral—including backdating corporate documents and filing fraudulent bankruptcies to thwart court orders.

78.    The Rajans and parties affiliated with them have a long history of engaging in improper and questionable acts designed to secure the benefits of Stream and the Collateral for their personal benefit and at the direct expense of Stream's Secured Creditors, shareholders and trade creditors. The Rajans' bad acts have been repeatedly noted by various courts that observed:

a.    The Rajans, despite having substantial amounts of secured debt, have ignored all corporate formalities. "During its existence, Stream's corporate governance practices have been virtually

26

nonexistent. Stream has never held annual meeting [sic] of stockholders and has not kept regular minutes of Board meetings. Stream has officers and employees, but their roles are not well defined."[39]

    b.    The Rajans back-dated corporate documents, including a purported May 6, 2020 Shareholder Consent in an effort to preempt the Omnibus Agreement and thwart Hawk's Secured Creditors Rights.[40]

    c.    In an effort to evade a duly issued injunction and thwart the rights of the secured creditors and SeeCubic, the Court of Chancery noted the Rajans "caused Stream to file for bankruptcy…. The bankruptcy court dismissed the case as a bad faith filing, describing it as an effort 'to gain a tactical litigation advantage that is a part of a continued pattern of effort to nullify, undermine, and/or interfere with the [O]mnibus [A]greement, vitiate the purpose and effect of the Chancery Court's order, and to maintain

---

[39] *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1022–23 (Del. Ch. 2020), vacated, 279 A.3d 323 (Del. 2022).

[40] *See id.* at 1026.

ownership and control over the assets of the debtor for [their] own benefit.'"[41]

d.   The Delaware Bankruptcy Court concluded the Rajans' additional efforts to interfere with the injunction included Mathu Rajan establishing a new company which "began to fundraise using Stream's assets despite the injunction."[42]

e.   The Court of Chancery also held the Rajans and those acting in concert with them pursued a frivolous effort to attack the Court's validly issued injunction noting that:

   i.   "After the bankruptcy stay lifted and litigation in this court resumed, Mathu Rajan filed a pro se letter application claiming that the Injunction Decision was the product of fraud."[43]

   ii.   After Mathu Rajan's filing, the Rajans "filed a formal motion to set aside the Injunction Decision."[44]

---

[41] *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, No. 2020-0766-JTL, 2021 WL 5816820, at *1 (Ch. Del. Dec. 8, 2021), vacated 279 A.3d 323 (Del. 2022).

[42] *See* Transcript of May 17, 2021 Hearing at 14:23–24, *In re Stream TV Networks, Inc.*, No. 21-10433 (KBO) (Bankr. D. Del. May 18, 2021), Dkt. No. 200 (the "Bankruptcy Transcript").

[43] *Stream TV Networks*, 2021 WL 5816820, at *1.

[44] *Id.*

28

        iii.    The "Rajans subsequently filed another motion to modify the preliminary injunction…. Then they had a third party seek to intervene and file additional motions."[45]

    f.    The above noted conduct caused the Court of Chancery to find that the Rajans employed a deliberate strategy to thwart the Secured Creditor Rights by creating litigation chaos: "[a]long the way, Stream and the Rajans ran through three different teams of lawyers from six different law firms, in addition to the times when Raja Rajan sought to act as Stream's attorney and Mathu Rajan sought to litigate pro se. Creating litigation chaos seemed to be one of the Rajans' strategies."[46]

    g.    The Delaware Bankruptcy Court confirmed that the Rajans attempted to evade their obligations under the Loan Documents "through machinations that included trying to change the management of the debtor's subsidiaries and attempting to remove prototype technology from a storage facility."[47]

    h.    The Bankruptcy Court further held "[i]t is clear, through documentary evidence, that Mr. Rajan intended to use a Stream

---

[45] *Id.*

[46] *Id.*

[47] Bankruptcy Transcript, at 14:12–15.

bankruptcy as a mechanism by which he could, via Stream, regain the Ultra-D assets from the secured lenders and then through [another company] obtain them at a fraction of what he believed was the assets' value."[48]

79.     Stream has openly stated that it does not intend to honor its obligations under the Loan Documents or Hawk's Secured Creditor Rights.  This is consistent with Stream's and the Rajans' long, detailed, and documented history of ignoring their obligations under the Loan Documents, court orders, and generally accepted norms of behavior.  Left to their own devices, the Rajans will do everything within their power—legally and illegally—to acquire the Collateral for their own benefit and at the direct expense of Hawk and Stream's other stakeholders.

## COUNT I
### Declaratory Judgment that Plaintiff Possesses and May Exercise Its Secured Creditor Rights

80.     Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

81.     Pursuant to the Loan Documents and the prior findings of the Delaware Supreme Court and Court of Chancery, Hawk is a secured creditor of Stream with valid Secured Creditor Rights.

---

[48] *Id.* at 14:25–15:4.

82.     As a secured creditor of Stream, Hawk validly possesses, may exercise, and/or has exercised the following Secured Creditor Rights (among all other rights granted under the Loan Documents):

      a.     The Marshaling Right (*see* Security Agreements, § 4.1(a)),

      b.     The Proxy Right (*see* Pledge Agreements, § 6), and

      c.     The Right to conduct an Article 9 Sale of the Collateral (*see* Security Agreements, § 4.1(b); Pledge Agreements, § 7).

83.     The Delaware Supreme Court and the Court of Chancery have each determined that Stream is in default under the terms of the Notes.

84.     Hawk is authorized under the Loan Documents to exercise and has exercised its Secured Creditor Rights against the Collateral in order to pursue and ultimately consummate an Article 9 Sale, including by taking control of the Operating Subsidiaries via the Proxy Right and expertise of the POA, marshaling the Collateral, and conducting a commercially reasonable sale.

85.     Stream denies Hawk's ability to enforce its Secured Creditor Rights without any justification and refuses to relinquish control of the Collateral.

86.     There being no legitimate basis to dispute Hawk's entitlement to exercise the Secured Creditor Rights, Hawk is entitled to a Declaration that:

      a.     Hawk is a secured creditor of Stream.

b.  Hawk possesses the Secured Creditor Rights outlined in the Loan Documents and available at law and equity.

c.  Stream has defaulted under the terms of the Loan Documents.

d.  Hawk is justified in exercising all of the Secured Creditor Rights in accordance with the Loan Documents and relevant law and equity.

e.  Stream is obligated to comply with the Pledge Agreements and October Proxy Notice by instructing Technovative to update the Register to reflect that Hawk is the sole nominal shareholder of Technovative, with legal title residing with Stream.

f.  The October Shareholder Consent adopted by Hawk validly amended and restated the By-Laws, removed all then-serving Directors of Technovative, and appointed Mr. Stastney as the sole director of Stream.

g.  Defendants and the Operating Subsidiaries are obligated to comply with the October Marshaling Directive.

h.  Defendants and the Operating Subsidiaries are precluded from voting or enabling or taking any other action to permit the sale, assignment, transfer, exchange, or disposal of, or grant any

32

option with respect to, the Collateral as noted in Section 4(a) of
the Pledge Agreements.

    i.    Hawk is authorized to pursue a sale of the Collateral, including
through an Article 9 Sale process, as noted in Section 7 of the
Pledge Agreements.

87.    Plaintiff lacks an adequate remedy at law.

88.    Plaintiff is entitled to the relief requested below, including the
declaration specified above.

## COUNT II
### Declaratory Judgment Pursuant to 8 *Del. C.* § 225

89.    Plaintiff repeats and realleges all of the preceding allegations as if fully
set forth herein.

90.    Pursuant to Hawk's valid exercise of its rights under the Pledge
Agreements and the October Proxy Notice, Technovative is contractually obligated
to update the Register to reflect Hawk as the sole beneficial shareholder of the
Technovative Interests.

91.    As the sole nominal shareholder of Technovative, Hawk validly
executed and delivered the October Shareholder Consent to Technovative.

92.    Under the October Shareholder Consent, Hawk validly caused the
former Technovative Director to be removed, and reconstituted the Technovative
Board with Mr. Stastney as the sole Director.

33

93.     Pursuant to the October Shareholder Consent, the By-Laws were also validly amended.

94.     Defendants' refusal to (i) recognize Hawk as the sole nominal shareholder of Technovative, (ii) recognize Mr. Stastney as the sole director of Technovative, and (iii) recognize that the By-Laws were validly amended is improper and unjustified.

95.     Plaintiff validly exercised its power as sole shareholder of Technovative to issue the Shareholder Consent, which removed all directors of Technovative and appointed Mr. Stastney as the sole director of Technovative.

96.     Defendants have wrongfully refused to recognize that Mr. Stastney is the sole director of Technovative.

97.     Section 225(a) of title 8 of the Delaware Code authorizes this Court, upon application of any stockholder or director, to hear and determine the validity of any election of appointment of any director or officer and the right of any person to hold or continue to hold such office, and to that end, the Court may make any order or decree as may be just and proper.

98.     Plaintiff lacks an adequate remedy at law.

99.     Plaintiff is entitled to the relief requested below, including the declaration specified above.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court:

a.       Enter an order declaring Hawk a valid secured creditor of Stream with rights appurtenant thereto;

b.       Enter an order declaring Hawk possesses the Secured Creditor Rights, including, but not limited to, the Marshaling Right, the Proxy Right, the POA, and the right to consummate an Article 9 Sale of the Collateral;

c.       Enter an order declaring Stream in default under the Loan Documents and that such Event(s) of Default may not be cured;

d.       Enter an order mandating that Stream comply with Hawk's exercise of its Secured Creditor Rights and enjoining it from taking any steps to thwart such exercise;

e.       Enter an order declaring that effective immediately the October Proxy Notice is effective and Hawk is the sole nominal holder of all Technovative Interests;

f.       Enter an order declaring that effective immediately the October Shareholder Consent is valid, that Mr. Stastney is the sole director of Technovative, and the By-Laws have been validly amended pursuant to the October Shareholder Consent;

g.       Order Stream to cease challenging the validity of the October Proxy Notice or the October Shareholder Consent in any way;

35

 h. Enjoin Defendants from encumbering, transferring, selling, or otherwise conveying the Collateral without the express written consent of Plaintiff;

 i. Award Plaintiff its reasonable costs and expenses, including reasonable attorneys' fees, incurred in connection with this matter; and

 j. Grant such other and further relief the Court deems proper and just.

Dated: October 17, 2022   **K&L GATES LLP**

        */s/ Steven L. Caponi*
        Steven L. Caponi (No. 3484)
        Matthew B. Goeller (No. 6283)
        Megan E. O'Connor (No. 6569)
        600 N. King Street, Suite 901
        Wilmington, DE 19801
        Phone: (302) 416-7000
        steven.caponi@klgates.com
        matthew.goeller@klgates.com
        megan.oconnor@klgates.com

        *Attorneys for Plaintiff*

# EXHIBIT 5

**TERM SHEET**

**FOR**

**DEVELOPMENT, SUPPLY, AND LICENSE AGREEMENT**

**BETWEEN**

**STREAM TV NETWORKS, INC.**

**AND**

**REMBRANDT 3D HOLDINGS LTD**

**April 9, 2019**

*[handwritten: Raja Rajan and Mathu Rajan are individuals who are defendants in the litigation]*

Stream TV Networks, Inc. ("Stream" or "Stream TV") is a Delaware corporation. Rembrandt 3D Holdings, Ltd ("Rembrandt") is a Nevis corporation. Rembrandt and Stream are referred to herein as the "Parties", and each one of them is a "Party". *[handwritten: Raja Rajan and Mathu Rajan,]*

This non-binding term sheet ("Term Sheet") details a global settlement arrangement between Stream and Rembrandt, intended to settle all disputes between them, ~~whether~~ existing as of the date hereof ~~or hereafter arising.~~ The final documentation regarding the Termsheet  (the "Agreement") shall be executed by May 31, 2019.  This Term Sheet is **non-binding** but subject to the Protective Order (Docket No. 60) signed by the Parties. in the litigation captioned *Rembrandt 3d Holding LTD v. Stream TV Networks, Inc., et al.*, No. 17 Civ. 00882 (S.D.N.Y.) (the "Litigation").

1. Confidentiality:   The Parties have executed a Protective Order in the Litigation (Docket No. 60) and the terms of the Protective Order shall cover this Term Sheet and negotiation.  The Parties agree further that the negotiation is subject to Rule 408 of the Federal Rules of Evidence and all discussions or negotiations are inadmissible in any proceeding.

2. Costs and Expenses   Each Party shall be responsible for its own costs and expenses in negotiating the terms of this transaction, and Rembrandt shall arrange for a first draft of the license, supply and development agreement(s).  Stream will draft the Release Agreement.

3. Law:   This Term Sheet and the terms for this transaction shall be governed by the laws of Delaware exclusively, and the Parties shall submit to that jurisdiction.

4. Commencement   Commencement of this intended settlement shall be only triggered only upon the signing of the long form agreements that include the release agreement and the license, supply and development agreement(s).

5. General Release   Contemporaneously with and subject to the payment of the

consideration of the settlement agreement, each Party shall enter into a general release of all claims, known and unknown (including any pending claims) against the other Party and its respective affiliates, subsidiaries, equity holders, directors, officers, employees, contractors, agents, advisors, counsel, successors and assigns.

6. Products

(a) Provision of 4K Units –Stream TV will ship to Rembrandt 50 [handwritten: 100] 4K Ultra-D 65" units; it is understood by the Parties that the 4K units will be provided "as is" and have no warranty or returnability available. Rembrandt will provide Stream TV with written notice ("Delivery Notice") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice.  Stream will pay transportation and all importation  costs of these units.

(b) High Resolution Units

(1) As Stream TV builds 8K resolution units, after the Agreements are mutually executed, Stream will provide Rembrandt with five [handwritten: eight] prototypes as follows:

i) the first unit by July 1, 2019;

ii) 2 units on or before September 1, 2019;

iii) 2 units on or before October 1, 2019; [handwritten: iii) 3 units on or before December 1, 2019.]

Stream will warehouse such 4k and 8k units (for the 4k units and prototypes of the 8k) in facilities until shipping is requested by Rembrandt to a destination within the United States.  Rembrandt will provide Stream TV with written notice ("Delivery Notice of Prototypes") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice of Prototypes. Stream will pay transportation and all importation costs of these units. The default is that the Delivery Notice of Prototypes is to the location of 128 Bull Hill Road, Newfield New York, 14867.

It is understood notwithstanding anything to the contrary Stream is not obligated to hold those samples for Rembrandt if the is a change to the default location Rembrandt is unwilling to ship the units within seven days of them being completed and in such case Stream may use those prototypes for any purpose thereafter without any obligation to Rembrandt.

(2) Standard Products - As Stream TV builds high-resolution

based 3D technology products, it shall offer Rembrandt a right of first refusal to purchase At Cost, ~~the lesser of 1% of the units produced or~~ _and otherwise at standard commercial terms,_ the minimums provided below. It is understood by both Parties that Stream TV is not required to change its business model which may or may not include completing finished units. If Rembrandt accepts the order and meet the financial and volume requirements required by Stream TV, then Rembrandt will retain this option. If Rembrandt does not exercise this option with a specific plan within seven (7) business days, then Stream TV can offer this inventory to other customers as needed. Rembrandt will have a minimum right of first refusal on 1,000 units by December 31, 2019 and then increasing by 1,000 units/month every three months thereafter until the end of term. Such minimum right of first refusal is not cumulative and if Rembrandt does not use such right within a given month it does not carry over to future months. _Rembrandt may purchase additional units by paying Most Favored Nation status at standard commercial terms_

7. **OEM**

Stream TV in good faith is not finishing products but will recommend to Rembrandt certain Original Equipment Manufacturers ("OEM") that Rembrandt may wish to utilize after it fully investigates the finished products capabilities under its specifications; however, the selection of OEM(s) is at Rembrandts discretion. In such case Stream TV will provide the 3D components directly to the OEM with Rembrandt's specifications.

White Label - Rembrandt may brand product purchased from Stream with Rembrandt trademarks. Rembrandt will not remove any patent number marking applied by Stream.

8. **Term**

The Term of the agreement shall continue through December 31, 2030. ~~Upon termination Stream shall have a fully paid up license to all technology rights provided under this agreement.~~

9. **Rembrandt Grant of Rights**

Rembrandt shall grant a non-exclusive license to Stream to all Rembrandt Technologies listed in Schedule A to this Term Sheet for Rembrandt.

10. **Stream Grant of Rights**

Stream shall grant Rembrandt a non-exclusive license to any existing Stream technologies that Stream has the right to license/sub-license solely to enable Rembrandt to distribute Products described herein. Rembrandt shall obtain or reimburse Stream for Stream's Philips license as part of the At Cost price, as applicable.

_SIS_
_SRB_

11. Field

The licensed field of use from Rembrandt to Stream is all applications

.

The licensed field of use from Stream to Rembrandt is all applications.

12. Territory

All territories whether or not patents are issued or pending or licensed.  Sale to any distributor in any territory is permitted for the Field ~~and such sales shall be subject to royalties.~~

13. Co-Marketing

Rembrandt and Stream shall work cooperatively to educate and co-market the benefit of the no glasses 3D technology and agree to not disparage the other Party.

Stream will be responsible for its own sales and marketing expenses and Rembrandt will be responsible for their own sales and marketing expenses.

14. Sub-license

Either Party may sublicense their rights to other parties for the purpose of having products ~~manufactured for sale~~ ∧distributed by the Party.  ~~Further sublicensing requires the consent of the Party granting the license, which shall not be unreasonably withheld if the granting party would receive the same royalties on sales as if the Party that received the license was making the sale.~~

15. Consideration

In addition to the product provided as consideration and described above, Stream shall provide the following as consideration:

a) Upon execution of the Agreements contemplated by this Term Sheet, Stream TV will pay to Rembrandt the lump sum of one million ($1,000,000) USD.  It is understood that total will be paid in four instalments paid quarterly with the final payment on or before June 30, 2020.

b) Stream TV will pay Rembrandt a ∧fee ~~of twenty thousand ($20,000) USD per month~~ ∧monthly beginning with the execution of the Agreement for the full Term of this Agreement, *According to the following schedule:*

*Stream shall also provide ∧two million ~~two~~ Warrants, with provision of a cashless exercise price at a $1.50 value per Warrant. ~~The warrants $20 O.b~~*

*• 12 months @ $20,000 / per month*
*• 12 months @ $24,000 / per month*
*• 12 months @ $28,000 / per month*
*• 12 months @ $32,000 / per month*
*• 12 months @ $36,000 / per month*
*• 79 months @ $40,000 / per month.*

*JLS*

*The monthly payments shall be Accellerated upon a merger, acquisition, or change of control. No Accelleration by IPO.*

**Signed for and on behalf of Stream:**

**Signed for and on behalf of Rembrandt:**

……………………………………………………………………

……………………………………………………………………..

Signature

Signature

……………………………………………………………………..

……………………………………………………………………..

Print Name

Print Name

……………………………………………………………………..

……………………………………………………………………………

Witness Signature

Witness Signature

……………………………………………………………………..

……………………………………………………………………………

Print name

Print name

……………………………………………………………………

……………………………………………………………………..

Date

Date

*Raja Rajan*

*Mathu Rajan*

## SCHEDULE A

1. Knowhow and trade secrets related to methodology for:

a. efficiently converting, correcting and optimizing a 2D+Depth video for playback on a 3D autostereoscopic associated with the Philips technology

b. utilizing the Philips 2d Switchable Lens technology for refractive and defractive lens switching for the creation of the 'lightfield' and 3d content artefact correction.

c. utilizing the On Screen Display functions of Borders and "Liveliness."

2. Trademarks

3. the patents asserted in Rembrandt's First Amended Complaint, and dismissed by the Court on March 28, 2018 (ECF No. 47)

## Representations and Warranties

The Parties represent and warrant ~~that~~ to one another that they will not bring a trade secret claim based upon any information that is the basis for the Litigation or was otherwise disclosed or learned ~~during the~~ during the pendency of the Litigation

## Next Steps

- Stream to provide Warrant Agreement, Supply Agreement, and any patents filed within last 18 months.

- Stream will investigate and provide Rembrandt an answer as to whether it can represent and warrant that it will not revive any abandoned patents



# EXHIBIT 6

EFiled: Nov 24 2021 04:29PM EST
Transaction ID 67123366
Case No. 2020-0766-JTL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| STREAM TV NETWORKS, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0766-JTL |
| | ) | |
| SEECUBIC, INC., | ) | |
| Defendant. | ) | |
| _____ | ) | |
| SEECUBIC, INC., | ) | |
| | ) | |
| Counterclaim and | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| STREAM TV NETWORKS, INC., | ) | |
| | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| and | ) | |
| MATHU RAJAN, and RAJA RAJAN, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## DECLARATION OF SHADRON L. STASTNEY IN SUPPORT OF SEECUBIC'S OPPOSITION TO MOTION TO MODIFY INJUNCTION PENDING APPEAL, OR ALTERNATIVELY FOR ENTRY OF <u>ADDITIONAL STATUS QUO ORDER PENDING APPEAL</u>

I, Shadron L. Stastney, hereby declare and state as follows:

1.      My name is Shadron L. Stastney, and I am the Executive Chairman of Seecubic, Inc. ("SeeCubic").  I am also a principal of SLS Holdings VI, LLC ("SLS").  I am over eighteen years of age and am competent to testify.

2.      I make this unsworn declaration in support of SeeCubic's Opposition to Motion to Modify Injunction Pending Appeal, or Alternatively for Entry of

Additional Status Quo Order Pending Appeal, and do so pursuant to 10 *Del. C.*
§ 3927 and standing orders of the Delaware courts.

3.     Since the Court entered the Order Granting Preliminary Injunction on
December 8, 2020 (Dkt. 111, the "PI Order"), SeeCubic has raised and deployed in
excess of $10 million in order to further develop the glasses-free 3-D technology
first started by Stream.  SeeCubic has purchased millions of dollars of equipment
and inventory, doubled the size of its staff by (among other things) bringing back
all the key members of the Ultra-D founding team from the Netherlands, who had
left Stream when the Rajans were exercising control.  SeeCubic has also reduced
its debt by over 50%, and it is not in default on any debt.

4.     SeeCubic also has continued to aggressively pursue outstanding assets
that Stream and the Rajans have not turned over to SeeCubic (despite repeated
requests), including those located in China.  Those assets included 65" 3D filters
and 65" displays (the "Lenses") that were in the possession of Weida Freight
("Weida").  (*See* Dkt. 212, Ex. A)

5.     On August 2, 2021, Weida contacted me regarding the Lenses it had
been holding in storage for Stream, and for which Stream had not been paying its
storage fees.  (*Id.*)  That same day, I wrote to Weida by email and explained that
the Lenses "have actually been the property of SeeCubic, Inc. since December 8,
2020" and that "by court order, while any liabilities incurred by StreamTV remain

2

the obligation of StreamTV, the stock [in Weida's possession] is the sole and

exclusive property of SeeCubic, Inc." (*Id.*)  I also noted to Weida that SeeCubic

would be in contact to arrange shipment to its facility in the Netherlands.  (*Id.*)

Weida responded by stating that the Lenses would not be released until the

warehouse storage fees were paid, and Weida proposed that SeeCubic pay those

fees. (*Id.*)

6.      On August 3, 2021, I responded by reiterating that, according to the

PI Order, "all the inventory and stock is awarded to [SeeCubic], but StreamTV

remains liable for the fees." (*Id.*)  I further explained that SeeCubic "cannot pay

any amounts owed to [Weida] by Stream" but noted that SeeCubic was willing to

pay for storage and shipping going forward.  (*Id.*)

7.       Upon review of the official quotation from Weida, it became apparent

that the expenses associated with storing and shipping the Lenses from China to

the Netherlands exceeded the value of the Lenses, which were from a largely

flawed, older batch and have been superseded by new lenses SeeCubic has since

designed for its projects.  As such, the Lenses were of marginal value to the

ongoing business.

8.      On September 3, 2021, SeeCubic made a business decision to have

the Lenses destroyed.  (*Id.*)  SeeCubic determined that it would not be in its

interests to allow Weida to sell the Lenses because there was a risk that the Lenses

3

could come into possession of one of SeeCubic's competitors who could attempt to reverse engineer parts of SeeCubic's technology from these older components. Therefore, SeeCubic asked that Weida destroy the Lenses.  (*Id.*)

9.    I have not been able to confirm whether the Lenses, which were being stored in China, were actually destroyed.

I declare under penalty of perjury under the laws of Delaware that the foregoing is true and correct.

Executed on this 24 day of November, 2021.

Shadron L. Stastney  (Printed Name)

*/s/ Shadron L. Stastney* (Signature)

# EXHIBIT 7

My
Account

# Partners of AutoSens
# Brussels 2022

These companies proudly partnered with us at AutoSens Brussels 2022. Find out how you can use our platform
to amplify your brand and grow your business.

**Sponsor AutoSens**

**View Exhibition Floorplan**

# Supercharge your business

AutoSens Brussels offers the perfect opportunity to showcase your latest technology advancements and research, and connect with potential customers from across the globe. This year's socially distanced exhibition will be no different, with a wide range of exhibitors at the leading edge of innovation in ADAS and autonomous vehicle technology.

If you're interested in joining them on the exhibition floor at Autoworld Brussels, get in touch with Richard.

**Email Richard**

**Request a call back**

My
Account

# Lead Sponsor



## Signature Sponsors









## Sponsors



# Floorplan



My
Account

# Exhibitors | Stand Number



**onsemi**

Lead Sponsor

**Stand Number:** 1

**NI**

Exhibitor

**Stand Number:** 2

**Cadence**

Exhibitor

**Stand Number:** 3

**Appen**

Exhibitor

**Stand Number:** 4

**Vector**

Exhibitor

**Stand Number:** 5

**Optikos**

Exhibitor

**Stand Number:** 6

**dSPACE**

Exhibitor

**Stand Number:** 7

My
Account



Intempora

Exhibitor



**Stand Number:** 8

**Arm**

Exhibitor



**Stand Number:** 9

**MicroVision**

Exhibitor



**Stand Number:** 10

**Imatest**

Exhibitor



**Stand Number:** 11

**Labsphere**

Exhibitor

**Stand Number:** 12

**Sony**

Exhibitor

SONY



**Stand Number:** 14

**Immervision**

Exhibitor

**Stand Number:** 15

**Anyverse**

Exhibitor

**My Account**



Stand Number: 16
**GEO Semiconductor**

Stand Number: 17

**rFpro**

Exhibitor



Stand Number: 19

**TRIOPTICS**

Exhibitor



Stand Number: 20

**VIAVI**

Exhibitor



Stand Number: 21

**STMicroelectronics**

Exhibitor



Stand Number: 22

**Xenomatix**

Exhibitor



Stand Number: 23

**Sunex**

Exhibitor



Stand Number: 24

**Teledyne FLIR**

Exhibitor



Stand Number: 25

**Algolux**

Exhibitor



Stand Number: 26

 

Valens Semiconductor



Exhibitor
**Stand Number:** 28

**OMNIVISION**

Signature Sponsor



**Stand Number:** 29

**Seagate**

Exhibitor

**Stand Number:** 30

**Heliaus**

Signature Sponsor



**Stand Number:** 31

**NextChip**

Exhibitor



**Stand Number:** 32

**Wideye by AGC**

Exhibitor



**Stand Number:** 33

**Image Engineering**

Exhibitor



**Stand Number:** 34

**Cogent Embedded**

Exhibitor

**Stand Number:** 35

**Samsung**

Signature Sponsor

My Account



**Stand Number:** 36

**aiMotive**

Exhibitor



**Stand Number:** 37

**Opsys Technologies**

Exhibitor



**Stand Number:** 39

**SeeCubic**

Exhibitor



**Stand Number:** 40

**DXOMARK**

Exhibitor



**Stand Number:** 41

**Lumentum**

Exhibitor

VISIONΛRY.ΛI

**Stand Number:** 42

**Visionary.ai**

Exhibitor



**Stand Number:** 44

**Hamamatsu**

Exhibitor



**Stand Number:** 45

**Vertilite**

Exhibitor

**Stand Number:** 46

**Analog Devices**



# Media Partners



My
Account







My
Account

**ASSEMBLY**



# Join us in Brussels

**We're meeting at Autoworld once again to discuss and shape the future of ADAS and AV.**

Join the 2023 waiting list



My
Account

## Quick Links

≡

## Stay Connected

Join our Community Newsletter to be the first to hear the latest news from AutoSens, plus you'll receive exclusive articles, videos and more.

## Subscribe



## Get in Touch

The Old Granary
Field Place Estate
Byfleets Lane
Broadbridge Heath
West Sussex
RH12 3PB

## Contact Us

# EXHIBIT 8



# EXHIBIT 9



ADG LEGAL

محمد الدهباشي للمحاماة ذ م م

October 21, 2022

**By courier**

**Vice Chancellor J. Travis Laster**
Court of Chancery of the State of Delaware
New Castle County
Leonard L. Williams Justice Center
500 North King Street
Wilmington, DE 19801
T: 302-255-0510

**RE: REQUEST FOR GUIDANCE**

Dear Vice Chancellor Laster,

We, ADG Legal, are the attorneys acting on behalf of our client **Mr. Mark Walpole** ("**Client**") in relation to a demonstrator Unit (the "**Unit**") which **SeeCubic, Inc.** ("**SeeCubic**") has entrusted to our Client for display purposes in the United Arab Emirates (the "**UAE**").

Our Client was contacted by the attorneys of **Stream TV Networks, Inc** ("**Stream TV**") on several occasions demanding that our Client deliver the Unit to Stream TV further to court orders on September 30, 2022, on October 3, 2022, and on October 14, 2022, issued by the Court of Chancery of the State of Delaware in connection with In Re Stream TV Networks, Inc. Omnibus Agreement Litigation (C.A. No. 2020-0766-JTL, (the "**Stream TV-SeeCubic Court Orders**").

SeeCubic has also contacted our Client, however, claiming that the Stream TV-SeeCubic Court Orders do not cover the Unit and that SeeCubic would pursue all legal remedies against our Client if the Unit were turned over to Stream TV. Our Client wishes to obtain legal guidance after receiving aggressive and contradictory correspondence from representatives of Stream TV and SeeCubic.

We have advised our Client that, pursuant to the laws of the UAE, a foreign judgment can only be enforced in the UAE if it is recognized by the UAE Courts through a process referred to as "Petition of Recognition". Thus, there is generally no obligation on our Client under UAE law to comply with the Stream TV-SeeCubic Court Orders until recognized by the UAE Courts. As part of the petition of recognition process, the relevant UAE enforcement judge would determine the obligatory steps (if any) that must be taken by UAE entities in respect of items located in the UAE.

In light of the above, our Client is soliciting your suggestions with regard to the disposition of the Unit, while at the same time noting that the disposition of the Unit will likely be subject to a legal process within the UAE.

Yours Faithfully,
ADG Legal

# EXHIBIT 10

US008558830B2

(12) **United States Patent**
     Blumenthal et al.

(10) Patent No.:     **US 8,558,830 B2**
(45) Date of Patent:     **Oct. 15, 2013**

(54) **SYSTEM AND METHOD FOR ADAPTIVE SCALABLE DYNAMIC CONVERSION, QUALITY AND PROCESSING OPTIMIZATION, ENHANCEMENT, CORRECTION, MASTERING, AND OTHER ADVANTAGEOUS PROCESSING OF THREE DIMENSIONAL MEDIA CONTENT**

(75) Inventors: **Stephen Blumenthal**, Newfield, NY (US); **Ilya Sorokin**, New York, NY (US)

(73) Assignee: **3D Fusion, Inc.**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 221 days.

(21) Appl. No.: **12/642,757**

(22) Filed: **Dec. 18, 2009**

(65) **Prior Publication Data**

US 2010/0156897 A1     Jun. 24, 2010

**Related U.S. Application Data**

(60) Provisional application No. 61/138,926, filed on Dec. 18, 2008.

(51) **Int. Cl.**
     *G06T 15/00*     (2011.01)
     *G06G 5/00*     (2006.01)

(52) **U.S. Cl.**
     USPC ........................... **345/419**; 345/581; 345/619

(58) **Field of Classification Search**
     USPC ........................................ 345/419, 581, 619
     See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,864,342 A | * | 1/1999 | Kajiya et al. | 345/418 |
| 6,313,838 B1 | * | 11/2001 | Deering | 345/420 |
| 6,496,598 B1 | * | 12/2002 | Harman | 382/154 |
| 6,765,568 B2 | * | 7/2004 | Swift et al. | 345/419 |
| 7,362,324 B2 | * | 4/2008 | Iizuka et al. | 345/419 |
| 7,844,001 B2 | * | 11/2010 | Routhier et al. | 375/240.25 |
| 2005/0078108 A1 | * | 4/2005 | Swift et al. | 345/419 |
| 2009/0167768 A1 | * | 7/2009 | Bull et al. | 345/473 |

* cited by examiner

*Primary Examiner* — Ke Xiao
*Assistant Examiner* — Jed-Justin Imperial
(74) *Attorney, Agent, or Firm* — Edward Etkin, Esq.

(57)     **ABSTRACT**

In at least one embodiment thereof, the inventive system and method are directed to providing and configuring a novel platform-independent 3D content media container operable to: (1) support and store a 3D content media file with at least one 3D content modification/improvement technique applied to only specific predetermined portions thereof, and (2) selectively enabling particular optimal 3D content-related parameter settings for future application of at least one additional 3D content modification/improvement technique, to likewise be associated with one or more specific corresponding 3D content media file portion(s), and to also be stored in association therewith in the inventive 3D content media container. In at least one additional embodiment thereof, the inventive system and method are capable of determining and implementing various storage, transmittal, and application(s) of 3D content media processing/settings/parameter/profile configuration(s) prior to, or during, display of corresponding 3D content media.

**19 Claims, 3 Drawing Sheets**



**FIG. 1**





FIG. 2

**FIG. 3**

/ **200**



```
┌─────────────────────────────────────────────────────┐
│ Capture 3D Content into 3D Content Media Container    │─── 202
│ (Optionally: Perform Initial Processing on            │
│ 3D Content Media at Time of Capture)                  │
└─────────────────────────────────────────────────────┘
                         │
┌─────────────────────────────────────────────────────┐
│ Transmit 3D Content Media Container to Storage /      │─── 204
│ Processing / Playback                                 │
└─────────────────────────────────────────────────────┘
```

Store 3D Content Media Container — 206

Perform Selective Processing on 3D Content Media (Manual / Semi-Automatic / Automatic) — 208

Processed 3D Content Media in 3D Content Media Container & Store Settings / Parameters / etc. separately — 210a

Store Processed 3D Content Media / Settings / Parameters / Profile etc. in 3D Content Media Container — 210b

Select Settings / Parameters / Profile for Playback & Optionally Select Media Processing Module(s) & Optionally Store Processed 3D Content Media / Settings / Parameters / Profile etc. in 3D Content Media Container or separately — 212

Play 3D Content Media from Container (Optionally Applying Stored Settings / Parameters / Profile / etc.) — 214

Display Played 3D Content Media (Optionally Using Display / Sensor-based Processing Functions & Optionally Applying Received Settings / Parameters / Profile / etc.) — 216

US 8,558,830 B2

1

# SYSTEM AND METHOD FOR ADAPTIVE SCALABLE DYNAMIC CONVERSION, QUALITY AND PROCESSING OPTIMIZATION, ENHANCEMENT, CORRECTION, MASTERING, AND OTHER ADVANTAGEOUS PROCESSING OF THREE DIMENSIONAL MEDIA CONTENT

## CROSS REFERENCE TO RELATED APPLICATION

The present patent application claims priority from the commonly assigned U.S. provisional patent application 61/138,926 entitled "SYSTEM AND METHOD FOR ADAPTIVE SCALABLE DYNAMIC CONVERSION, QUALITY AND PROCESSING OPTIMIZATION, ENHANCEMENT, CORRECTION, MASTERING, AND OTHER ADVANTAGEOUS PROCESSING OF THREE DIMENSIONAL MEDIA CONTENT", filed Dec. 18, 2008.

## FIELD OF THE INVENTION

The present invention relates generally to systems and methods for improving the 3D experience provided by playback and display of 3D media content, and more particularly to systems and methods for providing 3D content media-centric solutions that greatly improve the quality and impact and other desirable features of any 3D media content, while decreasing the required levels of computing power, and lowering the complexity of the necessary 3D media playback and 3D media display solutions, thus maximizing the 3D experience produced therefrom.

## BACKGROUND OF THE INVENTION

Various tools for capturing, generating, processing, playing back and displaying three dimensional (3D) content media (especially motion video), have been available for quite some time. Display technologies for 3D content media in particular have evolved quite a bit from the earliest barely passable offerings which required the audience to wear flimsy "glasses" provided with a different (red or blue) lens for each eye, to more advanced electronic "stereoscopic 3D" glasses equipped with remotely triggered liquid crystal display (LCD)-based lenses (acting as alternating individually controlled "shutters"), which provided its wearers with an engaging and quality '3D experience', given properly prepared 3D content media paired with the appropriate playback and corresponding display technologies working on conjunction with the 3D glasses.

However, this approach for providing a "3D experience" is quite cumbersome and very expensive to use and maintain, and has thus been of very limited commercial success, primarily being relegated to special entertainment venues, such as certain IMAX theaters and high-end amusement parks. In addition to expensive, and relatively fragile, glasses being required for each member of the audience (which in some cases excludes those who cannot comfortably wear them), the latest stereoscopic 3D solutions require sophisticated and expensive computer-based components for storing and processing the 3D content, as well as similarly complex and expensive electronic components for displaying the 3D content and remotely controlling the stereoscopic 3D glasses.

Of course, as is expected, the very limited availability and expense of the above 3D content media playback and display technologies, in particular, have led to a relative lack of interesting 3D content (due to the expense in its creation and the

2

very limited commercial interest therein), which in turn has resulted in a very limited availability of 3D content capture and processing tools, thus essentially resulting in a "vicious cycle".

Nonetheless, in recent years, there has been a revolutionary leap in the solutions being offered for displaying 3D content media. Specifically, a number of companies, have developed and offered flat panel displays of varying sizes capable of creating a virtual 3D experience for the viewer without the need for the viewer to wear electronic or other types glasses or similar devices. Moreover, these displays do not require other specialized equipment and can work with specially configured 3D content that may be stored on, and played back from, conventional readily available computers. And, while these displays are still quite expensive, they are priced within reach of most organizations (and within reach of some consumers), with the price certainly poised to decrease exponentially, commensurate with an increase in production (as has been the case with the HDTV flat panel display market).

Therefore, for the past several years, ever since these newest stand-alone 3D ("SA-3D") content media display technologies have become available at relatively reasonable prices, there has been a widespread consensus that proliferation of three-dimensional (3D) content media (both in entertainment and in advertising), as well as of the hardware and software technologies necessary for SA-3D content capture, processing, playback, and display, is inevitable, and that the market for 3D-related technologies will experience explosive growth.

Nevertheless, to date there has not been a dramatic push forward that would make the above predictions become reality. One of the main reasons for this aforementioned lack of the expected proliferation of commercially successful SA-3D-related content, software and hardware offerings, is the fact that although these newest SA-3D content media display technologies have a number of very significant advantages over all previously known 3D-related offerings, they also suffer from a number of flaws. Specifically, on the average, the quality and impact of the 3D experience delivered by the available SA-3D solutions is lower than that of conventional high-end glasses-based stereoscopic 3D offerings. Moreover the relative position of each viewer to the SA-3D screen (in terms of vertical and horizontal viewing angles, distance, etc.) has significant impact on that viewer's overall 3D experience when viewing the displayed SA-3D content. Moreover, the existing SA-3D hardware and software solutions for the capture, processing, playback and display of 3D content media have focused on areas of expertise, offer individual and discrete benefits in various narrow aspects of 3D and SA-3D technologies with little or no regard for the offerings of other solution providers, resulting in literally dozens of incompatible proprietary software and hardware products with nothing to tie them together.

It would thus be desirable to provide a system and method directed to one or more modular unifying scalable solutions, preferably implemented in a configurable infrastructure, that greatly improve the quality and impact of any 3D media content, while decreasing the required levels of computing power, and lowering the complexity of the necessary playback and display solutions. It would further be desirable to provide a system and method capable of achieving the above goals by selectively performing 3D content processing and/or settings/parameter configuration at one or more components of the infrastructure from 3D content capture to 3D content media display. It would moreover be desirable to provide a system and method capable of determining and implementing selective or optimal storage, transmittal, and application(s) of

US 8,558,830 B2

3

3D content processing/settings parameter/profile configuration(s) prior to display of corresponding 3D content media to one or more viewers thereof.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, wherein like reference characters denote corresponding or similar elements throughout the various figures:

FIG. **1** is a schematic block diagram of an exemplary embodiment of the inventive scalable modular infrastructure for selectively implementing, configuring, and managing various components of the inventive system for selectively providing adaptive scalable modular functions related to 3D content media capture, generation, quality/processing optimization, enhancement, correction, mastering, and other advantageous processing and/or configuration;

FIG. **2** is a schematic block diagram of exemplary embodiments of various components of the inventive system for selectively providing adaptive scalable modular functions related to 3D content media capture, generation, quality/processing optimization, enhancement, correction, mastering, and other advantageous processing and/or configuration, that may be implemented in the novel infrastructure of FIG. **1**; and

FIG. **3** is a process flow diagram of an exemplary embodiment of the inventive process, that may be performed in whole, or selectively in part, by at least one component of the inventive system of FIG. **2**, or that may otherwise be implemented in one or more components of the novel infrastructure of FIG. **1**.

## SUMMARY OF THE INVENTION

The present invention is directed to a system and method for providing 3D content-centric solutions that greatly improve the quality and impact of 3D media content, while decreasing the required levels of computing power, and lowering the complexity of the necessary 3D media playback and display solutions, thus maximizing the 3D experience produced therefrom. The novel system and method accomplish these goals by providing modular unifying scalable 3D content-centered solutions, preferably implemented in a configurable infrastructure, that improve the quality and impact of any 3D media content, while decreasing the required levels of computing power, and lowering the complexity of the necessary playback and display solutions.

The inventive system and method advantageously enable automatic, semi-automatic or user-controlled selective performance of 3D content processing and/or settings/parameter configuration at one or more components of the infrastructure (from 3D content capture, to 3D content processing (and/or 2D to 3D content conversion), and to 3D content media display), and in at least one embodiment thereof, the inventive system and method are capable of determining and implementing selective or optimal storage, transmittal, and application of 3D content processing/settings/parameter/profile configuration(s) prior to, or during, display of corresponding 3D content media to one or more viewers thereof.

Other objects and features of the present invention will become apparent from the following detailed description considered in conjunction with the accompanying drawings. It is to be understood, however, that the drawings are designed solely for purposes of illustration and not as a definition of the limits of the invention, for which reference should be made to the appended claims.

4

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

The system and method of the present invention, address all of the disadvantages, flaws and drawbacks of all previously known 3D-related hardware and software offerings, by providing novel 3D content media-centric solutions that greatly improve the quality and impact of any 3D media content, while advantageously decreasing the required levels of computing power, and lowering the complexity of the necessary 3D media playback and 3D media display solutions, thus maximizing the 3D experience produced therefrom for one or more viewers.

The novel system and method accomplish the above goals by providing modular unifying scalable 3D content-centered solutions, preferably implemented in a configurable infrastructure, that greatly improve the quality and impact of any 3D media content, while decreasing the required levels of computing power, and lowering the complexity of the necessary playback and display solutions.

In various exemplary embodiments thereof, the inventive system and method advantageously enable automatic, semi-automatic or user-controlled selective performance of 3D content processing and/or settings/parameter configuration at one or more components of the infrastructure (from 3D content capture to 3D content media display), and in at least one embodiment thereof, the inventive system and method are capable of determining and implementing selective or optimal storage, transmittal, and application(s) of 3D content processing/settings/parameter/profile configuration(s) prior to display of corresponding 3D content media to one or more viewers thereof.

It should be noted that current 3D media content capture, processing, playback and display solutions take the "lowest common denominator" approach to applying playback/display optimization and related settings (intended to improve the appearance, quality, impact and overall "3-D Experience") to the 3D content media being displayed to at least one viewer thereof. This is very problematic because the desirable settings and parameters, as well as the necessary processing power and other requirements, for optimizing and maximizing the quality, impact and overall 3-D experience level for any displayed 3D media content, vary greatly between different 3D content media files, and even between different segments/portions within any particular 3D content media file itself. In particular, these variations largely depend on the specific 3D scenes being shown (i.e., on the depicted objects/subjects, their relative motion, complexity, backgrounds, lighting, etc.), and on other external factors, such as the original 3D content capture and/or conversion parameter settings, the capture hardware used, the current display, and even on the viewers' relative position (orientation, elevation, distance, etc.) thereto.

Finally, prior to discussing the various embodiments of the present invention in greater detail below, it is important to note that while many of the embodiments of the present invention (and the various novel tools, techniques and processes relating thereto), are described and discussed as being implemented and/or utilized in the field of 3D visual entertainment (film, television, games, etc., all embodiments of the inventive system and method, can be readily and advantageously utilized in virtually any scientific, military, medical, forensic, or industrial application based on, or involving 3D visualization or display and/or manipulation of 3D content medial, as a matter of design choice, without departing from the spirit of the invention.

US 8,558,830 B2

5                                                                                    6

Referring now to FIG. **1**, an exemplary embodiment is shown of an inventive scalable modular infrastructure **10** for selectively implementing, configuring, and managing various components of the inventive system for selectively providing adaptive scalable modular functions related to 3D content media capture, generation, quality/processing optimization, enhancement, correction, mastering, and other advantageous processing and/or configuration.

The infrastructure **10** includes optional components **12** and **16** (3D content capture system **12**, and 3D content processing system **16**) for selectively capturing and optionally processing 3D content media prior to placing it into a 3D content media container (e.g., file, stream, etc.). The infrastructure **10** also includes a 3D content media storage/processing/playback SPP system **18**, operable to selectively store, process, and/or play back 3D content media from a medial container that may be received from components **12** and/or **16**, or that may be delivered from another 3D content media source (such as media converted from another 3D format, or from non-3D content source).

The SPP system **18** preferably communicates with a 3D content display system **24**, operable to display 3D content media (in one or more configurations, and capable of displaying/utilizing via at least one of: unprocessed 3D content media **20***a*, processed 3D content media **20***b*, optimized 3D content setting for use with other 3D media content received from a source outside of the infrastructure **10**, etc.) to at least one viewer (e.g., to viewers, **26***a*-**26***c*).

In at least one embodiment of the present invention, the 3D content processing system **16** may also optionally comprise at least one 3D content processing feature/function that is optimized for utilization in conjunction with the 3D content capture system **12**. For example, in one embodiment of the infrastructure **10**, the 3D content capture system **12** may actually be a conventional or a modified 3D content capture system, that is provided with additional necessary features (such as scene/visual field depth mapping (or equivalent capabilities) to enable dynamic (and optionally "on the fly") capture of 2D content, plus sufficient depth (and/or related non-image) information that is sufficient to enable the systems **12** and **16** to produce desirable 3D content for delivery to the SPP system **18**. An exemplary embodiment of operation of the infrastructure **10** is discussed in greater detail in conjunction with FIG. **3**.

Referring now to FIG. **2**, various exemplary embodiments of the possible components of an inventive system **100**, that may be implemented in the inventive infrastructure **10** of FIG. **1**, operable to selectively provide adaptive scalable modular functions related to 3D content media capture, generation, quality/processing optimization, enhancement, correction, mastering, and other advantageous processing and/or configuration, that may be implemented in the novel infrastructure **10** of FIG. **1**. Preferably, one or more of the components (**12**, **16**, **18**, and **24**), and subcomponents (**102** to **114***e*) of the inventive system **100**, are capable of performing one or more steps of an exemplary novel process **200** of FIG. **3**.

Referring now to FIG. **3**, an exemplary embodiment is shown as a process flow diagram of an exemplary embodiment of the inventive process, with steps **202** to **216**, that may be performed in whole, or selectively in part, by at least one component of the inventive system **100** of FIG. **2**, or that may be implemented in one or more components of the novel infrastructure **10** of FIG. **1**.

In summary, the inventive system **100** (through selective operation of one or more components thereof, as may be implemented in infrastructure **10** of FIG. **1**), in additional exemplary embodiments thereof, preferably associates at

least one predetermined 3D content improvement ("3DCI") parameter set (optimization, playback, and/or display settings and/or parameters, selection of one or processing modules and/or stages of use thereof (or example during one or more of: capture, post-processing, playback or display), display tool adjustments, etc.), with 3D media content containers.

In at least one embodiment thereof, the optimal 3DCI parameter set comprises a plurality of "static to dynamic" display tools adjustments, which may be advantageously recorded and/or otherwise embedded in the 3D content media file, to thereby become a permanent feature thereof during later playback and/or processing (e.g., post production, etc.) of the 3D content media. In another embodiment of the present invention, the optimal 3DCI parameter set integration technique may also be utilized as a playback feature which is interpreted by a proprietary software and/or hardware 3D media player (which, by way of example can be configured as a "set top box" or equivalent, for 2D to 3D content conversion, playback of "enhanced" 3D content media having an integrated 3DCI parameter set, and for other functions (such as utilization of de-encryption solutions for playback of protected 3D content media).

Advantageously, this association and/or linking, occurs on a scalable basis from the most basic level at which an optimal 3DCI parameter set is associated with one or more corresponding 3D content media containers (that may be in a container directory, a playlist, a queue, or in a similar storage container), such that the appropriate 3DCI parameter set is activated in conjunction with its corresponding 3D content media from the container being played, to a more advanced level at which different 3DCI parameter sets are associated with (or otherwise linked or assigned to), the appropriate different portions of each 3D content media container, such that during playback and/or display thereof, different sections of the displayed content receive the optimal level of "treatment".

The novel system and method advantageously address and cover both the creation/determination/configuration of various scalable 3DCI parameter sets during 3D content capture, during initial processing, at any other time up to and including on-the-fly during playback, or any combination of the above, as a matter of design choice without departing from the spirit of the invention. Similarly, the process of creation/determination/configuration of the 3DCI parameter sets can be wholly or partially automated, or can be manually performed as a "creative process" by one or more content professional, preferably utilizing one or more 3DCI tools and support modules as desired or as necessary.

For example, tools utilizing novel dynamic and adaptive variable 3D depth and layering techniques of the present invention, may readily be used for both automated and content professional-directed 3DCI parameter creation (e.g., the 3DCI may include desired depth adjustment parameters, variable layer densities centered on certain displayed objects or object types, dynamic variable resolution based on relative distance of the closest object depth layers to the viewer, etc.).

The 3DCI parameter sets may be linked to, or otherwise associated with the respective 3D content media containers (or portions thereof), and may thus be stored in dedicated or other form of files, containers or libraries, separately from the 3D content media containers, or may be stored within the 3D content media containers, (e.g., embedded therein, as discussed above).

The inventive system **100** (through selective operation of one or more components thereof, as may be implemented in infrastructure **10** of FIG. **1**, for example in accordance with the process **200**, or otherwise), in various additional exem-

US 8,558,830 B2

7

plary embodiments thereof is operable to provide selective, automatic, or user-controlled dynamic/adaptive/scalable utilization of layered depth measurement/mapping techniques in 3D content media, coupled with techniques for identifying and spatially (3D) tracking static and moving displayed objects in the depth mapped layered scenes to provide the desired optimal level of at least one predefined aspect of 3D content experience. Advantageously, in accordance with the present invention, the novel system **100** preferably comprises sufficient hardware and/or software components and sub-components to provide and utilize one or more of the following advantageous and novel functionalities/techniques which are contemplated by the present invention:

Utilization of existing 3D field depth-detection cameras (and related and/or substantially equivalent hardware) during the 3D content capture/acquisition stage, to acquire a predetermined number of depth layers for the 3D content to form the desired layered "depth field environment" for each 3D content frame/scene, etc., which may be the same depth quantity for the entire container, or which may dynamically, adaptively or selectively vary for different portions of the content.

Assignment of predetermined amounts of layers to various displayed objects in the 3D content being captured and/or converted. Optionally, the assignment process may utilize variable layer density (e.g., depending on relative depth of different parts of the objects). Alternately, an object's layer density distribution (or profile) may be shifted/adjusted dynamically as the object moves within the depth field.

Determination, tracking and use of at least one variable dynamically determined/adaptive "focal" layer (i.e., everything behind the focal layer needs less detail and less layer density, anything close needs more) for entire scenes, or for portions thereof.

Determination, tracking and/or use of variable variable dynamically determined/adaptive "focal object" plural layers assigned to one or more objects in various 3D content scenes, and that can move to different depths depending on relative depth positions of the assigned object, thus enabling variable layer density across objects (essentially providing, to the inventive system **100**, a control protocol for simplified manipulation of an object's depth layer distribution).

In conjunction with one or more of the various features above, utilization of a mixture of different image resolution magnitudes (pixel density, etc.), and/or optionally of related image processing (anti-aliasing, etc.), for portions of objects/scene regions in an optimized manner (for example, by processing/displaying higher resolutions for those object layers that are closest to the viewer (or that otherwise would benefit from additional detail)).

Optionally, maintaining a selected level of "geospatial accuracy" with external calibration distance points or with internal software reference markers, enables visual depth adjustment to precise geo-spatially accurate images to be accomplished to a degree as may be desired (or necessary) for one or more 3D content applications, up to, and inclusive of, extremely dense layering across each 3D content scene and/or object(s) (for example as may be required for military, scientific, and/or medical applications, etc.).

Utilization\ and/or adaptation of various advantageous geo-centric survey depth (elevation) mapping techniques and methodologies, preferably with additional modifications applied thereto to make them dynamic, adaptive, and highly configurable.

8

Selective configuration, implementation, and use of various additional features including, but not limited to: dedicated 3D processing (D3DP) hardware (e.g., "black box") re-mastering/editing tools, depth correction techniques, various display/media player modules and editing tools, streamlining D3DP hardware rendering conversion processes (e.g., grayscale values to corresponding layer depth locking, and later image depth manipulation/correction/optimization via grayscale value adjustments, etc.), and so forth.

It should also be noted that the various embodiments of the inventive system and method, can be advantageously configured, and/or adapted, to utilize and/or combine the very best of currently available (as well as any future) 3D-related solutions in an interoperable manner, that is transparent as possible to the end user (whether the user is in the field of 3D content creation, or is part of the 3D content audience).

By way of example, the present invention may be implemented, in whole or in part, in connection with, or utilizing a 2D to 3D video conversion server (3DVC server), utilizing various additional applications and software-based tools. This technique may employ a variety of commercially available software tools designed to provide for some specific 2D to 3D conversion techniques such as separate interval field sequential frame grabbing, and thereafter mixing of the subsequent frames to create a depth map based on horizontal motion (which in itself is a sub-standard 3D conversion technique). However, when this approach, is integrated with a variety of other compatible 3D content enhancement techniques, and further assisted/upgraded by the aforementioned inventive system features and tools, it may be configured and implemented to perform at a substantially higher standard of 3D depth conversion, and therefore become an excellent candidate for an inexpensive and easily to use basis for a Broadcast Quality 3D video standard. It should be noted that the opportunity to integrate a number of commercially available 2D to 3D video depth conversion methodologies with a 3DVC server exists only as a consequence of the implementation of the various novel depth mapping correction and relating techniques of the inventive system **100**.

Therefore, the combination of the various commercially available 3D-related tools in concert with a 3DVC server, a media player, the various novel post-processing and display tools of the present invention, unexpectedly and advantageously resulted in the discovery of a completely unique and new process of image correction, 3D depth mapping, and depth impact optimization, that, when properly used and configured in accordance with the present invention are capable of elevating conventional 2D+Depth 3D media to Broadcast quality.

The various inventive depth mapping solutions and novel techniques, when applied to 3D content media provided by a conventional 3D 3DVC, unexpectedly result in a "remastering" of the 3DVC server, thus constituting an entirely new commercial application of a conventional 3D technology package "fused" with various novel solutions offered by the present invention, and therefore providing a breakthrough opportunity to produce 3D 2D+Depth stereoscopic 3D content media having maximum depth 3D visual impact, but without distracting visual artifacts.

In addition, it should be noted that while a conventional 3DVC server most is most commonly used to convert 2D content to 2D+Depth 3D content, it is also capable of converting dual path stereoscopic optical signals to the 2D+Depth format, and also capable of converting stereoscopic side-by-side and field sequential stereoscopic 3D video, into the 2D+Depth format. Fortunately, the various

US 8,558,830 B2

9

techniques and solutions of the present invention are fully applicable for advantageous utilization in connection with any and all of the aforementioned conversion formats which are supported by the 3DVC server.

Essentially the system and method of the present invention have gone one step further and readily serve as a basis for producing a 3D software solution (that may be optionally augmented with, or replaced by, a hardware component) that is capable of grabbing stereoscopic pairs from a nine multi-view 2D+Depth conversion, and reformatting them back into a side-by-side, or a dual-path conventional 3D signal, for viewing the reformatted 3D content media using stereoscopic 3D glasses. Accordingly, the inventive techniques close the loop and allow the use of a conventional 3DVC server to convert 2D content media not only into a 2D+Depth format, but also automatically into a highly desirable and commercially viable stereoscopic 3D medial content that is necessary for all 3D gasses-based display systems, large and small, thereby enabling a highly demand solution to be offered during the inevitable transition between from 3D glasses-based display systems to ASD systems.

When the above-described combined technology package (hereinafter referred to as a "3DF-3DVC system") is used with conventional and/or novel 3D display tool adjustments and settings, (which, in accordance with the present invention may be readily embedded into a 3D content media file (and optionally recorded/captured "on-the-fly")), the resulting output not only corrects any remaining 3D video image issues/flaws, but will at the same time provide the basis for development and implementation of various guidelines and tools for rapidly effecting a major increase in the impact of the depth perspective visuals in the display of various available and future 3D content media, thus establishing the methodology and infrastructure that is required for widespread production and proliferation of 3D stereoscopic video broadcast quality standards.

For example, various inventive 3DF-3DVC system techniques may be employed in all of 3DVC server applications to effectively upgrade the 3D content media quality through "Re-mastering". When these techniques are applied to pre-converted 2D+Depth, s3D 3D video clips, which are designed for display on conventional commercially available 3D ASD screens, advantageously, the issues of depth error correction, cone double image removal and ghosting artifacts may be corrected and therefore eliminated.

The novel techniques and solutions provided in various embodiments of the inventive system **100**, and referenced above in connection with their advantageous ability to synergistically combine with, and vastly improve, conventional 3D systems and solutions (e.g., 3DVC servers, etc.) are described in greater detail below in connection with various additional exemplary embodiments of the present invention.

The various embodiments of the inventive system **100** of FIG. **2**, and of the system operation process **200** of FIG. **3**, preferably comprise and rely on a selection of a plurality of novel and proprietary "key guidelines" for selection of the most appropriate content (or portions thereof) for maximum impact and visual effect in 3D. By way of example, ideally, the best 3D stereoscopic video content produced for conversion, is captured with the intent to convert the content to 3D during the storyboard stage. Therefore, it is greatly preferable to capture 3D content media in dual optical path stereoscopic 3D, which can still be vastly improved by the various inventive post-production and 3DF-3DVC server techniques. Various additional key guidelines that may be readily implemented in accordance with the present invention include, but are not limited to, the following:

10

The editing process of pre-captured 2D video can make or break the depth impact produced in 3D content media produced through a 2D to 3D conversion process. Therefore, choosing the best video frames for 2D to 3D conversion, is described below as the first step in the editing/post-production/re-mastering process in optimal 3D-3DVC system operations. Specifically:

The best frames for 3D 3DVC server conversion have content that is on the brighter side, with few dark images (where the sense of depth can be easily lost). Therefore, designing the content media so that darker objects and backgrounds are behind brighter objects in the foreground, will maximize the 3D effect.

Content with multiple spatial layers, larger objects and smaller objects creating reference points for depth perspective, will provide richness in texture and lighting effects (e.g., shadows are quite advantageous).

Content which is not fast moving from shot to shot is also preferable. High speed dynamic content does not work well in 3D content media. This is because in stereo 3D the viewer's eyes need time to register the full impact of the image, so slower content motion is better, especially in the case where the content comprises complex action scenes.

Larger objects which hold perspective, such as depth perspective on equipment, large objects, such as buildings, or interior shots in which the perspective is already attempting to simulate 3D, are all advantageous. Any "3D type" shots during which the camera is moving around an object and looking at it from multiple viewpoints, are also excellent.

Content which comprises some objects or actions that are "coming forward" from a rear perspective of the display to the front of the display.

Content in which the background is darker than the foreground, or in which the object is in a high contrast to the background, and moving forward into the foreground facilitates a desirable 3D impact.

Content comprising text graphics that are relatively centered and stationary, as opposed to being in motion (e.g., from left to right, and vice-versa), as well as content comprising text graphics that are centered and moving from the rear of the display to the front of the display are good.

Content in which objects appear smaller in the background, which then move forward into the foreground, while growing in size as they do so, as well as content comprising object perspective shots, are likewise good.

Any content image that is rendered utilizing 3D modeling techniques for a 3D depth effect. All computer generated graphic images, if they are not being displayed at very high speed are good candidates for such conversion.

Content which comprises imagery that moves from the center of the display background to center of the display foreground, avoiding image overlap with the frame of the display, will give a far stronger, the best forward "POP out of the display", effect.

Likewise, the key guidelines also include a number of guidelines relating to identifying poor choices in 3D content media selection. Some examples of the worst types of content candidates for 3D conversion by the 3DF-3DVC server, include, but are not limited to:

Content comprising high speed "jump shots" which approx 6 seconds or less, from segue to segue.

US 8,558,830 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

Content comprising dark image shots in the foreground, and light image shots with many small moving objects on the display are difficult.

Content comprising Objects traveling from left to right with minimum size change, as well as content comprising multiple objects of the same size and in the same plane, with very little layering, or visual reference points.

Content in which blurred objects are moving away from each other, and objects lacking sharp lines and edges, make it difficult to visually defined masses.

The various embodiments of the inventive system **100** of FIG. **2**, and of the system operation process **200** of FIG. **3**, also advantageously comprise and rely, on a selection of a plurality of novel and proprietary "guidelines for post/prep 2D editing of 2D content for conversion" that facilitate the selection of the most appropriate techniques, methodologies and/or of parameters used in connection therewith, for achieving the maximum impact and visual effect in 3D:

1) Sharper Edge Detection Preparation: When assembling edited 2D content for conversion to 3D, brightness gain control should be used to step up the brightness level, thereby defining all edges hiding in shadows.

   (a) For this editing technique, it is useful to create maximum edge definition using the sharpness control and the contrast control to darken shadows, leaving edges behind. The use of color intensity to accomplish the same definition of edges and masses is also effective. Re-adjustment of contrast and brightness can thereafter be added on the display tool level stage after the 3D conversion process takes place.

2) Fast Action Time corrections: The rule of thumb for this exemplary inventive guideline, is that if a frame count of a clip of content media is less than 100 frames over 3 seconds, then 3D conversion is pointless. The visual detail for such content becomes too fast for the eye to register depth. The solution to dealing with such troublesome content is to either add frames to the pre-edited 2D "fast action shots" by duplication, or by recording the objects in slow motion at the highest resolution possible, or by slowing down the playback of the content media and utilizing any and all available editing tools to correct blurred edges, shadows without objects, and low focus moving elements (which blend into other objects due to poor video/film quality). Likewise, "speed jump shots" are among the worst candidates for conversion to 3D

   (a) The only effective option is to treat the wide variety of multiple "objects in fast action" content shots, as one large object, to only define the depth map in terms of two or three levels of depth, and to paint the objects without detail. As an alternative, maximum contrast, going from white foreground to gray side edges to black background may be used, treating every object in the scene in the same manner (the faster the scene, the fewer the contrasting depth map relationships).

   (b) Another novel technique that may be advantageously used to slow down an undesirably fast moving image, is to locate elements in high speed action shots which lend themselves to CGI content additions—it is sometimes possible to create a CGI insert edit with a number of frames which will be "new" content, and which are specifically designed to dramatize an existing scene with an additional 3D depth object in the image, with the purpose of creating a specific frame enhanced depth perspective.

3) Opening 3D impact is the most important image of the clip, and therefore it is very advisable to ensure that the 3D impact increases over the first 20 seconds, or few minutes of a 3D content media clip, giving the audience a chance to adjust their vision from 2D film to 3D content. It is also advantageous to script objects moving out of the display in the opening scenes of the content, and to ensure that all or most titles and graphics are rendered in 3D motion CGI (or equivalent) and not presented as 2D static images.

4) 3D Visual Rest spots: the time frame of a continuous display of depth intensive images should pre stage the dramatic, most intense elements of the story line. It is advantageous to use 3D depth perspective to create realism, which enhances the power and the significance of the story, the action and the drama. The counterpoint to this is also true in that lowering the 3D impact after the momentary high point in the story line, allows the audience to experience the previous images intensity and recover before the next onslaught.

   (a) Consequently there is a real need to create visual realism "highs" as well as "rests periods" to allow the intensity of the 3D content to be properly absorbed and processed by the viewers and contrasted to the imagery in the "rest" spots.

5) Use of camera angles. Use of normal videographic camera angles, close-ups, slow pans, and other conventional film techniques, allows the full detail of a scene to comes into focus. A greater level of detail leads to a higher quality conversion, and a corresponding greater degrees of perceived 3D depth realism and depth impact. It should be noted that 3D depth images are able to offer a variety of special effects in support of a story, or they can take the place of fast action shots, providing depth stimulus, as a substitute for dramatic action.

The various embodiments of the inventive system **100** of FIG. **2**, and of the system operation process **200** of FIG. **3**, further advantageously comprise and rely, on a selection of a plurality of novel and proprietary "guidelines for 3DF-3DVC system time editing and related techniques" that facilitate the selection of the most appropriate time line editing and related techniques, methodologies and/or of parameters used in connection therewith, for facilitating the maximum possible impact and visual effect in 3D content media.

There are many levels of 3D depth image impact, ranging from a classic "pop out of the display" major impact, in which the depth is the story, to a "depth window" where everything is three dimensional from the display surface backwards, and in which depth appears to be secondary to the story.

A third, and more subtle depth impact, which mimics realism, exists as a balance between the above two extreme effects, and advantageously offers an undercurrent of richness which supports the story line, while enhancing it by making the images so convincing, that the viewer is barely able to maintain their objectivity, or actually loses it—it the ultimate achievement for a 3D special effects to manipulate the viewer, without the viewer's realization. The process of guiding the viewer into this desirable "depth realism frame of mind" has undergone extensive scientific research and study, as is often referred to by the term "3D Presence".

The following exemplary novel and proprietary techniques that may be readily implemented in, and utilized using the inventive system **200**, are designed not only to enhance the depth map of the 3D content media image quality per se, but to also provide a framework of techniques which are designed to "seduce" the viewer into an involuntary loss of objectivity with respect to their viewership of the specially edited/processed 3D content. To accomplish this goal, the depth perspective in various scenes must be as self evident as possible—if the viewer is "hunting" for the 3D effect, them this

US 8,558,830 B2

13

14

technique has failed. The following inventive techniques, referred to above, may be used to produce desirable and advantageous "Depth special effects":

1) The first key step is to produce 3D content media that is free of all video artifacts causing any physical discomfort such as eye strain, dizziness, headaches etc. This leads directly to the need for all 3D stereoscopic images to perform at traditional 2D level of broadcast standards (This is the focus of the first group of the above-described inventive techniques, relating to 3D depth map correction.

2) One of the keys to creating broadcast quality 2D to 3D conversion images is to be able to address the depth spatial relationships in each frame in a manner which builds continuity of depth mapping, so that following frames are building the same depth relationships within the eye of the audience, as previously viewed frames of like images. This topic is the second area of novel capabilities of the inventive system and method the use of geo spatial depth grid points of reference.

3) By maintaining a consistent level of depth information on the screen, the audience is able to increasing perceive greater and greater degrees of depth detail, which results in a lowering of the mind's censorship cues telling us that these images are not "real". In 3D depth perspective, the greater the degree of depth realism, the higher the degree of 3D immersiveness, leading to an increase in the viewer's emotional engagement—this inventive technique is referred to as "command frames."

4) The audience needs to become accustomed to seeing everything in the frame in 3D, effortlessly. At that point the 3D cues which trigger depth perception, have formed the habit of seeing in 3D, as it is the natural way humans see, resulting in not seeing the non 3D visual cues, further intensifying the 3D impact. This novel development is based on using the layering technique of various commercial tools to enhance detail, sharper edge detection, and gray scale shading, creating a baseline 3D effect.

5) The overall intensity of the depth map image may alter dramatically between close up to wide shot, but the error correction of all the frames must be consistent, the general geospatial relationships, need to be consistent, and except where it is intentional that the image be driven to the edge for added impact, images should not be jarring in their incorrect juxtapositions to each other. If the effect of the depth perspective is to keep the viewer from "getting lost in the movie", then the effect is counter productive. The novel technique designed to accomplish this goal, is the adjustment of the 3DF-3DVC system screen position control. This control is part of the 3DF-3DVC system set up, and its adjustment is made before the clip is processed. A correct setting should be identified for each segment of the clip requiring drastic visual changes, and only the frames which are best served by the recorded position of the screen placement control should be exported at that particular screen position setting.

6) If the purpose of the 3D effect is to provide an entertaining visual level of excitement, then the effects which support this high impact depth visuals comprise "over the top pop out of the front of the screen" image quality. There are a number of proprietary techniques which have been discovered in connection with the present invention to create such effect by way of example, one such technique involves creation of multiple layers of contrasting depth maps, on adjacent objects, thus forming a visual basis for comparison.

7) Sometimes it is necessary to create an exaggerated depth effect in order to define the image and focus the viewers'

attention thereon. The means to accomplish this is utilization of the inventive "exaggerated depth mapped image" technique. This technique created an illusion of how a particular object is "expected" to look. It is more important that the images meet expectations, than be "correct". In order to accomplish this, many times it is necessary to overstate the depth effect of an object in gray scale values—in order to get many of the objects to appear consistent with the other depth effects, it is necessary to "showcase" a number of objects to create the desired focus of visual attention.

Other image correction effects, that may be used in accordance with the various embodiments of the novel system **100** and the novel process **200** of the present invention, include, but are not limited to, the following:

Gray scale depth mapping correction on multiple planes,

Creating sharper edge detection layers for volume definition.

Layers for Command Frames.

Layers for Action Frames

Layers for Static frame backgrounds

Layers for perspective shading and volume

3D boxes for grid mapping

3DF-3DVC system front of screen positioning, relative to projection out of the screen layer, and mapping tricks for impact.

3DF-3DVC system special effects for creating compromise image effects without losing definition.

3D Histogram adjustments.

As a result, in view of all of the above, the use of various embodiments of the inventive system and method (or of portions thereof), enables companies to offer, and consumers and other end-user parties to experience, 3D content media in a very cost-effective and efficient manner, thus overcoming the flaws and drawbacks of all prior 3D-related offerings that served as barriers to the well-deserved success of the 3D media experience market, and making inexpensive and ready availability of the "3D experience" a reality.

Thus, while there have been shown and described and pointed out fundamental novel features of the inventive system and method as applied to preferred embodiments thereof, it will be understood that various omissions and substitutions and changes in the form and details of the devices and methods illustrated, and in their operation, may be made by those skilled in the art without departing from the spirit of the invention. For example, it is expressly intended that all combinations of those elements and/or method steps which perform substantially the same function in substantially the same way to achieve the same results are within the scope of the invention. It is the intention, therefore, to be limited only as indicated by the scope of the claims appended hereto.

We claim:

**1**. A method, implemented in at least one data processing system, for improving the efficiency, quality, viewing comfort and/or visual impact of a 3D experience capable of being provided to at least one viewer of a 3D content media comprising a plurality of content sections, in conjunction with the use of at least a portion of a plurality of predetermined 3D content modification techniques, the method comprising the steps of:

(a) identifying at least one content section of the 3D content media comprising at least one 3D media element and selecting at least one corresponding predefined plural 3D content modification technique that is configured for provision of optimum improvement of the 3D experience when applied thereto;

US 8,558,830 B2

15

(b) for each said selected at least one predefined plural 3D content modification technique configured for then-current application to said corresponding at least one 3D media element, applying said selected at least one predefined plural then-current 3D content modification technique thereto;

(c) for each said selected at least one predefined plural 3D content modification technique configured for future application to said corresponding at least one 3D media element, determining a setting for at least one parameter of said selected at least one predefined plural future 3D content modification technique, optimal for application to said corresponding at least one 3D media element;

(d) associating a reference to said selected at least one predefined plural future 3D content modification technique and said determined at least one optimal parameter, with said corresponding at least one 3D media element;

(e) selectively repeating said steps (a), (b), (c) and (d) for at least one additional section of the 3D content media;

(f) enabling an operator to view results of said steps (a), (b), (c) (d), and (e), and to at least one of: selectively cancel at least one result of at least one operation previously performed at least one of said steps (a), (b), (c), (d), and (e), and selectively change at least one operation previously performed at least one of said steps (a), (b), (c), (d), and (e), to an alternate operation selected by the operator;

(g) after conclusion of said step (f), generating a dynamic 3D content media container file configured for playback to at least one viewer utilizing at least one 3D content playback system operable to apply said selected at least one predefined plural future 3D content modification technique to said corresponding at least one 3D media element in accordance with said at least determined at least one optimal parameter, and further configured to store, for each 3D content media element identified at said step (a), at least one of:

at least one immediate 3D content modification applied at said step (b), and

at least one said associated reference to said at least one corresponding predefined plural future 3D content modification technique, and said determined at least one optimal parameter therefor;

such that said dynamic 3D content media container file comprises 3D media content having at least one modified content section each comprising at least one modification specifically optimal for application thereto, thereby maximizing the efficiency, quality, viewing comfort and/or visual impact of the 3D experience being provided to viewers thereof during playback.

**2.** The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein said 3D content media comprises at least one of: stereoscopic 3D content, and auto-stereoscopic 3D content.

**3.** The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein said 3D content media comprises at least one of: first 3D content media previously captured by at least one 3D content capture system, second 3D content media previously generated by at least one 3D content source, third 3D content media previously converted, by a 3D content capture system, from captured 2D media content, and fourth 3D content media previously converted, by a 3D content source, from previously generated 2D content.

16

**4.** The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein said at least one content section of the 3D content media, identified at said step (a), comprises a plurality of content frames comprising said at least one 3D media element.

**5.** The method of claim **4**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein said predefined plural content frames comprise a corresponding scene, and wherein each said at least one 3D media element comprises at least one of: a static 3D displayed object, and a moving 3D displayed object.

**6.** The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein at least one of said steps (a), (b), (c), (d) and (e), is performed by the at least one data processing system under manual control of an operator.

**7.** The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein said at least one 3D content playback system comprises at least one of: a 3D content media player operable to process said dynamic 3D content media container file for playback by generating therefrom and transmitting a 3D content output signal to a corresponding connected 3D content display system, and a 3D content display system operable to process said dynamic 3D content media container file for playback by generating therefrom, and displaying said 3D content output signal.

**8.** The method of claim **7**, wherein said at least one 3D content playback system is operable to apply each said at least one predefined plural future 3D content modification technique to said corresponding at least one 3D media element of said 3D content media, in accordance with said at least one optimal parameter therefor, further comprising the steps of:

(h) providing said dynamic 3D content media container file, generated at said step (f), to said at least one 3D content playback system;

(i) identifying, by said at least one 3D content playback system in said dynamic 3D content media container file, at least one said associated reference to said at least one corresponding predefined plural future 3D content modification technique, and said determined at least one optimal parameter therefor; and

(j) applying said at least one referenced corresponding predefined plural future 3D content modification technique to said corresponding at least one 3D media element of said 3D content media, in accordance with said at least one optimal parameter therefor.

**9.** The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein said plurality of predetermined 3D content modification techniques further comprises a plurality of content modification techniques operable to optimize at least one additional visual characteristic of 3D content media, further comprising the steps of, prior to said step (e):

(k) identifying at least one content section of the 3D content media comprising at least one visual characteristic, and selecting at least one corresponding predefined plural content modification technique that is configured for provision of optimum improvement of the 3D experience when applied thereto; and

(l) for each said selected at least one predefined plural content modification technique configured for immediate application to said corresponding at least one content section, applying said selected at least one predefined plural immediate content modificalon technique thereto.

US 8,558,830 B2

17 | 18

**10.** The method of claim **9**, wherein said step (e) further comprises the step of:

(m) selectively repeating said steps (k) and (l) for at least one additional section of he 3D content media.

**11.** The method of claim **9**, further comprising the steps of, after said step (k) and prior to said step (e):

(n) for each said selected at least one predefined plural content modification technique configured for future application to said corresponding at least one content section, determining a setting for at least one parameter of said selected at least one predefined plural future content modification technique, optimal for application to said corresponding at least one content section; and

(o) associating a reference to said selected at least one predefined plural future content modification technique and said determined at least one optimal parameter, with said corresponding at least one content section.

**12.** The method of claim **11**, wherein said step (e) further comprises the step of:

(p) selectively repeating said steps (n) and (o) for at least one additional section of the 3D content media.

**13.** The method of lain **11**, wherein said at least one 3D content playback system is operable to apply said at least one corresponding predefined plural future content modification technique to at least one predetermined content section of said 3D content media, in accordance with said at least one optimal parameter therefor, further comprising the steps of:

(q) providing said dynamic 3D content media container file, generated at said step (f), to said at least one 3D content playback system;

(r) identifying, by said at least one 3D content playback system in said dynamic 3D content media container file, at least one said associated reference to said at least one corresponding predefined plural future content modification technique, and said determined at least one optimal parameter therefor; and

(s) applying said at least one referenced corresponding predefined plural future content modification technique to at least one predetermined content section of said 3D content media, in accordance with said at least one optimal parameter therefor.

**14.** The method of claim **13**, wherein said step (q) comprises the step of:

(t) streaming said dynamic 3D content media container file, generated at said step (f), to said at least one 3D content playback system from a remote 3D content source.

**15.** The method of claim **13**, wherein said dynamic 3D content media container file is stored on physical media operable to store 3D content media container files, and wherein step (q) comprises the step of:

(u) transmitting said dynamic 3D content media container file, generated at said step (f), to said at least one 3D content playback system from said corresponding physical media.

**16.** The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein the at least one data processing system operable to perform said steps (a), (b), (c), (d), and (e), is connected to said at least one 3D content playback system.

**17.** The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein said at least one 3D content playback system comprises the at least one data processing system operable to perform said steps (a), (b), (c), (d), and (e).

**18.** The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein the at least one data processing system is operable to perform said steps (a), (b), (c), (d), (e), and (f), prior to playback of said dynamic 3D content media container file, further comprising the step of:

(v) after said step (f), storing said dynamic 3D content media container file, on physical media operable to store 3D content media container files, for later payback by said at least one 3D content playback system.

**19.** The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein the at least one data processing system is operable to perform said steps (a), (b), (c), (d), (e), and (f), in conjunction with playback of said dynamic 3D content media container file by said at least one 3D content playback system.

*    *    *    *    *

# EXHIBIT 11

US009681114B2

(12) **United States Patent**
Blumenthal et al.

(10) Patent No.: **US 9,681,114 B2**
(45) Date of Patent: *Jun. 13, 2017

(54) **SYSTEM AND METHOD FOR ADAPTIVE SCALABLE DYNAMIC CONVERSION, QUALITY AND PROCESSING OPTIMIZATION, ENHANCEMENT, CORRECTION, MASTERING, AND OTHER ADVANTAGEOUS PROCESSING OF THREE DIMENSIONAL MEDIA CONTENT**

(71) Applicant: **Stephen Blumenthal**, Newfield, NY (US)

(72) Inventors: **Stephen Blumenthal**, Newfield, NY (US); **Ilya Sorokin**, New York, NY (US); **Edmund Mark Hooper**, Pointe-Claire (CA)

(73) Assignee: **REMBRANDT 3D HOLDING LTD**, Newfield, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/367,393**

(22) Filed: **Dec. 2, 2016**

(65) **Prior Publication Data**

US 2017/0085856 A1     Mar. 23, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 14/054,772, filed on Oct. 15, 2013, now Pat. No. 9,521,390, which is a continuation of application No. 13/168,252, filed on Jun. 24, 2011, now abandoned, which is a continuation-in-part of application No. 12/642,757, filed on Dec. 18, 2009, now Pat. No. 8,558,830.

(60) Provisional application No. 61/138,926, filed on Dec. 18, 2008.

(51) **Int. Cl.**
*H04N 13/00*     (2006.01)

(52) **U.S. Cl.**
CPC ..... *H04N 13/0018* (2013.01); *H04N 13/0022* (2013.01); *H04N 13/0055* (2013.01); *H04N 13/0059* (2013.01); *H04N 2213/003* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,765,568 B2 *   7/2004   Swift ................ H04N 7/17318
                                                        345/419
2008/0281566 A1 *  11/2008   Wang ...................... H01L 22/20
                                                        703/7

* cited by examiner

*Primary Examiner* — Ke Xiao
*Assistant Examiner* — Jed-Justin Imperial
(74) *Attorney, Agent, or Firm* — Brown & Michaels, PC

(57) **ABSTRACT**

A method, implemented in at least one Depth Based Image Rendering (DBIR) data processing system, for improving the efficiency, quality, viewing comfort and/or visual impact of a 3D experience capable of being provided to at least one viewer of a 3D content media comprising a plurality of content sections in 2D+Depth format, in conjunction with the use of at least a portion of a plurality of predetermined 3D content modification techniques.

**20 Claims, 6 Drawing Sheets**



**FIG. 1**



**FIG. 2**



**FIG. 3**



**FIG. 4A**



300a

304a

306a

302a

**FIG. 4B**



300b

304b

308b

306a

302b

Case 1:23-cv-00763-UNA Doc #69-1 Filed 04/03/23 Page 224 of 410 PageID #: 22
Case 1:23-cv-00763-UNA Doc #69-1 Filed 04/03/23 Page 724 of 1640 PageID #: 22
Exhibit A    Page 223 of 409

**FIG. 4C**



**FIG. 4D**

300d



SS-1

SS-2

US 9,681,114 B2

1

# SYSTEM AND METHOD FOR ADAPTIVE SCALABLE DYNAMIC CONVERSION, QUALITY AND PROCESSING OPTIMIZATION, ENHANCEMENT, CORRECTION, MASTERING, AND OTHER ADVANTAGEOUS PROCESSING OF THREE DIMENSIONAL MEDIA CONTENT

## CROSS REFERENCE TO RELATED APPLICATIONS

The present patent application is a continuation of U.S. patent application Ser. No. 14/054,772, filed Oct. 15, 2013, which is a continuation of U.S. patent application Ser. No. 13/168,252, filed Jun. 24, 2011, now abandoned, which is a continuation-in-part of U.S. patent application Ser. No. 12/642,757, filed Dec. 18, 2009 and issued as U.S. Pat. No. 8,558,830, which claims priority from U.S. Provisional Patent Application Ser. No. 61/138,926, filed Dec. 18, 2008.

## FIELD OF THE INVENTION

The present invention relates generally to systems and methods for improving the 3D experience provided by playback and display of 3D content, and more particularly to systems and methods for providing 3D content media-centric solutions that greatly improve the quality and impact and other desirable features of any 3D content media, while decreasing the required levels of computing power, and lowering the complexity of the necessary 3D media playback and 3D media display solutions, thus maximizing the 3D experience produced therefrom.

## BACKGROUND OF THE INVENTION

Various tools for capturing, generating, processing, playing back and displaying three dimensional (3D) content media (especially motion video), have been available for quite some time. Display technologies for 3D content media in particular have evolved quite a bit from the earliest barely passable offerings which required the audience to wear flimsy "glasses" provided with a different (red or blue) lens for each eye, to more advanced electronic "stereoscopic 3D" glasses equipped with remotely triggered liquid crystal display (LCD)-based lenses (acting as alternating individually controlled "shutters"), which provided its wearers with an engaging and quality "3D experience", given properly prepared 3D content media paired with the appropriate playback and corresponding display technologies working on conjunction with the 3D glasses.

However, this approach for providing a "3D experience" is quite cumbersome and very expensive to use and maintain, and has thus been of very limited commercial success, primarily being relegated to special entertainment venues, such as certain IMAX theaters and high-end amusement parks. In addition to expensive, and relatively fragile, glasses being required for each member of the audience (which in some cases excludes those who cannot comfortably wear them), the latest stereoscopic 3D solutions require sophisticated and expensive computer-based components for storing and processing the 3D content, as well as similarly complex and expensive electronic components for displaying the 3D content and remotely controlling the stereoscopic 3D glasses.

Of course, as is expected, the very limited availability and expense of the above 3D content media playback and display technologies, in particular, have led to a relative lack

2

of interesting 3D content (due to the expense in its creation and the very limited commercial interest therein), which in turn has resulted in a very limited availability of 3D content capture and processing tools, thus essentially resulting in a "vicious cycle".

Nonetheless, in recent years, there has been a revolutionary leap in the solutions being offered for displaying 3D content media. Specifically, a number of companies have developed and offered flat panel displays of varying sizes capable of creating a virtual 3D experience for the viewer without the need for the viewer to wear electronic or other types glasses or similar devices. Moreover, these displays do not require other specialized equipment and can work with specially configured 3D content that may be stored on, and played back from, conventional readily available computers. And, while these displays are still quite expensive, they are priced within reach of most organizations (and within reach of some consumers), with the price currently poised to decrease exponentially, commensurate with an increase in production (as has been the case with the HDTV flat panel display market).

Therefore, for the past several years, ever since these newest stand-alone 3D ("SA-3D") content media display technologies have become available at relatively reasonable prices, there has been a widespread consensus that proliferation of three-dimensional (3D) content media (both in entertainment and in advertising), as well as of the hardware and software technologies necessary for SA-3D content capture, processing, playback, and display, is inevitable, and that the market for 3D-related technologies will experience explosive growth.

Nevertheless, to date there has not been a dramatic push forward that would make the above predictions become reality. One of the main reasons for this aforementioned lack of the expected proliferation of commercially successful SA-3D-related content, software and hardware offerings, is the fact that although these newest SA-3D content media display technologies have a number of very significant advantages over all previously known 3D-related offerings, they also suffer from a number of flaws. Specifically, on the average, the quality and impact of the 3D experience delivered by the available SA-3D solutions is lower than that of conventional high-end glasses-based stereoscopic 3D offerings. Moreover the relative position of each viewer to the SA-3D screen (in terms of vertical and horizontal viewing angles, distance, etc.) has significant impact on that viewer's overall 3D experience when viewing the displayed SA-3D content. Moreover, the existing SA-3D hardware and software solutions for the capture, processing, playback and display of 3D content media have focused on areas of expertise, offer individual and discrete benefits in various narrow aspects of 3D and SA-3D technologies with little or no regard for the offerings of other solution providers, resulting in literally dozens of incompatible proprietary software and hardware products with nothing to tie them together.

It would thus be desirable to provide a system and method directed to one or more modular unifying scalable solutions, preferably implemented in a configurable infrastructure, that greatly improve the quality and impact of any 3D media content, while decreasing the required levels of computing power, and lowering the complexity of the necessary playback and display solutions. It would further be desirable to provide a system and method capable of achieving the above goals by selectively performing 3D content processing and/or settings/parameter configuration at one or more components of the infrastructure from 3D content capture to 3D

US 9,681,114 B2

3

content media display. It would moreover be desirable to provide a system and method capable of determining and implementing selective or optimal storage, transmittal, and application(s) of 3D content processing/settings parameter/ profile configuration(s) prior to display of corresponding 3D content media to one or more viewers thereof.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, wherein like reference characters denote corresponding or similar elements throughout the various figures:

FIG. **1** is a schematic block diagram of an exemplary embodiment of the inventive scalable modular infrastructure for selectively implementing, configuring, and managing various components of the inventive system for selectively providing adaptive scalable modular functions related to 3D content media capture, generation, quality/processing optimization, enhancement, correction, mastering, and other advantage s processing and/or configuration;

FIG. **2** is a schematic block diagram of exemplary embodiments of various components of the inventive system for selectively providing adaptive scalable modular functions related to 3D content media capture, generation, quality/processing optimization, enhancement, correction, mastering, and other advantageous processing and/or configuration, that may be implemented in the novel infrastructure of FIG. **1**;

FIG. **3** is a process flow diagram of an exemplary embodiment of the inventive process, that may be performed in whole, or selectively in part, by at least one component of the inventive system of FIG. **2**, or that may otherwise be implemented in one or more components of the novel infrastructure of FIG. **1**; and

FIGS. **4A-4D** are various views of a schematic representation of an exemplary 3D media content volume structure that may be utilized in conjunction with various embodiments of the present invention of FIGS. **1** to **3**, and illustrate a varying 3D spatial volume which contains at least one object of interest to the viewer of the 3D media content displayed therein.

## SUMMARY OF THE INVENTION

The present invention is directed to a system and method for providing 3D content-centric solutions that greatly improve the quality and impact of 3D media content, while decreasing the required levels of computing power, and lowering the complexity of the necessary 3D media playback and display solutions, thus maximizing the 3D experience produced therefrom. The novel system and method accomplish these goals by providing modular unifying scalable 3D content-centered solutions, preferably implemented in a configurable infrastructure, that improve the quality and impact of any 3D media content, while decreasing the required levels of computing power, and lowering the complexity of the necessary playback and display solutions.

The inventive system and method advantageously enable automatic, semi-automatic or user-controlled selective performance of 3D content processing and/or settings/parameter configuration at one or more components of the infrastructure (from 3D content capture, to 3D content processing (and/or 2D to 3D content conversion), and to 3D content media display), and in at least one embodiment thereof, the inventive system and method are capable of determining and implementing selective or optimal storage, transmittal, and application of 3D content processing/settings/parameter/

4

profile configuration(s) prior to, or during, display of corresponding 3D content media to one or more viewers thereof.

Other objects and features of the present invention will become apparent from the following detailed description considered in conjunction with the accompanying drawings. It is to be understood, however, that the drawings are designed solely for purposes of illustration and not as a definition of the limits of the invention, for which reference should be made to the appended claims.)

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

The system and method of the present invention, address all of the disadvantages, flaws and drawbacks of all previously known 3D-related hardware and software offerings, by providing novel 3D content media-centric solutions that greatly improve the quality and impact of any 3D media content, while advantageously decreasing the required levels of computing power, and lowering the complexity of the necessary 3D media playback and 3D media display solutions, thus maximizing the 3D experience produced therefrom for one or more viewers.

The novel system and method accomplish the above goals by providing modular unifying scalable 3D content-centered solutions, preferably implemented in a configurable infrastructure, that greatly improve the quality and impact of any 3D media content, while decreasing the required levels of computing power, and lowering the complexity of the necessary playback and display solutions.

In various exemplary embodiments thereof, the inventive system and method advantageously enable automatic, semi-automatic or user-controlled selective performance of 3D content processing and/or settings/parameter configuration at one or more components of the infrastructure (from 3D content capture to 3D content media display), and in at least one embodiment thereof, the inventive system and method are capable of determining and implementing selective or optimal storage, transmittal, and application(s) of 3D content processing/settings/parameter/profile configuration(s) prior to display of corresponding 3D content media to one or more viewers thereof.

It should be noted that current 3D media content capture, processing, playback and display solutions take the "lowest common denominator" approach to applying playback/display optimization and related settings (intended to improve the appearance, quality, impact and overall "3-D Experience") to the 3D content media being displayed to at least one viewer thereof. This is very problematic because the desirable settings and parameters, as well as the necessary processing power and other requirements, for optimizing and maximizing the quality, impact and overall 3-D experience level for any displayed 3D media content, vary greatly between different 3D content media files, and even between different segments/portions within any particular 3D content media file itself. In particular, these variations largely depend on the specific 3D scenes being shown (i.e., on the depicted objects/subjects, their relative motion, complexity, backgrounds, lighting, etc), and on other external factors, such as the original 3D content capture and/or conversion parameter settings, the capture hardware used, the current display, and even on the viewers' relative position (orientation, elevation, distance, etc.) thereto.

Finally, prior to discussing the various embodiments of the present invention in greater detail below, it is important to note that while many of the embodiments of the present

US 9,681,114 B2

invention (and the various novel tools, techniques and processes relating thereto), are described and discussed as being implemented and/or utilized in the field of 3D visual entertainment (film, television, games, etc., all embodiments of the inventive system and method, can be readily and advantageously utilized in virtually any scientific, military, medical, forensic, or industrial application based on, or involving 3D visualization or display and/or manipulation of 3D content medial, as a matter of design choice, without departing from the spirit of the invention.

Referring now to FIG. **1**, an exemplary embodiment is shown of an inventive scalable modular infrastructure **10** for selectively implementing, configuring, and managing various components of the inventive system for selectively providing adaptive scalable modular functions related to 3D content media capture, generation, quality/processing optimization, enhancement, correction, mastering, and other advantageous processing and/or configuration.

The infrastructure **10** includes optional components **12** and **16** (3D content capture system **12**, and 3D content processing system **16**) for selectively capturing and optionally processing 3D content media prior to placing it into a 3D content media container (e.g., the, stream, etc.). The infrastructure **10** also includes a 3D content media storage/processing/playback SPP system **18**, operable to selectively store, process, and/or play back 3D content media from a medial container that may be received from components **12** and/or **16**, or that may be delivered from another 3D content media source (such as media converted from another 3D format, or from non-3D content source).

The SPP system **18** preferably communicates with a 3D content display system **24**, operable to display 3D content media (in one or more configurations, and capable of displaying/utilizing at least one of: unprocessed 3D content media **20a**, processed 3D content media **20b**, optimized 3D content setting for use with other 3D media content received from a source outside of the infrastructure **10**, etc.) to at least one viewer (e.g., to viewers, **26a-26c**).

In at least one embodiment of the present invention, the 3D content processing system **16** may also optionally comprise at least one 3D content processing feature/function that is optimized for utilization in conjunction with the 3D content capture system **12**. For example, in one embodiment of the infrastructure **10**, the 3D content capture system **12** may actually be a conventional or a modified 3D content capture system, that is provided with additional necessary features (such as scene/visual field depth mapping (or equivalent capabilities)) to enable dynamic (and optionally "on the fly") capture of 2D content, plus sufficient depth (and/or related non-image) information that is sufficient to enable the systems **12** and **16** to produce desirable 3D content for delivery to the SPP system **18**. An exemplary embodiment of operation of the infrastructure **10** is discussed in greater detail in conjunction with FIG. **3**.

Referring now to FIG. **2**, various exemplary embodiments of the possible components of an inventive system **100**, that may be implemented in the inventive infrastructure **10** of FIG. **1**, operable to selectively provide adaptive scalable modular functions related to 3D content media capture generation, quality/processing optimization enhancement, correction, mastering, and other advantageous processing and/or configuration, that may be implemented in the novel infrastructure **10** of FIG. **1**. Preferably, one or more of the components (**12**, **16**, **18**, and **24**), and subcomponents (**102** to **114e**) of the inventive system **100**, are capable of performing one or more steps of an exemplary novel process **200** of FIG. **3**.

Referring now to FIG. **3**, an exemplary embodiment is shown as a process flow diagram of an exemplary embodiment of the inventive process, with steps **202** to **216**, that may be performed in whole, or selectively in part, by at least one component of the inventive system **100** of FIG. **2**, or that may be implemented in one or more components of the novel infrastructure **10** of FIG. **1**.

In summary, the inventive system **100** (through selective operation of one or more components thereof, as may be implemented in infrastructure **10** of FIG. **1**), in additional exemplary embodiments thereof, preferably associates at least one predetermined 3D content improvement ("3DCI") parameter set (e.g., optimization playback, and/or display settings and/or parameters, selection of one or more processing modules and/or stages of use thereof (for example during one or more of: capture, post-processing, playback or display), display tool adjustments, etc.), with 3D media content containers.

In at least one embodiment thereof, the optimal 3DCI parameter set comprises a plurality of "static to dynamic" display tools adjustments, which may be advantageously recorded and/or otherwise embedded in the 3D content media file, to thereby become a permanent feature thereof during later playback and/or processing (e.g., post production, etc.) of the 3D content media. In another embodiment of the present invention, the optimal 3DCI parameter set integration technique may also be utilized as a playback feature which is interpreted by a proprietary software and/or hardware 3D media player (which, by way of example can be configured as a "set top box" or equivalent, for 2D to 3D content conversion, playback of "enhanced" 3D content media having an integrated 3DCI parameter set, and for other functions such as utilization of de-encryption solutions for playback of protected 3D content media.

Advantageously, this association and/or linking, occurs on a scalable basis from the most basic level at which an optimal 3DCI parameter set is associated with one or more corresponding 3D content media containers (that may be in a container directory, a playlist, a queue, or in a similar storage container), such that the appropriate 3DCI parameter set is activated in conjunction with its corresponding 3D content media from the container being played, to a more advanced level at which different 3DCI parameter sets are associated with (or otherwise linked or assigned to), the appropriate different portions of each 3D content media container, such that during playback and/or display thereof, different sections of the displayed content receive the optimal level of "treatment."

In one exemplary embodiment of the present invention, the above-described techniques may be readily implemented in a media player (e.g., software based or otherwise), operable to process and play back a 3D media content clip, and which is operable to enable an operator thereof to (1) exercise full control over adjustments to 3DCI parameters on a scalable/variable granularity basis (ranging from a portion of a single content frame to a scene formed from a plurality of sequential frames), and (2) embed various settings and parameters (e.g., even data points of DCT (discrete cosine transform) settings), and automatically imbed them in the 3D media content clip for later optimized playback.

Advantageously, the novel media player is further operable to enable the operator to run a 3D media content clip, stop at a particular frame, apply predefined (e.g., DCT) adjustments and record them in the clip, such that the adjustment is automatically carried forward through the clip until the operator stops at the next frame which requires a different adjustment, or the clip ends.

US 9,681,114 B2

7

The novel system and method advantageously address and cover both the creation/determination/configuration of various scalable 3DCI parameter sets during 3D content capture, during initial processing, at any other time up to and including on-the-fly during playback, or any combination of the above, as a matter of design choice without departing from the spirit of the invention. Similarly, the process of creation/determination/configuration of the 3DCI parameter sets can be wholly or partially automated, or can be manually performed as a "creative process" by one or more content professional, preferably utilizing one or more 3DCI tools and support modules as desired or as necessary.

For example, tools utilizing novel dynamic and adaptive variable 3D depth and layering techniques of the present invention (i.e., Depth Based Image Rendering or "DBIR" techniques), may readily be used for both automated and content professional-directed 3DCI parameter creation (e.g., the 3DCI may include desired depth adjustment parameters, variable layer densities centered on certain displayed objects or object types, dynamic variable resolution based on relative distance of the closest object depth layers to the viewer, etc.).

The 3DCI parameter sets may be linked to, or otherwise associated with the respective 3D content media containers (or portions thereof), and may thus be stored in dedicated or other form of files, containers or libraries, separately from the 3D content media containers, or may be stored within the 3D content media containers, (e.g., embedded therein, as discussed above).

The inventive system **100** (through selective operation of one or more components thereof, as may be implemented in infrastructure **10** of FIG. **1**, for example in accordance with the process **200**, or otherwise) in various additional exemplary embodiments thereof is operable to provide selective, automatic, or user-controlled dynamic adaptive/scalable utilization of layered depth measurement/mapping (e.g., DBIR) techniques in 3D content media, coupled with techniques for identifying and spatially (3D) tracking static and moving displayed objects in the depth mapped layered scenes to provide the desired optimal level of at least one predefined aspect of 3D content experience.

In various exemplary embodiments thereof, the system and method of the present invention advantageously comprise the utilization of at least one of (and preferably both) the following novel 3DCI methodologies (that may be implemented utilizing one or more of various suitable 3D content processing techniques): (1) Dynamic Volumetry, and (2) Viewer Perception Enhancement, each described in greater detail below.

When presenting 3D content using a digital display or a projector, the challenge is not only to separate the elements of the content into a spatial continuum ranging from foreground to background, but also to reproduce correctly the viewer perspective that would naturally proceed from the action on screen. This is true for both content originally captured in 3D and for content converted from an original 2D source.

When presented with a visual field containing many objects, the observer will isolate the objects and focus on a specific one or few in order to better interpret the action within the field. The process of separation is based on many criteria/properties such as color, brightness and relative motion. Once the objects have been separated, the observer's primary focus is chosen. Following that choice, a different set of perceptual algorithms is used to track the action within the scene. The center of interest is maintained in tight focus and other elements of the image which are

8

closer, farther or moving at a different rate are defocused. Thus, in order to improve the 3D effect of any digital display, the system used must not only manage the correct definition of varying spatial relationship between image elements, it must also generate the presentation in accord with the environmental conditions of the display and the perceptual expectations of the viewer.

Essentially, there are two broad categories of activity that take place within any 2D-to-3D video transformation pipeline:

(A) Conversion: Development of a series of data which describe the calculated XYZ position of picture elements present within each frame of the video; and

(B) Presentation: A mathematical process that shows the viewpoint of picture elements from different perspectives. (For example: Two views are required for stereoscopic and g or more for ASD presentations).

Each of the above activities is performed at a different time & place. Conversion is a complex process, typically performed one time only for any given piece of content, whether live or off-line. The conversion process is usually performed in a studio or using a separate real-time technology module (in the case of live conversion). The Presentation processes involve different calculations that are performed at each viewing time on equipment located at the viewing position. In addition to the methods required to reproduce the basic sub-images inherent to the 3D presentation technology, the images must be adjusted according to viewer and site-based parameters such as specific output technology, venue physical format, ambient light conditions and viewer position/preference.

Dynamic Volumetry refers to the process of adjusting the generation of the 3D images to compensate for the parameters related to the spatial relationship between elements within a series of images comprising one or several 3D scenes. Referring now to FIGS. **4**A to **4**D, an exemplary embodiment of the inventive Dynamic Volumetry methodology is shown. FIGS. **4**A to **4**D show varying volumetric 3D spaces **300a-300d**, which contain a range of objects of interest **306a** to **306c** arranged from foreground to background. At different times in the video sequence, the volume or scale on any or all of the axes will change to allow a reasonable discrimination of the objects of interest. Additionally, the system performs the sub-image generation with a focus set in a plane containing the center of perceived action. FIG. **4**A shows a spatial volume ranging from foreground **302a** to background **304a** and including an object of interest **306a**.

FIG. **4**B shows a Perception Focus Plane **308b** At $T_0$ and a Primary object of Interest (Perception Focus) **306b**. The positioning of the focus plane is dynamically adjusted to center on the objects or zone with maximum relation to the action within the image sequence thus permitting the system to display the greatest degree of 3D separation.

FIG. **4**C shows a side view of 3D space and Primary object of Interest **306c**. (Perception Focus). Spatial data information can be linear across the space (foreground to background) or non-linear thus permitting the system to display the greatest degree of 3D separation around the area of maximum interest or action.

FIG. **4**D shows Scene Space at $T_0$ (SS-1) to Scene Space at $T_{0+n}$ (SS-2). The volume of the space is adjusted dynastically to allow the background and foreground to be imaged in such a way as to always include or exclude the zone of maximum interest with the greatest degree of 3D separation.

Presentation processes involve different calculations that are performed at each viewing time on equipment located at

US 9,681,114 B2

9

the viewing position. In addition to the methods (described above) required to reproduce the basic sub-images inherent to the 3D presentation technology, the images must be adjusted according to viewer and site-based parameters such as specific output technology, venue physical format, ambient light conditions and viewer position/preference.

The inventive system and method dynamically modify a series of coefficients/formulae affecting the presentation rendering of a data file containing and describing the sub-elements of an image sequence (video stream) in such a way as to emulate the natural interest and perception of a view when exposed to a real environment. The modifications may be based on variables such as the following:

Environment Specific:
Viewer position
Ambient lighting
Presentation equipment technology
Content Specific:
Foreground/background separation
Primary activity focus position
Overall scene topography
Topography of preceding and following scenes

Dynamic adjustments will be at frame speed and may impose specific adjustments for a single scene, a single frame, or an interpolated sequence of adjustments including linear and non-linear transforms between specified points of interest, whether scene-based or not.

Advantageously, in accordance with the present invention, the novel system **100** preferably comprises sufficient hardware and/or software components and subcomponents to provide and utilize one or more of the following advantageous and novel functionalities/techniques which are contemplated by the present invention in implementing various embodiments and aspects of the inventive Dynamic Volumetry methodology:

1) Automatic/Adaptive Depth Layer Acquisition:

Utilization of existing 3D field depth-detection cameras (and related and/or substantially equivalent hardware) during the 3D content capture/acquisition stage (or, as may be applicable during the initial intake stage of 2D content to be converted to 3D) to acquire a predetermined number of depth layers for the 3D content to form the desired layered "depth field environment" for each 3D content frame/scene, etc., which may be the same depth quantity for the entire container, or which, in accordance with the present invention, may dynamically, adaptively or selectively vary for different portions of the content (for example pursuant to one or more predetermined depth later variation profiles).

2) Dynamic Layer Density Assignment:

Assignment of predetermined amounts of layers to various displayed objects in the 3D content being captured and/or converted. Optionally, the assignment process may utilize variable layer density (e.g., depending on relative depth of different parts of the objects). Alternately, an object's layer density distribution (or profile) may be shifted/adjusted dynamically as the object moves within the depth field.

3) Dynamic Focal Layer Determination/Tracking:

Determination, tracking and use of at least one variable dynamically determined/adaptive "focal" layer (i.e., everything behind the focal layer needs less detail and less layer density, anything close needs more) for entire scenes, or for portions thereof.

4) Dynamic Multi-Layer Focal Objects/Scenes Determination/Tracking:

Determination, tracking and/or use of different variable dynamically determined/adaptive "focal object" plural lay-

10

ers assigned to one or more objects in various 3D content scenes, and that can move to different depths depending on relative depth positions of the assigned object, thus enabling variable layer density across objects (essentially providing, to the inventive system **100**, a control protocol for simplified manipulation of an object's depth layer distribution).

5) Assignment of Variable Spatial Resolution to Objects:

In conjunction with one or more of the various features above, utilization of a mixture of different image resolution magnitudes (pixel density, etc.), and/or optionally of related image processing (anti-aliasing, etc.), for portions of objects/scene regions in an optimized manner (for example, by processing/displaying higher resolutions for those object layers that are closest to the viewer (or that otherwise would benefit from additional detail)).

6) Geospatial External Calibration:

Optionally, maintaining a selected level of "geospatial accuracy" with external calibration distance points or with internal software reference markers, enables visual depth adjustment to precise geo-spatially accurate images to be accomplished to a degree as may be desired (or necessary) for one or more 3D content applications up to, and inclusive of, extremely dense layering across each 3D content scene and/or object(s) (for example as may be required for military, scientific, and/or medical applications, etc.).

7) Application of Dynamic Geospatial Survey Solutions in 3D Media Content Context:

Utilization and/or adaptation of various advantageous geo-centric survey depth (elevation) mapping techniques and methodologies to various DBIR techniques utilized in accordance with the present invention, preferably with additional modifications applied thereto, to make them dynamic, adaptive, and highly configurable.

8) Additional Novel Tools and Techniques:

Selective configuration, implementation, and use of various additional features including, but not limited to: dedicated 3D processing (D3DP) hardware (e.g., "black box") re-mastering/editing tools, depth correction techniques, various display/media player modules and editing tools, streamlining D3DP is hardware rendering conversion processes (e.g., grayscale values to corresponding layer depth locking, and later image depth manipulation correction/optimization via grayscale value adjustments, etc.), and so forth.

It should also be noted that the various embodiments of the inventive system and method, can be advantageously configured, and/or adapted, to utilize and/or combine the very best of currently available (as well as any future) 3D-related solutions in an interoperable manner, that is transparent as possible to the end user (whether the user is in the field of 3D content creation, or is part of the 3D content audience).

By way of example, the present invention may be implemented, in whole or in part, in connection with, or utilizing a 2D to 3D video conversion server (3DVC server), utilizing various additional applications and software-based tools. This technique may employ a variety of commercially available software tools designed to provide for some specific 2D to 3D conversion techniques such as separate interval field sequential frame grabbing, and thereafter mixing of the subsequent frames to create a depth map based on horizontal motion (which in itself is a sub-standard 3D conversion technique). However, when this approach, is integrated with a variety of other compatible 3D content enhancement techniques, and further assisted/upgraded by the aforementioned inventive system features and tools, it may be configured and implemented to perform at a substantially higher standard of 3D depth conversion, using one

11

or more suitable DBIR solutions, and therefore become an excellent candidate for an inexpensive and easily to use basis for a Broadcast Quality 3D video standard. It should be noted that the opportunity to integrate a number of commercially available 2D to 3D video depth conversion methodologies with a 3DVC server exists only as a consequence of the implementation of the various novel depth mapping correction and relating techniques of the inventive system **100**.

Therefore, the combination of the various commercially available 3D-related tools in concert with a 3DVC server, a media player, the various novel post-processing and display tools of the present invention, unexpectedly and advantageously resulted in the discovery of a completely unique and new process of image correction, 3D depth mapping, and depth impact optimization, that, when properly used and configured in accordance with the present invention are capable of elevating conventional 2D+Depth (i.e., DBIR) 3D media to Broadcast quality.

The various inventive depth mapping solutions and novel techniques, when applied to 3D content media provided by a conventional 3D 3DVC, unexpectedly result in a "remastering" of the 3DVC server, thus constituting an entirely new commercial application of a conventional 3D technology package "fused" with various novel solutions offered by the present invention, and therefore providing a breakthrough opportunity to produce 3D 2D+Depth stereoscopic 3D content media having maximum depth 3D visual impact, but without distracting visual artifacts.

In addition, it should be noted that while a conventional 3DVC server is most commonly used to convert 2D content to 2D+Depth 3D content utilizing one or more DBIR techniques, it is also capable of converting dual path stereoscopic optical signals to a 2D+Depth format (or equivalent thereof), and is also capable of converting stereoscopic side-by-side and field sequential stereoscopic 3D video, into a 2D+Depth format (or equivalent thereof). Fortunately, the various techniques and solutions of the present invention are fully applicable for advantageous utilization in connection with any and all of the aforementioned conversion formats which are supported by the 3DVC server.

Essentially the system and method of the present invention have gone one step further and readily serve as a basis for producing a 3D software solution (that may be optionally augmented with, or replaced by, a hardware component) that is capable of grabbing stereoscopic pairs from a nine multiview 2D+Depth conversion, and reformatting them back into a side-by-side, or a dual-path conventional 3D signal, for viewing the reformatted 3D content media using stereoscopic 3D glasses. Accordingly, the inventive techniques close the loop, and allow the use of a conventional 3DVC server to convert 2D content media not only into a 2D+Depth format, utilizing one or more DBIR techniques, but to also automatically convert 2D content media into highly desirable and commercially viable stereoscopic 3D medial content that is necessary for all 3D glasses-based display systems, large and small, thereby enabling a highly attractive and cost effective solution to be offered during the inevitable transition between from 3D glasses-based display systems to ASD systems.

When the above-described combined technology package (hereinafter referred to as a "3DF-3DVC system") is used with conventional and/or novel 3D display tool adjustments and settings, (which, in accordance with the present invention may be readily embedded into a 3D content media file (and optionally recorded/captured "on-the-fly")), the resulting output not only corrects any remaining 3D video image

12

issues/flaws, but will at the same time provide the basis for development and implementation of various guidelines and tools for rapidly effecting a major increase in the impact of the depth perspective visuals in the display of various available and future 3D content media, thus establishing the methodology and infrastructure that is required for widespread production and proliferation of 3D stereoscopic video broadcast quality standards.

For example, various inventive 3DF-3DVC system techniques may be employed in all of 3DVC server applications to effectively upgrade the 3D content media quality through "Re-mastering." When these techniques are applied to preconverted 2D+Depth, s3D 3D video clips, which may have been produced utilizing one or more DBIR techniques, and designed for display on conventional commercially available 3D ASD screens, advantageously, the issues of depth error correction, cone double image removal and ghosting artifacts may be corrected, and therefore eliminated.

As a result, in view of all of the above, the use of various embodiments of the inventive system and method (or of portions thereof), enables companies to offer, and consumers and other end-user parties to experience, 3D content media in a very cost-effective and efficient manner, thus overcoming the flaws and drawbacks of all prior 3D-related offerings that served as barriers to the well-deserved success of the 3D media experience market, and making inexpensive and ready availability of the "3D experience" a reality.

Thus, while there have been shown and described and pointed out fundamental novel features of the inventive system and method as applied to preferred embodiments thereof, it will be understood that various omissions and substitutions and changes in the form and details of the devices and methods illustrated, and in their operation, may be made by those skilled in the art without departing from the spirit of the invention. For example, it is expressly intended that all combinations of those elements and/or method steps which perform substantially the same function in substantially the same gray to achieve the same results are within the scope of the invention. It is the intention, therefore, to be limited only as indicated by the scope of the claims appended hereto.

We claim:

1. A method, implemented in at least one Depth Based Image Rendering (DBIR) data processing system, for improving the efficiency, quality, viewing comfort and/or visual impact of a 3D experience capable of being provided to at least one viewer of a 3D content media comprising a plurality of content sections in 2D+Depth format, in conjunction with the use of at least a portion of a plurality of predetermined 3D content modification techniques, the method comprising the steps of:

(a) identifying at least one content section of the 3D content media comprising at least one 3D media element and selecting at least one corresponding predefined plural 3D content modification technique that is configured for provision of optimum improvement of the 3D experience when applied thereto;

(b) for each said selected at least one predefined plural 3D content modification technique configured for thencurrent application to said corresponding at least one 3D media element, applying said selected at least one predefined plural then-current 3D content modification technique thereto;

(c) for each said selected at least one predefined plural 3D content modification technique configured for future application to said corresponding at least one 3D media element, determining a setting for at least one param-

US 9,681,114 B2

13

eter of said selected at least one predefined plural future 3D content modification technique, optimal for application to said corresponding at least one 3D media element;

(d) associating a reference to said selected at least one predefined plural future 3D content modification technique and said determined at least one optimal parameter, with said corresponding at least one 3D media element;

(e) selectively repeating said steps (a), b), (c) and (d) for at least one additional section of the 3D content media;

(f) selectively enabling an operator to view results of said steps (a), (b), (c), (d), and (e), and to at least one of: selectively cancel at least one result of at least one operation previously performed at least one of said steps (a), (b), (c), (d), and (e), and selectively change at least one operation previously performed at least one of said steps (a), (b), (c), (d), and (e), to an alternate operation selected by the operator; and

(g) after conclusion of said step (f), generating dynamic 3D content media data configured for playback to at least one viewer utilizing at least one 3D content playback system operable to apply said selected at least one predefined plural future 3D content modification technique to said corresponding at least one 3D media element in accordance with said at least determined at least one optimal parameter, and further configured to store, for each 3D content media element identified at said step (a), at least one of:

at least one immediate 3D content modification applied at said step (b), and

at least one said associated reference to said at least one corresponding predefined plural future 3D content modification technique, and said determined at least one optimal parameter therefor;

such that said dynamic 3D content media data comprises 3D media content having at least one modified content section each comprising at least one modification specifically optimal for application thereto, thereby maximizing the efficiency, quality, viewing comfort and/or visual impact of the 3D experience being provided to viewers thereof during playback.

**2.** The method of claim **1**, wherein the 3D content media comprises at least one of stereoscopic 3D content and auto-stereoscopic 3D content.

**3.** The method of claim **1**, wherein the 3D content media comprises at least one of: first 3D content media previously captured by at least one 3D content capture system, second 3D content media previously generated by at least one 3D content source, third 3D content media previously converted, by a 3D content capture system from captured 2D media content, and fourth 3D content media previously converted, by a 3D content source, from previously generated 2D content.

**4.** The method of claim **1**, wherein said at least one content section of the 3D content media, identified at said step (a), comprises a plurality of content frames comprising said 3D media element.

**5.** The method of claim **4**, wherein said plurality of content frames comprise a corresponding scene, and wherein said 3D media element comprises at least one of a static 3D displayed object and a moving 3D displayed object.

**6.** The method of claim **1**, wherein said 3D content playback system comprises at least one of: a 3D content media player operable to process said dynamic 3D content media data for playback by generating therefrom and trans-

14

mitting a 3D content output signal to a corresponding connected 3D content display system, and a 3D content display system operable to process said dynamic 3D content media data for playback by generating therefrom, and displaying said 3D content output signal.

**7.** The method of claim **6**, wherein said 3D content playback system is operable to apply each said at least one predefined plural future 3D content modification technique to said corresponding at least one 3D media element of said 3D content media, in accordance with said at least one optimal parameter therefor, further comprising the steps of:

(h) providing said dynamic 3D content media data, generated at said step (f), to said at least one 3D content playback system;

(i) identifying, by said at least one 3D content playback system in said dynamic 3D content media data, at least one said associated reference to said at least one corresponding predefined plural future 3D content modification technique, and said determined at least one optimal parameter therefor; and

(j) applying said at least one referenced corresponding predefined plural future 3D content modification technique to said corresponding at least one 3D media element of said 3D content media, in accordance with said at least one optimal parameter therefor.

**8.** The method of claim **1**, wherein said plurality of predetermined 3D content modification techniques further comprise a plurality of content modification techniques operable to optimize at least one additional visual characteristic of the 3D content media, further comprising the steps of, prior to step (e):

(k) identifying at least one content section of the 3D content media comprising at least one visual characteristic, and selecting at least one corresponding predefined plural content modification technique that is configured for provision of optimum improvement of the 3D experience when applied thereto; and

(l) for each said selected at least one predefined content modification technique configured for immediate application to said corresponding at least one content section applying said selected at least one predefined plural immediate content modification technique thereto.

**9.** The method of claim **8**, wherein said step (e) further comprises the step of:

(m) selectively repeating said steps (k) and (l) for at least one additional content section of the 3D content media.

**10.** The method of claim **8**, further comprising the steps of, after said step (k) and prior to said step (e):

(n) for each said selected at least one predefined plural content modification technique configured for future application to said corresponding at least one content section, determining a setting for at least one parameter of said selected at least one predefined plural future content modification technique, optimal for application to said corresponding at least one content section; and

(o) associating a reference to said selected at least one predefined plural future content modification technique and said determined at least one optimal parameter, with said corresponding at least one content section.

**11.** The method of claim **10**, wherein said step (e) further comprises the step of:

(p) selectively repeating said steps (n) and (o) for at least one additional section of the 3D content media.

**12.** The method of claim **10**, wherein said at least one 3D content playback system is operable to apply said at least one corresponding predefined plural future content modifi-

US 9,681,114 B2

15

cation technique to at least one predetermined future content section of said 3D content media, in accordance with said at least one optimal parameter therefor, further comprising the steps of:

(q) providing said dynamic 3D content media data, generated at said step (f), to said at least one 3D content playback system;

(r) identifying, by said at least one 3D content playback system in said dynamic 3D content media data, at least one said associated reference to said at least one corresponding predefined plural future content modification technique, and said determined at least one optimal parameter therefor; and

(s) applying said at least one referenced corresponding predefined plural future content modification technique to at least one predetermined future content section of said 3D content media, in accordance with said at least one optimal parameter therefor.

**13**. The method of claim **12**, wherein said step (q) comprises the step of:

(t) streaming said dynamic 3D content media data, generated at said step (f), to said 3D content playback system from a remote 3D content source.

**14**. The method of claim **12**, wherein said dynamic 3D content media data is stored on physical media operable to store 3D content media playback data, and wherein step (q) comprises the step of:

(u) transmitting said dynamic 3D content media data, generated at said step (f), to said at least one 3D content playback system from said corresponding physical media.

**15**. The method of claim **1**, wherein the at least one data processing system operable to perform said steps (a), (b), (c), (d), and (e), is connected to at least one 3D content playback system.

**16**. The method of claim **1**, wherein said at least one 3D content playback system comprises the at least one data processing system operable to perform said steps (a), (b), (c), (d), and (e).

**17**. The method of claim **1**, wherein the at least one data processing system is operable to perform said steps (a), (b), (c), (d), (e), and (f), prior to playback of said dynamic 3D content media data, further comprising the step of:

(v) after said step (f), storing said dynamic 3D content media data, on physical media operable to store 3D content media data, for later playback by said at least one 3D content playback system.

**18**. The method of claim **1**, wherein the at least one data processing system is operable to perform said steps (a), (b), (c), (d), (e), and (f), in conjunction with playback of said dynamic 3D content media data by said at least one 3D content playback system.

**19**. The method of claim **1**, wherein said dynamic 3D content media data includes a container file.

**20**. A method, implemented in at least one Depth Based Image Rendering (DBIR) data processing system, for improving the efficiency, quality, viewing comfort and/or visual impact of a 3D experience capable of being provided to at least one viewer of a 3D content media comprising a plurality of content sections in 2D+Depth format, in conjunction with the use of at least a portion of a plurality of predetermined 3D content modification techniques, the method comprising the steps of:

16

(a) identifying at least one content section of the 3D content media comprising at least one 3D media element and selecting at least one corresponding predefined plural 3D content modification technique that is configured for provision of optimum improvement of the 3D experience when applied thereto;

(b) for each said selected at least one predefined plural 3D content modification technique configured for then-current application to said corresponding at least one 3D media element, applying said selected at least one predefined plural then-current 3D content modification technique thereto;

(c) for each said selected at least one predefined plural 3D content modification technique configured for future application to said corresponding at least one 3D media element, determining a setting for at least one parameter of said selected at least one predefined plural future 3D content modification technique, optimal for application to said corresponding at least one 3D media element, wherein the at least one parameter includes at least one of 3D depth adjustment parameters, variable layer densities centered on display objects or object types, and dynamic variable resolution based on relative distance of the closest object depth layers to the viewer;

(d) associating a reference to said selected at least one predefined plural future 3D content modification technique and said determined at least one optimal parameter, with said corresponding at least one 3D media element;

(e) selectively repeating said steps (a), b), (c) and (d) for at least one additional section of the 3D content media;

(f) selectively enabling an operator to view results of said steps (a), (b), (c), (d), and (e), and to at least one of: selectively cancel at least one result of at least one operation previously performed at least one of said steps (a), (b), (c), (d), and (e), and selectively change at least one operation previously performed at least one of said steps (a), (b), (c), (d), and (e), to an alternate operation selected by the operator; and

(g) after conclusion of said step (f), generating dynamic 3D content media data configured for playback to at least one viewer utilizing at least one 3D content playback system operable to apply said selected at least one predefined plural future 3D content modification technique to said corresponding at least one 3D media element in accordance with said at least determined at least one optimal parameter, and further configured to store, for each 3D content media element identified at said step (a), at least one of:

at least one immediate 3D content modification applied at said step (b), and

at least one said associated reference to said at least one corresponding predefined plural future 3D content modification technique, and said determined at least one optimal parameter therefor;

such that said dynamic 3D content media data comprises 3D media content having at least one modified content section each comprising at least one modification specifically optimal for application thereto, thereby maximizing the efficiency, quality, viewing comfort and/or visual impact of the 3D experience being provided to viewers thereof during playback.

\* \* \* \* \*

# EXHIBIT 12

US009521390B2

(12) **United States Patent**  (10) **Patent No.:** **US 9,521,390 B2**
Blumenthal et al.  (45) **Date of Patent:** *Dec. 13, 2016

(54) **SYSTEM AND METHOD FOR ADAPTIVE SCALABLE DYNAMIC CONVERSION, QUALITY AND PROCESSING OPTIMIZATION, ENHANCEMENT, CORRECTION, MASTERING, AND OTHER ADVANTAGEOUS PROCESSING OF THREE DIMENSIONAL MEDIA CONTENT**

(71) Applicant: **Stephen Blumenthal**, Newfield, NY (US)

(72) Inventors: **Stephen Blumenthal**, Newfield, NY (US); **Ilya Sorokin**, New York, NY (US); **Edmund Mark Hooper**, Pointe-Claire (CA)

(73) Assignee: **Stephen Blumenthal**, Newfield, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/054,772**

(22) Filed: **Oct. 15, 2013**

(65) **Prior Publication Data**

US 2014/0044403 A1    Feb. 13, 2014

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 12/642,757, filed on Dec. 18, 2009, now Pat. No. 8,558,830, and a

(Continued)

(51) **Int. Cl.**
*H04N 13/00*    (2006.01)

(52) **U.S. Cl.**
CPC ...... *H04N 13/0018* (2013.01); *H04N 13/0003* (2013.01); *H04N 13/0055* (2013.01); *H04N 13/0059* (2013.01)

(58) **Field of Classification Search**
USPC ........................................ 345/419, 581, 619
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,765,568 B2 * 7/2004 Swift et al. .................. 345/419
2008/0281566 A1 * 11/2008 Wang et al. ...................... 703/7

* cited by examiner

*Primary Examiner* — Ke Xiao
*Assistant Examiner* — Jed-Justin Imperial

(57) **ABSTRACT**

In at least one embodiment thereof, the inventive system and method are directed to providing and configuring a novel platform-independent 3D content media container operable to: (1) support and store a 3D content media file with at least one 3D content modification/improvement technique applied to only specific predetermined portions thereof, and (2) selectively enabling particular optimal 3D content-related parameter settings for future application of at least one additional 3D content modification/improvement technique, to likewise be associated with one or more specific corresponding 3D content media file portion(s), and to also be stored in association therewith in the inventive 3D content media container. In at least one additional embodiment thereof, the inventive system and method are capable of determining and implementing various storage, transmittal, and application(s) of 3D content media processing/settings/parameter/profile configuration(s) prior to, or during, display of corresponding 3D content media.

**19 Claims, 6 Drawing Sheets**



## US 9,521,390 B2

Page 2

**Related U.S. Application Data**

continuation of application No. 13/168,252, filed on
Jun. 24, 2011, now abandoned, which is a continu-
ation-in-part of application No. 12/642,757, filed on
Dec. 18, 2009, now Pat. No. 8,558,830.

(60) Provisional application No. 61/138,926, filed on Dec.
18, 2008.

Case 1:23-cv-10763-IT  Document 65-1  Filed 04/03/23  Page 236 of 409

**U.S. Patent**     Dec. 13, 2016     Sheet 1 of 6     US 9,521,390 B2

**FIG. 1**



**FIG. 2**



**FIG. 3**



**FIG. 4A**



**FIG. 4B**



Case 2:23-cv-10763-LMA-UNA Document 69-1 Filed 04/03/28 02 Entered 04/03/23 16:44:44 Desc
Exhibit A    Page 240 of 409

FIG. 4C



**FIG. 4D**

300d



US 9,521,390 B2

| 1 | 2 |

# SYSTEM AND METHOD FOR ADAPTIVE SCALABLE DYNAMIC CONVERSION, QUALITY AND PROCESSING OPTIMIZATION, ENHANCEMENT, CORRECTION, MASTERING, AND OTHER ADVANTAGEOUS PROCESSING OF THREE DIMENSIONAL MEDIA CONTENT

## CROSS REFERENCE TO RELATED APPLICATIONS

The present patent application is a continuation-in-part of, and claims priority from, the commonly assigned co-pending U.S. patent application Ser. No. 12/642,757 entitled "System and Method For Adaptive Scalable Dynamic Conversion, Quality and Processing Optimization, Enhancement, Correction, Mastering, And Other Advantageous Processing of Three Dimensional Media Content", filed Dec. 18, 2009, which in turn claims priority from the commonly assigned U.S. Provisional Patent Application Ser. No. 61/138,926, entitled "System and Method For Adaptive Scalable Dynamic Conversion, Quality and Processing Optimization, Enhancement, Correction, Mastering, And Other Advantageous Processing of Three Dimensional Media Content", filed Dec. 18, 2008. The present application is also a continuation of, and claims priority from the commonly assigned co-pending U.S. patent application Ser. No. 13/168,252 entitled "System and Method For Adaptive Scalable Dynamic Conversion, Quality and Processing Optimization, Enhancement, Correction, Mastering, And Other Advantageous Processing of Three Dimensional Media Content", filed Jun. 24, 2011, which in turn claims priority from the commonly assigned co-pending U.S. patent application Ser. No. 12/642,757 entitled "System and Method For Adaptive Scalable Dynamic Conversion, Quality and Processing Optimization, Enhancement, Correction, Mastering And Other Advantageous Processing of Three Dimensional Media Content", filed Dec. 18, 2009, which in turn claims priority from the commonly assigned U.S. Provisional Patent Application Ser. No. 61/138,926, entitled "System and Method For Adaptive Scalable Dynar is Conversion, Quality and Processing Optimization, Enhancement, Correction, Mastering, And Other Advantageous Processing of Three Dimensional Media Content", filed Dec. 18, 2008.

## FIELD OF THE INVENTION

The present invention relates generally to systems and methods for improving the 3D experience provided by playback and display of 3D media content, and more particularly to systems and methods for providing 3D content mediacentric solutions that greatly improve the quality and impact and other desirable features of any 3D media content, while decreasing the required levels of computing power, and lowering the complexity of the necessary 3D media playback and 3D media display solutions, thus maximizing the 3D experience produced therefrom.

## BACKGROUND OF THE INVENTION

Various tools for capturing, generating, processing, playing back and displaying three dimensional (3D) content media (especially motion video), have been available for quite some time. Display technologies for 3D content media in particular have evolved quite a bit from the earliest barely passable offerings which required the audience to wear flimsy "glasses" provided with a different (red or blue) lens for each eye, to more advanced electronic "stereoscopic 3D" glasses equipped with remotely triggered liquid crystal display (LCD)-based lenses (acting as alternating individually controlled "shutters"), which provided its wearers with an engaging and quality "3D experience", given properly prepared 3D content media paired with the appropriate playback and corresponding display technologies working on conjunction with the 3D glasses.

However, this approach for providing a "3D experience" is quite cumbersome and very expensive to use and maintain, and has thus been of very limited commercial success, primarily being relegated to special entertainment venues, such as certain IMAX theaters and high-end amusement parks. In addition to expensive, and relatively fragile, glasses being required for each member of the audience (which in some cases excludes those who cannot comfortably wear them), the latest stereoscopic 3D solutions require sophisticated and expensive computer-based components for storing and processing the 3D content, as well as similarly complex and expensive electronic components for displaying the 3D content and remotely controlling the stereoscopic 3D glasses.

Of course, as is expected, the very limited availability and expense of the above 3D content media playback and display technologies, in particular, have led to a relative lack of interesting 3D content (due to the expense in its creation and the very limited commercial interest therein), which in turn has resulted in a very limited availability of 3D content capture and processing tools, thus essentially resulting in a "vicious cycle".

Nonetheless, in recent years, there has been a revolutionary leap in the solutions being offered for displaying 3D content media. Specifically, a number of companies, have developed and offered flat panel displays of varying sizes capable of creating a virtual 3D experience for the viewer without the need for the viewer to wear electronic or other types glasses or similar devices. Moreover, these displays do not require other specialized equipment and can work with specially configured 3D content that may be stored on, and played back from, conventional readily available computers. And, while these displays are still quite expensive, they are priced within reach of most organizations (and within reach of some consumers), with the price certainly poised to decrease exponentially, commensurate with an increase in production (as has been the case with the HDTV flat panel display market).

Therefore, for the past several years, ever since these newest stand-alone 3D ("SA-3D") content media display technologies have become available at relatively reasonable prices, there has been a widespread consensus that proliferation of three-dimensional (3D) content media (both in entertainment and in advertising), as well as of the hardware and software technologies necessary for SA-3D content capture, processing, playback, and display, is inevitable, and that the market for 3D-related technologies will experience explosive growth.

Nevertheless, to date there has not been a dramatic push forward that would make the above predictions become reality. One of the main reasons for this aforementioned lack of the expected proliferation of commercially successful SA-3D-related content, software and hardware offerings, is the fact that although these newest SA-3D content media display technologies have a number of very significant advantages over all previously known 3D-related offerings, they also suffer from a number of flaws. Specifically, on the average, the quality and impact of the 3D experience delivered by the available SA-3D solutions is lower than that of

US 9,521,390 B2

3

conventional high-end glasses-based stereoscopic 3D offerings. Moreover the relative position of each viewer to the SA-3D screen (in terms of vertical and horizontal viewing angles, distance, etc.) has significant impact on that viewer's overall 3D experience when viewing the displayed SA-3D content. Moreover, the existing SA-3D hardware and software solutions for the capture, processing, playback and display of 3D content media have focused on areas of expertise, offer individual and discrete benefits in various narrow aspects of 3D and SA-3D technologies with little or no regard for the offerings of other solution providers, resulting in literally dozens of incompatible proprietary software and hardware products with nothing to tie them together.

It would thus be desirable to provide a system and method directed to one or more modular unifying scalable solutions, preferably implemented in a configurable infrastructure, that greatly improve the quality and impact of any 3D media content, while decreasing the required levels of computing power, and lowering the complexity of the necessary playback and display solutions. It would further be desirable to provide a system and method capable of achieving the above goals by selectively performing 3D content processing and/or settings/parameter configuration at one or more components of the infrastructure from 3D content capture to 3D content media display. It would moreover be desirable to provide a system and method capable of determining and implementing selective or optimal storage, transmittal, and application(s) of 3D content processing/settings parameter/profile configuration(s) prior to display of corresponding 3D content media to one or more viewers thereof.

BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings, wherein like reference characters denote corresponding or similar elements throughout the various figures:

FIG. **1** is a schematic block diagram of an exemplary embodiment of the inventive scalable modular infrastructure for selectively implementing, configuring, and managing various components of the inventive system for selectively providing adaptive scalable modular functions related to 3D content media capture, generation, quality/processing optimization, enhancement, correction, mastering, and other advantage s processing and/or configuration;

FIG. **2** is a schematic block diagram of exemplary embodiments of various components of the inventive system for selectively providing adaptive scalable modular functions related to 3D content media capture, generation, quality/processing optimization, enhancement, correction, mastering, and other advantageous processing and/or configuration, that may be implemented in the novel infrastructure of FIG. **1**;

FIG. **3** is a process flow diagram of an exemplary embodiment of the inventive process, that may be performed in whole, or selectively in part, by at least one component of the inventive system of FIG. **2**, or that may otherwise be implemented in one or more components of the inventive infrastructure of FIG. **1**; and

FIGS. **4A-4D** are various views of a schematic representation of an exemplary 3D media content volume structure that may be utilized in conjunction with various embodiments of the present invention of FIGS. **1** to **3**, and illustrate a varying 3D spatial volume which contains at least one object of interest to the viewer of the 3D media content displayed therein.

4

SUMMARY OF THE INVENTION

The present invention is directed to a system and method for providing 3D content-centric solutions that greatly improve the quality and impact of 3D media content, while decreasing the required levels of computing power, and lowering the complexity of the necessary 3D media playback and display solutions, thus maximizing the 3D experience produced therefrom. The novel system and method accomplish these goals by providing modular unifying scalable 3D content-centered solutions, preferably implemented in a configurable infrastructure, that improve the quality and impact of any 3D rrredia content, while decreasing the required levels of computing power, and lowering the complexity of the necessary playback and display solutions.

The inventive system and method advantageously enable automatic, semi-automatic or user-controlled selective performance of 3D content processing and/or settings/parameter configuration at one or more components of the infrastructure (from 3D content capture, to 3D content processing (and/or 2D to 3D content conversion), and to 3D content media display), and in at least one embodiment thereof, the inventive system and method are capable of determining and implementing selective or optimal storage, transmittal, and application of 3D content processing/settings/parameter/profile configuration(s) prior to, or during, display of corresponding 3D content media to one or more viewers thereof.

Other objects and features of the present invention will become apparent from the following detailed description considered in conjunction with the accompanying drawings. It is to be understood, however, that the drawings are designed solely for purposes of illustration and not as a definition of the limits of the invention, for which reference should be made to the appended claims.

DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

The system and method of the present invention, address all of the disadvantages, flaws and drawbacks of all previously known 3D-related hardware and software offerings, by providing novel 3D content media-centric solutions that greatly improve the quality and impact of any 3D media content, while advantageously decreasing the required levels of computing power, and lowering the complexity of the necessary 3D media playback and 3D media display solutions, thus maximizing the 3D experience produced therefrom for one or more viewers.

The novel system and method accomplish the above goals by providing modular unifying scalable 3D content-centered solutions, preferably implemented in a configurable infrastructure, that greatly improve the quality and impact of any 3D media content, while decreasing the required levels of computing power, and lowering the complexity of the necessary playback and display solutions.

In various exemplary embodiments thereof, the inventive system and method advantageously enable automatic, semi-automatic or user-controlled selective performance of 3D content processing and/or settings/parameter configuration at one or more components of the infrastructure (from 3D content capture to 3D content media display), and in at least one embodiment thereof, the inventive system and method are capable of determining and implementing selective or optimal storage, transmittal, and application(s) of 3D con-

US 9,521,390 B2

5

tent processing/settings/parameter/profile configuration(s) prior to display of corresponding 3D content media to one or more viewers thereof.

It should be noted that current 3D media content capture, processing, playback and display solutions take the "lowest common denominator" approach to applying playback/display optimization and related settings (intended to improve the appearance, quality, impact and overall "3-D Experience") to the 3D content media being displayed to at least one viewer thereof. This is very problematic because the desirable settings and parameters, as well as the necessary processing power and other requirements, for optimizing and maximizing the quality, impact and overall 3-D experience level for any displayed 3D media content, vary greatly between different 3D content media files, and even between different segments/portions within any particular 3D content media file itself. In particular, these variations largely depend on the specific 3D scenes being shown (i.e., on the depicted objects/subjects, their relative motion, complexity, backgrounds, lighting, etc.), and on other external factors, such as the original 3D content capture and/or conversion parameter settings, the capture hardware used, the current display, and even on the viewers' relative position (orientation, elevation, distance, etc.) thereto.

Finally, prior to discussing the various embodiments of the present invention in greater detail below, it is important to note that while many of the embodiments of the present invention (and the various novel tools, techniques and processes relating thereto), are described and discussed as being implemented and/or utilized in the field of 3D visual entertainment (film, television, games, etc., all embodiments of the inventive system and method, can be readily and advantageously utilized in virtually any scientific, military, medical, forensic, or industrial application based on, or involving 3D visualization or display and/or manipulation of 3D content medial, as a matter of design choice, without departing from the spirit of the invention.

Referring now to FIG. 1, an exemplary embodiment is shown of an inventive scalable modular infrastructure 10 for selectively implementing, configuring, and managing various components of the inventive system for selectively providing adaptive scalable modular functions related to 3D content media capture, generation, quality/processing optimization, enhancement, correction, mastering, and other advantageous processing and/or configuration.

The infrastructure 10 includes optional components 12 and 16 (3D content capture system 12, and 3D content processing system 16) for selectively capturing and optionally processing 3D content media prior to placing it into a 3D content media container (e.g., file, stream, etc.). The infrastructure 10 also includes a 3D content media storage/processing/playback SPP system 18, operable to selectively store, process, and/or play back 3D content media from a medial container that may be received from components 12 and/or 16, or that may be delivered from another 3D content media source (such as media converted from another 3D format, or from non-3D content source).

The SPP system 18 preferably communicates with a 3D content display system 24, operable to display 3D content media (in one or more configurations, and capable of displaying/utilizing at least one of: unprocessed 3D content media 20a, processed 3D content media 20b, optimized 3D content setting for use with other 3D media content received from a source outside of the infrastructure 10, etc.) to at least one viewer (e.g., to viewers, 26a-26c).

In at least one embodiment of the present invention, the 3D content processing system 16 may also optionally com-

6

prise at least one 3D content processing feature/function that is optimized for utilization in conjunction with the 3D content capture system 12. For example, in one embodiment of the infrastructure 10, the 3D content capture system 12 may actually be a conventional or a modified 3D content capture system, that is provided with additional necessary features (such as scene/visual field depth mapping (or equivalent capabilities) to enable dynamic (and optionally "on the fly") capture of 2D content, plus sufficient depth (and/or related non-image) information that is sufficient to enable the systems 12 and 16 to produce desirable 3D content for delivery to the SPP system 18. An exemplary embodiment of operation of the infrastructure 10 is discussed in greater detail in conjunction with FIG. 3.

Referring now to FIG. 2, various exemplary embodiments of the possible components of an inventive system 100, that may be implemented in the inventive infrastructure 10 of FIG. 1, operable to selectively provide adaptive scalable modular functions related to 3D content media capture generation, quality/processing optimization enhancement, correction, mastering, and other advantageous processing and/or configuration, that may be implemented in the novel infrastructure 10 of FIG. 1. Preferably, one or more of the components (12, 16, 18, and 24), and subcomponents (102 to 114e) of the inventive system 100, are capable of performing one or more steps of an exemplary novel process 200 of FIG. 3.

Referring now to FIG. 3, an exemplary embodiment is shown as a process flow diagram of an exemplary embodiment of the inventive process, with steps 202 to 216, that may be performed in whole, or selectively in part, by at least one component of the inventive system 100 of FIG. 2, or that may be implemented in one or more components of the novel infrastructure 10 of FIG. 1.

In summary, the inventive system 100 (through selective operation of one or more components thereof, as may be implemented in infrastructure 10 of FIG. 1), in additional exemplary embodiments thereof, preferably associates at least one predetermined 3D content improvement ("3DCI") parameter set (optimization playback, and/or display settings and/or parameters, selection of one or processing modules and/or stages of use thereof (or example during one or more of: capture, post-processing, playback or display), display tool adjustments, etc.), with 3D media content containers.

In at least one embodiment thereof, the optimal 3DCI parameter set comprises a plurality of "static to dynamic" display tools adjustments, which may be advantageously recorded and/or otherwise embedded in the 3D content media file, to thereby become a permanent feature thereof during later playback and/or processing (e.g., post production, etc.) of the 3D content media. In another embodiment of the present invention, the optimal 3DCI parameter set integration technique may also be utilized as a playback feature which is interpreted by a proprietary software and/or hardware 3D media player (which, by way of example can be configured as a "set top box" or equivalent, for 2D to 3D content conversion, playback of "enhanced" 3D content media having an integrated 3DCI parameter set, and for other functions (such as utilization of de-encryption solutions for playback of protected 3D content media.

Advantageously, this association and/or linking, occurs on a scalable basis from the most basic level at which an optimal 3DCI parameter set is associated with one or more corresponding 3D content media containers (that may be in a container directory, a playlist, a queue, or in a similar storage container), such that the appropriate 3DCI parameter

US 9,521,390 B2

7

set is activated in conjunction with its corresponding 3D content media from the container being played, to a more advanced level at which different 3DCI parameter sets are associated with (or otherwise linked or assigned to), the appropriate different portions of each 3D content media container, such that during playback and/or display thereof, different sections of the displayed content receive the optimal level of "treatment".

In one exemplary embodiment of the present invention, the above-described techniques may be readily implemented in a media player (e.g., software based or otherwise), operable to process and play back a 3D media content clip, and which is operable to enable an operator thereof to (1) exercise full control over adjustments to 3DCI parameters on a scalable/variable granularity basis (ranging from a portion of a single content frame to a scene formed from a plurality of sequential frames, and (2) embed various settings and parameters (e.g., even data points of DCT (discrete cosine transform) settings), and automatically imbed them in the 3D media content clip for later optimized playback.

Advantageously, the novel media player is further operable to enable the operator to run a 3D media content clip, stop at a particular frame, apply predefined (e.g., DCT) adjustments and record them in the clip, such that the adjustment is automatically carried forward through the clip until the operator tops at a the next frame which requires a different adjustment, or the clip ends.

The novel system and method advantageously address and cover both the creation/determination/configuration of various scalable 3DCI parameter sets during 3D content capture, during initial processing, at any other time up to and including on-the-fly during playback, or any combination of the above, as a matter of design choice without departing from the spirit of the invention. Similarly, the process of creation/determination/configuration of the 3DCI parameter sets can be wholly or partially automated, or can be manually performed as a "creative process" by one or more content professional, preferably utilizing one or more 3DCI tools and support modules as desired or as necessary.

For example, tools utilizing novel dynamic and adaptive variable 3D depth and layering techniques of the present invention (i.e., Depth Based Image Rendering or "DBIR" techniques), may readily be used for both automated and content professional-directed 3DCI parameter creation (e.g., the 3DCI may include desired depth adjustment parameters, variable layer densities centered on certain displayed objects or object types, dynamic variable resolution based on relative distance of the closest object depth layers to the viewer, etc.).

The 3DCI parameter sets ray be linked to, or otherwise associated with the respective 3D content media containers (or portions thereof), and may thus be stored in dedicated or other form of files, containers or libraries, separately from the 3D content media containers, or may be stored within the 3D content media containers, (e.g., embedded therein, as discussed above).

The inventive system **100** (through selective operation of one or more components thereof, as may be implemented in infrastructure **10** of FIG. **1**, for example in accordance with the process **200**, or otherwise) in various additional exemplary embodiments thereof is operable to provide selective, automatic, or user-controlled dynamic adaptive/scalable utilization of layered depth measurement/mapping (e.g., DBIR) techniques in 3D content media, coupled it) with techniques for identifying and spatially (3D) tracking static and moving displayed objects in the depth mapped layered

8

scenes to provide the desired optimal level of at least one predefined aspect of 3D content experience.

In various exemplary embodiments thereof, the system and method of the present invention advantageously comprise the utilization of at least one of (and preferably both) the following novel 3DCI methodologies (that may be implemented utilizing one or more of various suitable 3D content processing techniques): (1) Dynamic Volumetry, and (2) Viewer Perception Enhancement, each described in greater detail below.

When presenting 3D content using a digital display or a projector, the challenge is not only to separate the elements of the content into a spatial continuum ranging from foreground to background, but also to reproduce correctly the viewer perspective that would naturally proceed from the action on screen. This is true for both content originally captured in 3D and for content converted from an original 2D source.

When presented with a visual field containing many objects, the observer will isolate the objects and focus on a specific one or few in order to better interpret the action within the field. The process of separation is based on many criteria/properties such as colour, brightness and relative motion. Once the objects have been separated, the observer's primary focus is chosen. Following that choice, a different set of perceptual algorithms is used to track the action within the scene. The centre of interest is maintained in tight focus and other elements of the image which are closer, farther or moving at a different rate are defocused. Thus, in order to improve the 3D effect of any digital display, the system used must not only manage the correct definition of varying spatial relationship between image elements, it must also generate the presentation in accord with the environmental conditions of the display and the perceptual expectations of the viewer.

Essentially, there are two broad categories of activity that take place within any 2D-to-3D video transformation pipeline:

(A) Conversion: Development of a series of data which describe the calculated XYZ position of picture elements present within each frame of the video; and

(B) Presentation: A mathematical process that shows the viewpoint of picture elements from different perspectives. (For example: Two views are required for stereoscopic and 9 or more for ASD presentations.)

Each of the above activities is performed at a different time & place. Conversion is a complex process, typically performed one time only for any given piece of content, whether live or off-line. The conversion process is usually performed in a studio or using a separate real-time technology module (in the case of live conversion). The Presentation processes involve different calculations that are performed at each viewing time on equipment located at the viewing position. In addition to the methods required to reproduce the basic sub-images inherent to the 3D presentation technology, the images must be adjusted according to viewer and site-based parameters such as specific output technology, venue physical format, ambient light conditions and viewer position/preference.

Dynamic Volumetry refers to the process of adjusting the generation of the 3D images to compensate for the parameters related to the spatial relationship between elements within a series of images comprising one or several 3D scenes. Referring now to FIGS. **4**A to **4**D, an exemplary embodiment of the inventive Dynamic Volumetry methodology is shown. FIGS. **4**A to **4**D show varying volumetric 3D spaces **300a-300d**, which contain a range of objects of

US 9,521,390 B2

9

interest 306a to 306c arranged from foreground to background. At different times in the video sequence, the volume or scale on any or all of the axes will change to allow a reasonable discrimination of the objects of interest. Additionally, the system performs the sub-image generation with a focus set in a plane containing the centre of perceived action. FIG. 4A shows a spatial volume ranging from foreground 302a to background 304a and including an object of interest 306a

FIG. 4B shows a Perception Focus Plane 308b At $T_O$ and a Primary object of Interest (Perception Focus) 306b. The positioning of the focus plane is dynamically adjusted to center on the objects or zone with maximum relation to the action within the image sequence thus permitting the system to display the greatest degree of 3D separation.

FIG. 4C shows a side view of 3D space and Primary object of Interest 306c. (Perception Focus). Spatial data information can be linear across the space (foreground to background) or non-linear thus permitting the system to display the greatest degree of 3D separation around the area of maximum interest or action.

FIG. 40 shows Scene Space at $T_O$ (SS-1) to Scene Space at $T_{O+n}$ (SS-2). The volume of the space is adjusted dynastically to allow the background and foreground to be imaged in such as way as to always include or exclude the zone of maximum interest with the greatest degree of 3D separation.

Presentation processes involve different calculations that are performed at each viewing time on equipment located at the viewing position. In addition the methods (described above) required to reproduce the basic sub-images inherent to the 3D presentation technology, the images must be adjusted according to viewer and site-based parameters such as specific output technology, venue physical format, ambient light conditions and viewer position/preference.

The inventive system and method dynamically modifies a series of coefficients/formulae affecting the presentation rendering of a data file containing and describing the sub-elements of an image sequence (video stream) in such a way as to emulate the natural interest and perception of a view when exposed to a real environment. The modifications may be based on variables such as the following:

Environment Specific:
Viewer position
Ambient lighting
Presentation equipment technology
Content Specific:
Foreground/background separation
Primary activity focus position
Overall scene topography
Topography of preceding and following scenes

Dynamic adjustments will be at frame speed and may impose specific adjustments for a single scene, a single frame, or an interpolated sequence of adjustments including linear and non-linear transforms between specified points of interest, whether scene-based or not.

Advantageously, in accordance with the present invention, the novel system 100 preferably comprises sufficient hardware and/or software components and subcomponents to provide and utilize one or more of the following advantageous and novel functionalities/techniques which are contemplated by the present invention in implementing various embodiments and aspects of the inventive Dynamic Volumetry methodology:

1) Automatic/Adaptive Depth Layer Acquisition: Utilization of existing 3D field depth-detection cameras (and related and/or substantially equivalent hardware) during the 3D content capture/acquisition stage (or, as may

10

be applicable during the initial intake stage of 2D content to be converted to 3D), to acquire a predetermined number of depth layers for the 3D content to form the desired layered "depth field environment" for each 3D content frame/scene, etc., which may be the same depth quantity for the entire container, or which, in accordance with the present invention, may dynamically, adaptively or selectively vary for different portions of the content (for example pursuant to one or more predetermined depth later variation profiles).

2) Dynamic Layer Density Assignment: Assignment of predetermined amounts of layers to various displayed objects in the 3D content being captured and/or converted. Optionally, the assignment process may utilize variable layer density (e.g., depending on relative depth of different parts of the objects). Alternately, an object's layer density distribution (or profile) may be shifted/adjusted dynamically as the object moves within the depth field.

3) Dynamic Focal Layer Determination/Tracking: Determination, tracking and use of at least one variable dynamically determined/adaptive "focal" layer (i.e., everything behind the focal layer needs less detail and less layer density, anything close needs more) for entire scenes, or for portions thereof.

4) Dynamic Multi-Layer Focal Objects/Scenes Determination/Tracking: Determination, tracking and/or use of different variable dynamically determined/adaptive "focal object" plural layers assigned to one or more objects in various 3D content scenes, and that can move to different depths depending on relative depth positions of the assigned object, thus enabling variable layer density across objects (essentially providing, to the inventive system 100, a control protocol for simplified manipulation of an object's depth layer distribution).

5) Assignment of Variable Spatial Resolution to Objects: In conjunction with one or more of the various features above, utilization of a mixture of different image resolution magnitudes (pixel density, etc.), and/or optionally of related image processing (anti-aliasing, etc.), for portions of objects/scene regions in an optimized manner (for example, by processing/displaying higher resolutions for those object layers that are closest to the viewer (or that otherwise would benefit from additional detail)).

6) Dynamic Geospatial External Calibration: Optionally, maintaining a selected level of "geospatial accuracy" with external calibration distance points or with internal software reference markers, enables visual depth adjustment to precise geo-spatially accurate images to be accomplished to a degree as may be desired (or necessary) for one or more 3D content applications up to, and inclusive of, extremely dense layering across each 3D content scene and/or object(s) (for example as may be required for military, scientific, and/or medical applications, etc.).

7) Application of Dynamic Geospatial Survey Solutions in 3D Media Content Context: Utilization and/or adaptation of various advantageous geo-centric survey depth (elevation) mapping techniques and methodologies to various DBIR techniques utilized in accordance with the present invention, preferably with additional modifications applied thereto, to make them dynamic, adaptive, and highly configurable.

8) Additional Novel Tools and Techniques: Selective configuration, implementation, and use of various addi-

US 9,521,390 B2

11

tional features including, but not limited to: dedicated 3D processing (D3DP) hardware (e.g., "black box") re-mastering/editing tools, depth correction techniques, various display/media player modules and editing tools, streamlining D3DP hardware rendering conversion processes (e.g., grayscale values to corresponding layer depth locking, and later image depth manipulation correction/optimization via grayscale value adjustments, etc.), and so forth.

It should also be noted that the various embodiments of the inventive system and method, can be advantageously configured, and/or adapted, to utilize and/or combine the very best of currently available (as well as any future) 3D-related solutions in an interoperable manner, that is as transparent as possible to the end user (whether the user is in the field of 3D content creation, or is part of the 3D content audience).

By way of example, the present invention may be implemented, in whole or in part, in connection with, or utilizing a 2D to 3D video conversion server (3DVC server), utilizing various additional applications and software-based tools. This technique may employ a variety of commercially available software tools designed to provide for some specific 2D to 3D conversion techniques such as separate interval field sequential frame grabbing, and thereafter mixing of the subsequent frames to create a depth map based on horizontal motion (which in itself is a sub-standard 3D conversion technique). However, when this approach, is integrated with a variety of other compatible 3D content enhancement techniques, and further assisted/upgraded by the aforementioned inventive system features and tools, it may be configured and implemented to perform at a substantially higher standard of 3D depth conversion, using one or more suitable DBIR solutions, and therefore become an excellent candidate for an inexpensive and easily to use basis for a Broadcast Quality 3D video standard. It should be noted that the opportunity to integrate a number of commercially available 2D to 3D depth conversion methodologies with a 3DVC server exists only as a consequence of the implementation of the various novel depth mapping correction and relating techniques of the inventive system **100**.

Therefore, the combination of the various commercially available 3D-related tools in concert with a 3DVC server, a media player, the various novel post-processing and display tools of the present invention, unexpectedly and advantageously resulted in the discovery of a completely unique and new process of image correction, 3D depth mapping, and depth impact optimization, that, when properly used and configured in accordance with the present invention are capable of elevating conventional 2D+Depth (i.e., DBIR) 3D media to Broadcast quality.

The various inventive depth mapping solutions and novel techniques, when applied to 3D content media provided by a conventional 3D 3DVC, unexpectedly result in a "remastering" of the 3DVC server, thus constituting an entirely new commercial application of a conventional 3D technology package "fused" with various novel solutions offered by the present invention, and therefore providing a breakthrough opportunity to produce 3D 2D+Depth stereoscopic 3D content media having maximum depth 3D visual impact, but without distracting visual artifacts.

In addition, it should be noted that while a conventional 3DVC server is most commonly used to convert 2D content to 2D+Depth 3D content utilizing one or more DBIR techniques, it is also capable of converting dual path stereoscopic optical signals to a 2D+Depth format (or equivalent

12

thereof), and is also capable of converting stereoscopic side-by-side and field sequential stereoscopic 3D video, into a 2D+Depth format (or equivalent thereof). Fortunately, the various techniques and solutions of the present invention are fully applicable for advantageous utilization in connection with any and all of the aforementioned conversion formats which are supported by the 3DVC server.

Essentially the system and method of the present invention have gone one step further and readily serve as a basis for producing a 3D software solution (that may be optionally augmented with, or replaced by, a hardware component) that is capable of grabbing stereoscopic pairs from a nine multi-view 2D+Depth conversion, and reformatting them back into a side-by-side, or a dual-path conventional 3D signal, for viewing the reformatted 3D content media using stereoscopic 3D glasses. Accordingly, the inventive techniques close the loop, and allow the use of a conventional 3DVC server to convert 2D content media not only into a 2D+Depth format, utilizing one or more DBIR techniques, but to also automatically convert 2D content media into highly desirable and commercially viable stereoscopic 3D medial content that is necessary for all 3D glasses-based display systems, large and small, thereby enabling a highly attractive and cost effective solution to be offered during the inevitable transition between from 3D glasses-based display systems to ASD systems.

When the above-described combined technology package (hereinafter referred to as a "3DF-3DVC system") is used with conventional and/or novel 3D display tool adjustments and settings, (which, in accordance with the present invention may be readily embedded into a 3D content media file (and optionally recorded/captured "on-the-fly")), the resulting output not only corrects any remaining 3D video image issues/flaws, but will at the same time provide the basis for development and implementation of various guidelines and tools for rapidly effecting a major increase in the impact of the depth perspective visuals in the display of various available and future 3D content media, thus establishing the methodology and infrastructure that is required for widespread production and proliferation of 3D stereoscopic video broadcast quality standards.

For example, various inventive 3DF-3DVC system techniques may be employed in all of 3DVC server applications to effectively upgrade the 3D content media quality through "Re-mastering". When these techniques are applied to preconverted 2D+Depth, s3D 3D video clips, which may have been produced utilizing one or more DBIR techniques, and designed for display on conventional commercially available 3D ASD screens, advantageously, the issues of depth error correction, cone double image removal and ghosting artifacts may be corrected, and therefore eliminated.

As a result, in view of all of the above, the use of various embodiments of the inventive system and method (or of portions thereof), enables companies to offer, and consumers and other end-user parties to experience, 3D content media in a very cost-effective and efficient manner, thus overcoming the flaws and drawbacks of all prior 3D-related offerings that served as barriers to the well-deserved success of the 3D media experience market, and making inexpensive and ready availability of the "3D experience" a reality.

Thus, while there have been shown and described and pointed out fundamental novel features of the inventive system and method as applied to preferred embodiments thereof, it will be understood that various omissions and substitutions and changes in the form and details of the devices and methods illustrated, and in their operation, may be made by those skilled in the art without departing from

US 9,521,390 B2

13 14

the spirit of the invention. For example, it is expressly intended that all combinations of those elements and/or method steps which perform substantially the same function in substantially the same gray to achieve the same results are within the scope of the invention. It is the intention, therefore, to be limited only as indicated by the scope of the claims appended hereto.

We claim:

**1**. A method, implemented in at least one data processing system, for improving the efficiency, quality, viewing comfort and/or visual impact of a 3D experience capable of being provided to at least one viewer of a 3D content media comprising a plurality of content sections, in conjunction with the use of at least a portion of a plurality of predetermined 3D content modification techniques, the method comprising the steps of:

(a) identifying at least one content section of the 3D content media comprising at least one 3D media element and selecting at least one corresponding predefined plural 3D content modification technique that is configured for provision of optimum improvement of the 3D experience when applied thereto;

(b) for each said selected at least one predefined plural 3D content modification technique configured for then-current application to said corresponding at least one 3D media element, applying said selected at least one predefined plural then-current 3D content modification technique thereto;

(c) for each said selected at least one predefined plural 3D content modification technique configured for future application to said corresponding at least one 3D media element, determining a setting for at least one parameter of said selected at least one predefined plural future 3D content modification technique, optimal for application to said corresponding at least one 3D media element;

(d) associating a reference to said selected at least one predefined plural future 3D content modification technique and said determined at least one optimal parameter, with said corresponding at least one 3D media element;

(e) selectively repeating said steps (a), b), (c) and (d) for at east one additional section of the 3D content media;

(f) selectively enabling an operator to view results of said steps (a), (b), (c), (d), and (e), and to at least one of: selectively cancel at least one result of at least one operation previously performed at least one of said steps (a), (b), (c), (d), and (e), and selectively change at least one operation previously performed at least one of said steps (a), (b), (c), (d), and (e), to an alternate operation selected by the operator;

(g) after conclusion of said step (f), generating a dynamic 3D content media container file configured for playback to at least one viewer utilizing at least one 3D content playback system operable to apply said selected at least one predefined plural future 3D content modification technique to said corresponding at least one 3D media element in accordance with said at least determined at least one optimal parameter, and further configured to store, for each 3D content media element identified at said step (a), at least one of:

at least one immediate 3D content modification applied at said step (b), and

at least one said associated reference to said at least one corresponding predefined plural future 3D content modification technique, and said determined at least one optimal parameter therefor:

such that said dynamic 3D content media container file comprises 3D media content having at least one modified content section each comprising at least one modification specifically optimal for application thereto, thereby maximizing the efficiency, quality, viewing comfort and/or visual impact of the 3D experience being provided to viewers thereof during playback.

**2**. The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein the 3D content media comprises at least one of stereoscopic 3D content, and auto-stereoscopic 3D content.

**3**. The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein the 3D content media comprises at least one of first 3D content media previously captured by at least one 3D content capture system, second 3D content media previously generated by at least one 3D content source, third 3D content media previously converted, by a 3D content capture system from captured 2D media content, and fourth 3D content media previously converted, by a 3D content source, from previously generated 2D content.

**4**. The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein said at least one content section of the 3D content media, identified at said step (a), comprises a plurality of content frames comprising said at least one 3D media element.

**5**. The method of claim **4**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein said predefined plural content frames comprise a corresponding scene, and wherein each said at least one 3D media element comprises at least cine of a static 3D displayed object, and a moving 3D displayed object.

**6**. The method of claim **1**, for improving the efficiency quality, vie raring comfort, and/or visual impact of the 3D experience, wherein at least one of said steps (a), (b), (c), (d) and (e), is performed by the at least one data processing system under manual control of an operator.

**7**. The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein said at least one 3D content playback system comprises at least one of: a 3D content media player operable to process said dynamic 3D content media container file for playback by generating therefrom and transmitting a 3D content output signal to a corresponding connected 3D content display system, and a 3D content display system operable to process said dynamic 3D content media container file for playback by generating therefrom, and displaying said 3D content output signal.

**8**. The method of claim **7**, wherein said at least one 3D content playback system is operable to apply each said at least one predefined plural future 3D content modification technique to said corresponding at least one 3D media element of said 3D content media, in accordance with said at least one optimal parameter therefor, further comprising the steps of:

(h) providing said dynamic 3D content media container file, generated at said step (f), to said at least one 3D content playback system;

(i) identifying, by said at least one 3D content playback system in said dynamic 3D content media container file, at least one said associated reference to said at least one corresponding predefined plural future 3D content modification technique, and said determined at least one optimal parameter therefor; and

US 9,521,390 B2

15

(j) applying said at least one referenced corresponding predefined plural future 3D content modification technique to said corresponding at least one 3D media element of said 3D content media, in accordance with said at least one optimal parameter therefor.

**9.** The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein said plurality of predetermined 3D content modification techniques further comprises a plurality of content modification techniques operable to optimize at least one additional visual characteristic of 3D content media, further comprising the steps of, prior to said step (e):

(k) identifying at least one content section of the 3D content media comprising at least one visual characteristic, and selecting at least one corresponding predefined plural content modification technique that is configured for provision of optimum improvement of the 3D experience when applied thereto; and

(l) for each said selected at least one predefined plural content modification technique configured for immediate application to said corresponding at least one content section applying said selected at least one predefined plural immediate content modification technique thereto.

**10.** The method of claim **9**, wherein said step (e) further comprises the step of:

(m) selectively repeating said steps (k) and (l) for at least one additional section of the 3D content media.

**11.** The method of claim further comprising the steps of, after said step (k) and prior to said step (e):

(n) for each said selected at least one predefined plural content modification technique configured for future application to said corresponding at least one content section, determining a setting for at least one parameter of said selected at least one predefined plural future content modification technique, optimal for application to said corresponding at least one content section; and

(o) associating a reference to said selected at least one predefined plural future content modification technique and said determined at least one optimal parameter, with said corresponding at least one content section.

**12.** The method of claim herein said step (e) further comprises the step of:

(p) selectively repeating said steps (n) and (o) for at least one additional section of the 3D content media.

**13.** The method of claim **11**, wherein said at least one 3D content playback system is operable to apply said at least one corresponding predefined plural future content modification technique to at least one predetermined content section of said 3D content media, in accordance with said at least one optimal parameter therefor, further comprising the steps of:

(q) providing said dynamic 3D content media container file, generated at said step (f), to said at least one 3D content playback system;

16

(r) identifying, by said at least one 3D content playback system in said dynamic 3D content media container file, at least one said associated reference to said at least one corresponding predefined plural future content modification technique, and said determined at least one optimal parameter therefor; and

(s) applying said at least one referenced corresponding predefined plural future content modification technique to at least one predetermined content section of said 3D content media, in accordance with said at least one optimal parameter therefor.

**14.** The method of claim **1**, wherein said step (q) comprises the step of:

(t) streaming said dynamic 3D content media container file, generated at said step (f), to at least one 3D content playback system from a remote 3D content source.

**15.** The method of claim **13**, wherein said dynamic 3D content media container file is stored on physical media operable to store 3D content media container files, and wherein step (q) comprises the step of:

(u) transmitting said dynamic 3D content media container file, generated at said step (f), to at least one 3D content playback system from said corresponding physical media.

**16.** The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein the at least one data processing system operable to perform said steps (a), (b), (c), (d), and (e), is connected to said at least one 3D content playback system.

**17.** The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience wherein said at least one 3D content playback system comprises the at least one data processing system operable to perform said steps (a), (b (c), (d), and (e).

**18.** The method of claim **1**, for improving the efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein the at least one data processing system is operable to perform said steps (a), (b), (c), (d), (e), and (f), prior to playback of said dynamic 3D content media container file, further comprising the step of:

(v) after said step (f), storing said dynamic 3D content media container file, on physical media operable to store 3D content media container files, for later playback by said at least one 3D content playback system.

**19.** The method of claim **1**, for improving efficiency, quality, viewing comfort, and/or visual impact of the 3D experience, wherein the at least one data processing system is operable to perform said steps (a), (b), (c), (d), (e), and (f), in conjunction with playback of said dynamic 3D content media container file by said at least one 3D content playback system.

*    *    *    *    *

# EXHIBIT 13

## BLUEBOX AGREEMENT

This Agreement is made on ~~Feb 11~~ , 2009

between:

(1)   **Philips Electronics Nederland B.V.**, a company duly incorporated under the laws of the Netherlands, acting through its Technology Incubator Venture 3D Solutions, with offices at High tech Campus 27, 5656 AE, Eindhoven, the Netherlands (hereafter referred to as "Philips");

and

(2)   **3D Fusion**, a company duly incorporated under the laws of United States, with office at 110 Wall street 7th Floor New York, NY 10005 (hereafter referred to as "Company"); (each, a "Party", and collectively, the "Parties")

(3)

(each, a "Party", and collectively, the "Parties")

Whereas:

A.)   Philips has developed certain content conversion tools capable of running multiple 3D content conversion applications that enable, among others, 2D to 3D conversion of video content;

B.)   Company desires to use such content conversion tools to enable its video content to be displayed inter alia, in a 3D format suitable for display on WOWvx 2D-plus-Depth-compliant 3D displays;

C.)   Philips is willing to provide to Company, as a paid service, access to such tools by means of the BlueBox (as defined below);

D.)   Philips and Company agree on certain terms and conditions governing the provision of such service.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, the Parties hereby agree as follows:

1.    **Interpretation**
As used in this Agreement, the following terms shall have the meanings set forth below:

"**Affiliate**" shall mean with respect to Philips, Koninklijke Philips Electronics N.V. (the ultimate parent company of Philips) and any corporation, company, or other legal entity in which Koninklijke Philips Electronics N.V. owns or controls, directly or indirectly, more than 50% (fifty percent) of the shares entitled to vote for the election of directors or other persons performing similar functions, and with respect to Company, any corporation, company, or other legal entity in which Company owns or controls, directly or indirectly, more than 50% (fifty percent) of the shares entitled to vote for the election of directors or other persons performing similar functions, but any such legal entity shall be considered to be an Affiliate of a Party only for so long as such ownership or control exists.

"**Agreement**" shall mean this BlueBox agreement, including all Exhibits hereto which form an integral part hereof.

"**BlueBox**" shall mean the BlueBox hardware specified in Exhibit A and the BlueBox Server Software, forming in combination with the BlueBox Client Software a client/server mixed/software platform for 3D content creation services.
"**BlueBox Server Software**" shall mean the software contained in the BlueBox as further specified in Exhibit A.

Initials Philips: 

Page 1 of 19

Initials Company:

"BlueBox Client Software" shall mean the software provided by Philips with the BlueBox as further specified in Exhibit A and for which Company must, as a condition for use, accept the applicable end-user license agreement accompanying the BlueBox Client Software.

"BlueBox Software" shall mean both or any of BlueBox Server Software and BlueBox Client Software

"BlueBox Functionality" shall mean the functionalities deliverable by the combination of the BlueBox Server Software and the BlueBox Client Software as further specified in Exhibit B.

"Change of Control" shall mean with respect to a Party, the occurrence of any of the following events: (a) any consolidation or merger of such Party with or into any other entity in which the holders of such Party's outstanding shares immediately before such consolidation or merger do not, but immediately after such consolidation or merger, do retain stock representing a majority of the voting power of the surviving entity or stock representing a majority of the voting power of an entity that wholly owns, directly or indirectly, the surviving entity; (b) the sale, transfer or assignment of securities of such Party representing a majority of the voting power of all of such Party's outstanding voting securities to an acquiring Party or group; (c) the sale of all or substantially all of such Party's assets; or (d) the transfer, directly or indirectly, of 50% (fifty percent) or more of the such Party's outstanding shares entitled to vote for the election of directors or other persons performing similar functions, or by equivalent change in ownership or control of such Party if a partnership or other non-corporate form.

"Documentation" shall mean all documentation relating to the BlueBox and BlueBox Client Software, including but not limited to manuals, instructions, Specifications, user's guides, technical, training and programmer guides Philips, or any of its Affiliates, provides with the BlueBox.

"Effective Date" shall mean the date of this Agreement first written above.

"Intellectual Property Rights" or "IPR" shall mean all present and future industrial and intellectual property rights, including, but not limited to, patents, utility models, trade and service marks, trade names, mask work rights, rights in domain names, right in designs, copyrights, moral rights, topography rights, rights in databases, trade secrets and know-how, in all cases whether or not registered or registrable and including all registrations and applications for registration of any of these and rights to apply for the same, as well as any renewals, extensions, combinations, divisions, continuations or reissues thereof, rights to receive equitable remuneration in respect of any of these and all rights and forms of protection of a similar nature or having equivalent or similar affect to any of these anywhere in the world.

"Open Source License Terms" shall mean terms in any license that require as a condition of use, modification and/or distribution of a work:

(a)    the making available of source code or other materials preferred for modification, or
(b)    the granting of permission for creating derivative works, or
(c)    the reproduction of certain notices or license terms in derivative works or accompanying documentation, or
(e)    the granting of a royalty-free license to any party under Intellectual Property Rights, regarding the work and/or any work that contains, is combined with, requires or otherwise is based on the work.

"Open Source Software" shall mean any software that is licensed under Open Source License Terms.

"Specifications" shall mean the functional specifications and performance requirements for the BlueBox server Software, as specified in the Documentation.

"Term" shall mean the effective period of the Agreement as further defined in clause 9.1.



Initials Philips:

Initials Company:

## 2. BlueBox Hardware and Software Delivery, Installation requirements

### 2.1 BlueBox Delivery

Subject to the terms and conditions of this Agreement, Philips hereby agrees to make available to Company the BlueBox (including the BlueBox Server Software), and shall deliver to Company a CD-Rom containing the BlueBox Client Software. The BlueBox is not sold, and ownership thereof remains with Philips at all times in accordance with Clause 7 hereof. Company is allowed to access the BlueBox solely through its network connection as described in Exhibit A. The BlueBox shall be shipped to Company at such time as mutually agreed between Philips and Company. Company may install the BlueBox Client Software on an unlimited number of workstations at its premises, subject to Company accepting the end-user license agreement accompanying the BlueBox Client Software for each workstation.

### 2.2 Installation requirements

In order for the BlueBox to function, it must be connected to a broadband internet connection in such a way that is has a direct link to the WOWvx web server at any time the BlueBox is in operation. The connectivity requirements of the BlueBox are as specified in Exhibit A. Company shall ensure that these connectivity requirements are met. This connection to the WOWvx web server shall be used for customer registration, account management, maintenance and monitoring purposes (including monitoring of usage for billing purposes). No video content shall be transmitted to the WOWvx web server via the internet connection.

## 3. Access to the BlueBox

### 3.1 Limited Right

Subject to Company's continuing compliance with the terms and conditions of this Agreement, Philips hereby grants to Company, and Company accepts from Philips, a fee-bearing, non-exclusive, non-transferable, non-assignable, limited license, without the right to sublicense, to access and use the BlueBox and the BlueBox Server Software, but only by means of the BlueBox Client Software installed on one or more of Company's computers, for the limited purpose of utilising the BlueBox Functionalities specified in Exhibit B.

### 3.2 Availability of BlueBox Functionalities

The list of BlueBox Functionalities available to Company as specified in Exhibit B may be altered by Philips from time to time by giving notice to Company, provided that, in the event Philips removes a BlueBox Functionality from the list of available BlueBox Functionalities, Philips shall provide Company with 90 days of prior notification thereof.

### 3.3 Need for Content Licenses

The license granted herein provides no rights with respect to any musical compositions, sound recordings, video recordings, game contents or other audio and/or video materials ("Content") that may be reproduced, converted, encoded, distributed, transmitted, performed, or otherwise used in connection with the BlueBox or the BlueBox Client Software. Company alone is responsible for ensuring that any Content is properly used in accordance with applicable laws and the rights of any third party with respect to such Content. Should Philips notice that the BlueBox and/or the BlueBox client Software is used by Company to infringe IPR's relating to Content, Philips may terminate this Agreement with immediate effect according to section 9.2.

### 3.4 Patent license

The license granted in section 3.1 includes a license under any patent that is owned or controlled by Philips or its Affiliates provided that (i) Philips or its Affiliate, as the case may be, has a right to grant such license without requiring the consent of or being obligated to pay any financial compensation to any third party (ii) such license excludes any combination, integration or implementation of the BlueBox, the BlueBox Client software or any Content created using the BlueBox with or in any product, service or technology, if the license required for such combination, integration or implementation would not be required but for such combination, integration or implementation; and (iii) such license excludes any

Initials Philips

Initials Company.

license that is available in or as part of a licensing program, including without limitation any licensing program in relation to any standard other than a standard standardizing the 2D+depth format (a standard being any proprietary or open technical specification promulgated for the purpose of widespread adoption) conducted by or on behalf of Koninklijke Philips Electronics N.V., where, with respect to licensing programs that do not relate to a standard, such exclusion is subject to notification of Koninklijke Philips Electronics N.V. to Company.

## 4    Restrictions

### 4.1    Restrictions

Except as expressly permitted under this Agreement or by mandatory applicable law in spite of this provision, and notwithstanding any restrictions applicable to the BlueBox Client Software, Company agrees not to, and agrees not to permit any third party to;

(a) open, disassemble, reverse engineer, or otherwise gain access to the hardware or software contained in the BlueBox;

(b) gain access to the BlueBox Functionalities other than through the BlueBox Client Software;

(c) use the BlueBox Functionalities for any other purpose other than the purposes outlined herein;

(d) copy, reproduce or distribute the BlueBox (including any software contained therein) and/or any Documentation;

(e) assign, sublicense, lease, rent, loan, transfer, disclose, or otherwise make available the BlueBox or any Documentation;

(f) modify, adapt, alter, translate, or create modifications from any portion of the BlueBox or create derivative works from any portion of the Documentation;

(g) reverse assemble, decompile, disassemble or otherwise attempt to derive source code or the algorithmic nature of the BlueBox Server Software;

(h) remove or circumvent the protection of the BlueBox or the BlueBox Server Software.

### 4.2    No other rights or licenses

Other than the limited license granted to Company under section 3.0 herein, no other rights or licenses are granted, or implied by estoppel or otherwise, under any Intellectual Property Rights of Philips and/or its Affiliates or any intellectual property residing in the BlueBox, the Documentation or any other Confidential Information furnished by Philips.

### 4.3    Exclusions

Notwithstanding anything to the contrary herein, this Agreement shall not be construed or interpreted as imposing on Philips and/or its Affiliates or any of its or their third party suppliers any obligation to furnish any manufacturing or technical information except as expressly required under this Agreement.

### 4.4    Open Source License Terms

The license granted hereunder does not include any right, license, power or authority to subject the BlueBox Software or any other software made available to Company to Open Source License Terms. Company shall not perform any actions with regard to the BlueBox Software or any other software made available to Company in a manner that would require the such software or any derivative work thereof to be licensed under Open License Terms. These actions include but are not limited to:

(i) combining such software or a derivative work thereof with Open Source Software, by means of incorporation or linking or otherwise; or

(ii) using Open Source Software to create a derivative work of such software.

Company shall indemnify Philips, its Affiliates and its third party suppliers against and hold Philips and its Affiliates harmless from any damage or costs arising from or in connection with any violation or breach of the provisions of this clause and Company shall reimburse all costs and expenses incurred by Philips, its Affiliates and its third party suppliers in defending any claim, demand, suit or proceeding arising from or in connection with such violation or breach.

Initials Philips:

Initials Company:

5. **Company's Other Obligations**

Company shall: (i) maintain high standards of professionalism and (ii) refrain from any conduct that may damage the reputation of Philips and its products or services.

6. **Delivery and Support**

6.1 Delivery

Upon Philips' receipt of the delivery and set-up fee as provided under clause 8, Philips will deliver the BlueBox and the BlueBox Client Software to Company in accordance with Incoterms DDU Company's premises.

6.2 Maintenance and Support

Subject to Company's full and timely payment of all fees in connection therewith, maintenance and support will be provided to Company under as specified in Exhibit D, it being acknowledged that Philips will only provide support for the most current version of the BlueBox Software as may be released by Philips from time to time.

7. **Ownership Rights**

7.1 Exclusive ownership

It is acknowledged and agreed by Company that Philips owns or has acquired all rights, title and interest in the BlueBox, the BlueBox Software, the Documentation and other Philips' Confidential Information and all modifications and derivative works of each of the foregoing, and all intellectual property rights therein. The BlueBox is provided on a loan basis only and shall, notwithstanding the fact that it will be connected to Company's computer network, remain the property of Philips at all times.

7.2 Notices

Company shall not remove or alter, and shall reproduce on copies of the BlueBox Server Software, Documentation and Confidential Information, without any amendments or changes thereto, any Philips' and its Affiliates copyright notices, proprietary information notices or confidentiality, restricted or proprietary rights notices, legends or marking contained in any of the BlueBox Server Software Tools, Documentation, and Confidential Information. Company shall affix to any media containing a copy or all or any portion of thereof all copyright notices, proprietary information notices and confidentiality and/or restricted rights notices as were affixed to the original media.

7.3 Right to use feedback

Philips and its Affiliates shall have the right to use any feedback provided by Company to Philips relating to the BlueBox Software and its related Documentation.

7.4 Ownership of content

Ownership of the content that is processed by the BlueBox Server Software Tools shall never transfer to Philips. Philips shall under no circumstance gain access to such content, nor shall Philips transfer any of such content via the Internet to Philips or any other third party. If the BlueBox needs to be sent back to Philips due to a service call or technical malfunction, any content stored locally on the BlueBox at that time will only be used for error investigation and bug analysis purposes. After assessment of the BlueBox failure, trained Philips support personnel will immediately thereafter delete all content locally stored on the BlueBox. .

8. **Fees**

8.1 Delivery and set-up fee.

In consideration of the delivery of the BlueBox by Philips, as well as of the license rights granted herein, Company shall pay Philips a non-refundable, non-recoupable one-time delivery and set-up fee as set forth in Appendix C. This one time delivery and set-up fee is due upon the execution of this Agreement.

Initials Philips:

Initials Company:

8.2   Per-Frame Conversion Fees

In consideration for the license rights granted pursuant to this Agreement and the loan of the Hardware, Company shall pay to Philips usage-based conversion fees ("Per-Frame Conversion Fees"). Per-Frame Conversion Fees accrue every time a video frame is processed by the BlueBox. Philips invoices the accrued amount of Per-Frame Conversion Fees on a monthly basis. The monthly Per-Frame Conversion Fees depend (a) on the BlueBox features during processing of the video frames and (b) on the accrued amount of video frame conversions processed by the BlueBox. The BlueBox Per-Frame Conversion Fees are specified in detail in Exhibit C. The accrued Per-Frame Conversion Fees shall be calculated separately and cumulatively for each different BlueBox Functionality used. After the end of each calendar month, Philips shall send to Company an invoice specifying the total fees due, which invoice shall be paid by Company to Philips ultimately within 30 (thirty) days after the date of invoice unless otherwise agreed between the Parties in writing.

Philips retains the right to update the fees specified in Exhibit C as may be necessary to reflect added BlueBox Functionalities or new versions of existing BlueBox Functionalities. In the event of price increases, these shall be applicable three months after the date of notification thereof to Company. Price decreases shall be applicable from the moment of notification to Company.

The Parties hereby explicitly agree that Philips may collect, use and record information about Company's usage of the BlueBox and the BlueBox Software through the connection with the WOWvx web server via the internet. Philips collects and analyses this information in order to generate the monthly invoice. Such usage data will be made anonymous and will be stored on a web server for a period of 12 months, treated in strict confidence and will not be published or provided to third parties in a manner that can identify customer

8.3   Other payments

Company shall pay any other amounts due to Philips hereunder to Philips ultimately within 30 (thirty) days after the date of invoice unless otherwise agreed between the Parties in writing.

8.4   Prices, bank account and no offset, withholding or reduction

All amounts are in EURO. Company shall pay all amounts due hereunder by wire transfer into the bank account designated by Philips in writing. Company shall not offset, withhold or reduce any payment(s) due to Philips.

8.5   Interest on late payments

As from the date any amount is due hereunder until payment thereof has been received by Philips in full, Company shall owe Philips an interest at the rate of 1.5 (one and a half percent) per month or the maximum rate permitted by applicable law, whichever is lower.

8.6   Costs, charges, taxes, duties, import and export fees

All costs, charges, taxes, duties, import and export fees, which are imposed by any bank, governmental entity or authority on (payment of) the amounts due hereunder, or which otherwise arise out of or are imposed on this Agreement, shall be borne by Company. Company shall not withhold any such costs, charges, taxes, duties or fees from payments. If any such governmental authority, however, imposes income taxes on any amounts paid by Company to Philips hereunder and requires Company to withhold such taxes, duties or fees from such payments, Company may deduct such taxes, duties and fees from such payments provided such taxes, duties and fees are paid to the appropriate authorities. In such event, Company shall promptly furnish Philips with tax receipts issued by appropriate tax authorities so as to enable Philips to support a claim for credit against income taxes which may be payable by Philips and/or its Affiliates in the Netherlands as well as to enable Philips to document, if necessary, its compliance with tax obligations in any jurisdiction outside the Netherlands. In case, it is impossible for Philips to achieve a claim for credit or refund of the taxes paid or withhold, Philips is entitled to ask for compensation by the other contracting Party.



Initials Philips:

Page 6 of 19

Initials Company: 

## 9. Term and Termination.

### 9.1 Term

This Agreement shall commence on the Effective Date and, unless and until terminated in accordance with the provisions of Section 9.1, 9.2 or 9.3, shall continue in force for a period of one (1) year from the Effective Date. Thereafter, this Agreement will automatically renew for additional periods of one year each, unless earlier terminated, upon thirty (30) days prior written notice by the terminating Party to the other Party.

### 9.2 Termination by Philips.

Without prejudice to any other rights or remedies Philips' has or may have hereunder and under the applicable law, Philips is entitled to terminate this Agreement with immediate effect by written notice to Company, if:

(a) Company fails to make any payment under this Agreement to Philips when due; or

(b) Company breaches or fails to perform any of the terms or conditions of this Agreement and:

    i. such breach or failure is not capable of remedy, or

    ii. such breach or failure, if capable of remedy, is not remedied within 30 (thirty) days after written notice from Philips requiring such breach or failure to be remedied; or

    iii. Company has otherwise come in default;

    unless such breach or failure, having regard to its nature or minor importance, does not justify this termination with its consequences; or

(c) a voluntary or involuntary petition in bankruptcy or winding up is filed against Company, any proceedings in insolvency or bankruptcy (including reorganization) are instituted against Company, a trustee or receiver is appointed over Company, or any assignment is made for the benefit of creditors of Company.

(d) Company use of the BlueBox does not reach the minimum usage amounts as specified in Exhibit C as calculated over the preceding calendar quarter.

(e) Philips notices that the BlueBox and/or the BlueBox client Software is used by Company to infringe IPR's relating to Content.

### 9.3 Termination by Company.

Without prejudice to any rights or remedies of Company, Company may, by written notice to Philips, terminate with immediate effect this Agreement, without any liability whatsoever, if:

(a) Philips breaches or fails to perform any of the terms or conditions of this Agreement and:

    i. such breach or failure is not capable of remedy; or

    ii. such breach or failure, if capable of remedy, is not remedied within 30 (thirty) days after written notice from Company requiring such breach or failure to be remedied; or

    iii. Philips has otherwise come in default;

    unless such breach or failure, having regard to its nature or minor importance, does not justify this termination with its consequences; or

(b) a voluntary or involuntary petition in bankruptcy or winding up is filed against Philips, any proceedings in insolvency or bankruptcy (including reorganization) are instituted against Philips, a trustee or receiver is appointed over Philips, or any assignment is made for the benefit of creditors of Philips.

### 9.4 Consequences of termination or expiration

Upon termination or expiration of this Agreement, all licenses granted to Company under this Agreement shall immediately end, as well as all licenses to the BlueBox Client Software. All payments to be made by Company under the Agreement shall become immediately due and payable.

Company shall immediately return to Philips the BlueBox, the Documentation and other Confidential Information, including any and all copies and derivative works thereof, and remove from its work-stations any copy of the BlueBox Client Software.

### 9.5 No compensation

Company shall not be entitled vis-à-vis Philips to any compensation based on the expiration or termination of this Agreement.

9.6    Survival

Any expiration or termination of this Agreement for whatsoever reason shall not prejudice the provisions which by their nature must be deemed to survive such expiration or termination, including but not limited to the provisions of sections 1.0 ('Definitions'), 4.0 ('Restrictions'), 7.0 ('Ownership Rights'), 8.0 ('Fees'), 9.0 ('Term and Termination'), 10.0 ('Confidentiality'), 11.0 ('Representations and Warranties'), 12.0 ('Indemnification'), 13.0 ('Limitation of Liability') and 14.0 ('Miscellaneous').

10.    **Confidentiality.**

Each Party agrees not to use any Confidential Information of the other Party for any purpose except to perform its obligations or exercise its rights under this Agreement. Each Party agrees not to disclose any Confidential Information of the other Party to third parties or to such party's employees, except to those employees or consultants of the receiving Party who are required to have the information with a need to know. Each Party agrees that it will take reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information of the other Party. Without limiting the foregoing, each Party will take at least those measures that it takes to protect its own most highly confidential information and will ensure that its employees and independent contractors who have access to Confidential Information of the other Party have signed a non-use and non-disclosure agreement in content similar to the provisions hereof. Each Party will reproduce the other Party's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original. Nothing in this Section 10.0 precludes either Party from disclosing the other Party's Confidential Information if required by law or legal process. Before making any disclosure as compelled by a court order, the Party being required to make the disclosure will immediately notify the other Party of the compelled disclosure and, wherever possible, give the other Party an opportunity to object to the disclosure and/or to seek and take reasonable protective (legal) measures and remedies to preserve confidentiality.

For the purpose of this Agreement, "Confidential Information" shall mean information not generally known to the public, whether of a technical, business or other nature that relates to this Agreement, which is marked or designated "confidential" or "proprietary" or other words of equal import, at the time of initial disclosure, or which, in good faith by its nature and the surrounding circumstances, ought to be treated as "confidential" and/or "proprietary". Confidential Information may be disclosed in written or other tangible form (including information in computer software or held in electronic storage media) or by oral, visual or other means. Confidential Information will not include any information which:

(a) was publicly known and made generally available in the public domain prior to the time of disclosure by the disclosing Party;

(b) becomes publicly known and made generally available after disclosure by the disclosing Party to the receiving Party through no action or inaction of the receiving Party;

(c) is already in the possession of the receiving Party at the time of disclosure by the disclosing Party as shown by the receiving Party's files and records immediately prior to the time of disclosure;

(d) is obtained by the receiving Party from a third party without a breach of such third party's obligations of confidentiality; or

(e) is independently developed by the receiving Party without use of or reference to the disclosing Party's Confidential Information, as shown by documents and other competent evidence in the receiving Party's possession.

Confidential Information may include third party's confidential information. The BlueBox Server Software Tools, Documentation and any other information provided by Philips or any of its Affiliates to Company under this Agreement is hereby designated as Confidential Information of Philips.

11.    **Representations and Warranties.**

11.1    General



Each Party hereby represents and warrants that it has full power and authority to enter into and perform this Agreement, and that the person signing this Agreement on such Party's behalf has been duly authorized and empowered to enter into this Agreement.

11.2  Delivery and acceptance 'as is'
Except as expressly set forth under clauses 11.3 through 11.5, the BlueBox and the BlueBox Software and related Documentation are provided to, and is accepted by, Company AS IS WITHOUT WARRANTY OF ANY KIND.

11.3  Rights, power and authority to license
Philips hereby warrants to Company that Philips owns or has acquired all necessary rights, power and authority to grant the rights hereunder to Company under Clause 3 ('Access to the BlueBox'). This clause 11.3 will not be construed as a representation or warranty of non-infringement. Company's sole and exclusive remedy for breach of the warranty set forth in this clause 11.3 is as set forth in Section 12.0.

11.4  Conformity to Specifications
Philips hereby warrants to Company that for a period of 90 days after installation of the BlueBox at Company's premises, or 90 days after any new BlueBox Functionality has become available to Company, as the case may be, the BlueBox will substantially conform to the Specifications for the BlueBox set forth in the Documentation, and upon delivery to Company, the BlueBox Server Software will be free of any virus, hidden program or intentionally harmful destructive or disabling mechanism or device. Company's sole and exclusive remedy for breach of the warranty set forth in this clause 11.4 is as set forth in clause 11.5 below.

11.5  Defects
Philips hereby warrants to Company that for a period of 90 days after installation of the BlueBox at Company's premises, or 90 days after any new BlueBox Functionality has become available to Company, it shall make commercially reasonable efforts to correct, or provide a workaround for, any Defect which, (a) is reported to Philips by Company (b) is reproducible, and (c) for which Company provides all necessary documentation, information and assistance. If Philips determines that correcting or providing a workaround for a Defect is not practicable notwithstanding its commercially reasonable efforts, Philips will refund to Company the amounts received by Philips hereunder for the use of the defective BlueBox Functionality over the period that the BlueBox or such BlueBox Functionality has not been functioning substantially in accordance with its specifications. As used herein, a "Defect" means an operation problem solely within the affected BlueBox Functionality as delivered by Philips to Company that prevents it from functioning substantially in accordance with the specifications for such BlueBox Functionality as set forth in the Documentation. The term Defect does not apply to, and excludes: (i) any modifications made to the BlueBox; or (ii) any problems or effects created by any modifications to the BlueBox or combination of the BlueBox with other products.

11.6  Hardware Warranty
The BlueBox shall remain property of Philips. Philips warrants to Customer that, for the term of this Agreement, (a) the Hardware will be free of defects in materials and workmanship under proper use in line with the specifications, and (b) such Hardware will conform in all material respects with its specifications included in the Documentation. Philips does not warrant that Customer's use of the BlueBox will be uninterrupted or error free. Customer's sole and exclusive remedy and the entire liability of Philips under this Section 11.6 will be that Philips shall use commercially reasonable efforts to, at its option, 1) to provide a replacement BlueBox for the non-conforming BlueBox (or replacement parts for the non-conforming parts of the BlueBox, as the case may be) or 2) to repair any non-conforming (portion of the) BlueBox, whether by correcting or modifying (parts of) the BlueBox or identifying workarounds for such non-conformities, at no additional charge.

11.7  Disclaimer
EXCEPT FOR THE LIMITED WARRANTIES SET FORTH ABOVE UNDER CLAUSES 11.3 THROUGH 11.6 ABOVE, PHILIPS AND ITS AFFILIATES EXPRESSLY DISCLAIM ALL REPRESENTATIONS AND



WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT.

11.8 No representations or warranties by Company

Company, its Affiliates and their Customers shall not make or publish any representations, warranties, or guarantees on behalf of Philips and/or its Affiliates concerning, directly or indirectly, the BlueBox or BlueBox Server Software without Philips' specific prior written approval.

11.9 Special warranty by Company

Company represents and warrants a.) that it will only access the BlueBox by using the BlueBox Client Software, and b.) that it will use the BlueBox and the BlueBox Functionalities only for lawful purposes and in accordance with this Agreement, and that it will not use the BlueBox or the BlueBox Functionalities to violate any law, regulation or ordinance or any right of Philips or its licensors or any third party, including without limitation, any right of privacy, publicity, copyright, trademark, or patent.

## 12. Indemnification.

12.1 Indemnification for Philips

Company shall indemnify, defend and hold harmless Philips and its Affiliates from and against any claims, suits, losses, damages, liabilities, costs, and expenses (including reasonable attorneys' fees) brought by third parties resulting from or relating to any breach by Company of its representations, warranties, obligations, duties, or responsibilities under this Agreement.

12.2 Indemnification for Company.

Philips, at its sole expense, shall defend any legal proceeding brought by a third party against Company to the extent that the proceeding includes a claim that the BlueBox Server Software directly infringes the claimant's copy rights or trade secrets and hold Company harmless against damages and costs awarded by final judgment in such proceeding and effectively incurred by Company to the extent directly and solely attributable to such infringement.

12.3 No indemnification for Company

Philips shall have no obligation or liability to Company under clause 12.2:

(a)   if Philips is not promptly: (i) notified in writing of any such claim; (ii) given the sole right and authority to control and direct the investigation, preparation, defence and settlement of such claim, including but not limited to the selection of counsel; and (iii) given full reasonable assistance and cooperation by Company in such defense and settlement; or

(b)   if the claim is not made within the term for claims specified in clause 13.3 of this Agreement and/or after the termination or expiration date of this Agreement; or

(c)   for unauthorized use or distribution of the BlueBox or the BlueBox Server Software or use beyond the Authorised Purpose; or

(d)   for infringement of any third party's Intellectual Property Rights with respect to which Philips has informed Company that a separate license has to be obtained.

12.4 Right of Philips

If the BlueBox Software is, or in Philips' opinion is likely to become, the subject of a claim of infringement as referred to under clause 12.2 above, Philips shall have the right, without obligation and at its sole discretion, to: (i) procure for Company the right to continue to use the BlueBox Software; (ii) replace or modify the BlueBox Software in such a way as to make the modified BlueBox Software non-infringing; or (iii) terminate this Agreement, provided that in the event of such termination, Philips shall refund the amounts received by Philips hereunder during the period in which Company has not been able to use the BlueBox but has nevertheless paid to Philips any amounts for the use thereof.

12.5 Entire liability

Initials Philips:

Initials Company:

Subject to the limitations set forth in Section 13.0 below, the foregoing states Philips' and its Affiliates' entire liability and obligation to Company and its customers and Company's sole remedy with respect to any actual or alleged infringement of any Intellectual Property Rights of any kind.

## 13. Limitation of Liability.

### 13.1 EXCLUSION

COMPANY ACKNOWLEDGES AND AGREES THAT NEITHER PHILIPS NOR ITS AFFILIATES SHALL BE LIABLE FOR ANY TYPE OF INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES OR LOSS, HOWSOEVER CAUSED OR ARISING, ON ANY THEORY OF LIABILITY, INCLUDING BUT NOT LIMITED TO ANY RECALL COSTS, LOST PROFITS, LOST INCOME AND/OR REVENUE, LOSS OF OPPORTUNITY, LOST PRODUCTION, LOSS OF - OR DAMAGE TO - GOODWILL AND REPUTATION, LOST SHELF-SPACE, LOST DATA, LOST INTEREST AND LOST SAVINGS. THIS LIMITATION SHALL APPLY EVEN IF PHILIPS HAS BEEN ADVISED, OR IS AWARE, OF THE POSSIBILITY OF SUCH DAMAGES OR LOSS.

### 13.2 LIMITATION

THE AGGREGATE LIABILITY OF PHILIPS AND ITS AFFILIATES SHALL IN NO EVENT EXCEED THE AMOUNT ACTUALLY RECEIVED BY PHILIPS IN CONVERION FEES UNDER THIS AGREEMENT IN THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO ANY SUCH LIABILITY. COMPANY ACKNOWLEDGES THAT THE AMOUNTS TO BE PAID BY COMPANY HEREUNDER REFLECT THIS ALLOCATION OF RISK.

### 13.3 TERM FOR CLAIMS

ANY CLAIM FOR DAMAGES AGAINST PHILIPS MUST BE BROUGHT BY COMPANY WITHIN 90 (NINETY) DAYS OF THE DATE OF THE EVENT GIVING RISE TO ANY SUCH CLAIM, AND ANY LAWSUIT RELATIVE TO ANY SUCH CLAIM MUST BE FILED WITHIN 1 (ONE) YEAR OF THE DATE OF THE CLAIM.

## 14. Miscellaneous.

### 14.1 Assignment

Company shall not assign its rights or obligations under this Agreement without the prior written consent of Philips, which consent shall not be unreasonably withheld by Philips. Any purported assignment without such consent shall be void and have no force or effect. Subject to the foregoing, this Agreement shall bind and inure to the benefit of the respective Parties hereto and their successors and assigns. Without limiting the generality of the foregoing, a Change of Control over Company shall be deemed an assignment of the Agreement by Company for the purpose of this clause 14.1. In the event of any assignment or attempted assignment by Company without the prior written consent of Philips, Philips may terminate this Agreement by written notice to Company with immediate effect and the BlueBox, including BlueBox Server Software, all Documentation, Confidential Information and related materials shall be returned to Philips within 10 (ten) days after such notification.

### 14.2 Relationship

The Parties hereto are independent contractors with neither Party having authority to act as an agent or legal representative of the other to create any obligation, express or implied, on behalf of the other. No principal/agent, joint venture or partnership relationship is created between them by this Agreement.

### 14.3 Compliance with laws

Each Party shall comply with all applicable laws, including, but not limited to export or import controls or restrictions of other applicable jurisdictions in its use of the BlueBox under this Agreement. .

### 14.4 Injunctive relief

Company acknowledges that a breach of its obligations under this Agreement may cause irreparable damage for which recovery of money damages would be inadequate, and that, in addition to any and all



Initials Philips:                                   Page 11 of 19                                   Initials Company:

remedies available at law. Philips shall be entitled to seek injunctive relief to protect its rights and interest under this Agreement.

14.5 **No trademark license**
Company hereby acknowledges and agrees that this Agreement does not confer any rights whatsoever to Company to use the trade or brand name, corporate name, trademarks and logos – or any other name or mark, or contraction abbreviation or simulation thereof – of Philips or its Affiliates, for any reason.

14.6 **Use of Company's name**
Company hereby acknowledges and agrees that during the Term of this Agreement, Philips shall be entitled, (i) to use Company's name and Company's logo(s), and (ii) disclose that Company is a Philips' customer, in Philips' press releases, advertising, promotion and other public disclosures in connection with Philips' products and services, provided, however, that - without Company's express prior written permission to that effect - such use and/or disclosure shall not indicate that Company in any way endorses any Philips' products or services.

14.7 **No waiver**
The failure on the part of either Party to exercise, or any delay in exercising, any right or remedy arising from this Agreement shall not operate as a waiver thereof; nor shall any single or partial exercise of any right or remedy arising there from preclude any other or future exercise thereof or the exercise of any other right or remedy arising from this Agreement or by law.

14.8 **Headings**
The headings and captions to sections, clauses, sub clauses and Appendices of this Agreement are for reference only and shall not affect the construction or interpretation of this Agreement.

14.9 **Governing law**
This Agreement shall be governed by and construed in accordance with the laws of the Netherlands, without regard to provisions concerning conflicts of law. The United Nations Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

14.10 **Dispute resolution**
Any dispute or controversy arising between the Parties out of or in connection with this Agreement, whether during or after its term, shall be finally resolved by the court in Amsterdam, the Netherlands, except that Philips, in its sole discretion, may also elect to bring legal action regarding any dispute or controversy relating to Company's non, or late, payment of any amounts payable to Philips hereunder or enforcement of any of its IPR, before the competent courts in the country in which Company is registered, to whose jurisdiction in these matters Company hereby submits and consents to, for the exclusive benefit of Philips.

14.11 **Communications**
All notices or communications to be given under this Agreement shall be in writing and shall be deemed to be validly given by delivery thereof to its recipient, if (i) delivered upon hand delivery; or (ii) by deposit in the mail of the home country of the Party, postage prepaid, by certified, registered or first class mail or equivalent; or (iii) by nationally recognized overnight courier service (e.g. FedEx, UPS, DHL) prepaid, all of which are addressed to the Parties at their address first written above or such other address that a Party may notify the other Party from time to time, in accordance with this clause [14.11]. Any written notice is deemed to have been received, if sent by hand delivery, certified or registered, first class (or equivalent) mail or prepaid overnight courier, at the time of its delivery.

14.12 **Publicity**
Neither Party shall publicize or disclose the actual terms of this Agreement to any third Party, other than on a confidential basis to its legal and financial advisors, without the prior written consent of the other, except as otherwise may be required by law.

### 14.13  Severability

In the event that any provision(s) of this Agreement shall be, or shall be held, void or unenforceable by a court of competent jurisdiction or by any future legislative or administrative action, the other provisions shall remain in full force and effect and enforceable. In such event the Parties hereto shall forthwith discuss and reasonably agree on a new provision replacing such void or unenforceable provision which gets as close as possible in terms of economic and legal effect to the void or unenforceable provision.

### 14.14  Execution

This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

### 14.15  Amendments

The terms and conditions of this Agreement may not be modified or amended except by written agreement which states that it is such a modification or amendment hereof, and is signed by an authorized representative of each Party hereto.

### 14.16  Entire understanding

This Agreement, including its Appendices and the documents referred to herein, constitutes the entire agreement between the Parties with respect to such subject matter. The Parties hereby agree that the provisions of sections 1.0 through 14.0 of this Agreement shall prevail over any conflicting provisions of the Appendices.

IN WITNESS WHEREOF, the Parties have executed this Agreement by their duly authorized officers as of the Effective Date.

3D FUSION CORP.
_____
[INSERT NAME Company]

(signature)                                             (signature)

Name:  STEPHEN BLUMENTHAL          Name:
Title:    PRESIDENT                            Title:


Philips ELECTRONICS NEDERLAND B.V.
3D SOLUTIONS

(signature)                                             (signature)

Name: Jos Swillens                          Name:
Title: CEO 3D SOLUTIONS                       Title :

Initials Philips:                    Page 13 of 19                    Initials Company:

# Exhibit A
## Specification of the Blue Box

**The BlueBox consists of the following:**
The BlueBox is a combination of hardware and software, consisting of the following components:

Hardware components:
* customized hardware cabinet in 19-inch technology
* uninterruptible power supply unit (UPS) for controlled shut-down procedures
* network switch
* computer

Software Components:
* BlueBox Server Software

The BlueBox, together with the BlueBox Client Software, supports the BlueBox Functionalities listed in Exhibit B.

**Functional Requirements:**
The BlueBox is operated in an indoor office environment.

The BlueBox is connected to the network (LAN) of the customer. The customer accesses the BlueBox via the BlueBox software tools installed on the customers own client workstations. The BlueBox requires a permanent Internet connection in order to be operational. For operation of the BlueBox, the customer starts the software tools on the client workstation and uses the graphical user interface of the BlueBox Client Software. Any operation with the BlueBox is always done via this software, which communicates with the BlueBox. The user cannot directly log in to the BlueBox.

The BlueBox Client Software operates on Microsoft Windows XP SP2 or Microsoft Vista based workstations. Other operating systems are not supported. The minimum requirements for the workstation are: WOWvx compatible graphics card (for 3D preview), 1GB of memory, 100GB of disk space (plus sufficient space for the content and temporary files), LAN connection to the BlueBox and the internet.

**Connectivity Requirements:**

Proper operation of the BlueBox requires the following connectivity requirements:
* Internal network (LAN) with minimum 100MBit/s and DHCP server
* Broadband Internet access
* Default access to Internet via https (with or without proxy server); BlueBox must be able to access HTTP servers on the Internet

**BlueBox Configurator:**

*Description:*
* BlueBox software configuration tool for administrating all BlueBoxes in the customer's local network (LAN).
* Pure administration tool, not used for 3D content conversion

*Functionalities:*
* Selecting an available BlueBox in the network at start-up time.
* Providing status information about the BlueBox such as network information, BlueBox version information, actual connection status information, and BlueBox name
* Administrating the available BlueBoxes
* Checking for updates of the BlueBox software via the WOWvx web server on the Internet. Customer can choose and install available update.

*Intended purpose:*

- Administration interface on client workstation
- Selecting dedicated BlueBox on the network
- Updating the BlueBox
- Checking status information of the BlueBox
- Setting of the proxy server to use (if any).



# Exhibit B
## Specification of the available BlueBox Functionality

This Exhibit B lists the BlueBox Functionalities available to Company. Philips may update this Exhibit B from time to time in accordance with Clause 3 of the Agreement.

**WOWvx Spacer**

*Description:*
- WOWvx Spacer enables offline conversion of 2D and/or Stereo video input content into 2D-plus-Depth output. When starting a new work project, the user can choose between stereo and non-stereo input formats. The WOWvx Spacer client front-end runs on the client's workstation with a graphical user interface and the WOWvx Spacer client software communicates with the BlueBox server for processing of the 2D-plus-Depth results.

1. Mode 1: WOWvx Spacer processes 2D input video source files into 2D-plus-Depth output in a semi-automated workflow
   WOWvx Spacer enables semi-automatic conversion of existing 2D video source content into 2D-plus-Depth compliant 3D video format. Conversion of 2D content is based on manually adding depth with a standard image editor to objects or areas in key frames, along with subsequent automatic processing of depth information in all other frames. Typically this workflow is repeated for each shot of the source video sequence.
2. Mode 2: WOWvx Spacer processes stereo-based video source files into 2D-plus-Depth output in a semi-automated workflow
   - Processes Depth from Stereo
   - Reads stereo files in left/right side by side format
   - Reads stereo from two separate files
   - Allows parameterization (disparity to depth mapping) of shot and/or whole video
   - Allows manual improvement of depth computed from stereo per shot by improving depth maps through Mode 1.
   - Stereo matching algorithm implemented on BlueBox

*Functionalities:*
- Selecting an available active BlueBox in the local network at start-up time.
- Semi-automatic offline conversion of input 2D videos into 2D-plus-Depth 3D format
- Semi-automatic offline conversion of input Stereo videos into 2D-plus-Depth 3D format
- Automatic software update of the WOWvx Spacer via the WOWvx web server on the Internet

*Intended purpose:*
- Generating WOWvx 2D-plus-Depth videos from 2D or Stereo source video content. The resulting WOWvx 2D-plus-Depth video file can be shown on a WOWvx 3D display.

*Current version:*
- WOWvx Spacer 2.4

Initials Philips

Initials Company:

## Exhibit B
## Specification of the available BlueBox Functionalities

**WOWvx Compositor**

*Description*

- The WOWvx Compositor is a tool enabling depth compositing of various video input sources, assisting the user in the generation of 3D videos in WOWvx 2D-plus-Depth format. It comes with an easy-to-use graphical user interface. WOWvx Compositor is complementary to existing video-editing software as it allows the composition of a diversity of video input files in separated depth layers. WOWvx Compositor can handle video input sources of different nature, e.g. 2D data without any depth information, 3D animated computer graphics input videos or existing 2D-plus-Deopth videos. Each input video file is added as a separate layer into WOWvx Compositor. WOWvx Compositor allows placing each layer into a different depth value. WOWvx Compositor combines all layers into a 3D video composition and generates WOWvx 2D-plus-Depth format, which can be shown on WOWvx 3D displays.

*Functionalities:*

- Selecting an available active BlueBox in the local network at start-up time.
- Adding video input files (2D or stereo input files, WOWvx 2D-plus-Depth video files) as separate depth layers
- Depth compositing per layer with depth adjustment per layer
- Link to WOWvx Spacer, i.e. possibility of adding depth to 2D content by WOWvx Spacer process them with WOWvx Spacer and immediately make the result available in a Compositor project
- Selecting existing audio channels per layer
- Automatic generation of Declipse output
- Generating 3D output video file in WOWvx 2D-plus-Depth format

*Intended purpose:*

- Multi-layer depth compositing of multiple video input files of different nature (2D or stereo input files, WOWvx 2D-plus-Depth video files). Generating WOWvx 2D-plus-Depth video file including Declipse generation from multiple video input source files with dedicated depth values for each layer per video input file. The resulting WOWvx 2D-plus-Depth video file can be shown on a WOWvx 3D display.

*Current version:*

- WOWvx Compositor 2.4

## Exhibit C
## Fees

A.) **Delivery and Set-up Fee:**

The initial delivery and set-up fee of € 12,000 will not be charged as it has already been paid by 3D Fusion in the previous rental period of the BlueBox.

B.) **Minimum monthly Fee:**

- Monthly fee will be based on usage and conversion rate as defined above. However a minimum fee of €2,500 will be charged on a monthly basis.
- This minimum monthly fee covers BlueBox conversion usage up to 10,000 CU (Conversion Units) in each month.
- Any additional CUs exceeding the threshold of 10,000 CU in the respective month are charged based on the conversion rate as defined in D.).
- The monthly recurring 10,000 CU credit cannot be accumulated over multiple months and expires by the end of each month.

C.) **Per-Frame Conversion Fees.**

There is a usage fee every time a video frame is processed or re-processed by the BlueBox, per functionality

The following fees apply:

- Usage tickers count each time a frame is processed by the BlueBox. BlueBox pricing takes into account that individual frames are typically processed multiple times (3x-5x). The term CU means "Conversion Units"

  | | |
  |---|---|
  | • Compositing | 0 CU per frame processed (free usage) |
  | • Single-pass 2D to 3D | 1 CU per frame processed |
  | • Two-pass 2D to 3D | 2 CU per frame processed (high quality spacing option) |
  | • Stereo to 3D | 3 CU per frame processed |

- Conversion Units consumed within current month are invoiced at beginning of next month
  - Invoice amount: Number of consumed Conversion Units multiplied by current monthly Conversion Rate
  - New month starts on the first day of the month at 0:00 UTC
  - Conversion rate as function of usage is in the attached table

D.) **Conversion rate:**

- The price point per CU is 0.25 €



Initials Phillips:

Page 18 of 19



Initials Company:

## Exhibit D
## Maintenance and Support Agreement

Helpdesk

Philips shall make available a service helpdesk as the single contact point for all technical questions and (reproducible) errors. The helpdesk shall support Company in installing and configuring the BlueBox and in all technical issues regarding the hardware and software contained in the BlueBox.

The helpdesk can be contacted by email at 3dservice@philips.com and is available during office hours on normal business days in The Netherlands.

Technical Support

In the event the BlueBox does not operate as specified in the accompanying documentation, the customer may report this to the 3D Solutions helpdesk. In case of operational or usage problems, the client must undertake his best efforts to exclude any problems, which are not caused by the BlueBox operation. Any problem-report must contain all relevant details and a comprehensive and clear description of the problem leading to a reproducible (hardware or software) malfunction of the BlueBox.

Philips undertakes to return to company an initial reply acknowledging receipt of the error within one business day and subsequently start the investigation. After investigating the error Philips shall, depending on the severity of the problem:

- Swap the BlueBox;
- Exchange the faulty hardware components of the BlueBox;
- Reinstall the software and restore the original state of the BlueBox;
- Provide a bugfix in form of a software update; or
- Provide workarounds;

Philips will seek a speedy resolution of the malfunction, but cannot guarantee any maximum repair times. If the investigation of the problem by Philips shows that the malfunction or error is not due to a fault of Philips or of the workmanship of the BlueBox, then the request is rejected. In such event, Philips and Company shall discuss other possible causes of the problem.

Repairing activities may require the BlueBox be shipped back to Philips. In such an event, Philips will provide a replacement system to the customer.

Software updates

Philips may from time to time provide software updates, including bug-fixes for reported errors and enhancements of the software. Software updates may include updates for the WOWvx Spacer, the BlueBox Configurator and the BlueBox. Updates are provided online at the WOWvx web server or via other means. Company will receive a notification (either through the BlueBox user interface or by e-mail) in case any updates have been made available. Company shall ensure any available updates provided by Philips are installed on the BlueBox for assuring proper operation of the system.

Initials Philips:

Initials Company:

# EXHIBIT 14

**Exhibit 13A Magic quote**

## Email from Dr. Bart Barenbrug the 3DFusion's EU Software Team Leader

\Begin forwarded message:
From: Bart Barenbrug <bart@c3d-vr.com>
Date: November 10, 2010 2:29:00 AM EST
To: ilya.sorokin@3dfusion.com
Cc: Ilya Sorokin <sorokin.ilya@gmail.com>, Stephen Blumenthal
<steve.blumenthal@3dfusion.com>, Walther Roelen <walther@c3d-vr.com>,
Grazzy Seskeviciute <grazinaseskeviciute@gmail.com>
Subject: Re: "remastered by" clips
Reply-To: bart@c3d-vr.com

Hi Ilya,

 Hello Bart, thanks for the effort, and I did download all of them this morning
and afternoon (US time).

I saw that in the ftp logs now. Apart from Alice with the "remastered by logo" for
which I think you only downloaded an erroneous version without audio (my
mistake that those ended up on the ftp, sorry about that). Please check that one.
The "no_audio" versions are gone from my ftp now, and all versions now have
proper audio.

We have run them in the office,

So did I, and checked the video, but didn't notice the bad (well, no) audio

until well after I'd got home again, when Steve was already on his way.
That's why I put a readme next to the files on the ftp and broke off your download
of the no-audio Pandora, in the hopes you'd see that (which you did, because I see
you downloaded the corrected version afterward), and check the readme. Like I said:
I think you still have an Alice version without audio,
so be aware of that. If audio is not an issue, run the version you downloaded
yesterday, but download the proper one (if there's still time) or take an
older version, if audio is needed (and it always help give more impact, imho).

> made appropriate setting adjustments to maximize effects (Steve's magic) He's

wizard at that for sure!

and are ready to show them at the Bon Jovi event tomorrow.

Fantastic.Have a great show, and we'll talk afterward,

Bart

# EXHIBIT 15

# Exhibit 13

CONFIDENTIAL

# T E C H N O L O G Y   L I C E N S E   A G R E E M E N T

This Technology License Agreement ("the Agreement") is entered into on May 1, 2010 ("the Effective Date") by and between Koninklijke Philips Electronics N.V., a Dutch corporation, having its registered office in Eindhoven, The Netherlands ("Philips") and 3DFusion Corporation, a Delaware corporation, having its registered office at 110 Wall Street, Suite 7-2, New York, NY 10005, United States of America ("3D Fusion").

In this Agreement, Philips and 3D Fusion are also referred to individually as a "Party" and collectively as the "Parties".

RECITALS

A.      Philips has developed and/or owns certain technology and software related to 3D Technology.

B.      Philips has developed valuable 3D Know-How and owns certain Intellectual Property Rights relevant to the 3D Technology.

C.      3D Fusion wishes to develop, manufacture and sell or otherwise dispose of 3D Displays, 3D Rendering Boxes, 3D Content Creation Tools and to provide 3D Content Services based on the 3D Technology.

D.      On December 11, 2009 the Parties entered into a Confidentiality and Non-Disclosure Agreement covering the disclosure and exchange of confidential information in connection with the possible licensing by Philips of its 3D Technology to 3D Fusion.

E.      3D Fusion has requested from Philips a license under Philips' Intellectual Property Rights relating to the 3D Technology and has further requested Philips to disclose and make available 3D Know-How and software relating to the 3D Technology in order to enable 3D Fusion to develop, manufacture and sell or otherwise dispose of Licensed Products and 3D Content Services.

F.      Philips is willing to grant 3D Fusion a license under the relevant Intellectual Property Rights and to disclose and make available 3D Know-How and software relating to the 3D Technology on the terms and conditions set forth in this Agreement.

The Parties hereby agree as follows:

1.      DEFINITIONS

The following terms when used in this Agreement shall have the meanings ascribed thereto below:

1

CONFIDENTIAL

"3D Display" means an auto-stereoscopic display configured to display images which a viewer perceives to be images extending in three dimensions that incorporates and/or that otherwise requires, the utilization of the Licensed Technology.

"3D Content Creation Tools" means software that incorporates and/or that otherwise requires, the utilization of the Licensed Technology, and which: (a) converts a two-dimensional content format (picture and / or video) into a content format that includes depth information and/or (b) renders a content format with depth information into a multiview content format suitable for playing on a 3D Display.

"3D Content Services" means all business activities of 3D Fusion and  / or its Affiliates, that incorporate, and/or that otherwise require the utilization of the Licensed Technology, where within the framework of a service model, 3D applications are provided to its customers or to third parties on behalf of its customers, including, without limitation, manufacturing, installing and operating 3D systems and providing content to be displayed on such systems, but excluding per-unit sales of 3D Displays and 3D Rendering Boxes. For the avoidance of any doubt, the parties agree that 3D Content Services shall not include any business activities of 3D Fusion, where within the framework of a service model, 3D applications are provided to its customers or to third parties on behalf of its customers, including, without limitation, manufacturing, installing and operating 3D systems and providing content to be displayed on such systems, but which do not incorporate, and/or which do not otherwise utilize the Licensed Technology.

"3D Know-How" means technical information (tangible or intangible), whether in the form of unpatented inventions, drawings, algorithms, formulas, documents, product designs, procedures or methods, or current and accumulated skills or experience acquired (or which after the Effective Date may be acquired) by Philips in the field of 3D Technology which is owned or controlled by Philips. 3D Know-How includes but is not limited to designs and technical information listed in Schedule B.

"3D Rendering Boxes" means a hardware device, that incorporates and/or that otherwise requires, the utilization of the Licensed Technology, and that is meant to be connected to a 3D Display and capable of rendering multiview content out of 2D or 2D+depth content (pictures and/or video).

"3D Technology" means the field of 3D lenticular display design (including lens design, lens manufacturing, 3D module manufacturing, and 3D processing), 3D content creation, 3D formats (including 2D + depth ) as developed by Philips, and that incorporates and/or that otherwise requires, the utilization of the Licensed Technology.

"Affiliate(s)" means any one or more legal entities: (i) owned or controlled by Philips or 3D Fusion, (ii) owning or controlling Philips or 3D Fusion, or (iii) owned or controlled by the legal entity owning or controlling Philips or 3D Fusion, but any such legal entity shall only be considered an Affiliate of Philips or 3D Fusion for as long as such ownership or control exists. For the purposes of this definition, a legal entity shall be deemed to own or to control another legal entity if more than 50% (fifty per cent) of the voting stock of the latter legal entity, ordinarily entitled to vote

CONFIDENTIAL

in the meetings of shareholders of that entity (or, if there is no such stock, more than 50% (fifty per cent) of the ownership of or control in the latter legal entity) is held directly or indirectly by the owning or controlling legal entity.

"Agreement" means this Technology License Agreement between Philips and 3D Fusion, dated May 1, 2010, and includes any Schedules or Exhibits hereto and any permitted amendments to the main part of this Technology License Agreement or any Schedule or Exhibit hereto.

"Due Diligence Period" means the period following execution of this Agreement during which 3D Fusion shall perform the necessary due diligence on the Licensed Technology, as defined below, and shall be the earliest of: completion of the due diligence on the Licensed Technology, or forty five (45) days.

"Executable Code" means any part or all of the machine-executable version of the Licensed Software, which results from compiling the Source Code into Object Code and linking, loading or assembling (or other similar process), as required, the Object Code into machine language, executable form.

"Improvements" shall mean findings, improvements, enhancements, discoveries, inventions, additions, modifications, formulations, derivative works, or changes (whether or not patented or patentable) with respect to the Licensed Patents/Licensed Know-How developed by 3D Fusion or its Affiliates after execution of this Agreement and including but not limited to any Modification of the Licensed Software, that, with respect to Improvements to Licensed Know-How, could not have been created and/or developed without access to the Licensed Know-How made possible under this Agreement, and that, with respect to Improvements to Licensed Patents, are directed to any products, product components, or processes that could not be utilized in provision of any commercial products and/or services, without such products and/or services infringing at least one of the Licensed Patents.

"Intellectual Property Rights" means Patents, utility certificates, utility models, design rights, copyrights, database rights and all registrations, applications, renewals, extensions, combinations, divisions, continuations or reissues of any of the foregoing.

"Licensed Know-How" means the (technical) information (including trade secrets if applicable but excluding the Licensed Patents), drawings and other material relevant to the development and / or manufacture of 3D Displays, 3D Rendering Boxes and 3D Content Creation Tools, owned or controlled by Philips and which Philips is free to disclose and license without any obligation for payment or other consideration to a third party at the Effective Date, as specified in Schedule B.

"Licensed Patents" means: (a) the Patents owned by Philips as of the Effective Date as listed in Schedule A and, (b) any Patents which are filed within 3 years of the Effective Date, provided that: (i) the patentable subject matter of such Patents is directly related to 3D Technology and where the invention results directly from research and development activities funded by Philips Intellectual Property & Standards and further provided that, in respect of both (a) and (b), Philips has the free right to license such Patents, not requiring payment or other consideration to any third

3

CONFIDENTIAL

party and that such Patents have not been and are not to be submitted to and included in a patent pool supporting an international accepted standard (e.g. BD, HDMI, MPEG). Upon written request of 3D Fusion, Philips will amend Schedule A to insert therein such additional Licensed Patents under (a) and (b) above, and to provide written notice of each such amendment to 3D Fusion in a commercially reasonable time, but not greater than after sixty (60) days following such request.

"<u>Licensed Products</u>" means 3D Displays, 3D Rendering Boxes and 3D Content Creation Tools boxes to be developed, manufactured, sold or otherwise disposed of by 3D Fusion incorporating or using any of the Licensed Patents, Licensed Software or Licensed Know-How and in accordance with the provisions hereof.

"<u>Licensed Software</u>" means the software provided by Philips to 3D Fusion as further described in Schedule B, and all copies or derivative works thereof that were created by Philips, or by any third party for the benefit of Philips.

"<u>Licensed Technology</u>" shall mean the Licensed Patents, Licensed Know-How and Licensed Software.

"<u>Modification</u>" means any reconfiguration, alteration, enhancement, translation, transformation or other derivative work of the Licensed Software.

"<u>Object Code</u>" means all or any portion of the machine-readable or machine language version of the Licensed Software.

"<u>Open Source Software</u>" means any software that is licensed under Open Source License Terms. As illustrative examples, any software under any version of the GNU General Public License, the GNU Lesser General Public License, the Mozilla Public License, the Berkeley Software Distribution (BSD) license, the Apache Software License and the MIT/X11 license are regarded as Open Source Software.

"<u>Open Source License Terms</u>" means the terms in any license that require as a condition of use, modification and/or distribution of a work:
(a)     the making available of source code or other materials preferred for modification, or
(b)     the granting of permission for creating derivative works, or
(c)     the reproduction of certain notices or license terms in derivative works or accompanying documentation, or
(d)     the granting of a royalty-free license to any party under intellectual property rights regarding the work and/or any work that contains, is combined with, requires or otherwise is based on the work.

"<u>Patent(s)</u>" means any and all patents (including but not limited to patents of implementation, improvement, or addition, utility model and appearance design patents, and inventors certificates, as well as divisions, reissues, continuations, renewals, and extensions of any of these), applications for patents, and patents that may issue on such applications.

"<u>Royalty Reporting Form</u>" means a written statement in the form as attached hereto as Schedule D, signed by a duly authorized officer on behalf of 3D Fusion.

4

CONFIDENTIAL

"<u>Source Code</u>" means the compilable and/or human-readable version of the Licensed Software, including without limitation, all comments and procedural code, associated flow charts, concepts, algorithms, technology and other written instructions.

## 2.    GRANT OF RIGHTS

2.1    Subject to 3D Fusion's compliance with its obligations under this Agreement, for the breach of which, Philips has the right of termination thereof under Section 5.2, below, Philips hereby grants to 3D Fusion and its Affiliates, during the term of this Agreement, a worldwide non-exclusive, non-transferable license, without the right to grant sub-licenses, under the Licensed Patents and the Licensed Know-How to: (a) use, sell, offer to sell, import, export, and otherwise dispose of the Licensed Products, and (b) lease, operate or otherwise make available to customers thereof, the Licensed Products, including the right to utilize any Licensed Products to provide services relating to 3D Content Services to any third party.

The rights granted to 3D Fusion pursuant to this Section 2.1 include the right for 3D Fusion to have Licensed Products manufactured in whole or in part by a third party manufacturer, provided that:

(i)    3D Fusion notifies Philips of the grant of such right to manufacture;

(ii)    3D Fusion will properly identify such third party manufacturer, the specific manufacturing facility(ies) and location(s);

(iii)    3D Fusion will indicate the quantities of Licensed Products so manufactured and purchased in the Royalty Reporting Form  to be submitted to Philips hereunder; and

(iv)    3D Fusion warrants that it has entered into a legally binding arrangement with such third party manufacturer whereby such third party manufacturer is bound to the same confidentiality obligations, as well as the undertaking not to 'reverse engineer', as set forth in this Agreement.

3D Fusion acknowledges and accepts that any breach by the third party manufacturer of the applicable obligations that directly results from a breach by 3DF Fusion of the warranty under Section 2.1(iv), shall be considered a breach by 3D Fusion under this Agreement, which 3D Fusion will have full opportunity to cure in accordance with the applicable terms and conditions thereof.

2.2    Subject to 3D Fusion's compliance with its obligations under this Agreement, for the breach of which, Philips has the right of termination thereof under Section 5.2, below, Philips hereby grants to 3D Fusion and its Affiliates, a non-exclusive, non-transferable license under the Licensed Software to:

a.    test, evaluate, and make derivative works of the Source Code portions of the Licensed Software and to compile such Source Code portions and derivative works thereof into Object Code, solely as strictly necessary to achieve, or to enhance, interoperability between the Licensed Software (including any Modification thereof) and the subsequent integration of the Licensed Software (including any Modification thereof) in the Licensed Products;

5

CONFIDENTIAL

b.     test, evaluate, and reproduce the Object Code portions of the Licensed Software for integration of the Licensed Software (including any Modification thereof), in Executable Code form only, in the Licensed Products;

c.     test, demonstrate, license or otherwise commercially exploit the Licensed Products to its customers, for subsequent distribution to, and ultimate use thereof by end-users;

d.     maintain and support Licensed Products sold or licensed to its customers, including, but not limited to, by performing error-correction and/or technical support on the Licensed Software (including any Modification thereof) integrated in these Licensed Products, and by testing and evaluating the integrated Licensed Software; and

e.     make as many copies of the Licensed Software (including any Modification thereof) as reasonably required for exercise of the rights granted under this Agreement.

2.3    The rights granted to 3D Fusion hereunder shall include the right of any 3D Fusion customer to use the Licensed Software (including any Modification thereof) integrated in Executable Code form only for its own personal use or within its normal business operations, and such right of use shall survive the expiration or termination of this Agreement.

2.4    3D Fusion acknowledges that it has been informed by Philips that the Licensed Software contains certain Open Source Software and that there may be Open Source Software that has not been specifically identified to 3D Fusion. 3D Fusion shall be solely responsible for compliance with any and all applicable Open Source License Terms.

Specifically, but without limitation, 3D Fusion shall ensure that appropriate notices are included in documentation and that source code is delivered to all those to whom 3D Fusion distributes the software where the license provisions of such Open Source Software so require.

2.5    3D Fusion further acknowledges that it has been informed by Philips that the Licensed Software operates in combination with certain commercial software, developed and owned by third parties and that there may be third party commercial software that has not been specifically identified to 3D Fusion. 3D Fusion shall be solely responsible for compliance with any and all applicable licence terms and of any such third party commercial software (including, without limitation, payment of royalties, if applicable).

2.6    It is expressly acknowledged and agreed that the Licensed Software is licensed to 3D Fusion and not sold.  It is further acknowledged and agreed that Philips owns and shall continue to own all rights, title and interest in the Licensed Software, as well as all derivative works of each of the foregoing that were created by Philips, or by any third party for the benefit of Philips, except as expressly set forth otherwise in this Agreement. 3D Fusion shall take all reasonable measures to protect Philips'

CONFIDENTIAL

(intellectual) property rights in at least the same way as 3D Fusion protects its own rights, but shall have no obligation whatsoever to take any affirmative action to enforce any intellectual property and/or related rights granted thereto under this Agreement. Other than the limited license granted to 3D Fusion hereunder, no other right or license under any intellectual property rights of Philips and/or its Affiliates or any intellectual property residing in the Licensed Software is granted and any implied licenses are expressly excluded.

2.7    To the maximum extent permitted by applicable law, 3D Fusion shall not, and shall not permit any third party under its direction or control, to:

a.    copy, reproduce or distribute Licensed Software (including any Modification thereof), other than in a form incorporated in Licensed Products or 3D Content Services as specifically permitted under this Agreement;

b.    assign, sub-license, lease, rent, loan, transfer, disclose, or otherwise make available the Licensed Software other than in a form incorporated in Licensed Products, or in 3D Content Services (including any Modification thereof), and/or as otherwise specifically permitted under this Agreement; or

c.    remove or circumvent the protection of the Licensed Software.

2.8    3D Fusion shall not perform any actions with regard to the Licensed Software in a manner that would require the Licensed Software or any derivative work thereof to be licensed under Open Source License Terms. These actions shall include without limitation:

(a)    combining the Licensed Software or a derivative work thereof with Open Source Software, by means of incorporation or linking or otherwise; or

(b)    using Open Source Software to create a derivative work of the Licensed Software.

2.9    3D Fusion shall not remove or alter any copyright notices or other proprietary rights notices, legends or marking(s) contained in or affixed to the Licensed Software provided hereunder (including any Modifications thereof). 3D Fusion shall reproduce such notices, legends and marking(s) and shall affix such notices, legends and marking(s) to any and all media containing a copy or any portion of the Licensed Software provided hereunder (including any Modifications thereof), in the same manner as these were affixed to the original media.

2.10    3D Fusion shall not make, nor permit its customers to make, or publish any representations, warranties, or guarantees on behalf of Philips, its Affiliates and/or its third party suppliers/licensors in relation to the Licensed Software without Philips' express prior written consent.

2.11    In the event that 3D Fusion owns any intellectual property rights relevant to the Licensed Technology ("3DF IP Rights"), 3D Fusion undertakes that, upon the request of Philips, unless doing so would conflict with then-existing obligations of 3D Fusion to any third party, it will negotiate in good faith with Philips and or its Affiliates for a license under such 3DF IP Rights on commercially reasonable, non-discriminatory terms and to use such 3DF IP Rights in the exploitation of the Licensed Technology (including Improvements thereof). For avoidance of any doubt, 3DF IP Rights shall

7

CONFIDENTIAL

be considered relevant to the Licensed Technology, if the 3DF IP Rights are directed to creation of new products based thereon that are intended for being utilized in conjunction with the Licensed Products, but: (a) that could have been created and/or developed without need for access to the Licensed Know-How made possible under this Agreement, and/or (b) that do not in themselves infringe any of the Licensed Patents.

2.12  3D Fusion shall notify Philips promptly of any Improvement(s) to the Licensed Technology. In consideration of the undertaking set forth in Section 2.1, 3D Fusion agrees to grant to Philips and its Affiliates a non-exclusive non-transferable, non-sublicensable license, to use the licensed Improvements and to develop, manufacture, license, sell or otherwise dispose of any Licensed Products embodying such Improvement(s) to the Licensed Technology or manufactured using any such Improvement(s), on commercially reasonable non-discriminatory terms.

2.13  Philips shall exclude any abandoned pending Patent applications and any abandoned Licensed Patents from Schedule A.


3.      DELIVERY OF LICENSED KNOW-HOW AND LICENSED SOFTWARE

3.1  Upon receipt by Philips of the first instalment of the amount specified in Section 4.1, Philips will make available the Licensed Know-How and Licensed Software to 3D Fusion in accordance with a jointly defined and mutually agreed hand-over plan. Such delivery may occur by means of access to a server, electronic transfer, delivery of a storage medium or by such other means as agreed by the Parties.


4.    PAYMENT AND REPORTING

4.1  In consideration of the delivery of the Licensed Know-How and the Licensed Software, 3D Fusion shall make a non-refundable, non-recoupable payment of US$5,000,000 (five million US Dollars) to Philips, payable 50% within 45 days of the Effective Date, 25% by January 15, 2011 and 25% by November 15, 2011.

4.2  In further consideration of the rights granted hereunder by Philips to 3D Fusion, for all Licensed Products developed, manufactured, sold or otherwise disposed of as from January 1, 2013, 3D Fusion shall pay to Philips a royalty in accordance with the table set forth in Schedule C (a) on each Licensed Product manufactured, licensed or sold or otherwise disposed of, and (b) on each Licensed Product leased, operated for the benefit of, or otherwise made available to, customers thereof, as well as on 3D Content Services provided by 3D Fusion, with a minimum of €100,000 (one-hundred thousand Euros) per calendar year. If 3D Fusion fails to pay to Philips said minimum royalty for two consecutive calendar years, Philips may terminate this Agreement with thirty (30) days written notice to 3D Fusion, unless 3D Fusion remedies its failure to pay the minimum royalties due to Philips under this Agreement within said notice period. Such right to terminate shall be without prejudice to any other right or remedy Philips may have against 3D Fusion.

CONFIDENTIAL

Royalties shall be due and payable on all Licensed Products manufactured prior to, but remaining in stock at the date of expiration or termination of this Agreement. Within 30 days after expiration or termination of this Agreement 3D Fusion shall submit to Philips a Royalty Reporting Form stating the number of Licensed Products in stock at the time of expiration or termination of this Agreement.

4.4     All payments by 3D Fusion to Philips under this Agreement shall be made in US Dollars to the US Dollar account with:

> CITIBANK in New York
> Bank Account No.:    406711-1001
> in the name of:         Koninklijke Philips Electronics N.V. –Licenses
> SWIFTCODE:          CITIUS33 021000089
> Reference:              "3D Display Technology, LP25049"

(or such other bank account as Philips may specify)

4.5     Within 30 days following 31 March, 30 June, 30 September and 31 December of each year during the term of this Agreement, 3D Fusion shall submit to Philips (even in the event that no Licensed Products have been manufactured, licensed, sold or otherwise disposed of and that no 3D Content Services have been provided by 3D Fusion) a Royalty Reporting Form, duly completed and signed by an authorized representative of 3D Fusion.

4.7     3D Fusion shall pay the royalties due to Philips hereunder within 30 calendar days after the end of each calendar quarter during the term of this Agreement.

4.8     In no event shall 3D Fusion have the right to set off any payments due hereunder against any claim, of whatever nature, it or any of its Affiliates may have against Philips or any of Philips' Affiliates.

4.9     Any payment under this Agreement that is not made on or before the date(s) specified herein, shall accrue interest at the rate of 2% (two per cent) per month (or part thereof), or the maximum amount permitted by law, whichever is lower, without any notification being required.

4.10    Each Party shall bear its own costs, stamp duties, taxes and other similar levies arising from or in connection with this Agreement. In the event that the governmental authorities of any country imposes any withholding taxes on payments made by 3D Fusion to Philips hereunder and requires 3D Fusion to withhold such tax from such payments, 3D Fusion may deduct such tax from such payments. In such event, 3D Fusion shall promptly provide Philips with tax receipts issued by the relevant tax authorities.

4.11    3D Fusion shall submit to Philips, within 90 calendar days after the end of 3D Fusion's fiscal year, an audit statement, signed by its external auditors, who shall be qualified accounting professionals (preferably, certified public auditors), confirming that all quarterly royalty statements as submitted by 3D Fusion to Philips during the preceding fiscal year, are true, complete and accurate in every respect. The correctness of this audit statement may be verified by Philips by means of a work

CONFIDENTIAL

paper review, conducted by one of the certified public auditors selected by Philips. 3D Fusion shall procure that its auditors provide full cooperation with said work paper review. This audit statement shall not affect the right of Philips to inspect the books and records of 3D Fusion from time to time in accordance with Section 4.12.

4.12    In order that the royalty statements provided for in this Section 4 may be verified, 3D Fusion shall keep complete and accurate books and records relating to the manufacture and sale or other disposal of Licensed Products and shall keep the books and records available for a period of 5 (five) years following the manufacture, sale or other disposal of each Product.

Philips shall have the right to inspect the books and records of 3D Fusion from time to time, in order to verify the correctness of the aforementioned royalty statements. Any such inspection shall take place no more than once per calendar year and shall be conducted by a certified public auditor appointed by Philips. Philips shall give 3D Fusion written notice of such inspection at least 14 calendar days prior to the inspection. 3D Fusion shall willingly co-operate and provide all such assistance in connection with such inspection as Philips and/or the auditor may require. The inspection shall be conducted at Philips' own expense, provided that, in the event that 3D Fusion has failed to submit royalty statements and/or yearly written statement(s) by its external auditors, as provided for in Section 4.11 and this Section 4.12 in respect of the period to which the inspection relates or in the event that any discrepancy or error of 3% (three per cent) or more of the monies actually due is established, the cost of the inspection shall be borne by 3D Fusion, without prejudice to any other claim or remedy as Philips may have under this Agreement or under applicable law.

4.13    Philips' right inspection as set out in Section 4.12 shall survive termination or expiration of this Agreement for 3 (three) years after termination or expiration of this Agreement.

4.14    Without limiting any other provision of this Agreement, 3D Fusion shall provide all relevant additional information as Philips may reasonably request from time to time, so as to enable Philips to ascertain that 3D Fusion has correctly paid the royalties on Licensed Products and 3D Content Services due hereunder.

4.15    Any information provided by 3D Fusion to Philips or its auditors under this Section 4 in writing and marked as Confidential shall be treated by Philips as confidential, save that the foregoing shall not prevent Philips from using such confidential information in connection with the enforcement of its rights under this Agreement.

5.    TERM AND TERMINATION

5.1    This Agreement shall enter into force on the Effective Date and shall remain in force until the transfer, expiration or invalidation of the last remaining Licensed Patent, unless terminated earlier in accordance with its provisions.

CONFIDENTIAL

5.2    Without prejudice to Section 5.3, a Party may terminate this Agreement at any time by means of written notice to the other Party in the event that the other Party breaches or otherwise fails to perform any of its obligations under this Agreement, provided that such breach or failure is not remedied within 30 (thirty) calendar days after receipt of a notice specifying the nature of such failure and requiring it to be remedied. Such right of termination shall not be exclusive of any other remedy or means of redress to which the non-defaulting Party may be lawfully entitled and all such remedies shall be cumulative.

5.3    Philips may terminate this Agreement forthwith by means of notice in writing to 3D Fusion in the event that:

a)      a creditor or other claimant takes possession of, or a receiver, administrator or similar officer is appointed over any of the assets of 3D Fusion;

b)      3D Fusion makes any voluntary arrangement with its creditors or 3D Fusion becomes subject to any court or administration order pursuant to any bankruptcy or insolvency law; or

c)      3D Fusion or any of its Affiliates brings a claim of infringement of any of 3D Fusion's, or any of 3D Fusion's Affiliates', Patent(s), in connection with which 3D Fusion has obligations under Section 2.11 and/or Section 2.12 of this Agreement, against Philips or any of Philips' Affiliates, and 3D Fusion refuses to license such Patent(s) on commercially reasonable and non-discriminatory conditions, as provided in Section 2.11 and/or Section 2.12 of this Agreement.

3D Fusion may terminate this Agreement at the end of the Due Diligence Period by means of notice in writing to Philips.

5.4    Any termination or expiration shall not affect any royalty payment or other obligation under this Agreement accrued prior to such termination, except in the event of termination by 3D Fusion pursuant to Section 5.3, in which case 3D Fusion shall not be obliged to pay the amounts set forth in Section 4.1.

5.5    Upon the termination of this Agreement by either party for any reason pursuant to the provisions hereof, the licenses granted by Philips to 3D Fusion and its Affiliates under the Licensed Patents and Licensed Know-How shall automatically terminate and 3D Fusion shall immediately cease and procure that its Affiliates cease, the (a) use of the Licensed Patents, Licensed Know-How and Licensed Software, and (b) development, manufacture, licensing, sale or other disposal of Licensed Products and the provision of 3D Content services. Further, upon such termination, any and all amounts outstanding hereunder shall become immediately due and payable.

In the event of termination by 3D Fusion pursuant to Section 5.3, 3D Fusion shall forthwith return to Philips any and all Licensed Know-How received during the Due Diligence Period.

5.6    Upon the termination of this Agreement by either party for any reason pursuant to the provisions hereof, any license to the Improvements to the Licensed Patents, Licensed Know-How and Licensed Software that may have been granted to Philips and its Affiliates under Section 2.12, shall likewise immediately terminate on the effective

termination date of this Agreement. Accordingly, as of the effective date of termination of this Agreement, Phillips and its Affiliates shall immediately (a) cease the use of the any Improvements to the Licensed Patents, Licensed Know-How and Licensed Software, and (b) cease development, manufacture, licensing, sale or other disposal of any Philips products and/or services utilizing or otherwise incorporating the Improvements.

5.7     If any license(s) to 3DF IP Rights were granted to Philips and/or its Affiliates under Section 2.11 of this Agreement, upon the termination of this Agreement by either party for any reason pursuant to the provisions hereof, 3D Fusion shall have the right, exercisable within 60 (sixty) calendar days thereof, at its sole and exclusive discretion, to terminate  any such license to the 3DF IP Rights. If 3D Fusion exercises this termination right, then Phillips and/or its Affiliates shall immediately: (a) cease the use of the 3DF IP Rights, and (b) cease development, manufacture, licensing, sale or other disposal of any Philips products and/or services utilizing or otherwise incorporating the 3DF IP Rights.


6.     CONFIDENTIALITY

6.1     3D Fusion shall during the term of this Agreement and for a period of 5 (five) years thereafter, not disclose to any third party any information acquired from Philips or any of Philips' Affiliates in connection with this Agreement, or use such information for any other purpose than the (a) development, manufacture, licensing, and sale of Licensed Products in accordance with this Agreement, and (b) manufacture and use of 3D Content Creation Tools in accordance with this Agreement, or (c) provision of 3D Content Services in accordance with this Agreement. This obligation shall not apply to the extent information so acquired:

a)          was known to 3D Fusion prior to the date on which such information was acquired from Philips or any of Philips' Affiliates, as shown by records of 3D Fusion or otherwise demonstrated to Philips' satisfaction within 14 calendar days following the disclosure of such information by Philips;

b)          is or becomes part of the public domain through no fault of 3D Fusion; or

c)          is lawfully obtained by 3D Fusion from a third party who was, at the moment of disclosure, not bound by similar confidentiality obligations.

6.2     3D Fusion shall protect all information acquired from acquired from Philips or any of Philips' Affiliates against any unauthorized disclosure in the same manner and with the same degree of care, but not less than a reasonable degree of care, with which it protects confidential information of its own.

6.3     3D Fusion acknowledges that the Source Code of the Licensed Software contains valuable, proprietary trade secrets of Philips, and 3D Fusion agrees to:

a.          ensure that every person with access to the Source Code of the Licensed Software has signed a written confidentiality agreement, prior to any such access, which is legally sufficient and effective to bind such person to all of the confidentiality obligations of Section 6;

CONFIDENTIAL

    b.    not allow any remote access to the Source Code of the Licensed Software, and not place or permit to be placed on any public website; and

    c.    promptly notify Philips of any unauthorized access to the Source Code of the Licensed Software, or any unauthorized use or disclosure of the Source Code of the Licensed Software.

6.4    The obligations concerning confidentiality contained in this Section 6 shall survive termination of this Agreement.

7.    NO WARRANTY AND LIABILITY

7.1    The Licensed Patents, Licensed Know-How, Licensed Software and all information made available by Philips under this Agreement are provided on an "AS IS" basis. Philips makes no representation or warranty as to the validity of the Licensed Patents, or the suitability of the Licensed Patents, Licensed Know-How and/or Licensed Software for any particular purpose (including without limitation, providing the 3D Content Services) nor with regard to the ability of 3D Fusion to develop, manufacture and sell or otherwise dispose of Licensed Products using the Licensed Patents, Licensed Know-How and/or Licensed Software, nor with regard to the quality and/or performance of such Licensed Products or otherwise in relation to the Licensed Patents, Licensed Know-How and/or Licensed Software.

7.2    It is acknowledged by 3D Fusion that third parties may own intellectual property rights in the field of 3D Technology, in Licensed Products, or in 3D Content Services. Philips makes no warranty whatsoever that the development, manufacture, sale or other disposal of Licensed Products and the provision of 3D Content Services does not infringe or will not cause infringement of any intellectual property rights other than the Licensed Patents.

7.3    Philips and its Affiliates shall not be liable for any damages of whatever nature howsoever resulting from the use of the Licensed Patents, Licensed Know-How and/or Licensed Software or otherwise in connection with this Agreement.

7.4    Philips and its Affiliates shall be fully indemnified and held harmless by 3D Fusion from and against any and all third party claims in connection with Licensed Products developed, manufactured, licensed, sold or otherwise disposed of by or for 3D Fusion or the provision of 3D Content Services by 3D Fusion.

7.5    In the event that a court of competent jurisdiction renders judgment against Philips and/or any of its Affiliates notwithstanding the limitation of liability as set out in this Section 7, in no event shall the aggregate liability of Philips and/or its Affiliates to 3D Fusion in connection with this Agreement, except for the liability for breach of section 5.6 hereof, exceed the lower amount of either the aggregate amount of the fees paid by 3D Fusion to Philips under this Agreement over the 12 months immediately preceding the event that gave rise to a claim.

7.6    Any claim for damages by 3D Fusion against Philips or any of Philips' Affiliates under or in connection with this Agreement must be filed within 12 months from the

CONFIDENTIAL

date that 3D Fusion learns of the event giving rise to any such claim and Philips and its Affiliates shall not be liable for any claim for damages brought or filed by 3D Fusion after said 12 month period. Further, and notwithstanding anything to the contrary provided in this Agreement, other than the breach by Philips or any of its Affiliates of Section 5.6, in no event shall Philips or any of its Affiliates be liable vis-à-vis 3D Fusion, 3D Fusion's Affiliates or its/their customers for any damages of whatever nature after the expiration or early termination of this Agreement. For the avoidance of any doubt, the liability of Philips or any of its Affiliates for breach of Section 5.6, shall continue after the expiration or early termination of this Agreement, subject to applicable statutes of limitations of the governing jurisdiction set forth in Section 16.1.

7.7     Philips and its Affiliates shall not be liable to 3D Fusion, its employees, directors, shareholders, agents or any third party for any indirect or consequential, incidental, punitive or special, damages (including, but not limited to, damages for loss of profit, for business interruption or for personal injury) arising out of or in any way related to or in connection with this Agreement, even if the other Party has been advised of the possibility of such damages.

7.8     The foregoing states the entire liability of Philips and its Affiliates for any actual or alleged infringement of third party or 3D Fusion's Intellectual Property Rights hereunder.

8.      EXCLUSIONS

Nothing contained in this Agreement shall be construed:

(a)     as granting, by implication, estoppel or otherwise, a license to any intellectual property, know-how or trade secrets other than stipulated in Section 2.1;

(b)     as a warranty or representation by Philips and/or its Affiliates as to the validity or scope of any patent rights licensed hereunder;

(c)     as imposing any obligation to file any patent application, to secure any patent or to maintain any patent in force;

(d)     as conferring any license or right to copy or imitate the appearance and/or design of any product of Philips or any of Philips' Affiliates;

(e)     as conferring any right upon 3D Fusion and/or its Affiliates to use in advertising, publicity or otherwise, any trademark or trade name, or any contraction, abbreviation or simulation thereof, of Philips and/or its Affiliates; or

(f)     as imposing on either Party any obligation to instigate any suit or action for infringement of any of the Licensed Patents or to defend any suit or action brought by any third party which challenges or relates to the validity of any such patents. 3D Fusion shall have no right to instigate any such suit or action for infringement of any of the Licensed Patents, nor to defend any suit or action which challenges or relates to the validity of any such Licensed Patents.

CONFIDENTIAL

9.    EXPORT CONTROLS

9.1    3D Fusion shall use the 3D Technology in accordance with export control laws and regulations applicable to the goods, countries and persons or entities that 3D Fusion is trading in or with. 3D Fusion represents and undertakes that the 3D Technology will not be exported or re-exported to any person or country prohibited under European or U.S. export control laws and regulations. 3D Fusion shall indemnify Philips against any claim or damages resulting from 3D Fusion's conduct in contravention of the aforementioned export control laws and regulations.

10.    NOTICES

10.1    Any notice, other than the Royalty Reporting Forms, required under this Agreement to be sent by either Party shall be given in writing by means of a letter, facsimile directed:

in respect of Philips to:
Philips Intellectual Property & Standards
P.O. Box 220
5600 AE Eindhoven
The Netherlands
F.a.o. Licensing Director 3D Technology
Fax no.: + 31 40 27 45267

In respect of 3D Fusion to:
110 Wall Street, Suite 7-2
New York, NY 10005
United States of America
F.a.o. CEO
e-mail: ilya.sorokin@3dfusionusa.com

or such other address as may have been specified in writing by either Party to the other.

11.    NO ASSIGNMENT

11.1    This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns. Notwithstanding the foregoing sentence, this Agreement may not be delegated or assigned by 3D Fusion, in whole or in part, to any third party, without the written consent of an authorized representative of Philips, whose consent shall not be unreasonably withheld. Philips may delegate or assign this Agreement to any third party, agreeing to take on all of the rights and obligations of Philips under this Agreement, upon 7 (seven) days written notice to 3D Fusion.

CONFIDENTIAL

## 12.   INDEPENDENT CONTRACTORS

12.1   The Parties are and intend to remain independent contractors. Nothing in this Agreement shall be construed as an agency, joint venture or partnership between the Parties.

## 13.   ENTIRE AGREEMENT

13.1   This Agreement sets forth the entire understanding and agreement between the Parties as to the subject matter of this Agreement and supersedes, cancels and merges all prior agreements, negotiations, commitments, communications and discussions between the Parties as to the subject matter hereof.

13.2   Neither Party shall be bound by any obligation, warranty, waiver, release or representation, except as expressly provided herein, or as may subsequently be agreed by a written instrument, signed by duly authorized representatives of each of the Parties.

## 14.   NO WAIVER

14.1   Neither the failure nor the delay of either Party to enforce any provision of this Agreement shall constitute a waiver of such provision or of the right of either Party to enforce each and every provision of this Agreement.

## 15.   DISPUTE RESOLUTION

15.1   Any dispute as may arise between the Parties shall be elevated to senior management of the Parties with the aim to resolve such dispute within 45 days of written notice by either Party requesting such resolution, provided that nothing shall prevent either Party from reverting to a competent court to obtain injunctive relief if in such Party's opinion, such injunctive relief is necessary to prevent irreparable, material harm.

## 16.   APPLICABLE LAW AND JURISDICTION

16.1   This Agreement shall be governed by and construed in accordance with the laws of The Netherlands.

16.2   Any dispute between the Parties in connection with this Agreement (including any question regarding its existence, validity or termination) shall be submitted to the competent courts of The Hague, The Netherlands, provided always that, in case Philips is the plaintiff, Philips may at its sole discretion submit any such dispute

CONFIDENTIAL

either to the competent courts in the venue of 3D Fusion's registered office. 3D Fusion hereby irrevocably waives any objection to the jurisdiction, process and venue of any such court and to the effectiveness, execution and enforcement of any order or judgment (including, but not limited to, a default judgment) of any such court in relation to this Agreement, to the maximum extent permitted by the law of any jurisdiction, the laws of which might be claimed to be applicable regarding the effectiveness, enforcement or execution of such order or judgment.

AS WITNESS, the Parties have caused this Agreement to be signed on the date first written above.

Koninklijke Philips Electronics N.V.          3DFusion Corporation

_____          _____

(signature)                                   (signature)

R.J. Peters                                   Name: I. Sorokin
Chief Executive Officer,                      Title: Chief Executive Officer
Philips Intellectual Property & Standards

17

CONFIDENTIAL

## Schedule A
## Licensed Patents

| Country | Application No | Priority Date | Filing Date | Publication No | Grant No | Philips Ref | Title |
|---|---|---|---|---|---|---|---|
| CN | 200680016380.7 | 13-05-2005 | 02-05-2006 | 101176354-A | | 000382 | Cost-effective rendering of 2.5D video signals on 3D displays |
| EP | 06728110.5 | 13-05-2005 | 02-05-2006 | 1882368-A | | 000382 | Cost-effective rendering of 2.5D video signals on 3D displays |
| JP | 08-510689 | 13-05-2005 | 02-05-2006 | | | 000382 | Cost-effective rendering of 2.5D video signals on 3D displays |
| US | 11/913877 | 13-05-2005 | 02-05-2006 | 2008-0252638-A1 | | 000382 | Cost-effective rendering of 2.5D video signals on 3D displays |
| CN | 200680014611.5 | 29-04-2005 | 20-04-2006 | 101167371-A | | 000443 | A 3D display with fractional views |
| EP | 06727987.7 | 29-04-2005 | 20-04-2006 | | | 000443 | A 3D display with fractional views |
| IN | 4854/CHENP/2007 | 29-04-2005 | 20-04-2006 | | | 000443 | A 3D display with fractional views |
| JP | 08-508366 | 29-04-2005 | 20-04-2006 | | | 000443 | A 3D display with fractional views |
| KR | 10-2007-7024425 | 29-04-2005 | 20-04-2006 | | | 000443 | A 3D display with fractional views |
| TW | 095114920 | 29-04-2005 | 20-04-2006 | 200711462-A | | 000443 | A 3D display with fractional views |
| US | 11/912440 | 29-04-2005 | 20-04-2006 | 2008-0204550-A1 | | 000443 | A 3D display with fractional views |
| CN | 200680025197.8 | 14-07-2005 | 12-07-2006 | | | 000496 | 2D/3D switchable display |
| EP | 06780056.5 | 14-07-2005 | 12-07-2006 | 1905247-A | | 000496 | 2D/3D switchable display |
| JP | 08-521019 | 14-07-2005 | 12-07-2006 | | | 000496 | 2D/3D switchable display |
| US | 11/995574 | 14-07-2005 | 12-07-2006 | 2008-0204872-A1 | | 000496 | 2D/3D switchable display |
| CN | 200680021219.3 | 14-06-2005 | 13-06-2006 | | | 000497 | Transflective Eink 3D LCD |
| EP | 06756125.8 | 14-06-2005 | 13-06-2006 | 1894422-A | | 000497 | Transflective Eink 3D LCD |
| JP | 08-516484 | 14-06-2005 | 13-06-2006 | | | 000497 | Transflective Eink 3D LCD |
| KR | 10-2007-7029099 | 14-06-2005 | 13-06-2006 | | | 000497 | Transflective Eink 3D LCD |
| TW | 095120665 | 14-06-2005 | 09-06-2006 | 200706911-A | | 000497 | Transflective Eink 3D LCD |
| US | 11/917157 | 14-06-2005 | 13-06-2006 | 2008-0211734-A1 | | 000497 | Transflective Eink 3D LCD |
| CN | 200680022544.1 | 23-06-2005 | 19-06-2006 | 101203881-A | | 001613 | Method to store, transfer and identify 3D files. |
| EP | 06765780.9 | 23-06-2005 | 19-06-2006 | | | 001613 | Method to store, transfer and identify 3D files. |
| IN | 5952/CHENP/2007 | 23-06-2005 | 19-06-2006 | | | 001613 | Method to store, transfer and identify 3D files. |
| JP | 08-517662 | 23-06-2005 | 19-06-2006 | | | 001613 | Method to store, transfer and identify 3D files. |
| US | 11/993239 | 23-06-2005 | 19-06-2006 | | | 001613 | Method to store, transfer and identify 3D files. |
| CN | 200680033881.0 | 16-09-2005 | 11-09-2006 | 101263722-A | | 001626 | Pixel Shapes for optimised 2D/3D display |
| EP | 06809277.4 | 16-09-2005 | 11-09-2006 | 1929792-A | | 001626 | Pixel Shapes for optimised 2D/3D display |
| JP | 08-530695 | 16-09-2005 | 11-09-2006 | | | 001626 | Pixel Shapes for optimised 2D/3D display |
| US | 12/066682 | 16-09-2005 | 11-09-2006 | 2008-0218855-A1 | | 001626 | Pixel Shapes for optimised 2D/3D display |
| CN | 200680036946.7 | 04-10-2005 | 03-10-2006 | 101278566A | | 001856 | Improvement of lenticular design by applying light blocking feature |
| EP | 06809476.2 | 04-10-2005 | 03-10-2006 | 1935186A | | 001856 | Improvement of lenticular design by applying light blocking feature |
| JP | 08-534128 | 04-10-2005 | 03-10-2006 | | | 001856 | Improvement of lenticular design by applying light blocking feature |
| US | 12/089215 | 04-10-2005 | 03-10-2006 | 2008-0259157-A1 | | 001856 | Improvement of lenticular design by applying light blocking feature |
| CN | 200680036864.2 | 04-10-2005 | 28-09-2006 | 101278557 | | 001857 | A 3D display with an improved pixel structure (pixelsplitting) |
| EP | 06809431.7 | 04-10-2005 | 28-09-2006 | | | 001857 | A 3D display with an improved pixel structure (pixelsplitting) |
| JP | 08-534120 | 04-10-2005 | 28-09-2006 | | | 001857 | A 3D display with an improved pixel structure (pixelsplitting) |
| US | 12/089212 | 04-10-2005 | 28-09-2006 | 2008-0231951-A1 | | 001857 | A 3D display with an improved pixel structure (pixelsplitting) |
| CN | 200680045378.7 | 02-12-2005 | 27-11-2006 | 101332240-A | | 002322 | Depth dependent filtering of image and depth to avoid artefacts with multiview rendering |
| EP | 06831955.7 | 02-12-2005 | 27-11-2006 | 1958459-A | | 002322 | Depth dependent filtering of image and depth to avoid artefacts with multiview rendering |
| JP | 08-542266 | 02-12-2005 | 27-11-2006 | | | 002322 | Depth dependent filtering of image and depth to avoid artefacts with multiview rendering |
| US | 12/095176 | 02-12-2005 | 27-11-2006 | 2009-0153652-A1 | | 002322 | Depth dependent filtering of image and depth to avoid artefacts with multiview rendering |
| CN | 200680041071.X | 04-11-2005 | 31-10-2006 | 101300855-A | | 002323 | Viewdirection dependent filtering for multiview screens. |
| EP | 06821266.1 | 04-11-2005 | 31-10-2006 | 1946566A | | 002323 | Viewdirection dependent filtering for multiview screens. |
| JP | 08-538476 | 04-11-2005 | 31-10-2006 | | | 002323 | Viewdirection dependent filtering for multiview screens. |
| US | 12/091944 | 04-11-2005 | 31-10-2006 | 2008-0291268-A1 | | 002323 | Viewdirection dependent filtering for multiview screens. |
| CN | 200680047908.1 | 19-12-2005 | 08-12-2006 | 101341760-A | | 002324 | Sparkling 3D rendering |
| EP | 06832157.9 | 19-12-2005 | 08-12-2006 | 1967016-A | | 002324 | Sparkling 3D rendering |
| JP | 2008-545190 | 19-12-2005 | 08-12-2006 | | | 002324 | Sparkling 3D rendering |
| US | 12/097575 | 19-12-2005 | 08-12-2006 | 2009-0027384-A1 | | 002324 | Sparkling 3D rendering |
| CN | 200680045321.7 | 02-12-2005 | 27-11-2006 | 101322155-A | | 002325 | Depth from focus |
| EP | 06831957.3 | 02-12-2005 | 27-11-2006 | 1958149-A | | 002325 | Depth from focus |
| IN | 2756/CHENP/2008 | 02-12-2005 | 27-11-2006 | | | 002325 | Depth from focus |
| JP | 08-542901 | 02-12-2005 | 27-11-2006 | | | 002325 | Depth from focus |
| KR | 10-2008-7016167 | 02-12-2005 | 27-11-2006 | | | 002325 | Depth from focus |
| RU | 2008126927 | 02-12-2005 | 27-11-2006 | | | 002325 | Depth from focus |
| US | 12/095183 | 02-12-2005 | 27-11-2006 | 2008-0303894-A1 | | 002325 | Depth from focus |
| CN | 200680040799.0 | 02-11-2005 | 25-10-2006 | 101300519-A | | 002451 | Multi-view 3D display without resolution loss and optical rendering |
| EP | 06809698.1 | 02-11-2005 | 25-10-2006 | 1948170-A | | 002451 | Multi-view 3D display without resolution loss and optical rendering |
| JP | 08-538465 | 02-11-2005 | 25-10-2006 | | | 002451 | Multi-view 3D display without resolution loss and optical rendering |
| US | 12/092415 | 02-11-2005 | 25-10-2006 | 208-0278808-A1 | | 002451 | Multi-view 3D display without resolution loss and optical rendering |
| CN | 200680041112.5 | 02-11-2005 | 26-10-2006 | 101300520-A | | 002452 | Multi-view 3D display without resolution or brightness loss |
| EP | 06809715.3 | 02-11-2005 | 26-10-2006 | | | 002452 | Multi-view 3D display without resolution or brightness loss |
| IN | 2163/CHENP/2008 | 02-11-2005 | 26-10-2006 | | | 002452 | Multi-view 3D display without resolution or brightness loss |
| JP | 08-538467 | 02-11-2005 | 26-10-2006 | | | 002452 | Multi-view 3D display without resolution or brightness loss |
| US | 12/092416 | 02-11-2005 | 26-10-2006 | 2008-0278809-A1 | | 002452 | Multi-view 3D display without resolution or brightness loss |
| CN | 200680030198.1 | 19-08-2005 | 17-08-2006 | 101243694 | | 002508 | Fractional view filtering for 3D displays |
| EP | 06795677.1 | 19-08-2005 | 17-08-2006 | 1922882A | | 002508 | Fractional view filtering for 3D displays |
| IN | 815/CHENP/2008 | 19-08-2005 | 17-08-2006 | | | 002508 | Fractional view filtering for 3D displays |
| JP | 08-526601 | 19-08-2005 | 17-08-2006 | | | 002508 | Fractional view filtering for 3D displays |
| RU | 2008110492 | 19-08-2005 | 17-08-2006 | | | 002508 | Fractional view filtering for 3D displays |
| US | 12/063859 | 19-08-2005 | 17-08-2006 | 2008-0225114-A1 | | 002508 | Fractional view filtering for 3D displays |
| CN | 200680032882.3 | 09-09-2005 | 08-09-2006 | 101258427-A | | 002525 | Painted LC material containing switchable lenticulars |
| EP | 06795967.6 | 09-09-2005 | 08-09-2006 | 1927021-A | | 002525 | Painted LC material containing switchable lenticulars |
| IN | 1176/CHENP/2008 | 09-09-2005 | 08-09-2006 | | | 002525 | Painted LC material containing switchable lenticulars |
| JP | 08-529762 | 09-09-2005 | 08-09-2006 | | | 002525 | Painted LC material containing switchable lenticulars |
| US | 12/065778 | 09-09-2005 | 08-09-2006 | | | 002525 | Painted LC material containing switchable lenticulars |

18

CONFIDENTIAL

| Country | Application No | Priority Date | Filing Date | Publication No | Grant No | Philips Ref | Title |
|---|---|---|---|---|---|---|---|
| CN | 200680041977.1 | 09-11-2005 | 30-10-2006 | 101305311 | | 002620 | Moiré reduction for displays |
| DE | 06821245.5 | 09-11-2005 | 30-10-2006 | | 602006009294.6 | 002620 | Moiré reduction for displays |
| FR | 06821245.5 | 09-11-2005 | 30-10-2006 | | 1949171 | 002620 | Moiré reduction for displays |
| GB | 06821245.5 | 09-11-2005 | 30-10-2006 | | 1949171 | 002620 | Moiré reduction for displays |
| JP | 08-539550 | 09-11-2005 | 30-10-2006 | | | 002620 | Moiré reduction for displays |
| US | 12/092872 | 09-11-2005 | 30-10-2006 | 2008-0316604-A1 | | 002620 | Moiré reduction for displays |
| CN | 200680040309.7 | 27-10-2005 | 23-10-2006 | 101297414-A | | 002623 | Directional OLED on structured substrate for multi/dual view displays or lighting applications |
| EP | 06821204.2 | 27-10-2005 | 23-10-2006 | 1943692 | | 002623 | Directional OLED on structured substrate for multi/dual view displays or lighting applications |
| IN | 2082/CHENP/2008 | 27-10-2005 | 23-10-2006 | | | 002623 | Directional OLED on structured substrate for multi/dual view displays or lighting applications |
| JP | 08-537273 | 27-10-2005 | 23-10-2006 | | | 002623 | Directional OLED on structured substrate for multi/dual view displays or lighting applications |
| US | 12/091592 | 27-10-2005 | 23-10-2006 | 2008-0285282-A1 | | 002623 | Directional OLED on structured substrate for multi/dual view displays or lighting applications |
| CN | 200680036052.8 | 28-09-2005 | 31-08-2006 | 101278367-A | | 002850 | A 2D/3D switchable display with arbitrary 2D and 3D areas |
| DE | 06795848.8 | 28-09-2005 | 31-08-2006 | | 602006007368.2 | 002850 | A 2D/3D switchable display with arbitrary 2D and 3D areas |
| FR | 06795848.8 | 28-09-2005 | 31-08-2006 | | 1932368 | 002850 | A 2D/3D switchable display with arbitrary 2D and 3D areas |
| GB | 06795848.8 | 28-09-2005 | 31-08-2006 | | 1932368 | 002850 | A 2D/3D switchable display with arbitrary 2D and 3D areas |
| IN | 1528/CHENP/2008 | 28-09-2005 | 31-08-2006 | | | 002850 | A 2D/3D switchable display with arbitrary 2D and 3D areas |
| JP | 08-532911 | 28-09-2005 | 31-08-2006 | | | 002850 | A 2D/3D switchable display with arbitrary 2D and 3D areas |
| US | 12/067964 | 28-09-2005 | 31-08-2006 | 2008-0252639-A1 | | 002850 | A 2D/3D switchable display with arbitrary 2D and 3D areas |
| CN | 200680036994.6 | 05-10-2005 | 25-09-2006 | 101283606-A | | 003372 | A configurable multi-view 2D/3D switchable display |
| EP | 06809390.5 | 05-10-2005 | 25-09-2006 | 1935187-A | | 003372 | A configurable multi-view 2D/3D switchable display |
| JP | 08-534115 | 05-10-2005 | 25-09-2006 | | | 003372 | A configurable multi-view 2D/3D switchable display |
| US | 12/089399 | 05-10-2005 | 25-09-2006 | 2008-0211977-A1 | | 003372 | A configurable multi-view 2D/3D switchable display |
| CN | 200680048559.5 | 20-12-2005 | 14-12-2006 | 101347001-A | | 003664 | Automatic correction for misaligned LCOS 3D displays |
| EP | 06842527.1 | 20-12-2005 | 14-12-2006 | 1967019 | | 003664 | Automatic correction for misaligned LCOS 3D displays |
| IN | 3114/CHENP/2008 | 20-12-2005 | 14-12-2006 | | | 003664 | Automatic correction for misaligned LCOS 3D displays |
| JP | 08-546765 | 20-12-2005 | 14-12-2006 | | | 003664 | Automatic correction for misaligned LCOS 3D displays |
| US | 12/158407 | 20-12-2005 | 14-12-2006 | 2009-0002484-A1 | | 003664 | Automatic correction for misaligned LCOS 3D displays |
| CN | 200680047032.0 | 13-12-2005 | 12-12-2006 | 101331776-A | | 003678 | Barrier usage in lenticular system design. |
| EP | 06842444.9 | 13-12-2005 | 12-12-2006 | 1964415-A | | 003678 | Barrier usage in lenticular system design. |
| JP | 08-545219 | 13-12-2005 | 12-12-2006 | | | 003678 | Barrier usage in lenticular system design. |
| US | 12/096935 | 13-12-2005 | 12-12-2006 | 2008-0316379-A1 | | 003678 | Barrier usage in lenticular system design. |
| CN | 200680048668.7 | 23-12-2005 | 20-12-2006 | 101347002A | | 003734 | Multiview 3D television using a set of microbeamers in rear projection |
| EP | 06842627.9 | 23-12-2005 | 20-12-2006 | 1967020-A | | 003734 | Multiview 3D television using a set of microbeamers in rear projection |
| JP | 08-546809 | 23-12-2005 | 20-12-2006 | | | 003734 | Multiview 3D television using a set of microbeamers in rear projection |
| US | 12/158702 | 23-12-2005 | 20-12-2006 | 2008-0304014-A1 | | 003734 | Multiview 3D television using a set of microbeamers in rear projection |
| CN | 200680043936.6 | 23-11-2005 | 17-11-2006 | 101313596-A | | 004239 | Motion Based 3D |
| EP | 06821483.2 | 23-11-2005 | 17-11-2006 | 1955553 | | 004239 | Motion Based 3D |
| JP | 08-541864 | 23-11-2005 | 17-11-2006 | | | 004239 | Motion Based 3D |
| US | 12/094628 | 23-11-2005 | 17-11-2006 | 2008-0309756-A1 | | 004239 | Motion Based 3D |
| CN | 200680047122.XA | 14-12-2005 | 04-12-2006 | 101331420-A | | 004329 | 2D/3D display with two depth modes |
| EP | 06832068.8 | 14-12-2005 | 04-12-2006 | 1963906-A | | 004329 | 2D/3D display with two depth modes |
| JP | 08-545161 | 14-12-2005 | 04-12-2006 | | | 004329 | 2D/3D display with two depth modes |
| US | 12/097395 | 14-12-2005 | 04-12-2006 | 2008-0316380-A1 | | 004329 | 2D/3D display with two depth modes |
| CN | 200680048372.5 | 20-12-2005 | 22-11-2006 | 101341433 | | 004353 | Improved 2D uniformity of switchable 2D/3D displays |
| EP | 06821528.4 | 20-12-2005 | 22-11-2006 | 1966643 | | 004353 | Improved 2D uniformity of switchable 2D/3D displays |
| JP | 08-546698 | 20-12-2005 | 22-11-2006 | 2008-0266472-A1 | | 004353 | Improved 2D uniformity of switchable 2D/3D displays |
| US | 12/097771 | 20-12-2005 | 22-11-2006 | 2008-0266472-A1 | | 004353 | Improved 2D uniformity of switchable 2D/3D displays |
| CN | 200680048340.5 | 28-11-2005 | 28-11-2006 | 101341762-A | | 004354 | Improved 2D uniformity of 2D/3D displays |
| EP | 06831985.4 | 28-11-2005 | 28-11-2006 | 1967014-A | | 004354 | Improved 2D uniformity of 2D/3D displays |
| JP | 08-543976 | 20-12-2005 | 28-11-2006 | | | 004354 | Improved 2D uniformity of 2D/3D displays |
| US | 12/097776 | 20-12-2005 | 28-11-2006 | 2008-0297594-A1 | | 004354 | Improved 2D uniformity of 2D/3D displays |
| CN | 200680047138.0A | 14-12-2005 | 05-12-2006 | 101331777-A | | 004358 | Optimal driving for locally switchable 2D/3D displays with both electrodes structured |
| EP | 06832091.0 | 14-12-2005 | 05-12-2006 | 1964414-A | | 004358 | Optimal driving for locally switchable 2D/3D displays with both electrodes structured |
| JP | 08-545167 | 14-12-2005 | 05-12-2006 | | | 004358 | Optimal driving for locally switchable 2D/3D displays with both electrodes structured |
| US | 12/097373 | 14-12-2005 | 05-12-2006 | 2009-0046143-A1 | | 004358 | Optimal driving for locally switchable 2D/3D displays with both electrodes structured |
| CN | 200680048292.X | 20-12-2005 | 11-12-2006 | 101444105-A | | 004361 | Adaptive 3D display |
| EP | 06832195.9 | 20-12-2005 | 11-12-2006 | 1967017-A | | 004361 | Adaptive 3D display |
| JP | 08-546714 | 20-12-2005 | 11-12-2006 | | | 004361 | Adaptive 3D display |
| US | 12/097781 | 20-12-2005 | 11-12-2006 | 2008-0266387-A1 | | 004361 | Adaptive 3D display |
| CN | 200780009362.5 | 15-03-2006 | 14-03-2007 | 101405767-A | | 004390 | High Quality Depth from Stereo by Multi-Candidate Surface Filtering |
| EP | 07735103.9 | 15-03-2006 | 14-03-2007 | 1997072-A | | 004390 | High Quality Depth from Stereo by Multi-Candidate Surface Filtering |
| JP | 2008-558971 | 15-03-2006 | 14-03-2007 | | | 004390 | High Quality Depth from Stereo by Multi-Candidate Surface Filtering |
| US | 12/282904 | 15-03-2006 | 14-03-2007 | 2009-0080767-A1 | | 004390 | High Quality Depth from Stereo by Multi-Candidate Surface Filtering |
| CN | 200680048482.1 | 20-12-2005 | 13-12-2006 | 101341763A | | 004581 | Method to increase the resolution and number of views of multi-view 3D displays |
| EP | 06842489.4 | 20-12-2005 | 13-12-2006 | 1967018-A | | 004581 | Method to increase the resolution and number of views of multi-view 3D displays |
| JP | 08-546748 | 20-12-2005 | 13-12-2006 | | | 004581 | Method to increase the resolution and number of views of multi-view 3D displays |
| US | 12/097778 | 20-12-2005 | 13-12-2006 | 2008-0259233-A1 | | 004581 | Method to increase the resolution and number of views of multi-view 3D displays |
| CN | 200780006979.1 | 27-02-2006 | 16-02-2007 | 101390131A | | 005093 | Texture adaptive depth scaling for stereoscopic television |
| EP | 07703906.1 | 27-02-2006 | 16-02-2007 | 1991965-A | | 005093 | Texture adaptive depth scaling for stereoscopic television |
| IN | 4460/CHENP/2008 | 27-02-2006 | 16-02-2007 | | | 005093 | Texture adaptive depth scaling for stereoscopic television |
| JP | 08-555919 | 27-02-2006 | 16-02-2007 | | | 005093 | Texture adaptive depth scaling for stereoscopic television |
| KR | 10-2008-7023542 | 27-02-2006 | 16-02-2007 | | | 005093 | Texture adaptive depth scaling for stereoscopic television |
| US | 12/280377 | 27-02-2006 | 16-02-2007 | 2009-0115780-A1 | | 005093 | Texture adaptive depth scaling for stereoscopic television |
| CN | 200780077028.6 | 28-02-2006 | 05-02-2007 | 101395634-A | | 005210 | Directional hole filling algorithm |
| EP | 07705793.3 | 28-02-2006 | 05-02-2007 | 1991958-A | | 005210 | Directional hole filling algorithm |
| IN | 4526/CHENP/2008 | 28-02-2006 | 05-02-2007 | | | 005210 | Directional hole filling algorithm |
| JP | 08-556879 | 28-02-2006 | 05-02-2007 | | | 005210 | Directional hole filling algorithm |
| US | 12/280573 | 28-02-2006 | 05-02-2007 | 2009-0016640-A1 | | 005210 | Directional hole filling algorithm |
| CN | 200780006577.1 | 24-02-2006 | 20-02-2007 | 101390405 | | 005229 | Reversed mechanics 3D-module |
| EP | 07703916.0 | 24-02-2006 | 20-02-2007 | 1989890-A | | 005229 | Reversed mechanics 3D-module |
| JP | 08-555920 | 24-02-2006 | 20-02-2007 | | | 005229 | Reversed mechanics 3D-module |
| KR | 10-2008-7020615 | 24-02-2006 | 20-02-2007 | | | 005229 | Reversed mechanics 3D-module |
| TW | 096106581 | 24-02-2006 | 20-02-2007 | 200739188-A | | 005229 | Reversed mechanics 3D-module |
| US | 12/279905 | 24-02-2006 | 20-02-2007 | 2009-0009669-A1 | | 005229 | Reversed mechanics 3D-module |
| CN | 200780013803.3 | 04-09-2006 | 04-09-2007 | 101512601-A | | 005273 | High Quality Depth from Stereo by Multi-candidate Surface Filtering (2) |
| EP | 07826248.2 | 04-09-2006 | 04-09-2007 | 2064675A | | 005273 | High Quality Depth from Stereo by Multi-candidate Surface Filtering (2) |
| IN | 1224/CHENP/2009 | 04-09-2006 | 04-09-2007 | | | 005273 | High Quality Depth from Stereo by Multi-candidate Surface Filtering (2) |
| JP | 2009-526255 | 04-09-2006 | 04-09-2007 | | | 005273 | High Quality Depth from Stereo by Multi-candidate Surface Filtering (2) |
| KR | 10-2009-7006726 | 04-09-2006 | 04-09-2007 | | | 005273 | High Quality Depth from Stereo by Multi-candidate Surface Filtering (2) |
| US | 12/439691 | 04-09-2006 | 04-09-2007 | 2009-0324059-A1 | | 005273 | High Quality Depth from Stereo by Multi-candidate Surface Filtering (2) |
| CN | 200780007667.2 | 03-03-2006 | 26-02-2007 | 101395932A | | 005279 | Switchable 3D display without 2D artefacts |
| EP | 07705945.9 | 03-03-2006 | 26-02-2007 | 1994767-A | | 005279 | Switchable 3D display without 2D artefacts |
| IN | 4649/CHENP/2008 | 03-03-2006 | 26-02-2007 | | | 005279 | Switchable 3D display without 2D artefacts |
| JP | 08-556896 | 03-03-2006 | 26-02-2007 | | | 005279 | Switchable 3D display without 2D artefacts |
| RU | 2008139308 | 03-03-2006 | 26-02-2007 | | | 005279 | Switchable 3D display without 2D artefacts |
| US | 12/281001 | 03-03-2006 | 26-02-2007 | 2009-0033812-A1 | | 005279 | Switchable 3D display without 2D artefacts |
| CN | 200780021439.0 | 09-06-2006 | 29-05-2007 | 101467106-A | | 005440 | Using reflective or transmissive LCD to implement amplitude electro-hologram without using an analys |
| EP | 07736037.8 | 09-06-2006 | 29-05-2007 | 2033052-A | | 005440 | Using reflective or transmissive LCD to implement amplitude electro-hologram without using an analys |
| JP | 09-513814 | 09-06-2006 | 29-05-2007 | | | 005440 | Using reflective or transmissive LCD to implement amplitude electro-hologram without using an analys |
| US | 12/303964 | 09-06-2006 | 29-05-2007 | | | 005440 | Using reflective or transmissive LCD to implement amplitude electro-hologram without using an analys |

19

CONFIDENTIAL

| Country | Application No | Priority Date | Filing Date | Publication No | Grant No | Philips Ref | Title |
|---|---|---|---|---|---|---|---|
| CN | 200780021529.X | 09-06-2006 | 29-05-2007 | 101467108A | | 005441 | Suppression of zeroth order diffraction by appropriate rotation of polarization with transmissive or |
| EP | 07736038.6 | 09-06-2006 | 29-05-2007 | 2033053-A | | 005441 | Suppression of zeroth order diffraction by appropriate rotation of polarization with transmissive or |
| JP | 09-513815 | 09-06-2006 | 29-05-2007 | | | 005441 | Suppression of zeroth order diffraction by appropriate rotation of polarization with transmissive or |
| US | 12/303971 | 09-06-2006 | 29-05-2007 | | | 005441 | Suppression of zeroth order diffraction by appropriate rotation of polarization with transmissive or |
| CN | 200780012472.7 | 31-03-2006 | 23-03-2007 | 101416520 | | 005471 | Generic stereoscopic format |
| EP | 07735242.5 | 31-03-2006 | 23-03-2007 | 2005757-A | | 005471 | Generic stereoscopic format |
| IN | 5240?CHENP/2008 | 31-03-2006 | 23-03-2007 | | | 005471 | Generic stereoscopic format |
| JP | 09-502293 | 31-03-2006 | 23-03-2007 | | | 005471 | Generic stereoscopic format |
| KR | 10-2008-7026820 | 31-03-2006 | 23-03-2007 | | | 005471 | Generic stereoscopic format |
| RU | 2008143203 | 31-03-2006 | 23-03-2007 | | | 005471 | Generic stereoscopic format |
| US | 12/294515 | 31-03-2006 | 23-03-2007 | | | 005471 | Generic stereoscopic format |
| CN | 200780017005.3 | 09-05-2006 | 07-05-2007 | 101443810-A | | 005826 | Image adaptive block erosion |
| EP | 07735787.9 | 09-05-2006 | 07-05-2007 | 2018626-A | | 005826 | Image adaptive block erosion |
| IN | 6069/CHENP/2008 | 09-05-2006 | 07-05-2007 | | | 005826 | Image adaptive block erosion |
| JP | 10-508630 | 09-05-2006 | 07-05-2007 | | | 005826 | Image adaptive block erosion |
| KR | 10-2008-7027140 | 09-05-2006 | 07-05-2007 | | | 005826 | Image adaptive block erosion |
| US | 12/299652 | 09-05-2006 | 07-05-2007 | 2009-0179920-A1 | | 005826 | Image adaptive block erosion |
| CN | 200780044922.0 | 04-12-2006 | 03-12-2007 | 101589626A | | 006177 | Modifying depth map encoding for a perceptual higher quality |
| EP | 07849316.0 | 04-12-2006 | 03-12-2007 | 2106668-A | | 006177 | Modifying depth map encoding for a perceptual higher quality |
| IN | 3866/CHENP/2009 | 04-12-2006 | 03-12-2007 | | | 006177 | Modifying depth map encoding for a perceptual higher quality |
| JP | 2009-538847 | 04-12-2006 | 03-12-2007 | | | 006177 | Modifying depth map encoding for a perceptual higher quality |
| US | 12/517224 | 04-12-2006 | 03-12-2007 | | | 006177 | Modifying depth map encoding for a perceptual higher quality |
| CN | 200780030765.8 | 18-08-2006 | 17-08-2007 | 101506716-A | | 006205 | Lifetime improvement for vacuum mounted lenticulars using buffers. |
| EP | 07805430.1 | 18-08-2006 | 17-08-2007 | 2057500-A | | 006205 | Lifetime improvement for vacuum mounted lenticulars using buffers. |
| JP | 09-524301 | 18-08-2006 | 18-08-2006 | | | 006205 | Lifetime improvement for vacuum mounted lenticulars using buffers. |
| US | 60/822763 | 18-08-2006 | 18-08-2006 | | | 006205 | Lifetime improvement for vacuum mounted lenticulars using buffers. |
| CN | 200780030647.7 | 17-08-2006 | 14-08-2007 | 101507288-A | | 006290 | Viewing angle doubling for 3D multi-view displays |
| EP | 07805399.8 | 17-08-2006 | 14-08-2007 | 2055110-A | | 006290 | Viewing angle doubling for 3D multi-view displays |
| JP | 2009-524294 | 17-08-2006 | 14-08-2007 | | | 006290 | Viewing angle doubling for 3D multi-view displays |
| US | 12/377680 | 17-08-2006 | 14-08-2007 | | | 006290 | Viewing angle doubling for 3D multi-view displays |
| CN | 200780031504.8 | 24-08-2006 | 11-04-2007 | 101506729-A | | 006308 | Curvature reduction switchable polymer lenticulars. |
| DE | 07735469.4 | 24-08-2006 | 11-04-2007 | | 2064590 | 006308 | Curvature reduction switchable polymer lenticulars. |
| FR | 07735469.4 | 24-08-2006 | 11-04-2007 | | 2064590 | 006308 | Curvature reduction switchable polymer lenticulars. |
| GB | 07735469.4 | 24-08-2006 | 11-04-2007 | | 2064590 | 006308 | Curvature reduction switchable polymer lenticulars. |
| JP | 2009-525130 | 24-08-2006 | 11-04-2007 | | | 006308 | Curvature reduction switchable polymer lenticulars. |
| KR | 10-2009-7003425 | 24-08-2006 | 11-04-2007 | | | 006308 | Curvature reduction switchable polymer lenticulars. |
| TW | 096130893 | 24-08-2006 | 21-08-2007 | 200817724-A | | 006308 | Curvature reduction switchable polymer lenticulars. |
| US | 12/376575 | 24-08-2006 | 11-04-2007 | | | 006308 | Curvature reduction switchable polymer lenticulars. |
| CN | 200780032421.0 | 31-08-2006 | 23-08-2007 | 101512414-A | | 006471 | Backlight for a lenticular 3D display with improved brightness and contrast |
| EP | 07826108.8 | 31-08-2006 | 23-08-2007 | 2062088-A | | 006471 | Backlight for a lenticular 3D display with improved brightness and contrast |
| JP | 2009-526225 | 31-08-2006 | 23-08-2007 | | | 006471 | Backlight for a lenticular 3D display with improved brightness and contrast |
| US | 12/438737 | 31-08-2006 | 23-08-2007 | 2009-0322862-A1 | | 006471 | Backlight for a lenticular 3D display with improved brightness and contrast |
| CN | 200780047085.7 | 19-12-2006 | 14-12-2007 | 101563935-A | | 006835 | Depth estimation from video assisted by audio |
| EP | 07849501.7 | 19-12-2006 | 14-12-2007 | 2092760A | | 006835 | Depth estimation from video assisted by audio |
| IN | 4204/CHENP/2009 | 19-12-2006 | 14-12-2007 | | | 006835 | Depth estimation from video assisted by audio |
| JP | | 19-12-2006 | 14-12-2007 | | | 006835 | Depth estimation from video assisted by audio |
| KR | 10-2009-7015008 | 19-12-2006 | 14-12-2007 | | | 006835 | Depth estimation from video assisted by audio |
| RU | 2009127757 | 19-12-2006 | 14-12-2007 | | | 006835 | Depth estimation from video assisted by audio |
| US | 12/519378 | 19-12-2006 | 14-12-2007 | | | 006835 | Depth estimation from video assisted by audio |
| CN | 200780037524.6 | 04-10-2006 | 02-10-2007 | 101523434-A | | 006957 | A novel method for depth map post processing for high quality 3D impression |
| EP | 07826616.0 | 04-10-2006 | 02-10-2007 | 2074586-A | | 006957 | A novel method for depth map post processing for high quality 3D impression |
| IN | 2396/CHENP/2009 | 04-10-2006 | 02-10-2007 | | | 006957 | A novel method for depth map post processing for high quality 3D impression |
| JP | 2009-530990 | 04-10-2006 | 02-10-2007 | | | 006957 | A novel method for depth map post processing for high quality 3D impression |
| KR | 10-2009-7008979 | 04-10-2006 | 02-10-2007 | | | 006957 | A novel method for depth map post processing for high quality 3D impression |
| US | 12/443728 | 04-10-2006 | 02-10-2007 | 2010-0002948-A1 | | 006957 | A novel method for depth map post processing for high quality 3D impression |
| CN | 200780043262.4 | 21-11-2006 | 15-11-2007 | 101542529-A | | 007031 | Depth from One Image using Visual Saliency |
| EP | 07849156.0 | 21-11-2006 | 15-11-2007 | 2087466A | | 007031 | Depth from One Image using Visual Saliency |
| IN | 3125/CHENP/2009 | 21-11-2006 | 15-11-2007 | | | 007031 | Depth from One Image using Visual Saliency |
| JP | 2009-537725 | 21-11-2006 | 15-11-2007 | | | 007031 | Depth from One Image using Visual Saliency |
| US | 12/514464 | 21-11-2006 | 15-11-2007 | | | 007031 | Depth from One Image using Visual Saliency |
| CN | 200780047096.5 | 19-12-2006 | 12-12-2007 | 101563629-A | | 007231 | 3D display with diminished blurring |
| EP | 07849438.2 | 19-12-2006 | 12-12-2007 | 2095158-A | | 007231 | 3D display with diminished blurring |
| JP | 2009-542292 | 19-12-2006 | 12-12-2007 | 2010-0027115-A1 | | 007231 | 3D display with diminished blurring |
| US | 12/519389 | 19-12-2006 | 12-12-2007 | | | 007231 | 3D display with diminished blurring |
| CN | 200780047217.6 | 19-12-2006 | 12-12-2007 | 101568873-A | | 007233 | Low-cost large-screen 3D (home) cinema |
| EP | 07849451.5 | 19-12-2006 | 12-12-2007 | 2095173-A | | 007233 | Low-cost large-screen 3D (home) cinema |
| JP | 2009-542300 | 19-12-2006 | 12-12-2007 | | | 007233 | Low-cost large-screen 3D (home) cinema |
| US | 12/518916 | 19-12-2006 | 12-12-2007 | | | 007233 | Low-cost large-screen 3D (home) cinema |
| CN | 200880021844.7 | 26-06-2007 | 19-06-2008 | | | 007944 | Efficient coding of occlusion data |
| EP | 08763388.9 | 26-06-2007 | 19-06-2008 | 2163103A | | 007944 | Efficient coding of occlusion data |
| IN | 366/CHENP/2010 | 26-06-2007 | 19-06-2008 | | | 007944 | Efficient coding of occlusion data |
| JP | not yet known | 26-06-2007 | 19-06-2008 | | | 007944 | Efficient coding of occlusion data |
| KR | 10-2010-7001680 | 26-06-2007 | 19-06-2008 | | | 007944 | Efficient coding of occlusion data |
| RU | | 26-06-2007 | 19-06-2008 | | | 007944 | Efficient coding of occlusion data |
| US | 12/665093 | 26-06-2007 | 19-06-2008 | | | 007944 | Efficient coding of occlusion data |
| CN | 200880023190.1 | 03-07-2007 | 24-06-2008 | | | 008006 | Motion Assisted Gravity |
| EP | 08776466.8 | 03-07-2007 | 24-06-2008 | | | 008006 | Motion Assisted Gravity |
| IN | 535/CHENP/2010 | 03-07-2007 | 24-06-2008 | | | 008006 | Motion Assisted Gravity |
| JP | not yet known | 03-07-2007 | 24-06-2008 | | | 008006 | Motion Assisted Gravity |
| US | 12/667241 | 03-07-2007 | 24-06-2008 | | | 008006 | Motion Assisted Gravity |
| AU | | 24-09-2007 | 16-09-2008 | | | 008351 | 2D compatibility using compressed stereo video formats |
| BR | | 24-09-2007 | 16-09-2008 | | | 008351 | 2D compatibility using compressed stereo video formats |
| CA | | 24-09-2007 | 16-09-2008 | | | 008351 | 2D compatibility using compressed stereo video formats |
| CN | | 24-09-2007 | 16-09-2008 | | | 008351 | 2D compatibility using compressed stereo video formats |
| EG | | 24-09-2007 | 16-09-2008 | | | 008351 | 2D compatibility using compressed stereo video formats |
| EP | 08807668.2 | 24-09-2007 | 16-09-2008 | | | 008351 | 2D compatibility using compressed stereo video formats |
| ID | | 24-09-2007 | 16-09-2008 | | | 008351 | 2D compatibility using compressed stereo video formats |
| IN | | 24-09-2007 | 16-09-2008 | | | 008351 | 2D compatibility using compressed stereo video formats |
| JP | | 24-09-2007 | 16-09-2008 | | | 008351 | 2D compatibility using compressed stereo video formats |
| KR | | 24-09-2007 | 16-09-2008 | | | 008351 | 2D compatibility using compressed stereo video formats |
| MX | | 24-09-2007 | 16-09-2008 | | | 008351 | 2D compatibility using compressed stereo video formats |
| MY | | 24-09-2007 | 16-09-2008 | | | 008351 | 2D compatibility using compressed stereo video formats |
| RU | | 24-09-2007 | 16-09-2008 | | | 008351 | 2D compatibility using compressed stereo video formats |
| US | 12/526665 | 24-09-2007 | 16-09-2008 | | | 008351 | 2D compatibility using compressed stereo video formats |
| ZA | | 24-09-2007 | 16-09-2008 | | | 008351 | 2D compatibility using compressed stereo video formats |
| CN | 200880012592.1 | 17-04-2007 | 14-04-2008 | | | 008450 | Improved GRIN-lens design for 2D/3D switchable displays |
| EP | 08737826.1 | 17-04-2007 | 14-04-2008 | 2140304-A | | 008450 | Improved GRIN-lens design for 2D/3D switchable displays |
| IN | 6603/CHENP/2009 | 17-04-2007 | 14-04-2008 | | | 008450 | Improved GRIN-lens design for 2D/3D switchable displays |
| JP | 2010-503637 | 17-04-2007 | 14-04-2008 | | | 008450 | Improved GRIN-lens design for 2D/3D switchable displays |
| KR | 10-2009-7023830 | 17-04-2007 | 14-04-2008 | | | 008450 | Improved GRIN-lens design for 2D/3D switchable displays |
| TW | 097113677 | 17-04-2007 | 15-04-2008 | 200900827-A | | 008450 | Improved GRIN-lens design for 2D/3D switchable displays |
| US | 12/595250 | 17-04-2007 | 14-04-2008 | | | 008450 | Improved GRIN-lens design for 2D/3D switchable displays |
| CN | 200880015625.8 | 11-05-2007 | 05-05-2008 | | | 008487 | Automatic disparity to depth conversion |
| EP | 08738076.2 | 11-05-2007 | 05-05-2008 | 2153669 | | 008487 | Automatic disparity to depth conversion |
| IN | 7128/CHENP/2009 | 11-05-2007 | 05-05-2008 | | | 008487 | Automatic disparity to depth conversion |
| JP | not yet known | 11-05-2007 | 05-05-2008 | | | 008487 | Automatic disparity to depth conversion |
| KR | 10-2009-7025762 | 11-05-2007 | 05-05-2008 | | | 008487 | Automatic disparity to depth conversion |
| US | 12/599362 | 11-05-2007 | 05-05-2008 | | | 008487 | Automatic disparity to depth conversion |

| Country | Application No | Priority Date | Filing Date | Publication No | Grant No | Philips Ref | Title |
|---|---|---|---|---|---|---|---|
| WO | IB2008/054420 | 02-11-2007 | 27-10-2008 | 2009/057030-A1 | | 008696 | Method for increasing resolution and viewing angle of multi-view displays |
| TW | 097137515 | 02-10-2007 | 30-09-2008 | 200923422A | | 008697 | Optimal pixel distribution for 3D displays with view doubling |
| WO | IB2008/053971 | 02-10-2007 | 30-09-2008 | 2009/044334-A1 | | 008697 | Optimal pixel distribution for 3D displays with view doubling |
| TW | 098103729 | 08-02-2008 | 05-02-2009 | 200938878-A | | 008794 | Application- and/or content-dependent adaptation of the lens strength in lenticular based 3D display |
| WO | IB2009/050395 | 08-02-2008 | 02-02-2009 | | | 008794 | Application- and/or content-dependent adaptation of the lens strength in lenticular based 3D display |
| CN | unknown | 26-07-2007 | 18-07-2008 | | | 008920 | Depth propagation with correction for 3D video production |
| EP | 08789359.0 | 26-07-2007 | 18-07-2008 | | | 008920 | Depth propagation with correction for 3D video production |
| IN | 923/CHENP/2010 | 26-07-2007 | 18-07-2008 | | | 008920 | Depth propagation with correction for 3D video production |
| JP | not yet known | 26-07-2007 | 18-07-2008 | | | 008920 | Depth propagation with correction for 3D video production |
| KR | | 26-07-2007 | 18-07-2008 | | | 008920 | Depth propagation with correction for 3D video production |
| US | 12/669828 | 26-07-2007 | 18-07-2008 | | | 008920 | Depth propagation with correction for 3D video production |
| WO | IB2008/054027 | 11-10-2007 | 02-10-2008 | 2009/047681-A1 | | 009182 | Post processing of centre view depth map using occlusion depth map |
| TW | 098104096 | 11-02-2008 | 09-02-2009 | 200952463-A | | 009443 | A 3D landscape/portrait display |
| WO | IB2009/050491 | 11-02-2008 | 06-02-2009 | | | 009443 | A 3D landscape/portrait display |
| TW | 097149181 | 20-12-2007 | 17-12-2008 | 200933872-A | | 009631 | Depth editor with interactive segment merging |
| WO | IB2008/055266 | 20-12-2007 | 15-12-2008 | | | 009631 | Depth editor with interactive segment merging |
| TW | IB2009/052765 | 27-06-2008 | 26-06-2009 | | | 009849 | Improved 3D display design using lenticulars combined with a diffusor layer or a micro-lens array |
| TW | 098102271 | 24-01-2008 | 21-01-2009 | 200948043A | | 009878 | Colour blending for calculating the hidden texture layer in a layered 3D video format |
| WO | IB2009/050222 | 24-01-2008 | 21-01-2009 | | | 009878 | Colour blending for calculating the hidden texture layer in a layered 3D video format |
| TW | 098118075 | 02-06-2008 | 01-06-2009 | 201004313-A | | 009896 | Depth map coding of side or occluded areas [Drape] |
| WO | IB2009/052225 | 02-06-2008 | 27-05-2009 | | | 009896 | Depth map coding of side or occluded areas [Drape] |
| TW | 098118246 | 02-06-2008 | 01-06-2009 | | | 010417 | A 3D Display with a low-dn lens array (revisited) |
| WO | IB2009/052233 | 02-06-2008 | 27-05-2009 | 201003123A | | 010417 | A 3D Display with a low-dn lens array (revisited) |
| TW | 098128413 | 26-08-2008 | 24-08-2009 | | | 010591 | A flexible format for multi-type multilayer 3D content storage and display. |
| WO | IB2009/053668 | 26-08-2008 | 17-08-2009 | | | 010591 | A flexible format for multi-type multilayer 3D content storage and display. |
| TW | IB2009/053167 | 28-07-2008 | 22-12-2009 | | | 010592 | Use of inpainting techniques for image and dept correction |
| TW | 098143942 | 22-12-2008 | 21-12-2009 | | | 010802 | Multi-view 3D display with reduced banding |
| WO | IB2009/055789 | 22-12-2008 | 16-12-2009 | | | 010802 | Multi-view 3D display with reduced banding |
| WO | IB2009/053858 | 11-09-2008 | 04-09-2009 | | | 010911 | Adaptive Weighed Mixing Adjustment for Bilateral Filter |
| TW | 098134162 | 10-10-2008 | 08-10-2009 | | | 011060 | Parallax Transform Interpolation |
| WO | IB2009/054302 | 10-10-2008 | 01-10-2009 | | | 011060 | Parallax Transform Interpolation |
| TW | 098132351 | 25-09-2008 | 24-09-2009 | | | 011080 | Depth signal improvement in the presence of alpha |
| WO | IB2009/054160 | 25-09-2008 | 23-09-2009 | | | 011080 | Depth signal improvement in the presence of alpha |
| TW | 098137138 | 04-11-2008 | 02-11-2009 | | | 011087 | Metadata for Occlusion Layers |
| WO | IB2009/054869 | 04-11-2008 | 03-11-2009 | | | 011087 | Metadata for Occlusion Layers |
| TW | 098131956 | 25-09-2008 | 22-09-2009 | | | 011089 | Specifying dependence between layers in multi-layer 3D representations |
| WO | IB2009/054088 | 25-09-2008 | 18-09-2009 | | | 011089 | Specifying dependence between layers in multi-layer 3D representations |
| TW | 098136208 | 28-10-2008 | 26-10-2009 | | | 011690 | Soft 2D-3D switching of 3D displays based on user attention |
| WO | IB2009/054713 | 28-10-2008 | 21-10-2009 | | | 011690 | Soft 2D-3D switching of 3D displays based on user attention |
| TW | 098136206 | 28-10-2008 | 26-10-2009 | | | 011691 | System and apparatus for automated generation of WOWvx Declipse content in 3D content creation tools |
| WO | IB2009/054638 | 28-10-2008 | 21-10-2009 | | | 011691 | System and apparatus for automated generation of WOWvx Declipse content in 3D content creation tools |
| WO | IB2009/055727 | 19-12-2008 | 14-12-2009 | | | 011820 | Automatic depth estimation for soccer video |
| TW | 098135302 | 21-10-2008 | 19-10-2009 | | | 012017 | Protection of 3D content in the Declipse 2 format against compression and resizing |
| WO | IB2009/054543 | 21-10-2008 | 15-10-2009 | | | 012017 | Protection of 3D content in the Declipse 2 format against compression and resizing |
| EP | 08170482.7 | 02-12-2008 | 02-12-2008 | | | 012030 | Question interface for 3D picture creation |
| TW | 098140846 | 02-12-2008 | 30-11-2009 | | | 012030 | Question interface for 3D picture creation |
| WO | IB2009/055363 | 02-12-2008 | 26-11-2009 | | | 012030 | Question interface for 3D picture creation |
| EP | 08171031.1 | 09-12-2008 | 09-12-2008 | | | 012036 | A hybrid interface for interactive image segmentation |
| TW | 098142117 | 09-12-2008 | 09-12-2009 | | | 012036 | A hybrid interface for interactive image segmentation |
| WO | IB2009/055486 | 09-12-2008 | 03-12-2009 | | | 012036 | A hybrid interface for interactive image segmentation |
| EP | 08169425.9 | 18-12-2008 | 18-12-2008 | | | 012085 | Ideal panel and lenticular configurations for autostereoscopic 3D displays |
| WO | IB2009/055705 | 18-12-2008 | 11-12-2009 | | | 012085 | Ideal panel and lenticular configurations for autostereoscopic 3D displays |
| EP | 08168248.6 | 04-11-2008 | 04-11-2008 | | | 012091 | Liveliness control for 2D to 3D conversion |
| TW | 098137434 | 04-11-2008 | 04-11-2009 | | | 012091 | Liveliness control for 2D to 3D conversion |
| WO | IB2009/054857 | 04-11-2008 | 02-11-2009 | | | 012091 | Liveliness control for 2D to 3D conversion |
| EP | 08171627.6 | 15-12-2008 | 15-12-2008 | | | 012131 | Image-based 3D video format. |
| WO | IB2009/055638 | 15-12-2008 | 10-12-2009 | | | 012131 | Image-based 3D video format. |
| EP | 09155332.1 | 17-03-2009 | 17-03-2009 | | | 012392 | A Colour Sequential display |
| TW | | 17-03-2009 | | | | 012392 | A Colour Sequential display |
| WO | | 17-03-2009 | | | | 012392 | A Colour Sequential display |
| EP | 09161377.8 | 28-05-2009 | 28-05-2009 | | | 012922 | A Blue Phase Switchable 3D Lenticular |
| TW | | 28-05-2009 | | | | 012922 | A Blue Phase Switchable 3D Lenticular |
| WO | | 28-05-2009 | | | | 012922 | A Blue Phase Switchable 3D Lenticular |
| EP | 09156092.0 | 25-03-2009 | 25-03-2009 | | | 012924 | R2R switchable cell making |
| EP | 09156465.8 | 25-03-2009 | 27-03-2009 | | | 012924 | R2R switchable cell making |
| WO | | 25-03-2009 | | | | 012924 | R2R switchable cell making |
| EP | 09161330.7 | 28-05-2009 | 28-05-2009 | | | 013213 | Single-cone auto-stereoscopic 3D display |
| EP | 09163875.9 | 28-05-2009 | 26-06-2009 | | | 013213 | Single-cone auto-stereoscopic 3D display |
| EP | | 28-05-2009 | | | | 013213 | Single-cone auto-stereoscopic 3D display |
| TW | | 28-05-2009 | | | | 013213 | Single-cone auto-stereoscopic 3D display |
| WO | | 28-05-2009 | | | | 013213 | Single-cone auto-stereoscopic 3D display |
| EP | 09174882.2 | 03-11-2009 | 03-11-2009 | | | 013358 | Time sequential subsubpixel driving of LCD's for improved resolution 3D. |
| TW | | 03-11-2009 | | | | 013358 | Time sequential subsubpixel driving of LCD's for improved resolution 3D. |
| WO | | 03-11-2009 | | | | 013358 | Time sequential subsubpixel driving of LCD's for improved resolution 3D. |
| EP | 09161339.8 | 28-05-2009 | 28-05-2009 | | | 013359 | Ultra high angle (3D) LCD |
| TW | | 28-05-2009 | | | | 013359 | Ultra high angle (3D) LCD |
| WO | | 28-05-2009 | | | | 013359 | Ultra high angle (3D) LCD |
| EP | 09163872.6 | 26-06-2009 | 26-06-2009 | | | 013360 | Improved 3D performance by time-sequential operation |
| TW | | 26-06-2009 | | | | 013360 | Improved 3D performance by time-sequential operation |
| WO | | 26-06-2009 | | | | 013360 | Improved 3D performance by time-sequential operation |
| EP | 09163866.8 | 26-06-2009 | 26-06-2009 | | | 013361 | Improved 2D mode of 2D/3D switchable TV |
| WO | | 26-06-2009 | | | | 013361 | Improved 2D mode of 2D/3D switchable TV |
| EP | 09174890.5 | 03-11-2009 | 03-11-2009 | | | 013883 | Capping layer on electrodes of (multi-electrode) gradient-index lens |
| TW | | 03-11-2009 | | | | 013883 | Capping layer on electrodes of (multi-electrode) gradient-index lens |
| WO | | 03-11-2009 | | | | 013883 | Capping layer on electrodes of (multi-electrode) gradient-index lens |
| EP | 09175913.4 | 13-11-2009 | 13-11-2009 | | | 014160 | Efficient alpha map coding in 3D/stereoscopic video enabling improved fore/background transitions. |
| TW | | 13-11-2009 | | | | 014160 | Efficient alpha map coding in 3D/stereoscopic video enabling improved fore/background transitions. |
| WO | | 13-11-2009 | | | | 014160 | Efficient alpha map coding in 3D/stereoscopic video enabling improved fore/background transitions. |
| EP | 09172096.1 | 02-10-2009 | 02-10-2009 | | | 014161 | Encoding preferred rendering direction in video signal |
| WO | | 02-10-2009 | | | | 014161 | Encoding preferred rendering direction in video signal |

21

Case 2:13-cv-00663-JRG-RSP Document 34-4 Filed 04/03/13 Page 295 of 294
Case 2:13-cv-00636-JRG-RSP Document 34-4 Filed 04/03/13 Page 295 of 294
Exhibit A    Page 295 of 409

CONFIDENTIAL

| Country | Application No | Priority Date | Filing Date | Publication No | Grant No | Philips Ref | Title |
|---|---|---|---|---|---|---|---|
| EP | 09175901.9 | 13-11-2009 | 13-11-2009 | | | 014307 | Rendering of 2D-plus-Depth content with asymmetric resolution of centre view and parallax map |
| WO | | 13-11-2009 | | | | 014307 | Rendering of 2D-plus-Depth content with asymmetric resolution of centre view and parallax map |
| CN | 99801455.9 | 30-06-1998 | 14-06-1999 | 1277698-A | 99801455.9 | A 023407 | STEREOSCOPIC 3D IN HARDWARE ACCELERATED RENDERING ARCHITECT. (stereo interception filter) |
| DE | 99922458.7 | 30-06-1998 | 14-06-1999 | 1038271-A1 | 69912576.6 | A 023407 | STEREOSCOPIC 3D IN HARDWARE ACCELERATED RENDERING ARCHITECT. (stereo interception filter) |
| FR | 99922458.7 | 30-06-1998 | 14-06-1999 | 1038271-A1 | 1038271 | A 023407 | STEREOSCOPIC 3D IN HARDWARE ACCELERATED RENDERING ARCHITECT. (stereo interception filter) |
| GB | 99922458.7 | 30-06-1998 | 14-06-1999 | 1038271-A1 | 1038271 | A 023407 | STEREOSCOPIC 3D IN HARDWARE ACCELERATED RENDERING ARCHITECT. (stereo interception filter) |
| JP | 00-557434 | 30-06-1998 | 14-06-1999 | 02-519792 | 4364436 | A 023407 | STEREOSCOPIC 3D IN HARDWARE ACCELERATED RENDERING ARCHITECT. (stereo interception filter) |
| KR | 10-2000-7001294 | 30-06-1998 | 14-06-1999 | 10-2001-0023290 | 10-0637612 | A 023407 | STEREOSCOPIC 3D IN HARDWARE ACCELERATED RENDERING ARCHITECT. (stereo interception filter) |
| TW | 089101981 | 30-06-1998 | 03-02-2000 | | 168772 | A 023407 | STEREOSCOPIC 3D IN HARDWARE ACCELERATED RENDERING ARCHITECT. (stereo interception filter) |
| US | 09/107918 | 30-06-1998 | 30-06-1998 | | 6496183 | A 023407 | STEREOSCOPIC 3D IN HARDWARE ACCELERATED RENDERING ARCHITECT. (stereo interception filter) |
| DE | 94201977.9 | 15-07-1993 | 08-07-1994 | 0634733-A3 | 69421967.3 | B 033861 | ENHANCING MPEG IMAGES WITH DEPTH INFORMATION |
| FR | 94201977.9 | 15-07-1993 | 08-07-1994 | 0634733-A3 | 0634733 | B 033861 | ENHANCING MPEG IMAGES WITH DEPTH INFORMATION |
| GB | 94201977.9 | 15-07-1993 | 08-07-1994 | 0634733-A3 | 0634733 | B 033861 | ENHANCING MPEG IMAGES WITH DEPTH INFORMATION |
| JP | 94-161086 | 15-07-1993 | 13-07-1994 | 95-78264 | 3645922 | B 033861 | ENHANCING MPEG IMAGES WITH DEPTH INFORMATION |
| KR | 10-1994-0017046 | 15-07-1993 | 15-07-1994 | 95-0004045 | 0329874 | B 033861 | ENHANCING MPEG IMAGES WITH DEPTH INFORMATION |
| US | 08/795295 | 15-07-1993 | 04-02-1997 | | 5784064 | B 033861 | ENHANCING MPEG IMAGES WITH DEPTH INFORMATION |
| DE | 96914378.3 | 05-07-1995 | 12-06-1996 | 0783825-A1 | 69616006.4 | B 033992 | PIXEL LAY-OUT FOR 3D MATRIX DISPLAY |
| FR | 96914378.3 | 05-07-1995 | 12-06-1996 | 0783825-A1 | 0783825 | B 033992 | PIXEL LAY-OUT FOR 3D MATRIX DISPLAY |
| GB | 96914378.3 | 05-07-1995 | 12-06-1996 | 0783825-A1 | 0783825 | B 033992 | PIXEL LAY-OUT FOR 3D MATRIX DISPLAY |
| JP | 97-504938 | 05-07-1995 | 12-06-1996 | 98-505689 | 4010564 | B 033992 | PIXEL LAY-OUT FOR 3D MATRIX DISPLAY |
| KR | 97-701421 | 05-07-1995 | 12-06-1996 | 97-0705907 | 0418146 | B 033992 | PIXEL LAY-OUT FOR 3D MATRIX DISPLAY |
| US | 08/670377 | 05-07-1995 | 25-06-1996 | | 6118584 | B 033992 | PIXEL LAY-OUT FOR 3D MATRIX DISPLAY |
| DE | 97921983.9 | 07-06-1996 | 29-05-1997 | 0843940-A1 | 69714351.4 | B 034082 | 3D GRAPHICS ARCHITECTURE FOR MULTIPLE VIEWS |
| FR | 97921983.9 | 07-06-1996 | 29-05-1997 | 0843940-A1 | 0843940 | B 034082 | 3D GRAPHICS ARCHITECTURE FOR MULTIPLE VIEWS |
| GB | 97921983.9 | 07-06-1996 | 29-05-1997 | 0843940-A1 | 0843940 | B 034082 | 3D GRAPHICS ARCHITECTURE FOR MULTIPLE VIEWS |
| JP | 98-500368 | 07-06-1996 | 29-05-1997 | 99-511316 | 4047387 | B 034082 | 3D GRAPHICS ARCHITECTURE FOR MULTIPLE VIEWS |
| US | 08/869912 | 07-06-1996 | 05-06-1997 | | 6023263 | B 034082 | 3D GRAPHICS ARCHITECTURE FOR MULTIPLE VIEWS |
| DE | 97924185.8 | 21-06-1996 | 12-06-1997 | 0846308-A1 | 69715136.0 | B 034084 | IMAGE DEPTH DATA COMPRESSION |
| FR | 97924185.8 | 21-06-1996 | 12-06-1997 | 0846308-A1 | 0846308 | B 034084 | IMAGE DEPTH DATA COMPRESSION |
| GB | 97924185.8 | 21-06-1996 | 12-06-1997 | 0846308-A1 | 0846308 | B 034084 | IMAGE DEPTH DATA COMPRESSION |
| JP | 98-502596 | 21-06-1996 | 12-06-1997 | 99-511884 | 3982835 | B 034084 | IMAGE DEPTH DATA COMPRESSION |
| KR | 98-701275 | 21-06-1996 | 12-06-1997 | 10-1999-0044043 | 0435609 | B 034084 | IMAGE DEPTH DATA COMPRESSION |
| US | 08/880038 | 21-06-1996 | 20-06-1997 | | 6104837 | B 034084 | IMAGE DEPTH DATA COMPRESSION |
| DE | 97200399.0 | 23-02-1996 | 13-02-1997 | 0791847-A1 | 69718534.6 | B 034113 | COLOUR FILTER LAY-OUT FOR 3D-LCD |
| FR | 97200399.0 | 23-02-1996 | 13-02-1997 | 0791847-A1 | 0791847 | B 034113 | COLOUR FILTER LAY-OUT FOR 3D-LCD |
| GB | 97200399.0 | 23-02-1996 | 13-02-1997 | 0791847-A1 | 0791847 | B 034113 | COLOUR FILTER LAY-OUT FOR 3D-LCD |
| JP | 97-38896 | 23-02-1996 | 24-02-1997 | 97-236777 | 3940456 | B 034113 | COLOUR FILTER LAY-OUT FOR 3D-LCD |
| JP | 07-034284 | 23-02-1996 | 24-02-1997 | 07-188097 | 4253345 | B 034113 | COLOUR FILTER LAY-OUT FOR 3D-LCD |
| JP | 08-268132 | 23-02-1996 | 24-02-1997 | | | B 034113 | COLOUR FILTER LAY-OUT FOR 3D-LCD |
| KR | 97-6580 | 23-02-1996 | 24-02-1997 | | 0429091 | B 034113 | COLOUR FILTER LAY-OUT FOR 3D-LCD |
| US | 08/798678 | 23-02-1996 | 12-02-1997 | | 6064424 | B 034113 | COLOUR FILTER LAY-OUT FOR 3D-LCD |
| DE | 97942159.1 | 14-11-1996 | 13-10-1997 | 0877966-A1 | 69728647.9 | B 034119 | SWITCHABLE LENTICULAR FOR AUTO-STEREOSCOPIC DISPLAY |
| FR | 97942159.1 | 14-11-1996 | 13-10-1997 | 0877966-A1 | 0877966 | B 034119 | SWITCHABLE LENTICULAR FOR AUTO-STEREOSCOPIC DISPLAY |
| GB | 97942159.1 | 14-11-1996 | 13-10-1997 | 0877966-A1 | 0877966 | B 034119 | SWITCHABLE LENTICULAR FOR AUTO-STEREOSCOPIC DISPLAY |
| NL | 97942159.1 | 14-11-1996 | 13-10-1997 | 0877966-A1 | 0877966 | B 034119 | SWITCHABLE LENTICULAR FOR AUTO-STEREOSCOPIC DISPLAY |
| US | 08/961640 | 14-11-1996 | 06-11-1997 | | 6069650 | B 034119 | SWITCHABLE LENTICULAR FOR AUTO-STEREOSCOPIC DISPLAY |
| EP | 98928497.1 | 23-07-1997 | 09-07-1998 | 0934546-A1 | | B 034172 | 3D-LCD LENTICULAR ADAPTOR |
| JP | 99-509574 | 23-07-1997 | 09-07-1998 | 01-501073 | 4213226 | B 034172 | 3D-LCD LENTICULAR ADAPTOR |
| KR | 10-1999-7002258 | 23-07-1997 | 09-07-1998 | 10-2000-0068579 | 0548662 | B 034172 | 3D-LCD LENTICULAR ADAPTOR |
| US | 09/119891 | 23-07-1997 | 21-07-1998 | | 6801243 | B 034172 | 3D-LCD LENTICULAR ADAPTOR |
| CN | 03818215.7 | 31-07-2002 | 09-07-2003 | 1672432 | | FR020079 | DISPARITY CODING SYNTAX |
| EP | 03740961.2 | 31-07-2002 | 09-07-2003 | 1527613-A | | FR020079 | DISPARITY CODING SYNTAX |
| JP | 04-525649 | 31-07-2002 | 09-07-2003 | 05-535203 | | FR020079 | DISPARITY CODING SYNTAX |
| KR | 10-2005-7001747 | 31-07-2002 | 09-07-2003 | | | FR020079 | DISPARITY CODING SYNTAX |
| US | 10/522464 | 31-07-2002 | 09-07-2003 | 2006-0023950-A1 | | FR020079 | DISPARITY CODING SYNTAX |
| CN | 200380101874.6 | 23-10-2002 | 01-10-2003 | 1799266 | 200380101874.6 | FR020109 | ENHANCEMENT SCHEME MPEG DEPTH-MAPS |
| EP | 03809395.1 | 23-10-2002 | 01-10-2003 | 1574079-A | | FR020109 | ENHANCEMENT SCHEME MPEG DEPTH-MAPS |
| JP | 04-546237 | 23-10-2002 | 01-10-2003 | 06-513596 | | FR020109 | ENHANCEMENT SCHEME MPEG DEPTH-MAPS |
| KR | 10-2005-7006878 | 23-10-2002 | 01-10-2003 | | | FR020109 | ENHANCEMENT SCHEME MPEG DEPTH-MAPS |
| US | 10/531935 | 23-10-2002 | 01-10-2003 | 2006-0088515-A1 | 7224355 | FR020109 | ENHANCEMENT SCHEME MPEG DEPTH-MAPS |
| CN | 09/888852 | 03-05-2000 | 20-04-2001 | 2001-0045951-A1 | 6888540 | G8030127 | OPTIMISATION OF THE 3D GRAPHICS PIPELINE AS APPLIED TO RENDI |
| CN | 200480022178.0 | 31-07-2003 | 22-07-2004 | 1830218-A | | G8030127 | 2D/3D LCD WITH PATTERNED OLED BACKLIGHT |
| EP | 04744227.2 | 31-07-2003 | 22-07-2004 | 1652388-A | | G8030127 | 2D/3D LCD WITH PATTERNED OLED BACKLIGHT |
| JP | 2006-521707 | 31-07-2003 | 22-07-2004 | | | G8030127 | 2D/3D LCD WITH PATTERNED OLED BACKLIGHT |
| KR | 10-2006-7001843 | 31-07-2003 | 22-07-2004 | | | G8030127 | 2D/3D LCD WITH PATTERNED OLED BACKLIGHT |
| US | 10/566548 | 31-07-2003 | 22-07-2004 | 2006-0187179-A1 | 7619604 | G8030127 | 2D/3D LCD WITH PATTERNED OLED BACKLIGHT |
| CN | 200480027121.X | 20-09-2003 | 20-09-2004 | 1853420A | | G8030159 | PATTERNED RETARDERS FOR 3D LCDS WITH IMPROVED PERFORMANCE |
| EP | 04769970.7 | 20-09-2003 | 09-09-2004 | 1668920-A1 | | G8030159 | PATTERNED RETARDERS FOR 3D LCDS WITH IMPROVED PERFORMANCE |
| JP | 06-526771 | 20-09-2003 | 09-09-2004 | 07-506131 | | G8030159 | PATTERNED RETARDERS FOR 3D LCDS WITH IMPROVED PERFORMANCE |
| KR | 10-2006-7005333 | 20-09-2003 | 09-09-2004 | | | G8030159 | PATTERNED RETARDERS FOR 3D LCDS WITH IMPROVED PERFORMANCE |
| TW | 093128266 | 20-09-2003 | 17-09-2004 | 200528795 | | G8030159 | PATTERNED RETARDERS FOR 3D LCDS WITH IMPROVED PERFORMANCE |
| US | 10/571823 | 20-09-2003 | 09-09-2004 | 2006-0279680-A1 | | G8030159 | PATTERNED RETARDERS FOR 3D LCDS WITH IMPROVED PERFORMANCE |
| CN | 200480027946.1 | 27-09-2003 | 23-09-2004 | 1856720-A | 200480027946.1 | G8030164 | 2D/3D SWITCHABLE LCD WITH GROOVED BACKLIGHT PANEL |
| EP | 04770067.9 | 27-09-2003 | 23-09-2004 | 1709467-A | | G8030164 | 2D/3D SWITCHABLE LCD WITH GROOVED BACKLIGHT PANEL |
| JP | 2006-527552 | 27-09-2003 | 23-09-2004 | | | G8030164 | 2D/3D SWITCHABLE LCD WITH GROOVED BACKLIGHT PANEL |
| KR | 10-2006-7005656 | 27-09-2003 | 23-09-2004 | | | G8030164 | 2D/3D SWITCHABLE LCD WITH GROOVED BACKLIGHT PANEL |
| TW | 093129083 | 27-09-2003 | 24-09-2004 | 200523504 | | G8030164 | 2D/3D SWITCHABLE LCD WITH GROOVED BACKLIGHT PANEL |
| US | 10/573084 | 27-09-2003 | 23-09-2004 | 2007-0109811-A1 | | G8030164 | 2D/3D SWITCHABLE LCD WITH GROOVED BACKLIGHT PANEL |
| CN | 200480028926.6 | 04-10-2003 | 30-09-2004 | 1864414-A | | G8030174 | DRIVING METHOD TO IMPROVE COLOURS FOR 3D LCD |
| EP | 04770133.9 | 04-10-2003 | 30-09-2004 | 1673947-A | | G8030174 | DRIVING METHOD TO IMPROVE COLOURS FOR 3D LCD |
| JP | 06-530952 | 04-10-2003 | 30-09-2004 | | | G8030174 | DRIVING METHOD TO IMPROVE COLOURS FOR 3D LCD |
| KR | 2006-7006448 | 04-10-2003 | 30-09-2004 | | | G8030174 | DRIVING METHOD TO IMPROVE COLOURS FOR 3D LCD |
| TW | 093129807 | 04-10-2003 | 01-10-2004 | 200519831 | | G8030174 | DRIVING METHOD TO IMPROVE COLOURS FOR 3D LCD |
| US | 10/574141 | 04-10-2003 | 30-09-2004 | 2007-0052699-A1 | | G8030174 | DRIVING METHOD TO IMPROVE COLOURS FOR 3D LCD |
| CN | 200480028923.2 | 04-10-2003 | 30-09-2004 | 1864413-A | | G8030175 | METHOD TO IMPROVE VIEWING ANGLE DEPENDENCY 3D LCD |
| EP | 04770135.4 | 04-10-2003 | 30-09-2004 | 1673948-A | | G8030175 | METHOD TO IMPROVE VIEWING ANGLE DEPENDENCY 3D LCD |
| JP | 06-530954 | 04-10-2003 | 30-09-2004 | | | G8030175 | METHOD TO IMPROVE VIEWING ANGLE DEPENDENCY 3D LCD |
| KR | 2006-7006451 | 04-10-2003 | 30-09-2004 | | | G8030175 | METHOD TO IMPROVE VIEWING ANGLE DEPENDENCY 3D LCD |
| TW | 093129894 | 04-10-2003 | 01-10-2004 | 200525492 | | G8030175 | METHOD TO IMPROVE VIEWING ANGLE DEPENDENCY 3D LCD |
| US | 10/574142 | 04-10-2003 | 30-09-2004 | 2006-0279547-A1 | | G8030175 | METHOD TO IMPROVE VIEWING ANGLE DEPENDENCY 3D LCD |
| CN | 200480028891.6 | 04-10-2003 | 30-09-2004 | 1864089-A | | G8030176 | DRIVING SCHEME TO IMPROVE IMAGE QUALITY BARRIER 3D LCD |
| DE | 04770136.2 | 04-10-2003 | 30-09-2004 | | 602004012129.0 | G8030176 | DRIVING SCHEME TO IMPROVE IMAGE QUALITY BARRIER 3D LCD |
| FR | 04770136.2 | 04-10-2003 | 30-09-2004 | | 1673652 | G8030176 | DRIVING SCHEME TO IMPROVE IMAGE QUALITY BARRIER 3D LCD |
| GB | 04770136.2 | 04-10-2003 | 30-09-2004 | | 1673652 | G8030176 | DRIVING SCHEME TO IMPROVE IMAGE QUALITY BARRIER 3D LCD |
| JP | 06-530955 | 04-10-2003 | 30-09-2004 | | | G8030176 | DRIVING SCHEME TO IMPROVE IMAGE QUALITY BARRIER 3D LCD |
| KR | 2006-7006463 | 04-10-2003 | 30-09-2004 | | | G8030176 | DRIVING SCHEME TO IMPROVE IMAGE QUALITY BARRIER 3D LCD |
| US | 10/574140 | 04-10-2003 | 30-09-2004 | 2007-0040778-A1 | 200480032496.5 | G8030176 | DRIVING SCHEME TO IMPROVE IMAGE QUALITY BARRIER 3D LCD |
| CN | 200480032496.5 | 07-11-2003 | 03-11-2004 | 1875302-A | 200480032496.5 | G8030200 | SWITCHABLE BACKLIGHT FOR 2D/3D DISPLAY |
| EP | 04799054.4 | 07-11-2003 | 03-11-2004 | 1682932-A | | G8030200 | SWITCHABLE BACKLIGHT FOR 2D/3D DISPLAY |
| JP | 06-537544 | 07-11-2003 | 03-11-2004 | | | G8030200 | SWITCHABLE BACKLIGHT FOR 2D/3D DISPLAY |
| US | 10/578071 | 07-11-2003 | 03-11-2004 | 2007-0091638-A1 | 7626643 | G8030200 | SWITCHABLE BACKLIGHT FOR 2D/3D DISPLAY |
| CN | 200480035751.1 | 03-12-2003 | 02-12-2004 | 1890988-A | | G8030215 | 2D/3D DISPLAYS |
| EP | 04801447.6 | 03-12-2003 | 02-12-2004 | 1692875-A | | G8030215 | 2D/3D DISPLAYS |
| JP | 06-542104 | 03-12-2003 | 02-12-2004 | | | G8030215 | 2D/3D DISPLAYS |
| KR | 10-2006-7010581 | 03-12-2003 | 02-12-2004 | | | G8030215 | 2D/3D DISPLAYS |
| US | 10/581215 | 03-12-2003 | 02-12-2004 | 2008-0278640-A1 | | G8030215 | 2D/3D DISPLAYS |

Case 2:13-cv-06701-JD Document 69-1 Filed 04/08/22 Page 24 of 61
Case 1:17-cv-00082 Document 124-4 Filed 04/03/23 Page 24 of 61 PageID 1295
Exhibit A    Page 296 of 409

CONFIDENTIAL

| Country | Application No | Priority Date | Filing Date | Publication No | Grant No | Philips Ref | Title |
|---|---|---|---|---|---|---|---|
| CN | 200580002169.X | 09-01-2004 | 06-01-2005 | 1910938-A | | GB040009 | OPTICAL PATH LENGTH ADJUSTER BASED ON BIREFRINGENT MATERIALS |
| EP | 05702599.1 | 09-01-2004 | 06-01-2005 | 1707015-A | | GB040009 | OPTICAL PATH LENGTH ADJUSTER BASED ON BIREFRINGENT MATERIALS |
| JP | 06-548523 | 09-01-2004 | 06-01-2005 | | | GB040009 | OPTICAL PATH LENGTH ADJUSTER BASED ON BIREFRINGENT MATERIALS |
| US | 10/596877 | 09-01-2004 | 06-01-2005 | 2007-0153234-A1 | | GB040009 | OPTICAL PATH LENGTH ADJUSTER BASED ON BIREFRINGENT MATERIALS |
| CN | 200580002163.2 | 09-01-2004 | 06-01-2005 | 1910499-A | | GB040011 | OPTICAL PATH LENGTH ADJUSTER FOR VOLUMETRIC DISPLAY |
| DE | 05702604.9 | 09-01-2004 | 06-01-2005 | | 602005060697.9 | GB040011 | OPTICAL PATH LENGTH ADJUSTER FOR VOLUMETRIC DISPLAY |
| FR | 05702604.9 | 09-01-2004 | 06-01-2005 | | 1706778 | GB040011 | OPTICAL PATH LENGTH ADJUSTER FOR VOLUMETRIC DISPLAY |
| GB | 05702604.9 | 09-01-2004 | 06-01-2005 | | 1706778 | GB040011 | OPTICAL PATH LENGTH ADJUSTER FOR VOLUMETRIC DISPLAY |
| JP | 06-548527 | 09-01-2004 | 06-01-2005 | | | GB040011 | OPTICAL PATH LENGTH ADJUSTER FOR VOLUMETRIC DISPLAY |
| US | 10/596882 | 09-01-2004 | 06-01-2005 | 2009-0021824-A1 | | GB040011 | OPTICAL PATH LENGTH ADJUSTER FOR VOLUMETRIC DISPLAY |
| CN | 200580002164.7 | 09-01-2004 | 06-01-2005 | 1910936-A | | GB040012 | A THREE-DIMENSIONAL DISPLAY |
| EP | 05702606.4 | 09-01-2004 | 06-01-2005 | 1707014-A | | GB040012 | A THREE-DIMENSIONAL DISPLAY |
| US | 10/596884 | 09-01-2004 | 06-01-2005 | 2007-0146358-A1 | | GB040012 | A THREE-DIMENSIONAL DISPLAY |
| CN | 200580005469.3 | 21-02-2004 | 17-02-2005 | 1922893-A | | GB040042 | NONUNIFORM PIXELS TO ENHANCE IMAGE QUALITY 3D DISPLAY |
| EP | 05703000.9 | 21-02-2004 | 17-02-2005 | 1716708-A | | GB040042 | NONUNIFORM PIXELS TO ENHANCE IMAGE QUALITY 3D DISPLAY |
| JP | 06-553753 | 21-02-2004 | 17-02-2005 | | | GB040042 | NONUNIFORM PIXELS TO ENHANCE IMAGE QUALITY 3D DISPLAY |
| KR | 10-2006-7016525 | 21-02-2004 | 17-02-2005 | | | GB040042 | NONUNIFORM PIXELS TO ENHANCE IMAGE QUALITY 3D DISPLAY |
| TW | 094104886 | 21-02-2004 | 18-02-2005 | 200540731-A | | GB040042 | NONUNIFORM PIXELS TO ENHANCE IMAGE QUALITY 3D DISPLAY |
| US | 10/598018 | 21-02-2004 | 17-02-2005 | 2008-0150936-A1 | | GB040042 | NONUNIFORM PIXELS TO ENHANCE IMAGE QUALITY 3D DISPLAY |
| CN | 200580005304.6 | 21-02-2004 | 17-02-2005 | 1922530-A | | GB040043 | AN OPTICAL PATH LENGTH ADJUSTER BASED ON A WIRE GRID POLARIS |
| DE | 05702995.1 | 21-02-2004 | 17-02-2005 | | 602005004895.2 | GB040043 | AN OPTICAL PATH LENGTH ADJUSTER BASED ON A WIRE GRID POLARIS |
| FR | 05702995.1 | 21-02-2004 | 17-02-2005 | | 1716446 | GB040043 | AN OPTICAL PATH LENGTH ADJUSTER BASED ON A WIRE GRID POLARIS |
| GB | 05702995.1 | 21-02-2004 | 17-02-2005 | | 1716446 | GB040043 | AN OPTICAL PATH LENGTH ADJUSTER BASED ON A WIRE GRID POLARIS |
| JP | 06-553750 | 21-02-2004 | 17-02-2005 | | | GB040043 | AN OPTICAL PATH LENGTH ADJUSTER BASED ON A WIRE GRID POLARIS |
| US | 10/598019 | 21-02-2004 | 17-02-2005 | 2007-0139760-A1 | | GB040043 | AN OPTICAL PATH LENGTH ADJUSTER BASED ON A WIRE GRID POLARIS |
| CN | 200680008360.X | 17-03-2005 | 14-03-2006 | 101142823A | 200680008360.X | GB050038 | COLOUR FILTER ARRANGEMENT FOR OPTIMISED 2D/3D DISPLAY |
| EP | 06711095.7 | 17-03-2005 | 14-03-2006 | 1862016-A | | GB050038 | COLOUR FILTER ARRANGEMENT FOR OPTIMISED 2D/3D DISPLAY |
| JP | 08-501476 | 17-03-2005 | 14-03-2006 | | | GB050038 | COLOUR FILTER ARRANGEMENT FOR OPTIMISED 2D/3D DISPLAY |
| KR | 10-2007-7020901 | 17-03-2005 | 14-03-2006 | | | GB050038 | COLOUR FILTER ARRANGEMENT FOR OPTIMISED 2D/3D DISPLAY |
| TW | 095108593 | 17-03-2005 | 14-03-2006 | 200720418 | | GB050038 | COLOUR FILTER ARRANGEMENT FOR OPTIMISED 2D/3D DISPLAY |
| US | 11/908410 | 17-03-2005 | 14-03-2006 | 2008-0191966-A1 | | GB050038 | COLOUR FILTER ARRANGEMENT FOR OPTIMISED 2D/3D DISPLAY |
| CN | 95191063.9 | 09-09-1994 | 01-09-1995 | 1137247-A | 95191063.9 | N.014976 | METHOD OF MANUFACTURING MECHANICALLY A MICROLENS ARRAY |
| DE | 95928598.2 | 09-09-1994 | 01-09-1995 | 0734314-A1 | 69529334.6 | N.014976 | METHOD OF MANUFACTURING MECHANICALLY A MICROLENS ARRAY |
| FR | 95928598.2 | 09-09-1994 | 01-09-1995 | 0734314-A1 | 0734314 | N.014976 | METHOD OF MANUFACTURING MECHANICALLY A MICROLENS ARRAY |
| GB | 95928598.2 | 09-09-1994 | 01-09-1995 | 0734314-A1 | 0734314 | N.014976 | METHOD OF MANUFACTURING MECHANICALLY A MICROLENS ARRAY |
| JP | 96-509332 | 09-09-1994 | 01-09-1995 | 97-505534 | 3818320 | N.014976 | METHOD OF MANUFACTURING MECHANICALLY A MICROLENS ARRAY |
| KR | 96-702394 | 09-09-1994 | 01-09-1995 | 96-0705666 | 407874 | N.014976 | METHOD OF MANUFACTURING MECHANICALLY A MICROLENS ARRAY |
| US | 08/525045 | 09-09-1994 | 08-09-1995 | | 7125505 | N.014976 | METHOD OF MANUFACTURING MECHANICALLY A MICROLENS ARRAY |
| US | 11/459710 | 09-09-1994 | 08-09-1995 | 2006-0254318-A1 | | N.014976 | METHOD OF MANUFACTURING MECHANICALLY A MICROLENS ARRAY |
| DE | 96939270.3 | 19-12-1995 | 09-12-1996 | 0809913-A1 | 69621778.3 | N.015875 | PARALLACTIC DEPTH-DEPENDENT PIXEL SHIFTS |
| FR | 96939270.3 | 19-12-1995 | 09-12-1996 | 0809913-A1 | 0809913 | N.015875 | PARALLACTIC DEPTH-DEPENDENT PIXEL SHIFTS |
| GB | 96939270.3 | 19-12-1995 | 09-12-1996 | 0809913-A1 | 0809913 | N.015875 | PARALLACTIC DEPTH-DEPENDENT PIXEL SHIFTS |
| JP | 97-522624 | 19-12-1995 | 09-12-1996 | 99-501188 | 4392060 | N.015875 | PARALLACTIC DEPTH-DEPENDENT PIXEL SHIFTS |
| KR | 97-705714 | 19-12-1995 | 09-12-1996 | 10-1998-0702317 | 0445209 | N.015875 | PARALLACTIC DEPTH-DEPENDENT PIXEL SHIFTS |
| US | 08/768484 | 19-12-1995 | 18-12-1996 | | 5929859 | N.015875 | PARALLACTIC DEPTH-DEPENDENT PIXEL SHIFTS |
| DE | 97943112.9 | 21-11-1996 | 20-10-1997 | 0877991-A1 | 69718291.6 | N.016076 | MULTI-LAYER TEXTURE MAPS |
| FR | 97943112.9 | 21-11-1996 | 20-10-1997 | 0877991-A1 | 0877991 | N.016076 | MULTI-LAYER TEXTURE MAPS |
| GB | 97943112.9 | 21-11-1996 | 20-10-1997 | 0877991-A1 | 0877991 | N.016076 | MULTI-LAYER TEXTURE MAPS |
| JP | 98-523384 | 21-11-1996 | 20-10-1997 | 00-504453 | 4071290 | N.016076 | MULTI-LAYER TEXTURE MAPS |
| US | 08/972977 | 21-11-1996 | 19-11-1997 | | 6049337 | N.016076 | MULTI-LAYER TEXTURE MAPS |
| CN | 99800874.5 | 01-04-1998 | 22-03-1999 | 1273001-A | 99800874.5 | N.016727 | FRAME RATE IMPROVEMENT BY MEANS OF FRAME WARPING |
| DE | 99942625.7 | 01-04-1998 | 22-03-1999 | | 69936029.3 | N.016727 | FRAME RATE IMPROVEMENT BY MEANS OF FRAME WARPING |
| FR | 99942625.7 | 01-04-1998 | 22-03-1999 | | 0986906 | N.016727 | FRAME RATE IMPROVEMENT BY MEANS OF FRAME WARPING |
| GB | 99942625.7 | 01-04-1998 | 22-03-1999 | | 0986906 | N.016727 | FRAME RATE IMPROVEMENT BY MEANS OF FRAME WARPING |
| JP | 99-549099 | 01-04-1998 | 22-03-1999 | 02-508146 | 4236705 | N.016727 | FRAME RATE IMPROVEMENT BY MEANS OF FRAME WARPING |
| KR | 10-1999-7011234 | 01-04-1998 | 22-03-1999 | 10-2001-0013243 | 10-0632195 | N.016727 | FRAME RATE IMPROVEMENT BY MEANS OF FRAME WARPING |
| US | 09/281351 | 01-04-1998 | 30-03-1999 | | 6442303 | N.016727 | FRAME RATE IMPROVEMENT BY MEANS OF FRAME WARPING |
| JP | 00907672.0 | 31-03-1999 | 09-03-2000 | 1082702-A1 | | N.017367 | DISPARITY MEASUREMENT VERIFICATION |
| JP | 00-609962 | 31-03-1999 | 09-03-2000 | 02-541568 | | N.017367 | DISPARITY MEASUREMENT VERIFICATION |
| US | 09/534209 | 31-03-1999 | 24-03-2000 | | 6625304 | N.017367 | DISPARITY MEASUREMENT VERIFICATION |
| CN | 01801321.X | 19-05-2000 | 26-04-2001 | 1381144-A | 01801321.X | N.000276 | DEPTH ESTIMATION WITH OCCLUSION |
| DE | 01931656.1 | 19-05-2000 | 26-04-2001 | | 60121443.9 | N.000276 | DEPTH ESTIMATION WITH OCCLUSION |
| FR | 01931656.1 | 19-05-2000 | 26-04-2001 | | 1290895 | N.000276 | DEPTH ESTIMATION WITH OCCLUSION |
| GB | 01931656.1 | 19-05-2000 | 26-04-2001 | | 1290895 | N.000276 | DEPTH ESTIMATION WITH OCCLUSION |
| JP | 01-586926 | 19-05-2000 | 26-04-2001 | | | N.000276 | DEPTH ESTIMATION WITH OCCLUSION |
| KR | 10-2002-7000734 | 19-05-2000 | 26-04-2001 | | 10-0808395 | N.000276 | DEPTH ESTIMATION WITH OCCLUSION |
| US | 09/850349 | 19-05-2000 | 07-05-2001 | 2002-0009211-A1 | 6985604 | N.000276 | DEPTH ESTIMATION WITH OCCLUSION |
| CN | 01802642.7 | 07-09-2000 | 27-08-2001 | 1547725-A | 01802642.7 | N.000494 | PARTIAL SEGMENTATION BASED ON DISTANCE TRANSFORMS |
| EP | 01969670.7 | 07-09-2000 | 27-08-2001 | 1374174-A | | N.000494 | PARTIAL SEGMENTATION BASED ON DISTANCE TRANSFORMS |
| JP | 02-525573 | 07-09-2000 | 27-08-2001 | 04-508639 | | N.000494 | PARTIAL SEGMENTATION BASED ON DISTANCE TRANSFORMS |
| KR | 10-2002-7005910 | 07-09-2000 | 27-08-2001 | 10-2002-0067514 | 10-843112 | N.000494 | PARTIAL SEGMENTATION BASED ON DISTANCE TRANSFORMS |
| US | 09/945954 | 07-09-2000 | 04-09-2001 | 2002-0064310-A1 | 7046850 | N.000494 | PARTIAL SEGMENTATION BASED ON DISTANCE TRANSFORMS |
| CN | 02801721.8 | 17-05-2001 | 16-05-2002 | 1488123-A | 02801721.8 | N.010309 | SEGMENTATION BASED ON MOTION VECTORS |
| EP | 02727928.0 | 17-05-2001 | 16-05-2002 | 1402477-A | | N.010309 | SEGMENTATION BASED ON MOTION VECTORS |
| KR | 10-2003-7000756 | 17-05-2001 | 16-05-2002 | | | N.010309 | SEGMENTATION BASED ON MOTION VECTORS |
| US | 10/143071 | 17-05-2001 | 14-05-2002 | 2003-0035583-A1 | 7120277 | N.010309 | SEGMENTATION BASED ON MOTION VECTORS |
| CN | 02801908.3 | 29-05-2001 | 28-05-2002 | 1511419-A | 02801908.3 | N.010352 | 2D COMPATIBLE TRANSMISSION AND CODING FOR 3D IMAGE |
| EP | 02733063.8 | 29-05-2001 | 28-05-2002 | 1407612-A | | N.010352 | 2D COMPATIBLE TRANSMISSION AND CODING FOR 3D IMAGE |
| JP | 03-500838 | 29-05-2001 | 28-05-2002 | 04-530218 | 4173440 | N.010352 | 2D COMPATIBLE TRANSMISSION AND CODING FOR 3D IMAGE |
| KR | 10-2003-7001249 | 29-05-2001 | 28-05-2002 | | | N.010352 | 2D COMPATIBLE TRANSMISSION AND CODING FOR 3D IMAGE |
| US | 10/478734 | 29-05-2001 | 28-05-2002 | | 7439976 | N.010352 | 2D COMPATIBLE TRANSMISSION AND CODING FOR 3D IMAGE |
| CN | 02803009.5 | 23-07-2001 | 25-06-2002 | 1476729-A | 100366096 | N.010496 | SIMULTANEOUSLY 3D AND 2D |
| DE | 02743471.1 | 23-07-2001 | 25-06-2002 | | 60234187.6 | N.010496 | SIMULTANEOUSLY 3D AND 2D |
| ES | 02743471.1 | 23-07-2001 | 25-06-2002 | | 1413148 | N.010496 | SIMULTANEOUSLY 3D AND 2D |
| FR | 02743471.1 | 23-07-2001 | 25-06-2002 | | 1413148 | N.010496 | SIMULTANEOUSLY 3D AND 2D |
| GB | 02743471.1 | 23-07-2001 | 25-06-2002 | | 1413148 | N.010496 | SIMULTANEOUSLY 3D AND 2D |
| IT | 02743471.1 | 23-07-2001 | 25-06-2002 | | 1413148 | N.010496 | SIMULTANEOUSLY 3D AND 2D |
| JP | 03-516228 | 23-07-2001 | 25-06-2002 | 04-522382 | 4098235 | N.010496 | SIMULTANEOUSLY 3D AND 2D |
| KR | 10-2004-7000847 | 23-07-2001 | 25-06-2002 | | | N.010496 | SIMULTANEOUSLY 3D AND 2D |
| US | 10/198497 | 23-07-2001 | 18-07-2002 | 2003-0020708-A1 | 7085410 | N.010496 | SIMULTANEOUSLY 3D AND 2D |
| VN | 1-2003-00278 | 23-07-2001 | 25-06-2002 | | 5732 | N.010496 | SIMULTANEOUSLY 3D AND 2D |
| CN | 02815878.4 | 09-07-2002 | 09-07-2002 | 1541485-A | 02815878.4 | N.010563 | DEPTH MAP FOR EYE TRACKING IN VIDEO-CONFERENCING |
| EP | 02751481.9 | 15-08-2001 | 09-07-2002 | 1433335-A | | N.010563 | DEPTH MAP FOR EYE TRACKING IN VIDEO-CONFERENCING |
| JP | 03-521629 | 15-08-2001 | 09-07-2002 | 05-500757 | 4198054 | N.010563 | DEPTH MAP FOR EYE TRACKING IN VIDEO-CONFERENCING |
| US | 10/216412 | 15-08-2001 | 09-08-2002 | 2003-0035001-A1 | | N.010563 | DEPTH MAP FOR EYE TRACKING IN VIDEO-CONFERENCING |
| CN | 02816287.0 | 21-08-2001 | 10-07-2002 | 1545815-A | 02816287.0 | N.010576 | AUTOSTEREOSCOPIC DISPLAY SYSTEM WITH TWO GRIDS OF LENSES |
| EP | 02751505.5 | 21-08-2001 | 10-07-2002 | 1421797-A | | N.010576 | AUTOSTEREOSCOPIC DISPLAY SYSTEM WITH TWO GRIDS OF LENSES |
| JP | 03-524273 | 21-08-2001 | 10-07-2002 | 05-501298 | 4147188 | N.010576 | AUTOSTEREOSCOPIC DISPLAY SYSTEM WITH TWO GRIDS OF LENSES |
| US | 10/222220 | 21-08-2001 | 16-08-2002 | 2003-0039031-A1 | 7298552 | N.010576 | AUTOSTEREOSCOPIC DISPLAY SYSTEM WITH TWO GRIDS OF LENSES |

23

CONFIDENTIAL

| Country | Application No | Priority Date | Filing Date | Publication No | Grant No | Philips Ref | Title |
|---|---|---|---|---|---|---|---|
| CN | 02820017.9 | 11-10-2001 | 18-09-2002 | 1568624-A | | NJ010697 | DISPLAY WITH 2D/3D SWITCHING POSSIBILITY |
| EP | 02765271.6 | 11-10-2001 | 18-09-2002 | 1438865-A | | NJ010697 | DISPLAY WITH 2D/3D SWITCHING POSSIBILITY |
| JP | 03-537333 | 11-10-2001 | 18-09-2002 | 05-506778 | 4145794 | NJ010697 | DISPLAY WITH 2D/3D SWITCHING POSSIBILITY |
| KR | 10-2004-7005082 | 11-10-2001 | 18-09-2002 | | | NJ010697 | DISPLAY WITH 2D/3D SWITCHING POSSIBILITY |
| TW | 091215094 | 11-10-2001 | 24-09-2002 | | UM-214518 | NJ010697 | DISPLAY WITH 2D/3D SWITCHING POSSIBILITY |
| US | 10/267083 | 11-10-2001 | 08-10-2002 | 2003-0085850-A1 | 7187344 | NJ010697 | DISPLAY WITH 2D/3D SWITCHING POSSIBILITY |
| CN | 02826822.9 | 07-01-2002 | 09-12-2002 | 1613093-A | 02826822.9 | NJ020004 | DEPTH SCALING |
| EP | 02785855.4 | 07-01-2002 | 09-12-2002 | 1466301-A | | NJ020004 | DEPTH SCALING |
| JP | 2003-558794 | 07-01-2002 | 09-12-2002 | | 4322121 | NJ020004 | DEPTH SCALING |
| KR | 10-2004-7010567 | 07-01-2002 | 09-12-2002 | | | NJ020004 | DEPTH SCALING |
| US | 10/500550 | 07-01-2002 | 09-12-2002 | 2005-0093892-A1 | 7167188 | NJ020004 | DEPTH SCALING |
| CN | 03803327.5 | 06-02-2002 | 23-01-2003 | 1628323-A | 03803327.5 | NJ020105 | TIME CONSISTENCY AND ACCURACY OF SEGMENTATION |
| US | 10/503424 | 06-02-2002 | 23-01-2003 | 2005-0129312-A1 | | NJ020105 | TIME CONSISTENCY AND ACCURACY OF SEGMENTATION |
| CN | 03804233.9 | 20-02-2002 | 06-02-2003 | 1751259-A | 03804233.9 | NJ020131 | 3D/2D DISPLAY WITH FLUID LENS PARTS |
| EP | 03700453.8 | 20-02-2002 | 06-02-2003 | 1478964-A | | NJ020131 | 3D/2D DISPLAY WITH FLUID LENS PARTS |
| JP | 03-570171 | 20-02-2002 | 06-02-2003 | 05-517991 | | NJ020131 | 3D/2D DISPLAY WITH FLUID LENS PARTS |
| KR | 10-2004-7012873 | 20-02-2002 | 06-02-2003 | | | NJ020131 | 3D/2D DISPLAY WITH FLUID LENS PARTS |
| US | 10/505490 | 20-02-2002 | 06-02-2003 | 2005-0253779-A1 | 7307672 | NJ020131 | 3D/2D DISPLAY WITH FLUID LENS PARTS |
| CN | 03816165.6 | 08-07-2002 | 18-06-2003 | 1666142-A | 03816165.6 | NJ020620 | REFLECTIVE 3D DISPLAY |
| EP | 03762829.4 | 08-07-2002 | 18-06-2003 | 1525510-A | | NJ020620 | REFLECTIVE 3D DISPLAY |
| JP | 04-519042 | 08-07-2002 | 18-06-2003 | | | NJ020620 | REFLECTIVE 3D DISPLAY |
| KR | 10-2005-7000370 | 08-07-2002 | 18-06-2003 | | | NJ020620 | REFLECTIVE 3D DISPLAY |
| US | 10/520339 | 08-07-2002 | 18-06-2003 | 2005-0254113-A1 | 7394506 | NJ020620 | REFLECTIVE 3D DISPLAY |
| CN | 038102638.6 | 01-11-2002 | 08-10-2003 | 1708996 | | NJ021087 | 3D DISPLAY WITH INTEGRATED RENDERING |
| EP | 03809817.4 | 01-11-2002 | 08-10-2003 | 1561184-A | | NJ021087 | 3D DISPLAY WITH INTEGRATED RENDERING |
| JP | 2004-547857 | 01-11-2002 | 08-10-2003 | | | NJ021087 | 3D DISPLAY WITH INTEGRATED RENDERING |
| US | 10/532904 | 01-11-2002 | 08-10-2003 | 2005-0285936-A1 | | NJ021087 | 3D DISPLAY WITH INTEGRATED RENDERING |
| CN | 200380107903.X | 30-12-2002 | 24-12-2003 | 1745589-A | | NJ021409 | INTEGRATED VIDEO FILTER FOR STEREO IMAGE RENDERER |
| EP | 03778681.1 | 30-12-2002 | 24-12-2003 | 1582074-A | | NJ021409 | INTEGRATED VIDEO FILTER FOR STEREO IMAGE RENDERER |
| JP | 04-563502 | 30-12-2002 | 24-12-2003 | 06-512833 | | NJ021409 | INTEGRATED VIDEO FILTER FOR STEREO IMAGE RENDERER |
| US | 10/540672 | 30-12-2002 | 24-12-2003 | 2006-0078180-A1 | | NJ021409 | INTEGRATED VIDEO FILTER FOR STEREO IMAGE RENDERER |
| CN | 200380108833.X | 17-01-2003 | 10-12-2003 | 1739119-A | | NJ030006 | COMPLETING PARTIAL DEPTH INFORMATION |
| EP | 03768071.7 | 17-01-2003 | 10-12-2003 | 1588327-A | | NJ030006 | COMPLETING PARTIAL DEPTH INFORMATION |
| IN | 1595/CHENP/2005 | 17-01-2003 | 10-12-2003 | | | NJ030006 | COMPLETING PARTIAL DEPTH INFORMATION |
| KR | 10-2005-7013149 | 17-01-2003 | 10-12-2003 | | | NJ030006 | COMPLETING PARTIAL DEPTH INFORMATION |
| US | 10/542137 | 17-01-2003 | 10-12-2003 | 2006-0056679-A1 | | NJ030006 | COMPLETING PARTIAL DEPTH INFORMATION |
| CN | 200480004808.1 | 21-02-2003 | 11-02-2004 | 1751525-A | | NJ030170 | FULL PARALLAX AUTOSTEREOSCOPIC SYSTEM |
| EP | 04710110.0 | 21-02-2003 | 11-02-2004 | 1597907-A | | NJ030170 | FULL PARALLAX AUTOSTEREOSCOPIC SYSTEM |
| JP | 06-502578 | 21-02-2003 | 11-02-2004 | | | NJ030170 | FULL PARALLAX AUTOSTEREOSCOPIC SYSTEM |
| US | 10/545648 | 21-02-2003 | 11-02-2004 | 2006-0158729-A1 | | NJ030170 | FULL PARALLAX AUTOSTEREOSCOPIC SYSTEM |
| CN | 200480006456.3 | 10-03-2003 | 27-02-2004 | 1759370-A | CN100340952-C | NJ030194 | MULTI-USER MULTI-VIEW TOUCH SCREEN |
| DE | 04715431.5 | 10-03-2003 | 27-02-2004 | | 602004011907.5 | NJ030194 | MULTI-USER MULTI-VIEW TOUCH SCREEN |
| FR | 04715431.5 | 10-03-2003 | 27-02-2004 | | 1604266 | NJ030194 | MULTI-USER MULTI-VIEW TOUCH SCREEN |
| GB | 04715431.5 | 10-03-2003 | 27-02-2004 | | 1604266 | NJ030194 | MULTI-USER MULTI-VIEW TOUCH SCREEN |
| JP | 06-506649 | 10-03-2003 | 27-02-2004 | | | NJ030194 | MULTI-USER MULTI-VIEW TOUCH SCREEN |
| US | 10/548242 | 10-03-2003 | 27-02-2004 | 2006-0279528-A1 | | NJ030194 | MULTI-USER MULTI-VIEW TOUCH SCREEN |
| CN | 200480008730.0 | 31-03-2003 | 26-03-2004 | 1768536-A | | NJ030299 | THREE-DIMENSIONAL DISPLAY |
| EP | 04723680.7 | 31-03-2003 | 26-03-2004 | 1623580-A | | NJ030299 | THREE-DIMENSIONAL DISPLAY |
| JP | 06-506769 | 31-03-2003 | 26-03-2004 | 06-522358 | | NJ030299 | THREE-DIMENSIONAL DISPLAY |
| US | 10/550880 | 31-03-2003 | 26-03-2004 | 2006-0262395-A1 | 7375885 | NJ030299 | THREE-DIMENSIONAL DISPLAY |
| CN | 200480009021.4 | 31-03-2003 | 26-03-2004 | 1768537-A | | NJ030300 | 3D DISPLAY WITH DIRECTIONAL BACKLIGHT |
| EP | 04723683.1 | 31-03-2003 | 26-03-2004 | 1623581-A | | NJ030300 | 3D DISPLAY WITH DIRECTIONAL BACKLIGHT |
| JP | 06-506771 | 31-03-2003 | 26-03-2004 | 06-523327 | | NJ030300 | 3D DISPLAY WITH DIRECTIONAL BACKLIGHT |
| US | 10/550881 | 31-03-2003 | 26-03-2004 | 2006-0262558-A1 | 7518663 | NJ030300 | 3D DISPLAY WITH DIRECTIONAL BACKLIGHT |
| CN | 200480019751.5 | 11-07-2003 | 05-07-2004 | 1973104-A | | NJ030816 | 3D SCALING BASED ON PROBABILITY OF VISIBILITY |
| DE | 04744492.2 | 11-07-2003 | 05-07-2004 | | 602004016347.3 | NJ030816 | 3D SCALING BASED ON PROBABILITY OF VISIBILITY |
| ES | 04744492.2 | 11-07-2003 | 05-07-2004 | | 1658558 | NJ030816 | 3D SCALING BASED ON PROBABILITY OF VISIBILITY |
| FR | 04744492.2 | 11-07-2003 | 05-07-2004 | | 1658558 | NJ030816 | 3D SCALING BASED ON PROBABILITY OF VISIBILITY |
| GB | 04744492.2 | 11-07-2003 | 05-07-2004 | | 1658558 | NJ030816 | 3D SCALING BASED ON PROBABILITY OF VISIBILITY |
| IN | 0136/CHENP/2006 | 11-07-2003 | 05-07-2004 | | 225040 | NJ030816 | 3D SCALING BASED ON PROBABILITY OF VISIBILITY |
| IT | 04744492.2 | 11-07-2003 | 05-07-2004 | | 1658558 | NJ030816 | 3D SCALING BASED ON PROBABILITY OF VISIBILITY |
| JP | 06-518475 | 11-07-2003 | 05-07-2004 | | | NJ030816 | 3D SCALING BASED ON PROBABILITY OF VISIBILITY |
| KR | 10-2006-7000605 | 11-07-2003 | 05-07-2004 | | | NJ030816 | 3D SCALING BASED ON PROBABILITY OF VISIBILITY |
| US | 10/563929 | 11-07-2003 | 05-07-2004 | 2006-0197783-A1 | 7388583 | NJ030816 | 3D SCALING BASED ON PROBABILITY OF VISIBILITY |
| CN | 200480022155.X | 05-08-2003 | 28-07-2004 | 1830217-A | | NJ030933 | DEPTH MAP BASED ON EDGE DETECTION |
| EP | 04744668.7 | 05-08-2003 | 28-07-2004 | 1654884-A | | NJ030933 | DEPTH MAP BASED ON EDGE DETECTION |
| IN | 766/CHENP/2006 | 05-08-2003 | 28-07-2004 | | 230286 | NJ030933 | DEPTH MAP BASED ON EDGE DETECTION |
| JP | 06-522460 | 05-08-2003 | 28-07-2004 | | | NJ030933 | DEPTH MAP BASED ON EDGE DETECTION |
| KR | 10-2006-7002454 | 05-08-2003 | 28-07-2004 | | | NJ030933 | DEPTH MAP BASED ON EDGE DETECTION |
| US | 10/567205 | 05-08-2003 | 28-07-2004 | 2006-0233666-A1 | | NJ030933 | DEPTH MAP BASED ON EDGE DETECTION |
| CN | 200480026700.2 | 17-09-2003 | 31-08-2004 | 1853200A | 200480026700.2 | NJ031094 | Depth of Field (DOF) RENDERING |
| EP | 04769896.4 | 17-09-2003 | 31-08-2004 | 1665166-A | | NJ031094 | Depth of Field (DOF) RENDERING |
| JP | 06-526750 | 17-09-2003 | 31-08-2004 | | | NJ031094 | Depth of Field (DOF) RENDERING |
| KR | 10-2006-7005480 | 17-09-2003 | 31-08-2004 | | | NJ031094 | Depth of Field (DOF) RENDERING |
| US | 10/571816 | 17-09-2003 | 31-08-2004 | 2007-0057944-A1 | 7528830 | NJ031094 | Depth of Field (DOF) RENDERING |
| CN | 200480028290.5 | 30-09-2003 | 22-09-2004 | 1860503-A | 200480028290.5 | NJ031170 | LIMITED HEAD MOTION IN 3D VISUALISATION |
| DE | 04770055.4 | 30-09-2003 | 22-09-2004 | | 602004008794.7 | NJ031170 | LIMITED HEAD MOTION IN 3D VISUALISATION |
| FR | 04770055.4 | 30-09-2003 | 22-09-2004 | | 1671276 | NJ031170 | LIMITED HEAD MOTION IN 3D VISUALISATION |
| GB | 04770055.4 | 30-09-2003 | 22-09-2004 | | 1671276 | NJ031170 | LIMITED HEAD MOTION IN 3D VISUALISATION |
| JP | 06-530911 | 30-09-2003 | 22-09-2004 | | | NJ031170 | LIMITED HEAD MOTION IN 3D VISUALISATION |
| US | 10/573559 | 30-09-2003 | 22-09-2004 | 2007-0035530-A1 | | NJ031170 | LIMITED HEAD MOTION IN 3D VISUALISATION |
| CN | 200480037527.6 | 19-12-2003 | 06-12-2004 | 1894728-A | 200480037527.6 | NJ031480 | INCREASE PERSPECTIVE OF 3D DISPLAY IMAGE |
| EP | 04801472.4 | 19-12-2003 | 06-12-2004 | 1697902-A | | NJ031480 | INCREASE PERSPECTIVE OF 3D DISPLAY IMAGE |
| JP | 06-544632 | 19-12-2003 | 06-12-2004 | | | NJ031480 | INCREASE PERSPECTIVE OF 3D DISPLAY IMAGE |
| KR | 10-2006-7012108 | 19-12-2003 | 06-12-2004 | | | NJ031480 | INCREASE PERSPECTIVE OF 3D DISPLAY IMAGE |
| US | 10/596436 | 19-12-2003 | 06-12-2004 | 2009-0009536-A1 | | NJ031480 | INCREASE PERSPECTIVE OF 3D DISPLAY IMAGE |
| CN | 200580007793.7 | 12-03-2004 | 01-03-2005 | 1930585-A | | NJ040243 | DEPTH FROM CURVATURE |
| EP | 05708894.0 | 12-03-2004 | 01-03-2005 | 1728208-A | | NJ040243 | DEPTH FROM CURVATURE |
| IN | 3758/CHENP/2006 | 12-03-2004 | 01-03-2005 | | | NJ040243 | DEPTH FROM CURVATURE |
| JP | 07-502465 | 12-03-2004 | 01-03-2005 | | | NJ040243 | DEPTH FROM CURVATURE |
| KR | 10-2006-7018261 | 12-03-2004 | 01-03-2005 | | | NJ040243 | DEPTH FROM CURVATURE |
| US | 10/598637 | 12-03-2004 | 01-03-2005 | 2007-0183648-a1 | | NJ040243 | DEPTH FROM CURVATURE |
| CN | 200580011256.1 | 14-04-2004 | 08-04-2005 | 1942902-A | | NJ040363 | METHOD FOR REDUCTION OF GHOST ARTEFACTS FOR RENDERING 2.75D |
| EP | 05718674.4 | 14-04-2004 | 08-04-2005 | 1738331-A | | NJ040363 | METHOD FOR REDUCTION OF GHOST ARTEFACTS FOR RENDERING 2.75D |
| JP | 2007-507898 | 14-04-2004 | 08-04-2005 | | | NJ040363 | METHOD FOR REDUCTION OF GHOST ARTEFACTS FOR RENDERING 2.75D |
| US | 10/599821 | 14-04-2004 | 08-04-2005 | 2008-0267527-A1 | | NJ040363 | METHOD FOR REDUCTION OF GHOST ARTEFACTS FOR RENDERING 2.75D |
| CN | 200580011280.5 | 13-04-2004 | 04-04-2005 | 1943249-A | 200580011280.5 | NJ040376 | 3D DISPLAY WITH ELECTROWETTING LENTICULAR SCREEN |
| EP | 05718626.4 | 13-04-2004 | 04-04-2005 | 1738589-A | | NJ040376 | 3D DISPLAY WITH ELECTROWETTING LENTICULAR SCREEN |
| JP | 07-507878 | 13-04-2004 | 04-04-2005 | | | NJ040376 | 3D DISPLAY WITH ELECTROWETTING LENTICULAR SCREEN |
| US | 10/599790 | 13-04-2004 | 04-04-2005 | 2008-0316302-A1 | | NJ040376 | 3D DISPLAY WITH ELECTROWETTING LENTICULAR SCREEN |

CONFIDENTIAL

| Country | Application No | Priority Date | Filing Date | Publication No | Grant No | Philips Ref | Title |
|---|---|---|---|---|---|---|---|
| CN | 200580027067.3 | 10-08-2004 | 28-07-2005 | 101002482-A | | NL040877 | VIEW-MODE ENCODED INZ-VALUES |
| EP | 05776474.8 | 10-08-2004 | 28-07-2005 | 1779676-A | | NL040877 | VIEW-MODE ENCODED INZ-VALUES |
| IN | 596/CHENP/2007 | 10-08-2004 | 28-07-2005 | | | NL040877 | VIEW-MODE ENCODED INZ-VALUES |
| JP | 07-525403 | 10-08-2004 | 28-07-2005 | | | NL040877 | VIEW-MODE ENCODED INZ-VALUES |
| US | 11/573281 | 10-08-2004 | 28-07-2005 | 2008-0043094-A1 | | NL040877 | VIEW-MODE ENCODED INZ-VALUES |
| CN | 200580034913.4 | 13-10-2004 | 26-09-2005 | 101040206-A | | NL041117 | OUT OF FOCUS LENTICULAR FOR 3D |
| EP | 05784801.2 | 13-10-2004 | 26-09-2005 | 1805549-A | | NL041117 | OUT OF FOCUS LENTICULAR FOR 3D |
| JP | 2007-536297 | 13-10-2004 | 26-09-2005 | | | NL041117 | OUT OF FOCUS LENTICULAR FOR 3D |
| US | 11/576909 | 13-10-2004 | 26-09-2005 | 2007-0247708-A1 | | NL041117 | OUT OF FOCUS LENTICULAR FOR 3D |
| CN | 200580036903.4 | 26-10-2004 | 21-10-2005 | 101048803-A | | NL041196 | FOCUS BASED DEPTH RENDERING |
| EP | 05819890.4 | 26-10-2004 | 21-10-2005 | 1807806-A | | NL041196 | FOCUS BASED DEPTH RENDERING |
| JP | 07-537466 | 26-10-2004 | 21-10-2005 | | | NL041196 | FOCUS BASED DEPTH RENDERING |
| US | 11/577745 | 26-10-2004 | 21-10-2005 | 2009-0073170-A1 | | NL041196 | FOCUS BASED DEPTH RENDERING |
| CN | 200580039226.1 | 16-11-2004 | 08-11-2005 | 101061519-A | | NL041259 | METHOD FOR RENDERING BASED ON IMAGE SEGMENTATION |
| DE | 05802412.6 | 16-11-2004 | 08-11-2005 | | 602005006836.8 | NL041259 | METHOD FOR RENDERING BASED ON IMAGE SEGMENTATION |
| ES | 05802412.6 | 16-11-2004 | 08-11-2005 | | 1815441 | NL041259 | METHOD FOR RENDERING BASED ON IMAGE SEGMENTATION |
| FR | 05802412.6 | 16-11-2004 | 08-11-2005 | | 1815441 | NL041259 | METHOD FOR RENDERING BASED ON IMAGE SEGMENTATION |
| GB | 05802412.6 | 16-11-2004 | 08-11-2005 | | 1815441 | NL041259 | METHOD FOR RENDERING BASED ON IMAGE SEGMENTATION |
| IN | 2072/CHENP/2007 | 16-11-2004 | 08-11-2005 | | | NL041259 | METHOD FOR RENDERING BASED ON IMAGE SEGMENTATION |
| IT | 05802412.6 | 16-11-2004 | 08-11-2005 | | 1815441 | NL041259 | METHOD FOR RENDERING BASED ON IMAGE SEGMENTATION |
| JP | 07-540788 | 16-11-2004 | 08-11-2005 | | | NL041259 | METHOD FOR RENDERING BASED ON IMAGE SEGMENTATION |
| US | 11/718917 | 16-11-2004 | 08-11-2005 | 2008-0187222-A1 | | NL041259 | METHOD FOR RENDERING BASED ON IMAGE SEGMENTATION |
| CN | 200580039292.9 | 18-11-2004 | 07-11-2005 | 101061416-A | | NL041261 | 2D - 3D POLARISING BACKLIGHT |
| DE | 05800635.4 | 18-11-2004 | 07-11-2005 | | 602005016007.8 | NL041261 | 2D - 3D POLARISING BACKLIGHT |
| FR | 05800635.4 | 18-11-2004 | 07-11-2005 | | 1815288 | NL041261 | 2D - 3D POLARISING BACKLIGHT |
| GB | 05800635.4 | 18-11-2004 | 07-11-2005 | | 1815288 | NL041261 | 2D - 3D POLARISING BACKLIGHT |
| JP | 07-542377 | 18-11-2004 | 07-11-2005 | | | NL041261 | 2D - 3D POLARISING BACKLIGHT |
| US | 11/719234 | 18-11-2004 | 07-11-2005 | 2009-0295689-A1 | | NL041261 | 2D - 3D POLARISING BACKLIGHT |
| CN | 200580040177.3 | 24-11-2004 | 07-11-2005 | 101065702-A | | NL041318 | FOURTH COMPENSATION LAYER IN 2D/3D DISPLAY |
| DE | 05802334.2 | 24-11-2004 | 07-11-2005 | | 602005007378.7 | NL041318 | FOURTH COMPENSATION LAYER IN 2D/3D DISPLAY |
| FR | 05802334.2 | 24-11-2004 | 07-11-2005 | | 1817624 | NL041318 | FOURTH COMPENSATION LAYER IN 2D/3D DISPLAY |
| GB | 05802334.2 | 24-11-2004 | 07-11-2005 | | 1817624 | NL041318 | FOURTH COMPENSATION LAYER IN 2D/3D DISPLAY |
| JP | 07-542374 | 24-11-2004 | 07-11-2005 | | | NL041318 | FOURTH COMPENSATION LAYER IN 2D/3D DISPLAY |
| KR | 10-2007-7011545 | 24-11-2004 | 07-11-2005 | | | NL041318 | FOURTH COMPENSATION LAYER IN 2D/3D DISPLAY |
| US | 11/719779 | 24-11-2004 | 07-11-2005 | 2009-0147160-A1 | | NL041318 | FOURTH COMPENSATION LAYER IN 2D/3D DISPLAY |
| CN | 200580041772.9 | 06-12-2004 | 05-12-2005 | 101073273-A | | NL041369 | DRIVING METHOD FOR STEREOSCOPICDISPLAY DEVICE |
| EP | 05826728.7 | 06-12-2004 | 05-12-2005 | 1825691-A | | NL041369 | DRIVING METHOD FOR STEREOSCOPICDISPLAY DEVICE |
| JP | 07-543393 | 06-12-2004 | 05-12-2005 | | | NL041369 | DRIVING METHOD FOR STEREOSCOPICDISPLAY DEVICE |
| KR | 10-2007-7012482 | 06-12-2004 | 05-12-2005 | | | NL041369 | DRIVING METHOD FOR STEREOSCOPICDISPLAY DEVICE |
| US | 11/720528 | 06-12-2004 | 05-12-2005 | 2009-0128474-A1 | | NL041369 | DRIVING METHOD FOR STEREOSCOPICDISPLAY DEVICE |
| CN | 200580007684.7 | 12-03-2004 | 04-03-2005 | 1930512A | | NL050007 | 3D DISPLAY WITH CONTINOUS CYCLIC VIEWS II |
| EP | 05708943.5 | 12-03-2004 | 04-03-2005 | 1728116-A | | NL050007 | 3D DISPLAY WITH CONTINOUS CYCLIC VIEWS II |
| IN | 3761/CHENP/2006 | 12-03-2004 | 04-03-2005 | | | NL050007 | 3D DISPLAY WITH CONTINOUS CYCLIC VIEWS II |
| JP | 07-502478 | 12-03-2004 | 04-03-2005 | | | NL050007 | 3D DISPLAY WITH CONTINOUS CYCLIC VIEWS II |
| US | 10/598643 | 12-03-2004 | 04-03-2005 | 2007-0177006-A1 | | NL050007 | 3D DISPLAY WITH CONTINOUS CYCLIC VIEWS II |
| CN | 200680002261.0 | 12-01-2005 | 12-01-2006 | 101103380-A | 200680002261.0 | NL050009 | INCREASING DEPTH PERCEPTION BY ADDING STRUCTURES |
| DE | 06710664.1 | 12-01-2005 | 12-01-2006 | | 602006005785.7 | NL050009 | INCREASING DEPTH PERCEPTION BY ADDING STRUCTURES |
| ES | 06710664.1 | 12-01-2005 | 12-01-2006 | | 1839267 | NL050009 | INCREASING DEPTH PERCEPTION BY ADDING STRUCTURES |
| FR | 06710664.1 | 12-01-2005 | 12-01-2006 | | 1839267 | NL050009 | INCREASING DEPTH PERCEPTION BY ADDING STRUCTURES |
| GB | 06710664.1 | 12-01-2005 | 12-01-2006 | | 1839267 | NL050009 | INCREASING DEPTH PERCEPTION BY ADDING STRUCTURES |
| IN | 3064/CHENP/2007 | 12-01-2005 | 12-01-2006 | | | NL050009 | INCREASING DEPTH PERCEPTION BY ADDING STRUCTURES |
| IT | 06710664.1 | 12-01-2005 | 12-01-2006 | | 1839267 | NL050009 | INCREASING DEPTH PERCEPTION BY ADDING STRUCTURES |
| KR | 10-2007-7018461 | 12-01-2005 | 12-01-2006 | | | NL050009 | INCREASING DEPTH PERCEPTION BY ADDING STRUCTURES |
| US | 11/813110 | 12-01-2005 | 12-01-2006 | 2009-0003728-A1 | | NL050009 | INCREASING DEPTH PERCEPTION BY ADDING STRUCTURES |
| CN | 200580005096.X | 17-02-2004 | 07-02-2005 | 1922631-A | 200580005096.X | NL050010 | DEPTH FROM PATH TO BORDER |
| DE | 05702909.2 | 17-02-2004 | 07-02-2005 | | 602005004125.7 | NL050010 | DEPTH FROM PATH TO BORDER |
| FR | 05702909.2 | 17-02-2004 | 07-02-2005 | | 1719079 | NL050010 | DEPTH FROM PATH TO BORDER |
| GB | 05702909.2 | 17-02-2004 | 07-02-2005 | | 1719079 | NL050010 | DEPTH FROM PATH TO BORDER |
| IN | 3384/CHENP/2006 | 17-02-2004 | 07-02-2005 | | | NL050010 | DEPTH FROM PATH TO BORDER |
| JP | 06-553726 | 17-02-2004 | 07-02-2005 | | | NL050010 | DEPTH FROM PATH TO BORDER |
| KR | 10-2006-7016549 | 17-02-2004 | 07-02-2005 | | | NL050010 | DEPTH FROM PATH TO BORDER |
| US | 10/597976 | 17-02-2004 | 07-02-2005 | 2007-0146232-A1 | | NL050010 | DEPTH FROM PATH TO BORDER |
| CN | 200680002347.9 | 18-01-2005 | 12-01-2006 | 101107644-A | | NL050033 | APPLY SHIFT IN SAMPLE ON BASIS OF LENS POSITION |
| EP | 06710666.6 | 18-01-2005 | 12-01-2006 | 1842179-A | | NL050033 | APPLY SHIFT IN SAMPLE ON BASIS OF LENS POSITION |
| IN | 3135/CHENP/2007 | 18-01-2005 | 12-01-2006 | | | NL050033 | APPLY SHIFT IN SAMPLE ON BASIS OF LENS POSITION |
| JP | 07-550910 | 18-01-2005 | 12-01-2006 | | | NL050033 | APPLY SHIFT IN SAMPLE ON BASIS OF LENS POSITION |
| US | 11/814098 | 18-01-2005 | 12-01-2006 | 2009-0115800-A1 | | NL050033 | APPLY SHIFT IN SAMPLE ON BASIS OF LENS POSITION |
| CN | 03815087.5 | 27-06-2002 | 10-06-2003 | 1666137 | 03815087.5 | US020226 | ELECTRICALLY CONFIGURABLE PHOTONIC CRYSTAL. |
| EP | 03735892.6 | 27-06-2002 | 10-06-2003 | 1520202-A | | US020226 | ELECTRICALLY CONFIGURABLE PHOTONIC CRYSTAL. |
| JP | 04-517085 | 27-06-2002 | 10-06-2003 | | | US020226 | ELECTRICALLY CONFIGURABLE PHOTONIC CRYSTAL. |
| US | 10/183803 | 27-06-2002 | 27-06-2002 | 2004-0001246-A1 | 6738178 | US020226 | ELECTRICALLY CONFIGURABLE PHOTONIC CRYSTAL. |

25

CONFIDENTIAL

## Schedule B
### Licensed Know-How and Licensed Software

The Licensed Know-How is based on the 3D Technology, developed by the former Philips incubator 3DSolutions, and implemented in several prototypes.
The Licensed Know-How includes:

1. available technical documentation on product designs, manufacturing process description and equipment specifications,
2. available rendering firmware,
3. available 3D content creation software.

The Licensed Know-How will be provided "as-is" and is handed over by enabling access for Licensees employees to the documentation, firmware and software relevant to the 3D Technology.

Details on [1] technical documentation on product designs, manufacturing process description and equipment specifications:
- all documentation which is available in 3 archives:
  - TPD archive
  - Software archive
  - Departmental archive
- Lens design software

Details on [2] rendering firmware:
- Firmware archive (including  schematics of Hydra, Spartak, SpartakNext)
- Firmware download tool

Details on [3] 3D content creation software:
- Software:
  - Display control tool
  - Player API
  - MediaPlayer9
  - Settings API
  - Monitor540_1080
  - MediaSequencer
  - WOWzone application
  - WOWvx Player
  - WOWvx Spacer
  - WOWvx BlueBox server
  - WOWvx BlueBox configurator
  - Compositor
  - BlueBox server configuration scripts
  - DirectX visualize
  - OpenGL control & visualiser
  - B3D source filter

26

CONFIDENTIAL

  - o  3DS MAX rendering plugins
  - o  Maya rendering plugins
  - o  Red Box
- Description of the software
- Documentation / manuals, when available.


3D prototype equipment and he use of 3D prototype equipment is not included in the Licensed Know-How. This equipment is managed by Philips Miplaza; Licensee can discuss access to the equipment via a rental arrangement to be agreed upon and signed between Licensee and Philips MiPlaza.

Equipment, prototype displays, components or other types of physical subjects are not included in the Licensed Know-How.

Philips remains the owner of the Licensed Know-How. Where available, a copy of the documentation, firmware and software will be provided.

The hand-over period will end 6 months after the effective date of the Agreement.

CONFIDENTIAL

## Schedule C
### running royalty

[1] <u>Royalty fee applicable to hardware sales</u> by 3DFusion and / or its Affiliates (e.g. 3D Displays and 3D Rendering Box):

   1,5% on Total Net Turnover, with a minimum of:

| 3D Display Size | Up to 6" | 6"-9.9" | 10"-13.9" | 14"-19.9" | 20"-26.9" | 27"-36.9" | 37" and up |
|---|---|---|---|---|---|---|---|
| Royalty (Euro) | 1.00 | 1.25 | 2.00 | 3.00 | 4.00 | 6.00 | 9.00 |
|  |  |  |  |  |  |  |  |
| Royalty fee per 3D Rendering Box: 9.00 euro | | | | | | | |

[2] <u>Royalty fee applicable to delivery of 3D Content Services by 3DFusion and / or its Affiliates  and 3D Content Creation Tools by 3DFusion and / or its Affiliates:</u>

   3% on Total Net Turnover.

"Total Net Turnover" shall mean all revenue generated by or for Licensee through the sale or other disposal of Licensed Products to customers less duties and sales taxes actually incurred by Licensee.

The rate of exchange for the minimum royalty fee from Euro to US Dollar shall be the European Central Bank (ECB) fixing rate of the relevant currency as officially quoted by the European Central Bank for payment of currency transactions on the day that the amount is due and payable.

CONFIDENTIAL

Schedule D
Royalty Reporting Form

Koninklijke Philips Electronics N.V.
c/o Philips Intellectual Property & Standards
GSA and Licenses Administration Department
P.O. Box 220
5600 AE Eindhoven
The Netherlands
Fax no.: + 31 40 27 45267

Date:
Company name:
Manufacturing site:
City:
Country:

## Reference: Royalties

This is to provide you with our royalty statement under the Technology Licensing Agreement of [date] between our companies, which covers the relevant business of Licensed Products for the [ 1st, 2nd, 3rd, 4th] calendar quarter of [year]. The total fee is to be calculated in conformity with Section 4.2 of and Schedule C to said agreement.

| Licensed Product, (serial number) | Description | Applicable Royalty Rate | Calculation of Applicable Royalty Amount | | Total Royalty fee due in Euro |
|---|---|---|---|---|---|
| | | | | | |
| | | | | Gross amount due | |
| | | | | Less withholding tax (if applicable) | |
| | | | | Net amount due | |

I attest that the above is true, complete and accurate.

Signed on behalf of 3D Fusion
Name:
Title:

29

# EXHIBIT 16

# Exhibit E

# 3DFusion, Corp.

### Mutual Non-Disclosure and Confidentiality Agreement

THIS AGREEMENT made on June 9th, (the "Effective Date") by and between 3DFusion, Corp. ("3DFusion"), a Delaware corporation, whose address is 110 Wall Street, 7th Floor, New York, NY 10005, and ___STREAM TV NETWORKS INC___ whose address is ___2009 CHESTNUT STREET PHILADELPHIA PA 19103;___

WHEREAS, Parties possesses certain confidential information and/or proprietary information and/or trade secrets, and;

WHEREAS, in connection with Business Purposes between the Parties, confidential information and/or proprietary information and/or trade secrets of one Party may become available to the other Party; and,

WHEREAS, each Party desires to prevent the unauthorized use and disclosure of its confidential information, proprietary information and trade secrets.

NOW THEREFORE, in consideration of the mutual covenants, terms and conditions and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree that the Disclosing Party will provide to the Recipient, certain confidential and proprietary information for Business Purposes in accordance with the following terms and conditions:

## 1. DEFINITIONS

### 1.1 Business Purposes

The pursuit, evaluation and/or feasibility assessment of a potential or actual business relationship, and/or the consummation of a transaction between Parties.

### 1.2 Confidential Information:

Any and all non-public technical and non-technical information provided by the Disclosing Party to the Recipient, whether conveyed verbally, in writing, electronically or by any other means, including but not limited to (i) patent and patent applications; (ii) trade secrets; and (iii) Derivative Materials, proprietary information including, but not limited to, ideas, sketches, techniques, drawings, works of authorship, models, inventions, know-how, processes, apparatuses, equipment, algorithms, Software programs, Source Code, Software source documents, and formulae related to the current, future and proposed products and services of each of the Parties, and including, without limitation, their respective information concerning business strategies, research, experimental work, development, design details and specifications, engineering, financial information, procurement requirements, purchasing, manufacturing, client and customer lists, investors, employees, business and contractual relationships, business forecasts, sales, merchandising, marketing plans and information the Disclosing Party provides regarding itself or

ANDA0804

third parties. Confidential Information also includes, but is not limited to any and all information disclosed by the Disclosing Party to the Recipient that is marked "confidential" or "proprietary.

Confidential Information does not include any information that the Recipient can demonstrate is:

    1.2.1 rightfully known prior to disclosure;

    1.2.2 rightfully obtained from a third party authorized to make such a disclosure, without breach of the terms and conditions of this Agreement;

    1.2.3 independently developed by the Recipient as demonstrated by contemporaneous documents;

    1.2.4 available to the public without restrictions;

    1.2.5 approved for disclosure with the prior written approval of the Disclosing Party; or

    1.2.6 disclosed by court order or as otherwise required by law, as set-forth in 2.7 of this Agreement.

### 1.3 Derivative Material:

May or may not consist of business related documents, computer program Source Code as determined solely by the Disclosing Party from time to time, and any written or computer based materials or instructions, including but not limited to, Documentation, computer or code or information, manuals or memos in any format whatsoever, system performance specifications or information, or system security measures or information provided from the Disclosing Party to the Recipient.

### 1.4 Disclosing Party:

A Party to this Agreement or a Party's Representatives that discloses or has disclosed Confidential Information to a Recipient.

### 1.5 Documentation:

The Disclosing Party's published or unpublished business and/or technical documents, memos, emails or any other source of information.

### 1.6 Permitted Use:

Use of Confidential Information for Business Purposes as defined herein.

### 1.7 Party:

Any Person who is Mr. Mark Frick, and/or 3DFusion, including their respective Representatives, as it relates to this Agreement and which shall be referenced herein as Party, Parties or Party's as the case may be.

### 1.8 Person:

ANDA0804

An individual, partnership, limited liability company, joint venture, corporation, trust, unincorporated association, any other entity, or a government or any department or agency or other unit thereof.

### 1.9 Recipient

A Party to this Agreement or a Party's Representatives that received or receives Confidential Information from a Disclosing Party.

### 1.10 Representative:

With respect to any Person, its directors, officers, employees, agents, consultants, advisors or other representatives.

### 1.11 Software:

The electronic instructions written and existing in both object and source code format or otherwise for computers, that now exists or may exist in the future, and  is owned by the Disclosing Party and any related computer software modules, updates, modifications, interim releases, bug fixes and patches applicable to such software.

### 1.12 Source Code:

The Software fully documented in its human readable form; and/or (i) a compiler, or similar computer program or any other software which is necessary to convert the Source Code form into the object code form of the Software; and/or (ii) runtime software necessary to execute the Source Code form of the Software, including but not limited to interpreters and templates.

## 2. CONFIDENTIALITY

All Confidential Information shall remain the sole property of the Disclosing Party, and the Recipient shall have no interest in or rights with respect thereto, except as expressly set forth in this Agreement. Parties further agree:

### 2.1 Obligation to Maintain Confidentiality:

During and after the term of this Agreement, the Recipient shall, and shall cause each of its Representatives, to keep Confidential Information confidential and to protect such Confidential Information from unauthorized use, access or disclosure in the same manner that it protects its own similar Confidential Information, but in no event with less care than a reasonably prudent business would exercise. Without limiting the effect of the previous sentence or the foregoing, the Recipient shall not and shall cause its Representatives not to:

2.1.1 disclose any of the Confidential Information to any Person except:

(i) with the prior written consent of an Officer of the Disclosing Party; or

(ii) as otherwise expressly permitted by this Agreement.

2.1.2 use any of the Confidential Information in any way detrimental to the Disclosing Party, it being acknowledged by the Recipient that any use other than in connection with the Business Purposes is detrimental.

3

ANDA0804

2.1.3 directly or indirectly, in any way, reveal, report, publish, disclose, transfer or otherwise use any of the Confidential Information except as specifically authorized by Disclosing Party in accordance with this Confidentiality Agreement.

2.1.4 reverse engineer, decompile or disassemble any hardware or software received from the other Party for any purpose inconsistent with this Agreement.

2.1.5 use any Confidential Information to compete or obtain unfair advantage in any commercial activity which may be comparable to the commercial activity contemplated by the Parties in connection with the Business Purposes.

### 2.2 Unauthorized Use:

The Recipient shall give prompt written notice to the Disclosing Party of any unauthorized use or disclosure of the Confidential Information and shall assist the Disclosing Party in remedying each unauthorized use or disclosure. Any assistance by Recipient does not waive any breach of this Agreement, nor does acceptance of the assistance constitute a waiver of any breach of this Agreement.

### 2.3 No Right to Confidential Information:

Recipient hereby agrees and acknowledges that:

2.3.1 no license, either express or implied, is hereby granted to Recipient by the Disclosing Party to use any of the Confidential Information;

2.3.2 all inventions, improvements, copyrightable works and designs relating to business plans, marketing plans, technology, machines, methods, compositions, or products of Disclosing Party directly resulting from or relating to the Confidential Information and the right to market, use, license and franchise the Confidential Information or the ideas, concepts, methods or practices embodied therein shall be the exclusive property of the Disclosing Party, and Recipient has no right or title thereto.

### 2.4. Rights and Licenses:

This Agreement and the furnishing of "Confidential Information" by the Disclosing Party shall not be construed as establishing, either expressly or by implication, any grant of rights or licenses to Recipient or any relationship between the Parties.

### 2.5 Permitted Disclosees:

The Recipient may disclose Confidential Information to only those of its Representatives who:

2.5.1 require the Confidential Information for the Permitted Use but to the extent practicable, only the part that is required; and

2.5.2 are informed by the Recipient of the confidential nature of the Confidential Material; and

2.5.3 are bound by the obligations of this Article and who are under a duty of confidentiality no less restrictive than that set forth herein.

ANDA0804

### 2.6 Termination; Return and Destruction of Confidential Information:

Upon the termination of this Agreement, the Recipient shall, and shall cause its Representatives to promptly, but in any event no later than ten (10) days after termination:

2.6.1 return to the Disclosing Party all Confidential Information furnished to the Recipient or any of its Representatives; and

2.6.2 destroy all Derivative Material and upon destruction, the Recipient shall certify in writing to the Disclosing Party that it has done so.

2.6.3 Notwithstanding anything to the contrary herein, in the event that Recipient is required by law or regulation to retain Confidential Information for compliance purposes, such Recipient and its Representatives shall:

2.6.3.1 retain one copy consisting of only the Confidential Information required for compliance purposes; and,

2.6.3.2 be subject to the obligation to maintain confidentiality of such retained Confidential Information until such time as Recipient complies with the provisions of this Section 2.6.1 and 2.6.2.

### 2.7 Compelled Disclosure:

If the Recipient or any of its Representatives is requested, becomes legally compelled or is required, in any case by a court or governmental body, to make any disclosure of Confidential Information (a "Compelled Representative"), the Recipient shall:

2.7.1 promptly, but in any event no later than three (3) days after the Recipient becomes aware that it is required to make such disclosure notify the Disclosing Party in writing;

2.7.2 consult with and assist the Disclosing Party, at the Disclosing Party's expense, in obtaining an injunction or other appropriate remedy to prevent such disclosure;

2.7.3 use its best efforts to obtain at the Disclosing Party's expense, a protective order or other reliable assurance that confidential treatment will be accorded to any Confidential Information that is disclosed.

### 2.8 Right to Disclose:

Subject to the provisions of Section 2.7, the Recipient or the Compelled Representative may furnish that portion and only that portion of the Confidential Information that, in form and substance reasonably acceptable to the Disclosing Party, the Recipient or the Compelled Representative is legally compelled or otherwise required to disclose.

### 2.9 Term:

Despite any other provision of this Agreement, the provisions of this Article 2 herein survives any termination of this Agreement or the consummation of the transactions that this Agreement contemplates for a period of five (5) years with respect to non-technical information and in perpetuity with respect to technical information, including the Software and Derivative Materials.

ANDA0804

## 3. GENERAL PROVISIONS

### 3.1 Indemnity:

The Recipient hereby agrees to indemnify the Disclosing Party against any and all losses, damages, claims, expenses, and attorneys' fees incurred or suffered by the Disclosing Party as a result of a breach of this Agreement by the Recipient or its Representatives.

### 3.2 Remedies; Injunctive Relief:

The Recipient understands and acknowledges that any disclosure or misappropriation of any Confidential Information in violation of this Agreement may cause the Disclosing Party irreparable harm, the amount of which may be difficult to ascertain, and therefore agrees that the Disclosing Party shall have the right to apply to a court of competent jurisdiction for specific performance and/or an order restraining and enjoining any such further disclosure or breach and for such other relief as the Disclosing Party shall deem appropriate, without the posting of a bond or other security and, without proof of actual damages. Such right of the Disclosing Party is to be in addition to any other remedies otherwise available to the Disclosing Party at law or in equity.

### 3.3 No Additional Agreements:

In the absence of any other written agreements between the Parties, neither the holding of discussions nor the exchange of ideas, material or information shall be construed as an obligation of either Party to perform any work, enter into any license, business engagement or other agreement with the other Party. Parties hereby acknowledge that they are not agents of each other. Nothing in this Agreement shall prohibit a Party from providing its own Confidential Information to third parties and entering into agreements with third parties. Each Party reserves the right, in its sole discretion, to reject any and all proposals made by the other Party or its Representatives with regard to a transaction between the Parties and to terminate discussions or negotiations at any time.

### 3.4 Severability:

If any provision of this Agreement is determined to be invalid, illegal or unenforceable, the remaining provisions of this Agreement remain in full force, provided that the essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

### 3.5 Governing Law:

The laws of the State of New York (without giving effect to its conflict of laws principles) govern all matters arising out of or relating to this Agreement, including without limitation, its interpretation, construction, performance, and enforcement. Parties hereby irrevocably consent to the jurisdiction of the state and federal courts located in the city of New York, State of New York, in any action arising out of or relating to this Agreement, and waive any claim that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

### 3.6 Captions; Number; Gender:

The descriptive headings of the Articles, Sections, and subsections of this Agreement are for convenience only, do not constitute a part of this Agreement, and do not affect this Agreement's construction or interpretation. Any reference in this Agreement to the singular includes the plural where appropriate, and any reference in this Agreement to the masculine gender includes the feminine and neuter genders where appropriate.

ANDA0804

### 3.7 Entire Agreement:

This Agreement constitutes the sole understanding of the Parties about the subject matter set out herein and may not be amended or modified except in writing signed by each of the Parties to the Agreement and supersedes all prior or contemporaneous proposals, agreements, representations and understandings, whether written or oral, with respect to the subject matter. This Agreement shall not limit any rights that either Party may have under trade secret, copyright, patent or other laws that may be available.

As to 3DFusion:
Ilya Sorokin

As to: STREAM TV NETWORKS, INC

_____
Signature

_____
Signature

CEO

Title: CEO

ANDA0804

## ADDENDUM TO AGREEMENT

On this 11th day of June 2010, Stream TV Networks, Inc. ("STV") and 3D Fusion, Inc. ("Fusion") (both parties collectively "Parties") desire to amend ("Amendment") a written agreement between them dated on or about June 9, 2010 concerning non-disclosure and confidentiality ("Agreement") according to the terms hereof.

**WHEREAS,** STV and Fusion have begun negotiating terms of a possible transaction in connection with the business purposes of the Agreement;

**WHEREAS,** the Parties desire to ensure the information below will be expressly covered by the Agreement and as described herein;

**NOW THEREFORE,** the Parties agree, intending to be legally bound hereby, agree as follows:

The Parties have been negotiating a possible transaction in connection with the business purposes of the Agreement ("Transaction"). Fusion specifically agrees that it shall treat the negotiations and mere existence of such Transaction discussions, and all terms thereof, including specifically but not limited to the involvement and identity of STV, its affiliates or employees and principals as the persons or entities in such discussions with Fusion ("Transaction Discussions") in strictest confidence and limited to employees of Fusion. Moreover, Fusion shall not use the Transaction Discussions or any disclosure thereof to aide in any way their negotiations with any third parties.

Except as otherwise indicated above, all other terms and conditions of the Agreement shall remain in full force and effect.

**IN WITNESS WHEREOF,** the Parties by their duly authorized representatives have executed this Addendum to Agreement on the date first written above.


3D Fusion, Inc.                                    Stream TV Networks, Inc.


(Signature)                                        (Signature)

Ilya Sorokin                                       Mathu Rajan
CEO, 3D Fusion, Inc.                               CEO, Stream TV Networks, Inc.

# EXHIBIT 17



## AGREEMENT

On this 28th day of September, 2010, Stream TV Networks, Inc. ("Stream), and 3D Fusion, Inc. ("Fusion) and its founders Ilya Sorokin and Steve Blumenthal ("Fusion Founders"), (all parties collectively "Parties")  desire to enter into a multi-party agreement as described herein ("Agreement").

**WHEREAS,** Stream and Fusion have executed a confidentiality and non-disclosure agreement dated on or about June 9, 2010 and an addendum/amendment to ensure confidentiality of additional information dated on or about June 11, 2010 (both documents collectively "NDA") to explore an investment or strategic partner relationship; and

**WHEREAS,** the Parties have reached an understanding and wish to memorialize the primary terms thereof.

 **NOW THEREFORE,** the Parties, intending to be legally bound hereby, agree as follows:

1.    Confidentiality of Transaction Discussions:  Fusion and Fusion Founders agree that the instant Agreement including Exhibit A and all discussions around same including but not limited to the fact the discussion are taking place shall be deemed confidential and fully covered and part of the NDA .

2.    Binding Nature.  The Parties agree, in full consideration of the time and expense that shall be expended by each party, to be bound by the transaction outlined in this Agreement and attachments hereto (hereinafter, the "Transaction") upon execution of definitive agreements comprising customary terms and conditions  including the material terms and conditions in this Agreement and attachments thereto.

 **IN WITNESS WHEREOF,** the Parties, by their duly authorized representatives, have executed this Agreement on the date first written above.

**3D Fusion, Inc.**

Ilya Sorokin
CEO, 3D Fusion, Inc.       <Seal.>

Ilya Sorokin, individually

Steve Blumenthal, individually

**Stream TV Networks, Inc.**

Mathu Rajan
CEO, Stream TV Networks, Inc. <Seal>

Mathu Rajan, Individually

Raja Rajan, Individually

**Attachment A**

**Capitalization
Strategy**

Stream is attempting to raise capital for its own business strategies and intends to allocate funds towards the development and commercialization of Fusion's 3D-related business opportunities. Under the terms herein, Fusion agrees to provide complete support to Stream to fulfill its capitalization strategy.

Stream agrees that it will keep Fusion informed of the capitalization efforts as the process commences.

**Post-Capitalization
Structure**

Stream intends to become an operating subsidiary of a holding company ("HoldCo") that may be newly-formed. It is understood that all the rights and obligations herein granted to Stream shall be fully assignable to and assumable by Holdco. It is intended that Fusion (or all its assets in a newly-formed entity) shall become a separate subsidiary of HoldCo jointly owned by HoldCo and the current owners of Fusion ("3D Sub"). Fusion shall have representation at HoldCo Board Level if the Strategic Option below is exercised.

**3D Fusion
Restructure**

The Parties understand that the 3D Sub may either be the current Fusion entity or a newly-formed entity that purchases 100% of the assets of Fusion and only assumes agreed-upon liabilities after which the current Fusion entity shall be wound down and closed. In the event that the 3D Sub is a restructure of Fusion the assets that shall be included in the asset purchase at a minimum shall be all intellectual property, know how, and trade secrets whether patent applications have been filed or not, all equipment and samples, all sales orders, contracts and opportunities, all employees hired and to be hired under contract and not, all subsidiaries including but not limited to the Dutch subsidiary for the Eindhoven based employees and facilities. All liabilities assumed by 3D Sub shall be identified and approved as part of the closing documents. One of the assumed liabilities shall be the inventor royalties already recorded with US Patent and Trademark offices with regard to the currently pending filings; however, it is understood that financial arrangement for employment contracts for the 3D Sub for founders shall take into account the possible

2

remuneration for these royalties when salaries are to be negotiated hereunder.

**Employment**

Mr. Sorokin and Mr. Blumenthal ("Fusion Founders") shall be employed by the 3D Sub to lead that entity's operations. Employment agreements for their employment shall include customary terms and conditions including non-competition clauses and shall each have duration terms of three years in length. The contracts shall also provide that terminations without cause will result in accelerated payment to each Fusion Founder of their full salary that would be payable during the remaining term and vesting of options including any prior "unpaid salary difference" (see below). The employment agreements shall include a well-defined bonus structure and shall specify mutually acceptable current salaries, and also specify the full agreed-upon base salaries, that will be reached as 3D Sub has sufficient funding until then the unpaid salary difference will be carried as the debt on the books of the 3DSub. In addition to the definition of the bonus structure, it is agreed that 5% of the monthly profits be allocated to Fusion Founders to be applied against such debt, until the agreed upon full salary levels are reached. The employment agreements shall be part of the definitive documents for the closing of the investment described herein.

**Board of Directors**

The board of directors of the 3D Sub, upon the first tranche of the Start Up Funds, shall commence with the HoldCo having one seat with one observer seat with two seats for Fusion Founders. Upon HoldCo investing the total Start Up Funds it shall be entitled to two seats equal to the two seats of Fusion Founders. If the complete funding goals of HoldCo specified below are not met thereafter, HoldCo agrees that is shall give up half of its seats on the board as required to make room for alternative investors who do provide the funding.   Additional members shall be added by mutual consent. Holdco agrees that it shall regularly report at the 3D Sub board meetings its own strategic decisions and business directions, as well as on its financial and business performance. 3D Sub agrees it shall provide customary reports and financial information to HoldCo as required as part of its investments in 3D Sub.

**Investor Rights
Agreement**

The 3D Sub shall not (i) liquidate, dissolve or wind up the affairs of the 3D Sub; (ii) amend, alter, or repeal any provision of the formation documents of the 3D Sub; (iii) purchase or redeem or make any distribution on any equity interest in the 3D Sub, other than as defined in this document; (iv) increase or decrease the size of the Board, (v) make any loan or advance to, or own any stock or other securities of, any subsidiary or other limited liability company, corporation, partnership, or other entity unless it is wholly-owned by the 3D Sub (vi) make any loan or advance to any person, including, any employee or director, except advances and similar expenditures in the ordinary course of business or under the terms of a employee incentive plan approved by the Board; (vii) make any investment other than investments in prime commercial paper, money market funds, certificates of deposit in any United States bank having a net worth in excess of $1,000,000,000, or obligations issued or guaranteed by the United States of America, in each case having a maturity not in excess of two years; (viii) incur any aggregate indebtedness in excess of $100,000 that is not already included in a Board-approved budget, other than trade credit incurred in the ordinary course of business; (ix) enter into or be a party to any transaction with any director, officer or employee of the 3D Sub or any "associate" (as defined in Rule 12b-2 promulgated under the Securities Exchange Act of 1934) of any such person; (x) change the principal business of the 3D Sub enter new lines of business, or exit the current line of business; (xi) sell, transfer, license, sublicense, pledge or encumber technology or intellectual property; or (xii) sell or dispose of all of its assets or equity without the consent of one of the two Fusion Founders and the consent of the authorized representative of HoldCo for such decisions. Such required consent shall exist for HoldCo so long as it owns or otherwise has rights to (by convertible debt or other equity right) 19% and for Fusion Founders while they collectively own more than 19% of 3DSub.

For purposed of clarity, HoldCo shall not use its investor rights to prevent 3DSub from raising additional funds alternative to HoldCo as long as such third party investment will not in HoldCo's opinion impair funds already invested.

**Ownership**

4

| | |
|---|---|
| **Structure** | The 3D Sub shall commence with 100% of it being owned by Fusion Founders.  HoldCo may provide funds to commence operations within the 3D Sub ("Start Up Funds") up to $5,000,000 in total.   The Start Up funds may be in tranches if mutually agreed upon in writing when the Parties complete their financial projections. |
| | Subsequently, HoldCo shall have the right at its discretion to contribute funds earmarked for growth in 3D Sub or any mutually agreed upon spin off company designed to commercialize an opportunity developed by 3D Sub ("Growth Funds"). |
| **Start Up Funds** | The Start Up Funds shall be issued as Senior Lien Convertible Debt, that accrues interest at 18% per annum with a 24 month Maturity that shall have ability to convert into 29% of the 3D Sub if not paid in full with accrued interest and costs, if any.  As the Start Up funds are provided, cashless/nominal conversion Warrants shall be issued to HoldCo equal to 20% of the 3D Sub fully diluted equity for the entire Start Up Funds.  All mutually agreed tranches less than the entire $5,000,000 shall be pro-rated for purposes of the warrants and shares for conversion. For the avoidance of doubt, if the entire Start Up Funds are provided and the debt is converted in such case HoldCo shall own 49% of the 3D Sub before any of the performance events mentioned below are met. Monies spent towards securing the Philips license shall be counted towards the Start Up Funds even if it doesn't flow through 3D Sub initially but, it is understood that the Parties still need to resolve as closing condition how to provide HoldCo sufficient protections for monies advanced towards the Philips license if placed into the 3D Sub before it reaches financial stability and while it remains a minority shareholder but not impair 3D Subs ability to raise alternative capital if HoldCo does not complete financing of the Start Up Funds. |
| **Growth Funds** | The Growth Funds shall purchase equity of the Company equal to an additional 21% of the 3D Sub for $20,000,000 if exercised by HoldCo.  The Growth Funds may only be invested by HoldCo as a single tranche unless mutually agreed otherwise and only upon the end of the term of the convertible debt from Start Up Funds or earlier if the convertible debt is paid in full. |
| **3rd Party Investment and Prepayment** | After HoldCo's investment of the first tranche, in an amount to be agreed upon,  in the Start Up Funds, the balance of the tranches of Start Up Funds should be identified as part of the financial |

forecasts for the 3D Sub as part of the Closing Conditions.  In the event they are not identified in such plan by mutual agreement, then  HoldCo shall only have 90 days from request of the 3D Sub to invest additional funds under the terms provided in this Agreement.  If HoldCo is unable to meet an agreed tranch payment or separate request for funds from 3D Sub, 3D Sub then may obtain 3rd Party funding immediately and HoldCo waives the right of first refusal for any 3rd Party offer obtained  but HoldCo shall maintain its preemption rights to maintain its pro-rata share. Until Maturity, the 3D Sub shall have an option to prepay the debt at anytime the HoldCo does not provide additional funding as identified herein.  Obtaining 3rd Party Funds alone in such manner shall not trigger an acceleration of the convertible debt. Additionally, HoldCo exercising its right of first refusal on the post StartUp 3rd Party investment offer also shall not accelerate the maturity of the convertible debt.

**Conversion and Acceleration of Debt**

HoldCo may but is not required to accelerate and convert the debt into equity as provided above under any of the following conditions: a) HoldCo invests the Growth Funds into the 3D Sub before Maturity at 3D Sub's request; b) the debt Matures and is not repaid by 3D Sub; c) there is an exit event before Maturity.  The debt shall contain customary protections and terms including those relating to acceleration of all amounts due in the event of conditions that may affect the 3D Subs ability to repay the obligations.

**Anti-Dilution**

The Warrants issued to HoldCo shall have full ratchet anti-dilution so that all equity or equity rights issued by the 3D Sub shall allow the amount of the Warrants to be adjusted to maintain the 20% ownership of the 3D Sub. The anti-dilution right for the Warrants expire if and when the 3D Sub pays off all amounts due on the convertible debt before Maturity and has an additional cash on its balance sheet sufficient to cover necessary company expenses for six months.  Similarly, the amount of equity that the debt may be converted (29%) into equity of the 3D Sub shall also maintain the same anti-dilution rights except such rights expire on repayment of the debt if repaid before Maturity.

HoldCo shall have a right, as qualified below, provide additional capital to obtain an additional 21 % of 3D Sub for $20 million , paid in a single tranche as part of the Growth Funds. (An example

of the ownership structure including the options described below is contained in <u>Exhibit A</u>) .

It is agreed that additional investments from any party, option grants for employees and advisors shall all be dilutive of the ownership configurations specified herein.

**License**    The 3D Sub shall grant Stream/HoldCo:

a) an exclusive worldwide license to all its technologies (including software and/or middleware and any auto conversion functions) to enable sale of devices with displays smaller than 20" for all consumer-related applications, for which Stream has product offerings (Stream is not requesting any manually driven blue box content conversion tools or devices). It is also understood that the exclusive license herein shall be limited to consumers as the end user (not medical or commercial applications for example) All Stream products should clearly identify 3DSub as the source of technology. HoldCo agrees that it shall in good faith consider and negotiate alterations of the exclusive license as opportunities may arise for the 3D Sub for devices identified in this subsection.

b) a non-exclusive worldwide license to all its technologies (including software and/or middleware and any auto conversion functions) to enable sale of all devices for all consumer related applications under the condition that for these goods Stream will obtain the consent of the 3D Sub, which shall not be unreasonably withheld, based on the terms and conditions acceptable to 3DSub which it shall use good faith efforts to provide. Such terms and conditions shall include reaching agreement on both a) intended pricing and product bundling by HoldCo so 3D Subs sales efforts are not likely to be cannibalized; and b) that 3D Sub is additionally compensated for consumer markets that it develops without HoldCo but which it is willing to forego to HoldCo for such additional compensation.

It is agreed that Stream will pay the 3D sub the royalty rate for each piece for a) the amount that the 3D sub pays Philips as part of the license (as if 3D sub sold the product itself) and b) the equivalent amount per piece for the 3D sub as royalty for its technology, unless different amounts are mutually agreed upon otherwise. It is agreed that if and when 3D Sub is able to demonstrate from 3rd party market demand in market of HoldCo/Stream that their royalty rate should be increased then such adjustment shall occur with 90 days notice and the royalty being at a 30% discount to such increased price. Similarly, if HoldCo is able to



7

demonstrate that the royalty being paid is too high due to lack of issued patents or otherwise, then the royalty shall be adjusted downward with 90 days notice.

For the non-exclusive license, if the manufacturing rights are granted, 3D Sub will provide guidance and full support in developing those products under the licenses herein for additional consulting fee and travel expenses, if required which shall be negotiated in good faith in consideration of market prices and HoldCo's discounted investment in 3D Sub; however, if the 3D sub is required to manufacture any of the actual devices that are part of the licenses then additional compensation for the goods must be mutually agreed upon.
All non-automatic content work is to be provided exclusively by 3DSub for all licensed products.

**Fusion Founder**
**Options**            Fusion Founders shall be granted options/restricted stock in number so that upon vesting shall allow Fusion Founders total fully diluted ownership (with only the issuances identified herein and any additional issuances would be dilutive) to equal total 60% of the 3D Sub (more if the convertible debt is paid off as provided). Vesting of these options/restricted stock shall occur upon: 1) the 3D Sub attaining a pattern of financial stability  before the one year anniversary of receipt of the Start Up Funds (the definition of financial stability is to be agreed upon by the Parties for the definitive documents upon agreeing upon a financial plan) ; 2) upon obtaining the validation of a mutually selected independent third party expert/firm  that the currently filed patent and provisional patent applications in (listed on Exhibit B hereto ) a) are likely to issue in the future, with any changes or modifications and b) upon issuance  with such changes if any, would protect and block the technologies and techniques to largely eliminate the viewing angle issues and overall viewing experience limitations of the Philips patents and technologies (in essence the approved patents would become indispensable for  the Philips technologies and patents  to be  commercialized) ("Performance B") The amount of options to vest for Performance A and B (whatever takes place first) is identified on Exhibit A hereto.

**Duration**
**Restrictions**       The Parties agree that they shall fully cooperate with each other and provide best efforts in working towards a closing of the

transaction described herein.  For all the good and valuable consideration described herein and the costs and expenses that have been and will be incurred by each party, the Parties agree they shall not shop for or seek any alternative financing or capitalization except for that which is described herein for a period of ninety days from completion of the Closing Deliverables (defined below)and consent to the final Definitive Agreements (mentioned above).  If a closing has not occurred within that time period then the obligations herein expire except for those relating to confidentiality.

**Closing Deliverables**

The "Closing Deliverables, at a minimum, that shall be provided by Fusion are:

a.  Eindhoven employees ready to execute approved contracts;
b.  Preliminary plans for Eindhoven facilities,
c.  Current patent applications and IP strategy call with 3DF patent counsel;
d.  Detailed liability description of all liabilities and assets that are to be part of the 3D sub.
e.  Mutually agreed upon detailed financial projections of the 3D sub operations through 2011 including projected P/L, Balance Sheet, and Cash Flow.

**Choice of Law**

The Parties agree they shall try to resolve all their disputes amicably and directly in the event that a conflict arises.  In the event that amicable resolution is not reached, then the Commonwealth of Pennsylvania and the county of Philadelphia shall be the exclusive choice of law and jurisdiction regardless of conflict of law principles.

**Expenses**

The Parties agree that they shall bear their own costs of this transaction which shall include legal costs, financial services costs, other professional services, travel, etc.

9

## Exhibit A
## (Ownership Example)

New One 8-27-2010

Example

**If Convertible Debt Not Repaid**

| Who | Event | Issuance | Cumu | | 3D F Cumu | 3DF % | HoldCo Cu | HoldCo % |
|---|---|---|---|---|---|---|---|---|
| 3DF | Start | 5,000 | 5,000 | | 5,000 | 100% | 0 | 0% |
| HoldCo | $5m^ | 4,900 | 9,900 | | 5,000 | 51% | | 49% |
| 3DF | Perfm A* | 4,000 | 13,900 | | 9,000 | 65% | 4,900 | 35% |
| HoldCo | $5m | 1,700 | 15,600 | | 9,000 | 58% | | 42% |
| HoldCo | $20m | 4,900 | 20,500 | | 9,000 | 44% | | 56% |
| 3DF | Perf B* | 8,000 | 28,500 | | 17,000 | 60% | 11,500 | 40% |

*\* vests (not new issue)*
^ warrants + stock

**If Convertible Debt Repaid-Only Start Up Funds from Holdco**

| Who | Event | Issuance | Cumu | | 3D F Cumu | 3DF % | HoldCo Cu | HoldCo % |
|---|---|---|---|---|---|---|---|---|
| 3DF | Start | 5,000 | 5,000 | | 5,000 | 100% | 0 | 0% |
| HoldCo | $5m^ | 1,250 | 6,250 | | 5,000 | 80% | | 20% |
| 3DF | Perfm A* | 2,500 | 8,750 | | 7,500 | 86% | 1,250 | 14% |
| 3DF | Perf B* | 8,000 | 16,750 | | 15,500 | 93% | 1,250 | 7% |

*\* vests (not new issue)*
^ warrants not stock



10

**Exhibit B**
(Current Patent and Provisional Applications)

# EXHIBIT 18

Thursday, February 2, 2017 | Follow Us:

[Search]



Home    On The Ground    Features    Development News    Innovation News    In The News    Neighborhoods    About You

## features

### how philly is leading the glasses-free 3d revolution

SUE SPOLAN | TUESDAY, JANUARY 25, 2011



I have seen the future, and it's your buddies sitting in your living room watching the Super Bowl in glasses-free 3D. Stream TV Networks, tucked away above a law firm on the 2000 block of Chestnut Street, offers the next big thing: the auto stereoscopic screen. That's 3D without glasses, and somebody better come up with a catchier name fast. Because the prototype is there, in a top floor office. And it's a good thing.

Attorney Daniel Rink greets me at the top of the stairs at the headquarters for Stream TV, a privately held new media company founded in 2009. Rink is doing some consulting for the tech start up, helmed by Bensalem-based entrepreneur Mathu Rajan. Stream TV Networks is listed at the same address as STV Networks Inc., which is billed as a Bollywood entertainment concern. The front room of the Stream TV office resembles an empty production set with wall murals and an anchor desk fronted with colorful mosaic tile. Somewhere down the hall is a dark makeup room and kitchen. But that's not the first thing they show me.

We go right to the star attraction. A real live 3D television that does not require glasses. It's HDTV format, full of pure three dimensional pleasure. To the geeky but unschooled eye, the eLocity-branded 3D effect appears to be hewn from several layers of phased, relatively large diameter pixel screens. If you walk across the back of the room and keep your eye on the screen, at regular intervals you get a moire or lenticular effect. At the stationary viewpoint, the image is crisp. Here comes Pinocchio's nose, straight at you. Here are some intense gaming graphics. Most titles are already available in 3D, so it's just the hardware that's

SHARE 

[Like 7]

DIVERSITY, EMERGING TECHNOLOGY, ENTREPRENEURSHIP

## recommended content



GIVE US YOUR EMAIL AND WE WILL GIVE YOU OUR WEEKLY ONLINE MAGAZINE. FAIR?

[Subscribe]

## related content

• Shofuso and Japan America Society merger strengthens Japanese roots in Philly

After years of pursing similar missions and programming, Philly's two premiere Japanese cultural groups have decided to join forces.

• Kingsessing Recreation Center is Southwest Philly's living room

• An inside perspective on Pennsylvania's new wine law

• Exploring the lifestages of an entrepreneur via four Philly companies

• Shift Capital's MaKen Studios brings big change to Kensington

• Germantown's YWCA gets another shot at redevelopment

## top feature stories

• Gabriel Mandujano
Gabriel Mandujano is the founder and CEO of Philadelphia-based Wash Cycle Laundry, a triple-bottom-line social enterprise that

How Philly Is Looking ... line 1233.a705 0705 s.o Rc Document 1 mc Filed 04/03/26 02 Entered ... w04/09/26 151m mtc a tuc s.mr streamtv0125.aspx

Exhibit A    Page 327 of 409

standing between you and your maker. Take that, Call of Duty: Black Ops.

Objects move smoothly through virtual 3D space. No shuddering, no pixelation. I am a believer. Along with the eLocity Android tablet offering, which we'll get to in a minute, Stream TV took the eLocity 3D TV screen to the Consumer Electronics Show (CES) two weeks ago. Zennie Abraham, a blogger at the San Francisco Chronicle, wrote, "I've seen the eLocity 3D without glasses TV, and it's real, and real impressive. Stream TV Networks' demonstration of the technology really works and if they can release it this year, eLocity will become a new household word in America."

Imagine. You are in a sports bar and the game is in 3D. You are in line at the bank and the display is in 3D. The fun never stops. Stream TV Networks' eLocity product line is wide. Aside from 3D TV sets and accompanying set top boxes that will transform two dimensionally produced shows into 3D, eLocity Android tablets are available right now. The full line will include 5-, 7- and 10-inch tablets, so far getting good reviews. Also planned: 3D digital picture frames, a 3D computer desktop and 3D digital cameras. View images on a future eLocity 3D without glasses Android tablet, widely discussed at CES. Produced in Taiwan and hovering at the $300 price point, eLocity's 7-inch tablet is useful and compact; the soon to be released 10-inch offers a better screen, open source Android 2.3/3.0, and a lighter profile.

Poised for greatness, the company is somewhat invisible. The brand, eLocity, has a website but Stream TV networks' is under construction. With just five employees in the Philadelphia headquarters and offices on the West Coast and China, the company, says Rink, can "start smaller and change on the fly." Rink says larger competitors, including Samsung, Sharp, Kodak and Philips, all of which have filed patents for autostereoscopic displays, have sunk millions of dollars into their products and cannot afford to change course easily.

Rajan, CEO of Stream TV Networks, says "our technology is a private jet compared to a moped. This product will completely revolutionize the viewing experience. Once you've gotten used to 3D you can't go back." Stream TV acquired a technology group in Fremont, Calif. that developed the concept of 3D without glasses.

Rajan, who comes from what he terms a private equity background, has many interests. His STV Networks is listed as an entertainment company. Mathu, along with his father Rajan G. Rajan, is the patent holder for a water filter manufactured by Zero Technologies Inc., which also lists Mathu's brother Raja as a partner. The ZeroWater filter bottle and pitcher are slated at major retailers nationwide, including Target, J&R, Sears and Amazon. A 1998 article in the Philadelphia Business Journal profiles the Rajan family's earlier water filtration company, Global Technology Solutions Inc., which was partly funded by Ben Franklin Technology Partners and housed in a West Philadelphia business incubator. Global Technology's Simply Best H2O was named winner of the 1998 Ben Franklin Emerging Business Award for most innovative product.

This chapter in Mathu Rajan's entrepreneurial history sheds light on his ability to rapidly place the eLocity line in the mass market. Many of the ZeroWater retailers are the same ones that are slated to stock the competitively priced eLocity Android tablets. And, as Engadget wrote at the time of the eLocity A7 pre-order, "Here's the tablet the economical among us have been waiting for." The Flash-enabled WiFi connected A7 line, with 1080p output and 512MB DDR2, is now in stock and shipping from Amazon, J&R, Wal-Mart, Sears and TigerDirect. The A10 line, running Android Honeycomb (3.0) is set to ship later this spring, and hints at



provides much-needed corporate laundry services while also providing green economy jobs to folks returning to the workforce.

- Gene Powell
- Maitreyi Roy
- Tayyib Smith
- 14 development projects that will transform Philadelphia
- Cost of Living: How Expensive is Philadelphia?
- Browse Local: A guide to Philadelphia's best used bookstores
- Our editor's 26 favorite dishes in Philadelphia
- Drink Up: Long a dry town, Collingswood welcomes downtown microbrewery
- Kingsessing Recreation Center is Southwest Philly's living room

VIEW ALL FEATURE STORIES



How Much is My Car Worth?
Find out how Much Your Car is Worth with a Free Black Book Valuation!
blackbook...

Man Who Predicted Trump Win - Makes Next Shocking Prediction
Trump's First Executive Order?
moneywise4...

Ron Paul's Gold Warning
Short interview with 22-year Congressman, Ron Paul, has many on edge. See his warning.
Stansberry Re...

3G mobile broadband options.

Back to that Bollywood story. A quick search on STV Networks reveals that in 2008, the company pledged 30 billion rupees, or about $650 million USD, to invest in Indian film "production, distribution and exhibition." Its game plan is vertical integration, "acquiring single screen theaters and distribution rights of films along with making a foray into the film production space in India," according to the Business of Cinema website. STV Networks, with offices in Mumbai, India, "already has more than 3,000 hours of India-based content and 1,500 hours of China-based content. The company has also acquired the rights to over 100 Bollywood movies and is in the process of acquiring rights to some others too." In 2007, STV released the English language edit of Jackie Chan's The Myth. The company also released and distributed Bollywood titles Mere Hote (2009) and Shaapit (2010).

There is no word as to when the eLocity 3D TV line will go to mass production and distribution, but Stream TV Networks' product roadmap lists five models, ranging from 42 to 72 inches, all in three stunning dimensions. You do the math.

**SUE SPOLAN** is Innovation and Job News editor for Flying Kite. Send feedback here.

**SHARE**

👍 Like 7

DIVERSITY, EMERGING TECHNOLOGY, ENTREPRENEURSHIP

## 0 Comments

Sort by  Oldest

Add a comment...

Facebook Comments Plugin

GIVE US YOUR EMAIL AND WE WILL GIVE YOU OUR WEEKLY ONLINE MAGAZINE. FAIR?

Subscribe

Funding provided by a grant from Team PA Foundation.

Contact Us | Privacy Policy | Have a Tip? | About Flying Kite | Philadelphia Links | Terms of Use | RSS

# EXHIBIT 19

From: **Christopher Michaels** michaels@bpmlegal.com
Subject: Rembrandt 3D IP Rights
Date: April 20, 2021 at 3:57 PM
To: mweis@dilworthlaw.com, lmcmichael@dilworthlaw.com, ycaplow@dilworthlaw.com
Cc: Chi Eng chi@englawfirm.com, stephen3d@mac.com, ntwallace@aol.com



Dear counsel for Stream TV:

We understand that there is a hearing on April 26, 2021 in the Stream TV bankruptcy chapter 11 filing and that you are defending motions to dismiss the Stream TV bankruptcy.

We assume that you are aware of our pending litigation against Stream TV, but I have attached copies of our First Amended Complaint filed against Stream TV (additional exhibits sent by separate email). Regardless of the outcome of the pending motions in the bankruptcy, we feel a negotiated settlement is in the best interest for all parties.

Stephen Blumenthal is the key originator of the intellectual property advancements, which resulted in the developments currently included in the on-screen display of the Stream Networks TVs that we have evaluated. Steve's company, Rembrandt3D Holdings, owns all of the rights to the 3D without glasses technology that were developed by Steve by late 2009 and included in a patent application filed in December of 2009.

In January 2010, Steve started working with the Eindhoven based team, transferring all of his advancements, trade secrets and the know-how he had discovered from over two years, and 1,000's of hours of rendering with the 3DSolutions licensed tools.  The-14-months spent working with his Dutch team included thousands of e-mails, hundreds of Skype calls, 43 3DFusion video projects, and 70 pages of detailed weekly meetings minutes with the same 12 Dutch team members that are now the SeeCubic engineering team.  The technology Stream purports to own was based on the technology disclosed by Steve and 3DFusion to the Rajans and Steve's former Philip's 3DSolution's team, during the time when the "team" was working for the 3DFusion wholly own Dutch Corporate subsidiary, 3DFusionEU.BV.

The lawsuit that we filed against Stream TV and the Rajan's as individuals originally included a patent infringement complaint, which has been separated out by Judge Abrams.  While the Supreme Court's decision in TC Heartland provides that we need to bring the patent infringement case in Philadelphia or Delaware, nothing about the substance of the patent infringement claim has changed.  Rembrandt's First Amended Complaint has provided a detailed claim chart showing how every TV sold by Stream TV includes every element of the patent claims. After years of being on notice of infringement of the Rembrandt patents, Stream TV has not identified a single element of a single claim of Rembrandt's patents that is missing from the Stream TV. Nothing about the Delaware action or the bankruptcy provides anyone a license to Rembrandt's patents.  Neither Stream TV, SeeCubic, or their licenses and customers are going to be able to sell a TV without infringing the Rembrandt's patents.

We thought we had reached a resolution with Stream TV that would have granted Stream TV a license to Rembrandt's technology rights and are seeking to enforce that resolution in the Southern District of New York.

Rembrandt's legal team is obviously working on contingency, while the costs of defending such a case will run into the 10-million-dollar range and be a detriment for any fund raising.  At the end of the day, Rembrandt still wants to see a 3D TV on the market rather than litigate.  Consequently, we still think there is a logical basis to seek a settlement now with a guaranteed outcome, rather than fight over IP rights with either Stream TV or SeeCubic.

Regardless of the outcome of SeeCubic's Delaware litigation or the motion to dismiss in the bankruptcy court, the Rembrandt technology rights are not transferring to SeeCubic. Stream TV can not transfer rights it does not own and Rembrandt's IP is interwoven into all of the technology Stream TV uses in its 3D displays.  I have worked with clients trying to raise money in such a posture and advised private equity companies considering investing in firms with pending IP claims.  While it is possible to raise

equity companies considering investing in firms with pending IP claims. While it is possible to raise funds under such a cloud, the investors pay pennies on the dollar for what would be a normal valuation.

I note from SeeCubic's filings that some of the common equity holders were included in SeeCubic in preference to any payments to the unsecured creditors. I would expect that the unsecured creditors will be unified in opposing the transfer of assets from Stream TV to SeeCubic or argue that any rights in SeeCubic that went to equity holders should be paid to the unsecured creditors instead.

The motion to dismiss is compelling except for its failure to mention the dispute regarding the ownership of the IP and licenses from Rembrandt. Even if the Delaware court's decision is upheld, I don't see anything in it that would transfer the license that Rembrandt is seeking to enforce against Stream TV. Assuming the bankruptcy proceeds, without the Rembrandt Licensing rights to the technology, it will not matter whose reorganization plan is approved. Rembrandt has the wherewithal to block any transfer of IP assets to either party, precluding any investor based business.

Ironically, if Stream TV performs its agreement with Rembrandt, Stream TV would have a license and be in a position to claim that the Rembrandt license is worth hundreds of millions of dollars such that Stream TV should be allowed to file a reorganization plan to allow it to proceed under license from Rembrandt to pay off the creditors.

We certainly contend that our IP rights are worth far more than Stream TV's liabilities and were clearly not transferred to SeeCubic in the Delaware action, so it seems that about the only asset Stream TV would have to oppose SeeCubic's motion to dismiss is to argue that it has a license from Rembrandt that dominates the assets that would be transferred to SeeCubic and that Stream TV has a going concern value based on the value of the licensing rights purchased from Rembrandt.

I propose that we set up a time to discuss in the near future, preferably in advance of the April 26 hearing.

Chris
IP Counsel for Rembrandt 3D

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

Email: michaels@bpmlegal.com
Direct Dial:  607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

                    

26-First
Amend...int.pdf          assignment-
               pat-42...50.pdf     US8558830.pdf     US9521390.pdf     US9681114.pdf

# EXHIBIT 20


**From:** **Christopher Michaels** michaels@bpmlegal.com 📎
**Subject:** Rembrandt 3D Holding LTD IP Rights and Stream TV
**Date:** April 20, 2021 at 4:08 PM
**To:** vinod@nichanilawfirm.com, jhoover@beneschlaw.com, jgentile@beneschlaw.com, wendy@cadence.com, david@hj-packing.com
, mediaAR@img.com, jona@cld1ltd.com, sal_lu@pegatroncorp.com, todd@tulsdairies.com, mediaAR@img.com,
ar@tripleco.com, mmassimi@dhglobaltax.com, phil@darivoff.com
**Cc:** Chi Eng chi@englawfirm.com, stephen3d@mac.com, ntwallace@aol.com



Dear counsel for creditors of Stream TV:

We understand that there is a hearing on April 26, 2021 in the Stream TV bankruptcy chapter 11 filing and you are a creditor of Stream TV.

Rembrandt 3D Holdings LTD has pending litigation against Stream TV.  I have attached copies of our First Amended Complaint filed against Stream TV (additional exhibits sent by separate email). Regardless of the outcome of the pending motions in the bankruptcy, we feel a negotiated settlement is in the best interest for all parties.

Stephen Blumenthal is the key originator of the intellectual property advancements, which resulted in the developments currently included in the on-screen display of the Stream Networks TVs that we have evaluated. Steve's company, Rembrandt3D Holdings, owns all of the rights to the 3D without glasses technology that were developed by Steve by late 2009 and included in a patent application filed in December of 2009.

In January 2010, Steve started working with the Eindhoven based team, transferring all of his advancements, trade secrets and the know-how he had discovered from over two years, and 1,000's of hours of rendering with the 3DSolutions licensed tools. The 14-months spent working with his Dutch team included thousands of e-mails, hundreds of Skype calls, 43 3DFusion video projects, and 70 pages of detailed weekly meetings minutes with the same 12 Dutch team members that are now the SeeCubic engineering team.  The technology Stream purports to own was based on the technology disclosed by Steve and 3DFusion to the Rajans and Steve's former Philip's 3DSolution's team, during the time when the "team" was working for the 3DFusion wholly own Dutch Corporate subsidiary, 3DFusionEU.BV.

The lawsuit that we filed against Stream TV and the Rajan's as individuals originally included a patent infringement complaint, which has been separated out by Judge Abrams.  While the Supreme Court's decision in TC Heartland provides that we need to bring the patent infringement case in Philadelphia or Delaware, nothing about the substance of the patent infringement claim has changed.  Rembrandt's First Amended Complaint has provided a detailed claim chart showing how every TV sold by Stream TV includes every element of the patent claims. After years of being on notice of infringement of the Rembrandt patents, Stream TV has not identified a single element of a single claim of Rembrandt's patents that is missing from the Stream TV. Nothing about the Delaware action or the bankruptcy provides anyone a license to Rembrandt's patents.  Neither Stream TV, SeeCubic, or their licenses and customers are going to be able to sell a TV without infringing the Rembrandt's patents.

We thought we had reached a resolution with Stream TV that would have granted Stream TV a license to Rembrandt's technology rights and are seeking to enforce that resolution in the Southern District of New York.  We reached this agreement with Stream TV when Shad Statsney was the CFO.

Rembrandt's legal team is obviously working on contingency, while the costs of defending such a case will run into the 10-million-dollar range and be a detriment for any fund raising.  At the end of the day, Rembrandt still wants to see a 3D TV on the market rather than litigate.  Consequently, we still think there is a logical basis to seek a settlement now with a guaranteed outcome, rather than fight over IP rights with either Stream TV or SeeCubic.

Regardless of the outcome of SeeCubic's Delaware litigation or the motion to dismiss in the bankruptcy court, the Rembrandt technology rights are not transferring to SeeCubic. Stream TV can not transfer rights it does not own and Rembrandt's IP is interwoven into all of the technology Stream TV uses in its

3D displays.  I have worked with clients trying to raise money in such a posture and advised private equity companies considering investing in firms with pending IP claims.  While it is possible to raise funds under such a cloud, the investors pay pennies on the dollar for what would be a normal valuation.

I note from SeeCubic's filings that some of the common equity holders were included in SeeCubic in preference to any payments to the unsecured creditors.  I would expect that the unsecured creditors will be unified in opposing the transfer of assets from Stream TV to SeeCubic or argue that any rights in SeeCubic that went to equity holders should be paid to the unsecured creditors instead.

The motion to dismiss is compelling except for its failure to mention the dispute regarding the ownership of the IP and licenses from Rembrandt.  Even if the Delaware court's decision is upheld, I don't see anything in it that would transfer the license that Rembrandt is seeking to enforce against Stream TV.  Assuming the bankruptcy proceeds, without the Rembrandt Licensing rights to the technology, it will not matter whose reorganization plan is approved. Rembrandt has the wherewithal to block any transfer of IP assets to either party, precluding any investor based business.

Ironically, if Stream TV performs its agreement with Rembrandt, Stream TV would have a license and be in a position to claim that the Rembrandt license is worth hundreds of millions of dollars such that Stream TV should be allowed to file a reorganization plan to allow it to proceed under license from Rembrandt to pay off the creditors.

We certainly contend that our IP rights are worth far more than Stream TV's liabilities and were clearly not transferred to SeeCubic in the Delaware action, so it seems that about the only asset Stream TV would have to oppose SeeCubic's motion to dismiss is to argue that it has a license from Rembrandt that dominates the assets that would be transferred to SeeCubic and that Stream TV has a going concern value based on the value of the licensing rights purchased from Rembrandt.

I propose that we set up a time to discuss in the near future, preferably in advance of the April 26 hearing.

Chris
IP Counsel for Rembrandt 3D


**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

Email: michaels@bpmlegal.com
Direct Dial:  607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

    

26-First      assignment-     US8558830.pdf   US9521390.pdf   US9681114.pdf
Amend...int.pdf   pat-42...50.pdf

# EXHIBIT 21



**From:** **Christopher Michaels** michaels@bpmlegal.com
**Subject:** Rembrandt 3D IP Rights
**Date:** April 20, 2021 at 3:24 PM
**To:** eben.colby@skadden.com, marley.brumme@skadden.com, joseph.larkin@skadden.com, jenness.parker@skadden.com, jason.liberi@skadden.com, jlathrop@rc.com, dwright@rc.com, Alissa.Castaneda@quarles.com, Brandon.Krajewski@quarles.com, Brittany.Ogden@quarles.com
**Cc:** stephen3d@mac.com, ntwallace@aol.com, Chi Eng chi@englawfirm.com

Dear counsel for SLS Holdings VI, LLC and SeeCubic, Inc.:

We understand that there is a hearing on April 26, 2021 in the Stream TV bankruptcy chapter 11 filing and that you have filed for a motion to dismiss the Stream TV bankruptcy.

We assume that you are aware of our pending litigation against Stream TV, but I have attached copies of our First Amended Complaint filed against Stream TV (additional exhibits sent by separate email). Regardless of the outcome of the pending motions in the bankruptcy, we feel a negotiated settlement is in the best interest for all parties.

Stephen Blumenthal is the key originator of the intellectual property advancements, which resulted in the developments currently included in the on-screen display of the Stream Networks TVs that we have evaluated. Steve's company, Rembrandt3D Holdings, owns all of the rights to the 3D without glasses technology that were developed by Steve by late 2009 and included in a patent application filed in December of 2009.

In January 2010, Steve started working with the Eindhoven based team, transferring all of his advancements, trade secrets and the know-how he had discovered from over two years, and 1,000's of hours of rendering with the 3DSolutions licensed tools. The 14-months spent working with his Dutch team included thousands of e-mails, hundreds of Skype calls, 43 3DFusion video projects, and 70 pages of detailed weekly meetings minutes with the same 12 Dutch team members that are now the SeeCubic engineering team. The technology Stream purports to own was based on the technology disclosed by Steve and 3DFusion to the Rajans and Steve's former Philip's 3DSolution's team, during the time when the "team" was working for the 3DFusion wholly own Dutch Corporate subsidiary, 3DFusionEU.BV.

The lawsuit that we filed against Stream TV and the Rajan's as individuals originally included a patent infringement complaint, which has been separated out by Judge Abrams. While the Supreme Court's decision in TC Heartland provides that we need to bring the patent infringement case in Philadelphia or Delaware, nothing about the substance of the patent infringement claim has changed. Rembrandt's First Amended Complaint has provided a detailed claim chart showing how every TV sold by Stream TV includes every element of the patent claims. After years of being on notice of infringement of the Rembrandt patents, Stream TV has not identified a single element of a single claim of Rembrandt's patents that is missing from the Stream TV. Nothing about the Delaware action or the bankruptcy provides anyone a license to Rembrandt's patents. Neither Stream TV, SeeCubic, or their licenses and customers are going to be able to sell a TV without infringing the Rembrandt's patents.

We thought we had reached a resolution with Stream TV that would have granted Stream TV a license to Rembrandt's technology rights and are seeking to enforce that resolution in the Southern District of New York. We reached this agreement with Stream TV when Shad Statsney was the CFO.

Rembrandt's legal team is obviously working on contingency, while the costs of defending such a case will run into the 10-million-dollar range and be a detriment for any fund raising. At the end of the day, Rembrandt still wants to see a 3D TV on the market rather than litigate. Consequently, we still think there is a logical basis to seek a settlement now with a guaranteed outcome, rather than fight over IP rights with either Stream TV or SeeCubic.

Regardless of the outcome of SeeCubic's Delaware litigation or the  motion to dismiss in the bankruptcy court, the Rembrandt technology rights are not transferring to SeeCubic. Stream TV can not transfer rights it does not own and Rembrandt's IP is interwoven into all of the technology Stream

TV uses in its 3D displays.  Assuming the physical assets and stock in the subsidiary companies are transferred to SeeCubic, that just means that SeeCubic is trying to raise funding after being put on notice of a patent infringement, contract, and trade secret misappropriation claim.  I have worked with clients trying to raise money in such a posture and advised private equity companies considering investing in firms with pending IP claims.  While it is possible to raise funds under such a cloud, the investors pay pennies on the dollar for what would be a normal valuation.

I note from SeeCubic's filings that some of the common equity holders were included in SeeCubic in preference to any payments to the unsecured creditors.  I would expect that the unsecured creditors will be unified in opposing the transfer of assets from Stream TV to SeeCubic or argue that any rights in SeeCubic that went to equity holders should be paid to the unsecured creditors instead.

Your motion to dismiss is compelling except for its failure to mention the dispute regarding the ownership of the IP and licenses from Rembrandt.  Even if the Delaware court's decision is upheld, I don't see anything in it that would transfer the license that Rembrandt is seeking to enforce against Stream TV.  Assuming the bankruptcy proceeds, without the Rembrandt Licensing rights to the technology, it will not matter whose reorganization plan is approved. Rembrandt has the wherewithal to block any transfer of IP assets to either party, precluding any investor based business.

Ironically, if Stream TV performs its agreement with Rembrandt, they would have a license and be in a position to claim that Rembrandt license is worth hundreds of millions of dollars such that Stream TV should be allowed to file a reorganization plan to allow it to proceed under license from Rembrandt to pay off the creditors.

We certainly contend that our IP rights are worth far more than Stream TV's liabilities and were clearly not transferred to SeeCubic in the Delaware action, so it seems that about the only asset Stream TV would have to oppose SeeCubic's motion to dismiss is to argue that it has a license from Rembrandt that dominates the assets that would be transferred to SeeCubic and that Stream TV has a going concern value based on the value of the licensing rights purchased from Rembrandt. In addition, the unsecured creditors could use it as a way to oppose the motion to dismiss and to push for the unsecured creditors to get a better outcome.

I propose that we set up a time to discuss in the near future, preferably in advance of the April 26 hearing.

Chris
IP Counsel for Rembrandt 3D


**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

Email: michaels@bpmlegal.com
Direct Dial:  607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.


26-First Amend...int.pdf


US8558830.pdf


US9521390.pdf


US9681114.pdf


assignment-pat-42...50.pdf

# EXHIBIT 22

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Stream TV Networks, Inc. | Case No.  21-10848 (KBO) |
| Alleged Debtor | **Related to D.I. 22** |

## DECLARATION OF STEPHEN BLUMENTHAL
## IN SUPPORT OF THE OBJECTION OF THE PETITIONING CREDITORS
## TO THE EMERGENCY MOTION TO DISMISS

1) My name is Stephen Blumenthal. I am the managing member of Rembrandt 3D Holding Ltd. ("Rembrandt - Holding") a Nevis corporation.  I am also the President and CEO of Rembrandt 3D Corp. ("Rembrandt – Delaware") a Delaware corporation.

2) The following facts are within my personal knowledge, except as noted, and are true and correct. I file this Declaration under 28 U.S.C. § 1746.

3) I was a co-founder of 3DFusion Corp. ("3DFusion"), the original owner of the improved Philip's 3DASD technology (or glasses-free 3D autostereoscopic display technology).

4) Philips offered a Glasses-Free three-dimensional (3D) autostereoscopic display ("3DASD") solution known as the WOWvx Platform for converting and generating 3D content from two-dimensional (2D) media content for rendering on Philips's 3DASD monitors. The WOWvx Platform uses mathematical algorithms to add depth and stereoscopic information to 2D content (i.e., 2D+Depth) thereby creating 3DASD content.

5) However, Philips's 3DASD solution suffered from significant image quality issues

because the 3DASD content generated by the WOWvx Platform contained numerous artifacts such as ghosting and required weeks of manual post-processing to correct. Nonetheless, 3DFusion licensed the WOWvx Platform from Philips.

6) Through extensive experimentation and research comprising more than 3000 hours of 2D-to-3D-depth-map rotoscoping, I developed a novel and non-obvious methodology to correct the image quality issues or artifacts in the 3DASD content generated by the Philips's WOWvx Platform.

7) In August of 2009, Philips notified 3DFusion that it was in the process of winding down its incubator 3DSolutions because it was unable to solve the aforementioned 3D image artifacts. However 3DFusion could continue to use the previously licensed hardware and software under its arrangement with 3DSolutions because Philips recognized that 3DFusion,  though a 2-man company, could through its proprietary technology, ~~could~~ continue to advance Philips's products and tools including the WOWvx platform.

8) In or about September 2009, upon the shutdown of 3DSolutions, which manufactured the 3DASD monitors and developer of the supporting software (e.g. the WOWvx platform), I acting on behalf of 3DFusion, immediately contacted the former 3DSolutions' key technology experts (the "Team") to join 3DFusion as part of an effort to re-establish support for the WOWvx platform that had been provided by the now defunct 3DSolutions, and to engage the Team in Eindhoven, Netherlands, through a wholly owned Dutch subsidiary of 3DFusion. The Team included Walther Roelen ("Roelen") a former 3DSolutions 3DTV lens designer and Bart Barenbrug ("Barenbrug") a former 3DSolutions senior software engineer, both of whom are Dutch residents.

2

9) For convenience sake, the Dutch subsidiary was named "C3D" prior to its corporate formation. The name "C3D" was later changed to "3DFusion EU" as indicated in an email dated March 15, 2010 from Walther Roelen.

10) In December 2009, I went to Eindhoven, Netherlands to negotiate a license with Philips to manufacture the Philips WOWvx platform and to use their 800+ patents, which cost Philips close to half a billion dollars in R&D and to upgrade the Philips products and tools.  3DFusion signed the Philips Technology License in April of 2010 At that time, I also demonstrated 3DFusion's proprietary technology to the Team including Roelen and Barenbrug, all of whom orally agreed to keep 3DFusion's proprietary technology confidential. After the demonstration, one of the members of the Team, Ms. Grazina Seskeciuite, stated that "it took two guys from New York to come to Philips to show us how to fix our TV."  My solution took two of the Philips tools which they considered 'constants' and I discovered that they could be used 'dynamically' to adjust and 'dial in the 3d image." Once the former 3DSolutions technical experts, (my Team) saw what their 3DTV could do, what it should look like with my solution, they immediately realized my solution was the first time anyone had seen the WOWvx 2D+Depth 3D image quality achieve a Broadcast Quality industry standard.  Consequently, the senior 3DSolutions engineers went to Philips Intellectual Property and Standards Division and convinced them to provide a license to me.

11) Later in this same month, 3DFusion engaged the Team, including Roelen and Barenbrug as independent contractors to support 3DFusion's efforts to restart manufacturing of Philips's 3DASD monitors and the WOWvx platform.

12) In January 2010, I commenced bi-weekly teleconferences with the Team for starting

up the new Dutch subsidiary, with meeting minutes (the "Minutes") recorded by Ms.
Ann-Marie van Ham, a member of the Team. The meeting minutes show the various
technical and administrative issues addressed by the Team including licensing issues
with Philips and my proposed 3D switchable lens design for joint development with
Corning Glass, all of which are deemed confidential and proprietary information of
3DFusion. See, e.g., Minutes of February 17, 2010.

13) Having secured Philips's intellectual property and key technology experts, 3DFusion
proceeded to seek funding and/or financing for its expanded operations and liabilities
required by the new business model.

14) In June of 2010, Raja and Mathu Rajan, as officers of Stream TV were introduced
(hereinafter collectively "the Rajans") to 3DFusion as potential investors.

15) On June 9 of 2010, Raja Rajan and Mathu Rajan, principals of Stream TV Networks,
Inc., came to 3DFusion's offices at 110 Wall Street, New York, NY to view a
demonstration of 3DFusion's 3DASD technology. Raja Rajan was the general
counsel and COO of Stream and his brother, Mathu Rajan, a technologist and the
CEO of Stream.

16) At the initial June 9, 2010 meeting, the Rajans stated that they had purchased a 42"
Philips 3DASD TV platform and experienced the same 3D image quality failure as
noted above. Upon viewing the 3DFusion's improved 3DASD tools and content on
the same 42" model of the Philips WOWvx platform that they owned, they became
immediately convinced of the significance of the 3DFusion solution to the Philips
3DASD problem.

17) At this time, Stream, with no 3DASD technology of their own, was trying (as yet
unsuccessfully) to develop a marketable glasses free 3D product. They realized that

4

3D Fusion's technology would make that possible.

18) They indicated that the 3DFusion technology solved what was previously believed to be an unsolvable problem, and that this development would therefore provide them with a commercially viable 3D television product.

19) Based on this demonstration, the Rajans immediately signed a Mutual Non-Disclosure and Confidentiality Agreement on June 9, 2010, and began equity funding negotiations, with the promise to provide $20 million in funding.

20) 3DFusion provided Stream with information regarding all of the Confidential Information that had been developed by me and the Team, including both the pathway to automation of the 3D content generation process, and the 3D playback optimization and correction process that had, prior to my ground breaking work, been impossible to solve.

21) Over the ensuing months, I worked with the Rajans, Roelen, and Barenbrug and the Team.  Under my leadership and supervision, we all worked collaboratively towards the goal of pursuing glasses free 3D television technology.

22) In September I officially hired Roelen as the General Director (CEO) of the 3DFusion EU. BV., the Dutch subsidiary, and paid him a Salary, with back pay to July 2010. Once the Dutch BV was established, employment contracts were initiated.

23) 3DFusion established and funded bank accounts for its Dutch subsidiaries 3DFusion Holding B.V. and 3DFusion EU B.V. W. Roelen withdrew certain funds from both of these bank accounts ostensibly for salary payments for the Team from about June 2010 through February 2011 including the period prior to his appointment as Director at 3D Fusion EU B.V in September 2010, even though Roelen was not an officer of 3DFusion Holding B.V. Barenbrug attended various trade shows on behalf of 3D

Fusion EU B.V. which paid for his trade shows related expenses and his equipment.

24)  In October 2010, under Roelen's directions, 3DFusion EU hired its first full time

employee, Ms. Grazina Seskeciuite, who was a graphic arts engineer and software

developer, who had worked closely with Barenbrug at the former 3DSolutions,

Roelen as the General Director with overall managerial responsibilities of the

company, handled all confidential documents, had approved the Team's employment

contracts template and was the Senior team organizer to whom the team looked to for

guidance.

25) After 4 months of negotiating with the Rajans, on September 28th we signed our

completed Term Sheet for their partnering investment, and I proceeded to provide

them with full Due Diligence disclosures.

26) On October 8, 2010, I visited Stream's office in Philadelphia, Pennsylvania during

which meeting I answered questions from Raja Rajan and Mathu Rajan and other

employees of Stream (including Mr. Suby Joseph, the CFO of Stream) about

3DFusion's business plans and startup strategy and demonstrated 3DFusion's

proprietary technology using 3DFusion's equipment loaded with 3DFusion's

proprietary software and educated them on my solution. I went through all aspects of

the workflow, of conversion, of optimization and correction of the artifacts in the

3DASD video content. I also explained how the lens design for the 3DASD monitors

was critical to matching the content to, and went over the 2d switchable technology.

This meeting lasted about 9 hours and Stream videotaped the entire 8-hour work

session.

27) On October 27, 2010, at a 3D Technology conference (i.e., the Kagan 3D Technology

Conference) at Waldorf Astoria hotel in New York City, I was seated on the same

6

panel as Mr. Jeffrey Katzenberg of DreamWorks, Mr. John Landau of Lucas Films, and other video pioneers discussing 3DASD technology. After the conference I invited them to our Waldorf suite for a full demonstration of the 3DFusion technology. The Waldorf conference and my 3DFusion, "Perfect Picture" broadcast quality 3DASD presentations resulted in our scheduling 3DASD demonstrations for Sony, Dreamworks, Intel, Technicolor, Sony, Pixar, Variety magazine and other west coast media companies, for the coming months.

28) On or about January 5, 2011, 3DFusion received a "Termination Agreement" dated January 5, 2011 and signed by Mathu Rajan on behalf of Stream and in his individual capacity, and Raja Rajan in his individual capacity contending that the Term Sheet is binding and that 3DFusion breached a clause in the Term Sheet.

29) 3DFusion subsequently learned that Director Roelen was acting to the detriment of 3DFusion EU and 3DFusion, in violation of his fiduciary and contractual duties to his employer 3DFusion and his confidentiality obligations under his NDA. Roelen understood that the information provided to him, or that was developed as derivative works of Philips's license technology, were all protected intellectual property and information of 3DFusion.

30) Upon information and belief, Roelen accepted an employment offer directly from Stream soon after the expiration of his NDA with 3DFusion, i.e., in or about January 2011.

31) Roelen continued to access and withdraw funds from 3DFusion Holding B.V. and 3DFusion EU B.V. until 3DFusion terminated his position of Director at 3DFusion EU B.V. in or about May 2011.

32)  In or about January 2012, to his dismay, I learned for the first time that Stream,

7

Rajans, Roelen, and Barenburg had benefited from their violation of their NDAs and breach of their fiduciary responsibilities and contractual obligations to 3DFusion. While attending the Consumer Electronics Show ("CES") at Las Vegas, Nevada in January 2012, I observed W. Roelen working at Stream's exhibit booth and representing himself as an employee of Stream, along with other former members of the 3DFusion EU technical team. The technology exhibited by Stream, Rajans, and W. Roelen at the CES show belonged to 3DFusion.

33) I also learned in or about 2017 that Roelen and Barenbrug filed a US patent application (Ser. No. 14/428,866) entitled "Depth Adjustment of an Image Overlay in a 3D Image" on March 17, 2015 claiming priority to a Dutch patent application (Ser. No. 2009616) with a filing date of Oct. 11, 2012, which applications disclose the Confidential Information in violation of their NDAs such as, for example, the border-blending and depth- smoothing functions or features described in at least paragraphs [0076], [0077], [0081], and [0082] of the 14/428,866 application.

34) U.S. patent application 14/428,866 is owned by Stream's wholly owned subsidiary Ultra-D Coöperatief U.A. in Einhoven, Netherlands and has since abandoned the patent application as part of the settlement agreement between Rembrandt-Holding and Stream.

35) 3DFusion Corp. could not withstand the blow to its finances from the loss of the Eindhoven team and theft of its technology and closed operations.

36) In 2016, I acquired all of the assets and interests including all causes of action of 3DFusion and its subsidiaries and in 2017, I assigned such interests and causes of action to Rembrandt 3D Holding, Ltd, which was the plaintiff in the action against the Rajans and Stream.

37) Rembrandt-Holding is the successor-in- interest to 3DFusion Corp.

38) Rembrandt-Holding filed a complaint in the New York State Supreme Court in January 2017 against Stream TV Network, Inc. ("Stream"), Raja Rajan, and Mathu Rajan among others (Stream, Raja Rajan, and Mathu Rajan, collectively referred to as the "Defendants").

39) Defendants removed the state action to federal court.

40) Rembrandt-Holding subsequently moved to amend its complaint (the First Amended Complaint (FAC)), which was unopposed by Defendants. Defendants were served with the FAC on June 23, 2017 which is attached as Exhibit 1 to this declaration.

41) During a hearing on May 11, 2018, the parties agreed to mediation by a magistrate judge. [Dkt# 56] Subsequently, Magistrate Judge Parker ordered the parties to attend a settlement conference in person with counsel on July 18, 2018 (the "First Mediation Conference"). [Dkt# 58] Raja Rajan attended the First Mediation Conference with Mr. Neal Kronley of DLA Piper (former counsel to Defendants) while I came as the sole director and officer of Rembrandt-Holding, and was represented by my counsel Chi Eng and Christopher Michaels.

42) At the First Mediation Conference, I demonstrated the 3DASD technology using the original 3DFusion equipment   loaned to Stream in 2010. This identical equipment was featured in a news article dated January 25, 2011 published by The Flying Kite Media, a Philadelphia based online magazine (the "2011 News Article"), wherein Defendants showcased 3DFusion's laptop and video content. (Ex. 1, 2011 News Article entitled "how philly is leading the glasses-free 3d revolution").

43) I felt having published photographic evidence of Stream claiming credit for the technology on my computer, using my software, and my content that I had developed

9

was fairly compelling evidence, but as mediations progressed both me and the
attorneys representing Rembrandt-Holding provided additional evidence and
argument that everyone of Stream's current products and their intended products
included intellectual property owned by Rembrandt-Holding.

44) I made specific mention of the fact that Roelen, Barenburg, and Stream's wholly
owned subsidiary Ultra-D Coöperatief U.A. in Einhoven, Netherlands were
attempting to patent my technology as their own in U.S. patent application
14/428,866. I provided specific examples of the portions of the patent application that
were my inventions.

45) After the First Mediation Conference, Ultra-D Coöperatief U.A. abandoned U.S.
patent application 14/428,866 that included my technology as part of our on-going
settlement discussions.  This effectively immediately resolved an extremely important
issue to me and injected some degree of good will into a difficult situation.

46) During the mediation presided over by Judge Kathleen Parker, Stream also provided
several of their 4K TVs for us to evaluate by sending them to our various locations
across the country at no charge which also paved the way for further settlement
discussions.

47) I was able to compare the Stream 4K TV to the old Philips 3D TVs and TVs made by
other manufacturers.  I was able to use my technology to correct image errors on the
Philips 3D TVs and compare it to how the Stream 4K TV managed to correct the
same content.  I reviewed these comparisons with Christopher Michaels in his offices
in Ithaca, NY.

48) For the following six months, the parties corresponded settlement terms via email and
conducted several in-person settlement conferences at Stream offices in Philadelphia

10

with me, Christopher Michaels, and Neil Wallace representing the Rembrandt-Holding, and Raja Rajan representing the Defendants. The parties did not resolve their differences.

49) On January 11, 2019, Magistrate Judge Parker ordered the parties to attend a second settlement conference in person with counsel on April 9, 2019 (the "Second Mediation Conference"). [Dkt# 67]

50) At the Second Mediation Conference, Stream was represented by its Chief Financial Officer, Shad Stastney, and its counsel Neil Kronley and John Wellschlager.

51) During the Second Mediation Conference, the parties reached the terms of an agreement and a term sheet was prepared by Stream's counsel that was initialed by me, Stream CFO Shad Stastney, our respective attorneys, and Magistrate Parker and I have attached a copy of this term sheet initialed by Shad Stastney as Exhibit 2.

52) This term sheet provided for Stream to license Rembrandt-Holding's:

   a. "*Knowhow and trade secrets related to methodology for:*

      i. *efficiently converting, correcting and optimizing a 2D+Depth video for playback on a 3D autostereoscopic associated with the Philips technology*

      ii. *utilizing the Philips 2d Switchable Lens technology for refractive and detractive lens switching for the creation of the 'lightfield' and 3d content artefact correction.*

      iii. *utilizing the On Screen Display functions of Borders and "Liveliness."*

   b. *Trademarks*

   c. *the patents asserted in Rembrandt's First Amended Complaint, and dismissed by the Court on March 28, 2018 (ECF No. 47}"* (See Schedule A of the April

9, 2019 term sheet – Exhibit 2)

53) Every TV sold by Stream incorporated the enumerated know-how and trade secrets and but for the license, infringed the patents referenced in the term sheet, so this settlement was essential for Stream to continue selling product free of infringement allegations.

54) Stream agreed to pay Rembrandt-Holding $5,840,000 in cash, 2,000,000 warrants to purchase Stream stock, 100 4K TVs for no charge, 8 8K prototypes at no charge, and the right to purchase 3,015,000 8K 3DASD LCD units at cost.

55) At each mediation, I emphasized that I wanted my companies to be one of Stream's largest customers and that the most important aspect of the deal was the right to purchase products.  Rembrandt-Delaware previously purchased a Stream TV for $5,250, so we estimated the value of the no charge TVs and the 8K prototypes to be about $567,000.

56) Based on Shad Stastney's statements, we estimated at Stream's margin was approximately $400/unit so the ability to purchase 3,015,000 units at cost was worth approximately $400/unit x 3,015,000 units = $1,206,000,000.

57) In other words, the total value of the settlement agreement between Stream and Rembrandt-Holding is far greater than all the secured and unsecured Stream creditors' claims combined.

58) As we were attempting to finalize the documents for settlement, we were contacted by counsel for Stream and asked to meet in person to make adjustments to the April 9, 2019 term sheet but promised that Stream intended to maintain the net present value of the April 9, 2019 terms.

59) We met with Shad Stastney, Mark Colemen (director of Stream), Neil Kronley, and

John Welschlager on July 8, 2019.  I attended with counsel, Chi Eng, Christopher Michaels, and Neil Wallace.

60) During our meeting, Mr. Stastney explained that Stream's production was delayed and he requested flexibility on timing of payments and shipments of products.  We asked a number of questions over the day, but Christopher Michaels asked Mr. Stastney a series of specific questions about the expected production costs, production capacity, and the expected margin.  As Mr. Stastney answered, I saw Mr. Michaels type the answers into a computer and later reviewed the spreadsheet that Mr. Michaels was using to show a financial model that evaluated the various proposals for modifications to the April 9, 2019 term sheet so we could assess whether the new proposals matched the net present value of the April 9, 2019 term sheet.

61) Mr. Michaels specifically asked Mr. Stastney about the margins for Stream's products and Mr. Stastney told us that it would be about $400/unit during early commercial scale production and then drop to as low as $120/unit during very high volume production in later years.

62) While our settlement agreement provides a right to purchase products at cost, we specifically discussed with Stream's various representatives that increasing Stream's volume of production would allow Stream to lower its production costs across all products such that Stream could command higher margins from other customer sales.

63) We confirmed directly with Mr. Stastney that the value the ability to purchase units at cost was $400/unit at the beginning trending to $120/unit at high volumes such that the value to Rembrandt-Holding of the right to purchase at cost products was approximately $360,000,000 to $1,206,000,000.

64) At some point after our July 8, 2019 meeting, Stream's management and board of

13

directors went through turn over and Stream fired DLA Piper as its litigation counsel. It was very challenging to get anyone to respond to our requests to complete the settlement, so Rembrandt-Holding eventually filed a motion to enforce the April 9, 2019 term sheet.

65) The motion to enforce was still pending when I learned that Stream had filed for bankruptcy. I asked Chi Eng to attempt to contact litigation counsel for Stream regarding informing the district court about the bankruptcy and stay, but received no response, so Chi Eng notified the court of the pending bankruptcy and the automatic stay. The court extended the response time on the motion.

66) I asked Mr. Michaels to reach out to Stream's bankruptcy counsel (Exhibit 3), the counsel for creditors (Exhibit 4,) and the counsel for SeeCubic (Exhibit 5) on April 20, 2021 to make sure they all knew about our claim and to invite resolution. Only Stream's counsel responded to our communications.

67) Despite having communicated with all represented party's counsels in the Stream Chapter 11 prior bankruptcy proceeding, neither Rembrandt-Holding or I have ever been provided any notice of any motions in any proceeding in the bankruptcy court or Delaware Chancery court.

68) Rembrandt-Holding was not a party to the Omnibus Agreement, yet Shad Stastney, Eben Coffer, Stream, and the Rajans were all well aware of our allegations that all Stream technology infringed the rights held by Rembrandt-Holding. They all knew that Stream had no right to transfer any rights to Rembrandt-Holding technology to SeeCubic.

69) It appears that Shad Stastney decided not to disclose to either the Chancery Court or the Bankruptcy Court that he personally represented Stream in our settlement

negotiations and initialed the April 9, 2019 term sheet providing Rembrandt-Holding
the settlement terms including over $6,400,000 in cash and free TVs, 2,000,000
warrants, plus the right to purchase new TVs at a collective discount worth over $1.2
billion.

70) After the bankruptcy case was dismissed, we were able to complete the settlement
agreement between Stream and Rembrandt-Holding on May 23, 2021 (Exhibit 6) and
the litigation in the Southern District ended.  The terms of the May 23, 2021
settlement agreement are basically the same terms negotiated with Mr. Stastney on
April 9, 2019 (Exhibit 2) except we provided flexibility on the timing of delivery of
the TVs and some of the payments which are similar to the changes Mr. Stastney
requested on Stream's behalf in our July 8, 2019 meeting.

71) The May 23, 2021 settlement agreement with Stream carries a substantial value to
both companies.

72) Our agreement provided Stream a complete resolution of the litigation through a
license to the technology and an expectation of large purchases from Rembrandt-
Holding.

73) It is my belief that ~~through~~ my companies have a market for all the TVs that Stream is
obligated to provide.

74) Rembrandt-Delaware has been purchasing 3D hardware from a variety of sources and
selling equipment and installations without using any UltraD technology.

75) Rembrandt-Delaware has successfully been selling a number of 3DASD product and
projects over the years, including bringing to market a 10" Android, no glasses 3D
tablet, which received rave reviews from Huffington Post science writer Robert
Elisberg (http://rembrandt3d.com/media-2/rembrandt-3d-10-auto-stereoscopic-no-

glasses-3d-android-tablet/) Rembrandt Delaware 3D tablet has been for sale on
Amazon for a number of years, until our entire remaining inventory was purchased by
one customer in 2020.

76) In 2015 we joined forces with Ken Love a renowned Frank Lloyd Wright
videographer for the production of a 3DASD film on Wright's iconic house,
"Fallingwater.  This Rembrandt 3DASD presentation is on display at the Fallingwater
site and at the Pittsburgh International Airport Frank Lloyd Wright exhibit. Our
website shows our installation regarding the Frank Lloyd Wright Falling Water
installation - http://rembrandt3d.com/the-opening-of-the-3d-no-glasses-frank-lloyd-
wright-film-fallingwater-in-3d-at-the-pittsburgh-international-airport/.

77) To my knowledge, Rembrandt-Delaware is the only company selling Broadcast
Quality, consumer glasses free products in the US and has the only glasses free 3D
installations in museums, public forums and other world class locations, which have
been operating seven days a week since 2010.

78) Rembrandt-Delaware has multiple vendor options for providing glasses free 3D
hardware and is about to expand its product line up and management team.  We
would like Stream's 3D products to fit into that business.

79) Our current plans include a continuation of the museum installations.  The ideal
project included 3D installations at the museum, installations in travel venues
(airports, train stations, etc.) and then travelling exhibits that the museum can use to
market the museum at other museums.  Rembrandt-Delaware works closely with the
content creators and provides content creation, conversion, and optimization services.
So an agreement with one museum can include a sale of 6-12 TVs and a large amount
of bundled services running into a total of hundreds of thousands of dollars.  The 3D

16

TVs are an essential part of that budget, but frankly a relatively small part compared to the budget for services and surrounding installations.

80) The main advantage to Rembrandt-Delaware of these installations is the ability to demonstrate the very high end of the market for 3D content and hardware that acts as an effective marketing tool for Rembrandt-Delaware.

81) Rembrandt-Delaware's primary market will be in-store advertising displays targeting chains, big box independents and department stores.  A single store might want dozens of 3D displays and the retail store can provide advertising of its own products or ads sold to its vendors.  This is already a common practice for 2D displays and a great deal of software, network management, and content services already exist.

82) However, to bring 3D into this market, the 3D display and 3D content must be exceptional and without any artifacts.  My technology allows impressive 3D effects to make images appear with depth from the face of the screen back to the perspective vanishing point and outward from the face of the screen, "forward pop" extending 40% of the screens diagonal measurement.  For advertising, it is possible to work with short 15-120 second clips to match the content to the capabilities of the 3D display.

83) I intend to target chain store retailers with overlapping products for cross pollination of 3D digital signage network advertising between them. I would pick them in five different categories. For example, a 3D ad for a video game could play in a variety of stores, e.g. Walmart-10,526 stores, Game Stop-4,816 stores, Best Buy-977.  Each of these stores, could install a dozen or more TVs.  20,000+ stores targeted for network of dedicated product. Once a particular store that sells video games starts using 3D displays, the competitive retail chains will be under pressure to follow suit.  Likewise,

once one video game is advertised with 3D video content, every other video game

creator will be under pressure to compete with 3D advertising.  Roughly 10,000 new

video game titles are published each year.  With each store or vendor paying for its

own content creation, Rembrandt 3D is able to charge tens of thousands for a simple

2D to 3D ad conversion ~~or millions for novel 3D content creations~~ and can charge a

percentage of the ad revenue for running the ads in the 3D display network.  Just

assuming video game retailers selling 6 3D displays per store over 20,000 locations,

would mean 120,000 3D displays and the potential for 3D ads for thousands of new

titles.

84) While using video games as an example, the same competitive logic exists for

numerous products, e.g. jewelry, make-up, clothing, etc.

85) Such advertising networks are extremely common for 2D video content and given the

number of venues like airports that are municipalities, we have downloaded the

standard contracts used by Clear Channel and others for revenue sharing with the

store.  There are already ad brokers to sell ad time in just about any major mall or

transportation venue in the US. While such networks are available for 2D video and

print displays, they have yet to be created for 3D content ads and Rembrandt-

Delaware intends to enter this market in force.

86) Statistica.com estimates that in 2020 digital out-of-home advertising spending in the

United States was to amount to 2.72 billion U.S. dollars. It is projected to further

grow to 3.84 billion dollars by the end of 2023. To date all of that revenue is for 2D

technology rather than 3D and does not count the charges for content creation and

other services.

87) Rembrandt-Delaware is expanding its management team to include John Endicott,

former Westfield Mall executive, as VP of Retail Sales He was Vice President of
Design & Construction, Vice President of Development, Vice President of Partner
Relations. His title in London was Executive Vice President of International
Development.  Mr. Endicott's prior position created relationships with a large number
of retail store chains.  Mr. Endicott created Westfield's tenant design criteria for new
and remodeling of stores and for Westfield's temporary kiosk tenants and the concept
for a permanent kiosk where tenants lease the kiosk and immediately commence
trading so he is extremely familiar with the necessary construction issues and permits
for both small and large 3D TV installations.

88) Rembrandt-Delaware also plans to provide "3D IN A BOX" as turn-key 3D platform
that is shipped in an automatic lift, display ATA travel Case on wheels, with remote
control operation of the lift mechanism which elevates the 3D display. The package
would include a 7-day ship and return, freight paid by buyer, plus a custom quote for
content. Effectively, this would a short term lease of the unit and we would retain
ownership of the units.  We plan to keep permanent housing of the units near typical
convention venues to allow companies to use the hardware at their trade shows.  If the
customers use them frequently enough, we would also offer the units for sale, but the
3D display would be one aspect of the total hardware sold to the customer.

89) Rembrandt-Delaware has a number of other product concepts in the works, but they
are less relevant to a specific purchase of 3D displays from Stream.

90) Rembrandt-Delaware can enter these markets with or without Stream or the UltraD
technology, but the Rembrandt-Holding and Stream settlement agreement provides a
strong incentive to work with Stream products.

91) To be clear, 100% of the products by Stream and all UltraD technology includes my

know-how, trade secrets, and would infringe the patents assigned to Rembrandt-

Holding.  All of this technology was licensed to Stream in the settlement agreement,

but Stream did not have the right to assign this license or to sub-license others (other

to have products made).

92) This is common in the industry and mimics the license that 3D Fusion had with

Philips that I have attached as Exhibit 7 (note the confidentiality period has expired)

note section 2.1:

*"Philips has the right of termination thereof under Section 5.2, below, Philips hereby*

*grants to 3D Fusion and its Affiliates, during the term of this Agreement, a worldwide*

*non-exclusive, **non-transferable license, without the right to grant sub-licenses**,*

*under the Licensed Patents and the Licensed Know-How to: (a) use, sell, offer to sell,*

*import, export, and otherwise dispose of the Licensed Products, and (b) lease,*

*operate or otherwise make available to customers thereof, the Licensed Products,*

*including the right to utilize any Licensed Products to provide services relating to 3D*

*Content Services to any third party."* (emphasis added)

93) Rembrandt-Holding provided Stream a non-exclusive license to the technology that is

embedded in the UltraD technology.  Stream had and has no power to sublicense

others.  More specifically, Stream does not have the power to transfer its license or to

sublicense SeeCubic.

94) Transferring rights to UltraD and/or Stream's Eindhoven corporations to SeeCubic

does not transfer any rights to the technology of Rembrandt-Holding.

95) Further, if those entities or individuals transferred any of the know-how, trade secrets,

or technology covered by the patents owed by Rembrandt-Holding, it would violate

both the settlement agreement with Rembrandt-Holding.

96) Despite the dispute between the parties, Rembrandt-Delaware had purchased a 4K UltraD TV from Stream in the past. During settlement negotiations, Stream provided several 4K TVs that included the UltraD technology. Reviewing the UltraD technology allowed me to assess whether it included the technology I developed through 3D Fusion (later transferred to Rembrandt-Holding). I found that the Rembrandt-Holding technology was embedded in every Stream TV. However, I was also able to compare the Stream product to other glasses 3D TVs made by other companies with Philips 3DASD units utilizing my technology, and identify image optimizations in the Stream Ultra-d monitor which utilized my patented methodology

97) I see from SeeCubic's website that Bart Barenbrug is now associated with SeeCubic. After Dr. Barenbrug ceasing to work with 3D Fusion and then going to Stream and filing a patent application seeking to protect my technology, it is upsetting to see that he is now working with yet another new company once again seeking to sell products using my technology without compensation.

98) While Ultra-D Coöperatief U.A. did abandon U.S. patent application 14/428,866 that included my technology as part of our on-going settlement discussions, that one act does nothing to address the rest of the technology that was eventually licensed to Stream.

99) Neither Ultra-D Coöperatief U.A. or SeeCubic has a license to my technology. While the CFO of Stream, Mr. Stastney was willing to have Stream pay many millions in value to obtain a license, he has not offered a single cent for a license from SeeCubic. It was my genuine impression that Mr. Stastney believed that the agreement we reached on April 9, 2019 was a fair valuation of my technology and we reached reasonable settlement terms. If he believed it was fair then, I can think of no excuse

that would justify a belief that SeeCubic should not pay a similar amount for a license to the exact same technology to make the exact same product.

100)    I do not see anything that SeeCubic has filed in any of the legal proceedings that lists Rembrandt-Holding as a party that it intends to compensate despite its often stated intention to fully deploy Ultra-D technology.

101)    The Stream TV with UltraD is an impressive product and quite frankly out performs any other currently available 3DASD options in a number of contexts. However, a large part of what makes it so impressive is that it includes much of technology that I have assigned to Rembrandt-Holding. Rembrandt-Delaware would use the Stream TV for a number of our projects. However, it is important to understand that as impressive as the Ultra-D technology is, it is not the only option on the market and I can and have deployed my technology in other products. Therefore, the settlement agreement also provides Stream with a major competitive advantage by strongly encouraging Rembrandt-Holding and Rembrandt-Delaware to purchase products from Stream rather than using other manufacturers. This increased volume lowers Stream's overall production costs, but also in turn makes it more difficult for competitors to Stream to achieve efficient production volume.

102)    While it is my expectation that Rembrandt-Delaware and Rembrandt-Holding will be large customers of Stream, I would expect that the Stream would have many other customers such that the $1.2 billion in profit margins saved by Rembrandt-Nevis would be matched by many billions in profits from sales by Stream to other major customers, whom they have been grooming for years.

103)    SeeCubic cannot sell any products without walking into the exact same litigation that Shad Stastney agreed should be settled for many millions of dollars and

there is not much incentive for Rembrandt-Holding to grant any license.

104)    Before agreeing to settle with Stream, I and others on my team, carefully

evaluated the products Stream built.  To my knowledge, SeeCubic has not made any

products.

105)    My personal interest, and the interests of Rembrandt-Holding and Rembrandt-

Delaware lie in having access to reliable glasses free 3D hardware. I am personally

largely indifferent to the company that makes that technology so long as the product

is high quality, meets the customer's needs, and has licensed my technology fairly.

Though I was certainly concerned about how my technology was used

inappropriately, my focus is on bringing 3D TVs to market. ~~not on seeking any form~~

~~of revenge.~~

106)    I have been in litigation with the Rajans and Stream for many years, yet the

resolution contemplated all the way back to the beginning of mediation (and

eventually reached with Shad Stastney on April 9, 2019) was for us to resolve the

litigation and work together to bring 3D technology to the marketplace.

107)    Stream now has a full license to use the Rembrandt-Holding technology,

SeeCubic does not.  After years of litigation, I am happy to be working with Stream

to bring TVs to market.

108)    I would be happy to work with SeeCubic if it was able to show that it had a

viable plan to manufacture a working 3D TV, given that the Philips License is only

for production and sales, not sub-licensing, it is not clear how SeeCubic will actually

have a viable business model without manufacturing its own products.  It is my

understanding that they intend to license others to use their technology, but any

licensee would need an independent license from Philips and Rembrandt-Holding.  I

do not see how they can possibly submit a credible plan for compensating creditors and investors without a license from Rembrandt-Holding yet they have taken no action to obtain a license. However, until SeeCubic has such a license, it can fully expect that Rembrandt-Holding will seek to fully enforce its rights in the various forums seeking injunctions and to have their products held at the border.

109)     Mr. Stastney clearly knows SeeCubic, and/or its customers and vendors, need a license from Rembrandt-Holding to actually make and sell products but has failed to disclose that to date or to make any attempt to obtain the needed license from Rembrandt-Holding.

110)     Frankly, the assets SeeCubic is hoping to take are actually highly compromised in SeeCubic's hands because SeeCubic lacks the license from Rembrandt-Holding. To my knowledge, SeeCubic is not actually making anything yet, but it appears that SeeCubic is attempting to transfer source code and servers that include Rembrandt-Holding technology.

111)     It would be possible to have someone remove all of the Rembrandt-Holding know-how and trade secrets from the software to be transferred from Stream to SeeCubic. As long as the software and technology transferred removed all functionality that included the enumerated intellectual property rights.

112)     It is important to note that Mr. Stastney agreed that the list of IP rights was valid and appropriate to include in the April 9, 2019 term sheet (Exhibit 2) that was prepared by DLA Piper attorneys and modifications were written in DLA Piper attorney's hand writing. The document was initialed by all parties and by Magistrate Parker.

113)     Assuming that Mr. Stastney is not taking a different position today than he did

on April 9, 2019 before all of us in the room, including Magistrate Parker, SeeCubic

should not object to removing all functionality covered by the Rembrandt-Holding

technology since he is unwilling to have SeeCubic take a license.

114)      The Rembrandt-Holding technology is not an asset of Stream and it certainly

cannot be transferred to SeeCubic without SeeCubic first obtaining a license from

Rembrandt-Nevis.

115)      The primary objective of Rembrandt-Holding in the current bankruptcy is to

prevent further misappropriation of our technology by allowing SeeCubic to gain

access to the technology of Rembrandt-Holding without a proper license.

116)      Further, Rembrandt-Holding would obviously like to collect the amounts that it

is owed under that license to Stream.

117)      Lastly, Stream was capable of working with vendors to build an excellent TV

in the past and even if 100% of all assets of Stream are transferred to SeeCubic, the

team of people at Stream are likely capable of working with the same or similar

vendors to build a high quality 3D TV.  While Ultra-D is nice, Rembrandt-Holding

owns the technology that was developed many years before Ultra-D and is frankly all

Rembrandt-Delaware has used in the marketplace for years and our 3D displays

literally are museum quality.

118)    In sum, Stream is a viable business entity and useful to both of my companies

even without any of the assets SeeCubic purports to now own.


Pursuant to 28 U.S.C. section 1746, I declare under penalty of perjury of the laws of the

United States of America that the foregoing is true and correct.



Dated: **June 8, 2021**

*/s/ Stephen Blumenthal*
_____
Stephen Blumenthal
Manager – Rembrandt 3D Holding Ltd.



Exhibit List (To Be Filed Separately):

| | |
|---|---|
| Exhibit 1 | First Amended Complaint and exhibits |
| Exhibit 2 | April 9, 2019 Term Sheet initialed by Shad Stastney |
| Exhibit 3 | Mr. Michaels email to Stream's bankruptcy counsel on April 20, 2021 |
| Exhibit 4 | Mr. Michaels email to the counsel for creditors of Stream on April 20, 2021 |
| Exhibit 5 | Mr. Michaels email to the counsel for SeeCubic on April 20, 2021 |
| Exhibit 6 | Settlement agreement between Stream and Rembrandt-Holding on May 23, 2021 |
| Exhibit 7 | Philips license to 3D Fusion. |

# EXHIBIT 23

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 7 |
| Stream TV Networks, Inc. | Case No.  21-10848 (KBO) |
| | **Related to D.I. 22** |
| Alleged Debtor | |

**DECLARATION OF CHRISTOPHER MICHAELS
IN SUPPORT OF THE OBJECTION OF THE PETITIONING CREDITORS
TO THE EMERGENCY MOTION TO DISMISS**

1) My name is Christopher Michaels. I am the President/CEO of Brown & Michaels, PC and represent Rembrandt 3D Holding Ltd. ("Rembrandt - Holding") a Nevis corporation.  I also represent Rembrandt 3D Corp. ("Rembrandt – Delaware") a Delaware corporation and Stephen Blumenthal personally.

2) The following facts are within my personal knowledge, except as noted, and are true and correct. I file this Declaration under 28 U.S.C. § 1746.

3) I am a patent attorney with years of experience in the TV and video display industry.

4) For many years, I was the managing attorney for our representation of Lucent and their patent work arising out of Bell Labs (arguably where TV was invented - https://www.earlytelevision.org/bell_labs.html).  I have worked for a number of companies and inventors in the display industry.  I written many patents for new types of displays, methods of making displays, and the materials used in those displays.  I took on an officer role first as VP of Business Development, and then CEO of a client, Nupix, LLC, a novel display developer.

5) I am familiar with typical licensing terms in numerous industries, but in particular, I have written and negotiated many license and development agreements in the display

industry.  As both attorney and officer, I negotiated licenses and joint development

agreements with Corning, eInks, Gyricon (subsidiary of Xerox), and Kent Displays.

6) I have also worked with a number of private equity fund clients that ask me to review

and advise them on intellectual property strategy for their portfolio companies.

7) I am a founding member and was on the original management team of a seed stage

venture capital/investment club fund, WEMBA 38 Investment Club LLC.

8) While I prosecuted many patent applications over the years, my current focus is

mostly in business consulting, technology strategy and licensing.

9) I studied inventory and production control at Stanford Engineering before deciding to

go to the Wharton School to earn a master's in business administration with

concentrations in finance and operations and information management.

10) I still take on officer roles for a number of clients and typically serve as CEO, CFO,

or as VP of Business Development.  I only take on such roles for developing

technology based companies.

11) I have been involved in a number of patent enforcement actions, but I do not work

with my clients as litigation counsel.  My role is limited to strategic analysis of

intellectual property issues and valuation of the technology.

12) I have taken courses in mediation and recommend mediation as a dispute resolution

practice to many of my clients.

13) I have known Stephen Blumenthal since approximately 1990.  He contacted me and

asked me to assist to assist Rembrandt-Holding in an upcoming mediation with

Stream TV Network, Inc. ("Stream").

14) While I had no part in preparing the original or first amended complaint (attached as

Exhibit 1), I reviewed the first amended complaint, all exhibits, and the license

agreement between 3D Fusion and Philips (Exhibit 7) in preparation for attending the

in person mediation.  I also reviewed as much as I could regarding the Stream

products, their patents, and their website.

15) Of the documents useful to establishing a reasonable royalty, the Philips agreement

(Exhibit 7) was the best example of a third party arm's length license to serve as a

benchmark.

16) Philips is well known to own a large portfolio of intellectual property rights and to be

experts in licensing that technology.  Their 2019 annual report states the following:

*"Royal Philips' total IP portfolio currently consists of 64,500 patent rights, 39,000*

*trademarks, 88,500 design rights and 3,200 domain names. Philips filed 1,015 new*

*patents in 2019, with a strong focus on the growth areas in health technology services*

*and solutions. Philips earns substantial annual income from license fees and*

*royalties. These are mostly earned on the basis of usage or fixed fees, recognized over*

*the term of the contract or at a point in time."*

17)  Philips had a large portfolio of patents in the glasses free 3D market and marketed

products under its WOWvx platform, but ultimately decided to exit the business itself

in 2009.  It was willing to license its technology and spun out a company with a

license, Dimenco https://www.dimenco.eu/about-us.

18) While the promise of the technology was exciting, the technology in the hands for

Philips had a number of problems.  Licensing a technology that did not work

completely and was developed in a business unit that a well-funded patent owner

chooses to abandon, can lead to a significantly lower valuation than licensing a

working technology.

19) I attended an in person settlement conference on July 18, 2018 (the "First Mediation

Conference"). [Dkt# 58] Raja Rajan attended the First Mediation Conference with Mr. Neal Kronley of DLA Piper (former counsel to Defendants).  I was accompanied by Stephen Blumenthal, the sole director and officer of Rembrandt-Holding, and litigation counsel Chi Eng.

20) At the First Mediation Conference, Mr. Blumenthal demonstrated the Rembrandt-Holding technology using what he identified as the original 3DFusion equipment share with Stream in 2010. This identical equipment looked identical to the equipment shown in in a news article dated January 25, 2011 published by The Flying Kite Media, a Philadelphia based online magazine (the "2011 News Article"), wherein Defendants showcased 3DFusion's laptop and video content. (Ex. 1, 2011 News Article entitled "how philly is leading the glasses-free 3d revolution").

21) Having such published photographic evidence of a defendant company claiming credit for the plaintiff's technology is rare and was a compelling beginning to the mediation.  Collectively, the Rembrandt-Holding team took the unwavering position that every Stream TV incorporated the Rembrandt-Holding know-how, trade secrets, and needed a license to the Rembrandt-Holding patents.  Our primary purpose was to discuss a business resolution, but at times it was helpful to pull out additional documentation and evidence demonstrating that the technology had been developed by Mr. Blumenthal prior to meeting the Rajans or Stream.

22) Eventually, negotiations progressed to the point where Stream started to take several actions to build good will.

23) After a compelling showing that U.S. patent application 14/428,866 included technology invented by Mr. Blumenthal, Stream had its wholly owned subsidiary Ultra-D Coöperatief U.A. in Einhoven, Netherlands abandon the patent application.

24) In my experience as a patent attorney, abandoning a pending application during such negotiations is a rare action and the fact that Stream did so, built good will to proceed with settlement negotiations.

25) Stream also provided several of their 4K TVs by sending them to various locations across the country for consultants to Rembrandt-Holding to evaluate at no charge which also paved the way for further settlement discussions.

26) Stephen Blumenthal reports that he worked with the original Philips WOWvx technology and got it working.  Mr. Blumenthal demonstrated the old technology and hardware Philips had developed and the hardware/software demonstrated by Rembrandt 3D Corp and the difference is remarkable.  I have also seen the Stream 4K television unit shipped during settlement negotiations and compared it to the other 3D technologies demonstrated by Mr. Blumenthal.

27) Working with the content tools and hardware that Mr. Blumenthal had developed with 3D Fusion, Mr. Blumenthal was able to demonstrate that he was able to create content optimized for a 3D display to obtain 3D effects to make images appear with depth inward from the face of the screen ("screen back") and outward from the face of the screen ("forward pop") on multiple displays not made by Stream.   We measured the image effects on TVs made by companies other than Stream relative to the diagonal size of the display against the Stream TV provided for evaluation.

28) Mr. Blumenthal was able to create images that provided further screen back and greater forward pop with other TVs but it required use of his technology to avoid artifacts and always looked best when Mr. Blumenthal optimized the content.  In other words, the Philips TV technology and other manufacturer's glasses free 3D displays all had issues until Mr. Blumenthal applied his technology to correct those

defects.  However, the Stream TV was able to convert a wide variety of content and looked very good.  Our assessment was that the Stream TV was a very good implementation of the Rembrandt-Holding technology that Mr. Blumenthal had disclosed years earlier.

29) We compared the patent claims element by element to the Steam TV and it was clear that use of the Stream TV infringed the Rembrandt-Holding patents.

30) From a strategic and valuation perspective, it was clear that: 1) Rembrandt-Holding and Rembrandt-Delaware did not require access to the Stream TV or UltraD technology to provide excellent quality 3D displays; and 2) Stream made a very good product that was a good enough implementation of the Rembrandt-Holding technology for many circumstances.  In other words, Stream needed a license from Rembrandt-Holding to sell any product, but Rembrandt-Holding and Rembrandt-Delaware were not dependent on Stream.  However, Stream's product was impressive enough that it made sense to work a purchase of future products into a settlement. These strategic considerations drove the mediation and negotiation process.

31) I recommended that Rembrandt-Holding negotiate for some cash, but that a right to purchase product on favorable terms would provide excellent value to Rembrandt-Holding because Rembrandt-Holding and Rembrandt-Delaware could include them in their products.

32) For the following six months, the parties corresponded settlement terms via email and conducted several in-person settlement conferences at Stream offices in Philadelphia with Mr. Blumenthal and me representing the Rembrandt-Holding, and Raja Rajan representing the Defendants. The parties did not resolve their differences.

33) On January 11, 2019, Magistrate Judge Parker ordered the parties to attend a second

settlement conference in person with counsel on April 9, 2019 (the "Second

Mediation Conference"). [Dkt# 67]

34) At the Second Mediation Conference, Stream was represented by its Chief Financial

Officer, Shad Stastney, and its counsel Neil Kronley and John Wellschlager.

35) During the Second Mediation Conference, the parties reached the terms of an

agreement and a term sheet was prepared by Stream's counsel that was initialed by

Shad Stastney, Stephen Blumenthal, and Magistrate Parker and I have attached a copy

of this term sheet initialed by Shad Stastney as Exhibit 2.

36) This term sheet provided for Stream to license Rembrandt-Holding's:

    a.  "*Knowhow and trade secrets related to methodology for:*

        i.  *efficiently converting, correcting and optimizing a 2D+Depth video*

        *for playback on a 3D autostereoscopic associated with the Philips*

        *technology*

        ii.  *utilizing the Philips 2d Switchable Lens technology for refractive and*

        *detractive lens switching for the creation of the 'lightfield' and 3d*

        *content artefact correction.*

        iii.  *utilizing the On Screen Display functions of Borders and "Liveliness."*

    b.  *Trademarks*

    c.  *the patents asserted in Rembrandt's First Amended Complaint, and dismissed*

    *by the Court on March 28, 2018 (ECF No. 47}"* (See Schedule A of the April

    9, 2019 term sheet – Exhibit 2)

37) Schedule A was prepared with care and while short, identified the specific technology

that was provided by Mr. Blumenthal and incorporated into Stream's products.

Having evaluated the Stream TV directly, it was and is my opinion that every TV sold

by Stream incorporated the enumerated know-how and trade secrets and but for the license, infringed the patents referenced in the term sheet.  This settlement was essential for Stream to continue selling product free of infringement allegations.

38) Stream agreed to pay Rembrandt-Holding $5,840,000 in cash, 2,000,000 warrants to purchase Stream stock, 100 4K TVs for no charge, 8 8K prototypes at no charge, and the right to purchase 3,015,000 units at cost.

39) At each mediation, Mr. Blumenthal emphasized that he wanted his companies to be one of Stream's largest customers and that the most important aspect of the deal was the right to purchase products.  That said, he knew that Philips charged at least $5,000,000 for a license with royalty minimums and that seemed like a reasonable floor for the cash component of the deal.

40) Rembrandt-Delaware previously purchased a Stream TV for $5,250, so we estimated the value of the no charge TVs and the 8K prototypes to be about $567,000.

41) We assessed that Stream was either going to fail rendering the warrants worthless or succeed making many billions in profit such that the value of the warrants would likely be worth tens of millions of dollars.  Offering warrants made sense for Stream as it was a cashless component of the deal at the time, but also provided Rembrandt-Holding a strong incentive to support Stream's success.

42) We estimated Stream's margin was approximately $400/unit so the ability to purchase 3,015,000 units at cost was worth approximately $400/unit x 3,015,000 units = $1,206,000,000.

43) In other words, the total value of the settlement agreement between Stream and Rembrandt-Holding is far greater than all the secured and unsecured Stream creditors' claims combined.  In addition, if Rembrandt-Holding was to fully capture the value of

its negotiated settlement, it would need to find a market for millions of Stream's
products.

44) To my knowledge, no other company has as many working installations of glasses
free 3D displays as Rembrandt-Delaware.  To have the leading company in glasses
free 3D displays supporting Stream and the sale of its products is a major asset to
Stream that has long last value.

45) During negotiations, I built a simple spreadsheet model to calculate the relative value
of each component of the settlement and we were able to compare various offers
proposed by each side.

46) As we were attempting to finalize the documents for settlement, we were contacted
by counsel for Stream and asked to meet in person to make adjustments to the April 9,
2019 term sheet but promised that Stream intended to maintain the net present value
of the April 9, 2019 terms.

47) We met with Shad Stastney, Mark Colemen (director of Stream), Neil Kronley, and
John Welschlager on July 8, 2019.  I attended with Stephen Blumenthal and counsel,
Chi Eng and Neil Wallace.

48) During our meeting, Mr. Stastney explained that Stream's production was delayed
and he requested flexibility on timing of payments and shipments of products.  We
asked a number of questions over the day, but I asked Mr. Stastney a series of specific
questions about the expected production costs, production capacity, and the expected
margin.  As Mr. Stastney answered, I typed the answers into a computer and was
using it to work with my valuation model.  The fact that I was entering the data into
my computer was obvious to everyone in the room. I later reviewed the spreadsheet
model with Mr. Blumenthal and we evaluated how the proposed modifications to the

April 9, 2019 term sheet so we could assess whether the new proposals matched the net present value of the April 9, 2019 term sheet.  Over the course of the day, I used my model to explain to everyone in the room that a particular proposal did not maintain the net present value and we would modify the terms until Mr. Blumenthal was satisfied that we were making reasonable modifications that preserved the value or the April 9, 2019 term sheet.

49) I specifically asked Mr. Stastney about the margins for Stream's products and Mr. Stastney told us that it would be about $400/unit during early commercial scale production and then drop to as low as $120/unit during very high volume production in later years.

50) While our settlement agreement provides a right to purchase products at cost, I specifically discussed with Stream's various representatives that increasing Stream's volume of production would allow Stream to lower its production costs across all products such that Stream could command higher margins from other customer sales.

51) At all times, Mr. Stastney proceeded with the expectation that sales to other customers of Stream would far exceed sales to Rembrandt-Holding.  At various times, he stated that he did not expect sales to Rembrandt-Holding to exceed 5-10% of the total capacity of Stream.

52) While 5-10% of Stream's production capacity would still make Rembrandt-Holding one of the largest customers, the profits that Stream would be able to make by fully using the technology licensed by Rembrandt-Holding is 10-20 times the cost of obtaining the license from Rembrandt-Holding.  If the value of the settlement agreement to Rembrandt-Holding is hundreds of millions of dollars, the value of having the license to Stream is billions of dollars.

53) I make these statements employing a high level of academic training in production forecasting and accounting as well as practical experience as an officer of technology companies and one called upon to advise private equity companies on valuing technology portfolios, but frankly, one does not need my level of expertise or training to follow the valuation.

54) The settlement agreement terms are clear on their face and provide significant value to Rembrandt-Holding in both defined amounts of revenue and product purchase rights.  No reasonable company or person, pays more for a technology license than it can generate in profit from that license and in almost all cases, licensees hope to make very large multiples of the amounts paid for a license in profit from implementing the business contemplated by the license.

55) Shad Stastney is a well-educated CFO and experienced in financial markets.  Unless he was purposefully looking to destroy Stream, he reasonably knew that the value of Stream would increase dramatically with the execution of a license to the Rembrandt-Holding technology.  More specifically, any reasonable business decision maker would have expected the value of Stream to increase by hundreds of millions to billions of dollars after agreeing to the terms on April 9, 2019.

56) I knew that our settlement agreement with Stream was advantageous to both sides and dramatically increasing Stream's production would help Stream achieve a positive cash flow much faster while creating significant value for Rembrandt-Holding and based on our conversations over two days of in-person negotiations largely focused on these issues, I believe that Shad Stastney shared the same opinion when we reached agreement.

57) I confirmed directly with Mr. Stastney that the value the ability to purchase units at

cost was $400/unit at the beginning trending to $120/unit at high volumes such that
the value to Rembrandt-Holding of the right to purchase at cost products was
approximately $360,000,000 to $1,206,000,000.

58) At some point after our July 8, 2019 meeting, Stream's management and board of
directors went through turn over and Stream fired DLA Piper as its litigation counsel.
It was very challenging to get anyone to respond to our requests to complete the
settlement, so Rembrandt-Holding eventually filed a motion to enforce the April 9,
2019 term sheet.

59) I reached out to Shad Stastney after he left Stream because I knew that he ran the fund
that was Stream's first position lender.  Mr. Stastney took my call and it was cordial,
but he quickly told me that things were happening that he could not disclose and
asked if he could call me in a few weeks after they resolved.  He never called me
back.

60) I also reached out to representatives of Hawk, the second position secured lender, and
received a similar response.

61) I learned that a group of shareholders were suing Stream and were represented by
Eben Colby.  I spoke to Mr. Colby on February 18, 2020 and explained the
Rembrandt-Holding litigation with Stream.  He indicated that he would discuss the
matter with his internal patent attorney partners and get back to me.  He never called
me back.

62) I later spoke to Mr. Stastney after I became aware of the Omnibus Agreement and
asked about SeeCubic's plan to obtain a license to the Rembrandt-Holding
technology.  He explained that he felt the obligation to pay for any license rested with
Stream and that SeeCubic had rights to all the technology of Stream.  I pointed out

that Stream had no power to transfer our license to SeeCubic. He stated that

SeeCubic did not plan to manufacture anything, but rather just license out rights to

Ultra-D. I pointed out that both the Rembrandt-Holding agreement with Stream and

the Philips license prohibited both assignment and sublicensing. He seemed surprised

by this information and ended the call claiming that he did not feel that was a

problem.

63) As an expert in intellectual property licensing, I don't think Mr. Stastney's stated

business plan for merely licensing technology rather than manufacturing is a viable

strategy and is likely completely prohibited by both the Philips license and the

Rembrandt-Holding technology rights.

64) It does not appear SeeCubic's business plans and the fact that they are just not

permitted by the various underlying technology rights of Philips or Rembrandt-

Holding were understood by the various parties to the Omnibus Agreement of the

litigations in the prior bankruptcy proceeding or Delaware Chancery court action.

65) I spoke with Mr. Stastney, Hawk's representative, and Even Colby all well prior to

any of them signing the Omnibus Agreement. They all knew about Rembrandt-

Holding and its claims regarding the technology.

66) Mr. Stastney specifically knew that he had negotiated to a term sheet before a

Magistrate Parker indicating the technology was worth millions in cash payments and

a right to purchase TVs and provided the information that shows such a right was

worth up to $1.2 billion dollars.

67) However, neither SLS, SeeCubic, Hawk, Mr. Stastney or Mr. Colby made the court

aware that the Stream technology used in its TVs incorporated technology owned by

Rembrandt-Holding and that transferring such technology to SeeCubic would further

misappropriate Rembrandt-Holding technology or that SeeCubic's business plans are prohibited under the terms of the Philips license.

68) At a bare minimum, Mr. Colby and Mr. Stastney could be under no reasonable delusion that Rembrandt-Holding was going to sit idly by and let SeeCubic use its technology without further litigation, yet they made no mention of it to the Chancery court or in the Stream Chapter 11 bankruptcy motion to dismiss.

69) I do not know if Mr. Colby explained to his representative shareholder clients that their rights in SeeCubic could be severely compromised by Rembrandt-Holding's claim prior to their entering the Omnibus Agreement, but it seems highly unlikely that they would have agreed to it if he had.

70) I don't know if counsel to the creditors were informed of Rembrandt-Holding's claim or the limitations of the Philips agreement when they agreed to be paid from SeeCubic, but it also seems highly unlikely that any reasonable creditor would voluntarily choose to work with SeeCubic knowing that it has no rights to license technology or execute its stated business plan.

71) I do not know if Mr. Stastney discussed the Rembrandt-Holding claim with potential investors in SeeCubic despite his intimate knowledge of both the claims and the value of the April 9, 2019 settlement term sheet he negotiated, but it seems unlikely that any informed investor would make any investment in SeeCubic if they knew of the Rembrandt-Holding claim or limitations of the Philips license.

72) Clearly, the settlement terms were covered by the protective order, but the Rembrandt-Holding complaint against Stream was publicly available on PACER and could have freely have been shared with all parties and the Chancery court but does not appear to have even been mentioned.

73) The motion to enforce was still pending when I learned that Stream had filed for bankruptcy. Chi Eng was asked to attempt to contact litigation counsel for Stream regarding informing the district court about the bankruptcy and stay, but received no response, so Chi Eng notified the court of the pending bankruptcy and the automatic stay. The court extended the response time on the motion.

74) I sent emails to Stream's bankruptcy counsel (Exhibit 3), the counsel for creditors (Exhibit 4,) and the counsel for SeeCubic (Exhibit 5) on April 20, 2021 to make sure they all knew about our claim and to invite resolution. Only Stream's counsel responded to my communications.

75) Despite having communicated with all represented parties' counsels in the Stream Chapter 11 prior bankruptcy proceeding, Rembrandt-Holding has not been provided any notice of any motions in any proceeding in the bankruptcy court or Delaware Chancery court.

76) Rembrandt-Holding was not a party to the Omnibus Agreement, yet Shad Stastney, Eben Coffer, Stream, and the Rajans were all well aware of our allegations that all Stream technology infringed the rights held by Rembrandt-Holding. They all knew that Stream had no right to transfer any rights to Rembrandt-Holding technology to SeeCubic.

77) It appears that Shad Stastney decided not to disclose to either the Chancery Court or the Bankruptcy Court that he personally represented Stream in our settlement negotiations and initialed the April 9, 2019 term sheet providing Rembrandt-Holding the settlement terms including over $6,400,000 in cash and free TVs, 2,000,000 warrants, plus the right to purchase new TVs at a collective discount of $1.2 billion.

78) After the bankruptcy case was dismissed, we were able to complete the settlement

agreement between Stream and Rembrandt-Holding on May 23, 2021 (Exhibit 6) and

the litigation in the Southern District ended.  The terms of the May 23, 2021

settlement agreement are basically the same terms negotiated with Mr. Stastney on

April 9, 2019 (Exhibit 2) except we provided flexibility on the timing of delivery of

the TVs and some of the payments which are similar to the changes Mr. Stastney

requested on Stream's behalf in our July 8, 2019 meeting.

79) The May 23, 2021 settlement agreement with Stream carries a substantial value to

both companies.

80) Stream now has a full license to use the Rembrandt-Holding technology, SeeCubic

does not.

81) However, until SeeCubic has such a license, it can fully expect that Rembrandt-

Holding will seek to fully enforce its rights in the various forums seeking injunctions

and to have their products held at the border.  Mr. Stastney clearly knows SeeCubic,

and/or its customers and vendors, need a license from Rembrandt-Holding to actually

make and sell products but has failed to disclose that to date or to make any attempt to

obtain the needed license from Rembrandt-Holding.

82) The assets SeeCubic is hoping to take are actually highly compromised in SeeCubic's

hands because SeeCubic lacks the license from Rembrandt-Holding.  To my

knowledge, SeeCubic is not actually making anything yet, but it appears that

SeeCubic is attempting to transfer source code and servers that include Rembrandt-

Holding technology.

83) Clearly, one does not need a license to do nothing (assuming that they are not copying

any of technology from Stream's servers).  If SeeCubic does not take possession of

anything that includes a Rembrandt-Holding technology, Rembrandt-Holding is not

affected by the Omnibus Agreement.

84) Rembrandt-Holding is not a party to the Omnibus Agreement and the Chancery court does not have subject matter jurisdiction to evaluate patent infringement, copyright infringement or other matters that are exclusively the jurisdiction of federal courts.  It seems likely that the Chancery court had no knowledge of Rembrandt-Holding's rights in the technology when issuing the preliminary injunction, but even if the Chancery court did know of Rembrandt-Holding's rights, it had no authority to transfer Rembrandt-Holding's technology to SeeCubic.

85) Put simply, SeeCubic has either misappropriated or is about to misappropriate Rembrandt-Holding's rights and if SeeCubic ever successfully made, used, sold, offered for sale, imported or exported a TV covered by a Rembrandt-Holding patent, it will be sued for patent infringement along with any individuals that knowingly committed such acts of misappropriation and/or infringement.

86) Certainly Dr. Barenbrug and Mr. Stastney are both well aware of the Rembrandt-Holding rights and I expect that other individuals will have knowledge of the misappropriation that will be discovered after further investigation.

87) I have no idea what Mr. Stastney could possibly argue to avoid a willful infringement claim, given that while CFO for Stream he felt the Rembrandt-Holding claim was worth millions, but now in the hands of SeeCubic using the exact same technology he somehow believes SeeCubic does not require a license.

88) Either Mr. Stastney knowingly committed Stream to millions of dollars of payments for worthless claims by Rembrandt-Holding or he is flagrantly intending to infringe the rights he reasonably valued on April 9, 2019 now that he is managing SeeCubic.

89) SeeCubic is not entitled to an assignment of the settlement and license between

Rembrandt-Holding and Stream because there is an express prohibition of such an assignment.  In fact, Stream's counsel wrote in a change of control provision to the April 9, 2019 term sheet that accelerates all cash payments if Stream goes through a change of controlling ownership (except in the event of an IPO).

90) If SeeCubic believes that it acquired all rights to Rembrandt-Holding technology under the settlement agreement, it needed to cut Rembrandt-Holding a check for $5,840,000 immediately.  SeeCubic has not paid or offered to pay Rembrandt-Holding any money.

91) Mr. Stastney agreed that the list of IP rights was valid and appropriate to include in the April 9, 2019 term sheet that was prepared by DLA Piper attorneys and modifications were written in DLA Piper attorney's hand writing.  The document was initialed by all parties and by Magistrate Parker.

92) Assuming that Mr. Stastney is not taking a different position today than he did before all of us in the room on April 9, 2019, including Magistrate Parker, SeeCubic should not object to removing all functionality covered by the Rembrandt-Holding technology since he is unwilling to have SeeCubic take a license.

93) The bankruptcy court does not need to reevaluate the merits of the Omnibus Agreement, for the current Stream bankruptcy, it merely needs to make sure that Stream does not transfer access to any of the Rembrandt-Holding technology that Stream did not have the right to transfer to SeeCubic.

94) If SeeCubic found keys in the Stream offices with a large "Hertz" tag on the key chain and found that the keys worked for a car in a nearby parking lot, it would be completely unreasonable to conclude that the Omnibus Agreement somehow gave SeeCubic title to a car belonging to Hertz.

95) Similarly, the Rembrandt-Holding technology is not an asset of Stream and it certainly cannot be transferred to SeeCubic.

96) While it would be easiest to leave all software and technology with Stream, it would be possible to have someone remove all of the Rembrandt-Holding know-how and trade secrets from the software to be transferred from Stream to SeeCubic.

97) As long as the software and technology transferred removed all functionality that included the enumerated intellectual property rights, SeeCubic could take possession of the remaining technology and property of Stream under the Omnibus Agreement.

98) The rights of Rembrandt-Holding can be protected in the current bankruptcy to prevent further misappropriation of Rembrandt-Holding technology by preventing Stream from breaching its settlement agreement by allowing SeeCubic to gain access to the technology of Rembrandt-Holding.

99) Stream was capable of working with vendors to build an excellent TV in the past and even if 100% of all assets of Stream are transferred to SeeCubic, the team of people at Stream are likely capable of working with the same or similar vendors to build a high quality 3D TV.  While Ultra-D is nice, Rembrandt-Holding owns the technology that was developed many years before Ultra-D.  Rembrandt-Delaware is a world leader in glasses free 3D displays and has never used Ultra-D in its products.

100)     By working with Rembrandt-Holding's technology, Stream is a viable business entity even without any of the assets SeeCubic purports to now own, whereas, SeeCubic is not a viable business without a license to Rembrandt-Holding's technology.

101)     Any reasonable and informed valuation of Stream (after executing the settlement agreement (Exhibit 6) with Rembrandt-Holding) is far in excess of all

claims of secured and unsecured creditors and this determination importantly flows

from the information provided to me directly by Shad Stastney while he was CFO of

Stream and the April 9, 2019 term sheet he negotiated (Exhibit 2).

102)    The best way to protect all parties is to proceed with the bankruptcy process to

ensure that an optimal result is achieved for all the secured and unsecured creditors.

Pursuant to 28 U.S.C. section 1746, I declare under penalty of perjury of the laws of the

United States of America that the foregoing is true and correct.


                                    */s/ Christopher Michaels*

Dated: **June 8, 2021**        _____
                                    Christopher Michaels
                                    Patent attorney for Rembrandt 3D Holding Ltd.



Exhibit List (To Be Filed Separately):

Exhibit 1    First Amended Complaint and exhibits
Exhibit 2    April 9, 2019 Term Sheet initialed by Shad Stastney
Exhibit 3    Mr. Michaels email to Stream's bankruptcy counsel on April 20, 2021
Exhibit 4    Mr. Michaels email to the counsel for creditors of Stream on April 20, 2021
Exhibit 5    Mr. Michaels email to the counsel for SeeCubic on April 20, 2021
Exhibit 6    Settlement agreement between Stream and Rembrandt-Holding on May 23, 2021
Exhibit 7    Philips license to 3D Fusion.

# EXHIBIT 24









# SeeCubic

Computers and Electronics Manufacturing

New York, NY · 1,613 followers

Developer of pioneering spatial display technology. Introducing the third dimension directly to your device screen.

See jobs          Follow

View all 57 employees

## About us

SeeCubic Inc. is an accomplished deep tech company founded to become a global leader in immersive display technology innovation. SeeCubic has created an unparalleled end-to-end spatial display technology for rendering and displaying content in lifelike rich and natural three dimensions on any type of screen.

The SeeCubic technology consists of integrated hardware components - a complex lenticular structure embedded onto the display panel and dedicated internal electronics - combined with proprietary software to create an endless variety of never-before-seen visual experiences. Our innovations go far beyond any of the earlier attempts to display visuals in three dimensions, including cinematic 3D which was popular in the past decade. The effect, superior to all others in both precision and detail, can be enjoyed on a TV, tablet, computer screen or phone without any glasses or peripherals - you can see the transformative SeeCube advantage with the naked eye.





incredible value to consumers, all of the available content will be instantly accessible on all SeeCube-enabled devices. The environment offers a pathway for movie studios and other content right holders to produce and convert every type of existing 2D or cinematic 3D content into our spatial display format, vastly increasing potential monetization.

SeeCubic is currently focused on working together with top-tier home and mobile device brands via strategic partnerships to deliver spectacular viewing experiences to all consumers. We are bringing our technology to all popular device types we all use on a daily basis – televisions, mobile devices, computer screens, and even in-car displays. With the transformative ability to display depth-infused movies, events, sports and video games, our technology is poised to become a mainstream feature of entertainment both at home and on the go.

| | |
|---|---|
| **Website** | [http://www.seecubic.com](http://www.seecubic.com) |
| **Industries** | Computers and Electronics Manufacturing |
| **Company size** | 51-200 employees |
| **Headquarters** | New York, NY |
| **Type** | Privately Held |
| **Founded** | 2011 |

**Specialties**

3D Displays, Visual Technologies, Autostereoscopy, 3D Cinema, Immersive Technologies, Visual Immersion, 3D Gaming, 3D Video, Depth Perception, 3D Without Glasses, Glasses Free 3D, Immersive Entertainment, Immersive Content, Content, and Content Conversion

# Locations

Primary

667 Madison Avenue
New York, NY 10055, US





Oxford Street
Portman House
London, England W1H 6DU, GB
Get directions ↗

Park Forum 1035
(route 6024)
Eindhoven, The Netherlands 5657 HJ, NL
Get directions ↗

---

## Employees at SeeCubic

### Chris Maiden
VP Projects at SeeCubic

### Nedim Osmanovic
Sr Process Engineer at SeeCubic B.V.

### Leo Riley

### Jeremy Nicolaides
Immersive content and technology Executive • 3D Executive Producer • 3D & Business
Development Consultant • Author • Investor • Speaker

See all employees

---

## Updates





Congratulations to **K2 Studios** on the **Giant Screen Cinema Association (GSCA)** award for their documentary **#Serengeti**! We loved working on this **#documentary** and appreciate the dedication of our CCO, **Meetal Gokul**, and our **SeeCubic India Pvt Ltd** team to this project!

62

| Like | Comment | Share |
|------|---------|-------|

## Join now to see what you are missing

✓ Find people you know at SeeCubic

✓ Browse recommended jobs for you

✓ View all updates, news, and articles

[ Join now ]

---

## Similar pages



**SeeCubic India Pvt Ltd**

Entertainment Providers

Pune, Maharashtra



**MEON**

Financial Services

Szczecin, Zachodniopomorskie



**BOT VFX**

Musicians

Alpharetta, Georgia



**PixStone Images Pvt Ltd**

Animation and Post-production

                                                                      

Show more similar pages ⌄

# Browse jobs

### Account Executive jobs
87,726 open jobs

### Artist jobs
56,032 open jobs

### 3D Artist jobs
970 open jobs

### Manager jobs
2,003,890 open jobs

### Sales Analyst jobs
60,183 open jobs

### Team Lead jobs
1,244,189 open jobs

### Engineer jobs
608,159 open jobs

### Release Engineer jobs
20,130 open jobs

### Field Representative jobs
122,285 open jobs

### Computational Biologist jobs
1,075 open jobs

Show more jobs like this ⌄

# More searches

© 2023                                                About

Accessibility                                          User Agreement




Brand Policy

Community Guidelines

Guest Controls

Language

# EXHIBIT 25

**From:** **stephen blumenthal** stephen3d@mac.com 
**Subject:** FW: Rembrandt 3D IP Rights
**Date:** February 2, 2023 at 12:08 PM
**To:** Neil Wallace ntwallace@aol.com, ademarco@devlinlawfirm.com, Stephen Blumenthal stephen3d@mac.com

---

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

Email: michaels@bpmlegal.com
Direct Dial:  607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Christopher Michaels
**Sent:** Tuesday, April 20, 2021 3:24 PM
**To:** eben.colby@skadden.com; marley.brumme@skadden.com; joseph.larkin@skadden.com; jenness.parker@skadden.com; jason.liberi@skadden.com; jlathrop@rc.com; dwright@rc.com; Alissa.Castaneda@quarles.com; Brandon.Krajewski@quarles.com; Brittany.Ogden@quarles.com
**Cc:** stephen3d@mac.com; ntwallace@aol.com; 'Chi Eng' <chi@englawfirm.com>
**Subject:** Rembrandt 3D IP Rights

Dear counsel for SLS Holdings VI, LLC and SeeCubic, Inc.:

We understand that there is a hearing on April 26, 2021 in the Stream TV bankruptcy chapter 11 filing and that you have filed for a motion to dismiss the Stream TV bankruptcy.

We assume that you are aware of our pending litigation against Stream TV, but I have attached copies of our First Amended Complaint filed against Stream TV (additional exhibits sent by separate email). Regardless of the outcome of the pending motions in the bankruptcy, we feel a negotiated settlement is in the best interest for all parties.

Stephen Blumenthal is the key originator of the intellectual property advancements, which resulted in the developments currently included in the on-screen display of the Stream Networks TVs that we have evaluated. Steve's company, Rembrandt3D Holdings, owns all of the rights to the 3D without glasses technology that were developed by Steve by late 2009 and included in a patent application filed in December of 2009.

In January 2010, Steve started working with the Eindhoven based team, transferring all of his advancements, trade secrets and the know-how he had discovered from over two years, and 1,000's of hours of rendering with the 3DSolutions licensed tools.  The-14-months spent working with his Dutch team included thousands of e-mails, hundreds of Skype calls, 43 3DFusion video projects, and 70 pages of detailed weekly meetings minutes with the same 12 Dutch team members that are now the SeeCubic engineering team.  The technology Stream purports to own was based on the technology

SeeCubic engineering team.  The technology Stream purports to own was based on the technology disclosed by Steve and 3DFusion to the Rajans and Steve's former Philip's 3DSolution's team, during the time when the "team" was working for the 3DFusion wholly own Dutch Corporate subsidiary, 3DFusionEU.BV.

The lawsuit that we filed against Stream TV and the Rajan's as individuals originally included a patent infringement complaint, which has been separated out by Judge Abrams.  While the Supreme Court's decision in TC Heartland provides that we need to bring the patent infringement case in Philadelphia or Delaware, nothing about the substance of the patent infringement claim has changed.  Rembrandt's First Amended Complaint has provided a detailed claim chart showing how every TV sold by Stream TV includes every element of the patent claims. After years of being on notice of infringement of the Rembrandt patents, Stream TV has not identified a single element of a single claim of Rembrandt's patents that is missing from the Stream TV. Nothing about the Delaware action or the bankruptcy provides anyone a license to Rembrandt's patents.  Neither Stream TV, SeeCubic, or their licenses and customers are going to be able to sell a TV without infringing the Rembrandt's patents.

We thought we had reached a resolution with Stream TV that would have granted Stream TV a license to Rembrandt's technology rights and are seeking to enforce that resolution in the Southern District of New York.  We reached this agreement with Stream TV when Shad Statsney was the CFO.

Rembrandt's legal team is obviously working on contingency, while the costs of defending such a case will run into the 10-million-dollar range and be a detriment for any fund raising.  At the end of the day, Rembrandt still wants to see a 3D TV on the market rather than litigate.  Consequently, we still think there is a logical basis to seek a settlement now with a guaranteed outcome, rather than fight over IP rights with either Stream TV or SeeCubic.

Regardless of the outcome of SeeCubic's Delaware litigation or the  motion to dismiss in the bankruptcy court, the Rembrandt technology rights are not transferring to SeeCubic. Stream TV can not transfer rights it does not own and Rembrandt's IP is interwoven into all of the technology Stream TV uses in its 3D displays.  Assuming the physical assets and stock in the subsidiary companies are transferred to SeeCubic, that just means that SeeCubic is trying to raise funding after being put on notice of a patent infringement, contract, and trade secret misappropriation claim.  I have worked with clients trying to raise money in such a posture and advised private equity companies considering investing in firms with pending IP claims.  While it is possible to raise funds under such a cloud, the investors pay pennies on the dollar for what would be a normal valuation.

I note from SeeCubic's filings that some of the common equity holders were included in SeeCubic in preference to any payments to the unsecured creditors.  I would expect that the unsecured creditors will be unified in opposing the transfer of assets from Stream TV to SeeCubic or argue that any rights in SeeCubic that went to equity holders should be paid to the unsecured creditors instead.

Your motion to dismiss is compelling except for its failure to mention the dispute regarding the ownership of the IP and licenses from Rembrandt.  Even if the Delaware court's decision is upheld, I don't see anything in it that would transfer the license that Rembrandt is seeking to enforce against Stream TV.  Assuming the bankruptcy proceeds, without the Rembrandt Licensing rights to the technology, it will not matter whose reorganization plan is approved. Rembrandt has the wherewithal to block any transfer of IP assets to either party, precluding any investor based business.

Ironically, if Stream TV performs its agreement with Rembrandt, they would have a license and be in a position to claim that Rembrandt license is worth hundreds of millions of dollars such that Stream TV should be allowed to file a reorganization plan to allow it to proceed under license from Rembrandt to pay off the creditors.

We certainly contend that our IP rights are worth far more than Stream TV's liabilities and were clearly not transferred to SeeCubic in the Delaware action, so it seems that about the only asset Stream TV would have to oppose SeeCubic's motion to dismiss is to argue that it has a license from Rembrandt that dominates the assets that would be transferred to SeeCubic and that Stream TV has a going concern value based on the value of the licensing rights purchased from Rembrandt. In addition, the

concern value based on the value of the licensing rights purchased from Rembrandt. In addition, the unsecured creditors could use it as a way to oppose the motion to dismiss and to push for the unsecured creditors to get a better outcome.

I propose that we set up a time to discuss in the near future, preferably in advance of the April 26 hearing.

Chris
IP Counsel for Rembrandt 3D


**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*


*Email:* michaels@bpmlegal.com
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

    

26-First Amend…int.pdf    US8558830.pdf    US9521390.pdf    US9681114.pdf    assignment-pat-42…50.pdf

# EXHIBIT 26

**From:** **stephen blumenthal** stephen3d@mac.com  📎
**Subject:** CHRIS NOTIECE LETTER Hawk and Rembrandt
**Date:** February 2, 2023 at 12:31 PM
**To:** Stephen Blumenthal stephen3d@mac.com



**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

Email: michaels@bpmlegal.com
Direct Dial:  607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

**From:** Christopher Michaels
**Sent:** Monday, August 29, 2022 3:24 PM
**To:** steven.caponi@klgates.com
**Cc:** stephen3d@mac.com; ntwallace@aol.com; 'Chi Eng' <chi@englawfirm.com>
**Subject:** Discussion with Hawk and Rembrandt

Steve:

I am writing to request a meeting with principals and counsel for Hawk and Rembrandt.

I want to thank you for time to discuss our respective positions with respect to Rembrandt's technology.  We prefer a voluntary resolution and continued reasonable and informed discussions is the best way to get to a resolution that works for all parties.

During our call, you asked what Rembrandt's course of action would be if we don't reach agreement.  While the details might vary, put simply, Rembrandt is first working to prevent further inappropriate transfer of our IP and will then work on enforcing its rights if necessary.

I see from your latest filing that you are arguing that Hawk should have received the higher voting shares and your client would be in a position to control Stream.  If your client intends to control Stream as an operating business, our settlement agreement provides Stream a license so long as the payments are made and units provided at cost.  In short, we would need do nothing at that point other than ensure the settlement agreement is honored.  Our concern arises if your client intends to further a transfer or our IP outside of Stream.

To be blunt, I think Rembrandt has done all that it needs to do to shut down an effective sale of

assets unless your team plans to attempt to hide or fail to disclose our claims to the potential purchaser. We have put you on notice of our rights.  Any reasonable investigation will show that Stream had no technology prior to taking Rembrandt's IP.  All of Stream's technology was built on our IP and by contract all those improvements are owned by Rembrandt and licensed to Stream through a non-exclusive license. While it is theoretically possible that you could make such a sale without including the settlement agreement, the discount to the valuation would be enormous. As we have pointed out previously, the practical cost of honoring our settlement agreement is far lower than the cost of not doing so.

However, if you want to continue to discuss what Rembrandt's next steps would be if Hawk proceeded with an attempt to transfer our technology out of Stream, we would ask the court to specifically exclude our technology from the transfer of assets under any foreclosure.  I can see the court doing one of several things with such a request: 1) ignore us and merely state that SeeCubic/SLS/Hawk are entitled to Stream's assets and if Rembrandt wants to allege their assets are included, Rembrandt and law enforcement can enforce independently against the individuals and companies involved in any misappropriation; 2) appointing a special master to assist in excluding Rembrandt technology from the sale; or 3) ordering anyone taking the technology assets from Stream to take them with our settlement agreement.  How do any of those results put your client in a good position? Ironically, the third outcome is the best situation for your client and is the one you seem to want to avoid.

There is little question that SLS, Hawk, SeeCubic, and their principals are not directly parties to Rembrandt's settlement agreement.  If you take the position in the foreclosure that you are not taking our settlement agreement as part of Stream's assets, your team does not take on the specific obligations but it also does not have the license either.  That means the entities and all people facilitating any unauthorized transfer are immediately subject to suit and nothing binds Rembrandt to the original relatively modest financial terms of the settlement agreement.

Are you hoping that our settlement demand will be lower for SeeCubic or for Hawk?  Stream was planning to make and sell its own products and had things to offer Rembrandt beyond cash.  Your client just wants to sell the technology to the highest bidder.  It is our understanding that many of the individuals and companies have far more assets than Stream or the Rajans.

While I understand that your client is confident about the negative allegations made by the Rajans and Stream, we are not similar actors.  When Philips shut down its 3D team, 3D Fusion/Steve Blumenthal when to Philips and licensed their technology. The Eindhoven team went from working with Philips to working with 3D Fusion and 3D Fusion developed the 3D technology for many months prior to cutting their deal with the Rajans and Stream.  Stream had zero technology and then took all of the IP we showed them.  We have years of interactions, documents, patents, designs, emails, etc. to support our claim and every allegation we have made has been supported by such documents.  We have not waivered or changed our position in 12 years.  To my knowledge, in the entirety of those 12 years, no one has accused Steve Blumenthal of stealing any technology and all documents to date prove our allegations.  I have challenged Stream to provide even a single page of development documents or an email that prove otherwise.  I have done so in front of Magistrate Parker, their legal counsel, all the Stream officers, and the Stream board.  The only effort that Stream made to contest our proof was to allege their engineers did not sign NDAs with 3D Fusion and promptly thereafter, we provided copies of the executed NDAs.  So not only did we have the documents to support our claims,

copies of the executed NDAs. So not only did we have the documents to support our claims, Stream and their engineers got caught in an immediate lie. I doubt that DLA Piper was suborning perjury. I am guessing that their client was lying to them and they were quickly caught.  As you can imagine, we made quite an issue about whether there were any documents DLA Piper relied upon to support their declarations and defenses and it was clear during negotiations that they had nothing to contest our mountain of documents supporting our claims and had relied on mere oral statements by employees of Stream.

Basically, everyone that was around in 2009 and 2010 amounted to Steve, the Rajans, and a bunch of foreign nationals that were likely to refuse to show up or take the 5th.  At some point, the Rajans are going to realize that their best interests are served by having as much technology as possible be owned by Rembrandt.  My guess is they will suddenly agree that all of Rembrandt's allegations are true and therefore all IP is owned by Rembrandt and licensed to Stream in a way that is not subject to foreclosure. It is our expectation that 100% of the people that are willing to testify and all documentation will show all original IP was Rembrandt's.

We have ensured that you and your client are fully on notice of our rights and provided a clear path to honor those rights going forward. I read your complaint against Stream and noted that while you do take time to allege that Stream was developing 3D technology, you fail to mention anything about the Phiips license, the 3D Fusion agreements, the Rembrandt litigation, or the claim that Rembrandt owns the underlying technology.  While I am unsure of what justification you could provide for ignoring Rembrandt's rights, it seems even more egregious that you failed to mention that anybody taking the technology through foreclosure would need a license from Philips.

3D Fusion had a license from Philips and so did Stream.  I don't believe the Stream license from Philips is assignable and Shad testified previously that SeeCubic had not paid for a license from Philips.  While Philips can enforce its own IP rights, it would be a very hard case for Hawk to defend given the fact that I have sent you copies of the Philips license 3D Fusion took and unlike your complaint, Rembrandt made sure to inform the court from the outset of other IP rights in play.  It seems that Hawk is intent on involving itself in misappropriation of a lot of intellectual property owned by multiple parties.

There is a clear path for your client to acquire rights to the technology in the right way.  It is the same path my client took back in 2009 – license the rights from the owner to the technology.  While many years, late, Stream has done so, but as best we can tell, your client, SLS, and SeeCubic seem intent on proceeding without a license from Rembrandt or Philips.

Rembrandt's team is working on contingency. We are not going to inefficiently initiate litigation in a wide variety of forums that have little impact on the actual transfer of our technology to new people.  We did pop our heads into the bankruptcy action, but have let the fights between SeeCubic and Stream play out because as best we can tell, no one new is being told about our technology as it appears to be the same engineering team.  We have engaged with you again now that we see someone trying to actually transfer our technology again.  Our successful litigation against Stream confirms that we are prepared to litigate if necessary, but it is reasonable for you to expect us to do so efficiently and when it will have the greatest practical impact.  However, I am reasonably confident that no further litigation by Rembrandt will be necessary as our claim has such a deleterious impact on any attempt to sell to a capable buyer and at some point your

team will have to disclose Rembrandt's claim. By that time,

I understand that your team will want to maintain some semblance of a position for having the right to sell off Stream assets without needing a license from Rembrandt, it is just not a practical business position. We are not demanding that your team accept our legal position or apologize. We are proposing business solutions to move all of our clients forward.

The current situation is that SLS/Hawk have a security interest in Stream's technology, but not technology owned by Rembrandt and licensed to Stream.  If I was representing Stream in defending the foreclosure action, I would highly support Rembrandt's claims of IP ownership and in particular the contractual ownership of all improvements to the technology.  That way none of the technology would be subject to foreclosure.  Sure SLS/Hawk can take the server, but ownership and all source code and patents should be assigned to Rembrandt pursuant to the terms of the agreement I previously sent you.  Basically, taking that position would leave the secured creditors with almost nothing of value and Stream would have its license from Rembrandt.

Even assuming that your team argued some of the technology was unrelated to what Mr. Blumenthal's team developed originally, those incremental pieces are unnecessary to have a high end 3D display.  The Rembrandt Delaware based operating company has been putting out product for many years without need of any of them.  You can go see one of our installations at the Frank Lloyd Wright museum or the Pittsburg airport.  Point being, a saleable product or technology package by Stream or SeeCubic needs Rembrandt's IP, but Rembrandt does not need any technology from Stream.  Rembrandt is in a position to provide IP to either party that allows it to operate without need to any of the technology from Stream.

Again, hypothetically placing myself into Stream's counsel's shoes, I would argue that the value of the technology provided in the foreclosure more than covers the debt owed.  I believe all parties have taken positions that the technology is worth hundreds of millions of dollars.  If a public sale without a license from Rembrandt only generated a portion of that value, I think we should expect that Stream would argue that any lowering of value in the public sale was due to the lenders' failure to take the proper license for Rembrandt allowing a clean sale.  Therefore, a foreclosure action by SLS/Hawk may actually relieve Stream of all of its debt.and leave Stream with the ability to sell a capable 3D product.

Obviously, taking a license from Rembrandt directly or pursuing assignment of the settlement agreement provides your client with freedom of action to sell an intact technology portfolio, however, Rembrandt is free to issue Stream another license to the technology as the settlement agreement is non-exclusive.  It is in the Rajans' and Stream's interest to argue that all technology developed by Stream were improvements to Rembrandt's technology and Rembrandt is free to license it back to them.

We have discussed the sale of Rembrandt Holding (subject to a license to Rembrandt Delaware). This is a solution which eliminates any issues with the IP and gives your client a clear path to achieving its goals. And we may also be able to give you the ability to end all litigation with Stream. You said that Stream owes SeeCubic enough money. That may be, but so far the Rajans individually owe nothing, whereas they have signed our settlement agreement owing just under $6 million in payments.  Rembrandt Holding has the ability to sue for collection directly against

$8 million in payments.  Rembrandt Holding has the ability to sue for collection directly against the Rajans and seize their shares in Stream (and associated entities) and acquire control of Stream. Hawk could pursue transfer to the settlement agreement to SeeCubic and block further licenses back to Stream.  Further, owning Rembrandt Holding would allow you to cancel the license as Stream has not paid us for it.

It should also be noted that the shares in Rembrandt Holding could be sold to anyone else, including Stream, the Rajans, or third party. We have not been shy about our interest in commercializing and generating revenue from Rembrandt's IP.

If the assets are returned to Stream and they are able to pay the SLS debt, it would seem that would end SLS/SeeCubic rights going forward. We are unclear whether Hawk's debt has been converted now that the omnibus agreement is void.  I imagine more litigation is contemplated on all those fronts and we would intend to stay out of those disputes, but that you might make different decisions if you owned Rembrandt Holdings.  Owning the Rembrandt patents, original technology, and the rights to enforce or terminate the license would give you far more control going forward.

While I understand that you will want to leave the option open to contest Rembrandt's claims, we believe that we have moved past the time for the initial dance around liabilities and need to move towards closing a deal if one is to be had.

I think you'll find our position more than reasonable given the benefits we can provide. I want to stress that the value of the developing rights to the Philips, Stream, and Rembrandt IP IP will be worth substantially more than attempting to just take rights actually owned by Stream because Stream owns relatively little compared to the technology they licensed from Philips and Rembrandt.

We propose setting up a phone or video conference with our team, you, and your client to discuss a business resolution.

I look forward to speaking with you.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email:* michaels@bpmlegal.com
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

# EXHIBIT 27

Exhibit 26  SeeCubic Attorney Jenness Parker Letter to STVN on Investment Banker Sale

*From: Parker, Jenness E <Jenness.Parker@skadden.com>*
*Sent: Sunday, July 31, 2022 8:14 PM*
*To: Dupre, Andrew; David, Bonnie W; Colby, Eben P; Townsend, Lilianna Anh P; Brumme,*
*Marley Ann*
*Cc: Lemon, Brian; Ferguson, Travis; Dallaire, Stephanie; Hitchens, Mark*
*Subject: RE: [Ext] Stream/SeeCubic: Special Master Order - Discussion Draft*
*\*\*External Message\*\**

*Andy — touching base on the special master order. We will be sending you a markup. However,*
*since we submitted the proposed order to the Court last week, in connection with further*
*assessment of its secured party <u>rights in light of Vice Chancellor Laster's ruling, Seecubic is</u>*
*<u>exercising its right to possession of then collateral under Article 9 of the UCC and the security</u>*
*<u>documents. It is also in the process of retaining an investment banker and will be pursuing a</u>*
*<u>public sale of the assets to satisfy the debt that</u> Stream has failed to pay for well over two years*
*now. This seems to moot the special master order. We will send a letter to the Court on this*
*issue.*
*Jenness*