**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,[1]<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Joint Administration Requested) |

**DEBTORS' (I) OBJECTION TO EMERGENCY MOTION FOR RELIEF FROM AUTOMATIC STAY PURSUANT TO 11 U.S.C. §362(d) AND (II) CROSS-MOTION FOR TURNOVER OF PROPERTY BY A CUSTODIAN[2]**

Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative"), the above-captioned debtors and debtors-in-possession (collectively, "Debtors"), hereby object to the *Emergency Motion for Relief from Automatic Stay Pursuant to 11 U.S.C. §362(d)* (the "Motion")[3] filed by Hawk Investment Holding Ltd. ("Hawk"), and respectfully represent as follows:

**PRELIMINARY STATEMENT**

In the Motion, which was filed a mere five days after Debtors commenced these chapter 11 bankruptcy cases, Hawk seeks relief from the automatic stay to continue with pending litigation

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

[2] Debtors reserve the right to bring an action under Sections 542 or 543 to the extent that Hawk argues that it is in control of the Debtors' property, *i.e.*, the proxy and voting rights relating to Stream's 100% stock ownership interest in Technovative.

[3] The Motion was filed in each of Debtors' cases, D.I. 16 in Bky. No. 23-10763 (MDC) and D.I. 19 in Bky. No. 23-10764 (MDC).

1

92960188.2

(the "225 Action") in the Delaware Court of Chancery (the "Chancery Court"). In the 225 Action, Hawk attempts to exercise contractual rights it purportedly holds as a secured creditor of Stream, including the exercise of a proxy of Stream's voting rights of Stream's undisputed 100% stock ownership interest in Technovative and the appointment of a director—Shad Stastney—to Technovative's board of directors to exert control over Technovative. Hawk's sole stated purpose for proceeding with such litigation in the Chancery Court is to allow Hawk to sell all of Debtors' valuable assets owned via their subsidiaries in a sale pursuant to Article 9 of the Uniform Commercial Code (the "Article 9 Sale").[4] Specifically, Hawk states that "[t]hrough this action, Hawk seeks a declaration confirming [Debtors] must comply with and not obstruct SeeCubic's Creditor Rights, including, but not limited to, the Marshaling Right, the Proxy Right, and the right to conduct a sale of the Collateral pursuant to Article 9 of the Uniform Commercial Code []." *See* D.I. 16-5, Amended Complaint, ¶1. To be clear, unlike cases cited by Hawk in the Motion whereby a creditor seeks stay relief to pursue liquidation of a claim in a different forum, Hawk does not seek monetary damages or the liquidation of any alleged claim in the 225 Action. To the contrary, Hawk seeks declarations that it can exercise rights as a purported secured creditor of Stream which Hawk believes would entitle it to proceed with the Article 9 Sale. These declarations are moot as a result of the bankruptcy filings and the automatic stay, and the Article 9 Sale should not proceed because it would eviscerate the primary assets of Debtors' estates which consist of valuable intellectual property held in their subsidiaries. The Article 9 Sale would be highly prejudicial to Debtors and their Estates, including other creditors like Rembrandt 3D Holding Ltd.

---

[4] Debtors view this attempt to dispose of Debtors' assets as an end-run around the Delaware Supreme Court's order directing that SeeCubic, Inc. return all of Debtors' assets to Debtors' that were wrongfully taken in violation of Stream's corporate documents. *See Stream TV Networks, Inc. v. Seecubic, Inc.*, No. 360, 2021 (Del. June 15, 2022)

92960188.2

("Rembrandt"), who asserts that Hawk seeks to impermissibly sell Rembrandt's trade secrets and intellectual property that are incorporated into Debtors' assets as part of the Article 9 Sale.

Even if pre-petition Hawk could have validly taken the actions that it seeks in the 225 Action—which Debtors dispute because any claim of Hawk has been converted to equity—the filing of Debtors' bankruptcy cases triggered the automatic stay thereby preventing Hawk from seeking a declaration of such rights and, importantly, from *exercising* any such rights. While Hawk does not specifically request stay relief in the Motion to exercise any purported rights afforded to it as an alleged secured creditor of Stream or to exercise any of Stream's stockholder voting rights in Technovative, that is the very relief that Hawk seeks in the 225 Action which should remain stayed. As the 100% stockholder of Technovative, Stream maintains that its shareholder voting rights have remained intact, because even if Hawk was entitled to exercise the proxy voting rights pre-petition, Hawk can no longer exercise such rights because of the automatic stay which removed any constraint on Stream's exercise of control over Technovative.

Hawk has not and cannot meet its burden demonstrating that it is entitled to relief from the automatic stay to proceed with the 225 Action, including the exercise of any creditor's rights or the Article 9 Sale. Again, in the 225 Action, Hawk seeks declarations that it validly appointed a director of Technovative by exercise of a proxy and that it can exercise its enforcement rights through the Article 9 Sale. If Hawk cannot obtain the ultimate relief sought in the 225 Action because such enforcement rights are stayed (Hawk has not specifically sought relief to exercise these rights in the Motion), then there is no need for the Chancery Court to address any gateway issues relating to whether Hawk's claim was converted or otherwise. In any event, this Court is more than capable of resolving in due course whether any contract claim asserted by Hawk in these Chapter 11 Cases should be treated as debt or equity and whether such claims may be entitled to

any setoff, including from, *inter alia*, the claims that Stream has asserted against Hawk in *Stream TV Networks, Inc.*, v. *Stastney, et al.*, Case No. 22-851-CJB (D. Del.), as part of the claims administration process. Indeed, the Court routinely deals with the treatment and classification of a creditor's claim (debt or equity), claims against the estate, and the estate's claims against creditors, all of which are core bankruptcy matters under the claims administration process.

Through these Chapter 11 Cases, Debtors intend to restructure their debt so that their debt service is reduced to a level that will allow Debtors to sustain long term operations, and Debtors have also identified investors who are willing to invest in Debtors in conjunction with these Chapter 11 Cases. Debtors should be afforded all protections under the Bankruptcy Code to allow Debtors an opportunity to propose their plan that will address the claims of all creditors, including Hawk, during Debtors' exclusivity period to propose a plan of reorganization. These protections include (i) the benefit of the section 362 automatic stay, which is designed to provide Debtors with a "breathing spell" from the exact type of litigation that Hawk seeks to proceed with in the Chancery Court while these Chapter 11 Cases are in their infancy and provide Debtors with an opportunity to formulate a plan of reorganization for the benefit of all creditors, and (ii) the benefit of section 542, which requires all entities in the possession, custody, or control of property of the estate deliver such property to the debtor and account for such property or the value of such property. Hawk's stay relief request should not come above and at the expense of Debtors and other creditors and interested parties of Debtors' estates.

Indeed, in just the limited time since the Petition Date, Debtors have been able to secure a purchase order for their products in excess of $12 million (see attached Exhibit A) and also gain million dollar commitments for additional investments in Debtors' business. Debtors believe that there will be adequate value to address the claims of Hawk (whether Hawk's claim is determined

4

to be debt and/or equity) and other secured and unsecured creditors through Debtors' eventual chapter 11 plan. In fact, even Hawk has acknowledged that the value of Debtors' assets exceeds $500 million, a number substantially more than Hawk's asserted claims. Debtors should not be unnecessarily rushed through the bankruptcy process or have to deal with Hawk's claims at this early stage of the bankruptcy cases merely because Hawk wants to proceed on its suggested path in a different forum to the detriment of all other interested parties. At this pivotal time, Debtors should be focusing on resuming business operations and developing a plan to address *all* creditors' claims, including $16 million in unsecured claims and at least two other intellectual property licensors' rights that, frankly, prior state court forums have either been unwilling or unable to address, but that the Federal Court system can and should exercise jurisdiction over, and not be bogged down with addressing Hawk's stay relief request or the 225 Action.

As further discussed herein, the Motion should be denied.

## BACKGROUND

### A. The Bankruptcy Filing

1. On March 15, 2023 (the "Petition Date"), Debtors filed voluntary petitions for relief with the Court under chapter 11 of title 11 of the Bankruptcy Code. Debtors filed in the Eastern District of Pennsylvania because that is the location of their principal place of business.

2. Since the Petition Date, Debtors have been operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Motion, no official committees have been appointed or designated.

**B. Overview of Debtors**

4. Debtors were founded in 2009 as "new media" companies to pursue new technologies that enhance user entertainment and communications experiences. The technology that Debtors are currently seeking to launch allows TV and tablet manufacturers to convert two dimensional devices into three dimensional without the need for viewing glasses. Debtors are incorporated in Delaware and have a principal executive office located in Philadelphia, Pennsylvania.

5. Technovative Media, Inc. is a wholly owned subsidiary of Stream TV Networks, Inc. Through their global engineering team, Debtors have developed breakthrough glasses-free 3D display technology launched under the trade name Ultra-D™ ("Ultra-D"). Ultra-D is a proprietary combination of hardware and software which creates a natural, comfortable and immersive Glasses-Free 3D viewing experience. Resulting from years of research and development in the field of 3D optics, multi-view rendering and content development solutions, Ultra-D solves the two biggest limitations of the market's current 3D technology: the need to wear special glasses and the scarcity of 3D content.

6. As a core technology, Ultra-D can be applied to panels of nearly any type and size and is compatible with touch screen features as well. This means that consumers can have a seamless experience with virtually any device – televisions, tablets, smartphones, portable game players, laptops, all-in-one computers and more. Stream's mission is to enable superior consumer media experiences by advancing the evolution of display technology from a flat 2D world to an immersive one made possible in 3D without glasses.

7. Debtors intend to generate revenue from providing 3D components to final market assemblers (such as TV manufacturers and tablet makers). Debtors view their approach as similar

92960188.2

to the way in which major computer manufacturers use processors in their products and note their products as such. Debtors have a term sheet for a distribution and supply chain finance agreement with Visual Semiconductor, Inc. which they intend to consummate in the ordinary course of business and with court approval as applicable.

8.      Debtors intend to restructure their debt through these Chapter 11 Cases so that their debt service is reduced to a level that will allow Debtors to sustain their operations for the long term and have identified investors who are willing to invest in Debtors once Debtors pursue these Chapter 11 Cases. Debtors also intend to complete recovery of assets, including assets which were previously and wrongfully transferred to SeeCubic, Inc. ("SeeCubic") in contravention of express provisions of Stream's corporate charter as confirmed by the Delaware Supreme Court through a decision on June 15, 2022. *See Stream TV Networks, Inc. v. Seecubic, Inc.*, No. 360, 2021, p. 3 (Del. June 15, 2022) (Holding that "a majority vote of Class B stockholders is required under Stream's charter" to "transfer pledged assets to secured creditors in connection with what was, in essence, a privately structured foreclosure transaction").[5] In holding that its corporate charter had been violated, the Delaware Supreme Court noted that Stream's charter was "unambiguous" and, ergo, "enforcing the unambiguous [c]harter provision [requiring Class B stockholders be allowed to vote on the asset transfer] is consistent with our policy of seeking to promote stability and

---

[5] The Delaware Supreme Court also held that the "agreement authorizing the secured creditors to transfer Stream's pledged assets . . . is invalid because Stream's unambiguous certificate of incorporation required the approval of Stream's Class B stockholders" and there was no "Board Only insolvency exception" to Section 271 of the DGCL, and even if there had been a board-only insolvency exception to Section 271, it had been superseded. *Id.*. at p. 34. The Delaware Supreme Court's opinion definitively established that there had been an improper transfer of assets, in violation of Debtor's corporate charter. *Id*. at p. 53 n. 180 ("We note that Section 271 presents no barrier to the parties' foreclosure proceedings in Superior Court (which are presently stayed pending this appeal), and no party has argued that judicial foreclosure proceedings implicate Section 271").

7

predictability in our corporate laws. . . ." *Id*. at pp. 53-54. Debtors had grave concerns that the Delaware Supreme Court mandate was not being followed, particularly due to the passage of time without full return of their assets, and those fears were confirmed recently. Valuable intellectual property and trade secrets are in danger of being transferred to third parties or are not being properly monitored and exposure to liability from the collapse of operations of Debtors' foreign subsidiaries due to the failure to make payments by third parties mandated by the Delaware Chancery Court to preserve those assets.

9. A detailed description of Debtors and their businesses, including facts and circumstances giving rise to these Chapter 11 Cases and supporting this Motion, is set forth in the *Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Chapter 11 Petition, Supporting Emergency Relief, and First Day Motions* [ECF No. 48], which is incorporated herein by reference.

**C. Post-Petition Improper Acts By Hawk and Related Parties**

10. Since the filing of these Chapter 11 Cases, Hawk and related parties, including Mr. Stastney, SeeCubic, SeeCubic B.V., SLS Holdings VI LLC, and Patric Theune, have taken numerous actions to hinder Debtors' ability to effectively reorganize. These actions have included, but are not limited to (i) violating the automatic stay, (ii) failing to turn over valuable and integral property of Debtors' Estates, including an optical bonding machine located in China, and (iii) interfering with the operation of Debtors' subsidiaries in the Netherlands. Debtors view these actions as willful given that the parties are fully aware of the bankruptcy filing and the implications of the automatic stay. Debtors have sought relief with the Court to address these issues.

**OBJECTION**

11. Under the well-established tests in this Circuit, the automatic stay should not be lifted to allow Hawk to proceed with the 225 Action.

**A. The Automatic Stay Applies to the Relief Sought by Hawk in the 225 Action**

12. While Hawk acknowledges that the automatic stay applies to the 225 Action, Hawk fails to articulate the exact relief and specific matters that it seeks to pursue in the 225 Action should stay relief be granted. Hawk references a determination of claim status and total claim amounts, but fails to acknowledge that those are only tangential issues to be addressed in the 225 Action. As noted above, the ultimate relief sought in the 225 Action is for the Chancery Court to authorize Hawk to proceed with the exercise of purported creditor's rights, including the exercise of control of Debtor Technovative and the subsequent sale of all of Debtors' subsidiaries' assets as part of the Article 9 Sale. As a result of this ambiguity in the relief sought by Hawk, it is worth noting that the automatic stay not only applies to the continuance of the 225 Action, but also applies to the exercise of the ultimate relief sought by Hawk in the 225 Action.

13. Indeed, a debtor's bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The definition of property of the estate is interpreted broadly, and 'every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of Section 541.'" *Geltzer v. Soshkin (In re Brizinova)*, 588 B.R. 311, 326 (Bankr. E.D.N.Y. 2018) (quoting *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008)) (brackets and quotation marks omitted).

14. "The broad definition of property of the estate clearly encompasses a debtor's interest in another corporation's stock." *Id.* (quotation and brackets omitted). Moreover, corporate

governance rights that are part and parcel with such equity interests also fall under section 541. *See, e.g.*, *See Walro v. Lee Grp. Holding Co., LLC (In re Lee)*, 524 B.R. 798, 804 (Bankr. S.D. Ind. 2014) (finding debtor's voting rights in limited liability company were property of the estate).

15. The automatic stay "operates as a stay, applicable to all entities, of," *inter alia*, "any act to . . . exercise control over property of the estate." 11 U.S.C. § 362(a)(3). It is well settled that the stay applies to intangible property. *See, e.g.*, *Vreugdenhil v. Hoekstra*, 773 F.2d 213, 214 (8th Cir. 1985) (goodwill is property of the estate protected by automatic stay). Thus, the automatic stay bars a creditor from exercising corporate governance rights over an entity the debtor owns. *See In re Marvel Entm't Grp.*, 209 B.R. 832, 839 (D. Del. 1997) (holding where bondholders and indenture trustee sought to vote debtor-holding companies' pledged shares of stock as a result of debtors' defaults under indentures: "Because the pledged shares were property of the Marvel Holding Companies' estates, appellants were required to seek . . . relief from the automatic stay in the Marvel Holding Companies case that prevented them from exercising control over those shares."); *In re Krueger*, No. 12-40328-RFN-7, 2014 WL 911857, at *7 (Bankr. N.D. Tex. Mar. 7, 2014), *aff'd sub nom. Krueger v. Torres*, No. 4:14-CV-413-O, 2014 WL 12584335 (N.D. Tex. Nov. 26, 2014), *aff'd sub nom. In re Krueger*, 812 F.3d 365 (5th Cir. 2016) (finding that chapter 7 debtor, by voting his shares in his company, "was exercising control over property of his bankruptcy estate" and that he "had no right to do this . . . . Section 362(a)(3) unambiguously precludes such control . . . and the facts of this case demonstrate why. [Debtor], by voting his shares and ultimately exercising control over [his company], caused it to dismiss all claims against him . . ."); *In re Cardinal Indus., Inc.*, 105 B.R. 834, 849-50 (Bankr. S.D. Ohio 1989) (holding that creditor exercise of control over contractual management interests of debtor as managing general partner violated the stay); *In re Bicoastal Corp.*, No. 89-8198-8P1, 1989 Bankr. LEXIS 2046, at

10

*17-18 (Bankr. M.D. Fla. Nov. 21, 1989) (holding that Section 362(a)(3) prevented creditor/preferred shareholder from exercising right to elect majority of debtor's board of directors that accrued when debtor failed to timely repay creditor/preferred shareholder's loan to debtor).

16. As such, on the Petition Date, the voting rights associated with and appurtenant to Stream's stock interest in Technovative constituted property of Stream's estate. Therefore, it is without question that Hawk cannot interfere with Stream's exercise of such rights, as it would violate the automatic stay thereby rendering any declaration from the Chancery Court on the issue of Hawk's pre-petition rights with regards to the voting of the Technovative stock, if any, moot. *See* 11 U.S.C. §§ 362(a)(3) (prohibiting "any act to . . . to exercise control over property of the estate"), 362(a)(4) (prohibiting "any act to create, perfect, or enforce any lien against property of the estate"). To the extent there is a dispute over estate property, it is this Court—not the Chancery Court—that should determine whether Stream or Hawk possesses the rights over the Technovative stock and corresponding voting rights. *See In re Continental Airlines*, 138 B.R. 442, 445 (D. Del. 1993) (the determination of what constitutes property of the debtor's estate is one of the core proceedings arising under Title 11 and is inherently an issue to be determined by the bankruptcy court).

### B. The Automatic Stay Should not be Lifted

17. "The Bankruptcy Code authorizes bankruptcy courts to grant relief from the automatic stay for 'cause.'" *Del. Tr. Co. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.)*, 533 B.R. 106, 117 (Bankr. D. Del. 2015) (quoting 11 U.S.C. §362(d)(1)). "Courts are to determine 'cause' based on the totality of the circumstances in each particular case." *Id.* (citing *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997)). Courts in this District apply a three-pronged test to determine whether cause exists for granting relief from the automatic

stay to continue in another forum: (1) whether the debtor or the estate will be greatly prejudiced by continuation of the litigation in the other forum; (2) whether the hardship to the non-debtor party outweighs the hardship to the debtor; and (3) whether probability of prevailing on the merits favors the non-debtor. *See In re Tribune Co.*, 418 B.R. 116, 126 (Bankr. D. Del. 2009) (citations omitted); *see All Am. Plazas, Inc. v. Petro Franchise Sys., LLC (In re All Am. Props.)*, No. 1:10-bk-00273MDF, 2010 Bankr. LEXIS 1286, at *7 (Bankr. M.D. Pa. Apr. 15, 2010).

18. The burden under Section 362(g) of the Bankruptcy Code only shifts to the debtor once the liftstay applicant makes out a *prima facie* case for stay relief. *Id.* (citing *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006) *aff'd*, 359 F. App'x 352 (3d Cir. 2010)). "A *prima facie* case requires a showing by the movant of 'a factual and legal right to the relief that it seeks.'" *Id.* (quoting *RNI*, 348 B.R. at 299) (additional quotation omitted). "Failure to prove a *prima facie* case requires denial of the requested relief." *Id.* (citing *RNI*, 348 B.R. at 299). "To apply section 362(g)(2) differently would force the debtor to prove a negative, that no cause exists." *Id.* (quoting *In re Rexene Products Co.*, 141 B.R. 574, 577 (Bankr. D. Del. 1992)).

19. Hawk has failed to make a *prima facie* case for stay relief under all three of the relevant factors. Accordingly, no burden should shift to Debtors, but even if it did, Debtors carry their burden.

    **i.**     **Lifting the Stay Would Greatly Prejudice Debtors and the Estates**

20. Granting the Motion and allowing Hawk to proceed with the 225 Action would greatly prejudice Debtors and the Estates. The purpose of the automatic stay is three-fold: (1) prevent certain creditors from gaining a preference for their claims against the debtor; (2) to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, (3) to avoid interference with the orderly liquidation or rehabilitation of the debtor.

92960188.2

*See In re Rexene Prods., Co.*, *supra*, 141 B.R. at 576. Affording Hawk stay relief would be counter to the very purpose of the automatic stay.

21. It is unquestioned that Hawk seeks to pursue the 225 Action in an effort to wrest control of Technovative's management from Stream so that Hawk can insert its own director, Mr. Stastney. Upon inserting its own director, Hawk intends to effectuate a sale of Technovative's downstream subsidiaries' assets, consisting primarily of Debtors' intellectual property which are necessary for Debtors to manufacture their glasses free 3D display and Ultra-D™ technology. Mr. Stastney would be looking out for the interests of Hawk, whereas the Debtors, fiduciaries of the Estates under the watch of the Court, are required to operate for the benefit of all interested parties. Should Hawk succeed in the 225 Action, it would cause irreparable harm to Debtors because they could lose through the Article 9 sale the very assets that are necessary to effectuate an orderly reorganization process that is already underway as evidenced by the approximately $12 million purchase order that Debtors have obtained since the Petition Date. Without the intellectual property of its subsidiaries, Debtors will have difficulty fulfilling the purchase orders which will negatively impact Debtors' ability to fund a plan and make distributions to creditors. Essentially, an adverse ruling in the 225 Action would paralyze Debtors in these Chapter 11 Cases. *See, e.g., In re Morysville Body Works, Inc.*, (Bankr. E.D. Pa. 1988) (denying creditor's request for stay relief because granting §362 say relief would have completely destroyed debtor's chances of a successful reorganization). Also, the value of the intellectual property that Hawk seeks to obtain via the Article 9 Sale is, by Hawk's own valuation, estimated to be at least $500 million. Hawk seeks to steal Debtors' assets for its own benefit and to the detriment of all other parties.

22. Hawk cites to various cases for the proposition that when a case is close to trial prepetition lifting the automatic stay to proceed with the litigation does not impose a burden on the

debtor. *See* Motion, p. 27. However, each of those cases is distinguishable. In each case the party was pursuing a claim for damages. Here, Hawk is not pursuing a claim for damages, but "seeks declaration confirming [Debtors] must comply with and not obstruct SeeCubic's Creditor Rights, including, but not limited to, the Marshaling Right, the Proxy Right, and the right to conduct a sale of the Collateral pursuant to Article 9 of the Uniform Commercial Code []." *See* D.I. 16-5, Amended Complaint, ¶1. Also, unlike here, there was no indication in any of those cases that the debtor had already asserted claims against the party seeking stay relief that would impact the moving party's claim in the bankruptcy case. All claims should be addressed in one claims process before this Court. While Hawk argues that the Chancery Court is specially adept at handling 225 actions, Hawk's underlying claim is more akin to a contract claims which this Court routinely addresses.

23.     Finally, the Chancery Court does not have all necessary parties before it that would be impacted by the potential Article 9 Sale—this Court does. As noted by Rembrandt, "Hawk is seeking to continue to misappropriate Rembrandt's technology, it has not asserted any ownership interest in Rembrandt's trade secrets or patents, so it is either planning to remove Rembrandt's technology, misappropriate Rembrandt's trade secrets, or sell the technology to related party at a purposefully depressed value." *See* D.I. 69, ¶17.

### ii.     The Automatic Stay Imposes No Hardship on Hawk

24.     Importantly, contrasted with the grave prejudice that Debtors and the Estate would suffer if stay relief were granted, Hawk cannot demonstrate any cognizable hardship if the stay remains in place. The only purported prejudice that Hawk could point to in the Motion is the potential delay in going to trial and having to prepare for a subsequent adjudication of Hawk's claim here. However, the parties in the 225 Action still had a pretrial conference to attend and had

14

92960188.2

not yet completed their trial preparation. Moreover, Hawk indicated that it believed the trial would last one day, indicating that there would not be any undue hardship if Hawk had to address is claim in this Court.

25. Also, Hawk's argument that Debtors' asset will decline in value if stay relief is not granted is unsubstantiated. Indeed, if Debtors' assets have any decline in value, it will be the result of the actions directed against Debtors by Mr. Stastney who is unabashedly interfering with Debtors' operation of their subsidiaries in the Netherlands, directing parties not to cooperate with Debtors in retrieving their optical bonding equipment in China, and otherwise refusing to return Estate property to Debtors. Debtors have already sought relief from the Court to remedy these actions. Debtors' actions in the bankruptcy case thus far have resulted in obtaining a substantial purchase order that would be more than sufficient to satisfy any claim on the SLS Notes, and Debtors intend to obtain more purchase orders once Mr. Stastney and his entities cease interfering with Debtors' reorganization efforts and Debtors regain possession of all of their assets which they are working tirelessly to achieve.

26. Further, now that the Debtors have filed the Chapter 11 Cases, they will be operating under this Court's supervision, and all interested parties, including Hawk, will enjoy the privileges and protections granted to creditors under the Bankruptcy Code.

### iii. Hawk Will Not Succeed on the Merits in the 225 Action

27. Finally, Hawk will not be able to prevail under the third factor. Hawk argues that Debtors filed these Chapter 11 Cases "as part of a baseless gambit" to avoid the trial in the 225 Action. To the contrary, Debtors believe that they would prevail in the 225 Action and have strong defenses to the 225 Action. However, Debtors still remain without their assets which the Delaware Supreme Court ordered should have been returned to Debtors almost a year ago. Even the

15

92960188.2

Chancery Court acknowledged that Debtors required possession of their assets to satisfy creditor claims. Hawk and its related parties have done everything possible both pre- and post-petition to hinder Debtors' efforts to regain possession of their assets and prevent Debtors from obtaining customer purchase orders. As evidenced by Debtors' schedules, Debtors have other claims that they need to address aside from their issues with Hawk and bankruptcy was the most logical forum to address all issues and allow Debtors' to formulate a path forward.

28. As for the 225 Action, any claims relating to the SLS Notes fail because Hawk's purported prosecution of those contracts in the 225 Action constitutes the tort of champerty and maintenance, and Hawk advanced no evidence of the amount of the SLS Notes to a sum certain, or the continued enforceability of that debt as against Stream, because Hawk declined to participate in discovery in good faith. Thus, Hawk is the wrong party to prosecute the SLS Notes and Hawk failed to put forth evidence substantiating the SLS Notes.

29. With regards to the Hawk Notes, Debtors have asserted that Hawk does not have the right to exercise any voting rights under the Hawk Notes or related Pledge Agreements because, *inter alia*, all of the Hawk Notes have been converted from debt to equity. There is no dispute that the Hawk Notes are convertible. And, Debtors provided all appropriate notices for conversion as required by the Conversion Agreement. Therefore, Hawk will likely not succeed on the merits of the 225 Action. Additionally, as noted above, to the extent that Hawk could exercise any voting rights of Stream's 100% stock ownership interest in Technovative pre-petition—which it could not—the Chancery Court cannot provide Hawk with the relief that it seeks because the Technovative stock and voting rights are clearly property of Stream's bankruptcy estate.

30. Accordingly, Hawk cannot demonstrate any likelihood of success on the merits of the 225 Action, and this factor also weighs against lifting the stay.

16

92960188.2

## **CONCLUSION**

For the reasons set forth above, Debtors respectfully request that the Court deny the Motion.

Date: April 5, 2023

Respectfully submitted,

/s/ Rafael X. Zahralddin-Aravena
Rafael X. Zahralddin-Aravena (PA Bar No. 71510)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
550 E. Swedesford Road, Suite 270
Wayne, PA 19087
Telephone: (302) 985-6000
Facsimile: (302) 985-6001
Rafael.Zahralddin@lewisbrisbois.com

-and-

Vincent F. Alexander (admitted *pro hac vice*)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
110 SE 6th Street, Suite 2600
Fort Lauderdale, FL 33301
Telephone: (954) 728-1280
Facsimile: (954) 678-4090
Vincent.Alexander@lewisbrisbois.com

-and-

Bennett G. Fisher (pro hac pending)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
24 Greenway Plaza, Suite 1400
Houston, TX 77046
Telephone: (346) 241-4095
Bennett.Fisher@lewisbrisbois.com

*Proposed Counsel to Debtors*

92960188.2

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on April 5, 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day by transmission of Notice of Electronic Filing generated by CM/ECF on all parties who are authorized to receive electronically Notice of Electronic Filing in this bankruptcy case.

/s/ Rafael X. Zahralddin-Aravena
Rafael X. Zahralddin-Aravena
