**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: | Chapter 11 |
| STREAM TV NETWORKS, INC.,[1] | CASE NO.: 23-10763 MDC |
| Debtor, | |
| and | Chapter 11 |
| IN RE: | CASE NO.: 23-10764 MDC |
| TECHNOVATIVE MEDIA, INC., | (Joint Administration Pending) |
| Debtor. | |

**MOTION OF HAWK INVESTMENT HOLDINGS LTD. (I) PURSUANT TO SECTION
1112(b) OF THE BANKRUPTCY CODE EITHER (A) (1) TO DISMISS THE DEBTORS'
CHAPTER 11 CASES OR (2) TO CONVERT SUCH CASES TO CASES UNDER
CHAPTER 7 OR, (B) IN THE ALTERNATIVE, PURSUANT TO SECTION 1104(a) OF
THE BANKRUPTCY CODE TO APPOINT A CHAPTER 11 TRUSTEE AND (II) TO
REQUEST EXPEDITED CONSIDERATION PURSUANT TO LOCAL RULE 5070-1(g)**

Hawk Investment Holdings, Ltd. ("Hawk"), as Collateral Agent for the secured

noteholders of SeeCubic, Inc. ("SeeCubic"), a secured creditor of Stream TV Networks, Inc.

("Stream") and Technovative Media Inc. ("Technovative" and, together with Stream,

the "Debtors") in the above-captioned chapter 11 cases (together, the "Chapter 11 Cases"), by and

through its undersigned counsel, K&L Gates LLP, respectfully moves this Court (the "Motion")

for entry of an Order (A) pursuant to sections 105, 349(a), and 1112(b) of title 11 of the United

States Code (the "Bankruptcy Code"), either (1) dismissing the Chapter 11 Cases with prejudice

or (2) converting such cases to cases under Chapter 7 of the Bankruptcy Code or, (B) in the

alternative, appointing a Chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code.

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers are Stream TV
Networks, Inc. (4092) and Technovative Media, Inc. (5015).  The location of the Debtors' service address is:
2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

In support of this Motion, Hawk respectfully submits the Declaration of Steven L. Caponi dated as of the date hereof (the "Caponi Decl.") and the exhibits annexed thereto and represents as follows:

## INTRODUCTION[2]

These Chapter 11 Cases are textbook examples of abuse of the bankruptcy process, and the Court should immediately (A) dismiss the Debtors' Chapter 11 Cases with prejudice, (B) convert them to cases under Chapter 7 or, (C) appoint a Chapter 11 trustee to act in the interest of all stakeholders. While the history of the dispute between Stream, on the one hand, and its Secured Creditors and most equity holders, on the other hand, is extensive—spanning at least *ten* litigations across five courts—the facts demonstrating that these Chapter 11 Cases should not endure with the Rajans in control are straightforward.

These Chapter 11 Cases represent the *third* bankruptcy cases filed or orchestrated by Mathu Rajan, Stream's CEO, in the last two years. Judge Karen Owens of the United States Bankruptcy Court for the District of Delaware dismissed both of Stream's Prior Bankruptcies as having been filed in bad faith, without a legitimate bankruptcy purpose, and to gain a tactical litigation advantage in the web of other actions between Stream and its Secured Creditors. Based on a full factual record, Judge Owens found that Mr. Rajan caused Stream to file for the Prior Bankruptcies in order to (i) evade an injunction issued by the Court of Chancery and (ii) use the bankruptcy process to, in Mr. Rajan's own words, "cherry-pick" from Stream's assets—paying "a fraction of their value"—and siphon them off to a newly created entity *he* owned and controlled, VTI. In other words, Stream had no plan to reorganize around Stream at all, but instead intended use the bankruptcy process to seed VTI with Stream's assets—*i.e.*, the Secured Creditors' Collateral.

---

[2] Capitalized terms used in this Introduction but not defined herein shall have the meanings given to them in the body of the Motion.

Having been caught in this scheme by the Delaware Bankruptcy Court, the Debtors have filed these Chapter 11 Cases as their latest gambit to avoid the Secured Creditors.  In doing so, Stream claims to have been vindicated by a Delaware Supreme Court opinion from ten months ago—June 2022—that invalidated a "friendly," consensual foreclosure, the so-called "Omnibus Agreement." Stream's characterization of and reliance on this decision is misleading at best: while the Delaware Supreme Court invalidated the Omnibus Agreement on the discrete legal issue that Stream's Class B stockholders were entitled to vote on it, the Court conspicuously confirmed that Stream was in default on significant amounts of the Secured Debt held by the Secured Creditors. The Delaware Supreme Court's opinion also adopted factual findings that make clear that the Debtors' principals are poor stewards of the assets, having mismanaged Debtors for more than a decade without monetizing the assets or turning Stream into a revenue-generating enterprise—let alone a profitable one.

Since June 2022, after restoring Stream's ownership of the assets consistent with the Delaware Supreme Court's opinion—a process overseen by the Court of Chancery—the Secured Creditors have been in the process of exercising their Secured Creditor Rights under the debt documents and the Uniform Commercial Code to effect a non-consensual foreclosure.  Since October 2022, Vice Chancellor Laster of the Delaware Court of Chancery has been presiding over an action attendant to this foreclosure and had appointed a receiver to oversee the assets while the dispute was ongoing.  In the course of those proceedings, the Court of Chancery also ruled that the Debtors were collaterally estopped from re-litigating the following established facts, among others:  (i) that Stream issued secured debt to the Secured Creditors; (ii) Stream had defaulted on that debt; (iii) prior to November 2021, none of the debt had been converted to equity under relevant conversion agreements (and, indeed, certain of the debt could not be converted); and (iv) the debt could only be converted after November 2021 by Stream raising new money.  On the

eve of trial, unable to marshal proof that Stream had raised such new money to support their conversion argument, the Debtors filed these Chapter 11 Cases to avoid a very likely adverse ruling in the 225 Action and to attempt to re-litigate, again, the Secured Creditors' claims.

The Debtors and Mr. Rajan, of course, have not stopped with abusing the automatic stay to avoid further rulings in the Court of Chancery.  With the Court of Chancery-appointed receiver displaced as a result of the filing of these Chapter 11 Cases, the Debtors—and Mr. Rajan in particular—have been improperly wielding the automatic stay as a sword.  Mr. Rajan, for example, is *currently in the Netherlands* hounding employees of Stream's indirect subsidiaries, which are *not* debtors in these Chapter 11 Cases, to turn over assets, claiming that failure to do so is a violation of the automatic stay.  Under clear Supreme Court precedent, it is not.  When the Secured Creditors asked that Stream provide adequate protection for their collateral, Debtors have refused to provide even proof of insurance—the most basic of requests.  The Debtors cannot have it both ways though:  If the assets they are seeking to seize are property of the estates, such assets are also the Secured Creditors' Collateral; if not, their machinations to recovery such assets are fraudulent.

Worse still, it has become crystal clear that these Chapter 11 Cases were filed with no legitimate bankruptcy purpose—just like the Prior Bankruptcies.  No substantive motions have been filed.  That is because there is no legitimate plan to reorganize the Debtors.  One of the purported customers referenced in Mr. Rajan's sworn declaration, IQH3D, for example, issued Stream a cease-and-desist notice in 2020, demanding that Stream cease claiming that they had any ongoing or prospective commercial relationship.  Put simply, Debtors and Mr. Rajan are using these cases to run the ***exact same scheme*** they attempted with the prior bad-faith bankruptcies, using the bankruptcy court to siphon off the Debtors' assets into a newly created shell entity, this time called VSI, into which they are aggressively attempting to raise capital.  In fact, on April 6,

representatives of the Debtors stated that Mr. Rajan's conquest of the assets of the Dutch Subsidiaries will have concluded by Monday, April 10.

The bankruptcy process, particularly in Chapter 11, is meant to facilitate legitimate intent to reorganize and rehabilitate the debtor, not to countenance underhanded litigation tactics. These Chapter 11 Cases were not filed with an intent to reorganize the Debtors, but to halt definitive litigation likely to result in a defeat for Debtors, and to benefit the Rajans' new business. The Rajans' abuse of the bankruptcy process—and the legal process in general—must come to an end in order to protect the Debtors' estates, creditors, and other stakeholders from continued abuse—whether by dismissal with prejudice or by appointment of an independent third party to steer the cases. Regardless of which route the Court chooses, the Rajans may put their proverbial money where their mouth is—either as part of the 225 Action (and ensuing Article 9 Sale) if the cases are dismissed or within the bankruptcy process in Chapter 7 or under the supervision of a Chapter 11 trustee if the cases endure. Fundamentally, however, the Rajans should not be left to abuse the bankruptcy process and system in these Chapter 11 Cases.

## **JURISDICTION**

The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. § 1409. The statutory predicates for the relief requested in this Motion are sections 105(a), 349(a), 1104(a), and 1112(b) of the Bankruptcy Code and the related Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Bankruptcy Rules for the Bankruptcy Court of the Eastern District of Pennsylvania (the "Local Rules") 5070-1(g) and 9014-1.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[3]

**A.    General Overview of Stream's History**

Stream is a company that has been researching and developing a technology that would allow users to watch television in 3-D without the need for special glasses.  Mathu Rajan and Raja Rajan (together, the "Rajans") are the controlling stockholders of Stream through their interests in various entities owning controlling interests in Stream—namely, Akshaya Holdings LLC and Visual Semiconductor, Inc. ("VSI").  Stream is the 100% owner of Technovative, which in turn is the 100% direct or indirect owner of the following "Subsidiaries":

1.    Technology Holdings Delaware, LLC ("THD"),

2.    Media Holdings Delaware, LLC ("MHD"),

3.    Ultra-D Ventures, C.V. ("Ultra-D Ventures"),

4.    Ultra-D Coöperatief U.A. ("Ultra-D Coop"),

5.    Stream TV International B.V. ("Stream BV"), and

6.    SeeCubic B.V. ("SCBV").

As used in this Motion, the subset of the Subsidiaries including only Ultra-D Ventures, Ultra-D Coop, Stream BV, and SCBV comprise the "Dutch Subsidiaries."

The Dutch Subsidiaries are entities formed under the laws of the Netherlands and function as the primary research and development engine for the business—primarily through the operations of SCBV.  *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1022 (Del. Ch. 2020), vacated, 279 A.3d 323 (Del. 2022) (the "Chancery PI Opinion").  Prior to the appointment

---

[3] For a full factual recitation, Hawk refers the Court to *Hawk Investment Holdings Ltd.'s (1) Emergency Motion for Relief From the Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code, and (2) Request for Expedited Consideration Pursuant to Local Rule 5070-1(g)* (the "Stay Motion") filed against Stream and the Declaration of Steven L. Caponi in support thereof [ECF No. 19] (the "Caponi Stay Declaration") and incorporates the same and all exhibits attached thereto by reference.  Citations to the exhibits attached to the Caponi Stay Declaration shall be referred to herein as "Stay Decl. Ex. __" and citations to the Declaration attached hereto shall be referred to as "Decl. Ex. __".  Capitalized terms used but not defined herein shall have the meanings given to them in the Stay Motion.

of the Receiver (discussed below), Technovative served as the intermediate holding company between Stream and the Subsidiaries.

**B.      The Hawk and SLS Notes**

In order to fund the Subsidiaries' research and development activities, Stream has incurred substantial amounts of secured debt obligations to Hawk and SLS Holdings VI, LLC ("SLS" and, together with Hawk, the "Secured Creditors").  Specifically, from 2014 to 2020, Hawk and Stream executed a series of promissory notes (the "Hawk Notes") which provided Stream with loans worth tens of millions of dollars to develop said technology.  *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 327 (Del. 2022).  With interest, the Hawk Notes are now valued in excess of $142,000,000 (the "Hawk Debt").  In exchange for the funds advanced under the Hawk Notes and pursuant to several Security Agreements and Pledge Agreements, Stream granted Hawk security interests in what is defined under the operative documents as the "Collateral."  The Collateral is broadly defined to include substantially all of the assets of Stream.  *See* Stay Decl. Ex. C.

Between August 8, 2011 and May 29, 2012, SLS loaned Stream funds in the aggregate principal amount of $6,000,000.00, pursuant to five promissory notes (collectively, as may have been amended from time to time, the "SLS Notes").  As of February 24, 2023, the total amount due and owing under the SLS Notes, including accrued interest, was approximately $14,383,523.06 (the "SLS Debt" and, together with the Hawk Debt, the "Secured Debt").  SLS and Stream also entered into Security Agreements and a Pledge Agreement in connection with the SLS Notes, granting SLS a security interest in the Collateral.  *See* Stay Decl. Ex. D.  SLS and Hawk's security interests in the Collateral are each properly perfected and are first and second in priority, respectively.

**C.      Stream's Mismanagement Results in Defaults on the Hawk Notes and SLS Notes**

Despite the significant funding provided by the Secured Creditors, Stream never evolved beyond a pre-revenue, development-stage business. It has never generated material revenue, and as the Court of Chancery of Delaware (the "Court of Chancery") found, the Rajans' management resulted in a grim picture:

> In addition to the debts that Stream owed to its secured creditors, Stream carried more than $16 million in trade debt and had fallen months behind on payments to customers and suppliers. Stream even failed to make the payments necessary to maintain the patents on its technology, which are the key to Stream's potential success. In January 2020, Stream missed payroll at least once. In February, Stream managed to make payroll, but only due to an emergency infusion of capital from Hawk and a short-term loan from another investor. Stream still furloughed numerous employees.

*See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1024 (Del. Ch. 2020), vacated, 279 A.3d 323 (Del. 2022) (the "Chancery PI Opinion").

The Court of Chancery was not alone in its assessment of the mismanagement at the hands of the Rajans. In January 2018, the management team of the Dutch Subsidiaries sent the Rajans a letter of no confidence stating that Stream lacked the strategy, organization, expertise, communication, diversity, professionalism, focus, realistic timelines, and business cooperation necessary to bring Stream's technology to market. *See* Decl. Ex. 1 (the "No Confidence Letter"). Specifically, the No Confidence Letter provides a glimpse into the management style (or lack thereof) of the Dutch Subsidiaries by the Debtors:

1. "With several people throughout the organization there has been a vision since the day we started cooperating. However, we still do not have a strategy that supports that vision."

2. "The monetization implementation plan is still being worked on, although slowly due to the lack of priority."

3. "The various teams around the world are not connected through a communicated and agreed organizational structure. Responsibilities are not defined and consequently accountability is not present."

4.    "By not cooperating nor being organized, the lack of expertise about the Ultra-D technology led to a full stop in the internal discussions between the business side and our technology side of the company."

5.    "The crucial part in a startup is to have focus; know how to cross the chasm to reach market introduction.  So far, there has not been such focus and, consequently, people are jumping into any opportunity."

No Confidence Letter (emphasis added).  In summing up management's frustrations with Stream's leadership, the No Confidence Letter laments:  "It is impossible for the [SCBV] management team to find the right words to describe the madness and the waste of money and time that is the result [of Stream's mismanagement of SCBV]….  Our very strong suggestion is to have the company Stream TV Networks managed by professionals with experience in the tasks that are needed for a successful introduction in the market of our Ultra-D technology."  *Id*.

Due to Stream's poor financial condition, in 2018, Stream was in need of a substantial monetary investment from an institutional investor in order to continue to develop its technology, scale up operations, and start generating revenue.  Stream, however, claimed that the size of its secured debt was scaring off new investors.  For that reason, Hawk entered into a conversion agreement with Stream dated January 29, 2018 (the "Conversion Agreement") pursuant to which the parties agreed to terms by which Stream could convert the then-outstanding portion of the Hawk Debt into equity.  *See* Stay Decl. Ex. E.

Despite having the opportunity raise new funding, Stream failed to do so and ultimately defaulted on the Hawk Notes and the SLS Notes.  The Court of Chancery found that an Event of Default had occurred under the Hawk Notes, the SLS Notes, Security Agreements, and Pledge Agreements, as Stream defaulted on its payments under the Hawk Notes and the SLS Notes by no later than February 2020.  *See Stream TV*, 250 A.3d at 1024.  In addition, Stream defaulted on the Hawk Notes and the SLS Notes by filing for bankruptcy on February 25, 2021, by consenting to an involuntary bankruptcy filed on May 23, 2021, and again by filing the above-captioned

bankruptcy petition (though both 2021 filings were dismissed as bad faith, as discussed further below). Those defaults are outstanding and cannot be cured.

Upon an "Event of Default," the rights granted to Hawk as a secured creditor include, but are not limited to, the right to: (i) order Stream to assemble and marshal the Collateral in anticipation of a sale under Article 9 of the Uniform Commercial Code (an "Article 9 Sale"); (ii) sell the Collateral pursuant to an Article 9 Sale; and (iii) exercise Hawk's proxy rights with respect to the Technovative equity interests in order to exert control over the Collateral by controlling various Subsidiaries of Stream (collectively, the "Secured Creditor Rights").

### D.    The Omnibus Agreement Litigation

Upon the Events of Default under the Hawk Notes and SLS Notes, several parties in interest decided to pursue a "friendly foreclosure" on the Collateral. In May 2020, Stream, its Secured Creditors, and fifty-two of its stockholders (who had brought suit against the Rajans for fraud and breach of fiduciary duty) entered into the Omnibus Agreement. In the Omnibus Agreement, the parties agreed that Stream would transfer all of its assets to a newly formed entity, SeeCubic, Inc. ("SeeCubic"), controlled by Stream's Secured Creditors. In exchange, and upon the satisfaction of certain conditions, the Secured Creditors (*i.e.*, Hawk and SLS) agreed to extinguish their claims against Stream. As part of the arrangement, Stream's minority stockholders received the right to exchange their shares in Stream for shares in SeeCubic, and Stream received the right to one million shares of SeeCubic common stock as well. Stream's outside directors approved the Omnibus Agreement on behalf of Stream. *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1025–26 (Del. Ch. 2020).

The Rajans were involved at various points in these discussions and negotiations surrounding the Omnibus Agreement, and they had even negotiated limited roles for themselves with SeeCubic. After deciding they were unhappy with their proposed treatment under the

arrangement, however, the Rajans changed course, reasserted control over Stream, and in September 2020, Stream filed suit against SeeCubic in the Court of Chancery. *See In re Stream TV Networks, Inc., Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL (Del. Ch. 2020) (the "Omnibus Agreement Litigation"). The Rajans' goal in initiating the Omnibus Agreement Litigation was to invalidate the Omnibus Agreement by any means possible and to reclaim control of the Collateral. During the Omnibus Agreement Litigation, the Court found that such "means," included the Rajans back-dating corporate documents, including a purported May 6, 2020 Shareholder Consent, in an effort to preempt the Omnibus Agreement. *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1026 (Del. Ch. 2020).

**E.     Stream Files the Previous Bankruptcy Actions**

*1.     The Voluntary Bankruptcy Action and VTI*

On February 24, 2021—only days before the Court of Chancery was poised to make a ruling adverse to Stream on a pending motion for summary judgment in the Omnibus Agreement Litigation—Mathu Rajan caused Stream to file a voluntary chapter 11 bankruptcy petition. *See In re Stream TV Networks, Inc.*, Case No. 21-10433-KBO (Bankr. D. Del. Feb. 24, 2021) (hereinafter, the "Voluntary Bankruptcy Action"). The Delaware Bankruptcy Court ultimately dismissed the Voluntary Bankruptcy Action as having been filed in bad faith, yet the Voluntary Bankruptcy Action provides a glimpse into the likely strategy the Debtors plan to implement in the Chapter 11 Cases at bar if left to their own devices. It also serves to highlight the extent of the Rajans' poor judgment and self-serving ambitions in managing the Debtors.

The Rajans' purpose in that prior case was to utilize a newly-formed affiliate of the Rajans to siphon potential investment out of Stream in an effort to manipulate the cases and acquire Stream's assets for a fraction of their actual value. In that vein, only a month before filing the Voluntary Bankruptcy Action, Mathu Rajan formed Visual Technology Innovations, Inc. ("VTI"),

11

an entity which he alone controlled.  *See* May 10, 2021 Hearing Transcript at 63:11–16, *Voluntary Bankruptcy Action* (Bankr. D. Del. May 12, 2021) [ECF No. 194] (the "May 10 Hearing Transcript"); Declaration of Mathu Rajan in Support of First Day Motions, at ¶ 20(b), *Voluntary Bankruptcy Action* (Bankr. D. Del. Mar. 12, 2021) [ECF No. 51] (the "2021 First Day Declaration").  Using VTI, Mathu Rajan intended to solicit investments therein on the basis that VTI could then use the investments to pose as DIP lender to Stream in order to "cherry-pick" Stream's assets at a fraction of their value—likely by VTI credit bidding in a sham sale process.

Damningly, during the months leading up to the filing of the Voluntary Bankruptcy Action, Mathu Rajan was telling potential investors he intended to "move" the Omnibus Agreement Litigation into federal court.  *See* May 10 Hearing Transcript, at 81:22–82:5.  Moreover, on February 8, 2021, only two weeks before commencing the Voluntary Bankruptcy Action, Mathu Rajan sent pitch materials to Burlington Resources ("Burlington") to raise capital for VTI, where he represented that VTI had the "exclusive right" to acquire the assets of Stream.  *Id.* at 142:2–4.  The materials focused on Stream's Ultra-D technology, and the Stock Purchase Agreement included as an attachment that baldly proclaimed:  "Stream has been valued between US $200m - $600m," but "[w]e can acquire the company for a fraction of the value, approximately US $25 million."  *Id.* at 92:18-24; 95:5–9.  Burlington ultimately agreed in principle to the arrangement—conditioned on Stream actually recovering the assets from SeeCubic and with no binding commitments in place.  *See id.* at 161:14–19.

On March 1, 2021, Stream filed a motion seeking approval of debtor-in-possession financing to be provided by VTI, with an initial draw of $200,000 and a total amount of up to $1 million, purportedly on the basis of the funding "committed" by Burlington.  *See* Motion of Stream TV Networks, Inc. for Entry of Order:  (I) Authorizing it to Obtain Post-Petition Financing Pursuant to Sections 363 and 364 of the Bankruptcy Code, (II) Authorizing it to Enter into the

Support Agreement, and (III) Granting Administrative Priority Claims to Lender Pursuant to Section 364 of the Bankruptcy Code and Modifying the Automatic Stay to Implement the Terms of the Order at ¶¶ 1–2, *Voluntary Bankruptcy Action* (Bankr. D. Del. Mar. 1, 2021) [ECF No. 30] (the "DIP Motion"). The Delaware Bankruptcy Court never approved the DIP Motion.

Stream also misrepresented its business prospects. Throughout the Voluntary Bankruptcy Action, Stream represented that it had a relationship with IQH3D, LLC ("IQH3D") and intended to rebuild Stream's business by fulfilling orders for them. On May 10, 2021, the CEO of IQH3D sent Mathu Rajan a cease and desist email stating: "This is to advise that IQH3D has no valid agreement with you and any company you are affiliated with. Please cease to use IQH3D's name in any of your business I will inform the court that we have no agreement and all contracts are null and void." Decl. Ex. 2. Interestingly, in the case at bar, Mathu Rajan has represented to this Court that "IQH3D [and other customers] have all issued letters of intent to purchase additional Ultra-D products when available." Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Chapter 11 Petition, Supporting Emergency Relief, and First Day Motions at ¶ 20 [ECF No. 48] (the "Rajan Declaration"). This statement is patently false.

Judge Owens ultimately dismissed the Voluntary Bankruptcy Case, finding that Stream's bankruptcy filing had no legitimate restructuring purpose, was not motivated by Stream's financial distress, and was ***not*** filed with "the hope of preserving [Stream's] business and maximizing its value for the benefit of its creditors and stakeholders." May 17 Hearing Transcript at 13:5–15, *Voluntary Bankruptcy Action* (Bankr. D. Del. May 17, 2021) [ECF No. 200]; Stay Decl. Ex. J. Instead, the court found that the bankruptcy filing was made in bad faith, for the purpose of directly evading the Court of Chancery's anticipated order:

> [T]he weight of the evidence, including the timing of the filing days before the Chancery Court was to enter a mandatory injunction permanently enjoining [Stream] from laying claim to substantially all

of Stream's assets, indicates that Mr. Rajan's primary purpose for filing this petition was to gain a tactical litigation advantage that is part of a continued pattern of effort to nullify, undermine, and/or interfere with the [O]mnibus [A]greement, vitiate the purpose and effect of the Chancery Court's [December 8, 2020] order, and to maintain ownership and control over the assets of [Stream] for his own benefit.

*Id.* at 13:16–14:1.

Moreover, Judge Owens found that the Rajans attempted to evade their obligations to Stream's Secured Creditors "through machinations that included trying to change the management of the debtor's subsidiaries and attempting to remove prototype technology from a storage facility." *Id.* at 14:5–15. Judge Owens also held "[i]t is clear, through documentary evidence, that Mr. Rajan intended to use a Stream bankruptcy as a mechanism by which he could, via Stream, regain the Ultra-D assets from the secured lenders and then through [another company] obtain them at a fraction of what he believed was the assets' value." *Id.* at 14:12–15.

In conclusion, Judge Owens explained, "Stream did not come to this court as the honest but unfortunate debtor to preserve and maximize value for its stakeholders." *Id.* at 15:14–19. Rather, the Voluntary Bankruptcy Action "was designed to stop SeeCubic and [Stream's] secured creditors from fully implementing [the Omnibus Agreement], to unravel it, and to avoid the Chancery Court's order… I will not permit the bankruptcy process to be used in such a fashion…." *Id.* at 19:12–16; *see also id.* at 19-20 ("[T]o be clear, this case is being dismissed as a result of Stream's attempt to interfere with the Chancery Court's order and the [O]mnibus [A]greement."). Indeed, Stream's and Mr. Rajan's scheme to misuse the bankruptcy court was so brazen that the court declined to enter a stay of its dismissal order, holding that doing so would, "be me acting as complicit in the bad faith filing." *Id.* at 22:10–18.[4]

---

[4] The District Court affirmed Judge Owen's dismissal of the Voluntary Bankruptcy Action on December 16, 2021. *See* Order at ¶ 1, *In re Stream TV Networks, Inc.*, No. 21-00723-RGA (D. Del. Dec. 16, 2021) [ECF No. 32].

2.    *The Involuntary Bankruptcy Action*

Nevertheless, while Stream's appeal of the dismissal of the Voluntary Bankruptcy Action remained pending, on May 23, 2021, three of Stream's unsecured creditors filed an involuntary Chapter 7 bankruptcy petition on Stream's behalf.  *In re Stream TV Networks, Inc.*, No. 21-10848-KBO (Bankr. D. Del. May 23, 2021) (the "Involuntary Bankruptcy Action" and, together with the Voluntary Bankruptcy Action, the "Prior Bankruptcies").[5]  Once again, various parties, including the office of the United States Trustee, moved to dismiss the petitions as having been filed in bad faith.  Tellingly, Stream openly and enthusiastically aligned itself with the petitioning creditors in supporting the involuntary petition.  In doing so, Stream objected to motions to dismiss and encouraged the Delaware Bankruptcy Court to convert the case into a second Chapter 11 case relying on the same proposed plan of reorganization Judge Owens had rejected in the Voluntary Bankruptcy Action.  Stay Decl. Ex. K.[6]

On June 10, 2021, after hearing argument from SeeCubic, the United States Trustee, Stream, and one of the filing unsecured creditors, the court dismissed the Involuntary Bankruptcy Action *and* enjoined Stream from filing any further bankruptcies for 12 months.  *See* Order Granting Emergency Motion of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order

---

[5] The petitioning creditors who filed the Involuntary Bankruptcy Action were Jamuna Travels, Inc., Walsh CHB, Inc., and, Rembrandt 3D Holding Ltd. ("Rembrandt").  It is suspicious, though not surprising, to see that Rembrandt appears to be coordinating its strategy with Stream in these Chapter 11 Cases, as Rembrandt has a tendency to appear when it can be of assistance to Stream.  Rembrandt had been suing Stream for years without executing any settlement. Rembrandt and Stream, however, finally executed a settlement agreement the ***same day*** the petition creditors filed the Involuntary Bankruptcy Action, using that settlement as the basis for Rembrandt's "claim" and its ability to serve as petition creditor.  Rembrandt moved to intervene in the 225 Action, though the Court of Chancery denied that motion.  *See* Stay Decl. Ex. A at Dkt. 60.  Rembrandt is also the only party listed as a creditor of Technovative in the Chapter 11 Cases—though Technovative is a non-operating holding company—and Stream notified Rembrandt of the emergency hearing held before this Court on Thursday, March 16, 2023, despite Rembrandt not being implicated in the relief sought nor a party to the 225 Action.  It appears Rembrandt's claim against Technovative is based on a lawsuit it filed against Technovative a few weeks before the commencement of these Chapter 11 Cases.

[6] SeeCubic's motion to dismiss described the unusual timing and circumstances of the filing of the Chapter 7 petition which strongly suggested that Stream was complicit in its filing.  *See* Emergency Motion of SeeCubic, Inc. and SLS Holdings VI, LLC for an Order Dismissing Involuntary Chapter 7 Case, at ¶¶ 23–26, *Involuntary Bankruptcy Action* (Bankr. D. Del. May 27, 2021) [ECF No. 5] (the "SeeCubic Motion to Dismiss Involuntary Action").

Dismissing Involuntary Chapter 7 Case, *Involuntary Bankruptcy Action* (Bankr. D. Del. Jun. 10, 2021) [ECF No. 36].  In so doing, the court did not mince words: "I thought I made myself clear when I dismissed the Chapter 11 case that I did not expect to see another case until the Chancery Court action was completed and the transfers to SeeCubic were accomplished.  The arguments today do not change my opinion."   June 10 Hearing Transcript at 64:21–65:1, *Involuntary Bankruptcy Action* (Bankr. D. Del. Jun. 11, 2021) [ECF No. 37].  Further:

> [C]onsidering the totality of the facts and circumstances presented, including the arguments that were made by counsel present today and the pleadings submitted and the documents attached thereto, it's clear to me that this proceeding was filed as another attempt by the parties ***to circumvent my dismissal order, gain some sort of litigation leverage over the secured lenders and the disputes in the Chancery Court***, and essentially get another bite of the appl[e] to try and pursue the previously submitted plan and theories that are already considered and rejected in the prior Chapter 11 proceeding.

*Id.* at 63:18–64:6 (emphasis added).

## F.    The Omnibus Agreement Is Invalidated

Once Stream's bad faith detour of the Prior Bankruptcies had concluded, the Court of Chancery entered its final summary judgment order (the "Chancery Summary Judgment Order"), which found that the Omnibus Agreement was valid and permanently enjoined Stream from interfering with its operation.  Stream immediately appealed the Chancery Summary Judgment Order.  Stream's appeal alleged that the Court of Chancery erred in finding the Omnibus Agreement enforceable "because Stream's unambiguous certificate of incorporation … required the approval of Stream's Class B stockholders."  *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 325 (Del. 2022) (hereafter "Stream Supreme Court Opinion").  On appeal, the Delaware Supreme Court overturned the Chancery Summary Judgment Order solely on the narrow legal basis that the Omnibus Agreement itself was not properly authorized on behalf of Stream because the agreement did not have the approval of Stream's Class B stockholders.  *See id.* at 355.  While

the Omnibus Agreement was found invalid, the Delaware Supreme Court adopted the primary

factual findings by the Court of Chancery—that Stream owed Hawk and SLS millions of dollars,

that the Hawk Notes and SLS Notes were secured by valid liens on the Collateral, and that Stream

was in default under such notes. *See id.* at 326–29. Stream, in fact, did not challenge any of those

findings on appeal.

Specifically, the Delaware Supreme Court found that Hawk was a secured creditor of

Stream, and that Stream had pledged "all of its assets" as security for the more than $50 million in

notes that Hawk lent to Stream. *Id.* at 327. The Delaware Supreme Court further found that the

Hawk Notes were executed in conjunction with security agreements that "authorized Hawk to take

control of Stream's assets to satisfy the Hawk Notes if Stream defaulted." *Id*.

On remand, the Delaware Court of Chancery ordered the parties to unwind the Omnibus

Agreement, but affirmed that the Secured Creditor Rights were intact, stating "[t]he court believes

that the [] secured creditors' rights are strong and may well result in Stream having to transfer the

Legacy Stream Assets [*i.e.*, the Collateral] back to SeeCubic in its capacity as Hawk's designee

and agent." *In re Stream TV Networks, Inc. Omnibus Agreement Litig.*, No. 2020-0766-JTL, 2022

WL 4491925, at *4 (Del. Ch. Sept. 28, 2022).

## G.    Enforcement of the Secured Creditor Rights

Upon the Delaware Supreme Court's decision nullifying the Omnibus Agreement, Hawk

began taking steps to secure the Collateral and pursue an Article 9 Sale.

In accordance with the Supreme Court's decision, on August 10, 2022, the Court of

Chancery directed SeeCubic to transfer legal title of the Collateral to Stream in order to fulfill the

Delaware Supreme Court's mandate. The Court of Chancery informed the parties that it

considered the most efficient route to effectuate the turnover of the Collateral to Stream was by

SeeCubic transferring the equity of Technovative to Stream, thereby turning over direct and indirect control of the Subsidiaries and the Collateral.

On September 30, 2022, Hawk received notice that SeeCubic had transferred the Technovative equity back to Stream. That same day, Hawk exercised the Secured Creditor Rights by issuing a Proxy Notice (the "September Proxy Notice"), directing the Technovative equity be registered in Hawk's name as secured creditor. Decl. Ex. 3. Shad Stastney, then the sole director of Technovative, completed the registration of Technovative's equity interests in Hawk's name as required by the Pledge Agreements Stream executed in support of the Hawk Notes.

Once Stream received the September Proxy Notice, it filed an "Emergency Motion for Post-Judgment Enforcement to Vest Shares of Technovative Media, Inc." (the "Emergency Motion") in the Court of Chancery, seeking an order vesting all of Technovative's equity in Stream and enjoining Hawk from taking any further actions to exercise control over such interests. Decl. Ex. 4.

The Court of Chancery granted the Emergency Motion in part, which divested Hawk of the equity interests in Technovative, vested title thereof in Stream, and enjoined Hawk (and other interested parties) from seeking to exercise the Secured Creditor Rights associated with the equity interests in Technovative for ten days (*i.e.*,, expiring on October 17, 2022, at 9:00 a.m.).

## H.    The 225 Action

Accordingly, on October 17, 2022, after expiration of the limited injunction, Hawk issued a new Proxy Notice. Decl. Ex. 5. Hawk further issued a Marshaling Directive to have Stream collect the Collateral to prepare for a sale in order to satisfy the Secured Debt. Stream refused to comply with the Proxy Notice or the Marshaling Directive, claiming that Stream had converted the Hawk Debt into equity pursuant to the Conversion Agreement, that Hawk no longer possessed the Secured Creditor Rights, and that Mathu Rajan was the sole director of Technovative. Decl.

Ex. 6.  That same day, Hawk filed a Complaint in the Delaware Court of Chancery seeking relief

under 8 *Del. C.* § 225—*i.e.*, the Delaware statute specifically tailored to resolve disputes over the

makeup of corporate boards.

     *1.*     *The Receiver and Related Matters*

     On October 20, 2022, the Court of Chancery ordered Technovative to operate according to

the "status quo" (the "Status Quo Order")[7] and appointed the Receiver (the "Receiver Order")[8] to

operate Technovative on a day-to-day basis to ensure compliance therewith.  In explaining the

Court of Chancery's decision in this regard, the Status Quo Order elucidated:

> A Section 225 proceeding is an *in rem* proceeding, because the
> Delaware corporation [*i.e.*, Technovative] is a *res* over which this
> court can exercise jurisdiction….  More precisely, when a Section
> 225 action seeks to adjudicate the status to director and officer
> positions at a Delaware corporation, the director and officer
> positions constitute a *res* over which this court can exercise *in rem*
> jurisdiction….  This court takes jurisdiction over the *res* consisting
> of the director positions at [Technovative].

Status Quo Order, at ¶ 4.  The Status Quo Order further explained that the Court of Chancery

"customarily enters an interim status quo order in a Section 225 proceeding that limits the entity

to operating in the ordinary course of business." *Id.* ¶ 5.

     The next day, on October 21, 2022, the Court of Chancery issued the Receiver Order,

outlining the Receiver's duties and obligations.  Specifically, the Receiver Order charged that the

Receiver "shall use his best efforts, and the authority granted herein, to ensure that [Technovative]

operates in the ordinary course of business and does not take any actions outside of the ordinary

course of business."  Receiver Order, at 3.  The order then outlined the scope of the Receiver's

authority to include "all authority necessary and proper for the fulfillment of his charge," including

---

[7] *See* Stay Decl. Ex. M.
[8] *See* Decl. Ex. **7**.

"all power and authority afforded to the Board under Section 141 of the Delaware General Corporation Law…." *Id.*

Because Technovative has no revenue of its own, SeeCubic—largely via loans from Hawk—has provided the funding to Technovative and the Subsidiaries since the Receiver's appointment pursuant to a promissory note from SCBV.  Under the terms of that promissory note, SCBV has drawn €2,882,119 million.  On March 14, 2023, the Receiver informed the parties that certain tax payments were required, without which SCBV would be unable to continue operating. Decl. Ex. 8.  Payment was made on March 15, so operations could continue.  However, as the Receiver noted in opposing Stream's subsequent motion to postpone the hearing date (discussed below):  "Inadequate and unpredictable funding has hurt SCBV's relationships with suppliers and employees, among causing other problems….  This possibility threatens significant downstream harm for Technovative and SCBV."  Decl. Ex. 9 at 2–3.

Indeed, the funding obligations for SCBV are substantial.  Over the course of the Receiver's control of Technovative, the expenses were approximately €500,000 per month, and such expenses were estimated to be around €750,000 per month for the next few months. Moreover, On March 20, 2023, SCBV received a letter from the local taxing authority, demanding payment of €120,519 (plus accruing interest) in payroll taxes that were outstanding and overdue. *See* Decl. Ex. 10.  If these taxes are not paid promptly, the local taxing authorities can forcibly shut down SCBV's operations.

Although SeeCubic (through Hawk) funded all of the operating expenses to keep Technovative's business running, Stream has funded ***nothing***.  Moreover, upon the appointment of the Receiver, Stream had agreed to pay for the Receiver's expenses.  Notwithstanding Stream's agreement to pay the Receiver's expenses (and Stream's representations to this Court that it has paid such expenses), it failed to do so for months, until Stream was admonished by the Court of

Chancery and ultimately sought SeeCubic to fund half of the amount due.  Because of Stream's

failure to pay the Receiver, the Receiver requested Hawk to pay half of his expenses, which Hawk

has done.[9]  Stream, however, still has not paid all of its one-half share, prompting the Receiver to

lament to the Court of Chancery in a letter dated February 27, 2023:  "Hawk, of the parties before

the Court in this action and the Omnibus Agreement Litigation, has borne the brunt of the expense

of funding SCBV since Hawk filed this action." *Id.* at 3.

Importantly, despite its refusal to pay the Receiver's expenses, the Receiver incurred

substantial expenses at Stream's behest.  For example, during the course of the Receiver's

appointment, Stream requested the return of certain bonding equipment (the "Bonding

Equipment"), which was recently the subject of an emergency motion to enforce the automatic

stay before this Court.  *See* ECF No. 49.  Stream asserted that it required the Bonding Equipment

to fulfill purported orders, but it never produced evidence of such orders to the Receiver, and the

Bonding Equipment is non-operational—requiring maintenance that is anticipated to take several

months to complete.  Thereafter, the Receiver engaged in lengthy negotiations with Hawk and

SeeCubic and ultimately filed a motion to set bond as a condition to turning over the Bonding

Equipment, which Hawk contested due to its past issues with recovering property from the Rajans,

but the Court of Chancery granted on February 4, 2023 (the "Bonding Order").  Decl. Ex. 11.

Under the Bonding Order, Stream was free to recover the Bonding Equipment by posting a

$1.5 million bond, and complying with certain reasonable, common-sense protections for the

assets, including adequate insurance coverage, possession and movement by specialized

technicians, and apprising the Receiver of the Bonding Equipment's ultimate destination.[10]

---

[9] Hawk understands that while Stream did make a payment to the Receiver of approximately $187,000, there remains an outstanding balance on past due amounts of at least $60,000, plus further accruals.  Hawk has satisfied the entirety of its obligations to pay its one-half share of the Receivers' expenses.

[10] Multiple times, Stream represented to the Receiver that Prematec Corporation ("Prematec") held a secured claim against the Bonding Equipment, which Stream claimed was senior in priority to the Secured Creditors' liens.  Hawk

2.    *The Collateral Estoppel Opinion*

On November 13, 2022, Hawk moved for summary judgment on whether Stream defaulted

on the Hawk Notes and sought a ruling that Stream was collaterally estopped from re-litigating

several issues pertinent to the 225 Action.  On November 29, 2022, the Court of Chancery issued

its decision with respect to this question among others.  *See Hawk Inv. Holdings Ltd. v. Stream TV*

*Networks, Inc.*, 2022 WL 17258460, at *2 (Del. Ch. Nov. 29, 2022) (the "Collateral Estoppel

Opinion").   In the Collateral Estoppel Opinion, the Court of Chancery found that Stream was

collaterally estopped from challenging the following findings:

1.    the Hawk Notes are valid and binding obligations of Stream;

2.    Stream is in default under the Hawk Notes;

3.    Hawk may exercise the Secured Creditor Rights—including Hawk's proxy rights;

4.    as of November 10, 2021, the Hawk Notes had not been converted or satisfied; and

5.    any conversion of the Hawk Notes must be supported by "new money" which had not occurred as of November 10, 2021.

*Id.*  The Court of Chancery also found that Hawk had standing to bring the 225 Action both because

Stream conceded it was a shareholder thereof, which satisfied the standing requirements of 8 *Del.*

*C.* § 225, and because Hawk had standing as Collateral Agent under the SeeCubic Security

Agreement to bring an action to enforce the Secured Creditor Rights.[11]  *Id.* at **8–12.

---

disputed the existence of this lien at the time, and notes that the Debtors' schedules list Prematec as an *unsecured claim*.  *See* Schedules E/F, at 3.66 (listing an unsecured claim for the benefit of "Iinuma Gauge Manufacturing Co. Ltd. (JPY)," which was the predecessor of Prematec).

[11] The circumstances surrounding Stream's argument at this point are complex, but, in short, Stream contested Hawk's standing due to certain arrangements between Hawk, SLS, and SeeCubic, whereby Hawk and SLS assigned SeeCubic their rights under the Hawk Notes and SLS Notes in exchange for rights in SeeCubic.  Notwithstanding Stream's arguments, the Court of Chancery ultimately found Hawk had standing to pursue the 225 Action its own name or in SeeCubic's name by virtue of Hawk's position as Collateral Agent on behalf of SeeCubic's secured noteholders, with such rights being triggered by the invalidation of the Omnibus Agreement.  For a more fulsome recitation of this dispute, Hawk directs the Court to the Collateral Estoppel Opinion.

3.    *Stream's "Third-Party" Investors*

In essence, the Collateral Estoppel Opinion proved Hawk's *prima facie* case in the 225

Action and effectively limited the open question in the 225 Action to Stream's affirmative

defenses, which formed the bulk of the parties' discovery and pleadings until the filing of the

petitions. *See Hawk Inv. Holdings Ltd. v. Stream TV Networks, Inc.*, 2022 WL 17258460, at *17

(Del. Ch. Nov. 29, 2022).  Ultimately, however, it became clear that Stream's only real affirmative

defense was to claim that it had converted the Hawk Notes under the Conversion Agreement,

which Stream could only do if it had raised "new money" through investments sufficient to cover

the net amounts funded under the Hawk Notes.

The vast majority of the money Stream claimed to utilize in order to effectuate a conversion

of the Hawk Debt was raised prior to November 10, 2021 (*i.e.*, the date the Court of Chancery set

after which collateral estoppel was no longer binding), and therefore is not available to be used to

support such a conversion.  For the remainder, however, Stream alleged that certain "third parties"

had invested such money in Stream.  Specifically, during discovery Stream produced documents

purporting to demonstrate that VSI, VTI, and Glasses-Free Technologies, Inc. ("GFT" and,

collectively with VSI and VTI, "Rajan Entities")[12] had invested a total of approximately

$12,176,251 in Stream at a price of $75 per share between November 28, 2022 and January 5,

2023.  *See* Decl. Ex. 12 at 274:21-275:1; 281:18-282-7; 286:6-23; 299:10-303:17.  During the

deposition of Mathu Rajan, he confirmed that the Rajan Entities are three entities that he

controlled.  *Id.* at 273:2–4.  Mr. Rajan further claimed that the Rajan Entities "raised money from

---

[12] Although Stream asserted the Rajan Entities invested their money with Stream between November 2022 and January 2023, it appears only VSI is currently active, with GFT having become defunct around August 2021 and VTI becoming defunct around May 2022.

investors [on behalf of Stream], spent the money on Stream expenses, and got shares in Stream TV." *Id.* at 271:24–272:3.

Notwithstanding this testimony, there are several issues with respect to these supposed investments.  First, to date, the evidence Stream produced demonstrates that only approximately $7.5 million total ever cleared the Rajan Entities' bank accounts.  More importantly, however, even if Stream could substantiate such investments to and through the Rajan Entities, it has produced no documentation evidencing that the Rajan Entities expended any of these investments on Stream—no invoices, checks, wire transfers, etc.  There is no detail as to what such Stream expenses were or how Stream accounted for such "investments" on its books (*e.g.*, whether such transactions were documented as investments, loans, etc.).

Second, Mathu Rajan claimed that he utilized the Rajan Entities (rather than Stream) to raise money during this period, because Stream had closed its bank accounts.  Mathu testified that Stream closed its accounts because the Court of Chancery ordered it to do so (which it did not) and because Stream's accounts would have been subject to the Secured Creditors' liens.  *See id.* at 267:15–268:14  Nevertheless, Stream ultimately produced bank statements for Stream's bank account that overlaps with the Rajan Entities' accounts.

Finally, Mathu Rajan admitted that Stream had no basis to support the $75 per share purchase price the Rajan Entities supposedly paid for the shares of Stream, and, instead, Rajan himself set the price at that amount specifically and solely in order to ensure Hawk did not receive too many additional shares in Stream as part of the purported conversion.  *See id.* 283:13–287:3 ("Limit our exposure to Hawk.  We don't want him to get even -- the guy's already got 200 to 300 million shares.").  Additionally, no independent third party even vetted the stock purchase on behalf of the Rajan Entities, as Rajan deputized Joseph Corso (an investor in Stream) with limited

powers of attorney specifically (and solely) to execute the stock purchase agreements. *See id.* at 278:22–279:8; *see also* Decl. Ex. 13 at 81:9–16.

## I.     The Rajans and Their Backers Outline Their New Scheme to Stream Shareholders

Although Stream represented to the Court of Chancery that it raised money through the Rajan Entities on Stream's behalf, communications Stream and its affiliates sent to its investors paint a very different picture.  Instead of raising money for Stream, money is being raised to VSI in order to have VSI take Stream's assets and reconstitute the business under a new entity, outside of the bankruptcy process.  In other words, Stream appears to be going back to its failed playbook from the Prior Bankruptcies—*i.e.*, to raise money into a Rajan Entity and then siphon the Debtors' assets into such entity at a fraction of the assets' actual value.

For example, on March 11, 2023, four days before commencing the bankruptcy cases at bar, Stream communicated with its investors through an email from Marc Dannenberg, a broker working with the Rajans on behalf of Stream and VSI, in which he stated:

> Hey there,
>
> *       *       *       *
>
> Here is the fair warning.
>
> We have been forced into a corner by the Chancery court due to their leniency towards Creditors and the little boy mafia at SeeCubic…. We are not getting a fair shake in Chancery…as shown by both the original ruling which was overturned in the Supreme Court, and the rulings in this current case.  Without saying too much to those who have not signed an NDA, Stream will be taking the necessary steps on Monday to protect all of our subsidiaries.  Not our fault, but the fault of the greedy and stupid [SLS] and Hawk.
>
> We are offering shares of VSI at .03 per share until Thursday, which will also include a 1 for 1 stock swap from Stream to VSI….  You must make a new purchase into VSI shares with new money.  I understand SeeCubic told you the same thing, but they stole the assets they said they had and the Supreme Court of Delaware

ordered them back to us…so in essence you were defrauded by
them, and aided by a highly dubious chancery court decision.

It is what it is.  The whole is worth more than the parts.  You are 100
percent at risk to lose your entire investment made into StreamTV
shares.

Stay Decl. Ex. Q (emphasis added) (the "March 11 Email").  After the Petition Date, an investor

followed up with Dannenberg, requesting additional information about the impact of the

bankruptcy filing.  The following exchange ensued:

Dannenberg:    The equity gets wiped out in Stream.  Stream will continue
to do business with VSI and ***VSI is now the vehicle for all
business***.  We are offering shares of VSI at .03 to existing
shareholders for a limited time.  After that time it will be 1
dollar….

Investor:        So what happens to Stream shares ? [sic]

Dannenberg:    They are wiped out.  We are offering shares of VSI at .03
which would trigger the amount of you Stream shares to
come over as well.

Investor:        So to be clear if I bought one share at 0.03 in VSI you would
transfer one (dissolved) share I have in Stream therefore
buying 2 shares at 0.03 until my Stream shares ( bought at
1.5 ) are allocated ?

Dannenberg:    If you make an investment equaled to 20 percent of your
investment in Stream into VSI at .03 the total amount of your
Stream shares would be gifted to you in the form of VSI
shares.

Decl. Ex. 14 (the "March 18 Emails") (emphasis added).

Moreover, Dannenberg also sought to solicit investments from SeeCubic investors using

the Chapter 11 Cases as a sword rather than a shield.  In seeking to undermine SeeCubic,

Dannenberg blatantly misrepresented the situation and impact of the Chapter 11 Cases in an email

dated March 17, 2023.  *See* Decl. Ex. 15 (the "March 17 Email").  In the March 17 Email,

Dannenberg offers to "talk to you to save your investment [in SeeCubic] before you lose any

chance of saving." *Id.*  Apparently unsatisfied with his reception, on March 21, 2023, Dannenberg

extended the deadline for investors to invest in VSI and "save" their investments, noting:

> Mathu has set a deadline of Thursday close of business to buy shares
> in VSI…. YOU MUST PUT NEW MONEY INTO VSI…. I
> understand all about the past and how some have 0 to show for it…0.
> Get used to that number because you will be seeing it quite a bit on
> your stock statement from SeeCubic.

*See* Decl. Ex. 16.  Disregarding the blatant character attacks against SeeCubic's principal, these

constant emails evidence a clear intent to abandon Stream and turn focus to VSI.

## J.      Stream Files the Current Chapter 11 Cases

That the Chapter 11 Cases were filed in the late evening of March 15, 2023 is no

coincidence.  At that point, the 225 Action was nearly complete—all fact discovery (both written

and witness testimony) was completed, pretrial briefing was submitted, and the pretrial order

accepted.  The last pieces were the pretrial conference scheduled for March 16, 2023, and then a

trial on March 23, 2023.  The parties had gone through six months of hearings and briefing,

thousands of pages of document discovery and numerous depositions.  The Court of Chancery had

already issued orders on collateral estoppel and standing (in addition to a number of discovery

disputes), narrowing the issues for trial, which ultimately amounted to Stream's affirmative

defenses.  The trial itself was to be short, consisting only of oral argument after the parties agreed

that there would be no live testimony.  Decl. Ex. 17.  Stream was bound by the Status Quo Order

from taking action at SCBV or the other Dutch Subsidiaries.  The stage was set to get to final

resolution.  Stream knew that its arguments would ultimately fail, and having already had its

motion to extend the proceedings denied by the Court of Chancery, these Chapter 11 Cases were

filed on the eve of trial.  Decl. Ex. 18.

Once in bankruptcy, Stream's first order of business was not to file motions to continue

any operations or seek standard first day relief, but to file a motion to enforce the automatic stay

in order to halt the pretrial conference, which the Chapter 11 petitions rendered merely a status conference regarding the effect of these Chapter 11 Cases on the 225 Action.[13] Three weeks have now passed from the Petition Date, and these Chapter 11 Cases have not even begun. While the Debtors claim to have pending orders to fulfill, operations to continue, and a need to obtain assets immediately, they have not filed any of the typical motions to allow them to do so—no financing motion, no motion for use of the Secured Creditors' Collateral, no motion to use cash management systems, pay prepetition wages, or pay utilities.[14] Beyond the Debtors' emergency filing in the opening minutes of these Chapter 11 Cases, the only substantive pleading the Debtors have filed as of the date hereof is yet another motion to enforce the automatic stay to obtain control of the Bonding Equipment.[15] Stream has made no attempt to continue operations at SCBV, the sole operating subsidiary or to support any purported operations at Stream (though given prior statements and evidence, Hawk does not believe that there are any operations at Stream). The removal of the Receiver disrupted the only financing mechanism for SCBV to continue operations—*i.e.*, the promissory note by SeeCubic to SCBV—without which it will not survive, harming all stakeholders.

But the Debtors have not been idle. Rather than seek to shore up operations or retake operational control, the Rajans have instead been pressuring employees of SCBV to turn over assets—source code, bonding equipment and others—without even bothering to take the

---

[13] As the Court of Chancery explained after Stream filed its motion to enforce the automatic stay and stop the pretrial conference: "The Receiver has informed me that the defendants have pursued an application with the bankruptcy court to enforce the stay as to the pretrial conference. That was an unnecessary burden on the bankruptcy judge, as I only intended to receive a status update from the parties and confirm that the trial would not go forward. Regardless, in light of the defendants' application, the pre-trial conference is cancelled." 225 Action Dkt. 191.

[14] Although the Debtors filed the Rajan Declaration supposedly in support of "first day" relief, the declaration does not discuss any such potential motions and none have yet been filed.

[15] While Hawk is not a party to the pending motion, it is notable that the Debtors have gone straight to a motion to enforce the automatic stay rather than the typical procedure of a turnover action under Section 542 of the Bankruptcy Code, especially in light of the United States Supreme Court's recent ruling in *City of Chicago v. Fulton*, 141 S. Ct. 585 (2021).

necessary, required steps to do so.  *See* Decl. Ex. 19, at 1.  In fact, as recently as April 6, 2023,

Marc Dannenberg sent another email to SeeCubic stakeholders saying:

> Right now Mat[hu] Rajan is in the Netherlands.  SeeCubic is falling
> apart.  ***By Monday they will cease to exist***.  If you do not believe me
> get in touch with anyone at SeeCubic.  Your SeeCubic investment
> is lost.  If you do want to make money, and a lot of money, with the
> tech you invested in, you should really get in touch with me.  This
> is in your hands, not mine.  Believe me when I tell you this is the
> biggest wealth swing decision you will ever make.

Decl. Ex. 20 (emphasis added).  Thus, Mathu Rajan is currently in the Netherlands seeking to

obtain the Collateral (none of which is part of the Debtors' bankruptcy estates) by amorphous and

inappropriate threats of retribution under the Bankruptcy Code.  Such haphazard threats are

particularly manipulative with respect to foreign workers who are not familiar with the strictures

of the Bankruptcy Code.  These actions demonstrate a continuing pattern of abuse of the automatic

stay and this process and an attempt to circumvent the protections embodied in the Status Quo

Order.

The Debtors' Schedules and Statements of Financial Affairs, which were filed on

March 30, also include several inconsistencies further evidencing that the Debtors have no intent

to seriously and in good faith pursue these Chapter 11 Cases.[16]  First, the information in the

Schedules directly conflicts with the information included in the Petitions filed merely weeks ago.

For example, Stream estimated its assets between $500 million and $1 billion as of the petition

date but lists only approximately $210 million in assets on its Schedules.  Of that $210 million,

over $204 million (or over 97%) are illiquid assets in the form of "intercompany" loans and

receivables and tax attributes.  Moreover, Stream does not even list Hawk as a creditor, despite

having no basis to omit Hawk, and, in fact, the Debtors filed these Chapter 11 Cases specifically

---

[16] This is not meant to be an exhaustive list.  As Hawk continues to review the Debtors' schedules, Hawk expects there
to be more inconsistencies and/or fallacies.

to avoid having the Chancery Court rule against Stream on that exact question.[17]  Finally, and most interestingly, Stream lists the Omnibus Agreement—the Omnibus Agreement pursuant to which Stream purported to transfer all of its assets to SeeCubic, and which the Rajans fought so hard to invalidate and which invalidation is the Debtors' talisman in justifying these Chapter 11 Cases—as an executory contract it intends to *assume*.[18]

## ARGUMENT

As evidenced by the conduct outlined above, the Debtors and their insiders have a shameful history of fraud, dishonesty, gross mismanagement, conflicts of interest, and self-dealing—not to mention an abject abuse of the bankruptcy process.  Fortunately for the Debtors' stakeholders, the Bankruptcy Code does not allow a debtor's principals to blatantly abuse and impugn the integrity of the bankruptcy process, courts, and system.  The Bankruptcy Code and related case law provide for various remedies in precisely this type of situation, including dismissal or conversion of the case or appointment of a chapter 11 trustee.

In short, the Chapter 11 Cases are the paradigmatic examples of cases for which dismissal is justified—the Rajans filed them in bad faith, in an attempt to abscond with the Debtors' assets, and without proper corporate authority for Technovative.  There is no reason these Chapter 11 Cases should remain or that the Debtors should continue enjoying the protections afforded by the Bankruptcy Code.  Nevertheless, Hawk acknowledges that an outright dismissal of the Chapter 11 Cases may not rectify all of the Rajans' misdeeds or alleviate the concerns raised thereby, potentially militating in favor of the Debtors remaining under the supervision of the Bankruptcy Courts.  If the Court determines dismissal is not justified, ample cause nevertheless exists to either

---

[17] Although the Debtors do not list Hawk as being a secured creditor, SLS is listed as a holder of a secured claim.
[18] The Omnibus Agreement is actually listed on Schedule G *three separate times* as a contract to be assumed, so it is unlikely to simply be an error.

convert the Chapter 11 Cases to cases under Chapter 7 or appoint a Chapter 11 trustee to operate

the Debtors during the pendency of the cases.[19]

## A.    Dismissal and Conversion under Section 1112(b) of the Bankruptcy Code

### 1.    *Legal Standard for Dismissal and/or Conversion under Section 1112(b) of the Bankruptcy Code*

#### (i)    Generally

Whether a movant requests dismissal or conversion, the standard provided by the

Bankruptcy Code is the same.  In pertinent part, section 1112(b) of the Bankruptcy Code provides:

> [O]n request of a party in interest, and after notice and a hearing, the
> court *shall* convert a case under this chapter to a case under chapter
> 7 or dismiss a case under this chapter, whichever is in the best
> interests of creditors and the estate, for cause unless the court
> determines that the appointment under section 1104(a) of a trustee
> or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1) (emphasis added).  A request for relief under section 1112(b) must be heard

no later than thirty days after the filing of the relevant motion and must be decided by the Court

no later than 15 days after the commencement of the hearings unless the movant expressly consents

otherwise or "compelling circumstances" prevent the Court from working within those time limits.

*See* U.S.C. § 1112(b)(3).

Accordingly, when a movant requests that the court dismiss or convert a case and

establishes that "cause" for such relief exists by a preponderance of the evidence, a court "shall"

dismiss or convert the case (or appoint a Chapter 11 trustee) depending on which alternative is in

the best interest of the creditors and the estate.  *See In re 1121 Pier Village LLC*, 635 B.R. 127,

137 (Bankr. E.D. Pa. 2022).  Once a movant establishes such cause, the burden shifts to the

---

[19] Moreover, to the extent the Court deems it proper for the Debtors to remain under the supervision of the Bankruptcy
Courts, Hawk would suggest the Court should transfer venue of the Chapter 11 Cases to the District of Delaware to
allow Judge Owens to once again preside over the cases, considering her intimate familiarity with the history of the
parties.

opposing party show why the requested relief would not be in the best interests of the estate and its creditors. *See id.*

If the opposing party fails to carry its burden, the court has a choice of (i) dismissing the case, (ii) converting the case to one under Chapter 7, or (iii) appointing a Chapter 11 trustee under section 1104 of the Bankruptcy Code, "whichever is in the best interest of creditors and the estate." As is relevant here, factors the courts may consider for assessing the best interests of the creditors and estate, include (i) whether the debtor would simply file another case after dismissal, (ii) the ability of the Chapter 7 trustee to reach assets of the debtor for the benefit of creditors, (iii) whether conversion or dismissal would maximize the estate's value as an economic enterprise, and (iv) whether the debtor had engaged in misconduct and the creditors' interests are in need of protection. *See* 7 Collier on Bankruptcy ¶ 1112.04[7].

In addition to the enumerated "causes" provided in the Bankruptcy Code, the Third Circuit has also determined that filing a petition in bad faith provides another basis for dismissal and/or conversion under section 1112(b).  *See 15375 Mem'l Corp. v. BEPCO, L.P. (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618 (3d Cir. 2009) ("Chapter 11 bankruptcy petitions are subject to dismissal under § 1112(b) unless filed in good faith, and the burden is on the bankruptcy petition to establish good faith.").

(ii)      "Cause"

Subpart (b)(4) of section 1112 provides a non-exhaustive list of events constituting such "cause" for the purposes of dismissal or conversion.   In relevant part, this list includes, "(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement of the estate; … [and] (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors …."  11 U.S.C. § 1112(b)(4).

        (a)        Substantial and Continuing Loss without Likelihood of
                      Rehabilitation

Considering whether the debtor has suffered a "substantial or continuing loss to or diminution of the estate and absence of reasonable likelihood of rehabilitation," courts evaluate two issues:  first, whether the debtor has or is continuing to suffer negative cash flows or declining asset values after the commencement of the case; and, second, whether there is a reasonable likelihood that the debtor or another party will be able to stem the debtor's losses and get the debtor back on solid financial footing.  *See Nestor v. Gateway Access Solutions, Inc. (In re Gateway Solutions, Inc.)*, 374 B.R. 556, 562 (Bankr. M.D. Pa. 2007).

Importantly, the loss and/or diminution of asset value prong is inapplicable when a debtor is a holding company.  *In re 3 Ram, Inc.*, 343 B.R. 113, 118 n.14 (Bankr. E.D. Pa. 2006).  Nevertheless, non-operating companies may suffer negative cash flow by accrual of administrative expenses without corresponding income.  *See Loop Corp. v. United States Trustee*, 379 F.3d 511, 516 (8th Cir. 2004) ("In the context of a debtor who has ceased business operations … any negative cash flow—including that resulting only from administrative expenses—effectively comes straight from the pockets of the creditors.  This is enough to satisfy the first element of § [1112(b)(4)(A)]."); *see also In re Alston*, 756 F. App'x 160, 164 (3d Cir. 2019) ("The record fully supports the Bankruptcy Court's conclusion that the value of the estate was diminishing.  In particular, [the debtor] admittedly failed to make post-petition mortgage payments on certain properties, causing unpaid administrative expenses to mount ….").

Additionally, "rehabilitation" of the debtor is different from "reorganization," so a debtor's mere ability to propose a confirmable plan is insufficient to meet this prong of the test, if such plan does not purport to reestablish business operations of the debtor.  *See Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Mem'l Corp.)*, 386 B.R. 548, 552 (Bankr. D. Del. 2008), rev'd on other

grounds, 400 B.R. 420 (D. Del. 2009); *see also Loop Corp.*, 379 F.3d at 515–16 (reasoning that "rehabilitation" means the restoration of a business's viability and liquidation is not the same as rehabilitation).   As such, where a debtor's inability—*or unwillingness*—to propose a viable business plan has been revealed, courts often conclude there little reason to proceed with a reorganization.  *In re Ramreddy, Inc.*, 440 B.R. 103, 115 (E.D. Pa. 2009) ("[W]hen a Chapter 11 debtor has no intention or ability to reorganize or perform its own liquidation or otherwise fulfill pertinent bankruptcy obligations … a debtor [should] not be permitted to remain in bankruptcy simply in order to enjoy the protections of the automatic stay.") (internal citations omitted).

(b)      Gross Mismanagement of the Estate

When evaluating gross mismanagement of the estate, courts may consider prepetition conduct only when such conduct continues post-petition.  "A debtor in possession is vested with significant powers under the provision of the Bankruptcy Code.  As is often the case, those powers come with certain responsibilities.  Significantly, a debtor in possession owes a fiduciary duty to its creditors." *Gateway Access*, 374 B.R. at 565.  As such, mismanagement may include a debtor's management's failure to comply with the requirements of the Bankruptcy Code, including seeking approval of post-petition lending/borrowing, and failure to keep the court and parties in interest apprised of the debtor's operations.  *Domiano v. Domiano (In re Domiano)*, 442 B.R. 97, 105 Bankr. M.D. Pa. 2010) ("Failure of a debtor to properly report income and expenses constitutes evidence of 'gross mismanagement' under § 1112(b)(4)(B)."); *Gateway Access*, 374 B.R. at 566 ("The court finds that entering into unapproved, unauthorized corporate borrowings on 'oral terms' is evidence of gross mismanagement of the estate.").

(c)      Unauthorized Use of Cash Collateral

Finally, a debtor's unauthorized use of cash collateral provides additional grounds for conversion, when such use causes substantial harm to at least one creditor.  A debtor's requirement

to obtain consent and/or authorization as a precondition to use of cash collateral serves as a substantial counterweight to the immediate effect of the automatic stay thwarting creditor's actions to recover such collateral.  7 Collier ¶ 1112.04[6][d].

(d)      Bad Faith

The Third Circuit has identified two elements for a "good faith" bankruptcy filing, "which ensure[] that the Bankruptcy Code's careful balancing of interests is not undermined by the petitioners whose aims are antithetical to the basic purposes of bankruptcy." *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 119 (3d Cir. 2004).  First, the petition must "serve[] a valid bankruptcy purpose." *Id.* at 120; *In re Schaffer*, 597 B.R. 777, 791 (Bankr. E.D. Pa. 2019).  Second, the debtor did not file the bankruptcy "merely to obtain tactical litigation advantage." *See Integrated Telecom*, 384 f.3d at 120; *15375 Mem'l*, 589 F.3d at 605; *Schaffer*, 597 B.R. at 791.  These limitations ensure that the Bankruptcy Code's impact on creditors (*i.e.*, the automatic stay, discharge of debts, avoidance powers, etc.) are justified and exercised for a proper purpose.  *See Integrated Telecom*, 384 F.3d at 120 ("Chapter 11 vests petitioners with considerable powers—the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.—that can impose significant hardship on particular creditors.  When financially troubled petitioners seek a chance to remain in business, the exercise of those powers is justified.  But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code.").

Importantly, when timing of a filing is such that "there can be no doubt that the primary, if not sole purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith.  *15375 Mem'l*, 589 F.3d at 625.  Moreover, filing a petition merely to obtain the benefits of the automatic stay is not a good faith justification to overcome an allegation of bad faith.  *See Integrated Telecom*, 384 F.3d at 128; *In re DCNC North Carolina I, LLC*, 407 B.R. 651,

661 (Bankr. E.D. Pa. 2009). "In fact, 'courts universally demand more of Chapter 11 petitions than a naked desire to stay pending litigation, and any perceived benefit of the automatic stay, without more, cannot convert a bad faith filing into a good faith one.'" *See In re Vascular Access Ctrs., L.P.*, 611 B.R. 742, 762 (Bankr. E.D. Pa. 2020) (quoting *15375 Mem'l Corp.*, 589 F.3d at 620).

Beyond these considerations, courts consider the "totality of the circumstances" in deciding whether a debtor filed its petition in bad faith, including by reference to the following factors:

1.  The debtor has few or no unsecured creditors;

2.  There has been a previous bankruptcy petition by the debtor or a related entity;

3.  The prepetition conduct of the debtor has been improper;

4.  The petition effectively allows the debtor to evade court orders;

5.  There are few debts to non-moving creditors;

6.  The petition was filed on the eve of foreclosure;

7.  The foreclosed property is the sole or major asset of the debtor;

8.  The debtor has no ongoing business or employees;

9.  There is no possibility of reorganization;

10. The debtor's income is not sufficient to operate;

11. There was no pressure from non-moving creditors;

12. Reorganization essentially involves the resolution of a two-party dispute;

13. A corporate debtor was formed and received title to its major assets immediately before the petition; and

14. The debtor filed solely to create the automatic stay.

*See Vascular Access*, 611 B.R. at 762–63 (quoting *DCNC*, 407 B.R. at 662). None of the foregoing factors are dispositive, and the foregoing list is not exhaustive. *See id.* at 763.

2.      *Relief under Section 1112(b) Is Justified in this Case*

36

The facts and circumstances at bar demonstrate ample grounds for the Court to grant relief in the form of dismissal or, if the Court deems it in the best interest of the estate, conversion to Chapter 7.  Specifically, the facts demonstrate that each of the "causes" listed above justifying such relief are present with respect to the Chapter 11 Cases.  First and foremost, the Debtors filed the Chapter 11 Cases in bad faith and are abusing the bankruptcy process in order to gain a litigation advantage over the Secured Creditors as well as a means for the Rajans to improperly abscond with the Debtors assets.  Relatedly, however—and as a result of the Debtors' bad faith filings—the estates are suffering losses/diminution in value with no chance of rehabilitation; the Rajans are grossly mismanaging the Debtors' estates; and the Debtors are using (or inevitably will use) the Secured Creditors' cash collateral and are seeking to use other items of Collateral without authorization or adequate protection.

(i)     <u>The Debtors Filed the Chapter 11 Cases in Bad Faith</u>

The facts and circumstances surrounding the filing of the Chapter 11 Cases show that the Debtors filed the Chapter 11 Cases in bad faith.  The Supreme Court of the United States has observed that chapter 11 embraces "two recognized principles [of] preserving going concerns and maximizing property available to satisfy creditors."  *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 435 (1999).  The Debtors' pre- and post-petition conduct (as directed by the Rajans) has demonstrated that they are uninterested in pursuing either of these principles in the Chapter 11 Cases.  Instead, the Rajans are wielding the Chapter 11 process as an improper litigation tactic and as a means of pursuing their own personal gain by seeking to abscond with the Debtors' assets without paying valid creditors who provided the large majority of the funding to develop the technology.

Stated bluntly, the Debtors commenced these Chapter 11 Cases as a bad faith litigation tactic in order to avoid an anticipated adverse ruling in the 225 Action.  They admit as much in

statements to investors, and even in the Rajan Declaration filed in these Chapter 11 Cases. *See* March 11 Email (admitting the Debtors commenced these cases because they were "forced into a corner by the Chancery court due to their [sic] leniency towards Creditors…. We are not getting a fair shake in Chancery…. "); Rajan Declaration, ¶¶ 90–94 (explaining, in relevant part, that the "Chancery Court … has allowed [the Secured Creditors, SeeCubic, and Stastney] to unlawfully seize, retain, and use the Debtor's assets…. The irreparable harm has necessitated the Debtor and its primary subsidiary, TechnoVative USA, seek chapter 11 relief"). But even outside those express statements, the Debtors' actions show this intent. This is the third time Stream has filed for bankruptcy on the eve of a hearing or dispositive order in litigation—with the previous two cases dismissed as bad faith. As with the Prior Bankruptcies, the Debtors filed these Chapter 11 Cases just five days before trial in the 225 Action, after discovery had concluded and opening briefs had been filed, and on the day of the pre-trial conference which they then scheduled an emergency motion to stay. There is a continuing pattern of bad faith bankruptcy filings on the eve of adverse court decisions as a litigation tactic. This is the exact type of abusive filing the Third Circuit has expressly disclaimed. *See 15375 Mem'l*, 589 F.3d at 605; *Schaffer*, 597 B.R. at 791.

   As further evidence that the Debtors are using the Chapter 11 Cases merely as a bad faith litigation tactic, they have done nothing since the commencement of the cases to preserve their assets. To date, the Debtors have filed none of the proverbial "first day" motions that should be necessary to support a case with assets between $500 million and $1 billion, according to the Petition (or even $210 million according to their Schedules). They have not sought financing to fund the Chapter 11 Cases, have not provided insurance to protect the value of the assets of the estates, and have not sought authority to use cash collateral, to use cash management systems, or to pay and retain a single employee or officer. In essence, the petitions are shams and do not even

comport with the Debtors' own Schedules which reveal that they have less than $3000 in a bank account.

Instead, the Debtors have only sought to create and impose the automatic stay, which, by itself does not establish a "good faith" basis for filing a petition.  *See Vascular Access*, 611 B.R. at 762; *Integrated Telecom*, 384 F.3d at 128.  The Debtors' only filings to date have requested the stay of the 225 Action and enforcement of the stay to recover the Bonding Equipment—without any evidence that the Debtors can provide adequate protection to the Secured Creditors for use of the Bonding Equipment, including appropriate insurance.  The Debtors have also been focused on harassing SCBV and its employees for turnover of the Bonding Equipment and other assets owned or held by SCBV[20] without proper procedures, and Mr. Rajan is *currently* in the Netherlands attempting to do so and anticipating he will have ransacked the business by the end of the weekend.  In effect, the Debtors are using the automatic stay as a sword to accomplish the Rajans' goal of pausing the 225 Action and obtaining control of the assets, unburdened by the Status Quo and Receiver Orders, while they strategize a way to remove the assets from the estates and into the Rajan Entities rather than legitimately taking steps to reorganize.

Notwithstanding that the foregoing representations and past history establish that the Debtors filed these cases in bad faith, the "totality of the circumstances" also demonstrates the Debtors' bad faith.  Specifically, of the fourteen factors courts consider in the Eastern District of Pennsylvania, *eleven* of the factors militate in favor of finding bad faith:

1.   Stream has filed *two* previous bankruptcies within the past three years, both of which were dismissed for having been filed in bad faith.

2.   As detailed below, the Debtors' prepetition conduct has been not only improper but egregious, including:  backdating corporate documents, filing (or acquiescing to)

---

[20] While not the subject of this proceeding, it is dubious that source code or other assets pertaining to the technology would belong to Stream directly, as based on the intellectual property portfolio put forth by the Debtors, Stream does not own any of the intellectual property directly.  *See* Rajan Declaration, at ¶ 10 (referring to the "patent portfolio" as being "[h]eld by one of the Debtor's subsidiary companies").

two separate bad faith bankruptcy filings as improper litigation tactics, lying directly to the Court of Chancery and Receiver, and conspiring to siphon assets to a newly-created, Rajan Entity.

3.    The petitions have allowed the Debtors to evade several orders of the Court of Chancery, including the Status Quo Order, the Receiver Order, the Bonding Order, the Collateral Estoppel Opinion, and the pretrial order the parties had recently collaboratively filed.

4.    Compared to the Secured Creditors' debts, there are relatively few other debts, nearly all of which are unsecured claims, for which the Debtors' allege in their Schedules and Statements of Financial Affairs that they would have no issue satisfying.

5.    The Debtors filed the petitions on the eve of foreclosure, as the Petition Date was merely days before the Court of Chancery trial on the 225 Action, which would have likely determined that the Secured Creditors' exercise of remedies in October 2022 was valid.

6.    As the operating assets sit at the Dutch Subsidiaries of Technovative, success in the 225 Action would constitute an exercise of remedies on substantially all of the Debtors' assets.

7.    There is no possibility of reorganization, as (i) the Debtors themselves have no ongoing operations, and the operating subsidiaries are not within the United States, (ii) the Subsidiaries are being starved of cash and will soon be forced to cease operations, and (iii) the Debtors are not pursuing a reorganization and instead appear only interested in pursuing a liquidation of their assets to a Rajan Entity.

8.    The Debtors and their Subsidiaries generate no income, as a result of the failure to create a viable product during more than 10 years of operation under Stream's control.  Furthermore, SeeCubic/Hawk have been funding the Subsidiaries since the placement of the Receiver, and Stream has demonstrated no ability to do so on its own.

9.    As far as the Secured Creditors are aware, no other creditors are pursuing the Debtors.[21]

10.    The Chapter 11 Cases effectively are a "two-party dispute," as the Debtors commenced the cases solely to avoid their obligations with respect to the Secured Debts.

---

[21] While Rembrandt has appeared in these cases, thus far Rembrandt has not been pursuing the Debtors, but instead has been pursuing the Secured Creditors.

11.    As noted above, the only other purpose in instituting the Chapter 11 Cases was to obtain the protections of the automatic stay, as demonstrated by the Debtors' only substantive pleadings thus far in the case being motions to enforce such protections.

*See Vascular Access*, 611 B.R. at 762–63; *DCNC*, 407 B.R. at 662.

Accordingly, the Rajans have initiated the Chapter 11 Cases in bad faith—at best, in order merely to obtain a tactical litigation advantage and employ the protections of the automatic stay, and, at worst, in an attempt to pilfer the Debtors' assets and abscond with them for a fraction of their value in order to defraud the Secured Creditors.  This Court should not allow the Debtors to so abuse the process and, accordingly, should order dismissal or conversion of the cases to ones under Chapter 7.

(i)      The Debtors' Estates Are Suffering Losses and/or Diminished Value with No Prospect of Rehabilitation

In addition to the Rajans' obvious bad faith in initiating the Chapter 11 Cases, "cause" also exists under section 1112(b) because the Debtors' estates are suffering losses and diminution to their values, without a reasonable likelihood of rehabilitation for either of the Debtors.  *See* 11 U.S.C. § 1112(b)(4)(A).

First, neither of the Debtors generate any revenue as neither are operating entities, yet they are incurring additional costs daily.  In addition to fees related to the administration of the Chapter 11 Cases and additional interest accruing on the Secured Debt, the Debtors are also incurring additional debts at the Subsidiaries in the amount of approximately €750,000 per month in the form of wages, taxes, and other obligations.  The Debtors are both holding companies with no revenue, and the Subsidiaries are pre-revenue enterprises with no cash flow.  Although SeeCubic and Hawk have borne the burden of paying the Subsidiaries' expenses in the past, because the Chapter 11 Cases have ousted the Receiver, they have no mechanism (or desire) to advance such expenses going forward.

41

This situation alone is sufficient to establish the first prong of Section 1112(b)(4)(A). *See Loop*, 379 F.3d at 516; *Alston*, 756 F. App'x at 164. However, if the Debtors fail to pay the Subsidiaries' expenses, the impact on the estates will be swift and catastrophic. Whether the Subsidiaries' employees quit due to missed payroll or the Dutch authorities shut down the enterprise for failure to pay their periodic tax obligations, a failure to pay these expenses would destroy the value of the Secured Creditors' Collateral. As explained above, the primary value in the business is the intellectual property as well as the human capital represented by the employees at the Dutch Subsidiaries conducting the research, so any action (or inaction) that harms such aspects of the business is unacceptable and irreparably harms the Secured Creditors' ability to recover on their Collateral. Nevertheless, because the Debtors have yet to seek any first day relief, they have no authority to obtain post-petition financing in order to fund the Subsidiaries' operations or to utilize cash collateral to do so.

To make matters worse, in Stream's Schedules, it listed its second largest asset as intercompany receivables from several of the Subsidiaries. Without conceding such amounts actually constitute "receivables," any failure to fund the Subsidiaries, and resulting harm from such failure, will mean the subsidiaries will have a reduced ability to repay such amounts. Thus, any harm to the Subsidiaries caused by the Debtors' failure to act and obtain funding for them will have a direct, negative impact on one of Stream's largest assets. In short, it appears the Debtors have completely disregarded the Subsidiaries in order to pursue their bad faith strategy in filing the Chapter 11 Cases.[22] At the end of the day, so long as they are able to obtain the intellectual

---

[22] Considering the Debtors' apparent strategy of purchasing the Debtors' assets at a discount, it is possible that insufficiently funding the Subsidiaries is a feature—without funding, the Subsidiaries will devalue, so they can be bought at an even larger discount. Even if this is the Debtors' strategy, however, the Secured Creditors retain the ability to credit bid for the Collateral as well, and they should not be allowed to devalue the Secured Creditors' Collateral.

property housed at the Dutch Subsidiaries for a discount, however, their ploy will have been successful.

Second, the Debtors also have no realistic prospect of rehabilitation. Beyond the Debtors' mere failure to pursue a reorganization thus far, "rehabilitation" requires more than merely confirming a liquidating plan or pursuing a sale of the Debtors' assets—it requires the Debtors to continue operating into the future. *See 15375 Mem'l* 386 B.R. at 552; *Loop Corp.*, 379 F.3d at 515–16. What such operations may be remains a mystery considering both of the Debtors are holding companies with no current operations, but until they file a business plan demonstrating the ability to operate in the future, no ability to rehabilitate seems possible.

Indeed, it does not appear the Debtors even anticipate pursuing a reorganization—let alone a rehabilitation—of the ongoing business conducted at the Subsidiaries. Instead, it appears the Rajans anticipate employing a similar strategy they sought to utilize in the Voluntary Bankruptcy Action—namely, to use an affiliated entity as a DIP lender to credit bid for the Debtors' assets as an artificially decreased price. As Marc Dannenberg has succinctly explained, the Debtors' current plans are for the shares of the Debtors to be "wiped out" and "*VSI is now the vehicle for all business.*" *See* March 18 Emails (emphasis added). The only contact the Debtors' appear to have with the subsidiaries is with respect to attempting to improperly seize control of SCBV's property, including the Bonding Equipment and others. *See* Decl. Ex. 19, at 1. In essence, the Rajans plan to pilfer the Subsidiaries' valuable assets at a diminished price in order to leave the Secured Creditors and the Secured Debt with the defunct Debtors. Indeed, Mr. Rajan is in the Netherlands *at this very instant* seeking to have completed his pillaging of SCBV by no later than Monday in pursuit of this goal. *See* Decl. Ex. 20. Nevertheless, an asset sale is not a "rehabilitation" of the Debtors sufficient for the purposes of section 1112(b)(4)(A).

*See Ramreddy*, 440 B.R. at 115.  Accordingly, cause exists under section 1112(b)(4)(A) of the Bankruptcy Code for the Court to order the dismissal or conversion of these Chapter 11 Cases.

(ii)    <u>The Rajans Are Grossly Mismanaging the Debtors' Estates</u>

Moreover, cause also exists under section 1112(b)(4)(B) of the Bankruptcy Code to dismiss or convert the Chapter 11 Cases based on the Rajans' gross mismanagement of the Debtors' estates.  Although the Debtors have only been in bankruptcy for a few weeks, the Rajans' priorities in the Chapter 11 Cases (as elucidated by the Debtors' actions thus far undertaken) demonstrate their inability to manage the Debtors' estates as fiduciaries of the Debtors' creditors.

Specifically, upon the Debtors' commencement of the Chapter 11 Cases, the Debtors owe fiduciary duties to their creditors to maintain the assets in the Debtors' estate for the creditors' benefit.  *Gateway Access*, 374 B.R. at 565.  Notwithstanding these fiduciary obligations, it appears the Debtors have completely forgotten about the need to protect the value of the Secured Creditors' Collateral and fund the Subsidiaries.  Indeed, every day that passes is another day of expenses accruing at the Subsidiaries—taxes are due monthly, payroll must be funded in the coming days, etc.  *See* Decl. Ex. 10.  Instead of arranging for funding of the Subsidiaries, the Debtors are willing to let them die on the vine, despite the fact that they hold the only real value in the Debtors' entire corporate enterprise.  Without any funding in place, the Subsidiaries, underlying technology, and, as a result, the Debtors' estates, will lose all value.  Once again, the only contact the Debtors have had with the Subsidiaries was to seek to obtain the Bonding Equipment—equipment the Debtors had the opportunity to obtain since January so long as they provided evidence of insurance and other reasonable "adequate protection" required by the Receiver and the Court of Chancery in the Bonding Order.  There is no worse mismanagement nor greater breach of fiduciary duties than a complete sacrifice of the value of the estates' assets in order to stop management from losing control of the assets—scorched earth, indeed.

The Rajans' tenure managing Stream resulted in more than ten years of development on a product that never reached market, defaults on tens of millions of dollars of secured debt obligations, failure to fund payroll on multiple occasions, two previously failed bankruptcy filings, forged corporate documents, a No Confidence Letter from management of the Dutch Subsidiaries, and the failure to protect their interest in the intellectual property that forms the basis for the entire enterprise.  Indeed, the hasty and imprudent decision to file for yet another bankruptcy on the eve of litigation demonstrates that the Rajans have not changed their ways and are too irresponsible to be trusted with the management of these Chapter 11 Cases going forward.

Instead, in order to ensure the management and oversight of the Debtors' bankruptcy cases are proper, the Court should either dismiss the cases and allow the Secured Creditors to obtain relief in the 225 Action or convert the Chapter 11 Cases to cases under Chapter 7 to allow an impartial third party to make decisions for the benefit of all constituencies and not just the Debtors' insiders.

(iii)  The Debtors are Using the Secured Creditors' Cash Collateral without<br>Authorization Causing the Secured Creditors Substantial Harm

Finally, cause exists to grant Hawk's relief under section 1112(b) because the Debtors do not have authority to use the Secured Creditors' cash collateral.  As discussed, the Debtors are pure holding companies with no income, controlling subsidiaries that also have not returned any income and still have a product that has yet to be monetized.  With no cash coming into the estate by operations, absent a motion to obtain post-petition financing on file, the Secured Creditors' cash collateral appears to be the only source of funding for Debtors to sustain not only the Chapter 11 Cases expenses but also the business and operations of the Subsidiaries.

To date, the Debtors have had no substantive contact with the Secured Creditors about the future of these Chapter 11 Cases.  The emails sent for the improper fundraising efforts suggest that

the Debtors have abandoned the Debtors and, instead, are pursuing fundraising in the Rajan

Entities that are beyond the Secured Creditors' security interest and not subject to the Court's

permission to use cash collateral.  To the extent the Debtors have used, or plan to use, any cash

collateral or cash that they hold in undisclosed affiliated accounts without Court permission, this

alone requires this Court to convert the cases to Chapter 7.  To the extent the Debtors have

somehow obtained funding to continue their "operations," it would appear such funding has been

"off the books" which courts in Pennsylvania have determined to be grounds for conversion.  *See*

*Gateway Access*, 374 B.R. at 566 (determining that unauthorized, oral postpetition financing

arrangements were a basis for conversion/dismissal).

      3.      *The Court Should Dismiss Rather than Convert the Chapter 11 Cases*

Despite the likelihood of continued abuses by the Rajans, dismissal—rather than

conversion—of the Chapter 11 Cases is proper in the case at bar.  Of the factors courts consider in

weighing whether to grant conversion or dismissal, only one of the four militates in favor of

conversion—protection of creditors.  Conversely, each of the other considerations, favor dismissal,

as (a) dismissal *with prejudice* (as discussed below) would alleviate any concerns of the Debtors

refiling; (b) there are no estate assets to pursue considering the Debtors are non-operational

entities; and (c) the estates will not be affected by either conversion or dismissal as both options

will likely conclude with a sale of the Debtors' equity in the Subsidiaries.

Although Hawk acknowledges that there is an appreciable risk to creditors that the Rajans

continue down the path of dilatory litigation tactics and otherwise contemptable behavior, the

possibilities of such behavior continuing in the future were diminishing with each passing day of

the 225 Action.  As of the Petition Date, the Debtors were backed into a corner, and the Secured

Creditors were poised to prevail—indeed, if the Debtors believed they had any satisfactory

defenses, they would not have filed the Chapter 11 Cases to derail the litigation.  Once the Court

of Chancery rules in the 225 Action, however, the Secured Creditors will be in a position to finally

conclude the saga of Stream TV Networks once and for all, and the Rajans will have lost their

means to obstruct any further.

4.      *Dismissal Should Be with Prejudice under Sections 105(a) 349(a)*

Considering dismissal with prejudice, section 349(a) of the Bankruptcy Code provides:

> Unless the court, *for cause*, orders otherwise, the dismissal of a case
> under this title does not bar a discharge, in a later case under this
> title, of debts that were dischargeable in the case dismissed; nor does
> the dismissal of a case under this title prejudice the debtor with
> regard to the filing of a subsequent petition under this title….

11 U.S.C. § 349(a) (emphasis added).   Moreover, section 105(a) of the Bankruptcy Code

authorizes the court to "tak[e] any action or mak[e] any determination necessary or appropriate to

enforce or implement court orders or rules, or *to prevent an abuse of process*.  11 U.S.C. § 105(a)

(emphasis added).

Taken together, sections 105(a) and 349(a) empower a bankruptcy court to dismiss a

debtor's chapter 11 case with prejudice and proscribe subsequent filings where the debtor has

commenced its bankruptcy case for an improper purpose or in bad faith.  *See Casse v. Key Bank

Nat'l Assoc. (In re Casse)*, 198 F.3d 327, 336 (2d Cir. 1999); *see also In re Real Veba Trust*, 529

B.R. 839, 844 (E.D. Pa. 2015) ("[I]n certain circumstances when there is 'cause,' a court may

dismiss a bankruptcy petition with prejudice to the refiling of a subsequent petition."); *In re Stream

TV Networks, Inc.*, No. 21-10848 (KBO) (Bankr. D. Del. June 10, 2021) [ECF No. 36] (granting

dismissal with prejudice and prohibiting Stream from filing another petition for one year from the

date of the order).

Here, if the Court determines that dismissal is the appropriate outcome, such dismissal

should be with prejudice and include a prohibition on commencing a subsequent case for each of

the Debtors for *at least* one year from the date of dismissal.  As noted above, this is the third

bankruptcy case initiated by the Rajans in order to frustrate honest litigation efforts against Stream, and even after the filing prohibition imposed by Judge Owens in the Involuntary Bankruptcy Action, they still have not learned their lesson.  The Rajans have demonstrated a brazen disrespect of the bankruptcy process, and the Court should take reasonable steps to ensure that such disrespect is curbed in the future.

5.      *The Rajans Did Not Have the Corporate Authority to Commence Technovative's Chapter 11 Case*

In addition to the foregoing "cause" and "bad faith" bases for dismissing the Debtors' Chapter 11 Cases, the Court should also dismiss Technovative's case specifically because Mr. Rajan did not possess corporate authority to file the petition.

It is black letter law that state law determines which persons are authorized to place a corporation into bankruptcy.  *See, e.g.*, *Keenihan v. Heritage Press, Inc.*, 19 F.3d 1255, 1258 (8th Cir. 1994) (citing *Price v. Gurney*, 324 U.S. 100, 106 (1945)) ("A person filing a voluntary bankruptcy petition on a corporation's behalf must be authorized to do so, and the authorization must derive from state law."); *In re Am. Globus Corp.*, 195 B.R. 263, 265 (Bankr. S.D.N.Y. 1996) ("[T]he Bankruptcy Code does not establish what the internal requisites are for the initiation of a voluntary corporate bankruptcy proceeding.  It is therefore appropriate to apply ... [the law] of the state in which the Court sits regarding such requirements.").  It is also axiomatic that in Delaware, "[t]he business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors."  8 *Del. C.* § 141; *see also United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, No. 404, 2020, 2021 WL 4344361 (Del. Sept. 23, 2021) ("A cardinal precept of Delaware law is that directors, rather than shareholders, manage the business and affairs of the corporation.") (internal quotations omitted).

Finally, it is also well established that the Board of Directors of a corporation must authorize a bankruptcy filing. *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981) ("Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del. C.* § 141(a)."); *In re Fedders N. Am., Inc.*, 405 B.R. 527, 542 (Bankr. D. Del. 2009) ("[T]he decision whether to file for bankruptcy protection or not is generally a matter of directors' business judgment."); *In re Beck Rumbaugh Assocs.*, Inc., 49 B.R. 920, 921 (Bankr. E.D. Pa. 1985) ("It has long been held that the president of a corporation cannot, without authority or ratification of the board of directors, institute voluntary bankruptcy proceedings on behalf of the corporation."); *In re Moni–Stat, Inc.,* 84 B.R. 756, 757 (Bankr. D. Kan. 1988) ("[T]he law is clear that the decision of whether [or] not a corporation should file bankruptcy is a business decision to be made only by the board of directors."); *see also generally* 9A Am.Jur.2d Bankruptcy § 894 (2009) ("The authority to file a bankruptcy petition generally rests with the corporation's board of directors….").

In initiating the Chapter 11 Cases, Mathu Rajan purported to have the authority to place Technovative into bankruptcy as a Director of Technovative. *See* ECF Doc. No. 1. But Hawk, Stream, and Technovative were litigating, in the 225 Action, the precise question of whether Technovative's sole director was Mathu Rajan, or if Mathu Rajan had been displaced by Mr. Stastney. If Hawk prevails in the 225 Action, the Court of Chancery would order that the October 17, 2022, Proxy Notice (and a related Shareholder Consent appointing Mr. Stastney to the Board) were valid, and that Mathu Rajan had been removed as Director as of that date.

Precisely because there was uncertainty regarding who was the director of Technovative, the Court of Chancery appointed Ian Liston as Receiver of Technovative pending the litigation. The Court of Chancery "empowered the Receiver with (i) all of the power and authority afforded

to the board of directors of the Company (the 'Board') under Section 141 of the Delaware General Corporation Law." *See* Decl. Ex. 7; *see also* Stay Decl. Ex. M ("This court takes jurisdiction over the *res* consisting of the director positions at the Company.").  The Court of Chancery ordered the Receiver to operate the company in the "ordinary course of business," and stated that Technovative, "may not take any of the following actions … and the parties and anyone acting in conjunction with them are enjoined from taking or purporting to cause [Technovative] to take any of the following: … (n) filing a bankruptcy petition …."  Stay Decl. Ex. M.

The Court of Chancery, in other words, expressly installed the Receiver in the place of Technovative's directors, and granted all of the "power and authority afforded to the board of directors" to the Receiver.  Such grant of authority included the power and authority to file a bankruptcy petition on behalf of Technovative as otherwise allowed under Delaware law. Accordingly, notwithstanding the arguments lodged in the 225 Action, Mathu Rajan ceased to be a Director of Technovative no later than the moment that the Court of Chancery entered the Status Quo Order on October 20, 2022, which appointed the Receiver.  *See* Stay Decl. Ex. M ("The appointment of the Receiver displaces the ability of the parties to cause [Technovative] to take actions outside of the ordinary course of business.").  Furthermore, the Court of Chancery expressly ordered that the parties and anyone acting in conjunction with them—which clearly includes Mathu Rajan—could not cause Technovative to file a bankruptcy petition. Notwithstanding those clear court orders, Mathu Rajan purported to do so anyway.

It is well established that lack of authority to commence a bankruptcy case constitutes cause for dismissal. *See In re ComScape Telecommunications, Inc.*, 423 B.R. 816, 829–30 (Bankr. S.D. Ohio 2010) (citations omitted).  However, dismissal of the petition here is mandatory because where a court "finds that those who purport to act on behalf of the corporation have not been granted authority by local law to institute the proceedings, it has no alternative but to dismiss the

petition." *Id*. (citing *Price v. Gurney*, 324 U.S. 100, 106 (1945)); *In re Franchise Servs. of N. Am.,*

*Inc.*, No. 1702316EE, 2018 WL 485959, at *6 (Bankr. S.D. Miss. Jan. 17, 2018), *aff'd*, 891 F.3d

198 (5th Cir. 2018), *as revise*d (June 14, 2018) ("If the corporate authority to file bankruptcy is

lacking, the bankruptcy court does not acquire jurisdiction, and the case must be dismissed.").

Mathu Rajan, as a former Director of Technovative that was displaced by the Court of Chancery's

Status Quo Order and Receiver Order, no longer had the corporate authority to initiate a voluntary

bankruptcy proceeding on behalf of Technovative.   Therefore, the bankruptcy petition filed on

behalf of Technovative must be dismissed.

**B.**     **Appointment of a Chapter 11 Trustee under Section 1104 of the Bankruptcy Code**

As delineated above, Hawk has demonstrated that cause exists for the Court to dismiss or

convert the Chapter 11 Cases pursuant to section 1112(b) of the Bankruptcy Code.   Having

demonstrated cause thereunder, section 1112(b) provides that Hawk has also demonstrated cause

for appointment of a Chapter 11 trustee if the Court deems such appointment in the best interest

of creditors and the Debtors' estates.   *See* 11 U.S.C. § 1112(b)(1); *see also In re Morningstar*

*Marketplace, Ltd.*, 544 B.R. 297, 304 (Bankr. M.D. Pa. 2016).   Alternatively, if the Court finds

that Hawk has not carried its burden under section 1112(b), there remains an independent basis

under section 1104 for the Court to order the appointment of a Chapter 11 trustee in these Chapter

11 Cases.

1.     *Legal Standard for Appointment of a Chapter 11 Trustee under Section 1104 of*
      *the Bankruptcy Code*

Section 1104 of the Bankruptcy Code governs the appointment of a Chapter 11 trustee.

Section 1104(a) provides that a court, after notice and a hearing:

> **shall** order the appointment of a trustee—
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross
> mismanagement of the affairs of the debtor by current management,

> either before or after the commencement of the case, or similar
> cause … or
>
> (2) if such appointment is in the interest of creditors, any equity
> security holders, and other interests of the estate, without regard to
> the number of holders of securities of the debtor or the amount of
> assets or liabilities other debtor.

11 U.S.C. § 1104(a) (emphasis added).  Within the Third Circuit, the movant bears the burden of establishing the need for appointment of a Chapter 11 trustee by clear and convincing evidence. *See In re Marvel Entertainment Grp., Inc.*, 140 F.3d 463, 473 (3d Cir. 1998); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989).  Ultimately, once the movant has met this burden, however, the Court must appoint a trustee.  *See Marvel*, 140 F.3d at 471; *Sharon Steel*, 871 F.2d at 1225–26.

Whether cause exists based on the existence of fraud, dishonesty, and incompetence of a debtor's management requires a fact-intensive analysis of management's behavior.  *See In re Ancona*, No. 14-10532, 2016 WL 7868696, at *9 (Bankr. S.D.N.Y. Nov. 30, 2016).  As such, there are no specific facts necessary to establish fraud, dishonesty, and incompetence and instead the courts consider the entirety of the facts and circumstances of the situation, including pre- and post-petition conduct.  *See id.* ("A court may consider both pre- and post-petition misconduct of the current management when making the determination of whether cause' exists under section 1104(a)(1).").

With respect to what constitutes "gross mismanagement," the standards are similar to those for mismanagement under section 1112(b) noted above, however, the mismanagement may relate to either prepetition or post-petition mismanagement of the debtors' affairs.  *See Sharon Steel*, 871 F.2d at 1227–28 (considering both pre- and post-petition conduct of the debtors' management).  In general, gross mismanagement exists when the actions of management "raise[] grave questions about current management's ability to fulfill its fiduciary duty as debtor-in-possession to [the

debtor's] creditors." *Id.* at 1228.  For example, courts within the Third Circuit have appointed a

chapter 11 trustee when management "engaged on the eve of bankruptcy in a systemic syphoning

of [the debtor's] assets to other companies under common control," failed to stymie operating

losses during the pendency of a bankruptcy proceeding, and appeared to be too conflicted to be

trusted to investigate potential improper transactions with affiliates.  *See id.*

Additionally, however, the factors included in section 1104(a)(1) are not exhaustive, and

courts have also found that "cause" exists for appointment of a trustee in other situations as well.

Specifically, in considering when such other "cause" exists, courts consider:

> [1] conflicts of interest, including inappropriate relations between
> corporate parents and the subsidiaries; [2] misuse of assets and
> funds; [3] inadequate recordkeeping and reporting; [4] nonfiling of
> required documents, including lack of adequate disclosure; [5] lack
> of appropriate cost controls; [6] various transgressions as to taxes,
> including nonpayment of taxes, failure to file returns, and
> nonwitholding of taxes; [7] various instances of conduct found to
> establish fraud or dishonesty; [8] failure to make required payments;
> and [9] lack of credibility and creditor confidence.

*In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 985 (Bankr. E.D. Pa. 1988).  For example, courts have

found that conflicts of interest may justify appointment of a receiver when the court determined

that a debtor's principal had an irreconcilable conflict through his interest in another enterprise

that sought to acquire technology owned by the debtor.  *See In re Embrace Sys. Corp.*, 178 B.R.

112, 128–29 (Bankr. W.D. Mich. 1995).  Similarly, intense, irreconcilable conflicts and acrimony

between the debtor's management and the debtor's creditors can sometimes rise to the level of

"cause" for appointment of a trustee.  *See Marvel*, 140 F.3d at 472–73.

In addition to the factors constituting "cause" noted above, however, section 1104(b)(2)

also authorizes the court to appoint a Chapter 11 trustee when doing so is "in the interests of

creditors, any equity security holders, and other interests of the estate…."  To demonstrate

appointment of a trustee is in the best interests of these constituencies, the movant must establish

that the benefits of such appointment outweigh the costs.  The benefits to be gleaned are determined on a case-by-case basis, but the costs generally include considerations of (i) the trustworthiness of the debtor's management, (ii) the debtor's historical performance and prospects of rehabilitation, and (iii) whether confidence in management has been eroded.  *See* 7 Collier ¶ 1104.02[d][ii].  Importantly, courts have held that a movant must establish that appointment of a trustee is in the best interests of *all* of the constituencies listed in the provision and not merely in the interest of the creditors.  *See id.* ¶ 1104.02[d][i].

2.      *The Court Should Appoint a Chapter 11 Trustee*

Even if the Court is not inclined to convert the Debtors' cases under section 1112(b) of the Bankruptcy Code, the Court should appoint a Chapter 11 trustee to displace the Rajans as managers of the Debtors.  Not only does the Rajans' history of fraud, dishonesty, self-dealing, and gross mismanagement provide ample cause for the Court to appoint a trustee, but it is also clear from the Rajans' past and present near-sighted and self-interested decisions that appointment of a trustee would also be in the best interest of all stakeholders of the Debtors.

(i)      The Rajans Have a Demonstrated History of Fraud and Dishonesty

First, the history delineated above demonstrates that the Rajans have consistently and routinely acted fraudulently and dishonestly in their positions as managers of the Debtors, have continued to do so during the 225 Action and with their filings with this Court, and there is little reason to believe such fraud and dishonesty will stop now that the Debtors have initiated their third bankruptcy case in as many years.  Whether they are abusing the bankruptcy process, engaging in insider transactions, hindering and delaying the efforts of legitimate creditors, or outright lying to investors or courts, the Rajans have demonstrated a complete lack of integrity or trustworthiness.

First, during the Prior Bankruptcies, the Rajans not only had two bankruptcy cases dismissed as having been filed in bad faith, but the Delaware Bankruptcy Court expressly found

that Mathu Rajan was using the bankruptcy process specifically in a manner designed to undermine the Court of Chancery's authority and abscond with the Secured Creditors' Collateral. Stay Decl. Ex. J, at 13:16–14:1. The Rajans did so on the eve of a damaging order by the Court of Chancery in ongoing litigation with the Secured Creditors. We are here today in the same posture—this case was filed on the eve of trial in the 225 Action, where the Court had indicated that Hawk satisfied its *prima facie* case, where an adverse decision would result in the Court of Chancery ratifying the Secured Creditors' exercise of remedies—and all signs point to a similar scheme being afoot. Thus, Judge Owens' statements with respect to the Rajans' "machinations" to pilfer the Collateral and defraud the Secured Creditors remain valid today.

Leading up to and during the Prior Bankruptcies, the Rajans also caused the Debtors to make material misrepresentations to the Delaware Bankruptcy Court as well as to investors. Specifically, during a hearing on May 10, 2021, Mathu Rajan stated under oath that Stream was in discussions with IQH3D about a "strategic relationship" wherein IQH3D would place five individuals as employees with Stream and bring a customer base with them to Stream. *See* May 10 Hearing Transcript, at 211:11–14; 231:17–232:3. Nevertheless, *on the same day* as soon as the hearing on May 10, 2021 concluded, the CEO of IQH3D sent Stream a cease and desist note, claiming that "IQH3D has no valid agreement with you and any company you are affiliated with." Delc. Ex. 2. Similarly, in investor materials the Rajans were distributing in connection with the Voluntary Bankruptcy Action, they were representing that Stream's bankruptcy filing provided VTI—one of the Rajan Entities—the "exclusive right" to acquire Stream's operating assets at a substantial discount. *See* May 10 Hearing Transcript, at 92:18-24; 95:5–9; 124:2–4. Indeed, Mr.

Rajan has continued to lie to this Court about IQH3D, where he identies IQH3D as a "major customer" of Stream in August 2020.  *See* Rajan Declaration, at ¶ 18.[23]

There was also evidence presented to the Bankruptcy Court to suggest that the Rajans were involved with the petitioning creditors initiating the Involuntary Bankruptcy Action against Stream as well:

> Less than 24 hours after the Chapter 7 Petition was filed, Mr. Rajan sent a letter to the Chancery Court "advis[ing]" the court that "certain of the creditors" of Stream had commenced this Chapter 7 Case.  The very next day, Mr. Rajan sent yet another letter, this time to "bring to [the Chancery Court's] attention" certain "fraud" that was purportedly "perpetrated on both [Stream] and the Court," claiming that "[t]he Omnibus Agreement on its face is a fraudulent conveyance and a clear violation of the absolute priority rule," and asking the court to rescind the injunction.  The same day, one of the Petitioning Creditors sent a mass-email to Stream's creditors indicating that by simply filling out an involuntary petition against the Debtor and sending it to counsel to the Petition Creditors "he may be able to get every ones [sic] money" purportedly because "stream tv is willing to pay all vendors."  Finally, just yesterday Mr. Rajan contacted a Stream creditor to set up a Zoom meeting, purportedly to discuss the Chapter 7 Petition.

SeeCubic Motion to Dismiss Involuntary Action, at ¶ 25 (internal citations omitted) (alterations in original).  Essentially, as if he knew the involuntary petitions were forthcoming, Mr. Rajan did not miss a beat in wielding the Involuntary Bankruptcy Action to his advantage as a litigation tactic before the Court of Chancery and as propaganda to investors in the same manner he had used the Voluntary Bankruptcy Action.

The Rajans' dishonest actions go beyond merely their actions as part of the Prior Bankruptcies however.  In addition to the malfeasance detailed above, the Rajans have:

---

[23] The Rajan Declaration also states that IQH3D is now a current customer.  Hawk finds this clai to be dubious as well, given IQH3D's repudiation in 2021, and Stream's lack of operations since that time.  *See id.* at ¶ 20.

1.      fraudulently backdated corporate documents and presented them to the Court of Chancery as genuine (*see Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1026 (Del. Ch. 2020));

2.      lied to the Court of Chancery on many occasions, including

(i)      by claiming that the Rajan Entities raised over $12 million on behalf of Stream, when the entire history of the Rajan Entities' bank statements demonstrate that only a grand total of approximately $7.5 million ever cleared such accounts (with no proof that much, if any, of that money was ever spent on behalf of Stream) (*see* Decl. Ex. 12 at 274:21-275:1; 281:18-282:7; 286:6-23; 299:10-303:17);

(ii)      claiming they had commitments for over $50 million that should be reflected in the Rajan Entities' bank accounts, which it was not (*see id.* at 304:2–6);

(iii)      representing that Stream had no bank accounts, but including such accounts on the Schedules in these Chapter 11 Cases (*see id*. at 267:15–268:14);

(iv)      intentionally manipulating the price of Stream's equity in order to harm Hawk's interests (*see id.* 283:13–286:23);

3.      represented to the Receiver that Stream would pay all of his fees and then half of his fees, then only paying a portion of such fees (Decl. Ex. 9 at 2–3);

4.      represented that Stream would post the bond and purchase insurance in order to recover the Bonding Equipment if the Receiver pursued an action to authorize its turnover and never doing so (Delc. Ex. 11); and

5.      continued to distribute lies to the investors in Stream in attempts to extort additional investments in VSI without disclosure to this Court or to the Secured Creditors, by claiming that the equity of Stream has been "wiped out" and suggesting it is a foregone conclusion that VSI will ultimately remain as the successor of Stream as the operating entity (*see* March 11 Email; March 17 Email).

In short, the Rajans' actions over the course of the dispute between the parties clearly demonstrate that the Rajans are wholly untrustworthy and are willing to do anything to gain a tactical advantage over the Secured Creditors and retain the Debtors' assets for their own benefit. *See, e.g., Hawk*, 2022 WL 17258460, at **16–17 (noting Stream's use of "slippery language, which Stream has a history of deploying" and Stream's "wily ways with words").  The Rajans

have demonstrated their inability to act in a trustworthy and fiduciary capacity, especially with respect to the Secured Creditors, and, accordingly, cause exists to appoint a Chapter 11 trustee.

(i)    The Rajans Have a History of Grossly Mismanaging the Debtors' Businesses

In addition to the fraudulent and dishonest actions denoted above, the Rajans have also demonstrated a history of gross mismanagement of the Debtors' affairs.  Stream was founded in 2009 and to this day remains a pre-revenue, development-stage enterprise with no income and only prototype technology.  Despite the infusion of tens of millions of dollars over a period of nearly a decade with full support of the Secured Creditors and other investors, the Debtors utterly failed to monetize the underlying technology, and is and has been in default on tens of million dollars of secured debt obligations, failed to fund payroll on multiple occasions, failed to pay over $16 million in trade debt, became debtors or proposed debtors in three separate bankruptcy filings, and failed to protect their interest in the intellectual property representing the flagship technology of the business.  To say their stewardship has been a failure is a gross understatement.

Importantly, the Secured Creditors are not alone in their pessimism about the Rajans' ability to manage the business—as early as 2018, the managers of the Dutch Subsidiaries expressed their displeasure in the Rajans and doubt that they would be able to provide the company the guidance needed to become profitable.  In the No Confidence Letter, the Dutch Subsidiaries' management did not mince words:  "The SeeCubic [B.V.] management team does not have confidence anymore that the Ultra-D technology can be brought to a successful market introduction together with Stream TV Networks the way it is organized now.  ***The main reason is the current/absent organizational structure of Stream TV Networks and the way its management team operates***."  No Confidence Letter (emphasis added).  "***Our very strong suggestion is to have the company Stream TV Networks managed by professionals with experience in the tasks that***

***are needed for a successful introduction in the market of our Ultra-D technology***." *Id.* (emphasis

added).  This is a resounding rebuke of the Rajans' leadership and management by the parties that

are most intimately familiar therewith.

Finally, the Rajans also have a history of using Stream in a manner that sacrifices the best

interests of the various stakeholders therein for the benefit of the Rajans individually.  For example,

prior to the filing of the Prior Bankruptcies, the Court of Chancery was poised to grant summary

judgment in favor of SeeCubic, which would have effectuated the Omnibus Agreement.

Significantly, the Omnibus Agreement would have provided value to all of Stream's stakeholders,

and the Rajans were originally in support of the transactions contemplated thereby.  Nevertheless,

after agreeing to the terms of the Omnibus Agreement, the Rajans decided that the arrangement

would too greatly harm their personal interests, so they endeavored to invalidate the Omnibus

Agreement at any cost—including by falsifying corporate documents and filing bad faith

bankruptcy petitions.  Unfortunately for the Stream stakeholders, the Rajans' crusade against the

Omnibus Agreement was ultimately successful.  Further, instead of using the intervening three

years to try to repay creditors who have invested millions into Stream, the Rajans have done

everything they can to avoid repaying their debts and to hinder the efforts of the Secured Creditors

to collect on the obligations.

     (ii)     <u>Additional Cause Exists to Appoint a Trustee as the Rajans Have Engaged
in Self-Dealing and Have Eroded Creditor Confidence</u>

In addition to the foregoing "cause" for appointment of a Chapter 11 trustee, other cause

exists for such an appointment, because the Rajans have acted self-interestedly and engaged in

self-dealing, which has led to irreconcilable acrimony between the Rajans and several of the

Debtors' stakeholders.

As has been explained above, the Rajans have clearly and unabashedly abandoned fundraising efforts on behalf of the Debtors and are currently employing the Chapter 11 Cases, in part, as a fundraising mechanism for another one of their companies—VSI—to manufacture a takeover of Stream's assets at a bargain price.  As the various emails cited above establish, insiders of the Debtors are wielding the Chapter 11 Cases against existing investors as a threat that their equity in Stream will be "wiped out" unless they invest more money in VSI.  *See* March 11 Email; March 17 Email.  This is tantamount to an old-fashioned shakedown.  Importantly, the Rajans have used this tactic before as part of the Voluntary Bankruptcy Action, representing to investors that if they invested in VTI, such an investment would be akin to investing in Stream, because VTI would have the "exclusive right" to obtain Stream's assets at a fraction of their actual cost.

Courts have considered such a scheme sufficient to justify appointment of a Chapter 11 trustee in other cases with similar facts.  Specifically in *Embrace Systems*, the bankruptcy court appointed a Chapter 11 trustee *sua sponte* because the debtor's president sought to use the Chapter 11 process as a forum to license the debtor's technology to a third party for whom the president acted as a consultant.  *See Embrace Sys.*, 178 B.R. at 128.  In appointing the trustee, the court stated, "the Debtor, through [the president], acted unfairly, and lacks good faith, in pursuing the private sale to [the third party]." *Id.*  In essence, the *Embrace* court considered the president's role as consultant to the third party disqualifying because of the inherent conflict of interest, meaning he did not have the best interest of the debtor in mind with the transaction.  As should be clear, the situation at bar is far more damning than that presented in *Embrace Systems*, as the "third party" seeking to obtain the Debtors' technology in this case is actually a wholly-owned entity of the Rajans and not merely an entity to which the Rajans act as consultants.

Finally, the Rajans' and Secured Creditors' sordid and acrimonious past alone justifies removing the Rajans and appointing a Chapter 11 trustee.  Specifically, in *Marvel Entertainment*,

the Third Circuit affirmed a lower court's determination that appointment of a Chapter 11 trustee

was necessary when an impasse arose between the lenders and the company's management.  In

explaining this impasse, the Third Circuit stated:

> [T]he Lenders accuse the [insiders] of an elaborate scheme to take
> over [the company] at a discount price while diminishing the value
> of the Lender's claims on the company as creditors.  They claim that
> [certain litigation initiated as part of the bankruptcy case] is part of
> that scheme, and was brought, at least in part, as a weapon to punish
> the Lenders for not consummating the two Settlements….   The
> Lenders claim that the present board is incapable of neutrality, and
> is guilty of breaching its fiduciary duties to creditors.

*Marvel*, at 140 F.3d at 469.  The situation described by the Third Circuit in *Marvel* is directly

analogous to the situation between the Rajans and the Secured Creditors in this case, as Hawk has

detailed throughout this Motion.  The Rajans' actions to date have been spiteful and self-interested,

and such actions demonstrate a scheme to defraud the Secured Creditors in breach of their fiduciary

duties while seeking to pilfer the assets of the Debtors' estates for pennies on the dollar (including

by intentionally devaluing the assets to do so).  *See*, *e.g.*, Rajan Declaration (engaging in personal

attacks throughout bearing little relevance to the pending motions in the case).

As such, it is unlikely the parties to these Chapter 11 Cases will be able to cooperate in an

effective manner for the Debtors to effectuate a reorganization.  The Rajans do not appear

interested in pursuing such a reorganization and, instead, are interested merely in ensuring that the

Secured Creditors are unable to foreclose on their Collateral so they can keep the assets for

themselves.  Ultimately, replacement of the Rajans with a Chapter 11 trustee would mitigate these

concerns and allow a disinterested third party make the proper decisions with respect to the

Debtors' estates and assets for the benefit of all stakeholders.

(iii)    Appointment of a Chapter 11 Trustee Is in the Best Interest of the
Creditors, Equity Holders, and Other Stakeholders of the Debtors

Finally, the Court can appoint a Chapter 11 trustee in these Chapter 11 Cases under section 1104(b)(2) of the Bankruptcy Code as being in the best interests of all of the Debtors' stakeholders. Although bankruptcy courts take the decision to appoint a Chapter 11 trustee very seriously, comparing the costs and benefits of appointing a trustee in these Chapter 11 Cases clearly demonstrates that appointment is justified.

Considering the factors noted above that courts analyze in determining the "costs" of appointment of a trustee, such costs are effectively nil. Specifically, and as exhaustively detailed above, the Rajans are wholly untrustworthy and poor managers of the Debtors and their businesses; the Debtors' historical performance of reorganizing and paying creditors has been abysmal; there is no realistic prospect of rehabilitation if the Rajans remain in control; and stakeholder confidence in the Rajans has clearly eroded to a point that cannot be resuscitated. The Rajans have also abandoned these Debtors as they seek to capitalize a new entity to pick the corpse and take assets at a discount price.

Accordingly, allowing the Rajans to pursue their current strategy will harm all stakeholders in the Debtors. For example, the Debtors have failed to prosecute these Chapter 11 Cases by filing first day motions, the Subsidiaries will suffer and not be able to meet their payroll obligations, harming their employees. Moreover, without funding, the Subsidiaries will also be unable to meet other operating expenses, including tax obligations, killing their going-concern value. Such harms are in addition to the consequences of Stream continuing as owner of the Dutch Subsidiaries, as the Dutch Subsidiaries delineated in the No Confidence Letter. Furthermore, the longer the Rajans remain in control of the Debtors, the more opportunities they will have to threaten their existing investors and extract additional undisclosed investments into their insider affiliate VSI.

Conversely, by removing the Rajans, a Chapter 11 trustee can ensure that the Chapter 11

Cases are prosecuted expeditiously and appropriately.  A Chapter 11 trustee would ensure that

employees are paid and assets are not wasting due to a lack of funding.  A Chapter 11 trustee would

pursue a reorganization or liquidation strategy for the benefit of all interested parties and not just

the Rajans.  And, a Chapter 11 trustee would neuter the Rajans' ability to abuse the Chapter 11

process and use it as a fundraising tool by misleading uninformed and innocent investors.

In short, there is little downside and tremendous upside to the removal of the Rajans.

Accordingly, it is in the best interest of all parties (other than existing management and their

comrades) for the Court to appoint a Chapter 11 trustee in these Chapter 11 cases.

## REQUEST FOR AN EXPEDITED HEARING PURSUANT TO LOCAL RULE 5070-1(G)

In conformance with Local Rule 5070-1(g)(1) and (2), Hawk consulted via email with

Asher Block, Esq., Vincent Alexander, Esq. and Rafael Zahralddin, Esq., proposed counsel for

Debtors; Andrew DeMarco, Esq., attorney for Rembrandt 3D Holding Ltd.; Jennifer R. Hoover,

Esq. and James E. von der Heydt, Esq., attorneys for Trans World International, LLC and IMG

Media Ltd.; and Kevin Callahan, Esq., and John Schanne, Esq., attorneys for the Office of the

United States Trustee but was unable to reach an agreement with respect to scheduling an

expedited hearing on the Motion.  Mr. Block, Mr. Alexander, and Mr. Zahralddin have not agreed

to the requested expedited relief.  Mr. Callahan, Mr. Schanne, Mr. DeMarco, Ms. Hoover, and Mr.

von der Heydt had no objection to the request for expedited consideration.

In conformance with Local Rule 5070-1(g)(2)(A), expedited consideration of the Motion

is necessary allowing the Rajans to continue holding positions of power at the Debtors seriously

threatens the Secured Creditors' Collateral and the viability of the Subsidiaries in general.  First

and foremost, every day that passes, the Debtors continue their assault on employees and

management of the Dutch Subsidiaries, demanding they turnover assets that are not a part of the

Debtors' estates or risk violation of the automatic stay.  Such continued harassment is seriously

hampering the Dutch Subsidiaries' ability to continue operating in the ordinary course of business,

is confusing to employees outside of the United States who are not familiar with the Bankruptcy

Code, and is completely inappropriate to do outside of the normal procedures for recovery of estate

assets under the Bankruptcy Code.  As explained above, the Rajans are seeking to gather as many

assets of the Subsidiaries as possible in order to abscond with them for their own benefit, even if

those assets are not part of the Debtors' estate, and longer they have the pretense of operating under

the protections of the Bankruptcy Code, the worse for everyone.

Moreover, there are operating expenses coming due for the Subsidiaries and, without any

funding plan, a disruption of the businesses is immanent.  *See* Decl. Ex. 10.  As the Receiver stated

previously in addressing the Subsidiaries' funding issues:  "Inadequate and unpredictable funding

has hurt SCBV's relationships with suppliers and employees, among causing other problems….

This possibility ***threatens significant downstream harm for Technovative and SCBV***."  Decl. Ex.

9 at 2–3 (emphasis added).  As explained in the Motion, the Rajans appear wholly uninterested in

pursuing a reorganization of the Debtors, have sought no relief in order to allow them to fund the

Subsidiaries, and have presented no plan to keep the Subsidiaries operational.  They appear poised

to allow the Subsidiaries to wither and die, devaluating their own assets and the Secured Creditors'

Collateral.  As such, any delay in granting the relief requested in the Motion will threaten the value

of the Debtors' primary assets—the employees and intellectual property housed at, and being

developed by, the Subsidiaries.

In the alternative, if the Court grants the relief requested, the Secured Creditors will be

comfortable continuing to fund the Subsidiaries' operations and ensure the value thereof is

preserved for the benefit of the Debtors' stakeholders.  Furthermore, expedited consideration of

this Motion will sterilize the Rajans' onslaught against the Subsidiaries' employees and remove the confusion the Rajans are seeking to sow.

In conformance with Local Rule 5070-1(g)(2)(d), Hawk provided Asher Block, Esq., Vincent Alexander, Esq., Rafael Zahralddin, Esq., Andrew DeMarco, Esq., Jennifer Hoover, Esq., James E. von der Heydt, Esq., Kevin Callahan, Esq., and John Schanne, Esq., with notice of this Motion via email prior to filing.  Hawk also provided notice of this Motion to Chambers via telephone this morning Hawk will also provide parties with copies of the Motion via e-mail as soon as it is filed.

For the foregoing reason, the undersigned respectfully requests that the Court conduct an expedited hearing on the Motion on April 19, 2023.

**<u>CONCLUSION</u>**

Accordingly, Hawk respectfully requests that the Court dismiss the Chapter 11 Cases with prejudice.  If the Court believes that allowing the Chapter 11 Cases to remain under the oversight of the Bankruptcy Court is in the best interest of creditors, however, Hawk requests the Court convert the Debtors' Chapter 11 Cases to cases under Chapter 7 or, in the alternative, appoint a Chapter 11 trustee to act in the interests of all creditors.

Dated:  April 6, 2023                    **K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi, Esq. (No. 91881)
K&L Gates LLP
600 King Street, Suite 901
Wilmington, DE 19801
Telephone: (302) 416-7000
Facsimile: (302) 416-7020
Email: steven.caponi@klgates.com


*/s/ Margaret R. Westbrook*
Margaret R. Westbrook, Esq.
K&L Gates LLP

300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Telephone:  (704) 331-7400
Email:  margaret.westbrook@klgates.com

*/s/ Aaron S. Rothman*
Aaron S. Rothman, Esq.
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Telephone:  (704) 331-7400
Email: aaron.rothman@klgates.com

*/s/ Jonathan N. Edel*
Jonathan N. Edel, Esq.
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Telephone:  (704) 331-7400
Email: jon.edel@klgates.com

*/s/ Megan E. O'Connor*
Megan E. O'Connor
K&L Gates LLP
600 King Street, Suite 901
Wilmington, DE 19801
Telephone: (302) 416-7000
Facsimile: (302) 416-7020
Email: megan.oconnor@klgates.com

*Attorneys for Hawk Investment Holdings Ltd.*