UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: | : |
|  | : Case No.  23-10764 |
|  | :           23-10763 |
| STREAM TV NETWORKS, INC.   CH: 11 | : |
|  | : Philadelphia, Pennsylvania |
| A) Emergency Motion For Entry Of | : April 14, 2023 |
| An Order Enforcing The Automatic | : 12:42 p.m. |
| Stay And For Sanctions For | : |
| Willful Stay Violation Filed By | : |
| Stream Tv Networks, Inc. | : |
| Represented By Rafael X. | : |
| Zahralddin | : |
|  | : |

. . . . . . . . . . . . . . . . .

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtor:              Rafael X. Zahralddin, Esq.
                             Lewis Brisbois
                             500 Delaware Avenue, Suite 700
                             Wilmington, DE 19801
                             302-985-6004

                             Vincent F. Alexander, Esq.
                             Lewis Brisbois Bisgaard & Smith
                             110 SE 6th Street, Suite 2600
                             Fort Lauderdale, FL 33301
                             954-728-1280

For SeeCubic:                James J. Mazza, Jr., Esq.
                             Skadden Arps Slate Meagher &
                             Flom, LLP
                             155 North Wacker Drive
                             Chicago, IL 60606-1720

                             Joseph Oliver Larking, Esq.
                             Skadden Arps Slate Meagher &
                             Flom, LLP
                             920 North King Street
                             One Rodney Square
                             Suite 7th Floor
                             Wilmington, DE 19801

```
                                    Marley Ann Brumme, Esq.
                                    Eben P. Colby, Esq.
                                    Skadden Arps Slate Meagher &
                                    Flom, LLP
                                    500 Boylston Street, 23rd Floor
                                    Boston, MA 021116
                                    617-573-4800

For Hawk Investment Holdings        Steven Caponi, Esq.
Ltd:                                K&L Gates
                                    600 N. King Street, Suite 901
                                    Wilmington, DE 19801
                                    302-416-7080

                                    Aaron Rothman, Esq.
                                    Margaret R. Westbrook, Esq.
                                    K&L Gates LLP
                                    300 South Tryon Street, Suite
                                    1000
                                    Charlotte, NC 28202
                                    704-331-7400

For Rembrandt 3D Corp:              Andrew DeMarco, Esq.
                                    Devlin Law Form, LLC
                                    1526 Gilpin Avenue
                                    Wilimington, DE 19806
                                    302-449-9010

For the United States              Kevin P. Callahan, Esq.
Trustee:                            John Henry Schanne, Esq.
                                    Office of The United States
                                    Trustee
                                    Robert N.C. Nix Federal
                                    Building
                                    900 Market Street, Suite 320
                                    Philadelphia, PA 19107
                                    202-934-4154
```

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

1

<u>APRIL 14, 2023</u>

1

2          THE COURT:  All right.  So this is the matter of

3    Stream TV Networks and Technovative Media, Inc.  There are two

4    matters presently scheduled before the Court today.  One is the

5    Debtor's emergency motion for issuing an order enforcing the

6    stay for other turnover and sanctions.  And there is an

7    emergency motion to dismiss the Hawk Investment Holdings, to

8    dismiss this debt as paid or convert, or in the alternative, to

9    appoint a Chapter 11 Trustee.

10          So let's start first with entering appearance for the

11    attorneys who are going to participate in the two matters.

12    Let's start first with the attorneys who are going to

13    participate in the Debtor's motion with respect to the stay and

14    turnover.  Counsel for the Debtor?

15          MR. ALEXANDER:  Good morning, Your Honor.  Or good

16    afternoon, now.  Vincent Alexander, A-L-E-X-A-N-D-E-R.  And

17    also Rafael Zahralddin, it's Z-A-H-R-A-L-D-D-I-N, of Lewis

18    Brisbois Bisgaard & Smith on behalf of the Debtors.  And that's

19    the counsels who will be speaking today.

20          THE COURT:  Okay.  Counsel for any Respondent?

21          MR. MAZZA:  Good afternoon, Your Honor.  This is Jim

22    Mazza, M-A-Z-Z-A, from Skadden Arps.  I represent SeeCubic.

23          THE COURT:  Okay.  Is there anyone else who is

24    participating in the argument?

25          MR. LARKIN:  Good afternoon, Your Honor --

1           THE COURT:  Hello?

2           MR. LARKIN:  Good afternoon, Your Honor.  This is Joe

3    Larkin, also from Skadden Arps.  My partner, Mr. Mazza, will be

4    handling the argument for SeeCubic.  I just wanted to let Your

5    Honor know that Mr. Mazza's pro hac motion was filed, and it's

6    at docket 108 through 112.

7           THE COURT:  And when was that filed, counsel?

8           MR. LARKIN:  Your Honor, it was filed yesterday.

9           THE COURT:  Oh, okay.  And do you think I need --

10   well, I'll figure it out.  Not where I want to be.  Okay.  I

11   want to be there.  Okay.  So it was filed at 108 through 112,

12   you said?

13          MR. LARKIN:  That's correct.  Mr. Mazza --

14          THE COURT:  I see --

15          MR. LARKIN:  Mr. Mazza --

16          THE COURT:  I see a motion -- uh-huh?

17          MR. LARKIN:  Mr. Mazza's pro hac motion is at docket

18   112, Your Honor.

19          THE COURT:  Okay.  So you filed several pro hac

20   motions yesterday, starting at 108 through 112.  And Mr.

21   Mazza's is actually number 112; is that correct?

22          MR. LARKIN:  That's correct, Your Honor.  That's

23   correct.  Correct.

24          THE COURT:  All right.  And counsel, do you believe I

25   need to enter an order before Mr. Mazza leads the arguments

1   today?

2          MR. LARKIN:  I do not, Your Honor.  I was just

3   letting you know that we filed it.

4          THE COURT:  Okay.  Okay.  Well, let me get the

5   appearance of everyone else and see if anybody else thinks to

6   the contrary.

7          Who else is here with respect to the motion

8   for -- all the Debtor's motion speaking of order for violation

9   of the stay and turnover?

10          MR. CALLAHAN:  Your Honor, Kevin Callahan and John

11   Schanne on behalf of the United States Trustees.

12          THE COURT:  Okay.

13          MR. CALLAHAN:  We're actually here on both matters.

14          THE COURT:  Okay.  Trustee.  Anyone else?  Okay.  And

15   does anybody take any position with respect to whether I need

16   to sign those pro hac -- Mr. Mazza's motion to appear pro hac

17   vice before he can appear?

18          MR. ROTHMAN:  Your Honor, I apologize.  I was

19   expecting one of my partners to speak up.  This is Aaron

20   Rothman at K&L Gates on behalf of Hawk.  My partner Steve

21   Caponi is on the line as well.

22          THE COURT:  Okay.  I'm sorry, could you state your

23   name again for the record, sir?

24          MR. ROTHMAN:  Aaron -- sorry.  Sorry, Your Honor.

25   Aaron Rothman, R-O-T-H-M-A-N.

1          THE COURT:  And who do you represent?  Hawk?

2          MR. ROTHMAN:  Hawk.  Yep.  And my partner Mr. Caponi

3  is on --

4          THE COURT:  And who else is with you?

5          MR. ROTHMAN:  Steve Caponi and Margaret Westbrook.

6          THE COURT:  Okay.  Anyone else here on any of these

7  matters?

8          We have 35 people, so there are other people just

9  observing?

10          MR. ALEXANDER:  Your Honor, this is Vincent

11  Alexander.  Would you like us to name all counsel even if

12  they're not going to be speaking today?

13          THE COURT:  You know what?  I think since we're not

14  in court, it probably makes sense.  And I will just note that

15  these are the attorneys who will be arguing with respect to the

16  motions.  And then, I'm going to put present.  And then you

17  could -- people could tell me who else is present. I mean, in

18  open court, you typically don't do it.  But it was just because

19  we're on the telephone, it would be good to know exactly who's

20  here.

21          MR. ALEXANDER:  Your Honor, on behalf of the Debtor,

22  we also have Bennett Fisher, F-I-S-H-E-R.

23          THE COURT:  And he is?

24          MR. ALEXANDER:  He's counsel at Lewis Brisbois.

25          THE COURT:  Counsel, okay.  Okay.  Who else?  Anyone

```
 1  else?
 2          MR. ALEXANDER:  Rafael, do we have any other
 3  attorneys?  Do we have any other attorneys on?
 4          MR. ZAHRALDDIN:  Yes, Your Honor.  I believe Karen
 5  Poppel is also on the line.  She's an associate with us here at
 6  Lewis Brisbois Bisgaard & Smith.  And it's P-O-P-P-E-L, Karen
 7  Poppel.
 8          THE COURT:  Okay.  For the Debtor.
 9          MR. ZAHRALDDIN:  I believe that's it for the Debtors,
10  Your Honor.
11          MR. ALEXANDER:  For the counsel, at least.
12          THE COURT:  Okay.  Anyone else?
13          MR. ALEXANDER:  Your Honor, we also have
14  representatives of the Debtor on.
15          THE COURT:  Wait a minute.  Let's --
16          MR. ALEXANDER:  Would you like them, as well?
17          THE COURT:  Yes.
18          MR. ALEXANDER:  We have Mathu Rajan, it's R-A-J-A-N.
19  He's the CEO of the Debtors.
20          THE COURT:  Okay.  Anybody else representing the
21  Debtor?  Is there counsel and --
22          MR. ZAHRALDDIN:  Yes, Your Honor.
23          MR. ALEXANDER:  We do.
24          MR. ZAHRALDDIN:  Dan --
25          MR. ALEXANDER:  Dan --
```

1         MR. ZAHRALDDIN:  Dan Rink is also in-house counsel

2  for the Debtor.  He is on the line.  And that's R-I-N-K.  And

3  Mr. Bud Robertson, also an employee of the Debtor, is on the

4  line.  And I believe -- I don't recognize this name, so I'll

5  have to confirm.  But someone identified themselves as Sarah

6  Brewer (phonetic), perhaps, and indicated that they were an

7  employee of the Debtor.  But they can confirm their status.

8         MS. BREWER:  Yes, that's correct.

9         MR. ZAHRALDDIN:  Okay.

10       THE COURT:  Apparently, I was disconnected.  So where

11  I stopped at was I was asking was there anyone other than Mr.

12  Mazza and Mr. Larkin here for SeeCubic?

13       MR. ZAHRALDDIN:  Okay.  And Your Honor, I think

14  we -- did you hear us provide the names of the employees and

15  representatives from the Debtor that were here?  Or were you

16  off the line?

17       THE COURT:  Yes.

18       MR. ZAHRALDDIN:  Okay.

19       THE COURT:  No, I heard Mr. Fisher and Ms. Poppel and

20  Mr. Rajan.  Hello?

21       Counsel, I also didn't give my typical instructions,

22  which are could you please keep your telephone on mute until

23  you speak, and that when you do speak, that you first state

24  your name for the record.  I would ask that you not interrupt

25  anyone.  And everyone will get an opportunity to speak.  And I

1  would also ask that you keep your telephone on mute until you

2  do speak.

3          Okay.  So I did hear the representatives of the

4  Debtor.  And I was asking were there anyone else other than Mr.

5  Mazza and Mr. Larkin for SeeCubic?

6          MS. BRUMME:  Yes, Your Honor.  This is Marley Ann

7  Brumme, B-R-U-M-M-E.  And also with me is Eben Colby.

8          THE COURT:  And your relationship to SeeCubic?

9          MS. BRUMME:  We are both -- yes, we are both counsel

10  at Skadden.

11          THE COURT:  Okay.  Anyone else here?  Okay.  Mr.

12  Callahan, I'm assuming it's just you and Mr. Schanne, and

13  there's no one else for Hawk except Mr. Rothman, Caponi, and

14  Ms. Westbrook.  Anyone else?  Hello?  Oh, come on.

15          MR. ALEXANDER:  We can hear you, Your Honor.

16          MR. MAZZA:  We hear you, Your Honor.

17          THE COURT:  Oh, good.  I'm like, come on, don't tell

18  me I'm going to just keep getting disconnected.

19          All right.  So there's no one else for anyone

20  appearing who has not been named in connection with these two

21  matters?

22          MR. ALEXANDER:  Your Honor, there's two more.

23          MR. RILEY:  Judge, Leo Riley, an employee of

24  SeeCubic, Inc.

25          THE COURT:  I'm sorry, who else?

1              MR. RILEY:  Leo Riley, an employee of SeeCubic, Inc.

2              THE COURT:  Okay.  Anyone else?

3              MR. MAZZA:  Yes, Your Honor.

4              MR. ALEXANDER:  There's also two employees of the

5    Debtor.

6              THE COURT:  Okay.  Wait a minute.

7              MR. ALEXANDER:  Suby Joseph.

8              THE COURT:  For the Debtor?

9              MR. ALEXANDER:  Yeah.  Two more employees, Your

10   Honor.  I apologize.  Suby Joseph.  It's S-U-B-Y, J-O-S-E-P-H.

11   And Amanda Gonzalez, A-M-A-N-D-A, G-O-N-Z-A-L-E-Z.

12             THE COURT:  Okay.  Anyone else?  Anyone else?

13   Because I heard -- the last I heard other than -- was for --

14             MR. DEMARCO:  Yes, Your Honor.  I apologize.  I've

15   been trying to wait my turn to introduce myself.  My name is

16   Andrew DeMarco.  I am counsel for Creditor Rembrandt 3D.

17   That's D-E-M-A-R-C-O.  I also have with me a fact witness,

18   Chris Michaelson (phonetic), the president and CEO, Steven

19   Blumenthal (phonetic), and the in-house counsel Neil Wallace

20   (phonetic), for Rembrandt.  They are also on the line.

21             THE COURT:  Am I the only one who's getting

22   disconnected, John?

23             COURT REPORTER:  Yes, apparently.

24             THE COURT:  Apparently.  So now I have computer

25   issues and phone issues today.  Great.  If we get disconnected

1   again, I'm going to try to move to a different office and see

2   if the works.  Hopefully, I won't get disconnected again.

3          Okay.  I think where we left off was that we had the

4   appearance of all counsel and all persons who are present in

5   connection with the two matters.

6          Okay.  And so the first -- I think, have the parties

7   discussed exactly what it is or how they would like to proceed

8   today?  I know there have been numerous telephone calls to my

9   JA and my courtroom deputy regarding amending orders or

10  whatever it is the parties were looking for.  So let me lay

11  this out before I have any questions.

12         Typically, on an emergency motion, I'm going to hear

13  arguments, but I am not going to take evidence.  I typically

14  will hear the arguments and come to some sort of -- figure out

15  where there are -- what the actual disputes are.  And then, if

16  we need an evidentiary hearing, then I schedule the evidentiary

17  hearing.

18         So I'm not sure if the parties were unclear whether

19  there was going to be an evidentiary hearing today.  That is

20  not going to happen.  Because clearly, I would need more than

21  this afternoon to hear evidence in connection with just one of

22  these motions.

23         So with respect to the motion for relief, we can

24  start with that and then we can have some discussion and figure

25  out exactly where we're going with respect to, one, whether we

1   need an evidentiary hearing.  Based on my review of those

2   pleadings, I am going to assume that we do.  And two, what were

3   the parties expecting in terms of getting that evidentiary

4   hearing.  Okay.  We're going to start with the motion for the

5   alleged violation of the stay and for turnover.

6         Counsel for Debtor?

7         MR. ALEXANDER:  Good afternoon again, Your Honor.

8   Vincent Alexander on behalf of the Debtors.

9         THE COURT:  Okay.

10        MR. ALEXANDER:  Your Honor, may I proceed?

11        THE COURT:  Yes, you may.

12        MR. ALEXANDER:  Thank you, Your Honor.  The Debtors

13   filed these cases on March 15th.  So we haven't even been in

14   these cases a full month yet.  And immediately upon the filing

15   of these cases, the Debtors were met with resistance from

16   various parties, including Hawk Investment Holdings, SLS

17   Holdings, SeeCubic, Inc., and various of their representatives,

18   including Shad Stastney, regarding the Debtors' ability to

19   regain possession of their property of the estate and also

20   operate in these bankruptcy cases.

21        And so we filed an emergency motion for violations of

22   the automatic stay.  Initially, with regards to one specific

23   piece of estate property, and that's an optical bonding

24   machine.  Before I get into that, though, I think it makes

25   sense, Your Honor, since you really haven't had a full hearing,

1   to kind of tell you what the Debtor does so you can see why

2   this bonding equipment is important to the Debtor's operations.

3           Stream was founded in -- would that be helpful to

4   Your Honor?

5           THE COURT:  Yes.  And counsel, it would also be

6   helpful if you'd give me some background because we have been

7   trying to, you know, based on the charts and the various

8   information in the motions, piece together who the various

9   entities are, their relationship.  Because I didn't get that at

10  the first hearing.

11          So if you, in the process of telling me the

12  information about Stream, to the extent relevant, how the

13  various players are involved in this matter.  Okay?

14          MR. ALEXANDER:  Absolutely, Your Honor.  I can do

15  that as we go through the process.

16          THE COURT:  Okay.

17          MR. ALEXANDER:  But Stream -- and as soon as I touch

18  on one of the entities, I'll tell you who they are and --

19          THE COURT:  Okay.

20          MR. ALEXANDER:  -- if you have any follow-up, I'd be

21  glad to add additional color and background as necessary.

22          THE COURT:  Okay.  Okay.

23          MR. ALEXANDER:  But Stream was founded in 2009 to

24  develop technology allowing consumers to view 3D content

25  without the need to wear glasses or goggles, right?  So

1   typically, when you see people utilizing 3D technology, they

2   have some type of viewer on, whether it's basic glasses or more

3   advanced type of goggles.

4          What was done, what the Debtors were doing, is they

5   trademarked what they called their Ultra-D technology.  And

6   this is a proprietary combination of hardware and software that

7   creates a, you know, as noted by the Debtor's principal, Mr.

8   Rajan, in various declarations, it creates a natural,

9   comfortable, and immersive glasses-free 3D viewing experience.

10         And so their goal --

11         THE COURT:  And what's it called again, counsel?

12         MR. ALEXANDER:  Ultra-D.

13         THE COURT:  What's the trademark?  Ultra?

14         MR. ALEXANDER:  Hyphen, D.  Capital D.

15         THE COURT:  Okay.  Okay.

16         MR. ALEXANDER:  And so as a technology itself, the

17  Ultra-D can be applied to panels, you know, of nearly any type

18  and size, and it's compatible with touchscreen features as

19  well.  So ultimately, what this means is that consumers are

20  going to be able to experience this technology on any device,

21  whether it's a television, a tablet, a smartphone, portable

22  game player, a laptop, you know, computers, you name it.

23         To the extent there's a panel or a type of screen,

24  you could apply this technology to it.  And as of the end of

25  last year, the Debtor and various of its subsidiaries have been

1    granted 128 patents in 13 patent families.

2           So as part of this process of taking this Ultra-D

3    technology and applying it to these panels, the Debtors

4    commissioned to manufacture a specialized optical bonding

5    equipment which would manufacture video panels utilizing the

6    Ultra-D technology.  If you want to think about this, what the

7    machine does is it glues a 3D lens to a video panel.  And you

8    know, this particular -- and that is the large machine that the

9    Debtors purchased and had built customized for them to bring

10   this technology to various panels.

11          Currently, this particular machine, this bonding

12   equipment is located in a warehouse in China.  There's no

13   dispute that the Debtor is the entity that bought this

14   equipment and there should be no dispute that the Debtor owns

15   this equipment and has title to this equipment.

16          But this equipment, in its current form, it needs to

17   be reassembled.  It's currently in parts.  But it was

18   previously put together and it was calibrated and optimized so

19   that the Debtor was achieving a high-yield rate of production

20   of 65-inch video panels.  And there were some of these panels

21   that were manufactured and, you know, were sold onto the market

22   in terms of that.

23          This machine is integral to the Debtor's ability to

24   operate, to be successful in this Chapter 11 case, and various

25   parties have been preventing the Debtor from obtaining this

1   equipment.  When we first filed the case, the Debtor had been

2   in year-long litigation with various entities that loaned the

3   Debtor money.  One of those entities was SLS Holdings and the

4   other was Hawk Investment Holdings.

5           You know, you'll hear lots of, you know, argument

6   about what the basis of that litigation was.  But essentially,

7   the litigation started when there were alleged defaults under

8   various loan documents with the parties.  And then, the SLS and

9   Hawk entities ultimately entered into an agreement, which is

10  called the omnibus agreement, which stripped Stream of all of

11  its assets.  Essentially, it transferred it to a new entity,

12  which is called SeeCubic, Inc.

13          And you're going to hear multiple SeeCubic entities.

14  But SeeCubic, Inc., is an entity that was created by SLS and

15  Hawk to take the Debtor's assets.  There was litigation over

16  the validity of that agreement.  And ultimately, in the

17  Delaware Chancery Court, the court ruled -- it entered a

18  preliminary injunction, you know, holding that that agreement

19  was effective, even though Stream argued that it was

20  ineffective because it required the vote of its Class B

21  shareholders before it could be effective, which it did not

22  get.  And Class B is for the most part controlled by Mr. Rajan.

23          However, they proceeded to transfer the assets

24  pursuant to that agreement.  There was a bankruptcy that the

25  Debtor filed, Stream, originally in Delaware.  And that was

1   ultimately dismissed.  And one of the primary reasons if not

2   the sole reason it was dismissed is because the bankruptcy

3   court held that the Chancery --

4          THE COURT:  Hello?  Turn your phone on mute, whoever

5   is talking.  Hello?  Turn your phone down.  Do we know who's

6   talking, that we can mute them?

7          COURT REPORTER:  I just muted him.

8          THE COURT:  Thank you.

9          MR. ALEXANDER:  The bankruptcy court ultimately

10   upheld -- or dismissed it primarily because it said that

11   agreement was valid and there was a transfer of the assets and

12   the Debtors didn't have any assets.  But to the extent that

13   issue got resolved, then maybe another bankruptcy would be

14   appropriate.

15          Fast forward a couple years.  That makes its way

16   through the appellate courts in Delaware.  And ultimately, the

17   Delaware Supreme Court, in a 5-0 opinion, determined that that

18   preliminary injunction and the final injunction and declaratory

19   judgment with respect to that omnibus agreement should not have

20   been entered because the Class B shareholder never voted to

21   approve that, and therefore, it violated Stream's charter in

22   order to authorize the transfer of the Debtor's assets.

23          So that went back down.  It was supposed to go back

24   down to the Chancery Court with all of the Debtor's assets

25   going back to Stream from this entity SeeCubic that was

 1   created.  Because SeeCubic, as soon as they got that ruling

 2   from the Chancery Court, they went and started taking all of

 3   Stream's assets under, you know, the protection -- supposed

 4   protection of this order and this agreement.

 5           But that agreement ended up being void.  So they were

 6   required to return all of the assets back to the Debtor.  And

 7   they never did that.  You know, to this day, we're still

 8   missing assets that were taken that were not returned.

 9           With respect to the bonding equipment itself, what

10   they ultimately did is they tried to transfer it to other

11   entities to keep it out of the Debtor's possession.  Right?

12   They recognized that it was owned by the Debtor, but they made

13   it seem as if they put it in another entity's hands because

14   they were afraid of what might happen to it.

15           But that's not the issue.  The issue is who should

16   have possession, you know, of this bonding equipment.  And the

17   Debtor is the entity that should have possession of the bonding

18   equipment.  It's integral to its reorganization.  It's one of

19   the key pieces of technology that allows the Debtor to produce

20   these screens or these panels.

21           And so we filed it on an emergency basis because once

22   the Debtor gets this equipment, you know, there's going to be a

23   ramp up period where they need to reassemble the equipment and

24   they need to get the line up and running.  And then, they can

25   start fulfilling orders for customers.

1          Since they've been in this case, the Debtors, they've

2     already had deals with various customers in which they have

3     purchase orders for an excess of $100 million.  And so if the

4     Debtor can get through this bankruptcy case, it's going to need

5     this optical bonding equipment in order to do that.

6          And once that happens, you know, what will take place

7     is the Debtor will be able to satisfy any claims that these

8     Creditors had or have.  You know, there's going to be disputes

9     as to the amounts of the claims.  And then specific -- and also

10    disputes with respect to whether any portion or all of the Hawk

11    Investment Holding claim, you know, was converted to equity.

12         But those issues don't need to be resolved right now

13    and those claims will be dealt with as part of the claims

14    process and in the Debtor's plan.  But in order to get to that

15    point, the Debtor needs to get started because there's going to

16    be an approximately 60-day period for it to reassemble this

17    equipment and get everything up and running.

18         During that time period, it will be able to send

19    some, I guess, initial product to some of its ultimate end

20    users.  But in order to get the mass production, you know, it's

21    going to take, you know, that full 60 to 90 days to do.  So

22    every day the Debtor does not have the equipment, it pushes us

23    further behind in terms of being able to fulfill the

24    obligations in this bankruptcy case.

25         And so we've seen arguments from the other side that

1   this isn't an emergency because the Debtor has not had its

2   equipment.  But that misses the point.  The Debtor needs the

3   equipment and must have the equipment in order to be successful

4   in the case.  There's no reason for the Debtor not to have this

5   equipment and it should have been turned over immediately upon

6   the bankruptcy filing.

7           And in fact, in one of the actions that was pending,

8   there was a receiver pendent lite that was appointed over

9   Technovative.  His name was Mr. Ian Liston.  And upon the

10  filing, Debtor's counsel reached out to Mr. Liston.  And he

11  said, well, here's the location of the bonding equipment.  You

12  know, you guys are in control now, you know, go get it.

13          But when we attempted to get it, and as we outline in

14  our motion, the landlord indicated that various parties,

15  through counsel, said that the equipment couldn't be released

16  for the Debtor.  And when we dug a little deeper to figure out,

17  you know, who was making these claims and preventing the

18  release, we find out that the lease of the building is in the

19  name of SeeCubic, B.V., which is a subsidiary of the Debtors.

20  And the lease was executed by a Patrick Thune.  But Mr. Thune,

21  in collaboration with Mr. Shad Stastney, who's a representative

22  of SeeCubic, have indicated that they're not going to allow

23  Debtors to get the bonding equipment.

24          And so there's no basis at all for them to not allow

25  the Debtors access to the bonding equipment.  You know, once

1    the Debtors have the bonding equipment, they're going to set it

2    up in a facility, start doing the test runs, and get it fully

3    operational so that they can go ahead and move forward with the

4    production.

5            You know, the Debtors, based on their discussions

6    with various other end users, have been told that once they

7    actually get possession of the bonding equipment, there's going

8    to be more orders to come.  So you have these Creditors on the

9    one hand who are fighting the Debtors from getting their

10   assets, but the reason they're fighting them is because they

11   want to keep the assets for themselves and strip the Debtor of

12   all of its value and leave all of the Creditors and the Debtor

13   -- other Creditors and the Debtor holding the bag.

14           But that's not how the bankruptcy process works.  The

15   Debtors are fiduciaries for all parties, and their goal is to

16   come up with a plan.  And that's what the Debtors are doing

17   here, to come up with a plan to treat all Creditor claims.  And

18   they believe that once they get the equipment, they'll be on

19   the path to doing that.

20           You know, we've already filed redacted versions of

21   certain of the purchase orders showing that this is real and

22   the Debtor is going to be capable of -- in order for the Debtor

23   to fulfill those, it needs the bonding equipment.  Okay?

24           So that is what relates specifically to the bonding

25   equipment.  And as we dug in deeper to get the bonding

1   equipment, Mr. Rajan actually flew over to the Netherlands.

2   And when you talked about corporate structure and parties, Your

3   Honor, I'm not sure how detailed you'd like me to get into the

4   various, I guess the corporate structure.

5          But the way it works -- and this is -- I don't know

6   if you have access to your docket right now.  But if you look

7   at docket entry 48-5, that lays out the structure and the

8   ownership from Stream TV being the parent company, owning 100

9   percent of the shares of Technovative.  And then, there's

10  another entity in between called Ultra-D Ventures, C.V.  And

11  then --

12         THE COURT:  Hold on, counsel.  Hold on.  I actually

13  have -- we have our own little chart here that --

14         MR. ALEXANDER:  Okay.

15         THE COURT:  -- we've got to make.  Stream TV is the

16  Debtor.  And then, Stream owns 100 percent of Technovative; is

17  that correct?

18         MR. ALEXANDER:  That is correct.

19         THE COURT:  And then, Technovative is the 99 percent

20  general partner of Ultra-D Ventures Curacao.  Where is that?

21  Am I pronouncing that right?

22         MR. ALEXANDER:  Yes, you are.  Correct, Your Honor.

23         THE COURT:  Well, let me -- okay.  Is that correct?

24         MR. ALEXANDER:  Yes, Your Honor.

25         THE COURT:  And then, Ultra-D Ventures is 99

 1   percent -- I don't know if they're a general partner or owner

 2   of Ultra-D Cooperative in the Netherlands.  Is that correct?

 3            MR. ALEXANDER:  That's correct, Your Honor.  And

 4   then, if you drop down one more, you get to the SeeCubic, B.V.

 5   entity.

 6            THE COURT:  Right.  Which is 100 percent owned by the

 7   Ultra-D Cooperative, or am I wrong about that?

 8            MR. ALEXANDER:  You are right about that, Your Honor.

 9            THE COURT:  Okay.  And then, there's a SeeCubic,

10   Limited.  That is 100 percent owned by SeeCubic, B.V.?

11            MR. ALEXANDER:  That's not on the chart I'm looking

12   at, Your Honor.  And for today's purposes, I don't --

13            THE COURT:  Well, we made our own chart.  This is my

14   chart.

15            MR. ALEXANDER:  Oh, okay.

16            THE COURT:  This is my chart.

17            MR. ALEXANDER:  Understood.

18            THE COURT:  So let's stop with your chart.

19            MR. ALEXANDER:  Okay.

20            THE COURT:  We'll stop at SeeCubic, 100 percent of

21   SeeCubic, B.V., is owned by Ultra-D Cooperative.  I want to

22   stop there because we were trying to figure -- believe it or

23   not, I do read these things.  Trying to figure out who's what.

24            Okay.  And then, we have U.S. Debtors, three Dutch

25   entities, and then we have SeeCubic entities.  Okay.  All

 1   right.  And we got them color-coded, which, you know, didn't

 2   come out too well.  Okay.

 3            MR. ALEXANDER:  Yeah.

 4            THE COURT:  So --

 5            MR. ALEXANDER:  And so just so you know, the --

 6            THE COURT:  I need for the --

 7            MR. ALEXANDER:  The limited entity is not related to

 8   the Debtor that you just mentioned.

 9            THE COURT:  Which one is not related to the Debtor?

10            MR. ALEXANDER:  You said SeeCubic, Limited.

11            THE COURT:  Right.  That's not related to the Debtor?

12            MR. ALEXANDER:  No.

13            THE COURT:  Okay.  Are you using --

14            MR. ALEXANDER:  It's my understanding -- it's my

15   understanding that that's one of Mr. Shad Stastney, whose of

16   SeeCubic, Inc., that's one of his U.K. entities.

17            THE COURT:  Okay.  Okay.  And to the extent this is

18   relevant to the matter before the Court today is what I am

19   trying to figure out.  I don't need to know all of these

20   different -- but only with respect -- because what the Debtor,

21   with respect to the motion to enforce stay and direct turnover,

22   has at least at some point -- or maybe in the opposition, some

23   reference to these various entities.  And I think on page 19 of

24   the opposition, there was also a chart.  Am I in the right one?

25   Let me see.

1           There was a chart on page -- yes -- 19 that -- well,

2    it looks better than my chart.

3           MR. ALEXANDER:  Which --

4           THE COURT:  Okay.

5           MR. ALEXANDER:  Your Honor, could you -- which

6    opposition?  Because there's been lots of oppositions and

7    affirmative motions filed.

8           THE COURT:  This is the Opposition --

9           MR. ALEXANDER:  What's the docket entry number?

10          THE COURT:  Yeah.  This is docket entry 105.

11          MR. ALEXANDER:  Okay.

12          THE COURT:  Which is SeeCubic's objection to the

13   Debtor's emergency motion for entry of an order.  And on page

14   19, there was also a chart that to some extent follows this --

15   but had more than what at least was on mine.

16          MR. MAZZA:  Your Honor, I'm sorry to interrupt.  This

17   is Jim Mazza from Skadden.  And I interrupt because you're

18   referring to the papers that we filed on behalf of SeeCubic.

19   So in that, that chart does indicate which entities are, you

20   know, putative Debtors and then the entities below them, which

21   are non-Debtors, down to the entities that I believe have been

22   framed by the putative Debtors as subject to this automatic

23   stay dispute.  And those are color-coded in green, beginning at

24   Cooperative.

25          THE COURT:  Okay.  Well, mine did not color-code.  So

 1    I have --

 2            MR. MAZZA:  Oh, I apologize.

 3            THE COURT:  No, it's not your fault.  It just didn't.

 4            MR. MAZZA:  Yeah.

 5            THE COURT:  And so there's -- yes.  I think what was

 6    missing on mine are the ones that you had in between the

 7    Technology Holdings Delaware, Media Holdings Delaware, Ultra-D

 8    Ventures C.V. Curacao is on there.  Ultra-D Cooperative, the

 9    Netherlands is there.  And then, the Stream TV Netherlands is

10    on there.  And the SeeCubic, B.V., the Netherlands is on your

11    chart.  I have SeeCubic, Limited, and I also have SeeCubic

12    India, which is not on yours.

13            So as I said, we tried to figure this out.  Not sure

14    how well we did, but we tried.  So at some point, I just want

15    the parties to at least tell me how they think they're related.

16    The Debtors think that their -- the assets are somehow related

17    to the Debtor.  Obviously, the opposition does not believe that

18    they're any way related to the Debtor, but I'll hear those

19    arguments.

20            Okay.  So Mister -- counsel for Debtor, you can

21    continue with respect to -- I think we have the corporate

22    structure, at least what I need to know at the moment just from

23    an overall basis.  I am assuming that the parties will get into

24    more detail.  Okay?

25            MR. ALEXANDER:  Thank you, Your Honor.  So in terms

1    of what was discovered after we filed the initial motion, and

2    as you may recall, I said that there was a, you know, a

3    receiver in place who, upon the filing of the bankruptcy,

4    recognized that he was displaced.  And the receiver was

5    directly controlling, you know, all of these subsidiaries

6    through the rights of Stream and Technovative.

7            So upon the filing, you know, all these rights vested

8    or revested in the Debtor.  And they worked with Mr. Liston,

9    who was the receiver.  He acknowledged that he was displaced.

10   He began turning over information and materials regarding, you

11   know, all of the subsidiaries, including with respect to the

12   bonding equipment.

13           And then, in order to continue using these management

14   rights and operate these subsidiaries that are integral, you

15   know, to the Debtor's business because they hold the Debtor's

16   intellectual property, Mr. Rajan flew over to the Netherlands

17   in order to assess the situation there, you know, from a

18   financial standpoint, from an employee standpoint, and also

19   determine what was going on, advise the parties of the

20   bankruptcy, advise that he was the CEO, which he is.  And he's

21   the sole director of those entities.  And that they needed to

22   start cooperating with respect to the Debtors being able to

23   proceed in the bankruptcy case and that Mr. Liston was no

24   longer involved.

25           And in fact, Mr. Liston actually sent correspondence

1   to SeeCubic, B.V., and Mr. Patrick Thune, who works at

2   SeeCubic, B.V., you know, advising them that this transition

3   was taking place.  And so there was no doubt that all of these

4   parties, you know, had knowledge of the bankruptcy cases and

5   that there's no dispute of the ownership.

6           There's never at any point, you know, been any

7   transfer of the ownership of any of these entities.  There's

8   been no foreclosure of stock interests.  None of these

9   Creditors have ever taken that step.  And so they are still

10  owned by the Debtors.

11          And so what comes along with that are the rights to

12  manage and operate these entities.  And so that's what Mr.

13  Rajan was doing when he went over there, was to assess it, take

14  control, and also to determine what type of funding was

15  necessary to keep running these entities and also determine,

16  you know, whether that lines up what the vision is going

17  forward in terms of the Debtor's operations.

18          And what Mister --

19          THE COURT:  Counsel?

20          MR. ALEXANDER:  Yes, Judge?

21          THE COURT:  Counsel?

22          MR. ALEXANDER:  Sure?

23          THE COURT:  When you say these entities, specifically

24  what entities are you referring to?

25          MR. ALEXANDER:  SeeCubic, B.V. is the specific entity

 1   that he went over to the Netherlands in terms of the operations

 2   of.  And that's owned by the Stream TV Network and

 3   Technovative, when you follow through the chart.

 4            THE COURT:  If I look at this chart and do a

 5   back -- okay.  There's two different -- your chart doesn't have

 6   the Delaware and the Hawk has Technology Holdings Delaware and

 7   Media Holdings.  And mine just goes straight from -- and I

 8   don't know which one is right, I just made my own chart --

 9   Stream TV to Technovative, Technovative to Ultra-D, and Ultra-D

10   Ventures to Ultra-D Cooperative, and then Ultra-D Cooperative

11   to SeeCubic, B.V.  So we're talking about SeeCubic, B.V. is the

12   one in the Netherlands that you went over for?  Mr. Rajan went

13   over for?

14            MR. ALEXANDER:  Yeah.  That's correct, Your Honor.

15   Okay.  And so that entity.  And what they were met with was Mr.

16   Patrick Thune advising them that Mr. Stastney -- remember Mr.

17   Stastney is affiliated with SeeCubic, Inc., and those are

18   Creditors, you know, of --

19            THE COURT:  Now, wait a minute.  Could you spell that

20   for me?

21            MR. ALEXANDER:  Stastney is S-T-A-S-T-N-E-Y.

22            THE COURT:  I'm sorry, say that again.

23            MR. ALEXANDER:  His first name is Shadron.  I believe

24   I said that correctly.  It's S-H-A-D-R-O-N.  The last name is

25   Stastney, S-T-A-S-T-N-E-Y.

1          THE COURT:  And he is?  And who is he again?

2          MR. ALEXANDER:  He's a principal at SeeCubic, Inc.

3    And also I believe affiliated with Hawk Investment Holdings.

4          THE COURT:  Okay.  So I think you were going --

5          MR. ALEXANDER:  I'm sorry.  He's affiliated with SLS.

6    I apologize.

7          THE COURT:  With SLS.

8          MR. ALEXANDER:  SLS Holdings.

9          THE COURT:  Wait.  S?

10         MR. ALEXANDER:  L-S, Holdings.

11         THE COURT:  Okay.

12         MR. ALEXANDER:  And those are parties, if you recall,

13   that said the Debtor had financing arrangements with Hawk

14   Investment Holdings and also SLS Holdings, I believe it's VI,

15   LLC.  None of those entities, you know, loaned money to any of

16   the subsidiary entities.  It was solely Stream TV, the Debtor.

17         THE COURT:  Okay.

18         MR. ALEXANDER:  And what Mr. Thune was telling Mr.

19   Rajan is Mr. Stastney, based on his debts with the Debtors,

20   right, so the claims that he believes he has against the

21   Debtors, you know, he's able to direct, you know, certain

22   actions at the subsidiaries.  And so they're trying to use

23   their debts against the Debtors to try and impact these

24   subsidiaries that are integral to the Debtor's reorganization

25   process and were set up for, you know, tax and research and

1 design purposes.

2            And so they're interfering with the Debtor's ability

3 to be able to manage these entities.  And they have no basis to

4 do that.  You know, Mr. Rajan is the CEO.  And again, there's

5 been no argument or I haven't seen anything in any of the

6 papers, you know, indicating that stock ownership was

7 transferred away from Stream TV or Technovative with respect to

8 any of the downstream entities.

9            And so upon the filing, all of that ownership

10 remained with the Debtor's estates.  And so what these parties

11 are trying to do is make an end run and try to go now at the

12 other assets.  But their only basis for attempting to do that

13 is based on their claims that they assert that they have

14 against the Debtors.

15            And so their actions are damaging the estates and the

16 abilities of the Debtor to proceed and progress in this case.

17 Because again, the SeeCubic, B.V. entity holds the R&D and

18 certain of the intellectual property that's utilized by the

19 Debtors to manufacture those panels that we discussed about

20 earlier through the use of the bonding machine.

21            So it's all interrelated in terms of the process in

22 which the Debtors are going to be able to succeed.  And so you

23 have parties that have come before this Court, you know, who

24 filed a motion to seek relief from the automatic stay to

25 proceed with a, you know, dispute in the Chancery Court in

1    Delaware.  But then, they're taking the very action that they

2    were seeking to obtain by seeking the relief.

3             And so clearly, they know that the actions they're

4    doing are improper and are a violation of the stay.  And so

5    what we're seeking from the Court with respect to that is for

6    them to stop interfering with the Debtor's management.  And

7    they've even gone so far as to file a lawsuit in the

8    Netherlands trying to strip the Debtors of their management

9    rights with respect to SeeCubic, B.V.

10            And so the Debtor has those rights through its

11   ownership interests, you know, through the various

12   subsidiaries.  And we believe that's an intentional

13   interference with property of the estate and the Debtor's

14   ability to manage, you know, its assets.

15            And so we think it clearly falls within a violation

16   of the stay.  And so the first two violations that we have are,

17   one, with respect to the bonding equipment.  And you know,

18   quite frankly, I haven't seen anything filed which indicates

19   it's not owned by the Debtors and shouldn't be in their

20   possession.

21            And now, we have the management rights of the

22   subsidiaries that are being interfered with by the acts of, you

23   know, Mr. Stastney directing people such as Patrick Thune.  And

24   then also, you know, the filing of the lawsuit, which was

25   purportedly filed on behalf of SLS, Hawk, SeeCubic, Inc., and

 1  Mr. Stastney.

 2         And so if the Debtors are going to have a chance to

 3  succeed in this case, you know, this interference has to stop.

 4  You know, these parties are looking to steal the Debtor's

 5  assets and keep them for themselves, but that's not what

 6  bankruptcy is about.  It's an equitable process in which the

 7  Debtors have a statutory right to attempt to reorganize.  And

 8  that's what they're trying to do in this, but they need

 9  possession of all of their assets and they need the

10  interference to cease.

11         The third basket, in terms of the stay relief and

12  turnover, if you recall, I previously had mentioned that

13  omnibus agreement.  And part of that agreement and the order

14  from the Chancery Court required certain assets -- and we list

15  the assets in the motion, with respect to various display

16  units, tablets, corporate laptops.  All of those ended up being

17  turned over from Stream to SeeCubic, Inc.

18         Once the omnibus agreement was determined to be void

19  and improper by the Delaware Supreme Court, those assets were

20  all supposed to come back.  The Chancery Court entered an order

21  saying all those assets needed to come back.  And to this day,

22  those assets still have not been returned to the Debtor.  And

23  we outlined, you know, the specific assets in our -- and let me

24  get the document entry number.  We believe it's 76, Your Honor.

25         THE COURT:  Let me -- I don't think I've printed out

1  76, but let me look at -- motion for sanctions.  Is that the

2  original motion?

3           MR. ALEXANDER:  Let me double check.  Maybe that's

4  not -- it's not.  I apologize, Your Honor.  It's not outlined.

5  I'll get the docket entry for you that has those identified.

6  But those are the assets that were transferred and were

7  supposed to come back to the Debtor.

8           THE COURT:  All right.

9           MR. ALEXANDER:  And SeeCubic, Inc., has refused to

10  deliver them, or alternatively, account for them in terms of

11  what happened to them.  Because the response the Debtor had

12  when it sought certain of these are, well, some of those aren't

13  really property of the Debtor because maybe we made some

14  improvements to them.  Or they were returned.

15           But you know, we believe the code requires more than

16  that, and it actually requires not only the return but an

17  accounting for those assets, so.

18           THE COURT:  Okay.  And what assets are you -- what

19  docket entry number are you referring to?

20           MR. ALEXANDER:  I'm scrolling through to try and find

21  that as we talk, Your Honor.

22           THE COURT:  Is it in your supplemental, number 90?  I

23  did print 90, but not -- supplemental motion for stay for

24  turnover and sanction.

25           MR. ALEXANDER:  It may be 76, and then, number 3.

1          THE COURT:  Number 3?

2          MR. ALEXANDER:  So 76-3.

3          THE COURT:  Okay.  Exhibit C?

4          MR. ALEXANDER:  That's correct, Your Honor.  Where we

5   list the other Stream assets, a list of Debtor's property, you

6   know, in possession of SeeCubic, Inc.  And we go through there,

7   there's the Ultra-D -- their demonstrator samples.  We identify

8   the last location, you know, where they were at or where the

9   Debtors knew they were at.  And then, we also go through and

10  list the tablets.  To the extent that we have serial numbers,

11  we listed the serial numbers.

12         And so we provided as much information as possible so

13  that there's no misunderstanding in terms of, you know, what

14  assets are being referred to and which ones need to be turned

15  over.  And so we've identified, you know, each of those assets

16  and the reasons why those assets are important.

17         You know, putting aside the business computers, which

18  had numerous information of the Debtor's in terms of their

19  business operations on it, which they no longer have access to,

20  but the specific samples.  This is what the Debtors use when

21  they go out to pitch the product and sell it to other parties.

22         And so again, part of the equation is, is it of

23  inconsequential value.  And certainly, these are very material

24  and they allow the Debtors to go out and get more purchase

25  orders with the goal in mind of being able to deal with the

1    debts of SLS and Hawk, you know, in this bankruptcy process.

2         And so these are very integral to the Debtors being

3    able to do that.  And these are samples that, you know,

4    customers want to see.  I mean, they actually want to see the

5    product work and how it works before they, you know, issue more

6    purchase orders or for entities that the Debtors have not done

7    business with in the past, new purchase orders.

8         And so all of that property, you know, should be

9    returned and turned back over to the Debtors so that they can

10   utilize it as part of the process, in terms of reorganization.

11   And so you know, most creditors that I see in bankruptcy cases,

12   they want to get paid.  And so in order for these Creditors to

13   get paid, you know, they need to allow the Debtors to operate

14   and not interfere with their operations and allow them to have

15   all of their property in their possession.

16        It's all going to be under this Court's, you know,

17   jurisdiction, in terms of how the Debtor operates, reporting

18   requirements.  And so that is, you know, what we're looking to

19   do here, is to stop the violations of the automatic stay,

20   require property to be turned over to the Debtor.  There's no

21   good faith basis for it not to be in the possession of the

22   Debtors.  And this is very material to the Debtors.

23        And you know, I just want to note in terms of the

24   urgency with respect to the interference at SeeCubic, B.V., you

25   know, they've filed a proceeding and they have a hearing set on

1   the 20th where they're trying to oust Mr. Rajan, you know, from

2   the management of that entity.  And you know, that could be

3   very detrimental because again, the Debtor then won't have

4   control over its intellectual property which it utilizes in

5   terms of creating these panels, which is has $100 million-plus

6   in orders that it's obtained since the bankruptcy cases were

7   filed.

8        So we need the actions to stop.  We need the parties

9   to comply with what the bankruptcy code requires.  And then,

10   the Debtors can go ahead and proceed with the case in an

11   orderly fashion.  And instead of focusing on, you know, where

12   are our assets, who's interfering with it, they can actually

13   focus on the restructuring part and making sure that Creditors

14   in this case and their claims ultimately get satisfied as part

15   of a plan because there should be plenty of money, based on

16   these orders, to deal with all the claims in this bankruptcy

17   case.

18        But the Debtors need the breathing spell and they

19   need to be afforded the rights under the bankruptcy code in

20   order to do that without the violations by SLS, Hawk, SeeCubic,

21   and Mr. Stastney, and their work essentially interfering in the

22   operations of the Debtor's subsidiary, SeeCubic, B.V., in the

23   Netherlands.

24        And so Your Honor, we believe that there's an urgency

25   in granting this relief and we would request that Your Honor

1    enter an order directing them to stop interfering with the

2    Debtor's management of its subsidiaries, turn over and allow

3    access to the bonding equipment, and also all of the other

4    property that's listed in 76-3.

5              THE COURT:  Okay.

6              MR. ALEXANDER:  And if Your Honor has any questions,

7    I'm happy to help clarify.  I know when we do this over the

8    phone, it's not as easy as if we're able to hand you things in

9    person.  But I'm happy to try and point you to any other

10   documents or follow-up on any questions that you may have.

11             THE COURT:  Okay.  Not at this time.  I want to hear

12   from SeeCubic.  Okay.  And you said Mr. Mazza on behalf of

13   SeeCubic?  Or did I have that backwards?

14             MR. MAZZA:  You are correct, Your Honor.  This is Jim

15   Mazza from Skadden on behalf of SeeCubic.  And if I may

16   proceed?

17             THE COURT:  Yes.

18             MR. MAZZA:  I'll respond to what Mr. Alexander went

19   through.  And I got to say, first off, there's a long history

20   here, and I know the Court has seen a lot of papers get filed

21   with that history.  And I'm not going to belabor it, but -- and

22   I think it's going to come out as more as there will actually

23   be evidence as part of this case.

24             But I think the axiom that an honest debtor is

25   entitled to the benefit of the doubt does not apply here.

1   There is history with this being the third filing, and Mr.

2   Alexander has an explanation as to why this was an okay filing.

3   I'll respond to that in due course.

4          But every one of these filings was at the eleventh

5   hour to avoid a foreclosure.  It's a textbook bad faith use of

6   the bankruptcy system, and I think Hawk's motion to dismiss,

7   convert, or have a trustee appointed is actually much more

8   relevant than the rich irony of the Debtor hauling us into

9   court to try to have to explain ourselves when they have both

10  the facts and the law completely wrong.  And it should be their

11  principal, Mr. Rajan, explaining himself as to why these cases

12  were filed and what this is really about.

13         The automatic stay issues, Your Honor, are actually

14  pretty simple when you look at the law.  And I don't think -- I

15  know this isn't an evidentiary hearing.  I know there seems

16  like there was a lot of testimony from the podium from Mr.

17  Alexander.  And what it boils down to, it's pretty simple.

18         We're looking at a few different discrete items that

19  they're making complaints about, the first of which is this

20  bonding equipment.  And I think there's enough in the record

21  that the Court can take judicial notice of to the extent

22  there's any need for facts.  But the bottom line is there's a

23  simple legal principal that applies here that the Supreme Court

24  had put in a holding very recently.  And that is the retention

25  of estate property is not a stay violation.  And that, we cited

1    in our papers, Fulton v. City of Chicago.

2            And that's the law, period, full stop.  I've

3    mentioned --

4            THE COURT:  Okay.  Counsel, let me ask you -- let me

5    ask you with respect to the Fulton decision.  Retention.  In

6    those cases, the -- I think it was a couple of cases -- the

7    City of Chicago had repossessed the vehicles in question.  So

8    they were rightfully in possession.  In other words, they had

9    a -- they were holding it pursuant to, I guess, their rule,

10   whatever.

11           And what I'm trying to figure out in this case, what

12   right did SeeCubic have to -- let's start with that bonding

13   equipment first.  Under what basis did SeeCubic have -- so

14   that's the first thing you have to establish, is that you had a

15   right to retain it.  So what basis did SeeCubic have to be in

16   possession of this bonding equipment?

17           MR. MAZZA:  Your Honor, let me answer that question

18   as to the facts as it relates to the bonding equipment that we

19   laid out in our papers and what has been going on in the Court

20   of Chancery.  So that bonding equipment is sitting in a

21   warehouse in a city in China, and it's been sitting there

22   inoperable for a long period of time.

23           And so SeeCubic is --

24           THE COURT:  Okay.

25           MR. MAZZA:  SeeCubic is not doing anything to

1   exercise any control over that equipment.  It just remains in

2   the warehouse.  And so that --

3           THE COURT:  Okay.  So why isn't it being -- no, no,

4   no.  It's more than that.  Why isn't is being released to the

5   Debtor?

6           MR. MAZZA:  So and Hawk, I know, is on the phone as

7   well.  And I think one thing that the Debtor's counsel has not

8   conveyed to the Court are discussions where the parties have

9   tried to figure out a way to consensually actually return the

10  equipment to Stream under the ordinary process of dealing with

11  adequate protection.

12          And let me tell you, Your Honor, the discussions

13  around that were pretty basic, asking the Debtor for proof of

14  insurance, method by which they would move the equipment,

15  because it's highly technical equipment, where they might

16  actually move the equipment, as far as ultimate location.

17  Those particular details have not been shared with either us or

18  Hawk as part of this discussion.

19          So really, the --

20          THE COURT:  So counsel, let me ask you this.  You

21  represent SeeCubic.

22          MR. MAZZA:  Correct.

23          THE COURT:  What is SeeCubic's interest in this

24  bonding equipment?

25          MR. MAZZA:  SeeCubic's interest in the bonding

1  equipment, I think, Your Honor, there's a few points.  Again,

2  it's sitting in a warehouse in China --

3          THE COURT:  Counsel, I get all that.

4          MR. MAZZA:  Correct.  Right.

5          THE COURT:  My question is what is SeeCubic's

6  interest in the bonding equipment and what is it based on?

7          MR. MAZZA:  So we are a secured Creditor, along with

8  Hawk, in connection with the bonding equipment.  And therefore,

9  we have an interest in the Debtor providing adequate

10 protection, which, again, we tried to resolve --

11         THE COURT:  Okay.  So wait a minute, counsel --

12         MR. MAZZA:  -- resolve with the Debtor.

13         THE COURT:  Counsel.  Counsel, let me walk you

14 through this.  So you're a secured Creditor in that you have a

15 bonding equipment?

16         MR. MAZZA:  Correct.

17         THE COURT:  And when I say you, you mean SeeCubic has

18 a security interest in the bonding equipment?

19         MR. MAZZA:  That's right, Your Honor.  Your Honor,

20 this --

21         THE COURT:  SeeCubic -- wait a minute.

22         MR. MAZZA:  This --

23         THE COURT:  Hold on.  Hold on.  I mean, I'm trying to

24 get the facts, because my reading -- and that's why I'm asking

25 questions -- is that I thought -- and there's a couple of

1  SeeCubics.  I thought the -- which SeeCubic are you referring

2  to?  So maybe that makes a difference.

3          MR. MAZZA:  Yeah.  Yeah.  Right, Your Honor.  I can

4  see how it can get a little bit --

5          THE COURT:  So SeeCubic.  Who has a security interest

6  in the bonding?  SeeCubic, Inc.?

7          MR. MAZZA:  Correct.

8          THE COURT:  Now, I thought SeeCubic, Inc., was formed

9  to take possession pursuant to that agreement?

10          MR. MAZZA:  You're right, Your Honor.  It was the

11  acquisition vehicle through the foreclosure that previously

12  occurred.  And so --

13          THE COURT:  So how does it have a security interest?

14  It's actually, its interest in the bonding equipment arose

15  pursuant to that agreement that is now void.  At least,

16  according to the Delaware Supreme Court, that agreement is

17  ineffective and any transfer to SeeCubic would be ineffective.

18          MR. MAZZA:  Right.

19          THE COURT:  So SeeCubic's interest was pursuant to a

20  void order.  How is it a secured Creditor?

21          MR. MAZZA:  So let me peel it back a little bit

22  further, Your Honor.  So Hawk is a secured Creditor of Stream.

23  Under pledge agreements securing loans, Stream granted Hawk the

24  right to vote all of its shares in Technovative common stock

25  following an event of default.

1              After the omnibus agreement was approved, Hawk and

2    SLS made loans to SeeCubic to help grow the business.  And they

3    entered into a note and purchase agreement amongst those

4    parties, in conjunction with which Hawk and SLS --

5              THE COURT:  What parties?  Wait a minute.  What

6    parties?

7              MR. MAZZA:  Hawk, SLS --

8              THE COURT:  What parties?

9              MR. MAZZA:  Hawk, Your Honor, and SLS, who's the

10   first lien Creditor, and SeeCubic.  And they transferred their

11   rights --

12             THE COURT:  Okay.  Okay.

13             MR. MAZZA:  And they transferred their rights as

14   Creditors to SeeCubic, thereby consolidating those rights

15   within a single entity.  Pursuant to that agreement, Hawk is

16   still able to enforce and levy enforcement rights against

17   Stream because of an agreement between SeeCubic and Hawk.  So

18   that's how the interplay works between the secured Creditors.

19   And that's been already decided by the Chancery Court in a

20   collateral estoppel opinion that was issued --

21             THE COURT:  Okay.  And that had nothing to do with

22   that agreement because I understand the agreement, it was

23   pursuant to this agreement that the assets, including this

24   bonding equipment, was transferred to SeeCubic.  So right now,

25   the title to this thing belongs to the -- unless you're telling

 1  me the Debtor never had title, title and ownership remains with

 2  the Debtor.  And that according to -- so whatever the -- with

 3  respect to -- not with the rights to who had security interests

 4  or any of that other stuff.

 5          MR. MAZZA:  Right.

 6          THE COURT:  Transfer of the equipment -- talking

 7  about the bonding equipment -- to SeeCubic was undone because

 8  the court found that whatever happened with respect to that

 9  agreement was not enforceable.  And so to the extent the

10  equipment had been transferred, it really has to go back to the

11  Debtor.

12          MR. MAZZA:  So --

13          THE COURT:  So the bonding equipment -- no?  Who did

14  it go back to?

15          MR. MAZZA:  Sorry.  Go ahead.

16          THE COURT:  So who did it go back to?  Who owns it

17  right now?

18          MR. MAZZA:  Yeah.  So Your Honor, it's property of

19  the estate.  So the --

20          THE COURT:  Counsel, that did not answer my question.

21  My question is who owns -- if the transfer to SeeCubic is

22  undone --

23          MR. MAZZA:  Correct.

24          THE COURT:  -- who is the owner of the bonding

25  equipment?

1          MR. MAZZA:  Stream.

2          THE COURT:  Okay.  So if Stream is the owner and no

3  one has repossessed or foreclosed or did anything with respect

4  to the bonding equipment -- okay?  I get you might have a

5  security interest, and I'm not saying you don't.  And if the

6  Delaware court already decided you did, that's fine.  But for

7  my purposes, if you didn't foreclose, you meaning either

8  SeeCubic, who has the rights of Hawk and SFL -- or am I

9  pronouncing right?  Is it FSL or FLS?

10         MR. ALEXANDER:  SLS.

11         THE COURT:  They transferred --

12         MR. MAZZA:  SLS, Your Honor.

13         THE COURT:  SL what?

14         MR. MAZZA:  SLS.

15         THE COURT:  SLS.  That's what I thought I said.  SLF.

16  I'm saying SFL.  SLS.  Whatever security interests that Hawk

17  and SLS had in the bonding equipment, they transferred those

18  rights to SeeCubic, correct?

19         MR. MAZZA:  Correct.

20         THE COURT:  Correct?

21         MR. MAZZA:  Correct.  You're right.

22         THE COURT:  And neither Hawk, SLS, or SeeCubic

23  foreclosed on that or took possession of it, because that order

24  was undone, correct?

25         MR. CAPONI:  Your Honor, from Hawk's perspective,

1   incorrect.  But I'll let Mr. --

2           THE COURT:  Okay.

3           MR. CAPONI:  Only because you had mentioned Hawk.

4           MR. MAZZA:  Yeah.

5           THE COURT:  Well, okay.  Well, let's put it this way.

6   Did anybody foreclose on that bonding equipment?  Did anybody

7   repossess the bonding equipment?

8           MR. CAPONI:  So Your Honor, again, Steve Caponi for

9   Hawk.  Factually, what occurred, Your Honor -- and the answer

10  to your question is yes.  Factually, what occurred in the

11  connection with -- the Delaware Supreme Court invalidated the

12  omnibus agreement and directed the Court of Chancery to unwind

13  the omnibus agreement, effectively, and move assets back to

14  where they belong.

15          With respect to the piece of bonding equipment, it

16  was never, full stop, never an asset of this estate.  It was

17  always --

18          THE COURT:  Wait a minute.

19          MR. CAPONI:  Yes, Your Honor?

20          THE COURT:  Wait a minute.  I just -- I just -- Mr.

21  Mazza just said it's property of the estate.  Which one is it?

22  Who owns it?

23          MR. CAPONI:  I can only answer for my client, Your

24  Honor.  The piece of bonding equipment was always retained at

25  the SeeCubic, B.V., level.  That's where the equipment was

1   owned.  Stream was always and remains a holding company.  It's

2   only asset -- it had no operations.  Its only asset was stock

3   in Technovative and then downstream to the SeeCubic, B.V.,

4   level.

5          THE COURT:  Okay.

6          MR. CAPONI:  The way the Court of Chancery

7   effectuated the omnibus agreement, meaning when it first

8   ordered the omnibus agreement to be complied with, what

9   occurred was the stock of Technovative was moved over to

10  SeeCubic because once you took Technovative, all the operating

11  subsidiaries fell underneath that to the really only operating

12  subsidiary, which is SeeCubic, B.V.

13         So fast forward --

14         THE COURT:  Okay.  So who has --

15         MR. CAPONI:  Fast forward --

16         THE COURT:  Counsel, let's cut to the chase.

17         MR. CAPONI:  Yes.

18         THE COURT:  Who is the title owner of the bonding

19  equipment?

20         MR. CAPONI:  The title owner of the bonding equipment

21  is SeeCubic, B.V., in the Netherlands.  But Your Honor, to your

22  point about foreclosure, after the Supreme Court set aside the

23  omnibus agreement and it came back to the Court of Chancery,

24  the Vice Chancellor Lassiter (phonetic), gave Stream a 10-day

25  window to raise the funds sufficient to pay off the secured

1  debt before it would allow the secured Creditors to exercise

2  their secured Creditor rights, which included foreclosure,

3  self-help, et cetera.

4       That 10-day window expired, Stream having done

5  nothing.  Hawk, in the name of Hawk and SLS and SeeCubic --

6  again, as Mr. Mazza indicated, there was a pooling of these

7  security interests -- executed a series of documents

8  repossessing its collateral, directing that the stock in

9  Technovative be transferred over to SeeCubic.

10       That triggered the 225 action.  And the court put in

11 place the receiver to freeze everything in place.  The receiver

12 was at the Technovative level and lower.  And I think the

13 quickest way to dispose of Your Honor's question is if you

14 look, again, judicial notice, at what occurred in the Court of

15 Chancery.

16       When Stream wanted to get possession of the bonding

17 equipment, it negotiated with the receiver, who was below

18 Stream.  So if Stream had the bonding equipment, it would not

19 have been negotiating with the receiver.  It was negotiating

20 with the receiver, vis a vis Technovative, ultimately

21 controlled SeeCubic, B.V.

22       THE COURT:  Okay.

23       MR. CAPONI:  There was a motion made with the Court

24 of Chancery where the receiver -- and the Court of Chancery

25 authorized this, so this is like collateral estoppel here.  The

1   Court of Chancery authorized the receiver to permit Stream to

2   take possession of the bonding equipment.  And the order is

3   very clear, the receiver could cause SeeCubic, B.V., to turn

4   over possession of the bonding equipment -- and SeeCubic, B.V.

5   is a non-Debtor -- if certain conditions were made, which was

6   Mr. Mazza indicated, proof of insurance, putting up a bond, et

7   cetera.

8           The Debtor never did that.  So the state of play when

9   this case was filed was that the bonding equipment was still

10  resident under the ownership of SeeCubic, B.V., rights, title,

11  and interest, subject to the secured Creditor's liens.  There

12  was an opportunity for the Debtor to take possession -- oh,

13  sorry, SeeCubic, B.V., being a non-Debtor.  The Debtor could

14  take possession if it satisfied the court order.

15          It never did.  So once the bankruptcy was filed, we

16  are back to the beginning.  Stream wants an asset that the

17  right, title, and interest resides pursuant to the Court of

18  Chancery order on this point, at SeeCubic, B.V., subject to the

19  foreclosure options that my client exercised as well as a

20  secured interest.

21          THE COURT:  Okay.  So you believe that your client

22  actually foreclosed on the property and that it's not property

23  of the Debtor's estate?

24          MR. CAPONI:  Correct.  Well, it's not property of the

25  Debtor's estate, A, because it's at the SeeCubic, B.V., level,

 1   which is not a Debtor or even a subsidiary of a Debtor.  It's

 2   about four steps removed.  And as the Vice Chancellor --

 3        THE COURT:  Well, but wait a minute.  But --

 4        MR. CAPONI:  Yes, Your Honor?

 5        THE COURT:  But counsel, you would also agree -- and

 6   maybe I'm missing something -- that the SeeCubic, B.V., is

 7   owned 100 percent by Ultra-D Cooperative, which is 99 percent

 8   owned by Ultra-D Ventures, and Ultra-D Ventures is 99.9

 9   percent -- Technovative is the 99.9 percent general partner.

10   So that any interest that these Debtors have -- or the only one

11   I guess would be Technovative -- have is pursuant to its

12   ownership interests in the various companies that flow down to

13   SeeCubic, B.V.?

14        MR. CAPONI:  Your Honor --

15        THE COURT:  And not directly.  And not directly.

16        MR. CAPONI:  Yes, Your Honor.  So I do not profess to

17   be a -- I'm a litigator, not a pure bankruptcy lawyer.  And so

18   I just point out that whatever the legal effect is of the

19   Debtor not putting a subsidiary into bankruptcy is for someone

20   else on this call to address.  I will only comment to the

21   extent to say that the laws in the Netherlands, which is why I

22   think there's a hearing next week.  I'm not involved in it.  I

23   don't know much.  But the law in the Netherlands is such that

24   the directors owe duties, I think, greater than to just their

25   controlling stockholder.  And that is why the controlling

1    stockholder cannot just replace necessarily a director, which

2    is what the Debtor is trying to do.

3              Again, above my pay grade to a certain extent.  But

4    this is not -- if this was in the United States, Your Honor, in

5    Delaware where I'm most familiar, yes, I would agree with you,

6    a wholly owned sub of a wholly owned, you know, sub of a wholly

7    owned sub ultimately goes back to the parent.  That apparently

8    is not the case --

9              THE COURT:  Right.  And the --

10             MR. CAPONI:  -- in the Netherlands.  And because this

11   is not a Debtor.

12             THE COURT:  But it doesn't matter that it's not a

13   Debtor.  The Debtor's interest in those entities is property of

14   the estate.

15             MR. CAPONI:  Yes, Your Honor.

16             THE COURT:  You don't disagree with that?

17             MR. CAPONI:  The Debtor does not have an interest in

18   the assets, the specific assets, of the non-Debtor entity.

19             THE COURT:  I get that.

20             MR. CAPONI:  It has an interest of in the entity.

21   Yes, I agree with you.

22             THE COURT:  I get that, counsel.  And that's what I'm

23   saying, is the Debtor's interest in the subsidiaries, as I'm

24   going to call them, is property of the estate.

25             Now, I'm a little confused because the Debtor --

1   Debtor's counsel said that the Debtor had title to and

2   purchased the bonding.  So somebody is wrong.  It can't be

3   both.  It can't be that the Debtor purchased and had title, and

4   your position, counsel, that in fact, the Debtor did not

5   purchase and that title lied with SeeCubic, B.V.

6           I don't know which one it is.  And I guess -- I mean,

7   I'm not going to decide that today.  But it goes to me trying

8   to figure out where we are and whether there's some preliminary

9   relief that I can grant pending a full-blown evidentiary

10  hearing.

11          MR. CAPONI:  Your Honor?

12          THE COURT:  But it's a --

13          MR. CAPONI:  I agree with your -- this is not

14  the -- will not be the first and last time there's a polar

15  opposite view of the facts from the Debtor and the secured

16  Creditors.  I would just say the easiest way for the Court to

17  look at this in a preliminary level -- and again, an

18  evidentiary hearing may be required -- is to look at the court,

19  which, the Court can take judicial notice of there was a

20  specific order entered in the Court of Chancery where the

21  Debtor petitioned the receiver in order to get control of this

22  asset.

23          And in that proceeding and in those orders, nowhere

24  did the Debtor argue that it had title.  Everyone acknowledged

25  title and possession belonged to SeeCubic, B.V.  I understand

1    they're changing their tune now, and we can, you know, tease

2    that out in the future for Your Honor.

3              But lastly on this point, Your Honor, my clients, as

4    the Court of Chancery noted several times, had expansive

5    self-help rights on all of the assets, top to bottom.  And we

6    exercised those rights prior to this bankruptcy.  The only

7    reason my client was funding and managing and operating

8    SeeCubic, B.V., the only reason we didn't take title to the

9    stock, et cetera, was because the Court of Chancery put the

10   receiver in place during the 225 action.  But that occurred

11   after we had already issued all the notices required under the

12   various contracts to pull the trigger on our self-help rights.

13             THE COURT:  Okay.  So that just means, as far as I'm

14   concerned, is that if you exercised -- and when you say you,

15   presumably, you mean SeeCubic, because what I'm hearing -- or

16   maybe I misunderstood, was that all of the rights for your

17   stock had been transferred to SeeCubic.  Was that correct?

18             MR. CAPONI:  That is correct, Your Honor.  And the

19   reason I refer to -- the reason everyone refers to Hawk in the

20   shorthand for SeeCubic is that SeeCubic -- sorry, SeeCubic

21   issued notes separately to Hawk.  Those notes are in default.

22   And Hawk, under those notes, is the collateral agent of

23   SeeCubic, with all of the rights to exercise all of SeeCubic's

24   rights in Hawk's own name or in the name of SeeCubic.

25             So with regard to the secured debt, it is not

1    directly owned by Hawk.  But as a result of a default under a

2    different set of notes, for all intents and purposes, Hawk is

3    the party exercising all of SeeCubic's rights.

4           THE COURT:  And does SeeCubic exercise and

5    grant -- it's going to get a little dicey, as far as I'm

6    concerned, the -- you said SeeCubic issued notes to Hawk that

7    it defaulted on.

8           MR. CAPONI:  Yes.

9           THE COURT:  And those notes to Hawk gave -- what did

10   SeeCubic give to Hawk on those notes?  In connection with those

11   notes?

12          MR. CAPONI:  Your Honor, those -- yeah.  Those notes,

13   by virtue of those notes, Hawk was the first lien secured

14   Creditor over all of the assets -- let me -- if I could step

15   back for one second.  Hawk was the primary funder of Stream and

16   had a security interest over everything at Stream.  When Hawk

17   contributed that debt and those rights to SeeCubic, one of the

18   things --

19          THE COURT:  Let me ask -- hold on a minute.

20          MR. CAPONI:  And this is shorthand.

21          THE COURT:  Hold on.

22          MR. CAPONI:  Yes.

23          THE COURT:  Hold on. Back up a minute.  You told me

24   that Stream -- Steam, right?  The Debtor Stream was just a

25   holding company and had no operations.  It was just a holding

1  company for all these other subsidiaries.

2          MR. CAPONI:  Correct.

3          THE COURT:  So what did you -- what did you fund

4  Stream TV to do?  I mean, it was a non-operating company.  What

5  did you loan -- you, meaning Hawk -- loan them money for?

6          MR. CAPONI:  Well, Stream was the primary vehicle

7  through which third parties made an -- when I refer to Stream,

8  I'm referring -- I was referring to it as the family.  But to

9  be technical, the Stream entity that is the Debtor was the

10 vehicle through which funding was raised.  That money was then

11 downstreamed to the operating entities.

12         And in certain instances, Hawk -- I'm not sure about

13 SLS, but Hawk funded directly past Stream down to the SeeCubic,

14 B.V., level as well.  And in exchange for the totality of that

15 funding -- there were 18 different notes -- when you wrap them

16 all together, Hawk had a security interest with self-help

17 rights, et cetera, over all of the assets in the Stream family,

18 from top to bottom, from the Stream parent level to the

19 SeeCubic, B.V., level, and had pledge rights and -- these are

20 very voluminous documents.

21         THE COURT:  Okay.

22         MR. CAPONI:  But when those rights were contributed

23 to SeeCubic, Hawk received a commensurate level of protection

24 at the SeeCubic level, meaning if there was a default on the

25 underlying notes or the notes between SeeCubic and Hawk, Hawk

1    would have the right to basically step in and be out back in

2    position as the first lien, you know, priority secured Creditor

3    with pledge rights and everything else.

4           And so that's what Hawk -- what SeeCubic gave to Hawk

5    in exchange for Hawk contributing the notes, among other

6    things, was the right to be what is called the collateral

7    agent.  And that is to exercise all of SeeCubic's rights under

8    those 18 notes that I referred to a minute ago.

9           THE COURT:  Okay.  So let's see if I understand it.

10   Hawk and maybe SLS contributed whatever security for all of

11   their claims against the Stream family into SeeCubic.  And in

12   exchange for that, SeeCubic also gave notes or however it was

13   documented where there was a default -- and I don't know who

14   the default would be by, because you didn't tell me that.

15   There was a default, then all the rights would then actually --

16   I'm going to use the word revest.  That might not be the proper

17   terminology.  But they would go back, revest back in Hawk,

18   correct?

19          MR. CAPONI:  Yes.  At a high level, Your Honor.  And

20   the default was if the omnibus agreement was not fully

21   implemented or invalidated, that triggered a default.  So when

22   the Supreme Court -- there was a definitive default when the

23   Supreme Court invalidated the omnibus agreement.  That then

24   triggered Hawk's rights as collateral agent.

25          THE COURT:  And it went back to -- I'm going to say

 1   it went back.  So now, because that agreement is now no longer

 2   effective, all of the rights that Hawk had originally rest with

 3   Hawk as the collateral agent, correct?

 4              MR. CAPONI:  Correct.  Yes, that's -- I think that's

 5   correct.

 6              THE COURT:  So what rights if any does SeeCubic have

 7   at this point?

 8              MR. CAPONI:  Well, the rights that Hawk is

 9   exercising, those rights still belong to SeeCubic.  We are --

10   Hawk is just exercising them as the collateral agent.  So under

11   the agreement, Hawk can enforce the notes, the 18 notes, in its

12   own name or it can enforce them in the name of SeeCubic.  This

13   was litigated --

14              THE COURT:  And -- right.  And they can be enforced

15   against the entire -- I'm going to say Stream family.  Or

16   whatever collateral was pledged, correct?

17              MR. CAPONI:  Correct.

18              THE COURT:  Okay.  And that hasn't happened yet.

19              MR. CAPONI:  Well, it started, Your Honor, when,

20   after the Supreme Court decision, all the various notices to

21   exercise the pledge rights, to marshal -- there's an obligation

22   where all they need to do is issue a marshalling directive to

23   have all the assets put in one location.  And that was

24   exercised.  And so it became sort of a jump ball at that point.

25              We exercised our secured Creditor rights to take

1    possession of the collateral.  The collateral always remained

2    at SeeCubic, B.V.  That has always been the operating entity.

3    So it didn't matter when Stream had the "assets" or when

4    SeeCubic, Inc., got the assets, everyone kept SeeCubic, B.V. in

5    place.  And that was the operating entity.

6            So from my perspective, when we issued -- my client

7    issued the marshalling directives and the pledge rights under

8    its secured agreements, it took possession of those assets.

9    Title, it had not taken possession of because it had not

10   completed an Article 9 sale.  But as far as possession, 9/10ths

11   of the law possession, those assets, including the bonding

12   equipment, belonged to the secured Creditors.  I know the

13   Debtor disagrees with that, but that's our position.

14           THE COURT:  Okay.  So your position is that title was

15   with SeeCubic, B.V., and that the secured Creditor had

16   exercised his right of possession.  Okay.

17           MR. CAPONI:  Correct.

18           THE COURT:  Okay.  And so you then would be in the

19   same position as in Fulton County, where you -- you, meaning

20   SeeCubic through its collateral agent, Hawk -- had possession

21   pursuant to a secured Creditor's right.  And therefore, you

22   don't have to turn it over because you had a right.  You

23   basically were maintaining the status quo.  Is that your

24   position?

25           MR. CAPONI:  Your Honor, I think that's correct.  But

 1    again, I would defer to Mr. Mazza on that because I am not a

 2    bankruptcy lawyer.  He is.  And I've never read that case and I

 3    suspect he has.  But from the argument I can follow, it sounds

 4    correct.

 5         MR. MAZZA:  Yeah.  Yeah.  If I can interrupt.  And

 6    thank you, Mr. Caponi, for clarifying some of the record there

 7    with respect to what happened in the Court of Chancery.  And

 8    yeah, I agree with that position, Your Honor.

 9         THE COURT:  Okay.  Okay.  So obviously, I'm going to

10    have to have an evidentiary hearing, because the Debtor's

11    position is you didn't do that, and that the Debtor is the

12    owner.  And your position is you did exercise.  And that would

13    go to issues relating to whether there was a violation of the

14    stay or not.  Okay?

15         And also, that would go over to turnover actions,

16    because turnover actions relate to certain things.  And that

17    would also affect whether there's a turnover action.  But I

18    will say, counsel, that to the extent -- and there is a

19    distinction between, obviously, the various entities, the

20    non-Debtor various entities and the Debtor entities.

21         But I have to acknowledge and everybody has to

22    recognize that part of the Debtor's assets are its interests in

23    the companies who had interest.  It's a holding company.

24    That's how it was described.  And that the holding company's

25    interests, however they may flow, those interests are property

 1   of the estate.  And to the extent they're property of the

 2   estate, they're related to -- and there may be some

 3   consequences that, you know, the stay can apply to.

 4          Yes, they're not in bankruptcy.  But there are often

 5   third party beneficiaries -- I'm going to use third party, but

 6   that may not even be the correct -- but in my mind, that's how

 7   they work -- that there are related parties that may get to

 8   have the benefit of that because they serve to the benefit of

 9   the Debtor who is in bankruptcy.

10          So I'm hearing two different things.  One is that

11   this is not the Debtor's property.  This is actually property

12   of an entity that the Debtor, through one of its subsidiaries

13   or part of its family, holds title to.  That's a different

14   issue than if the Debtor actually owns it and it belongs to the

15   Debtor directly.  Those are all different things that I have to

16   consider in both whether there's a violation of the stay or

17   whether there is a turnover, whether turnover is appropriate.

18          Okay.  I get that.  And I'm sorry, because counsel, I

19   started -- I didn't ask any questions to Debtor's counsel

20   because I didn't have any conflict.  So I don't want you to

21   think that I'm just questioning you and didn't question him.

22   But I only had one side.  And now that I have a different side,

23   I'm trying to parse through the difference.  Okay?

24          I'm sorry, counsel.  Where did I -- I think I

25   interrupted you when I started asking, well, wait a minute, who

1   owns this stuff?  You can continue with your argument, Mr.

2   Mazza.  I apologize.  Go ahead.

3            MR. MAZZA:  No apology needed, Your Honor.

4   Appreciate the colloquy and Mr. Caponi helping clarify some of

5   the issues.  Hopefully, that was helpful.  So I think we're --

6            THE COURT:  It was very helpful.

7            MR. MAZZA:  Where we're going next is that on Fulton,

8   I understand what Your Honor is saying with respect to what the

9   Supreme Court had to say there.  I think it's important in the

10  context here to understand really, I think, how the court

11  looked at why it came out, you know, the way it did as there

12  not being a stay violation in that case.

13           And that putting aside who is rightfully or not

14  rightfully possessing the property, the bottom line is if

15  somebody has property and a secured creditor has interest in

16  it, what needs to happen to the secured creditor one way or the

17  other is that it needs to get adequate protection.

18           And where I was going, Your Honor, is that we did try

19  to engage in a dialog on that discussion, based on pretty

20  simple requirements to address adequate protection, just to try

21  to reach a resolution that would be acceptable amongst the

22  parties and clearly cut against any allegation that there's

23  some kind of willful violation of the automatic stay.

24           But when counsel to Debtor can't provide us with any

25  proof of insurance, any sort of details about what they intend

1    to do to the property, that's pretty telling in our view as to

2    the gamesmanship that's going on here.  And so I think that if

3    Your Honor is thinking of any kind of interim relief at any

4    point in time here, that those are going to be important

5    requirements to include with anything that might be decided to

6    relate to the bonding equipment.  And so I really would

7    emphasize that as part of the overall package of what we're

8    looking at here.

9          And moving on from the bonding equipment, there's a

10   few things that I'll get to around sort of this urgency the

11   Debtors have tried to create around this with purchase orders

12   and the like.  And again, I know this isn't an evidentiary

13   hearing, but there's been the appearance of this entity called

14   Visual Semiconductor, Inc., which we've laid out in our papers.

15         And this entity, apparently, is a party to these

16   pressing purchase orders that the Debtors are --

17         THE COURT:  What's the name again, counsel?

18         MR. MAZZA:  Yeah.  The name --

19         THE COURT:  Visual what?

20         MR. MAZZA:  Semiconductor, Inc.  It's VSI, is the

21   acronym.

22         THE COURT:  Okay.

23         MR. MAZZA:  And so --

24         THE COURT:  Yeah.  Okay.

25         MR. MAZZA:  So this entity --

1          THE COURT:  Okay.  I've heard that.

2          MR. MAZZA:  -- it is --

3          THE COURT:  I note VSI.  Okay.  You believe this

4    entity is what?

5          MR. MAZZA:  Not to be confused with VTI, which was an

6    entity from a previous bankruptcy case that was involved in

7    running the same kind of "cherry-picking" exercise.  And in the

8    previous bankruptcy, when Judge Owens became wise to what was

9    going on there, she did bar Stream from filing for bankruptcy

10   for a year.

11         And I know they're going to try and they have been

12   trying to distinguish things this time because of vindication

13   from the Delaware Supreme Court on a decision nine months ago

14   on the omnibus agreement.  But again, that's just not the full

15   record.  They didn't file for bankruptcy when that decision

16   came down.

17         No, they fought tooth and nail in litigation in the

18   Court of Chancery for nine months to evade secured Creditors

19   and their exercise of remedies that Mr. Caponi artfully went

20   through as to what was happening.  And when the shoe was about

21   to drop, they filed again.  And that's why we're here before

22   Your Honor.

23         And I would say that, you know, this alter ego, VSI,

24   which is owned and operated by, our understanding is, the

25   principal of the Debtors, Mr. Rajan.  And they've put in a

1   purchase order, again, that needs to be urgently performed on

2   that involves the production of 100,000 units on behalf of this

3   entity.  So Stream is obligated outside of this court approval

4   process for production of a really outlandish amount of units

5   of these particular items.

6          And so we have serious questions as to what's going

7   on with that and if that was manufactured in order to try to

8   establish that there's something going on with Creditors and

9   trying to manufacture some claims as they relate to this

10  alleged automatic stay violation, which again, we don't think

11  stands up as a matter of law.

12         THE COURT:  Counsel, I'm not sure how -- you believe

13  that -- okay.  So this VSI is party to these purchase

14  agreements.  And you believe that they're not real and that

15  they're only to support claims for violation of the stay with

16  respect to the bonding?

17         MR. MAZZA:  Well, they've certainly created a sense

18  of urgency around things that they want to perform on these

19  particular orders in emergency fashion.  And the kind of

20  numbers that are in the orders are just not -- they're just not

21  achievable in any sort of reality whatsoever.

22         So we have some serious doubts about it.  And we've

23  been in contact with, you know, engineers regarding the same.

24  And they've never heard of the kind of production that these

25  really bare bones purchase orders are indicating the Debtor

1  would try to satisfy here.

2          So it's a real headscratcher, Your Honor.  And I was

3  just putting it out there that it does bear this uncanny

4  resemblance to what they attempted to do in the first -- one of

5  the first bankruptcy cases that was duly dismissed for bad

6  faith by Judge Owens.

7          So if they're running the same scheme, which

8  apparently, they may very well be doing here, because as we

9  laid out in our papers, there are communications that are also

10 been going around about the plan to scuttle the equity interest

11 in Stream and move that all over to VIS, that again, raises

12 serious doubts about it and we've been in contact with, you

13 know, engineers regarding the same.  They've never heard of the

14 kind of -- kind of production that these really bare bones

15 purchase orders are indicating the Debtor would -- the Debtor

16 would try to satisfy here.

17         So it's a real head scratcher, Your Honor.

18         THE COURT:  Uh-huh.

19         MR. MAZZA:  And I just put it out there that it does

20 bare this uncanny resemblance to what they attempted to do in

21 the first -- one of the first bankruptcy cases that was duly

22 dismissed for bad faith by Judge Owen.  So if they're running

23 the same scheme, which apparently they may very well be doing

24 here.

25         Because as we laid out in our papers, there are

1  communications that are also -- been going around about the

2  plan to scuttle the equity interest in Stream and move that all

3  over to VSI.  That again, raises serious questions as to -- as

4  to the good faith here.

5          And if there wasn't the track record that is already

6  part of previous bankruptcy cases, maybe we might not have

7  questions.  But this is almost too coincidental, Your Honor,

8  for us to not be asking serious questions that go to, really, I

9  think Hawk's motion that's also on the docket today.

10         I think turning attention to really corporate

11 authority, and I think Your Honor focused on the right issues

12 that we laid out in our papers about who's a debtor and who's

13 not a debtor and whose interest is protected or not.

14         I think though one important point that is also in

15 Hawk's motion is that when the Technovative entity, the Debtor

16 entity was filed, there was no corporate authority for Mr.

17 Rajan to actually initiate a filing for that particular entity.

18 That corporate authority was vested in the receiver under

19 Delaware corporate law.  And so while we can't control what the

20 receiver does, Mr. Rajan can't step in and just exercise

21 corporate authority that did not exist.  He was -- he was not

22 the board.  The board was the receiver.

23         And so that is -- that filing was clearly alterverus

24 (phonetic), and so there's no -- there's been no authority to

25 file that entity.  And you know, that flows down through the

1  structure, but again, doesn't really change the answer as it

2  relates to the Dutch entities.  Because as we went through

3  those entities, none of which are debtors, they don't have the

4  automatic stay apply to them.  That's clear under the law and

5  how 362 is written, Your Honor.

6            If they had authority to file, and they didn't have

7  authority to file Technovative, as I just said, then use the

8  automatic stay if you want to put the foreign entities in the

9  bankruptcy and then you can use the stay.  But you can't -- you

10 can't use the stay when it doesn't apply.

11           Now is there a procedure, Your Honor, to extend the

12 stay to non-debtors?  Yes, there is.  Is that procedure pretty

13 hard to be able to satisfy?  Of course it is.  It's exceptional

14 circumstances that need to be established to do so.  And while

15 the circumstances are indeed exceptional here, they're

16 exceptional for all the wrong reasons and don't support

17 extension of the stay to what Mr. Rajan is trying to accomplish

18 over in the Netherlands by trying to install himself as the

19 director in that entity.

20           And it's a dispute that is a dispute of Dutch

21 corporate law that would be decided under the principals of

22 Dutch law.  So there's no impact on the Debtors.  Mr. Rajan is

23 not a debtor and these are -- this is property outside the

24 estate.

25           Because if you follow corporate form, which I know

1    these debtors don't have a tendency to want to follow.  But

2    there is a reason why corporate formalities and corporate form

3    is followed that would apply here such that these entities

4    should not -- not be -- this shouldn't be any kind of violation

5    of the stay that's trumped up here.  Again, it's all -- it's

6    all in the auspices of trying to have their cake and eat it too

7    such that they don't -- they can go -- go down to non-debtors.

8    Demand assets be returned to them and then not report back to

9    this Court because they're not operating under any supervision

10   by this Court.

11          And that falls into the idea that these cases really

12   deserve to have a trustee appointed, whether that's a Chapter 7

13   trustee or a Chapter 11 trustee, or just be dismissed outright

14   because of the acts that have been taken here.  But again,

15   that's part and parcel of what the separate motion is.

16          But to take all of that into context and to say that

17   this amounts to violations of the automatic stay, Your Honor,

18   is just not a proper use of the automatic stay.  It's a

19   weaponization of it.  We've tried to come to the table to

20   figure things out.  They've decided they just want to litigate.

21          So if they want to litigate, that's fine.  But they

22   have to go to -- they have to come to Your Honor with more than

23   emergency motions.

24          Third Circuit law requires them to file an adversary

25   proceeding for turnover.  We still have not seen that.  They

 1   want to go through that, that's fine.

 2          We had a long colloquy with Your Honor about

 3   complicated issues, about the property, and what interest

 4   parties have in it.  There's a legitimate dispute.  They're

 5   trying to say, well, this is all willful violation of the

 6   automatic stay.  That's just not how it works, Your Honor.

 7   They've got to go through the proper procedure if it's indeed

 8   their property, if it's something that they're entitled to and

 9   creditors are not left out in a lurch, unprotected by a group

10   here that their past conduct should certainly be taken into

11   account in any decision that Your Honor is inclined to make one

12   way or the other.

13          So with that, Your Honor, I think that covers the

14   points that I wanted to make, unless you have any other

15   specific questions for me.  I'm happy to cede the podium or

16   telephonic podium over to whoever else -- I think maybe Mr.

17   Caponi might have something to add.  But that's my presentation

18   for the moment.

19          THE COURT:  Okay.  I've got -- you've answered all my

20   questions.  I may be a little more confused than when I

21   started, but all right.  I may have a better understanding, but

22   I don't have any questions at the moment.

23          MR. MAZZA:  Thank you, Your Honor.

24          THE COURT:  Okay.  And so is there anyone else -- I

25   think the only opposition that was filed was by SeeCubic for

1  the joinder.  I think that was a -- was that a joinder from

2  Hawk's right?  Or am I confusing the motions?

3       MR. CAPONI:  I think that's correct, Your Honor.

4       THE COURT:  Okay.  And --

5       MR. MAZZA:  And Your Honor, just -- I'm sorry to

6  interrupt.

7       THE COURT:  No, go ahead.

8       MR. MAZZA:  Mr. Mazza.  And we did -- the fact that

9  you mentioned a joinder.  Hawk did join in our opposition.  We

10  did join in Hawk's motion as well in our opposition, not to

11  make it more confusing than it already is.  But just wanted to

12  make it clear.

13       THE COURT:  No, I know there were -- right.  I saw

14  those joinders.  Does anybody -- is there anything else that

15  Hawk thinks that I need -- and I'm saying Hawk.  I don't know

16  if it's in its capacity for itself or it's the collateral

17  SeeCubic, whatever.  Does Hawk have anything else other than

18  what I already heard with respect to the ownership of the

19  bonding and who has what with respect to why this is not a

20  violation of the stay?

21       MR. CAPONI:  Yes, Your Honor.  The only other thing I

22  would add, Your Honor, is --

23       THE COURT:  Who's here?  How's speaking?

24       MR. CAPONI:  This is Steve Caponi, Your Honor.  I

25  apologize.

1    The only other thing that I would add is again, we

2  took discovery in the underlying 225 action, you know, which

3  ended about a week or two before the filing.  So the

4  information we have is fairly current.

5    The -- Mr. Rajan testified, I took his deposition and

6  the records bore this out, and they submitted some affidavits

7  to the Court that Stream had no operations since at least 2020.

8  Mr. Rajan testified that, again, because it was a holding

9  company.  Not only did it not have any operations, it had no

10  bank accounts.  He submitted an affidavit and he testified at

11  his deposition that starting in 2020, Stream has had no bank

12  accounts, and it had no bank accounts as to his deposition

13  about a week or two before this case -- this Chapter was filed.

14    So the notion that this was a company that has --

15  sorry, not only they had no bank accounts, Your Honor.  Had no

16  bank accounts, had no employees, had no payroll, had no

17  nothing.

18    The notion that it is on the cusp of fulfilling

19  orders for hundreds of thousands of units worth hundreds of

20  millions of dollars is a farce.  It just is.  I mean, I could

21  be more polite about it.  But it's the same story you've heard

22  over and over, and they said the same thing in the Court of

23  Chancery.  And when you ask for a purchase order, what you get

24  is a redacted document through VSI and that's what they've done

25  here.

1          So they won't tell the Court allegedly who this

2    purchase orders from because it doesn't exist.  And even if a

3    purchase order existed, it was given at an entity that has no

4    operations and no bank accounts.

5          There's been no activity in this case.  No first day

6    motions.  No -- and if you start with the proposition Stream

7    had no operating business, anything it does is outside the

8    ordinary course.

9          So entering into a distributorship agreement, for

10   lack of a better term, that was disclosed last night for the

11   first time in Mr. Rajan's affidavit, how that occurred without

12   Court approval or notice is an anathema to me.  How they could

13   be entering into purchase orders when they had not entered into

14   a purchase order with anybody for at least the prior three

15   years.  To do so without the Court approval, again, seems to be

16   a pretty blatant violation of the rule.

17         So I just say when we talk about the equipment and

18   who owns what, if you don't have a bank account for three years

19   and you don't have any assets for three years, it's kind of

20   hard to take the argument with a straight face that they're the

21   direct owners of this bonding equipment or anything else for

22   that matter.  And that's the last thing I'll say, Your Honor.

23         THE COURT:  Counsel, you said that Mr. Rajan had

24   testified that he had no operations since when?

25         MR. CAPONI:  2020, Your Honor.  When the Court of

1   Chancery --

2           THE COURT:  Okay.

3           MR. CAPONI:  -- moved the assets over to SeeCubic,

4   Mr. Rajan testified that Stream ceased all operations, had no

5   employees, what employees existed went to other entities, and

6   he was -- and there were no bank accounts.

7           Because one of the things in the 225 action, the pur

8   -- not one of the things, the thing.  Was did Stream convert

9   the debt to equity and in order to do that it needed to

10  demonstrate that it raised money, so we asked for the bank

11  accounts.  All right.  Give us your Stream bank accounts.  And

12  Mr. Rajan told the Court in an affidavit and me in a deposition

13  that once the assets were moved over into SeeCubic, Stream shut

14  down all of its bank accounts and in that day in, I think, the

15  middle of 2020, has never had a bank account.

16          THE COURT:  Well, counsel, I'm not quite sure that

17  means anything.  All the assets were turned over to SeeCubic,

18  of course they had no assets.  What are they going to have?

19  I'm not quite sure that means anything from my perspective,

20  because if you took all their assets, what do they have left?

21          MR. CAPONI:  Your Honor --

22          THE COURT:  I mean, that's a whole different issue.

23  I'm just saying, I'm not sure what you think it will -- what

24  that means here.  I don't know.

25          MR. CAPONI:  If I --

1          THE COURT:  I mean, it may not mean anything.  I'm

2    sorry, go ahead.

3          MR. CAPONI:  Yeah, sure.  Your Honor, I just want to

4    elaborate.  I'm not sure how -- that it checks a legal box.

5    The Debtors are relying very heavily on this notion that we

6    have this -- you know, we have these purchase orders, et

7    cetera.  And they're trying to portray -- no, don't try.

8    They're telling Your Honor this case was filed so that Stream

9    could reorganize and get back in production.

10         And my only point in raising it is, there was nothing

11   to reorganize because the assets never got returned.  So Stream

12   lost its assets three years ago.  Lost its bank account.  Lost

13   its employees.  Never regained them.  It may hope to get them

14   back in the future.

15         But the notion they can go from a zero asset, zero

16   bank account entity to stand in front of Your Honor today and

17   say they're on the cusp of fulfilling a $100 million order?  I

18   would just note for Your Honor, this company never turned a

19   dime in revenue or profit.  Its entire lifecycle lived off of

20   debt.

21         And we would love to see them to have this purchase

22   order.  We would love to see $100 million come in, but they

23   make the same promise over and over.

24         And I'm only just pointing out, Your Honor, you have

25   to learn how to walk before you can, you know, crawl before you

 1   can walk and walk before you can run.  The testimony is on the

 2   eve of this bankruptcy, this was an infant in the cradle at

 3   best.  So the notion that they can now run a marathon if you

 4   just give them bonding equipment is a fallacy.  That was my

 5   point in raising it.

 6           THE COURT:  Right.  But counsel, you also have to --

 7   also admit that on the cusp of bankruptcy, they didn't have any

 8   assets.  They had all gone to SeeCubic.  So how could they

 9   crawl, walk, or do anything if they didn't have their assets?

10           So from my perspective is once they got it at the --

11   at least on the eve of bankruptcy, a portion had been returned,

12   perhaps not to them but to their subsidiary because that

13   agreement was undone.  So we're talking about a different

14   point, different company in terms of what I would be looking

15   at.

16           Clearly, if they didn't have their assets, they

17   weren't doing anything.  But once they were returned, they

18   weren't the same company in terms of what they were, a company

19   with mounts something being returned as to a company where

20   everything -- all assets had been taken.  I can't look at that

21   and say, well, they're trying to run now.  I don't know what

22   they're trying to -- maybe they are trying to rub because even

23   though the assets were returned, they may still be crawling.  I

24   don't know.

25           But I'm just saying it just doesn't mean what you

1   think it might mean to this Court, the fact that they didn't

2   have anything because they had been foreclosed upon, so that's

3   the only point I'm making.

4        MR. CAPONI:  Your Honor, if I could just clarify one

5   point, Your Honor, the assets have never been returned.  The

6   assets all -- the operating assets all were at the Technovative

7   level or below.  And those assets never went back -- they went

8   from SeeCubic, Inc to the receiver and they were held by the

9   receiver prior to the bankruptcy.

10       So those assets -- Stream came into the bankruptcy an

11   assetless company with the hope of getting its assets back.

12   That's just my only clarification.

13       THE COURT:  Well, wait a minute --

14       MR. CAPONI:  Your other points are well taken.

15       THE COURT:  Wait a minute.  My point is that when the

16   -- and maybe I'm misunderstanding.  When they Delaware Supreme

17   Court undid whatever it undid, who then had titles to whatever

18   these assets -- I know they weren't in your position.  If they

19   weren't owned by Stream.  It was going to be Technovative or

20   one of the other companies.  And the receiver was only for

21   Technovative.  Technovative.

22       So when that was undone, undone meaning SeeCubic

23   couldn't -- didn't have -- couldn't have taken these assets,

24   that they went back to Technovative, right.  And at the time,

25   immediately prior to bankruptcy, those assets were in control

1   by the receiver.  And once the bankruptcy was filed, they were

2   no longer controlled by the receiver, but now controlled by

3   Technovative.  That's my -- how I look at this.

4           MR. CAPONI:  Your Honor, you are correct, the way --

5   so you are correct that the assets -- the title -- as a result

6   of the supreme court decision, title to the assets always

7   resided with the non -- the predecessor to SeeCubic, and then

8   the Court of Chancery was tasked with physical possession going

9   back in an orderly fashion.

10          That physical possession going back is what I was

11  referring to, never occurred.  It went -- they stayed at the

12  entity levels and the receiver took possession of Technovative

13  and everything -- and everything below Technovative by virtue

14  of Technovative -- everything being wholly owned.

15          So yes, Your Honor is correct that as of the -- the

16  day -- the minute before the bankruptcy filing, Stream had no

17  assets.  As a result of the bankruptcy filing, the receiver is

18  out of the way and you could argue that Stream has, you know,

19  assets again.

20          THE COURT:  So Stream doesn't have anything,

21  Technovative has it.  All that Stream has is its interest in

22  Technovative.

23          MR. CAPONI:  Correct.

24          THE COURT:  The assets, whatever they are that the

25  trust -- that the receiver was in charge of remain with the

1   receiver.  And now, once the receiver is no longer in place,

2   then they belong to whoever.  In this case it would be either

3   -- you were saying SeeCubic, B.V. with the receiver was in

4   control over is no longer in control and the receiver's no

5   longer in control, then whoever was in control before the

6   receiver was appointed remains in control.

7           MR. CAPONI:  Yeah, so now -- yes.

8           THE COURT:  And you guys want to challenge that in

9   the Netherlands, which is a whole different issue because I

10  have to find out what in counsel you acknowledge that you can

11  in fact defend the stay of third parties -- I'm going to call

12  them third parties to the extent that it's an extraordinary

13  relief, but it has been done.  I'm not saying that I would do

14  that.

15          But I have -- counsel, I think I've told you that and

16  this is my apologizing.  I had a couple emergency -- I have

17  some emergencies.  I'm going to try to see if someone else can

18  take care of my 3 o'clock responsibility.  I've got about -- is

19  that 2:58?  I've got about seven minutes to get someone.

20          I'm going to put everybody on hold.  Do not hang up.

21  And I will see if I can get someone to cover for me and then we

22  can just continue without any interruption, okay.  Hold on one

23  second.

24          MR. CAPONI:  Thank you, Your Honor.

25          THE COURT:  All right.  Now, how do I do this?

1              Okay.  Counsel, we can continue.  I think where we

2    left was Mr. Mazza was -- or maybe it was Mr. Caponi was

3    discussing their position with respect to the custom of the

4    deposition testimony of Mr. Rajan and what that meant with

5    respect to the alleged violation of the stay, and what assets,

6    and actually some other points that Mr. Caponi was trying to

7    make.

8              Is there anything else that we need with respect to

9    the parties in opposition to the motion for relief from stay?

10   Anybody else?

11             MR. DEMARCO:  Yes, Your Honor.  This is Andrew

12   Demarco from Devlin Law Firm regarding Rembrandt 3D.  We filed

13   an objection in this matter, this was DI 103.  We have concerns

14   regarding our license to our intellectual property among the

15   creditors.  We also seek --

16             THE COURT:  Wait a minute.  Wait a minute.  Wait a

17   minute, counsel.

18             MR. DEMARCO:  Absolutely.

19             THE COURT:  You filed an objection -- you filed an

20   objection to the motion for relief you're saying?  I mean, the

21   motion for violation -- alleged violation of the stay?

22             MR. DEMARCO:  We -- it is -- Rembrandt's position is

23   we do not wish any relief of the stay.

24             THE COURT:  Okay.  Wait a minute.  You filed a -- you

25   filed -- where's your filing at, counsel?

1          MR. DEMARCO:  It is docket entry 103, Your Honor.

2          THE COURT:  Oh, so yours was an objection to the

3    motion to dismiss.

4          MR. DEMARCO:  I apologize, Your Honor.

5          THE COURT:  That's okay.  I see it.  I see it.  So

6    right now, we're just looking at the motion for alleged

7    violation of the stay, but we'll get to the other stuff.  I'm

8    just trying to keep --

9          MR. DEMARCO:  I apologize.

10         THE COURT:  That's all right, counsel, because other

11   counsel actually sort of talked about  it already, so that's no

12   -- not -- I get it, because they did kind -- two counsel did --

13   did discuss briefly the motion to dismiss in connection with

14   the motion for a finding of a violation.  So I'll get to that.

15         MR. DEMARCO:  Absolutely.

16         THE COURT:  I just want to try to wrap up that.

17         MR. DEMARCO:  That's okay, Your Honor.  I'm happy to

18   sit back -- I'm happy to sit back and wait.

19         THE COURT:  All right.  Thank you, counsel.

20         Okay.  So are there any other oppositions, anyone who

21   wishes to set forth their opposition to the Debtor's request

22   for a finding that there is -- there was a violation of the

23   stay and that there is a need for turnover and for -- and they

24   were also asking for sanctions, I guess.  All right.  Anybody

25   else?

1          All right.  Hearing no response, I'm going to let --

2    is there a brief response -- brief, counsel, from debtors with

3    respect to -- I really need some clarification on this

4    ownership issue of this bonding equipment.

5          MR. ALEXANDER:  Thank you, Your Honor.  Vincent

6    Alexander on behalf of the Debtor.  Can you hear me fine, Your

7    Honor?

8          THE COURT:  Yes, I can.

9          MR. ALEXANDER:  Okay.  I just wanted to clarify a

10   couple points and it relates to the ownership of the bonding

11   equipment.

12         First, we attached to our motion the actual purchase

13   contract which shows that the purchase was in the name of

14   Stream.  So Stream is the entity that purchased the equipment.

15   There have been no --

16         THE COURT:  Okay.  Wait a minute, counsel.  Wait a

17   minute.  Where is that at?  You said you guys filed a motion,

18   then you filed your supplemental motion.  Is it in the original

19   -- attachment to your original motion?

20         MR. ALEXANDER:  Yes, Your Honor.

21         THE COURT:  Okay.

22         MR. ALEXANDER:  That docket entry 49-1.

23         THE COURT:  Yeah, okay.  49-1.  Exhibit 1.  Okay.

24   Purchase agreement.  Okay.  The sales agreement between Stream

25   TV and I'm not even going to try to pronounce this name.

1          MR. ALEXANDER:  Your Honor --

2          COURT REPORTER:  This is the Court Recorder.  The

3   Judge got disconnected briefly.  She'll be back in a moment.

4          THE COURT:  Counsel, I'm back.  I guess I have to

5   have two disconnects before the phone will continue.  We're

6   going to follow a pattern here.  I have no clue what that's all

7   about.

8          So there's a sales agreement between Stream and the

9   seller which is in Nagano, Japan.  I don't even know if I'm

10  pronouncing it correct, for delivery in China from what I can

11  gather.  And that, counsel, you believe is the stay of

12  agreement for this bonding equipment?

13         MR. ALEXANDER:  That's correct, Your Honor.  And the

14  purchaser of the equipment was Stream TV Networks, Inc, who is

15  the Debtor in this bankruptcy case.

16         THE COURT:  Well, there's a little dispute because

17  the -- the -- SeeCubic says that it was actually owned by

18  SeeCubic, B.V.  I don't know if there's some other documents

19  after this, but I know --

20         MR. ALEXANDER:  They don't have any --

21         THE COURT:  What, counsel?

22         MR. ALEXANDER:  They don't have any documents

23  demonstrating -- they don't have any documents demonstrating

24  that, Your Honor.  There are no documents demonstrating the

25  transfer that they had from Stream TV Networks to SeeCubic B.V.

1   That's not a disputed issue.

2          THE COURT:  Well, they believe it's disputed.  I

3   guess I have to figure out how --

4          MR. ALEXANDER:  Well, you can believe a lot, but that

5   doesn't mean it's actually disputed.  So that's one of the

6   things that they say a lot of things in terms of counsel for

7   Hawk and SeeCubic.  But when you actually look at the

8   underlying facts, it just doesn't bear out.

9          And that also goes to the point of when you ask about

10  foreclosure and repossession, to be clear, there has been no

11  foreclosure completed by Hawk or SeeCubic with respect to any

12  assets of --

13         THE COURT:  So counsel, they -- I think they

14  acknowledged that there's been no completed foreclosure.

15         MR. ALEXANDER:  And there's --

16         THE COURT:  I think what they said is that they sent

17  notices that under the terms of their documents that

18  constituted foreclosing.  I'm assuming they did it under -- I'm

19  not going to assume anything.  They believe they had security

20  interests and that they executed and foreclosed pursuant to

21  whatever those rights were as a secured creditor.

22         I was going to say I'm assuming they did use CC

23  remedies.  But I don't know.  I could be totally wrong.  But

24  that's --

25         MR. ALEXANDER:  But no, I understand.  But they never

1  had possession of the, you know, at the time this happened,

2  they didn't have possession.  And I think Mr. Caponi even said

3  they demanded the share certificates but they never received

4  them.

5           So they never had possession of the assets and they

6  certainly today don't have possession of the bonding equipment,

7  but they're interfering with the Debtor's interest in the

8  bonding equipment.  It seems almost as if they're arguing on

9  behalf of SeeCubic B.V., but neither of them represent SeeCubic

10 B.V. with respect to the bonding equipment.  That's a

11 subsidiary of the Debtor.  So it seems a little disingenuous to

12 argue that somehow they have possession, you know, of the

13 equipment.

14           So it's not like how the supreme court case in which

15 they're citing.  There's no paths of retention because there

16 was no -- A, there was no foreclosure process, there was no

17 repossession, and they're not actually in possession.  But

18 they're interfering with the Debtor's possession and that's the

19 exact point, is that they're interfering with the Debtor's

20 possession of that bonding equipment, which is integral to the

21 reorganization process.

22           And I know Your Honor picked up on the fact that

23 there were no operations while they didn't have the assets, so

24 I'm not going to discuss that.  But prior to that point, they

25 did have contracts and they did have revenue with companies

 1   like Bosh and Google.  So you know, there were instances when

 2   they did sell 5,000 units, and so it's not as if this entity

 3   never sold.  I mean, it has product it did ship out and it

 4   wants to get back to that, but it needs possession of its

 5   assets in order to do so.  So you know, this is not --

 6          THE COURT:  And when you say -- so who so counsel?

 7   Which entity did this --

 8          MR. ALEXANDER:  Stream -- Stream TV Networks, Your

 9   Honor, the Debtor.

10          THE COURT:  Okay.  Okay.  So what I'm trying to

11   figure out is the bonding equipment is actually in possession

12   of a third party?

13          MR. ALEXANDER:  That's correct.

14          MR. MAZZA:  You're right, Your Honor.  Correct.

15          THE COURT:  So it's in possession of a third party

16   who is willing to turn it over under what conditions?

17          MR. ALEXANDER:  The condition for turnover, Your

18   Honor, is that Patrick Soon (phonetic) at SeeCubic B.V., who is

19   the -- who leased the space.  Apparently, he leased the space

20   once SeeCubic entities directed the transfer of the property

21   during the time in which the omnibus agreement was in effect,

22   for him to authorize it.  And he's refused to authorize it

23   because Mr. Stastny on behalf of the secured entities has said

24   don't release it to them because it's not their property.

25          THE COURT:  So who's property is it?

1           MR. ALEXANDER:  It's the Debtor's property.

2           THE COURT:  They sent a purchase agreement.

3           MR. ALEXANDER:  Correct, Your Honor.

4           THE COURT:  Okay.  So basically a third party has it

5   and someone's told the third party -- and the third party is

6   basically to be indemnified and said you guys figure this out.

7   I'm not turning this over to that.  If there's a problem, I'm

8   stuck with it.  I get that.

9           And now if the lease by -- who was the original party

10  to the lease?

11          MR. ALEXANDER:  Well, Your Honor, if you recall, the

12  length the omnibus agreement was in effect, SeeCubic took

13  control of the Debtor's assets, including the downstream

14  entities, which would include SeeCubic B.V.  And once they took

15  control, they had SeeCubic B.V. enter into a contract with

16  entity which moved the equipment from the prior location that

17  it was being housed to this new location.

18          THE COURT:  But under the terms of the -- that

19  agreement is not affective anymore.

20          MR. ALEXANDER:  I understand, which is why the

21  Debtor --

22          THE COURT:  How do you unwind this?  So how do you un

23  -- so what was supposed to happen when this -- the assets were

24  given to -- I'm going to say given, because I'm not -- well,

25  transferred to SeeCubic.  One the Delaware Court said this is

1   not effective because the Class B didn't sign, we have to

2   unwind.  Because that's basically what they were saying, unwind

3   it, okay.

4          What did the parties -- what did unwind mean?  Undo?

5   What do you think it meant?

6          MR. ALEXANDER:  Well, Your Honor, SeeCubic B.V. was

7   not a party to that agreement, so the assets should have

8   gone --

9          THE COURT:  I mean, not SeeCubic -- right.

10          MR. ALEXANDER:  No, no.  Understood.  I'm talking

11   about the supreme court in that litigation, so.

12          THE COURT:  Right.  SeeCubic Inc.

13          MR. ALEXANDER:  The supreme court --

14          THE COURT:  Right, right.

15          MR. ALEXANDER:  But the Supreme Court said the assets

16   are supposed to go back to Stream.  It's clear that the omnibus

17   agreement was of no effect and that it should be unwound.  And

18   then there's a Delaware Chancery Court order after that that

19   says the assets are supposed to go back to Stream.  It says

20   Stream should be entitled to have its assets so that it has the

21   opportunity to repay its creditors.  That is the -- they were

22   supposed to go back to Stream.

23          MR. MAZZA:  Your Honor, if I may just interrupt for a

24   second.  The -- there was an order entered by the chancery

25   court that said if Stream wanted to get back the bonding

1    equipment, it had to post a bond.  So that was how the state of

2    play had been set up after the supreme court issued its opinion

3    last summer, invalidating the omnibus agreement.

4            As you can imagine, the chancery court -- there were

5    practical issues in unwinding -- unscrambling the egg.  And so

6    it took, you know, quite some time to figure out how to do

7    that.  Mr. Caponi had explained that the stock was essentially

8    given back to Stream and Technovative so that they could have

9    control again.  And then the judge -- chancellor put in place

10   an injunction for Hawk to be able to exercise its remedies for

11   ten days.  And then when that expired, Hawk exercised its

12   remedies and that got the parties into this 225 action that was

13   near completion in the chancery court right before the filing

14   here.

15           So for counsel of the Debtor to say that this is all

16   supposed to be returned, the chancery court was dealing with

17   this all on remand and had a receiver in there to deal with all

18   the practical issues around it, who incidentally put a bonding

19   -- who recommended to the vice chancellor to put a bonding

20   order in place, which the vice chancellor thought was a good

21   idea, which would resemble any kind of adequate protection that

22   might happen in a bankruptcy court if this were to be turned

23   over.  And so that's where we are.

24           THE COURT:  Yes.  And now we're in bankruptcy.

25   Receiver no longer in effect.  What does that -- first of all,

 1   in bankruptcy, you're going to have to have insurance.  That's

 2   just a given.  You can't be in bankruptcy and not ensure the

 3   assets of the estate.

 4          Assuming that the bonding -- based on that purchase

 5   agreement, and counsel, you're going to have to -- I haven't

 6   seen anything from the other side to the contrary.  Because you

 7   said it was owned by SeeCubic B.V.  The only document I've had

 8   so far, and maybe you do have some and you're going to point

 9   them out to me. The purchase agreement was with Stream.  And so

10   if the purchase agreement was with Stream, I'm not quite sure

11   absent some record or document how ownership went to SeeCubic.

12   Okay?  So as far as I am concerned unless you want to show me

13   something to the contrary.  That would be assets of -- the lack

14   asset of the Debtor -- of Stream TV.

15          And so my question then becomes, okay.  If it's the

16   property of the Debtor, then yes, if you executed on it and it

17   your properly executed then you don't have to turn it over as

18   to the turnover action.  But if you didn't properly execute on

19   it, you may have two things you're facing.  Yes, you may have a

20   turnover action, but if you haven't properly exercised control,

21   you're violating the stay.

22          So the fact that on their -- on the Supreme Court

23   decision a turnover action is required, that's if you are

24   lawfully -- and you didn't use the word lawfully in possession

25   but you were in possession and you were maintaining the status

1   quo, then obviously, you didn't violate the stay.  But if

2   you're not in possession and you don't have a right to be in

3   possession, you're not maintaining the status quo.  You're

4   violating the stay.

5            I don't know which one of it is.  I don't, you know,

6   I see documents that say they own it.  And you're saying that

7   even if they own it, we executed against it so we're properly

8   exercising control over it.  But it's with a third party.

9            So my question is did you send something to the third

10  party saying we have control over this.  This is ours.  That's

11  really where this is going to go because it's no different if

12  something was with a bailiff that they have that you have to

13  send something to them saying, hey, this is mine.  Don't give

14  it to anybody else.   I don't know if you did or did not do

15  that.

16           And if you didn't do that, it seems to me on a high

17  level looking at this, you don't have a right to do anything

18  with this thing yet.  And if you don't, whether they file a

19  turnover action or not, there's some issues about whether

20  that's a violation of the stay.  I don't know.  I don't know.

21  I don't have a record.

22           And I'm -- obviously we need an evidentiary record.

23  I'm not going to sit here and say, oh, I find it without a

24  record.  But I'm just saying just from discussion with counsel,

25  logically for me, is that I see a purchase agreement and the

1   only evidence I have is this purchase agreement which is

2   between Stream and the seller from Japan who I'm not going to

3   try to pronounce, for the bonding equipment.

4           I don't have anything saying that it went to this --

5   now, maybe Stream sent it to SeeCubic B.V.  I don't know how it

6   got to SeeCubic B.V.  And what I'm hearing is that before

7   SeeCubic Inc took over, there was a lease between someone else

8   and a storage unit and it got transferred to a different one

9   under a lease that I don't know is valid or invalid or I don't

10  know what it means because SeeCubic Inc -- what is it, who

11  everything was transferred to, one says that omnibus agreement

12  was void or invalid, never had a right to do anything.

13          So you know, it gets a little complicated for me.

14  I'm trying to unwind  what does the unwinding mean.  And so

15  that's on a high level for me is what does that mean as an

16  initial -- initial matter.

17          I get the concern about insurance.  That's a

18  requirement.  So whether the chancery court ordered it, you

19  have to insure assets in bankruptcy.  So that's nonnegotiable.

20          The other issue that I think I heard was, well we

21  want to know how they're moving equipment, who's working on it,

22  and all that other stuff.  As a secured creditor, we have that

23  right to ask for that.  That has nothing to do with whether you

24  exercised your rights.  It has to do with whether the

25  collateral securing your loan is going to be protected.  That

 1  has nothing to do with this claims about violating a stay or

 2  any of that stuff.  That is just simple bankruptcy requirements

 3  and issues.  So even if you tell us to turn it -- to release it

 4  to them, that they don't have to insure this.  They should be

 5  insuring it no matter where it is because it's an asset of the

 6  estate, and so that's how I'm looking at this.

 7          Counsel, is there anything that you have for me that

 8  -- all I have is this purchase agreement that shows it was

 9  owned by SeeCubic CV?  I think that's who you said owned it?

10          MR. CAPONI:  Yes, Your Honor.  Steve Caponi again.

11  Do I have anything?  No, that's what discovery is for.  We

12  don't control -- we don't have access to the records of

13  SeeCubic B.V. other than --

14          THE COURT:  Well, then on what basis then are you

15  asserting that they're the owner?

16          MR. CAPONI:  Because during the course of the --

17          THE COURT:  You're telling me -- okay.

18          MR. CAPONI:  During the course of the 225 action and

19  the receivership, Your Honor, we had multiple discussions with

20  the receiver, and if you recall, there was a motion practice

21  over who should take possession of the equipment.  And it was

22  all parties to the receiver who had access to the company and

23  the individuals, as well as Stream, all acknowledged that the

24  equipment belonged to SeeCubic B.V.

25          And that's why the court entered -- the Court of

1   Chancery entered a specific order after the receiver

2   recommended that it was appropriate for Stream to get access to

3   it if it complied with certain requirements, including posting

4   a -- I think it was a three or four-million-dollar bond, that

5   it got transferred.

6           So we litigated this issue.  Stream never once said

7   this belongs to me.  Everyone acknowledged it was in possession

8   of SeeCubic B.V.  My client never controlled SeeCubic B.V.

9           THE COURT:  In possession doesn't mean --

10          MR. CAPONI:  Sorry, owned by.

11          THE COURT:  Counsel, in the --

12          MR. CAPONI:  Owned by, Your Honor.

13          THE COURT:  Right.

14          MR. CAPONI:  Owned by SeeCubic B.V.

15          THE COURT:  Everybody acknowledged -- there's some

16  document that says we acknowledge that it's owned by SeeCubic

17  B.V. or it's in possession of SeeCubic B.V.?   Two separate

18  issues.

19          MR. CAPONI:  Owned, Your Honor, and again, this is

20  why, you know, an evidentiary hearing -- there are a lot of

21  complicated issues.  There are very divergent views as to the

22  history.  It's a long history.  You're looking at a purchase

23  order from almost a decade ago.  Two bankruptcies, you know, an

24  omnibus agreement, and multiple defaults of secured debt, you

25  know, and many years of operating this company, a lot has

 1  changed.

 2         Title of this as our understanding and my belief is

 3  with SeeCubic B.V.  We get some targeted discovery from

 4  SeeCubic B.V. and the Debtors, we'll prove it at an evidentiary

 5  hearing.  And Your Honor will find out as between these two

 6  parties whether there's a real purchase order or a fake order

 7  or whether they're, you know, who owns this or who doesn't.

 8         THE COURT:  Well, you mean you think that -- you

 9  believe that this -- that what's presented here is a fake

10  purchase order?

11         MR. CAPONI:  The purchase order?  Yeah, Your Honor.

12  We absolutely believe that there is no legitimate third party

13  that ordered $100 and some million worth of TVs.

14         THE COURT:  No, no, no, no.  No, no, no, no, counsel.

15  I'm talking about this sales agreement.

16         MR. CAPONI:  No, no, the sales agreement.

17         THE COURT:  Yes.

18         MR. CAPONI:  No, no, I'm not contesting the sales

19  agreement, but it's from 2015.  A lot has transpired since then

20  and we don't -- we -- it is my understanding and I believe

21  Stream conceded this point, we were told this by the receiver

22  that -- exactly how or when or why, I don't have the answer

23  because it was never in dispute, that SeeCubic B.V. owns this

24  equipment.  That's why SeeCubic B.V. has been paying for it and

25  paying the rent on it and renting the warehouse.  No one

 1   contested that.  It wasn't until they filed this motion a

 2   couple days ago that I've heard a different story.  So I can't,

 3   you know --

 4          THE COURT:  But counsel, you were also -- but my

 5   concern also was that there was an original lease between

 6   somebody and someone, and then that equipment -- maybe that's -

 7   - maybe that's wrong, that the equipment was moved to a

 8   different location under a different lease by SeeCubic B.V.,

 9   right?  Or was it SeeCubic Inc?  Who has the current lease?

10          MR. CAPONI:  It's -- well, so make sure I'm

11   understanding your question, Your Honor.  The equipment is

12   owned.  It is put in a warehouse and that space is leased.  And

13   there was a -- SeeCubic B.V. had the original warehouse and I

14   believe a few months ago the owner of that warehouse was

15   converting the building or something, and SeeCubic B.V. leased

16   new space and moved the equipment into the new space.

17          THE COURT:  Okay.

18          MR. CAPONI:  So if you're referring to real property

19   lease, that was SeeCubic B.V.

20          THE COURT:  SeeCubic B.V. is the party to the lease.

21   Okay.  And the Debtor has an interest in -- the Debtor has an

22   interest -- at least Technovative has an interest in SeeCubic

23   B.V., right?

24          MR. CAPONI:  Indirectly, yes.

25          THE COURT:  What do you mean indirectly?  Don't they

1   own the party that -- the general partner who owns the interest

2   in the Netherlands entity that owns SeeCubic, do they not own

3   the interest in all those things?  So yes, they're not

4   directly, but the own the -- they're the -- 99 percent .9,

5   they're respectively the owners of the company who -- they're

6   the owners of the --

7           MR. CAPONI:  Of course, Your Honor.  I just meant to

8   insinuate --

9           THE COURT:  Right.

10          MR. CAPONI:  -- they were not the direct owner, but

11  there are some levels in between.

12          THE COURT:  Right.

13          MR. CAPONI:  I don't recall how many, but yes,

14  ownership wise, they eventually get there.

15          THE COURT:  All right.  So what I'm trying to

16  understand is Technovative owns through its ownership interest

17  or the ownership interest of the ownership interest is saying

18  that we -- that some -- that they directed someone to allow the

19  property to be returned to or released to Stream.  And so what

20  they're saying is that our interest in this interest in this

21  interest, we -- is being interfered with and we have an

22  interest in that asset through these other parties, and that

23  someone's directing the -- someone's directing SeeCubic B.V.

24  not to release it to Stream.  Isn't that sort of what I'm

25  hearing?

1          MR. CAPONI:  So Your Honor, yeah.  That's -- that is

2     what the Debtor's position is.  My client, to be clear, Hawk,

3     is  not instructing anybody to do or not do anything.  We're

4     here because we were accused of hiding this equipment and we're

5     not and -- yeah.  Go ahead, Your Honor.  Sorry.

6          THE COURT:  So why isn't somebody just finding --

7     what's the problem?  Let's cut to the chase, why isn't it being

8     given to Stream?

9          Okay.  I get the insurance issue.  I get the

10    insurance.  They have to insure it.  As a secured creditor with

11    a security interest, you want something in addition, correct?

12         MR. CAPONI:  Yes, we want adequate protection.  Yes.

13         THE COURT:  Okay.  And adequate protection means that

14    you believe you have possession of it and because you have

15    possession, it shouldn't go back to them.  But I don't get how

16    the secure creditor who doesn't have possession because it's

17    with a third party and you don't control SeeCubic B.V., how you

18    get to say anything.  You can always ask for adequate

19    protection.

20         MR. CAPONI:  Your Honor --

21         THE COURT:  But I'm not quite sure how you get

22    through all of that.

23         MR. CAPONI:  Yeah, I -- Your Honor, I think maybe --

24    maybe everyone got the cart before the horse on this one.

25         THE COURT:  Yes, you did.

1              MR. CAPONI:  Okay.  Let me -- let me step back for a

2    second.  SeeCubic B.V., as far as I'm -- my client Hawk and I

3    am concerned, SeeCubic B.V. -- why is SeeCubic B.V. not turning

4    anything over?  SeeCubic B.V. is the operating entity where

5    these employees reside and this is where they get their

6    paychecks and this is their future.  They absolutely detest Mr.

7    Rajan, and don't trust him. They've been burned by him. They --

8              THE COURT:  What does that have to do with anything?

9    I mean --

10             MR. CAPONI:  It has to do with your question.  Why

11   are they not turning it over?  And why are they taking steps in

12   there?  Because they feel like their company's being fleeced by

13   this guy, not at my client's direction.  They're human beings

14   with their own brains and they're in an entity.  We're being

15   accused by the Debtor of orchestrating that.

16             What I'm saying is I'm not orchestrating it.  You

17   asked me why they're doing it.  I told you why they're doing

18   it.  Whether there's legal color to do that, that's I guess for

19   the Netherlands court and this Court to concern.  I can only

20   tell you as a secured creditor, I'm not telling them to do it.

21   I'm not violating any stay for a whole host of reasons.  And if

22   at some point that entity is told to turn it over, we want that

23   turnover to be -- only occur after we're, you know, we have

24   adequate protection.

25             I'm only responding -- this is not a turn -- as Mr.

 1   Mazza indicated, this is not a turnover motion.  This isn't an

 2   adversary proceeding where the Debtor --

 3          THE COURT:  Even if it is an -- even if it is or is

 4   not an adversary, you're not in possession so I'm not quite

 5   sure whether there's a motion, an adversary or whatever.  Yes,

 6   on the 7001 turnover or adversary matter.  It doesn't matter

 7   because you're not in possession.

 8          MR. CAPONI:  Your Honor, I don't know why we're here.

 9   We're not in possession.  I don't -- my client does not have

10   it.  It's not sitting on the Debtor's assets, but the Debtor

11   filed a motion accusing my client of interfering with its

12   assets.  So the Court's point --

13          THE COURT:  Because they believe --

14          MR. CAPONI:  You're right.

15          THE COURT:  Yeah.  That's because they believe --

16   whether you deny it or not, they believe that you are

17   orchestrating this.

18          MR. CAPONI:  Your Honor --

19          THE COURT:  That's how I'm seeing it.  Now, I don't

20   know who is or isn't.  You're saying you don't have -- your

21   client is not involved in this at all.  This is solely at

22   SeeCubic's direction and then you mentioned some names.  I

23   don't know who these people are, I mean, and nobody's -- I

24   heard Mr. Stastney?  Who's he?

25          MR. CAPONI:  Stastney.  Mr. Stastney was the

 1   individual who used to be at Stream and then ran SeeCubic, Inc.

 2   And Your Honor, I've had -- I, my firm, has had zero

 3   communication with the individuals at SeeCubic B.V. to ask them

 4   why they are doing or not doing what they're doing and I guess

 5   discovery will bear that out as well, but it's not at my

 6   client's direction.

 7        THE COURT:  Okay.  But Mr. Stastney, did -- was part

 8   of SeeCubic Inc who everything was transferred to, correct?

 9        MR. CAPONI:  Correct.  And I should also mention, he

10   is, I believe, a director -- he is the director of SeeCubic

11   B.V. as well.  So I think one of the issues that the employees

12   of SeeCubic B.V. has is that Mathu Rajan proports to be the

13   director, but in the registry over there, which is the official

14   document, it's Mr. Stastney so they're questioning who they're

15   supposed to take direction from and I think that's the purpose

16   of the proceeding over there.  But I'm not involved in it.

17   That's just my understanding.

18        THE COURT:  And who filed the proceedings in the

19   Netherlands?

20        MR. CAPONI:  I don't know if Mr. Mazza knows.  I do

21   not know.

22        THE COURT:  Well, who filed the --

23        MR. MAZZA:  Yeah, this is Mr. Mazza.  It is the -- it

24   was the law firm Brisbois who brought a summary proceeding in

25   connection with the --

 1              THE COURT:  On whose behalf?  Who all --

 2              MR. MAZZA:  If you give me a --

 3              THE COURT:  Yeah, you go ahead and I'm going to --

 4    I'm going to do something in a minute.  We'll get to that.

 5              MR. ALEXANDER:  Your Honor, this is Vincent Alexander

 6    on behalf of the Debtors.  In terms of the lawsuit, I believe

 7    what you're referencing is at docket entry  90-1.

 8              COURT REPORTER:  I think the Court dropped off for a

 9    minute.

10              MR. ALEXANDER:  Okay.

11              THE COURT:  Hello?  Counsel?

12              MR. ALEXANDER:  Your Honor, this is Vincent

13    Alexander, counsel for the Debtors.  The lawsuit, it's -- we

14    filed it.  It's docket entry 90-1.  And parties to that lawsuit

15    are Mr. Stastney, SOS Holdings 6, LLC, Hawk Investment Holdings

16    Limited, SeeCubic, Inc, and then some of the Stream

17    subsidiaries that are directly and indirectly controlled by the

18    Debtors.

19              So for counsel to sit here and say that their clients

20    aren't involved, it just doesn't bear out by the document that

21    they actually filed.

22              MR. MAZZA:  Your Honor, it -- Jim Mazza, here.  So

23    just to be more precise, the Dutch entities that their party

24    would be the Alterate Coopertif (phonetic), if you have the

25    chart handy, Stream TV International B.V., and SeeCubic B.V.

1   So all are non-debtor entities.  Just the --

2            THE COURT:  Counsel, I didn't ask if they were

3   debtors.  I asked who -- because counsel said we aren't

4   involved in that.  We don't know anything.  This is Mr.

5   Stastney and SeeCubic B.V. filing in the Netherlands.  And now

6   I'm hearing that it's more than that.  So of your clients all

7   so whoever involved in the litigation in the Netherlands?  Yes

8   or no?

9            MR. CAPONI:  Your Honor, this is Steve Caponi again.

10  I will take counsel's word.  It was not my understanding that

11  Hawk was involved in the Netherlands litigation.  I thought it

12  was actually filed by the employees, but again, I'm not

13  involved in it.  My client had no involvement in telling them

14  not to turn over the equipment.  If it was named as a defendant

15  in a proceeding, news to me, but okay.

16           THE COURT:  You didn't say this -- counsel, are they

17  defendants?  Plaintiffs?  I mean, if they're defendants,

18  they're defendants.  I asked who brought it.  What is this at?

19           MR. MAZZA:  I think that --

20           MR. ALEXANDER:  Your Honor, they're plaintiffs.  It's

21  documented in 90-1.

22           THE COURT:  You know what?  Where's the -- where's

23  the document.  Just point me to the document.

24           MR. ALEXANDER:  90-1.

25           THE COURT:  90 -- oh, that's the Exhibit --

 1   translated.  Is that what we're talking about?

 2          MR. ALEXANDER:  That's correct, Your Honor.  And

 3   that's the matter that they're trying to set for hearing -- or

 4   is set for hearing on the 20th.  And if you look on the first

 5   page, with regards to plaintiffs, if you look at 4 through 7,

 6   SeeCubic Inc is in 4, Hawk is in 5, SLS is in 6, and Mr.

 7   Stastney, individual is in 7, and they're all the plaintiffs.

 8          MR. CAPONI:  I stand corrected.

 9          THE COURT:  Okay, so the -- yeah, I mean, so --

10          MR. CAPONI:  I was unaware, Your Honor.

11          THE COURT:  Okay.

12          MR. CAPONI:  But a document is a document.  That's

13   why I deferred to --

14          THE COURT:  Right.

15          MR. CAPONI:  When you asked me, I said I'd defer to

16   Mr. Mazza because I wasn't sure, and now we have the answer.

17          THE COURT:  Yes.  So all of these entities that are

18   over here in bankruptcy saying that whatever's going on with

19   these companies that the Debtor clearly sees is a holding

20   company for all of these companies.  Nobody's disputing that.

21   Nobody's disputing that the Debtor's interest in these holding

22   companies may be something that it needs to -- assuming, and

23   I'm not making any finding.  Assuming that the Debtor gets the

24   opportunity to reorganize, the Debtor's clearly saying we need

25   these entities.

1          Someone's filing in the Netherlands some issues with

2     respect to these debtor's interest in these exact properties

3     that the Debtor has an interest in.  And I know it's against

4     Mr. Rajan, I think is what I can gather is that to a point

5     somebody else as they're attorney, and they want -- what do

6     they want to do?  And then they talk about Ultra-D Cooperative

7     UA having a principle business in somewhere as purportedly

8     represented by Mr. Rajan.  Okay.

9          So what are they -- what are they trying to do?  The

10    court issues --

11          MR. MAZZA:  If I may, Your Honor.  So the issue --

12          THE COURT:  Who's speaking?

13          MR. MAZZA:  It's Mr. Mazza again, Your Honor.

14          THE COURT:  Uh-huh.

15          MR. MAZZA:  So the issue is it's an issue of

16    compliance with Dutch corporate law and determination as to who

17    are the -- who is the board at these non-debtor entities.  And

18    there have been issues with regard to legal notice and the like

19    that would be applicable under Dutch law that the parties don't

20    believe have been complied with.

21          And so really what this particular proceeding was

22    brought to do was to implement a status quo so that parties

23    could figure out where to go from here.

24          What Mr. Rajan has done is held himself out through

25    what we're advised by Dutch counsel have not been acts that

 1  have complied with Dutch law at these non-debtor subsidiaries

 2  and therefore there's a dispute as to whether he -- as an

 3  individual, has the control to hold himself out as such.

 4      MR. ALEXANDER:  Your Honor, this is Vincent Alexander

 5  for the Debtor.  I mean, that just really begs -- the question

 6  is what do these creditors of the Debtor, what is their

 7  interest at the downstream entities in terms of trying to

 8  impact and effect how the Debtor runs these entities and who

 9  the Debtor appoints.  I mean, it's clear that there's never

10  been any transfer of the stock ownerships.

11      And so upon the bankruptcy filing, all of these

12  management and control rights belong to these debtors, whether

13  it's Stream or Technovative, yet they're trying to usurp that

14  process by going to the Netherlands.  You know, these same

15  entities that in individual are before this Court are trying to

16  go to the Netherlands and take advantage of some proceedings

17  over there, where they can then gain control over SeeCubic B.V.

18      And if you recall, Your Honor, they're arguing that

19  SeeCubic B.V. and if you recall, Your Honor, they're arguing

20  that SeeCubic B.V. owns the bonding equipment.  So then they're

21  trying to seek and exert control over the bonding equipment.

22      And so this is all an end run around the bankruptcy

23  in terms of what they're trying to do.  And on one hand, they

24  claim that they have no knowledge of what's going on.  But then

25  when documents come out, oh, I guess that is happening.

1          That's the Debtor's concern is that they're trying to

2  strip the Debtor of its management and asset rights through its

3  subsidiaries.  And we believe that's improper and it does

4  impact the estate, and that shouldn't go forward.

5          MR. MAZZA:  And Your Honor, if I may just briefly.  I

6  think the point --

7          THE COURT:  Who is -- wait a minute.  State your

8  name.

9          MR. MAZZA:  It's Mr. Mazza.  It's Mr. Mazza again,

10  sorry, Your Honor.  Is that it's really a question of

11  compliance with Dutch law.  And I think the Debtor is taking a

12  really loose view of how things work in a way that we filed --

13  we filed for bankruptcy.  I've already gone over the argument

14  that Mr. Rajan had no authority to file Technovative.  And then

15  he wants to go down the chain and assert his authority which is

16  contested as a matter of Dutch law at a Dutch entity.

17          There are employees down there who don't know what

18  their fiduciary duties are because of the issues around --

19          THE COURT:  Well, as to the employees, their

20  fiduciary duty is to the company.

21          MR. MAZZA:  Right, right.

22          THE COURT:  So now you're stating that Mr. Rajan has

23  asserted that he's in charge.  Somebody else claims that

24  they're in charge.  And this all needs to be cleared up because

25  what?

1          MR. MAZZA:  It needs to be cleared up so -- it needs

2    to be cleared up --

3          THE COURT:  But that's to whose benefit?  To whose

4    benefit?  Because I'm not understanding why Hawk or any of the

5    other parties -- what's their interest in this?  What is the

6    interest of Hawk Investments, SLS Holdings, what is it to them

7    who controls SeeCubic B.V.?

8          MR. MAZZA:  I'm sorry, Your Honor.  Could you repeat

9    the question?

10          THE COURT:  What is it -- what is Hawk and SLS

11    Holdings, what is their interest as to who controls B.V. --

12    SeeCubic B.V.?  I guess it's current shareholders.

13          MR. MAZZA:  Well, as secured -- right.  As secured

14    creditors in the structure, Your Honor.

15          THE COURT:  Okay.  So secured creditors -- I don't

16    know Dutch law.  So secured creditors can there file to have

17    someone determine who's in charge?  Could you do that?  I guess

18    you could in Delaware.  I don't remember Delaware law 10 to 15

19    years ago.  I don't remember.

20          MR. ALEXANDER:  Your Honor, Vincent Alexander on

21    behalf of the Debtor.  To be clear, they're not secured

22    creditors of SeeCubic B.V.  They're creditors of --

23          THE COURT:  They claim that they are.

24          MR. ALEXANDER:  No, they don't.  They don't claim

25    that they are.  Their agreements are with Stream.  That's who

 1  their agreements are with.  They're agreements are with Stream.

 2          THE COURT:  Yeah, but counsel, but they said Stream

 3  assigned their interest in, I guess, including SeeCubic B.V.

 4  for security for the loans to Stream.

 5          MR. ALEXANDER:  No, I don't think any interest -- no,

 6  no interests were ever assigned.  I mean, you're saying there

 7  were pledge agreements as part of some of the instruments, but

 8  they can't effectuate those post-petition.

 9          THE COURT:  So are they or are they not creditors of

10  SeeCubic B.V.

11          MR. ALEXANDER:  They are not creditors of SeeCubic.

12  They are not creditors of SeeCubic B.V.  I haven't seen any

13  filing in which they said SeeCubic B.V. owes them any dollar

14  amount.

15          THE COURT:  Mr. Mazza, are you saying you're a

16  secured creditor?  How are you a secured creditor?

17          MR. MAZZA:  I need to -- Your Honor, we need to take

18  a look at the security documents as to how far down the pledges

19  go.  I think, though, the point is --

20          THE COURT:  What's the pledge?

21          MR. MAZZA:  I'm sorry, Your Honor?

22          THE COURT:  And the pledge agreement was a pledge of

23  what?

24          MR. MAZZA:  It would have been shares of various

25  entities in the structure.  And I think the open question is

1  how far down does the share pledge go, so I don't know the

2  answer to that off the top of my head.

3       THE COURT:  So then what basis are you asserting that

4  you're a creditor if your only interest that you know of is

5  that Stream pledge is -- if ownership  interest in SeeCubic

6  B.V.  That doesn't make you a creditor.  It just makes you a

7  possible shareholder or interest or whatever it is that -- that

8  Stream TV has when Stream TV currently owns.

9       MR. MAZZA:  Right.

10       THE COURT:  And if you haven't foreclosed on that

11  interest, I don't know what your interest is.

12       MR. MAZZA:  You're -- yeah.

13       THE COURT:  This boggles me.  Everything about this

14  case.  And I'm not pointing at any one of you, but you know,

15  none of this makes -- is adding up.  It isn't good for anybody,

16  okay.  Because I have questions about all of the parties, all

17  of them.

18       And so I'm not understanding if you are not a secured

19  creditor in the sense that you haven't loaned money to SeeCubic

20  B.V.  They haven't put up their assets.  What the heck are you

21  guys doing in the Netherlands?

22       MR. MAZZA:  Your Honor, and I'm sorry to complicate

23  this even further.  But yes, there have been loans made to

24  SeeCubic B.V. to fund that entity so there is a direct credit

25  relationship.  So I know this isn't an evidentiary hearing and

1    there's a lot of complicated facts here, but there are direct

2    credit relationships that relate to B.V. given the funding that

3    has been made to B.V. during the course of its operations by

4    Hawk --

5            THE COURT:  You have loans and security agreements

6    with SeeCubic B.V. is what you're telling me?

7            MR. CAPONI:  Correct.  Correct, Your Honor.

8            MR. MAZZA:  I can tell you there's loans and go

9    ahead, Mr. Caponi.

10           MR. CAPONI:  Your Honor, I don't get -- to Mr.

11   Mazza's point, I don't have -- there's 20 some security

12   agreements.  Most -- during -- some of the 18 original notes

13   the money went directly to B.V., but more recently when the

14   case was back in the Court of Chancery and the receiver was

15   appointed, SeeCubic, Hawk, et cetera, funded the approximately

16   $1 million a month cash burn rate at SeeCubic B.V. directly

17   with -- from -- to SeeCubic B.V. with the receiver and there

18   were lines of credit.  I just don't know all the terms of

19   those.  But they were heavily secured, et cetera, et cetera.

20   It was effectively like a dip financing.

21           MR. ALEXANDER:  Your Honor, this is Vincent Alexander

22   for the Debtors.  That was part --

23           THE COURT:  Wait a minute.

24           MR. ALEXANDER:  That was part of the receivership.

25           THE COURT:  Right.  So the receiver, on behalf of

```
 1  SeeCubic B.V., entered into some transactions where there was

 2  money and a security interest granted.

 3          MR. CAPONI:  It was court approved, Your Honor, yes.

 4  It wasn't some sort of, you know, secretive transaction.

 5          THE COURT:  Okay.

 6          MR. CAPONI:  The stream was for their --

 7          THE COURT:  Counsel, I wasn't even suggesting it was

 8  secretive.

 9          MR. CAPONI:  No, I think the other side is.  Your

10  Honor, honestly, Stream is -- I mean, Stream is well aware of

11  this.  It was -- it was -- they were -- it was a multi-party

12  negotiated funding agreement where everyone signed off on it.

13  So it's -- I just don't happen to have all the terms, but

14  everyone's aware of it.

15          MR. ALEXANDER:  Your Honor, this is Vincent

16  Alexander.  Just to be clear, I wasn't trying to indicate that

17  I was not aware and the Debtors aren't aware that there was

18  some funding as part of the receivership, that some of these

19  entities may have done.  Which particular one, I don't know.  I

20  personally haven't seen a security agreement in terms of that

21  funding that occurred.

22          But again, that's not -- they're acting based on what

23  they believe are their rights as secured creditors and the

24  secured documents with respect to the Debtors in terms of being

25  able to control management.  That's what they're acting --
```

1   they're not acting on behalf of anything that happened in terms

2   of funding as part of the receivership.  I mean, so there's a

3   clear distinction about what they're trying to do.  So that's

4   -- that's irrelevant to what they're attempting to do.

5          MR. CAPONI:  Your Honor, again, this is Steve Caponi.

6   I'm not intimately familiar with the ins and outs of the

7   pleading in the Netherlands, so I'm not going to proport

8   otherwise.  I just want to correct counsel's statement.

9          My client is seeking to enforce all of its rights

10  however acquired, and that includes its secure creditor rights

11  at the stream level as well as the, you know, millions of

12  dollars that was more recently funded and is secured directly

13  against the assets at the B.V. level.  My client is not proud.

14  It will enforce its rights in whichever manner it can, but it's

15  enforcing all of them.

16         THE COURT:  But counsel, what I'm trying to figure

17  out how is bringing an action to have Mister -- and determine

18  that Mr. Rajan is not in charge of SeeCubic B.V. an exercise of

19  its rights in its collateral?  That's all I'm trying to figure

20  out.

21         MR. CAPONI:  Yeah, Your Honor --

22         THE COURT:  Because I'm reading this and that's what

23  this thing is trying to do.

24         MR. CAPONI:  Unfortunately, Your Honor, I can't shed

25  any light because I have no insights of -- never read the

```
 1   pleadings, not been involved in it.  I was just responding to

 2   -- it is not simply -- whatever Hawk's doing or SeeCubic,

 3   whatever's going on in the Netherlands, there are direct

 4   fundings as well as the legacy fundings, I'll call it, or the

 5   18 plus, 20 plus loans, so.

 6           THE COURT:  Yeah, so these pleadings have nothing to

 7   do with the funding.  They're not trying to foreclose on

 8   collateral.  What it relates to is whether Mr. Rajan has the

 9   authority to be in charge of this company, and I'm not quite

10   seeing how that's an exercise against collateral.  How that's a

11   foreclosure on collateral.  I don't know.

12           MR. CAPONI:  I would need to consult with Dutch

13   counsel, Your Honor, because I don't know either.  All I know

14   is -- all I know is that there's an action in the Netherlands

15   under Dutch law, and that's where my knowledge ends and we

16   would need to get some, you know, understanding from Dutch law

17   experts as to the nature of the action and the questions that

18   Your Honor has.

19           MR. MAZZA:  And if I may, Your Honor, Mr. Mazza

20   again.  So on the pledges, there is a -- and we can file a

21   supplement with the Court to provide additional information.

22   So there is a pledge and escrow agreement that is in favor of

23   SLS, the party -- secured creditor, by the Debtors Stream and

24   Technovative Technology Holdings, Delaware LLC, Ultra-D

25   Ventures CV, and down the chain to Ultra-D Cooperative.
```

1              The share pledges are 65 percent of the equity

2    interest in Technoventures B.V. and 65 percent of the equity

3    interest in SeeCubic B.V.

4              THE COURT:  Okay, counsel.  And you believe that --

5    I'm not understanding the relevance.  Hello?

6              MR. MAZZA:  I apologize, Your Honor.  There was

7    background noise.  Do you mind repeating that?

8              THE COURT:  I said, I didn't -- I'm not understanding

9    the relevance to my question of what you just said, that there

10   was a pledge of certain interest in SeeCubic B.V.

11             MR. MAZZA:  Yeah, so to close the loop on that, Your

12   Honor.  The issue regarding the contested governance down there

13   is the exercise of the pledge as it relates to those non-debtor

14   entities that is before the issue of contested governance

15   that's in the Netherlands.

16             THE COURT:  I get that, but you're saying based on

17   the pledge, your clients have a right to do that because the

18   interest was pledged?

19             MR. MAZZA:  I apologize, Your Honor.  The issue --

20   there's a pledge down there.

21             THE COURT:  Okay.

22             MR. MAZZA:  So let's take a step back.  The issue

23   before that is the status quo was that Mr. Stastney was a

24   director down there and that's what's dispute as a matter of

25   Dutch law as to whether Mr. Rajan has taken the steps in order

 1   to be able to take that claim as the director down at those

 2   entities.

 3          The pledge is in there.  It's not been exercised on

 4   as far as I know.

 5          THE COURT:  Right.

 6          MR. MAZZA:  But it is a non-debtor entity.  So sorry

 7   for the long-winded clarification, but that -- those are the

 8   facts and happy to --

 9          THE COURT:  But counsel --

10          MR. MAZZA:  Sure.

11          THE COURT:  But counsel, I'm not understanding -- you

12   only have a pledge.  You haven't foreclosed on the interest.

13   At what -- what basis, when I have a debtor here who clearly

14   has an interest in these entities and now their interest in the

15   -- in management or whatever it is that's going on is now being

16   callused somewhere else.  Because it clearly says -- and not

17   only that, they specifically talk about Stream's demand that

18   the bonding equipment be turned over to them.  They're opposing

19   that.

20          How are they going to go to Dutch court and oppose

21   something that's before me?  I'm leading this.  I got a problem

22   with that.  That's what they're saying that Mr. Rajan's trying

23   to take our assets and turn it over and he shouldn't be and we

24   want you to stop him.  No, no, no, no, no.  You're not going

25   over there with that claim.  That claim is here.

1              Now, at the end of the day, I may say, okay.

2      Somebody needs to figure out who has control of this, but it's

3      not now.  Not when it's before me.  I have to first figure out

4      who owns this thing.  Now, at the end of the day I say that

5      SeeCubic owns it and somebody needs to figure out what to tell

6      SeeCubic to do, we'll get there, but we're not there yet.

7              Now, I don't appreciate people going to another

8      jurisdiction and to get another court to decide that they own

9      it and that nothing should happen and no direction should be

10     made with respect to the turnover or release of that equipment.

11     Because that's exactly what you guys have asked for.  I'm

12     reading it and I don't appreciate that.  That's not going to

13     happen.

14             Now, if you guys want to go over there and fight

15     about who's in charge, but I'm reading this and that's not all

16     you're trying to do.

17             MR. MAZZA:  So, Your Honor --

18             THE COURT:  It says Mathu Rajan attempts to dispose

19     of a value asset of Dutch SeeCubic operation.  He wants them to

20     turn over that bonding equipment, which is the exact issue

21     before me as to who owns it.

22             And so it's not a matter of whether Mr. Rajan is

23     going to tell somebody to turn it over.  I get to decide who

24     owns it and then if I say it belongs to Stream, what in the

25     world is going to happen in the Netherlands if they say, oh,

 1   no.  We decided it belongs to SeeCubic.  You can't do that.  We

 2   can't have two conflicting decisions.

 3        MR. MAZZA:  Mr. Mazza, again, Your Honor.  Your

 4   Honor, completely understand, I think the issue around who owns

 5   it does need to be decided and I think there's confusion on

 6   that point.  Is it the B.V.?  Is it Stream?  I believe there's

 7   a letter from Mr. Rajan saying it's both Stream and B.V.s.

 8        And I think to just deescalate the allegations around

 9   stay violations, that Your Honor hit the nail on the head as to

10   how this all can be dealt with through insurance and telling

11   people where this equipment would otherwise go and we'd be sort

12   of done with it.

13        I think that Your Honor also hit the nail on the head

14   as to the corporate law dispute.  That is what it is over in

15   the Netherlands, and to the extent that that doesn't deal with

16   issues around the bonding equipment which can be dealt with in

17   a commercial fashion as already stated by Your Honor, then I

18   think we can save a lot of people a lot of time around here.

19        THE COURT:  And who was this?  Wait, who was that,

20   that proposed that?

21        MR. MAZZA:  It was Mr. Mazza again.

22        THE COURT:  Okay.  All right.

23        MR. MAZZA:  And that's what, Your Honor, we proposed

24   previously, so.

25        THE COURT:  Okay.

1        MR. CAPONI:  Steve Caponi, again, for Hawk.  Just to

2   chime in on what Mr. Mazza just said, and this gets to the

3   motion we're eventually going to get to I hope about the

4   dismissal.  I think regardless of who -- I mean, let's assume

5   -- we know at the start of this bankruptcy, this asset was

6   sitting at the SeeCubic B.V. level and it was being used and

7   housed there.  That's the ordinary course, let's just call it.

8        The problem we have with this case is there is no --

9   the Debtors are not doing anything that you normally see.  No

10  first filed -- no first day motions, no bank accounts, no dip

11  financing, no anything.

12       If this were proceeding in the ordinary course, a lot

13  of these issues would be addressed.  But the Debtor, rather

14  than teeing them up the way a debtor normally does, so for here

15  example, Mr. Rajan versus -- rather than flying to the

16  Netherlands and trying to get -- just take the equipment out,

17  should have come to Your Honor and said I want to do something

18  out of the ordinary course.  I want to take a valuable piece of

19  equipment.  I want to move it from one subsidiary and I want to

20  move it to the ownership of a different, and we would hash out

21  adequate assurance and all those kind of issues.

22       The reason this case is such a mess is because the

23  Debtor's not doing any of the normal step one, step two, step

24  three processes.  Rather it's, you know, it's reorganizing by

25  chaos.

1              And I'm happy -- from my client's perspective, Hawk,

2      I can represent to Your Honor, if we're going to tackle the

3      ownership and adequate assurances in front of Your Honor, we're

4      happy to do it.  If it's going to be a smash and grab in the

5      Netherland because that's where Mr. Rajan's doing, then we'll

6      have to do it there.

7              I mean, we want to bring order to this and we think,

8      you know, dismissal or trustee does that, and we can get to

9      that.  But Your Honor, I understand your frustration, but I

10     think it really needs to be directed at the Debtor before it

11     starts taking extraordinary actions, which this clearly is.

12             Why isn't it before Your Honor on a proper motion so

13     that all the stakeholders can be heard in an orderly fashion?

14     That's what we really were advocating for.

15             MR. ALEXANDER:  Your Honor, Vincent Alexander on

16     behalf of the Debtors.  I can briefly respond to that.

17             THE COURT:  Yes.

18             MR. ALEXANDER:  The Debtor would love to have the

19     opportunity to not deal with these other issues and focus on

20     what Mr. Caponi described as normal debtor operations.

21     However, since the petitions were filed, we've been met with

22     immediate resistance from each of the creditors with respect to

23     the simplest things of the Debtor even having access to its own

24     property.

25             Also, they talk about how -- it sounds like they're

1    trying to parse out, you know, management and equipment.  But

2    the only way you get through the management is through the

3    Debtor's management rights going down.  You can't cut through

4    the chain.  So by doing anything with regards to management in

5    the Netherlands, they're impacting the Debtor's rights here in

6    the United States, and that's exactly what they're trying to do

7    is impact the Debtor's rights.

8           The Debtors want to propose a plan and have a plan

9    that they're going to propose that's going to take care of the

10   secured creditor's claims.  But in order to do that they do

11   need their assets in order to do that.

12          You know, this isn't a bankruptcy -- I don't know the

13   word is ambush -- or chaos, I think is the word.  We would like

14   a controlled process.  But you can't hold the Debtor hostage

15   for its assets and then say, we'll give you your assets if you

16   give us something.  Right, that's not the way it works.  The

17   Debtor's entitled to its assets and issues of adequate

18   protection or anything else are dealt with in due course.  But

19   you can't tell the Debtor, you know, you need to take care of

20   all of these issues but then they don't have the ability or the

21   assets to do that.

22          So we agree.  We should be able to work out some type

23   of arrangement or agreement with regards to the equipment.  But

24   we don't think any of this usage of the equipment would be

25   outside the ordinary course because it's outside the ordinary

1    course of the business and this is the business of the Debtor.

2            So we can work out bankruptcy specific issues, but we

3    need our assets in order to do that and we need the

4    interference to stop.  And so that's what the Debtor would

5    like.  And if we can get that, then we'll be able to proceed on

6    a path here in this case in terms of all the parties working

7    together to have a successful outcome.

8            Because at the end of the day, that bonding

9    equipment, I don't know how they used the words take or -- it

10   would be under the control and the supervision of this Court.

11           So unless they -- the creditors don't respect what

12   this Court's capabilities are to do to the Debtor if the Debtor

13   doesn't comply with its requirements, then there should be no

14   issue.  It's not as if the Debtor was taking equipment and

15   transferring it to some entity that the Debtor didn't have

16   control over.  No, the Debtor said this is my property, which

17   means it's property of the estate, which means it's under the

18   supervision of this Court.

19           We want everything to be under the supervision of

20   this Court so that we can move on a path forward to get the

21   issues resolved.  But we can't keep having all of these, you

22   know, offramp litigations and disputes.  Everything should be

23   in the bankruptcy court.

24           MR. CAPONI:  Your Honor, again, Steve Caponi --

25           MR. MAZZA:  Your Honor --

```
1              THE COURT:  If you would --

2              MR. CAPONI:  If I could just briefly respond.

3              THE COURT:  Wait a minute.  I have a question.

4    Counsel, you would agree that with respect to the issue of

5    management of these companies, that this -- I don't think that

6    -- well, even assuming I had the ability to address that

7    because it's property that a debtor has, that there's a

8    different company of companies that the Debtors --

9              MR. ALEXANDER:  Your Honor, are you still there?

10             MR. CAPONI:  May have dropped again.

11             MR. ALEXANDER:  Okay.

12             Is Your Honor back?

13             COURT REPORTER:  No, she's not back on yet.

14             MR. ALEXANDER:  Okay.

15             COURT REPORTER:  That was her disconnecting.

16             MR. ALEXANDER:  Oh.

17             MR. CAPONI:  I think she said she has to do it twice

18   now, right?

19             COURT REPORTER:  Yeah.

20             MR. ALEXANDER:  Yes.

21             COURT REPORTER:  There's a delay, apparently.

22             THE COURT:  Well, counsel, that was -- that was hang

23   up number two, so I guess we're good for the rest of the day,

24   I'm hoping.

25             Did everybody hear what I was saying before I got
```

1   disconnected?

2          MR. ALEXANDER:  Your Honor, I think -- this is

3   Vincent Alexander for the Debtor.  The last thing I believe you

4   said was counsel, you would agree regarding management, and

5   then you cut off.

6          THE COURT:  Right.  That regarding management, that

7   that is the issue -- I'm not quite sure that you heard me say

8   that even if it was something that I would have jurisdiction to

9   decide, and I don't know if I do or I don't, it's a core I get

10  a final decision if it's related to, I issue a report and a

11  recommendation that goes to the district court.  Or it's

12  something that I say, even if I can hear it, I'm going to --

13  which I do with a lot of things.  For instance, I may have

14  landlord tenant issues.  I may have property disputes.  Things

15  that I'm capable of doing but I think it's more appropriate to

16  be in a court that has a familiar -- that does this on a

17  regular basis, knows what the law is as opposed to me trying to

18  interpret the law.

19          So and this goes to Mr. Alexander.  Do you not think

20  that at some point the issue of control over the subsidiaries

21  is going to have to be -- I'm going to call them subsidiaries,

22  because it's not -- it's a whole new company.  I don't know

23  what else to call them.  But of the related companies is going

24  to have to be decided at some point?

25          MR. ALEXANDER:  Your Honor, we believe that that is

1   under the jurisdiction and control of this Court because it all

2   flows down from the right that Technovative has which is before

3   this Court as a debtor.  And those are assets of this estate.

4   So those management rights are assets of this estate and we do

5   believe that the Court should do that in terms of exercising

6   control over that.

7           And with respect to -- you know, I believe they've

8   hinted and alluded to -- I think they're trying to bring in the

9   authority to file type issue.  But we'll happily address that

10  with this Court because we believe that the caselaw supports

11  that we have a valid filing and we can proceed with the

12  bankruptcy case.

13          And when you control the entity at the Technovative

14  level, you control all the downstream entities.

15          THE COURT:  Well, there's still some issue because at

16  the time of the file -- well, at the time of the filing, there

17  was a receiver who was in control, was there not?

18          MR. ALEXANDER:  There was a receiver pendent right

19  that was in place.

20          THE COURT:  Uh-huh.

21          MR. ALEXANDER:  And that --

22          THE COURT:  But that's what I -- I guess we have

23  different pronunciation.  I say pendant, you say pendant like -

24  -

25          MR. ALEXANDER:  You're much more sophisticated than I

1    am, Your Honor.

2          THE COURT:  No, I don't think it has anything to do

3    with that.  I just think it has to do with what your initial

4    language is.  I think that that sort of colors how I pronounce

5    words.

6          But with that being said is that while I may have

7    jurisdiction over the Debtor's interest and I may have the

8    authority to decide the Debtor's interest, what I'm saying it

9    may not be something I necessarily would want to decide and I

10   might defer to another court to make that decision.

11         The question is, is it now or is it later on whether

12   I would do it at all.  Because -- so that's all I'm saying.

13         MR. ALEXANDER:  Your Honor, I mean -- Vincent

14   Alexander again.  I mean, in terms of that issue, I think if

15   the authority to file issue is addressed, which is I believe a

16   core ruling and under the jurisdiction of this Court, right, is

17   the authority to file.

18         THE COURT:  Definitely.  Definitely.  That wouldn't

19   go to anybody else.

20         MR. ALEXANDER:  Yeah.  I think once --

21         THE COURT:  And I don't think that -- I don't think

22   that anybody's in the Netherlands challenging whether the two

23   companies have the right to file.  I don't think that's what's

24   going on.

25         What I think is going on and from what my reading of

1   this and it was very brief because you just pointed it out to

2   me, but I could also read the parties various pleadings was

3   that post-bankruptcy, when the receiver was in place was no

4   longer in place, then who was in charge of the subsidiaries?

5          Clearly, it would have been the -- whoever the --

6   whoever was in charge prior to -- and I say in charge, was the

7   person with the authority, prior to the Chancery Court's

8   installation of the receiver pending the litigation.

9          That -- what did that mean in terms of I don't know

10  who was in charge.  I don't know.  And then once the receiver

11  no longer has the authority, then that authority could go to

12  either the party who was there or whatever process for changing

13  that would be the appropriate way to have that done.

14         But the relevance of that is that it's kind of at

15  this point, these are entities that the Debtor needs to rely

16  upon for its success, whether that's something that needs to be

17  done now or at some point in the future, or whether it's

18  something that gets resolved in the motion to dismiss because

19  whether the authority -- and I don't know what the authority is

20  because I don't know what the different articles -- whatever

21  they're called in the Netherlands, whatever it is for formation

22  or how you operate, any of those different things, I'm not

23  quite sure what that means.  I just know that right now we are

24  in a specific place, and whether you are in my court or

25  somewhere else, whether those are issues that get immediately

1  addressed or not.

2          With respect to the Netherlands, what I gathered from

3  this summary proceeding is that the Debtor -- well, the company

4  SeeCubic wants to prevent Mr. Rajan from directing the --

5  whoever the representative of that company to execute the exact

6  document that someone says they need to do here in my Court,

7  and that Mr. Rajan is exceeding his authority.

8          Because they have it broken down into what the court

9  issued, the parties, the jurisdiction, the Rajan brothers

10 leading to intervention by funders in 2020, leading up to these

11 present invalid decisions making an attempted asset stripping.

12 That's the one that caught my -- let's see.  The unpaid

13 financiers, SLS and Hawks are in the process of forcing their

14 security issues, consistently -- consisting essentially of the

15 ownership in the country, one in the Netherlands, and now the

16 value is in danger of being impaired in the very future by the

17 person who attracted the debt investment but is not repaying

18 it.

19         So that's sort of what they said the bottom line was,

20 which you know, are you trying to exercise your rights in these

21 companies?  I don't know what they're trying to do over there.

22 But we still have a problem for this is -- it says, these

23 failure of enforcement proceeding is initiated by the

24 financiers to obtain the assets given as a security prompted

25 the independent directors of Stream to enter into an amicable

1    settlement, the omnibus agreement.  Okay.  Well, that's no

2    longer in effect.

3           And it says Stream and Rajan brothers refuse to

4    accept that control of the company lies with the financiers.

5    Counsel, who's to tell them that?  You haven't foreclosed on

6    your security interest in the control or any of that.  I'm a

7    little concerned why you would go say that and somebody would

8    allege all of that.  That's all disputed, and you agree you

9    haven't foreclosed on the ownership interest.

10          So maybe you might have foreclosed on your interest

11   in the assets, but I haven't heard anybody say that you

12   foreclosed on the ownership interest of the Debtors and

13   actually, they're in this Court.  I don't know how you could be

14   in the Netherlands saying something to the contrary.  I'm a

15   little concerned about that.

16          MR. MAZZA:  Your Honor, Mr. Mazza, again.  I don't

17   know -- I don't think that that's the -- maybe it got lost in

18   translation or something to that effect.  But I think the point

19   is that the status quo was that Mr. Rajan as of the filing of

20   these entities was not a director down properly recognized at

21   the non-debtor Dutch subs.

22          And so I think that the issue that may not be

23   elegantly presented in those Dutch pleadings is that that's

24   what's contested because the financing parties that have rights

25   against those non-debtors is -- doesn't entitle Mr. Rajan to

1  come down and declare himself the sole director.

2          So I think that's what's meant to be said and to the

3  extent it's not said that way, then it's not, I think,

4  elegantly presented.  But there's --

5          THE COURT:  But you would agree that at the time of

6  the filing, the receiver was in control of all of that.

7          MR. MAZZA:  Correct.

8          THE COURT:  And once he was no longer in control,

9  what did that mean for the Debtors, the holding company,

10 Technovative essentially is the owner of -- through its

11 ownership of various entities actually the owner.  You know,

12 what does that mean in terms of how it's affecting debtors is a

13 concern.

14         So okay, so obviously --

15         MR. MAZZA:  Your Honor, if I may --

16         THE COURT:  Uh-huh.

17         MR. MAZZA:  Right.  So and I -- I don't think -- I

18 think that the dispute in the Netherlands is that because of

19 the filing, that didn't meant that there was some

20 transformation such that Mr. Rajan legitimately became a

21 director down at the non-debtor subs.  I think that your point

22 -- there is no intent to quarrel with any of the Court's

23 jurisdiction as it relates to the Debtor entities.

24         We do think that, again, it was an alterviras

25 (phonetic) act of Technovative and that's a separate story.

 1  But I think Your Honor was honing in on how the issue really

 2  flagged down at the non-debtor sub.  It's an issue of Dutch

 3  corporate law for that court's jurisdiction to decide.  And

 4  while there may be this sort of indirect interest that rolls

 5  back up to the Debtor entities, they don't get the benefit of

 6  being able to say that I can just avoid my creditors down below

 7  that I don't file for bankruptcy, that I don't put under the

 8  supervision of the bankruptcy court in order to -- and extend

 9  the stay in that way.

10          Again, I think Your Honor, we had a colloquy earlier

11  about extending the stay and the like.  And they certainly

12  haven't done it -- done that, so.

13          THE COURT:  Hold up.  It's not even -- it's not even

14  -- counsel, I don't see it as both -- I also have the ability

15  to say this is part of the Debtor's assets, they have an

16  interest.  Don't do anything until I figure out what I want you

17  to do with it.

18          I'm not saying that the Dutch court may not have

19  jurisdiction.

20          MR. MAZZA:  Right.

21          THE COURT:  But I clearly have jurisdiction over all

22  of their interests, and the Debtors, through their entities,

23  have an interest in these companies.  So the question becomes

24  is what happens now?

25          Because as I said, one of the things they want to do

1   is to stop, and if the Court says, there.  Make a declaration

2   that in fact that bonding equipment belongs to SeeCubic B.V.

3   and no turnover and I find exact opposite, now we've got a

4   problem.  We have got a problem.

5           MR. MAZZA:  And Your Honor, I think -- okay.  I'm

6   sorry.

7           THE COURT:  Go ahead.

8           MR. MAZZA:  I was just -- I was going to say I think

9   that where you were honing in is that there is a commercial

10  resolution that could be dealt with with the bonding equipment,

11  and that would save a lot of parties a lot of time.

12          I think there's a question of who really owns that

13  bonding equipment, but really does it ultimately matter if we

14  can come up with a commercial resolution as a protection of the

15  equipment, insurance that a debtor needs that, et cetera.

16          And so to me, to escalate this to some allegations

17  around willful violations of the stay when we've come to the

18  table and unfortunately, I don't think counsel has had great

19  candor with the Court about discussions around these issues

20  which Your Honor has again pointed out.

21          And the last point I'll make on this Dutch subsidiary

22  issue, Judge Silverstein, a couple days ago, had an opinion

23  where she addressed issues regarding non-debtor subs and she

24  found that a lawsuit against a non-debtor subsidiary does not

25  violate the automatic stay if such lawsuit may impact the value

1   of the stock that the parent debtor owns as it does not alter

2   the estates -- bankruptcy estate's rights, liabilities, options

3   for freedom, or action, and that ownership of the outstanding

4   stock by the parent debtor does not confer jurisdiction to the

5   bankruptcy court.

6        So again, Your Honor, we completely have all

7   deference to everything that is under your jurisdiction and

8   what you're trying to sort out in this case and we are not

9   looking to go afoul of anything that Your Honor wants to make

10  sure is control.  But let's take a step back as to how this all

11  came about.

12       We're in discussions, Mr. Rajan's headed over to the

13  Netherlands and is trying to take control, and frankly, parties

14  are just trying to protect their rights.  And so any guidance

15  from Your Honor would certainly be appreciated because these

16  are issues that are complicated.

17       And again, they have a commercial solution that we

18  can deal with one way or the other.  But this does not mean

19  that Mr. Rajan can just throw himself around and cloak himself

20  in the automatic stay when it simply doesn't apply.

21       THE COURT:  Right, and I get that.  Right.

22       MR. ALEXANDER:  Your Honor, this is Vincent

23  Alexander, the Debtor.  When you're done, I would like an

24  opportunity to speak.  I don't mean to cut you off.

25       THE COURT:  Right.  No, I just want to comment that,

```
 1   right.  I don't know what rights Mr. Rajan has, doesn't have.

 2   I'm sorry.  I don't know what rights -- who has what rights

 3   with respect to the control over these companies or whether you

 4   can or cannot replace whoever was there.  That's an issue that

 5   needs to be resolved either -- because is it the Debtor's

 6   interest that's being affected or whose interest?

 7           And I get it, I haven't read Judge Silverstein's

 8   decisions.  I don't know if they're factually the same.  I have

 9   no idea what the soup was, what -- if they're exactly the same

10   or whether they were trying to foreclose on something.  I don't

11   know.

12           My concern with respect to that action with respect

13   to the secured creditors, they are secured creditors, at least

14   from what I can gather, prior to the installation of -- or the

15   appointment rather, of the -- and from what I'm gathering, and

16   I could have this factually incorrect, it was prior to the

17   appointment of the receiver during the litigation.  It does not

18   appear that SeeCubic B.V. had any direct loans or pledges or

19   anything with the creditors who brought the action in the

20   Netherlands.  At least I haven't heard any.  What I've heard is

21   -- yes?

22           MR. MAZZA:  Your Honor, Mr. Mazza again, and I know

23   there's been a lot of facts.  But yes, the B.V. equity is

24   pledged, 55 percent of it to their creditors, so.

25           THE COURT:  Right.  But it was a pledge through who?
```

1          MR. MAZZA:  It would have been a pledge by the owner

2     Cooperativ.

3          THE COURT:  Okay.  But that's what I'm saying.  I --

4     what I'm saying is that the ownership interest in that company

5     was pledged either by Stream or by some other entity.  So and I

6     don't know if that was prior to -- I understood that it was

7     during the receivership that loans were made, pledges were

8     made.  You're saying that there was loans to Cooperativ and

9     they pledged their interest?

10          MR. MAZZA:  Correct.  Cooperativ had pledged it's

11     interest to SLS and Hawk.  So it's set forth in I believe, is

12     that the collateral estoppel opinion written by Chancellor

13     Laster.  If I can just indulge, Your Honor.

14          "Between 2010 and 2020" -- and I'm reading from the

15     opinion,

16               "stream borrowed millions of dollars.  Stream's

17               senior secure creditors SLS Holdings 4 LLC to be

18               referred to as SLS between 2011 and 2012, Stream

19               borrowed six million from SLS under a series of

20               notes, the SLS notes.  Stream pledged all of its

21               assets as security for the SLS notes and executed a

22               security agreement that authorized SLS to levy on its

23               assets in the event of default.

24               "Seniors Streams junior creditors Hawk between 2010

25               and 2020, Stream borrowed more than 50 million from

1          Hawk plus additional millions denominated in dollars.

2          The loans are documented in a total of 18

3          substantively identical notes.

4          "In connection with the Hawk notes, Stream executed

5          18 substantially identical security agreements,

6          subject to the senior security interest held by SLS.

7          Each of the Hawk security agreements granted Hawk a

8          security interest in substantially all of Stream's

9          assets including the company shares.  Each of the

10          Hawk security agreements authorized Hawk to levy on

11          and take control of Stream's assets to satisfy Hawk

12          if Stream defaulted.

13          "Also in connection with the Hawk notes, Stream

14          executed a total of 15 substantially identical pledge

15          agreements.  Each provided if Stream defaulted on any

16          of their Hawk notes, then Hawk could vote the company

17          shares."

18          Bear with me a second, just don't fail me the rest.

19   I apologize, Your Honor.  Just one second.  The opinion's kind

20   of lengthy.

21          MR. ZAHRALDDIN:  Your Honor, this is Raphael

22   Zahralddin.  Can someone identify which date of which opinion

23   Mr. Mazza's reading from?

24          THE COURT:  Well, I don't know if it answers my

25   question.  My question is --

```
1              MR. MAZZA:  November 29th, 2022, is the date.

2              MR. ZAHRALDDIN:  Thank you.

3              THE COURT:  Okay.  So my question is did some -- an

4    opinion on non-opinion, did Cooperativ pledge it's interest

5    separately?

6              MR. MAZZA:  Yes.

7              THE COURT:  Not separately pledge it's interest in

8    SeeCubic as security?  Not through Stream.  Not Stream pledging

9    its interest in Cooperativ, but Cooperativ directly itself

10   getting a loan, or maybe Cooperativ in connection with Stream's

11   loan pledge their its interest.  Did each entity also pledge

12   their interest in whatever else they have?

13             MR. MAZZA:  Yes.  That's what I'm -- I'm trying to

14   find that specifically.  But if we could file a supplement to

15   the Court to provide that information, again.

16             THE COURT:  Yeah, that would be filed -- or that

17   would be fine.

18             MR. MAZZA:  Yeah, okay.  Your Honor.  Thank you.

19             THE COURT:  Okay.  So I guess we've gotten through

20   enough of -- I mean, this is colloquy.  Can you imagine what

21   trial's going to be like if we have to try this matter on

22   relief from the State.

23             So I think I sort of know where I am with that, and

24   I'll figure out what I want to do.

25             Let's talk about the motion to dismiss.  Clearly,
```

1    that's going to need evidentiary hearing because I can't even

2    do it without it.  So let's talk about that.

3            MR. CAPONI:  Yes, this is Steve Caponi for Hawk who

4    filed the motion.

5            THE COURT:  Wait a minute.  Wait a minute.  Wait a

6    minute.

7            MR. ALEXANDER:  Mr. Caponi, I apologize.  This is

8    Vincent Alexander.  I apologize.  I didn't mean to cut you off.

9            THE COURT:  No, it's somebody else's fault.

10           MR. ALEXANDER:  I had asked Your Honor if I could

11   just clarify one point before you had moved on.  It's Vincent

12   Alexander on behalf of the Debtor.

13           THE COURT:  Sure.  Okay.  What was the point?  Be

14   fast.

15           MR. ALEXANDER:  I'm sorry.  It was just --

16           THE COURT:  Go ahead.

17           MR. ALEXANDER:  A, there was just one comment made

18   about candor to the Court, and I just want to let you know,

19   we're just stating the facts to Your Honor and being very

20   candid in terms of what the position is.

21           And our whole view is that the control goes

22   downstream.  So if you have control at the top, you have

23   control at the bottom.  And so our position is that if the

24   bankruptcy is authorized, the Debtors have control of all the

25   downstream entities and there shouldn't be any proceedings

1    anywhere else trying to determine the control issues because it

2    all stems from assets of the estate.

3            So we agree that we can't have parallel proceedings,

4    and we think this Court should decide those issues first.  And

5    if they want to do something in the Netherlands after this

6    Court makes a decision, then, so be it.  But those issues need

7    to get decided here first.

8            THE COURT:  Well, I'm not sure if any of it is black

9    and white is that, because whether the Debtor has control over

10   its interest in these various entities are governed and

11   controlled by separate agreements, separate laws, separate

12   everything.  So yes, I agree the Debtor has interest and that

13   interest is property of the estate.  But what that interest is,

14   is to the extent somebody who's challenging is typically

15   interest in property of the estate is determined by the

16   bankruptcy court.

17           And so I'm not sure and I'll take a good look at

18   Judge Sue's (phonetic) decision.  What does that mean if a

19   debtor has interest in a subsidiary, and there is some

20   litigation against that subsidiary.  There are cases clearly

21   where the stay is put into effect to say, we're going to just

22   put a hold on everything, until we can first get something

23   going in the bankruptcy.  But I think as an initial matter,

24   even before we get to any of that, if there is a motion to

25   dismiss on the basis that this is an unauthorized filing, which

```
 1    in and of itself, may take care of everything, assuming that

 2    this is -- I'm not -- I don't know if it's right or wrong.  But

 3    let's talk about that.

 4           So I get your position, counsel.  And I'm not -- you

 5    know, I'm not quite sure that even -- I'm not saying that

 6    you're not correct in that this is property of the estate and

 7    control lies with the Debtor.  But that control is not defined

 8    by bankruptcy law.  The interest of the Debtor in the property

 9    is not disputed.  No one's saying the Debtor through its

10    subsidiary doesn't have an interest, but what that interest is

11    and how you exercise that interest may be property of the

12    estate.  And I can't recall, I probably -- I think I addressed

13    that issue somewhere at some point.

14           But in interpreting that, it may not be something I

15    would want to undertake.  It would be something that I would

16    likely defer to the Netherlands, because that is more -- for

17    instance, if this was an issue of Pennsylvania corporate law,

18    Jersey corporate law, even Delaware, I mean, I took the bars

19    years ago.  I'm not saying I'm not that much of an expert, but

20    I think I would have the wherewithal to say, okay, I can figure

21    this out.  And I'll figure it out.  Sometimes when even when I

22    have jurisdiction to, "figure it out" I defer to a more

23    competent court.  So that's all I'm saying with respect to

24    that.  Okay?  All right.

25           MR. MAZZA:  Your Honor, Real quick.  And I'm sorry to
```

 1   belabor.  Mr. Mazza again.  And as far as what's been said in

 2   the Court around the buying equipment, the point I was making

 3   is that, as Your Honor had suggested, if we could just come up

 4   with a commercial arrangement that could be dealt with and not

 5   waste the Court's time.  So that's why I made that point is

 6   that counsel hadn't said anything about that.  And we wish they

 7   had come to the table to be more commercial as opposed to try

 8   to come up with stay violations.

 9          And then just the last point that you raised

10   regarding what's going on in the Netherlands, and the courts of

11   competent jurisdictions alike, and I think this is just a

12   preview to what you're going to hear from Mr. Caponi on the

13   motion for alternative relief, but the 225 action was advanced

14   to virtually the end of the line, and then this case got filed.

15   The 225 action would have decided all these things in Vice

16   Chancellor Laster's court.

17          So in our view, while we've completely respected have

18   full deference for what Your Honor has under your jurisdiction,

19   these state law property estate issues have been really run to

20   the ground.  And for that reason, that's going to support what

21   Mr. Caponi is about to lay into.

22          THE COURT:  Okay.  All right.  Mr. Caponi.

23          MR. CAPONI:  All right, Your Honor.  I take it to

24   heart that we've been going for quite a while here.  And I

25   think we've plowed a lot of ground.  And you know,

```
1    there's -- the Debtor thinks it's a legitimate entity.  These

2    are organized.  We think it's a bad faith filing and an effort

3    to avoid, you know, the creditors.  And I don't want to belabor

4    that point.

5              I take Your Honor's issue regarding the need for an

6    evidentiary hearing.  And I think, you know, rather than

7    arguing the merits of the motion, we ought to focus on that

8    with one exception.  And that exception, Your Honor, would be

9    the authority to file I think it's the primary one.  There's no

10   evidence needs to be taken on that.  The Court need only look

11   at the receivership order.  Counsel, you know, we had a

12   discussion a few minutes ago about pendente lite or lite.

13             If you look at the face of the order itself, that is

14   incorrect.  The Vice Chancellor's decision, which is a reason

15   decision made it very clear that on behalf of the state of

16   Delaware, he was reclaiming the entity, control of the entity.

17   And he put the receiver in place to be the board of directors,

18   not to manage assets.  So it's not a situation where you have a

19   board of directors and then a receiver is overseeing the

20   assets.  The board was removed and replaced with the receiver.

21   And that's spelled out very clearly in the order.

22             As a result, this isn't a situation where was there a

23   constitutional infringement on the entity's right to file

24   bankruptcy?  No.  The receiver was the board and was the only

25   one able to do it.  Mr. Rajan was a third party, a stockholder
```

1  at best and had no authority.  So I think, Your Honor, we could

2  tee that up, and that could be resolved on the papers that

3  currently exist.

4         THE COURT:  Okay.

5         MR. CAPONI:  When you get into the -- and again, I

6  would urge the Court to read Vice Chancellor Laster's decision.

7  I'm a corporate law lawyer geek.  There's a huge distinction

8  between if you look at the order, it refers to the statutory

9  appointment of a receiver, that you would appoint for a

10  pendente lite.

11         And then it -- but it specifically says that under

12  Section 141, which is the provision of 8 Del code 141, which

13  governs the authority of a board of directors and states that

14  all corporations are managed by the board, Vice Chancellor

15  Laster says, I am vesting in this receiver all rights and

16  authority that would otherwise sit with the board of directors.

17  And I think once he did that, the only person who could file

18  bankruptcy, speaking as the board of directors, was the

19  receiver.  Not Mr. Rajan.  So we think as to Technovative,

20  that's why it's a fraudulent filing.

21         On the merits of the rest, Your Honor, I'm going to

22  take a quick stab at just saying this is the third go around.

23  Two bad faith -- you know, two filings that dismissed before.

24  Each one has a pattern, on the eve of a negative decision in

25  the Court of Chancery twice before they were dismissed.  We

1   think Your Honor could take judicial notice of all that, and

2   reach the same conclusion right now.

3            And I think that is bolstered by as I mentioned, just

4   look at the docket.  Any credible debtor would have filed first

5   day motions -- would have filed other motions, financing

6   motions, would have given the Court some indication of what it

7   is doing.  I mean, we've been here a month.  And the only thing

8   the Debtors have filed are sanctions motions, trying to reclaim

9   assets, but without dealing with insurance, and all these

10  issues that you need to do on a credible basis.

11           So I think the lack of activity speaks for itself,

12  combined that with the past history, I think, Your Honor, could

13  make a decision here.  But again, if Your Honor is more

14  comfortable with an evidentiary hearing on those aspects, and

15  would rather talk about scheduling, I think it needs to happen

16  faster and quicker.  And the Debtors are going to say August

17  and we need evidence.  No, we don't.  This needs to happen now.

18  And as I mentioned, the very first time we spoke.

19           Now, I think this is a critical point.  There's an

20  operating subsidiary that has no revenue and payroll is due.

21  My clients covered the last payroll.  And it is shocking that

22  the Debtors have not reached out.  The Debtors have not picked

23  up the phone once to talk to secured creditors, my client in

24  particular, about the assets are funding this estate.

25           There's payroll coming due.  Everyone stops getting

1   paid.  Everyone walks out the door.  All the intellectual

2   property is gone.  And there's no TVs being made and no

3   intellectual property to monetize.  The fact that this debtor

4   has done nothing to come before Your Honor and say this is what

5   our plan is to pay for those people or ask my client, under

6   what terms will you continue funding the operations is a huge

7   red flag.  And so we don't have till August.  I don't think we

8   have to the end of April, before payroll's not met.

9        THE COURT:  Well, that was -- and I'll ask this to

10  counsel.  I wanted to know who's funding these people?  I mean,

11  there's no cash collateral.  Who's funding anything?  That was

12  one of my questions.

13       MR. CAPONI:  It's been my --

14       THE COURT:  I wanted to know who was going to fund

15  them?  And how was that working?

16       MR. CAPONI:  Your Honor, as to my clients to date, we

17  have -- we funded the last payroll and left enough money there

18  when they filed the bankruptcy to cover the payroll.  So in the

19  taxes, that's presently current.  But I believe by the end of

20  April, that situation --and now payroll's due and -- did we

21  lose Your Honor?

22       THE COURT:  No, no, I'm still here.

23       MR. CAPONI:  Okay.  I heard a beep.

24       THE COURT:  Somebody else dropped off.

25       MR. CAPONI:  So Your Honor, there's a lot of pie in

 1   the sky from the Debtor about they have orders and whatnot, it

 2   takes cold hard cash to fund.  There it is irresponsible at the

 3   highest order that the Debtor has not filed something with Your

 4   Honor.  Has not reached out.  Has not even initiated a

 5   discussion.  That we think is telling and explains why this is

 6   a bad faith bankruptcy.

 7          And we need to get clarity as to either they're going

 8   to fund and they've got proof of it.  And we're not and my

 9   clients secure collateral is not going to dissipate at the end

10   of the month.  Or they got to come to this Court and admit they

11   can't fund and then we can all deal with the repercussions of

12   that.  But to want to push a bad faith filing and a dismissal

13   or trustee motion out until August, this thing is going to be

14   off the cliff long before then.

15          My client filed the motion it did, because it was

16   willing to work with an independent receiver who was going to

17   preserve the assets to fund this entity.  My client most likely

18   is willing to do the same again.  Is it willing to fund an

19   entity so Mr. Rajan can run over there and download source code

20   and move equipment?  No.  So I'll stop there.

21          THE COURT:  Okay.  So not that any of these companies

22   are in bankruptcy, right?

23          MR. CAPONI:  Correct.

24          THE COURT:  I mean, who owns the -- I'm assuming

25   there's a patent, there's trademarks, there's something with

1    respect to the technology.  Who owns the technology?

2            MR. CAPONI:  Well, Your Honor, that is what led to

3    the first motion.  Our view is it's owned at the different

4    levels, you know, the patents are owned by whoever they were

5    assigned.  A lot of the intellectual property belongs to

6    SeeCubic B.V.  Stream is of the position that if it's owned by

7    a subsidiary, no matter how far down the line, Stream has the

8    right to go down to that subsidiary and pluck it out and bring

9    it up to the Stream level.

10           THE COURT:  I don't know about --

11           MR. CAPONI:  And that's our -- that's our, like,

12   look, Your Honor, it's a bonding equipment issue.  As an

13   example, if Mr. Rajan was saying, SeeCubic B.V., I'd like you

14   to turn the equipment on and make some panels.  There'll be a

15   lot less heartburn on my end, and my clients' end.  Instead

16   he's saying I want you, SeeCubic B.V., to give Stream the

17   asset.  And he's been trying to do that with all the

18   intellectual property.  So my client can't fund an entity, have

19   the lights turned on and the heat and air conditioning so that

20   it's comfortable and Mr. Rajan and Stream -- I'll stop accusing

21   Mr. Rajan -- so that Stream can upstream all of the assets out

22   of that entity.

23           UNIDENTIFIED SPEAKER:  Your Honor --

24           THE COURT:  Wait a minute, wait a minute, wait a

25   minute.

1          UNIDENTIFIED SPEAKER:  Yes, Your Honor.  Apologies.

2          THE COURT:  Okay.  Hold on a minute.  I will say

3    this.  Bankruptcy is not a free for all where you get to do

4    things because you're in bankruptcy.  There are rules.  There

5    are just because you're in bankruptcy and you have an interest

6    in something doesn't give you the right to go do anything more

7    than what rights you had in connection with that entity.

8    Whatever those rights are, they are.  If they are -- if you

9    don't have them before bankruptcy, you surely didn't get them

10   because of the bankruptcy.

11         So whoever owns the intellectual property,

12   whoever -- whatever they are, the ownership remains.  So I'm

13   not saying that who's right who's wrong, but there is to be no

14   movement of anything with the claim that because I'm in

15   bankruptcy, I get to do it.  If it's an asset of the two

16   debtors, it remains their asset.  If it's an asset of their

17   subsidiary or whoever owned it before, they continue to own it.

18   So all of that has to be sort of sorted out.  But what you're

19   saying, counsel, is that the Delaware court has already decided

20   on all of these assets?

21         MR. CAPONI:  No, Your Honor.  I mean, on an asset-by-

22   asset basis, no.  The Delaware court and -- when I say

23   Delaware, the parties, it wasn't a -- it was a finding, but it

24   was an admission by all the parties.

25         THE COURT:  Right.

1        MR. CAPONI:  All of the hard assets, all the assets

2    of value, are at the operating subsidiary level, not even at

3    the Technovative level.  I mean, Technovative is just the choke

4    point.  It owns the stock of the company that then owns all the

5    operating subsidiaries.  So there are no assets really at the

6    upper levels.

7        But you know, Your Honor, I would be remiss if I

8    didn't mention, the Debtor never even filed an objection to the

9    pending motion.  So I know you're not -- I highly doubt your

10   Court's going to grant it on that basis.  But I will point out

11   that there was a motion filed, a serious motion, the court set

12   a deadline that passed and the Debtor never even responded.  We

13   have funding they haven't responded to.  And we have --

14       THE COURT:  I thought -- wait a minute, I just

15   printed out -- I'm printing and I can't find them.  I'm like,

16   hold on.  I thought I had -- wait a minute.  I thought I had

17   docket number -- oh, they filed an objection to request for

18   expedited consideration of the motion to dismiss.  And they

19   filed that I guess I preliminary the the intent -- to you

20   know -- then they said object.  They don't think that should be

21   different.  I guess I took that as an objection and they

22   requested a status conference instead.

23       MR. CAPONI: Your Honor had granted the motion to

24   expedite and then set, I believe Wednesday night is the date to

25   file any opposition to the motion.  And that's what I was

1   referring to.

2          THE COURT:  I filed --

3          MR. CAPONI:  That date came and went.

4          THE COURT:  Okay.

5          MR. ALEXANDER:  Your Honor, this is counsel for the

6   Debtor, Vincent Alexander.  It was a request -- an objection to

7   the request for the expedited relief.  And that's our

8   understanding in terms of what was being heard today was

9   whether or not it should be heard on an expedited basis as

10  opposed to --

11         THE COURT:  I don't think -- let me look at the

12  order.  Because I don't recall -- I don't recall any

13  discussions.  I'm not going to say what happened.  I think I

14  may have said schedule them both for the same time.  But I know

15  I wasn't going to have an evidentiary hearing.  That definitely

16  wasn't going to happen.  What did the order say?  Did we issue

17  an order and my courtroom deputy contacted you?

18         MR. ALEXANDER:  Well, an order was entered, Your

19  Honor, that set the -- today as the hearing date.  Granted the

20  motion to expedite, scheduled a hearing for today or a

21  conference for today and set Wednesday as the deadline for any

22  opposition to the substantive motion.

23         THE COURT: More -- okay, hold on.  What docket entry

24  is that?  A joinder motion to relief.  Okay.  Hearing schedule.

25  Motion to sanction.  Motion to move -- hearing rescheduled.

1   Did we put an extra order in there?  I'm just looking.

2          Counsel, what are you referring to when I set the

3   deadline to file a response?

4          MR. ALEXANDER:  Your Honor, I don't have access to

5   the docket.  I don't know if one of my colleagues on the phone

6   does, and --

7          THE COURT:  I'm seeing hearing reschedule as the

8   start time.  Oh, that was for today.  Never mind.

9          MR.ZAHRALDDIN:  Your Honor, this is Raphael

10  Zahralddin from the Debtor.  We spoke to I believe a

11  gentleman's name was John.  He was substituting for your deputy

12  and --

13     (Court and clerk confer)

14          THE COURT:  Yeah.  Okay.  87.  There we go.  Thank

15  you.  Thank you, Michael.  The Court hasn't reviewed the

16  motion.  A hearing on the motion will be held on the 14th day

17  of April.  Any responses must be filed on or before the 12th

18  day of April.  And it usually says 5 p.m., but that's missing.

19  So clearly,  I mean, I authorized it.  And we -- I discussed it

20  with Mr. Barbetta (phonetic) and told him what to put in here.

21          So clearly his response is he just didn't pick the

22  date out.  I gave him the date.  So clearly my order granted

23  the expedited.  I would have considered your objection.  And it

24  wasn't because -- I think there were numerous phone calls.  And

25  again, counsel, I'm going to admonish you.  Do not call my JA

```
 1   or my courtroom deputies and inundate them with phone calls

 2   about asking for status conference and issuing amended orders.

 3   Don't do that.  If I want amended order --

 4            UNIDENTIFIED SPEAKER:  Your Honor --

 5            THE COURT:  Don't do that.  I mean --

 6            UNIDENTIFIED SPEAKER:  Understood, Your Honor.

 7            THE COURT:  I mean, I said that at the last hearing.

 8   Don't do it.  You know, I don't like that they feel overwhelmed

 9   and bombarded with requests that they know I'm not going to

10   give and I'm not going to do.  If I want to schedule the

11   status, I know how to schedule one.  I never -- and I'm not

12   sure where you guys are, you know, every court practices

13   differently.  But I never have an expedited hearing without --

14   and particularly if it's going to be evidentiary -- without

15   telling people ahead of time that I'm going to have it.

16            If you look at my rule, they specifically state, if

17   anything more than 30 minutes, we have to specifically schedule

18   as our trial, if it's going to be a trial more than 30 minutes,

19   I always do an -- even on an expedited basis.  If I need -- if

20   something is critical, where for instance, you know, something

21   doesn't happen in the next day, that there's going to be some

22   detriment to the Debtor, I'll have an initial hearing and do

23   some preliminary ruling, and then have a following hearing with

24   a final order, which you can do in connection with any type of

25   motion.
```

1             Now, obviously, with respect to a motion to dismiss,

2    I can't do that because I either dismiss it or don't, or I hear

3    enough to say, you know what?  I mean, I sua sponte appointed a

4    Chapter 11 trustee based on what I heard, but that was after

5    evidentiary hearing.  Or I issued an order saying why I

6    shouldn't appoint one, based on what I heard at some hearing.

7    But I always -- I want to give people their due process rights.

8             So unless you get an order saying we're having an

9    evidentiary hearing, you can rest assured it's going to be what

10   we're doing today is going over trying to figure out, you know,

11   even if I have an evidentiary hearing, it's not going to be on

12   the full blown because there's enough things that are clearly

13   established, and it would only be on the disputed matter.

14            So with respect to the motion to dismiss, what I'm

15   hearing from counsel is this can be disposed of, from a legal

16   perspective without any evidence.  Or when I say not any

17   evidence, presumably, they've asked for the motion to dismiss

18   and say, take judicial notice or attach a copy of the order and

19   decisions from the Chancery Court, and you can -- based on

20   this, this is the order.  Nobody's disputing that that's the

21   order.  I'm interpreting what the order means and how it

22   relates to authority to file and look at everybody's arguments.

23            I would do that before I even schedule an evidentiary

24   hearing.  Because if I find that as a matter of law it wasn't

25   authorized, then that's it.  If I find that a matter of law was

1    not precluded, then we go to an evidentiary hearing on the

2    issues of bad faith, whether it's legitimate bankruptcy

3    purpose, all those other things.

4           So don't do that.  Don't call.  And if I issue an

5    order, you can rest assured that it says what it says and I

6    know what it says.  And it means what I said.  Okay.  Now, I

7    forgot how we went off on that because I think I was -- there

8    was a reference to no response filed.  Okay.  And I did print

9    out the objection, which I saw as an objection only to the

10   expedited request.  But that can be addressed here, which is

11   the Debtors don't want it to be done on an expedited basis, the

12   relief sought, which we could address today.

13          MR. CAPONI:  Well, Your Honor --

14          THE COURT:  That's -- yes.  Who's speaking now?

15          MR. CAPONI:  Sorry.  Steve Caponi again.  What you

16   just said, one, I will make sure everyone on my end does not

17   pester your chambers.  Two, I agree with what Your Honor just

18   said wholeheartedly as a way to proceed.  I think Your Honor

19   should look at the Court of Chancery's order on whether there

20   was an authority to file Technovative.  It's a pure legal

21   issue.  Read the order.  And Your Honor will either determine

22   that the trustee has the sole authority or not.

23          And if Your Honor agrees, that solves that problem,

24   and if not, go to an evidentiary hearing.  And I think our time

25   this afternoon will be best spent on discussing a schedule for

 1   that evidentiary hearing if it's necessary or putting in place

 2   the hearing date, so Your Honor can, you know, have time to

 3   review the current pleading on the legal issue, the parties can

 4   do whatever discovery the Debtor wants.

 5            But again, I would just say, there's no funding at

 6   the operational level.  We're teetering on the cliff.  So I

 7   would just plead for a earliest date as possible.  And note

 8   that every day that goes by is to a detriment to my clients as

 9   a secured creditor.  And I'll pause there to see if Your Honor

10   has any questions.

11            THE COURT:  No, I don't have any more questions or

12   comments at this time.

13            Okay.  Mister -- is it counsel for the Debtors.  Is

14   it Mr. Alexander?

15            MR. ALEXANDER:  Yeah, that --

16            THE COURT:  Okay.  Go ahead, counsel.

17            MR. MAZZA:  Just -- sorry to interrupt, Mr.

18   Alexander.  Just on the SeeCubic side, I know we joined in the

19   motion, so if I can just briefly --

20            THE COURT:  Oh, I'm sorry.

21            MR. MAZZA:  No problem.

22            THE COURT:  I apologize.  Okay, go ahead.

23            MR. MAZZA:  Mr. Mazza again, Your Honor, for

24   SeeCubic.  Just real quick, I agree with everything that Mr.

25   Caponi laid out and that set forth in the papers and this can

1   be dealt with in an expeditious fashion relating to the ultra

2   vires act issue.  But one thing as it relates to this kind

3   of -- the bankruptcy code and requirements on hearing things,

4   we do think this is urgent to move forward as quickly as

5   possible, obviously, in full deference to Your Honor's

6   schedule, a lot of complicated facts here.

7          And the outside date under 1112(b)(3) is 45 days for

8   this kind of motion to be adjudicated.  So and I know, again,

9   it's very complicated, but there are issues that can be

10  addressed, I think, in a very discreet fashion to get to a

11  quick ruling here, Your Honor.  And given the issues that are

12  real as to the preservation of value for the business that have

13  been laid out in the papers and that Mr. Caponi has gone

14  through, that is something that's going to be important to the

15  secured creditors for there to be relief sooner rather than

16  later.

17         And we do think given what has been filed so far in

18  the case, or lack thereof, as far as moving forward, in a way

19  that these cases would actually be a legitimate bankruptcy

20  purpose, really, this is just a rehash of litigation, in our

21  view, and is already been set forth in Mr. Rajan's affidavit

22  that they're just seeking essentially, to convert the debt,

23  which they were essentially going to lose on in the 225 action

24  fully and finally.  And only a minor issue was left to be

25  decided on that, that this should not -- this should not

1    continue for much longer, given the real business exigencies

2    here and what the bankruptcy code requires, as far as this sort

3    of motion to be heard.

4             But in the meantime, as it relates to the earlier

5    motions that were before Your Honor, some maintenance of a

6    status quo that does not allow for any situation where the

7    assets do not get preserved, is of paramount importance, while

8    the Court considers the issues are in front of it.  So we'd

9    also emphasize that as being something that needs to be done in

10   order to protect creditors interests in this case.  Thank you,

11   Your Honor.

12            THE COURT:  Okay.  Anybody else with respect to the

13   motion -- in support of the motion to dismiss?  Okay.

14   Opposition to the motion to dismiss.

15            MR. ALEXANDER:  Hi, Your Honor.  Vincent Alexander on

16   behalf of the Debtor.  I'm not sure there is an order that

17   you'd like me to address the issues raised, but in terms of it

18   seems like the authority to file seems to be an issue that was

19   prominently argued on the other side, and we believe that the

20   case law supports that the Debtors did have the authority to

21   file the bankruptcy when it was filed.

22            And the case law addresses, you know, orders when

23   receivers are acquainted in terms of, you know, from state

24   courts, and whether or not an order that restricts the filing

25   of a bankruptcy is enforceable.  We believe that the order that

1   was entered by the Chancery Court restricted the ability of

2   anybody to file bankruptcy.  And therefore, that order is void

3   with respect to its treatment, and how in terms of the

4   authority to file and the authority to file bankruptcy is not

5   vested in the receiver.  But there's nowhere in the order that

6   says it is vested in the receiver.

7         What the order did is it strips the Debtor Stream

8   from its ability to file bankruptcy for Technovative, and

9   that's an unenforceable order.  We believe the state lawyer is

10  clear on that.  And we can certainly brief that issue for Your

11  Honor since that is considered a legal issue.  But we can

12  provide all the factual support for that argument, in terms of

13  legal support for that argument, in terms of whether or not the

14  Delaware order was enforceable given its impact and its

15  restriction on a fundamental right of a corporate entity, which

16  is the ability to file bankruptcy.

17        So we believe that that issue will be dispensed of,

18  and in terms -- and will ultimately show that Stream had the

19  authority to put Technovative into bankruptcy.  And this is a

20  lawful filing under the bankruptcy code and that the case

21  should have and should proceed.

22        In terms of the other arguments about funding at the

23  lower levels, Stream was prepared to fund the lower levels.

24  And in order to do that, that's one of the reasons why Mr.

25  Rajan went over to the Netherlands was to again, assess the

1    situation and the operations in the Netherlands.  Because prior

2    to the omnibus agreement and all the assets being transferred,

3    over -- improperly transferred over to SeeCubic, the Debtors

4    had no issues, you know, managing SeeCubic B.V.  What

5    ultimately happened after they lost the management rights,

6    which ultimately came back is SeeCubic multiplied the workforce

7    over there, ran up the expenses, and that's not -- and that was

8    for SeeCubic's benefit, right.

9           So what the Debtor needs to do is reassess the

10   situation over there.  It's prepared to fund whatever the

11   expenses -- the necessary expenses are over there.  But when

12   Mr. Rajan goes over there to look at the books and records and

13   talks to people, and he's denied access to the information to

14   which he's entitled, it's difficult to say you should be

15   funding something, but then you're not getting the records from

16   the entity in order to determine what the funding needs are,

17   and that you're going to have control over the entities that

18   you're funding.

19          So the Debtor is prepared to do that, but it needs to

20   know exactly what the needs are.  And it needs to stop being

21   interfered with in terms of the management, so it can determine

22   how much money it needs to put in to this bankruptcy case.  And

23   then appropriate motions will be filed with the Court.  But at

24   this point, we don't know what the numbers are.

25          We've heard you know, what a number may be, but we

 1   don't have the backup for that number.  We don't know what all

 2   the people do that are there.  We don't know whether they're

 3   necessary to stay there in terms of the operations.  And that's

 4   all the information that the Debtor needs in order to determine

 5   what the funding sources are in the Netherlands.  But the

 6   Debtor is prepared to fund the Netherlands in terms of the

 7   operations.

 8           And it's also the Debtors understanding that we

 9   believe based on discussions with the receiver, that there was

10   a delinquency in funding, possibly in excess of a million

11   dollars by the secured creditors prior to -- and when I say the

12   Hawk parties, you know, prior to the bankruptcy filing.  So we

13   don't believe under their --

14           THE COURT:  What about -- wait a minute.  What did

15   the receiver tell you when he set the funding?

16           MR. ALEXANDER:  That they were -- that the Hawk

17   parties were delinquent on their funding under a promissory

18   note.

19           THE COURT:  What promissory note?

20           MR. ALEXANDER:  That they -- when they agreed to fund

21   in the receivership to SeeCubic B.V., there was a promissory

22   note.  That's what we talked about earlier, Your Honor, at the

23   post-receivership funding that there was deficiencies in terms

24   of the amounts that were supposed to be funded.

25           THE COURT:  So there was a promissory note issued by

 1  SeeCubic B.V. --

 2          MR. CAPONI:  Your Honor, I'd have to see.  I think it

 3  was with the recent I have to check.

 4          MR. ALEXANDER:  That's what everybody was talking

 5  about earlier in terms of getting the actual documents.  I

 6  don't know if --

 7          THE COURT:  Counsel, can you hold one second, please?

 8          MR. ALEXANDER:  Sure, Your Honor.

 9          THE COURT:  Counsel, can you hold one second, please?

10          MR. ALEXANDER:  Yes, Your Honor.

11          MR. CAPONI:  Yes, Your Honor.

12          THE COURT:  I'm sorry, counsel.  So hold on one

13  second.  So page 20 of the motion to dismiss talks about the

14  funding?  Counsel?

15          MR. CAPONI:  Sorry, Your Honor.  What was that

16  question, Your Honor?  I didn't --

17          THE COURT:  I think page 20 of your motion to dismiss

18  talks about the funding.

19          MR. CAPONI:  I'm turning there right now.  Yes, Your

20  Honor.  So just to briefly -- my client -- the promissory

21  there was funding from SeeCubic Inc., to SeeCubic B.V. via the

22  receiver.  The funding to cover payroll, and we covered every

23  single payroll and covered all the taxes was, I think, a little

24  over $3 million.  And so the notion that it was a line of

25  credit, basically.

1         The receiver was able to draw down when needed and

2    the receiver -- contrary to what was just represented, the

3    receiver kept all the parties including Stream apprised of --

4    there was a budget that was put together in connection with

5    management of SeeCubic B.V.  The receiver did this with

6    SeeCubic B.V.  It has nothing to do with SeeCubic, Inc. or Mr.

7    Stastney or anything like that.  Everyone had that budget, and

8    the receiver kept everybody updated.  So Stream for many months

9    prior to the bankruptcy was well aware of the burn rate at the

10   B.V. level.

11        And you know, I can understand wanting to have more

12   information to know what your obligations are going to be going

13   forward.  But when you take ownership of something like they

14   have by filing this bankruptcy, you have an obligation to come

15   up with the funding.  Stream has $3,000, allegedly in the bank

16   account.  And the cash burn rate at SeeCubic B.V. is -- was

17   750,000 pounds, a little over a million dollars a month.

18        MR. ALEXANDER:  Your Honor, Vincent Alexander on

19   behalf of the Debtor.  But that's the whole point is we should

20   have control of it as the Debtors.  We should have access to

21   all of that information as the Debtors of the control.  And

22   once we get that, we can determine what funding is appropriate

23   and what needs are there.  So that's exactly what --

24        THE COURT:  But counsel --

25        MR. ALEXANDER:  -- the Debtor is trying to do.  We're

1    trying to get --

2           THE COURT:  But in the meantime -- counsel, in the

3    meantime, who's funding this?  You keep saying we need to get

4    information.  We need to do this.  You have an idea of how much

5    is this costing.  You think it's going to be less than a

6    million dollars a month?

7           MR. ALEXANDER:  Yes, Your Honor, we do.

8           THE COURT:  What was it before?

9           MR. ALEXANDER:  It needs to be litigated.

10          THE COURT:  Well, how much do you think it was?

11          MR. ALEXANDER:  Well, I can tell you --

12          THE COURT:  Or how much do you think it's going to

13   be?

14          MR. ALEXANDER:  I can tell you, Your Honor, before

15   the SeeCubic Inc. took over, once they took over, the cost

16   tripled.

17          THE COURT:  Okay.

18          MR. ALEXANDER:  So when the Debtors were running it,

19   the costs were significantly less in terms of operating  --

20          THE COURT:  What's significant -- what is

21   significantly less?

22          MR. ALEXANDER:  I believe from a payroll and taxes

23   standpoint, it was 150,000 to $200,000 a month.

24          THE COURT:  And does the Debtor have that?

25          MR. ALEXANDER:  The --

```
 1                    THE COURT:  I mean, even assuming --

 2                    MR. ALEXANDER:  Yes.  The Debtor has the money to

 3     fund that.

 4                    THE COURT:  Okay.  So --

 5                    MR. MAZZA:  So with all due respect, Your Honor --

 6                    THE COURT:  Counsel.  Counsel, you don't

 7     get -- didn't I say don't interrupt.  You get to ask the

 8     question, but not now.

 9                    MR. MAZZA:  Yes, sir.  Yes, ma'am.

10                    THE COURT:  That's not --

11                    MR. MAZZA:  I agree.  Sorry.

12                    THE COURT:  All right.  Okay.  So the Debtor believes

13     that the Debtor can fund 150 and 250 a month.  Okay.

14                    MR. ALEXANDER:  At least that, Your Honor.  That's

15     what they were funding before.  But if they go in there and

16     look, and it's the actual costs are higher, then we'll actually

17     do that.  But they need to know what cost --

18                    THE COURT:  They need to know -- well, that's all

19     fine and well.  But what happens if this play does get -- I

20     mean, we're all -- you guys are all fighting in here.  What

21     happens if payroll is not met?  And when is payroll going to be

22     due?

23                    MR. ALEXANDER:  I believe payroll is due the end of

24     this month, and it's already covered some of this month.

25                    THE COURT:  And after that?
```

1            MR. ALEXANDER:  A payment needs to be made.  And if a

2   payment is not made, then presumably some employees will not

3   come to work.

4            THE COURT:  So?  Do you expect they're going to work

5   for free?  How many --

6            MR. ALEXANDER:  Well, I mean, if they have an

7   understanding --

8            THE COURT:  -- or how often --

9            MR. ALEXANDER:  If they understanding of how they're

10  going to get paid, I believe --

11           THE COURT:  Yes.  But they don't know -- you just

12  said you don't know who you want to keep.  You believe some

13  people are unnecessary.  How do they know about -- why is my

14  understanding I'm going to get paid if I might be the one of

15  the ones you decide you don't need.  So I don't know how that's

16  going to work.  But how often --

17           MR. ALEXANDER:  Well, they'll still get paid.  I

18  mean, I believe that they will still need to get paid pursuant

19  to the requirements of paying employees.

20           THE COURT:  Well, where is Stream getting the money?

21  You don't have any cash, and you don't -- and you're not

22  selling.  Where's the cash coming from?

23           MR. ALEXANDER:  The cash will come from VSI.  And

24  we'll have a -- we should have a --

25           THE COURT:  Who?

1          MR. ALEXANDER:  The entity called VSI.

2          THE COURT:  B?  V or B?

3          MR. ALEXANDER:  V as in Victor.

4          THE COURT:  Um-hum.

5          MR. ALEXANDER:  S as in Stream and I as in Igloo.

6          THE COURT:  And is that the company that's owned by

7    Mr. Rajan?

8          MR. ALEXANDER:  That is a company that is

9    predominantly owned -- that Mr. Rajan has an investment in as

10   well.  But there are other owners of the entity.

11         THE COURT:  And is this the same entity that has

12   these contract with the Debtor and whoever else?

13         MR. ALEXANDER:  It's a distributor.  It has a

14   distributor agreement with end users.  So they are an

15   intermediary between the Debtor and end users of the product.

16         THE COURT:  So they have a distribution agreement

17   with the end users or with the Debtor?

18         MR. ALEXANDER:  With the Debtor.

19         THE COURT:  And when was that entered into?  Hello?

20         MR. ALEXANDER:  I don't -- hello.  I don't know

21   the -- I'd have to check the date of that, Your Honor.

22         THE COURT:  And why does the Debtor need

23   distributors?  Why can't the Debtor just sell the --

24         MR. ALEXANDER:  Well, the Debtor needs -- I believe

25   the understanding of the relationship is that VSI provides

1    additional resources that the Debtor doesn't have in order

2    to --

3             THE COURT:  What additional resources?

4             MR. ALEXANDER:  To facilitate with the end user.

5             THE COURT:  And what are those?

6             MR. ALEXANDER:  I believe some of it has to do with

7    electronic capabilities in terms of what's needed.  The chips

8    that go into the products, they're semiconductor related issue

9    as well.  And also VSI has relationships with certain customers

10   that Stream did not have relationships with and then there's

11   also relating to some expertise with lens films.  There's

12   hologram technology that VSI has as well.  And so all of that

13   is used in connection with the process.

14            THE COURT:  How does that make them a distributor as

15   opposed to just a simple supplier?  All right.

16            MR. ALEXANDER:  You asked me --

17            THE COURT:  And so -- um-hum.

18            MR. ALEXANDER:  No, and you asked where the money

19   would come from.  And that's where the money has come from.

20   And it's available and we'll have the appropriate documentation

21   on file when we know how much money we actually need to do it.

22   But it looks like we might just have to put a dollar amount on

23   in terms of what may be needed right now, as opposed to the

24   full amount in terms to address the issues.

25            THE COURT:  And so who's running SeeCubic B.V. right

1  now?

2          MR. ALEXANDER:  When you say running, Your Honor, do

3  you mean like on those grounds, like --

4          THE COURT:  I mean, who's in charge of the day-to-day

5  operations?

6          MR. ALEXANDER:  Well, Mr. Rajan pursuant to the

7  corporate records filed there, is the CEO.  There is an

8  individual and he's listed as the CEO in the corporate

9  documents filed with the government.  In terms of on the

10  ground, like actually, in the office there, I believe an

11  individual Patrick Thune, who we brought up earlier, has been

12  instructing some employees.  But he has not been listening to

13  Mr. Rajan, who is the CEO.

14          THE COURT:  Okay.  Well, who was running this before

15  bankruptcy?

16          MR. ALEXANDER:  The receiver was giving the

17  instructions.

18          THE COURT:  To who?  I'm sure he wasn't down there

19  doing it himself.

20          MR. ALEXANDER:  No.  He was -- I believe he was

21  coordinating with Mr. Thune.

22          THE COURT:  With Mr. who?

23          MR. ALEXANDER:  Mr. Thune.  Patrick Thune.

24          THE COURT:  Okay.  So --

25          MR. ALEXANDER:  And so our view is once the receiver

 1  was displaced by the bankruptcy filing, aside from the fact

 2  that the Debtors didn't step back in and Mr. Rajan was the CEO

 3  of --

 4         THE COURT:  And who -- well, who was the CEO before

 5  the receiver was appointed?

 6         MR. ALEXANDER:  Mr. Rajan.

 7         MR. MAZZA:  Your Honor, we disagree with that.

 8  That's part of the dispute that we talked at length about

 9  earlier.

10         UNIDENTIFIED SPEAKER:  Mister -- I won't interrupt,

11  Your Honor.  I'll wait.

12         MR. ALEXANDER:  So Mr. Rajan was the CEO prior to the

13  receivership being appointed -- I'm sorry, the receiver being

14  appointed, not the receivership.  The receiver being appointed.

15  And so we attempted to then discuss and work on operating in

16  the Netherlands, and that's when we were hit with the

17  resistance in terms of Mr. Thune indicating that he was taking

18  direction from Mr. Stastney, but the receiver --

19         THE CLERK:  The Judge got cut off.  Sorry.

20         MR. ALEXANDER:  Okay.  Yeah.  No problem.  Thank you

21  for letting me know.

22         THE CLERK:  So that was the last thing we heard, if

23  you want to backtrack --

24         UNIDENTIFIED SPEAKER:  Your bankruptcy for now.  But

25  Matthew filed it when the receiver --

```
1              THE CLERK:  Someone is speaking with --

2              THE COURT:  Counsel, I'm back.  I guess I went for a

3    record of three today.

4              MR. ALEXANDER:  I --

5              THE COURT:  And now, when I came back it said I had

6    originally 35 participants, now I'm down to four.

7              MR. ALEXANDER:  The lucky four.  On a Friday

8    afternoon.

9              MR. CAPONI:  It's a Friday afternoon.

10             MR. ALEXANDER:  Yep, there you go.

11             THE COURT:  All right.  So let's try to get -- so my

12   question to Mr. Alexander was, who was the CEO before the

13   receiver was appointed?

14             MR. ALEXANDER:  It's the Debtor's position based on

15   corporate resolutions that Mr. Rajan --

16             THE COURT:  Counsel.  Counsel.  I did not ask you

17   what the Debtor -- at the time the receiver was appointed who

18   was the CEO?

19             MR. ALEXANDER:  Mathu Rajan.

20             THE COURT:  -- at the time the -- Mr. Rajan --

21             MR. ALEXANDER:  Mathu Rajan.

22             THE COURT:  -- was the CEO?

23             MR. ALEXANDER:  Mathu Rajan.

24             THE COURT:  So that's a different -- is that somebody

25   different than --
```

1           MR. ALEXANDER:  No.  Mr. -- I called him Mr. Rajan

2    before, but his name is Mathu Rajan.

3           THE COURT:  So at the time the receiver was

4    appointed, Mr. Mathu Rajan was the CEO?

5           MR. ALEXANDER:  That is correct.

6           THE COURT:  Okay.  And he continued to be the CEO

7    after the receiver was appointed?

8           MR. ALEXANDER:  Well, no --

9           THE COURT:  He was dismissed?

10          MR. ALEXANDER:  Yes.  He continued to be because it

11   was a status quo.  So the answer's yes.

12          THE COURT:  Okay.

13          MR. MAZZA:  Sorry to interrupt, Your Honor.  Mr.

14   Mazza again.  That's part of the dispute in the Netherlands.

15          THE COURT:  Okay.

16          MR. ALEXANDER:  But as the upstream equity holder,

17   Technovative gets to appoint all the downstream officers,

18   directors.  So that's how it works when they get to appoint the

19   downstream ones.

20          MR. MAZZA:  Right, but you have to comply with such

21   law in order to put people downstream --

22          MR. ALEXANDER:  Understood.

23          THE COURT:  Well, I don't -- listen.  I don't know

24   what you have to do, because that may override anything.  I

25   don't know.  I don't know what the point -- because when you

 1  sign an agreement that says we can do all of this, that may

 2  override anything else you do.  I don't know.  No clue.

 3          MR. CAPONI:  Your Honor.

 4          THE COURT:  Yes?

 5          MR. CAPONI:  Steve Caponi.  And I think, you know,

 6  given the hour and the day of the week to try to bring some

 7  closure.  I think what I heard debtors counsel agree that on

 8  the ultra vires filing issue, that's something Your Honor can

 9  address on the papers maybe with the parties filing some

10  supplemental briefing on that.  And I think that is a clear

11  path with a rare instance of agreement.

12          On the balance of the motion and whether we have an

13  evidentiary hearing or not, I think -- Your Honor, I think

14  there's also agreement that there is tremendous uncertainty

15  around whether there's going to be a funding of payroll, who

16  would do it, and how they would do it.  And even if debtor's

17  counsel is correct, that, you know, the Debtor can get the

18  money from VSI, you still then have a related party transaction

19  within it -- with an insider with an entity controlled by Mr.

20  Rajan.  That needs to get vetted and why --

21          THE COURT:  Well --

22          MR. CAPONI:  That hasn't been filed with the Court by

23  now so the parties can kick the tires on it.  I don't -- that's

24  not -- my point, Your Honor, is that's not something you file

25  the day before payroll's due.  Why is Mr. Rajan running

1   around --

2          THE COURT:  Well, counsel --

3          MR. CAPONI:  -- and not dealing with those important

4   issues?  That needs to get addressed.

5          THE COURT:  Well, it doesn't matter whether it's

6   inside or outside or whoever, you can't get funding without

7   filing an appropriate motion on the 354(b).  I don't care who

8   they're funding with.  And that's why I'm here.  So I don't

9   know how they plan on doing that.  And the funding is till the

10  end of the month, so somebody needs to do something.

11         I mean, at the end of the day, you know,

12  360 -- 1112(b)(3) says I shall commence the hearing not later

13  than 30 days after filing of the motion.  I don't know this

14  considered commencing the hearing and not later than 15 days

15  after commencement of such hearing.

16         I mean, I don't know how that's going to work,

17  because you could have a hearing that started today, and it

18  takes me three -- a month to finish the trial.  So I don't

19  know.  If the parties express any consent to the continuous for

20  a specific period of time, or compelling circumstances prevent

21  the Court from meeting the guidelines established via the

22  paragraph.  I'm sure there are cases that state what compelling

23  circumstances are.

24         So the best I could do is say if everybody consents

25  that we have a continued hearing to a specific time, that's

1  really going to tie my hands because I don't necessarily --

2  that now means I have to put this issue of dismissal to the

3  front of other things I'm working on to meet -- unless we do a

4  specific date by which we would have a trial, and then that

5  would give me X amount of time to rule on the legal issues.

6  And if I -- yes?

7          MR. CALLAHAN:  Your Honor, this is Kevin Callahan on

8  behalf of the United States Trustee.  I appreciate the time you

9  offer for us today.  And I appreciate counsel presenting their

10  respective positions.  The United States Trustee does not take

11  a position at this time.  However, I'm a little familiar with

12  the Court's procedures with respect to evidentiary hearings.  I

13  appreciate counsel's requests that this be heard promptly.  And

14  of course, I'm aware of the Court's busy calendar.

15          Nevertheless, I don't think counsel may be aware of

16  the Court's procedure on handling evidentiary hearings.  And

17  simply as a suggestion or an observation, it may be a good idea

18  if the Court were to let parties aware of the evidentiary

19  hearing protocol that the Court has instituted, if the hearing

20  is going to be on Zoom.  That would allow --

21          THE COURT:  Well, they put -- well, this one -- well,

22  Mr. Callahan, this one will likely not be.  This is one that I

23  likely would come into the court for.

24          MR. CALLAHAN:  Oh, that's fine.

25          THE COURT:  This is too complicated to try to do this

1   over Zoom.

2          MR. CALLAHAN:  Well, saying that, Your Honor, I

3   really appreciate that.  And I think that might be the

4   preference for most attorneys, probably most of the attorneys

5   here.  But certainly the Court's website offers suggestions on

6   how to present a briefing schedule.  And also a scheduling

7   order, which may give the parties here the opportunity to fully

8   vet their positions.

9          I noticed that there are many declarations and

10  documents attached to the pleadings.  As of right this moment,

11  they're not in evidence.  And of course, if they were to

12  be -- if counsel for both sides, were able to agree on perhaps

13  the list of the exhibits that could be admitted without

14  opposition, that would be a start.  And of course, those

15  exhibits and testimony or other evidence that would be

16  contested, at least to let all parties know what's going to be

17  argued.  I also agree, Your Honor, that what -- I'm sorry, I'd

18  also add that next week is another hearing on a motion for

19  relief.  Possibly the Court might entertain --

20          THE COURT:  Is --

21          MR. CALLAHAN:  Possibly the Court may entertain

22  consolidating the three issues that are before the Court

23  presently into one consolidated hearing.  I think that might be

24  helpful not only to the Court, but to the parties to fully

25  resolve these issues.

1         THE COURT:  Counsel, I have not even looked at my

2    schedule for next week, because my courtroom deputy is on

3    vacation.  She usually sends it to me on Friday.  And maybe she

4    did, and I just haven't seen it because it's Friday, and I

5    haven't had a chance to look at my mail.  And so let's see.

6    Okay.  I don't see any -- nope.  I don't see anything yet.

7         So thank you, Mr. Callahan, for pointing out that

8    there's another hearing in this matter next week.  But what I

9    would like to do is, if we could pick -- everybody consents to

10   a trial date, or the parties confer.  And I don't mean in

11   August, because that is not happening.  I'm talking May

12   sometime.  Because I don't want this case dragging out if it's

13   something that is not properly before me.  And so that needs to

14   be done on an -- agree on an expedited basis.

15        Because if this motion had been filed, it was filed

16   last week, we would have had our first hearing sometime in

17   maybe the end of the month, beginning of May, would have

18   scheduled a hearing sometime in June.  We a little bit above

19   that.  So I want to try to get this done sometime in May.  That

20   will give me an opportunity to have the parties submit briefs.

21   An opportunity for us to go over the legal issues.

22        Because I don't think there's a dispute that they're

23   basing -- they meaning the parties -- the moving parties in the

24   motion to dismiss, are relying on the judge or the judge's

25   decision in the chancery court, or a judge's order rather

1   appointing the receiver and what that means on the Delaware law

2   -- staying that order no matter what it said is improper

3   because it strips the Debtors of their authority to file

4   bankruptcy.

5           I've looked at the issue briefly, know what the cases

6   say.  But I don't know, the -- I mean, I know what, you know,

7   what does that explicitly do?  You have to explicitly say you

8   have the sole authority to file.  Nobody else can file.  I

9   don't know, you know, for cases that I have had some exclusive

10  language.  I don't know.  I don't know what that means.  So and

11  I don't think there's any dispute that this -- that the issue

12  of the authority is relying on that order and the appointment

13  of the receiver unless somebody is telling me different.

14          So I don't think that anybody would argue that this

15  is what I need to look at in deciding whether it was authorized

16  or not.  And that whether the receiver has a way -- I don't

17  know.  And whether or whether that order in of itself

18  was -- I'm going to use the word void, because it didn't -- you

19  couldn't take away the Debtor's rights to file.  I don't know.

20  No clue.

21          And so I would need a time frame to get the briefs

22  and then schedule a trial, sometime thereafter -- two weeks

23  thereafter gives me an opportunity to read the briefs and do

24  some reading, do my own research, look at your cases, and

25  hopefully be able to render a decision and say trial will

1   proceed or trial is canceled.  I don't know.

2           So do the parties want to confer and try to set some

3   deadline or that they would -- that would work for them?  Or

4   they want me to set some.  I think it would make sense for the

5   parties to try to look at their schedules and come up with some

6   dates.  And if you can't, I most certainly will.  Which one do

7   you want to do?

8           MR. CAPONI:  Your Honor, this is Steve Caponi again,

9   for Hawk.  I think the -- so I appreciate the guidance you just

10  gave.  And I'm confident the parties can work out a schedule,

11  if we know what the end date is.  So if there was -- if there

12  would be a way for Your Honor just to say, here's the date in

13  May that we're going to have a hearing, I know I'm confident we

14  can work backwards and get everything to you within two weeks

15  prior to that.

16          THE COURT:  Well, counsel, I don't -- my courtroom

17  deputy is not in today.  And she is the keeper of the calendar.

18  And I --

19          MR. CAPONI:  Can you reach out on Monday?

20          THE COURT:  Yes, reach out Monday to Ms. Godfrey and

21  pull -- let me just look initially at my calendar, because as I

22  said, I would prefer to have this in person.  This is too

23  complicated to do over Zoom.  Not complicated, but I think it's

24  too many moving parts.  May.  That's Memorial Day.  We'd like

25  to have it before Memorial Day.  Up to you guys.

1          MR. CAPONI:  Yes, Your Honor.

2          THE COURT:  Not the Friday before Memorial Day.

3   What's the Monday?  The Monday is the 22nd.  I just have to

4   figure out -- counsel, just give me a minute.  I have a

5   standing appointment -- doctor's appointment every other Monday

6   for medication.  And I just have to figure out where I am in

7   that schedule.

8          Let's see.  I went on Monday.  So I think the next

9   one's the 24th.  Why doesn't it say 24th on here?  Wait a

10  minute.  Did I go on Monday?  No, because it's on Wednesday.

11  Went on the 12th.  The next one should be the 26th.  Yes.

12  Okay, hold on.  Let me calculate from there.  The 24th.  Okay,

13  I'm good if we can do the 22nd of May, because that will give

14  everybody enough time.  Or the next one would be the 20 -- no,

15  that's Memorial Day.  It would have to be --

16         MR. CAPONI:  How does the 22nd work, Your Honor?

17         THE COURT:  Let me see the 22nd, if that's a -- I

18  just my calculations.  The 22nd is fine.  That should work,

19  because I think I'm --

20         MR. CAPONI:  Is this for the -- this would be the

21  final trial date, Your Honor.  Is that what you --

22         THE COURT:  That would be the final trial date

23  on -- the problem as I see it is that we will be doing a

24  consolidated trial evidentiary record on the motion for -- and

25  that may take longer than a day.  Their motion for violation of

1    the stay, the motion to dismiss.  And I've heard Mr. Callahan

2    say there's a motion for relief.  But that might be pushing it.

3    You may just have to wait on that one.  And because I may just

4    have to wait on that.  I don't know whose motion it is.  I

5    think we may have to wait on that.  So maybe we reserve the

6    22nd the whole day.  What's on the 23rd?  And maybe the half of

7    the 23rd?  Hello?  Counsel?

8            MR. CAPONI:  Yes, Your Honor.  That works for Hawk,

9    Your Honor.

10           MR. ALEXANDER:  I'm checking with my -- this is

11   Vincent Alexander for the Debtors.  I'm checking with my side

12   regarding -- what was that date?

13           MR. MAZZA:  It works for SeeCubic, Your Honor.  Jim

14   Mazza here.

15           THE COURT:  Okay.  So that would be all day on the

16   22nd.  And on the 23rd a half a day.  I guess maybe we -- you

17   think we should reserve 24th a half a day?  Let's see what we

18   got on the calendar.  Okay.  It's a pretrial conference.  All

19   right.

20       (Court and Deputy confer)

21           THE COURT:  So we start at 12:30 on the 23rd and

22   12:30 on the 24th, to the extent we need it.  So that means

23   that I would have to have briefs two weeks before the 22nd,

24   which would mean briefs would be due on the 8th.

25           UNIDENTIFIED SPEAKER:  Okay.

1          THE COURT:  5 p.m. on the 8th, briefs.  Well, we

2     cutting it close for me trying to get a response.  that doesn't

3     give me much time to try to get an answer in -- a decision, but

4     I'm sure I'll start looking at it before that.  Okay.  Now, so

5     with respect to the motion for the stay, I want everything to

6     just wait.

7          I want the matters in the Netherlands, which is

8     scheduled for next week to just hold on a minute, because I'm

9     concerned that this is going to have some impact on what I'm

10    doing.  It's going to have some impact on whether the Debtor

11    believes to have their rights here in this Court, and it

12    belongs to them here.  And I need to protect those rights with

13    respect to their ability to control these things.

14          I will be honest.  I ultimately will not decide that.

15    I ultimately -- if that is an issue, I'm going to send you guys

16    to the Netherlands to have them because they understand --

17    unless I look at the original agreement and find that the

18    original agreements with the parties where they say they have a

19    underlying agreement where they can appoint it.  And that that

20    supersedes anything.  I could make that finding.  I don't know

21    yet.  I don't know, because you're argument was it doesn't

22    matter what they agree, they have to abide by the statute, the

23    state or the country they're in.  I don't know whether I'll

24    find that.

25          I could say well, that's superseded in this

1 agreement, gave them the authority notwithstanding anything.  I

2 don't know.  Because I don't know what it said.  So I don't

3 want -- I want everything to just stay until we can get some

4 feel for where we are on this thing.  Mr. -- nobody's turning

5 over anything.  Because I'm not quite sure how, with respect

6 to -- I'm only hearing the parties saying that they can work

7 this out with respect to turning over the bonding equipment

8 that -- you know, you got to have insurance.  And I mean,

9 that's a requirement.

10   And so I don't know, you know, if I can facilitate

11 some sort of settlement and discussion on that, purely, or if

12 you want me to refer you to one of my colleagues to try to come

13 up with a settlement with respect to that bonding equipment.

14 That's fine.  Because I think one of the big issues I can see

15 in this is in the Netherlands, was that there was some concern

16 that Mr. Rajan was having the company turn over this bonding

17 equipment, and he believed he was taking away their assets.

18   Well, I'm going to decide that.  So I don't know what

19 to tell them, except they need to hold on.  Mr. Rajan, I don't

20 want you doing anything.  Nobody's to do anything, except

21 somebody's got to figure out how to pay these people or you're

22 not going to -- you're going to be fighting over nothing.

23 Nobody is to transfer assets, nobody's to take technology.

24 Nobody could take trade.  Nothing.  Everything stands still.

25   And if somebody believes that somebody is moving

 1    something, file something.  Because no.  You can't come to

 2    bankruptcy and say I'm going to -- anybody.  Even the people

 3    in -- you know, I don't know.  I don't know if I have

 4    jurisdiction over people over whatever assets are over there.

 5    That asset we're talking about right now is in China.  So I'm

 6    not uncomfortable, I don't feel -- I'm comfortable saying just

 7    everybody stop.  Don't do anything until we can get at least to

 8    find out, one, is this a legitimate filing.  Legitimate meaning

 9    authorized.  I don't mean -- and also, who has what.  What

10    assets that -- you know, if the Debtor believes that they have

11    the exclusive right to appoint somebody, and that's the asset

12    that belongs to the estate, I don't want anybody saying

13    anything about it.  I get to say something first.  So

14    everything is stayed.  Nobody is to touch anything.  And you

15    guys try to work on the issue with respect to the bonding

16    equipment.

17              UNIDENTIFIED SPEAKER:  Understood, Your Honor.

18              THE COURT:  Okay.

19              MR. ALEXANDER:  Your Honor, understood.  Your Honor,

20    one question.

21              THE COURT:  Wait a minute.  Somebody has a question.

22    Hold on.

23              MR. ALEXANDER:  To the extent -- this is Vincent

24    Alexander, Your Honor.  To the extent the parties can't come to

25    an agreement on the bonding equipment, which I'm hopeful we

 1   can, did you say that one of -- either you or you can refer

 2   that quickly to one of your colleagues to help facilitate that?

 3          THE COURT:  I'm volunteering them.

 4          MR. ALEXANDER:  Well, I hope we can come to a

 5   resolution quickly on that issue.

 6          THE COURT:  Right.  I would encourage you to do so

 7   because I think that's the gist of all of the big problems in

 8   the Netherlands and problems here.  You know, maybe you guys

 9   agree that, you know, that it gets put somewhere and everybody

10   gets to use it.  I don't know.  I don't know what to tell you.

11   But I get the issue.  Okay.

12          MR. DEMARCO:  If I may, this is Andrew DeMarco with

13   Rembrandt.

14          THE COURT:  Yes.  I'm sorry.  You didn't get to say

15   anything.  I'm sorry.  Go ahead.

16          MR. DEMARCO:  I appreciate that, Your Honor.  Well, I

17   won't keep everyone here much longer.  We've covered a great

18   deal of ground.  But there were two things I simply wanted to

19   address.  In the upcoming hearing regarding the motion to

20   dismiss, I just wanted to request that Rembrandt may have some

21   time to present, you know, its arguments against that issue.

22   And I just want to raise that.

23          I also just wanted to note to Your Honor's question

24   you've been asked earlier about who owns the intellectual

25   property, and I just wanted to raise for the Court and make

 1   sure it was on the record.  That's actually a matter of dispute

 2   there is an ongoing lawsuit in the district of Delaware on that

 3   matter.

 4          It is Rembrandt's contention that Rembrandt owns the

 5   intellectual property that is at issue in the suit.  So

 6   particularly the trade secrets, that are at issue in that case.

 7   So I just want to make sure that Your Honor was aware of that.

 8   In fact --

 9          THE COURT:  The --

10          MR. DEMARCO:  I apologize, Your Honor.  You had a

11   question?

12          THE COURT:  Who -- you said there was ongoing

13   litigation.  Between who and who?

14          MR. DEMARCO:  Yes, Your Honor.  That would be a

15   Stream and Hawk.  Stream, Hawk, and Technovative.  However,

16   with the automatic stay, that has been the stay.

17          THE COURT:  Okay.  So Stream, Technovative, and Hawk

18   are the plaintiffs, defendants?  What are they?

19          MR. DEMARCO:  They are the defendants.  Rembrandt is

20   the plaintiff.

21          THE COURT:  Okay.  So Rembrandt is suing these

22   parties saying that it owns the intellectual property and is

23   suing Stream.  I'm not sure how Hawk fits in there, but

24   technically, which is the Debtors, right?  The two debtors.

25          MR. DEMARCO:  Sure.  We can get into the full details

 1   probably during that motion to dismiss, but it is in our -- in

 2   the objection documents that we provided.  So we can provide

 3   the further detail there.  But the short version, Your Honor,

 4   is Rembrandt provided a license to Stream for the underlying

 5   technology.  And now, it is our understanding based on public

 6   statements that have been put forth by Stream and by Hawk, that

 7   they are seeking to take some of that technology claiming

 8   ownership of that technology that is rightfully Rembrandt.

 9   So --

10          THE COURT:  Okay.  So --

11          MR. DEMARCO:  -- to Stream.

12          MR. ZAHRALDDIN:  Your Honor, Raphael's arguing from

13   the Debtor, excuse me for one second.  Let me just give some

14   clarity.  I believe that when Technovative was sued by

15   Rembrandt, the receiver was in charge of that.  There is no and

16   there never has been any indication that we are not going to

17   follow through on our license or our license, or respect our

18   license with Philips.  So I just want to make sure that Your

19   Honor understands that issue.  And we haven't been able to

20   discuss because that action has been stayed with the

21   bankruptcy.  We haven't been able to discuss anything with

22   Rembrandt as to what's happening after the bankruptcy because

23   we've been preoccupied with these matters.  So I just wanted to

24   put that

25          THE COURT:  Okay.  Well -- okay.  Well, right.  It's

1  property of the estate and who owns it.  I get that.  Mister --

2  I'm sorry, counsel.  I didn't write your name.  You started and

3  I started writing it down and I didn't later.  What's your name

4  again?

5          MR. DEMARCO:  No worries, Your Honor.  My name is

6  Andrew DeMarco.  It's D-E-M-A-R-C-O.

7          THE COURT:  Okay.  So Mr. DeMarco, are you in favor

8  of dismissal or against dismissal?

9          MR. DEMARCO:  We are against dismissal here, Your

10 Honor.

11         THE COURT:  All right.  So then you need to

12 file -- you can file something too if you want.  You don't have

13 to.  If you want to say you're in favor and you believe it's

14 valid, you're free to file and present your arguments in

15 support.  You don't have to, but if you do, it's due by May 8th

16 at 5 p.m., and if we have a trial you are definitely -- because

17 you have filed something in opposition, you definitely can

18 present whatever evidence.  You can question.  You can argue

19 whatever you want, to the extent we have a hearing because I

20 don't know yet, on the 22nd, 23rd, and 24th.  Okay?

21         MR. DEMARCO:  Yes, Your Honor.  I appreciate that

22 greatly.

23     (Proceedings adjourned)

24

25

## C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____
John Buckley, CET-623
Digital Court Proofreader

*TheRecordXchange*
www.trxchange.com · (800) 406-1290