UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,[1]<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |

**DEBTORS' MOTION FOR WITHDRAWAL OF WRIT OF SUMMONS AND EVIDENTIARY HEARING FOR MONETARY DAMAGES**

Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative"), the above-captioned debtors and debtors-in-possession (collectively, "Debtors"), hereby submit this motion (the "Motion"), pursuant to sections 105 and 542 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §101, *et seq.* (as amended, the "Bankruptcy Code"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), *inter alia*, requiring SeeCubic Inc., SLS Holdings VI LLC, Shadron L. Stastney, Hawk Investment Holdings Limited, and Arthur Leonard Robert Morton (collectively, the "Hawk Parties") to withdraw their Writ of Summons from the Amsterdam Court in the Netherlands (the "Writ") and commencing an evidentiary hearing regarding the imposition of monetary damages against the Hawk Parties. In support, Debtors state as follows:

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

1

93546672.1

**PRELIMINARY STATEMENT**

1. Through these Chapter 11 Cases, Debtors intend to restructure their debt so that their debt service is reduced to a level that will allow Debtors to sustain long term operations, and Debtors have also identified investors who are willing to invest in Debtors in conjunction with these Chapter 11 Cases. Debtors should be afforded all protections under the Bankruptcy Code to allow Debtors an opportunity to propose their plan that will address the claims of all creditors during Debtors' exclusivity period to propose a plan of reorganization. These protections include the benefit of the section 362 automatic stay, which is designed to provide Debtors with a "breathing spell" from litigation and provide Debtors with an opportunity to formulate a plan of reorganization for the benefit of all creditors, and the benefit of section 542, which requires all entities in the possession, custody, or control of property of the estate deliver such property to the debtor and account for such property or the value of such property.

2. In order for Debtors to be successful in these Chapter 11 Cases, Debtors need possession and use of all estate property and the right to manage their assets, including their subsidiaries. The Writ of Summons filed against Debtors' management in the Amsterdam Court of the Netherlands (the "Writ") by the Hawk Parties has hindered—and will continue to hinder— Debtors' ability to effectively reorganize in these Chapter 11 Cases. Further, the Hawk Parties have previously been held in contempt by the Delaware Court of Chancery (the "Chancery Court") for orchestrating efforts to deprive Debtors' of control of their assets.

3. The Debtors have engaged with the Hawk Parties and their U.S. and Netherlands counsel and made repeated requests over the weekend and throughout Monday, April 17, 2023 to speak. Several emails were sent alerting U.S. counsel that the pending Writ hearing set for Thursday, April 20, 2023 in the Amsterdam Court of the Netherlands required Mathu Rajan to

appear as defendant; in order to arrive in time to prepare for the hearing, he would need to board a flight Sunday night, April 16, 2023. Counsel was assured by Jim Mazza of Skadden, Arps, Slate, Meagher & Flom that there would be no hearing and that no one would have to board a plane to attend a hearing. A full business day passed in the Netherlands without a withdrawal. Dutch counsel for the Hawk Parties has responded that they will proceed to set a new hearing and have not withdrawn the action. Now, Mr. Rajan faces consequences, and the Debtors face dire consequences, as they could lose assets, if he does not board a flight by Tuesday April 11, 2023 and appear before the Amsterdam Court of the Netherlands on Thursday.

4. The Debtors file this motion **in the excess of caution and are hopeful that Dutch counsel, De Brauw, will with draw the action,** which can be filed again with leave of the Bankruptcy Court, without prejudice, when appropriate and, if, approved by the Bankruptcy Court. However, Dutch counsel for the Debtors have cautioned the Debtors as to the consequences of having the hearing go forward on Thursday, April 20, 2023, which could result in an adverse ruling, including consequences for the failure to appear. There is a six hour time difference between the Eastern Standard time and Eastern European Standard time, which is six hours ahead of Eastern Standard time. Unfortunately, De Brauw would not make itself available until Tuesday to discuss the issue, leaving a short, and very unreasonable, time period to discuss and negotiate with the Debtor. The Debtors hope the relief requested will be mooted by discussions with De Brauw, but cannot rely on success of that discussion due to the lack of availability of the Hawk Parties Dutch counsel to date, the flight schedules and time zone differences and challenges, the requirement by the Dutch Court of Mr. Rajan's presence, and the significant ramifications of the hearing moving forward as well as the impact of the currently filed documents incorrect statements on the Debtors' operations.

3

93546672.1

5. A similar attempt by the Hawk Parties to engage in self-help resulted in a contempt sanction against Mr. Stastney and the Hawk Parties by the Chancery Court. The Chancery Court ordered a nearly identical Writ action in the Netherlands withdrawn, and the Hawk Parties refused until threatened with an adverse ruling by the Chancery Court on their substantive claims. The presence of certain false statements regarding the U.S. proceedings in the Writ – a Netherlands public record – including several statements that were highlighted by the Bankruptcy Court at the April 14, 2023 hearing as false, are causing damage to the Debtors' estate. Whether such statements are inadvertent, a product of not understanding U.S. law or proceedings, or not, these statements have put a cloud on Debtors in terms of operations, impacting employees, customers, vendors, and funding sources. Most concerning are statements that the Hawk Parties have foreclosed on the assets, which the Hawk Parties acknowledged before the Bankruptcy Court were false.

6. The Hawk Parties have stated their explicit goal to dispose of Debtors' assets through an Article 9 sale under the Uniform Commercial Code (the "Article 9 Sale"), thereby divesting Debtors and their shareholders of all value.

## JURISDICTION AND STATUTORY PREDICATES

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is Bankruptcy Code sections 105, 362, and 542.

## BACKGROUND

A. **The Bankruptcy Filing**

8.  On March 15, 2023 (the "Petition Date"), Debtors filed voluntary petitions for relief with the Court under chapter 11 of title 11 of the Bankruptcy Code. Since the Petition Date, Debtors have been operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Hawk Parties have made a request for the appointment of a trustee. No request for an examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Motion, no official committees have been appointed or designated.

B. **Overview of Debtors**

9.  Debtors were founded in 2009 to pursue new technologies that enhance user entertainment and communications experiences. Technovative Media, Inc. is a wholly owned subsidiary of Stream TV Networks, Inc. Debtors are incorporated in Delaware and have a principal executive office located in Philadelphia, Pennsylvania.

10. Through their global engineering team, Debtors developed breakthrough glasses-free 3D display technology launched under the trade name Ultra-D™ ("Ultra-D"). Ultra-D is a proprietary combination of hardware and software which creates a natural, comfortable, and immersive Glasses-Free 3D viewing experience.

11. As a core technology, Ultra-D can be applied to panels of nearly any type and size and is compatible with touch screen features as well. This means that consumers can have a seamless experience with virtually any device – televisions, tablets, smartphones, portable game players, laptops, all-in-one computers and more.

12. As of December 2022, Debtors had been granted 128 patents in 13 patent families. Held by one of the Stream's subsidiary companies, this patent portfolio is a significant asset.

13. A detailed description of Debtors and their businesses, including facts and circumstances giving rise to these Chapter 11 Cases and supporting this Motion, is set forth in the *Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Chapter 11 Petition, Supporting Emergency Relief, and First Day Motions* (Docket No. 48).

14. Debtors intend to generate revenue by providing 3D components to final market assemblers (such as TV manufacturers and tablet makers). Debtors view their approach as similar to the way in which major computer manufacturers use processors in their products and note their products as such. Debtors have a term sheet for a distribution and supply chain finance agreement with Visual Semiconductor, Inc. which they intend to consummate in the ordinary course of business and with court approval as applicable.

15. Debtors intend to restructure their debt through these Chapter 11 Cases so that their debt service is reduced to a level that will allow Debtors to sustain their operations for the long term and have identified investors who are willing to invest in Debtors once Debtors pursue these Chapter 11 Cases. Debtors also intend to complete recovery of assets (the "Stream Assets") which were previously and wrongfully transferred in contravention of express provisions of Stream's corporate charter as confirmed by the Delaware Supreme Court through a decision on June 15, 2022. *See Stream TV Networks, Inc. v. Seecubic, Inc.*, No. 360, 2021, p. 3 (Del. June 15, 2022) (Holding that "a majority vote of Class B stockholders is required under Stream's charter" to "transfer pledged assets to secured creditors in connection with what was, in essence, a privately structured foreclosure transaction").[2] In holding that its corporate charter had been violated, the

---

[2] The Delaware Supreme Court also held that the "agreement authorizing the secured creditors to transfer Stream's pledged assets . . . is invalid because Stream's unambiguous certificate of incorporation required the approval of Stream's Class B stockholders" and there was no "Board Only insolvency exception" to Section 271 of the DGCL, and even if there had been a board-only insolvency exception to Section 271, it had been superseded. *Id.*. at p. 34. The Delaware Supreme

6

93546672.1

Delaware Supreme Court noted that Stream's charter was "unambiguous" and, ergo, "enforcing the unambiguous [c]harter provision [requiring Class B stockholders be allowed to vote on the asset transfer] is consistent with our policy of seeking to promote stability and predictability in our corporate laws. . . ." *Id*. at pp. 53-54.

16. Stream is not a holding company, it is an operating company through which sales are conducted and research and development are managed through its subsidiaries. Prior to the stripping of its assets pursuant to the void Chancery Court preliminary injunction order of December 8, 2020, Stream had business development, sales and marketing, and financial staff on its direct payroll. Those employees negotiated contracts with Google and Robert Bosch GmbH for product development. They developed strategic relationships with international partners like BOE, Skyworth, and Lenovo. Many of Stream's staff have been retained by Visual Semiconductor, Inc. so that their skills and deep knowledge of the Debtors' technology will be available to Debtors through these chapter 11 reorganizations.

17. Technovative is the wholly owned subsidiary of Stream, established for tax purposes, to manage the Media Holdings Delaware LLC and Technology Holdings Delaware LLC as holding companies. Ultra-D Ventures, C.V. and Ultra-D Cooperatief U.A. were established as wholly owned entities to hold and manage the company's intellectual property, which was the primary subject of the Delaware Supreme Court Opinion and the primary assets which were to be protected by the Stream charter which was upheld by the Delaware Supreme Court over the schedule to take the assets through the now invalidated private foreclosure. As a matter of fact,

---

Court's opinion definitively established that there had been an improper transfer of assets, in violation of Debtor's corporate charter. *Id*. at p. 53 n. 180 ("We note that Section 271 presents no barrier to the parties' foreclosure proceedings in Superior Court (which are presently stayed pending this appeal), and no party has argued that judicial foreclosure proceedings implicate Section 271").

the Technovative shares have been a constant target of the Hawk Parties, which efforts have been rebuffed by the Delaware Supreme Court and the Chancery Court on remand.  ***There is no question that any action but return of all assets***, ***both in title and possession***, including the assets held in the foreign subsidiaries is a first step requirement under state law as dictated by the Delaware Supreme Court.  Any other action is an end run around controlling state law precedent over these assets.

      **C.**      **Estate Assets Held by the Hawk Parties**

18. Debtors initiated these Chapter 11 Cases because they had grave concerns that the Delaware Supreme Court mandate would not be followed, particularly due to the passage of ten months without full return of their assets. Those fears were confirmed as recently as April 14, 2023 in the status conference in these Chapter 11 Cases, in which counsel for Hawk Investment Holdings Limited ("Hawk") stated:

> "Your Honor, **the assets have never been returned**. The assets all -- the operating assets all were at the Technovative level or below. And those assets never went back -- **they went from SeeCubic, Inc. to the receiver and they were held by the receiver prior to the bankruptcy**. … Stream came into the bankruptcy an assetless company with the hope of getting its assets back."

(*April 14, 2023 Status Conference Transcript*, p 77, 5-11, emphasis added)

19. To date, the Hawk Parties have failed to account for and deliver Debtors' Estate assets, which remain in possession of the Hawk Parties or in the possession of the Debtors' subsidiaries over which the Hawk Parties are exercising or attempting to exercise control.

      **D.**      **The Writ of Summons**

20. The Hawk Parties are directly interfering with Debtors' ability to reorganize in these Chapter 11 Cases by, *inter alia*, preventing Debtors from resuming operational control over their subsidiaries and seeking recovery of the Estate assets.

21. On April 6, 2023, through Dutch counsel De Brauw Blackstone Westbroek N.V. (De Brauw"), the Hawk Parties filed a Writ of Summons in the Amsterdam Court, stating, among other things, that the Hawk parties had foreclosed on the assets of Debtors and that corporate resolutions passed by Debtors in October 2022 to restore management control over their own subsidiaries were invalid. The Writ seeks to remove Mathu Rajan as director of the Ultra-D Cooperatief U.A., Stream TV International B.V., and SeeCubic B.V. (the "Stream Dutch Subsidiaries"). Further, the Writ seeks to establish Shadron L. Statsney, CEO of SeeCubic, Inc., as sole director with operational control of the Dutch Subsidiaries, effectively blocking Debtors from managing their assets and successfully reorganizing through these Chapter 11 Cases for the benefit of Debtors' creditors, shareholders, and all other stakeholders.

22. If the Hawk Parties had an issue with Debtors asserting management control over the Dutch Subsidiaries and other Estate assets like the optical bonding equipment, then the Hawk Parties should have filed a motion in the Bankruptcy Court seeking relief there rather than from an international court. This is an affront to the Bankruptcy Court and its authority to determine such matters.

E. **Prior Contempt of the Hawk Parties**

23. The filing of the Writ is yet another example of the Hawk Parties' determination to control Debtors' assets by any means necessary. The Hawk Parties were previously found to be in contempt by the Delaware Court of Chancery ("Chancery Court") for their closely coordinated effort so seize control of Technovative stock only minutes after finally returning it to Stream following the Delaware Supreme Court mandate. Vice Chancellor Laster wrote:

> "This decision holds that SeeCubic and Hawk engaged in contumacious conduct. Shad L. Stastney was the puppet master who pulled the strings. He controls SeeCubic and Technovative, and he also controls SLS Holdings VI, LLC ("SLS"), Stream's only secured creditor other than Hawk. Stastney caused SeeCubic to notify Hawk that the transfer was

coming. To effectuate the transfer, Stastney gave instructions to SeeCubic's counsel to give instructions to himself (this time in his capacity as an officer and director of Technovative) to title the Shares in Stream's name. As planned, Hawk immediately asserted its rights to the Shares, at which point Stastney transferred title to the Shares into Hawk's name. Stastney and SLS benefitted, because SLS's rights as a secured creditor are senior to Hawk's.

(*Chancery Court Opinion*, October 3, 2022, pp 2-3).

24. The Hawk Parties were enjoined from taking further action against the Debtors for a period of ten days. Shortly thereafter, on October 20, 2023, the Chancery Court put a receiver in place pending further determination of whether or not the Hawk Parties could validly exercise their secured creditors rights, including but not limited to whether or not they could act on seizing the stock of Technovative in order to control the downstream subsidiaries which hold the intellectual property of the Debtors for avoidance of double taxation. This corporate structure may no longer be advantageous as the tax considerations that were basis for the corporate structure no longer exist and the Debtors have been unable to address tax issues over the past three years as the company's assets have been tied up in litigation.

F. **False Statements and Overreach by the Hawk Parties in the Amsterdam Court**

25. Judge Coleman rebuked the Hawk Parties, finding them to have made a false statement in the Writ:

"So maybe you might have foreclosed on your interest in the assets, but I haven't heard anybody say that you foreclosed on the ownership interest of the Debtors and actually, they're in this Court. I don't know how you could be in the Netherlands saying something to the contrary. I'm a little concerned about that."

(*April 14, 2023 Status Conference Transcript*, p129, 10-15).

26. Additionally, Judge Coleman rebuked the Hawk Parties for attempting to assert control over Estate assets, initiating action in an international venue despite the automatic stay. Filing of the Writ was particularly egregious since the Hawk Parties had already requested, but had not yet been granted, leave from the Bankruptcy Court to resume the Chancery Court action

10

93546672.1

outside of the Bankruptcy Court. By entering the Bankruptcy Court with its request for leave, the Hawk Parties had already (i) confirmed their knowledge and understanding of Debtors' bankruptcy status, (iii) subjected themselves to the personal jurisdiction of the Bankruptcy Court, and (iii) agreed to abide by decisions of the Bankruptcy Court. Discovering that the Writ specifically involved Debtors' optical bonding equipment, Judge Coleman said:

> "[Y]ou only have a pledge. You haven't foreclosed on the interest. At what -- what basis, when I have a debtor here who clearly has an interest in these entities and now their interest in the -- in management or whatever it is that's going on is now being [challenged] somewhere else. Because it clearly says -- and not only that, **they specifically talk about Stream's demand that the bonding equipment be turned over to them. They're opposing that. How are they going to go to Dutch court and oppose something that's before me?** I'm leading this. I got a problem with that. That's what they're saying that Mr. Rajan's trying to take our assets and turn it over and he shouldn't be and we want you to stop him. No, no, no, no, no. You're not going over there with that claim. That claim is here."

(*Id* at p116, 11-25, emphasis added).

### G.  **Withdrawal of the Writ**

27.  Judge Coleman stated that the Hawk Parties must not move forward with the Writ until after the next hearing in these Chapter 11 Cases, currently scheduled for May 22, 2023. Debtors requested that the Hawk Parties withdraw the Writ and refile when and if permitted by the Bankruptcy Court. Withdrawal is important to Debtors' reorganization efforts because leaving the open challenge to its authority to manage the Dutch Subsidiaries on the Netherlands docket – even if the Writ is temporarily stayed – creates a continued cloud of confusion for employees of Debtors' Dutch Subsidiaries as well as for Debtors' investors, customers, and strategic partners. The allegations must be withdrawn.

28. The Hawk Parties, through De Brauw, have communicated to Debtors' Dutch counsel that they intend to reschedule the hearing to June 2023, not withdraw the Writ as requested by Debtors.

29. The Hawk Parties were willing to withdraw the nearly identical Writ of Summons in October 2022 to honor directions of the Chancery Court, but now that they have received similar direction from the Bankruptcy Court, they are refusing to do so. What was good for one court should be good for the other, especially since Judge Coleman recognized that the Writ contains certain false information that the Hawk Parties seem more than willing to leave on the docket in the Netherlands' public domain to the detriment of Debtors.

**H.    Article 9 Sale**

30. The Hawk Parties have openly stated their intention to satisfy their alleged secured debts by conducting a sale of Debtors' Estate assets through Article 9 of the Uniform Commercial Code. The Estate assets include all holdings of Debtors and their subsidiaries, including but not limited to intellectual property, specialized production equipment, customer contracts, and more. In fact, The Hawk Parties previously made a public announcement of its intent to conduct a sale in December 2022. (see **Exhibit B**)

31. The value of Debtors' assets, which constitute the value of Debtors as business entities, is approximately $749 million according to a study conducted by an independent analyst[3]. Should the assets be lost, and pending purchase orders and protective orders be imperiled, the near-term damages will exceed $200 million, far greater than the current alleged debt owed to the Hawk

---

[3] In February 2021, independent analyst Richard Windsor of Radio Free Mobile estimated that Debtors' technology was valued at $749 million. (https://www.radiofreemobile.com/about/)

Parties.[4] The current, secured purchase orders total $138 million and are detailed in the *Third Declaration Of Mathu Rajan In Support Of Stream Tv Networks, Inc. And Technovative Media, Inc. Motions For Entry Of An Order: (1) Enforcing The Automatic Stay; (2) Directing The Turnover Of Property Of Debtors' Estate; And (3) Imposing Sanctions For Willful Stay Violations* (Docket No. 114-1).

**I.    Damages**

32.    By seizing and possessing Debtors' assets, and by interfering with Debtors' ability to manage its subsidiaries, the Hawk Parties have put Debtors at risk of losing critical purchase orders. The potential direct damages exceed $200 million (Stream has already secured purchase orders for $138 million and has additional multi-million-dollar orders promised from a repeat customer contingent on reinstallation of Stream's optical bonding equipment at a Stream-controlled facility in Asia).

33.    Debtors seek an emergency evidentiary hearing by this Court to determine the relevant damages caused by the Hawk Parties to Debtors and the appropriate remedies therefore.

34.    Debtors request that damages awarded by the Bankruptcy Court should be assessed first against any remaining secured or unsecured debt owed by Debtors to the Hawk Parties after adjudication of debt-to-equity conversions initiated by Debtors. Debtors request that additional damages be assessed next against the equity holdings of the Hawk Parties in Debtors, with stock, warrants, and options forfeited by the Hawk Parties as appropriate.

---

[4] The Debtors believe that unilateral debt-to-equity conversion rights held by Debtors and claims for setoffs that may arise from its litigation in the United States District Court for the District of Delaware against the Hawk Parties for a variety of damages resulting from their tortious interference, civil conspiracy, breach of fiduciary duty, and other actions converts the Hawk debt to equity and the Hawk Parties are subject to setoff for the damages caused in the wake of their failed takeover scheme. See **Exhibit C** (*Stream TV Networks, Inc. v. Shadron Stastney, et al.* (No. 22-851-RGA)).

93546672.1

**RELIEF REQUESTED**

35. Debtors seek entry of an order, substantially in the form attached as **Exhibit A**, pursuant to sections 105(a), 362, and 542 of the Bankruptcy Code, ordering the Hawk Parties to withdraw the Writ from the Amsterdam Court in the Netherlands not later than 5pm on April 18, 2023, and seeking an evidentiary hearing to impose monetary damages against the Hawk Parties in the amount of $200 million, such damages to be assessed against any outstanding debt owed to the Hawk Parties by Debtors plus forfeiture of the Hawk Parties' holdings in Debtors. The purpose of the relief requested herein is to aid in the administration of these Chapter 11 Cases and to preserve and enhance the value of Debtors' business operations.

**BASIS FOR RELIEF**

36. The automatic stay in section 362(a) is essential to the effective reorganization of a debtor and is one of the fundamental protections provided by the bankruptcy laws. Indeed, as the legislative history explains:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors . . . . The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors.

See H.R. REP. No. 95-595, at 340 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6313.

37. The automatic stay is one of the most significant protections that the Bankruptcy Code affords a debtor. *Midlantic Nat'l Bank. v. N.J. Dep't of Envt'l Prot.,* 474 U.S. 494, 503 (1986); see also *In re Drexel Burnham Lambert Group Inc.*, 113 B.R. 830, 837 (Bankr. S.D.N.Y. 1990) ("automatic stay is key to the collective and preservative nature of a bankruptcy proceeding"). The automatic stay is designed to, among other things, give the debtor a "breathing spell" after the commencement of a chapter 11 case, shielding debtors from creditor harassment

14

and a multitude of litigation in a variety of forums at a time when the debtor's personnel should be focusing on restructuring. See *Taylor v. Slick*, 178 F.3d 698, 702 (3d Cir. 1999), cert. denied, 528 U.S. 1079 (2000).

38. The automatic stay broadly extends to all matters which may have an effect on a debtor's estate, enabling bankruptcy courts to ensure that debtors have the opportunity to rehabilitate and reorganize their operation. See *Manville Corp. v. Equity Sec. holders Comm.* (*In re Johns-Manville Corp.*), 801 F.2d 60, 62-64 (2d Cir. 1986); see also *Fid. Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 53 (2d Cir. 1976) ("Such jurisdiction is 'necessary to exclude any interference by the acts of others or by proceedings in other courts where such activities or proceedings tend to hinder the process of reorganization.'") (citation omitted). Indeed, the automatic stay is "undeniably broad" and encompasses "all legal obligations of the debtor, no matter how remote or contingent." *In re Baldwin-United Corp.*, 57 B.R. 759, 763-64 (S.D. Ohio 1985) (quoting H.R. Rep. No. 595, 95th Cong., 2d Sess. 309).

39. The automatic stay applies to "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Pursuant to Section 541(a) of the Bankruptcy Code, "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a); see also *ACandS, Inc. v. Travelers Cas. and Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006) ("The interests classified as 'property of the estate' protected by § 362(a)(3) are defined by 11 U.S.C. § 541."). Further, Section 541 of the Bankruptcy Code comprises such property "wherever located and by whomever held." 11 U.S.C. § 541. In accord with the broad language of this section, courts have universally held that property of the estate extends to any property located worldwide. See, e.g., *Hong Kong & Shanghai Banking Corp. v. Simon* (In re Simon), 153 F.3d

15

991, 996 (9th Cir. 1998) (explaining that property of the estate "includes property outside the territorial jurisdiction of the United States"); *Nakash v. Zur* (*In re Nakash*), 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996) (noting that "wherever located" is broadly construed "to include property located in and outside of the U.S.").

The Stream Assets constitute property of the estate. Indeed, these assets were improperly turned over to SeeCubic prior to the Petition Date as a result of an order wrongfully entered by the Delaware Court of Chancery which was ultimately overturned by the Delaware Supreme Court. The result of the Delaware Supreme Court's opinion, as acknowledged by the Delaware Court of Chancery, was that all property of Stream that was transferred to SeeCubic, even property that was disputed by SeeCubic or not easily segregated, was required to be returned to Stream. Indeed, the Delaware Court of Chancery advised that Stream was entitled to the return of its assets so that it could conduct business and make efforts to satisfy creditor claims. As of the date of this Motion, this has not occurred despite multiple demands by Stream to SeeCubic for the return of such property, including the Stream Assets. Second, Debtors intend to use the Stream Assets in accordance with section 363 of the Bankruptcy Code. Finally, the Stream Assets have substantial value to Debtors and their estates. Specifically, Debtors require the Stream Assets in order to obtain additional purchase orders, conduct ordinary business operations, and develop and propose a plan of reorganization. SeeCubic is acutely aware of Debtors' need for the Stream Assets, yet SeeCubic seeks to remain in possession of such assets in order to hinder Debtors' progress in these Chapter 11 Cases and, as a competitor of Stream, utilize the Stream Assets for the advancement of its business to the detriment of Debtors and their Estates.

## REQUEST FOR AN EMERGENCY HEARING

16

93546672.1

Debtors request a hearing on an emergency basis. The foreign subsidiaries are integral to the success of Debtors and their ability to achieve a successful plan of reorganization. The failure to immediately withdraw the pending action in the Netherlands will likely result in Debtors losing current client purchase orders and will impact Debtors' ability to obtain future purchase orders. Further, Debtors' ability to obtain funding in these Chapter 11 Cases is premised on Debtors' ability to commence production and raise funding, which cannot be achieved unless and until Debtors have control of their foreign subsidiaries which hold their key assets.

## CONCLUSION

**WHEREFORE**, Debtors respectfully request that this Court enter an order, substantially in the form of the proposed order attached hereto as **Exhibit A** and granting such other and further relief as the Court deems just and proper.

Date: April [], 2023

Respectfully submitted,

/s/ Rafael X. Zahralddin-Aravena
Rafael X. Zahralddin-Aravena (PA Bar No. 71510)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
550 E. Swedesford Road, Suite 270
Wayne, PA 19087
Telephone: (302) 985-6000
Facsimile: (302) 985-6001
Rafael.Zahralddin@lewisbrisbois.com

-and-

Vincent F. Alexander (admitted *pro hac vice*)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
110 SE 6th Street, Suite 2600
Fort Lauderdale, FL 33301
Telephone: (954) 728-1280
Facsimile: (954) 678-4090
Vincent.Alexander@lewisbrisbois.com

93546672.1

-and-

Bennett G. Fisher (pro hac pending)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
24 Greenway Plaza, Suite 1400
Houston, TX 77046
Telephone: (346) 241-4095
Bennett.Fisher@lewisbrisbois.com

*Proposed Counsel to Debtors*

93546672.1