# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STREAM TV NETWORKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 22-851-RGA |
| | ) | |
| SHADRON STASTNEY, ARTHUR | ) | |
| LEONARD ROBERT MORTON, ALASTAIR | ) | |
| CRAWFORD, ASAF GOLA, KEVIN | ) | **JURY TRIAL DEMANDED** |
| GOLLOP, KRZYSZTOF KABACINSKI, | ) | |
| PATRICK MILES, ROBERT PETCH, HAWK | ) | |
| INVESTMENT HOLDINGS LIMITED, and | ) | |
| JOHN DOES 1-75, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Stream TV Networks, Inc. ("Stream TV" or the "Company"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 8, stating its Amended Complaint against Defendants, alleging as follows:

## NATURE OF ACTION

1.      This is a $500,000,000.00 tort damages case.  Defendants stole Plaintiff's assets and intellectual property via a complicated hostile takeover conspiracy of internal business sabotage and bribery.  The Supreme Court of Delaware *en banc* recently declared that unlawful takeover scheme void *ab initio*.  During their period of unlawful control of the assets, Defendants valued the stolen technology at $560 million in their public investment solicitations.  Now, Defendants are liable in damages for conduct already declared unlawful by a unanimous Delaware Supreme Court, in damages grounded at least upon valuations that Defendants themselves published.

1

2.    Defendants are not good faith investors who made an honest mistake.  They are serial malfeasants in crooked takeover schemes and also frequent defendants in sanctions proceedings by U.S. federal authorities.

3.    Defendant Shadron L. Stastney ("Stastney") runs unlawful takeover schemes as his personal business model and has been sued up and down the East Coast at least six times for defrauding investors in similar shady gambits.  He also has paid a $3 million fine to the SEC for fraudulently concealing his personal interests in such takeover schemes.  This time around, he engaged two UK co-conspirators: Alistair Crawford and Arthur "Bob" Morton.

4.    Defendant Arthur Leonard Robert "Bob" Morton ("Morton") is a notoriously unscrupulous takeover artist dubbed "Bad Bob" by the Financial Times, among others. Immediately prior to the events of this case, the UK Financial Conduct Authority banned all UK banks and brokers from participating in any take-over activity in which Mr. Morton is involved, a dramatic sanction known as "Cold Shouldering".  The Cold Shoulder is the colloquial "death penalty" sanction for UK investment managers, because it establishes both criminal and civil abetting liability for any other regulated entity who deals with the recipient of the sanction.  The committee that punished Morton found that he systematically lied, had invented an agreement to try to hide his malfeasance, and had engaged in egregious misconduct.  Barred from acquisition activity in the United Kingdom, Mr. Morton chose to take his show on the road by joining Mr. Stastney in similar misconduct in the US.

5.    Defendant Alastair Crawford ("Crawford") is a serial litigant who, spurned by not receiving undeserved commissions, began a campaign to smear Stream TV's controlling stockholders with the goal of taking over Stream TV and its assets.

2

6.      In 2019 and early 2020, Stastney, Crawford, and Morton concocted a scheme to bribe a series of Plaintiff's managers to sabotage: (a) Plaintiff's exercise of certain debt conversion rights held against Plaintiff's secured debtholders, (b) Plaintiff's recapitalization via an equity issuance, which rendered their (anyway converted) debt instruments obsolete; and (c) Plaintiff's ability to raise funds and sell products.  The point of the conspiracy was to destroy Stream TV from the inside, to cause default events on certain debt instruments that the conspirators had acquired, and thereafter to use those manufactured default events as a pretext for the co-conspirators to sign over all assets of Stream TV to a shell company, SeeCubic, Inc. ("SeeCubic"), controlled by the conspirators, for zero dollars, through an Omnibus Agreement (Ex. A).  Stastney, Crawford, and Morton employed the other Defendants to carry out their scheme.

7.      The scheme was grounded upon bribing at least three of Plaintiff's managers and directors: Defendants Kabacinski, Gollop, and Gola.  The debtholders promised those managers lavish compensation within a future investment vehicle – now known to be SeeCubic – (some of which has since been paid), as a quid pro quo for manufacturing default events within Stream TV and for putting Stream TV's assets and intellectual property under the control of the Defendants. Gollop and Gola were each paid a substantial amount for their participation in the conspiracy. Kabacinski cut a better deal for himself and was paid $390,000.  Additionally, all received stock in SeeCubic, the newly formed entity that received Stream TV's assets.

8.      Kabacinski and Stastney in turn bribed other managers and contractors to facilitate and carry out the conspiracy.  For example, Kabacinski bribed Kaushik Banerjee ("Banerjee"), Stream TV's Vice President of Engineering, to transfer an IT server holding critical intellectual property from Stream TV to the conspirators.  In return, Kabacinski promised Banerjee a $2 million contract in a subsequent shell company to manage the technology.  But Kabacinski double-

crossed Banerjee and failed to pay the bribe after Banerjee upheld his end of the illegal bargain to steal the server. That double-cross resulted in California fraud litigation through which many facts of the conspiracy came to light.

9.    For a time, Defendants' conspiracy succeeded due to a series of unfortunate erroneous rulings by the Delaware Court of Chancery beginning in December 2020. But on June 15, 2022, the Delaware Supreme Court sitting *en banc* reversed the Court of Chancery and definitively ruled that Plaintiff is now and was always the lawful owner of Plaintiff's own assets and intellectual property. Defendants never had any right to Plaintiff's assets and intellectual property; their takeover scheme was unlawful.

10.    Because Defendants never held any right whatsoever to Plaintiff's property, all of Defendants' exercise of dominion and control over that property from January 2020 to today constitutes tort conversion. The Defendants conspired together to convert Plaintiff's assets and intellectual property, and thereafter to monetize it for their own benefit, at a publicly stated valuation of $560,000,000.00. Defendants stole Plaintiff's property under fraudulent color of law, at their own peril, hoping they could outlast Plaintiff in the prior litigation before being called to account. Defendants' unlawful conspiracy bet did not pay off, and all Defendants are now liable in tort for the harm their unlawful scheme caused Plaintiff.

## **PARTIES**

11.    Plaintiff Stream TV Networks, Inc. is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. Stream TV is a new media company founded in 2009 that aims to advance the evolution of display technology from a flat 2-D world to an immersive one made possible in 3-D without the viewer needing to wear special 3-D glasses.

12.     The Rajan family controls Stream TV.  Mathu Rajan holds 18,000 shares of Class A common stock.  An investment vehicle owned by Mathu Rajan, his brother, Raja Rajan, and their parents holds the majority of Stream TV's Class B voting stock.

13.     In addition to the Rajan family, 116 investors own 7,698,964 Class B voting shares of Stream TV.

14.     Defendant Shadron L. Stastney is a resident of New Jersey.  Stastney was a director of Stream TV from 2011 through 2014, when he resigned because he faced sanctions from the Securities and Exchange Commission, in an action captioned *In the Matter of Shadron L. Stastney*, United States Security and Exchange Comm. Admin. File No. 3-15500, Release Nos. 3671, 30689 (Sept. 18, 2013).   Stastney later re-engaged with Stream TV as a director from approximately September 2018 to January 2020 and Chief Financial Officer from December 1, 2018 to January 30, 2020.  Stastney is also the Managing Member of SLS Holdings VI, LLC ("SLS").  SLS in turn is Stream TV's senior secured creditor, on convertible notes for approximately $6 million.

15.     Defendant Arthur Leonard Robert Morton is a resident of Jersey of the United Kingdom Channel Islands.  Upon information and belief, Morton owns and/or controls Defendant Hawk Investment Holdings Limited ("Hawk"), Stream TV's junior secured creditor, through other entities owned and controlled by him, including Albany Directors Limited.   In addition to the "Cold Shouldering," Morton earned two private censures and one public censure from the United Kingdom's Panel on Takeovers and Mergers.

16.     Defendant Hawk Investment Holdings Limited is an entity formed under the laws of Guernsey. Upon information and belief, Morton owns and/or controls Hawk, including through entities owned and controlled by him, including Albany Directors Limited.

5

Case 2:22-07630-RDC Doc 125-3 Filed 04/18/23 Entered 04/18/23 14:43:17 Desc
Exhibit De District Court Complaint    Page 6 of 82

17.     Defendant Alastair Crawford is a resident of the United Kingdom and an investor in Stream TV.

18.     Defendant Patrick Miles is a resident of the United Kingdom and an investor in Stream TV.

19.     Defendant Robert Petch is a resident of the United Kingdom and an investor in Stream TV.

20.     Defendant Asaf Gola is a resident of New York.  Gola is an equities trader and portfolio manager by training, previously employed by various investment banks and capital managers.  From approximately March until May 2020, Gola was briefly a director of Stream TV.  Gola joined the Stream TV Board as an act in furtherance of the conspiracy alleged in this Amended Complaint, for the specific purpose of unlawfully signing over Stream TV's assets to shell companies owned by the other Defendants.  In exchange, Gola was awarded the position of Head of Capital Markets at one of those shell companies, SeeCubic, at which he is currently employed in New York, and, on information and belief, was also paid a substantial amount.

21.     Defendant Kevin Gollop is a resident of Jersey of the United Kingdom Channel Islands.  Gollop is an insurance broker by training, specializing in maritime insurance.  He later owned various Jersey-based consultancies and investment firms.  He currently is Managing Director of a Jersey-based maritime industry recruitment firm known as Channel Ship Services.  From approximately March until May 2020, Gollop was briefly a director of Stream TV.  Gollop joined the Stream TV Board as an act in furtherance of the conspiracy alleged in this Amended Complaint, for the specific purpose of unlawfully signing over Stream TV's assets to shell companies owned by the other Defendants.  In exchange, Gollop was paid a substantial sum.

6

22.     Defendant Krzysztof "Kris" Kabacinski is a resident of the United Kingdom. Kabacinski was CEO and recently demoted to Chief Strategy Officer of SeeCubic and was described on its website as "one of two founding architects of its current corporate structure," which he structured and operated specifically to carry out the unlawful conspiracy described in this Amended Complaint. Kabacinski was previously an executive of MEON Corporate Group, which *inter alia* manages paving projects in Central Europe.  Kabacinski briefly served on the Board of Stream TV from March to May 2020, to which he was appointed at the request of Stastney Crawford, and Morton in furtherance of the conspiracy described in this Amended Complaint.  In exchange, on information and belief, Kabacinski was paid $390,000 and given a large amount of stock in SeeCubic.

## JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332(a) (diversity jurisdiction) because there is complete diversity of citizenship between Stream TV and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

24.     The Court has personal jurisdiction over Stastney pursuant to 10 *Del. C.* § 3114 because he was at the relevant time, a director and officer of Stream TV, a Delaware corporation.

25.     The Court has personal jurisdiction over Stastney pursuant to 10 *Del. C.* § 3104 because he transacts business and performs work in Delaware, and because he caused tortious injury to Stream TV within Delaware.

26.     The Court has personal jurisdiction over Morton pursuant to 10 *Del. C.* § 3104 because he transacts business and performs work in Delaware, and because he caused tortious injury to Stream TV within Delaware.

7

27.     The Court has personal jurisdiction over Crawford pursuant to 10 *Del. C.* § 3104 because he transacts business and performs work in Delaware, and because he caused tortious injury to Stream TV within Delaware.

28.     The Court has personal jurisdiction over Miles pursuant to 10 *Del. C.* § 3104 because he transacts business and performs work in Delaware, and because he caused tortious injury to Stream TV within Delaware.

29.     The Court has personal jurisdiction over Petch pursuant to 10 *Del. C.* § 3104 because he transacts business and performs work in Delaware, and because he caused tortious injury to Stream TV within Delaware.

30.     The Court has personal jurisdiction over Hawk pursuant to 10 *Del. C.* § 3104 because it transacts business and performs work in Delaware, and because it caused tortious injury to Stream TV within Delaware.

31.     The Court has personal jurisdiction over Gola pursuant to 10 *Del. C.* § 3114 because was at the relevant time a director of Stream TV, a Delaware corporation.

32.     The Court has personal jurisdiction over Gola pursuant to 10 *Del. C.* § 3104 because he transacts business and performs work in Delaware, and because he caused tortious injury to Stream TV within Delaware.

33.     The Court has personal jurisdiction over Gollop pursuant to 10 *Del. C.* § 3114 because he is, or was at the relevant time, a director of Stream TV, a Delaware corporation.

34.     The Court has personal jurisdiction over Gollop pursuant to 10 *Del. C.* § 3104 because he transacts business and performs work in Delaware, and because he caused tortious injury to Stream TV within Delaware.

35.    The Court has personal jurisdiction over Kabacinski pursuant to 10 *Del. C.* § 3114 because he is, or was at the relevant time, a director and officer of Stream TV, a Delaware corporation.

36.    The Court has personal jurisdiction over Kabacinski pursuant to 10 *Del. C.* § 3104 because he transacts business and performs work in Delaware, and because he caused tortious injury to Stream TV within Delaware.

37.    Venue is proper under 28 U.S.C. § 1391.

## FACTS

### A.    Stream TV

38.    Between 2009 and 2020, Stream TV raised approximately $160 million through equity investments, unsecured convertible debt, and direct loans. Stream TV used those funds to further develop its 3D technology by obtaining numerous patents, improving image resolution, increasing the size of the displays, developing mobile-type tablets, and moving algorithms into hardware (which reduces costs and makes the technology compatible with most devices in the industry).

39.    Eventually, Stream TV perfected its mass production "bonding" process – precise gluing of proprietary lenses to video panels with sub-pixel accuracy – which major competitors such as Philips Electronics and Dolby have not achieved. Stream TV thereafter pivoted to readying its technology for implementation into the devices of major industry players that sell TVs, tablets, laptops, and mobile phones.

40.    Stream TV's assets include two optical bonding lines – a Mass Production Line and a Small Production Line that can be used to bond products for all three technology platforms: Two-View, Multi-View, and Stream TV's proprietary Ultra-D™.

9

41.     Stream TV grew to over 100 employees and consultants worldwide.

42.     Through one of its Netherlands subsidiaries, Stream TV entered into an agreement with Robert Bosch GmbH in March 2020 to co-develop a glasses-free 3D instrument cluster for the automotive market.

43.     During this critical commercialization period in early 2020, Stream TV suffered financial challenges.  As it had through its past $160 million of prior capital raises, Stream TV intended to address its liquidity requirements with an additional capital raise.

44.     Stream TV's secured creditors had signed certain debt-to-equity conversion agreements in 2018. And, in 2020, Stream TV was weeks away from signing a major commercialization agreement with Alphabet, Inc., the parent company of Google.

45.     Stream TV did not declare Chapter 11 bankruptcy or take other judicial reorganization acts during those early 2020 financial difficulties because it instead intended to raise capital (as it had successfully done in the past) after announcing its anticipated contract with Google.

**B.      Stream TV's Charter Guarantees Blocking Rights to the Class B Voting Shareholders to Veto Asset Transfers**

46.     Stream TV's December 17, 2018 Third Amended and Restated Certificate of Incorporation (the "Charter," Ex. B) expressly requires Class B voting shareholder approval for all possible transactions that could remove control of Stream TV's technology from the Class B voting shareholders (including the Rajans), however named.  This provision was originally added in 2013, and Stastney voted in favor of adding this provision.

47.     Charter § IV.D.2(d) provides:

> **Separate Vote of Class B Voting Stock**. For so long as shares of Class B Voting Stock remain outstanding, in addition to any other vote or consent required herein or by law, the affirmative vote or written consent of the

10

holders of a majority of the then-outstanding shares of Class B Voting Stock, voting as a separate class, shall be necessary for the Company to consummation [sic] an Acquisition or Asset Transfer.

48.     Charter § IV.D.4(b) further defines the term "Acquisition" as:

(A) *any consolidation, stock exchange or merger* of the Company with or into any other corporation or other entity or person, *or any other corporate reorganization*, other than any such consolidation, merger or reorganization in which the stockholders of the Company immediately prior to such consolidation, merger or reorganization, continue to hold a majority of the voting power of the surviving entity in substantially the same proportions (or, if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, merger or reorganization; *or (B) any transaction or series of related transactions to which the Company is a party and in which in excess of fifty percent (50%) of the Company's voting power is transferred* provided that an Acquisition shall not include (x) any consolidation or merger effected exclusively to change the domicile of the Company, or (y) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled or converted or a combination thereof.

(emphasis added).  And, the term "Asset Transfer" is defined as:

a sale, lease or other disposition of all or substantially all of the assets or intellectual property of the Company or the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of the Company.

**C.     Stream TV's Secured Creditors**

49.     In 2011 and 2012, SLS loaned Stream TV $6 million via multiple senior notes, secured against all assets of Stream TV and its subsidiaries.

50.     Between 2014 and 2020, Hawk loaned Stream TV over £50 million plus $1.336 million through a series of 17 separate notes.   Stream TV also pledged its assets for those notes subject to SLS's senior security, thereby rendering Hawk a junior secured creditor.

51.     Under separate conversion agreements between and amongst Stream TV, Hawk, and SLS, all of the notes issued to Stream TV by Hawk and SLS would convert to equity in the

11

event Stream TV raised additional capital.  Under each of the conversion agreements, Stream TV

had the sole and unilateral discretion to convert debt to equity.

       **D.**    **The Conspiracy to Take Stream TV's Assets**

52.     Stastney was an early investor in Stream TV and was on its Board from 2011 until

2014.  Stream TV was unaware of Stastney's legal troubles and his history of takeovers when he

joined Stream TV.

53.     At some point, Stream TV became aware that Stastney had legal issues with the

SEC.  While he was being investigated by the SEC, Stastney voluntarily quit Stream TV's Board.

He was reappointed to the Board by the other Board members in 2018 without the Rajans' consent

or knowledge.  Stastney was promoted to Vice-Chairman without prior consultation of the Rajans.

Stastney was also named CFO at the insistence of Crawford.  Stastney resigned his Board and CFO

positions on January 30, 2020 so that he could pursue his takeover scheme.

54.     Morton was an early investor in Stream TV, and his legal troubles were similarly

unknown to Stream TV when he first invested in 2011.  Stream TV and the Rajans had a good

relationship with Morton through 2020.  However, upon information and belief, Morton

maintained a good relationship with the Rajans in furtherance of the conspiracy to take control of

Stream TV's assets.

55.     Similarly, Stream TV was unaware of Crawford's character and history when he

first became an investor.  Stream TV originally had a good relationship with Crawford, who

brought numerous investors to Stream TV.

56.     Stream TV had a good relationship with Stastney until 2018.  Upon information

and belief, Stastney became unhappy with the Rajans' leadership of Stream TV at the end of 2018

because he feared that Stream TV's fundraising efforts would cause him to lose the control and

influence that he had regained in Stream TV, and he was concerned that SLS's loans would be converted to equity despite having previously signed the conversion agreement.

57.    Further, Stastney was unhappy with his inability to receive payment on the senior debt owned by SLS, even though payments were not yet due on those loans. Stastney's conversion agreement permitted Stream TV to convert the $6 million of senior debt owned by SLS (controlled by Stastney) to common equity. Stastney did not want his debt converted despite having previously signed the conversion agreement. The Rajan family wished to execute Stream TV's conversion rights against SLS, clearing Stream TV's balance sheet to ramp up fundraising efforts to go to mass production.

58.    Stastney proposed an alternative to converting the SLS debt into equity: instead, Stream TV should repay SLS $6 million loan dollar-for-dollar using funds from the intended capital raise. Further, Stastney proposed that a sweep account be set up whereby Stream TV's new investment funds, in excess of a certain amount, would be swept into an SLS bank account. The funds that would have been swept into that account would have surpassed the amount owed to SLS. Unsurprisingly, the Rajan family rejected Stastney's alternative proposal.

59.    Upon information and belief, Crawford became unhappy with the Rajans' leadership of Stream TV in late 2016 or early 2017. Crawford's discontent resulted from his desire to receive unwarranted commissions from the fundraising efforts of others. When he did not receive the unwarranted commissions, Crawford began his multi-year smear campaign to damage the Company and the Rajans.

60.    Upon information and belief, as early as 2018, Stastney, Crawford, and Morton began to work together to take control of Stream TV and transfer its assets and intellectual property to a new company they would control together, later incorporated as SeeCubic. Upon information

13

and belief, Stastney, Crawford, and Morton recruited Miles, Petch, Hawk, and John Does 1-75 to aid in their effort to take control of Stream TV and its assets.

61.    Upon information and belief, Stastney, Crawford, Morton, Miles, Petch, Hawk, and John Does 1-75 actively worked to prevent Stream TV from raising money.  The goal of this effort was to force Stream TV to default on its secured loans and enable SLS and Hawk as secured creditors to seize Stream TV's assets.

62.    As part of this effort, Crawford began defaming the Rajan family to investors, including Morton, as early as the summer of 2018.  Indeed, Crawford falsely alleged to investors, including at least Morton, that the Rajans had committed fraud and were lying to investors.

63.    Upon information and belief, Stastney, Miles, Petch, Hawk, and John Does 1-75 similarly defamed the Rajans in an attempt to prevent Stream TV from raising funds so that Stream TV's secured creditors could notice a default of the secured loans.

64.    In November 2019, months before the signing of the Omnibus Agreement, and while he was still a director and CFO of Stream TV, Stastney offered employment in SeeCubic to numerous key Stream TV employees, including Kaushik Banerjee.  Stastney used these promises of employment as bribes to Stream TV employees to effectuate the takeover of Stream TV and transfer of assets to SeeCubic.

65.    In January 2020, before the Omnibus Agreement was signed, in anticipation of loan defaults that had not yet occurred, and while he was still a director and CFO of Stream TV, Stastney and Morton directed Stream TV employees to restrict access to servers containing vital intellectual property and computer source code.  Stream TV management, engineers, and contractors were blocked from using the software, thus interfering with contracts and opportunities, causing millions of dollars in damages.

14

66.     Also in January 2020, Stastney shared his detailed plan for transferring Stream

TV's assets and intellectual property with Crawford.  Upon information and belief, Crawford and

Morton agreed with Stastney's plan and aided in its execution.  Upon information and belief, Miles,

Petch, Hawk, and John Does 1-75 were informed of the plan and aided in its execution.  Upon

information and belief, the Defendants rewarded themselves with millions of shares in SeeCubic.

67.     Stastney resigned from his roles as a member of Stream TV's Board and CFO on

January 30, 2020, to allow himself to declare Stream TV in default on its loans to SLS.  Litigation

ensued.

68.     Historically, as controlling shareholders, Mathu and Raja Rajan served as the sole

members of Stream TV's Board of Directors (the "Board").   Between 2011 and 2014,[1] Stastney

served as an outside director, and later rejoined the Board as Vice Chairman in 2018 until resigning

in January 2020.  Two other outside directors, Leo Hindery and Mark Coleman, also served on the

Board between 2015 and July 2019.

69.     When Stastney's proposed "sweep account" was rejected by the Rajans, Hindery

and Coleman left the Stream TV Board. The Rajans agreed to replace them and to further expand

the Board to satisfy the Defendants' requests.

70.     In February 2020, four new outside directors were invited to join the Board:

Kabacinski, Gola, Gollop, (the "Outside Directors") and Frank Hodgson.

---

[1]  Stastney settled a set of SEC charges regarding breaches of fiduciary duty in unrelated
investments in September 2013.  The settlement *inter alia* barred Stastney from investment
advisory work for 18 months.  The SEC settlement is public record.  *In the Matter of Shadron L.
Stastney*, United States Security and Exchange Comm. Admin. File No. 3-15500, Release Nos.
3671, 30689 (Sept. 18, 2013), published at https://www.sec.gov/litigation/admin/2013/ia-3671.pdf.

ME1 41601090v.1

71.    In May 2020, in furtherance of the takeover plan and without prior notice to the Rajans, Kabacinski, Gola and Gollop voted to negotiate a reorganization with Stream TV's secured creditors to address Stream TV's financial difficulties.  Hodgson left the meeting early and did not participate in any voting that day. Upon information and belief, the Outside Directors were acting upon instructions from the other Defendants.  As part of this endeavor, Gola proposed that the Board create a Resolution Committee, comprised of himself and Gollop, to "resolve any existing or future debt defaults or claims, and any existing or future litigation, or threats thereof, on behalf of Stream."  The Rajans requested time for a legal review of the proposal, but the request was denied, and the Resolution Committee was formed by a vote with the Rajans abstaining from the Board vote.

72.    As described herein, Gola and Gollop, acting as the Resolution Committee, purported to bind Stream TV to an Omnibus Agreement in May 2020 to effect that takeover goal.

73.    Upon information and belief, other, unknown individuals participated in the conspiracy discussed in this Complaint.

**E.    The Omnibus Agreement and Secret Letter Agreement**

74.    In January 2020, Crawford, Miles, and a number of other investors filed a lawsuit against the Rajans in the Court of Chancery of the State of Delaware, captioned *Crawford v. Rajan*, No. 2020-0004-JTL.  Upon information and belief, the goal of the lawsuit was to block Stream TV's ability to raise money, and thus allow Crawford's co-conspirators to allegedly foreclose on their secured debt.

75.    On March 9, 2020, SLS noticed default of its secured notes. The default notice sparked a flurry of activity among Stream TV's investors, which eventually led to the appointment of the Outside Directors and creation of the Resolution Committee on May 4, 2020.

16

76.    On March 23, 2020, before the creation of the Resolution Committee, SLS commenced litigation in the Delaware Superior Court against Stream TV and three of its wholly owned subsidiaries for, among other things, the transfer of collateral subject to SLS's loan agreements with Stream TV (the "SLS Lawsuit"). The Superior Court assigned a hearing date of June 2021, nearly 14 months after the filing date. If Stastney wanted to seize Stream TV's assets quickly, he would have to find another way.

77.    On or about May 6, 2020, Gola and Gollop, acting as the Resolution Committee without input from any other director, third-party legal consultation, or interaction with Company management, delivered the Omnibus Agreement, signed by them, purporting to bind Stream TV to a global settlement of pending litigations.  The Omnibus Agreement also contemplated the transfer of all of Stream TV's assets to a "Newco" established and controlled by SLS and Hawk. "Newco" was later identified as SeeCubic.

78.    The Outside Directors did not obtain approval for the Omnibus Agreement from Stream TV's Class A or B stockholders, even though Class B stockholder approval is specifically required by the Company's Charter for transfer of all or substantially all of the Company's assets.

79.    In addition to Gola and Gollop, the Omnibus Agreement was also signed by: (i) Stastney, on behalf of SLS as its managing member, (ii) Emma McIntosh and Lee Mealing as authorized signatories for Albany Directors Limited, as sole director of Hawk, and (iii) Crawford, Petch, and Miles on behalf of a group of 52 of Stream TV's investors.

80.    On information and belief, the execution of the Omnibus Agreement by Gola, Gollop, Crawford, Petch, Hawk, and Miles was orchestrated by all of the Defendants to circumvent the proper adjudication of the SLS Lawsuit, such that Defendants would obtain possession of Stream TV's assets before their alleged right to these assets was adjudicated by the Delaware

17

Superior Court.  Also in this way, Defendants were able to take the entire value of Stream TV, not just what the secured creditors were allegedly owed.

81.     By its terms, the Omnibus Agreement transferred all of Stream TV's assets to SeeCubic in lieu of SLS and Hawk foreclosing on Stream TV's assets.  In this way, the Defendants thwarted the rights of the Class A and Class B shareholders entitled to vote on this transaction under the Charter, and illegally took possession of all of Stream TV's assets.

82.     The Omnibus Agreement also provided for the issuance of one million shares in SeeCubic to Stream TV, though that issuance was never effectuated.  Stream TV's Class A common shareholders, other than the Rajans who were expressly excluded, were granted the right to "exchange" their Class A common shares for the equivalent number of shares of SeeCubic's common stock for no cost.  The Defendants were able to give themselves a larger ownership interest in SeeCubic than they had in Stream TV, and thus enrich themselves.

83.     In connection with the Omnibus Agreement, SLS, Hawk, and certain of Stream TV's equity investors (including Crawford, Miles, and Petch) also executed a secret Letter Agreement dated May 6, 2020.  (Ex. C).  The existence of this Letter Agreement was purposely hidden from the Rajans until it was discovered during litigation.

84.     The Omnibus Agreement incorporated the secret Letter Agreement, under which Stream TV was obligated to issue 48 million new shares of Stream TV Class A common stock to SLS, Hawk, and certain investors that could be immediately converted into shares of SeeCubic common stock.

85.     The first Whereas clause of Letter Agreement expressly conditions the Omnibus Agreement upon the additional terms of the Letter Agreement.

18

86.     Those 48 million shares are precisely numbered to shift majority voting control from the Rajans, whose voting control within Stream TV would decline to 49.9%.

87.     The Omnibus Agreement therefore not only transferred all of Stream TV's assets to SeeCubic and exchanged Stream TV's common shares for SeeCubic's common shares, but it also granted SeeCubic an option to take majority voting control of Stream TV whenever it likes.

88.     Specifically, the Letter Agreement contemplates that Hawk shall receive 40,000,000 shares of Stream TV's Class A common stock, which Hawk shall then be entitled to exchange for a pro rata portion of SeeCubic's common shares.

89.     The Letter Agreement also provides that SLS shall receive 4,000,000 shares of Stream TV's Class A common stock, which SLS would be able to exchange for a pro rata portion of SeeCubic's common shares.

90.     In addition, the Letter Agreement provides that the investors signing the Omnibus Agreement would receive (i) 4,000,000 shares of Stream TV's Class A common stock, and (ii) 2,000,000 warrants of Stream TV.  Each investor was entitled to exchange these shares for a pro rata portion of SeeCubic's common shares.

**F.      Defendants Use the Unlawful Omnibus Agreement To Seize Control of Stream TV and Its Assets**

91.     Following the Resolution Committee's approval of the Omnibus Agreement through Gola and Gollop, and the execution of the Omnibus Agreement on May 6, 2020, Defendants commenced their premeditated plan to take control of Stream TV and its assets, and to divert Stream TV's assets to SeeCubic, which is owned and controlled by Defendants. Defendants described their plan as a coup.

19

92.     Defendants began by sending a letter to Stream TV's shareholders informing them of the takeover.  However, Defendants were only able to procure a list of shareholders after Kabacinski bribed a current Stream TV employee with the promise of employment at SeeCubic.

93.     Defendants strong-armed Stream TV's investors into becoming investors of SeeCubic.  Stream TV's investors were presented with two options: (i) convert their ownership of Stream TV into ownership of SeeCubic, which would hold all of Stream TV's assets and intellectual property, or (ii) continue to own Stream TV, which would have no assets or intellectual property.

94.     Defendants went to great lengths to harass investors that backed the Rajans, including showing up at one investor's house unannounced and, upon finding out that the investor was not home, defaming the Rajans to the investor's wife.

95.     Upon information and belief, Defendants transferred all of Stream TV's assets and intellectual property to SeeCubic for their own gain.  For example, Defendants improperly caused the assignment of Stream TV's trademarks to SeeCubic.

96.     Beginning at least in September 2021, Defendants also caused the destruction of assets rightfully owned by Stream TV.  For example, in September 2021, Stastney instructed a contract partner in Hong Kong to destroy 500 specialty lenses used to calibrate certain asset machinery.

97.     Defendants' mismanagement of Stream TV and its assets has caused substantial damage to Stream TV.  For example, Defendants' unreasonable requests to Google caused it to pull out of a contract that had been negotiated before Defendants took control of Stream TV's assets.

20

98.     Upon information and belief, SeeCubic lacked any assets or capital until the Defendants transferred Stream TV's valuable assets to SeeCubic.

99.     Upon information and belief, Defendants used Stream TV's assets to raise capital in SeeCubic to enrich themselves.

100.    Stastney benefited from the improper theft of Stream TV's assets because he owns or controls shares of SeeCubic's stock and was named the Executive Chairman of the Board of SeeCubic.

101.    Morton benefited from the improper theft of Stream TV's assets because he owns or controls shares of SeeCubic's stock.

102.    Hawk benefited from the improper theft of Stream TV's assets because it owns or controls shares of SeeCubic's stock.

103.    Crawford benefited from the improper theft of Stream TV's assets because he owns or controls shares of SeeCubic's stock.

104.    Gola benefited from the improper theft of Stream TV's assets because he was offered a high paying position on SeeCubic's Board of Directors.

105.    Gollop benefited from the improper theft of Stream TV's assets because he was offered a high paying position on SeeCubic's Board of Directors.

106.    Kabacinski benefited from the improper theft of Stream TV's assets because he was offered a high paying position on SeeCubic's Board of Directors and was made CEO of SeeCubic.

107.    Upon information and belief, Miles benefited from the improper theft of Stream TV's assets because he received shares of SeeCubic's stock as part of the Omnibus Agreement.

108.    Upon information and belief, Petch benefited from the improper theft of Stream TV's assets because he received shares of SeeCubic's stock as part of the Omnibus Agreement.

ME1 41601090v.1

109.    Upon information and belief, John Does 1-75 benefited from the improper theft of Stream TV's assets because those individuals received shares of SeeCubic's stock as part of the Omnibus Agreement.

**G.    The Omnibus Agreement is Invalid Because Stream TV's Charter Bars Transfer of Stream TV's Assets Without the Approval of the Class B Shareholders**

110.    On June 15, 2022, the Delaware Supreme Court issued an opinion finding that the Omnibus Agreement was not valid because Stream TV's Class B Shareholders did not vote to approve it.

111.    Thus, the Supreme Court's ruling confirms that Gollop and Gola wrongfully caused Stream TV to enter into the Omnibus Agreement and that Defendants' appropriation of Stream TV's assets was unlawful.

### Count I—Conversion (All Defendants)

112.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, the allegations in the foregoing paragraphs.

113.    As described above, by orchestrating a plan to manufacture Stream TV's default on the notes, which then paved the way for the Omnibus Agreement, Defendants unlawfully used this scheme to appropriate Stream TV's assets through the Omnibus Agreement.

114.    Stream TV possesses, and has always possessed, a property interest in and right to possess its assets and intellectual property.

115.    Defendants wrongfully exercised dominion and control over Stream TV's assets by manufacturing a default event, improperly approving and causing the approval of the Omnibus Agreement, taking Stream TV's assets and giving them to SeeCubic, and, in some cases, disposing of certain assets as if they were Defendants' own assets.

116.    As a direct result of Defendants' conversion of Stream TV's assets, Stream TV has suffered damages in an amount to be determined at trial.

### Count II—Civil Conspiracy (All Defendants)

117.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, the allegations in the foregoing paragraphs.

118.    Defendants conspired together and knowingly participated in a scheme to wrongfully convert Stream TV's assets for their personal benefit.

119.    In furtherance of the conspiracy, Stastney, Morton, and Crawford offered Gola, Gollop, and Kabacinski lucrative jobs in exchange for approving and executing the Omnibus Agreement.  And, Miles, Petch, Hawk, and John Does 1-75 were incentivized to participate in and further the conspiracy because SeeCubic would obtain and control Stream TV's valuable assets from which SeeCubic's shareholders could profit, and all Defendants, including Miles, Petch, Hawk, and John Does 1-75, were given shares of SeeCubic.

120.    Once the Omnibus Agreement was signed, Defendants caused the transfer of Stream TV's assets to SeeCubic.  Defendants therefore unlawfully stole Stream TV's assets.

121.    The conspiracy benefited Defendants and harmed Stream TV in that Stream TV was wrongfully deprived of its valuable assets, some of which were destroyed, and Defendants benefited from their misconduct due to their ownership of stock in SeeCubic, which received Stream TV's valuable assets, and correspondingly increased SeeCubic's own value.

122.    Defendants acted together as a confederation and committed the unlawful acts described herein, which caused damage to Stream TV by forcing Stream TV into default and depriving Stream TV of its valuable assets.

## Count III—Unjust Enrichment (All Defendants)

123.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, the allegations in the foregoing paragraphs.

124.    Defendants have been enriched by their illegal takeover and control of Stream TV and its assets.

125.    Stream TV has been impoverished by Defendants' actions.

126.    There is a relationship between the enrichment and the impoverishment because Defendants were unjustly enriched by exerting control over Stream TV to force it into default, to manufacture a basis for the Omnibus Agreement, so that Defendants could unlawfully obtain Stream TV's valuable assets to the detriment of Stream TV.

127.    Defendants lack any justification in taking control over Stream TV and its assets.

## Count IV—Breach of Fiduciary Duty (Against Gola and Gollop)

128.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, the allegations in the foregoing paragraphs.

129.    As directors of Stream TV both before and after the Omnibus Agreement was executed, Gola and Gollop owed Stream TV the fiduciary duty of loyalty, which obligates them to act in good faith in the best interests of Stream TV.

130.    In approving the Omnibus Agreement, Gola and Gollop stood on both sides of the transaction because they stood to profit personally from it as they would become directors and stockholders of SeeCubic if the Omnibus Agreement succeeded.  Gola's and Gollop's decision to use the Omnibus Agreement to divert Stream TV's assets to SeeCubic, an entity they and other Defendants control, demonstrates a lack of good faith.

131.    As alleged herein, Gola and Gollop engaged in an opportunistic and disloyal scheme to profit personally by approving the Omnibus Agreement to allow Defendants, including

24

themselves, to steal from Stream TV. Further, they did so without seeking third-party legal advice

on a significant transaction affecting hundreds of shareholders and millions of dollars in assets.

132.    Gola and Gollop put their personal interests above the interests of Stream TV by

devising, structuring, and approving the Omnibus Agreement, which was designed to allow Gola

and Gollop, and the other Defendants to capitalize and profit from Stream TV's valuable assets.

This was a disloyal and bad faith act undertaken for no legitimate business purpose and in direct

contravention of Gola's and Gollop's fiduciary duties under Delaware law.

133.    Based on the foregoing, Gola and Gollop breached their fiduciary duties.

### Count V—Aiding and Abetting Breach of Fiduciary Duty (Against Stastney, Morton, Crawford, Miles, Petch, Hawk, and John Does 1-75)

134.    Plaintiff realleges and incorporates by reference, as though fully set forth herein,

the allegations in the foregoing paragraphs.

135.    Defendants Stastney, Morton, Crawford, Miles, Petch, Hawk, and John Does 1-75

aided and abetted breaches of fiduciary duty by Gola and Gollop.

136.    Upon information and belief, Defendants Stastney, Morton, Crawford, Miles, Petch,

Hawk, and John Does 1-75 knew that Gola and Gollop were on Stream TV's Board and that Gola

and Gollop owned fiduciary duties to Stream TV, and that signing the Omnibus Agreement would

breach Gola's and Gollop's fiduciary duties.

137.    Defendants Stastney, Morton, Crawford, Miles, Petch, Hawk, and John Does 1-75

acted with knowledge of Gola's and Gollop's breaches of fiduciary duty to Stream TV and actively

participated in those breaches of fiduciary duty by encouraging Gola and Gollop to enter into the

Omnibus Agreement, knowing that Gola and Gollop would receive compensation and stock in

SeeCubic in return for their actions (at least because Stastney, Crawford, and Morton had offered

Gola and Gollop these benefits).

138.    Defendants Stastney, Morton, Crawford, Miles, Petch, Hawk, and John Does 1-75 knowingly aided and abetted the Gola's and Gollop's wrongdoing alleged herein and rendered substantial assistance to them.

139.    As a result of this conduct, Stream TV has been harmed.

**Count VI—Tortious Interference With Prospective Economic Advantage (Against All Defendants)**

140.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, the allegations in the foregoing paragraphs.

141.    Plaintiff had an economic relationship with Alphabet and Google, with the probability of entering into an agreement for Plaintiff to provide technology to Alphabet and Google.

142.    Defendants were aware of Plaintiff's relationship with Alphabet and the anticipated business relationship that would result.  Defendants took intentional actions that were designed to interfere with and disrupt the Alphabet relationship, including manufacturing Stream TV's default and creating the Omnibus Agreement as a way to convert and appropriate Stream TV's assets.

143.    Defendants' interference was wrongful in that, among other things, it involved: (i) a breach of fiduciary duty by Gola and Gollop, (ii) conversion of Stream TV's assets, and (iii) conspiracy to steal and divert Stream TV's assets to SeeCubic.

144.    Defendants' interference with the Alphabet relationship disrupted Stream TV's relationship and opportunity with Alphabet, which has caused harm to Plaintiff because as a direct and proximate result of that interference, Plaintiff was unable to pursue a deal with Alphabet further.  Plaintiff has and will continue to suffer monetary damages in an amount to be determined at trial.

26

## Count VII—Civil RICO (Against All Defendants)

145.    Plaintiff realleges and incorporates by reference, as though fully set forth herein, the allegations in the foregoing paragraphs.

146.    As described above, Defendants directed the conduct of their enterprise to illegally take possession of Stream TV's assets and intellectual property.

147.    Defendants took over Stream TV through a pattern of bribery and threats of financial loss.

148.    Defendants' unlawful conversion of Stream TV's assets and intellectual property deprived Stream TV of its assets and intellectual property, causing injury to Stream TV.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully asks the Court to enter an order:

A.    Directing Defendants to return Stream TV's assets that they have in their possession, custody, or control that the Defendants removed from Stream TV.

B.    Awarding Stream TV damages for conversion, civil conspiracy, unjust enrichment, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, tortious interference with prospective economic advantage, and violations of the civil RICO statute, including treble damages, in an amount to be proved at trial.

C.    Awarding Stream TV its costs and expenses, including reasonable attorneys' fees and costs, incurred in this action;

D.    Awarding Stream TV pre- and post-judgment interest; and

E.    Granting such other and further relief that this Court deems just, proper and equitable.

27

Dated:  July 28, 2022

**McCARTER & ENGLISH, LLP**

*/s/ Brian R. Lemon*
Andrew S. Dupre (No. 4621)
Brian R. Lemon (No. 4730)
Stephanie Dallaire (No. 5184)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, Delaware 19801
Tel.: (302) 984-6300

*Attorneys for Plaintiff*

# EXHIBIT A

## OMNIBUS AGREEMENT

OMNIBUS AGREEMENT (this "Agreement"), dated as of May 6, 2020, by and among Stream TV Networks, Inc., a Delaware corporation (the "Company"), SLS Holdings VI, LLC, a Delaware limited liability company ("SLS"), Hawk Investment Holdings Limited, an entity registered in Guernsey ("Hawk"), and certain equity investors of the Company listed on Annex I attached hereto (each an "Investor" and collectively, the "Investors").

WHEREAS, certain of the Investors have brought claims against Mathu Rajan, an individual ("MR"), Raja Rajan, an individual ("RR"), Suby Joseph, an individual ("SJ" and together with MR and RR, the "Company Officers"), Mediatainment, Inc., a Delaware corporation ("Mediatainment"), and Akshaya Holding LLC, a Nevada limited liability company ("Akshaya") in an action filed with the Court of Chancery of the State of Delaware (the "Lawsuit");

WHEREAS, the Company and SLS have entered into that certain (i) 5% Senior Secured Note, dated April 8, 2011, in the principal amount of $3,000,000 ("SLS Note 1"); (ii) 5% Senior Secured Note, dated February 8, 2012, in the principal amount of $1,500,000 ("SLS Note 2"); (iii) 5% Senior Secured Note, dated May 1, 2012, in the principal amount of $500,000 ("SLS Note 3"); (iv) 5% Senior Secured Note, dated May 29, 2012, in the principal amount of $500,000 ("SLS Note 4"); and (v) 5% Senior Secured Note, dated July 5, 2012, in the principal amount of $500,000 ("SLS Note 5", together with SLS Note 1, SLS Note 2, SLS Note 3 and SLS Note 4, each as amended through the date hereof, the "SLS Notes"), and SLS has filed a foreclosure action in Delaware Chancery Court to enforce such rights (such lawsuit and any responses or counterclaims related thereto, the "Foreclosure Action");

WHEREAS, the Company and Hawk have entered into that certain (i) Promissory Note, dated March 26, 2014, in the principal amount of £6,000,000 ("Hawk Note 1"); (ii) Promissory Note, dated October 15, 2014, in the principal amount of £3,000,000 ("Hawk Note 2"); (iii) Promissory Note, dated January 2, 2015, in the principal amount of $8,000,000 ("Hawk Note 3"); (iv) Promissory Note, dated August 6, 2015, in the principal amount of $8,000,000 ("Hawk Note 4"); (v) Promissory Note, dated October 12, 2015, in the principal amount of $5,000,000 ("Hawk Note 5"); (vi) Promissory Note, dated February 15, 2016, in the principal amount of £3,000,000 ("Hawk Note 6"); (vii) Promissory Note, dated July 8, 2016, in the principal amount of £3,500,000 ("Hawk Note 7"); (viii) Promissory Note, dated September 27, 2016, in the principal amount of £2,500,000 ("Hawk Note 8"); (ix) Promissory Note, dated May 3, 2017, in the principal amount of £650,000 ("Hawk Note 9"); (x) Promissory Note, dated December 11, 2017, in the principal amount of £3,500,000 ("Hawk Note 10"); (xi) Promissory Note, dated June 26, 2018, in the principal amount of £600,000 ("Hawk Note 11"); (xii) Promissory Note, dated December 6, 2018, in the principal amount of £1,250,000 ("Hawk Note 12"); (xiii) Promissory Note, dated July 2, 2019, in the principal amount of £3,000,000 ("Hawk Note 13"); (xiv) Promissory Note, dated September 18, 2019, in the principal amount of $770,000 ("Hawk Note 14"); (xv) Promissory Note, dated October 3, 2019, in the principal amount of £2,000,000 ("Hawk

Note 15"); (xvi) Promissory Note, dated January 16, 2020, in the principal amount of £600,000 ("Hawk Note 16"); (xvii) Promissory Note, dated February 26, 2020, in the principal amount of $183,601.19 ("Hawk Note 17a"); (xviii) Promissory Note, dated February 26, 2020, in the principal amount of $382,757.14 ("Hawk Note 17b", together with Hawk Note 1, Hawk Note 2, Hawk Note 3, Hawk Note 4, Hawk Note 5, Hawk Note 6, Hawk Note 7, Hawk Note 8, Hawk Note 9, Hawk Note 10, Hawk Note 11, Hawk Note 12, Hawk Note 13, Hawk Note 14, Hawk Note 15, Hawk Note 16, Hawk Note 17a and any other indebtedness of the Company in favor of Hawk, each as amended through the date hereof, the "Hawk Notes", and together with the SLS Notes, the "Notes");

WHEREAS, each of the SLS Notes and each of the Hawk Notes have matured or are in default and immediately due and payable, and the Company is obligated to pay to the holders of the respective notes, the amounts due thereunder (including, without limitation, principal and accrued and unpaid interest thereon) (such amounts, with respect to any such note, the "Applicable Obligations") without the giving of notice or demand by the applicable holder;

WHEREAS, the Company is unable to satisfy and pay the Applicable Obligations as required;

WHEREAS, each of SLS and Hawk has notified the Company that (i) the Applicable Obligations are immediately due and payable, an Event of Default has occurred and is continuing and the default rates of interest and late fees, as applicable, provided thereunder, are in effect and (ii) each of SLS and Hawk intend to exercise all rights and remedies available to them under the SLS Notes and Hawk Notes, and under the Amended and Restated Security Agreement, dated as of February 8, 2012, by and between the Company and SLS (the "SLS Security Agreement") and each Security Agreement and Pledge Agreement, relating to Hawk Notes 1 through 12, entered into by and between the Company and Hawk (the "Hawk Security Agreements", together with the SLS Security Agreement, the "Security Agreements"), as applicable, including foreclosure on all assets of the Company (the "Foreclosure");

WHEREAS, SLS and Hawk have each agreed to stay the Foreclosure and satisfy and extinguish each of the SLS Notes and the Hawk Notes in their entirety subject to the Company assigning all right, title and interest in and to all assets of the Company to a newly-formed holding company ("Newco") established by SLS and Hawk, in satisfaction of the SLS Notes and the Hawk Notes;

WHEREAS, subject to the performance by the Company of its obligations hereunder, the Investors have agreed to forebear from asserting any claims against the Company related to the Lawsuit; and

WHEREAS, the parties desire to memorialize in this Agreement the terms and conditions of certain other actions to be performed by the parties, and this Agreement shall govern the respective rights and obligations of the parties in connection with such actions.

2

CONFIDENTIAL

## ARTICLE I

## THE TRANSACTIONS

1.1    <u>Transactions</u>.  Subject to the terms and conditions set forth herein, and on the basis of and in reliance upon the representations, warranties, covenants and agreements set forth herein, the parties hereto shall promptly take the actions described in this <u>Section 1.1</u> (each, a "<u>Transaction</u>" and, collectively, the "<u>Transactions</u>"):

(a)    Each of SLS and Hawk shall agree to stay the Foreclosure and satisfy and extinguish, in their entirety, the SLS Notes and the Hawk Notes, respectively (collectively, the "<u>Discharged Indebtedness</u>"), upon the Company's immediate conveyance, transfer, delivery and assignment, of all right, title and interest of the Company in, to or under all of the rights, properties and assets of the Company (including those of any direct or indirect subsidiary of the Company) of every kind and description, wherever located, real, personal, or mixed, tangible or intangible, to the extent owned, leased, licensed, used or held for use in or relating to the business, as the same shall exist on the date hereof, to Newco, including, but not limited to, all right, title and interest of the Company (or any direct or indirect subsidiary of the Company) in, to and under the assets listed or described below (the "<u>Transferred Assets</u>"):

(i)    all accounts receivable (whether current or noncurrent) outstanding as the date hereof;

(ii)    all intercompany accounts receivables as to which any subsidiary is an obligor or is otherwise responsible or liable and which are owed or payable to the Company;

(iii)    all credits, claims for refunds and prepaid expenses and other prepaid items;

(iv)    the contracts listed, described or otherwise identified on <u>Schedule 2.5</u> for transfer to Newco as such schedule may be amended from time to time and the rights thereunder;

(v)    all raw materials, work-in process, prototypes, finished goods, supplies, components, packaging materials, and other inventories to which the Company or any of its subsidiaries have title that are in the possession of the Company or any of its subsidiaries or any third party and used or held for use in connection with the business, including, but not limited to, those items set forth on <u>Schedule 2.9</u>;

(vi)    all machinery, equipment, apparatus, appliances, computers and computer-related hardware, network and internet and information technology systems-related equipment and all other tangible personal property used or held for use in conduct of the business, including, but not limited to, those items set forth on <u>Schedule 2.8</u>;

3

(vii)    all equity, voting and economic interest in each subsidiary of the Company;

(viii)    all intellectual property (including, but not limited to, patents, trademarks, trade secrets, copyrights, internet domain names and all applications for, and registrations of, any of the foregoing) and all of the rights of the Company or any of its subsidiaries therein, including all rights to sue for and recover and retain damages for present and past infringement thereof, and, in the case of any trademarks, all goodwill appurtenant thereto, including, but not limited to, those items set forth on Schedule 2.10;

(ix)    all rights under non-disclosure or confidentiality, invention and intellectual property assignment covenants executed for the benefit of the Company or any of its subsidiaries with current or former employees, consultants or contractors of the Company, its subsidiaries or with third parties;

(x)    all books and records of the Company and its subsidiaries;

(xi)    to the extent transferable, all permits required for the operation of the business and all pending applications therefor;

(xii)    to the extent transferable, all insurance policies and rights thereunder;

(xiii)    all goodwill associated with the business and the Transferred Assets;

(xiv)    all rights, claims, rebates refunds, causes of action, actions, suits or proceedings, hearings, audits, rights of recovery, rights of setoff, rights of recoupment, rights of reimbursement, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any person, including all warranties, representations, guarantees, indemnities and other contractual claims (express, implied or otherwise) to the extent related to the business or the assets of the Company or any of its subsidiaries (including any claims for past infringement or misappropriation); and

(xv)    any and all insurance proceeds, condemnation awards or other compensation in respect of loss or damage to any of the assets to the extent occurring on or after the date hereof, and all rights and claims of the Company or any of its subsidiaries to any such insurance proceeds, condemnation awards or other compensation not paid by the date hereof.

4

(b)     Newco shall assume and agree to pay, perform, fulfill and discharge solely those liabilities and obligations of the Company, in each case, to the extent expressly set forth on Schedule 1.1(b), to be provided as promptly as practicable hereafter (the "Assumed Liabilities").

(c)     SLS and Hawk shall form Newco in accordance with the applicable laws of its jurisdiction of formation. Newco shall issue promissory notes and shares to SLS and to Hawk as decided between them. The holders of such promissory notes shall jointly determine the size and composition of the initial Board of Directors of Newco, and shall name the initial executive officers of Newco.

(d)     Each holder of shares of Class A Common Stock of the Company (as defined in the Third Amended and Restated Certificate of Incorporation of the Company, dated as of December 17, 2018 (the "Existing Charter"), other than the Company Officers, Mediatainment, Akshaya or their respective affiliates, shall be entitled to exchange their respective shares of Class A Common Stock of the Company for an identical number of the common shares of Newco for no cost, and otherwise on such terms and conditions as will be decided by Newco.

(e)     Each holder of shares of common stock of Mediatainment, other than the Company Officers, Akshaya or their respective affiliates (as such are defined jointly by SLS and Hawk, the "Redeemed Mediatainment Holders"), shall have their respective shares of Mediatainment redeemed by Mediatainment in exchange for their pro rata portion of the shares of Class A Common Stock of the Company held by Mediatainment (the "Redemption"). Immediately following the Redemption, the Redeemed Mediatainment Holders shall be entitled to exchange their respective shares of Class A Common Stock of the Company for an identical number of the common shares of Newco for no cost, and otherwise on such terms and conditions as will be decided by Newco.

(f)     The Company shall be entitled to receive 1,000,000 shares of Class A Common Stock of Newco in respect of any residual interest it may have in the transferred assets (the "Company Issuance"), on the terms and conditions as set forth on Annex II.

(g)     Each holder of shares of Class A Common Stock of the Company that elects to exchange his, her or its respective shares of Class A Common Stock of the Company for a pro rata portion of the common shares or equity of Newco pursuant to Sections 1.1(d), (e), and (f) hereof, shall, in addition to those terms and conditions set by Newco and as a condition to such transfer, irrevocably, unconditionally, and fully release the Company, SLS, Hawk, the Investors and each of their respective affiliates, and shareholders, officers and directors, from any and all, actual or potential, charges, complaints, claims, counterclaims, duties, actions, causes of action in law or in equity, suits, liens, liabilities, debts due, sums of money, demands, obligations, accountings, damages, punitive damages, losses, costs or expenses, attorneys' fees or any nature whatsoever and liabilities of any kind or nature whatsoever, known or unknown, suspected or unsuspected, whether arising under state, federal or other law, or based on

5

common law, statutory law, regulations or otherwise, that such holders of shares of Class A Common Stock of the Company at any time had or claimed to have in respect of their investment in the Company.

(h)    The Company and the Board shall promptly take all action necessary to change the name of the Company to exclude any reference to "Stream TV", "Ultra D" or any similar service or technology.

1.2    Dismissal of Lawsuit and Foreclosure Action.  In consideration of the Transactions contemplated by Section 1.1 of this Agreement and such other agreements as made be made among the parties hereto and upon consummation thereof, (i) the Investors hereby irrevocably agree to forbear from including any claims against the Company or any of the Transferred Assets as part of the Lawsuit, and (ii) each of the SLS and the Company agree to dismiss their applicable claims or responses in the Foreclosure Action.

1.3    Employees.  Effective as of the date of the assignment of the Transferred Assets to Newco, (a) each employee of the Company set forth on Annex II hereto or subsequently identified to the Company in writing shall be released from all of his or her employment obligations to the Company, so that he or she may commence employment with Newco or its subsidiaries, and (b) without limiting the foregoing, the Company shall waive any restrictive covenants between the Company and any such employee solely to the extent such waiver allows such employee to be employed by Newco or its subsidiaries and not be subject to such covenants in connection with his or services to Newco or its subsidiaries.

1.4    Consent to Transactions.  Subject to the last sentence of this Section 1.4, each of the parties hereto, and their respective directors, officers, employees and representatives, shall use best efforts to (i) execute and deliver such other instruments of conveyance, transfer or assumption, as the case may be, and take such other action as may be reasonably requested to implement more effectively the conveyance and transfer of the Transferred Assets to Newco and (ii) effect, or cause to be effected, to the extent within its control, each of the Transactions.  In furtherance of the foregoing, each of the Company and its subsidiaries hereby grants to Shad Stastney an irrevocable power of attorney to take all action necessary or advisable to effect the delivery, conveyance, transfer and assignment to Newco of the Transferred Assets.  If, following the date hereof, the Company receives or becomes aware that it holds any asset, property or right which constitutes a Transferred Asset, then the Company shall transfer such asset, property or right to Newco and/or, as applicable, one or more designees of Newco as promptly as practicable for no additional consideration.  In furtherance and without limitation of the foregoing, the Company shall use its best efforts and shall take all action necessary to solicit and obtain any approvals, consents, or waivers that may be necessary or appropriate in order to effect the Transactions contemplated hereby.  Each of SLS, Hawk and the Investors hereby irrevocably agrees to execute any written consent and to vote, and to cause their respective affiliates to execute any written consent and to vote, in each case to the extent necessary or requested by the Company or the Investors, all of the

6

CONFIDENTIAL

SEECUBIC-00000011

shares of capital stock of the Company over which each has voting control in favor of the Transactions contemplated hereby.

## ARTICLE II

### REPRESENTATIONS AND WARRANTIES

2.1     <u>Representations and Warranties</u>.  Each party hereto hereby represents and warrants to all of the other parties hereto as follows:

(a)     The execution, delivery and performance by such party of this Agreement and of the other documents contemplated hereby, to the extent a party thereto, has been duly authorized by all necessary action (subject to receipt by the Company of all of the applicable approvals).  If such party is not an individual, such party is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization or incorporation.

(b)     Such party has the requisite power, authority, legal right and, if such party is an individual, legal capacity, to execute and deliver this Agreement and each of the other documents contemplated hereby, to the extent a party thereto, and to consummate the transactions contemplated hereby and thereby, as the case may be.

(c)     This Agreement and each of the other documents contemplated hereby, to the extent a party thereto, has been duly executed and delivered by such party and constitutes the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and (ii) general equitable principles (whether considered in a proceeding in equity or at law).

(d)     Neither the execution, delivery and performance by such party of this Agreement and the other documents contemplated hereby, to the extent a party thereto, nor the consummation by such party of the transactions contemplated hereby, nor compliance by such party with the terms and provisions hereof, will, directly or indirectly (with or without notice or lapse of time or both), (i) if such party is not an individual, contravene or conflict with, or result in a breach or termination of, or constitute a default under (or with notice or lapse of time or both, result in the breach or termination of or constitute a default under) the organizational documents of such party, (ii) constitute a violation by such party of any existing requirement of law applicable to such party or any of its properties, rights or assets or (iii) require the consent or approval of any person or entity, except, in the case of clauses (ii) and (iii), as would not reasonably be expected to be material to the ability of such party to consummate the transactions contemplated by this Agreement.

2.2     Except for the Lawsuit, the Investors represent and warrant to the Company that the Investors have not filed and will not file any complaints, claims, or

7

actions against the Company or any Released Party (as defined in <u>Section **Error! Reference source not found.**</u> below) with any state, federal, or local agency or court.

        2.3    Except for the Foreclosure Action, each of SLS, the Company and Hawk represent and warrant to each other party hereto that it has not filed and will not file any complaints, claims, or actions against such other party or any Released Party (as defined in <u>Section **Error! Reference source not found.**</u> below) with any state, federal, or local agency or court.

        2.4    The Company represents and warrant to the Investors that it has not filed and will not file any complaints, claims, or actions against the Investors or any Released Party (as defined in <u>Section 3.1</u> below) with any state, federal, or local agency or court. The Company covenants and agrees that it shall not file any complaints, claims, or actions against the Investors or any Released Party with respect to a claim released pursuant to <u>Section 3.1</u> below at any time hereafter.

        2.5    The Company represents and warrants  that <u>Schedule 2.5</u> of this Agreement sets forth a true, complete and correct capitalization table of the Company including (a) the number and class of shares of capital stock or other equity interests (including, all warrants, options, convertible securities or other similar interests) that are (i) authorized and (ii) issued and outstanding, (b) the class and number of such equity interests held by each record holder thereof, and (c) the identity of each record holder thereof.  Except as set forth in <u>Schedule 2.5</u>, there are not issued, reserved for issuance or outstanding, and there are not any outstanding obligations of the Company to issue, deliver or sell, or cause to be issued, delivered or sold, (x) any capital stock or any securities of the Company convertible into or exchangeable or exercisable for shares of capital stock or voting securities of, or other equity interests in, the Company, (y) any warrants, calls, options, phantom stock, stock appreciation rights or other rights to acquire from the Company, or any other obligation of the Company to issue, deliver or sell, or cause to be issued, delivered or sold, any capital stock or voting securities of, or other equity interests in, the Company or (z) any rights issued by, or other obligations of, the Company that are linked in any way to the price of any class of Company capital stock, the value of the Company or any part of the Company or any dividends or other distributions declared or paid on any shares of capital stock of the Company.

        2.6    The Company represents and warrants to the Investors, SLS and Hawk that true, complete and correct copies of all contracts material to the business of the Company or any of its subsidiaries or their respective assets, liabilities, operations or prospects, including all amendments, modifications, and supplements thereto have been made available to the Investors, SLS and  Hawk as are listed on <u>Schedule 2.6</u> hereto. Each such material contract is valid, binding, enforceable and in full force and effect in all material respects in accordance with its terms with respect to the Company, and to the knowledge of the Company, each other party to such material contracts.

        2.7    The Company represents and warrants to the Investors that <u>Schedule 2.7</u> of this Agreement sets forth a true, complete and correct list of (i) all of the

8

SEECUBIC-00000013

creditors of the Company or any of its subsidiaries and (ii) the outstanding obligations owed to each such creditor.

      2.8    The Company represents and warrants to the Investors that Schedule 2.8 of this Agreement sets forth the addresses of all of the real property owned, leased (as lessor or lessee), subleased (as sublessor or sublessee), licensed (as licensor or licensee) by the Company or any of its subsidiaries and a true, complete and correct list of all of the leases relating thereto (including all amendments and modifications thereof) as in effect on the date hereof.

      2.9    The Company represents and warrants to the Investors that Schedule 2.9 of this Agreement sets forth a true, complete and correct list of all of the machinery, equipment, apparatus, appliances, computers and computer-related hardware, network and internet and information technology systems-related equipment and all other tangible personal property owned or leased by the Company or any of its subsidiaries.

      2.10    The Company represents and warrants to the Investors that Schedule 2.10 of this Agreement sets forth a true, complete and correct list of all of the raw materials, work-in process, prototypes, finished goods, supplies, components, packaging materials, and other inventories to which the Company or any of its subsidiaries have title that are in the possession of the Company or any of its subsidiaries or any third party and used or held for use in connection with the business.

      2.11    The Company represents and warrants to the Investors that Schedule 2.11 of this Agreement sets forth a true, complete and correct list of all of the intellectual property (including, but not limited to, patents, trademarks, trade secrets, copyrights, internet domain names and all applications for, and registrations of, any of the foregoing) of the Company or any of its subsidiaries.

## ARTICLE III

## RELEASE OF CLAIMS

      3.1    Company Release of Claims. In consideration for the promises and obligations set forth in this Agreement, and subject to the consummation of the Transactions contemplated by Section 1.1 of this Agreement, the Company and each of its subsidiaries (the "Releasing Parties"), on behalf of themselves and the Released Parties, hereby irrevocably, unconditionally and fully release the Investors, SLS, Hawk and each of their respective heirs, family, and affiliates, and all trusts established by the Investors and the trustees thereof, whether or not such individuals are acting as trustees as of the date hereof, and each of their respective agents, trustees, trust beneficiaries, employees, officers, directors, attorneys, executors, successors, assigns and administrators (the "Released Parties"), from any and all, actual or potential, charges, complaints, claims, counterclaims, actions, causes of action in law or in equity, suits, liens, liabilities, debts due, sums of money, demands, obligations, accountings, damages, punitive damages, losses, costs or expenses, attorneys' fees of any nature whatsoever and liabilities of any kind or nature whatsoever, known or unknown, suspected or

9

unsuspected, whether arising under state, federal or other law, or based on common law, statutory law, regulations or otherwise (hereinafter referred to as "claim" or "claims"), that the Releasing Parties or any Released Party at any time had or claimed to have or that the Releasing Parties or any Released Party may have or claim to have regarding any matter from the beginning of time up to and including the date of this Agreement and any matter related to the Lawsuit.

      3.2    No Admission of Liability.

      (a)    *No Admission of Liability by the Releasing Parties or any Released Party.* This Agreement and compliance with this Agreement shall not be construed as an admission by the Releasing Parties or any Released Party of any liability whatsoever, or as an admission by the Releasing Parties or any Released Party of any violations of the rights of the Investors or any person or violation of any order, law, statute, duty, or contract whatsoever against the Investor or any person.

      (b)    *No Admission of Liability by the SLS, Hawk or the Investors.* This Agreement and compliance with this Agreement shall not be construed as an admission by the Investors or any Investor Released Party of any liability whatsoever, or as an admission by the Investors or any Investor Released Party of any violations of the rights of the Releasing Parties or any person or violation of any order, law, statute, duty, or contract whatsoever against the Releasing Parties or any person.

      3.2    Communication with Government Agency. Nothing in this Agreement in any way interferes with an Investor's or the Company's right and responsibility to give truthful testimony under oath.  The releases set forth in this Article III are effective except to the extent prohibited by law.

## ARTICLE IV

## INDEMNIFICATION

      4.1    Indemnification.  From and after the date hereof, except for the Assumed Liabilities, the Company shall indemnify (on a full indemnity basis), defend and hold harmless SLS, Hawk, the Investors, Newco and each of their affiliates, and each such party's directors, officers, managers, employees, stockholders, representatives, successors and assigns (each, an "Indemnified Party") from and against any and all losses, liabilities, expenses, costs, claims, suits, actions, penalties, judgments, fines and damages resulting from, imposed upon or suffered by any Newco Indemnified Party, arising out of or related to:

      (a)    any claims against or liabilities or obligations of the Company or its affiliates and subsidiaries not explicitly assumed hereunder;

      (b)    any claims, liabilities or obligations arising out of the Transferred Assets not explicitly assumed hereunder; and

10

SEECUBIC-00000015

(c)    any claims, liabilities or obligations brought against the Company, its affiliates and subsidiaries or any Indemnified Party by any equity investor or creditor of the Company and its affiliates and subsidiaries.

### ARTICLE V

### MISCELLANEOUS

5.1    <u>Amendments and Waivers</u>. This Agreement may be modified, amended or waived only with the written approval of each of the parties hereto. The failure of any party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such party thereafter or any other party hereto to enforce each and every provision of this Agreement in accordance with its terms.

5.2    <u>Successors and Assigns</u>. This Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns. No rights or obligations under this Agreement may be assigned by any party hereto without the prior written consent of each other party hereto.

5.3    <u>Notices</u>. All notices, requests and other communications to any party hereunder shall be in writing (including electronic mail ("e-mail") transmission, so long as a receipt of such e-mail is requested and not received by automated response or notice is given on the next business day by alternative means permitted by this Section 5.3). All such notices, requests, and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. on a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed to have been received on the next succeeding business day in the place of receipt. All such notices, requests and other communications to any party hereunder shall be given to such party as follows:

If to the Company and the Company Officers:

Stream TV Networks, Inc.
2009 Chestnut Street
Philadelphia, Pennsylvania 19103
Attention: Raja Rajan
Email: raja@streamtvnetworks.com

with a copy (which shall not constitute notice) by email to:

[●]

If to the Investors:

Alastair Crawford

11

    SEECUBIC-00000016

c/o Adams & Remers LLP
55-58 Pall Mall
London, United Kingdom SW1Y 5JH
Attention: Alastair Crawford
Email: alastair.crawford@gmail.com

with a copy (which shall not constitute notice) by email to:

Skadden, Arps, Slate, Meagher & Flom LLP
920 North King Street
Wilmington, Delaware 19801
Attention: Faiz Ahmad
Email: faiz.ahmad@skadden.com

If to SLS:

SLS Holdings VI, LLC
392 Taylor Mills Road
Marlboro, New Jersey 07746
Attention: Shad Stastney
Email: slstastney@hotmail.com

with a copy (which shall not constitute notice) by email to:

Quarles & Brady
411 E. Wisconsin Avenue, Suite 2400
Milwaukee, Wisconsin 53202-4426
Attention: Jonathan Hackbarth, Esq.
Email: jon.hackbarth@quarles.com

If to Hawk:

Hawk Investment Holdings Limited
Newport House
15 The Grange
St. Peter Port, Guernsey GY1 2QL, Channel Islands
Attention: [●]
Email:a.holt@albanytrustee.com; r.maunder@albanytrustee.com

with a copy (which shall not constitute notice) by email to:

First Sentinel
Attention: Colin Maltby
Email: colin@first-sentinel.com

12

SEECUBIC-00000017

5.4    Entire Agreement. Except as otherwise expressly set forth herein, this Agreement, together with the other documents contemplated hereby, embodies the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements, or representations by or among the parties, written or oral, that may have related to the subject matter hereof in any way. Each party acknowledges that it is not entering into this Agreement on the basis of or in reliance upon any promise, representation, or warranty other than as explicitly contained in this Agreement. This Agreement shall be valid, binding and enforceable among the parties that have executed this Agreement as between such parties, notwithstanding the failure of any other person expected to be a party to this Agreement to so execute.

5.5    No Third Party Beneficiary. Nothing in this Agreement shall confer any rights, remedies or claims upon any creditors of a party hereto or any other natural person, corporation, company, partnership, association, limited liability company, limited partnership, limited liability partnership, joint venture, business enterprise, trust, or other legal entity not a party or a permitted assignee of a party to this Agreement.

5.6    Governing Law; Jurisdiction; Enforceability. This Agreement shall be governed in all respects by the laws of the State of Delaware, without regard to the conflicts of law rules of such State that would result in the application of the laws of any other State. Each party hereby agrees and consents to be subject to the exclusive jurisdiction of the Court of Chancery of the State of Delaware or, if the Court of Chancery lacks subject matter jurisdiction, any court of the State of Delaware situated in New Castle County or the United States District Court for the District of Delaware in any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby. Each of the parties irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of or in connection with this Agreement in the Court of Chancery of the State of Delaware or, if the Court of Chancery lacks subject matter jurisdiction, any court of the State of Delaware situated in New Castle County or the United States District Court for the District of Delaware and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit, or proceeding brought in any such court has been brought in an inconvenient forum, and agrees not to raise any other objection to venue in any such court. It is agreed and understood that monetary damages would not adequately compensate an injured party for the breach of this Agreement, that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order. Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

5.7    WAIVER OF JURY TRIAL. FOR THE AVOIDANCE OF DOUBT, EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13

CONFIDENTIAL

SEECUBIC-00000018

5.8     Counterparts; Facsimile Signatures.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.  This Agreement may be executed by facsimile, e-mail or .pdf format signature(s).

5.9     Other Definitional and Interpretative Provisions.  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Sections and Exhibits are to Sections and Exhibits of this Agreement unless otherwise specified.  All Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit but not otherwise defined therein shall have the meaning as defined in this Agreement.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes", or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  "Writing", "written", and comparable terms refer to printing, typing, and other means of reproducing words (including electronic media) in a visible form. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder.  References to any agreement or contract are to that agreement or contract as amended, modified, or supplemented from time to time in accordance with the terms hereof and thereof. References to any person or entity include the successors and permitted assigns of that person or entity.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.  This Agreement is being entered into between sophisticated parties, each of which or whom has reviewed the Agreement, had the opportunity to discuss it with its, his or her counsel, and is fully knowledgeable about its terms and conditions. The parties therefore agree that this Agreement shall be construed without regard to the authorship of the language and without any presumption or rule of construction in favor of any of them.

5.10    Expenses.  Each party shall bear its own expenses in connection with the Transactions contemplated by this Agreement, including costs of their respective attorneys, accountants, investment bankers, brokers, and other representatives.

5.11    Non-Disparagement.  In consideration of the transactions contemplated hereunder, each party hereto agrees that, as long as the other parties comply with each of their respective obligations under this Agreement, such party shall not, directly or indirectly, (i) make any public statement concerning the circumstances resulting in the execution of this Agreement or (ii) make comments which are intended to disparage any other party hereto.

5.12    Confidentiality.  All information contained herein or related to the contents of this Agreement, including the terms and existence of this Agreement, is

14

CONFIDENTIAL                                                                                           SEECUBIC-00000019

confidential, and shall not be disclosed to anyone including to any stockholder or investor of the Company not a party hereto, other than the parties hereto and their legal or financial advisors who (a) need to know the information to evaluate the Transactions or perform their respective obligations hereunder and (b) are bound to keep such information confidential, unless disclosure is expressly required in order to comply with, law, regulatory authority or judicial, legal or regulatory process, or in order to enforce a party's rights hereunder, in which case the other parties shall be notified in advance to the extent practicable and permitted by law.

[Signature Page to Follow.]

15

IN WITNESS WHEREOF, the parties hereto have executed this Omnibus
Agreement as of the date first above written.

**STREAM TV NETWORKS, INC.**

By:

Name: Asaf Gola
Title: Authorized Signatory

By: _____

Name:
Title:

**SLS HOLDINGS VI, LLC**

By:

Name: Shad L. Stastney
Title: Managing Member

**HAWK INVESTMENT HOLDINGS
LIMITED**

By: _____

Name:
Title:

[Signature Page to the Omnibus Agreement]

CONFIDENTIAL                                                                                                   SEECUBIC-00000021

IN WITNESS WHEREOF, the parties hereto have executed this Omnibus Agreement as of the date first above written.

STREAM TV NETWORKS, INC.

By: _____
　　Name: _____
　　Title: _____

By: _____
　　Name: KEVIN JOHN GOLLOP
　　Title: AUTHORIZED SIGNATORY

SLS HOLDINGS VI, LLC

By: _____
　　Name: _____
　　Title: _____

HAWK INVESTMENT HOLDINGS LIMITED

By: _____
　　Name: _____
　　Title: _____

SEECUBIC-00000022

IN WITNESS WHEREOF, the parties hereto have executed this Omnibus Agreement as of the date first above written.

STREAM TV NETWORKS, INC.

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**SLS HOLDINGS VI, LLC**

By: _____
    Name:
    Title:

**HAWK INVESTMENT HOLDINGS LIMITED**

By: _____
    Name: EMMA MCINTOSH & LEE MCALOON,
    Title: AUTHORISED SIGNATORIES FOR
    ALBANY DIRECTORS LIMITED AS SOLE
    DIRECTOR OF HAWK INVESTMENT
    HOLDINGS LIMITED

[Signature Page to the Omnibus Agreement]

SEECUBIC-00000023

Signed for and behalf of the Investors
listed in Annex I

_____

Alastair Crawford

_____

Robert Petch

_____

Patrick Miles

[Signature Page to the Omnibus Agreement]

## ANNEX I

### INVESTORS

Adam Bidwell
Adrian Conrad Holmes
Alan Wood
Alastair Duncan Hadfield Crawford
Amlin Investments Ltd.
Andrew Charles Finnemore Capon
Andrew Mark Slinger
Anthony Wigram
Batten Trustee Ltd. As Trustee of the Arrow Trust
Broughton Ltd.
Charles J. Caminada
Charles William David Birchall
David Taylor
DEAR SPA
Keith Owen Claude Merrick
Eamonn Manson
Edward Napier Tremayne Miles
Framse Holding GmbH
Guy Henry Toller
Reyker Nominees Limited
Hadron Master Fund
Hallfield Holdings SA
Hanson Holdings Lux S.a.r.l.
Guy H.A. Chisenhale-Marsh
Jacopo Franzan
Keith Gordon Marsden
Keith Young
Lapis Ventures SAC Limited
Leman Management Nominees Limited
Leonardo Zampatti
Londer Securities S.A.
Mark Andrew Vully De Candole
Mark Dyer
Joel Pace Kallan
Michael Haggiag Family Trust u/a dtd 1/6/2014
Hugh Rokeby Holland
Nicholas P Wentworth-Stanley
Oliroma Holdings SRL
Patrick Miles
Pepper Grove Holdings Limited
Kathryn Toller
Pershing Nominees Ltd. a/c CCCLT

[Exhibit A]

864366-WILSR01A - MSW

Puddles 2 Limited
Richard F.B. Milligan-Manby
Rupert Corfield
S F Booth
Tarlton Parsons
Timothy D.K. Simond
Tracy Anne Pernice
Victoria Alice Slinger
Walmer Capital Limited
Windsor International Corporation

[Exhibit A]

CONFIDENTIAL                                    SEECUBIC-00000026

## ANNEX II

## RELEASED EMPLOYEES

To be provided

[Exhibit A]

SEECUBIC-00000027

# EXHIBIT B



# Delaware

Page 1

## The First State

    *I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF*

*DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT*

*COPY OF THE RESTATED CERTIFICATE OF "STREAM TV NETWORKS, INC.",*

*FILED IN THIS OFFICE ON THE SEVENTEENTH DAY OF DECEMBER, A.D.*

*2018, AT 11:27 O`CLOCK A.M.*

    *A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE*

*NEW CASTLE COUNTY RECORDER OF DEEDS.*



Jeffrey W. Bullock, Secretary of State

4747282  8100
SR# 20188181729

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 204113537
Date: 12-17-18

STREAM PI 0059
CONFIDENTIAL

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:27 AM 12/17/2018
FILED 11:27 AM 12/17/2018
SR 20188181729 - File Number 4747282

**THIRD AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
STREAM TV NETWORKS, INC.**

(Pursuant to Sections 242 and 245 of the
General Corporation Law of the State of Delaware)

Mathu Rajan, on behalf of Stream TV Networks, Inc., a corporation organized and existing under the laws of the State of Delaware (the "*Company*"), does hereby certify that:

**ONE:**        He is the duly elected and acting President of the Company.

**TWO:**        The date of filing the original Certificate of Incorporation of the Company with the Secretary of State of the State of Delaware was October 28, 2009. The original Certificate of Incorporation of the Company was amended and restated pursuant to the filing with the Secretary of State of the State of Delaware of an Amended and Restated Certificate of Incorporation on July 19, 2012 (the "*First Restated Certificate of Incorporation*"). The First Restated Certificate of Incorporation was further amended and restated pursuant to the filing with the Secretary of State of the State of Delaware of a Second Amended and Restated Certificate of Incorporation on November 8, 2013 (the "*Second Restated Certificate of Incorporation*").

**THREE:**        The Third Amended and Restated Certificate of Incorporation of this Company attached hereto as Exhibit A, which is incorporated herein by this reference, and which restates, integrates and further amends the provisions of the Certificate of Incorporation of this Company as heretofore amended and/or restated, including, without limitation, the Second Restated Certificate of Incorporation, has been duly adopted by the Company's Board of Directors and by the stockholders of the Company in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware, with the approval of the Company's stockholders having been given by written consent without a meeting in accordance with Section 228 of the General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, this Company has caused this Third Amended and Restated Certificate of Incorporation to be signed by its duly authorized officer and the foregoing facts stated herein are true and correct.

Dated:   December 17, 2018                STREAM TV NETWORKS, INC.


                                                     By: /S/ Mathu Rajan_____
                                                     Name: Mathu Rajan
                                                     Title: Chief Executive Officer

STREAM PI 0060
CONFIDENTIAL

EXHIBIT A

STREAM TV NETWORKS, INC.

THIRD AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

## I.

The name of the corporation is Stream TV Networks, Inc. (the "*Company*").

## II.

The Company's registered office in the State of Delaware is located at 300 Delaware Avenue, Suite 210-A, Wilmington, County of New Castle, 19801.  The registered agent in charge thereof is United States Corporation Agents, Inc.

## III.

The purpose of the Company is to engage in any lawful act or activity for which a corporation may be organized under the Delaware General Corporation Law ("*DGCL*").

## IV.

**A.**    The total number of shares of stock of all classes which the Company has authority to issue is 130,000,000  shares of capital stock, par value $0.00001 per share, consisting of: 86,000,000 shares of Class A Common Stock ("*Class A Common Stock*"); 34,000,000 shares of Class B Voting Stock ("*Class B Voting Stock*"); and 10,000,000 shares of Preferred Stock (the "*Preferred Stock*"), of which 10,000,000 of the authorized shares of Preferred Stock are hereby designated "*Series B Preferred Stock*" (the "*Series B Preferred*").  Class B Voting Stock shall be uncertificated (unless otherwise determined by the Company), with the record of holders thereof to be kept solely by the Company and/or its transfer agent.

**B.**    Prior to the filing of this Third Amended and Restated Certificate of Incorporation (this "*Third Restated Certificate of Incorporation*"), all previously issued and outstanding shares of the Company's Series A Preferred Stock, par value $0.00001 per share (the "*Prior Preferred Stock*"), were converted into shares of the Company's Class A Common Stock.  The designations, rights, preferences, privileges and restrictions of the Prior Preferred Stock are hereby eliminated.

**C.**    Irrespective of any contrary provisions contained in Section 242(b)(2) of the DGCL, the number of authorized shares of Class A Common Stock or Class B Voting Stock may be increased or decreased (but not below the number of shares of Class A Common Stock or Class B Voting Stock then outstanding) by the affirmative vote of the holders of a majority of the stock of the Company entitled to vote (voting together as a single class on an as-converted basis).

2.

STREAM PI 0061
CONFIDENTIAL

    **D.**     The rights, preferences, privileges, restrictions and other matters relating to the Class A Common Stock, Class B Voting Stock, and Series B Preferred are as follows:

      **1.**    **DIVIDEND AND DISTRIBUTION RIGHTS**.

      **(a)** Class B Voting Stock is a special class of stock that entitles the holders of Class B Voting Stock to the voting rights set forth in this Restated Certificate of Incorporation, but does not entitle the holders of Class B Voting Stock to any economic rights in the Company, including the right to share in profits of the Company or the distribution of the Company's assets upon liquidation and dissolution. Accordingly, the holders of Class B Voting Stock shall not be entitled to share in any dividend, whether in cash or property, or any other distribution made with respect to the Company's capital stock and the Company shall not pay or declare any dividend, whether in cash or property, or make any other distribution on the Class B Voting Stock.

      **(b)** The Company shall not declare, pay or set aside any dividends on shares of any other class or series of capital stock of the Company (other than dividends on shares of Class A Common Stock payable in shares of Class A Common Stock) unless (in addition to the obtaining of any consents required elsewhere in this Third Restated Certificate of Incorporation) the holders of the Series B Preferred then outstanding shall first receive, or simultaneously receive, a dividend on each outstanding share of Series B Preferred in an amount at least equal to (i) in the case of a dividend on Class A Common Stock or any class or series that is convertible into Class A Common Stock, that dividend per share of Series B Preferred as would equal the product of (A) the dividend payable on each share of such class or series determined, if applicable, as if all shares of such class or series had been converted into Class A Common Stock and (B) the number of shares of Class A Common Stock issuable upon conversion of a share of Series B Preferred, in each case, calculated on the record date for determination of holders entitled to receive such dividend, or (ii) in the case of a dividend on any class or series that is not convertible into Class A Common Stock, at a rate per share of Series B Preferred determined by (A) dividing the amount of the dividend payable on each share of such class or series of capital stock by the original issuance price of such class or series of capital stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to such class or series) and (B) multiplying such fraction by an amount equal to the Original Issue Price (as defined below); provided that, if the Company declares, pays or sets aside, on the same date, a dividend on shares of more than one class or series of capital stock of the Company, the dividend payable to the holders of Series B Preferred pursuant to this <u>Section 1(b)</u> shall be calculated based upon the dividend on the class or series of capital stock that would result in the highest Series B Preferred dividend. The "***Original Issue Price***" shall be the price per share actually paid by the original holder of the Series B Preferred for a share of the Series B Preferred, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series B Preferred.

      **(c)** Whenever a dividend provided for in this Section 1 shall be payable in property other than cash, the value of such dividend shall be the fair market value of such distribution as determined in good faith by the Board**.**

STREAM PI 0062
CONFIDENTIAL

## 2.  VOTING RIGHTS.

(a) **General Rights of Series B Preferred**.  Each holder of shares of the Series B Preferred shall be entitled to the number of votes equal to the number of shares of Class A Common Stock into which such shares of Series B Preferred could be converted (pursuant to Section 5 hereof) immediately after the close of business on the record date fixed for such meeting or the effective date of such written consent and shall have voting rights and powers equal to the voting rights and powers of the Class A Common Stock, and shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of the Company.  Except as otherwise provided herein or as required by law, the Series B Preferred shall vote together with the Class A Common Stock at any annual or special meeting of the stockholders and not as a separate class, and may act by written consent in the same manner as the Class A Common Stock.

(b) **Separate Vote of Series B Preferred.**  For so long as shares of Series B Preferred remain outstanding, in addition to any other vote or consent required herein or by law, the affirmative vote or written consent of the holders of a majority of the then-outstanding shares of Series B Preferred, voting as a separate class, shall be necessary for the Company to create, or authorize the creation of, any additional class or series of capital stock unless the same ranks junior to the Series B Preferred with respect to the distribution of assets on the liquidation, dissolution or winding up of the Company.

(c) **General Rights of Class A Common Stock and Class B Voting Stock.**  Each holder of shares of Class A Common Stock shall be entitled to one (1) vote per share of Class A Common Stock and shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of the Company.  Each holder of shares of Class B Voting Stock shall be entitled to ten (10) votes per share of Class B Voting Stock and shall be entitled to notice of any stockholders' meeting in accordance with the bylaws of the Company.  Except as otherwise expressly provided by this Third Restated Certificate of Incorporation or as provided by law, the holders of shares of Class A Common Stock and Class B Voting Stock shall (a) at all times vote together as a single class on all matters (including the election of directors) submitted to a vote or for the consent (if action by written consent of the stockholders is permitted at such time under this Third Restated Certificate of Incorporation) of the stockholders of the Company, and (b) be entitled to vote upon such matters and in such manner as may be provided by applicable law.  There shall be no cumulative voting.  The number of authorized shares of Class A Common Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of shares of capital stock of the Company representing a majority of the votes represented by all outstanding shares of capital stock of the Corporation entitled to vote, irrespective of the provisions of Section 242(b)(2) of the DGCL.

(d) **Separate Vote of Class B Voting Stock.**  For so long as shares of Class B Voting Stock remain outstanding, in addition to any other vote or consent required herein or by law, the affirmative vote or written consent of the holders of a majority of the then-outstanding shares of Class B Voting Stock, voting as a separate class, shall be necessary for the Company to consummation an Acquisition or Asset Transfer.

4.

STREAM PI 0063
CONFIDENTIAL

3.    **LIQUIDATION RIGHTS**.

(a) **No Liquidation Right for Class B Voting Stock**.  The holders of Class
B Voting Stock shall not be entitled to share in any payment or distribution of Company assets,
whether in cash or property, upon a Liquidation Event or Deemed Liquidation Event and the
Company shall not make any provision therefor.

(b) **Series B Preferred**. Subject to Section 3(d) below, upon any
liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary (a
"***Liquidation Event***"), before any distribution or payment shall be made to the holders of any Class
A Common Stock, the holders of Series B Preferred shall be entitled to be paid out of the assets of
the Company legally available for distribution, or the consideration received in such transaction,
for each share of Series B Preferred held by them, an amount per share of Series B Preferred equal
to the sum of (i) the Original Issue Price plus (ii) any declared but unpaid dividends on such share
of Series B Preferred.  If, upon any such Liquidation Event, the assets of the Company (or the
consideration received in such transaction) shall be insufficient to make payment in full to all
holders of Series B Preferred of the liquidation preference set forth in this Section 3(b), then such
assets (or consideration) shall be distributed among the holders of Series B Preferred at the time
outstanding, ratably in proportion to the full amounts to which they would otherwise be
respectively entitled if such amounts had been paid in full.

(c) **Remaining Assets.**  After the payment of the full liquidation preference
of the Series B Preferred as set forth in Section 3(b) above, the remaining assets of the Company
legally available for distribution in such Liquidation Event (or the consideration received in such
transaction), if any, shall be distributed ratably to the holders of the Class A Class A Common
Stock.

(d) **Deemed Conversion.**  Notwithstanding Sections 3(b) and (c) above,
solely for purposes of determining the amount each holder of shares of Series B Preferred is
entitled to receive with respect to a Liquidation Event, the Series B Preferred shall be treated as if
all holders of Series B Preferred had converted such holder's shares of Series B Preferred into
shares of Class A Common Stock immediately prior to the Liquidation Event if, as a result of an
actual conversion of the Series B Preferred (including taking into account the operation of this
paragraph (d) with respect to the Series B Preferred), holders of Series B Preferred would receive,
in the aggregate, an amount greater than the amount that would be distributed to holders of Series
B Preferred if such holders had not converted the Series B Preferred into shares of Class A
Common Stock.  If holders of Series B Preferred are treated as if they had converted shares of
Series B Preferred into Class A Common Stock pursuant to this paragraph, then such holders shall
not be entitled to receive any distribution pursuant to Sections 3(b) or (c) above that would
otherwise be made to holders of Series B Preferred.

4.    **ASSET TRANSFER OR ACQUISITION RIGHTS.**

(a) An Acquisition or Asset Transfer (each as hereinafter defined) shall be
deemed to be a liquidation of the Company (including, without limitation, for the purposes of
Section 3 above) (a "***Deemed Liquidation***"), unless the holders of a majority of the then-
outstanding Series B Preferred (the "***Requisite Holders***"), voting as a separate class, elect

STREAM PI 0064
CONFIDENTIAL

otherwise by written notice given to the Company prior to the effective date of any such Acquisition or Asset Transfer.  The Company shall not have the power to effect any transaction constituting a Deemed Liquidation unless the definitive documents effecting such Deemed Liquidation provide that the consideration payable to the stockholders of the Company shall be allocated among the holders of capital stock of the Company in accordance with Sections 3(a), (b), (c) and (d) above.  The amount deemed paid or distributed to holders of capital stock of the Company upon any Deemed Liquidation shall be determined in accordance with Section 4(c) below.

(b) For the purposes of this Article IV: (i) "*Acquisition*" shall mean (A) any consolidation, stock exchange or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the stockholders of the Company immediately prior to such consolidation, merger or reorganization, continue to hold a majority of the voting power of the surviving entity in substantially the same proportions (or, if the surviving entity is a wholly-owned subsidiary, its parent) immediately after such consolidation, merger or reorganization; or (B) any transaction or series of related transactions to which the Company is a party and in which in excess of fifty percent (50%) of the Company's voting power is transferred; provided that an Acquisition shall not include (x) any consolidation or merger effected exclusively to change the domicile of the Company, or (y) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled or converted or a combination thereof; and (ii) "*Asset Transfer*" shall mean a sale, lease or other disposition of all or substantially all of the assets or intellectual property of the Company or the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of the Company.

(c) In any Acquisition or Asset Transfer, if the consideration to be received is securities of a corporation or other property other than cash, its value will be deemed its fair market value as determined in good faith by the Board, on the date such determination is made; provided, however, that any publicly-traded securities to be distributed to stockholders will be valued as follows:

(i)     Securities not subject to investment letter or other similar restrictions on free marketability:

(A) If traded on a securities exchange, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty (30)-day period ending three (3) calendar days prior to the closing; and

(B) If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever are applicable) over the thirty (30)-day period ending three (3) calendar days prior to the closing.

(ii)    The method of valuation of securities subject to investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a stockholder's status as an affiliate or former affiliate) shall be to make an appropriate discount

6.

STREAM PI 0065
CONFIDENTIAL

from the market value determined as above in Sections 4(c)(i)(A) and (B) to reflect the approximate fair market value thereof, as determined in good faith by the Board.

**(d)** Notwithstanding anything to the contrary in this Section 4, if the definitive transaction documents for an Acquisition or Asset Transfer provide for a different method of valuation, the method of valuation set forth in such documents shall control.

**(e) Allocation of Escrow**.  In the event of a Deemed Liquidation, if any portion of the consideration payable to the stockholders of the Company is placed into escrow or is payable to the stockholders of the Company subject to contingencies, the definitive acquisition agreement relating thereto shall provide that (i) the portion of such consideration that is not placed in escrow and not subject to any contingencies (the "*Initial Consideration*") shall be allocated among the holders of capital stock of the Company in accordance with Section 3 above as if the Initial Consideration were the only consideration payable in connection with such Deemed Liquidation and (ii) any additional consideration which becomes payable to the stockholders of the Company upon release from escrow or satisfaction of contingencies shall be allocated among the holders of capital stock of the Company in accordance with Section 3 above after taking into account the previous payment of the Initial Consideration as part of the same transaction.

**(f) Redemption Right**.  Unless (i) prohibited by Delaware law governing distributions to stockholders or (ii) a Liquidity Event (as defined below) has occurred, at any time on or after December 31, 2021, each holder of shares of Series B Preferred shall have the right to request a redemption by the Company ("*Redemption Request*") of any or all of its Series B Preferred Shares a price equal to the Original Issue Price per share, plus an annualized eight percent (8%) cumulative dividend accrued on the Original Issue Price for each share of Series B Preferred, whether or not declared, together with any other dividends declared but unpaid thereon (the "*Redemption Price*").  Upon receipt of a Redemption Request, the Company shall, within 60 days of such request, apply all of its assets to any such redemption, and to no other corporate purpose, except to the extent prohibited by Delaware law governing distributions to stockholders.  The date of each such redemption shall be referred to as a "*Redemption Date.*"  If on any Redemption Date, Delaware law governing distributions to stockholders prevents the Company from redeeming all shares of Series B Preferred to be redeemed, the Company shall ratably redeem the maximum number of shares that it may redeem consistent with such law, and shall redeem the remaining shares as soon as it may lawfully do so under such law.  For purposes of this paragraph (f), a Liquidity Event shall be defined as (i) a public listing of the Company's equity, or (ii) an Acquisition.

**(g) Redemption Process**.  In order to be a valid Redemption Request, each Redemption Request shall: (i) state the number of shares of Series B Preferred held by the holder that the Company shall redeem on the Redemption Date specified in the Redemption Request, and (ii) for holders of shares in certificated form, include his, her or its certificate or certificates representing the shares of Series B Preferred to be redeemed. Thereupon the Redemption Price for such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof.  If the Redemption Request shall have been duly given, and if on the applicable Redemption Date the Redemption Price payable upon redemption of the shares of Series B Preferred to be redeemed on such Redemption Date is paid or tendered for payment or deposited with an independent payment agent so as to be available therefor in a timely manner,

STREAM PI 0066
CONFIDENTIAL

then notwithstanding that any certificates evidencing any of the shares of Series B Preferred so requested for redemption shall not have been surrendered, dividends with respect to such shares of Series B Preferred shall cease to accrue after such Redemption Date and all rights with respect to such shares shall forthwith after the Redemption Date terminate, except only the right of the holders to receive the Redemption Price without interest upon surrender of any such certificate or certificates therefor.  Any shares of Series B Preferred that are redeemed or otherwise acquired by the Company shall be automatically and immediately cancelled and retired and shall not be reissued, sold or transferred.

      **5.**       **CONVERSION RIGHTS OF SERIES B PREFERRED**.

      The holders of the Series B Preferred shall have the following rights with respect to the conversion of the Series B Preferred into shares of Class A Common Stock (the "***Conversion Rights***"):

      **(a) Conversion.**  Subject to and in compliance with the provisions of this Section 5, each share of Series B Preferred, if any, will automatically be converted into Class A Common Stock in the event of (i) a public listing of the Company's capital stock, (ii) a Liquidation Event or Deemed Liquidation, (iii) the Company receives (a) cumulative new investment from and after December 31, 2018 and on or prior to December 31, 2019 in an amount at least equal to the cumulative original purchase price of the Series B outstanding as of December 31, 2018, or (b) cumulative new investment at any time from and after December 31, 2018, in an amount at least two (2) times the cumulative original purchase price of the Series B outstanding as of December 31, 2018, or (iv) the written consent of the Requisite Holders.  Additionally, subject to and in compliance with the provisions of this Section 5, each share of Series B Preferred, if any, may at any time be converted into Class A Common Stock upon the election of the holder of such shares of Series B Preferred.  The number of shares of Class A Common Stock to which a holder of Series B Preferred shall be entitled upon conversion shall be the product obtained by multiplying the Series B Preferred Conversion Rate then in effect for the Series B Preferred by the number of shares of Series B Preferred being converted.  The conversion rate in effect at any time for conversion of the Series B Preferred (the "***Series B Preferred Conversion Rate***") shall be the quotient obtained by dividing the Original Issue Price of the Series B Preferred by the Series B Preferred Conversion Price.  The conversion price of the Series B Preferred shall initially be the Original Issue Price of the Series B Preferred (the "***Series B Preferred Conversion Price***").  Such initial Series B Preferred Conversion Price shall be adjusted from time to time in accordance with this Section 5.  All references to the Series B Preferred Conversion Price herein shall mean the Series B Preferred Conversion Price as so adjusted.

      **(b) Mechanics of Conversion.**  Each holder of Series B Preferred who desires to convert the same into shares of Class A Common Stock pursuant to this Section 5 shall surrender the certificate or certificates therefor, duly endorsed, at the office of the Company or any transfer agent for the Series B Preferred, and shall give at least ten (10) days prior written notice to the Company at such office that such holder elects to convert the same.  Such notice shall state the number of shares of Series B Preferred being converted.  Thereupon, the Company shall promptly issue and deliver at such office to such holder a certificate or certificates for the number of shares of Class A Common Stock to which such holder is entitled and shall promptly pay (i) at the election of each holder of Series B Preferred in his, her or its sole discretion, in cash or in Class

8.

STREAM PI 0067
CONFIDENTIAL

A Common Stock (at the Class A Common Stock's fair market value determined in good faith by the Board as of the date of such conversion), any declared but unpaid dividends on the shares of Series B Preferred being converted and (ii) in cash (at the Class A Common Stock's fair market value determined in good faith by the Board as of the date of conversion) the value of any fractional share of Class A Common Stock otherwise issuable to any holder of Series B Preferred.  Such conversion shall be deemed to have been made at the close of business on the date of such delivery of the conversion notice and surrender of the certificates representing the shares of Series B Preferred to be converted, and the person entitled to receive the shares of Class A Common Stock issuable upon such conversion shall be treated for all purposes as the record holder of such shares of Class A Common Stock on such date.

(c) **Adjustment for Stock Splits and Combinations.**  If at any time or from time to time after the date that the first share of Series B Preferred is issued (the "*Original Issue Date*") the Company effects a subdivision of the outstanding shares of Class A Common Stock without a corresponding subdivision of the Series B Preferred, the Series B Preferred Conversion Price in effect immediately before that subdivision shall be proportionately decreased.  Conversely, if at any time or from time to time after the Original Issue Date the Company combines the outstanding shares of Class A Common Stock into a smaller number of shares, without a corresponding combination of the Series B Preferred, the Series B Preferred Conversion Price in effect immediately before the combination shall be proportionately increased.  Any adjustment under this Section 5(c) shall become effective at the close of business on the date the subdivision or combination becomes effective.

(d) **Adjustment for Class A Common Stock Dividends and Distributions.**  If at any time or from time to time after the Original Issue Date the Company pays to holders of Class A Common Stock a dividend or other distribution on the Class A Common Stock in additional shares of Class A Common Stock without a corresponding dividend or other distribution to holders of Series B Preferred, the Series B Preferred Conversion Price that is then in effect shall be decreased as of the time of such issuance, as provided below:

(i)     The Series B Preferred Conversion Price shall be adjusted by multiplying the Series B Preferred Conversion Price then in effect by a fraction:

(A) the numerator of which is the total number of shares of Class A Common Stock issued and outstanding immediately prior to the time of such issuance, and

(B) the denominator of which is the total number of shares of Class A Common Stock issued and outstanding immediately prior to the time of such issuance plus the number of shares of Class A Common Stock issuable in payment of such dividend or distribution;

(ii)     If the Company fixes a record date to determine which holders of Class A Common Stock are entitled to receive such dividend or other distribution, the Series B Preferred Conversion Price shall be fixed as of the close of business on such record date and the number of shares of Class A Common Stock shall be calculated immediately prior to the close of business on such record date; and

9.

STREAM PI 0068
CONFIDENTIAL

(iii)     If such record date is fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefore, the Series B Preferred Conversion Price shall be recomputed accordingly as of the close of business on such record date and thereafter the Series B Preferred Conversion Price shall be adjusted pursuant to this Section 5(d) to reflect the actual payment of such dividend or distribution.

(e) **Adjustment for Reclassification, Exchange, Substitution, Reorganization, Merger or Consolidation.** If at any time or from time to time after the Original Issue Date, the Class A Common Stock issuable upon the conversion of the Series B Preferred is changed into the same or a different number of shares of any class or classes of stock, whether by recapitalization, reclassification, merger, consolidation or otherwise (other than an Acquisition or Asset Transfer as defined in Section 4 or a subdivision or combination of shares or stock dividend or a reorganization, merger, consolidation or sale of assets provided for elsewhere in this Section 5), then following such recapitalization, reclassification, merger, consolidation or other change, each share of Series B Preferred shall thereafter be convertible in lieu of the Class A Common Stock into which it was convertible prior to such event into the kind and amount of securities, cash or other property that a holder of the shares of that number of shares of Class A Common Stock issuable upon conversion of such share of Series B Preferred immediately prior to such recapitalization, reclassification, merger, consolidation or other change would have been entitled to receive pursuant to such event, subject to further adjustment as provided herein or with respect to such other securities or property by the terms thereof.  In any such case, appropriate adjustment shall be made in the application of the provisions of this Section 5 with respect to the rights of the holders of Series B Preferred after the capital reorganization to the end that the provisions of this Section 5 (including adjustment of the Series B Preferred Conversion Price then in effect and the number of shares issuable upon conversion of the Series B Preferred) shall be applicable after that event and be as nearly equivalent as practicable.

(f) **Maintenance of Voting Rights.** If at any time or from time to time, the Class A Common Stock is changed into the same or a different number of shares of any class or classes of stock, whether by recapitalization, reclassification, merger, consolidation or otherwise (other than an Acquisition or Asset Transfer as defined in Section 4 or a subdivision or combination of shares or stock dividend or a reorganization, merger, consolidation or sale of assets provided for elsewhere in this Section 5), then following such recapitalization, reclassification, merger, consolidation or other change the shares of Class A Common Stock and Class B Voting Stock may not be subdivided, combined or reclassified unless the shares of the other class are concurrently therewith proportionately subdivided, combined or reclassified in a manner that maintains the same proportionate voting rights between the holders of the outstanding Class A Common Stock and Class B Voting Stock on the record date of such subdivision, combination or reclassification; provided however, that shares of one such class may be subdivided, combined or reclassified in a different or disproportionate manner if such subdivision, combination or reclassification is approved in advance by the affirmative vote (or written consent if action by written consent of stockholders is permitted at such time under this Restated Certificate of Incorporation) of the holders of a majority of the outstanding shares of Class A Common Stock and Class B Voting Stock, each voting separately as a class.

STREAM PI 0069
CONFIDENTIAL

6.      **RESTRICTION ON TRANSFER**

(a) **Defined Terms.**  As used in this Section 6, the following terms shall have the following meanings:

(i) "***Founder***" shall mean either Mathu Rajan or Raja Rajan, each as a natural living person, and any entity owned or controlled by one or more of them (other than for the avoidance of doubt, the Company).

(ii) "***Class B Stockholder***" shall mean (a) the Founders, and (b) the registered holders of a share of Class B Voting Stock on date of filing of this Third Restated Certificate of Incorporation (the "***Effective Time***").

(iii) "***Permitted Entity***" shall mean, with respect to any individual Class B Stockholder, any trust, corporation, partnership, or limited liability company specified in Section 6(c)(ii) established by or for such individual Class B Stockholder, so long as such entity meets the requirements of the exception set forth in Section 6(c)(ii) applicable to such entity.

(iv) "***Transfer***" of a share of Class B Voting Stock shall mean any sale, assignment, transfer, conveyance, hypothecation or other transfer or disposition of such share or any legal or beneficial interest in such share, whether or not for value and whether voluntary or involuntary or by operation of law; provided, however, that the following shall not be considered a "Transfer": (x) the granting of a proxy to officers or directors of the Company at the request of the Board of Directors of the Company in connection with actions to be taken at an annual or special meeting of stockholders, or (y) entering into a voting trust, agreement or arrangement (with or without granting a proxy) with the Founders.

(v) "***Voting Control***" with respect to a share of Class B Voting Stock shall mean the power (whether exclusive or shared) to vote or direct the voting of such share of Class B Voting Stock.

(b) **Restrictions on Transfer Generally.**  Shares of Class B Voting Stock may not be Transferred, except as provided in this Section 6, and any attempted Transfer in violation of this Agreement shall be null and void and not recognized for any purpose

(c) **Permitted Transfers.**  Notwithstanding the general restriction on Transfer specified in Section 6(b), shares of Class B Voting Stock may be Transferred as follows:

(i) from a Founder, or such Founder's Permitted Entities, to the other Founder, or such Founder's Permitted Entities.

(ii) by a Class B Stockholder who is a natural person to any of the following Permitted Entities, and from any of the following Permitted Entities back to such Class B Stockholder and/or any other Permitted Entity established by or for such Class B Stockholder:

(A) a trust for the benefit of such Class B Stockholder and for the benefit of no other person, provided such Transfer does not involve any payment of cash,

11.

STREAM PI 0070
CONFIDENTIAL

securities, property or other consideration (other than an interest in such trust) to the Class B Stockholder;

(B) a trust for the benefit of persons other than the Class B Stockholder so long as the Class B Stockholder has sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such trust, provided such Transfer does not involve any payment of cash, securities, property or other consideration (other than an interest in such trust) to the Class B Stockholder;

(C) a corporation in which such Class B Stockholder directly, or indirectly through one or more Permitted Entities, owns shares with sufficient Voting Control in the corporation, or otherwise has legally enforceable rights, such that the Class B Stockholder retains sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such corporation;

(D) a partnership in which such Class B Stockholder directly, or indirectly through one or more Permitted Entities, owns partnership interests with sufficient Voting Control in the partnership, or otherwise has legally enforceable rights, such that the Class B Stockholder retains sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such partnership; or

(E) a limited liability company in which such Class B Stockholder directly, or indirectly through one or more Permitted Entities, owns membership interests with sufficient Voting Control in the limited liability company, or otherwise has legally enforceable rights, such that the Class B Stockholder retains sole dispositive power and exclusive Voting Control with respect to the shares of Class B Voting Stock held by such limited liability company.

(iii) by a Class B Stockholder that is a partnership, or a nominee for a partnership, which partnership beneficially held more than five percent (5%) of the total outstanding shares of Class B Voting Stock as of the Effective Time, to any person or entity that is a partner of such partnership pro rata in accordance with their ownership interests in the partnership, and any further Transfer(s) by any such partner that is a partnership or limited liability company to any person or entity that was at such time a partner or member of such partnership or limited liability company pro rata in accordance with their ownership interests in the partnership or limited liability company. All shares of Class B Voting Stock held by affiliated entities shall be aggregated together for the purposes of determining the satisfaction of such five percent (5%) threshold.

(iv) by a Class B Stockholder that is a limited liability company, or a nominee for a limited liability company, which limited liability company beneficially held more than five percent (5%) of the total outstanding shares of Class B Voting Stock as of the Effective Time, to any person or entity that is a member of such limited liability company pro rata in accordance with their ownership interests in the company, and any further Transfer(s) by any such member that is a partnership or limited liability company to any person or entity that was at such time a partner or member of such partnership or limited liability company pro rata in accordance with their ownership interests in the partnership or limited liability company. All shares of Class

STREAM PI 0071
CONFIDENTIAL

B Voting Stock held by affiliated entities shall be aggregated together for the purposes of determining the satisfaction of such five percent (5%) threshold.

   **(v)** by a Class B Stockholder that is a corporation, or a nominee for a corporation, which corporation beneficially held more than five percent (5%) of the total outstanding shares of Class B Voting Stock as of the Effective Time, to any person or entity that is a shareholder of such corporation pro rata in accordance with their ownership interests in the corporation, and any further Transfer(s) by any such shareholder that is a partnership or limited liability company to any person or entity that was at such time a partner or member of such partnership or limited liability company pro rata in accordance with their ownership interests in the partnership or limited liability company. All shares of Class B Voting Stock held by affiliated entities shall be aggregated together for the purposes of determining the satisfaction of such five percent (5%) threshold.

   **(vi)** by a Class B Stockholder to the Company or any other person or entity upon approval of the Company's Board of Directors.

   **(d) Compliance with Securities Laws.**  Notwithstanding any other provision of this Agreement, no Transfer of shares of Class B Voting Stock may be made in violation of the Securities Act of 1933, as amended, or any other federal or state securities laws.

**V.**

   **A.**  To the fullest extent permitted by law, a director of the Company shall not be personally liable to the Company or its stockholders for monetary damages for breach of fiduciary duty as a director.  If the DGCL or any other law of the State of Delaware is amended after approval by the stockholders of this Article V to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Company shall be eliminated or limited to the fullest extent permitted by the DGCL as so amended.

   **B.**  To the fullest extent permitted by applicable law, the Company is authorized to provide indemnification of (and advancement of expenses to) directors, officers and agents of the Company (and any other persons to which the DGCL permits the Company to provide indemnification) through Bylaw provisions, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the DGCL.

   **C.**  Any repeal or modification of this Article V shall only be prospective and shall not affect the rights under this Article V in effect at the time of the alleged occurrence of any action or omission to act giving rise to liability.

   **D.**  Unless the Company consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Company to the Company or the Company's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, this Amended and Restated Certificate of Incorporation or the Company's Bylaws or (iv) any action asserting a claim governed by the internal affairs doctrine.

13.

STREAM PI 0072
CONFIDENTIAL

## VI.

For the management of the business and for the conduct of the affairs of the Company, and in further definition, limitation and regulation of the powers of the Company, of its directors and of its stockholders or any class thereof, as the case may be, it is further *provided* that:

**A.**    The management of the business and the conduct of the affairs of the Company shall be vested in its Board.  The number of directors which shall constitute the whole Board shall be fixed by the Board in the manner provided in the Bylaws, subject to any restrictions which may be set forth in this Restated Certificate of Incorporation.

**B.**    Subject to any additional vote required by this Restated Certificate of Incorporation, in furtherance and not in limitation of the powers conferred by statute, the Board is expressly empowered to adopt, amend or repeal the Bylaws of the Company.

**C.**    The directors of the Company need not be elected by written ballot unless the Bylaws so provide.

**D.**    Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Company may provide.  The books of the Company may be kept outside the State of Delaware at such place or places as may be designated from time to time by the Board or in the Bylaws of the Company.

* * * *

14.

STREAM PI 0073
CONFIDENTIAL

# EXHIBIT C

## LETTER AGREEMENT

AGREEMENT (this "Agreement"), dated as of May 6, 2020, by and among SLS Holdings VI, LLC, a Delaware limited liability company ("SLS"), Hawk Investment Holdings Limited, an entity registered in Guernsey ("Hawk"), and certain equity investors of the Company listed on Annex I attached hereto (each an "Investor" and collectively, the "Investors").

WHEREAS, of even date herewith, the parties hereto have also executed that certain OMNIBUS AGREEMENT (the " Omnibus Agreement"), dated as of May 6, 2020, by and among Stream TV Networks, Inc., a Delaware corporation (the "Company"), SLS Holdings VI, LLC, a Delaware limited liability company ("SLS"), Hawk Investment Holdings Limited, an entity registered in Guernsey ("Hawk"), and certain equity investors of the Company listed on Annex I attached hereto (each an "Investor" and collectively, the "Investors"). All terms not defined herein shall be used according to their definitions in the Omnibus Agreement.

WHEREAS, the parties hereto wish to agree among themselves to certain additional matters related to the Omnibus Agreement, and on which their execution of the Omnibus Agreement is conditioned; and

WHEREAS, the parties desire to memorialize in this Agreement the terms and conditions of certain other actions to be performed by the parties, and this Agreement shall govern the respective rights and obligations of the parties in connection with such actions.

## ARTICLE I

## THE TRANSACTIONS

1.1    Transactions. Subject to the terms and conditions set forth herein, and on the basis of and in reliance upon the representations, warranties, covenants and agreements set forth herein, the parties hereto shall promptly take the actions described in this Section 1.1 in addition to all such transactions to be taken by each of them pursuant to the Omnibus Agreement (each, a "Transaction" and, collectively, the "Transactions"):

(a)    SLS and Hawk shall form Newco in accordance with the applicable laws of its jurisdiction of formation. Newco shall issue (i) a promissory note to SLS as provided in Annex II, and (ii) a promissory note to Hawk as provided in Annex II. The holders of such promissory notes shall jointly determine the size and composition of the initial Board of Directors of Newco, and shall name the initial executive officers of Newco. Each promissory note issued by Newco referenced in clauses (i) and (ii) above shall have such other terms and conditions as set forth on Annex II.

(b)    Hawk shall receive 40,000,000 shares of Class A Common Stock of the Company in respect of any and all foregone accrued interest, penalties and

SEECUBIC-00000028

fees (including placement, brokerage, finder's or similar fees) applicable to the Hawk Notes (the "Hawk Issuance").  Immediately following the Hawk Issuance, Hawk shall be entitled to exchange its shares of Class A Common Stock of the Company for a pro rata portion of the common shares or equity interests of Newco on the terms and conditions as set forth on Annex II.

(c)      SLS shall receive 4,000,000 shares of Class A Common Stock of the Company in respect of any and all foregone accrued interest, penalties and fees (including placement, brokerage, finder's or similar fees) applicable to the SLS Notes (the "SLS Issuance").  Immediately following the SLS Issuance, SLS shall be entitled to exchange its shares of Class A Common Stock of the Company for a pro rata portion of the common shares or equity interests of Newco on the terms and conditions as set forth on Annex II.

(d)      In consideration of the Investors signing the Omnibus Agreement the Investors shall receive (i) 4,000,000 shares of Class A Common Stock of the Company, and (ii) 2,000,000 warrants of the Company, with a three-year term and a strike price of $1.00 per common share, in respect of any and all legal or other fees and expenses incurred in connection with the Lawsuit or the transactions contemplated hereby (the "Investor Issuance").  Immediately following the Investor Issuance, each Investor shall be entitled to exchange its shares of Class A Common Stock of the Company for a pro rata portion of the common shares or equity interests of Newco as on the terms and conditions as set forth on Annex II; provided, however, that the warrants included in the Investor Issuance shall be carried over in exactly the same number and terms.

1.2      Investors' Expenses.  Each of the Investors has funded or agreed to fund a pro rata portion of the fees and expenses related to the Lawsuit, this Agreement and the Transactions pursuant to one or more Inter-Party Agreements among the Investors. Each of the Investors, SLS, Hawk and Newco hereby agree that all such amounts shall constitute contributions made by such Investors to Newco respectively on the same terms and conditions and in exchange for notes of the same term and tenor as those to be issued by Newco to SLS and Hawk; provided, however, that any Investor may choose to instead forego all or a portion of such note in exchange for and in satisfaction of any future subscription for shares of Newco.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

2.1      Representations and Warranties.  Each party hereto hereby represents and warrants to all of the other parties hereto as follows:

(a)      The execution, delivery and performance by such party of this Agreement and of the other documents contemplated hereby, to the extent a party thereto, has been duly authorized by all necessary action (subject to receipt by the Company of all of the applicable approvals).  If such party is not an individual, such party

2

is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization or incorporation.

(b)     Such party has the requisite power, authority, legal right and, if such party is an individual, legal capacity, to execute and deliver this Agreement and each of the other documents contemplated hereby, to the extent a party thereto, and to consummate the transactions contemplated hereby and thereby, as the case may be.

(c)     This Agreement and each of the other documents contemplated hereby, to the extent a party thereto, has been duly executed and delivered by such party and constitutes the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and (ii) general equitable principles (whether considered in a proceeding in equity or at law).

(d)     Neither the execution, delivery and performance by such party of this Agreement and the other documents contemplated hereby, to the extent a party thereto, nor the consummation by such party of the transactions contemplated hereby, nor compliance by such party with the terms and provisions hereof, will, directly or indirectly (with or without notice or lapse of time or both), (i) if such party is not an individual, contravene or conflict with, or result in a breach or termination of, or constitute a default under (or with notice or lapse of time or both, result in the breach or termination of or constitute a default under) the organizational documents of such party, (ii) constitute a violation by such party of any existing requirement of law applicable to such party or any of its properties, rights or assets or (iii) require the consent or approval of any person or entity, except, in the case of clauses (ii) and (iii), as would not reasonably be expected to be material to the ability of such party to consummate the transactions contemplated by this Agreement.

## ARTICLE III

## MISCELLANEOUS

3.1     <u>Amendments and Waivers</u>.  This Agreement may be modified, amended or waived only with the written approval of each of the parties hereto.  The failure of any party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such party thereafter or any other party hereto to enforce each and every provision of this Agreement in accordance with its terms.

3.2     <u>Successors and Assigns</u>.  This Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns.  No rights or obligations under this Agreement may be assigned by any party hereto without the prior written consent of each other party hereto.

3

SEECUBIC-00000030

       3.3   <u>Notices</u>.  All notices, requests and other communications to any party hereunder shall be in writing (including electronic mail ("e-mail") transmission, so long as a receipt of such e-mail is requested and not received by automated response or notice is given on the next business day by alternative means permitted by this <u>Section 3.3</u>).  All such notices, requests, and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. on a business day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed to have been received on the next succeeding business day in the place of receipt. All such notices, requests and other communications to any party hereunder shall be given to such party as follows:

If to the Investors:

Alastair Crawford
c/o Adams & Remers LLP
55-58 Pall Mall
London, United Kingdom SW1Y 5JH
Attention: Alastair Crawford
Email: alastair.crawford@gmail.com

with a copy (which shall not constitute notice) by email to:

Skadden, Arps, Slate, Meagher & Flom LLP
920 North King Street
Wilmington, Delaware 19801
Attention: Faiz Ahmad
Email: faiz.ahmad@skadden.com

If to SLS:

SLS Holdings VI, LLC
392 Taylor Mills Road
Marlboro, New Jersey 07746
Attention: Shad Stastney
Email: slstastney@hotmail.com

with a copy (which shall not constitute notice) by email to:

Quarles & Brady
411 E. Wisconsin Avenue, Suite 2400
Milwaukee, Wisconsin 53202-4426
Attention: Jonathan Hackbarth, Esq.
Email: jon.hackbarth@quarles.com

If to Hawk:

CONFIDENTIAL                                  SEECUBIC-00000031

Hawk Investment Holdings Limited
Newport House
15 The Grange
St. Peter Port, Guernsey GY1 2QL, Channel Islands
Attention: [●]
Email:a.holt@albanytrustee.com; r.maunder@albanytrustee.com

with a copy (which shall not constitute notice) by email to:

First Sentinel
Attention: Colin Maltby
Email: colin@first-sentinel.com

      3.4   <u>Entire Agreement</u>.  Except as otherwise expressly set forth herein, this Agreement, together with the other documents contemplated hereby and the Omnibus Agreement, embodies the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersedes and preempts any prior understandings, agreements, or representations by or among the parties, written or oral, that may have related to the subject matter hereof in any way. Each party acknowledges that it is not entering into this Agreement on the basis of or in reliance upon any promise, representation, or warranty other than as explicitly contained in this Agreement.  This Agreement shall be valid, binding and enforceable among the parties that have executed this Agreement as between such parties, notwithstanding the failure of any other person expected to be a party to this Agreement to so execute.

      3.5   <u>No Third Party Beneficiary</u>.  Nothing in this Agreement shall confer any rights, remedies or claims upon any creditors of a party hereto or any other natural person, corporation, company, partnership, association, limited liability company, limited partnership, limited liability partnership, joint venture, business enterprise, trust, or other legal entity not a party or a permitted assignee of a party to this Agreement.

      3.6   <u>Governing Law; Jurisdiction; Enforceability</u>.  This Agreement shall be governed in all respects by the laws of the State of Delaware, without regard to the conflicts of law rules of such State that would result in the application of the laws of any other State.  Each party hereby agrees and consents to be subject to the exclusive jurisdiction of the Court of Chancery of the State of Delaware or, if the Court of Chancery lacks subject matter jurisdiction, any court of the State of Delaware situated in New Castle County or the United States District Court for the District of Delaware in any suit, action, or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby.  Each of the parties irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of or in connection with this Agreement in the Court of Chancery of the State of Delaware or, if the Court of Chancery lacks subject matter jurisdiction, any court of the State of Delaware situated in New Castle County or the United States District Court for the District of Delaware and hereby

5

SEECUBIC-00000032

further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit, or proceeding brought in any such court has been brought in an inconvenient forum, and agrees not to raise any other objection to venue in any such court.  It is agreed and understood that monetary damages would not adequately compensate an injured party for the breach of this Agreement, that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order.  Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

        3.7    WAIVER OF JURY TRIAL.  FOR THE AVOIDANCE OF DOUBT, EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

        3.8    Counterparts; Facsimile Signatures.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.  This Agreement may be executed by facsimile, e-mail or .pdf format signature(s).

        3.9    Other Definitional and Interpretative Provisions.  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Sections and Exhibits are to Sections and Exhibits of this Agreement unless otherwise specified.  All Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit but not otherwise defined therein shall have the meaning as defined in this Agreement.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes", or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  "Writing", "written", and comparable terms refer to printing, typing, and other means of reproducing words (including electronic media) in a visible form.  References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder.  References to any agreement or contract are to that agreement or contract as amended, modified, or supplemented from time to time in accordance with the terms hereof and thereof.  References to any person or entity include the successors and permitted assigns of that person or entity.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.  This Agreement is being entered into between sophisticated parties, each of which or whom has reviewed the Agreement, had the opportunity to discuss it with its, his or her counsel, and is fully knowledgeable about its terms and conditions. The parties therefore agree that this

CONFIDENTIAL

SEECUBIC-00000033

Agreement shall be construed without regard to the authorship of the language and without any presumption or rule of construction in favor of any of them.

      5.10   Expenses.  Except as set forth in Section 1.2 above, each party shall bear its own expenses in connection with the Transactions contemplated by this Agreement, including costs of their respective attorneys, accountants, investment bankers, brokers, and other representatives.

      5.11   Non-Disparagement.  In consideration of the transactions contemplated hereunder, each party hereto agrees that, as long as the other parties comply with each of their respective obligations under this Agreement, such party shall not, directly or indirectly, (i) make any public statement concerning the circumstances resulting in the execution of this Agreement or (ii) make comments which are intended to disparage any other party hereto.

      5.12   Confidentiality.  All information contained herein or related to the contents of this Agreement, including the terms and existence of this Agreement, is confidential, and shall not be disclosed to anyone including to any stockholder or investor of the Company not a party hereto, other than the parties hereto and their legal or financial advisors who (a) need to know the information to evaluate the Transactions or perform their respective obligations hereunder and (b) are bound to keep such information confidential, unless disclosure is expressly required in order to comply with, law, regulatory authority or judicial, legal or regulatory process, or in order to enforce a party's rights hereunder, in which case the other parties shall be notified in advance to the extent practicable and permitted by law.

[Signature Page to Follow.]

7

SEECUBIC-00000034

IN WITNESS WHEREOF, the parties hereto have executed this Omnibus Agreement as of the date first above written.

**SLS HOLDINGS VI, LLC**

By: _____

    Name:  Shad L. Stastney

    Title:

        Managing Member

**HAWK INVESTMENT HOLDINGS LIMITED**

By: _____

    Name:

    Title:

[Signature Page to the Letter Agreement]

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have executed this Omnibus Agreement as of the date first above written.

**SLS HOLDINGS VI, LLC**

By: _____

Name:

Title:

**HAWK INVESTMENT HOLDINGS LIMITED**

By: _____

Name: ANNUA MENRUSY + LEE MERLING,

Title: AUTHORISED SIGNATORIES FOR ALBANY DIRECTORS LIMITED AS SOLE DIRECTOR OF HAWK INVESTMENT HOLDINGS LIMITED

[Signature Page to the Omnibus Agreement]

SEECUBIC-00000036

Signed for and behalf of the Investors
listed in Annex I


_____
Alastair Crawford


_____
Robert Petch


_____
Patrick Miles

SEECUBIC-00000037

# Annex I

SEECUBIC-00000038

**ANNEX II**

**NEWCO CAPITALIZATION TERMS AND CONDITIONS**

- Incorporation.  Newco shall be incorporated as a Delaware entity.

- Bylaws.  Newco shall be governed by bylaws or an operating agreement (the "Bylaws") in form and substance reasonably and mutually satisfactory to the Parties and shall include customary minority shareholder protections including tag along rights and pre-emption rights.

- Board of Managers.  With respect to the management of Newco, the Bylaws shall provide, among other things:
  - Newco shall be managed by a board of directors (the "Board").
  - The Board shall initially consist of three (3) persons.
  - SLS shall have the power to nominate not more than one (1) person to the Board (who shall be the Executive Chairman of the Board).
  - Hawk shall have the power to nominate not more than two (2) persons to the Board (one of whom shall be the Chief Executive Officer of Newco).
  - Each of the Executive Chairman and the Chief Executive Officer of Newco shall earn an annual salary of not more than $250,000 per year (unless otherwise agreed to by the unanimous consent of the Board).

- Business Plan. The board will provide a detailed business plan to all parties within 30 days of incorporation including a pro-forma balance sheet.

**CONTRIBUTION AND EXCHANGE**

- Contribution of SLS Obligations.

  - Simultaneously upon the formation of Newco as described in Section 2(a), SLS shall contribute to Newco all of the outstanding SLS Obligations as of the date of the formation of Newco (the "Formation Date"), including all accrued but unpaid interest, fees and expenses allowable under the SLS documentation through such date (the "SLS Contributed Obligations").

  - In exchange for the contribution of the SLS Contributed Obligations, SLS shall receive from Newco: (i) a secured promissory note, executed by Newco in favor of SLS, maturing on the date that is three (3) years following its execution, in a principal amount equal to the total amount of the net amount funded in cash by SLS to StreamTV (the "SLS Net Funded Amount") and bearing interest at 3.00% per annum (the "New SLS Note"); (ii) Common Stock of Newco in an amount equal to its current StreamTV common shares, plus a number of common shares as set forth in Section

[Exhibit A]

864366-WILSR01A - MSW

SEECUBIC-00000039

1.1(g) hereof, and (iii) Warrants of Newco in an amount equal to SLS's current Warrants issued to it by StreamTV on the terms described below.

- Contribution of Hawk Obligations.

  o Simultaneously upon the formation of Newco as described in Section 2(a), Hawk shall contribute to Newco all of the outstanding Hawk Obligations as of the Formation Date, including all accrued by unpaid interest, fees and expenses allowable under the Hawk documentation through such date (the "Hawk Contributed Obligations"; and, together with the SLS Contributed Obligations, the "Contributed Obligations").

  o In exchange for the contribution of the Hawk Contributed Obligations, Hawk shall receive from Newco: (i) a secured promissory note, executed by Newco in favor of Hawk, maturing on a date that is three (3) years following its execution, in a principal amount equal to the total amount of the net amount funded in cash by Hawk to StreamTV (the "Hawk Net Funded Amount"), and bearing interest at 3.00% per annum (the "New Hawk Note"); (ii) Common Stock of Newco in an amount equal to Hawk's current share ownership of Newco, plus a number of common shares equal to the number of common shares as set forth in Section 1.1(f) hereof; and (iii) Warrants of Newco in an amount equal to Hawk's current Warrants issued to it by StreamTV on the terms described below.

- Pari Passu. Any and all of the liens and security interests granted to SLS and Hawk in connection with the New SLS Note and New Hawk Note, respectively, shall be of equal priority and rank *pari passu* in all respects.

- Conversion Option. Each of the New SLS Note and New Hawk Note shall be convertible at any time by the holder thereof into such number of common units of Newco at the greater of (i) $1.50 per common share, or (ii) the same terms and conditions as the most recent offering by the Company (the "Conversion Option"); provided, however, that in the case of (ii), the amount convertible by each of SLS and Hawk in respect to any particular offering shall be no greater than the total amount of such offering. The New SLS Note and New Hawk Note may be converted in whole or in part from time to time. Other terms and conditions of the Conversion Option shall be set forth in the definitive documentation governing the New SLS Note and New Hawk Note, and the terms of the Conversion Option shall be identical as to the New SLS Note and the New Hawk Note.

- Amendments to the New SLS Note and the New Hawk Note. No amendment, modification or other change may be made to any of the terms and conditions contained in, and no action may be made by either SLS or Hawk to enforce, the New SLS Note or the New Hawk Note without the unanimous written consent of both SLS and Hawk.

[Exhibit A]

SEECUBIC-00000040

- Additional Shareholders.  Promptly following the Formation Date, SLS and Hawk shall be issued shares in Newco equal to their previously-issued shares and warrants in the Company, and shall cause Newco to offer to all other shareholders of Stream TV as of the date Newco is incorporated (including the Investors as per Annex I and other than, for the avoidance of doubt, any person or entity affiliated with Mathu and/or Raja Rajan, or any such other party as deemed necessary by both SLS and Hawk, and any affiliated entities) for subscription Common Stock and Warrants at a price of $0.00 per share of Common Stock  (with no additional payment for a number of such Stream TV shareholders' associated  Warrants pro rata to the number of its shares so purchased),  and otherwise on the terms and conditions set forth herein, but only upon the execution and delivery by each such shareholder of a release for the benefit of the Investors, SLS and Hawk, on terms and conditions mutually agreeable to each of the Investors, SLS and Hawk; provided, however, that the issued and outstanding shares of Common Stock (following any issuances pursuant to this Section 2(g)), may not exceed 150,000,000 shares.

- Warrant Terms.

  o  1/2 of Warrants exercisable at $1.00/share with a maturity date 3 months after the Formation Date
  o  1/2 of Warrants exercisable at $1.50/share with a maturity date 12 months after the formation date.
  o  Warrant holders to have the option prior to maturity of any option to exchange any 6 such warrants for 1 warrant with the same strike price, expiring 3 years from the date of original issuance

- Shareholders Agreement.      Subject to final terms set forth in definitive documentation, each shareholder shall, as part of its subscription for shares or otherwise, enter into a Shareholders Agreement that shall govern the material terms of ownership of Newco, including but not limited to control of Newco, protections from anti-dilution and transferability of shares.

[Exhibit A]

SEECUBIC-00000041