## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc.,[1] | Bky. No. 23-10763 (MDC) |
| Debtor. | |

| | |
|---|---|
| In re: | Chapter 11 |
| Technovative Media, Inc., | Bky. No. 23-10764 (MDC) |
| Debtor. | (Jointly Administered) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS TO PAY (I) PREPETITION EMPLOYEE OBLIGATIONS, (II) PREPETITION WITHHOLDING OBLIGATIONS, AND (III) POST-PETITION EMPLOYEE OBLIGATIONS IN THE ORDINARY COURSE

Debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") hereby move (the "Motion"), pursuant to sections 105, 363, 503, 507(a)(4), 507(a)(5), 541, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of an interim order substantially in the form annexed hereto as **Exhibit "A"** (the "Interim Order") and a final order substantially in the form annexed hereto as **Exhibit "B"** (the "Proposed Orders"): authorizing Debtors, in their sole discretion, to continue to honor and pay (i) prepetition employee obligations as described more fully herein, (ii) prepetition federal, state and applicable foreign withholding obligations, and (iii) post-petition obligations in the ordinary course, and in support state:

---

[1] Debtors, along with the last four digits of Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant of to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the belief requested herein are sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 9014-3.

## BACKGROUND

4.      On March 15, 2023 (the "Petition Date"), Debtors filed voluntary petitions for relief with the Court under chapter 11 of title 11 of the Bankruptcy Code. Debtors filed in the Eastern District of Pennsylvania because that is the location of their principal place of business.

5.      Since the Petition Date, Debtors have been operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      There is a pending request for the appointment of a trustee.  No request for examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Motion, no official committees have been appointed or designated.

**Overview of Debtors**

7.      Debtors were founded in 2009 as "new media" companies to pursue new technologies that enhance user entertainment and communications experiences.  The technology that Debtors are currently seeking to launch allows TV and tablet manufacturers to convert two dimensional devices into three dimensional without the need for viewing glasses. Debtors are incorporated in Delaware and have a principal executive office located in Philadelphia, Pennsylvania.

8.      Technovative is a wholly owned subsidiary of Stream. Through their global engineering team, Debtors have developed breakthrough glasses-free 3D display technology launched under the trade name Ultra-D™ ("Ultra-D"). Ultra-D is a proprietary combination of hardware and software which creates a natural, comfortable and immersive Glasses-Free 3D viewing experience. Resulting from years of research and development in the field of 3D optics, multi-view rendering and content development solutions, Ultra-D solves the two biggest limitations of the market's current 3D technology: the need to wear special glasses and the scarcity of 3D content.

9.      As a core technology, Ultra-D can be applied to panels of nearly any type and size and is compatible with touch screen features as well. This means that consumers can have a seamless experience with virtually any device – televisions, tablets, smartphones, portable game players, laptops, all-in-one computers and more. Stream's mission is to enable superior consumer media experiences by advancing the evolution of display technology from a flat 2D world to an immersive one made possible in 3D without glasses.

10.      Debtors intend to generate revenue from providing 3D components to final market assemblers (such as TV manufacturers and tablet makers). Debtors view their approach as similar

to the way in which major computer manufacturers use processors in their products and note their products as such. Debtors have a term sheet for a distribution and supply chain finance agreement with Visual Semiconductor, Inc. which they intend to consummate in the ordinary course of business and with court approval as applicable.

11.     Debtors intend to restructure their debt through these Chapter 11 Cases so that their debt service is reduced to a level that will allow Debtors to sustain their operations for the long term and have identified investors who are willing to invest in Debtors once Debtors pursue these Chapter 11 Cases. Debtors also intend to complete recovery of assets, including assets which were previously and wrongfully transferred to SeeCubic, Inc. ("SCI") in contravention of express provisions of Stream's corporate charter as confirmed by the Delaware Supreme Court through a decision on June 15, 2022. *See Stream TV Networks, Inc. v. Seecubic, Inc.*, No. 360, 2021, p. 3 (Del. June 15, 2022) (Holding that "a majority vote of Class B stockholders is required under Stream's charter" to "transfer pledged assets to secured creditors in connection with what was, in essence, a privately structured foreclosure transaction").[2] In holding that its corporate charter had been violated, the Delaware Supreme Court noted that Stream's charter was "unambiguous" and, ergo, "enforcing the unambiguous [c]harter provision [requiring Class B stockholders be allowed to vote on the asset transfer] is consistent with our policy of seeking to promote stability and

---

[2] The Delaware Supreme Court also held that the "agreement authorizing the secured creditors to transfer Stream's pledged assets . . . is invalid because Stream's unambiguous certificate of incorporation required the approval of Stream's Class B stockholders" and there was no "Board Only insolvency exception" to Section 271 of the DGCL, and even if there had been a board-only insolvency exception to Section 271, it had been superseded. *Id.*. at p. 34. The Delaware Supreme Court's opinion definitively established that there had been an improper transfer of assets, in violation of Debtor's corporate charter. *Id.* at p. 53 n. 180 ("We note that Section 271 presents no barrier to the parties' foreclosure proceedings in Superior Court (which are presently stayed pending this appeal), and no party has argued that judicial foreclosure proceedings implicate Section 271").

predictability in our corporate laws. . . ." *Id*. at pp. 53-54. Debtors had grave concerns that the Delaware Supreme Court mandate was not being followed, particularly due to the passage of time without full return of their assets, and those fears were confirmed recently. Valuable intellectual property and trade secrets are in danger of being transferred to third parties or are not being properly monitored and exposure to liability from the collapse of operations of Debtors' foreign subsidiaries due to the failure to make payments by third parties mandated by the Delaware Chancery Court to preserve those assets.

12.    A detailed description of Debtors and their businesses, including facts and circumstances giving rise to these Chapter 11 Cases, is set forth in the *Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Chapter 11 Petition, Supporting Emergency Relief, and First Day Motions* [ECF No. 48], which is incorporated herein by reference.

### **RELIEF REQUESTED**

13.    Prior to the Petition Date, Debtors incurred payroll and various other obligations and offered standard employee benefits funded by either Debtors, their employees or both. The payroll and various other obligations as well as the standard employee benefits were designed to be an integral part of the compensation Debtors' employees receive.  Debtors, by this Motion, seek authority, in their sole discretion (and subject to the statutory caps contained in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code and in accordance with any orders authorizing post-petition financing and the use of cash collateral and the applicable budget thereunder), to pay and honor, as the case may be, (i) all prepetition claims of Employees, including, but not limited to, claims for Wages, Overtime, and Temporary Employee Compensation, as applicable, and certain costs and disbursements related to the foregoing, (ii) any claims or payments pursuant to the Employee Benefit Plans, (iii) all Benefits Withholding Obligations (romanettes (i) through (iii) collectively,

the "Employee Obligations"), and (iv) the Reimbursable Expenses. Notwithstanding the

foregoing, nothing in this Motion seeks to authorize (1) the payment of any amounts in satisfaction

of bonus or severance obligations subject to section 503(c) of the Bankruptcy Code; (2) the

payment of any amounts owing to any retired or former Employees (as defined herein) under any

supplemental executive retirement plan or otherwise, or (3) Debtors to cash out unpaid vacation

or leave time upon termination of an Employee, unless applicable state law requires such payment.

Furthermore, payments of prepetition amounts owed on account of Employee Obligations and to

Temporary Employees will be subject to the statutory caps contained in sections 507(a)(4) and

507(a)(5) of the Bankruptcy Code.

## **FACTS RELEVANT TO THIS MOTION**

14.    As of the Petition Date, Stream had only one employee in the United States, Mathu

Rajan, who serves as President and Chief Executive Officer. Technovative, a wholly owned

subsidiary of Stream, is a holding company that has never had any employees, though Mr. Rajan

serves as President and CEO. Mr. Rajan provides unpaid services to both entities.

15.    As of the Petition Date, Debtors had 28 full-time salaried employees in their

research and development subsidiary company, SeeCubic B.V. ("SCBV"), located in the

Netherlands. SCBV also utilizes the services of staffing agencies and independent contractors to

fulfill critical employment needs and provide special skills required by the SCBV and Debtors.

The number of independent contractors fluctuates at any given time depending upon Debtors'

needs, and as of Petition Date, is currently approximately 6 individuals.

16.    The Netherlands employees and contractors perform several critical functions for

Debtors' businesses, including research, engineering, information technology, and sales support.

Their skills and specialized knowledge of Debtors' technology, as well as their relationships with vendors and other third parties, are essential to Debtors' continuing business operations.

17.    In the months leading up to the improvident December 8, 2020 Preliminary Injunction Order (the "PI Order") of the Delaware Court of Chancery (the "Chancery Court") which stripped Stream of its assets, Stream had approximately 20 full-time salaried employees in the United States engaged in administration, finance, investor relations, legal, business development, sales and marketing, engineering, project management, and other areas critical to its business. When Stream lost its assets pursuant to the PI Order, it was unable to retain its employees and ceased to function as an operating company. Upon approval of the Bankruptcy Court, Stream intends to re-hire these employees to re-establish Stream as a full operational entity.

18.    Prior to the PI Order, Debtors also had approximately 3 full-time, salaried employees in their Taiwan sales subsidiary, STREAM TV INTERNATIONAL B.V. (Representative Office). Due to uncertainty caused by the efforts of SeeCubic, Inc. ("SCI") to enforce the later-invalidated Omnibus Agreement, those employees resigned. However, Debtors have maintained their relationship with those employees and intend to rehire them upon approval of the Court, so that they may solicit new customer orders in Asia.

19.    Prior to the PI Order, Stream had also engaged approximately 15 independent contractors in Beijing, China through ST4M, Inc. to provide global sales staff, product engineering, and related support. Stream has maintained their relationship with those contractors and intends to hire them as direct employees of its China subsidiary upon Court approval, so that they may solicit new customer orders in Asia and assist with completion of low-cost 3D components required to satisfy Stream's current customer orders.

20.     For the benefit of Debtors, Visual Semiconductor, Inc. ("VSI") has retained many of Debtors' former employees and independent contractors rather than lose them to other employment opportunities or competitors. As of the date of this Motion, VSI has retained (i) 9 of Stream's former full-time salaried employees, (ii) all 3 former full-time salaried employees of Debtors' Taiwan subsidiary, and (iii) all 15 of the ST4M, Inc. independent contractors in Beijing.

21.     VSI and Stream are in negotiations for VSI to serve as Debtors' bankruptcy plan sponsor, subject to approval of the Bankruptcy Court. As part of Debtor's reorganization plan negotiations, VSI and Stream hope to execute a business combination of both entities through a stock exchange. The newly combined entity intends to engage the former Stream employees and JoveAI contractors as full-time salaried employees.

## **Wages, Incentive Payments and Payroll Obligations**

### A.     **The Netherlands**

22.     In order for Debtors to execute their fiduciary obligations to the bankruptcy estate, as well as maximize value for all creditors, Debtors request that the Court condition any payments on Debtors' examination and due diligence of the books and records of SCBV. To date, Debtors have incomplete records and, in order to execute their responsibilities, Debtors require transparency and disclosure from their subsidiaries in order to support the extraordinary relief requested in this Motion. Debtors intend to make emergency payments on an interim basis in order to allow Debtors to assess their human resources and move forward on a final basis after proper due diligence. In the absence of the appointment of a committee of unsecured creditors, Debtors will work with the office of the U.S. Trustee to ensure they receive the required information from their subsidiaries.

23.     In the ordinary course of Debtors' businesses, Debtors pay wages, salaries and compensation ("Wages and/or Overtime") to their Dutch Employees on a monthly basis by wire transfer to SCBV, which them pays the employees by direct bank deposit. The pay date in practice is the 25th day of the month[3] unless such date falls on a weekend or bank holiday, in which case the pay date for such period is the immediately preceding business day.

24.     The SCBV gross payroll is approximately €165,000 euros (USD $180,000) per month, excluding payroll taxes and other government-mandated fees (as defined below). Debtors fund payroll on or about the 21st day of the month to allow for international funds transfers and local processing by the SCBV finance team. As of the Petition Date, Debtors estimate that there are no unpaid Wages and Overtime earned prior to the Petition Date. By way of this Motion, Debtors request the authority, in the ordinary course of business, to pay the Dutch Employees.

25.     In addition to SCBV Employees, Debtors also provide funding in the ordinary course of business for SCBV's engagement of 6 independent contractors (the "SCBV Independent Service Providers") who provide unique engineering services essential to Debtors' ongoing business operations (the "SCBV Independent Services"). The SCBV Independent Service Providers are employed by, and provided to SCBV by, staffing agencies, including TMC Electronics B.V. and TMC Physics B.V. The current post-petition cost for the SCBV Independent Services is approximately €42,000 euros (USD $46,000) per month, payable 30 days after the last day of the month in which SCBV Independent Services are rendered.

26.     Debtors estimate that the aggregate accrued amount owing to the SCBV Independent Service Providers as of the Petition Date is approximately €176,190 euros (USD $193,000). The SCBV Independent Service Providers are paid through SCBV's respective

---

[3] Contractually, the SCBV pay date must occur by the last day of the calendar month.

accounts payable and not through the SCBV's payroll. Nonetheless, if Debtors are unable to pay the SCBV Independent Service Providers, Debtors may lose the services, continuity and institutional knowledge of the SCBV Independent Service Providers, and Debtors' business operations could be severely and irreparably compromised. Debtors reserve the right to seek to reject any executory contract, including those of the SCBV Independent Service Providers after conducting their due diligence.

27.    By way of this Motion, Debtors request the authority, in the ordinary course of business, to pay SCBV Independent Service Providers for obligations accrued prepetition, and to continue to otherwise pay SCBV Independent Service Providers in the ordinary course of business. Because of the integrated work performed by the SCBV Independent Service Providers, Debtors will need to assess current needs and likely implement a brief transition period, as necessary, if the SCBV Independent Service Providers are reduced in number.

28.    As an employer, SCBV is required by Dutch law to withhold taxes from Wages for remittance to appropriate tax authorities (the "Employee Taxes"). In addition to the Employee Taxes, Debtors are required to pay, from their own funds, additional amounts for certain social costs (together with the Employee Taxes, the "Payroll Taxes") and remit the same to the appropriate authorities (collectively, the "Taxing Authorities").

29.    In the aggregate, Debtors estimate that unpaid and outstanding prepetition Payroll Taxes dating back to December 31, 2022, owed to the Taxing Authorities, including penalties and interest, is €544,000 euros (USD $596,000). Post-petition SCBV Payroll Taxes total approximately €136,000 euros (USD $149,000) per month, based on actual monthly Payroll Taxes owed in February 2023. Debtors seek authority, in their sole discretion, to continue remitting the

Payroll Taxes to the appropriate Taxing Authorities as needed, including, without limitation, with respect to the most recent payroll period up to the Petition Date, and any prior period.

30.     Debtors note that SCBV, as approved by Debtors' CEO, Mathu Rajan, entered into a promissory note arrangement with SeeCubic, Inc. ("SCI") whereby SCI was obligated to provide up to $3,500,000 for SCBV operating and payroll expenses. Despite budget submissions from SCBV for monthly drawdowns totaling € 3,020,074 (USD $3,312,574) from November 2022 through February 2023; and despite the fact that promissory note drawdowns totaling €2,882,119 euros (USD $3,161,258)[4] were signed by Mr. Rajan, the court-appointed receiver, and Shadron L. Stastney on behalf of SCI; SCI appears to have sent only €1,935,083 (USD $2,118,641), leaving a shortfall of €947,036 euros (USD $1,038,758)[5] that was committed and agreed but not delivered by SCI, resulting in the significant arrears in payment of Payroll Taxes noted above, among other things.

31.     The fact that only approximately $2.1 million was provided by SCI and a balance of approximately $600,000 in unpaid Payroll Taxes dating back to December 2022 remains, is contradictory to the statement of Steve Caponi, counsel to Hawk Investment Holdings Limited ("Hawk"), a major shareholder of SCI representing SCI's purported complete support of SCBV. In the status conference for these Chapter 11 Cases held on April 14, 2023, Mr. Caponi erroneously declared:

> [T]here was funding from SeeCubic Inc., to SeeCubic B.V. via the receiver. The funding to cover payroll, and **we covered every single payroll and covered all the taxes** was, I think, **a little over $3 million**. … we funded the last payroll and left enough money there

---

[4] Approved draws against the promissory note were: €690,000 euros (USD $756,828) on November 17, 2022; €692,119 euros (USD $759,152) on December 17, 2022; €750,000 euros (USD $822,639) on January 3, 2023; and €7500,000 euros (USD $822,639) on February 17, 2023.

[5] Receipt of funds as indicated in limited financials provided by SCBV to Debtors.

when they filed the bankruptcy to cover the payroll. **So in the taxes, that's presently current**.

(*Status Conference Transcript*, p 161, 21-24 and p 145, 17-19)

32.     Debtors routinely withhold from SCBV Employee paychecks the Employee Taxes, and are required to transmit these amounts to the Taxing Authorities. Debtors believe that such withheld funds, to the extent that they remain in Debtors' possession, constitute moneys held in trust and therefore, are not property of Debtors' estates. Thus, whether or not such funds are prepetition amounts, Debtors believe that directing such funds to the Taxing Authorities does not require Court approval. Nevertheless, in the interests of transparency and full disclosure, Debtors seek authority to pay any outstanding amounts owed for Employee Taxes, in the ordinary course of business, including those incurred prior to the Petition Date.

33.     In the ordinary course of business, under Dutch law, Debtors have a set of guidelines pursuant to which they must offer severance payments to Employees whose employment has been involuntarily terminated (the "Severance Guidelines"). Debtors believe that, under the Severance Guidelines, these Employees would be entitled to receive, upon involuntary termination, a severance payment equal to the greater of three months of such Employee's base salary or one month for each year such Employee was employed by Debtor[6].

34.     Debtors utilize the services of Ernst & Young Nederland LLP for SCBV payroll processing. Fees ranging from approximately 3% to 8% of gross payroll depending on the category of SCBV Employee are paid to Ernst & Young Nederland LLP, totaling approximately €8,000 euros (USD $8,775) per month.  To the best of Debtors' knowledge, as of the Petition Date,

---

[6] To the extent Debtors propose to make severance payments to any SCBV Employees, Debtors will seek separate approval from this Court prior to making any such payments.

Debtors do not currently owe any balance for prepetition services provided to Debtors. Debtors are seeking authority to pay post-petition payroll processing fees in the ordinary course of business.

35.     As part of SCBV Employees' overall compensation, Debtors offer Employees certain fixed amounts of paid leave. Debtors' paid time off policy provides paid leave for holiday, sick and personal days ("Holiday Allowance"), accrued based upon the Employee's years of service to Debtors. Although it accrues during the year, the Holiday Allowance, which is equal to approximately 85% of a single month's gross pay, is paid to Employees each year as a single bonus payment added to the regular monthly payroll in May. The next Holiday Allowance is due to be paid on May 25, 2023, with transfer of funds by Debtors to SCBV on or about May 21, 2023.

36.     Debtors also allow their SCBV Employees to take certain other leaves of absence for personal reasons, many of which are required by law ("Leaves of Absence," and along with Holiday Allowance, collectively, "Paid Leave").  Leaves of Absence include medical leaves, among other things, and they do not count toward an Employee's Holiday Allowance. Debtors do not believe that they presently owe any amounts to Employees for Paid Leave.

37.     By this Motion, Debtors request authority to continue to honor their Paid Leave policies in the ordinary course of business and to honor all prepetition obligations up to the statutory cap related thereto in a manner consistent with their prepetition practices.

38.     SCBV is required to contribute toward state-sponsored pension on a monthly basis, with such contribution calculated in proportion to the gross Employee payroll for the period. The current monthly pension contribution is approximately €39,000 (USD $43,000).  Debtors do not believe there are any unpaid and outstanding pension payments due as of the Petition Date. Debtors are seeking authority to make required post-petition pension contributions in the ordinary course of business.

39.     Business expenses incurred by SCBV Employees in the course of employment and in furtherance of Debtors' business are generally paid directly by the Employee and then charged to Debtors in accordance with Debtors' reimbursement policy. Debtors reimburse Employees for certain ordinary course expenses incurred within the scope of employment, including personal protection equipment, travel and other miscellaneous expenses (collectively, the "Business Expenses").

40.     As of the Petition Date, Debtors are aware of approximately €18,300 (USD $20,000) in accrued and unpaid prepetition Business Expenses awaiting payment. Failing to reimburse employees for Business Expenses could have a negative effect on Employee morale and would cause those employees with outstanding Business Expenses to suffer undue hardship. Of course, all legitimate and reviewed prepetition Business Expenses will be reimbursed, but this will require disclosure and transparency to justify the extraordinary relief being requested in this Motion.

41.     Accordingly, Debtors seek authority, in their sole discretion, to (i) continue their prepetition practices with respect to the Business Expenses in the ordinary course of business, (ii) continue to pay the Business Expenses as they deem appropriate in their business judgment (subject to and in accordance with any orders authorizing post-petition financing and the use of cash collateral and the applicable budget thereunder), and (iii) pay all prepetition amounts outstanding in connection with the Business Expenses.  As part of the relief requested herein, Debtors seek authorization to pay the Employee Taxes and all other withholdings such as contributions to savings, retirement or pension plans, insurance contributions and charitable contributions, if any (collectively, the "Withholding Obligations").

### B.    The United States

42.    Debtors had no monthly payroll obligations as of the Petition Date, but Debtors seek to re-hire 9 key individuals who left Stream's employment following the PI Order in December 2020.  Gross payroll for such rehired employees (the "Re-Hired Employees") would be approximately $30,000 per month, excluding Payroll Taxes and related social costs (as defined below).

43.    Debtors would fund payroll on a semi-monthly basis, on approximately the 1st and 15th days of the month to allow for processing by third-party payroll firm Paychex or equivalent.

44.    As of the Petition Date, Stream estimates that it owes the 9 former Employees that it wishes to re-hire an aggregate of $30,232 in accrued Wages and Overtime earned prior to the Petition Date (subject to the variability described above), and no Employee is owed in excess of the statutory cap under section 507(a)(4) of the Bankruptcy Code on account of such Wages and Overtime.  By way of this Motion, Debtors request the authority, in the ordinary course of business, to pay Wages and Overtime accrued prepetition to Stream's Employees, up to the statutory priority amount of $15,150 per Employee (inclusive of other Employee Obligations that are subject to section 507(a)(4) of the Bankruptcy Code). Debtors further seek authority to engage and pay the Re-Hired Employees in the ordinary course of business.

45.    Stream also contracts with independent contractors (the "Stream Independent Service Providers") who provide content creation services that are essential to the Debtor's ongoing business operations (the "Stream Independent Services"). The Independent Service Providers are critical to Debtors' operations, and they rely on Debtors for their individual income. Debtors estimate the cost for Stream Independent Services to be approximately $10,000 per month,

and they seek authority to engage and pay the Stream Independent Service Providers in the ordinary course of business.

46.    Debtors estimate that the aggregate accrued amount owed to one specific Stream Independent Service Provider ("SISP-A") as of the Petition Date is approximately $29,578. Stream Independent Service Providers are paid through Debtors' respective accounts payable and not through Debtors' payroll. Nonetheless, if Debtors are unable to pay SISP-A, Debtors will lose the services, continuity and institutional knowledge of SISP-A, and Debtors' business operations will be severely and irreparably compromised. SISP-A is well known to Debtors, has produced excellent work and results in the past, provides great value and quality, and has met all due diligence requirements of Debtors.

47.    By way of this Motion, Debtors request the authority, in the ordinary course of business, to pay Stream Independent Service Providers for obligations accrued prepetition, and to continue to otherwise pay Stream Independent Service Providers in the ordinary course of business.

48.    As employers, Debtors are required by law to withhold Employee Taxes from Wages for remittance to appropriate tax authorities. In addition to the Employee Taxes, Debtors are required to pay, from their own funds, social security and Medicare taxes and pay, based on a percentage of gross payroll and subject to state- imposed limits, additional amounts for state and federal unemployment insurance (together with the Employee Taxes, the "Payroll Taxes") and remit the same to the Taxing Authorities.

49.    In the aggregate, Debtors estimate that Payroll Taxes related to the Re-Hired Employees would total approximately $10,000 to $12,000 per month. As of the Petition Date, Debtors owed approximately $178,493 to the Taxing Authorities on account of Payroll Taxes.

Debtors hereby seek authority, in their sole discretion, to remit the Payroll Taxes to the appropriate Taxing Authorities as needed, including, without limitation, any post-petition payroll period as well as prepetition amounts owed for prior payroll periods.

50.     As part of their overall compensation, Debtors offer Employees certain fixed amounts of paid leave. Debtors' paid time off policy provides paid leave for vacation, sick and personal days ("PTO"), accrued based upon the Employee's years of service to Debtors. Employees are not allowed to carry over any days of vacation from one calendar year to the next calendar year.

51.     Debtors also allow their Employees to take certain other leaves of absence for personal reasons, many of which are required by law ("Leaves of Absence," and along with PTO, collectively, "Paid Leave").  Leaves of Absence include family medical leaves, military leaves, and jury duty, and they do not count toward an Employee's PTO. Debtors do not believe that they presently owe any amounts to Employees for Paid Leave. By this Motion, Debtors request authority to continue to honor their Paid Leave policies in the ordinary course of business.

52.     Prior to the PI Order of December 2020 that stripped Debtors of their assets, Stream had established certain benefit plans and policies for eligible Employees that provided, among other benefits, medical, dental and vision plans, life insurance, disability insurance, and other benefits (collectively, including any administrative costs with respect thereto, the "Employee Benefit Plans"). A brief description of the Employee Benefit Plans is provided below.

53.     Stream intends to re-establish the Employee Benefit Plans simultaneously with its employment of the Re-Hired Employees. Stream seeks to sponsor several health and welfare benefit plans, including medical and dental coverage for eligible Employees in the United States through a self-funded plan (the "Medical Plan") administered by Allied Benefit Systems.

Employees would be eligible to participate in the Medical Plan if they are full-time Employees working at least thirty (30) hours per week.

54.    Debtors would be required to pay for all costs arising under the Medical Plan, including claims payments and associated administrative costs, but Employees would be responsible for satisfying the annual deductible and for paying copayments to a network provider. Debtors estimate that the total cost to provide the Medical Plan for all Stream Employees, inclusive of administrative fees, would be approximately $12,000 per month. As of the Petition Date, Debtors had no liability on account of incurred but unpaid medical claims for Employees in the Medical Plan.

55.    Debtors also intend to carry stop-loss insurance to cover any individual's claims in excess of the amount of estimated medical and dental claims in a calendar year. Debtors estimate that they would pay approximately $11,000 per month for such stop-loss coverage provided by Allied Benefit Systems. As of the Petition Date, there are no unpaid and outstanding administrative fees and insurance premiums owed on account of the Medical Plan.

56.    Debtors intend to offer vision benefits to their eligible Employees and their dependents through a fully insured plan (the "Vision Plan," and together with the Medical Plan, the "Health Plans") administered by Sun Life.  Employees are eligible to participate in the Vision Plan if they are full-time Employees working at least thirty hours per week.  Debtors intend to pay the premiums for the Vision Plan, which Debtors estimate would cost approximately $100 per month. As of the Petition Date, Debtors had no unpaid and outstanding premiums on account of the Vision Plans.

57.    Business expenses incurred by Employees in the course of employment and in furtherance of Debtors' business have previously been paid directly by the Employee and then

charged to Debtors in accordance with Debtors' reimbursement policy. Debtors intend to reimburse Employees for certain ordinary course expenses incurred within the scope of employment, including personal protection equipment, travel and other miscellaneous expenses (collectively, the "Business Expenses").

58.    As of the Petition Date, Debtors are aware of approximately $267,792 in accrued and unpaid Business Expenses awaiting payment by Stream. Failing to reimburse employees for Business Expenses could have a negative effect on Employee morale and would cause those employees with outstanding Business Expenses to suffer undue hardship. In the absence of the appointment of a committee of unsecured creditors, Debtors will work with the office of the U.S. Trustee to conduct a thorough review of the applicable Business Expenses and Debtors will review the various state labor laws, some of which broadly define wages to include both benefits and reimbursements of expenses.

59.    Accordingly, Debtors seek authority, in their sole discretion, to (i) continue their prepetition practices with respect to the Business Expenses in the ordinary course of business, (ii) continue to pay the Business Expenses as they deem appropriate in their business judgment, and (iii) pay all prepetition amounts outstanding in connection with the Business Expenses.

60.    As part of the relief requested herein, Debtors seek authorization to pay the Payroll Taxes and all other withholdings such as contributions to savings, retirement or pension plans, insurance contributions and charitable contributions, if any (collectively, the "Withholding Obligations"). Debtors routinely withhold from Employee paychecks the Withholding Obligations, and are required to transmit these amounts to third parties. Debtors believe that such withheld funds, to the extent that they remain in Debtors' possession, constitute moneys held in trust and therefore, are not property of Debtors' estates. Thus, whether or not such funds are

prepetition amounts, Debtors believe that directing such funds to the appropriate parties does not require Court approval. Nevertheless, in the interests of transparency and full disclosure, Debtors seek authority to pay any outstanding amounts owed for Withholding Obligations, in the ordinary course of business, including those incurred prior to the Petition Date.

### C.    Taiwan

61.    Debtors have a wholly owned, downstream subsidiary for Asia sales. That entity, Stream TV International B.V. (Representative Office) ("Stream Taiwan"), does not currently have any employees. Its 3 former employees resigned during the Chancery Court litigation that resulted in the improvident PI Order. As stated above, VSI has retained those individuals as independent contractors for the benefit of Debtors. Stream Taiwan intends to re-hire those individuals (the "Taiwan Employees") upon approval of the court, so that they may resume sales activities in Asia on behalf of Debtors.

62.    Stream Taiwan's gross payroll would be approximately $7,000 per month, including Payroll Taxes and related social costs. Debtors would fund payroll on or about the 25th day of the month to allow for international funds transfers and local processing by the Stream Taiwan finance team. As of the Petition Date, Debtors are not aware of any unpaid and outstanding accrued Wages and Overtime earned prior to the Petition Date (subject to the variability described above), and no Taiwan Employee is owed in excess of the statutory cap under section 507(a)(4) of the Bankruptcy Code on account of such Wages and Overtime.  By way of this Motion, Debtors request the authority to re-hire and pay the Taiwan Employees in the ordinary course of business.

63.    Debtors are required to contribute to a state-sponsored health plan (the "Taiwan Medical Plan") for the Taiwan Employees. The cost to Debtors for the Taiwan Medical Plan is approximately $3,000 per month. As of the Petition Date, Debtors had no unpaid balance owing

toward the Taiwan Medical Plan. By this Motion, Debtors seek authority to make payments as required by the Taiwan government for the Taiwan Medical Plan.

64.     Business Expenses incurred by the Taiwan Employees in the course of employment and in furtherance of Debtors' business have previously been paid directly by the Employee and then charged to Stream Taiwan in accordance with Debtors' reimbursement policy. Debtors intend to reimburse Taiwan Employees for certain ordinary course expenses incurred within the scope of employment, including personal protection equipment, travel and other miscellaneous expenses.

65.     As of the Petition Date, Debtors are aware of approximately $3,437 in accrued and unpaid Business Expenses of the Taiwan Employees awaiting payment. Failing to reimburse employees for Business Expenses could have a negative effect on Employee morale and would cause those employees with outstanding Business Expenses to suffer undue hardship.

66.     Accordingly, Debtors seek authority, in their sole discretion, to (i) continue their prepetition practices with respect to the Business Expenses in the ordinary course of business, (ii) continue to pay the Business Expenses as they deem appropriate in their business judgment (subject to and in accordance with any orders authorizing post-petition financing and the use of cash collateral and the applicable budget thereunder), and (iii) pay all prepetition amounts outstanding in connection with the Business Expenses.

**D.     China**

67.     Prior to the improvident PI Order of December 2020, Debtors contracted with ST4M, Inc. for the services of 15 independent contractors who provided a wide variety of services in Beijing, China, including but not limited to administration, finance, sales and marketing, business development, engineering, and manufacturing.

68.    As stated above, VSI has engaged all 15 contractors in recent months for the benefit of Debtors, so that these key individuals with valuable knowledge of Debtors' Asia operations would not be lost to other employment opportunities. All of these contractors have expressed a desire to become employees of Debtors' China subsidiary subject to approval of the Bankruptcy Court.

69.    Although Debtors have two subsidiaries in China – Shanghai Ruishi Technology Development Co. and Suzhou Trading Company – they intend to establish a Beijing-based subsidiary, upon approval of the court, to accommodate the 15 Beijing employees (the "Beijing Employees"), so that they may resume business and sales activities in China on behalf of Debtors.

70.    Gross payroll for the Beijing Employees would be approximately ¥150,000 yuan (USD $21,825) per month, including Payroll Taxes and related social costs. Debtors would fund payroll on or about the 25th day of the month to allow for international funds transfers and local processing in China. As of the Petition Date, Debtors had no unpaid and outstanding accrued Wages and Overtime owed because all staff providing services were doing so as independent contractors through ST4M, Inc. By way of this Motion, Debtors request the authority to establish a Beijing subsidiary and subsequently hire and pay the Beijing Employees in the ordinary course of business.

71.    Debtors are required to contribute to a state-sponsored health plan (the "China Medical Plan") for the Beijing Employees. The cost to Debtors for the China Medical Plan is approximately ¥200,000 yuan (USD $29,100) per quarter. As of the Petition Date, Debtors had no unpaid balance owing toward the China Medical Plan. By this Motion, Debtors seek authority to make payments as required by the Taiwan government for the China Medical Plan.

72.     Business Expenses incurred by the Beijing Employees in the course of employment and in furtherance of Debtors' business have previously been paid directly by the Employee and then charged to Debtors in accordance with Debtors' reimbursement policy. Debtors intend to reimburse Beijing Employees for certain ordinary course expenses incurred within the scope of employment, including personal protection equipment, travel and other miscellaneous expenses. As of the Petition Date, Debtors are not aware of any accrued and unpaid Business Expenses of the Beijing Employees awaiting payment.

73.     Accordingly, Debtors seek authority, in their sole discretion, to (i) continue their prepetition practices with respect to the Business Expenses of the Beijing Employees, should Debtors be authorized to hire them, in the ordinary course of business, and (ii) continue to pay the Business Expenses as they deem appropriate in their business judgment.

## BASIS FOR RELIEF

74.     Pursuant to section 507(a)(4)(A) of the Bankruptcy Code, claims of employees against a debtor for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status to the extent of $15,150 per individual. 11 U.S.C. § 507(a)(4)(A). Similarly, section 507(a)(5) of the Bankruptcy Code provides that employees' claims for contributions to certain employee benefits plans are also afforded priority unsecured status to the extent of $15,150 per employee covered by such plan, less any amount paid pursuant to Bankruptcy Code section 507(a)(4). 11 U.S.C. § 507(a)(5).

75.     Furthermore, section 363(b)(1) of the Bankruptcy Code provides that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code

further provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

76.    Debtors believe that many of the Employee Obligations relating to the period prior

to the Petition Date constitute priority claims under sections 507(a)(4) and (5) of the Bankruptcy

Code. As priority claims, these obligations must be paid in full before any of Debtors' general

unsecured obligations may be satisfied.  Accordingly, the relief requested will affect only the

timing of the payment of these priority obligations and should not prejudice the rights of general

unsecured creditors or other parties in interest.

77.    The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which

the bankruptcy court can exercise its equitable power to allow payment of critical prepetition

claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested

herein. *See In re Lehigh and New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a

court may authorize payment of prepetition claims if such payment is essential to continued

operation of the debtor); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989)

(authorizing the payment of prepetition employee wages and benefits while acknowledging that

there is judicial power to "authorize a debtor in a reorganization case to pay prepetition claims

where such payment is essential to the continued operation of the debtor"); *see also In re Just For

Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999) (holding that Bankruptcy Code section 105(a)

"provides a statutory basis for the payment of prepetition claims" under the doctrine of necessity

and noting that the Supreme Court, the United States Circuit Court of Appeals for the Third Circuit, and the District Court of Delaware all accept the authority of the bankruptcy court "to authorize the payment of prepetition claims when such payment is deemed necessary to the survival of a debtor in a chapter 11 reorganization"); *In re Columbia Gas Sys., Inc*., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan). The rationale for the "doctrine of necessity" is consistent with the paramount goal of chapter 11 – "facilitating the continued operation and rehabilitation of the debtor. . . ." In re Ionosphere Clubs, Inc., 98 B.R. at 176. Accordingly, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, this Court is empowered to grant the relief requested herein.

78.     Debtors submit that, as set forth above, payments made in connection with the Employee Obligations and Employee Benefits are justified by the facts and circumstances of the Chapter 11 Cases. Courts in this and other districts have ruled that the standard for approval under section 503(c)(3) of the Bankruptcy Code – that the programs are justified by the facts and circumstances of the case – is essentially the same as the standard for similar transactions under section 363(b)(1) of the Bankruptcy Code: the business judgment standard. S*ee, e.g.*, *In re Global Home Prods., LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007) (reviewing incentive plans under the business judgment standard); *In re Dana Corp*., 358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006) (reviewing bonus plans under the business judgment standard). Thus, payments in connection with Employee Obligations and Employee Benefits are allowed under section 503(c)(3) of the Bankruptcy Code because they represent the exercise of Debtors' sound business judgment under section 363 of the Bankruptcy Code and are in the best business interest of Debtors' estates and their creditors.

79.    In these cases, any delay or failure to pay Employee Obligations and Employee Benefits could irreparably damage the Employees' morale, dedication, confidence and cooperation and could adversely affect Debtors' relationship with the Employees at a time when the Employees' support is critical. Debtors simply cannot risk the substantial harm to their businesses that would inevitably attend any decline in their Employees' morale. Such relief allows Debtors to focus on maximizing value for the benefit of their estates and creditors. Under these circumstances, approval of the requested relief is appropriate.

80.    Absent an order granting the relief requested herein, the Employees could suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question may be needed to enable certain of the Employees to meet their own personal financial obligations. Imposing such hardship on the Employees could undermine Debtors' stability, perhaps irreparably, because it could cause otherwise loyal Employees to seek other employment alternatives. In addition, it would be inequitable to require the Employees to bear personally the cost of any Business Expenses they incurred prepetition on behalf of Debtors with the understanding that they would be reimbursed.

81.    With respect to Payroll Taxes in particular, the payment of such taxes will not prejudice other creditors, as the relevant Taxing Authorities generally would hold priority claims under section 507(a)(8) of the Bankruptcy Code with respect to such obligations. Moreover, Payroll Taxes withheld from an Employee's wages on behalf of an applicable Taxing Authority are held in trust by Debtors. Therefore, these Payroll Taxes are not property of Debtors' estates under section 541 of the Bankruptcy Code. *See, e.g.*, *Begier v. IRS*, 496 U.S. 53, 60-61 (1990) (concluding that withholding taxes are property held by a debtor in trust for another and, as such, are not property of the debtor's estate).

82.    Debtors do not seek to alter any of the Employee Benefits at this time.  This Motion is intended only to permit Debtors, in their discretion, to (i) make payments consistent with existing policies to the extent that, without the benefit of an order approving this Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code and (ii) continue to honor practices, programs, and policies with respect to their Employees, insofar as such practices, programs, and policies were in effect as of the Petition Date. Payment of all Employee Benefits in accordance with Debtors' prepetition business practices is in the best interests of Debtors' estates, their creditors and all parties in interest and will enable Debtors to continue to operate their businesses in an economic and efficient manner and to conduct a successful reorganization without disruption. Debtors' Employees are central to their businesses and are vital to these Chapter 11 Cases, and failure to pay the Employee Benefits would have a detrimental impact on Debtors and their efforts to preserve and maximize value for their stakeholders. The total amount sought to be paid herein is modest compared with the magnitude of Debtors' overall business and the importance of the Employees to Debtors' operations during these Chapter 11 Cases.

83.    In other chapter 11 cases, courts in this Circuit have approved payment of prepetition claims for compensation, benefits, and expense reimbursements similar to those described herein. *See, e.g., In re National Museum of American Jewish History*,  No. 20-11285 (MDG), *In re Kabbage, Inc.*, No. 22-10951 (CTG) (Bankr. D. Del. Oct. 6, 2022); *In re Nine Point Energy Holdings, Inc.*, No. 21-10570 (MFW) (Bankr. D. Del. Mar. 18, 2021); *In re Alamo Drafthouse Cinemas Holdings, LLC*, No. 21-10474 (MFW) (Bankr. D. Del. Mar. 4, 2021).  The Local Rule 1002-3 for the United States Bankruptcy Court for the Eastern of Pennsylvania also contemplates the review of similar relief on an expedited basis of both a Motion for Approval to Pay Pre-Petition Employee Wage Claims, Benefits, and Related Taxes to all Employees,

Independent Contractors, and Tax Authorities (L.R. 1002-3(14)) and a Motion for Approval to Pay

Other Pre-Petition Claims (L.R. 1002-3(14)).

84.     Accordingly, by this Motion, Debtors seek authority, pursuant to sections 105(a)

and 363(b) of the Bankruptcy Code, to continue to provide Employee Benefits and pay Employee

Obligations, at their discretion, as they become due and owing during the pendency of these cases

and to continue, uninterrupted, all practices, programs and policies with respect to Debtors'

Employees, insofar as such practices, programs and policies were in effect as of the Petition Date.

## THE MOTION SATISFIES BANKRUPTCY RULE 6003

85.     Bankruptcy Rule 6003 provides that to the extent relief is necessary to avoid

immediate and irreparable harm, a bankruptcy court may grant certain forms of relief during the

twenty-one (21) days immediately following the filing date. As described herein and in the Rajan

Declaration, Debtors' Employees are integral to their operations. Failure to satisfy Debtors'

obligations with respect to their Employees in the ordinary course of business during these cases

will jeopardize the Employees' loyalty and trust, possibly causing Employees to leave Debtors'

employment; such a departure of vital employees would severely disrupt Debtors' operations at

this critical juncture. Moreover, the Employees rely on their compensation, benefits, and

reimbursement of expenses to pay their living expenses, and it could be financially ruinous if

Debtors cannot pay them in the ordinary course of business. Accordingly, Debtors submit that they

have satisfied the requirements of Bankruptcy Rule 6003 to support immediate payment of certain

prepetition obligations related to the Employees.

## REQUEST FOR EXPEDITED CONSIDERATION OF THE MOTION
## TO AVOID IMMEDIATE AND IRREPARABLE HARM

86.     Debtors submit that for the reasons already set forth herein, the relief requested in

this Motion is necessary to avoid immediate and irreparable harm to Debtors, and, therefore,

Debtors seek the relief requested in this Motion on an expedited basis, on or before April 24, 2024. As recognized by the Court at the hearings on April 14, 2023, Debtors have an immediate need for funding of operations, including the funding of the operations of Debtors' subsidiaries in the Netherlands.

## **WAIVER OF BANKRUPTCY RULE 6004(h)**

87.     Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, paying the Employee Obligations and maintaining Employee Benefits is necessary to prevent irreparable damage to Debtors' business operations and, therefore, the value of Debtors' businesses.  Accordingly, Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## **DEBTORS' RESERVATION OF RIGHTS**

88.     Nothing contained in this Motion or any actions taken by Debtors pursuant to relief granted in any order is intended or should be construed as: (a) an admission as to the validity of any particular claim against Debtors; (b) a waiver of any party's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; I a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of any party's rights under the Bankruptcy Code or any other applicable law; or (g) a concession by any party that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and all parties' rights to

contest the extent, validity, or perfection or seek avoidance of all such liens are hereby reserved.

If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not

intended and should not be construed as an admission as to the validity of any particular claim or

a waiver of any party's rights to subsequently dispute such claim.

## NOTICE

89.    Debtors will provide notice of this Motion to the following parties or their

respective counsel: (i) the U.S. Trustee for the Eastern District of Pennsylvania; (ii) the Office of

the United States Attorney General for the Eastern District of Pennsylvania; (iii) the Internal

Revenue Service; (iv) the holders of the twenty (20) largest unsecured claims against Debtors on

a consolidated basis; and (v) all parties that have filed a notice of appearance and request for

service of papers pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  Debtors

submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

90.    No prior request for the relief sought in this Motion has been made to this Court or

any other court.

**WHEREFORE**, Debtors respectfully request that the Court grant the relief requested

herein and such other and further relief as the Court may deem just and proper.

Date: April 21, 2023                    Respectfully submitted,

                                        /s/ Rafael X. Zahralddin-Aravena
                                        Rafael X. Zahralddin-Aravena (PA Bar No. 71510)
                                        **LEWIS BRISBOIS BISGAARD & SMITH, LLP**
                                        550 E. Swedesford Road, Suite 270
                                        Wayne, PA 19087
                                        Telephone: (302) 985-6000
                                        Facsimile: (302) 985-6001
                                        Rafael.Zahralddin@lewisbrisbois.com

                                        -and-

Vincent F. Alexander (admitted *pro hac vice*)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
110 SE 6th Street, Suite 2600
Fort Lauderdale, FL 33301
Telephone: (954) 728-1280
Facsimile: (954) 678-4090
Vincent.Alexander@lewisbrisbois.com

-and-

Bennett G. Fisher (pro hac pending)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
24 Greenway Plaza, Suite 1400
Houston, TX 77046
Telephone: (346) 241-4095
Bennett.Fisher@lewisbrisbois.com

*Proposed Counsel to Debtors*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 21, 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day by  transmission of Notice of Electronic Filing generated by CM/ECF on all parties who are authorized to receive electronically Notice of Electronic Filing in this bankruptcy case.

/s/ Rafael X. Zahralddin-Aravena
Rafael X. Zahralddin-Aravena