# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc.,[1] | Bky. No. 23-10763 (MDC) |
| Debtor. | |

| | |
|---|---|
| In re: | Chapter 11 |
| Technovative Media, Inc., | Bky. No. 23-10764 (MDC) |
| Debtor. | (Jointly Administered) |

## DEBTORS' EXPEDITED MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS TO TAKE CERTAIN ACTIONS IN THE ORDINARY COURSE OF BUSINESS

Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), substantially in the form of the proposed orders attached hereto as **Exhibits A and B**, pursuant to sections 105(a), 363, 541, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9014-3 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Local Rules"), authorizing, on an interim and final basis, (a) Debtors to sell unissued shares of Class A common stock of Stream; (b) Debtors to use their optical bonding equipment; (c) Stream to enter into a distribution agreement with Visual Semiconductor, Inc. ("VSI"); and (d) Debtors to fund the operations of their subsidiaries, including SeeCubic B.V. ("SCBV"), and in support state:

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. The Debtors confirm their consent to the Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a), 363, 541, 1107, and 1108 of the Bankruptcy Code, Rule 6004 of the Bankruptcy Rules, and Rule 9014-3 of the Local Rules.

## BACKGROUND

### A.  The Bankruptcy Filing

4.      On March 15, 2023 (the "Petition Date"), Debtors filed voluntary petitions for relief with the Court under chapter 11 of title 11 of the Bankruptcy Code. Debtors filed in the Eastern District of Pennsylvania because that is the location of their principal place of business.

5.      Since the Petition Date, Debtors have been operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Motion, no official committees have been appointed or designated.

93593930.4

### B.  Overview of Debtors

7.      Debtors were founded in 2009 as "new media" companies to pursue new technologies that enhance user entertainment and communications experiences.  The technology that Debtors are currently seeking to launch allows TV and tablet manufacturers to convert two dimensional devices into three dimensional without the need for viewing glasses. Debtors are incorporated in Delaware and have a principal executive office located in Philadelphia, Pennsylvania.

8.      Technovative is a wholly owned subsidiary of Stream. Through their global engineering team, Debtors have developed breakthrough glasses-free 3D display technology launched under the trade name Ultra-D™ ("Ultra-D"). Ultra-D is a proprietary combination of hardware and software which creates a natural, comfortable and immersive Glasses-Free 3D viewing experience. Resulting from years of research and development in the field of 3D optics, multi-view rendering and content development solutions, Ultra-D solves the two biggest limitations of the market's current 3D technology: the need to wear special glasses and the scarcity of 3D content.

9.      As a core technology, Ultra-D can be applied to panels of nearly any type and size and is compatible with touch screen features as well. This means that consumers can have a seamless experience with virtually any device – televisions, tablets, smartphones, portable game players, laptops, all-in-one computers and more. Stream's mission is to enable superior consumer media experiences by advancing the evolution of display technology from a flat 2D world to an immersive one made possible in 3D without glasses.

10.      Debtors intend to generate revenue from providing 3D components to final market assemblers (such as TV manufacturers and tablet makers). Debtors view their approach as similar

to the way in which major computer manufacturers use processors in their products and note their products as such.

11.     Debtors intend to restructure their debt through these Chapter 11 Cases so that their debt service is reduced to a level that will allow Debtors to sustain their operations for the long term and have identified investors who are willing to invest in Debtors once Debtors pursue these Chapter 11 Cases. Debtors also intend to complete recovery of assets, including assets which were previously and wrongfully transferred to SeeCubic, Inc. ("SCI") in contravention of express provisions of Stream's corporate charter as confirmed by the Delaware Supreme Court through a decision on June 15, 2022. *See Stream TV Networks, Inc. v. Seecubic, Inc.*, No. 360, 2021, p. 3 (Del. June 15, 2022) (Holding that "a majority vote of Class B stockholders is required under Stream's charter" to "transfer pledged assets to secured creditors in connection with what was, in essence, a privately structured foreclosure transaction").[2] In holding that its corporate charter had been violated, the Delaware Supreme Court noted that Stream's charter was "unambiguous" and, ergo, "enforcing the unambiguous [c]harter provision [requiring Class B stockholders be allowed to vote on the asset transfer] is consistent with our policy of seeking to promote stability and predictability in our corporate laws. . . ." *Id*. at pp. 53-54. Debtors had grave concerns that the Delaware Supreme Court mandate was not being followed, particularly due to the passage of time

---

[2] The Delaware Supreme Court also held that the "agreement authorizing the secured creditors to transfer Stream's pledged assets . . . is invalid because Stream's unambiguous certificate of incorporation required the approval of Stream's Class B stockholders" and there was no "Board Only insolvency exception" to Section 271 of the DGCL, and even if there had been a board-only insolvency exception to Section 271, it had been superseded. *Id*. at p. 34. The Delaware Supreme Court's opinion definitively established that there had been an improper transfer of assets, in violation of Debtor's corporate charter. *Id*. at p. 53 n. 180 ("We note that Section 271 presents no barrier to the parties' foreclosure proceedings in Superior Court (which are presently stayed pending this appeal), and no party has argued that judicial foreclosure proceedings implicate Section 271").

93593930.4

without full return of their assets, and those fears were confirmed recently. Valuable intellectual property and trade secrets are in danger of being transferred to third parties or are not being properly monitored and exposure to liability from the collapse of operations of Debtors' foreign subsidiaries due to the failure to make payments by third parties mandated by the Delaware Court of Chancery ("Chancery Court") to preserve those assets.

12.    A detailed description of Debtors and their businesses, including facts and circumstances giving rise to these Chapter 11 Cases, is set forth in the *Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Chapter 11 Petition, Supporting Emergency Relief, and First Day Motions* [ECF No. 48], which is incorporated herein by reference.

## ADDITIONAL FACTS RELEVANT TO THIS MOTION

### A.  Sale of Shares in Stream

13.    Prior to the Petition Date, Stream sold shares of its unissued stock to various third parties in the ordinary course of its business. The sale of stock is typical for early stage and growth companies. One entity that Stream sold unissued stock to was VSI Semiconductor, Inc. ("VSI"). Stream's CEO, Mathu Rajan, is also the CEO of VSI. VSI held 49,369 shares of Stream as of the Petition Date.

14.    The sale of stock allowed Stream to pay its expenses, as well as the expenses of its subsidiaries. Stream seeks to continue to sell shares postpetition on an as-needed basis. The proceeds from any sale of stock will be utilized to pay for Debtors' business operations. Further, Stream seeks to enter into a stock purchase agreement with VSI for the sale of Stream shares to VSI up to a maximum purchase of $10 million.

93593930.4

### B. Bonding Equipment

15.      In 2015, Stream purchased two optical bonding lines (the "Bonding Equipment")

from Iinuma Gauge Manufacturing Company ("Iinuma"): a Small Production Line ("SPL") and a

Mass Production Line ("MPL"). The cost for the Bonding Equipment was a total of 935,000,000

Japanese yen. The Bonding Equipment is essential to Debtors' business. The SPL has certain

manual operation functions and limited capacity, and it was previously used by Stream for small

production runs while the MPL was being built. The MPL is much larger (the size of a room with

many separate robotic stations), includes more automation, and has the capacity to bond 14,000

units per month.

16.      Stream installed the SPL and MPL at the Pegatron Corporation factory in Suzhou,

China and produced approximately 1,000 units of 65-inch glasses-free 3D displays with the SPL

and an additional 4,000 units with the MPL, achieving a 96% yield rate.

17.      Both the SPL and MPL were optimized for bonding 65-inch panels. The optical

bonding process, which involves "gluing" a 3D lens to a normal 2D video panel with special

optical adhesive, requires extremely accurate alignment. The Bonding Equipment was adapted by

Iinuma to include certain intellectual property of Stream to meet the critical alignment

specification.

18.      The Bonding Equipment is currently disassembled and stored in a China warehouse

pending release and delivery to a facility operated by Debtors' strategic partner in Dongguan City,

Guangdong Province, China. Once reassembled, the Bonding Equipment will be repaired as

necessary by a representative of the original equipment manufacturer.

93593930.4

19.     Debtors anticipate the need to have a SCBV[3] process engineer on site in Dongguan City to assist with recommencement of bonding operations and optimization for maximum yield.

20.     Once the Bonding Equipment is reassembled and installed, small bonding runs can commence to test the equipment, ramping up toward mass production as soon as possible.

21.     The post-petition purchase orders obtained by Stream in excess of $100 million are for products measuring 65-inches in size, perfectly matching the proven capabilities of the Bonding Equipment. This is no coincidence; Stream sought customers willing to accept delivery of products in the available size and resolution (4K) previously produced and delivered.

**C.  Distribution Agreement with VSI**

22.     While engaged in its legal quest to reverse the improvident injunction of the Chancery Court discussed above, Stream remained mired in debt without title to or possession of its assets. As such, it was unable to attract the necessary capital to maintain operations or retain its employees.

23.     To resolve that issue, Mr. Rajan formed VSI as a vehicle to raise new capital for Stream and to support Stream. VSI is a semiconductor design firm. Funded by dozens of investors who remain committed to bringing the Ultra-D technology to a global market, VSI made strategic investments into Stream and engaged key Stream employees rather than lose them to competitors.

24.     While the Debtors reorganize in chapter 11, VSI is prepared to fund product development and even the supply chain if necessary to satisfy Stream's customers.

25.     As compensation for this support, Stream has entered into an Exclusive Distribution Agreement (the "Distribution Agreement") with VSI where VSI will accept orders from and make

---

[3] SCBV is one of Debtors' subsidiaries located in the Netherlands.

delivery to third-party customers. A true and correct copy of the Distribution Agreement is attached hereto as **Exhibit C.**

26.     VSI will then issue back-to-back purchase orders to Stream for 90% of the value of those third-party orders, retaining a 10% margin for funding technical, business, and sales development.[4] In essence, VSI will act as a distributor for Stream to these customers.

27.     In addition to the financial support, VSI will assist Debtors with productization of electronics, an area in which Stream needs support. VSI will also assist Debtors with translating computer software and hardware code, designing chips for use in end-user products, and supporting Debtors' customers with integration of those chips into end-user products.

**D. Funding of Debtors' Subsidiaries**

**a.  Overview of SCBV as an R&D Subsidiary**

28.     One of Debtors' subsidiaries located in the Netherlands is SCBV. SCBV was formed in 2011 by Stream for the purpose of engaging in research and development activities related to creation of a glasses-free 3D solution that could be marketed globally. Stream licensed a portfolio of glasses-free 3D patents from Koninklijke Philips N.V. ("Philips"), hired several former Philips engineers who had been instrumental in developing those patents, established operations in Eindhoven, the Netherlands, and trademarked the name Ultra-D.

29.     Stream made its first public showing of Ultra-D technology demonstration samples in January 2012, at the Consumer Electronics Shows in Las Vegas, NV, USA. Reception of the low-resolution HD displays was encouraging, and Stream continued to support development by SCBV for the next several years, expanding the SCBV staff from a handful of engineers to more than 30 by 2018.

_____

[4] A 10% markup is industry standard for distributors.

93593930.4

30.    During those years, Stream fully funded SCBV operations while the R&D team engaged in various projects to prepare the Ultra-D technology for global adoption by device makers, including, but not limited to, supporting 4K and higher panel resolutions, tablet and phone applications, integration into the Android operating system, conversion of algorithms from software to hardware, and more.

31.    By 2018, it became clear that additional product engineering would be required to successfully bridge the gap between the SCBV R&D team and brand customers expressing interest in adopting Ultra-D for their products. Stream directly engaged its own engineers in Silicon Valley, CA, USA as well as engineers in Dusseldorf, Germany and Beijing, China.

32.    While Stream expanded its global team, the SCBV team downsized, mostly due to R&D engineers who left to seek opportunities where they could be more closely involved with productization. The core team at SCBV liaised with their international counterparts from 2018 through early 2020, when the COVID-19 pandemic affected Debtors' global operations, fundraising, and business development.

33.    On March 17, 2020, through its subsidiary Stream TV International B.V. ("STVI"), Stream executed a $3 million co-development agreement with Robert Bosch GmbH ("Bosch")[5] to create a 12.3" 4.5K-resolution glasses-free 3D instrument cluster for the automotive market. Stream levied its relationship with Beijing BOE Optoelectronics Technology Co Ltd. ("BOE"),[6]

---

[5] The Bosch Group is a leading global supplier of technology and services. It employs roughly 420,000 associates worldwide (as of December 31, 2022). According to preliminary figures, the company generated sales of 88.4 billion euros in 2022.  https://www.bosch.com/

[6] Founded in April 1993, BOE is a leading IoT company providing intelligent interface products and professional services for information interaction and human health. BOE produces thin film transistor display devices, photoelectric sensors, and other optoelectronic products.

the world's largest video panel manufacturer, to participate in the project by creating the highest-resolution automotive grade panel yet available. Throughout 2020, SCBV engaged directly with Bosch and BOE engineers. At the time of the improvident December 8, 2020 Chancery Court Preliminary Injunction Order (the "PI Order"), the Bosch project was running smoothly, and Bosch had already made the first $250,000 milestone payment which could be used to partially support SCBV operations.

34.    At the time the Chancery Court entered the improvident PI Order, improperly stripping Debtors of their assets and no longer allowing them to manage their subsidiaries, SCBV had 18 employees and 2 contract employees.

### b. Negligent Expansion of SCBV While Under the Control of the Hawk Parties

35.    On December 8, 2020, pursuant to the PI Order, SCI assumed operational control of SCBV. Debtors' email accounts were suspended by SCI and communication between Debtors and their former employees terminated.

36.    Despite multiple requests since the June 15, 2022 Delaware Supreme Court ruling that the transfer of Debtors' assets was invalid and void, Debtors have been provided no specific information regarding the projects SCBV has worked on from December 2020 through the present. Debtors have only SCI's confirmation that SCBV created 8K-resolution Ultra-D demonstrators, and a SCBV company organization chart indicating that SCBV is also working on a project related to artificial intelligence.

37.    On April 18, 2023, Debtors received a financial request from SCBV manager Patric Theune detailing imminent funding requirements. It is clear from this information that, during the time it controlled Debtors' subsidiaries, SCI expanded (or allowed the expansion of) SCBV to nearly twice the size it had been under Debtors' management. There now appear to be 28

93593930.4

  
employees and 6 contract employees currently on staff. Additionally, more than €50,000 euros (USD $54,852) are reported as bonuses due to be paid to 3 unknown employees.

38.    Debtors intend to fund their subsidiaries through intercompany loans, as they had done for many years in the ordinary course of business, but they require additional information in order to determine the exact amount of funding needed by SCBV. Debtors are still in the process of reviewing and creating a budget and will submit the proposed budget to the Court as soon as it is completed.

### c.    SCBV Mismanagement Under SCI

39.    From the financial request submitted to Debtors by SCBV, it is obvious that the subsidiary has been poorly run while Debtors were prevented from exercising managerial control. The payables show €581,835 euros (USD $638,298) in payroll taxes owed, dating back to the November 2022 payroll period. This significant past due balance owed to the Dutch government refutes representations made by counsel for Hawk Investment Holdings Ltd. ("Hawk"). At the April 14, 2023 status conference held by this Court, Hawk's counsel stated: "[SCI and Hawk] funded the last payroll and left enough money there when they filed the bankruptcy to cover the payroll. **So in the taxes, that's presently current**." *See* H'rg Tr., 145:17-19 (April 14, 2023) (emphasis added). This representation to the Court was clearly false.

40.    Additionally, as many as 8 contract employees have been engaged by SCBV in 2023 alone. The payables request from SCBV includes €218,078 (USD $239,241) in unpaid contractor services dating back to December 2022. Although SCI may have arranged to cover net payroll expenses for direct SCBV employees, it has left a huge debt behind for unpaid payroll taxes and contract employee services.

41.    Under SCI control, whether through mismanagement or poor performance of SCBV, the $3 million co-development agreement with Bosch was canceled by Bosch less than a year after the PI Order. Debtors have learned that attempts by SCI to renegotiate terms of the agreement damaged relations with Bosch, and the failure of SCBV to deliver samples with acceptable quality ultimately led to cancellation of the Bosch co-development agreement. This poor management deprived Debtors and their subsidiaries of more than $2.5 million in non-recurring engineering revenue as well as ongoing annual royalty payments on products that would have been released in the automotive market starting in 2023 or 2024.

42.    In late 2019, Stream entered into a co-development arrangement with Google for creation of a 65" 8K teleconferencing display, and Google placed a purchase order for 2 sample units (the "Initial Google Samples"). Based on good collaboration during the months that followed, Stream and Google commenced negotiations in March 2020, for a phased project that included a small production run of "beta test" units and a mass production run of 10,000 units per year at a unit cost of $2,000, generating $20 million in gross revenues annually for Stream. Google conducted its due diligence on Stream and approved Stream as a vendor in the summer of 2020. To facilitate development of the Initial Google Samples, Debtors engaged SCBV engineers in weekly calls with Google and Stream's Silicon Valley engineers. When SCI seized control of the Google relationship in December 2020 pursuant to the improvident PI Order, SCI pressed the Google project manager for negative information it could use against Stream in an effort to further decimate the business of Stream. Uncomfortable with SCI's focus on obtaining "dirt" on Stream rather than on running a successful project, Google canceled the project in February 2021, only two months after SCI seized control and shortly before the Initial Google Samples were due for completion and delivery. The Initial Google Samples have never been delivered to Google.

93593930.4

43.     To Debtors' knowledge, no revenue-generating projects were secured by SCBV or by SCI for the benefit of SCBV during the time that SCI exercised its operational control of SCBV. As a result, SCBV has incurred significant debt of its own with no revenue to pay its current operating costs or satisfy its pre-petition debt.

### d. Analysis of Personnel and Projects

44.     Debtors must be allowed to conduct an extensive analysis of SCBV's current operations and the facts surrounding the cancelation of its key customer contracts with Bosch and Google. Debtors must be allowed to determine which SCBV operations align with Debtors' business plans and customer requirements, and, if necessary, restructure SCBV personnel and projects.

45.     Management of Debtors has requested from SCBV, but has not yet received, (i) a list of current employees and contract employees, their titles, work assignments, and salaries; (ii) a list and status of all ongoing projects; (iii) a list of Ultra-D presentations subsequent to December 8, 2020, made to all potential customers, brand/technology partners, content creators/distributors, strategic partners, and financial partners/funding sources; (iv) a list of all contracts with third parties, both executed and in-progress; (v) a list of all demonstration units currently on hand at SCBV's offices in Eindhoven, the Netherlands; and (vi) a list of all locations where demonstrators were shipped by SCBV to all third parties.

46.     Debtors require operational control of SCBV so they can evaluate the status of all projects and determine which, if any, align with the business goals of Debtors and the requirements of Debtors' customers rather than the business goals of SCI as implemented during the improvident injunction period.

93593930.4

### e. Severance and Transition Costs

47.     It is possible, or even likely, that Debtors will recommend downsizing the SCBV staff to correlate with projects Debtors intend to maintain, commence, or terminate. A reduction in the SCBV labor force would incur additional near-term costs related to a labor mediation specialist and employee severance but would ultimately result in a use of funds appropriate to the business goals of the Debtors and would be more closely aligned with revenue-generating projects.

48.     Downsizing costs, if any, are unknown until a full analysis can be conducted by Debtors.

## RELIEF REQUESTED

49.     By this Motion, Debtors request entry of interim and final orders, pursuant to Bankruptcy Code sections 105(a), 363, 541, 1107, and 1108 of the Bankruptcy Code, Rule 6004 of the Bankruptcy Rules, and Rule 9014-3 of the Local Rules, authorizing, but not directing, Debtors to issue shares in Stream and enter into a stock purchase agreement with VSI for the sale of Stream's equity to VSI, up to a maximum purchase of $10 million.

50.     Debtors also request the authority to use the Bonding Equipment and seek approval of the Distribution Agreement.

51.     Finally, Debtors request the authority to manage and fund their subsidiaries, including SCBV, pursuant to a proposed budget.

52.     For the reasons set forth herein, Debtors submit that the relief requested is in the best interest of Debtors, their estates, creditors, and other parties in interest, and, therefore, should be granted.

93593930.4

**BASIS FOR RELIEF**

**A. Debtors May Sell Unissued Shares of Stream Stock Without Court Approval Under 11 U.S.C. § 363**

53.     Stream should be authorized to sell unissued shares of Class A common stock of Stream. As a threshold matter, authorized but unissued stock is not an asset of the corporation. *See In re Mid-America Petroleum, Inc.*, 71 B.R. 140, 141 (Bankr. N.D. Tex. 1987) (the debtor may issue shares of authorized stock without complying with the requirements of 11 U.S.C. § 363, because that section applies only to sales of property.). Accordingly, unissued securities in Stream are not property of the estate. Therefore, Stream is not required to comply with 11 U.S.C. 363 before selling shares in Stream to VSI or any other entity.

54.     To the extent that the unissued shares are property of the estate, then Stream seeks to issue shares of its stock in the ordinary course of business pursuant to section 363(c) of the Bankruptcy Code. Section 363(c)(1) of the Bankruptcy Code authorizes a debtor in possession to use, sell, or lease property of the estate in the ordinary course of its business providing, in relevant part:

> If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204 or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

55.     Debtors, operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate and operating the business for the benefit of its creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the duties of chapter 11 debtors in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.*

56.     Prior to the Petition Date, Stream routinely sold shares of its stock in order to fund operations. Section 363 of the Bankruptcy Code is designed to strike a balance between allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets. *See In re Lavigne*, 114 F.3d 379, 384 (2d Cir. 1997). The ordinary course of business standard is intended to allow a debtor in possession the flexibility required to run its business and respond quickly to changes in the business environment. *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992). Accordingly, a debtor in possession may use, sell, or lease property of the estate without need for prior court approval if the transaction is in the ordinary course. *See Lavigne*, 114 F.3d at 384; *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796–97 (Bankr. D. Del. 2007) ("Thus, whether notice and a hearing are required depends on whether a transaction is 'in the ordinary course of business.'"); *In re Chernicky Coal Co.*, 67 B.R. 828, 834 (Bankr. W.D. Penn. 1986) (holding that bankruptcy court approval was not required for a transaction in which the debtor "did nothing postpetition that it did not do pre-petition in the ordinary course of its regular business activities"). Stated differently, creditors are not entitled to the right to notice and a hearing when transactions are in the ordinary course of business "because their objections to such transactions are likely to relate to the [debtor's] chapter 11 status, not the particular transactions themselves." *See In re James A. Phillips, Inc.*, 29 B.R. 391, 394 (S.D.N.Y. 1983). Nevertheless, Debtors file this Motion out of an abundance of caution to ensure their ability to continue selling and issuing new shares in Stream consistent with its pre-bankruptcy practices in order to bring valuable and necessary funds into these chapter 11 cases.

57.     The Bankruptcy Code does not define the "ordinary course of business." To determine whether a transaction is in the ordinary course of business under section 363 of the

Bankruptcy Code, courts typically apply a two-part test: the objective horizontal test and the subjective vertical test. *See, e.g., Lavigne*, 114 F.3d at 384–85 (citing *Roth Am.*, 975 F.2d at 952–53). The horizontal test is a factual analysis as to whether the transaction in question is of the sort commonly undertaken by companies in the relevant industry. *See Lavigne*, 114 F.3d at 384–85. The vertical test is an analysis conducted from the perspective of a hypothetical creditor to determine whether the transaction subjects such creditor to an economic risk of a nature different from those it accepted when it entered into a contract with the debtors. *Id.* In making this determination, courts look to the debtor's prepetition business practices and conduct and compare them to the debtor's postpetition conduct. *See, e.g., Nellson Nutraceutical*, 369 B.R. at 797. Here, the sale of unissued shares of Stream to VSI or any other entity satisfies both the horizontal and vertical tests.

58.    The sale of the unissued shares to VSI satisfies the horizontal test. It is commonplace for companies similar to Stream in the early stage/growth phase to issue shares in order to raise capital to fund operations and pay expenses. Thus, the horizontal test is satisfied here.

59.    With regard to the vertical test, a hypothetical reasonable creditor would see no change in its exposure to economic risk in connection with Debtors' sale of shares to VSI because Debtors are taking on no liability by issuing the shares in exchange for cash and this is also consistent with Debtors' pre-petition business practices and conduct. Moreover, the funds received by Debtors will allow Debtors to administer their bankruptcy estates and propose a plan that will provide substantial benefits to all creditors. Without the sales of shares in Stream to VSI, it will be difficult for Debtors to stay afloat in these chapter 11 cases and pay operational expenses, including those of its subsidiaries, such as SCBV. Importantly, the sale of shares to VSI is consistent with

93593930.4

pre-petition transactions. A reasonable creditor would expect Debtors to continue to raise funds

and issue shares postpetition. As such, Debtors believe that the transaction passes the vertical test

for determining transactions in the ordinary course of business.

60.     To the extent necessary, Section 363(c)(1) of the Bankruptcy Code provides

sufficient authority for Debtors to enter into a stock purchase agreement with VSI for the sale of

up to $10 million of shares in Stream on grounds that such activity is squarely "ordinary course"

under the binding precedent of this circuit.

**B. Debtors' Use of the Bonding Equipment Falls Within the Ordinary Course of Business**

61.     While the industry for glasses-free 3D technology companies is limited, it is

undisputed that technology and manufacturing companies that produce a product require access to

and use of equipment in order to assemble, create, or produce their product or portions of their

product. Stream is no different. Here, the Bonding Equipment is essential to Debtors' business. As

noted above, the Bonding Equipment was created specifically for Stream, and both the SPL and

MPL have been optimized for bonding 65-inch panels. The optical bonding process, which

involves "gluing" a 3D lens to a normal 2D video panel with special optical adhesive, requires

extremely accurate alignment. The Bonding Equipment was adapted by Iinuma to include certain

intellectual property of Stream to meet the critical alignment specification. Use of the Bonding

Equipment is at the very heart of Stream's business, and it is essential to Stream being able to

produce 3D panels. Thus, the horizontal test is satisfied here.

62.     With regards to the vertical test, the creditors of Debtors' estates would have

reasonably expected Debtors to continue using the Bonding Equipment in an effort to produce 3D

panels and fulfill customer orders. Use of the Bonding Equipment is the significant source of how

Debtors generate revenue. Pre-bankruptcy, when Debtors were in possession of the Bonding

93593930.4

Equipment, they used the Bonding Equipment to make approximately 5,000 units of display modules between 55-inch and 65-inch products. The Bonding Equipment is essential to Debtors' business operations, and it is inconceivable that a creditor would not expect Debtors to use the Bonding Equipment as part of the reorganization process. Debtor already has purchase orders in excess of $100 million and the Bonding Equipment is essential to meeting this need and is consistent with creditors' expectations. Use of the Bonding Equipment also satisfies the vertical test.

63.     Section 363(c)(1) of the Bankruptcy Code provides sufficient authority for Debtors to insure, transport, reassemble, repair, maintain, and use the Bonding Equipment in order to produce 3D panels to fulfill contracts on grounds that such activity is squarely "ordinary course" under the binding precedent of this circuit.

### C. Stream's Entry into the Distribution Agreement is a Transaction in the Ordinary Course of Business

64.     Debtors' entry into the Distribution Agreement with VSI satisfies both the horizontal test and vertical test for ordinary course activities. From an industry-wide perspective, technology companies routinely partner with other companies in order to fill a void or weakness in their product development line or in taking their product to market. Here, VSI can provide support to Debtors in terms of funding, customer contacts, technical know-how in the areas of electronics productization, translating computer software and hardware code, designing chips for use in end-user products, and integration of those chips into end-user products. Thus, the Distribution Agreement satisfied the horizontal test for ordinariness.

65.     As for the vertical or creditor expectation test, while Debtors concede that they did not have a similar agreement to the Distribution Agreement in place prior to the Petition Date, creditors are not being subjected to economic risk of a different nature from those accepted when

93593930.4

they became creditors of Debtors. Indeed, any creditors should have anticipated that Debtors would utilize partners in order to bring their products to market in the most efficient way, including using distributors possessing expertise that Debtors do not possess. Also, Debtors anticipate that the Distributor Agreement will allow Debtors to receive customer orders in excess of $100 million, which Debtors likely would not have been able to accomplish without the involvement of VSI. The Distribution Agreement is not fundamentally different from any agreement that Debtor's creditors would have expected Debtors to enter into pre-petition, and entry into the Distribution Agreement does not materially alter or increase the risk to creditors. Thus, the transaction passes the vertical test for ordinary course.

66.    Therefore, entry into the Distribution Agreement is an ordinary course transaction.

**D.  Management of Debtors' Subsidiaries and Funding**

67.    Stream should be authorized to manage the affairs of SCBV and its other subsidiaries, including having the authority to pay approved expenses of the subsidiaries in the ordinary course of business pursuant to a budget. Debtors' corporate structure chart is located at D.I. 48-5.

68.    Debtors managed their subsidiaries prepetition by taking actions pursuant to the various corporate documents which authorized Debtors to appoint the directors and officers for each of their subsidiaries. Indeed, except for the period in which the improvident order from the Chancery Court was in effect that improperly divested Debtors' of their ownership interests in their subsidiaries, Debtors were solely responsible for the operation of the subsidiaries in the ordinary course of their business. Debtors exercise of their management rights with regards to the subsidiaries are integral to a successful reorganization process. Debtors need their subsidiaries, including SCBV, in order to reassemble and calibrate the Bonding Equipment and sell the 3D

93593930.4

panels to customers. Along with directing their subsidiaries, Debtors also funded their subsidiaries through loans. Debtors have injected more than $85 million into SCBV since the subsidiary was founded in 2011.

69.    Debtors seek authorization for the following:

- to (i) direct SCBV engineers to complete assembly of the Initial Google Samples; (ii) direct SCBV to ship the Initial Google Samples to JoveAI Innovation, Inc. ("JoveAI") in Silicon Valley, CA, USA for final electronics evaluation and delivery to Google; and (iii) accept a purchase order and payment from VSI for the Initial Google Samples since the original Google purchase order was cancelled;

- to direct SCBV to assist with productization by (i) providing reference software code and initial hardware translations from SCBV to Debtors' product engineers; (ii) providing technical guidance as necessary to ensure good understanding of the algorithms by Debtors' product engineers; and (iii) troubleshooting in collaboration with Debtors' product engineers if required;

- to direct SCBV to produce 65-inch 8K-resolution technology demonstrator units and 10.1-inch 4K-resolution demonstrator units for sales, marketing, business development, and other purposes;

- to direct SCBV to provide engineering support to BOE and Debtors' sales and technical representatives, assisting with business development efforts in the automotive market. Support may range from engineering consultation to production of additional automotive demonstrator units;

- to reimburse SCBV for reasonable costs related to the production of 65-inch 8K-resolution (TV) demonstrator units, 10.1-inch 4K-resolution (tablet) demonstrator units, and 12.3-inch 4.5K-resolution automotive-grade demonstrator units;

- to direct SCBV to provide process engineering support to Debtors and their strategic partner during reassembly and repair of Debtor's Bonding Equipment, and during recommencement of bonding operations in China;

- to take operational control of their Dutch subsidiary, SCBV. Such control consists of Debtors implementing their corporate resolutions of October 2020 appointing Mathu Rajan as director and CEO of SCBV. Mr. Rajan's status as director and CEO of SCBV shall be recognized by all parties until and unless the Amsterdam Court in the Netherlands issues a contrary ruling, when and if such Amsterdam Court proceedings are permitted by this Court to recommence;

- to conduct an analysis of SCBV projects and personnel;

93593930.4

- to reorganize SCBV, including, but not limited to, reducing personnel and eliminating projects, if necessary, to align the activities and obligations of SCBV with Debtors' business objectives and customer requirements; and

- to engage a labor mediation specialist in the Netherlands to assist with reduction, if any, of the SCBV labor force. Any costs associated with labor mediation or employee severance shall be presented as part of Debtors' overall operating budget.

70.    With regards to the horizontal test for ordinary course of business, regardless of industry, it is common for parent companies to exercise management control and fund operations for their wholly owned subsidiaries through various agreements. Here, that is exactly what Debtors seek to do. Debtors seek to direct their subsidiaries in order to operate Debtors' businesses, including fulfillment of purchase orders. The horizontal test is undoubtedly satisfied.

71.    As for the vertical test, as noted above, Debtors have historically managed and funded their subsidiaries, except for the period in which the Chancery Court improvidently entered orders stripping Debtors of their valuable assets and management of their subsidiaries.

72.    Thus, a hypothetical creditor would anticipate Debtors' continued management and funding of their subsidiaries during these bankruptcy cases. Directing and funding Debtors' subsidiaries will provide a benefit to all interested parties, as the actions Debtors seek to engage in will maximize the value of Debtors' estates. The vertical test for ordinary course is also established.

### E. The Relief Sought in this Motion is a Sound Exercise of Debtors' Business Judgment and is in the Best Interests of their Estates

73.    To the extent any of the requested relief above is determined to be outside of Debtors' ordinary course of business, Debtors submit that the actions sought to be taken are a sound exercise of Debtors' business judgment and are in the best interests of their estates and all stakeholders. The actions sought to be taken will maximize recovery for all interested parties in these chapter 11 cases. Accordingly, Debtors seek to: (i) sell shares in Stream to VSI; (ii)

93593930.4

reassemble, repair, and use the Bonding Equipment; (iii) enter into the Distribution Agreement

with VSI; and (iv) manage, operate, and fund Debtors' subsidiaries (pursuant to a budget) under

sections 363(b) and 105(a) of the Bankruptcy Code. The Court should approve these actions.

74.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1). A court may authorize non-ordinary course transactions using

property of the estate pursuant to section 363(b) when "a sound business purpose dictates such

action." *Stephens Industries, Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (approving a sale

of assets pursuant to section 363(b)); *In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992)

(requiring a "good business reason" to grant a section 363(b) application). Moreover, "[w]here the

debtor articulates a reasonable basis for its business decisions (as distinct from a decision made

arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."

*In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air,

Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment

rule on the merits is a near-Herculean task.").

75.     Thus, if a debtor's actions satisfy the business judgment rule, then the transaction

in question should be approved under section 363(b) of the Bankruptcy Code. Indeed, when

applying the "business judgment" standard, courts show great deference to a company's business

decisions. *See Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re

Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Courts are loath to interfere with

corporate decisions absent a showing of bad faith, self-interest, or gross negligence.") (quoting

*Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also Granada Invs., Inc. v. DWG Corp.*,

823 F. Supp. 448, 454 (N.D. Ohio 1993) (observing that "courts employ the business judgment

93593930.4

rule because in order for a corporation to be managed properly and efficiently, latitude must be given in the handling of corporate affairs") (internal quotation omitted). The business judgment rule asks whether the transaction at issue is "within the fair and reasonable business judgment of the Debtors and thus within the zone of acceptability." *In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016).

76.    Furthermore, section 105(a) of the Bankruptcy Code provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). The general equitable powers granted under section 105(a) of the Bankruptcy Code confer upon a court the power to "exercise equity in carrying out the provisions of the Bankruptcy Code." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003). As explained by the Supreme Court, section 105(a) of the Bankruptcy Code is a "statutory directive consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." *U.S. v. Energy Res. Co.*, 495 U.S. 545 (1990).

77.    The relief requested herein is appropriate and warranted under both sections 363(b) and 105(a) of the Bankruptcy Code. Authorizing Debtors to (i) sell shares in Stream to VSI; (ii) reassemble, repair, and use the Bonding Equipment; (iii) enter into the Distribution Agreement with VSI; and (iv) manage, operate, and fund Debtors' subsidiaries (pursuant to a budget) are in the best interest of Debtors' estates and their creditors and demonstrate a sound exercise of Debtors' business judgment. Authorizing these actions would maximize the value of Debtors' estates by allowing Debtors to act in the full spectrum of their business cycle, *i.e.*, funding, production, and sales. Furthermore, section 105(a) of the Bankruptcy Code provides this Court with authority to further provisions of the Bankruptcy Code, such as section 363(b) Bankruptcy

Code. The actions requested herein will only provide a benefit to Debtors' estates by increasing the value of assets of the estates and allowing Debtors to fulfill current purchase orders in excess of $100 million and obtain new purchase orders. Authorizing the requested relief will afford Debtors with the opportunity to propose a plan that will address all creditor claims pursuant to priority under the Bankruptcy Code. The ability of Debtors to conduct these activities with this Court's approval falls squarely within the parameters of sections 363(b) and 105(a).

78.    The facts of these chapter 11 cases warrant approval of the aforementioned actions. First, allowing Stream to sell shares to VSI will provide Debtors with the liquidity to fund these chapter 11 cases, including Debtors' subsidiaries, without incurring a correlating debt. This provides only upside for Debtors' creditors, as no new priority creditor would come ahead of any current estate creditors, yet creditors will be able to take advantage of the upside of Debtors' operations.

79.    Second, in order to create any substantial revenue in the near term, Debtors need to insure, transport, reassemble, repair, and use the Bonding Equipment. Without the Bonding Equipment, Debtors will not be able to fulfill any current orders and it will be difficult to obtain new end customers if there is no timetable for when Debtors will have actual possession of the Bonding Equipment. From possession of the Bonding Equipment, it will likely take 45 – 60 days to get the Bonding Equipment operational and eventually in mass production. The Bonding Equipment has the capacity to produce approximately 168,000 units per year, and based on Debtors' current orders, the Bonding Equipment is at capacity for over six months. Time is of the essence, and Debtors must start the process now in order to start generating revenue.

80.    Third, the Distribution Agreement with VSI is integral to Debtors' operations. VSI can provide support to Debtors in terms of funding, customer contacts, technical know-how in the

93593930.4

areas of electronics productization, translating computer software and hardware code, designing

chips for use in the end-user products, and integration of those into end-user products.

81.    Finally, the funding of Debtors' subsidiaries is essential to the success of these

bankruptcy cases. Debtors need to collaborate with the subsidiaries, including SCBV, in order to

efficiently and effectively get the Bonding Equipment fully operational so that Debtors can begin

production. Further, Debtors' subsidiaries currently hold Debtors' valuable intellectual property.

Stream has put in excess of $85 million into SCBV, and Debtors need to protect all of Debtors'

assets. It is imperative that Debtors be able to manage SCBV and perform a full analysis as to

SCBV's needs to ensure that its operations align with Debtors' business plans and customer

requirements, and also to reorganize SCBV, to the extent necessary, in order to stabilize SCBV's

finances.

82.    Accordingly, for the reasons set forth herein, the actions Debtors seek to take in

this Motion are within Debtors' sound business judgment and will further maximize stakeholder

recovery and should be approved by the Court.

**REQUEST FOR EXPEDITED CONSIDERATION OF THE MOTION**
**TO AVOID IMMEDIATE AND IRREPARABLE HARM**

83.    Debtors submit that for the reasons already set forth herein, the relief requested in

this Motion is necessary to avoid immediate and irreparable harm to Debtors, and, therefore,

Debtors seek the relief requested in this Motion on an expedited basis, on or before April 24, 2024.

As recognized by the Court at the hearings on April 14, 2023, Debtors have an immediate need for

funding of operations, including the funding of the operations of Debtors' subsidiaries in the

Netherlands. Thus, Debtors need authorization to immediately sell shares in Stream in order to

obtain funding from VSI. Additionally, the Bonding Equipment is integral to the success of

Debtors and their ability to achieve a successful plan of reorganization. The failure to immediately

93593930.4

have the Bonding Equipment will likely result in Debtors losing current client purchase orders and

will impact Debtors' ability to obtain future purchase orders. Possession and use of the Bonding

Equipment is essential to Debtors' ability to commence production of glasses-free 3D panels for

integration in consumer and commercial video products. Moreover, entry into the Distribution

Agreement will allow Debtors to partner with VSI to have the full resources of VSI available in

order to gain new customers and fulfill current and future orders. Finally, if Debtors are going to

fund their subsidiaries, including SCBV, then Debtors need to have the confidence that they are

authorized to instruct SCBV to take certain actions in the ordinary course of business in order to

determine which SCBV operations align with Debtors' business plans and customer requirements,

and also to reorganize SCBV, to the extent necessary, in order to stabilize SCBV's finances.

## **WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)**

84.    To implement the foregoing successfully, Debtors request that the Court enter an

order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and

that Debtors have established cause to exclude such relief from the fourteen-day stay period under

Bankruptcy Rule 6004(h).

## **RESERVATION OF RIGHTS**

85.    Nothing contained in this Motion or any actions taken by Debtors pursuant to relief

granted in any order is intended or should be construed as: (a) an admission as to the validity of

any particular claim against Debtors; (b) a waiver of any party's rights to dispute any particular

claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication

or admission that any particular claim is of a type specified or defined in this Motion; (e) a request

or authorization to assume any agreement, contract, or lease pursuant to section 365 of the

Bankruptcy Code; (f) a waiver or limitation of any party's rights under the Bankruptcy Code or

93593930.4

any other applicable law; or (g) a concession by any party that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and all parties' rights to contest the extent, validity, or perfection or seek avoidance of all such liens are hereby reserved. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of any party's rights to subsequently dispute such claim.

## NOTICE

86.     Debtors will provide notice of this Motion to the following parties or their respective counsel: (i) the Office of the U.S. Trustee for the Eastern District of Pennsylvania; (ii) the Office of the United States Attorney General for the Eastern District of Pennsylvania; (iii) the Internal Revenue Service; (iv) the holders of the twenty (20) largest unsecured claims against Debtors on a consolidated basis; and (v) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

87.     No prior request for the relief sought in this Motion has been made to this or any other court.

**WHEREFORE**, Debtors respectfully request that the Court enter the Order granting the relief requested herein and such other and further relief as the Court deems just and appropriate under the circumstances.

93593930.4

Date: April 21, 2023                    Respectfully submitted,

                                        /s/ Rafael X. Zahralddin-Aravena
                                        Rafael X. Zahralddin-Aravena (PA Bar No. 71510)
                                        **LEWIS BRISBOIS BISGAARD & SMITH, LLP**
                                        550 E. Swedesford Road, Suite 270
                                        Wayne, PA 19087
                                        Telephone: (302) 985-6000
                                        Facsimile: (302) 985-6001
                                        Rafael.Zahralddin@lewisbrisbois.com

                                        -and-

                                        Vincent F. Alexander (admitted *pro hac vice*)
                                        **LEWIS BRISBOIS BISGAARD & SMITH, LLP**
                                        110 SE 6th Street, Suite 2600
                                        Fort Lauderdale, FL 33301
                                        Telephone: (954) 728-1280
                                        Facsimile: (954) 678-4090
                                        Vincent.Alexander@lewisbrisbois.com

                                        -and-

                                        Bennett G. Fisher (pro hac pending)
                                        **LEWIS BRISBOIS BISGAARD & SMITH, LLP**
                                        24 Greenway Plaza, Suite 1400
                                        Houston, TX 77046
                                        Telephone: (346) 241-4095
                                        Bennett.Fisher@lewisbrisbois.com

                                        *Proposed Counsel to Debtors*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 21, 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day by transmission of Notice of Electronic Filing generated by CM/ECF on all parties who are authorized to receive electronically Notice of Electronic Filing in this bankruptcy case.

                                        /s/ Rafael X. Zahralddin-Aravena
                                        Rafael X. Zahralddin-Aravena

93593930.4