## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,[1]<br><br>    Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,<br><br>    Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |

**DECLARATION OF MATHU RAJAN IN SUPPORT OF
(1) DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING DEBTORS TO PAY (I) PREPETITION EMPLOYEE OBLIGATIONS,
(II) PREPETITION WITHHOLDING OBLIGATIONS, AND (III) POST-PETITION
EMPLOYEE OBLIGATIONS IN THE ORDINARY COURSE; AND (2) DEBTORS'
EXPEDITED MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING DEBTORS TO TAKE CERTAIN ACTIONS IN THE ORDINARY
COURSE OF BUSINESS**

I, Mathu Rajan, hereby declare under penalty of perjury ("Declaration"):

I am the Chief Executive Officer of Stream TV Networks, Inc., ("Stream") and the Chief

Executive Officer of Technovative Media, Inc. ("Technovative") (collectively, the "Debtors"),

both Delaware corporations and the debtors-in-possession in the above-captioned chapter 11 cases.

1.        On March 15, 2023 (the "Petition Date"), Debtors filed voluntary petitions with the

Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the

"Bankruptcy Code"). Debtors are planning to resume operating their organizations and managing

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV
Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009
Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Hawk Parties have requested that a trustee be appointed.  No request for the appointment of an examiner has been made in these chapter 11 cases, and no official committees have been appointed or designated.

2.      Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of Debtors' operations and finances, information learned from my review of relevant documents, and information supplied to me by Debtors' advisors.  I am authorized to submit this Declaration on behalf of Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

3.      SeeCubic, Inc., SLS Holdings VI, LLC, Shadron L. Stastney, and Hawk Investment Holdings Limited (collectively, the "Hawk Parties") have claimed in the Delaware Court of Chancery ("Chancery Court") and elsewhere that Stream has no interest and/or ability to properly manage its business affairs. Below are recited numerous recent instances where the Debtors have worked tirelessly to recover assets which have not been released to Stream by the Hawk Parties. The Debtor has detailed pending purchase orders and requirements to fulfill them in *Debtors' Expedited Motion For Entry Of Interim And Final Orders Authorizing Debtors To Take Certain Actions In The Ordinary Course Of Business (Docket 135)* which I incorporate into this Declaration by reference as if fully stated herein.

# I. HAWK PARTIES CAUSED DEBTORS TO EXPEND SIGNIFICANT EFFORTS TO REGAIN THEIR ASSETS FROM THE HAWK PARTIES.

4.      The following chronology of recent events involving the Parties for the approximately last nine months. This summary highlights the efforts which Debtor Stream TV has expended in its attempt to secure its assets from the Hawk Parties.

A.  **June 15, 2022** - The Delaware Supreme Court in an *en banc* unanimous decision by the five-member court, written by Justice Karen L. Valihura, removed an injunction approved by Vice Chancellor J. Travis Laster in December 2020 barring Debtor Stream TV from interfering in the company's turnover without a stockholder vote to SeeCubic, Inc. The Court vacated a Chancery Court ruling that a common law "insolvency exception" to state corporation law eliminates a requirement for a stockholder vote before directors can hand a troubled company to secured creditors. Reversed in the same decision was the Vice Chancellor's declaratory judgment that an Omnibus Agreement, pushed through by Stream TV directors aligned with the secured creditors, enabled a transfer of all assets to SeeCubic by way of a power of attorney granted to the same creditors. (No. 360, 2021 Court Below – Court of Chancery of the State of Delaware C.A. No. 2020-0766) **(Exhibit A)**

B.  **July 1, 2022** – The Delaware Supreme Court issued a Mandate to the Delaware Court of Chancery whereby for the reasons stated therein and in its decision of June 15, 2023, the Supreme Court VACATED the injunction, REVERSED the declaratory judgment, and REMANDED for further proceedings consistent with those opinions. (No. 360, 2021

Court Below – Court of Chancery of the State of Delaware C.A. No. 2020-0766).

**(Exhibit B)**

C. **July 20, 2022** – In oral argument before Vice Chancellor J. Travis Laster of the Delaware
Court of Chancery held via ZOOM on Seecubic's post-remand Motion to Preserve the
Status Quo and Motion to Expedite and subsequent Rulings of the Court, the Court
Transcript reflected the Court's denial of Seecubic's motions. Despite arguments by
counsel for the Hawk Parties that the assets have been enhanced in one way or another by
Seecubic, Inc., the Court furthermore ruled that the assets in question should be
transferred to Stream TV.  References to Attorney Parker are to Jeness Parker of Skadden
who represented SeeCubic of Delaware in the Chancery and Supreme Court Appeal.

Page 4, Lines 21 - 24

Attorney Parker:

And the issue, really, is, in this situation, where SeeCubic has had the assets for 18 months,
they've been enhanced, there have been changes to the business, including, you know, repairs


Page 5, Lines 1 – 3

Attorney Parker

to relationships, to employees, the tech has changed, you know, things like that; but also,
pending is a foreclosure action.

Page 6, Lines 3 -24

Attorney Parker

So demo units, Your Honor. These are physical assets that were put together and that use
technology that incorporates changes that were made since December 8, 2020. So I don't
think there's any way, from -- my understanding is there's no way to, like, take those apart
and return how it was then. Patents and IP rights. As of December 8, the patent portfolio
for Ultra D was at risk of being lost because Stream had failed to pay required
maintenance fees. So SeeCubic brought those accounts current before they were lapsed.
So one of the issues is who owns the patents. Does SeeCubic own them, or are they a
Stream asset, when they were in jeopardy of being lost.

Stream also made filings for continuations on certain patents that incorporate the developments they've made to the technology. So like with the demo units, how do you rip that apart? And then, finally, they've filed new patents in new jurisdictions that never existed when Stream was in control. That's just another -- I just wanted

Page 7, Lines 1 – 3

Attorney Parker

to give Your Honor some examples, instead of generally, hey, the assets have changed, let us keep them.

Page 28, Lines 1 -13

The Court:

And so, in my view, we're in a world where title right now, both equitable and legal, to the extent that one can wind the clock back, is in the hands of Stream. Then the question becomes what am I being asked to do? And technically what I'm being asked to do today is to allow SeeCubic to keep the assets pending the result of a foreclosure proceeding. I don't think I can do that. That may well be the status quo today, in that SeeCubic has the assets, but the reality is, based on the Delaware Supreme Court decision, SeeCubic, right now, shouldn't have the assets.

Page 29, Lines 6 -8

The Court:

I don't think that there's any basis for any type of relief that would leave these assets in SeeCubic's hands.

Page 31 Lines 13 – 20

The Court:

In terms of the actual request for a status quo order, I'm denying it. I don't think that good cause exists for that type of status quo order. I'm also not going to issue any type of order that's going to prevent the assets that SeeCubic currently has from being transferred back to Stream. In fact, I'm prepared to issue relief that would facilitate that transfer.

Page 34 – Lines 23 -24

The Court:

The bottom-line ruling today is that the request for relief is denied.

Page 35 – Lines 1 – 5

The Court:

I want the parties to try to move forward with some type of Rule 54(b) order that implements the Delaware Supreme Court's decision. I think that order needs to result in these assets being moved back to Stream.

**(Exhibit C)**

D. **July 26, 2022** – In a Motion filed with the Delaware Court of Chancery,

Plaintiff/Counterclaim Defendant Stream TV and other third parties, pursuant to Court of

Chancery Rule 54(b), respectfully moved the Court to enter an order, granting partial

Final Judgment in favor of Stream on Count I of Stream's Verified Complaint (Dkt. 1)

and against Defendant/Counterclaim-Plaintiff SeeCubic, Inc. on Counterclaims I and II of

SeeCubic's Verified Counterclaims and Third-Party Complaint (Dkt. 8) First, Stream

asks the Court to declare that the Omnibus Agreement is invalid. Second, Stream asks the

Court to declare that Stream always owned title to the Assets. Third, Stream asks the

Court to order SeeCubic to return the Assets to Stream, without prejudice to SeeCubic's

claims for monetary relief.  Fourth, Stream asks the Court to order i) SeeCubic not to use

the Assets pending their return to Stream and ii) the parties stipulate that unauthorized use

of the Assets is irreparable harm. **(Exhibit D)**

E. **August 10, 2022** - Vice Chancellor J. Travis Laster of the Delaware Court of Chancery

expressly directed in Case No. 2020-0766-JTL that partial final judgment under Rule

54(b) be entered in favor of Stream TV and against SeeCubic, Inc. as set forth below:

i) In accordance with the mandate of the Delaware Supreme Court dated

July 1, 2022 (the "Mandate"), it is hereby DECLARED that the May 6, 2020

**Omnibus Agreement** ("Omnibus Agreement") between Stream, SLS Holdings VI,

LLC, Hawk Investment Holdings Limited, and those parties listed on Annex I

thereto **required the approval of Stream's Class B shares to become effective, which did not occur. The Omnibus Agreement is therefore without legal effect.**

ii) As a result of the Mandate and the failure of the Omnibus Agreement to become effective, it is hereby DECLARED that the **Omnibus Agreement did not validly transfer legal title to any asset of Stream (collectively, the "Assets") from Stream to SeeCubic**.

iii) The parties shall cooperate to effectuate the Mandate, including by causing SeeCubic to transfer legal title to the Assets from SeeCubic to Stream as expeditiously as possible.

iv) Pending transfer of the Assets from SeeCubic to Stream, SeeCubic and all those acting in concert with it shall not use, impair, encumber, or transfer the Assets, except as necessary to maintain the Assets in the ordinary course of business and preserve their value pending transfer to Stream.

Counterclaim II of SeeCubic's Verified Counterclaims and Third- Party Complaint was Dismissed. **(Exhibit E)**

**F. September 30, 2022** - In a Motion filed with the Delaware Court of Chancery, Plaintiff/Counterclaim Defendant Debtor Stream TV and other third parties, an Emergency Motion For Post-Judgment Enforcement To Vest Shares Of Debtor Technovative Media, Inc. requesting the following pursuant to Court of Chancery Rule 70(a):

i) Ownership of all shares of Debtor Technovative Media, Inc. is hereby divested from SeeCubic, Inc.;

ii) Ownership of all shares of Debtor Technovative Media, Inc. is hereby divested from Hawk Investment Holdings Limited;

iii) Ownership of all shares of Debtor Technovative Media, Inc. is hereby vested in Stream TV; and

iv) SeeCubic, Inc. and all those acting in concert with it including without limitation Hawk and Mr. Stastney are enjoined from interfering with Debtor Stream TV's ownership of all the shares of Debtor Technovative Media, Inc. until further order of the Court. (Case No. 2020-0766-JTL). **(Exhibit F)**

**G. October 3, 2022** - Vice Chancellor J. Travis Laster of the Delaware Court of Chancery in Case No. 2020-0766-JTL issued an Order Regarding Emergency Motion To Enforce whereby,

i). SeeCubic, Inc. acquired the assets of Debtor Stream TV under the Omnibus Agreement.

ii). The assets that SeeCubic acquired from Stream TV included 1,000 shares of common stock of Debtor Technovative Media, Inc., (the "Company") representing 100% of its equity (the "Shares").

iii). The Delaware Supreme Court subsequently held that the Omnibus Agreement was not valid. Stream TV Networks, Inc. v. SeeCubic, Inc., 279 A.3d 323 (Del.2022) (the "Mandate").

iv). The court entered a partial final judgment which determined that in light of the Mandate, the Omnibus Agreement did not validly transfer legal title to any of Stream's assets (the "Legacy Stream Assets"). Dkt. 266. The court directed the parties to "cooperate to effectuate the Mandate, including by causing SeeCubic to transfer legal title to the [Legacy Stream Assets] from SeeCubic to Stream as expeditiously as possible." Id. ¶ 4. The Shares are one of the Legacy Stream Assets.

v). At 11:45 a.m. on September 30, 2022, SeeCubic informed the court that it

caused the Company to transfer title to the Shares from SeeCubic to Stream. Id. at

2.

SeeCubic provided a copy of its stock ledger evidencing transfer of the Shares. Id.

Ex. A.

vi). At 12:08 p.m. on September 30, 2022, Hawk Investment Holdings Ltd.

("Hawk") instructed Shad L. Stastney, acting in his capacity as a director and

officer of the Company, to register the Shares in the name of Hawk. Dkt. 312 Ex.

A. Shortly thereafter, Stastney acknowledged receiving the instructions and

provided an updated stock ledger of Technovative. Id. Hawk then issued a "Proxy

Notice" to Technovative "demanding that Hawk be listed as the holder of record

of all Technovative stock in the Technovative share registry." Dkt. 311 at 1.

Stastney complied with the request. Id. at 2.

vii). Stream has filed an Emergency Motion to Enforce Judgment (the "Motion")

in which Stream seeks an order canceling Hawk's purported ownership of the

Shares and

the vesting of ownership of the Shares in Stream. Stream also seeks an injunction

barring

SeeCubic and anyone acting in concert with it, including Hawk and Stastney,

from

interfering with Stream's ownership of the Shares until further order of the court.

viii). The court issued an opinion granting the Emergency Motion in part (the

"Enforcement Opinion").

NOW, THEREFORE, FOR THE REASONS STATED IN THE

ENFORCEMENT OPINION, IT IS HEREBY ORDERED:

1. Hawk is divested of title to the Shares.

2. Title to the Shares is vested in Stream.

3. Within twenty-four hours, the Company will update its stock ledger to reflect the

transactions set forth in this order and file a copy of the updated ledger with the court.

4. For a period of ten days, SeeCubic, Hawk, Stastney, and anyone acting in concert with

them are enjoined from taking any action that would interfere with either Stream's

ownership of the Shares or Stream's exercise of rights associated with the Shares. In

accordance with Court of Chancery Rule 6, the injunction will lift on Monday, October

17, 2022, at 9:00 a.m., at which point SeeCubic, Hawk, Stastney, and anyone acting in

concert with them may exercise any rights or remedies that they believe they have

regarding the Shares. **(Exhibit G)**

**H. October 3, 2022** – Email was issued by Mathu Rajan to Shadron Stastney informing him

of a special meeting at Seecubic, Inc. to be held on October 11, 2022, to remove him and

others from the board of directors of Seecubic, Inc. and be replaced with Mathu Rajan.

**(Exhibit H)**

**I. October 12, 2022** – Picked up inventory in San Ramon, CA – see pictures from that event.

**(Exhibit I)**

**J. October 17, 2022** – Picked up Inventory in UK – see Inventory list from that pick up.

**(Exhibit J)**

**K. October 20, 2022** – Status Quo Order from VC Laster. **(Exhibit K)**

**L. October 21. 2022** – Appointment of Receiver OC **(Exhibit L)**

**M. December 22, 2022** – Date Stream TV emails returned; Stream TV's access to its email system was shut down by Seecubic, Inc. in December 2022. See subsequent email. **(Exhibit M)**

**N. March 15, 2023** – Debtors filed for Chapter 11 protection in EDPA US Bankruptcy Court. See both Petitions from Stream TV and Technovative. **(Exhibit N)**

**O. March 20, 2023** - Email from Receiver confirming that Debtor Stream TV is in charge of subsidiary Seecubic B.V.; Ian told management of Seecubic B.V. that they should release the bonding equipment. **(Exhibit O)**

**P. April 1, 2023** – Receiver stated that he did not know the identity of Seecubic, Inc.'s/Seecubic B.V.'s Chinese legal counsel. **(Exhibit P)**

**Q. April 4, 2023** – Register showing Mathu Rajan is CEO and Board member of Seecubic, B.V. **(Exhibit Q)**

**R**. **Various Dates** - Promissory Note and Draw Advances for payroll payments to The Netherlands agreed upon by Stream TV, Shadron Stastney and Ian Liston (Receiver) **(Exhibit R)**

**S**. **Various Dates** - Spreadsheet reconciling the funds for the Seecubic B.V. payroll.

Regarding the Dutch subsidiaries, the subsidiaries are suffering financially.  Counsel for Hawk Mr. Steve Caponi, mislead the Court and made false statements regarding the Dutch

subsidiary Seecubic B.V.:

Page 145, Lines 16 – 19 of Transcript of April 14, 2023 Hearing before United States Bankruptcy Judge Magdeline D. Coleman:

MR. CAPONI:

Your Honor, as to my clients to date, we have -- we funded the last payroll and left enough money there when they filed the bankruptcy to cover the payroll. So in the taxes, that's presently current.

**(Exhibit S)**

**T**. April 14, 2023 Hearing before United States Bankruptcy Judge Magdeline D. Coleman:

The Court clearly told Hawk and SeeCubic that false statements were being made to the Dutch Court in Amsterdam:

Page 129, Lines 5 -15 of Transcript of April 14, 2023 Hearing before United States Bankruptcy Judge Magdeline D. Coleman

The Court:

Counsel, who's to tell them that? You haven't foreclosed on your security interest in the control or any of that. I'm a little concerned why you would go say that and somebody would allege all of that. That's all disputed, and you agree you haven't foreclosed on the ownership interest. So maybe you might have foreclosed on your interest in the assets, but I haven't heard anybody say that you foreclosed on the ownership interest of the Debtors and actually, they're in this Court. I don't know how you could be in the Netherlands saying something to the contrary. I'm a little concerned about that.

U.     De Brauw's counsel has made the following false statements, among others, in the Netherlands filings.

Summons. Page 9.

(b) on March 29, 2023, Mathu Rajan, **posing as CEO and Director of SeeCubic**, among others, instructed a storage space rental company in China to transfer valuable equipment **owned by SeeCubic to Stream**; (emphasis added).

Summons. Page 10.

11. As the invalidity of the decision-making process cannot be definitively determined in this litigation, at this point in time at least, a situation must be assumed in which there is uncertainty about the governance of the Dutch SeeCubic Entities. This is not in the interest of the company and therefore requires intervention to clarify the governance of the Dutch SeeCubic Entities and safeguard the status

quo, **while in the United States it will be determined who should control the shares inTechnoVative.  (emphasis added).**

Summons. Page 10.

12. In addition, SeeCubic's management has serious concerns that Rajan will not guarantee the payment of salaries, which must be paid by April 25, 2023. To this end, a sum of money in excess of EUR 500,000 must be deposited in SeeCubic's account by April 20, 2023. Failure to make salary payments is a huge risk to the continuity of the company. **Previously, Stastney took care of this through SeeCubic Inc.** but because of his recent deregistration as a director from theTrade Register, Stastney now has even less certainty than before that he will ever see these additional investments again. (emphasis added).

Cover Letter to Court re: Summons. Page 2.

5. Hawk and SLS **will** obtain full ownership of the Dutch SeeCubic Entities **through that foreclosure.** However, the assets of the Dutch SeeCubic Entities, and thus a significant portion of the value of the entire company, are currently at risk of being alienated by the person who raised the investment but did not redeem it: defendant Rajan.(emphasis added).

6. This has happened before: on Wednesday, Oct. 19, 2022, SeeCubic et al. had already applied for summary judgment - in which, with the permission of the District Court (the same permission that SeeCubic et al. are now requesting again), summary judgment was granted - because of a similar concrete threat. However, the hearing, which had been set for Monday, Oct. 24, 2022, did not then go ahead at the last minute. In fact, a court order to maintain the status quo (a so called status quo order) had been issued in the United States. In it, the U.S. court appointed an independent official, a so-called *Receiver*, **who was to ensure that the status quo was maintained during the foreclosure of collateral.** With that, the threat of Rajan had passed. (emphasis added).

Cover Letter to Court re: Summons. Page 3.

(c)   On March 29, 2023, Rajan, posing as "CEO and Director" of SeeCubic B.V., among others, instructed a warehouse rental company in China to transfer valuable equipment **owned by SeeCubic B.V.** to a Rajan controlled U.S. company, Stream TV Networks, Inc. ("Stream").

5.        . As noted, the Debtors are gravely concerned, with the misrepresentations on the record  in the Dutch Court regarding the ownership of the assets  The Hawk parties should have heeded the Court's warnings and withdrawn the action so that there would not be any misrepresentations on the record in the Netherlands . The clients represented by Hawk's Dutch counsel De Brauw, instead of withdrawing the action, arbitrarily picked a date in June 2023 and scheduled a new court hearing in Amsterdam, thus allowing false statements to remain on the

record/docket, and allowing the false lawsuit information to spread around The Netherlands and Germany, causing further damage to Debtors' business relationships and confusion in the market as to the ownership of various Stream assets, including the Technovative shares and various pieces of equipment.

6.      The clients represented by Hawk's Dutch counsel De Brauw filed the same lawsuit in October 2022, when they were forced to turn Debtor Technovative as well as all its subsidiaries back to Debtor Stream TV.  When the Delaware Court of Chancery said it was wrong for the clients represented by Hawk's Dutch counsel De Brauw to go to another court, the De Brauw clients withdrew the Amsterdam lawsuit.  The Debtors are further concerned as to why they have not withdrawn the lawsuit and fear that the clients represented by Hawk's Dutch counsel De Brauw, if they lose in the bankruptcy, will try to proceed with the Amsterdam lawsuit and steal the assets and move to a foreign jurisdiction.  The clients represented by Hawk's Dutch counsel De Brauw have already established another Seecubic entity "Seecubic Limited" in the Channel Island of Jersey proven in the screengrab below.  Such a subsidiary could effectuate such a transfer:



## II. CONCLUSION

7.      The Hawk Parties argue that that Debtors have no interest and/or ability to properly manage their business affairs, but the plain facts show otherwise. Our current investigation into the books and records of the subsidiaries in the Netherlands, necessary and appropriate due

diligence to support making prepetition payments out of the estate, has shown a very different set of facts from that "argued" by counsel to the Hawk Parties to the Court. The Debtors have demonstrated that they are responsible and serious in recovering their assets from the Hawk Parties to fulfill their pending purchase orders, despite the dogged and relentless efforts of the Hawk Parties to thwart and distract the Debtors.

8.      The Debtors have prepared for the transfer of its assets back to Stream since the Supreme Court ruling by maintaining relationships and putting into place the distribution and supply chain network necessary to get their products to market.  After the Supreme Court ruling, the Vice Chancellor indicated that all the assets of Stream have to come back to Stream in both title and possession. Stream had been unable to even locate the bonding equipment which was moved by Mr. Stastney in contravention of the Delaware Supreme Court opinion and subsequent Chancery Court orders. Frankly, the filing of the chapter 11 is what finally provided the location of the equipment as the state court receiver, with the advice of counsel, recognized that the Debtors' estate now takes precedence over the receivership. Our  Chancery Court counsel has also alerted the Hawk Parties that there is a superior lien on the bonding equipment by its manufacturer for maintenance and repairs. Despite these warnings, the Hawk Parties moved the equipment, did not notice either the manufacturer or Stream as the owner of the equipment as to the move or the machine's whereabouts.  If it were not for the receiver, Stream would still not know to where the equipment was moved.

9.      SeeCubic of Delaware, the Hawk Parties "NewCo.", set up as part of the now voided settlement agreement, is **a market competitor of the Debtors** which has been ordered to return all assets to Stream TV.  Despite being told by the Chancery Court to stop using the assets to advance SeeCubic of Delaware's business interests, such activity persists to this day, including

signing contracts and raising investment dollars into SeeCubic of Delaware based on the stolen technology from Stream.  Mr. Eben Colby of Skadden persists in saying that certain assets that were created by his client, SeeCubic of Delaware, are now somehow his client's property despite an express ruling on this issue from the Chancery Court which declared that title and possession must be given to Stream on all assets, whether "created" with stolen/misappropriated technology or .not.

10.      There are an estimated $16 million of unsecured claims and investors whose investment far exceeds anything invested by the Hawk Parties.  The SLS loan and Hawk loan were both supposed to be extinguished upon hitting certain fund raising milestones.  The Hawk debt is extinguished as money is raised  and then converted to equity precisely to avoid the extreme prejudice to unsecured creditors and other shareholders that would result if an investor weaponized its secured status to try and takeover the company. Now, we have the full funding to fulfill two orders for over $100 million.  The Debtors reserve their rights on the treatment of the Hawk Parties claims., but that sum both far exceeds what is owed to the Hawk Parties even if they were correct in all their legal arguments and provides more than adequate protection for their loans as the value of Stream only goes up as a going concern.  The customer who placed the $100 million order has indicated that it sees their annual purchases being close to $500 million, especially if they can get the bonding machine up and running.  They are ready to send more purchase orders and advances for the financing to reserve the capacity of the machine to meet these projections.  The client which has made the purchase order needs the process to start immediately, so they can produce and start the marketing and make the sales deadlines for TVs which culminates in the Super Bowl.  The client with the $100 million purchase order has established connections with major retailers, and

has offices in Bentonville, Arkansas where it works in an integrated fashion with Walmart on product sales and distribution.

11.     The Debtors have asked for access to its assets so that it can operate in the ordinary course of business without impediment.  The Debtors are also under the supervision of the Bankruptcy Court and the United States Trustee, so the concerns of the Hawk Parties are unfounded and disguise their true intentions.  The Hawk Parties are competitors who want the assets for themselves and it is not a hypothetical what their intentions are, and have been, as to the unsecured creditors and any shareholder who would not "side" with them.  They took all the assets of the Debtors and left all the liabilities with their now void settlement agreement.  They also left behind shareholders and threatened others with the loss of their investment.  They increased costs and lost income in the foreign subsidiaries when they were operating them, and contrary to statements before this Court, failed to make critical payments, like employment taxes during the time period that they were obligated to do so.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on April 23, 2023                              **Stream TV Networks, Inc.**

                                    By:     _Mathu Rajan_

                                            Mathu Rajan
                                    Title:    Chief Executive Officer

# EXHIBIT A
# Supreme Court Ruling – Opinion

**Filed: Jun 15 2022 11:41AM EDT**
**Filing ID 67727771**
**Case Number** 360,2021

## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STREAM TV NETWORKS, INC., | § | |
| | § | No. 360, 2021 |
| Plaintiff Below, Appellant, | § | |
| | § | Court Below:  Court of Chancery |
| v. | § | of the State of Delaware |
| | § | |
| SEECUBIC, INC., | § | C.A. No. 2020-0766 |
| | § | |
| Defendant Below, Appellee, | § | |
| | § | |

---

| | |
|---|---|
| SEECUBIC, INC., | § |
| | § |
| Counterclaimant and Third-Party | § |
| Plaintiff Below, Appellee, | § |
| | § |
| v. | § |
| | § |
| STREAM TV NETWORKS, INC., | § |
| | § |
| Counterclaim Defendant Below, | § |
| Appellant, | § |
| | § |
| and | § |
| | § |
| MATHU RAJAN and RAJA RAJAN, | § |
| | § |
| Third-Party Defendants Below, | § |
| Appellants. | § |

Submitted:  April 6, 2022
Decided:  June 15, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery.  **VACATED**, **REVERSED** and **REMANDED**.

Andrew S. Dupre, Esquire (*argued*), Brian R. Lemon, Esquire, Steven P. Wood, Esquire, Sarah E. Delia, Esquire, Stephanie H. Dallaire, Esquire of McCarter & English, LLP, Wilmington, Delaware for Appellants.

Robert S. Saunders, Esquire, Jenness E. Parker, Esquire (*argued*), Bonnie W. David, Esquire, Lilianna Anh P. Townsend, Esquire, Trevor T. Nielson, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware. *Of Counsel*: Eben P. Colby, Esquire, Marley Ann Brumme, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Boston, Massachusetts for Appellee.

**VALIHURA**, Justice:

We address whether approval of a corporation's Class B stockholders was required to transfer pledged assets to secured creditors in connection with what was, in essence, a privately structured foreclosure transaction. Stream TV Network, Inc. ("Stream" or the "Company"), along with Mathu and Raja Rajan,[1] argue that the agreement authorizing the secured creditors to transfer Stream's pledged assets (the "Omnibus Agreement") is invalid because Stream's unambiguous certificate of incorporation (the "Charter") required the approval of Stream's Class B stockholders. Stream's Charter requires a majority vote of Class B stockholders for any "sale, lease or other disposition of all or substantially all of the assets or intellectual property of the company." Stream argues that the court erred by applying a common law insolvency exception to Section 271 in interpreting the Charter, and that the enactment of 8 *Del. C.* § 271 and its predecessor superseded any common law exceptions. It contends that, in any event, such a "board only" common law exception never existed in Delaware.

SeeCubic, Inc. ("SeeCubic") argues that the court correctly found that neither the Charter, nor Section 271, required approval of the Class B shares to effectuate the Omnibus Agreement.

Because we agree that a majority vote of Class B stockholders is required under Stream's charter, we **VACATE** the injunction, **REVERSE** the declaratory judgment, and **REMAND** for further proceedings consistent with this opinion.

---

[1] For simplicity, we refer only to Stream when discussing the positions that Stream and the Rajans have advanced in their briefing. Mathu and Raja Rajan are members of Stream's board of directors, corporate officers, and controlling stockholders.

3

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

We focus only on the facts relevant to the issue on appeal which is whether the Class

B stockholders are entitled to a vote in connection with the transactions contemplated by

the Omnibus Agreement.

### A.    Stream.

Stream is a Delaware corporation that was founded in 2009 to develop and

commercialize technology that enables viewers to watch three-dimensional content

without 3D glasses.[3]   Stream hired engineers to develop Stream's technology, which has

been described as promising and revolutionary; however, eleven years after its founding,

Stream remained a pre-revenue, development-stage company.

The Rajan family controlled Stream primarily through an investment vehicle owned

by Mathu Rajan, his brother Raja Rajan, and their parents.  Together, they hold 19,000,000

Class B shares carrying ten votes per share, giving the Rajans a majority of the Class B

common stock and a majority of Stream's outstanding voting power.[4]   The Court of

---

[2] The background facts pertinent to this appeal are drawn primarily from the December 8, 2020
Preliminary Injunction Opinion, *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del.
Ch. 2020) (the "P.I. Opinion"), the September 23, 2021 Order Granting In Part SeeCubic, Inc's
Motion for Summary Judgment, *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 4352732
(Del. Ch. Sept. 23, 2021) (the "SJ Order"), the November 10, 2021 Order Entering Partial Final
Judgment Under Rule 54(b), *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 5240591 (Del.
Ch. Nov. 10, 2021) (the "Partial Final Judgment Order"), and the December 8, 2021 Order Denying
Stream's Motion to Modify the Injunction, *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL
5816820 (Del. Ch. Dec. 8, 2021),  (the "Modification Opinion").

[3] *Stream TV*, 250 A.3d at 1022.

[4] *Id.*  At the board level, the Rajan brothers historically have controlled Stream.  There were,
however, three outside directors on the board at various times.  From approximately 2015 until
2019, Leo Hindery served as an outside director, but he resigned in July 2019 over disputes with
the Rajan brothers.  From approximately 2018 until 2019, Mark Coleman served as a second

4

Chancery observed that "[d]uring its existence, Stream's corporate governance practices have been virtually nonexistent."[5]  Stream did not hold annual meetings of stockholders or keep regular minutes of Board meetings.

B. *Stream's Investors.*

Since Stream's founding in 2009, Stream raised approximately $160 million from third-party investors in the form of a combination of debt and equity.  Stream's senior secured creditor, SLS Holdings VI, LLC ("SLS"), loaned $6 million to Stream through a series of secured notes (the "SLS Notes").  Stream pledged all of its assets, and the assets of its wholly-owned subsidiaries, as security for the SLS Notes and executed a security agreement which authorized SLS to take control of Stream's assets to satisfy the SLS Notes if Stream defaulted.

Stream's junior secured creditor, Hawk Investment Holdings Limited ("Hawk"), loaned Stream more than £50 million, plus $1.336 million, through a series of junior secured notes (the "Hawk Notes").  Subject to the senior security interest held by SLS, Stream pledged all of its assets as security for the Hawk Notes and executed a security agreement that authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted.

---

outside director but resigned in July 2019 over disputes with the Rajan brothers.  From 2011 until 2014, Shad Stastney, the principal of Stream's senior secured creditor, served as an outside director.  He rejoined the board in 2019 and served as Chief Financial Officer before resigning on January 30, 2020.  *Id*. at 1023.  The Rajan brothers also dominated Stream at the officer level. Mathu has served as Stream's Chief  Executive Officer since the Company's founding, and Raja served as general counsel and Chief Operating Officer since soon after the Company's founding.

[5] *Id*. at 1023.

5

### C. Stream's Financial Difficulties.

In 2019, Alistair Crawford ("Crawford"), a stockholder of Stream and the representative of fifty-two of Stream's stockholders (the "Equity Investors"), engaged in discussions with SLS, Hawk, and the Rajan brothers about restructuring Stream. Crawford proposed forming a "NewCo" that would acquire Stream's assets and have a more transparent and investor-friendly governance structure. In December 2019, Crawford provided the Rajan brothers, SLS, and Hawk with a draft of the Omnibus Agreement and other documents to implement the restructuring. The Rajan brothers refused to agree to the restructuring, and the discussions broke down.

In January 2020, the Equity Investors filed a lawsuit in the Court of Chancery against the Rajan brothers. During the same month, Stream missed payroll at least once.

In February 2020, Stream managed to make payroll, but only due to an emergency infusion of capital from Hawk and a short-term loan from another investor. Stream still furloughed numerous employees, and by the end of February 2020, Stream had defaulted on the SLS Notes and Hawk Notes.

On March 9, 2020, SLS notified Stream that Stream was in default.[6] With the Company failing, SLS, Hawk and Crawford urged the Rajan brothers to appoint outside directors. Three days later, on March 12, 2020, the Board was comprised of the Rajan

---

[6] *Id.* at 1024. In addition to the debts that Stream owed its secured creditors, SLS, and Hawk, Stream carried more than $16 million in trade debt and had fallen months behind on payments to customers and suppliers. Stream even failed to make the payments necessary to maintain the patents on its technology. *Id.*

brothers and four independent outside directors:  Krzystof Kabacinski, Asaf Gola, Kevin

Gollop, and Frank Hodgson (collectively, the "Outside Directors").[7]

On March 23, 2020, SLS filed a complaint in Delaware Superior Court against

Stream seeking foreclosure and other relief.

### D. The Resolution Committee.

From March 2020 through May 2020, the Outside Directors participated in Board

meetings, approved minutes, voted on resolutions, and approved other corporate actions.

When the Outside Directors learned of Stream's financial difficulties, they concluded that

the only path forward was to negotiate a resolution with the Company's secured creditors

and the Equity Investors.  In April 2020, the Outside Directors revisited the restructuring

discussions with the Rajan brothers.  Raja initially participated in the discussions, but his

presence generated tension.  It became clear that the Outside Directors would have to

attempt to broker a resolution.

On May 4, 2020, during a meeting of the Board, Gola proposed three resolutions

for consideration.  Two of Gola's resolutions, and an alternative to Gola's third resolution,

were adopted.  Only Gola's second resolution is relevant to the appeal.  It proposed the

creation of the Resolution Committee with Gola and Gollop as its members.  The

Resolution Committee would have "the full power and authority of the full Board of

---

[7] In the proceedings before the Court of Chancery, Stream and the Rajan brothers challenged whether the Outside Directors were validly appointed.  However, on appeal, Stream does not challenge the Court of Chancery's finding that the Outside Directors were either appointed validly, or in the alternative, that they were *de facto* directors.  Therefore, we do not discuss the facts regarding the appointment of the Outside Directors.

Directors to resolve any existing or future debt defaults or claims, and any existing or future litigation, or threats thereof, on behalf of [Stream], without further action being required from the Board of Directors or any executive of the [C]ompany."[8]   The Rajan brothers abstained from the vote; however, the three directors who voted in favor constituted a majority of a quorum, and the motion carried.

### E.   *The Omnibus Agreement.*

On May 6, 2020, the Resolution Committee approved the Omnibus Agreement. The parties to the Omnibus Agreement were Stream, SLS, Hawk, and certain Equity Investors.[9]

The Omnibus Agreement provided that Stream would assign its assets to SeeCubic in lieu of SLS and Hawk continuing to pursue foreclosure, and SeeCubic would allow Class A common stockholders to exchange their shares.  Specifically, the Omnibus Agreement provided that SLS and Hawk "agreed to stay the [f]oreclosure and satisfy and extinguish each of the SLS Notes and the Hawk Notes in their entirety subject to [Stream] assigning all right, title and interest in and to all assets of [Stream] to a newly-formed holding company [SeeCubic] established by SLS and Hawk, in satisfaction of the SLS Notes and the Hawk Notes."[10]   Further, the Omnibus Agreement gave holders of Stream's Class A common stock, other than the Rajan Brothers and their affiliates, the right to exchange their shares of Stream's Class A common stock for an identical number of shares of SeeCubic's

---

[8] *Id.* at 1025 (alternations in original) (quoting Dkt. 101 Ex. 56, at 1057).

[9] Stream's authorized signatories were Gola and Gollop.  A150–51 (Omnibus Agreement).

[10] *See* A136 (Omnibus Agreement WHEREAS clause).

common stock at no cost.[11]   The Omnibus Agreement also provided that Stream would

receive one million shares of SeeCubic's Class A common stock.[12]

*F. The Rajan Brothers' Attempt to Nullify the Omnibus Agreement.*

Soon after the Board created the Resolution Committee, the Rajan brothers

attempted to neutralize it.   Initially, the Rajan brothers drafted a written consent of

stockholders that purported to remove the Outside Directors.[13]   When that failed, the Rajan

brothers developed theories designed to undermine the Resolution Committee, including

recruiting Raja's assistant to search for documentation reflecting whether the Outside

Directors had accepted their directorships.   Eventually, the Rajan brothers resorted to

refusing to comply with the Omnibus Agreement by trying to change who managed certain

Stream subsidiaries and attempting to remove prototype technology from a storage facility

in the Netherlands.[14]

Once it became clear that the Rajan brothers intended to challenge the Omnibus

Agreement's validity, SLS, Hawk, the Equity Investors, and the Resolution Committee

attempted to negotiate with the Rajan family to convince them to support the deal.  SLS,

---

[11] *Stream TV*, 250 A.3d at 1025; A139 (Omnibus Agreement § 1.1(d)).

[12] *Stream TV*, 250 A.3d at 1025; A139 (Omnibus Agreement § 1.1(f)).

[13] At the time of the P.I. Opinion, Stream alleged that the May Stockholder Consent (a written consent of stockholders drafted by the Rajan brothers dated May 6) removed the Outside Directors prior to the approval of the Omnibus Agreement, thereby causing the Omnibus Agreement to be invalid.  However, the Court of Chancery concluded that the evidence demonstrated that the Rajan brothers executed the May Stockholder Consent later, and possibly during the evening of May 8 or on May 9, and then backdated the document to May 6 in an effort to preempt the Omnibus Agreement.  *Stream TV*, 250 A.3d at 1026.

[14] Mathu went as far as incorporating a new entity named Glasses-Free Technologies, Inc., and purported to grant it a license to use Stream's technology.  *Id*. at 1027.

Hawk, and the Equity Investors offered to amend the Omnibus Agreement to give the Rajan brothers greater consideration, and the Rajan brothers pushed for personal benefits for themselves.[15]  Ultimately, the negotiations failed.

### G. Stream Files Suit in The Court of Chancery.

On September 8, 2020, Stream filed suit and moved for a temporary restraining order ("TRO") to bar SeeCubic from seeking to enforce the Omnibus Agreement. SeeCubic filed counterclaims and third-party claims requesting expedition and a TRO.  The court entered a status quo order and scheduled a hearing on the parties' competing motions for preliminary injunctive relief.  From there on, "[c]reating litigation chaos seemed to be one of the Rajans' strategies."[16]

### 1. The Preliminary Injunction Opinion.

On December 8, 2020, the court issued the P.I. Opinion, concluding that SeeCubic was entitled to injunctive relief because the Resolution Committee had the authority to bind Stream to the Omnibus Agreement and that the Omnibus Agreement did not require a shareholder vote under Section 271 or the Class Vote Provision in Stream's Charter.  The court concluded that "[n]either [Section 271 nor the Class Vote Provision] applie[d] to the transfer of assets contemplated by the Omnibus Agreement."[17]  Therefore, the court

---

[15] These personal benefits included employment, compensation, and indemnification for litigation expenses.  *Id.*

[16] *Stream TV*, 2021 WL 5816820, at *1.  Stream went through two sets of lawyers (at the time of the Injunction Order, Stream was on its third set of lawyers), and the Rajan brothers' represented themselves during portions of the litigation.

[17] *Stream TV*, 250 A.3d at 1033.  The P.I. Opinion also concludes that the Outside Directors were appointed validly and that the members of the Resolution Committee did not breach their fiduciary

granted SeeCubic's motion for a preliminary injunction and denied Stream's competing motion.[18]

### a. The Court's Section 271 Analysis at the Preliminary Injunction Stage.

Starting with Section 271 of the DGCL, the court determined that the question before it was "whether the transfer of Stream's assets to its secured creditors under the circumstances presented [] constitute[d] a sale or exchange within the scope of Section 271."[19] To answer this question, the court stated that although the assignment of Stream's assets to SeeCubic could be classified as a "sale" or an "exchange" under Section 271, the better course of action was to "accept that the language of Section 271 is ambiguous as to whether it applies to transactions like the Omnibus Agreement," and look to principles of statutory interpretation.[20] The court then turned to Section 271's legislative history, applied an insolvency exception *sua sponte*, and made three findings.

First, the court found that the common law rule requiring a board to seek unanimous shareholder approval before selling all of the corporation's assets was subject to an

---

duties, therefore, the Court of Chancery did not enter a mandatory injunction. *See id.* at 1028–31, 1045–47. However, these conclusions are not challenged on appeal.

[18] The court concluded that it was reasonably probable that the Omnibus Agreement was a valid and binding agreement, and prohibited Stream, the Rajans, and anyone acting in concert with them, from interfering with SeeCubic's rights under the Omnibus Agreement.

[19] *Id.* at 1033.

[20] *Id.* at 1041. Specifically, the court noted that "Stream does not cite any dictionary definitions, but argues without support that the plain meaning of the terms 'sale' and 'exchange' must encompass the transfer of all Stream's assets to SeeCubic. In light of the [Black's Law Dictionary] definitions [of 'sale' and 'exchange'] . . . that conclusion *is plausible but not mandated*." *Id.* at 1040 (emphasis added).

insolvency exception, thereby allowing boards to transfer all or substantially all of an insolvent company's assets to creditors without shareholder approval.

Second, the court found that the evolution of Section 271's language, mainly the addition of specific acceptable forms of consideration that did not include "forgiveness of debt," supported allowing an insolvent or failing firm to transfer all or substantially all of its assets to creditors.[21]

Third, the court found that, because Section 272 does not require a shareholder vote for the pledging of corporate assets as collateral (unless the corporate charter specifies otherwise), requiring a shareholder vote under Section 271 before a company could otherwise transfer its assets to a creditor "would be contrary to the plain language of Section 272" and against Delaware public policy.[22]

The Court of Chancery explained that, prior to the General Assembly modernizing Delaware's merger statutes, the preferred transaction vehicle involved the target corporation selling all of its assets and then dissolving and distributing the consideration to its stockholders, *i.e.,* asset transfers.[23] Further, at common law, the general rule was that the directors only have the power of management in conducting ordinary business affairs. This prevented directors from selling the assets of the business without unanimous stockholder approval. Thus, the objection of a single shareholder could thwart the efforts to sell a corporation's assets.

---

[21] *Id.* at 1042.

[22] *Id.* at 1043.

[23]*Id*. at 1033–34.

However, the court stated that this strict rule was not without exceptions. "A late nineteenth century treatise noted that for 'a failing company the rule is different, and a sale of the whole property may be made by the directors.'"[24] The court cited to two twentieth-century treatises for the same proposition,[25] and noted that even today, a "Delaware treatise acknowledges the 'failing business' exception to the common law rule."[26] The court also cited a Court of Chancery opinion from 1915 that "acknowledged the general prohibition on selling all of a corporation's assets, as well as the exception for an insolvent or failing firm."[27] After reviewing Section 271's statutory predecessor, Section 64a, the court found that "[t]here is no indication that the General Assembly intended to restrict or eliminate authority that already existed at common law, such as the power of the directors of an insolvent and failing corporation to sell its assets."[28]

Against this common law backdrop, the court reviewed Section 271's revisions. "A 1929 amendment confirmed that the consideration could consist 'in whole or in part [of] shares of stock in, and/or other securities of, any other corporation or corporations.'"[29] In 1967, the General Assembly revised the statute again by expanding the expressly permitted

---

[24] *Id.* at 1035 (quoting 1 Charles Fisk Beach, Jr., *Company Law: Commentaries on the Law of Private Corporations* § 357, at 582 (1891)).

[25] *Id.* at 1036 (citing Thomas Conyngton & R. J. Bennett, *Corporation Procedure* 232 (rev. ed. 1927); Henry Winthrop Ballantine, *Ballantine on Corporations* § 281 (1946)).

[26] *Id.* (citing 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* §10.7, 10–34 (3d ed. 1998 & 2011 Supp.)).

[27] *Id.* at 1036 (citing *Butler v. New Keystone Copper Co.*, 93 A. 380, 382 (Del. Ch. 1915)).

[28] *Id.* at 1037.

[29] *Id.* at 1037 (alteration in original) (quoting 36 Del. Laws ch. 135 § 19 (1929)).

forms of consideration to include "money or other property."[30]  In addition, the court noted

that the 1967 revision made two related changes to the DGCL:  adding a new provision,

Section 272, and eliminating a provision that did not require either board approval or a

stockholder vote to accomplish a sale of assets to a secured creditor by decree  because that

provision was unnecessary given the rights generally available to secured creditors.[31]

The court observed that, today, Section 271 mandates a "two-step process" that first

requires board approval, and then requires stockholder approval.[32]   Section 271(a)

provides:

> Every corporation may at any meeting of its board of directors or governing
> body sell, lease or exchange all or substantially all of its property and assets,
> including its goodwill and its corporate franchises, upon such terms and
> conditions and for such consideration, which may consist in whole or in part
> of money or other property, including shares of stock in, and/or other
> securities of, any other corporation or corporations, as its board of directors
> or governing body deems expedient and for the best interests of the
> corporation, when and as authorized by a resolution adopted by the holders
> of a majority of the outstanding stock of the corporation entitled to vote
> thereon or, if the corporation is a nonstock corporation, by a majority of the
> members having the right to vote for the election of the members of the
> governing body and any other members entitled to vote thereon under the
> certificate of incorporation or the bylaws of such corporation, at a meeting
> duly called upon at least 20 days' notice.  The notice of the meeting shall
> state that such a resolution will be considered.[33]

---

[30] *Id*. at 1037–38.  The revision added the words "substantially all" as well.

[31] *Id*. at 1038; *see also id.* at 1038 n.18 ("The revisions attempted to eliminate redundant and
unnecessary provisions.").

[32] *Id.* at 1039.

[33] 8 *Del. C.* § 271(a).

The court concluded that interpreting Section 271 as requiring a shareholder vote for the type of transaction contemplated by the Omnibus Agreement would create a conflict with Section 272.  Section 272 provides:

> The authorization or consent of stockholders to the mortgage or pledge of a corporation's property and assets shall not be necessary, except to the extent that the certificate of incorporation otherwise provides.[34]

In explaining the conflict, the court reasoned that:

> [i]nterpreting Section 271 to require a stockholder vote before an insolvent or failing corporation can transfer its assets to secured creditors would conflict with Section 272 of the DGCL, which authorizes a corporation to mortgage or pledge all of its assets without complying with Section 271. Section 272 is silent as to whether a secured creditor can foreclose on its security interest in the debtor corporation's assets, but the statutory scheme would not function if the debtor corporation had to comply with Section 271 before the creditor could foreclose.  When facing the prospect of foreclosure, the board and stockholders of the debtor corporation would have no incentive to approve the transfer of the corporation's assets.  As a practical matter, any creditor who wanted to ensure that it had the ability to levy on the pledged collateral would have to obtain a stockholder vote when entering into the credit agreement, contrary to the plain language of Section 272.[35]

The court concluded that Section 271 did not apply to the Omnibus Agreement because Stream was insolvent, its stockholders no longer had a "meaningful interest in the firm," and the secured creditors were entitled to its assets.[36]  Therefore, "[u]nder the DGCL, the Omnibus Agreement did not require a stockholder vote."[37]

---

[34] 8 *Del. C.* § 272.

[35] *Stream TV*, 250 A.3d at 1021–22.

[36] *Id.* at 1043.

[37] *Id.*

b. *The Court of Chancery Interprets the Charter.*

After analyzing Section 271, the court turned to the Charter's Class B stockholder

vote provision (the "Class Vote Provision").  The court found that the language in the Class

Vote Provision was "parallel" to Section 271 such that the Charter's language warranted

the same interpretation as Section 271.

In full, the Charter's Class Vote Provision provides:

> For so long as shares of Class B Voting Stock remain outstanding, in addition
> to any other vote or consent required herein or by law, the affirmative vote
> or written consent of the holders of a majority of the then-outstanding shares
> of Class B Voting Stock, voting as a separate class, shall be necessary for the
> Company to consummation [sic] an Acquisition or Asset Transfer.[38]

The Charter defines "Acquisition" as:

> (A) any consolidation, stock exchange or merger of [Stream] with or into any
> other corporation or other entity or person, or any other corporate
> reorganization, other than any such consolidation, merger or reorganization
> in which the stockholders of [Stream] immediately prior to such
> consolidation, merger or reorganization, continue to hold a majority of the
> voting power of the surviving entity in substantially the same proportions (or,
> if the surviving entity is a wholly-owned subsidiary, its parent) immediately
> after such consolidation, merger or reorganization; or

> (B) any transaction or series of related transactions to which [Stream] is a
> party and in which excess of fifty percent (50%) of [Stream's] voting power
> is transferred; provided that an Acquisition shall not include

> (x) any consolidation or merger effected exclusively to change the domicile
> of [Stream], or

> (y) any transaction or series of transactions principally for bona fide equity
> financing purposes in which cash is received by [Stream] or any successor or

---

[38] A124 (Charter § IV.D.2(d)).

indebtedness of [Stream] is cancelled or converted or a combination thereof.[39]

The Charter defines "Asset Transfer" as:

> a sale, lease or other disposition of all or substantially all of the assets or intellectual property of [Stream] or the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of [Stream].[40]

Although the court did not expressly conclude, at this stage, that the Omnibus Agreement was an "Asset Transfer" as defined under the Charter, the court stated in a footnote that "[t]he Omnibus Agreement involves a transfer of assets, so if any aspect of the Class Vote Provision covered the transaction, it would be the definition of 'Asset Transfer.'"[41]  Starting with the definition of "Asset Transfer," the court determined that "[t]he language of the Class Vote Provision track[ed] Section 271 of the DGCL," and therefore resulted in the same outcome:  "Stream need not obtain stockholder approval under the Class Vote Provision to transfer mortgaged or pledged assets to the secured creditors who hold security interests in those assets."[42]

---

[39] A126 (Charter § IV.D.4(b)(i)).

[40] A126 (Charter § IV.D.4(b)(ii)).

[41] *Stream TV*, 250 A.3d at 1044 n.24.  In contrast, in the court's September 23, 2021 Order Denying The Rajans' Motion to Modify the Preliminary Injunction Under Rule 65, the court states unequivocally that "*The Omnibus Agreement contemplated an Asset Transfer.  It provided for Stream to transfer all of assets [sic] in exchange for SLS and Hawk 'stay[ing] the [f]oreclosure [of Stream's assets] and satisfy[ing] and extinguish[ing], in their entirety, the SLS Notes and the Hawk Notes, respectively.'"  Stream TV Networks, Inc. v. Seecubic, Inc.*, 2021 WL 4352731, at *2 (Del. Ch. Sept. 23, 2021) (alterations in original) (emphasis added).

[42] *Stream TV*, 250 A.3d at 1043.

Comparing Section 271 and the Class Vote Provision, the court found "only two differences."[43]  First, the Class Vote Provision expressly refers to "intellectual property."[44] According to the court, the phrase "intellectual property" "does not enlarge the voting obligation beyond the scope of Section 271, because intellectual property is already a type of asset."[45]

Second, the provision refers to "the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of [Stream]."  The court acknowledged that the Omnibus Agreement "does not contemplate an exclusive license," but it concluded that the Class Vote Provision's reference to exclusive licenses shows that the drafters "knew how to define the concept of an 'Asset Sale' to include transactions that Section 271 would not otherwise reach."[46]  It then stated that, "[i]f the drafters of the Class Vote Provision wanted to require a class vote before a secured creditor could foreclose on pledged or mortgaged assets, then the definition of 'Asset Sale' should have referred to that type of transaction."[47]  Accordingly, the court concluded that the reference to "a sale, lease or other disposition" in the Asset Transfer definition tracked the language of Section 271 and "warrants the same

---

[43] *Id.* at 1045.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

interpretation."[48]  The court did not separately address whether the Omnibus Agreement fell into the "*other disposition*" category within the definition of Asset Transfer.[49]

Accordingly, the court denied Stream's motion for a preliminary injunction and granted SeeCubic's motion for a preliminary injunction preventing Stream from interfering with the Omnibus Agreement.

### 2. SeeCubic's Motion for Summary Judgment.

On January 19, 2021, SeeCubic moved for summary judgment and filed its opening brief.  SeeCubic's motion for summary judgment sought the following relief:  a declaratory judgment that the Omnibus Agreement is valid and binding, a permanent injunction ordering Stream and the Rajans to comply with the Omnibus Agreement, and a judgment against the Rajans for converting the assets identified in the Omnibus Agreement.

Stream filed its answering brief on February 17, 2021, relying exclusively on the briefs it filed in connection with the parties' cross motions seeking preliminary injunctive relief.  Before the parties completed the briefing, Stream and the Rajans filed for

---

[48] *Id*. (citing *Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 969 (Del. Ch.), *aff'd,* 567 A.2d 419, 1989 WL 136971 (Del. Oct. 18, 1989) (TABLE)).

[49] In a footnote, the court addressed Stream's "conclusory" claim that the Omnibus Agreement was an Acquisition under the Charter.  According to the court, "[t]he Omnibus Agreement does not contemplate a consolidation or merger, which are specific types of transactions having independent legal significance," and therefore part (A) of the definition of Acquisition did not apply.  *Id*. at 1044 n.24.  The court reasoned that the Omnibus Agreement also did not "result in the transfer of any of Stream's voting power," and therefore part (B) of the definition of Acquisition did not apply.  *Id*.  "By process of elimination" the court determined that "perhaps Stream [thought] the Omnibus Agreement contemplate[d] a 'reorganization.'"  *Id*.  However, the court determined that "Stream would have to provide authorities delineating the content of the term and why it could encompass the Omnibus Agreement" as well as "explain why that concept would trigger a stockholder vote when the definition of 'Asset Transfer' did not."  *Id*.

bankruptcy, resulting in an automatic stay of the proceedings before the Court of Chancery.[50]  The bankruptcy court dismissed the case as a bad faith filing, and described it as an effort "to gain a tactical litigation advantage that is a part of a continued pattern of effort to nullify, undermine, and/or interfere with the [O]mnibus [A]greement, vitiate the purpose and effect of the Chancery Court's order, and to maintain ownership and control over the assets of the debtor . . . ."[51]

On September 23, 2021, the Court of Chancery granted, in part, SeeCubic's motion for summary judgment.[52]  The SJ Order granted summary judgment in SeeCubic's favor declaring the Omnibus Agreement to be valid and binding.  The court also granted SeeCubic's motion for a permanent injunction and converted the preliminary injunction into a permanent injunction.  Finally, the court denied SeeCubic's motion as to the conversion claim because the court found that the summary judgment record did not support it.

---

[50] *Stream TV*, 2021 WL 5816820, at *1; A043 (Dkt. 126).

[51] *Stream TV*, 2021 WL 5816820, at *1 (alterations in original); B36–37 (Bankruptcy Ruling at 13–14).  On May 27, 2021, after the bankruptcy stay lifted, Mathu Rajan filed a *pro se* letter application claiming that the P.I. Opinion was the product of fraud.  *Stream TV*, 2021 WL 5816820, at *1; A048 (Dkt. 138).  On June 4, 2021, Mathu filed a formal motion to set aside the P.I. Opinion. *Stream TV*, 2021 WL 5816820, at *1; A049 (Dkt. 143).  Then, on September 15, 2021, the Rajans had a third-party seek to intervene and file additional motions.  *Stream TV*, 2021 WL 5816820, at *1; A057 (Dkt. 183).  The very next day, on September 16, 2021, the Rajans filed another motion to modify the preliminary injunction.  *Stream TV*, 2021 WL 5816820, at *1; A058 (Dkt. 185).  The court rejected the Rajans' various efforts to set aside the P.I. Opinion, prompting the Court of Chancery's statement that "litigation chaos" seemed to be the Rajans' strategy.  *Stream TV*, 2021 WL 5816820, at *1.

[52] *See generally Stream TV*, 2021 WL 4352732 (granting in part SeeCubic's motion for summary judgment as to the validity of the Omnibus Agreement and its request for a permanent injunction).

3.  *Stream and the Rajans Move for Partial Final Judgment, Appeal to This Court, and Move to Modify or Stay the Permanent Injunction Pending Appeal.*

On September 28, 2021, Stream and the Rajans moved to have the Court of Chancery enter the SJ Order as a partial final judgment and to stay SeeCubic's conversion claim, which the court granted on November 10, 2021.[53]

On November 12, 2021, Stream and the Rajans noticed this appeal.  On the same day, Stream and the Rajans moved to modify or stay the permanent injunction pending appeal.  The court denied both requests.[54]  The court denied Stream's request to modify the permanent injunction because "[t]here have not been any significant changes in the status quo" since the court entered comparable relief in the form of a preliminary injunction on December 8, 2020.[55]  After analyzing the four factors from *Kirpat, Inc. v. Delaware Alcoholic Beverage Control Commission* that guide a trial court's discretion to grant or deny a stay, the court concluded that a stay was unwarranted.[56]  In doing so, the Court of Chancery elaborated on its reasoning that Section 271 did not supersede the common law's recognition that directors could sell the assets of an insolvent firm without stockholder approval.

---

[53] *See generally Stream TV*, 2021 WL 5240591 (entering partial final judgment under Rule 54(b)).

[54] *See Stream TV*, 2021 WL 5816820, at *2.

[55] *Id.*

[56] *Id.* at *15.  This Court identified the four factors in *Kirpat, Inc. v. Delaware Alcoholic Beverage Control Comm'n*, 741 A.2d 356 (Del. 1998).

*H. The Parties' Contentions on Appeal.*

Stream raises four arguments on appeal.  First, it contends that the Class Vote

Provision unambiguously requires Class B stockholder approval and renders Section 271's

default voting rule irrelevant.  Second, Stream contends that the Court of Chancery erred

by looking first to Section 271 prior to construing the Charter.  Stream further asserts that

the court bypassed the Charter's plain terms in order to apply a "board only" common law

insolvency exception to Section 271.  Third, Stream contends that Section 271 superseded

any such common law exceptions assuming, *arguendo*, that such an exception did exist.

Finally, Stream argues that the ruling, as a matter of public policy, would upset Delaware's

contractarian focus and the predictable application of Section 271.

## II.    STANDARD OF REVIEW

This matter involves the interpretation of both a charter provision and a statute.

"The construction or interpretation of a corporate certificate or by-law is a question of law

subject to *de novo* review by this Court."[57]  "Certificates of incorporation are regarded as

contracts between the shareholders and the corporation, and are judicially interpreted as

such."[58]  "Unless there is ambiguity, Delaware courts interpret contract terms according to

their plain, ordinary meaning."[59]  "Statutory interpretation is a question of law, which we

review *de novo*."[60]

---

[57] *Centaur Partners, IV v. National Intergroup, Inc.*, 582 A.2d 923, 926 (Del. 1990).

[58] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[59] *Id.*

[60] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 112 (Del. 2020) (citing *Corvel Corp. v. Homeland Ins. Co. of N.Y.*, 112 A.3d 863, 868 (Del. 2015)).

## III.    ANALYSIS

First, we consider whether the Class Vote Provision requires Class B majority stockholder approval of the Omnibus Agreement.    Stream argues that the Court of Chancery analyzed the issue "upside down" by applying its interpretation of Section 271 to a clear and unambiguous charter provision.  Instead, Stream contends, the plain text of the Class Vote Provision controls and Section 271's default rules are irrelevant.[61]  We agree and explain our reasoning below.

In assessing corporate action for legal compliance, the DGCL does outrank a corporation's charter such that a charter provision is invalid if it conflicts with a provision of the DGCL.  As we recognized in *Salzberg v. Sciabacucchi*,[62] Section 102(b)(1) governs the scope of corporate charters, and its scope is "broadly enabling."[63]  But Section 102(b)'s broad authorization "is constrained by the phrase, 'if such provisions are not contrary to the laws of this State.'"[64]  We stated further that:

> in *Sterling v. Mayflower Hotel Corp.*, this Court held that Section 102(b)(1) bars only charter provisions that would "achieve a result forbidden by settled rules of public policy."    Accordingly, "the stockholders of a Delaware corporation may by contract embody in the [certificate of incorporation] a provision departing from the rules of the common law, *provided that it does*

---

[61] To be clear, Stream argued below that "[e]ven if [the] Charter's approval procedures do not govern, the Omnibus Agreement is still void because Section 271 [of the] Delaware Code requires shareholder-approval."  A209 (Pls.' Opening Br. Supp. Mot. Prelim. Inj.).  Stream abandons this argument on appeal and asserts that Section 271 is "irrelevant."  Opening Br. at 14 ("The Charter Unambiguously Controlled The Class B Voting Shareholders' Blocking Rights; Section 271 Was Irrelevant.").

[62] *Salzberg*, 227 A.3d 102.

[63] *Id.* at 115.

[64] *Id.* (citing 8 *Del. C.* § 102(b)(1)).

*not transgress a statutory enactment or a public policy settled by the common law or implicit in the General Corporation Law itself.*"[65]

Thus, we proceed with analyzing whether the Class Vote Provision requires a vote of the Class B stockholders.[66]    Considering the plain and ordinary meaning of the term "disposition," we conclude that it does.  More specifically, the Omnibus Agreement effects an "Asset Transfer" that unambiguously triggers a majority vote of the Class B stockholders.   Therefore, extrinsic evidence is not used to interpret the Class Vote Provision.[67]

Next, because we disagree with the Court of Chancery that the language of the Class Vote provision of the Charter "tracks the text of Section 271,"[68] we do not look to Section 271 as an interpretative guide in construing the provision.  And because we conclude that a vote is required because the Omnibus Agreement falls within the materially broader definition of Asset Transfer, we need not resolve whether such a vote is also required under the plain language of Section 271, *i.e.,* whether the Omnibus Agreement effects a "sale,

---

[65] *Id.* at 115–16 (alteration in original) (emphasis added) (footnotes omitted) (quoting *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 118 (Del. 1952)).

[66] *See, e.g., Jones Apparel Grp., Inc. v. Maxwell Shoe Co.*, 883 A.2d 837, 840–41 (Del. Ch. 2004) (analyzing first whether Maxwell's charter precluded Maxwell's board from setting the record date in connection with plaintiff's consent solicitation (*i.e.,* the proper interpretation of the charter), and second, determining whether that charter provision was valid under the DGCL), *reprinted in* 30 Del. J. Corp. L. 284, 288–90 (2005).

[67] *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

[68] *Stream TV*, 250 A.3d at 1044–45; *Stream TV*, 2021 WL 5816820, at *15 ("As explained in the Injunction Decision, the language of [the Asset Transfer] provision 'tracks the text of Section 271 and warrants the same interpretation.'").

lease or exchange" within the meaning of Section 271.  In sum, we agree with the Vice Chancellor that the Omnibus Agreement effects an Asset Transfer under the Charter. However, because Section 271's language is materially different, our agreement ends there, as does our analysis, as the parties have raised no argument that the Charter violates "a public policy settled by the common law or implicit in the [DGCL] itself."[69]

Finally, although we need not further consider Section 271, we clarify that a common law insolvency exception, if one existed in Delaware, did not survive the enactment of Section 271 and its predecessor.  Thus, there is no Delaware common law "board only" insolvency exception under Section 271.  Rather, the enactment of Section 271 and its predecessor superseded any such common law exception, to the extent one existed in Delaware.

A.  *The Charter Requires a Class B Stockholder Vote Because the Omnibus Agreement Effects an "Asset Transfer" under Stream's Charter.*

Stream argues that the Omnibus Agreement is both an Acquisition and an Asset Transfer, and therefore requires a vote of the Class B stockholders under the Charter. Because we conclude that the Omnibus Agreement effects an "Asset Transfer," we need not decide whether or not it also constitutes an "Acquisition."

"Delaware adheres to an objective theory of contracts, meaning that a 'contract's construction should be that which would be understood by an objective, reasonable third

---

[69] *See Sterling*, 93 A.2d at 118.  Rather, the Court of Chancery identified only one public policy concern, namely, "interpreting Section 271 as applying to a creditor's efforts to levy on its security would undercut the value of the security interest."  *Stream TV*, 250 A.3d at 1042.  Also, no party in this litigation has argued that in the context of judicial foreclosure proceedings, a stockholder vote is required.  Rather, the Omnibus Agreement effects a type of privately-structured work-out.

party.'"[70]  We "place[] great weight on the plain terms of a disputed contractual provision,"

and, therefore, we "interpret clear and unambiguous terms according to their ordinary

meaning."[71]   "We do not consider extrinsic evidence unless we find that the text is

ambiguous."[72]   "Ambiguity is present 'only when the provisions in controversy are

reasonably or fairly susceptible of different interpretations or may have two or more

different meanings[,]'"[73] and not "simply because the parties do not agree upon its proper

construction."[74]

An affirmative vote of the holders of a majority of the then-outstanding shares of

Class B stock is necessary to consummate an Asset Transfer.  The Charter defines "Asset

Transfer" as:

> a sale, lease or other disposition of all or substantially all of the assets or
> intellectual property of [Stream] or the granting of one or more exclusive
> licenses which individually or in the aggregate cover all or substantially all
> of the intellectual property of [Stream].[75]

The parties agree that the Omnibus Agreement is not a sale or lease of all of Stream's

assets.  The parties also agree that the Omnibus Agreement addresses all of the assets of

Stream.  Thus, Stream focuses on the phrase "*other disposition*" and argues that the

---

[70] *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, --- A.3d ---, ---, 2022 WL 619700, at *5 (Del. Mar. 3, 2022).

[71] *Id.* (quoting *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019)).

[72] *Id.* (citing *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017)).

[73] *Id.* (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

[74] *Rhone-Poulenc Basic Chems. Co.*, 616 A.2d at 1196.

[75] A126 (Charter § IV.D.4(b)(ii)).

Omnibus Agreement effects an Asset Transfer that requires a vote of Class B stockholders to be effective.

Stream argues that the words, "other disposition," are "broader" than the word "exchange" in Section 271.  Further, Stream argues that the difference in word choice must be seen as "intentional" and reinforces a conclusion that the parties intended for the Charter to have a different meaning than the statute.  We agree and conclude that the Charter's definition of Asset Transfer differs materially from Section 271.  The definition of Asset Transfer changes Section 271's phrase of "sell, lease *or exchange*,"[76] to "sale, lease *or other disposition*."[77]  Further, the Class Vote Provision contains express references to "intellectual property" and the granting of "exclusive licenses."[78]  The drafters "could have simply tracked the language of the statute," but did not.[79]  Accordingly, the Charter's use of the phrase "other disposition" has a meaning that is different, and broader, than the term "exchange."[80]  It follows that, there is no need to look to Section 271 as an interpretative

---

[76] 8 *Del. C.* § 271(a).

[77] A126 (Charter § IV.D.4(b)(ii)).

[78] *Id.*

[79] *See Jones Apparel Grp. Inc*, 883 A.2d at 842 ("[T]he drafters [of a charter] could have simply tracked the language of the statute, but did not.  That choice cannot be seen as anything other than intentional, reinforcing the conclusion that to read a proviso back into [the charter] allowing the board to set the record date would contravene the plain meaning of that provision.").

[80] *See, e.g., Wilmington Trust Co.*, 2008 WL 555914, at *8 (Del. Ch. Feb. 29 2008) ("[T]he words 'transfer' and 'disposition,' in particular, are inherently broad terms generally understood to encompass changes in title or ownership.").

guide in construing the language of the Class Vote Provision because the Charter's language does not track Section 271.[81]

That leads us to the key inquiry -- the meaning of "*other disposition*," which is not defined in the Charter.   Corporate charters are contracts, and our rules of contract interpretation apply.[82]   "The Court must first attempt to ascertain the parties' intent from the language of the contract."[83]  Words or phrases used in a bylaw or charter are to be given their commonly accepted meaning, and this Court "often looks to dictionaries to ascertain a term's plain meaning."[84]

Black's Law Dictionary defines "disposition" as "[t]he act of transferring something to another's care or possession," "the relinquishing of property" and as "[a] final settlement or determination," such as a "court's disposition of the case."[85]   Merriam-Webster defines "disposition" as "the act or the power of disposing or the state of being disposed:  such as . . . a final arrangement[] settlement" and "the transfer to the care or possession of

---

[81] The Class Vote Provision is also more specific than Section 271 in function as it requires a majority vote of outstanding Class B shares whereas Section 271 requires a vote of all outstanding shares.

[82] *BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 977 (Del. 2020); *Centaur Partners, IV*, 582 A.2d at 928.

[83] *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 56 (Del. 1995).

[84] *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1132 (Del. 2020) (citing *Lorillard Tobacco Co. v. Am. Legacy Found*, 903 A.2d 728, 738 (Del. 2006)).   *See State of Delaware Dep't of Nat. Res. And Env't Control v. McGinnis Auto & Mobile Home Salvage, LLC*, 225 A.3d 1251, 1260–61 (Del. 2020) (Valihura, J., dissenting) ("Delaware case law is well settled that undefined words are given their plain meaning based upon the definition provided by a dictionary.").

[85] *Disposition*, Black's Law Dictionary (11th ed. 2019).   "Disposition" also contains specific definitions for certain types of dispositions, such as testamentary, ambulatory, and informal.   *See id.*

another."[86]  Similarly, American Heritage defines "disposition" as "[a]n act of disposing; a bestowal or transfer to another."[87]  Cambridge Dictionary defines "disposition" as "the process of selling something or formally giving it to someone" and "the way in which a formal process, such as a business deal or a matter dealt with in a court of law, is completed."[88]  Collins similarly defines "disposition" as "a selling or giving away, as of property."[89]  Finally, Ballentine's Law Dictionary defines "disposition" as "[a]n arrangement.  A transfer of property.  The power of disposal."[90]  We conclude, as explained further below, that the term, "other disposition," includes the transfer of assets contemplated in the Omnibus Agreement.

The Omnibus Agreement effects a transfer and assignment of all rights, title and interest in all of Stream's assets for the benefit of Stream's creditors.  This is evident from the language of the agreement itself as it recites:

> WHEREAS, SLS and Hawk have each agreed to stay the [f]oreclosure and satisfy and extinguish each of the SLS Notes and the Hawk Notes in their entirety subject to the Company *assigning all right, title and interest in and to all assets of the Company* to a newly-formed holding company ("Newco") established by SLS and Hawk, in satisfaction of the SLS Notes and the Hawk Notes.[91]

---

[86] *Disposition*, Merriam-Webster, https://www.merriam-webster.com/dictionary/disposition (last visited Apr. 19, 2022).

[87] *Disposition*, The American Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=disposition (last visited Apr. 19, 2022).

[88] *Disposition*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/disposition (last visited May 27, 2022).

[89] *Disposition*, Collins, https://www.collinsdictionary.com/us/dictionary/english/disposition (last visited May 27, 2022).

[90] *Disposition*, Ballentine's Law Dictionary (3d ed. 2010).

[91] A136 (Omnibus Agreement WHEREAS clause) (emphasis added).

Further, Section 1.1(a) of the Omnibus Agreement provides:

Each of SLS and Hawk shall agree to stay the [f]oreclosure *and satisfy and extinguish*, in their entirety, the SLS Notes and the Hawk Notes, respectively (collectively, the "Discharged Indebtedness"), upon the Company's immediate conveyance, *transfer*, delivery and *assignment, of all right, title and interest of the Company in, to or under all of the rights, properties and assets of the Company* (including those of any direct or indirect subsidiary of the Company) of every kind and description, wherever located, real, personal, or mixed, tangible or intangible, to the extent owned, leased, licensed, used or held for use in or relating to the business, as the same shall exist on the date hereof, *to Newco*, including, but not limited to, all right, title and interest of the Company (or any direct or indirect subsidiary of the Company) in, to and under the assets listed or described below (the "Transferred Assets")[.]"[92]

An assignment of all rights, title and interest in the assets of the Company to Newco is a "disposition" because it is a type of transfer or relinquishment of property. Dictionary definitions of "assignment" reinforce this conclusion. Black's Law Dictionary defines "assignment" as: "[t]he transfer of rights or property."[93] Merriam-Webster defines "assignment" as: "the transfer of property *especially*: the transfer of property to be held in trust or to be used for the benefit of creditors."[94] The American Heritage Dictionary defines "assignment" to mean: "[t]he transfer of a claim, right, interest or property from one to another."[95] Thus, "disposition" includes the assignment of Stream's assets to Newco (SeeCubic) under the Omnibus Agreement, thereby triggering the Class B Vote Provision.

---

[92] A137 (Omnibus Agreement § 1.1(a)) (emphasis added).

[93] *Assignment*, Black's Law Dictionary (11th ed. 2019).

[94] *Assignment*, Merriam-Webster, https://www.merriam-webster.com/dictionary/assignment (last visited May 10, 2022) (emphasis in original).

[95] *Assignment*, The American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=assignment (last visited May 10, 2022).

Further, the assignment of all rights, title, and interest in Stream's assets is a "disposition" because it effects a "relinquishing of property" in consideration for a resolution, settlement, or determination of certain claims. For example, Section 1.2 of the Omnibus Agreement provides:

> 1.2 Dismissal of Lawsuit and Foreclosure Action
>
> In consideration of the Transactions contemplated by Section 1.1 of this Agreement and such other agreements as made be made [sic] among the parties hereto and upon consummation thereof, (i) the Investors hereby irrevocably agree to *forbear from including any claims against the Company or any of the Transferred Assets as part of the Lawsuit*, and (ii) each of the SLS and the Company *agree to dismiss their applicable claims or responses in the Foreclosure Action*.[96]

Transferring assets in consideration for resolving or settling certain claims falls within the common dictionary definitions of "disposition" set forth above. Thus, the transactions set forth in the Omnibus Agreement unambiguously effect a "disposition" as that term is commonly used.

SeeCubic disagrees, and argues that the term "other disposition" in this context is limited by the concept of *nonscitur a sociis*, a canon of construction that suggests words grouped together in a list should be given related meaning in light of the words around it.[97] SeeCubic asserts that an "other disposition" must mean something akin to a "sale" or a "lease" and that it "does not unambiguously include a transfer of assets to secured creditors

---

[96] A140 (Omnibus Agreement § 1.2) (emphasis added). Further, the recitals in the Omnibus Agreement (including the one quoted above) make clear that the agreement was intended to resolve the issues relating to Stream's default on the SLS and Hawk notes.

[97] Answering Br. at 19 ("Here, the undefined term 'other disposition' is limited to a similar meaning as the terms 'sale' and 'lease.'").

in satisfaction of debt."[98]  We disagree that "other disposition" is ambiguous.  Rather, as shown above, the plain meaning of "other disposition" includes the transactions contemplated in the Omnibus Agreement.  "When the contractual provision is clear and unambiguous, the court will give the provision's terms their plain meaning."[99]

If any of the canons of construction applied, it would be the "elementary canon of contract construction" where "the intent of the parties must be ascertained from the

---

[98] *Id.*  SeeCubic also argues that if "'other disposition' were intended to encompass all dispositions of Stream's assets without limitation, the terms 'sale' and 'lease'–which are dispositions—would be superfluous." *Id.* at 20.

[99] *E.I. du Pont de Nemours & Co.*, 711 A.2d at 57 (citing *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982)).  *See BlackRock Credit Allocation Income Tr.*, 224 A.3d at 977 ("Under the applicable interpretation rules, if the bylaw's language is unambiguous, the court need not interpret it or search for the parties' intent."); *see also Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 365 n.56 (Del. 2013) ("[W]hile we will construe an ambiguous partnership agreement against the drafter under the *contra proferentem* doctrine, that doctrine only applies if the partnership agreement is ambiguous." (citing *SI Mgnt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del.1998))); *Rubick v. Sec. Instrument Corp.*, 766 A.2d 15, 18 (Del. 2000) ("If the statute is unambiguous, there is no room for interpretation, and the plain meaning of the words controls." (*Ingram v. Thrope*, 747 A.2d 545, 547 (Del. 2000))); *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 66 (Del. 1993) ("Where the intent of the legislature is clearly reflected by unambiguous language in the statute, the language itself controls." (quoting *Spielberg v. State*, 558 A.2d 291, 293 (Del. 1989))); Norman J. Singer & Shambie Singer, 2A *Sutherland Statutes and Statutory Construction* § 46:4 (7th ed.), Westlaw SUTHERLAND (database updated Nov. 2021) ("If a court does find that a statute is not clear and unambiguous, then it may look to a wide variety of intrinsic and extrinsic sources to discover the meaning of legislative language, including the maxims *expressio unius est exclusio alterius*, *ejusdem generis*, and *noscitur a sociis*, as well as legislative history . . . ." (footnote omitted)).  In any event, our interpretation of the term "other disposition" respects the *noscitur a sociis* canon because it treats disposition, sale, and lease similarly—mainly as methods of transferring and assigning the right to use or own an asset.  By specifying that "other disposition[s]" of assets would trigger the Class Vote Provision, the drafters made clear that "sale[s]" and "lease[s]" were themselves dispositions.

language of the contract."[100]  Reading the agreement as a whole,[101] other provisions within

the Omnibus Agreement shed light on what the parties meant by "other disposition."  We

note, for example, that the Charter's definition of "Transfer" as it pertains to Class B Voting

Stock, defines "Transfer" as:

> *any sale, assignment, transfer, conveyance, hypothecation or other transfer*
> *or disposition of such share or any legal or beneficial interest in such share,*
> *whether or not for value and whether voluntary or involuntary or by*
> *operation of law; provided, however, that the following shall not be*
> *considered a "Transfer"*: (x) the granting of a proxy to officers or directors
> of the Company at the request of the Board of Directors of the Company in
> connection with actions to be taken at an annual or special meeting of
> stockholders, or (y) entering into a voting trust, agreement or arrangement
> (with or without granting a proxy) with the Founders.[102]

This definition reinforces that any assignment, transfer, conveyance, or hypothecation of

the Class B shares is a "disposition" of such share, whether or not in value and whether or

not voluntary or involuntary.

One could argue that the definition of "Transfer" provided above shows that the

drafters knew how to ensure that specific types of transfers would pertain to dispositions

of Class B *stock*.  It follows that one may find it significant that these events are not also

specifically addressed in the context of transactions involving corporate *assets*, particularly

---

[100] *E.I. du Pont de Nemours & Co.*, 711 A.2d at 56 (quoting *Citadel Holding Corp. v. Roven*, 603
A.2d 818, 822 (Del. 1992)).  *See Cox Commc'ns Inc.*, 2022 WL 619700, at \*5 (explaining that this
Court reviews "questions of contract interpretation *de novo*, with the objective of determining the
intent of the parties from the language of the contract" (footnote omitted) (citing *Exelon
Generation Acquisitions, LLC*, 176 A.3d at 1267)).

[101] *See Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 918 n.28 (Del. 2021) ("Delaware courts 'read
a contract as a whole and . . . give each provision and term effect, so as not to render any part of
the contract mere surplusage[.]'" (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159
(Del. 2010))).

[102] A131 (Charter § IV.D.6(a)(iv)) (emphasis added).

in the definition of Asset Transfer.  However, the terms in the more expanded "Transfer" definition dealing with transfers of Class B Voting stock are entirely consistent with the plain meaning and common definitions of "disposition."[103]  Reading the provisions as a whole, we see no inconsistency in these provisions and in construing "other disposition" to plainly encompass the contemplated transfer and assignment of Stream's assets for the benefit of its creditors in furtherance of a resolution of certain claims.[104]

### B.  There Is No Common Law "Board-Only" Insolvency Exception to Section 271.

We have concluded that the Omnibus Agreement unambiguously contemplates a transaction constituting an "Asset Transfer" triggering the Class Vote Provision.  We clarify a final point, namely, whether there exists today an insolvency exception to Section 271.  We conclude that any such exception that might have existed has been superseded.

The Vice Chancellor engaged in a thoughtful analysis of the common law pre-dating the enactment of Section 271 and its predecessor.  Relying primarily on some treatises and

---

[103] *See Alta Berkeley VI C.V.*, 41 A.3d at 385–86 ("[I]t is well established that a court interpreting any contractual provision, including preferred stock provisions, must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." (quoting *Elliott Assoc., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998))); *see also Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) ("When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language." (citing *Osborn*, 991 A.2d at 1159–60)).

[104] We are mindful that an overly broad reading of the phrase "other disposition" could render certain exceptions within the definition of "Acquisition" superfluous, if these exceptions were read to fall into the catch-all definition of Asset Transfer.  For example, the term "disposition" likely does not encompass "(x) any consolidation or merger effected exclusively to change the domicile of [Stream]," or "(y) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by [Stream] or any successor or indebtedness of [Stream] is canceled or converted or a combination thereof."  A126 (Charter § IV.D.4(b)(i)).  Otherwise, these exceptions would be rendered meaningless.  Therefore, the phrase "other disposition" must have some limits.  However, we need not attempt to delineate what they are.

case law from other jurisdictions, the court determined that a board-only insolvency exception existed, despite the lack of any precedent in Delaware.  These authorities ranged in date from 1926 to 1948, with no case cited after 1948 upholding such an exception.

In its P.I. Opinion, the Court of Chancery cited the following treatises:

- 1 Charles Fisk Beach, Jr., *Company Law:  Commentaries on the Law of Private Corporations* §§ 357, 358 (1891) (For "a failing company the rule is different, and sale of the whole property may be made by the directors.");[105]

- Thomas Conyngton & R.J. Bennett, *Corporation Procedure* 232 (rev. ed. 1927) (footnote omitted) ("The directors may, however, without authorization of the stockholders, sell the corporate assets if necessary to pay the corporate debt, and they may, in the absence of statutory or other prohibitions, make an assignment for the benefit of creditors.");[106]

- Henry Winthrop Ballantine, *Ballantine on Corporations* § 281, at 667 (1946) (footnote omitted) ("If a corporation is insolvent or in failing condition[,] the board of directors have authority to sell the entire assets in order to pay the debts and avoid the sacrifice of an execution sale[,] even without the vote or consent of the shareholders.  They may also make an assignment for the benefit of creditors or file a voluntary petition in bankruptcy.");[107]

- 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 10.7 at 10–34 (3d ed. 1998 & 2011 Supp.) (acknowledging a "failing business" exception to the common law general rule that directors have no authority to sell out the entire property of the corporation and terminate its business).[108]

---

[105] *Stream TV*, 250 A.3d at 1035.

[106] *Id*.

[107] *Id*.

[108] *Id*. at 1036.  In its Modification Opinion, the Court of Chancery supplemented this list with citations to the Cook, Purdy and later Noyes and Cox & Hazen treatises discussed herein.  *See Stream TV*, 2021 WL 5816820, at *8–9, 11.

The Court of Chancery cited six cases from other jurisdictions,[109] and two Delaware cases, namely, *Butler v. New Keystone Copper Co.*, a case from 1915, and *Allied Chemical & Dye Corp. v. Steel & Tube Co.*, a case from 1923.[110]   In *Butler*, the Court of Chancery confronted a litigation involving a sale of assets that occurred prior to the enactment of any statute addressing a sale of assets.   Chancellor Curtis stated that

> the general rule as to commercial corporations seems to be settled that neither the directors nor the stockholders of a prosperous, going concern have power to sell all, or substantially all, the property of the company if the holder of a single share dissent.  But if the business be unprofitable, and the enterprise be hopeless, the holders of a majority of the stock may, even against the dissent of the minority, sell all the property of the company with a view to winding up the corporate affairs.[111]

*Butler* bases its holding on the majority exception to the general rule requiring stockholder unanimity and does not address a board-only insolvency exception.

The court then cited *Allied Chemical* for the proposition that, when Section 271 was enacted, the General Assembly did not intend to govern a transfer of assets by a failing firm.[112]   Specifically, the court stated that "[t]he General Assembly enacted the statutory predecessor to Section 271 to make clear that the board of directors of a corporation, with

---

[109] *See Stream TV*, 250 A.3d at 1035 (citing *City Nat. Bank v. Fuller*, 52 F.2d 870, 872–73 (8th Cir. 1931); *Autauga Coop. Leasing Ass'n v. Ward*, 250 Ala. 229, 33 So. 2d 904, 906 (1948)); *Sherrard State Bank v. Vernon*, 243 Ill. App. 122, 128 (Ill. App. Ct. 1926); *Oskaloosa Sav. Bank v. Mahaska Cnty. State Bank*, 205 Iowa 1351, 219 N.W. 530, 533 (1928); *Candor v. Mercer Cnty. State Bank*, 257 Ill. App. 192, 197–98 (Ill. App. Ct. 1930); *Howard v. Republic Bank & Tr. Co.*, 76 S.W.2d 187, 191 (Tex. Civ. App. 1934).

[110] *See id.* at 1036–37 (citing *Butler*, 93 A. 380; *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486 (Del. Ch. 1923)).

[111] *Butler*, 93 A. at 382; *Stream TV*, 250 A.3d at 1036.

[112] *Stream TV*, 250 A.3d at 1041.

the approval of a majority of its stockholders, could sell all of the firm's assets, even if the corporation was profitable and solvent."[113]  According to the court, because the common law did not prohibit the board of directors of an *insolvent* or *failing* firm from transferring its assets to creditors, "the General Assembly did not need to establish that point by statute."[114]

We have independently surveyed the law, and we concur that the weight of treatise authority, supported by cases from various states, supports the existence, at least in the early part of the twentieth century, and at least in certain jurisdictions, of certain common-law rules governing sales of all assets, including the following:

- If a corporation is solvent and profitable, then a sale of all assets requires unanimous approval by all stockholders.

- If a corporation is solvent but unprofitable and without prospect of becoming profitable, then a sale of all assets may be made with the approval of a majority of the stockholders.

- If a corporation is insolvent, then a sale of all assets may be made by the directors without stockholder approval.

At least five treatises, published before the Delaware General Assembly's enactment of Section 271's predecessor in 1917, support the existence of these rules.

First, Charles Fisk Beach, in his 1891 treatise, states that, "a majority of the shareholders of a prosperous corporation can not sell out the property and invest in other

---

[113] *Id.* (citing *Allied Chem.*, 120 A. at 490).

[114] *Id.*

enterprises against the wishes of the minority."[115]  He observes that, "in [the] case of a failing company the rule is different, and sale of the whole property may be made by the directors."[116]

Second, an 1898 treatise by William W. Cook states that "[n]either the directors nor a majority of the stockholders have power to sell all the corporate property as against the dissent of a single stockholder, unless the corporation is in a failing condition."[117] Arguably this passage supports the existence of the board-only exception by negative implication.  The 7th edition of Cook's treatise (published in 1913) cites *Common Sense Mining & Milling Co. v. Taylor* with approval,[118] in which the Missouri Supreme Court held that a "corporation being in failing circumstances, the directors had the legal right to dispose of its assets to pay its debts."[119]

Third, a 1905 treatise, authored by James Hart Purdy, repeats that a majority of the shareholders of a prosperous corporation cannot sell against the wishes of the minority, but that in the case of a failing company, the sale may be made by the directors.[120]

---

[115]  1 Charles Fisk Beach, Jr., *Company Law: Commentaries on the Law of Private Corporations* § 357, at 582 (1891).

[116] *Id.*

[117]  William W. Cook, *A Treatise on the Law of Corporations Having a Capital Stock* § 670, at 1337 (4th ed. 1898) (emphasis omitted).

[118]  William W. Cook, *A Treatise on the Law of Corporations Having a Capital Stock* § 670, at 2604 n.2 (7th ed. 1913).

[119] *Common Sense Mining & Milling Co. v. Taylor*, 247 Mo. 1, 152 S.W. 5, 10–11 (1912).

[120]  James Hart Purdy, *Treatise on the Law of Private Corporations* § 830, at 1243–44 (1905). Purdy does not cite Beach.  Purdy does add two additional case citations, namely, *Miners' Ditch Co. v. Zellerbach*, 37 Cal. 543, 99 Am. Dec. 300 (1869); *Bartholomew v. Derby Rubber Co.*, 69 Conn. 521, 38 A. 45 (1897).

Fourth, the 1909 treatise by Thompson & Thompson states that at common law, "neither the directors nor the majority of the stockholders of a prosperous corporation, able to achieve the objects of its creation, had power to sell or otherwise dispose of all the property without the unanimous consent of all stockholders."[121]  But this treatise notes that the majority of stockholders may dispose of all the corporate property "where the continuation of the business would be at a loss and where there was no prospect or hope that the enterprise could be made profitable."[122]  The treatise further explains that the board may dispose of all the corporate property when "by reason of its embarrassed or insolvent condition[, the corporation] is unable either to pay its debts or to secure capital and funds for the further prosecution of its enterprise," especially where creditors are pressing their claims and threatening litigation.[123]

Fifth, according to a 1909 treatise by Walter Chadwick Noyes, "[t]he general rule that a majority cannot sell the entire assets of a prosperous corporation is based upon the principle that a majority cannot control corporate powers to defeat corporate purposes."[124] The treatise distinguishes between a "losing" corporation – one in which "the further prosecution of the business of the corporation would be unprofitable"[125] – and an insolvent

---

[121] 3 Seymour D. Thompson & Joseph W. Thompson, *Commentaries on the Law of Private Corporations* § 2421, at 342 (2d ed. 1909).

[122] *Id.* § 2424, at 345.

[123] *Id.* § 2418, at 336.

[124] Walter Chadwick Noyes, *A Treatise on the Law of Intercorporate Relations* § 111, at 210 (rev. 2d ed. 1909).

[125] *Id.* at 211.

corporation.    Because the disposal of all the assets of a losing corporation furthers the

corporate purpose, the treatise notes that it may be accomplished by a majority of the

stockholders.[126]   The directors, on the other hand, are "equally without implied authority

to wind up [a corporation's] affairs and dispose of its assets" in a solvent corporation *and*

in a "losing, but not insolvent, corporation."    As the treatise explains, in a losing

corporation, the transfer of all assets "involves primarily the relations between a

corporation and its stockholders."[127]   But in an insolvent corporation, such transfer is a

matter of "the relations between a corporation and its creditors."[128]   "In the absence of a

controlling statute or by-law of the corporation, the directors have power to authorize an

assignment of the property of an insolvent corporation for the benefit of its creditors."[129]

Two later treatises also acknowledge the existence of a board-only insolvency

exception.    First, *Ballantine on Corporations* (1946) states that "[i]f a corporation is

insolvent or in failing condition[,] the board of directors have authority to sell the entire

assets in order to pay the debts and avoid the sacrifice of an execution sale even without

the vote or consent of the shareholders."[130]

Ballantine observes that under statutes adopted in more than forty states, "a

---

[126] *Id.*

[127] *Id.* § 112, at 212.

[128] *Id.* at 213 ("The assignment of property by an insolvent corporation for the purpose of paying its debts is a very different action from so disposing of its property while solvent as to make its continued exercise of its franchises impossible." (citing *Vanderpoel v. Gorman*, 140 N.Y. 563, 568, 35 N.E. 932, 934 (1894))).

[129] *Id.*

[130] Henry Winthrop Ballantine, *Ballantine on Corporations* § 281, at 667 (1946).

prosperous and going [concern] corporation may with the vote or consent of its board of directors and two-thirds of its voting shareholders or some other specified majority, sell and convey all or substantially all [of] its property rights."[131]  These provisions were adopted to relax the strict common law unanimity rule.  "Some of these statutory requirements apply even though the corporation is insolvent, particularly if the sale is made for the purpose of reorganization and continuance of the business in another corporation rather than for the purpose of liquidation."[132]  However, "[i]n other states expressly or by implication the requirements of such a statute are held not to apply to insolvent corporations."[133]

Second, Cox and Hazen's *Treatise on the Law of Corporations* states that, "[i]f a corporation is insolvent or in failing condition, the common law recognizes the authority of the board of directors to sell the entire assets without the vote or consent of the shareholders in order to pay the debts of the corporation and avoid the sacrifice of an execution sale.  The directors may also make an assignment for the benefit of creditors or file a voluntary petition in bankruptcy."[134]

Cases from at least fifteen states, from the late 1800's to the early 1900's, support

---

[131] *Id*. § 282, at 668.

[132] *Id*. Notably, Ballantine observes that, "if the purpose of a sale is [a] reorganization or recapitalization as contrasted with liquidation and dissolution, that class voting should be required as much as in [the] case of merger or consolidation."  *Id*. at 669.

[133] *Id*. at 668.  *See also infra* note 171 (citing Fletcher noting that courts in different jurisdictions vary on whether such statutory provisions have altered the common law rules for corporations in financial distress).

[134] 4 James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* § 22:4 (3d ed., rev. Dec. 2021), *available at* Westlaw (Dec. 2021 update) (footnote omitted).

the existence of the board-only insolvency exception in those jurisdictions during that time:

Alabama,[135] California,[136] Connecticut,[137] Illinois,[138] Indiana,[139] Iowa,[140] Massachusetts,[141]

---

[135] *Autauga Coop. Leasing Ass'n*, 33 So. 2d at 906 (Prior to passage of a state statute in 1911, if corporation was "insolvent or in failing condition, the directors or a majority of its stockholders could sell all its property without any special procedure."); *Chamberlain v. Bromberg*, 83 Ala. 576, 581, 3 So. 434, 435 (1888) ("We think it too clear to admit of discussion, unless our statutes after noticed have made a change, that the Alabama Insurance Company, being unable to meet its debts, had the power to make an assignment for the benefit of its creditors, if done in good faith; that the board of directors, as its governing body, was the proper authority to execute that power . . . .").

[136] *Miners' Ditch Co.*, 37 Cal. at 593 (citing with approval *Sargent v. Webster*, 54 Mass. 497, 498 (1847)).

[137] *Mills v. Tiffany's*, 123 Conn. 631, 640, 198 A. 185, 189 (1938) (noting that a statute requiring approval by vote of two-thirds of the stockholders was inapplicable to "a sale of all its assets by a corporation which is insolvent or in failing circumstances made for the purpose of closing up its affairs" (citing *Bassett v. City Bank & Tr. Co.*, 116 Conn. 617, 165 A. 557 (1933))); *Chase v. Tuttle*, 55 Conn. 455, 12 A. 874, 875–76 (1888) (upholding directors' assignment of an insolvent corporation's assets for the benefit of creditors). The court in *Mills* suggested that the insolvency exception would not apply if the purpose of the sale was the continuation of the business in another corporation and not the bona fide winding up of its business. *Mills*, 198 A. at 189.

[138] *Candor*, 257 Ill. App. at 197–98 ("The general rule is that where a business is in a failing condition and has become financially involved and insolvent, and the creditors are pressing their claims, the directors may dispose of the assets without the sanction of the stockholders, when it is deemed of imperative necessity." (citing *Oskaloosa Sav. Bank*, 219 N.W. at 530)).

[139] *De Camp v. Alward*, 1876 WL 6785, at *3 (Ind. May 1, 1876) (Assignment for the benefit of creditors "may be made by the board of directors, without the express authority or consent of the stockholders." (citing *Dana v. Bank of U.S.*, 1843 WL 5023 (Pa. Jan. 1, 1843))).

[140] *Oskaloosa Sav. Bank*, 219 N.W. at 533 ("[I]t is an exception to the general rule that where a business is in a failing condition and has become financially involved and insolvent, and the creditors are pressing their claims, the power of the directors to alienate the property is conceded where it is regarded as of imperative necessity.").

[141] *Sargent*, 54 Mass. at 497 ("The directors of an insolvent manufacturing corporation have authority to convey all the property of the corporation to one of its creditors, upon condition that he shall apply the property to the payment of his claim, and pay over the surplus, if any, to the treasurer of the corporation."); *In re E.T. Russell Co.*, 291 F. 809, 816 (D. Mass. 1923) (Assignment of all assets to creditor for payment of debts "is something the directors have power to do[,]" and also stating that a "sale" does not include an assignment for the benefit of creditors and, thus, "the powers of the corporation to execute assignments for the benefit of creditors are not conferred by law upon the stockholders.").

Michigan,[142]   Minnesota,[143]   Missouri,[144]   Montana,[145]   New  York,[146]   Pennsylvania,[147]

---

[142] *Boynton v. Roe*, 114 Mich. 401, 407, 72 N.W. 257, 259 (1897) ("It is well settled in this state than an insolvent corporation has the right to make a general assignment of its property for the benefit of its creditors, unless prohibited by its charter or a statute of the state.  The directors may make such assignment for the benefit of creditors without the assent of the stockholders." (citation omitted)).  *But see Michigan Wolverine Student Coop. v. Wm. Goodyear & Co.*, 314 Mich. 590, 600, 22 N.W.2d 884, 888 (1946) ("We are not in accord with the proposition that in this State the directors of a domestic corporation may sell all or substantially all of the assets of the corporation without the consent or approval of the holders of a majority of the shares, on the ground that the corporation was 'in financial distress' or 'in a failing condition.'").

[143] *Tripp v. Northwestern Nat'l Bank*, 41 Minn. 400, 403, 43 N.W. 60, 61 (1889) ("The weight of authority seems to be in favor of the proposition that the board of directors of a corporation to which the general management of its affairs is committed, without particular restriction, may authorize a general assignment of the corporate property to be made for the benefit of creditors when the condition of its affairs is such as to reasonably justify such a course, as in the case of insolvency.").

[144] *Common Sense Mining & Milling Co.*, 152 S.W. at 10–11 ("The corporation being in failing circumstances, the directors had the legal right to dispose of its assets to pay its debts."); *Calumet Paper Co. v. Haskell Show-Printing Co.*, 144 Mo. 331, 45 S.W. 1115, 1115 (1898) ("Where there is nothing in the charter or by-laws of an insolvent corporation prohibiting it, the board of directors of such a corporation may make an assignment of its property for the benefit of its creditors." (citing *Chew v. Ellingwood*, 1885 WL 7913, at *2 (Mo. Apr. 1, 1885); *Descombes v. Wood*, 91 Mo. 196, 4 S.W. 82, 85 (1887)); *Hutchinson v. Green*, 91 Mo. 367, 1 S.W. 853, 855 (1886) ("[W]hen the corporation becomes crippled, and unable to meet its obligations in the usual course of business, it is competent for the directors to make an assignment, and this they may do without the consent of the stockholders."); *Chew*, 1885 WL 7913, at *7 ("The right of the directors of a bank in failing circumstances to make an assignment for the benefit of creditors, where there is nothing in the charter or general laws forbidding it, we think, is clear.").

[145] *Wortman v. Luna Park Amusement Co.*, 61 Mont. 89, 201 P. 570, 571 (1921) ("To summarize some of the rules of common law so far as applicable to the instant case, a solvent and prosperous corporation could sell all of its assets only by unanimous consent of its stockholders; *if insolvent* and unable to execute the purposes of its creation, *by the directors* if the best interests of the stockholders demanded; in the proper pursuit of its business, and within the purposes of its creation, sell any or all assets even against the dissent of a minority or perhaps a majority of its stockholders." (emphasis added)).

[146] *Vanderpoel*, 140 N.Y. at 576 ("The corporation had the power to make an assignment.  It was a corporate act and neither the statute nor any by-law, so far as the record shows, provided that it should be otherwise done than by the president and secretary or treasurer, under the authority of the board of directors.").

[147] *Ardesco Oil Co. v. N. Am. Oil & Mining Co.*, 66 Pa. 375, 382, 1871 WL 10959, at *6 (Pa. Jan. 3, 1871) ("[A]n insolvent corporation may make a general assignment for the benefit of its

Texas,[148] and Wisconsin.[149]    Some authorities that reject the board-only insolvency

exception do so on the basis of state statutes.[150]

Yet no Delaware case expressly addresses or adopts the board-only insolvency

exception.[151]  The closest Delaware came to addressing the exception was in *Butler v. New*

*Keystone Copper Co.*[152]  Although the Chancellor in *Butler* did not mention the board-only

exception, he did cite two treatises that generally acknowledged the exception:  Thompson

---

creditors, and this power may be exercised by the directors, unless special provision to the contrary
is made in the charter[.]" (citing *Dana*, 1843 WL 5023, at *8).

[148] *Birmingham Drug Co. v. Freeman*, 15 Tex. Civ. App. 451, 454, 39 S.W. 626, 628 (1897) ("[A]n
insolvent corporation may make a general assignment for the benefit of its creditors, and this may
be exercised by the directors, or under their authority.").

[149] *Goetz v. Knie*, 103 Wis. 366, 79 N.W. 401, 402 (1899) (acknowledging cases where "it was
held that the board of directors of an insolvent corporation has power to make a voluntary
assignment of all its property for the benefit of its creditors, without the authority or consent of its
stockholders, unless restrained by its charter or other legal enactment.").

[150] *See, e.g.*, *Kyle v. Wagner*, 45 W. Va. 349, 32 S.E. 213, 214 (1898) (The court noted the existence
of "numerous authorities" for the board-only insolvency exception but held that this rule was
abrogated in West Virginia by statute providing for voluntary dissolution and windup of
corporations by the stockholders instead of assignment of assets by directors.  Thus, the court held
that the directors had no authority to direct the assignment of the entire property without the
consent of the stockholders.).

[151] Although defendants raised the issue in *Russell v. Morris*, the Court of Chancery declined to
address whether § 271 applied to "the sale of assets by a failing company facing an emergency
situation" because it found that no emergency existed.  1990 WL 15618, at *4–5 (Del. Ch. Feb.
14, 1990) ("Defendants also contend that the transaction is valid and Russell's motion must be
denied because § 271 does not apply to a sale of assets by a failing company facing an emergency
situation.  Even assuming such an exception exists under our law, I need not address it here because
the facts clearly indicate that no emergency requiring three hours notice of a board meeting
existed."), *appeal refused*, 577 A.2d 754, 1990 WL 84682 (Del. 1990) (ORDER).

[152] *Butler*, 93 A. 380.

& Thompson's *Commentaries on the Law of Private Corporations* and Cook's *A Treatise on the Law of Corporations Having a Capital Stock*.[153]

Both *Butler* and *Allied* addressed circumstances under which a corporation could sell its assets with majority stockholder approval.  We understand the Vice Chancellor's response, set forth in his final opinion in this matter, namely, that if a sale of assets obtained majority stockholder approval, "then the court did not need to address whether the corporation's condition was sufficiently dire that the directors alone would have had authority to effectuate the sale."[154]  But we note that in *Allied Chemical*, Chancellor Wolcott observed that Section 64(a), the predecessor to Section 271(a), "remains in the law to-day [sic] and fixes in statutory form the rule imposed on *all* corporations organized under the general act by which they are to be governed *whenever* the question of the sale of their entire assets is under consideration."[155]

Therefore, *Butler* and *Allied Chemical* can also be read to suggest that Section 271's predecessor provided the only default rule and did not save room for a "board only" insolvency exception for transactions otherwise falling within the statute's ambit.  We think this is the better view.  For one thing, given the complete absence of any Delaware case support, it is not entirely clear that the exception was ever adopted in Delaware in the first

---

[153] *Butler* cites to Sections 2471 and 2424 of the Thompson & Thompson treatise.  However, the reference to the board-only exception is in Section 2429 which the court in *Butler* did not cite.

[154] *Stream TV*, 2021 WL 5816820, at *8.  The Vice Chancellor acknowledged that "*Butler* did not specifically involve the insolvency-based exception that permits directors to sell all of a corporation's assets without stockholder approval." *Id.* at *10.  This was also true of *Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 595–96 (1921).

[155] *Allied Chem.*, 120 A. at 490 (emphasis added).

45

place. It follows, that before addressing whether a statute supersedes the common law, it must be established that the exception was indeed part of the common law in that jurisdiction.[156] Ascertaining the initial question of what the common law *is* often is not an easy task.[157] Stream argues that Delaware chose to adopt a majority vote exception instead of an insolvency exception.[158] It argues that our General Assembly then codified the majority exception set forth in *Butler* in Section 64a.

---

[156] It is a fundamental principle of State sovereignty that the common law decisions of some jurisdictions are merely persuasive authority in the law of another jurisdiction until that State's courts adopt it. *See, e.g., Casey v. Beeker*, 321 So. 3d 662, 670 (Ala. 2020) (concurring opinion) (discussing how treatises are only persuasive authority, may differ in applicability by jurisdiction, and can vary in persuasiveness based on the relevance and age of the source); *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 82, 69 N.E.3d 834, 859 ("[D]ecisions from other state courts and secondary sources are not binding on [the Supreme Court of Illinois] . . . ."); *Cadillac Rubber & Plastics, Inc. v. Tubular Metal Sys., LLC*, 331 Mich. App. 416, 425, 952 N.W.2d 576, 581 n.2 (2020) ("Treatises are not binding authority but may be considered persuasive." (citing *Fowler v. Doan*, 683 N.W.2d 682, 686 (Mich. Ct. App. 2004))). *See generally* A. W. B. Simpson, *The Rise and Fall of the Legal Treatise: Legal Principles and the Forms of Legal Literature*, 48 U. Chi. L. Rev. 632, 676 (1981) ("From the beginning, the treatise in America had to contend with the considerable number of different jurisdictions in which the law was administered, each state potentially possessing its own common law. This obviously presented an obstacle to the exposition of a universal common law by the text writers.").

[157] This is evidenced by the painstaking work done by the American Law Institute in formulating the various Restatements of the Law. For example, as the recent draft of the Restatement of the Law of Corporate Governance, Tentative Draft No. 1 (April 2022) notes at its outset that Restatements "aim at clear formulations of the common law . . . ," and that the Restatement process seeks first to "ascertain the nature of the majority rule." *Id*. at x. "If most courts faced with an issue have resolved it in a particular way, that is obviously important to the inquiry." *Id*. The draft further observes that:

> Like a Restatement, the common law is not static. But for both a Restatement and the common law the change is accretional. Wild swings are inconsistent with the work of both a common-law judge and a Restatement. And while views of which competing rules lead to more desirable outcomes should play a role in both inquiries, *the choices generally are constrained by the need to find support in sources of law*.

*Id*. at x–xi (emphasis added).

[158] Opening Br. at 31–34.

46

Even if we were to determine that a board-only insolvency exception was part of our common law at one time, the pivotal question is whether it survived the enactment of Section 64a. As explained below, we do not believe it did, assuming, *arguendo*, it existed.

In 1917, the Delaware General Assembly responded to *Butler*'s affirmation of the common law unanimity rule by enacting Section 64a. This section superseded the common law rule requiring unanimous consent to the sale, lease or exchange of all the property and assets of the corporation. Instead, it provided for a majority vote of the outstanding stock:

> Every corporation organized under the provisions of this chapter, may at any meeting of its board of directors, sell, lease or exchange all of its property and assets, including its good will and its corporate franchises, upon such terms and conditions as its board of directors deem expedient and for the best interests of the corporation, when and as authorized by the affirmative vote of the holders of a majority of the stock issued and outstanding having voting power given at a stockholders' meeting duly called for that purpose, or when authorized by the written consent of a majority of the holders of the voting stock issued and outstanding, provided, however, that the certificate of incorporation may require the vote or written consent of a larger proportion of the stockholders.[159]

When Delaware comprehensively revised its General Corporation Law in 1967, Section 64a was renumbered Section 271(a), and language was added to clarify that the provision covered sales, leases, or exchanges of "substantially all" assets and that permissible consideration included "money or other property."[160] The General Assembly

---

[159] 29 Del. Laws ch. 113, § 17 (1917). Section 64a was amended in 1925 to replace the phrase "a majority of the holders" with "the holders of a majority" and "a larger proportion of the stockholders" with "a larger proportion of the stock issued and outstanding." 34 Del. Laws ch. 112, § 13 (1929). In 1929, the statute was amended again to allow the consideration to include "shares of stock in, and/or other securities of, any other corporation or corporations." 36 Del. Laws ch. 135, § 19 (1925).

[160] 56 Del. Laws ch. 50, § 271 (1967).

47

also added Section 272.[161]    Section 272 clarified that Section 271 does not apply to

mortgages or pledges of corporate assets.[162]    The Delaware General Corporation Law

Revision Committee, the group tasked with drafting the comprehensive revisions,

considered adding a specific exception for sales in the ordinary course of a corporation's

business, but ultimately decided not to do so.[163]    Other provisions were eliminated as

unnecessary or redundant.[164]

---

[161] 56 Del. Laws ch. 50, § 272 (1967); *see* 8 *Del. C.* § 272.

[162] 3 Robert S. Saunders, Allison L. Land, Jennifer C. Voss, & Cliff C. Gardner, *Folk on the Delaware General Corporation Law* § 272.01 (7th ed., 2022-1 Supp.); *accord* 1 R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations & Business Organizations* § 10.1 (4th ed. 2022-1 Supp.).

[163] *See* Samuel Arsht, *Memorandum to the Corporation Law Revision Committee on Folk Report on Proposed 1967 Amendments* (Sept. 14, 1965) ("Folk points out many states and Model Act expressly dispense with stockholder approval for sales of all assets in usual course of business and for mortgages or pledges, unless charter requires it. He suggests appropriate language to this effect at page 209."); *Minutes of the Twenty-Second Meeting of Delaware Corporate Law Study Committee* (Sept. 14, 1965) ("Disapproved the recommendation with respect to sale of all assets in the course of business.").

[164] For example, as the Vice Chancellor observed, prior to 1967, the DGCL contained a provision that authorized "[s]ales of the property and franchises" of a corporation "under a decree of Court . . . ." *Stream TV*, 250 A.3d at 1038 (alteration in original). That provision did not require either board approval or a stockholder vote to consummate a sale of assets to a secured creditor by decree. "As part of the 1967 revision, the General Assembly eliminated this provision," likely because it is "unnecessary" given the rights afforded to secured creditors. *Id*. Section 271 was subsequently amended five times. None of the amendments bears on this analysis. 57 Del. Laws ch. 148, § 30 (1969) (Amended to remove the reference to stockholder approval by written consent, as this was made redundant by § 228, and to add that the notice to stockholders of a meeting to vote on a proposed transaction under § 271 must state that this is the purpose of the meeting.); 64 Del. Laws ch. 112, § 55 (1983) (adding a clause to cover non-stock corporation); 65 Del. Laws ch. 127, § 9 (1985) (inserting "the holders of" into § 271(a) between "resolution adopted by" and "a majority of the outstanding stock"); 75 Del. Laws ch. 30, § 28 (2005) (adding subsection (c), which permits transfers of all or substantially all assets of a parent corporation to a wholly-owned subsidiary without a stockholder vote); 77 Del. Laws ch. 253, § 58 (2010) (As part of a comprehensive revision of the DGCL to address nonstock corporations, Section 271(a) was revised to provide that, in addition to members who are entitled to vote for the election of a nonstock corporation's governing body, any other members given the right to vote on the sale of all or substantially all of

The Vice Chancellor concluded that Section 271 superseded only one aspect of the common law rule, namely, the unanimity requirement but "did not supersede the common law's recognition that directors could sell the assets of an insolvent or failing firm without stockholder approval."[165]  We disagree.  In *A.W. Financial Services, S.A. v. Empire Resources, Inc.*,[166] this Court set forth the analysis we employ when determining whether the enactment of a statute has superseded the common law.[167]  We applied the following three-pronged inquiry: (1) does explicit language in the statute supersede or limit the common law; (2) does the statutory scheme evidence a legislative intent to occupy the field; and (3) does the statutory scheme actually conflict with the common law.[168]

The plain language of Section 271 suggests the answer to the first two questions as Section 271 applies to "*[e]very corporation . . .* ," and requires a vote by the holders of a majority of the corporation's outstanding shares when their corporation engages in a sale, lease, or exchange of "all or substantially all of its property and assets."[169]  The creation of Section 64a's majority vote rule indisputably replaced the common law unanimity rule.[170]

---

the corporation's assets under the corporation's certificate of incorporation or by-laws are also entitled to do so.).

[165] *Stream TV*, 2021 WL 5816820, at *13.

[166] 981 A.2d 1114 (Del. 2009).

[167] *Id.* at 1123.  The concept of "'[s]uperseder' describes circumstances where a statute replaces or ousts ('supersedes') the common law." *Id.* at 1121.  *See Cline v. Prowler Indus. of Maryland, Inc.*, 418 A.2d 968, 977–78 (Del. 1980) (analyzing whether it was the General Assembly's intent to supersede the doctrine of strict tort liability in cases involving a sale of goods when it adopted the Uniform Commercial Code).

[168] *A.W. Fin. Servs., S.A.*, 981 A.2d at 1123.

[169] 8 *Del. C.* § 271(a) (emphasis added).

[170] One might logically view the statute as a restriction, rather than expansion of stockholder rights. *See Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 376 (Del. Ch. 2004) ("The origins of §

49

The question is whether the rule's exceptions were abrogated as well.  We think the better view is that, when the common law unanimity rule was superseded, so too was any insolvency exception to that rule.[171]  This conclusion is reinforced by the plain language of Section 271, which contains no exceptions and is not ambiguous.[172]  As such, the language

---

271 did not rest primarily in a desire by the General Assembly to protect stockholders by affording them a vote on [the] transactions previously not requiring their assent.  Rather, § 271's predecessors were enacted to address the common law rule that invalidated any attempt to sell all or substantially all of a corporation's assets without unanimous stockholder approval.").

[171] Cases from other jurisdictions are mixed on whether similar statutes apply to a sale of all or substantially all assets by the directors of an insolvent corporation.  In *Mills v. Tiffany's*, the Supreme Court of Errors of Connecticut held that a Connecticut statute, providing that a corporation "may sell, lease, or exchange all its assets when that action is authorized by a vote of two-thirds of the outstanding stock of each class at a meeting duly warned and held for the purpose[,]" did not apply to a sale of all assets of an insolvent corporation made for the purpose of winding up its affairs.  198 A. at 189.  That court cited *Basset v. City Bank & Trust Co.*, which explained that the statute was intended to supersede the common law unanimity rule and thus, transactions to which that general rule did not apply at common law were "outside the scope and purpose of the statute[.]" 165 A. at 561.  However, in *Michigan Wolverine Student Cooperative*, the Supreme Court of Michigan stated that "[t]he statute does not authorize the board of directors of a corporation to sell all or substantially all of the corporate assets whenever, in the opinion of the directors, the corporation is not a going and prosperous concern, or is in a failing condition.  If a corporation is no longer a going concern the statute provides several methods whereby the corporation may wind up its affairs, dispose of its assets, and cease to exist.  None of these methods authorizes a board of directors to wind up corporate affairs and dispose of the assets without action by the stockholders, or by a court." *Michigan Wolverine Student Coop.*, 22 N.W.2d at 888.  Yet this is *dicta* because the Supreme Court of Michigan ultimately assumed, *arguendo*, there was room in the statute for such an exception, but found that the corporation was solvent, and therefore, that the common law exception did not apply (even assuming it existed and survived the enactment of Michigan's § 271 analogue).  *See also* 6A Fletcher Cyc. Corp. § 2949.21 (2021) (observing that "[a] question may arise concerning what bearing these statutory provisions have on the common-law rules regarding a corporation in financial distress or in a failing condition.  Some of these statutory requirements have been held to apply even though a corporation is insolvent.  On the other hand, in some jurisdictions, expressly or by implication, the requirements of such statutes have been held not to apply to insolvent corporations." (footnotes omitted)).

[172] *See Balma v. Tidewater Oil Co.*, 214 A.2d 560, 562 (Del. 1965) (stating that "[w]ords in a statute must be given ordinary meaning[,]" and that "[c]ourts have discretion to construe statutes only when they are obscure or doubtful in their meaning.  Where its language is clear and unambiguous, a statute must be held to mean that which it plainly states, and no room is [left] for construction.").

50

of the statute should be conclusive of the General Assembly's intent.[173]   In this sense, a

"board only" insolvency exception is inconsistent with a statutory default majority vote

rule.[174]   Thus, we conclude that Section 271 was intended to occupy the field and that no

such insolvency exception survives, assuming *arguendo*, that it existed in the first place.[175]

As a matter of policy, unearthing a "board only" insolvency exception cited only

decades ago, and never by any Delaware court, would foster uncertainty and potential

inconsistency in a context where predictability is crucial for corporations that have availed

themselves of Delaware law.   "Our General Assembly has [] recognized the need to

maintain balance, efficiency, fairness, and predictability in protecting the legitimate

interests of all stakeholders, and to ensure that the laws do not impose unnecessary costs

on Delaware entities."[176]   Promoting stability in our DGCL is and remains of paramount

---

[173] *See Dewey Beach Enters., Inc. v. Bd. of Adjustment of Town of Dewey Beach*, 1 A.3d 305, 307 (Del. 2010) ("If [a statute] is unambiguous, no statutory construction is required, and the words in the statute are given their plain meaning."); *Grand Ventures, Inc.*, 632 A.2d at 68 (observing that, "[i]n the absence of any ambiguity, the language of the statute must be regarded as conclusive of the legislature's intent[,]" and in such a circumstance, "[t]he judicial role is then limited to an application of the literal meaning of the words"); *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del. 1985) (explaining that if a statute is unambiguous, "the Court's role is then limited to an application of the literal meaning of the words." (citing *Delaware Solid Waste Auth. V. News-Journal Co.*, 480 A.2d 628, 634 (Del. 1984))).

[174] *See also* Balotti & Finkelstein, *supra* note 162, § 10.7 ("As a practical matter, in many instances federal bankruptcy statutes and other statutes governing creditors' rights have displaced the common law exception by providing explicit methods for addressing proposed asset dispositions by failing businesses.").

[175] *See Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 606 (Del. Ch.), *aff'd*, 316 A.2d 619 (Del. 1974) ("If the sale is of assets quantitatively vital to the operation of the corporation and is out of the ordinary and substantially affects the existence and purpose of the corporation, then it is beyond the power of the Board of Directors.").

[176] *Salzberg*, 227 A.3d at 136.

importance.[177]    Stability and predictability are not advanced by reading Section 271 to embody a common law exception that was never the basis of a single holding by any Delaware court nor by other courts, according to the parties, for decades.

Instead, we think, the focus should be on the statute's plain language.  As we said in *Salzberg*, the "most important consideration for a court in interpreting a statute is the words the General Assembly used in writing it."[178]    As to Section 271 in particular, this notion was reinforced by the Court of Chancery when then-Vice Chancellor Strine wrote:

---

[177] In aid of this goal, for example, Article IX of the Delaware Constitution requires a two-thirds supermajority vote of both chambers of our General Assembly to amend the DGCL.  Del. Const. art. IX, § 1 ("No general incorporation law, nor any special act of incorporation, shall be enacted without the concurrence of two-thirds of all the members elected to each House of the General Assembly.").

[178] *Salzberg*, 227 A.3d at 113 (quotation marks omitted).  As we note above, we need not reach the question of whether a private foreclosure transaction, such as the one here, falls within the plain language of Section 271, and specifically, whether it would qualify as a "sale, lease or exchange" within the meaning of Section 271.  The Vice Chancellor, relying on dictionary definitions, provided the following observations:

> Black's Law Dictionary contains an extensive section on the term "sale."  The hallmarks of the various definitions include (i) the status of the parties as "buyer" and "seller," (ii) the exchange of money or other property in return for goods and services, and (iii) a transfer or title.  *See Sale*, Black's Law Dictionary (11th ed. 2019).  Black's Law Dictionary distinguishes a "sale" from a "foreclosure sale," defining "foreclosure sale" to mean "[t]he sale of mortgaged property, authorized by a court decree or a power-of-sale clause, to satisfy the debt."  In a separate entry, Black's Law Dictionary defines the term "foreclosure" as "[a] legal proceeding to terminate a mortgagor's interest in property, instituted by the lender (the mortgagee) either to gain title or to force a sale in order to satisfy the unpaid debt secured by the property."

> Black's Law Dictionary defines "exchange" to mean "[t]he act of transferring interests, each in consideration for the other," and defines the related term "bargained-for-exchange" to mean "[a] benefit or detriment that the parties to a contract agree to as the price of performance."  As with the definition of a "sale," the hallmarks of these definitions include a voluntary transfer of interests between similarly situated parties.

52

> [O]ur courts arguably have not always viewed cases involving the interpretation of § 271 through a lens focused by the statute's plain words. Nonetheless, it remains a fundamental principle of Delaware law that the courts of this state should apply a statute in accordance with its plain meaning, as the words that our legislature has used to express its will are the best evidence of its intent. To analyze whether the vote requirement set forth in § 271 applies to a particular asset sale without anchoring that analysis to the statute's own words involves an unavoidable risk that normative preferences of the judiciary will replace those of the General Assembly.[179]

Accordingly, we clarify that there presently is no insolvency exception embedded in Section 271.

Because we have concluded that the Charter provision and Section 271 are materially different, we have not looked to Section 271 to interpret the Charter. And the parties have identified no public policy that would detract from our analysis of the Charter.[180] Rather, enforcing the unambiguous Charter provision is consistent with our

---

*Stream TV*, 250 A.3d at 1040 (alterations in original) (emphasis omitted). *See also In re E.T. Russell Co.*, 291 F. at 816 ("I am unable to extend the meaning of the word 'sale,' so that it will include an assignment for the benefit of creditors.").

[179] *Hollinger Inc.*, 858 A.2d at 376–77 (footnotes omitted).

[180] As we noted earlier, the Court of Chancery identified a single public policy concern, namely, "interpreting Section 271 as applying to a creditor's efforts to levy on its security would undercut the value of the security interest." *Stream TV*, 250 A.3d at 1042. The court cited to then Vice-Chancellor Strine's transcript ruling in *Gunnerman v. Talisman Capital Talon Fund, Ltd.* where he observed that the DGCL distinguishes between financing transactions, mortgage transaction, collateral transactions, and sales of assets. *Id.* at 1043 (citing *Gunnerman v. Talisman Cap. Talon Fund, Ltd.*, C.A. No. 1894-VCS (Del. Ch. July 12, 2006) (TRANSCRIPT)). Following this reasoning, the court, in its P.I. Opinion, reasoned that interpreting Section 271 to require a stockholder vote before an insolvent or failing corporation can transfer its assets to secured creditors would conflict with Section 272 of the DGCL. *Id.* at 1021. We note that Section 271 presents no barrier to the parties' foreclosure proceedings in Superior Court (which are presently stayed pending this appeal), and no party has argued that judicial foreclosure proceedings implicate Section 271. Moreover, Section 272 is a default rule that corporations can alter in their charters, which Stream has done here.

policy of seeking to promote stability and predictability in our corporate laws,[181] and with

recognition that Delaware is a contractarian state.[182]

## IV. CONCLUSION

For the reasons stated herein, we **VACATE** the injunction, **REVERSE** the

declaratory judgment, and **REMAND** for further proceedings consistent with this opinion.

---

[181] *See Salzberg*, 227 A.3d at 137 ("The policies underlying the DGCL include certainty and predictability, uniformity, and prompt judicial resolution to corporate disputes.").

[182] *See NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 180 n.14 (2015) ("Delaware upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreements of sophisticated parties." (quoting *NACCO Indus., Inc. v. Applican Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009))); *see also A & J Cap., Inc. v. L. Off. Of Krug*, 2018 WL 3471562, at *6 (Del. Ch. July 18, 2018) ("Delaware's pro-contractarian policy in the alternative entity space is alive and well.").

# EXHIBIT B
# Supreme Court Ruling – Mandate

# IN THE SUPREME COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| STREAM TV NETWORKS, INC. | § | No. 360, 2021 |
|  | § |  |
| v. | § | Court Below – Court of Chancery |
|  | § | of the State of Delaware |
| SEECUBIC, INC. | § |  |
| _____ | § | C.A. No. 2020-0766 |
|  | § |  |
| SEECUBIC, INC. | § |  |
|  | § |  |
| v. | § |  |
|  | § |  |
| STREAM TV NETWORKS, INC. | § |  |
|  | § |  |
| And | § |  |
|  | § |  |
| MATHU RAJAN and RAJA | § |  |
| RAJAN | § |  |

The following docket entry has been efiled in the above cause.

July 1, 2022.                    Mandate to Clerk of Court Below.
                                 **Case closed**.

cc:    The Honorable J. Travis Laster
       Andrew S. Dupre, Esquire
       Robert S. Saunders, Esquire

                          Register in Chancery
                          Received Above

                          By _____

                          Date _____

Date:  July 1, 2022

                          /s/ *Lisa A. Dolph*
                          _____
                          Clerk of Supreme Court

## *M A N D A T E*

THE SUPREME COURT OF THE STATE OF DELAWARE

TO:   Court of Chancery of the State of Delaware:

*GREETINGS:*

**WHEREAS**, in the case of:

Stream TV Network, Inc. v. SeeCubic, Inc.
C.A. No. 2020-0766

a certain judgments or orders were entered on the 10th day of November 2021, to

which reference is hereby made; and **WHEREAS**, by appropriate proceedings the

judgment or order was duly appealed to this Court, and after consideration has been

finally determined, as appears from the Opinion decided June 15, 2022, a certified

copy of which is attached hereto;

**ON CONSIDERATION WHEREOF IT IS ORDERED AND ADJUDGED**

that the order or judgment be and is hereby **VACATED, REVERSED and**

**REMANDED**.

/s/ *Lisa A. Dolph*
Clerk of Supreme Court

Issued:  July 1, 2022

Supreme Court No. 360, 2021

**Filed: Jun 15 2022 11:41AM EDT**
**Filing ID 67727771**
**Case Number 360,2021**

## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STREAM TV NETWORKS, INC., | § | |
| | § | No. 360, 2021 |
| Plaintiff Below, Appellant, | § | |
| | § | Court Below:  Court of Chancery |
| v. | § | of the State of Delaware |
| | § | |
| SEECUBIC, INC., | § | C.A. No. 2020-0766 |
| | § | |
| Defendant Below, Appellee, | § | |
| | § | |

---

| | |
|---|---|
| SEECUBIC, INC., | § |
| | § |
| Counterclaimant and Third-Party | § |
| Plaintiff Below, Appellee, | § |
| | § |
| v. | § |
| | § |
| STREAM TV NETWORKS, INC., | § |
| | § |
| Counterclaim Defendant Below, | § |
| Appellant, | § |
| | § |
| and | § |
| | § |
| MATHU RAJAN and RAJA RAJAN, | § |
| | § |
| Third-Party Defendants Below, | § |
| Appellants. | § |

Submitted:  April 6, 2022
Decided:  June 15, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery.  **VACATED**, **REVERSED** and **REMANDED**.

Andrew S. Dupre, Esquire (*argued*), Brian R. Lemon, Esquire, Steven P. Wood, Esquire, Sarah E. Delia, Esquire, Stephanie H. Dallaire, Esquire of McCarter & English, LLP, Wilmington, Delaware for Appellants.

Robert S. Saunders, Esquire, Jenness E. Parker, Esquire (*argued*), Bonnie W. David, Esquire, Lilianna Anh P. Townsend, Esquire, Trevor T. Nielson, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware. *Of Counsel*: Eben P. Colby, Esquire, Marley Ann Brumme, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Boston, Massachusetts for Appellee.

**VALIHURA**, Justice:

We address whether approval of a corporation's Class B stockholders was required to transfer pledged assets to secured creditors in connection with what was, in essence, a privately structured foreclosure transaction.  Stream TV Network, Inc. ("Stream" or the "Company"), along with Mathu and Raja Rajan,[1] argue that the agreement authorizing the secured creditors to transfer Stream's pledged assets (the "Omnibus Agreement") is invalid because Stream's unambiguous certificate of incorporation (the "Charter") required the approval of Stream's Class B stockholders.  Stream's Charter requires a majority vote of Class B stockholders for any "sale, lease or other disposition of all or substantially all of the assets or intellectual property of the company."  Stream argues that the court erred by applying a common law insolvency exception to Section 271 in interpreting the Charter, and that the enactment of 8 *Del. C.* § 271 and its predecessor superseded any common law exceptions.  It contends that, in any event, such a "board only" common law exception never existed in Delaware.

SeeCubic, Inc. ("SeeCubic") argues that the court correctly found that neither the Charter, nor Section 271, required approval of the Class B shares to effectuate the Omnibus Agreement.

Because we agree that a majority vote of Class B stockholders is required under Stream's charter, we **VACATE** the injunction, **REVERSE** the declaratory judgment, and **REMAND** for further proceedings consistent with this opinion.

---

[1] For simplicity, we refer only to Stream when discussing the positions that Stream and the Rajans have advanced in their briefing.  Mathu and Raja Rajan are members of Stream's board of directors, corporate officers, and controlling stockholders.

I.    *FACTUAL AND PROCEDURAL BACKGROUND*[2]

We focus only on the facts relevant to the issue on appeal which is whether the Class B stockholders are entitled to a vote in connection with the transactions contemplated by the Omnibus Agreement.

A.   *Stream.*

Stream is a Delaware corporation that was founded in 2009 to develop and commercialize technology that enables viewers to watch three-dimensional content without 3D glasses.[3]   Stream hired engineers to develop Stream's technology, which has been described as promising and revolutionary; however, eleven years after its founding, Stream remained a pre-revenue, development-stage company.

The Rajan family controlled Stream primarily through an investment vehicle owned by Mathu Rajan, his brother Raja Rajan, and their parents.  Together, they hold 19,000,000 Class B shares carrying ten votes per share, giving the Rajans a majority of the Class B common stock and a majority of Stream's outstanding voting power.[4]   The Court of

---

[2] The background facts pertinent to this appeal are drawn primarily from the December 8, 2020 Preliminary Injunction Opinion, *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020) (the "P.I. Opinion"), the September 23, 2021 Order Granting In Part SeeCubic, Inc's Motion for Summary Judgment, *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 4352732 (Del. Ch. Sept. 23, 2021) (the "SJ Order"), the November 10, 2021 Order Entering Partial Final Judgment Under Rule 54(b), *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 5240591 (Del. Ch. Nov. 10, 2021) (the "Partial Final Judgment Order"), and the December 8, 2021 Order Denying Stream's Motion to Modify the Injunction, *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 2021 WL 5816820 (Del. Ch. Dec. 8, 2021),  (the "Modification Opinion").

[3] *Stream TV*, 250 A.3d at 1022.

[4] *Id.*  At the board level, the Rajan brothers historically have controlled Stream.  There were, however, three outside directors on the board at various times.  From approximately 2015 until 2019, Leo Hindery served as an outside director, but he resigned in July 2019 over disputes with the Rajan brothers.  From approximately 2018 until 2019, Mark Coleman served as a second

4

Chancery observed that "[d]uring its existence, Stream's corporate governance practices have been virtually nonexistent."[5]  Stream did not hold annual meetings of stockholders or keep regular minutes of Board meetings.

### B. Stream's Investors.

Since Stream's founding in 2009, Stream raised approximately $160 million from third-party investors in the form of a combination of debt and equity.  Stream's senior secured creditor, SLS Holdings VI, LLC ("SLS"), loaned $6 million to Stream through a series of secured notes (the "SLS Notes").  Stream pledged all of its assets, and the assets of its wholly-owned subsidiaries, as security for the SLS Notes and executed a security agreement which authorized SLS to take control of Stream's assets to satisfy the SLS Notes if Stream defaulted.

Stream's junior secured creditor, Hawk Investment Holdings Limited ("Hawk"), loaned Stream more than £50 million, plus $1.336 million, through a series of junior secured notes (the "Hawk Notes").  Subject to the senior security interest held by SLS, Stream pledged all of its assets as security for the Hawk Notes and executed a security agreement that authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted.

---

outside director but resigned in July 2019 over disputes with the Rajan brothers. From 2011 until 2014, Shad Stastney, the principal of Stream's senior secured creditor, served as an outside director.  He rejoined the board in 2019 and served as Chief Financial Officer before resigning on January 30, 2020.  *Id.* at 1023.  The Rajan brothers also dominated Stream at the officer level. Mathu has served as Stream's Chief  Executive Officer since the Company's founding, and Raja served as general counsel and Chief Operating Officer since soon after the Company's founding.

[5] *Id.* at 1023.

5

## C. Stream's Financial Difficulties.

In 2019, Alistair Crawford ("Crawford"), a stockholder of Stream and the representative of fifty-two of Stream's stockholders (the "Equity Investors"), engaged in discussions with SLS, Hawk, and the Rajan brothers about restructuring Stream. Crawford proposed forming a "NewCo" that would acquire Stream's assets and have a more transparent and investor-friendly governance structure. In December 2019, Crawford provided the Rajan brothers, SLS, and Hawk with a draft of the Omnibus Agreement and other documents to implement the restructuring. The Rajan brothers refused to agree to the restructuring, and the discussions broke down.

In January 2020, the Equity Investors filed a lawsuit in the Court of Chancery against the Rajan brothers. During the same month, Stream missed payroll at least once.

In February 2020, Stream managed to make payroll, but only due to an emergency infusion of capital from Hawk and a short-term loan from another investor. Stream still furloughed numerous employees, and by the end of February 2020, Stream had defaulted on the SLS Notes and Hawk Notes.

On March 9, 2020, SLS notified Stream that Stream was in default.[6] With the Company failing, SLS, Hawk and Crawford urged the Rajan brothers to appoint outside directors. Three days later, on March 12, 2020, the Board was comprised of the Rajan

---

[6] *Id.* at 1024. In addition to the debts that Stream owed its secured creditors, SLS, and Hawk, Stream carried more than $16 million in trade debt and had fallen months behind on payments to customers and suppliers. Stream even failed to make the payments necessary to maintain the patents on its technology. *Id.*

brothers and four independent outside directors:  Krzystof Kabacinski, Asaf Gola, Kevin

Gollop, and Frank Hodgson (collectively, the "Outside Directors").[7]

On March 23, 2020, SLS filed a complaint in Delaware Superior Court against

Stream seeking foreclosure and other relief.

*D. The Resolution Committee.*

From March 2020 through May 2020, the Outside Directors participated in Board

meetings, approved minutes, voted on resolutions, and approved other corporate actions.

When the Outside Directors learned of Stream's financial difficulties, they concluded that

the only path forward was to negotiate a resolution with the Company's secured creditors

and the Equity Investors.  In April 2020, the Outside Directors revisited the restructuring

discussions with the Rajan brothers.  Raja initially participated in the discussions, but his

presence generated tension.  It became clear that the Outside Directors would have to

attempt to broker a resolution.

On May 4, 2020, during a meeting of the Board, Gola proposed three resolutions

for consideration.  Two of Gola's resolutions, and an alternative to Gola's third resolution,

were adopted.  Only Gola's second resolution is relevant to the appeal.  It proposed the

creation of the Resolution Committee with Gola and Gollop as its members.  The

Resolution Committee would have "the full power and authority of the full Board of

---

[7] In the proceedings before the Court of Chancery, Stream and the Rajan brothers challenged
whether the Outside Directors were validly appointed.  However, on appeal, Stream does not
challenge the Court of Chancery's finding that the Outside Directors were either appointed validly,
or in the alternative, that they were *de facto* directors.  Therefore, we do not discuss the facts
regarding the appointment of the Outside Directors.

Directors to resolve any existing or future debt defaults or claims, and any existing or future litigation, or threats thereof, on behalf of [Stream], without further action being required from the Board of Directors or any executive of the [C]ompany."[8]   The Rajan brothers abstained from the vote; however, the three directors who voted in favor constituted a majority of a quorum, and the motion carried.

   E.  *The Omnibus Agreement.*

   On May 6, 2020, the Resolution Committee approved the Omnibus Agreement. The parties to the Omnibus Agreement were Stream, SLS, Hawk, and certain Equity Investors.[9]

   The Omnibus Agreement provided that Stream would assign its assets to SeeCubic in lieu of SLS and Hawk continuing to pursue foreclosure, and SeeCubic would allow Class A common stockholders to exchange their shares.  Specifically, the Omnibus Agreement provided that SLS and Hawk "agreed to stay the [f]oreclosure and satisfy and extinguish each of the SLS Notes and the Hawk Notes in their entirety subject to [Stream] assigning all right, title and interest in and to all assets of [Stream] to a newly-formed holding company [SeeCubic] established by SLS and Hawk, in satisfaction of the SLS Notes and the Hawk Notes."[10]   Further, the Omnibus Agreement gave holders of Stream's Class A common stock, other than the Rajan Brothers and their affiliates, the right to exchange their shares of Stream's Class A common stock for an identical number of shares of SeeCubic's

---

[8] *Id.* at 1025 (alternations in original) (quoting Dkt. 101 Ex. 56, at 1057).

[9] Stream's authorized signatories were Gola and Gollop.  A150–51 (Omnibus Agreement).

[10] *See* A136 (Omnibus Agreement WHEREAS clause).

common stock at no cost.[11]   The Omnibus Agreement also provided that Stream would

receive one million shares of SeeCubic's Class A common stock.[12]

   *F. The Rajan Brothers' Attempt to Nullify the Omnibus Agreement.*

   Soon after the Board created the Resolution Committee, the Rajan brothers

attempted to neutralize it.   Initially, the Rajan brothers drafted a written consent of

stockholders that purported to remove the Outside Directors.[13]  When that failed, the Rajan

brothers developed theories designed to undermine the Resolution Committee, including

recruiting Raja's assistant to search for documentation reflecting whether the Outside

Directors had accepted their directorships.   Eventually, the Rajan brothers resorted to

refusing to comply with the Omnibus Agreement by trying to change who managed certain

Stream subsidiaries and attempting to remove prototype technology from a storage facility

in the Netherlands.[14]

   Once it became clear that the Rajan brothers intended to challenge the Omnibus

Agreement's validity, SLS, Hawk, the Equity Investors, and the Resolution Committee

attempted to negotiate with the Rajan family to convince them to support the deal.  SLS,

---

[11] *Stream TV*, 250 A.3d at 1025; A139 (Omnibus Agreement § 1.1(d)).

[12] *Stream TV*, 250 A.3d at 1025; A139 (Omnibus Agreement § 1.1(f)).

[13] At the time of the P.I. Opinion, Stream alleged that the May Stockholder Consent (a written consent of stockholders drafted by the Rajan brothers dated May 6) removed the Outside Directors prior to the approval of the Omnibus Agreement, thereby causing the Omnibus Agreement to be invalid. However, the Court of Chancery concluded that the evidence demonstrated that the Rajan brothers executed the May Stockholder Consent later, and possibly during the evening of May 8 or on May 9, and then backdated the document to May 6 in an effort to preempt the Omnibus Agreement. *Stream TV*, 250 A.3d at 1026.

[14] Mathu went as far as incorporating a new entity named Glasses-Free Technologies, Inc., and purported to grant it a license to use Stream's technology. *Id*. at 1027.

Hawk, and the Equity Investors offered to amend the Omnibus Agreement to give the Rajan brothers greater consideration, and the Rajan brothers pushed for personal benefits for themselves.[15]  Ultimately, the negotiations failed.

   *G.  Stream Files Suit in The Court of Chancery.*

   On September 8, 2020, Stream filed suit and moved for a temporary restraining order ("TRO") to bar SeeCubic from seeking to enforce the Omnibus Agreement. SeeCubic filed counterclaims and third-party claims requesting expedition and a TRO.  The court entered a status quo order and scheduled a hearing on the parties' competing motions for preliminary injunctive relief.  From there on, "[c]reating litigation chaos seemed to be one of the Rajans' strategies."[16]

   *1.  The Preliminary Injunction Opinion.*

   On December 8, 2020, the court issued the P.I. Opinion, concluding that SeeCubic was entitled to injunctive relief because the Resolution Committee had the authority to bind Stream to the Omnibus Agreement and that the Omnibus Agreement did not require a shareholder vote under Section 271 or the Class Vote Provision in Stream's Charter.  The court concluded that "[n]either [Section 271 nor the Class Vote Provision] applie[d] to the transfer of assets contemplated by the Omnibus Agreement."[17]    Therefore, the court

---

[15] These personal benefits included employment, compensation, and indemnification for litigation expenses.  *Id.*

[16] *Stream TV*, 2021 WL 5816820, at *1.  Stream went through two sets of lawyers (at the time of the Injunction Order, Stream was on its third set of lawyers), and the Rajan brothers' represented themselves during portions of the litigation.

[17] *Stream TV*, 250 A.3d at 1033.  The P.I. Opinion also concludes that the Outside Directors were appointed validly and that the members of the Resolution Committee did not breach their fiduciary

granted SeeCubic's motion for a preliminary injunction and denied Stream's competing motion.[18]

### a. The Court's Section 271 Analysis at the Preliminary Injunction Stage.

Starting with Section 271 of the DGCL, the court determined that the question before it was "whether the transfer of Stream's assets to its secured creditors under the circumstances presented [] constitute[d] a sale or exchange within the scope of Section 271."[19] To answer this question, the court stated that although the assignment of Stream's assets to SeeCubic could be classified as a "sale" or an "exchange" under Section 271, the better course of action was to "accept that the language of Section 271 is ambiguous as to whether it applies to transactions like the Omnibus Agreement," and look to principles of statutory interpretation.[20] The court then turned to Section 271's legislative history, applied an insolvency exception *sua sponte*, and made three findings.

First, the court found that the common law rule requiring a board to seek unanimous shareholder approval before selling all of the corporation's assets was subject to an

---

duties, therefore, the Court of Chancery did not enter a mandatory injunction. *See id.* at 1028–31, 1045–47. However, these conclusions are not challenged on appeal.

[18] The court concluded that it was reasonably probable that the Omnibus Agreement was a valid and binding agreement, and prohibited Stream, the Rajans, and anyone acting in concert with them, from interfering with SeeCubic's rights under the Omnibus Agreement.

[19] *Id.* at 1033.

[20] *Id.* at 1041. Specifically, the court noted that "Stream does not cite any dictionary definitions, but argues without support that the plain meaning of the terms 'sale' and 'exchange' must encompass the transfer of all Stream's assets to SeeCubic. In light of the [Black's Law Dictionary] definitions [of 'sale' and 'exchange'] . . . that conclusion *is plausible but not mandated*." *Id.* at 1040 (emphasis added).

insolvency exception, thereby allowing boards to transfer all or substantially all of an insolvent company's assets to creditors without shareholder approval.

Second, the court found that the evolution of Section 271's language, mainly the addition of specific acceptable forms of consideration that did not include "forgiveness of debt," supported allowing an insolvent or failing firm to transfer all or substantially all of its assets to creditors.[21]

Third, the court found that, because Section 272 does not require a shareholder vote for the pledging of corporate assets as collateral (unless the corporate charter specifies otherwise), requiring a shareholder vote under Section 271 before a company could otherwise transfer its assets to a creditor "would be contrary to the plain language of Section 272" and against Delaware public policy.[22]

The Court of Chancery explained that, prior to the General Assembly modernizing Delaware's merger statutes, the preferred transaction vehicle involved the target corporation selling all of its assets and then dissolving and distributing the consideration to its stockholders, *i.e.,* asset transfers.[23] Further, at common law, the general rule was that the directors only have the power of management in conducting ordinary business affairs. This prevented directors from selling the assets of the business without unanimous stockholder approval. Thus, the objection of a single shareholder could thwart the efforts to sell a corporation's assets.

---

[21] *Id.* at 1042.

[22] *Id.* at 1043.

[23] *Id.* at 1033–34.

However, the court stated that this strict rule was not without exceptions. "A late nineteenth century treatise noted that for 'a failing company the rule is different, and a sale of the whole property may be made by the directors.'"[24] The court cited to two twentieth-century treatises for the same proposition,[25] and noted that even today, a "Delaware treatise acknowledges the 'failing business' exception to the common law rule."[26] The court also cited a Court of Chancery opinion from 1915 that "acknowledged the general prohibition on selling all of a corporation's assets, as well as the exception for an insolvent or failing firm."[27] After reviewing Section 271's statutory predecessor, Section 64a, the court found that "[t]here is no indication that the General Assembly intended to restrict or eliminate authority that already existed at common law, such as the power of the directors of an insolvent and failing corporation to sell its assets."[28]

Against this common law backdrop, the court reviewed Section 271's revisions. "A 1929 amendment confirmed that the consideration could consist 'in whole or in part [of] shares of stock in, and/or other securities of, any other corporation or corporations.'"[29] In 1967, the General Assembly revised the statute again by expanding the expressly permitted

---

[24] *Id.* at 1035 (quoting 1 Charles Fisk Beach, Jr., *Company Law: Commentaries on the Law of Private Corporations* § 357, at 582 (1891)).

[25] *Id.* at 1036 (citing Thomas Conyngton & R. J. Bennett, *Corporation Procedure* 232 (rev. ed. 1927); Henry Winthrop Ballantine, *Ballantine on Corporations* § 281 (1946)).

[26] *Id.* (citing 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* §10.7, 10–34 (3d ed. 1998 & 2011 Supp.)).

[27] *Id.* at 1036 (citing *Butler v. New Keystone Copper Co.*, 93 A. 380, 382 (Del. Ch. 1915)).

[28] *Id.* at 1037.

[29] *Id.* at 1037 (alteration in original) (quoting 36 Del. Laws ch. 135 § 19 (1929)).

forms of consideration to include "money or other property."[30]  In addition, the court noted that the 1967 revision made two related changes to the DGCL:  adding a new provision, Section 272, and eliminating a provision that did not require either board approval or a stockholder vote to accomplish a sale of assets to a secured creditor by decree  because that provision was unnecessary given the rights generally available to secured creditors.[31]

The court observed that, today, Section 271 mandates a "two-step process" that first requires board approval, and then requires stockholder approval.[32]    Section 271(a) provides:

> Every corporation may at any meeting of its board of directors or governing body sell, lease or exchange all or substantially all of its property and assets, including its goodwill and its corporate franchises, upon such terms and conditions and for such consideration, which may consist in whole or in part of money or other property, including shares of stock in, and/or other securities of, any other corporation or corporations, as its board of directors or governing body deems expedient and for the best interests of the corporation, when and as authorized by a resolution adopted by the holders of a majority of the outstanding stock of the corporation entitled to vote thereon or, if the corporation is a nonstock corporation, by a majority of the members having the right to vote for the election of the members of the governing body and any other members entitled to vote thereon under the certificate of incorporation or the bylaws of such corporation, at a meeting duly called upon at least 20 days' notice.  The notice of the meeting shall state that such a resolution will be considered.[33]

---

[30] *Id*. at 1037–38.  The revision added the words "substantially all" as well.

[31] *Id*. at 1038; *see also id.* at 1038 n.18 ("The revisions attempted to eliminate redundant and unnecessary provisions.").

[32] *Id.* at 1039.

[33] 8 *Del. C.* § 271(a).

The court concluded that interpreting Section 271 as requiring a shareholder vote for the type of transaction contemplated by the Omnibus Agreement would create a conflict with Section 272.  Section 272 provides:

> The authorization or consent of stockholders to the mortgage or pledge of a corporation's property and assets shall not be necessary, except to the extent that the certificate of incorporation otherwise provides.[34]

In explaining the conflict, the court reasoned that:

> [i]nterpreting Section 271 to require a stockholder vote before an insolvent or failing corporation can transfer its assets to secured creditors would conflict with Section 272 of the DGCL, which authorizes a corporation to mortgage or pledge all of its assets without complying with Section 271. Section 272 is silent as to whether a secured creditor can foreclose on its security interest in the debtor corporation's assets, but the statutory scheme would not function if the debtor corporation had to comply with Section 271 before the creditor could foreclose.  When facing the prospect of foreclosure, the board and stockholders of the debtor corporation would have no incentive to approve the transfer of the corporation's assets.  As a practical matter, any creditor who wanted to ensure that it had the ability to levy on the pledged collateral would have to obtain a stockholder vote when entering into the credit agreement, contrary to the plain language of Section 272.[35]

The court concluded that Section 271 did not apply to the Omnibus Agreement because Stream was insolvent, its stockholders no longer had a "meaningful interest in the firm," and the secured creditors were entitled to its assets.[36]  Therefore, "[u]nder the DGCL, the Omnibus Agreement did not require a stockholder vote."[37]

---

[34] 8 *Del. C.* § 272.

[35] *Stream TV*, 250 A.3d at 1021–22.

[36] *Id.* at 1043.

[37] *Id.*

b.   *The Court of Chancery Interprets the Charter.*

After analyzing Section 271, the court turned to the Charter's Class B stockholder

vote provision (the "Class Vote Provision").  The court found that the language in the Class

Vote Provision was "parallel" to Section 271 such that the Charter's language warranted

the same interpretation as Section 271.

In full, the Charter's Class Vote Provision provides:

> For so long as shares of Class B Voting Stock remain outstanding, in addition
> to any other vote or consent required herein or by law, the affirmative vote
> or written consent of the holders of a majority of the then-outstanding shares
> of Class B Voting Stock, voting as a separate class, shall be necessary for the
> Company to consummation [sic] an Acquisition or Asset Transfer.[38]

The Charter defines "Acquisition" as:

> (A) any consolidation, stock exchange or merger of [Stream] with or into any
> other corporation or other entity or person, or any other corporate
> reorganization, other than any such consolidation, merger or reorganization
> in which the stockholders of [Stream] immediately prior to such
> consolidation, merger or reorganization, continue to hold a majority of the
> voting power of the surviving entity in substantially the same proportions (or,
> if the surviving entity is a wholly-owned subsidiary, its parent) immediately
> after such consolidation, merger or reorganization; or

> (B) any transaction or series of related transactions to which [Stream] is a
> party and in which excess of fifty percent (50%) of [Stream's] voting power
> is transferred; provided that an Acquisition shall not include

> (x) any consolidation or merger effected exclusively to change the domicile
> of [Stream], or

> (y) any transaction or series of transactions principally for bona fide equity
> financing purposes in which cash is received by [Stream] or any successor or

---

[38] A124 (Charter § IV.D.2(d)).

indebtedness of [Stream] is cancelled or converted or a combination thereof.[39]

The Charter defines "Asset Transfer" as:

a sale, lease or other disposition of all or substantially all of the assets or intellectual property of [Stream] or the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of [Stream].[40]

Although the court did not expressly conclude, at this stage, that the Omnibus Agreement was an "Asset Transfer" as defined under the Charter, the court stated in a footnote that "[t]he Omnibus Agreement involves a transfer of assets, so if any aspect of the Class Vote Provision covered the transaction, it would be the definition of 'Asset Transfer.'"[41]  Starting with the definition of "Asset Transfer," the court determined that "[t]he language of the Class Vote Provision track[ed] Section 271 of the DGCL," and therefore resulted in the same outcome:  "Stream need not obtain stockholder approval under the Class Vote Provision to transfer mortgaged or pledged assets to the secured creditors who hold security interests in those assets."[42]

---

[39] A126 (Charter § IV.D.4(b)(i)).

[40] A126 (Charter § IV.D.4(b)(ii)).

[41] *Stream TV*, 250 A.3d at 1044 n.24.  In contrast, in the court's September 23, 2021 Order Denying The Rajans' Motion to Modify the Preliminary Injunction Under Rule 65, the court states unequivocally that "*The Omnibus Agreement contemplated an Asset Transfer.*  It provided for Stream to transfer all of assets [sic] in exchange for SLS and Hawk 'stay[ing] the [f]oreclosure [of Stream's assets] and satisfy[ing] and extinguish[ing], in their entirety, the SLS Notes and the Hawk Notes, respectively.'"  *Stream TV Networks, Inc. v. Seecubic, Inc.*, 2021 WL 4352731, at *2 (Del. Ch. Sept. 23, 2021) (alterations in original) (emphasis added).

[42] *Stream TV*, 250 A.3d at 1043.

Comparing Section 271 and the Class Vote Provision, the court found "only two differences."[43]  First, the Class Vote Provision expressly refers to "intellectual property."[44] According to the court, the phrase "intellectual property" "does not enlarge the voting obligation beyond the scope of Section 271, because intellectual property is already a type of asset."[45]

Second, the provision refers to "the granting of one or more exclusive licenses which individually or in the aggregate cover all or substantially all of the intellectual property of [Stream]."  The court acknowledged that the Omnibus Agreement "does not contemplate an exclusive license," but it concluded that the Class Vote Provision's reference to exclusive licenses shows that the drafters "knew how to define the concept of an 'Asset Sale' to include transactions that Section 271 would not otherwise reach."[46]  It then stated that, "[i]f the drafters of the Class Vote Provision wanted to require a class vote before a secured creditor could foreclose on pledged or mortgaged assets, then the definition of 'Asset Sale' should have referred to that type of transaction."[47]  Accordingly, the court concluded that the reference to "a sale, lease or other disposition" in the Asset Transfer definition tracked the language of Section 271 and "warrants the same

---

[43] *Id.* at 1045.

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.*

interpretation."[48]  The court did not separately address whether the Omnibus Agreement

fell into the "*other disposition*" category within the definition of Asset Transfer.[49]

Accordingly, the court denied Stream's motion for a preliminary injunction and

granted SeeCubic's motion for a preliminary injunction preventing Stream from interfering

with the Omnibus Agreement.

### 2. *SeeCubic's Motion for Summary Judgment.*

On January 19, 2021, SeeCubic moved for summary judgment and filed its opening

brief.  SeeCubic's motion for summary judgment sought the following relief: a declaratory

judgment that the Omnibus Agreement is valid and binding, a permanent injunction

ordering Stream and the Rajans to comply with the Omnibus Agreement, and a judgment

against the Rajans for converting the assets identified in the Omnibus Agreement.

Stream filed its answering brief on February 17, 2021, relying exclusively on the

briefs it filed in connection with the parties' cross motions seeking preliminary injunctive

relief.  Before the parties completed the briefing, Stream and the Rajans filed for

---

[48] *Id*. (citing *Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 969 (Del. Ch.), *aff'd*, 567 A.2d 419, 1989 WL 136971 (Del. Oct. 18, 1989) (TABLE)).

[49] In a footnote, the court addressed Stream's "conclusory" claim that the Omnibus Agreement was an Acquisition under the Charter.  According to the court, "[t]he Omnibus Agreement does not contemplate a consolidation or merger, which are specific types of transactions having independent legal significance," and therefore part (A) of the definition of Acquisition did not apply. *Id*. at 1044 n.24.  The court reasoned that the Omnibus Agreement also did not "result in the transfer of any of Stream's voting power," and therefore part (B) of the definition of Acquisition did not apply. *Id*. "By process of elimination" the court determined that "perhaps Stream [thought] the Omnibus Agreement contemplate[d] a 'reorganization.'" *Id*.  However, the court determined that "Stream would have to provide authorities delineating the content of the term and why it could encompass the Omnibus Agreement" as well as "explain why that concept would trigger a stockholder vote when the definition of 'Asset Transfer' did not." *Id*.

19

bankruptcy, resulting in an automatic stay of the proceedings before the Court of Chancery.[50]  The bankruptcy court dismissed the case as a bad faith filing, and described it as an effort "to gain a tactical litigation advantage that is a part of a continued pattern of effort to nullify, undermine, and/or interfere with the [O]mnibus [A]greement, vitiate the purpose and effect of the Chancery Court's order, and to maintain ownership and control over the assets of the debtor . . . ."[51]

On September 23, 2021, the Court of Chancery granted, in part, SeeCubic's motion for summary judgment.[52]  The SJ Order granted summary judgment in SeeCubic's favor declaring the Omnibus Agreement to be valid and binding.  The court also granted SeeCubic's motion for a permanent injunction and converted the preliminary injunction into a permanent injunction.  Finally, the court denied SeeCubic's motion as to the conversion claim because the court found that the summary judgment record did not support it.

---

[50] *Stream TV*, 2021 WL 5816820, at *1; A043 (Dkt. 126).

[51] *Stream TV*, 2021 WL 5816820, at *1 (alterations in original); B36–37 (Bankruptcy Ruling at 13–14).  On May 27, 2021, after the bankruptcy stay lifted, Mathu Rajan filed a *pro se* letter application claiming that the P.I. Opinion was the product of fraud.  *Stream TV*, 2021 WL 5816820, at *1; A048 (Dkt. 138).  On June 4, 2021, Mathu filed a formal motion to set aside the P.I. Opinion. *Stream TV*, 2021 WL 5816820, at *1; A049 (Dkt. 143).  Then, on September 15, 2021, the Rajans had a third-party seek to intervene and file additional motions.  *Stream TV*, 2021 WL 5816820, at *1; A057 (Dkt. 183).  The very next day, on September 16, 2021, the Rajans filed another motion to modify the preliminary injunction.  *Stream TV*, 2021 WL 5816820, at *1; A058 (Dkt. 185).  The court rejected the Rajans' various efforts to set aside the P.I. Opinion, prompting the Court of Chancery's statement that "litigation chaos" seemed to be the Rajans' strategy.  *Stream TV*, 2021 WL 5816820, at *1.

[52] *See generally Stream TV*, 2021 WL 4352732 (granting in part SeeCubic's motion for summary judgment as to the validity of the Omnibus Agreement and its request for a permanent injunction).

3.  *Stream and the Rajans Move for Partial Final Judgment, Appeal to This Court, and Move to Modify or Stay the Permanent Injunction Pending Appeal.*

On September 28, 2021, Stream and the Rajans moved to have the Court of Chancery enter the SJ Order as a partial final judgment and to stay SeeCubic's conversion claim, which the court granted on November 10, 2021.[53]

On November 12, 2021, Stream and the Rajans noticed this appeal.  On the same day, Stream and the Rajans moved to modify or stay the permanent injunction pending appeal.  The court denied both requests.[54]  The court denied Stream's request to modify the permanent injunction because "[t]here have not been any significant changes in the status quo" since the court entered comparable relief in the form of a preliminary injunction on December 8, 2020.[55]  After analyzing the four factors from *Kirpat, Inc. v. Delaware Alcoholic Beverage Control Commission* that guide a trial court's discretion to grant or deny a stay, the court concluded that a stay was unwarranted.[56]  In doing so, the Court of Chancery elaborated on its reasoning that Section 271 did not supersede the common law's recognition that directors could sell the assets of an insolvent firm without stockholder approval.

---

[53] *See generally Stream TV*, 2021 WL 5240591 (entering partial final judgment under Rule 54(b)).

[54] *See Stream TV*, 2021 WL 5816820, at *2.

[55] *Id.*

[56] *Id.* at *15.  This Court identified the four factors in *Kirpat, Inc. v. Delaware Alcoholic Beverage Control Comm'n*, 741 A.2d 356 (Del. 1998).

*H. The Parties' Contentions on Appeal.*

Stream raises four arguments on appeal.  First, it contends that the Class Vote Provision unambiguously requires Class B stockholder approval and renders Section 271's default voting rule irrelevant.  Second, Stream contends that the Court of Chancery erred by looking first to Section 271 prior to construing the Charter.  Stream further asserts that the court bypassed the Charter's plain terms in order to apply a "board only" common law insolvency exception to Section 271.  Third, Stream contends that Section 271 superseded any such common law exceptions assuming, *arguendo*, that such an exception did exist. Finally, Stream argues that the ruling, as a matter of public policy, would upset Delaware's contractarian focus and the predictable application of Section 271.

## II.    STANDARD OF REVIEW

This matter involves the interpretation of both a charter provision and a statute. "The construction or interpretation of a corporate certificate or by-law is a question of law subject to *de novo* review by this Court."[57]  "Certificates of incorporation are regarded as contracts between the shareholders and the corporation, and are judicially interpreted as such."[58]  "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[59]  "Statutory interpretation is a question of law, which we review *de novo*."[60]

---

[57] *Centaur Partners, IV v. National Intergroup, Inc.*, 582 A.2d 923, 926 (Del. 1990).

[58] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[59] *Id.*

[60] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 112 (Del. 2020) (citing *Corvel Corp. v. Homeland Ins. Co. of N.Y.*, 112 A.3d 863, 868 (Del. 2015)).

*III.    ANALYSIS*

First, we consider whether the Class Vote Provision requires Class B majority stockholder approval of the Omnibus Agreement.    Stream argues that the Court of Chancery analyzed the issue "upside down" by applying its interpretation of Section 271 to a clear and unambiguous charter provision.  Instead, Stream contends, the plain text of the Class Vote Provision controls and Section 271's default rules are irrelevant.[61]  We agree and explain our reasoning below.

In assessing corporate action for legal compliance, the DGCL does outrank a corporation's charter such that a charter provision is invalid if it conflicts with a provision of the DGCL.  As we recognized in *Salzberg v. Sciabacucchi*,[62] Section 102(b)(1) governs the scope of corporate charters, and its scope is "broadly enabling."[63]  But Section 102(b)'s broad authorization "is constrained by the phrase, 'if such provisions are not contrary to the laws of this State.'"[64]  We stated further that:

> in *Sterling v. Mayflower Hotel Corp.*, this Court held that Section 102(b)(1) bars only charter provisions that would "achieve a result forbidden by settled rules of public policy."    Accordingly, "the stockholders of a Delaware corporation may by contract embody in the [certificate of incorporation] a provision departing from the rules of the common law, *provided that it does*

---

[61] To be clear, Stream argued below that "[e]ven if [the] Charter's approval procedures do not govern, the Omnibus Agreement is still void because Section 271 [of the] Delaware Code requires shareholder-approval."  A209 (Pls.' Opening Br. Supp. Mot. Prelim. Inj.).  Stream abandons this argument on appeal and asserts that Section 271 is "irrelevant."  Opening Br. at 14 ("The Charter Unambiguously Controlled The Class B Voting Shareholders' Blocking Rights; Section 271 Was Irrelevant.").

[62] *Salzberg*, 227 A.3d 102.

[63] *Id.* at 115.

[64] *Id.* (citing 8 *Del. C.* § 102(b)(1)).

*not transgress a statutory enactment or a public policy settled by the common law or implicit in the General Corporation Law itself.*"[65]

Thus, we proceed with analyzing whether the Class Vote Provision requires a vote of the Class B stockholders.[66]   Considering the plain and ordinary meaning of the term "disposition," we conclude that it does.  More specifically, the Omnibus Agreement effects an "Asset Transfer" that unambiguously triggers a majority vote of the Class B stockholders.   Therefore, extrinsic evidence is not used to interpret the Class Vote Provision.[67]

Next, because we disagree with the Court of Chancery that the language of the Class Vote provision of the Charter "tracks the text of Section 271,"[68] we do not look to Section 271 as an interpretative guide in construing the provision.  And because we conclude that a vote is required because the Omnibus Agreement falls within the materially broader definition of Asset Transfer, we need not resolve whether such a vote is also required under the plain language of Section 271, *i.e.,* whether the Omnibus Agreement effects a "sale,

---

[65] *Id.* at 115–16 (alteration in original) (emphasis added) (footnotes omitted) (quoting *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 118 (Del. 1952)).

[66] *See, e.g., Jones Apparel Grp., Inc. v. Maxwell Shoe Co.*, 883 A.2d 837, 840–41 (Del. Ch. 2004) (analyzing first whether Maxwell's charter precluded Maxwell's board from setting the record date in connection with plaintiff's consent solicitation (*i.e.,* the proper interpretation of the charter), and second, determining whether that charter provision was valid under the DGCL), *reprinted in* 30 Del. J. Corp. L. 284, 288–90 (2005).

[67] *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

[68] *Stream TV*, 250 A.3d at 1044–45; *Stream TV*, 2021 WL 5816820, at *15 ("As explained in the Injunction Decision, the language of [the Asset Transfer] provision 'tracks the text of Section 271 and warrants the same interpretation.'").

lease or exchange" within the meaning of Section 271. In sum, we agree with the Vice Chancellor that the Omnibus Agreement effects an Asset Transfer under the Charter. However, because Section 271's language is materially different, our agreement ends there, as does our analysis, as the parties have raised no argument that the Charter violates "a public policy settled by the common law or implicit in the [DGCL] itself."[69]

Finally, although we need not further consider Section 271, we clarify that a common law insolvency exception, if one existed in Delaware, did not survive the enactment of Section 271 and its predecessor. Thus, there is no Delaware common law "board only" insolvency exception under Section 271. Rather, the enactment of Section 271 and its predecessor superseded any such common law exception, to the extent one existed in Delaware.

A. *The Charter Requires a Class B Stockholder Vote Because the Omnibus Agreement Effects an "Asset Transfer" under Stream's Charter.*

Stream argues that the Omnibus Agreement is both an Acquisition and an Asset Transfer, and therefore requires a vote of the Class B stockholders under the Charter. Because we conclude that the Omnibus Agreement effects an "Asset Transfer," we need not decide whether or not it also constitutes an "Acquisition."

"Delaware adheres to an objective theory of contracts, meaning that a 'contract's construction should be that which would be understood by an objective, reasonable third

---

[69] *See Sterling*, 93 A.2d at 118. Rather, the Court of Chancery identified only one public policy concern, namely, "interpreting Section 271 as applying to a creditor's efforts to levy on its security would undercut the value of the security interest." *Stream TV*, 250 A.3d at 1042. Also, no party in this litigation has argued that in the context of judicial foreclosure proceedings, a stockholder vote is required. Rather, the Omnibus Agreement effects a type of privately-structured work-out.

party.'"[70] We "place[] great weight on the plain terms of a disputed contractual provision,"

and, therefore, we "interpret clear and unambiguous terms according to their ordinary

meaning."[71] "We do not consider extrinsic evidence unless we find that the text is

ambiguous."[72] "Ambiguity is present 'only when the provisions in controversy are

reasonably or fairly susceptible of different interpretations or may have two or more

different meanings[,]'"[73] and not "simply because the parties do not agree upon its proper

construction."[74]

An affirmative vote of the holders of a majority of the then-outstanding shares of

Class B stock is necessary to consummate an Asset Transfer.  The Charter defines "Asset

Transfer" as:

> a sale, lease or other disposition of all or substantially all of the assets or
> intellectual property of [Stream] or the granting of one or more exclusive
> licenses which individually or in the aggregate cover all or substantially all
> of the intellectual property of [Stream].[75]

The parties agree that the Omnibus Agreement is not a sale or lease of all of Stream's

assets.  The parties also agree that the Omnibus Agreement addresses all of the assets of

Stream.  Thus, Stream focuses on the phrase "*other disposition*" and argues that the

---

[70] *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, --- A.3d ---, ---, 2022 WL 619700, at *5 (Del. Mar. 3, 2022).

[71] *Id.* (quoting *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019)).

[72] *Id.* (citing *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017)).

[73] *Id.* (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

[74] *Rhone-Poulenc Basic Chems. Co.*, 616 A.2d at 1196.

[75] A126 (Charter § IV.D.4(b)(ii)).

Omnibus Agreement effects an Asset Transfer that requires a vote of Class B stockholders to be effective.

Stream argues that the words, "other disposition," are "broader" than the word "exchange" in Section 271.  Further, Stream argues that the difference in word choice must be seen as "intentional" and reinforces a conclusion that the parties intended for the Charter to have a different meaning than the statute.  We agree and conclude that the Charter's definition of Asset Transfer differs materially from Section 271.  The definition of Asset Transfer changes Section 271's phrase of "sell, lease *or exchange*,"[76] to "sale, lease *or other disposition*."[77]  Further, the Class Vote Provision contains express references to "intellectual property" and the granting of "exclusive licenses."[78]  The drafters "could have simply tracked the language of the statute," but did not.[79]  Accordingly, the Charter's use of the phrase "other disposition" has a meaning that is different, and broader, than the term "exchange."[80]  It follows that, there is no need to look to Section 271 as an interpretative

---

[76] 8 *Del. C.* § 271(a).

[77] A126 (Charter § IV.D.4(b)(ii)).

[78] *Id.*

[79] *See Jones Apparel Grp. Inc*, 883 A.2d at 842 ("[T]he drafters [of a charter] could have simply tracked the language of the statute, but did not.  That choice cannot be seen as anything other than intentional, reinforcing the conclusion that to read a proviso back into [the charter] allowing the board to set the record date would contravene the plain meaning of that provision.").

[80] *See, e.g., Wilmington Trust Co.*, 2008 WL 555914, at *8 (Del. Ch. Feb. 29 2008) ("[T]he words 'transfer' and 'disposition,' in particular, are inherently broad terms generally understood to encompass changes in title or ownership.").

guide in construing the language of the Class Vote Provision because the Charter's language does not track Section 271.[81]

That leads us to the key inquiry -- the meaning of "*other disposition*," which is not defined in the Charter.   Corporate charters are contracts, and our rules of contract interpretation apply.[82]   "The Court must first attempt to ascertain the parties' intent from the language of the contract."[83]   Words or phrases used in a bylaw or charter are to be given their commonly accepted meaning, and this Court "often looks to dictionaries to ascertain a term's plain meaning."[84]

Black's Law Dictionary defines "disposition" as "[t]he act of transferring something to another's care or possession," "the relinquishing of property" and as "[a] final settlement or determination," such as a "court's disposition of the case."[85]   Merriam-Webster defines "disposition" as "the act or the power of disposing or the state of being disposed:  such as . . . a final arrangement[] settlement" and "the transfer to the care or possession of

---

[81] The Class Vote Provision is also more specific than Section 271 in function as it requires a majority vote of outstanding Class B shares whereas Section 271 requires a vote of all outstanding shares.

[82] *BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 977 (Del. 2020); *Centaur Partners, IV*, 582 A.2d at 928.

[83] *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 56 (Del. 1995).

[84] *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1132 (Del. 2020) (citing *Lorillard Tobacco Co. v. Am. Legacy Found*, 903 A.2d 728, 738 (Del. 2006)).   *See State of Delaware Dep't of Nat. Res. And Env't Control v. McGinnis Auto & Mobile Home Salvage, LLC*, 225 A.3d 1251, 1260– 61 (Del. 2020) (Valihura, J., dissenting) ("Delaware case law is well settled that undefined words are given their plain meaning based upon the definition provided by a dictionary.").

[85] *Disposition*, Black's Law Dictionary (11th ed. 2019).   "Disposition" also contains specific definitions for certain types of dispositions, such as testamentary, ambulatory, and informal.   *See id.*

another."[86]  Similarly, American Heritage defines "disposition" as "[a]n act of disposing; a bestowal or transfer to another."[87]  Cambridge Dictionary defines "disposition" as "the process of selling something or formally giving it to someone" and "the way in which a formal process, such as a business deal or a matter dealt with in a court of law, is completed."[88]  Collins similarly defines "disposition" as "a selling or giving away, as of property."[89]  Finally, Ballentine's Law Dictionary defines "disposition" as "[a]n arrangement.  A transfer of property.  The power of disposal."[90]  We conclude, as explained further below, that the term, "other disposition," includes the transfer of assets contemplated in the Omnibus Agreement.

The Omnibus Agreement effects a transfer and assignment of all rights, title and interest in all of Stream's assets for the benefit of Stream's creditors.  This is evident from the language of the agreement itself as it recites:

> WHEREAS, SLS and Hawk have each agreed to stay the [f]oreclosure and satisfy and extinguish each of the SLS Notes and the Hawk Notes in their entirety subject to the Company *assigning all right, title and interest in and to all assets of the Company* to a newly-formed holding company ("Newco") established by SLS and Hawk, in satisfaction of the SLS Notes and the Hawk Notes.[91]

---

[86] *Disposition*, Merriam-Webster, https://www.merriam-webster.com/dictionary/disposition (last visited Apr. 19, 2022).

[87] *Disposition*, The American Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=disposition (last visited Apr. 19, 2022).

[88] *Disposition*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/disposition (last visited May 27, 2022).

[89] *Disposition*, Collins, https://www.collinsdictionary.com/us/dictionary/english/disposition (last visited May 27, 2022).

[90] *Disposition*, Ballentine's Law Dictionary (3d ed. 2010).

[91] A136 (Omnibus Agreement WHEREAS clause) (emphasis added).

Further, Section 1.1(a) of the Omnibus Agreement provides:

Each of SLS and Hawk shall agree to stay the [f]oreclosure *and satisfy and extinguish*, in their entirety, the SLS Notes and the Hawk Notes, respectively (collectively, the "Discharged Indebtedness"), upon the Company's immediate conveyance, *transfer*, delivery and *assignment, of all right, title and interest of the Company in, to or under all of the rights, properties and assets of the Company* (including those of any direct or indirect subsidiary of the Company) of every kind and description, wherever located, real, personal, or mixed, tangible or intangible, to the extent owned, leased, licensed, used or held for use in or relating to the business, as the same shall exist on the date hereof, *to Newco*, including, but not limited to, all right, title and interest of the Company (or any direct or indirect subsidiary of the Company) in, to and under the assets listed or described below (the "Transferred Assets")[.]"[92]

An assignment of all rights, title and interest in the assets of the Company to Newco is a "disposition" because it is a type of transfer or relinquishment of property. Dictionary definitions of "assignment" reinforce this conclusion. Black's Law Dictionary defines "assignment" as: "[t]he transfer of rights or property."[93] Merriam-Webster defines "assignment" as: "the transfer of property *especially*: the transfer of property to be held in trust or to be used for the benefit of creditors."[94] The American Heritage Dictionary defines "assignment" to mean: "[t]he transfer of a claim, right, interest or property from one to another."[95] Thus, "disposition" includes the assignment of Stream's assets to Newco (SeeCubic) under the Omnibus Agreement, thereby triggering the Class B Vote Provision.

---

[92] A137 (Omnibus Agreement § 1.1(a)) (emphasis added).

[93] *Assignment*, Black's Law Dictionary (11th ed. 2019).

[94] *Assignment*, Merriam-Webster, https://www.merriam-webster.com/dictionary/assignment (last visited May 10, 2022) (emphasis in original).

[95] *Assignment*, The American Heritage Dictionary, https://ahdictionary.com/word/search.html?q=assignment (last visited May 10, 2022).

Further, the assignment of all rights, title, and interest in Stream's assets is a "disposition" because it effects a "relinquishing of property" in consideration for a resolution, settlement, or determination of certain claims. For example, Section 1.2 of the Omnibus Agreement provides:

1.2 Dismissal of Lawsuit and Foreclosure Action

In consideration of the Transactions contemplated by Section 1.1 of this Agreement and such other agreements as made be made [sic] among the parties hereto and upon consummation thereof, (i) the Investors hereby irrevocably agree to *forbear from including any claims against the Company or any of the Transferred Assets as part of the Lawsuit*, and (ii) each of the SLS and the Company *agree to dismiss their applicable claims or responses in the Foreclosure Action*.[96]

Transferring assets in consideration for resolving or settling certain claims falls within the common dictionary definitions of "disposition" set forth above. Thus, the transactions set forth in the Omnibus Agreement unambiguously effect a "disposition" as that term is commonly used.

SeeCubic disagrees, and argues that the term "other disposition" in this context is limited by the concept of *nonscitur a sociis*, a canon of construction that suggests words grouped together in a list should be given related meaning in light of the words around it.[97] SeeCubic asserts that an "other disposition" must mean something akin to a "sale" or a "lease" and that it "does not unambiguously include a transfer of assets to secured creditors

---

[96] A140 (Omnibus Agreement § 1.2) (emphasis added). Further, the recitals in the Omnibus Agreement (including the one quoted above) make clear that the agreement was intended to resolve the issues relating to Stream's default on the SLS and Hawk notes.

[97] Answering Br. at 19 ("Here, the undefined term 'other disposition' is limited to a similar meaning as the terms 'sale' and 'lease.'").

in satisfaction of debt."[98]  We disagree that "other disposition" is ambiguous.  Rather, as shown above, the plain meaning of "other disposition" includes the transactions contemplated in the Omnibus Agreement.  "When the contractual provision is clear and unambiguous, the court will give the provision's terms their plain meaning."[99]

If any of the canons of construction applied, it would be the "elementary canon of contract construction" where "the intent of the parties must be ascertained from the

---

[98] *Id.*  SeeCubic also argues that if "'other disposition' were intended to encompass all dispositions of Stream's assets without limitation, the terms 'sale' and 'lease'–which are dispositions—would be superfluous." *Id.* at 20.

[99] *E.I. du Pont de Nemours & Co.*, 711 A.2d at 57 (citing *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982)).  *See BlackRock Credit Allocation Income Tr.*, 224 A.3d at 977 ("Under the applicable interpretation rules, if the bylaw's language is unambiguous, the court need not interpret it or search for the parties' intent."); *see also Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 365 n.56 (Del. 2013) ("[W]hile we will construe an ambiguous partnership agreement against the drafter under the *contra proferentem* doctrine, that doctrine only applies if the partnership agreement is ambiguous." (citing *SI Mgnt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del.1998))); *Rubick v. Sec. Instrument Corp.*, 766 A.2d 15, 18 (Del. 2000) ("If the statute is unambiguous, there is no room for interpretation, and the plain meaning of the words controls." (*Ingram v. Thrope*, 747 A.2d 545, 547 (Del. 2000))); *Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 66 (Del. 1993) ("Where the intent of the legislature is clearly reflected by unambiguous language in the statute, the language itself controls." (quoting *Spielberg v. State*, 558 A.2d 291, 293 (Del. 1989))); Norman J. Singer & Shambie Singer, 2A *Sutherland Statutes and Statutory Construction* § 46:4 (7th ed.), Westlaw SUTHERLAND (database updated Nov. 2021) ("If a court does find that a statute is not clear and unambiguous, then it may look to a wide variety of intrinsic and extrinsic sources to discover the meaning of legislative language, including the maxims *expressio unius est exclusio alterius*, *ejusdem generis*, and *noscitur a sociis*, as well as legislative history . . . ." (footnote omitted)).  In any event, our interpretation of the term "other disposition" respects the *noscitur a sociis* canon because it treats disposition, sale, and lease similarly—mainly as methods of transferring and assigning the right to use or own an asset.  By specifying that "other disposition[s]" of assets would trigger the Class Vote Provision, the drafters made clear that "sale[s]" and "lease[s]" were themselves dispositions.

language of the contract."[100]  Reading the agreement as a whole,[101] other provisions within

the Omnibus Agreement shed light on what the parties meant by "other disposition."  We

note, for example, that the Charter's definition of "Transfer" as it pertains to Class B Voting

Stock, defines "Transfer" as:

> *any sale, assignment, transfer, conveyance, hypothecation or other transfer*
> *or disposition of such share or any legal or beneficial interest in such share,*
> *whether or not for value and whether voluntary or involuntary or by*
> *operation of law; provided, however, that the following shall not be*
> *considered a "Transfer"*: (x) the granting of a proxy to officers or directors
> of the Company at the request of the Board of Directors of the Company in
> connection with actions to be taken at an annual or special meeting of
> stockholders, or (y) entering into a voting trust, agreement or arrangement
> (with or without granting a proxy) with the Founders.[102]

This definition reinforces that any assignment, transfer, conveyance, or hypothecation of

the Class B shares is a "disposition" of such share, whether or not in value and whether or

not voluntary or involuntary.

One could argue that the definition of "Transfer" provided above shows that the

drafters knew how to ensure that specific types of transfers would pertain to dispositions

of Class B *stock*.  It follows that one may find it significant that these events are not also

specifically addressed in the context of transactions involving corporate *assets*, particularly

---

[100] *E.I. du Pont de Nemours & Co.*, 711 A.2d at 56 (quoting *Citadel Holding Corp. v. Roven*, 603
A.2d 818, 822 (Del. 1992)).  *See Cox Commc'ns Inc.*, 2022 WL 619700, at *5 (explaining that this
Court reviews "questions of contract interpretation *de novo*, with the objective of determining the
intent of the parties from the language of the contract" (footnote omitted) (citing *Exelon
Generation Acquisitions, LLC*, 176 A.3d at 1267)).

[101] *See Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 918 n.28 (Del. 2021) ("Delaware courts 'read
a contract as a whole and . . . give each provision and term effect, so as not to render any part of
the contract mere surplusage[.]'" (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159
(Del. 2010))).

[102] A131 (Charter § IV.D.6(a)(iv)) (emphasis added).

in the definition of Asset Transfer.  However, the terms in the more expanded "Transfer"

definition dealing with transfers of Class B Voting stock are entirely consistent with the

plain meaning and common definitions of "disposition." [103]   Reading the provisions as a

whole, we see no inconsistency in these provisions and in construing "other disposition"

to plainly encompass the contemplated transfer and assignment of Stream's assets for the

benefit of its creditors in furtherance of a resolution of certain claims.[104]

*B.  There Is No Common Law "Board-Only" Insolvency Exception to Section 271.*

We have concluded that the Omnibus Agreement unambiguously contemplates a

transaction constituting an "Asset Transfer" triggering the Class Vote Provision.  We

clarify a final point, namely, whether there exists today an insolvency exception to Section

271.  We conclude that any such exception that might have existed has been superseded.

The Vice Chancellor engaged in a thoughtful analysis of the common law pre-dating

the enactment of Section 271 and its predecessor.  Relying primarily on some treatises and

---

[103] *See Alta Berkeley VI C.V.*, 41 A.3d at 385–86 ("[I]t is well established that a court interpreting any contractual provision, including preferred stock provisions, must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." (quoting *Elliott Assoc., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998))); *see also Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) ("When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language." (citing *Osborn*, 991 A.2d at 1159–60)).

[104] We are mindful that an overly broad reading of the phrase "other disposition" could render certain exceptions within the definition of "Acquisition" superfluous, if these exceptions were read to fall into the catch-all definition of Asset Transfer.  For example, the term "disposition" likely does not encompass "(x) any consolidation or merger effected exclusively to change the domicile of [Stream]," or "(y) any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by [Stream] or any successor or indebtedness of [Stream] is canceled or converted or a combination thereof."  A126 (Charter § IV.D.4(b)(i)). Otherwise, these exceptions would be rendered meaningless.  Therefore, the phrase "other disposition" must have some limits.  However, we need not attempt to delineate what they are.

case law from other jurisdictions, the court determined that a board-only insolvency exception existed, despite the lack of any precedent in Delaware. These authorities ranged in date from 1926 to 1948, with no case cited after 1948 upholding such an exception.

In its P.I. Opinion, the Court of Chancery cited the following treatises:

- 1 Charles Fisk Beach, Jr., *Company Law: Commentaries on the Law of Private Corporations* §§ 357, 358 (1891) (For "a failing company the rule is different, and sale of the whole property may be made by the directors.");[105]

- Thomas Conyngton & R.J. Bennett, *Corporation Procedure* 232 (rev. ed. 1927) (footnote omitted) ("The directors may, however, without authorization of the stockholders, sell the corporate assets if necessary to pay the corporate debt, and they may, in the absence of statutory or other prohibitions, make an assignment for the benefit of creditors.");[106]

- Henry Winthrop Ballantine, *Ballantine on Corporations* § 281, at 667 (1946) (footnote omitted) ("If a corporation is insolvent or in failing condition[,] the board of directors have authority to sell the entire assets in order to pay the debts and avoid the sacrifice of an execution sale[,] even without the vote or consent of the shareholders. They may also make an assignment for the benefit of creditors or file a voluntary petition in bankruptcy.");[107]

- 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 10.7 at 10–34 (3d ed. 1998 & 2011 Supp.) (acknowledging a "failing business" exception to the common law general rule that directors have no authority to sell out the entire property of the corporation and terminate its business).[108]

---

[105] *Stream TV*, 250 A.3d at 1035.

[106] *Id*.

[107] *Id*.

[108] *Id*. at 1036. In its Modification Opinion, the Court of Chancery supplemented this list with citations to the Cook, Purdy and later Noyes and Cox & Hazen treatises discussed herein. *See Stream TV*, 2021 WL 5816820, at *8–9, 11.

The Court of Chancery cited six cases from other jurisdictions,[109] and two Delaware cases, namely, *Butler v. New Keystone Copper Co.*, a case from 1915, and *Allied Chemical & Dye Corp. v. Steel & Tube Co.*, a case from 1923.[110]   In *Butler*, the Court of Chancery confronted a litigation involving a sale of assets that occurred prior to the enactment of any statute addressing a sale of assets.   Chancellor Curtis stated that

> the general rule as to commercial corporations seems to be settled that neither the directors nor the stockholders of a prosperous, going concern have power to sell all, or substantially all, the property of the company if the holder of a single share dissent.  But if the business be unprofitable, and the enterprise be hopeless, the holders of a majority of the stock may, even against the dissent of the minority, sell all the property of the company with a view to winding up the corporate affairs.[111]

*Butler* bases its holding on the majority exception to the general rule requiring stockholder unanimity and does not address a board-only insolvency exception.

The court then cited *Allied Chemical* for the proposition that, when Section 271 was enacted, the General Assembly did not intend to govern a transfer of assets by a failing firm.[112]   Specifically, the court stated that "[t]he General Assembly enacted the statutory predecessor to Section 271 to make clear that the board of directors of a corporation, with

---

[109] *See Stream TV*, 250 A.3d at 1035 (citing *City Nat. Bank v. Fuller*, 52 F.2d 870, 872–73 (8th Cir. 1931); *Autauga Coop. Leasing Ass'n v. Ward*, 250 Ala. 229, 33 So. 2d 904, 906 (1948)); *Sherrard State Bank v. Vernon*, 243 Ill. App. 122, 128 (Ill. App. Ct. 1926); *Oskaloosa Sav. Bank v. Mahaska Cnty. State Bank*, 205 Iowa 1351, 219 N.W. 530, 533 (1928); *Candor v. Mercer Cnty. State Bank*, 257 Ill. App. 192, 197–98 (Ill. App. Ct. 1930); *Howard v. Republic Bank & Tr. Co.*, 76 S.W.2d 187, 191 (Tex. Civ. App. 1934).

[110] *See id.* at 1036–37 (citing *Butler*, 93 A. 380; *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486 (Del. Ch. 1923)).

[111] *Butler*, 93 A. at 382; *Stream TV*, 250 A.3d at 1036.

[112] *Stream TV*, 250 A.3d at 1041.

36

the approval of a majority of its stockholders, could sell all of the firm's assets, even if the corporation was profitable and solvent."[113]  According to the court, because the common law did not prohibit the board of directors of an *insolvent* or *failing* firm from transferring its assets to creditors, "the General Assembly did not need to establish that point by statute."[114]

We have independently surveyed the law, and we concur that the weight of treatise authority, supported by cases from various states, supports the existence, at least in the early part of the twentieth century, and at least in certain jurisdictions, of certain common-law rules governing sales of all assets, including the following:

- If a corporation is solvent and profitable, then a sale of all assets requires unanimous approval by all stockholders.

- If a corporation is solvent but unprofitable and without prospect of becoming profitable, then a sale of all assets may be made with the approval of a majority of the stockholders.

- If a corporation is insolvent, then a sale of all assets may be made by the directors without stockholder approval.

At least five treatises, published before the Delaware General Assembly's enactment of Section 271's predecessor in 1917, support the existence of these rules.

First, Charles Fisk Beach, in his 1891 treatise, states that, "a majority of the shareholders of a prosperous corporation can not sell out the property and invest in other

---

[113] *Id.* (citing *Allied Chem.*, 120 A. at 490).

[114] *Id.*

enterprises against the wishes of the minority."[115]   He observes that, "in [the] case of a failing company the rule is different, and sale of the whole property may be made by the directors."[116]

Second, an 1898 treatise by William W. Cook states that "[n]either the directors nor a majority of the stockholders have power to sell all the corporate property as against the dissent of a single stockholder, unless the corporation is in a failing condition."[117] Arguably this passage supports the existence of the board-only exception by negative implication.  The 7th edition of Cook's treatise (published in 1913) cites *Common Sense Mining & Milling Co. v. Taylor* with approval,[118] in which the Missouri Supreme Court held that a "corporation being in failing circumstances, the directors had the legal right to dispose of its assets to pay its debts."[119]

Third, a 1905 treatise, authored by James Hart Purdy, repeats that a majority of the shareholders of a prosperous corporation cannot sell against the wishes of the minority, but that in the case of a failing company, the sale may be made by the directors.[120]

---

[115]  1 Charles Fisk Beach, Jr., *Company Law: Commentaries on the Law of Private Corporations* § 357, at 582 (1891).

[116] *Id.*

[117]  William W. Cook, *A Treatise on the Law of Corporations Having a Capital Stock* § 670, at 1337 (4th ed. 1898) (emphasis omitted).

[118]  William W. Cook, *A Treatise on the Law of Corporations Having a Capital Stock* § 670, at 2604 n.2 (7th ed. 1913).

[119] *Common Sense Mining & Milling Co. v. Taylor*, 247 Mo. 1, 152 S.W. 5, 10–11 (1912).

[120]  James Hart Purdy, *Treatise on the Law of Private Corporations* § 830, at 1243–44 (1905). Purdy does not cite Beach.  Purdy does add two additional case citations, namely, *Miners' Ditch Co. v. Zellerbach*, 37 Cal. 543, 99 Am. Dec. 300 (1869); *Bartholomew v. Derby Rubber Co.*, 69 Conn. 521, 38 A. 45 (1897).

Fourth, the 1909 treatise by Thompson & Thompson states that at common law, "neither the directors nor the majority of the stockholders of a prosperous corporation, able to achieve the objects of its creation, had power to sell or otherwise dispose of all the property without the unanimous consent of all stockholders."[121] But this treatise notes that the majority of stockholders may dispose of all the corporate property "where the continuation of the business would be at a loss and where there was no prospect or hope that the enterprise could be made profitable."[122] The treatise further explains that the board may dispose of all the corporate property when "by reason of its embarrassed or insolvent condition[, the corporation] is unable either to pay its debts or to secure capital and funds for the further prosecution of its enterprise," especially where creditors are pressing their claims and threatening litigation.[123]

Fifth, according to a 1909 treatise by Walter Chadwick Noyes, "[t]he general rule that a majority cannot sell the entire assets of a prosperous corporation is based upon the principle that a majority cannot control corporate powers to defeat corporate purposes."[124] The treatise distinguishes between a "losing" corporation – one in which "the further prosecution of the business of the corporation would be unprofitable"[125] – and an insolvent

---

[121] 3 Seymour D. Thompson & Joseph W. Thompson, *Commentaries on the Law of Private Corporations* § 2421, at 342 (2d ed. 1909).

[122] *Id.* § 2424, at 345.

[123] *Id*. § 2418, at 336.

[124] Walter Chadwick Noyes, *A Treatise on the Law of Intercorporate Relations* § 111, at 210 (rev. 2d ed. 1909).

[125] *Id.* at 211.

corporation.  Because the disposal of all the assets of a losing corporation furthers the corporate purpose, the treatise notes that it may be accomplished by a majority of the stockholders.[126]  The directors, on the other hand, are "equally without implied authority to wind up [a corporation's] affairs and dispose of its assets" in a solvent corporation *and* in a "losing, but not insolvent, corporation."  As the treatise explains, in a losing corporation, the transfer of all assets "involves primarily the relations between a corporation and its stockholders."[127]  But in an insolvent corporation, such transfer is a matter of "the relations between a corporation and its creditors."[128]  "In the absence of a controlling statute or by-law of the corporation, the directors have power to authorize an assignment of the property of an insolvent corporation for the benefit of its creditors."[129]

Two later treatises also acknowledge the existence of a board-only insolvency exception.  First, *Ballantine on Corporations* (1946) states that "[i]f a corporation is insolvent or in failing condition[,] the board of directors have authority to sell the entire assets in order to pay the debts and avoid the sacrifice of an execution sale even without the vote or consent of the shareholders."[130]

Ballantine observes that under statutes adopted in more than forty states, "a

---

[126] *Id.*

[127] *Id.* § 112, at 212.

[128] *Id.* at 213 ("The assignment of property by an insolvent corporation for the purpose of paying its debts is a very different action from so disposing of its property while solvent as to make its continued exercise of its franchises impossible." (citing *Vanderpoel v. Gorman*, 140 N.Y. 563, 568, 35 N.E. 932, 934 (1894))).

[129] *Id.*

[130] Henry Winthrop Ballantine, *Ballantine on Corporations* § 281, at 667 (1946).

prosperous and going [concern] corporation may with the vote or consent of its board of directors and two-thirds of its voting shareholders or some other specified majority, sell and convey all or substantially all [of] its property rights."[131]   These provisions were adopted to relax the strict common law unanimity rule.   "Some of these statutory requirements apply even though the corporation is insolvent, particularly if the sale is made for the purpose of reorganization and continuance of the business in another corporation rather than for the purpose of liquidation."[132]   However, "[i]n other states expressly or by implication the requirements of such a statute are held not to apply to insolvent corporations."[133]

Second, Cox and Hazen's *Treatise on the Law of Corporations* states that, "[i]f a corporation is insolvent or in failing condition, the common law recognizes the authority of the board of directors to sell the entire assets without the vote or consent of the shareholders in order to pay the debts of the corporation and avoid the sacrifice of an execution sale.   The directors may also make an assignment for the benefit of creditors or file a voluntary petition in bankruptcy."[134]

Cases from at least fifteen states, from the late 1800's to the early 1900's, support

---

[131] *Id*. § 282, at 668.

[132] *Id*. Notably, Ballantine observes that, "if the purpose of a sale is [a] reorganization or recapitalization as contrasted with liquidation and dissolution, that class voting should be required as much as in [the] case of merger or consolidation." *Id*. at 669.

[133] *Id*. at 668. *See also infra* note 171 (citing Fletcher noting that courts in different jurisdictions vary on whether such statutory provisions have altered the common law rules for corporations in financial distress).

[134] 4 James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* § 22:4 (3d ed., rev. Dec. 2021), *available at* Westlaw (Dec. 2021 update) (footnote omitted).

the existence of the board-only insolvency exception in those jurisdictions during that time:

Alabama,[135] California,[136] Connecticut,[137] Illinois,[138] Indiana,[139] Iowa,[140] Massachusetts,[141]

---

[135] *Autauga Coop. Leasing Ass'n*, 33 So. 2d at 906 (Prior to passage of a state statute in 1911, if corporation was "insolvent or in failing condition, the directors or a majority of its stockholders could sell all its property without any special procedure."); *Chamberlain v. Bromberg*, 83 Ala. 576, 581, 3 So. 434, 435 (1888) ("We think it too clear to admit of discussion, unless our statutes after noticed have made a change, that the Alabama Insurance Company, being unable to meet its debts, had the power to make an assignment for the benefit of its creditors, if done in good faith; that the board of directors, as its governing body, was the proper authority to execute that power . . . .").

[136] *Miners' Ditch Co.*, 37 Cal. at 593 (citing with approval *Sargent v. Webster*, 54 Mass. 497, 498 (1847)).

[137] *Mills v. Tiffany's*, 123 Conn. 631, 640, 198 A. 185, 189 (1938) (noting that a statute requiring approval by vote of two-thirds of the stockholders was inapplicable to "a sale of all its assets by a corporation which is insolvent or in failing circumstances made for the purpose of closing up its affairs" (citing *Bassett v. City Bank & Tr. Co.*, 116 Conn. 617, 165 A. 557 (1933))); *Chase v. Tuttle*, 55 Conn. 455, 12 A. 874, 875–76 (1888) (upholding directors' assignment of an insolvent corporation's assets for the benefit of creditors). The court in *Mills* suggested that the insolvency exception would not apply if the purpose of the sale was the continuation of the business in another corporation and not the bona fide winding up of its business. *Mills*, 198 A. at 189.

[138] *Candor*, 257 Ill. App. at 197–98 ("The general rule is that where a business is in a failing condition and has become financially involved and insolvent, and the creditors are pressing their claims, the directors may dispose of the assets without the sanction of the stockholders, when it is deemed of imperative necessity." (citing *Oskaloosa Sav. Bank*, 219 N.W. at 530)).

[139] *De Camp v. Alward*, 1876 WL 6785, at *3 (Ind. May 1, 1876) (Assignment for the benefit of creditors "may be made by the board of directors, without the express authority or consent of the stockholders." (citing *Dana v. Bank of U.S.*, 1843 WL 5023 (Pa. Jan. 1, 1843))).

[140] *Oskaloosa Sav. Bank*, 219 N.W. at 533 ("[I]t is an exception to the general rule that where a business is in a failing condition and has become financially involved and insolvent, and the creditors are pressing their claims, the power of the directors to alienate the property is conceded where it is regarded as of imperative necessity.").

[141] *Sargent*, 54 Mass. at 497 ("The directors of an insolvent manufacturing corporation have authority to convey all the property of the corporation to one of its creditors, upon condition that he shall apply the property to the payment of his claim, and pay over the surplus, if any, to the treasurer of the corporation."); *In re E.T. Russell Co.*, 291 F. 809, 816 (D. Mass. 1923) (Assignment of all assets to creditor for payment of debts "is something the directors have power to do[,]" and also stating that a "sale" does not include an assignment for the benefit of creditors and, thus, "the powers of the corporation to execute assignments for the benefit of creditors are not conferred by law upon the stockholders.").

Michigan,[142] Minnesota,[143] Missouri,[144] Montana,[145] New York,[146] Pennsylvania,[147]

---

[142] *Boynton v. Roe*, 114 Mich. 401, 407, 72 N.W. 257, 259 (1897) ("It is well settled in this state than an insolvent corporation has the right to make a general assignment of its property for the benefit of its creditors, unless prohibited by its charter or a statute of the state.  The directors may make such assignment for the benefit of creditors without the assent of the stockholders." (citation omitted)).  *But see Michigan Wolverine Student Coop. v. Wm. Goodyear & Co.*, 314 Mich. 590, 600, 22 N.W.2d 884, 888 (1946) ("We are not in accord with the proposition that in this State the directors of a domestic corporation may sell all or substantially all of the assets of the corporation without the consent or approval of the holders of a majority of the shares, on the ground that the corporation was 'in financial distress' or 'in a failing condition.'").

[143] *Tripp v. Northwestern Nat'l Bank*, 41 Minn. 400, 403, 43 N.W. 60, 61 (1889) ("The weight of authority seems to be in favor of the proposition that the board of directors of a corporation to which the general management of its affairs is committed, without particular restriction, may authorize a general assignment of the corporate property to be made for the benefit of creditors when the condition of its affairs is such as to reasonably justify such a course, as in the case of insolvency.").

[144] *Common Sense Mining & Milling Co.*, 152 S.W. at 10–11 ("The corporation being in failing circumstances, the directors had the legal right to dispose of its assets to pay its debts."); *Calumet Paper Co. v. Haskell Show-Printing Co.*, 144 Mo. 331, 45 S.W. 1115, 1115 (1898) ("Where there is nothing in the charter or by-laws of an insolvent corporation prohibiting it, the board of directors of such a corporation may make an assignment of its property for the benefit of its creditors." (citing *Chew v. Ellingwood*, 1885 WL 7913, at *2 (Mo. Apr. 1, 1885); *Descombes v. Wood*, 91 Mo. 196, 4 S.W. 82, 85 (1887)); *Hutchinson v. Green*, 91 Mo. 367, 1 S.W. 853, 855 (1886) ("[W]hen the corporation becomes crippled, and unable to meet its obligations in the usual course of business, it is competent for the directors to make an assignment, and this they may do without the consent of the stockholders."); *Chew*, 1885 WL 7913, at *7 ("The right of the directors of a bank in failing circumstances to make an assignment for the benefit of creditors, where there is nothing in the charter or general laws forbidding it, we think, is clear.").

[145] *Wortman v. Luna Park Amusement Co.*, 61 Mont. 89, 201 P. 570, 571 (1921) ("To summarize some of the rules of common law so far as applicable to the instant case, a solvent and prosperous corporation could sell all of its assets only by unanimous consent of its stockholders; *if insolvent* and unable to execute the purposes of its creation, *by the directors* if the best interests of the stockholders demanded; in the proper pursuit of its business, and within the purposes of its creation, sell any or all assets even against the dissent of a minority or perhaps a majority of its stockholders." (emphasis added)).

[146] *Vanderpoel*, 140 N.Y. at 576 ("The corporation had the power to make an assignment.  It was a corporate act and neither the statute nor any by-law, so far as the record shows, provided that it should be otherwise done than by the president and secretary or treasurer, under the authority of the board of directors.").

[147] *Ardesco Oil Co. v. N. Am. Oil & Mining Co.*, 66 Pa. 375, 382, 1871 WL 10959, at *6 (Pa. Jan. 3, 1871) ("[A]n insolvent corporation may make a general assignment for the benefit of its

Texas,[148] and Wisconsin.[149]   Some authorities that reject the board-only insolvency exception do so on the basis of state statutes.[150]

Yet no Delaware case expressly addresses or adopts the board-only insolvency exception.[151]   The closest Delaware came to addressing the exception was in *Butler v. New Keystone Copper Co.*[152]   Although the Chancellor in *Butler* did not mention the board-only exception, he did cite two treatises that generally acknowledged the exception:  Thompson

---

creditors, and this power may be exercised by the directors, unless special provision to the contrary is made in the charter[.]" (citing *Dana*, 1843 WL 5023, at *8).

[148] *Birmingham Drug Co. v. Freeman*, 15 Tex. Civ. App. 451, 454, 39 S.W. 626, 628 (1897) ("[A]n insolvent corporation may make a general assignment for the benefit of its creditors, and this may be exercised by the directors, or under their authority.").

[149] *Goetz v. Knie*, 103 Wis. 366, 79 N.W. 401, 402 (1899) (acknowledging cases where "it was held that the board of directors of an insolvent corporation has power to make a voluntary assignment of all its property for the benefit of its creditors, without the authority or consent of its stockholders, unless restrained by its charter or other legal enactment.").

[150] *See, e.g.*, *Kyle v. Wagner*, 45 W. Va. 349, 32 S.E. 213, 214 (1898) (The court noted the existence of "numerous authorities" for the board-only insolvency exception but held that this rule was abrogated in West Virginia by statute providing for voluntary dissolution and windup of corporations by the stockholders instead of assignment of assets by directors.  Thus, the court held that the directors had no authority to direct the assignment of the entire property without the consent of the stockholders.).

[151] Although defendants raised the issue in *Russell v. Morris*, the Court of Chancery declined to address whether § 271 applied to "the sale of assets by a failing company facing an emergency situation" because it found that no emergency existed.  1990 WL 15618, at *4–5 (Del. Ch. Feb. 14, 1990) ("Defendants also contend that the transaction is valid and Russell's motion must be denied because § 271 does not apply to a sale of assets by a failing company facing an emergency situation.  Even assuming such an exception exists under our law, I need not address it here because the facts clearly indicate that no emergency requiring three hours notice of a board meeting existed."), *appeal refused*, 577 A.2d 754, 1990 WL 84682 (Del. 1990) (ORDER).

[152] *Butler*, 93 A. 380.

& Thompson's *Commentaries on the Law of Private Corporations* and Cook's *A Treatise on the Law of Corporations Having a Capital Stock.*[153]

Both *Butler* and *Allied* addressed circumstances under which a corporation could sell its assets with majority stockholder approval.  We understand the Vice Chancellor's response, set forth in his final opinion in this matter, namely, that if a sale of assets obtained majority stockholder approval, "then the court did not need to address whether the corporation's condition was sufficiently dire that the directors alone would have had authority to effectuate the sale."[154]  But we note that in *Allied Chemical*, Chancellor Wolcott observed that Section 64(a), the predecessor to Section 271(a), "remains in the law to-day [sic] and fixes in statutory form the rule imposed on *all* corporations organized under the general act by which they are to be governed *whenever* the question of the sale of their entire assets is under consideration."[155]

Therefore, *Butler* and *Allied Chemical* can also be read to suggest that Section 271's predecessor provided the only default rule and did not save room for a "board only" insolvency exception for transactions otherwise falling within the statute's ambit.  We think this is the better view.  For one thing, given the complete absence of any Delaware case support, it is not entirely clear that the exception was ever adopted in Delaware in the first

---

[153] *Butler* cites to Sections 2471 and 2424 of the Thompson & Thompson treatise.  However, the reference to the board-only exception is in Section 2429 which the court in *Butler* did not cite.

[154] *Stream TV*, 2021 WL 5816820, at *8.  The Vice Chancellor acknowledged that "*Butler* did not specifically involve the insolvency-based exception that permits directors to sell all of a corporation's assets without stockholder approval."  *Id.* at *10.  This was also true of *Geddes v. Anaconda Copper Mining Co.*, 254 U.S. 590, 595–96 (1921).

[155] *Allied Chem.*, 120 A. at 490 (emphasis added).

place.  It follows, that before addressing whether a statute supersedes the common law, it must be established that the exception was indeed part of the common law in that jurisdiction.[156]  Ascertaining the initial question of what the common law *is* often is not an easy task.[157]  Stream argues that Delaware chose to adopt a majority vote exception instead of an insolvency exception.[158]  It argues that our General Assembly then codified the majority exception set forth in *Butler* in Section 64a.

---

[156] It is a fundamental principle of State sovereignty that the common law decisions of some jurisdictions are merely persuasive authority in the law of another jurisdiction until that State's courts adopt it.  *See, e.g., Casey v. Beeker*, 321 So. 3d 662, 670 (Ala. 2020) (concurring opinion) (discussing how treatises are only persuasive authority, may differ in applicability by jurisdiction, and can vary in persuasiveness based on the relevance and age of the source); *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 82, 69 N.E.3d 834, 859 ("[D]ecisions from other state courts and secondary sources are not binding on [the Supreme Court of Illinois] . . . ."); *Cadillac Rubber & Plastics, Inc. v. Tubular Metal Sys., LLC*, 331 Mich. App. 416, 425, 952 N.W.2d 576, 581 n.2 (2020) ("Treatises are not binding authority but may be considered persuasive." (citing *Fowler v. Doan*, 683 N.W.2d 682, 686 (Mich. Ct. App. 2004))).  *See generally* A. W. B. Simpson, *The Rise and Fall of the Legal Treatise: Legal Principles and the Forms of Legal Literature*, 48 U. Chi. L. Rev. 632, 676 (1981) ("From the beginning, the treatise in America had to contend with the considerable number of different jurisdictions in which the law was administered, each state potentially possessing its own common law.  This obviously presented an obstacle to the exposition of a universal common law by the text writers.").

[157] This is evidenced by the painstaking work done by the American Law Institute in formulating the various Restatements of the Law.  For example, as the recent draft of the Restatement of the Law of Corporate Governance, Tentative Draft No. 1 (April 2022) notes at its outset that Restatements "aim at clear formulations of the common law . . . ," and that the Restatement process seeks first to "ascertain the nature of the majority rule."  *Id.* at x.  "If most courts faced with an issue have resolved it in a particular way, that is obviously important to the inquiry."  *Id.*  The draft further observes that:

> Like a Restatement, the common law is not static.  But for both a Restatement and the common law the change is accretional.  Wild swings are inconsistent with the work of both a common-law judge and a Restatement.  And while views of which competing rules lead to more desirable outcomes should play a role in both inquiries, *the choices generally are constrained by the need to find support in sources of law*.

*Id.* at x–xi (emphasis added).

[158] Opening Br. at 31–34.

46

Even if we were to determine that a board-only insolvency exception was part of our common law at one time, the pivotal question is whether it survived the enactment of Section 64a.  As explained below, we do not believe it did, assuming, *arguendo*, it existed.

In 1917, the Delaware General Assembly responded to *Butler*'s affirmation of the common law unanimity rule by enacting Section 64a.  This section superseded the common law rule requiring unanimous consent to the sale, lease or exchange of all the property and assets of the corporation.  Instead, it provided for a majority vote of the outstanding stock:

> Every corporation organized under the provisions of this chapter, may at any meeting of its board of directors, sell, lease or exchange all of its property and assets, including its good will and its corporate franchises, upon such terms and conditions as its board of directors deem expedient and for the best interests of the corporation, when and as authorized by the affirmative vote of the holders of a majority of the stock issued and outstanding having voting power given at a stockholders' meeting duly called for that purpose, or when authorized by the written consent of a majority of the holders of the voting stock issued and outstanding, provided, however, that the certificate of incorporation may require the vote or written consent of a larger proportion of the stockholders.[159]

When Delaware comprehensively revised its General Corporation Law in 1967, Section 64a was renumbered Section 271(a), and language was added to clarify that the provision covered sales, leases, or exchanges of "substantially all" assets and that permissible consideration included "money or other property."[160]  The General Assembly

---

[159] 29 Del. Laws ch. 113, § 17 (1917).  Section 64a was amended in 1925 to replace the phrase "a majority of the holders" with "the holders of a majority" and "a larger proportion of the stockholders" with "a larger proportion of the stock issued and outstanding."  34 Del. Laws ch. 112, § 13 (1929).  In 1929, the statute was amended again to allow the consideration to include "shares of stock in, and/or other securities of, any other corporation or corporations."  36 Del. Laws ch. 135, § 19 (1925).

[160] 56 Del. Laws ch. 50, § 271 (1967).

also added Section 272.[161]    Section 272 clarified that Section 271 does not apply to

mortgages or pledges of corporate assets.[162]    The Delaware General Corporation Law

Revision Committee, the group tasked with drafting the comprehensive revisions,

considered adding a specific exception for sales in the ordinary course of a corporation's

business, but ultimately decided not to do so.[163]    Other provisions were eliminated as

unnecessary or redundant.[164]

---

[161] 56 Del. Laws ch. 50, § 272 (1967); *see* 8 *Del. C.* § 272.

[162] 3 Robert S. Saunders, Allison L. Land, Jennifer C. Voss, & Cliff C. Gardner, *Folk on the Delaware General Corporation Law* § 272.01 (7th ed., 2022-1 Supp.); *accord* 1 R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations & Business Organizations* § 10.1 (4th ed. 2022-1 Supp.).

[163] *See* Samuel Arsht, *Memorandum to the Corporation Law Revision Committee on Folk Report on Proposed 1967 Amendments* (Sept. 14, 1965) ("Folk points out many states and Model Act expressly dispense with stockholder approval for sales of all assets in usual course of business and for mortgages or pledges, unless charter requires it. He suggests appropriate language to this effect at page 209."); *Minutes of the Twenty-Second Meeting of Delaware Corporate Law Study Committee* (Sept. 14, 1965) ("Disapproved the recommendation with respect to sale of all assets in the course of business.").

[164] For example, as the Vice Chancellor observed, prior to 1967, the DGCL contained a provision that authorized "[s]ales of the property and franchises" of a corporation "under a decree of Court . . . ." *Stream TV*, 250 A.3d at 1038 (alteration in original). That provision did not require either board approval or a stockholder vote to consummate a sale of assets to a secured creditor by decree. "As part of the 1967 revision, the General Assembly eliminated this provision," likely because it is "unnecessary" given the rights afforded to secured creditors. *Id*. Section 271 was subsequently amended five times. None of the amendments bears on this analysis. 57 Del. Laws ch. 148, § 30 (1969) (Amended to remove the reference to stockholder approval by written consent, as this was made redundant by § 228, and to add that the notice to stockholders of a meeting to vote on a proposed transaction under § 271 must state that this is the purpose of the meeting.); 64 Del. Laws ch. 112, § 55 (1983) (adding a clause to cover non-stock corporation); 65 Del. Laws ch. 127, § 9 (1985) (inserting "the holders of" into § 271(a) between "resolution adopted by" and "a majority of the outstanding stock"); 75 Del. Laws ch. 30, § 28 (2005) (adding subsection (c), which permits transfers of all or substantially all assets of a parent corporation to a wholly-owned subsidiary without a stockholder vote); 77 Del. Laws ch. 253, § 58 (2010) (As part of a comprehensive revision of the DGCL to address nonstock corporations, Section 271(a) was revised to provide that, in addition to members who are entitled to vote for the election of a nonstock corporation's governing body, any other members given the right to vote on the sale of all or substantially all of

The Vice Chancellor concluded that Section 271 superseded only one aspect of the common law rule, namely, the unanimity requirement but "did not supersede the common law's recognition that directors could sell the assets of an insolvent or failing firm without stockholder approval."[165]   We disagree.   In *A.W. Financial Services, S.A. v. Empire Resources, Inc.*,[166] this Court set forth the analysis we employ when determining whether the enactment of a statute has superseded the common law.[167]   We applied the following three-pronged inquiry: (1) does explicit language in the statute supersede or limit the common law; (2) does the statutory scheme evidence a legislative intent to occupy the field; and (3) does the statutory scheme actually conflict with the common law.[168]

The plain language of Section 271 suggests the answer to the first two questions as Section 271 applies to "*[e]very corporation . . .* ," and requires a vote by the holders of a majority of the corporation's outstanding shares when their corporation engages in a sale, lease, or exchange of "all or substantially all of its property and assets."[169]   The creation of Section 64a's majority vote rule indisputably replaced the common law unanimity rule.[170]

---

the corporation's assets under the corporation's certificate of incorporation or by-laws are also entitled to do so.).

[165] *Stream TV*, 2021 WL 5816820, at *13.

[166] 981 A.2d 1114 (Del. 2009).

[167] *Id.* at 1123.  The concept of "'[s]uperseder' describes circumstances where a statute replaces or ousts ('supersedes') the common law." *Id.* at 1121.  *See Cline v. Prowler Indus. of Maryland, Inc.*, 418 A.2d 968, 977–78 (Del. 1980) (analyzing whether it was the General Assembly's intent to supersede the doctrine of strict tort liability in cases involving a sale of goods when it adopted the Uniform Commercial Code).

[168] *A.W. Fin. Servs., S.A.*, 981 A.2d at 1123.

[169] 8 *Del. C.* § 271(a) (emphasis added).

[170] One might logically view the statute as a restriction, rather than expansion of stockholder rights. *See Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 376 (Del. Ch. 2004) ("The origins of §

The question is whether the rule's exceptions were abrogated as well. We think the better view is that, when the common law unanimity rule was superseded, so too was any insolvency exception to that rule.[171] This conclusion is reinforced by the plain language of Section 271, which contains no exceptions and is not ambiguous.[172] As such, the language

---

271 did not rest primarily in a desire by the General Assembly to protect stockholders by affording them a vote on [the] transactions previously not requiring their assent. Rather, § 271's predecessors were enacted to address the common law rule that invalidated any attempt to sell all or substantially all of a corporation's assets without unanimous stockholder approval.").

[171] Cases from other jurisdictions are mixed on whether similar statutes apply to a sale of all or substantially all assets by the directors of an insolvent corporation. In *Mills v. Tiffany's*, the Supreme Court of Errors of Connecticut held that a Connecticut statute, providing that a corporation "may sell, lease, or exchange all its assets when that action is authorized by a vote of two-thirds of the outstanding stock of each class at a meeting duly warned and held for the purpose[,]" did not apply to a sale of all assets of an insolvent corporation made for the purpose of winding up its affairs. 198 A. at 189. That court cited *Basset v. City Bank & Trust Co.*, which explained that the statute was intended to supersede the common law unanimity rule and thus, transactions to which that general rule did not apply at common law were "outside the scope and purpose of the statute[.]" 165 A. at 561. However, in *Michigan Wolverine Student Cooperative*, the Supreme Court of Michigan stated that "[t]he statute does not authorize the board of directors of a corporation to sell all or substantially all of the corporate assets whenever, in the opinion of the directors, the corporation is not a going and prosperous concern, or is in a failing condition. If a corporation is no longer a going concern the statute provides several methods whereby the corporation may wind up its affairs, dispose of its assets, and cease to exist. None of these methods authorizes a board of directors to wind up corporate affairs and dispose of the assets without action by the stockholders, or by a court." *Michigan Wolverine Student Coop.*, 22 N.W.2d at 888. Yet this is *dicta* because the Supreme Court of Michigan ultimately assumed, *arguendo*, there was room in the statute for such an exception, but found that the corporation was solvent, and therefore, that the common law exception did not apply (even assuming it existed and survived the enactment of Michigan's § 271 analogue). *See also* 6A Fletcher Cyc. Corp. § 2949.21 (2021) (observing that "[a] question may arise concerning what bearing these statutory provisions have on the common-law rules regarding a corporation in financial distress or in a failing condition. Some of these statutory requirements have been held to apply even though a corporation is insolvent. On the other hand, in some jurisdictions, expressly or by implication, the requirements of such statutes have been held not to apply to insolvent corporations." (footnotes omitted)).

[172] *See Balma v. Tidewater Oil Co.*, 214 A.2d 560, 562 (Del. 1965) (stating that "[w]ords in a statute must be given ordinary meaning[,]" and that "[c]ourts have discretion to construe statutes only when they are obscure or doubtful in their meaning. Where its language is clear and unambiguous, a statute must be held to mean that which it plainly states, and no room is [left] for construction.").

of the statute should be conclusive of the General Assembly's intent.[173]   In this sense, a

"board only" insolvency exception is inconsistent with a statutory default majority vote

rule.[174]  Thus, we conclude that Section 271 was intended to occupy the field and that no

such insolvency exception survives, assuming *arguendo*, that it existed in the first place.[175]

As a matter of policy, unearthing a "board only" insolvency exception cited only

decades ago, and never by any Delaware court, would foster uncertainty and potential

inconsistency in a context where predictability is crucial for corporations that have availed

themselves of Delaware law.   "Our General Assembly has [] recognized the need to

maintain balance, efficiency, fairness, and predictability in protecting the legitimate

interests of all stakeholders, and to ensure that the laws do not impose unnecessary costs

on Delaware entities."[176]  Promoting stability in our DGCL is and remains of paramount

---

[173] *See Dewey Beach Enters., Inc. v. Bd. of Adjustment of Town of Dewey Beach*, 1 A.3d 305, 307 (Del. 2010) ("If [a statute] is unambiguous, no statutory construction is required, and the words in the statute are given their plain meaning."); *Grand Ventures, Inc.*, 632 A.2d at 68 (observing that, "[i]n the absence of any ambiguity, the language of the statute must be regarded as conclusive of the legislature's intent[,]" and in such a circumstance, "[t]he judicial role is then limited to an application of the literal meaning of the words"); *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del. 1985) (explaining that if a statute is unambiguous, "the Court's role is then limited to an application of the literal meaning of the words." (citing *Delaware Solid Waste Auth. V. News-Journal Co.*, 480 A.2d 628, 634 (Del. 1984))).

[174] *See also* Balotti & Finkelstein, *supra* note 162, § 10.7 ("As a practical matter, in many instances federal bankruptcy statutes and other statutes governing creditors' rights have displaced the common law exception by providing explicit methods for addressing proposed asset dispositions by failing businesses.").

[175] *See Gimbel v. Signal Cos., Inc.*, 316 A.2d 599, 606 (Del. Ch.), *aff'd*, 316 A.2d 619 (Del. 1974) ("If the sale is of assets quantitatively vital to the operation of the corporation and is out of the ordinary and substantially affects the existence and purpose of the corporation, then it is beyond the power of the Board of Directors.").

[176] *Salzberg*, 227 A.3d at 136.

importance.[177]  Stability and predictability are not advanced by reading Section 271 to embody a common law exception that was never the basis of a single holding by any Delaware court nor by other courts, according to the parties, for decades.

Instead, we think, the focus should be on the statute's plain language.  As we said in *Salzberg*, the "most important consideration for a court in interpreting a statute is the words the General Assembly used in writing it."[178]  As to Section 271 in particular, this notion was reinforced by the Court of Chancery when then-Vice Chancellor Strine wrote:

---

[177] In aid of this goal, for example, Article IX of the Delaware Constitution requires a two-thirds supermajority vote of both chambers of our General Assembly to amend the DGCL.  Del. Const. art. IX, § 1 ("No general incorporation law, nor any special act of incorporation, shall be enacted without the concurrence of two-thirds of all the members elected to each House of the General Assembly.").

[178] *Salzberg*, 227 A.3d at 113 (quotation marks omitted).  As we note above, we need not reach the question of whether a private foreclosure transaction, such as the one here, falls within the plain language of Section 271, and specifically, whether it would qualify as a "sale, lease or exchange" within the meaning of Section 271.  The Vice Chancellor, relying on dictionary definitions, provided the following observations:

> Black's Law Dictionary contains an extensive section on the term "sale."  The hallmarks of the various definitions include (i) the status of the parties as "buyer" and "seller," (ii) the exchange of money or other property in return for goods and services, and (iii) a transfer or title.  *See Sale*, Black's Law Dictionary (11th ed. 2019).  Black's Law Dictionary distinguishes a "sale" from a "foreclosure sale," defining "foreclosure sale" to mean "[t]he sale of mortgaged property, authorized by a court decree or a power-of-sale clause, to satisfy the debt."  In a separate entry, Black's Law Dictionary defines the term "foreclosure" as "[a] legal proceeding to terminate a mortgagor's interest in property, instituted by the lender (the mortgagee) either to gain title or to force a sale in order to satisfy the unpaid debt secured by the property."

> Black's Law Dictionary defines "exchange" to mean "[t]he act of transferring interests, each in consideration for the other," and defines the related term "bargained-for-exchange" to mean "[a] benefit or detriment that the parties to a contract agree to as the price of performance."  As with the definition of a "sale," the hallmarks of these definitions include a voluntary transfer of interests between similarly situated parties.

> [O]ur courts arguably have not always viewed cases involving the interpretation of § 271 through a lens focused by the statute's plain words. Nonetheless, it remains a fundamental principle of Delaware law that the courts of this state should apply a statute in accordance with its plain meaning, as the words that our legislature has used to express its will are the best evidence of its intent.  To analyze whether the vote requirement set forth in § 271 applies to a particular asset sale without anchoring that analysis to the statute's own words involves an unavoidable risk that normative preferences of the judiciary will replace those of the General Assembly.[179]

Accordingly, we clarify that there presently is no insolvency exception embedded in Section 271.

Because we have concluded that the Charter provision and Section 271 are materially different, we have not looked to Section 271 to interpret the Charter.  And the parties have identified no public policy that would detract from our analysis of the Charter.[180]  Rather, enforcing the unambiguous Charter provision is consistent with our

---

*Stream TV*, 250 A.3d at 1040 (alterations in original) (emphasis omitted).  *See also In re E.T. Russell Co.*, 291 F. at 816 ("I am unable to extend the meaning of the word 'sale,' so that it will include an assignment for the benefit of creditors.").

[179] *Hollinger Inc.*, 858 A.2d at 376–77 (footnotes omitted).

[180] As we noted earlier, the Court of Chancery identified a single public policy concern, namely, "interpreting Section 271 as applying to a creditor's efforts to levy on its security would undercut the value of the security interest."  *Stream TV*, 250 A.3d at 1042.  The court cited to then Vice-Chancellor Strine's transcript ruling in *Gunnerman v. Talisman Capital Talon Fund, Ltd.* where he observed that the DGCL distinguishes between financing transactions, mortgage transaction, collateral transactions, and sales of assets.  *Id.* at 1043 (citing *Gunnerman v. Talisman Cap. Talon Fund, Ltd.*, C.A. No. 1894-VCS (Del. Ch. July 12, 2006) (TRANSCRIPT)).  Following this reasoning, the court, in its P.I. Opinion, reasoned that interpreting Section 271 to require a stockholder vote before an insolvent or failing corporation can transfer its assets to secured creditors would conflict with Section 272 of the DGCL.  *Id.* at 1021.  We note that Section 271 presents no barrier to the parties' foreclosure proceedings in Superior Court (which are presently stayed pending this appeal), and no party has argued that judicial foreclosure proceedings implicate Section 271.  Moreover, Section 272 is a default rule that corporations can alter in their charters, which Stream has done here.

policy of seeking to promote stability and predictability in our corporate laws,[181] and with

recognition that Delaware is a contractarian state.[182]

## IV.  CONCLUSION

For the reasons stated herein, we **VACATE** the injunction, **REVERSE** the

declaratory judgment, and **REMAND** for further proceedings consistent with this opinion.

---

[181] *See Salzberg*, 227 A.3d at 137 ("The policies underlying the DGCL include certainty and predictability, uniformity, and prompt judicial resolution to corporate disputes.").

[182] *See NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 180 n.14 (2015) ("Delaware upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreements of sophisticated parties." (quoting *NACCO Indus., Inc. v. Applican Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009))); *see also A & J Cap., Inc. v. L. Off. Of Krug*, 2018 WL 3471562, at *6 (Del. Ch. July 18, 2018) ("Delaware's pro-contractarian policy in the alternative entity space is alive and well.").

**STATE OF DELAWARE**          }
                              } ss.
**KENT COUNTY**                }

I, Lisa A. Dolph, Clerk of the Supreme Court of the State of Delaware, do hereby

certify that the foregoing is a true and correct copy of the Opinion decided June 15,

2022, in *Stream TV Networks, Inc. v. SeeCubic, Inc.,* No. 360, 2021, as it remains on

file and of record in said Court.

**IN TESTIMONY WHEREOF,**

I have hereunto set my hand and affixed the seal of
said Court at Dover this 1st day of July A.D. 2022.

/s/ *Lisa A. Dolph*
Clerk of Supreme Court

# EXHIBIT C
# Chancery Court Transcript – July 20, 2022

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

----------------------------------------

STREAM TV NETWORKS,            :
                Plaintiff,     :
        v                      : C. A. No.
                               : 2020-0766-JTL
SEECUBIC, INC.,                :
                               :
                Defendant.     :

----------------------------------------

SEECUBIC, INC.,                :
                Counterclaim and    :
                Third-Party Plaintiff, :
        v                      :
                               :
STREAM TV NETWORKS, INC.,      :
                               :
                Counterclaim Defendant,:
                               :
        and                    :
                               :
MATHU RAJAN and RAJA RAJAN,    :
                               :
                Third-Party Defendants.:

----------------------------------------

                        - - -
                Chancery Court Chambers
                Leonard L. Williams Justice Center
                500 North King Street
                Wilmington, Delaware
                Wednesday, July 20, 2022
                12:45 p.m. ampm
                        - - -
BEFORE: HON. J. TRAVIS LASTER, Vice Chancellor
                        - - -

ORAL ARGUMENT and RULINGS OF THE COURT ON SEECUBIC'S
  POST-REMAND MOTION TO PRESERVE THE STATUS QUO AND
        MOTION TO EXPEDITE  -HELD VIA ZOOM

----------------------------------------------------------

2

APPEARANCES:

    JENNESS E. PARKER, ESQ.
    BONNIE W. DAVID, ESQ.
    TREVOR T. NIELSEN, ESQ.
    LILIANNA ANH P. TOWNSEND, ESQ.
    Skadden, Arps, Slate, Meagher & Flom LLP
        -and-
    MARLEY ANN BRUMME, ESQ.
    EBEN P. COLBY, ESQ.
    of the Massachusetts Bar
    Skadden, Arps, Slate, Meagher & Flom LLP
      for Defendant/Counterclaim Plaintiff SeeCubic


    ANDREW DUPRE, ESQ.
    BRIAN R. LEMON, ESQ.
    McCarter & English, LLP
      for Third-Party Defendants




                  - - -

3

1                    THE COURT:  All right.  Welcome,

2       everyone.  Thank you for being here.

3                    I apologize that we're short of time

4       today.  I'm in the midst of a trial, and so I'm doing

5       this at the lunch hour.  So I'm going to have to keep

6       a fairly tight rein on proceedings today.

7                    With that in mind, Ms. Parker, why

8       don't you go ahead.  And then, Mr. Dupre, you can

9       respond.

10                   ATTORNEY PARKER:  Yes, Your Honor.

11      Thank you.  And thank you so much to Your Honor and

12      the Court for hearing us during your break today.

13                   Jenness Parker on behalf of SeeCubic,

14      Your Honor.  And with me today, also from Skadden, is

15      Eben Colby, Bonnie David, Marley Brumme, Lilianna

16      Townsend, and Trevor Nielsen.  Also on the line, Your

17      Honor, is Steve Caponi from K&L Gates, counsel for

18      Hawk.

19                   Happy to go ahead, unless Mr. Dupre

20      wants introductions.

21                   THE COURT:  Why don't you go ahead,

22      and I'll let Mr. Dupree do his introductions when we

23      get to them.  I know it's a little bit of a deviation,

24      but let's just move ahead.

4

1              ATTORNEY PARKER:  Okay.

2              Your Honor, I wanted to say at the

3   outset, we are not ignoring, disrespecting, or

4   disputing the Supreme Court's opinion.  The way we

5   understand it is the omnibus agreement is valid but

6   there needed to be a Class B vote.

7              Stream says, you know, this is an easy

8   one.  Stream owns the assets.  But I do think there is

9   a little bit of limbo there because if the omnibus

10  agreement is valid, Section 1.4 requires a Class B

11  vote, requires Stream and its officers and directors

12  to use best efforts to effect the transfers.

13             What I understand from counsel for

14  Stream -- we spoke this weekend about a few things,

15  trying to potentially get on the same page-- is there

16  is not going to be a Class B vote.  So I just wanted

17  to note that at the outset.

18             Aside from that, it's a highly unique

19  situation.  We have scoured the case law and couldn't

20  find anything, you know, practical or otherwise, to

21  kind of help us out here.  And the issue, really, is,

22  in this situation, where SeeCubic has had the assets

23  for 18 months, they've been enhanced, there have been

24  changes to the business, including, you know, repairs

5

1    to relationships, to employees, the tech has changed,

2    you know, things like that; but also, pending is a

3    foreclosure action.

4              So the question is, does SeeCubic

5    preserve the assets pending that foreclosure action,

6    where Stream is insolvent and where the assets, if

7    they go back to Stream, should be managed for the

8    creditors, under *Gheewala*.

9              As we understand it, the sole person

10   on the board, and the person that would manage the

11   assets, is Mathu, who has acted disloyally to Stream,

12   including in connection with the license to GFT, which

13   was in the second half of 2020, and after that.  And

14   this was a finding in the bankruptcy action, that the

15   plan was for a new entity, VTI, for Mathu and others

16   to cherry-pick the assets for a track of their value.

17             So another unique factor, which I

18   just -- which I alluded to at the beginning, is the

19   assets have changed.  I think it's easy to say the

20   assets have changed, how do we give them back, Your

21   Honor.  And I understand, you know, and took very

22   seriously your letter.

23             So we, in thinking about this -- and

24   including, you know, talking with Mr. Dupre -- it's

CHANCERY COURT REPORTERS

6

1   really -- I wanted to give you some examples, just two

2   examples.  And I know I'm running short on time.

3              So demo units, Your Honor.  These are

4   physical assets that were put together and that use

5   technology that incorporates changes that were made

6   since December 8, 2020.  So I don't think there's any

7   way, from -- my understanding is there's no way to,

8   like, take those apart and return how it was then.

9              Patents and IP rights.  As of December

10  8, the patent portfolio for Ultra D was at risk of

11  being lost because Stream had failed to pay required

12  maintenance fees.  So SeeCubic brought those accounts

13  current before they were lapsed.  So one of the issues

14  is who owns the patents.  Does SeeCubic own them, or

15  are they a Stream asset, when they were in jeopardy of

16  being lost.

17             Stream also made filings for

18  continuations on certain patents that incorporate the

19  developments they've made to the technology.  So like

20  with the demo units, how do you rip that apart?

21             And then, finally, they've filed new

22  patents in new jurisdictions that never existed when

23  Stream was in control.

24             That's just another -- I just wanted

7

1   to give Your Honor some examples, instead of

2   generally, hey, the assets have changed, let us keep

3   them.

4                  THE COURT:  No, no, that's very

5   helpful.

6                  When these patent applications are

7   being filed, whose name were they filed in?

8                  ATTORNEY PARKER:  My understanding is

9   SeeCubic.  Yes?  Yes.

10                 THE COURT:  Okay.

11                 ATTORNEY PARKER:  My team will correct

12  me if I'm wrong, but that's my understanding.  I feel

13  like I'm back in December 2020.

14                 So those are some of the reasons, Your

15  Honor, just factually, to set the stage for Your

16  Honor.  Because, again, I took your letter really

17  seriously.  And I, of course, as a Holland clerk, take

18  the Supreme Court very, very seriously.  I even told

19  Andy this weekend, look, I get it, you know.

20                 But this is just really, really

21  unique.  And Mr. Dupre can speak for himself, but he

22  said, look, I haven't found anything in this context

23  either.

24                 And I remember, in December, you said

1  to me, Your Honor, is there anything on this certain

2  issue.  And so we scoured before coming in to you, as

3  we always do.

4              On the legal factors, quickly, not to

5  regurgitate my briefs, especially with the time.

6              Irreparable harm.  I think, just like

7  in September 2020, which I know Mr. Dupre wasn't part

8  of the case then, but well familiar.  I think

9  everybody agrees that harm to the assets is

10  irreparable harm.

11             On likelihood of success on the

12  merits.  The foreclosure action, in our view, is

13  likely to succeed at this point.  Stream didn't pay

14  its debts due, to the tune of 300 million.  Hawk, who

15  is an investor in SeeCubic, whose counsel is here

16  today, is extremely concerned about the collateral

17  going back to the Rajans and being harmed or taken.

18             And a breach of fiduciary duty claim

19  is also likely to succeed.  Stream says, but that's

20  unripe and it's speculative, but it's not.  We have

21  the evidence that the assets were licensed to Glasses

22  Free Technology in the latter half of 2020 with a 5

23  percent royalty going to Stream.

24             Mathu had an interest in Glasses Free

1  and also has an interest in VTI, which was the entity

2  during the bankruptcy proceeding where, we found

3  out -- and Mathu admitted to this -- look, the plan is

4  to cherry-pick the assets for a fraction of their

5  value, put them somewhere else.  And then, in March of

6  2020, yet another entity was formed, VSI.

7              So finally, Your Honor, on unjust

8  enrichment, Stream argues, well, look, this isn't

9  ripe.  But Stream is seeking the return of the assets,

10  which we have argued are greatly enhanced.  So to

11  return it would just be an unjust windfall to Stream

12  and the Rajans.

13              A little different, but also in the

14  unjust enrichment bucket, is Stream's argument we

15  can't get equitable relief for this in the form of a

16  status quo because money damages suffices.  You said

17  you put 35 million in; you can get 35 million back if

18  you're right.

19              But that's not sufficient, for some of

20  the reasons I discussed earlier.  Unscrambling eggs.

21  How do you quantify -- and it's difficult; I suppose

22  not impossible, but difficult to quantify -- we

23  brought people back.  You'll recall the employees

24  weren't paid.  They were furloughed or they had left.

10

 1    We brought some of the really critical employees back

 2    into the fold to continue to develop the technology.

 3    Enhanced reputation, enhanced relationships.

 4                    So that's unjust enrichment.  Again,

 5    relying on my briefs for anything I'm not talking

 6    about today, Your Honor.

 7                    And for balance of the equities,

 8    Stream and the Rajans say, look, we're -- we're going

 9    to be hurt in this situation if the assets stay at

10    SeeCubic and are preserved there.  But they're not

11    going to be hurt.  The assets are going to be

12    preserved, including for the creditors.

13                    I probably cited *Gheewala* a lot today,

14    and I know I did to the Supreme Court.  But the

15    Supreme Court did hold, in *Gheewala*, when the company

16    is insolvent, it's managed for the creditors.

17                    And I get it, that's a derivative

18    claim, which is what I pled.  But it is managed for

19    the creditors.  We have one person there who is

20    managing the assets, one person on the board, who we

21    know has essentially tried to take the assets from the

22    creditors.  So that's balance of the equities, Your

23    Honor.

24                    Alternatively, if the Court disagrees

CHANCERY COURT REPORTERS

1   with our motion -- and we have noted this in our reply

2   brief, and I did pitch this, again, in the alternative

3   to Mr. Dupre and haven't heard back from him.  If you

4   disagree with our motion, the Court should consider of

5   a neutral third-party receiver.

6               So unless Your Honor has any

7   questions, happy to cede the floor to Mr. Dupre.

8               THE COURT:  Before you do, what is the

9   status of the foreclosure action, in terms of schedule

10  and moving forward?

11              ATTORNEY PARKER:  Sure, Your Honor.

12  So SeeCubic is in the process of issuing direction

13  to -- there was assignment.  SeeCubic is in the

14  process of issuing direction to SLS, who is the party

15  in that case, to get the action unstayed and moving.

16  My understanding is that that letter may go to the

17  Court today.  But I'm not -- we've been discussing

18  with counsel in that case.

19              THE COURT:  No.  That's helpful.  But

20  the current status -- and I haven't looked at the

21  docket over there.  If I were to look at the docket

22  over there, I would see, I'm inferring that it's

23  stayed?

24              ATTORNEY PARKER:  Yes.

12

1                    THE COURT:  And how far had the case

2      gotten before it was stayed?

3                    ATTORNEY PARKER:  My understanding is

4      that there was a trial set that was to take place in

5      ten months from -- I'm not sure what the date is.  Oh,

6      from the filing.  And then Stream filed in

7      September 2020 with Your Honor, with the Chancery

8      Court, and we were off to the races then here.

9                    THE COURT:  All right.  Thank you.

10                   Mr. Dupre.

11                   ATTORNEY DUPRE:  Thank you, Your

12     Honor.  Thank you for hearing us on lunch.

13                   I'll talk even faster than I usually

14     do.  And I'm not a Holland clerk, but I was trained by

15     Mike Kelly, who was a Holland clerk, so I have

16     derivative Holland clerk status for this purpose, Your

17     Honor.

18                   Your Honor, Stream is a little bit

19     frustrated in this case in the sense of what does it

20     have to do to get its assets back beyond invalidating

21     the contract that transferred its assets before the

22     Delaware Supreme Court *en banc*.

23                   There's not any good-faith dispute, at

24     this point, nor a new claim in the case, that says

1   SeeCubic owns the assets.  And I don't think there can

2   be.  It is now undisputed that Stream TV owns the

3   assets.

4              This business about the contract is

5   valid but it needs a shareholder vote is incorrect.

6   The majority shareholder of Stream TV, which are the

7   Rajans, voted this down in documents in this case on

8   May 8, 2020.  Your Honor already ruled upon those.

9   They were written consents, but they were shareholder

10  consents.  You ruled upon them in the context of that

11  *de facto* director issue that wasn't appealed.

12             So that's all water over the dam.

13  Discovery closed on it a year ago.  It's not like

14  there's like an, oh, well, maybe the Rajans are going

15  to vote to destroy Stream and strip the assets and

16  wipe themselves out while subsidiary shareholders walk

17  away with the assets.  That's not going to happen.

18  It's a strawman argument.

19             This argument that there's $300

20  million in debt is a false argument.  Where is that

21  figure coming from?  We attached the complaint in the

22  foreclosure action to our opposition here.  It's 10

23  million bucks.  That's what's at issue.  It's $10

24  million.  SeeCubic has said, well, we already raised

14

1   35 million off the assets.

2            The statutory foreclosure regime, if

3   handled properly, will do setoffs and redemption

4   claims and creditor priority among all the creditors

5   and constituents of Stream, not just SLS.  The point

6   here, and the reason this is so vigorously contested,

7   is the assets are worth a lot more than 10 million.

8   If -- if SLS supposedly assigning its claims to

9   SeeCubic won every single claim, the new claims that

10  you allowed into the case here, and also won every

11  single claim in the foreclosure case, they still won't

12  get the assets.  That's why there was an omnibus

13  agreement.

14            They needed that transaction to get

15  the assets away from us.  Otherwise, what they have a

16  right to is 10 million bucks.  It's just a monetary

17  damages claim.  It's subject to all of Delaware's

18  statutory foreclosure protections and remedies, and we

19  should be allowed to litigate it over there.

20            Just turning to the merits of this

21  argument, our position is that the standard of review

22  is being miscited.  This case is two years old.  We're

23  way past the benefit of a colorable claim standard.

24  It's got to be the summary judgment standard.  What's

1  really being asked here is the final remedy.  They

2  want a permanent injunction to keep the assets while

3  they go litigate a foreclosure claim for ten months.

4  That's the ask.

5                The likelihood of success element,

6  they're not going to win these claims.  But let's just

7  assume *arguendo* that they win everything.  They win

8  the two new claims that are in the case — unjust

9  enrichment and a fiduciary duty of loyalty claim

10 against Mathu.  They don't get the assets.

11               Even if they have a 100 percent

12 likelihood of success -- which they do not -- they

13 still don't get the remedy that they're asking for

14 here.  That alone should be dispositive of this issue.

15 We need to follow the Supreme Court and the mandate

16 rule, put the assets back where they belong, and they

17 can litigate foreclosure as much as they like before

18 Judge Johnston.  But our position is they're going to

19 lose that foreclosure action too.

20               The irreparable harm that's being

21 advanced by SeeCubic has basically been stipulated

22 throughout the case, Your Honor.  The parties agree

23 that interference with lawful control of the assets is

24 irreparable harm.  The assets are unique technology.

16

1           So the real question before Your Honor

2    is who lawfully controls the assets.  And I think

3    Ms. Parker was quite candid, and I'll be equally

4    candid.  I don't think there's a single case anywhere

5    in the country, in any jurisdiction, including

6    Delaware, that says, well, we do an injunction in aid

7    of foreclosure that transfers the assets from the

8    debtor to the creditor.  So intra-foreclosure, during

9    a foreclosure proceeding that's contested, the

10   creditor gets to keep the benefit of the assets.

11           There is no precedent for that

12   whatsoever.  The farthest that Delaware law ever goes

13   is your case in *Destra* and Vice Chancellor Lamb's

14   case, my old judge who I clerked for, in *Mitsubishi*

15   *Power*.  Those cases are prejudgment attachments.

16   They're the most aggressive examples of prejudgment

17   attachments in Delaware law on an insolvent entity.

18   And they leave the assets in place, and they just say

19   the debtor can't transfer them.

20           That's the maximalist relief in

21   Delaware law that's possibly available; not the

22   creditor takes the assets and does whatever it wants

23   with them and destroys the debtor so it can't defend

24   itself during a foreclosure proceeding.  It has no

CHANCERY COURT REPORTERS

17

1   ability to conduct ordinary business, it has no

2   ability to raise money.

3              That remedy doesn't exist in Delaware

4   law.  There's no case cited in the papers whatsoever

5   for that, and they went far afield, to Utah and the

6   District of California.  There is no law, seemingly,

7   in the United States, let alone Delaware, that is an

8   injunction in aid of foreclosure.

9              The balance of the harms.  We agree

10  that the harm is irreparable.  Interference with the

11  legal right to control the assets is irreparable harm.

12  So SeeCubic should not have had these assets.  They

13  have gotten a windfall of, basically, raising 35

14  million against assets that they didn't own and never

15  should have owned.  That's their harm, they might lose

16  the 35 million that they had as a windfall.

17             Our harm is we can't control our

18  assets.  We never have.  We always owned them.  We

19  always had the legal right to control them during the

20  foreclosure.  We had the right to control the assets

21  to try to save ourselves during the foreclosure.  And

22  it was erroneously taken away from us.  We were taken

23  out of the foreclosure regime, the assets moved on to

24  the creditor.

18

1              In that balance of harms, Stream is

2    much more harmed than SeeCubic in this context.   The

3    idea that SeeCubic went and patented Stream's

4    technology in Korea, say, that's irreparable harm to

5    Stream.   Having somebody else patent your technology

6    in their name is more irreparable harm to Stream.

7              The stuff that's being advanced as an

8    idea that it's unfair to SeeCubic to have to follow

9    the implication of the Supreme Court opinion, as Your

10   Honor ruled, just heaps more irreparable harm upon

11   Stream as we go along.   It's the interference with its

12   lawful ownership and control of the assets.

13              This receivership issue, I have to

14   object, Your Honor.   Ms. Parker called me about it

15   yesterday -- or, excuse me, on Monday.   My opposition

16   was already in.   It's not in the complaint.   It's not

17   a Section 291 claim.   It's not a Rule 149 *pendente*

18   *lite* claim.   It's just alternative argument sandbagged

19   into the reply brief.   It's not appropriate.

20              The case law that's being cited in

21   support of it -- and I don't want to make a huge deal

22   out of it because it's only an alternative argument in

23   the last paragraph of a reply.   Those are all Section

24   291 claims.   Some of them are post-trial opinions,

1  where an entire receivership claim was fully

2  litigated.

3            That alternative relief is not fairly

4  at issue, and it's not fairly presented here.  If they

5  want to move to have you amend the complaint again and

6  put in a 291 complaint, or claim, let them try, and I

7  can respond.  But it's not at issue on the procedural

8  posture that we're in.  It's not fairly presented.

9            So I will cease talking and let Your

10  Honor eat, unless you have any questions for me.

11            THE COURT:  I've got a couple

12  questions for you.

13            I don't have them precisely in front

14  of me, but I did make factual findings about Stream's

15  insolvency and the level of debt that it was facing.

16  And I feel like it was in excess of 10 million.

17            What, if anything, do I do with that?

18            ATTORNEY DUPRE:  So the -- what is

19  being asked from Your Honor by SeeCubic is keep the

20  assets with SeeCubic to let the foreclosure proceeding

21  happen.  And I attached the foreclosure papers to the

22  opposition, and the debt is stated.

23            So does Stream have ancillary debt to

24  secondary creditors that's not a part of the

20

1   foreclosure proceeding that Your Honor previously

2   ruled on in some context?  And I have to tell you that

3   it was 2020, so it's a bit stale.  Yes, it does have

4   ancillary, secondary debt.  But that's not the ask

5   that's being presented to you.  The ask that's being

6   presented to you is there's a stayed foreclosure

7   proceeding over there.  We're going to act with

8   alacrity.  Give us the assets for ten months while we

9   go through this foreclosure process.  And if you just

10  look at the pleadings in that complaint, it's 10

11  million bucks.

12                  THE COURT:  The one aspect of a

13  receiver that was attractive to me is a receiver who

14  would help transition the assets back to you.  Because

15  I suspect that you and Ms. Parker are going to have

16  trouble agreeing on the mechanics of all this.

17                  Why isn't that something that I should

18  be thinking seriously about, in terms of putting

19  somebody in place to help transition this?

20                  ATTORNEY DUPRE:  So, Your Honor

21  certainly does have the power to have a special master

22  appointed or something like that.  It's within your

23  discretion.

24                  The objection is receivership

21

1    specifically *qua* either 291 or -- I think it's Rule

2    149, Court of Chancery Rule 149.  Both of those are

3    inappropriate because Stream is fine and can run its

4    own affairs.  We don't need a sort of trustee in

5    bankruptcy type receiver.

6              If it was, hey, we need a special

7    master to untangle the assets to make sure that you're

8    not accidentally getting something of SeeCubic's --

9    and I must be frank, Your Honor.  I don't know what

10   that could be.  They're only building on our

11   technology, which they never should have had.

12             So it's possible that we could go

13   through this big, long, unjust enrichment rigmarole,

14   even though I think it's a legal claim, and come up

15   with some number of benefit that we have to compensate

16   them for.  But that's just a monetary damages claim.

17             I think, if Your Honor were inclined

18   to do something like that, it would be a Master rather

19   than a receiver.  Because we're allowed to run the

20   assets in the interim.

21             THE COURT:  What should I do, or what

22   should I think about the finding in the bankruptcy

23   about cherry-picking the assets?

24             ATTORNEY DUPRE:  Quite candidly -- we

1    can be just very direct, Your Honor.  The bankruptcy

2    court was following you.  The Rajans were flailing

3    around trying to figure out what to do with the

4    improvident injunction.  They thought they were

5    entitled or Stream was entitled to the protections of

6    Chapter 11 under the federal bankruptcy rules in that

7    context.

8               The bulk of that bankruptcy opinion,

9    if you read Judge Owens, says this has all already

10   been determined by the very distinguished Court of

11   Chancery, which was correct, in fairness to Judge

12   Owens.  And contextually, you could see the behavior

13   as trying to do an end-run around the improvident

14   injunction to save yourself.

15              THE COURT:  Let me try to cut to the

16   chase on this.  I have read it.  I do agree with you

17   that a lot of what he was concerned was about

18   bypassing the injunction.

19              I'm asking a different question, which

20   is, is it reasonable to infer that your fellows will

21   do things to move assets out of the entity for less

22   than fair value, given that record in the bankruptcy

23   proceeding?  And should I take that into account in

24   deciding what, if any, interim relief to award?

23

1          ATTORNEY DUPRE:  The factual answer is

2    no.  We've been moving heaven and earth to try to get

3    these assets back for the benefit of Stream TV.  We've

4    also gone on the record and said they're worth way

5    more than the debt.

6          We have the obligation to pay the

7    debt, subject to setoff defenses that we'll litigate

8    in the foreclosure action.  But the whole point of

9    everything I've done since I came before you, Your

10   Honor, is to try to get the assets for Stream.

11          If you were concerned about that, I

12   don't think it's fairly presented.  But if you were

13   concerned about it in an equities context, the case

14   law examples are you, in *Destra*, and Vice Chancellor

15   Lamb in *Mitsubishi Power*.  It's not the creditor keeps

16   the assets.  It's the assets go back and you say don't

17   transfer them anywhere.

18          THE COURT:  What do you think about

19   that type of remedy?  And it would have to be -- you

20   know, let's take it down a level, because my prior,

21   coming in, is that you-all should have the ability to

22   manage the assets, and if you can raise money to pay

23   off the debt, you ought to be able to pay off the

24   debt.

1              But why wouldn't I, based on that

2    record in the bankruptcy -- which, again, I find

3    personally a little troubling.  And I know that your

4    fellows are frustrated with me.  Given some of the

5    things that I saw in the record and behavior in this

6    case, I don't have a lot of confidence in them.

7              Why wouldn't I say to SeeCubic, you've

8    got to transfer all the assets back.  That's what the

9    Supreme Court says.  But once you give them back,

10   we're going to have to have some notice requirement

11   where, if the Stream folks are going to do something

12   major, that they would have to give you -- insert

13   number of days of notice, 10, 20, something like

14   that -- so that you can potentially roll in and make

15   an application to me?

16             ATTORNEY DUPRE:  I'd sign that order

17   today, Your Honor.  We don't -- we don't mind giving

18   you notice of material transactions or something like

19   that.  The point of it isn't to, like, take the assets

20   and hide them.  That's, like, a strawman.  The point

21   is to take the assets and use them for our own

22   commercial benefit.

23             So that's not the injunction you're

24   being asked for.  But if you were inclined to write

1  your own, it wouldn't really hurt us to give you a

2  notice requirement.  We -- I wouldn't fight it.

3                  THE COURT:  No, look, I know it's not

4  the specific relief that Ms. Parker is requesting, and

5  I know that there are decisions that seem to say that

6  one can only do what the party asks for and nothing

7  else.

8                  I continue to harbor the potentially

9  misguided view that part of being a court of equity is

10  that I'm supposed to exercise some type of discretion

11  and potentially come up with case-specific outcomes

12  that I think are in the best interests of the

13  litigants and the broader situation, even if it's

14  something that the litigants, given their

15  understandable interests, can't propose or haven't

16  proposed themselves.

17                  What I'm hearing you say, though, is

18  you could live with a result where things get

19  transferred back to you but you're under some type of

20  notice obligation?

21                  ATTORNEY DUPRE:  That's correct, Your

22  Honor.  I'd gladly consent to that.

23                  There was stuff in the SeeCubic ask

24  that's to the effect of Stream can't raise money with

26

1   the assets and all that.

2                   We need to be able to raise money and

3   sign commercial contracts and otherwise behave

4   normally.  That's what we need to do.

5                   THE COURT:  All right.

6                   I'm going to go ahead and give you an

7   answer now, in the interest of time.  I very much

8   appreciate counsel's presentations.  It's always good

9   to see you-all, even under the current circumstances.

10                   We are here on remand after the

11   Delaware Supreme Court's reversal of a decision in

12   which I declared that the omnibus agreement was valid.

13   My understanding of the state of play is not that the

14   omnibus agreement is valid pending some type of

15   stockholder vote.  I think the omnibus agreement, at

16   this point, is not valid.

17                   I do agree that it required

18   stockholder approval to become valid, as held by the

19   Delaware Supreme Court.  It didn't receive stockholder

20   approval.  And so at this point, I don't view the

21   omnibus agreement as in play anymore.  I think it just

22   hasn't gone into effect.

23                   That's my starting point.  What flows

24   from that is that I do think title to the assets

1  should be at Stream.  I think, technically, title to

2  the assets never left Stream, and I think, at this

3  point, equitable title to the assets has to be viewed

4  as at Stream.

5              In terms of the TRO situation, that

6  puts us in a fundamentally different position than we

7  were when we were last together over 18 months ago.

8  At that point, I thought and understood that there was

9  a litigable dispute over who actually had the right to

10  control the assets, with Stream on one side saying,

11  "This agreement is invalid, we have control of them,"

12  and SeeCubic on the other side saying, "No, the

13  omnibus agreement gives us equitable title to the

14  assets."

15              And my view was that the irreparable

16  harm in that situation flowed from the fact that you

17  had two people, each one of whom asserted they had the

18  right to own and determine the fate of these assets.

19  I thought, therefore, that a status quo order was

20  necessary to make sure that neither side did anything

21  while that issue was contested.

22              We got to a point where I held that

23  the assets were validly SeeCubic's under the omnibus

24  agreement.  That is the decision that has been

1    reversed.  And so, in my view, we're in a world where

2    title right now, both equitable and legal, to the

3    extent that one can wind the clock back, is in the

4    hands of Stream.

5                    Then the question becomes what am I

6    being asked to do?  And technically what I'm being

7    asked to do today is to allow SeeCubic to keep the

8    assets pending the result of a foreclosure proceeding.

9    I don't think I can do that.  That may well be the

10   status quo today, in that SeeCubic has the assets, but

11   the reality is, based on the Delaware Supreme Court

12   decision, SeeCubic, right now, shouldn't have the

13   assets.

14                    Now, that doesn't mean that SeeCubic

15   has lost whatever other rights it has.  Whatever

16   creditor rights SeeCubic had or may have been assigned

17   independent of the omnibus agreement, those rights

18   still exist.  Those rights, as I understand it, are

19   being enforced in the foreclosure action in Superior

20   Court.  And those rights, again, as I understand it,

21   are of a magnitude where, at least in theory, Stream

22   could raise money to satisfy that debt and then go on

23   free of that claim.

24                    I don't know whether they can or not,

1 | but by virtue of being the proper owner of these

2 | assets, I think they have the right to try.  In other

3 | words they should get to, if they want to, seek to

4 | raise capital based on these assets and try to satisfy

5 | the debts that they owe.

6 |                    I don't think that there's any basis

7 | for any type of relief that would leave these assets

8 | in SeeCubic's hands.

9 |                    Then I get to the point of, well, what

10 | types of claims does SeeCubic actually have.  And I

11 | think SeeCubic has colorable claims -- I would even

12 | say fairly litigable claims -- for breach of duty and

13 | unjust enrichment.  The unjust enrichment claim seems

14 | particularly litigable because I've read the *Fleer*

15 | case.

16 |                    It seems to me there's a setting

17 | where, depending on how the facts come out, SeeCubic

18 | could have a sizable claim for increasing the value of

19 | the company.  I also understand that Stream doubtless

20 | will argue that what SeeCubic actually has done is

21 | harm the value of the company.  That's a factual

22 | dispute.  We've got to have some type of hearing on

23 | that.  I can't decide it today.

24 |                    Then the question becomes, in my mind,

30

1  if SeeCubic, as I believe it does, has viable claims

2  for money damages, is there a reason to put some type

3  of temporary restraining order or status quo order in

4  place to help protect SeeCubic's interests?  That

5  order indeed would be in the form of some type of

6  prejudgment attachment.

7              As you-all have accurately briefed,

8  those types of orders are not generally granted.  They

9  are rarely granted.  But the type of situation where

10 they are granted is when you have an entity that

11 appears to be insolvent, or near insolvent, and

12 there's some reason to believe that assets will be

13 secreted out or transferred out of the entity for less

14 than fair value in an effort to impair the creditors'

15 claim.

16             That, I think, is the gist of

17 *Mitsubishi* and *Destra*.  That, I think, is potentially

18 the case here.  In other words, I issued these

19 decisions that found that Stream was carrying a lot of

20 debt.  I think my number was, ballpark, 50-plus

21 million.  I don't remember what the trade creditors

22 added onto that, but it amounts to a lot of debt.  And

23 I certainly found that the entity was insolvent.

24             Perhaps it is true now that Stream is

1   no longer insolvent.  But at least on a pleading stage

2   basis, on a restraining order basis, I think there's a

3   colorable assertion that it's insolvent.

4              I also think there's reason to worry

5   about what the Rajans could potentially do.  And I

6   rely for that on the record in the bankruptcy action

7   and the statement about potentially cherry-picking

8   assets for less than fair value.  And I also rely on

9   my oversight of the case where, before Mr. Dupre got

10  involved, there were a lot of things going on that

11  caused me to be worried about how people were

12  behaving.

13             So where does this leave me?  In terms

14  of the actual request for a status quo order, I'm

15  denying it.  I don't think that good cause exists for

16  that type of status quo order.  I'm also not going to

17  issue any type of order that's going to prevent the

18  assets that SeeCubic currently has from being

19  transferred back to Stream.  In fact, I'm prepared to

20  issue relief that would facilitate that transfer.

21             I've already indicated that it strikes

22  me that that's a place where some form of special

23  master or receiver or monitor, or whatever you want to

24  call it, would be helpful.  It would be someone who

32

1   could help you-all work through the knotty problems

2   that we're going to have unwrapping literally a year's

3   worth of stuff that's happened.

4              I'm not going to facilitate relief

5   that would stop that from happening.  I would enter

6   relief that would facilitate that happening.

7              Then, once the assets get back into

8   Stream's hands, they need to be protected against

9   non-ordinary-course transfers, given the record that I

10  have.  The record I have is preliminary, and I'm the

11  first one to admit that it is stale, because it's from

12  anywhere from a year to 18 months ago.

13             But what I would do is I would issue

14  some type of temporary restraining order, and then I

15  would allow the parties to proceed, if they couldn't

16  reach agreement, with some type of injunction hearing,

17  where people could present evidence as to whether

18  there needed to be a more durable interim relief put

19  in place to protect the assets pending the outcome on

20  these creditors' claims.

21             I'd invite you-all to try to reach

22  some type of agreement on that.  My personal view is

23  that some type of generous notice requirement should

24  be enough.  I don't know what the right number is.  If

33

1  we were to err on the side of generosity, we'd

2  probably say 30 days.  Maybe you end up at 20.  But

3  something that would give SeeCubic an opportunity to

4  come in and seek some type of injunctive relief prior

5  to any non-ordinary course transfer.

6                    I'm not going to enter any orders that

7  prevent Stream from raising capital through stock

8  issuances or debt issuances, or things of that sort,

9  because I do think Stream has the ability to try to

10 raise money to pay off this debt.

11                    I recognize that there's going to be

12 some overlap there.  So let's envision that Stream

13 goes out and wants to raise debt, and part of what the

14 lender wants is a security interest in all the assets.

15 We might have to parse through some issues, and that's

16 where I can envision notice having to go out, some

17 type of application, and then a hearing to figure out

18 what, if anything, was going on.  I not only don't

19 have instant recall, but I don't have meaningful

20 recall of the SLS or Hawk credit agreements to know

21 what types of blocks, if any, they have on things of

22 that sort.  All of that would have to be parsed

23 through.

24                    For purposes of today, I'm denying the

1  application.  I think that what has to happen is that

2  we need to move to a world where Stream gets its

3  assets back, subject to SeeCubic's claims.  When we're

4  in that world, at least on a preliminary basis, I'm

5  going to be receptive to some type of application for

6  interim protective relief, whether it's at the notice

7  level -- which I think is probably easiest -- or

8  whether it's some non-ordinary-course transaction

9  restriction.

10            Once we get to that point, I think

11  what we have on SeeCubic's side are monetary claims

12  that need to be litigated and figured out.  I also

13  think you have the foreclosure action to figure out,

14  whatever is going to happen over there.

15            At that point, I don't see any need

16  for expedition.  I see a lot of headaches.  I think

17  it's going to be very hard to go back in time to

18  figure out what was done that shouldn't have been done

19  and whether it had positive value or whether it had

20  negative value.  This whole thing, I just find very

21  challenging in terms of how we're going to go about

22  doing it.

23            That's where we are.  The bottom-line

24  ruling today is that the request for relief is denied.

1   I want the parties to try to move forward with some

2   type of Rule 54(b) order that implements the Delaware

3   Supreme Court's decision.

4                    I think that order needs to result in

5   these assets being moved back to Stream.  If you-all

6   were able to agree on some type of person to help you

7   transition, I would happily enter that type of order.

8   It seems to me like a good idea.  And if someone wants

9   to apply for it and the other people want to resist

10  it, we can go that way too.  But at least for purposes

11  of today, I'm denying the application, and you'll have

12  to move forward on that basis.

13                   I apologize for not being able to take

14  any questions or discuss things with you further.

15  I've got a bunch of people waiting for me upstairs and

16  I need to go back and continue this trial.

17                   I hope you-all have a good rest of the

18  afternoon.  Thank you for your time.

19                   ATTORNEY PARKER:  Thank you, Your

20  Honor, for your time.

21                   ATTORNEY DUPRE:  Thank you, Your

22  Honor.

23           (Proceedings concluded at 1:29 p.m.)

24                         - - -

36

1                          CERTIFICATE

2

3               I, JULIANNE LaBADIA, Official Court

4    Reporter for the Court of Chancery of the State of

5    Delaware, Registered Diplomate Reporter, Certified

6    Realtime Reporter, and Delaware Notary Public, do

7    hereby certify the foregoing pages numbered 3 through

8    35, contain a true and correct transcription of the

9    proceedings as stenographically reported by me at the

10   hearing before the Vice Chancellor of the State of

11   Delaware, on the date therein indicated.

12               IN WITNESS WHEREOF, I have hereunto

13   set my hand at Wilmington this 21st day of July, 2022.

14

15

16

17                   /s/ Julianne LaBadia
                     ----------------------------
18                      Julianne LaBadia
                     Official Court Reporter
19                 Registered Diplomate Reporter
                   Certified Realtime Reporter
20                    Delaware Notary Public

21

22

23

24

CHANCERY COURT REPORTERS

# EXHIBIT D
# 54B Motion – July 26, 2022

EFiled:  Jul 26 2022 01:35PM EDT
Transaction ID 67860465
Case No. 2020-0766-JTL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STREAM TV NETWORKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0766 JTL |
| | ) | |
| SEECUBIC, INC., | ) | **CONFIDENTIAL** |
| | ) | **FILED UNDER SEAL** |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| SEECUBIC, INC., | ) | |
| | ) | |
| Counterclaim and | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STREAM TV NETWORKS, INC., | ) | |
| | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MATHU RAJAN and RAJA RAJAN, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

**PLAINTIFF/COUNTERCLAIM DEFENDANT AND THIRD PARTY
DEFENDANTS' JOINT MOTION FOR RENEWED ENTRY OF
PARTIAL FINAL JUDGMENT UNDER RULE 54(b)**

**YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING FROM THE
COURT OF CHANCERY OF THE STATE OF DELAWARE**

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS PROHIBITED EXCEPT AS
AUTHORIZED BY COURT ORDER.

If you are not authorized by Court Order to view or retrieve this document, read no further than this page.  You should immediately contact the following person(s):

Andrew S. Dupre (No. 4621)
Brian R. Lemon (No. 4730)
Sarah E. Delia (No. 5833)
Stephanie H. Dallaire (No. 5184)
MCCARTER & ENGLISH, LLP
405 North King Street, 8th Floor
Wilmington, DE 19801
Tel.: (302) 984-6300

*Attorneys for Stream TV Networks, Inc. and Mathu & Raja Rajan*

**A public version of this document will be filed on or before August 2, 2022**

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS PROHIBITED
EXCEPT AS AUTHORIZED BY COURT ORDER.

ME1 41630619v.1

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STREAM TV NETWORKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0766 JTL |
| | ) | |
| SEECUBIC, INC., | ) | **CONFIDENTIAL** |
| | ) | **FILED UNDER SEAL** |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| SEECUBIC, INC., | ) | |
| | ) | |
| Counterclaim and | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STREAM TV NETWORKS, INC., | ) | |
| | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MATHU RAJAN and RAJA RAJAN, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

### PLAINTIFF/COUNTERCLAIM DEFENDANT AND THIRD PARTY DEFENDANTS' JOINT MOTION FOR RENEWED ENTRY OF PARTIAL FINAL JUDGMENT UNDER RULE 54(b)

Plaintiff/Counterclaim Defendant Stream TV Networks, Inc. and Third Party

Defendants Mathu Rajan, and Raja Rajan (together, "Stream"), pursuant to Court

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS PROHIBITED
EXCEPT AS AUTHORIZED BY COURT ORDER.

1

of Chancery Rule 54(b), respectfully move the Court to enter the proposed form of order filed herewith (the "Proposed Order"), granting partial Final Judgment in favor of Stream on Count I of Stream's Verified Complaint (Dkt. 1) and against Defendant/Counterclaim-Plaintiff SeeCubic, Inc. ("SeeCubic") on Counterclaims I and II of SeeCubic's Verified Counterclaims and Third-Party Complaint (Dkt. 8), as follows:

1.      The parties have conferred in good faith, but are not able to agree to language for an order granting partial final judgment.  Four disputes remain.[1]

2.      First, Stream asks the Court to declare that the Omnibus Agreement is invalid.  Stream needs such a clear statement to end market confusion regarding ownership of Stream's assets.  SeeCubic does not agree that an explicit statement of the Omnibus Agreement's invalidity is necessary, because it can be inferred from the Delaware Supreme Court's opinion.  Stream replies that mere implication is insufficient.  For example, on the motion for status quo order, SeeCubic professed to interpret the Delaware Supreme Court's opinion to mean that the Omnibus Agreement is valid and awaiting a later shareholder vote.  *See* July 20, 2022 Hearing Transcript at 4 (Exhibit A hereto).  If SeeCubic can sincerely misinterpret the Delaware Supreme Court's opinion, so too can lay stakeholders.

---

[1] The parties compromised on several points not addressed in this Motion.

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS PROHIBITED
EXCEPT AS AUTHORIZED BY COURT ORDER.

2

ME1 41630619v.1

A plain English declaration of the Omnibus Agreement's invalidity in the partial final judgment is necessary.  Validity or invalidity of the Omnibus Agreement was always the core dispute of the case, and already was declared within the reversed order of summary judgment.  *See* Dkt. 193.

3.      Second, Stream asks the Court to declare that Stream always owned title to the Assets.   Again, Stream assets that it needs a clear statement of ownership, without which it cannot resume its business.  SeeCubic does not agree that such an express statement is necessary, and that implication is sufficient.  The Court has already ruled that the Omnibus Agreement did not transfer legal or equitable title to the Assets.  *See* Ex. A at 26-28.  Stating so in the judgment should not be disputed.

4.      Third, Stream asks the Court to order SeeCubic to return the Assets to Stream, without prejudice to SeeCubic's claims for monetary relief.  Further, any subset of Assets subject to good faith dispute can be resolved by a special master process.  SeeCubic argues that it should not be ordered to return the Assets because Stream has not won a mandamus injunction.  Stream ripostes that SeeCubic was already ordered to return the Assets during the July 20 hearing, and that the Court already invited a proposed order granting that relief.  *See* Ex. A at 31.

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

5.      Fourth, Stream asks the Court to order SeeCubic not to use the Assets pending their return to Stream.  SeeCubic asserts the right to use the Assets for its own purposes during the interregnum.  SeeCubic continuing to use Stream's Assets would have the practical effect of granting-in-part the status quo motion that the Court denied on July 20.  The Court stated that SeeCubic should not have the Assets (*see* Ex. A at 26-27); ergo, SeeCubic should not be using the Assets to advance SeeCubic's business, which competes with Stream.  SeeCubic continuing to enjoy use of the Assets also will incentivize foot-dragging qua the Asset return.

6.      Moreover, the parties stipulate that unauthorized use of the Assets is irreparable harm.  The current harm is concrete rather than speculative.  For example, Stream is aware that SeeCubic is pursuing a contract with Netflix, including through the use of displays that belong to Stream.  If SeeCubic were to succeed in winning a contract with Netflix, and then that contract has to be cancelled because SeeCubic does not own the Assets, the prospective business relationship with Netflix (grounded upon Netflix's desire to acquire rights to use the Assets) will be damaged, at a value difficult to quantify monetarily.  The $1 million bond in this case is not sized sufficiently to protect Stream from such enormous lost opportunities.

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS PROHIBITED
EXCEPT AS AUTHORIZED BY COURT ORDER.

4

7.     Stream has made sincere effort to remove any point of tendentiousness from this request.  Somewhat frustratingly, the parties appear to agree that the Omnibus Agreement is invalid, that Stream owns the Assets without prejudice to SeeCubic's other claims, and that the Assets must be transferred back to Stream.  The only disagreements are whether the Court should declare those truths in plain English for the benefit of the lay public, and whether SeeCubic can use the Assets while they await transfer back to Stream.

8.     Stream respectfully requests that the Court resolve these issues via the Proposed Order filed herewith.

Dated:  July 26, 2022

**McCARTER & ENGLISH, LLP**

*/s/ Andrew S. Dupre*
Andrew S. Dupre (No. 4621)
Brian R. Lemon (No. 4730)
Sarah E. Delia (No. 5833)
Stephanie H. Dallaire (No. 5184)
Renaissance Centre
405 North King Street, 8th Floor
Wilmington, DE 19801
Tel.:  (302) 984-6300
Fax:  (302) 984-6399

*Attorneys for Stream TV Networks,
Inc. and Mathu & Raja Rajan*

**Words: 780**

THIS DOCUMENT IS A CONFIDENTIAL FILING.  ACCESS PROHIBITED
EXCEPT AS AUTHORIZED BY COURT ORDER.

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 26, 2022, I caused a true and correct copy of the

foregoing *Plaintiff/Counterclaim Defendant and Third Party Defendants' Renewed*

*Joint Motion for Entry of Partial Final Judgment Under Rule 54(b) and for Stay* to

be served via File & Serve*Xpress* on the following counsel of record:

Jenness E. Parker, Esquire
Bonnie W. David, Esquire
Lilianna Anh Townsend
Trevor T. Nielson
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Rodney Square
P. O. Box 636
Wilmington, DE  19899-0636

Steven L. Caponi
K&L GATES LLP
Courthouse Square
600 N. King St., Suite 901
Wilmington, DE 19801


*/s/ Andrew S. Dupre*
Andrew S. Dupre (No. 4621)

EFiled:  Jul 26 2022 01:35PM EDT
Transaction ID 67860465
Case No. 2020-0766-JTL

# EXHIBIT A

1

IN  THE  COURT  OF  CHANCERY  OF  THE  STATE  OF  DELAWARE

---------------------------------------
STREAM TV NETWORKS,                     :
                Plaintiff,              :
        v                               :  C. A. No.
                                        :  2020-0766-JTL
SEECUBIC, INC.,                         :
                                        :
                Defendant.              :
---------------------------------------
SEECUBIC, INC.,                         :
                Counterclaim and        :
                Third-Party Plaintiff,  :
        v                               :
                                        :
STREAM TV NETWORKS, INC.,               :
                                        :
                Counterclaim Defendant, :
                                        :
        and                             :
                                        :
MATHU RAJAN and RAJA RAJAN,             :
                                        :
                Third-Party Defendants. :
---------------------------------------

                        - - -
                Chancery Court Chambers
                Leonard L. Williams Justice Center
                500 North King Street
                Wilmington, Delaware
                Wednesday, July 20, 2022
                12:45 p.m. ampm
                        - - -
BEFORE: HON. J. TRAVIS LASTER, Vice Chancellor
                        - - -

ORAL ARGUMENT and RULINGS OF THE COURT ON SEECUBIC'S
  POST-REMAND MOTION TO PRESERVE THE STATUS QUO AND
        MOTION TO EXPEDITE  -HELD VIA ZOOM

--------------------------------------------------------
            CHANCERY COURT REPORTERS
        Leonard L. Williams Justice Center
        500 North King Street - Suite 11400
            Wilmington, Delaware 19801
                (302) 255-0523

2

```
 1   APPEARANCES:

 2         JENNESS E. PARKER, ESQ.
           BONNIE W. DAVID, ESQ.
 3         TREVOR T. NIELSEN, ESQ.
           LILIANNA ANH P. TOWNSEND, ESQ.
 4         Skadden, Arps, Slate, Meagher & Flom LLP
                   -and-
 5         MARLEY ANN BRUMME, ESQ.
           EBEN P. COLBY, ESQ.
 6         of the Massachusetts Bar
           Skadden, Arps, Slate, Meagher & Flom LLP
 7           for Defendant/Counterclaim Plaintiff SeeCubic

 8

 9         ANDREW DUPRE, ESQ.
           BRIAN R. LEMON, ESQ.
10         McCarter & English, LLP
             for Third-Party Defendants
11

12

13                            - - -

14

15

16

17

18

19

20

21

22

23

24
```

3

1                    THE COURT:  All right.  Welcome,

2    everyone.  Thank you for being here.

3                    I apologize that we're short of time

4    today.  I'm in the midst of a trial, and so I'm doing

5    this at the lunch hour.  So I'm going to have to keep

6    a fairly tight rein on proceedings today.

7                    With that in mind, Ms. Parker, why

8    don't you go ahead.  And then, Mr. Dupre, you can

9    respond.

10                    ATTORNEY PARKER:  Yes, Your Honor.

11   Thank you.  And thank you so much to Your Honor and

12   the Court for hearing us during your break today.

13                    Jenness Parker on behalf of SeeCubic,

14   Your Honor.  And with me today, also from Skadden, is

15   Eben Colby, Bonnie David, Marley Brumme, Lilianna

16   Townsend, and Trevor Nielsen.  Also on the line, Your

17   Honor, is Steve Caponi from K&L Gates, counsel for

18   Hawk.

19                    Happy to go ahead, unless Mr. Dupre

20   wants introductions.

21                    THE COURT:  Why don't you go ahead,

22   and I'll let Mr. Dupree do his introductions when we

23   get to them.  I know it's a little bit of a deviation,

24   but let's just move ahead.

4

1          ATTORNEY PARKER:  Okay.

2          Your Honor, I wanted to say at the

3  outset, we are not ignoring, disrespecting, or

4  disputing the Supreme Court's opinion.  The way we

5  understand it is the omnibus agreement is valid but

6  there needed to be a Class B vote.

7          Stream says, you know, this is an easy

8  one.  Stream owns the assets.  But I do think there is

9  a little bit of limbo there because if the omnibus

10 agreement is valid, Section 1.4 requires a Class B

11 vote, requires Stream and its officers and directors

12 to use best efforts to effect the transfers.

13         What I understand from counsel for

14 Stream -- we spoke this weekend about a few things,

15 trying to potentially get on the same page-- is there

16 is not going to be a Class B vote.  So I just wanted

17 to note that at the outset.

18         Aside from that, it's a highly unique

19 situation.  We have scoured the case law and couldn't

20 find anything, you know, practical or otherwise, to

21 kind of help us out here.  And the issue, really, is,

22 in this situation, where SeeCubic has had the assets

23 for 18 months, they've been enhanced, there have been

24 changes to the business, including, you know, repairs

5

1   to relationships, to employees, the tech has changed,

2   you know, things like that; but also, pending is a

3   foreclosure action.

4           So the question is, does SeeCubic

5   preserve the assets pending that foreclosure action,

6   where Stream is insolvent and where the assets, if

7   they go back to Stream, should be managed for the

8   creditors, under *Gheewala*.

9           As we understand it, the sole person

10   on the board, and the person that would manage the

11   assets, is Mathu, who has acted disloyally to Stream,

12   including in connection with the license to GFT, which

13   was in the second half of 2020, and after that.  And

14   this was a finding in the bankruptcy action, that the

15   plan was for a new entity, VTI, for Mathu and others

16   to cherry-pick the assets for a track of their value.

17           So another unique factor, which I

18   just -- which I alluded to at the beginning, is the

19   assets have changed.  I think it's easy to say the

20   assets have changed, how do we give them back, Your

21   Honor.  And I understand, you know, and took very

22   seriously your letter.

23           So we, in thinking about this -- and

24   including, you know, talking with Mr. Dupre -- it's

6

1   really -- I wanted to give you some examples, just two

2   examples.  And I know I'm running short on time.

3                   So demo units, Your Honor.  These are

4   physical assets that were put together and that use

5   technology that incorporates changes that were made

6   since December 8, 2020.  So I don't think there's any

7   way, from -- my understanding is there's no way to,

8   like, take those apart and return how it was then.

9                   Patents and IP rights.  As of December

10  8, the patent portfolio for Ultra D was at risk of

11  being lost because Stream had failed to pay required

12  maintenance fees.  So SeeCubic brought those accounts

13  current before they were lapsed.  So one of the issues

14  is who owns the patents.  Does SeeCubic own them, or

15  are they a Stream asset, when they were in jeopardy of

16  being lost.

17                  Stream also made filings for

18  continuations on certain patents that incorporate the

19  developments they've made to the technology.  So like

20  with the demo units, how do you rip that apart?

21                  And then, finally, they've filed new

22  patents in new jurisdictions that never existed when

23  Stream was in control.

24                  That's just another -- I just wanted

7

1   to give Your Honor some examples, instead of

2   generally, hey, the assets have changed, let us keep

3   them.

4                    THE COURT:  No, no, that's very

5   helpful.

6                    When these patent applications are

7   being filed, whose name were they filed in?

8                    ATTORNEY PARKER:  My understanding is

9   SeeCubic.  Yes?  Yes.

10                   THE COURT:  Okay.

11                   ATTORNEY PARKER:  My team will correct

12  me if I'm wrong, but that's my understanding.  I feel

13  like I'm back in December 2020.

14                   So those are some of the reasons, Your

15  Honor, just factually, to set the stage for Your

16  Honor.  Because, again, I took your letter really

17  seriously.  And I, of course, as a Holland clerk, take

18  the Supreme Court very, very seriously.  I even told

19  Andy this weekend, look, I get it, you know.

20                   But this is just really, really

21  unique.  And Mr. Dupre can speak for himself, but he

22  said, look, I haven't found anything in this context

23  either.

24                   And I remember, in December, you said

1    to me, Your Honor, is there anything on this certain

2    issue.  And so we scoured before coming in to you, as

3    we always do.

4                On the legal factors, quickly, not to

5    regurgitate my briefs, especially with the time.

6                Irreparable harm.  I think, just like

7    in September 2020, which I know Mr. Dupre wasn't part

8    of the case then, but well familiar.  I think

9    everybody agrees that harm to the assets is

10   irreparable harm.

11               On likelihood of success on the

12   merits.  The foreclosure action, in our view, is

13   likely to succeed at this point.  Stream didn't pay

14   its debts due, to the tune of 300 million.  Hawk, who

15   is an investor in SeeCubic, whose counsel is here

16   today, is extremely concerned about the collateral

17   going back to the Rajans and being harmed or taken.

18               And a breach of fiduciary duty claim

19   is also likely to succeed.  Stream says, but that's

20   unripe and it's speculative, but it's not.  We have

21   the evidence that the assets were licensed to Glasses

22   Free Technology in the latter half of 2020 with a 5

23   percent royalty going to Stream.

24               Mathu had an interest in Glasses Free

9

1  and also has an interest in VTI, which was the entity

2  during the bankruptcy proceeding where, we found

3  out -- and Mathu admitted to this -- look, the plan is

4  to cherry-pick the assets for a fraction of their

5  value, put them somewhere else.  And then, in March of

6  2020, yet another entity was formed, VSI.

7           So finally, Your Honor, on unjust

8  enrichment, Stream argues, well, look, this isn't

9  ripe.  But Stream is seeking the return of the assets,

10  which we have argued are greatly enhanced.  So to

11  return it would just be an unjust windfall to Stream

12  and the Rajans.

13           A little different, but also in the

14  unjust enrichment bucket, is Stream's argument we

15  can't get equitable relief for this in the form of a

16  status quo because money damages suffices.  You said

17  you put 35 million in; you can get 35 million back if

18  you're right.

19           But that's not sufficient, for some of

20  the reasons I discussed earlier.  Unscrambling eggs.

21  How do you quantify -- and it's difficult; I suppose

22  not impossible, but difficult to quantify -- we

23  brought people back.  You'll recall the employees

24  weren't paid.  They were furloughed or they had left.

10

1   We brought some of the really critical employees back

2   into the fold to continue to develop the technology.

3   Enhanced reputation, enhanced relationships.

4                    So that's unjust enrichment.  Again,

5   relying on my briefs for anything I'm not talking

6   about today, Your Honor.

7                    And for balance of the equities,

8   Stream and the Rajans say, look, we're -- we're going

9   to be hurt in this situation if the assets stay at

10  SeeCubic and are preserved there.  But they're not

11  going to be hurt.  The assets are going to be

12  preserved, including for the creditors.

13                   I probably cited *Gheewala* a lot today,

14  and I know I did to the Supreme Court.  But the

15  Supreme Court did hold, in *Gheewala*, when the company

16  is insolvent, it's managed for the creditors.

17                   And I get it, that's a derivative

18  claim, which is what I pled.  But it is managed for

19  the creditors.  We have one person there who is

20  managing the assets, one person on the board, who we

21  know has essentially tried to take the assets from the

22  creditors.  So that's balance of the equities, Your

23  Honor.

24                   Alternatively, if the Court disagrees

11

1   with our motion -- and we have noted this in our reply

2   brief, and I did pitch this, again, in the alternative

3   to Mr. Dupre and haven't heard back from him.  If you

4   disagree with our motion, the Court should consider of

5   a neutral third-party receiver.

6                    So unless Your Honor has any

7   questions, happy to cede the floor to Mr. Dupre.

8                    THE COURT:  Before you do, what is the

9   status of the foreclosure action, in terms of schedule

10  and moving forward?

11                   ATTORNEY PARKER:  Sure, Your Honor.

12  So SeeCubic is in the process of issuing direction

13  to -- there was assignment.  SeeCubic is in the

14  process of issuing direction to SLS, who is the party

15  in that case, to get the action unstayed and moving.

16  My understanding is that that letter may go to the

17  Court today.  But I'm not -- we've been discussing

18  with counsel in that case.

19                   THE COURT:  No.  That's helpful.  But

20  the current status -- and I haven't looked at the

21  docket over there.  If I were to look at the docket

22  over there, I would see, I'm inferring that it's

23  stayed?

24                   ATTORNEY PARKER:  Yes.

12

1                  THE COURT:  And how far had the case

2      gotten before it was stayed?

3                  ATTORNEY PARKER:  My understanding is

4      that there was a trial set that was to take place in

5      ten months from -- I'm not sure what the date is.  Oh,

6      from the filing.  And then Stream filed in

7      September 2020 with Your Honor, with the Chancery

8      Court, and we were off to the races then here.

9                  THE COURT:  All right.  Thank you.

10                 Mr. Dupre.

11                 ATTORNEY DUPRE:  Thank you, Your

12     Honor.  Thank you for hearing us on lunch.

13                 I'll talk even faster than I usually

14     do.  And I'm not a Holland clerk, but I was trained by

15     Mike Kelly, who was a Holland clerk, so I have

16     derivative Holland clerk status for this purpose, Your

17     Honor.

18                 Your Honor, Stream is a little bit

19     frustrated in this case in the sense of what does it

20     have to do to get its assets back beyond invalidating

21     the contract that transferred its assets before the

22     Delaware Supreme Court *en banc*.

23                 There's not any good-faith dispute, at

24     this point, nor a new claim in the case, that says

13

1    SeeCubic owns the assets.  And I don't think there can

2    be.  It is now undisputed that Stream TV owns the

3    assets.

4              This business about the contract is

5    valid but it needs a shareholder vote is incorrect.

6    The majority shareholder of Stream TV, which are the

7    Rajans, voted this down in documents in this case on

8    May 8, 2020.  Your Honor already ruled upon those.

9    They were written consents, but they were shareholder

10   consents.  You ruled upon them in the context of that

11   *de facto* director issue that wasn't appealed.

12             So that's all water over the dam.

13   Discovery closed on it a year ago.  It's not like

14   there's like an, oh, well, maybe the Rajans are going

15   to vote to destroy Stream and strip the assets and

16   wipe themselves out while subsidiary shareholders walk

17   away with the assets.  That's not going to happen.

18   It's a strawman argument.

19             This argument that there's $300

20   million in debt is a false argument.  Where is that

21   figure coming from?  We attached the complaint in the

22   foreclosure action to our opposition here.  It's 10

23   million bucks.  That's what's at issue.  It's $10

24   million.  SeeCubic has said, well, we already raised

CHANCERY COURT REPORTERS

14

1   35 million off the assets.

2           The statutory foreclosure regime, if

3   handled properly, will do setoffs and redemption

4   claims and creditor priority among all the creditors

5   and constituents of Stream, not just SLS.  The point

6   here, and the reason this is so vigorously contested,

7   is the assets are worth a lot more than 10 million.

8   If -- if SLS supposedly assigning its claims to

9   SeeCubic won every single claim, the new claims that

10  you allowed into the case here, and also won every

11  single claim in the foreclosure case, they still won't

12  get the assets.  That's why there was an omnibus

13  agreement.

14          They needed that transaction to get

15  the assets away from us.  Otherwise, what they have a

16  right to is 10 million bucks.  It's just a monetary

17  damages claim.  It's subject to all of Delaware's

18  statutory foreclosure protections and remedies, and we

19  should be allowed to litigate it over there.

20          Just turning to the merits of this

21  argument, our position is that the standard of review

22  is being miscited.  This case is two years old.  We're

23  way past the benefit of a colorable claim standard.

24  It's got to be the summary judgment standard.  What's

1   really being asked here is the final remedy.  They

2   want a permanent injunction to keep the assets while

3   they go litigate a foreclosure claim for ten months.

4   That's the ask.

5              The likelihood of success element,

6   they're not going to win these claims.  But let's just

7   assume *arguendo* that they win everything.  They win

8   the two new claims that are in the case — unjust

9   enrichment and a fiduciary duty of loyalty claim

10  against Mathu.  They don't get the assets.

11             Even if they have a 100 percent

12  likelihood of success -- which they do not -- they

13  still don't get the remedy that they're asking for

14  here.  That alone should be dispositive of this issue.

15  We need to follow the Supreme Court and the mandate

16  rule, put the assets back where they belong, and they

17  can litigate foreclosure as much as they like before

18  Judge Johnston.  But our position is they're going to

19  lose that foreclosure action too.

20             The irreparable harm that's being

21  advanced by SeeCubic has basically been stipulated

22  throughout the case, Your Honor.  The parties agree

23  that interference with lawful control of the assets is

24  irreparable harm.  The assets are unique technology.

16

1         So the real question before Your Honor

2    is who lawfully controls the assets.  And I think

3    Ms. Parker was quite candid, and I'll be equally

4    candid.  I don't think there's a single case anywhere

5    in the country, in any jurisdiction, including

6    Delaware, that says, well, we do an injunction in aid

7    of foreclosure that transfers the assets from the

8    debtor to the creditor.  So intra-foreclosure, during

9    a foreclosure proceeding that's contested, the

10   creditor gets to keep the benefit of the assets.

11        There is no precedent for that

12   whatsoever.  The farthest that Delaware law ever goes

13   is your case in *Destra* and Vice Chancellor Lamb's

14   case, my old judge who I clerked for, in *Mitsubishi*

15   *Power*.  Those cases are prejudgment attachments.

16   They're the most aggressive examples of prejudgment

17   attachments in Delaware law on an insolvent entity.

18   And they leave the assets in place, and they just say

19   the debtor can't transfer them.

20        That's the maximalist relief in

21   Delaware law that's possibly available; not the

22   creditor takes the assets and does whatever it wants

23   with them and destroys the debtor so it can't defend

24   itself during a foreclosure proceeding.  It has no

1 | ability to conduct ordinary business, it has no
2 | ability to raise money.
3 |             That remedy doesn't exist in Delaware
4 | law.  There's no case cited in the papers whatsoever
5 | for that, and they went far afield, to Utah and the
6 | District of California.  There is no law, seemingly,
7 | in the United States, let alone Delaware, that is an
8 | injunction in aid of foreclosure.
9 |             The balance of the harms.  We agree
10 | that the harm is irreparable.  Interference with the
11 | legal right to control the assets is irreparable harm.
12 | So SeeCubic should not have had these assets.  They
13 | have gotten a windfall of, basically, raising 35
14 | million against assets that they didn't own and never
15 | should have owned.  That's their harm, they might lose
16 | the 35 million that they had as a windfall.
17 |             Our harm is we can't control our
18 | assets.  We never have.  We always owned them.  We
19 | always had the legal right to control them during the
20 | foreclosure.  We had the right to control the assets
21 | to try to save ourselves during the foreclosure.  And
22 | it was erroneously taken away from us.  We were taken
23 | out of the foreclosure regime, the assets moved on to
24 | the creditor.

1           In that balance of harms, Stream is

2    much more harmed than SeeCubic in this context.   The

3    idea that SeeCubic went and patented Stream's

4    technology in Korea, say, that's irreparable harm to

5    Stream.   Having somebody else patent your technology

6    in their name is more irreparable harm to Stream.

7           The stuff that's being advanced as an

8    idea that it's unfair to SeeCubic to have to follow

9    the implication of the Supreme Court opinion, as Your

10   Honor ruled, just heaps more irreparable harm upon

11   Stream as we go along.   It's the interference with its

12   lawful ownership and control of the assets.

13          This receivership issue, I have to

14   object, Your Honor.   Ms. Parker called me about it

15   yesterday -- or, excuse me, on Monday.   My opposition

16   was already in.   It's not in the complaint.   It's not

17   a Section 291 claim.   It's not a Rule 149 *pendente*

18   *lite* claim.   It's just alternative argument sandbagged

19   into the reply brief.   It's not appropriate.

20          The case law that's being cited in

21   support of it -- and I don't want to make a huge deal

22   out of it because it's only an alternative argument in

23   the last paragraph of a reply.   Those are all Section

24   291 claims.   Some of them are post-trial opinions,

1  where an entire receivership claim was fully

2  litigated.

3              That alternative relief is not fairly

4  at issue, and it's not fairly presented here.  If they

5  want to move to have you amend the complaint again and

6  put in a 291 complaint, or claim, let them try, and I

7  can respond.  But it's not at issue on the procedural

8  posture that we're in.  It's not fairly presented.

9              So I will cease talking and let Your

10 Honor eat, unless you have any questions for me.

11             THE COURT:  I've got a couple

12 questions for you.

13             I don't have them precisely in front

14 of me, but I did make factual findings about Stream's

15 insolvency and the level of debt that it was facing.

16 And I feel like it was in excess of 10 million.

17             What, if anything, do I do with that?

18             ATTORNEY DUPRE:  So the -- what is

19 being asked from Your Honor by SeeCubic is keep the

20 assets with SeeCubic to let the foreclosure proceeding

21 happen.  And I attached the foreclosure papers to the

22 opposition, and the debt is stated.

23             So does Stream have ancillary debt to

24 secondary creditors that's not a part of the

foreclosure proceeding that Your Honor previously ruled on in some context? And I have to tell you that it was 2020, so it's a bit stale. Yes, it does have ancillary, secondary debt. But that's not the ask that's being presented to you. The ask that's being presented to you is there's a stayed foreclosure proceeding over there. We're going to act with alacrity. Give us the assets for ten months while we go through this foreclosure process. And if you just look at the pleadings in that complaint, it's 10 million bucks.

THE COURT: The one aspect of a receiver that was attractive to me is a receiver who would help transition the assets back to you. Because I suspect that you and Ms. Parker are going to have trouble agreeing on the mechanics of all this.

Why isn't that something that I should be thinking seriously about, in terms of putting somebody in place to help transition this?

ATTORNEY DUPRE: So, Your Honor certainly does have the power to have a special master appointed or something like that. It's within your discretion.

The objection is receivership

1  specifically *qua* either 291 or -- I think it's Rule

2  149, Court of Chancery Rule 149.  Both of those are

3  inappropriate because Stream is fine and can run its

4  own affairs.  We don't need a sort of trustee in

5  bankruptcy type receiver.

6              If it was, hey, we need a special

7  master to untangle the assets to make sure that you're

8  not accidentally getting something of SeeCubic's --

9  and I must be frank, Your Honor.  I don't know what

10  that could be.  They're only building on our

11  technology, which they never should have had.

12              So it's possible that we could go

13  through this big, long, unjust enrichment rigmarole,

14  even though I think it's a legal claim, and come up

15  with some number of benefit that we have to compensate

16  them for.  But that's just a monetary damages claim.

17              I think, if Your Honor were inclined

18  to do something like that, it would be a Master rather

19  than a receiver.  Because we're allowed to run the

20  assets in the interim.

21              THE COURT:  What should I do, or what

22  should I think about the finding in the bankruptcy

23  about cherry-picking the assets?

24              ATTORNEY DUPRE:  Quite candidly -- we

1   can be just very direct, Your Honor.  The bankruptcy

2   court was following you.  The Rajans were flailing

3   around trying to figure out what to do with the

4   improvident injunction.  They thought they were

5   entitled or Stream was entitled to the protections of

6   Chapter 11 under the federal bankruptcy rules in that

7   context.

8            The bulk of that bankruptcy opinion,

9   if you read Judge Owens, says this has all already

10  been determined by the very distinguished Court of

11  Chancery, which was correct, in fairness to Judge

12  Owens.  And contextually, you could see the behavior

13  as trying to do an end-run around the improvident

14  injunction to save yourself.

15           THE COURT:  Let me try to cut to the

16  chase on this.  I have read it.  I do agree with you

17  that a lot of what he was concerned was about

18  bypassing the injunction.

19           I'm asking a different question, which

20  is, is it reasonable to infer that your fellows will

21  do things to move assets out of the entity for less

22  than fair value, given that record in the bankruptcy

23  proceeding?  And should I take that into account in

24  deciding what, if any, interim relief to award?

23

1        ATTORNEY DUPRE:  The factual answer is

2   no.  We've been moving heaven and earth to try to get

3   these assets back for the benefit of Stream TV.  We've

4   also gone on the record and said they're worth way

5   more than the debt.

6        We have the obligation to pay the

7   debt, subject to setoff defenses that we'll litigate

8   in the foreclosure action.  But the whole point of

9   everything I've done since I came before you, Your

10  Honor, is to try to get the assets for Stream.

11        If you were concerned about that, I

12  don't think it's fairly presented.  But if you were

13  concerned about it in an equities context, the case

14  law examples are you, in *Destra*, and Vice Chancellor

15  Lamb in *Mitsubishi Power*.  It's not the creditor keeps

16  the assets.  It's the assets go back and you say don't

17  transfer them anywhere.

18        THE COURT:  What do you think about

19  that type of remedy?  And it would have to be -- you

20  know, let's take it down a level, because my prior,

21  coming in, is that you-all should have the ability to

22  manage the assets, and if you can raise money to pay

23  off the debt, you ought to be able to pay off the

24  debt.

24

1              But why wouldn't I, based on that

2    record in the bankruptcy -- which, again, I find

3    personally a little troubling.  And I know that your

4    fellows are frustrated with me.  Given some of the

5    things that I saw in the record and behavior in this

6    case, I don't have a lot of confidence in them.

7              Why wouldn't I say to SeeCubic, you've

8    got to transfer all the assets back.  That's what the

9    Supreme Court says.  But once you give them back,

10   we're going to have to have some notice requirement

11   where, if the Stream folks are going to do something

12   major, that they would have to give you -- insert

13   number of days of notice, 10, 20, something like

14   that -- so that you can potentially roll in and make

15   an application to me?

16             ATTORNEY DUPRE:  I'd sign that order

17   today, Your Honor.  We don't -- we don't mind giving

18   you notice of material transactions or something like

19   that.  The point of it isn't to, like, take the assets

20   and hide them.  That's, like, a strawman.  The point

21   is to take the assets and use them for our own

22   commercial benefit.

23             So that's not the injunction you're

24   being asked for.  But if you were inclined to write

1  your own, it wouldn't really hurt us to give you a

2  notice requirement.  We -- I wouldn't fight it.

3              THE COURT:  No, look, I know it's not

4  the specific relief that Ms. Parker is requesting, and

5  I know that there are decisions that seem to say that

6  one can only do what the party asks for and nothing

7  else.

8              I continue to harbor the potentially

9  misguided view that part of being a court of equity is

10 that I'm supposed to exercise some type of discretion

11 and potentially come up with case-specific outcomes

12 that I think are in the best interests of the

13 litigants and the broader situation, even if it's

14 something that the litigants, given their

15 understandable interests, can't propose or haven't

16 proposed themselves.

17             What I'm hearing you say, though, is

18 you could live with a result where things get

19 transferred back to you but you're under some type of

20 notice obligation?

21             ATTORNEY DUPRE:  That's correct, Your

22 Honor.  I'd gladly consent to that.

23             There was stuff in the SeeCubic ask

24 that's to the effect of Stream can't raise money with

1  the assets and all that.

2            We need to be able to raise money and

3  sign commercial contracts and otherwise behave

4  normally.  That's what we need to do.

5            THE COURT:  All right.

6            I'm going to go ahead and give you an

7  answer now, in the interest of time.  I very much

8  appreciate counsel's presentations.  It's always good

9  to see you-all, even under the current circumstances.

10           We are here on remand after the

11 Delaware Supreme Court's reversal of a decision in

12 which I declared that the omnibus agreement was valid.

13 My understanding of the state of play is not that the

14 omnibus agreement is valid pending some type of

15 stockholder vote.  I think the omnibus agreement, at

16 this point, is not valid.

17           I do agree that it required

18 stockholder approval to become valid, as held by the

19 Delaware Supreme Court.  It didn't receive stockholder

20 approval.  And so at this point, I don't view the

21 omnibus agreement as in play anymore.  I think it just

22 hasn't gone into effect.

23           That's my starting point.  What flows

24 from that is that I do think title to the assets

27

1   should be at Stream.  I think, technically, title to

2   the assets never left Stream, and I think, at this

3   point, equitable title to the assets has to be viewed

4   as at Stream.

5               In terms of the TRO situation, that

6   puts us in a fundamentally different position than we

7   were when we were last together over 18 months ago.

8   At that point, I thought and understood that there was

9   a litigable dispute over who actually had the right to

10  control the assets, with Stream on one side saying,

11  "This agreement is invalid, we have control of them,"

12  and SeeCubic on the other side saying, "No, the

13  omnibus agreement gives us equitable title to the

14  assets."

15              And my view was that the irreparable

16  harm in that situation flowed from the fact that you

17  had two people, each one of whom asserted they had the

18  right to own and determine the fate of these assets.

19  I thought, therefore, that a status quo order was

20  necessary to make sure that neither side did anything

21  while that issue was contested.

22              We got to a point where I held that

23  the assets were validly SeeCubic's under the omnibus

24  agreement.  That is the decision that has been

28

reversed. And so, in my view, we're in a world where title right now, both equitable and legal, to the extent that one can wind the clock back, is in the hands of Stream.

Then the question becomes what am I being asked to do? And technically what I'm being asked to do today is to allow SeeCubic to keep the assets pending the result of a foreclosure proceeding. I don't think I can do that. That may well be the status quo today, in that SeeCubic has the assets, but the reality is, based on the Delaware Supreme Court decision, SeeCubic, right now, shouldn't have the assets.

Now, that doesn't mean that SeeCubic has lost whatever other rights it has. Whatever creditor rights SeeCubic had or may have been assigned independent of the omnibus agreement, those rights still exist. Those rights, as I understand it, are being enforced in the foreclosure action in Superior Court. And those rights, again, as I understand it, are of a magnitude where, at least in theory, Stream could raise money to satisfy that debt and then go on free of that claim.

I don't know whether they can or not,

1  but by virtue of being the proper owner of these

2  assets, I think they have the right to try.  In other

3  words they should get to, if they want to, seek to

4  raise capital based on these assets and try to satisfy

5  the debts that they owe.

6           I don't think that there's any basis

7  for any type of relief that would leave these assets

8  in SeeCubic's hands.

9           Then I get to the point of, well, what

10  types of claims does SeeCubic actually have.  And I

11  think SeeCubic has colorable claims -- I would even

12  say fairly litigable claims -- for breach of duty and

13  unjust enrichment.  The unjust enrichment claim seems

14  particularly litigable because I've read the *Fleer*

15  case.

16           It seems to me there's a setting

17  where, depending on how the facts come out, SeeCubic

18  could have a sizable claim for increasing the value of

19  the company.  I also understand that Stream doubtless

20  will argue that what SeeCubic actually has done is

21  harm the value of the company.  That's a factual

22  dispute.  We've got to have some type of hearing on

23  that.  I can't decide it today.

24           Then the question becomes, in my mind,

CHANCERY COURT REPORTERS

1   if SeeCubic, as I believe it does, has viable claims

2   for money damages, is there a reason to put some type

3   of temporary restraining order or status quo order in

4   place to help protect SeeCubic's interests?  That

5   order indeed would be in the form of some type of

6   prejudgment attachment.

7                As you-all have accurately briefed,

8   those types of orders are not generally granted.  They

9   are rarely granted.  But the type of situation where

10  they are granted is when you have an entity that

11  appears to be insolvent, or near insolvent, and

12  there's some reason to believe that assets will be

13  secreted out or transferred out of the entity for less

14  than fair value in an effort to impair the creditors'

15  claim.

16               That, I think, is the gist of

17  *Mitsubishi* and *Destra*.  That, I think, is potentially

18  the case here.  In other words, I issued these

19  decisions that found that Stream was carrying a lot of

20  debt.  I think my number was, ballpark, 50-plus

21  million.  I don't remember what the trade creditors

22  added onto that, but it amounts to a lot of debt.  And

23  I certainly found that the entity was insolvent.

24               Perhaps it is true now that Stream is

1   no longer insolvent.  But at least on a pleading stage

2   basis, on a restraining order basis, I think there's a

3   colorable assertion that it's insolvent.

4                   I also think there's reason to worry

5   about what the Rajans could potentially do.  And I

6   rely for that on the record in the bankruptcy action

7   and the statement about potentially cherry-picking

8   assets for less than fair value.  And I also rely on

9   my oversight of the case where, before Mr. Dupre got

10  involved, there were a lot of things going on that

11  caused me to be worried about how people were

12  behaving.

13                  So where does this leave me?  In terms

14  of the actual request for a status quo order, I'm

15  denying it.  I don't think that good cause exists for

16  that type of status quo order.  I'm also not going to

17  issue any type of order that's going to prevent the

18  assets that SeeCubic currently has from being

19  transferred back to Stream.  In fact, I'm prepared to

20  issue relief that would facilitate that transfer.

21                  I've already indicated that it strikes

22  me that that's a place where some form of special

23  master or receiver or monitor, or whatever you want to

24  call it, would be helpful.  It would be someone who

could help you-all work through the knotty problems
that we're going to have unwrapping literally a year's
worth of stuff that's happened.

I'm not going to facilitate relief
that would stop that from happening.  I would enter
relief that would facilitate that happening.

Then, once the assets get back into
Stream's hands, they need to be protected against
non-ordinary-course transfers, given the record that I
have.  The record I have is preliminary, and I'm the
first one to admit that it is stale, because it's from
anywhere from a year to 18 months ago.

But what I would do is I would issue
some type of temporary restraining order, and then I
would allow the parties to proceed, if they couldn't
reach agreement, with some type of injunction hearing,
where people could present evidence as to whether
there needed to be a more durable interim relief put
in place to protect the assets pending the outcome on
these creditors' claims.

I'd invite you-all to try to reach
some type of agreement on that.  My personal view is
that some type of generous notice requirement should
be enough.  I don't know what the right number is.  If

1    we were to err on the side of generosity, we'd

2    probably say 30 days.  Maybe you end up at 20.  But

3    something that would give SeeCubic an opportunity to

4    come in and seek some type of injunctive relief prior

5    to any non-ordinary course transfer.

6                        I'm not going to enter any orders that

7    prevent Stream from raising capital through stock

8    issuances or debt issuances, or things of that sort,

9    because I do think Stream has the ability to try to

10   raise money to pay off this debt.

11                       I recognize that there's going to be

12   some overlap there.  So let's envision that Stream

13   goes out and wants to raise debt, and part of what the

14   lender wants is a security interest in all the assets.

15   We might have to parse through some issues, and that's

16   where I can envision notice having to go out, some

17   type of application, and then a hearing to figure out

18   what, if anything, was going on.  I not only don't

19   have instant recall, but I don't have meaningful

20   recall of the SLS or Hawk credit agreements to know

21   what types of blocks, if any, they have on things of

22   that sort.  All of that would have to be parsed

23   through.

24                       For purposes of today, I'm denying the

1    application.  I think that what has to happen is that

2    we need to move to a world where Stream gets its

3    assets back, subject to SeeCubic's claims.  When we're

4    in that world, at least on a preliminary basis, I'm

5    going to be receptive to some type of application for

6    interim protective relief, whether it's at the notice

7    level -- which I think is probably easiest -- or

8    whether it's some non-ordinary-course transaction

9    restriction.

10                   Once we get to that point, I think

11   what we have on SeeCubic's side are monetary claims

12   that need to be litigated and figured out.  I also

13   think you have the foreclosure action to figure out,

14   whatever is going to happen over there.

15                   At that point, I don't see any need

16   for expedition.  I see a lot of headaches.  I think

17   it's going to be very hard to go back in time to

18   figure out what was done that shouldn't have been done

19   and whether it had positive value or whether it had

20   negative value.  This whole thing, I just find very

21   challenging in terms of how we're going to go about

22   doing it.

23                   That's where we are.  The bottom-line

24   ruling today is that the request for relief is denied.

35

1   I want the parties to try to move forward with some

2   type of Rule 54(b) order that implements the Delaware

3   Supreme Court's decision.

4                I think that order needs to result in

5   these assets being moved back to Stream.  If you-all

6   were able to agree on some type of person to help you

7   transition, I would happily enter that type of order.

8   It seems to me like a good idea.  And if someone wants

9   to apply for it and the other people want to resist

10  it, we can go that way too.  But at least for purposes

11  of today, I'm denying the application, and you'll have

12  to move forward on that basis.

13               I apologize for not being able to take

14  any questions or discuss things with you further.

15  I've got a bunch of people waiting for me upstairs and

16  I need to go back and continue this trial.

17               I hope you-all have a good rest of the

18  afternoon.  Thank you for your time.

19               ATTORNEY PARKER:  Thank you, Your

20  Honor, for your time.

21               ATTORNEY DUPRE:  Thank you, Your

22  Honor.

23          (Proceedings concluded at 1:29 p.m.)

24                     - - -

36

CERTIFICATE

1

2

3          I, JULIANNE LaBADIA, Official Court

4    Reporter for the Court of Chancery of the State of

5    Delaware, Registered Diplomate Reporter, Certified

6    Realtime Reporter, and Delaware Notary Public, do

7    hereby certify the foregoing pages numbered 3 through

8    35, contain a true and correct transcription of the

9    proceedings as stenographically reported by me at the

10   hearing before the Vice Chancellor of the State of

11   Delaware, on the date therein indicated.

12          IN WITNESS WHEREOF, I have hereunto

13   set my hand at Wilmington this 21st day of July, 2022.

14

15

16

17              /s/ Julianne LaBadia
                ----------------------------
18                 Julianne LaBadia
                Official Court Reporter
19          Registered Diplomate Reporter
             Certified Realtime Reporter
20             Delaware Notary Public

21

22

23

24

EFiled:  Jul 26 2022 01:35PM EDT
Transaction ID 67860465
Case No. 2020-0766-JTL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| STREAM TV NETWORKS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   C.A. No. 2020-0766 JTL |
| | ) |
| SEECUBIC, INC., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |
| | ) |
| SEECUBIC, INC., | ) |
| | ) |
| Counterclaim and | ) |
| Third-Party Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| STREAM TV NETWORKS, INC., | ) |
| | ) |
| Counterclaim Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| MATHU RAJAN and RAJA RAJAN, | ) |
| | ) |
| Third-Party Defendants. | ) |

## [PROPOSED] ORDER GRANTING PARTIAL
## FINAL JUDGMENT UNDER COURT OF CHANCERY RULE 54(B)

WHEREAS, on July 1, 2022, the Delaware Supreme Court issued its

Mandate (Dkt. 237) that incorporated its *en banc* Opinion, dated June 15, 2022;

**IT IS HEREBY ORDERED** that:

1.     Final Judgment is entered in favor of Plaintiff Stream TV Networks, Inc. ("Stream"), and against SeeCubic, Inc. ("SeeCubic"), on Count I of Stream's Verified Complaint (Dkt. 1) and Counterclaim I of SeeCubic's Verified Counterclaims and Third-Party Complaint (Dkt. 8).

2.     It is hereby **DECLARED** that:

a.     The May 6, 2020 Omnibus Agreement ("Omnibus Agreement") between Stream, SLS Holdings VI, LLC, Hawk Investment Holdings Limited, and those parties listed on Annex I thereto, is invalid and without legal effect.

b.     The Omnibus Agreement did not transfer title to any asset of Stream (collectively, the "Assets") to SeeCubic; and therefore, at all times, Stream has owned all Assets purported to be transferred by the Omnibus Agreement.

c.     SeeCubic shall transfer the Assets back to Stream as expeditiously as possible.  By August 2, 2022, the parties shall confer in good faith and file either a stipulated proposed order, or separate proposed orders if unable to agree, to govern the process by which the Assets shall be transferred.

d.     Pending transfer to Stream, SeeCubic and all those acting in concert with it shall not use, impair, encumber, nor transfer the Assets.

2

3.      Final Judgment is entered in favor of Stream and Mathu Rajan and Raja Rajan, and against SeeCubic, on Counterclaim II of SeeCubic's Verified Counterclaims and Third-Party Complaint (Dkt. 8).

4.      Plaintiff and Third-Party Defendants may file a costs motion per Court of Chancery Rule 54(d), by August 12, 2022.  SeeCubic may file a combined opposition and motion seeking costs per Court of Chancery Rule 54(e), by August 26, 2022.

5.      Nothing herein shall prejudice SeeCubic's claims alleged in the Verified Supplemental Counterclaims, Derivative Complaint, and Third-Party Complaint (Dkt. 241) nor any right it may have to pursue foreclosure.


**SO ORDERED** this _____ day of _____, 2022.



_____
Vice Chancellor J. Travis Laster

3

# EXHIBIT E

# 54B Motion Ruling – August 10, 2022

EFiled:  Aug 10 2022 10:09AM EDT
Transaction ID 67917012
Case No. 2020-0766-JTL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STREAM TV NETWORKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2020-0766-JTL |
| | ) | |
| SEECUBIC, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| SEECUBIC, INC., | ) | |
| | ) | |
| Counterclaim and | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STREAM TV NETWORKS, INC., | ) | |
| | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MATHU RAJAN and RAJA RAJAN, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## ORDER GRANTING PARTIAL
## FINAL JUDGMENT UNDER COURT OF CHANCERY RULE 54(B)

1.      There being no just reason for delay, the court expressly directs that

partial final judgment under Rule 54(b) is entered in favor of Stream TV Networks,

Inc. ("Stream") and against SeeCubic, Inc. ("SeeCubic") as set forth herein.

2.      In accordance with the mandate of the Delaware Supreme Court dated July 1, 2022 (the "Mandate"), it is hereby **DECLARED** that the May 6, 2020 Omnibus Agreement ("Omnibus Agreement") between Stream, SLS Holdings VI, LLC, Hawk Investment Holdings Limited, and those parties listed on Annex I thereto required the approval of Stream's Class B shares to become effective, which did not occur. The Omnibus Agreement is therefore without legal effect.

3.      As a result of the Mandate and the failure of the Omnibus Agreement to become effective, it is hereby **DECLARED** that the Omnibus Agreement did not validly transfer legal title to any asset of Stream (collectively, the "Assets") from Stream to SeeCubic.

4.      The parties shall cooperate to effectuate the Mandate, including by causing SeeCubic to transfer legal title to the Assets from SeeCubic to Stream as expeditiously as possible.

5.      Pending transfer of the Assets from SeeCubic to Stream, SeeCubic and all those acting in concert with it shall not use, impair, encumber, or transfer the Assets, except as necessary to maintain the Assets in the ordinary course of business and preserve their value pending transfer to Stream.

6.      Counterclaim II of SeeCubic's Verified Counterclaims and Third-Party Complaint is **DISMISSED**.

7.     Stream may file a motion for costs per Court of Chancery Rule 54(d), by August 15, 2022.

8.     SeeCubic may file a combined opposition and motion seeking costs per Court of Chancery Rule 54(e), by August 26, 2022.

9.     Nothing herein shall prejudice any of the claims asserted in SeeCubic's Verified Supplemental Counterclaims, Derivative Complaint, and Third-Party Complaint (Dkt. 241) nor any right that SeeCubic or any party acting in concert with SeeCubic may have separate and apart from the Omnibus Agreement.

*/s/ J. Travis Laster*
Vice Chancellor J. Travis Laster
August 10, 2022

# EXHIBIT F
# Emergency Motion filed September 30, 2022

EFiled:  Sep 30 2022 03:04PM EDT
Transaction ID 68196046
Case No. 2020-0766-JTL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE STREAM TV NETWORKS, INC.,    )        C.A. No. 2020-0766 JTL
OMNIBUS AGREEMENT LITIGATION    )

## STREAM TV NETWORKS, INC.'S EMERGENCY MOTION FOR POST-JUDGMENT ENFORCEMENT TO VEST SHARES OF TECHNOVATIVE MEDIA, INC.

Pursuant to Ch. Ct. R. 70, Stream TV Networks, Inc. respectfully moves for emergency post-judgement enforcement relief, stating:

1.    SeeCubic, Inc. ("SeeCubic"), Shadron Stastney, and Hawk Investment Holdings Limited ("Hawk"), acting in concert together, have purported to transfer all the shares of Technovative Media, Inc. from SeeCubic to Hawk, in direct defiance of a Memorandum Opinion denying that exact relief just two days ago, and which is the subject of a pending motion for post-judgment enforcement (Dkt. No. 287).

2.    The correspondence by which SeeCubic, Mr. Stastney, and Hawk purport to have stolen Technovative out from under the Court's crystal clear injunction jurisdiction is attached hereto at Exhibit A.

3.    The actions taken by SeeCubic, Mr. Stastney, and Hawk stand in open contempt of the Memorandum Opinion on the Motion to Modify the Partial Final Judgment, and the Order Granting Final Judgment Under Court of Chancery Rule 54(b), which enjoin the secured creditors acting in concert with SeeCubic from exercising their creditors' rights.  The Motion further stands in contempt of the

1

ME1 42611086v.1

Court's Opinion On Stream's Motion For Mandatory Injunction. The Court ordered SeeCubic and those acting in concert with it to give Stream's its Assets and litigate creditor claims thereafter. Instead, SeeCubic and those acting in concert with it including Hawk, attempted a scheme to pretend to give Stream's Assets to Stream, but to really give those exact same Assets to Hawk. SeeCubic has not returned Stream's Assets, including those specifically discussed in the Court's Opinion On Stream's Motion For Mandatory Injunction issued just this morning.

4.    Moreover, SeeCubic has executed this scam in direct contempt of the Court's order on the Mandatory Injunction, issued just this morning. The Court ordered SeeCubic to issue to Stream a set of specific Assets. SeeCubic instead falsely claims to have issued the shares of Technovative Media, Inc. to Stream (the subject of a different motion upon which the Court has not yet ruled) on the basis that Technovative owns those Assets, only to minutes later have its principal Mr. Statsney instead transfer those shares, and presumably the Assets, to Hawk. The Court did not order, "Transfer Technovative to Stream and then to Hawk". The Court instead ordered, in paraphrase, SeeCubic to transfer server contents, source code, lenses, demonstrator units, and bonding equipment to Stream.

5.    The Court already stated all the legal analysis justifying injunctive relief for post-judgment enforcement on these topics in its Memorandum Opinion

2

denying the Motion To Modify.  All of that reasoning is still correct; it is merely being defied in contempt by Hawk, SeeCubic, and Mr. Stastney.

6.      SeeCubic, Mr. Stastney, and Hawk have repeatedly demonstrated that they do not fear the injunction authority of this Court, and will continue to exercise unlawful control of Stream's Assets until the Court enforces a serious sanction.

6.      As vexed as the Court must be to field these seriatim motions to enforce clear orders, Stream is even more vexed to have to file them.  There is no possible good faith excuse for today's contemptuous actions by SeeCubic and its acting-in-concert conspirators.  A motion for contempt sanctions will follow in due course.

Wherefore, Stream respectfully asks the Court to enter an order:

a.      Declaring per Court of Chancery Rule 70(a), that ownership of all shares of Technovative Media, Inc. is hereby divested from SeeCubic, Inc.;

b.      Declaring per Court of Chancery Rule 70(a), that ownership of all shares of Technovative Media, Inc. is hereby divested from Hawk Investment Holdings Limited;

c.      Declaring per Court of Chancery Rule 70(a) that ownership of all shares of Technovative Media, Inc. is hereby vested in Stream TV Networks, Inc.;

d.      Declaring that SeeCubic, Inc. and all those acting in concert with it including without limitation Hawk and Mr. Stastney are enjoined from interfering

3

with Stream TV Networks, Inc.'s ownership of all the shares of Technovative Media,

Inc. until further order of the Court.

Dated:  September 30, 2022          **McCARTER & ENGLISH, LLP**

                                    */s/ Andrew S. Dupre*
                                    Andrew S. Dupre (No. 4621)
                                    Brian R. Lemon (No. 4730)
                                    Sarah E. Delia (No. 5833)
                                    Stephanie H. Dallaire (No. 5184)
                                    Renaissance Centre
                                    405 North King Street, 8th Floor
                                    Wilmington, DE 19801
                                    Tel.:  (302) 984-6300
                                    Fax:  (302) 984-6399

                                    *Attorneys for Stream TV Networks,*
                                    *Inc. and Mathu & Raja Rajan*

                                    **Words: 646**

4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2022, I caused a true and correct copy

of the foregoing *Stream's Emergency Motion For Post-Judgment Enforcement*

*Vesting Shares of Technovative Media, Inc.* to be served via File & Serve*Xpress* on

the following counsel of record:

Jenness E. Parker, Esquire
Bonnie W. David, Esquire
Lilianna Anh Townsend
Trevor T. Nielson
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Rodney Square
P. O. Box 636
Wilmington, DE  19899-0636

Steven L. Caponi
K&L GATES LLP
Courthouse Square
600 N. King St., Suite 901
Wilmington, DE 19801


*/s/ Andrew S. Dupre*
Andrew S. Dupre (No. 4621)

ME1 42611086v.1

EFiled:  Sep 30 2022 03:04PM EDT
Transaction ID 68196046
Case No. 2020-0766-JTL

# <u>EXHIBIT A</u>

| | |
|---|---|
| **From:** | Caponi, Steven L. <Steven.Caponi@klgates.com> |
| **Sent:** | Friday, September 30, 2022 12:08 PM |
| **To:** | Shad Stastney; streamtvnetworksinc@gmail.com; mattrajan1471@gmail.com; mathu@streamacquisitiongroup.com |
| **Cc:** | Dupre, Andrew; mathu@streamacquisitiongroup.com |
| **Subject:** | RE: Technovative |
| **Attachments:** | 220930 - RM - Form of Proxy Notice .pdf |

**External Message**

Mr. Stastney and Mr. Rajan:

I write as counsel for Hawk Investment Holdings Limited to provide the attached letter. Mr. Stastney, as a director and officer of Technovative I would appreciate your promptly confirming compliance with the instructions in the attached letter.

Regards
SLC


Steven L. Caponi
Partner
K&L Gates LLP
600 N. King Street
Suite 901
Wilmington, DE 19801
Phone: 302.416.7080
Fax: 302.416.7020
steven.caponi@klgates.com
www.klgates.com

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Steven.Caponi@klgates.com<mailto:Steven.Caponi@klgates.com>.-4

ATTORNEY WORK PRODUCT
PRIVILEGED AND CONFIDENTIAL

September 30, 2022

Stream TV Networks, Inc.
2009 Chestnut Street, 3d Floor
Philadelphia, PA 19103
Attn: Mathu Rajan, President

TechnoVative Media, Inc.
The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801
Attn: Shadron L. Stastney

Mr. Rajan and Mr. Stastney:

We refer to those several Pledge Agreements by and among (a) Hawk Investment Holdings Limited ("Hawk"), on the one hand, and (b) Stream TV Networks, Inc. ("Stream"), TechnoVative Media, Inc. ("TVM"), Ultra-D Ventures, CV ("UDV"), and Ultra-D Cooperative, U.A. ("UDC" and collectively, with Stream, TVM, and UDV, the "Pledgors"), on the other hand, dated intermittently between December 17, 2014 and February 26, 2020 (collectively, the "Pledge Agreements"). As each of you are aware, pursuant to the Pledge Agreements, the Pledgors pledged to Hawk the Pledged Interests as security for loans made pursuant to those certain Promissory Notes referenced in the Pledge Agreements (collectively the "Notes"). As used in the Pledge Agreements, the "Pledged Interests" includes the interests issued by TVM (such interests, the "TVM Interests"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Pledge Agreements.

Pursuant to Section 6 of the Pledge Agreements, upon the occurrence of an "Event of Default" (as defined in the Notes), the Pledgors authorized Hawk, in relevant part, to "have any or all shares of Pledged Interests registered in its name or the name of its nominee, and Hawk or its nominee may thereafter exercise all voting, related and other rights pertaining to such Pledged Interests at any meeting of members or shareholders of an Issuer or otherwise ...." Pledge Agreements, at § 6.

Events of Default have occurred under the Notes, which permit Hawk to exercise any or all of its available remedies under the Notes, the Pledge Agreements, the other documents executed in connection therewith, and applicable law. Such Events of Default, include, but are not limited to, (a) the maturity date on certain of the Notes was no later than February 1, 2020, yet the obligations due thereunder remain outstanding and Stream has never remitted a single payment with respect thereto (*see* Notes, § 12(a) or 13(a)); (b) there are cross-default provisions included in all of the Notes, so all of the Notes are in default as a result of the foregoing (*see* Notes, § 12(e) or 13(e)); (c) Stream similarly is in default with respect to its obligations to SLS Holdings VI,

ATTORNEY WORK PRODUCT
PRIVILEGED AND CONFIDENTIAL

LLC, similarly triggering cross defaults under the Notes (*see id.*); and (d) Stream filed for bankruptcy protection on February 25, 2021, and failed to contest an involuntary bankruptcy filed against it on May 23, 2021, resulting in further defaults. *See Notes*, § 12(c) or 13(c). The Court of Chancery of the State of Delaware has conclusively found that certain of the foregoing defaults have occurred. *See Memorandum Opinion*, at pg. 5 (Sept. 28, 2022) ("Hawk Investment Holdings Ltd. ("Hawk") is a secured creditor of Stream.… Hawk correctly notes that the fact of Stream's default has been established.").

As a result of the foregoing, this letter constitutes formal notice of Hawk's intention to enforce its rights pursuant to Section 6 of the Pledge Agreements. Accordingly, to the extent the stock ledger of TVM (as referenced in the TVM By-Laws) and/or register (as referenced in the Pledge Agreement) (such document(s), the "Register") is within your control, Hawk hereby directs you to register the TVM Interests in Hawk's name on such Register and to deliver to Hawk a copy of such Register upon the completion of the registration thereof. Further, Hawk directs each of you to cease any actions that may be in contravention of Hawk's rights under the Pledge Agreements being so exercised. Effective immediately upon the issuance of this letter, all voting rights of Stream in and to any of the TVM Interests are hereby terminated and instead vested in Hawk. Further, as of the date hereof, no Issuer of Pledged Interests shall honor or acknowledge any vote, directive, or other action issued by a Pledgor in respect of the Pledged Interests except with the prior written consent of Hawk. Any attempt to hinder or disrupt Hawk in exercising its rights hereunder, or to exercise any rights in respect of the Pledged Interests, shall be considered a breach of the Pledge Agreements.

Very truly yours,

HAWK INVESTMENT HOLDINGS LTD.

By: _____

Name: For : ALBANY DIRECTORS LIMITED
Title: SOLE DIRECTOR

| | |
|---|---|
| **From:** | Shad Stastney <slstastney@hotmail.com> |
| **Sent:** | Friday, September 30, 2022 12:11 PM |
| **To:** | Caponi, Steven L. |
| **Cc:** | streamtvnetworksinc@gmail.com; mattrajan1471@gmail.com; mathu@streamacquisitiongroup.com; Dupre, Andrew |
| **Subject:** | Re: Technovative |
| **Attachments:** | TechnoVative_-_Stockholder_Ledger.xlsx; Untitled attachment 00007.txt |

**External Message**

Mr. Caponi,

Received and acknowledged, attached please find a copy of the updated official stock ledger of Technovative.  We will await Hawk's further instructions.

Best,

Shad Stastney

**TechnoVative Media, Inc.**

**Stockholder Ledger**

As of September 30, 2022

| Name of Stockholder | Address of Stockholder | Number | Share Class | Share Certificate No. | Date of Issuance | From Whom Transferred | To Whom Transferred | No. of Shares Transferred | Date of Transfer | Balance of Shares Held | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Stream TV Networks, Inc. | 2009 Chestnut Street Philadelphia, PA 19103 | 1,000 | Common | 01 | November 3, 2011 | -- | -- | -- | -- | 1,000 | 1,000 shares of common stock held by Stream TV Networks, Inc. pledged to Hawk Investment Holdings Limited pursuant to that certain Pledge Agreement, dated as of October 8, 2019 |
| Stream TV Networks, Inc. | 2009 Chestnut Street Philadelphia, PA 19103 | -- | -- | -- | -- | -- | SeeCubic, Inc. | 1,000 | September 4, 2020 | 0 | |
| SeeCubic, Inc. | 1732A Marsh Road Suite 124 Wilmington, DE 1980 | 1,000 | Common | -- | -- | Stream TV Networks, Inc. | -- | 1,000 | September 4, 2020 | 1,000 | 1,000 shares of common stock transferred to SeeCubic, Inc. by Stream TV Networks, Inc. in uncertificated form in accordance with the Bylaws and that certain Affidavit of Loss, dated as of December 22, 2020 |
| SeeCubic, Inc. | 1732A Marsh Road Suite 124 Wilmington, DE 1980 | -- | -- | -- | -- | -- | Stream TV Networks, Inc. | 1,000 | September 30, 2022 | 0 | |
| Stream TV Networks, Inc. | 2009 Chestnut Street Philadelphia, PA 19103 | 1,000 | Common | -- | -- | SeeCubic, Inc. | -- | 1,000 | September 30, 2022 | 1,000 | Shares remain subject to pledge in favor of Hawk Investment Holdings Limited pursuant to that certain Pledge Agreement, dated as of October 8, 2019 |

EFiled:  Sep 30 2022 03:04PM EDT
Transaction ID 68196046
Case No. 2020-0766-JTL

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE STREAM TV NETWORKS, INC.,    )        C.A. No. 2020-0766 JTL
OMNIBUS AGREEMENT LITIGATION    )

## [PROPOSED] ORDER GRANTING STREAM TV NETWORKS, INC.'S EMERGENCY MOTION FOR POST-JUDGMENT ENFORCEMENT VESTING SHARES OF TECHNOVATIVE MEDIA, INC.

WHEREAS, on September 30 2022, Plaintiff Stream TV Networks, Inc. ("Stream") filed the Stream TV Networks, Inc.'s Emergency Motion For Post-Judgment Enforcement Vesting Shares of Technovative Media, Inc. (the "Motion");

WHEREAS, the Court, having considered all the submissions and arguments;

IT IS HEREBY ORDERED this _____ day of _____, 2022 that:

1.    The Motion is GRANTED;

2.    Per Court of Chancery Rule 70(a), ownership of all shares of Technovative Media, Inc. is hereby divested from SeeCubic, Inc.;

3.    Per Court of Chancery Rule 70(a), ownership of all shares of Technovative Media, Inc. is hereby divested from Hawk Investment Holdings Limited;

4.    Per Court of Chancery Rule 70(a), ownership of all shares of Technovative Media, Inc. is hereby vested in Stream TV Networks, Inc.;

5..    SeeCubic, Inc. and all those acting in concert with it including without limitation Hawk and Mr. Stastney are enjoined from interfering with Stream TV

Networks, Inc.'s ownership of all the shares of Technovative Media, Inc. until

further order of the Court

     **SO ORDERED** this _____ day of _____, 2022.


_____
The Honorable J Travis Laster

# EXHIBIT G
# Order on Emergency Motion – October 3, 2022

EFiled: Oct 03 2022 09:00AM EDT
Transaction ID 68198898
Case No. 2020-0766-JTL

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

IN RE STREAM TV NETWORKS, INC.   )  C.A. No. 2020-0766-JTL
OMNIBUS AGREEMENT LITIGATION   )

**ORDER REGARDING EMERGENCY MOTION TO ENFORCE**

WHEREAS,

A.    SeeCubic, Inc. acquired the assets of Stream TV Network, Inc. ("Stream")

under an agreement among Stream, its two secured creditors, and fifty-two of its

stockholders (the "Omnibus Agreement").

B.    The assets that SeeCubic acquired from Stream included 1,000 shares of

common stock of Technovative Media, Inc. ("Technovative" or the "Company"),

representing 100% of its equity (the "Shares").

C.    The Delaware Supreme Court subsequently held that the Omnibus

Agreement was not valid. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del.

2022) (the "Mandate").

D.    The court entered a partial final judgment which determined that in light of

the Mandate, the Omnibus Agreement did not validly transfer legal title to any of Stream's

assets (the "Legacy Stream Assets"). Dkt. 266. The court directed the parties to "cooperate

to effectuate the Mandate, including by causing SeeCubic to transfer legal title to the

[Legacy Stream Assets] from SeeCubic to Stream as expeditiously as possible." *Id.* ¶ 4.

The Shares are one of the Legacy Stream Assets.

E.    At 11:45 a.m. on September 30, 2022, SeeCubic informed the court that it caused the Company to transfer title to the Shares from SeeCubic to Stream. *Id.* at 2. SeeCubic provided a copy of its stock ledger evidencing transfer of the Shares. *Id.* Ex. A.

F.    At 12:08 p.m. on September 30, 2022, Hawk Investment Holdings Ltd. ("Hawk") instructed Shad L. Stastney, acting in his capacity as a director and officer of the Company, to register the Shares in the name of Hawk. Dkt. 312 Ex. A. Shortly thereafter, Stastney acknowledged receiving the instructions and provided an updated stock ledger of Technovative. *Id.* Hawk then issued a "Proxy Notice" to Technovative "demanding that Hawk be listed as the holder of record of all Technovative stock in the Technovative share registry." Dkt. 311 at 1. Stastney complied with the request. *Id.* at 2.

G.    Stream has filed an Emergency Motion to Enforce Judgment (the "Motion") in which Stream seeks an order canceling Hawk's purported ownership of the Shares and the vesting of ownership of the Shares in Stream. Stream also seeks an injunction barring SeeCubic and anyone acting in concert with it, including Hawk and Stastney, from interfering with Stream's ownership of the Shares until further order of the court.

H.    The court issued an opinion granting the Emergency Motion in part (the "Enforcement Opinion").

**NOW, THEREFORE, FOR THE REASONS STATED IN THE ENFORCEMENT OPINION, IT IS HEREBY ORDERED**:

1.    Hawk is divested of title to the Shares.

2.    Title to the Shares is vested in Stream.

- 2 -

3.      Within twenty-four hours, the Company will update its stock ledger to reflect the transactions set forth in this order and file a copy of the updated ledger with the court.

4.      For a period of ten days, SeeCubic, Hawk, Stastney, and anyone acting in concert with them are enjoined from taking any action that would interfere with either Stream's ownership of the Shares or Stream's exercise of rights associated with the Shares. In accordance with Court of Chancery Rule 6, the injunction will lift on Monday, October 17, 2022, at 9:00 a.m., at which point SeeCubic, Hawk, Stastney, and anyone acting in concert with them may exercise any rights or remedies that they believe they have regarding the Shares.

/s/ J. Travis Laster
Vice Chancellor Laster
October 3, 2022

# EXHIBIT H
# Emails to Shad about Special Meeting for Netherlands Board and to remove himself – October 3, 2022

# SEECUBIC B.V.

Mr. Shadron L. Stastney
Mr. Hans Zuidema
Mr. Krzysztof Kabacinski
c/o Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0636

Via Email: Jenness E. Parker

October 3, 2022

Re: Extraordinary General Meeting on October 11, 2022

Dear SeeCubic Directors and Officer,

On behalf of Ultra-D Coöperatief U.A., which owns 100% of SeeCubic B.V., I hereby invite you to attend an Extraordinary General Meeting (the "Meeting") of SeeCubic B.V., a private company with limited liability, organized and existing under the laws of the Netherlands, having its registered address of Park Forum 1035, 5657HJ Eindhoven, the Netherlands (the "Company"), which will be held via video teleconference on October 11, 2022 at 5:00 PM CET. The purpose of the Meeting is to conduct discussion and vote on the items described in the attached agenda.

Please inform us if you are unable to attend the Meeting.

If you will be able to attend, please send the name and email address of your designated representative to mathu@streamacquisitiongroup.com so we can circulate the teleconference link.

Respectfully,

Mathu Rajan
Sole Director
Ultra-D Coöperatief U.A.
On behalf of the Company
SeeCubic B.V.

**AGENDA**
**OF THE EXTRAORDINARY GENERAL MEETING OF**
**SEECUBIC B.V.**

a private company with limited liability, organized and existing under the laws of the Netherlands, having its registered address of Park Forum 1035, 5657HJ Eindhoven, the Netherlands to be held via video teleconference on October 11, 2022 at 4:30 PM CET (the "Meeting").

---

1. Appointment of chairman and secretary of the Meeting and opening of the Meeting

2. Approval of the agenda of the Meeting

3. Review changes in ownership and management of Ultra-D Cooperatief U.A., representing 100% of the issued capital of SeeCubic B.V.

4. Make changes to the directors and officer of SeeCubic B.V.

    a. Remove Shadron Lee Stastney as Director/Bestuurder A

    b. Remove Hans Zuidema as Director/Bestuurder B

    c. Remove Krzysztof Kabacinski as CEO

    d. Appoint Mathu Rajan as Director/Bestuurder A and CEO

5. Any other business

6. Adjournment of the Meeting

# STREAM TV INTERNATIONAL B.V.

Mr. Shadron Lee Stastney
Mr. Hans Zuidema
c/o Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0636

Via Email: Jenness E. Parker

October 3, 2022

Re: Extraordinary General Meeting on October 11, 2022

Dear Stream TV International B.V. Directors,

On behalf of Ultra-D Coöperatief U.A., which owns 100% of Stream TV International B.V., I hereby invite you to attend an Extraordinary General Meeting (the "Meeting") of Stream TV International B.V., a private company with limited liability, organized and existing under the laws of the Netherlands, having its registered address of Park Forum 1035, 5657HJ Eindhoven, the Netherlands (the "Company"), which will be held via video teleconference on October 11, 2022 at 4:30 PM CET. The purpose of the Meeting is to conduct discussion and vote on the items described in the attached agenda.

Please inform us if you are unable to attend the Meeting.

If you will be able to attend, please send the name and email address of your designated representative to mathu@streamacquisitiongroup.com so we can circulate the teleconference link.

Respectfully,

Mathu Rajan
Sole Director
Ultra-D Coöperatief U.A.
On behalf of the Company
Stream TV International B.V.

**AGENDA**
**OF THE EXTRAORDINARY GENERAL MEETING OF**
**STREAM TV INTERNATIONAL B.V.**

a private company with limited liability, organized and existing under the laws of the Netherlands, having its registered address of Park Forum 1035, 5657HJ Eindhoven, the Netherlands to be held via video teleconference on October 11, 2022 at 4:30 PM CET (the "Meeting").

---

1. Appointment of chairman and secretary of the Meeting and opening of the Meeting

2. Approval of the agenda of the Meeting

3. Review changes in ownership and management of Ultra-D Cooperatief U.A., representing 100% of the issued capital of Stream TV International B.V.

4. Make changes to the directors and officers of Company

    a. Remove Shadron Lee Stastney as Director/Bestuurder A

    b. Remove Hans Zuidema as Director/Bestuurder B

    c. Appoint Mathu Rajan as Director/Bestuurder A and CEO

5. Any other business

6. Adjournment of the Meeting

<u>Via e-mail</u>
Mr. Mathu Rajan
Ultra-D Coöperatief U.A.
Park Forum 1035
5657 HJ Eindhoven
The Netherlands

October 9, 2022

Re: My proposed dismissal as director of the Dutch SeeCubic entities

Dear Mr. Rajan,

I refer to your letters of October 3, 2022, by which you, purportedly on behalf of Ultra-D Coöperatief U.A., invited me to attend the Extraordinary General Meetings of SeeCubic B.V. and Stream TV International B.V. (such entities, together with Ultra-D Coöperatief U.A., the **"Dutch SeeCubic Entities"**), to be held on October 11, 2022. The proposed agendas for these meetings include proposals to dismiss both me and Mr. Hans Zuidema as directors of these companies and to appoint yourself as director and CEO of these companies. I also refer to the copy of the document which purports to contain a written resolution of the general meeting of members of Ultra-D Coöperatief U.A. dated October 3, 2022, which states that I and Mr. Hans Zuidema have been removed as directors of this entity, and that you have been appointed as director of this entity.

Each of these documents have come as a surprise to me. I do not believe the dismissal of me or Mr. Hans Zuidema as a director of any of the Dutch SeeCubic Entities is appropriate, nor that such dismissals are in the best interest of these companies. As you are aware, the Dutch SeeCubic Entities have been managed successfully over the past few years by both me and Mr. Zuidema, in contrast to previous management by yourself which had led these companies into serious distress. Therefore, I do not believe that the proposed change of management will serve the best interests of the companies and their stakeholders, and believe that such change of management will in fact result in the exact opposite.

As you are aware, the Court of Chancery of the State of Delaware has ordered that I am enjoined from taking any action that would interfere with either Stream TV Network, Inc.'s ownership of the shares in TechnoVative Media, Inc. or its exercise of rights associated with those shares until October 17, 2022, at 9:00 a.m. As such, I consider myself prevented from attending the Extraordinary General Meetings on October 11, 2022, to oppose my proposed dismissal as a director. I do therefore not expect to be in a position to attend these meetings. However, neither my absence nor this letter should be construed in any way as an acceptance of the proposed dismissals. For the avoidance of doubt, I reserve all rights in respect of my proposed dismissal as a director of the Dutch SeeCubic Entities and all related matters.

Respectfully,

Shadron L. Stastney

Cc:      Andrew Dupre

# EXHIBIT I
# Received assets back from San Ramon, CA October 12, 2022





# EXHIBIT J
# Received assets back from United Kingdom October 17, 2022

**SeeCubic Inc / Stream TV Networks**

**Asset Exchange**

**65" 4K UltraD screens (loose)**

5 x Brand New
10 used (of which 1 x Scrap and 4 faulty/suspect)

**65" 4K UltraD screens (palleted)**

1 pallet of 6 brand new /unopened
1 pallet of 5 brand new /unopened

| | |
|---|---|
| **50" *Cello* UltraD screens** | 6 |
| **50" ROM UltraD screens** | 3 |
| **Seecube Pro units** | 1 |
| **Seecube units** | 3 |
| **65" BV3** | 1 |

Plus 7 sets of feet for TVs

# EXHIBIT K

# Status Quo Order – October 20, 2022

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HAWK INVESTMENT HOLDINGS LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0930-JTL |
| | ) | |
| STREAM TV NETWORKS, INC., AND | ) | |
| TECHNOVATIVE MEDIA, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## STATUS QUO ORDER

WHEREAS:

A.     On October 17, 2022, plaintiff Hawk Investment Holdings, Ltd. filed a Verified Complaint for Declaratory Relief and pursuant to 8 *Del. C.* § 225. Through its action, among other things, Hawk seeks a determination that it has validly exercised its creditor rights to vote the shares of Technovative Media, Inc. (the "Company") and reconstitute its board of directors with Shad Stastney as its sole director.

B.     The complaint alleges that the Company has rejected Hawk's position and maintains that Mathu Rajan is the Company's sole director.

C.     In conjunction with its complaint, Hawk filed a Motion for Expedited Proceedings, a Motion for Injunction, and an Opening Brief in Support of the Motion for Injunction and Expedited Proceedings.

D.     On October 19, 2022, the defendants filed an opposition to the Motion to Expedite.

E.      On October 20, 2022, Hawk provided the court with information indicating that one of the Company's subsidiaries faced a risk of missing payroll because of disputes over control of the Company.

F.      On October 22, 2022, the Court of Chancery heard oral argument on the Motion.

G.      For the reasons discussed during the hearing, the defendants' grounds for opposing expedition are meritless.

H.      As in most Section 225 actions, a status quo order is warranted, but Hawk's proposed injunction is not appropriate. It goes too far in granting relief.

**NOW, THEREFORE, THE COURT FINDS AND ORDERS AS FOLLOWS:**

1.      A bona fide dispute exists over the composition of the board of directors of the Company (the "Board").

2.      Section 225 exists to address precisely this type of dispute. It is a specialized, summary proceeding under Delaware law designed to determine, among other things, who holds office as a director of a Delaware corporation.

3.      A Section 225 proceeding is an *in rem* proceeding, because the Delaware corporation is a *res* over which this court can exercise jurisdiction. *Genger v. TR Invs., LLC*, 26 A.3d 180, 200 (Del. 2011). More precisely, when a Section 225 action seeks to adjudicate the status to director and officer positions at a Delaware corporation, the director and officer positions constitute a *res* over which this court can exercise *in rem* jurisdiction. *Id.* at 199–200 (noting that defendants in a Section 225 action appear "not individually, but

2

rather as respondents being invited to litigate their claims to the *res* (here, the disputed corporate office) or forever be barred from doing so"); *see Feeley v. NHAOCG, LLC*, 2012 WL 966944, at *5 (Del. Ch. Mar. 20, 2012) (discussing analogous provision of Delaware Limited Liability Company Act).

4.      This court takes jurisdiction over the *res* consisting of the director positions at the Company. This court will adjudicate the claims that Hawk has advanced, which bear on the determination of entitlement to the *res* and are necessary to decide that issue. *See Kahn Bros. & Co. v. Fishbach Corp.*, 1988 WL 122517, at *5 (Del. Ch. Nov.15, 1988) ("[T]he question whether an issue is properly litigable in a Section 225 action turns . . . upon a determination of whether it is necessary to decide in order to determine the validity of the election or designation by which the defendant claims to hold office."). This court commonly addresses the consequences that other agreements have on the outcome of director elections or removal efforts, including arguments about the validity of those agreements. *See id.* (collecting cases).

5.      This court customarily enters an interim status quo order in a Section 225 proceeding that limits the entity to operating in the ordinary course of business. *See, e.g., Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *2 (Del. Ch. Nov. 7, 2013); *Arbitrium (Cayman Islands) Handels AG v. Johnson*, 1994 WL 586828, at *3 (Del. Ch. Sept. 23, 1994). The grounds for that relief are well understood and need not be repeated. Those reasons apply in this case.

3

6.      Accordingly, pending further order of the court, the Company shall operate only in the ordinary course of business.

7.      The following actions are outside the ordinary course of business. The Company may not take any of the following actions without leave of court, and the parties and anyone acting in conjunction with them are enjoined from taking or purporting to cause the Company to take any of the following:

(a)      any action that would require the consent, approval or vote of the Board or the Company's stockholders;

(b)      any action that would result in any change to the size or composition of the Board;

(c)      any action that would result in the termination, suspension, or modification of the employment status or terms of employment of any officer of the Company;

(d)      any action that would result in the hiring of any new officer of the Company or its subsidiaries;

(e)      any action that would result in the appointing any new director of the Company or its subsidiaries;

(f)      the issuing, selling, distributing, authorizing, establishing, creating, changing, or disposing of any securities of, or interest in securities of, the Company;

(g)      the authorizing, entering into any contract or arrangement or otherwise binding the Company, directly or indirectly, to sell, transfer, contribute, or

4

otherwise dispose of, pledge, materially encumber or otherwise materially restrict or limit any interest in the Company, or any asset (whether tangible or intangible) in which the Company has an interest, except in the ordinary course of business;

(h)    modifying, amending, or abandoning any contract or arrangement to which the Company is currently a party, except in the ordinary course of business;

(i)    authorizing, issuing, incurring, or assuming new debt or changing the terms of the Company's debt, except in the ordinary course of business;

(j)    undertaking, authorizing, approving, or directing any action in furtherance of a merger, consolidation, liquidation, dissolution, winding-up, or restructuring of the Company, a sale, transfer, exclusive license, or other disposition of all or substantially all of the assets of the Company;

(k)    undertaking, authorizing, approving or directing any action in furtherance of amending, altering, modifying, repealing, or adopting any provision of the By-laws or the Certificate of Incorporation of the Company;

(l)    making, or directing any person to make, changes to the contents of the Company's website;

(m)    declaring any dividend or distribution with respect to the common stock of the Company;

(n)    filing a bankruptcy petition or acquiring or selling any business or operation of the Company, whether by merger, purchase of assets or equity interest, or otherwise;

5

(o)      entering into any legally binding commitment with respect to, or agreeing to do, any of the foregoing, except to the extent required by an existing contract or applicable law; or

(p)      advancing or otherwise using any funds of the Company or its subsidiaries to pay the fees or expenses (including but not limited to attorneys' fees) of a party in this action.

8.      The following actions fall within the ordinary course of business. The Company and its subsidiaries may take any of the following actions:

(a)      payment of payroll, including standard employee benefits;

(b)      payment of recurring costs related to operating infrastructure including rent, information systems and technology, and utilities;

(c)      payment of fees and expenses to professional advisors related to Company business and unrelated to this action, including without limitation, corporate attorneys' and accountant fees;

(d)      maintenance and update of Company systems; and

(e)      service to existing clients, and solicitation and onboarding of new clients.

9.      The parties shall not knowingly tamper with, destroy, relocate, or discard any documents or electronic data in their possession, custody, or control relating in any way to the matters alleged in the complaint. Nothing herein shall waive any parties' right to attorney-client or work product protections and privileges.

10.    In this action, the court believes that a status quo order, standing alone, is insufficient to ensure that the Company operates in the ordinary course of business pending the outcome of this proceeding. This action is part of a larger dispute between Stream TV Networks, Inc. and its secured creditors. The court is familiar with the parties as a result of having presided over aspects of the larger dispute, including in C.A. No. 2020-0766-JTL. The parties have had numerous disputes, and the court expects those disputes to continue. It is highly likely that those disputes will interfere with the Company's ability to operate in the ordinary course, which creates a threat of irreparable harm to the Company. It is highly likely that those disputes will impose a significant burden on the court.

11.    Accordingly, in addition to imposing a status quo order, the court is appointing Ian Liston of Wilson, Sonsini, Goodrich & Rosati P.C. as receiver pendente lite (the "Receiver").

12.    The Receiver shall take charge of the Company and ensure that it operates in the ordinary course of business and in conformity with this order.

13.    Pending further order of this court, the Receiver shall exercise (i) all of the power and authority afforded to the Board under Section 141 of the Delaware General Corporation Law and (ii) all of the power and authority afforded to a receiver appointed under Section 279 of the Delaware General Corporation Law. The court will enter a separate order elaborating on the Receiver's authority.

14.    The parties and their respective affiliates, directors, agents, employees, attorneys, and any other person acting in concert with them shall cooperate fully with the

7

Receiver to assist the Receiver in ensuring that the Company continues to operate in the ordinary course of business, but only in the ordinary course of business.

15.    The appointment of the Receiver displaces the ability of the parties to cause the Company to take actions outside of the ordinary course of business. Nevertheless, the restrictions are salutary and provide an additional layer of protection.

16.    This order applies to the parties and their respective affiliates, directors, agents, employees, attorneys, and any other person acting in concert with them.

17.    To the extent that any party contends that another party has failed to comply with the requirements under this order, or that exigent circumstances require that this order be modified or vacated for good cause, that party shall give notice to the Receiver. With the Receiver's assistance, the parties shall attempt to negotiate a resolution in good faith. If no resolution has been reached within five days, the party who served the notice may file a motion seeking relief from the court. The parties will brief the motion on an expedited basis. The parties should expect the court to ask the Receiver for input on how to resolve the dispute.

18.    Nothing in this order shall waive, modify, relinquish or otherwise affect any claim or defense filed or asserted by any party in connection with this action.

19.    The provisions of this Order may be amended on a case-by-case basis by written agreement of the parties and the Receiver. As with all orders, the Court can modify this one for good cause shown.

Vice Chancellor J. Travis Laster
October 20, 2022

# EXHIBIT L
# Appointment of Ian Liston – October 21, 2022

EFiled:  Oct 21 2022 01:26PM EDT
Transaction ID 68288039
Case No. 2022-0930-JTL

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| HAWK INVESTMENT HOLDINGS LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    C.A. No. 2022-0930-JTL |
| | ) |
| STREAM TV NETWORKS, INC., AND | ) |
| TECHNOVATIVE MEDIA, INC., | ) |
| | ) |
| Defendants. | ) |

## ORDER REGARDING RECEIVER PENDENTE LITE

WHEREAS:

A.    The court entered a status quo order on October 20, 2022 (the "Status Quo Order") which requires that Technovative Media, Inc. (the "Company") operate only in the ordinary course of business pending further order of the court.

B.    The court determined that in addition to the restrictions imposed by the Status Quo Order, the situation warranted the appointment of a receiver pendente lite (the "Receiver").

C.    In the Status Quo Order, the court appointed Ian Liston as Receiver.

D.    In the Status Quo Order, the court directed the Receiver to take charge of the Company and ensure that it operates in the ordinary course of business and in conformity with the Status Quo Order.

E.    In the Status Quo Order, the court empowered the Receiver with (i) all of the power and authority afforded to the board of directors of the Company (the "Board") under Section 141 of the Delaware General Corporation Law and (ii) all of the power and

authority afforded to a receiver appointed under Section 279 of the Delaware General Corporation Law.

F.      In the Status Quo Order, the court noted that it would enter a separate order elaborating on the Receiver's authority and the protections afforded to the Receiver by the court.

G.      This Order supplements and elaborates on the Status Quo Order. It does not displace or amend the Status Quo Order. If the Receiver or the parties perceive any conflict between this order and the Status Quo Order, they will seek to resolve it by proposing a stipulated modification. If they cannot, they will bring the issue to the court's attention.

**NOW, THEREFORE, IT IS ORDERED AS FOLLOWS:**

1.      <u>APPOINTMENT OF RECEIVER</u>: As set forth in the Status Quo Order, Ian Liston is appointed Receiver with the powers and duties specified in this Order and the Status Quo Order. The Receiver shall have authority, but shall not be required, to petition this court for instructions at any time or from time to time. The Receiver may seek to modify the terms of this Order, including by seeking supplemental authority under this Order, for good cause shown.

2.      <u>ACCEPTANCE AND TERM OF APPOINTMENT</u>: The Receiver shall file in this court a written acceptance of this appointment. The Receiver shall serve at the pleasure of the court, and the provisions of this Order shall remain in effect pending further order of the court.

3.      <u>WAIVER OF DUTIES AND BOND</u>: The provisions of Court of Chancery Rules 149–168, to the extent otherwise applicable, are hereby waived. The Receiver shall

not be required to post a bond. In lieu of these provisions, the Receiver shall report to the court as directed herein and shall provide additional interim reports to the court at quarterly intervals from the date of this Order throughout the conclusion of this case, or until the Receiver is discharged by the court.

4.    CHARGE: The Receiver shall use his best efforts, and the authority granted herein, to ensure that the Company operates in the ordinary course of business and does not take any actions outside of the ordinary course of business.

5.    SCOPE OF AUTHORITY: The Receiver shall have and may exercise all authority necessary and proper for the fulfillment of his charge. As set forth in the Status Quo Order, the Receiver shall exercise (i) all of the power and authority afforded to the Board under Section 141 of the Delaware General Corporation Law and (ii) all of the power and authority afforded to a receiver appointed under Section 279 of the Delaware General Corporation Law. The Receiver may pursue any rights or remedies that the Company possesses and would assert either in the ordinary course of business or to enable the Company to operate in the ordinary course of business.

6.    INFORMATIONAL RIGHTS: The Company shall provide the Receiver with any books and records of the Company that he requests. For the avoidance of doubt, the Receiver possesses the same informational rights as those afforded to a director under 8 *Del. C.* § 220(d).

7.    AUTHORITY TO RETAIN ADVISORS: The Receiver is authorized to retain one or more experts or advisors, including financial advisors, professional sales agencies, accountants, attorneys, brokers, and other professionals as the Receiver deems

3

necessary in carrying out his duties. The Receiver is authorized to utilize the services of professionals from the law firm of Wilson Sonsini Goodrich & Rosati P.C. (the "Firm") and may use attorneys from the Firm as counsel.

8.    <u>CONSULTATION</u>: The Receiver may, to the extent deemed practical or necessary in his judgment, consult with corporate constituencies, including directors, officers, stockholders, creditors, employees, customers, and suppliers, with respect to the performance by the Receiver of his duties, but shall not be subject to the direction or control of any corporate constituency and shall not be required to take any course of action that any corporate constituency may favor or disfavor. The Receiver may consult with the court, including through *ex parte* communications.

9.    <u>COOPERATION</u>: The appointment of the Receiver is binding upon the directors, officers, employees, agents, stockholders, equityholders, and creditors of the Company, who shall cooperate with the Receiver in the performance of his duties. No party to this action, and no other person acting or purporting to act as a director, officer, employee, representative, agent, stockholder, equityholder, or creditor of the Company, shall institute any proceeding in any forum other than this court challenging any action, recommendation, or decision by the Receiver.

10.    <u>EXCULPATION, INDEMNIFICATION, AND ADVANCEMENT</u>: The Receiver shall have no liability to the Company, its stockholders, or any other person or entity, regardless of whether such person or entity is affiliated with the Company or its stockholders, for actions taken in good faith pursuant to this Order. Notwithstanding anything to the contrary contained in the Company's organizing documents, charter, or

4

bylaws, the Receiver shall be entitled to all protection, limitation from liability, and immunity available at law or in equity to a court-appointed receiver including, without limitation, all protection, limitation from liability, and immunity provided by the indemnification provisions of applicable law. Expenses, including attorneys' fees, incurred by the Receiver in defending any civil, criminal, administrative, or investigative action, suit, or proceeding arising by reason of or in connection with the Receiver's duties shall be paid by the Company monthly in advance of the final disposition of such action, suit, or proceeding, subject to the repayment of such amount if it shall be ultimately determined by this court that the Receiver is not entitled to be indemnified by the Company because he acted in bad faith.

11. <u>COMPENSATION OF THE RECEIVER, COUNSEL TO THE RECEIVER, EXPERTS, AND ADVISORS</u>: The Company shall pay the expenses of the Receivership (collectively, the "Expenses"). The Expenses include the fees of the Receiver, and those of other professionals at the Firm who provide services or counsel to the Receiver, which may be billed at their customary hourly rates. The Expenses include out-of-pocket expenses, which shall be reimbursed. The Expenses include the invoices submitted by all experts, advisors, and other professionals retained by the Receiver, who shall submit invoices to the Receiver on a monthly basis.

12. <u>PAYMENT OF EXPENSES</u>: The Company shall pay the Expenses promptly on a monthly basis. The Company may dispute Expenses, but will make payment notwithstanding the dispute. On a quarterly basis, the Receiver shall apply to the court for

approval of any Expenses that are in dispute. If the court disapproves any disputed amounts, then those amounts will be refunded to the Company, without interest.

13.    <u>PRIORITY OF PAYMENT AND RECOVERY AS COURT COSTS:</u> The Expenses shall have priority over all other obligations, payments, claims, and distributions of the Company. If the Company does not satisfy any of the Expenses, then those expenses will be billed to the parties as court costs. As with other court costs, if the parties do not pay them, then the unpaid expenses will become the obligation of the parties' counsel. The court may bar counsel from making filings with the court, not only in this action but in other actions, if court costs go unpaid. Counsel are advised to make arrangements with their clients to ensure that counsel are not forced to bear the expense or incur the consequences of nonpayment.

*/s/ J. Travis Laster*_____
Vice Chancellor J. Travis Laster
Dated: October 21, 2022

# EXHIBIT M
# We received certain (not all) Stream TV emails back on December 22, 2022

**amanda@streamacquisitiongroup.com**

| | |
|---|---|
| **From:** | Lemon, Brian <blemon@McCarter.com> |
| **Sent:** | Thursday, December 22, 2022 10:59 AM |
| **To:** | amanda@streamacquisitiongroup.com |
| **Cc:** | Dallaire, Stephanie; Hitchens, Mark; Dupre, Andrew; 'mathu rajan'; 'Raja Rajan'; dan@streamacquisitiongroup.com; 'Suby Joseph'; 'Nicole Maneen'; 'bud@streamacquisitiongroup.com' |
| **Subject:** | FW: Stream TV |

Hi Amanda,

Please see below.  Skadden is allegedly providing all of the requested e-mails.  Please let me know if they have provided everything.

Best,
Brian

---

**From:** Brumme, Marley Ann <Marley.Brumme@skadden.com>
**Sent:** Thursday, December 22, 2022 10:53 AM
**To:** Lemon, Brian <blemon@McCarter.com>; David, Bonnie W <Bonnie.David@skadden.com>; Dupre, Andrew <ADupre@McCarter.com>; Dallaire, Stephanie <sdallaire@mccarter.com>
**Cc:** Parker, Jenness E <Jenness.Parker@skadden.com>; Colby, Eben P <Eben.Colby@skadden.com>
**Subject:** RE: Stream TV

**\*\*External Message\*\***

---

Brian,

All of the emails should be here:

https://seecubic-my.sharepoint.com/:f:/g/personal/infoshare_streamtvnetworks_com/Eor2D-dVKAlBmQPR6CuH-ggB5HOxygeoKa6WYsps_oRnCQ?e=w7V96q

**Both your and Amanda's email addresses have been granted access.**

**Thanks,**
**Marley**

**Marley Ann Brumme**
**Skadden, Arps, Slate, Meagher & Flom LLP**
**T: +1.617.573.4861 | F: +1.617.305.4861**
**marley.brumme@skadden.com**

This email message from the law firm of McCarter & English, LLP is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

# EXHIBIT N
# Stream TV and Technovative filed for Bankruptcy March 15, 2023

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

Eastern _____ District of _____ Pennsylvania _____
(State)

Case number (*If known*): _____ Chapter __11__

☐ Check if this is an amended filing

## Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy    06/22

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.**

1. **Debtor's name**

   Stream TV Networks, Inc.

2. **All other names debtor used in the last 8 years**

   Include any assumed names, trade names, and *doing business as* names

3. **Debtor's federal Employer Identification Number (EIN)**

   2 7 – 1 2 2 4 0 9 2

4. **Debtor's address**

   **Principal place of business**

   209 Chestnut Street
   Number     Street

   3rd Floor

   Philadelphia, PA     19103
   City          State     ZIP Code

   Philadelphia
   County

   **Mailing address, if different from principal place of business**

   Number      Street

   P.O. Box

   City          State     ZIP Code

   **Location of principal assets, if different from principal place of business**

   Number      Street

   City          State     ZIP Code

5. **Debtor's website** (URL)

| Debtor | Stream TV Networks, Inc. | Case number *(if known)* _____ |
|---|---|---|
| | Name | |

---

**6. Type of debtor**

☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

---

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☒ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
http://www.uscourts.gov/four-digit-national-association-naics-codes .

___ ___ ___ ___

---

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☐ Chapter 7

☐ Chapter 9

☒ Chapter 11. *Check **all** that apply:*

☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

☐ A plan is being filed with this petition.

☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

---

| Debtor | Stream TV Networks, Inc. | Case number *(if known)* _____ |
|---|---|---|
| | Name | |

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

- ☐ No
- ☒ Yes. District **Delaware** When **02/24/2021** Case number **21-10433**
  MM / DD / YYYY
  District **Delaware** When **05/23/2021** Case number **21-10848**
  MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

- ☐ No
- ☒ Yes. Debtor **Technovative Media, Inc.** Relationship **Subsidiary**
  District **Eastern District of Pennsylvania** When _____
  MM / DD / YYYY
  Case number, if known _____

**11. Why is the case filed in *this district*?**

*Check all that apply:*

- ☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.
- ☒ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

- ☒ No
- ☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

  **Why does the property need immediate attention?** *(Check all that apply.)*

  - ☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

    What is the hazard? _____

  - ☐ It needs to be physically secured or protected from the weather.

  - ☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

  - ☐ Other _____

  **Where is the property?** _____
  Number        Street
  _____
  _____
  City                                State ZIP Code

  **Is the property insured?**

  - ☐ No
  - ☐ Yes. Insurance agency _____

    Contact name _____

    Phone _____

---

■ **Statistical and administrative information**

---

Debtor   Stream TV Networks, Inc._____     Case number *(if known)*_____
         Name

---

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

---

**14. Estimated number of creditors**

☐ 1-49
☐ 50-99
☒ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5,001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than 100,000

☐

---

**15. Estimated assets**

☐ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million

☐ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
  $100,000,001-$500 million

☒ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

---

**16. Estimated liabilities**

☐ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million

☐ $1,000,001-$10 million
☒ $10,000,001-$50 million
☐ $50,000,001-$100 million
  $100,000,001-$500 million

☐ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

---

### Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   03/15/2023_____
             MM  / DD / YYYY

✗ _Mathu Rajan_ (signature)_____        Mathu Rajan_____
Signature of authorized representative of debtor    Printed name

Title   Director_____

---

Debtor      Stream TV Networks, Inc.
_____        Case number (if known)_____
            Name

**18. Signature of attorney**        ✗ /s/ Rafael X. Zahralddin-Aravena        Date    03/15/2023
                                    _____              _____
                                    Signature of attorney for debtor                     MM  / DD / YYYY

                                    Rafael X. Zahralddin-Aravena
                                    _____
                                    Printed name
                                    Lewis Brisbois Bisgaard & Smith
                                    _____
                                    Firm name
                                    550 E. Swedesford Road, Suite 270
                                    _____
                                    Number      Street
                                    Wayne                                           PA        19087
                                    _____        _____  _____
                                    City                                        State       ZIP Code
                                    (302) 985-6004                                   Rafael.Zahralddin@lewisbrisbois.com
                                    _____             _____
                                    Contact phone                                   Email address

                                    71510                                           PA
                                    _____                     _____
                                    Bar number                                      State

# **STREAM TV NETWORKS, INC.**

# **CORPORATE RESOLUTION**

I, Mathu Rajan, do hereby certify:

I am a Director, Secretary and Chief Executive Officer of Stream TV Networks, Inc. (hereinafter called the "Company").

At a meeting of the Company's Board of Directors duly held according to law and pursuant to the organization documents of the Company on March 8, 2023, at which a quorum was present in person, or telephonically, the following resolution was made, seconded and duly adopted:

**WHEREAS**, the Company is unable to pay its debts when due,

**WHEREAS,** the Board has met on numerous occasions with the Company's management and restructuring, financial, and legal advisors and considered certain materials presented by the foregoing, including, but not limited to, materials regarding the Company's liabilities, liquidity, and prospects, the strategic alternatives available to it, and the effect of the forgoing on the Company's business, and

**WHEREAS**, the Company's Board of Directors, in its business judgment, has determined that the Company and its creditors and other stakeholders would be best served by reorganization of the Company under Chapter 11 of Title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code"), be it:

**RESOLVED**, that the Company file as soon as practicable a voluntary petition for reorganization of the Company under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court"),

**FURTHER RESOLVED**, that the Company is authorized to initiate such proceedings under the Bankruptcy Code and take all actions it deems as are appropriate – specifically including, but not limited to, the immediate filing of a Chapter 11 proceeding in order to maintain the ordinary course of the Company's business,

**FURTHER RESOLVED**, that the Company is authorized and empowered  and directed to employ the law firm of Lewis Brisbois Bisgaard & Smith LLP ("Lewis Brisbois") as the Company's counsel to represent and assist the Company in carrying out its duties under the Bankruptcy Code and to take any and all actions to advance the Company's rights and remedies, including filing any pleadings and conducting any potential restructuring on behalf of the Company; and in connection therewith, the Company is hereby authorized, empowered, and directed to execute the appropriate prepetition agreements, pay appropriate fees, and cause to be filed an appropriate application to retain Lewis Brisbois in accordance with applicable law.;

**FURTHER RESOLVED**, that the Company is authorized to employ, as applicable, a notice, claims, and balloting agent and administrative advisor at its discretion to further the Chapter 11 objectives as stated herein;

**FURTHER RESOLVED**, that the Company be, and hereby is, with power of delegation, authorized, empowered, and directed to execute and file all petitions, schedules, motions, lists, applications, pleadings, and other papers and, in connection therewith, to employ and retain all assistance by legal counsel, accountants, financial advisors, and other professionals and to take and perform any and all further acts and deeds that each of the Authorized Officers deem necessary, proper, or desirable in connection with the Company's Chapter 11 Case, with a view to the successful prosecution of such cases;

**FURTHER RESOLVED**, that in addition to the specific authorizations heretofore conferred upon the Company (and their designees and delegates)("Authorized Officers") be, and they hereby are, authorized, empowered, and directed, in the name of and on behalf of the Company, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver, and file any and all such agreements, certificates, instruments, and other documents and to pay all expenses, including but not limited to filing fees, in each case as in such Company's officer's or officers' judgment, shall be necessary, advisable, or desirable in order to fully carry out the intent and accomplish the purposes of the resolutions adopted herein;

**FURTHER RESOLVED**, that each of the Authorized Officers be, and hereby is, authorized and empowered to take or cause to be taken in the name of and on behalf of the Company, any and all such other and further action to carry out the intent and accomplish the purposes of the resolutions adopted herein as such purposes related to the Company;

**FURTHER RESOLVED**, that the Company and the Board have received sufficient notice of the actions and transactions relating to the matters contemplated by the foregoing resolutions, as may be required by the organizational documents of the Company, or hereby waive any right to have received such notice;

**FURTHER RESOLVED**, that all acts, actions, and transactions relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved and ratified as the true acts and deeds of the Company with the same force and effect as if each such act, transaction, agreement, or certificate has been specifically authorized in advance by resolution of the Board;

**FURTHER RESOLVED**, that each of the Authorized Officers (and their designees and delegates) be, and hereby is, authorized, empowered, and directed to take all actions, or to not take any action in the name of the Company, with respect to the transactions contemplated by these resolutions hereunder, as such Authorized Officer shall deem necessary or desirable in such Authorized Officer's reasonable business judgment, as may be necessary or convenient to effectuate the purposes of the transactions contemplated herein; and

2

The undersigned hereby certifies that he is the duly elected and qualified Secretary and the custodian of the books and records and seal of Stream TV Networks, Inc., a corporation duly formed pursuant to the laws of the State of Delaware and that the foregoing is a true record of a resolution duly adopted at a meeting of the Company's Board of Directors and that said meeting was held in accordance with State laws and the Bylaws of the above-named Company on March 8, 2023, and that said resolution is now in full force and effect without modification or recission. I do further certify that the above resolution has not been altered, amended or repealed.

**IN WITNESS WHEREOF**, I have executed my name as Secretary this 8th day of March 2023.

_____
Mathu Rajan, Secretary

| Fill in this information to identify the case: | |
|---|---|
| Debtor name | **Stream TV Networks, Inc.** |
| United States Bankruptcy Court for the: | Eastern District of Pennsylvania |
| Case number (if known): | |

☐ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

**12/15**

**A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Adept Chip Service Private Ltd.** Site No.86, 1st Floor, LRDI Layout Karthik Nagar, fvlarathahalli Outer Ring Bengaluru, India 560037 | A. Tirumala Kumar madanlolugu@adeptchips.com (916)363-0926 | **Employee and/or Consultant Search and Placement Firm** | | | | $324,644.60 |
| **Arasan Chip Systems, Inc.** 2150 North First Street, Suite 240 San Jose, CA 95131 | Vinod Nichani, Principal vinod@nichanilawfirm.com (408) 800-6174 | **Vendor for computer chips and systems** | | | | $132,500.00 |
| **Cadence Design Systems, Inc.** 2655 Seely Avenue San Jose, CA 95134 | Wendy Lujan-Cavin wendy@cadence.com | **Electronics Design Automation** | | | | $524,340.00 |
| **DLA Piper LLP(US)** 6225 Smith Avenue Baltimore, MD 21209-3600 | diane.williams@dlapiper.com (410) 580-3000 | **Professional Fees** | | | | $798,925.44 |
| **Elliott Greenleaf** 1105 North Market Street 17th Floor Wilmington, DE 19801-1216 | jms@elliottgreenleaf.com 215-977-1000 | **Professional Fees** | | | | $216,179.17 |
| **Hold Jumper (Suzhou) Packing Co. Ltd.** No. 1, Xiang Street, High-Tech District Suzhou, China | David Lee david@hj-packing.com suzhousjg@163.com | **Exporter/Manufacturer** | | | | $1,359,151.61 |

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

| Debtor | **Stream TV Networks, Inc.** | | Case number *(if known)* | |
|---|---|---|---|---|
| | Name | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Iinuma Gauge Manufacturing Co., Ltd (JPY)** 11400-327 Harayama, Tamagawa Chino-City Nagano, Japan 391-0011 | kz.iinuma@iinuma-gauge.co.jp 0266-79-5600 | **Flat Panel Display Production related Equipment** | | | | $7,643,690.74 |
| **IMG Media Ltd Building 6, Chiswick Park 566 Chiswick High Road London, England UK W4 5HR** | media.AR@img.com 44/0203 107 0765 | **Marketing/Rebranding Fees** | | | | $426,437.00 |
| **Innoventures Group LLC 1105 William Penn Drive Bensalem, PA 19020** | innoventuresgroupllc@gmail.com 267-566-0354 | **Engineering Consulting** | | | | $118,465.00 |
| **Jamuna Travels, Inc 6439 Market St Upper Darby, PA 19082** | Reji Abraham Fax (610) 352-9819 (610) 352-7280 | **Travel Agent** | | | | $122,768.45 |
| **Marcum LLP One SE Third Ave, Suite 1100 Miami, FL 33131** | Ilyssa K. Blum, CPA ilyssa.blum@marcumllp.com (305) 995-9600 | **Professional Fees** | | | | $146,820.00 |
| **Matrex Exhibits, Inc. 301 S. Church St. Addison, IL 60101** | Jonathan Aniszewski jona@cld1ltd.com +44 7803115526 | **CES Show Booth** | | | | $155,000.00 |
| **Mentor Graphics Corporation 8005 SW Boeckman Rd. Wilsonville, OR 97070-7777** | Sandie Beebe sandra_beebe@mentor.com (503) 685-1858 | **Electronics Design Automation** | | | | $402,564.00 |
| **Pegatron Corporation 5F., No. 76, Ligong St., Beitou District Taipei City 112 Taiwan** | Sal Lu sal_lu@pegatroncorp.com | **Manufacturer products for consumer electronics companies** | | | | $500,000.00 |

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy

| Debtor | **Stream TV Networks, Inc.** | | Case number *(if known)* | |
| | Name | | | |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
|---|---|---|---|---|---|---|
| **ST4M Electronics, Inc. Beijing Office Room 1102, Building 313 Hui Zhong Bei Li Beijing, Chaoyang District, China** | **Wangling** mattjjlo@gmail.com **(Fax)** +86-10-64800719-18 | | | | | **$116,844.97** |
| **Cipher Development Partners, LLC** | (408) 222-6462 | | | | | **$109,200.00** |
| **Trans World International, LLC 200 Fifth Ave 7th Floor New York, NY 10010** | mediaAR@img.com 44/0203107 0765 | **Marketing/Rebranding Fees** | | | | **$420,000.00** |
| **Triple Crown Consulting, LLC 10814 Jollyville Rd, Suite 100 Austin, Texas 78759-0000** | ar@tripleco.com (512) 331-8880 | **Employee and/or Consultant Search and Placement Firm** | | | | **$162,115.13** |
| **US Compliance Services LLC 199 North Woodbury Road Suite # 103 Pitman, NJ 08071** | mmassimi@dhglobaltax.com (267) 908-6620 | **Professional Fees** | | | | **$165,281.93** |
| **Vayikra Capital LLC 1 Farmstead Road Short Hills, NJ 07078** | phil@darivoff.net 973-379-4044 | **Unsecured Loans** | | | | **$173,798.00** |

Software Copyright (c) 1996-2021 Best Case, LLC - www.bestcase.com

**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **Stream TV Networks, Inc.,** | **Bky. No. _____ (___)** |
| **Debtor.** | |

## STATEMENT OF CORPORATE OWNERSHIP

Pursuant to Fed. R. Bankr. P. 1007(a)(1) and 7007.1, the Debtor files this Statement of Corporate Ownership and states that the following entities, other than the Debtor or a governmental unit, directly or indirectly own 10% or more of any class of equity interests of the Debtor:

**Hawk Investment Holdings Limited**

**Fill in this information to identify the case and this filing:**

Debtor Name __Stream TV Networks, Inc._____

United States Bankruptcy Court for the: ____Eastern_____ District of _Pennsylvania___
(State)

Case number (*If known*): _____

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐ *Schedule H: Codebtors* (Official Form 206H)

☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐ Amended *Schedule* _____

☒ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☒ Other document that requires a declaration __Corporate Ownership Statement_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __03/15/2023__          **✗** _____
MM / DD / YYYY                    Signature of individual signing on behalf of debtor

                                 Mathu Rajan
                                 Printed name

                                 Director
                                 Position or relationship to debtor

Official Form 202          **Declaration Under Penalty of Perjury for Non-Individual Debtors**

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

Eastern _____ District of _Pennsylvania_____
                                                    (State)

Case number (*If known*): _____ Chapter _____

☐ Check if this is an
   amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy    06/22

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.**

1. **Debtor's name**

   Technovative Media, Inc.

2. **All other names debtor used in the last 8 years**

   Include any assumed names, trade names, and *doing business as* names

3. **Debtor's federal Employer Identification Number (EIN)**

   4  5  –  4  3  4  5  0  1  5

4. **Debtor's address**

   | Principal place of business | Mailing address, if different from principal place of business |
   |---|---|
   | 2009 Chestnut Street, 3rd Floor | |
   | Number      Street | Number      Street |
   | | P.O. Box |
   | Philadelphia          PA      19103 | |
   | City          State    ZIP Code | City          State    ZIP Code |
   | | **Location of principal assets, if different from principal place of business** |
   | Philadelphia | |
   | County | Number      Street |
   | | |
   | | City          State    ZIP Code |

5. **Debtor's website** (URL)

Debtor **Technovative Media, Inc.**
_____ Case number (*if known*)_____
Name

| | |
|---|---|
| **6. Type of debtor** | ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP)) |
| | ☐ Partnership (excluding LLP) |
| | ☐ Other. Specify: _____ |

| | |
|---|---|
| **7. Describe debtor's business** | **A. Check one:** |
| | ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A)) |
| | ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B)) |
| | ☐ Railroad (as defined in 11 U.S.C. § 101(44)) |
| | ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A)) |
| | ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6)) |
| | ☐ Clearing Bank (as defined in 11 U.S.C. § 781(3)) |
| | ☒ None of the above |
| | |
| | **B. Check all that apply:** |
| | ☐ Tax-exempt entity (as described in 26 U.S.C. § 501) |
| | ☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3) |
| | ☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11)) |
| | |
| | C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes . |
| | ___ ___ ___ ___ |

| | |
|---|---|
| **8. Under which chapter of the Bankruptcy Code is the debtor filing?** | **Check one:** |
| | ☐ Chapter 7 |
| A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box. | ☐ Chapter 9 |
| | ☒ Chapter 11. *Check **all** that apply:* |
| | ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B). |
| | ☐ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B). |
| | ☐ A plan is being filed with this petition. |
| | ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b). |
| | ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form. |
| | ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2. |
| | ☐ Chapter 12 |

Debtor    <u>Technovative Media, Inc.</u>        Case number *(if known)* _____
         Name

---

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No

☐ Yes. District _____ When _____ Case number _____
                         MM / DD / YYYY

        District _____ When _____ Case number _____
                         MM / DD / YYYY

---

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☐ No

☒ Yes. Debtor   Stream TV Networks, Inc.         Relationship   Subsidiary _____

        District    Eastern District of Pennsylvania        When _____
                                               MM / DD / YYYY

        Case number, if known _____

---

**11. Why is the case filed in *this district*?**

*Check all that apply:*

☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☒ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

---

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

       **Why does the property need immediate attention?** *(Check all that apply.)*

       ☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

          What is the hazard? _____

       ☐ It needs to be physically secured or protected from the weather.

       ☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

       ☐ Other _____

       **Where is the property?** _____
                                   Number      Street

                                   _____

                                   _____
                                   City                          State ZIP Code

       **Is the property insured?**

       ☐ No

       ☐ Yes. Insurance agency _____

              Contact name _____

              Phone _____

---

**Statistical and administrative information**

---

| Debtor | Technovative Media, Inc. | Case number (if known) _____ |
|---|---|---|
| | Name | |

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

☒ 1-49
☐ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5,001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than 100,000

**15. Estimated assets**

☐ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million

☐ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☐ $100,000,001-$500 million

☒ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

**16. Estimated liabilities**

☐ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million

☐ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☒ $100,000,001-$500 million

☐ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

---

**Request for Relief, Declaration, and Signatures**

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  03/15/2023
              MM / DD / YYYY

X _____        Mathu Rajan
Signature of authorized representative of debtor        Printed name

Title  Director

---

| Debtor | Technovative Media, Inc. | Case number (if known) |
|---|---|---|
| | Name | |

**18. Signature of attorney**

✗ /s/ Asher A. Block

Signature of attorney for debtor

Date 03/15/2023

MM / DD / YYYY

Asher A. Block

Printed name

Lewis Brisbois Bisgaard & Smith

Firm name

550 E. Swedesford Road, Suite 270

Number        Street

Wayne

City

PA

State

19087

ZIP Code

(215) 977-4066

Contact phone

Asher.Block@lewisbrisbois.com

Email address

315908

Bar number

PA

State

## <u>TECHNOVATIVE MEDIA, INC.</u>

## <u>CORPORATE RESOLUTION</u>

I, Mathu Rajan, do hereby certify:

I am a Director, Secretary and Chief Executive Officer of Technovative Media, Inc. (hereinafter called the "Company").

At a meeting of the Company's Board of Directors duly held according to law and pursuant to the organization documents of the Company on March 15, 2023, at which a quorum was present in person, or telephonically, the following resolution was made, seconded and duly adopted:

**WHEREAS**, the Company is unable to pay its debts when due,

**WHEREAS,** the Board has met on numerous occasions with the Company's management and restructuring, financial, and legal advisors and considered certain materials presented by the foregoing, including, but not limited to, materials regarding the Company's liabilities, liquidity, and prospects, the strategic alternatives available to it, and the effect of the forgoing on the Company's business, and

**WHEREAS**, the Company's Board of Directors, in its business judgment, has determined that the Company and its creditors and other stakeholders would be best served by reorganization of the Company under Chapter 11 of Title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code"), be it:

**RESOLVED**, that the Company file as soon as practicable a voluntary petition for reorganization of the Company under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court"),

**FURTHER RESOLVED**, that the Company is authorized to initiate such proceedings under the Bankruptcy Code and take all actions it deems as are appropriate – specifically including, but not limited to, the immediate filing of a Chapter 11 proceeding in order to maintain the ordinary course of the Company's business,

**FURTHER RESOLVED**, that the Company is authorized and empowered  and directed to employ the law firm of Lewis Brisbois Bisgaard & Smith LLP ("Lewis Brisbois") as the Company's counsel to represent and assist the Company in carrying out its duties under the Bankruptcy Code and to take any and all actions to advance the Company's rights and remedies, including filing any pleadings and conducting any potential restructuring on behalf of the Company; and in connection therewith, the Company is hereby authorized, empowered, and directed to execute the appropriate prepetition agreements, pay appropriate fees, and cause to be filed an appropriate application to retain Lewis Brisbois in accordance with applicable law.;

**FURTHER RESOLVED**, that the Company is authorized to employ, as applicable, a notice, claims, and balloting agent and administrative advisor at its discretion to further the Chapter 11 objectives as stated herein;

**FURTHER RESOLVED**, that the Company be, and hereby is, with power of delegation, authorized, empowered, and directed to execute and file all petitions, schedules, motions, lists, applications, pleadings, and other papers and, in connection therewith, to employ and retain all assistance by legal counsel, accountants, financial advisors, and other professionals and to take and perform any and all further acts and deeds that each of the Authorized Officers deem necessary, proper, or desirable in connection with the Company's Chapter 11 Case, with a view to the successful prosecution of such cases;

**FURTHER RESOLVED**, that in addition to the specific authorizations heretofore conferred upon the Company (and their designees and delegates)("Authorized Officers") be, and they hereby are, authorized, empowered, and directed, in the name of and on behalf of the Company, to take or cause to be taken any and all such other and further action, and to execute, acknowledge, deliver, and file any and all such agreements, certificates, instruments, and other documents and to pay all expenses, including but not limited to filing fees, in each case as in such Company's officer's or officers' judgment, shall be necessary, advisable, or desirable in order to fully carry out the intent and accomplish the purposes of the resolutions adopted herein;

**FURTHER RESOLVED**, that each of the Authorized Officers be, and hereby is, authorized and empowered to take or cause to be taken in the name of and on behalf of the Company, any and all such other and further action to carry out the intent and accomplish the purposes of the resolutions adopted herein as such purposes related to the Company;

**FURTHER RESOLVED**, that the Company and the Board have received sufficient notice of the actions and transactions relating to the matters contemplated by the foregoing resolutions, as may be required by the organizational documents of the Company, or hereby waive any right to have received such notice;

**FURTHER RESOLVED**, that all acts, actions, and transactions relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved and ratified as the true acts and deeds of the Company with the same force and effect as if each such act, transaction, agreement, or certificate has been specifically authorized in advance by resolution of the Board;

**FURTHER RESOLVED**, that each of the Authorized Officers (and their designees and delegates) be, and hereby is, authorized, empowered, and directed to take all actions, or to not take any action in the name of the Company, with respect to the transactions contemplated by these resolutions hereunder, as such Authorized Officer shall deem necessary or desirable in such Authorized Officer's reasonable business judgment, as may be necessary or convenient to effectuate the purposes of the transactions contemplated herein; and

2

The undersigned hereby certifies that he is the duly elected and qualified Secretary and the custodian of the books and records and seal of Technovative Media,  Inc., a corporation duly formed pursuant to the laws of the State of Delaware and that the foregoing is a true record of a resolution duly adopted at a meeting of the Company's Board of Directors and that said meeting was held in accordance with State laws and the Bylaws of the above-named Company on March 15, 2023, and that said resolution is now in full force and effect without modification or recission. I do further certify that the above resolution has not been altered, amended or repealed.

**IN WITNESS WHEREOF**, I have executed my name as Secretary this 15th day of March 2023.

_____
Mathu Rajan, Secretary

| Fill in this information to identify the case: |
|---|
| Debtor name   Technovative Media, Inc. |
| United States Bankruptcy Court for the:   Eastern   District of Pennsylvania<br>(State) |
| Case number (If known):   _____ |

☐ Check if this is an amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider,* as defined in 11 U.S.C. § 101(31).  Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Rembrandt 3D Holding Ltd.<br>128 Bull Hill Road<br>Newfield, NY 14867 | Stephen Blumenthal<br>Stephen3d@mac.com | Breach of Agreement | Contingent Unliquidated Disputed | | | $100,000,000 + |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |

Debtor    Technovative Media, Inc.                                     Case number (if known)_____
Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | | | |
| 13 | | | | | | |
| 14 | | | | | | |
| 15 | | | | | | |
| 16 | | | | | | |
| 17 | | | | | | |
| 18 | | | | | | |
| 19 | | | | | | |
| 20 | | | | | | |

**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **Technovative Media, Inc.,** | **Bky. No. _____  (__)** |
| **Debtor.** | |

## **STATEMENT OF CORPORATE OWNERSHIP**

Pursuant to Fed. R. Bankr. P. 1007(a)(1) and 7007.1, the Debtor files this Statement of Corporate Ownership and states that the following entities, other than the Debtor or a governmental unit, directly or indirectly own 10% or more of any class of equity interests of the Debtor:

**Stream TV Networks, Inc.  – 100%**

**Fill in this information to identify the case and this filing:**

Debtor Name ___Technovative Media, Inc.___

United States Bankruptcy Court for the: ___Eastern___ District of ___Pennsylvania___
(State)

Case number (*If known*): _____

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors   12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐ *Schedule H: Codebtors* (Official Form 206H)

☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐ Amended *Schedule* _____

☒ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☒ Other document that requires a declaration ___Corporate Ownership Statement___

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___03/15/2023___          **✗** _Mathu Rajan_
MM / DD / YYYY                  Signature of individual signing on behalf of debtor

                         Mathu Rajan
                         Printed name

                         Director
                         Position or relationship to debtor

Official Form 202          **Declaration Under Penalty of Perjury for Non-Individual Debtors**

# EXHIBIT O
# Receiver Email

**amanda@streamacquisitiongroup.com**

| | |
|---|---|
| **From:** | Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com> |
| **Sent:** | Monday, March 20, 2023 12:15 PM |
| **To:** | mathu@streamacquisitiongroup.com; bud@streamacquisitiongroup.com; nicole@streamacquisitiongroup.com; 'Suby Joseph'; amanda@streamacquisitiongroup.com |
| **Cc:** | Alexander, Vincent; Freeman, Christina |
| **Subject:** | FW: Information and Return of |
| **Attachments:** | Confirmation of final acceptance(A620436)Sign.pdf |

Please see below re: bonding equipment  - I would move quickly.



**Rafael Zahralddin**
**Partner**
**Rafael.Zahralddin@lewisbrisbois.com**

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Liston, Ian <iliston@wsgr.com>
**Sent:** Monday, March 20, 2023 11:35 AM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Cc:** Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; kevin.p.callahan@usdoj.gov; John.Schanne@usdoj.gov; Finnimore-Pierce, Robyn <rfinnimorepierce@wsgr.com>; Griffin-Stanco, James <jstanco@wsgr.com>; Hart, Ryan <rhart@wsgr.com>; Iqbal, Daniyal <diqbal@wsgr.com>; Liston, Ian <iliston@wsgr.com>; Manning, Joshua <jmanning@wsgr.com>; Fay, Erin <EFAY@wsgr.com>
**Subject:** [EXT] RE: Information and Return of

Dear Rafeal,

Thank you for your email.

I have informed SCBV that the filing of the Technovative petition superseded my authority as Receiver, and that SCBV should expect communications from Stream or its counsel; and I have not attempted to exercise any authority as receiver since learning of the petition on Thursday morning , March 16.

I have the following information about the location of the bonding equipment.  The English translation below the Chinese is not official, but represents our best understanding.

    • the address where the equipment is currently stored
江苏省昆山市康庄路369号

No. 369, Kang Zhuang Road, Kun Shan City, Jiangsu Province

    • information about the landlord

1

南通讯格泰半导体科技有限公司

Tel.: +8613584870279

Manager Han.

Nantong Xunge Semiconductor Technology Limited Corp. (We were unable to find the company's official English name, so this is a transliteration).

Because the equipment was moved in January 2023 by the landlord of the warehouse where it had been stored without permission of any of the parties, SCBV asked the manufacturer of the equipment (Prematec) to inspect the equipment in it its new location for any damage or loss that occurred in transit – I have attached Prematec's report of its 2/14/23 inspection, which found no visible damage.

_____

Email/domain data transfers:

When I corresponded with Stream's counsel regarding transfer of email archives and domains previously in December 2022, SCBV provided three options – Stream selected the third, and I asked for follow up information to put Stream's IT people in contact with SCBV's IT people, but I did not hear back further from Stream. I assume these options are still available:

**Option 1**
We create a new tenant and move the email accounts to them. Once the move is complete – we remove any permissions assigned and transfer cost and ownership to Stream.
Consideration: In a transfer of this nature the destination accounts will need to be empty mailboxes with no data – if accounts exist in the destination with the same name and the source – the data in the destination will be overwritten. Together with stream we can initiate a domain transfer request to move the relevant domain names to their registrar of choice where all future responsibility and cost will be assumed my stream from moment of transfer.

**Option 2**
We can move the accounts to StreamTV's existing tenant and move the email accounts to them. For this to work we will need permission to move, create accounts in their tenant while the move is in progress. Once the move is complete – they can remove any permissions assigned.
Consideration: In a transfer of this nature the destination accounts will need to be empty mailboxes with no data – if accounts exist in the destination with the same name and the source – the data in the destination will be overwritten. Together with stream we can initiate a domain transfer request to move the relevant domain names to their registrar of choice where all future responsibility and cost will be assumed my stream from moment of transfer.

**Option3**
We export all emails to .pst for them via the tools inherent in Office 365. We then upload and share the content of these PST's files – named according to the associated user accounts exported. The Stream TV team can then import or use as they see fit. Internally we delete these accounts.
Together with stream we can initiate a domain transfer request to move the relevant domain names to their registrar of choice where all future responsibility and cost will be assumed my Stream TV from moment of transfer.

You can speak to SCBV about additional data needs.

Individuals at SCBV with whom I have corresponded most frequently are:

Patric Theune (patric.theune@seecubic.com)
Bram Riemens (bram.riemens@seecubic.com)
Ad Luijks (ad.luijks@seecubic.com) (finance issues only)

Regards,
Ian Liston

**WILSON SONSINI**

**Ian Liston | Of Counsel | Wilson Sonsini Goodrich & Rosati**
222 Delaware Avenue, Suite 800 | Wilmington, DE 19801 | 302.304.7606 (direct) | 302.430.1360 (mobile)
iliston@wsgr.com

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Sunday, March 19, 2023 11:58 PM
**To:** Liston, Ian <iliston@wsgr.com>
**Cc:** Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; kevin.p.callahan@usdoj.gov; John.Schanne@usdoj.gov
**Subject:** Information and Return of

EXT - rafael.zahralddin@lewisbrisbois.com

Dear Ian,

We have some exigent circumstances as there is purchase order pending which would bring in $5 million -$10 million contingent on using the bonding machine, which is property of Stream TV and not Technovative, where you were the receiver prior to the bankruptcy. The damages of refusing or delaying the return are significant because this and several pending orders would satisfy the secured debt and go towards paying the unsecured creditors in this bankruptcy.

I think you are aware that this equipment was transferred to Stream TV Netherlands in violation of the Delaware Supreme Court Opinion and applicable law by SeeCubic of Delaware, the "newco" set up by SLS and Hawk. The Supreme Court's decision invalidated possession and the transfer of the bonding equipment.

The manufacturer of this equipment is also the largest unsecured creditor in this case and the plan to foreclose by Hawk and SLS would leave this creditor with a loss of close to $7 million. Selling the IP to satisfy the secured debt as opposed to using it to bring a recovery, *through cure of the manufacturer's claims or otherwise (via settlement)* in the chapter 11 would be contrary to the stay and the rights and duties of the Debtor in Possession.

I have been told by the client and corporate counsel that you have the information on the whereabouts of the bonding machine. It is critical that we have the bonding machine information by noon tomorrow to facilitate its transfer to Stream so we can send it to this company which will then pay for the production and the goods sold by Stream and handle production. As you might also know, the secured lenders likely do not have rights over equipment under contract. Hawk's loans carve this out explicitly.

We also need the following returned to the Debtor. We would ask that you inform any third parties and those in the foreign subsidiaries that the Debtor in Possession is now the custodian of the company so we can facilitate their use for the Debtor and there is no delay in retrieving the bankruptcy estate assets. This includes:

o        Website domains, email archives, data archives, etc. maintained on the servers managed by SCBV in the Netherlands.

It is my understanding that there have been registrations at the Netherlands Chamber of Commerce which we would ask that you inform the Chamber that the Debtor in Possession is now the custodian of the company. Again, we will be doing so as well, but this will avoid further delay of the Debtors' operations and bankruptcy objectives.

3

Violations of automatic stay include taking or holding assets of the estate.  Some of the property was seized improperly by others and has been used in violation of Delaware Supreme Court Order and a Chancery order. Others were put in your care and must now be turned over pursuant to the automatic stay and the United States Bankruptcy Code.

Now, being in bankruptcy, it is irrelevant whether anyone claims to hold them properly or improperly.  Holding them now that the stay is in place is a stay violation should anyone retain or delay their return. We are actively trying to mitigate any damages from a stay violation  - especially in light of this and other pending orders.

I can't reiterate enough that we currently have an investor who needs the property for production and has a purchase order contingent on receipt of the bonding equipment.   Violations of the stay include direct, consequential, and punitive damages.

This is time critical and would provide funding to pay the valid secured debt in this matter. We request your assistance and to the extent that you are holding these assets you are now on notice to return them. Thank you for your help in this matter.

We believe this will go far in resolving the issues, if the secured creditors are seeking to be paid as opposed to taking the assets and leaving $16 million of unsecured claims unpaid.



**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

# EXHIBIT P
# Ian Liston stating he had no knowledge of a Chinese Lawyer

**mathu@streamacquisitiongroup.com**

| | |
|---|---|
| **From:** | Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com> |
| **Sent:** | Saturday, April 1, 2023 6:05 PM |
| **To:** | mathu@streamacquisitiongroup.com |
| **Subject:** | FW: Information and Return of |
| | |
| **Flag Status:** | Flagged |



**Rafael Zahralddin**
Partner
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Liston, Ian <iliston@wsgr.com>
**Sent:** Saturday, April 1, 2023 5:51 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Cc:** Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; kevin.p.callahan@usdoj.gov; John.Schanne@usdoj.gov; Finnimore-Pierce, Robyn <rfinnimorepierce@wsgr.com>; Griffin-Stanco, James <jstanco@wsgr.com>; Hart, Ryan <rhart@wsgr.com>; Iqbal, Daniyal <diqbal@wsgr.com>; Manning, Joshua <jmanning@wsgr.com>; Fay, Erin <EFAY@wsgr.com>
**Subject:** [EXT] Re: Information and Return of

Mr. Theune at SCBV entered the lease and would be able to direct the landlord to release the equipment.

I have no knowledge that there is a law firm in China involved.

On Apr 1, 2023, at 5:38 PM, Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com> wrote:

EXT - rafael.zahralddin@lewisbrisbois.com

Dear Ian,

Do you know who entered into the lease contract in China (person and entity)?

# EXHIBIT Q
# Register showing Mathu Rajan as CEO and Board Member of SCBV

# Inzien uittreksel - SeeCubic B.V. (52962911)

Kamer van Koophandel, 04 april 2023 - 20:03

**KvK-nummer** 52962911

### Rechtspersoon

| | |
|---|---|
| RSIN | 850685813 |
| Rechtsvorm | Besloten Vennootschap |
| Statutaire naam | SeeCubic B.V. |
| Statutaire zetel | Eindhoven |
| Eerste inschrijving handelsregister | 05-07-2011 |
| Datum akte van oprichting | 04-07-2011 |
| Datum akte laatste statutenwijziging | 04-01-2016 |
| Geplaatst kapitaal | EUR 18.000,00 |
| Gestort kapitaal | EUR 18.000,00 |
| Deponering jaarstuk | De jaarrekening over boekjaar 2021 is gedeponeerd op 29-12-2022. |

### Onderneming

| | |
|---|---|
| Handelsnaam | SeeCubic B.V. |
| Startdatum onderneming | 17-06-2011 |
| Activiteiten | SBI-code: 72192 - Technisch speur- en ontwikkelingswerk |
| | SBI-code: 6420 - Financiële holdings |
| Werkzame personen | 29 |

### Vestiging

| | |
|---|---|
| Vestigingsnummer | <u>000022853960</u> |
| Handelsnaam | SeeCubic B.V. |
| Bezoekadres | Park Forum 1035, 5657HJ Eindhoven |
| Telefoonnummer | 0402351088 |
| Internetadres | www.seecubic.com |
| E-mailadres | info@seecubic.com |
| Datum vestiging | 17-06-2011 |
| Deze rechtspersoon drijft de vestiging sinds | 04-07-2011 (datum registratie: 05-07-2011) |
| Activiteiten | SBI-code: 72192 - Technisch speur- en ontwikkelingswerk |
| | SBI-code: 6420 - Financiële holdings |
| | Het voeren van onderzoek en ontwikkeling op het gebied van driedimensionele (3D) technologie en het uitvoeren van driedimensionaal (3D) content creatie en conversie; alsmede houdster- en financieringsactiviteiten |
| Werkzame personen | 29 |

### Enig aandeelhouder

| | |
|---|---|
| Naam | Ultra-D Coöperatief U.A. |
| Bezoekadres | Park Forum 1035, 5657HJ Eindhoven |
| Ingeschreven onder KvK-nummer | <u>53995813</u> |
| Enig aandeelhouder sedert | 23-11-2011 (datum registratie: 29-11-2011) |

### Bestuurder

| | |
|---|---|
| Naam | Rajan, Mathu |
| Geboortedatum | 04-01-1971 |
| Datum in functie | 11-10-2022 (datum registratie: 30-03-2023) |
| Titel | Bestuurder A / Chief Executive Officer |
| Bevoegdheid | Alleen/zelfstandig bevoegd |

Gegevens zijn vervaardigd op 04-04-2023 om 20.03 uur.

# EXHIBIT R
# Promissory Note and Draw Advances for payroll payments to the Netherlands

**THIS SENIOR PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR STATE SECURITIES LAWS. NO SALE, ASSIGNMENT, TRANSFER, PLEDGE, HYPOTHECATION OR DISPOSITION OF THIS NOTE MAY BE EFFECTED EXCEPT IN COMPLIANCE WITH RULE 144 UNDER SAID ACT OR AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO AND UNDER ANY APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL FOR THE HOLDER SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT OR RECEIPT OF A NO- ACTION LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION.**

## SENIOR PROMISSORY NOTE

Up to €3,500,000                                                              November 14, 2022

For value received, SeeCubic BV, a *Besloten vennootschap* under the laws of the Netherlands (the "***Company***"), promises to pay to the order of SeeCubic, Inc., a Delaware corporation (together with its successors and assigns, the "***Holder***"), the aggregate principal sum of up to three million, five hundred thousand, AND 00/100 EUROS (€3,500,000), or, if less, the unpaid principal amount of Advances made hereunder (the "***Maximum Principal Amount***"), together with all accrued and unpaid interest on the outstanding principal amount due hereunder, each due and payable on the date and in the manner set forth in this Senior Promissory Note (the "***Note***").

1.       **Advances**.

(a)       On the date hereof, the Holder shall make an advance to the Company in the initial principal amount of €600,000 (the "***Initial Advance***"). Thereafter, the Company may request and the Holder shall make one or more additional advances (each, an "***Additional Advance***" and, together with the Initial Advance, each, an "***Advance***"); provided that the aggregate principal amount of all Advances shall not exceed the Maximum Principal Amount; provided further that the obligation of the Holder to make any Advances under Section 1 hereunder is subject to Holder's prior receipt of a Notice of Advance (as defined below, in the form attached hereto as Exhibit A) requesting such Advance, and where the request for such Advance has been approved by (1) the Receiver (defined below) and (2) upon appointment, an independent director of the Company who has been selected with the approval of the Receiver as a request for funds to be used by the Company in the ordinary course of business; provided further that each Additional Advance (i) shall be made no more frequently than one time per month and (ii) shall not exceed €750,000 absent the express written consent of Holder, with Holder retaining full discretion to approve or reject any amounts in excess of €750,000.  Once repaid, Advances may not be reborrowed.

(b)       The Company may, prior to the Commitment Termination Date and so long as no Event of Default shall have occurred and be continuing at such time, no more than once each calendar month, request an Additional Advance by delivering written notice to the Holder (a "***Notice of Advance***"), substantially in the form attached hereto as Exhibit A, by 1:00 p.m. (Greenwich Mean Time) not less than five (5) days prior to the requested date of such Additional Advance. Each Notice of Advance shall (i) specify the aggregate amount of the requested Additional Advance and the requested Additional Advance date, which shall be a business day and (ii) be accompanied by a report showing the Company's expenses for the calendar month immediately preceding such Advance and

a budget showing the proposed use of the funds requested for such Advance. Each Notice of Advance shall be approved by or on behalf of Mr. Ian Liston, as receiver pendente lite for TechnoVative Media Inc., a Delaware corporation, or his successor (in such capacity, and together with any successor appointed by the Delaware Chancery Court, the "***Receiver***"). The "***Commitment Termination Date***" means the earliest of (i) December 31, 2023, (ii) the date of acceleration of this Note pursuant to Section 6 and (iii) the termination of the Receiver's appointment by order of the Delaware Chancery Court, unless extended in writing by the Holder.

(c)     All Advances shall be made by wire transfer of immediately available funds to the bank account ending in 0324 with Rabobank. Such account may only be changed by request of the Receiver, with the prior written consent of the Holder (which consent shall not be unreasonably withheld).

**2.     Repayment**. The Company shall repay the outstanding principal of this Note (the "***Principal Balance***"), along with any accrued and unpaid interest thereon, and other amounts due and owing hereunder, on the Maturity Date, or such earlier date that this Note is accelerated pursuant to Section 6. The Company may prepay the Principal Balance at any time or from time to time, without premium or penalty. All payments shall be applied, *first*, to all accrued and unpaid interest due hereunder, and, *second*, to the Principal Balance.

**3.     Interest Rate**.

(a)     The Principal Balance shall accrue interest from (and including) the date hereof until (but excluding) the earlier of (i) the date of the full and final repayment of the Principal Balance and all accrued and unpaid interest thereon and (ii) the Maturity Date (as defined below) at an aggregate rate of 4.03% per annum, or if different, the 100% Applicable Federal Rate published by the United States Internal Revenue Service for short term, monthly compounding loans, from time to time (the "***Interest Rate***"), compounding monthly. On the last day of each calendar month while this Note remains outstanding, all accrued and unpaid interest on the Principal Balance shall be added to the Principal Balance (all such interest, "***PIK Interest***"), and shall thereafter accrue interest at the Interest Rate and be considered as the part of the Principal Balance for all purposes. Interest shall be computed on the basis of a year of 360 days and charged for the actual days elapsed during the period for which interest accrues.

(b)     Notwithstanding the foregoing, upon the occurrence and during the continuance of any Event of Default (as defined below), all amounts due hereunder shall bear interest from the date of occurrence of such Event of Default until such Event of Default is cured or waived by the Holder at a rate equal to the sum of (i) the Interest Rate and (ii) two percent (2%) per annum (the "***Default Interest Rate***").

(c)     In the event that any interest rate(s) provided for in this Section 3 or otherwise in this Note shall be determined to exceed any limitation on interest under applicable law, such interest rate(s) shall be computed at the highest rate permitted by applicable law. Any payment by the Company of any interest amount in excess of that permitted by law shall be considered a mistake, with the excess being applied to the principal amount of the Note without prepayment premium or penalty; if no such principal amount is outstanding, such excess shall be returned to the Company.

**4.     Maturity**. The Principal Balance, together with all unpaid and accrued interest thereon, shall be fully due and payable on the earlier of (i) December 31, 2023 and (ii) the date that is forty-five (45) days following termination of the Receiver's appointment by order of the Delaware Chancery Court, unless extended in writing by the Holder (the "***Maturity Date***").

**5.** **Use of Proceeds**. The Company shall use the proceeds of Advances under this Note solely for payment of the expenses set forth in the applicable Notice of Advance.

**6.** **Default**. If any Event of Default shall have occurred and is continuing, at the option and upon the declaration of the Holder and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under <u>Section 6(d)</u>, in which case, automatically and without any further action by any party), this Note shall accelerate and the Principal Balance, together with all unpaid and accrued interest thereon, shall become immediately due and payable. The occurrence of any one or more of the following events shall constitute an "***Event of Default***":

(a)    The Company fails to pay any of the Principal Balance on the date the same becomes due and payable or any unpaid and accrued interest thereon or other amounts due under this Note on the date the same becomes due and payable;

(b)    The Company shall violate <u>Section 5</u> of this Note;

(c)    The Company shall materially fail to perform or observe any covenant under this Note and such failure shall continue unremedied for a period of five (5) days after receipt of written notice of such failure by the Holder;

(d)    A proceeding is commenced by or against the Company or any guarantor under any bankruptcy, reorganization, insolvency or moratorium law, or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; provided that this Section 6(d) shall not apply to the proceedings currently pending in the Court of Chancery of the State of Delaware captioned as *Hawk Investment Holdings, Ltd. v. Stream TV Networks, Inc., and Technovative Media, Inc.* (C.A. No. 2022-0930-JTL); or

(e)    The Company shall incur (i) any indebtedness for borrowed money or any indebtedness secured by a lien on any of the Company's assets without the Holder's prior written consent or (ii) any indebtedness senior in right of payment, security or otherwise to the indebtedness evidenced under this Note, in each case without the prior written consent of the Holder.

**7.** **Taxes**. Notwithstanding anything to the contrary contained herein, all payments to be made by or on behalf of Company to any the Holder under this Note shall be made free and clear of and without deduction for or on account of any setoff, counterclaim, or Tax, unless a deduction for any Tax is required by applicable law.

(a)    The Company and its subsidiaries have filed all material Tax returns that are required to have been filed in any jurisdiction, and have paid all Taxes shown to be due and payable on such returns and all other Taxes payable by them, to the extent such Taxes have become due and payable and before they have become delinquent, except for any Taxes the amount, applicability or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which the Company or such subsidiary, as the case may be, has established adequate reserves in accordance with GAAP.

(b)    The Company will maintain, in electronic format or otherwise, at its principal place of business, a register of the names and addresses of the holder(s) of this Note and the principal amount (and stated interest) owing to each holder (the "***Register***"), and will update the Register to reflect any permitted assignments or transfers subsequent to the date hereof.  The Company will make payments of principal and interest as specified hereunder to the holder(s) named as such in the

Register. Notwithstanding anything to the contrary herein, the entries in the Register shall be conclusive, absent manifest error; the Company and each holder shall treat the person whose name is recorded in the Register as the owner of its portion of the Note for all purposes of this Note, notwithstanding notice to the contrary; and the registered owner of this Note (or any portion hereof) as indicated on the Register shall be the party with the exclusive right to receive payment of any principal amount and accrued and unpaid interest thereon under this Note. The Register shall be available for inspection by any holder, at any reasonable time and from time to time upon reasonable prior notice. This provision is intended to constitute a "book entry system" within the meaning of U.S. Treasury Regulations section 5f.103-1(c)(1)(ii) and shall be interpreted consistently with such intent, and this provision shall be construed so that the Note is at all times maintained in "registered form" within the meaning of section 163(f), 871(h)(2) and 881(c)(2) of the U.S. Internal Revenue Code of 1986, as amended (the "*Code*"), and any related Treasury Regulations (or any other relevant or successor provisions of the Code or of such Treasury Regulations).

(c)    The obligations of Company under this <u>Section 7</u> shall survive any termination of this Note and the payment in full of the obligations hereunder, and are in addition to, and not in substitution of, any of the other obligations hereunder.

**8.**    **Waiver**. The Company hereby waives demand, notice, presentment, protest, and notice of dishonor for all purposes in connection with this Note.

**9.**    **Governing Law**. This Note shall be governed by and construed under the laws of the State of Delaware (without giving effect to principles of conflict of laws). Any legal action or proceeding with respect to this Note shall be brought exclusively in the courts of the State of Delaware or federal courts sitting in the District of Delaware. By execution and delivery of this Note, the Company and the Holder each hereby accept for themselves and in respect of their property, generally and unconditionally, the jurisdiction of the aforesaid courts; provided that nothing in this Note shall limit the Holder's right to commence any proceeding in the federal or state courts of any other jurisdiction to the extent that the Holder determines that such action is necessary or appropriate to exercise its rights or remedies under this Note. The parties hereto hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of *forum non conveniens*, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

**10.    JURY TRIAL WAIVER. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS NOTE, ANY DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS NOTE BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

**11.**    **Modification; Waiver**. Any provision of this Note may be amended, waived, or modified only upon the written consent of each party hereto.

**12.**    **Assignment**. This Note may be transferred by the Holder at any time, upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument

of transfer in form reasonably satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and all unpaid and accrued interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal. The Company may not assign any of its rights or obligations hereunder without the prior written consent of the Holder.

**13.    Severability**.  Every provision of this Note is intended to be severable.  In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions remain binding and enforceable.

**14.    Counterparts**. This Note may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Note by telecopy or other electronic image (e.g., "PDF" or "TIF" via electronic email) shall be effective as delivery of a manually executed counterpart of this Note. The words "execution", "signed", "signature", and words of like import in this Note shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable requirement of law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**15.    Authority.** All persons asserting the right to be directors of the Company execute this Note for the avoidance of doubt.  If any signatory hereto identified as Director A lacks authority to sign for this Note on behalf of the Company, this Note shall nonetheless remain valid so long as at least one signatory hereto identified as a Director A signing director held valid authority to execute the Note on behalf of the Company on the date of execution.

*[Signature Pages Follow]*

**COMPANY**:

**SeeCubic BV,**
a Besloten vennootschap
under the laws of the Netherlands

By: _____
Name: Shadron Stastney
Title: Director A

By: _____
Name: Mathu Rajan
Title: Director A

**RECEIVER APPROVAL:**

By: _____
Name: Ian Liston
Title: Receiver pendente lite for TechnoVative
Inc., the Company's indirect sole shareholder

*[Signature Page to Senior Promissory Note]*

**<u>EXHIBIT A</u>**

**Form of Notice of Advance**

**[_____ __, 20__]**

Reference is made to the Senior Promissory Note, dated as of November 14, 2022 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Note**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and between SeeCubic BV, a Besloten vennootschap under the laws of the Netherlands, as a borrower thereunder (the "***Company***"), and SeeCubic, Inc., a Delaware corporation (together with its successors and assigns, the "***Holder***").

Pursuant to Section 1 of the Note, the Company desires that the Holder make the following Advance to Company in accordance with the applicable terms and conditions of the Note:

1. Requested Advance Date: _____ ____, _____.[1]

2. Requested Advance Amount: $_____.[2]

3. Attached hereto as <u>Annex A</u> is a report showing the Company's expenses for the calendar month immediately preceding the requested Advance.

4. Attached hereto as <u>Annex B</u> is a budget showing the proposed use of the funds for the requested Advance.

The undersigned, on behalf of the Company, hereby certifies that:

(a) the representations and warranties contained in the Note are true and correct in all material respects (except for those representations and warranties that are conditioned by materiality, in which case, such representations and warranties are true and correct in all respects) as of the date hereof; and

(b) as of the date hereof, no event has occurred and is continuing or would result from the consummation of the funding of the Advance contemplated hereby that would constitute an Event of Default under the Note.

*[Signature Page Follows]*

---

[1] Must be at least five (5) days after to the date of the Notice of Advance.
[2] Must not exceed Maximum Principal Balance.

**COMPANY**:


**SeeCubic BV,**
a Besloten vennootschap
under the laws of the Netherlands


By: _____
Name: Shadron Stastney
Title: Director A



By: _____
Name: Mathu Rajan
Title: Director A




**RECEIVER APPROVAL:**


By: _____
Name:
Title: Receiver pendente lite for TechnoVative
Inc., the Company's indirect sole shareholder

## Annex A

**Expense Report**

## **Annex B**

**Use of Proceeds**

**EXHIBIT A**

**Form of Notice of Advance**

November 17, 2022____

Reference is made to the Senior Promissory Note, dated as of November 14, 2022 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Note**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and between SeeCubic BV, a Besloten vennootschap under the laws of the Netherlands, as a borrower thereunder (the "***Company***"), and SeeCubic, Inc., a Delaware corporation (together with its successors and assigns, the "***Holder***").

Pursuant to Section 1 of the Note, the Company desires that the Holder make the following Advance to Company in accordance with the applicable terms and conditions of the Note:

1.  Requested Advance Date: November 17, 2022.

2.  Requested Advance Amount: Euro 750,000.

3.  Attached hereto as <u>Annex A</u> is a report showing the Company's expenses for the calendar month immediately preceding the requested Advance.

4.  Attached hereto as <u>Annex B</u> is a budget showing the proposed use of the funds for the requested Advance.

The undersigned, on behalf of the Company, hereby certifies that:

(a)  the representations and warranties contained in the Note are true and correct in all material respects (except for those representations and warranties that are conditioned by materiality, in which case, such representations and warranties are true and correct in all respects) as of the date hereof; and

(b)  as of the date hereof, no event has occurred and is continuing or would result from the consummation of the funding of the Advance contemplated hereby that would constitute an Event of Default under the Note.

*[Signature Page Follows]*

**COMPANY**:

**SeeCubic BV,**
a Besloten vennootschap
under the laws of the Netherlands

By: _____
Name: Shadron Stastney
Title: Director A

By: _____
Name: Mathu Rajan
Title: Director A

**RECEIVER APPROVAL:**

By: _____
Name:
Title: Receiver pendente lite for TechnoVative
Inc., the Company's indirect sole shareholder

**Form of Notice of Advance**

**December 6 , 2022**

Reference is made to the Senior Promissory Note, dated as of November 14, 2022 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Note**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and between SeeCubic BV, a Besloten vennootschap under the laws of the Netherlands, as a borrower thereunder (the "***Company***"), and SeeCubic, Inc., a Delaware corporation (together with its successors and assigns, the "***Holder***").

Pursuant to Section 1 of the Note, the Company desires that the Holder make the following Advance to Company in accordance with the applicable terms and conditions of the Note:

1. Requested Advance Date:          December 12, 2022

2. Requested Advance Amount:    Euro 800,000

3. Attached hereto as <u>Annex A</u> is a report showing the Company's expenses for the calendar month immediately preceding the requested Advance.

4. Attached hereto as <u>Annex B</u> is a budget showing the proposed use of the funds for the requested Advance.

The undersigned, on behalf of the Company, hereby certifies that:

(a) the representations and warranties contained in the Note are true and correct in all material respects (except for those representations and warranties that are conditioned by materiality, in which case, such representations and warranties are true and correct in all respects) as of the date hereof; and

(b) as of the date hereof, no event has occurred and is continuing or would result from the consummation of the funding of the Advance contemplated hereby that would constitute an Event of Default under the Note.

*[Signature Page Follows]*

**COMPANY**:


**SeeCubic BV,**
a Besloten vennootschap
under the laws of the Netherlands


By: _____
Name: Mathu Rajan
Title: Director



By: _____
Name:
Title: Director



**RECEIVER APPROVAL:**



By: _____
Name:
Title: Receiver pendente lite for
TechnoVative Inc., the Company's indirect
sole shareholder

**Form of Notice of Advance**

**January 3, 2023**

Reference is made to the Senior Promissory Note, dated as of November 2014, 2022 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Note**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and between SeeCubic BV, a Besloten vennootschap under the laws of the Netherlands, as a borrower thereunder (the "***Company***"), and SeeCubic, Inc., a Delaware corporation (together with its successors and assigns, the "***Holder***").

Pursuant to Section 1 of the Note, the Company desires that the Holder make the following Advance to Company in accordance with the applicable terms and conditions of the Note:

1.  Requested Advance Date:        January 3, 2023

2.  Requested Advance Amount:   Euro 750,000

3.  Attached hereto as <u>Annex A</u> is a report showing the Company's expenses for the calendar month immediately preceding the requested Advance.

4.  Attached hereto as <u>Annex B</u> is a budget showing the proposed use of the funds for the requested Advance.

The undersigned, on behalf of the Company, hereby certifies that:

(a)  the representations and warranties contained in the Note are true and correct in all material respects (except for those representations and warranties that are conditioned by materiality, in which case, such representations and warranties are true and correct in all respects) as of the date hereof; and

(b)  as of the date hereof, no event has occurred and is continuing or would result from the consummation of the funding of the Advance contemplated hereby that would constitute an Event of Default under the Note.

*[Signature Page Follows]*

**COMPANY**:


**SeeCubic BV,**
a Besloten vennootschap
under the laws of the Netherlands


By: _____
Name: Shadron Stastney
Title: Director A


By: _____
Name: Mathu Rajan
Title: Director A


**RECEIVER APPROVAL:**


By: _____
Name:
Title: Receiver pendente lite for
TechnoVative Inc., the Company's indirect
sole shareholder

**Form of Notice of Advance**

**February 17, 2023**

Reference is made to the Senior Promissory Note, dated as of November 14, 2022 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Note**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and between SeeCubic BV, a Besloten vennootschap under the laws of the Netherlands, as a borrower thereunder (the "***Company***"), and SeeCubic, Inc., a Delaware corporation (together with its successors and assigns, the "***Holder***").

Pursuant to Section 1 of the Note, the Company desires that the Holder make the following Advance to Company in accordance with the applicable terms and conditions of the Note:

1.  Requested Advance Date:          February 17, 2023

2.  Requested Advance Amount:    Euro 750,000

3.  Attached hereto as <u>Annex A</u> is a report showing the Company's expenses for the calendar month immediately preceding the requested Advance.

4.  Attached hereto as <u>Annex B</u> is a budget showing the proposed use of the funds for the requested Advance.

The undersigned, on behalf of the Company, hereby certifies that:

(a)  the representations and warranties contained in the Note are true and correct in all material respects (except for those representations and warranties that are conditioned by materiality, in which case, such representations and warranties are true and correct in all respects) as of the date hereof; and

(b)  as of the date hereof, no event has occurred and is continuing or would result from the consummation of the funding of the Advance contemplated hereby that would constitute an Event of Default under the Note.

*[Signature Page Follows]*

**COMPANY**:


**SeeCubic BV,**
a Besloten vennootschap
under the laws of the Netherlands


By: _____
Name: Shadron Stastney
Title: Director A


By: _____
Name: Mathu Rajan
Title: Director A




**RECEIVER APPROVAL:**


By: _____
Name:
Title: Receiver pendente lite for
TechnoVative Inc., the Company's indirect
sole shareholder

**COMPANY**:


**SeeCubic BV,**
a Besloten vennootschap
under the laws of the Netherlands

By: _____
Name: Shadron Stastney
Title: Director A



By: _____
Name: Mathu Rajan
Title: Director A




**RECEIVER APPROVAL:**


By: _____
Name:
Title: Receiver pendente lite for
TechnoVative Inc., the Company's indirect
sole shareholder

# EXHIBIT S
# Spreadsheet reconciling the funds for the SCBV payroll

| Euros | Oct-22 | Nov-22 (f) | Nov-22 | Dec-22 (f) |
|---|---|---|---|---|
| Payroll fixed personnel | 133,033 | 130,665 | 130,665 | 135,936 |
| Contractors  (incl. Projects) | 248,587 | 98,180 | 98,180 | 118,544 |
| Wage tax  / Pensions | 61,794 | 342,669 | 243,301 | 181,766 |
| VAT-recovered on paid expenses | | (34,004) | (34,003) | (43,271) |
| Payroll account | 443,414 | 537,510 | 438,143 | 392,974 |
| | | | | |
| Delta Patents | 33,108 | 21,223 | 21,223 | 52,925 |
| Building Rent | 11,187 | 42,374 | 42,374 | 20,374 |
| Software (Incl. Siemens)/IT capex | 3,848 | 88,852 | 88,852 | 50,810 |
| Other operational expenses | 21,303 | 98,534 | 98,534 | 175,035 |
| Operational account | 69,446 | 250,983 | 250,983 | 299,145 |
| | | | | |
| **Total  payments** | **512,860** | **788,493** | **689,126** | **692,119** |
| | | | | |
| Funding by bank transfers | 600,000 | | 584,493 | 669,119 |
| Funding November US-reconciliation balances | | | (18,101) | |
| Investor capital received @ Rabo NL | 18,117 | | 41,899 | 23,000 |
| Funding | 618,117 | - | 608,291 | 692,119 |
| | | | | |
| | | | | |
| Cash balance beginning of month | 230 | | 105,487 | |
| Cash change current month | 105,257 | | (80,835) | |
| Cash received regarding budget previous month | | | | |
| Cash balance end of month | 105,487 | | 24,652 | |

| Month | Requested | Funded | |
|---|---|---|---|
| Nov-22 | 788,493 | 608,291 | |
| Dec-22 | 692,119 | 380,675 | |
| Jan-23 | 759,555 | - | |
| Feb-23 | 779,908 | 328,000 | as of 2/20 |
| **Total** | **3,020,074** | **1,316,966** | |

| Dec-22 | Jan-23 (f) | Jan-23 | Feb-23 (f) | |
|---|---|---|---|---|
| 144,404 | 190,607 | 159,516 | 164,781 | rapid increase since Dec |
| 120,615 | 177,915 | 27,439 | 201,442 | huge fluctuations |
| 170,413 | 288,750 | 39,857 | 182,392 | |
| (43,302) | (33,243) | (33,243) | (28,580) | |
| 392,130 | 624,029 | 193,569 | 520,035 | |
| | | | | |
| 54,148 | 30,000 | - | 24,000 | |
| 42,375 | 20,374 | 21,187 | 21,187 | Nov/Dec seems 2x |
| 65,368 | 23,250 | 28,983 | 84,250 | |
| 65,234 | 61,902 | 35,719 | 130,436 | |
| 227,125 | 135,526 | 85,889 | 259,873 | |
| | | | | |
| **619,255** | **759,555** | **279,458** | **779,908** | |
| | | | | |
| 339,728 | 750,000 | - | 328,000 | |
| | | | | |
| 40,947 | | | | |
| 380,675 | 750,000 | - | 328,000 | |
| 692k budgeted | | 750k budgeted | 328k funded as of 2/20 | |
| | | | | |
| 24,652 | | 58,565 | 59,427 | |
| (238,580) | | (279,458) | (451,908) | |
| 272,493 | | 280,320 | | what is this? |
| 58,565 | | 59,427 | (392,481) | |

| Description | Account | Cur. | Amount | Invoice date | Due date | Payment Date | Document | balance 4-4-2023 | Urgent payments We 12/4 | 14-Apr | 21-Apr | 28-Apr | 5-5-2023 | Notes | payroll | contractors | wage taks/pensions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tax-Salary November 2022 | Nov 2022 Payroll Tax | EUR | 115,519 | | 30/Dec22 | 9/Mar/23 | € -115,589.29 | | | 115,519 | | | | due 18 april, Notice of appeal sent April, 12 2023 | | | 115,519 |
| Tax-Salary Dec2022 | Dec 2022 payroll Tax | EUR | €108,501.00 | | 30/Dec22 | 9/Mar/23 | € -224,090.29 | | | | | | | due 19 april, Notice of appeal sent April, 12 2023 | | | 108,501 |
| 230218 Allianz InkomenCombinatie Q1 2023 | 693 - Allianz Benelux inkoming | EUR | €2,176.96 | 1/Mar/23 | 15/Mar/23 | 4/Apr/23 | € -226,267.25 | | 2,177 | | | | | | | 2,177 | |
| 230219 Allianz Inkomens Combinatie Q1 2023 | 693 - Allianz Benelux inkoming | EUR | €366.94 | 1/Mar/23 | 15/Mar/23 | 3/Apr/23 | € -226,634.19 | | 367 | | | | | | | 367 | |
| 221019 TMC working hours Martin Dec2022 | 574 - TMC Electronics B.V. | EUR | €1,999.69 | 31/Dec/22 | 14/Feb/23 | 14/Feb/23 | € -228,633.88 | | 2,000 | | | | | | | 2,000 | |
| 221013 TMC working hours Marten Dec2022 | 574 - TMC Electronics B.V. | EUR | €2,329.31 | 31/Dec/22 | 14/Feb/23 | 14/Feb/23 | € -230,963.19 | | 2,329 | | | | | | | 2,329 | |
| 221015 TMC working hours Harry De Groot Dec2022 | 634 - TMC Physics B.V. | EUR | €15,286.66 | 31/Dec/22 | 30/Jan/23 | 30/Jan/23 | € -246,249.85 | | 15,287 | | | | | | | 15,287 | |
| 221014 TMC working hours Mai Dec2022 | 574 - TMC Electronics B.V. | EUR | €14,552.32 | 31/Dec/22 | 14/Feb/23 | 14/Feb/23 | € -260,802.17 | | 14,552 | | | | | | | 14,552 | |
| 230025 On time engineers selection fee for Hans Van | 739 - On Time Engineers Detacher | EUR | €22,264.00 | 12/Jan/23 | 11/Feb/23 | 11/Feb/23 | € -283,066.17 | | 22,264 | partial payments negotiable | | | | | | 22,264 | |
| Payroll tax monthly catch up (Feb 2023) | Payroll Tax monthly catch up | EUR | €25,282.00 | | 28/Feb/23 | 28/Feb/23 | € -308,348.17 | | 25,282 | | | | | | | | 25,282 |
| Now2 return Monthly ( Feb 2023) | Now 2 | EUR | €8,447.53 | | 02-28-2023 | 8/Apr/23 | € -316,795.70 | | 8,448 | | | | | | | | 8,448 |
| 230112 Limes immigration advice Alex Dec2022 | 718 - LIMES intern. tax + global mc | EUR | €886.33 | 15/Feb/23 | 1/Mar/23 | 1/Mar/23 | € -317,682.03 | | 886 | | | | | | | 886 | |
| 230182 Luijks Advies charge legal fee | 648 - Luijks Advies B.V | EUR | €13,915.00 | 6/Mar/23 | 14/Mar/23 | 20/Mar/23 | € -331,597.03 | | 13,915 | | | | | | | 13,915 | |
| 230163 Woutru working hours Frank Feb2023 | 62 - Woutru B.V. | EUR | €358.22 | 6/Mar/23 | 20/Mar/23 | 20/Mar/23 | € -331,955.25 | | 358 | | | | | | | 358 | |
| 230195 travel allowance Shaoping Lu Feb2023 | 765 - Shaoping Lu | EUR | €444.60 | 16/Mar/23 | 24/Mar/23 | 24/Mar/23 | € -332,399.85 | | 445 | | | | | | | 445 | |
| Tax-Salary March 2023 | Payroll Tax 01/Mar/2023 | EUR | €134,735.00 | | | 28/Feb/23 | € -467,134.85 | | | 134,735 | | | | | | | 134,735 |
| 230108 Loyr legal service Jan 2023 | 752 - LOYR | EUR | €1,002.79 | 14/Feb/23 | 28/Feb/23 | 28/Feb/23 | € -468,137.64 | | 1,003 | | | | | | | 1,003 | |
| 230086 TMC working hours Martin van Tol Jan2023 | 574 - TMC Electronics B.V. | EUR | €15,566.19 | 31/Jan/23 | 15/Feb/23 | 15/Feb/23 | € -483,703.83 | | 15,566 | | | | | | | 15,566 | |
| 230063 TMC working hours Marten Jan2023 | 574 - TMC Electronics B.V. | EUR | €13,591.69 | 31/Jan/23 | 15/Feb/23 | 15/Feb/23 | € -497,295.52 | | 13,592 | | | | | | | 13,592 | |
| 230064 TMC working hours Marten Jan2023 | 574 - TMC Electronics B.V. | EUR | €12,918.24 | 31/Jan/23 | 15/Feb/23 | 15/Feb/23 | € -510,213.76 | | 12,918 | | | | | | | 12,918 | |
| 230093 TMC working hours Harry Jan 2023 | 634 - TMC Physics B.V. | EUR | €16,014.59 | 1/Feb/23 | 15/Feb/23 | 15/Feb/23 | € -526,228.35 | | 16,015 | | | | | | | 16,015 | |
| 230118 Limes advice services for Patric Dec2022 | 718 - LIMES intern. tax + global mc | EUR | €847.00 | 21/Feb/23 | 23/Mar/23 | 23/Mar/23 | € -527,075.35 | | 847 | | | | | | | 847 | |
| Payroll tax monthly catch up (Mar 2023) | Payroll Tax monthly catch up | EUR | €25,282.00 | | | | € -552,357.35 | | 25,282 | | | | | | | | 25,282 |
| Now2 return Monthly ( Mar 2023) | Now 2 | EUR | €8,447.53 | | 31/Mar/23 | 31/Mar/23 | € -560,804.80 | | 8,448 | | | | | | | | 8,448 |
| Tax-Salary Feb 2023 | Payroll Tax 01/02/2023 | EUR | €110,777.00 | | | 31/Mar/23 | € -671,581.89 | | | | 110,777 | | | | | | 110,777 |
| 230141 TMC working hours Marten Feb2023 | 574 - TMC Electronics B.V. | EUR | €9,107.10 | 28/Feb/23 | 30/Mar/23 | 30/Mar/23 | € -680,688.99 | | | | 9,107 | | | | | 9,107 | |
| 230150 TMC working hours Danny Jan 2023 | 302 - TMC Software B.V. | EUR | €605.00 | 28/Feb/23 | 30/Mar/23 | 30/Mar/23 | € -681,293.99 | | | | 605 | | | | | 605 | |
| 230151 TMC working hours Marten Feb2023 | 574 - TMC Electronics B.V. | EUR | €10,963.16 | 28/Feb/23 | 30/Mar/23 | 30/Mar/23 | € -692,257.15 | | | | 10,963 | | | | | 10,963 | |
| 230143 TMC working hours Marten Feb2023 | 574 - TMC Electronics B.V. | EUR | €12,160.98 | 28/Feb/23 | 30/Mar/23 | 30/Mar/23 | € -704,418.13 | | | | 12,161 | | | | | 12,161 | |
| 230169 TMC working hours Harry Feb2023 | 634 - TMC Physics B.V. | EUR | €14,558.72 | 28/Feb/23 | 30/Mar/23 | 30/Mar/23 | € -718,976.85 | | | 14,559 | | | | | | 14,559 | |
| 230224 declatation travel allowance Yunus March2022 | 761 - Yunus Karatas | EUR | €660.74 | 8/Apr/23 | 8/Apr/23 | 8/Apr/23 | € -719,637.59 | | | | 661 | | | | | 661 | |
| 230225 declaration Cristian Dan travel allowance Mar | 735 - Cristian Dan | EUR | €157.86 | 31/Mar/23 | 8/Apr/23 | 8/Apr/23 | € -719,795.45 | | | | 158 | | | | | 158 | |
| 230226 declaration travel allowance Milan March2023 | 768 - Milan Gansi | EUR | €63.84 | 31/Mar/23 | 8/Apr/23 | 8/Apr/23 | € -719,859.29 | | | | 64 | | | | | 64 | |
| 230172 Limes Service advice for Patric Jan2023 | 718 - LIMES intern. tax + global mc | EUR | €356.95 | 31/Mar/23 | 7/Apr/23 | 7/Apr/23 | € -720,216.24 | | | | 357 | | | | | 357 | |
| 230177 Turien&CO Wegas XL-insurance Tot June20 | 654 - Turien & Co. Assuradeuren B | EUR | €114.95 | 31/Mar/23 | 3/Apr/23 | 3/Apr/23 | € -720,331.09 | | | | 115 | | | | | 115 | |
| Pension Apr 2023 | National Netherlands | EUR | €39,000.00 | | 15/Apr/23 | 15/Apr/23 | € -759,331.09 | | | | 39,000 | | | | | | € 39,000.00 |
| 230220 Limes Service cost Feb for Alex closing the fi | 718 - LIMES intern. tax + global mc | EUR | €310.06 | 29/Mar/23 | 28/Apr/23 | 28/Apr/23 | € -759,641.15 | | | | | 310 | | | | 310 | |
| 230221 Limes Service cost Feb 2023 Lu Xiaoping file | 718 - LIMES intern. tax + global mc | EUR | €471.90 | 29/Mar/23 | 28/Apr/23 | 28/Apr/23 | € -760,113.05 | | | | | 472 | | | | 472 | |
| 230199 Allianz incoming insurance Q2 2023 | 693 - Allianz Benelux inkoming | EUR | €10,937.55 | 1/Apr/23 | 1/May/23 | 1/May/23 | € -771,050.60 | | | | | 10,938 | | | | 10,938 | |
| WIA Apr2023 (incl bonus gross 55k) | Payroll Apr 2023 | EUR | €165,000.00 | 25/Mar/23 | 25/Apr/23 | 25/Apr/23 | € -936,050.60 | | | 165,000 | | | | | 165,000 | | |
| WIA May | Yousure | EUR | €2,350.00 | | 30/Apr/23 | 30/Apr/23 | € -938,400.60 | | | | | 2,350 | | | | 2,350 | |
| Tax-Salary Mar2023 | Mar-23 | EUR | €112,303.00 | | 30/Apr/23 | 30/Apr/23 | € -1,050,769.60 | | | | 112,303 | | | | | | 112,303 |
| Payroll tax catch up (April 2023) | Payroll Tax monthly catch up | EUR | €25,282.00 | | 31/Mar/23 | 31/Mar/23 | € -1,075,985.60 | | | | | 25,282 | | | | | 25,282 |
| Now2 return Monthly ( April 2023) | Now 2 | EUR | €8,447.53 | | 31/Mar/23 | 31/Mar/23 | € -1,084,433.13 | | | | | 8,448 | | | | | 8,448 |
| VAT March 2023 received April 17 | | EUR | | | | | | | | -37,250 | | | | | | | -37,250 |
| 230228 TMC working hours Marten March 2023 | 574 - TMC Electronics B.V. | EUR | €11,779.87 | 31/Mar/23 | 30/Apr/23 | 30/Apr/23 | € -1,096,213.00 | | | | | 11,780 | | | | 11,780 | |
| 230237 TMC working hours Martin March2023 | 574 - TMC Electronics B.V. | EUR | €19,377.33 | 31/Mar/23 | 30/Apr/23 | 30/Apr/23 | € -1,115,590.33 | | | | | 19,377 | | | | 19,377 | |
| 230231 TMC working hours Mai March 2023 | 574 - TMC Electronics B.V. | EUR | €10,730.28 | 31/Mar/23 | 30/Apr/23 | 30/Apr/23 | € -1,126,320.61 | | | | | 10,730 | | | | 10,730 | |
| **Totals** | | | | | | | | 0 | 123,891 | 81,193 | 313,355 | 104,245 | 466,316 | | 165,000 | 201,977 | 722,024 |
| | | | | | | | | | | | | | | 1,089,000 | | | |

| | balance 4-4-2023 | Urgent payments We 12/4 | 14-Apr | 21-Apr | 28-Apr | 5-5-2023 |
|---|---|---|---|---|---|---|
| Balance Payroll Acct after weekly payment | -70 | -123,961 | -205,154 | -518,509 | -622,754 | -1,089,070 |
| Balance Operational Acct after weekly payment (zie tab operational account) | -843 | -78,134 | -128,622 | -228,516 | -228,516 | -228,516 |
| **Total Cash need cumulative** | -914 | -202,095 | -333,776 | -747,026 | -851,271 | -1,317,587 |
| Change in week | | -201,182 | -131,681 | -413,250 | -104,245 | -466,316 |
| | | | | | | -1,317,587 |

**Funding requests April-2023**

| | 4-Apr | 12-Apr | 14-Apr | 21-Apr | 28-Apr | 5-May | |
|---|---|---|---|---|---|---|---|
| funding request 21/4 | | | | 750,000 | | | |
| funding request 28/4 | | | | | 125,000 | | |
| funding request 5/5 | | | | | | 475,000 | |
| **Total funding/week** | 0 | 0 | 0 | 750,000 | 125,000 | 475,000 | 1,350,000 |

| Balance after funding & payments end of week: | -914 | -202,095 | -333,776 | 2,974 | 23,729 | 32,413 | 32,413 |
|---|---|---|---|---|---|---|---|

| Cumulative funding needed April 21, 2023 | | | | 750,000 | 875,000 | 1,350,000 |
|---|---|---|---|---|---|---|

**SeeCubic B.V.**

**Budget April - 2023**

April 2023-
budget

|  | Proposed use of funds | Comments |
|---|---|---|
| **Payments** | | |
| | | |
| Payroll fixed personnel | 165,000 | Tab payroll april 2023 incl. target bonus 55k |
| Contractors | 239,227 | Tab payroll payment register * |
| Wage tax / Pensions | 722,023 | Tab wage taks_Pensions |
| VAT-recovered on paid expenses | -37,250 | *Included in payroll payment reg. Contractors |
| **Payroll account** | **1,089,000** | |
| | | |
| Delta Patents | 22,169 | Tab operational paym reg. |
| Building Rent | 87,562 | Tab operational paym reg. |
| Software (Incl. Siemens) | 43,317 | Tab operational paym reg. |
| Other operational expenses | 74,625 | Tab operational paym reg. EXCL. Projectcosts |
| | | |
| **Operational account** | **227,673** | |
| | | |
| **Total  payments** | **1,316,673** | |
| | | |
| Funding request due April 21, 2023 | 750,000 | Promisory note dated April 17, 2023 |
| Funding request due April 28, 2023 | 125,000 | |
| Funding request due May 5 for Wage tax liabilities / cash balance end of month | 475,000 | |
| **Proposed Advance Budget** | **1,350,000** | |
| | | |
| Cash balance beginning of month | -914 | |
| | | |
| **Cash change current month** | **33,327** | |
| | | |
| **Cash balance end of month** | **32,413** | |

# SeeCubic B.V.

| Description | Account | Cur. | Amount | Invoice date | Due date | Payment Date | | 4-Apr | Urgent payments We 12/4 | 14-Apr | 21-Apr | 28-Apr | 5-May | Patents | rent | Software | Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | -€843.47 | | | | | | | | | | |
| 220912 Declaration Patric Legal advice cost Oct2022 Lawyer T | 144 - Patric Theune | EUR | € 13,715.35 | 7/dec/22 | 15/dec/22 | 15/dec/22 | € -14,558.82 | | | | 13,715 | | | | | | 13,715 |
| 230181 declaration Patric trip to London 23Feb 2023 | 144 - Patric Theune | EUR | € 1,137.98 | 22/mrt/23 | 22/mrt/23 | 22/mrt/23 | € -15,696.80 | | | 1,138 | | | | | | | 1,138 |
| 230236 Digi-Key parts for Mark team | 419 - Digi-Key Electronics | EUR | € 66.78 | 1/mrt/23 | 31/mrt/23 | 4/apr/23 | € -15,763.58 | | | 67 | | | | | | | 67 |
| 230223 Romex cleaningroom doekjes | 56 - Romex B.V. | EUR | € 298.27 | 1/mrt/23 | 31/mrt/23 | 4/apr/23 | € -16,061.85 | | | 298 | | | | | | | 298 |
| Financial service CuraCao | CuraoTrust | USD | € 6,122.13 | | | | € -22,183.98 | | | 6,122 | | | | | | | 6,122 |
| 230066 Trebaxvastgoed Rental PF1033 March 2023 | 149 - Trebax Vastgoed B.V. -march | EUR | € 10,230.94 | 31/jan/23 | 2/mrt/23 | 2/mrt/23 | € -32,414.92 | | 10,231 | | | | | | 10,231 | | |
| 230065 Peeters rental March 2023 | 5 - Peeters Onroerend Goed B.V.- march | EUR | € 10,956.38 | 1/feb/23 | 3/mrt/23 | 3/mrt/23 | € -43,371.30 | | 10,956 | | | | | | 10,956 | | |
| 230092 Bechtle M365 license Jan 2023 | 48 - Bechtle direct B.V. | EUR | € 4,957.03 | 1/feb/23 | 3/mrt/23 | 3/mrt/23 | € -48,328.33 | | 4,957 | | | | | | | 4,957 | |
| 230123 Buro040 ISO-9001 interne audit Feb2023 | 655 - Buro040 | EUR | € 1,529.92 | 24/feb/23 | 10/mrt/23 | 10/mrt/23 | € -49,858.25 | | 1,530 | | | | | | | | 1,530 |
| 230102 one minute coaching session Franklin Feb 2022 | 682 - One minute coaching / VM Corporation B.V. | EUR | € 151.25 | 10/feb/23 | 12/mrt/23 | 12/mrt/23 | € -50,009.50 | | 151 | | | | | | | | 151 |
| 230103 one minute coaching session Patric Feb2023 | 682 - One minute coaching / VM Corporation B.V. | EUR | € 151.25 | 10/feb/23 | 12/mrt/23 | 12/mrt/23 | € -50,160.75 | | 151 | | | | | | | | 151 |
| 230136 Innofour Siemens ALM subscription 2023 PO 634 | 399 - Innofour B.V. | EUR | € 32,078.31 | 28/feb/23 | 14/mrt/23 | 14/mrt/23 | € -82,239.06 | | 32,078 | | | | | | | 32,078 | |
| 230148 CWS Rental Hygiene March 2023 | 211 - CWS  Hygiene | EUR | € 154.89 | 1/mrt/23 | 15/mrt/23 | 15/mrt/23 | € -82,393.95 | | 155 | | | | | | | | 155 |
| 230149 Ergonomique office article | 778 - Ergonomique | EUR | € 534.17 | 3/mrt/23 | 17/mrt/23 | 17/mrt/23 | € -82,928.12 | | 534 | | | | | | | | 534 |
| 230180 Adhesive Dispensing Ltd  Dispense Equipment | 746 - Adhesive Dispensing Ltd | GBP | € 1,855.98 | 13/mrt/23 | 21/mrt/23 | 21/mrt/23 | € -84,784.10 | | 1,856 | | | | | | | | 1,856 |
| 230116 One Minutes Coaching session Jonny Feb 2023 | 682 - One minute coaching / VM Corporation B.V. | EUR | € 151.25 | 17/feb/23 | 19/mrt/23 | 19/mrt/23 | € -84,935.35 | | 151 | | | | | | | | 151 |
| 230058 CSU cleaning cost Jan 2023 | 499 - CSU BV | EUR | € 670.46 | 20/feb/23 | 22/mrt/23 | 22/mrt/23 | € -85,605.81 | | 670 | | | | | | | | 670 |
| 230122 CSU cleaning cost Feb2023 | 499 - CSU BV | EUR | € 670.46 | 20/feb/23 | 22/mrt/23 | 22/mrt/23 | € -86,276.27 | | 670 | | | | | | | | 670 |
| 230162 High Tech Institute training for Baris C++ fundamenta | 417 - The High Tech Institute (HTI) B.V. | EUR | € 3,025.00 | 7/mrt/23 | 21/mrt/23 | 21/mrt/23 | € -89,301.27 | | 3,025 | | | | | | | | 3,025 |
| 230139 NETVIA Huawei switcher services support | 751 - Netvia B.V. | EUR | € 296.45 | 1/mrt/23 | 28/mrt/23 | 28/mrt/23 | € -89,597.72 | | 296 | | | | | | | | 296 |
| 230120 Gemeente Eindhoven gemeent belasting 2023 | 98 - Gemeente Eindhoven belastingen | EUR | € 4,433.58 | 27/feb/23 | 29/mrt/23 | 29/mrt/23 | € -94,031.30 | | 4,434 | | | | | | | | 4,434 |
| 230134 Isotron Code reader PO678 | 774 - Isotron Systems B.V. | EUR | € 4,869.65 | 28/feb/23 | 30/mrt/23 | 30/mrt/23 | € -98,900.95 | | 4,870 | | | | | | | | 4,870 |
| 230166 Bechtle license Professional Promo Feb2023 | 48 - Bechtle direct B.V. | EUR | € 5,162.69 | 28/feb/23 | 30/mrt/23 | 30/mrt/23 | € -104,063.64 | | 5,163 | | | | | | | 5,163 | |
| 230132 Peeters Rental PF1035 Apr2023 | 5 - Peeters Onroerend Goed B.V.- April | EUR | € 10,956.38 | 1/mrt/23 | 31/mrt/23 | 31/mrt/23 | € -115,020.02 | | | 10,956 | | | | | 10,956 | | |
| 230133 Trebaxvastgoed rental PF1033 Apr2023 | 149 - Trebax Vastgoed B.V.-April | EUR | € 10,230.94 | 1/mrt/23 | 31/mrt/23 | 31/mrt/23 | € -125,250.96 | | | 10,231 | | | | | 10,231 | | |
| 230157 Lavans cleaning room article Jan Feb 2023 | 692 - Lavans B.V. | EUR | € 331.82 | 1/mrt/23 | 31/mrt/23 | 31/mrt/23 | € -125,582.78 | | | 332 | | | | | | | 332 |
| 230147 one minute coaching session Franklin, Patric Feb2023 | 682 - One minute coaching / VM Corporation B.V. | EUR | € 302.50 | 2/mrt/23 | 1/apr/23 | 1/apr/23 | € -125,885.28 | | | 303 | | | | | | | 303 |
| 230207 Grenke quarter cost HP printer t Q2 2023 | 547 - GrenkeN.V. | EUR | € 1,280.74 | 22/mrt/23 | 1/apr/23 | 1/apr/23 | € -127,166.02 | | | 1,281 | | | | | | | 1,281 |
| 230208 Orangeblend 30pcs cleaning  tablet | 434 - Orange Blend B.V. | EUR | € 27.20 | 24/mrt/23 | 1/apr/23 | 1/apr/23 | € -127,193.22 | | | 27 | | | | | | | 27 |
| 230209 OrangeBlend coffee March | 434 - Orange Blend B.V. | EUR | € 377.53 | 24/mrt/23 | 1/apr/23 | 1/apr/23 | € -127,570.75 | | | 378 | | | | | | | 378 |
| warehouse rental in China Q2 2023 | Nantong Xungetai Semiconductor Technology Co. | EUR | € 24,000.00 | | | 1/apr/23 | € -151,570.75 | | | 24,000 | | | | | 24,000 | | |
| 230152 DELO kantoor office article March2023 | 560 - Delo B.V. | EUR | € 141.39 | 3/mrt/23 | 2/apr/23 | 2/apr/23 | € -151,712.14 | | | 141 | | | | | | | 141 |
| 230177 Turien&CO Wegas XL-insurance  Tot June2023 | 654 - Turien & Co. Assuradeuren B.V. | EUR | € 114.85 | 4/mrt/23 | 3/apr/23 | 3/apr/23 | € -151,826.99 | | | 115 | | | | | | | 115 |
| 230154 Cloudoe telephone cost March2023 | 443 - CLOUDOE | EUR | € 84.41 | 6/mrt/23 | 5/apr/23 | 5/apr/23 | € -151,911.40 | | | 84 | | | | | | | 84 |
| Greenchoice Apr  energie cost | 503 - Greenchoice | EUR | € 2,376.00 | | | 6/apr/23 | € -154,287.40 | | | 2,376 | | | | | | | 2,376 |
| 230281 Greenchoice eindnota 2022 | 503 - Greenchoice | EUR | € 2,544.06 | 12/okt/22 | 26/okt/22 | 10/apr/23 | € -156,831.46 | | | 2,544 | | | | | | | 2,544 |
| 230173 declaration Patric lawyer cost Feb2023 | 144 - Patric Theune | EUR | € 3,466.65 | 8/mrt/23 | 7/apr/23 | 7/apr/23 | € -160,298.11 | | | 3,467 | | | | | | | 3,467 |
| 230234 Transip BladeVPS Apr2023 | 324 - Transip B.V. | EUR | € 30.24 | 1/apr/23 | 9/apr/23 | 9/apr/23 | € -160,328.35 | | | 30 | | | | | | | 30 |
| 230197 One Minutes coaching Session M. Gokul | 682 - One minute coaching / VM Corporation B.V. | EUR | € 302.50 | 17/mrt/23 | 16/apr/23 | 16/apr/23 | € -160,630.85 | | | 303 | | | | | | | 303 |
| 230183 Bechtle GravityZone  t/m Aug2023 | 48 - Bechtle direct B.V. | EUR | € 1,530.40 | 13/mrt/23 | 12/apr/23 | 12/apr/23 | € -162,161.25 | | | 1,530 | | | | | | 1,530 | |
| 230198 Medusa website certificated 2023 | 549 - Medusa Media Usage Advice B.V. | EUR | € 580.07 | 15/mrt/23 | 14/apr/23 | 14/apr/23 | € -162,741.32 | | | 580 | | | | | | | 580 |
| 230186 Siko BV OC4022 900g | 580 - Siko B.V. | EUR | € 2,614.33 | 16/mrt/23 | 15/apr/23 | 15/apr/23 | € -165,355.65 | | | 2,614 | | | | | | | 2,614 |
| 230222 Deltapatents advance payment May2023 | 19 - Deltapatents | EUR | € 22,169.00 | 30/mrt/23 | 19/apr/23 | 19/apr/23 | € -187,524.65 | | | | 22,169 | | | | 22,169 | | |
| 230200 CSU leaning cost March2023 | 499 - CSU BV | EUR | € 670.46 | 20/mrt/23 | 19/apr/23 | 19/apr/23 | € -188,195.11 | | | | 670 | | | | | | 670 |
| Vattenfall electricity PF1035 March2023 | 576 - N.V. Nuon Vattenfall Sales Nederland | EUR | € 1,853.70 | 8/mrt/23 | 22/mrt/23 | 22/apr/23 | € -190,048.81 | | | | 1,854 | | | | | | 1,854 |
| Vattenfall electricity PF1033 Apr 2023 | 609 - Nuon vattenfall  Klantenservice | EUR | € 2,214.00 | 10/mrt/23 | 24/mrt/23 | 24/apr/23 | € -192,262.81 | | | | 2,214 | | | | | | 2,214 |
| Credit Card  Apr2023 | Credit Card Apr 2023 | EUR | € 10,000.00 | | | 25/apr/23 | € -202,262.81 | | | | 10,000 | | | | | | 10,000 |
| 230233 Netvia  Huawei SLA server supportr Apr 2023 | 751 - Netvia B.V. | EUR | € 296.45 | 1/apr/23 | 28/apr/23 | 28/apr/23 | € -202,559.26 | | | | 296 | | | | | | 296 |
| 230235 One minute coaching session Franklin March2023 | 682 - One minute coaching / VM Corporation B.V. | EUR | € 151.25 | 31/mrt/23 | 30/apr/23 | 30/apr/23 | € -202,710.51 | | | | 151 | | | | | | 151 |
| 230227 Visiativ  Designation software service | 779 - Visiativ Industry Solution B.V. | EUR | € 378.13 | 31/mrt/23 | 30/apr/23 | 30/apr/23 | € -203,088.64 | | | | 378 | | | | | 378 | |
| 230229 Peeters Rental Park Forum1035 May2023 | 5 - Peeters Onroerend Goed B.V. - may | EUR | € 10,956.38 | 3/apr/23 | 3/mei/23 | 3/mei/23 | € -214,045.02 | | | | 10,956 | | | | 10,956 | | |
| 230230 Trebaxvastgoed rental Parkform 1033 May2023 | 149 - Trebax Vastgoed B.V. - may | EUR | € 10,230.94 | 3/apr/23 | 3/mei/23 | 3/mei/23 | € -224,275.96 | | | | 10,231 | | | | 10,231 | | |
| Exact Sub May2023 | Exact | EUR | € 740.52 | | | 6/mei/23 | € -225,016.48 | | | | 741 | | | | | 741 | |
| New desk for office | ime kantoor en magazijn | EUR | € 3,500.00 | | | 1/apr/23 | € -228,516.48 | | | | 3,500 | | | | | | 3,500 |
| | | | | | | | | 0 | 77,291 | 50,488 | 99,895 | 0 | 0 | 0 | 22,169 | 87,562 | 43,317 | 74,625 |
| | | | | | | | | | | | | | | 227,673 | | | 227,673 |
| Balance operational Acct after weekly payment | | | | | | | | -843 | -78,134 | -128,622 | -228,516 | -228,516 | -228,516 | | | | |

Operational Account

# SeeCubic B.V.

**Payroll April 2023 (incl. bonus)**

| # | Nett | incl. (gross) bonus |
|---|------|---------------------|
| 1 | 3,479 | |
| 2 | 2,769 | |
| 3 | 10,392 | |
| 4 | 3,676 | |
| 5 | 4,967 | |
| 6 | 3,669 | |
| 7 | 3,510 | |
| 8 | 5,180 | |
| 9 | 3,909 | |
| 10 | 9,343 | 8,703 |
| 11 | 4,603 | |
| 12 | 4,965 | |
| 13 | 5,182 | |
| 14 | 9,779 | 9,792 |
| 15 | 4,286 | |
| 16 | 4,006 | |
| 17 | 5,850 | |
| 18 | 4,966 | |
| 19 | 5,451 | |
| 20 | 3,353 | |
| 21 | 3,579 | |
| 22 | 7,185 | |
| 23 | 25,357 | 36,117 |
| 24 | 3,591 | |
| 25 | 2,334 | |
| 26 | 10,203 | |
| 27 | 5,608 | |
| 28 | 3,599 | |
| | **164,791** | **54,612** |

# SeeCubic B.V. - Wage tax liabilities per March 31, 2023

| | | Amount Due | Date<br>1st reminder<br>"naheffingsaanslag" | Date<br>2nd reminder<br>"aanmaning" | Ultimate<br>payment date<br>to prevend writ<br>of execution | Penalty of<br>writ<br>Euro | |
|---|---|---|---|---|---|---|---|
| Wage tax Month November  Euro 107,405 due December 31, 2022 +  3 % + 18 dd 24 feb 2023 + Eur 9,874 fine | | 115,519 | 23/jan/23 | 24/feb/23 | 19/mrt/23 | 9,874 | 4/4 request postponement (of March 14) denied, Notice of appeal sent Apr 12, 2023 |
| Wage tax Month December  Euro 110,220 due January 31, 2022 + 3 %  23 feb 2023 | | 108,501 | 23/feb/23 | 23/mrt/23 | 19/apr/23 | 9,686 | 4/4 request postponement (of March 14) denied, Notice of appeal sent Apr 12, 2023 |
| Wage tax Month January 2023   Euro 130,815 due February 28, 2023 + 3 % dd 29 March 2023 | | 134,735 | 29/mrt/23 | 29/apr/23 | 21/mei/23 | 12,017 | |
| Wage tax Month February 2023   Euro 110,777 due March 31, 2023 | | 110,777 | 20/apr/23 | 29/mei/23 | 21/jun/23 | 9,888 | |
| Wage tax Month March 2023  Euro 112,302 due March 31, 2023 | | 112,302 | 20/mei/23 | 29/jun/23 | 21/jul/23 | 10,023 | |
| | | 581,835 | | | | | |
| 25,282 | Monthly installment wage tax Covitloan | 75,846 | | | | | |
| 8,448 | Monthly installment NOW loan | 25,343 | | | | | |
| | Pension premium | 39,000 | | | | | |
| | Grand total payment register Payroll account | **722,023** | | | | | |
| | Urgent due April 21,2023  wage taxNov-2023 | -115,519 | | | | | |
| | Urgent Pension premium | -39,000 | | | | | |
| | Urgent due April 21,2023 Covit-loan / NOW loan | -101,189 | | | | | |
| | "wage tax financing" april 2023 | 466,315 | | | | | |