## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,[1]<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |

| | |
|---|---|
| In re:<br><br>Technovative Media, Inc.,<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |

## DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105 AND 364 FOR ENTRY OF INTERIM AND FINAL ORDERS: (1) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION UNSECURED FINANCING TO FUND DEBTORS' FOREIEGN SUBSIDIARIES; (2) MODIFYING THE AUTOMATIC STAY; AND (3) SETTING FINAL HEARING

Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), hereby move the Court for entry of an interim order and a final order authorizing the Debtors to obtain post-petition unsecured financing ("DIP Financing") to fund Debtors' foreign subsidiaries, pursuant to 11 U.S.C. §§ 105 and 364, from Visual Semiconductor, Inc. ("VSI" or the "DIP Lender") and, in support thereof, respectfully state as follows:

## I.
## STATUS OF THE CASE AND JURISDICTION

1.      On March 15, 2023 (the "Petition Date"), Debtors filed voluntary petitions for relief with the Court pursuant to chapter 11 of title 11 of the Bankruptcy Code.  Debtors filed in the Eastern District of Pennsylvania because that is the location of their principal place of business.

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015).  The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

2.      Since the Petition Date, Debtors have been operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      A request for the appointment of a trustee has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Motion, no official committees have been appointed or designated.

4.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (O). Venue of these proceedings and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief sought herein are 11 U.S.C. § 105(a) and 364 of the Bankruptcy Code.

## II.
## BACKGROUND

6.      Debtors were founded in 2009 as "new media" companies to pursue new technologies that enhance user entertainment and communications experiences.  The technology that Debtors are currently seeking to launch allows TV and tablet manufacturers to convert two dimensional devices into three dimensional without the need for viewing glasses. Debtors are incorporated in Delaware and have a principal executive office located in Philadelphia, Pennsylvania.

7.      A more detailed factual background of Debtors and their businesses, including facts and circumstances giving rise to these Chapter 11 Cases, is set forth in the *Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Chapter 11 Petition, Supporting Emergency Relief, and First Day Motions* [ECF No. 48], which is incorporated herein by reference.

**A.  VSI – the DIP Lender**

1.      While engaged in its legal quest to reverse the improvident injunction of the Delaware Chancery Court discussed above, Stream remained mired in debt without title to or possession of its assets. As such, it was unable to attract the necessary capital to maintain operations or retain its employees.

2.      To resolve that issue, Mathu Rajan formed VSI as a vehicle to raise new capital for an entity that could pursue a variety of advanced visual technologies as well as provide financial and technical support to Stream. VSI is a corporation formed in 2022 pursuant to the laws of Wyoming.

3.      Funded by dozens of investors who share Mr. Rajan's vision of bringing advanced imaging experiences to a global market, VSI seeks to help Stream productize its Ultra-D glasses-free 3D technology. Accordingly, VSI made three strategic prepetition investment commitments to Stream totaling $3,702,630 and engaged certain of Stream's former employees rather than lose them to competitors.

4.      With VSI's focus on product engineering, it can also assist Stream with translating algorithms, c-code, RTL, and other computer code; designing chips for use in commercial and consumer end-products; and integrating those chips into the end-products.

5.      While Debtors reorganize in chapter 11, VSI is prepared to fund product development and even the supply chain if necessary to satisfy Stream's customers.

6.      VSI is also prepared to issue one or more unsecured senior promissory notes to Stream's Netherlands subsidiary, SeeCubic B.V. ("SCBV"), as needed, at a nominal 1% annual interest rate, to guarantee continuity of specialized knowledge for product development.

8.      As compensation for this support, Stream has entered into an Exclusive Distribution Agreement (the "Distribution Agreement") with VSI (Docket 135-3), for which Stream has sought

court approval. Through the proposed Distribution Agreement, VSI would accept orders from and make delivery to third-party customers, while issuing back-to-back purchase orders to Stream for 90% of the value of those third-party orders. VSI would retain a 10% margin for funding technical, business, and sales development.[2] In essence, VSI would act as a distributor for Stream to these customers.

9.      Debtors should be authorized to obtain post-petition financing from VSI.  If the requested post-petition financing is disallowed, the Debtors will breach their fiduciary duty as the parent companies to SeeCubic B.V. ("SCBV"), a corporation formed and operating in the Netherlands, because they would be unable to pay employee obligations of the Debtors' subsidiary.

### III.
### RELIEF REQUESTED

10.      By this Motion, the Debtors seek this Court's authorization under § 364 and hereby request entry of entry of interim and final orders authorizing the Debtors to obtain post-petition unsecured financing to pay employee obligations of Debtors' subsidiaries in the ordinary course of business.  Contractually, the payroll deadline of the employees of Debtors' subsidiary in the Netherlands, SeeCubic B.V. ("SCBV"), must occur by the last day of the calendar month. Debtors typically fund payroll on or about the 21st day of the month to allow for international funds transfers and local processing by the SCBV finance team.  Debtors need authorization to obtain funding from VSI pursuant to the terms and conditions set forth herein. Stream TV will then make direct payment to its subsidiaries which are already undercapitalized due to the ongoing U.S. litigation.  This is a protective payment to the subsidiary, but the Debtor is incurring the obligation, which is critical to operations and preserving the assets of the estate.  Alternatively, VSI has offered

---

[2] A 10% markup is industry standard for distributors.

to make a direct payment through a draw on the same terms.  However, the Debtors argue that the transaction is better managed and supervised under the bankruptcy estate as opposed to a transaction between non-debtor third parties.   Joseph Corso, VSI Strategic Advisor, also a significant shareholder for VSI, authorized to negotiate and execute documents for VSI, negotiated the terms for the loan and will execute on behalf of VSI pursuant to Court approval of the laon.

11.      The Debtors seek entry of interim and final orders (the "DIP Order"), substantially in the form of the order submitted herewith, to borrow from VSI €872,031.00. The funds to be extended under the DIP Order will provide Debtors with operating capital to allow them to fund existing payroll obligations and related amounts of SCBV as set forth in the budget attached hereto as **Exhibit A** (the "Budget").

12.      The DIP Lender has proposed to lend the funds requested by Debtors pursuant to the DIP Order.

13.      The Debtors have determined that the DIP Loan is vital to the Debtors' ability to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors, make payroll and satisfy other working capital and general corporate purposes of the Debtors and their subsidiaries. Without access to the DIP Loan, the Debtors will not have sufficient funds to finance these minimum operations and SCBV may be forced to cease all corporate activities.  Consequently, the Debtors' continued viability and ability to preserve the Debtors' estates for all interested parties is dependent upon obtaining the DIP Loan.

14.      The Debtors submit that the terms of the DIP Loan are fair and reasonable under the circumstances. The DIP Lender is offering the DIP Loan with the view that this financing will provide necessary capital to allow Debtors to continue their efforts to preserve various estate

assets. The Debtors therefore request that this Court approve the use of the DIP Loan consistent

with the terms of the Budget.

## IV.
## SUMMARY OF KEY TERMS

15.    The DIP Lender has proposed the following terms for the DIP Loan:

| | |
|---|---|
| Debtors/Borrowers: | Stream TV Networks, Inc. and Technovative Media, Inc. (collectively, the "**Company**") |
| DIP Lender: | Visual Semiconductor, Inc. (the "**DIP Lender**") |
| Amount: | Up to €872,031.00 |
| Interest: | 1% per annum, which interest shall be payable in-kind by adding such amounts to the then outstanding principal balance on each interest payment date. |
| | Automatically upon the occurrence and during the continuance of any event of default, all outstanding principal, fees and other obligations under the DIP Note shall bear interest at a rate per annum of 1% in excess of the rate then applicable to such DIP Loan. |
| Use of Proceeds: | No Debtor shall pay any expenses or other disbursements other than those set forth in the Budget. |
| Maturity Date: | The maturity date of the DIP Note shall be the earlier of (a) 365 days after the Interim Order Entry Date, (b) the effective date of any Chapter 11 plan for the reorganization of the DIP Borrowers, (c) the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to Bankruptcy Code section 363 or otherwise, and (d) the termination of the DIP Note (the "***DIP Maturity Date***"). |
| Events of Default: | The Events of Default (each, an "***Event of Default***") include: |
| | 1. The failure to make any payments when due; the material inaccuracy of representations and warranties when made or deemed made; violations of covenants; material monetary |

and non-monetary judgments enforceable and payable prior to payment of the DIP Note;

3. The filing of a motion by any Debtor seeking dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or the bankruptcy or insolvency of any Guarantor without the prior written consent of the DIP Lender;

4. The dismissal or conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

5. The appointment of a trustee, examiner or other person with expanded powers under any of the Chapter 11 Cases;

6. The Bankruptcy Court's entry of an order granting any lien or claim that is senior to or *pari passu* with the DIP Lender's liens and claims under the DIP Note without the prior written consent of the DIP Lender;

7. The payment or granting of adequate protection with respect to prepetition debt (other than with the prior written consent of the DIP Lender);

9. The filing of a motion by any Debtor seeking, or the entry of, one or more orders of the Bankruptcy Court (i) reversing, amending, supplementing, vacating, or otherwise modifying the Interim DIP Order or Final DIP Order, as applicable, without the prior written consent of the DIP Lender, or (ii) avoiding or requiring repayment of any of the payments made to the DIP Lender in accordance with the terms thereof;

10. The entry of one or more orders of the Bankruptcy Court modifying the automatic stay without the prior written consent of the DIP Lender;

11. The making of any payment not provided for in the Budget, or any deviation in the "Total Receipts" or "Total Disbursements" line of the Budget by more than 10% (measured on a cumulative basis from the Interim Order Effective Date);

12. Any Debtor's failure to comply with any other material term of the Interim DIP Order or Final DIP Order; and

13. On or before the date that is thirty (30) calendar days following the Interim Order Entry Date, the Final DIP Order shall have been entered by the Bankruptcy Court.

<u>Collateral/Priority</u>:    The DIP Note shall be unsecured .

**V.**
**BASIS FOR RELIEF REQUESTED**

**A.  Approval Under § 364 of the Bankruptcy Code**

16.    Section 364 of the Bankruptcy Code allows the Debtors to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, and (c) obtain credit with specialized priority or with security. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to super-priority administrative expense status or is secured by a lien on unencumbered property, or a combination of the foregoing.

17.    The Debtors propose to obtain post-petition financing pursuant to the terms of the DIP Order and pursuant to § 364 on an unsecured basis.  VSI is willing to provide the Debtors with unsecured financing up to €872,031.00 at 1% interest with other favorable terms.

18.    Given the favorable terms, including the 1% interest rate, the Debtors believe that they would not be able to obtain post-petition financing or other financial accommodations from any alternative to VSI or on more favorable terms and conditions than those for which approval is sought herein.

19.    As noted above, the need for the Debtors to obtain financing is critical because of the potential for substantial loss of enterprise value through Debtors' subsidiaries. Further, the evidence at the interim hearing, if necessary, will show that a facility of the type needed in these Chapter 11 cases are very favorable to the Debtors.

**B.  The Debtors Do Not Have a Better Alternative to the DIP Loan and the DIP Order**

20.     If necessary, the evidence at the interim hearing will show that a facility of the type needed in this case is being obtained on an unsecured basis and in the best interests of the Estates. Indeed, other potential sources of a credit facility for the Debtors, obtainable on an expedited basis and on reasonable terms, are practically nonexistent. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co.*, 789 F.2d at 1088.

**C.  Application of the Business Judgment Standard**

21.     As described above, the Debtors have concluded that the DIP Loan offered by the DIP Lender provides the only alternative available under the circumstances. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. *See Group of Institutional Investors v. Chicago Mit St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *Ames*, 115 B.R. at 38 (in examining requests by a debtor for interim financing, courts apply the same business judgment standard applicable to other business decisions); *In re Simasko Prod Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

22.     In general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  *See In re Curlew Valley Assoc.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981).

Courts generally will not second-guess a debtor-in-possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." *Id.* at 513-14 (footnotes omitted).

23.    Debtors have an obligation to fund their subsidiaries, including SCBV, and could potentially face liability for failing to do so. Under the alter ego theory, a creditor of SCBV could seek to pierce the corporate veil. To pierce the corporate veil of a parent corporation, a party must establish two elements: (1) the subsidiary was dominated by the parent corporation, and (2) adherence to the fiction of separate corporate existence would perpetrate a fraud or injustice, or otherwise circumvent the law. *FDA Smart, Inc. v. Dishman Pharmaceuticals and Chemicals Ltd.*, 448 N.J. Super. 195, 203-204.

24.    Moreover, courts have found personal jurisdiction over defendant directors for the claims of a foreign subsidiary because those claims "arise out of the same core facts as [the claims of the parent] and because it was therefore reasonably foreseeable that [the subsidiary] as well as [the parent] would seek to recover those diverted funds in the same lawsuit." *Actrade Fin. Techs. v. Aharoni*, No. 20168, 2003 Del. Ch. LEXIS 114, 14 (Ch. 2003). The *Actrade* court found breach of a fiduciary duty by the parent. Because of the ongoing litigation in the United States, the foreign subsidiaries all rely on U.S. entities to pay for almost all of their fees and costs, including non-operating intermediate holding companies. Because SCBV is a research and development subsidiary, it always spends more than its income. The litigation has strained its finances and the Debtors will be making further long term proposals for the operations and stabilization of SCBV.

25.    Prepetition Debtors infused approximately $85 million into SCBV and SCBV's existence is depending on this continued funding. This funding would be consistent with previous

course of dealings between the parties and failure to do so could open Debtors up to potential liability and also diminish the value of Estate assets to the detriment of all parties.

26.    The Debtors have exercised sound business judgment in determining that a post-petition secured financing is appropriate and has satisfied the legal prerequisites to borrow under the DIP Loan and the DIP Order. The terms of the DIP Loan are fair and reasonable and are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted authority to borrow from the DIP Lender on an unsecured basis described above, pursuant to § 364, and take the other actions contemplated by the DIP Order as requested herein.

27.    The Debtors believe that they could not obtain financing from any other lender on terms more favorable than the DIP Loan offered by the DIP Lender.  The Debtors currently lack sufficient funds to pay the business expenses, including payroll, of SCBV. The Debtors' management exercised its best business judgment in negotiating the DIP Loan and the DIP Order that is presently before the Court.

28.    The Debtors previously used the DIP Lender to raise capital in order to operate as a business; therefore, obtaining the DIP Loan from the DIP Lender would serve the exact same purpose.  The DIP Lender operates as a separate entity and has assisted in capitalization of the Debtors.  Additionally, in obtaining the DIP Loan, the Debtors would receive the same type of funding to further legitimate, ordinary business to pay employee obligations of their subsidiaries to preserve value of SCBV and thereby the Estates.

29.    In addition, the Debtors would breach their fiduciary duty to the SCBV and their other foreign subsidiariesby not obtaining and properly using the DIP Loan to pay employee obligations and other expenses of SCBV.  The DIP Loan is necessary for the Debtors to fulfill their duty as the parent company of their subsidiaries, including SCBV, and also the creditors of their

estates given the substantial value that SCBV holds as part of the Debtors' businesses, and allow

for each of the entities to continue their operations in the ordinary course of business.

### D. Request for Modification of the Automatic Stay

30.    As set forth more fully in the proposed DIP Order, the proposed DIP Loan

contemplates a modification of the automatic stay established pursuant to § 362 of the Bankruptcy

Code to permit the DIP Lender to take certain actions required or permitted by the DIP Order.

More specifically, the DIP Order provides the DIP Lender with relief from the automatic stay to

allow the DIP Lender, inter alia, to enforce certain default remedies, without having to obtain any

further order of the Bankruptcy Court. The Debtors submit that stay modification provisions of

this sort are ordinary and usual features of post-petition debtor-in-possession financing facilities

and, in the Debtors' business judgment, are reasonable under the present circumstances.

Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP

Order.

### E. Good Faith

31.    Section 364(e) was designed to "encourage the extension of credit to Debtor" by

allowing lenders to "rely on a bankruptcy court's authorization of the transaction." *In re EDC

Holding Co.*, 676 F.2d 945, 947 (7th Cir. 1982) (the purpose of § 364(e) is "to overcome people's

natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them

that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction

they need not worry about their priority merely because some creditor is objecting to the

transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy

judge."). *See also In re North Atlantic Millwork Corp.*, 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of section 364(e) is to allow good-faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankrupt entities.").

32.    The terms and conditions of the DIP Loan are fair and reasonable and, while they were negotiated with an insider, they are sufficiently favorable to the Debtors under the circumstances that they should be considered to be in good faith. The Debtors believe that the terms of the DIP Loan are fair and reasonable under the circumstances, and that DIP Lender is entitled to the benefits of § 364(e) of the Bankruptcy Code.

## VI.
## REQUEST FOR FINAL HEARING

33.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## VII.
## DEBTORS' RESERVATION OF RIGHTS

34.    Nothing contained herein is intended or should be construed as, or deemed to constitute, an agreement or admission as to the validity of any claim against the Debtors on any grounds, a waiver or impairment of the Debtors' rights to dispute any claim on any grounds or an assumption or rejection of any agreement, contract or lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve their rights to contest any claims related to the DIP Loan. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended, and should not be construed as, an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## VIII.
## NOTICE

35.      Debtors will provide notice of this Motion to the following parties or their respective counsel: (i) the Office of the U.S. Trustee for the Eastern District of Pennsylvania; (ii) the Office of the United States Attorney General for the Eastern District of Pennsylvania; (iii) the Internal Revenue Service; (iv) the holders of the twenty (20) largest unsecured claims against Debtors on a consolidated basis; and (v) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### IX.
### NO PRIOR REQUEST

36.      The Debtors have not previously sought the relief requested herein from the Court or any other court.

WHEREFORE, the Debtors respectfully request that this Court (i) enter an order substantially in the form of the proposed DIP Order , authorizing the Debtors to borrow the funds necessary for the interim period; (ii) authorize the Debtors to execute and deliver the DIP Loan Documents and perform such other and further acts as may be necessary in connection therewith; (iii) set a final hearing as soon as this Court's schedule permits, for approval and entry of a final order; (iv) after a final hearing on the relief requested herein, entry of a Final Order approving the DIP Financing, substantially in the form that shall be filed with the Court; and (v) grant the Debtors such other and further relief as this Court may deem just and proper.

Date: April 25, 2023                    Respectfully submitted,

                                        /s/ Rafael X. Zahralddin-Aravena
                                        Rafael X. Zahralddin-Aravena (PA Bar No. 71510)
                                        **Lewis Brisbois Bisgaard & Smith, LLP**
                                        550 E. Swedesford Road, Suite 270

93933231.1

Wayne, PA 19087
Telephone: (302) 985-6000
Facsimile: (302) 985-6001
Rafael.Zahralddin@lewisbrisbois.com

-and-

Vincent F. Alexander (admitted *pro hac vice*)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
110 SE 6th Street, Suite 2600
Fort Lauderdale, FL 33301
Telephone: (954) 728-1280
Facsimile: (954) 678-4090
Vincent.Alexander@lewisbrisbois.com

-and-

Bennett G. Fisher (admitted *pro hac vice*)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
24 Greenway Plaza, Suite 1400
Houston, TX 77046
Telephone: (346) 241-4095
Bennett.Fisher@lewisbrisbois.com

*Proposed Counsel to Debtors*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 25, 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day by transmission of Notice of Electronic Filing generated by CM/ECF on all parties who are authorized to receive electronically Notice of Electronic Filing in this bankruptcy case.

/s/ Rafael X. Zahralddin-Aravena
Rafael X. Zahralddin-Aravena

93933231.1

**EXHIBIT A**

| Payment | Interim Amount (By April 25, 2023) | Final Amount (April 26, 2023–May 31, 2023) | Total (Interim and Final Amounts) |
|---|---|---|---|
| *Payroll Fixed Personnel* | €165,000.00 | €165,000.00 | **€330,000.00** |
| *Wage Tax / Pensions* | €115,519.00 | €108,501.00 | **€224,020.00** |
| *Contractors* | €0.00 | €112,000.00 | **€112,000.00** |
| *Building Rent* | €22,000.00 | €44,000.00 | **€66,000.00** |
| *Software Expenses* | €0.00 | €43,217.00 | **€43,217.00** |
| *Other Operational Expenses* | €0.00 | €74,625.00 | **€74,625.00** |
| *Delta Patents* | €0.00 | €22,169.00 | **€22,169.00** |
| ***Total*** | **€ 302,519.00** | **€ 569,512.00** | **€872,031.00** |