UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

```
                                       :
IN RE:                                 : Case No.  23-10764
                                       :           23-10763
STREAM TV NETWORKS, INC.   CH: 11      :
                                       : Philadelphia, Pennsylvania
A) Motion To Approve Debtors'          : April 24, 2023
Expedited Motion For Authority To      : 10:50 a.m.
Take Certain Actions In the            :
Ordinary Course Of Business Filed      :
By Stream Tv Networks, Inc.,           :
Technovative Media, Inc.               :
Represented By Rafael X.               :
Zahralddin                             :

. . . . . . . . . . . . . . . . . .
```

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtor:                   Rafael X. Zahralddin, Esq.
                                  Karen Poppel, Esq.
                                  Lewis Brisbois
                                  500 Delaware Avenue, Suite 700
                                  Wilmington, DE 19801
                                  302-985-6004

                                  Bennett G. Fisher, Esq.
                                  Lewis Brisbois Bisgaard & Smith
                                  24 Greenway Plaza, Suite 1400
                                  Houston, TX 77046
                                  346-241-0495

                                  Vincent F. Alexander, Esq.
                                  Lewis Brisbois Bisgaard & Smith
                                  110 SE 6th Street, Suite 2600
                                  Fort Lauderdale, FL 33301
                                  954-728-1280

For SeeCubic:                     James J. Mazza, Jr., Esq.
                                  Skadden Arps Slate Meagher &
                                  Flom, LLP
                                  155 North Wacker Drive
                                  Chicago, IL 60606-1720

```
                                        Eben P. Colby, Esq.
                                        Skadden Arps Slate Meagher &
                                        Flom, LLP
                                        500 Boylston Street, 23rd Floor
                                        Boston, MA 021116
                                        617-573-4800

For Hawk Investment Holdings            Steven Caponi, Esq.
Ltd:                                    K&L Gates
                                        600 N. King Street, Suite 901
                                        Wilmington, DE 19801
                                        302-416-7080

                                        Aaron Rothman, Esq.
                                        Margaret R. Westbrook, Esq.
                                        K&L Gates LLP
                                        300 South Tryon Street
                                        Suite 1000
                                        Charlotte, NC 28202
                                        704-331-7400

                                        Jonanthan N. Edel, Esq.
                                        300 South Tyron Street
                                        Suite 1000
                                        Charlotte, NC 28202

For the United States                   Kevin P. Callahan, Esq.
Trustee:                                Office of The United States
                                        Trustee
                                        Robert N.C. Nix Federal
                                        Building
                                        900 Market Street, Suite 320
                                        Philadelphia, PA 19107
                                        202-934-4154
```

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

1

<u>APRIL 24, 2023</u>

1

2          THE COURT:  Okay.  Before we begin, this -- I have --

3    this is an expedited hearing in the matter of Stream TV

4    Network, Inc. and Technovative Media.  Before we begin,

5    counsel, I would ask that everybody -- I'm going to have

6    everybody first place their name on the record and who they

7    represent.  I would then ask that before anyone speaks that

8    they please state their name before speaking.  I would also ask

9    that the parties not interrupt one another or talk over one

10   another.  Unfortunately, I have a habit of doing that, but I'm

11   the only one who gets to do it, and I will try my best not to

12   interrupt.  So let's start with counsel for the moving party,

13   the Debtor.

14          MR. ZAHRALDDIN:  Good morning, Your Honor, Rafael

15   Zahralddin from Lewis Brisbois, on behalf of the Debtors.

16          MR. ALEXANDER:  Good morning, Your Honor, Vincent

17   Alexander of Lewis Brisbois, on behalf of the Debtors.

18          MR. FISHER:  Your Honor, Benett Fisher, Lewis

19   Brisbois, on behalf of the Debtors.

20          MS. POPPEL:  Your Honor, this is Karen Poppel on

21   behalf of the Debtors for Lewis Brisbois.

22          THE COURT:  I'm sorry, I didn't hear that.  Could you

23   please state your name again?

24          MS. POPPEL:  Yeah.  Good morning, Your Honor, this is

25   Karen Poppel of Lewis Brisbois on behalf of the Debtors.

1          THE COURT:  Okay.  Anyone else here on behalf of the

2    Debtor attorney?  Is there any representative from the Debtor,

3    Mr. Zahralddin?

4          MR. ZAHRALDDIN:  Yes, Your Honor.  Mr. Mathu Rajan,

5    who's the CEO, is here and ready to answer questions and put on

6    direct testimony, should Your Honor allow it.

7          THE COURT:  Okay.  And who is here for -- I saw there

8    were two objections that were filed this morning, which I have

9    had an opportunity to quickly review.  And I'll discuss those

10   objections or my comments before I think we even get to

11   anything.  But in any event, I saw there was one that was filed

12   by SeeCubic.  And who is here on behalf of SeeCubic?

13         MR. MAZZA:  Good morning, Your Honor, Jim Mazza from

14   Skadden Arps, on behalf of SeeCubic.  I believe my colleague

15   and partner, Eben Colby, is also on telephonically.

16         MR. COLBI:  That's correct.  Good morning, Your

17   Honor.

18         THE COURT:  I'm sorry, your name again, counsel?  I

19   heard Colby, but I didn't hear the first name.

20         MR. COLBI:  Sure.  The first name is Eben, E-B-E-N.

21         THE COURT:  Okay.  And is anyone else here for

22   SeeCubic?  Okay.  And I saw also that Hawk filed an objection.

23         Who's here on behalf of that entity?

24         MR. CAPONI:  Good morning, Your Honor, Steve Caponi

25   from K&L Gates.  I'm with here, my colleagues, I believe Aaron

```
 1   Rothman, Margaret Westbrook, and John Edel.
 2           THE COURT:  All right, counsel, I'm going to ask you
 3   to say that because I don't write that fast.  I heard Aaron --
 4           MR. CAPONI:  Rothman.
 5           THE COURT:  -- and Margaret -- Aaron Rothman?
 6           MR. CAPONI:  Yes, then Margaret --
 7           THE COURT:  And Margaret Westbrook?
 8           MR. CAPONI:  Correct.
 9           THE COURT:  And who was the last person?
10           MR. CAPONI:  John Edel, E-D-E-L.
11           THE COURT:  Anyone else?
12           MR. CAPONI:  That's it, Your Honor.
13           THE COURT:  Okay.  Anyone else here -- is anyone form
14   the U.S. Trustee's Office or any other offices held?
15           MR. CALLAHAN:  Yes, Your Honor.
16           THE COURT:  Yes, okay, who's here?
17           MR. CALLAHAN:  Good morning, Your Honor, Kevin
18   Callahan, on behalf of United States Trustee.  Thank you.
19           THE COURT:  Anyone else here on this matter?  Okay.
20   All right.  The Debtors have filed two motions on an expedited
21   basis.  And before we begin, I hope this is the last time that
22   I have to discuss the proper procedure for following the filing
23   matters on an expedited basis.  The rules set forth -- I think
24   it's Rule 5070 of the Local Rules -- it sets forth the process
25   by which expedited motions are to be filed.  This is at least a
```

1   third time that I've had to admonish Debtor's counsel about

2   following the local rules.  Notwithstanding my prior

3   instructions to review the rule, this was filed without

4   following that process.  Typically, I would have just denied

5   the motion for failure to comply with the local rule.  But

6   given that this was purported to be a request for payment of

7   employee wages, I allowed the request to be granted and a

8   motion and this hearing scheduled.

9           This is the last time that I am going to bring this

10  to Debtor's counsel's attention.  Should the rules not be

11  followed in the future, there will be consequences, including

12  but not limited to Rule 9011 issues.  I don't want to have to

13  say it again.  With respect to this motion itself, I'm also not

14  very pleased with what is in this motion and what are actually

15  not expedited matters.  As far as this Court is concerned, the

16  only matter that is expedited is whether there will be payment

17  of the salaries of the employees that have been previously

18  funded by Hawk or SeeCubic, whichever one was funding that.

19          More importantly, this is a self-created emergency.

20  My understanding, and someone will have to correct me if I am

21  wrong, but everyone knew when the last funding was for employee

22  wages.  This wasn't something that was learned on the day this

23  motion was filed.  I am not understanding why this was not a

24  first day motion, seeking approval to pay employee wages that

25  would become due tomorrow.

1          So there are lots of things about these motions that

2   have given this Court great pause, concern -- and I want to

3   choose my wording carefully.  I'm going to stick with the word

4   concerned.  So I think I needed to put that all before we

5   proceed with what I think is again, a self-created emergency

6   speaking and including matters that are not emergencies, unless

7   somebody can, at least based on my reading of the pleading, are

8   not any other than payment of wages, involve matters that are

9   not emergencies, matters that I would never consider on an

10  expedited basis, and involves what I think is just financing

11  and other matters that are not appropriately under payment of

12  -- that connected with payment of wages.

13         So with that being said, counsel or Debtor, who's

14  ever addressing this, you need to tell me exactly why this is

15  an emergency and what are all these other reliefs that have

16  nothing to do with the works that are due tomorrow. So who's --

17         MR. ZAHRALDDIN:  Yes, ma'am.

18         THE COURT:  -- who's going to talk to that?

19         MR. ZAHRALDDIN:  I'll respond to that, Your Honor.

20  This is Rafael Zahralddin.  I hope Your Honor would agree that

21  the Debtor cannot makes payments on prepetition amounts that

22  are accrued.

23         THE COURT:  Whose phone is that?

24         MR. ZAHRALDDIN:  I'll wait until that's muted.  Thank

25  you.

1          We cannot make any make payments on prepetition

2    amounts accrued until we can verify where the payments are

3    going, how they're going to be applied, and where the -- we

4    have  information as to how the payments have been handled in

5    the past.  And in fact --

6          THE COURT:  Let me stop you right there.

7          MR. ZAHRALDDIN:  Yes, ma'am.

8          THE COURT:  What prepetition wages for you are trying

9    to pay because the only prepetition wages that I'm aware of

10   have been paid and funded by Hawk.  So --m

11         MR. ZAHRALDDIN:  No, they have not, Your Honor, and

12   that's exactly the point.  When we received information and

13   exactly when -- about the time we filed the motion last week

14   from Mr. Patrick Thune in the Netherlands, it showed that there

15   was a great shortfall.  And the shortfall was also in terms of

16   payment of past wage taxes.  And there were amounts --

17         THE COURT:  So --

18         MR. ZAHRALDDIN:  -- on there for brand new debts for

19   Mr. Thune and things of that nature.  So --

20         THE COURT:  So --

21         MR. ZAHRALDDIN:  -- before we want to send anything

22   out, Your Honor, we wanted to make sure we knew what exactly

23   was owed.  We confirmed that there were prepetition --

24   significant shortfalls, not just from the most recent amount,

25   but from prior periods.  And that raised the current.

1          THE COURT:  Okay, so wait a minute, counsel.

2          MR. ZAHRALDDIN:  Yes, ma'am.

3          THE COURT:  Let's back up a minute.

4          MR. ZAHRALDDIN:  Uh-huh.

5          THE COURT:  You say that you were prepared to pay

6  prepetition wages.  None of the information in that motion sets

7  forth the prepetition wages that would be allowed to be paid,

8  which would be paid on the 50784.  Anything prior to that is

9  just a regular claim.  So I'm --

10          MR. ZAHRALDDIN:  I --

11          THE COURT:  -- not quite --

12          MR. ZAHRALDDIN:  -- I --

13          THE COURT:  -- sure what wages.  Nowhere did you say

14  these are the wages we're paying during the priority time

15  period.  What I saw was there was an issue about prepetition

16  taxes, which we're not even going to address.  Wages are wages.

17  If you wanted to pay -- these are now, as far as I can see from

18  the motion, are post-petition wages that are becoming due

19  tomorrow because there is nothing that indicates in that motion

20  that those wages had not been paid with the March 25th payrolls

21  and that what you're really talking about are prepetition

22  taxes, which that's a different issue, or there's some

23  prepetition wage that's owed to employees that are not -- that

24  are outside of the priority time period.

25          So I'm a bit confused when you say you'd want to

1    confirm that you were going to pay prepetition -- what

2    preparation wages that you were proposing to be paid.  I didn't

3    see any of that or maybe I missed it because it was -- I

4    must've missed it.

5              MR. ZAHRALDDIN:  Yeah --

6              THE COURT:  Yes?

7              MR. ZAHRALDDIN:  -- Your Honor, Mr. Alexander and I

8    went over them this morning.  He has a list of them, and he can

9    point them out to you in the motion if I can indulge him

10   jumping on and walking through those.  And yes, ma'am, there

11   are preposition wages in there.  There are also contractors.

12   which are critical, and we've seen relief like that, you know,

13   requested on an emergency basis and granted because different

14   companies outsource or do work in different ways.  And --

15             THE COURT:  So counsel, you want to pay contractors

16   out beyond the priority time period.  And I saw -- you cited to

17   the doctrine of necessity for that.  And --

18             MR. ZAHRALDDIN:  Yes, ma'am.

19             THE COURT:  -- I'm not understanding how those -- I

20   guess I'm going to equate them to vendors -- are going to be

21   paid because this is clearly outside the ordinary as far as I'm

22   concerned because they're not priority creditors.  They're just

23   regular creditors with respect to their prepetition contract.

24   They're not employees because what you were asking me for what

25   have paid wages.  They're not -- they're independent

```
 1   contractors so this isn't payment of wages.  This is payment of
 2   contract.
 3            MR. ZAHRALDDIN:  Yes, ma'am.  They're --
 4            THE COURT:  So Mister --
 5            MR. ZAHRALDDIN:  -- critical -- they're critical
 6   vendors, essentially.  And again, if you're asking why we're
 7   trying to do this, it's because we're trying to fulfill these
 8   two purchase orders.  And at every turn --
 9            THE COURT:  I get that, counsel, but that's not what
10   you filed.  You filed two separate -- you want to pay employee
11   wages and we want to do -- we want to sell shares.  That's a
12   whole different issues because that is definitely not an
13   expedited matter however you try to phrase it or characterize
14   it.  I have my own comments with respect to that.
15            Mr. Alexander, he's invoked you as being able to
16   explain to this Court what the prepetition wages are that are
17   not in the motion, and I'm not understanding how it was even
18   filed if they didn't even have that information, but that's
19   neither here nor there.  What information do you have with
20   respect to prepetition wages that have to be paid?
21            MR. ALEXANDER:  Good morning, Your Honor, Vincent
22   Alexander, on behalf of the Debtors.  Your Honor, there's a
23   couple of paragraphs in the filing.  And when you talk to
24   specific, you know, wages issues, it's a little different than
25   your typical scenario here because we're talking about the
```

1  subsidiary wages in terms of what the Debtor, you know, funded

2  prepetition and then also, it was also funded as Your Honor was

3  aware, as part of the -- when the receiver was put in place.

4         So we've had discussions with the entities, or the

5  individual, primarily Mr. Thune, in the Netherlands.  And he's

6  indicated that for funding of the operations in the

7  Netherlands, there were certain dollars that needed to be paid

8  in order for them to move forward with their operations.  And

9  certain net money includes wages of the employees, payroll

10 taxes in Europe.  And then specifically in our motion, the

11 paragraphs are 24, and that refers to approximately $180,000

12 per month wages of the Dutch employees.

13        Then, there's also independent contractors, which is

14 about $46,000 per month that's payable.  Then, there's the

15 independent service providers, where it's about $193,000.  And

16 I believe that's the amount that was due as of the petition

17 date.  And that is the dollar amount --

18        THE COURT:  Okay, so --

19        MR. ALEXANDER:  -- that --

20        THE COURT:  Right.  So these are prepetition claims

21 that are not wages.  It seems to me the only thing that are

22 wages would be the 180,000 for the employees that we are due

23 tomorrow.  Is that what we're talking about?  Income and --

24        MR. ALEXANDER:  Yeah, in the pure sense of the word,

25 wages, Your Honor, yes.  That is correct.  That is the amount

1    that we're seeking to pay for these subsidiary wages.

2              THE COURT:  Right, but what you said to me, counsel,

3    is you spoke to Mr. Thune, and you discussed with him what

4    would need for the operations of the business because this

5    isn't just a pure wage motion.  This is a motion to allow

6    payments of amounts due and owing for operations.  And you're

7    saying that you owe these independent servicers $193,000 for

8    prepetition services.  For what time period did you say in your

9    motion the time period?

10             MR. ALEXANDER:  I'll have to clarify that, but I

11   believe it's dating back through I think November of 2022, some

12   of those accrued from.  But this is a situation --

13             THE COURT:  Okay.

14             MR. ALEXANDER:  -- where Mr. Thune had indicated that

15   none of these people will continue to work and provide services

16   unless these amounts are paid.

17             THE COURT:  Well, let me ask you -- that was a

18   receiver appointed when?

19             MR. ALEXANDER:  I believe the receiver was appointed

20   -- counsel for -- maybe it would help, but I think it was July.

21             MR. ZAHRALDDIN:  It's October.  October.

22             MR. ALEXANDER:  It was --

23             MR. ZAHRALDDIN:  October 20th.

24             THE COURT:  Of '21, '22 -- what year?

25             MS. POPPEL:  22.

1       THE COURT:  Okay.  And presumably, my understanding

2   is that the receiver through -- was -- had -- there was some

3   sort of arrangement where the receiver was making and that were

4   funded by Hawk, SeeCubic, one of the two or maybe the two

5   incomes.  And so explain to me why the November payments

6   weren't being paid to the receiver and these independent people

7   continued to work.  I'm not understanding.

8       MR. ZAHRALDDIN:  Your Honor, our understanding from

9   what we've learned in our brief investigation, once Mr. Thune

10  was willing to actually give us information because he's not

11  recognizing the authority of this Court or the bankruptcy being

12  filed, he said so through counsel, et cetera.  And of course --

13      THE COURT:  Okay.

14      MR. ZAHRALDDIN:  -- there was a filing to prevent

15  that.  So what we've learned from him is that the process was,

16  in talking to our client, the process was that the receiver

17  would talk to Mr. Stastney and to Mr. Rajan, and they would

18  sign off on the draws.  So as far as we were concerned, because

19  no one was telling us, meaning, the Stream side, that the

20  payments weren't being made, we thought as soon as the draws

21  were authorized, they were being effectuated.  That is not

22  correct.  And our review of the books and records that were

23  sent to us show that there were shortfalls, significant

24  shortfalls, and that they go back to 2022. So that's where we

25  are right now.

1          THE COURT:  So did you reach out -- so counsel,

2   presumably --

3          MR. ZAHRALDDIN:  Yes, ma'am?

4          THE COURT:  -- the receiver was in charge of all of

5   this.  So for you to say you didn't know -- did anybody ask the

6   receiver for records?

7          MR. ZAHRALDDIN:  Yes, yes.

8          THE COURT:  Was anybody following this?

9          MR. ZAHRALDDIN:  Yes, Your Honor.  We asked and they

10  were not provided.  That was the problem with the receiver.  It

11  was the receiver, pendente lite who kept on saying that he only

12  had certain responsibilities.  And we did not know about this

13  until we actually got the books last week.

14         THE COURT:  And you didn't ask --

15         MR. ZAHRALDDIN:  Your Honor?

16         THE COURT:  -- the receiver?

17         Wait a minute -- whoa, whoa -- I'm talking.

18         And you didn't get any information from the receiver

19  when this bankruptcy was filed?  You didn't get any information

20  from the receiver as to who was paid?  Was the receiver --

21         MR. ZAHRALDDIN:  That's the problem. Your Honor --

22         THE COURT:  Wait a minute.

23         MR. ZAHRALDDIN:  -- that's the problem.  We did get

24  some --

25         THE COURT:  Stop.

 1              MR. ZAHRALDDIN:  -- information.

 2              THE COURT:  Stop.

 3              MR. ZAHRALDDIN:  I'm sorry, go ahead.

 4              THE COURT:  I'm talking.  Don't interrupt me.

 5              MR. ZAHRALDDIN:  Sure, sure.

 6              THE COURT:  You're telling me that the receiver

 7    wasn't filing any reports with the chancery court on what it

 8    was disbursing and what was being allowed?  The receiver was

 9    just operating out there on his own?

10              MR. ZAHRALDDIN:  Your Honor, I'm going to tell you

11    that the receiver sent us very promptly, at the beginning of

12    the bankruptcy, the records that he had.  What we've found is

13    the records that came from Mr. Thune do not match up with the

14    receiver's records.  And that's why we're asking for authority

15    and that's why we also asked in our motion that we work with

16    the Office of the United States Trustee to review these

17    payments so that whatever we send out -- we're willing to pay

18    but we didn't want to pay without making sure that we knew

19    exactly what was going on there.  And I don't know -- I'm

20    assuming Mr. Caponi is not aware of what happened here, but he

21    represented to you, things were paid.  We've looked at what Mr.

22    Thune has sent us, what the receiver sent us, and there are

23    discrepancies.

24              THE COURT:  So you don't know if anything's owed or

25    not because there's a discrepancy.

1          MR. ZAHRALDDIN:  Oh, no, we know it's owed because

2     the employees are going to walk and they're threatening to file

3     a bank --

4          THE COURT:  Counsel, that's employees.  There's no

5     issue, which is why I scheduled this, that there were payments

6     to employees.  You are now saying not only do you want -- and

7     that's a different issue.  It's always clear that you need

8     employees because if employees aren't paid, nobody's going to

9     get anything, and this company is going to go out of business.

10    But what you are also doing is that you have now thrown in

11    issues about contractors, independent services, payment of

12    prepetition taxes -- all of this what you think I'm going to do

13    on an expedited basis, based on information that's conflicted

14    or we don't even know what is what.  And then --

15         MR. ZAHRALDDIN:  We did --

16         THE COURT:  -- the --

17         MR. ZAHRALDDIN:  Yes, ma'am.

18         THE COURT:  -- serve -- and then we're going to get

19    to the so-called financing of this, which is definitely going

20    to be a problem.  So you say that -- so how much money are you

21    actually asking this Court to approve for payroll, for payment

22    of independent contractors, for payment of independent

23    services?  And then, I saw something about wanting to go back

24    to rehire people.  That is not a wage motion.  That is not a

25    payment of independent contractor -- none of it.  And none of

1   this is expedited, other than the wages.  So I'm not

2   understanding, and I've got a problem.

3          MR. ZAHRALDDIN:  Your Honor, part of the problem is

4   that even if we went into California, for example, and you look

5   at the definition of wages is, in jurisdictions where they're

6   very employee friendly, there are going to be a lot of things

7   that are going to be considered wages and that the Government

8   is going to require you to pay.  And we have noted in our

9   filing that there are several instances where the Dutch

10  Government is going to require certain things to be paid.  So

11  while I understand if the Court is not amenable to making these

12  other payments, we'd like to try to convince you to let us do

13  it because we believe that a lot of these contractors, which

14  are under NDAs which have been working for quite some, and in

15  particular, there are employees through this TMC  provider, who

16  provides contract employees.  These are the day-to-day

17  engineers who are literally the guys driving the production and

18  driving the operations.  So we risk losing those engineers

19  because they're four months past due at this point.  So I don't

20  think that we're asking for things.  And we asked for the

21  authority to do these things, not the direction.  And we wanted

22  to be able to do that in conjunction with the review with the

23  U.S. Trustee because there's no committee here right now to be

24  able to handle this issue.

25          THE COURT:  So you don't even have the records.

1          MR. ZAHRALDDIN:  No.

2          THE COURT:  You're going to have to review -- wait a

3    minute.   You're going to have to review before you make these

4    payments.  That's not going to happen by tomorrow.  So I don't

5    understand what was expedited about that because they're not

6    going to -- they're not going to be paid tomorrow.

7          MR. ZAHRALDDIN:  No, we are going to make those

8    payments.  We were willing --

9          THE COURT:  To who?

10         MR. ZAHRALDDIN:  -- make the payments to avoid

11   employees walking out.

12         THE COURT:  No, counsel.  I'm not talking about

13   employees.

14         MR. ZAHRALDDIN:  Okay.

15         THE COURT:  I'm talking about these independent

16   contractors, independent service.  No way you're paying them

17   tomorrow because you don't even know what they're owed -- the

18   time period.  And you said you're going to talk to the U.S.

19   Trustee.  I don't think that that's going to happen by

20   tomorrow.  Perhaps the wages, which again, the wages I get you

21   need on an expedited basis.  As to authorizing these payments

22   of other -- the independent contractors and however you

23   characterize, I haven't seen any reference to Dutch law that

24   requires you to pay them, and that they'd be treated as wages.

25   We're not in California.  So that is irrelevant.

1           MR. ZAHRALDDIN:  No, we're probably in a more liberal

2     place than California in the Netherlands if it goes to

3     employees.  But I understand --

4           THE COURT:  Well --

5           MR. ZAHRALDDIN:  -- what you're saying, Your Honor.

6           THE COURT:  That may be all fine and well, but you

7     never said anything in this motion about independent

8     contractors being treated in the Netherlands as the same as

9     wages.  So there's absolutely no basis for that other than your

10    colloquy with me.  And there was nothing, absolutely nothing,

11    preventing you from talking to the trustee since you got this

12    information to say this is what we have -- this is what we're

13    proposing to do.  You're mixing apples and oranges.  The apples

14    are the wages; oranges are the other things.  And I don't

15    appreciate it being put together as some expedited matter that

16    is not going to be -- at least with respect to these

17    independent contractors, the independent services, the wages

18    that the prepetition taxes, all of that which get dealt with in

19    the ordinary course, they're prepetition.  You really want me

20    to now authorize you to pay prepetition taxes, to pay money to

21    rehire employees who haven't worked for this company for God

22    knows how long? How would that have anything to do with payment

23    of wages on an expedited basis?

24          This is all some separate relief that is not going to

25    be done expeditiously -- absolutely --

```
1              MR. ZAHRALDDIN:  Okay.

2              THE COURT:  -- not.

3              MR. ZAHRALDDIN: Okay.

4              THE COURT:  So I'm warning you -- do not do this

5      again -- put in all sorts of things that are irrelevant to the

6      -- and are totally different than the relief that you title

7      this as.  Not payment of wages.  Payment of contract, or if you

8      believe there were wages, you should have said they were wages

9      on the Dutch law.  And some of this is on the rehiring people

10     in the U.S.  What does that have to do with payment of wages?

11     You know, I mean, I have a whole laundry list when I went

12     through this of things that I thought were, like -- first of

13     all, they're beyond the self-created emergency.  They're not

14     even emergencies without more, especially with particularly

15     trying to rehire people in the U.S.  Well, how is that an

16     emergency?

17              You know --

18              MR. ALEXANDER:  Your Honor --

19              THE COURT:  -- how?

20              MR. ALEXANDER:  We hear you, and we'll be more than

21     happy to simply be able to go back to the folks in the

22     Netherlands and pay their wages.  We were concerned -- and this

23     was not a frivolous motion.  We were concerned very much so

24     with what's happened over the past two weeks, that we would

25     have a foreign subsidiary who would just revolt and walk away.
```

1    And we have had, as you know, actions filed by the Hawk parties

2    prematurely, trying to move to do things they couldn't do here

3    over there.  But that's the --

4              THE COURT:  Well, that seems everybody --

5              MR. ALEXANDER:  -- reason that we filed.

6              THE COURT:  -- seems to be doing.  Seems to be finger

7    pointing.  Everybody in this case, as far as I'm concerned, is

8    trying to do things they can't do and think that, you know,

9    they're going to go to another court or they're going to come

10   to this court, and I'm not going to recognize this for what it

11   is.  I am very disappointed and very unhappy about how this is

12   unfolding.  Everything is an emergency, everything is done.

13   This should have been -- you guys filed.  You had more than

14   enough time to figure this out.  You knew wages were going to

15   have to be paid whether you knew the amount or not.

16              You know that funding was going to only go through

17   March 25th.  So no matter what the number is -- counsel, hold

18   one second.  Counsel, as I was saying, you knew you filed on

19   March 15th.  You knew that the employees' wages were only

20   funded through March 26th.  So to tell me this is an emergency,

21   I'm sorry.  It's not.  You knew there was going to be no money

22   tomorrow, no matter if it was one penny or a million dollars.

23   You knew that and yet you didn't file it until Friday.  So

24   don't tell me that the reason you didn't do it because you

25   didn't know how much has to be paid.  This should have been a

1  first day motion, where you said we have to pay wages on April

2  25th.  We don't know how much it is because we think it's this.

3  And then you could've amended it to say, we have now found out

4  that the numbers aren't what it is.  But you knew a long time

5  ago that tomorrow was due and there was no money for it.  So

6  I'm very unhappy about that.

7          MR. ZAHRALDDIN:  Well, Your Honor, we're trying to

8  make sure that we ask -- we've thought through a lot of this,

9  and we stated in the motion as any ordinary course.  But

10 instead, we came to -- we're seeking your permission before

11 doing it because we're in the middle of a very contentious

12 situation.  No matter what we do, if we don't have the money,

13 we get complaints prematurely from the Hawk parties.  If we do

14 have an order and the money, and we're trying to get there, we

15 get complaints from them that we're somehow trying to convert

16 them, which by the way is a contractual thing that they agreed

17 to.  There's a separate contract that says this is what happens

18 because they were never supposed to be lenders.  They were just

19 supposed to be equity with the protection of some security. So

20 I --

21          THE COURT:  On that, counsel, you guys can agree to

22 disagree on what your agreement was.  The bottom line is, is

23 that you knew that you had to pay these wages tomorrow.  And

24 how you were planning to pay them, you claim it's ordinary

25 course.  We're going to get to that so-called sale because you

1  wanted another party to finance these wages, whether you're

2  saying they're doing them through a sale of stock or some

3  subscription agreement where they're getting 10 percent for

4  financing -- however you want to characterize it.  You knew

5  that this has to be done by tomorrow.  So to point the finger

6  at opposing parties -- I'm not accepting that.  You knew that,

7  and you weren't paying them with money through the ordinary

8  course.  They weren't from sale of the product; they weren't

9  through anything.  They weren't through sale of stock.  This

10 company does not sell stock -- they sell product.  And you've

11 got a subscription agreement that says, oh, we're going to give

12 you 10 percent for financing us also.  So this isn't some --

13          MR. ZAHRALDDIN:  Your Honor --

14          THE COURT:  -- counsel.  You didn't figure this out

15 on Friday.  You knew how you were proposing to pay them.  And

16 then to spring this on the Court on Friday and say, oh, it's an

17 emergency.  We have to pay them and now we need you to approve

18 the process on how we were going to pay them -- that's not an

19 emergency.  It wasn't.

20          MR. ZAHRALDDIN:  Yes, ma'am.  If --

21          THE COURT:  You knew how you were proposing to do

22 this.  So I am not happy that everybody, at least from the

23 Debtor's perspective, unless you telling me on Friday, Thursday

24 last week that we figured out how they were going to pay these

25 people?  I don't think so.

 1              MR. ZAHRALDDIN:  Your Honor, we did tell you before

 2     that we had these purchase orders.  Everyone else, Mr. Caponi

 3     included --

 4              THE COURT:  Counsel?

 5              MR. ZAHRALDDIN:  -- so this --

 6              THE COURT:  What did that have to do with how you

 7     were going to fund --

 8              MR. ZAHRALDDIN:  Because that's the only way we can

 9     pay for anything is to get --

10              THE COURT:  Counsel?

11              MR. ZAHRALDDIN:  -- advance payments from customers

12     or to sell these products.

13              THE COURT:  That's not what -- counsel, that's not

14     what you were -- that's not nowhere in anything you filed, did

15     you say you want to use or get an advance payment from

16     customers to fund our ongoing wage obligations and other

17     operational obligations.  You filed --

18              MR. ZAHRALDDIN:  Your Honor, we have --

19              THE COURT:  -- motions to sell shares to be able to

20     pay for this.  Did I miss something?

21              Yes?

22              MR. ZAHRALDDIN:  Yes, ma'am.  We're trying to raise

23     that money through the sale of shares, but it is connected to

24     providing services that are essential to selling the TVs to be

25     able to deliver on the purchase order.  And it's not -- yes,

1   ma'am?

2       THE COURT:  When did you know that that's what you

3   were going to do -- that you were going to --

4       MR. ZAHRALDDIN:  When we filed this first stay

5   enforcement motions, Your Honor, when we asked relief to please

6   get us our equipment back -- to ask relief to allow us to

7   proceed in the Netherlands, unmolested by this.  That's when we

8   said that to Your Honor.  This is the first time.

9       THE COURT:  Did you tell me on the first day when you

10  filed your motion you were going to sell shares to fund this?

11  This is the first I've read it, or maybe I missed it somewhere

12  in the pleading.  But for you to tell me that you told me this,

13  you absolutely did not tell me.

14      MR. ZAHRALDDIN:  Your Honor, I have to go back, but

15  I'm pretty sure we did mention that there was -- VSI was going

16  to -- we mentioned that there was a distributorship agreement

17  and that's how the financing was going to happen.  That way, we

18  wouldn't get into any sort of problem with the lenders.

19      THE COURT:  But that's not what you're asking me.

20  You're asking me to authorize sales.  You didn't mention that

21  before.  I knew about the subscription and the 10 percent. And

22  I asked you, well, what are they doing for 10 percent -- why

23  can't they just do it directly.  We've definitely had that

24  discussion at the last hearing.  We did not at any time -- and

25  again, maybe I missed it in the pleading -- but nowhere

1   anywhere did the Debtor, Stream, say, I'm going to try to

2   finance this by selling shares -- nowhere.  And you're telling

3   me this just came up last week that they decide that's what

4   they were going to do?

5           MR. ZAHRALDDIN:  Your Honor --

6           THE COURT:  Yeah.

7           MR. ZAHRALDDIN:  -- we have discussed that in the

8   sense that we indicated that particularly the Hawk parties.

9   SLS used to have a conversion agreement.  The only way --  the

10  only way to meet the obligations in the conversion agreement is

11  by the sale of shares.  That's how --

12          THE COURT:  And counsel, did you tell the court that?

13  Did you tell the court that we were going to ask me to approve

14  sales that this existed; we intended to exercise that; we

15  intended to do that.  You never mentioned it ever.  And for you

16  to file on an expedited basis is unacceptable when you knew

17  this, as you said, when you filed your motion to enforce.  So

18  don't hand me, well, it was part and parcel and it was under --

19  I don't know who it was understood because it was never pointed

20  out to this court.  And since it was never pointed out to me, I

21  don't even, how you can with a straight face, tell me it was

22  understood that we were going to sell shares.  Unless you can

23  point to me where you told me that, or it was in some pleading

24  that I overlooked, this was not an expedited matter.  The fact

25  that you --

1        MR. ZAHRALDDIN:  I believe it was in the first

2   declarations by Mr. Rajan.  We described --

3        THE COURT:  He said he was going to sell some

4   shares --

5        MR. ZAHRALDDIN:  That's all they've been doing --

6   selling shares while the company has been without its

7   operations and assets.  There'd be no other way --

8        THE COURT:  Counsel?

9        MR. ZAHRALDDIN:  -- for them to make any money.

10        THE COURT:  Counsel, did they sell shares post-

11   petition?

12        MR. ZAHRALDDIN:  Have they sold shares post-petition?

13        THE COURT:  Uh-huh.

14        MR. ZAHRALDDIN:  No, we're waiting for approval for

15   this motion --

16        THE COURT:  Counsel, did you just tell me that that's

17   all they've been doing is all good and well.  But nowhere did

18   you come to this court and tell me that that was your

19   intention.  I don't read minds.  If that was what you intended,

20   explain to me why you waited till the last minute to file it.

21   You must have thought court approval was required.  Did it just

22   suddenly dawned on you that it was required?

23        MR. ZAHRALDDIN:  No, ma'am.  We were trying to

24   fulfill these orders and get the company back into operation.

25   And the way to do that with the emergency of getting payments

```
1    done in the Netherlands and the interference.  That's why we

2    came in in the excess of caution, asking for permission to do

3    these things so we can get operations going.  I apologize if

4    the Court took umbrage that we did it on an expedited basis,

5    but we do think the two things are tied.  In order for the

6    Netherlands to actually start making money or income again,

7    which it used to do before it was taken over by SeeCubic.

8           We needed to get all these things in place, and we're

9    trying desperately to pull this together.  So I apologize for

10   the -- I would rather be doing this under the normal course and

11   have gotten this done, but this was an emergency filing that

12   was done because --

13           THE COURT:  No, it wasn't -- it was not.

14           MR. ZAHRALDDIN:  -- of the pending purchase --

15           THE COURT:  Counsel --

16           MR. ZAHRALDDIN:  No, no, no.

17           THE COURT:  -- it was not an emergency.

18           MR. ZAHRALDDIN:  The bankruptcy, Your Honor, the

19   bankruptcy.  I'm referring to the bankruptcy.

20           THE COURT:  Okay.

21           MR. ZAHRALDDIN:  The bankruptcy was done for these

22   purchase orders to get filed -- not -- if you don't believe

23   these were emergencies, I'm not going to argue with you about

24   that.  That's not what the --

25           THE COURT:  Counsel --
```

1           MR. ZAHRALDDIN:  -- Debtors are --

2           THE COURT:  -- the emergency filing was March 15th.

3   It is April 24th.  And for you to tell me that a sale of shares

4   were ordinary course and did not need -- you need to explain to

5   me where -- I know there have been some cases where, for

6   instance, I think it was in a case where there was something

7   about allowing --  can't remember the case -- that they wanted

8   to sell shares for means that they wanted to do.  But I don't

9   think this is some ordinary that you go and sell shares and

10  then you sell the shares to finance -- finance the business.

11          MR. ZAHRALDDIN:  I think you're referring to probably

12  the Hertz (phonetic) case, which was a little bit different

13  because it was publicly traded.  But --

14          THE COURT:  Yeah, so where in the world is it

15  ordinary course to sell shares?

16          MR. ZAHRALDDIN:  Every high technology case, Netflix,

17  et cetera, they run on a deficit.  They have not made money,

18  and everything that's coming in is from investment into the

19  technology, even once they --

20          THE COURT:  Counsel?

21          MR. ZAHRALDDIN:  -- go into production.  That --

22          THE COURT:  And you're saying investment into the

23  technology.  Does that investment involve sale of shares?

24          MR. ZAHRALDDIN:  Yes, ma'am, it does.  It always

25  does.  They're usually --

```
1              THE COURT:  Oh, okay.

2              MR. ZAHRALDDIN:  They're usually A, B, C, D, you

3    know, a series financing, and there are -- we're at the angel

4    and super angel space, so --

5              THE COURT:  Exactly what you called them -- series

6    financing.

7              MR. ZAHRALDDIN:  Yes, ma'am.

8              THE COURT:  And that is not what you're proposing.

9    Yes, you didn't have your different tranches, whatever.

10             MR. ZAHRALDDIN:  But we're --

11             THE COURT:  That isn't what you're proposing to do.

12   You're calling this -- you're saying we want to sell our

13   shares.  You're not saying, and we want to finance, we want to

14   use that to fund our operation.

15             MR. ZAHRALDDIN:  And the bankruptcy.

16             THE COURT:  So I'm not quite sure -- I'm not quite

17   sure how that's ordinary course to begin with, which is why I

18   know you would have never done it without coming to this court

19   because, you know, you can't do it.  And I bet you dime to

20   donuts in none of those cases, they do it without court

21   approval.

22             MR. ZAHRALDDIN:  Your Honor, in all fairness, we're

23   coming to you because we know that there are grave consequences

24   to not getting permission from the court.  So even when things

25   are in the ordinary course, people come to you to get
```

1   permission and that's what we did.

2           THE COURT:  Counsel, I'm not saying that you can't

3   come to me.  What I'm saying is the manner that you're doing it

4   is unacceptable.  I don't care what your beef is or the

5   parties.  It's clear to me there's not a great relationship

6   between the parties, the Debtor, and its creditor.  But you

7   guys need to leave that.  That stops when you get here.  I

8   don't care what you think about one another.  I don't care what

9   you believe you're doing.  You're not going to do it here.  And

10  I'm telling you this isn't something because as you have

11  already just said, you know, about series financing, for

12  instance, in Netflix, which apparently is what you're trying to

13  do.  And now you're trying to tell me it's expedited?  It's

14  not.  And I would never -- and I'm pretty sure those were teed

15  up with evidence and everything.  There is no way that's going

16  to get done today.

17          MR. ZAHRALDDIN:  Okay.

18          THE COURT:  I would never do that -- never, ever.  So

19  I want you -- and I'm going to say this again -- you better

20  think twice about filing anything expedited.  And first of all,

21  you better consult with opposing counsel because I've had it.

22  This case -- I don't know where you guys think you're at.  I

23  don't know what courts you've been in, but I can tell you that

24  will not fly in this one.  And if you think that somehow we

25  don't understand these cases, or we're not on top of it, let me

1  tell you just in case you have any doubt, we are not.  We

2  understand it.  We know how this works.

3          MR. ZAHRALDDIN:  Now, Your Honor, we're actually

4  happy to be in your court because it's one of the courts --

5          THE COURT:  I'm sure you are because you weren't

6  happy in Delaware.

7          MR. ZAHRALDDIN:  Yes, ma'am, we were.

8          THE COURT:  But that's neither here nor there.  But

9  just don't think because this isn't Delaware that things are

10  going to be any different.  They are going to be exactly the

11  same in terms of how this case goes, how the matters are

12  handled, how they're heard, which leads me to a bigger concern.

13  I don't even know if these cases belong here or are properly

14  filed.  Now, with respect to Stream, that's a different issue

15  because there was no receiver.

16          MR. ZAHRALDDIN:  Uh-huh.

17          THE COURT:  But there was clearly a receiver in the

18  other one.  And I am not about to do anything that would

19  basically make it a fait accompli if I decided that this should

20  have never been filed or was not properly filed.  Those are

21  other things that I have to consider or I'm not doing anything

22  -- I'm not doing anything that is going to be an end around or

23  have an effect of overdoing anything that I ultimately may

24  decide.  Wages, yes.  Those are ordinary matters that are

25  handled in an ordinary course.  Anything outside of that,

```
 1   absent some hearing, absent some legal argument, I'm not doing

 2   it -- absolutely not.

 3           So let's hear about these wages that you want to pay.

 4   And when I say wages, I mean the wages that were paid on March

 5   -- they were paid in March, and you're telling me are now due

 6   in April.  How much are we talking about?

 7           MR. ZAHRALDDIN:  Do you mind if we ask Mr. Rajan

 8   because he has put together, with his team, the amounts --

 9           THE COURT:  No.

10           MR. ZAHRALDDIN:  -- and maybe he can tell us the

11   exact number, or --

12           THE COURT: Somebody --

13           MR. ZAHRALDDIN:  -- the --

14           THE COURT:  Counsel, do you -- first of all, we're

15   doing this under colloquy.

16           MR. ZAHRALDDIN:  Yes, ma'am, I understand that.

17   Whatever you want to do.

18           THE COURT:  Right.  I mean, he can just tell me.  So

19   let me just say, I'm going to hear this as in connection with

20   colloquy.  If somebody's opposing this, we're going to have to

21   make an evidentiary record.

22           MR. ZAHRALDDIN:  That's fine, that's fine.

23           THE COURT:  And maybe that's what we -- you know

24   what?  Let me hear from opposing counsel before we make a

25   record.  Who wants to go first?
```

1          MR. CAPONI:  Your Honor, this is Steve Caponi for

2   Hawk.

3          THE COURT:  Uh-huh.

4          MR. CAPONI:  I'll keep my comments brief because we

5   echo all the Court's concerns.  I'd just like to -- want to

6   address the factual matter, and that is, when we come to

7   emergencies here, this bankruptcy filing was not an emergency.

8   This was not a -- it was filed to avoid a trial.  It was not a

9   catastrophic financial event that caused the company to go into

10  bankruptcy unexpectedly.  This was a planned filing.  And as

11  Your Honor noted, and as we noted at the first phone call we've

12  had and every phone call since, this employee funding cliff was

13  coming and that, you know, wages have been paid through March,

14  and they need to be paid in April.  So why they filed the

15  bankruptcy not preparing to deal with wages when they had

16  plenty of time to prepare for the bankruptcy concerned us.

17  Getting the motion filed -- since the last hearing I should

18  say, we've written to the other side several times to say,

19  engage with us on the employee wages.  We paid them

20  prepetition.  We're willing to engage in a similar process

21  post-petition because it's protecting our collateral.

22          The Debtor has refused to engage at all.  The only

23  response we received was, we're preparing motions -- not what

24  motions, but we're preparing motions.  That's it.  We've copied

25  the U.S. Trustee on these communications, hoping the U.S.

1    Trustee's Office would intervene and maybe put some pressure on

2    the Debtors to engage.  So that's how we ended up where we are

3    today.

4           With regard to the concept of lack of information.

5    Your Honor has not been told the truth here by the other side,

6    and I don't blame counsel.  I suspect they were not involved.

7    It's coming from their client.  There was a very detailed

8    process once the receiver was appointed where both Mr. Stasney,

9    who was a purported director and Mr. Rajan as the other

10   purported director, met with the trustee and met with the

11   subsidiary, and they prepared budgets.  Every month they

12   prepared a budget.  And the receiver and everyone approved that

13   budget.  Mr. Rajan actually signed board resolutions approving

14   the budgets.  And then once the budgets were approved, my group

15   of secured creditors funded those budgets pursuant to the

16   budget.  Everyone knew what the budgets were, and these are

17   detailed Excel spreadsheet budgets, Your Honor, and employee by

18   employee taxes, wages, equipment, you know, et cetera.

19          Any notion -- I've got a computer full of these.  Any

20   notion that they did not know what the money was going to, how

21   it was being spent, is just false.  Now, I have Mr. Rajan's

22   four resolutions.  The last one was signed in March before the

23   bankruptcy.  So they knew -- we knew.  That's why we kept

24   saying, Your Honor, that's how we knew there was a funding

25   cliff.  And we knew that when the bankruptcy was filed there

1   was enough money to get us up to this point.  So that concerns

2   us.  Then we get the filing on Friday, and Your Honor, the

3   Debtor has admitted that it has $2,000 in the bank, it's

4   administratively insolvent, and it has no prospects of

5   generating any revenue unless it sells stock.

6          So as it stands here today, the Debtor has admitted

7   in its motion that it has no ongoing operations -- it builds no

8   products.  Even if it wanted to build products, it has only

9   $2,000 in the bank, which was spent probably 30 minutes ago

10  just in this hearing alone in billable hours by counsel.  Then,

11  there was four or five lawyers that joined the call.  And the

12  only way they can come up with to fund this case is to sell --

13  allegedly sell stock to another insider, Mr. Rajan and his

14  other entity.  So we have an administratively insolvent Debtor

15  with no money in the bank.  And what he's asking this Court to

16  do is trying to use Chapter 11 to start a business, not to

17  restructure a business.  We can sort that all out in the

18  hearing that's coming up later in May, and we think that's

19  appropriate.  Our primary concern, and I'll move on to the

20  primary concern, which is the funding.  The employees need to

21  get paid.  You know, we can haggle over whether it's 150,000 or

22  175,000.  We know we're not talking -- it's not a situation

23  where no one knows what the number is or not within our realm

24  or reason.

25         The secure creditors, and I can let my folks at

1   Skadden, friends at Skadden, jump in on this one to talk about,

2   you know, we're prepared to continue the ordinary course, which

3   is funding along the same mechanism procedures that were used

4   with the receiver.  But under this Court's supervision, if

5   that's what's necessary, if the Debtors had the cash to pay the

6   employees, we are all ears in a way to make that work -- that

7   it doesn't require some weird, insider trading funding

8   mechanism.  But when they say the buck stops here, literally,

9   you know, it's not a made up statement.  Maybe it's not bucks

10  -- I'm not sure what the denomination is in the Netherlands,

11  but someone needs to come up with cold hard cash.  We have it

12  -- if they have it, great.  They can just get on the phone

13  right now and say yes, we have $200,000 in the bank, and we're

14  going to wire it and pay their salaries.  Okay, let's talk

15  about the mechanism for making that happen.  If there's some

16  reasonable step, there's something they need to do in order to

17  get the money, we're all ears.  If not, we're here.

18          THE COURT:  And counsel, that's why -- and this is

19  for everybody.  I said at the very first hearing, is there

20  going to be some -- I thought I would see some -- something --

21  cash collateral, and there was, oh, there's no cash.  Am I

22  going to see -- oh, no, no, we're going to sell funds.  Okay,

23  that's what I heard -- we're going to sell funds.  And so the

24  Debtor doesn't have the money to sell funds.  It wants to fund

25  by selling shares.  And I guess the issue is, there is, you

```
 1   know, I can't make the Debtor take the money, but I can tell
 2   you there's not about a one share about to be sold on their
 3   motion today -- not happening.  So what I would suggest, what I
 4   suggest before we even get into a lengthy evidentiary hearing,
 5   is that the parties, including the U.S. Trustee, have a little
 6   conversation about how it would make sense in getting this done
 7   because at the end of the day, if those employees do not get
 8   paid tomorrow, there will be nothing to fight over.  And I said
 9   that at the last hearing that you guys need to -- or one of my
10   hearings, that if this doesn't get worked out, there's nothing.
11   And actually -- that I have to do except say the company's
12   defunct, and I don't know what you want to do in chapter.
13   Maybe you do orderly liquidation.  I don't know.
14           But the whole point of the matter is that I know
15   there was a receiver.  I've actually been, I've actually, you
16   know, before I was a Judge, I did practice.  I did do receiver
17   work.  I did represent court appointed receivers.  I know how
18   that works, and nobody's really, really paying money.  You have
19   to submit all of that to a court.  You have to do the same
20   thing you do in bankruptcy.  Here's a budget, and all the
21   parties get to look at it.  Everybody puts their input in it
22   and then it's approved.  Now, whether you got all the
23   information, whether everything wasn't done, I don't know.  And
24   at this point, it's irrelevant to me.  The only thing relevant
25   for my purposes, is there is a request to pay wages tomorrow.
```

1    The Debtor is proposing some sort of sale, which I'm telling

2    you I'm not hearing it today.  That is not anything I would

3    ever do on an expedited basis.  And even in those cases where

4    it was allowed, I am quite confident that if I go review that,

5    none of it was done on a short notice without an evidentiary

6    hearing, which is going to take a couple of days.  That's not

7    going to happen.

8            And then the next issue is, is that you guys can

9    agree to disagree who has what rights, whatever, who has

10   conversion, no conversion, whatever.  That is irrelevant for

11   today's purposes.  So I would suggest that the parties go -- I

12   guess I can just hang up, and you can talk here.  We just won't

13   record it.  We would not record it, and you guys can try to

14   figure this out because again, the only thing I'm going to have

15   evidence on an expedited basis, is whether the wages are

16   necessary, which I don't think I'm hearing anybody say they're

17   not.  There's not going to be payment of any prepetition

18   because unless somebody can tell me that those payments were

19   not made, they were not requested, you know, which means

20   somebody -- and I'm not even in court to see the matter, which

21   I guess in retrospect, I probably should have just had

22   everybody come in or do this as a Zoom hearing because I don't

23   know how I'm going to see the evidence.  But since it was done

24   at the last minute and we tried to accommodate, I guess we just

25   didn't really think through that.  This should have been a Zoom

```
 1   hearing so that I could at least see what the parties are and
 2   there's nothing stopping us from turning it into a Zoom
 3   hearing.  We would just have to put the information out there
 4   and everybody call in.
 5           But absent -- so I don't think the necessity is an
 6   issue.  The amount may be an issue and how it's getting funded
 7   is an issue.  And I am not going to hear anything about selling
 8   shares today.  So that may be limiting what you guys are going
 9   to do.
10           MR. ZAHRALDDIN:  Would Your Honor entertain a junior
11   dip, then, if we were able to -- because I would imagine that
12   the other secured creditors would not be prejudiced by that.
13   And even if they objected for other purposes, a junior dip we
14   could do and get this paid and done by tomorrow.
15           THE COURT:  A junior dip with who?
16           MR. ZAHRALDDIN:  Well, we would have to do it either
17   with -- individual investors would have to do a loan, or we
18   would have to do it otherwise.  I'd have to talk to my client,
19   but you know, VSI is the investor is putting money in, so they
20   would simply loan over to VSI.  VSI would loan --
21           MR. MAZZA:  Your Honor, I'm sorry.
22           THE COURT:  Who --
23           MR. MAZZA:  This is Mr. Mazza from Skadden Arps.  I
24   haven't said anything with respect to the pending motions.  And
25   given that we've offered up financing to take care of this
```

1   unfortunate emergency that's been self-created, I wanted to at

2   least get a few words in before this proceeds any further, if I

3   may?

4          THE COURT:  Yes.

5          MR. MAZZA:  Thank you.  Thank you, Your Honor.  So

6   in our objection, we included the exhibit, it's Exhibit A, the

7   promissory note, that SeeCubic has funded since the receiver

8   was put in place.  And given the brinksmanship that we're

9   experiencing here and the need to provide comfort over to the

10  Dutch subsidiary, we think just being able to go through that

11  same arrangement and fund directly to the Dutch subsidiary,

12  which is not operating in bankruptcy, would be the easiest way

13  to do this as opposed to, you know, what Debtor's counsel is

14  trying to come up with on the fly here. We all know that they

15  don't -- the share sales is not going to work.  It still isn't

16  clear if they have the money.  We have the commitments to make

17  a direct -- a direct unsecured loan to the Dutch entity that

18  would just save us all a lot of heartache here to move this

19  forward -- keep the Dutch subsidiary calm and the employees

20  calm and have no need for any further issues to discuss and

21  essentially keep the status quo in place.

22          And so I would advocate for a simple solution here as

23  opposed to something that is going to require negotiations that

24  are very difficult with the other side on.  And so I just want

25  to put that out there for Your Honor.

1    THE COURT:  Well counsel, first of all, to get dip

2  financing, you're going to have to tell me why they can't get

3  it anywhere else.  That's the first thing you have to show.  We

4  can't get it anywhere else, so Judge, approve this financing.

5    MR. ZAHRALDDIN:  Your Honor my client just called me,

6  and he's happy to speak to you and confirm this.  But there

7  were subscription agreements that were done prepetition, and he

8  indicates that there is money in the accounts that can pay

9  these much smaller amounts that are just wages.  So we could

10  make the payment and get it done today.

11    THE COURT:  No, because you're telling me -- now

12  you're telling me something that wasn't disclosed.  All of a

13  sudden there's money from subscriptions that were not

14  disclosed?

15    MR. ZAHRALDDIN:  Let me make sure it was disclosed.

16    Mr. Fisher, do you know if we have any disclosures in

17  the schedules?

18    MR. FISHER:  No, they're not on the schedules.

19    THE COURT:  Absolutely not.  No, no.

20    MR. ZAHRALDDIN:  Okay, okay.

21    THE COURT:  I'm already unhappy with the Debtor.

22  Don't dig a deeper hole.

23    MR. ZAHRALDDIN:  Your Honor, I'm just trying to make

24  something simple because my client said he has the money --

25    THE COURT:  It's not simple, counsel -- it's not

1   simple.

2          MR. ZAHRALDDIN:  Okay.

3          THE COURT:  You said the Debtor only has $2,000.

4   Now, I'm going to have to a hearing where the money came from

5   -- wasn't disclosed.  Now, we want to have some financing by

6   some other investors.  Let's look what financing requires.

7   Financing, in order for me to approve some financing, even if

8   you say they want to be investors, and they want to be --

9   you're saying they would be junior secured --

10         MR. ZAHRALDDIN:  Yep, yep.

11         THE COURT:  -- you still have to tell me that they

12  can't get unsecured.  And I have parties here saying, well,

13  we're going to give them an unsecured loan.

14         MR. ZAHRALDDIN:  Let me -- if you want, I can call my

15  client and find out if they'll do an unsecured loan and talk to

16  the folks, and we'll get that done, in fact, right now.

17         THE COURT:  Counsel, I already told you guys, I think

18  you need to get off this hearing, do your discussions, I'll

19  call back in.  But it seems to me, from the Debtor's

20  perspective, one, you're going to have to prove that you can't

21  get unsecured financing.  I have parties here saying, we're

22  going to give you -- you can't even meet the first hurdle.

23         MR. ZAHRALDDIN:  That's because they wish to take the

24  assets, Your Honor, that they're a competitor.

25         THE COURT:  I don't care -- counsel, counsel,

1    everybody wishes to take the assets.  If we're going to start

2    throwing aspersions out there, it appears that VSI wants to do

3    the same thing because you basically said you want to merge.

4    Everybody's trying to take the assets.  Let's not try to--

5    let's not try to --

6              MR. ZAHRALDDIN:  They're willing to pay -- to do

7    that.

8              THE COURT:  Counsel, counsel, let's not try to play

9    we the good guy -- they the bad guy.  As far as I'm concerned,

10   nobody's -- anybody's looking good in here.  So let's not --

11             MR. ZAHRALDDIN:  Yes, ma'am.

12             THE COURT:  -- try to cast aspersions on one another.

13   I see this for what it is.  Again, this isn't anything new.

14   This is anything I haven't seen or any other judge in my

15   position has seen.  Everybody points to the other party as the

16   bad guy.  You guys got into bed with one another and now you

17   want a divorce, and everybody's trying to take as much of the

18   assets in the divorce -- in the in the property settlement.  It

19   belongs to me, not the husband, not the wife.  That's all this

20   is.  And so I don't need to hear that this party is a bad guy

21   and I'm the good guy.  The bottom line is, is that you are in

22   bankruptcy.  There are rules.  And if you want to finance this,

23   either through some alleged subscription where you're holding

24   money which has never been disclosed or you want to get some

25   investors, you're going to have to follow the rules.  And the

1   rules say to get secured lending, you have to first show that

2   you cannot get unsecured.

3          MR. ZAHRALDDIN:  Okay.

4          THE COURT:  And we have an offer for unsecured.  So I

5   suggest everybody -- I will hang up and you guys hash this out.

6   I've already said what I have to say.  And if you don't, if you

7   want to --

8          MR. ZAHRALDDIN:  Okay.

9          THE COURT:  -- put a hearing on, if I haven't told

10   you what I think you're going to have to prove and maybe

11   you can, maybe you can't, your call.  But I'm telling you, this

12   divorce, leave the animosity, the gamesmanship, whatever it is

13   you guys think you're doing, at the door.  I'm not going to

14   entertain here.  And at the end of the day, I am not doing

15   anything that cannot be undone in the event I find these

16   bankruptcy were -- it would --  Stream didn't have a receiver

17   -- that's a whole different standard.  But could they put -- a

18   receiver in this?  I'm going to look at the law, and I'm going

19   to figure it out.  And I'm not about to do anything that in the

20   event that I find that this is an unauthorized filing, that

21   can't be undone -- not going to happen.  So it seems that if it

22   is proper, it should be done in the course of either financing

23   or either sales through the -- sales, which are not ordinary

24   course or plans, or proposal -- all of those things.  Everybody

25   wants his assets for themselves.  When I say everybody I mean

1    all of the parties.  And it's going to follow the rules to get

2    there.  And --

3              MR. CAPONI:  Your Honor, this is --

4              THE COURT: -- having it.

5              MR. CAPONI:  Your Honor, Steve Caponi.  We fully

6    appreciate the Court's comments.  We are prepared to work with

7    the Debtor.  I agreed with you, Your Honor, look, there's a lot

8    of acrimony, and there's no reason to cast dispersions.  But I

9    will not cast an aspersion, but I want the Court to know, my

10   client does want these assets.  It believes it already has

11   these assets in the divorce.

12             THE COURT:  Counsel --

13             MR. CAPONI:  But we'll take our time getting there,

14   but our primary concern is like a divorce, I want the children,

15   but I don't want them to starve to death before the divorce is

16   over.  So we're here to make sure the kids get fed so that, you

17   know, there is actually a live human being to fight over in the

18   end, and we're committed to doing that.

19             THE COURT:  Okay, counsel.  So I'm going to sign off.

20             John, stop recording to give them an opportunity --

21             MR. CALLAHAN:  This is Kevin Callahan, and I'd just

22   like the opportunity to be heard before we do break, Your

23   Honor.

24             THE COURT:  Okay.  Counsel, hold one second.

25             Mr. Callahan?

1          MR. CALLAHAN: Yes, Your Honor, thank you.  And I

2     apologize if some of my remarks are repetitive of the Court's

3     statements or redundant, but I think it's important to note

4     that U.S. Trustee, of course, has an institutional interest

5     here.  And with respect to the motion that was filed by the

6     Debtors, it is now apparent, if not clear, that this is not a

7     motion to pay prepetition wages to employees and which might

8     typically be considered on a first day hearing.  So 507(a)(4)

9     does not apply.  And the Court rightly pointed out that with

10    respect to the independent contractors that are referenced in

11    the Debtor's motion, there are requirements in 507(a)(4), to

12    the extent that there were prepetition obligations.  But the

13    Debtors motion states that the employees are not owed

14    prepetition.  I'm certainly cognizant of the Court's comments

15    at the last hearing and the parties' agreement, I think, that

16    these employees must be paid, and they would be paid presumably

17    for services rendered after the petition.  And I think that's

18    hopefully the focus of the conversation going forward when the

19    Court breaks.

20          If that is the case, and we take no position as to

21    which party would provide the funding, we certainly would want

22    to know the terms and some of which may need to be re-noticed

23    in some fashion, whether it's an order sending out with

24    negative notice or the like of the terms and conditions of that

25    arrangement.  These suggestions were just made by counsel for

1   both sides.  The amounts, at least some semblance, of

2   information regarding to whom those distributions would be

3   made.  I take special note that counsel for the Debtor's

4   remarks that the Debtor may have cash, or at least access to

5   some fund somewhere, is not evidence on the Debtor's schedules,

6   nor is it evident on the operating report that was just filed

7   last week.

8          So clearly, we certainly -- I think everybody would

9   want to know where that source of funds might be.  I appreciate

10  the Court not ruling, at least today, on the issues -- other

11  issues that are set forth in the motion -- the ordinary course,

12  motion, the stock transfers and the like, all of which we think

13  need to be vetted further, Your Honor.  So I think our

14  conversation going forward is simply on the payroll that needs

15  to be met and we appreciate the urgency with that.

16         Will the Court be willing to hear the parties later

17  today if there is an agreement or disagreement to discuss the

18  resolution?

19         THE COURT:  Oh, definitely.  Yeah, my -- when I say

20  the parties, I would sign off, let the parties try to hash it

21  out.  If they can't, my staff will text me, email me, say you

22  need to come back -- there's no agreement, there is agreement.

23  And then, I would handle this like any other payment of wages.

24  Again, nobody's arguing about necessity.  So I would need

25  information on how much -- here's the documents -- we'd have to

1    do it as a Zoom because I need to see the documents and so does

2    everyone else; would need to see -- here's the people we're

3    proposing to pay; this is how much we're proposing to pay them;

4    and this is the source of the payment, and I would need some

5    evidence on that.

6            Again, the first thing is that unless it's unsecured

7    -- well, I don't know how you'd get around because the first

8    thing is you'd have to say that I can't get unsecured

9    financing.  And maybe the other parties would want to give

10   someone -- I don't know what because I don't know how or what

11   the thought process is for the Debtor.  And again, maybe

12   I'm being a little unfair because I'm not very happy how this

13   is playing out.  And I'm not, you know, trying to call out this

14   one party, but it seems to me that somebody had to have thought

15   what would happen if we couldn't sell these shares and finance

16   it, and what's alternative -- how do we plan to do it.  It

17   can't be on the fly.  It's not my job to try to figure out the

18   appropriate way to do this.  And I will also say that I am very

19   disappointed that the parties have not discussed this, that

20   there have been no discussions other than -- and I'm only

21   taking counsel's word.

22           I have no reason not to believe the -- that said that

23   we have reached out and they have sent some emails, but no

24   discussion.  And so -- and maybe the, and that the U.S. Trustee

25   was copied on that information.  I don't know, I don't get to

```
 1   see that.  I only get to see what I see in court.  But I tell
 2   you, it's not going to bode well if people don't talk to one
 3   another.  The court is not the place to come and talk.  You
 4   discuss it.  You don't have to tell me the discussions because
 5   the settlement, they don't come to me, but we tried to work it
 6   out on your own and we discussed it -- we couldn't come to an
 7   agreement.
 8           But for me to hear that they didn't even try to --
 9   that the parties didn't even discuss it, I'm not happy -- not
10   at all.  And I think from the tone and the way this is going,
11   everybody is pretty clear I'm unhappy and what I'm going to
12   tolerate.  So where we are right now is that I will sign off.
13   The parties can try to work this out.  To the extent they
14   cannot, my staff will reach out to me, John or Eileen call me,
15   and I will figure out that we need to have an evidentiary
16   hearing, and we'll set up that process.  Again, no one is
17   saying necessity unnecessarily.  So the only issue for me will
18   be how much with a payment.  But I am confident that you guys
19   can work this out.
20           MR. ZAHRALDDIN:  And Your Honor, if we have pre-
21   petition subscription agreements that haven't yet been funded
22   but are due and owing, and obviously we have to fix our issue
23   with the schedules, I'm assuming that would be acceptable to
24   recover money that's owed to the Debtor.
25           THE COURT:  Nothing's preventing the Debtor from --
```

```
 1   to collect.  It's like any other business.  You're owed

 2   accounts receivable, you're owed whatever.

 3           MR. ZAHRALDDIN:  Okay.

 4           THE COURT:  You make demands.  Should they not, then

 5   you file an action to force them to pay.  This isn't rocket

 6   science.  This isn't some unique case that's never happened

 7   before.  So if you believe somebody --

 8           MR. ZAHRALDDIN:  We'll work with the other parties,

 9   Your Honor.

10           THE COURT:  You know, but it's not going to happen

11   today, and it's not going to be, oh, we're going to collect.

12   It's what you have today.  And to the extent that there's money

13   that's not been disclosed, that is not going to look good.  I

14   can tell you that much.  So again, I will allow the parties

15   time to discuss.  I will sign off.  John -- or actually,

16   Eileen, you call me and let me know where we are.  If it's not

17   resolved, then John, put together for a Zoom hearing.  And

18   that's where we are.  So I'm going to sign off.  My Court is in

19   recess.  We're in recess for -- I'll give you guys an hour and

20   then somebody check in with me in an hour.  That's 1:00.  Okay?

21           MR. ZAHRALDDIN:  You'd like us to stay on the line

22   then, to discuss things?

23           THE COURT:  Yeah.  My staff -- they're just going not

24   let you guys talk.  We're not going to record it.  It's just

25   that all the parties are here.  I don't want to differ -- well,
```

1    I couldn't reach him, and we had to -- no.  Everybody's here.

2             MR. ZAHRALDDIN:  Okay.

3             THE COURT:  You can talk.  My staff is going to let

4    you go.  We're not recording.

5        (Recess taken)

6             THE COURT:  Good afternoon.

7             MR. ZAHRALDDIN:  Good afternoon, Your Honor.

8             THE COURT:  Okay.  We're back on the record on Stream

9    TV and Technovative.

10            Counsel, again, if I would just ask that you please

11   state your name for the record before you speak, I would be

12   appreciative.

13            Counsel for Debtor, where are we on your two motions?

14            MR. ZAHRALDDIN:  Your Honor, Rafael Zahralddin from

15   Lewis Brisbois on behalf of the Debtor.  And we did have some

16   discussions with counsel for SeeCubic and for Hawk.  And we

17   have the -- we sent over a proposal.  The Debtors are willing

18   to pay on an unsecured basis, either through VSI paying

19   directly or VSI paying the Debtors and then them paying the

20   subsidiary, whatever is the easiest to do.

21            And there is a wage -- I'm sorry.  There's payroll of

22   155 Euros, wage tax of 115,519, and building rent of 22,000

23   Euros for a total of roughly 300,000 Euros.  We are prepared to

24   pay the 115 immediately on the wage tax.  We are also prepared

25   before Friday to pay the -- I'm sorry, I'm sorry.  We're

1  willing to pay payroll at 155 immediately.  And then the 115

2  and the 22 by Friday, if the Court approves it.

3          And then there are amounts coming due next month,

4  totaling close to 569,512 Euros.  The Debtor will commit to pay

5  that.  We of course would like to review those numbers and make

6  sure that they're accurate.  We believe we have a little more

7  time to do that, since it's not an emergency.  And we also at

8  least began a discussion on some issues we thought were in the

9  ordinary course.  Because if the employees are going to be

10 paid, and we understand the urgency in paying this so it

11 doesn't, as Mr. Mazza said, fall off a cliff.  But we also want

12 the employees to help get some things done.

13         And there were a few things we thought that were in

14 the ordinary course that we told Ms. Westbrook, Mr. Mazza, Mr.

15 Colby, and the other folks that were on the line, that we would

16 work -- try to work conceptually with them.  And if not, then,

17 you know, take up Your Honor's offer to have one of your

18 colleagues help us resolve that issue.  I think that's a

19 summary of where we are.

20         I don't know if Mr. Alexander thinks we're missing

21 something.  And then certainly the other side will want to talk

22 about, you know, they may have an alternate proposal, they may

23 be okay with ours.  We're just trying to get information over

24 to them, and back and forth.  And that's where we sit.

25         Mr. Alexander, do you have anything else to add to

1  that?

2           MR. ALEXANDER:  Vincent Alexander on behalf of the

3  Debtor.  The only thing I would add is to the extent it was a

4  promissory note from VSI to the subsidiary, it would be on I

5  believe the same terms, the four percent.

6           MR. ZAHRALDDIN:  Yeah.

7           MR. ALEXANDER:  And with respect to the receiver

8  notes were prior to the filing.

9           MR. MAZZA:  Your Honor, Jim Mazza here from Skadden

10  on behalf of SeeCubic.  If I may provide some comments.

11          THE COURT:  Yes.

12          MR. MAZZA:  Thank you.  So a couple of things.  We

13  did have discussions with counsel to the Debtors in their

14  discussions to get money, I guess from VSI, who doesn't appear

15  to have counsel.  But in any event, the numbers that counsel

16  went through as far as what's due this week on the 302,519

17  Euro, I think there's agreement amongst the parties on that

18  being due this week.

19          However, we did not receive any -- we asked for proof

20  of funds, that VSI again, who doesn't have counsel it appears,

21  would have available and we received a -- it looks like a Chase

22  for Business screenshot of a account that holds $233,041.55

23  U.S. dollars.  So that's short of what's needed this week.  And

24  given the issues here, and the urgency around this, we think

25  that -- well, it's all well and good to make a commitment.  If

1    the money's not there, it's not there.

2            So we have worked together with Hawk to come up with

3    a term sheet that's pretty simple, that I believe has been

4    shared with the U.S. Trustee that would fund this amount

5    immediately and we have the funds to do so.  So there wouldn't

6    be an issue on that front.  And that would be a simpler way to

7    deal with this and not waste more parties time on whether or

8    not money's going to come in the door.

9            As counsel for the Debtors also went through, there's

10   money that's going to be due in May that is not insubstantial,

11   in the grand scheme here of 569,512 Euro.  Given that they

12   don't have enough to cover the end of this week, then covering

13   that, well, we can probably punt that for a little bit of time.

14   We'd be prepared to address that in short order as well.

15           So we appreciate them trying to see what they can get

16   done.  But we didn't receive this information and proposal

17   until I guess about a little -- a few minutes before 4:00 this

18   afternoon.  That's our assessment of it.  And we'd like to just

19   take care of this as quickly as possible and not leave any

20   conditionality out there so that the deductions here isn't kind

21   of left in the lurch potentially as the next couple of days go

22   by.  So that's our assessment and what we're willing to do.

23   And that's really it.

24           As far as the conditions that were mentioned by

25   debtors' counsel, there's no agreement on any of the conditions

1    that they have talked about or getting together to discuss

2    those.  We don't think they're anything of the ordinary course.

3    But I don't want to sort of leave that unsaid.  I don't think

4    it's an issue here today that needs to be thought through at

5    all given what the business in the Netherlands is facing at the

6    moment.  So I think with that, that's the status update.

7            MR. ZAHRALDDIN:  And Your Honor, I know Mr. Mazza is

8    not doing it on purpose.  But just to be clear, we did not make

9    any of those conditions to the funding.  We simply wanted to

10   open up the dialog in response to questions from counsel

11   earlier in the afternoon.  And I've also received information

12   from my client that we should have another 120,000 coming into

13   the VSI account in the morning so that we would be able to make

14   the payments.  And certainly we have enough to make the

15   immediate payment on wages.  And we will have everything for

16   this week.

17           THE COURT:  Okay.  Who is we?

18           MR. ZAHRALDDIN:  Well, the Debtors will, because

19   they're owed money by VSI.  And if the Court is more

20   comfortable with VSI paying directly to the sub and having the

21   relationship, it can be done that way, or it can be done with a

22   note from the Debtor to the sub.  But the money is there.  It's

23   an obligation owed to the Debtors.  And it is ready there and

24   VSI said that they will fund -- they will be happy to fund it

25   no matter what because they want to make sure that the

1    subsidiaries are protected.

2            THE COURT:  So who is negotiating on behalf of VSI?

3            MR. ZAHRALDDIN:  VSI, I don't know all the VSI

4    officers and directors.  Mr. Rajan is involved with VSI, but he

5    has -- and a lot of the employees that used to be in Stream are

6    working at VSI.  But they do have other outside directors who

7    come in that are either put there by investors or have come in

8    at different times.  There's a gentleman --

9            THE COURT:  Counsel.

10           MR. ZAHRALDDIN:  -- named Joe Corso (phonetic) --

11           THE COURT:  Who --

12           MR. ZAHRALDDIN:  -- signed on behalf of VSI in the

13   past.

14           THE COURT:  Counsel.

15           MR. ZAHRALDDIN:  Yes, ma'am.

16           THE COURT:  Who are you consulting with at VSI to

17   determine their ability to fund the proposal?  Who are you

18   negotiating with?

19           MR. ZAHRALDDIN:  There are current and past investors

20   in VSI, who Mr. Rajan has contacted and has worked with Mr.

21   Corso in order to get these commitments.

22           THE COURT:  So Mr. Rajan is contacting investors on

23   behalf of VSI.  And he's negotiate -- that's the point.  Who

24   are you talking to for VSI?  I don't want this investor -- who

25   is talking to you on behalf of VSI?  You meaning debtors'

1    counsel.

2          MR. ZAHRALDDIN:  Meaning Debtors' counsel.  They

3    didn't have --

4          THE COURT:  Who is Debtors' counsel discussing with

5    at VSI the terms for what can be paid, and what information is

6    being prepared?  Who from VSI is providing that information to

7    you?

8          MR. ZAHRALDDIN:  That is coming from Mr. Rajan, who's

9    talking directly to the investors at VSI.

10          THE COURT:  And who is the representative for the

11    Debtor in this case that is negotiating with VSI?

12          MR. ZAHRALDDIN:  Well, Mr. Rajan is the only officer

13    director and employee right now at Stream, because we don't

14    have employees since the company was blown up by the attempted

15    takeover.  So that was one of the things that we were trying to

16    handle.  But that is -- that's Mr. Rajan.  He's the one talking

17    to the investors --

18          THE COURT:  He's negotiating with himself.

19          MR. ZAHRALDDIN:  No, he's not.  No, ma'am.

20          THE COURT:  He's negotiating with himself.

21          MR. ZAHRALDDIN:  He's not negotiating with himself

22    because he answers to investors that are putting money in --

23          THE COURT:  Counsel.  Counsel, I don't know who he's

24    talking to.  And I don't know -- the point of the matter is,

25    he's on both side of these deals.  I don't care who he's

1    talking to.  How can he negotiate on behalf of the Debtor, with

2    another entity that he has an interest in that he's talking to

3    investors in?  That's a problem.  Putting that aside, has

4    everybody agreed that the number that needs to be funded this

5    week is the 302,000 plus Euros or that -- is that an agreement

6    between -- everybody's on the same page with that number?

7              MR. ZAHRALDDIN:  If you are, Your Honor, because you

8    had only indicated you wanted to see payroll paid.  But yes, we

9    are in agreement on the other numbers with the caveat that we

10   didn't hear you say clearly that you wanted the wage tax or the

11   building rent paid.  You wanted the payroll.  And so

12   certainly --

13             THE COURT:  Well --

14             MR. ZAHRALDDIN:  -- if you believe that those should

15   be paid, the Debtor would support that.

16             THE COURT:  I don't believe anything.  My question --

17   the next question is, what were the wage taxes for?  Were they

18   for the current payroll?  What are they for?  That was so if

19   the parties were agreeable, that they believe that this should

20   be paid, presumably, it's for -- because if this would have

21   been in the ordinary course, you would have had, this is how

22   we -- or we need funding.  We're going to get unsecured

23   financing.

24             And in the course of that financing, we are proposing

25   to pay X amount for wages presumably -- and I don't know, and I

```
 1   don't want to make an assumption -- in that, maybe or maybe not
 2   that 155 included taxes.  I don't know.  Nobody told me.  And
 3   is the 115 for current taxes?  Is it for pre-petition taxes?
 4   And then the building with our -- I think I heard you say rent.
 5              MR. ZAHRALDDIN:  Yes, ma'am.
 6              THE COURT:  And that would be -- and that's for
 7   current risk?
 8              MR. ZAHRALDDIN:  Your Honor, we have a blind spot on
 9   that which I mentioned earlier.  We were -- we got these
10   numbers from Hawk and from SeeCubic.  And we agreed to them
11   because on an interim amount, we figured that these were
12   essential.  But again, I wanted to make sure that the Court was
13   comfortable with paying with them -- or paying those.
14              Maybe Mr. Mazza can tell us if those are current or
15   not, because we still had some discussion during the time you
16   gave us.  And I don't know if we got final resolution on that.
17              THE COURT:  Well, counsel, as I said, had this been
18   done in the ordinary course, that would have been a request for
19   financing.  That would have been a proposed budget that the
20   parties would have agreed upon.  And I don't get to say well,
21   you can't pay this line item, that line item.  If the parties
22   are agreeable to a loan in a certain amount, and that this is
23   how the proceeds would be used.  We're going to pay payroll,
24   we're going to pay associated taxes, we're going to pay rent,
25   we're going to pay insurance.  We're going to pay all of the
```

1    ordinary things that you would pay post-petition when you got

2    financing.

3         So my comments with respect to paying the payroll,

4    was because that's all that was asked.  We are at a different

5    juncture now.  We are now at --

6         MR. ZAHRALDDIN:  Okay.

7         THE COURT:  We are going to get financing.  And this

8    is how we're proposing to use the proceeds of that.  And that's

9    why my question was okay, is everybody agreeable if there's

10   some financing, that this is what is going to get paid from the

11   financing, as identified by payroll -- I don't know if that

12   includes current taxes -- certain wage taxes and certain

13   building rent which came out to 302,000 Euros.  So the

14   financing --

15        MR. ZAHRALDDIN:  I think --

16        THE COURT:  Yes.  Go ahead.

17        MR. ZAHRALDDIN:  -- I can answer part of that from

18   our discussions.  So I think what the parties were able to

19   identify and agree that there was a payment that wasn't funded.

20   That was the -- that straddled the filing date for pre-petition

21   and post-petition.  And so certainly there is current rent

22   that's due.  And I don't know if that's the same for the wage

23   tax.  I would imagine it would be based upon the -- and counsel

24   can correct me.  I think it was around a $750,000 amount that

25   wasn't funded because of the uncertainty of the bankruptcy and

```
 1    the effect on the receiver.

 2            And so I would imagine that both the wage tax and the

 3    building rent could be safely considered current amounts that

 4    would be paid.  There may be some in the -- in arrears, but

 5    certainly it could be designated that those are being paid for

 6    current due amounts.  How much of that is pre-petition, and how

 7    much is it?  I'm not sure, because we wanted to get things

 8    reconciled.  But certainly, I think we would be comfortable in

 9    making that payment in that amount, based upon the larger

10    amount that hadn't been funded.  And again, not casting

11    anything on the other side, that's just simply something we

12    were able to come to terms on and confirm.

13            THE COURT:  Well, it seems to me that they were

14    amounts that the receiver did not get a budget or approval for,

15    in which you were saying straddled some time in between that

16    time period.  So clearly, no one would have paid them.  So --

17            MR. ZAHRALDDIN:  Oh, no.  They were in a budget.

18    They were approved, they just weren't paid because of the

19    bankruptcy being filed.

20            THE COURT:  Right.  So there's no --

21            MR. ZAHRALDDIN:  I'm certain of that.  There was a

22    draw and there was --

23            THE COURT:  So there's no aspersion to be cast on

24    anyone because if they filed bankruptcy no one was going to pay

25    them and this is where we are now.
```

1            MR. ZAHRALDDIN:  Understood.  I just wanted to make

2    sure you knew that they had been budgeted.  So that's why I

3    have some certainty that something is due.  And I thought the

4    parties at least agreed on that much.

5            THE COURT:  All right.  Mr. Mazza, you're agreeable

6    to this 302,000 Euros to be allocated; the 165 for immediate

7    payroll, and I don't know if that includes wage tax.  115 for

8    wage -- I'm assuming it's not, because there's a separate line

9    for wage taxes.  And then 22,000 Euros for building rent.  Is

10   everybody agreeable that that is the universe of what we're

11   talking about right now?

12           MR. MAZZA:  Your Honor, Mr. Mazza here.  That's

13   correct for this week, and just a little bit of additional

14   color on the wage tax was paid normally in arrears.  So if it's

15   not paid at the end of this week, at the end of the month, then

16   things would not be in good order in the Netherlands, such that

17   there's potential liability for E's & O's.  So it's the sort of

18   thing that you'd normally see in a first day wages motion that

19   would get paid.

20           And so it's my understanding is that it gets paid

21   every month on arrearage around that number.  So you'll see a

22   number for May, for example, of 108,000 as it relates to that

23   line item.  But yes, that aggregate for what needs to be done

24   this week is 302,519 Euros, and we agree.

25           THE COURT:  Okay.  So the controversy seems to be

1   who's going to fund that?  And I am not quite sure how anybody

2   thinks I'm going to select which one of these -- which option

3   is appropriate without some evidence?  I'm just not going to do

4   this on colloquy and it appears to me that all you guys have

5   agreed on is the number.  You haven't agreed upon who's

6   financing the payment.

7           And so Mr. Zahralddin has said that VSI can fund it

8   on an unsecured basis, and presumably as either a loan -- with

9   a loan to Stream with either payment going to Stream or

10  directly to the various parties, or Mr. Massa, your client can

11  fund it obviously with direct payments to -- well, I'm assuming

12  you guys are sending the money to the receiver and he was

13  making the payments.  But that may be a wrong assumption on my

14  part.

15          But typically, that's how you're going to track this.

16  You're going to send it to the party who's going to make the

17  payments, will get the money and then disperse the payments.

18  And so you're saying that your client has the immediate

19  ability, and the Debtor has only presumed information

20  for -- and I'm not quite sure why the Debtor is producing

21  anything, because it's VSI who's doing the funding.  I'm not

22  quite sure why they're not represented by counsel.  Mr. Rajan

23  is on both sides of this.  So I'm not quite sure how I even get

24  to that.

25          But be that as it may, how do I get to pick which one

1   of these is the most appropriate method for financing without

2   some evidence?  I can't just say, oh, yeah, counsel, you're

3   right.  You're not right.  I can't do that.  So I need some

4   evidence.  And if this had been done typically, even if this

5   was a typical, I want to do financing.  If the parties were in

6   agreement, they would make a record.  This is what we're doing.

7   This is the source.  This is how we're doing it, and counsel

8   would make a proffer on the parties, or either they agree or

9   they disagree.  If they disagree, then I'd have to take some

10  evidence.  If you agree, then the proffer is accepted.

11          Where we are is, the only thing the parties have

12  agreed upon, is the dollar number.  There is no agreement which

13  as to the source of the funding, which means I now have to take

14  some evidence to figure out which one of these I'm going to

15  pick?

16          MR. MAZZA:  Judge --

17          THE COURT:  And allow.  Yes.

18          MR. MAZZA:  Your Honor, If I may.  This is Jim Mazza

19  again.  This is Mr. Mazza again.  So you know, we gave the

20  Debtors a chance to come up with the funding here.  They've

21  created this unfortunate emergency.  We are where we are.  As I

22  said, we're on standby ready to fund.  We can put documentation

23  in and any evidence necessary for this funding to happen post

24  haste.  And we're happy to do that to move this forward.

25          And you know, we waited until just before the -- till

```
 1    4:00 to get the information from the Debtor regarding VSI, who

 2    was their funder, notwithstanding the issues that Your Honor

 3    has raised in connection with that relationship, and they're

 4    short.  So from our standpoint, we can provide proof of funding

 5    and a term sheet and any testimony that would be necessary.

 6            We're just in a tough spot because these debtors

 7    didn't run a debt financing process like most debtors would in

 8    these kinds of circumstances.  And so we're having to swoop in

 9    at the last minute to take care of this and preserve the

10    overall value here.  So that's where we are.  I'm not

11    complaining about it.  But we're ready to move swiftly and to

12    get this done.  And we've given them all the opportunity in the

13    world to try to do this.

14            MR. CALLAHAN:  Your Honor, this is Kevin Callahan.

15            THE COURT:  Wait a minute.  Wait, Mr. Callahan.  I

16    just have one quick question.  When is payroll due?

17            MR. MAZZA:  Yeah.  So my understanding it's due at

18    the end of the month, but with the way buyers have to work and

19    the like, wires need to get in by Wednesday at the latest so it

20    can be funded by the end of the week.  So that's the timetable

21    we're looking at, Your Honor.

22            THE COURT:  Okay.  Mr. Callahan, I'm sorry.  What was

23    your -- what were you going to say?

24            MR. CALLAHAN:  I've been quiet through most of this

25    in the earlier proceeding.  And I don't have much to add, other
```

1    than I think it's fair to say that the Court is not going to

2    hear the motions or not rule on the motions that were filed

3    previously, because neither of them asked for relief under what

4    I think is being proposed here now, and that would be a 363

5    motion along with a 354 financing.

6              THE COURT:  Um-hum.

7              MR. CALLAHAN:  We are not certain of who -- for

8    example, SeeCubic's and Hawk's offer.  We don't know anything

9    about the terms and conditions other than what they're

10   presented on the phone today.  I did receive a copy of the

11   lease projections as they appear, and I think the parties agree

12   that there are obligations of the Debtor going forward.  No

13   pre-petition obligations are being discussed now.  Post-

14   petition obligations that these -- this subsidiary has that

15   have to be paid.  Again, we don't know who will be making the

16   payments, who's offering to make the payments on whose behalf?

17             I don't have any objection presently.  Certainly we

18   could reserve -- the U.S. Trustee would reserve rights as to

19   whether those obligations are actually appropriate, necessary,

20   that would otherwise cause immediate and irreparable harm if

21   they weren't paid.  My concern is now with more -- and the

22   Court has already just raised this, Judge.  VSI has been

23   mentioned a lot.  In fact, it was mentioned in the motion.

24   There's a proposed distributorship agreement.

25             Certainly if VSI is proposing to lend money to the

1    Debtor, it has to fit within the requirements of 364.  I think

2    it's a real concern for our office as well as to who is

3    representing VSI.  No one has filed an entry of appearance on

4    their behalf, who was negotiating on behalf of VSI for these

5    terms.  I think I heard that there was a proposal for a four

6    percent loan.  We'd like to know who negotiated that, if the

7    Debtor looked elsewhere.  We certainly want the term sheet.  So

8    how is this done?

9            I don't think anyone can ask for relief today, Judge.

10   I think perhaps as soon as possible, but somebody has to put

11   something on the docket that shows exactly what they're

12   seeking, which would include either SeeCubic or the Debtor

13   filing appropriate motions, perhaps asking for expedited

14   consideration given the importance of having employees of a

15   subsidiary pay.  Motions also filed under 105, because it's not

16   the Debtors' employees.  But I think this has to be documented.

17           And as the Court just finished, and that's why I want

18   to add in, Judge, is there's been absolutely no evidence

19   demonstrated here today, in support of the motions, or of the

20   offer now of SeeCubic.  So I think we have to have a record.  I

21   think documents have to have been filed, and the opportunity

22   for parties to examine the transactions both between the Debtor

23   and VSI and of course, SeeCubic on their efforts to finance

24   this debtor.

25           THE COURT:  I understood that SeeCubic is proposing

1    to make the payments under the same terms and conditions that

2    had existed with the receiver.  What those are, I don't know,

3    but presumably the parties know.

4             MR. MAZZA:  Your Honor, Mr. Mazza, again.

5             MR. CALLAHAN:  Judge, nobody knows.

6             THE COURT:  Wait a minute.  One at a time.  One at a

7    time.

8             MR. CALLAHAN:  Since I last spoke, nobody knows.

9    It's not on the record.  Something has got to be --

10            MR. MAZZA:  Your Honor, it's not --

11            THE COURT:  Wait a minute.

12            MR. MAZZA:  Yeah, sorry.

13            THE COURT:  Wait a minute.  Wait a minute.  Mr.

14   Callahan, all I am saying --

15            MR. CALLAHAN:  It's not been introduced -- I'm sorry,

16   Your Honor.

17            THE COURT:  Counsel.  All I am saying that Mr. Mazza

18   stated on the record, that the terms and conditions that were

19   being proposed, were the same terms and condition that existed

20   when the financing or the monies were paid through the

21   receiver.  What those are, you are right, I don't know.  Other

22   parties may not know, but presumably the Debtor and SeeCubic

23   know, because they participated in the receivership.

24            And that's all I was saying is that that's why I

25   understood the terms and conditions would be, but the precise

1    information as to the amount, the interest -- yes, there is no

2    record of that.  But I understood that that's what they were

3    proposing and when the parties we're discussing they knew what

4    they were talking about, not the rest of us.  So that's all I'm

5    saying.

6             MR. MAZZA:  Your Honor, if I may.  Mr. Mazza again.

7    And you're spot on there.  I just want to make another quick

8    note.  We did in our objection, include the note that had been

9    previously funded, so it would be on those terms.  So they said

10   that that Exhibit 8 or our objection could be taken into the

11   record, then those terms and conditions would be what we're

12   talking about.  And so we look at what we filed to be sort of a

13   classic kind of competing gift that you would see if you had a

14   creditors committee in a case.  And so we're in kind of a

15   difficult spot because we've had a debtor who wouldn't really

16   negotiate with us.

17            And while we toyed with the idea of filing a motion

18   for a involuntary DIP, the normal way we would see it is a

19   competing proposal gets put in, when a debtor doesn't have a

20   way of actually financing things, which we've given them a

21   chance to try to figure out.  They did file a raft of pleadings

22   on Friday that we had to spend a bunch of time to deal with.

23            But where we are right now is if it's necessary for

24   us to put in motion papers that would include the terms of that

25   note, we're more than happy to do so and would ask Your Honor

1  to have a hearing on that quickly, so that we can deal with the

2  timetable I've laid out earlier and would be -- you know, put

3  on the necessary evidence to get that documented.  But I think

4  that's how we saw things.

5            And unfortunately, you know, not a perfect situation.

6  But that's how we got to where we currently are.  And again, we

7  didn't know until 3:57 this afternoon that the Debtor was not

8  going to be able to fund this through its related entity, VSI,

9  to begin with, so.

10           THE COURT:  Well, they're proposing, but you believe

11  that the documentation to date does not -- the documentation

12  provided to you does not indicate that there's sufficient funds

13  to fund the entire amount?

14           MR. MAZZA:  That's right.  Correct, Your Honor.

15           THE COURT:  Right, and the promissory note attached

16  as Exhibit A, is a senior promissory note.  Is that a

17  promissory note that was executed each month, or was it a total

18  number and then you just drew down on that?  I don't know.  I'm

19  just looking at -- I don't know.

20           MR. MAZZA:  Great question, Your Honor.  I believe

21  that there were draws on it.  And so there was a total number

22  and then draws would come in periodically that would be signed

23  off on when there was -- this was operating under the

24  receiver's tutelage.  And those I believe were also signed off

25  on by the -- Mr. Rajan and Mr. Stastney at the time, as well,

1    based on how the receiver ran things during that period.

2           THE COURT:  And what -- I guess the question is, what

3    is the status of that promissory note?  Did it go away?  Did

4    it -- does it still exist?  I'm just asking.  I'm just thinking

5    off the top of my head.

6           MR. MAZZA:  Is there any powder left in it, is the

7    question?  Boy, if there were and if that could provide a

8    commercial solution to that, that would be great.  But let me

9    see if anybody knows.  Because I don't know off the top --

10          MS. WESTBROOK:  Jim, this is Margaret Westbrook with

11   K&L Gates.  You stated that correctly that there were draws

12   under it.  It was a -- it was set up Your Honor, to fund the

13   business operation of STV while the trial was pending.  The

14   receiver had both directors sign off on that; Mathu Rajan and

15   Mr. Stastney.

16          Because of the dispute in the Netherlands, he was

17   unable to tell who was in charge of the entity.  So he had both

18   of them sign on to it.  The head of STV would work with the

19   receiver, they would draw down those amounts.  We could amend

20   that very easily it seems to increase the amount of

21   availability to stretch that through the end of May if Your

22   Honor thought that was an appropriate way to handle it.

23          THE COURT:  Well, I was just trying to figure out if

24   it still was there and was there funds available.  I mean, the

25   promissory note just didn't go away, did it?

1         MR. MAZZA:  No, it didn't, Your Honor.

2         MS. WESTBROOK:  No, Your Honor.  It's an unsecured

3    note.  And for the subsidiary, I just -- I think that it was

4    fairly close to the funding amount -- full funding amount

5    because of the trial date being so close by, but we could get

6    you that information.  And then in the event there needed to be

7    some additional availability on it, that would be an easy way

8    to just increase that amount.

9         THE COURT:  Well, the issue is that this promissory

10   note is between SeeCubic and the actual entity.  And I'm not

11   quite sure -- if it was directly between the parties, what does

12   that have to do with this bankruptcy?

13        MR. MAZZA:  That's a great question, Your Honor.

14        THE COURT:  I don't know.

15        MS. WESTBROOK:  Well, and Your Honor, we thought you

16   reserved some of those rights, you know, in determination from

17   the May 22nd hearing, so --

18        THE COURT:  Right.  I'm not --

19        MS. WESTBROOK:  -- we were a little bit hesitant to

20   fund under that note without disclosing any of that.

21        MR. MAZZA:  Exactly.  And maybe one way to look at it

22   is, given how we've discussed these issues in a previous

23   hearing with Your Honor, getting some kind of comfort -- so

24   Your Honor does comfort orders about funding a non-debtor.  And

25   I've been in front of judges that have given me grief for

1  asking for those kinds of orders before, and I get it, because

2  it's outside of the bankruptcy court.

3          We're just, we want to make sure that entity gets

4  funded, and want to be part of full disclosure on whatever that

5  funding is going to look like.  But if we don't need an order

6  from Your Honor, then that's one way to potentially deal with

7  it.  I think, given the issues related to disputes in the

8  Netherlands, and just the cloud over these cases to begin with,

9  having some direction from Your Honor in that respect, could be

10  helpful.

11          We don't have the receiver anymore.  And not having

12  the receiver in there to sort of broker the funding has kind of

13  created this issue.  I am informed in the meantime, that there

14  is about over $1 million that's been unfunded so far in that

15  note, so if that could be made available through a mechanism

16  that parties could agree upon here, then that would solve the

17  issues that we've been banging our heads against the wall on

18  here, that we're all trying to do the right thing.  So --

19          THE COURT:  Well, I understand that the Debtor wants

20  to do this funding.  And I haven't heard why, except that they

21  want VSI to do it, because I guess there's some relationship

22  there through I don't know subscription, or proposed sales.

23  I'm not quite sure.  But what I haven't heard from the Debtor,

24  and that's what number one, is why is the Debtor funding this?

25  The Debtor would have to make the -- and that's what I'm

1   saying.

2          None of -- these aren't the Debtors -- other than

3   wanting to fund the -- I guess the rehiring because that's what

4   I'm going to -- and I don't want anybody to say that I'm saying

5   that -- but that's the term I'm using with respect to the

6   employees of Stream, who are no longer employed because Stream

7   has no money to authorize this.  I can understand the request

8   for this Court to authorize and come to this Court to say we

9   want to fund the rehiring of the former Stream employees, and

10  we need to be able to do that because this is not -- it's not

11  ordinary because at the time, we didn't have any employees, and

12  we want to now fund to rehire them and we want to -- I get that

13  portion, which we're not dealing with today.

14          But what no one has explained to me is why is the

15  Debtor requesting that I approve wages for non-debtor

16  employees?  I get the Debtor has interest in all the companies,

17  but I'm not understanding why this is of the Debtors' business

18  who funds its employee -- I get that it's an issue, because

19  there's a dispute as to who has the ownership, who has what.

20          I get all about the conversion agreement and all this

21  other stuff that the pending actions in Delaware.  I get all of

22  that dispute.  But for my purposes, I'm not understanding what

23  does that have to do with this?  Is the Debtor obligated to

24  fund this?  I haven't heard anything.  Now, if the Debtor is

25  obligated, and I haven't seen anything that told me why they

1   were obligated.  Maybe I missed it.

2          MR. ZAHRALDDIN:  Your Honor, the Debtor has

3   traditionally and is obligated as the owners.  I know that

4   there is a dispute.  Okay.  So let's just respect that there's

5   a more than colorful claim that the Debtor through several

6   orders from the Vice Chancellor following the Delaware Supreme

7   Court opinion that we own the stock in Technovative, which was

8   set up as the holding company.  It's not -- you know, Stream is

9   the operating company, that's the holding company.  And then

10  other operations for tax purposes and otherwise, were placed

11  into other countries, including in the Far East, as well as in

12  the Netherlands.

13         So there has been prior to the company getting blown

14  up by the private foreclosure attempts, that's the way that

15  things ran.  There is a history of money coming through Stream,

16  and intercompany loans back and forth through Stream for quite

17  some time.  I can't remember off top of my head what the number

18  is on the funding that's gone through Stream to the

19  Netherlands.  But it's fairly significant, probably somewhere

20  in the neighborhood of 85 million or 80 million, but I'd have

21  to look at the documents to confirm that.

22         So that traditionally, that is what happened.  The

23  Netherlands had a couple of projects, which were bringing some

24  income, but they did not exist other than as an operating arm

25  of Stream.  And that's why they're important.  That's why we

1   brought up the things we believe were in the ordinary course.

2   These are things that would have traditionally been done by

3   them.

4          So in addition to we believe we are obligated to pay

5   for their operations as the wholly owned.  And again, I know

6   that there are entities in between.  Those were put there for

7   tax reasons.  But we own those entities too.  That's one of the

8   reasons.  The other is that the intellectual property, which

9   was the subject of the Delaware Supreme Court opinion, and

10  which was the main issue in terms of the charter and not

11  transferring any of those valuable intellectual property

12  without getting a preferred shareholder vote, those are all

13  issues that make this crucial, critical to the success of the

14  Debtor on a go forward basis.

15         It'll just cause delays and more time.  There are

16  some assets in Stream.  There are other complementary assets

17  and technologies in VSI.  That's one of the reasons they want

18  to try to get together and work on this.  But I will say that

19  if there aren't -- there are very valuable assets in the

20  Netherlands.  And that's why the Debtor wants to protect them.

21         THE COURT:  I get that.  But counsel, you need to

22  tell me where, what document, what are the written obligations

23  does the Debtor have to fund these companies?  You're saying

24  that -- and at the time of the bankruptcy filing, they weren't

25  doing that.  Someone else was.  So at least as of when the

1   receiver was appointed, I understand in November of 2020,

2   October, November 2022, the Debtor was no longer funding those

3   operations and that they were being done SeeCubic.  So first of

4   all, you said --

5           MR. ZAHRALDDIN:  But Your Honor, that was being done

6   by SeeCubic almost in lieu of a bond.  In essence, SeeCubic

7   had --

8           THE COURT:  Counsel, I'm not -- counsel.  I'm not

9   saying it was a bond, it was anything.  I'm not -- no, I'm not.

10          MR. ZAHRALDDIN:  Okay.

11          THE COURT:  The facts are that there was a promissory

12  note, a senior promissory note, and SeeCubic was paying.  And

13  you're saying well, it was traditional, it was history.  That

14  may be all well and good, but where was the obligation, written

15  obligation for Stream to fund these operations?  I get that

16  they want to protect their interests.  When I say they, I mean

17  Stream, and not VSI.  Stream wants to protect its interest in

18  what it believes is a valuable downline company that's owned by

19  a subsidiary or -- I don't know if it's a wholly owned, I don't

20  remember the chart.

21          But I do know that if this was done in the ordinary

22  course, done in an ordinary fashion, the first thing that would

23  have happened is the Debtor would come in and say, we need

24  a -- we need financing, because we have an obligation to fund

25  these things.  And this is the basis for our obligation.  And

1   therefore, we've traditionally whatever we've done this, and

2   therefore we want to continue to do this.  And we're proposing

3   to do this.  Originally, we're proposing by selling shares in

4   the Debtor, which, you know, even when you say Netflix.

5   Netflix wasn't in bankruptcy, as far as I can recall.  Maybe

6   they were when they did the series financing.

7           We're talking about debtors in bankruptcy looking to

8   sell shares to a related entity owned by somebody who's on both

9   sides of the transaction, now proposing to finance -- and I

10  don't know who's negotiating with who.  Because it's still

11  whose interest is being protected?  I don't know.  I mean,

12  these are Delaware corporations, are they not?  Or am I missing

13  something?

14          You know, you have a duty of -- it's been a long time

15  since I took the Delaware bar, but I know there's loyalty care

16  and something else, that you're supposed to be exercising, and

17  I'm not sure how you get there when there's the same person on

18  both sides, whether he's talking to other people or not, you're

19  not talking to the other people.  He's talking to himself.

20  Right, he may be going out and discussing with other people,

21  but ultimately, how do we know it's a good deal if he's on this

22  side and on the other side?

23          But putting that aside, I don't know, one, whether

24  debtor has an obligation to make these -- the finances to.  And

25  even as a debtor has an obligation, whether the Debtors'

```
 1   proposal one, is sufficient, and two, is the better of the deal

 2   that's being proposed.  So --

 3            MR. ZAHRALDDIN:  Well, Your Honor --

 4            THE COURT:  All that being said -- um-hum?

 5            MR. ZAHRALDDIN:  We will have the funding by as early

 6   as tomorrow.  And again, we're not -- I know we're not talking

 7   about general DIP financing for everything.  But the issue that

 8   we had is we knew it was going to be a contested DIP.  We

 9   didn't want to spend the resources there.  We had another means

10   of financing, which we put in front of Your Honor.

11            I appreciate and we hear you loud and clear that it

12   shouldn't have been done on the expedited basis that we did,

13   and that you'd have some concerns with that.  But we've kind of

14   been in a very unique situation as a debtor whose assets were

15   stripped from it and then were not returned for over a year to

16   us.

17            THE COURT:  Counsel, that's neither here nor there.

18            MR. ZAHRALDDIN:  So --

19            THE COURT:  As of the bankruptcy filing, the Debtor

20   knew what the Debtor needed.  And all of this what happened in

21   the past, that's the past.  We are where we are today.  And all

22   of this strips and -- you guys are going to have -- this is all

23   going to get sorted out.

24            MR. ZAHRALDDIN:  Okay.

25            THE COURT:  Whether they are a secured creditor or
```

```
 1   not is up for debate.  I don't -- but that's not the issue for

 2   me today.  The issue for me today is one, is funding -- the

 3   funding is clearly needed to maintain a substantial asset of

 4   the Debtor.

 5          MR. ZAHRALDDIN:  Okay.

 6          THE COURT:  And the question becomes is who gets to

 7   finance that?  Does the Debtor have an obligation to do that,

 8   or the Debtor just wants to do that?  But the Debtor doesn't

 9   have an obligation.  I'm not quite sure why you're here asking

10   me to approve something that you don't have an obligation.  And

11   I don't know, because I haven't seen anything.

12          And nor does the motion say, you know, the motion is

13   written as if these are employees of the Debtor.

14   Notwithstanding that it may say that they're the employees of

15   the Dutch -- of the company in the Netherlands.  It doesn't

16   matter.  But the effect is the same as if the Debtor is funding

17   payment of its employee payroll.

18          MR. ZAHRALDDIN:  Yes, ma'am.  And I can tell you that

19   historically, through promissory notes, the Netherlands never

20   made enough money to make their payroll.  So they were funded

21   from the very beginning, almost entirely by the Debtors.  And

22   again, there's an intervening period where the assets were

23   stripped and all the liabilities were left with Stream without

24   any assets, by the -- you know, the negotiated settlement that

25   was then voided.
```

1        But yes, we believe that there is -- that that's the

2   practice, and I will confirm it, but I'm almost positive that

3   that's what we got from our Dutch lawyers was that yes, this is

4   an obligation.  But I will have to confirm that.

5        THE COURT:  Well, that's fine and well, but nobody,

6   but --

7        MR. ZAHRALDDIN:  I understand that, Your Honor.  Let

8   me ask you if we can indulge in a request from you.  As you

9   said, you're going to need to do an evidentiary hearing.  Is it

10  possible, and do you have time if we prepare the proper motion

11  tonight on financing and put in the -- and attach evidence and

12  have an evidentiary hearing tomorrow?  And then I assume that

13  the other side will want to do the same thing.  Would you have

14  time to hear us tomorrow in the afternoon?

15       THE COURT:  This is the problem, counsel.  I have a

16  family's funeral tomorrow at 12:30.

17       MR. ZAHRALDDIN:  I'm sorry, Your Honor.

18       THE COURT:  And so I anticipated that I would be back

19  by 2:00 and I don't even know because I'm not going to

20  everything.  12:30, 1:00, probably home by 2.  And that means

21  that I would go -- and I have to make arrangements for my 3:00

22  obligation.  I can take care of that.  So we would be talking

23  about doing this at 2:00 tomorrow.

24       There's another wrinkle that I have to -- I have a

25  doctor -- I have to go to the doctors for a quick injection.

1   So I got to figure that out.  That's tomorrow morning.  But

2   things I needed to do today, I didn't get to do to prepare for

3   that, because I had this hearing.  So I have to sort of juggle

4   my schedule a little bit.

5          I'm going to try to push off that until Wednesday,

6   which would give me all of the afternoon tomorrow.  So the

7   earliest I can hear that is 2:00 tomorrow.  That would be a

8   Zoom hearing.

9          MR. ZAHRALDDIN:  Okay.

10         THE COURT:  And we'd have to do it by Zoom.  The

11  parties would have to exchange by noon all the documents that

12  they intend to introduce, send that to my ESR so that he could

13  bring them up.

14         MR. ZAHRALDDIN:  Okay.

15         THE COURT:  So Mr. Callahan, they want to file a

16  motion.  Give notice to everyone.  I mean, we're talking

17  overnight here.  There are -- and I don't look at the

18  schedules.  I don't know are there numerous creditors involved?

19  Are all the creditors or all the people who have a stake in

20  this are on this call?

21         MR. MAZZA:  Join the party.

22         MR. CALLAHAN:  Judge, there are creditors.  They have

23  not participated to date, but I do know, representative

24  Rembrandt has appeared before.  But there are other creditors.

25         THE COURT:  Are any of the parties -- are they the

1  party who appeared and said they had an issue with the -- they

2  own the license?  Is that the party?

3          MR. ZAHRALDDIN:  Yes, ma'am.  They're the ones who

4  have a -- there's a license and they don't want any of the

5  assets transferred because they have a license with the

6  Debtor --

7          THE COURT:  Well, I have a little problem, because

8  counsel -- and I was going to discuss this.  I did see in the

9  filing that there was some text messages, stating that I said

10  for somebody to turn things over to -- turn over the equipment

11  or whatever it is that dispute.  I want to reiterate for the

12  record, no one is to turn over anything, obtain anything, say

13  that payment is contingent over turning over.  None of that.  I

14  don't know if their -- the text messages are out of context, I

15  don't know what they said, I'm just putting again on the

16  record.

17          This Court has not, is not at this time telling

18  anyone to turn over anything.  And to the extent someone is

19  representing that I'm saying that, again, been brought to the

20  attention in the filing, don't know the whole context.  Just

21  want to put it back on the record.  No one is turning over

22  anything to anyone.  No payroll payments are contingent on

23  turning over anything.  We are maintaining the status quo.

24  Okay?

25          MR. ZAHRALDDIN:  Yes, ma'am.  We understand that

1  fully.  And to the extent that anything like that's happening,

2  I will make sure it stops.  But our understanding and our

3  commitment was to get the information on adequate protection

4  over to the other side on the equipment.  And then if we were

5  unable to get to a resolution, to seek the help of one of your

6  colleagues on an expedited basis in order to resolve that

7  issue.

8          We are not doing anything else.  And again, I also

9  uncoupled and we're not conditioning.  Our only concern with

10 the employee payments was we just want to make sure that the

11 employees are going to be working because we don't know what

12 else they're doing.  But again, we understand the exigency

13 here.  And that's loud and clear to me, and certainly I will

14 deliver that message to our client.

15         THE COURT:  So counsel, tomorrow.  Well, I'm going to

16 expect -- so you're going to have to get this done, served on

17 everybody tomorrow.  Rembrandt, I know there was something

18 those parties.

19         And Mr. Callahan, is there any other creditor whose

20 reached out to the U.S. Trustee that you concerned about having

21 notice?

22         MR. CALLAHAN:  Judge, there are other creditors,

23 that's all I can say.  They have not participated to date.

24         THE COURT:  Right.

25         MR. ZAHRALDDIN:  Your Honor, I think every -- I think

1    we're serving out everyone.  We can serve out the 100 and so

2    creditors through BMC if Your Honor would like us to do so or

3    we can serve the top 20 as we've done in the past for something

4    that's broad for anyone who hasn't filed the 2002 notice of

5    appearance.

6         THE COURT:  I think at this point, we only need the

7    top 20.

8         MR. ZAHRALDDIN:  Okay.

9         THE COURT:  Because -- and that would include

10   Rembrandt, because this is unsecured financing that we're

11   talking about.

12        MR. CALLAHAN:  Judge, may I just interject.  I think

13   it would be an interim use of any loan proceeds.  So that would

14   have to be -- well, one, it's on an expedited basis.  And

15   secondly, it would be a final order.  So presumably the Court

16   would -- if the Court is okay with the loan proposal, and how

17   the proceeds will be distributed, then it would only be to

18   those expenses necessary over the next 10 or 15 days, with a

19   final order to be entered at a later date to cover either the

20   end of the next month or any longer than that.  So we

21   do -- those 20 largest should be sufficient to at least review

22   it on an interim basis.

23        THE COURT:  Right.  And that's not unusual when you

24   have expedited financing requests to limit it to the top 20.

25        MR. CALLAHAN:  Yes, Your Honor.

1          THE COURT:  Particularly since this is for what I'm

2    going to call administrative expenses that have to be paid no

3    matter what.  And unsecured creditors are not going to get paid

4    before you start.  They're not priming them or doing anything

5    because they would get paid first in any event.  So I'm not

6    concerned if it's just the top 20 which presumably they're

7    doing anyway.  So you need to be prepared to tell me one, Your

8    Honor, why the Debtor is obligated to make -- to fund these

9    obligations.

10          And more importantly, why the Debtor should have --

11    because there are two sources who are proposing to fund this on

12    behalf of this debtor.  And why is VSI as opposed to SeeCubic?

13    And that's going to be the real issue.  Because you're going to

14    have to tell me where the money is there, why this is a better

15    deal for the Debtor because they think the Debtor is obligated

16    to do so.  And I'm going to be particularly concerned because

17    VSI is a related entity.  And maybe they have this, I guess

18    from the Debtor's perspective, they have a -- they agree that

19    they all, you know, on the same page, as opposed to SeeCubic

20    who has its own claims to do that.

21          At the end of the day, only one of these parties are

22    going to end up with this asset.  I don't know which one it is.

23    But that's not for today.  It's not for financing.  It's not

24    for any of these things.  It's simply to protect an asset that

25    the Debtor claims an interest in, and that SeeCubic -- and it

1    benefits no one to have this lost or destroyed.  And so at the

2    end of the day, I get what the parties want to do.  Get the

3    emergency motion filed.

4              Mr. Zahralddin, when you send out the notice, put the

5    date that it is to be heard, which is tomorrow at 2 p.m.

6              John, I know that you're way past your time.  Can you

7    set up the Zoom information that needs to be included in the

8    notice?  Do you have time to do that?

9              THE CLERK:  Yeah, 2:00 tomorrow?

10             THE COURT:  2 p.m. tomorrow.  Zoom information that

11   needs to be included in the notice.  The deadline for

12   exchanging all of the -- I'm sorry, you guys are going to

13   have -- you know, you're going to have a nice -- great night

14   doing this, which is I'm glad I don't practice anymore.  But

15   unfortunately, you're going to have -- you know, it is what it

16   is.  I don't know what to tell you.

17             And at the end of the day, to the extent that the

18   parties' agreements provided that the Debtor claim for this.  I

19   don't know what your agreement says.  It's going to cost

20   somebody for this.  And in any event, I want by 12 noon

21   tomorrow, all of the exhibits, a list of witnesses.  You know,

22   this is going to be a fire drill, but I don't know what to tell

23   you.  To put a list of -- this is what I need by 12.  And it's

24   going to be in -- John, can we share a Zoom scheduling order

25   with debtor's counsel.  So we can tell them to look for one in

1  one of the cases.

2        THE CLERK:  Oh, you mean look -- you want to follow

3  with the template?

4        THE COURT:  Yes, there's a template so that they can

5  put the hearing is on this day, visiting witnesses are to be by

6  12 noon tomorrow.  The list of witnesses, exhibits provided to

7  you, blah, blah, blah.  And the Zoom information.  That's

8  typically on that, right?  Is it typically on that notice?

9        THE CLERK:  Yeah, I mean, all the -- everything I

10  guess, besides the link, you know what I mean?  Like the actual

11  link and the passcode.  That wouldn't be normally on the order

12  itself, that's usually just by email.  But, I mean, we can work

13  it out.  We'll get it all together.

14        THE COURT:   Yes, just give that so it's all --

15  because we don't have the luxury of having weeks to do this.

16  So counsel for debtor, you are going to file your emergency

17  motions serving on the top 20 creditors.  You -- with a notice

18  that accompanies this.  You are going to put on that -- it's a

19  Zoom scheduling order.  It's called something else, but

20  effectively, that's what it is.  You notice the parties that

21  we're going to have a hearing and put the motion in, the time.

22  And then you're going to include in this one, you're going to

23  add, if you want to attend, you can participate by the Zoom,

24  and you're going to give them the Zoom link and the password.

25        And then you're going to add, I think there's a

1   paragraph that says, any documents, witness list, typically

2   it's one week before, but it's going to be 12 noon tomorrow.

3   And that's only for the primary direct case.  Clearly, you

4   don't know what you need for rebuttal.  But you know, so if

5   it's a -- if you know there's some rebuttal that you may want

6   to use, you should identify that.  And then by 12 noon

7   tomorrow, you send to Ms. Godfrey those documents with -- that

8   has the witness list, the list of all documents, which she will

9   then share with the ESR.  I don't see them till the trial.  So

10  do not send any copy to me, because I'm not going to look at

11  it.

12        MR. ZAHRALDDIN:  Okay.

13        THE COURT:  And we'll proceed accordingly.  So you

14  need -- what will happen is, John, you can put up that

15  information, email it to debtors -- email it to all the parties

16  so they will have the Zoom link.  But I want it in the notice.

17  And then 2:00 tomorrow is --

18        THE CLERK:  Okay.

19        THE COURT:  -- scheduled for that time.  And then I

20  will move from the bench based on the evidence and the

21  testimony that I hear whether this is going to be funded by

22  VSI, or whether it's going to be -- well, first of all,

23  nobody's arguing that it shouldn't be funded.  And so the

24  question for me is one, is it the Debtors' obligation, and to

25  the extent it is, then the Debtor is proposing VSI.  The other

1   interested party creditors are saying we believe that this is a

2   better alternative for financing, I choose between the two of

3   them.  The other issue is that the Debtor is not obligated,

4   then I'm not quite sure how I get involved in this.  So that's

5   what I'm going to be looking for.  Okay?

6          MR. ZAHRALDDIN:  Okay.  Thank you, Your Honor.

7          MR. MAZZA:  Your Honor, may I speak?

8          THE COURT:  Yes.

9          MR. MAZZA:  Yeah, Mr. Mazza here.  And thank you for

10  the helpful commentary there, Your Honor.  Just a couple of

11  things on the SeeCubic side.  As far as styling this, I'm not

12  asking for advice, I'm just going to explain to you how we're

13  going to approach this, given how you have laid out the

14  requirements of debtors' counsel.  We have the competing

15  proposal.  We'll put in papers, again, tonight.  It would be

16  directly to the Dutch entity, which would not be a debtor, but

17  just in full disclosure of how that would be set up, we'll lay

18  that out in papers.

19          I'm going to call it a comfort order.  You may have

20  issues with that.  You can if you want, tell me now if you want

21  to, or tomorrow, but we want to make sure we're fully putting

22  out there what we're willing to do so that this will be handled

23  one way or the other tomorrow, and then maybe the Debtor is

24  going to be able to come up with something that's going to make

25  sense.  We have our doubts, but we'll see.  So that's how

```
 1    we'll --

 2           THE COURT:  Well, counsel, what I'm anticipating from

 3    your client, is that if I find that this is the Debtors'

 4    obligation, you are proposing to fund it, correct?  And if it

 5    is not the Debtors' obligation, you are proposing to just pay

 6    it directly, correct?

 7           MR. MAZZA:  I think we would propose to pay directly

 8    in either scenario, but if Your Honor would prefer, that if you

 9    do find the Debtors obligation, which I don't think they have a

10    contractual obligation to fund.  I think it's just to preserve

11    the value of that subsidiary is really -- it's really a

12    fiduciary obligation, if you will, for the overall benefit of

13    things.  Hopefully, I didn't give them the answer to the test

14    there.  But in any event, I think we would still want to fund

15    directly, but however Your Honor wants --

16           THE COURT:  Yes.

17           MR. MAZZA:  -- to draw it up.  We just want to make

18    sure that this does not go neglected for any further time.

19           THE COURT:  Counsel, when I say fund directly, I

20    wasn't talking about how the payments were going to be made.

21    When I said fund directly, I meant without the Debtors'

22    involvement, and --

23           MR. MAZZA:  Right.

24           THE COURT:  -- through the promissory notes that you

25    say has approximately a million Euros still unfunded.
```

1              MR. MAZZA:  Right.

2              THE COURT:  That's right.  So if I find it's the

3    Debtors' obligation, what I have to make a choice is either VSI

4    or SeeCubic.  How that gets paid, maybe that's a different

5    issue.  So that's issue number one.

6              MR. MAZZA:  Agreed.

7              THE COURT:  If it's not the Debtors' obligation, then

8    your proposal is that you just proceed under the existing

9    senior promissory note.  And then I would have to make that

10   finding, and it wouldn't be a comfort order.  It would say

11   debtors are obligated, therefore, they can seek funding from

12   VSI or SeeCubic.  I'd pick one of them.  If I say that the

13   Debtor is not obligated, and the parties can deal directly with

14   the entity in the Netherlands, then I would say that.  It's not

15   going to be a -- this is my finding.  So whether you call that

16   a comfort order, but it's going to directly say which one of

17   these apply.

18             MR. MAZZA:  That makes a lot of sense, Your Honor.

19   One thing just to anticipate if it ends up in that last

20   scenario, given the dispute about directorship in the

21   Netherlands, there may have to be an agreement amongst the

22   parties that is similar to what was dealt with in the receiver

23   that everyone signs off.  We'll cross that bridge if we come to

24   it.  I just don't want to necessarily run into the dispute over

25   directorship that would throw more of a fly in the ointment

1   tomorrow, if we get through everything else.  So I just want to

2   anticipate that --

3              THE COURT:  Well, then counsel, what I would likely

4   say is because there is a dispute as to the Debtors, and who is

5   the director and who can authorize it.  I would say both

6   parties sign off on this because I'm not finding it's an

7   obligation, but the Debtor has some interest, so everybody

8   signs.  I think that's the way -- assuming that I find that

9   way.  Because I'm not saying that I will.  I don't know what

10  the documents will say.

11             You know, I could find that it's the Debtors'

12  obligation.  And then I'll say one of you do it and it'll be

13  financing pursuant to the Debtors' request.  You're saying if

14  it is, we want to finance.  We don't believe it is, we should

15  be able to do it directly, but because the Debtors disputing

16  our ability to do it, we want the Debtors to sign on.  And I

17  will be able to authorize that.  Okay?

18             MR. MAZZA:  All right.  Thank you, Your Honor.

19  Thanks for indulging my question.

20             THE COURT:  Anybody have anything else with respect

21  to before we end for tonight?  Anything that I think they will

22  need for the group for tomorrow?

23             MR. CALLAHAN:  I think we have our homework, Your

24  Honor.  Thank you.

25             THE COURT:  Oh, well.  Have fun.  That concludes the

1   matters that are scheduled before the Court today.  Court is

2   adjourned until tomorrow at 10:30.  Thank you.

3        (Proceedings adjourned)

4

5

6

7

8                        C E R T I F I C A T E

9

10        I hereby certify that the foregoing is a true and

11   correct transcript from the electronic sound recording of the

12   proceedings in the above-entitled matter.

13

14

15

16      /s/
        _____
        John Buckley, CET-623
17      Digital Court Proofreader

18

19

20

21

22

23

24

25