UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

```
                                          :
 IN RE:                                   : Case No.  23-10764
                                          :            23-10763
 STREAM TV NETWORKS, INC.   CH: 11 :
                                          : Philadelphia, Pennsylvania
 A) Motion To Approve Debtors'            : April 25, 2023
 Expedited Motion For Authority To : 3:12 p.m.
 Take Certain Actions In the              :
 Ordinary Course Of Business Filed :
 By Stream Tv Networks, Inc.,             :
 Technovative Media, Inc.                 :
 Represented By Rafael X.                 :
 Zahralddin                               :
 . . . . . . . . . . . . . . . . . .
```

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                    Rafael X. Zahralddin, Esq.
                                   Karen Poppel, Esq.
                                   Lewis Brisbois
                                   500 Delaware Avenue, Suite 700
                                   Wilmington, DE 19801
                                   302-985-6004

                                   Bennett G. Fisher, Esq.
                                   Lewis Brisbois Bisgaard & Smith
                                   24 Greenway Plaza, Suite 1400
                                   Houston, TX 77046
                                   346-241-0495

                                   Vincent F. Alexander, Esq.
                                   Lewis Brisbois Bisgaard & Smith
                                   110 SE 6th Street, Suite 2600
                                   Fort Lauderdale, FL 33301
                                   954-728-1280

For SeeCubic:                      James J. Mazza, Jr., Esq.
                                   Skadden Arps Slate Meagher &
                                   Flom, LLP
                                   155 North Wacker Drive
                                   Chicago, IL 60606-1720

Marley Ann Brumme, Esq.
Eben P. Colby, Esq.
Skadden Arps Slate Meagher &
Flom, LLP
500 Boylston Street, 23rd Floor
Boston, MA 021116
617-573-4800

For Hawk Investment Holdings Ltd:

Steven Caponi, Esq.
K&L Gates
600 N. King Street, Suite 901
Wilmington, DE 19801
302-416-7080

Aaron Rothman, Esq.
Margaret R. Westbrook, Esq.
K&L Gates LLP
300 South Tryon Street
Suite 1000
Charlotte, NC 28202
704-331-7400

Jonanthan N. Edel, Esq.
300 South Tyron Street
Suite 1000
Charlotte, NC 28202

For the United States Trustee:

Kevin P. Callahan, Esq.
Office of The United States
Trustee
Robert N.C. Nix Federal
Building
900 Market Street, Suite 320
Philadelphia, PA 19107
202-934-4154

For SLS Holding VI, LLC:

Brittany Ogden, Esq.
Quarles & Brady
33 East Main Street
Suite 500
Post Office Box 2038
Madison, WI 53701
608-257-7181`

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **WITNESSES:** | | | | |
| Mathu Rajan | | | | |
| (By Mr. Alexander) | 20 | | 124/138 | |
| (By Mr. Caponi) | | 68 | | 137 |
| (By Mr. Callahan) | | 110 | | |
| Shadron Stastney | | | | |
| (By Mr. Colby) | 158 | | 200 | |
| (By Mr. Alexander) | | 187 | | |

APRIL 25, 2023

THE COURT:  All right.  I apologize for the technical difficulties.  So this is the Stream TV Network, Inc. and Technovative Media.  We have one -- four matters that are listed for today.  One is a motion to approve -- to approve interim and final order authorizing debtor to obtain post-petition unsecured financing.  B is motion to approve SeeCubic's motion and the alternative for entry of an order approving the emergency funding; C, motion to approve Debtor's expedited motion for authority to take certain actions in the ordinary course; and D, motion to improve employees' obligations.  All right.

Counsel for the Debtor.

I think everybody's on mute, John?

MR. ALEXANDER:  Good afternoon, Your Honor.  Can you hear me?

THE COURT:  Yes.

MR. ALEXANDER:  Vincent Alexander of Lewis Brisbois, Bisgaard, and Smith, on behalf of the Debtors.  As counsel joined is Rafael Zahralddin and Bennett Fisher.

THE COURT:  And who else?  I see -- who was the other counsel you said, counsel?

MR. ALEXANDER:  Bennett Fisher.

THE COURT:  Okay, for the Debtors.

Anyone else here for the Debtors?

MR. ALEXANDER:  Your Honor, we also have our paralegals on the Zoom -- Candace Russell (phonetic) and Christina Freeman (phonetic).  And we have the principal of the Debtor, Mr. Mathu Rajan.

THE COURT:  Anybody else for the Debtors?

MR. ALEXANDER:  Yes.  We also have Amanda Gonzalez.

THE COURT:  And she is?

MR. ALEXANDER:  She's an employee.

THE COURT:  Employee of whom?

MR. ALEXANDER:  Currently, I believe she's an employee of VSI.

Okay.  Anybody else here for the Debtor?

MR. ALEXANDER:  I think that's it, Your Honor, for the debtors.

THE COURT:  Okay.  Anyone else?  Let's start with SeeCubic.  Who's here for SeeCubic?

MR. MAZZA:  Good afternoon, Your Honor, Jim Mazza from Skadden Arps here, on behalf of SeeCubic.  I'm joined on the Zoom by my partner, Eben Colby.  Our principal, Shadron Stastney is also here on the Zoom, the principal executive chairman of SeeCubic.

THE COURT:  Okay.  I don't see a picture.  Is his not working like mine?  Everybody needs to have -- I need to be able to see everyone.

MR. MAZZA:  There is, Your Honor.  Do you see him?

THE COURT:  Oh, he might've moved.

MR. MAZZA:  Yeah.

THE COURT:  Oh, yes, I see him.  Okay.  He's the principal of SeeCubic?

MR. MAZZA:  That is correct, Your Honor.

We also, I believe, have some associates and my partner Joe Larkin on the Zoom.  Brad Lenox is the name there.

So Brad, if you want to go on video?  Brad won't be speaking today Your Honor, but just to --

THE COURT:  Right, just to see who's here.

MR. MAZZA:  Right.

THE COURT:  He's your co-counsel?

MR. MAZZA:  Yeah, he's one of my fine associates.

THE COURT:  Oh, okay, all right.

Who else is here?  Any other associates you have?  I thought you --

MR. MAZZA:  Marley Ann Brumme is also here on the Zoom.  She just popped up on my screen, so I don't know where she --

THE COURT:  I don't know where -- oh, I've got to look.

MR. MAZZA:  Oh, Marley, sorry.  Marley Ann.  Sorry about that.

THE COURT:  Okay, associate, okay.

MR. MAZZA:  She's a counsel.

THE COURT:  Oh, counsel, okay.

MR. MAZZA:  And then, I'm joined in this -- I'm in a conference room, and I'm joined by some of my colleagues, Justin Winerman, Rob Fitzgerald, and Rebecca Ritchie.

THE COURT:  Okay, who are -- can you, like, change so I can see who's there?  I mean, I want to be able to see as if we were in court.  Who else is there with you, Mr. Mazza?

MR. MAZZA:  Mr. Winerman's here with me.

THE COURT:  What's his name again?

MR. MAZZA:  Justin Winerman.

THE COURT:  Justin Winerman, okay.  Who else?

MR. MAZZA:  Rebecca Ritchie is also here.

THE COURT:  Okay.  Where's Ms. Ritchie?

Hello.

All right, who else?

MR. MAZZA:  That's it, Your Honor.

THE COURT:  Okay.  All right.  Anybody else here for SeeCubic?  Okay.

Anyone else here who I haven't -- is somebody here for Hawks [sic].

MR. CAPONI:  Yes, good afternoon, Your Honor, Steve Caponi from K&L Gates.  I'll start by apologizing.  I'm at a partners retreat this week, and I did not bring a tie, so -- I have a jacket, but I'm tieless.  Not intentional.  I couldn't find one on short notice.

THE COURT:  That's okay.

MR. CAPONI:  So if that's okay with the Court?  With me today is Margaret Westbrook.  Also with me today is Tom Warns.

Mr. Warns, if you could turn your video on?

THE COURT:  Okay.

MR. CAPONI:  And we have Megan O'Connor --

THE COURT:  Okay.

MR. CAPONI:  -- and John Edel.

THE COURT:  Okay.  Now, are they all counsel, or are they --

MR. CAPONI:  They're all lawyers with the firm, Your Honor, all my colleagues.

THE COURT:  Okay.  All right.  All right, anyone -- and that's it for Hawks, right?

MR. CAPONI:  Correct, Your Honor.

THE COURT:  Anyone else here?  Is anyone from the U.S. Trustee's Office here?  Oh, there's Mr. Callahan.

Go ahead, Mr. Callahan, I see you.  Anyone else there with you?

MR. CALLAHAN:  There we go, yes.  Good afternoon, Your Honor, Kevin Callahan, on behalf of the United States Trustee.  I am the only person here today from the U.S. Trustee's Office.

THE COURT:  And I hope not the only person in the

office?

MR. CALLAHAN:  Almost, at this time of hour, Your Honor.

THE COURT:  Unfortunately.  All right.

MR. CALLAHAN:  And Your Honor --

THE COURT:  Uh-huh?

MR. CALLAHAN:  -- I think there may be other parties here, and they can introduce themselves, but I do have a question for the Court once those introductions are made and before opening statements are made.

THE COURT:  Okay.  Is there anyone who has been identified?  Did I hear Brittany Ogden?  Do I have her name on here?

MS. OGDEN:  Yes.  Good afternoon, Your Honor.  This is Attorney Brittany Ogden from Quarles & Brady.  We represent the interested secured creditor, SLS Holdings V1, LLC.  And I'm also joined with my counsel, Davis Wright of Robinson & Cole.

THE COURT:  Okay.  Anyone else?  I have a whole page of just counsel.  Is there anyone else -- who's Richard Riley?  Oh, I saw Rebecca -- who's Richard Riley?

MR. RILEY:  Your Honor, this is Richard Riley.  I'm just observing today.  I'm an attorney at Whiteford, Taylor and Preston in Wilmington, Delaware.

THE COURT:  And who do you -- you're observing just to observe or you're representing someone?

MR. RILEY:  No, I'm just interested in the case.

THE COURT:  Okay, all right.  I'm just trying to make sure I have everybody's -- who's on the screen.  Do we have two -- I thought we had two screens, but apparently not, right?  Oh, wait, there is another screen.  All right.  Okay.

THE CLERK:  Judge, this is John.  If you can find the little arrow to point you back and forth --

THE COURT:  I saw that.

THE CLERK:  Yeah, you'll see everybody.

THE COURT:  I know, but when I'm going back and forth, I'm still seeing the same people on page 1.  For instance, at the top next to me is Mr. Fisher and then in my top row is Mr. Caponi.  If go to the next one, Mr. Caponi's there and then other people.  So I don't know what this is doing, but I'll -- it'll just -- it'll switch to whoever's speaking.  So that's fine.  All right.

I think we have everyone, Mr. Callahan, so what is it that you would like to do before we have opening statements?

MR. CALLAHAN:  Your Honor, I appreciate the Court holding the hearing at this time.  However, for me, I have a personal commitment later tonight that I might be able to change.  But I wanted to ask the Court if, you know, we had this hearing yesterday and, and perhaps there was some hope that there might have been a resolution of some sort.  But given the filings today, it does not appear to be the case.

And as Your Honor is aware, this will require an evidentiary hearing.  Does the Court -- has the court considered a time frame for today's hearing to tonight?

THE COURT:  Well, I assume that this should not take more than two hours, which, unfortunately had we started at three, I thought we'd be done at 5.  It now appears we're not even started yet, so I do not plan to go past 6:00 tonight.  So I'm giving everybody as -- you know, hopefully, a lot of this can be -- I don't know if the parties stipulated to some of the facts, the documents.  I don't think I'm going to need, you know, all that background if the parties can stipulate.  The documents are either authentic or they're not.

And so a lot of this is just going to be -- I don't anticipate, and this is my position -- I could be totally wrong -- that there is going to be much in terms of disputed facts. The facts are what they are unless the parties are telling me this is really disputed facts.  This is going to boil down to that are giving me their position, SeeCubic their position, and then I'll just look at the facts and decide which -- what I want to do.  So I don't anticipate this should take a long time, but I don't know what the parties intend.  But my intention is not to go past 6:00.  I'm going to give, you know, two hours to this.  I don't think it should take more than that.  Mr. Callaghan, when do you have to leave?

MR. CALLAHAN:  I'll stay for the hearing, Your Honor,

12

absolutely.

THE COURT:  Okay.

MR. CALLAHAN:  I'll just make arrangements.

THE COURT:  Okay, all right.  With that being said, these matters are contested -- they're not resolved.  So I am not going to -- I don't think that I need -- unless somebody thinks I need an opening statement -- that we just move right to the evidence.  Anybody think we need opening statements?

Mr. Alexander?

MR. ALEXANDER:  Your Honor, I don't believe we need an opening statement.  I just do want to bring to Your Honor's attention that we did hear you at yesterday's hearing in terms of trying to come to a resolution, and we did have discussions, counsel to attempt to reach a resolution for today's hearings.  But unfortunately, we were not able to come to an agreement with respect to the funding.

THE COURT:  Okay.

Anything from Mr. Mazza?  Do you think we need --

MR. MAZZA:  Thank you, Your Honor.  No, no need for an opening statement.  I do think they're -- if they are efficient with their evidence and getting it in, there may be some threshold issues that Your Honor and highlighted yesterday as to their potential financing as to whether there are claims that could be brought by SCBV against the Debtor, which we think is a threshold issue that they haven't established to

actually even provide the financing.  But it's up to Your Honor how you want to handle that with their presentation of their motion and their evidentiary record.  I didn't see any declaration.  I know a lot of papers got filed over the course of the last several hours.  So I don't know if they intend to elicit direct testimony from their principal or how they intend to proceed.  But again, given the time constraints, we want to be as efficient as possible here.

THE COURT:  Hold on one second.  Hello?

All right, counsel, I'm back.

Counsel, what were you saying you believe was a was threshold issue?

MR. MAZZA:  Yes, Your Honor.  You had asked yesterday as to whether or not the Debtors would have had an obligation to actually fund the non-debtor, SCBV, here, which has the expenses that are at issue.  And we don't think that they've established that in their motion.  Really, just looking real quick at fiduciary duties and what Judge Strine, Vice Chancellor Strine has said, under settled principles of Delaware law, and we're talking about Delaware corporations here.  A parent corporation does not owe fiduciary duties to its wholly owned subsidiaries or the creditors.  So I think that answers the question as a legal matter.  They present in their papers that they believe there could be a potential veil piercing claim that would require them to fund the subsidiary.

We don't think that's legitimate.  They've actually in the chancery court, their chancery court lawyer, we submitted an exhibit whereby that lawyer, Andy Dupre, had stated that in negotiating the promissory note, which is our presentation of the better financing package here, the only real financing package here, that the  debtors, Technovative, Stream, should not be liable for SCBV's liability, so they wanted it structured so when we structured this promissory note that was in place such that there would not be any liability.

So both legally and factually, they've answered those -- or those questions are answered.  And so now they've come up with a new theory, which tends to be the case for them, when something --

THE COURT:  Counsel, counsel.  I don't want to hear that from anybody --

MR. MAZZA:  Sure, no problem.

THE COURT:  -- about strategy or what people do.

MR. MAZZA:  Right.  I apologize.  And then come up with veil piercing as their justification for having to fund the BV entity.  And we don't think that that holds at the end of the day, and is a reason for their attempt to provide dip financing here.

THE COURT:  So counsel, is it your position that as a matter of law, they're not responsible for funding?

MR. MAZZA:  Yes.  And I, yes.  They have not cited

any contractual arrangement requiring as such.  And turning a corporate veil piercing theory on it on itself to invite claims against the Debtor entity is not really consistent with the entity's -- manages the entity in connection with the fiduciary duties that they have to that corporate entity.

So inviting claims of corporate veil piercing, we don't think gets the job done for the justification that they're seeking to make here for providing a dip to the Dutch subsidiary.

THE COURT:  So then is it your position that I don't even need to hear evidence on that matter Because as a matter of law, they don't have a matter -- on the Delaware law, they don't have any legal obligation to fund the subsidiary.  And you also say that their argument about veil piercing does not rise to the level that it would overcome that legal position?

MR. MAZZA:  Yes, I would, Your Honor.  There are also arguments that that we think they haven't established an evidentiary record to have said --

THE COURT:  Well, we don't have a record yet.  All we have is their motion.  So why don't we just get, because I was trying to avoid this.  I'm trying to avoid this.

MR. MAZZA:  No, that's -- I under --

THE COURT:  Let's just hear what they hear, and then you can argue at the end that --

MR. MAZZA:  Right.

THE COURT:  -- because I get, you know, I get -- then I have to hear argument about why it's not legally precluded, was legally -- they have no obligation.  Let me just hear this because I'm trying to get this done as quickly as possible with the appropriate evidentiary record.

MR. MAZZA:  Sounds great.

THE COURT:  Okay.  So Mr. Alexander -- yes?

MR. CALLAHAN:  I'm sorry for interrupting, Your Honor.  Kevin Callahan.  And I would like the opportunity to make an opening statement.  And that is, Your Honor, of course, you know the U.S. Trustee is a neutral party here.  We're representing an institutional interest.  There has not been an unsecured creditor's committee formed, but the Debtor has scheduled unsecured claims.

It appears to me today that we are focusing on the 364 motion filed by the Debtor and not the two motions -- the two last motions the Court addressed.  We talked about them a lot yesterday.  There's also the motion of the creditor to essentially compel the SCBV's directors to borrow money on a promissory note that was in place before the petition was filed.  I'm not sure the Court would have authority to do that, but certainly the Debtor could authorize that in some way, or the sub could authorize that.

But nevertheless, back to the Debtor's motion, Your Honor.  I think it's clear, at least -- well first, law

enforcement let me say that Mr. Mazza's comments just now suggest to me, and certainly I thought before, was that there are significant disputes about the facts presented by both the Debtor and contrary by the Debtor to SeeCubic's and Hawk's motions. So I think there will be a significant cross-examination of any witnesses, the discussion, and perhaps objection to the exhibits that's been introduced.

We reserve the right to cross-examine Debtor's representative. I note that, Your Honor, under 364 and typically, under a 364 or 363 motion, where the Debtor needs cash, needs to borrow money, that motion's filed in the first day, and there is a perhaps an inference that the monies that the Debtor proposes to pay are necessary to avoid immediate and irreparable harm to the Debtor. And I think one of the first hurdles we have to discuss today and is at the courthouse the court has to examine and consider, is that this is a non-debtor that is getting funds on an obligation that's created by the Debtor. The Debtor gets nothing in this transaction, and it's from an insider. So all the requirements of 364 have to be met first. And then of course, the Court's going to have to consider whether those -- whether the Debtor could adequately prove that it is appropriate for the Debtor to borrow money and to the detriment of unsecured creditors of the Debtor, that somehow that will preserve or enhance the value of its subsidiary.

And Your Honor, I don't know if the papers have demonstrated that, and I think that's where the evidence is going to have to come in through witnesses.  I did not see anybody from the VSI party listed by the Debtor as one of the parties to testify today.  It's already been mentioned by SeeCubic and Hawk on the insider relationship of, of VSI and any kind of transaction, whether it's a stock issue or here or now, a proposed loan, has to be examined with a high degree of scrutiny, Your Honor.  And I'm not sure as I see the papers today that they've met that burden -- at least not yet.

So I do see this as, as a dispute that's going to have to be -- the Court's going to have to rule on facts as presented by the parties and of course based on the law.  So presently, I'm not sure they have demonstrated those facts necessary to support the 364 motion filed by the Debtor.  And I've also addressed the response and the motion filed by SeeCubic to lend money to the subsidiary.

THE COURT:  Okay, all right.

Anybody else thinks they want to say something before -- make some opening statement.  I think I'm pretty clear of the 364.  Mr. Callaghan has articulated all of the things the Court knows it needs to address.  Is there anything anybody else thinks I need to keep into consideration when I'm listening to this evidence?  All right.

With that being said and no response, Mr. Alexander,

19

please commence with -- presenting the evidence that you are prepared to submit in support of the motion.

MR. ALEXANDER:  Thank you.

THE COURT:  And at this point, we're only talking about A and B.  With respect to taking certain actions and the ordinary course, I'll address that at the end.  I didn't rule on it.  I carried it into today, but I pretty much said what I needed to say yesterday, and with respect to funding anything other than salaries for the -- funding anything other than the Dutch company, I'm going to rule on that, too -- not rule -- it's something I'm not hearing today -- something that will have to be addressed at a later time.

All right, let's start.

MR. ALEXANDER:  Thank you, Your Honor.  We intended to call Mr. Rajan as a witness.

THE COURT:  Okay.  Is that your first witness and you're calling him in what capacity?

MR. ALEXANDER:  Mr. Rajan is being called in the capacity as -- well, he has several capacities, Your Honor. He's an officer of Stream, he's an officer of Technovative, and he's also an officer of VSI.

THE COURT:  Okay, that's all well and good, but who is he appearing for?

MR. ALEXANDER:  The Debtors are calling him on behalf of the Debtors.

THE COURT:  Okay, let's go.

MATHU RAJAN, DEBTORS' WITNESS, SWORN

THE CLERK:  Could you please state and spell your name for the record?

THE WITNESS:  Yeah.  It's Mathu Rajan.  First name is M-A-T-H-U.  The last name is Rajan, R-A-J-A-N.

THE CLERK:  And can you please state your address for the record?

THE WITNESS:  My home address is 1105 William Penn Drive, Bensalem, PA  19020.

THE CLERK:  Thank you very much.

DIRECT EXAMINATION

BY MR. ALEXANDER:

Q    Good afternoon, Mr. Rajan. You heard us reference Stream Networks, Inc. What connection, if any, do you have to Stream Networks --

A    I --

Q    -- or TV Networks?

A    I am the founder of the company.  I am the CEO right now, and I am a board member of Stream TV networks.

Q    How long have you been in those roles?

A    Since its founding in 2009.

Q    What are your responsibilities in those roles?

A    Well, my responsibilities is finance and also overseeing the employees, whether it's engineering or sales or, you know,

different aspects of the business.

Q    And are you familiar with Technovative Media, Inc?

A    Yes, I am.

Q    Do you have any connection to Technovative Media Inc.?

A    Yes.  I am a board member for Technovative.  The receiver turned control back to me when Stream TV and Technovative filed in bankruptcy.  We consulted with his attorneys, and he turned control of Technovative back to me.

Q    You mentioned a receiver.  So can you kind of explain how long you've had your role at Technovative?

A    I was the board member for Technovative from the founding of Technovative until 2020 when the chancery court ruled in favor of the omnibus.  At that point, I was replaced by Mr. Stastney.  And Technovative, I believe before the ruling, he may have tried altering the records back in September.  But for sure, after the ruling, he was -- I believe was the board member.  Then after the Supreme Court ruled in Stream TV's favor, there was -- they were ordered to all the assets over.  SeeCubic of Delaware did not want to turn the assets over obviously.  And there was an incident where it was moved from SeeCubic to Stream TV, Mr. Stastney, because he had not left the board --

        THE COURT:  Listen.  I don't know -- anybody is not objecting.  But can you just keep your answers to what was your role?  You were a board member from when to when.  I'm going to

ask everybody.  We do not need the commentary.  Can you just answer the question?

THE WITNESS:  I would treat it as a board member. And I believe end of September early October 2020 when the Chancery Court divested the Technovative shares from SeeCubic and gave it to Stream TV.  I return as a board member.  Then I gave control of Technovative to the Receiver when the Receiver was put in during the status quo and he gave it back to me when we filed for bankruptcy.

BY MR. ALEXANDER:

Q     In terms of Stream, can you describe for the Court Stream's business?

A     Stream's business is glasses free 3D.  We are business -- our business model is we sell a chip that has our algorithms on it.  We well a film that is designed, has an optical design on it that is glued to a panel.  Then we provide -- you know, we provide that to hardware companies who put it inside their devices.  It's just a chip and a film.  And then we also provide software plugins to content companies in exchange for revenue share.  That is essentially our business model.

Q     What is the corporate structure?  Well, let me ask the question differently.  Does Stream have any subsidiaries?

A     Yes.  Stream has multiple subsidiaries.

Q     Can you describe the corporate structure of stream?

A     Stream TV currently is the top co, and below that is

Technovative.  And I'll have to pull it up from the docket.

Here's another company called --

THE COURT:  No, no, no.  You do not get to look at any documents.

THE WITNESS:  Okay.  From memory, it would be Technovative.  And below Technovative is Media Holdings.  And then I believe there's a company in the Curacao.  And then from the Curacel it goes to the Ultra D Cooperative in the Netherlands.  Then from the Cooperative it goes to Stream TV International as well as SeeCubic of the Netherlands.  And then I believe below Stream TV International, we have two Chinese subsidiaries and a Taiwan subsidiary, I believe, from memory.

BY MR. ALEXANDER:

Q    I'd like to show you what we've marked as Exhibit 5, Debtor's Exhibit 6.  And, Your Honor -- okay, there we go.

THE COURT:  All right.  Can you pull that up, John?

MR. ALEXANDER:  And specifically, we're going to go to DE48-5, which is page 78 of that document.

THE COURT:  Before we continue, did everybody provide the list of exhibits that they intended to introduce into evidence by 12:00?

MR. ALEXANDER:  Your Honor, I believe the parties provided them to the other side and your chambers around noon today.

THE COURT:  So just a list, right?  Not the actual

documents?

MR. ALEXANDER:  We actually provided the documents. I believe all three parties, Hawk, SeeCubic, and the Debtors provided the documents only to -- obviously, each side.  And then also to Ms. Godfrey (phonetic).

THE COURT:  Right.  So I'm not understand why he's on the docket if the documents were all -- so we should just be able to go to Exhibit 6.

UNIDENTIFIED SPEAKER:  So, Judge, that was my choice because it was such a large file, I didn't resave it.

THE COURT:  Oh, okay.  I'm sorry.  Go ahead, John. Pull it up.

MR. ALEXANDER:  It'll be Exhibit E, I believe.

THE COURT:  Which is Exhibit E to what docket entry, 48?  And Exhibit 6 as identified in the exhibit list, correct?

MR. ALEXANDER:  It's part of Exhibit 6, Your Honor. That is correct.

THE COURT:  All right.  All right.

BY MR. ALEXANDER:

Q   Can you scroll to page 2?  Mr. Rajan, we just talked about the corporate structure of Stream.  Do you recognize this document?

A   Yes, I do.

Q   Does that refresh your recollection with regards to the corporate structure of Stream?

A    Yes.

Q    Okay.  Is there anything from your testimony that you need to correct regarding the structure of Stream?

A    Yes.  There's also that Technology Holdings, but they only hold a small piece.

THE COURT:  John, you can take it down.  It's only to refresh his recollection.  Go ahead.

BY MR. ALEXANDER:

Q    And, Mr. Rajan, why was Stream set up that way?

A    Stream was set up that way because when we registered the company, that was during the Obama Administration essentially.  And they didn't have -- there was a huge issue with territorial taxes back then where we were going to have to pay double taxation.  And so, the L.A. Piper required -- not required, they recommended that we follow that structure to reduce our corporate tax load.  And some of the assets were at Stream TV.  Some of the assets were below Stream TV.  But, you know, but were kept their mainly for tax purposes instead of having everything inside Stream TV.  And then there was a couple customers where the felt more comfortable issuing the purchase order to one of our subs.  If you look at it, the Bosch contract, they did it with Stream TV International.  Some people wanted to have their contracts directly with Stream TV.  And depending on what people were working on, you know, we kept some of the assets at Stream TV USA, so it was mainly for tax

purposes.  Mainly, just for tax purposes.

Q    So what was the relationship between Stream and the subsidiaries, specifically with regards to funding prepetition?

A    Well, number 1, the relationship is that we owned all the subsidiaries 100 percent.  Number 2, we gave money from Stream TV for things like payroll and development.  Sometimes we did do loans.  There were times in the company when we weren't doing quite as well financially.  In those cases we just did inner company transfers like we're proposing today for the BV so as not to burden the subs.  But we basically transferred -- all of the subs were reporting to the parent company in terms of direction and instruction and that sort of thing.

Q    Do you recall how much funding Stream provided to the subsidiaries, including SeeCubic BV?

A    SeeCubic -- for the Netherland subsidiaries, it would have been around 80-85 million.  Some other money went to some of the other subs.  The exact amount, not quite sure.  You know, like China and Taiwan for some of those subs, I'd have to get back to you on that.  It wasn't much.  It wasn't a huge number.  It was a fair amount, but not that much.

Q    Was it important for Stream to fund the subsidiaries?

A    Yeah.  I mean, it was absolutely important.  That's where they -- first of all, they were our employees.  They were doing work for Stream TV.  You know, they were doing work for our customers.  They were our employees.  We're all one big team.

And so, we had an obligation to fund our employees and fund our projects and fund our assets.  And then also, our understand from what we were told when we had registered the company back then from counsel, that the parent company had an absolute obligation to fund the subs.  Were told that if we don't fund the subs, the parent is liable.  The management of the companies are liable.  We are even told that if we don't fund the Netherland subsidiaries properly, executives from Stream TV would no longer be allowed to even fly into the Netherlands anymore.  So that's what we were told both by the employees there and by counsel at the time registering for the company and for years on end --

MR. CAPONI:  Objection, Your Honor.

THE WITNESS:  My understanding was we had a liability.

THE COURT:  What's the objection?

MR. CAPONI:  Your Honor, Mr. Rajan seems to be floating in and out of disclosing attorney-client privilege communications. And if he is waiving the attorney-client privilege for all purposes, that's one thing.  But, you know, it can't be a sword and a shield.

THE COURT:  Counsel, is he waiving?

THE WITNESS:  I'm not.

MR. ALEXANDER:  We are --

THE COURT:  Mr. Rajan, I'm didn't ask you.  I'm

asking Mr. Alexander.  Do you want to consult with your client?  Is he waiving because he's telling us what his counsel told him?

MR. ALEXANDER:  We are not waiving the attorney-client privilege period.

THE COURT:  So then should we strike his testimony about what his counsel told him his legal obligations were?  Because that's -- I assume that's legal advice; is it not?

THE WITNESS:  Can I ask a question for my attorney?

THE COURT:  I guess, John, can you put them in a little sidebar?  And remember, Mr. Rajan, you are under oath and that you can consult with your counsel, but I'm not quite sure at this point because you are under examination whether you can consult other than with respect to the issue of waiving the attorney-client privilege.  So leave it at that.

THE WITNESS:  Yeah, no.  That's all we're going to talk.

MR. CAPONI:  Your Honor, before they go.  One other issue I'd like to address.  As Mr. Rajan's testifying, I don't know if it's coming from his or others, but there's this beeping that sounds like it's messages or emails.  And I just want to make sure --

THE COURT:  That's my -- unfortunately, that beeping that you're hearing is my computer, which is why I'm going in and out of my laptop, which is why my video is going in and

out.  I didn't know other people could hear it.

MR. CAPONI:  That's fine, Your Honor.  I just wanted to make sure the witness wasn't receiving text messages or emails while he's testifying.  That's fine.  Thank you.

THE COURT:  Well unfortunately, that's mine.

THE WITNESS:  Yeah, we're off.  Do I call you Vince, or what am I supposed to do?

THE COURT:  John, can you put them in a room?

MR. ALEXANDER:  No.  They'll put you in a breakout room.

THE WITNESS:  On the Zoom?

THE COURT:  Yes.  Just hold on.

THE WITNESS:  All right, thank you.

(Recess taken)

THE WITNESS:  Hello?  Yeah, I think we're back.  Are we back?

MR. ALEXANDER:  We are back.

THE COURT:  Yes, you're back.  Okay, counsel, where are we with the issue of waiving attorney-client privilege?

MR. ALEXANDER:  The client has advised that -- specifically, with respect to discussions with DLA Piper on the structuring of the entities, he's waiving the privilege.

MR. CAPONI:  Your Honor, that's not sufficient.  Either waiving attorney-client -- I mean, that's a definition of the sword and the shield.  I'm only going to waive certain

topics on certain areas.  I don't think that's appropriate.

THE WITNESS:  Your Honor, I'd like to respond to that please.

MR. CAPONI:  No.  I'm asking.  You don't get to respond.

THE COURT:  You don't get to respond.  You're not counsel.

THE WITNESS:  Oh, sorry.  My bad.

THE COURT:  Okay.  He's objecting.  And said that it's a complete waiver.  There's no such -- or counsel, is you saying -- are you saying there's no such thing as a partial waiver? It's either all or nothing?

MR. CAPONI:  Your Honor, yeah.  I think with respect to his relying on -- at least with respect to DLA Piper and the subject matter that we're talking about here today.  If he's bringing up legal advice that he received, he's waiving that legal advice.  I don't -- he can't pick and choose which questions he wants to waive the advice on.

THE COURT:  So it's only with respect to DLA Piper that he's waiving.  But he only wants to waive with respect to the structuring advice.  And so, the you want to -- and that would then -- because that was more than structuring advice that he was discussing.  It was more their obligations for financing.  Are you saying that's part and parcel?  Because it seems to me that's a real -- a waiver of everything with

respect to -- well, let me back off.

The DLA Piper represent Stream in any other capacity than structuring these entities. Mr. Alexander, do you know the answer to that?

MR. ALEXANDER: Your Honor, I believe the answer is yes. That's why we're limiting it to the testimony today, which -- that he provided, which specifically related to the structuring and why it was structured a certain way and what would happen to the company if it were not structed.

THE COURT: All right. And what other capacity did the represent Stream?

MR. ALEXANDER: I believe them represented them in business advice as well, Your Honor, outside of the structuring capacity.

THE COURT: Well, funding seems to be outside -- well, to me, that goes more than structuring, and you're saying what your obligations are with finances. I'm not quite sure whether you can just limit it to -- did the represent them in any other capacity other than with these -- did they represent them in litigation? Did they represent them in anything -- other capacity other than in connection with forming and operating these businesses?

MR. ALEXANDER: Your Honor, I don't know the answer to that question, Your Honor.

THE WITNESS: Can I answer the question?

THE COURT:  Wait a minute.  Counsel, are you still objecting?  What specifically do you think a complete waiver of the attorney-client privilege with DLA Piper means?

MR. CAPONI:  I think at this point we're looking at a fairly broad application of subject matter waiver.  Mr. Rajan testified regarding the tax implications, tax legal advice he received, the structural legal advice he received.  He's testified about the financing obligations that they received.  That all of this was done at the direction of counsel.  He testified that the would -- the executives that would be in legal jeopardy if they didn't fund the subsidiaries.  So he's trying to establish all the predicate elements for why there's an obligation to fund the subsidiaries based on advice of counsel allegedly from DLA Piper.

And he either -- and he can't do that.  If he wants to do that, I mean, I think he's waived it as to tax advice, structure, funding, legal obligations.  You know, I don't know how far it goes, but in the 15 minutes Mr. Rajan's been testifying, he's consistently trying to bolster --

THE COURT:  I get what he's trying to do.  Counsel, there's nothing wrong with what he's trying to do.  The issue for me is the extent of the waiver.  And they want to keep it to structure.  But he's also -- Mr. Alexander talked about tax advice, financing, legal responsibilities, all of those things. You can't just say I'm only going to waive it to structure.

It's any subject matter that he testifies about.

And to the extent he's talking about legal advice, he's either waiving it or he's not.  He can't just pick and choose and say, oh, it's structure only and then testify about financial obligations, testify about taxing advice, legal obligations. All of those things if he's going to say was legal advice, he has to waive it or not.  You can't just limit it to one and testify about five different things.

MR. ALEXANDER:  Your Honor, understood.  The structuring of the entities in my view, it encompassed the tax advice and the obligations.  So I viewed them as one in the same.  So that's why I was saying that's what we were limiting it to because my understanding was based on his testimony. That's what he was waiving it as too.

THE COURT:  Mr. Caponi?

MR. CAPONI:  I'm sorry, Your Honor.  I didn't hear you.

THE COURT:  Your response to that.  I'm sorry.

MR. CAPONI:  Your Honor, if they're waiving the legal advice, I covered the broad topics that he's testified -- Mr. Rajan's testified too already.  If he's waiving that legal advice, and to be clear, that's waiving it today and for all purposes in the future, because once it's waived, it's waived, I can't stop him from doing that.  I just want to make it very clear on the record that it's been waived, and we will all deal

with the repercussions of that down the loan.  And if he wants to retract it, now's the opportunity to do so.

THE WITNESS:  Can I ask a question?

MR. ALEXANDER:  Not to Mister --

MR. CAPONI:  It--

THE COURT:  Wait a minute.  I was on mute.  If you want to consult Mr. Alexander, that's fine.  But you can't ask me any questions, and you can't ask Mr. Caponi any questions. But if you want to ask a question to Mr. Alexander, you're free to go back in the -- we'll put you in the little conference room, breakout room.

THE WITNESS:  All right.  Yeah, we'll go back in. Okay.  Can we go into the breakout room?

THE COURT:  Yes.  You got to give him a minute to get you there.

(Recess taken)

MR. ALEXANDER:  Your Honor, we're back.

THE COURT:  Okay.

MR. ALEXANDER:  With regards to the waiver, to be clear, the client has agreed to waive the attorney-client privilege with regards to DLA Piper, with regards to tax advice, structuring, financing, with respect to the creation of these entities.

THE COURT:  And, counsel, let's be clear, on whose behalf is he waiving this?

MR. ALEXANDER: He's waiving it on behalf of Stream, Technovative, and those are the two entities that created the other entities.

THE COURT: Okay. Mr. Caponi?

MR. CAPONI: I think we have the record, Your Honor, and a waiver.

THE COURT: Okay. Continue, Mr. Alexander.

BY MR. ALEXANDER:

Q    With regards to the subsidiaries, was there a point in time in which Stream did not fund the subsidiaries prebankruptcy?

A    During the time period when we lost in the Chancery Court, and then we lost in the Chancery Court, we did not fund the subsidiaries. And after we won in the Supreme Court, we haven't been able to fund the subsidiaries. This will be our first funding. We hope, since we lost in the Chancery Court.

Q    What value, if any, do the Stream subsidiaries, including SeeCubic BV add to Stream?

A    Are you talking in terms of the monetary value or are you talking about operational value or both?

Q    Both.

A    In terms of monetary value, it's worth hundreds of millions of dollars to Stream TV's valuation. The assets over there would be worth easily hundreds of millions of dollars. In terms of operational value, they are helpful in terms of

preparing -- helping with assisting our teams in Silicon Valley for preparation of the electronics.  You know, the work is done by our electronics team, the programming.  For our business model is for the -- is done in Silicon Valley.  They mainly do assistant work.  They also do design work for the lenses.  They also do consulting work for quality control on the bonding machines.  The bonding machines are mainly handled by Stream TV USA and our team in Asia.  The mechanicals and all those things are handled by our team in Asia and those things.  We also have a lens team in the United States.  So they'll be working with the Netherlands team on lenses.  The software things have been moved to United States in terms of the content teams.

Q    Is it important for Stream to preserve SeeCubic BV?

A    Absolutely.

Q    Why?

A    Because number one, the assets are worth hundreds of millions of dollars.  Number two, Stream TV is doing a reorganization, so those assets will be part of the reorganization.  We want to limit the liabilities on the subsidiaries.  So we don't want any more liabilities added to the company if we can avoid it.  And because it's going to interfere with our reorganization at the Stream TV level.  And so, it's critical that those assets stay in good shape and that the companies there stay in good shape.  And we're in the process of reorganizing right now, so we don't want to make the

situation worse.

Q    Do you believe it's integral to the debtor's ability to reorganize to have the subsidiaries in good standing?

A    Yes.  My understanding is that the SeeCubic BV is facing imminent collapse, and we don't want to add any more debt to SeeCubic BV.

Q    What would happen if SeeCubic BV were not funded?

A    If SeeCubic BV is not funded, then the engineers who work on the 3D -- well one, they would leave the company.  So two, we would not have use of their, you know, their ability to help us with doing consulting working for the electronics and then the bonding.  There are physical assets in the Netherlands.  We would still have access to the physical assets, but the people there, we would lose access to their ability to help with the programming of like the electronics and also again the bonding.

Q    Was Stream and the other entities, were they set up to be integrated?

A    Originally, yes.  They were going to be integrated.  It was because of tax purposes they were separated.  In our reorganization plan that we'll be submitting soon, all the liabilities and all the assets will be consolidated.

Q    In terms of, you know, these Chapter 11 cases, to successfully reorganize, will the debtors need to have SeeCubic BV as a going valid -- as a viable going concern?

A    We need SeeCubic BV to be a valid going concern during the

bankruptcy.  But on the exit from the bankruptcy, we don't need

SeeCubic BV as an entity anymore, no.  Our plan is to

reconsolidate everything, all the assets, all the liabilities,

with court approval.  So we don't need SeeCubic BV anymore, no.

They -- right now the employees get paid through Ernst & Young.

SO Ernst & Young for all their employees when we're setting it

up, you can just run the payroll globally for like London and

some of the other places we sign the leases direct.  So no, you

don't really need it.

Q    But for purposes of making it through the Chapter 11

process, they are integral; is that your testimony?

A    Right.  When we exit bankruptcy, we don't need it as a

growing concern anymore.

Q    In terms of the current funding needs of SeeCubic BV, are

you aware of what the funding needs are?

A    Yes.  I --

Q    How did you --

A    Sorry, go ahead.  Go ahead.

Q    No.  You can finish your answer, Mr. Rajan.

A    I got a report from -- I got three reports.  I got a

report from the receiver, directly from the receiver.  What

happened was the receiver told me in Feb -- told our team in

February that the Netherlands was facing imminent collapse

because they did not receive the funding they wanted or that I

had signed for them, sorry that I had signed for on the papers

for the draws.  They did not receive the wires.  And then he gave a report that showed a huge shortfall of money received by the Netherlands.  Then Patrick Thune, who is an employee there emailed a report a few days ago and then their financial person who works at the BV called me several times too saying that --

MR. CAPONI:  Objection, Your Honor.  This is hearsay.

THE COURT:  Counsel, objection, hearsay.  Telling you what somebody else told him.  Response?

MR. ALEXANDER:  Your Honor, he's going to -- the response is that his testimony is relating to the impact in terms of why the Debtor believes it needs to take certain actions.

THE COURT:  Counsel, I get that.  The question was, what's the financial conditions?  And he said it was based on reports from the receiver, something from Patrick Thune and something from someone else, but he can't tell  us what somebody else told him.  That's hearsay.

THE WITNESS:  Okay, that's fine.  I'm sorry.

THE COURT:  Mr. Rajan, I wish you would -- you're not the lawyer, okay.  I think you forget what your role is here. You're a witness.  You may be a representative of the companies.  You're not the lawyer.  Please stick to your role.

Mr. Alexander, response?

MR. ALEXANDER:  Your Honor, I'll rephrase my question in terms of how I --

THE COURT:  Objection sustained.  You cannot tell us what someone else told you.  If there's a report that you want to rely on that you have a document, then you can ask him about that.  There is absolutely no way Mr. Caponi, Mr. Mazza, will be able to ask the person who allegedly said what they said.  That's what hearsay is.  Okay, sustained.  Go ahead.

BY MR. ALEXANDER:

Q    Thank you, Your Honor.  Mr. Rajan, are you familiar with an entity called VSI?

A    Yes.

Q    What is VSI?

A    VSI is a company that was set up.  It's called Visual Semiconductor.  It was a company set up when the Chancery Court made the incorrect ruling against Stream TV.

THE COURT:  Counsel.  Mr. Rajan, I don't need the incorrect, all of the comments about the Chancery Court.  Just leave that out.  I really don't want to hear all of this.  I don't want to hear about who's the bad guy, who's the good guy, the Chancery Court is terrible.  That is not going to help me make my decision.  It's just really going to irritate me. Okay, so please refrain from all the commentary and just answer the questions directly.  And if no one else is going to object, it's not my role.  But to the extent, I only want to hear what's going to help me.  This other extraneous commentary will not, okay.

THE WITNESS:  Okay.  Visual Semiconductor, VSI, was set up and has been funding Stream TV expenses because we were blocked during that time period from having a Stream TV bank account or even using the Stream TV name.  We had to pay about 65 percent of the employees from Stream went to VSI, and we had to pay those people.  And we kept the operations at Stream afloat during the period that we were blocked.

BY MR. ALEXANDER:

Q    Was it important to keep the operations of Stream afloat at that time?

A    Yes.  Because we fault -- we were going to get the assets back, so we needed a place to run payroll and maintain operations since Stream TV was blocked under the omnibus agreement.

Q    I'm going to show you what's marked as Debtor's Exhibit Number 4.  Mr. Rajan, do you recognize this document?

A    Yes.  That's a -- that is the second email we received from Patrick Thune post the hearing of a few days ago.  Not the hearing from two days ago, the hearing from before.  He sent this email saying they have a 1.5 million dollar shortfall.  Euros through shortfall, I'm sorry, euros.  These are euros.  And they're going to go into bankruptcy.

THE COURT:  Does it say that in there?

THE WITNESS:  Yeah, right there.

THE COURT:  So this is an email from Patrick --

THE WITNESS:  Thune.

THE COURT:  -- to?

THE WITNESS:  Me.

THE COURT:  Okay, so that's what this is?

THE WITNESS:  Correct.

THE COURT:  Okay.

MR. ALEXANDER:  Your Honor, we'd like to move the email into evidence.

THE COURT:  Well, he hasn't been cross-examined on it yet.  Okay.  I do things a little differently.  Some people move at the same -- at the time, some people do after cross.  There's always this technicality as whether if it's not admitted at the time, it's not, whether you can cross-examine.  Does anybody take any position with respect to that?

MR. ALEXANDER:  Your Honor, if I may before you get that answer.  We have no issue with waiting until the end of cross to move all the documents in and address it at that time.

THE COURT:  Opposing counsel?  Because again, there's two theories with respect to admission of documents.  Some take the position you need to do it after each time.  And otherwise, you can't cross-examine on the matter that hasn't been admitted.  Does opposing counsel take any position?

MR. CAPONI:  Your Honor, Steve Caponi.  I think for purposes of expediency and making this an easier process, I think documents, you know, we should just -- unless someone

objects, they can just be deemed admitted as we use them.

THE COURT:  Okay.

MR. CAPONI:  Like for example, this document, I would consider a business record.  I wouldn't object.  I don't know that we necessarily have to stop each time and say admitted.  I think let's just call out the exceptions if that's okay with the Court.

THE COURT:  Mr. Alexander?

MR. ALEXANDER:  Your Honor, that's acceptable to us.

THE COURT:  Okay, that's fine.  All right.  Okay.  You can continue, Mr. Alexander.

(Exhibit 4 admitted into evidence)

BY MR. ALEXANDER:

Q    Thank you.  And in terms of the correspondence that you received, you know, that indicated that SeeCubic BV was in need of funding; was that your testimony?

A    Yeah.  My testimony is SeeCubic BV, Patrick Thune, said that they are in desperate need of funding.  They received 1.5 million dollars less than what the papers that I signed to give --

THE COURT:  Where does it say that in there?

THE WITNESS:  If you total this up, it's 1.5 million is the --

THE COURT:  Where does he say anything about -- counsel, I'm cutting the chase if anybody's not going to start

objecting.  This is what it says in here.  He can tell me what it says.  He can't tell me anything else that's not in this document unless he's going to put something else.

THE WITNESS:  We're going to put something else. There's another email.

THE COURT:  Then it's not in here.

THE WITNESS:  Okay.

THE COURT:  So let's just stick to what we have.  I'm getting a little short patience.

THE WITNESS:  Okay, so we --

THE COURT:  It's not my job to object.  It's not my job to say hearsay.  It's not my job to say where does it say this in this document.  Let's stick to what we have.  And counsel, Mr. Alexander, you're supposed to be in charge of this as counsel.  You introduced a document.  You're supposed to be asking him what it says, okay.  We're not just going to have rambling.  Let's try to do this in an orderly fashion.  We're never going to get through this.  It'll be 10:00 tonight.  If you guys want to stay until 10:00, I'm here.  But I don't know whether you want to do that or not, but go ahead.

THE WITNESS:  Patrick Thune sent that email, which is the report from the -- from Ian who was the receiver.  We have to --

MR. CAPONI:  Again, it's hearsay.  He's talking -- this is an email.  It says what it says.  Now it's a report

from somebody else and he's going to tell us what the Receiver said.  I'm trying not to object to be obstructionist.  I don't want to come across that way, but I share Your Honor's frustrations, so I'll start objecting more.  But Mr. Rajan just needs to keep to the facts.

THE COURT:  I'm not encouraging people to object, but I want them to try to -- I shouldn't be the one saying where is this on this document.  I'm trying to follow along.  So Mr. Rajan, only testify as to what is in the document.  Your commentary, your addition, it was not in this document.  If it's in another document, you wait until that document.  But nowhere in this does it say anything about a short -- it just says you will find the requested funds and the possible consequence if payment will not take place as soon as possible. Nothing about a shortfall.  It just says request funding for April salaries.  That's all this is, which I don't know why you didn't ask him what this was.

Okay.  I don't want to take over and I'm trying to let people make their own case.  But if you don't get there, I'm going to help you get there.  All right, Mr. Alexander, ask him a question.

MR. CAPONI:  Sorry, Your Honor.  Again, to try to speed things along.  If the purpose is to establish that SCBV in this timeframe is in need of funding, I think we all agreed to that yesterday.  We stipulate to that.  We don't need

testimony on it.  If there's another reason to bring it in, that's fine.  I just want to make that offer to speed things up.

THE COURT:  Mr. Alexander, you heard him?

MR. ALEXANDER:  I did hear him.  There is another reason to bring it in.  Because it --

THE COURT:  Okay.  Because it what?

MR. ALEXANDER:  Well, because it's going to demonstrate that SeeCubic didn't fulfill its obligations with funding.  But that's why I don't want to say that, Your Honor.  I'm letting the testimony --

THE COURT:  Well, this says requesting funding for April salaries, so I don't know what they were supposed to do.  This just says April.  All right.

MR. ALEXANDER:  That's why I was going to let the testimony come out, Your Honor, in terms of why the numbers are what the numbers are.

THE COURT:  Counsel, how does he know what they are?  They said request funding for April.  It does not say a shortfall.  I don't see anything in here that says shortfall.  All this is is request for April 7th.  Okay.  That's all he can testify as to this document.  If there's another document that there's a shortfall, you put it up and you ask us what it says.  But he can't tell us what somebody else said, okay.  And I want to avoid that.  Ask him something relating to this document.

47

BY MR. ALEXANDER:

Q    Mr. Rajan, in terms of contractors at SeeCubic BV, how much was owed to contractors?

A    My understanding from the reports I got is it's 239,000 euros.

Q    How much money was owed for wage, taxes, and pension obligations?

A    720,000 euros.

Q    How much were owed for patents?

A    They had -- from this report, which is the April report, it's 22,000.  But there's another report that shows a --

Q    Mr. Rajan, let's focus on this document.

A    On this report, 22,000.

Q    And do you know what the monthly rent is for SeeCubic BV?

A    It's about 15,000 euros.

Q    And how much money was being requested with respect for building rent?

A    87,000 euros.

Q    And do you know why 87,000 was being requested?

A    Because they had a huge shortfall from January through January, February, and March.

        MR. CAPONI:  Objection, Your Honor.

        THE WITNESS:  They had a huge shortfall and --

        THE COURT:  Objection.  What's the objection?

        MR. CAPONI:  There's no foundation for how Mr. Rajan

would know why -- didn't pay it's rent allegedly.

THE WITNESS:  I got it from the other reports.

THE COURT:  Well, then we'll get to the other reports.

THE COURT:  We're talking about this.

THE WITNESS:  This one -- yeah, it says 87,000.

THE COURT:  Okay.

THE WITNESS:  But the monthly rent is only 15.

THE COURT:  Okay.

THE WITNESS:  So logical would indicate it's previous rent.

THE COURT:  Well logic doesn't have anything to do with this.  It's just this is what it says.  That's your opinion on how you got there.  I don't know why, and you don't know why either.  It just says we want 87,562 collection of the department or eviction of the -- collection of the DEP or eviction of the building.  I don't know what that means, okay.

BY MR. ALEXANDER:

Q   Mr. Rajan, do you have a position with SeeCubic BV?

A   Yes.  I am listed in the Netherlands as the sole director of SeeCubic of the Netherlands.  And I'm listed in the Netherlands in the Chambers of Commerce, which is the regulatory body over there, as the CEO of SeeCubic of the Netherlands.

Q   Your Honor, I'm going to pull up Debtor's Exhibit Number

5.   Mr. Rajan, do you recognize this document?

A    Yes.  This is the --

Q    What is this document?

A    It's the Netherland's Chamber of Commerce.

Q    And what is the Netherlands Chamber of Commerce?

A    That is where, through the help of legal entities such as either a law firm or they have notaries, professional notaries, they do due diligence as to who should be on the board or the management of a company, and they help you register onto the company.  We did due diligence once Technovative was turned back and --

Q    Mr. Rajan, in terms of the document, I was just asking, what the Netherlands Chamber of Commerce is.

A    It the registry that is the governing document for who is on the board and who is the CEO.

Q    And who is the CEO of SeeCubic BV?

A    If you scroll down, it says me.

Q    During the time period of the -- you previously referenced a receiver being appointed in a chance reaction, during that time, would you receive reports from the receiver?

A    Correct.

Q    And would you review those reports?

A    Yes.

Q    And based on your review of those reports, do you recall how much money was requested from SeeCubic BV during the time

in which the receiver was in place?

A    Yeah. They -- yeah, I do remember that they had -- yes, I do remember how much they requested.

Q    How much did they request?

A    They wanted about 3.4 million euros, about 3.5 million euros.

Q    And do you recall how much money was approved through the receivership?

A    3.4 million euros.

Q    Do you know how much money was actually sent through the receivership?

A    1.9 million euros.

Q    And can you explain what the process was for funding during the receivership?

A    Yeah.  The receiver came.  He contacted us and said this is how much money the Netherlands would -- was requesting.  He wanted me to sign it and Mr. Stastney, which we did.  Twice he had a small revision.  I think it was November and December, and then we'd sign the revision.  The he would come back with a new request for the next month, and we would sign it.

Q    Based on the information provided, do you know how much money was -- or who had the obligation to send the money?

A    SeeCubic of Delaware.

Q    And of the -- you said there was about 3.5 million that was approved?

A     $3.5 million was approved with the receiver, myself, and Mr. Stastney.  That was roughly what the Netherlands people were asking for.  Then he told us, the receiver -- and we have a report.  We have a report that shows that only 1.9 million was sent.

Q     Now going back to VSI, has VSI agreed to provide funding to Stream in this case?

A     Yes.

Q     Okay.  What funding has VSI agreed to provide to Stream in this case?

A     They have agreed to buy equity from Stream and also loans, if needed, unsecured loans, those things for Stream.

Q     Are you aware that Stream filed a motion with the court seeking to obtain financing on an unsecured basis from VSI?

A     Yes.

Q     Who was involved in the discussions regarding VSI providing funding to Stream in these bankruptcy cases?

A     I was involved on the Stream side and Joe Corso or Joseph Corso was involved on VSI side.

Q     Who is Joseph Corso?

A     He's a strategic advisor for VSI who has authority to negotiate investment deals, sales deals, and he has authority to sign documents, and he's a shareholder.

Q     And how long has he been involved with VSI?

A     He's been involved with VSI since the founding.  He's been

involved with VSI for -- since we lost in the Chancery Court.

Q    And in terms of the funding with respect to VSI, how much has VSI agreed to fund to the Debtors?

A    For this payroll issue for the Netherlands, it's over 300,000 euros.  So there's other fundings that VSI and Stream are doing, but that's independent of the payroll stuff.

Q    And currently, you talked about funding the payroll.  Are there any other obligations in connection with the payroll?

A    I don't understand.  Do you mean for the payroll for the BV?

Q    That's correct.

A    Yeah.  They've got a $1.5 million shortfall.  They've got obligations all over the place.

Q    How much has -- other than the -- well, let me ask the question differently.  Does VSI currently have the funds to pay the 300,300 euros to fund SeeCubic BV?

MR. CAPONI:  Objection, Your Honor.  He's not here testifying on behalf of VSI.

THE COURT:  Counsel?

MR. ALEXANDER:  He is also testifying on behalf of VSI.

THE COURT:  Counsel, that's not what you told me. You told me he was here as a representative of the Debtor.  I asked you that at the very beginning.  Who was he here for? And you said he was testifying on behalf of the Debtors, not

VSI.  I specifically wrote that down and that's why I asked you that question.

MR. ALEXANDER:  Your Honor, I thought your question you asked me was who was calling Mr. Rajan.  I thought that was specifically what you asked me is who is calling.  Because I originally started out explaining what Mr. Rajan's titles were.

THE COURT:  Then, counsel, we have a problem.  He cannot just -- never mind.  I'll allow it for what it's work, Mr. Caponi.

MR. CAPONI:  Your Honor, look.  I think this goes to the heart of the issue.

THE COURT:  Yeah, I know.

MR. CAPONI:  Yeah, I mean, I'm not sure what to do about it.  I mean, I'll stick to my limited objection.  Mr. Rajan can't be everything.  He can't be, you know, as I say, Jesus Christ, the Father, Son, the Holy Ghost.  Like, you know, we don't do that here.  So that's my objection.  He's not VSI. If he wants to testify as to Stream, fine.

THE COURT:  I guess I should have been a little more specific when I asked who was calling him, and were you calling him for this one, this one, and this one.  I guess I wasn't specific enough to say in what capacity he was testifying as. And if I recall correctly, you said that he was -- his role was as the founder and a board member.  I guess I should have been more specific as to -- because he said he was a founder and a

board member, that he was testifying in that capacity.  Nowhere did you say he was going to testify in two capacities.  One, in the capacity as -- so the Debtor has not called him in his capacity as a board member.  And now at the same time, the Debtor is now calling him in his capacity as a representative of VSI?

MR. ALEXANDER:  Your Honor, the Debtor will withdraw calling him as a representative of VSI.

THE COURT:  Okay.

MR. CAPONI:  Your Honor, just for purposes of clarification since we had a -- I thought I understood the lay of the land earlier on.  But is Mr. Alexander also, or his firm also representing VSI here today, or is VSI not present, either by counsel or witness?  I thought I knew the answer to that. I'd like to clarify.

MR. ALEXANDER:  Lewis Brisbois and Smith is not representing VSI in any capacity.  Never has represented VSI in any capacity.  And is not representing VSI in any capacity here today.

MR. CALLAHAN:  This is Kevin Callahan from the US Trustee's Office.  I specifically pointed out at the beginning of this hearing that it did not appear that the Debtor was proposing to have a witness for VSI.  And I think that -- as other counsel has just stated, extremely material to the Debtor's motion to barrow money from an insider.  So to the

extent that VSI is not here today or represented by counsel, I think we have a significant issue. And I don't think this case can be -- I don't think the motion can be granted until the US Trustee and obviously other parties have the opportunity to examine the proposed lender to the bona fide to this transaction.

There are documents attached that are not signed.

THE COURT: Mr. Callahan.

MR. CALLAHAN: Yes, Your Honor?

THE COURT: Mr. Callahan, they have to make their case. They either make it or they don't. I think we're a little premature discussing it. They either put their witness on or they don't. You argue at the end. He's not represented. I get your argument, but we're not there yet. The are --

MR. CALLAHAN: Well, Your Honor -- Yes, Your Honor. I'm sorry. There was just an attempt by counsel to have him testify as to VSI, and I appreciate the Court stopping that.

THE COURT: Right. I mean, it's not that I stopped. He objected and I said wait a minute. I understood something. And then Mr. Alexander said that's not what he meant. But now he's withdrawn Mr. Rajan as a representative, so it's a nonissue at this point. I think the Debtor has to make -- the Debtor has the burden of proof on its motion. Either it will meet that burden, or it will not. And that means certain things have to be shown. And if they don't, they don't.

I think we're jumping the gun.  I know what they've attached to their motion.  But as you know, motions are just motions.  I can't rule on just motions.  I rule on evidence.  So now Mr. Rajan is not testifying in his capacity as his -- whatever his role is with VSI, and that's being withdrawn.  All right.  Go ahead, Mr. Alexander.

BY MR. ALEXANDER:

Q    Did Stream request from VSI proof of funds with regards to payment of the 300,300 euros?

A    Yes, we did.  And we received it and the proof of funds for --

MR. CAPONI:  Objection, Your Honor.  Yeah, I don't have a problem with him saying he asked for proof of funds.  But any evidence of what funds VSI does or doesn't have needs to come from a VSI witness.  He's not a VSI witness.

THE COURT:  Well, if he requested information and it was provided, I'm not necessarily going to rule that he can't say this is what he received.  Here's the document.  You give it whatever weight it -- I give it whatever weight that document has or does not have.

MR. CAPONI:  Understood, Your Honor.  Thank you.

THE COURT:  Okay.  So you said, yes, you got proof of funds from VSI?

THE WITNESS:  Yeah.  We put it on the docket.

THE COURT:  Okay.  Well, that's nice.  But we'll get

to it.

BY MR. ALEXANDER:

Q    We'd like to put up Debtor Exhibit Number 3.  Do you recognize this document?

A    Yeah.  That's it.

Q    Do you recognize this document?

A    Yeah.  I recognize the document.  That's the proof of funds.

Q    And this document shows that -- what does this document show?

A    It shows 357,000.

Q    Would that be sufficient to cover the interim funding request with regards -- that the Debtor is seeking?

A    Correct.

Q    I'd like to bring up Debtor's Exhibit Number 2.  Do you recognize this document?

A    Yes.

Q    And what is this document?

A    My understanding, this was -- came from Scadden, what they understood the BV needed for April.

Q    And in terms of the needs for SeeCubic BV, what are the payroll needs in terms of, you know, by April 25th?

A    It's 150,000 euros.  I'm sorry, 165,000 euros. I'm sorry, 165,000 euros.

Q    And do you know what that's for?

A     That's for the people on the payroll.  That's their take home pay.  That doesn't include the taxes.  And also, there's three bonuses in there, I think.

Q     With regards --

MR. CAPONI:  Objection, Your Honor.

THE COURT:  Counsel?

MR. CAPONI:  This document says nothing about bonuses or taxes.  The testimony -- he's adlibbing under the document.  That he admitted was not his document.  It came from --

THE COURT:  Counsel?  His response?  Your response to the objection?  It says 165 euros, and his testimony is he believes this is what is comprised -- what comprises this 165.

MR. ALEXANDER:  The witness has personal knowledge of what comprises the 165.  He testified to it.

THE COURT:  Are you asking him that?  I didn't hear any question as to how you know?  What's the basis, foundation?  Something. Ask him.

MR. ALEXANDER:  I'll try to lay the foundation for that, Your Honor.

THE COURT:  Okay.  So objection is sustained.  Foundation.

BY MR. ALEXANDER:

Q     How much is owed for payroll?

A     My understanding is it's 165,000 euros.

Q     And in terms of -- are there any amounts owed for wage

taxes and pension obligations?

A    You're asking regarding this chart or my --

Q    I'm asking regarding amounts that the Debtors are seeking financing to fund.

A    Oh, okay.  It would be 115,000 for the wage tax and pensions, euros.

Q    And are there any other amounts that the Debtor seeks funds for on an interim basis?

A    22,000 for the rent, also.

Q    And VSI has demonstrated the wherewithal to provide those funds?

A    Right.

Q    In terms of -- and that's with regards to the interim amounts, does SeeCubic BV also need additional funding?

A    Yes.

Q    For what periods?

A    They need funding.  My understanding is they need funding for expenses that went back as far as December that never got paid.  And they're going to collapse if they don't take care of it.

Q    In terms of the immediate request, what are the funds that the Debtors are seeking to provide to SeeCubic BV?

A    302,000 euros.  And also, we don't want to put any more debt on the company, on the BV.  We want to keep --

Q    Why do you not want debt on the BV?

A    They're 1.5 million euros in the hole and they're going to collapse.  And we shouldn't put any more debt on it.  We should just take the money as non-debt, like as either grant or intercompany transfer.  They're in serious trouble and we shouldn't add any more debt to that company, especially since the assets are so valuable.

Q    Has VSI indicated a willingness to fund the additional 569,000 euros on the chart?

MR. CAPONI:  Objection, Your Honor.  Again, that's hearsay.  If VSI wanted to propose -- you know, advance its funding, it should be here.

THE COURT:  Counsel.

THE WITNESS:  Yeah.  I would agree with --

MR. CAPONI:  Counsel -- excuse me.  Mr. Rajan.

THE COURT:  Mr. Rajan.  Counsel, he's objecting on the basis that he's asked him have they agreed to -- your question was whether they agreed to -- I guess the additional funding.

MR. ALEXANDER:  I don't believe that's hearsay.  The question is have they agreed to it.

THE COURT:  Well, he's going to tell us what somebody -- well, Mr. Caponi, you're objection.  I'm not going to make it for you.

MR. CAPONI:  Yeah, Your Honor.  I mean, telling me somebody's answer is by definition hearsay.  If these VSI

wasn't -- wanted to be here, it could articulate its wants, hopes, and dreams and what it's willing to do and what it has the resources to do or not.  Now, I'm sorry, Your Honor, just to be practical here, blunt here, VSI is Mr. Rajan.  He's creating a fake account.

THE COURT:  Hey.  What happened?  Uh-oh.

MR. CAPONI:  I'm sorry.

THE COURT:  Wait.  No, no, Counsel.  I lost you guys.

MR. CAPONI:  I'm sorry.

THE COURT:  I just have a Zoom. I'm trying to find --

MR. CAPONI:  We can hear you, Your Honor.

THE COURT:  I know you can hear me, but I can't see the screen.

MR. CAPONI:  Oh, okay.

THE COURT:  Uh-oh.  John, what do I need to do?

THE CLERK:  Check the bottom.  It probably just got moved.

THE COURT:  All right.  All right.  I got it back.  I went to the bottom.  All right.  I am so computer literate.

All right.  So the objection is that Mr. Rajan is telling the Court something someone else told him?

MR. CAPONI:  Correct, Your Honor.  And, you know, Your Honor, in addition to it just being hearsay, you know, this is just an unfair prejudice to my client because Mr. -- the Debtor wants to dance around.  For example, I just want to

say that VSI is willing to commit and VSI said it's willing to

have the funds.  And there's no one here from VSI for me to

cross-examine to find out it's --

THE COURT:  That's why it's --

MR. CAPONI:  -- and what's their point.

THE COURT:  Well, hearsay is for that exact purpose. And you can't ask or cross-examine whoever told this to Mr. Rajan.  So, Counsel, I'm going to have to sustain the objection.  The same way he had to have proof or there's something, but he can't tell us what somebody else told him. He has some correspondence.  I've got a -- you know, something, but he can't say what someone else agreed to when that someone else is not available for cross-examination.  That is classic hearsay.  Sustained.

BY MR. ALEXANDER:

Q    Did Stream agree to enter into an agreement with VSI for funding?

A    Yes.

Q    And how much funding?

A    Right now --

Q    With respect to the current motion.

A    -- it has agreed to fund the 300,000.  Then Stream TV, I believe, has agreed to additional fundings with VSI that could be used for other purposes for Stream.  And Stream TV is working with VSI right now on the reorganization plan for

Stream.

Q    What relationship -- I'm going to pull up Exhibit Number 1, Debtor's Exhibit Number 1.  Do you recognize this document, Mr. Rajan?

A    Yes.  This is the -- this is a promissory note.

Q    And what is this promissory note for?

A    This is money that Stream TV is getting from VSI to take care of the payroll right now for the BV.

Q    And in terms of the funding itself, what type of loan would it be?

A    It's a one percent loan, one percent interest rate.

Q    Is it secured, unsecured?

A    Unsecured.

Q    And in terms of the current document on the screen, if you look at page 6.  Do you recognize this document?

A    Yeah.  This is -- this is to help pay the -- for this money that's due right now for the Netherlands.

Q    What is this document

A    This is money that Stream TV is getting from VSI.

Q    What's the title of the document?

A    It's a promissory note.

Q    And what are the terms of this promissory note?

        THE COURT:  So, wait a minute.  There's two promissory notes?  Let's go back to the top.

        THE WITNESS:  Yeah.  There's three notes from Stream

-- I'm sorry -- that Stream TV is getting from VSI.  One is for
the payroll.  One is for the rent.  One is for the payroll
taxes.  This is for the payroll taxes.

THE COURT:  So don't you think we need to go by these
one by one?  I shouldn't be -- never mind.  So let's go with
number one.  The first is a senior promissory note in the
amount of how much and what for?

THE WITNESS:  165,000 euros to pay the payroll for
the BV.

THE COURT:  Okay.  What's the next one?

THE WITNESS:  115,000 euros to pay -- that is for
those payroll taxes for the Netherlands.

THE COURT:  Okay.  Promissory note number --

THE WITNESS:  Number --

THE COURT:  -- 3?

THE WITNESS:  20,000 to pay for the rent in the
Netherlands.

THE COURT:  Okay.  Is there another one or is this
it?  No.  Okay.  So there's three promissory notes.

MR. ALEXANDER:  Correct.

BY MR. ALEXANDER:

Q    And Stream has agreed to give three promissory notes to
VSI in exchange for the 302,519 euros?

A    Correct.

Q    And what is the interest rate on each of the notes?

A    One percent.

Q    And do these documents accurately reflect your understanding of the agreement with VSI regarding the terms in which they're willing to lend?

A    Correct.  This is for the payroll and these emergency monies for April.  Then the money will be transferred from Stream TV, if the Court allows it, to the BV as an inner company transfer.  There will be no additional debt burden put on the Netherlands entities.

Q    And upon receipt of these funds, how will Stream administer them?

A    Patrick Soon (phonetic) sent the wire information to get the money.  He gave information on where to send the money for the payroll.  It goes to their payroll count.  Then Ernst & Young takes it and pays their employees directly.  Then he gave information on where to send money for like the rent and -- the rent and also where to send the payroll taxes.  He gave us the wire instructions.

Q    And does Stream believe it's necessary to obtain this funding?

A    Yes.  It's absolutely necessary.  We have to keep the -- we need to reduce the debt at the SeeCubic BV so we can bring down the debt at the BV right now.

Q    Has Stream attempted or contacted any other parties or entities to try and obtain financing?

A    For this short-term money, yes, we did.

Q    Okay.  How many parties did Stream contact?

A    We got a broker and the broker contacted a whole bunch of entities at Seaport here in the United States.  They contacted a whole bunch of short-term lenders that finance companies in Chapter 11.  They went out to the market and they couldn't find people fast enough.  Those people are interested in the company, but they couldn't move quick enough because this was an emergency situation.

Q    Did Stream receive any other proposals for funding?

A    Not for this, no.

Q    Was Stream advised in terms of what other proposals would look like in terms of Chapter 11s today?

        MR. CAPONI:  Objection, Your Honor.  Again --

        THE COURT:  Is this --

        MR. CAPONI:  -- hearsay.  Guessing what he was advised by some -- what Stream was advised by some unknown third party.

        THE COURT:  Counsel.

        MR. ALEXANDER:  Well, we don't need it to be true. We're just asking it in terms of what the -- whether or not the Debtor decided to pursue some of those other options.

        THE COURT:  I'm not a --

        MR. ALEXANDER:  It's not for the proof of the matter asserted.

THE COURT:  Well, then what's he telling me for?

MR. ALEXANDER:  He's telling you why or not he decided to pursue some of those other options.

THE COURT:  What was the question again?  I am lost.  What was the question again?

MR. ALEXANDER:  I believe that the question was what is -- what was the environment for loans in bankruptcy right now.

THE COURT:  No.  I don't think that was the question.

MR. CAPONI:  The question was something along the lines of did their -- did Debtor receive advice regarding going into bankruptcy.

THE COURT:  All right.  How about we just rephrase it?

MR. CAPONI:  That's fine.

BY MR. ALEXANDER:

Q    Do you have an understanding of the current market for bankruptcy loans?

A    Do you mean not including these payroll loans?  Is that what you're asking me?

Q    Did you receive terms from any other party with respect to providing financing?

A    For this payroll loan, the answer is no.  The money that's going to the Netherlands right now, the short-term money, the answer is no.

Q    Okay.

MR. ALEXANDER:  Your Honor, I have no further questions at this time and I reserve for redirect.

THE COURT:  Okay.  All right.  Who's cross-examining?

MR. CAPONI:  Me, Your Honor.  It's Steve Caponi again.  Thank you.  I'll try to be targeted as best I can.

CROSS-EXAMINATION

BY MR. CAPONI:

Q    Mr. Rajan, nice to meet you again.  If you recall, I took your deposition about a month and a half ago.  So let's get right --

A    Nice to see you again too, Steve.

Q    Mr. Rajan, it's your testimony that you negotiated the notes that we just -- you just looked at with Mr. Corso, correct?

A    Correct.

Q    And when did that negotiation take place?

A    That happened yesterday.

Q    Okay.  And what legal counsel represented Mr. Corso?

A    He didn't have any.

Q    What banker represented Mr. Corso?

A    He didn't have a banker.

Q    What financial advisor represented Mr. Corso?

A    He is the strategic advisor for VSI.

Q    Other than himself, what financial advisor assisted Mr.

Corso?

A    I don't think he used one.

Q    What legal counsel was present with you in the room when you were negotiating with Mr. Corso for Stream?

A    For Stream?  Let me see.  I was calling our legal counsel on the phone and saying this is what we're discussing.  They were not on the conference call because he was driving in his car and he was -- it was not easy for yesterday for him to -- for Mr. Corso to get on a conference call because this was all last minute, unexpected.  So I called the lawyers and said, here's what we're discussing.

Q    What bank was present with you when you were negotiating these promissory notes with Mr. Corso?

A    Bank?

Q    Bank.  Any bankers.

A    No.  We didn't have any bankers involved.  It was only 300,000 transaction.

Q    Any -- what financial advisor, if any, was with you when you were negotiating these transactions with Mr. Corso?

A    None.  None.  It's a small transaction.

Q    And it's a small transaction, 300,000 euros.  Is that your testimony?

A    Yes.  It's a very small transaction.

Q    And you testified earlier that the subsidiary, SCBV, is worth hundreds of millions of dollars, correct?

A    Correct.

Q    So, just monetarily, this investment would be relatively small to what you deem the value of SCBV, correct?

A    It is small regarding the value.  It is not small regarding the outstanding debt of SeeCubic BV, which is about to collapse, which is 1.5 million euros.

Q    So 1.5 million is but a fraction of several hundred million.  You would agree with me, correct?

A    We're not going to sell any assets to pay the debt. That's not going to happen, so.

THE COURT:  That's not the -- Mr. Rajan, answer the question.  Nobody asked about selling assets.  The question was 1.5 euro small in comparison to what you value SeeCubic BV.  Is it SeeCubic BV?  Am I calling it the correct one or are you guys a different --

MR. ALEXANDER:  That's correct, Your Honor.

THE WITNESS:  SCBV.

THE COURT:  Thank you.  All right.  That was the question.

THE WITNESS:  It's small.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q    Mr. Rajan, under your testimony, am I correct it is your view that despite a relatively small number being required to fund SCBV compared to its overall value, do you believe that

additional amount of debt cannot be obtained by SCBV?

A     The BV obtained what?

Q     It's your testimony that SCBV could not be burdened with another 300 and some thousand dollars in debt, correct?

A     Correct.

Q     Even though it's worth hundreds of millions of dollars, correct?

A     Correct.  The reason is, is that right now -- first of all, the BV never generated revenue.  It was providing services for Stream.

Q     I think you answered my question.  I appreciate that.  My next question would be -- again, I just want to understand your testimony -- that despite a relatively small amount of money being required, the Debtor was unable to find anyone in the market to provide that funding other than your other entity, VSI, correct?

A     Yes.  With a short-term notice.  That is correct.

Q     And that include -- and the Debtor, am I correct, or any of its representatives, never contacted any of Stream's current secured lenders to see if they were interested in funding SCBV, correct?

A     Was Stream's secured lenders?

Q     Was Stream nor any of its advisors ever contacted, Stream's current secured lenders, to see if they were willing to continue funding SCBV --

A     I don't know who they are.

Q     You're not aware of Hawk or SLS, Mr. Rajan?

A     Hawk is not a lender.  He's equity.  SLS gave their loan to another company.  And Hawk had an anti-assignment clause.  I don't know who the secured lenders are.  I don't know if you even have a viable company.

MR. ALEXANDER:  Your Honor, the testimony at the --

THE WITNESS:  There's no --

THE COURT:  Whoa, whoa, whoa, whoa.  Your answer is no because you don't believe they have secured creditors.  Go on, Mr. Caponi.

BY MR. CAPONI:

Q     Okay.  Mr. Rajan, it's your testimony to this Court that as the chief executive officer of Stream having -- you said you're the sole board member -- you're unaware of who the secured lenders of Stream are?

A     I believe that there are people claiming they are secured lenders when they're not and I believe there are people who did several illegal transactions that are making claims that they have debt that they don't have.  I don't believe SeeCubic of Delaware is a legitimate company.  They claim they had assets when they didn't have it.  They attempted to take the Hawk loan when they --

THE COURT:  Mr. Rajan, Mr. Rajan, your answer is you do not believe they have secured creditors, correct?

THE WITNESS:  And they're not legitimate companies.

THE COURT:  Well, whether they're legitimate companies or not is not for me or you to determine.  You can -- the issue is you believe there's no secured creditors, correct?

THE WITNESS:  Yes.  I believe they are not secured creditors.

THE COURT:  And who are the they?

THE WITNESS:  I believe that SeeCubic and Hawk are making misrepresentations on their current structure of their --

THE COURT:  Uh-uh.  Mr. Rajan, I did not ask you about their structure or any what you believe about whether they're legitimate companies or not.  Why do you believe they are not secured creditors?  You said something about any assignment, something else.  Why do you believe they're not secured creditors?

THE WITNESS:  Because they transferred their debt to another company through an illegal transaction.

THE COURT:  And who has determined it's an illegal transaction?  You or some court?

THE WITNESS:  No.  I am making the determination that they did an illegal transaction because our --

THE COURT:  So you made that determination.  It is your belief that it was an illegal transaction.

THE WITNESS:  Correct.

THE COURT:  Well, then say that.  Don't say it is.  You don't have the authority to say it is or it isn't.  It is your belief that it is.

THE WITNESS:  It's my belief that it is an illegal transaction.

BY MR. CAPONI:

Q    Mr. Rajan, you're aware of the -- prior to the bankruptcy there was a proceeding in the Delaware Court of Chancery, what's called a -- we refer to it as a 225 action.

A    Right.

Q    Did you participate in that, correct?  And I took your deposition in that action?

A    Yeah.

Q    And do you recall at the beginning of that action there was a substantial briefing and a hearing before Vice-Chancellor Laster regarding whether or not there was secured debt owed by Stream TV.  Do you recall that?

A    Right.

Q    Do you recall that the Court of Chancery issued an opinion only a few months ago stating that there was a secured debt held by SeeCubic and that debt was in default.  Do you recall that?

A    That is incorrect.

Q    Your --

THE COURT:  Wait a minute.  Whoa, whoa, whoa, whoa,

75

whoa, whoa.  One of you.  You can't both talk.  Let him ask his question.

MR. CAPONI:  All right, Your Honor.

THE COURT:  Mr. Caponi, your question is that you believe that the Chancery Court --

MR. CAPONI:  I'll rephrase the question, Your Honor.

THE COURT:  Rephrase it, okay.

BY MR. CAPONI:

Q    Do you recall, Mr. Rajan, that the Court issued a written opinion specifically finding that SeeCubic held secured debt in Stream TV and that that debt was in default?

A    Your statement is false.

Q    Is my statement false because you disagree with the Court's --

MR. ALEXANDER:  Your Honor, I'm going to object to the question.  It's outside of the scope of direct and it's irrelevant.

THE COURT:  Counsel, he said it's outside the scope of direct and it's irrelevant.

MR. CAPONI:  Your Honor, I asked Mr. Rajan where he spoke to -- if he spoke to the secured creditors about them funding.  He was asked about his efforts to find other funding sources, and this is how we ended up here.  He's denying that there were secured creditors.  I'm just trying to explore why he did not ask third parties, arm's length third parties, to

fund this debtor.

THE WITNESS:  We did.

THE COURT:  Wait.  That wasn't the -- I am going to allow it because he said they're not -- he didn't reach out to them because they weren't secured creditors.  And the question is why do you believe they're not secured creditors.  And in response to that, he's asking them a question about the opinion.  I don't know what the opinion says.  The opinion is going to say what it says, but I'll allow it for what it's worth.

BY MR. CAPONI:

Q    Mr. Rajan, again my question is -- you say my prior question is incorrect.  Are you disagreeing with Mister -- or excuse me -- the Vice-Chancellor's conclusions or are you saying that I mischaracterized his conclusions?

A    You mischaracterized it.

Q    Okay.  And, again, the opinion will speak for itself.  And I'll take the Court's comments and move on.  Mr. Rajan, Mr. Corso, he's not present at this hearing today, is he?

A    No.

Q    And in the 225 action below, you submitted into evidence -- you being Stream -- a series of documents executed on one hand by Stream and on the other hand, by three entities, Glasses Free Technologies, VTI, and VSI.  Do you recall that?

A    Correct.

Q    And those documents memorialized the sale, alleged sale,
of shares to Stream to VSI, VTI, and Glasses Free, correct?

A    Correct.

Q    And VTI, VSI, and Glasses Free are all companies owned and
controlled by you and your family, correct?

A    I am 1 of 75 shareholders in those companies.

THE COURT:  Which companies?  Wait a minute.  Wait a
minute.  I only can write so fast.

THE WITNESS:  There's --

THE COURT:  There was a series of --

MR. CAPONI:  It's VSI, Your Honor.

THE COURT:  Uh-huh.

MR. CAPONI:  Then there's VTI.

THE COURT:  Oh, VTI, okay.

MR. CAPONI:  VTI.  And then Glasses Free Technology.

THE COURT:  Okay.  And the Debtor sold shares, some
of its shares, to these three entities?

MR. CAPONI:  Yes, Your Honor.

BY MR. CAPONI:

Q    The -- in the 225 action, Mr. Rajan, Stream, produced
documents purporting to memorialize the sale of shares by
Stream to those three entities, correct?

A    That is correct.

Q    And you and your family control those three entities,
correct?

A    We are minority economic shareholders.  We are majority voting stock in those companies.

Q    So by having majority voting stock, you are the controlling shareholders of those entities, correct?

A    Yeah.  That is correct.

Q    Okay.  And for each one of those documents that purported to memorialize the sale of shares, Mr. Corso was the party that you had sign on behalf of each of those entities, correct?

A    Correct.

Q    And in your deposition when I asked you why -- well, strike that.  Mr. Corso is not employed by either VSI, VTI, or Glasses Free, correct?

A    He's not an employee, no.

Q    Correct.  And he's not a board member or an officer of either one of those entities, correct?

A    No.  He's a strategic advisor.

Q    And when I asked you in your deposition if Mr. Corso was employed by or was an officer or director, you did not tell me he was a strategic advisor for those entities, did you?

A    I thought I did.  I'm not sure.

Q    Okay.  We'll move past that one, Mr. Rajan.  When I asked you in your deposition why you had Mr. Corso execute those documents on behalf of the entities that your family controls, your answer was that it -- you thought it would look better, correct?

A     Yeah.  I think we should have somebody independent do it.

Q     All right.  You didn't say, Mr. Rajan, you wanted someone independent to do it.  You said you wanted it to "look better", meaning you wanted a signatory other than your own on both sides of the document, correct?

A     I don't recall what I said back then, but we wanted somebody independent to do it and he did a good job for us, so he did it for us.

Q     And, Mr. Rajan, you testified again in your deposition that Mr. Corso executed --

        MR. ALEXANDER:  Your Honor, I'm going to object.  I mean, is this impeachment?  I mean, he's talking about testimony from another proceeding.  I'm just trying to see the relevance of the proceeding here.

        MR. CAPONI:  Sure, Your Honor.

        THE COURT:  Counsel, what's the --

        MR. CAPONI:  The relevance --

        THE COURT:  -- relevance because I'm wondering the same thing?

        MR. CAPONI:  The relevance is, Your Honor, that Mr. Rajan has the same playbook as -- exactly what he did here, he did below.  He relies upon Mr. Corso, who executes documents under a power of attorney whenever there is a need to create the appearance of a separation.  So I'm establishing a -- with regard to this Debtor, it's pattern of conduct.

THE COURT:  Mr. Alexander.

MR. ALEXANDER:  Well, there's nothing of record that shows pattern of conduct, and he's asking something that took place in a different proceeding.

THE COURT:  Well, I think that's the point, is it not?

MR. ALEXANDER:  Well, the point would -- I mean, he would need to demonstrate some factual foundation and a predicate in order to do that.  I don't see how asking what testimony was and in terms of the issues here.  I mean, the --

MR. CAPONI:  I'm happy to make a slight proffer for Your Honor or I can get it through the witness.  It will just take a little bit of time, given the --

THE COURT:  I thought you asked him did he -- about your prior deposition and what it was in connection with.

MR. CAPONI:  I did, Your Honor.

THE COURT:  Did I miss?  Okay.  And you don't believe that's sufficient foundation, Mr. Alexander?

MR. ALEXANDER:  In terms of the -- it leading from that foundation to the relevance here, I don't.

MR. CAPONI:  Your Honor, I can -- I'd be happy to try to do it very quickly.

THE COURT:  All right.

BY MR. CAPONI:

Q   Mr. Rajan, as we testified before the 225 action, there

was a hearing coming up the week before Stream filed

bankruptcy, correct?

A     No.   There was not a hearing coming up.   It was a pretrial

conference.

Q     Followed by a hearing on the merits, correct, Mr. Rajan?

A     The hearing was later.

Q     But there was going to be a hearing within a short period

of time, a trial on the merits, correct, Mr. Rajan?

A     There was eventually going to be a hearing, correct.

Q     Mr. Rajan, there was a date set for the hearing, was there

not?

A     Yes, there was.

Q     Okay.   And it -- I'll move on.   Mr. Rajan, the point in

the underlying 225 action, what was going to be tried, the

primary question, was whether stream had converted the secured

lenders from debt to equity, correct?

A     No.

Q     That's not your understanding of what was trying to be --

Stream was seeking to establish in that litigation?

A     No.

Q     Mr. Rajan, I'll remind you, you're under oath and there is

a substantial written record in the --

           THE COURT:   Just ask him the question and if you have

something --

           THE WITNESS:   What happened again.

THE COURT:  Mr. Rajan, don't interrupt me.  What I am saying to him is that he says, no, it's not.  And if you have some evidence to the contrary, you put it in and I'll deal with it.  You know, what is his understanding of what the trial was going to be about?

THE WITNESS:  Can I say what the understanding was?

THE COURT:  I'm asking.  What was his --

MR. CAPONI:  Mr. --

THE COURT:  -- understanding?  Go ahead.

THE WITNESS:  Can I answer?

THE COURT:  Yes.  What was your understanding the trial was going to be about?

THE WITNESS:  My understanding was that Stream TV was entitled to receive its assets back --

THE COURT:  No, no, no.  What was your understanding that the trial that had been set for a date certain was on the 225 action, what was the trial going to be about?

THE WITNESS:  The trial was about if Stream TV wishes to pay SeeCubic either with shares or with cash to get -- or not SeeCubic. I'm sorry. Hawk. With shares or cash to basically get rid of the debt because they wanted to exercise --

THE COURT:  I didn't want to hear what they wanted to do.

THE WITNESS:  I'm trying to tell you what the hearing was about.

THE COURT:  The hearing was about whether you could convert their debt.  You would either pay through cash or converting it to equity.  Is that what it was about?

THE WITNESS:  Well, but there's one important part, okay.  They wanted to make a change at the board level, not the ownership of the asset, a change at the board level where they could exercise their discretion later to sell.

THE COURT:  So that's what the hearing was going to be about?

THE WITNESS:  Right.

THE COURT:  That's your understanding.

THE WITNESS:  My understanding.

THE COURT:  So when he said that whether Stream could convert the debt to equity, that was part of what it was about, was it not?

THE WITNESS:  It was a portion.

THE COURT:  That's what he asked you, so that should have been a yes.

THE WITNESS:  A portion.

THE COURT:  But he didn't' ask you everything, so it was also the hearing or the trial was going to be whether Stream could convert whatever obligation between itself and Hawk to equity, to shares.  Was that going to be part of the trial?

THE WITNESS:  Part of it, correct.

THE COURT:  All right.  So the answer is yes, Mr. Caponi.

BY MR. CAPONI:

Q    Mr. Rajan, and one of the ways you -- Stream was seeking to establish that the debt had been converted was through the sale of -- documenting the sale, alleged sale of shares, from Stream to VSI, Glasses Free, and VTI, correct?

A    Yes.

Q    And the documents that memorialized that transaction were signed on behalf of those three entities by Joe Corso, correct?

A    Correct.

Q    The same Joe Corso who signed and allegedly negotiated the funding agreement we're discussing here today, correct?

A    Correct.

MR. ALEXANDER:  Objection to the form of the question.  Mischaracterizes testimony.

THE COURT:  Mr. Caponi, rephrase it.

MR. CAPONI:  Sure.

THE COURT:  Leave out the word, allegedly, okay.  Come on.

MR. CAPONI:  Yes, Your Honor.  Strike alleged.  I'll concede that point.

BY MR. CAPONI:

Q    Mr. Rajan, with respect to Mr. Corso and in the underlying transaction, all right, do you recall that my clients tried to

-- sought to depose Mr. Corso to get his understanding of those transactions.  Do you recall that?

A    I believe that you were trying to do that.  Yes, I think so.

Q    And do you recall that we requested that Stream provide contact information for Mr. Corso or facilitate his deposition and Stream refused?

A    I wasn't involved in it.  You were talking to our attorney.

Q    So if your attorneys made those decisions, it's your -- well, we'll strike that.  I'm not going to ask you about your attorney communications.  Mr. Corso, again, is not here today, is he?

A    No.

Q    Okay.  Does Mr. Corso actually exist as a person, Mr. Rajan?

A    Yes, he does.

Q    Do you have any evidence whatsoever that Mr. Corso exists as a person other than your testimony?

A    Well, he comes to our office.  We've met him a number of times.  He's given us money.  I mean, and he's met with our employees.

Q    Mr. Corso executed the documents in the 225 action and the documents that we're discussing here today pursuant to a power of attorney, correct?

A     Yes, he did.

Q     And that was a power of attorney given to him by you, correct?

A     Yeah.

Q     And you gave him that power of attorney on behalf of VSI, VTI, and Glasses-Free, correct?

A     Correct.

Q     So your understanding or your position, am I correct, as the Chief Executive of Stream, that Mr. Corso -- strike that. I'm going to ask you another question.  Mr. Corso is also one of the largest shareholders in VSI, correct?

A     Yes.

Q     And he's also a significant shareholder in Stream, correct?

A     Yeah.  He put more money in than SLS did.

Q     Okay.  That was my question.  He's a significant shareholder in Stream, correct?

A     Yeah, he did.  He gave money.

Q     And as the Chief Executive of Stream, it's your opinion or determination that Joseph Corso, who operated under a power of attorney granted to you by him and who was a shareholder of VSI and a shareholder of Stream and is a advisor retained by you on behalf of all those entities, that he was an independent third party with whom you can negotiate an arm's length financing?

          MR. ALEXANDER:  Objection.  Mischaracterizes the

testimony.

THE WITNESS:  Yes.  He's a shareholder --

THE COURT:  Whoa, whoa, whoa.  He's objecting.

MR. CAPONI:  I don't think anything was mischaracterized.  I think I laid the foundation on each one of those points.

MR. ALEXANDER:  You said that a power of attorney was granted to Mr. Rajan.

MR. CAPONI:  No.  The power of attorney --

THE COURT:  Yeah.  You need to rephrase it.  I know what you meant.

MR. CAPONI:  Sorry.

THE COURT:  I know what you meant, but you said it --

MR. CAPONI:  Sure.

BY MR. CAPONI:

Q    Mr. Rajan, again, as the Chief Executive of Stream, is it your position that Mr. Corso, who was a shareholder of VSI and a shareholder of Stream, who was an advisor retained by you on behalf of Stream and VSI, and who operated under a power of attorney granted to him by you, that he qualifies as an independent third party with whom you can negotiate an arm's length financing?

A    Can I answer the question?

Q    Please.

THE COURT:  That's a yes or no.

THE WITNESS:  Yes, I believe so.  He's looking at -- because he will not come in like an investor and cram down Stream TV, because he has holdings over there, too.  So he would actually be somewhat respectful of the Stream people.  If I just got somebody that had no Stream shares, they'd want, when they see all the stuff going on, they'd really cram down Stream TV.  So I'm trying to protect Stream.

BY MR. CAPONI:

Q    And under that logic, Mr. Rajan, aren't you the perfect person to negotiate the financing with yourself?  Because nobody has a bigger interest in Stream than you and your family?

A    No, because basically, SeeCubic did an illegal transaction and tried to strip my shares, so that's why --

THE COURT:  Mister -- that wasn't the question.  I don't want to hear about any illegal this.  You guys can have whatever position you want about what you believe.  SeeCubic believes that they own it, you believe you own it.  That's for another day.  Today, the only thing I need to figure out is was there a loan offer made, was it negotiated, is it in the best interests of the Debtor and its Creditors to approve the loan, and whether it's an arm's length transaction, and whether there's a -- nobody's debating that the money needs to be paid.  So I don't think the necessity is an issue.

So all this other stuff, you guys are not helping.

And I'm not going to -- and if you think it's going to somehow sway or somehow make the Court think bad of one another, all that, I'm not going to do any of that.  I am very good about being able to disassociate what I believe is nonsense.  And I say nonsense because it doesn't help me get where I need to go. Anything that doesn't help me get there is extraneous, unnecessary, and I don't really give that much weight or attention to it.

So I think I've tried to say that.  Maybe not as succinctly as I just did.  But keep that in mind, everybody. That would be you, Mr. Caponi, with your questions, and you, Mr. Rajan, with your answers.  Okay?

MR. CAPONI:  Yes, Your Honor.  I'll try my best.

BY MR. CAPONI:

Q   Mr. Rajan, I think you testified earlier that you negotiated today's financing with Mr. Corso while he was in the car yesterday; is that correct?

A   Yesterday, we had a call.  Well, but starting the day before yesterday, and mainly yesterday.  And then, we had a little bit this morning.

Q   Mr. Rajan, and this is a bit of a formality.  I apologize. It may seem like an obvious question, but and the Debtor did not file its motion seeking to get today's financing approved until today, correct?

A   Yeah.  For Stream TV to get the money, yes.  Because

yesterday, if you recall, we originally said we don't need --

THE COURT:  We don't need an -- it's a yes or no answer.

THE WITNESS:  Yes.

BY MR. CAPONI:

Q    And Mr. Rajan, the Debtor did not file any sort of motion the first, second day or first, second, or third week of the bankruptcy filing seeking to obtain financing for SCVBV, correct?

A    We did not send in the filing for SCVBV, yes, because we didn't think it was going to turn into this big drama.

Q    Mr. Rajan, so your testimony here today that SCVBV is worth hundreds of millions of dollars, and the Debtor needs to fund it because it's crucial to the survival of Stream, yet the Debtor waited well over a month into the bankruptcy before filing any motions or seeking any court approval to obtain funding for that entity?

A    Yeah, because I didn't think you were going to sabotage it.  I thought you were going to leave us alone and let us take care of it.

THE COURT:  Mr. Rajan, first of all, I have told you about the issue of -- they have every right to object.  You may not like it, but I don't like the word sabotage.  They have the right to object, the same way you have the right to come and ask.  Please, that doesn't help.

THE WITNESS:  Okay.

THE COURT:  I get you guys don't -- that there's some animosity, there's some belief.  The bottom line is your company borrowed money, got money from Mr. Caponi's clients.  However that is dealt with, it is a fact.  Now, everybody believes that they as the lender are entitled to collect.  You believe they don't have the right to collect and that you want to do something else.  I get that.

But all that, that doesn't help.  So keep the commentary to yourself.  Yes, no.  Your lawyer, Mr. Alexander, will be able to redirect and ask you to maybe explain.  But at this point, I don't need the commentary.  It's just a waste of time and we're way past six o'clock.  And we haven't even gotten past the first witness.

THE WITNESS:  I apologize.  Yes, we did not file.  I thought it was going to be a lot easier.

BY MR. CAPONI:

Q    So Mr. Rajan, would you agree with me that had the Debtor filed this motion a month ago, it would have been the Debtor would have had more of an opportunity to potentially find third parties to provide this financing?

A    That is correct.  I wish we did, and that was a mistake. We should have done it sooner.

Q    Mr. Rajan, I believe you testified that -- correct that VSI is working with the Debtor on a reorganization plan for

Stream; is that correct?

A    Yes.  That is correct.

Q    Has that been proposed anywhere?

A    We haven't submitted it yet.  We're working --

Q    Sorry.  Was that disclosed in the motion that was filed with the Court this morning seeking to approve financing by VSI?

A    That was disclosed two or three motions ago.

Q    It's your testimony that the parties to this bankruptcy and the Court were aware that the party with whom the Debtor is trying to enter into financing is also the party that is working with the Debtor to create its plan of reorganization?

A    I'm 90 percent sure I put it in my filings earlier, yes. You didn't see it?

Q    Just to be clear, VSI, the lender in today's notes that we're discussing, you're working with to restructure Stream in this bankruptcy?

A    We're working on a plan that the Court has to approve.

Q    And who -- strike that.  I don't need to worry about that.

        Mr. Rajan, I'm going to try to speed things up here. With regard to VTI --

        MR. CAPONI:  I'll skip that, Your Honor.  Your Honor, if I can get one minute just to look through my notes to make sure.  I'm going to heed your advice and try to skip over things that aren't necessary here.  I think the points have

been made.

BY MR. CAPONI:

Q   Oh, Mr. Rajan, in the motion that was filed, the initial motion that was filed, there was language in that motion stating that part of the compensation VSI is receiving for the lending is the distribution agreement.  Yet when I look at the actual order, and your testimony which says that it's unsecured, I don't see that requirement.  Are you able to clarify that for me?

A   I don't understand your question.  What are you saying?

Q   Let me ask you this way.  Is part of the compensation VSI is getting for lending money to Stream execution and performance of the distributorship agreement?

A   It's an aspirational -- The Court has to approve it.  It's an aspirational hope.  The Court has to -- we submitted it for approval by the Court.  The Court didn't approve it yet.

THE COURT:  Mister -- what is it that you believe that you submitted to the Court for approval?

THE WITNESS:  Vince, correct me if I'm wrong.  Didn't we submit in one of our motions approval for the distribution agreement?

THE COURT:  Right.  And the question is, is the distribution agreement, which provides for 10 percent, part of the compensation that VSI is receiving for financing the Debtor?

THE WITNESS: No, because the Court didn't approve the distribution --

THE COURT: We didn't ask you about whether the Court approved it. I'm asking you, he's asking you, it is a part of the compensation that you want the Court to approve.

THE WITNESS: Oh, that we want the Court to approve. Yes.

THE COURT: Okay.

BY MR. CAPONI:

Q    And the distribution agreement, who executed that document on behalf of VSI?

A    I got to go back and check. I don't remember.

Q    Was that Joseph Corso as well? Does that refresh your recollection?

A    Maybe. Yeah.

MR. CAPONI: Would it be possible, Your Honor, to get a 10-minute recess to, one, use the facilities, and two, to just make sure I'm not missing anything before I turn the witness over?

THE COURT: That's fine. I need a recess, too.

MR. CAPONI: Okay.

THE COURT: Okay. All right. Court is in recess until -- let's go 6:20. That's 12 minutes. Thank you.

Mr. Rajan, you're still under oath. You can't talk to anyone during the recess. Okay?

THE WITNESS:  All right.  Thanks.

THE COURT:  All right.

(Recess taken)

THE COURT:  Okay.  We're back on the record.  Mr. Caponi.  Oh, you moved over there.

MR. CAPONI:  Yes, Your Honor.

THE COURT:  Okay.

MR. CAPONI:  Thank you.  I only have one other topic to cover very briefly.  And if I could get docket entry number 83 pulled up, Exhibit 14, to that document.

THE COURT:  What docket entry?  What?

MR. CAPONI:  Docket entry 83.  Before I go there, Your Honor, let me -- well, let's pull up that docket entry if we can.  I would appreciate it.  I'm not sure who does that.  I assume it's not me.  I hope it's --

THE COURT:  No, it's John.

MR. CAPONI:  Okay.

MR. ALEXANDER:  Your Honor, I don't see Mr. Rajan's face yet.

MR. CAPONI:  Oh, okay.  We better hold off, then.

THE COURT:  No, I see him, but I don't see that he's back on.

MR. ALEXANDER:  Your Honor, may I call him on the phone to advise him we're back in session?

THE COURT:  Yes.

MR. ALEXANDER:  He's coming, Your Honor.

THE COURT:  Okay.  All right.

MR. CAPONI:  And I assume we're back on the record, Your Honor?

THE COURT:  Yes, we're back on the record.

MR. CAPONI:  Thank you.  So yeah, Exhibit 14 would be great.

THE COURT:  Docket entry 83, Exhibit 14?

MR. CAPONI:  Yes, Your Honor.  If you could scroll down to -- we'll stop right here.  Thank you.

BY MR. CAPONI:

Q    Mr. Rajan, do you see this exhibit on the screen in front of you?

A    Yes.

Q    The email from Mark Dannenberg?

A    Yes.

Q    Mister --

MR. ALEXANDER:  Your Honor, I'm going to object. That's hearsay.

MR. CAPONI:  I haven't asked a question yet, other than does it say Marc Dannenberg.  So I'm not sure it's hearsay.

MR. ALEXANDER:  All right.  Go right ahead.

MR. CAPONI:  Sorry.

BY MR. CAPONI:

Q    Mr. Rajan, Mr. Dannenberg is an individual who solicits investments on behalf of VSI, correct?

A    On behalf of VSI?  Yes.

Q    Okay.  What is he?  Is he a stockbroker?  Can you tell me?

A    I'm not sure.

Q    You're not sure --

THE COURT:  What does he do?  You asked that he did what on behalf of VSI?

MR. CAPONI:  He solicits investments into and for VSI, as well as other Rajan-related entities.

BY MR. CAPONI:

Q    Mr. Rajan, you don't know if he's a broker, but you have him solicit investments for you?

A    He --

MR. ALEXANDER:  Objection, Your Honor.  They've asked Mr. Rajan not to testify about VSI, and then they're asking him about VSI.  So I don't think they can have it both ways.

THE COURT:  Mr. Caponi?

MR. CAPONI:  Sorry.  I'll lay the foundation.

BY MR. CAPONI:

Q    Mr. Rajan, Mr. Dannenberg is involved with Stream, correct, as well?

MR. ALEXANDER:  I'm going to object.  This is outside of the scope of direct.

THE COURT:  Mr. Caponi?

MR. CAPONI:  Your Honor, I'm going to -- happy to give you a proffer.

THE COURT:  Okay.

MR. CAPONI:  Mr. Dannenberg, very recently, as we've attached to court documents, has been soliciting investments into VSI.  And as this email will get down to and will show, he is telling everyone that the game plan is that Stream is getting wiped out and all the assets are going to get moved over to VSI, and that's where they need to invest their money.

And I just want to explore with Mr. Rajan and confirm that this is the same VSI that is intending to finance the estate.

THE WITNESS:  He doesn't work for Stream --

MR. ALEXANDER:  Hold on, Mr. Rajan.

THE COURT:  Whoa, whoa, whoa.

MR. ALEXANDER:  Hold on.

THE COURT:  Whoa.  Mr. Alexander?

MR. ALEXANDER:  Well, he just indicated that he's trying to introduce an email to demonstrate the truth of the matter that's in the email.  So --

THE COURT:  Well, right now, we're not talking about the email.  He's talking about Mister -- what's his name?

MR. ALEXANDER:  Dannenberg.

MR. CAPONI:  Dannenberg.

THE COURT:  Dannenberg.

MR. ALEXANDER:  But he's asking about Mr. Dannenberg's services for VSI.

THE COURT:  And he's also providing services for Stream, I just heard him say.

THE WITNESS:  No, I said he's not.

THE COURT:  Oh, he's not.

THE WITNESS:  He's not.

THE COURT:  I mean, I will allow it because you're proposing that VSI loan the money.  VSI doesn't -- I think he can ask, to the extent Mr. Rajan has knowledge with respect to VSI and their emails at Stream or as VSI.  Or however he has the knowledge, I think he can explore the proposed lender, because this is what this is going to.  And I'll allow it for that purpose only, Mr. Caponi.

MR. CAPONI:  Understood, Your Honor.  That's the purpose I'm exploring the question.

THE COURT:  Okay.

MR. CAPONI:  So with that foundation, if we could scroll down to page 9 of this email.  And I will note for everyone in advance, it comes out very odd and it gets down to basically like this, one line -- one word per line.  Keep going down, please.  So stop here, please.

BY MR. CAPONI:

Q    And in this email, Mr. Rajan, Mr. Dannenberg, in soliciting investments for VSI, states, "The debt will be

settled and all court cases are stayed, meaning they go no

further than they are right now.  The equity gets wiped out in

Stream."  If you could scroll down a little bit further.

"Stream will continue to do business with VSI and VSI

is now the vehicle for all business."  I'll stop there.

MR. ALEXANDER:  Your Honor, I'm going to object to --

MR. CAPONI:  Mr. Rajan --

THE COURT:  Wait.

MR. CAPONI:  I'm sorry.

THE COURT:  He's objecting to?

MR. ALEXANDER:  I'm objecting to foundation and

hearsay.

MR. CAPONI:  Again, I haven't asked a question yet.

MR. ALEXANDER:  Well, you just read an entire email.

MR. CAPONI:  I read a line, and I'm going to ask a

question about that line I just read which will address your

foundational question.

THE COURT:  Okay.  I'll allow it for what it's worth.

But are you relying on the -- never mind.  I'll allow it for

what it's worth, because you're not relying on that email, from

what I gather.

BY MR. CAPONI:

Q   Mr. Rajan, were you aware that Mr. Dannenberg, on behalf

of VSI, was telling investors that the plan was to wipe out the

equity in Stream and to make VSI the vehicle that everyone

should be participating in going forward?

A   No.

Q   Okay.

A   He doesn't work for Stream.  He works for SeeCubic.  And he came from SeeCubic.  It is my understanding SeeCubic of Delaware hired him.  I don't know what he's doing.

Q   Mr. Rajan, a few minutes ago, you testified in response to my question that Mr. Dannenberg solicits investments for VSI, correct?

A   He is -- he was working for SeeCubic.  He got all the --

Q   Mr. Rajan, excuse me.  I asked you earlier, did Mr. Dannenberg solicit investments for VSI.  And you told me yes, he did; is that correct?

A   I believe so.

Q   Okay.

A   I'm not able to --

Q   You are the -- and we established earlier --

        THE COURT:  Whoa, whoa.

        MR. CAPONI:  Sorry.

        THE COURT:  You just say yes or no.  Mr. Alexander can redirect.  But this is a yes or no, okay?

BY MR. CAPONI:

Q   Mr. Rajan, earlier, am I correct, you testified that you and your family have voting control over VSI, correct?

A   Correct.

Q    And you are the board of directors of VSI, correct?

A    Yes.

Q    Okay.  And so Mr. Dannenberg, on behalf of the company that you have majority voting control in and you are the board of directors of, you have testified solicits investments for VSI, correct?

A    I believe so.

Q    Okay.  And were you aware that in soliciting those investments on your behalf, that he was telling investors that VSI's plan is to wipe out the equity in Stream and take all of its assets and to be the operating entity going forward?

A    No, I'm not aware of it.  I'm stay out of -- I try to stay out of whatever they're doing at VSI.

Q    So yeah, just to put the finer point, the party with whom -- let me ask you this question.  Now that you know that he was doing this on behalf of VSI, as a fiduciary of Stream, does it cause you any concern or doubts whether you should be proceeding forward with the financing on behalf -- with VSI?

        MR. ALEXANDER:  I'm going to object to the form of the question.  It lacks foundation.  He's acting as if this document has been authenticated.  It has not.

        THE COURT:  Mr. Caponi?

        MR. CAPONI:  Good question, authentication.  All I can say is this email was sent out -- sorry.  As far as authentication goes, I just did authenticate it.  Mr. Rajan --

103

THE COURT: How did -- whoa, whoa, whoa, whoa, whoa. No, you did not. You didn't. Who is it addressed to? Did he see it before? That's not -- how did you authenticate that document?

MR. CAPONI: I'll explain, Your Honor.

THE COURT: Okay.

MR. CAPONI: Mr. Rajan testified that Mr. Dannenberg is retained as an agent of VSI to solicit investments on behalf of VSI. This is an email from Mr. Dannenberg soliciting investments on behalf of VSI.

THE COURT: To who?

MR. CAPONI: Excuse me?

THE COURT: Who is he sending it to?

MR. CAPONI: If we can go back to the top of the email? If you can go --

THE COURT: All the way to the top, John.

MR. CAPONI: All the way to the top, yeah.

So I didn't produce this exhibit, Your Honor. I wasn't personally involved, but it appears redacted. So I don't know who --

THE COURT: So how do we even know -- I mean, come on, counsel. I don't know who he sent it to.

MR. CAPONI: Okay.

THE COURT: I don't know. Did --

MR. CAPONI: Well Your Honor, I'm also not offering

it for the truth of the matter.  I'm offering it, you know, my question is simple.  This email says what it says from Mr. Dannenberg.  And I'm not saying, Mr. Rajan, it's true --

THE COURT:  So counsel, so your question really should have been if I were to tell you, blah, blah, blah, blah, blah, blah, blah, that Mr. Dannenberg were this, would you agree that that's a true statement?  Or is he aware.  Would you agree that that's the plan, or something.  But you can't rely on a -- that's not -- no.

MR. CAPONI:  Okay, Your Honor.  Fair enough.  Again, I will rephrase the question, then.

BY MR. CAPONI:

Q    Mr. Rajan, if this document, this email -- strike that.

Mr. Rajan, do you have any reason to believe this email is not authentic or was not sent by Mr. Dannenberg?

A    I have no idea.

Q    Okay.  Assuming this email was sent by Mr. Dannenberg on behalf of VSI, as the fiduciary in charge of Stream, does it cause you concern or to want to second guess whether Stream should be borrowing money from VSI?

MR. ALEXANDER:  I'm going to object.  It asks for a hypothetical and speculation.

THE COURT:  Counsel?

MR. CAPONI:  I think it's highly relevant, Your Honor.  This is --

THE COURT:  Well, that's not his objection.  His objection is speculation and hypothetical.

MR. CAPONI:  Yeah.  Your Honor, I'm asking this fiduciary, who exercises his fiduciary duty, allegedly -- this is a factor.  Right now, I mean, this is a factor this fiduciary needs to consider before he even proceeds with this motion today.  And I'm simply asking him how he's considering it.

MR. ALEXANDER:  Objection stays.  I mean, he hasn't set the foundation for the document to have him even consider it.

MR. CAPONI:  Your Honor, Mr. Rajan is fiduciary.  He now knows that there's an email.  He may not know it's 100 percent authentic.  It may not be admissible for court purposes.  But for purposes of exercising his fiduciary duties, he knows there's an email from Mr. Dannenberg containing this very damning statement.  He has to factor that in the next decision he makes 30 seconds from now, which is whether to proceed with this motion.

And I am simply asking him whether this impacts his support for this motion.  He can tell me no and tell me why.  But I'm entitled to explore his thought process and his judgment.

THE COURT:  Well, the objection is speculation and hypothetical, because we don't have any evidence about this

email.  So the question is, is it speculative.  I think he said speculative and hypothetical.

MR. CAPONI:  Well Your Honor, I would say the probative value outweighs any prejudicial effect there may be.  And Mr. Rajan's on the stand.  And since I'm only asking about his thought process, he is fully in command of those facts to answer that question and explain it however he would like.

MR. ALEXANDER:  Your Honor, Mr. Rajan already testified that he wasn't aware of this email.

THE COURT:  So I guess the question is he's not aware of it.  What am I supposed to do with that?  Whose document is this?

MR. CAPONI:  Let me see if I have an answer to that, Your Honor.  The document was -- I will say Mr. Dannenberg is a prolific --

THE COURT:  No, whose document?  This was your client's document?  No, it was filed by --

MR. CAPONI:  I'm not sure where it came from, Your Honor.  It was sent to -- Mr. Dannenberg sent it to all the individuals who are involved in the Stream cases.  So we sort of all get them.  I'm not sure, you know, I could say it's one person's document versus another.

THE COURT:  Well, I don't know --

MR. CAPONI:  We produced it.  We produced it and attached --

THE COURT:  Who produced it?

MR. CAPONI:  Hawk attached it to its motions.  That's how it's attached to this docket entry.

THE COURT:  I get it, but you can attach anything you want.  How do I know this is accurate?  I mean, it's not to anybody, so I don't know what I'm supposed to do with that.

MR. CAPONI:  Well Your Honor, what I would say is there's no jury here and you can give it whatever weight you want to give it.  And I think we've probably already spent enough time on it as it is.

THE COURT:  Well, I will allow you -- I'm going to ask.

Mr. Rajan, if you were aware that these statements were made, would you still proceed with a transaction with VSI?

THE WITNESS:  Can I talk?

MR. ALEXANDER:  Your Honor, before that goes, I haven't seen any misstatements in terms of what's going on.  I understand the questions and what Mr. Caponi is trying to do.  But Mr. Dannenberg is not Stream and Mr. Dannenberg is not SeeCubic -- I'm sorry, is not VSI.

THE COURT:  No, he's their agent.

MR. ALEXANDER:  Well, I haven't seen anything --

THE COURT:  So my question is, is if he was aware that the agent of VSI was making these statements to potential investors.  He said he was unaware of it.  My question is if he

was aware of it, would he enter into or would that cause him to be concerned, or whatever word you want to use, with the loan transaction with VSI?

MR. ALEXANDER:  Your Honor, just to be clear, my question is I don't believe Mr. Rajan has testified that Mr. Dannenberg is an agent of VSI.

THE COURT:  He said that Mr. Dannenberg solicited investments on behalf of VSI.  I used the word agent.  He solicited on their behalf.  I don't know what the proper word is.

MR. ALEXANDER:  Okay.

THE COURT:  Maybe it's not agent, but he acted -- in acting on behalf of VSI, if he had made those statements, would it change anything?

THE WITNESS:  Okay.  Can I answer now?

THE COURT:  Yes.

THE WITNESS:  Sorry.  Okay.  I'm sorry.  Okay.  First of all, just to let you know, Your Honor, the investors with VSI, when I speak to Mr. Corso, I know who the investors are in VSI.  They're all very nice people and I vetted them before Stream takes the money.  And also, for the reorganization --

THE COURT:  Mr. Rajan.  Mr. Rajan, that's all well and good, but the wasn't my question.  You testified that Mr. Dannenberg --

THE WITNESS:  I know that wasn't --

THE COURT:  -- solicited investors on behalf of VSI. My question is were you aware of that, of the alleged statements that we're making that the plan is for VSI to take over or whatever it said in that email.  You said you were unaware of that.

THE WITNESS:  I'm not aware of his statements.  I do know he sends emails out, says statements that I'm not aware of.  I vetted all the money that comes into Stream TV.

THE COURT:  I didn't ask you that.  I didn't ask anything about vetting.

THE WITNESS:  No --

THE COURT:  He's asking.  So you are unaware of it. Mr. Caponi, we're going to leave it at that.  That's it.

THE WITNESS:  Okay.  Thanks.

THE COURT:  Because the question is he's unaware of it.  And I'm not quite sure if he's unaware of it, what are we going to do with it.  You want to ask if he was aware, would it change his position.

MR. CAPONI:  Mr. Rajan, could you get closer to the camera?  At least, I can't see you.  You seem to be fading out.

THE WITNESS:  Oh, yeah.  Sorry.  Can you see now?

BY MR. CAPONI:

Q    Yeah.  Mr. Rajan, isn't it true that the plan here, from your perspective, is to collapse everything up into Stream and then collapse Stream up into VSI?  That's your ultimate plan,

correct?

A    No.

MR. CAPONI:  All right.  Your Honor, I have no further questions.

THE COURT:  Okay.  Anybody else, any cross-examine of Mr. Rajan?

Mr. Callahan still here?  Mr. Callahan?

MR. CALLAHAN:  Yes.  Thank you, Your Honor.  I have a couple questions.

Mr. Rajan, good evening.  I'm Kevin Callahan from the U.S. Trustee.  If the Court doesn't mind, or the court reporter, if they could pull up Exhibit 1, the promissory note.

CROSS-EXAMINATION

BY MR. CALLAHAN:

Q    And Mr. Rajan, can you confirm, did Mr. Corso sign this promissory note?

A    No.  He didn't sign it because it's not approved by the Court yet.

Q    Okay.

A    We're waiting to hear from the Judge.  He wants me to call him if it's approved or not and then we'll sign it.

Q    Okay.  But as far as you know, on behalf of Stream, these are the terms and conditions that were negotiated between you on behalf of Stream and VSI on behalf -- I'm sorry, Mr. Corso on behalf of VSI, correct?

A     That is correct.

Q     Are you familiar with promissory notes of this kind?  Have you, on behalf of either Stream or other entities, entered into promissory notes like this?

A     Yes.  We've done quite a few promissory notes.  That's why we're here today.  Yes.

Q     All right.  And I don't know the specific page, and I don't know if we have to refer to it immediately, but there's a description of the events of default.

A     Sure.

Q     That is to say, if Stream were to default on this obligation.

A     Can you scroll down to that section?  I can't see it.

Q     Yeah.  Please.  Thank you.  Did you review that on behalf of Stream?

A     Yeah.

Q     And you believe that the Debtor, Stream TV, will not default if this loan is approved by the Court and made by VSI, correct?

A     Correct.  And this is a draft.  So we'll change it however you or the Judge decide, if you don't like it.

Q     Well, thank you.  I would not be involved in that.  But if the Court approves it, that's certainly the Court's prerogative.

A     -- to make sure there's no problem.

Q    But sir, I didn't see what happens, what remedies does VSI have if Stream defaults on the obligation?

A    It doesn't.  It's unsecured debt.  And basically, we have to get through the reorganization plan.  It is high-risk capital.  But basically we have to get through the reorganization plan.  And the reorganization plan, we're going to take care of the secured lenders, so being secured or unsecured.  So they'll be among a whole bunch of unsecured.  They don't have one.  It's high-risk capital.  It's -- the hope is we -- we get through the reorganization plan.  That's the hope.

Q    And you believe Mr. Corso negotiated with you in good faith on behalf of VSI.

A    Yeah, absolutely negotiated in good faith.

Q    All right.  Let's go to Exhibit 3 if we could.  I think that's the Chase business account statement.

A    Do you see that, Mr. Rajan?

Q    Correct.

Q    And could you tell me the source of the funds that are indicated as a total balance of $357,739?

A    Oh, yeah.  VSI has raised money from investors.

Q    Okay.  And were you part of that effort to gain investors to deposit money into VSI?

A    Yeah, I -- I was brought in for due diligence, and I had to explain the court situation with Stream, what the use of the

money from VSI is.  It's going to go to Stream and then it's going to go to the Netherlands payroll.  I had to tell them -- I -- I got a copy of the receiver report and told them what the situation is.  And then they -- you have to understand that VSI -- when Stream went down, we didn't have a bank account.  Because of the omnibus, we didn't -- weren't allowed to do operations.  So Stream was set up, and investors put money in to keep Stream alive.

Q    Okay.  And can you tell me who has authority to transfer funds out of this account, if you know?

A    I've got to go back and check.  It'll be a VSI employee.

Q    Do you think you may have authority to transfer funds from this account?

A    When I was registered on the account, they -- I'm sorry, in the company -- I did set up bank accounts.  I've never done a wire.  Okay.  I've never done a wire.  For Stream, I'm going to do the wire.  I'm going to go into the branch, and the branch will do the wire.  The bank -- bank officer will do the wire to the BV and get it -- get it out.  I'll have the bank do it.

Q    All right.  Let's go back to Exhibit 4, if you don't mind, and that's the email, I think, from Mr. Thune from the Netherlands.

A    Yes.

Q    Again, what is Mr. Thune's title with the company?

A    He is an employee.  He's not an officer, to the best of my knowledge.  As I understand, he was organizing the engineers from a technology point of view.  But I do not think he has a title, to the best of my knowledge.  If he has one, it's news to me.  He' just one of the employees.  They're in a difficult situation right now, so he sort of stepped up to the microphone.

Q    Okay.  And I think you testified earlier and correct me if I'm not, not accurate.  Are you one of the directors of the -- of SCBV?

A    I am the sole director and as listed in the Chamber of Commerce.  I am the CEO of SeeCubic BV; that is correct.

Q    And do you know who the officers of SCBV are?

A    Right -- there used to be officers.  Because of what's happened in the last year or two, they don't have officers right now.  They have division heads, to the best of my knowledge.  There's somebody in charge of, like, finance, somebody in charge of different functions in the company, different functions, but they don't have officers.  They used to, but not -- not right now.  That's not my understanding.

Q    Do you know if SCBV is represented by counsel, attorney, solicitor?

A    We have been using a law firm in the Netherlands called Lexence.

Q    And could you spell that for me, please, if you know?

A    L-E-X-E-N-C-E.  Then there was, it was my understanding, some employment lawyers involved.  Patrick Thune was coordinating.  We introduced him to our lawyers.  In fact, is his lawyers on this email -- are lawyers are on the email; I'm not sure.  I think he had an employment lawyer.

Q    So if the Court approves this transaction -- if the Court approves Stream borrowing from VSI, how will Stream make a distribution to SCBV, at least in your mind right now?

A    He gave a payroll account.  So we're going to send money into the payroll account right away, 165 here.  Then, he gave an account where they've got to pay the rent.  We'll do that one because they're going to get thrown out of the building.  Then, he gave a rent -- I'm sorry -- he gave -- I think it's the same as the payroll account for the wage tax.  We're going to take care of that right away.  Then, we'll work with the folks over in the Netherlands to get the debt cleared out.  We'll have to put in another motion into the court.  The Court has to approve it here that we can clear their debts out, and hopefully they can help us with our customers and our purchase orders.  And we're going to put in more motions in the court for additional funding for Stream for operations.  You guys call it dip.  You know, I refer to it as equity and dip.  And then, we'll submit our reorganization plan.

Q    Okay.  Well, let's go back and stay with this transaction as I understand it.

A     We'll do this one first.

Q     Yeah.  And you're asking for -- the Debtor is asking for interim permission to borrow money for a specific amount.  And I think it's confined to the employees, perhaps also to rent.  So I think you said 165, and I think --

A     Taxes -- 22 for the rent.

Q     You're also requesting rent?  And again, the immediate and irreparable harm that you're declaring, if they're not paid, is set forth in this exhibit.  And this is what Mr. Thune says will happen if those payments are not made, correct?

A     Correct.

Q     So you're relying on his expertise that these are necessary expenses?

A     His and also there's somebody on the email chain there, Ad Luijks.  He's in charge of the finances.  He's on the chain.  Do you see him on the chain -- Ad Luijks.

Q     Okay.

A     He's their financial guy, and he's the guy that called me, and they told me not to say that, but he was on the chain on this email.

Q     So it's your intent that if the Court is to approve this transaction, you would simply wire the funds to a bank account of some sort that hasn't been yet defined?

A     No, no.

Q     Mr. Thune would have authority to make those

disbursements.  Is that what Stream has negotiated with this company?

A    Yeah, no, he's given the bank account our information already.  It's the same accounts we used for 10 years with them, but he reconfirmed it was the same accounts.

Q    But he would be the person responsible for making the disbursements?

A    William Anmusio (phonetic), this Ad Luijks and there's a girl that works in the financial department, and also E & Y, all four of them would probably work together.

Q    And do you contemplate any kind of agreement or arrangement, whereby SCBV would then account for those disbursements?  In other words, would show you bank statement information -- would show you who was paid?

A    I -- I can send that email tonight if you'd like, and I'll get an answer from him tomorrow on this.

Q    So you don't have anything in place at the moment?

A    I understand.  We'll send him an email tonight, and I'll show that to you tomorrow.  We'll make it track him.  And E & Y will also send us some information if we ask him.

Q    Okay.  So you said earlier, in response to counsel, Mr. Caponi's question, we don't want more debt on SCBV.  Do you remember making that statement?

A    Yes.

Q    Now, of course, I think you also said that SCBV has never

had -- never generated revenue; is that right?

A    SCBV never did.  Stream TV International did.  I do not believe SCBV generated revenue, to the best of my knowledge. Stream TV International did because it had the Bosch contract. So they got revenue out of that.  That's, like, a sister company.

Q    Yeah, we're not talking about Stream International.

A    So we wired money from SC -- you jogged my memory -- Stream TV International to the BV because we were getting payments from Bosch.  So I don't know if you can count that as revenue.

Q    So you said, we don't want any more debt on SCBV.  The only debt is the debt that's set forth on this exhibit, correct?

A    Wow.  What do you mean so forth on this exhibit?

Q    Well, if the debt -- what debt has this company generated other than -- if it hasn't generated any revenue, all it has is operating expenses, correct?

A    Yeah.  And what happened was when we did the 225, a promissory note was put in place.

Q    Yes.

A    That note was put on the BV.  There is a def -- so those loans got to get paid back in December of this year.  Then, there is vendor debt because of the deficit.  And their bankruptcy doesn't work like it does here.  What happens over

there, and that's what he's saying in the email, any of the --
one vendor can go file, and they weigh way more towards the
vendor, they'll shut the company down.

Q    Okay.  So --

A    It doesn't work over there like it does here.

Q    So a vendor that's not identified in this, for one of a
better word, is budget.  It's not identified.  There may be
creditors who may exercise whatever legal rights they have in
the Netherlands to collect on those debts, right?

A    Oh, no.  All the creditors on this list can put them into
bankruptcy.

Q    Yes.

A    In theory, SeeCubic of Delaware could, but I think -- I'm
assuming because I signed that Stream TV could pick up that
obligation.  I may have to talk to a lawyer about that one.
But the -- so anybody on this list could knock them into
bankruptcy, or, you know, let's just take SeeCubic off the
table.  These people could put into bankruptcy.  If you look at
the --

Q    Let's take SeeCubic and Hawk off the table for now.

A    Right.

Q    Perhaps they may have the claim against SCBV.  But putting
that aside, if I understand this correctly, there were payments
made to payroll, rent, contractors, up through somewhere before
the bankruptcy was filed.  Would that be a fair statement?

A      Partial payments made.

Q      Partial payments?  So there's money still due --

A      Right, it's a --

Q      -- but this is just current debt, right?

A      No, these are payments that go back to December.

Q      Back to December, okay.  And according to Mr. Thune, he believes that these things will happen if those payments are not made, correct?

A      If the vendors are not cleared out, they will be put into bankruptcy, correct.

Q      And as I understand it, the two creditors who are here in Court today, SeeCubic and Hawk, believe that they can make these payments in the form of either a loan going forward or a draw on a promissory note that was entered into prior to the petition, correct?

A      The --

Q      I'm asking you if that's your belief that's what their position is.

A      What's your question again?  Can you repeat it?

Q      Okay.  There was a promissory note that you just referenced that creditors maintain or represent that there's still an amount that could be drawn on that promissory note. Do you recall that?  Are you aware of that?

A      Yeah, they're saying there is an amount that could be drawn on the promissory note to pay.

Q    To pay -- I'm sorry, to pay the expenses that are listed.

A    No, no, no, no, no, no.  I think we're not saying the same thing.  I signed a draw.  The wire didn't go from the draw.  So the draws were signed, but the money wasn't released.

THE COURT:  That wasn't the question, Mr. Rajan.  Can you please answer the question?  Mr. Callaghan's question is, what is your understanding of SeeCubic's and Hawk's position with respect to the ability to fund the request, which is, they believe that there's amount that they can draw down under the promissory note with SeeCubic, CBVCV -- the Netherlands, or that they can issue pay -- or they can make another loan.  Isn't that your question, Mr. Callahan?

MR. CALLAHAN:  Yes, Your Honor.

THE WITNESS:  They believe that they can give additional funds in the form of debt that can go to the BV, that is correct.

BY MR. CALLAHAN:

Q    And that debt would be an obligation owed by SCBV, correct?

A    I'm not sure because as I understood it, from what I -- my understanding was before, it was on the BV, but ultimately Stream had to make sure it was cleared out by December 2020 when we were doing the transaction.  I'm not sure exactly is it straight BV has to take care of it, or does Stream have to step in and take care of it.  I'm not quite sure.  I -- as I

understood it, there was a tacit understanding that Stream had had to take care of it at the end of December.

Q    Okay.  And your belief is still the same today as it was in December, that if there was a draw -- let me just phrase it out this way -- that if there was a draw on that promissory note to pay the expenses that are set forth in this exhibit, that you believe Stream would be obligated on that draw on that promissory note?

A    Yeah, because we -- we hope to emerge from reorganization and then we got to pay these guys back this debt on top of the -- where's all the other stuff.

Q    And that's your understanding presently, right?

A    Yeah.  So from my --

Q    I presume you will see the promissory note introduced as evidence by one of the creditors today.  And you can determine whether on behalf of Stream, whether Stream will be obligated, correct?

A    Correct.  But we're obligated for what they actually wired.

Q    Well, we, meaning, as far as you know, you think Stream would be obligated on that obligation, right?

A    Ultimately, and Stream will be obligated.

Q    Ultimately, okay.  So you've worked with Mr. Corso on in his representation of VSI and your representation of Stream, correct?

A      Yeah.

Q      Did it ever come up in the conversation at any time whether Mr. Corso thought or believed that the loan could be made, VSI's loan, could be made directly to SCBV to pay these costs and expenses?

A      He didn't like it.  He -- yesterday, he -- yesterday it would suggest that VSI should go direct in.

UNIDENTIFIED SPEAKER:  Objection, Your Honor.  Mr. Corso's not here.  If they wanted to bring him or VSI in, they could have.  They did not -- just as hearsay.

MR. CALLAHAN:  I'll withdraw that question.  That's fine.  It would call for perhaps a hearsay response.

BY MR. CALLAHAN:

Q      So sorry, Mr. Rajan.

A      Okay.

Q      So what does Stream out of this loan?  Stream, you want to borrow -- Stream wants to borrow money from VSI, create an obligation for which it receives no consideration, but for the benefit of a subsidiary.  How do you see that as potentially helpful to the Debtor's reorganization when you're adding more debt to the company without any benefit?

A      The Stream -- okay.  So right now, Stream's benefit is this loan that we're getting from VSI is only one percent.  Number two, Stream, pending court approval, VSI, pending court approval, gets the contract, which is through sales.  So this

will all get taken care of through revenue, which it hopes to obtain once we now have the Netherlands, you know, hopefully they contribute, better situated.

Q     And on behalf of -- I'm sorry, on behalf of Stream, do you believe as part of this loan transaction or issue of stock transaction, transaction that was originally requested, that VSI should receive a distributorship agreement?

A     Right.

Q     Yes.

A     Yes, that is correct.

Q     Thank you.

        MR. CALLAHAN:  Your Honor, I don't have any further questions.

        THE COURT:  Does anybody else have any cross-examination from Mr. Rajan?  All right.

        Mr. Alexander, redirect.

        MR. ALEXANDER:  Thank you, Your Honor.

                    REDIRECT EXAMINATION

BY MR. ALEXANDER:

Q     Mr. Rajan, I'm just going to kind of start where we left off -- or where you left off with Mr. Callahan with respect to the distributor agreement.  Is the distributorship agreement contingent upon any financing by VSI?

A     No.

Q     Do you -- does Stream view those as two separate

agreements?

A    They are two separate agreements, but we're using the distributor agreement to help Stream to attract capital and to get its purchase orders financed.

Q    Understood.  But that agreement, subject to court approval, is separate from the financing that VSI would like to do today?

A    Correct.

Q    In terms of Mr. Corso, and there was a reference to a POA, do you know if that POA makes Mr. Corso a fiduciary of VSI?

A    I don't think -- I don't think so.

Q    Is there a document that would refresh your recollection?

A    I don't know.  We'd have to go look at the documents.  Now you're asking me a legal question.  We've got to take a look at it.

        MR. ALEXANDER:  Your Honor, can I share my screen, or do I need to email the document?

        THE COURT:  What?

        MR. ALEXANDER:  Do I need to email the document to your --

        MR. CAPONI:  Objection, Your Honor.  This was a document that was not exchanged pursuant to the protocols.

        THE COURT:  Counsel?

        MR. ALEXANDER:  Your Honor, we didn't know we were going to need the document for today, and it didn't come up

until the testimony on the cross-examination.

THE COURT:  Mr. Caponi?

MR. CAPONI:  Can I get a proffer of what this document is so I can respond?

MR. ALEXANDER:  Sure.  It's going to be the power of attorney, which indicates that he is a fiduciary.

MR. CAPONI:  Your Honor, that's exactly what I thought.  So for them to not think they would need to bring the power of attorney that gave Joe Corso the authority to execute that agreement, okay, I would say that's nuts.  I was going to argue that's --

THE COURT:  Well, I had never heard that -- I didn't know nuts -- that's nuts -- it's a legal objection, counsel.

But Mr. Alexander, Mr. Rajan testified that Mr. Corso was operating pursuant to a power of attorney.  You knew that that was what he was relying on. For you not to identify it, for you not to have it, that's not rebuttal.  I'm not quite sure how you wouldn't know that because it was -- they could have objected to his testimony.  They could have said, the doc, what's the document?  No.  I'm -- no.  I'm not going to allow that.  You should've anticipated that and provided.

That is not -- a rebuttal is something that you can't anticipate, have no idea you're going to need.  This is the fact that he was testifying by the power of attorney.  That's not a surprise.  And it wouldn't have been a surprise had

somebody objected and said, where's the documents.  Because it's his testimony in lieu of a document.  He's describing a document.  We didn't know what it was to begin with, and nobody objected, and it's not my job.  But no, this isn't rebuttal -- I'm not allowing it.

MR. ALEXANDER:  Understood, Your Honor.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q   At the time the bankruptcy was filed, there was discussion.  I believe Mr. Caponi asked you regarding why the motion wasn't filed sooner.  Had Mr. Thune provided Stream with the finances of SCBV at the time the bankruptcy case was filed?

A   He did not provide financials.  The BV was not cooperating up until very recently because SeeCubic International was providing the financing.  The BV was not helping with the Google projects or our purchase orders, or any of the things that Stream TV needs to generate cash flow.  They were not cooperating because SeeCubic International was providing finance.  So only recently have they started cooperating because they're thinking that Stream may be providing finance. It's affecting our bankruptcy.

Q   Does SeeCubic BV have any income right now?

A   To the best of my knowledge, no.

Q   And are you aware -- Mr. Caponi talked about, you know, whether or not there was counsel present when the promissory

notes were being negotiated between Stream and VSI.  Are you aware of any requirement for counsel to be present when a document is being negotiated?

A    No, I wasn't aware of any requirement, and we've never had counsel involved for, like, payroll expenses.  It was just an ordinary course of business -- it used to be.

Q    And with regards to the funding in the debtor's business judgment, do you believe that the funding is necessary to provide to the subsidiary?

A    Yeah.  The funding is absolutely require -- needed because we need help with Google and our other projects.  And my understanding is we have a legal obligation to do it.

Q    In terms of the amount of the funding compared to the overall debt, I think Mr. Caponi indicated that there was a small investment, you know, large value of assets.  Do you believe the large value of assets will be lost if this funding is not provided?

A    Yes, it will be lost because the engineers, one, will collapse; and then two, we're increasing the debt size at SeeCubic BV, which is going to potentially frighten the vendors.  They already know they're in serious trouble.

Q    And if this money's provided, do you believe that -- I think you testified just now that the two entities, Stream and SCBV, will be able to work together.  Do you believe that will begin to produce revenue for SCBV and also this estate?

A     Absolutely.  We've had conversations in the last few days. They want to help us with our projects.  We have immediate projects that will generate revenue for both Stream TV and the BV.  Also, if they can go to their vendors and say that the new money coming in is not debt, it's essentially a grant, that's going to calm down a lot of their vendors.  And we had a 10-year relationship with a lot of those vendors.  We'll be able to help them to calm everybody down.  And they have phone calls scheduled later this week with the vendors because they're freaking out.

MR. ALEXANDER:  Your Honor, I don't have any further questions on redirect for Mr. Rajan.

THE COURT:  Okay.  I have a question, and I hate to do this because I like people, but I have something that I --

Mr. Rajan, you knew that the last payment from SeeCubic was going to be March 25th, right?

THE WITNESS:  That is correct.

THE COURT:  What did you expect to happen in April?

THE WITNESS:  I went there two weeks ago.

THE COURT:  No, what did you expect would happen for payment in April?

THE WITNESS:  I'm sorry.  I was expecting to pay the payroll two weeks ago.

THE COURT:  With what money?

THE WITNESS:  With money from VSI going to Stream.

THE COURT:  And how did you expect to get the loan?  You were just going to get the money?  You weren't going to go to the court?  What were you going to do?

THE WITNESS:  We were actually going to go to the court.  We were going to file a motion in the court.  I went to go get the information to make the payment two weeks ago, and I got stopped.  And --

THE COURT:  What stopped you from filing the motion and supplying the information for the exact amount later?

THE WITNESS:  We -- we didn't -- we weren't sure what even the -- the exact payroll was for this month.  They were cooperating.  But Patrick Thune wasn't giving us any information.

THE COURT:  Mr. Rajan, what my point is, you knew that you were going to need to pay payroll.

THE WITNESS:  That is --

THE COURT:  You've known that since when?

THE WITNESS:  We've known that since -- since March.  Okay.  Your Honor, if you're saying that I should've put the motions in two weeks ago, I'm sorry.  You're absolutely right -- my bad.  I'm not I'm not a bankruptcy expert, okay?  So it wasn't, you know, with this technology, I never thought I was going to go into bankruptcy.  I should have filed it two weeks ago.  I should have made arrangement two weeks ago when these guys started fighting with me, which I didn't expect, and it

caught me off guard, and we were scrambling.  I should have put a motion in two weeks ago, and you are absolutely right.  This is a small issue.  It's just a dinky payroll, and it shouldn't have turned in his grandiose thing.  It should have never happened, and it's not going to happen again.  So we now know what's happened with the one-and-a-half million.  First, I was shocked that I signed a whole bunch of draws and the money didn't go over.

THE COURT:  That's not in evidence.  That's just your testimony.

THE WITNESS:  Well --

THE COURT:  You don't have anything -- you don't have any documents -- we don't have anything.

THE WITNESS:  Yes, we do.

THE COURT:  We're not talking about anything that's not in evidence, okay?  I don't have any draws -- I don't have anything.  My other question is, who drafted the promissory note?

THE WITNESS:  Somebody in the company drafted it.

THE COURT:  Who's somebody -- in what company?

THE WITNESS:  It was, I think, some -- I think in VSI went and the in-house counsel, and they may have worked with some attorneys to actually do the drafting.

THE COURT:  Who's in-house counsel for VSI?

THE WITNESS:  Dan Rank (phonetic).

THE COURT:  Okay. So I mean, there's some terms in there that nobody asked about, but the document is what it is. Okay, so that was my question with respect to the promissory note.

My other question is, you said that SCBV has -- who owns the assets in question?

THE WITNESS:  Stream TV does.

THE COURT:  Who?

THE WITNESS:  Stream TV owns all the assets of the company.

THE COURT:  Wait a minute.  Who owns the assets? You're saying Stream owns all of the assets of each of the individual companies or each individual company owns the assets, and Stream has an ownership interest in those entities? Because you testified that SCBV has a very significant asset that it owns.

THE WITNESS:  Okay, all right.  Let's separate the issues here.  If you're asking possession and title --

THE COURT:  Yes.

THE WITNESS:  Okay, all right.  Oh, boy, that's a big question.  All right.  So there are assets in possession and title in Stream TV worth hundreds of millions of dollars.  What was in one of the hearings was totally wrong.  The revenues also were mostly in Stream TV contracts and deals and stuff, are  mostly in Stream TV.  Stream TV has software, it has lens

technology, it has all kinds of electronics technology, bonding technology -- nothing to do with the Netherlands.  The Netherlands have a second set of software that they have. Then, they have their own, some of their own lens technology. Then, there is another company that has patents.  Then --

THE COURT:  No, no, no, no, no.  We're talking about -- you had said that SCBV has a significant -- I mean, what -- SeeCubic, the Netherlands, you testified, has a significant asset.  And you didn't tell me how much it was.  So my question is, I don't need to know what it is.  What is the value of their significant asset?  You said it was worth millions and millions.

THE WITNESS:  Yeah, that -- it's over 740 million. It would be over 750 million?

THE COURT:  Dollars?

THE WITNESS:  Dollars, dollars, dollars.

THE COURT:  So SeeCubic, the Netherlands, has assets valued in excess of 750 million, correct?

THE WITNESS:  Correct.

THE COURT:  Okay.  All right.  And you said that they don't generate any income at all?

THE WITNESS:  No, not to the best of my knowledge, no.

THE COURT:  Okay, so --

THE WITNESS:  That's why I want to make a grant.

THE COURT:  No, no, no, no, no, no, no, no.  So they don't generate any income.  What do they do?

THE WITNESS:  They basically do pro -- or they did -- they did the original algorithms, okay, and we -- but we also have algorithms at Stream TV.  Then, they do -- this is for Stream TV's business model.  SeeCubic may be doing other things than them.  For Stream TV, they do optical design work.  Then, they have a stack of code for -- that can be used inside the electronics, but it has to be modified for products.  Those are the three main things they do.  They did some very early software plug-in work, which our Silicon Valley team is doing now.  So they don't do that anymore.  They are working on artificial intelligence.

THE COURT:  So what are they doing with this stuff?  I'm not understanding.  Then you want to give them money to do what?  To produce -- to produce what if they're not selling?  What are they doing with this stuff?

THE WITNESS:  They have to help our -- that's a good question.  They have to help our electronics team basically get the electronics ready for production.  They basically will be -- our electronics team is the one that prepares the electronics and prepares the code.  And they basically do consulting work in terms of QC on the electronics.  Then they will be helping our team in Asia regarding the preparation of the lens and they'll do some consulting work for the bonding.

Yes, there is some issues in the Netherlands.  You're getting to the nerve of the issue.

THE COURT:  No.  So the issue is they basically function to provide services to Stream TV and its other related entities?

THE WITNESS:  Absolute --

THE COURT:  Is that all they do?  Is that all they do?

THE WITNESS:  That is correct.  And they haven't been doing it because we didn't pay and SeeCubic was paying and they haven't been providing the services.  They were supposed to help Google and some --

THE COURT:  If you're not providing -- paying them, I guess they weren't.  Do they have other creditors?

THE WITNESS:  Yeah.  It's on that list.

THE COURT:  What list?

THE WITNESS:  Can somebody pull up the list that Patrick --

THE COURT:  No.  Nobody has -- all they have is rent and payroll and taxes.  Other creditors.

THE WITNESS:  Yes, they have software -- online software vendors.  They had -- they had -- they have creditors for, like, the patents and stuff like that.  They had a whole list of them.  The contracting company.  They had a whole list of it over there.  There's a tab on the report from the

Receiver.  It lists all their vendors.

THE COURT:  I don't have the receiver.  I don't have anything from a receiver.  All I have is Mr. Thune (phonetic) that says this is what we need for funding for April.  That's it.

THE WITNESS:  I posted the Receiver's report --

THE COURT:  I don't -- Mr. Rajan, unless it is introduced into evidence, I don't care what you put on the docket.  I don't go perusing the docket.

So did my question generate -- and limited to what -- who -- we already know why he -- I don't think we need to go into why he didn't file before that.  I got it.  The promissory note and what the heck does SeeCubic BV does.  That was it.  And my questions generated any questions from anybody.  Just on that.

THE WITNESS:  What's your question again?

THE COURT:  Does anybody have --

UNIDENTIFIED SPEAKER:  It's not to you, Mr. Rajan.

THE WITNESS:  Oh.

THE COURT:  Counsel, did any questions generate any questions with respect to the promissory notes and with respect to the SeeCubic in the Netherlands?

MR. CAPONI:  Yes, Your Honor, one question on my part.

THE COURT:  Yeah, okay.

CROSS EXAMINATION

BY MR. CAPONI:

Q   Mr. Rajan, a minute ago, in response to Your Honor's question, I believe you testified that the notes were drafted by VSI's in-house counsel Dan Rink; is that correct?

A   I think so.  I'm not sure.  And, also, the attorneys for Stream may have helped.  I'm not sure.

Q   So Dan Rink is in-house counsel for VSI?

A   Yes.

Q   And VSI, again, is the entity that you have voting control over and you're on the board of directors; correct?

A   Yes.

Q   We had a hearing on April 14th before this Court and Mr. Zalhralddin -- you're familiar with him; correct?  He's your debtors' counsel?

A   Yes.

Q   Okay.  Can you tell me why he would have told the Court, quote, Dan Rink is also in-house counsel for the debtor.  He's on the line.  And that is Rink, R-I-N-K, period?

A   He's not -- he's not working at Stream.

Q   Okay.  So it's your testimony that despite Mr. Rink being on the line, being introduced as working for the debtor, that both he and Mister -- your debtors' counsel had his position wrong and no one corrected that?

A   It's probably a mistake.  I apologize.

Q    And you were on the line for that hearing as well, Mr. Rajan; correct?  You participated in that hearing?

A    No.  I was told I wasn't allowed to talk.

Q    It's your testimony that Mr. Rink probably drafted this document?

A    I don't know.  I think so.

Q    Thank you, Mr. Rajan.

A    Let me double-check.

         THE COURT:  Mr. Alexander, any questions?

         Where did he go?  Oh, there you are.

         MR. ALEXANDER:  I think I'm still there.  I know it's getting late but I don't think I disappeared yet.

         THE COURT:  Well, some people, their cameras are off, they're on mute, and my -- and my -- my screen shifts.  You are where Mr. Caponi is and he's where you were.  So I apologize if I'm -- and Mr. Rajan is now below Mr. Caponi when he was where Mr. Callahan is.  So I apologize if I'm looking and getting the wrong person.

         Okay.  Do you have any questions, Mr. Alexander, just on those two issues?

         MR. ALEXANDER:  Just to clarify one point, Your Honor.

                    REDIRECT EXAMINATION

BY MR. ALEXANDER:

Q    Mr. Rajan, when the judge asked what do you need Stream

for, do you need -- I'm sorry, what do you need SCBV for, right, what do they do for Stream, you know, will they be providing any assistance to Stream in fulfilling any purchase orders?

A    Yes.  They will -- they have agreed to provide help with fulfilling the purchase orders, which are going to be part of our reorganization plan and also financing going forward. They're also going to help us with some of the customers getting their samples out.  And they'll be helping with electronics and the bonding.  They've agreed to do that. Again, that's one of the reasons why I want to do this funding.

Q    And what's the value of those purchase orders?

A    It's -- it's in excess of $130 million.  There will be more people coming online if they actually start cooperating.

        MR. ALEXANDER:  Nothing else, Your Honor.

        THE COURT:  Okay.  Mr. Callahan, did my question generate any questions for you?

        MR. CALLAHAN:  I have no further questions, Your Honor.  Thank you.

        THE COURT:  Okay.  All right.  I think this is it in terms of examination of Mr. Rajan unless, Mr. Alexander, you want to reserve as a rebuttal witness.  I don't know what you want to do, but I don't -- I think that's for his direct testimony and his testimony in support of the motions.

        Anything else with respect to him at this time,

Mr. Alexander?

MR. ALEXANDER:  Not from the debtors, Your Honor.

THE COURT:  Okay.  And the process was that all the documents would be deemed admitted unless there was an objection.  And I think the only objection was that email from Mr. Dan -- Dannen --

MR. CAPONI:  Dannenberg.

MR. ALEXANDER:  Dannenberg, Your Honor.

THE COURT:  Dannenberg.  And, Counsel -- well, you weren't trying to admit any in any event.  It's Mr. Alexander, you're -- let's make sure we have the documents that you want to admit or that were deemed admitted because they weren't objected to, and that would be --

John, do we have a list of the exhibits that were testified?  Because they went a little bit out of order.

THE CLERK:  I may have to improvise a little bit.  I have a Debtor Exhibit 6.

THE COURT:  Hold on.  Let me -- right.  Let me get to my notes.

THE CLERK:  Actually 1 through 6 as far as debtor exhibits.

THE COURT:  I have 4, 5, 3, 1, 2.  1, 2, 3, 4, 5.  And then did we say 6?

THE CLERK:  I think that was the very first thing we looked at.

THE COURT:  That's what I thought.  It was like way out of -- well, not out of order but it wasn't number one.  Okay.  So let's start with what they are.  I'm going to address them the way they were discussed.  They may be a little out of order, okay, but the first one was Exhibit 6, and that was the chart regarding the -- for the various entities; is that correct?

MR. ALEXANDER:  That's correct.

THE COURT:  All right.  That's admitted.

(Exhibit 6 is admitted into evidence)

THE COURT:  Exhibit 4 was the email from Thune to Mr. Rajan setting forth the request for the April payments.  Exhibit 4.  Exhibit 5 was the Netherlands chamber of commerce document.  Exhibit 3 was the bank statement evidencing the proof of funds.  Exhibit 2 was the chart that came from Skadden setting forth some -- the numbers for April and then some numbers with respect to financing requirements for May.  Exhibit 1 was the senior -- was a series of promissory notes, three to be precise:  One for 165,000 euros, one for 115,000 euros, and one for $22,000 -- 22,000 euros.

And I think that covered all of the exhibits that were discussed in connection with Mr. Rajan's testimony.

Did I miss anything, Mr. Alexander?

Those are all admitted.

(Exhibits 1-5 admitted into evidence)

THE CLERK: Judge, this is John. I think there's a -- from the Hawk side. It was Hawk --

THE COURT: Well, we haven't got to -- we haven't got to them yet.

THE CLERK: Okay. That's the only other one. That's the only other one I had.

THE COURT: All right. That was Mr. Alexander exhibits. And Mr. Caponi gets to put his evidence in opposition to that so we don't get to his exhibits yet.

Mr. Caponi, you have evidence that you want to admit in opposition to the debtors' motion for finance?

MR. CAPONI: The only document I used, Your Honor, was the Dannenberg email, which I think the Court excluded.

THE COURT: Right. But that wasn't my question.

MR. CAPONI: Oh.

THE COURT: Because you would have gotten -- my question is -- because, typically, your exhibits would get admitted after you put your -- your evidence in and it would be with that. So my question is or do you plan -- let me back up.

Mister -- I guess I jumped the gun. Mr. Alexander, did you have any other witnesses that you intend to call? Because those were connection with Mr. Rajan's testimony. Do you have any other witnesses you plan to call?

MR. ALEXANDER: Your Honor, we do not have any other witnesses we're going to call. We reserve for rebuttal.

THE COURT:  Okay.  And so you rest with respect to your case in chief in support of your motion?

MR. ALEXANDER:  We do.  We do, Your Honor.

THE COURT:  I didn't jump the gun.

Mr. Caponi, do you wish to introduce evidence in opposition to the motion?

MR. CAPONI:  Your Honor, of the exhibits that we --

THE COURT:  Well, not exhibits.  Not exhibits.

MR. CAPONI:  Sorry.

THE COURT:  They've rested.  It's now it's your turn. You've opposed it.

MR. CAPONI:  Your Honor, I have --

THE COURT:  Do you want to put evidence in opposition?

MR. CAPONI:  I do not intend to call any witnesses in opposition.

THE COURT:  Okay.  Then next is your motion -- your alternative -- well, I guess that's, with respect to the debtors' motion, the record is closed with respect to their evidence; correct?

MR. CAPONI:  Correct, Your Honor.

THE COURT:  So now I'm going to hear -- so I guess we should have just made it -- well, we didn't say it was a consolidated record but now I'm not going to rule on the debtors' motion until I hear the motion for

alternate -- because you did file an objection and you asked for an alternative financing.  So that's why I thought you want to put your evidence in support of the alternative financing. It's a separate motion.  Is it in opposition?  I think -- okay.

MR. CAPONI:  I believe Mr. Mazza and his team are going to put on the affirmative motion for the alternative financing.  And we -- obviously, Hawk supports that, but that's a presentation they're going to make on behalf of SeeCubic.

THE COURT:  Okay.  So with respect to the debtors' motion, we're done because you're not presenting any witness in opposition and the only document you relied upon, I obviously -- there was an objection, it wasn't automatically admitted.  And are you trying to move it in or do you want me to --

MR. CAPONI:  No, Your Honor.  I will withdraw the Dannenberg email and I will say, with respect to the debtors' motion, I -- when I say I was not putting on affirmative evidence to -- to knock it down, so to speak, other than what --

THE COURT:  Cross-examination?

MR. CAPONI:  -- other than what Mister -- other than what Mr. Mazza is going to do, which is to establish that there is an alternative financing option that is better, and that is we're incorporating their motion.  So I'm not -- they go hand in glove, so to speak.

THE COURT:  Okay.  Okay.

Mr. Callahan?  Uh-oh.

Oh, there you are.

MR. CALLAHAN:  I am.

THE COURT:  Do you have anything else that you want with respect to the debtors' motion?

MR. CALLAHAN:  I do not.

THE COURT:  We're not arguing yet.  We're going to argue all at once.

MR. CALLAHAN:  No, Your Honor.  I have no other -- I have no witnesses or evidence to introduce.

THE COURT:  Okay.  Then we're going to move to the next motion.  Because they go hand in hand.  Either I will grant the debtors' motion to financing through the -- first of all, I have to find that I'm going to allow the financing.  That's number one.  And to the extent that I say it's necessary and I'll allow it, will I allow the debtor to get the financing from VSI or is there an alternative -- a better alternative.  That's sort of where I am.  One, is it even necessary?  Everybody is saying it is.  And then if it's necessary, does it make sense to have the debtor borrow the money from VSI or the debtor borrow it from SeeCubic?  Or I may determine that it's not even -- I'm not letting the debtor do any financing.  I don't know the answer yet.  I need some more -- I mean, I haven't decided because I actually, obviously, don't have a

full record.

All right. So now we move on to the motion -- Mr. Mazza, what's your motion called? Let's see, A, B. Where's the B motion? Oh. Motion to approve SeeCubic Inc.'s motion in the alternative for an entry of an order allowing SeeCubic to fund the non-debtor SeeCubic BV and directing SeeCubic BV directors to execute a promissory draw request -- whoof, not sure if I can do that -- or approval of competing DIP financing and a preliminary response to Debtors' anticipated DIP financing filed a SeeCubic.

Okay. The debtors' -- okay. All right. Let's go to the B matter. Whoof.

MR. MAZZA: All right. Thank you, Your Honor. Good evening. Yeah, that's a mouthful, that title. But really what it breaks down to is a motion to approve financing directly to BV, the non-debtor. And we did include in there what we, I believe, had a colloquy on yesterday in that the way that this would be set up such that the -- there's a dispute with respect to directorship over in the Netherlands, that if we did this under the way it was done through the receiver with that note being outstanding, that if Your Honor would direct Mr. Rajan and Mr. Stastney to sign off on the funding here, that that would be the easiest way to do it. And we'll get to our presentation on that in a moment. So just wanted to translate that mouthful of a title. And then we did include in there as

well preliminary objection based on what we anticipated the debtors to file in their financing.

And just one housekeeping matter on that front, Your Honor.  It relates to exhibits.  We did include one exhibit in our objection to the debtors' motion that includes an email from their Chancery report counsel regarding funding of the promissory note that went to the issue that I raised a few hours ago regarding whether or not there was an obligation to fund BV.  So that was the only, I think, other housekeeping exhibit that was out there that at least relates to the earlier motion that the debtor had put on.  And that is in our exhibit list as Number 2 in our exhibit list which was filed on the docket at 162.

THE COURT:  And, Counsel, presumably, you're going to present that with your case.

MR. MAZZA:  Well, that has to do with our objection to their financing so that's --

THE COURT:  But you didn't put any evidence in objection.  That's why I was like, anybody else objecting.  I'm confused.

MR. MAZZA:  I apologize, Your Honor.  Yes.  Well, we did object.  And I apologize for not taking that cue on that front.  So that was -- because that was the only other issue as it relates to the debtors' motion.

THE COURT:  Well, you can just do it in connection

with yours and why you think yours is better.

MR. MAZZA:  Yeah.  It's no problem at all, Your Honor.

Okay.  So moving to our motion that we put on file. So we did include with our motion a declaration from Shadron Stastney that is in support of the relief requested in the motion.  That declaration is at docket No. 158, and lays out some of the history behind the promissory note, how it was negotiated with the receiver and the like.

And I know it's getting late in the day.  I would -- I would make a request to the Court to take that declaration into evidence subject to any cross-examination that might want to be done with respect to that testimony, just an attempt to try to be efficient on these issues.  But unless Your Honor --

THE COURT:  Okay.

MR. MAZZA:  Yep.

THE COURT:  That's -- I don't have an issue with it but I guess I would have to ask opposing counsel because it's a declaration.  Typically, they can get admitted subject to cross-examination.  That then cuts out you having to go through and ask the questions that are on the declaration.  That's really what it's about as long as -- and I see Mr. Stastney -- Shasney -- I apologize --

MR. STASTNEY:  It's a tough one.  It's a tough one,

Your Honor.

THE COURT:  How do you -- Stastney?

MR. STASTNEY:  Yeah, the last T is silent.  I don't know why it's there.

THE COURT:  Stastney.

MR. STASTNEY:  Yeah.

THE COURT:  Okay.  So that's your proposal with respect to his, Mr. Stastney's, testimony.

Does anybody oppose that declaration being admitted and then cross-examination on the declaration?

MR. ALEXANDER:  Your Honor, I'm reviewing it again right now.  I mean are they --

THE COURT:  Okay.

MR. ALEXANDER:  -- to have the declaration and all of the exhibits admitted?  Or what are they looking to have done?

THE COURT:  Mr. Mazza?

MR. MAZZA:  Yeah.  I'm going to turn that over to my litigation colleague, Eben Colby, who's on the line on that issue.  So if he can take over.

MR. COLBY:  Good evening, Your Honor.  Eben Colby on behalf of SeeCubic.

Yeah, we propose to submit Mr. Stastney's testimony by declaration.  There are a handful of what I believe should be fairly non-controversial documents attached to it and -- and so I think those should come in as well.  That would be the

most efficient way to do it.  I'm prepared to walk Mr. Stastney through direct testimony if need be, but I think this is fairly simple stuff and we could save ourselves some time if we do it that way.

THE COURT:  Well, I've been saying it was fairly simple.  Mr. Callahan said, I don't think it is, and I think he was right.  So I don't know if we can say anything is fairly simple.

Mr. Alexander, you're opposing their motion.

So I didn't see anybody else file any opposition, at least I don't recall, because there was some filings at 12 noon and I just was not -- I did try to look at them between my return from the funeral till about a half an hour so I'm not quite sure if I got everything, but I'm quite sure that, if I didn't, people will explain it to me.

Mister -- other than Mr. Alexander on behalf of the debtors objecting to -- or opposing the motion, did anybody else file any opposition or is opposing the motion?

MR. CALLAHAN:  Judge, Kevin Callahan for the U.S. Trustee.  I said at the beginning of this hearing that, while it appears that this agreement is in place and I have no issue with respect to the factual representations made in the declaration or the documents, including the promissory note that was entered prior, I don't know if the Court has the authority under the Bankruptcy Code to direct non-debtors to do

or not do anything.

THE COURT:  Well, Mr. Callahan, fortunately, I thought about that, and I think there may be a way that I do have authority.

MR. CALLAHAN:  Then if that's the case, then the Court can overrule my concern.

THE COURT:  I think -- I think -- I'm not going to overrule --

MR. CALLAHAN:  I'm not aware of any.  We did not file an objection, and certainly --

THE COURT:  Right, you didn't.

MR. CALLAHAN:  -- it does affect the debtors' request.

THE COURT:  Right.  It does.

MR. CALLAHAN:  It certainly does --

THE COURT:  Right.

MR. CALLAHAN:  -- in the context that there are monies available to SCBV.

THE COURT:  Exactly.

MR. CALLAHAN:  Yes.

THE COURT:  And the question is, is that there is no issue that SCVB is an asset of the debtors' estate.  They --

MR. CALLAHAN:  Judge, I disagree with that.  I don't believe it is an asset of the estate.  I believe it is --

THE COURT:  No.  You didn't let me finish.

MR. CALLAHAN: Sorry.

THE COURT: Their interest in SCVB is property of the estate. It is. They own a -- they have an interest in the interest or whatever. So they have some interest in it. So whether that -- it's a separate entity, but they have an interest in that entity, and that interest is property of the estate. I don't think there's any issue that it is. And so the issue may be a little more complicated where, if there's assets of the estate and it's a separate entity, what if anything the debtor can do or whether the debtor has the right to try to protect its interest in its assets.

That's how I'm looking at it. And I may be wrong but I thought about it. I mean, it isn't anything -- I mean, I actually thought about it for a while so -- and you're right, whether I have the authority to direct another entity, the representatives of SCVB -- am I pronouncing that right -- whether I have the authority to direct that party to sign may be a different issue, whether I can authorize the debtor to sign something. That's two different issue.

But what I'm hearing, Mr. Rajan is saying he's in charge of that entity. I don't know if he is or isn't. And there is another party who signed with the receiver. Who was he? I can't remember his name --

MR. STASTNEY: It --

UNIDENTIFIED SPEAKER: That's Mr. Stastney, Your

Honor.

THE COURT:  That's you, Mr. Stastney.  Okay.

MR. STASTNEY:  Yes.

THE COURT:  I don't know whether he says he's going to -- you know, he may -- I don't know what his position is. He may say, I'm ready to sign.  I don't know.  I may not have to direct him to do anything.  I may only have to authorize the debtor to do something, assuming that I thought that was a better option.  So I --

MR. MAZZA:  Your Honor, he'd be prepared to say he's ready to sign if -- if that --

THE COURT:  Right.  So I'm not directing anybody to do anything.  The only thing I have to do is I pretty much have the authority to authorize the debtor to sign certain things, but I don't -- you're right.  I don't have the authority to direct another non-debtor entity to do anything.  So I thought about it.

MR. CALLAHAN:  And, Your Honor, just to add a little bit to this, and I think it was mentioned by Mr. Mazza yesterday or sometime, that, alternatively, just simply consider that the relief from stay is such that they can enter into an agreement if that's the case, that it would not be a violation of the automatic stay if SCBV decided to borrow money pursuant to that promissory note.

THE COURT:  Well, I'm not quite sure how it would be

a violation when they're a separate entity.  The debtor simply has an interest in that.  I don't think the stay actually extends to assets in terms of -- in the separate -- I was trying to analyze it as if -- and I was thinking about it but that didn't work -- where you are in bankruptcy and you own a separate entity who operates separately from you.  While you may control that entity, that entity is also independent, has its own set of obligation, has its own set of creditors.  And, yes, the debtor may take action and ask that the stay extends to protect its interest, it doesn't automatically.

So I'm not quite sure how that would be a stay violation.  But I have, believe it or not, thought about these things.

MR. CAPONI:  Your Honor, to try to crystalize this, because it's the way I think about it, if it helps, you know, I think there's a question as to whether the Court authorizes the debtor to, you know, use assets to support a subsidiary. That's question one.

THE COURT:  Yeah.  I thought about that too.

MR. CAPONI:  That's clearly -- and whether they do that through borrowing or they get the money some other way, that's for Your Honor to decide.

From the creditor side, I think there's -- we have two things.  I mean, one, does the Court authorize the creditors to fund?  That's one question.

The other one, which I think Mr. Callahan is getting to, which we're -- we're also fine with, is funding just so long as we know we're not upsetting the Court of violating an order.  And one of the reasons we haven't acted is because we don't want to get crossed with the Court.  So --

THE COURT:  Well, it's not crossed with the Court. You don't want to violate any rules or code or anything.

MR. CAPONI:  Correct.

THE COURT:  I don't look at it as my own -- you know, sometimes I am a little cranky, but it's -- I'm not going to take it personally like you're somehow offending the Court.  I look at everything through the lens of the Bankruptcy Code and the rules, and I try to fashion what I think is appropriate. And I get you that don't want to run afoul of any of those things.  I get it.

MR. CAPONI:  We also don't want to --

THE COURT:  The debtor doesn't want to run afoul either -- well, I would hope the debtor doesn't want to run afoul by entering into financing agreements and doing different things that basically the Bankruptcy Code says you need to get court approval, and you need court approval because all the players, all of the interested parties, get to weigh in.

And that's what we're doing today.  We're having the debtors' request and people are weighing in, and now we have -- I want to offer an alternative.  I want an alternate

method because nobody's -- nobody's disputing that the money is required.  No one.  The only dispute is how it gets funded.

And the debtor is proposing funding by financing with VSI because they believe that it's beneficial to the debtors' estate because it will allow them to continue to operate, because they can't operate without SeeCubic BV, and it will facilitate their plan.

The other parties are saying that is not the best interest of the debtor and we should just do this directly because we shouldn't get the debtors' estate involved, or if we are going to get the debtors' estate involved, we have a better deal than VSI because VSI is a related party and we don't think it's an arm's-length transaction and all the other things that they -- a basis for opposition.  So that's how I see this.

MR. CAPONI:  That's correct.

MR. MAZZA:  Your Honor, yeah, we agree.  And I think that with the evidence in the declaration from Mr. Stastney that essentially lays out the promissory note that's in place that's available for SCBV to be able to draw from is a better alternative than what we heard when the debtors presented their insider DIP motion that, I think, didn't hit what it needed to hit on its burden to show that this insider DIP that's going to lever up the debtor entity, even with unsecured claims, their admin claims are going to have to be --

THE COURT:  All right, Counsel.  Counsel, we're not

arguing now.  Let's get --

MR. MAZZA:  Okay.  I --

THE COURT:  That's going to argue later.  Let's just get to the end.

MR. MAZZA:  That's fine, Your Honor.

THE COURT:  All right.  Mr. Colby, you're proposing that you offer and submit into evidence the declaration of Mr. Stastney.

And, Mr. Alexander, you were considering whether you would agree to that process or you want him to walk through -- well, one, was it just a declaration or declaration inclusive of the -- of the exhibits, or you want to walk through it and then cross-examine?  What's your preference?

MR. ALEXANDER:  Your Honor, I'm cognizant of the time of the evening as well.

THE COURT:  It is what it is.  We're already into 8 o'clock.  I draw the line at 10:00.

MR. ALEXANDER:  Oh.  Well, hopefully, we're not there but we may be.

I'm just looking through some of the exhibits, and I think they need to lay some type of foundation for some of the exhibits before I even do a cross for --

THE COURT:  Okay.  So.

MR. ALEXANDER:  -- exhibit.

THE COURT:  Right.  So let's just cut this short.

Mr. Colby, walk Mr. Stastney through his direct.

MR. COLBY:  Thank you very much, Your Honor.

Mr. Stastney, would you please tell the Court --

THE COURT:  Whoa, he's got to get sworn in.
Whoa-whoa.

John, swear him in.

THE CLERK:  Mr. Stastney, do you swear that the
testimony you are about to give to the Court will be the truth,
the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE CLERK:  Will you please state and spell your name
for the record?

THE WITNESS:  Sure.  It's Shadron, S-H-A-D-R-O-N,
Stastney, S-T-A-S-T-N-E-Y.

THE CLERK:  Thank you.  Please state your address for
the record.

THE WITNESS:  392 Taylor Mills Road, Marlboro, New
Jersey, 07746.

THE CLERK:  Thank you.

SHADRON STASTNEY, SWORN

DIRECT EXAMINATION

BY MR. COLBY:

Q    Mr. Stastney, would you please -- do you have a role at
any of the entities that have been discussed here today?

A    At SeeCubic, Inc., yes.

Q    What's -- what's your role?

A    I am the chairman and CEO.

Q    Okay.

MR. COLBY:  Your Honor, I would like to at least move Mr. Stastney's declaration into the record.  I'm happy to go do the exhibits individually.  If there's an objection to that, then we'll just walk through it piece by piece, but I'm trying to save some time here.

THE COURT:  Mr. Alexander, you heard the proposal.

MR. ALEXANDER:  I -- I heard the proposal.

THE COURT:  Do you prefer him just to walk through?

MR. ALEXANDER:  I just want him to walk through it --

THE COURT:  Walk through it.

MR. ALEXANDER:  -- sit here and pick through and see if there's any specific thing that I object to.  If he has questions and he wants to ask him, he can go ahead and then I'll reserve my objections.

THE COURT:  Okay.

MR. COLBY:  Okay.

THE COURT:  Well, you can either object to the testimony as it occurs and then you can cross-examine.

MR. ALEXANDER:  Thank you.

MR. COLBY:  Thank you.

BY MR. COLBY:

Q    So, Mr. Stastney, in your capacity as the chairman of

SeeCubic, are you familiar with Stream TV, the debtor?

A    Yes.

Q    Okay.  And how did you become familiar with Stream TV, the debtor?

A    Initially as an investor through an entity of which I'm a partner, SLS Holdings Six, which invested initially with Stream in 2011 and again in 2012 --

THE COURT:  Whoa-whoa.  Can you slow down a little bit.  I can't write that fast.

THE WITNESS:  I get this --

THE COURT:  You are familiar because you investor -- you invest --

THE WITNESS:  I --

THE COURT:  -- SLS Holdings?

THE WITNESS:  Yes.

THE COURT:  Oh, there we go.

THE WITNESS:  Yes.

THE COURT:  Okay.

THE WITNESS:  Yes, Your Honor.

THE COURT:  And when?

THE WITNESS:  First in 2011 and again in 2012.

THE COURT:  Okay.

MR. ALEXANDER:  Your Honor, I do not believe the declaration should be up.

THE COURT:  All right.  John, put it down.

He was just trying to help me because he was trying to help me figure out what to do.

MR. ALEXANDER:  Oh, I'm sorry, Your Honor.  If it's for you and your purposes.

THE COURT:  No, that's fine.  No problem.

All right, you know.  So Mr. Stastney, you are familiar through SLS Holdings invested in --

THE WITNESS:  In Stream, correct.

THE COURT:  In Stream, okay.  In 2011 and 2012.

THE WITNESS:  Yes, ma'am.

THE COURT:  And you invested -- go ahead.  I guess somebody's going to tell me what invested means.

Go ahead.  I'm sorry, Mr. Colby.

MR. COLBY:  No problem.

BY MR. COLBY:

Q    And in your capacity here as the CEO of SeeCubic, Inc, tell me what is SeeCubic's relationship with Stream, if any.

A    Sure.  SeeCubic, Inc is the entity that the secured creditors, SLS, and Hawk formed in 2020 to receive the assets from Stream TV as a result of the fraud foreclosure known as the omnibus agreement.

THE COURT:  Counsel, hold on one minute.  My pen is now empty and I need to get another one.  Now if I only could remember where I had them at.  Hold on one second.

Okay.  All right.  So SeeCubic, my ink went blank.

So counsel, could you say that -- or I mean, Mr. Stastney, could you say that again?

THE WITNESS:  Yeah, of course.  SeeCubic, Inc is the entity formed by the secured creditors, SLS and Hawk, to receive the assets that comprise their collateral from Stream TV in 2020 pursuant to the omnibus agreement.

BY MR. COLBY:

Q    And what's the purpose of SeeCubic's existence today now that the omnibus agreement has been invalidated?

A    SeeCubic continues to hold those rights on behalf of the secured creditors to pursue the assets, and to continue to advance the business that I took over in December of 2020 when it first received the assets, and in which an additional $40 million has been invested since.

Q    Okay.  There have been some references today to certain Dutch based subsidiaries of Stream TV.  If I refer to those as the Dutch entities, will you know what I'm referring to?

A    I will.

Q    Are you familiar with them?

A    I am.

Q    And what's your understanding as to who owns those Dutch subsidiaries today?

A    Stream T --

MR. ALEXANDER:  Object to the question.  I don't -- it's -- lack of foundation in terms of what Dutch entities he's

referring to.

BY MR. COLBY:

Q    Mr. -- we'll do it the real slow way.  Mr. Stastney, are you familiar with an entity Ultra-D Cooperatief U.A. Stream TV?

A    Yes.

Q    I'm sorry.  Ultra-D Cooperatief U.A.  Yes, right.

A    Yes.

Q    Are you familiar with the --

          THE COURT:  What's it called?  Ultra what?

          MR. COLBY:  Ultra dash D, Cooperatief.

          THE COURT:  Okay.

          MR. COLBY:  U, period, A, period.

BY MR. COLBY:

Q    Are you familiar with that entity Mr. Stastney?

A    I am familiar with that entity, yes.

Q    Okay.  Are you familiar with the entity Stream TV International, BV?

A    I am.

Q    And are you familiar with the entity SeeCubic, BV?

A    I am.

Q    And can we refer to those as the Dutch entities?

A    Yes.

          THE COURT:  Okay.  So we have Ultra-D Cooperatief U.A., Stream TV what?

          THE WITNESS:  International BV

THE COURT:  International BV, and then we have SeeCubic, C.V.

THE WITNESS:  BV

THE COURT:  BV  Why do I keep calling it C.V.?  And those are what you are referring to as the Dutch entities?

THE WITNESS:  Correct.

THE COURT:  Okay.

BY MR. COLBY:

Q    Are these the same Dutch subsidiaries that Mr. Rajan described based on the org chart at the outside of his testimony today?

A    Yes.

Q    And what's your understanding as to -- broadly speaking, what's your understanding as to who owns the Dutch subsidiaries today?

A    They're indirect top parent is Stream TV Networks, Inc.

Q    Okay.  And since when has that been the case, to your understanding?

A    Since at least October 3rd of 2022.

Q    Okay.  Are all of these entities holding companies, operating companies, or some of each?

A    Some of each.  SeeCubic, BV is an operating entity and Stream TV International BV and Ultra-D Cooperatief are holding companies.

Q    As an operating company, does SeeCubic, BV have expenses

it needs to pay for to do whatever it is it does?

A     It does.

Q     Okay.  And what's your understanding as to how those expenses have been funded since Stream TV became the indirect top-level parent of those entities -- of SeeCubic BV, sorry.

A     Starting in October 3rd, 2022, SeeCubic BV received no funding from Stream TV until the 225 motion was filed by Hawk, at which point a receiver was appointed by the chancery court. And the receiver together with the parties SeeCubic, Inc and Stream TV negotiated a promissory note funding facility and SeeCubic, Inc, in the absence of Stream's ability to do so, agreed to fund the subsidiaries operations.

Q     Okay.  How did that situation unfold during that period of time after Stream TV, the debtor, became the ultimate top-level parent of SeeCubic BV up until the point of time when SeeCubic agreed to fund SeeCubic BV's operations?

A     Yes.  Fairly similar to what's happening now in that after the assets were formally moved into the name of Stream TV, SeeCubic, Inc, which had been funding those subsidiaries for almost the two years prior, could no longer fund.  And SeeCubic, BV, despite frequent requests, did not get any funding or funding commitments from Stream.  And therefore, when the receiver was put in place, one of the rationales was that the subsidiaries did need funding and there would have to be someone overseeing that funding both in terms of its

structuring and its deployment in order to make it workable.

Q    Okay.  And I'd like to take a look at Exhibit 2 from our list.

THE COURT:  What are we looking at?  Exhibit what?

MR. COLBY:  We're getting there.  It's Exhibit 2. It's SeeCubic Exhibit 2 from what we submitted earlier today.

THE COURT:  Okay, so Exhibit 2.  Okay.

John, where we at?  We need Exhibit 2.

MR. COLBY:  Yep, if we could -- we could -- it's Exhibit B to Mr. Stastney's declaration for help locating it. I know we're not admitting it in that way, but the actual -- yeah, here we are.  And so --

THE COURT:  So this is Exhibit 2, separate from the declaration.  So it's just Exhibit 2.  Let's keep it that way. Exhibit 2, okay.

BY MR. COLBY:

Q    And Mr. Stastney, you're not copied on this email, are you?

A    I don't appear to be, no.

Q    Okay.  But do you see myself, Marley Brumme, Jenness Parker, and Bonnie David identified as recipients of this email?

A    I do.

Q    And who's that group?

A    Our -- SeeCubic's counsel at Scaddon.

Q    Okay.  And so we -- just to put it plainly, we were acting as SeeCubic's lawyers, the company that you're the chairman of, correct?

A    That's correct.

Q    Okay.  And is this -- and it's also an email from Ian Liston.  Who is Ian Liston?

A    Ian Liston was the receiver pendente lite appointed by the Delaware chancery court.

Q    Okay.  And do you also see the first recipient in the to field is Andy -- Andrew Dupre, do you see that?

A    I do.

Q    What's your understanding as to who Mr. Dupre is?

A    Mr. Dupre was borrowers -- was or is, borrower's counsel in the chancery court action.

Q    By borrower, you mean Stream TV, the debtors here today?

A    Yes, apology.  Debtor's counsel.

Q    And then also Mr. Caponi's copied.  Now, is this -- to your understanding, is this type of routine correspondence what was taking place during that period of time?  Emails back and forth between Mr. Liston, your lawyers, Stream's lawyers, and you also see Mr. Caponi from Hawk on there, is that what was happening?

A    Yes.

        MR. COLBY:  So I think I've laid a foundation here that this is a business record.  If there's any objection to

168

its admission, we can sort it out now or we can sort it out later, but --

MR. ALEXANDER:  Yeah, we object to the admission of that as an exhibit.  Mr. Stastney has no personal foundation of personal knowledge of that.  He's not copied on the email.  He admitted that, and none of the other parties that are on that email are here testifying.  So that email and the substance of it, it's hearsay and inadmissible.

MR. COLBY:  I'm not offering it necessarily for the truth of the matter asserted.  But -- and I also think that the business record exception applies in given that Mr. Stastney's lawyers were copied on the email.  Unless there's some basis to question the accuracy or the legitimacy of it, I think we've established that it's a business record.

MR. ALEXANDER:  Your Honor, we still object.  They haven't met the business record exception in terms of admitting this document.

THE COURT:  Counsel, who's business record is this?

MR. COLBY:  SeeCubic's.

THE COURT:  And how is it SeeCubic's business record?  Was this given to SeeCubic?  Did you send it to them?  Did you share it?  Is he going to testify that he got a copy of this?  You don't have to be copied because your lawyer can send stuff and then send you a copy of what they sent or a copy of what they filed.  Did Mr. Stastney get a copy of this and it would

have to be SeeCubic, Inc's records.  This is more attorney
records and their process, but I haven't heard anything about
how this is SeeCubic's.

The business record exception is a document that is
either made or held through the ordinary business course and
that is maintained by the business.  Is this document
maintained by SeeCubic, Inc?

MR. COLBY:  Well, we could get at that two ways.  I'm
happy to ask Mr. Stastney if he remembers receiving a copy of
it, but also --

THE COURT:  Well, I guess you better ask him then,
because right now, I don't see any business record.

BY MR. COLBY:

Q    Mr. Stastney, do you recall receiving a forward of this
correspondence, Exhibit 2?

A    I do.

MR. COLBY:  I would also argue, Your Honor, that it
is in SeeCubic business's possession, custody, and control
because it was kept by its lawyers.  But if Mr. Stastney's
memory is sufficient, we move to admit it on that basis.

MR. ALEXANDER:  Your Honor, we still object.  He
hasn't testified when it was received, how it was received,
whether it was in the ordinary course.

THE COURT:  You can lay a foundation.  You can lay a
foundation.

MR. COLBY:  Sure.

BY MR. COLBY:

Q    Mr. Stastney, is there an ordinary practice that you can testify to regarding your -- SeeCubic's lawyers forwarding communications with Mr. Liston or with Stream's lawyers to you?

A    Yes.  Almost all communications during the pendency of the receivership were done by counsel, through counsel, with provision of the email chains to me afterwards for approval or action if any approval or action was needed.

Q    Would they be sent to you just to keep you updated on the discussions that were taken place?

A    Absolutely.

MR. COLBY:  Your Honor, is that satisfactory to establish the foundation?

THE COURT:  Well, is this one of the ones you received?

THE WITNESS:  I do recall receiving this one, yes.

THE COURT:  And what did you do with the emails when you received them?

THE WITNESS:  I would have read them to see whether the process that was occurring and the discussions were happening were going in a direction that was going to be acceptable to SeeCubic since we were likely the ones that were going to be asked to fund or were not going to be acceptable to SeeCubic.

THE COURT:  Oh, I'm sorry.  Sorry.

MR. ALEXANDER:  We -- our objection remains because it's still hearsay within hearsay.  He hasn't demonstrated that it was an email that he actually received and these are statements that are coming from the receiver.  They're not from SeeCubic.

MR. COLBY:  I would also, Your Honor, if I could make a -- if we could scroll down a little bit and I could make a proffer here.

THE COURT:  Okay.

MR. COLBY:  This is a statement by Mr. Dupry who is debtor's counsel.  And whether you consider it a statement against interest or something along those lines, Mr. Dupry is stating that he wants -- he does not want to break the corporate forum protection between SCBV and Technovative nor render Technovative liable for SCBV liabilities.  And that I think is a statement that is contrary to the position that has been articulated today that somehow Stream was liable for all of the liabilities that might exist down at the SCBV level.

THE COURT:  Mr. Alexander, he's saying it's a statement against interest by Mr. Andrew Dupre from McCarter, I guess McCarter & English, I'm not sure, who was Stream TV's counsel in the chancery court.

MR. ALEXANDER:  Your Honor, a statement needs to be made by the -- normally, it's by the deponent or who's being

the entity.  I mean, Mr. Dupre may have been representing them in the other case, but this document -- well, A, no one's authenticated this document in terms of a witness here today. So I still think they have issues and evidentiary issues in terms of admitting it and I don't think it qualifies as a statement, you know, by the party against interest.

THE COURT:  Mr. Colby?  I'll be getting in the weeds.

MR. COLBY:  I know.

THE COURT:  In the weeds.  I know somebody stole -- I had a book that had all the -- it was by -- I forgot the name, it was a really good book on evidence and it laid all the questions and foundation.  And when I went to change my office from the law firm to chambers, somebody -- I'm going to use the word hijacked -- lifted, whatever word you want to use, it wasn't there when I got to chambers, so I don't have my handy dandy book.  It's not Pakle and Fallen (phonetic), it was another one that I could just look at and tell you what the foundations are.

So what's the statement -- what's the statement against interest?

MR. COLBY:  It's a statement that either -- that either admits or places --

THE COURT:  But it was laid by or on behalf of?

MR. COLBY:  Yes, made by a person, and I would argue here where it's being articulated by a lawyer, that that would

count.  It's an exception to the rule on hearsay.  The content of the statement -- the idea is it's authenticated by the logic that the content of the statement is so prejudicial, the person making it, they would not have made the statement unless they believed the statement was true.

So here, clearly, in light of the position that the debtors have been taking over the course of the day, this is a statement against interest and we don't think it would have been stated unless the person making it, who was acting on behalf of the debtor, unless they believed it to be true.

THE COURT:  All right.  I'm looking at the exceptions to the hearsay rule.

MR. ALEXANDER:  Your Honor, I also believe that they need to demonstrate that the declarant's unavailable.

THE COURT:  For a statement against interest?

MR. ALEXANDER:  Under 804(a)?

THE COURT:  Let's see, 804.8, you said?

MR. ALEXANDER:  They need to be unavailable pursuant to 804(a).

THE COURT:  Okay.  Counsel, let's see what 804(a) says.  A, exception when the declarant is unavailable as a witness.  But does that apply when you -- when the exception is a statement against interest?  Does the person have to be available or is the statement simple?  What exception are you relying on counsel for -- let's see, here is 803.  That where I

would find it at or is it somewhere else?  Okay.

Recorded recollections.  6 is the business exceptions.  All right, counsel, where -- that's not an interest in property.  Where are we at, counsel?

MR. COLBY:  801(d)(2).

THE COURT:  801(d)(2).  Okay.  Please don't tell me I don't have -- okay, 801(d)(2).  Hearsay means a statement that a party offers in evidence to prove the truth of a matter asserted in the statements.  Oh, wait.  I'm in C.

Statements that are not hearsay.  A statement that meets the following condition is not hearsay.  An opposing party's statement.  The statement is offered against an opposing party and was made by the party in an individual or a representative capacity and -- so that's the one you said is a statement was made by the party in an individual or a representative capacity.

MR. COLBY:  Right.

THE COURT:  Or was made by a person whom the party authorized to make a statement on the subject, was made by the party's agent or inquiry, or a matter within the scope of the relationship and while it existed, and the statement that must be considered does not by itself establish the declarants authority on the existence or scope of the relationship under or the existence of it -- well, we're not talking about conspiracy here.

So you believe that there is a -- it's a statement -- it's an opposing party's statement.

MR. COLBY:  Yes.

THE COURT:  Because it was made by the party -- by someone in a representative -- was made by a person whom the party authorized to make the statement on the subject?

MR. COLBY:  Yes.

THE COURT:  Mr. Alexander?

MR. ALEXANDER:  So I'm just trying to clarify, Your Honor, because he originally said it's a statement against interest.

THE COURT:  Well, I think that's what he's calling it, but it's an opposing party's statement.

MR. ALEXANDER:  Because under 804, it requires unavailability.

THE COURT:  Well, he's now on the 802, 801(d)(2) -- (d)(2)(c).

Counsel, is that what we're moving onto?

MR. COLBY:  Yes, yes.

THE COURT:  Counsel?

MR. ALEXANDER:  I'm thinking about it now, Your Honor.  I -- Your Honor, I still don't think they've demonstrated in terms of authority to make that statement or whether they've adopted it.  So we'll stand on our objection.

THE COURT:  Well, it doesn't say they have to adopt

it.  All it has to say is it's a statement made by the party's agent or employee on a matter within the scope of that relationship and why it existed.  It doesn't say anything about it that has to be adopted.  All it has to satisfy is it was made by the party's agent or employee on a matter within the scope of that relationship and white it existed.

So what their position is, it was made by the attorney as their agent, because they were representing them, and it was in the scope of that relationship and it was made why it existed.  So why wouldn't it qualify?

MR. ALEXANDER:  Well, I mean the other issue, and I don't know the answer to this, is whether or not these were a part of settlement discussions in turn trying to resolve the issues with regard to funding.  I don't know the answer to that.

THE COURT:  Well --

MR. COLBY:  There's no indication on the face of the document that it was part of settlement discussions.

THE COURT:  Well, it doesn't say on it.  Typically all you guys are all, you know, typically -- well, I'm not going to say all you guys.  I have my own opinion.  I did work at a large law firm.  But typically you say, this is settlement discussions not to be revealed.  It's always typed on there, big as day.

MR. COLBY:  It's plainly on its face a negotiation

over financing and it's a routine business negotiation over financing that has been discussed by Mr. Rajan earlier today. There's no indication it is a settlement discussion.  It is simply working out how SeeCubic BV was going to be funded during this period of time.

THE COURT:  Okay.  And this was from -- and is there any dispute that Mr. Dupre was counsel for Stream TV during this -- in connection with this.  Because it also cc -- who's WSGR?

MR. COLBY:  That is Wilson Constini.  That's the receiver's team.  He had a distribution list.  So you see Mr. Liston was listed, and then WSGR was sort of their project email address from what I understood.

THE COURT:  Okay.  And there's somebody from Sacaton, two people from Sacaton, three people from Sacaton, McCarty -- so Mr. Dupre was also copying someone else at McCarter (sic).  And then Mr. Caponi, you on there too.  Okay.

I'm going to allow it for what it's worth.  I mean, it seems to me it meets the exception.  It doesn't say they have to adopt it.  There's no issue that Mr. Dupre was acting as counsel.  He sent it in his capacity at that and he was -- it was within the scope of their relationship as client counsel -- attorney client and it made it during the course of the representation.  Okay.  I'll allow it for what it's worth.

MR. COLBY:  Thank you, Your Honor.

THE COURT:  But that's only Mr. Dupre's email.

MR. COLBY:  That's all I'm interested in, Your Honor.

THE COURT:  Right.  The others -- just that portion.

MR. COLBY:  Okay.  Thank you.

BY MR. COLBY:

Q   Now, Mr. Stastney, this discussion -- Mr. Dupre's email that we see here is part of the dialog during this period of time in October when you were discussing how SeeCubic BV would be funded, correct?

A   That's correct.

Q   Okay.  So now, what was the culmination of those discussions?

A   Ultimately the parties agreed that a promissory note facility would be put in place as CDV, by which a total amount of committed funding was agreed on, which was 3.5 million euros.  A maximum monthly drawdown amount was agreed on, which was 750,000 euros, and a process was put in place whereby SeeCubic BV would request funding each month, the receiver would approve it, it would be signed as both myself and Mr. Rajan as the two potentially valid directors, and then SeeCubic, Inc would fund.

Q   Okay.  And just focusing now on the period of time when you were negotiating this arrangement.  What did you understand the receiver's responsibility to be in that process?

A   The receiver's mandate overall was to maintain the

ordinary course of business and continued existence of SeeCubic BV until the Rule 225 case had concluded at the Delaware chancery court level.

Q   Okay.  Now you also described a process for approving the budget, for a lack of a better term, prior to funding on a monthly basis.  What was the receiver's responsibility in that process?

A   The -- SeeCubic BV would prepare a proposed budget, would run it by the receiver for approval, and then would distribute to both parties, both SeeCubic and Stream for signoff prior to funding.

Q   Okay.  And what was your understanding of -- and I'm sorry if you said this and I missed it.  I'm not so much focused on the process, but what was your understanding of the receiver's responsibility part of that process?  Why was he part of that process, to your understanding?

A   To ensure that the funding was used for the purposes that it was intended to be used for and to ensure that the funding was sufficient to maintain the operational health of the -- of SCBV.

Q   Did you understand the ordinary course of business to be part of the receiver's responsibilities in approving those monthly budgets?

A   Yes, sorry.  I said that earlier as well, yes.  Ordinary course was the overall mandate.

Q    Got it.  Okay.  Let's take a look at our SeeCubic Exhibit 1.  Do you recognize this document, Mr. Stastney?

A    I do.

Q    And what is it?

A    This is the senior promissory note facility that was entered into between the parties to fund SeeCubic, BV in November of 2022.

Q    Okay.  And if we go down to page -- this is the note that you just described the negotiation process for, correct?

A    That's correct.

Q    All right.  And you signed it?

A    Yes, I did.

Q    If we go to page 12.  That's your signature there?

A    Oh, I'm sorry.  Yes.  I said yes, sorry.

        MR. COLBY:  Okay.  Is there any objection to moving this document into evidence?

        MR. ALEXANDER:  No objection.

        THE COURT:  Okay.  Are we going to do the same --

        MR. ALEXANDER:  I don't know if we're doing it in-between or if we're doing it at the end.  I didn't --

        MR. COLBY:  Well --

        THE COURT:  Well, are we going to do the same process where unless there's an objection, it's going to be deemed admitted and then we'll deal with the objected documents, I guess, right there?  That's what we did last time.  I just, at

the end, confirmed what they were.

MR. COLBY:  Sure, yeah.  That's fine.

THE COURT:  You want to use that process, Mr. Alexander?

MR. COLBY:  Yeah.  Oh, sorry, Your Honor.

MR. ALEXANDER:  That's acceptable, Your Honor.

THE COURT:  Okay.  All right.

MR. COLBY:  Okay.

THE COURT:  Okay.

BY MR. COLBY:

Q    Mr. Stastney, what's your understanding of the costs that were to be funded via this promissory note?

A    Generally, it was intended to cover all of the ordinary cores operating costs associated to SeeCubic, BV, including everything the business needed to continue to operate and do the work that it needed to do.

Q    Okay.  Let's take a look at Exhibit --

MR. COLBY:  I'd like to do a group exhibit, if possible, to avoid going through them one by one.  They're Exhibits 3, 4, 5, and 6 to what we submitted earlier today. These are the monthly funding notices, the budgets for November 2022, December 2022, January of 2023, and February 2023.

If there's an objection to the admissions of those, I will go through and establish a foundation for each one.  If not, I'd like to save us some time and just deem them admitted

and move on.

THE COURT:  All right.  Well, let's see them.

MR. COLBY:  Sure.  Let's take a look at these, please.

THE COURT:  Exhibit 3, 4, 5, and 6, John.  Okay, 4, oh wait a minute.  Where are we at?  Wait a minute, you're going too fast.  Back up.  Let's start -- the first one was in November of '22.  Form of notice of advance.  Okay.  Okay.

Exhibit 4 was for -- wait a minute, wait a minute.  3, 4, 5, 6.  4 is for December of 2022?

MR. COLBY:  Correct.

THE COURT:  Okay.  And it says how much is advanced, requested.  All right.

And those things -- and those notices have attachments to them, counsel?  Because it says attached is --

MR. COLBY:  Yeah, so it's short.  There are some spreadsheets and other numbers attached --

THE COURT:  Okay.

MR. COLBY:  -- which varies month by month.

THE COURT:  So it's --

MR. COLBY:  And then the signature pages of Mr. Stastney, Mr. Rajan, and Mr. Liston.

THE COURT:  So is Exhibit 4 comprised of how many pages?  Each one of those are going to have.  Okay.  So Exhibit 4 is 7 pages.

What's Exhibit 3, John?  Seven pages.

MR. COLBY:  I'm sorry, Your Honor.  That one is eight pages.

THE COURT:  Oh, eight pages.  Which one, is 3?

MR. COLBY:  yep.

THE COURT:  Eight pages.  4 has how many, John? Seven.  How many does 5 have?  Nine.  Wow, they're getting longer.  Number -- Exhibit 6 has how many?  14.  Okay.

Mr. Alexander, he's proposing to admit those unless you have some questions or want him to lay a foundation?  What?

MR. ALEXANDER:  I'm scrolling through them.  I mean, they appear to be the note -- the notice of advance.  So I mean, if he's admitting them for the purpose of them being the notice of advance, then we don't have an objection to that.

THE COURT:  Well, what purpose would he be admitting them for?

MR. ALEXANDER:  Well, if he's trying to -- I don't know what he's trying to argue by it because he hasn't argued --

THE COURT:  Well, he's not arguing anything.  He's just saying I want to admit these.  You guys can argue later. The question is does he need to have Mr. Stastney testify here they are, these are what was done or are we just going to agree that these are what they are.

If you want him to put testimony on in your cross,

that's fine.  I think what he's saying is can we agree that these are the notice of advances.

MR. ALEXANDER:  Yeah, subject to my ability to cross-examine him on them.

MR. COLBY:  Of course.

THE COURT:  Okay.  Admitting them.  Admitting.

MR. COLBY:  Thank you.  Just trying to establish that those are the notices of advances.

BY MR. COLBY:

Q    Mr. Stastney, pursuant to the promissory note and the notices of advances, do you know what the total amount that SeeCubic funded to SeeCubic BV under this promissory note was?

A    From November -- or October through March, the total was 2.975 million.

Q    Okay.  And do you recall what the total amount of the requests were?

THE COURT:  Wait a minute.  How much was it?

THE WITNESS:  2.975 million.

THE COURT:  Million or euro -- are we in million or euros?

THE WITNESS:  Actually, euros.  Million euros.  2.975 million euros.

THE COURT:  Okay.  All right.  Through March what?

THE WITNESS:  Through March 15th.

THE COURT:  Okay.

BY MR. COLBY:

Q    And Mr. Stastney, do you recall approximately what the number -- what the amount was that was requested pursuant to these notices of advance?

A    Yes.  Yeah.  Including the March notice, 4.232 million.

Q    Okay.  Why is there a discrepancy between the amount that was requested and the amount that was funded?

A    Well, first, the March notice wasn't funded because of the bankruptcy, so that's 750,000 that we've not been able to fund. And there was an amount approximately equal to 500,000 before that that we had yet to fund from previous advance notices.

Q    Okay.  Was there a particular reason or reasons why you had not funded those amounts from the previous notices?

A    Generally, we tried to fund when the funds were needed and in order of priority.  So funding generally happens over time, over the course of a month, to meet SCBV's needs.

Q    Early today Mr. Rajan testified about a missing $1.9 million or $1.9 million worth of underfunding.  Do you recall that testimony?

A    I do recall that testimony, yes.

Q    Would that make any sense to you?

A    No.  That's not what the records show.

Q    Mr. Stastney, are you willing to continue -- I should rephrase that.  Mr. Stastney, is SeeCubic willing to continue to fund SeeCubic BV and its work in the ordinary course of

business?

A    Yes.

Q    That's why you're here today, correct?

A    That's correct.

Q    Okay.  And on what terms is SeeCubic willing to fund SeeCubic BV?

A    We're happy to continue to fund on the terms agreed by all the parties and the receiver up to the maximum amount allowable under the facility, which is about another $500,000.  And if the facility is extended or expanded, we're willing to continue to fund as much as SCBV needs for its ordinary course of operations until the termination of the need.

Q    Okay.  So there's some capacity left under the existing note, correct?

A    That's correct.  Slightly over $500,000 -- or euros, rather.

Q    And would you be willing to increase that capacity if needed?

A    We would.

Q    Okay.  If we could just take a look at Debtor's Exhibit -- sorry, let me ask you one more question and then we'll switch documents.   Mr. Stastney, does SeeCubic BV have the liquid assets available to fund SeeCubic BV -- sorry.  Does SeeCubic have the liquid assets available to continue to fund SeeCubic BV in the manner you just described?

A    It does.

Q    Okay.  Let's just take a look at Debtor Exhibit 2 that was used earlier today.  Mr. Stastney, do you recognize this document?

A    I do.

Q    What is it?

A    This is an extract from the funding request that Patrick Thune had put together, attempting to prioritize the amounts needed by SeeCubic BV to ensure that the most urgent needs are paid when they're needed to be paid.

Q    Okay.  And is SeeCubic willing to fund these amounts?

A    Yes.

Q    For these purposes?

A    Yes.

          MR. COLBY:  Let me just take a quick look.  I don't think I have any additional direct question.  I don't think I have any additional direct questions at this time.

          THE COURT:  Okay.  Mr. Alexander, cross-examination?

          MR. ALEXANDER:  Yes, Your Honor.

                    CROSS-EXAMINATION

BY MR. ALEXANDER:

Q    I guess it's good evening now, Mr. Stastney.

A    Good evening.

Q    You testified that SeeCubic was created to take the assets of the debtor pursuant to what has been termed the omnibus

agreement, correct?

A     That is correct.

Q     So SeeCubic's sole purpose was to take the debtor's assets and divest the debtor of all of its assets, correct?

A     It was to receive the assets pursuant to the omnibus agreement.

Q     And that omnibus agreement was determined to be void and of no effect by the Delaware Supreme Court, correct?

A     That's correct.

Q     And that's because the transaction with the omnibus agreement was never approved by the appropriate shareholders of Stream TV, correct?

          MR. COLBY:  Objection, Your Honor.  Relevance.

          THE COURT:  Counsel, relevance?

          MR. ALEXANDER:  Well, this is his direct testimony, so I'm asking about the direct testimony that he put in, so I'm cross-examining him on his direct testimony.

          THE COURT:  Well, his direct testimony was that he was phoned and that -- never mind.  Counsel, I'll allow it for -- counsel, yes?  Hello?  For what it's worth.  I mean, I don't know what you guys want me to do.  I mean, whatever happened in Delaware happened.

          MR. COLBY:  Objection withdrawn.

          THE COURT:  You're objection with what, counsel?

          MR. COLBY:  Objection withdrawn.  I thought the

details of the legal arguments behind the supreme court opinion aren't relevant at this hour, but objection withdrawn.

THE COURT:  Okay.  Okay, counsel, go ahead.

THE WITNESS:  Would you please ask the question again?

BY MR. ALEXANDER:

Q    The omnibus agreement, which you indicated SeeCubic obtained the assets of the debtor, was ultimately determined by the Delaware Supreme Court to be void and of no effect, correct?

A    That is -- I believe that's correct.

Q    And you referenced that you had a relationship with Stream and you were familiar with Stream, and you mentioned an entity SLS, correct?

A    That is correct.

Q    But that wasn't your only connection with SLS -- with Stream, correct?

A    That is correct.

Q    You also worked for Stream, correct?

A    That is correct.

Q    You were a director or officer of Stream?

A    Yes, that is not working for Stream, but yes.

Q    You were a director or officer of Stream, correct?

A    I was a director of Stream from 2011 to 2014 and again from 2018 to 2020.  And I was an officer of Stream from 2018 to

2020.  December of 2018 through January of 2020.

Q    And you were a director of Stream at the time when you attempted to transfer the assets of Stream to SeeCubic?

A    No, I was not.

Q    Did SLS have members on the board of Stream at the time that that transfer occurred?

A    It did not.

Q    At SeeCubic?

A    It did not.  SeeCubic had not been formed.

Q    Okay.  But you spent several years as a director or officer, otherwise an insider at Stream, correct?

A    I did.

Q    Are you aware if Hawk had board members on Stream?

A    Not that I'm aware of.

Q    You talked about funding with regards to the SeeCubic BV and you referenced amounts that you've testified to that SeeCubic funded.  Do you recall that testimony?

A    I do.

Q    You haven't presented any evidence to this Court that any of that funding actually occurred, have you?

        MR. COLBY:  Objection.  That misstates a lot of prior testimony.

        MR. ALEXANDER:  I'm asking a question.  It's yes or no.

        THE COURT:  Wait a minute, he's saying you misstated

the prior testimony. I don't know what Mister -- what Mister --

MR. ALEXANDER:  Well, there was no prior testimony.
No prior testimony.

THE COURT:  Mr. Colby, did you hear his response?

MR. COLBY:  I understood --

MR. ALEXANDER:  Sorry, go ahead.

THE COURT:  Hold on.  Hold on.

MR. COLBY:  I understood the question to be whether or not Mr. Stastney presented an evidence to this Court that the funding of SeeCubic-to-SeeCubic BV had actually occurred. He just testified to that extensively, and so that's evidence. I'm not sure why Mr. Alexander is characterizing Mr. Stastney's prior testimony as not evidence.

THE COURT:  All right.

MR. ALEXANDER:  That was not my -- that was not my statement, Your Honor.  I said they've provided no documentary evidence with respect to any of the --

THE COURT:  Oh, I didn't hear the word -- did you say documentary?

Maybe he did, Mr. Colby.  I can't recall.  All right, so his question is you submitted no documentary evidence of what?

MR. ALEXANDER:  Of any wires going to SeeCubic BV.

THE COURT:  Okay.

MR. ALEXANDER:  I haven't heard -- is -- are they --

THE COURT: Mr. Stastney, he said did you provide any documentary evidence of wires going to SeeCubic BV.

THE WITNESS: I am not aware of whether that's been done or not as part of the record in the case. Not today certainly, no.

BY MR. ALEXANDER:

Q    In fact, the receiver's records actually show that SeeCubic did not fully advance 2.975 million euros; isn't that right?

A    I do not know what those records so, and if so, they're incorrect.

Q    But you don't have any records to demonstrate that you actually made the transfers, correct?

A    We do have records that show that we made the transfers.

Q    You just haven't provided them to the Court?

A    We have not been asked for them. We'd be happy to provide them.

Q    In terms of the availability of funding for SeeCubic, has SeeCubic set forth any documents demonstrating availability of funds?

A    I'm sorry. For funding to SeeCubic? Has SeeCubic set forth documents for funding to SeeCubic?

Q    Has SeeCubic provided any documents demonstrating proof of funds to support its ability to fund any amounts to SeeCubic BV?

A    I'm sorry.  No, not that I'm aware of.  But again those are available upon request.

Q    But in terms of evidence today, no one has provided those documents, correct?

A    We have not.

Q    Where does SeeCubic get its money from?

A    From raising money from investors, as well as revenue.

Q    And what investors does SeeCubic get its money from?

A    Various investors.

Q    Which investors?

        MR. COLBY:  Objection, Your Honor.  Relevance. SeeCubic's not the debtor here, and I don't understand the relevance of SeeCubic's investors.

        THE COURT:  I'm going to allow it.  Because he's saying, what's the source, he says investors.  I don't know what he wants to say for investors, he answered it.  But investors.  What's the next question.

BY MR. ALEXANDER:

Q    The next question is why did SeeCubic not provide evidence to the Court demonstrating its wherewithal in terms of documents, proof of funds, that it can fund any monies to SeeCubic BV?

A    SeeCubic has been funding hundreds of thousands of dollars to SeeCubic BV every month for the past two and a half years. I think our Bonafede's on that are established, but we're happy

to provide proof of funds if that's helpful.

Q    But you haven't provided any funds demonstrating the amount of funding those two and a half years either, though, as you previously testified.

A    Not today.

Q    You said not true?

A    Not today.

            THE COURT:  Not today.

            MR. ALEXANDER:  Oh, not today.  I apologize.

BY MR. ALEXANDER:

Q    You agree that SeeCubic wants to -- wants the debtor's assets, correct?  I believe you testified to that earlier in terms of I believe you said they were a secured party with rights in all of the assets.

A    I don't believe I said that.  But I do --

            THE COURT:  Wait a minute.  When did he say that?

            MR. ALEXANDER:  I believe he testified that all the rights that he believed were in SLS and Hawk with respect to the debtor's assets were transferred to SeeCubic.

            MR. COLBY:  Objection.  That wasn't the question you asked.

            THE COURT:  The answer doesn't mean he wants it. Let's rephrase the question.

BY MR. ALEXANDER:

Q    Well, you previously facilitated a transfer of the

debtor's assets to SeeCubic, correct?

A    I don't understand the question.

Q    Did you previously facilitate through the omnibus agreement the transfer of the debtor's assets to SeeCubic?

A    The omnibus agreement facilitated the transfer of the assets.

Q    You had involvement in the omnibus agreement, correct?

A    Of course.  I was a signatory to the omnibus agreement.

Q    And you've also stated that your goal with respect to the debtor's subsidiary assets is to have an Article 9 sale to sell all the assets, correct?

A    I have never stated that's our goal.

Q    Do you recall scheduling or attempting to schedule an Article 9 sale of the debtor's assets?

A    I did not attempt to schedule or -- I did not attempt to schedule or schedule an Article 9 sale.

Q    Did Hawk?

A    I don't know.

Q    You're unaware of any of that occurring?

A    I'm unaware of whether Hawk scheduled an Article 9 sale.

        MR. ALEXANDER:  Your Honor, if you could just give me a couple minutes to just look at my notes.

        THE COURT:  Go ahead.

        MR. ALEXANDER:  And then I will come home for a -- I believe, a landing, if I could?

THE COURT:  That's fine.

MR. ALEXANDER:  Okay.  Thank you.

MR. FISHER:  Judge?

THE COURT:  Yes?  Who's this?

MR. FISHER:  This is Bennet Fisher.

THE COURT:  Yes, Mr. Fisher?

MR. FISHER:  May we take a bathroom break?

THE COURT:  Sure.  I think that would be appropriate.
And let's take a -- come back at 9.  That gives me a chance to
go get some water because my mouth is dry.

MR. FISHER:  Thank you.

THE COURT:  John, are you okay staying late?  John?

UNIDENTIFIED SPEAKER:  Sure.

THE COURT:  All right.  We haven't had one of these
in a long time.  Okay.  We'll come back at 9:00.

(Recess taken)

THE COURT:  I'm sorry.  I lost track of time.

All right.  Where did we leave off with Mr.
Alexander.  You were reviewing your notes to make sure that you
had all the questions that you wanted to ask, correct?

MR. ALEXANDER:  Yeah, just a few brief questions.

THE COURT:  Okay.

MR. ALEXANDER:  May I proceed?

THE COURT:  Yes, you may.

BY MR. ALEXANDER:

Q     Mr. Stastney --

MR. ALEXANDER:  Oh, there he is.  I lost him on my screen.

THE COURT:  He's right above you on mine.

MR. ALEXANDER:  All right.

BY MR. ALEXANDER:

Q     Mr. Stastney, you previously testified that SeeCubic, Inc did not make a funding in March because of the bankruptcy filing, correct?

A     No.  SeeCubic Inc did not make any fundings with respect to the March drawdown because of the bankruptcy filing.

Q     And with respect to the January promissory note, SeeCubic did not advance any funds to SCBV in January, correct?

A     No, that's incorrect.

Q     So do you recall submitting your declaration with attachments to it?

A     I do.

Q     And you submitted a form of notice of advance of February 17th, 2023.  And do you recall that?

A     I do.

Q     And as part of that document, it has the budget and the actuals, correct?

A     Yes.

Q     And we can pull up -- well, it's Document 158.

THE COURT:  Well, no.  They have exhibits of February

-- which one are we looking at for February?  It's Exhibit 6.

MR. ALEXANDER:  Exhibit 6, please.

THE COURT:  And Exhibit 5 is January.

MR. ALEXANDER:  Yeah, and if you scroll -- like the --

THE COURT:  What page you want him to go to?

MR. ALEXANDER:  Fourth page.

THE COURT:  Yeah, what page do you want him to go to?

MR. ALEXANDER:  Four -- fourth page.

THE COURT:  Four, John.  There we are.

MR. ALEXANDER:  And if you look at the January 2023 actual --

THE COURT:  Well, let's see how we get there.  Give us a minute.  Okay.

MR. ALEXANDER:  -- it doesn't show any funding.

THE COURT:  Wait a minute, where's January?  Keep going, John.

MR. ALEXANDER:  Yep, one more page.

THE COURT:  January, okay.

BY MR. ALEXANDER:

Q   It doesn't show any funding was received by SCBV in January, correct?

A   It shows 279,458 was received.

Q   Well, that shows payments.

A   Correct.

Q    Those are payments by SCBV, correct?

A    Below it says 280,320 is cash received regarding budget previous.  So 280,320, I believe, is what was received for that month unless I'm incorrect.

Q    But there was no funding, when you look at bank transfers, it says zero, correct?

A    Yes.  But the funding may have been on behalf of.  So according to our records, the 280,320 is what was paid either on behalf of or directly for SeeCubic, BV, and that's what their records show as well.  That's what the 283,020 is.

Q    But the 750 was not advanced; is that right?

A    280,320 of it was.

Q    And did you ever send an email to SeeCubic's shareholders regarding an Article 9 sale?

A    I don't recall, but I may have.

            MR. ALEXANDER:  Your Honor, I don't have any further cross questions.

            THE COURT:  All right.  Any redirect, Mr. Colby?

            MR. COLBY:  Yeah, just one while we're on this document.

            THE COURT:  Wait a minute, wait a minute, wait a minute, I forgot.  Anybody else want to cross-examine Mr. Stastney?

            And hearing no one saying that they would like to, Mr. Colby, you may redirect.

MR. COLBY:  Sure.

REDIRECT EXAMINATION

BY MR. COLBY:

Q    Sure.  Just one issue on this document while we're on it, If we could go back to the first page of Exhibit 6, please. Okay.  And what's the date of this document, Mr. Stastney?

A    February 17th, 2023.

Q    Okay.  And do you recall at what point in the month Mr. Liston would begin the dialog about the next month's funding?

A    Usually at the beginning of the month, I believe.

Q    Okay.  And so do you have an understanding as to whether or not this document shows all of the dollars that were funded in January or some of the dollars that were funded in January?

A    It was typically just a rolling funding.  So with respect to any advance, there would have been some numbers that would have been funded probably before it, some after it.  It was generally a pay as needed provision.

MR. COLBY:  Okay.  That's all I have, thank you.

Thank you, Your Honor.

THE COURT:  Okay.  All right.  Anything else for Mr. Stastney.

THE WITNESS:  It took me about five years to learn how to say it too.

THE COURT:  Anything else, Mr. Colby, for Mr. Stastney?

MR. COLBY:  No, Your Honor.

THE COURT:  All right.  Any other evidence that SeeCubic would like to -- I have to remember which party, would like to introduce into evidence in connection with its motion, which is to -- well, I'm not even sure I get the authorized funding directly to SeeCubic BV or as an alternative financing source.  Because I'm just boiling down that motion to those terms.  I know it says more than that.  Any other evidence that you would like to introduce in support of your motion?

MR. COLBY:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Mister -- hold on one second, counsel.

Sorry about that.  Mr. Alexander, any evidence in opposition to the motion or are you going to rely on the evidence that you submitted in connection with your motion of financing as opposition?

MR. ALEXANDER:  Your Honor, we're going to rely on the evidence that we submitted with regards to the affirmative relief sought by the Debtors.

THE COURT:  Okay.  All right.  So with that being said, I would say the record is -- well, with respect to the motion, what was admitted was Exhibits for SeeCubic, Inc was Exhibit 1, the senior promissory note, Exhibit 3, 4, 5, and 6.  And was there a 2?  That's all I see.

MR. COLBY:  There was a 2.  That was the Mr. Dupre

email.

THE COURT:  Oh, and the Mr. Dupre email, and we had lots of test -- and I actually went back and look on -- I was researching whether I was correct and researching on the partial waiver of attorney/client privilege, which you can do.

Okay.  So all those are admitted.  1 through 6.  Any other exhibits, Mr. Colby?

MR. COLBY:  No, Your Honor.

THE COURT:  Okay.  All right.  Let's hear argument. Mr. Alexander, I will allow you to go first, then Mr., I guess, Caponi, then Mr. Colby, and then Mr. Callahan.

MR. COLBY:  It will be -- for SeeCubic, it will be Mr. Mazza.

THE COURT:  Mr. Mazza for SeeCubic?

MR. COLBY:  Yes.

THE COURT:  Oh, that's right.  You're litigation counsel.

MR. COLBY:  I have a very narrow role here, Your Honor.

THE COURT:  That's the best role, no offense to the bankruptcy attorneys.

MR. COLBY:  I won't disagree with you at this point in the evening.

MR. MAZZA:  My command of the Rules of Evidence are a little behind.

THE COURT:  Well, mine are okay because I did litigate but I haven't done it in a while and I don't have my handy dandy rule book.  But I do have a law clerk who's good at sending me emails, so I get to cheat.

All right.  Let's go, Mr. Alexander.

MR. ALEXANDER:  Thank you, Your Honor.  We're -- the Debtor's filed a motion seeking authority from the Court under 105 and 364 for interim and final orders authorizing post-petition financing.  But the financing that the Debtor's seek they believe is in their business judgment, in the best interest of the estate because it will allow the estates to recognize their entire enterprise value.

You heard testimony today regarding the significant value of SeeCubic BV and also the interrelationship between SeeCubic BV and how that benefits the Debtors in their ability to make product and ultimately propose a plan of reorganization.

The terms that the Debtors are seeking the funding on we believe are more than reasonable and are better than any other terms -- and they're certainly better than the terms of the proposal provided by, I believe, the SeeCubic parties.

With respect to the exact terms, they're seeking to fund an unsecured note at one percent interest.  You heard testimony from Mr. Rajan that they did reach out to other parties, you know, regarding financing and they didn't receive

any calls back with respect to financing.

He indicated that they spoke to -- he spoke with a broker and no proposals were provided to the Debtor with respect to the funding and their immediate needs that they need right here, especially given the fact that there are employees at SeeCubic BV that need to get paid and there are other associated expenses that need to get paid in the interim of about 303,000 euros to allow that entity to continue to operate and also not have the employees leave the job and also have them have a place in which to work.

There's been a lot made about the, you know, insider nature of the transaction with respect to the funding between Stream and VSI with regards to the dip financing.  However, you need to look at the whole picture in terms of what the actual terms are, so what's being given up and what's being received.

Normally, the concern with insider transactions is you know, one party trying to take advantage of the other party.  You don't have that here.  What you have is a one percent loan going into the debtors and it's allowing the debtors to continue to fund their subsidiaries.

You heard testimony from Mr. Rajan that while the debtors were in control of their subsidiary, specifically with SeeCubic BV, you know, they funded approximately 85 million dollars, and the current value --

THE COURT:  May I ask you something?  Of that 85

million, how much of that was borrowed from -- well, never mind.  How much of that was borrowed money?

MR. ALEXANDER:  I don't know the answer to that, Your Honor --

THE COURT:  Okay.

MR. ALEXANDER:  -- in terms of how much was borrowed and how much was equity that was delivered into the entity. But based on my understanding, it was a -- and I don't have an exact number, but I believe it was around 25 percent.

THE COURT:  Twenty-five percent was what?

MR. ALEXANDER:  Borrowed --

THE COURT:  From the --

MR. ALEXANDER:  Delivered into that entity.

THE COURT:  And that would have been from Hawk and SLS.  Those are the, the lenders that I'm aware of, Your Honor.

THE COURT:  Okay.

MR. ALEXANDER:  I'm not aware of other lenders in terms of the funds.

THE COURT:  Well, what do you mean others?  With Hawk, you mean Hawk and SLL's were lenders, or they weren't? Were they? I mean I don't know.  That's the question.

MR. ALEXANDER:  Were they -- were they initially lenders such that they signed notes? The answer is yes.

THE COURT:  Okay.

MR. ALEXANDER:  Whether or not they are lenders in

the sense of having a secured debt today?

THE COURT:  I didn't ask about today.  We're not --

MR. ALEXANDER:  Oh, okay.  So you're talking about the original inception.  I --

THE COURT:  And we don't know what they are. Nobody's determined --

MR. ALEXANDER:  No, and I --

THE COURT:  So I just asked was, of the 25 percent loans, and you said 25 percent was loans, and I asked you who were the loans from -- which I guess I should have asked when Mr. Rajan was testifying -- whether they continue to be loans or whether it's converted.  That's for another day.  We have what we have today.  Nobody's determined anything.  So, go ahead.

MR. ALEXANDER:  Right.

THE COURT:  Okay.  So they borrowed, and 85 of the remaining 75 percent was investments?

MR. ALEXANDER:  That's my understanding, Your Honor.

THE COURT:  Okay.  All right.

MR. ALEXANDER:  In turn --

THE COURT:  And the 85 million was directly into SeeCubic BV, right?  Is that what you're saying?

MR. ALEXANDER:  That --

THE COURT:  That whole 85 million?

MR. ALEXANDER:  That is correct, Your Honor.

THE COURT:  Okay.

MR. ALEXANDER:  It was a combination of the entities, you know, in the Netherlands, and I believe the large percentage of that was SeeCubic BV

THE COURT:  Okay.  So that 85 million wasn't just in SeeCubic BV

MR. ALEXANDER:  That's correct, Your Honor.  It was in all of the underlying Netherland entities.  But the vast majority, the bulk of that was in SeeCubic BV because that was the R&D, the research and design entity of the debtors as part of their enterprise.

THE COURT:  Okay.

MR. ALEXANDER:  And you also heard testimony from Mr. Rajan regarding how the entities were set up in order to be, you know, collaborative entities and essentially be collaborative in terms of how they work together, and the only reason they were set up in various ways was based on, you know, advice of counsel, and to take -- and to address tax issues, as I believe Mr. Rajan referenced double taxation issues.  So, you know, these are interrelated companies.  There is no existence of SeeCubic BV without the funding and support and existence, especially from inception of Stream TV and, you know, Technovative.  We were talking about the actual loan here that they're getting, or attempting to obtain, from VSI and, you know, we acknowledge that there are -- they are related

entities, however, there's no per se bar to funding from related entities. A lot of times that is the entity that wants to fund because it's a win-win for all the parties involved. To the extent the debtor does well, they do well. In this situation if the debtor does not do well then the investment is lost. You know, we talk about the default provisions and, you know, really the only default that ends up occurring is they just have the unsecured claim. You know, they can't take any action against the debtor with or without court relief, and so that is, you know, a benefit, you know, to the estate because they're getting the money in, and they're coming in with a party that's willing and hoping that the upside occurs on confirmation of the plan. And so the terms of the note very reasonable in terms of doing it, and Mr. Rajan did negotiate the loan with Mr. Corso regarding entry into it. And I believe there was a question regarding whether or not VSI had signed the promissory note, but at the end of the day, it's Stream that will sign the promissory note because it's obligating itself to VSI, so that will be done, you know, upon court approval.

And the debtors put in the bank statements of VSI indicating that they have the immediate funds available in order to fund the interim amounts that are needed, and those wires can be sent out as earlier -- as early as tomorrow. And once those wires are sent out, certainly they'll coordinate

with the Netherlands in terms of, you know, with the payroll company -- I believe it was E&Y -- in terms of how the funds are used, and make sure they're consistent with the requested use and the intended use of the funds.

And we believe it's important, you know, that the bankruptcy court have jurisdiction and an eye, you know, over that process, and so it's not something that's left out, you know, kind of outside of the purview of this court because previously -- and if you look at the notes thought SeeCubic is looking to fund under -- you know, those require approval of the receiver.  There is no more receiver, you know, once the bankruptcy was filed, Mr. Liston turned everything over to the debtors, and the debtors are in that role now.

So, you know, the process and the oversight that was there is now before this court.  And so we think that's important in terms of keeping everything under this court, keeping everything in line, and allowing the debtor the full opportunity to work with its subsidiaries -- which it has an interest -- in order to maximize that value, you know, for all of the parties involved.  And they believe that obtaining this funding to fund the foreign subsidiaries will set them up in order to be able to make that plan --

THE COURT:  Hold on.  Hold on one second, counsel.

Yes, AJ.

Hold on counsel.  Okay.  I'm sorry.

MR. ALEXANDER:  That's okay.

THE COURT:  I have a 13 year old who does not want to go to bed and is trying to use this as an excuse.  Gone -- go to bed.

MR. ALEXANDER:  Yeah, I was going to say --

MR. MAZZA:  However we can help, Your Honor.  However we can help.

THE COURT:  I'm too old for this -- for a 13 year -- not for this.

MR. ALEXANDER:  And with regards --

THE COURT:  Hold on.

MR. ALEXANDER:  Would you like me to proceed, Your Honor?

THE COURT:  Okay.  I'm sorry.  I can concentrate back where to -- Mr. Alexander.

MR. ALEXANDER:  Okay.  And in terms of the interrelatedness and the -- what SeeCubic BV provides to the debtor, you heard testimony regarding the optical design, the stack of code, they assisted with the software plug in.  Stream needs SeeCubic BV in order to produce samples which they can send to end users in order to get additional purchase orders which are ultimately going to be the part of the funding source for this bankruptcy case.  And Mr. Rajan testified that, you know, they've already -- have purchase orders from parties that are willing to put in and buy product in excess of $100

million, but in order to do that, they're going to need collaboration with SeeCubic BV also on the bonding equipment because there are certain employees at SeeCubic BV who do have an expertise in dealing with the optical bonding equipment, and once the debtors are able to actually recover the bonding equipment they're going to work collaboratively to make the bonding equipment produce the end product which are the screens.

THE COURT:  I mean, this is -- I know this is not relevant, but what do you mean recover the bonding equipment?

MR. ALEXANDER:  Well, if you recall, Your Honor, the bonding equipment is currently in a warehouse in China.

THE COURT:  Okay.

MR. ALEXANDER:  And so the debtors are, with the -- subject to either a final court order or agreement with the other parties -- plan on transferring that so they can reestablish it and set it up in terms of their manufacturing line.

THE COURT:  Okay.  And this is the equipment that needs the signature of who to be released?  Is it the --

MR. ALEXANDER:  It's SeeCubic BV

THE COURT:  So SeeCubic BV doesn't want to release the bonding, but they want funding.  Hmm.  Okay.  Interesting. Go ahead.

MR. ALEXANDER:  But it's my understanding that --

assuming they have this court authority for the funding by the debtor -- that they're willing to work with the debtor along with, obviously, the other parties who are involved regarding the release of that equipment.

THE COURT:  So, in other words, they're holding it hostage till they get some money?

MR. ALEXANDER:  Your Honor, I don't necessarily believe they're holding it hostage.

THE COURT:  Well, that's what it seems like to me was hold --

MR. ALEXANDER:  I think part of it has to do with, you know, they're looking  for a blessing from this court in terms of the funding.

THE COURT:  What does that have to do with releasing the bonding equipment?

MR. ALEXANDER:  Well, Your Honor, if you recall, at one of the previous hearings, you know, the -- which Your Honor tabled till the end of the month, but the debtors did file a motion for stay violation with respect to the equipment.  So it's the debtor's position that there is no basis to withhold the equipment, but the debtors asserted that -- and they believe they have evidence -- that there were various parties in conjunction with SeeCubic BV that were instructing them not to release the equipment.

THE COURT:  Okay.

MR. ALEXANDER:  And so that has been the issue there.

THE COURT:  Okay.

MR. ALEXANDER:  But the debtors are working through that to try and get that done because, again, the debtors see this as a valuable enterprise that's going to be to everybody's benefit if they're able to produce.  You know, all of these claims that people believe they have will be able to get paid. And so we believe getting this funding in is, you know, one of these steps in order to getting that done in terms of, you know, being successful in this bankruptcy case.  We talked about the wherewithal to make the payments.

THE COURT:  Yes.

MR. ALEXANDER:  We discussed the benefits, you know, we think there's a substantial benefit.

THE COURT:  Right.

MR. ALEXANDER:  And also, you know, we do believe, and the debtors believe, under various theories of law, just given the way that financing occurred, that they could be liable to the extent they let some of these subsidiaries, you know, essentially die on the vine or ultimately -- as Mr. Thune (Phonetic) indicated in his email -- you know, file bankruptcy. You know, if they do that, you know, the -- it loses control of a valuable asset, right?  And the debtors interests in these entities are ultimately going to be impacted.  So we believe there's -- as I believe all parties agree -- you know, there's

an urgent need for this funding.  The debtors have shown that doing the funding with VSI provides a substantial benefit to the overall estate, and, you know, the parties working together will be able to move forward in terms of producing in this case, which I think is the goal all around is for the debtors to be able to generate sufficient revenue to pay back all the creditors and fund the plan.  So we believe that -- in terms of alternatives -- we believe this option is better than the other option, given the collaboration that will occur.  And this loan is at 1 percent and will be treated as, you know, part of the debtor's plan, and it's very, you know, lenient in terms of default provisions because essentially it is -- you know, kind of as, you know, Mr. Rajan stated -- high risk funding, right? So under the debtor's business judgment, you know, we believe given the protection that providing this money will provide to the debtors in terms of, you know, eliminating risk of them being held liable for other debts, of their --

THE COURT:  Well, how are they going to be held -- what basis would they be held liable?  Liable for what, though?

MR. ALEXANDER:  Well, under -- we've cited alter ego law, Your Honor --

THE COURT:  Okay.

MR. ALEXANDER:  -- in terms of holding the parent liable for the subsidiaries.

THE COURT:  Well, has somebody-- has somebody sued

them for that? There's always a possibility so --

MR. ALEXANDER: Well, you --

THE COURT: -- we're going to talk about possibilities now?

MR. ALEXANDER: Well, we are, Your Honor, because what we're trying to do is eliminate the possibility, right? I mean the debtor wants to focus on moving forward and producing, and to not have to deal with that potential -- whether it's large, potential, small potential -- they want to deal with that, and they believe that this is the best way in order to deal with that, and you know, as Mr. Rajan testified they don't want to leverage up the subsidiaries --

THE COURT: But they want to leverage up --

MR. ALEXANDER: -- in terms of the debt.

THE COURT: So they want to leverage up the parent instead of the subsidiary?

MR. ALEXANDER: Well, the --

THE COURT: Is that what we're talking about?

MR. ALEXANDER: Well, by the money coming into the parent, and the parent has the, you know, the larger potential operation in terms of the sales that will ultimately happen, it's going to be a larger benefit to all parties, you know, with respect to --

THE COURT: But the debt is with the parent, not the subsidiary, which are separate entities, however you want to

characterize it so --

MR. ALEXANDER:  Understood, Your --

THE COURT:   So that's really how I'm looking at this.

MR. ALEXANDER:  Okay.

THE COURT:  You're really talking about the debtor undertaking the debt for its subsidiaries.

MR. ALEXANDER:  Correct, Your Honor, and, you know, again, we believe that that eliminates the risk of -- or lessens the risk of potential alter ego type liability, you know, any breaches of fiduciary duty type liability in terms of claims, and also opens up the collaboration better than what it has been, you know, between the debtor and the subsidiaries, again, with the ultimate goal of producing the screens, the 3D technology, and putting it to use because they, you know, they believe it's a valuable product that they have, and they've indicated that there's a market for them to sell it, and this is, again, one of the steps in order to do that.  So the debtor believes that they've satisfied, you know, all of the standards with regards to obtaining the funding,  It's unsecured financing, the interest rate's one percent, on an interim basis, it's €303,000, on a final basis I believe it was 800 --

THE COURT:  Oh.  So --

MR. ALEXANDER:  I'm sorry, Your Honor.

THE COURT:  So, you're looking for the number?  Is

that all?

MR. ALEXANDER:  Yeah, I was looking for the number.

THE COURT:  It's on the --

MR. ALEXANDER:  Yeah, it's €872,000 and $31, collectively, on a final basis, is ultimately what they'd be looking for.  So 302, 519, and 569, 512.  The debtors believe it's, you know, a exercise of their business judgment to do this.  And also in terms of the, you know, the other option, you know, that's available -- or that has been argued is available -- the debtor isn't even certain that it is available given that it required receiver approval, and the receiver is no longer in place in terms of --

THE COURT:  So you need court approval.  I don't know what it means.  But the bottom line is counsel, I think it's disingenuous to suggest that they don't have -- that it's not available when they just recently funded in March, and you agree, has been funded for quite some time.  So I'm not sure how I'd get around that, but go ahead.

MR. ALEXANDER:  Your Honor, to be clear there was no funding in March.

THE COURT:  Well, who paid the funding in March -- on March 25th?  So that's --

MR. ALEXANDER:  There was no funding on March 25th.

THE COURT:  So the payroll -- there was no payroll made in March?

MR. ALEXANDER:  That was previously funded.

THE COURT:  By who?

MR. ALEXANDER:  Your Honor, that was funded under the notes prior to the bankruptcy when the receiver was still in place, and the receiver and other parties signed off on the note.

THE COURT:  I get that counsel.  I thought that the last payroll was March 25th.

MR. ALEXANDER:  But the -- Your Honor, the money was already in SeeCubic BV

THE COURT:  I get that.

MR. ALEXANDER:  Okay.

THE COURT:  And who funded that?  I --

MR. ALEXANDER:  I don't think there's a -- I'm not disputing that, Your Honor.  I'm talking about the post-bankruptcy funding.  I agree that it was funded by SeeCubic BV under the prior note -- one of the prior notes.

THE COURT:  And it was distributed post-petition.

MR. ALEXANDER:  Not to SeeCubic BV

THE COURT:  Well, who was it distributed to?

MR. ALEXANDER:  It was already in the possession of SeeCubic BV as of the petition date.

THE COURT:  Okay.  So the March --

MR. ALEXANDER:  So there was no --

THE COURT:  -- so the March expense was paid already,

and the debtor did not pay that.  Correct?

MR. ALEXANDER:  That's correct, Your Honor.  The money was already in a SeeCubic BV account to be paid.  The debtor did not pay that.  It was previously signed off on by the receiver and the debtor --

THE COURT:  Not the debtor.

MR. ALEXANDER:  -- representative Mr. Rajan.  No, I said the representative, Mr. Rajan, and --

THE COURT:  Well, he didn't sign in his representative capacity as the debtor.  He signed as his capacity as a -- as -- because there's a dispute as to who's in control of SeeCubic BV  I --

MR. ALEXANDER:  Your Honor, I'm not trying to --

THE COURT:  Oh, that's the --

MR. ALEXANDERL  -- conflate or mix that -- yeah, I'm not trying to conflate that issue.  Mr. Rajan signed it, and Mr. Stastney signed it, and the receiver Mr. Liston signed it.

THE COURT:  But the debtor was not involved in that transaction and had nothing to do with that.

MR. ALEXANDER:  The debtor was I -- I'm not disagreeing -- I agree with you on that.

THE COURT:  Okay.

MR. ALEXANDER:  That wasn't the point of what I was trying to get at.  My point was they already had the funds prior to the bankruptcy filing.  That was the only point I was

trying to make there, Your Honor.

THE COURT:  Okay.  So it was already in there.  They had already funded it sometime prior to the bankruptcy.

MR. ALEXANDER:  That is correct.  So the debtors believe that this is the best option for the estate, will realize the most value for the estate.  They do believe that the note was negotiated with VSI in good faith, the terms are very favorable, and we believe that it should be improved -- approved on an interim basis so that the debtor could immediately fund the €302,519, and schedule a final hearing to consider approval of the remainder amounts.

THE COURT:  Okay.  And presumably at that time they would have to have proof, because all I've seen is 300, so they're going to have to raise another 500,000 --

MR. ALEXANDER:  They will have proof -- they will have proof of funds as well, similar to as they presented today.

THE COURT:  Okay.  Okay.  I'm sorry, I'm going to interrupt Mr. Mazza just as much.  So I won't tell you --

MR. ALEXANDER:  It's --

THE COURT:  -- I didn't have questions.  All right --

MR. ALEXANDER:  As --

THE COURT:  I'm sorry, Mr. Alexander.  I hope I didn't take you off your train of thought.

MR. ALEXANDER:  Well, hopefully I answered all of

your questions.  And if you have any other questions I'm happy to answer them.

THE COURT:  Okay.  All right, Mr. Mazza, why shouldn't I approve this?

MR. MAZZA:  Thanks, Your Honor.  So let me answer that.  We think that the funding that's available already through the note that is available -- the non-debtor SCBV -- through an ordinary course process, that was vetted through an -- the receiver, and that the debtors principal had signed off on is the right answer here.

THE COURT:  So he signed off, but he signed off not in his capacity as the -- as the debtor's -- but as his capacity with respect -- as an officer, a board member, or whatever.  I don't remember what the Chamber of Commerce described him as, but it was in his capacity and his relationship to that entity, not in his relationship to the debtor.  Correct?

MR. MAZZA:  No, that's correct.  It would have been in relationship to the non-debtor entity, and we think that actually makes it easier in a lot of ways that I'll get to.  And, again, because of the dispute around directorship down there, the -- you know, both he and Mr. Stastney had signed off on that with the receiver brokering that deal, which worked in the ordinary course, and there wasn't any issues with the -- BV being put on the brink, which we unfortunately found ourselves

in here over the course of the last couple of days.  The alternative on which, you know, Mr. Rajan insists upon between the debtor and VSI really does burden the estate with claims owed to VSI which is an entity controlled by him; we all obviously see that.  And it's important -- Mr. Alexander mentioned -- look at what's received from, you know, by the estate.  It's essentially replacing what are theoretical claims that don't really exist because there's funding already available to cover BV through our proposal that is not going to create some sort of alter ego claim that they've talked about, which I think is really a red herring.  We didn't really hear any real testimony or evidence that there is an obligation that the debtors have to take on more debt themselves in order to be able to cover what is down at the BV  And then the question is why would a fiduciary burden an estate that had $2500 in the bank when they filed for bankruptcy with a new debt to an insider that's going to be an administrative claim near a million dollars that they certainly can't pay back on their own, so it's really hard to understand why they would insist upon doing it that way.  The reason we got here, Your Honor, they -- with this emergency, which was unfortunate, they knew they had to ask for this all along, and showed up today for the first time with an actual proposal, when this particular note that has been out there for months was available, and all they had to do was -- if Mr. Rajan could exercise his fiduciary

duties in his capacity to the extent he's a director down at the BV could have -- could have made that asset available quickly, and things could have moved on, and the employees in the Netherlands wouldn't have questions about where this thing is going.  They didn't -- they didn't talk to us, they didn't talk to their secured creditors.  Debtors talked to the secured creditors about DIP financing, they said there was something about a DIP financing process.  It's certainly not a conventional one given that they didn't talk to us.  We get it, they don't want to pay our client back.  They think our client's converted, as you said, it's an issue for another day. At some point the collateral estoppel opinion will see the light of day, and we'll see how that goes.  But the bottom line, Your Honor, is --

THE COURT:  I will say this, counsel, you guys can dispute whatever you want to dispute.

MR. MAZZA:  Sure.

THE COURT:  Everybody's trying to characterize -- this is to me a simple, simple dispute.

MR. MAZZA:  Agreed.  Very --

THE COURT:  You loaned money, you believe they defaulted, they believe they didn't, you dispute the terms of the loan and what the remedies are.  You believe that you had a right to do a friendly foreclosure.  You did it, you didn't. Whether you had a right to do it -- to do it and to just do a

regular UCC sale.  Those are all things that happen in the ordinary course of disputes between lenders and borrowers.

MR. MAZZA:  Agreed.

THE COURT:  That is it.  I don't know why it's being blown up into this huge -- he's bad, they bad, the chance record is bad or, you know, the debtor is bad.  This is all unnecessary.

MR. MAZZA:  Agreed.  I won't even --

THE COURT:  It's unnecessary.  It's just a simple --

MR. MAZZA:  It is.

THE COURT:  -- they loaned, they borrowed, we dispute the remedies, and that's it.  Now, you guys want to spend millions of dollars fighting, I can't tell you what to do, but have at it, but it just won't be here because I'm not going to tolerate that.  Go ahead.

MR. MAZZA:  Okay.

THE COURT:  I'm sorry.

MR. MAZZA:  Yeah.  No, no apology needed, Your Honor. Totally get it.  Won't go down those tangents.  I think what it comes down to, you know, a few more things on fiduciary duties. At the outset, again when then-Vice Chancellor Strine had said what the law was on -- in the Trenwick case at 906 Atlantic 2nd 168 that there's no fiduciary duty owed by a parent to its sub, I think speaks well to that issue.  And, again, we didn't really hear evidence and -- on that point except for the

admission by their counsel, Mr. Duprey (Phonetic), when the promissory note was put into place when the receivership was in place as to the need for Technovative, one of the debtors here, not to be responsible for SCBV's liabilities.  I think the standard for them -- I think I heard business judgment -- it's not business judgment, Your Honor, it's the higher standard in entire fairness, and this certainly does not satisfy it on their end.  At some point Mr. Rajan tried to testify for both VSI and Stream.  You stopped him, and rightfully so.

My question is -- that I think a lot of people have -- is where is Mr. Corso who apparently cleanses all this? He's not here, nobody seems to know where he is, nobody could answer that, and he doesn't seem to have advisors or anybody telling him what's fair or not fair.  So that's not a real independent process to show an arm's length insider DIP, and as Your Honor said earlier this week, you're in bankruptcy, you've got to play by the rules.

So you've got to run a real DIP process if you're going to try to get an insider DIP done, and really, I think there's a case that was decided several years ago, but in the Eastern District of Pennsylvania by Judge Scholl (phonetic) where he refused to approve a proposed financing agreement between a debtor and insider to fix a payroll emergency that was created by the insider.  That case is Norris Square Civic Associates (sic) v. Saint Mary Hospital at 86 B.R. 393.

So that fact pattern does really seem to resonate here and is part of the reason, I think, why we find ourselves where we are. And so it really -- it's not good enough for Mr. Rajan to be able to just apologize and say, well, I won't do it again, sorry. He's got lawyers, he's got advisers, they could have easily teed up a motion much sooner to get to the right process.

But what it comes down to is our note, it's simple, it's clean. The events of default are cleaner than theirs. They've actually created new events of default on the debtor entity, again, that they've levered up unnecessarily to make that entity go into default if certain things adversely happen to essentially Mr. Rajan's interest in the case, dismissal, conversion, things of that nature, even granting of adequate protection to secured lenders. Your Honor, that doesn't -- that doesn't make a lot of sense, and it shows that there wasn't a real process in what they've put together.

Again, ours is clean, it's very simple, and it's an asset of the S -- the non-debtor entity that can easily be drawn upon to, you know, solve issues that really shouldn't have come before the court, but we are here, and we -- we've gone through today's hearing. At bottom, what are the parties fighting for?

Sometimes I ask that question myself. It's really the Dutch employees that have been waiting in the lurch, and

this could have been solved some time ago.

Once again, I think the funding available to those employees and to fund the expenses over there, there's an easy answer, and it's what is presented in our in our motion, and I think if Mr. Rajan could really think about what his fiduciary duties, are he should think about accepting that and moving forward and then, you know, let it -- if they've got a plan to move forward, they can focus on that as opposed to creating emergencies that don't need to waste a lot of people's time.

As far as pricing and the like are concerned, I have no doubt that if my client -- the principal of my client, Mr. Stastney --- would -- asked in testimony to go down to the one percent interest rate he'd do so.  Again, that's a claim against BV which Mr. Rajan thinks is worth hundreds of millions of dollars, so I'm not sure why he's so concerned about new debt at that entity, but he's fine putting almost a million dollars of debt at the debtor entities to come ahead of any unsecure creditors there.  Those are the entities that are in front of this court.

Those are the entities that need to make fiduciary decisions in the corporate box in which they operate.  And, again, he needs to think through those when he makes these decisions around what to pursue and what not to pursue.  Just a couple more, I guess, points.  As it relates to the receiver heard an argument that the receiver is not here anymore because

they filed, so the receiver displaced, but nevertheless, Your Honor, that was a protection that was part of the process in negotiating the funding for that entity, SCBV, during that period.  So it provided our group protection when they -- when they made that funding.  What we're saying is we're willing to provide the funding without the protection of the receiver.  We just need some sort of in per monitor to be able to do so now.  And again, if folks are acting within their fiduciary duties, then this should be a very, very simple question.

So I hate to go to the bonding equipment, but the point on that is it came up.  I know there's a discussion around insurance, adequate protection and the like, and hopefully, that gets resolved consensually.  Hopefully, we can make some consensus in these cases to the extent they continue on.

But we are where we are here today.  And I think that the resolution we have should have been something that was looked at as available much earlier.  But when you don't talk to your secured lenders, you get to situations like this that can be avoided.  And I don't think the record is complete today by any stretch to approve what they want to do, and Your Honor could approve a much easier, simpler financing package that is not burdensome on the estates that are before this Court.

THE COURT:  Okay.  Anybody else want to argue?  Mr. Caponi?

MR. CAPONI:  Yes, Your Honor.

THE COURT:  Yes, okay.

MR. CAPONI:  I'm going to try to be brief given the late hour.  And I just to start by the obligatory thank you very much for taking the time in this late hour and thank you to your staff.  I actually mean it this time.  This is horrendous.  And a lot of credit to everyone for participating here and sticking this out and dealing with this important stuff.  I thought I wanted to get that off first.

Going to the merits, Your Honor, to take over where Mr. Mazza left off, the Debtor made a conscious decision to leave SCBV out of this bankruptcy.  Okay.  Leave it out of this bankruptcy.  Let my clients go fund it outside the bankruptcy through the mechanism that already --

THE COURT:  But counsel, could they have brought it here?  Would they have had to file a Chapter 15?  I mean, do they have to go file over there?  What?

MR. CAPONI:  Your Honor, I'm --

MR. MAZZA:  That's a good question.  Can I sub in for a second?  I think it's an interesting question, Your Honor.  I don't know if they have the corporate capacity to file it, to be honest with you.  But I think it all --

THE COURT:  Who's talking?

MR. MAZZA:  It's Mr. Mazza, I'm sorry.  Sorry I didn't identify myself.

THE COURT:  Where -- I lost you here on -- oh, there you are.  Okay, I'm sorry.

MR. MAZZA:  Hello, sorry.

THE COURT:  Okay.

MR. MAZZA:  So I think there's an issue as to whether they could have filed it, but they -- there's an issue that we're going to have teed up before Your Honor, is it aware they could have filed Technovative to begin with, but that's later on on May 22nd.

I think that by filing the entity, that could have triggered issues over in the Netherlands where they may have ended up with a receiver that they wouldn't have wanted to have.  So that could be part of their strategy, but I can't read their mind.

THE COURT:  All right.  All right.  Let's go, Mr. Caponi.

MR. CAPONI:  Yeah, so Your Honor --

THE COURT:  Okay.

MR. CAPONI:  You know, look, they made a tactical decision to treat that entity separately and that has some consequences.  So then the easiest thing, let's keep it out, keep the bankruptcy in the bankruptcy.

I agree with much of what Mr. Mazza had to say.  This is entire fairness.  There's not even a straight-faced credible argument, it's business judgment.  The Debtor wants good faith

finding and there's been no record to establish that at this point in time.

And what I really want to focus the rest of my brief comments on, Your Honor, I think goes to my part in this play today and that is the evidence.

The Court holds evidence -- evidentiary hearings and listens to witness and one of the main reasons is credibility. And so I'm not taking gratuitous shots at anyone, but I think the credibility factor is important and I think when the Court weighs the evidence and the testimony, it will come to the conclusion that other courts have come to that Mr. Rajan lacks credibility and the story that he is selling just doesn't square in any manner. And I'm going to just tick through a few examples.

Mr. Rajan is testifying -- well, before I get there. Your Honor, this -- the evidence in this case and every case involving Mr. Rajan is the same. And it's like that old sitcom. I cannot remember who was in it. But they go to a restaurant and the maître'd is one person and they sit down at the table and the waiter comes out, and it's the same actor, and then the chef comes out, and it's the same actor, and then, you know, the person comes out to clean up the table and it's the same actor, they just keep going into the kitchen and changing their uniform. The only person that backs up any evidence of anything is always Mr. Rajan.

He has hundreds of millions of dollars in orders from credible third parties, no one knows who they are but Mr. Rajan.  Nobody's spoken to them but Mr. Rajan.  Nobody's seen the documents but Mr. Rajan.  And I would say, Your Honor, that's suspect.

Then when you add into the fact that if there are these parties out there willing to commit to hundreds of millions of dollars, none of them are willing to put in $300,000 to keep this thing afloat and to get their product?  Not one of them is even worth talking to?

THE COURT:  Well, let me ask you this, counsel.

MR. CAPONI:  It makes no sense.

THE COURT:  Well, counsel, if you believe there is no product, no anything, why does your client want it?

MR. CAPONI:  Your Honor, my client knows there's no product.  My client knows that there is no way to fulfill hundreds of millions of dollars of orders any time soon.  My client knows the bonding equipment is not functional.  What my client is trying to do is salvage the employees at SCBV so that in time, this company can get there.  We are not selling the pipedream that Mr. Rajan is selling that somehow a company worth billions and billions of dollars filed for bankruptcy three times in the course of two years and can't get anybody to lend it any money other than Mr. Rajan.  That's what I mean by credibility.

What we're saying is credible.  We're funding it. This company has a way to go.  It's got great technology, and with the right stewardship, being someone other than Mr. Rajan, this company has a shot, and my clients are willing to put their money where their mouth is.  So that answers that question, Your Honor.

But what the difference there is my clients have put their money where their mouth is.  My clients are out in the daylight.  Their documents are vetted by third parties.  And Mr. Rajan is selling this fantasy which he has sold over and over and over again to every court that he has millions and millions and hundreds and millions of dollars of people ready to fund.

THE COURT:  Well, wait a minute, counsel.  I mean, I heard Mr. Alexander say that -- that Stream invested 85 million into the Dutch companies.  Not all of it into SeeCubic BV, but a lot of it.  So where'd they get the money if they were doing that -- I mean, someone's putting up some money for this.

MR. CAPONI:  Our clients, Your Honor.

THE COURT:  Well, your clients -- well, his position is your clients only put up 25 percent.

MR. CAPONI:  Well, look, I don't -- there wasn't a great evidentiary record here on that point.

THE COURT:  Right.

MR. CAPONI:  But Your Honor, look, this company's

been funded since 2011 off the backs of the secured creditors by 90 cents on the dollar.  I mean, the reason why there's -- you don't have all of these stockholders showing up and participating in this case.  You don't have creditors showing up.  I mean, you have a case that apparently according to Mr. Rajan's worth billions of dollars and there's no creditors committee?  Why?  Because there's no creditors because my clients paid them all.

The reality is the only stakeholders here are the secured creditors and that's why they're here and they're trying to salvage their investment and they're actually trying to salvage a good technology.  Which takes me to another point on credibility.

Three strikes and you're out.  I mean, if the Court's trying to decide who's the best steward to protect these assets for the next 30 days or 60 days while we explore this bankruptcy, it's not the person who filed three bankruptcies, two of which were kicked out for bad faith.  It's the individuals who have funded this company for over the past decade, and for the last three years, have funded the company, grown it, and paid all the bills.  So you know, that's another factor.

Your Honor, you have Mr. Rajan telling you that the subsidiary, he told me if you go back and look at the transcript, he told me SCBV was worth hundreds of millions of

dollars.  He then tells Your Honor it's worth $750 million.

Mr. Rajan says whatever Mr. Rajan needs to say to survive to

the next question.

THE COURT:  Well, hundreds of millions could equal

750 million -- 700.

MR. CAPONI:  And if you ask him tomorrow and he

thinks he needs to say one billion, that would have been your

answer, Your Honor.  Again, I'm drawing credibility

conclusions.  The Court will draw its own credibility

conclusions.  I'm just saying, we hold evidence because

credibility matters.

And let's -- and why do I, again, question the

credibility?  Because if SCBV was worth $750 million, nobody

will fund it for $350,000 other than my clients which are doing

it for obvious reasons is that they're secured creditors, it's

collateral, and Mr. Rajan.

THE COURT:  Well, their position is we didn't have

enough time, and I -- I didn't get really enough evidence on

who they went out to.  All I got was a broker.  I don't know

what the broker did, how many people they talked out to.  But

also that they tried but couldn't get anyone and that there was

too short a time period.

MR. CAPONI:  Yes, Your Honor, and that goes to

credibility as well.  You're taking me down my path.

Credibility.  Why -- if they even contacted anybody, Mr. Rajan

testified he was unable to get any answers in the short period of time, which meant yesterday, to today.  Well, why is that?

Well, the Debtor has to establish this transaction is arm's length and entirely fair.  To manufacture an emergency to when you then say, well, I'm sorry, I didn't have time to do my due diligence, that was the plan all along.  The plan was never to have the tires kicked here.  The plan was to manufacture an emergency, hoping the Court -- we were all on the phone yesterday, Your Honor, and we heard.

What were we told yesterday?  You were told by Debtor's counsel that the Debtor had the funds ready to go.  Your Honor, approve emergency motion.  We'll fund this.  And we have the funds because VSI owes us money already under an existing commitment.  Your Honor said I'm not approving this tomorrow -- you said I'm not approving this today, no way.  We're having an evidentiary hearing.  And what happens?  I heard nothing today about existing commitments.  I heard nothing today about VSI owing money.  What we heard is there's going to be a whole new note, a whole new loan.

Well, okay.  And why did that happen, Your Honor, because last night we said to the Debtor, by the way, if you had these existing commitments, why was none of that on your schedules and aren't you going to have to explain that tomorrow?  Mysteriously, that goes away and a new note appears.  It goes to credibility.  There's no consistency here.

Credibility.  Mr. Rajan testifies when you asked who drafted the notes, and he said VSI's counsel had drafted the note and he identified the individual.  It just so happens to be the same individual that Debtor's counsel identified as being Debtor's in house counsel.  And then Mr. Rajan, who is the CEO of both companies, the controlling stockholder of all companies, purports to tell me and Your Honor he doesn't understand who the guy exactly works for.  It's unclear to him.  No credibility here.

So what I do know according to Mr. Rajan's own testimony is that last night he negotiated a note.  Straight question.  When did you negotiate this note with Mr. Corso?  He said last night while he was in the car -- Mr. Corso was in the car.  Not last week.  Not yesterday.  They filed an emergency motion to approve funding allegedly that was negotiated with Mr. Corso but that negotiation took place only after the emergency motion got shot down.  No credibility.

And so what Your Honor has right now is a Debtor that has an entire fairness burden.  We have the documents drafted by in house counsel for VSI and in house counsel for VSI -- sorry, for Stream, who happen to be the same individual, never reviewed by Debtor's counsel -- outside counsel.  Debtor's counsel played no role in the process.

I asked Mr. Rajan, where was your counsel?  I didn't have any.  Where was Mr. Corso's counsel?  He didn't have any.

Honestly, Your Honor, I start to scratch my head and like, how on are those facts that we even waste seven hours today. It is bizzarro land in my experience. So lack of credibility on that front.

And why? Because the story keeps changing because it's that, it's a story. And I'll wrap, I'll end with this. Mr. Corso, the mysterious Mr. Corso. I've been chasing him down like Where's Waldo. I can't find a human being on this planet who can say that they've ever met this individual other than Mr. Rajan, and I say with complete sincerity, I don't believe he exists. I tried to get his deposition, Debtor's counsel, Stream's litigation counsel, they refused to even tell me what state he lives in, where to tell the Court. They came here today with no Mr. Corso.

More fundamentally, they never produced a power of attorney that allegedly gave Mr. Corso the authority to bind VSI. So I submit to Your Honor as you sit here today, you cannot approve this financing because you have no evidence that VSI can be bound by this financing. Nobody from VSI came and spoke and said, yes. You could approve this financing tomorrow and Mr. Rajan will place VSI in bankruptcy in Wyoming Thursday, where it's incorporated, and claim that the financing was Ultravaries and he wants the money back. That's how this game has been played.

Why is there acrimony, Your Honor? Because this

should be a simple foreclosure.  Everyone tried to make it a simple foreclosure except for Mr. Rajan, and that goes to credibility.  Every stockholder, secured creditor signed off on the omnibus agreement, and he took us down this briar patch, everyone, for the last three years and he's continuing to do it and this is yet another example of it.

So Your Honor, I don't know how you can approve the financing.  The fundamental evidence isn't put in.  I don't believe Mr. Corso exists and there's no evidence he exists.  And you know, we're dealing with a manufactured emergency and everything the Debtor is seeking to do is outside the ordinary course.

The Debtor hasn't funded this entity in over three years.  This Debtor hasn't had any -- according to its schedules, any business relationship with VSI for three years.  Today we hear for the first time that VSI is drafting with Mr. Rajan the plan of reorganization and the reason they're doing it is they have ongoing funding relationships with VSI.  I don't know if anybody else caught that in testimony but go back and look at the transcript.  That's what he said.  They have ongoing funding relationships with VSI, none of which is disclosed in the schedules.  I'm actually shocked I'm remembering all this stuff at this late hour.

THE COURT:  Well, counsel, let me just say, I always understood and maybe I don't know where I got it from, that VSI

was going to be a partner in -- and when I use the word

partner, I'm using it in terms of that they were going to help

the debt -- basically be the funding partner of the reorganized

Debtor under the plan.  I always understood that that's what

the plan was.

MR. CAPONI:  Your Honor --

THE COURT:  That's what I understood from one of the

hearings.

MR. CAPONI:  Your Honor, I appreciate that and what I

would say to you is Mr. Dannenberg had it right.  They're not

funding the reorganization of Debtor.  This thing has been set

up from the beginning to steal the assets to get them into VSI

and out from underneath the secured creditors.  That is why to

this day Mr. Alexander will sit here and complain that --

MR. ALEXANDER:  Your Honor, I normally don't

interrupt closing, but I'm going to object to his reference to

Mr. Dannenberg because you didn't admit any of that evidence

with respect to the text, and so we think it's improper to try

to utilize that in the closing.  I've let him testify for a

long period, but you ruled that evidence out.

MR. CAPONI:  I will retract it, Your Honor.

THE COURT:  Okay.

MR. CAPONI:  I will retract it and tell you that it

is my opinion based on the evidence that we've seen that it's

very clear this is set up for VSI to take the equipment out

from underneath the obligations of the lenders.

And Mr. Alexander kindly interrupted to correct me about Mr. Dannenberg told you about the bonding equipment, and to this day, they don't have insurance on any of the bonding equipment. They don't have money to pay employees, and they still don't have money and still have not taken care of basic necessities like the bonding equipment.

So Your Honor, I'm going to conclude with one last thing that again, goes to credibility. Mr. Rink, the in-house counsel for everything that's a Rajan entity. Your Honor can take judicial notice of this. I asked Mr. Rajan your counsel at the hearing testified that Mr. Rink represented the Debtor. Mr. Rink was on the phone. Neither one corrected the Court and said that's not correct. I said you were on the phone -- you participated in that hearing, and Mr. Rajan said, no, I was not in that hearing. I was told I was not allowed to participate.

And if one goes to the transcript at page 7 at line 18, Debtor's counsel. We have Mathu Rajan, it's R-A-J-A-N. He's the CEO of the Debtors. So we have the transcript once again proving that Mr. Rajan has an inability, from my opinion to tell the truth. But it's been demonstrated he has a propensity to fail to tell the truth, whether intentional or not.

And Your Honor, I'll stop there, but if the Court has any questions.

THE COURT:  No.  No questions.

Mr. Callahan?

MR. CALLAHAN:  Yes, Your Honor.

THE COURT:  Any comments?

MR. CALLAHAN:  Your Honor, I said early on that even after the evidence now produced, we believe the Debtor has not satisfied its burden under 364.

I also made the observation with respect to the second motion that the Court indicated that she has an idea how that could be resolved if she denies the 354 motion.

One comment -- observation I would make, Judge, is after 14 hours on this discrete issue, discrete issue, the parties have demonstrated, though the professionals involved in this case have been very civil and courteous to each other --

(Interruption in audio)

MR. CALLAHAN:  -- from the U.S. Trustee's perspective that this appears to be a case that needs to be on a fast track.  And certainly, unless something different happens, Judge, all the issues that you heard today and yesterday are going to come right back to the Court regardless of how this Court rules on again, a motion that I don't think can be granted given the lack of support from the creditors and the lack of any evidence sufficient to meet the criteria of 364.

THE COURT:  Mr. Callahan, and what do you think the criteria is and what has the Debtor failed to prove?

MR. CALLAHAN: Well, the Debtor has failed -- well, I think there was -- well, I think there was a lot of issues here, Judge. One is that the Debtor did not demonstrate that it sought financing through other means. I don't accept a comment by Mr. Rajan that a broker went looking. That's usually the first hurdle.

We have an insider transaction that has to be scrutinized, and Mr. Corso was not here. We don't have the opportunity to examine that transaction.

Third, the Debtor, if this agreement is approved, gets straddled with a million-dollar debt with an argument that, well, an asset not owned by the Debtor, but an ownership may be jeopardized or diminished in value. That's extremely -- that's a big stretch from the Debtor's use of cash collateral or the Debtor's borrowing money. There's no meaningful, legitimate benefit to the Debtor. I know that's contrary to Mr. Alexander's remarks, but he did not suggest any evidence to suggest this alter ego theory, other than a fear that that might be the case.

THE COURT: Well, I'm not quite sure how you're going to have an alter ego if you don't have the money and can't fund.

MR. CALLAHAN: That's right, Judge.

THE COURT: If you have a problem if you have the money and you don't fund. But if you don't have any money, how

244

are you going to sue somebody for not paying when you don't have it.

MR. CALLAHAN:  And the Debtor did not demonstrate that it has any legal obligation to pay those funds.  And the reality is the evidence shows that there were these other parties that were funding SCTV -- SCBV for the last several months.  They apparently are ready, willing, and able to do it that way as well.

So I don't think that they've demonstrated that there are other options available.  I don't see how this Debtor -- and I'm -- again, counsel has pointed out that there's not much creditor interest, and that's correct.  But nevertheless, the Debtor has scheduled significant amounts owed to creditors.  I don't have that right in front of me, but the schedules would show that.

THE COURT:  Okay.  Anybody else?

MR. MICHAELS:  Yes, Your Honor.  This is Chris Michaels and I'm a representative of Rembrandt 3D Holding.  And I would like to comment on the -- that we are a creditor, we are a major creditor, and we are quite interested in how this is proceeding.

We have not offered any objection and quite frankly we lack any particular opinion as to whether SeeCubic's proposal or Stream's proposal for funding is the one accepted.  But we feel very strongly that the best way to destroy the

value of the company is to not fund this transaction.

Everybody seems to agree in terms of the Debtors and the

secured creditors that it should be funded, and I just want to

weigh in that we also agree to that.

And as an unsecured creditor that would be

potentially diluted or even put behind additional debt, we

would like to see that happen.  Our claim is either going to be

worth -- either going to be fully paid or worth nothing.  And

the best way to make it worth nothing is to have these

employees disappear and this does not get funded.  And with

that, that's our only comment on this entire matter.

THE COURT:  And you are a creditor of --

MR. MICHAELS:  We are a creditor of Stream and

Technovative as well.

THE COURT:  And you're an unsecured creditor?

MR. MICHAELS:  We are an unsecured creditor.

THE COURT:  For financing?  For products?  For what?

MR. MICHAELS:  Rembrandt 3D Holding owns intellectual

property and has a settlement agreement and license agreement

with Stream for that intellectual property.

THE COURT:  So they owe you for using those -- so

your license, right?

MR. MICHAELS:  Yes.

THE COURT:  But you own the license, you meaning

Rembrandt.

MR. MICHAELS:  We own the intellectual property, they own the license.

THE COURT:  The intellectual property -- I mean, that's what I meant.  Okay.  All right.  And how much are you owed?  You meaning Rembrandt.

MR. MICHAELS:  The total cash payments owed to Rembrandt are about $5.8 million, roughly $600,000 in equipment, and arguably, we are also entitled to receive product when it's being manufactured in the neighborhood of the value of that particular right in the 300 million to 1.2 billion range.

THE COURT:  Okay.  But for products and your license right now, it's about 5.8 million?

MR. MICHAELS:  Yes.

THE COURT:  Okay.  Anybody else want to weigh in?

Okay.  I think given the urgency of this, I'm going to have to rule from the bench.  And as an initial matter, it appears that the entire fairness doctrine is what I need to look at, and I'm relying on In re LATAM Airlines Group S.A. 620 B.R. 722.  It's a bankruptcy decision out of the southern district of New York in 2020 and it addressed the proposed dip financing where there was an insider's transaction, and because it's an insider transaction, it's the entire fairness standard and not the business judgment deference that may have been -- that sometimes is applied.

So as an initial matter, I'm not quite sure why the Debtor would incur debt for its subsidiary.  Now I heard Mr. Alexander say because they've done it.  Mr. Rajan said that his counsel told him that they were legally obligated.  I haven't seen anything to support that.

The other issue is that well, we might be alter ego if we don't, but I'm not quite sure how you get to alter ego if you don't have any money.

But the more important thing for me and what I can't understand is that you have a separate entity, who by Mr. Rajan's testimony is worth millions of dollars or $750 million. We have a Debtor who I'm not quite sure, I think he said the Debtor, Stream TV has assets, and I don't recall exactly how much he said it was, but we know they don't have that much cash on hand because they haven't been operating.

What I don't understand is Mr. Rajan is on all sides of this -- these transactions.  He -- according to his testimony is the -- I guess the person -- I'm just going to use the person with authority because I'm not quite sure what -- without -- well, I guess I could look at the notes as to exactly what his role is in Stream.  He said that he was -- where is he in Stream?  He is -- I'm trying to find his exact testimony as to what his relationship is with the Debtor.  My notes aren't that great.  I thought they were.  All right. Well, I can't find them --

MR. ALEXANDER:  Your Honor, if I -- if I may, I believe he testified that he was the chief executive officer.

THE COURT:  All right.  He also testified -- what was he with respect to SeeCubic BV?  He did produce some documents from the commerce that said he was -- what was his position there?

MR. ALEXANDER:  I believe it is C.E.O.

THE COURT:  And what's his position at VSI?  Doesn't he have one?  Shareholder?

MR. ALEXANDER:  Well, it -- I believe there he is the president, Your Honor.

THE COURT:  So he's on all sides of these deals, and in his position, he has a fiduciary obligation to each and every one of those entities.  And what I don't understand is he has a fiduciary obligation to SeeCubic BV, and I'm not quite sure in that capacity when there was money available pursuant to a promissory note, why he just didn't do that as opposed to coming to this Court, asking this Court to have the debtor undertake almost a million dollars in debt that would be an administrative claim that would work to the detriment of the creditors of the Debtor.  I'm not understanding that.  I don't understand that at all.

So I don't know who's interests he's promoting at this point.  Is it Stream?  Is it SeeCubic BV?  Is it VSI?  I have a problem with that.  You're coming to me and you're

asking me to make the Creditors of Stream TV basically become responsible and become below a million dollars to benefit some other subsidiary who apparently according to Mr. Rajan has 750 million in assets.  So I don't  understand there was available money to pay this -- and nobody's disputed that under the original promissory note between SeeCubic BV and -- where's the promise --

John, bring up the promissory note for me.  I think that was Exhibit 1 from the Movant SeeCubic, Inc, if I'm not mistaken.  Well, no.  We want -- that's Exhibit 4.  We need 1, which is the promissory note dated November 14th.  These are -- I think this is 3, 4, 5, 6.  We got 1 up here somewhere?  Here we go.

It is a promissory note between SeeCubic BV and SeeCubic, Inc for the aggregate sum of up to 3,500,000 euro. And it is undisputed, at least I haven't heard anything to the contrary, there is approximately 700,000 euros available for SeeCubic BV  I don't understand why Mr. Rajan in an exercise of his fiduciary obligation to that company did not see fit to just borrow against that note.

And the fact that there was a receiver, the parties could have -- the parties could have waived that.  They could have done whatever.  But to not use available funds, I'm not quite sure what his issue -- what his exposure is with respect to his fiduciary obligation to that entity.  That's not for me

to say.

But I can tell you what respect to his fiduciary obligation to does the Debtor before me, there is absolutely no way I am going to allow a million-dollar loan to be imposed on this Debtor at the expense of the Creditors when there is another available source.

This would be a different matter if there was not that promissory note, there was no money, and there was no option.  There is an option.  But for whatever reason, and I'm not going to speculate -- I have my own ideas.  But I can tell you, you guys need to stop letting the acrimony between these two parties -- between the parties guide what you need to do.

Everybody needs to take a step back, and particularly Mr. Rajan, and he needs -- he's in this -- he's a fiduciary to the Debtor.  He's a fiduciary to VSI.  He's one to BVM.  He cannot exercise that obligation properly because it is at the expense of one of the others.

I don't understand this.  And for the Debtor to come here and ask me when there's another available source is ridiculous.

Now, I get it's only 700, so at some point it will get exhausted and maybe at that point, when there's no other source, I may have to say, oh, well, what's -- but at this point, it doesn't even make sense.  It does not make sense and there's no way I am going to jeopardize the interest of the

creditors of Stream TV when it does not have to be.

What should have happened was there was an already existing source.  That should have been the first place to look.  If that didn't work, then you come here and you say, we don't have any money.  We don't know what to do.  We want to save our subsidiary.  Can we borrow some money?

What I don't understand is if this company has $750 million in assets, why in the world should the creditors of Stream take the hit?  They have their own assets.  And I get they don't -- what I get is happening is they're producing money, they're doing activity.  They're apparently not billing or nobody's told me that they're billing the parent company.  Because in the normal process, the sub produces, sells to the parent, and the parent then pays either by funding the activity, whatever.

I don't know how these companies are being run, but I can tell you in bankruptcy there is absolutely no way, no way a company that has its own ability to fund its own operations with $750 million in assets should be imposing a million dollars of liability on the Debtor.  There's absolutely no way I'm going to approve that.  No way.

With respect to what the parties want to do outside of bankruptcy, you know, I kind of thought, I don't have to do anything.  I don't have to tell anybody to go and access available funds.  Mr. Rajan has a fiduciary obligation to that

company.  He chooses not to exercise it, not my problem.  Not my problem whatsoever.

So with that being said, denying the Debtor's request to enter into a loan with VSI.  And that VSI loan, I don't have any evidence that it was properly negotiated or an arm's length transaction.  Nothing.

I also understood Mr. Rajan to say -- now, he has different testimony today, but I recall from our prior hearings that is part of the -- as the compensation for funding that they were going to get this 10 percent contract.  I heard that.  Now, today, he says no it's not, but I'm pretty sure I go back and look at the transcript from the prior hearing, that was my understanding, or maybe I misunderstood.

I don't know what the relationship is between VSI and Stream, but I can tell you there is absolutely no way that VSI is going to use this Debtor to do whatever it is that they think that it's doing.  It appears simply to have been another company form to be able to operate because Stream could not.  I don't know what the intentions are, but as long as they are here in bankruptcy, any transaction, anything between Stream, Technovative, and VSI I am going to scrutinize.  And the reason is because Mr. Rajan is on both side of these transactions.  There is no way that he can fulfill his obligation to these debtors when he's obligated to the other company and has a fiduciary to that one.  Whose interests he's pursuing, I have a

question.

So this is where we are.  Debtor's motion denied.  I do not have to do anything with the alternate source, because it doesn't need an alternate source.  BVM -- SeeCubic BV has the ability to obtain its own financing.  Go down and let it do that.  If it cannot, then you come back here and you say we want to save our subsidiary.  It has no money and it does not have the ability to obtain financing and we should be the only -- and we're the only ones who can do it.  That's not what I'm hearing, so there's absolutely no way.

So you guys, I don't need to order anybody to do anything.  You have a promissory note.  SeeCubic BV can come and ask you.  If it chooses not to, I don't know what to tell you.  I can't force anybody to do anything.

But I will put this on the record, Mr. Rajan has a fiduciary obligation to that company, and I would recommend that he exercise it.

So everybody agrees they need this money, so unless everybody wants this company to go down the drain, I would suggest that you work this out.  There is a source, there is an ability.  Use what's there.  That's where I am.  I don't know what else you guys want me to tell you.

MR. CAPONI:  Than you, Your Honor.

MR. CALLAHAN:  Thank you, Your Honor.

MR. CAPONI:  Thank you for your time, Your Honor.

THE COURT:  Woah, woah, woah, before we stop. Denying the Debtor's motion.  With respect to SeeCubic, Inc's order, I'm going to say that, you know, I don't have to -- I don't -- first of all, I don't think alternative financing is required because SeeCubic BV has its own source.  And I don't need to order anybody to do anything.  I don't have the authority, because I thought Mr. Rajan had signed onto that promissory note as a representative of Stream.  He did not.  He is signing because there's a dispute as to who's in charge of SeeCubic BV  They choose to let it go down the drain, I don't know what to tell you.

MR. CAPONI:  Your Honor, can I just get one point of clarification?

THE COURT:  I'm sorry, yes.

MR. CAPONI:  Again, Steve Caponi for the record. Fully understand the ruling.  With regard then to this is an issue for SCBV, and I will preface my request for clarification by saying, and I think I speak for Mr. Mazza and his team.  We fully understand Your Honor's notion of keeping order and not doing anything to disrupt the apple cart to the end of the -- at least the end of the month and the Court's hearing on the pending motions.

But should the, you know, Dutch counsel indicate -- and I fully hope that Mr. Alexander will be able to work this out and get this funding done.  But if for some reason Mr.

Rajan chooses not to follow Your Honor's advice and Dutch counsel believes that that presents the opportunity or the obligation to seek Court assistance to get the funding approved, is that -- would Your Honor consider that a violation of what you've told us?  Do you want us to come back to you first?  I just don't want to act or fail to act on a misunderstanding.

THE COURT:  Okay.  Let me just --

MR. ALEXANDER:  Your Honor, Mr. Rajan's on this call. He's heard everything loud and clear.  I don't -- I don't think that comment was necessary.  We will work together to get this resolved.

THE COURT:  Well, the rate it's going, I don't think you guys are working on anything.  I don't see what --

MR. ALEXANDER:  So I --

THE COURT:  Counsel, this shouldn't --

MR. ALEXANDER:  We've had productive calls, they just haven't been able to reach resolution.

THE COURT:  I don't know -- I don't see -- all I can tell you is this should have been the first order of business. This shouldn't have even come to me unless there was no money. You guys chose to go down a road you shouldn't have.  You don't -- you let -- you're letting the acrimony between the parties get in the way of thinking logically and thinking appropriately.

There is absolutely no way I was ever going to do this when there was a source.  Never.  No court in the world is going to let a Debtor incur a million dollars in debt to fund some other company that has $750 million in assets and also has its own ability to fund.  I don't know who didn't think this through and wasted all of our time.

Now, Mr. Caponi, what are you asking?  Are you asking me if the Dutch counsel says who needs to approve this?  You need to go to a court there or?

MR. CAPONI:  Correct, Your Honor.  For example, if the employees -- and again, I'm being very upfront about this.  Not looking for any kind of order to replace board members or take control of the company or anything like that.  But if there is a -- if the parties, you know, if Mr. Rajan does not approve the funding, and I hope he does.  But since we're all here, let's save ourselves -- I figured I'd ask the question.

And the employees or SeeCubic were to go to -- like in Delaware, I would go to the Court of Chancery and say, Your Honor, you know, Court, I need you to approve this on behalf of the corporation because if not, the corporation goes down the tubes.  Is that something that would be pursuant, would that be contrary to what Your Honor's prior statements were?  Would Your Honor want us to come to you first?  I --

THE COURT:  For what?  I don't have jurisdiction over SeeCubic BV  I don't have jurisdiction.

MR. CAPONI:  I understand your comments, Your Honor, but again, our goal is to make sure we stay away from the -- I don't like playing near the razor's edge, here.  So that's why I was asking.

THE COURT:  I do -- I mean, Mr. Callahan had a very valid point.  I don't have jurisdiction over that entity.  I thought that Mr. Rajan had signed that promissory note in his capacity as the representative of Stream TV.  That was just my thought.  I hadn't seen the document.  I didn't know what it said.  And when I looked at it, I'm like, I can't order him to do anything.  I don't have jurisdiction over this company.

And at this point, I'm not quite sure other than -- and I said don't go to the Dutch because I said take no further action.  That I said.  I want to get the status quo.  But if this company is in -- if this doesn't get, excuse me, funded, I don't know what to tell you.

And I'm hearing Mr. Alexander saying Mr. Rajan is hearing.  I don't know what you guys are thinking, all I can tell you is it gets funded or it tanks.  I don't have control over that.  It's not a debtor before me.  Not even clear if it can be.

My position with respect to the Debtor's motion, denied.  The motion to approve the funding under the promissory note, I don't have jurisdiction over that.  They're not before me.  The parties aren't -- I have no jurisdiction over that.

You guys can do whatever you think is appropriate, you can do.

MR. CAPONI:  Thank you, Your Honor.

THE COURT:  With respect to the -- so there's no need for alternative financing because financing is already -- so I'm just going to deny everybody for the reasons stated on the record.  I don't have jurisdiction over.  I guess with respect to the second motion, denied for lack of jurisdiction.  Two, denied for lack -- denied because it's unnecessary.

I mean, I don't know what else to tell you.  I'm not telling you that if you need to go -- I don't know where you would go.  I guess who has jurisdiction over that entity?

MR. CAPONI:  The Dutch.

MR. MAZZA:  Yeah, Your Honor.  That would be the court in Amsterdam, this is Mr. Mazza speaking, would be our view.

I think just a few words.  We're hopeful that Mr. Alexander's words about what his client would be willing to do are going to be consistent with his fiduciary duties and this is not going to be an issue.  But if they're -- if this devolve into an issue, then there's I think relief that we may have to drastically ask for from Your Honor.  I hope it doesn't come to that.  You've said I don't want you guys fighting over nothing down there, and if fiduciary duties aren't exercised, then we might be and we need to do something to --

THE COURT:  I'm not quite sure what'd you'd need from

me. I don't have jurisdiction over SeeCubic BV

MR. MAZZA: Sure. But I think you have jurisdiction over the Debtors. And if the Debtor is not trying to maximize value of the overall enterprise, then the Debtor's principal is not in a position to act as a fiduciary overall.

THE COURT: Well, that's a whole different story. That's something different.

MR. MAZZA: Yeah, then that's all. I'm just flagging that.

THE COURT: Okay.

MR. MAZZA: I hate to have to go there now, but yes.

THE COURT: I can't tell you what to do, not to do, how I'm going to rule. All I can -- I heard Mr. Alexander say this is an enterprise they want to save, and if that is the goal, then the parties need to do whatever is necessary.

Because at the end of the day, a hundred percent of zero is zero. And you guys can do whatever you want with that.

It is now 10:41 and I hope my grandson is in bed and did not take advantage of this, and I'm sure he likely did.

So I don't know what you guys plan. I understand that you need to fund this by tomorrow. I am not quite sure what, if anything, I could do. But I will tell you tomorrow I am not available in the morning because I changed my doctor's appointment to tomorrow morning. If there is any way or any -- any requests from something from this Court, do it -- even

though I'm not in, my staff is in at 8 o'clock even though they're here until 10:41, somebody will respond.

And I hope that the parties will think about what I had to say.  Try to resolve this and try to save this company.  This company meaning SeeCubic BV  If you choose not to, I don't know what -- the chips are going to fall where they fall.  But for my purposes, I'm not doing anything.

And counsel, speaking of the May 22nd trial, that's a Monday and I know we're looking forward to that.  I am trying to adjust my schedule because my daughter at the last minute advised that she was participating in her Ph.D. graduation.

MR. CAPONI:  Oh, good.  Congratulations.

THE COURT:  Yeah, well, in New Orleans, which means I have to now jump through hoops to get back here by the 22nd. It's the 18th of May.

So I will endeavor to get back here by the 21st, because we're doing this in person.  So if we have to change it, I will see what I can do.  I will let the parties know what I'm going to -- because that is a very significant issue as to whether these filings are appropriate or not.  Which is another reason why I'm trying to maintain the status quo, not incur unnecessary expenses, burdens, and anything else.  Okay.

MR. CAPONI:  Yes, Your Honor.  Thank you.  Have a good night.

MR. ALEXANDER:  Thank you again for your time, Your

Honor.

THE COURT:  John, thank you much.

I'm thanking my staff.  Thank you for seeing this through.

Good night, everybody.

MR. CALLAHAN:  Thank you, Your Honor.

MR. MICHAELS:  Good night.  Bye-bye.

(Proceedings adjourned at 10:52 p.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/
_____
John Buckley, CET-623
Digital Court Proofreader