## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| STREAM TV NETWORKS, INC.[1] | : | Chapter 11 |
| | : | Bankr. No. 23-10763 (MDC) |
| Debtor | : | |
| | : | Chapter 11 |
| TECHNOVATIVE MEDIA, INC. | : | Bankr. No. 23-10764 (MDC) |
| | : | |
| Debtor | : | (Jointly Administered) |

### NOTICE OF ENTRY INTO RESTRUCTURING SUPPORT AGREEMENT

     **PLEASE TAKE NOTICE** that on July 13, 2023, Stream TV Networks, Inc. ("Stream") and the other above-captioned debtors and debtors in possession ("Debtor(s)") entered into a Restructuring Support Agreement (together with all exhibits, annexes, and schedules thereto, the "RSA") with the Consenting Parties.

     **PLEASE TAKE FURTHER NOTICE** that a copy of the RSA attached hereto as **Exhibit A**.

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015).  The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

**THIS CHAPTER 11 RESTRUCTURING SUPPORT AGREEMENT DOES NOT CONSTITUTE, AND SHALL NOT BE DEEMED TO BE, AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OR 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS CHAPTER 11 RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS CHAPTER 11 RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.**

### *CHAPTER 11 RESTRUCTURING SUPPORT AGREEMENT*

This CHAPTER 11 RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto) may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "Agreement") is made and entered into as of July 13, 2023 (the "Execution Date"), by and among the following parties (each of the following described in clauses (a) through (d) of this preamble, collectively, the "Parties"):

(a)    Stream TV Networks, Inc. ("Stream"), a company incorporated under the Laws of Delaware, and each of its direct and indirect subsidiaries that are debtors and debtors in possession in the Chapter 11 Cases that have executed and delivered counterpart signature pages to this Agreement, (collectively, the "Debtors"); and

(b)    Visual Semiconductor, Inc., ("VSI") a company incorporated under the Laws of Wyoming, the Plan Proponent in this case, has executed and delivered counterpart signature pages to this Agreement; and

(c)    Rembrandt 3D Holdings LTD ("Rembrandt"), the largest unsecured creditor in these Chapter 11 Cases and the licensor of key technology underlying the Debtors technology, ("Rembrandt, together with the Debtors and VSI the "Consenting Parties").

## *RECITALS*

**WHEREAS**, on March 14, 2023 (the "Petition Date"), each of the Debtors commenced a case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "Bankruptcy Court");

**WHEREAS**, the Debtors and the Consenting Parties  have in good faith and at arm's length negotiated certain restructuring transactions with respect to the Debtors on the terms set forth in this Agreement and as specified herein  (as may be amended, supplemented, or otherwise modified from time to time pursuant to this Agreement, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto, the "Restructuring Term Sheet"), subject to agreement on definitive documentation and approval by the Court; and

**WHEREAS**, the Parties have agreed to take certain actions to implement the Restructuring Transactions on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound, hereby agrees as follows:

## *AGREEMENT*

**Section 1.**    *Definitions and Interpretation*

### 1.01 Definitions

"Agreement" has the meaning set forth in the preamble hereof and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto.

"Bankruptcy Code" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Court" has the meaning set forth in the recitals to this Agreement.

"Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of Pennsylvania.

"Chapter 11 Cases" has the meaning set forth in the Recitals to this Agreement.

"<u>Consenting Parties</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Debtors</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Execution Date</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Law</u>" means any federal, state, provincial, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"<u>Transfer</u>" means, as the context requires, (a) to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions), or (b) a transaction effectuating any of the foregoing.

"<u>U.S. Trustee</u>" means the United States Trustee for the Eastern District of Pennsylvania.

**1.02 Interpretation** For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(d)    unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(e)    the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety, including all exhibits, annexes, and schedules attached hereto rather than to any particular portion of this Agreement;

(f)    captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(g)    references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(h)    the use of "include" or "including" is without limitation, whether stated or not; and

## Section 2.    *Effectiveness of this Agreement*

**2.01** This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)    each of the Debtors shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)    VSI has executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(c)    Rembrandt shall have executed and delivered a counterpart signature page of this Agreement to counsel to each of the Parties; and

(d)    counsel to the Debtors shall have given notice to counsel to the Consenting Parties  (by email or otherwise) that the conditions to the Agreement Effective Date set forth in this **Section 2** have occurred; and

(e)    Notice of the Equity Rights Offering has been sent to the creditors and Equity Holders in this case.

## Section 3.    *Definitive Documents*

**3.01** The Definitive Documents governing the Restructuring Transactions shall include the following, which shall, in each case, be in form and substance consistent with this Agreement:

(a)    the Plan (including, for the avoidance of doubt, all exhibits, annexes, exhibits, schedules, and supplements related thereto, including the Plan Supplement);

(b)    the Confirmation Order;

(c)    the Disclosure Statement Order;

(d)    the Solicitation Materials, including the Disclosure Statement;

(e)    the Stock Purchase Agreement executed as part of the Restructuring Transactions;

(f)    the Equity Rights Offering Documents;

(g)    the New Money Capital Equity and Backstop Commitment Letter;

(h)    the New Organizational Documents;

(i)    the documentation setting the distribution record date and means of distribution under the Plan and the procedures for designating the recipients of distributions under the Plan;

(j)    all other documents, motions, pleadings, briefs, applications, orders, agreements, supplements, and other filings, including any summaries or term sheets in respect thereof, that are directly related to any of the foregoing or as may be reasonably necessary or advisable to implement the Restructuring Transactions.

**3.02** The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion. The Definitive Documents, including all amendments and modifications thereto and including all forms thereof filed with the Bankruptcy Court, shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented and be in form and substance reasonably acceptable to the Debtors and the Consenting Parties.

## Section 4.    *Commitments of the Consenting Parties*

### 4.01 Affirmative Commitments

(a)    During the Agreement Effective Period as to each Consenting Party, such Consenting Party agrees, (in the case of each Consenting Party, in respect of all of its Company Claims/Interests presently owned and hereafter acquired (for so long as it remains the beneficial or record owner thereof, or the nominee, investment manager, or advisor for beneficial holders thereof)), to:

(i)    support the consummation and implementation of the Restructuring Transactions;

(ii)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents to which it is required to be a party;

(iii)    support, and not directly or indirectly object to, delay, impede, or take any other action to interfere with, Confirmation or consummation of the Plan; and

(iv)    support, and not directly or indirectly object to, delay, impede, or take any other action to interfere with, any motion or other pleading or document filed by a Debtor in the Bankruptcy Court or any other court that is consistent in all respects with this Agreement and the Restructuring Transactions.

### 4.02 Negative Commitments

(a)    During the Agreement Effective Period as to each Consenting Party, such Consenting Party agrees that it shall not directly or indirectly, and it shall not direct any other Entity to:

(i)      object to, delay, impede, or take any other action to interfere with, delay, or impede the acceptance, consummation, or implementation of the Plan or the Restructuring Transactions;

(ii)     seek, solicit, propose, file, support, vote in favor of, assist, engage in negotiations in connection with, or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal;

(iii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement or the Restructuring Transactions;

(iv)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind that is inconsistent with this Agreement or the Restructuring Transactions against the Debtors or the other Parties (it being understood, for the avoidance of doubt, that any litigation or proceeding to enforce this Agreement or any Definitive Document or that is otherwise permitted under this Agreement shall not be construed to be inconsistent with this Agreement or the Restructuring Transactions);

(v)      exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Company Claims/Interests in a manner that is inconsistent with this Agreement; or

(vi)     object to, delay, impede, or take any other action to interfere with the Debtors' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code, other than as permitted by this Agreement.

### 4.03 Additional Provisions Regarding the Consenting Parties' Commitments

Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a)      be construed to prohibit any Consenting Party from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of delaying, interfering, or impeding, directly or indirectly, the Restructuring Transactions;

(b)      affect the ability of any Consenting Party to consult with any other Consenting Party, the Debtors, or any other party in interest in the Chapter 11 Cases (including the United States Trustee), so as long as such consultation and any communications in connection therewith are not inconsistent with this Agreement or any applicable confidentiality agreement, and are not for the purpose of delaying, interfering, or impeding, directly or indirectly, the Restructuring Transactions;

(c)    impair or waive the rights of any Consenting Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(d)    prevent any Consenting Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement;

(e)    prohibit any Consenting Party from taking any other action that is not inconsistent with this Agreement, the Restructuring Transactions, or any Definitive Document.

## Section 5. *Commitments of the Debtors*

**5.01** Affirmative Commitments. Except as expressly permitted herein, each of the Debtors agrees to, and agrees to cause each of its direct and indirect subsidiaries to:

(a)    support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)    to the extent any legal or structural impediment arises that would prevent, hinder, impede, or delay the consummation of the Restructuring Transactions, take all steps reasonably necessary and desirable to address any such impediment, and negotiate in good faith any appropriate additional or alternative provisions or agreements to address any such impediment;

(c)    use commercially reasonable efforts to obtain any and all required governmental, regulatory, and/or third-party approvals for the Restructuring Transactions;

(d)    negotiate in good faith and use commercially reasonable efforts to take all steps reasonably necessary to (i) consummate the Restructuring Transactions and (ii) execute and implement the Definitive Documents;

(e)    not file or seek authority to file any pleading inconsistent with this Agreement or the Restructuring Transactions;

(f)    timely file a formal objection to any motion, application, or pleading filed with the Bankruptcy Court seeking the entry of an order for relief that: (i) is materially inconsistent with this Agreement or any Definitive Document; or (ii) would, or would be reasonably expected to, frustrate the purposes of this Agreement or any Definitive Document, including by preventing the consummation of the Restructuring Transactions;

(g)    oppose and object to any motion, application, adversary proceeding, or cause of action filed with the Bankruptcy Court by any party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (iii) dismissing the Chapter 11 Cases; or (iv) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(h)    oppose any objections filed with the Bankruptcy Court to the Plan, any other Definitive Document, or the Restructuring Transactions;

(i)        inform counsel to the Consenting Parties within two (2) Business Days after becoming aware of (i) any matter or circumstance, that they know or believe is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (ii) a breach of this Agreement (including a breach by any Debtor); or (iii) any representation or statement made or deemed to be made by any Debtor under this Agreement which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made; and

(j)        upon reasonable request of any Consenting Party, reasonably and promptly inform counsel to such party of: (i) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents; and (ii) the status of obtaining any necessary authorizations (including any consents) from each Consenting Party, any competent judicial body, governmental authority, banking, taxation, supervisory, regulatory body, or any stock exchange.

**5.02 Negative Commitments** Except as expressly permitted herein, each of the Debtors shall not, and shall cause each of its direct and indirect subsidiaries to not, directly or indirectly:

(a)        without the reasonable consent of the Consenting Parties, object to, delay, impede, or take any other action or inaction that is reasonably avoidable and would interfere with, delay, or impede the acceptance, implementation, or consummation of the Plan or the Restructuring Transactions;

(b)        take any action or inaction that is inconsistent in any material respect with, or is intended or could reasonably be expected to frustrate or impede approval, implementation, and consummation of the Restructuring Transactions or this Agreement;

(c)        file any motion or pleading, with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent with this Agreement or the Restructuring Transactions;

(d)        execute or file any Definitive Document with the Bankruptcy Court (including any modifications or amendments thereto) that, in whole or in part, is inconsistent with this Agreement or the Restructuring Transactions;

(e)        take any other action or inaction in contravention of this Agreement or any Definitive Document, or to the material detriment of the Restructuring Transactions;

**Section 6.    *Additional Commitments*.**

**6.01 Cooperation and Support** The Debtors shall provide draft copies of all material pleadings and documents that any Debtor intends to file with or submit to the Bankruptcy Court or any governmental authority (including any regulatory authority), as applicable, and draft copies of all press releases that any Debtor intends to issue regarding this Agreement or the Restructuring Transactions to counsel for the Consenting Parties  at least two (2) Business Days prior to the date when such Debtor intends to file, submit or issue such document to the extent reasonably

practicable, but in all events at least one (1) day prior to such date. Counsel to the respective Parties shall consult in good faith regarding the form and substance of any such proposed filing with or submission to the Bankruptcy Court.

**Section 7.**    ***Additional Provisions Regarding Fiduciary Obligations***

    **7.01**  Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require any Debtor or the board of directors, board of managers, or similar governing body of any Debtor (the aforementioned parties collectively as to the Debtors, "Fiduciaries"), in each case, acting in their capacity as such, to take any action or to refrain from taking any action to the extent such Fiduciary determines, after consulting with counsel, that taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, including based on the results of an independent investigation; provided that counsel to the Debtors shall give notice not later than two (2) Business Days following such determination (with email being sufficient) (a "Fiduciary Out Notice"), to counsel to each other Party to this Agreement.

**Section 8.**    ***Milestones***

    **8.01**  The Debtors shall implement the Restructuring Transactions in accordance with the following milestones (the "Milestones"):

    (a)        Approval of this Agreement by the Court.

    (b)        Approval of the Settlement Agreement with Rembrandt.

    (c)        Approval of the  Disclosure Statement and Confirmation of the Plan.

    (d)        Commencement of any necessary actions or motion practice to recover: 1) bonding equipment and 2) recover essential Intellectual Property for the fulfilment of financed purchased orders.

    **8.02**  A Milestone may only be extended or waived with the prior written consent of VSI.

**Section 9.**    ***Restructuring Transactions Pursuant to the Plan and Other Definitive Documents***

    **9.01 Capital Raise and  Issuance of Shares**

    (a)        Subject to the terms and conditions of a separately executed Stock Purchase Agreement between Debtor Stream and VSI, and the terms of the Plan, the Plan Proponent in this case, VSI agrees to the binding obligation to purchase 21,000,000 shares of Class A Common Stock (the "Shares") in the Reorganized Debtor (the "Reorganized Debtor")  and Debtor Stream agrees to the binding obligation to sell and issue the Shares to VSI  for the total purchase price of Thirty-One Million Five Hundred Thousand USD Dollars (USD $31,500,000) (the "Purchase Price"). The Shares provided to VSI will equal 90% of all Class A Common Stock in the Reorganized Debtor. VSI will place the Purchase Price in escrow pending confirmation of the

Plan (the "Purchase Price Escrow"), which funds will only vest in the Debtor upon confirmation of the Plan, the Effective Date of the Plan, and the issuance of shares as agreed upon in the Stock Purchase Agreement.

(b)      VSI will agree to make preliminary distributions from the Purchase Price Escrow, both pre and post-confirmation, upon mutual agreement of the Debtors and VSI to the extent necessary for the continued operations of the Debtors, to satisfy administrative expenses of the estates, and otherwise in furtherance of the Restructuring and Plan.

(c)      The "Other Unsecured Claims" Class as defined in the Restructuring Term Sheet attached as Exhibit A to this Agreement will be given the option, pursuant to the Plan, to either: 1) receive pro rata Class D Common Stock in the Reorganized Debtor up to a total of 5% of the Reorganized Debtor's equity to the entire unsecured creditor class, by participating in the Plan's proposed Equity Rights Offering in lieu of the proposed payment, or 2) receive payment in cash of 50% of such Holder's claim on the Effective Date. The "Unsecured Claims of Former Employees" and the "Unsecured Claims of Specialized Equipment" classes as defined in the Restructuring Term Sheet will not participate in the Equity Rights Offering.

(d)      Equity Holders in the Debtors will be given the option, pursuant to the Plan, to receive pro rata Class D Common Stock in the Reorganized Debtor up to a total of 5% of the Reorganized Debtor's equity to the entire Equity Holder Class, by purchasing such Class A Common Stock at a $1.5 per share, the same price VSI is paying on a per share basis.

(e)      Debtor Stream shall issue all necessary Stock in the Reorganized Debtor necessary for the proposed Restructuring Transactions to take place.

### 9.02 The Equity Rights Offering

(a)      The Debtors shall distribute the Equity Subscription Rights to the Equity Rights Offering Participants as set forth in the Plan, the Backstop Commitment Agreement, and the Equity Rights Offering Procedures. Pursuant to the Backstop Commitment Agreement and the Equity Rights Offering Procedures, the Equity Rights Offering shall be open to all Equity Rights Offering Participants. Equity Rights Offering Participants shall be entitled to participate in the Equity Rights Offering up to a maximum amount of each Eligible Holder's Pro Rata share of the Aggregate Rights Offering Amount (or, if applicable, the Adjusted Aggregate Rights Offering Amount). General Unsecured Creditor Equity Rights Offering Participants shall have the right to receive pro rata shares in the Reorganized Debtor in lieu of the proposed distribution options to the unsecured creditor classes in these cases. The Equity Holder Equity Rights Offering Participants will be given the opportunity to purchase their allocated shares of New Common Stock at $1.5 dollars per Share.

(b)      The Equity Rights Offering will be backstopped, severally and not jointly, by the VSI pursuant to the Backstop Commitment Agreement. Ten percent (10%) of the New Class D Common Stock to be sold and issued pursuant to the Equity Rights Offering shall be reserved for VSI pursuant to the Backstop Commitment Agreement, at the $1.5 dollar Price Per Share.

(c)        Equity Subscription Rights that an Equity Rights Offering Participant has validly elected to exercise shall be deemed issued and exercised on or about (but in no event after) the Effective Date. Upon exercise of the Equity Subscription Rights pursuant to the terms of the Backstop Commitment Agreement and the Equity Rights Offering Procedures, Reorganized Holdings shall be authorized to issue the New Common Stock issuable pursuant to such exercise.

(d)        Pursuant to the Backstop Commitment Agreement, if after following the procedures set forth in the Equity Rights Offering Procedures, there remain any unexercised Equity Subscription Rights, the VSI shall purchase, severally and not jointly, their applicable portion of the New Common Stock associated with such unexercised Equity Subscription Rights in accordance with the terms and conditions set forth in the Backstop Commitment Agreement, at the $1.5 dollar Price Per Share.

(e)        All shares of New Common Stock issued upon exercise of the Equity Commitment Parties' own Equity Subscription Rights and in connection with the Backstop Commitment Premium will be issued in reliance upon Section 1145 of the Bankruptcy Code to the extent permitted under applicable law. The Reserved Shares and the shares of New Common Stock that are not subscribed for by holders of Equity Subscription Rights in the Equity Rights Offering and that are purchased by VSI in accordance with their backstop obligations under the Backstop Commitment Agreement (the "Unsubscribed Shares") will be issued in a private placement exempt from registration under Section 5 of the Securities Act pursuant to Section 4(a)(2) and/or Regulation D thereunder and will constitute "restricted securities" for purposes of the Securities Act. In the Backstop Commitment Agreement, VSI will be required to make representations and warranties as to their sophistication and suitability to participate in the private placement.

(f)        Entry of the Confirmation Order shall constitute Bankruptcy Court approval of the Equity Rights Offering (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by Reorganized Holdings in connection therewith). On the Effective Date, as provided in the Description of Transaction Steps, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors, as applicable.

## 9.03 Additional Receivable Financing by VSI to the Debtors and Reorganized Debtor

(a)        In addition to the New Equity and Backstop Commitments, VSI is prepared to provide the Debtors, and upon confirmation, the Reorganized Debtor, with receivables factoring financing  at or below market rates on a "best efforts" basis. VSI will finance the purchase orders it secures for the Debtors and the Reorganized Debtor from customers at a factor discount of 10% and stands ready to provide the Debtor and the Reorganized Debtor with $144,000,000 of operating capital to fulfill the $160,000,000 in purchaser orders that VSI has already procured.

**Section 10. *Mutual Representations, Warranties, and Covenants*** Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executes and delivers this Agreement and as of the Plan Effective Date:

(a)      such Party is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      the entry into and performance of the transactions contemplated by this Agreement do not and will not conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, or other constitutional documents;

(c)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(d)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement; and

(e)      it has been represented by legal counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement, has had the opportunity to review this Agreement with its legal counsel, and has not relied on any statements made by any other Party or its legal counsel as to the meaning of any term or condition contained herein or in deciding whether to enter into this Agreement or the transactions contemplated hereby.

## Section 11. *Termination Events*

**11.01 Termination Events** Any of the Consenting Parties may terminate this Agreement as to all Parties (except as otherwise provided below), by delivering a Termination Notice to counsel to the other Consenting Parties upon the occurrence of any of the following events, unless waived in writing (such events, the "Termination Events"):

(a)      the material breach by any Consenting Party of any of the representations, warranties, or covenants contained herein, that remains uncured (to the extent curable) for ten (10) Business Days after the transmission of a Breach Notice detailing any such breach;

(b)      any Consenting Party files, amends, modifies, executes, or enters into, or files a pleading seeking authority to execute, enter into, amend or modify, any Definitive Document that is not in form or substance consistent with this Agreement, set forth in **Section 3** of this Agreement, or publicly announces its intention to take any such action;

(c)      the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions, or (ii) (A) would prevent the consummation of a material portion of the Restructuring Transactions, and (B) remains in effect for ten (10) Business Days after transmittal by a Consenting Party of a written notice detailing any such issuance; notwithstanding the foregoing, this termination

right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(d)      any Consenting Party provides a Fiduciary Out Notice;

(e)      any Debtor files any motion or application seeking authority to sell any material asset or right used in the business of the Debtors to any Entity outside the ordinary course of business without the prior written consent of the other Consenting Parties;

(f)      the entry of an order by the Bankruptcy Court or other court of competent jurisdiction, or the filing of a motion or application by any Consenting Party seeking an order (without the prior written consent of the other Consenting Parties):

(i)      (A) converting one or more of the Chapter 11 Cases of a Debtor to a case under chapter 7 of the Bankruptcy Code; (B) appointing a trustee, receiver, or an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases of a Debtor; (C) dismissing the Chapter 11 Cases; or (D) terminating any of the Debtors' exclusive right to file a plan pursuant to section 1121 of the Bankruptcy Code;

(ii)      (A) approving the rejection of this Agreement or the Backstop Commitment Agreement, or (B) denying approval of the Backstop Motion; or

(iii)      (A) denying confirmation of the Plan, or confirming the Plan pursuant to an order that is not in form and substance consistent with this Agreement, including the consent rights set forth in **Section 3**, and such order remains in effect for (10) Business Days after entry thereof; (B) reversing or vacating the Confirmation Order; or (C) approving any plan, disclosure statement, or Definitive Document, in any such case, that is not in form or substance consistent with this Agreement, including the consent rights set forth in **Section 3**.

(g)      the Debtors take any action or inaction to receive or obtain debtor-in-possession financing, cash collateral usage, exit financing, and/or financing arrangements, other than as expressly contemplated in this Agreement or with the consent of the other Consenting Parties.

**11.02 Mutual Termination** This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the Consenting Parties.

**11.03 Automatic Termination** This Agreement shall terminate automatically without any further required action or notice immediately after the occurrence of the Plan Effective Date.

## Section 12.      *Amendments and Waivers*

(a)      Except as otherwise set forth in this **Section 11**, this Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner without the prior written consent of each of the Consenting Parties.

(b)      Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 11 shall be ineffective and void ab initio.

(c)      The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

(d)      Any consent or waiver contemplated in this Section 11 may be provided by electronic mail from counsel to the relevant Party.

### Section 13.      *Miscellaneous*

**13.01 Acknowledgement** Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

**13.02 Exhibits Incorporated by Reference; Conflicts** Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

**13.03 Further Assurances** Subject to the other terms of this Agreement during the Agreement Effective Period, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

**13.04 Complete Agreement** Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

**13.04 GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM** THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF PENNSYLVANIA APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this

Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

**13.05  TRIAL BY JURY WAIVER** EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**13.06 Execution of Agreement** This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

**13.07 Rules of Construction** This Agreement is the product of negotiations among the Debtors and the Consenting Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Debtors and the Consenting Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

**13.08 Successors and Assigns; Third Parties** This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.

**13.09 Notices** All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

| To the Debtors | To VSI | To Rembrandt |
|---|---|---|
| Rafael Zahralddin 500 Delaware Avenue, Suite 700 Wilmington, DE 19801 Telephone: (302) 985-6004 Rafael.Zahralddin@lewisbrisbois.com | Adam Swick, SBN 24051794 500 West 5th Street, Suite 1210 Austin, Texas 78701 Telephone: (737) 999-7100 Facsimile: (512) 623-6701 adam.swick@akerman.com | Christopher A. Michaels 118 N. Tioga St., Suite 400 Ithaca, NY 14850 Tel: 607.203.9470 Fax: 607.256.3628 Michaels@bpmlegal.com |

**13.10 Reservation of Rights; Waiver** If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies, claims, and interests, in the case of any claim for breach

of this Agreement. Further, nothing herein shall be construed to prohibit any Party from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, during the Agreement Effective Period, such appearance and the positions advocated in connection therewith are consistent with this Agreement and any Definitive Document and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying, or preventing the consummation of the Restructuring Transactions.

**13.11 Independent Due Diligence and Decision-Making** Each Consenting Party hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial, and other conditions, and prospects of the Debtors.

**13.12 Settlement or Compromise** Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transactions, or the payment of damages to which a Party may be entitled under this Agreement.

**13.13 Specific Performance** It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and, except as otherwise provided herein each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder. Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect, or consequential damages or damages for lost profits.

**13.14 Several, Not Joint, Claims** Except where otherwise specified, the agreements, representations, warranties, and obligations of the Consenting Parties under this Agreement are, in all respects, several and not joint.

**13.15 Severability and Construction** If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

**13.16 Remedies Cumulative** Except as otherwise provided herein (including **Section 6.02** hereof), all rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

**13.17 Email Consents** Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in

writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

**13.18 Enforceability of Agreement** Each of the Parties waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the parties have executed this Stock Purchase Agreement as of the Effective Date first written above.

Stream TV Networks, Inc.

By:   /s/ Mathu Rajan
        Name:   Mathu Rajan
        Title:    CEO

Visual Semiconductor, Inc.

By:

        Name:   Daniel J. Rink
        Title:

Rembrandt 3D Holdings LTD

By:

        Name:
        Title:

THE TERMS SET FORTH HEREIN ARE ILLUSTRATIVE, SUBJECT TO DILIGENCE, AND SUBJECT TO THE EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION BY THE PARTIES AND CONFIRMATION BY THE BANKRUPTCY COURT. THIS RESTRUCTURING TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## STREAM TV NETWORKS, INC.
## RESTRUCTURING TERM SHEET

This restructuring term sheet (this "**Restructuring Term Sheet**") describes the terms of a restructuring (the "**Restructuring**") of STREAM TV NETWORKS, INC. ("**Stream**"), and TECHNOVATIVE MEDIA, INC ("**Technovative**" collectively with Stream, the "**Debtors**") in their chapter 11 cases jointly administered under *In re Sream TV Networks, Inc., et al.*, Case No. 23-10763 (MDC)in the United States Bankruptcy Court for the Eastern District of Pennsylvania. This Restructuring Term Sheet is being agreed to in connection with the Debtors' and the Consenting Parties  entry into that certain Restructuring Support Agreement, dated as of _____(including all exhibits, annexes, and schedules thereto and as may be further amended, supplemented, or modified pursuant to the terms thereof, the "**Restructuring Support Agreement**"), to which this Restructuring Term Sheet is attached as **Exhibit A**. Pursuant to the Restructuring Support Agreement, the Debtors and the Consenting Parties  have agreed to support the transactions contemplated therein and herein.

The Debtors will implement the Restructuring through a joint plan of reorganization (including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto, including the Plan Supplement, collectively, as amended or supplemented from time to time, the "**Plan**"), which shall be consistent with the terms of this Restructuring Term Sheet and the Restructuring Support Agreement, under chapter 11 of the Bankruptcy Code.

This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Definitive Documents, which remain subject to negotiation and completion in accordance with the Restructuring Support Agreement and applicable law. This Restructuring Term Sheet incorporates the rules of construction set forth in section 102 of the Bankruptcy Code.

This Restructuring Term Sheet is a draft, is intended for discussions purposes only and is subject to Federal Rule of Evidence 408. Accordingly, this Restructuring Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

| GENERAL PROVISIONS OF THE RESTRUCTURING | |
|---|---|
| **Chapter 11 Plan** | On the Effective Date, or as soon as is reasonably practicable thereafter, each Holder of an Allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described in this Restructuring Term Sheet in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such Holder's Allowed Claim or Interest, except to the extent different treatment is agreed to by the Debtors.<br><br>The Plan will constitute a separate chapter 11 plan for each Debtor.<br><br>For the avoidance of doubt, any action required to be taken by the Debtors on the Effective Date pursuant to this Restructuring Term Sheet may, to the extent required by the Restructuring Support Agreement, be taken on the Effective Date or as soon as is reasonably practicable thereafter. |
| **Plan Settlement** | Pursuant to section 1123(b)(3) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure, the Plan shall contain and effect a global and integrated compromise and settlement (the "**Plan Settlement**") of all actual and potential disputes between the Consenting Parties.<br><br>The Plan Settlement shall be binding upon all creditors and all other parties in interest pursuant to section 1141(a) of the Bankruptcy Code. |
| **Restructuring** | On the Effective Date, the Reorganized Debtor shall issue new Shares pursuant to the Stock Purchase Agreement, the Plan, Restructuring Support Agreement, and the Definitive Documents.<br><br>Prior to confirmation, the Plan Proponent, Visual Semiconductor, Inc., ("VSI"), will place $35,000,000 in escrow pending the Court's approval of the Plan and Disclosure Statement and pending the Effective Date of such a Plan and Disclosure Statement, pursuant to the Stock Purchase Agreement entered into between the Debtors and VSI.<br><br>VSI will agree to make preliminary distributions from the Purchase Price Escrow, both pre and post-confirmation, upon mutual agreement of the Debtors and VSI to the extent necessary for the continued operations of the Debtors, to satisfy administrative expenses of the estates, and otherwise in furtherance of the Restructuring and Plan.<br><br>Upon issuance of the new Class A Common Stock (the "**New Class A Shares**") pursuant to a confirmed Plan and on the effective date, the |

| | |
|---|---|
| | $31,500,000 will vest in the Debtor and will be used to fund the Plan payments as proposed herein.<br><br>The $3,500,000 will remain in escrow to fund VSI's obligation s under the Backstop Commitment in accordance therewith. Upon closing of the Right Offering, the portion of the escrowed funds required to fund the Backstop Commitment obligations shall be released to the Debtor and the excess released to VSI.<br><br>If the Debtors fail in seeking confirmation of a Plan, any funds placed in escrow will be returned to VSI without further Court order. |
| **New Securities** | On the Effective Date, Reorganized Debtor shall (i) wipe out all prior equity holders of the Debtors and cancel all prior equity issuances; (ii) issue the New Class A Shares in accordance with this Restructuring Term Sheet and (iii) issue the new Class D non-voting Shares (the "**New Class D Shares**") pursuant to the Rights Offering.<br><br>The New Class A Shares issued by the Reorganized Debtors shall be subject to the consent rights contained in the Restructuring Support Agreement. In return for the $31,500,000 vesting in the Debtor, VSI will immediately receive New Class A Shares at an offering price of $1.50 per New Class A Share, which in the aggregate shall represent 90% of the equity value in the Reorganized Debtor.<br><br>The Reorganized Debtor shall offer to the Debtor's prior equity holders New Class D Shares, equal to 5% in the Reorganized Debtor, at an offering price of $1.50 per share.  VSI shall backstop any unsubscribed New Class D Shares pursuant to the Backstop Commitment Agreement.<br><br>The remaining 5% of equity, also in the form of New Class D Shares, which will be made available to the Debtor's General Unsecured Creditors who elect to take a pro rata interest therein, in satisfaction of their allowed unsecured claim, at the rate of $1.50 per share. VSI shall backstop any unsubscribed New Class D Shares pursuant to the Backstop Commitment Agreement. |
| **Equity Rights Offering** | On the Effective Date, Reorganized Debtor shall consummate the  Equity Rights Offering, pursuant to which it shall issue  (i) New Class D Shares up to 5% of the equity in the Reorganized Debtor to General Unsecured Creditors  who elect to take a pro rata equity interest in the Reorganized Debtor in lieu of the proposed payment to those creditors pursuant to the Plan; and (ii) New Class D Shares up to 5% of the equity in the Reorganized Debtor to Debtor's equity holders, other than VSI, who opt |

|  | to purchase their pro rata share thereof at a purchase price of $1.50 per New Share.<br><br>90% of the New Class A Shares shall be acquired by VSI.<br><br>VSI shall fully backstop the Equity Rights Offering on the terms set forth in the Backstop Commitment Agreement.<br><br>The New Class D Shares issued pursuant to the Equity Rights Offering and as part of the proposed Restructuring will wipe out all prior equity holders of the Debtors. |
|---|---|
| **Effective Date Cash** | On the Effective Date, or as soon as reasonably practicable thereafter, all cash on handheld by the Debtors as of the Effective Date, most of which will vest in the Debtor from the $35,000,000 [consistent of $31.5 mm equity infusion and $3.5 mm backstop] held in escrow pursuant to VSI's purchase of the New Class A Shares in the Reorganized Debtor and pursuant to the Backstop Commitment Agreement.<br><br>*first*, used to pay in full in cash Allowed Administrative Claims (including cure claims arising from the assumption of executory contracts and unexpired leases), Allowed Priority Tax Claims, Allowed Secured Claims, and Allowed Other Priority Claims, as and to the extent that such Claims are required to be paid in cash on the Effective Date under the Plan;<br><br>*second*, used to fund the Professional Fee Escrow;<br><br>*third*, distributed to holders of Claims other than those described above in accordance with this Restructuring Term Sheet; and<br><br>*fourth*, retained by the Reorganized Debtor as balance sheet cash for general corporate purposes. |

| TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | | | |
|---|---|---|---|
| **Class No.** | **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **Claims Against the Debtors** | | | |
| **N/A** | **Administrative Claims** | On the later of the Effective Date, the date such Administrative Claim is Allowed, or the date such Allowed Administrative Claim becomes due and payable in the ordinary course, or as soon as | N/A |

| TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | | | |
|---|---|---|---|
| Class No. | Type of Claim | Treatment | Impairment / Voting |
| **Claims Against the Debtors** | | | |
| | | reasonably practicable thereafter, except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted  agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim, other than an Allowed Professional Compensation Claim, shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, payment in full in cash | |
| **Classified Claims Against and Interests In the Debtors** | | | |
| I | **Secured or Partially Secured Claims** | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Secured or Partially Secured Claim and the Debtor against which such Allowed  Secured or Partially Secured Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Secured or Partially Secured Claim shall receive, at the option of the Debtor against which such Allowed Secured or Partially Secured Claim is asserted (with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Plan Proponents), in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, either: (i) payment of the Secured Claim in full in Cash on the Effective, with any Under-secured Claim paid out on the Effective date, 50% of the Under-secured Claim paid in Cash on the Effective Date;  (ii) such other treatment rendering such Allowed Secured or Partially Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, ; or (iii) or any other treatment determined by the Holder of a Priority Claim.  Any Under-Secured Claim shall | Unimpaired; presumed to accept |

| TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | | | |
|---|---|---|---|
| Class No. | Type of Claim | Treatment | Impairment / Voting |
| Claims Against the Debtors | | | |
| | | be treated as Class V Other General Unsecured Claims. | |
| II | Priority Claims | Except to the extent that a Holder of an Allowed Priority Claim and the Debtor against which such Allowed Priority Claim is asserted (with the consent not to be unreasonably withheld, conditioned, or delayed) of the Plan Proponents agree to less favorable treatment for such Holder, each Holder of an Allowed Priority Claim shall receive, at the option of the Debtor against which such Allowed Priority Claim is asserted (with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Plan Proponents), in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, either: (i) on the Effective Date; (ii) such other treatment rendering such Allowed Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; or (iii) or any other treatment determined by the Holder of a Priority Claim. | Unimpaired; presumed to accept |
| III | Unsecured Claims of Specialized Equipment | On the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Unsecured Claim of Specialized Equipment shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, either: (i) payment in Cash of 90% of such Holder's claim; or (ii) such other treatment determined by the Holder of an Unsecured Claim of Specialized Equipment. | Impaired; entitled to vote |
| IV | Unsecured Claims of Former Employees | On the Effective Date, or as soon as reasonably practicable thereafter, each Holder of an Allowed Unsecured Claim of Former Employees shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, either (i) payment in Cash of 50% of such Holder's claim, or (ii) payment in Cash of 80% of | Impaired; entitled to vote |

| TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | | | |
|---|---|---|---|
| Class No. | Type of Claim | Treatment | Impairment / Voting |
| Claims Against the Debtors | | | |
| | | such Holder's claim over 36 months from the Effective Date. | |
| V | **Other Unsecured Claims** | On the Effective Date, each Holder of an Allowed Other Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, either (i) payment in Cash of 50% of such Holder's claim, or (ii) receive a pro rata interest up to a total of 5% of the equity in the Reorganized Debtors pursuant to the Equity Rights Offering. | Impaired; entitled to vote |
| VI | **Equity Security Holders** | Equity Holders shall receive no recovery or distribution on account of such Interests. On the Effective Date, all prepetition Equity Interests will be canceled, released, extinguished, and discharged, and will be of no further force or effect. Equity Holders shall be able to participate in the ERO. | Impaired; entitled to vote |

Stream TV – Stock Purchase Agreement VSI

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of the 13 day of July 2023 (the "**Effective Date**"), by and between STREAM TV NETWORKS, INC., a Delaware corporation (the **"Company"**), and VISUAL SEMICONDUCTOR, INC., a Wyoming corporation (the **"Purchaser"**), each a "**Party**" and together the "**Parties.**"

## RECITALS

A.    The Parties seek to enter into a binding arrangement whereby Purchaser shall acquire 21,000,000 shares of the Company's Class A Common Stock (the "**Class A Common Stock**"), par value $0.0001 per share, at a price of $1.50 per share for a total Purchase Price, defined below, of $ 31,500,000; and

B.    The Purchaser desires to purchase the shares of Class A Common Stock on the terms and conditions set forth herein.

C.    The Company has filed for bankruptcy protection. in the United States Bankruptcy Court for the Eastern District of Pennsylvania ("**Bankruptcy Court**"), in the jointly administered chapter 11 cases filed in the Bankruptcy Court and currently styled IN RE STREAM TV NETWORKS, LLC Bankr. No. 23-10763 (MDC) and TECHNOVATIVE MEDIA, INC., Bankr. No. 23-10764 (MDC)(jointly administered, the "**Chapter 11 Cases**").

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises, representations, warranties, and covenants hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.    <u>Purchase and Sale of Shares.</u>

    1.1    <u>Sale and Issuance of Shares.</u>  Subject to the terms and conditions of this Agreement and confirmation of the Restructuring Plan in the Chapter 11 Case, Purchaser agrees to the binding obligation to purchase 21,000,000 shares of Class A Common Stock (the "**Shares**") and the Company agrees to the binding obligation to sell and issue the Shares to Purchaser for the total purchase price of USD Dollars Thirty One Million Five Hundred Thousand (USD $31,500,000) (the "**Purchase Price**"). Purchase shall deposit the Purchase Price with _____ ("**Escrow Agent**") who shall hold such funds subject to an Escrow Agreement between Escrow Agent, Purchaser and Company on Escrow Agents standard form and mutually acceptable to the Company and Purchaser (the "**Escrow Agreement**"); *provided that,* solely for purposes of funding pre-confirmation expense and with the Purchaser's written consent, which may not be unreasonably withheld, the Escrow Agreement shall permit, the Escrow Agent to release up to $3.0 million dollars, to the Company, in one or more draws prior to Closing.

Stream TV – Stock Purchase Agreement VSI

1.2 <u>Closings; Future Deliveries</u>.

(a) This Agreement shall take place remotely via the exchange of documents and signatures, at 10 a.m. Eastern Time, on the first Business Day following the Bankruptcy Court's confirmation of the Company's Plan of Reorganization (the "**Closing**").

(b) <u>Future Deliveries</u>. Both Parties have the requirement to immediately fulfill their respective obligations pursuant to Section 1.1 of this Agreement.

(c) At the Closing:

 i. the Company shall confirm that all representations and warranties reflected in Section 2 hereof are true and correct and that it has satisfied any and all conditions precedents reflected in the Restructuring Plan or the Restructuring Support Agreement.

 ii the Escrow Agent shall release the escrowed funds remaining balance to the Company;

 iii. the Company shall issue to Purchaser a stock certificate representing the Shares;

1.3 <u>Use of Proceeds</u>.  In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from this transaction for any lawful general business purpose, including working capital, payment of expenses, acquisitions, global expansion, repayment of debt and internal restructuring.

2. <u>The Company's Representations and Warranties</u>.  The Company hereby represents and warrants to Purchaser that, except as set forth on the Disclosure Schedule attached hereto, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Closing, except as otherwise indicated.

2.1 <u>Organization</u>.  The Company is a corporation duly organized, validly existing under the laws of the State of Wyoming and has all requisite corporate power and authority to carry on its business as presently conducted.

2.2 . <u>Capitalization</u>. The Company currently has three classes of outstanding stock: Class A Common Stock, of which there were [  ] shares issued and outstanding; Class B Voting Stock, of which there were [  ] shares issued and outstanding as of the Petition Date; and Series B Preferred Stock, of which there were [  ] shares issued and outstanding as of the Petition Date. The rights, privileges and preferences of the Class A Common Stock, Class B Voting Stock and Series B Preferred Stock are as stated in the Certificate of Incorporation, as restated and refiled, and as otherwise provided by the Delaware General Corporation Law. All issued and outstanding shares of the Company's Class A Common Stock and Class B Voting Stock and Series B Preferred Stock have been duly authorized and validly issued and are fully paid and non-assessable. The Company has no outstanding subscriptions,

Stream TV – Stock Purchase Agreement VSI

options or other agreements or commitments obligating it to issue shares of its capital stock.  Any previously issued options, warrants or conversion rights have been triggered, converted or otherwise satisfied.

2.3    Authorization.  All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into this Agreement has been taken or will be taken prior to the Closing.  All action on the part of the officers of the Company necessary for the execution and delivery of this Agreement, the performance of all obligations of the Company under this Agreement to be performed as of the Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Closing.  This Agreement constitutes the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies. .   Neither the Company's execution, delivery nor performance of this Agreement will conflict with or result in a violation or breach of any term or provision nor constitute a default under, the Company's Articles of Incorporation or Bylaws, or under any contract or agreement to which the Company is a party or by which the Company is bound, or violate any order, writ, injunction or decree of any court, administrative agency or governmental body.

2.4    Valid Issuance of Shares.   The Shares will have been duly authorized and, when issued, sold and delivered, and will be validly issued, fully paid and non-assessable, in accordance with the terms and for the consideration set forth in this Agreement.

2.5    Governmental or Other Consents and Filings.  Assuming the accuracy of the representations made by the Purchaser in Section 3 of this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority or other person is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for filings, if any, pursuant to applicable securities laws.

2.6    Litigation.  Except as set forth in Section 2.6 of the Disclosure Schedule, there is no material claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending against the Company, or that questions the validity of this Agreement or the right of the Company to enter into this Agreement, or to consummate the transactions contemplated by this Agreement. The Company is not subject to any continuing court or administrative order, writ, injunction, judgment, award or decree applicable to the Company or any of its assets, business or property..

2.7    Intellectual Property.  Except as set forth in Section 2.7 of the Disclosure Schedule:

(a)    The Company owns or possesses sufficient legal rights to use all foreign and domestic rights in, to and concerning (i) trademarks, brand names, d/b/a's, Internet domain names, logos and trade names; (ii) patents, registrations, and applications therefor; and

(iii) copyrights and registrations and applications therefor (collectively, the "**Intellectual Property**") in all material respects necessary for its business as currently conducted.

(b)    The Company has not received any communications alleging that the Company has violated or, by conducting its business as presently conducted, would violate any of the Intellectual Property of any other person.

(c)    The Company has the right to use the Intellectual Property owned by it free and clear of any rights, liens, encumbrances or claims of others, except that the possibility exists that other persons may have independently developed trade secrets or technical information similar or identical to those of the Company.  None of the Company's Intellectual Property has been cancelled or adjudicated invalid (other than any expiration in the ordinary course) or is subject to any outstanding order, judgment or decree restricting its use or adversely affecting or reflecting the Company's rights thereto.

(d)    All contracts relating to Intellectual Property to which the Company is a party are valid and binding in accordance with their terms, and the Company is not in material default of any material terms thereof.

2.8    <u>Compliance with Other Instruments</u>.  The Company is not in material violation or material default (i) of any provisions of its Certificate of Incorporation or Bylaws, (ii) of any instrument, judgment, order, writ or decree, or (iii) under any material contract to which it is a party or by which it is bound.

2.9    <u>Property</u>.  The Company has good title to, or a valid leasehold interest in, all of its property and assets free and clear of all material liens, except for statutory liens for the payment of current taxes that are not yet delinquent and encumbrances and liens that arise in the ordinary course of business and do not materially impair the Company's ownership or use of such property or assets.  The Company does not own any real property.

2.10    <u>Compliance with Laws</u>.  The Company has complied in all material respects with all applicable federal, state, municipal and other political subdivision or governmental agency statutes, ordinances and regulations in every applicable jurisdiction, in respect of the ownership of its properties and the conduct of its businesses, including, without limitation, laws imposing taxes, wherein failure to be in compliance would have a material adverse effect on the Company.

2.11    <u>Permits</u>.  The Company has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could not reasonably be expected to have a material and adverse effect on the Company.

2.12    <u>Environmental</u>.  The Company is and has been in compliance, in all material respects, with any law, regulation, or other applicable requirement relating to (a) releases or threatened release of any pollutant, contaminant or toxic or hazardous material, substance or waste or petroleum or any fraction thereof (each a "**Hazardous Substance**"); (b) pollution or protection of employee health or safety, public health or the environment; or (c) the manufacture, handling, transport, use, treatment, storage, or disposal of Hazardous Substances.

2.13    <u>Books and Records</u>.  The books and records of the Company (including the

Stream TV – Stock Purchase Agreement VSI

books and records of account) are in all material respects complete and correct and fairly reflect a true record of all financial affairs, meetings and proceedings of the Board of Directors and shareholders of the Company

2.14    Professional and Consulting Fees.  The Company at Closing will not have any liability for consulting, accounting or legal fees (including, but not limited to, brokerage or finder's fees), in connection with the negotiation, preparation, execution or performance of this Agreement or the transactions contemplated hereby.

2.15    No Default.  The Company is not in default under any term or condition of any instrument evidencing, creating or securing any indebtedness of the Company and there has been no default in any material obligation to be performed by the Company under any other contract, lease, agreement, commitment or undertaking to which it is a party or by which it or its assets or properties are bound, nor has the Company waived any material right under any such contract, lease, agreement, commitment or undertaking.

2.16    Full Disclosure.   The representations and warranties made by Seller hereunder or in schedules or other communication furnished to Buyer pursuant hereto do not and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the representations or warranties herein or in schedules or other communication furnished to Buyer pursuant hereto, in light of the circumstances in which it is or they are made, not misleading.

2.17    No Further Representations.   EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS SECTION 2, THE COMPANY HAS NOT MADE ANY OTHER REPRESENTATIONS AND WARRANTIES AND HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT MADE OR INFORMATION COMMUNICATED (WHETHER ORALLY OR IN WRITING) TO PURCHASER OR ITS REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION OR ADVICE, WHICH MAY HAVE BEEN PROVIDED TO PURCHASER BY ANY DIRECT OR INDIRECT EQUITY-HOLDER, DIRECTOR, OFFICER, EMPLOYEE, ACCOUNTING FIRM, LEGAL COUNSEL, OR OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF ANY EQUITY-HOLDER OF THE COMPANY OR ANY ESTIMATES, PROJECTIONS OR OTHER FORECASTS AND PLANS (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING SUCH ESTIMATES, PROJECTIONS AND FORECASTS) INCLUDED IN ANY SUCH INFORMATION OR COMMUNICATIONS).

3.    Purchaser's Representations and Warranties.  Purchaser hereby represents and warrants to the Company that:

3.1    Authorization.  Purchaser has full power and authority to enter into this Agreement and perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of Purchaser, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

Stream TV – Stock Purchase Agreement VSI

3.2     Purchase Entirely for Own Account.  Purchaser confirms that the Shares are being acquired for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. Purchaser does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Shares. The Purchaser is an entity, was not formed for the specific purpose of acquiring the Shares, and owns investments in excess of $5,000,000.

3.3     Securities Laws.  The Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares.  The Purchaser's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of the Purchaser's jurisdiction.  The Purchaser hereby represents that it is not acquiring any Shares hereunder for the account or benefit of any U.S. Person and that it has no agreement, understanding or intention to distribute, sell, transfer or pledge any of the Shares, directly or indirectly, in the United States or to U.S. Persons. The Purchaser understands that the Shares have not been and will not be registered under the Securities Act of 1933, as amended, or any state law. The Purchaser understands that the Shares are subject to restrictions on transferability and resale and may not be transferred or resold in the United States or to U.S. persons except as permitted under the Securities Act and the applicable state securities laws, pursuant to registration or exemption therefrom. The Purchaser understands that the Company has no intention to register the Shares with the United States Securities and Exchange Commission or any State of the United States and is under no obligation to assist the Purchaser in obtaining or complying with any exemption from registration. The Company may require that a proposed transferee meet appropriate financial suitability standards and that the transferor furnish a legal opinion satisfactory to the Company and its counsel that the proposed transfer complies with applicable federal, state and any other applicable securities laws. An appropriate legend evidencing such restrictions will be placed on any certificates issued representing the Shares and appropriate stop transfer instructions will be placed with respect to the Shares.  Purchaser understands that Purchaser's Shares will not be evidenced by a certificate at this time and may never be evidenced by a certificate.  Purchaser also understands that hedging transactions involving the Shares may not be conducted except in compliance with the Securities Act.

3.4     Disqualification.  Purchaser represents that neither Purchaser, nor any person or entity with whom Purchaser shares beneficial ownership of Company securities, is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as Annex I).

3.5     Acknowledgment.  Purchaser acknowledges that neither the Company nor any other person acting on behalf of the Company has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company, except as expressly set forth in Section 2 of this Agreement.  In connection with Purchaser's

Stream TV – Stock Purchase Agreement VSI

investigation of the Company, certain financial projections and business plan information has been made available to Purchaser.  Purchaser acknowledges that there are uncertainties inherent in attempting to make such projections and plans, that Purchaser is familiar with such uncertainties, and that Purchaser shall have no claim with respect thereto.  Purchaser acknowledges that it has conducted to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Company and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied on the results of its own independent investigation and verification.

4.    <u>Miscellaneous</u>.

4.1    <u>Survival of Warranties</u>.  The representations and warranties of the Company and the Purchaser contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing until expiration of the applicable statute of limitations with respect thereto.

4.2    <u>Court Approval</u>. This Subscription Agreement has been or will be approved by the United States Bankruptcy Court for the Eastern District of Pennsylvania USA.

4.3    <u>Successors and Assigns</u>.  This Agreement may not be assigned by the Purchaser without the express written consent of the Company.  The provisions hereof shall inure to the benefit of and be binding upon the parties hereto and their respective successors permitted assigns, heirs, executors and administrators.

4.4    <u>Governing Law</u>.  This Agreement and any disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by and construed in accordance with the domestic laws of the Commonwealth of Pennsylvania without giving effect to any choice or conflict of law provision or rule (whether of the Commonwealth of Pennsylvania or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the Commonwealth of Pennsylvania.

4.5    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

4.6    <u>Titles and Subtitles</u>.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

4.7    <u>Notices</u>.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day

Stream TV – Stock Purchase Agreement VSI

after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this section.

4.8    <u>Amendments and Waivers</u>.  Any term of this Agreement may be amended, terminated or waived only with the written consent of the Company and Purchaser.

4.9    <u>Severability</u>.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid, void or unenforceable provision and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

4.10    <u>Delays or Omissions</u>.  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

4.11    <u>Entire Agreement</u>.  This Agreement constitutes the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties are expressly canceled.

4.12    <u>Dispute Resolution; Waiver of Jury Trial</u>.  The parties (a) hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the state courts located in the Commonwealth of Pennsylvania and the federal courts of the United States of America located in the Eastern District of Pennsylvania, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the aforementioned courts*,* and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

Stream TV – Stock Purchase Agreement VSI

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

      4.13   <u>Publicity</u>.  The Purchaser shall not issue any press release or make any public disclosure with respect to this Agreement and the transactions contemplated hereby, unless such press release or public disclosure shall be approved in advance by the Company.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

Stream TV – Stock Purchase Agreement VSI

IN WITNESS WHEREOF, the parties have executed this Stock Purchase Agreement as of the Effective Date first written above.

COMPANY:

Stream TV Networks, Inc.

By:   /s/ Mathu Rajan
      Name:   Mathu Rajan
      Title:    CEO

Address:  2009 Chestnut Street, Philadelphia, PA 19103

PURCHASER:

Visual Semiconductor, Inc.

By:

      Name:   Daniel J. Rink
      Title:

Stream TV – Stock Purchase Agreement VSI

## Annex I

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended

(i)  Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A)  In connection with the purchase or sale of any security;

(B)  Involving the making of any false filing with the Commission; or

(C)   Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii)   Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A)  In connection with the purchase or sale of any security;

(B)  Involving the making of any false filing with the Commission; or

(C)   Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii)  Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A)  At the time of such sale, bars the person from:

(1)  Association with an entity regulated by such commission, authority, agency, or officer;

(2)  Engaging in the business of securities, insurance or banking; or

(3)  Engaging in savings association or credit union activities; or

(B)  Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv)  Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

(A)  Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

Stream TV – Stock Purchase Agreement VSI

(B)  Places limitations on the activities, functions or operations of such person; or

(C)  Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v)  Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A)  Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B)  Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi)  Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii)  Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii)  Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

Stream TV – Stock Purchase Agreement VSI

# DISCLOSURE SCHEDULE

This Disclosure Schedule is delivered pursuant to and in connection with the Stock Purchase Agreement (the "Agreement"), dated as of July _____, 2023, by and between STREAM TV NETWORKS, INC., a Delaware corporation ("Company"), and VISUAL SEMICONDUCTOR, INC., a Wyoming corporation ("Purchaser").

Capitalized terms used but not defined herein shall have the respective meanings assigned thereto in the Agreement.  The representations and warranties of the Company in the Agreement are made and given subject to the disclosures contained in the following schedules.  Any matters disclosed in any part of this Disclosure Schedule shall be deemed disclosed for purposes of each other part of these Disclosure Schedules in which it is apparent on its face that it applies to such other section of this Disclosure Schedule.

The inclusion of any fact, item, matter, circumstance, transaction or event on a schedule is not deemed to be an admission or representation that the fact, item, matter, circumstance, transaction or event is or is not "material" and such inclusion shall not be deemed an acknowledgment that such fact, item, matter circumstance, transaction or event is required to be disclosed pursuant to the Agreement.  In no event shall the listing of any matters in this Disclosure Schedule be deemed or interpreted to broaden or otherwise amplify the representations and warranties or covenants of the Company contained in the Agreement.

The introductory language and the heading to each schedule, if any, are inserted for convenience only and shall not create a different standard for disclosure than the language set forth in the Agreement.  Headings in the schedules are inserted for convenience only and shall not create a representation regarding the completeness or accuracy of the organization of the information on such schedules.

Stream TV – Stock Purchase Agreement VSI

**Schedule 2.6**

**Litigation**

- The Chapter 11 Cases

- Itemize each pending litigation.

    ○

    ○

    ○

- Itemize and threatened litigations.

    ○

    ○

    ○

    ○

    ○

Stream TV – Stock Purchase Agreement VSI

## Schedule 2.7

## Intellectual Property

Itemize each exception to §2.7:

(a)

(b)

(c)

(d)

Stream TV – Stock Purchase Agreement VSI

## Schedule 2.10

## Compliance

List all exceptions

- 
- 
-

July 13, 2023

Stream TV Networks, Inc.
Technovative Media, Inc.
2009 Chestnut Street, 3rd Floor
Philadelphia, PA 19103

Attention:_Mathu Rajan, President

**New Money Capital Equity ($31,500,000) and**
**Backstop ($3,500,000) Commitment Letter**

In connection with that certain *Joint Plan of Reorganization of Stream TV Networks, Inc.. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated July 13, 2023 (as may be amended, supplemented or otherwise modified from time to time in accordance herewith, the "**Plan**"), filed by Stream TV Networks, Inc. and Technovative Media, Inc. (collectively, the "**Company**" or "**you**") in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Bankruptcy Court**") in jointly administered Case No. 23-10763 (collectively with Case No. 23-10764, the "**Chapter 11 Case**"), Visual Semiconductor, Inc, (the "**Equity Sponsor**") has been requested by the Company to commit to provide to the Company as reorganized pursuant to the Plan, subject solely to the conditions precedent set forth under the heading "Conditions Precedent to Closing" in the New Money Capital Term Sheet attached as **Annex A** hereto (the "**Term Sheet**") and in Annex I attached thereto (collectively, the "**Closing Conditions**"): (i) an equity infusion in an aggregate amount resulting in the Company receiving $31,500,000 in net proceeds; and (ii) backstopping the Plan's Rights Offering with an additional cash contribution of up to $3,500,000; in each case subject to any increases as described in the Plan and this letter (together with the Term Sheet and any schedules, annexes and exhibits hereto, this "**Commitment Letter**") or the Term Sheet. To the extent not defined in this Commitment Letter, each capitalized term shall have the meaning assigned to it in the Plan, or in an amended, modified, or supplemented Plan in form and substance acceptable to Equity Sponsor.

1. **Commitment to Provide New Money Capital.**

Equity Sponsor hereby commits to provide the New Money Capital (i) in the amount of $31,500,000 (the "**Equity Amount**") by acquiring 21,000,000 shares of the Reorganized Debtor's Class A Common Stock (the "**Class A Common Stock**") at a price of $1.50 per share pursuant to a Stock Purchase Agreement substantially in the form attached as <u>Exhibit A</u> hereto (the "**Stock Purchase Agreement**"); and (ii) backstop the subscription of up to an additional $3.5 million (the "**Backstop Amount**") in the Reorganized Debtor's Class D Non-Voting Stock (the "**Class D Non-Voting Stock**") pursuant to the Plan's Rights Offering; in each case pursuant to the terms and subject solely to the Closing Conditions. [The Equity Amount together with the Backstop Amount, collectively referred to as the "**New Money Capital**"].

2. **Purposes; Certain Conditions.**

The New Money Capital shall be made available on the Closing Date (as defined in the Term Sheet) to the Company for the purposes and subject to the terms as set forth in the Term Sheet. The Equity Sponsor's commitments in respect of the New Money Capital and the funding of the New Money Capital are subject solely to the Closing Conditions, any of which may be waived or modified by or with the consent of the Equity Sponsor and you, and upon satisfaction (or waiver) of such Closing Conditions, the funding of the New Money Capital shall occur. There are no conditions (implied or otherwise) to the commitments hereunder with respect to the New Money Capital, and there will be no conditions (implied or otherwise) under the definitive documentation of the New Money Capital on the Closing Date, other than the Closing Conditions.

3.      **Backstop Discount**

As consideration for the commitment and obligation of the Equity Sponsor, the Equity Sponsor shall receive a 33% discount with respect to the backstop of the Class D Non-Voting Stock rights offering.  For the avoidance of doubt, if the backstop is triggered, the rights offered to the General Unsecured Creditors and the prepetition Equity Holders of the Company at $1.50 per share for the Class D Non-Voting Stock will be acquired by the Equity Sponsor at $1.00 per share for the Class D Non-Voting Stock.

4.      **Indemnification and Expenses.**

You agree to reimburse the Equity Sponsor for all reasonable and documented out-of-pocket fees, costs and expenses (including the reasonable and documented out-of-pocket fees and expenses of one legal counsel (and local counsel, if applicable) incurred before, on or after the date hereof until the termination of this Commitment Letter in accordance with its terms that have not otherwise been paid pursuant to the RSA, or in connection with the Chapter 11 Cases, in each case in connection with the New Money Capital, including, without limitation, any fronting and similar out-of-pocket costs and fees charged by any fronting institution and the preparation, negotiation and execution of the New Money Facilities Documents and the enforcement of any rights and remedies under this Commitment Letter, whether or not the Closing Date occurs or any New Money Facilities Documents are executed and delivered or any extensions of credit are made under the New Money Capital (the foregoing reimbursement obligations, the "**Expense Reimbursement**"), which Expense Reimbursement shall be made by the Company (i) to the extent invoiced at least two business days prior to the Closing Date, on the Closing Date or (ii) otherwise, within five (5) business days after the date of the invoice for such fees, costs or expenses.

You agree to indemnify and hold harmless the Equity Sponsor and each of its respective affiliates and control persons and their respective directors, officers, employees, members, agents, advisors and other representatives, successors and assigns (each, a "**Protected Party**"), promptly after written demand therefor, from and against all claims, damages, liabilities and out-of-pocket expenses that may be incurred by or asserted or awarded against any Protected Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding (each, a "**Proceeding**") or preparation of a defense in connection therewith) any aspect of the New Money Capital (or any use made or proposed to be made with the proceeds thereof) or this Commitment Letter, except to the extent such claim, damage, liability or expense (a) in any case (x) is found in a final, non- appealable judgment by a court of competent jurisdiction to have resulted from fraud, the gross negligence or willful misconduct of, or a material breach of this Commitment Letter by, such Protected Party or (y) arises from any claim, action, suit, inquiry, litigation, investigation or proceeding that does not involve an act or omission of you or any of your respective affiliates and that is brought by any Protected Party against any other Protected Party, or (b) in the case of indemnification by the Company pursuant to this paragraph, is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from fraud, the gross negligence or willful misconduct of, or a material breach of this Commitment Letter by the Company. In the case of a Proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such Proceeding is brought by you, your respective equity holders or creditors or a Protected Party, whether or not a Protected Party is otherwise a party thereto and whether or not any aspect of the New Money Capital is consummated.

No Protected Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your respective subsidiaries or affiliates or to your or their respective equity holders or creditors arising out of, related to or in connection with any aspect of the New Money Capital, this Commitment Letter (including, for the avoidance of doubt, the Term Sheet), except solely to you, and then solely to the extent of direct (as opposed to special, indirect, consequential or punitive) damages determined in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from the fraud, gross negligence, willful misconduct or a material breach by such Protected Party of its obligations under this Commitment Letter or the Stock Purchase Agreement. Notwithstanding anything herein to the contrary, neither you, nor

any of your respective affiliates shall be liable for any special, indirect, consequential or punitive damages (whether in contract or tort or otherwise) arising out of, related to or in connection with, this Commitment Letter, the Stock Purchase Agreement or any aspect of the New Money Capital; provided, that nothing contained in this sentence shall limit your indemnification and reimbursement obligations to the extent such special, indirect, consequential or punitive damages are included in any third-party claim with respect to which such Protected Party is entitled to indemnification hereunder.

No Protected Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems, other than for direct or actual damages resulting from the fraud, gross negligence or willful misconduct of, or a material breach of this Commitment Letter by, such Protected Party, in each case as determined by a final and non-appealable judgment of a court of competent jurisdiction.

The Expense Reimbursement and the indemnity obligations contained in this Section 4 shall, pursuant to the Equity Order, constitute Allowed Administrative Claims, which, for the avoidance of doubt, shall be *pani passu* with all other Allowed Administrative Claims.

Solely with respect to the Company, notwithstanding anything in this Commitment Letter to the contrary, this Section 4 will terminate with respect to the Company upon, and the Company shall have no further obligation to indemnify (either directly or indirectly, and regardless of when the matter alleged to be subject to indemnification occurred or when a claim therefor is first made) the Protected Parties following the Closing Date.

**5.     Sharing of Information; Absence of Fiduciary Relationship; Affiliate Activities.**

You acknowledge that the Equity Sponsor (together with its respective affiliates, a "**Financial Firm**") may be engaged, either directly or through affiliates, in various activities, including securities trading, investment banking and financial advisory, investment management, principal investment, hedging, financing and brokerage activities and financial planning and benefits counseling for both companies and individuals. The Financial Firms may have economic interests that conflict with those of you and your respective affiliates. In the ordinary course of these activities, each Financial Firm may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and/or financial instruments (including bank loans) for its own account and for the accounts of its customers and may at any time hold long and short positions in such securities and/or instruments. Such investment and other activities may involve securities and instruments of you and your respective affiliates, as well as of other entities and persons and their affiliates which may (a) be involved in transactions arising from or relating to the engagement contemplated by this Commitment Letter, (b) be customers or competitors of you or your respective subsidiaries or affiliates, or (c) have other relationships with you or your respective subsidiaries or affiliates. With respect to any securities and/or instruments so held by any Financial Firm or any of its customers, all rights in respect of such securities and instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion. In addition, the Financial Firms may provide investment banking, underwriting and/or financial advisory services to such other entities and persons. The Financial Firms may also co-invest with, make direct investments in, and invest or co-invest client monies in or with funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities of you or such other entities. The transactions contemplated by this Commitment Letter may have a direct or indirect impact on the investments, securities or instruments referred to in this paragraph.

The Financial Firms, in the course of such other activities and relationships, may acquire information about the transactions contemplated by this Commitment Letter or other entities and persons which may be the subject of the financing contemplated by this Commitment Letter. None of the Financial Firms and none of their respective affiliates will use confidential information obtained from you or your respective affiliates or on your or their behalf by virtue of the transactions contemplated hereby in connection with the performance

by the Financial Firms of services for other companies or other persons and none of the Financial Firms will furnish any such information to any of their other customers. You also acknowledge that the Financial Firms have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or other persons.

To the extent that information provided in connection with this Commitment Letter constitutes material non-public information, the you and we shall negotiate in good faith and mutually agree to a "cleansing" non-disclosure agreement to address such information.

This Commitment Letter is the only agreement that has been entered into among us and you with respect to the commitment to provide the New Money Capital and sets forth the entire understanding of the parties with respect thereto.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Financial Firms is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Financial Firms have advised or are advising you on other matters, (b) the Financial Firms, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of the Financial Firms (and you hereby waive and release, to the fullest extent permitted by law, any claims that you may have against the Equity Sponsor and their respective affiliates with respect to any breach or alleged breach of fiduciary duty and agree that Equity Sponsor shall not have any liability (whether direct or indirect) to you in respect of such fiduciary duty claim or to any person asserting a fiduciary duty on behalf of or in right of you, including your respective equity holders, employees or creditors, in each case in connection with the transactions contemplated by this Commitment Letter), (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, and (d) you have been advised that the Equity Sponsor are engaged in a broad range of transactions that may involve interests that differ from your interests and that the Financial Firms have no obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship. In addition, please note that the Equity Sponsor do not and have not provided accounting, tax, investment, regulatory or legal advice.

6.    **Miscellaneous.**

This Commitment Letter shall not be assignable by you without the Equity Sponsor's prior written consent (and any purported assignment without such consent shall be null and void).

This Commitment Letter is intended to be solely for the benefit of the parties hereto and the Protected Parties and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the Protected Parties to the extent expressly set forth herein, except to the extent that you and the Equity Sponsor otherwise agree in writing. The Equity Sponsor reserves the right to employ the services of its affiliates in performing the obligations contemplated hereby (and, in connection with such employment and solely for the purpose thereof, the Equity Sponsor may exchange with such affiliates information concerning you and your respective affiliates in connection with the New Money Capital and, to the extent so employed, such affiliates shall be entitled to the benefits afforded to the Equity Sponsor hereunder), but Equity Sponsor shall not be relieved of its obligations under this Commitment Letter as a result thereof, other than as specifically set forth herein.

This Commitment Letter may not be amended or any provision hereof or thereof waived or modified except by an instrument in writing signed by you and each of the Equity Sponsor or, to the extent specifically set forth herein, you and the Equity Sponsor. Each of the parties hereto agrees that this Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein (except as may be limited by applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, concepts of reasonableness, good faith and fair dealing and equitable principles of general applicability).

Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., ".pdf" or ".tif") shall be effective as delivery of a manually executed counterpart hereof.

This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of Pennsylvania and to the extent applicable, Title 11 of the United States Code.

The parties hereto hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court or, if the Bankruptcy Court abstains from exercising jurisdiction, any Pennsylvania state court or, to the fullest extent permitted under applicable law, federal court sitting in the State of Pennsylvania over any suit, action or proceeding arising out of or relating to the New Money Capital or the other transactions contemplated by this Commitment Letter or the performance of the obligations hereunder, and agree that any such suit, action or proceeding shall be brought in such courts. Service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. The parties hereto hereby irrevocably and unconditionally waive, to the fullest extent permitted under applicable law, any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. The parties hereto hereby irrevocably agree to waive, to the fullest extent permitted under applicable law, trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the New Money Capital or this Commitment Letter or the performance of the obligations hereunder. A final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

The Equity Sponsor hereby notify you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (as amended, the "**PATRIOT Act**"), they may be required to obtain, verify and record information that identifies the Debtor, which information includes names, addresses, tax identification numbers and other information that will allow the Equity Sponsor to identify the Debtor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Equity Sponsor.

Notwithstanding anything to the contrary in this Commitment Letter, your obligations under this Commitment Letter (including the obligations to indemnify the Protected Parties and reimburse the Equity Sponsor for their fees and expenses in accordance with the terms hereof) shall be subject to the Equity Order and such obligations shall not be enforceable until the Equity Order has been entered.

7.    **Termination.**

The Equity Sponsor may terminate this Commitment Letter, the commitments and the Equity Sponsor' obligations hereunder by written notice to you if: (a) the Restructuring Support Agreement is terminated; (b) the Equity Order shall not have been entered on or prior to August [   ], 2023 (provided that, with the consent of the Equity Sponsor, the date under this clause (b) may be extended); (c) the Chapter 11 Cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code, or a trustee or examiner shall be appointed with respect to all or substantially all of the Debtors with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or (d) after entry thereof, the Equity Order is reversed, modified, amended, vacated or subject to a stay pending appeal, in each case without the consent of the Equity Sponsor.

If the Closing Date does not occur at or before the Termination Time (as defined below), then the commitments hereunder shall automatically terminate unless the Equity Sponsor shall, in its sole and absolute discretion, agree to an extension. "**Termination Time**" means the earliest to occur of (i) 11:59 p.m., Eastern

Standard time, on [_____, 2023] (provided that, with the consent of the Equity Sponsor, the date under this clause (i) may be extended to a date not later than the Outside Expiration Time), (ii) the Closing Date, and (iii) the Outside Expiration Time. "**Outside Expiration Time**" means 11:59 p.m., Eastern Standard time, on [_____, 2023].

8.   **Acceptance.**

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter by delivering executed counterparts of this Commitment Letter not later than 11:59 p.m., New York City time, on July [ ], 2023 (the date of receipt of such executed counterparts, the "**Acceptance Date**"). This offer will automatically expire at such time if such counterparts have not been executed and delivered in accordance with the preceding sentence. This Commitment Letter will become a binding commitment on the Equity Sponsor only after it has been duly executed and delivered by the Company in accordance with the first sentence of this paragraph and approved by the Bankruptcy Court pursuant to the Equity Order.

*[Remainder of page intentionally left blank]*

**EQUITY SPONSOR:**                    **VISUAL SEMICONDUCTOR, INC.**

By: _____
    Name:
    Title:

**ACCEPTED AND AGREED:**

**STREAM TV NETWORKS, LLC**

By:_____
Name:
Title:


**TECHNOVATIVE MEDIA, INC.**

By:_____
Name:
Title: