UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

```
                                        :
IN RE:                                  : Case No.  23-10764
                                        :          23-10763
STREAM TV NETWORKS, INC.   CH: 11 :
                                        : Philadelphia, Pennsylvania
A) Trial Re: Emergency Motion To  : June 26, 2023
Dismiss Case. Motion Of Hawk      : 3:12 p.m.
Holdings Ltd. (I) Pursuant To     :
Section 1112(B) Of The Bankruptcy :
Code Either (A)(I) To Dismiss The :
Debtors Chapter 11 Cases Or (2)   :
To Convert Such Cases To Cases    :
Under Chapter 7 Or (B) In The     :
Alternative, Pursuant To Section  :
1104(A) Of The Bankruptcy Code To :
Appoint A Chapter 11 Trustee And  :
(Ii) To Request Expedited         :
Consideration Pursuant To Local   :
Rule 5070-I(G)Filed By Hawk       :
Investment Holdings Ltd.          :
Represented By Steven Caponi .    :
. . . . . . . . . . . . . . . . . .
```

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                   Rafael X. Zahralddin, Esq.
                                  Lewis Brisbois
                                  500 Delaware Avenue, Suite 700
                                  Wilmington, DE 19801
                                  302-985-6004

                                  Bennett G. Fisher, Esq.
                                  Lewis Brisbois Bisgaard & Smith
                                  24 Greenway Plaza, Suite 1400
                                  Houston, TX 77046
                                  346-241-0495

                                  Vincent F. Alexander, Esq.
                                  Lewis Brisbois Bisgaard & Smith
                                  110 SE 6th Street, Suite 2600
                                  Fort Lauderdale, FL 33301
                                  954-728-1280

| | |
|---|---|
| For SeeCubic: | Marley Ann Brumme, Esq.<br>Eben P. Colby, Esq.<br>Skadden Arps Slate Meagher &<br>Flom, LLP<br>500 Boylston Street, 23rd Floor<br>Boston, MA 021116<br>617-573-4800 |
| For Hawk Investment Holdings<br>Ltd: | Steven Caponi, Esq.<br>K&L Gates<br>600 N. King Street, Suite 901<br>Wilmington, DE 19801<br>302-416-7080 |
| | Thomas L. Warns, Esq.<br>K&L Gates LLP<br>599 Lexington Avenue<br>New York, NY 10022<br>212-536-3901 |
| | Margaret R. Westbrook, Esq.<br>Aaron Rothman, Esq.<br>Jonanthan N. Edel, Esq.<br>K&L Gates LLP<br>300 South Tryon Street<br>Suite 1000<br>Charlotte, NC 28202<br>704-331-7400 |
| For the United States<br>Trustee: | Kevin P. Callahan, Esq.<br>Office of The United States<br>Trustee<br>Robert N.C. Nix Federal<br>Building<br>900 Market Street, Suite 320<br>Philadelphia, PA 19107<br>202-934-4154 |
| For Rembrandt 3D Holding<br>Ltd.: | Andrew Peter Demarco, Esq.<br>Devlin Law Firm LLC<br>1526 Gilpin Avenue<br>Wilmington, DE 19806<br>302-449-9010<br>Chris Michaels |

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

JUNE 26, 2023                                           10:56 A.M.

THE COURT:  All right.  Good morning.  This is Stream TV Network Inc and it's a trial on several matters.  The first is the emergency motion to dismiss case, filed by Hawk Investments Holding, Ltd., pursuant to 1112(b) the Code or to dismiss or in the alternative to -- to dismiss or in the alternative, appoint a Chapter 11 trustee.  That's filed by Hawk.  What's the B matter I need.  There're so many notes on this?  The B matter is --

UNIDENTIFIED SPEAKER:  The motion for relief from stay --

THE COURT:  Emergency motion for relief from stay filed by Hawk Investments.  And C, a motion to improve the Debtor's expedited motion for authority to take certain action in the ordinary course of business filed by Stream.

All right, counsel.  I don't have to do my usual please state your name for the record before you speak because I can clearly see who's here today.  All right.  Let's have entry of appearance.  Who's here for Hawk?

MR. CAPONI:  Good morning, Your Honor.  Steven Caponi from K&L Gates.  I have with me Margaret Westbrook and Jon Edel, and shortly will be joining us will be Tom Warns.

THE COURT:  All right.  Counsel, give me an opportunity to write this down.  So we have Mr. Caponi.  We have Ms. Westbrook.

MR. CAPONI:  Mr. Edel, Jon Edel.  E-D-E-L.

THE COURT:  Jon Edel.

MR. CAPONI:  And then Tom Warns will be joining. He's just looking for a parking spot.

THE COURT:  All right.  Have fun.  How do you spell his last name?

MR. CAPONI:  W-A-R-N-S, Warns.

THE COURT:  Warns.  Okay.  And you're all for Hawk, correct?

MR. CAPONI:  Correct.  And Your Honor, if you -- if you want the other secure creditor, there's also -- I don't know if you want to do introductions as well.

THE COURT:  Yes.  Who else is here?

MR. COLBY:  Good morning, Your Honor.  My name is Eben Colby from Sadden Arps, here on behalf of SeeCubic, Inc.

THE COURT:  I'm sorry, Eben?

MR. COLBY:  Colby, C-O-L-B-Y.

THE COURT:  And you're here for SeeCubic --

MR. COLBY:  Incorporated.

THE COURT:  Inc.  Okay.  Who else is here?

MR. COLBY:  Also from Skadden, Marley Brumme and one of our summer associates, Lavinia Liang, L-I-A-N-G.

THE COURT:  And the last name again?

MR. COLBY:  L-I-A-N-G.

THE COURT:  Oh, Liang, okay.  And Ms. Biroshad Dabney

(phonetic) from SeeCubic.

THE COURT:  Okay.  Anybody else here?

MR. CAPONI:  Not from the call side, Your Honor.

THE COURT:  All right.  For the Debtors?

MR. ALEXANDER:  Good morning, Your Honor.  Vincent Alexander of Lewis Brisbois Bisgaard & Smith on behalf of both of the Debtors.  I'm joined with my partner, Rafael Zahralddin, and we also have Mr. Thomas Park, and he's CFO for the Debtor.  That's P-A-R-K.  Thank you, Your Honor.

THE COURT:  And who's -- what's his position again?  What he's CFO?

MR. ALEXANDER:  C-F-O.

MR. CALLAHAN:  Good morning, Your Honor.  Kevin Callahan for the U.S. Trustee.

THE COURT:  Anybody else?  Okay.  I know there was people who called in and wanted to observe.  Did you respond to those people, Eileen?

THE BAILIFF:  I did, Judge.

THE COURT:  Okay.  Told them they needed to --

THE BAILIFF:  I told them no.  I mean, I didn't --

THE COURT:  Yes.  They were not far enough from the courthouse that they needed to call in.

Other than court staff, John, is there anyone else on the line?

THE COURT REPORTER:  I've got a half dozen numbers.

THE COURT:  Do we know who they are?

THE COURT REPORTER:  Chris Michaels, Bennett Fisher, Andrew DeMarco, Aaron Rothman.

THE COURT:  Who are all these people?

MR. ALEXANDER:  Your Honor, Bennett Fisher is an attorney representing the Debtors.

THE COURT:  Okay.  And where is he located?

MR. ALEXANDER:  He's located in Texas.

THE COURT:  Okay.  So Bennett.  So we need to know everyone, even if they're not in the courtroom, who's here.

So we've got Bennett Fisher.  Who else?

THE COURT REPORTER:  Aaron Rothman.

THE COURT:  Who's that?

THE COURT REPORTER:  I believe he's with KNLK.  Aaron Rothman.

THE BAILIFF:  Yes, I'm sorry.  Aaron Rothman is on the phone, Your Honor.

THE COURT:  All right.  Counsel, I need to know everyone who is participating whether they are in the courtroom or not.  If they are appearing telephonically, we need to know not withstanding that I'm not sure what their roles are.  If they're just observing, we still need to know who's on the phone.

So we have Bennett Fisher from the Debtor, who's in Texas, correct?

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  All right.  Who else do we have?

MR. CAPONI:  Andrew DeMarco.

THE COURT:  Who's Andrew DeMarco?

MR. ALEXANDER:  He's counsel for Rembrandt.

THE COURT:  Okay.  Mr. DeMarco.

THE COURT REPORTER:  I don't know who -- do you need everyone?

THE COURT:  I'm going to need everyone.

AUTOMATED VOICE:  All participants are now in interactive talk mode.

THE COURT:  Okay.  I'm -- so who's on the telephone and do you intend to participate or are you just observing?

MR. DEMARCO:  This is Andrew DeMarco, Your Honor. Counsel for Rembrandt.  Good morning.  I am simply observing this morning.

THE COURT:  Okay.  Who else is on the telephone?

MR. FISHER:  Your Honor, this is Bennett Fisher in Houston, Texas.  I'm a partner with Lewis Brisbois, representing Stream and Technovative, and I will be listening in and not participating.

THE COURT:  I can tell you, it's so much cooler here than in Houston, but --

MR. FISHER:  By a lot.

THE COURT:  A lot. All right.  Who else is on here?

MR. ROTHMAN:  Your Honor, this is Aaron Rothman at K&L Gates for Hawk down in Charlotte, North Carolina.

THE COURT:  Okay.

MR. ROTHMAN:  I will be just observing.

THE COURT:  I'm sorry, your last name -- your name again?

MR. ROTHMAN:  Rothman.  R-O-T-H-M-A-N.

THE COURT:  Okay.  And you're also for Hawks, correct?

MR. ROTHMAN:  Yes, that's correct.

THE COURT:  All right.  Anyone else?

MR. MICHAELS:  This is Chris Michaels representing Rembrandt Holding, Limited.  I'm also joined by Neal Wallace, also with Rembrandt Holding, Limited.  And we're just observing, Your Honor.  We will not be participating.

THE COURT:  Okay.  I just want to know who's on the phone.  All right.  Anybody else other than staff?

THE COURT REPORTER:  This is the Court Recorder.  Whose number ends in 6098, please?

THE COURT:  Hold on.  No, it's not.  8242 should be on there.  Is that on?  Okay.  All right.  That's the one number that I know.  This is a different number.

Okay.  Anybody else?

All right.  With that being said, let's -- there are several matters listed for today and I think our last

discussion was that the parties were going to do a joint record with respect to the various motions, at least with respect to the motion to dismiss and the motion for relief from stay.

AUTOMATED VOICE:  All participants are now in listen only mode.

THE COURT:  Well, that's new.  Mr. Caponi, is that your intention with respect to your motions?

MR. CAPONI:  Yes, Your Honor.  So Mr. Alexander and myself had talked earlier today and we believe the way to proceed is to start with the motion -- go by, this was an authorized filing.  Then deal with the motion for relief from stay, and then after that, deal with the Debtor's motion as to whether it's authorized to sell stock, and that would sort of close out the legal related arguments.  And from there, we would move to -- the motion to dismiss and evidence on those issues.

THE COURT:  Okay.  So the motion to file, the motion to dismiss, whether it's an authorized filing.

MR. CAPONI:  Correct.

THE COURT:  And then the next would be the motion for --

MR. CAPONI:  Relief from stay.

THE COURT:  Okay.  And then the Debtor's motion?

MR. CAPONI:  The Debtor's motion.  I'm not sure what it calls but it deals with --

THE COURT:  It's in the --

MR. CAPONI:  -- whether they're authorized to sell stock.

THE COURT:  Right.  They're amended motion that they recently filed.  That motion?

MR. ALEXANDER:  Your Honor, the ordinary course motion that was filed and then it was the --

THE COURT:  The amended -- yep.  The amended motion that you filed --

MR. ALEXANDER:  Your Honor, it was amended with regards to the dollar amount, but yes.

THE COURT:  A lot more than the dollar amount.  It's also amended with respect to who's the investor, but I'll get to that in a minute.

MR. CAPONI:  And correct me if I'm wrong, I believe the Debtor is going to proceed on that issue just as to the legal issue as to whether or not they're authorized to sell stock, not the whole motion, but you can --

THE COURT:  Yes.

MR. ALEXANDER:  Vincent Alexander, Your Honor.  When we went before Your Honor last week discussing the procedure, I believe that what we discussed and came to the conclusion of, the parties and the Court, was that there would be legal argument on various issues.  And then once the legal argument was done, then we would proceed with the evidentiary trial

portion --

THE COURT:  Okay.

MR. ALEXANDER:  -- with respect to the matters.

THE COURT:  Okay.  Well, that addresses my concern with your amended motion, notwithstanding the legal argument. I am not quite sure that it's in a position to be heard today with evidence, and I'll tell you why.

You filed an amended motion that is significantly different than the one that you filed on April 21st.  And that you also said it's an ordinary course transaction and the dollar number is different.  I have no clue who the proposed purchaser is, and whether a transaction of this size that was filed on the eve of a trial, and I don't know whether the Hawks or any of the other parties have had an opportunity to respond, that is different than what you filed.

And so I don't know whether this meets the notice requirements to allow the -- anybody whom -- and maybe they don't oppose it.  I don't know.  But I don't see that filing an amended motion that is so significantly different is something that I'm going to hear today.

Now, I may hear the legal arguments and if I conclude that it's an ordinary course of business transaction that does not need Court approval, okay.  But if I find that it's not, I would have to take evidence and I'm not prepared to take -- well, you may be prepared to present evidence, but I am not

Case 23-10763-djb   Doc 302   Filed 07/24/23   Entered 07/24/23 09:58:17   Desc Main
Document   Page 12 of 288

12

quite sure -- well, I'm pretty confident that filing a significantly different motion does not afford the due process notice requirements to anybody who may want to oppose that.

So I'm not quite sure how you guys want to address that.  You can make the legal arguments, but I am definitely not going to hear evidence on that motion, unless of course, there's no one opposing it.

Mr. Caponi?

MR. CAPONI:  Yes, Your Honor.  We would be opposing it for many of the reasons that you indicated.  We just learned about it and did not have an opportunity to kick the tires on it.  We're happy to proceed with the legal argument, but on the evidentiary piece, we would need time.

THE COURT:  Mr. Alexander?

MR. ALEXANDER:  Your Honor, we believe that with respect to the motion and the threshold gateway issues, we believe, Your Honor, can certainly address those in terms of whether or not a stock issuance requires Court approval. Whether or not it's ordinary course but to the extent we need more than that and we'd go to the evidentiary portion, we're also going to need Mr. Rajan for that as well and he's unavailable.  So we would not be able to proceed with that.

THE COURT:  Well, the path that you're presenting that you think I need to apply for the ordinary course and whatever this is objective or objecting, host in and of itself

www.trxchange.com · (800) 406-1290

will require me to look at what you're proposing before I can even determine whether it's ordinary course.

So I'm not quite sure -- yes, I may conclude that a Debtor in the ordinary course may have the authority to do what you're proposing.  But it's more than do you have the authority.  It is when I look at that proposed transaction, is that specific transaction one that meets the test for an ordinary course business.  And so I'm not quite sure how I'm going to get there because there's a legal proposition -- you may have that authority, but that authority is specific to the proposed transaction.

So I'm not quite sure how I get to answer.  Once we have a legal argument, yes, you have the authority.  How I get to conclude whether you then -- I guess your position is, okay, you say we can.  And I'm -- again, the cases say that you can, but there are certain tests that I need to apply.

So I'm not quite sure how we even need a legal argument if the cases say you can when the real issue is can you in this situation.  That's the issue for me, and I'm not going to -- but you know, I'll hear the legal arguments.  I just wanted to be clear, I was not hearing any evidence today with respect to the Debtor's motion.

MR. ALEXANDER:  Understood, Your Honor.  And as I indicated, we will need Mr. Rajan for that as well, and he's still currently in the hospital, so.

THE COURT:  Okay.  Or someone else who is -- because I understand -- I can't tell you who the witnesses are, but I'm not quite sure if at some point, you know, depending on how long this takes, there may be someone else who may have to step up and present the evidence.

MR. ALEXANDER:  We understand that as well, Your Honor.

THE COURT:  Okay.

MR. ALEXANDER:  We're trying to get others up to speed such that they would be able to do that.

THE COURT:  Okay.

MR. ALEXANDER:  And that's one of the reasons why we brought in Mr. Park, but he's not there yet quite.

THE COURT:  Okay.

MR. ALEXANDER:  And so once he does get up to speed, certainly, we'll evaluate that.

THE COURT REPORTER:  One second, Your Honor.  This is Michael.

THE COURT:  Sure.

MR. ALEXANDER:  So Your Honor, we're in agreement with that in terms of how to proceed.

THE COURT:  Okay.  All right.  Counsel, I think there was another issue that you guys raised with my courtroom deputy about timing for today and whether you would need to have some sort of break during this process and the timing.  Did anybody

-- I can go straight through.  I don't really care, without maybe a brief break, but if people want to break for lunch, that works for me.

But given that we've gone over a couple of days it may make sense to have the parties discuss how much time they want to devote today?

MR. ALEXANDER:  I think one of the questions, Your Honor, was at the least hearing, you indicated that we would be done today at 2:30.

THE COURT:  No, I said I might have to leave at 2:30. I needed to -- I needed to work out some details on whether I needed to leave or not, and I would work it out.  I don't.

MR. ALEXANDER:  Okay.  That -- that was the question.

THE COURT:  Right.

MR. ALEXANDER:  You said you'd let us know, and I --

THE COURT:  Right, yes.  I'm not -- no.  I -- I made arrangements for someone else to cover that appointment.

MR. ALEXANDER:  Okay.

THE COURT:  Hopefully, it will work out, but we'll see.  Now, I will tell you probably at 2:30, I may need a brief break to make a telephone call to make sure that the process -- the person who's covering for me doesn't have any issues, okay. But otherwise, we can take a brief break or however you --

MR. CAPONI:  My thinking on the fly would be deal with the motion regarding whether this was an authorized

filing, back and forth, put that to bed, and then we'll look at the clock and sort of take a break -- maybe not make a decision now, but sort of go by the seat of our pants a little bit.

THE COURT:  That's fine.  But yes, I think I indicated that I may have to stop at 2:30 and come back, that I was going to work on trying to get someone to cover for me for that appointment, and I'll work that out.  Okay.  So we don't have to stop at 2:30.

MR. CAPONI:  Okay.

THE COURT:  Okay.  So now that we have all the logistics out of the way, Mr. Caponi, are you ready to proceed with your motion with respect to the issue of whether this was an authorized filing?  And this is an authorized filing by both parties or an authorized filing with respect to Technovative?

MR. CAPONI:  This would be -- excuse me, Your Honor. This would be whether it's an authorized filing only to Technovative, not as to Stream.

THE COURT:  Right.

MR. CAPONI:  And I have a PowerPoint presentation, Your Honor.  And along with the screen, I also have a hard copy, if I could hand those out?

THE COURT:  Yeah.  Because I have a -- not a very good view from here.

Counsel, are we marking these as exhibits or are these just a tool for the Court to follow along?

MR. CAPONI: Sorry, Your Honor?

THE COURT: Are we going to mark this as an exhibit or is it just a tool for the Court to follow along?

MR. CAPONI: It's a tool for the Court to follow along, Your Honor, but we can mark it as an exhibit if that makes the record a little more clean.

THE COURT: It probably makes the record -- because we're not going to have that presentation, and I will have that. So if I need to look at it, I'd rather it's been entered.

MR. CAPONI: Then that's fine, Your Honor.

THE COURT: Okay. We'll mark --

MR. CAPONI: Mark it as Exhibit 1.

THE COURT: Exhibit 1. Okay. So who is this -- whose view is this? You're going to have to start, because if it was from me, I cannot see anything.

MR. CAPONI: Well, and actually, it will probably work for me, Your Honor.

THE COURT: Okay. Because this is definitely not working for me.

MR. CAPONI: Okay. And I'm ready to proceed, Your Honor, when you would like.

THE COURT: Okay.

THE COURT REPORTER: I'll call it H-1, Exhibit 1.

THE COURT: H-1?

THE COURT REPORTER:  Hawks.

THE COURT:  Hawks 1.  H-1.

Okay, Mr. Caponi, you may proceed.

MR. CAPONI:  Thank you, Your Honor.  So Your Honor, as we discussed a minute ago, there's --

THE COURT:  John, he wants to be able to see it so make sure because I have this in front of me.  Whether -- you can turn it back.  I'm good with this.

MR. CAPONI:  I can see it either way, so thank you.

THE COURT:  Okay.  There you go.  All right.

MR. CAPONI:  So Your Honor, there's two legal issues to be addressed in this PowerPoint.  The first is the motion to dismiss Technovative Media, and the question there is whether Mr. Rajan was authorized to file the Technovative bankruptcy.  And I as I would explain, the answer to that is no.  The following was an ultra vires filing because only the Receiver acting as the Board of Directors of Technovative was authorized to file bankruptcy.

And I'll skip for now the relief from stay and we'll deal with that later.

THE COURT:  Okay.

MR. CAPONI:  And just focus on the ultra vires filing.  Your Honor, most of this is not very controversial.  State law determines who's authorized to file a bankruptcy.  In this case, Technovative is a Delaware entity so Delaware law,

specifically, the Delaware General Corporation Law governs who's authorized to initiate a bankruptcy.

And the relevant provision of the DGCL is Section 141, which is the authorizing/enabling statute that says the affairs of the business of every entity is to be run by the Board of Directors and solely by the Board of Directors.  So that is the -- from a state law perspective, it's pretty simple that we have only the Board of Directors of an entity in Delaware is authorized to initiate a bankruptcy filing or approve a bankruptcy filing.

And we tried to where we could in this PowerPoint presentation, Your Honor, cite mode and caselaw.  I'm going to discuss it in my presentation, but we have the citations there for future reference.

Importantly, Your Honor, officers may not authorize a filing.  So the directors can, the officers cannot.  The authorizers can implement a filing once it's approved by the Board, but they have no authority to act on their own.

Today, Your Honor, we are here discussing this particular filing, which is on page 6, and it is the petition -- the voluntary petition for Technovative Inc.  It was filed on March 15th of this year and was signed by Mr. Rajan, purporting to be a director and he signed this as is highlighted, he declares under penalty of perjury that the foregoing is true and correct.

What we know, Your Honor, is Mr. Rajan lacked authority to file the petition for two independent reasons. Both of those reasons tie back to the October 20th of 2022 Court of Chancery status quo order. And the status quo order, Your Honor, was entered -- by way of background, there was a dispute as to whether Mr. Stastney constituted the bord of directors or whether Mr. Rajan constituted the board of directors of Technovative.

Each individual had a claim to the throne, so to speak, and we initiated a Section 225 proceeding, which is the proceeding that's still pending in the Court of Chancery. And that's a statutory provision specifically designed to address when there is a dispute, a bono fide dispute over who constitutes a director or the board of directors.

So Vice Chancellor Laster held a hearing and oral argument on that issue, and he entered a status quo order in order to govern the affairs of the Technovative entity.

Importantly, Your Honor, by way of getting a little wonky on Delaware corporate law, entities are creatures that are created, sanctioned by the State of Delaware. So they are, as this slide indicates, the board, it's res. It's property of the State of Delaware and the State of Delaware allows someone to form a corporation, but the State of Delaware always has authority to reclaim or cancel an entity if it believes the entity is being abused or if there's something going on that

the State of Delaware does not like.

So what happened through the status quo order is Vice Chancellor Laster, on behalf of the State of Delaware, exercised that authority and took position of what he deemed to be the res, which was the board of directors.  And he did so because it was unclear who ran the company and who could make decisions, and so therefore, it is sort of a situation, Your Honor, if a child has two people claiming to be the parent, the State may appoint a receiver or a guardian who acts on behalf of the child.  Neither purported parent gets to until the issues are solved.

And in that status quo order, importantly -- this is the two reasons that Mr. Rajan lacked authority.  Paragraph 7-A precluded Mr. Rajan from acting as the board of directors of Technovative.  It also precluded Mr. Stastney from purporting to act as the board of directors of Technovative.  Separately and independently, the status quo order appointed a receiver to be the board of directors until the conclusion of the 225 proceeding, and I'm going to go through these two basis right now.

Slide 8 is just a copy of the status quo order.  It was entered in October of 2022, so many months before this bankruptcy was filed -- approximately five months before this bankruptcy was filed, this status quo order was in place.

THE COURT:  And counsel, were you going to enter all

these as exhibits that you'll be marking these?

MR. CAPONI:  Well, Your Honor, we're going to enter the status quo order, but I'll do it right now because I think the Court can take judicial notice of this, if I can say a filing by the State of Delaware.  And I'm not sure how Your Honor wants to handle marking of exhibits.

THE COURT:  Well, counsel, if you're going to refer to them, I would -- you may not have to -- you need to label them now so that I know when we go back and look at the record, the record is clear that the status quo order was exhibit number --

MR. CAPONI:  I'll do that right now, Your Honor.

THE COURT:  Okay.

MR. CAPONI:  The status quo order is CR-7 -- I'm sorry, CR-1.  CR-1.

THE COURT:  We already have --

MR. ALEXANDER:  Your Honor, if --

THE COURT:  Are we going to --

MR. ALEXANDER:  I'm going to object.  I thought we were just doing legal argument.  If we're doing precedents and exhibits, I don't -- I just want to be clear how they want to proceed.

THE COURT:  Well, I guess the question, counsel, and you can make legal argument, but how am I going to make a conclusion if I don't have --

MR. ALEXANDER:  Well, I --

THE COURT:  That's what I kept trying to say at the hearing that I was -- when we had our emergency hearing on Friday -- I think it was Friday, that I'm not quite sure how we're going to get to any of this without looking at the actual evidence.  You can make the argument on legal argument that this is the law in Delaware.  Okay.  This is what Delaware law says, this is what it is.  Okay.  I know what the law is.  Now, how does that law apply to the situation that I am addressing?

Okay.  I get what it says, but how do I then make a determination without the evidence?  And that's why I wasn't clear, you know, you guys can make your legal arguments, but okay.  I understand what the law is.  Now, how do I rule without having this specific evidence for me to make a determination?

MR. CAPONI:  But Your Honor, this particular exhibit is Creditor's Exhibit 1, and I would like to move it into evidence as would Exhibit 2 in this proceeding.

THE COURT:  Okay.  And Mr. Alexander is saying we're not doing evidence at this point.  That's why I was trying to figure out how you guys -- how you intended to make these arguments without giving me the documents.

MR. CAPONI:  Your Honor, so as we -- I mentioned yesterday, and Ms. Westbrook corrected me last time you were on the phone.  We are not relying on any witness testimony for

this presentation, but asking the Court to take judicial notice of documents such as this we think is within the oral argument.

THE COURT: Yeah. My judicial notice requires what, counsel? Requires you to provide me with a copy.

MR. CAPONI: It's in -- it's in the binders, Your Honor. Exhibit -- Creditor's Exhibit 1.

THE COURT: Oh, my, what am I -- Eileen, can you see if it's on my desk. Currently I took my rule book. I had one, but I bet you it's not the right one. I should have one on my desk. I don't think judicial notice has changed since 2020. Yeah, we need to update the documents on my -- on the -- these are all 2020 --

MR. CAPONI: If it helps, Your Honor, we did a bench memo on the standard for judicial notice.

THE COURT: Okay. Want to hand it up? Did you share that with Mr. Alexander? And I have my own little notes, but I don't have my book with my -- see, I have my -- I still have my old markings, but you can tell how long -- I think the last time we did a hearing was in -- museum. Because we had this many binders and I wasn't doing that from my office at home, and that was in '21.

UNIDENTIFIED SPEAKER: It --

THE COURT: I was here, and I had all the documents, but I had my rule book. That's why I have 21 books.

Okay. All right, counsel, you believe that I can

take judicial notice and what's the rule that I need to apply? You said Federal Rule of Evidence 20 --

MR. CAPONI:  It's 201(b)(1).

THE COURT:  Okay.  Okay.

MR. CAPONI:  That's the fact that it's not subject to reasonable dispute.  Is a fact that can be accurately and readily determined by a source whose accuracy cannot reasonably be questioned.  This was entered by the -- an order entered by the Delaware Court of Chancery.  It's on the public docket, and this is -- that's where it's pulled from and I don't think anyone can -- or anyone in this courtroom's going to dispute that this is in fact what it's in the binder, the order entered by -- by Chancellor Laster.

THE COURT:  I think it was more of a process.  If you want me to take judicial notice, what's the process?  You give me -- does it have to be a regular copy?  Does it have to be a certified copy?  What is it that you need to give to me to satisfy Rule 201?

MR. CAPONI:  Just a copy, Your Honor.

THE COURT:  Okay.

MR. CAPONI:  And then if someone wants to challenge the -- that the copy be provided in a binder or somehow not be court copy pulled from the docket, I guess they can do so.  But it does not need to be a certified copy or a dated copy or anything like that.

THE COURT:  Right, I have no issue with the issue of what judicial notice required.

MR. CAPONI:  Okay.

THE COURT:  Only the process of getting it to this Court.  And you believe that all you need to do for a judicial notice is provide me with a copy of the status quo order and that a copy is sufficient, correct?

MR. CAPONI:  Correct, Your Honor.  What -- and I will say that under the rule, the Court has broad discretion.  So if the Court wants more than that, we're happy to provide more than that.  Or if the Court needs less than that, we're happy to do less than that.

THE COURT:  Mr. Alexander, any objection, or any position with respect to the status quo order?

MR. ALEXANDER:  I guess my question is the purpose of what they're using it for.  Because typically, a judicial notice, you just take notice that that is the document that exists.

THE COURT:  Right.  It's sort of I take notice but all -- if someone asks me to take judicial notice, say, of the docket, I take notice that it was filed, but not the content itself.

MR. ALEXANDER:  Correct, Your Honor.

THE COURT:  So that -- what he's arguing is this is the notice -- this is judicial notice of the order itself, and

whether the contents -- are you saying that I can just take notice that it was filed but not the contents?  Which I'm not quite sure, Mr. Caponi, that's what he's arguing.  Or that's his position, rather.

MR. CAPONI:  My position is, Your Honor, you can take notice of the contents here.  This is a -- the fact that it was filed, and this order was the -- was a governing order at the time this bankruptcy was filed.

MR. ALEXANDER:  Your Honor, we would object.  I don't think -- believe that's what judicial notice allows you to take notice of.  It allows you to take notice that it was actually filed on the document and that's what the document -- that it exists.

THE COURT:  So you believe judicial notice is only the existence, not the content.  Right, Mr. Alexander?

MR. ALEXANDER:  Correct, Your Honor.

THE COURT:  Okay.  I guess I'll have to at some point rule on that. I don't have one and it's not marked, because all my notes are on my old one.  I swear, I've been operating for the past three years.  Okay.

MR. CAPONI:  Your Honor, I think the issue Mr. Alexander raises is addressed in this bench memo which we handed up and, you know --

THE COURT:  Okay.  What does it say?  Okay.

MR. CAPONI:  From the --

28

THE COURT:  It says the Court may take judicial notice of a fact that is not subject to reasonable dispute. Hence, stating a court, and then you cite to *In Re: Lockings* (phonetic), which is I guess one of my colleagues because I don't recognize this to be mine and I wasn't in the bench in 2006, so clearly this isn't my case.  People love to do that and I'm like, I wouldn't quote my cases.  I'm not necessarily correct.

But in any event, it says a fact that is not subject to reasonable dispute is a fact that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.  And so I may take judicial notice at any stage of the proceedings but must take judicial notice if a party requests it and the Court is supplied with the necessary information, which was what I was going through about is this necessary.

So Mr. Alexander, given that's what they're citing to, at least a couple of cases and Third Circuit cases, do you still view that I can only take judicial notice of the existence of the order as opposed to not only the existence but the contents of that order?

MR. ALEXANDER:  Your Honor, I believe that the rule also requires that we have an opportunity to vet the judicial notice, what it's going to be used for.  And so I haven't read these cases.  I don't have these cases.  I understand it's a

memo that they've provided but I haven't had a chance to look at that.

THE COURT:  Okay.  So --

MR. CAPONI:  Your Honor, I would also point you in the memo on page 2, *In Re: Mullock*, which is a bankruptcy in this district, you know, says I may take judicial notice of the dockets of bankruptcy cases in this district and the contents of the documents filed in such cases for the purposes ascertaining the timing and status of events, et cetera, so.

THE COURT:  But facts not reasonably in dispute.

MR. CAPONI:  Yeah.

THE COURT:  My position has always been when I take judicial notice of my dockets, I take judicial notice that they've been filed.  As to the contents, sometimes I require that you give me a little more because the facts are in dispute.  It's because someone may say the Debtor filed this petition and it says this and the Debtor's like, oh, that's not what I meant.  I need to interpret what was in the filing.

And so, and Mr. Alexander's position is this that this is some -- this is subject to reasonable dispute as to what is in that order, then that's a different issue.

Is that what -- are you disputing what's in the order?

MR. ALEXANDER:  I don't -- I don't know what of the order he's attempting to use as a fact that he would like you

to accept.  So if he's asking you to accept that this order was entered on a docket at a particular date at a particular time, assuming that's what it says, you know, we don't dispute that. But just because there may be something in the order, doesn't mean it's not subject to reasonable dispute.

THE COURT:  Okay.  So he's going exactly how I look at judicial notice.  I can take notice of what was filed, and I can take notice of anything that is not subject to a reasonable -- a fact.  He's arguing that there may be facts within that order that may be disputed, and I don't know if they are or not.  So I can take judicial notice of the fact that this order was filed, and it was issued for -- it was issued by -- who's the Chancery?

MR. CAPONI:  Vice Chancellor Laster, Your Honor.

THE COURT:  Vice Chancellor Laster, and it was entered in the case that's listed and it's called the status quo order and it was issued on October 20th, 2022.  I can take judicial notice of that.  To the extent that you want some fact to be -- from there to be presented, and Mr. Alexander can say whether it's reasonably disputed.  I don't know if it is, or it isn't.  If the order says what it says, I don't know.  But I'll get to that when I get to that.

MR. CAPONI:  Fair enough.

THE COURT:  So submitted as being filed and entered by the Court, but right now, only for that purpose.

MR. CAPONI:  Understood, Your Honor.  And Mister -- as I go through it, if Mr. Alexander thinks I'm straying from that, you can lodge an objection and we'll address it.

THE COURT:  Right.  Okay.  Great.

MR. CAPONI:  So the status quo order, again, was filed in October of 2022, approximately five months before this bankruptcy.  The order was entered, Your Honor, as I noted. The Court found that there was a bona fide dispute as to whether -- as to who composed the board of directors, and that Section 225, you know, exists as a statutory provision --

THE COURT:  Where -- what am I looking for for this?

MR. CAPONI:  This is on page 9.

THE COURT:  The orders -- the findings and orders, okay.  And that's paragraph 1 of that order.

MR. CAPONI:  Correct.  Your Honor, paragraph 7 of the order states the parties -- they said there was two reason -- two bate -- two aspects of the order that precluded Mr. Rajan from filing it.  The first was paragraph 7 of the order, which states that the parties, which included Mr. Stastney and Mr. Rajan and anyone acting in conjunction with them were enjoined from purporting to cause the company to take any of the following.  And the first action they were precluded from taking was any action that would require the consent or approval or a vote of the board of directors of Technovative.

So paragraph 7, again, applied to the two individuals

who were claiming to be the directors, and the Court was saying during the pendency of the 225, I'm prohibiting either one of you from acting as the board of directors, and that applied to Mr. Rajan.

And then Your Honor, so we have at this point, as a result of paragraph 7, Mathu Rajan was not a director of Technovative. The Court found that it was a bona fide dispute. He was specifically precluded from acting as the board of directors of Technovative, and therefore, he lacked authority to place Technovative in bankruptcy, which renders that petition an ultra vires act and a void act by Mr. Rajan, and that's paragraph 7 of the order.

THE COURT: It's 7-8, right?

MR. CAPONI: Separately, under the status quo order, you have paragraph 13. Paragraph 13 itself has two provisions. It appoints the procedure pursuant to two separate and distinct Delaware statutes. The first is Section 141 and the second section is 279, both in Title VIII of the DGCL. So the receiver's authority ties back to two independent statutory provisions.

The first one I have in this slide is -- goes back to Section 141, and the court again took position of the board as the res, gave that to Mr. Liston, the receiver, and the order says that all of the power and authority afforded the board of directors under Section 141 of the DGCL belongs to Mr. Liston.

He became the board of directors.

Separately, it says all the power and authority afforded to a receiver appointed under Section 279 also vested in Mr. Liston.

Your Honor, Del Code 141, as I mentioned earlier, is the enabling statute that vests all authority to manage a corporation in the board of directors.  And the title of that section, as upper in the screen and on your PowerPoint at slide 14, it's titled Board of Directors, Powers, Numbers, and it goes on, and it confirms that the board is the only governing body.

In contrast, Section 279 covers traditional receivers, and this section is titled Trustees or Receivers, Appointed Powers, and Duties.  And under a 279 appointment, the receiver takes charge of the corporation's property, collects its debts, and is able to exercise the authority that is granted to it under Section 279.  Big distinction here, Your Honor, as noted in this slide.

When a receiver or an individual is appointed pursuant to Section 141, they replace the board of directors. They become the board of directors, and they're the sole authority for the company.

In contrast, the receiver under Section 279 coexist with the board.  They share authority with the existing board. So the receiver under 141 has no equal, they are the sole

authority.  279, the receiver has the authority, but I would note, if there's 10 things that can be done by the board and five are given to the receiver, the receiver can exercise those five, the board cannot.  But the board remains -- retains the authority to exercise the other five.  So it's not a complete divestiture of authority from the board under 279.

So in this order by Vice Chancellor Laster, he clearly replaced the board with Mr. Liston.  So by Mr. Rajan filing the bankruptcy petition, he purported to exercise the authority of the Technovative board of directors.  When he did that, Your Honor, he violated paragraph 7(a) of the status quo order which says he's not allowed to act as the board of directors, and he violated paragraph 13 of the status quo order, which said that Mr. Liston was the board of directors and had sole authority to exercise all of the powers under Section 141.

That makes the petition an ultra vires petition, and in addition, it means Mr. Rajan committed perjury when he filed a document purporting to hold himself out as a board of director when there is a court order saying that he is not.

THE COURT:  I don't know about the perjury, but you know, it is what it is.  I don't get to, but that's what it says.

MR. CAPONI:  Your Honor, subliminal, the Debtor's defense as I understand it, is not with anything really that I

just said.  I mean, they -- I believe they agree that the order is in place, and they agree that the order says what I've laid out.  Their argument is in within the order, one of the things the receiver was not allowed to do without court approval was file a bankruptcy and the Debtor believes that that is unconstitutional.  That the receiver order itself gets thrown out and the receiver is eliminated, and they believe once you remove the receiver, Mr. Rajan becomes the director again.

THE COURT:  Well, let me ask you, what is the status of that status quo order?

MR. CAPONI:  Your Honor, the status quo order remains -- I'll defer to Margaret.  She can -- Ms. Westbrook, she can tell me if I'm wrong about this.  The bankruptcy -- the order is in place.  It was never retracted by the Delaware court, and it remains in full force and effect --

THE COURT:  Was it appealed?

MR. CAPONI:  -- absent some issue with the bankruptcy law that may impact on it.

THE COURT:  Was it appealed?

MR. CAPONI:  No, Your Honor.  It would not be subject to a final appeal.  They could have moved for an interlocutory appeal, but no one did.

THE COURT:  An interlocutory order?

MR. CAPONI:  Yeah, no one moved for an interlocutory appeal.

THE COURT:  So it's an order -- an order that is -- I'm going to use the word valid, but not valid in the sense that I think it's wrong or anything, but it still is an order entered by the court that has not been overruled, has not been appealed.

MR. CAPONI:  It remains an operative order.

THE COURT:  Uh-huh.

MR. CAPONI:  The only thing that would diminish its application would be if there were some bankruptcy issue that, you know, impacted the order.  But other than that, the order -- according -- put it this way, in the eyes of the State of Delaware, that's the operative order governing this entity.

THE COURT:  That's why I asked what's the status.

MR. CAPONI:  Yeah.

THE COURT:  Because it has something for me, if it's an order that's on an appeal, I then have to look to state law that says what's the effect of an order once there's an appeal, but you're telling me it isn't because it was an interlocutory order, and nobody sought to file an appeal or request any authority to appeal that order.

MR. CAPONI:  Correct.

THE COURT:  Okay.  All right.

MR. CAPONI:  And again, Your Honor, going to the Debtor's -- if I understand it, they have -- it's this three-part defense, you know, you have to find that a prohibition

against bankruptcy is unconstitutional.  You have to then take that purported defect and strike down the order completely so there's no receiver, and then thirdly, reinstall Mr. Rajan on the board.  And this argument has multiple defects.

The first defect, Your Honor, which we put in our briefing, and I'm not going to belabor it here, we believe the caselaw is -- favors the conclusion that a prohibition -- or having the C court approval to file bankruptcy is not unconstitutional, it's permissible.  And we'll rely on our papers for that point.

THE COURT:  And the issue was a blanket prohibition, you agree that it's not unconstitutional.

MR. CAPONI:  We believe it's not unconstitutional, Your Honor.  I shouldn't say it was a blanket prohibition.  It was a you can't do that until you come back and talk to me, the court.  So because Your Honor, the Vice Chancellor Laster, because the State of Delaware had an entity that was a ship with no captain, the Court put Mr. Liston in to be the captain, deputized him, and said you're going to manage our assets for us.  You can do certain things, but before you go any further, you need -- you know, if you go a certain line, you need to come talk to me, the court, first.

And the reason, Your Honor, is because the State of Delaware, through Vice Chancellor Laster, had repossessed the res.  The State of Delaware says the board of directors belongs

to me, the State.  Someone has -- I don't know who is supposed to be captaining my ship, so I'm taking my ship back.

So this was the State just simply saying as the stakeholder, before you do anything extraordinary, I want you to come talk to me first.  And we believe that that, under the *Sono Clean Energy* case, et cetera, is permissible and does not create an affirmative with this order.

But even assuming, Your Honor, that there's an issue with that one restriction, there's no authority, say by the Debtor, that you throw an entire order out because one provision may be infirmed.  I mean, you know, Your Honor, I'm sure with your tenure on the bench you've confirmed plans and other complex documents that have gone up for appeal, if the Third Circuit of the District Court strikes out one piece of a plan, you don't throw the entire plan out the window.  That's what the Debtors are proposing here.

So even if the Court were to find a problem --

THE COURT:  Well, I guess the question for me is what authority do I have to determine that this is unconstitutional or not?

MR. CAPONI:  Your Honor, I would say this to you --

THE COURT:  I mean, I guess I would have to figure out -- I would have to look at -- because no one has raised that issue with the Delaware court, but somebody has to figure out if this is unconstitutional.  And I guess in the context of

the filing of this petition, I guess that would fall to me to figure it out and I would have to look at what, if any, case law there is on this issue directly.  So that's why I asked what was the status, has it been appealed, had any other court in Delaware looked at that issue?

MR. CAPONI:  Yes, Your Honor.  You raise an interesting point which is I don't think you need this qualified issue, and I don't think the issue's teed up because it's -- they're seeking an advisory opinion.  The receiver never came forward.  We'd be in a different position if the receiver filed bankruptcy and the receiver were standing before Your Honor saying that restriction doesn't apply to me because it's unconstitutional.  The receiver never questioned it.

THE COURT:  Yes, but the parties can.

MR. CAPONI:  But they did not.

THE COURT:  Well, isn't that what they're arguing here is that that was a -- that order itself, precluding or prohibiting anyone from filing is unconstitutional and therefore we filed bankruptcy because it's unconstitutional and we're not prohibited?  I mean, that's their argument, correct?

MR. CAPONI:  So Your Honor, A, it's their burden, and B, that's their argument.  But to your point, Mr. Rajan doesn't have the authority to engage in self-help.  If he thought the order was impermissible, he should have gone back to Vice Chancellor Laster and said -- or the Delaware Supreme Court and

said I think this is -- this aspect of your order is incorrect. He does not get to say, and again, I'd be -- I can't stress this enough.  If he was the receiver who had the authority to act and the receiver thought his authority to act was being improperly restricted, he should still go to the court, but maybe he files the bankruptcy anyway.

Mr. Rajan is sitting over there in the bleachers.  He doesn't get to run down onto the field and grab the football and say, I'm now the quarterback.  He was not a director.  He was -- that prohibition did not apply to him.  He never had the authority to file bankruptcy.

THE COURT:  Well, you look at it, you using the quarterback analogy, maybe I'm the backup quarterback and I get to run on the field if I think the quarterback isn't -- he's hurt or can't function.  So I get to run on the field and take over the ball.

MR. CAPONI:  And if the Debtor can cite caselaw --

THE COURT:  That's -- that's what I think he's saying.

MR. CAPONI:  That gets to my next point.  So right this is the Debtor's argument, and let's just stick with the quarterback because I really do like it.  It works.  They're saying that Mr. Rajan was the backup quarterback.

THE COURT:  Okay.

MR. CAPONI:  Right.  But the Delaware Court of

Chancery, Vice Chancellor Laster, when entering the status quo order found after process of argument that it was not clear whether Mr. Stastney was the backup quarterback or whether Mr. Rajan was the backup quarterback.  And so the Court said, under the eyes of the State of Delaware, neither one of you are the backup quarterback until I finish the 225 action.

So Mr. Rajan may have thought he was the backup quarterback, but when we use Vice Chancellor Laster as the coach.  The coach said take your uniform off and you sit in the stands because I don't know which one of you, I want as my backup quarterback.

THE COURT:  Or as my quarterback.

MR. CAPONI:  Right.  So what Mr. Rajan is arguing is that, well, okay, there's an infirmity with the order, so Your Honor, throw the entire order out the window, which is they have no caselaw or authority for that proposition.  And then they're saying install -- and then we want Mr. Rajan to be the backup quarterback.  Well, if that's the case --

THE COURT:  Or the quarterback.  Or the quarterback.

MR. CAPONI:  Or the quarterback.  But if that's the case, Your Honor, if Mr. Rajan -- and they'd cite no legal authority for this.  If they have any authority that says Mr. Rajan can be treated as a director because he was one of the two individuals who claimed it, well, then Mr. Stastney was a director too the minute the order gets thrown out.  And what

does that mean?  You have a board of two and neither one of them have authority to file because you need 50.1 percent.

So the argument that Mr. Rajan can just claim the throne, right, if you have a contested -- you know, you're running -- another analogy, Your Honor, that I'd look at is if you're running for office, two people may think they have won the office but neither one gets to actually exercise the authority of the office until the court resolves that issue.

THE COURT:  Or whoever has the authority.

MR. CAPONI:  Whoever has the authority, right.  But you don't just get to say I think I won the election; therefore, you start signing orders.  The process to resolve that question was the 225 action.  Mr. Rajan, his -- Debtors counsel's argument is there's a constitutional infirmity, throw out the entire order, and let Mr. Rajan engage in self-help by anointing himself the victor of the 225 proceeding that he deliberately came to this Court and filed a bankruptcy to prevent getting that answer.

THE COURT:  Well, let me ask you this, Mr. Caponi.  If the order -- assuming the order was unconstitutional.  Just assume.  I don't know if it is or isn't.  What does that mean?  Is it binding on these guys?

MR. CAPONI:  If that line in the order's unconstitutional, then Your Honor would not enforce that line of the order.

THE COURT: Is it only that line or is it -- because of that -- I mean, when you have an order and you cannot separate out, they're all integrated, what am I supposed to do with it? I get if there's something that says, you know, I'm trying to stick with one of the two analogies we have here. That the coach gets the say who the quarterback is. And there's something that says you can't do that. Not only can you not designate -- or whatever authority the coach had is somehow defective. Does that mean that everything that the coach does with respect to that quarterback determination is out the window? Or is it I only look at -- because it's more the -- as it relates to the quarterback, because the coach may have something to do with other players and all those other things. But as to the quarterback, is that authority or whatever's been given to the coach is clearly unconst -- well, I'm going -- it wouldn't be unconstitutional, but defective, what happens to that authority? Does the whole thing go out the window or only part of it?

MR. CAPONI: Well, Your Honor --

THE COURT: But only as to the quarterback because we know that the coach may have some authority with respect to the players. So but -- so what happens to that authority? To the coach?

MR. CAPONI: Sure, Your Honor. So it -- if -- it's important to -- from which angle you look at that question and

answer.  And what I mean by that is you have to start from the, you know, beginning, the validity of the order.  So as I walk through in this PowerPoint with you, there's no dispute that Vice Chancellor Laster was empowered under Section 141 and 279 to appoint a receiver.  There's no dispute that Mr. Liston was appointed the receiver.  There's no question as to the constitutionality or authority to do that.  Just when the Court then listed the things that Mr. Liston could not do, one of the 15 may have gone a bridge too far.

So you strike that you still have a court of competent jurisdiction, statute -- exercising the appropriate statute to appoint a receiver over this entity.  The receiver's entitled to do 100 things, maybe we say, okay, in reality, you can only do 99.  But you don't throw out -- you don't ignore the fact, you've got a court of competent jurisdiction, valid statutory provisions, and valid exercise of that authority to appoint a receiver.  That stays in place.

I would say, again, Your Honor, if you confirmed a plan that had many aspects of it, that one aspect of a plan was infirmed, you don't throw the whole plan out, you remove that.

Your Honor's question, I think, goes too well, let's assume that a fundamental tenant of a plan that now the plan becomes unworkable, maybe you have to throw the plan out.  Had there been a constitutional challenge to this order that was fundamental to the order, for example, the statute that the

Court relied upon, that entire statute was stricken as unconstitutional, then that would go to the fundamental integrity of the order.  Or if Mr. Liston was using our election analogy, failed to meet one of this -- you know, was not an American citizen so therefore couldn't run for President.  Now that's fundamental to it.

Here, the fundamental aspect of this order, the integrity is unassailable.  It's court of competent jurisdiction authorizing after due process statutory provisions and statutory authority were given.  If there was a minor issue, Your Honor, it -- you strike that issue.  And I would say one more sort of shot at an analogy, but not an analogy, but actually, for me, real issue.

I live in a neighborhood that was -- you know, has deed restrictions in it and Delaware struck one of the deed restrictions.  You know, as the State of Delaware stated, public policy, we're not going to enforce it.  All the other deed restrictions remain in place.  You just don't enforce -- you can't enforce that one.

But that -- this is all theoretical because Mr. Liston never attempted to exercise the right of filing bankruptcy.  Mr. Rajan was an interloper.  He had no -- he was -- you know, he's the fan who maybe had one too many beers and bought a jersey at the store and now thinks they can run onto the field and take the quarterback position.  Doesn't work that

way. He wasn't even a player on the team.

THE COURT: But he was.

MR. CAPONI: No.

THE COURT: He was just a player who was sidelined.

MR. CAPONI: Your Honor, according to Vice Chancellor Laster, both Mr. Stastney and Mr. Rajan were not on the team. They both wanted to be on the team, and he was going to have to hold a proceeding to determine -- the 225, as to whether either one of them had a valid right to be on the team because only one of them could be the director. That's undisputed. And the Court said I don't know which one of you under Delaware law is -- has the authority to be the director. It's unclear.

THE COURT: It's a little bit different than a fan who has no claim to be the quarterback. We have two people who were saying I have the right to be the quarterback. So it's a little bit different than saying you're a fan that just ran on the court -- I mean, ran on the field. That's different than somebody who's disputing, hey, I'm the quarterback. No, I'm the quarterback. That's not a fan who's sitting in the stands drinking and decides I want to be the quarterback.

MR. CAPONI: I think I went a little too far, Your Honor. Okay, but --

THE COURT: You want to know -- I wouldn't go with that.

MR. CAPONI: -- from my perspective, he went that

far.

THE COURT:  I wouldn't.  I think that's a little bit different.

MR. CAPONI:  If he was sitting on the bench, I would want to check his water bottle.

THE COURT:  All right.

MR. CAPONI:  We'll say.

THE COURT:  Right.

MR. CAPONI:  But I hear you, Your Honor.

THE COURT:  Okay.

MR. CAPONI:  Point taken.  So again, the Debtors argument, again, we think it's constitutional, but even if it's not, at most, you blue pencil, you ignore that provision.  And I think that's a -- I think that Your Honor, goes to an advisory opinion.  The receiver never came before this Court saying I want to exercise the -- the prohibition, that's a prohibition against the receiver acting.  The receiver never came to this court or any other court to take issue with that.

Where does Mr. Rajan have standing to claim someone else was precluded from exercising an authority they have no desire -- they have no interest in exercising?

THE COURT:  But I can look at it from the other point, then.  There was no -- because the prohibition against the receiver, saying it's unconstitutional, then who's prohibited from filing?

MR. CAPONI:  The receiver's prohibited?  Who could file?  Any stockholder could have gone to the Court of Chancery, Mr. Rajan or Mr. Stastney could have gone to the Court of Chancery and said dear court, we believe your order is incorrect in this regard.  We want you to modify it because it's wrong.  You don't engage in self-help.  You don't ignore -- you don't just -- sua sponte invalidate a court order in your mind and then presume that you're the winner of the 225 action and run in and file a bankruptcy.

There was process here that Mr. Rajan or his counsel could have followed to gain clarity or to point out to the court -- and it happens all the time, Your Honor.  You know, the number of times I've been in front of the court saying, we need to tweak this order because when we were all writing it out, we didn't think about a particular set of facts or a circumstance, and the court modifies it.  That's why you come to court.

This was not a shareholder who lacked a remedy.  But I'm unaware of when self-help becomes the remedy.

THE COURT:  I guess is it self-help or is it there's no order and there's nothing precluding me, so I'm going to do it.

MR. CAPONI:  Your Honor, again, I -- maybe I'm an attorney and I view this differently, but I've never taken it upon myself nor have ever dreamed to take it upon myself to

deem an order invalid and therefore just I get to decide to ignore it.  I come back to the court.  I go to -- I come to you as a higher court or a different court, or I go back to the judge that entered the order.

THE COURT:  Definitely not higher.  Different.

MR. CAPONI:  Different.

THE COURT:  Different.

MR. CAPONI:  But I certainly don't just decide upon myself that an order doesn't apply when all its facing applies and just ignore it.

THE COURT:  Oh, well I guess that depends on how you look at it.  I mean, people have looked at my orders and said, well, it doesn't stop me from doing what I need to -- well, I want to go do something in state court.  I don't think that this bankruptcy court order precludes me from doing that.  Most people would come here and ask me to have me preclude them, but a lot of people just go ahead and say I'm going to go to state court and they argue to the state court, well, bankruptcy order did not preclude me from taking whatever steps I'm taking, and presumably the state court will say you're right, you're wrong, or go back to bankruptcy court, I'm not addressing it.  So people do it.  Whether it's a proven way to proceed, I don't know.

MR. CAPONI:  A very important distinction, Your Honor.  I'm glad you brought that up because it goes to this

issue, to this order, and the Debtors argument.  The Debtors are not arguing, I read the order and it doesn't apply to me.  That's not the argument.  The argument is we think one sentence out of this five-page order is incorrect, therefore, we are going to ignore the order.  We are deeming it invalid.

They acknowledge, they have to acknowledge because it's written in plain English, that the language of the order appointed Mr. Liston as the board and precluded Mr. Rajan from acting as a director.  I'd be shocked if Mr. Vincent were to stand up here and say he reads the order any other way.  The difference is it's not an argument of -- and I agree with, Your Honor.

You can read an order and say does it cover this circumstance or not.  That's not where we are.  We're in a situation where someone said I'm invalidating the order, the entire order.  I'm just going to just take that order, right, I don't like what it says, so doesn't apply to me.  That is not -- that's what happened here.  That's not what Your Honor said, where I go, okay.  Look at this order, it says, you know, on a Thursday, well, is it a holiday weekend, maybe doesn't apply to me when you apply your legal talents to interpreting the order.  This is not an interpretation issue.  This is a wholesale invalidation issue.

THE COURT:  Well, is it a wholesale invalidation or -- I mean, there -- it appears that the receiver was appointed

under two sections.

MR. CAPONI:  Correct.

THE COURT:  Okay.  And with respect to a prohibition on filing, what -- was the on the 141?  Was it on the 279?  Or it was just in the order?

Because I think at least you pointed out the fact that the receiver was appointed under two statutory provisions, and they clearly have different meanings.  So that was he precluded on the -- at -- in his role under 141 or was he precluded under his role as provided on the 279?

Maybe it's a just -- maybe it doesn't matter, but it seems to be me I would want to know what -- because typically, you can have a receiver order.  Put aside the 141.  And under the receiver order, the receiver is given certain authority to act, I don't know what that is.  To act.  And so those actions are governed by a specific set of laws that I would look at and say, okay, as a receiver, you are authorized to do certain things and only the receiver when you're the receiver can do these things, and the Court may say you can or cannot file bankruptcy.

And maybe that's a stretch or maybe it's you can't preclude the receiver, maybe you can.  I mean, without going into case law this is what can or can't happen.  That's one issue.

There's also appointing under 141 with certain

authority, and did the prohibition apply to the 141 authority? Because it seems to me there's two different things going on.

MR. CAPONI: Yeah.

THE COURT: And that's what I -- not quite clear what the argument is.

MR. CAPONI: Your Honor, I -- so I would say it's not a prohibition. It's simply you need to come and get court approval to do it.

THE COURT: It was an authority -- wasn't it you do not have the authority to do it without this court authorizing it.

MR. CAPONI: Correct.

THE COURT: So again, was that an authority that was --

MR. CAPONI: I think that was under both, Your Honor.

THE COURT: You think it was under both.

MR. CAPONI: I think that was -- I'll reread the order and if I come to a differing conclusion, I'll let you know. But my standing here now I believe the listing of what the receiver was permitted to do and not permitted to do was a -- sort of a blanket statement that fell under the -- plainly under those two statutes. So I don't know if you could parse it one statute or another.

THE COURT: Okay.

MR. CAPONI: Other than, you know, theoretically,

53

Your Honor, you could say maybe it applies to 141, filing bankruptcy because that requires board approval, but it wasn't like it was delineated in the order.

THE COURT:  Well, it seems to me that -- and I don't know what Vice Chancellor Laster had in mind, but the fact that he did it under two provisions has to mean something.  I don't know what, and I'll figure out what I think, but.

MR. CAPONI:  Right.

THE COURT:  It -- clearly, he just didn't appoint a receiver.  He did something else too.

MR. CAPONI:  Right.

THE COURT:  So that's why I need to sort of parse that out.

MR. CAPONI:  And that's -- Your Honor, that's why I went through that slide because what was going through the Court's mind was this.  That under -- if you appoint a receiver under 279, there -- the board, the existing board still is there.  It's in place and it has whatever authority was not given to the receiver.

But under 141, there is no incumbency.  There's no incumbent director.  If the receiver is hit by a car, that just means that you don't have anybody acting as the board until you have the conclusion of the 225 or a new receiver gets appointed.

So the Court was making clear that Mr. Liston was the

board of directors.  He did not -- I think what the Debtors may argue is that, well, Mr. Rajan stayed as a director and Mr. Liston was above him.  Well, that's 279.  There was -- once Mr. Liston comes in, there's nobody else around the table.  It's just him.  And that's 141, so that's the important thing.

THE COURT:  Okay

MR. CAPONI:  Your Honor, I think again, then it's the end of my necessarily presentation there, unless Your Honor has any questions.  Again, I think it's abundantly clear by this order -- I think most of the facts here are undisputed.  The order was entered.  It governs Mr. Rajan.  It says he's not allowed to act as the board and it installed Mr. Liston as the board.

The Debtors' entire argument comes down to you should throw the entire order out, which we, you know, don't think you should.  But even if you did, Debtors cannot cite any case law, Delaware case law or federal case law or bankruptcy case law that allows Mr. Rajan to become the decision maker.  Because -- and if they did come up with any authority, that authority would apply with equal weight to Mr. Stastney, and you would have a situation where both of them constituted the board, and it would require both of their approvals to file.  So there's no scenario by which Mr. Rajan has sole authority to initiate this bankruptcy for Technovative.

THE COURT:  Okay.  And so if they were both claiming

to be the quarterback here, either one of them could run on the field and grab the ball?  Is that what you're --

MR. CAPONI:  No, Your Honor.  If Mr. -- if they -- if the receiver goes away and the two people claiming the position, if there was such authority, and there is none, my point is only going down the theoretical rabbit hole.  If the receiver goes away, that doesn't make Mr. Rajan in charge of the board.  You have to finish the 225 action to find out who the director is.  It just means he's one of two people who wants to be the director.

THE COURT:  Or wants to the quarterback.

MR. CAPONI:  He wants to be the quarterback, but it doesn't get you the ball.  If anything, they both get appointed, you know, backup quarterbacks, but they have to -- then there's other directors.  They have to vote.  You have to have a board meeting.  You have to call a meeting, notice a meeting, take a vote, and everyone has to raise their hands and vote.  There's no scenario by which Mr. Rajan gets to seize control of this entity on his own.

THE COURT:  So your position is he just like -- he just kind of crystalizes for me from my position -- perspective, rather, is that it didn't matter what this order said, if you look at it.  Whether it's constitutional or unconstitutional.  There was still an underlying dispute as to who had authority to file it.

MR. CAPONI:  And that's the 225.

THE COURT:  You believe until that action was resolved, neither Mr. Stastney or Mr. Rajan had the authority to file this case.

MR. CAPONI:  Precisely, Your Honor.

THE COURT:  Okay.  I thought --

MR. CAPONI:  I think that's the critical infirmity with the Debtors' position.  No matter -- even if you ignore all the other things, you've got to go through this waterfall of, you know, all the stars need to align, but even if they align, they can't get past that fact that you just pointed out. Until the 225 is resolved, we don't know who would fill the shoes left by Mr. Liston.  You don't get to just assume it's yourself and file a bankruptcy.

THE COURT:  Okay.

MR. CAPONI:  Unless Your Honor has any questions, that's my remarks on that -- the motion.

THE COURT:  Okay.

MR. CAPONI:  Thank you.

THE COURT:  All right.  Mr. Alexander, Debtors' response?

MR. ALEXANDER:  Good afternoon, Your Honor.  Vincent Alexander on behalf of the Debtors.  Your Honor, you know, listing to the argument, you know, the one thing that keeps getting overlooked and looked over is Hawk counsel is having

you look at this in a vacuum, and you can't look at this in a vacuum.

It's not solely a government issue under Delaware law, and that's because they're refusing to accept or acknowledge that impermissible restrictions on the filing of the bankruptcy petition that the chancery court put in both orders, the status quo order and the order governing the rights of the receiver.

THE COURT:  And that is a separate order?

MR. ALEXANDER:  That is a separate order.

THE COURT:  Which hasn't been referenced.

MR. ALEXANDER:  That has not.

THE COURT:  And so let me understand this.  There was a 141 -- is the status quo order the 141 order or is that -- and then there's a separate 279 order?  No?

MR. ALEXANDER:  No, Your Honor.  If you take a look at the status quo order --

THE COURT:  Okay.

MR. ALEXANDER:  -- it indicates that --

THE COURT:  Hold on, let me -- let me go back. Because obviously, as I tell people, I don't look at any of this stuff until we get to court because I don't think I'm supposed to.

All right.  All right.  So this was the issue in connection with the 225 action?

MR. ALEXANDER:  Correct.  It was issued in the 225 action.

THE COURT:  Okay.  So the status quo -- okay.  All right.  So how did this -- so did someone file a 225 action and in the 225 action the Court appointed a receiver or was there a second action to appoint a receiver?

MR. ALEXANDER:  If, Your Honor, it was -- I guess we'll take a step back.

THE COURT:  Okay.

MR. ALEXANDER:  And see how you got to the 225 action.

THE COURT:  Okay.  Excuse me.

MR. ALEXANDER:  How the parties got to the 225 action was there had been litigation between Stream -- and this kind of why I think this is an evidentiary issue, but I guess you just heard a lot of testifying so I'll go ahead and do a little bit myself.

THE COURT:  Well, you can just -- I mean, this is -- I would see this as background.  Nobody's entering anything. You're just telling me your understanding and --

MR. ALEXANDER:  Understood.

THE COURT:  -- Mr. Caponi thinks you're wrong on your recitation of the facts, he can object or he can tell me when he responds.  Okay.

MR. ALEXANDER:  So there was litigation between

Stream and certain of its parties that indicated they were secured lenders.  Those being FLS Holdings VI and Hawk.  I believe it's Hawk Investment Holdings Limited, rather than calling them Hawk.

Pursuant to that, there was a -- and part of that -- after that litigation, there was what you previously heard, the omnibus agreement, which was what was -- oh, Your Honor.

THE COURT:  I don't -- you mean, at another hearing?

MR. ALEXANDER:  Yes, at a different hearing.  Not today.  Not today.

THE COURT:  Oh, okay.  Not today.  I didn't hear that word.  Okay.

MR. ALEXANDER:  Right.  Where all of the assets of Stream were transferred to an entity called SeeCubic, okay.  That was appealed by Stream, so that was entered by Vice Chancellor Laster in a different proceeding.

THE COURT:  Not the 225?

MR. ALEXANDER:  Not the 220.  This is before the 225.

THE COURT:  This is in litigation.

MR. ALEXANDER:  In litigation, prior to that.

THE COURT:  So there's litigation and then there's the 225 action and the status quo order and the receiver order were both in the 225 action?

MR. ALEXANDER:  That's correct.

THE COURT:  Okay.  All right.

MR. ALEXANDER:  And as part of that prior litigation, which have been referred to as the omnibus agreement litigation, it was appealed to the Delaware Supreme Court.  And the Delaware Supreme Court ultimately ruled that Vice Chancellor Laster's approval of all of the transferring of Stream's assets to this entity called SeeCubic was invalid and unwound the transaction.  And so that entire process whereby SeeCubic received the assets, supposedly on behalf of SLS and Hawk, was undone and it was held to be an improper exercise of what they were allowed to do and also what Stream was allowed to do under its corporate charter, in terms of the transfer of assets.

THE COURT:  So the omnibus agreement is out the window.

MR. ALEXANDER:  It's out the window.  There's nothing about it that's in force in effect today.

THE COURT:  Okay.

MR. ALEXANDER:  Because it was overruled, it was vacated and reversed and remanded from the supreme court to Vice Chancellor Laster in order to effectually the unwinding of it.

THE COURT:  Okay.

MR. ALEXANDER:  Okay.

THE COURT:  And in the meantime, the 225 is still going on.

MR. ALEXANDER:  The 225 was not filed yet.

THE COURT:  Okay.

MR. ALEXANDER:  Right.  So that's part of the problem.  And so the creditors had filed a foreclosure proceeding and they determined at that foreclosure proceeding, because they -- remember, Stream is the 100 percent stockowner of Technovative.

THE COURT:  Well, at least -- well it's disputed.

MR. ALEXANDER:  There's no dispute about that.  No, it's not disputed.

THE COURT:  Well, wait a minute.  I thought that was the omni -- oh, never mind.  Never mind.

MR. ALEXANDER:  Yep.  Omnibus is unwound.

THE COURT:  Unwound.

MR. ALEXANDER:  Unwound.  So there's no dispute that Stream owns 100 percent of the stock of Technovative, okay.  The creditors wanted the stock of Technovative, because if they get the stock, then they can control it downstream.

They filed another proceeding at a different court in Delaware --

THE COURT:  So where was the omnibus agreement at?  Litigated?  In chancery court, right?

MR. ALEXANDER:  Chancery court.

THE COURT:  Different vice chance?

MR. ALEXANDER:  No, same vice chancellor.

THE COURT:  I guess this is like if I get a case that stays with me.

MR. ALEXANDER:  I'm not exactly sure how they did it, the referral, I don't know.

THE COURT:  Most courts --

MR. ALEXANDER:  But he ended up with both.

THE COURT:  Right.  You file a case and I have you, and you appeal, and you file -- it usually goes -- I mean, it's a waste of judicial resources to have it somewhere else and then everybody has to -- whatever.  I don't know what the rule is.

MR. ALEXANDER:  I'm not -- I don't know what the rule is as to how it did, but the 225 action, that was a separate filed action, also went to the same vice chancellor.

THE COURT:  And that was filed post litigation, post reversal?

MR. ALEXANDER:  Post reversal.

THE COURT:  Okay.  Let's go post reversal.

MR. ALEXANDER:  Yes.  And it was filed as an alternative to trying to proceed with a foreclosure in which they were exercising their creditor rights.

THE COURT:  Okay.

MR. ALEXANDER:  Okay.  So essentially what they were attempting to do was do an end run around the foreclosure proceedings and come up with a way in which they could take the

Debtors rights and do --

THE COURT: So what exactly? So there was litigation about this omnibus agreement, and did that in any way relate to foreclosure?

MR. ALEXANDER: No.

THE COURT: It was just a dispute over whether in fact the omnibus agreement was enforceable. The Court says not. And they filed post reversal the 225. But prior to filing there had been a foreclosure action?

MR. ALEXANDER: That's correct, Your Honor.

THE COURT: Okay. So number 2 was the foreclosure.

MR. ALEXANDER: Number 2 was the foreclosure.

THE COURT: Number 3 is the 225.

MR. ALEXANDER: I believe that's the order of events, Your Honor.

THE COURT: Okay. Foreclosure. And presumably in the foreclosure action, there must have been some dispute about authority to do it or something.

MR. CAPONI: Objection, Your Honor. There was never a foreclosure proceeding. I mean, I don't mind getting into some background over --

THE COURT: Well, what --

MR. CAPONI: Characterizing filings in a way that's not correct.

THE COURT: Okay. So no foreclosure action was

filed, but was there a foreclosure commenced?

MR. CAPONI:  Was their foreclosure commenced?

MR. COLBY:  Your Honor, sorry.

THE COURT:  All right, now we can't have all these people.

MR. COLBY:  I may be able to help a little bit here, just because I think I'm the lawyer who has been with this all longer than anybody else.

THE COURT:  Wait a minute.  Wait a minute.  I generally only let one person, Mister --

MR. COLBY:  Just --

THE COURT:  Wait a minute, wait a minute.  Mr. Alexander, do you have any opposition to Mister --

MR. COLBY:  Colby.

THE COURT:  Colby giving you what he thinks happened in this proceed -- well, even though it's not a court proceeding, you have to do something to commence foreclosure. Either you send a notice, you file something, you did something.  You don't have to file a court -- you don't have to file with the court.

MR. ALEXANDER:  It was my understanding that there was a proceeding in the Superior Court of Delaware, but.

THE COURT:  Mr. Colby?

MR. ALEXANDER:  But if he can --

MR. COLBY:  Just for clarification purposes, because

I know it wasn't intentional.  There was a foreclosure action.  It also preceded all of this that's on the page.

THE COURT:  So it proceeded the -- so -- so what I'm thinking happens is, you filed the foreclosure.  They objected under the basis that the omnibus agreement was unenforceable, right?

MR. COLBY:  Yeah, so.

THE COURT:  So that's how you got to you can't proceed with foreclosure because this agreement's no good.

MR. ALEXANDER:  Judge, I'll let Mr. Colby go first so we don't talk at the same time.

THE COURT:  All right.

MR. COLBY:  So there was a --

MR. ALEXANDER:  I --

MR. COLBY:  Sure.  We've referred to it as the foreclosure action.

Thank you.  Sorry to interrupt.

We've referred to it as the foreclosure action, but it's actually a breach of contract case, that --

THE COURT:  So you filed a breach of contract claim?

MR. COLBY:  Correct.

THE COURT:  Litigation.

MR. COLBY:  Litigation.

THE COURT:  Okay.

MR. COLBY:  In the superior court, and the party who

filed that was SLS Holdings, one of the secured creditors that loaned money to Stream in 2011 and 2020.

THE COURT:  All right.  Who again?

MR. COLBY:  SLS Holdings.

THE COURT:  Okay.  You mentioned that.  SLS Holdings. Okay.  And in the course of that -- so I'm not even -- it's not even a foreclosure.  It's a contract dispute.

MR. CAPONI:  Contract over the debt documents, correct.

THE COURT:  Okay.

MR. CAPONI:  Yeah.  That litigation, before it got too far, was sort of overtaken by the chancery court action.

THE COURT:  The 225?

MR. CAPONI:  The first chancery court action.

THE COURT:  And what was that?

MR. CAPONI:  So that's the one that mostly centered on the omnibus agreement.

THE COURT:  And who filed that?

MR. CAPONI:  Stream filed that in September, September of 2020.  And SeeCubic filed some counterclaims.  And the issue there was whether or not the board members, the independent board members, nonrogin -- board members --

THE COURT:  Had authorized this decision?

MR. CAPONI:  Were valid board members whether they had validly entered into the omnibus agreement.  A lot of

Case 23-10763-djb   Doc 302   Filed 07/24/23   Entered 07/24/23 09:58:17   Desc Main
Document     Page 67 of 288

67

litigation went on.  Ultimately, they were validated as board members and the omnibus agreement was validated by Vice Chancellor Laster.  A legal issue went up on appeal.  And that was whether or not the Class B stock was required to vote.

THE COURT:  And they didn't.

MR. CAPONI:  Yeah.  The Delaware Supreme Court ruled on that.  The -- either not appealed or adopted by the Delaware Supreme Court were some of the factual findings.  But the legal issue, Vice Chancellor Laster was reversed on.

After that, and this is where we're getting out of -- I'll let you go then, but after that, there was some back and forth in that case.  Ultimately, that litigation was overtaken by the 225 that Hawk filed.

MR. CAPONI:  In terms of the sequence.

MR. CAPONI:  Yes.  Yes.  Right.

THE COURT:  So let me see if I understand it.  SLS Holdings filed a breach of contract claim.

MR. CAPONI:  Yeah.

THE COURT:  And then while that was pending, Stream challenged their authority saying -- well, not authority.  The basis for that saying you're obviously proceeding on the omnibus agreement or something and we're going to chancery court because this agreement is invalid because it wasn't properly authorized.

MR. CAPONI:  Yeah.  Just to be clear.  The basis of

www.trxchange.com · (800) 406-1290

the contract action was not the omnibus agreement. That was just SLS's debt documents.

THE COURT: Right, but okay.

MR. CAPONI: Then the omnibus agreement, which Vice Chancellor Laster referred to as a friendly foreclosure, that took place and that's exactly what was challenged in the first chancery court action.

THE COURT: So what's going on with the breach of contract action?

MR. CAPONI: Not much, Your Honor. Because it was overtaken by the subsequent events and litigation.

THE COURT: Okay.

MR. CAPONI: But it is still pending in the superior court in Delaware.

THE COURT: All right. But at this point, the Delaware Supreme Court has said that that omnibus agreement is void?

MR. CAPONI: Correct. Correct.

THE COURT: For lack of a better word.

MR. CAPONI: Correct.

THE COURT: Okay. And so, that means you have to now go do something else to foreclose?

MR. CAPONI: Yes. And that's where you get beyond my area of expertise.

THE COURT: Then you get to the 225 to say who has

the authority to authorize this stuff.  I get where you guys are going.

MR. CAPONI:  Okay.  Yeah, that's how we got here.

THE COURT:  I get it.

MR. CAPONI:  Okay.

THE COURT:  I did do some chancery court, but that was in another lifetime.

MR. CAPONI:  I've done more of it than I care to admit to.

THE COURT:  No.  I got admitted to Delaware and then went on the bench subsequently thereafter.

MR. CAPONI: All right, thank you.

THE COURT:  So, I mean, and I'm not saying that I'm familiar with any of this, you know, like litigating.  I have a rudimentary understanding of how some of this works.  So let's limit my -- with respect to litigation, I can figure out how that works.

So you're saying, Mr. Alexander, that somehow this reversal of the omnibus agreement has some effect on the status quo order?

MR. ALEXANDER:  It does because it's the reason why they attempted to do the 225.  So it was taking too long with the breach of contract action.  The omnibus agreement in which they gratuitously transferred the assets to an entity that the creditors set up.

THE COURT:  SeeCubic?

MR. ALEXANDER:  Yeah, SeeCubic.  Tha entity that SLS and Hawk set up to take the assets of Stream.  That was vacated and reversed by the --

THE COURT:  Supreme Court.

MR. ALEXANDER:  -- Supreme Court.

THE COURT:  So where does that leave the parties?  And I want to dispute over whether they are still asserting their claim.  And then the question becomes is who has authority to run this?  Okay.  So they filed a 225 saying Mr. Rajan is saying he's in charge and Mr. Stastney is the director. Presumably, how was Mr. Stastney?

MR. ALEXANDER:  Because one the secured creditors, either SLS or Hawk, attempted to exercise their what they believe are creditor rights and to exercise a proxy trying to get Stream to transfer the Technovative stock to Hawk.  And also for Stream to recognize Mr. Stastney as the director of Technovative.

THE COURT:  But this was after the omnibus agreement went out the window?

MR. ALEXANDER:  Correct.

THE COURT:  Okay.  So at that point we now have a fight over who's in charge.  Who is the board of directors?

MR. ALEXANDER:  But, you know -- correct, you do.  But the one thing that's clear and I think this is partially

how we got there.  Stream is the 100 percent stock owner of Technovative.

THE COURT:  Okay.

MR. ALEXANDER:  And there's no dispute with respect who is the stock owner is.

THE COURT:  Okay.  The secured creditors never obtained the stock.  They never --

THE COURT:  So does that mean something for here?

MR. ALEXANDER:  It does.

THE COURT:  Okay.

MR. ALEXANDER:  And what it means is who has the ability to appoint a director?  A stockholder has the ability to appoint the director pursuant to the corporate documents.

THE COURT:  Well, there's apparently some litigation that says otherwise.  There's 225 litigation saying -- attempting to foreclose creditor believes that they have the right under their documents to appoint a director.  And 100 percent stockholders say no you don't, right?

MR. ALEXANDER:  I agree with that, Your Honor.

THE COURT:  Okay.  So presumably then, SLS Holding and Hawk, who are the secured creditors, alleged secured creditors?

MR. ALEXANDER:  Alleged secure creditors.

THE COURT:  I wrote alleged.  Alleged secured creditors.

MR. ALEXANDER:  Yes.

THE COURT:  I have that that's your position, the alleged secured creditors.  They want to exercise their right under some document, I'm assuming, that gave them what they allege is the right to appoint the director?

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  And that litigation is ongoing in chancery court with Judge Laster as to who's correct, whether they have that right or not?

MR. ALEXANDER:  That's correct.

THE COURT:  Okay.  Okay.

MR. ALEXANDER:  So that was just to give Your Honor the background as to who the actual stock owner is.  Because regardless of that 225 action, the stockholder is Stream.

THE COURT:  Okay.

MR. ALEXANDER:  That's not an issue that's being addressed in the 225 action.

THE COURT:  Okay.

MR. ALEXANDER:  So the Debtor's position is with regards to it being the stockholder, that certain rights come with that in terms of being able to appoint the members of the board of Technovative.  And the Debtor Stream had appointed Mr. Rajan, not as the director.

THE COURT:  But that's disputed?

MR. ALEXANDER:  Well it's not disputed that he was

appointed.  I guess they dispute whether or not subsequently

Mr. Stastney was appointed.

THE COURT:  They're exercising their alleged secured creditor rights?

MR. ALEXANDER:  Correct.  So --

THE COURT:  So you would agree the parties are disputing who has the right to do what with respect to the board?

MR. ALEXANDER:  We would agree that they're disputing Mr. Rajan's authority.

THE COURT:  Well, I guess the question -- well, I'm not in any way trying to interpret the 225.  Whether the stockholders had the right to appoint certain rights with respect to the board, the real issue is -- never mind.  I'm probably going to say more than I should.  Let's just keep going.  Okay.  So they're not disputing the shareholder's rights.  They're just saying they also have the same right to appoint the board?

MR. ALEXANDER:  They're saying they have some document that they have the rights to appoint the director, one director, multiple directors.  That's what they're arguing.

THE COURT:  And that they've exercised their right?

MR. ALEXANDER:  Correct.

THE COURT:  And that that over superseded -- I'm not sure what word I would use with respect to the shareholder's

appointment of a --

MR. ALEXANDER:  Their argument is that it --

THE COURT:  Superseded?

MR. ALEXANDER:  I would say superseded would be the appropriate term.

THE COURT:  Okay.

MR. ALEXANDER:  So, Your Honor, that's the background in terms of how you got to the status quo order.  That was previously referred to with respect to the chancery court.  But specifically in that order when you look at what was listed as paragraph 7N, it prohibited anybody from filing bankruptcy.  It didn't just prohibit Mr. Rajan.  It prohibited anybody from filing the bankruptcy because it restricted the actions solely to ordinary course activity.  And what was carved out of that, and as I said in section 7N, was the filing of a bankruptcy petition.

So it wasn't within the scope of the receiver's authority to file a bankruptcy petition, and it was also expressly prohibited.  So it's not something that he could have even done.  It was excluded.  And a receiver only has the authority that's granted to them pursuant to an order.  So those are two issues with the order.  It wasn't there in terms of the authority to do, and it was expressly prohibited.  And courts that have looked at these restrictions when dealing with receivership orders, have held that these type of injunctions

are impermissible and the orders are void, and I'll go through the cases.

THE COURT:  So the order, the entire order is void or only that provision is void?

MR. ALEXANDER:  Well, I'll go through the cases because the cases typically look at -- and that's the issue that they address.

THE COURT:  Okay.

MR. ALEXANDER:  Is the appointment of the receiver and the authority to file bankruptcy.  Because nothing else really matters because typically receivers are displaced once you file the bankruptcy petition.

THE COURT:  Okay.

MR. ALEXANDER:  So we believe consistent with those cases, Mr. Rajan, who was the sole director of Technovative, had the authority to file the bankruptcy petition.

But the effective part of the argument, and then I'll get into a little more detail on the first one, is that, you know, even if Technovative -- I'm sorry, Stream, through Mr. Rajan, didn't have the authority to file based on that order, the receiver was merely a custodian of those rights, and upon Stream's bankruptcy filing, those rights would have reverted back to Stream as the 100 percent stockholder.

So the subsequent filing of Technovative after Stream's filing, would have encompassed those rights with

respect to the filing of the bankruptcy.  So we believe there's the two actions that get us to the end result that it was a valid bankruptcy filing on behalf of Technovative.  And also, there was the corporate resolution that was filed with respect to -- was listed on the docket Mr. Caponi previously referred to.

THE COURT:  Okay.

MR. ALEXANDER:  And again, the issue with the status quo order, you know, is the fact that it's solely limited the receiver's authority to ordinary course transactions.

And if you take a look at that order, you know, the one thing that is missing from the order is there's nothing that specifically indicates that Mr. Rajan was removed as a director.  There are certain cases in which the order specifically provide that a former director is removed.  That wasn't in this particular order.  What it said is the court -- what it was as of the filing, that's what it was, but I'm going to put in a receiver to kind of oversee certain things during the case.  But there's nothing that I saw in the order that specifically removed Mr. Rajan as a director.

THE COURT:  Okay.

MR. ALEXANDER:  And again, we believe the order specifically prohibited the receiver from taking any action outside the ordinary course of business.  And there was even a reference in the order that the receiver served at the pleasure

of the state court.  And so, that's one of the things when you look at what are the restrictions?  Is there an independent person that can file?  Now, that further goes to the point that the order was invalid because it constitutionally restricted the ability to file bankruptcy.  State courts do not get the authority and they don't have the right because of a supremacy clause to tell any individual that they can or can't -- or corporation, that they can or cannot file bankruptcy.

And that's one of the pivotal issues here is the supremacy clause.  There's a specific -- and I'll get to the article.  It is Article 1, Section 8, Clause 4, you know, indicates that congress shall have the power to establish uniform laws on the subject of bankruptcy throughout the United States.  And so, congress uniformly legislates who can be a debtor in terms of the filing.  And so, a state court can't restrict the access to the bankruptcy courts.

And so, it's the Debtor's position that congress and the federal bankruptcy courts maintain exclusive jurisdiction of deciding who can and cannot be at bankrupt.

One of the cases that we site is In Re Criser's Inc., which is 112 BR 996.

THE COURT:  Wait a minute.  You're going a little too fast for me.  I'm sure I probably have a copy if you cited it in your papers, but go ahead.  What case is this?

MR. ALEXANDER:  It's In Re Criser's Inc., 112 BR 996.

And in that case, the state court did enter an order enjoining the company's directors and officers in a receivership case from commencing a bankruptcy petition and also appointed a receiver.

Despite that, the officers and directors subsequently filed a bankruptcy petition on behalf of the company.  And when the bankruptcy court looked at the issue that was brought to attention in terms of whether or not there was authority to file, the court denied the motion to dismiss holding that overwhelming authority holds that generally corporate offices and directors may enact a resolution authorizing bankruptcy, despite a receiver being appointed.  And neither a state court injunction or the pendency of a state court receivership can bar the filing of an otherwise permitted bankruptcy due to the grant of the exclusive bankruptcy jurisdiction to the federal courts and the constitutional principle of supremacy.

The Court did note that it's not unfettered.  For example, you know, there could be fraud or abuse or a federal receivership under way.  But none of those issues are present here with respect to the request for dismissal and the authority issue here.

And, Your Honor, we list and go through six or seven other cases in our papers. You know, I'm not going to go through and read all of them to you.  But the consistent theme is that when the corporation itself is prevented from filing a

bankruptcy petition, that provision is void.  The order is void.  In terms of what's going to be done.  And in all of those cases, the former directors were held to -- when they filed a bankruptcy petition, the petitions were held to be valid.

There's even a bankruptcy court in Delaware.  It's the In Re MTE Facts International, Inc., case that we cite in our papers.  You know, where the court noted that the state court clearly has no jurisdiction to interfere with a commenced bankruptcy proceeding.  It seems to be equally to follow from the rational discussed in these cases that a state court would not have any authority to enjoin the filing of a petition.

The only cases in which former officer and directors were not able to commence the bankruptcy filing, were cases in which the ability to file was expressly given to the receiver.  And that can be done in a couple of different ways.  If you had given directly to the receiver -- and again, these are some of the outlier cases.  That it be given directly to the receiver, or the receiver had the ability to appoint a board, and then the board that was appointed by the receiver would have the authority in those cases to commence the bankruptcy petition.

So we do not believe that in any of the cases that were cited in the motion to dismiss for lack of corporate authority.  You know, none of the orders restricted the ability of the receiver or any other party to commence a bankruptcy

filing.  And that's what we have here, which is what violates the supremacy clause of the United States and Federal preemption.

In one of the cases that was cited in their papers, it was Oil and Gas Co. v. Ferhey (phonetic), you know, we believe that one is readily distinguishable.  You know, the first issue with that case is it dealt with a domestic insurance company, which isn't even eligible to be a debtor under the bankruptcy code in the first instance.  And the second point is that the authority to file issue related to the rehabilitator, having the authority to do it once they were appointed.  So again, that's kind of the reverse of what we have here.

It wasn't a restriction.  It was the granting of the authority to do it.  And we think that's a key distinction in terms of whether or not that order should be void and whether Mr. Rajan had the authority to commence the bankruptcy case at the time for Technovative once it was filed.

And again, I don't know if it's Sino or Sino Clean Energy case that was cited.  But again, one of the material differences was in that case, you know, not only was a receiver appointed, but the prior directors under an order were expressly removed and the receiver inserted new directors.  And so, in that case, the Ninth Circuit did say, well, you have these new directors that were actually inserted.  Not only just

a receiver appointed, but they were inserted. You know, there's nothing in this order, although certain -- and I would call it limited abilities were given to the receiver. You know, the receiver did not have the authority of a board of directors.

I mean, if you look at the order, there are carve outs in terms of what the receiver can and can't do. The only thing the receiver was allowed to do is take ordinary course actions. So it wasn't as broad, you know, in terms of the rights that the receiver had. So it was a limited receiver for a limited period of time in which he was appointed. And so, he didn't have the authority to file, and it was expressly prevented from doing it.

THE COURT: Does he have the authority to appoint a board?

MR. ALEXANDER: No. He did not have the authority to appointed a board.

THE COURT: Did you have the authority to access the board?

MR. ALEXANDER: Well, he had the authority to act pursuant to the order. If you look at all the actions that a board can take, and I believe it's under Section 141 that you looked at, it's a lot more expansive than the limited activity that the receiver was allowed to do in the order. Because again, his actions were limited to, you know, ordinary course

actions.  And, you know, we got to N, which was the limit or the restriction on the bankruptcy filing.  But, you know, there was at least 20 things that the receiver couldn't do with respect to his actions.

So this wasn't a receiver that had total unfettered control, you know, over the Debtor and could act. He was restricted.  And one of those restrictions was the ability to commence bankruptcy.  And the scope of his authority is limited to what's in the order, so he couldn't file the bankruptcy.

THE COURT:  Well, I guess my question is, Mr. Caponi has said on the 141 that the receiver was given the authority to act as the board and decided to -- you understand only the board may authorize the filing.  And let me see what he said about this 141.  It says in the status quo order at paragraph 7, the parties and anyone acting in conjunction with them are joined from taking or purporting to cause the company to take any of the following.  Any action that would require the consent, approval, or vote of the board.

So that order, while not authorizing the receiver -- prohibiting the receiver not authorizing the receiver to file. Did that require, prohibit anyone without -- well, it didn't say he -- never mind.  All right.  It just said that you would require the consent or approval of the board.  Does it say who the board is?

MR. ALEXANDER:  Now, you were specifically looking at

seven?

THE COURT:  Paragraph 7.  It's only a -- I don't -- let's see.  Do I have the entire order, or do I have only portions of the order?

MR. ALEXANDER:  It's -- I mean, I think 7A, I mean, it was just the intro to it that I believe you read.  It says that the parties and anyone acting in conjunction with them are enjoined from taking or purporting to cause the company to take any of the following.  And then a you read, it says any action that would require the consent, approval, or vote of the board or the company stockholders.

THE COURT:  Well, is there still company stockholders in here?  I only have a portion of it.

MR. ALEXANDER:  Oh, I'm just -- I'm reading it.

MR. CAPONI:  CR1 in the binders is the entire order.

THE COURT:  All right.  Well, so is it CR1 --

MR. CAPONI:  Exhibit 2, I believe.

THE COURT:  So all of that is what you were -- because I only -- okay.  So the admitted CR1 for judicial notice simply that it was issued?

MR. ALEXANDER:  Correct.

THE COURT:  All right.  And so, with respect to specific provisions, Mr. Caponi talked about certain provisions and what they meant.  And now you're pointing me -- because I only had a portion of it.  I didn't have the entire in front of

me. So it says -- so seven -- it says the following options are outside the ordinary course of business. And the company may not take any of the following actions without legal court and the parties and anyone acting in conjunction with them are enjoined from taking or purporting to cause the company to take any of the following. Any action that would require the consent, approval, or vote of the board or the company's stockholders. So, okay. We're not talking about you -- only any action that would require the consent, approval, or vote of the board of the company's stockholders.

So the court precluded the party from doing any of this because it was outside the ordinary course?

MR. ALEXANDER: That's correct. And so, it's not a typical board that the receiver -- I mean, he wasn't a director of any normal capacity. I mean, it goes through N, O, P. It goes up to P as to actions that nobody could take on behalf of the company. So the reference to 141, it's great, but it's severely limited. So he doesn't have the expansive power of a typical board of directors with respect to a company.

THE COURT: So the court, the chancery court was saying the company can't take any action that would require the consent or approval of the company's stockholders. But you're saying that provision could not be used to bar the -- somebody from filing bankruptcy?

MR. ALEXANDER: Along with N.

THE COURT:  Along with N, okay.  And the Court said that -- okay, so you couldn't take any action that would require the consent or approval of the board of the stockholders.  And that included filing a bankruptcy petition or acquiring or selling any business or operation.  So you're saying that 7N is impermissible?

MR. ALEXANDER:  It is impermissible.  All of these issues --

THE COURT:  So if it's impermissible, you can't say the board couldn't do it.

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  And if the board could still give back to -- who the heck is the board, right?

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  And they're saying the board was the receiver.  That's what they're saying.

MR. ALEXANDER:  I understand that.  And what we're saying though is in the cases that we cite, even when the receiver is given the rights of the board and there's a restriction on bankruptcy filing, it's the former board members that are allowed to file and commence the bankruptcy petition.

THE COURT:  Well, isn't there a dispute on who's a board member?

MR. ALEXANDER:  They dispute it.  But it's -- our position is that Techno -- I'm sorry, Stream is the 100 percent

shareholder. You don't have the right to appoint the board member. And that was the status --

THE COURT: Well, they were saying, well, that may be true, but we, SLS and Hawks say that we are appointing somebody pursuant to our loan document, right, or whatever their basis for asserting that they had the right to appoint the receiver. Which is why you have to 225 action because both parties are saying we have the right to appoint the receiver, right?

MR. ALEXANDER: I understand that, Your Honor. I mean, I indicated at our last hearing that I believed that this would take evidence, you know, in order for the Court to determine that.

THE COURT: Well, isn't that what's going on in the 225 action?

MR. ALEXANDER: Well, the 225 action, you know, we -- I can argue why that stay really shouldn't be granted there, but I'll save that.

THE COURT: Fine. But let me ask you this. In order to find out who had the authority to file this, because you're saying that the order, the status quo order, precluded not only the receiver, but apparently the company also. Because it says the company may not take any of the following actions. Filing a bankruptcy.

MR. ALEXANDER: Your Honor, but I will tell you, I didn't see anything in their initial papers on dismissal that

said Mr. Stastney had the right to --

THE COURT:  No.

MR. ALEXANDER:  Or had the right for the authority to file.

MR. ALEXANDER:  I'm not talking about Mr. Stastney. I'm talking about you're saying that paragraph 7 was -- is unconstitutional as to the company and as to the receiver because you can't bar anyone from filing.

MR. ALEXANDER:  Correct.

THE COURT:  Because it says the company cannot take any of the following actions.  The company is prohibited from filing a bankruptcy.

MR. ALEXANDER:  Correct.

THE COURT:  And you're saying that order is invalid because you cannot bar the company from filing.

MR. ALEXANDER:  Yes, Your Honor.

THE COURT:  Okay.  Now, that gets to the next question.  Is the court could not bar the Debtor from filing, Technovative because that's who we're talking about, then the question becomes is because you can't stop the company, who could act on behalf of the company to file?  They're arguing Mr. Rajan did not have the authority to act on behalf of the company because the receiver had that authority because he was appointed under 141 to act as the board of directors.  That's their argument.

MR. ALEXANDER:  Right.  But if you look at the order, it expressly says that the receiver can't take any actions outside of the ordinary course as well.

THE COURT:  So --

MR. ALEXANDER:  He didn't have the authority.

THE COURT:  Okay.  So then it falls on if he didn't have it, then who did?  And they're saying Mr. Rajan didn't have it because it was disputed as to his authority as the board because they, they meaning the opposing party, had appointed Mr. Stastney as the board.  And that's -- so somebody has to determine who had the authority to file.  Isn't that really what they're arguing?

MR. ALEXANDER:  It is, Your Honor, and you're the Court to decide who has the authority to file.  Because the ability to file a bankruptcy petition is reserved to the bankruptcy court.

THE COURT:  But isn't the bankruptcy court also going to look at state law to determine who has what authority on the state law?

MR. ALEXANDER:  I agree with that, Your Honor.  But you're the court to make that final determination.  It's not the other court.  This court has the exclusive jurisdiction to determine who should be in the bankruptcy court.

THE COURT:  Okay.  I get that, but that's not what they're arguing.  They're arguing I can send you guys back over

there with the 225 action and let that court decide who is the board of directors.

MR. ALEXANDER:  No.  They're disputing the validity of the petition.  So it's their burden to demonstrate that it's not valid.  I mean, we have a corporate document indicating that it's a valid file.

THE COURT:  But doesn't it still get back to whether Mr. Rajan has the authority on the Delaware law to file? They're arguing he didn't.

MR. ALEXANDER:  I agree, and I'm telling you that based on our arguments, we believe he did have the authority and you're the court to decide that issue.

THE COURT:  Okay.  But the authority to file would necessarily require me to determine who was the board of director, right?

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  And isn't that what you guys are doing the 225 action over there in Delaware is determining who is the board?

MR. ALEXANDER:  But what you have to understand though is once you're in the bankruptcy --

THE COURT:  Right.  It's under my jurisdiction, but I can figure out what I want to do with it.  I can always defer to state court.  I can also decipher that question myself.  I don't know.  You know, I need to figure out.  Because

basically, you want to have a 225 dispute here.  Because it's the same dispute; is it not?

MR. ALEXANDER:  Your Honor, not quite and I'm going to go into our second argument as to why I think, you know, there's other grounds in which you could decide this as well.

THE COURT:  Okay.  Because there's no dispute that Stream was 100 percent owner, the stock was never foreclosed on by any of the secured lenders. So upon the bankruptcy filing --

THE COURT:  I'm sorry.  I probably will take a little break just to go at 1:00.  Maybe 2:15 just to make sure the person's covering for me.  My -- well, there was an appointment that I had for someone else that I just could not -- that I'm responsible for.  Could not just not go.  Couldn't reschedule. It has to be done today.  So I want to make sure the person that's -- where he has to go.

MR. ALEXANDER:  Yeah.

THE COURT:  Okay.  So far it seems to be okay.  So I want to just understand that if I kind of look at things, I'm not not listening, but just give me a minute to kind of respond, okay.  All right.  So you're saying there was no dispute that there were other -- that --

MR. ALEXANDER:  Stream is the 100 percent owner of the stock of Technovative.

THE COURT:  And because there was no foreclosure, they remained as such and that this Court has to recon -- I get

what your argument is.

MR. ALEXANDER: And so, any efforts by the secured lenders, purported secured lenders, to exercise any creditor rights, are stayed by the bankruptcy filing.

THE COURT: It's kind of like a foreclosure, okay. You're in foreclosure for a home. And you're in state court and the parties are mitigating whether the secured creditor has the right to foreclose. They're all arguing this in state court. And then they file bankruptcy. And there's still a dispute as to whether there was authority to file it, to foreclose. I see it in that context. The Debtor argues, I didn't sign any of those papers. That mortgage is invalid. They do not have the authority to foreclose on my property. There's litigation going on in state court because at some point there was a big issue about debtors contesting the validity of mortgages.

MR. ALEXANDER: Right.

THE COURT: Okay. And then they would file here. And of course, that -- the validity of those underlying mortgages would get stayed in state court. And then they would come here. And ultimately, I would have to decide whether the mortgage is valid or not. Or I can send the parties back to state court and let the state court decide whether the mortgages were valid or not. But that was my discretion. So I get what you're saying.

You're saying is that they're alleging they had a right to foreclose based on their document.  That was being litigated in state court.  Now that you filed, they don't get to continue -- well, that is stayed.  And now this court has to decide whether the underlying -- in the context of the mortgages, whether that was a valid mortgage or not.

MR. ALEXANDER:  Not only whether it was a valid mortgage, but whether they should be proceeding with the determination as to whether it's a valid mortgage.  Because here it's not just -- they're not just trying to seek a determination that, you know, whether or not they could appoint a director, right?  Because to the extent they have that right based on a document, the automatic stay prevents them from continuing to take that action.  And so, that action itself, seeking to enforce a document against the Debtor and the Debtor being Stream, not Technovative, is stayed.  And so --

THE COURT:  Well, of course.  That's why they filed a motion for relief.

MR. ALEXANDER:  And we'll get to -- we'll they filed the motion for relief for a different reason, but we'll get to that as well.

THE COURT:  Well, they want to go back to --

MR. ALEXANDER:  No, they do want to go back.  But they aren't seeking to enforce their rights in their motion with respect to exercise.  They -- I believe they limited to a

few issues being determining the amount of their claim.

THE COURT:  Which I can do here.

MR. ALEXANDER:  And whether --

THE COURT:  The --

MR. ALEXANDER:  Correct.

THE COURT:  And whether or not the claim of Hawk was converted from debt to equity.  I believe -- I'll let them argue what their positions are, but I believe those are the two issues that they're asking for stay relief to do.  And yes, we believe that those can be dealt with as part of the claims administration process because they filed a proof of claim there.

THE COURT:  Well, what it boils down to from my perspective, is did the status quo order conclude -- did that order specifically say who could file?  You're saying it says only the receiver could have the authority to file once the receiver went back to the court. That's what they're saying. It says --

MR. ALEXANDER:  Uh-huh.

THE COURT:  The order said receiver.  You cannot file.  If you want to file, you got to come back to me.

MR. ALEXANDER:  But what's missing from that is the State Court could say no.  And so the fact that the State Court has any discretion as to whether or not they can do the filing, that's the issue.  You can't -- because the State Court is not

the one that should be deciding whether or not a bankruptcy petition can be filed.

THE COURT:  And so your argument is, is that because the State Court prohibited both the Debtor, the Debtor, the company --

MR. ALEXANDER:  Technovative.

THE COURT:  -- Technovative from filing and did not -- and prohibited the receiver, that was pro -- that's the supremacy clause.  And so since the receiver couldn't file, your position is the only party who had the authority was the 100 percent shareholder because it remained share -- the owner and it hadn't been foreclosed on.

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  Okay.  All right.

MR. ALEXANDER:  And then --

THE COURT:  I'm not saying one way or the other.

MR. ALEXANDER:  I understand.

THE COURT:  I'm just saying I hadn't -- I had sort of focused on the receiver order and what that meant with authority.

MR. ALEXANDER:  Right.  But our argument in our papers, it's -- it is the two-prong.  It's one, we believe it's not -- it's an impermissible restriction on filing.  And Mr. Rajan was a director, was never removed as a director and he had the authority to do it.  And then also, Stream, as the 100

percent stock owner of Technovative, assuming certain of those rights were given to Mr. Stastney or given to the receiver upon the bankruptcy filing of Stream -- and when you have the turnover provisions, either of those parties would be a custodian because they didn't have the actual stock.  They only had certain rights and the stock is there.  So those would have reverted back upon filing.

THE COURT:  What you're saying is that the fact that Hawk and SLS disputed where -- who was the board didn't change the fact that the 100 percent shareholder was Mr. Rajan.

MR. ALEXANDER:  Well, was Stream.

THE COURT:  Stream, rather.

MR. ALEXANDER:  Correct.

THE COURT:  Technovative and as the 100 percent owner, Stream, through Mr. Rajan had the company.  I get it.

MR. ALEXANDER:  So -- and we've cited cases in our papers, you know, indicating that corporate governance rights are property of the estate, such that upon the filing, those become assets of the estate as well.  So you have the stock and you have the rights and upon the filing, those were all with Stream.  And so the minute that Stream filed the bankruptcy case, you know, all of those rights that it had in Technovative with the stock it owned became property of the estate.  So --

THE COURT:  Of whose estate?

MR. ALEXANDER:  Stream's estate as the stockholder.

So you know, under that line, you don't even need to address the other issues because they would have all come back to the estate regardless of who was the proper director prior to the filing.  Because upon the filing, you know, there's a resolution from Stream, you know, authorizing the filing of Technovative.

THE COURT:  But we still get back to -- I have to figure out whether Stream as the 100 percent shareholder had the -- because clearly, if you're correct, the order prohibiting both the receiver and the company from filing is preempted by the supremacy clause, then it's -- then I have to say, okay, who was authorized under -- well, the receiver clearly wasn't.  The company wasn't, at least under this order.

And if that order said -- doesn't preclude -- well, the receiver clearly couldn't do it.  Couldn't do it, because the order said you've got to come ask me.  And if the company isn't precluded by the supremacy clause, then I've got to go look and say, okay, who had the right to file?  We're not talking about Stream.  Stream is -- we're talking about Technovative.

MR. ALEXANDER:  But --

THE COURT:  And their argument is, well, we were disputing who had the authority.  Isn't that what this is about?

MR. ALEXANDER:  They are, but the missing link for

the last argument that I did, Your Honor, was the fact that upon Stream's bankruptcy filing, the stock of Technovative became an asset of Stream's bankruptcy estate.

THE COURT:  Yeah, but you're jumping the gun here.  I still have to figure out whether it became property, not property at the time of the filing and who had the authority to file.

MR. ALEXANDER:  And I'm getting there, Your Honor, because --

THE COURT:  Okay.

MR. ALEXANDER:  -- you know, we went through the argument as to why we believe Mr. Rajan had the authority, being the last director of Technovative.  The other argument is regardless of who the director of Technovative was prior to Stream's bankruptcy filing, okay, once Stream filed, the stock of Technovative and the rights associated with that stock, which include the right to appoint a director, vested in Stream under the turnover provisions of the bankruptcy code.

THE COURT:  But you're kind of getting there after I still have to figure out --

MR. ALEXANDER:  But Stream --

THE COURT:  -- who had the authority to file.

MR. ALEXANDER:  You don't, Your Honor, because Technovative filed after Stream.

THE COURT:  Oh, Okay.

MR. ALEXANDER:  so Technovative filed subsequent to Stream, so once those rights became part of Stream's bankruptcy estate, then Stream had the ability and those rights in order to appoint a director and file the bankruptcy petition.

THE COURT:  But isn't Stream's right to appoint still governed by state law?

MR. ALEXANDER:  It is governed by state law, but you also have to look at the turnover provisions of the bankruptcy code, which require --

THE COURT:  Immediate turnover.

MR. ALEXANDER:  Immediate turnover.

THE COURT:  I just had a hearing on that with somebody who didn't think it meant immediate.

MR. ALEXANDER:  So upon Stream's filing, those vested with Stream and then so Stream would have had the stock and the rights.

THE COURT:  But what I'm hearing, Mr. Caponi argue is those rights did not exist prior to the filing, so you're sort of bootstrapping those rights by filing.  No, you -- the rights --

THE COURT:  The right to file have been curtailed or restricted or whatever words you want to use by the status quo order.  And the status quo said the company could -- Technovative --

MR. ALEXANDER:  Well, yes, Your Honor.  You still

have to have a finding that the status quo order is an impermissible restriction on the filing of bankruptcy.

THE COURT: Well, doesn't it still go back to -- I mean, we're round-robin here. Assuming that you're correct that when Stream filed, Stream's interest in -- 100 percent shareholder interest in Technovative, it became property of Stream's estate. All right. And just because it's property of the estate doesn't mean I throw out the window what Stream is allowed to do with that property. That property interest is -- well, the shareholder interest in Technovative.

Wouldn't I still need to say, all right, stream has a property interest. That property interest is governed by Delaware law. What can and cannot happen with respect to its interest in that property is still governed by lien -- but upon its filing, whatever receiver was there had to turn over everything as the receiver is out the window. But the receiver didn't have the authority to file anyway, correct?

MR. ALEXANDER: Correct.

THE COURT: And the company that they're referring to is Technovative, right?

MR. ALEXANDER: Correct.

THE COURT: And that company -- the Court said you can't file, which you said is unconstitutional because you can't tell Technovative they can't file. The question that I still have to go back to is who could file. And you're saying

that Stream was 100 percent shareholder, their rights had not been terminated.  And because of the status quo order can't stop anybody from filing.  I still have to figure out who would -- who had the right to file.

MR. ALEXANDER:  I'm going to give one more run at this, Your Honor.

THE COURT:  All right.

MR. ALEXANDER:  Pursuant to Technovative's governing documents, the shareholder has the right to appoint a director. The director has the right and the ability to file bankruptcy. Okay.  The secured -- alleged secured creditors argued that they have a document, which allows them to exercise certain creditor rights with respect to Technovative.

THE COURT:  They didn't exercise that pre-petition.

MR. ALEXANDER:  They didn't exercise the foreclosure.

THE COURT:  The foreclosure pre-petition.

MR. ALEXANDER:  Correct.  They did not exercise the foreclosure.  So, because they didn't exercise the foreclosure, any access that they could have had or right that they could have had to appoint a director would have been a right subject to turnover from them as well because they didn't have possession of the stock.  They weren't the sole stockholder. So not only would the receiver had to turn over any rights, the secured lenders would have also had to immediately turn over any rights because they didn't own or possess the stock.

THE COURT:  They didn't -- well, they didn't foreclose.  It's the same, I guess the same issue.  Well, maybe a little bit different when you have -- because I like to stop -- sticking to secure the property issue.  Is this similar to -- and maybe it's not because it's a corporation,  but it seems to me that if you are trying to foreclose on a right that you have, okay, that right, if it's disputed, when you come into bankruptcy, it's disputed.

And it remains disputed, unless there was something somewhere else that said specifically that that right has been determined and/or anybody's prohibited from doing something until those rights are determined, which is what I hear the creditors saying is that the Chancery Court told you not to do anything because it was disputed.  Isn't that what they're arguing?  Or they're arguing the right to proceed had been given by the Chancery Court to the receiver.  And you're saying, I don't care what he gave them.  Once they filed, they have to give those rights back?

MR. ALEXANDER:  Correct.

THE COURT:  Ah.  Okay.  I got it.  All right.

MR. ALEXANDER:  And so we believe that Your Honor has to determine, but again, they have to give it back.  But did they have -- the receiver had it before they filed?

MR. ALEXANDER:  Irrelevant.

THE COURT:  It is relevant.

MR. ALEXANDER:  It's not relevant if you go under that approach.

THE COURT:  I'm sorry?

MR. ALEXANDER:  If you go under that approach, that they immediately have to be turned over upon Stream's filing --

THE COURT:  Oh, Strea -- never mind.  Okay.

MR. ALEXANDER:  It's irrelevant.

THE COURT:  Because once the Stream filed, whatever rights the receiver had reverted back to Stream and Stream then therefore had the authority to file for Technovative.

MR. ALEXANDER:  That's correct.

THE COURT:  Is that what you're arguing?

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  All right.  I'll give it all of the thoughts, all of it.  I mean, I will -- okay.

MR. ALEXANDER:  So Your Honor, we believe that this court is the appropriate court to determine the federal question in terms of the bankruptcy filing and whether or not the filing of the Technovative petition was proper and valid. And as we've argued here today and in our papers, we believe that it was failure.

THE COURT:  Okay.

MR. ALEXANDER:  And if Your Honor has any other questions, I'm happy to answer.

THE COURT:  No, but Mr. Caponi stood up, I'm

assuming --

MR. ALEXANDER: Mr. Caponi doesn't have any rebuttal.

MR. CAPONI: No. I'm just wondering if we can take a quick break, Your Honor, before we make the final push to 2:00.

THE COURT: That's fine. I just let -- hopefully I can get my questions answered, so we don't have to stop at 2:30. What time do you want to come back? It's 1:15.

MR. CAPONI: Five, ten minutes, something like that, Your Honor. Brief break.

THE COURT: Oh, you only want five, ten minutes?

MR. CAPONI: Yes. Just a quick break. We can -- I'm going to confer and then I'll give my last rebuttal, which shouldn't be very long at all and we'll wrap this up.

THE COURT: With respect to the authority to file. All right. So how about we come back at 1:30?

MR. CAPONI: Okay.

THE COURT: That's 15 minutes. And hopefully I won't kill myself trying to -- I will just have to leave from here. I'm not --

MR. CAPONI: Well, I can send to the --

THE COURT: That is a -- well, I'm going to go to -- but that's not lighting up, either.

MR. CAPONI: It would --

THE COURT: Yeah, we'll you're going to have to hold that door. I'm a klutz. I've already fallen too many times.

All right.  Court is in recess until 1:30.

MR. CAPONI:  Thank you, Your Honor.

MR. ALEXANDER:  Thank you.

THE COURT:  Thank you.  All right.

(Recess taken)

THE COURT:  All right, counsel.  That was the longest 15 minutes.  I apologize.  I just had five emergencies that I had to deal with.  All right.  We still have some technical difficulties.  No phone for my courtroom deputy and I'm not quite sure of her -- this stuff working.

UNIDENTIFIED SPEAKER:  You can call at her desk.

THE COURT:  Okay.  No.  I'm just going to test it.  All right.  I'm sorry, counsel.  So where we left was with Mr. Alexander's arguments and you're going to do a rebuttal, right?

MR. CAPONI:  Yes, Your Honor.

THE COURT:  All right.

MR. CAPONI:  And I just -- very few rebuttal points and I'm going to try to get rid of the -- one is a little more complex, but the easy ones are, Your Honor, the receiver needed to obtain court approval.  But the question was, you know, who was authorized to authorize the bankruptcy?  It was always the Court that, you know, had that authority.  And again, I think we're in a different situation than a court saying I'm putting you in charge of something.

Come back before you do anything, you know, out of

the ordinary, is different than the court entering an order in response to a request saying no, you cannot file a bankruptcy full stop, period.  So, you know, we're not in a situation.  I don't think there's any case law where simply having to seek approval as a receiver, that's a different context than seeking and being denied the right to file bankruptcy.  Minor point.  I just want to highlight that.

Your Honor, the bigger issue goes to the conversation you were having with Mr. Alexander.  And I think the -- there's been a misunderstanding as to what occurred and what we're arguing here.  And it's to this point.  Your Honor kept saying, well, who's the board?  And Mr. Alexander's fallback was, well, Stream remained the stockholder.  That's not entirely correct.  Prior to the bankruptcy, in October of -- actually, October 17 of 2022, my client exercised its proxy rights to vote his shares of -- sorry.

Let me step back before I go there, Your Honor.  I jumped ahead of myself.  I apologize.  Lot of loan documents here and there were a very robust set of self-help rights, meaning rights that my client could exercise, that did not require a foreclosure or any kind of court or judicial approval.  One of those rights was what we call -- is referred to as the proxy right.

THE COURT:  Uh-huh.

MR. CAPONI:  Upon the default, my client, the secured

creatitors, had the right to acquire the voting power of the shares in Technovative as well as a bunch of other companies down the line.

THE COURT:  Uh-huh.

MR. CAPONI:  By the Supreme Court decision that Mr. Alexander referenced, setting aside the omnibus agreement, that decision as well as the Court of Chancery's subsequent collateral estoppel opinion in the 225 action all confirm that there had been a default under the notes going back to 2020. My client, in October, exercised its proxy rights and what that results in, Your Honor, is Stream remains the beneficial owner of the shares, but the power to vote those shares now belong to the secured creditors.

THE COURT:  And somebody's determined that already?

MR. CAPONI:  That is what led to the 225 action.

THE COURT:  So it's disputed.

MR. CAPONI:  It's dispute -- absolutely.  It's disputed, but my point being that the notion --

THE COURT:  Right.

MR. CAPONI:  -- that Stream is 100 percent shareholder is --

THE COURT:  Is disputed.

MR. CAPONI:  -- it has the voting rights, is disputed.

THE COURT:  And nobody has determined that they're

not.

MR. CAPONI:  That is the sole purpose of the 225.

THE COURT:  But for my purposes --

MR. CAPONI:  Undisputed -- or is disputed.

THE COURT:  Disputed.  So I -- so it's this.  I look at it this way, okay?  This is how -- this is what I was trying to parse out during my little break here was, let's look at it this way.  And maybe it's not precisely the same, but somewhat. You are a secured creditor.  You have a right to the rents of the -- okay?  And if you exercise right to the rent pre-petition, the Third Circuit has said that those rents are no longer property of the estate, okay?

If there is a dispute as to whether that right was exercised, it has to get resolved, okay?  And -- but it's not an automatic determination as to who has the rights on the rent.  Somebody's got to figure that out.  So here, there is no -- at least from what I can gather, it is unclear who had what rights to what because you're asserting your clients or the movants here, are asserting that they had exercised that right in October and therefore the Debtor didn't have it.  The Stream debtor no longer had that right.

Stream is contesting it the same way as like, well, we exercised our rights to the rent.  The Debtor said, you didn't, and so now it's got to be resolved as to who -- whether the rents were effectively foreclosed upon.  So I'm not quite

sure it's as easy as, well, we did it and somebody's made that determination as to whether -- who owns the rents.  It's the same thing as -- and I keep going back to the same thing, which is somebody has to determine whether that exercised right of -- I think it was SLS and Hawk, their -- whether they actually terminated the Debtor's right to whatever rights they had in the stock, whether those rights were totally terminated or not. That answer hasn't been determined yet, correct?

MR. CAPONI:  Correct, Your Honor.  And if I could direct the Court's attention to the status quo order.  I think this -- if I can walk you through two, three paragraphs, three short paragraphs, it -- I think it puts everything in context and answers the Court's questions on this whole thing.  And if you go to the very first page of the status quo order, it says on paragraph A, on October 17th, Plaintiff Hawk, you know, filed its complaint and then it says the second sentence. "Through its action, among other things, Hawk seeks a determination that it has validly exercised its creditor rights to vote the shares of Technovative Media and that it reconstituted the board."

And what the complaint alleges, Your Honor, and is noted here is that we exercised the right to take the shares. We executed a document removing Mr. Rajan and then executed a document installing Stastney.

THE COURT:  None of --

MR. CAPONI:  Undisputed.

THE COURT:  Right.  What am I supposed to do?

MR. CAPONI:  So I'm saying, if you go to the next paragraph, Your Honor --

THE COURT:  Uh-huh.

MR. CAPONI:  -- it says, "The complaint alleges the company has rejected that position."  It's disputed.

THE COURT:  Okay.

MR. CAPONI:  Right?

THE COURT:  Uh-huh.

MR. CAPONI:  Then if you go to the next page and you go to paragraph one --

THE COURT:  Uh-huh.

MR. CAPONI:  -- under the therefore, it says, "A bona fide dispute exists over the composition of the board."  That's the 225.  We say we took the voting rights.  Removed, replaced. They disagree.  And the court said, as you're sitting here right now, you each facially have an argument.  I don't know who's right.

THE COURT:  Right.

MR. CAPONI:  We'll figure it out.

THE COURT:  But the point of the matter is, their argument is that that right remains with them, the right to the rent remains with them.  And you're saying, no, it doesn't.  We have the right to the rent.  So I can't automatically say --

and I have to parse this through.  What does that mean?  Because you're saying they absolutely did not have the right and nobody's determined that they absolutely have not had the right because in order for me to say dismissal is appropriate, I would have -- or somebody's got to say they didn't have the right to do what they did.

MR. CAPONI:  Well --

THE COURT:  And I don't -- I -- that a, that's a, that's a different issue.  But as it stands is that I can't say that they definitely did not have the right to do what they did.  I can't definitely say that.

MR. CAPONI:  Let me address that real briefly, Your Honor.  If the status quo order remains in place, if the Court were to find the prohibition against filed the bankruptcy was wrong and you strike just that provision, then you can absolutely find Mr. Rajan didn't have the authority because the order clearly states that he --

THE COURT:  But what's the effect of that order once the bankruptcy was filed?

MR. CAPONI:  It remains.  It --

THE COURT:  It remains, but is it enforceable?

MR. CAPONI:  It is --

THE COURT:  You're saying the right to file and act as the board of director was with the receiver.

MR. CAPONI:  Correct.

THE COURT:  Whatever rights the receiver had, what did he have when the bankruptcy was filed?

MR. CAPONI:  Right.  On that point, Your Honor, there is the -- I would say, if Mr. Vincent's argument is that when Stream filed, you can no longer enforce the automatic stay -- or excuse me, the status quo order, I'm with you on that argument.  I would note, though, that there is -- Stream never executed a document after it filed bankruptcy purporting to install Mr. Rajan a director.

THE COURT:  That's the whole, that's, that's, that's --

MR. CAPONI:  That's a defect in his case.

THE COURT:  That's evidence.  That's evidence.  I don't know.

MR. CAPONI:  Well --

THE COURT:  You guys are going -- you're assuming -- you're saying he didn't --

MR. CAPONI:  I --

THE COURT:  -- and trust me, I already thought about that, too.  And I said now we get the evidence on that because I don't know what happened or who did what.

MR. CAPONI:  Well Your Honor --

THE COURT:  And then -- because if their argument is, is that the receiver no -- the receiver order was kaput and the receiver had to return everything back to us until it was

decided, they then had to do whatever it is that they needed to do to do their authorization.  I don't know if they did or didn't.  That's going to be for them to give me that evidence.  But now I'm not going to hear it in arguments.

Somebody's got to make a record for me and if they didn't do what they were supposed to, that's a whole different issue.  But that still doesn't get me to who has the authority and nobody has said who does.  And it's still a dispute.  I can't -- it seems to me, I can't say they definitively did not because nobody has said who definitively had that right.  But that leads me to somewhere else --

MR. CAPONI:  The -- absolutely in dispute.  And on the issue of them not authori -- Mr. Rajan never being reappointed to the board by Stream, I can't enter into evidence something that doesn't exist, So all I can do is say --

THE COURT:  Well, then --

MR. CAPONI:  -- it doesn't exist.

THE COURT:  But I don't know if it does or doesn't because we're not hearing evidence.

MR. CAPONI:  Okay.  Fair enough, Your Honor.

THE COURT:  At some point, they're going to put their evidence in and you're going to put whatever you have and then I'm going to find whether it was sufficient or not.

MR. CAPONI:  Your Honor, if I could just on this point because I think we've covered it is give the Court the

citation in re: CII Parent, Inc.  It's a April 12th of 2023 decision out of Delaware.  The citation is 2023 Bankruptcy Lexus 103.  And I mention that, Your Honor, because Judge Silverstein in that case found that, to your point, once the voting rights -- their voting rights are severed from the beneficial ownership rights pre-bankruptcy -- said the voting rights do not revert back as a result of the filing of the bankruptcy.

THE COURT:  Right.

MR. CAPONI:  And I'd just refer Your Honor to that opinion.

THE COURT:  Right.  But that's assuming that somebody finds they were.

MR. CAPONI:  I agree, Your Honor, yeah.

THE COURT:  Right.  And so what I'm looking at, to be perfectly honest is I don't know who had the authority.

MR. CAPONI:  Your Honor, look.

THE COURT:  And somebody's got to go figure that out, but for me to find that they had no authority, I would have to find they didn't have the authority, which means -- it's -- I mean, I'm thinking about it.

MR. CAPONI:  Well, Your Honor, is this not the perfect segue in argument two, relief from stay?

THE COURT:  Apparently, well, I guess it is.

MR. CAPONI:  I think we've hashed out argument one

and we keep come -- all roads keep leading to Rome, which is relief from stay, so --

THE COURT:  All right.  Mister --

MR. CAPONI:  -- with the Court's permission, I'll tackle that one.

THE COURT:  Mr. Alexander, any response to his rebuttal or we good to go to relief from stay?

MR. ALEXANDER:  Your Honor, the only response will be that, you know, the issue that was raised is an evidentiary issue and we'll address it with respect to --

THE COURT:  Right.

MR. ALEXANDER:  -- the evidentiary portion.

THE COURT:  I mean, I can't rule -- that because at the end of the day, what I told everybody is you guys are going to make all these arguments and I'm going to need evidence because I already know what the parameters are from the law.  I hadn't really thought about your argument, Mr. Alexander, but it raised something else.  I thought it was going to be a little more straightforward, you know, just looking at the orders, I would be able to determine just from the orders what was what because it's pretty easy.

The orders say this.  Who has that.  Who has authority.  It's a little bit different than what I thought.  So at this point, I get everybody's telling me what the law is, but we're not going to get to any of that determination until I

get some evidence.  So, notwithstanding, even if there's a dispute as to whether --what I'm hearing you say, Mr. Caponi, doesn't matter whether they're right on the argument that they had the authority.

They didn't exercise it properly, assuming they had any.  Assuming that there was -- again, when I look at it from just simple, simple who had the rights to the rents in a bankruptcy, which is the same thing as who had the right to exercise control over the stock, is disputed.  And that has to be determined.   Whether it gets determined here or whether it gets determined in 225, I don't know yet, but it's the same thing.

And so -- but I don't know, even assuming that the issue is is that you -- well, would be a little bit different if the -- you know the security lender is saying I exercise the right to the rent.  You don't get it.  It's not property of the estate.  It remains with me, which is what you're saying is we exercise our right to --

MR. CAPONI:  Of the shares.

THE COURT:  -- of proxy, our proxy rights and it came to us.  And if you're right and it's done pre-petition and it -- well, it was done pre-petition, but if you're right on the exercise of that right, then it's done.  It doesn't go back. Bankruptcy doesn't restore those rights.

MR. CAPONI:  Correct.

THE COURT:  They belong with the creditors.

MR. CAPONI:  Yes.

THE COURT:  If they didn't do it or it wasn't done, then the rights would remain with Stream.

MR. CAPONI:  Yes.

THE COURT:  I don't know which one of you guys -- you know, again, I mean, somebody's got to determine whether that was a proper exercise or not.

MR. CAPONI:  Your Honor, again, I think -- you know -- I think the order remains in place.  I think Your Honor could find on its face, it was an improper filing, but I understand Your Honor's points.

THE COURT:  I don't --

MR. CAPONI:  They're very valid points.

THE COURT:  -- because I don't -- it's no different than I have a -- I just had this exact -- which is why I'm using the receiver issue.

MR. CAPONI:  Correct.

THE COURT:  I just had -- Mr. Callahan, were you in MBMK?

MR. CALLAHAN:  I was not, Your Honor.

THE COURT:  Oh, okay.  Exact.  There was a rent receiver.  The receiver -- the bankruptcy was filed.  The receiver claimed that he still had the right to exercise control over the rent pursuant to the court order.  I'm like

no.  Court order is out the window.  Automatically, whatever rights the -- well, in that case, there was an issue whether the rents were effectively -- the rent order was appropriate or not.  I don't know if it was or wasn't.

It didn't matter because they filed bankruptcy and whatever rights the receiver had under that order, out the window.  It had to come back to the Debtor and then I had to -- they worked it out.  I don't see that happening here, but they worked it out with respect to the secured creditor and the rent.  I didn't have to decide whether it wasn't a proper exercise, but it's the same thing.

MR. CAPONI:  Understood.

THE COURT:  And they weren't even -- it wasn't in the context of dismissal.  It was more in the context of who had rights to what and that underlying issue is the same for me as who has rights to what, which then decides who has the right to file.

MR. CAPONI:  Well, Your Honor, as we move to the relief from stay motion --

MR. ALEXANDER:  Excuse me, Your Honor.  Can I just --

THE COURT:  Right.

MR. ALEXANDER:  -- make one, just one point?

THE COURT:  Uh-huh.

MR. ALEXANDER:  It's just to clarify one issue.  I mean, I know Mr. Caponi testified that no such document exists,

but I just wanted to say that a document does exist where he was appointed and it's evidentiary issue --

THE COURT:  On what?

MR. ALEXANDER:  -- but I didn't want the record to sit there with Mr. Caponi stating that he believes that it doesn't.

THE COURT:  And you believe it does.

MR. ALEXANDER:  Well, I know that it does.

THE COURT:  Okay.  But I'm not seeing any of that right.

MR. ALEXANDER:  Understood.

THE COURT:  I'll get that later.  And counsel, I will everybody that I took the time to kind of parse through these issues and do a lot of things, but what I did not do was take time to get something to eat.  I may have to take a further break because I'm getting a little lightheaded.

MR. CAPONI:  Your Honor, I --

THE COURT:  I've not eaten today and only having coffee.

MR. CAPONI:  Tell -- as my wife tells everybody, I'm like a baby.  It's sleep and food, so I'm with you 100 percent on that.  So what would be a good time to take a lunch break? We're open.  I'm happy to take it now or I know you may have something at 2:30.  Do you want to wait for lunch?

THE COURT:  No, I'm good.

MR. CAPONI:  Okay.

THE COURT:  My 2:30 is out the wi -- not -- it has been taken care of.

MR. CAPONI:  Okay.

THE COURT:  So we're going to go through straight 'til 5:00, 5:30.

MR. CAPONI:  And Your Honor, I would suggest, since you're feeling a little peckish, as am I, why don't we take a break now and then --

THE COURT:  Yeah.

MR. CAPONI:  -- we can go 'til 5:00.

THE COURT:  You goes don't want me to see me when I'm hungry.  Definitely not.  I already can be a little --

THE COURT:  But I don't want -- as you start to lean over, so -- yeah.

MR. CAPONI:  I know myself and I'm and I'm going through my chambers and everything that -- everything in there that I can eat expired in 2021.  And I'm like -- I usually grab a --

MR. CAPONI:  Don't eat it, Your Honor.

THE COURT:  No.  Some cheese and crackers, '19, out the win -- they expired before COVID -- 2/22.  So I'm going to have to do something, order something, walk and get something.  So let's take, I don't want to waste a lot of time.  I just need to grab a little something.

MR. CAPONI:  Sure.

THE COURT:  And then maybe everybody else might be the same or maybe you were smart and had breakfast, unlike me. But -- so that might not be an issue.  How much time do you -- I don't know how much time -- I can just run through --

MR. CAPONI:  One hour, Your Honor?  Does that, Your Honor, for everyone?

THE COURT:  That works for me.

MR. CAPONI:  Okay.  That -- I mean --

UNIDENTIFIED SPEAKER:  Your Honor --

THE COURT:  Just a half?  I'm a little stressed today.  It was my grandson's first day at camp and I had to figure out how to get him to camp, get him here on time and his doctor's appointment at 3:00, all of which worked out, but it's a little, you know -- I'm not -- I'm back to being a par -- never that I -- I have kids.  It's not that you're never a parent, but a parent of a young child --

UNIDENTIFIED SPEAKER:  Full time parenting.

UNIDENTIFIED SPEAKER:  You're being back -- active, active duty.

THE COURT:  Yes.  I'm back on active duty raising a 13 year-old, so --

MR. CAPONI:  So we'll come back at --

THE COURT:  So we'll be back at 3:15.  And I will endeavor to stick to that.

MR. CAPONI:  All right.

THE COURT:  Okay.

(Recess taken)

THE COURT:  Okay.  I think where we left off, Mr. Caponi, you were going to segue into the motion for relief.

MR. CAPONI:  Correct, Your Honor.

THE COURT:  Okay.

MR. CAPONI:  With your permission, I'll jump right in.

THE COURT:  All right.  And I don't need this.

MR. CAPONI:  It's the same PowerPoint, if you want to follow along.  On --

THE COURT:  Oh, it's on -- in your --

MR. CAPONI:  It's all in one PowerPoint.

THE COURT:  Oh, Okay.

MR. CAPONI:  So --

THE COURT:  Now, with respect to the motions to dismiss, were there documents that we were going to admit into evidence?  Because we finished -- well not --

MR. ALEXANDER:  Well Your Honor, I didn't thing we were admitting any documents --

THE COURT:  Well --

MR. ALEXANDER:  -- into evidence.

THE COURT:  Well, I think that what they reserved was to have witnesses, but not the do -- I mean, how am I going to

look at this --

MR. ALEXANDER:  But --

THE COURT:  -- without these documents?

MR. ALEXANDER:  But which document, though, are they -- because they gave --

THE COURT:  Are we talking about --

MR. ALEXANDER:  -- and we would object to the PowerPoint --

THE COURT:  No, but yeah, we're not -- no.  We marked the Exhibit M -- was it M-1?

MR. ALEXANDER:  No, H-1.

THE COURT:  H-1.  H-1, the PowerPoint.  So the question is there were certain documents in that PowerPoint presentation that was also marked.  One was --

MR. CAPONI:  It was just the status quo order.

THE COURT:  Right.

MR. CAPONI:  It was the only document in there.  So do you have an objection to the admission of the status quo order?

MR. ALEXANDER:  For the judicial notice of that order?

THE COURT:  Yes.

MR. ALEXANDER:  No.

THE COURT:  Right.  And I said I can take judicial notice of documents that are filed and any undisputed facts

that are in that order.  And there was nothing that you're disputed in that order, right?

MR. ALEXANDER:  There was nothing disputed?

THE COURT:  Did you dispute anything in the order itself?

MR. ALEXANDER:  Well, Your Honor, I mean there -- I mean, I think the order said everything is disputed --

THE COURT:  No, no, no, no, no.

MR. ALEXANDER:  -- in the order itself because one --

THE COURT:  No, no, no, no, no.

MR. ALEXANDER:  -- party claims this.  One --

THE COURT:   No, no, no, no, no, no.  That's not what I'm saying.

MR. ALEXANDER:  Okay.

THE COURT:  The order itself is -- I can take judicial notice that it was filed.

MR. ALEXANDER:  No objection.

THE COURT:  And it was issued.  I also can take judicial notice of what it says, if what it says is undisputed, What it means is a different -- different.  For instance, there was a reference to paragraph one -- make sure -- right. And you talked about them, also.

MR. CAPONI:  Paragraph 7 and paragraph 13.

THE COURT:  Right?

MR. ALEXANDER:  We're not disputing that those are in

the document.

THE COURT:  Right.  And that they say what they say.

MR. ALEXANDER:  I agree with you.

THE COURT:  Right.  So I can admit it on the judicial notice that this order was filed and this order says what it says.  Not what it means.  It just says this.  I have to figure out what I think it means.

MR. ALEXANDER:  Correct.  Because there's no findings in that order, so --

THE COURT:  Right, but he didn't --

MR. ALEXANDER:  And I agree so --

THE COURT:  So admitted.

MR. CAPONI:  Thank you, Your Honor.

THE COURT:  All right.  I just want to make sure we're all on the same page.  So what did we call that document?  The status quo order, John?

MR. SCHANNE:  Yes, Your Honor.  It's the quo order.

THE COURT:  Right.  What was it marked as?

MR. SCHANNE:  Well, the whole thing is H-1.

THE COURT:  But we're not admitting the whole thing.  We're only admit -- I thought we remarked it?

UNIDENTIFIED SPEAKER:  That was the --

UNIDENTIFIED SPEAKER:  No.  No.

UNIDENTIFIED SPEAKER:  It was the --

THE COURT:  Wait a minute.

UNIDENTIFIED SPEAKER:  It was in another binder.

THE COURT:  Yeah.  It was --

MR. CAPONI:  It's Exhibit 1 in the binder.  It's CR-1 in the binder.

THE COURT:  So are we admitting CR-1?  What's CR-1 -- CR-1.

MR. CAPONI:  CR-1.

THE COURT:  Right.  That's what we're admitting, okay, John?  Which is -- you have the binder?

UNIDENTIFIED SPEAKER:  I don't have one -- H-2.

UNIDENTIFIED SPEAKER:  I think you had it down as H-2, Your Honor.

THE COURT:  You want to do it as H-2?

MR. CAPONI:  I think that's what it was put in -- down as.

THE COURT:  Okay.  Because --

MR. CAPONI:  But however -- whatever -- however the Court proposed.

THE COURT:  Okay.  Wait a minute.  I think Eileen was saying something when we were talking about that, because I said I haven't seen the order.  All right.  So we're going to mark -- paragraph seven.  All right.  We're going to mark that as H-2.  John, do you have a copy of that?

MR. SCHANNE:  Not now, but I'll -- I have a -- I'll note --

THE COURT:  Do you want mine?  Counsel, are we using a specific -- or because we have a binder for the Court.  Are you handing one up or should I just give this as is?

UNIDENTIFIED SPEAKER:  Do you have a separate --

UNIDENTIFIED SPEAKER:  Your Honor, there was the second order that was referenced, too, because we explained that there were the two orders.  One was entered on one day and one was entered on the second day.  We said that there was the status quo order and the order appointing the receiver with the responsibilities.

THE COURT:  Well, he didn't ask me to take judicial notice of that, did you, counsel?

UNIDENTIFIED SPEAKER:  You just did the one order?

MR. ALEXANDER:  I just did the one order.  Do -- yeah.  I have no objection with the other one then.

THE COURT:  All right.  Which one is the --

MR. CAPONI:  That's CR-2, I believe, Your Honor.

THE COURT:  Now --

MR. CAPONI:  In our binder.

THE COURT:  So CR-1 and C-2.  CR-1 is the status quo order.  I didn't even know there was a separate order, counsel?

UNIDENTIFIED SPEAKER:  We -- okay.  Understood.

THE COURT:  Nobody told me there was two separate orders and CR-2 is the order regarding receiver's pendente lite.  That's how I pronounce it.  Lite.  I don't know.  But

anyway, those two orders are -- which are marked CR-1 and CR-2, we're just going to leave them, because they're already marked. It just makes my life easier when I have to go back and look at that.

MR. CAPONI:  That's fine.

THE COURT:  CR-1 and CR-2, in connection with the motion to dismiss -- I guess -- so the argument was only on the -- oh, wait -- on the authority to file.  That was the authority to file on the motion to dismiss.  That's the only thing we looked at.  Correct, counsel?

MR. CAPONI:  Correct.  It was only the --

THE COURT:  Yeah, the in --

MR. CAPONI:  Yes.

THE COURT:  That was it.

MR. CAPONI:  Correct.

THE COURT:  Okay.  Well, that is entered in connection with the motion to dismiss, CR-1 and CR-2.  That's it.  Right?

MR. CAPONI:  That's it.

THE COURT:  Anything from you, Mr. Alexander?

MR. ALEXANDER:  No, Your Honor.

THE COURT:  All right.  All right.  Now we move to the motion for relief from stay.  I guess I should start a new page as opposed the bottom of the page.  Okay.

MR. CAPONI:  All right, Your Honor.  So --

THE COURT:  All right.  And I can use this little handy dandy --

MR. CAPONI:  And picks up at page -- slide 21, is where the second motion starts.

THE COURT:  Okay.

MR. CAPONI:  All right.  Your Honor, if we just start -- and if we just start, you know, the applicable standard is pretty straightforward, 362(d)(1).  The Court can grant relief from stay for cause.  Cause is broadly defined.  And under the standard, once Hawk establishes cause and the burden shifts to the Stream or Technovative to prove the cause does not exist.  And as I mentioned, you know, cause is the intentionally broad and flexible concept, but the Court, Your Honor, as I put in the slide 22, generally looks at six factors.  I think the Debtor's papers cite a three factor test that's often used in Delaware.  I think the six factors are just a slightly more granular view of the three factors they cite.  I think we're all talking about the same data points that the Court will look at when deciding whether to find cause.

I'm just going to walk through these in order.  I think this should not take very long, Your Honor, because these are mostly undisputed.  I mean, not only are they not disputed, they think they're almost all undisputed.  Well, the relief of the -- going back to the Court of Chancery result in a partial

or complete resolution of the issues.

So, Your Honor, as we discussed earlier, it will resolve a number of issues.  It will resolve whether the proxy rights were validly held and exercised.  It will resolve whether Mr. Rajan had authority to file or Stream had the authority to file the bankruptcy.  It will also resolve what -- whether the secured creditors continue to hold their secured debt and the amount of that debt.  All those issues are part of the 225 action and will be conclusively resolved by Vice Chancellor Laster.  So I think that's factor one.

Factor two.  Is there a specialized tribunal with the experience necessary to resolve this issue?  Well, obviously, the Court of Chancery exists.  It is the preeminent corporate court in the world.  Section 225, which is the statutory basis for the proceeding requires, that all 225 actions be filed before the Court of Chancery.  So as to this Court, this action, the Court of Chancery is specialized and has the necessary expertise and is ready, willing and able to resolve the 225 action.

I would also note that all of the operative documents governing the party's relationship, being the creditor versus debtor relationship, are governed by Delaware law.  Third factor, judicial economy and expeditious, economical resolution.  Your Honor, in almost every phone call, teleconference, hearing that we've had, I would note that the

Debtor touts Mr. Rajan's extensive knowledge that he's been involved in this from the beginning and he's indispensable.

The other person that's been involved in this from the beginning, and I would say he's indispensable, is Vice Chancellor Laster. He's been dealing with this litigation since 2020. It's -- he's had multiple hearings, trials. It's gone up to Delaware Supreme Court. It's come back down. He knows the players. He knows their lawyers. He knows their motivations.

The documents, the lending documents are, you know, yea high and Vice Chancellor Laster is intimately familiar with all of those documents, so his ability to get up to speed to resolve this issue is great and it's going to be far more efficient than I think this court trying to get up to speed on three years of litigation and having to hear it from either Mr. Rajan or Mr. Stastney or a witness tell Your Honor what happened. Vice Chancellor Laster had a front row seat. It happened in front of him. In fact, he was a participant to it, so that gives him context with which to evaluate the party's arguments, credibility, etcetera.

Your Honor, the next bullet point is the most important one and I'm going to say it over and over and over again. All that remains is a one-day oral argument. The parties stipulated before the bankruptcy that the bench trial did not need any witnesses. So we're going back in front of

Vice Chancellor Laster and approximately in the amount of time that we will spend in this courtroom today, Vice Chancellor Laster will resolve all of these open issues without the need for any additional filings, without the need for any additional pretrial work.

It's all been done.  He's going to conduct at most a one-day oral argument and that's by stipulation of the parties. And that was a joint letter, Your Honor.  And this is CR-5. It's document -- we cite to the docket, which is a Docket Entry 185, and this is a letter that I submitted on behalf of both parties.  And you know, it says what it says.   After reviewing the pretrial opening briefs, the parties believe that no live witnesses are necessary at trial and the case can proceed on a paper record with deposition, excerpts.

So Your Honor, we are one oral argument away from the most significant issues in this bankruptcy being resolved.  We are one argument away from the -- what the court observes as entrenched positions and back and forth between the parties. We're going to get answers to all this.  Who's a secured creditor, what's the amount of secure debt and were these assets foreclosed upon proxies rights exercised pre-bankruptcy or not?

Vice Chancellor Laster is going to not deal with the foreclosure of the assets, but he's going to deal with the proxy rights having been exercised.  That, Your Honor, goes

into relief from the stay, promoting judicial economy.  The Debtor's prior counsel in the action below, or current counsel in the action below submitted proofs of claim totaling around $3 million.  So this estate, this debtor pre-bankruptcy already spent $3 million preparing for this 225 action.  And I would cite Your Honor to CR-7, which is a pretrial order, as well as CR-144 and 146, which are the proofs of claim.

THE COURT:  So CR --

MR. CAPONI:  CR --

THE COURT:  7?

MR. CAPONI:  -- 7 is the pretrial order and CR-144 and 146 are the proofs of claim filed by counsel for Stream and Technovative, in this case, for the work that they did in -- before the Court of Chancery.

UNIDENTIFIED SPEAKER:  Your Honor, just one --

THE COURT:  The relevance of that is to what?

MR. CAPONI:  Excuse me, Your Honor?

THE COURT:  Which of the seven fact -- six factors you believe this relates to?

MR. CAPONI:  This goes to promotes judicial economy, the amount of money that's already been spent.  It's a sunk in cost and to have to re-spend more money relitigating these issues here and getting this Court up to speed is less efficient.  It'll burden the Court.  It'll burden the parties.

THE COURT:  Okay.

MR. CAPONI:  Because if we end up staying here, Your Honor, I'm sure there's going to be -- the Debtor is going to ask for additional discovery.  We're obviously going to have to have additional briefing for Your Honor to submit briefs, unless Your Honor just says give me the docket below.  And we're going to have to redo the pretrial process.  We're going to have to deal with Your Honor on a pretrial order. Witnesses -- if -- well, I guess there are no witnesses, but --

THE COURT:  All it is is a legal argument.

MR. CAPONI:  That's all it is is a legal argument, Your Honor.

THE COURT:  Okay.

MR. CAPONI:  The fourth bullet point.  Are the parties ready for a trial.  Yes.  We are one week from trial. All the submission -- all pretrial submissions were filed.  All the exhibits were exchanged.  Again, we've even agreed to forego witnesses and we are -- we were one oral argument away before Mr. Rajan filed this bankruptcy to avoid that -- the outcome of that oral argument.  So -- and you know, the Court of Chancery, Your Honor, much like yourself, is a court that does not have juries, so Vice Chancellor Laster's schedule is very flexible and I anticipate he'll be able to get us this one day on fairly short notice.

THE COURT:  Okay.

MR. CAPONI:  We're not talking six months, a year

from now or, you know, a week-long trial.  So again, your argument, Your Honor -- excuse me.  You know, one oral argument away from resolving this.  Impact on other parties, due to the relief from the stay.  There's no impact on other parties.  The parties may -- their rights may be informed.  They may gain more knowledge, but we're not adjudicating anyone else's rights.

The status of the secured debt has to be resolved regardless of what happens.  Right?  Regardless of whether you grant relief from stay or not, determining who holds secured debt and the amount of that debt, whether it's still outstanding, whether the proxy rights were entered -- excuse me, exercised, all that needs to get resolved.

THE COURT:  Okay.

MR. CAPONI:  It may impact the other parties, but on a positive way, because it's going to speed up this bankruptcy.  Because again, I believe that Vice Chancellor Laster, in a brief oral argument, is going to be able to resolve this case in a one-day oral argument and we'll be off to the races and we'll come back here and everyone's going to know whether there's secured debt or not and what's the amount that secured debt and what -- you know, then this Court -- I think it's the important point, Your Honor, is we have to then come back to Your Honor to exercise that secured debt.

THE COURT:  Well, that's assuming that you get more

than that.  I thought the 225 action was to figure out who is the board of directors.

MR. CAPONI:  Sorry.  With respect to the -- who had the right to vote the shares --

THE COURT:  Uh-huh.

MR. CAPONI:  -- it will determine who the board of directors is.  Now, I -- you know, maybe deferred it to Ms. Westbrook here.  I don't know if that means the board of directors, given the fact that there is a stay in place, automatically gets seated or whether we come back to Your Honor on that, but we will come back to Your Honor with a decision under Delaware law as to who had the right to appoint the director.  Now, whether they -- you know, that gets ultimately appointed with your blessing or not, I'm not that steeped in the code, but we'd be fine with that.  I'll stipulate to that.

THE COURT:  Well, I'm -- sort of what I'm thinking is at some point, I figure out who's supposed to be in charge of this debtor, Technovative and then once I'm -- you know, whoever decides that, if it's Mr. Rajan, then obviously we stay here.  If it's not, then I guess the other board of directors say we want out.  That's I'm thinking, but I don't know what happens until we get that decision.

MR. CAPONI:  I agree, Your Honor.  Once we have that decision, we're going to come back here.

THE COURT:  And if it's not Mr. Rajan -- no offense,

but what do I care what the proof of claim is or any of that stuff?  Because it won't be before me.

MR. CAPONI:  Well, Your Honor, the --

THE COURT:  All that matters if that case stays here is somebody determines how much it is and whether you're a secured creditor or -- my understanding and this is from hearings from months ago, was that there was a dispute whether you are a secured creditor or whether you are an owner, you meaning SLS and Hawk.  And so that if you are the owner of the stock, well, it doesn't matter how much you're owed.  I mean, it does for the foreclosure.  I don't know, but for my purposes, it may not matter if the case gets dismissed.  You guys going to go fight somewhere else --

MR. CAPONI:  Your Honor --

THE COURT:  -- matters to me.

MR. CAPONI:  It'll matter to you in this regard.  The secured debt is at the Stream level as well, so if the Stream -- well, even if you dismiss the Technovative bankruptcy --

THE COURT:  Uh-huh.

MR. CAPONI:  -- finding out -- the argument in the 225 action, the only argument that was left for the Debtor to make was that they had converted the debt to equity.

THE COURT:  Okay.

MR. CAPONI:  Right.  So the court, by way of a brief

background, Your Honor, the 225 action was filed.  We -- my client said we had these rights.  The Debtor said, no, you did not and they raised a a lot of arguments that challenged how the debt was acquired and whether defaults were improperly triggered by my clients and you know, a lot of the acrimony that you've witnessed was taken out there.

What Vice Chancellor Laster did was he bifurcated the 225 action and the first piece that he resolved wa -- were issues of law, much like we're were doing this morning.  And Vice Chancellor Laster, we took witness testimony and we had briefing and we had oral argument and he resolved the legal issues.  And the legal issue that he resolved, the main one was collateral estoppel.

And Vice Chancellor Laster found that collateral estoppel precluded the Debtors from challenging that Hawk and SeeCubic had lent money.  It was secured debt, that there had been defaults under that debt and that the debt and all these various self-help rights existed as of November 10th --

MS. WESTBROOK:  2022, Your Honor.

MR. CAPONI:  -- 2022.

MS. WESTBROOK: Oh, sorry.

MR. CAPONI:  Sorry, 2021.  That was the --

THE COURT:  Wait a minute.  Wait a minute.

MR. CAPONI:  -- date --

THE COURT:  Wait a minute.  When did he issue --

MR. CAPONI:  That's called the, what we refer to as the collateral estoppel opinion.  It's an opinion by Vice Chancellor Laster, which is in our -- it's CR-3, Your Honor, which the Court can take a look at.

THE COURT:  Okay.

MR. CAPONI:  In the binder.

THE COURT:  So collateral estoppel opinion.

MR. CAPONI:  And in that opinion, what the Court found broadly was a lot of issues were in connection with the omnibus litigation were argued and litigated and they went up on appeal.  And what the court concluded was that any arguments that the Debtor failed to raise or raise and the Supreme Court had rejected, they were collaterally estopped from relitigating those points.

MR. ALEXANDER:  Your Honor, to the extent he's trying to admit that as evidence, we would object to the admission of any findings.  I mean, it's a nonfinal order.

THE COURT:  Oh, it's not final?  It's under appeal?

MR. ALEXANDER:  it's not a final order.

MR. CAPONI:  CR-3 is the opinion and lays out everything I'm saying.

THE COURT:  And under appeal.

MR. CAPONI:  Sorry?

THE COURT:  Is CR-3 appealed?

MR. CAPONI:  CR-3 is not appealed, no.

THE COURT:  Is not appealed, counsel?

MR. ALEXANDER:  Well, it was interlocutory order. It's a nonfinal --

MR. CAPONI:  They did not seek interlo -- they did not seek to appeal it.

THE COURT:  But it's an interlocutory order?

MR. CAPONI:  It's an interlocutory order, but it's a decision of the Court of Chancery.  The Court can do the same analysis, but the facts remain the same.  Under collateral estoppel, the Debtor cannot raise certain arguments because they were adjudicated already.

THE COURT:  Well, you said that either they failed to raise it or it was rejected by the Supreme Court of Delaware.

MR. CAPONI:  Correct.  So Vice Chancellor Laster made a number of findings in the omnibus litigation that the Debtor did not appeal and they became final findings.  And then there are ones that the Debtor did appeal and lost and they became obviously final findings because there's nowhere to go.  And Vice Chancellor Laster addresses those very specifically in a collateral estoppel opinion.

THE COURT:  Okay.

MR. CAPONI:  Of which this Court can take judicial notice.

MR. ALEXANDER:  We just reserve our objection to that?

THE COURT:  Okay.  Objection to what?  That I can't take judicial notice of what it says or --

MR. ALEXANDER:  You can take judicial notice of what it says, but we do not believe that you can use any of those findings as facts for your -- for purposes of this argument.

THE COURT:  So your disputing those?

MR. ALEXANDER:  Correct.

THE COURT:  Okay.  Yeah, judicial notice.  I can't take judicial notice of disputed facts, because they're saying they're disputing whether that order, which is interlocutory, is a final decision.

MR. ALEXANDER:  It is not not a final decision and also there was a Supreme Court order that vacated and remanded a lot of the findings that happened in the omnibus litigation because this order is not from the omnibus.  This order is from the omnibus litigation.  It's not from the 225 litigation.

THE COURT:  Right.  I get what he's saying --

UNIDENTIFIED SPEAKER:  This is the 225 litigation?

UNIDENTIFIED SPEAKER:  This is in the 225.

UNIDENTIFIED SPEAKER:  I apologize on that.

UNIDENTIFIED SPEAKER:  This is the order --

THE COURT:  All right.  What he's saying is that in the -- in that -- in collateral estoppel opinions or order or whatever we're calling it, that Vice Chancellor Laster went through and identified what he believed had been not raised

initially or had been raised and rejected by the Supreme Court and therefore is collateral estoppel attached to those issues.

MR. CAPONI:  Correct.

THE COURT:  It says what it says what it says.

MR. ALEXANDER:  it says what it says, but I'm just talking about the weight that you can give any of those findings.  It's a non-final order that can be appealed.  I mean, it's still subject to appeal.

MR. CAPONI:  Your Honor, I would -- I disagree with Mr. --

THE COURT:  Well, when was that issued?  Well, interlocutory, you don't appeal until there's a final order in the case and there's no final order in the case.  They wouldn't have a right to appeal anyway.  Right?

MR. ALEXANDER:  Well, that's what I was saying, Your Honor.  To --

THE COURT:  Right.  So, it's an inter -- I have to figure out what weight I give to the interlock orders.  I don't know.  And I hadn't thought about that because I didn't realize that this -- some of these decisions were not final decisions.  The only final decision we have is the Supreme Court of Delaware with respect to what you guys call the operating -- what --

UNIDENTIFIED SPEAKER:  Omnibus.

THE COURT:  Omnibus agreement.

MR. CALLAHAN:  Omnibus, Your Honor.

THE COURT:  That's the only final order we have, right?

MR. ALEXANDER:  It's the only one I'm aware of.

THE COURT:  Okay.  I don't know what -- I don't know. I'll figure it out.

MR. CAPONI:  Trust your judgment, Your Honor.

THE COURT:  Oh, why, thank you.

MR. CAPONI:  So, again, back to the -- what I was saying was the -- what Vice Chancellor Laster held was that as of the date that the Supreme Court issued its opinion, those findings and things that were not appealed, are done.  And so what -- going in -- what we were litigating going into the 225 phase two, the one-day oral argument is whether the secured debt, after November of 2021, had been converted.

So Your Honor, when we talk to the impacted other parties, Vice Chancellor Laster is going to determine whether the secured debt exists, whether it was converted, because we know it existed.  Was it converted after November of 2021?  And if it was converted, was all of it converted does some remain as secured debt.  So that applies to both Technovative and Stream.  So that issue needs to get resolved one way or the other and Vice Chancellor Laster is ready to do it.

THE COURT:  Well, we respect to -- just to refresh. The secured creditors, limited secure creditors, loaned money

to Stream?

MR. CAPONI:  Correct.

THE COURT:  And in exchange Stream, gave them some security interest in their shares and the in -- and Technovative or was Technovative directly con --

MR. CAPONI:  Broadly speaking, Your Honor, there's a lot of entities, but my client's got all the security right in Stream and in order to -- because the assets were at the operating level --

THE COURT:  Uh-huh.

MR. CAPONI:  -- it got -- Technovative is the entity that's sort of the -- the entity that then controls all the operating stuff, so we have secured rights and all the stock pledge rights, et cetera of that entity.

THE COURT:  In Technovative also?

MR. CAPONI:  Yes.

THE COURT:  And so Stream pledged their whatever and Technovative also pledged their -- oh.  Did Stream pledge its interests in Technovative?

MR. CAPONI:  Stream pledged the stock in Technovative.

THE COURT:  Right.  That's what I'm saying. Technovative didn't directly do it with voting members.  Was it via Stream?

MR. CAPONI:  Uh-huh.  There were 18 different notes,

Your Honor, and some of the money went directly down to the subsidiary level.  But in broad strokes, yes, the -- you can view it as the money went into the Stream, which is the holding company level.  We have a first and second, you know, secured priority interest in everything at Stream and below it.  And then separately, my clients had the rights to take the Technovative stock and appoint the board to --

THE COURT:  I get that, but that wasn't -- my question is, which is what I think I'm understanding you to say is that these -- whatever relationship existed between Stream and these -- between SLS and Hawk was the direct loan and the monies went down to some -- however it filtered down, but the agreements were directly with Stream with the security being the downstream entities.

MR. CAPONI:  Correct, Your Honor.

THE COURT:  And there's no direct loans between those downstream entities and these other parties, except maybe with SeeCubic in Amsterdam, but we're not going to talk about them.

MR. CAPONI:  Okay.  I agree, Your Honor.

THE COURT:  Is that a correct understanding of how this relationship is?

MR. CAPONI:  One or more of these downstream entities may be co signatories to the loan --

THE COURT:  Okay.

MR. CAPONI:  -- but functionally again, there,

there's 18 different -- or more than 18.  There's 18 Hawk notes and there's even more as additional SLS notes.  I think some of the lower entities may have been co-signatories, but functionally --

THE COURT:  so the --

MR. CAPONI:  -- was Stream.

THE COURT:  -- the assets that were pledged were Stream's --

MR. CAPONI:  Yes.

THE COURT:  -- interest in Technovative and their down --

MR. CAPONI:  Once you've wrapped Stream and Technovative if you have tho -- if you have the interest in those entities, everything else was wrapped up within.

THE COURT:  Right.  Okay.  All right.

MR. CAPONI:  So Your Honor, you know, impact on other parties.  The more quickly we can resolve whether there's secured debt and the amount of the secured debt, it's in everyone's best interest in this estate.  It will -- I mean, if my clients are correct, right, there is no estate because they exerci -- they're going to exercise their rights.  They're going to take the assets.  Maybe they'll be sold.

I mean, we view these assets as being worth substantially less than the debt.  I know Mr. Rajan thinks they're worth a fortune but, you know, that's a bridge for

another day, but we need to resolve whether there's secured debt.  And again, if the sales is pursued, if we have secured debt, we're going to pursue a sale in front of Your Honor.  It's not going to be a an extrajudicial sale or something along those lines.  And as a result, we will not be altering the rights of any of the other creditors by pursuing the 225 action.

THE COURT:  So counsel, is it Hawk and SLS' position that they're not secured creditors, that they are the owners of the shares and they own the company or that they are actually secured creditors with security interest in the shares that they want then sell or do something later on?  I'm not sure what.

MR. CAPONI:  So my clients are secured creditors and as part of that security, they received pledge rights where Stream pledged the shares in Technovative, the voting rights and those share -- sorry.  They pledged the shares.  Included within that was in the event of default, the proxy right, where we could say you have to give us, the lenders, the voting rights.  Not -- not -- we didn't take -- doesn't give us the right to just snatch without process the ownership rights, but we were able through self-help to take the simple stroke of a pen, our position, the voting rights and we did that.

THE COURT:  And with the voting rights, you could then do whatever the heck you want to do with the shares.

MR. CAPONI:  So one of the things -- so -- Your Honor, they're what's called, you know, this basket of secured creditor rights.

THE COURT:  Uh-huh.

MR. CAPONI:  And the main secured creditor rights pending a foreclosure sale were we had the right to instruct, we being my clients, had the right to instruct the Debtor to marshal all of the assets.  That's called the marshaling directive.

THE COURT:  Okay.

MR. CAPONI:  And then to turn those assets over to whomever we direct to preserve the assets pending a foreclosure sale or some other proceeding.  One of the way -- another way my client protected themselves was they had the voting rights to appoint the director of Technovative because as I mentioned, all the actual operating entities are below Technovative.  So if you control the board of Technovative, you're able to preserve your assets.

THE COURT:  When was this case filed?

MR. CAPONI:  Which case?

THE COURT:  This case.

MR. CAPONI:  This case was filed --

MS. WESTBROOK:  March.

MR. CAPONI:  -- March 15th of 2023.

THE COURT:  Okay.

MR. CAPONI:  So my clients in pre-bankruptcy, pre-225, exercised the marshaling right, the proxy right.  Mr. Rajan refused to honor any of that and the 225 is what was viewed as the most expeditious way because if we could get Technovative directorship, we could preserve the collateral because Stream, despite whatever, you know, the Court keeps hearing is it's nothing but a holding company.  It never had anything, no employees, no assets.

THE COURT:  Well --

MR. CAPONI:  It's technician on down.

THE COURT:  That it has something.

MR. CAPONI:  Right, but that's all it had that was worth anything.

THE COURT:  Okay.

MR. CAPONI:  It was never a functioning company.  So again, we're not going to alter anybody's rights, Your Honor.  We're going to adjudicate the secured debt and its status with the Debtor and then we're going to come back here.

THE COURT:  Right.  So one of the things I would assume -- maybe I shouldn't -- was that if I send you back to Chancery -- to the Chancery Court and there's a determination made that the right to exercise the proxy right was correct, you guys do whatever you want to come back here and say this is what we're doing.  Or it says it wasn't and then we are where we are.  And presumably we continue, assuming I don't, you

know, I don't dismiss it.  I'm not quite sure how I get to at this point, but I -- figuring out who was supposed to file this thing.  And then, if it stays here, you'll be -- well, with respect to Stream, you exercised your proxy rights with respect Stream's shares, Technovative's shares, whose shares?

MR. CAPONI:  Stream's shares in Technovative.

THE COURT:  Technovative.  Okay.  But not -- but Stream also pledged its shares --

MR. CAPONI:  No, Your Honor.

THE COURT:  No.

MR. CAPONI:  Yeah.  Not one cares about Stream.  It was -- it's just a holding company.

THE COURT:  I know, but that didn't mean --

MR. CAPONI:  Yeah, we -- so we didn't bother with that with that.

MR. CAPONI:  Didn't bother with that.  You may actually have the rights and then just didn't do anything with it.

MR. CAPONI:  I don't believe that right exists, Your Honor.

THE COURT:  Okay.  I don't know.  I'm just trying to make sure I have a correct understanding.  So, you actually -- you said you exercised proxy right -- your rights with respect to Stream's ownership interest in Technovative?

MR. CAPONI:  Correct.

THE COURT:  Okay.  And -- okay.

MR. CAPONI:  So Your Honor, if you send us back and let the 225 play out, you're going to get -- when he comes back, you're going to have all the facts that you need regarding whether there's secured debt, the amount of the secured debt, who has the voting rights and the ability to appoint the director of Technovative and from that, you'll be able to determine whether that was -- so a one day oral argument is going to do a tremendous amount of heavy lifting for this Court.  And the way I would -- because I like my analogies, Your Honor.  Vice Chancellor Laster --

THE COURT:  Football --

MR. CAPONI:  Vice Chancellor Laster is going to decide which cards each party ends up holding and then we'll come back in front of Your Honor in this bankruptcy and we'll play the cards, each side as best they can.  But all he's going to be doing is dealing the cards.  As far as this estate goes, we're going to come back here to play those cards and to find out who can do what and what each party's respective rights enable them to get out of this estate.

THE COURT:  Okay.

MR. CAPONI:  So the balance of the harm, Your Honor, it's far greater to the estate if relief is not granted because it's going to cost more money to stay here.  It's going to take more time and the questions regarding the secured debt or

threshold issues, that until they're resolved, they practically impede the Debtor's ability to get financing or to have a plan of confirmation.

I mean, the Debtor keeps saying, oh, we're going to get financing and we're going to have a plan.  You can't have a plan unless you know if you have secured debt, how much it is and what assets it covers.  Nobody in their right mind lends money to an estate not knowing whether they have any assets or hundreds of millions of dollars in assets.

THE COURT:  Well, apparently nobody is doing lending.  People want to buy in, from what I gather from the motion, that it was -- amended motion.  There's somebody willing to buy into the company.  They're not looking to lend money.  They want to take the risk of investment.

MR. CAPONI:  When we get to that motion, Your Honor, we'll explain to you that we believe that document is a fiction.  We don't believe that there's any such individual or any such company ready invest, but that's not an issue for today.  Again, the harm to the estate for having to redo everything here, the 225 presents an opportunity to have complex issues resolved very efficiently and it's going to be more costly here.

Your Honor, I mean, like as I've said from the beginning, we have an abandoned estate.  This thing has been languishing.  Nothing's been happening.  The Debtor -- it is

very clear they filed this case to avoid this one day oral argument and all that this estate has done is block, block forward progress. We've been stuck in status quo. No creditors committee. There's been no process to move anything forward. You don't see the Debtor coming forward and saying we want to resolve the secured debt.

Your Honor, we need to clear up whether SLS still has secured debt and if so, how much. They don't want answers to any of these questions because their goal is not to get answers. Their goal is to hide.

THE COURT: Counsel, I'm going to have to --

MR. CAPONI: Sure.

THE COURT: -- take on a -- just a five --

MR. CAPONI: Pardon?

THE COURT: -- five minutes.

MR. CAPONI: Sure. Thank you, Your Honor.

THE COURT: All right. Let's recess.

(Recess taken)

THE BAILIFF: All rise. Court is back in session.

THE COURT: -- interruption -- correct, counsel?

MR. CAPONI: Yes, Your Honor. A few things that -- one thing I wanted to point out the more I thought about it. The -- this is a one day rule argument, but it's by no means a simple issue being addressed. It's a one day oral argument. It's on a paper record, but it's not legal issues, meaning that

the Court is going to be taking into consideration deposition excerpts and transcripts and, you know, giving Vice Chancellor Laster's familiarity with the parties, the case and the witnesses, counsel at the trial level, myself, my counterpart, concluded that a paper record trial was doable, but this is by no means a, you know, one trick pony legal issue that could be resolved.

And I would also note that with respect to staying here, it appears that, my -- you know, Mr. Alexander now wants to contest the validity of the collateral estoppel opinion and whether there was collateral estoppel.  So not only would Your Honor have to be resolving all of the factual issues regarding the debt, now Your Honor's going to have to redo the work of the collateral estoppel opinion, where it would be much cleaner to let the Vice Chancellor Laster clean up the last bit and then if they want to take any of his findings up to the Supreme Court of Delaware and have them become final, they're free to do so.

MR. CAPONI:  Well, let me say with respect today.  This goes back to Chancery and their final orders issued and their appeal.  What do you think is going to happen there -- still going to sit here and languish until I get a final order?

MR. CAPONI:  Your Honor, Your Honor --

THE COURT:  I mean, the same thing could -- listen.  The same thing could happen here.  I could decide something and

somebody appeals and then what happens?

MR. CAPONI:  I don't think that far down the road in this case because every -- again, I was one week away from, from putting the 225 to bed.  Every time I think something in within my grasp, someone snatches it away.

THE COURT:  But counsel, even if --

MR. CAPONI:  So I think right in front of me.

THE COURT:  Right.  Even if they had not filed bankruptcy and you have your one day trial and the judge ultimately, perhaps by now -- because your trial was sometime in March?

MR. CAPONI:  It was going to be -- yeah, the week after, so March --

MR. CALLAHAN:  23rd.

MR. CAPONI:  -- 22nd.

THE COURT:  So about a little more than three months ago.  Presumably, you know, they're pretty quick.  Get the answer out.  Would that have resolved it or you still have to appeal and do all this other stuff?

MR. CAPONI:  Your Honor, it would have resolved it from our -- my client's position because once the court concluded that the debt existed, we automatically would have gotten the proxy rights.  We would have controlled Technovative.

THE COURT:  Even if they appealed it?

MR. CAPONI:  If they appeal it, they'd have to, Your Honor, the -- you -- the order from the Court of Chancery, unless Vice Chancellor Laster were to stay his own order, it becomes effective.  And I -- you know, again, this is -- as a litigant talking and being in front of Vice Chancellor Laster, he had had enough of the Debtor.  He was -- I can't fathom he would have stayed the implementation of that order.

THE COURT:  No, never mind.  Okay.

MR. CAPONI:  I mean, you know, stranger things have happened, but I don't think that was -- Your Honor, again --

THE COURT:  My question is only what is the effect of an appeal on that order?

MR. CAPONI:  -- the appeal the order is -- unless -- they would have to get to court in Delaware -- you have to make a petition to the trial court to stay the order.

THE COURT:  Uh-huh.

MR. CAPONI:  If the trial court then agrees, they have to post a bond.  And given the amount of -- given the, you know, the issues that are here and the fact that the Debtor filed bankruptcy, I think it's pretty clear they would not have had -- I mean, the bonding equipment alone, in order to get the bonding equipment, the court had required the posting of a $1 million bond.

So if you want to stay control over all of the other assets, as we see the Debtor had $2,000 in his bank account.

He was not going to be able to post a bond.  And then, you know, you'd have to post a bond that would be sufficient to protect the secured debt and then hope that the court would agree.  The court doesn't agree.

THE COURT:  So you don't have an automatic superseding bond like here in Pennsylvania.  If you -- and I would the equate the Chancery Court to the Commonwealth Court, which is not a regular court of common pleas.  It's not the superior court.  Commonwealth deals with specific issues typically involving governmental entities.  That's a little bit different, but it's still sort of get to the Supreme Court from there.  The Chancery Court is off on the side and it's not part of the superior court.

That -- but presumably, you both need the Supreme Court here, if you post a supersedeas bond and may, in fact -- and I haven't done state court litigation in 14 years, so don't hold me to that, but it typically stays everything until there's that ultimate decision.  So you're saying that that's not how it works in Delaware, that if -- even if you are able to post a bond, it does not stay the effect of the order.

MR. CAPONI:  You're not master of your own destiny in that regard be -- and because now the bond has to get set.  That gets determined by the trial court and I suspect one of the reasons Delaware may be different if we don't have any intermediate appellate court.  You go right, you know, from

Chancery to the --

THE COURT:  Right.

MR. CAPONI:  -- top brass.

THE COURT:  And I don't -- as I said, that's --

MR. CAPONI:  Yeah.

THE COURT:  -- typically we only have that from Commonwealth Court, but it's a different animal than corporations that you typically -- government entities, we don't have a supersedeas bond.  I don't think that -- and maybe the maybe the other parties.  I don't know in Your Honor.

MR. CAPONI:  And Your Honor, I mean, look, your question on appeal is a fair question, but I can tell you unequivocally whether you find against the Debtors or Vice Chancellor Laster finds against the Debtors, it's going to get appealed by the Debtor because you just need to look at the paper, at the record here.  Take judicial notice of the fact that this has been going on forever.

THE COURT:  Well, I --

MR. CAPONI:  It's going to happen.

THE COURT:  Well, that is a given.  If your client loses, you're going to appeal, too.

MR. CAPONI:  You know, we may, but I'm not going to lose.  And Your Honor --

THE COURT:  But that's not the point.  The point of the matter, when there are two parties who have such stark

differences in their opinion, whoever's the losing party, at least in my experience, it's appealed --

MR. CAPONI:  Well --

THE COURT:  -- because they believe that the court got it wrong or there was something that didn't happen right or whatever and that they were going to be vindicated on appeal.

MR. CAPONI:  Well, Your Honor, there's a slight twist in this case, which I'll explain to you right now.  There's two tranches of debt.  There's the SLS debt and the Hawk debt.  As I mentioned to Your Honor, the SLS debt was deemed outstanding and is outstanding.  The issue of conversion applied only to the Hawk debt.  There was a conversion rate that Hawk granted.

THE COURT:  Okay.

MR. CAPONI:  And that's what we were really litigating in the Court of Chancery is whether that conversion right has been exercised.  There's no conversion right with the SLS debt.  It cannot be converted.  It can only be paid off in full.

THE COURT:  So that only -- how much it is.

MR. CAPONI:  Well, and how much it is is math.  It's -- you know, there's no dispute about that.  Everyone agrees with what was borrowed.  The interest rate is set in there, so we -- what --

THE COURT:  It's a mathematical equation or is the Debtor contesting that they even owe this?

MR. CAPONI:  No.  They don't contest that they don't owe the SLS debt.  I think -- I believe it's even scheduled here, right.  So they even -- even in this bankruptcy --

THE COURT:  So what are you going --

MR. CAPONI:  -- it's listed as debt.

MR. CAPONI:  So what are you going to Chancery Court to determine?  That's just simple math.  What do you need to go there for?

MR. CAPONI:  Well, in SLS, Your Honor --

THE COURT:  Uh-huh.

MR. CAPONI:  -- the only thing we're doing there is to have the court say yes, they validly exercised their proxy, right.  And the reason I'm say --

THE COURT:  I thought that was only Hawk that had a proxy.

MR. CAPONI:  Hawk has the proxy right and so does SLS, but only the Hawk debt can be converted, so going into the trial, Your Honor --

THE COURT:  Uh-huh.

MR. CAPONI:  -- and again, to give context, I'm one week -- I'm a day from the pretrial conference.  We've agreed this is going to be argued on the paper record.

THE COURT:  Uh-huh.

MR. CAPONI:  And the Debtor has admitted that the Hawk -- excuse me -- the SLS debt cannot be converted and they

don't have the money to pay it off.

THE COURT:  Okay.

MR. CAPONI:  What that means is I can't lose, because I only need one dollar of secured debt to exercise those proxy rights and I have in excess of $15 million in secured debt. The Debtor acknowledged it can't -- it cannot even conjure an argument to get rid of it.

THE COURT:  But even if -- you just put the SLS separately.  You go back to Chancery Court.  All you're going to get from the Chancery Court is how much is owed.

THE COURT:  With regard to the Hawk debt, whether it's secured, how much, you know, is there secured debt and the amount of that secured debt.

MR. CAPONI:  I thought we were talking about SLS, the only thing the Court of Chancery is going to do is say, yep they exercise their proxy right.

THE COURT:  But I thought it was the other way around.  I thought Hawk had -- only had the proxy right and SLS didn't.

MR. CAPONI:  They each had a proxy right.  Each had separate independent proxy rights

THE COURT:  But SLS is not --

MR. CAPONI:  Subject to conversion.

THE COURT:  Okay.  But I thought you said SLS had no conversion rights.

MR. CAPONI:  It has no conversion -- right -- sorry.

When I say conversion rights, what I mean is SLS, it's debt, cannot be converted by the Debtor.

THE COURT:  Converted by the Debtor or converted by the --

MR. CAPONI:  By the -- cannot be converted by the Debtor.

THE COURT:  Converted -- meaning, what do you mean by converting?

MR. CAPONI:  By converted means the Debtor raises -- the way the conversion worked with Hawk is if the Debtor raised a certain amount of new money --

THE COURT:  Right.

MR. CAPONI:  -- then the Hawk debt would go from debt to equity.

THE COURT:  Okay.

MR. CAPONI:  And so if you wipe it out from secured debt to equity --

THE COURT:  Okay.

MR. CAPONI:  -- then you don't have any secure credit rights.  But SLS could not be converted by the debt.

THE COURT:  Right.  They only had a -- they had a right to exercise the property and they had a right to get paid.

MR. CAPONI:  Exactly.  And the Debtor now doesn't and

he didn't have and clearly doesn't have the money to repay SLS.

THE COURT:  But that's -- that's besides the point. The point for my purposes is SLS did not exercise their right of property prior to bankruptcy.

MR. CAPONI:  Yes.

THE COURT:  Okay.  And so the only issue right now is that in respect to the Chancery Court, the only thing you're going to go back there for SLS is find out how much they owe.

MR. CAPONI:  No. The only thing we're dealing with SLS is to find -- is for the court to confirm that the SLS debt is still outstanding and then exercise its proxy rights and therefore could appoint --

THE COURT:  You would want to exercise their property right.  Or did they already?  I thought they didn't.

MR. CAPONI:  We did all -- we exercised them, the Debtor rejected that and said I don't honor it.

THE COURT:  So as -- so both SLS and Hawk exercised their proxy right?

MR. CAPONI:  Of course.

THE COURT:  Oh, I -- okay.

MR. CAPONI:  They did -- everything they've done they've done in tandem.

THE COURT:  Oh, okay.  All right.

MR. CAPONI:  And so the state of play going into the trial was the Debtor had no defense to the SLS debt and the

right to exercise the proxy.  And they were attempting to argue that the Hawk debt had been converted.

THE COURT:  Okay.

MR. CAPONI:  So again you're, you're obviously explaining my confidence that I can't lose because I can't lose unless the Debtor somehow comes up with $15 million in cash. And the last time I turned around, they've got $2000 in the bank account.   So.

THE COURT:  Well maybe that's why they want to get in the investment of 300 million because they may have the money there.  I don't know.  Seems to me that -- that's to be what the play might be, I don't know.

MR. CAPONI:  So, Your Honor, in getting to the, again, you know, balance  of the harms.  I think it's more harmful to let this issue linger than to get it resolved.  This estate has been languishing and the Debtor is taking no forward motion and moving this estate along.

The Debtors only defense, Your Honor, as I understand it, is to argue balance of the harms and the Debtors raises two points really, which I think are illusory arguments. The first one is they don't want to lose.  Well, losing is not a harm --

THE COURT:  No one wants to lose.

MR. CAPONI:  That's not a harm under the code.  When you look at what is, you know, what's cause and what's a harm, or relief from stay, the harm is going through the process, is

going back to state court a harm that Your Honor should consider.  The outcome is not a harm.  Because if my client owns debt, well then being told that you don't own what you don't own isn't a harm; that's just called the legal outcome.

It's a question of, is the process going to be burdensome on the Debtor.  And as I walked through the process, it's going to be far less burdensome, going back to the Court of Chancery where we have a one day oral argument then it's going to be to recreate the wheel here.

The second claim that the Debtors have argued is that somehow the Court of Chancery is going to rule and we're going to run off and sell all the assets.

But as I explain, Your Honor, we can't sell the assets and we have no intention of selling the assets.  Once the Court of Chancery rules we will come back here and advocate, when I win, that the Technovative bankruptcy has to be dismissed and then we will proceed to levy on our collateral and deal with whatever arguments are raised by the Debtor or other creditors at that time.

But unlike Mr. Rajan, we don't take matters in our own hands.  I'm not going to go rent a U-Haul truck and start hauling away equipment, right?  So --

THE COURT:  Somebody do that?

MR. CAPONI:  Excuse me?

THE COURT:  Did anybody actually went and took

equipment and hauled it away?

MR. CAPONI:  Your honor, you know, Mr. Rajan has been engaging in self-help when he doesn't like an order and he files a bankruptcy --

THE COURT:  Well, Counsel --

MR. CAPONI:  -- rather than going to court.

THE COURT:  Well, he can -- he made his choice. He made his argument and he believed he had a legal basis to file. I don't necessarily call that self-help; that's arguing your position.  My question is, is he taking equipment?  Is somebody moving the equipment?

MR. CAPONI:  Oh, Mr. Rajan has repeatedly attempted to take the equipment and that's what we've been fighting with over in --

MR. ALEXANDER:  Your Honor, I'm going to object. There's no evidence, record for this.  There's nothing attached to their motion.

MR. CAPONI:  Just answering a question.

MR. ALEXANDER:  I understand.

THE COURT:  So you asserted that unlike Mr. Rajan, you weren't going to go cart it away.  And my question is, has he been carting it away, and it seems to me the answer is no. And so I don't think I would give much weight to that.  So that's all I'm saying, is you're going to say something, I need something to back it up.

MR. CAPONI:  Well, when I say, engage in self-help, Your Honor, I'll parse -- or disagree with what you said. You know, I'm free to argue.  This is arguing.  Ignoring an order and not going back to court, what Mr. Rajan did, was not, that was self-help.  He didn't like something and he acted.

THE COURT:  Well, I don't think I agree with that.

MR. CAPONI:  Okay.

THE COURT:  I think that he looked at the order.  He believed that it was -- once it was -- once it was determined that the bar was unconstitutional, that they proceeded.  I'm not --

MR. CAPONI:  I understand, Your Honor.  I'm explaining to you why I consider it to be self-help.

THE COURT:  Okay.

MR. CAPONI:  And why I used that term and I didn't use it lightly.

THE COURT:  Okay.

MR. CAPONI:  With regard to, again the case, Your Honor, the Debtor has no harm.  These questions have to be answered one way or the other and the most efficient way to do it is to have -- chance last to resolve it.

Now, Your Honor, I'll wrap up my remarks by saying this.  It makes eminent sense to go back, if the Debtor is confident in its position, it wants a resolution as quickly as my clients want a resolution.  Every creditor in this case

should want these issues resolved as quickly as possible as

should Your Honor.  And that gets done before the Court of

Chancery for the least amount of disruption and cost.

It also has the benefit, Your Honor, of -- because

we're not taking any live testimony, we can go resolve those

issues while Mr. Rajan recuperates and maybe by the time he's

better, Vice Chancellor Laster will have given us a decision

and he can go back here and pick up -- and we're not, again

just stagnating along with this case the way --

THE COURT:  Well, Mr. Rajan's testimony or anything

is not required with respect to any issues.  Who has what

authority and whether that these proxy rights more properly

exercised, correct?

MR. CAPONI:  Correct.  And we've all taken his

deposition and that's part of the record, and there will be no

live witnesses, including Mr. Rajan.  So, you know, why we wait

for him to recuperate, here's a way to substantively advance

this estate.

THE COURT:  Okay.

MR. CAPONI:  And Your Honor, again it -- you know, I

came here today thinking okay well, it's going to resolve the

secured debt, but now it's going to resolve the secured debt,

it's going to resolve the collateral estoppel opinion validity.

It's going to resolve the proxy.  It's going to resolve whether

the filing results are -- so there's many, many benefits to

having Vice Chancellor Laster just resolve this.

And I, you know, the only, only reason not to do it is because the Debtor doesn't want to hear the outcome and it --

THE COURT:  Let me call you back.  I'm in court.

MR. CAPONI:  -- it is doing what it did from the beginning, Your Honor, it filed this case to get the benefit of the automatic stay, to freeze everybody in place.  But one only need to look at the docket to see since this case was filed there's been no substantive forward progress.

And if the Debtors really believed -- if the Debtors counsel believed they were administering the state and pushing it forward, they'd be the ones in front of Your Honor, and they would have said -- they would have filed a motion three days into this bankruptcy saying we want Your Honor to resolve these issues of the secured creditors.  We need Your Honor to immediately address whether Hawk has secured debt.

I mean you -- conspicuously absent from any filing by the Debtor or getting answers to those questions because they know the answers to the question.  Everybody knows the answer to those questions.  They just don't want to hear the answer to those questions coming from someone wearing a robe.  And unless you any questions, I'll yield the podium.

THE COURT:  No questions.

MR. CAPONI:  Thank you.

THE COURT: Mr. Alexander, why shouldn't I get -- so you guys can go back to the Chancery Court and get these matters resolved?

MR. ALEXANDER: Good afternoon, Your Honor. We believe the motion should be denied for various reasons, and as a threshold matter we do believe that it does require evidence I mean half of what was argued, you know, isn't supported by legal argument. You need evidence in order to get that admitted for the Court to make the factual determination as to whether cause exists. Cause itself is a factual finding that requires evidence.

So that's an initial matter, Your Honor.

In terms of why this court should not send the proceeding back to Chancery Court because all that's doing is creating more work for this Court. You know, as Mr. Caponi indicated, sending it back to Chancery Court does not resolve all of the issues. There would need to be some findings there and then they still have to come back to this Court where this Court is a forum that can address all of the issues.

THE COURT: Well, what I'm hearing from Mr. Caponi is that if you guys go back to state court with Judge Laster and he issues a ruling with respect to all of these disputes, that absent some stay, it's final. I mean, it would -- that would be nothing impeding SLS and Hawk from proceeding and exercising their rights, if we went back. Well, I guess they'd have to

come back here and ask could they exercise their rights, because I don't know, but --

MR. ALEXANDER:  But Your Honor, they can't exercise their rights unless they get state relief in order to exercise their rights.

THE COURT:  Right, I get it --

MR. ALEXANDER:  They haven't requested state relief to exercise their rights.

THE COURT:  Well, what I'm -- what I'm -- what I'm not understanding is that they go to state court and they go back to Judge Laster, and he makes a ruling, and in that ruling he finds that they properly exercised their proxy right. Then they would have to come back here and say Judge Laster said that we properly exercised and we want you to recognize that, and then we're going to do this here.

What I'm hearing is that if Judge Laster makes a ruling with respect, let's just focus on the property rights, that the likelihood that that decision would be stayed or not given effect is slim to none.  That's what Mr. Caponi is saying.  He'd be shocked if Judge Laster stayed the effect of that decision.

MR. ALEXANDER:  Well, I can appreciate what he may have said, but that's not evidence.   His remarks --

THE COURT:  I --

MR. ALEXANDER:  -- aren't evidence because you can

post a supersedeas bond and in that case, there are no damage. I don't know what damages they're seeking because --

THE COURT: Well --

MR. ALEXANDER: -- there is no damage claim.

THE COURT: Well --

MR. CAPONI: It's an equitable claim that being sought.

THE COURT: Well, that's what I'm saying. I'm not talking about evidence. I'm talking about what I asked, what what was the legal effect if that decision is in favor of SLS and Hawk. He said that there would be no stay of that order. Because I asked, I said, well --

MR. ALEXANDER: He can apply for a stay, Your Honor.

THE COURT: He said you -- the likelihood you get one is slim to none.

MR. ALEXANDER: Well, I'll say the likelihood is better than that. What does that get us? It doesn't help us Your Honor. I mean, if the judge has to make a determination and if you post a bond, I believe you get the stay.

THE COURT: Well, I don't -- I don't know because what I'm trying to figure out is if you went back to Chancery Court and the Chancery Court decided and then you will come back to me with that decision. If that decision is stayed, what the heck does it get me?

And he's saying it won't be stayed. And so I don't

know enough about Delaware law, which is what I was asking for, is if you appeal, or is it stayed absent -- if you post a supersedeas bond, is it automatically stayed?  He said no.

MR. ALEXANDER:  Your Honor, I'm not a Delaware lawyer.  I'm not going to opine on that, but I'm sure we can look at the issue for you and advise you whether or not such a ruling could be stayed.

THE COURT:  But I mean, that's important for me.  Well, I mean, it doesn't really -- I mean, if you come here and I decide, and you appeal, I guess I would have to -- the same of the same thing would happen.  You would ask for a stay pending appeal and I would say yes or no.  And if you didn't like my decision, you'd go to the district court and say we want a stay pending appeal.

MR. ALEXANDER:  The difference is, Your Honor, that's not the sole issue between the parties.

THE COURT:  I get that.

MR. ALEXANDER:  And so in order to resolve the claim --

THE COURT:  Well, that's the claim, but it's a real threshold matter for the authorization of a file because their position is, is that we exercised our proxy right and therefore because we exercised our proxy right, we exercise the voting rights with respect to the -- respect to stream interests or shares, not interest shares in Technovative.  And if we, we

mean the moving party have that right, we're going to come here and say we don't want this case here, because we do have that right and not Mister -- not Stream.

MR. ALEXANDER: Well, you know, on that point, Your Honor, I'm not sure which of them -- I don't think they can both exercise the proxy right at the same time.

THE COURT: Well, they claim --

MR. ALEXANDER: I think one of them need to exercise it. I'm not sure. We'd have to look at the documents that I don't have in front of it.

THE COURT: Well, Mister --

MR. ALEXANDER: I understand what he's claiming.

THE COURT: -- that they both get it.

MR. ALEXANDER: He's claimed a lot of things, but that doesn't mean there's record to support what he's claiming. I don't know, I don't have that in front of me right now.

THE COURT: Well, I'm --

MR. ALEXANDER: But the issue, Your Honor, is what we talked about earlier, is even if they did exercise a right, then we believe that we have case law that we've presented in our papers that indicated that because Technovative was the sole owner of the -- I'm sorry, Stream was the owner of the stock, those rights based on the turnover provisions of the bankruptcy code, which is an issue for this Court to decide, property of the estate under 541, come back to the Debtor.

THE COURT:  I get that.  But the only thing that comes back to the Debtor is what existed at the time of the filing.  And if the Debtor didn't have that right at the time of the filing, the bankruptcy court filing -- I mean the bankruptcy filing doesn't send it back.

MR. ALEXANDER:  Your Honor, if it's a management, right, we believe that it does come back, and we --

THE COURT:  Well, they're that it's not -- they're saying it's a right --

MR. ALEXANDER:  It's a proxy, it's a voting right.

THE COURT:  But --

MR. ALEXANDER:  But if they didn't retain, they didn't accept a rent that's not returnable because they already have it in their physical possession.  This is an intangible that goes along with the stock. So they, you know, the other --

THE COURT:  Well, putting that aside, it's still disputed and somebody has to figure it out.  So what they're saying is just send it back and let Judge Laster figure it out. You don't have to -- and then when he does it, just bring it back.  That's -- I don't have to decide today who had the right, whether they properly exercised the right of proxy, whether they even have the right.

All of that is what's before me is let us go back to Chancery Court because we believe that that court is better equipped and in a better position to most expeditiously resolve

that issue.  That's what they're saying.

MR. ALEXANDER:  Yes, Your Honor, that's what they're saying.

THE COURT:  Right.  And you're saying, no, I shouldn't give them relief because, and one of the things that I was asking was, okay, this isn't anything any of you guys brought up, which was okay by -- let me go back there and it gets, and there's a decision, well what does that mean for me. If it's repealed, or I mean, are we going to be right back where we are today with me waiting for some court to decide who has the right to do anything. These cases aren't going to just sit here while somebody's trying to figure that out.

MR. ALEXANDER:  Your Honor, I think that's one of the important things that the Debtors are attempting to do and as we filed a motion with respect to the equity contribution. What that will do, and Mr. Caponi acknowledged, the SLS claim can be repaid.  And so the Debtor is still in its exclusivity period in this bankruptcy case to propose a plan, and the Debtor intends to propose a plan during the exclusivity period.

THE COURT:  Yeah, but Counsel --

MR. ALEXANDER:  The plan will take care of the debt, once the debt --

THE COURT:  I don't see much happening in here. I mean, we got a couple of motions.  I do have an answer on the request for a mediator for my colleague.  We did manage to get

that done on my little lunch break.  But what else has happened so far?

MR. ALEXANDER:  Your Honor, let me tell you what will happen once that money comes in.  You know, the Debtor, the Debtors will be able to satisfy the SLS claim and the Hawk debt is convertible.

THE COURT:  Well, they say it's not.

MR. ALEXANDER:  No, they didn't.  They acknowledged that it is convertible.

THE COURT:  If you have the money.

MR. ALEXANDER:  Well, that's what convertible means. If you satisfy the conditions, then it can be converted.

THE COURT:  I get that, but I --

MR. ALEXANDER:  They're saying we can't, we're incapable of --

THE COURT:  Incapable of --

MR. ALEXANDER:  -- getting the money to do it, not that the debt isn't convertible to equity.

THE COURT:  Oh, okay.  So --

MR. ALEXANDER:  So --

THE COURT:  Let me parse this out for my --

MR. ALEXANDER:  Okay.

THE COURT:  -- edification. Your position is not -- which, you know, getting into the weeds because it's really trying to figure out whether I grant relief or not.  But the

issue is, is that -- not that you don't have the right to do it, they're arguing you can't do it.  Right?

MR. ALEXANDER:  That's what their argument is.

THE COURT:  Right.  Not that you don't have the right to do it.

MR. ALEXANDER:  That's the way I understood their argument.

THE COURT:  Okay.

MR. ALEXANDER:  And we're indicating that through the plan and through the equity, via the amendment to the motion that we filed, that will resolve all of those issues.  It will not only be sufficient to satisfy the SLS debt, but it would be sufficient to convert the Hawk debt.  And once that's done, they have no more proxy rights, the proxy rights go away.

THE COURT:  Well --

MR. ALEXANDER:  And if Your Honor were to send it back and two weeks later we bring the money into this bankruptcy court through the screen bankruptcy, that changes the whole dynamics of the 225 action.

THE COURT:  Well, what I'm trying to figure out maybe this is not my -- maybe this is just me not understanding, is that the right to exercise the proxy right was conditioned upon default.  Right?  I mean, you just can't go exercise just because you feel like it.  There has to be some condition preceding that would have allowed this to happen.

MR. ALEXANDER:  I believe there's a document which indicates and it -- the title of the document --

THE COURT:  Right.

MR. ALEXANDER:  -- but there's a document with the requirements in order for them to exercise, I agree.

THE COURT:  Right, but there's some conditions preceding that they --

MR. ALEXANDER:  Correct.

THE COURT:  -- that have to occur, one of which they claim is default.  I don't know if that's right or wrong because I don't know the documents, I haven't seen the documents.  One of which was, was default.  He defaulted, we exercise our proxy rights.  My question is, once that was exercised, does that cut off Stream's right to convert?

MR. ALEXANDER:  No, it did not cut off the right and that's why due to the bankruptcy and the money that comes in conversion is still alive.  And although, you know, I indicated I'm not sure what weight you can give the collateral estoppel order, but I believe in that order, it's still indicated that the Hawk debt is convertible.

THE COURT:  So what do you believe will happen if it goes back to Chancery Court?  And why it shouldn't?  I mean, the whole, what I'm understanding is, if there's two reasons I gather everybody wants to go back there.  One is to determine the proxy right to figure out did Mr. Rajan -- did Mr. Rajan

have the authority to file.  Because if you go back there and the proxy was properly exercised, clearly then their person was a -- and not Mr. Rajan.

MR. ALEXANDER:  Well, we dispute the result of that would mean that Stream once it filed bankruptcy didn't have the authority to remove the director and appoint a new director --

THE COURT:  So you're saying even if you go back to 225, who cares what the Chancery Court said because once they filed it didn't matter anymore.

MR. ALEXANDER:  That's correct, Your Honor.  That's the point I made earlier.  So we're doing a exercise in our view of futility because based on the bankruptcy code, those rights be vested with the Debtor, because they never foreclosed on the interest.

THE COURT:  Okay.  And so -- well, they believe they foreclosed on the --

MR. ALEXANDER:  They do not believe they foreclosed on the interest.   There's no evidence record of anywhere that they foreclosed on anything.

THE COURT:  Okay.  Well, they believe -- let me back up.  They believe that they properly exercised their right to the proxy right, right?  Isn't that what they said, that they properly --

MR. ALEXANDER:  They did say that, Your Honor.

THE COURT:  Okay.

MR. ALEXANDER:  But as we indicated, we've cited case law in which the rights related to an ownership interest -- if you don't foreclose prior to a bankruptcy filing, those gets turned back over because essentially you're a custodian, holding those rights, they're not yours.  You don't own them, you're a custodian, and they go back immediately to the Debtor.

THE COURT:  So you're saying even if I send this back to Chancery Court, who cares if they found out that they properly exercised their rights, their proxy rights because they didn't foreclose it.

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  They had a right to foreclose, but they didn't, so therefore it comes back to the Debtor when they file bankruptcy.

MR. ALEXANDER:  That's right.  And they haven't sought stay relief in order to exercise any other rights.

THE COURT:  Well, I guess it's sort of a round robin. Because I'm saying if -- giving me something.  I'm trying to parse this up.  If they exercise their proxy right now. Okay. Which they believe they did by appointing -- they did -- they exercised their proxy right and then Mister -- I apologize if I'm butchering the name.  Okay.

MR. ALEXANDER:  He explained to me that the second T is silent.

THE COURT:  My accent sometimes in, so I apologize

and that's why I pronounce names the way I want to pronounce them.  Because I have my own version of how you interpret English words.  But in other words, what I am trying to figure out is that I have to sort of balance what you're saying is that once bankruptcy was filed, which is typically what happens, whatever goes on in state court, bye bye.

You're here now and I got to figure it out.  So if you were in -- back in state court, and I want to go back to my mortgage because it's very simple for me.  And the parties were arguing that there was not a valid mortgage, and the lender said there was a valid mortgage, and I exercise my right on the valid mortgage.  And this typically is going to in a commercial because in a --

MR. ALEXANDER:  Individual.

THE COURT:  -- in a personal residential -- some complications.  But if they said we had a right to confess judgment and take it, and there's the issue of whether the concession was properly done because you confess you once you screw it up you're done.  So we confess judgment and we properly did it and therefore that gave us the right to not only take the prop -- to get a judgment against you, but also to exercise our right with respect to whatever collateral was placed.  In this case it was the shares, it was Stream shares in Technovative.

MR. ALEXANDER:  It was shares of Technovative.

THE COURT:  Yes.  Stream -- the shares that Stream --

MR. ALEXANDER:  Owns.

THE COURT:  -- owns, which you believe is 100 percent of the shares in Technovative.  Okay.  So if that happened in a court and you came here, I'd have to figure out, well, did you properly exercise your right of confession, confession and judgment.  And even if you got a confession and judgment, what does that mean you can do with it, unless you executed and took title, you can't do anything.  Okay.  Good.  You do now have a secured client.  So is that the same thing that we're talking about or we talking about something different?

MR. ALEXANDER:  I think it's a little different.

THE COURT:  Uh-huh.

MR. ALEXANDER:  I mean, one there is no judgment with respect to the actions that they took --

THE COURT:  Right.  Well, we put -- right.  Let's put the judgment aside.

MR. ALEXANDER:  Yes.

THE COURT:  Let's put that I properly exercised my con -- my confessed judgment and I properly did it.  And when I properly confessed judgment that gave me the right to exercise, because it's not only me putting the issue of whether I got a judgment.  When I confessed judgment it gave me all of these remedies and one of the remedies was I'm going to exercise my right of proxy with respect to those shares.

MR. ALEXANDER:  Uh-huh.

THE COURT:  And the Debtor is contesting whether the lender properly exercised the right of confession.  Okay.  Are you arguing the same thing that they didn't properly exercise the right -- their proxy rights?

MR. ALEXANDER:  So twofold, Your Honor.

THE COURT:  Uh-huh.

MR. ALEXANDER:  In the 225 action, I believe, yes, they are arguing that the -- they didn't have the right to exercise the proxy because Stream raised sufficient funds such that the Hawk debt would be converted.

THE COURT:  But you're saying that right still exist, the right to convert.

MR. ALEXANDER:  Our position is that they are converted, and you know, that is an issue --

THE COURT:  Oh.

MR. ALEXANDER:  -- that we'll address, they filed the proof of claim and it'll be addressed as part of the proof of claim process.

THE COURT:  And the proof of claim is for what?  So they're creditor, lender, owner, what?

MR. ALEXANDER:  Well, it's tough to tell because they listed just about everything you could possibly list.  I mean, each of SLS, SeeCubic, and Hawk, kind of all listed the same thing for their claims.  Hawk obviously listed more than

SeeCubic and SLS, but the Hawk claim included all of the purported SLS and SeeCubic claims.

THE COURT:  So what was the basis for their claim?

MR. ALEXANDER:  The basis for -- Well, the basis for the SLS claim, I believe was the debt that they're owed.  And they also said that they may have funded other monies to debtor affiliates, that they believe the Debtor owes.

THE COURT:  And they claim their secured in what?

MR. ALEXANDER:  Well during --

THE COURT:  I mean in their proof of claim.

MR. ALEXANDER:  In their proof of claim?  They just attached their documents and they believe that they're secured in all assets of Stream.

THE COURT:  Okay.  Any mention of these proxy rights in their claim?

MR. ALEXANDER:  There was no mention of proxy rights, other than I believe the proxy is possibly part of the loan documents.

THE COURT:  It's a question.

MR. ALEXANDER:  But I don't -- I don't specifically know that, but I don't think they had on the proof of claim form.  I don't recall seeing, I mean, they would know better than me, but I don't recall seeing any claims specifically with respect to proxy rights.

THE COURT:  That's -- the question.  And this is just

talking because I don't have anything in front of me.  I don't have any evidence, but that's why I'm like, I don't know why we're spending all this time arguing when I'm going to need evidence.  But go ahead. So you believe that by filing the proof of claim that they submitted to the exclusive jurisdiction of this Court and therefore I should not grant them relief from stay?

MR. ALEXANDER:  They submitted to the jurisdiction of the court and the claim administration process is a court proceeding within this court and should be resolved as part of the bankruptcy process because the -- core jurisdiction over that claim.

THE COURT:  Well, you don't think it matters that I have court jurisdiction over -- I can have somebody do an initial finding for me?

MR. ALEXANDER:  When you say someone do an initial --

THE COURT:  Well, in other words --

MR. ALEXANDER:  Who -- I don't know who --

THE COURT:  Well, someone would be Chancery Court.

MR. ALEXANDER:  Uh-huh.

THE COURT:  That I don't have the authority to say yes, the proof of claim is an issue before me.  But there are some basic -- well, there are some fundamental issues I need resolved before I can get to the proof of claim, and say, well, another court was adjudicating that -- adjudicate those matters

for me and then I will figure it out in the proof of claim mitigation.

MR. ALEXANDER:  Well, you haven't made that argument, Your Honor, that you don't have the jurisdiction to do that.

THE COURT:  No, I know that, but --

MR. ALEXANDER:  That's not.  We didn't make that argument --

THE COURT:  Right.

MR. ALEXANDER:  -- and I don't believe that would be an accurate depiction of the law.

THE COURT:  Okay.  But what I'm saying is that -- my question is, is why wouldn't I send it back to a court who has already have all of the information, all of the -- because what needs to be -- seems to me you file a proof of claim, what is it that I'm going to adjudicate in this proof of claim?  I'm -- you're already here.  I need this other court to help me figure that out.

MR. ALEXANDER:  Well, there -- the issue, Your Honor, is that there are other -- there's other litigation pending against certain of the -- I don't know if it's all three of them, but there was pre-petition litigation that the Debtors filed against those parties.

THE COURT:  What's going on with that?

MR. ALEXANDER:  It's been -- it hasn't moved forward since the bank --

THE COURT: Well, you're the plaintiff, you have them come in and ask for relief, because they're the claimant, right?

MR. ALEXANDER: Correct. Actually they both have not proceeded. But as part of the claim administration process, we believe those would be addressed, so the Court can address all of those issues in one forum as opposed to the Delaware District Court, the Delaware Chancery Court, it will all be brought into one forum and it will be more efficient for this Court to address that as opposed to piecemealing it in different forms.

THE COURT: Well, what are you trying to figure out?

I get that one of the core issues that the parties want resolved is who was in charge, who was the board of directors for this debtor because it goes to the core issue of whether this filing was appropriate or not. And you're saying it does not matter whatever was pending in the, Chancery Court because once we filed whatever those issues were, they're stayed and it can't be addressed because -- went back to Stream, the Stream issues, is that what you're saying?

MR. ALEXANDER: Yeah, their exercise of any creditor rights are stayed by virtue of the automatic stay.

THE COURT: Okay.

MR. ALEXANDER: By virtue of the property of the estate and turnover provisions of the bankruptcy code to the

extent they're claiming that they had the right to exercise the proxy or that they weren't exercising the proxy --

THE COURT:  Or they did exercise the proxy.

MR. ALEXANDER:  Or they did exercise the proxy because they didn't foreclose those rights came back because they were merely a custodian holding those rights.

THE COURT:  Okay.  So what I'm hearing you saying, somebody has to, you're saying that with respect to the governing law that even if you exercise the right of proxy -- right of proxy, your right of proxy, that it really doesn't mean anything until you foreclose?

MR. ALEXANDER:  It -- no, not that it doesn't mean anything --

THE COURT:  Uh-huh.

MR. ALEXANDER:  -- but that to the extent you didn't foreclose a bankruptcy filing requires it to go back to the Debtor.

THE COURT:  Even if you properly exercise a pre-petition?

MR. ALEXANDER:  Correct, Your Honor.

THE COURT:  And that's based on what?

MR. ALEXANDER:  I believe there's a -- I'd have to get the name, but we cited a few cases in our papers --

THE COURT:  Okay.

MR. ALEXANDER:  -- and also Judge -- in Delaware

issued an opinion, or an order in a case in which a similar issue was tried. And he found that the rights were part and parcel of the ownership interest. And so they came back to the estate of going to bankruptcy file.

THE COURT: Oh, okay.

MR. ALEXANDER: And we have a couple of cases that we cited, you know, in our papers indicating that management rights our property of the estate.

THE COURT: But again, my question is management rights as of when? As of the petition -- when?

MR. ALEXANDER: So I'm saying in connection with a equity ownership.

THE COURT: Uh-huh.

MR. ALEXANDER: So you have the ownership interest and you have the other rights that come along with it.

THE COURT: So you're saying even if they had exercised their proxy right, it was an equity ownership?

MR. ALEXANDER: But they never received the actual ownership and so our view is because they didn't actually have the stock as well --

THE COURT: Oh, okay.

MR. ALEXANDER: -- they were a custodian of whatever those rights were under the proxy.

THE COURT: Even if they'd exercised it?

MR. ALEXANDER: Right, they are a custodian of them.

And that those go back to the estate under the turnover provisions because it's expressing -- dictates what happens to custodians.

THE COURT:  Okay.  I'll have to -- I'm trying to parse this out again.  Is that if Hawk, because we want to stick with Hawk because Hawk -- they said that Hawk exercised their right -- well, they said, actually both of them.  Let's say this the secure -- well, you're -- are you disputing that SLS is a secured creditor?

MR. ALEXANDER:  Are we disputing that they're a secured creditor?  Their debt was listed as disputed on the petition.

THE COURT:  But are you disputing that they're a secured creditor?  You can dispute the amount, but are you disputing whether they are a secured creditor at all?

MR. ALEXANDER:  Oh.  I mean they have documents that they executed which gave them rights and gave them a security interest in the Debtors assets.

THE COURT:  Okay.  So you're not disputing that?

MR. ALEXANDER:  I'm not disputing that those documents were entered into.

THE COURT:  Okay.  And you're disputing what with respect to SLS?

MR. ALEXANDER:  I'm not sure what we're disputing yet.  They just filed their proof of claim and if the amount of

their claim is appropriate, then maybe the only issue and claim against them would be any set off that they have for the mitigation claims.  But in terms of their debt --

THE COURT:  Uh-huh.

MR. ALEXANDER:  -- if, you know, the debt is a calculation of what that is --

THE COURT:  Uh-huh.

MR. ALEXANDER:  -- you know, then --

THE COURT:  Well, I wasn't asking the cal -- because you can dispute a debt for two reasons, you can -- one good reason, so one could be, you don't believe we owe the money.  We don't believe they're secured or we don't believe whatever they're claiming they're owed is valid.  I'm trying to parse out the number that we -- we don't believe they're secured, the number is wrong, or -- what was the other one?  I forgot.

MR. ALEXANDER:  Well, how about this, Your Honor?

The claims that may be asserted against SLS --

THE COURT:  Uh-huh.

MR. ALEXANDER:  -- may reduce the amount of the claim.

THE COURT:  Okay.

MR. ALEXANDER:  And if it reduces the amount of the claim, meaning that the Debtor's claim against SLS is greater than the claim against the estate, then SLS is not a secured creditor.

THE COURT: Okay. But --

MR. ALEXANDER: But in terms of their debt instruments --

THE COURT: Right.

MR. ALEXANDER: -- I -- as of today --

THE COURT: Uh-huh.

MR. ALEXANDER: -- I'm unaware of there being an issue with regards to the entry into those debt instruments. I don't -- I'd have to talk with the Debtor more.

THE COURT: Well, right now --

MR. ALEXANDER: -- I'm not.

THE COURT: Right. So let's assume for my question that they are a secured creditor -- are a secured creditor in the sense that they have the proper documents --

MR. ALEXANDER: Uh-huh.

THE COURT: -- they've -- everything necessary to secure their interest. Okay. And they secured their interest in Stream shares in Technovative, right?

The shares -- the security for their loan is Stream ownership of these shares in -- whatever shares -- there's 100 percent shares that Stream owns -- holds in Technovative.

MR. ALEXANDER: I believe that would fall under the security interest --

THE COURT: Okay. Now, they want to go back because I'm separating Hawk -- they want to go back and say we

exercised our right of proxy back in November sometime, and

when we exercised that right, we appointed our own board

member, that's basically what they're saying, Mr. Fetch (sic).

MR. ALEXANDER:  Stastney.

THE COURT:  Stastney.  All right.  Mr. Stastney.

MR. ALEXANDER:  Mr. Stastney.

THE COURT:  Stastney.  And that's the --

MR. ALEXANDER:  Right.

THE COURT:  I just wrote it.  I don't know why.  I

don't -- I apologize, Mr. Stastney.  Did I say that right this

time?

MR. ALEXANDER:  I believe that time you got it.

THE COURT:  Okay.  I think it's more than just a

dispute over the amount because what I'm hearing Mr. Caponi say

is send this back to the Chancery Court.  So then, yeah, I know

it's 5:00, but I give you a little more since --

MR. ALEXANDER:  Oh, no, we'll take as much time as

you give --

THE COURT:  I don't -- I -- we can go -- we're not

going until 10:00, 11:00 --

MR. ALEXANDER:  Understood.

THE COURT:  -- but we can go a little further so we

can at least finish out the arguments on the relief from stay.

What I am trying to parse out, Mr. Alexander, is that

they want to go back to Judge -- Vice Chancellor Laster, so

that he can determine, one, whether SLS appropriately or properly or actually whatever words you want to use, their right to proxy -- of proxy, and whether the amount of the claim, and I think the amount of the claim.

MR. ALEXANDER:  I thought -- I thought Mr. Caponi said that they were just seeing whether the claim was outstanding and they weren't looking for the amount of the claim.

THE COURT:  No?  He said that if you went to state that they -- they would -- the things that could happen in the Chancery Court was one -- that all of these things would be resolved, that really no -- one -- the status of secure debt must be resolved.  That was on number five, okay?

MR. ALEXANDER:  But I didn't -- I don't recall him saying the amount, but he --

THE COURT:  He did.

MR. CAPONI:  The amount of the debt as of the debt accrues interest every single day, but yes, so it's not going to be as current as of today, but we go into the -- as of the date of the trial saying the total outstanding is X and the Debtor is going to reduce that, and if they reduce it down to zero --

THE COURT:  But --

MR. CAPONI:  -- if they don't reduce it down to zero then Vice Chancellor Laster's going to say well there was ten

million outstanding and tomorrow it'll be ten million and --

you know.  The baseline amount as of the date.  Yes.

THE COURT:  Right.  That's what he said.  One of the reasons to go over there was that the court could determine the amount of the claim.

MR. ALEXANDER:  The record, whatever he said, I'm sure will appear on the record.  That's just not what I wrote down.

THE COURT:  Right.  But he said --

MR. ALEXANDER:  But again, it's still is going to be required to come back to this Court to deal with it as part of the claims administration process because of the claims that the Debtor has against SLS.

THE COURT:  Well, he's saying that the judge is going to do it over there.

MR. ALEXANDER:  The judge can't do re characterization, the judge can't do equitable subordination.  Those are only actions that can happen in this court.

THE COURT:  So you're saying, you believe the only thing that Judge Laster could do is determine the dollar number.

MR. ALEXANDER:  Right.  I believe that --

THE COURT:  He could do that.

MR. ALEXANDER:  Assuming he could calculate the number.

THE COURT: Uh-huh.

MR. ALEXANDER: I think Your Honor could calculate the number to the extent -- it's a calculation. I mean Mr. Caponi indicated that it's a mathematical calculation. So there's nothing specialized. I mean, they made an argument about a specialized court, but there's nothing specialized about calculating a dollar amount of a claim that's outstanding. So I don't believe that that requires any specialty of Judge Laster. I believe you deal with those types of claims all the time with respect to secured creditors, unsecured creditors in various cases. So, you know, I don't believe that they would satisfy that prong, that a specialized court is required to determine the amount of any of these claims.

THE COURT: I thought I asked that and -- just a mathematical comment, but I don't think that's all they want that court to do. They're not -- at least with respect to SLS. They want the court to calculate the claim and determine the issue of their proxy rights.

MR. ALEXANDER: Your Honor, I --

THE COURT: Right?

MR. CAPONI: There's no dispute as to the amount of the SLS claim. It's just determining proxy rights. The Hawk debt --

THE COURT: Right, but that's why I'm parsing them

out.

MR. ALEXANDER:  Yeah.

THE COURT:  We'll get to the Hawk.

MR. ALEXANDER:  As to, I believe the SLS debt is scheduled by the Debtors as secured debt --

UNIDENTIFIED SPEAKER:  And -- dispute in the box --

THE COURT:  This -- my -- that's why my question was disputed as to amount, disputed as to whether it's secured, disputed whether you're --

MR. ALEXANDER:  Your Honor, let's take -- I can explain to you.  So I mean part of the issue is we have this whole issue where there was a period of time in which SeeCubic took --

THE COURT:  Uh-huh.

MR. ALEXANDER:  -- the Debtors assets.  That was determined to be wrongful by the Delaware Supreme Court.  Now, one of the questions is, is SLS entitled to interest during that time period.  Is it entitled to default interest during that time.

THE COURT:  Well, can't Judge Laster determine that?

MR. ALEXANDER:  But that's not an issue that's before Judge Lassiter.

THE COURT:  I thought he said before Judge Laster was calculating the amount owed.

MR. ALEXANDER:  Well, I don't think, Your Honor, I

don't think that's -- I don't think that's completely accurate because all Judge Laster --

MR. ZAHRALDDIN:  May I interrupt for one second, I apologize.  I believe that only Hawk is asserting a matter in the 5 -- in the 525 action, not SLS, so that's -- that's important.

THE COURT:  Okay.  So who brought the -- you're saying that Hawk's the only --

MR. CAPONI:  SLS is not a party to that action.

MR. ALEXANDER:  Yeah, SLS is not a party --

MR. CAPONI:  A named party.  I don't know what the structure is.

THE COURT:  Because where the collateral --

MR. CAPONI:  The 225 action --

THE COURT:  Okay.

MR. CAPONI:  -- the debt is owed to SLS and SeeCubic.  Sorry, SLS and Hawk.

THE COURT:  Okay.

MR. CAPONI:  Vis a vis the Debtor.  It is SLS and Hawk enforcing their rights.  Hawk is acting as the collateral agent of SeeCubic which then received -- was assigned those rights.

THE COURT:  So is SLS a party in this or not?

MR. CAPONI:  The SLS debt is a party but it was assigned to SeeCubic.  The answer is no, they're not a party.

The party is Hawk.

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  CR11.

UNIDENTIFIED SPEAKER:  Yeah, CR.

THE COURT:  Who's CR11?

(Counsel confer)

THE COURT:  Okay.  I mean, we're talking, that's why I said I'm not quite sure why you just didn't go over there with the evidence and then everybody makes their arguments because I'm looking at stuff that's really not in evidence and then I'm going to have to have evidence.  I see 10.

UNIDENTIFIED SPEAKER:  CR -- the --

THE COURT:  CR is 10.  Where's 11.

MR. CAPONI:  Sorry, SLX is not a party to the proceeding.  SLS, the entity.  The SLS debt is.

THE COURT:  They have assigned to somebody else.

MR. CAPONI:  To SeeCubic.

THE COURT:  So they don't own it anymore.  They assigned it.

MR. CAPONI:  They assigned it to SeeCubic.

THE COURT:  So the party is SeeCubic.

MR. CAPONI:  The party to the action --

THE COURT:  Is SeeCubic.

MR. CAPONI:  -- is Hawk.

THE COURT:  Is Hawk?

MR. CAPONI:  As a collateral agent --

THE COURT:  For who?

MR. CAPONI:  -- for SeeCubic.

THE COURT:  Right, but not as the collateral agent for SLS.

MR. CAPONI:  Yes, sorry, Your Honor.

THE COURT:  All right.

MR. CAPONI:  Hawk and SLS had two separate sets of notes.

THE COURT:  Okay.

MR. CAPONI:  Both sets of notes were assigned to SeeCubic.

THE COURT:  Okay.

MR. CAPONI:  All right.  Hawk separately --

THE COURT:  On its own.

MR. CAPONI:  -- had a set of notes with SeeCubic.

THE COURT:  Okay.

MR. CAPONI:  Under those notes in the event of a default, one of the events of default was the omnibus agreement being set aside.

THE COURT:  Okay.

MR. CAPONI:  Hawk could sue -- Hawk had a personal -- interest and everything; it could sue in its own name or in the name of SeeCubic to enforce all of the rights under the -- what had been the Hawk and SLS notes.

THE COURT:  But they assigned it to someone else.

MR. CAPONI:  To SeeCubic.

THE COURT:  So what interest does Hawk and SLS have if they assigned all of their rights to somebody else?

MR. CAPONI:  Hawk is here as the collateral agent.

THE COURT:  I get that, but that doesn't mean that SLS and Hawk are parties to the action.

MR. CAPONI:  They're not, Your Honor, their debt is a party to the action.

THE COURT:  Well, that's all fine and well, but that don't tell me who the parties are.

MR. ALEXANDER:  And Your Honor, that's troubling because they each filed proofs of claim.

MR. CAPONI:  They assign the benefits of the debt, Your Honor, not the debt itself., but --

THE COURT:  Well, I don't know --

UNIDENTIFIED SPEAKER:  Vice Chancellor Laster lays all this out.

THE COURT:  That's all fine and well, but that doesn't help me.  The whole point of the matter is, is that you're here telling me that the 225 action was brought by Hawk as agent -- collateral agent for SeeCubic.

MR. CAPONI:  Correct.  And SeeCubic holds the SLS --

THE COURT:  They can hold whatever they want.

MR. CAPONI:  Hawk deb.

THE COURT: They hold the debt --

MR. CAPONI: Correct.

THE COURT: -- once you assign something, what happens.

MR. CAPONI: The other person owns it.

THE COURT: So then what does this have to do with SLS and Hawk if they've already assigned their rights to SeeCubic.

MR. CAPONI: Well, Your Honor, when I've been referring to SLS and Hawk it's referring to the SLS debt and the Hawk debt.

THE COURT: It's not the debt that's controlling, it's who owns those debts. And you're telling me -- who owns the - who owns the debt?

MR. CAPONI: SeeCubic.

THE COURT: So what does it have to do with Hawk and SLS? You can call the debt, you can name it ABC debt CVE.

MR. CAPONI: Your Honor, sorry. Mr. Colby, correct me. The debt itself is, is still owned by SLS and Hawk.

THE COURT: What does SeeCubic have to do with this.

UNIDENTIFIED SPEAKER: They were assigned the benefits in the enforcement act.

MR. CAPONI: They were assigned the benefits and the enforcement rights under the -- under those notes.

THE COURT: And ownership -- so there's a third party

benefit.  I don't know that's the word I'm using.  So the assignment documents will say that we -- that we, SLS, and we Hawk, have assigned the benefit and the enforcement rights to SeeCubic.

MR. CAPONI:  Your Honor, what happened, let me give you a practical explanation here.  Is when they formed SeeCubic under the omnibus agreement.

THE COURT:  This is no longer enforceable, right?

MR. CAPONI:  Excuse me?

THE COURT:  With -- the Delaware court said it is not enforceable.

MR. CAPONI:  Right.  This is before it was invalidated.

THE COURT:  Okay.

MR. CAPONI:  The parties of the secured debt, Hawk and SLS, worked with the independent directors on the omnibus agreement.  What that resulted in is the --

THE COURT:  Well, the alleged independent because somebody said it is not.

MR. CAPONI:  Oh.  All right.

THE COURT:  All right.  Come on.

MR. CAPONI:  The debt -- the assets of SeeCubic was through the Stream friendly foreclosure were moved into SeeCubic.

THE COURT:  Okay.  And that was --

MR. CAPONI:  And as part of that to sort of help fund SeeCubic --

THE COURT:  Uh-huh.

MR. CAPONI:  -- the secured note holders, because the assets moved over, contributed to SeeCubic the right to collect any monies under those notes, as well as the right to enforce the notes.  But the ownership of the notes stayed with the note holders which would have been SeeCubic and Hawk.  So it was a sort of a way for all the former stakeholders of Stream to continue to be stakeholders and SeeCubic going forward.

THE COURT:  Notwithstanding that the parties to this action in the section 225 --

MR. CAPONI:  Yes.

THE COURT:  -- is Hawk as the collateral agent for SeeCubic who has been assigned the right to enforce the agreement.

MR. CAPONI:  Correct.

THE COURT:  Okay.  So SLS and Hawk are not parties to the section 225.

MR. CAPONI:  Right.

THE COURT:  But because -- and what were those rights that they, they had the right to collect and enforce?

MR. CAPONI:  For example, the property rights.  To the extent the Debtor wants to pay off what we refer to as the SLS notes --

THE COURT: Uh-huh.

MR. CAPONI: -- that check would go to SeeCubic.

THE COURT: Okay. But who had the right to enforce the right benefits and all that?

MR. CAPONI: SeeCubic.

THE COURT: So did SeeCubic then exercise the proxy rights?

MR. CAPONI: SeeCubic exercised the proxy rights.

THE COURT: Well, how could they exercise it if they had assigned it?

MR. CAPONI: Hawk, SeeCubic exercised its right to instruct Hawk to exercise the proxy right. That's how it works. SeeCubic has the enforcement rights and what it -- what it has the right to do is to tell the counter party to the contract. Okay.

THE COURT: Uh-huh.

MR. CAPONI: In this case, Hawk -- Hawk, I want you to sign this piece of paper and exercise the proxy right? Hawk, I want you to sign a piece of paper and declare a default and then Hawk has no choice but to listen to SeeCubic and then carries out that instruction.

THE COURT: So it wasn't a complete assignment.

MR. CAPONI: Correct.

THE COURT: I don't know any of this because this is all you got --

MR. CAPONI:  Well, it's not relevant to the 225.

THE COURT:  Well, it's relevant for me, because I need to know who the heck of the parties are.  Who are you asking me to give relief for?  And what is it you want to go do over there.

MR. CAPONI:  Yes.  And Your Honor, if you want to -- the collateral estoppel order, which is CR3 walk through this entire history of who assigned what to whom and who held what right?

THE COURT:  Right, but that's not the whole point of this is why -- and I kept saying because I don't know how you guys are going to argue this without evidence because I need to see what you're relying on and you kept saying we don't need witness.  I said, I'm going to need something because you guys can tell me and talk till you're blue in the face.  Until I get these documents.

MR. CAPONI:  Your Honor, we're moving those documents into evidence as part of my argument, their judicial notice of the ones that I've cited in my PowerPoint.  I was waiting -- so I will do that.

THE COURT:  Okay.  He's going to --

MR. ALEXANDER:  I'm going to object.

THE COURT:  Okay.

MR. ALEXANDER:  To the findings in the --

THE COURT:  What?

MR. ALEXANDER: I don't know which finding they're going to use.

THE COURT: Well, he's saying there was a -- well, there was signed in the collateral estoppel order. Is it a final order?

MR. ALEXANDER: I don't believe that's a final order either.

THE COURT: Well, I mean, I have to give effect to final orders. The rules are pretty clear what I do, at least if I recall correctly. I haven't looked at that issue lately, but I think that one of the first things is what happens to an order that's not final, what effect it has on me. I'm bound by final orders.

MR. ALEXANDER: I don't believe you're bound by an interlocutory order.

THE COURT: I mean -- I don't know. We'll figure it out.

MR. CAPONI: We're not arguing that you're bound by the order. We're not arguing that you're bound by the documents I'm going to move into evidence. What we're simply saying is you could take judicial notice --

THE COURT: And do what with it?

MR. CAPONI: You take judicial notice of the state of the proceeding in Delaware. What was -- what had progressed to by the bankruptcy filing and what is left to be done?

THE COURT: Okay.

MR. CAPONI: The Court -- you take judicial notice of that.

THE COURT: Okay. Well, I don't need to read it. I don't need to read any of that. If it's here, he says it's collateral estoppel and it's not a final order, which means can they appeal it?

MR. CAPONI: I'm sure they could seek relief from stay, Your Honor, you'll --

THE COURT: No.

MR. CAPONI: -- if they wanted to.

THE COURT: No. The defendant or the plaintiff?

MR. CAPONI: Well, they'll start -- in that case, it would be the movement, so I assume they could just --

THE COURT: I --

MR. CAPONI: -- that's not how release from stay works. It's the defendant is in the underlying action, regardless of who the --

THE COURT: If you're the plaintiff in -- and the Debtor is the plaintiff --

MR. CAPONI: The Debtor is not the plaintiff in the --

UNIDENTIFIED SPEAKER: That is -- debtor would be the party seeking to overturn it. So they would just seek an interlocutory appeal.

UNIDENTIFIED SPEAKER:  That's not how -- it works though.

THE COURT:  I mean, I don't --

UNIDENTIFIED SPEAKER:  The entire action is stayed when the defendant is the Debtor.

THE COURT:  Right, but nothing precludes the Debtor from going and asking a thing.

MR. ALEXANDER:  We would have to come to this court first.

THE COURT:  Well, probably only because the plaintiffs are going to say I'm not doing anything because I don't have and I don't want to respond by violating the stay. That's typically, I mean, typically the Debtor defendant does not need relief.  But what happens is the only time the Debtor needs relief is when the Debtor is the plaintiff, at least that's what I recall from my --

MR. ALEXANDER:  I think you got it reversed.

THE COURT:  Well, no, why would the Debtor need relief if the Debtor is the defendant?  Nobody's -- the Debtor wants to go and appeal something --

MR. ALEXANDER:  So you're saying needs relief?

THE COURT:  Yes.

MR. ALEXANDER:  Understood.  I apologize.

THE COURT:  No, needs relief.  So --

MR. ALEXANDER:  Correct.

THE COURT:  -- if the Debtor is the defendant and the Debtor wanted to go and appeal this, you could, you really don't really need to say I need relief.  But typically what happens is the plaintiffs will say, judge, they want to go forward, but I don't want to answer because I might violate the stay. Can I at least go -- we're going to go forward in state court, give me a comfort order saying I can go respond.

MR. ALEXANDER:  But you, practically speaking though, you would appeal it at the end of the case depending on the outcome of the case.

THE COURT:  Yes.  Right.

MR. ALEXANDER:  So you wouldn't want to premature -- that's why you don't always appeal interlocutory orders because you may ultimately be victorious.  I know Mr. Caponi guaranteed victory, but that's not the case.  You still have to litigate the issue.

THE COURT:  Right.  But still we're going round and round in circles here.  The question really becomes is assuming that I said go back to Vice Chancellor Laster and allow him to resolve these issues with respect to calculation of SLS I don't know why you would go back there, if he's just doing the calculations, what's that going to do for me?  I can calculate myself.  But if the issue really is to go find out whether they executed their proxy rights.  But you're saying who cares if they executed their proxy right because they didn't foreclose.

It came back when we filed bankruptcy.

MR. ALEXANDER:  Correct, Your Honor.

THE COURT:  And if that's the right position, then what are you going back there for?  But if it's the wrong position.  I get why you -- I would likely send you back and go figure out.

MR. ALEXANDER:  But the other issue on top of that, Your Honor, is like I said, once the money comes in as part of a plan or prior to the plan, that changes the entire dynamics of the state court action.

THE COURT:  Yeah, but you don't have the money yet.  So --

MR. ALEXANDER:  Well, we --

THE COURT:  I get it.  So what's wrong with saying, go back over there, figure it out, you get the money and now what?

MR. ALEXANDER:  It's moot.

THE COURT:  So all of that would be much ado about nothing?

MR. ALEXANDER:  Correct.

THE COURT:  I don't know if you're right --

MR. ALEXANDER:  If the money comes in, we pay off whatever they claim their debt, SLS --

THE COURT:  You convert --

MR. ALEXANDER:  -- and we convert them, if 225 is

moot.  They have no proxy rights.

THE COURT:  So you're saying I should stay this until you at least figure out whether you got some mon -- whether the Debtor has some money.

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  Because otherwise it's a -- I heard Mr. Caponi say you already spent $3 million on this litigation. You the Debtor.

MR. ALEXANDER:  I don't believe that's accurate.  I understand there was a proof of claim filed, but I don't believe it was solely related to the 225 action.

THE COURT:  Oh, okay.

MR. ALEXANDER:  And it wasn't my firm that handled that.

THE COURT:  Well, clearly not, because you wouldn't be representing the Debtor.

MR. ALEXANDER:  Well, with that dollar, no, no, Your Honor.

THE COURT:  Well, not even with any dollar.  You'd -- creditor.  You've have to waive that.

MR. ALEXANDER:  I understand, Your Honor.

THE COURT:  Okay, so I don't --

MR. ALEXANDER:  For our declarations we had no outstanding monies owed from the Debtors to --

THE COURT:  Right.  So you don't know that $3

million --

MR. ALEXANDER:  I don't know --

MR. CAPONI:  -- was accrued.

THE COURT:  At the end of the day, I have to figure out what is the best way to handle this.  And if the -- if you're right, and I don't know if you are or you aren't, because I haven't really looked at that issue, is even if they exercise their proxy right, and it's just a bundle of rights that has to come back to the Debtor when the Debtor filed bankruptcy.  Right.  Isn't that what you're saying?

MR. ALEXANDER:  Yes, Your Honor.

THE COURT:  Even if they've exercised that right pre-petition?

MR. ALEXANDER:  Correct.

THE COURT:  That it would come back and you can undo it.  It's kind of a round robin, but -- okay, and I'm sure Mr. Caponi is going to tell me that's not how it works.  I don't know, I, I don't know.  I don't know the answer to that because I really was looking at this motion for relief and the motion to dismiss from a different lens on what it is I thought the parties were saying.

And that's why I say I never try to figure these things out because my understanding is never the same as the party.  So I don't, that's why I don't look at anything.  I just read the brief and the motion.  Okay.

So you believe that, that we should not send it back because this would be a waste of time and money.

MR. ALEXANDER: We do, Your Honor. That's is position. Everything can get resolved in this forum. You know, the deadlines, you know, we have the exclusivity deadline, you know, that's coming up to file the plan. We have a motion before Your Honor with respect to funding. So to say that things haven't been done, you know, the Debtor disagrees with that. And also another big issue has been the Debtor attempting to get back its finding --

THE COURT: Oh, I don't --

MR. ALEXANDER: That is another issue that's prevented the Debtor from moving forward. The Debtor has purchase orders that it's ready to fulfill.

THE COURT: All of what they say is bogus.

MR. ALEXANDER: I understand, but that's the whole point of why we would put on evidence and you would do it, and if they want to contest it, that's the proper forum to do that.

THE COURT: Okay. So let me see if I can understand your position. Your position is that, one, there isn't anything for the Chancery Court to really resolve because everything's back with the Debtor and doesn't matter what he says, it's back here already -- once the bankruptcy was filed, whatever rights Hawk and SLS was holding, which is a right, a proxy right, which they apparently did not assign to --

And I don't know cause I don't know the SeeCubic documents.  But what I'm gathering is that when they assign something with SeeCubic, it said they only assigned the right to collect and the right to receive the benefits of the loan. They somehow also still needed to approve any exercise of the right -- the proxy right because what I heard said was that, well, they had to direct Hawk and SLS to sign the appropriate documents in order for them to enforce it.  So presumably that right -- with these two other parties.  I don't know.

MR. ALEXANDER:  I'm not quite sure how that works.  I mean, I know the original document with the Debtors had non assigned -- provisions.  So I don't know how all of that fits into it.

THE COURT:  Oh, well that's another problem because if all of that other stuff was undone, meaning the --

MR. ALEXANDER:  But I don't, we haven't -- I don't know that issue that will be dealt with again as part of the claims process.

THE COURT:  Well, it's more than sort of claim.

MR. ALEXANDER:  Well, there's standing issues too. So --

THE COURT:  Because in 225 actions, SeeCubic is acting as the assignor or assignee, which --

MR. ALEXANDER:  Well, one of the arguments I believe that was made and I think it will be something that the Debtor

would appeal to the extent it's unsuccessful, is that the Debtor made the argument that in the 225 action only a shareholder could bring it. And --

THE COURT: Oh, I don't know.

MR. ALEXANDER: -- that was an issue there. So I know that's -- when you talk about potential appellate issues, I know that will be an appellate issue depending on the ultimate outcome.

THE COURT: Well, I don't know. I took Delaware corporate law in 2005, 6, when I took the bar, I don't know anything after that. I only know what I studied for the bar and that was it. So I don't know anything about the specifics of 225. I know there was some recent case law with respect to the outstanding issues and all that other stuff. Would I profess to be an expert? No, I can only tell you what I read recently. So the question maybe comes for me, is I now have to somehow decipher whether sending this back over here and letting Judge Laster, Vice Chancellor Laster, decide this, is this going to any way advance what's before me?

And they're saying it will because it will determine who had the right to exercise as the board of directors. And you're saying it really didn't matter because they didn't foreclose, so they don't have any rights, and with respect to SLS, I'm not quite sure why we're going over there, other than the proxy, and you're arguing that both of them couldn't

exercise it, so I can't send them back over there unless they're going to go figure out who had the right to exercise it.

MR. ALEXANDER:  And we also believe the Debtor should have a chance during your exclusivity period to propose a plan to take care of the debts.

THE COURT:  Well -- Okay.  I get the issue about the debt.  That I understand completely.  That if the Debtor is filing bankruptcy and the Debtor has a plan to pay the debt of SLS, which we believe is a secured creditor with some dollar number to be paid, if any, because you believe they had a right of set off, but no conversion provision.  That's clearly going to be payment or non-payment -- pay whatever is owed.  Because I'm not hearing anything about they didn't effectively perfect, they're not secured, there's a dispute, but I'm seeing the dispute as to the number.

MR. ALEXANDER:  I mean, I'm, -- I'm not going to profess that I fully analyzed their proof of claim --

THE COURT:  Right.  Assuming that they have a valid secured claim.

MR. ALEXANDER:  Correct.

THE COURT:  Valid in the sense it was perfected, the documents.  There's no basis to challenge it.  The only issue is the number.

MR. ALEXANDER:  I have seen the UCC finance.

THE COURT:  Right?  So the only issue is the number, I don't know what we're going back to Chancery Court for that portion, but they want to go back to Chancery Court for another, which is the issue of the exercise of their proxy rights.  And if that needs to be determined, so I determine whether this case was properly filed, why wouldn't I send it back over there so somebody can tell me whether -- who was the, who was the proper director at the time?

MR. ALEXANDER:  Your Honor, because we believe that you need to address the property of the estate issue as well. The Chancery Court can't address the property of the estate issue with respect to their rights.

THE COURT:  Okay, but -- okay.

MR. ALEXANDER:  So I mean, it's just causing a big -- in my view that causes a further delay and then you have another court trying to adjudicate an issue that ultimately will be resolved by this Court.

THE COURT:  Why would I want to figure out who had the right to appoint the --

MR. ALEXANDER:  Your Honor, you would still have to fix -- so assuming Mr. Stastney was the appropriate board member,

THE COURT:  Uh-huh.

MR. ALEXANDER:  -- under an exercise of a proxy.

THE COURT:  Uh-huh.

MR. ALEXANDER:  But upon the bankruptcy filing, that came, those rights came back to the Debtor.

THE COURT:  Oh, which means the Debtor could not do whatever it wants.

MR. ALEXANDER:  Correct.  You would still need to address that issue.

THE COURT:  Okay.  I get what you're saying.  It's -- it doesn't matter what Mister -- what the proxy rights were at the time of the file -- Well --

MR. ALEXANDER:  Well, did they come back upon the filing of Stream?  So did the proxy rights with respect to the Technovative stock come back to Stream.

THE COURT:  Okay.  And so at the time when Stream filed, they had reverted back to Stream --

MR. ALEXANDER:  Before Technovative filed.

THE COURT:  Before Tech -- okay, okay.  Okay.

Do you don't care what they did prior to the filing.

MR. ALEXANDER:  Well, we -- under our alternative argument, we don't care.  I mean, our first argument is we believe Mr. Rajan was, but even assuming that doesn't matter, you don't need to reach that issue because our position is that whatever the proxy rights were, they would have come back to Stream once Stream filed and then Technovative filed.

THE COURT:  Right?  So you believe that even if Mr. Stastney, once he had been properly appointed as the board of

director, as a director, once the case was filed, Stream case was filed, that right no longer existed with the parties who had exercised their proxy rights, and the rights actually went back to Stream and Stream then appropriately exercised its right to appoint a director and file for -- and direct that director --

MR. ALEXANDER:  Technovative to file.  And so that's an issue that Your Honor would have to determine because that deals with --

THE COURT:  Bankruptcy --

MR. ALEXANDER:  -- bankruptcy law, and that's not an issue that's being addressed in the 225.

THE COURT:  So even if I sent them back, your position, send them back if you want, but even if Judge Las -- Vice Chancellor Laster says that they appropriately appointed Mr. --

MR. ALEXANDER:  Stastney.

THE COURT:  -- Stastney; who cares?  Because when we filed, we got that right back.

MR. ALEXANDER:  Correct.

THE COURT:  And so it's what happened post-petition that's governing and not pre-petition.

MR. ALEXANDER:  Of Stream.

THE COURT:  Of Stream.  Yes.  We're not --

MR. ALEXANDER:  Yes.

THE COURT:  So then even if I -- so I get what you're saying, send it back if you want, it won't matter.

MR. ALEXANDER:  Because it's just creating more work.

THE COURT:  Well, it doesn't answer the question whether --

MR. ALEXANDER:  Because you still have to address the other issue.

THE COURT:  Which is whether it came back to the --

MR. ALEXANDER:  Correct.

THE COURT:  -- whether it's property of the estate or not.

MR. ALEXANDER:  Yes.

THE COURT:  Okay.  Okay.

MR. ALEXANDER:  So, Your Honor, we believe it's most efficient if all the matters stay before this court, as we indicated, there are other parties who have indicated that they believe their rights could be impacted as well.

THE COURT:  Rembrandt.

MR. ALEXANDER:  One of those parties is Rembrandt, who have licenses with regards to the property --

THE COURT:  Are they the lic -- who are the licensees?  I mean -- I know -- they own it?

MR. ALEXANDER:  I because they would be the licensee, Your Honor.

THE COURT:  They own the license.

MR. ALEXANDER:  Yes.

THE COURT:  If this was mortgage, mortgagee, it can get a little -- quite crazy.  So you believe that there's other -- so let's run down your points here.  Okay.  The point is they went through six -- I did have it.  I must have somehow put it somewhere where it shouldn't be.  I'm looking for your folder.

MR. ALEXANDER:  PowerPoint.

THE COURT:  Wait.  I must have put it somewhere in one of these folders.  I've only been in two of them, so they can't --

MR. ALEXANDER:  I think if you find it, it's on page 22.

THE COURT:  Here we go.  All right.  Tell me, Counsel, they thought a result would only -- the relief would result in partial or complete resolution of the issue.  The collateral estoppel opinion, which is in a lot was, was that they were a secured creditor, who was a secured creditor?  SeeCubic was a -- who cares?

MR. ALEXANDER:  But I'm not quite sure SeeCubic is a secured creditor of the Debtor.

THE COURT:  I'm sorry.  Did I turn that around?  I'm sorry.  Was that SeeCubic was a secured creditor?  SeeCubic filed a proof of claim.

MR. ALEXANDER:  SeeCubic did file a proof of claim

but I -- I'd have to go back --

THE COURT: Are you filing -- who was filing the motion -- who filed the motion for relief?

MR. CAPONI: Hawk filed it under the -- as collateral agent.

THE COURT: As a collateral agent for who?

MR. CAPONI: SeeCubic.

THE COURT: Okay. Okay. And even if SeeCubic was a secured creditor, I thought you said that only certain rights were assigned to them, which was the right to collect and the right to receive payment and that Hawk and SLS retained some interest or something else that they still retain ownership.

MR. CAPONI: SeeCubic has the right to collect and to enforce the notes.

THE COURT: But you said the right of ownership remains with SLS and Hawk.

MR. CAPONI: Correct.

THE COURT: Okay.

MR. CAPONI: Your Honor, I should also mention Vice Chancellor Laster also found that under those documents, Hawk could sue in its own name, or could sue in the name of SeeCubic, that's one of the rights that was granted to Hawk.

THE COURT: But that's an interlocutory order; is it not?

MR. CAPONI: Excuse me, Your Honor?

THE COURT:  It's not a final order, right?

MR. CAPONI:  No, but it explains the history and it explains the state of play as of the filing of the bankruptcy.

THE COURT:  Okay.  But that's not what the 225 action is, is it, it to find anything about Hawk or only SeeCubic?  I mean --

MR. CAPONI:  It's about the debt and the holders of the debt and with regard to the 225, the holder, the person, the entity, committed to exercise the proxy right is SeeCubic in the first instance, but then Hawk is the collateral agent. Because you have a double default, you have the Debtor defaulted, which then gave SeeCubic the right to exercise the proxy, and then SeeCubic defaulted giving Hawk the right to exercise the proxy as collateral agent.

THE COURT:  And what about SLS?  You said they exercised their right too?  Did they separately exercise or did they exercise through SeeCubic?

MR. CAPONI:  One second, Your Honor.  So like Vice Chancellor Laster found, Your Honor, after the issuance of the Supreme Court decision, Hawk had the power to exercise SeeCubic's rights under the assignment agreement, by enforcing the Hawk pledge agreement.  Hawk had the power to do so in SeeCubic's name, or as it did, in its own name.

THE COURT:  In its own name as what?

MR. CAPONI:  Its own name. Its own Hawk.

THE COURT:  In its own name as owner, own name as agent, own name as what?

UNIDENTIFIED SPEAKER:  Lender.

MR. CAPONI:  As Lender.

THE COURT:  Okay.  Well, how do I -- I don't know, I have to read --

MR. CAPONI:  But I don't want to get too down into the weeds on this, but I don't know --

THE COURT:  All right.

MR. CAPONI:  I don't know -- I don't know the capacity in which --

THE COURT:  It doesn't matter.  My -- I really need to find out, even assuming that the proxy rights had been exercised pre-petition, what happened when the petition was filed?  Who owned the rights?  Did they go back to the Debtor or did they remain with SeeCubic, Hawk as agent, Hawk as owner?  Who had the right to exercise whatever rights came along with ownership of those shares?

MR. ALEXANDER:  As I've argued before, Your Honor, I believe the Debtor, and --

THE COURT:  And you're saying the Debtor didn't, Mr. Caponi?

MR. CAPONI:  Yeah, Your Honor, this is the case I cited to you, Judge Silverstein of April this year,   In Re: CII --

THE COURT:  And what did she say?

MR. CAPONI:  She said specifically that when in -- when you exercise a proxy right, which you then acquire the voting rights, we didn't acquire the economic interest, but we acquired under the pledge agreement Technovative was required in its register, it's share register, to list SeeCubic as the holder of those shares.  Once that happens, when you file bankruptcy, the Debtor's estate is only what constitutes the estate of the filing.  It did not own or hold the right to vote those shares. They don't revert back --

THE COURT:  That's assuming that the proxy right was properly exercised.

MR. CAPONI:  Of course, Your Honor, and that's what, that is what will be decided in the 225 action.  But as far as the, the question is, is it futile act to send it back?  Judge Silverstein says no.  Judge Silverstein says that Vice Chancellor Laster determined those proxy rights are validly issued.  The right to vote those shares does not revert back to the estate.

THE COURT:  And I'll bet you somebody is going to cite me a case which is the opposite.

UNIDENTIFIED SPEAKER:  That is a threshold issue.

THE COURT:  Yeah, I got to figure that out.  Okay, so we --

MR. CAPONI:  That's an issue.

THE COURT:  Yeah, that's an issue that I'm going to have to -- that's a legal issue.  Am I wrong that that's a legal issue?  And what happens if you properly -- I don't know if it properly was or wasn't?  Okay?  But isn't that a threshold issue as to who owned what?  It -- a determination of whether that proxy right was, one, even if it -- your position, even if it was, it doesn't matter, it come back to the estate.  Their position is no, if it was done right, it doesn't come back to the estate.  Isn't that what I'm hearing?

MR. CAPONI:  Correct.

MR. ALEXANDER:  Correct, Your Honor.  I don't believe in their papers they disputed our position, but --

THE COURT:  I recall -- I recall a mention of Judge Silverstone --

MR. CAPONI:  Silverstein is the opinion I cited, Your Honor.

THE COURT:  Yeah.  Was that in your brief or did you talk to me about that later?

MR. CAPONI:  It was in the brief but also cited it today, Your Honor.

THE COURT:  Okay.  I remember -- I remember reading it.  It was a while ago, but the question still becomes, you know, I don't know, I'm going to have to look because I am quite sure -- and maybe I did, I don't know, I'm -- we do our own research.  I mean, I don't just read what the parties give

me.  I do my own.  I don't recall whether there were some cases to the contrary and I know there's no third circuit case on that issue.

MR. ALEXANDER:  I don't recall finding it.

THE COURT:  And I don't know if anybody cited to maybe there is, and maybe I'm, I don't recall correctly whether there was a Delaware Supreme Court decision on that issue, is there?

MR. CAPONI:  I don't think you would have it in that context because that was --

THE COURT:  Well, no -- well --

MR. CAPONI:  -- bankruptcy court because it's a bankruptcy --

THE COURT:  No, it wasn't a bankruptcy issue.  I think it was an issue of what happens when you exercise the right of proxy.  What I heard from that decision is that once you exercise that right, if -- you can't undo it, isn't that what she said?  And because you can't undo it, it can't be property of the estate.

UNIDENTIFIED SPEAKER:  That's right.

MR. ALEXANDER:  It can't be property of the estate because it left the estate before the filing occurred.

THE COURT:  But that's what I --

MR. ALEXANDER:  I gave away the keys to the car on our own car.

THE COURT:  So that's what I just said.

MR. ALEXANDER:  Yeah, I agree, Your Honor.

THE COURT:  That what she found was that again what the Debtor has and does not have relies on state law, 541 says that property of the estate gives them -- I looked at state law, which is what I started out with all at the very beginning saying, well, what is, do I have to figure out if this is property of the estate or not?  And is it state law I have to look for or what do I have to do here?

And what Mr. Alexander is saying, if I look at the appropriate state law governing this, that it didn't matter because you did not -- so you didn't -- okay.

MR. ALEXANDER:  I think you have to look at it in the context of turnover provisions in 541 of the bankruptcy --

THE COURT:  Yeah, but --

MR. ALEXANDER:  -- I mean, well, cars can be turned over once people do them as long as they didn't ultimately --

THE COURT:  Is --

MR. CAPONI:  Correct.

THE COURT:  You got to give it back.

MR. ALEXANDER:  Right --

THE COURT:  But --

MR. ALEXANDER:  -- there was no title to the shares that were taken.  They were still owned by Stream.

THE COURT:  Well, I think the judge, she was saying

that -- well, just because you just because you didn't record them doesn't mean that you didn't have ownership.  I don't know, I have to read these debt agreements.

MR. ALEXANDER:  Well, I mean, I think the way that I, I think under state law that wouldn't be accurate because you need, there's certain ways that you can be the title owner and just because you tell someone they can use the title or if they don't do it.

THE COURT:  Well --

MR. ALEXANDER:  You don't --

THE COURT:  Well, you can -- Okay.  In the case with the car you could for -- you could repossess, you can repossess the car.

MR. ALEXANDER:  They didn't repossess the stock.

THE COURT:  Well, all right, you authorize me to sign the appropriate documentation, transferring title to the court.  I the lender exercise that I, I signed the title.  I needed you to sign, but you didn't sign off on it.  Now, what?

MR. ALEXANDER:  That wasn't completed prior to the petition --

THE COURT:  Well, Judge Silverstein is saying that once you get it just because you didn't put it in the books.

MR. ALEXANDER:  I'm -- Your Honor, I'm responding to the --

THE COURT:  I get it.

MR. ALEXANDER:  -- example --

THE COURT:  Right.

MR. ALEXANDER:  -- under that example, I don't think so.  I'll reread Judge Silverstein's opinion as well, but the Debtor's position is that the stock was still owned by Stream upon the bankruptcy filing.  It was never foreclosed on.  It was never turned over to SeeCubic, Hawk, SLS, anybody.  So the Debtor was the 100 percent owner as of the bankruptcy filing and whatever the rights were associated with that stock that we believe are part of the bankruptcy estate because their interest has never been foreclosed on with respect to those rights.

THE COURT:  Well, I think what Judge Silverstein was saying that if once you exercise that proxy right, the ownership automatically went to the party exercising the proxy right, notwithstanding whether it was recorded or not.  I think that's what she said.  And so a failure to record that doesn't mean that ownership --

MR. ALEXANDER:  Well can we -- I would disagree from an ownership standpoint.  I do think they need to have a transfer of the stock.

THE COURT:  I don't know.  I have to read her opinion again.  I don't know.  All right.  So your position if I understand correctly, is that why send this back?  Because this is just going to be a waste of time and it's going to be a

waste of time because the Debtor still has the right to convert the Hawk debt, which is actually now is assigned to SeeCubic, who has the right to enforce and collect the benefits.

MR. ALEXANDER:  Correct.

THE COURT:  So presumably if you convert it, I don't know who the heck is going to own it at that point.

MR. ALEXANDER:  Well, someone will have some stock.

THE COURT:  Right.  It will either be SLS and -- Well, you're going to pay off SLS.

MR. ALEXANDER:  Well, yes.

THE COURT:  You pay off SLS.  That's a done deal.

MR. ALEXANDER:  Correct.

THE COURT:  And it doesn't matter because they're getting paid off and you still have the right to pay them off. I guess that also depends on whether you have the right to pay them off.  I don't know.

MR. ALEXANDER:  Well, Mr. Caponi, I believe indicated we have the right to pay the debt.

THE COURT:  Well, okay.  And do you have the right to convert, that still exists?

MR. ALEXANDER:  Correct.  The right to convert --

THE COURT:  So what is the consequence other than I guess saying the -- that the -- this is what I'm trying to figure out.  Assuming that I say, okay, Stream didn't have the right to put Technovative in bankruptcy, right?  Okay. So

technically, he's not.  But I find that Stream can stay here.

Steam still has the right to convert and payoff?

MR. CAPONI:  Yes.  And so, our view is that that all should be dealt with as part of the bankruptcy process because it's the most efficient means of dealing with the issues as opposed to some piecemeal litigation.

THE COURT:  Nothing's very simple.  Okay.  So let me write this down because I'm talking and I -- because it's getting late, and I have not written notes.  I just want to make sure because I'm going to go back, and I won't have any notes.  Let me just put Debtor's position.

You'll have the right to payoff.  But I guess the question becomes if you -- what are you going to payoff if the Technovative and sell it?  And this would be -- or whatever the heck they claim to do with it.  You won't owe any money, right? You meaning Stream.

MR. CAPONI:  If we pay off SLS, they can't take Technovative.

THE COURT:  Yes, but --

MR. CAPONI:  Because their debt would be paid. They'd no longer be a creditor because there's no rights.

THE COURT:  Right.  But if Technovative is no longer in bankruptcy, what would prevent SLS from collecting this claim that's owed by --

MR. CAPONI:  I don't believe Technovative owes any --

THE COURT: No, no, no. What would prevent SLS from collecting the debt that Stream owes by liquidating or whatever the heck they plan to do with Technovative?

MR. CAPONI: Well, they can't sell the stock because the stocks property of the state. That's prevented by the 362. They'd have to get stay relief from Your Honor in order to liquidate that asset.

THE COURT: But they wouldn't need relief from the state to sell its assets, would they? To sell Technovative --

MR. CAPONI: Sell assets of Technovative?

THE COURT: Uh-huh.

MR. CAPONI: I don't know under what mechanism they would sell the assets of Technovative.

THE COURT: Well, they want to foreclose on their assets.

MR. CAPONI: I don't think they can foreclose. I have not seen a security interest executed between Technovative and SLS. I'm not saying it doesn't exit. I'm saying I haven't seen that.

THE COURT: Okay. Do you believe that any foreclosure would be against Stream?

MR. CAPONI: Correct. I think the only thing that was pledged at that level was the Stream's stock ownership interest in Technovative.

THE COURT: And what difference does it make whether

they executed their proxy with respect to the shares or not?

MR. CAPONI:  Because then they would have the management control rights of Technovative and all the other downstream entities.

THE COURT:  Okay.  But the ownership would still remain with Stream?

MR. CAPONI:  Correct.

THE COURT:  So are we fighting about management rights?

MR. CAPONI:  Well, it's not only management rights. It's what you can do with the management rights.

THE COURT:  Yeah, I get it.

MR. CAPONI:  Because they've indicated that at the end of the day, prior to the bankruptcy filing and I believe what precepted the 225 action, was the sent an Article 9 sale notice indicating that they wanted to sell whoever's assets they believe they could sell.

THE COURT:  Well, that's what I just said. Liquidate, sell, whatever they want to do.

MR. CAPONI:  But my point was they couldn't sell the stock ownership interest because that's prevented by the 362 stay.  And if they could sell -- they start being a -- like creditor rights, I'm not quite sure how they could just sell the assets of the subsidiaries other than having their boards agree to it because they don't have security interest directly

with them with regards to their assets.

THE COURT:  But Stream still owns the shares?

MR. CAPONI:  Of Technovative.

THE COURT:  Right.

MR. CAPONI:  But what they're trying to do is gut everything underneath.

THE COURT:  I get what they want to do.  What I'm trying to figure out, what does it have to do in this bankruptcy case?

MR. CAPONI:  Well because there's value there that gets up streamed to the bankruptcy estate.  So Stream has operations and will sell and previously sold some of its screens, right.  It's 3D glasses free screens.

THE COURT:  So is Technovative -- Technovative is not in bankruptcy.  What does that mean with respect to this debtor?

MR. CAPONI:  If Technovative is not in bankruptcy, the Debtor's position is they believe that the automatic stay would still prevent and protect them from going after the downstream entities because it impacts the state and that they have rights. So whatever rights the Debtor would have and the downstream entities, we believe those could be not be interfered with, whatever those rights are.

THE COURT:  But it's not management rights because they believe they have the management rights.  Wouldn't they

have the same right as any owner to when you try to foreclose? Well, what do the owners get say?

MR. CAPONI:  But they can't -- so, I mean, essentially what they would do is they would put their own management in place and instruct that management to take whatever action they instruct them to take, which based on what they've indicated previously would be to liquidate and sell and of the subsidiaries.  Some of which hold the intellectual property, which impacts the screens and the panels that the Debtor produces.

THE COURT:  I know we're going a little far and we're going into the weeds.  But what I'm trying to figure out is what would be accomplished if I sent this back to the chancery court?  And ultimately, what does that mean for this bankruptcy?  If I sent it back to chancery court and Judge Silverstein's opinion is correct, than once the proxy rights were executed, there's nothing that belongs to this debtor, than clearly I need to figure that out.  But I have to first figure out what is the obsess of the proxy with respect vis-à-vis bankruptcy.

MR. CAPONI:  Well, I believe the secured creditor's opinion would be that once they get the proxy rights, even if they don't own the stock, they can -- they'll argue that they can put their own director in at Technovative who can then put directors in at all the subsidiaries.

THE COURT:  I get all that.  But I'm trying to figure out --

MR. CAPONI:  Again, it's the value of the intellectual property.

THE COURT:  It's not even that.

MR. CAPONI:  Okay.  Well, maybe, Your Honor, I'm not understanding the question.

THE COURT:  Let's back all the way to the basic issue.  The basic issue as I see it is that either it's consequential for the proxy being executed or it's not.  If Judge Silverstein's decision is correct that a proxy was executed or whatever they --

MR. CAPONI:  Couldn't be undone.

THE COURT:  Couldn't be undone.  That was it with respect to Stream.  That Stream had no more rights with respect to anything.  They still had ownership.

MR. CAPONI:  Correct.

THE COURT:  But no -- couldn't undue the proxy.

MR. CAPONI:  Then I believe it's a race to potentially pay them off because then they lose whatever rights they have because their claims would be satisfied or averted.

THE COURT:  And you would pay them off before they start executing?

MR. CAPONI:  Well certainly, Your Honor, I think we would argue that there's a potential stay violation if they

attempted to do that and we would try to brief that issue.

THE COURT:  Violation of what?

MR. CAPONI:  I'm saying, Your Honor, we'd have to evaluate that.  I haven't evaluated that.  But I think the goal would be they would have to get paid or converted assuming you took that approach and that was the law, but we don't think that's the law.

THE COURT:  Okay.

MR. CAPONI:  I mean, the Debtors would still have the right to repay the debt.

THE COURT:  That's what I'm trying to figure out.

MR. CAPONI:  The right to repay the debt, the right to convert the debt, those still exist. And so, the Debtor believes that being in the bankruptcy during its exclusivity period, it should have the opportunity to put forth a plan to address the debts without impacting any of the subsidiaries or any other rights.  Now that's what it really boils down to for the Debtor because they want the opportunity to repay, and they want to be able to present that to the court and present that to the creditors.

THE COURT:  So that really goes back to the issue of -- let me look at this motion for relief here.  You'll -- relief result in partial or complete resolution of the issues. You believe it will not because they still want to -- the Debtor still has the right to pay off or to convert?

MR. CAPONI:  Correct.

THE COURT:  And nobody has decided that the Debtor can't do that?

MR. CAPONI:  Nobody has decided that the Debtor can't do that.

THE COURT:  All right.  Okay.  And the specialized tribunal -- I get that I'm not a 225 court.

MR. CAPONI:  But it's not a 225 issue.  I mean, what you've heard today is how much of a debt, you know --

THE COURT:  Well, with respect to SLS, how am I seeing it?  With respect to the determination of the amount of their debt, I can do that.

MR. CAPONI:  But that's the same issue with --

THE COURT:  No.  There also was the issue of the impact of the execution of the proxy.  That's something I ultimately -- even if the court says they properly executed it, I have to still figure out what it means in bankruptcy.  It might help if I know if they did or didn't properly execute it.  I don't know.  I don't think you're arguing they didn't properly execute the proxy, did you?  Are you?

MR. CAPONI:  Your Honor, I don't know the answer to that question as to whether or not that was asserted in 225 action.

THE COURT:  I don't know.  I'm just asking.  So assuming we send you back to vice chancellor, the vice

chancellor and he says that he properly did, I ultimately still have to figure out what it means in bankruptcy.

MR. CAPONI:  That's correct.

THE COURT:  Right?

MR. CAPONI:  Yes.

THE COURT:  But as an initial, don't I need to know whether it was -- you're saying I don't need to know whether it was proper or not and they're saying, yes I do.  Because Judge Silverstein said if it was done, bye-bye.  There's nothing else.  Bankruptcy had no effect.  You don't have the right. You didn't come back.  Okay.

MR. CAPONI:  Your Honor can make an independent ruling on that.

THE COURT:  Oh, yeah.  I'm not saying I'm bound.  I'm not bound by him.  That's the third --

MR. CAPONI:  I don't believe there's controlling third-circuit law.

THE COURT:  There's no controlling third circuit law. There's no -- nobody's telling me there's a supreme court in Delaware.  And dime for donuts there's probably cases that say the difference and I have to figure out which one I want to follow, or which one makes sense to me.  I don't know.  I don't know yet.  So that's a threshold matter for me to say if I believe that Judge Silverstein's decision is the one I want to follow, then I send you guys back over there to state court

242

and let -- assuming everything else falls the way I think it should, I need a determination because then that may have to do with whether they have the right to go and do whatever they want.  But it also means they have the right to determine whether bankruptcy was filed.  Only with respect to Technovative because they don't have anything to do with Stream.  Nobody's saying that Stream's filing was unauthorized.

MR. CAPONI:  Correct.

THE COURT:  Okay.  So two different things.  The only issue for authorization is with Stream.  I mean, with Technovative.  So I may need to send you guys back over there for that.  I don't know -- yeah because there's an initial matter, I have to figure out does it matter?  And if I find it doesn't matter, what the heck am I going to send you over there for?  If I find it does matter, maybe it makes sense to go back with somebody who's familiar with it and can rapidly and expeditiously say I don't need that court to determine how much is owed or not owed.  That's something I can figure out here.

All I need that court to tell me is was the proxy correct?  How much is owed?  You still have the claims against Stream.  I can figure that out.  So it seems to me there's a discreet issue assuming that I follow Judge Silverstein's decision.  If I go the other way, then why would I send you back therefore anyway because it won't matter.  It won't matter because I would have to find that they came back to the Debtor,

and who cares what they did pre-petition.  I don't know the answer yet, so nobody take anything about -- I'm just like discussing what I'm -- what I know I have to point to.

So with respect to complete resolution of the issues, the only issue that will be a complete resolution is whether the proxy was properly exercised.  At least from my perspective.  I don't need the judge to tell me the numbers.  I can figure that out myself.

Is there specialized tribunal?  Well apparently I would think that chancery court has the issues of authority and the ability to do Section 225 actions, which is the issue of -- well, the court is going to decide who was the proper --

MR. CAPONI:  Director.

THE COURT:  -- director.  But in getting to that, it has to decide whether the proxy was proper, correct?

MR. CAPONI:  I believe it would have to find it.

THE COURT:  How else are you going to get there?

MR. CAPONI:  I think it's a little -- it's difficult from the normal 225 action.

THE COURT:  Well usually they're fighting.

MR. CAPONI:  Correct.

THE COURT:  It's just two people fighting over who has what.  I get it.  Judicial economy and expeditious and economical resolution.  Again, I'm not quite sure if I need the chancery court to tell me how much the debt is with respect to

Stream.  Because all of this is with respect to Stream.
Nobody's saying anything about the receiver and all that.  That
was just Technovative.  I mean, that's kind of easy for me to
figure out.

They're ready for trial.  Clearly, you guys are ready
to go argue whether the proxy was properly implemented so that
the court can determine who was the proper board of directors.
And the impact of the stay on other parties, well, I don't know
what parties there are except maybe Rembrandt.  And Rembrandt
is the licensor.  And you may have some impact on them or not.
I don't know because I haven't heard their position.  They've
only listened in.

MR. CAPONI:  Well they filed papers.

THE COURT:  Well they didn't argue it.  I mean, I
have heard their counsel say we --

MR. CAPONI:  Their position, I believe, is that --

THE COURT:  Is in support of the Debtor.

MR. CAPONI:  No.  But their position is that the
technology and the patens and everything that they have can't
be sold to a third-party because they didn't license it through
those third-parties.

THE COURT:  Who'd they license it to?

MR. CAPONI:  Stream.

THE COURT:  Oh, jeez.  So that's still a whole other
issue as to who owns these license.  That I'm going to have to

figure out irrespective of what happens in --

MR. CAPONI:  And that issue is not before -- the chancery court refused to --

THE COURT:  And the chancery court 225 is not going to address that.

MR. CAPONI:  It did not address that.

THE COURT:  That's going to be over here no matter what happens.  The issue of who has the licenses and whether it's property of the Debtor Stream because it has nothing to do with Technovative, right? Correct?  That issue of ownership of license is not part of the 225 action?

MR. CAPONI:  The issue of licenses --

MR. ALEXANDER:  No, Your Honor.

THE COURT:  So I don't know what you guys think you're going to come back over here for that.  So the only thing it seems to me is what is the impact of the execution of a proxy with respect to the right to file the Technovative bankruptcy.

MR. CAPONI:  Well, Your Honor, there's another piece that you're missing.  But I'll wait.  I can do it now or wait to discuss it at the 225.

THE COURT:  Well I'm telling you to the extent it's determining the amount owed, I don't think I need another court to tell me how to do that.

MR. CAPONI:  Your Honor, the Hawk debt, the question

is not can it be converted.  It's was it converted.  The Debtor

has argued in the 225 that there were, over the course of

several years, dozens and dozens and dozens of transactions.

That each one resulting in a minor conversion of the Hawk debt.

To the point where the Hawk debt is being completely converted.

So Vice Chancellor Laster, he's determined under Delaware law,

under that conversion agreement, that you have to have --

there's a conversion, can it occur piece by piece by piece?

And does each one of those little ones count?  Or do you have

to do a major refinancing to convert the debt.

So the issue with -- if the Debtor showed up with $2

hundred million dollars tomorrow, could it -- or did a $2

hundred-million-dollar financing, could it convert?  That's not

what the court in chancery is considering.  It's looking at

over the course of the four or five years, did the Debtor

convert the debt --

THE COURT:  I get that.

MR. CAPONI:  -- that comports with the Delaware

contract.

THE COURT:  Do they still have the right to convert?

MR. CAPONI:  Do they still have the right to convert?

THE COURT:  Yes.

MR. CAPONI:  I think that's up in the air.  But

that's not what's before the --

MR. ALEXANDER:  Your Honor, explicitly in the order.

THE COURT:  Wait a minute.  Frankly, I don't care what the payment.  The question becomes for me, as Mr. Alexander said 50 times, they still have the right to convert, and I said I guess Mr. Caponi will tell me if he agrees with that or not.

MR. CAPONI:  Your Honor, the issue isn't can you convert.  It's how you convert.  Can you convert?

THE COURT:  Can you -- can the Debtor come in here and propose a plan where the Debtor proposes to convert by paying what's owed?  Now maybe the issue is how much has to paid to convert?  But that wasn't the question that I'm asking.

MR. CAPONI:  Your Honor, conversion is not repayment.  That's where I think we're getting confused.  Repayment is you come up with case and you repay.

THE COURT:  Well, what's conversion?

MR. CAPONI:  Conversion is -- it's a very -- see, this is my point.  It's a very complex document under Delaware law.  The Debtor, during its course of operations, did -- raided funds and issued new -- a new share offerings that met certain criteria.  So what it was supposed to be and what our argument is, if the Debtor did a major financing, like went out there and issued preferred shares and raised $50 million, $50 million of the debt would convert to equity.

THE COURT:  Okay.

MR. CAPONI:  Share for share.

THE COURT:  Okay.

MR. CAPONI:  It's not repayment.  The money doesn't come to Hawk.  Hawk debt converts.  So can the Debtor repay?  Yes.  What's before the court of chancery was, we argued, under the conversion agreement as written and under Delaware law, you needed to do a major offering, like a preferred share offering of $45, $50, $60 million dollars to trigger the conversion right.  The Debtor has argued that no, it could issue shares, $5, $10, $5, $10 and that did in fact did that over the course of 10 years.  And when you aggravate all that up, that converted the debt. So as of the time that Hawk exercised the proxy, it had already been converted and it had no debt.  It was only equity.

THE COURT:  Okay.

MR. CAPONI:  So that entire net is what Vice Chancellor Laster is to be determined.

THE COURT:  Well, that still doesn't answer a question for me, which was I don't care what he decides.  Whether -- if he decides they -- well, I do care.  If he says that they did convert already, assuming he said that, then I don't have to worry about it.  But assuming he says they didn't convert, my question is, can they now do it?

MR. CAPONI:  Well, Your Honor, the issue there is what Vice Chancellor Laster is going to decide is a) were they converted?

THE COURT:  Okay.

MR. CAPONI:  Okay.  And if they were converted, if all the debt was converted, then that resolves the proxy right issue.

THE COURT:  Okay.

MR. CAPONI:  If Vice Chancellor Laster determines that the conversion didn't occur, what he's determining is that all of those transactions don't count for conversion under Delaware law.

THE COURT:  Okay.

MR. CAPONI:  Debtor, if you want to convert based on something new, which we haven't heard of before, they could maybe argue that in front of Your Honor, but Your Honor won't have to decide -- the Debtor would not be able to come back in front of Your Honor and argue over again.  Oh, all those little minor conversions count.  That's going to be resolved by Vice Chancellor Laster.

THE COURT:  That's the only thing.  He's not going to resolve whether they have -- the only issue I was trying to figure out is did they ultimately have the right to convert?

MR. ALEXANDER:  Your Honor, I believe that the collateral estoppel order that they've referenced, has a provision in there that indicates that the Hawk debt is convertible.

MR. CAPONI:  The Hawk debt is convertible, Your

Honor.

MR. ALEXANDER:  It's convertible.

MR. CAPONI:  When you go to the 225 action, it's not just deciding -- the threshold question as to whether or not you have the proxy rights --

THE COURT:  My purpose --

MR. CAPONI:  -- the conversion occurs.

THE COURT:  I get that.  And the only way there was -- that I would be concerned is if the Debtor wanted to convert and say I'm only paying you -- I'm only going to convert a half mil -- I'm just using a number.  I don't know what the number is.  But we are going to raise $300 million.  And once we've raised $300 million, we have a right to convert $300 million of Hawk into equity.

MR. CAPONI:  And Vice Chancellor Laster is going to determine the method under Delaware law that's applied to this contract for how that conversion process is to unfold.  He will decide that issue for you and --

THE COURT:  No.  The only thing he's going to decide is whether they did or didn't and how much -- and they can pay it in one lump sum; is that what you're saying?

MR. CAPONI:  Your Honor, the document itself, it's not an agreement that has the conversion rights.  It's not special under Delaware law.  It's a contract.  So what the contract says --

MR. ALEXANDER:  It's still the law.

THE COURT:  Well, it's governed by Delaware law, but Delaware law does not have a specific case or provision that indicates how you convert debt.  So it's nothing specialized. You look at the contract and you determine where the criteria met.  And as of today, the Hawk debt is still convertible.  If that money comes in -- we believe that it's already converted. But what's not being addressed is -- say he says it's not converted, but you allow us to bring money into this case. That changes the whole dynamics of it.

THE COURT:  Well, it doesn't change.  It just says how much you have to pay.

MR. CAPONI:  Well, he's not going to determine how much you have to pay.  The document itself already dictates how much you have to pay --

THE COURT:  That's not what I meant.  If he says that you didn't convert it and none of the payments that you used was conversion apply, then the numbers still remain within the contract, correct?

MR. CAPONI:  Yes.  That would be correct.

THE COURT:  Right.  That's all I'm saying.

MR. CAPONI:  Your Honor, the Debtor's position is that the debt was converted.

THE COURT:  Okay.

MR. CAPONI:  That there is no debt.

THE COURT:  Is that your position?

MR. CAPONI:  That is their position.

THE COURT:  Is that your position now in this case?

MR. ALEXANDER:  That is our position in the 225.
That is our position in this case.  And we said that to the
extent and raised even more money.

THE COURT:  Well, then somebody's got to figure out
did you convert or not.

MR. CAPONI:  Your Honor, that's the point.  It's not
a question of can the Debtor convert in the future.  The
Debtor's position is this debt was converted, and Vice
Chancellor Laster is going to answer that question.  And if he
answers that question as of a month from now, that being -- if
the Debtor wants to convert, it has to come up with some new
transaction assuming --

THE COURT:  Which they claim they're working on. So
at the end of the day, the only thing Judge Laster is going to
figure out for me if I send it back is whether it was converted
or not.

MR. CAPONI:  Which is a -- involves analyzing
hundreds of transactions over many years, which we've all
been --

MR. CAPONI:  No.  You just said he's going to decide
whether they can pay the transactions over time or whether they
had to do it in one major transaction.  And so, if he says it

was one major transaction, he's not looking at anything.  He's saying one major transaction, goodbye.  If he says that you could do it in -- over time with all the other things, then he's going to look at all the payments and say which one was or wasn't.

MR. CAPONI:  Correct.

THE COURT:  So I don't know what's so special about that.  I mean, these are -- and you're telling me that Delaware law dictates how the conversion is to be interpreted?

MR. CAPONI:  No.  Your Honor, Delaware law dictates how you interpret the contract, the conversion agreement as between these parties.  And the Debtor is arguing, well, you should read the agreement --

THE COURT:  I get that.  But that's just contract law.  It's just basic contract law.

MR. CAPONI:  I agree with you on that, Your Honor.  But my point is, Vice Chancellor Laster is not deciding just did the proxy right occur.  He's dealing with was hundreds of millions of dollars in debt converted or not, which requires him to determine how to read this contract and apply it to all these transactions.  That is a tremendous amount of work that the parties -- that's why he spent $3 million.

THE COURT:  Counsel.  If he says that it was not payable in increments, that's a done deal.  Or he's interpreting the law to say payment on the Delaware has to be

done all in one.  You can't do it over time.  You have to do it with big offering, and not with these little increments of 20 shares here, 100 shares there.  I don't know what he's going to say.  Now, you may be right if he says, you know what, they can pay in stages.  Then you're right.  That may be a large undertaking to figure out how many transactions we're talking about.  Hundreds?  Thousands?

MR. CAPONI:  Hundreds, Your Honor.

THE COURT:  Hundreds, Mr. Alexander?

MR. ALEXANDER:  They're just in a spreadsheet and I can't recall what the number is.

THE COURT:  So to the extent -- and that's another issue.

MR. CAPONI:  But it is a spreadsheet that you just do in Excel, and it calculates it for you. So it's not a very difficult task.

THE COURT:  Well yeah, but as a threshold matter, somebody has to figure out under Delaware law, which no offense, I don't think there's a specialty.  I can read contracts and apply laws to figure out how -- whether conversion occurred or not and whether it should have been -- he's going to do the same thing I'm going to do.  He's going to go look at Delaware law and figure out how do you do conversions.  You look at the contract.  Figure out what the contract says.  And says yes, you can do this in these

increments or no you couldn't.  One big payment.  If it's one big payment, we're done.  You didn't convert.  If it's in little piecemeal, then yeah, maybe I want him to look at the piecemeal and figure it out, not me.  That's all I'm saying.  I don't think there's any specialty about that.

MR. CAPONI:  All right.  It's also the factual issue that the Debtor was claiming that a lot of these repayments were the Debtor Stream paying normal course daily expenses of the Debtor.  And so, we're not only talking sharer -- you're trying to convert saying the issue of share we can convert.  We pay down obligations of debtor reconvert.  We have to look -- that's why we took all this discovery for six months.

THE COURT:  Counsel, what does that have to do with anything?  This is a simple contract dispute.  I get that Judge Laster, Vice Chancellor Laster may be in a better position because all of the evidence is before him.  But it's not because debt specific.  It's not a specialty.  I get that it may be a more efficient use of judicial resources.

MR. CAPONI:  That's my point, Your Honor.

THE COURT:  Right.

MR. CAPONI:  One oral argument away --

THE COURT:  Right.

MR. CAPONI:  -- from answering all these questions.  One oral argument away from answering all these questions we've been talking about today.

THE COURT:  Which you're positive you're going to win?

MR. CAPONI:  I'm positive.  But even if I lose -- I'll tell you what, I'd rather lose after one oral argument away then do another six months of this with the Debtor.  One oral argument away and we all get the answers to all of these questions.  How does that not satisfy the cause for relief from stay?  Thank you, Your Honor.

MR. ALEXANDER:  Your Honor, we don't believe it satisfies all of these issues and questions in this case.  It's a discreet piece.

THE COURT:  Well, what's wrong with having a discreet piece?

MR. CAPONI:  There's nothing that you can't do.  I mean, that's the whole point.  There's nothing special that it needs to be done in a different form.

THE COURT:  No.  It's not that it's special to be done in a different form because I clearly can interpret a contract.  I clearly can figure out on the Delaware law how this is supposed to happen.  Clearly review the documents and figure this out.  I'm not quite sure whether the issue is not so much whether this is the 225 action obviously.  If he finds that it was conversion, obviously the proxy is out the window.  If he finds that it wasn't converted, then he has to look to the next issue was whether the proxy was properly executed,

257

okay.  All of that may help me.  Because at the end of the day, it still doesn't mean that any of this is going to go away. None of it's going to go away.  You're coming back here because number one, I have to figure out -- if the prox -- if it wasn't converted, you have -- nobody is saying you don't have to right to convert.  Then you want to do it in bankruptcy, okay.

The other issue becomes is if you execute the proxy. What happened with it when you filed bankruptcy?  I still have to determine that.  The only thing -- if I send this back to Judge Laster that he's going to do is maybe set the ground work so I can figure some things out.  And some of the things I may not want him to figure out.  I don't need him to do claim objection.  We don't need that litigated over there.  Because you're right, there may some bankruptcy afforded rights that he can't adjudicate.  You're saying equitable subordination.  You can't do that.  None of that's going to happen over there.  So maybe with respect to SLS, the only issue that they need to figure out is did they exercise their right of proxy over there.  Because nobody is saying that they had a right of conversion.  So the only issue with respect SLS is did they exercise their right of proxy.  And if they did, I got to figure out what that means when bankruptcies on trial.

MR. CAPONI:  Whether or not the issue of SLS having a conversion, I'll leave that to the --

THE COURT:  Well, you said they don't have one.

MR. CAPONI:  I'm saying I don't know that so I'm not going to agree.  I just don't know that.

THE COURT:  Well, if you said they don't have one, what am I sending them over there for other than whether Hawk -- because he's not asking me to allow him to go over there and let the chancery court decide whether they exercise their right of conversion.  He's not asking that.  He's saying that's not an issue.  So if it's not an issue, I don't see why I would give relief and say to go do something they're saying that they don't want to go to the courts for.  What I'm hearing they want to go to the courts for to determine whether the conversion occurs.  If it did occur, than the issue of proxy is out the window.  If it didn't occur, then the issue of whether the proxy was proper becomes okay and the court says they properly exercise.

All right.  Then you come back here, and I have to figure out what happened.  Did it come -- did it get terminated when the stay -- when the bankruptcy was filed, and everything reverted back to the Debtor?  Do you now have a right to convert?  And if you do and the chancery court said you didn't pay anything back, well, we know what the number is and I get to calculate that number, so I don't know.  I'm just trying to toss out what would make sense.  What makes sense.

And I'm not sure, counsel, if you glee that -- I heard Mister -- counsel for Hawk -- well, I guess SeeCubic and

Hawk as the agent, saying that only argument away.  Why come back here and spend money to -- because trust me, even if I kept it, you guys will be one argument away because they're going to make the same -- put all the record in.  You don't need anything.  Because if you're one argument away in that court, unless you think there's something else and you already agree that it's one argument away, do you get to change that now?  Do you get to come here and say, no, we now want to renege on that agreement?

          MR. ALEXANDER:  Your Honor, I don't know what the -- again, we weren't counsel for that, so I don't know what the agreement was.  I saw Mr. Caponi's letter.  I --

          THE COURT:  So don't you think as a threshold matter you need to figure out whether that was an agreement that the Debtor made and whether that agreement is not enforceable here?  I don't know.

          MR. ALEXANDER:  I don't know whether that was moved due to an order.  I don't know.

          MR. CAPONI:  I'm sorry, was it an order?  No.  It was a joint letter to the Court saying that's how we were going to proceed and that's how the case was going to proceed.

          THE COURT:  So now the Debtor doesn't want to proceed that way.

          MR. CAPONI:  I filed it on behalf of both myself and debtor's counsel.

THE COURT:  And the Debtor in possession says I'm not going to be agreeable to what the company said.  I'm the Debtor in possession.  I want to revoke that agreement.  Did you think about that?

MR. ALEXANDER:  Well, we have not addressed that issue, Your Honor.  But that's something -- I don't know if we can -- I don't -- again, I said I didn't know if that was in an order or what it was.  If it's just a letter agreement, I don't know if the court issued an opinion saying here's what I'm going to address, and this is solely what I'm going to address.

THE COURT:  Don't you guys think you should have told me that?  Don't you think that's something I need to consider?  Whether this is something that the Debtor in possession wants to go forward with?  And then that gets to the lawyers and who's the difference between the Debtor and the -- I don't know what you call the prefiling company and now the Debtor in possession.  Is that an agreement that's enforceable?  Is it -- contract and now I don't want to -- I don't know.  Have you guys -- I mean, why am I the one asking all these questions?  There's a lot of stuff I'm going to have to look at.

And if it is, then maybe you go and you figure it out.  And you guys say, okay, this is all before Judge Vice Chancellor Laster, and the only issue -- we've got all the evidence and everything here.  He just needs to decide.  And then once he decides, we come back over here, Judge, and you

figure it out in the bankruptcy context.

MR. CAPONI:  Your Honor, if I may?  I think that one of the things that might be helpful is if we talk to Mr. Dupre.

THE COURT:  Who's Mr. Dupre?

MR. ALEXANDER:  He's the chancery court lawyer who -- at McCarther & English, who works on this but that wasn't a chancery case.  He was also in charge of the district court case that was filed against the Hawk parties as well.  Only because there are some things that I believe -- in discussions with him, he's told me differently from what I've heard today.

THE COURT:  But that's why I need some evidence.

MR. ALEXANDER:  I understand that, Your Honor.  And I'm just making a point that we're going to go reach out to him as well.  I'm not saying Mr. Caponi is misrepresenting anything said here.  I just need to get --

THE COURT:  Well, everybody has a different --

MR. ALEXANDER:  I just have to have the understanding of particularly the conversion agreement issues to make sure we've got those solid.  Because even the estopple order, which I have read, indicates that they're -- that they had not converted at that time, but that they could convert in the future, so.

THE COURT:  Right now, all I heard was arguments.  We have spent I don't know how many hours on argument, and I don't have an iota of evidence.  That we've heard argument.  I don't

have anything except we want to look at an estopple.

MR. ALEXANDER:  I understand, Your Honor.

THE COURT:  So even if I said, okay, you made your case on argument, then the burden shifts to them and then they get to put their evidence in.  So I don't know, again, why we just didn't go with the evidence, and you make your --

MR. CAPONI:  Your Honor, we requested that.

MR. ALEXANDER:  Your Honor, the reason we were not going into evidence -- well one, I do have evidence so to put these exhibits in, which would be evidence in a minute.  But Mr. Rajan is unavailable and they're going to say that they need him for evidence.  And so, we're waiting another three-four months.

THE COURT:  No.  That's not what I said.  What I said was we would make a record of everything we needed.  And then if Mr. Rajan needed to testify, we would hold it open for some specific time to add his testimony in. I never said we were going to hold up on all the testimony.  That I definitely said. No, no, no.  You're not holding this up.  You put all your evidence.  And I said when you did that, you may take the risk that if Mr. Rajan testified that they then want to recall your witnesses to address some -- you know, because when you put your witness, they can reserve the right to call them in rebuttal.  I don't know what you want to do.

MR. CAPONI:  Your Honor, if I may?  You keep saying

there's no -- can I now go through what exhibits I'm admitting into evidence?

THE COURT:  Sure.

MR. CAPONI:  Sure, CR3.

THE COURT:  Which is what?

MR. CAPONI:  Which is the collateral estoppel opinion.

THE COURT:  Okay.

MR. CAPONI:  CR5, which is the 225 --

THE COURT:  Wait, one at a time.  Collateral estoppel.  Mr. Alexander, any objection?

MR. ALEXANDER:  Well, I don't -- I mean, it's a judicial notice. I mean, so to the extent there's factual findings, that's an interlocutory order.  So if he's just using it to show a date and the document was filed.

THE COURT:  Right.  He's disputing whether it's an adjudicated fact because it's an interlocutory order.

MR. CAPONI:  We don't believe it is.

MR. ALEXANDER:  And he's saying you can enter it into the record for the sole purpose of saying the court issued the order.  As to its content, I cannot take any -- give any weight to that because it's an interlocutory order and he's disputing the findings.

MR. CAPONI:  And I don't agree with that, Your Honor. Your Honor can take judicial notice of the contents.  So for

example, the collateral estoppel opinion.  The Court can read it and say this is what Vice Chancellor Laster said.  I'm not bound by it, but this is what he says, and this was the state -- so when I go through the opinion, the docket, and the pretrial order, this court can look at the contents of those documents and say this was the state of play of this case immediately before the bankruptcy.  And when I weigh judicial efficiency and everything else, I can look at those orders and I can look at that letter where Mr. Dupre agreed that it was one day oral argument and say that was an agreement by the Debtor.  Now whether the Debtor wants to back off on its agreement --

THE COURT:  Well, it wasn't about a debtor in possession.

MR. CAPONI:  Sorry, not that.  Right.  If the Debtor wants to try to walk away from that, they can make that argument.  But the court is able to read that letter and say I understand the contents.  I'm not saying you're bound by it. So there's a difference between Vice Chancellor Laster making a decision and saying a factual findings.  The Court can observe that he made the factual finding.  I'm not -- the court isn't bound by it.

THE COURT:  Okay.  I can look at a petition and say on the petition that they put that.  That was a secured debt. Okay.  They said it was a secured debt.  What am I supposed to

do with that.

MR. CAPONI:  Okay.  Well, Your Honor --

THE COURT:  Because that's what you're saying.  I'll look at it and say he said that.  What weight am I going to give it?  What is this supposed to help me say?  Well, okay, the court said this.  Now what?  How does that -- you're saying I'll look at it and I'd say, well, the court was ready to proceed because he'd already made these decisions.  Is that what I'm supposed to be saying?

MR. CAPONI:  But I'm saying, you would look at the pretrial order and say there was a pretrial order.  And in that pretrial order, it set a trial date.  It set a pretrial date.

THE COURT:  What's the pretrial order?

MR. CAPONI:  The pretrial order is CR7.

THE COURT:  Any objection to CR7, Mr. Alexander? We'll come back to CR3.

MR. ALEXANDER:  Same objection.

THE COURT:  What?  It says what it says.

MR. ALEXANDER:  Okay.  It says what it says, but I don't know what weight you're going to give the order.

MR. CAPONI:  Can we take like maybe a five-minute break so I can just kind of understand what he wants to do with them, because maybe he can help me --

THE COURT:  Maybe we can agree to all of it or not.

MR. ALEXANDER:  Yeah.  I just want to talk to him to

understand what he wants to do --

THE COURT:  Okay.  I'll give you a five-minute break.
Well, we -- you know, you're hitting 6:25, and I've got a kid
I --

MR. CAPONI:  Your Honor?

THE COURT:  Uh-huh.

MR. CAPONI:  I have some travel issues.  Can the
Court give some idea of when you're going to conclude the
hearing this evening?

THE COURT:  In that ten minutes.

MR. CAPONI:  However, the five-minute break.

THE COURT:  As soon as that five-minute break is
done, I'm going to go over the -- the issues of what he wants
to admit, and you'll just have a standing objection and then
I'll say yes or no and that's it.

MR. CAPONI:  Thank you, Your Honor.

THE COURT:  I'm sorry, Mr. Callahan.

MR. CALLAHAN:  Yes.

THE COURT:  No.  I have to -- I don't know why you --

MR. CALLAHAN:  I couldn't get out of the building and
all that -- was in like upstairs and --

THE COURT:  Oh, man.  You couldn't get out?

MR. CALLAHAN:  I couldn't get up here.

THE COURT:  Oh, you were -- you were in the -- why
couldn't -- we're off the record.

(Recess taken)

MR. CAPONI:  All right.  So I'm going to try to be quick, Your Honor.  I'm going to move these exhibits, Mr. Alexander's going to lodge his objection, I'm going to rest on my memo, and then Your Honor, can just make the decision on, you know, back in chambers when you're considering all the --

THE COURT:  Yeah, I'm not making that tonight.

MR. CAPONI:  Right, so.

THE COURT:  I guess I'll be working tonight.

You hear that, Michael?  You will be working.

All right.

MR. CAPONI:  It was CR-3.

THE COURT:  Uh-huh.

MR. CAPONI:  CR-6, which is the 225 docket.

THE COURT:  Okay.

MR. CAPONI:  CR-7, which was a pretrial order that Your Honor already has.  Then there's CR-144 and 146.  They are the persuasive claim of counsel in the 225-action restraint from Technovative.  And then there's CR-40 and 49, which are the Debtors monthly operating reports.  Sorry, 40 through 49.  They are the monthly operating reports and then --

THE COURT:  So there's nine MORs.  Nine monthly operating --

MR. CAPONI: Yeah, 40 through 49.  So there's --

THE COURT:  So that should be nine.

MR. CAPONI:  Yes.

THE COURT:  Ten?

MR. CAPONI:  If you count zero, it's ten.

THE COURT:  And they have ten -- have they been in --

MR. CAPONI:  How are there that many operating reports?

THE COURT:  They've only been in bankruptcy since March.

MR. CAPONI:  A number of them were amended and --

THE COURT:  And then that's for both of the Debtors.

MR. CAPONI:  Yes, correct.

THE COURT:  Okay.  So both Debtors.

MR. CAPONI:  Correct.

THE COURT:  So even if we have five a piece, which is the initial which would have been in March, April, May, June, four and then five.

MR. CAPONI:  There's some amendments to them.

THE COURT:  Okay.

MR. CAPONI:  Okay.  So that -- that is the, Your Honor, the exhibit issue.

And then the only other thing I want to raise, because I think we've -- all my points I wanted to cover, we've covered, is the -- Your Honor, we were having a conversation with Mr. Alexander about proxy rights and do they revert back. And the point I want to make there is that is a, in part, a

Delaware state law issue.

In this regard, Delaware recognizes that there are both an economic -- that all ownership rights, whether they be stock or an LLC membership interest, et cetera, they're severable into the economic and the beneficial interest, and they are separate and distinct interests. So that would be something akin to you may own the apartment, the apartment building, but I have a lease to this particular apartment. So under Delaware law, the -- when the proxy right was issued, there's two separate rights, you know, the beneficial right which includes voting, and then there's the economic rights.

The economic rights stayed with the Debtor, but the Debtor lost the beneficial right, which was particularly the right to vote. And now it's a state law issue, Judge Silverstein discussed, it's not just a federal issue because in Delaware you sever -- the rights can be served, the ownership rights and the stock.

THE COURT: Right. Well, you don't want to use landlord tenant, because the landlord still owns the building.

MR. CAPONI: Okay.

THE COURT: The tenant only has the right to occupy subject to the landlord's right to revert.

MR. CAPONI: Your Honor, it's somewhat analogous because the Debtor retains the economic right. So if the company sells the stock, and that's what people really care

about, the money goes to the -- back -- you know, the Debtor who owns the economic interest.  But the beneficial interest, the voting rights, those issues, they stay with the parties. So I just, it's --

THE COURT:  I get that counsel, but I still would have to determine on the -- even if they're stood up, what does that mean in a bankruptcy context.

MR. CAPONI:  I agree, Your Honor, and I think I'm just saying when you were reading Judge Silverstein's decision and other, just when you were using with Mr. Alexander the notion of you have to perfect your right, under Delaware law, your right's perfected the minute you get that beneficial right.  There is no second step.  Like you own that piece.

THE COURT:  Right.  But what does it mean upon a bankruptcy?  It may mean according to Judge Silverstein, it doesn't mean anything, it's an absolute done, and bankruptcy has no impact.  I don't know.

MR. CAPONI:  Your Honor, I agree.  Again, I just wanted to --

THE COURT:  Right.

MR. CAPONI:  -- note that the underlying principle that -- I don't know what other states do, but in Delaware, those rights are severable.

THE COURT:  Right.

MR. CAPONI:  And that's unique and that's -- I just

wanted to --

THE COURT: Oh, yeah. She said even on some, you know, I do have a little blurb of what she says. They were no longer permitted to vote as of the -- of the condition B. What all that means, I don't know.

MR. CAPONI: That's it, Your Honor.

THE COURT: Okay. All right. Mr. Alexander, you have a standing objection to the admission of all of these -- all of these?

MR. ALEXANDER: I believe he's trying to use judicial notice for each of them.

THE COURT: And your objection is that what? I can take judicial notice of the fact they were filed and that's it.

MR. ALEXANDER: That's correct, Your Honor, or that certain things exist on the docket. But in terms of any statement or anything in the documents, we don't believe you can take judicial notice of that.

THE COURT: So with respect to the monthly operating reports, I'm not quite sure what he wants me to do with those because I don't think he talked about the monthly operating reports.

MR. CAPONI: It goes to, again, Your Honor, we talked about the fact that this was an administratively absolvent entity. It already spent $3 million. Look at its monthly operating reports. It proves up that it should want the most

expeditious and quick path to resolution of these issues.

THE COURT: All right. Well, you didn't tell me that, counsel. You just said here's the monthly operation -- what am I supposed to do with them? Okay. Now I know what you want me to do with them.

MR. CAPONI: I -- with them, Your Honor. Just pointing that out.

THE COURT: All right. What am I supposed to do this? And the proof of claim again goes to that issue of how much money they've already spent?

MR. CAPONI: I'm sorry, Your Honor?

THE COURT: Proof of claim, how much money they've already spent?

MR. CAPONI: Correct. That's in the PS. That's --

THE COURT: That was PR --

MR. CAPONI: That was covered by the --

THE COURT: -- 144 and 147.

MR. CAPONI: Yeah. 144 and 147.

THE COURT: And the 7 is only to say, hey, there's a -- here's a pretrial. We're ready to go to trial. That goes to expedite -- I get it.

MR. CAPONI: Yes.

THE COURT: Okay.

MR. CAPONI: All these are -- so if you match them up with the PowerPoint they go to, as Your Honor factors in, what

makes the most sense, these documents lay out, this was the

state of -- right, and this is what's, you know, it supports

the slides.

THE COURT:  So Mr. Alexander, he says he wants me

to --

MR. ALEXANDER:  Well, he asked you to take -- he

wants you to use their proof of claim, the actual amount that

they incurred with that number.

THE COURT:  I don't know if it was or wasn't.

MR. ALEXANDER:  Exactly.  So I don't believe they

would -- what's the point of it.

THE COURT:  I can take judicial notice that it was

filed.

MR. ALEXANDER:  Correct.  But the --

THE COURT:  I can't take judicial notice that it's

correct.

MR. CAPONI:  Your Honor, I'm not asking to adjudicate

that Mr. Dupree's entitled to $3 million.  What I'm asking you

to take notice of is that Debtors' counsel is saying it spent

$3 million --

THE COURT:  So what?

MR. CAPONI:  -- litigating this 225 action.

MR. ALEXANDER:  That's not even what it says.

MR. CAPONI:  Whether it's 10.5 or 3.1 --

THE COURT:  I can't do anything with this.

MR. CAPONI:  I'm not asking you too now.  But again, it goes to my argument, a lot of money was spent.

THE COURT:  I don't know -- how do I know a lot of money was spent?  Just because you put it on that paper, doesn't mean it was there.

MR. CAPONI:  Well, I think Mr. Dupree's an honest guy.

THE COURT:  I'm not -- it's not about honesty.  It's whether -- I mean, he makes a $3 million.  They may say we paid you and calculations are off.  All I can do is take judicial notice it was filed.  As to the accuracy and all of that, I can't give any weight.

MR. CAPONI:  Your Honor, and that goes to like any piece of evidence weight.  Your Honor can give it whatever weight you want to give it, but if you --

THE COURT:  You can give it none.

MR. CAPONI:  But when you admit something via judicial notice, it is no different than admitting testimony on the stand.  You don't say I'm only going to acknowledge the witness sat in the stand.  The Court's able to listen to everything and accord it whatever weight it wants.  That's what --

MR. ALEXANDER:  Your Honor, we disagree with that.

MR. CAPONI:  And we get what the disagreement is, but Your Honor will sort that out.  My position is once it comes in

through judicial notice, it's like any other piece of evidence. There's no restriction on it.  Your Honor accords whatever weight you want to accord it.

THE COURT:  But taking judicial notice means that from the beginning that I have to say what I'm taking judicial notice of.  If I'm taking judicial notice that this was filed in this amount, that's it.  I don't give any weight to what the number is or -- oh, yeah.  You filed it and you put $3 million. You want me to find that they're claiming that they spent all this money already litigating and therefore it's too costly, and I don't know how I get there by just saying, oh, they filed a proof of claim.  I can take judicial notice that they filed it, but I can't necessarily say I'm going to give some weight to it to conclude that it was expensive proposition and if you continue it's going to be more expensive.  That's different.

MR. CAPONI:  Your Honor, again, Your Honor -- the Court is going to give it whatever weight you want to give it. If you think the factors are so overwhelming, I can, you know, I'm happy to lose at the margins.

THE COURT:  All right.

MR. CAPONI:  Your Honor, I think one day of oral argument, and we're done.

MR. ALEXANDER:  It's not the weight you can give it. That's not the issue, and I think Your Honor understands that. It's not the weight.  You can't consider it at all.

THE COURT:  Well, I can consider that it was filed.

MR. ALEXANDER:  Correct.

THE COURT:  And that's it.

MR. ALEXANDER:  That's it.

THE COURT:  And you're saying because I -- to do anything else would attribute truth to the matter of what's in it.

MR. ALEXANDER:  Correct.

THE COURT:  This is a -- judicial notice is an exception to the hearsay rule, and I have to give it certain considerations.  I can again consider it was filed.  I can say it says that.  That's it.  I don't think I can say, well, I'm going to give it some weight.  I don't get to give it any weight if it's just judicial notice of the document.  I'll figure it out.  I sort of know the answer, but I will go do my own research.  I'm pretty sure I have a memo already because I've had to look at that issue a long time ago and I'll pull my own memo out and I'll be.

All right.  Mister -- oh, Mr. Michaels?  Michaels, you wanted to add something.  Hello?

MR. MICHAELS:  Hello.  Can you hear me, Your Honor?  This is Chris Michaels.

THE COURT:  Yes, I can hear you very clearly.

MR. MICHAELS:  Okay.  We have previously stated that we did not intend to participate and that was in fact true

while we stated it.  While we've been on this call, I wanted to let the Court know that an oral argument has been scheduled in the Delaware court action brought by Rembrandt against Hawk and SeeCubic on Technovative.  The Technovative portion is stayed, but the other descendants -- we had filed for a preliminary injunction motion to enjoin the parties from undertaking efforts to take control of Rembrandt's intellectual property, which is precisely what they're trying to do in the Delaware Chancery Court action.

We tried to enter the chancery court action and were told that it was not the appropriate forum to adjudicate whether they had the right to take control of Rembrandt's intellectual property, so we brought the Delaware court action, and then this bankruptcy court -- bankruptcy action was filed.

So to the point of judicial efficiency, all this may be incredibly moot given the Delaware court action that is -- we filed pretty compelling papers which we've also provided to this Court.  Secondly, I would make the point if you were asking --

THE COURT:  Wait a minute, wait a minute, wait a minute.  So you say there's a hearing scheduled on your request for a preliminary injunction, your meaning Rembrandt --

MR. MICHAELS:  Yes.

THE COURT:  -- against -- against Hawk and who else?

MR. MICHAELS:  And SeeCubic.

THE COURT:  And when's that scheduled for?

MR. MICHAELS:  It was just scheduled for July 7th.

THE COURT:  That's two weeks.  Okay.

MR. MICHAELS:  And the second point --

THE COURT:  Okay.  And you believe -- wait a minute. You believe that that action will make moot here with respect to --

MR. MICHAELS:  The --

THE COURT:  Okay.

MR. MICHAELS:  Yes.  Which I will bring to the second point that we would make.  Is we have provide -- we are the licensor to Stream and a -- it was a settlement of a matter that has been fully adjudicated and the settlement agreement entered, and a case dismissed.  So there's no rights of appeal or anything.  This is a fully adjudicated matter in terms of our rights with respect to Stream and our intellectual property.

The -- we have licensed Stream.  We have not licensed Technovative, and we certainly have not licensed Hawk or SeeCubic.  And if they take control of Technovative, which has possession of Rembrandt's intellectual property, they will be one, potentially causing immense harm to Stream's bankruptcy estate.  Because they're not authorized to do that, they would be incurring extensive liability to Rembrandt.  And secondly, we would be -- that is the nature of our injunction action

against them, to prevent them from taking that course of action.

So there is a significant harm to the bankruptcy estate to give managerial control of Technovative to somebody other than Stream.  Stream is licensed to control and have possession of our intellectual property.  Hawk and their directors and Technovative is not unless they are preparing product and doing work for Stream.  We specifically authorized that in our license.

There is a substantial difference between control of Technovative in the hands of an entity other than Stream.  And that -- like I said, it has a negative impact on the bankruptcy estate and will throw the major asset of the estate into a complete -- there will be injunctions going back and forth.  We will immediately have rights of patent infringement, trade secret, et cetera, against the parties who are taking that asset.

Whereas if it stays in the bankruptcy estate, the control of Technovative as a bankruptcy estate asset, we -- we are saying that that is covered by the current license.  I believe Stream has filed papers saying that they have planned to accept that license as part of their plan, so that it resolves significant issues just leaving it where it sits.

THE COURT:  Okay.  Well let me -- let me -- before Mr. Caponi, we're going to get to Mr. Callahan and gives him

about ten minutes.

MR. CALLAHAN:  That's okay.  And may I make a remark with respect to the gentleman on the phone.  We're here for a legal argument.  The U.S. Trustee is not taking a position. But if Mr. Michaels is making those representations, I think Rembrandt had notice that this hearing was today --

THE COURT:  Well, they filed, and they just said we are going to -- they did file a response.

MR. CALLAHAN:  Yeah.

THE COURT:  And they said we weren't going to participate, but they have now heard things in the case where they have changed their position about not participating.

MR. CALLAHAN:  Well, then they would have -- if the Court were to invite them to appear --

THE COURT:  Yeah.  We're not handling that tonight. We can -- they can come tomorrow.

MR. CALLAHAN:  While I have no reason to dispute any of these representations, certainly they come as a surprise to me and perhaps --

THE COURT:  Well, the point of the matter is, it doesn't really matter what's going on with these other three parties.  What -- for my purposes, if the Debtor owns the license, okay.  And they're saying the license is between the Debtor and Rembrandt, I have not heard anybody say that that license isn't property of the estate and it's presumably the

Debtor must have licensed it to Technovative, and now we've got a problem as to who says what happens to the license.  And what they're arguing is they get the management rights, they get the ownership rights, I don't know what the heck they mean anymore.

MR. CALLAHAN:  Because my only point is stepping in at this hour to make an argument on behalf of either party, I think is inappropriate.

THE COURT:  When I'm -- but I'm not here -- I just wanted to hear what he had to say.  I thought it had to do with something else.  To the extent he wants to support the Debtors, they can come and present their evidence.  We're not doing it tonight.

MR. CALLAHAN:  And there's other aspects of this trial going forward tomorrow, Wednesday --

THE COURT:  We're having evidence going to be put in tomorrow.

MR. CALLAHAN:  Yes, Your Honor.

THE COURT:  The question --

MR. CALLAHAN:  And what Mr. Michaels was suggesting may be true.  I don't dispute that.  But it is something that would certainly --

THE COURT:  I'm not hearing that tonight.

MR. CALLAHAN:  -- the Court should have to consider it.

THE COURT:  I'm not hearing that tonight.  I'm --

he's just saying -- right.  All --

MR. CALLAHAN:  And I'm suggesting that the Court not hear this tonight.

THE COURT:  No, all he's saying is that -- what I heard him say is that we had decided we weren't going to participate because we were just going to observe.  We have now heard things that we have now -- we could say, we have filed something, and they weren't going -- now we've heard, and we've got to pursue what we have to pursue, and they don't get to do that until the Debtor puts on their response and then they put on their response.  As an initial matter, the movement has left in respect to the issue -- right, Mr. Caponi, on the motion for relief.

MR. CAPONI:  Yes, Your Honor.

THE COURT:  Do you believe that this is sufficient to carry forward your burden to support a finding that you're entitled to relief?

MR. CAPONI:  Correct.

THE COURT:  All right.  So that's the first thing I have to figure out did they meet their burden on argument and documentary evidence.  I don't know.  Assuming they did, then the burden shifts to the Debtor and Mr. Michael's client, Rembrandt, to come in opposition, but all I heard is argument then they get to make their defense.  These is not a fear of completing because they've done their -- assuming they've met

their burden.  They're saying that in D-1 for cause and cause exists because it should go somewhere else.  I don't know.  I don't know if I have enough evidence or not to say yes, you're right.

Now, Debtor, tell me why I shouldn't.  I already said, I don't know how I'm supposed to do this.  You know, they're saying even -- they don't need to call a witness.  What is a witness going to tell me?  Here's the documents.  Here I get them in?  I ultimately have to interpret what they're presenting.  But the problem will become what weight, if any, I can give to these things.  I don't know.  Yes?

MR. CAPONI:  Your Honor, again, I think we have enough on the record.  But I think, Your Honor, since you say about more evidence, Mr. Stastney's going to testify tomorrow and --

THE COURT:  He's going to testify for who?

MR. CAPONI:  For us.

THE COURT:  I thought you said you didn't have any witnesses?

MR. CAPONI:  No, we're waiting for the evidentiary portion, Your Honor.  Mr. Stastney and then Mr. Park is the other witness.

THE COURT:  Oh, okay.

MR. CAPONI:  We were going to do Mr. Rajan, but he's not here, so.

THE COURT:  So why would anybody be thinking I'm making a decision based on legal argument if you're going to have some witnesses.  Am I making a -- I kept telling you guys this makes no sense to me that you're going to do legal arguments with no witnesses, and then I'm going to say, okay, that's fine.  I need some evidence.

MR. CAPONI:  Well, by the end of tomorrow, Your Honor, you'll have your only two witnesses and you can take the whole thing under advisement.

THE COURT:  Well, no.  I won't take it under advisement.  Because if that only means that you have made your burden -- you've met your burden, now they get a chance to --

MR. CAPONI:  Well, Your Honor, we'll call --

MR. ALEXANDER:  Your Honor, the burden --

MR. CAPONI:  -- Mr. Rajan later.

THE COURT:  Well, he made his burden -- he met his burden in terms of establishing that they have a right to relief from stay and in the burden to the Debtor or the opposing party to say why I shouldn't.  At least that's what I think is a shifting.

MR. ALEXANDER:  Right.  To the extent you find that they met their burden.

THE COURT:  Yes.

MR. ALEXANDER:  Yes.

THE COURT:  And then I said I have to find the

burden, and right now, I'm not figuring out how I do that based on these documents is all I'm saying.  And he's saying, don't worry, Your Honor, because we're putting some witnesses on tomorrow, which they should have done today, but.

MR. CAPONI:  Can we start tomorrow at 12:30, so that housekeeping matters; is that correct?  Unless --

THE COURT:  Yes, 12:30 tomorrow.

MR. CAPONI:  12:30. Okay.  Just want to make sure.

THE COURT:  Yeah.  Now, counsel, that is all contingent on me getting through my 11:30 meeting.

MR. CAPONI:  Okay.

THE COURT:  I do have an 11 -- sometimes, depending on who counsel is, I might not get through it until 1:00 o'clock.  Sometimes I will move somebody.

Do we have any -- what do we have tomorrow?  Let me pull my list up.  Hopefully, it's not anyone -- there are some counsel that I can tell you whatever we're going to have on longer time than 11:30.  Where's my list?  Where's my list? Come on, Eileen.  Who do we have tomorrow?  Eileen sent the list out.  On Friday, hold on.  I need next week's calendar.

Counsel, we will start at 12:30.  I don't think we're going to -- we're going to start as close as possible to 12:30.

MR. CAPONI:  Your Honor, it was my understanding and I just wanted to confirm, we're okay to leave our documents over in the corner there?

THE COURT:  Yes, you can leave them here.  We're going to lock it up.

MR. CAPONI:  Oh, thank you, Your Honor.

THE COURT:  Nobody's going to be in here.  Hold on.

John, going to -- I have some sort of notice that I have to put something in and now I can't open anything.  Hold on.  Let me just tell you what I have tomorrow and what's the likelihood that it's going to be exactly -- it won't let me open it.  I don't know.  I knew that the minute you came up here.  But I did get some little warning that I need --

Okay.  We have claim objection, motion for relief.  They want a continuance.  Continued.  Frame objection -- assert -- I just need to see who counsel is to see whether we need -- oh.  Acrobat has quit because you're not signed in.  See, I told you, John.  This thing -- now it just kicked me out.  Something about something.

MR. ALEXANDER:  Do you want to do 12:45, Your Honor?

THE COURT:  Well, they can check in at 12:30, if everything's done.  Because sometimes I finish at 11:30, 12:00 o'clock.  So show up at 12:30 and we'll see where we are.

MR. CAPONI:  Sounds good here, Your Honor.

THE COURT:  Okay.  Counsel, to the extent you guys can -- can discuss the issue of whether -- what evidence that you're going to stipulate to be entered, so you're only having testimony tomorrow.  Presumably --

MR. ALEXANDER:  Your Honor, we still have the legal issue of the stock.

THE COURT:  Oh, okay.  Why don't we leave that to the end because I'm not taking any evidence on that.  I'm not because it was an amended motion, it was filed on the eve of trial, and I don't think any of the parties have had an opportunity to respond to that motion from a legal -- I don't even know from a legal or a factual perspective.  So let's put that to the end.  I'll hear the legal arguments, but since I'm not taking evidence on that, I'd rather get through these two things first, okay.

All right.  Anything?  Court is adjourned until tomorrow at 10:30.

MR. CAPONI:  12:30.

THE COURT:  No, 10:30.

(Proceedings adjourned)

C E R T I F I C A T E


        I hereby certify that the foregoing is a true and

correct transcript from the electronic sound recording of the

proceedings in the above-entitled matter.




        /s/
_____
John Buckley, CET-623
Digital Court Proofreader