UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
|  | : |
| IN RE: | : Case No.  23-10764 |
|  | :         23-10763 |
| STREAM TV NETWORKS, INC.   CH: 11 | : |
|  | : Philadelphia, Pennsylvania |
| A) Trial Re: Emergency Motion To | : June 27, 2023 |
| Dismiss Case. Motion Of Hawk | : 12:49 p.m. |
| Holdings Ltd. (I) Pursuant To | : |
| Section 1112(B) Of The Bankruptcy | : |
| Code Either (A)(I) To Dismiss The | : |
| Debtors Chapter 11 Cases Or (2) | : |
| To Convert Such Cases To Cases | : |
| Under Chapter 7 Or (B) In The | : |
| Alternative, Pursuant To Section | : |
| 1104(A) Of The Bankruptcy Code To | : |
| Appoint A Chapter 11 Trustee And | : |
| (Ii) To Request Expedited | : |
| Consideration Pursuant To Local | : |
| Rule 5070-I(G)Filed By Hawk | : |
| Investment Holdings Ltd. | : |
| Represented By Steven Caponi . | : |
| . . . . . . . . . . . . . . . . . . | |

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtor:                    Rafael X. Zahralddin, Esq.
                                   Lewis Brisbois
                                   500 Delaware Avenue, Suite 700
                                   Wilmington, DE 19801
                                   302-985-6004

                                   Bennett G. Fisher, Esq.
                                   Lewis Brisbois Bisgaard & Smith
                                   24 Greenway Plaza, Suite 1400
                                   Houston, TX 77046
                                   346-241-0495

                                   Vincent F. Alexander, Esq.
                                   Lewis Brisbois Bisgaard & Smith
                                   110 SE 6th Street, Suite 2600
                                   Fort Lauderdale, FL 33301
                                   954-728-1280

For SeeCubic:                          Marley Ann Brumme, Esq.
                                       Eben P. Colby, Esq.
                                       Skadden Arps Slate Meagher &
                                       Flom, LLP
                                       500 Boylston Street, 23rd Floor
                                       Boston, MA 021116
                                       617-573-4800


For Hawk Investment Holdings           Steven Caponi, Esq.
Ltd:                                   K&L Gates
                                       600 N. King Street, Suite 901
                                       Wilmington, DE 19801
                                       302-416-7080


                                       Thomas L. Warns, Esq.
                                       K&L Gates LLP
                                       599 Lexington Avenue
                                       New York, NY 10022
                                       212-536-3901


                                       Margaret R. Westbrook, Esq.
                                       Aaron Rothman, Esq.
                                       Jonanthan N. Edel, Esq.
                                       K&L Gates LLP
                                       300 South Tryon Street
                                       Suite 1000
                                       Charlotte, NC 28202
                                       704-331-7400


For the United States                  Kevin P. Callahan, Esq.
Trustee:                               Office of The United States
                                       Trustee
                                       Robert N.C. Nix Federal
                                       Building
                                       900 Market Street, Suite 320
                                       Philadelphia, PA 19107
                                       202-934-4154


For Rembrandt 3D Holding               Andrew Peter Demarco, Esq.
Ltd.:                                  Devlin Law Firm LLC
                                       1526 Gilpin Avenue
                                       Wilmington, DE 19806
                                       302-449-9010
                                       Chris Michaels

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

INDEX

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES:

Shadron Stastney
  (By Mr. Colby)                    50

JUNE 27, 2023                                              12:49 P.M.

THE BAILIFF:  All rise.

THE COURT:  Good afternoon.

THE BAILIFF:  The Court is now in session.

THE COURT:  Okay.  Appearance, please.  This is Stream TV and it's a continued trial on the motion to offer relief from stay and the motion to dismiss and whether there was authority to file.  Okay.  Appearances, please.

MR. ALEXANDER:  Good morning, Your Honor.  Vincent Alexander of Lewis Brisbois Bisgaard & Smith.  On the telephone is Bennet Fisher, who's in our Texas office, and joined in the courtroom with me is Mr. Park.

THE COURT:  Okay.  And he is not a CFO of the Debtor, correct?

MR. ALEXANDER:  Correct, Your Honor.

THE COURT:  Of Stream.

MR. ALEXANDER:  Of Stream.

THE COURT:  Okay.  And Debtor -- Debtor, okay.

MR. COLBY:  Good afternoon, Your Honor.  Eben Colby and Marley Brumme from Skadden Arps on behalf of SeeCubic, Inc, joined by Mr. Stastney, with a silent T from SeeCubic, Inc.

THE COURT:  So the A team is taking over today.

MR. COLBY:  Yes, well, that's -- you know, we probably let Mr. Caponi twist in the wind for a day, but he deserves a break now.

MR. CAPONI:  Just picking up the phone call now, Your Honor.  I found out who the backup quarterback is.

THE COURT:  Okay.  Okay.

MR. CAPONI:  So for the record, Steven Caponi from K&L Gates on behalf of Hawk and SeeCubic collateral agent.  I have with me Margaret Westbrook as well.

THE COURT:  And is Ms. Westbrook counsel or representative?

MR. CAPONI:  Pardon, Your Honor?

THE COURT:  Is she counsel or represent --

MR. WESTBROOK:  Counsel.

MR. CAPONI:  Sorry, counsel, yes, Your Honor.  One of my partners.  And on the phone, I believe from K&L Gates also is Aaron Rothman, who's also a partner with K&L Gates.

THE COURT:  Counsel.  And is there any representative from SeeCubic -- I mean from, yes, I guess Hawks as the agent for SeeCubic -- no, just counsel.

MR. CAPONI:  Just counsel.

AUTOMATED VOICE:  All participants are now in interactive talk mode.

THE COURT:  Okay.

MR. CAPONI:  Thank you, Your Honor.

MR. CALLAHAN:  Good afternoon, Your Honor.  Kevin Callahan on behalf of the United States Trustee.

THE COURT:  And no one else Mr. Callahan?

MR. CALLAHAN:  Not today.  Thank you, Your Honor.

THE COURT:  Okay.  Who's on the telephone?

THE COURT REPORTER:  Michaels, again like yesterday.

THE COURT:  Okay.  Mr. Michaels, could you please state your name for the record, please?

MR. MICHAELS:  Christopher Michaels appearing for Rembrandt Holding, Limited.  I'm also joined by Neal Wallace.

THE COURT:  And Mr. Michaels, are you in listening mode or are you planning on participating?

MR. MICHAELS:  I wasn't planning on participating yesterday.  Mostly, we're not planning to call any witnesses. We may ask some questions for follow-up.  What I learned yesterday is I probably should not say we're planning to not participate.

The other thing we did put the Court on notice yesterday that we had received -- a judge had ordered a conference for July 7th for our pending case in Delaware. SeeCubic's counsel reached out to us to request an extension and that he had had a preplanned vacation.  We have granted that request, but we have not set a time for that hearing.  So we're probably -- right now it's scheduled, but July 7th is probably not the date that it will occur.

THE COURT:  Okay.  Anyone else on the phone now that we don't know who is?

THE COURT REPORTER:  Blumenthal?

THE COURT:  Blumenthal, I heard -- I haven't heard that name.  Could you state your name for the record, please?  Blumenthal?  Hello?

MR. MICHAELS:  This is Chris Michaels speaking and Stephen Blumenthal is the CEO of Rembrandt Holding, Limited.  He might be on mute.

THE COURT:  Okay.  So I'm sorry, your name is -- oh, that's Mr. Michael again?

MR. MICHAELS:  Yes, this is Chris Michaels and identifying the Stephen Blumenthal is the CEO of Rembrandt Holding, Limited, and so he's a representative.

THE COURT:  Okay.  Anybody else on here, John, that we haven't been able to identify?

MR. FISHER:  This is Bennett Fisher, Judge.  F-I-S-H-E-R, Lewis Brisbois, representing Stream and Technovative.

THE COURT:  Yes.  Mr. Alexander did say that you were on the telephone and participating from Texas, correct?

MR. FISHER:  Thank you very much.

THE COURT:  Yes, okay.

MR. FISHER:  Okay.  Thank you.  I'll go back on mute.

THE COURT:  Okay.  All right.  I think we have all the parties here who are participating today.

AUTOMATED VOICE:  All participants are now in listen only mode.

THE COURT:  Okay.  Before we start, I think there was

some outstanding issues on admissibility of certain documents and there were objections I had to rule on.  Parties recall that?  There was TR-3, CR-6, CR-7, CR-144 and 146, CR-40 through 49.  Okay.  And with respect to TR-3 collateral, that was the collateral estoppel judicial decision.  And Mr. Alexander was objecting that that document satisfied the requirements for judicial notice, correct?

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  Okay.  Well, I think it qualifies for judicial notice, but only for the fact that I can say it was. That's it.  I can't do anything else with it other than this is what it said and that's what the judge said, that's it.  The docket CR -- so it's admitted as -- for under the -- as an exception to hearsay on the judicial notice on the 201 but only using the parameters of that exception, which is I can take judicial notice that it was filed or issued and judicial notice of what it says, that's it.  And anything -- if you look at the rule that says that it's not -- can't be disputed.  Okay.  I can't -- you can't dispute that that's it and that's what it says.  That's all judicial notice allows me to do.

CR-6, this is the Section 225 docket, same.  And whatever the docket is, that's what the docket says.  I don't get to interpret anything from it.  I mean, that's what it says.  It says the complaint was filed a certain date.  Okay. Complaints filed.  I don't know what I'm supposed to do with

that, but it meets the parameters.

CR-7, a pretrial order.  Same thing, I can admit it because it says what it says.

CR-144 and 146, I'm not quite sure how that -- other than it says it was filed and it says what it says, that's it. I don't get to do anything with it.  I don't get to find it was truthful.  I don't get to find that it's somehow some evidence of the expenses that the Debtor incurred during their litigation.  I can't give any weight to any of that.  And to the extent it would be offered for the Court to find that this was proof that the Debtor had already spent this money, can't do anything with that.  So only for the limited purpose that it was filed and on it lists some number.  I can't do anything else with it.  The same thing for the monthly operating reports, CR-40 through 49.

The only thing I can do with respect to judicial notice is that it was filed, it's on the docket, it says what it says.  That's it.  I don't get to interpret anything.  I don't get to say it's correct, not correct, only that it was filed.  I think there's -- like, I think there's some misunderstanding of what judicial notice means.  It only means that I can take notice that it was filed and that it says what it says.  I cannot conclude that that information was correct or give any weight to say the Debtor actually incurred -- for instance, the monthly operating report.  Okay.  That's what the

Debtor reported, that's what the Debtor reported.

I think that those documents, the proof of claim and the monthly operating report -- well, first of all, the monthly operating reports weren't even referenced in the -- they were just like, here's the monthly operating reports.  There wasn't even a reference in argument to them so I'm not even sure how they get in.  But as soon that you want me to take judicial notice, all again, is I can say they were filed, and they say what they say.

If somebody wants me to make some conclusions from that, I can't -- that's not what judicial notice is for.

MR. CAPONI:  Your Honor, I understand your ruling.  Agree with everything, just the last on the monthly operating reports, separate from the judicial notice, they're an admission of a party opponent.  They're admission of a debtor, that way they came in if that --

THE COURT:  Well, you didn't ask me for that.  You asked me on the judicial notice, now you want to argue something else?

MR. CAPONI:  I don't think -- I don't think there's an argument.  It's by definition admission.  It's a state --

THE COURT:  Well, but you can't -- you can't now argue that, oh, well, I want you to take it under as party admission against interest.  You asked me to admit it as a judicial -- as to take judicial notice.  Now you're saying, no,

Judge.  I want you to recognize it as a party admission which you did not say at the time.

And so now Mr. Alexander, he now wants it to be admitted under a different basis.  I see you smiling over there.  I don't know what that means, but you didn't say that at all.  And I would not, under any circumstances conclude it was a statement against interest just on my own.  You have to tell me that.  I don't make evidentiary rulings without somebody asking me to.  I mean, anything I could look at and I go, oh, well, I'm going to decide this is a statement against interest.  Doesn't work that way.

All right, Mr. Alexander, he now wants -- I guess he's abandoning the judicial notice since I only can recognize it was filed.

MR. ALEXANDER:  I mean, Your Honor, the issue is we sort of brought that up yesterday when we were arguing whether admissibility.  The only way he sought to have that admitted was via judicial notice, and that was the document.  He said he didn't need any witnesses, he didn't need anything else to do it, and he chose -- because it's hearsay.  And the way that he tried to get around the hearsay objection was judicial notice, so we would argue that it's untimely.

THE COURT:  He's correct.

MR. CAPONI:  Your Honor, I wasn't -- it is not hearsay because under the Rules of Evidence, a statement by a

party is by definition not hearsay.  It's an exception to the hearsay rule.  Your Honor, the space it comes in is a statement by a party.

MR. ALEXANDER:  You still have to move it in.

THE COURT:  Well, that's what he's trying to do.  I know he still has -- how are you going to authenticate it?

MR. CAPONI:  It doesn't have to be, Your Honor.  A statement against interest is different than an admission.  An admission is a -- a statement against interest is an exception to the hearsay rule.

THE COURT:  Okay.

MR. CAPONI:  And that doesn't apply to a party opponent that supplies the --

THE COURT:  Any party, but at the same time --

MR. CAPONI:  But a party statement is an admission, and it is not covered by the hearsay rule.

THE COURT:  You hear that, Mr. Alexander?

MR. ALEXANDER:  I hear him, Your Honor.  Just indulge me one second.

THE COURT:  Well, I guess me too, because I thought even if it was a statement against interest, I have to figure out what statement it is, how is it being argued.  I guess you guys have to bring somebody in opposition.  I don't know.  You tell me.

MR. CAPONI:  So Your Honor, I'd go to Rule 812(d).

13

THE COURT:  Okay.  Hold on.

MR. CAPONI:  A statement that is not hearsay.

THE COURT:  But counsel, it would have been incumbent upon you to tell me that yesterday.  Not after you'd figured out that I wasn't going to admit it under the judicial notice.  That -- no.  No.

MR. CAPONI:  Oversight on my part.

THE COURT:  No, counsel.  You were adamant yesterday.  You even had a memo prepared.  You guys went back and thought about it and then came up with an alternative.  That's how I see it.  That does not mean I won't let you do it, but no.  That's not how I operate.  If you tell me one thing and then if you figure you can't win on that one, you don't get a second bite to come back and say, well, let me figure something out.

Okay.  So you say it's under rule what?

MR. CAPONI:  802(d)(2).

THE COURT:  Okay.  I must have some wrong rules.

MR. CAPONI:  802(d) is a statement -- statements that are not hearsay.

THE COURT:  Okay.  I guess I must have an old rule book, because 802 says --

MR. CAPONI:  The Rules of Evidence?  802?

THE COURT:  Yes, it says The Rules of Evidence.

MR. CAPONI:  I wasn't sure what --

THE COURT:  The rules -- I don't know what other

rules I would have, counsel.  802, the rules against hearsay.

MR. CAPONI:  Right, D.

THE COURT:  I don't have a D.

MR. CAPONI:  D -- D as in David.

THE COURT:  I don't have anything undermine.

MR. CAPONI:  Is it 801?  Sorry, Your Honor, 801.  I apologize.  801.

THE COURT:  801, I'm not -- all right.  801(d).

MR. CAPONI:  D.

THE COURT:  Okay.  I'm just -- wanted to make sure. Hearsay means statements that are not hearsay.  On here -- a statement that meets the following condition is not hearsay.

MR. CAPONI:  Yes.

THE COURT:  An opposing party's statement.  The statement is offered against an opposing party and was made by the party in an individual or representative capacity is one the party manifested that it adopted or believed to be true, was made by a person whom the party authorized to make a statement on the subject, was made by the party's agent or employee or matter within the scope of the relationship while it existed, or was made by the co -- well, it's not a coconspirators, because that goes in furtherance of a conspiracy.

The statement must be considered but does not by itself establish the declarant's authority under C, the

existence or scope of the relationship under D, and we don't need the issue about the conspiracy.

So I guess, Mr. Alexander, you get to state something about that. I don't know. I'm not quite sure how I get to admit it when Mr. Alexander doesn't get to probe it. That's the -- that's the issue with a party statement. You're saying statement -- it's a statement -- what is it called. A statement is a -- the following statements are not hearsay, and it says an opposing party statement.

So now, in order for me to say it's admissible, Mr. Alexander gets to address whether he believes it satisfies all the requirements of A, B, C, D -- we don't need E because it's not a co-conspiracy. And it says it does not by itself establish the declarant's authority. So you have to at least -- I don't know how you establish the authority of the person who did it. Or the existence or relationship of the scope of the relationship underneath.

So yes, I can maybe find A, maybe I can find B, but apparently, according to the rules I can't find -- it doesn't establish C or D on its face. So how do you establish C and D without some testimony or something, because on its face, it doesn't.

MR. CAPONI: Your Honor, it is filed by the Debtor and Debtor's counsel. Debtor's counsel will like to stand up and question or if authenticity is an issue that comes up when

challenged.  The Debtor's counsel wants to challenge that filing was false or they didn't make it.

THE COURT:  Counsel, that's not what it says.  It says it does not establish on its face the authority.  So you -- if it's not on its face established, how do you do it.

MR. CAPONI:  Well, because it's filed on a court docket by counsel subject to ethical obligations.  If they want to stand up and say they didn't have authority to file it.  I guess they could stand up and make that argument, but I don't know why we're arguing about something I don't think they're going to stand up and make.

THE COURT:  Well, you should have argued -- you should have brought it yesterday --

MR. CAPONI:  And it's find, Your Honor, so the --

THE COURT:  So what?  And I got -- you got to pass all the notes you want.  I'm annoyed.  I'm annoyed that you brought this up at the last minute.  Now I and Mr. Alexander is now put in the position, he's got to figure out at the last minute what we're talking about, and now I --

MR. CAPONI:  Your Honor, I would suggest that we table this and then Mr. Alexander -- I agree.  If he's caught off guard, we can --

THE COURT:  Well, it's not about he's caught off guard, counsel.  You guys went last night and came up with a new theory.  I know what happened.  I was a litigator before I

was here.  You guys figured you couldn't get it out on the that and you went and tried to research another way.  You've got some smart people right here.  I know exactly what happened. And now you want to now ask the Court to consider it when you didn't think about it.

And so I'm not necessarily saying I'm not going to let you go back and think about it, but to spring it up at the -- at the last minute when we have already closed the objections and now say let's -- I want to now open up the basis as to why I want to admit it and say, oh, here's another thought.  Maybe we should do it under this.  And so that is what I'm annoyed about is that you can't do that.  That's not how I run my court.

If you wanted to reserve your right to say it could be admitted under some other basis, then we would have all been prepared for that.  And one thing I like to do is be prepared.

MR. CAPONI:  Your Honor, look, as I said I'm happy -- you want to -- I'll just bring it in through Mr. Park.  I mean, I -- we're spending a lot of time over something that's coming in one way or another, so we'll wait.  Fine with me.

THE COURT:  So why did we -- why did we even raise it if you want to bring it in with Mr. Park?

MR. CAPONI:  Because Your Honor -- contrary to Your Honor's suspicions, I was just sitting there when you were going through the exhibits, in my head I'm like, well, no.  I

didn't raise that because that's an admission.  Let me clarify.
There's no conspiracy last night.

THE COURT:  I -- well --

MR. CAPONI:  I should have done it yesterday.  I
apologize.  I'll clean up my own mess.

THE COURT:  Well, I would think that -- I would think
that they probably came up with -- no offense to you, because
they're the ones they keep referring to.

MR. CAPONI:  We're pointing a finger at me.  This is
all me.

THE COURT:  All right.

MR. CAPONI:  They have nothing to do with it.

THE COURT:  But, well no, and it wouldn't have
anything to do with it.  Because if they're smart enough to
come and tell you about it, that's -- well, I'm don't know if
you're their supervising attorney or not.  But I'm assuming
you're the partner and they're not.

MR. CAPONI:  No, they're two different firms.

THE COURT:  Oh, okay.  But in any event, if you can
get it in any other way why we even talking about it?

MR. CAPONI:  I'll get it in through Mr. Park.  That's
fine, Your Honor.

THE COURT:  That's what I'm saying.  Why are we
talking about it?  We've wasted ten minutes.  All right.  So
it's not admissible -- it's admissible on the judicial notice

only for the fact that it was filed, and it says what it says. You can do anything else you want with it.

All right. Where does that leave us with respect -- now we've already said that they're all admissible only for the fact that they were filed. The collateral estoppel, it says what it says. I get that you want me to say, well, the judge said this, and this is where we are in terms of the trial itself. That I get.

Okay. Now, the next place we are is there is -- we're at -- everybody agrees we're at the evidentiary -- evidence stage?

MR. ALEXANDER: Yes, Your Honor.

THE COURT: Okay. And you're going to -- well, this is your motion, so presumably, you're going to make your record and then we'll go from there. Are we doing -- let me make sure. We're doing the evidentiary record on both motions. Not the Debtors motion, but on both of -- even though Hawk is listed as the agent for SeeCubic, is it SeeCubic's motion? It's Hawk's motion as the agent of SeeCubic?

MR. COLBY: That's correct. SeeCubic also separately joined.

THE COURT: And that's you guys.

MR. COLBY: That's us, yeah. And its Hawk is the collateral agent and in its own capacity.

THE COURT: Okay. So Mr. Caponi was proceeding as

what?

MR. COLBY:  Hawk as the collateral agent, and on Hawk's own capacity in its own capacity.

THE COURT:  I'd say.  So he was -- which is a little confusing to me.  If Mr. Caponi was acting as counsel as agent -- collateral agent for SeeCubic, correct?

MR. COLBY:  Correct.

THE COURT:  You're what for SeeCubic?

MR. COLBY:  We also represent SeeCubic.  SeeCubic filed a joinder to the motion to dismiss.

THE COURT:  Okay.

MR. COLBY:  And is directing Hawk in its agent capacity.

THE COURT:  But I'm not understanding how Hawk has a separate claim if it has its agent representing its claim.  I mean, I get -- would you guys just split up the work?  Is that the deal?

MR. COLBY:  That's part of it.  We think that there are overlapping basis.  And frankly, Your Honor, this question and the basis on which Hawk is proceeding is one to the issues that was heavily litigated in the 225 action and a lot of the collateral estoppel opinion addresses that.

I won't pretend to be able to wade through all of that analysis here for you.  But the conclusion of it was that Hawk could proceed through really kind of a pretty complex

series of arrangements and things.  The conclusion of it was that Hawk could proceed as the collateral agent and in its own capacity.

THE COURT:  In the 225 action.

MR. COLBY:  Correct.

THE COURT:  I don't know what that has to do with whether they can proceed here.  Because the way I've looked at it is often I see mortgages.  I'm a big mortgage person here. And the mortgage has assigned -- been assigned to a trust, okay.  And the trustee for the trust pursues all of the claims. The mortgage holder, who has put everything in the hands of the trust, does not separately appear because its interest is being represented by the representative of the trust who holds the mortgage.

Now, it has been represented in this court that Hawk and SLS assigned whatever benefits and the right to enforce whatever rights they have to Hawk as their collateral agent. So I'm trying to figure out if Hawk has the capacity and I have been assigned the right to enforce the term.  What exactly is SeeCubic trying to do?  The same thing?

MR. COLBY:  Yes, Your Honor.

THE COURT:  So did it retain that right separately?

MR. COLBY:  It retained the right to direct Hawk.

THE COURT:  Okay.

MR. COLBY:  And what that has meant practically is

just as it sounds.  It can direct Hawk, in addition to Hawk proceeding on its own basis.  So it's not as if it has -- this is a rough and ready, sort of my interpretation of it.  It has the ability to direct Hawk.  Part of that direction is we are, you know, we are also joining in this motion, the motion to dismiss, we filed a joiner.  And we are appearing here in support of Hawk's motion.

THE COURT:  But they've already told Hawk to proceed and enforce our rights.  Did they retain their right to -- who has the right to pursue enforcement?  You think they didn't give a complete assignment to Hawk?

MR. COLBY:  Well --

THE COURT:  As collateral agent or it was a partial or it was a -- I mean, I don't have any of that and so that's why I'm a bit confused.  Because Mr. Caponi said he is appearing in his capacity -- in the capacity as Hawk as collateral agent for SeeCubic, okay?  And I don't recall or maybe he did say he was also appearing on behalf of Hawk in its individual capacity.  I guess I didn't write that down because -- I'm not saying he didn't say it, but I didn't write it down.

And let me go back to the very beginning of what I wrote down, who Mr. Caponi was representing.  Again, I am not saying he didn't say it.  I have Mr. Caponi, Ms. Westbrook, Mr. Adele, Mr. Warner, Mr. Brockman, as for Hawk.  The men for SeeCubic, I have you, Ms. Rumble, and I guess some other

people.

So Mr. Caponi, you're at -- you're at the podium so explain to me what my disconnect was with respect to who's representing who in this court.

MR. CAPONI:  Again, I agree with Mr. Colby.  The -- this was heavily litigated in the opinion --

THE COURT:  That's fine.  That's fine.  But that's the 225 action.  It has nothing to do with what I'm going to decide who gets to appear before me and how I interpret that.

MR. CAPONI:  Your Honor --

THE COURT:  That judge can say whatever he wants.  That has nothing to do -- I don't know what the standard for standing in 225 actions are.  The fact that that judge may have decided in a 225 action that all these parties can participate, that's all fine and well.  But that is not necessarily the standard that applies in a bankruptcy or who would -- or whether -- often I will say you get one counsel, and if you're all talking about the same thing, use one counsel.  I'm not saying -- I don't know if you guys divvied it up and you did the argument and they're doing the evidence.  That's all I'm saying.  Is that what's going on or are we talking about two different things going on?

MR. CAPONI:  Effectively, we divided the work, Your Honor.  But --

THE COURT:  That's what I asked.

MR. CAPONI:  Well, that could be what's taking place, yeah.

THE COURT:  But I asked that.

MR. CAPONI:  Well, you did.  I'm answering.

THE COURT:  Well, he didn't.

MR. CAPONI:  Well, we know him.

MR. COLBY:  Sorry, Your Honor.  I thought I said that's part of it, but I also wanted to address any concerns you had about the -- just explain that the standing issue was something that was also been, you know --

THE COURT:  Listen, again, standing for 225 --

MR. COLBY:  Understood.

THE COURT:  -- is not the same standing under 107 as an interested party.  And if somebody comes and says I'm representing this party, I don't necessarily -- you can represent him but both of you don't get a bite at the apple.  And that's why I said, oh, are you dividing them up because you said I'm spearing for SeeCubic.  I'm like okay, well, who's presenting the evidence for Hawk as collateral agent and that's what generated my question.

MR. ALEXANDER:  Understood.

THE COURT:  Okay.  So again, with all due respect to Vice Chancellor Laster, his finding about standing has nothing to do with mine.

MR. CAPONI:  Your Honor, just to clarify that point,

and again, this is division of labor.  But Vice Chancellor Laster determined under Delaware law our client's respective contract rights which were established outside of bankruptcy under Delaware law.  He then applied them to standing in the 225.  So he didn't apply -- he didn't determine our rights super sue to 225.  He determined under the agreement who held what rights in this debt and who could act in what capacity. That is the law coming into this case.

THE COURT:  In the final order?

MR. ALEXANDER:  Your Honor, we object that it's not the law coming into the case because it's not a final order. So it's not the law.

THE COURT:  Counsel.

MR. CAPONI:  You're immortal, Your Honor.  I'm bound by that opinion.

THE COURT:  Well, you're bound in 225 by that.  I'm not bound by that.

MR. CAPONI:  Your Honor can -- I agree.  Your Honor can do with the opinion whatever you want.  I'm just clarifying he didn't determine our rights vis a vi 225.  The Court of Delaware was litigated, collateral estoppel, rights judicata, whatever you want to call it.  What party -- as between Hawk and SeeCubic holds what right vis-a-vis the debt and what capacities we can appear in.  If you choose not to respect that or --

THE COURT:  Whoa, whoa, whoa, whoa, whoa, whoa, don't got with not --

MR. CAPONI:  I didn't mean respect.  I meant --

THE COURT:  No, no, no, no, no.  I respect what that Court may have concluded.  I am not bound by that.

MR. CAPONI:  That's fine, Your Honor.

THE COURT:  That's what I'm saying.  So and I don't know whether whatever that was with respect to in what context, whether they -- whether the Debtor or whoever it is who sued challenged the capacity to bring the action.  And I'm not an expert on 225, but I did read a little article by some law -- by one firm regarding recent decisions.  And one of the things in order to bring a 225, you have to be in a certain capacity.  And I am quite sure that Judge or Vice Chancellor Laster, in order to address the standing issue, had to look at the issues -- the contract rights between the parties and decide within the context of 225, whatever those rights were, whether they complied with the requirements for a 225.

And I don't care -- I mean, he may have said, oh, you have a right to do this, you have a right to do that, and as a result, you qualify to bring a 225 action.  Yes, he probably did all of those things.  But the point of the matter is I don't know what that means in bankruptcy and context matters.  So yes, I'm sure he did do that, but he did it in a particular context.

And we cannot just say, oh, well, he decided what the parties' rights were and who has standing to bring whatever. That's fine. Because you could have had certain rights that didn't qualify you under 220 -- bring standard under 225. So that's all I'm saying.

So what I'm trying to figure out, because again, he said he was appearing for SeeCubic, was this also establishing the record as to Hawk as the collateral agent, and he's saying yes. You guys decided to divvy up the labor.

MR. COLBY: Yes, Your Honor.

THE COURT: So his appearance did not say I'm also establishing a record for Hawk as collateral agent. He only said he's appearing for SeeCubic, so I want the record to be clear who's representing who. I don't think that's -- that's something that does not have to be clarified.

So your position is that you guys just sort of divvied up the labor because you believe that SeeCubic -- that when Hawk and SLS assigned their rights to SeeCubic, there were certain rights that it retained.

MR. COLBY: Correct.

THE COURT: And part of whatever those rights were was a right, obviously, the same thing again in the mortgage context is when they make the assignment, the underlying mortgage issuer is still the party who makes the ultimate decision. They've assigned to the trustee the right to collect

the money, the right to enforce the terms of the mortgage, but they have retained the right to make the ultimate decision and direct the trustee how to proceed, which is what you're telling me we have here.

MR. COLBY: Yes, Your Honor.

THE COURT: Okay. It's the same thing, it's just not a trust. Or I don't know. When they created SeeCubic and in most cases, like ABC Trust Number 4 that has been created to hold these mortgages. And when that happens, because they have directed the trustee in this case, the collateral agent Hawk, to proceed, those entities rarely, if ever, show up in court and say, oh, well we want to participate too because all of those rights have been given to the trust and the trustee.

So what I'm hearing you say is that that is not the situation here. That SLS and Hawk have retained, I guess, some sort of rights and that those rights are being directed by Hawk and SLS. But I'm not quite sure when that assignment was made, but it's split up between Hawk as the collateral agent and SeeCubic itself as to who would do what.

MR. CAPONI: In that regard, again, we're in a situation of a double default. So SeeCubic --

THE COURT: Double default? What do you mean double default?

MR. CAPONI: There's -- let's just take the Hawk notes.

THE COURT:  Uh-huh.

MR. CAPONI:  The Debtor defaulted under the Hawk notes.

THE COURT:  Well, alleged.  They question.  I don't know if they did or didn't.

MR. CAPONI:  Well, I mean, as a matter of Delaware Supreme Court peeled -- unappalled Delaware Supreme Court finding law, they defaulted under those notes.

THE COURT:  Okay, so.

MR. ALEXANDER:  The Supreme Court didn't make any findings, so move to strike.

MR. CAPONI:  They certainly did.

THE COURT:  Okay, this is --

MR. CAPONI:  We --

MR. ALEXANDER:  The order speaks for itself.

THE COURT:  Listen -- listen, the order speaks, but I'm not -- I don't care.

MR. ALEXANDER:  It's not before you.

THE COURT:  But my -- for my purposes, I'm just trying to figure out if SeeCubic has the right to proceed, okay, through Hawk, how does it then also get to proceed separately.  Because SeeCubic only has the rights that were given to it by SLS and Hawk, right?  And they gave certain rights to SeeCubic, but they did it through you as the collateral agent.

MR. CAPONI:  Your Honor, I'm getting there.

THE COURT:  So explain that to me.

MR. CAPONI:  The double default was the Debtor -- whether the Debtor made it's brief, defaulted under the Hawk notes.

THE COURT:  Okay.

MR. CAPONI:  The Hawk note had been contributed or assigned, and I'm speaking in general terms, to SeeCubic.

THE COURT:  Okay.  I get that.

MR. CAPONI:  So SeeCubic generally had the right to enforce those -- the Hawk notes.

THE COURT:  Uh-huh.

MR. CAPONI:  Hawk -- I'm sorry, SeeCubic separately issued notes to Hawk.

THE COURT:  Okay.

MR. CAPONI:  Just like the original Hawk note, the Debtor gave Hawk the right to come in and exercise proxy rights and engage in self-help.  The note between SeeCubic and Hawk had similar provisions.

THE COURT:  Okay.

MR. CAPONI:  And one of the -- again, what Vice Chancellor Laster found in broad strokes is that SeeCubic can either -- the right to enforce the collection belongs to SeeCubic, Hawk can tell SeeCubic, I want you to file an action and you to do it or we can step in and do it in our own name

31

because it's our collateral.

And so effectively, my client Hawk has the right to step in and do it solely on its own.  It can say to SeeCubic, you have to go do it, or it can cooperatively do it.  But it's enforcing the same set of notes that the relationship is governed by the second set of notes, the SeeCubic Hawk.

THE COURT:  But you're appearing as collateral agent for who?

MR. CAPONI:  SeeCubic.

THE COURT:  But that's the point.  And as collateral agent, what is it that you are doing for SeeCubic?

MR. CAPONI:  I'm sorry, Your Honor.  Well, technically I'm not doing anything -- sorry, maybe it's the title that's confusing.

THE COURT:  No, it's not.

MR. CAPONI:  We're not the collateral agent.  We are the collateral agent, I would say, of SeeCubic.

THE COURT:  Okay.

MR. CAPONI:  We're not the collateral agent for the benefit of SeeCubic.

THE COURT:  But that's not the point.

MR. CAPONI:  But when you say of, we're the collateral agent for the noteholders who SeeCubic defaulted with.  So we're -- we have the right to preserve all the collateral that's covered by those notes.  We are the

collateral agent for those noteholders.

It's called -- in the document, it's called the SeeCubic collateral agent, that's just the name it was given. But if you're looking at the legal purpose of it, it is Mr. Colby gave me a note --

THE COURT:  Mr. Colby can --

MR. CAPONI:  I'm enforcing the collateral rights for my benefit, not necessarily for his.

THE COURT:  So again, again, SeeCubic gave some notes to who?  Hawk?

MR. CAPONI:  To Hawk, yes.

THE COURT:  Hawk and --

MR. CAPONI:  I think SLS received notes as well.

THE COURT:  Okay.  And Hawk and SeeCubic -- I mean, Hawk and SLS in connection with those notes, did what?  Made Hawk the collateral agent?

MR. CAPONI:  In the event of a default, Hawk becomes the collateral agent to protect the lender's rights in the collateral.  And in this case, the collateral are -- is all of the assets of SeeCubic, which includes the notes upon which the Debtor defaulted.  Which means our collateral downstream is the Debtor's assets.

THE COURT:  Okay.  And so your capacity then is separate from -- so when SeeCubic was assigned the rights to collect from Hawk and SLS, that is a separate right, separate

and distinct from what Hawk's pursuing, because Hawks is not representing SeeCubic.  Hawks is representing, I'm going to say itself and SLS as the holder of notes from SeeCubic.

MR. CAPONI:  Correct, Your Honor.

THE COURT:  Okay.  And then SeeCubic, these counsel -- good counsel, these two counsel, are pursuing the rights assigned to them by SLS and Hawk when they assigned their -- SLS and Hawk assigned whatever rights they had in the underlying notes from the debtor to SeeCubic and authorized SeeCubic to pursue collection efforts and to get the -- collect the money.

MR. CAPONI:  I think that's -- that is correct, Your Honor.  Yeah, so it's confusing because Hawk assigned certain rights to SeeCubic and eventually got those rights back via a different contract.

THE COURT:  I get that.

MR. CAPONI:  Yeah.  That's why it's confusing.

THE COURT:  Well, it's not, not if you've explained it, it's not confusing at all.

MR. CAPONI:  It's not -- and after I explain it.

THE COURT:  So when SeeCubic is appearing, they are appearing on their own behalf in connection with their right to pursue collection efforts that were assigned to it by SLS and Hawk.

MR. CAPONI:  Correct.  And --

THE COURT:  And together the parties have divvied up how they want to pursue those collection efforts.

MR. CAPONI:  Correct.  Because it ultimately, if --

THE COURT:  I don't care --

MR. CAPONI:  -- if money comes into SeeCubic, it comes --

THE COURT:  I don't need to know how it goes.  I'm just trying to figure out.

Mr. Alexander, do you have any comment?

Again, that's why I said, with all due respect to Vice Chancellor Laster, it had nothing to do with what this Court needed to figure out.

MR. ALEXANDER:  Your Honor, I understand what they said.  My only -- yesterday we brought up the issue with regards to we don't believe all of them can file proofs of claim so we think that standing issue is going to get dealt with but that's not for today.

THE COURT:  Well, if --

MR. ALEXANDER:  No.  Standing is for today because standing is always an issue before the Court.

THE COURT:  Standing is always an issue under 107.

MR. ALEXANDER:  So that's always an issue.

THE COURT:  And, again, was not saying I didn't respect what Vice Chancellor Laster concluded.  I'm simply saying, for bankruptcy purposes, who had the right to do what

in terms of the various claims that have been asserted.  They each have filed a proof of claim to which no objection has been filed.  And so that could have been the simple answer.  We each filed a proof of claim and we're pursuing that.  We're pursuing our claims and we have standing on the -- 107?  No.  109.  107.  And so that -- that's fine.

I just needed to know who was doing -- who was on first, second, and third base.  Are we -- no.  Are we sticking to the -- you know, we're on the baseball.

MR. ALEXANDER:  We switched to baseball now.  Yesterday we --

THE COURT:  So we were --

MR. ALEXANDER:  -- football.

THE COURT:  -- on football.  Well, I don't want football because that's not going to help me.  I need first, second, and third.  We're on baseball today.  Not that I'm -- well, I think -- I don't have -- well, I'm not an expert on either one of them, but baseball is easier to understand.  You hit the ball, you run, and hope nobody catches it before it hits the ground or touches you before you hit the base.

So all right.  So now I understand that you are appearing on behalf of SeeCubic in its capacity as the -- is it Stastney of Hawk and SLS with respect to the underlying notes that were issued by Stream.

MR. ALEXANDER:  I don't think that's accurate but --

THE COURT:  That's what they're telling me, that there was an assignment from SLS and Hawk.  SeeCubic was formed so that the underlying notes could be assigned -- certain portions of the underlying notes, meaning the right to collect and the right to enforce, were assigned to SeeCubic.  Okay?

MR. ALEXANDER:  No, I understand that.  But then they brought up the double default which dealt with --

THE COURT:  There's no double --

MR. ALEXANDER:  Well, because they were dealing with notes that don't have anything to do with Stream directly.

THE COURT:  Right.  And the default is under the notes from -- the notes from -- that the debtor gave to Hawk and SLS that SeeCubic would now hold, they allege there was a default under.

MR. ALEXANDER:  No.  I believe they were referencing two sets of notes but --

THE COURT:  Yeah.  But the second note is the note from SeeCubic to the other parties.

MR. ALEXANDER:  Yes.

THE COURT:  And they believe that they have standing, which now I got to -- now I got to figure this out.  Because their claim against the debtors is the same issue that is -- but on a different level is that SeeCubic has their own note.

Did SeeCubic issue separate notes to SLS and Hawk?

MR. COLBY:  Yes.  Yes, Your Honor.

THE COURT:  Okay.  And in issuing those notes, the security was the underlying note from the debtor?

MR. COLBY:  The -- the security was what had been assigned from those underlying notes from the debtor and --

THE COURT:  So the notes that we're talking about from the debtor serves as the basis for the -- SeeCubic's right to collect and receive the money, and whatever those rights are, they have assigned to Hawk and SLS back to them.

MR. COLBY:  No.  They are collateral for -- well, I'll --

THE COURT:  Yeah.  But in connection with the collateral, what did they give them?

MR. CAPONI:  The notes themselves were not assigned to -- back to Hawk the way they had been originally assigned to SeeCubic.  Hawk, as the -- again, the term collateral agent has the right to -- has a first lien security interest in all assets of SeeCubic, which happens to include these notes that they've been litigating here, and my client has the right to marshal the collateral and preserve the collateral in order to satisfy the notes.  So it's not -- that's where it's a contract right to do that.  It was -- it was not an assignment back.

THE COURT:  But what I'm confused about now is that the basis for your claim is the default with SeeCubic because the collateral is now in default.  Is my understanding this

wrong?

MR. CAPONI:  The -- there were a number of triggers that would trigger a default.  Several of those triggers occurred.  One of them was the omnibus agreement being invalidated.  That was a primer.

THE COURT:  But that -- but, Counsel, Hawk as collateral agent is collecting based on notes issued to whoever by SeeCubic; right?

MR. CAPONI:  From SeeCubic to Hawk and SLS, yes.

THE COURT:  Okay.  So it's not as simple as I thought.  Okay.  And in the notes that were issued to SeeCubic, then Hawk and SLS, the collateral for that is what?

MR. CAPONI:  The collateral for that is all of the assets of SeeCubic.

THE COURT:  Okay.

MR. CAPONI:  And that --

THE COURT:  And in connection with that interest -- it's obviously a security interest; right?

MR. CAPONI:  Correct.

THE COURT:  And in connection with that security interest, what did you get the right to do, you meaning Hawk and SLS, what did they get the right to do?

MR. CAPONI:  Well, broadly speaking, we have the right to marshal all the collateral and to enforce the enforcement rights under the notes.  So we have the right to

instruct SeeCubic to take actions with respect to the collateral or to refrain from taking actions.  We have the right to step in and, in our own name, meaning Hawk's name as collateral agent, to pursue those rights.

So, for example, if there was -- taking it out of this context, if there was an IRS refund due SeeCubic, we could say to SeeCubic, Go get the money from the IRS, or we're permitted to go to the IRS and get the money directly and then put it in with the rest of the collateral to then be -- you know, obviously the collateral exceeds the debt, then, you know --

THE COURT:  But that's assuming there's some sort of default by SeeCubic; right?

MR. CAPONI:  Right.

THE COURT:  Has SeeCubic defaulted?

MR. CAPONI:  Yes.

THE COURT:  And how did they do that?

MR. CAPONI:  SeeCubic defaulted -- again, there were a slew of defaults, but one of the defaults was the invalidation of the omnibus agreement.  Another default was the failure to obtain all of the assets that they were supposed to acquire in order to originally fund or build out SeeCubic.

And so, again, the -- included within that bucket of collateral were the enforcement rights against the debtors under the original SLS, Hawk notes.

THE COURT:  Okay.

MR. CAPONI:  Same thing like the IRS.  You know, we have the right to --

THE COURT:  So I get that.  So what I'm trying -- so let's keep it in the IRS context.  If you believe -- and I don't know whether they -- you know, I guess SeeCubic stayed in default, and I -- I don't think that's important for me, but the default by SeeCubic entitles Hawk as collateral agent actually -- it says what SeeCubic does.  Actually collateral agent of the SeeCubic notes is what it really should have said.

MR. CAPONI:  Right.

THE COURT:  That would have made my life easier.

MR. CAPONI:  The document.

THE COURT:  Right.  But it was in connection with the notes -- I know, Counsel, we got till 5, maybe 5:15 -- in connection with those notes.  The -- Hawk, as the collateral agent, was given certain rights that SeeCubic gave to it to pursue the underlying, whether -- if it was the IRS; right?

MR. CAPONI:  Right.

THE COURT:  And there was a claim from the IRS and SeeCubic had a claim from the IRS but it defaulted, and under the terms of the agreement, Hawk as collateral agent for the notes could go to the IRS, because they've given you the right to go pursue with the IRS; correct?

MR. CAPONI:  Correct.

THE COURT: Did SeeCubic also reserve its own rights following default to go to the IRS and try to collect?

MR. CAPONI: Yes.

THE COURT: Okay. So --

MR. CAPONI: We don't -- we -- going to Mr. Alexander's, you know, discussions of yesterday, it's the -- the default did not result in us taking title, legal title, to these rights. We don't own the IRS debt. What we have is the right --

THE COURT: I know that. But I get that.

MR. CAPONI: Yeah.

THE COURT: I'm not saying --

MR. CAPONI: So SeeCubic never got divested of its right in the --

THE COURT: So in the assignment, it retained -- because typically the way -- again, I'm going to go to my mortgages. When there is mortgages put into a -- a series of trusts, typically, the mortgage company gives the exclusive right to collect to the trustee. You're saying, in this case, the exclusive right to collect was not given by SeeCubic to Hawk, this collateral agent.

MR. CAPONI: Correct. I think one of the disconnects here -- and, again, this is -- this is one of the many reasons why the one-day trial is so appetizing, because we -- we plowed this ground and it's -- I'm trying on the fly, there's

extensive briefing, but the -- I think the core issue is it was not an assignment of rights.

My client as the collateral agent is vested with the power of attorney.  So it wasn't like it was dumped into a trust.  We were assigned -- once there's a default, we have the power of attorney to instruct or act as SeeCubic.  So it's -- we're not -- rights didn't come to us in the -- like if we're arguing over who owns this bottle, I didn't get direct rights in the bottle --

THE COURT:  But you have the right to drink the water.  You have the right to drink the water and not let SeeCubic drink the water.

MR. CAPONI:  Right.  But they still possess all the rights.  My rights are flowing through them as power of attorney.

THE COURT:  But that doesn't answer my question.

MR. CAPONI:  Okay.

THE COURT:  Upon default, who had the right to drink the water?  Both parties or only one party?

MR. CAPONI:  Both parties.

THE COURT:  And that's the question I --

MR. CAPONI:  And as between the two parties, if I'm more thirsty than Mr. Eben (sic), I get to drink it before him.

THE COURT:  Right.

MR. CAPONI:  But we both have the right to the water.

THE COURT:  Okay.  And so here in this court, you are saying that both parties have the right to do the same thing, which is to try -- you're not trying, but you both want to be able to get some relief to go back to state court, to the chancery court, to be able to enforce your rights with respect to whatever it is you're arguing in the 225 action.

MR. CAPONI:  Correct.

THE COURT:  Okay.  And so while you both may have reserved that right, I don't necessarily let both people pursue the same right.  One party comes here and does it.  That's how I typically do that.  But what I'm hearing is that you split the work up, and while they're saying we're -- we're -- we're appearing as SeeCubic, we're also doing it so that the evidence that is being made on the record can also be used by Hawk as collateral agent in support of its position.

MR. CAPONI:  Correct, Your Honor.

THE COURT:  Okay.

MR. CAPONI:  So is that Mr. Colby has represented Mr. Stastney for many years in this case in his capacity as -- with SeeCubic.  But rather than my trying to get up to speed and prep him and do all that, it's most efficient that Mr. Colby put him up for examination because he's walked the path of Mr. Stastney for the last three years.

THE COURT:  Right.  And I'm not saying he can't.

MR. CAPONI:  That's the logic.

THE COURT:  Right.  I just think it should have been made more clear, or maybe I just didn't get it, but it seems to me none of this was really explained as to how, as collateral agent for the SeeCubic, Hawks was doing this and SeeCubic in its own capacity was doing the same thing.

Okay.  Now I understand what you're saying, that you both have the right, you meaning the collateral agents for the notes, the SeeCubic notes, has some rights to try to, you know, get the bottle of water, and SeeCubic also has a right to collect the bottle of water, and you're dividing up how you're going do it.  You're not doing it -- while he's saying it's in support of, it's really the same thing.  Okay.

MR. CAPONI:  We're hand in glove, Your Honor.

THE COURT:  All right.  Mr. Alexander, did that -- anything you want to comment?

MR. ALEXANDER:  No.  We're just reserving our objections to the claims that they filed as we indicated yesterday.

THE COURT:  Only you can go --

MR. ALEXANDER:  We'll deal with that.

THE COURT:  You know, there's duplicate claims and there's duplicate claims.  If it's not, it's not.  But we're not there yet.  We're not even halfway near.  I mean, you can always file claim objections tomorrow should you choose to.

MR. ALEXANDER:  And we may choose to, Your Honor.

THE COURT:  Right.  And then, you know, that just complicates a little further my 107 analysis, but don't -- you didn't do that so, thank God, I'm going to have to figure that out today.  All right.  Now that we spent an hour figuring out who's what, who's on first, second, or third, Counsel, you may proceed with your evidence.

MR. COLBY:  Thank you, Your Honor.  We would call Mr. Shad Stastney to the witness --

THE COURT:  Well, you were about to mess his name up too.

MR. COLBY:  I do apologize for that.

THE COURT:  No.  I don't feel like I'm the only one that has a little issue with pronunciation.

SHADRON STASTNEY, SWORN

THE CLERK:  Can you please state and spell your name for the record?

THE WITNESS:  My full name is Shadron, S-H-A-D-R-O-N Stastney, S-T-A-S-T-N-E-Y.

THE CLERK:  And your address for the record, please.

THE WITNESS:  392 Taylor, T-A-Y-L-O-R, Mills Road, Marlboro, M-A-R-L-B-O-R-O, New Jersey, 07746.

THE CLERK:  Okay.

THE COURT:  One second.

(Court and clerk confer)

THE COURT:  I mean, unless somebody has

46

claustrophobia and feels I have a way out.  Okay.

MR. COLBY:  Your Honor, may we approach?  We have the documents we anticipate using with Mr. Stastney in a couple of binders for you.

THE COURT:  Are we going to use any of these?

MR. COLBY:  There's some overlap of the documents.

THE COURT:  Okay.

MR. COLBY:  But we've got them in a self-contained -- a couple of self-contained units.

THE COURT:  So I can put all these over here?

MR. COLBY:  Yeah.

THE COURT:  And then not using --

MR. ALEXANDER:  The -- references the same stuff; right?

MR. COLBY:  Some of the -- there's some overlap.

THE COURT:  All right.  Do I need to hold on to this PowerPoint?  Nope.

All right.  Mr. Callahan, do you have any?

MR. CALLAHAN:  I don't.  Your Honor, I was prepared to just refer to the list that was submitted by KL Gates but is completely different set of exhibits.

MR. COLBY:  It's the same list.  We've just taken the ones we think we're going to use and dropped them into a binder for the Court's convenience.

MR. CALLAHAN:  So the same ones.

MR. COLBY:  They're the same ones.

THE COURT:  And you have those; right?

MR. CALLAHAN:  Well, I have a list, yes.

THE COURT:  Okay.

MR. CALLAHAN:  We didn't get a binder but --

THE COURT:  Well, I don't know.  I don't have anything.  Because I don't get to see it until people appear so --

UNIDENTIFIED SPEAKER:  I -- copy to me?

MR. COLBY:  Yes.

UNIDENTIFIED SPEAKER:  Oh, okay.  That's what I wasn't sure about.

THE COURT:  So one for the witness and one for the Court.  And no one has -- and I've always -- I got to ask.  And no one has any objection to the Court looking at those before they're formally admitted into evidence?

MR. ALEXANDER:  I mean, I don't know why you wouldn't look at them before --

THE COURT:  Well, technically, the rules do not allow me to see them.

MR. ALEXANDER:  Right.  So I don't -- that's why I'm saying I don't know why you -- they're not showing them to you.

THE COURT:  No.  Once they refer to them and they're not formally admitted, I technically am not supposed to look at them until they're introduced into evidence.  I mean, I

don't --

MR. ALEXANDER:  No, no, just -- well --

THE COURT:  I don't mean --

MR. ALEXANDER:  -- can we just take a step back?

THE COURT:  I don't mean go skim through them.

MR. ALEXANDER:  Right.  Your Honor, I'm just trying to understand your process for admitting them because we've done two different ways in the past.  You've done it at the end and then you've also done it at the time so --

THE COURT:  Oh, I think I just followed counsel -- technically, the way the rules go, they need to be admitted as they go.  The parties really often waive that and say, We'll object at the end and as if they were -- and then we'll leave those issues, whether they get admitted or not.

But, technically, the rules require you get them admitted as you go so that the party can -- so that a witness can testify regarding those, you know, once they lay that foundation, it's admitted, and then they testify.  And then I get to look at it.

MR. ALEXANDER:  We'd like to make the objections as we go.

THE COURT:  Okay.  But the question becomes, is do you care if I look -- look at them before -- I mean, I need to see them to rule on them, but I mean, the rules are a little screwy, I mean a little -- a little -- in implementation,

they're a little wonky.

MR. ALEXANDER:  Your Honor, I'm okay if you skim them prior to --

THE COURT:  I mean, as they -- not like go through the book.

MR. ALEXANDER:  Correct.

THE COURT:  As they bring them up.

MR. ALEXANDER:  Right.

THE COURT:  Okay.  Because I usually need to see them to rule on them in any event.  Okay?  But that's only when it's moved into admission.  Okay.

So, John, is there a book for me, a binder for me?

And I thought we talked about this.  That might have just been in passing.  Does anybody care if I look at them before they're formally admitted and nobody objected yesterday. Right.  But I don't think I explained the reason for my question.  There's one that has a sheet on it and one that doesn't.

MR. COLBY:  Right.  There's two binders.

THE COURT:  Uh-huh.

MR. COLBY:  The one with the sheet, I believe, we will refer to as volume one and the one without the sheet will be volume two.

THE COURT:  Okay.  Since this is my copy, I'm going to write on it.  Volume one.  All right.  Give me a minute.

(Court and clerk confer)

THE WITNESS: All right. Witness has been sworn in. You may proceed.

MR. COLBY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. COLBY:

Q    Please state your name for the record.

A    Shadron Stastney.

Q    Mr. Stastney, do you have a role at any of the entities that we've been discussing in the context of this hearing over the last couple of days?

A    Yes. I'm currently the chairman and chief executive officer at SeeCubic, Inc. I'm also the managing member of SLS Holdings VI, LLC.

THE COURT: So you're the managing member of who?

THE WITNESS: SLS Holdings VI, LLC.

BY MR. COLBY:

Q    And it's that entity, what has been referred to as SLS in these proceedings?

A    It is.

Q    So you've just been here in the courtroom while there was some colloquy about the relationships between these various parties, but just for the sake of the evidentiary record, maybe we could go through it a little bit. Just to be clear, who did Stream borrow money from?

A    Stream borrowed money from SLS Holdings and from Hawk Investment Holdings.

Q    And what were those borrowings secured by, if anything?

A    As to the SLS borrowings, they were first lien on all of the assets of Stream.  And as to the Hawk holdings, they were second lien on all of the assets of Stream.

Q    And how is SeeCubic related to that debt you just described?

A    So SeeCubic was formed in late May of 2020 to receive the assets that were being delivered to the secured creditors under the omnibus agreement.

Q    And was there a mechanism or an agreement by which that was accomplished?

A    Yes.

Q    What was it?

A    The omnibus agreement.

Q    Sorry.  You referenced SeeCubic being formed to sort of accept the benefits of the omnibus agreement?

A    Right.

Q    Since that time, has the basis of SeeCubic's relationship to that SLS and Hawk debt changed?

A    Yes.

Q    Okay.  In what way?  What's the current situation?

A    Well, that was formalized under notes issued to both Hawk and SLS and the other investors in SeeCubic in exchange for the

rights assigned by SLS and Hawk to SeeCubic.

Q    Okay.  There was some discussion today about the -- a collateral agent.  What's a collateral agent, to your understanding?

A    Yeah.  In corporate debt documentation where there are multiple holders of the debt, there's often a collateral agent appointed as part of the documentation process who can take all of the actions on behalf of the holders in the event of a default, for instance.

Q    Is there a collateral agent in the context of the notes that SeeCubic issued to SLS and Hawk and the other investors in SeeCubic?

A    Yes, there is.

Q    Who is that?

A    That is Hawk Investment Holding.

Q    Okay.  And at what point in time, if any, does the collateral agent have a more active role or have an active role in this type of situation?

A    Generally, upon a default -- upon an event of default or a default.

Q    Okay.  And did either of those occur here?

A    Yes.  Both.

Q    What were they and what were the effect of them?

A    There were several, but the one primarily that -- that happened and that occurred first was the invalidation of the

omnibus agreement --

MR. ALEXANDER:  I'm going to object to that based on personal knowledge.  It's hearsay.

THE COURT:  The objection is hearsay.  Your response?

MR. COLBY:  Yeah.  It's -- it's not hearsay.

BY MR. COLBY:

Q    Mr. Stastney, are you testifying on behalf -- do you have firsthand knowledge of the event of default?

A    Yes.

Q    Okay.

MR. ALEXANDER:  Well, his testimony was that he heard of a default so that's why I objected to hearsay.

THE COURT:  Okay.  He heard, he said -- and he objected and he said because he heard.  So now he said no, I'm testifying based on my own knowledge, not something I heard.

THE WITNESS:  Yep.

THE COURT:  Okay?

MR. COLBY:  In light of the new testimony, are we maintaining the objection or can we move on?

THE COURT:  He stated he's testifying on his own knowledge.

MR. ALEXANDER:  My objection was to his last.  I didn't raise a new objection, Your Honor.

THE COURT:  Okay.  So objection to the original was he heard, which clearly would be hearsay.  You rephrased

question in response to the objection and now the new question

he's not objecting to.

          MR. COLBY:  Okay.  Thank you.  Thank you, both.

          THE COURT:  Okay.

BY MR. COLBY:

Q    Okay.  Sorry.  Now I've just lost track of where we were.

The events of default, what was it?

A    It was the invalidation of the omnibus agreement.

Q    Okay.  And what was the effect of that, to your

understanding?

A    That the agreement which had awarded the assets of Stream

to the secured creditors, Hawk and SLS, and which were then

delivered to SeeCubic was invalid, without effect.

          MR. ALEXANDER:  I'm going to object and move to

strike.  Lack of foundation.

          THE COURT:  Okay.

          MR. ALEXANDER:  For his understanding of what he --

BY MR. COLBY:

Q    Mr. Stastney, are you familiar with the terms of the notes

between SeeCubic and SLS and Hawk?

A    Yes.

Q    How so?

A    I was involved in drafting those terms.

Q    Okay.

          THE COURT:  So wait a minute.  He's familiar with the

notes between Stream and who?

MR. COLBY:  Between SeeCubic and SLS and Hawk.

THE COURT:  Oh.  I'm sorry.  So the notes between SeeCubic, SLS, and Hawk.  Okay.

MR. COLBY:  Yeah.

BY MR. COLBY:

Q    And, Mr. Stastney, are you familiar with the notes between SLS and Stream?

A    Yes.

Q    What's the basis of that familiarity?

A    I also took the primary role in negotiating and documenting those notes.

Q    On behalf of who?

A    SLS.

Q    Mr. Stastney, are you familiar with the terms of the notes between SLS -- I'm sorry -- between Stream and Hawk?

A    Yes, generally.

Q    Okay.  And what's the basis of that familiarity?

A    Both my time spent at Stream as CFO and the filings that preceded this case.

Q    Was there a period of time when SeeCubic was responsible for enforcing the Hawk notes?

A    Yes.

Q    Did you have any familiarity with them as a result of that --

A     Yes.

Q     -- portion of these proceedings?

A     Yes.

Q     All right.  So let's go back to the beginning a little bit.  How did you first come to be introduced to Stream TV?

THE COURT:  How did he what?

MR. COLBY:  First come to be introduced to Stream TV.

THE WITNESS:  I believe I was contacted by an investment banker who said he had a company that I might be interested in investing in.

BY MR. COLBY:

Q     Okay.  And how did you get -- did you invest in Stream?

A     Yes.

Q     How did that come about?

A     Essentially, after seeing a demonstration of the technology and -- and doing due diligence, we determined that it was a -- the investment that we were comfortable making and we proposed a structure which Stream accepted.

Q     And that structure, was that captured in any documents?  Is that the notes we've been discussing?

A     Yes, it is.

Q     Now, other than as an investor in Stream versus SLS, have you had any other personal involvement with Stream since 2011?

A     Yes.  I was a board member of Stream from 2011 to 2014 and again from 2018, December, until 2020.  And I was CFO of Stream

from December of 2018 until February of 2020.

Q    Okay.  Why were you on the board at Stream?

A    For the -- in the first instance, because SLS had the right to appoint a board member.  And in the second instance, from '18 to '20, because I was asked to rejoin the board.

Q    Do you have an understanding as to why you were asked to rejoin the board?

A    Because at that time Stream was struggling with the ability to attract institutional investors and strategic partners and thought that I could be helpful.

Q    Why did you leave the board of Stream TV in 2020?

A    I left the board of Stream in 2020 because my debt, the SLS debt, had defaulted and I felt it would cause a conflict of interest for me to continue on the board.

Q    Okay.  And why did you leave -- sorry.  You left in -- also in 2014.  Why did you leave the board in 2014?

A    In 2014 I left because I had, shortly before that, entered into a settlement agreement with the SEC, and Stream felt it would be potentially difficult for them to raise capital in light of that if I were on the board.

Q    Got it.  Okay.  Tell the Court a little bit, if you will, about the beginnings of Stream TV.  Where did it come from?  How is it formed?

A    The underlying technology was originally developed by Philips in the Netherlands starting in the early 2000s.  And

58

Philips exited many of their businesses in the 2008 to 2010

time frame as they refocused on medical and some other areas.

This was one of those businesses that they exited.  The team in

the Netherlands wanted to continue to develop the technology

and so they went looking for funding effectively to do so.

Stream TV Networks had started doing other things, as you can

tell by the name Stream TV Networks, none of which is really

applicable to what they do now.  And they were looking also for

a new business line and determined that they would be able to

raise money to provide a facility and working capital for the

team in the Netherlands.

Q    Okay.  Did -- did you or SLS have any role in that portion

of the -- that history that you just described?

A    Yes.  SLS is the one that provided the funding so that

facility in the Netherlands could be set up and so that the

initial license with Philips of the patent portfolio on which

the technology is based could be obtained.

Q    Okay.  That facility and group of employees that -- in the

Netherlands that you just described, have you heard that

referred to here over the last couple of days by any particular

name?

A    Yes.  The entity for which they work is called SeeCubic

B.V.

Q    Got it.  And is SeeCubic B.V. a subsidiary of Stream?

A    It is an indirect subsidiary of Stream, yes.

Q    Do you have an understanding as to how many levels down from Stream it may be?

A    Yes, generally.

Q    What's -- what is the answer to that?

A    I believe four levels down from Stream.

Q    Are you familiar with an entity called Technovative?

A    Yes, I am.

Q    What's the basis of your familiarity with Technovative?

A    During the time that SeeCubic, Inc. owned them, operated the assets of Stream from December of 2020 until June of 2022, Technovative was --

THE COURT:  From when?

THE WITNESS:  December of 2020.

THE COURT:  Uh-huh.  Till when?

THE WITNESS:  Until June of 2022.

THE COURT:  SeeCubic did what?

THE WITNESS:  Operated the assets and owned them under the omnibus agreement.

THE COURT:  Owned the assets of who?

THE WITNESS:  Stream.

THE COURT:  Of Stream.  Okay.  From 20 -- December '20 to June 2022.  Okay.

BY MR. COLBY:

Q    Okay.  And you -- you've referenced now in just the previous answer the assets of Stream.  Just tell the Court

generally what the assets of Stream are that are at issue

between the parties here.

A    Virtually, all of the assets of Stream are contained

within the subsidiaries of which Technovative is a top-level

subsidiary, and primarily that is intellectual property,

patents, some equipment, and the people and the know-how to

implement the technology for clients.

Q    Okay.  Now, you referenced Technovative -- well, let me

just ask this.  Yes, you referenced Technovative.  What's

Technovative?

A    Technovative is the top-level subsidiary of the chain of

subsidiaries that was owned by Stream initially; then during

the omnibus agreement's validity owned by SeeCubic; and then

once it was invalidated, went back to being the top-level

subsidiary of Stream.

Q    Okay.  And the assets that you just described, the IP, the

equipment, and the people and know-how, where does that exist

in this corporate structure?

A    Within, essentially, the three Netherlands subsidiaries of

Stream.

Q    Okay.  Does -- to your understanding, does any of it exist

as the Stream TV corporate level?

A    None or virtually none.

Q    And to your understanding, does any of it exist at the

Technovative level?

A     Also none, to the best of my knowledge.

Q     Okay.

THE COURT:  So let me see if I understand this testimony.  The IP, the patent, the equipment, and I'm calling people knowledge, know-how is owned by the three subs in the Netherlands?

MR. COLBY:  Correct, Your Honor.  That was his testimony.

THE COURT:  And not owned by Technovative or Stream.

MR. COLBY:  Stream, correct.

THE COURT:  All right.  And, you know, one of the subs is the SeeCubic B.V.

MR. COLBY:  That's one of the three Netherlands subsidiaries, correct.

THE COURT:  Okay.  Got to keep my notes straight.

BY MR. COLBY:

Q     Are -- do either Stream TV or Technovative own directly the three Netherlands subsidiaries that hold the assets you just described?

A     Neither own them directly, no.

Q     Just on a general level, what's between them, if anything?

A     Several other subsidiaries.

Q     Okay.  The assets that you just described, is there anything happening with them over the last -- let's say since December 2020?

MR. ALEXANDER:  Objection.  Foundation.

MR. COLBY:  Mr. Stastney has established that he -- his -- the company that he's chairman and CEO of owned these assets --

THE COURT:  Owned what assets?

MR. COLBY:  The --

THE COURT:  Well, they asserted ownership.

MR. COLBY:  Sorry?

THE COURT:  They asserted ownership but that ownership was revoked; right?

MR. COLBY:  It -- it was given and then taken away, but we can go through.

THE COURT:  Well, I'm not going to parse the language, but didn't the Delaware Supreme Court said it should have never been given?

MR. COLBY:  Correct.  But in terms of a foundation, a factual foundation for what was happening at the company during that time period, SeeCubic was the owner.  And I think we've established that.  And I'm happy to ask Mr. Stastney about his specific involvement in the work.  I was just trying to establish that something occurred.

MR. ALEXANDER:  I believe the question was to the present, and I haven't heard any foundation as to what their involvement is through today.  You said from June '20 -- June 2020 --

THE COURT:  I --

MR. ALEXANDER:  So I'm going to stand on my foundation objection.

THE COURT:  Narrowly.  Because you said it was timed to an ownership and ownership was at some given time.

MR. COLBY:  Let's -- we'll go through it one bit at a time.

THE COURT:  Okay.

BY MR. COLBY:

Q    So Mr. Stastney, you testified a few minutes ago that, in December of 2020, SeeCubic, Inc. assumed ownership of the assets of Stream, which would include the three categories you described a couple of minutes ago; correct?

A    That's correct.

Q    Okay.  So tell me what, if anything, did SeeCubic, Inc. do with those assets when it assumed ownership?

A    At that point, SeeCubic, Inc. began funding, providing funding for the assets, and also operating the assets so as to attempt to commercialize the underlying technology.

Q    Okay.  And what do you mean by "operating"?  Explain in more detail to the Court what you were doing during that time period.

A    Of course.  Everything from understanding the technology, understanding the competitors, understanding the market, directing people as to what to be working on, establishing a

business development capability that was now -- that would enable the technology to presented to and ultimately purchased by and used by partners.  Everything having to do with running a business.

Q    Okay.  And describe to the Court your personal involvement in what you just described?

A    Pretty much everything I just described.  It was, you know, critically important to get the technology to market as quickly as possible.  Nothing lasts forever.  Nothing has a head start forever.  Without commercializing the technology, there would never be any revenues.  And therefore, the company would ultimately fail.

Q    Okay.  Let's roll forward.  We'll take discrete chunks of time here.  Roll forward to the end of that period of ownership.  So you testified that the omnibus agreement was invalidated, right?  And let's take the period of time -- well, let me just ask.  At that point in time, did your involvement with the assets of Stream TV change?

A    Yes.

Q    How so?

A    As the Delaware Chancery Court determined how to unwind the omnibus agreement, ownership and control of the assets was given back to Stream for a period of 10 business days in October of 2022.  During which time the secured creditors were not able to exercise any rights.  And at the end of that time,

the secured creditors exercised their rights. And the Delaware Chancery Court determined to put in place a receiver for the assets.

Q Okay.

THE COURT: Counsel, can you give me some time period? You said the end of that time, 10 days, when?

BY MR. COLBY:

Q Yeah. So if you could, and if you recall, Mr. Stastney, just for the benefit of the Court explain kind of the specific time periods. I think you started with -- let's start with the Supreme Court decision.

A So the Supreme Court decision happened in June of 2022. I don't remember the exact day.

THE COURT: That's fine.

THE WITNESS: The Delaware chancery court entered its order that I referred to earlier, I believe around the 1st of October, 2022. The 10-business day period expired around October 15th of 2022. And the receiver was put in place approximately a week after that.

BY MR. COLBY:

Q Okay. I'm getting head of -- I'm getting ahead of myself of where I want to go, but we're on a lull here, so let's keep going. The -- for how long, if you know, was the receiver in place?

A The receiver was in place from that date, approximately

October 22nd or 23rd, 2022, until May 15th of 2020 -- March 15th, pardon me, of 2023.

Q   Okay.  So let's take -- break that into two chunks of time.  And again, I'm just going back to establish your involvement in the business.  From the period of time that the omnibus agreement was invalidated to the period of time when the receiver was appointed, what, if anything, did SeeCubic, Inc., continue to do with respect to those assets?

A   SeeCubic, Inc., continued to provide funding financing for all of the assets until the vice chancellor's order in October 1st or around about October 1st of 2022, that Stream had to be given full control of the assets for a period of 10 business days.

Q   Okay.  And then jumping to the period of time from when the receiver was in place until the receivership was terminated, did SeeCubic Inc., continue to work with the assets related to those goals you had talked about earlier?

A   Yeah.

Q   Describe how that worked?

A   The arrangement with the receiver was put in place by Vice Chancellor Laster so that the assets could continue to be funded and to continue to be operated during the time that the 225 action was pending.

        MR. ALEXANDER:  Your Honor, I'm going to object to the testimony.  He's testifying to a document or an order.  I

mean, to the extent that he's testifying as to what his impression was, but the document would speak for the document.

MR. COLBY:  I'm just asking Mr. Stastney for his understanding and what he was doing at the time.

MR. ALEXANDER:  I don't think the question was what's your understanding is.  I mean, the question was what happened at that time, and he was testifying as to what the document states.  So I believe it's hearsay in terms of this.

THE COURT:  Rephrase.

BY MR. COLBY:

Q    Arguably, the question -- the problem was with the answer not the question.  Mr. Stastney, just in terms of like the day-to-day work of the company, could you tell us what was happening during the period of time when the receiver was in place?

A    Of course.  We worked with the receiver to both negotiate first a document that would allow us to continue funding, and second to propose, vet, and then work on projects that would allow us to continue to advance the technology.

Q    And did you do that?

A    We did.

Q    So okay.  Now, after the receiver was displaced and during the pendency of the bankruptcy, do you have an understanding of whether or not the work that you just described at that asset level, the Netherland level, whether or not that was continued?

MR. ALEXANDER:  Objection.  Foundation.

THE COURT:  Okay, wait a minute.  What was the question?

MR. COLBY:  The question was after the receiver was displaced to now, so during the pendency of the bankruptcy. Does Mr. Stastney have an understanding of whether or not the work that he had just described continued. And I think the answer will establish or not the foundation.

THE COURT:  So from the position date to when?

MR. COLBY:  Until now.

THE COURT:  Well not -- I guess it might not be your petition date.  What was the date -- are you referring to a specific date where the bankruptcy code receiver no longer functions?

MR. COLBY:  I'm not an expert on that issue, but we can use the petition date if it's helpful. I mean, my understanding is that it was on or around that period of time that the receiver had considered himself to be displaced.  So I'm just picking a timeframe.  I don't need the rest of the legalities of it.

THE COURT:  No.  I'm trying to write -- follow the time period.  I just have a little log with time period here.

MR. COLBY:  Got it.

THE COURT:  Because I have some blanks.  I have the receiver appointment to March because whenever they filed.  And

then before that, I have something until return.  I don't know what those dates are.  I'll go back and figure it out.  Because you're asking him, but you're not saying specific dates.  So I'm trying to follow along.

MR. COLBY:  Got it.  Well, we can do that.  Specific dates, Mr. Stastney, we're here for the Court's benefit.  So specific dates.  Do you recall when the Supreme Court decision was issued that invalidated the omnibus order?

THE COURT:  I have that.

BY MR. COLBY:

Q    Okay.  Do you recall when the assets were returned, that 10-day period?

A    Approximately October 1st, 2022.

Q    Okay.

THE COURT:  Okay.

BY MR. COLBY:

Q    And do you recall when the receiver was appointed?

A    Approximately October 22nd, 2022.

Q    Okay.  And I think that that order is now in evidence, so.

THE COURT:  All right. Well, let me ask you this. When -- maybe I have that date.  When was ownership given to SeeCubic under that omnibus operating agreement?

BY MR. COLBY:

Q    Mr. Stastney, when was ownership given to SeeCubic under that omnibus agreement?

A    I believe it was December 9th, 2020.

THE COURT:  December 9th of 2022?

THE WITNESS:  2020.

THE COURT:  2020, okay.  Now wait a minute.  Hold on. I probably have -- I just want to make sure.

MR. COLBY:  Absolutely.

THE COURT:  Because when I go back and look at my notes -- oh, from December 2020 assume ownership until October 1st, okay.

THE WITNESS:  Of '22, yes.

THE COURT:  All right.  I have it.  All right.

BY MR. COLBY:

Q    And just to clarify too.  In the 10-day period that you described, okay, what was that exactly?

A    That was a period of time that Judge Laster decided Stream had to be able to own its assets with no exercise of secured -- of powers by the secured creditors.

Q    Okay.  So that was -- a period of time when the secured creditors couldn't exercise their rights; did I understand that correctly?

A    That is correct.

Q    Okay.  At that point in time, had the assets already been returned?

A    Yes, they had.

Q    Okay.  All right.  So I think where we were was trying to

move to this most recent period of time.  And just
understanding your understanding of the work of the company, do
you have any understanding of the day-to-day work of those --
the assets at the Netherlands level during the period of this
bankruptcy?

A     Generally, yeah.

Q     Okay.  What's that based on?

MR. ALEXANDER:  No objection.

THE COURT:  Go ahead.

THE WITNESS:  It's based on the work that we're both
doing with clients as SeeCubic TV.

BY MR. COLBY:

Q     Okay.  When you say we're both doing it, who are you
referring to?  Who is the we?

A     SeeCubic, Inc., and SeeCubic BV.

Q     Okay. All right. And you're personally involved in that?

A     Yes, I am.

Q     Okay. All right. That was establishing -- I think we're
good on that.  I want to go back to the story of investment in
Stream TV, okay.  How much did SLS invest in Stream?

A     A total of approximately $6.35 million dollars.

THE COURT:  How much?

THE WITNESS:  $6.35 million.

THE COURT:  Okay.

BY MR. COLBY:

Q    And in what form?

A    Six million as senior secured debt, and $350,000 as equity.

Q    When was that approximately?

A    The first $3 million was in 2011.  The second $3 million was in 2012.  And $350,000 was I believe 2014.

Q    Okay.  And generally speaking --

        THE COURT:  2014?

        THE WITNESS:  Yes.

        THE COURT:  And that $350,000 is what?

        THE WITNESS:  Equity.  An equity investment, $350,000 of equity.

BY MR. COLBY:

Q    Was the debt secured in any way?

A     It was secured by all of the assets of Stream TV and guarantees of several of its then existing subsidiaries.

Q    Okay.  Do you have an understanding of how much Hawk has invested in Stream?

A    Yes, I do.

Q    What's your understanding?

        MR. ALEXANDER:  Objection.  Foundation.

        MR. COLBY:  I've established the foundation.  Mr. Stastney previously testified that he was familiar with Hawk's investments from the period of time when he was both a board member and a CFO, and the period of time when SeeCubic was

enforcing Hawk's rights.

MR. ALEXANDER:  Well, the timeframe in terms of the investment.  I don't believe it was during the time when he was a CFO.

MR. COLBY:  I asked if he was familiar with the investment and the terms of the investment, and he said he became familiar with them when he was CFO.  I don't think that that needs to have happened while he was CFO.  He became familiar with the company's obligations, and he had responsibility for enforcing those agreements.

THE COURT:  Mr. Alexander, he responded.  You think that that's insufficient to establish personal knowledge?

MR. ALEXANDER:  I'll withdraw that objection.

THE COURT:  All right.  Go ahead, counsel.

BY MR. COLBY:

Q    So what's your understanding of -- I'm sorry.  I think I asked the amount, but I'm not sure.  So let's just make sure. What's your understanding of the amount that Hawk had invested?

A    I believe approximately $60 million pounds total, which based on the exchange rates at the time would have been approximately $90 million dollars.

Q    And in what form was that investment made?

A    That was invested as second lien secured debt.

Q    Was it invested all at once?

A    It was not.

Q    Tell the Court your understanding of how it was invested.

A    It was generally invested in pieces over the course of seven years.  Whenever the company needed money and was unable to obtain from somewhere else, it would go to Hawk and would request an investment.

THE COURT:  Investment or a loan?

THE WITNESS:  Loan, sorry.

BY MR. COLBY:

Q    Do you recall approximately when the last Hawk note was issued?

MR. ALEXANDER:  Your Honor, I'm going to object.  I mean, to the extent that he's trying to get the terms of documents, I need to see the documents.

MR. COLBY:  I'm not trying to get the terms of the documents.  I'm just asking if he understands how it all happened broadly speaking, like in the world.

MR. ALEXANDER:  He's not asking how they were negotiated or what the parties did.  He's asking for the terms of the documents.

MR. COLBY:  I'm asking for his understanding what the debt was.  When was it --

THE COURT:  I think the last question do you know when the last note was issued.  Mr. Alexander, why are you objecting?  Because you're saying that the term as opposed to his understanding of when the last note was issued?  That's the

only question he asked. What's your understanding of when the last note was issued by Hawk? He might not have an understanding. He might have one. I'm going to overrule that.

THE WITNESS: Late 2019 or early 2020.

BY MR. COLBY:

Q Do you have an understanding as to why that investment occurred at that time?

A Because I believe Stream wasn't able --

MR. ALEXANDER: Objection. Foundation. He wasn't involved at the time that it was done or the last note. Which note were you referring to?

THE COURT: You said the last note was in early 2019. Late 2019, early '20 Mr. -- wait. Was he involved in the company in late 2019 early 2020?

THE WITNESS: Yes, I was.

MR. COLBY: He's testified that he was.

THE COURT: All right.

MR. ALEXANDER: No I believe that was the testimony. I'll withdraw that objection.

THE COURT: All right, go ahead.

BY MR. COLBY:

Q So what's your understanding as to why that investment was made at that time?

A Because Stream was about to miss payroll and needed an injection of funds.

Q    Okay.  So you've testified, Mr. Stastney, about big picture SLS as in Hawk's investment in Stream TV.  Do you have an understanding as to whether or not SLS and Hawk were Stream's only investors?

A    Yes, I do.

Q    What's that understanding based on?

A    During my time, both as a board member and a CFO, I became familiar with all of Stream's other investors.

Q    Okay.  How -- why did you become familiar with Stream's other investors?

A    Because Stream was in a constant state of raising capital.  And so, shareholders were always being talked to, asked for more money, and generally solicited.

Q    Okay.  And what's your understanding of -- based on that experience, what's your understand of the nature of Stream's shareholder base other than Hawk and SLS?

A    Other than --

Q    I misspoke.

        THE COURT:  Is Hawk an investor?

        MR. COLBY:  In the form of debt, yes.

        THE COURT:  Well, that's debt.  You got to do -- I'm sorry.

        MR. COLBY:  I'm a dumb litigator, so I confuse these things all the time.

        THE COURT:  So am I.  I'm not a dumb litigator.  But

I'm just trying to keep straight my notes.

MR. COLBY:  Fair point.

THE COURT:  Alexander, are you on the ball over there?  You heard him say Hawk is an investor and I said when was Hawk an investor?

MR. ALEXANDER:  No.  I hear what he's saying, but I don't have an objection to that.

THE COURT:  Well, I did because I didn't understand --

MR. COLBY:  Fair enough.

THE COURT:  You are on the ball over there.  I'm just saying I -- can you ask the question and not me?

MR. COLBY:  He's not letting me get away with anything.  You don't need to worry about Mr. Alexander.

THE COURT:  But I'm relying on him to ask the question, so the Court doesn't.  All right.  So Hawk was not -- Hawk is a secured creditor lender?

MR. COLBY:  Correct.  Correct.

BY MR. COLBY:

Q   So let's just talk about the other -- the non-Hawk and non-SLS people who have put money in some form or fashion into Stream TV.  That people, and I will just refer to them as the other investors; does that make sense?

A   It does.

Q   Okay.  So based on your experience with them, can you

explain to the Court, broadly speaking, the nature of that investor pool?

A    That investor pool is almost exclusively individual investors.  Some high net worth, some not high net worth.  Who invested in the form of equity, usually stock plus --

Q    Are you familiar with the term as it's used in your line of work, institutional investor?

A    Yes.

Q    Would you consider SLS and Hawk to be institutional investors?

A    No.

Q    Okay.  To your knowledge, does Stream TV have any institutional investors among that pool of investors?

A    It does not.

Q    Do you have an understanding as to why that might be?

A    Yes, I do.

Q    What's your understanding?

        MR. ALEXANDER:  Objection.  Foundation.

BY MR. COLBY:

Q    What does your understanding come from?

A    My experience attempting to solicit or get investment from institutional investors on Stream's behalf.

Q    And when were you doing that?

A    From 2017 until 2020.

Q    Okay.  And what's your understanding of why there are no

institutional investors among that pool of other investors?

A   From an institutional investor prospective, Stream was essentially uninvestable.

Q   What do you mean by that?

A   The characteristics and the due diligence that institutional investors look for and the due diligence that they do, always turned up reasons not to invest in Stream.

Q   Okay.  Based on your experience, explain to the Court what the nature of that due diligence is that you just described.

A   Institutional investors would spend a tremendous amount of time diving into the management of the entity, the corporate structure of the entity, the corporate governance of the entity, the underlying technology, the customer relationships, virtually everything to do with the potential company.

Q   Why did they do that?

A   Because they -- this is not --

MR. ALEXANDER:  I'm going to object, Your Honor.  I mean, he's not here as an expert as to what institutional investors do and he's essentially eliciting expert testimony as to what the process is for institutional investors.  And he indicated that his company is not an institutional investor.

MR. COLBY:  I asked him, in his experience, what institutional investors did in their examination of Stream. And he's answering that question.

THE COURT:  Counsel, your question was why.

MR. COLBY:  Yes.  And my question was do you have an understanding as to why?

MR. ALEXANDER:  Well, what's  his basis for understanding why a third-party did the investigation that they did?

MR. COLBY:  The basis is having been a participant in those investigations.

THE COURT:  And he's asking him his understanding.

MR. COLBY:  Correct.

THE COURT:  How do you get around all of it?  I'll overrule the objection. Your understanding why.  That doesn't mean that's why they did it.  It just means his understanding.

BY MR. COLBY:

Q    What's your understanding as to why institutional investors perform that type of diligence?

A    My understanding is that they are fiduciaries for large pools of money who have a record and a track record and need to ensure that they don't take any risks that they don't fully understand and aren't getting compensated for.

Q    Okay.  And in your experience at Stream, what's your understanding -- let me back up.  During your time at Stream, were there efforts to obtain investments from institutional investors?

A    Yes.

Q    And did they come to fruition?

A     None came to fruition.

Q     Why not?

A     Every institutional investor ultimately passed on the opportunity.

Q     Do you have an understanding as to why?

A     It varied by the institutional investor.  Sometimes you never got a reason.

Q     Okay.  In the instances where you developed an understanding, what were they?

A     The ones who gave reasons included the quality of senior management, included the lack of corporate governance, included the high voting stocks --

      MR. ALEXANDER:  Objection, Your Honor.  That's hearsay testimony that he's eliciting.  I mean, he's asking him specifically why they didn't invest and he's stating reasons why they explained to him why they didn't invest.

      MR. COLBY:  I'm doing something slightly different than that, Your Honor.  I asked Mr. Stastney his understanding of why they didn't invest.  Hearsay would be if the statements that the institutional investors made.  There's no corporate governance.  I'm not trying to establish that that's true.  I'm just trying to establish that the -- that Mr. Stastney gained an understanding through this process of what the state reasons were.  I'm trying to prove that they're true.

      MR. ALEXANDER:  Well, then I'm going to object to

relevance because then that has no relevance.

THE COURT:  Well, I think he said the reasons given would imply somebody told him that.

MR. COLBY:  True.  But the purpose of the offering isn't necessarily to establish that the statements made by the institutional investors are true.  So let's just suggest that they said --

THE COURT:  Then why do you care what they said?

MR. COLBY:  Because it explains the context of the company.  It informs Mr. Stastney's understanding of the investability of the company.

THE COURT:  But doesn't that go to the truth of the matter?

MR. COLBY:  No.  It goes to Mr. Stastney's understanding of the investability, which is all I've really asked for.

MR. ALEXANDER:  I'm standing on the objection, Your Honor.  I don't think he clarified or overcame the objection.

THE COURT:  I'm torn by the fact that he said some of them never gave a reason and some of them was because, which means they told him something.  And you want me to say that's why they're not invested. I'm going to sustain it.

BY MR. COLBY:

Q   Okay.  Let me ask a different question then.  Mr. Stastney, has the person who was attempting to or part of the

efforts to get these institutional investors, which never happened, what's your understanding as to why Stream TV, I'm just asking about Stream TV, your optics into Stream TV, what's your understanding as to why Stream TV was unable to garner institutional investments?

MR. ALEXANDER:  Your Honor, I'm going to object to hearsay to the extent that he's basing it on statements from third parties.

MR. COLBY:  I'm asking for Mr. Stastney's understanding based on his experience at Stream TV.

MR. ALEXANDER:  But his only experience is based on discussions with third parties.  He can't independently have knowledge of what other people are thinking unless they tell him.

BY MR. COLBY:

Q    Mr. Stastney, do you have a view, do you personally on your efforts to garner, based upon what you saw at Stream TV, do you have a view as to why Stream TV is uninvestable for institutional investors?

A    Yes.

Q    Based on your view from the inside of Stream TV when you were there, what's that view?

MR. ALEXANDER:  I'm going to object to foundation.  I mean, what's the view based on?  There's no basis for how he has this understanding from third parties just because he's at

the company.

THE COURT:  Response?

MR. COLBY:  I think we've established that Mr. Stastney has experience in this area and generally has been involved in efforts to obtain institutional investment and knows how they work.

THE COURT:  Knows how they --

MR. COLBY:  Knows how they operate, right.

THE COURT:  Based on what?

MR. COLBY:  Based on having gone through the due diligence process with them.  So he has an understanding, an independent understanding of what they -- when they came in the door and say are we going to invest or not?  He has an independent understanding of what they look at.

THE COURT:  Okay.

MR. COLBY:  Correct.  And now I'm asking him based upon that understanding, when he's sitting inside Stream TV and he looks around at what he sees, does he have a view as the CFO, as a board member, does he have a view as to whether or not this company that I'm apart of is going to get institutional investing money.  That's what I'm asking.

THE COURT:  Based on what they have to look at?

MR. COLBY:  Based upon his personal experience of being subjected to diligence processes and his view around the inside of the company.  He can see management.  He can see

corporate governance.  He can see the voting stock structure.
He knows these things.  We've established that.  And he knows
the questions that they ask.  That's his personal experience.
And I'm asking him as the CFO of a company if he has the view,
former CFO, former director, if he has the view of whether or
not the company was investable for this type of investor.

It's like I'm looking at myself.  I watch NFL.

THE COURT:  I'm looking at counsel.

MR. COLBY:  I watch NFL football.  I know myself.  I
know I'm not an NFL football player.

THE COURT:  Okay.

MR. ALEXANDER:  Your Honor, he's not here testifying
as an expert.  He's here testifying as a fact witness.  He's
not an expert.  So he can't testify as to what people in the
industry do when they're doing due diligence.

THE COURT:  Right.  I will allow it for what it's
worth.  Because what I understand the question is based on his
involvement in efforts to obtain institutional investors, in
his personal observation, why he believes they didn't invest.
I don't know what that's worth, but he can tell me why he
believes they didn't invest.  That may not be why -- and if
it's to conclude that that's why they didn't invest, it doesn't
get there.  Just to his opinion why he thinks they did.

MR. ALEXANDER:  Well then, he can't give opinion
testimony.  He's a --

THE COURT:  Well, let's back off.  I shouldn't have used the word opinion.  Based on his observation or why does he believe it.  It's on his own experience, not an opinion.

MR. ALEXANDER:  Well, it's not a fact either, Your Honor.

THE COURT:  Well, people can always give what they think and it's not doing it as an expert.  So I'm allowing him to testify based on his involvement, what his conclusions are to why they didn't.  That's it.  Not as an expert.  It's not as anything.  Except it would be different if he was looking at all the facts and say, oh, look at this.  I'm going to give an opinion. That's not what he's doing.  He's basing it -- you know, I looked at all this.  I was directly involved, and this is what I think happened.  I don't know what it's worth, but you want to put it in, put it in.  Go ahead.  You can answer the question.  Why do you think they didn't invest?

THE WITNESS:  I think they didn't invest for several reasons.  I think the senior management was a problem.  It didn't inspire confidence.  I think the corporate structure was problematic.  I think the capital structure was problematic, especially the high vote shares held primarily by the senior management.  And I think any efforts to verify progress with customers was ultimately very underwhelming.

BY MR. COLBY:

Q    Okay.  I just want to put a little more meat on those

bones. When you say senior management, weren't you part of the senior management?

A    I was, yeah.

Q    Okay. But again, just your understanding, what was the issue with senior management?

A    The issue with senior management was that the two senior officers were brothers, and through their exercise of high vote stock control of the company.

Q    Okay. So you referenced capital structure. Is that the high vote stock thing you were referring to?

A    It is.

Q    What's that?

A    In I think 2013, the company granted or purportedly granted high vote shares to the shareholders at that time right before a larger investment came in.

Q    Pause for a second. What's a high vote share?

        MR. ALEXANDER: Your Honor, I'm going to object in terms of foundation and in terms of the high vote shares. It was discussing in 2014.

        THE COURT: Thirteen.

        MR. ALEXANDER: Thirteen.

BY MR. COLBY:

Q    And as the CFO and a member of the board of directors, were you familiar with the company's capital structure?

A    I was.

Q    Were you familiar with the high vote stock?

A    I was.

Q    Okay.  Does it have a name, the high vote stock?

A    It's class B common stock --

Q    Okay.  And so, please continue.

A    So the class B common stock had a vote that was 10 times what a class A share had.

Q    What do you mean by that?

A    For every share, class B got 10 votes on all matters submitted to shareholders of the company and also had a veto vote over significant transactions of the company.

Q    Okay.  And how held that class B stock?

A    It was the shareholders at the time of when it was granted 2013 originally.  And then in 2018, it was somehow moved almost entirely into the hands of the Rajan family.

Q    Okay.  So just based on your understanding sitting here today, do you have an understanding of who owns the, currently owns the class B stock as far as you know?

A    The vast majority is owned or controlled by the Rajan family.

        MR. ALEXANDER:  Objection to foundation in terms of how he knows it today.

        MR. COLBY:  I'm asking sitting here today, what's his understanding and as of, you know, whenever he gained that knowledge.  That's all I'm asking.  Sitting here today, what's

his understanding.

MR. ALEXANDER:  If it's his understanding -- I thought the question was who owns it.  Now, if he used the word understanding --

THE COURT:  He can use the word understanding.

MR. ALEXANDER:  Well, it hasn't been used each time.

THE COURT:  Yeah.  He asked what is his understanding the last time he knew.  I don't when the last time he knew.  He said his last understanding of who owns it.  That does not mean it's today.  He said as of today, what is your understanding of whose the owner.  His understanding as of today.  That does mean as of today who actually owned it.

BY MR. COLBY:

Q    And in addition, do you have a basis for understanding who owns that class B stock beyond the period of time when you were at the company?

A    Yes.

Q    What's that?

A    The filings made by the company and the previous two bankruptcies and in this bankruptcy.

Q    What are you referring to?

A    The capital structure is filed by the debtor.

MR. ALEXANDER:  Judge, and that's hearsay.

MR. COLBY:  I'm just asking for the basis of his understanding.

MR. ALEXANDER:  Basis of his understanding is hearsay.  He says he heard it from another -- he read it from another document that was filed in a different case.

MR. COLBY:  The Court can take it for what it's worth.  I'm asking the basis of his understanding.

THE COURT:  Well the -- so what are we supposed to do with that?  His basis is the document is a -- is he supposed to have the document?  Is he supposed to refer to the document?  I'm asking him what's the basis for his objection?

MR. ALEXANDER:  His testimony is hearsay because it's not based on personal knowledge.  That's my objection.

THE COURT:  Well, he said it's based on personal -- counsel, just --

MR. ALEXANDER:  There's a broader point here I think, Your Honor.

MR. COLBY:  That I think is frankly a little bit silly, which is Stream objecting to the content of documents that Stream filed in this case.

THE COURT:  He's not objecting to Stream's document.  He's objecting to how does he know it was Stream's document.  How do you know it was in there?  Did you see the documents?  What do you know?  That's what he's objecting to.

MR. COLBY:  Okay, fair.

THE COURT:  All right.

BY MR. COLBY:

Q   Fair enough.  Fair enough.  Mr. Stastney, what forms the basis of your understanding that Stream filed a document identifying its capital structure in this case?

A   Because I looked and found it.

Q   What did you look at?

A   The filing by Stream in this case.  I don't recall the number of the filing on the docket that identified its capital structure as of the date of filing or the date that was listed in that filing.

Q   Okay.  All right.  That was a bit of a digression.  I want to go back.  We were kind of following the arc of Stream and Hawk's investment, all right.  And I don't know the bankruptcy. I'm not a lending lawyer.  But is that debt still in good standing?  Is it in default?  What's the status of it?  Just tell me.

A   The debt held by SLS and Hawk and Stream was declared in default in March of 2020.

Q   Okay.  Please walk the Court through what, if anything, led up to that declaration of default in March of 2020.

A   Sure.

Q   The Court's writing it down, so take your time.

        THE COURT:  Yes, please.

        THE WITNESS:  As to SLS and also has to Hawk, there were many earlier maturity dates for the debt, which were extended several times.  I think SLS extended its debt five

times starting in 2014 and Hawk extended its debt multiple times as well.

THE COURT:  When was --

THE WITNESS:  2014 was the first maturity date.  All was with an eye to giving the company a chance to succeed in its commercialization efforts.  As time went on and those didn't materialize and no institutional investors came into the company, I know SLS made a decision that it was not going to extend its debt any further absent certain corporate governance changes to ensure that the company could operate appropriately and could attract institutional investments.  And in June of 2018, the board of directors of the company was composed of a majority of independent directors.

BY MR. COLBY:

Q    Just pause for a moment.  What do you mean by that?

THE COURT:  Who's composed?  What -- SLS, Stream, who?

BY MR. COLBY:

Q    Great question.  Let's go slow and take it smaller bites.

A    Yeah.  So in June of 2020, the board of Stream was composed of five directors.  Three of them were not the Rajan brothers and two of whom --

Q    Okay.  And you refer to the three as independents, correct?

A    Correct.

Q    What did you mean by that?

A    That they were not controlling shareholders of Stream.

Q    Okay.  And just to clarify the time period, the first time you talked about this you said 2018 and then you later said 2020.  What -- let me just be clear.

A    Okay.

Q    Okay.  So let's step back.  Were there times when Stream had independent board members?

A    Yes, there were.

Q    When?  One at a time.

A    From 2011 until 2018, there was at all times one independent board member and two Rajan brothers on the board. From December of 2018 until June of 2019, there were three board members who were not the Rajan brothers.

THE COURT:  Wait a minute.  From when in '18?

THE WITNESS:  December of 2018 until June of 2019. Actually, technically July of 2019.  There were three board members who were not the Rajan brothers and two Rajan brothers. During that period of time, the other two -- I was one of those board members.  Leo Hindery (phonetic) was one of those board members and Mark Coleman (phonetic) was one of those board members.

BY MR. COLBY:

Q    Okay.  Who are Mr. Hindery and Mr. Coleman?

A    Leo Hindery is the former CEO of TCI, the former CEO of

Global Crossing.

THE COURT: Who?

THE WITNESS: Global Crossing.

THE COURT: Please spell that. TCI?

THE WITNESS: TCI.

THE COURT: And Global Crossing.

THE WITNESS: And also I think the former president and CEO of AT&T Broadband, one of the pioneers in the cable industry, known as Mr. Coleman. Mr. Coleman was his -- Leo Hindery's partner at InterMedia Partners. And in June and early July of 2019, the board, the independent members of the board, determined to institute some corporate governance measures after becoming frustrated and concerned with the progress the company was making on the institutional investment front.

BY MR. COLBY:

Q    Just pause there for a second. You made this reference to corporate governance a few times. What are you referring to, at least in this instance, when you just referred to it?

A    Policies and procedures, which would ensure that the actions taken by the company were consistent or at least more consistent with best standards, best practices.

Q    Okay. So you made reference to this period of time, 2018, 2019, some focus on corporate governance or implementing corporate governance changes. What happened next?

A    Those changes were never implemented because Mathu and Raja Rajan exercised the Class B shares to remove Leo Hindery and Mark Coleman from the board.  Then, from 2000 -- from July of 2019 from March of 2020, the board was again, primarily was myself and the Rajan brothers, at which point again, four additional members of the board were appointed.

Q    Okay.

THE COURT:  Well, from 2019 to 2020, there was only three board members?

MR. COLBY:  Yeah, yes.

BY MR. COLBY:

Q    I want to go back to defaults, but since we're on this vein, let's mine it fully.  Who were those independent board members during that period of time you just referenced?

A    They were Asaf Gola?

THE COURT:  Who?

THE WITNESS:  Asaf, A-S-A-F Gola, G-O-L-A.

THE COURT:  Uh-huh.

THE WITNESS:  Kevin Gollop, G-O-L-L-O-P; Chris Kabacinski, K-A-B-A-C-I-N-S-K-I -- makes my name look easy.

THE COURT:  Kabacinski.

THE WITNESS:  Yeah.  And Frank Hodgson, H-O-D-G-S-O-N.

THE COURT:  And what time period was that?

THE WITNESS:  From March of 2020 until I'm not quite

sure when they were officially off the board.

THE COURT:  Okay.

BY MR. COLBY:

Q    Okay, and just to complete that story there, do you have an understanding as to the circumstances in which they left the board?

A    I do.

Q    What's your understanding based on?

A    My involvement in the negotiation and implementation of the omnibus agreement.

Q    Okay.  So just very briefly, we don't need to dwell on all of that omnibus agreement story -- I won't go through that here, but just tell us about -- tell the Court about the termination of those board members as board members.

A    Sure.  So as I referenced earlier, in March of 2020, both SLS and Hawk defaulted Stream on its debt with each of them, separately.  SLS filed a breach of contract action in the Delaware Superior Court.

Q    Okay, pause for a second.

A    Uh-huh.

Q    You were here yesterday?

A    I was.

Q    And that action, was that discussed yesterday?

A    It was.

Q    Okay.  Was that the action that I mistakenly called the

97

foreclosure action?

A    It is.

Q    Okay, all right.  I just want to connect the dots here epigenetically.

A    Yep.  And in response to those defaults and that breach of contract action, the secured creditors, and the independent members of the board of directors again negotiating a settlement that would resolve the debt and the defaults, and the breach of contract action, and that became the omnibus agreement.

Q    Okay, all right.  To just clean up two things real quickly. So that became the omnibus agreement.  Just -- how does that relate to the termination of those independent board members?

A    Despite the fact that a majority of the board, the independent members of the board, voted in favor of the omnibus agreement, the Rajans opposed it at the board level and then undertook several actions after the board took that action, to attempt to undo or void the execution of the omnibus agreement.

Q    Okay.  And do one of those things include terminating the board members?

A    Yeah.  So I think they variously asserted that the board members were never board members in the first place and then provided a document purporting to show that the board members had been terminated prior to taking the action in the omnibus

agreement.  And that document, I believe, was subsequently found to have been backdated by the Court of Chancery.

Q   Okay.  Now, let's go back, just finish off the defaults. I think you testified there had been some extensions and then the warrant extensions.  Just finish that off for the Court. Why did, to your understanding, like, why did SLS declare the default when it did.

A   The -- the removal of Leo Hindery and Mark Coleman from the board in 2019 made it very clear that the Rajans never intended to make the changes to the company that would be necessary to allow it to move forward, to attract sufficient investment, to commercial technology.  And so the next maturity date after that was February of 2020, which we said we were not going to extend.

Q   Okay.  And again, just, how did that relate to your role on the board?

A   At the point of -- when my debt matured, and before we declared default, I resigned from the board.

Q   All right.

THE COURT:  When was that?

THE WITNESS:  February of 2020.

BY MR. COLBY:

Q   And the default was?

A   March of 2020.

Q   Okay.  Why did SLS grant all those extensions to Stream,

on its nose?

A    SLS never intended to own or operate the company. It intended to make a lot of money as an investor in a promising technology company.  So to the extent that management needed more time and seemed to be making progress toward its commercializing the technology, we were more than happy to extend the debt to allow them to do that. But when it became clear that that was never going to happen, and that management was never going to take the actions needed to allow the company to move forward, it -- it became pointless extending further.

Q    If someone were to suggest that SLS is some sort of a predatory lender that was just trying to lend money, default, foreclose, and steal the assets, how would you, as a representative of SLS, respond to that?

        MR. ALEXANDER:  Objection, Your Honor.  I mean, it's calling for speculation and not relevance.

        MR. COLBY:  I'm not asking for speculation.  I'm asking for Mr. Stastney to talk about the type of investor that has --

        THE COURT:  Let me ask you, what if someone said that your X, Y, and Z.

        MR. COLBY:  Let me -- I can rephrase --

        THE COURT:  Please rephrase that --

        MR. COLBY:  I'll rephrase the question then.

        THE COURT:  -- because that is speculation.

BY MR. COLBY:

Q   Mr. Stastney, is SLS -- is SLS some sort of predatory lender that had designs on lending money to Stream, declaring a default, foreclosing, stealing away the assets?

A   No, and if we were, we'd be having this trial in 2014.

Q   Why is that?

A   Because we would not have extended the debt five times to give Stream infinite chances to find a way to succeed and repay the debt.

Q   Okay, all right.  Do you have an understanding of, today, approximately how much Stream owes SLS and Hawk respectively in the secured creditors view -- do you have an understanding of that?

A   I do.

Q   What's your understanding based on?

        MR. ALEXANDER:  Objection to foundation with respect to Hawk.

        MR. COLBY:  I'm asking, what's your understanding based on.  I'm establishing the foundation right now.  I haven't put in the number.

        MR. ALEXANDER:  You didn't ask that question.

        MR. COLBY:  I did.  I said, what's your understanding based on.  Do you have an understanding, yes, what is your understanding based on.

        THE COURT:  Well, no, no, no, no.  Originally, you

said what is your understanding of what it is today.  And he's saying you didn't -- a foundation on how he knows what it is today.  And I agree that he said he knew in the past.

MR. COLBY:  I'm asking what is his understanding -- do you have an understanding.

THE COURT:  No, no, no, the basis.  I'm --

MR. COLBY:  Okay.  I'll go --

THE COURT:  Tell me how he knows.

MR. COLBY:  Let me ask him if he has it again.  We'll start all over.

THE COURT:  Well, SLS is pretty clear, but Hawk is where he objected.

MR. COLBY:  Sure.

BY MR. COLBY:

Q    And so Mr. Stastney, do you have an understanding as to -- do you have an understanding as to how much Hawk claims it's owed by Stream TV currently?

A    To SLS, slightly an excess of 17 million U.S. dollars, and to Hawk, someone in excess of 161 million U.S. dollars.

Q    Okay, all right.  I'm going to move on --

MR. COLBY:  If that's okay with Your Honor?

THE COURT:  Yeah, I'm just a little confused, but that's okay.

MR. COLBY:  I'm happy to address any confusion.

THE COURT:  No.

MR. COLBY:  I think that's what we're here for.

THE COURT:  Okay.

MR. COLBY:  Well, let me do this.

BY MR. COLBY:

Q    Mr. Stastney, how do you get to those numbers?

THE COURT:  Oh, yeah because all I saw -- all you told me was the 2.3 million -- it's only in the record, I only have 2.3 million as being given.

MR. COLBY:  I think the testimony was Hawk had lent 6.something.

THE COURT:  Yeah, and --

MR. COLBY:  I'm sorry.  SLS was 6.something.

THE COURT:  Yeah, but he only said the timing was 1 million in 2011; 1 million in 2015; and 350k in 2014.  By my calculation, that's 2.35.

MR. COLBY:  Okay.

BY MR. COLBY:

Q    Well, let's break it down for the Court, Mr. Stastney.

THE COURT:  Uh-huh.

THE WITNESS:  Yep.  It was -- SLS's money was lent to Stream -- $3 million in 2011.

THE COURT:  Okay, well, I didn't have that.  Okay, wait a minute.  That's their last loan.  That's how much in 2011?

THE WITNESS:  Three million dollars.

THE COURT:  Okay, three million, okay.

THE WITNESS:  Another three million in 2012.

THE COURT:  2012, that's three.  Okay?

THE WITNESS:  And then 350,000 was invested as equity.

THE COURT:  Okay, and the one million that you referenced was wrong earlier?

THE WITNESS:  If I had referenced on million earlier, it was wrong.

THE COURT:  Okay.

BY MR. COLBY:

Q   Okay.  And so then sticking with SLS, how do you get from that 6 million to the 17 or so you just testified about?

A   The SLS loan bore interest at five percent every year until it defaulted, at which time it adjusted to a default rate of interest, which -- and also defaulted self, incurred a 10 percent penalty and entitles SLS to its fees and costs of collection.

Q   Okay.  And what's the rationale for the interest and penalties that you just discussed from SLS' perspective as a lender?

A   As a lender, you certainly don't want to reward a creditor when they don't pay you back.  So the idea is, number one, on the interest side, you should be paid for the cost of capital, and then when a default occurs, the term should be adjusted to

increase the incentive to repay the money that's due.

Q    Okay.  As a lender, do you factor risk into setting terms like that?

A    How so?

Q    Everything -- risk and reward should mirror each other . So the greater risk you're taking with a company, the greater reward you should get.  And so you try to minimize your risk as much as you can in making an investment -- for instance, by being the senior secured lender, meaning that whatever -- if things don't work as you hope, and you always hope for the best, you'll get first slice of whatever's left.  And that means you can offer a lower interest rate on your loan. Those who come after and don't have that same security then have to generally offer a higher interest rate or other terms to compensate them for the fact that they're taking more risk than you took.

Q    Okay.  And so just go back to the number you gave for the total amount of the Hawk debt currently.  How do you get there?

A    Hawk -- Hawk's investments generally in -- included a couple of features that SLS's didn't.  There was a discount from the initial principal amount.  So if Hawk, for instance, lent the company a million dollars, the initial principal amount would be more than that.  And Hawks interest rate was initially, I believe, 24 percent a year and then was reduced to 12 percent a year, I think, in 2018 or 2019.

Q    Okay.  And you've done the math?

A    And that's how the number comes up.

Q    Okay, all right.

MR. COLBY:  Now I'm really going to move on, unless Your Honor has any other questions --

THE COURT:  No.

MR. COLBY: -- about that?  Okay.

BY MR. COLBY:

Q    So there's been a reference already to the breach of contract, foreclosure-ish action in the Delaware Superior Court.  Are there any other litigations between the parties here, SeeCubic, SLS, Hawk, Stream?

A    Yes.

Q    Okay.  What are they?

A    There are several, involving the parties in some way, shape, or form.

Q    Okay.  Do you have a role in those litigations?

A    Anything that would involve SeeCubic or SLS, yes.

Q    What's your role?

A    I would be in charge of overseeing managing that litigation.

Q    And what do you do in that regard?

A    Everything required.  So essentially, you know, choosing counsel, instructing counsel, reviewing pleadings, reviewing filings, directing strategy.

Q   Who was the superior court action, the breach of contract action, who is that between?

A   That is between SLS Holdings and Stream TV Networks.

Q   And what's the current status of that case?

A   I believe it's been stayed.

Q   Why?

A   It was stayed, I think, at the time of the omnibus agreement or during the pendency of the omnibus agreement.

Q   Okay.  To your recollection, what was the next litigation that followed?

A   After the execution of the omnibus agreement, Stream filed, in the Delaware chancery court, for a temporary restraining order to stop SeeCubic from enforcing the omnibus agreement.

Q   Okay.

A   And that was in September of 2020.

Q   Okay.  You've already, I believe, described -- unless the Court wants more clarity -- I think you've already described at a high level, the omnibus agreement.  But let me just ask the question.  Why did, to your understanding, SLS and Hawk form SeeCubic to absorb those Stream assets pursuant to the omnibus agreement?

A   The omnibus agreement not only awarded the assets to the secured creditors, but also required that the secured creditors offer the shareholders of Stream the chance to receive a

matching number of shares in a new entity. So there had to be a new entity to hold the assets and operate them.

Q    Okay.   Just unpack that a little bit.   Who offered what to who?

A    The -- the -- the omnibus agreement was negotiated between the independent board members of Stream TV at that time in March of -- in May of 2020 and the secured creditors.

Q    Okay.

A    And one of the --

Q    I couldn't hear.

A    Okay.

Q    And who?

A    And the secured creditors.

Q    Okay.

A    And one of the conditions that the independent board members asked for, and the secured creditors agreed to, was that not only in -- in exchange for delivering all the assets of stream to settle the defaults on the debt and the superior court action, that they felt that the shareholders of Stream, other than the Rajans, were blameless in the default and should be -- should be given the chance to recoup their investments by also owning stock in the new entity that was going to go on and operate the assets.

Q    Okay.   So the equity investors would carry over to SeeCubic --

A    Correct.

Q    -- and therefore, still be invested, for lack of a better term, in these assets --

A    Correct.

Q    -- right, the technology in this?

A    And -- and therefore, there had to be an entity that --

Q    Yep.

A    -- all that could happen in.

Q    Got it.

A    And that was SeeCubic.

Q    Got it.  And did shareholders avail themselves with that option?

A    Approximately 90 percent -- 95 percent of shareholders ultimately did, yes.

Q    Okay.  So these are those other investors, the non-institutional, individual investors --

A    In Stream.

Q    -- in Stream --

A    Correct.

Q    -- got an investment in SeeCubic?

A    Correct.

Q    Got it.  Okay.  And what did SeeCubic intend to do with the Stream assets that it obtained through the omnibus agreement?

A    Provide funding and operate the assets to bring the

technology to market -- to commercialize the technology.

Q    Okay, okay.  Were you going to sell the assets?

A    No.

Q    All right.  There's a lot of water that went underneath the omnibus litigation in the chancery court. I'm not going to ask you to go through it, for all of our benefit to go through it in great detail.

THE COURT:  Counsel, I have a question.

MR. COLBY:  Of course.

THE COURT:  What does all of that have to do with this motion for releasing stay?

MR. COLBY:  Well, I believe we're also offering evidence on the motion to dismiss.

THE COURT:  Okay.

MR. COLBY:  And so there's a broader context here. But I'm happy to --

THE COURT:  No, okay.  I guess I was just thinking in the context --

MR. COLBY:  Yeah.

THE COURT:  -- of the -- this is really more going to the -- well -- I think the only thing that was argued in the motion to dismiss was the -- the only thing that was argued was the authority issue.  The other issues were not argued that you have offering the evidence on the other basis for dismissing?

MR. COLBY:  Correct, correct.

THE COURT:  All right.

MR. COLBY:  You know, also to the extent it's relevant to the other pending motions, I think the Court could take that into account, but --

THE COURT:  Okay, but it's primarily towards the motion -- right now, the motion to dismiss?

MR. COLBY:  Yeah, yeah, yeah.

THE COURT:  Okay.  All right.

MR. COLBY:  And we'll try to speed through this --

THE COURT:  Now, counsel, you haven't much -- we have tomorrow, we have Thursday.  Well, what's today, Tuesday.  We have three more days.  So you can --

MR. COLBY:  Okay.

THE COURT:  -- use as much time as you need.

MR. COLBY:  All right.  A lot's happened, and I just want to make it clear, so all right.

BY MR. COLBY:

Q   So the omnibus agreement litigation -- I think you previously -- so again, high level, what happened in that?

A   The omnibus agreement?

Q   Yeah.  The omnibus agreement litigation --

A   Litigation?

Q   -- that chancery court case.

A   Sure, sure.  So Stream -- that case started in September of 2020 --

Q    Yeah.

A    -- when Stream filed for a temporary restraining order.

Q    Yeah.

A    That was assigned to Judge -- Vice Chancellor Laster, who Stream also requested expedited treatment.  So that was heard on an expedited basis.  There was discovery, there was -- there were proceedings.  And on December 8th, I believe, of 2020, Judge Laster issued his preliminary injunction order --

Q    Okay.

A    -- which awarded all of the assets and control of all the assets to Stream -- I mean to -- to SeeCubic, Inc. and provide that all of the assets could be owned and operated immediately by SeeCubic, Inc.

Q    Okay.  And just to connect the dots of what we talked about earlier, you previously gave the Court the date of when SeeCubic began operating the Stream assets -- that was December 8th of 2020 -- that was the result of this preliminary injunction order?

A    Yeah.  I -- I believe I said December 9th of 2020?

Q    Ninth.

A    Yeah, because 8th was the order, and the 9th was when --

THE COURT:  It was December 9th?

THE WITNESS:  Yeah, Uh-huh.

MR. COLBY:  You got it.  Okay.

THE COURT:  So these should be on it, too.

MR. COLBY:  Yeah.

BY MR. COLBY:

Q    Okay.  So that was the preliminary order.  What -- to your -- what happened next or what was supposed to happen next?

A    The court established a briefing schedule for a summary -- summary judgment motion --

Q    Okay.

A    -- to finally turn the preliminary injunction into a final injunction.  And that was -- the final briefs were due, I believe, on February 24th -- 26th, rather --

THE COURT:  And that's February?

THE WITNESS:  February 26th of 2021.  And that was the last of action needed before the chancery court would be able to issue a ruling.

BY MR. COLBY:

Q    Yeah.

A    It could have been any time after that.

Q    Well, let me -- just pause there.  Why did you jump from a preliminary order to briefing on summary judgment?

A    Because I believe SeeCubic filed for summary judgment.

Q    And as the person who directed the litigation, what's your understanding as to why SeeCubic filed for summary judgment after that preliminary injunction order?

A    Definitely -- a lot of people say that they're dumb litigators. I'm -- I'm too dumb to be a litigator, so I'm

definitely not going to get this right.  But the -- it's because there were no issues that remained --

Q    Okay.

A    -- to be heard.

Q    All right, all right.  Do you recall whether Vice Chancellor Laster said anything about summary judgment in that preliminary injunction order?

MR. ALEXANDER:  Objection, hearsay.

MR. COLBY:  Just asking if he recalls what he said.

THE COURT:  What he said.

MR. COLBY:  Yep.

THE COURT:  Counsel?

MR. COLBY:  I'm not offering it for the truth of what Vice Chancellor Laster said.  I'm --

MR. ALEXANDER:  Then, it has no relevance.

MR. COLBY:  All right, fine.  We'll move on.

THE COURT:  I mean, he issued an order; did he not?

MR. COLBY:  He did.

THE COURT:  Okay.

MR. COLBY:  Maybe we'll just seek judicial notice of it.

THE COURT:  How about you ask him, has he seen the order, does he understand what it says?

MR. COLBY:  Yeah.

THE COURT:  Okay?

MR. COLBY:  No, that's okay.  We'll move on.

BY MR. COLBY:

Q    So you said something about the final briefs being due in February 26th of 2021, right?

A    I believe that's correct.

Q    Yeah.  What do you mean by that -- the final briefs were due?

A    On -- in order -- in order to render judgment on the summary judgment motion, as I recall, Judge Laster had -- Vice Chancellor Laser -- had said, final briefs were due on the 26th and that he could -- he could and would render his decision at any point after that.

Q    Okay.  So --

MR. ALEXANDER:  Objection to --

THE WITNESS:  -- final briefs are due on the --

THE COURT:  Wait, whoa, whoa, whoa, objection.

MR. ALEXANDER:  To the second half, I mean, it's hearsay in terms of when he would render a decision.  I mean, it's not --

THE COURT:  Vaguely --

MR. COLBY:  I'm asking Mr. Stastney his understanding of what was going to happen on the 26th -- just your understanding.

THE COURT:  And he said it was because the judge said, so --

MR. COLBY:  And I'm asking if he can answer the question without that.

THE COURT:  Okay.

THE WITNESS:  It was my understanding that the judge could render judgment any time after the 25th.

BY MR. COLBY:

Q   Okay.  And did -- were those final briefs filed?

A   I believe they were not.

Q   Okay, not in February of 2021, correct?

A   Correct.

Q   Why not?

A   Because Stream declared bankruptcy on February 24th of 2021.

Q   Okay.  What effect did that have on the omnibus litigation to your understanding?

A   It stayed the omnibus litigation.

Q   All right.  So let's just take a quick look at -- this is in Volume II, Your Honor, CR-17.

THE COURT:  Uh-huh.  Are you going to show this to the witness?

MR. COLBY:  Yep.  Mr. Stastney's going to take a look at it as well.

THE WITNESS:  Yeah.

THE COURT:  All right, But only at CR-17.

MR. COLBY:  CR-17.

116

BY MR. COLBY:

Q    So Mr. Stastney, do you recognize this document?

A    I do.

Q    What is it?

A    It is the voluntary petition for bankruptcy filed by Stream TV Networks, Inc. on February 24th, 2021.

Q    Okay.  And how are you familiar with this document?

A    I pulled it up when it was filed.

Q    Sorry?

A    I pulled it up --

Q    Yeah, okay.

A    -- when it was filed.

Q    Sure.

A    And --

MR. COLBY:  Your Honor, I would seek to move this document into evidence.  It's the February 24th, 2021 bankruptcy filing by Stream TV Networks Inc., which is both a party admission, non-hearsay, as we've talked about previously and you, under your judicial notice ruling of earlier today, to take judicial notice of the document that it was filed and what it says.

THE COURT:  Counsel, he's asking to admit on the judicial notice because it was filed and it has the little headings and all this on here, and that I can take judicial notice that it was filed.  And it says what it says, but I

don't know what I'm supposed to do with that.  I mean, I don't think that --

MR. ALEXANDER:  For judicial notice purposes, Your Honor, that's fine.  And he also -- what was the other part?

THE COURT:  Well, I don't need two -- I only need one.

MR. COLBY:  That was the same basis for --

THE COURT:  Right.

MR. COLBY:  -- admission of those documents --

THE COURT:  But if you --

THE COURT:

MR. COLBY:  -- we discussed.

THE COURT:  -- but if you take judicial notice --

MR. COLBY:  That's fine.

MR. ALEXANDER:  But it's subject to the -- what was -- the date it's filed and that it was filed, but that's all you can do for judicial notice.

THE COURT:  Well, I think that's all he's asking.

MR. COLBY:  That's all I'm asking.

MR. ALEXANDER:  And I explained that, no objection, Your Honor, so I don't know --

THE COURT:  Right, right.  It says that it was filed on -- at the hearing on October 24th, and it has a signature on here by Mr. Weiss (phonetic).  And it's authorized -- apparently, Mr. Mathu Rajan, because I know there's a reference

to two Rajan now.

MR. COLBY:  Yeah.  And actually, let's just -- so I think I've established what I want established with this.

THE COURT:  It was when it was filed, okay.

MR. COLBY:  When it was filed.

(Plaintiff's Exhibit CR-17 admitted into evidence)

BY MR. COLBY:

Q    And Mr. Stastney -- what effect did that have on the omnibus litigation that was within a couple of days of being fully briefed by Vice Chancellor Laster.

A    It was stayed.

Q    It was stayed, okay.  Let's just quickly clear something up for the Court.  There's been a reference to a couple of Rajans -- who are they?

A    Mathu Rajan is the -- historically, has been the chairman and CEO of Stream TV Networks.

THE COURT:  Chairman and CEO?

THE WITNESS:  Uh-huh.

THE COURT:  Okay.

THE WITNESS:  Not always chairman, but always CEO.

THE COURT:  Okay.

THE WITNESS:  And his --

THE COURT:  Sometimes chairman -- always CEO.

THE WITNESS:  Yes.

THE COURT:  Okay.

THE WITNESS:  And his brother Raja Rajan, R-A-J-A R-A-J-A-N --

THE COURT:  Uh-huh?

THE WITNESS:  -- has been chief operating officer --

THE COURT:  Yeah, C --

THE WITNESS:  O-O.

THE COURT:  -- O-O.

THE WITNESS:  And general counsel.

THE COURT:  And general counsel?

THE WITNESS:  Yeah.  And they were also both directors of the company from at least when I invested until 2020.

MR. COLBY:  All right.

THE COURT:  So that was from -- what year was that?

THE WITNESS:  2011.

THE COURT:  To when -- 2020?

THE WITNESS:  2020, uh-huh.

THE COURT:  As far as you know?

THE WITNESS:  Correct.

THE COURT:  Okay.  The -- okay.

BY MR. COLBY:

Q    And have other members of the Rajan family had a role at Stream TV, in your experience?

A    Yes.

Q    Doing what?

A    There's an entity called -- and I forget the name -- that was owned and operated by Mathu and Raja's parents.  And through that entity, the provided consulting services --

Q    Okay.

A    -- to the company.

Q    And any other -- like, in the day-to-day operations of the company?

A    No.

Q    Did the Rajan brothers' mother ever have a role at the company?

A    Yes, through that entity.

Q    Okay, and what was that role?

A    She was effectively the bookkeeper for the company and the signatory on the bank accounts --

Q    Okay.

A    -- and approved the expenses.

THE COURT:  So what was her role?

THE WITNESS:  She was the bookkeeper.

THE COURT:  Bookkeeper.

THE WITNESS:  She was the signatory on all the bank accounts, and she approved expenses.

MR. COLBY:  Your Honor, it's just about 3:30.

THE COURT:  Okay.

MR. COLBY:  I know you're tireless, but if you were inclined to take a break, now would be a good time, but I'm

happy to keep going.

MR. COLBY:  It's up to you.

THE COURT:  I'm assuming you need a break.

MR. COLBY:  No, no, no.  I'm fine.  I got a note that said it might be a good time to take a break, so someone else might, but --

THE COURT:  Somebody else might need a break.

MR. COLBY:  I'm having too much fine.

THE COURT:  All right.  How about we come back at 3:45?

MR. COLBY:  All right, thank you.

THE COURT:  The Court is in recess.

(Recess taken)

THE COURT:  All right.

MR. COLBY:  Thank you, thank you.  So where we left off, I believe, was the February 2021 filing of a Chapter 11 bankruptcy.  Okay?

THE COURT:  All right.

MR. COLBY:  That's where we're at?  Okay, all right.

BY MR. COLBY:

Q   So Mr. Stastney, what was the disposition of that Stream TV Chapter 11 bankruptcy?

A   It was dismissed.

Q   Okay.  Do you have an understanding as to why it was dismissed?

A     It was dismissed as a bad faith filing.

Q     Okay, all right.  So let's just, if we could, everyone take a look at CR-18 in the 22.  Do you recognize this document, Mr. Stastney?

A     I do.

Q     Where have you seen it before?

A     From the -- the -- the disposition of this case when I was managing the SeeCubic's litigation affairs.

Q     Okay.  When you said, this case, you mean the Chapter 11 Stream TV bankruptcy filing?

A     That's correct.

Q     Okay.  I would ask the Court to take judicial notice of this on the same terms as it admitted the other decisions and rulings of the court of other courts.

          MR. ALEXANDER:  No objection.

          THE COURT:  Admitted.

     (Plaintiff's Exhibit CR-18 admitted into evidence)

BY MR. COLBY:

Q     Do you know, Mr. Stastney, whether or not Stream appealed that dismissal to the district court?

A     I believe it did.

Q     Okay.  Do you know what the outcome of that appeal was?

A     It was denied.

Q     Okay.  So just to put it in more technical terms, if you can, the ruling we just looked at was upheld or overturned?

A    It was upheld.

Q    Okay.  Do you know whether or not Stream appealed that further?

A    I don't recall.

Q    Okay.  And dismissal the dismissal here, CR-18, was done in response to a motion to dismiss; do you see that?

        THE COURT:  Counsel, can you give me just one moment?

        MR. COLBY:  I'll give you a moment, of course.

        THE COURT:  Yes.  I have all of today listed.  I just want -- okay.

BY MR. COLBY:

Q    Okay, so looking at CR-18 here -- court's hearing; do you see that?

A    I do.

Q    Okay.  Do you know what that refers to?

A    The motions to dismiss filed by SeeCubic, Inc. and SLS Holdings.

Q    Okay.  And what was the basis of those motions to dismiss?  What was the argument?

A    That the bankruptcy had been filed in bad faith as a litigation tactic and without basis.

Q    Okay.  Litigation tactic how?

A    That it was filed to attempt to avoid or undo the decisions that had been rendered or about to be rendered int eh chancery court action.

Q    Okay.  And those are the motions to dismiss that were granted, correct?

A    That's correct.

Q    All right.  Do you have an understanding as to why they were granted?

A    Well, I --

Q    Do you have?

A    I do have an understanding.

Q    What's that based on?

A    My participation in the -- in the proceedings in front of the bankruptcy court.

Q    Okay.  And what's your understanding?

A    That the judge found that --

        MR. ALEXANDER:  Your Honor, we'd object to hearsay.

        MR. COLBY:  Just asking for Mr. Stastney's understanding that the person overseeing the litigation, what his understanding was.  And that's all I'm introducing it for is to just to establish what his understanding was.

        MR. ALEXANDER:  Two things, Your Honor.  A, that has no relevance; B, he started his testimony with saying, the judge found.  That's hearsay, and it's irrelevant.

        THE COURT:  Okay.  Can we -- well, I guess we will strike the answer.

        MR. ALEXANDER:  Well, Your Honor, I don't think that cures it.

THE COURT:  It's his understanding of why it was -- you can understand anything you want.  I'm going to look at what the judge said.

MR. ALEXANDER:  Maybe you'll look at what the judge said, but that's not --

THE COURT:  Right.

MR. ALEXANDER:  -- evidence either.

THE COURT:  Well, if he -- I'm not quite sure.  I mean, there's always a reason something that would give the judge --

MR. ALEXANDER:  Well, I guess we'll deal with that if they try to get that in, Your Honor.

THE COURT:  Right.

MR. ALEXANDER:  But as of now, in terms of his testimony --

THE COURT:  Right.

MR. ALEXANDER:  -- A, he's understanding zero of it, and I don't see what that goes to.  And his understanding -- I think it's still hearsay.

THE COURT:  Well, if it's offered for the truth of why the judge dismissed it, then clearly, it is hearsay.

MR. ALEXANDER:  Then, but what's the relevance of to what his understanding of to why it was dismissed, in terms of his actions?

MR. COLBY:  Well, the relevance is it informed Mr.

Stastney was overseeing and had been involved in a number of litigations, of which pertained to motions that are currently before the Court.  This is both background and informs the prosecution of the various claims between the parties.  Those are very much at issue here.

THE COURT:  Was informing who -- me?

MR. COLBY:  It's informing Mr. Stastney, who is --

THE COURT:  No it's not counsel.  You want me to understand why the Court -- and I'm going to sustain that.  Not his understanding that you want to get in, okay?  Go ahead.

MR. COLBY:  Okay.

THE COURT:  Go ahead.

MR. COLBY:  Well, I -- all right.

BY MR. COLBY:

Q    Mr. Stastney, you a minute ago, described the arguments that were made in favor of the motion to dismiss, correct?

A    Correct.

Q    Do you know, in granting the motion to dismiss, whether or not the court articulated any basis for doing so other than what was argued?

MR. ALEXANDER:  Objection, hearsay.

MR. COLBY:  I'm just asking if she did it or not. I'm asking --

MR. ALEXANDER:  Well, then it's speculation.

MR. COLBY:  -- any basis.

THE COURT:  Well, can't you just ask him if he was over -- never mind.  What they want.

MR. ALEXANDER:  Well, that's hearsay was well, Your Honor.

THE COURT:  No.

MR. COLBY:  Yeah, it's a fact -- did she say something or not.

THE COURT:  Well --

MR. ALEXANDER:  But if it's something that she said, that is hearsay.  And if you're not -- you mean --

MR. COLBY:  Yeah.

MR. ALEXANDER:  -- for the truth of the matter asserted, than it's irrelevant.

MR. COLBY:  It's a yes -- I'm not seeking to introduce any statement by the court.  I'm asking Mr. Stastney a yes or no question, whether or not the court articulated a basis other than the arguments that SeeCubic made.

THE COURT:  And what was the basis -- and what's the basis for relevance because you want me to find there was no other basis.  Other than that, what is this for?

MR. COLBY:  The relevance is that -- a couple of things.  One, SeeCubic is in hock, or making a motion here on the basis of the bankruptcy filing being a bad faith filing.

THE COURT:  Uh-huh.

MR. COLBY:  And so the history, just to put it

plainly, this history of previous filings informs their decision to bring a motion in this matter, seeking to dismiss it as a bad faith filing.  And really all I'm asking is that yes or no question.

THE COURT:  Counsel?

MR. ALEXANDER:  I still don't believe it's relevant, so I'll stand on the relevance objection.

THE COURT:  Sustained, counsel.  It's irrelevant what she did or did not say or he didn't hear her say.

MR. COLBY:  Okay.

THE COURT:  It's a way to get his answer, but I think I said probably more than I should.  Hit what you want me to hear but go ahead.

MR. COLBY:  I'm happy to keep trying.

THE COURT:  Well, keep trying.  I'm sure you're going to figure it out.

MR. COLBY:  I'm not so confident, but I'll try.  So the objection is relevance currently, or the objection is hearsay?

THE COURT:  It was both, and I sustained on relevance.

MR. COLBY:  Okay.

THE COURT:  So you can try something other than to say --

MR. COLBY:  Okay.

THE COURT:  Well, it's irrelevant the way you phrased the question, which was, did the court not articulate some other reason.

MR. COLBY:  Okay.

THE COURT:  I don't know what the relevance --

MR. COLBY:  Yeah, okay.

BY MR. COLBY:

Q   Yes or no question -- yes or no question, Mr. Stastney. Did the court articulate a basis for dismissing the action that was consistent with the bad faith arguments that SeeCubic made in the motions to dismiss?

MR. ALEXANDER:  Objection, Your Honor.  I mean, he's trying to backdoor in information with respect to what the court said in terms of why a matter was dismissed.

THE COURT:  I'm getting frustrated.  I'm about to ask the question myself, but I will sustain that.  Go ahead.  Try again.

MR. COLBY:  I'm going to move forward.

THE COURT:  Okay.

MR. COLBY:  I'm going to rack my brain, Your Honor, to see if I can come up with a question that works for you.

THE COURT:  That -- you want -- never mind.  I know what you want me to know.  You've got to figure out how to get it to me.  I know how you can, but that's not my job to --

MR. COLBY:  Fair enough.

THE COURT:  So I have to stop.  Sometimes it just gets frustrating.  I ask my own question, and I have to -- I'm trying not to do that.

MR. COLBY:  Fair enough, okay.

BY MR. COLBY:

Q    After the dismissal, Mr. Stastney, what happened next in the course of these litigations that we've been talking about?

A    There was an involuntary bankruptcy petition filed in -- with respect to Stream TV Networks, Inc.

Q    Okay.  Did anything happen in the Chancery report?

A    I don't recall.

Q    You don't recall, okay.  But to your understanding, that was ripe or about to be ripe for a decision?

A    Correct.

Q    Okay.  And so this Chapter 11 is dismissed.  There was an involuntary -- tell me what that was.

A    I believe it was six days later.  The filing -- there was a filing, attempting to put Stream into involuntary bankruptcy by three creditors.

Q    Okay.  And let's just take a look at the document, C-20.  It's Volume II.

THE COURT:  No, 21 maybe?  No?

MR. COLBY:  Twenty.

THE COURT:  Okay, you can't look through.

THE WITNESS:  I can't look at that?

THE COURT: Can't look. You can't just go looking through, and I can't either. That's why I stopped. Somebody has a list -- Ms. Callahan has a list.

UNIDENTIFIED SPEAKER: I believe it's CR-20.

THE COURT: Twenty is the, yeah. Okay.

Notice CR-20, Mr. Stastney.

MR. ALEXANDER: Well, I'm not going to do anything.

THE COURT: Yet, until he asks him something about it.

MR. COLBY: Just so the record's clear and make sure I didn't misspeak one of these times, we've done --

THE COURT: So far all we've done in CR-18 and 17.

MR. COLBY: Correct.

THE COURT: Seventeen is a voluntary petition filed on 2/24.

MR. COLBY: Yep and -- sorry.

THE COURT: Well, 18 is the order, right?

MR. COLBY: It's the order and then 20. So let's take a look at CR-20 -- my apologies.

THE COURT: Okay.

BY MR. COLBY:

Q    Mr. Stastney, do you recognize this document?

A    I do.

Q    What is it?

A    It is the involuntary filing for -- for a Chapter 17

bankruptcy in respect of Stream TV Networks, Inc.

Q    And how do you know that -- how are you familiar with it?

A    I looked at this I think on PACER monitor back in 2021.

Q    Okay.

MR. COLBY:  And so Your Honor, I would ask that the Court, on the same basis, take judicial notice of CR-20, the involuntary petition, Stream TV -- for the debtor, Stream TV Networks.

THE COURT:  Mr. Alexander?

MR. ALEXANDER:  No objection with regards to judicial notice that this was filed on the date that it was filed.

THE COURT:  Okay, and just says what it says?

MR. ALEXANDER:  Correct, Your Honor.

THE COURT:  Okay.

MR. ALEXANDER:  Yes.

THE COURT:  All right.  CR-20 is admitted.

(Plaintiff's Exhibit CR-20 admitted into evidence)

MR. COLBY:  Okay.

BY MR. COLBY:

Q    So what happened, if anything, Mr. Stastney, in the Chancery Court litigation as a result of the filing of this involuntary petition?

A    The Chancery court action was again, stayed.

Q    Okay, all right.  And if you take a look at the third page of this document, it lists the petitioners; do you see that?

A    I do.

Q    And who's the third petitioner listed there?

A    Rembrandt 3D Holding, Ltd.

Q    Okay, all right.  I don't have any question.  I just want to put a pin on that because we'll come back to it later, but I just want to put a pin in that.  Now, Mr. Stastney, did Stream take a position -- I'm sorry.  Did SeeCubic take a position with respect to this involuntary petition of Stream TV Networks?

A    Yes, it did.

Q    What position did SeeCubic take?

A    It -- it challenged it again on the grounds that it was a bad faith filing --

Q    Okay.

A    -- and moved for dismissal.

Q    And what was the outcome of that challenge?

A    It was dismissed.

Q    Let's take a look at CR-22, please.  And just before we talk about CR-22, what date was the involuntary petition filed?

A    On May 23rd, 2021.

Q    Okay.  And let's just take a look at CR-22.  What's that document?  Are you familiar with it?

A    I am.

Q    How are you familiar with it?

A    From the filings, public filings in this case.  In the --

in the case of the bankruptcy, the Chapter -- Chapter 7 bankruptcy of Stream TV.

Q    Okay.  And what is it?

A    It is a order granting the motion to dismiss the Chapter 7 bankruptcy of Stream TV.

Q    All right.  I would move to admit this into evidence on the same judicial notice basis as we've been admitting the other a court documents.

THE COURT:  Mr. Alexander?

MR. ALEXANDER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit CR-22 admitted into evidence)

BY MR. COLBY:

Q    What was the basis of SeeCubic's challenge to the involuntary Chapter 7 petition for Stream TV Networks?

A    That it was organized by Stream TV Networks as an on-going litigation tactic.

Q    Okay.  And when was this order issued?

A    June 10th, 2021.

Q    Okay. All right.  So  after the second Stream petition was dismissed, what -- what happened?  Did you go back to the Chancery Court?

A    Yes, we did.

Q    And what happened there?

A    The next inflection point was the final summary judgment

decision and granting a final injunction in September of 2021.

Q   Okay, all right.  So let's keep rolling forward.  We got the final injunction September 2020 --

A   One.

Q   -- September '21, right.  And what happened next in the life of that litigation?

A   Shortly thereafter, Stream TV Networks challenged that in the Delaware Supreme Court.

Q   On what grounds?

A   That the order was invalid because the vote of the Class B shares was required to approve the omnibus agreement.

Q   Okay.  And --

THE COURT:  Counsel, can we take just a two-minute break?

MR. COLBY:  Yes, absolutely.

THE COURT:  All right.  Two minutes. The Court is in recess.

(Recess taken)

THE COURT:  All right, counsel, I apologize.

MR. COLBY:  No problem.  It gave me an opportunity to brainstorm a little bit about the magic question.

THE COURT:  Okay.  I'm sure Mr. Caponi knew the answers.  Well, we're giving him the credit.  It may be the gentleman next to him.

MR. COLBY:  Well, I don't know.  We'll see -- we'll

see.

BY MR. COLBY:

Q    If we're ready to go, so going back, Mr. Stastney, to the dismissal of the Stream TV Chapter 11 case --

        THE COURT:  Uh-huh.

BY MR. COLBY:

Q    SeeCubic made a motion on what basis?

A    . That the filing had been in bad faith because it was a litigation tactic and without basis.

Q    Was the motion granted?

A    Yes, it was.

Q    Did the court say why the motion was granted?

A    Yes, it did.

Q    What did the court say?

        MR. ALEXANDER:  Objection, it's hearsay.

        THE COURT:  You got what you needed, counsel.

BY MR. COLBY:

Q    Why was the motion granted?

A    The -- what the judge said.

Q    Mr. Stastney, to your understanding, why was the motion granted?

        MR. ALEXANDER:  Objection, it's still hearsay because his only basis for knowing it is because he heard it from the judge.  It's not in the order.

        THE COURT:  Well, they failed a motion to dismiss on

the basis of a bad faith.  They alleged X.  Motion granted.

MR. COLBY:  Okay, fair.

THE COURT:  You knew what the basis was, correct?

MR. COLBY:  Well, we'll get to that, but --

THE COURT:  He said he was in charge of litigation. He understood that the basis for motion was bad faith as a litigation tactic.  After that argument, motion was read -- unless they made some other argument -- I don't know, but it was granted thereafter.  Now, I don't know what that means, but I can figure it out.  Counsel, I don't know what you want me to say -- you can't -- you got where you needed to go.

MR. COLBY:  Okay.

THE COURT:  I'm sure somebody would've figured it out.

MR. COLBY:  At risk of -- if we could take a look at CR-74.

THE COURT:  Okay.  Okay.

BY MR. COLBY:

Q    Mr. Stastney, do you recognize CR-74?

A    I do.

Q    And how or why do you recognize it?

A    It's the transcript of Judge Owens' ruling on May 17th, 2021.

Q    Okay.  And how do you recognize it?

A    I was provided this by counsel.

Q    Okay.  And did you participate in the hearing?

A    I did.

Q    All right.

MR. COLBY:  All right.  So I would just move to admit the transcript order on the same basis as the other decisions, of course, that we've been admitting.

THE COURT:  And this is judicial notice because what?

MR. COLBY:  This is judicial notice, correct.

MR. ALEXANDER:  This is not judicial notice.

THE COURT:  Counsel, tell me --

MR. ALEXANDER:  Not even close.

MR. COLBY:  It is an official transcript of an oral ruling by the court, similar to or equivalent to the written decisions that have already been admitted as judicial notice.

THE COURT:  Well, judicial notice has typically been involved -- orders of the court, documents filed of record. I'm not quite sure.  This is a new one for me, that a transcript falls under judicial notice.  I've never had to address that.  I've always addressed filings and all this other stuff.  So counsel, we're going to have to look at --

MR. COLBY:  Well --

THE COURT:  -- Federal Rule 201.

MR. COLBY:  Sure.  And let me ask one more factual question, too.

BY MR. COLBY:

Q    Mr. Stastney, do you see a notation at the top of the page of CR-74?

THE COURT:  Uh-huh.

THE WITNESS:  I do.

BY MR. COLBY:

Q    And what does that reflect?

A    It is the filing -- the case that -- the filing that's represents and the case number.

Q    Okay.  So was this filed on the docket in that bankruptcy case?

A    Yes, it was.

MR. ALEXANDER:  Your Honor --

THE COURT:  Well, his question --

MR. ALEXANDER:  Well, he didn't go to move it in, so --

THE COURT:  Well, his question is, was it filed on the docket.

MR. COLBY:  I did ask --

MR. ALEXANDER:  But you can't take judicial --

THE COURT:  No, no.  His question was, was it filed on the docket, to Mr. Stastney.

MR. ALEXANDER:  Okay.

MR. COLBY:  I can ask -- I can make it more gran --

BY MR. COLBY:

Q    Mr. Stastney, a minute ago, you said that you recognized

the Chancery Report petition -- I'm sorry.  You recognized the
Chapter 7 filing because you saw it on PACER, correct?

A    That's correct.

Q    And so do you review, in the cases that you supervise, do
you log in to PACER yourself and review filings?

A    Yes.

Q    Okay.  And do you -- did you review your transcript of the
decision on the motion to dismiss, the Chapter 11 filing, did
you view that on the docket of that case?

A    Yes.

Q    And is that what's reflected at the top of the page?

A    Yes.

        MR. ALEXANDER:  I'm waiting for what he's going to
try to do with it.

        MR. COLBY:  I will make the motion again.  So I would
move to admit it into evidence via judicial notice, for the
fact that it exists on the docket and that it says what it
says, that's it.

        MR. ALEXANDER:  And we're going to object.

        THE COURT:  Okay.

        MR. ALEXANDER:  I don't believe it satisfies the
judicial notice requirements.

        THE COURT:  Okay.  Well let's go --

        MR. ALEXANDER:  And it's hearsay.

        THE COURT:  Okay, it's hearsay why?

MR. ALEXANDER:  Because it's a document.

THE COURT:  Well, all these other things are documents that are on the docket.

MR. ALEXANDER:  Okay, Your Honor.  But the reason why they're giving this to you is for to read this document.

THE COURT:  Correct.

MR. ALEXANDER:  The document itself is hearsay.  Can you look at the docket itself and see that a hearing took place on a day? Possibly, but the contents of it?

THE COURT:  Well, what's the difference between looking at an order that was entered on a given date, and that's what the docket said?

MR. ALEXANDER:  Your Honor, you have to take each document as it comes, and we're objecting to this one.  We don't believe it overcomes the hearsay objection --

THE COURT:  Okay, well --

MR. ALEXANDER:  -- or whether you can take judicial notice of the document.

MR. COLBY:  On judicial notice, Your Honor, I believe that an appropriate basis for an objection would be that the facts are reasonably in dispute.  The fact at issue here is simply whether or not it says what it says.  I don't believe --

THE COURT:  And what do you want me to do with that? Okay it says that, so what?  Do you want me to --

MR. ALEXANDER:  I -- irrelevant.  There's no purpose.

THE COURT:  Do you want me to conclude that that was the basis why she dismissed this case?  That's what you want me to do with it, right?

MR. COLBY:  Just that it says what it says.

THE COURT:  Counsel, I'm looking for Rule 201.  Let's parse the Rule 201.  Because sometimes you get very close to whether this is really a judicial notice or something more.  And a lot of that is judicial notice of adjudicated facts, okay?  So that title right there tells me sometimes we really go afar.  Okay, so an adjudicated fact only.  "The court may judicially notice a fact that is not subject to reasonable dispute because it is generally known within the trial court territorially jurisdiction or can be accurately and readily determined from sources when the accuracy cannot reasonably be questioned."

So this is a fact.  The only fact that I can -- that's not subject to dispute -- is that the court that does a transcript of the hearing, and that is it accurately reflects what happened.  Now, what else am I going to do with that?

MR. COLBY:  The fact that the court said what it said.

THE COURT:  Well, what do you want me to do with -- no, no, no.  You want me to take -- you want me to do more than just look at it and say, here's the transcript.  The transcript sets forth what the court said, and you want me to go to the

next step, which is that the court found the basis for the dismissal.  And I'm not quite sure if that's the same thing as saying, hey, here's the proof of claim.  The claim says this, and I'm supposed to conclude -- we know what the court said.  I'm not quite sure what you want me to do with that.

MR. COLBY:  Right.  I think the issue, Your Honor, is you may be assuming that I want more out of this document than I actually do.  I think the dividing line between what you can and can't take judicial notice of may be whether or not you can accept that that filing was done in bad faith.  I'm not asking you to accept that that filing was done in bad faith.

THE COURT:  Then, what's the relevance?

MR. COLBY:  The relevance is that a court stated that it was dismissing the case because it found that it was done in bad faith.

THE COURT:  So exactly what do you want me to do?  You want me to take and give some weight to what the judge concluded.  I mean, that --

MR. COLBY:  That --

THE COURT:  But no, that's not what you just said.  You just said there was a motion, the court granted the motion, and the court said that it granted the motion because it found bad faith.  And I'm not quite sure how that -- it semes to be a little bit different when you file -- here's a petition.  The petition says what it says.  Okay, it said that.  What do you

want me to do with it?

MR. COLBY:  Well, it's substantially similar, though, to for example, the collateral estoppel opinion.

THE COURT:  Which I'm going to do nothing with.

MR. COLBY:  Okay.

THE COURT:  I mean, I admitted it for -- it was issued, and the court said what it said.  But I don't make any conclusions because, okay, the court said that -- what am I supposed to do with it.  I acknowledge the court said that.  The same thing here.  I get that you want me to take notice that it was filed, and they noticed that it was on the docket and then just take notice and it contains what it contains.

If that's what you want, Mr. Alexander, I think it could be admitted solely for that purpose.

MR. ALEXANDER:  Your Honor, we would still object.  I mean, it's prejudicial to take judicial notice of this document.  I mean, they -- I mean, if you want to look at the actual docket, and the docket it indicates that a transcript was filed, fine.  But the contents, the contents of this should not be part of the record.

THE COURT:  Okay, so wait a minute.  When I'm taking judicial notice of something, aren't I supposed to look at it, what it is you want me to take judicial notice?  He doesn't want me to take judicial notice of the dockets.  He want me to take judicial notice of the actual transcript.  And that's

where I'm not sure where the dividing line is.  Is that an adjudicated fact?  The only adjudicated fact is that it was filed, and it was on the docket.  That's what you guys are all ignoring -- what was the adjudicated fact that you're asking me to take notice of.  And the only adjudicated fact is that this transcript was filed and put on the docket.

MR. COLBY:  Well, I think the rule says the court may judicially notice a fact --

THE COURT:  And okay, and --

MR. COLBY:  -- not necessarily an adjudicated fact.

THE COURT:  No, it's titled adjudicated fact.  That's the title of 201.

MR. COLBY:  Okay, but --

THE COURT:  I'm sure it means something.

MR. COLBY:  Well, it's distinguishing -- it seems to be distinguishing in Part A between an adjudicated fact and not a legislative fact.

THE COURT:  Okay.  So you're not talking about a legislative fact, are you?

MR. COLBY:  So I think we're in the realm because this is --

THE COURT:  Counsel?

MR. COLBY:  -- an adjudication.

THE COURT:  The only adjudicated fact that I'm looking at is that this was filed, it's on the docket, and it

says something.  I'm not making any conclusions.  I'm not saying anything else.

MR. COLBY:  That's right.

THE COURT:  And I'm not sure -- whatever she did, she did for her own reasons.  I might've came to a different conclusion about whether this was bad faith or not.

MR. COLBY:  That's right.  And I think that fact is relevant.  I'm about to explain why, but I don't think --

THE COURT:  All right.  Tell me why you think -- well, he's objecting on the basis of it's not a -- it's not a -- something that is subject to judicial notice.  And again, I've looked at a lot of things, but never whether I can take judicial notice of a transcript.  It's a new one for me.  So I'm not quite sure.  I may have to --

MR. ALEXANDER:  Your Honor, let's take their position to the extreme, right?

THE COURT:  Okay.

MR. ALEXANDER:  All you have to do is go file something on a docket in a case and there you go.  It's evidence, and you can look at the contents and everything. That's not what the rules are for.

MR. COLBY:  Not necessarily, Your Honor.

MR. ALEXANDER:  If you accept their premise, that's what you can do.

MR. COLBY:  No.

MR. ALEXANDER:  It'll flip the Rules of Evidence on their head.

MR. COLBY:  No --

THE COURT:  Oh --

MR. COLBY:  -- because part of our premise in that, we also satisfy number 2, which is it's determined from a source whose accuracy cannot be reasonably questioned.

THE COURT:  I get that.

MR. COLBY:  If I were to just file something, then I would fail that.  Something random --

THE COURT:  No, because it's on the docket, and you can say it's on the docket.  And that is -- the docket is a reliable source, and it was on the docket.  Now, it wouldn't matter what -- it could've just been a blank piece of paper.  I could still take notice that you filed a blank piece of paper.

MR. COLBY:  Sure.  But the difference is, if I were to say, and something on the docket, if I were to say, Judge Owens had said this, then I think we would fail, too, because Mr. Alexander would clearly dispute the accuracy of my recitation of what Judge Owens stated.  Here, it's simply the fact that she stated what she stated.

THE COURT:  And what do you want me -- but that's -- counsel, it's -- I'm not quite sure that that's what judicial notice -- I don't know. I'm going to have to reserve on this --

MR. COLBY:  Okay.

THE COURT:  -- because I don't know the answer right off the top of my head.  The others I'm very comfortable with.  This is the first time I have encountered someone asking me to take a judicial notice of a transcript on a docket and take as true.  You want me to take as true whatever's on here because that's what the judge said.  She said what she said.

MR. COLBY:  That's it.

THE COURT:  But I don't know what you think I'm supposed to do with it.

MR. COLBY:  I can --

THE COURT:  And their argument is it's prejudicial because you want me to make this -- counsel, let's call it like it is.  I'm not a jury, and I didn't fall off the turnip truck, okay?  Or maybe I might have, I don't know.  But the real issue is you want me to know that Judge Owens dismissed this as a bad faith filing, and this is a pattern.  Come on.

THE COURT:  Okay.  And that's why it troubles me whether this falls within the real basis of an adjudicated fact.  And maybe it can be.

MR. COLBY:  I think I can help.

THE COURT:  Okay.

MR. COLBY:  I think I can help.

MR. ALEXANDER:  Your Honor, just to be clear, we also have a hearsay objection as well.

THE COURT:  Right.

MR. COLBY:  And I think it would fall in the residual exception to the hearsay ruling.  And also --

THE COURT:  Okay, what residual?  Where -- under what rule?

MR. COLBY:  Well, just to finish the thought --

THE COURT:  Uh-huh.

MR. COLBY:  -- before we got to hearsay.  The reason, Your Honor, why I think this can be accepted with judicial notice, is because -- and why it has some value, even if you can't -- I'm not asking you to conclude.  I'm not asking the Court to conclude that that other filing was, indeed, in fact, a bad faith filing.  I'm actually only asking you to take judicial notice --

THE COURT:  Okay.

MR. COLBY:  -- of the fact that Judge Owens dismissed it as a bad faith filing, that was her conclusion, and here's why.  It's not necessarily because it's a pattern.  It's also because the fact that they were dismissed for Judge Owens' reasons, right or wrong, suggests why instead of going back to Delaware after striking out twice, they came to this Court.  And that goes into the mix of facts around why this is a bad faith filing.

THE COURT:  Okay, hold on, counsel.

MR. COLBY:  The fact itself of that dismissal is indeed relevant to the bad faith here.

THE COURT: Counsel, hold on. Okay. All right, counsel, I think we might have an answer on this judicial notice for a transcript. Counsel?

MR. COLBY: Yep.

THE COURT: All right. It appears that the court may take judicial notice, a publicly available record, including hearing transcripts from other court's proceedings. However, the court may take judicial notice of the document in order to notice the existence of the document but not for the truth of the matter asserted in the document. The court will take judicial notice of hearing transcript excerpts. However, it does not take notice of what -- how it should be interpreted.

So again, which is what I said, Mr. Alexander, okay, so on the docket, it's filed, so what. What am I going to do with that? I can take judicial notice again that it's on the docket and that it was filed, but as to the contents, no, what it says. And I'm relying on the case of Foster Poultry Farms v. Alkar-Rapidpak-MP Equipment, which is a 868 F.Supp. 2d. 983 out of the Eastern District of California in 2012.

And we have another case that's also -- Morillo v. Wells Fargo, which is a bankruptcy case at 2020 Westlaw 2539068, Southern District of New York, May 19, 2020. So I can take judicial notice, exactly what I said, as far as what's on the docket, okay. Okay. But as to the contents and whether it's anything else, cases seem to say no. So I --

151

MR. ALEXANDER:  Your Honor --

THE COURT:  -- I'll allow it.  Yes?

MR. ALEXANDER:  We agree, but the prejudice part is that they're going to read, and you're not in the jury so it's going -- so it all comes into your head once you look at the document.  And that's exactly the purpose that they're wanting you to read the document.

THE COURT:  I'm not quite sure that I get to read it.

MR. ALEXANDER:  Okay.

THE COURT:  Based on that decision, the earlier one, I get to admit it, but I don't get to read the contents.

MR. ALEXANDER:  Then what's the relevance?

THE COURT:  I don't know.  I'll allow it.

MR. ALEXANDER:  I still have a relevance objection.

MR. COLBY:  The relevance is what I articulated.

THE COURT:  Well, the relevance is it was filed and is on the docket.

MR. ALEXANDER:  But does that relate to any claim that they have?  How is it the fact that a transcript was filed on a docket relevant to any claim that they're asserting in this action?  It's not.

THE COURT:  I'll allow it for what it's worth.  I've already said my position.  I looked at the cases quick, thank you.

MR. ALEXANDER:  Okay.

MR. COLBY:  Just for the record --

THE COURT:  Uh-huh.

MR. COLBY:  -- I will note that in response, and this may be unnecessary, but in light of the colloquy with Mr. Caponi earlier today, I'm going to put quickly our other basing for admission on the record -- one of which is Rule 803(6), which is records of a regularly conducted activity and then also the residual exception to the hearsay rule, Rule 807.

MR. ALEXANDER:  Your Honor, 803(6) doesn't apply because they don't have anybody here who can authenticate that, so whose business record is it?  Who is testifying to that?  They can't meet that standard.  So that's not a valid exception.  And what was the second one?

THE COURT:  Okay, counsel, you said whose authenticating this?

MR. COLBY:  Well, the standard is the record was made at or near the time by information transmitted by someone with knowledge --

THE COURT:  Okay.

MR. COLBY:  -- so on and so forth.  Yeah.

THE COURT:  And how do we know when it was put on the docket, who did it, and all this other stuff?

MR. ALEXANDER:  It's not when it was put on the docket.  It's --

THE COURT:  Well, he's saying it's somebody with

knowledge of the document.

MR. ALEXANDER:  Of the document itself --

THE COURT:  Okay.

MR. ALEXANDER:  -- who created the document.  We don't have anybody here testifying who created the document.

MR. COLBY:  No, I'll point to the certificate at the end of it by a certified court reporter that a foregoing is a correct transcript from the electronic sound recording.  The proceedings, May 17th, 2021.

THE COURT:  And is she here?  No.

MR. COLBY:  The court reporter's not here, Your Honor.

THE COURT:  Counsel, you do not get -- just because you do hearsay, does not mean you still don't have an authentication issue.  You've got to authenticate the document and then say, this document, which has been authenticated, we want to introduce on the 803 -- whatever number it is -- and under the residual provision.  That hearsay still doesn't get around the authentication issue.

MR. COLBY:  Okay, well --

THE COURT:  All right.  So I will sustain the objection as an exception to the hearsay on the 80 --

MR. COLBY:  3 - 6.

THE COURT:  -- 6 and 36.  I don't think it's covered by the residual.  And counsel, I also am inclined to, as to

reading the content, I'm going to sustain that it's prejudicial because it, you know, I read this and what am I supposed to think and doing it again?

MR. COLBY:  Well, that's what I was saying before, Your Honor.  The relevance isn't necessarily to validate that filing was bad faith, but to show one of the reasons why we're today, why we think this filing was done in bad faith is because they were unable to obtain the release that they were seeking in another court.  It sort of goes into why, despite having gone to the bankruptcy court in Delaware twice, that was met with no success for whatever reason and so now, we're here.  That's all.  It's --

THE COURT:  And counsel, I've already gotten that.

MR. COLBY:  Okay.

THE COURT:  They filed.  Mr. Stastney testified that they objected as a charge of litigation and directing and hiring counsel, that there was an objection made on the basis of a bad faith filing because it was a litigation tactic, so --

MR. COLBY:  Okay.

THE COURT:  It's what it said.  I mean, I don't know what -- I'm not quite sure -- taking back the issue of whether it's prejudicial, it may be prejudicial if I read the contents and figure out why she did what she did.  That may be an issue.  But the issue is it was dismissed based on the motion of the parties, which is --

MR. COLBY: Okay.

THE COURT: I'm not asking -- I don't know what to tell you. I got what I got out of that, which is that it was -- you asked for dismissal on bad faith, and it was dismissed, unless somebody -- and I get that you wanted me to conclude there was no other basis, but I don't know how you'd get there -- maybe you do, I don't know. But I don't know. You can argue all of those things. I'm looking at another decision. Right. And it says, transcripts are subject to -- that are not subject to reasonable dispute and may provide relevant information as to the nature, scope and status of the other action. You already know -- I know the nature, I know the status, and what the scope was.

MR. COLBY: Okay. Your Honor, just to complete the record --

THE COURT: Uh-huh.

MR. COLBY: -- if I could, I would like to go to CR-75. Then I think Mr. Caponi may have an issue. But CR-75, which is another transcript, and I would just seek to have it admitted for the same purpose and on the same basis.

THE COURT: And what is CR-75? Okay, how about somebody tell me what it is?

MR. COLBY: Let's go through it.

THE COURT: Well, I mean, and first of all, judicial notice does not even require that somebody testifies regarding

it.  And it just says, Judge, I want you to take judicial notice.  It just --

MR. COLBY:  Right.

THE COURT:  -- typically, Mr. Caponi said you don't even have to give me a copy.  He just points out the docket and where it is typically, I don't know.  I have to go back on that whether you'd give me a copy on that.  I mean, certified documents, yes, you have -- if it's certified, you give me a copy, then I'll understand.  But with respect to judicial notice, maybe you're not required to.  Maybe courtesy and you'll give it me so I don't have to go try to find it somewhere because I wouldn't necessarily have access to the bankruptcy court in Delaware and their dockets and how I would go get a copy of this.  So you want to -- and I just read there are rules that say I can take judicial notice of what was filed.

MR. COLBY:  I understand your ruling, Your Honor. I'm simply seeking to have the same ruling made with respect to CR 75, which is also filed on the docket.  This is the transcript of the same case.

THE COURT:  Is that the same case?

MR. COLBY:  It is the involuntary petition.

THE COURT:  Okay.  And that case is a different case. But it's on that was filed according to the heading on the document it was filed on June 11th and there's 66 pages and

it's documentary 37 in case number 2110848 assigned to Judge KBO, which I know is Judge Karen Owens. I don't know what the B. is for.  But I know it's Judge Owens.

MR. COLBY:  That's right and this is the transcript of the dismissal in that Chapter 7 involuntary petition.  So same request, same ruling.

THE COURT:  Mr. --

MR. ALEXANDER:  Same objections.

THE COURT:  And in light of my prior finding that transcripts are admissible, they're admissible because the reliability of the actual on the docket transcript.  I can take judicial notice that it's on there and that it's filed.  But it tells me in these cases what I'm supposed to do with that. It's the same thing I do with anything else.  Okay.  It's filed.  What do you want me do with it?  It's filed.  It's on the docket.  Fine.  But it says that it's limited what I can do with that.

MR. ALEXANDER:  Okay.  Understood.  And it's still hearsay.

THE COURT:  Okay.  It's hearsay.

MR. ALEXANDER:  The last one's hearsay, too.  I mean, I don't think you didn't get around to hearsay objections.  I mean, if you're just looking at the transcript to say a transcript was filed.

THE COURT:  Yes.  But if they succeed on judicial

notice, what do I care if it's hearsay?

MR. ALEXANDER:  Because on judicial notice, you can't look at the contents of it.

THE COURT:  Well, they're not asking me to.

MR. ALEXANDER:  So what's the relevance then, Your Honor?

THE COURT:  The relevance is I guess that it was filed and there's a transcript that reflects that it was dismissed, I guess.

MR. ALEXANDER:  But what can they use that for? There's nothing in that fact that it was a hearing transcript was filed on a certain date.  What issue is that relevant to?

THE COURT:  Counsels are objecting to relevance.

MR. ALEXANDER:  That goes to the last one, too.  We objected to the same thing.

THE COURT:  Okay.

MR. COLBY:  So I think I've articulated one basis for why it's relevant that --

THE COURT:  Which is?

MR. COLBY:  -- this is a, you know, a court proceeding that resulted in the dismissal and that the fact of the transcript, the fact that the judge issued a ruling. That's it.

THE COURT:  Is it a disputed issue?

MR. ALEXANDER:  You have the ruling, Your Honor.

That's the whole point. You have the ruling to get the order and you took judicial notice of the actual order.

MR. COLBY: So what's the objection here?

THE COURT: The objection is to relevance.

MR. ALEXANDER: The objection is to the contents and the relevance of this other investigation.

THE COURT: And I will -- listen. I'm only going to note that it was filed on the docket. As to relevancy whatever is in there I'm not going to take judicial notice of because I can't. And as to the extent that you want me to go read it and take something from it is irrelevant because he already issued an order and I'm not quite sure. I don't know. I mean, if you gave me -- listen, if it was a published opinion, let's look at it this way. It's a published opinion and it's in the Bankruptcy Reporter, do you think I couldn't read it and do something with it? But that's --

MR. ALEXANDER: This is not a published opinion.

THE COURT: Right.

MR. ALEXANDER: It's a transcript.

THE COURT: Right. It's a transcript, so --

MR. ALEXANDER: And so you have to satisfy all the requirements and if they cited the opinion in support of, I don't know. But what we have here is a transcript.

THE COURT: A transcript.

MR. COLBY: Mr. Caponi, you're not in there. You can

whisper to him.  But two -- I never let two people on.  I try not to.  Tell him what you want to argue.

MR. CAPONI:  Yeah.  I guess on that relevance objection, I mean, I think it's relevant plainly to the bad faith issue.  It's only irrelevant if you accept -- I'm not sure if they're relevant.  But according to Mr. Alexander's argument, it is irrelevant because you can't -- Your Honor can't read it.

So two responses.  One is, again, this is not a jury.  So we trust, Your Honor, to take it in the way in which the Court has ruled it good and to treat it accordingly.  We're not putting in front of the jury.  They're not going to be able to draw these fine distinctions.

THE COURT:  I'm not going to read it.  So what do you want me to do with it?

MR. CAPONI:  Secondly --

THE COURT:  It says in here I'm not supposed -- I can take it and I can look at it.  I can look it at it for the scope and the status.

MR. CAPONI:  Putting aside the sort of the technical admissibility, it's not clear to me what rule the debtor is relying on here today to say that this Court can't read a transcript of an oral ruling in another case just like it could a published decision.

THE COURT:  Because it's not a published decision.

And it's --

MR. CAPONI:  But what ruling says that?

THE COURT:  But it's a transcript.  The cases that I'm relying on say that I can take judicial notice of the transcript that it was filed.  I can take it for the nature and the scope and the status of the action.  The nature of it was a motion to dismiss, the status is the scope of it was bad faith and the court granted it.

MR. ALEXANDER:  Your Honor, I don't believe they could admit an opinion from some other case of evidence either, even if it was published.  So it's not evidence.  Opinions of courts are evidence.

THE COURT:  It's not evidence.  They could cite it to me to say you can go read that.  I can go read it that way.  But I'm not quite sure I can read it in the context of a transcript.  That's the difference.

MR. CAPONI:  Okay.  So Your Honor, in terms of evidence, we're satisfied if you would admit it for the purpose that you articulated separately from that.  It's an order of the court.  This question --

THE COURT:  But have already got, counsel, we already have the order.  So what's the purpose for giving me the transcript except that you want me to know the court's reasoning which I'm not reading.

MR. CAPONI:  And a court can read a decision, a

ruling of another court and take it for what it's worth all the time.  Not as an evidentiary matter, but this court can read a written opinion by Judge Owens, it can read a docketed dismissal.  It can read --

THE COURT:  But that's the Court's option.  That's not what you're asking me to do.  You're specifically asking me to -- I don't have to read anything Judge Owens --

MR. CAPONI:  Correct.  Correct.

THE COURT:  -- and she did not give any support.  She issued an order.  She said for the reason stated on the record.  Okay.  That's what she said.  At least with respect to the bad faith original filing.  It's stated on the record.  I don't have to go and read what she said on the record.  And even if she issued opinion, I don't have to read that either.  I can choose to.  But that's not what you're asking me to do.  You're asking me to definitively do that.  And again, my reading of the case is, Mr. Alexander, is I can take it, but I'm not quite sure why you care.  I already said what's going to happen with it.  What difference does it make?  I'll admit it on the judicial notice for what it's worth.  I'll overrule your hearsay because he's already met one exception.

MR. ALEXANDER:  Which exception did he meet?

THE COURT:  Judicial notice.  That I'm just going to I note that it was filed.  It's on the docket.  Okay.

MR. ALEXANDER:  Has he met the relevance?

THE COURT:  So you believe that in if I take judicial notice and that's an exception that the next --

MR. ALEXANDER:  It still has to be relevant.

THE COURT:  It still has to be relevant.  Okay.  He says it's irrelevant.  Okay.  And he believes it's irrelevant because I can't even -- but I guess a week, a week is --

MR. ALEXANDER:  And the Rules of Evidence aren't technical.  They're the rules.

THE COURT:  I know.  So if I'm going to admit it on the judicial notice only, I am not quite sure whether I have to get to the relevancy because all they're telling me is it is a transcript supporting the court's decision.  Okay.

MR. ALEXANDER:  Evidence always has to be relevant.

THE COURT:  No, no, counsel.  I'm saying it's relevant that they want me to know it's on the docket and that it's been filed.

MR. ALEXANDER:  Yes.

THE COURT:  The relevance is a fact that she issued an order and there's --

MR. ALEXANDER:  it has to be relevant to this litigation.  That's the whole point.  It's not just relevant to life.  It has to be relevant to this litigation.

THE COURT:  Counsel, I take it.

MR. CAPONI:  Understood, Your Honor.

THE COURT:  Okay.  It's relevant in the fact that

there was an order issued and they want me to know that it was issued and, oh, by the way, there is a transcript.  Okay.  I take it for that.

MR. ALEXANDER:  Okay.

THE COURT:  That's it.  So I'm not quite sure why we're spending all this time because I already said what I'm going to do with it.  And under the rules, what it allows me to do with it, which is about nothing.  So at least based on these rules, it says I can acknowledge it.  I can see it.  Whether I can actually read it, the cases say no.

MR. COLBY:  Right.  Yeah.  Under that judicial notice exception, I understand your ruling there.

THE COURT:  Okay.  So I'll allow it for that.

MR. COLBY:  Thank you.

THE COURT:  And I'll overrule your relevance.  Okay?

MR. COLBY:  We have a separate point that we don't need to address here because we're addressing evidence now. But I just to make the record clear, I think we have a separate argument that the Court can look at rulings orders, transcripts of another court in the ordinary course.

THE COURT:  Yes.  I always have that.  But that's not what you're doing.  You're asking me to look at it.  I can choose to look at it.

MR. COLBY:  Correct.

THE COURT:  That's a big difference.

MR. COLBY:  Correct.

THE COURT:  But telling me that I have to or I should, that's a whole different ball game.

MR. COLBY:  Correct.

THE COURT:  And so yes, you can argue at the end of this hearing when there's all the evidence in.  Judge, we urge you to go on your own because I can go on my own, take notice of something and say, oh, I got it.  I read it.  I likely will be in all honesty probably read it before because not the transcript itself but her order and that it was dismissed because we get different things from different courts.  For this specific case, I don't remember if I read it or not.  I look at my other colleagues decision.  For instance, Judge Silverstein's decision that was discussed yesterday.  I am positive I probably read that already whether the party has asked me to or not.  I likely read it because that's how I keep abreast of what's going on.  But I don't go.  One thing I don't do, I mean, in the history of this, it comes up when I get these cases that it tells me all the prior filings anywhere in the US that someone filed, I get when a case is filed before me, it comes up.  They filed before, what case it was, what was the chapter, what was the status and when it was dismissed.  And then typically we try to get, maybe we'll get the order to see.  Typically I get it to see if there's a bar order because typically with individuals they'll file and then they come here

and they don't tell us.  Usually they don't tell us.  But I'm sure in the petition you guys must have listed that you filed. You, meaning --

MR. ALEXANDER:  The debtor.

THE COURT:  -- the debtor listed at a minimum it's entire filing that one we were discussing and that would have come up in my review.  Would I have gone and looked to see why the court dismissed it?  I might have.  But that would have been on my own accord.  I can't recall that I can say I did or didn't.  But it's different when the parties are asking me to do it.  I can go look at anything I want in terms of another court's decision because there is the court on its own can take judicial notice.  But again, what can I take judicial notice of?  I'm still restricted by the same restrictions that apply to parties.  I can go look at it and say, oh, look, my dockets reflect that this happened.  But I can't unless I issued it, I can't say why.  You know the case is transferred to me and my colleague did something else, I will look at it and if there's an opinion I will take a look at it and I will do my, you know, I can do my own research.  But whether, again, I can look at different things.  But when the parties ask me to, there's a different restriction and you have to meet one of those rules within the rules.  So --

MR. COLBY:  I understand that, Your Honor.

THE COURT:  So the same thing I said earlier today

applies to these transcripts.  I can but I'm limited in what I can and cannot look at.  Okay.

MR. COLBY:  Understood.

THE COURT:  All right.

MR. COLBY:  All right.

THE COURT:  Now that we spent how much on that, let's move.  It's almost 5:00, counsel.

MR. COLBY:  Yeah, I will.  I've discussed with Mr. Alexander and if it's okay with the Court, we think it makes sense to have a timely stop today.

THE COURT:  Right.

MR. COLBY:  So we don't ruin people's travel plans and those sorts of things.

THE COURT:  And Mr. Callahan, is it raining today?

MR. CALLAHAN:  I'm prepared to stay all night, Judge.

THE COURT:  I'm not.

MR. CALLAHAN:  I brought my sleeping bag.

THE COURT:  Nope.  I have a firm stop at 5:15.

MR. COLBY:  Okay.  So let me just, if it's ok with Your Honor, a few more questions that may take, you know, the better part of the time we have left before 5.  At that point, I would be starting sort of a new section and so --

THE COURT:  So then we have a good stop.  Okay.

MR. COLBY:  -- good stopping point.  Okay.  And so just a couple of minutes and I'm not going to try to do any

more documents.  So that should keep us --

THE COURT:  So that should keep our argument.

MR. COLBY:  Between now and 5; between now and 5.

THE COURT:  That's fine.

BY MR. COLBY:

Q    Okay.  so I think where we were, Mr. Stastney, was you had mentioned the Supreme Court decision that invalidated the omnibus ruling, correct?

A    Correct.

Q    Okay.  just tell us what you remember about the basis for that -- for the reasoning.  Yeah.

A    From my recollection, the Supreme Court decided that the class -- that the omnibus agreement was invalid because such an agreement under Stream's Charter required the vote of the class B shares.

Q    Okay.  Those are those high vote shares.

A    The high vote shares.

Q    Okay.  Thank you.  All right.  And so at that point in time, you've testified Stream had been -- sorry.  SeeCubic had been managing the assets.  In other words, running the operating part of the company since December of 2020, correct.

A    That's correct.

Q    Okay.  So then what did you do when the Supreme Court decision came down?  What did you do with those businesses that you had been running?

A     We continued to run it pending the Chancery Court's disposition -- reversal of methodology for the assets.

Q     Okay.  All right.  And when that Chancery Court directed sort of the reversal, the unwinding of the previous transfer, how did you go about doing that?

A     When the Chancery Court ordered the reversal of the assets.

Q     Yes.

A     It made several specific requirements that we followed.

Q     Okay.  So but like as a practical matter, SeeCubic's running these businesses just explain to the Court how you like handed it back over.

A     Because of the nature of the assets, most of which are in techno -- in the subsidiary called Technovative.

Q     Yes.

A     We essentially transferred the stock of Technovative to Stream.

Q     Okay.  All right.  So by moving the stock in that top level sub, you've effectively moved the title to everything underneath it.  Is that --

A     Virtually everything.

Q     -- have I got that right?

A     That's right.

Q     Okay.  All right.  Great.  And at that point in time, SeeCubic is representing the interests of secured creditors?

Do I have that right?

A    Correct.

Q    Okay.  And so just briefly tell the Court what --

THE COURT:  Wait a minute.  SeeCubic is representing who?

MR. COLBY:  The interest of the secured creditors. This is that --

THE COURT:  Assigned?

MR. COLBY:  Yes.

THE COURT:  Okay.

MR. COLBY:  Okay.  And --

THE COURT:  So it's exercising the rights that were provided in that assignment?

MR. COLBY:  Correct.

THE COURT:  That was an assignment, right?

MR. STASTNEY:  Correct, Your Honor.

MR. COLBY:  Yes.  So but just, again, without getting into the technicalities of what Mr. Caponi walked us all through earlier today --

THE COURT:  But it wasn't security for that -- not yet.  SLS was an assignment.  From my understanding is it was created as a vehicle to take the notes and which SLS and Hawks with ownership and other shareholders of Stream would have some ownership in this.

MR. COLBY:  Correct.

THE COURT:  And that entity would own or be the beneficial owner because they had the right to receive the money.  That's what was then said.  And they also had the right to exercise the creditor rights under the whatever assets were transferred.

MR. COLBY:  Yeah.  I won't pretend to.

THE COURT:  Well, that's what was said to me.

MR. COLBY:  I will rest on Mr. Caponi's explanation from earlier today on that.

THE COURT:  Okay.

BY MR. COLBY:

Q    But I think all I'm trying to put out here is did, at that time, did the secured creditors have any rights with respect to the Stream assets that had been handed back over to Stream?

A    In light of the invalidation of the omnibus agreement, the secured creditors had all the rights that they had ever had under their secured debt.

Q    Okay.  Great.  It's a perfect stopping point before we get to the next chapter if the Court is okay with that.

THE COURT:  Okay.  The only question I had is that they were operating during the time when the Chancery Court made its decision until the return.  He said that they were running businesses.  What businesses?  I mean, it would help for me to know.

MR. COLBY:  Yep.  Yep, of course.

BY MR. COLBY:

Q    So Mr. Stastney, when we refer to that period of time when SeeCubic was running the businesses, what were you referring to there?

MR. STASTNEY:  Operating the subsidiaries.

THE COURT:  And how many, I mean, it seems to me and I don't know, you said there was like nine between Technovative and --

MR. COLBY:  I believe the testimony was about four or five levels.

THE COURT:  I thought he said more than four.  But I wrote down nine.  Maybe he said four.  But some level between because I need a little and I put nine.  I made a drawing between --

MR. ALEXANDER:  Your Honor, maybe the four looked like a nine based on how you did that.

MR. COLBY:  That's what I did.

THE COURT:  Okay.  Yeah, because it says SeeCubic, okay.  Let me look at my little chart here.  No.  Not that one.  Oh, okay.  Stream, Technovative, other subs and that's subs between Technovative and SeeCubic B.V. and two other Netherland companies.

MR. COLBY:  So I believe the assets that Mr. Stastney described were --

THE COURT:  Well, he can tell me.

MR. COLBY:  Okay.

THE COURT:  What were you running because you said there were three in the Netherlands and then there's some in between Technovative and these three in the Netherlands.

THE WITNESS:  I think it might be helpful for me to tell you what we do.

THE COURT:  Well, no.  Just tell me which one you're operating.

THE WITNESS:  Okay.  All of them because each of them do different things -- different parts of what we do.  Several are holding companies and several are operating.  But there's an interplay --

THE COURT:  Okay.  So how many companies were there? I just want to know how many companies there were.

THE WITNESS:  So there were really, during our period of time, two operating companies.

THE COURT:  Okay.

THE WITNESS:  There was SeeCubic, Inc. and there was SeeCubic B.V.

THE COURT:  Okay.

THE WITNESS:  And those two companies work together.

THE COURT:  But those are the ones that you were operating?

THE WITNESS:  That's correct.

THE COURT:  You weren't doing anything with anybody

in between?

THE WITNESS:  They are holding companies.

THE COURT:  Okay.  I got it.  That's all I'm trying to figure out because I just hear operating subs.  What subs and I've heard that there's a whole level of them.  Okay.

THE WITNESS:  And they're all holding companies.

THE COURT:  Okay.

THE WITNESS:  Between.

THE COURT:  Between Technovative and down to the --

THE WITNESS:  Including Technovative.  Technovative also is just a holding company.

THE COURT:  Yeah.  Right.  But between Technovative because there was the point between them and the Netherland companies, I'm going to call them.  You said there were some others that are holding.  For my purposes, I just want to know what you were operating.

MR. COLBY:  Correct.

BY MR. COLBY:

Q    And I think Mr. Stastney, just to clarify, you said really effectively two operating companies, SeeCubic, Inc. and SeeCubic, B.V., correct?

A    That's correct.

MR. COLBY:  Okay.

THE COURT:  That's all I wanted to know.

BY MR. COLBY:

Q    Some of the other Netherlands subsidiaries held assets, correct?

A    Correct.

Q    Such as?

THE COURT:  Counsel, at this point, I mean, I just want clarification.

MR. ALEXANDER:  If he can answer your questions, then no objection, Your Honor.

THE COURT:  Tight.  I mean, it's not that I just want it for the Court's own clarification.  It's really not going to just make me able to understand it a little bit.  I mean, I could have just asked the questions myself but go ahead.

THE WITNESS:  There's -- yeah, there are other entities that hold assets, particularly intellectual property.

BY MR. COLBY:

Q    Okay.  And just to be abundantly clear of the two operating companies you described, SeeCubic, Inc., during this period of time, where was that?  That was what?  Top level?

A    Top level.  SeeCubic, Inc. was top level.

THE COURT:  What do you mean top level?  Holding company, operating company, what?

THE WITNESS:  It was operating company.  But it was the highest level of subsidiary.  Above that is shareholders and debt holders.

THE COURT:  Okay.

BY MR. COLBY:

Q    And what I think would be helpful to make clear is this SeeCubic, Inc., was was that ever a Stream TV asset?

A    No.

Q    No.  That was the entity that you created to absorb the assets?

A    Correct.

Q    And you operated that as an operating company. Additionally, it held the Technovative shares and therefore controlled all the subs, correct?

A    That's correct.

Q    Okay.  And down at the bottom of that --

THE COURT:  Okay.  At the bottom of the subs is --

BY MR. COLBY:

Q    Right.  Was SeeCubic B.V., which was the other operating company?

A    Correct.

Q    Okay.  And then what you handed back were the Technovative shares?

MR. ALEXANDER:  Your Honor, I'm going to object now. I mean, I think he's going past answering your questions and he's testifying --

THE COURT:  Right.  So the Stream company that they were operating because SeeCubic is not a stream company.  the Stream asset that they were operating appears to me to be B.V.

and when they gave the assets B.V. went back.

THE WITNESS:  That's correct.

THE COURT:  All right.  That's all I need because when you said they were operating companies, I was trying to figure out which companies of Stream that was related to Stream.  The only one that was related to Stream is SeeCubic B.V.  The other one is totally unrelated.  It is the entity that was formed under the omnibus agreement.  I got that.

THE WITNESS:  Correct.

MR. COLBY:  We have a meeting of the minds and it's 5:01.

THE COURT:  Oh.  Well you have ten minutes.  I said 5:15.

MR. COLBY:  5:15.  Okay.  Well, I was about to start a new --

THE COURT:  No.  No, no, no.  Only with respect to this.  And counsel, I did make my rulings on the issue of the transcript.  I said that I had not addressed that before because no one had ever asked me.  I did some quick research and I made my decision.  I reserve the right to review the cases again and if I can always change, clarify, what my exact ruling is and then the parties can proceed accordingly.  I don't like to do things what I believe when I'm unprepared and I'm not asking the parties to tell me what the issues are with respect to evidence.  But I think sometimes what happens is you

guys exchange exhibits and you know in advance what the issues may be.  Sometimes you can I don't see it in terms of a motion in limine because it's not that and maybe they are motions in limine.  But often the Court is given a little preview so that I can have particularly when it's nuanced issues.  And this transcript is, again, a nuanced issue for me.  Maybe not for other judges, but it is for me.  All right.

With that being said, counsel, we will rest.  We will adjoin for the day.  Mr. Stastney, you are still, I guess, under oath.  So you cannot -- you can talk to Mr. Counsel for anything, you know.  Well, I don't know if you're here in Philadelphia or if you guys are downtown.  Oh, he said he's in New Jersey.  So he's likely driving here.  The rest of you,  I don't know.  I'm assuming you guys are out of Delaware or New York.  I'm not quite sure.  But maybe you're in Philadelphia. Enjoy Philadelphia while you're here.  Just be careful.

All right.  With that being said, we're in recess until tomorrow at 12:30.

Also counsel, I did mention yesterday that I spoke to one of my colleagues regarding the party's request for a mediator with respect to the bonding equipment.  I am in the process of getting that order out.  It's a little bit getting the order out is a little bit of a challenge because as I may have mentioned, my JA retired and she was the keeper of all those and the person who would have helped me get that out.  So

I'm working on getting that order out.  Judge Mayer has agreed to serve as the mediator and typically my order says I refer to that judge and she's going to issue an order telling you guys what she needs from you and to schedule.  Although she sits in Reading, she does come to Philadelphia on Wednesdays and I'm sure, well, I'm sure she would not object to coming here and meeting the parties in Philadelphia as opposed to one already.  Okay.  I'll try to get that out as soon as possible.

Now, we are in recess until tomorrow at -- well, I'm in recess tomorrow at 10:30 and I'll see the parties again on the continued hearing at 12:30.

MR. COLBY:  Thank you.

MR. ALEXANDER:  Thank you.

(Proceedings adjourned)

C E R T I F I C A T E


I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




/s/
_____
John Buckley, CET-623
Digital Court Proofreader