UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| | : |
| IN RE: | : Case No.  23-10764 |
| | :         23-10763 |
| STREAM TV NETWORKS, INC.   CH: 11 | : |
| | : Philadelphia, Pennsylvania |
| A) Trial Re: Emergency Motion To | : June 29, 2023 |
| Dismiss Case. Motion Of Hawk | : 12:52 p.m. |
| Holdings Ltd. (I) Pursuant To | : |
| Section 1112(B) Of The Bankruptcy | : |
| Code Either (A)(I) To Dismiss The | : |
| Debtors Chapter 11 Cases Or (2) | : |
| To Convert Such Cases To Cases | : |
| Under Chapter 7 Or (B) In The | : |
| Alternative, Pursuant To Section | : |
| 1104(A) Of The Bankruptcy Code To | : |
| Appoint A Chapter 11 Trustee And | : |
| (Ii) To Request Expedited | : |
| Consideration Pursuant To Local | : |
| Rule 5070-I(G)Filed By Hawk | : |
| Investment Holdings Ltd. | : |
| Represented By Steven Caponi . | : |

. . . . . . . . . . . . . . . . . .

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtor:                    Rafael X. Zahralddin, Esq.
                                   Lewis Brisbois
                                   500 Delaware Avenue, Suite 700
                                   Wilmington, DE 19801
                                   302-985-6004

                                   Bennett G. Fisher, Esq.
                                   Lewis Brisbois Bisgaard & Smith
                                   24 Greenway Plaza, Suite 1400
                                   Houston, TX 77046
                                   346-241-0495

                                   Vincent F. Alexander, Esq.
                                   Lewis Brisbois Bisgaard & Smith
                                   110 SE 6th Street, Suite 2600
                                   Fort Lauderdale, FL 33301
                                   954-728-1280

```
For SeeCubic:                    Marley Ann Brumme, Esq.
                                 Eben P. Colby, Esq.
                                 Skadden Arps Slate Meagher &
                                 Flom, LLP
                                 500 Boylston Street, 23rd Floor
                                 Boston, MA 021116
                                 617-573-4800


For Hawk Investment Holdings     Steven Caponi, Esq.
Ltd:                             K&L Gates
                                 600 N. King Street, Suite 901
                                 Wilmington, DE 19801
                                 302-416-7080


                                 Thomas L. Warns, Esq.
                                 K&L Gates LLP
                                 599 Lexington Avenue
                                 New York, NY 10022
                                 212-536-3901


                                 Margaret R. Westbrook, Esq.
                                 Aaron Rothman, Esq.
                                 Jonanthan N. Edel, Esq.
                                 K&L Gates LLP
                                 300 South Tryon Street
                                 Suite 1000
                                 Charlotte, NC 28202
                                 704-331-7400


For the United States            Kevin P. Callahan, Esq.
Trustee:                         Office of The United States
                                 Trustee
                                 Robert N.C. Nix Federal
                                 Building
                                 900 Market Street, Suite 320
                                 Philadelphia, PA 19107
                                 202-934-4154


For Rembrandt 3D Holding         Andrew Peter Demarco, Esq.
Ltd.:                            Devlin Law Firm LLC
                                 1526 Gilpin Avenue
                                 Wilmington, DE 19806
                                 302-449-9010
                                 Chris Michaels


Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.
```

INDEX

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES:

Shadron Stastney
  (By Mr. Colby)

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Shadron Stastney | | | | |
| (By Mr. Colby) | | | 27 | |
| (By Mr. Alexander) | | 7 | | |
| Jung Ho Park | | | | |
| (By Mr. Alexander) | 42 | | 133 | |
| (By Mr. Caponi) | | 61 | | 139 |

JUNE 29, 2023                                        12:52 P.M.

THE COURT:  Good afternoon.

MR. COLBY:  Good afternoon, Your Honor.

MR. ALEXANDER:  It is a good afternoon.

THE COURT:  Yes.

THE BAILIFF:  You may be seated.  The Court is in session.

THE COURT:  Okay.  Mr. Stastney, I think?  Oh, okay.  Are we going to continue with his cross or are we not?

MR. ALEXANDER:  I'll continue with his cross.

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  I just wanted to provide the Court with an update.

THE COURT:  Yes.

UNIDENTIFIED SPEAKER:  So earlier today in the Netherlands --

THE COURT:  Uh-huh.

UNIDENTIFIED SPEAKER:  -- the Dutch Court replaced or started the process of replacing Mathu Rajan with an independent director to oversee SCBD.  I don't have all the details on it --

THE COURT:  Uh-huh.

UNIDENTIFIED SPEAKER:  -- but I just wanted to make sure the Court was aware, so we weren't accused of keeping information to ourselves.

THE COURT:  And what do you believe that has to do with this?

UNIDENTIFIED SPEAKER:  I don't know that it necessarily has a lot to do other than obviously, from our perspective, the operations or the working piece of Stream is at that level -- it's now going to be overseen by an independent.  So I assume, you know, we'll find out what it means in the coming days.  But again, just because it happened, I wanted --

THE COURT:  So it means neither party is in charge, correct?

UNIDENTIFIED SPEAKER:  Correct.  It's an independent -- it will be one, as I understand it, one director, who's an independent director that's been appointed by the court.

THE COURT:  Which is replacing Stream's ability to do whatever?

UNIDENTIFIED SPEAKER:  Correct.  Anybody's ability to do whatever.

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  Correct.  Just wanted to share that, Your Honor.  Thank you.

THE COURT:  Okay.

MR. ALEXANDER:  And I haven't seen that, Your Honor, so I have no comment.

THE COURT:  I don't know what it has to do with me.

MR. ALEXANDER:  If an order has been issued -- I don't know.

THE COURT:  I mean --

MR. ALEXANDER:  And I don't think that's before Your Honor, but --

THE COURT:  Well, no, I get to the extent it may have had some impact -- some consideration for my decision.  Maybe, maybe not.  I don't know.  Then --

MR. ALEXANDER:  -- it's just not before you.  I don't --

THE COURT:  Well, it's not that it's not before me, but it may be a fact that may -- the issue of whether there's an independent director may not be before me, but it's a factor that's in this case.  It's a fact that's in this case.

MR. ALEXANDER:  My only point was, Your Honor, I haven't seen what it said.  I understand what Mr. Caponi just said, but I don't know.  So I'm assuming if an order is entered, we can review it.

THE COURT:  Right, but other than that, okay.  Okay, thank you for the information.  It may or may not have any -- if it doesn't have anything in terms that I'm not overseeing that because it's in the Netherlands, so it really has no -- I don't have -- I don't have any jurisdiction over SeeCubic B.V. whether there's and independent director or not.  I don't have any --

MR. ALEXANDER:  No, I understand.

THE COURT:  Right.

MR. ALEXANDER:  I'm saying I haven't seen the order. I don't know if it has -- what impact, if any, it has on the bankruptcy case.

THE COURT:  Okay.  Unless they're telling me not to do -- I don't know why they would tell me anyway because I'm not overseeing that matter.  Whatever.

All right let's continue with the cross-examination.

No, he remained under oath.

MR. ALEXANDER:  Your Honor, may I proceed?

THE COURT:  Yes.

CROSS-EXAMINATION (RESUMED)

BY MR. ALEXANDER:

Q    Good afternoon, Ms. Stastney.

A    Good afternoon.

Q    Do you have an email address that is slstastney@hotmail.com?

A    I do.

Q    And you had that address in 2020?

A    Yeah.

Q    Do you also have an email address that is sstastney@gmail.com?

A    I do.

Q    Did you have that email address in 2020?

A    I believe so, uh-huh.

Q    You're not an engineer, correct?

A    I'm not an engineer.

Q    When you were involved with Stream in terms of CFO or board member, you weren't involved in the actual operations of Stream, correct?

A    Except to the extent that those rules would require that CFO or director, we'd have some oversight of that, no.

Q    All right.  You were involved with the finance, correct?

A    I was involved in the finance primarily.

Q    You weren't involved with the manufacturing or production of any prototype samples with the Ultra-D technology, correct?

A    I was not at that time, no.

Q    You were not involved with any of the mass produced displays with the Ultra-D technology, correct?

A    There were no displays being mass produced at that time.

Q    Were you involved with the production of the displays at Stream at that time?

A    I was not involved in the production of displays at that time.

Q    And SeeCubic, Inc. is not a manufacturing company, correct?

A    SeeCubic, Inc. is not a manufacturing company, no.

Q    SeeCubic, Inc. has never manufactured any products using the Ultra-D technology, correct?

A    That's correct.

Q    With regards to the bonding equipment, I believe you testified that the capacity of Stream's bonding equipment was 10,000 units per year; do you recall that testimony?

A    I do.

Q    What bonding equipment was that based on?

A    The bonding equipment that was -- the only bonding equipment that Stream owned.

Q    Which one is that?

A    The -- the build -- the mass -- the large bonding machine from the two that Stream owns.

Q    You've never operated the bonding equipment though, correct?

A    No.

Q    So any understanding you would have with regards to the capacity you would have received from a third party, correct?

A    That's correct.

Q    And you're aware that Stream, because you were employed at Stream, has two pieces of optical bonding equipment, correct?

A    Correct.

Q    There's a mass production line, which is the MPL; is that right?

A    That's correct.

Q    And there's the small production line, which is the SPL?

A    That's correct.

Q    And are you aware that the SPL can produce 50,000 3D modules per year?

A    I am.

Q    Are you aware that the MPL can produce in excess of 180,000 3D modules per year?

A    It depends on the size of the module.

Q    Sixty-five inch?

A    I don't believe that's correct for 65s.

Q    Okay.  So if the -- I understand your testimony, but if the MPL could produce in excess of 180,000 3D modules per year of the 65 inch, it'd be able to satisfy the 100,000 unit production in -- if you factor in the SPL as well -- in six months or so, correct?

MR. COLBY:  Objection, Your Honor.  He should be asking the witness about his first-hand knowledge, not if this, then -- I mean, this is a math question.

THE COURT:  Your response?

MR. ALEXANDER:  I don't think just because it's a math question is an objection to a question.

MR. COLBY:  The question was effectively, if it can produce more than 100,000, then wouldn't you agree it could produce more than 100,000.  And just ask the question -- ask the witness what is -- what he knows and that's really all that's relevant.

THE COURT:  Your response?

MR. ALEXANDER:  I don't think that's a valid objection.  I feel like the question I asked --

THE COURT:  Are you objecting on the basis that -- you said it's a math problem.  What is the basis for your objection?

MR. COLBY:  The basis for the objection is that he's not asking the witness for his first-hand knowledge.  He's simply providing a fact and then asking him to confirm it.

THE COURT:  Okay.  And you offered him as lay expert?

MR. COLBY:  Hypothetical -- I'm sorry?

THE COURT:  You offered him as a lay expert, right?

MR. COLBY:  No.  He was offering lay opinion testimony.

THE COURT:  Oh, lay opinion, I'm sorry.  I used the wrong words -- lay opinion.

MR. COLBY:  Yeah.

THE COURT:  Okay.

MR. COLBY:  But this hypothetical I don't think is asking for the witness's first-hand knowledge or even really information based on his rationale perception.  It's just simply giving a hypothetical and asking him to confirm it.

THE COURT:  So lay opinion has to only be from personal information is what you're saying, right?

MR. COLBY:  Based on personal perceptions.

THE COURT:  Your response?

MR. ALEXANDER: Your Honor, I think it's a valid question that he can answer with respect to whether or not he believes that based on those production numbers, if the company could produce 100,000 units. I mean, he testified that they're not capable of producing 100,000 units based on the bonding equipment.

THE COURT: Well, based on his understanding that the bonding equipment should only do 10,000 limit. And your question is if they can do more than 10,000 --

MR. ALEXANDER: Well --

THE COURT: -- then they could satisfy.

MR. ALEXANDER: Well, his testimony was already that one of the bonding equipment could be 50,000.

THE COURT: Okay. So based on the 50,000 a month, a month?

MR. ALEXANDER: That would be 50,000 per year with that one machine.

THE COURT: Okay. But you also asked him about the 180,000 per year?

MR. ALEXANDER: Correct, Your Honor.

THE COURT: Okay. And you're saying combined, they should be sufficient.

THE COURT: That was the question?

MR. ALEXANDER: That's correct, Your Honor.

THE COURT: All right. Mr. Colby's standing up to

further articulate his objection.

MR. COLBY:  Yeah, I don't want to make --

MR. ALEXANDER:  Well, Your Honor, I'm going to withdraw the question.

THE COURT:  Okay.  Withdraw the question, go ahead.

MR. ALEXANDER:  Withdrawn.  I think I have the facts I need on that.

BY MR. ALEXANDER:

Q    You testified that SeeCubic controlled the Debtor's assets for at least an 18-month period, correct?

A    Correct.

Q    While SeeCubic was in control of the Debtor's assets, SeeCubic did not produce any 3D modules, correct?

A    Incorrect.

Q    SeeCubic, Inc. produced a 3D module?

A    SeeCubic, Inc. had never produced a 3D module.

Q    Well, that was my question.  So what was incorrect about my question?

A    SeeCubic B.V.  You said SeeCubic.

Q    That's not the question.  The question is, during the time when SeeCubic, Inc. held the Stream assets wrongfully, did SeeCubic, Inc. produce --

MR. COLBY:  Objection, Your Honor.  It was pursuant to a court order that was valid at the time.  It was later reversed but I don't think --

MR. ALEXANDER:  Your Honor, I don't know what the objection -- I mean, the question.

MR. COLBY:  I don't think wrongfully is a necessary interjection.

THE COURT:  Okay, so he's objecting to the use of the wrongfully.

MR. ALEXANDER:  I can ask the question, Your Honor, and if he disagrees with the question --

THE COURT:  No, no, no.  He's disagreeing with your wording of the use of the wrongful provision.

MR. ALEXANDER:  I didn't understand the evidentiary objection to that though.

THE COURT:  The objection was that he is objecting to your characterization.  And I shouldn't be the one.  I'm only telling you what I understand it to be is that he's objecting to your characterization of the possession as wrongful because they believe it was pursuant to a valid court order.

MR. COLBY:  Yeah, it's argumentative given the background.

THE COURT:  Well, it was in possession later determined to be incorrect by the lower court.  That really what happened, Alexander.  Their position was later determined to be improper.

MR. ALEXANDER:  Well, legally we believe -- the Debtor believes it was wrongful the entire time, but to get rid

of the argumentative objection --

THE COURT:  Okay.

MR. ALEXANDER:  -- I can just ask the question with regards to his possession --

THE COURT:  Okay.

MR. ALEXANDER:  -- on SeeCubic.

THE COURT:  Which he said was for 18 months.

MR. ALEXANDER:  Correct.

THE COURT:  And then you asked him, during that 18 months, did they produce -- SeeCubic, Inc. because we're talking about SeeCubic, Inc. --

MR. ALEXANDER:  Yes.

THE COURT:  -- produce anything during that -- produce any products because I don't even know what it is -- the TVs or screens or whatever.

MR. ALEXANDER:  The working modules.

THE COURT:  Did they produce any 3D modules, and he said no.  Well, initially he said that's incorrect because he assumed you were talking about SeeCubic B.V., which you were not.  His understanding of the question was incorrect.

So what's your answer now, Mr. Stastney?  Did SeeCubic, Inc. produce any 3D module during the 18 month that it was in possession of the assets?

THE WITNESS:  May I clarify the question?

THE COURT:  There's no need to clarify.  Did

SeeCubic, Inc. produce 3D modules -- yes or no -- during the 18 months?

THE WITNESS:  I apologize.  What do you mean by produce -- do the physical work of making the modules?  No. SeeCubic, Inc. did not.

THE COURT:  Were there any other ways -- what else does make mean -- produce mean?  Look, we're not going to have -- I'm already starting off the day annoyed.

MR. ALEXANDER:  I'm trying to move through this.  I know a lot of people that --

THE COURT:  I'm already starting off annoyed.

MR. ALEXANDER:  -- we'd like to try and get, so I'm going to try and move as quickly as we can.

THE COURT:  I'm not telling you to -- you're entitled to your questions, Mr. Colby is entitled to object, but this useless, a word, gamesmanship -- I already told you guys yesterday I'm up to here with it.  And I'm not trying to prevent you guys from doing your job.  I think you're both doing -- everybody here is doing a great job.  I'm just telling you I -- you know, you guys are litigators.  You're used to doing all this stuff.  I was a litigator.  I know the games.  I know -- it's not only about games.  It's strategy -- I get it.

You don't need to try to strategize here.  I understand what's going on.  I understand better than you guys think I understand, okay?  So I'm just saying there's no need

to be super litigator here, okay?  That's all I'm telling you.

I'm not saying you can't do your case.  I'm just saying you're

not, you know, I get -- and I'm not a jury.

So I don't need all of the different things that come

into the strategy of being litigators.  I'm not trying to stop

you from doing your job.  But I can see what I can see.  And

all of the strategy is not going to stop me from seeing what I

see.  So let's just try to get to the real issues that I need

to address.  And that's for everybody.  I'm not pointing a

finger at anybody.  I'm just saying let's just try to focus on

the issues, okay?

All right.  So no, they did not produce, make,

whatever words you want use, any 3D models, okay?

Go on, Mr. Alexander.

BY MR. ALEXANDER:

Q    While SeeCubic, Inc. was in control of the Debtor's

assets, SeeCubic, Inc. did not sell any 3D modules or

components, correct?

A    During that time period, that's correct.

Q    I believe you testified yesterday regarding a technology

sublicense between SeeCubic, Inc. and SeeCubic B.V.; do you

recall that?

A    I do.

Q    When was that license agreement entered?

A    I don't recall.

Q     Was it entered prior to execution of the omnibus agreement?

A     I don't recall.

Q     Well, when was SeeCubic, Inc. formed?

A     Late May or early June of 2020.

Q     What is the date of the omnibus agreement?

A     May of 2020.

Q     So you would agree that it would have had to have been entered into after the entry of the -- or the entry into the omnibus agreement, correct?

A     Absolutely.

Q     What is your understanding of the scope of the license agreement?

A     I don't know the standard scope for those license agreements.

Q     Do you not have an understanding of what the scope is?

A     I have a basic understanding of what the standard scope is.   It allows the user of the device to include what was called Ultra-D technology for a period of time.

Q     What was the period of time?

A     I think it varies by license.

Q     I'm talking about this particular license.

A     I don't know.

Q     Are you aware of any restrictions on SeeCubic B.V.'s ability to sublicense intellectual property to SeeCubic, Inc.

or any other party?

A    I am not, but I assume that if there are any that they're aware of, they abide by them.

Q    So that's just an assumption on your part, correct?

A    That's correct.

Q    You said you don't have any knowledge of any restrictions, correct?

A    That's correct.

Q    Does SeeCubic, Inc. hold a license with Philips.

A    It does.

Q    Is it a direct license?

A    I don't know who -- I don't believe SeeCubic B.V. is the licensor -- or the licensee, rather.

        THE COURT:  Wait, who did you ask had a license with Philips?

        MR. ALEXANDER:  I asked if SeeCubic, Inc. held a license with Philips.

        THE COURT:  Okay.  And he said?

        THE WITNESS:  No.

        THE COURT:  Well, you originally said yes?

        THE WITNESS:  I'm sorry, I thought you said SeeCubic B.V., but if I --

        MR. ALEXANDER:  Can I -- I don't think I did, but let's just clarify the record so we get a --

        THE COURT:  Uh-huh.

BY MR. ALEXANDER:

Q    Does SeeCubic, Inc. hold a license with Philips?

A    No.

Q    Did SeeCubic B.V. or SeeCubic, Inc. continue to use all of the Philips technology during the period of time in which SeeCubic, Inc. asserted ownership over Stream's assets?

A

Q    Yes.

THE COURT:  What was that question?  I got a yes, but I didn't --

MR. ALEXANDER:  The question, Your Honor, was did SeeCubic B.V. or SeeCubic, Inc. continue to use all of the Philips technology during the period of time in which SeeCubic, Inc. asserted ownership over Stream's assets.

THE COURT:  He just said 18 months -- my shortcut, yes, okay.

BY MR. ALEXANDER:

Q    And SeeCubic, Inc.'s business plan is premised on being able to license the Phillip [sic] technology, correct?

A    Yes.

Q    SeeCubic, Inc., is currently party to NDAs with SeeCubic B.V. and specific clients who may be interested in the Ultra-D technology, correct?

A    Correct.

Q    These agreements were not approved by Stream, correct?

A      Correct.

THE COURT:  Wait a minute.  You're going a little too fast.  What was the -- never mind.  I got the --

MR. ALEXANDER:  I can take a step back and slow down, Your Honor.  I apologize.

THE COURT:  All right.  We have until -- I mean, you guys want to finish today.  I'll go until 7:30 again, but that's it, unless you need tomorrow morning, which I think you're going to have some time tomorrow because I'm not sure when my trial is tomorrow, but anyway.  I don't know if it's a trial or it was just -- I have to look at my calendar.  Maybe it was just a request to continue the trial.

So it must only be the motions of whether -- and then is the trial the next week?  I don't know.  Don't worry about it.  Okay.

Okay, go ahead.

MR. ALEXANDER:  I'm going to take a step back on those questions, Your Honor --

THE COURT:  Okay.

MR. ALEXANDER:  -- so you can get them in.

BY MR. ALEXANDER:

Q    SeeCubic, Inc. is currently party to NDAs with SeeCubic B.V. and specific clients who may be interested in the Ultra-D technology, correct?

A      Correct.

Q     These agreements were not approved by Stream, correct?

A     With one exception, correct.

Q     What is the one exception?

A     Not -- Bosch -- the agreement with Bosch.

THE COURT:  B-O-S-C-H?

THE WITNESS:  Yes, ma'am.

THE COURT:  Like Bosch dishwashers?

THE WITNESS:  Yes, exactly, same.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q     And is your position that SeeCubic, Inc. cannot share the specific names of these clients with Stream, even though SeeCubic B.V. is a subsidiary of Stream, correct?

A     That's correct.

Q     SeeCubic, Inc. is a holding company, right?

A     It's both operating and holding.

Q     SeeCubic, Inc. is not currently raising equity, correct?

A     Correct.

Q     However, SeeCubic, Inc. is still receiving money through debt instruments?

THE COURT:  Hold on, hold on.  The next page.  So they're not -- the question was, SeeCubic, Inc. was not --

MR. ALEXANDER:  Currently raising equity.

THE COURT:  The answer was no, correct?

MR. ALEXANDER:  Correct.

THE COURT:  Okay.  The next question, counsel?

BY MR. ALEXANDER:

Q    However, SeeCubic, Inc. is still receiving money through debt instruments, correct?

A    Correct.

Q    SeeCubic, Inc. ceased raising equity at some point in 2022, correct?

A    SeeCubic, Inc. never raised straight equity and the equity that was issued was issued together with the debt instrument.

Q    But it did raise equity, correct?

A    The equity was an additional incentive with an investment in debt.

Q    So is it just -- is it your testimony that yes, it raised equity, but it did not independently raise equity without debt?

A    My -- my response is it raised debt and some investors along with their debt investment also got equity.

Q    But nobody received straight equity without a debt investment?

A    I believe that's correct.

Q    What is the current amount of SeeCubic, Inc.'s debt?

A    Approximately $180 million.

Q    Do you remember the discussion regarding SoftBank?

A    I do.

Q    You said that SoftBank was not a potential institutional lender for Stream?

A    No, that's not what I said.

Q    That wasn't your testimony?

A    No.

Q    Okay.  What SoftBank entity were you referring to?

A    We, I believe, discussed two SoftBank entities -- one, a very large on, which had the marquee name, SoftBank and one which was -- held forth at SoftBank -- that SoftBank, but was different.

Q    But its name was still SoftBank?

A    Its name was no longer SoftBank at that time.  Its name had previously been SoftBank.

Q    Would you agree that the assets of Stream are worth more as a growing concern than if liquidated?

A    Yeah.

Q    I believe that you testified that Hawk made multiple loans to Stream, correct?

A    Correct.

Q    Hawk did not make one lump sum loan to Stream, correct?

A    Correct.

Q    I believe you testified that one of the issues you believe is being addressed by the Chancery Court is whether Stream had to raise money in one capital raise or if the equity could come in overtime in order to convert the Hawk debt.  Is that accurate?

A    Yes.

THE COURT:  Wait, what was that question again?

MR. ALEXANDER:  He testified that one of the issues you believe is being addressed by the Chancery Court in the 225 action, is whether Stream had to raise money in one capital raise or if the equity could come in overtime in multiple raises in order to convert the Hawk debt.

BY MR. ALEXANDER:

Q    Is that accurate?

A    Yes.

Q    Sitting here today, are you aware of a specific provision in the conversion agreement that states that Stream needs to raise the capital at one time?

A    The definition of -- the way that raise is defined I think is the question.

Q    So you believe it's in the definition of raise?

A    The way raise is defined or interpreted in the agreement. I think the -- the language that describes the capital raise that would qualify.

Q    Okay.  Is there a definition section in the agreement which indicates that?

A    Not that not that I'm aware of.

THE COURT:  The language in where -- which document?

THE WITNESS:  The Hawk conversion document.  Hawk conversion agreement, which is not part of the loan documents. It's a separate document.

MR. ALEXANDER:  Your Honor, I'd like to just take a brief five-minute break to go over my notes, and I may be done with my --

THE COURT:  Okay.

MR. ALEXANDER:  -- cross.

THE COURT:  All right, we'll take a five-minute break.

Yes, Mr. Caponi?

Oh, I thought Mr. Caponi was coming to this -- to the -- unless you need to --

UNIDENTIFIED SPEAKER:  I'll stay here.

THE COURT:  Okay.

(Recess taken)

THE COURT:  All right, Mr. Alexander.  If you want to finish up with you?

MR. ALEXANDER:  I do, Your Honor.

THE COURT:  Okay, go ahead.

BY MR. ALEXANDER:

Q   Mr. Stastney, isn't it true that Stream was the only party to a license with Rembrandt?

A   I don't know.

Q   Was it also true that Rembrandt attempted to intervene in the Chancery Court action, correct?

A   I believe so.

Q   And that was denied by the Chancery Court, correct?

A    I believe so.

Q    In terms of Hawk, what is the principal amount of the Hawk debt?

A    I don't know.

MR. ALEXANDER:  Your Honor, I have no further questions.

THE COURT:  Okay.  Hold on.  I'll just finish writing my notes before you redirect.

Okay, let's go with redirect.

MR. COLBY:  Thank you, thank you, Your Honor, just a few quick clean-up points.

REDIRECT EXAMINATION

BY MR. COLBY:

Q    About Rembrandt, do you recall yesterday Mr. Stastney (sic) asked you questions, and you offered testimony about litigation history between Stream and Rembrandt and other parties here?

A    I do.

Q    Okay.  Were you testifying from memory during that question and answer?

A    I was.

Q    Okay.

MR. COLBY:  If I could just show the witness a couple of things to refresh the witness' recollection, I'd like to do that.  They don't need to be admitted.  I just want --

THE COURT:  Refresh his recollection about what?

MR. COLBY:  Well, I want --

MR. ALEXANDER:  I object because there's been no question that needs --

THE COURT:  Well, you didn't object -- I asked the question.

MR. COLBY:  Yeah, Your Honor.

THE COURT:  Excuse me, I'm sorry.

MR. ALEXANDER:  Well, I was going to object and then you -- my objection is there's no basis for refreshing recollection because there's no question that has been pending.

MR. COLBY:  Okay, look, I mean --

THE COURT:  Ask him the question.

MR. COLBY:  Yeah.

BY MR. COLBY:

Q    Mr. Stastney --

THE COURT:  I'm sorry because I get that I shouldn't be the one asking the questions.

MR. COLBY:  It's okay, it's okay.

THE COURT:  I just want the answer.

MR. COLBY:  Yeah.  Housekeeping more than anything else, Your Honor.

THE COURT:  Okay.

BY MR. COLBY:

Q    But Mr. Stastney, when you were testifying about the

litigation history between -- when you were testifying about the litigation history between Stream and Rembrandt, and Technovative and others, you were testifying from memory, correct?

A    Correct.

Q    And are you absolutely certain that your answers with regard to the litigation history was 100 percent correct?

A    No.

Q    Okay.  Would it be helpful to look at the dockets to refresh your recollection so you can answer those questions with a higher degree of certainty?

A    It would.

Q    Okay.  I don't think there will be an objection.

MR. ALEXANDER:  No, Your Honor.  For the purpose that he's using this --

THE COURT:  Okay.

MR. ALEXANDER:  -- I don't object.

THE COURT:  Go ahead.

MR. COLBY:  Thank you.

THE COURT:  You're not marking.  You expressly show him --

MR. COLBY:  I -- for those purposes, a docket from the U.S. District Court, Southern District of New York, involving the Rembrandt litigation against Stream TV Networks and then a docket from the U.S. District Court in the District

of Delaware between Rembrandt, Technovative Media, Hawk, and

SeeCubic. Let's take a look first, if you will, Mr. Stastney,

at the Southern District of New York document.

THE COURT: Whoa, whoa, whoa. Counsel, refresh your

recollection means you look at it --

MR. COLBY: Yep.

THE COURT: -- and you give it back.

MR. COLBY: Yep. I'm not introducing it as an

exhibit.

THE COURT: Oh, but you want him to review it?

MR. COLBY: No, I'm asking him to -- I can point him

to a couple things and see if it refreshes his recollection.

BY MR. COLBY:

Q    Mr. Stastney --

THE COURT: He shouldn't be looking at that. Counsel,

my understanding of how refresh recollection happens is you ask

the question, and you say, okay, reading this piece -- I'm just

going to throw something. It may not even be relevant. Do you

recall the date that this happened. You said it was in 2012.

MR. COLBY: Yep.

THE COURT: Are you sure --

MR. COLBY: That's what I was about to do.

THE COURT: Okay, so why don't we do that before he

starts looking at it.

MR. COLBY: Sure.

THE COURT: Okay?

MR. COLBY: Sure. That's all I was about to do.

BY MR. COLBY:

Q   Do you recall, Mr. Stastney, do you recall the date that the -- precisely the date that the Southern District action was filed?

A   I do not.

Q   Okay. Would it help to look at the docket to determine that?

A   It would

Q   Okay. Go ahead. I think you can find it right at the top.

THE COURT: I -- because I said it. So you can find it right?

THE WITNESS: It appears to have been filed --

THE COURT: Whoa, whoa, whoa -- back.

THE WITNESS: Okay.

THE COURT: And then you say, yes, it refreshed my memory.

THE COURT: I mean, I know this is just technical, but I want the record to be clear.

MR. COLBY: Fair enough. That's all we're going for here.

THE COURT: Okay.

THE WITNESS: Yes, it refreshed my recollection.

BY MR. COLBY:

Q    Okay, so when was that action filed?

A    February 6th, 2017.

Q    Okay.

THE COURT:  What year?

THE WITNESS:  2017.

THE COURT:  Okay.

BY MR. COLBY:

Q    And do you recall, Mr. Stastney, whether that case originated in federal court?

A    I don't recall.

Q    Okay.  Would it refresh your recollection to look at the docket?

A    It would.

Q    Okay.  Let's take a look at page 5 down at the bottom, the bottom entry.

A    Okay.

Q    Does that refresh your recollection?

A    It does.

Q    What do you remember now?

A    It appears to have been removed from Supreme Court, New York.

Q    Okay.  And do you recall the specific -- I believe you previously testified there were two claims at issue here.  Do you recall the specific disposition of each of those two

claims?

A    I do not.

Q    Okay.  Do you -- let's just take a look at page 17, the bottom docket entry.  Does that refresh your recollection --

A    It does.

Q    -- as to which of the two claims?

A    As to the -- NDA violation claim.

Q    Okay.  As to the other claim, the intellectual property based claim, what's your recollection as to how that was disposed of?

A    I don't recall exactly.

Q    Okay.  Great.  Let's take a look at the District of -- well, let me ask you the question first and then maybe you might need to take a look at the other one.   Do you recall the precise file date of the District of Delaware action?

A    I do not.

Q    All right.  If it would help to look at the first page of the docket to refresh your collection, please do so.

A    It did help.

Q    Okay.   When was that case filed?

A    February 21st, 2023.

Q    Okay.  Do you recall exactly who the parties were to that case?

A    I believe I do, but I'm not sure.

Q    Okay.  Would it help to look at the docket?

*TheRecordXchange*
www.trxchange.com · (800) 406-1290

A      It would.

Q      Go ahead.

A      I recall.

Q      Okay.  Who were the defendants in that case?

A      Technovative, Hawk, and SeeCubic, Inc.

Q      Okay.  Is Stream a defendant in that case -- do you have a recollection?

A      It appears not to be.

Q      All right.  Do you remember the exact claim that was asserted in that case?

A      I do not.

Q      If it would be helpful to take a look at the first docket entry to refresh your recollection, please do so.  Did that refresh collection?

A      It did.

Q      Okay.  What was the exact claim in that case?

A      Claim for injunctive relief and misappropriation of trade secrets.

Q      Trade secrets, okay.  All right.  Thank you.  There's been some testimony with Mr. Vincent (sic) about bonding equipment. What's your understanding of which entity currently owns the bonding equipment.

A      I understand the SeeCubic B.V. currently owns the bonding equipment.

Q      Okay.  Do you recall yesterday -- actually, I think it was

yesterday -- in response to some of Mr. Alexander's questions, you were asked about an intent to run the business or to sell the business if the creditors were able to exercise their rights to possess it; do you recall that testimony?

A    I do.

Q    Okay.  And if you could just remind us what -- if those efforts are successful, what is your intent with respect to the business?

A    Our intent is to run the business to maintain the value of the collateral until the bankruptcy concludes its work.

Q    Okay.  And have you foreclosed any options that you might have as a result of that bankruptcy process?

A    We know that we can't conduct an Article 9 sale because that would only exist in the absence of a bankruptcy -- bankruptcy process.

Q    Okay, but in in terms of run the business sale or something else that I may not be familiar with in terms of the bankruptcy process, have you foreclosed any options?

A    No.

Q    Okay.  Do you recall some testimony with Mr. Alexander about CR-11, that's the notice of Hawk exercising its property?

A    I do.

Q    And to your understanding, once that notice was sent, to your understanding, who owned those voting rights associated with it?

MR. ALEXANDER:  Object, Your Honor.  I mean, his understanding --

MR. COLBY:  Yes.

MR. ALEXANDER:  -- is irrelevant as to the issue here.

MR. COLBY:  I think it is.

MR. ALEXANDER:  As he testified yesterday, he's not giving legal conclusions, so whether he believes is irrelevant.

MR. COLBY:  I think it informed the subsequent conduct and the litigation that we're here discussing whether or not relief from stay should be granted in order to proceed.  So this testimony wasn't objected to yesterday, and it wasn't --

THE COURT:  Allow it for what it's worth.

MR. COLBY:  Yeah, thank you.  So --

THE COURT:  He believed that it was --

MR. COLBY:  Yeah.

BY MR. COLBY:

Q    So just --

A    My belief that it was effective immediately, that self-help.

Q    Okay.  To your understanding, was there anything else left to do after that notice was sent before Hawk could exercise those rights and actually vote those shares?

A    I don't believe there's anything else to do.

Q    Okay.  There was -- during the period of time that you were CFO of Stream, I believe you testified Stream manufactured some 3D units; do you recall that testimony?

A    Yes.  They didn't manufacture during the time --

Q    Okay.

A    -- but -- but prior to the time --

Q    Okay.

A    -- and when I was director.

Q    Okay.

THE COURT:  Wait a minute -- down the time because I'm not understanding.

MR. COLBY:  Yeah.  Maybe just -- maybe just back up. I've got my time periods.

BY MR. COLBY:

Q    By virtue of the experience you testified about at Stream you're familiar with the cost associate -- are you familiar with the costs that were associated with the production of those units?

A    Yes, I am.

Q    Okay.  And I just forgot to ask this yesterday and then Mr. Vincent asked you some questions, so it reminded me. What's your -- to the best of your memory, what approximately was the cost per unit to manufacture those units?

A    It was approximately $10,000 per unit to manufacture.

Q    Okay.  And if we could just take a look at CR-6, which was

the chancery court's docket.  Do you recall yesterday, you had a back-and-forth with Mr. Alexander about the schedule for the Chancery Court action?

A    Yes.

Q    And the status of the trial when this current bankruptcy was filed?

A    I do.

Q    Okay.  Can you just take a look at the very first, the top docket entry?

MR. ALEXANDER:  Your Honor, I'm going to object. This document was admitted solely for judicial notice purposes, so he shouldn't be testifying from the document.

MR. COLBY:  It's the same purpose that we've used it before, what happened on a particular date, as recorded in -- the --

MR. ALEXANDER:  -- and it's cumulative, and it's already in --

THE COURT:  Wait a minute.  The first objection was it was judicial notice, and the only thing that I can say is it says what it says.  And so the docket says what it says -- it's already in evidence.  I'm not quite sure why we need to testify --

MR. COLBY:  Just to clarify, I think after the back and forth yesterday regarding the status of trial and whether or not trial was scheduled or not scheduled in the order.

THE COURT:  He needs to clarify?  This thing says what it says.

MR. COLBY:  Okay, well, let me just ask him --

THE COURT:  Sustained as to it was admitted under judicial notice.  Now, you may have another basis, but I'm not quite sure, and I pretty much have been clear the judicial notice is for it to say what it says and that's what the document is testimony.

MR. COLBY:  Okay.

THE COURT:  Okay?  So I'll sustain that.

BY MR. COLBY:

Q    Mr. Stastney, do you recall what the court of chancery did upon learning of the filing of the bankruptcy in this matter?

A    I believe the court of chancery issued a note to the parties, requesting a status update and requesting some information around who was involved in that file.

MR. ALEXANDER:  Objection, Your Honor.

BY MR. COLBY:

Q    What else did it do?

THE COURT:  One minute -- he's objecting.

MR. ALEXANDER:  Hearsay.

THE COURT:  He says hearsay.

MR. COLBY:  I'll withdraw the question.  No, it's --

THE COURT:  It's not important.  Proceed.

MR. COLBY:  Yeah.

BY MR. COLBY:

Q    Mr. Stastney, to your recollection, what did the courts do with respect to any trial that may have been cancelled -- may have been scheduled in that 225 action on the filing of the Stream bankruptcy?

A    Stayed those -- stayed those hearings.

Q    Okay, okay, thank you.

MR. COLBY:  No more.

THE COURT:  So that's it?

MR. COLBY:  That's it.

THE COURT:  Any recross?

MR. ALEXANDER:  No, Your Honor.

THE COURT:  Okay.  Can you hear me now?  Sorry.  All right.  So there are no more questions for Mr. Stastney at this point.  Mr. Colby, are you releasing him as a witness, or you reserve him for a rebuttal?  Which one is it?

MR. COLBY:  Your Honor, I believe we would like to reserve for rebuttal if necessary.

THE COURT:  Okay, so you're not releasing him as a witness.  You may step down, Mr. Stastney.

So if I recall, the next step is that the movants had listed Mr. Park as a witness, but we were going to proceed with Mr. Alexander calling him with direct and a cross in the interest of time.  Is that correct?

MR. ALEXANDER:  That's my understanding, Your Honor.

THE COURT:  Okay.  Mr. Caponi, are you doing this part of the cross-examination of Mr. Park?

MR. CAPONI:  I will be cross-examining Mr. Park.

THE COURT:  Okay.  All right, Mr. Park, you can come on up.

THE BAILIFF:  Place your left on the bible, raise you right hand.

JUNG HO PARK, PLAINTIFF'S WITNESS, SWORN

UNIDENTIFIED SPEAKER:  Please state and spell your name.

THE COURT:  Now, you can move all that stuff, Jung.  I don't know whose water that it is.

UNIDENTIFIED SPEAKER:  Unless you want me to --

THE COURT:  No, absolutely not.

THE WITNESS:  Yes, my name is Jung Ho Park.  I'm referred to as Thomas.

THE COURT:  Okay, can you --

UNIDENTIFED SPEAKER:  Spell it for us.

THE WITNESS:  J-U-N-G.

THE COURT:  Wait a minute, hold on.  G --

THE WITNESS:  J.

THE COURT:  Oh, J.

THE WITNESS:  J-U-N-G.

THE COURT:  Okay, Jung.

THE WITNESS:  Middle, H-O.  Last name, Park.

THE COURT:  Jung Ho Park.

THE WITNESS:  It's equivalent to John in Korean.

THE COURT:  And what's your known name?

THE WITNESS:  I use Thomas.  I've used that name since six years old.

THE COURT:  Okay.  All right.

THE BAILIFF:  State your address for the record, please.

THE WITNESS:  175 Buckelew Avenue, Building 2, Suite 6, Jamesburg, New Jersey.

THE COURT:  Say that again.  175 --

THE WITNESS:  Bucklelew, B-U-C-K-E-L-E-W Avenue.

THE COURT:  Okay.

THE WITNESS:  Building 2, Suite 6 -- or Apartment 6.

THE COURT:  And then where's that?

THE WITNESS:  Jamesburg, New Jersey.

THE COURT:  Jamesburg?

THE WITNESS:  Yes.  08831.

THE COURT:  Okay.

MR. ALEXANDER:  May I proceed?

THE COURT:  Yes.

DIRECT EXAMINATION

BY MR. ALEXANDER:

Q    Good afternoon, Mr. Park.

A    Good afternoon.

Q    I think we just went through this in terms of other names you go by but for purpose of today, Mr. Park is okay?

A    Mr. Park or Thomas, either way.  That's fine.

Q    So Mr. Park what is your current connection, if any, to Stream TV Networks, Inc., the Debtor in this case?

A    I've currently been, I guess, the CFO until further approved by the courts.

Q    Before we get into your work with Stream, I just want to talk a little bit about your background.

A    Sure.

Q    Please tell us about your education.

A    I received my BA, Bachelors of Arts in Economics and English from the University of Virginia and my MBA in general management/finance and strategy at the Darden School -- Darden Graduate School of Business at the University of Virginia.

Q    And when did you receive your undergraduate degree?

A    1992 and 1998 for grad school, '92 undergrad.

Q    Do you have any other education?

A    There's classes I've taken at Virginia Commonwealth University for economics and classes I've taken at the University of Richmond for Middle East Studies.

Q    When you received your MBA, did you have any specialization?

A    Specifically in corporate finance, which is -- back then, they didn't have specialization in private equity, but it was

investment in Bank of Private Equity and venture capital.

THE COURT:  Counsel, can you hold just one second?  I need to take a two-minute break.  You can pause just a minute.

(Recess taken)

THE COURT:  You may be seated.  Nothing to do with you guys.  I'm just extremely annoyed, and it has nothing to do with you guys, and I will not -- but it was my grandson's camp, and he's fine.

MR. ALEXANDER:  Well, that's good to hear.

THE COURT:  Yeah.  And counsel, I mean, not that it's anybody's, but he's autistic, so that is why my level of concern is pretty high.  So if something happens, I kind of have to immediately address it.

MR. ALEXANDER:  Do what you need to do, Your Honor.

THE COURT:  All right.

MR. ALEXANDER:  May I proceed?

THE COURT:  Yes, go ahead.

BY MR. ALEXANDER:

Q    Did you have any employment between your undergrad and your MBA?

A    Yes.  I actually served as a major account -- national account representative, national account manager for General Mills food company and also a corporate account sales for Nextel Communications.

Q    What was your role or your duties, your job description

there?

A     Sure.  In particular for General Mills, basically selling General Mills products to grocery store chains.  And for Nextel Communications --

THE COURT:  I'm sorry -- can you say that again?

THE WITNESS:  Yes.  For General Mills, I was their national account representative manager, selling General Mills products, which are like -- cereal, to grocery store chains. And then for Nextel Communications, I was one of the very early sales people for the company that later became Speck Communications.

BY MR. ALEXANDER:

Q     Did you have any other employment?

A     Small projects here and there but usually around a month at time -- something very small in between.

Q     After receiving your MBA, describe what your employment was.

A     Sure.  First job right out of -- day after graduation was with British Petroleum.  I was considered a international strategy manager on the retail side.  And so I was -- my first project was the merger of BP and Amoco at the time.  And then after that -- sorry?

Q     No, I was just listening, so I was letting you answer.

A     Okay.  And after the completion, I had moved on to the next, Lucent Technologies -- part of the MBA rotation program

with finance and strategy.  And then from there, I started my own company to raise venture capital.  And them, after that, we had to close down in around 2001.  We moved to Michigan, where I was an executive consultant for several years.  In addition, I was also a CFO for a technology staffing company.

Q    And what year was that?

A    And that was roughly 2002, 2003 timeframe.

Q    That was with Park Consulting, LLC?

A    It wasn't Park Consulting, but for the CFO position, I was a W-2 during that time -- or started off as a 1099 then moved to a W-2 situation.

Q    Then, what was your employment after that?

A    Employment after that, we came back to the East Coast, and I became a interim CFO for GAIN capital, an online retail FX broker.  And then from there, I moved to Integra LifeSciences, where I was director of finance responsible for accounting consolidations, SEC reporting, responsible for any responses to accounting statements and accounting rules for GAAP and et cetera.  And from there, I moved to UBS.  And about four years at UBS, four or five years.  Then, seven years a CFO for multiple business lines.

Q    You said you served as a CFO in multiple --

A    Yes.

Q    -- business lines?

A    Yeah, business unit CFO for some of the different

products.

Q    Which products did you sell as CFO?

A    I had responsibility -- stock option as a product as a separate group.  Also, we had what we call Buyside Trading Group (phonetic).  And in addition, we had several other structured products and so forth.  I had a team, and each one of the team members were -- my team was individual accountants, and I served as a CFO across all the business units.

Q    Like, what timeframe was that?

A    That was from 2006 to 2010.

Q    So after 2010 and your work at UBS --

A    2006 -- that was UBS.

Q    Correct.  After --

A    After UBS.

Q    Your work from 2006 to 2010 at UBS --

A    That is correct.

Q    -- what was your next employment?

A    After that, I went into consulting for a little bit, took on several projects and then ended up with a -- again, a director position at MUFG Bank of Tokyo.  And so I was there for a couple years, and then went into consulting again.  And then, 2017 to 2019, was offered a position as Senior Vice President at Brown Brothers Harriman.

        THE COURT:  Where?

        THE WITNESS:  Excuse me, Brown Brothers Harriman.

THE COURT:  Oh, okay.

BY MR. ALEXANDER:

Q    And how long were you at Brown Brothers Harriman?

A    From 2017 to 2019, two years.

Q    So we're getting closer to current, so --

A    Yeah.  After that --

Q    -- after Harriman --

A    -- I went into my own business, but this time I also got involved in many different partnerships and so forth and different companies.  So even though I started off with my own company at TMCV, I also ended up being a partner in a private equity firm in Europe, board members in several different companies, tech companies, technology companies, and fintech companies.

Q    And is that your current --

A    Stream.

Q    Let me finish, Mr. Park.

A    Sure.

Q    Outside of your current role with Stream, is that the extent of your prior employment?

A    I can go into the specific.  I roughly serve on four different boards, maybe a fifth one coming up very soon.

Q    Okay.  What types of companies are you serving?

A    For example, one is a fintech -- Text'nPayMe is a fintech company; Mobilum Technologies.  I actually serve on the board

of directors of public traded company there.  I serve also

again, I'm managing -- partner managing member and board member

for Penton Partners.  And then, we'll go into the -- so I've

been offered and accepted the position of Director, Board of

Trustees for the Seattle School -- theological school in

Seattle as well.

Q    I believe you testified that you served as CFO.  How many

times have you served in the role as CFO?

A    Let's see.  At UBS, also at -- CFO at Anacon.  And also

there have been several consulting experiences as well.  And

also, Integra LifeSciences, I reported directly to the CFO and

corporate control as well.

Q    I went to talk about your employment with Stream.

A    Yes.

Q    Are you aware that Stream filed a motion to approve your

retention?

A    Excuse me?

Q    Are you aware that Stream filed a motion to approve your

retention?

A    Yes.

Q    When were you first introduced to Stream?

A    Back in February, 2001, Rafael had asked me, you know,

this company that's in bankruptcy at the time.  I didn't do

anything with it at the time.  And then, I got approached again

in April of 2023.

Q    You said 2000 and?

A    2021.  It was just an email, and we had a brief
conversation.  At the time, I couldn't do it.

Q    In terms of your current introduction or reintroductions
to Stream --

A    Yes.

Q    -- what were the circumstances surrounding the current?

A    I was informed that it was a company in bankruptcy,
Chapter 11, that was looking for capital to -- initially told
debtor-in-possession financing.

Q    And did you explore that with the Debtor?

A    We did.

Q    Did that role or the discussions ultimately change?

A    Yes.

Q    How did they change?

A    They felt that based on my regulatory background, which is
being the CFO and serving as -- also in addition my
capitalization skills, they felt I could come in as a CFO --
scheduled out toward the end of April.

Q    Those discussions were at the end of April 2023?

A    That is correct, about me coming in as CFO.

Q    Did you ultimately enter into an employment agreement with
Stream for the position of CFO?

A    Yes, I did.

Q    Who at Stream did you negotiate that agreement?

A    Mathu.  Mathu Rajan.

Q    Do you recall when that became effective in terms of your employment date?

A    We thought on May 1.

Q    Had there been any time since your employment began that you've been unavailable to focus solely on --

A    A hundred percent focus -- there was about two weeks where I was on vacation in May -- from May 14th to about May 27th, 28th, on vacation.  But nevertheless, I was still having communication with Mathu when -- when he called me.

Q    Is it fair to say you've been working at Stream as CFO for about six or seven weeks?

A    Yes, that is correct.

Q    As CFO, what are your duties?

A    As the CFO for Stream?

Q    Let me ask it again.  As CFO of Stream, what are your duties?

A    My responsibilities for -- the core, first one, is ensuring that it raised capital.  I'm still in communications. And then, ensuring that we had the books and records cleaned up and recorded; create a team of accountants because we really don't have one, I've been told, except for the bookkeeper.  And literally recreate the entire finance accounting that we -- for a company of this size going forward.

Q    You mentioned debtor-in-possession financing and also work

you've done with the company.  But can you specifically say what type of work you've been able to perform thus far?

A    Specific for them?

Q    No, just for the company in general.

A    Just for the company overall?  Because my focus has been ensuring that I am in constant communications with different types of institutional investors, at the same time, starting to look at some of their financial reports, account tables and stuff like that, to get my understanding of where the company is at -- at this point in time.

Q    In your view, have you been able to get fully up to speed yet?

A    I have not.

Q    Why?

A    I still have not had time to go over the all the transactions for the different legal entities.

Q    Why is that?

A    Mathu, when I came back from my trip, Mathu was overseas traveling and then he got sick.

Q    You indicated that one of your functions as CFO is to assist with obtaining financing for the Debtor.  Have you been attempting to find financing for the Debtors?

A    I still am, yes.

Q    What have you done on that front?

A    Initiate conversations with different organizations with

contact I have there; initiating new contacts; letting them to know what Stream TV Networks is about.

Q    How many companies have you discussed financing with?

A    Dip financing or capital equity raising?  I want to be very specific.

Q    Well, break that up.

A    Okay.

Q    How many companies have you discussed dip financing?

A    Dip financing, four.  And on the equity raising, four so far of introductions and letting people know where I am.

Q    With regards to the dip financing companies --

A    Yes?

Q    -- how many of them are you still in discussions with?

A    I'm active in all discussions.  Even Truist, who is the only one that's come back to say no to.  They are still interested in us post-bankruptcy.

THE COURT:  Which one, I'm sorry?

THE WITNESS:  Truist.

THE COURT:  Truist?

THE WITNESS:  Truist Bank, yes.

BY MR. ALEXANDER:

Q    Other than Truist Bank, do you remember any other --

A    Yeah, Sandton.

Q    -- companies that you were --

A    Yes.  Sandton Partners is a firm that I've -- have engaged

with several times since 2019.  They're multi-international,
multi-billion dollar firm, excuse me, that looks for -- their
specialty is specialty finance, so distressed situations.

Q    Talking about you, specifically, since you joined
Stream --

A    Yeah.

Q    -- what's the size of financing or funding you have?

A    The size was about 25 million.  And then sometimes we
talked about 30, but it was mostly 25 -- 25 million in --

Q    Have the Debtors been able to secure dip financing yet?

A    No, we have not.

Q    Are the Debtors still attempting to obtain dip financing?

A    As a company right now, the focus is raising more capital
to not get financing now.

Q    The company is trying to obtain equity funding?

A    That is correct.

Q    What, if any, has your involvement been with that process?

A    I have my own contacts I'm going with, and Mathu has been
doing his financing as well.

Q    And when you say Mathu, who are you referring to?

A    Mathu Rajan.

Q    Would it be fair to say that your involvement initially
started with dip financing and has evolved --

A    Yes.

Q    -- to equity funding?

A    That is correct.

Q    Do you anticipate being involved with the equity funding efforts going forward?

A    Yes.

Q    Have you heard of a company called Xiangsheng (phonetic) Group Holdings, Ltd?

A    Yes.

Q    What is your understanding of Xiangsheng Group Holdings, Ltd.?

A    It is a publicly traded entity on the Hang Seng Index of Hong Kong.  Predominantly, their business is auto dealerships. It appears to be on the high end.  And they -- they have multiple holding company -- companies underneath that as well.

Q    What types of holding companies?

A    One of them appears to be finance arm.

Q    Are you aware that Stream filed, in their bankruptcy case, a term sheet with Xiangsheng Group Holdings Ltd. --

A    That is correct.

Q    -- with regards to Class A Common Stock?

A    Yes.

Q    Were you involved with the negotiations regarding that --

A    I was not.

Q    Why were not involved with those negotiations?

A    That was strictly by Mathu Rajan.

Q    Okay.  Since you've come on as CFO, have you been able

to --

A    Let me clarify this quickly.  It's Mathu and whoever he uses, but not my participation.

Q    Since you've come on as CFO --

A    Yes.

Q    -- have you been able to discuss that financing with Mr. Rajan in any detail?

A    No, because it's going to be extensive.  I haven't had a chance to do that with -- while he's in the hospital.

Q    Do you have experience raising capital in the United States?

A    Yes.

Q    What have you experienced?

A    Raising capital for if -- if I have to break it down, the way we do it is there's venture capital, there's private equity and then there's specialty finance, specialty finance distress. So I've experienced all three different types.

THE COURT:  What was number two, I'm sorry, venture capital --

THE WITNESS:  We call it specialty finance with distressed investing.

THE COURT:  There was -- but you said three.  What was number two?

THE WITNESS:  Venture capital and private equity.

THE COURT:  Oh, private equity.

BY MR. ALEXANDER:

Q    Okay, what is the process?  What's entailed with that type of --

A    Okay.  For -- it's very different for each one, okay, but they're starting to blur.  Venture capital, depending on the maturity of the organization, it can go from Pre-Seed to Seed round to Series A, B, C, D, then eventually a CF IPO.  Private equity is more fluid in the sense that it could -- sometimes we partner with venture capital, but most of the time I choose to accelerate a company's growth or acquisition of a company, take a company private, so there's a lot of room in that area, and I've been involved in a little bit of all of that functionality, and then specialty finance for companies that are in trouble or about to go into Chapter 11.

Q    Mr. Park, do you also have experience raising capital debt or equity outside of the United States?

A    Yes, I have.

Q    Can you describe that experience?

A    Raising capital where, in the Middle East; raising capital in Hong Kong, Korea, sometimes Japan and mainland China.

Q    Does that process differ, if at all, from --

A    Absolutely.

Q    -- the United States?

A    Absolutely.

Q    And how does it differ?

A     In the United States, we tend to be very more analytical in a sense that it's more structured in a sense that you go from Pre-Seed, Seed, A, so forth, in venture capital -- and the focus is on return to investors, valuations.  In Korea, for example, they're more focused on -- to start up situations. They're looking for -- most of the time, they're looking for exits where it's not an IPO, but more of being bought out by one of the other larger Korean companies. Japan, very similar to that.  In China, venture capital private equity both are unique in the sense that there's a lot of government money involved, unlike it here in the United States where we don't have a -- a state sponsored investment fund per say, like a national fund.  Every country seems to have one except for the U.S.  In China in particular, they have a lot of development funds.  And so their focus isn't so much a return on investments, per se.  It's more of a -- a larger concern instead of just a return.

Q     Mr. Park, you've been in the courtroom this week, correct?

A     Excuse me?

Q     You've been in the courtroom this week?

A     Yes.

Q     You've heard Mr. Stastney discuss purchase orders that Stream has filed in this bankruptcy case?

A     Yes.

Q     Were you involved in the procurement of those purchase

orders?

A    I was not.

Q    But based on your experience, do you have any understanding of why a customer may want to have a purchase order that large?

A    I wasn't in charge of the purchase orders.  I was not involved in getting the PO.  I was involved in finding some details and that's about it.  I'm sorry, in terms of POs, in the past, my experience?

Q    No, it's do you have an understanding as to why a customer may want to have a purchase order that large fulfilled?

A    Yes.

Q    What's your understanding?

A    Depending on, for example, I can relate it to Mya Medical (phonetic), which I'm a part of, sometimes we had to go make purchase orders because they wanted to lock up our sources and to be able to lock up our channels and to be able to dedicate more of the volume to one particular customer.

Q    In terms of the business of Stream, what is your understanding or what have you been able to gain as an understanding of the business of Stream since you've been employed as the CFO?

A    Stream provides the technology behind the 3D visual format, which includes providing our technology that's built into the -- and also -- screen as well.

Q   And with regards to the business of Stream, which you've been involved, who would have the most knowledge regarding the business of Stream?

A   Mathu Rajan.

Q   And what's his role with Stream?

A   Our -- he is the CEO.

Q   And what is your current understanding of where Mr. Rajan is?

A   Currently, he's in the hospital -- in the hospital.

Q   I want to talk a little bit about maybe the plan for the bankruptcy case there.  Are you assisting the Debtors with everything for the bankruptcy?

A   Yes.

Q   Do you have an understanding of how the Debtors intend to exit bankruptcy --

A   Yes.

Q   -- cases?  Okay.  What's your understanding?

A   Our understanding is that we need to provide capital inside of Stream and so in order to retire debt.  And from there, convert the -- some of the debt into equity.  And from there, also have capital going forward for operations.

Q   When you say capital going forward for operations, what do you mean by that?

A   It could be for just hiring people.  It could be for a little bit of everything.

Q    In terms of Stream, I mean, who's the primary representative at Stream who's responsible for determining the strategy with regards to the exit?

A    I would say it's going to be both but right now until I have that meeting with Mathu, it's in Mathu's hands.

Q    And as the CFO, do you believe it's in Stream's best interest to try and exit this bankruptcy case --

A    Absolutely.  There's a lot of people who are interested.

Q    When you say there's a lot of people that are interested, what do you mean?

A    Both the potential customers and also for investors, especially on the institutional side.

        MR. ALEXANDER:  Your Honor, I have no further direct questions for Mr. Park.

        THE COURT:  Cross, Mr. Caponi?

        MR. CAPONI:  May I approach?

        UNIDENTIFIED SPEAKER:  The -- witness binder for Mr. Park?

        THE COURT:  Okay.

        MR. CAPONI:  May I proceed, Your Honor?

        THE COURT:  Yes.

                        CROSS-EXAMINATION

BY MR. CAPONI:

Q    Mr. Park, it's nice to see you again.  Thank you for coming in today to offer some testimony.  I just want to cover

a few topics with you today.  I think you've covered some of my initial topics, but I want to make sure I heard you correctly. So you were first contacted in April of this year by Mr. Zahralddin to work with the Debtor to raise capital and financing; is that correct?

A    Yeah, Rafael, as I know him, yes.

Q    And then, by the end of April, you had reached an agreement with Mr. Rajan that you would become the CFO?

A    Yes.

Q    And your initial efforts as the CFO were looking at dip financing, but by the end of May, your focuses shifted to raising capital, i.e., equity investments?

A    Yes.

Q    If you just keep you voice up a little bit, Mr. Park --

A    Sure.

Q    -- so the audio recording captures it, sorry.  Okay.  And when you first joined the company in April through May, am I correct you were speaking to Mr. Rajan on a daily basis?

A    Yes.

Q    And when Mr. Rajan was sick more recently, you've been speaking to him roughly every other day?

A    Yes, fair assessment.

Q    And even when you were on vacation, you were in contact with Mr. Rajan, correct?

A    Yes.

Q    All through May, all through May.  Up through May.

Q    So you're earlier in your testimony you indicated that Mr. Rajan in dealing with this potential new equity investment that you were not involved in it.

A    That's correct.

Q    And then you clarified and said something to the effect of Mathu and whoever he uses.  Do you recall that?

A    Yes.

Q    Who were you referring to when you say whoever Mathu uses?

A    For that one, I'm just saying overall, I'm not saying specific for Rajon. I know that since I've been on here, I've had conversations with one broker, I guess, he used in the past.  So from that I understand that they use several brokers.

Q    So it's your understanding Mr. Rajan's using different brokers to look at raising capital financing for the Debtors?

A    Yes and plus his direct efforts as well.

Q    With regard to your employment currently, you are still with Penton Partners, correct?

A    Yes.  Uh-huh.  Penton Partners.

Q    P-E-N-T-O-N? Did I get that right?

A    P-E-N-T-O-N.  Yes.

Q    And you currently serve on the board of around four different companies, correct?

A    Yes.

Q    So you started working with Stream in April through to

today, you've been in continuous contact working with Stream to raise capital and financing, correct?

A    Yes.

Q    With regard to the you said you had worked with Mr. Rajan and he was using other brokers and you had spoken to one.  Who was the broker that you spoke with?

MR. ALEXANDER:  Your Honor, I'm going to object.

THE WITNESS:  Mark Dannenburg.

THE COURT:  Wait a minute.  He's objecting.

MR. ALEXANDER:  I'm going to object to that.  It mischaracterizes the testimony.

THE COURT:  Okay.  Mischaracterized how?

MR. ALEXANDER:  He didn't testify that he has actually used the brokers.  He said he was aware that they --

THE WITNESS:  I never used them.

THE COURT:  No.  No.  No.  No. The question --

MR. CAPONI:  I messed up using but spoken.  So I'll rephrase, Your Honor.

THE COURT:  Okay.  Rephrase.

BY MR. CAPONI:

Q    In your testimony a few minutes ago, you indicated that Mr. Rajan may have been using other brokers to raise capital, correct?

A    That is correct.

Q    And that I think you said you had spoken to one?

65

A     That's correct.

Q     Who was the broker that you spoke with?

A     Mark Dannenburg.

Q     So it's your understanding that Mr. Rajan has been using Mark Dannenburg to help raise funds or capital for the Debtors?

A     That is correct.

Q     Would you be surprised to know if I were to tell you that Mr. -- in a prior hearing, Mr. Rajan indicated he did not know Mr. Dannenburg?

A     They were in contact.

Q     I'll withdraw the question.

A     No.

        THE COURT:  There's no question.  You don't have to answer.

BY MR. CAPONI:

Q     With regard to dip financing, Mr. Park, again it's saying you initially started looking at dip financing.  What is your understanding of what is dip financing or what's your definition of dip financing?

A     Debtor position financing.  Financing given to a company in Chapter 11 for operational purposes.

A     And you reached out to a number of companies that you understood were involved in doing dip financings, correct?

A     That is correct.

Q     And that includes Truist and Sand --

A    Sandton Partners   Yes.   Sandton Capital.

THE COURT:  Can you spell that? Hold on.  How do you spell what was it?  The second one.

THE WITNESS:  S-A-N-D-T-O-N.

THE COURT:  Okay.  Sorry, Counsel.

BY MR. CAPONI:

Q    And Mr. Park, am I correct you indicated that Truist decided they did not want to provide dip financing because there were not sufficient hard assets on the ground, correct?

A    That is correct.

Q    And with regard to Sandton Partners, they specialize in difficult financing?

A    I -- financing.  Yeah.

Q    Okay.  So they sort of the more risky dip financing is what that company specializes in?

A    Difficult situations.  This is not the -- is not the most difficult one by the way.

Q    And neither Truist nor Sandton has expressed an interest in lending dip financing into this estate, correct?

MR. ALEXANDER:  I'm going to object.  He hasn't testified regarding this.

THE COURT:  He only said Truist.  It was the only one that had declined.

MR. CAPONI:  Yes.  I'm missing the point of the objection.  I asked the witness a question.  Am I correct that

these two companies have expressed no interest?  It's within
his knowledge.  He can answer me however he wants to answer me.
I'm not sure I have to establish that he knows that there's a
specific outcome to my question.

MR. ALEXANDER:  He hasn't testified to it.

MR. CAPONI:  He's about to.  That's the point of the
question.

MR. ALEXANDER:  So I thought we were doing cross.

THE COURT:  Right.  I mean, okay.  I'll allow it
because then you can just, I mean, you guys --

MR. ALEXANDER:  Based on how we've agreed --

THE COURT:  Yes.

MR. ALEXANDER:  Then go right ahead.

THE COURT:  Go ahead.

MR. ALEXANDER:  I'll withdraw the objection.

THE COURT:  Right.  Because he did not on direct say
that Sandton had declined.  It doesn't matter.  He's
withdrawing his objection.  Answer the question.

BY MR. CAPONI:

Q    Mr. Sandton (sic), am I correct that neither Truist --
sorry.  Mr. Park, that neither Truist nor Sandton Partners have
entered into any kind of term sheet or dip financing of the
Debtor?

A    Neither one have presented timesheets for this Court.

Q    And in your efforts today, you're focused on equity

financing and the dip financing side of it is on the back burner, correct?

A    Define back burner.

Q    I believe in your deposition, am I correct, that you testified that you're keeping those entities generally abreast of what you're doing, but it's not your focus.  Raising equity is your focus?

A    Equity is my focus.  I do communication for them.  Yes.

Q    And you're looking to raise equity and what you testified to is a new legal entity, correct?

A    I said NewCo.  What I mean by NewCo in my deposition, I was referring to the fact that NewCo, the way I look at it is a revised or reauthored Stream --

Q    If you open the binder in front of you, if you go to the first tab, it's your deposition.

A    Okay.

Q    If you could turn to page 27.

        THE COURT:  Wait a minute, do I have that?

        MR. CAPONI:  Yes, Your Honor.  It's in with the binder.

        THE COURT:  Hold on a minute.  Okay.

        MR. CAPONI:  If you go to page 27 to line 17.

        THE COURT:  Wait a minute.  Tab 1 you said?

        MR. CAPONI:  Line 17.

        THE COURT:  What page are these on?

MR. CAPONI:  27, Your Honor.

THE COURT:  Okay.

BY MR. CAPONI:

Q    The question I asked you, Mr. Park, was what entity, if this goes forward, would you anticipate these investors investing in?  Can you read me your answer?

A    I wrote -- I said the new legal entity.

Q    Thank you.

A    I was referring --

Q    Mr. Park, thank you for answering my question.

THE COURT:  Counsel is going to ask you a follow up. Okay?

BY MR. CAPONI:

Q    And the reason you were raising money -- you're looking to raise money in a new legal entity is because you testified that no one would put entity into this bankrupt debtor, correct?

MR. ALEXANDER:  Your Honor, I'm going to object.  I mean, he's not impeaching him and he's talking about out of court statements.  So I mean, if you have a question, you can ask him the question like a direct.

MR. CAPONI:  I just asked him a question about what he testified to in his deposition.

MR. ALEXANDER:  I'm just making my objection to the Court.  But he's asking what he testified to.  It mischaracterizes his testimony here.

THE COURT:  So this --

MR. CAPONI:  You can tell me if I mischaracterized his testimony.

THE COURT:  Well, lawyer says objection mischaracterized.  Your question is did you testify -- just re-ask the question.

BY MR. CAPONI:

Q    Sure.  Mr. Park, the reason you're looking to raise equity in a new entity is because no one's going to invest equity into this bankrupt debtor, correct?

MR. ALEXANDER:  Objection.  Mischaracterizes his deposition.

THE COURT:  He's asked a question.  He's not mischaracterizing.  I'm going to overrule.

MR. ALEXANDER:  Understood.

THE COURT:  He's just asking is this why you're looking for equity?  And it's yes or no.

THE WITNESS:  We were looking to raise money for the revised Stream TV networks.

BY MR. CAPONI:

Q    You're looking, Mr. Park, am I correct, to raise equity into an entity other than the Debtor because no one will invest equity into this bankrupt entity, correct?

A    We were looking to raise money for the Debtor.  When I made that -- can I go into detail on this?

Q    Okay.  Let's look at your deposition --

A    Okay.

Q    -- on Page 48, Mr. Park, at line 9 to 13.

MR. ALEXANDER:  Excuse me.  I didn't hear the page number.

MR. CAPONI:  Page 48.

THE COURT:  Line 9.

MR. CAPONI:  Line 9 through 13.

BY MR. CAPONI:

Q    This is your answer to one of my questions, Mr. Park, could you read lines 9 to 13?

A    Sure.  We wouldn't put equity into a bankruptcy situation. But we would put equity in a new legal entity or VSI, for example.  So depending on what approach you wanted to take based on how the bankruptcy regime goes accordingly.

Q    So again, do you stand by your deposition testimony that you wouldn't put equity into bankruptcy situation but you would put it into a new legal entity or VSI?

A    When I made that comment --

THE COURT:  Wait a minute.  But there's the rest of that statement.  That's what you said, right?

MR. CAPONI:  For example --

THE COURT:  No.  It says depending on what approach we wanted to take based on how the bankruptcy trading goes accordingly.  That's your testimony, right?

MR. PARK:  Yes.

THE COURT:  Okay.

MR. CAPONI:  Thank you.

BY MR. CAPONI:

Q    And you have at least four investors who are interested in investing in this new legal entity, correct?

A    Yes -- yes.

Q    And just --

A    Well, let me, as I stated going -- as I stated, when you -- can you further -- can you repeat that question?  I need more clarity on that.

Q    I believe you testified in your deposition as well as on direct here, that you have four companies that you're talking to about being potential investors in this new entity?

A    And Stream reorganize going forward --

Q    And this new legal entity is going to offer technology that allows 3D viewing without glasses across any type of technology platform, correct?

A    Where are you -- where are you reading that?

Q    I'm asking you a question.

A    Okay.  Can you repeat that again, please?

Q    Sure.  And this reorganized entity, new legal entity that you're referring to.

A    Yes.

Q    Its business is going to be offering technology that

73

allows 3D viewing without glasses across any type of technology platform, correct?

A     Yes.

Q     And that is the same line of business that Stream was in pre-bankruptcy, correct?

A     Yes.

Q     And this new legal entity is not Stream, the Debtor, correct?

A     I revised reorganized Stream is what I'm seeing as the new entity.

Q     So we have a debtor that's in bankruptcy, which is Stream.

A     Okay.

Q     And you're contemplating an entity, post-bankruptcy, correct?  Is that what you're referring to as a new entity or the reorganized entity?

A     I'm thinking of the entity Stream coming out of bankruptcy is what I'm thinking.

Q     But you're not raising money for Stream in bankruptcy; this Stream?

A     Stream in bankruptcy, the -- can you please clarify because let me explain how I'm perceiving the question versus what you say.

Q     Let's if we could take a look at page 41 of your deposition.

          MR. ALEXANDER:  Your Honor, I'm going to object in

terms of him just having him look at his deposition.  I mean

there's no impeachment.  There's nothing.  You don't just get

to show --

THE COURT:  Hold it right there.  I need another --

we'll take a quick break.  Okay.

MR. CAPONI:  Your Honor, Mr. Park.

BY MR. CAPONI:

Q    So when you use NewCo, you do so to express the difference

between VSI versus Stream versus NewCo, correct?

A    NewCo.  So yes.

Q    And NewCo may be VSI, correct?

A    NewCo is a revised, reorganized Stream coming out of

bankruptcy and VSI could be an investor and a reorganize Stream

going forward.

Q    But that reorganized entity may be VSI itself, correct?

A    In our discussions, it could be.  But are you asking is it

going to be?

Q    Well, let's start with it could be, correct?

MR. ALEXANDER:  Objection.  Calls for speculation.

BY MR. CAPONI:

Q    Mr. Park, let's take a look at since you answered this

question page 21.

THE COURT:  Wait a minute.  Wait a minute.  You

objected.  What was your objection?

MR. ALEXANDER:  Speculation.

THE COURT:  Your response.

MR. CAPONI:  He's the one raising the money.  I'm asking him what entity he's looking to raise the money into.  That's not speculation.  That's his job.

MR. ALEXANDER:  Well that wasn't the question.  And you already asked and answered that question.

THE COURT:  I'll allow it for what it's worth.  I already heard what he said.  But go ahead.

BY MR. CAPONI:

Q    So if we can go to page 41 of your deposition.  And actually, if you could start at page 40 and we go to line 22, what my question to you was I think we were talking about compensation.  But with regard to NewCo, has NewCo been formed yet?  Is there a NewCo or is this a concept?  And you answered the way, let me rephrase.  I like to use the word NewCo to express the difference between, you know, even VSI.  I would consider NewCo versus Stream.  So we are contemplating VSI, for example, as one of the legal entities that we will -- we can offer shares into or even a brand new entity.  But right now, the discussion has been about an entity outside the best way to describe an entity outside of Stream.  Did I read your testimony correctly?

A    Yes.

Q    Okay.  So you're raising capital for money for an entity currently that will be an entity other than Stream.  And his

current thinking is it's going to be VSI, correct?

A     Can I clarify that with a question please, sir?

THE COURT:  No questions.  Just answer.  It says what it says.

MR. PARK:  It says what it says.

THE COURT:  And the question is -- what's the question?  Is that your testimony?  Is this?  What are we asking him?

BY MR. CAPONI:

Q     So let me ask you this question, Mr. Park.  So your current thinking is that you are likely to use VSI as NewCo, but you may form a new entity or use a different entity other than VSI; is that correct?

MR. ALEXANDER:  Your Honor, I'm going to object.  Is he asking him to read what's on the paper?  Is that accurate?  I don't understand what the question is.

MR. CAPONI:  I just asked him a question.  I didn't ask him to read anything.  I'm not sure what you're --

THE COURT:  Well, you.  Listen.  Cut it out.

MR. CAPONI:  I'm not, honestly, I'm not sure what the objection --

THE COURT:  I'm just telling you guys cut it out. Okay?  You read him the question and you're asking him based on -- what are you ask -- you read his testimony and you're asking him to characterize this question?  What is your question to

him?

MR. CAPONI:  My question is just to be clear, Your Honor.  When I read my outline, I may read my question.  That is still a question.  I'm not reading his transcript.  I can still read his transcript in the question.  My question is, Mr. Park, so your current thinking is that you're likely to use VSI as NewCo but you may form a new entity or use a different entity other than VSI, is that correct?

THE COURT:  But he's objecting because you read the transcript.  Are you asking him to interpret what he said on the -- what are you asking him?  I'm kind of confused and he's objecting because maybe they're confused.  You read the transcript.  Are you asking him is that what he meant when he said this or what is the relevance of this transcript? Are you asking him something different or I'm not quite sure what?

MR. CAPONI:  All right.  To be clear to everybody --

THE COURT:  Okay.

MR. CAPONI:  Here's the transcript.

THE COURT:  Okay.

MR. CAPONI:  Closed.  I put it on the table.

THE COURT:  Okay.

MR. CAPONI:  So Mr. Park --

THE COURT:  Okay.

MR. CAPONI:  Your current thinking is that you are

likely to use VSI and NewCo, but you may form a new entity or use a different entity other than VSI; isn't that correct?

MR. PARK:  The way it's worded is tricky for me.

THE COURT:  Well, do you not understand the question?

MR. PARK:  That's why I'm asking.  Can I ask a question?

THE COURT:  He doesn't understand the question.

MR. CAPONI:  Okay.  Let's go to your transcript.

THE COURT:  Okay.

MR. ALEXANDER:  Your Honor, improper impeachment. You can't impeach someone if they don't give an answer and you can't use the transcript as --

MR. CAPONI:  I can impeach a witness if he does not know the answer to my question.

THE COURT:  Well, he said he didn't understand your question.  Let's try to break it.  Why don't you just -- just try to break the question down and then maybe we can get where he answers and then you can impeach him.

MR. CAPONI:  Sure.  So Mr. Park, you're currently contemplating using VSI as the NewCo that you're raising equity into, correct?

THE COURT:  It's a yes or no.

MR. CAPONI:  I think it is, Your Honor.

BY MR. CAPONI:

A    Technically, can I have a clarification.  So I would say

yes.

Q     Excuse me.  Did you say yes?

A     I will say yes.

Q     Okay.  And this NewCo, which may be VSI, may not even acquire any of Stream's assets, correct?

A     No.

Q     Let's go to your deposition at page 29, line 9 to 16.

THE COURT:  Okay.  Hold on.

BY MR. CAPONI:

Q     Are you there, Mr. Park?

A     Yes.

Q     Okay.  My question was maybe he misunderstood my question.

BY MR. CAPONI:

Q     My question was Stream may or not choose to -- sorry. NewCo may or may not to seek to acquire Streams assets; is that fair?  You answered, in other words, the decision will be made as to what they will do.  Yes.  But the way again, the investors are interested in the technology of 3D and the technology of 3D where that relies, that will be resolved with a court matter, I believe.  Is that your answer?

A     Yes.

Q     Okay.  So am I correct that the NewCo, depending on how this bankruptcy turns out, may or may not acquire Streams assets?

A     Yes.

Q   Okay.  So you are fundraising capital foreign entity that may never acquire Streams assets, correct?

MR. ALEXANDER:  I'm going to Object, Your Honor. Calls for speculation.

THE COURT:  Your response. He's objecting.

MR. CAPONI:  My response.  I'm sorry.  My response is he's the CFO who's out there raising equity and telling investors why he's raising this equity and you're seeking to have him retained by this Court to raise equity.

THE COURT:  We're not retaining anything today.

MR. CAPONI:  We're not.  But they proffer him to be the person to be -- strike that.  He's currently working for the company out there raising capital.  I'm entitled to ask him what he's raising capital into, for, and what he's telling people.  That's not speculation.  That's his job.

THE COURT:  Just ask him that directly.

MR. CAPONI:  I did.

THE COURT:  No.  Counsel, just who are you telling people the equity is for and what are you telling them? I mean, can you answer that question because it's to me it's even confusing.  I'll be honest.

BY MR. CAPONI:

Q   Mr. Park, you are raising capital for NewCo, correct?

A   Yes.

Q   And NewCo may be VSI, ultimately?

81

A     Last word right there.  I didn't like it.

THE COURT:  What?

MR. PARK:  Ultimately. It's my consideration

BY MR. CAPONI:

Q    Using your current thinking, Mr. Park, is that NewCo will be VSI, correct?

A    No.

Q    Turn to page 41, line 16 of your deposition.  Question I understand.  So the current thinking is that you are likely to use VSI as NewCo.  But you may form a new entity or use a different entity other than VSI.  After an objection, your answer was yes, that is correct.  Did I read that correctly?

A    Yes.

Q    So then currently your current thinking is that you're likely to use VSI as NewCo, correct?

MR. ALEXANDER:  Your Honor, I'm going to object.  He already answered the question.  And if Mr. Caponi is going impeach him, it's improper impeachment.  Then he just reads the impeachment that you just read it then you move on.

MR. CAPONI:  I read it.  I don't have to move on.  I can ask him a follow up question.  But I don't think move on is an objection.

MR. ALEXANDER:  You can't ask him the same question that he already answered.  He just didn't like his answer.  So I'm going to object and say it's asked and answered.

THE COURT:  He said it was asked and answer.  He just said yes.  This is correct.

MR. CAPONI:  Okay.  I'll move on, Your Honor.

THE COURT:  All right.  Thank you.

BY MR. CAPONI:

Q   So we've established, Mr. Park, that your current thinking is that NewCo will be VSI.  I think you testified a few minutes ago, am I correct, that the new entity may or may not ever acquire Stream's assets, correct?

MR. ALEXANDER:  We're objecting.  Mischaracterization.

THE COURT:  Wait a minute.  He said it's a mischaracterization.

MR. ALEXANDER: Of a compound question.

THE COURT:  Okay.

BY MR. CAPONI:

Q   Do you understand the question, Mr. Park?

A   No.

THE COURT:  Wait.  He's objecting.

MR. CAPONI:  Okay.  Well, I think if the witness doesn't understand the question, then --

THE COURT:  That wasn't his objection.  His objection was that it was a compound question.  And what else?

MR. ALEXANDER:  I believe we also said it was asked and answered and mischaracterizes his prior testimony.

THE COURT:  So he says it mischaracterizes prior testimony and already asked and answered.  Compound Mr. Caponi.

MR. CAPONI:  Okay.  Compound is not an objection as long as the witness understands the question.  And if the witness believes I mischaracterized his prior testimony, he's free to clarify in his answer.

THE COURT:  No.  When it's asked and answered, I say sustain or overruled.

MR. CAPONI:  Excuse me, Your Honor.

THE COURT:  If somebody objects that it's asked and answered, I either say yes, it has been and move on.

MR. CAPONI:  I'm sorry.  I don't believe it's been asked and answered.

THE COURT:  All right.  That's the point.

MR. CAPONI:  He had three, he had two.

THE COURT:  Right.  So you don't believe it's been asked and answered?

MR. CAPONI:  Correct.

THE COURT:  Okay.  And what is it you believe that was asked and answered?

MR. ALEXANDER:  Who the new entity is going to be that's going to have funding post-bankruptcy?

THE COURT:  And it's his answer.  Okay.  You said he already asked that question.

MR. CAPONI:  That wasn't the thrust of my question.

The thrust of my question was am I correct that your current thinking is to use VSI's NewCo and that that entity may or may not acquire the Debtor's assets?

THE COURT:  He answered that back a couple of questions earlier.  I'll allow it for what it's worth.  I have my notes and he said what he said.  But go ahead.  Do you understand the question?

MR. PARK:  Can you repeat the question please?

BY MR. CAPONI:

Q    Your current thinking, Mr. Park, is you're going to use VSI to be NewCo and NewCo may or may not acquire the Debtor's assets in this estate, correct?

A    Can you repeat the question very slowly?

Q    Your current thinking is to use VSI as NewCo and NewCo may or may not acquire the Debtors assets?

A    No.

Q    You say no/  Which part of my question are you --

A    That's the point.  I need clarification.

THE COURT:  So Mr. Caponi, you said it was not a compound question and then you ask him which part.  So how about we break it down into two parts because by asking him which part, you can see that it was two parts,

BY MR. CAPONI:

Q    Mr. Park, your current thinking is use VSI as NewCo, correct?

A    As a scenario.

Q    And NewCo, whether it's VSI or something else may or may not acquire the Debtors assets, correct?

A    That's as a compound question, too.

THE COURT:  No, it's not.  It may or may not.  It's not a compound.

THE WITNESS:  All right.  So yes.  It may or may not.  So yes.

BY MR. CAPONI:

Q    Thank you.  And you're, Mr. Park, am I correct, you're entitled to a success fee in your role raising capital of the Debtors, correct?

A    Yes.

Q    And it's your understanding you will receive a three percent success fee for any equity that you raise, correct?

A    Yes.

Q    And you will receive a one percent success fee for any debt that you raise, correct?

A    Yes.

Q    But you also believe you're entitled to receive equity compensation from NewCo as well, correct?

A    Yes.

Q    Could you turn to tab 2 of your binder?

A    Yes.

Q    Are you familiar with this document?  It's titled Motion

for the Debtors for entry of an order authorizing the Debtors
to enter into an employment agreement with Thomas Jung Ho Park
as Chief Financial Officer to the Debtors?

A     Yes.

Q     Did you review this document before it was filed with the
Court?

A     Yes.

Q     And if we look at paragraph 14 of this document.

A     Okay.

Q     Which is on page actually page 4.

A     Yes.

Q     Actually it goes on to page 6.  It lists --

        THE COURT:  Hold on, counsel.  I'm on my fourth pen.
Okay.  Paragraph 14, you said, counsel?

        MR. CAPONI:  Yes, Your Honor, on page 4 which
continues on to page 6 and alphabetically there's sub
paragraphs A through S.

BY MR. CAPONI:

Q     Do you see that, Mr. Park?

A     Yes.

Q     Do these sub paragraphs accurately describe what your role
is or will be with the Debtor?

A     That is correct.

Q     Okay.  We can turn to --

        THE COURT:  Hold on one second.  Thank you.  Okay.

Go ahead, counsel.

BY MR. CAPONI:

Q    Turn to paragraph 13 on page 4 under sub paragraph D titled compensation.  Do you see that, Mr. Park?

A    Yes.

Q    So under the proposal, you will receive $3,250 per week working as a CFO and accrue 1,750 shares of common stock and reorganize debtor.  Do you see that?

A    Yes.

Q    And then it says post confirmation through effective date, you'll receive $4,000 per week and have a weekly accrual of 1,000 shares of common stock and reorganize debtors, correct?

A    Yes.

Q    And then lastly part of data plan, you're entitled to 1 million shares of common stock in the reorganized debtors, correct?

A    Yes.

Q    There's no reference in here under compensation, Mr. Park, am I correct, to your receiving three percent for raising any equity, correct?

A    Yes.  On this paragraph.

Q    There's no reference in here either to your receiving one percent for any debt that you raise, correct?

A    Yes.

Q    Is it your understanding that you will be entitled to the

three percent for equity and one percent for debt even though it's not listed in this motion?

A    Mr. Caponi, can you repeat that question one more time please?

Q    At your deposition in a few minutes ago --

A    Yes.

Q    You testified that you're entitled -- you believe you're entitled to receive three percent of any equity that you raise in NewCo, correct?

A    Yes.

Q    And you believe you're entitled to one percent of any debt you raise in NewCo

A    That is correct.

Q    And but in this motion to employ you by the Debtor under compensation it does not reference three percent or one percent.  Do you agree with me on that?

A    Yes.

Q    My question is is it your understanding that you will -- you're still entitled to the three percent and one percent if you were to raise debt or equity?

A    Yes.

Q    And when it refers to in the compensation shares of in the reorganized debtor, is that NewCo?

A    Yes.

Q    And again, the current thinking is may be VSI, correct?

A    Could be.  Yes.

Q    And with regard to your efforts to raise capital, you don't see a distinction between VSI and Stream, correct?

A    I do.

Q    If you could take a look at your deposition at page 47, line 14 through 16.  And we'll start at line 7 so you have my question.  Mr. Park, I asked you so at some point, am I correct, that your strategy shifted from --

THE COURT:  Wait a minute, counsel.

MR. CAPONI:  I'm sorry,

THE COURT:  I'm sorry.  What page are we on?

MR. CAPONI:  Page 47, line 7 and I'll be going all way through line 16.

BY MR. CAPONI:

Q    So my question, Mr. Park, was so at some point, am I correct, that the strategy shifted from you being a banker to you becoming CFO and looking to raise money for NewCo: is that correct?  You proceeded to answer when I was offered the CFO position it wasn't just on NewCo.  I would still -- I was still focused on Stream/NewCo the overall entity as I know it as Stream.  There wasn't a bifurcation or delineation between Stream as a legal entity versus VSI as to what I was raising capital for.  Did I read that correctly?

A    Yes.

Q    Thank you.  So am I correct, based on what we just read

that if you raise equity or debt in either Stream or VSI, you're going to be entitled to either your three percent or one percent; is that correct?

A    In my discussion with investors, I never mentioned VSI as the source or the place that we offer shares of the new equity. In my conversation with the foreign investment firms, it's always been Stream or revised Stream coming out of bankruptcy.

Q    My question, Mr. Park, was if you raise based on your testimony, my question is based on your testimony that there was no delineation between VSI and Stream.  Am I correct that if you were to raise a million dollars in equity for VSI, you would feel that you're entitled to your three percent; is that correct?

A    Not VSI, no.

Q    So if you raise one percent in debt for VSI, you do not believe you're entitled to your one percent.

A    Not for VSI, no.

Q    Mr. Park, if you go stay on page 47, and we'll go down to line 17.

A    Okay.

Q    My question was, "So am I correct that you viewed your role as to bring new money to the table, what entity that would go into, how that money would be deployed was to be determined," question.  And then there were two objections by your counsel, and then you answered, "Okay.  Thank you.

Initially, it was through Stream because of DIP financing, as we were looking, as some of those discussions I had with my own people that I brought to the table, the questions started shifting more towards other legal entities that are all related to each other.  Of course, VSI, et cetera.  And the determination was made it's going to be DIP or is it going to be Equity."  Did I read that correctly?

A    Yeah.

Q    And then you go on to say, "We wouldn't put equity into a bankrupt situation, but we would put Equity in a new legal entity or VSI, for example."  Did I read that correctly?

A    Yes.

Q    Thank you.  And Mr. Park, you've been on conversations -- strike that.  You've been working -- since your time with the Stream, you've been remote, correct?

A    Yes.

Q    As has Mr. Rajan, correct?

A    That is correct.

Q    So when you communicate, you're doing it over phone or by video.

A    That is correct.

Q    Okay.  And during the discussion that you had regarding raising capital in your role here, you've been on conversations with Mr. Rajan where you're discussing both Stream and VSI, correct?

A    I would answer yes, but we never made that distinction between the two in terms of when we raise capital.  I want to be very clear on this.  Raise capital, we always said Stream. I never said -- we never said VSI.

Q    I think I'll -- we'll move on here.  Do you have any involvement, Mr. Park, with VSI?

A    No.

Q    So even though VSI is -- a current thinking is to make VSI NewCo, you have not been involved in any planning regarding VSI?

MR. ALEXANDER:  I'm going to object.  It misstates the witness's testimony.

MR. CAPONI:  I did not mischaracterize his testimony. If he believes counsel did, I think he can address that on redirect.

THE COURT:  I'll allow it for what it's worth.  He said what he said in his testimony.  I can read.  I'll allow it for what it's worth, okay?

MR. CAPONI:  I'll move on, Your Honor.  It's not that major a point, and I want to make sure everybody makes their plane tonight.  I'm not going to be the one getting yelled at.

THE COURT:  Counsel, let me back up a minute.  I don't mean to yell.  I just get a little frustrated, and right now, I'm not frustrated with you guys.  I'm just frustrated overall, okay?  So let's just put that on the table.  And I

like probably need to take a break to get something to eat because my sugar is probably dropping.

MR. CAPONI:  Then we should take a break, Your Honor. I have no reason --

THE COURT:  Right.  Well, let me -- no, let me let you finish with Mr. Park because you said you -- are you almost done with him, or you've got a bit to go?  I'm not rushing you. We have like --

MR. CAPONI:  Your Honor, I'm not almost done.  I mean, I'm getting close to the end, but this is a logical breaking point in my --

THE COURT:  Right.  Right.  Let's break right now. As I said, my sugar is dropping, so I can get a little antsy, and I apologize for that.  All right.  We'll break.  How time you want, four o'clock?  Back here at four?  That leaves us until 7:30.  That's like another three and a half hours.

MR. CAPONI:  We shouldn't take nearly that long.  I don't have that much left, but four o'clock works.

THE COURT:  But if you do, you have it.  I just --

MR. CAPONI:  I appreciate it, Your Honor.  I may take you up on it.

THE COURT:  I just need to get something.

(Recess taken)

THE COURT:  Please be seated.  Okay.  I think we left with Mr. Caponi cross-examining Mr. Park.

MR. CAPONI: Thank you, Your Honor.

BY MR. CAPONI:

Q    Mr. Park.

A    Yes.

Q    You're currently -- you don't have access to the Debtor's financial records, bank statements, and bank account information, correct?

A    Repeat that very carefully. There's some things I do, some things I don't. I want to -- could you clarify that question, please?

Q    Sir, although you've been fulfilling the role as CFO, you currently don't have access to the Debtor's financial records, bank statements, and bank account information, correct?

A    I have been given reports and the financial statements, but I have not been given direct access to anything of the bank account information itself.

Q    So you have not been given -- you've been given reports, and then you've been given --

A    Correct.

Q    -- those by Mathu Rajan, correct?

A    The reports were -- some by Mathu, some by others in the -- some by other people.

Q    Okay. But you have not been given access to the source information such as bank statements and bank accounts.

A    That is correct.

Q    But you're -- you've been the CFO for almost 60 days, correct?

A    I've been for about six weeks and the 60 days, yes.

Q    Who are the other people that would have provided you these reports?

A    For Stream itself?  Only Mathu.

Q    Only Mathu.

A    Yes.  Finance reports for Stream, yes.

Q    What other reports have you been given?  Sorry.  Strike that.  You said for Stream -- reports for Stream itself.  What financial reports were you given other than reports for Stream?

A    I request information on VSI.  Financial reports.

Q    And who has been giving you information related to VSI?

A    Su Joy (phonetic).

Q    And --

A    Subi (phonetic).  Excuse me.  Subi Joseph.

Q    Subi Joseph?

A    Yes.

Q    And am I correct that you have not been involved -- strike that.  Are you familiar -- are you aware that the Debtor has to file monthly operating reports with the Court?

A    Yes, I'm aware of that.

Q    But you have not been involved in preparing those monthly operating reports, correct?

A    That is correct.

Q    And even though you've been the CFO of the company since
May, you did not participate in the May monthly operating
report that was filed only a few weeks ago, correct?

A    That is correct.

Q    Have you ever seen the monthly operating reports?

A    I've seen not -- I've -- yes.

Q    Okay.  If you could turn to Tab 3 in you binder.

A    I'm sorry.  Can you repeat that again?

Q    Sure.  If you could turn to Tab 3 in your binder.

A    Yes.

Q    Which is the most recent operating report for Stream TV
Network.  Do you see that, Mr. Park?  Let me see if -- may
help, Mr. Park.  At the very top it indicates this was filed on
June 21, '23.

A    Yeah.

Q    So it would be last week.

A    Yes.

Q    So, Mr. Park, have you seen this document before?

A    No.

Q    Did you have any involvement in compiling information for
this document?

A    No.

Q    Do you know who would have provided the financial
information to compile this document?

A    I would not.

Q    Stream has -- if you look at the first page of this document, under monthly operating report 1, 2, 3, 4, 5 lines down, it says right before supporting documentation --

MR. ALEXANDER:  Your Honor, I'm going to object.  He testified he doesn't recognize this document.

MR. CAPONI:  One, Your Honor, the document is admissible as a admission by the Debtor.  It was filed by the Debtor, and therefore it's a -- it's admissible for that purpose.  It's also a business record of the Debtor.  And I'm not asking -- I'm simply asking him a question that he either knows the answer to or he doesn't.

MR. ALEXANDER:  But he -- this witness doesn't have any personal knowledge of the document.  He's asking him to read a document.  If he's moving it into evidence, you still need to move it through a witness somehow, and this witness stated that he has no personal knowledge of it.

MR. CAPONI:  So I'm going to ask him a question about some of the information in this document.  Either he knows it -- it either comports with his knowledge or it doesn't.  He can let us know.

MR. ALEXANDER:  I don't believe that addresses the objection.

THE COURT:  The objection is that this isn't into evidence, correct?

MR. ALEXANDER:  Well, it's not entered into evidence.

THE COURT: Okay. And he testified he doesn't know anything about it.

MR. ALEXANDER: Correct.

THE COURT: And therefore, because he doesn't know anything about it, he's going to -- he can't ask him any questions about this document. He can ask him questions. He's going to say he doesn't know. He didn't prepare it. I'll allow it for what it's worth.

MR. CAPONI: Thank you, Your Honor.

BY MR. CAPONI:

Q    Mr. Park, it says Debtor's full-time employees as of the date of the order for relief, zero. Do you see that?

A    Yes.

Q    And that's consistent with your understanding that the Debtor has no full-time employees, correct?

A    That is correct.

Q    And that the only person working for the Debtor, or people working for the Debtor at the moment would be yourself and Mr. Rajan.

A    Correct.

Q    And you said at your deposition last week it was your understanding that the Debtor only has a few thousand dollars in the bank -- its bank accounts, correct?

A    That's correct.

Q    And the Debtors have no income stream or sources of

revenue at this time, correct?

A    Correct.

Q    And as of May, you had performed a calculation and determined that the Debtor's legal fees in this bankruptcy to date were approximately $750,000, correct?

A    Yes, from my -- yes.

Q    And that does not include whatever fees have been incurred in June including this week and this proceeding, correct?

A    Yes.

Q    During your examination by Mr. Vincent, you were asked about purchase orders.  Do you recall that?

A    Yes.

Q    And I believe you testified that you were not involved in negotiating the purchase orders.  That was Mr. Rajan, correct?

A    That is correct.

Q    But you -- after the purchase orders were secured, you had communications with the potential buyers regarding the purchase orders; is that correct?

A    Not the purchase order.  Not specifically with the purchase order.  That was not the communication.

Q    Okay.  Did you speak with the -- so let's refer to the parties in the purchase orders who issued the purchase orders who will be the buyers.  Do you agree with that?

A    Okay.  Yes.

Q    Did you have communication with those potential buyers?

A    Yes.

Q    And what were you communicating with them about?

A    Getting their financial statements.

THE COURT:  Five-minute break.

MR. CAPONI:  Sure, Your Honor.

THE COURT:  Two-minute.

(Recess taken)

UNIDENTIFIED SPEAKER:  It always needs your attention, whether you like it or not.

THE COURT:  I know.

UNIDENTIFIED SPEAKER:  Yeah.

THE COURT:  I'm not answering my phone.  I ignored it, but --

UNIDENTIFIED SPEAKER:  You can't help it.  You can't help it.

THE COURT:  You can't.  All right.  I don't think we'll have any more interruptions today.

UNIDENTIFIED SPEAKER:  You're human.  I mean, you can't help it.  You're human.

THE COURT:  Well, you can see I have short patience. All right.  Whenever you're ready, Mr. Caponi, we can go back on the record.

MR. CAPONI:  Thanks, Your Honor.

THE COURT:  All right.  And I think that's the last interruption we're going to have for today.  I have to put the

mean judge hammer down.

MR. CAPONI:  I'm not a big believer of conspiracy theories, but everybody seems to have drank all the water.  I think that's the way --

THE COURT:  Oh, you need some more water?  You need --

MR. CAPONI:  No, no.  We found some, Your Honor.  But I brought bottles, but someone -- somehow they all disappeared.  But --

THE COURT:  Do you want -- do we need to get some more?  We can get more water.

BY MR. CAPONI:

Q    Okay.  Mr. Park.

A    Yes.

Q    Pick up where we left off.

THE COURT:  Okay.

BY MR. CAPONI:

Q    You spoke to the buyers under the purchase orders regarding her financial information.

A    That is correct.

Q    And who were the buyers under the purchase orders?

A    It was -- the ones that I communicated with?

Q    Yes.

A    Southern Telecom.

Q    Okay.

THE COURT:  Who?  Who did you say?

THE WITNESS:  Southern Telecom.

THE COURT:  Okay.

BY MR. CAPONI:

Q   And -- but as we sit here today, the Debtors did not have the ability to satisfy those purchase orders, correct?

A   Are you asking for my personal opinion or knowledge of the situation?  Would -- I just want to have you clarify that question first.

Q   I'm asking -- sure.  I'm asking for your knowledge.

A   Okay.

Q   As you sit here today, the Debtors don't have the ability to satisfy those purchase orders, correct?

A   I can't give a definitive answer on that one.

Q   So you say the answer is no?

THE COURT:  Can't give a definitive answer on that.

MR. CAPONI:  Oh, okay.

BY MR. CAPONI:

Q   Well, let's turn to Page 77 of your transcript.

A   Okay.

Q   And want to go to Line 2.  My question to you, Mr. Park, was, "And as we sit here today, does Stream have any funds -- strike that."

"As we sit here today, does Stream the Debtor have the capacity to fulfill any purchase orders?"  You answered,

"The legal entity Stream itself you are seeking, correct?"  My answer -- my -- I responded, "Correct.  Yes, the Debtor."  And you said, "Okay.  The Debtor.  The Debtor right now from my understanding and from what I had seen, okay, would not at this particular moment have the cash to do anything, okay?  To fulfill that PO, because we need to get raising the funds and so forth."  Did I read that correctly?

A    Yes, you did.

Q    Okay.  And the Debtor does not have, not only the funds. It doesn't have the infrastructure or the employees or the material or the capacity to fulfill those purchase orders, correct?

A    Let's go back to -- please repeat that question again, please?

Q    Sure.  Stream, the Debtor, as you sit here today, does not have the infrastructure, the employees, the material, capacity, or the cash to fulfill these purchase orders, correct?

A    Yes.

Q    So just to be clear, when you say yes, yes, you agree with me that Stream does not have the capacity to fulfill the purchase orders, correct?

A    Yes.

Q    And it's your understanding, am I correct, that VSI has been providing funds and/or satisfying the Debtor's obligations, correct?

A    What obligations are you referring to?

Q    So Stream's building expenses that are being satisfied, to your knowledge, are being satisfied by the VSI, correct?

A    The way you phrased that up, could you clarify that more? The part of the VSI piece, please?

Q    I'm not sure I can be more specific, but let me try.  To the extent that debtor is incurring expenses and fees that are being paid, they're being paid by Mr. Rajan's other entity, VSI, correct?

A    Yes.

Q    As you sit here today, you cannot give me or the Court -- you can't quantify how much VSI has been paying of the Debtor's expenses, correct?

A    That's correct.

Q    And VSI, is your understanding, is an entity that is controlled by Mr. Mathu Rajan, correct?

A    That is correct.

Q    And if we turn back to Exhibit 3, which is the monthly operating report.

A    Yes.

Q    If you go to Page 2?

A    Yes.

Q    Under Part 1, Cash Receipts and Disbursements.

A    Yes.

Q    Section C, Total Disbursements --

THE COURT:  Wait a minute, what?  Which one are we at?

MR. CAPONI:  Exhibit 3?

THE COURT:  Oh, 3.  I'm at 2.

MR. ALEXANDER:  Tab 3.

MR. CAPONI:  Tab 3.

THE COURT:  Tab 3.

MR. CAPONI:  Sorry, Tab 3.

THE COURT:  Okay.  Which is marked CR-44.

MR. CAPONI:  Part 1  --

THE COURT:  Yes.

MR. CAPONI:  Subsection C.  At the top of the second page.

BY MR. CAPONI:

Q   And it says, "Total disbursements net of transfers between accounts."  And it says, "Cumulative over the course of the estate, $607."  Do you see that?

A   Yes.

Q   Do you see any notation on this page that indicates whether any of that money was paid by VSI?

A   No.

Q   Do you see any indication in this area of the report that indicates any of the money on behalf of the Debtor has been paid by VSI?

A   No.

Q    Okay.  And if you go to the next page, under Part 5, Professional Fees, and Expenses, under III, it says, "U.S. Trustee."  And then it has Paid Cumulative, on the far right column, $500.  Do you see that?

THE WITNESS:  Repeat that objection again.

MR. ALEXANDER:   Your Honor, I'm just going to object because he's just asking him to read a document.  It's easy to see something on.  I mean, this isn't --

THE WITNESS:  No.

MR. ALEXANDER:  -- any testimony that Mr. Park has knowledge of.  It's just not relevant.

MR. CAPONI:  I'm asking Mr. Park if he sees it and then I will ask the question that will define the relevance.

MR. ALEXANDER:  He's trying -- it's a document.

THE COURT:  He's asking him, does this document have this on it?  I'll allow it, again, for what it's worth.

MR. CAPONI:  Thank you, Your Honor.

BY MR. CAPONI:

Q    See here where it says $500, Mr. Park?

A    Yes.

Q    Do you know how fees to U.S. Trustee's office is calculated?

A    No.

Q    And you're unaware as to whether or not there's any formal arrangement between Stream and VSI for how the VSI will be

compensated or repaid for the money it's paying on behalf of Stream, correct?

A    Your Honor, no.  I do not know.

Q    Thank you.  And what have -- to the extent there is an arrangement between the VSI and Stream for these expenses, that would have been handled by Mathu Rajan, correct?

MR. ALEXANDER:  Clear objective, calls for speculation.

MR. CAPONI:  To the extent you know.

THE COURT:  Move off with the speculation.  Respond. Respond, sir.

MR. CAPONI:  Either the witness, it's -- I'm not asking the witness to speculate, I'm asking if the witness knows.

THE COURT:  He said he didn't know already, anything about any reimbursement agreement.  And now you're asking him what about that arrangement?

MR. CAPONI:  He's saying he's unaware of what the arrangement may be.  I'm asking him if he knows, to the extent there is an arrangement, whether that was produced by Mr. Rajan.

THE COURT:  Answer the question if you know.

THE WITNESS:  No.  I don't know.

MR. CAPONI:  Thank you.

BY MR. CAPONI:

Q    All right.  Getting near the end here.  You have, am I correct, Mr. -- well, going back to your prior testimony.  When you first joined in May, you were in contact with Mr. Rajan every day up until he became ill, correct?

A    Yes.

Q    And when did he become ill?

A    After his trip.

Q    I've no idea when his trip was.  Can you tell us a month?  A week?

A    It's June.

Q    Mid-June?  early June?

A    I think towards, my best guess is, like, the second week, first week, second week timeframe.

Q    Was it --

A    I suspect second week.

Q    Before or after, say June 10th?

A    I'm not sure when he came back from his trip.  That's when he got injured during his trip.  That was what I was informed.

A    Okay.

Q    And then you testified that after he became ill, you were talking to him roughly every other day.

A    Some days, day-to-day, some days would be a week at a time or not even a week or four or five days.  We're not -- we maintain contact with him.

Q    And in advance of your deposition, I believe you testified

earlier that you prepared with Mr. Rajan for roughly 90 minutes, correct?

A    Yes.

Q    And your deposition was just last week?

A    Yes.

Q    Okay.  You were asked questions regarding the potential -- well, you were asked questions by Mr. Alexander regarding the term sheet from John Schanne.  Do you recall that?

A    Yes.

Q    Okay.  And I believe you testified you had no involvement with that term sheet?

A    That is correct.

Q    Okay.  And at your deposition, am I correct in that you told me that as far as you knew, the company was not progressing --

MR. ALEXANDER:  Your Honor, we're going to object. He's asking him about hearsay, an out of court statement.  You know, if you have a question, you can -- he's asking him what his testimony was that was out of court.  If he has a question, just ask the question.

MR. CAPONI:  I just did ask him a question.  I'm not sure what the objection --

THE COURT:  The objection was that you asked him a question about something he said in his deposition, as opposed to just asking him, and then impeaching him with his

deposition.  Is that what you're saying?

MR. ALEXANDER:  Yes, Your Honor.

MR. CAPONI:  I'm not impeaching him or seeking to impeach him, I am -- it is not hearsay to ask a witness about his own statement because the witness is in court and able to respond to his statement.

MR. ALEXANDER:  He's asking him about an out of court statement, which is hearsay.

THE COURT:  Could you just rephrase the question?

MR. CAPONI:  Sure.

BY MR. CAPONI:

Q    Mr. Park, were you aware of the term sheet at your deposition?

A    Yes.

Q    Thanks.  Then why at your deposition, did you tell me that the company was not progressing towards any form of term sheet with an investor?

A    At that point in time -- at that point in time, I hadn't -- I had not seen the term sheet to confirm that.  For me, I need to see the term sheet.

Q    Let's take a look at Page 34 of your deposition.  Line 25, I think I may be off here.  So my question is starting at Line 22.

"Q    So am I correct that while the DIP financing opportunities you explored are still -- you were

keeping those channels of communication open?  Those

-- you are not progressing towards a term sheet or

any kind of definitive financing at the moment?"  And

you answered:

"A   No, not with them.  Term sheets with the new

co."

Do you see that?

A     Yes.

Q     Why did you not tell me that it was your understanding
that the Debtor may have entered into a $300 million term sheet
several weeks before your deposition?

A     I was not actually -- I hadn't seen term sheets.  I -- I -
- there was a discussion of -- of -- there was a discussion.
I'm trying to think if I can arrange --

          MR. ALEXANDER:  Objection.

          THE WITNESS:  -- about the possibility --

          THE COURT:  Whoa, whoa, whoa.  You're objecting about
what?  Objecting to his answer?

          MR. ALEXANDER:  I am going to object.  No, Your
Honor, I'm going to object to his answer to the extent that the
only basis he knows it is based upon discussions with --

          THE WITNESS:  Yeah.

          MR. ALEXANDER:  -- Counsel.

          MR. CAPONI:  There's nothing in my answer that would
implicate a communication with Counsel.

THE COURT:  Wait a minute.

MR. CAPONI:  My question wouldn't implicate Counsel.

THE COURT:  Right.  But he keeps saying that the answer would require, you know, revelation of discussion with Counsel.

Is that what you're saying?

MR. ALEXANDER:  Yes, Your Honor.

MR. CAPONI:  Now, the question was, why did you not tell me about the term sheet?  So Mr. Alexander is suggesting that he was told by his Counsel not to tell me and that -- I'm okay with that.  He can claim privilege over it.

MR. ALEXANDER:  I ask if Mr. Caponi has a response, Your Honor.  I think it should be to the Court and not to me.

MR. CAPONI:  There's my response, Your Honor.  Mr. -- my question was --

MR. ALEXANDER:  No.

THE COURT:  Okay, he's asserting privilege.  Is that what -- attorney-client privilege?

MR. ALEXANDER:  I was asserting attorney-client privilege to the extent that the only basis Mr. Park knew about -- to the extent he knew, and it requires him to answer, I'm instructing him not to answer.  If he independently knows it, outside of discussions from Counsel, then he can answer.

MR. CAPONI:  So to make this record abundantly clear, I'm going to make sure I restate my question.

THE COURT:  Okay.

BY MR. CAPONI:

Q   Mr. Park, why at your deposition did you not tell me that you were aware that the Debtor had executed a $300 million term sheet in response to this question here on Page -- we just read on Page 34?

MR. CAPONI:  Hold up, please.  I'm uncertain -- I'm not sure if you're going to reassert the objection.

THE COURT:  Well, he didn't.

MR. CAPONI:  Okay.  Well, I wasn't sure.  I just wanted to make sure,  I didn't want to get --

THE COURT:  If he was going to, he would have.  I'm not asserting one.  I don't know, I mean, well, I'm -- I just called the strikes and balls.

Go ahead, Mr. Park.  He asked you why did you --

THE WITNESS:  I would like to know where that term sheet is at.

BY MR. CAPONI:

Q   Were you aware -- am I correct, from your testimony, you said, a minute ago, you were aware that a term sheet may have been signed or existed?  Is that correct?

A   There were discussions of financing about a 300 number, but I've never seen or heard about a term sheet.  I'd never definitely seen, "Here's a term sheet cover."  No one's ever said that.

Q    Well, what were you aware of regarding this potential $300 million --

A    That the discussions were under -- under -- the discussions were happening, so I was at least notified of that.

Q    Okay.  So you're the -- and this term sheet was dated January 6th, correct?

A    June.

Q    June 6th, correct?

A    Yes.

Q    Which is more than two weeks -- around two weeks before your deposition, correct?

A    Right.

Q    And you're the CFO of the company, correct?

A    Right.

Q    And you're in contact with Mr. Rajan on a regular basis during that -- between June 6th and your deposition, correct?

A    Correct.

Q    And is your testimony that Mr. Rajan never told you that he had an executed term sheet for $300 million?

A    He had only talked about this Chinese company.  That's it.

Q    That wasn't my question.  Did Mr. Rajan --

        THE COURT:  No.

        MR. CAPONI:  -- tell you --

        THE COURT:  His answer's he's not.

        MR. CAPONI:  Okay.

THE WITNESS:  He didn't come here.

BY MR. CAPONI:

Q    As you sit here today, are you surprised as the CFO who spoke to the CEO on a regular basis that he -- and you're in charge of raising funding, that he didn't tell you that he had an executed term sheet for $300 million?

A    Am I surprised?

Q    Yes.

A    Well, the way -- no, I'm not surprised, no.

Q    So in your experience, in this -- the financial world that you've been in, a company lists debtor's position of being bankrupt with no employees, no source of income, and $2,000 in the bank, it wasn't noteworthy to tell the CFO, in advance of his deposition, that the company secured a $300 million term sheet?

A    Term sheets are -- I -- I -- I want to speak for -- term sheets are one of the things I always look for in term sheets is whether it's definitive or not, okay?  So I don't even know how to answer that question because there's some term sheets that are very definitive in terms of what they're for.  So I -- I could not answer that question in terms of being surprised or not.  You're also assuming that the dollar amounts internal, okay?  I just -- for me, I actually would like to see something written before I commit to comment about it.  When I infer-- I've learned over time in this industry, you have to see it in

writing first.  So it doesn't surprise me after I see it.

Q   My question was -- well, I'm not sure I understand your answer.  My question was, given the circumstances, are you surprised that you're the only other employee -- you're effective, your comrade in running this company --

A   Right.

Q   There's only two of you.  It doesn't faze you or bother you that he didn't tell you about the term sheet?

        MR. ALEXANDER:  Your Honor, I'm going to object.  I mean, he's in the hospital.

        THE COURT:  He -- well, now, you asked him was he surprised, and he said no.  So now you're asking him another question -- different.  He said he wasn't surprised.  So now you're asking him, was he bothered by him not telling him that.

BY MR. CAPONI:

Q   I'm -- well, I'm asking you, why it would not -- why you were not surprised, I guess, is my question.  I'm -- I'm -- laying some groundwork here.  I would think in your shoes, a person would kick open the door and be popping champagne.  So how is it that you weren't surprised or troubled that you were not told about this, as the CFO.

A   For me, I need to see the term sheet written and then, at the same time, see whether there's a definitive term sheet. The term sheets are dependent on what practice and what part of the world.  I don't out credence to term sheets until I

actually see what the requirements are.

Q    I --

A    Can we just give you an example?  I've seen a term sheet for $21 billion.  I didn't buy it.  Okay?  So I -- until I actually read it.  It's all the conditions for the term sheets, Some term sheets have two pages, and some will be four or five. It depends on the nature of the transaction and so forth.  So what I'm saying to you is, until I see it.

Q    And are you aware of that the term sheet was filed with the Court less than 24 hours after your deposition?

A    Isn't it?  Counsel?

Q    I'm asking you, are you aware -- strike that.  You testified that as of the date of your deposition --

A    Right.

Q    No one had shown you the term sheet.

        MR. ALEXANDER:  Your Honor?

BY MR. CAPONI:

Q    You have not seen it, correct?

A    That is correct.

Q    And that's one of the reasons you didn't tell me about it when we were talking about financing, correct?

A    That is correct.  Yes.

Q    When I asked -- what I'm saying to you, were you aware that less than 24 hours after your deposition, that term sheet was filed with the Court and publicly disclosed to the world?

A    Does it make a difference he gave me the information?  I mean, it came from --

Q    Sir, I'm not asking you who gave you anything.

A    All right.

Q    And that's because I don't want to intrude on the privilege.  My gosh --

A    My -- I want to in -- assert my client's privilege, that's where I'm at.

Q    Sure, this term sheet --

A    Yes.

Q    I'm not asking what you saw.

A    All right.

Q    I'm telling you, were you aware that the term sheet was disclosed to the public and filed with the Court less than 24 hours after your deposition?

A    Yes.  Okay.

Q    You were aware of that?

A    I was aware that it was filed.  Yes.

Q    And when did you become aware of that?

A    Within a matter of -- after the deposition, that's when I was told about the definitive nature of this term sheet.

Q    So the first time someone showed you the term sheet was after your deposition?

A    That -- actually, yeah.  That is correct.

Q    And who showed you the term sheet?

MR. ALEXANDER:  I disclosed this to you.  I'm going to object to the extent that it was based on discussions with Counsel.

MR. CAPONI:  Well, I'm not asking for any discussion, just who gave my documents.  I don't think it's a privilege --

THE COURT:  Overruled.  Answer the question.  Who gave it to you?

THE WITNESS:  My counsel.

BY MR. CAPONI:

Q   And then, just to put a finer point on this, you spoke with Mr. Rajan for 90 minutes before your deposition and neither he, nor anyone else, including Counsel, gave you or told you -- gave you the term sheet before your deposition?

MR. ALEXANDER:  Your Honor, we'll object.  He asked him specifically what Counsel would have told him prior to his deposition.

MR. CAPONI:  Sorry --

MR. ALEXANDER:  I'm objecting based on attorney-client privilege because you asked him specifically whether or not he had a -- discussions with Counsel.

THE COURT:  Well --

MR. CAPONI:  Let me rephrase that.

THE COURT:  No, then he --

MR. CAPONI:  I meant for discussions.  Let me --

THE COURT:  Right.  But he said neither Mr. Rajan or

Counsel told you --

MR. CAPONI: Well --

THE COURT: -- which would have to mean he'd tell you what his Counsel told him. We agree.

MR. CAPONI: Sure.

BY MR. CAPONI:

Q So you spoke with Mr. Rajan for 90 minutes before your deposition and he didn't tell you or give you the term sheet, nor did Counsel give you the document, the term sheet, before your deposition, correct?

A Yeah, I did have the information printed out.

Q Do you know who negotiated the term sheet on behalf of Stream?

A I do not.

Q Since -- well, strike that.

MR. CAPONI: Your Honor if I could have a five minute recess to --

THE COURT: Well, you can have as many, since I've taken, probably, at least four of them.

MR. CAPONI: Well, if we could take a quick ten minutes and then I think I'll be done but I just want to confirm and make notes.

THE COURT: But I'm going to stay here.

MR. ALEXANDER: Your Honor --

THE COURT: So you don't -- No, no, no, no. You can

have your break.  I'm not going to move so when you come back
and you're ready, you don't have to look for me.

MR. CAPONI:  Thank you, Your Honor.

(Recess taken)

THE COURT:  Please be seated.

MR. CAPONI:  Thank you.  Your Honor, I have no
further questions, Your Honor.  But I did want to move into
evidence Exhibit -- or Binder Tab 2, which was the motion to
employ Mr. Park filed by the Debtor, as well as, the Debtor's
monthly operating report for May.

THE COURT:  Okay, now, let's start with the
application which you said was listed as --

THE CLERK:  Tab 2 and which one?

THE COURT:  Tab 2.  Which is -- do you have a number
on this?  Or you want me to take -- what do you want me to do?

MR. CAPONI:  I believe it's admissible as a statement
admission by a party opponent.  It's admissible as a business
record.  And if we have to -- and it's also admitted that Mr.
Park testified that he reviewed it and approved it before it
was filed.

THE COURT:  Okay.  So you want it admitted.  Then you
have to mark it.

MR. ALEXANDER:  Your Honor, I object.  I don't
believe a motion itself can be admitted evidence.  I mean,
that's hearsay.  It's also not a business record.

THE COURT:  I don't know.  Well, let's start with the business record.  Whose business record?

MR. CAPONI:  This will be -- well, one, it was authenticated, testified to, and approved by the witness. Anything can be moved into evidence.  I've never heard the no motion rule to a business record of the Debtor.

MR. ALEXANDER:  It's not a business record of the Debtor.  He hasn't established that a motion is kept in the ordinary course of the Debtor's business.

THE COURT:  Well, I'm not going to sustain, not as a business record, but that doesn't mean it might not be admissible.  Next, I don't think it's a business record because we have no testimony that it was kept in the ordinary course, who all it is -- I mean, there's a whole litany that you have to have for a business record, and I don't think there's any testimony or the record for that, so.

MR. CAPONI:  Not to quibble, Your Honor, but it is -- I don't need testimony.  It's on the Court docket.  It's documented.  It documents everything the Debtor files.

THE COURT:  Well, it doesn't have to be -- that's not a business record.  Who -- the docket belongs to the Court. It's not the Debtor's business record.  So you're saying it's a business record of the Court?

MR. CAPONI:  Oh, I think it qualifies as a business record of the Court or the Debtor in that it's contained --

THE COURT: Because the Court has --

MR. CAPONI: -- in the ordinary course of business.

THE COURT: By who?

MR. CAPONI: Well, the Debtor uploads these -- every motion, everything the Debtor does, the business records of the Debtor, the motions it files, the monthly operating reports is a business activity of the Debtor. They are filed on the docket as required, and they're maintained on the docket in the ordinary course of business of both the Debtor and the Court so the public can see them, and they qualify as a business record.

But nevertheless, Mr. Park testified that he reviewed and approved this document. How does it not come in?

THE COURT: Counsel, I'm going one by one.

MR. CAPONI: Okay.

THE COURT: I said -- I'm not quite sure dockets are -- I've never had to look at the Court's dockets as business records, because they're not made in the ordinary -- the business records are usually records that are prepared by and maintained by the organization. The Court never prepared this. We might have made -- so that's no different.

Let me tell you how I equate it. If an appraiser gives an appraisal to a mortgage company, it's not their business records. It's just they have a copy of it. The fact that somebody put a motion on the -- the Court didn't prepare it. There's all sorts -- again, just because I have a copy

doesn't make it the Court's business records.  There's some things that go onto it.  Now, maybe you believe it's the company's business record and --

MR. CAPONI:  Well, Your Honor, if I may.

THE COURT:  Mm-hmm.

MR. CAPONI:  We don't need to get into a business record.  It's an admission by a party opponent.

THE COURT:  All right.  Let's -- all right.  Let's go to the next one.

MR. CAPONI:  Right.  So it's an admission by a party opponent.  It's not -- it doesn't even qualify as hearsay. This was drafted and filed by the Debtor -- a representative of the Debtor.  It's a statement by the Debtor.

THE COURT:  Okay.  Anyway --

MR. CAPONI:  And I don't think even Mr. Alexander can dispute it's a statement by the Debtor because it is a motion by the Debtor making statements.  And that -- it's admissible for that reason alone, which is not hearsay.

THE COURT:  All right.  Mr. Alexander?

MR. ALEXANDER:  I'm evaluating that, Your Honor.

THE COURT:  Okay.

MR. ALEXANDER:  Just give me one second.

THE COURT:  Well, let's see what statement against entry -- statement -- what are we -- let's look at the rule book.  I think we looked at that before, but I'll look at it

again.

MR. CAPONI:  It's 801D, Your Honor.

THE COURT:  Mm-hmm.  801D?

MR. CAPONI:  D as in David, I believe.

THE COURT:  D what?

MR. CAPONI:  Or maybe B as in boy.  I'm going to doublecheck.

THE COURT:  Right.  The statements that are not -- a statement that meets the following conditions is not hearsay.  It's a declarant to witness prior statement.  Oh, that's different.  That -- we're not talking about that.  An opposing -- you're talking about D2, right?

MR. CAPONI:  I think it would be D2, Your Honor.

THE COURT:  Yeah, that's what I just said, D2.  The statement is offered against an opposing party and was made by the party in an individual or representative capacity, is one that the party manifested that is adopted or believe to be true, was made by a person whom the party authorized to make this statement on the subject, was made -- or was made by the party's agent or employee on the matter within the scope of their relationship while it existed, and -- well, we're not going to go to E because we're not talking about coconspirators.  That's typically in a criminal proceeding.

MR. CAPONI:  I think it satisfies almost every one of those criteria, Your Honor, and their --

THE COURT:  Mr. Alexander?

MR. CAPONI:  So I don't know if Mister --

THE COURT:  Well, I think D and E are or. I don't -- no, I don't know.  It says the statement must be considered but does not by itself establish the declarant's authority under C, and the existence of the scope of the relationship under D, and we're not going to talk about E because we're not talking about conspiracy.

MR. CAPONI:  Right.

THE COURT:  And I think your position --

MR. CAPONI:  Yes.

THE COURT:  -- the last time we talked about this was that there's no dispute that it was established by -- under the declarant's authority under C or the existence or scope of the relationship under D.

MR. CAPONI:  Correct.

THE COURT:  If this was made by the party's agent or employee on a matter within the scope of that relationship while it is --

MR. ALEXANDER:  I mean, is there a particular part of the document that they're saying is the statement, or are they seeking to move the entire document in?  Because there's legal argument.  I mean, so I'm not --

THE COURT:  So what he --

MR. ALEXANDER:  -- quite sure what evidence he's

trying to move in.

THE COURT:  Right.  Which parts.  So he wants to know which statement --

MR. CAPONI:  The entire document.

THE COURT:  Jurisdiction and all of those things?

MR. CAPONI:  They are all the statements of the Debtors.

THE COURT:  Okay.

MR. CAPONI:  Debtor chose to make those statements. I didn't make Mr. Alexander or anyone else type them up.  They didn't get in there by someone else's hand.  They're the statements of the Debtor.

THE COURT:  Okay.  Mr. Alexander?  This is the first time I've heard a motion as a statement, but I'm --

MR. ALEXANDER:  I mean, we'll preserve our objection.

THE COURT:  I'll look at it again, you know.  I'll overrule the objection and allow it for what it's worth.

MR. ALEXANDER:  Understood.

THE COURT:  I mean --

MR. CAPONI:  In the same argument, I think what applied to Tab 3, which is the Debtor's monthly operating reports -- report for May.

UNIDENTIFIED SPEAKER:  That's --

THE COURT:  Well, what did we mark the motion?  Was it being marked as something?

MR. CAPONI:  Excuse me, Your Honor?

THE COURT:  Is the motion -- does it have a number on it?  If it's in there, I don't see a CR number.

MR. CAPONI:  It's CR222, Your Honor.

THE COURT:  Where?

MR. CAPONI:  It's not marked on the document.  It's in the exhibit binder, CR222.

THE COURT:  All right.  We'll --

MR. CAPONI:  We're going to add that to our list.  We have a list typed up for Your Honor of all these.

THE COURT:  Well, no, just so that my ESR knows how to -- if we need to look for this, because I'm going to look at this.

MR. CAPONI:  Okay.

THE COURT:  He just -- you just need to tell him which one it is.

MR. CAPONI:  Sure.  This is --

THE COURT:  CR what?

MR. CAPONI:  222.

THE COURT:  All right.

MR. CAPONI:  And it is docket entry on this Court docket 234.

THE COURT:  Because I'm sure I could have just taken judicial notice, so -- but you're not going to go there.

MR. CAPONI:  And Tab 3 --

THE COURT:  It's CR44.

MR. CAPONI:  -- is CR44, which will be docket entry 253 on the Court's docket.

THE COURT:  And you believe again this is a statement against interest and it's admissible under that theory?  Oh, no, it's a party statement that's not hearsay, correct?

MR. CAPONI:  And I have no further questions.

MR. ALEXANDER:  Your Honor, I just had one on the objections.  I just had one clarification.  I believe Mr. Caponi stated that Mr. Park authorized the filing.  I'm not sure if that was his -- I don't believe that was his testimony.

THE COURT:  No, he said it was authorized by the Debtor.

MR. ALEXANDER:  I don't -- that's not what I believe I heard, but if that's what it was, then that's fine.

THE COURT:  Who did you say authorized the filing?

MR. CAPONI:  Mr. Park, I believe his testimony, and -- we'll have a transcript.  I believe his testimony was he reviewed this and signed off on it prior to being filed.

THE COURT:  But he didn't say he authorized it.  He said he reviewed it and he agreed with it.

MR. CAPONI:  Either way, it's an admission of the Debtor.

THE COURT:  Right.  But it's a -- it hasn't -- this document, you're not -- have nothing to -- not having anything

to do with Mr. Park's testimony, you were relying on this rule where it said it was signed by a party or their representative and they made the statement.  That's what I was looking at.

MR. CAPONI:  Yes, Your Honor.

THE COURT:  Not anything to do with Mr. Park's testimony.

MR. CAPONI:  And Mr. Park -- well, I think Mr. Park's testimony also goes to the authentication of the document, because he said that --

THE COURT:  Well, then you need to authenticate it if you said it's --

MR. CAPONI:  I agree.  Your Honor, Mr. Vincent's going to throw everything at the wall against me, so I'm going to throw every defense I have up that I can think of.

THE COURT:  I mean, I can --

UNIDENTIFIED SPEAKER:  Your Honor, Mr. Alexander is not going to do that.  And to the extent there's something that's objectionable, I'll object.

THE COURT:  Yes, and I don't -- listen.  It is what it is.  You guys make your record.  I'm not saying you can't. You made your record.  You believe that it was not -- that he said Mr. Park authorized it.  And to the extent he did say that, Mr. Park never said he authorized it.  He only said he reviewed it, and he knew what was in it, and the filing was authorized and signed not by Mr. Park but signed by counsel for

the Debtor from what at least I recall looking at this, so.

UNIDENTIFIED SPEAKER:  Actually, Your Honor, it was signed by Mr. Rajan, but Mister -- if you read through it, it's got Mr. Fisher who's counsel for the Debtor as well as Mr. Rajan.

THE COURT:  Wait a minute.  Wait a minute.  What are we talking -- we're back on the motion.

UNIDENTIFIED SPEAKER:  No, we're talking about -- I thought we were discussing the monthly operating report.

THE COURT:  No, because Mr. Alexander said he wanted to go back and object to something in connection with the motion, which was that he believed Mr. Caponi had said that Mr. Park authorized the filing of that motion.  That's -- is that what you were talking about?

UNIDENTIFIED SPEAKER:  That's correct, Your Honor.

THE COURT:  Right.  And I said he didn't say he authorized it.  He just said he reviewed it.  And my finding that it was admissible was because the motion had been filed by the Debtor through their counsel who signed it.

UNIDENTIFIED SPEAKER:  And my apologies, Your Honor, because I couldn't understand how Mr. Park could be authorizing his own retention application.  But I thought --

THE COURT:  Okay.  And that's what he was saying, that he didn't authorize, reviewed.  And I said I didn't even admit it under the -- that Mr. Park had authorized it, only

that it had been signed by an authorized agent when we went through this.

MR. CAPONI:  Correct, Your Honor.

THE COURT:  Okay.  Now, we're on CR44.

MR. CAPONI:  44, the operating report.

THE COURT:  The operating report.  You believe that is a party statement, and this was signed by debtor's counsel, Mr. Fisher.

MR. CAPONI:  I think -- also indicated it was signed by Mr. Raja, maybe.  I don't know if that's true or not.

MR. ALEXANDER:  It's true.

UNIDENTIFIED SPEAKER:  It's true.

MR. CAPONI:  It was signed by both.

THE COURT:  Where?  Am I blind?

UNIDENTIFIED SPEAKER:  Scroll a couple pages.

THE COURT:  Couple of pages in?  The first page is signed --

UNIDENTIFIED SPEAKER:  Page 9.  Page 9.

THE COURT:  Well, nobody -- I mean, again, I don't go perusing through these documents.

UNIDENTIFIED SPEAKER:  I'm just trying --

THE COURT:  And so, that's why I said why do you see it, because we didn't go beyond the first, second, and third pages.

MR. CAPONI:  Correct, Your Honor.

THE COURT:  So that's why I said, well, I need to see that.  So thank you for Page 9.  Okay.  And it was signed by Mathu Rajan, director, on June 21st.  Okay.  So any objection to the admission for this monthly operating report?

MR. ALEXANDER:  No objection.

THE COURT:  Okay.  That's admitted.

MR. CAPONI:  We'll end on a high note, Your Honor. I'll take victory, and I'm done.

THE COURT:  All right.  Redirect?

MR. ALEXANDER:  Yes, please, Your Honor.

THE COURT:  All right.  You're not bad.  It's only 5:00.  You guys have two and a half hours if you need it.  All right.

REDIRECT EXAMINATION

BY MR. ALEXANDER:

Q   Mr. Park, do you recall, there was some discussion regarding NewCo, new legal entity with regards to Mr. Caponi's questions?

A   Yes.

Q   Okay.  What is your understanding of NewCo?

MR. CAPONI:  Objection, Your Honor.  I think Mr. Alexander actually successfully raised this objection with me. Asked and answered.  Mr. Park, multiple times, explained what his understanding of NewCo was.

MR. ALEXANDER:  It's my question.  I haven't asked it

yet.

THE COURT:  Well, he's on -- you're saying he can't ask him the same question you asked?

MR. CAPONI:  Well, yeah.  Mr. Alexander objected when I asked -- that I asked Mr. Park too many times what his understanding of NewCo was.  He said objection.  Asked and answered.  And then it was sustained, and I'm lodging the same objection.  Mr. -- the testimony is in the record several times from Mr. Park as to his understanding of NewCo.

MR. ALEXANDER:  Right.  I don't believe I asked the exact specific question that Mr. Caponi asked.

MR. CAPONI:  I don't know how many different ways you're going to ask what you're understanding of NewCo, Your Honor.  In fact, I --

THE COURT:  Well --

MR. CAPONI:  Mr. Alexander objected several times to it.

THE COURT:  I'm not --

MR. ALEXANDER:  That's irrelevant.  Your Honor, I'm going to ask another question.

THE COURT:  I'll allow it for what it's worth --

MR. ALEXANDER:  No, it's -- Your Honor, we'll move on to another question.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q    Mr. Park, is it your understanding that any plan proposed by the Debtor must be approved by the Court?

A    That is correct.

Q    Is it also your understanding that your retention in this case also must be approved by the Court?

A    That is correct.

Q    Do you still have the binder in front of you with respect to Tab 2?

A    Yes.

Q    Mr. Caponi pointed you to Paragraph 13 and asked that -- the terms of your employment; do you recall that?

A    Yes.

          THE COURT:  What, Paragraph 13 in Exhibit 2?

          THE WITNESS:  Page 4.  I think I had Page 4.

          THE COURT:  Hold on.  I'm in the wrong -- I'm on the wrong page.  Okay.  Okay.  Okay.  What -- Paragraph 13.  Okay.

BY MR. ALEXANDER:

Q    Is that a complete description of your employment or a summary?

A    It's missing a piece.

Q    Okay.  And if we take a look -- which piece is it missing?

A    The compensation related to raising capital.

Q    And if you turn to -- does the footnote also say that it's the summary of the employment agreement?

A    Yes, at the footnote, there's a summary of employment

agreement.

Q   And it says that for a complete list of the terms, you should look at the employment agreement.  Do you see that as well?

A   That is correct.  Yes, I see that.

Q   And if you look at Exhibit B, which is Page 10 of 10 --

A   Yes.

Q   -- of your employment agreement, it says Docket 234-2 at the top.

A   Yes.

THE COURT:  Okay.  And what page?  What are we looking for?  It says -- one minute.

MR. ALEXANDER:  It'll say 234-2 at the top, Page 10 of 10.

THE WITNESS:  This is ten of ten, maybe.

UNIDENTIFIED SPEAKER:  There's pages --

THE COURT:  Okay.  I see them.  I see one of ten starting --

UNIDENTIFIED SPEAKER:  Yeah.

THE COURT:  Okay.

MR. ALEXANDER:  It's the same ten of ten at the bottom and top.

THE COURT:  Oh, okay.  Yeah.  Well, one of ten?  Two of ten?

THE WITNESS:  Ten of ten, Your Honor.

THE COURT:  Am I in the wrong place?  Oh, Page 10 of 10.  Okay.  Page 10 of 10.  Okay.

BY MR. ALEXANDER:

Q    Does that document describe what your investment success fee would be?

A    Yes, it does.

Q    And where does it describe that?

A    It describes it and points the following shares of stock, of common stock and of reorganized company equal to 18 percent of the equity issued to the investor if the investor's share price is greater than a dollar per share or be three shares for every $100 invested -- of invested in investor share parts equal to or lesser and valid to share.

Q    And that's part of the agreement that you're --

A    Yes, sir.

Q    -- seeking approval from the Court, correct?

A    Those are my updates there, as well.

Q    Is Stream attempting to raise money via debtor or equity in order to finance this bankruptcy case?

A    Yes.

Q    And when you talk about financing the bankruptcy case, what's your understanding of that?

A    I was -- anything related with Stream is what I was informed.  That's what I say to investors.

Q    Okay.  Is it prior to confirmation or before confirmation?

A    It's in total.  That's -- I'd always assume that it's

during.  That's what I've mitigated to.

Q    So it's your understanding that the Debtor is attempting

to obtain financing as --

A    Absolutely.  In fact, the bonus is tied to that, actually.

Going forward, I didn't expect to be paid if I didn't -- if

I  -- after -- post-bankruptcy, I don't expect to have a

success fee.  That's all part of the responsibility of a CFO to

raise capital.  This is related to try to get the Debtor out of

bankruptcy.

Q    Are you employed by VSI?

A    No.

Q    Do you have any agreement with VSI?

A    None.

Q    Does your -- do your shares under the employment agreement

relate solely to the reorganized debtor?

A    Yes, Stream only.

Q    Are you in charge of the Debtor's business operations?

A    No.  I -- once I'm confirmed, yes, I will be.  But until

then, I'm not.

Q    And who's currently in charge of the business operations?

A    It'll be -- at this moment.

Q    So you're the primary person responsible for raising

equity at the time of -- well, as of June 6th, 2023.

A    I was at the primary.  There was several others involved.

Q   Do you anticipate -- your goal, once Mr. Rajan is available, is to have discussions with Mr. Rajan to get the debt --

A   In great detail, yes.

Q   At this time, are you responsible for determining the structure of Stream's Chapter 11 plan?

A   I am not solely responsible.

Q   Is that something that Stream is still in the process of formulating?

A   Yes.  With Mathu when he's back.

MR. ALEXANDER:  Your Honor, I have no further questions of Mr. Park.

THE COURT:  Any recross?

RECROSS-EXAMINATION

BY MR. CAPONI:

Q   Mr. Park, you testified a little earlier that you received financial information about VSI from Subi Joseph, correct?

MR. ALEXANDER:  Your Honor, I'm going to object. This is outside of redirect.

THE COURT:  I'm laying the groundwork to make --  put it inside redirect. Don't let ground work to be inside the redirect.

MR. ALEXANDER:  You don't lay groundwork to be inside the redirect; it needs to be in the redirect.

MR. CAPONI:  I am in a redirect.  It will be known to

Mr. Alexander how and why when I get my next question out.

THE COURT:  Okay.  I'll allow it.

THE WITNESS:  Repeat the question, please.

BY MR. CAPONI:

Q    You received financial information from VSI from Mr. Subi Joseph?

A    At my -- at my -- at my direction.

Q    And you received that information so you could create a consolidated financial statement?

A    To make an attempt at what a consolidated financial statement would look like.

Q    And that would be a consolidated financial statement of VSI and the Debtor stream, correct?

A    For his -- confirmation so that any investor looking at it would have a -- a educated opinion of what a -- what a view would be.

Q    Right  And the reason you wanted to provide an educated in invest -- investor, you want to educate the investor as to what a combined Stream --

MR. ALEXANDER:  Your Honor, I'm going to object. This is out -- this is all outside of what we were doing on --

THE COURT:  The only thing --

MR. ALEXANDER:  -- redirect.

THE COURT:  -- on redirect was about equity, business operation, and attempt at financing.  Is that what you're

saying -- he talked about his bonus.  He actually withdrew a question.  He talked about the bonus, talked about the business operations, who was involved in raising equity, and the Chapter 11 plan.

UNIDENTIFIED SPEAKER:  Yes, Your Honor.

THE COURT:  So what you're saying is related to one of these redirect topics?

MR. CAPONI:  Mr. Park just testified that he compiled the financial information --

THE COURT:  No, no, no, no.

MR. CAPONI:  Oh.

THE COURT:  It was -- my question to you was anything about compiling financial redoing anything on redirect?  Because if it's not, it's outside of redirect.  So you got to tell me which one of these topics does it fall under because Mr. Alexander asked him on redirect.  Let me make sure I didn't skip a page.  He asked him on redirect about -- that his retention has to be approved by the court.  The plan has to be approved by the court.

MR. CAPONI:  It relates to that.

THE COURT:  Okay.  The plan has to be re -- approved.  That's all he asked.  And that there was a missing piece about the summary.  He talked about his success fee.

MR. CAPONI:  Relates to that.

THE COURT:  Okay.  And financing the bankruptcy.

MR. CAPONI:  Relates to that.

THE COURT:  And his bonus is tied to that and he's not --

MR. CAPONI:  To that.

THE COURT:  -- in charge of business operations and he is -- several others were involved in raising equity.

MR. CAPONI:  Relates to that.

THE COURT:  And that he's not the only person in charge of the Chapter 11 claim.  So you believe that asking him about consolidated financial records re -- relates to all of these questions in this area?

MR. CAPONI:  Yes, it does, Your Honor.  Which will become clear when Mr.  Park answers my question.

THE COURT:  Mr. Alexander.

MR. ALEXANDER:  I believe the objection remains valid, Your Honor.  It's outside of the scope.  So --

THE COURT:  I'll allow it for what it's worth.

UNIDENTIFIED SPEAKER:  So Mr. --

THE COURT:  So it's not just VSR (sic), it's all entities associated with Stream.  Okay.

BY MR. CAPONI:

Q    Mr. Park, I wasn't sure where we left off before the interruption.

A    Okay.

Q    So let me  -- You -- you obtained financial information

regarding VSI from Mr. Subi Joseph to create consolidated financial sheets showing a combined VSI and Stream, correct?

MR. ALEXANDER:  Your Honor, I'm going to object -- and he's asking him a question because what is that relating to?  It's outside of the scope of what was done?

THE COURT:  Well, he said he --

MR. CAPONI:  I'm relaying -- making sure what we got -- we got interrupted here.  I'm trying to reset the conversation.

THE COURT:  No, no, no, no, no, I get that.  But where on redirect did he ask him anything about obtaining financial records from Subi or whoever regarding VSI?

MR. CAPONI:  He asked him about raising capital, what the reorganized entity would look like, and how his bonus was calculated.  And I'm like --

THE COURT:  I don't know -- I don't recall him asking what the reorganized debtor would look like.  He asked about the bo -- that his bonus was tied to the Debtor coming out of bankruptcy.

MR. CAPONI:  Your Honor, if you would like to have a side bar, so I don't tell the witness what the answer to the question is, I'm happy to explain to counsel, but if I say it here, what is the point of me asking the question?

THE COURT:  Counsel, I get it, but I'm trying to figure out how is -- a top -- how is that related to any of the

matters that were on redirect?

MR. CAPONI:  And I will be happy to explain that at a sidebar.

MR. ALEXANDER:  And Your Honor, it's not just how it has to be related to it, it has to be with respect to the answers that were given.  Otherwise anything's related to the Debtor and he'd be able to ask any question he wants.  So that's broader than what you're allowed to do on recross.

MR. CAPONI:  It relates -- relate to the topics covered, not to the answer.

THE COURT:  No, no, no, no, no.  It has to be -- Counsel, it's not.  If he asked him a specific question and you want to -- you want to recross him on that question.  You're telling me that if he asked him, what the -- he said the Debtor planned to -- the Debtor's plan to reorganize.  That that would open the door to say -- and it might -- to ask him anything about the plan for reorganization.  You believe he could?

MR. ALEXANDER:  No, he can't.  Because there was one specific question.  Is the Debtor still in the process of re formulating a plan?

THE COURT:  And you believe he couldn't ask him what that plan is?

MR. ALEXANDER:  Well, to the extent that it would disclose attorney client privilege, then no.

THE COURT:  Counsel --

MR. ALEXANDER:  But if he has something in general --

THE COURT:  -- you're talking in general.  In general.

MR. ALEXANDER:  Then I do not -- I would not object to that question.

THE COURT:  Okay.  So he's saying the question that he's asking somehow comes out of this -- one of these topics that you ask -- you did on redirect.  I'm going to give him some leeway.  Go ahead.  But I'm telling you if I think it's outside the scope, I'm going to cut you off.

MR. CAPONI:  All right.

THE COURT:  Go ahead.

BY MR. CAPONI:

Q    Again, I'm asking this question just to reset the conversation since we were interrupted, Mr. Park.  You again received financial information about VSI from Subi Joseph to create a consolidated financial statement of VSI and Stream, correct?

A    Now, with everything else we just talked about, that's what the answer is.

THE COURT:  Yes or no --

THE WITNESS:  For myself at my discussion, yeah.

BY MR. CAPONI:

Q    Okay.  And -- but a minute ago you testified that you were doing that in order to give potential investors a view into

what the consolidated company would look like, correct?

A    Yeah.

Q    And the reason you were giving investors a view into a consolidated Stream, VSI, is because that's what you were asking them to invest in, correct?  A consolidated Stream, VSI?

A    I was asking -- for my part, I was asking for a reorg, or a revise, or reincorp -- whatever language you want about Stream.  And also currently did -- what -- with Stream that's in bankruptcy, the Debtor in bankruptcy.

Q    Mr. Park, you -- you -- you said that you were giving the consolidated financial statement of the assigned Stream to invest -- potential investors, correct?

            THE COURT:  He never said that --

            MR. ALEXANDER:  I object as to redirect.

            THE WITNESS:  I never said that.

            THE COURT:  He never said that, Counsel.

            MR. CAPONI:  He can tell me, Your Honor.  I think -- I think he did, but --

            THE COURT:  But I don't care -- Counsel, it's not what you think --

            MR. CAPONI:  Okay.

            THE COURT:  -- it's what the record -- listen, I'm -- I'm --

            MR. CAPONI:  I'm not understanding.  We can only --

            THE COURT:  Counsel, you cannot ask a question based

on something he did not say.  He did not say he gave it to anyone.  That's what you want him to say.

MR. CAPONI:  No.

THE COURT:  So ask him and -- and Mr. Park, please try to answer exactly what he is asking you because your answer was not to what his question was, and his question was, did you prepare the consolidated statement and that is the -- what you were giving to investors when you were seeking investors.

THE WITNESS:  The answer is no.

BY MR. CAPONI:

Q    Why did you create the consolidated financial statements?

A    For my understanding of what this actual view should be. Because you have a company that had no employees, right?  So I needed to see what this looked like.

Q    A few minutes ago on redirect, you said you created the financial statements, and you -- you alluded to it had something to do with investors.  Am I wrong about that?

A    In the process of creating documentation for investors.

Q    Okay.

A    You would go through a lot of iterations of spreadsheets to get to a point where you could say this is what we represent, that's the iteration exercise that I wanted to go through.

Q    So you were creating documentation for investors?

A    I was creating documentation for myself, determine what

should be used to in order to show investors.

Q    And you --

A    From a -- from the it -- for looking at a situation where post-bankruptcy.  Okay?  Because you have to look at a couple of years.  Debtor bankruptcy is purely just get from whatever documentation you want to provide.  But when you're talking about a post-bankruptcy, it's a different type of analysis.

Q    And so you were talking, am I correct, to investors about what a post-bankruptcy combined VSI, Stream, would look like?

A    That was my intent, but I didn't.

Q    Could you say that again?  I'm sorry, I didn't catch that.

A    That was the intention, but I never did.

Q    Thank you.

        MR. CAPONI:  No questions, Your Honor.

        THE COURT:  Okay.  What are we doing?  Mr. Callahan, do you have any -- oh, you're just observing, right?

        MR. CALLAHAN:  Pardon, Your Honor?

        THE COURT:  You don't have any questions, right?

        MR. CALLAHAN:  No.  Thank you.

        THE COURT:  All right.

        MR. ALEXANDER:  Your Honor, I have no further questions of Mr.  Park.

        THE COURT:  Are you releasing him or you reserving because --

        MR. ALEXANDER:  I -- I'm going to reserve for

rebuttal in terms of the case in chief of the Debtor.

THE COURT:  So you may step down.

THE WITNESS:  Okay.

THE COURT:  You're done for today, in case they want to call you.  Do we have any other witnesses that we're calling or are we done with the witness from the movant's standpoint?

MR. CAPONI:  Your Honor, no, other than I would ask the Court to take note that in the Debtors -- during the process that we had approved by the court to exchange identity of potential witnesses, the Debtors had disclosed a representative from Jhong Zheng Company that had filed this -- sheet.  We had asked for that deposition and asked for documents related to that and the Debtor neither produced any documents nor a witness.  And we asked for a witness to be here for trial.  The Debtor did not respond to produce a witness.

So I have no other witnesses to call, but I would like it noted for the record that the Debtor thwarted our opportunity to depose a witness from that entity.

THE COURT:  Well, were you presented some subpoena today?

MR. CAPONI:  WE issued a deposition notice, Your Honor.  Yes.

THE COURT:  What did you issue?

MR. CAPONI:  Well, I mean -- you know, we're talking about this company is in China, so I couldn't compel them to be

here. I just wanted it noted for the record that the Debtor identified this entity as on their list of witnesses. And so we said okay, we want to depose them. They deposed our witnesses; they never produced this company.

THE COURT: Okay. Mister --

MR. ALEXANDER: Your Honor, I'm not sure what the point of that was, other than to just let Your Honor know that that didn't occur, but that has no factual bearing on anything in this case. With respect to the order --

THE COURT: I --

MR. ALEXANDER: -- indicated that to the extent the party wants to present somebody at the trial, they need to make them available for deposition. We're not presenting a representative at -- for Jhong Zheng at this time at trial. So it says people you may call. So I don't understand the point of that.

MR. CAPONI: The Debtor thwarted our discovery. They identified --

THE COURT: Whoa, whoa.

MR. ALEXANDER: Mr. Caponi mischaracterizes things --

MR. CAPONI: That's not --

THE COURT: Wait a minute. Would the two of you -- cut it out. You asked, they didn't. That didn't stop you from doing anything else. How did they stop you from taking whatever effort you could have exercised to depose that

witness?  You said he tworted (sic) you.  How did he stop you?  He just said, no, I'm not producing him.

MR. CAPONI:  Well, I  -- you -- Your Honor, my humble opinion as the party, as the Debtor, who listed this party as a witness that they intended to call, they had an obligation to make that party available during discovery.  The way I had an obligation to make my witnesses available during discovery.  And when we repeatedly asked, the Debtor said they were speaking to the company and they would get his dates, and then they never did.  And then we said, well, we, you know, because if we had that deposition, I wouldn't need to call him for trial, I could rely upon the deposition.

I think this Court is entitled to take notice, whether it's an -- spoliation, or some other related part, that there was evidence out there, and that the --

THE COURT:  Spoliation.

MR. CAPONI:  Spoliation.  When the party makes -- takes steps to prevent evidence from coming to light, the Court's entitled to take --

THE COURT:  But Counsel, the fact that they did not produce them does not mean that I'm going to conclude they took steps to stop you from deposing them, from subpoenaing them, from coming to this court and said, they listed -- they don't want to produce them, order them to produce.  You can't just make conclude that.  I'm -- So that's what I'm saying.

MR. CAPONI:  I --

THE COURT:  Yes, I'm -- I'm not --

MR. CAPONI:  I'm asking.  You, I understand the Court's position.  I just want the rec -- for whatever it's worth --

THE COURT:  You can put it on the record --

MR. CAPONI:  -- I just want it in the record what happened.

THE COURT:  All right.  And Mr. Alexander, you can be -- but I don't know why you guys think I'm going to do anything with you.

MR. ALEXANDER:  Your Honor, my only response is I'd like to strike everything Mr. Caponi said, because it's not evidence, there's nothing before your court with respect to any of those communications.  So none of that should be considered by the Court or come in.

If they wanted to subpoena somebody, they could have subpoenaed them.  If they wanted documents, there's a procedure to issue documents, and there's rules that -- that com -- that you're required to comply with, with the issuance of documents and responses.  They haven't alleged that we violated any rule and we're not required to produce another party to appear, legally.

So anything that Mr. Caponi would like this Court to consider, there's no factual basis for it before this Court.

So we ask that you not consider it.

THE COURT:  Well, I -- it's nothing for me to consider.  I -- that's what I'm like.  I don't know why you guys are telling me this.  If you had a discovery dispute, you bring it to me.  I don't want to hear it.  It has nothing to do with this.  If you had a dispute, you file it, you don't file it, you don't tell me anything about it.  I don't want to hear it.  You need to -- you need to file something and you ask me to resolve it.  You can't ask me to determine they're the bad guy because they didn't respond.

Now, if you tell me they had a legal obligation and they failed to do so, then I make a -- make a decision.  But anything else, I -- I really don't want to get involved in that.  And if you believe that they were obligated and they didn't -- this hearing isn't done.  You still can file to compel.  But to tell me all of this and I can't do anything with it.  It's a waste of time and it's the two of you just bickering.  Because that's all I see this.

MR. CAPONI:  Well, Your Honor, I appreciate -- the reason I'm now going to raise it because you gave me guidance.

THE COURT:  I'm not --

MR. CAPONI:  If you're still open, I will -- I will move forward to take steps to compel because -- any other witnesses.

THE COURT:  Right.

MR. CAPONI:  The reason I don't, and I will take steps to do that.

THE COURT:  Right.  But the point of the matter is, it's a third party.  So I don't know what you're going to do with that.

MR. CAPONI:  Well --

THE COURT:  But I'm just telling you, if you guys have a dispute, just bring it to me.  Don't just tell me about it.  And then I can resolve it and you don't have to say he tworted (sic) and he doesn't have to say you mischarac -- none of that.  Okay?

MR. CAPONI:  I understand your guidance, Your Honor. We're going to follow it.

THE COURT:  You guys are all experienced litigators, very experienced, and you know how to get witnesses.  And if you guys think this is any way going to -- see sometimes -- a little bit -- I get a little bit offended because I think you guys don't think that I know how this stuff works, but that's how I take it.  Maybe that's not how it's intended and I get offended that you guys think that I somehow don't figure this game or know what's going on, or I don't have whatever.

And I don't have to prove anything to anybody.  But I'm going to tell you right now, you guys don't waste my time with this nonsense.  Because at some point, yes, I may lose my temper because I get a little low in sugar.  But trust me, you

guys do not want me to start getting really -- and doing more than just, you know, being a little testy.  I'll be throwing out some Rule 11 -- at some point if you guys don't cut it out.

I didn't want to go there, and I'm -- I'm pretty sure I don't, but this last little bit is just uncalled for.  I expect better from experienced counsel.  You guys can go bicker in the hall, you can bicker when I'm not here, we're not going to do it on the record.  Okay?

And this is meant for everybody.  I'm not singling out anyone.  Okay?

So please, if you have an issue, there's rules, there's a procedure, engage in that.  Okay?

Now, with that being said, you reserve the right, Mr. Caponi, to bring another witness in, correct?

MR. CAPONI:  Correct.  Get a hold of this witness.  Yes.

THE COURT:  Yes.  All right. So you're not resting yet because you may have a witness, right?  And I still -- they still -- they still have -- we still have an open with respect to Mister -- oh, Mister --

MR. CAPONI:  Mathu.

THE COURT:  -- Mathu Rajan, right?  There's two Rajan's, right?

MR. CAPONI:  Your Honor, with regard to the motion for an -- to file, and the motion to stay resting; with regard

to the motion for dismissal slash appointment of a trustee, that one we're keeping open.

THE COURT:  And with respect to the --

MR. CAPONI:  Yes.  Okay.  So you're resting on the -- the issue of the authority to file --

MR. CAPONI:  Correct.

THE COURT:  -- correct?  And you're resting on the motion for relief, correct?

MR. CAPONI:  Correct.

THE COURT:  Okay.  Now, Mr. Alexander, do you intend to present evidence in opposition, other than Mr. Park?  Or what was Mr. Park -- what is your response with respect to the authority to file?

MR. ALEXANDER:  We intend to put on the evidence of Mr. Rajan.

THE COURT:  Okay.  And well, with respect to the motion for release?

MR. ALEXANDER:  We're going to put on the evidence of Mr. Rajan.

THE COURT:  Okay.  And obviously the -- the motion to dismiss is, they're not resting.  Okay.  All right.  Let me tell you guys where I am on this.  Okay?  Let me --

I wrote some notes, so I want to go through with. Clearly the record is still open.  You know, I find that they have made sufficient case to go -- to meet their burden with

respect -- well, let me back up a little bit.  They've made a record with respect to the -- okay.  They -- they -- they believe that Mister -- they've they made the case that they've asserted in the 225 litigation that Mr. Mathu Rajan did not have the authority to file for Technovative.  There's no issue with respect to the Stream.  The ultra vires is only with respect to Technovative, correct?

MR. CAPONI:    Correct, Your Honor.

THE COURT:  All right.  There're been no definitive determination as to who has the authority.  That's going on in the Section 225, okay?

So they've made the case that we believe, based on some litigation that nobody's decided yet, which is why they want relief to go back and get a decision.  I can't really rule on that because I don't know who has the authority to file.  Because I don't know who the director is, okay?  And so that would mean, at some point, you guys got to go -- somebody got to determine who was director was.

And so they're resting.  And you want to come back?  I'm not quite sure what Mister -- you know, I guess the testimony is going to be, you know -- I'm not.  In some ways, you guys had a little mini litigation about who the director was.  Because that would require me to figure that out in order to find out that was ultra vires.  How else am I going to figure that out unless I know who the director is?  So that

would either require me to decide that or send you guys back over to change the recording and let them figure it out.  I don't know yet.

Now, with respect to the motion for relief, they're asking me for relief to go back to Chancery Court and have certain issues resolved.  One of which is who -- well, I think, my understanding of the 225, that is, when the parties dispute as to who's in control of the company.  And in order for Vice Chancellor Laster to make that decision, there's some underlying issues having to do with that pledge conversion, whatever.  I get it.  I understood that.  And so, in order for me to even say, "Okay, does it make sense for me to try to resolve that?"  I'll see you guys back over to Chancery Court to resolve that.

Mr. Ross -- Mr. Rajan has not testified or has not -- I can't deprive him of his opportunities to defend against those two.  So I'm saying with respect to the ultra vires, they're saying we -- Mr. Stastney was actually the director.  And he was director because under the pledge agreement -- oh, yeah, it hadn't been  -- we, meaning Hawks, because Hawks sent to terminate the notice to transfer the shares, that -- and put them in Hawk's name, and -- which authorized Hawk to be in control of Technovative.  That -- you guys all fighting over in Chancery Court about that.  I'm not quite sure how I even get to do anything with that, unless I decide, "Well I'm going to

hear it and I'll make the decision."

So I'm trying to figure out, if you bring Mr. Rajan to testify, am I going to be anywhere more than where I am today?  Because that's what those -- that's what you're telling me is that, somebody's got to decide who's the director.

MR. ALEXANDER:  Your Honor, I don't know if you're opening up for questions, but at the point you do --

THE COURT:  Yeah.

MR. ALEXANDER:  I'd like to --

THE COURT:  So that's sort of what I'm trying to lead you guys to where I am.  So those things ultimately have to be decided by somebody, and even in the -- in their request to dismiss for ultra vires, somebody has to decide who has the authority to do that.  And it's either me, or Vice Chancellor Laster, but I can't on the record say who definitively was, so I can't even get to that, whether Mr. Rajan testifies or not. I don't know how I get there.  I don't know if you guys thought this out, but I don't know how I get there.

But next is the motion for relief, which is, let us go back over there and decide who has authority and to let that litigation finish.  I think that was all you were asking for in your motion for relief, right?

MR. CAPONI:  Correct, Your Honor.  Just to finish that one day trial.

THE COURT:  But it also, which I'm a little confused,

is what was that trial for?  Because my understanding of a 225 is just to resolve who's in charge.  I've heard all sorts of what we going to do the claims litigate.  We're going to figure out who is what.  Is that part of it?  Now I'm not an expert in 225s litigation.  Is that part and parcel to determine how much the debt is or is it just who's in charge?

MR. CAPONI:  The ultimate question is who's in charge.  The Debtor's defense to why the proxy was ineffective was that the debt had been converted.  So in order to ultimate -- to resolve the ultimate question, the Court needs to decide that defense and was the debt converted at a high level.  That's the issue.

THE COURT:  Right.  But determining how much is owed?

MR. CAPONI:  It's not, I'm sorry, how much is, it's just if any of the debt --

THE COURT:  I get that.

MR. CAPONI:  -- was bought back.

THE COURT:  I get that, but there was testimony that we want to go back to -- from Mr. Stastney, we want to go back to the -- so that the Vice Chancellor Laster can determine how much is owed.  He said that.

MR. CAPONI:  Well, I can only tell you as a lawyer, I think when the Court -- if the Court determines some or all or none of the --

THE COURT:  I get it.

MR. CAPONI:  -- that was converted, there may be a number so that --

THE COURT:  There is --

MR. CAPONI:  -- isn't a final number but we know --

THE COURT:  Yes.  Right.  And that I completely understand.

MR. CAPONI:  Yeah.  I agree but it's also a certain file so no problem.

THE COURT:  But I also think there's a dispute over what, I think he said, make or something there was a dispute about what was supposed to be done.  I think Mr. Alexander's question about what that -- what their definition.  Mr. Stastney had his.  I'm assuming they have theirs.  And the Court's going to figure out what he thinks is the -- what the meaning is and what it's supposed to mean.

Now if the Court says it means all in one, and he will look at it and figure out, or he says it's over time, and I expect that he would say how much.  But that will have nothing to do with me because this, ultimately, only will allow that Court to decide who the director is, okay?

Once that decision is made, I'll be honest, I don't know how you got -- whoever loses is going to appeal.  It's -- I'm -- I mean, I see you guys are spending -- you said $3 million fighting over this.  You're going to appeal; somebody.  What does that do for me?  Because, ultimately, somebody has to

tell me who the director is.  And if I don't have a final answer, I'm -- we're going to be sitting here in limbo.  So even if I send you back and say, you know, after we get through testimony and say, "Okay, you've got to go back over there, and, like, let Vice Chancellor Laster decide," you only can come back here with a final decision.

And I don't know enough about Delaware, and I've done my own research about what -- because you said that, you know, they don't have a right to post the bond.  Well, I've looked at Delaware law myself and I've got my own interpretation of what I think they can -- the Court can do and then what they shall do: two different provisions on post-judgment appeal bonds or whatever you call them.

MR. ALEXANDER:  Supersedeas bonds.

THE COURT:  Well, there was a section that has to do with how you do it, who sets it, and then this may, and this one shall.

I'm not trying to be a deal -- I mean, I was at one time, but I'm not anymore, and I'm not trying to get it.  But all I'm telling you is from my perspective, I will not be able to do anything until I get a final order.  I get a final order saying who's the director, then I'll say okay, then, if it's Mr. Stastney, okay.  Then you guys will come here and say, "Ultra vires."  If it's not him, then that would answer that question.  And then the same -- so that has to do with the

ultimate whether this -- whether I would grant the motion for ultra vires for Technovative.

MR. ALEXANDER:  Your Honor, we'd just also like to remind the Court that there is a legal issue as to the impact of the filing of the Stream bankruptcy with respect to the stock in Technovative --

THE COURT:  Ah, ah, ah.

MR. ALEXANDER:  -- what rights --

THE COURT:  I get all that.

MR. ALEXANDER:  Look at that because that could get rid of --

THE COURT:  But --

MR. ALEXANDER:  -- the gateway issue because it'd be irrelevant.

THE COURT:  But guess what?  You guys are asking other person, Judge Laster, to -- because what Jeff -- Vice Chancellor Laster, if he decides that Mr. Stastney is the director, is the issue before him also -- well, for him to be the director, that he would have to conclude that the demand to -- with respect to the stock was affected.

MR. ALEXANDER:  In terms of the transfer of ownership of the stock?

THE COURT:  Well, I --

MR. ALEXANDER:  Because Mr.--

THE COURT:  Because that's --

MR. ALEXANDER:  Well, they're just trying to exercise, saying under a proxy, they had the authority to appoint the director.  So assuming they have the authority to do that under the proxy, our argument is that you still have the bankruptcy property of the estate to do.

THE COURT:  Okay.  Well, that's still for me.

MR. ALEXANDER:  Okay.

THE COURT:  That's the --

MR. ALEXANDER:  Understood.

THE COURT:  I'm parsing out Technovative.

MR. ALEXANDER:  No, but that -- it directly impacts Technovative because --

THE COURT:  Who did it --

MR. ALEXANDER:  -- if it affects their rights are with the stock, and we can --

THE COURT:  Well, okay.

MR. ALEXANDER:  -- see if we can begin part of it.

THE COURT:  I'm not right.

MR. ALEXANDER:  Okay.

THE COURT:  That Stream's argument, that even if they did all these things, they still have time.

MR. ALEXANDER:  Correct.

THE COURT:  But they back to us.

MR. ALEXANDER:  Correct.

THE COURT:  That's the issue I have to figure out.

MR. ALEXANDER:  Understood.

THE COURT:  But I'm just talking as an initial, even getting to that --

MR. ALEXANDER:  Well --

THE COURT:  Because I don't even get to that until I get at least an answer as to who was the director.

MR. ALEXANDER:  No, I --

THE COURT:  You think it's separate and apart?

MR. ALEXANDER:  We disagree.  We believe it's separate because --

THE COURT:  Okay.  Then who --

MR. ALEXANDER:  -- even if Mr. Stastney was the director and they hadn't foreclosed, the argument is that those rights would have come back to the Tech- -- I'm sorry, to the Stream estate --

THE COURT:  Okay.  Well, you're right.

MR. ALEXANDER:  -- upon the rights to filing.

THE COURT:  But I feel --

MR. ALEXANDER:  So that's --

THE COURT:  That's another issue.

MR. ALEXANDER:  Okay.  I just wanted --

THE COURT:  So ultimately --

MR. ALEXANDER:  -- to mention the issue so it wouldn't go by.

THE COURT:  -- ultimately, I still need to figure out

if Mr. -- you're saying, well, I get it.  You're saying there's a point where it really wouldn't matter what the Vice Chancellor said.

MR. ALEXANDER:  Correct.

THE COURT:  Because if it comes back -- so maybe you're saying I decide that first.  Because if -- and I did, you know, I heard the arguments about Judge Silverstein's decision, about when you went out and it was -- what happened when they sent out a notice saying -- exercising their voting rights.  Totally different situation, not the same.  So I'm not quite sure how much that would help me.

But what I'm getting to is that -- this is not going to happen tomorrow.  I'm not going to have an answer from -- even if I send you back to the Chancery Court.  I'm not going to have an answer for a bit.  What do you guys think is supposed to happen in the interim?  We're supposed to sit here?

MR. ALEXANDER:  The Debtor intends to propose a plan, Your Honor.

THE COURT:  Well, I'm a little concerned about that. The Debtor's been in here since March, okay?  I haven't seen -- I'm concerned about the progress in this case.  Let me just -- I want to make sure I'm going to -- I wrote some notes.

MR. ALEXANDER:  Well, debtor's goal is to file the plan during the initial exclusivity period.

THE COURT:  I get that, Counsel, but that's more than

what I'm concerned about.  Where's my notes?  Oh, I just had this.  Oh, I hope I didn't delete it.  Did I want them to talk once again?  Mm-mm-mm.  Oh, okay.

I'm a little concerned about the direction of this case here.  And as far as this docket, nothing's happened, but you guys fighting.  I haven't seen a plan.  I haven't seen this.  I heard some testimony.  I haven't seen anything.  And one of the remedies that you've asked for is appointment of a trustee.  Well, I can't do anything, at least until I give the Debtor an opportunity to respond to that.  I'm not going to let this case just sit around while you guys go back and fight somewhere else.  It's not going to happen.

So with that being said, and it's the best interest of creditors that I have to look at, at this point.  So you know, I'm not sure I'm going to wait 45-60 days for Mr. Mathu Roger to come here and testify.  You know, I'm going to set a shorter date, maybe the beginning of August.  And you guys need to figure out who you want to bring here to tell me what I need to do because this case isn't moving.

In terms of moving toward -- you said, yeah, you're going to file a plan.  You're going to do all these different things.  I am concerned by the testimony I've heard over the course of these few days, that we need to start moving with respect to this case.  And that the ultimate decision with respect -- this is just with respect to Stream.  What is it

going to -- what are -- oh, you want to reorganize.  We're going to do all these things.  We need to get moving.  And I get there's moving the parts here, parts there, about financing, equity.  We need to get moving with respect to the Debtor making some progress in this case.  And I am not inclined to wait 45 to 60 days.  Because even if you file a plan, who is -- I don't know Mr. Rajan's health.  Well, Mr. Park, you need to get up to speed.  You guys need to do something.  You can't just think I'm going to let this languish here.  It's not happening.

MR. ALEXANDER:  That's not the intention, Your Honor.  The intention is get Mister --

THE COURT:  I get what the intent is.

MR. ALEXANDER:  And he's getting up to speed.  And he will be of good health.

THE COURT:  I get that.  But that's not what I have today.  Intentions are all fine and well, but I got to go with what I have.  And I don't see much on that document except the parties burning up money, fighting.  Because at the end of the day, their position is going to be -- is part and parcel of what we add to our debt.  And you're going to say, "No."  And then it's going to be whatever.  Because at the end of the day, this is where we are.

Yes, Mr. Caponi, you're going to stand.

MR. CAPONI:  Your Honor, I look at there's a lot of

validity to what you're saying.  You're not the first jurist in the first jurisdiction to ask what these parties are doing.  Each side -- each dog's got a piece of the bone and no one's letting go.  And I agree, there's going to be -- if the Debtor loses -- again, I'm going back, I'm confident, we're going to win it.  If debtor loses, yes, there's going to be an appeal, absolutely.  I'm going to be shocked if there wasn't.  The only way it's going to stop is if somebody runs out of money.  But we can at least get started.  And, I think, we're talking about a one day oral argument.  If Vice Chancellor Laster provides minimal guidance to this Court, he may answer a tremendous number of questions and relieve the Court of tremendous burden or he may not.  I think he will.  It's one day.

THE COURT:  I get that, Counselor.

MR. CAPONI:  We could probably get that done before this August date.  I mean, now look, Your Honor, I understand you want to push it in August.  I'd like it, like, second week in July.

THE COURT:  Not happening on my --

MR. CAPONI:  But if we're going to having to --

THE COURT:  I'm out the last two weeks of July.

MR. CAPONI:  Can we start -- I think there's a fair possibility the Vice Chancellor Laster could hear that argument and get close to resolving this issue before we come back in the beginning of August.

THE COURT:  The problem is, I can't deprive the Debtor of their opportunities to defend against your motion. They get a right to do that.  I'm just cutting off how much time they're going to get to do it.

MR. CAPONI:  Well, Your Honor, I think on our motion there's nothing Mr. Rajan can say that would impact, I think, this is my position, take it for what it's worth.  We've established that we're one oral argument away from resolving a slew of issues.  The Debtor is saying, "No," which means the Debtor wants to relitigate all those issues here.

THE COURT:  We're not going --

MR. CAPONI:  How's it possible that relitigating those issues here is more effective to the creditors then a one day oral argument.  I -- unless Mr. Rajan is going to come in and testify he's going to donate millions of dollars to everybody, it would be far more expensive and take a lot more time here, then go back all afternoon.

THE COURT:  I --

MR. CAPONI:  Like, you can't change the equation.

THE COURT:  I get that, Counsel, but I cannot deprive them of their due process right to defend.  You're asking me to say, "We made our case.  Don't listen to anything they have to say."  And I can't do that.

MR. CAPONI:  I -- look, Your Honor, I appreciate your position.  I hope you appreciate mine I've got to ask.

THE COURT:  Yes, you can ask --

MR. CAPONI:  I --

THE COURT:  -- but I can't.  Because the first thing is, the district court or the Third Circuit will tell me is, "They had a right and you cut them off."

MR. CAPONI:  Right.

THE COURT:  And listen, I've been reversed before, so I'm not concerned about that.  It doesn't mean anything.

MR. CAPONI:  Well, Your Honor, our --

THE COURT:  But I don't want the parties to be in a position, because once, assuming I granted it, you need relief from stay.  You know, it's still a 14-day time period, unless somebody waived it, and then they would be entitled to ask for a stay and go to the district court, file an appeal, and go to the district court.  This is not going to happen tomorrow.  It's -- even if I granted your motion today, relief from the stay has a 14-day time period, unless I waived it, and I don't know where I would, nobody's asking to, and I'm not volunteering to do that.  So now you have 14-days on the -- What is it?  On 362A, whatever, I know the number, but it's 14 days.  And then, now they have a right for consideration.  That's it.  Trust me, I know people play this game all out until it's like 35 -- a long time.

So that's what I'm saying -- so that's why I'm like, listen, give them their rights.  Let them, you know, let them

put whatever, but we're not doing it 45 or 60 days out.  That is not happening.  I can't say 30 days because 30 days would be July 30th, which I know is a Saturday, is it not?  Or a Sunday because I'm coming back from vacation on the 30th.

THE COURT REPORTER:  Sunday, Your Honor.

THE COURT:  Sunday.  So the soonest would be the 1st and you guys don't even want to see my August calendar because all my trials are in August.  So I want to get it done as soon as possible.  And I want to put on the table, and put the Debtor on notice, I'm seriously considering a Chapter 11 trustee to the extent one is required.  They need to get moving.  I want everybody to understand, I'm not going to let this case languish.  I'm -- you guys can fight all you want. I'm not going to put up with that here.

So it's still that and that still does not mean I have not -- I'm ignoring your bad faith argument.  That's still on the table.  But I'm just saying if I can't -- if all of this is going to take time when we're talking 45-50 days, something's got to give here.

MR. CAPONI:  Your Honor, we --

THE COURT:  And these will respect to Stream.

MR. CAPONI:  We would be very supportive of the trustee in any fashion, even if it's interim between now and August.  It's --

THE COURT:  Well, but they haven't had a chance to

defend on my case.  That's the problem.

MR. CAPONI:  So, I think Your Honor has --

THE COURT:  I can't -- I know --

MR. CAPONI:  -- inherent powers to manage that --

THE COURT:  Well, I already looked that up.

MR. CAPONI:  Okay.

THE COURT:  Okay?  And the Third Circuit has says, I can sue a sponte, but I got to give the Debtor a response, a time to response to my sua sponte.

MR. CAPONI:  I'll yield the podium right now because I think that --

THE COURT:  Counsel, I'm --

MR. CAPONI:  -- I'll get out of the way.

THE COURT:  I'm one step, believe it or not, I do think about these things.

MR. CAPONI:  I do appreciate that, Your Honor.

THE COURT:  And I do have a Third Circuit case that says even if I wanted to sua sponte, I'd have to give this debtor an opportunity to respond to my sua sponte on the 1104 and 105 in combination.  But the date of that case, let me just tell you what that case is.  It's called -- it's a 2004 case, so I don't know how much 105 has any value, given recent Supreme Court cases that kind of say we shouldn't be using 105.  But the Third Circuit in an unpublished opinion, so I don't know what precedential value, but it's called United States

Mineral Products Company, and it's at 105 State Appendix 428. They talked about bankruptcy court's ability to sua sponte appoint a Chapter 11.

I've done it in another case, but again, I gave you the Debtors an opportunity to defend as to why I shouldn't. So I want it out on the table. I don't want anybody to be surprised about what I'm thinking. I'm telling everybody what I am thinking. That is with respect to Stream. Because if there is some assets, if there is some ability for creditors to make recovery, that's what bankruptcy is for.

The other issues with respect to Technovative, that's a whole different ball of wax. That's something I have to -- that gets figured out separately, okay?

So that's where I am. I just want to let you guys know where I am because, obviously, we're not finished with this. So I don't know if you guys can consult and come up with something. I don't know. I have no clue. I had suggested earlier that the parties try to work cooperatively, but it seems to me, from my observation, that will never happen. Simply because Mr. Rajan is asserting that he owns it. Mr. Stastney is. And frankly, neither one -- never mind. Neither one of them is standing up, in my opinion, as to their -- well, I haven't heard anything from Mr. Rajan. I don't know his prior involvement in the case. I wasn't too pleased with that and I'm, you know, some of the things I've heard Mr. Stastney

say, calls question for me for him, too.  I'm telling you guys what I'm thinking.  I'm putting it right on the table.  So I'm not -- nobody's looking good from my perspective in these cases.

So, putting that aside, I want you guys to know what my thoughts are.  We need -- so what I'm going to do is I'm going to let you guys consult.  Come up with days and I'm going to have my courtroom deputy give you some days in August.

Mr. Alexander, you're going to have to figure out what you're doing.  I'm not waiting 60 days.  There is no way.  That's not happening, cannot happen.  Particularly in -- and that's the next issue, you said before we began, that the Dutch Court had removed Mr. Rajan as the director of SeeCubic, B.V.  Was he the only listed director?  Was there a dispute?  Was he the only one with Mr.--

MR. CAPONI:  I know there were a lot -- well, Your Honor, I'm not -- I know there -- I think there was a -- I think Mr. Rajan had said he had replaced Mr. Stastney.  And I'm not -- there probably is a disagreement between the two of them as to who was what.  But bottom line; it's in Dutch?  I don't know what it's in.  But the order, it'll get translated at some point.  But it was --

THE COURT:  Right and I want to --

MR. CAPONI:  An independent has been --

THE COURT:  I get that, but I want to know how that

happened.

MR. CAPONI:  Meaning?

THE COURT:  How does an independent director come to be appointed?

MR. CAPONI:  The, I believe that the Dutch court is requiring Mr. Rajan to -- in the Dutch registry, appoint list -- withdraw himself and list the -- this independent which I believe is a lawyer, a Jones Day, and the Dutch was --

THE COURT:  Well, was that -- I'm trying to figure out, was the judge -- did the Court just do that on its own? Did someone ask the Court to do it?  How did it come to be?

MR. CAPONI:  So --

THE COURT:  If you know.

MR. CAPONI:  Yeah, I believe it was -- they wanted Mr. Rajan not recognized as the director --

THE COURT:  Who wanted them to --

MR. ALEXANDER:  Is the question who filed something to initiate the -- Your Honor?

THE COURT:  Yes.

MR. CAPONI:  Yes.

MR. ALEXANDER:  It was filed by Mr. Stastney.

THE COURT:  When?

MR. ZAHRALDDIN:  And Mister -- and Hawk.

THE COURT:  Wait a minute.

MR. ALEXANDER:  After the bankruptcy case was filed.

MR. ZAHRALDDIN:  Yes, ma'am.

THE COURT:  You guys better go back and look at what I said on that first day about actions in the Netherlands.  I -- and I had hoped because I actually went and read the transcript.  Believe it or not, I do do things when I go back there other than yell about people calling me.  I read the transcript.  I actually have it in front of me.  And I said you guys better not do anything in the Netherlands; nothing's going to happen.  Don't do anything.  Did they file a new action?  Or did they continue in the one that was existing at the time?

MR. ALEXANDER:  I don't know the answer to that, Your Honor.

THE COURT:  I'm asking if there was --

MR. CAPONI:  I don't know, Your Honor.  What I know is the --

THE COURT:  Well, then, I want an answer.  I want on the docket how that order came to be entered.

MR. CAPONI:  Sure.

THE COURT:  I'm hoping it was just the Court on its own decided to do that.  And I want everybody to know that, if it was not, there are going to be some serious consequences.  Because I was clear that nothing was to go before that --my -- if that Court, I understand that the Netherlands have control over all of their corporations.  And they can -- and I understood that they could, on their own, say, "Hey, we're

going to -- we're going to take over these companies." Because you're not filing your reports, you're not doing this, you're not doing whatever. That was what was represented to me on the first date or whenever we had the little hearing. And I -- which was to stay the action in the Chancery Court and that I understand in the pleadings the Debtor had said there was a pending action in there. And I said, "Don't do anything in there. It is a stay. Don't do anything." So that's why I'm trying to figure out how this order came to be. That's all. It could have been the Court just decided on its own that this stuff was in here and I'm going to rule. I don't know what happened. I just want somebody to tell me what --

MR. CAPONI: We'll get you an answer. I have to talk to Dutch counsel, and we'll get you an explanation.

THE COURT: Right.

MR. CAPONI: But I know both parties were there and, you know, it's been going on. But I haven't been involved in it.

THE COURT: I don't know who both parties was, wasn't --

MR. CAPONI: Sorry, Mr. Zahraldddin.

THE COURT: All I know is what I said.

MR. CAPIONI: Understood, Your Honor.

THE COURT: And if it has anything to go against what I said, I'm going to be very unhappy.

MR. CAPIONI:  Understood.

THE COURT:  And if they did it on their own, okay. But what you told me at the beginning was because there was a whole new director and Mr. Rajan wasn't there.  Stream had no involvement now in running SeeCubic B.V.  And that automatically set off something from me.  And again, I went back, and I pulled the transcript off and I have it right in front of me.  I'm not going to go read it, but I just wanted to make sure what I said, which is a totally different issue.

MR. CAPONI:  Yeah.  We'll get you an answer on that. I don't have it now, but we'll get it.  I don't recall saying Stream has nothing to do with running B.V.

THE COURT:  You did.

MR. CAPONI:  And the director's in charge.

THE COURT:  You did --

MR. CAPONI:  I think that person makes the decision.

THE COURT:  Right.

MR. CAPONI:  But --

THE COURT:  But it is what it is.  He's there by virtue of some connection with Stream or whatever.  It didn't matter.  I said don't do anything, when they did, consequences. If they didn't, and the Judge -- the Court just on its own, sua sponte, it is what it is.

MR. CAPONI:  Okay, Your Honor.

THE COURT:  So, also Mister -- this is for Mr.

Alexander.  I think you also need to, when we have a new hearing with respect to how this case is proceeding, I'm going to need some testimony on funding and how this is really going, and who knows what.  Because apparently Mr. Park really has no information, and if I -- I'm going to need from -- if I don't get it, it is what it is.

I'm just telling you guys what the lay of the land, okay?

MR. ALEXANDER:  Understood, Your Honor.  We'll be prepared for that.

THE COURT:  All right.  So what I'm going to do, obviously this is the, you know, the movant has rested.  We now will move at the -- in the next few weeks to the response on -- or at least two of them, because you still kept open your issue on this dismissal.

MR. ALEXANDER:  Correct, Your Honor.

THE COURT:  Okay.  So we, you know, we need -- what I need for you guys to do, and I'm sure Mr. Alexander, and Mr. Caponi, and Mr. Colby, you guys can come up with some dates.  Once -- what I -- what you can do is say how much time you think you need, and then reach out to my courtroom deputy, and say we need two days, three days, and I will endeavor to do exactly what we did.  You might not get a full day, but I can probably -- and I'm saying that with all kind of confidence without looking at how many trials I have in August.  You know,

you can, you know, if it has to be spread over a week, we'll spread it over a week and come in at 12:30 to 7:30 or 7:00. That's seven hours.  Five days is 35 hours.  I can't think that you guys have 30 worth of stuff.  Maybe you do, maybe you don't.  I don't know.

But let me just take a peek at my calendar.  In August --

MR. ALEXANDER:  Your Honor?  May I be excused for a brief minute?  Mr. Zahralddin is still here.  I just need to go change my flight.

THE COURT:  Oh my.  What time's your flight?

MR. ALEXANDER:  6:45.

THE COURT:  You'll never make that.

MR. ALEXANDER:  No, no.  That's what I'm saying.

THE COURT:  All right.

MR. ALEXANDER:  I just need cancel.

THE COURT:  All right, so --

MR. ALEXANDER:  It's not going through the wi-fi.

THE COURT:  All right.  So we'll be in recess.

Mr. Zahralddin, you can talk to Mr. Caponi and Mr. Colby.  I've got some briefs I'm reading.  I'm looking at all this.

The first week, the first day I'm back, I think there's daylight.  Oh, I have a trial on the 1st.  Nothing on the 2nd.  Nothing on the 3rd.  A trial on the 4th.  So write

this down, I have the 2nd, and did I say the 3rd?  I-I-I-I.
Nope.  The 2nd, the 3rd, the 7th, the 9th, and the 11th.  And
the next week, trial on the 14th, 15th is open, 17th is open.
And that's as far as I'm going to go, okay?  So you guys can
think about that, figure it out.

MR. ZAHRALDDIN:  You said the 15th, Your Honor?

THE COURT:  Did I say the 15th?  Okay.

MR. ZAHRALDDIN:  I just -- that's fine.  I just
couldn't hear you then.

THE COURT:  Oh.  Hold on.  I've got to go back.  Did
I?  14th?  Wait a minute, the 14th, that's a Thursday.  I-I-I.
The 15th is, actually --

MR. CAPONI:  Your Honor?

THE COURT:  Yes.  The 15th is a free day.

MR. CAPONI:  We're good the second and third.

THE COURT:  Okay.  All right.

MR. CAPONI:  If --

THE COURT:  So why don't you -- because you may want
to get the other witnesses because, remember, we got to get --

MR. CAPONI:  Well, Your Honor, I think at this -- up
to this point, I think the Debtors have to produce someone the
first day the Court has available.

MR. ZAHRALDDIN:  Yes.

MR. CAPONI:  The second and third, they produce their
witness.  I mean if I had --

THE COURT:  And then --

MR. CAPONI:  The fact that Mr. Rajan is healthy or not or it was Mr. Park --

THE COURT:  Somebody.

MR. CAPONI:  I think -- I don't think we need to schedule a date that works for everybody.  I think the Court should set the date and they come --

THE COURT:  I'm just saying I don't know what Counsel consulting their calendar, Mr. Alexander's not here.  Those are the dates.  You guys tell me what dates you have, and you can reach -- you can just send them to Miss Godfrey.

MR. CAPONI:  Okay, we will.

THE COURT:  And then I will just say, "Okay, this is what we're doing."

MR. CAPONI:  Thank you, Your Honor.

THE COURT:  Okay?

MR. CAPONI:  Okay.  Thank you, Your Honor.  We'll work it out.

THE COURT:  All right.  Well, with that being said, well, look, it's only 6:10.

MR. CAPONI:  Take the night off.

THE COURT:  No, I don't.

MR. CAPONI:  Thank you, Your Honor.  I'm -- I know, well, at least my side of the table, I'm sure I speak for the other side, your indulgence, the time you spent, going late in

the evening, going straight through was much appreciated.  Not everyone does that and it got this process done a lot more quickly and we appreciate it.

MR. ZAHRALDDIN:  I can only take judicial notice that that's the last time he'll speak for me, but I agree with everything he said.

THE COURT:  Okay.  Well, thank you.  And thank you guys for indulging my little -- hopefully, we won't have breaks every now and then but it is what it is without going into my own personal issues.

So thank you for your indulgence.  And again, Counsel, thank you for being prepared.  Thank you for presenting this and making this easy for me.  Other than a few little hiccups, I think we're doing pretty good.

Okay?

Yes, Mr. Colby?

MR. COLBY:  Your Honor, just a quick question with respect to exhibits, if it's okay with you rather than take up everybody's time.  I think we have agreements with the other side as to what's been admitted and on what basis.  We could just submit a written list.  You recall, we had that big group of loan documents.

THE COURT:  Right.

MR. COLBY:  So we were just going to put them all on one list and provide it to Miss Godfrey and John if that works.

THE COURT:  That would make sense.  In terms of your actual -- all these binders, if you want to just leave them in the jury without having to take them, send them all over there. The likelihood that I'm going to have another -- I have another -- no, I do have another trial, but --

THE COURT REPORTER:  I'll take them.

THE COURT:  Not with a jury.  So you can put all your documents over in the jury area, and then we'll put ours -- we'll just put them somewhere.  Okay?

MR. COLBY:  Thank you.

THE COURT:  Thank you.

MR. ZAHRALDDIN:  Thank you, Your Honor.

THE COURT:  All right.  Enjoy -- oh, wait, it's not Friday.

MR. COLBY:  I'm off.

THE COURT:  Enjoy the rest of the week.

    (Proceedings adjourned)

<u>C E R T I F I C A T E</u>

     I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


/s/
_____
John Buckley, CET-623
Digital Court Proofreader