**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE:<br><br>STREAM TV NETWORKS, INC.,[1]<br><br>Debtor,<br><br>and<br><br>IN RE:<br><br>TECHNOVATIVE MEDIA, INC.,<br><br>Debtor. | Chapter 11<br><br>CASE NO.: 23-10763 MDC<br><br><br>Chapter 11<br><br>CASE NO.: 23-10764 MDC<br><br>(Jointly Administered) |

**HAWK INVESTMENT HOLDINGS LTD.'S OBJECTION**
**TO THE APPLICATION OF THE DEBTORS FOR ENTRY**
**OF AN ORDER AUTHORIZING THE DEBTORS TO RETAIN**
**THOMAS JUNG HO PARK AS CHIEF FINANCIAL OFFICER TO THE DEBTORS**

Hawk Investment Holdings, Ltd. ("Hawk"), as Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SeeCubic"), a secured creditor of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative" and, together with Stream, the "Debtors") in the above-captioned chapter 11 cases (together, the "Chapter 11 Cases"), by and through its undersigned counsel, files this objection (this "Objection") to the *Application of the Debtors for Entry of an Order Authorizing the Debtors to Retain Thomas Jung Ho Park as Chief Financial Officer to the Debtors* [ECF No. 298] (the "Park Application").[2]

In the Park Application, the Debtors request the Court approve the Employment Agreement between Stream and Thomas Jung Ho Park ("Mr. Park"), dated as of June 9, 2023 (the "Employment Agreement"), to be effective as of May 1, 2023 (the "Employment Date"),

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Emergency Motion.

pursuant to sections 327 and 328 of the Bankruptcy Code.[3]  In support of this Objection, Hawk respectfully represents as follows:

**OBJECTION**

1. Several aspects of the Park Application are disconcerting and require the Court deny Mr. Park's proposed employment.  Specifically, the Debtors (i) have provided no basis or reason justifying the necessity of Mr. Park's employment at this stage of these Chapter 11 Cases; (ii) have not established that Mr. Park is a "disinterested" person for the purposes of section 327 of the Bankruptcy Code due to the structure of his proposed compensation package; and (iii) have provided no basis or justification for authorizing Mr. Park's employment as of the Employment Date.  As such, Hawk objects to the retention and employment of Mr. Park.

**A.  The Debtors Have Failed to Demonstrate Any Valid Reason or Basis for Employing Mr. Park or Why a CFO is Necessary in these Chapter 11 Cases**

2. As a threshold matter, the Debtors have provided no valid reason or justification for why Mr. Park's services are required by these Debtors whatsoever.  Under section 327(a), a debtor must demonstration that "it is reasonably necessary [to] the administration of an estate to have professional persons, such as attorneys or accountants, employed." *See In re Sylvania Area Inv. Grp., Inc.*, 35 B.R. 82, 84 (Bankr. N.D. Ohio 1983) (quoting 2 Collier on Bankruptcy ¶ 327.01 (15th ed. 1982)).  In the Park Application, the Debtors assert that Mr. Park's employment is necessary and justified because of "the complexity of the Debtors' business, the structure of the Debtors' debt, the Debtors' need to raise capital, and the Debtors' need to hire a CFO to fill the

---

[3] On June 14, 2023, the Debtors filed their *Motion of the Debtors for Entry of an Order Authorizing the Debtors to Enter Into an Employment Agreement with Thomas Jung Ho Park as Chief Financial Officer to the Debtors* [ECF No. 234] (the "Park Employment Motion").  Hawk filed an objection and reservation of rights [ECF No. 285] (the "Prior Objection") to the Park Employment Motion on the basis that it sought approval of the Employment Agreement in the ordinary course of business, which was inappropriate.  It appears the Office of the United States Trustee expressed similar concerns.  *See* Park Application, at 1 n.2.  Although the Debtors seek to cleanse the Park Employment Motion by the filing of the Park Application, Hawk reasserts and incorporates herein the Prior Objection in its entirety.

2

vacant role." Park Application, at ¶ 10.  The Debtors provided no evidence to support these allegations, and, in fact, based on the various representations made to the Court during these cases—as well as the Disclosure Statement the Debtors recently filed and to which they appended a draft Plan[4]—the foregoing justifications are invalid.

3. First, the Debtors have cited no facts demonstrating why these Chapter 11 Cases are so complex they require a dedicated CFO.  Mr. Park testified to this point during the hearings before the Court on June 26–29, 2023 (the "June Hearings"):

> Q: Mr. Park, it says Debtor's full-time employees, as of the date of the order for relief, zero.  Do you see that?
>
> A: Yes.
>
> Q: And that's consistent with your understanding that the Debtor has no full-time employees, correct?
>
> A: That is correct.
>
> …
>
> Q: Stream, the Debtor, as you sit here today, does not have the infrastructure, the employees, the material, capacity, or the cash to fulfill these purchase orders, correct?
>
> A: Yes.

---

[4] As used herein, the "Plan" refers to that *Joint Plan of Reorganization of Stream TV Networks, LLC [sic] and Technovative Media, Inc. pursuant to Chapter 11 of the Bankruptcy Code*, attached as Exhibit A to *Disclosure Statement for Joint Plan of Reorganization of Stream TV Networks, Inc. and Technovative Media, Inc. Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 293] (the "Disclosure Statement").

Though this Objection does not expressly object to the Plan, Hawk reserves all rights to do so in the future.  To the extent the provisions of the Plan are discussed herein, they are assumed to be true for the purposes of argument, but Hawk reserves the right to contest any such facts in the future.  Nothing herein shall be construed as or considered a waiver of any objection to the Plan.

> Q: So just to be clear, when you say yes, yes, you agree with me that Stream does not have the capacity to fulfill the purchase orders, correct?
>
> A: Yes.

Transcript of Hearing (Day 4) at 98:11–16 & 103:15–22, *In re Stream TV Networks, Inc.*, No. 23-10763 (Bankr. E.D. Pa. June 29, 2023) [hereinafter, "Day 4 Transcript"]. The Debtors' most recent Monthly Operating Report from June 2023 [ECF No. 300] further buttresses this fact, as the Debtors state that to date they have no operations, no employees, no revenue, and have disbursed only $623 during the course of these Chapter 11 Cases. Moreover, during the June Hearings, Mr. Park testified that he had not prepared, nor even reviewed, the Debtors' operating report for May 2023 [ECF No. 253], despite having purportedly been employed for the entire duration of the month. *See* Day 4 Transcript, at 95:19–96:19 (acknowledging Mr. Park had not seen the May Operating Reports).

4. Mr. Park also testified that as of the June Hearings he had still not received access to the Debtors' books and records. Day 4 Transcript, at 94:23–25 (Q: "But you have not been given access to the source information such as bank statements and bank accounts." A: "That is correct."); *See* Transcript of Remote Video Deposition of Thomas Park, at 67:6–10, *In re Stream TV Networks, Inc.*, No. 23-10763 (MDC) (Bankr. E.D. Pa. June 21, 2023) [hereinafter, the "Park Deposition"]. All of those records remained in the possession and under the control of Mr. Rajan despite Mr. Rajan being hospitalized and Mr. Park being the only other (proposed) employee of the Debtors at that time. *See id.* at 66:23–67:5. If the Debtors did not require Mr. Park to provide these types of services while Mr. Rajan was hospitalized, they certainly will not need him when Mr. Rajan is recuperated. If the Debtors anticipate needing more robust financial and reporting

4

services in the future (post-emergence), they can hire Mr. Park at that time. In the interim, however, the business and operations of the Debtors clearly do not justify the expense.

5. Second, the "structure of the Debtors' debt" also does not justify Mr. Park's retention, as the Debtors have a simple capital structure with only two secured creditors and a few dozen general unsecured creditors. Moreover, the Debtors have already filed their Plan, in which they provide proposals as to the treatment of the few claims filed against the estates and the capital structure for the reorganized Debtors. Although Hawk will dispute the Debtors' proposed treatment of its claim and transactions included in the Plan, the Debtors are obviously able to develop and propose strategies for dealing with their current debt obligations without the assistance of Mr. Park.

6. Third, the Debtors do not need any further assistance in obtaining financing based on their several representations made, and pleadings filed, to date. Specifically, the Debtors have represented that they have secured a $300 million term sheet for an equity investment by Zhongsheng Group Holdings Limited ("Zhongsheng"),[5] and the Plan proposes an investment by insider Visual Semiconductor, Inc. ("VSI") of an additional $35 million. *See* Plan, at § 9.01(a). In other words, the Debtors apparently have access to over $330 million of *equity investments*, all of which were either negotiated by Mr. Rajan or are being provided by an entity controlled and owned by Mr. Rajan, without any assistance—or even input—from Mr. Park. *See* Park Deposition, at 34:25–35:2 (stating Mr. Park was unaware of any term sheets or financing proposals into the Debtors, stating, "no not with them [the Debtors], term sheets with [VSI]"). Thus, Mr. Park has apparently played no role in securing these financing sources, and no additional sources of financing will be needed in the future given the magnitude of the investments purportedly in hand.

---

[5] *See* Exhibit A to *Amendment to Debtors' Expedited Motion for Entry of Interim and Final Orders Authorizing Debtors to Take Certain Actions in the Ordinary Course of Business* [ECF No. 258].

7. Moreover, given the proposals included in the Plan, it is unclear what role Mr. Park would play going forward with the Debtors as well. As explained further below, the Debtors have proposed that VSI will acquire the majority interest in the reorganized Debtors and, thereafter, will subsume the reorganized Debtors' businesses and operations pursuant to a stock-for-stock merger. Post-merger, the reorganized Debtors will not require any of the services that they propose Mr. Park to provide as CFO (unless, of course, Mr. Park would remain employed by VSI).

8. Thus, the only justification remaining for the Debtors' hiring Mr. Park as CFO is that the CFO role is vacant—a fact that has been true for the past several years. This vacancy alone, however, cannot justify the Debtors' incurrence of tens of thousands of dollars of administrative expenses without any appreciable corresponding benefit. In fact, the only benefit of hiring Mr. Park appears to be providing a veneer of independence to the Debtors by having Mr. Park's presence "cleanse" any insider transactions the Debtors propose in the future or as part of their Plan. Even this benefit, however, is illusory, as the Park Application expressly states, "the CFO shall be subject to the direction of the CEO of the Debtors." *See* Park Application, at ¶ 13. Unless the Debtors demonstrate some—*any*—tangible benefit to the estates, Mr. Park's retention should be denied.

9. In conclusion, based on the various representations the Debtors have made during the course of these Chapter 11 Cases, there appears to be no need for Mr. Park to serve the Debtors in the role as dedicated CFO, and the Debtors have not articulated why such retention is "reasonably necessary" or beneficial to the estates. The Debtors have no operations (or prospects of near-term operations), no revenue, and no robust reporting obligations, and the Debtors have developed and proposed a plan already in these cases. What would Mr. Park even do in his role as CFO? Either several of the representations the Debtors have made to this Court are blatantly and brazenly false, or Mr. Park's services are wholly unnecessary to the continuation and viability

of these Chapter 11 Cases and the Debtors' reorganization efforts. Although Hawk does not concede that any of the proposals or representations the Debtors have made to date are, in fact, true, it objects to Mr. Park's retention as being wasteful and unnecessary unless the Debtors can demonstrate otherwise.

      **B.**      **Mr. Park Is Not a "Disinterested" Person**

      10.      Moreover, even if the Court finds that the Debtors have established the necessity of Mr. Park's retention, based on the compensation structure proposed in the Employment Agreement, Mr. Park does not qualify as a "disinterested person" for the purposes of retention under section 327. Section 327(a) authorizes the trustee to employ "professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons …." 11 U.S.C. § 327(a). A "disinterested person" is one who is "not a creditor, an equity security holder, or an insider" of the debtor and "does not have an interest materially adverse to the interest of the estate or any class of creditors or equity security holders …." 11 U.S.C. § 101(14). An "adverse interest" is "any economic interest that would tend to lessen the value of the bankruptcy or that would create either an actual or potential dispute in which the estate is a rival claimant." *See In re Vascular Access Cntrs., L.P.*, 613 B.R. 613, 623 (Bankr. E.D. Pa. 2020).

      11.      The requirements imposed by the Bankruptcy Code that professionals retained by the estate be "disinterested" are to ensure that the shepherds of chapter 11 estates exercise their best judgment for the benefit of the estate and the debtor's stakeholders—absent any ulterior motives. "[T]he relevant question in determining whether [a professional person] is 'disinterested,' for the purpose of employment by the trustee, is whether the [professional] has a meaningful incentive to act contrary to the best interest of the estate and its creditors or the reasonable perception of such incentive." *See In re Quality Beverage Co., Inc.*, 216 B.R. 592, 595 (Bankr. S.D. Tex. 1995); *see also In re T & D Tool, Inc.*, 125 B.R. 116, 120 (Bankr. E.D. Pa. 1991)

7

("[T]he purpose of §§ 327 and 1107(a) is to insure, in advance, the employment of debtor's [professionals] to the estate and that such [professional] is disinterested and able to serve the best interests of the estate."). Courts have found that a professional receiving an equity interest in a reorganized debtor creates this sort of *actual* conflict of interest by effectively foreclosing potential strategic alternatives. *See In re Cascadia Project LLC*, No. 09-20780, 2011 WL 2134379, at *5 (Bankr. W.D. Wash. May 26, 2011) (finding that a financial advisor had an actual, material conflict of interest when it was proposed to participate as equity holder of an entity to acquire the debtor out of bankruptcy, finding "[o]nce tied to [the entity] under the LOI, [financial advisor] was bound to pursue that option to the exclusion of other options that might have been available to the debtor").

12. Here, Mr. Park does not qualify as a "disinterested" person, because his compensation package provides him with a vested interest in *one particular* outcome of these Chapter 11 Cases, which may not be in the best interest of the estates or stakeholders. As set forth in the Park Application, Mr. Park's compensation is proposed to include a cash component as well as an equity component (the "Equity Component"). *See* Park Application, at ¶ 13(d) & (g). The Equity Component of Mr. Park's compensation includes the accrual of a specific number of "shares of common stock in the reorganized Debtors" each week until a plan of reorganization becomes effective, at which time Mr. Park is to receive a bonus of 1,000,000 such shares. *Id.* Mr. Park would not receive the Equity Component (or such shares would be rendered worthless) if the Debtors ultimately consummate a sale of assets (whether under a plan or pursuant to section 363 of the Bankruptcy Code) or consummate a plan of liquidation.

13. In other words, as was the case with the *Cascadia* financial advisor, Mr. Park has an incentive to ensure that these Chapter 11 Cases conclude with a plan of reorganization and recapitalization with the Debtors' business continuing as a going concern—notwithstanding that

some other alternative may provide a better result for the estates and the Debtors' stakeholders. Mr. Park has a financial interest in ensuring that the Debtors' hands are tied and they do not pursue any alternative other than this type of "traditional" reorganization. Thus, he is not a disinterested person as he has "a meaningful incentive to act contrary to the best interest of the estate." *Quality Beverage Co., Inc.*, 216 B.R. at 595.

14. Worse yet, Mr. Park's conflict of interest becomes more concerning in context. Throughout these Chapter 11 Cases, the Debtors have indicated that they anticipate the Debtors ultimately merging with VSI—an entity created and controlled by the founder and CEO of the Debtors, Mathu Rajan. *See Debtors' Motion for Entry of Interim and Final Orders Authorizing debtors to Pay (I) Prepetition Employee Obligations, (II) Prepetition Withholding Obligations, and (III) Post-Petition Employee Obligations in the Ordinary Course* [ECF No. 134], at ¶ 21 ("VSI and Stream are in negotiations for VSI to serve as Debtors' bankruptcy plan sponsor, subject to approval of the Bankruptcy Court. As part of Debtor's reorganization plan negotiations, VSI and Stream ***hope to execute a business combination of both entities through a stock exchange***.") (emphasis added). Such a "stock exchange"—*i.e.*, a stock-for-stock merger—would result in Mr. Park ultimately exchanging his shares in the reorganized Debtors for shares in VSI.

15. Although that merger has never been presented to the Court, let alone approved, Mr. Park has repeatedly demonstrated that he considered and treated VSI and the Debtors as the same entity. For example, Mr. Park stated that while engaging in his fundraising activities, "[t]here wasn't a bifurcation or delineation between Stream as a legal entity versus VSI as to what I was raising capital for." Park Deposition, at 47:14–16; *see also id.* at 55:7–11 (referring to the Employment Agreement's reference to his Equity Component of equity in the reorganized Debtors as an "equity position in NewCo [*i.e.*, VSI]" "based on a successful exit from bankruptcy"); *id.* at 47:11–14 ("When I was offered the CFO position, it wasn't just on NewCo [*i.e.*, VSI]. It was still

Case 23-10763-djb    Doc 306    Filed 07/25/23    Entered 07/25/23 16:10:49    Desc Main
Document    Page 10 of 14

focused on Stream/NewCo, the overall entity as I know it as Stream."); *id.* at 47:17–48:6 (Q: "So am I correct that you viewed your role as to bring money to the table; what entity that would go into, how that money would be deployed was to be determined?" A: "Initially it was through Stream, because of DIP financing. As we were looking - - as some of those discussions I had with my own people that I brought to the table, the question started shifting more towards other legal entities that are all related to each other, of course, VSI, etcetera."). Furthermore, Mr. Park also stated under oath that he was actively seeking investments in VSI rather than the Debtors after he could not secure financing for the Debtors directly. *See id.* at 41:1–6 ("So we are contemplating VSI, for example, as one of the legal entities that we can offer shares into."); *id.* at 33:15–21 (Q: "And then you have moved your focus to an equity structure, which would be a NewCo; is that correct?" A: "That is correct."); *id.* at 48:9–13 ("We wouldn't put equity into a bankruptcy situation, but we would put equity into a new legal entity or VSI, for example."). At the June Hearings, Mr. Park tried to "clean up" many of these statements, but ultimately he relented and admitted that certain of his services were for the benefit of VSI. Day 4 Transcript at 75:24–76:5 (Q: "So you're raising capital for money for an entity currently that will be an entity other than Stream. And his current thinking is that it's going to be VSI, correct?" … A: "It [the Park Deposition] says what it says.").

16.    Recently, the Debtors filed a Disclosure Statement (to which they attached the first draft of their Plan), in which they proposed that VSI would acquire 90% "of all Class A Common Stock in the Reorganized Debtor" in exchange for an investment of $31,500,000.[6] *See* Plan, §

---

[6] In addition to the direct conflicts highlighted above, Mr. Park's Equity Component in the reorganized Debtors is also objectionable by being devoid of any assessable valuation. It is impossible for creditors to vet whether Mr. Park is being overpaid or underpaid, as there is no capitalization table or valuation data available for the reorganized Debtors and, therefore, the value of a share is undetermined. Indeed, there are no organization documents for the reorganized Debtors yet, so Mr. Park's Equity Component could represent the majority of the reorganized Debtors' equity interests or could represent a tiny fraction of such interests. As of today, it is simply impossible to know.

9.01(a). True to their word, the Plan represents the first affirmative step towards consummating the merger between VSI and the Debtors. Interestingly, as of April 2023, VSI produced a bank statement indicating it only had approximately $230,000 on hand, and the Debtors have provided no information regarding the source of the additional $30 million VSI has allegedly secured during the past 90 days.

17. Thus, not only does Mr. Park have a vested interest in the Debtors' pursuing only a traditional reorganization to the exclusion of all other alternatives, but he also has an interest in ensuring that VSI ultimately succeeds in acquiring the Debtors' assets—potentially with capital that *Mr. Park* helped raise. Mr. Park is not "disinterested" as required by section 327 of the Bankruptcy Code, and there is no safeguard in place to ensure that his decisions as CFO would actually be in the best interests of the estates and the Debtors' stakeholders. The purpose of the disinterestedness requirement in section 327 is to ensure that a debtor's professionals are motivated with only the debtor's (and its stakeholders') interests in mind. Based on the proposal in the Employment Agreement and the Park Application, however, the Court cannot be certain that will be the case.

    **C.**    **The Debtors Have Provided No Evidence of the Value Mr. Park Has Provided to the Estate to Date or for Why His Employment Should Relate Back to May 1, 2023**

18. Finally, even if the Court finds that Mr. Park's employment is justified and he is disinterested, Mr. Park's employment should be effective no earlier than the date the order approving his employment is entered. The Park Application requests Mr. Park's retention date back to May 1, 2023 (including the approval of accrued compensation in the amount of approximately $42,250, as of the date hereof). Such approval requires the Court to find "(1) that it would have approved the employment had the professional applied in advance, and (2) that there are 'extraordinary circumstances' excusing the professional's failure to get advance approval."

11

*See In re Grasso*, 490 B.R. 500, 524 (Bankr. E.D. Pa. 2013) (quoting *F/S AirLease II, Inc. v. Simon*, 844 F.2d 00, 105 (3d Cir. 1988)). To date, the Debtors have provided no evidence in support of either of the foregoing requirements nor have they shown that Mr. Park has provided ***any*** value to the Debtors' estates whatsoever.

19. As noted above, during the June Hearings, Mr. Park testified that as of late-June he still had not obtained access to various financial records for the Debtors, and he had not even reviewed the Debtors' monthly operating reports, including the May operating reports that the Debtors filed over 50 days after the Employment Date. Furthermore, he was neither aware of—nor had he vetted—the purported $300 million investment in the Debtors by Zhongsheng, and he had not obtained any independent or alternative financing for the Debtors at that time. In short, by his own admission, he had not—nor could he have—performed the services outlined in his Employment Agreement as of at least June 29, 2023.

20. If the Court authorizes Mr. Park's employment, it should be only as of the date of entry of the order authorizing such employment and no earlier.

## CONCLUSION

Accordingly, Hawk respectfully requests that the Park Application in its entirety and that the Court grant any other and further relief as it may deem just and appropriate.

Dated: July 25, 2023                **K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi, Esq. (No. 91881)
Megan E. O'Connor, Esq.
K&L Gates LLP
600 King Street, Suite 901
Wilmington, DE 19801
Telephone: (302) 416-7000
Facsimile: (302) 416-7020
Email: steven.caponi@klgates.com
           megan.oconnor@klgates.com

        Margaret R. Westbrook, Esq.
        Aaron S. Rothman, Esq.
        Jonathan N. Edel, Esq.
        K&L Gates LLP
        300 South Tryon Street, Suite 1000
        Charlotte, NC 28202
        Telephone: (704) 331-7400
        Email: margaret.westbrook@klgates.com
              aaron.rothman@klgates.com
              jon.edel@klgates.com

*Attorneys for Hawk Investment Holdings Ltd.*

**CERTIFICATE OF SERVICE**

I, Steven L. Caponi, certify that on July 25, 2023 I caused a copy of the forgoing *Hawk Investment Holdings Ltd.'s Objection to the Application of the Debtors for Entry of an Order Authorizing the Debtors to Retain Thomas Jung Ho Park as Chief Financial Officer to the Debtors* to be served on those persons receiving notice through CM/ECF.

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 91881)