# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,[1]<br><br>      Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,<br><br>      Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |
| STREAM TV NETWORKS, INC. and<br>TECHNOVATIVE MEDIA, INC.,<br><br>            Plaintiffs,<br>v.<br><br>SHADRON L. STASTNEY, SLS HOLDINGS<br>VI, LLC, HAWK INVESTMENT HOLDINGS<br>LIMITED, ARTHUR LEONARD ROBERT<br>"BOB" MORTON, SEECUBIC, INC.,<br>ALASTAIR CRAWFORD, KRZYSZTOF<br>KABACINSKI, KEVIN GOLLOP, ASAF<br>GOLA, JOHN DOE(S), JANE DOE(S),<br>DELAWARE and OTHER LAW FIRMS<br>representing and acting in concert with John<br>Doe(s) and/or Jane Doe(s), INVESTMENT<br>BANKS employed by John Doe(s) and/or Jane<br>Doe(s), PATRIC THEUNE, and SEECUBIC<br>B.V.,<br><br>            Defendants. | Adv. No. 23-_____ |

## ORIGINAL COMPLAINT

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (…4092) and Technovative Media, Inc. (…5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

Stream TV Networks, Inc. ("Stream" and the "Company") and Technovative Media, Inc. ("Technovative") and collectively with Stream, the "Plaintiffs" or "Debtors"), by and through their undersigned counsel, hereby file this Complaint against (1) Shadron L. Stastney ("Stastney"); (2) SLS Holdings VI, LLC ("SLS"); (3) Hawk Investment Holdings Limited ("Hawk"); (4) Arthur Leonard Robert "Bob" Morton ("Morton"); (5) SeeCubic, Inc. ("SCI"); (6) Alastair Crawford ("Crawford"); (7) Krzysztof Kabacinski ("Kabacinski"); (8) Kevin Gollop ("Gollop"); (9) Asaf Gola ("Gola"); (10) "John Doe(s);" (11) "Jane Doe(s);" (12) Delaware and other law firms representing and acting in concert with "John Doe(s)" and/or "Jane Doe(s);" (13) investment banks employed by the Debtors or "John Doe(s)" and/or "Jane Doe(s)"; (14) Patric Theune ("Theune"); and (15) SeeCubic B.V. ("SCBV") (collectively, the "Defendants");[2] alleging as follows:

## I.      Preliminary Statement

1.      This case arises from Defendants' scheme to defraud the shareholders and creditors of Stream TV Networks, Inc. ("Stream" or the "Company"), and in so doing, plunder the Company to create a multi-million-dollar windfall for themselves (the Defendants) while rendering the Company's reorganization and equitable treatment of creditors practical impossibilities.  The Individual Defendants (many of whom were board members or officers of Stream, and some who are yet to be identified) conspired to take over the assets of the Company in breach of their fiduciary, contractual, and other duties.  The conspiracy that Defendants engaged in included an effort to (a) sabotage Plaintiffs' exercise of certain debt-to-equity conversion rights held against Plaintiffs' secured debtholders, (b) vitiate Plaintiffs' recapitalization, which would have rendered certain Defendant debt instruments obsolete; (c) restrict and/or interfere with Plaintiffs' ability to raise funds and sell products, and (d) use their status as secured lenders to deny Stream the assets

---

[2] Defendants 1-15 are referred to herein as the "Scheme Defendants."

and other business resources essential to its successful reorganization. Defendants' conspiracy was designed to destroy Stream from the inside; to cause default events on certain debt instruments that the secured lender conspirators later transferred to their new entity, SeeCubic, Inc. ("SCI"); and to use those manufactured default events as a pretext for the co-conspirators to sign over all assets of Stream to SCI (controlled by Defendants) for zero dollars.

2.      The conspirators were led by shareholders who held secured debt which was subject to conversion to equity upon Stream meeting certain fundraising targets.[3]  The secured debt was convertible to equity to encourage future investment.  However, rather than acknowledge the convertible nature of their debt instruments, these lenders made bad-faith allegations, abused their insider status, and engaged in "self-help" to the detriment of Stream and its business operations and opportunities.  Moreover, the principals of these lenders manipulated their position and status both as secured lenders and officers and directors of the Company to orchestrate a takeover scheme in which several allied and like-minded conspirators used their insider access and insider information to enhance their financial position to the detriment of other stakeholders. Bearing all the hallmarks of a fraudulent conveyance, their scheme virtually eliminated any recovery by unsecured creditors, as it resulted in a debtor that had been stripped of all its assets.

3.      Not only did they exert control over the operations of the board, but they disrupted governance of the board and violated the Company charter in a manner so blatantly inconsistent with longstanding basic tenets of Delaware corporate law that the Delaware Supreme Court, in a unanimous *en banc* decision, vacated a lower court decision which had essentially ratified their actions. These lenders / officers and directors lured investment away from Stream to their new venture in violation of the employment agreement of one of Stream's officers who was leading the

---

[3] SLS Holdings VI, LLC and Hawk Investment Holdings Limited as more fully discussed in Section III.

conspiracy. These same lenders actively contacted and utilized existing Stream employees to carry out the conspiracy. They improperly seized assets using self-help and accessed customer lists, investor lists, and even conspired with Stream's investment banker, who was under contract with Stream, to divert fundraising to their new venture and away from Stream.

4.      More than 100 investors relied upon representations made by the conspirators that they would honor their conversion agreements, and those investors subsequently contributed funds to Stream with those conversion agreements factored into their investment decisions. Over a period of several years, sufficient funds were raised by Stream to extinguish and convert the majority of the secured loans, with a small deficiency remaining to convert the balance of the secured debt. In bad faith, the senior secured lender improperly amended its agreement to avoid its obligation. Both senior and junior secured lenders have actively conspired and continue to act in bad faith to prevent Stream from recovering its assets or raising funds, even after the Delaware Supreme Court mandated the return of all assets to Stream. The continuing disruption includes, without limitation: tortious interference by harassing and threatening investors, employees, customers, and lenders; violations of Stream's intellectual property rights; and infringement of Stream's existing third-party licenses.

5.      Defendants' scheme continues despite these bankruptcy proceedings. Scheme Defendants have held valuable and key equipment of the Debtors hostage to prevent and thwart their ability to operate efficiently and fulfill open customer orders. Scheme Defendants continue their unauthorized use of Debtors' technology to support SCI as a competitor to Debtors in the global marketplace, damaging Stream and its creditors. Scheme Defendants have also interfered with the ownership and governance of the wholly owned subsidiaries of the Debtors. Scheme Defendants have also engaged in unabated, fraudulent communications with Debtors' potential and current customers and investors.

6.      Scheme Defendants' unlawful and systemic actions must stop, and they must be held accountable for their actions.

## II.      <u>Jurisdiction and Venue</u>

7.      This Court has jurisdiction over this adversary proceeding (the "<u>Adversary Proceeding</u>") pursuant to 28 U.S.C. §§ 157 and 1334, and the General Order of Reference of the United States District Court for the Eastern District of Pennsylvania. This Court or the Federal District Court has original jurisdiction of the asserted federal law claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and under federal question jurisdiction pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1357 and § 1367 because it is part of the same case or controversy and DTSA, 18 U.S.C. § 1836.

8.      This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H), (K), and (O).

9.      Venue is proper pursuant to 28 U.S.C. § 1409 because the Adversary Proceeding arises in, and is related to, the above-captioned jointly administered bankruptcy case (the "<u>Bankruptcy Case</u>") of Stream and Technovative pending in the United States Bankruptcy Court of the Eastern District of Pennsylvania.

10.     Plaintiffs consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution but reserve the right to withdraw the reference or such consent under applicable law.

## III.    The Parties

**A.    The Plaintiffs/ Debtors**

a.    Stream TV Networks, Inc.

17.    Plaintiff Stream TV Networks, Inc. is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. Stream is a new media company founded in 2009 with a mission to advance the evolution of display technology from a flat 2D world to an immersive world of 3D where viewers do not need special glasses or goggles.

b.    Technovative Media, Inc.

18.    Plaintiff Technovative, a wholly owned subsidiary of Stream and organized pursuant to the laws of Delaware, is a holding company that owns directly or indirectly all the remaining entities in the Stream global group, which subsidiaries own or hold rights in both proprietary and licensed technology.

19.    Through its global engineering teams, Stream developed breakthrough glasses-free 3D display technology launched under the trade name Ultra-D™ ("Ultra-D"). Ultra-D is a proprietary and trade secret combination of hardware and software that creates a natural, comfortable, and immersive glasses-free 3D viewing experience.

**B.    The Defendants**

a.    Shadron L. Stastney

20.    Defendant Stastney, a resident of New Jersey, was an insider of Stream[4] by virtue of his position as a director of Stream and as Stream's Chief Financial Officer. Stastney is currently the Managing Member of Defendant SLS Holdings VI, LLC and the Chairman of Defendant SCI.

---

[4] Stastney was a Stream director from 2011 to 2014, when he resigned because the Securities and Exchange Commission levied nearly $3 million against him in disgorgement, penalties, and interest and barred him from certain fiduciary roles in an action captioned *In the Matter of Shadron L. Stastney*, United States Security and Exchange

b. <u>Arthur Leonard Robert Morton</u>

21.     Defendant Arthur Leonard Robert Morton is a resident of Jersey of the United Kingdom Channel Islands.  Upon information and belief, Morton owns and/or controls Hawk through entities owned and controlled by him, including Albany Directors Limited.

c. <u>Alastair Crawford</u>

22.     Defendant Alastair Crawford, a resident of the United Kingdom, is an investor in Stream. Additionally, he provided services to Stream by introducing other investors and otherwise assisting with Stream's capital raising efforts.

d. <u>Krzysztof Kabacinski</u>

23.     Defendant Krzysztof Kabacinski, a resident of the United Kingdom, is a former director and officer of SCI and SCBV.  In addition, Kabacinski was a director of Stream.

e. <u>Kevin Gollop</u>

24.     Defendant Kevin Gollop, a resident of the United Kingdom, is a director of SCI. Gollop was also one of the Stream directors.

f. <u>Asaf Gola</u>

25.     Defendant Asaf Gola, a resident of New York, is an officer and director of SCI. Gola was also one of the Stream directors.

g. <u>SLS Holdings VI, LLC</u>

26.     Defendant SLS Holdings VI, LLC is an entity controlled by Stastney, who acts as its Managing Member.   SLS is Stream's senior secured creditor, holding convertible notes totaling

---

Comm. Admin. File No. 3-15500, Release Nos. 3671, 30689 (Sept. 18, 2013). Stastney later re-engaged with Stream as a director from September 2018 until his resignation on January 30, 2020.

$6 million in principal amount. As further described in this Complaint, SLS purports to have transferred its Stream debt to SCI.

h. <u>Hawk Investment Holdings Limited</u>

27. Defendant Hawk Investment Holdings Limited is an entity formed under the laws of Guernsey of the United Kingdom Channel Islands. Upon information and belief, Defendant Morton owns and/or controls Hawk through entities owned and controlled by him, including Albany Directors Limited. As noted in this Complaint, Hawk is Stream's junior secured creditor, through 18 convertible promissory notes (defined herein as the "<u>Hawk Notes</u>") totaling approximately £50,600,000 British pounds, €183,601 euros, and USD $1,152,757 in principal amount. Like SLS above, Hawk purports to have transferred its Stream debt to SCI.

i. <u>SeeCubic, Inc.</u>

28. Defendant SCI, a privately held corporation organized in 2020 pursuant to the laws of Delaware, was formed by Stastney and Morton. Upon information and belief, Stastney and Morton created SCI to serve as a vehicle to receive Stream's assets seized through an order which was originally issued by the Chancery Court in 2020 but later vacated and reversed by the Delaware Supreme Court in 2022.

j. "John Doe(s)"

29. Defendant "John Doe(s)" refers to unidentified members of the aforementioned Defendants' scheme.

k. "Jane Doe(s)"

30. Defendant "Jane Doe(s)" refers to unidentified members of the aforementioned Defendants' scheme.

l. <u>Law firms employed by "John Doe(s)" and "Jane Doe(s)"</u>

31.    Defendant law firms, formed and/or operating under Delaware law, employed by "John Doe(s)" and "Jane Doe(s)" refers to the law firms which knowingly represented, and furthered the acts of the unidentified members of the aforementioned Defendants' scheme.

m.    <u>Investment banks employed by "John Doe(s)" and "Jane Doe(s)"</u>

32.    Defendant investment banks, formed and/or operating under Delaware law, employed by "John Doe(s)" and "Jane Doe(s)" refers to the investment banks which knowingly assisted funding, and furthered the acts of the unidentified members of the aforementioned Defendants' scheme, and upon information and belief, also included Defendant investment bank(s) that were also employed under contracts with Stream.

n.    <u>Patric Theune</u>

33.    Defendant Patric Theune, an individual residing variously in both Portugal and the Netherlands, is the Head of Technology for SCBV. Theune was promoted to the Head of Technology position by Defendants Stastney and Kabacinski while they exercised control of SCBV prior to reversal of the improvident Chancery Court ruling that returned control of the Debtors and their subsidiaries to Plaintiffs. Prior to the Petition Date and thereafter, Theune was instrumental in withholding assets of Plaintiffs' bankruptcy estates that were under his control and acted in concert with the other Defendants.

o.    <u>SeeCubic B.V.</u>

34.    Defendant SeeCubic B.V is a limited liability company formed under the laws of the Netherlands to conduct research and development activities for the benefit of Plaintiffs.  SCBV is ultimately 100% owned by Stream.

## IV.   Factual Background

**A.   Stream's Early History**

35.    Between 2009 and 2020, Stream raised approximately $160 million through equity investments, unsecured convertible debt, and direct loans. Stream formed SCBV as a Dutch research and development ("R&D") subsidiary for the purpose of developing a glasses-free 3D technology solution that could be marketed globally. Stream licensed a portfolio of glasses-free 3D patents from Koninklijke Philips N.V. ("Philips"), hired engineers who had been instrumental in developing the Philips patents, established operations in Eindhoven, the Netherlands, put considerable effort into researching and developing its glasses-free 3D technology, and trademarked the name Ultra-D™.

36.    Stream made its first public showing of its Ultra-D technology when it unveiled Ultra-D demonstration samples in January 2012 at the Consumer Electronics Shows in Las Vegas, NV, USA. Based on initial interest in Stream's fledgling Ultra-D technology, Stream continued to use investor capital to further develop its technology by, among other things, supporting enhanced image resolution, increasing the size of the displays, improving multi-view optics, improving real-time conversion of content from 2D/3D to the Ultra-D glasses-free 3D format, creating content creation software tools, and moving core algorithms from software to hardware, thus reducing production cost and making the technology compatible with most devices in the industry.

37.    During this period, Stream also perfected its mass production optical bonding process—the precise gluing of proprietary 3D lenses to standard 2D video panels with sub-pixel accuracy—which major competitors such as Philips and Dolby Laboratories had failed to achieve. Stream commissioned the manufacture of specialized optical bonding equipment to meet its unique requirements, a Small Production Line ("SPL") and a Mass Production Line (the "MPL", and together with the SPL, the "Bonding Equipment"). Both machines were installed at the facility of

contract manufacturer Pegatron in Suzhou, China for bonding of 55" and 65" 3D panels. The MPL, with its greater automation, achieved milestone efficiency with a 96% yield rate during production of 4,000 units of 65" glasses-free 3D advertising displays. The Bonding Equipment is an asset of Stream.

38.    From its inception to 2020, Stream grew to over 100 employees and consultants worldwide and focused its efforts on further developing its Ultra-D technology for implementation into the devices of major industry brands selling TVs, tablets, laptops, and mobile phones. The Company added product engineering teams in California, USA; Dusseldorf, Germany; Bangalore, India; and Beijing, China while simultaneously putting significant effort into business development and customer acquisition.

39.    Stream pitched its Ultra-D technology to numerous strategic partners and customers throughout the United States and the world. By 2019, Stream had attracted the interest of two world-class customers: Google LLC[5] and Robert Bosch GmbH ("Bosch").[6]

40.    In late 2019, Stream entered into a co-development arrangement with Google for creation of a 65" 8K glasses-free 3D teleconferencing display, and Google placed a purchase order for two sample units to be delivered to Google in the United States. Based on good collaboration during the months that followed, Stream and Google commenced negotiations in March 2020 for a phased project that would include a small production run of "beta test" units and a mass production run of 10,000 units per year at a unit cost of approximately $2,000, generating nearly

---

[5] Google is a multinational technology company focusing on artificial intelligence, online advertising, search engine technology, cloud computing, computer software, e-commerce, and consumer electronics. It has been referred to as "the most powerful company in the world" and as one of the world's most valuable brands. With 140,000 employees worldwide, the company reported gross revenues of nearly $280 billion in 2022.  https://about.google/.

[6] The Bosch Group is a leading global supplier of technology and services. It employs roughly 420,000 associates worldwide (as of December 31, 2022). According to preliminary figures, the company generated sales of 88.4 billion euros in 2022.  https://www.bosch.com/

$20 million in annual gross revenues for Stream. These units were to be distributed and sold worldwide, including United States-based businesses of all kinds that would benefit from this new video teleconferencing solution.

41.     In addition to its efforts with Google, on March 17, 2020, Stream (through its Dutch subsidiary Stream TV International B.V.), executed a $3 million co-development agreement with Bosch to create a 12.3" 4.5K-resolution glasses-free 3D instrument cluster using Ultra-D for the automotive market. Stream leveraged its relationship with BOE Technology Group Co., Ltd. ("BOE"),[7] the world's largest video panel manufacturer, to participate in the project by creating the highest-resolution automotive grade panel yet available. These Ultra-D automotive units were intended for sale worldwide, including to major automakers based in Detroit, Michigan.

42.     Stream's product engineering teams liaised with both Google and Bosch on a weekly basis as both projects moved forward in parallel. At that point, Stream had finally created its first real paths to market.

43.     During this critical commercialization period in early 2020, Stream suffered financial challenges but did not declare chapter 11 bankruptcy or take other judicial reorganization action because it intended to raise additional capital (as it had successfully done in the past) after announcing its anticipated contracts with Google and Bosch. With two major customers engaged, Stream began negotiations with institutional investors that could provide critical go-to-market production funding with the representations in signed agreements that the secured lenders had agreed to convert their secured debt holdings into equity of the Company.  Subsequently, not only

---

[7] BOE is the world's largest manufacturer of LCD, OLEDs and flexible displays, with 68,175 employees worldwide and annual revenues of $34.57 billion as of 2021. BOE and Stream announced a strategic marketing agreement on August 2, 2018, and held a joint press conference in November 2018 to announce their partnership: https://www.bloomberg.com/press-releases/2018-11-29/stream-tv-and-boe-partner-to-bring-high-resolution-glasses-free-3d-to-the-8k-global-market  https://www.boe.com/en/

did both lenders fail to adhere to these agreements, but they also actively plotted and executed a scheme designed to sabotage and undermine the business efforts of the Debtors.

**B.    Stream's Secured Creditors and Related Loans/Notes**

44.    In 2011 and 2012, SLS loaned Stream $6 million via multiple senior notes, secured by all assets of Stream and its subsidiaries (previously defined as the "SLS Notes").

45.    Between 2014 and 2020, Hawk loaned Stream approximately £50,600,000 British pounds, €183,601 euros, and $1,152,757 dollars through a series of 18 separate promissory notes (previously defined as the "Hawk Notes"). The terms of the Hawk Notes contain anti-assignment provisions which prohibit assignment of rights under the notes without the consent of the other party.  Stream also pledged its assets for those instruments subject to SLS's senior security interest, thereby rendering Hawk a junior secured creditor.

**C.    The Conversion Agreements**

46.    From 2014-2017, Intrinsyc Corporation ("Intrinsyc") provided third-party engineering services to Stream for integration of Stream's real-time conversion algorithms into the Qualcomm Snapdragon computer chip. Stream paid Intrinsyc for such services, but during that time, Intrinsyc also made certain unsecured loans to Stream in consideration of future additional guaranteed work from Stream.

47.    In early 2018, prospective investors expressed concern about the amount of Stream's debt, both secured and unsecured, and it became clear to Stream's management that executing debt-to-equity conversion agreements with SLS, Hawk, and Intrinsyc would be in the best interest of the Company and its shareholders. To facilitate new investment and growth of the Company, and to strengthen the Stream balance sheet, the three primary holders of the Company's debt(s) signed conversion agreements — *i.e.*, the Hawk Conversion Agreement, the SLS

13

Conversion Agreement, and the Intrinsyc Conversion Agreement — with such conversions to be made at Stream's sole discretion.

48.     More than 100 investors subsequently contributed funds to Stream with those conversion agreements factored into their investment decisions.

49.     In May 2018, Intrinsyc honored the Intrinsyc Conversion Agreement and accepted equity in Stream.  The accrued value of the Intrinsyc debt was $1,661,384 at the time of conversion, and Intrinsyc was issued 415,346 common shares of Stream Class A common stock.

50.     Under separate conversion agreements between and amongst Stream, Hawk, and SLS, the SLS Notes and the Hawk Notes would convert to equity under certain circumstances related to Stream's successful raising of additional capital.  Mr. Morton personally participated in all the events relevant to the Hawk debt and the conversion agreements, and he negotiated those agreements on Hawk's behalf.  Under each of the conversion agreements, Stream had the sole and unilateral discretion to convert debt to equity. Stream has met its contractual obligations under the Hawk Conversion Agreement; it raised the required capital, extinguished any purported liens, and sent stock certificates to Hawk on or about August 9, 2023.

51.     Hawk has been informed of the extinguishment of its secured notes multiple times as money was being continuously raised by the Debtors. The Debtors sent notices of the extinguishment in 2018 and 2020 to Hawk, which have been ignored or to which Hawk has responded in bad faith.  Hawk has misrepresented its secured position in filings with several courts, including through its filed proofs of claim, without any explanation that its security is subject to extinguishment through the conversion agreement.  Hawk has a contractual obligation to cooperate with its obligations under the conversion agreement and has breached that contract through its efforts to harm the Company and its operations, both surreptitiously and directly. Hawk is engaged in a continuous breach through its ongoing interference in the Debtors' estate as detailed herein.

**D.      Stream and Technovative Reject Unethical Proposals of Various Defendants**

52.      Stream had a good relationship with Stastney until 2018.  Stastney became unhappy with Stream's management near the end of 2018 because he feared Stream's fundraising efforts would cause him to lose the control and influence he had gained in Stream.  He was also concerned that SLS's loans would be converted to equity per the SLS Conversion Agreement, just as Intrinsyc's loan had been converted earlier that year.

53.      In 2019, Stastney proposed an alternative to converting the SLS debt to equity: instead, Stream would repay the SLS $6 million loan dollar-for-dollar using funds from the intended capital raise Stream was engaged in. Stastney proposed that a "sweep account" be set up whereby Stream's new investment funds, in excess of a certain amount, would be swept into an SLS bank account. The funds that would have been swept into that account would have surpassed the amount owed to SLS. Surprised that Stastney would prioritize self-interest over his fiduciary duty as an officer and director, Stream rejected the proposal.

54.      Near the end of 2019, Crawford approached Raja Rajan, Stream's COO and in-house counsel at the time, with a proposal that Stream reclassify Crawford's equity as a loan. Crawford, it seemed, wanted to retain his shareholdings while also getting repaid his investment. He insisted that Stream put him in the junior lender position, subordinating the Hawk debt so that Crawford would be second only to SLS. Worse still, Crawford asked Stream to make such changes secretly, keeping the information hidden from Hawk. To add more pressure, he threatened to file the Crawford Lawsuit (as described below) if Stream did not comply with his equity-to-debt conversion demand. Stream refused to concede to the attempted blackmail, and Crawford filed the Crawford Lawsuit in January 2020.

**E.      Defendants Begin a Scheme to Steal Stream**

1. **Stastney and the Other Defendants Begin the Scheme while Stastney is Stream's CFO and Vice Chairman of the Board**

55.     Defendants began taking steps to weaken Stream from the inside, making it ripe for a takeover. In late 2019, Stastney, while serving as a Stream officer and director, and Crawford conducted a campaign of contacting Stream shareholders and urging them not to reinvest in Stream. On at least one occasion, a Stream investor who ignored the warning was contacted again by Crawford, who berated the investor for a "stupid" decision to support Stream.

56.     Between December 29, 2019 and January 30, 2020, while Stastney served in the capacities as both Stream's Vice Chairman of the Board of Directors and its Chief Financial Officer, Stastney, along with Morton and Crawford, began to implement their scheme to force a reorganization of Stream that would result in relegating Stream Founder and CEO, Mathu Rajan, to a mere consultant, passing along institutional knowledge to a Stastney-controlled Stream or a new Stastney-controlled entity.

57.     Stastney outlined the scheme in a January 17, 2020 email to Crawford:

- SLS and Hawk would first send default notices to Stream—a default which Stastney, as CFO of Stream, allowed to occur;

- An agreement by Stream would then transfer all of its assets to the "Newco"—*i.e.*, SCI—formed by Stastney, Crawford, and Morton;

- Stream's shareholders would be given the opportunity to swap Stream shares for SCI shares, which would result in Stream shares becoming diluted and less valuable; and

- The SLS and the Hawk debts would be used as leverage to ensure that "creditors stay in line and manageable."

58.     To effectuate the scheme, Scheme Defendants had to ensure that Stream could not raise capital to convert or otherwise extinguish SLS's and Hawk's secured debt. Hence, on January 3, 2020, Crawford filed a lawsuit in the Delaware Court of Chancery ("Chancery Court") against

Stream's management and controlling shareholders on behalf of himself and several of Stream's other investors, alleging fraudulent misconduct and other mismanagement (the "Crawford Lawsuit").[8] The Crawford Lawsuit was clearly intended to negatively impact Stream's ability to raise money. Gollop sent an email on March 23, 2020 to Stream management regarding text messages he had exchanged with Patrick "Paddy" Miles ("Miles"), one of the plaintiffs in the Crawford Lawsuit. Gollop stated: "Paddy Miles has already stated in an SMS message that *the purpose of the lawsuit is / was to block the company from raising money, especially from institutions*." (Emphasis added).  Gollop supported his statement with a screen shot of his phone showing a text message from Miles that said: "We haven't been pushing the timetable as *the initial and main purpose [is] to have something out in the public domain*." (emphasis added).

59.     In addition to blocking Stream's ability to raise money, Defendants solicited Stream's current investors, encouraging them to invest in a new company controlled by Defendants rather than reinvest in Stream.

60.     The Scheme Defendants did not stop at soliciting investors; they also solicited Stream's key employees.  Stastney shared details of his malicious takeover scheme with Kaushik Banerjee ("Banerjee"), Stream's VP of Engineering, in a December 29, 2019 email that included details on the new structure.  Stastney also sent an email to Bill Hennessey, Stream's finance controller, on January 30, 2020 stating that Stastney could not simultaneously act as CFO and Vice Chairman/Director of the Board and pursue a default on behalf of SLS, emphasizing that "this doesn't change the plan at all, just tactics to allow SLS to apply maximum pressure."  Stastney lured and attempted to lure Stream employees by promising them jobs at the new entity with

---

[8] *Alastair Crawford et al. v. Mathu Rajan et al.* (No. 2020-0004-JTL)

lucrative salary increases, bonuses, and significant issuances of equity while he was still employed

at Stream (and after).

61.     On January 16, 2020, in an email exchange between Banerjee and Stastney,

Banerjee acknowledged the anticipated stripping of Stream's assets when he stated he was taking

"necessary steps to safeguard our interests & hard work" until "Organization changes are

announced & *assets pulled out by the investors.*" (Emphasis added).

62.     All of Stasney's actions were breaches of his employment agreement and fiduciary

duties to Stream.  Stastney entered into an employment agreement with Stream on December 1,

2018 and was named Chief Financial Officer (the "Stastney Employment Agreement"). Under the

Stastney Employment Agreement, Stastney was prohibited from, among other things:

(i)     solicit[ing], entic[ing] or induc[ing] any person who presently is or at any time
during the term hereof shall be an employee of the Company to become
employed by any other person, firm or corporation or to leave their
employment with the Company . . .

(ii)    (compet[ing] with, or encourage[ing] or assist[ing] others to compete with, or
solicit[ing] orders or otherwise participat[ing] in business transactions in
competition with, the business engaged in by the Company . . .

**2.      Stastney Resigns and Continues the Scheme to Sabotage Stream with the other
Defendants**

63.     Scheme Defendants' misconduct continued well after Stastney (finally) resigned as

Stream's Vice Chairman of the Board and Chief Financial Officer on January 30, 2020.

64.     Upon his resignation, and in violation of his fiduciary duties, Stastney offered to

extend the due dates of the SLS Notes to March 1, 2020, *but only if* Stream made a lump sum

payment of $202,500 to him personally by February 7, 2020.  Stastney also offered to continue

extending the SLS Notes, so long as he was paid his annual salary of $360,000 through December

31, 2021 (despite the relinquishing of his responsibilities toward Stream). Stream ultimately paid an additional $28,987.76 to Stastney.

65.     Following Stastney's resignation from Stream, the efforts by the Scheme Defendants and their allies to interfere with Stream's business began to accelerate.  On February 8, 2020, the day after Stastney's demand deadline for Stream to pay $202,500 to him personally, Andrew Roughly ("Roughly"), a Stream investor and unsecured debtholder, sent an email to Derick Bowker, founder and Executive Vice President of MotivIT, the third-party custodian of Stream's Silicon Valley computer servers containing Stream's valuable intellectual property.  The email to Bowker (with a copy to Morton, Stastney, and Banerjee) stated that Stream was in default of the Hawk debt and that MotivIT was prohibited from allowing anyone to remove any server or data without Hawk's permission.

66.     In February 2020, unaware of the secret actions being taken by the Scheme Defendants, Stream expanded its board of directors as requested by Defendants SLS, Stastney, Hawk, Morton, and Crawford.  Directorships were offered to Frank Hodgson, Gola, Gollop, and Kabacinski, with Stream also unaware that the latter three of these new directors were acting as agents for the benefit of Stastney, SLS, Morton, and Hawk.

67.     Despite claims by Defendants throughout the Omnibus Agreement Lawsuit (defined below) from 2020-2021 that Gollop was independently pursuing the best interests of Stream, during his November 8, 2020 deposition, Gollop admitted that he was or at minimum felt obligated to act on behalf of Hawk in order to serve on the Stream board.

68.     While Defendants were infiltrating Stream's board of directors, Stastney was informing certain Stream stakeholders, including but not limited to employees, investors, strategic partners, and customers, that SLS would be issuing a Notice of Default to Stream on March 1,

2020, and would then immediately take possession of Stream's assets.  This created the false impression that the unpaid SLS Notes would result in the immediate loss by Stream of its assets.

69.     On March 11 and 12, 2020, Stastney communicated with Robin Hill ("Hill"), Founder & CEO of Ruffena Investment Group Ltd. ("Ruffena"), Stream's investment banker in the United Kingdom. In the email exchange, in which Morton and Kabacinski also participated, Stastney and Hill discussed the progress of Stastney's plan to take over Stream's assets, the use of the investor presentation deck for which Ruffena appeared to have been raising funds to assist Stastney in transferring assets to SCI, the need to raise immediate funds for SCI, and the status of transitioning from Stream to SCI's team.

70.     Despite not having filed – much less having received adjudication of – any foreclosure action,[9] Stastney sent his own email to MotivIT on March 12, 2020, stating:

> Stream is now in foreclosure, and all assets of Stream TV are the property of SLS. Additionally, SLS has been granted power of attorney by Stream to direct disposition on behalf of Stream of all those assets until it is repaid in full.

> Therefore, whether or not StreamTV pays any or all of its outstanding amount to MotivIT, SLS directs, as power of attorney for StreamTV, that MotivIT hold such assets in trust for SLS until directed otherwise by SLS.

71.     In March 2020, Stream began negotiating a $50 million Strategic Cooperation Agreement with Beijing ToJoy Shared International Consulting Co., Ltd. ("ToJoy"), simultaneous with Stream's execution of the $3 million Bosch co-development deal and the commencement of negotiations for a multi-million-dollar agreement with Google. As Stream worked to secure the ToJoy funding, Kabacinski – as a newly appointed Stream director – worked to undermine the investment which would have enabled Stream to fully convert the Hawk debt to equity.

---

[9] Stastney did not file a foreclosure action on behalf of SLS until March 23, 2020 (C.A. No. N20C-03-225 MMJ CCLD.

72.     During critical negotiations in late April 2020, Kabacinski interfered on behalf of Hawk to sabotage the deal, prompting the ToJoy representative to send an urgent message to Mathu Rajan: "Kris [Kabacinski] sent a lot of negative information and messages to our companies. Please let Kris stop that stupid behaviour!!!!"  As a direct result of the Scheme Defendants' activities, ToJoy ultimately abandoned its proposed investment in Stream.[10]

**F.     The Defendants Breach their Fiduciary Duties and Negotiate an Omnibus Settlement Agreement to the Obvious Detriment of Stream (and Ultimately Vacated by the Delaware Supreme Court)**

73.     On May 4, 2020, in furtherance of the takeover plan, Defendants Kabacinski, Gollop, and Gola voted as directors in a regularly scheduled Stream board meeting to establish a Resolution Committee and empower it to negotiate a settlement with Stream's secured creditors.

74.     On May 6, 2020, Gola and Gollop, acting as sole members of the Resolution Committee of Stream's Board, delivered to Stream's management a fully executed Omnibus Agreement, purporting to bind Stream and accomplish the Defendants' goal of seizing Stream's assets. The Resolution Committee did not obtain approval for the Omnibus Agreement from Stream's Class A or Class B Voting stockholders, even though Class B Voting stockholder approval is specifically required by Stream's Charter for transfer of all or substantially all of Stream's assets.  In addition to Gola and Gollop, the Omnibus Agreement was also signed by: (i) Stastney, on behalf of SLS, as its managing member; (ii) Emma McIntosh and Lee Mealing, as

---

[10] Actions to interfere with Stream's business continues despite these Bankruptcy Cases.  Recently, Stream publicly revealed a term sheet and corresponding subscription agreement for proposed Stream investor Zhongsheng Group Holdings Ltd. ("Zhongsheng"). Amit Patel, one of SCI's agents and investors, attempted to interfere with Zhongsheng's investment into Stream. Amit Patel verified those attempts by sending a July 17, 2023, WhatsApp message to Stream's CEO stating: "We already made contact with [Zhongsheng]. They are going to sue your as[s]." The message implies continued efforts by SCI to intimidate potential Stream investors post-bankruptcy. Further, Leo Riley, SCI Senior Vice President of Strategy & Product, attempted to contact Skyworth Corporation, a partner of Stream who has expressed interest in developing 65-inch and 75-inch 8K-resolution televisions featuring Stream's Ultra-D glasses-free 3D technology and has offered to provide engineering cooperation for such development, in what can only be a further attempt by SCI to intimidate Stream's business relationships.

authorized signatories for Albany Directors Limited, the sole director of Hawk; and (iii) Crawford, Miles, and Robert Petch on behalf of the Crawford Lawsuit plaintiffs.

75.     By its terms, the Omnibus Agreement transferred all of Stream's assets to SCI in lieu of SLS and Hawk foreclosing on Stream's assets.  In this way, Defendants thwarted the rights of the Class A and Class B Voting shareholders entitled to vote on the transaction under the Charter, and wrongfully took possession of all of Stream's assets.

76.     The Omnibus Agreement also provided for the issuance of one million shares in SCI to Stream, though that issuance was never effectuated.   Stream's Class A common shareholders, other than Stream founder Mathu Rajan and his family, who were expressly excluded, were granted the right to "exchange" their Class A common shares of Stream for the equivalent number of common shares of SCI at no cost.  In this way, Defendants gave themselves a larger ownership interest in SCI than they had in Stream and thus enriched themselves.

77.     As stated by Gollop in an email on May 9, 2020, the Omnibus Agreement blindside was "essentially a coup."

78.     In connection with, and simultaneous to the Omnibus Agreement, SLS, Hawk, and certain of Stream's equity investors (including Crawford, Miles, and Petch) executed a secret side letter (the "Letter Agreement") in which SLS and Stastney, Hawk and Morton, Crawford, Miles, and Petch – all beneficiaries of and signatories to the Omnibus Agreement – detailed the structure of their new Delaware corporation, SCI. The Letter Agreement, which was purposely hidden from Stream management until it was produced much later in discovery during the Omnibus Agreement Lawsuit (defined below) in Chancery Court, was a critical component of the settlement, stating: "the parties hereto wish to agree among themselves to certain additional matters related to the Omnibus Agreement, *and on which their execution of the Omnibus Agreement is conditioned…*" (Emphasis added").  Detailed in the Letter Agreement were equity distributions for SLS, Hawk,

and certain of Stream's investors who had supported Stastney's plan to take over Stream. Despite the fact that no representative of Stream signed the Letter Agreement, it required Stream to issue 48 million shares of Stream's common stock: 40 million shares to Hawk; four million shares to SLS; and four million shares to Crawford and certain other investors. Stream never issued such additional equity.

79.    Those 48 million shares were precisely numbered to shift majority voting control from the Rajans, whose voting control within Stream would decline to 49.9%. The Omnibus Agreement and its companion Letter Agreement therefore not only transferred all Stream's assets to SCI and exchanged Stream's common shares for SCI's common shares, but it also granted SCI an option to take majority voting control of Stream whenever it liked.

80.    Stream's directors who signed the Omnibus Agreement had clear conflicts of interest because they would receive compensation and other benefits once Stream's assets were transferred to SCI. The private placement memorandum used by SCI to raise capital only weeks after the Omnibus Agreement was executed listed Kabacinski, Gola, and Gollop as having key roles at SCI, the newco to which they had transferred the assets.

81.    Stream passed a Written Resolution of the Shareholders, dated May 6, 2020, that removed Kabacinski, Gola, and Gollop as directors of Stream, effective immediately. Although there is some dispute whether the resolution was signed and effective on May 6 or possibly later on May 8 or May 9 as speculated by Vice Chancellor Laster in his Chancery Court Opinion of December 8, 2020, it is clear that Kabacinski, Gola, and Gollop were removed as directors of Stream not later than May 9, 2020.

G.    **Defendants Begin Seizing Stream's Assets Pursuant to the Invalid Omnibus Agreement**

82.    Despite the fact that the Rajans disputed the validity of the Omnibus Agreement; despite the fact that its terms were in obvious conflict with Stream's Charter; and despite the fact that the purported validity had not been adjudicated by any court of law, Defendants began seizing and attempting to assert control of Steams assets almost immediately.

83.    In a May 14, 2020 email, Stastney confirmed to Crawford that Kabacinski had bribed Franklin Rodgers ("Rodgers"), an employee accountant in Stream's finance department, with a position at SCI to obtain confidential Stream investor data.  Stastney's email stated that after Rodgers was assured a position with SCI, Rodgers provided a list of all shareholders, and Stastney drafted a notice to shareholders of the current state of Stream for Crawford to review. Stastney's draft notice to Stream shareholders stated that Stream was in default on "$125mm of secured debt" with no realistic prospects of paying any material portion of the debt, and that this would cause Stream to lose all its assets with no recovery available to Stream shareholders.  Stastney's notice proposed that the only rational solution was to (i) enter into a settlement with the secured creditors and shareholders suing Mathu and Raja Rajan personally and to (ii) deliver the assets and key liabilities of Stream in order to settle the default. Stastney further stated that Mathu and Raja Rajan had previously improperly used their "super-voting" Class B shares in Stream to fire previous board members who proposed changes in Stream's corporate governance.  Ultimately, Stastney intended to send a message to Stream shareholders that the Rajans were no longer operating Stream in the best interests of the shareholders, and that they should execute subscription agreements to receive shares in SCI in return for their shares in Stream and thus undermine the Rajans as part of the take-over scheme.

84.    On May 29, 2020, using the investor database obtained from Rodgers, Crawford sent out emails on behalf of the "Stream TV Action Group steering committee" to other Stream investors soliciting support for SCI and informing them, among other things, that Stream's assets had been transferred to SCI.

85.    Using the Omnibus Agreement as a foundation, SLS and Hawk began claiming ownership of and seizing Stream's assets through their new business entity. On the title page of its June 2020 private placement memorandum, SCI declared itself "Owner of the brand Ultra-D."

86.    SCI hired Stream's VP of Sales, Leo Riley ("Riley"), and directed him to refuse access by Stream to items vaulted in a New Jersey storage facility controlled by Riley. Although Stream had been paying the storage facility fees for several years, the storage unit had been registered in Riley's personal name, and thus, he was able to deny access to Stream and hold the assets for the benefit of SCI. Riley is now the Senior Vice President, Strategy and Product for SCI.

87.    In July 2020, SCI contacted Vistra B.V. ("Vistra"), the Netherlands administration company serving as an obligatory Dutch director for Stream's three Dutch subsidiaries. With the Omnibus Agreement as "proof" of its authority, SCI convinced Vistra to remove Mathu Rajan as Director A and replace him with Stastney. Fortunately, due to Dutch law, Vistra was required to notify Mathu Rajan prior to his removal, and Stream was able to inform Vistra of the disputed nature of the Omnibus Agreement. Unsure what to believe and wanting to avoid risk, Vistra resigned as director of all Debtors' Dutch subsidiaries.

88.    In August 2020, Stastney entered Stream's office headquarters in Philadelphia, PA without invitation, notice, authorization, or accompaniment, using an office key he had not returned at the time of his resignation seven months earlier. Stastney broke into Stream's office in search of stock certificates confirming Stream's 100% ownership of Technovative Media, Inc. According to his own testimony, Stastney felt entitled to the certificates pursuant to the Omnibus

Agreement and had no compunction about his unlawful entry and attempted self-help. Unable to find the stock certificates, Stastney created paperwork certifying them as "lost" and created a new ownership paper trail dated September 4, 2020.

89.    On August 7, 2020, upon learning that Stream had engaged Buchanan Ingersoll & Rooney PC ("BIR") as legal counsel to protect its assets, and despite his removal from Stream's board of directors three months earlier, Kabacinski used Stream's letterhead claiming to be Stream's "Director and acting executive" and informed BIR that it was "not authorized to represent my company Stream TV Networks, Inc." Kabacinski's cease-and-desist letter further threatened "prompt legal action against you personally for your tortious interference with [Stream's] legitimate operations."

90.    On August 18, 2020, Crawford and other unspecified Omnibus Agreement signatories, through their law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), sent a letter to Stream's third-party product engineering team at JoveAI Innovation, Inc. ("JoveAI"). The letter informed JoveAI that the Omnibus Agreement had given SCI ownership of Stream's assets and ordered JoveAI to (i) cease and desist from continuing any work on Stream's intellectual property unless directed by SCI and (ii) return to SCI any funds received from Stream since the date of the Omnibus Agreement.

91.    On August 24, 2020, despite being removed from their directorships in May 2020, Gollop and Gola signed a Delegation of Authority Letter using, without Stream's approval, Stream's letterhead, purporting to give a third-party power of attorney to represent some of Stream's subsidiaries for the purpose of assuming the Chinese facility lease where Stream's Bonding Equipment was stored. Once it had assumed the Chinese facility lease, Defendants could exercise control over the equipment, moving it out of Stream's possession and control.

92. On August 27, 2020, despite being removed from his directorship in May 2020, Kabacinski, again using Stream's letterhead and claiming to be Stream's "Director and acting executive," made demands and threats to Bud Robertson, Stream's executive vice president who also served as Chief Executive Officer of SCBV. The letter and following email correspondence on August 29, 2020 contained slanderous accusations and threatened legal consequences to Robertson for cooperating with Stream's management.

## H. The Delaware Litigation Leads to this Bankruptcy Case

### 1. Chancery Court Rulings were Eventually Vacated

93. In September 2020, Stream and SCI each filed competing claims in the Chancery Court seeking Temporary Restraining Orders to prevent the other from controlling Stream's assets (the "Omnibus Agreement Lawsuit").[11] On September 23, 2020, the Chancery Court issued a Status Quo Order allowing SCI to retain the assets it had already seized under the Omnibus Agreement. Further, the Chancery Court restricted Stream's ability to raise capital for its own defense or for any other purpose:

> Stream TV or any direct or indirect subsidiary [is prohibited] from raising capital on behalf of Stream TV or any direct or indirect subsidiary, including but not limited to effecting any recapitalization or issuing any common stock, preferred stock, options, warrants, derivative or convertible securities, or purchase rights…

94. On December 8, 2020, the Chancery Court issued a Preliminary Injunction Order (the "PI Order"), which enjoined Stream from "Disputing the validity of the Omnibus Agreement (except as part of their claims and defenses in this litigation)."

95. On December 15, 2020, one week after the Chancery Court issued its PI Order giving SCI control of Stream's assets pending final adjudication, Stastney finally delivered to Stream's management the Schedule 1.1(b) to the Omnibus Agreement, in which SCI declared

---

[11] *In re Stream TV Networks, Inc. et al.* (No. 2020-0766-JTL).

which liabilities of Stream it was willing to accept. Besides certain shareholder debt, only one payable would be assumed by SCI: the license fee for the Philips patent portfolio. SCI intended to leave more than $16 million in trade debt and other payables at Stream while stripping out all the assets.

96.    Stripped of its assets but left with millions of dollars in payables, Stream filed for chapter 11 protection in the United States Bankruptcy Court for the District of Delaware on February 24, 2021 (the "Initial Bankruptcy Case"). Stream subsequently sought financing to support its reorganization and emergence from bankruptcy. Defendants SCI and SLS, with the participation of Stastney, challenged Stream's reorganization efforts by filing a motion to dismiss the bankruptcy petition.

97.    During the Initial Bankruptcy Case, Stream entered into a proposed arrangement with Visual Technology Innovations, Inc. ("VTI") to provide $1 million in initial financing. VTI solicited the interest of Timothy McCarthy ("McCarthy") and his investment vehicle, Burlington Asia Resources Limited ("Burlington"), and on May 6, 2021, VTI and Burlington entered into an amended stock purchase agreement valued at $300 million. To support Stream's reorganization, McCarthy also was a key witness in the bankruptcy hearing on Defendants' motion to dismiss.

98.    Although Defendants were successful in getting Stream's bankruptcy petition dismissed on May 17, 2021, Burlington and VTI remained supportive in their efforts to provide investment capital that would assist Stream in reorganizing its debt outside of bankruptcy. Having discovered the identity of McCarthy through the bankruptcy proceedings, Crawford researched the home address of McCarthy and, without invitation or notice, visited McCarthy's London home on June 21, 2021. This was confirmed in an email from McCarthy to Mathu Rajan. McCarthy was not home for the unannounced visit, but Crawford proceeded to maliciously defame the Rajans and Stream to McCarthy's wife. Crawford then instructed in thuggish fashion that Mrs. McCarthy

give her husband the message that he should reconsider supporting Stream and invest in SCI instead. McCarthy and his wife were understandably disturbed by this unsolicited home intrusion by an agent of Defendants. VTI was forced to send Crawford a cease-and-desist letter on June 25, 2021 to protect McCarthy from Crawford's intimidation.[12]

99.    On November 10, 2021, the Chancery Court issued a Partial Final Judgment in the Omnibus Agreement Lawsuit. Although deferring judgment on SCI's claim of conversion, the Vice Chancellor declared the Omnibus Agreement to be legally valid and binding upon Stream. Six weeks later, on December 21, 2021, Stream filed an appeal with the Delaware Supreme Court.

## 2.    Delaware Supreme Court Unanimously Overturns Chancery Court's Decisions

100.    On June 15, 2022, the Delaware Supreme Court, sitting *en banc,* unanimously reversed the Chancery Court decision in the Omnibus Agreement Lawsuit and definitively ruled that Stream is (and always was) the lawful owner of Stream's own assets and intellectual property. The Delaware Supreme Court stated: "We **VACATE** the injunction, **REVERSE** the declaratory judgment, and **REMAND** for further proceedings consistent with this opinion." Defendants never had any right to Plaintiffs' assets and intellectual property; and as detailed in this Complaint, Defendants' takeover scheme was unlawful and void.

## 3.    Chancery Court's Rulings After Remand

---

[12]On May 25, 2021, Defendants, through Skadden, also sent a letter to Ali Osman ("Osman"), an investor who had offered indirect support to Stream's Initial Bankruptcy Case by entering into a joint venture agreement with Stream's proposed DIP financier. The bullying letter put Osman "on actual notice" that he faced "personal liability" for any continued action contemplating use of Stream's assets in violation of the PI Order.

Similarly, on May 25, 2021, Defendants, through Skadden, sent a letter to Knight-Davis Associates LLP, a United Kingdom investment banker working with VTI to secure capital to support Stream in the event that its Second Bankruptcy Case survived the anticipated challenge from Defendants. Skadden's bullying letter put principals Frances Knight-Davis and Glen Davis "on actual notice" that they faced "personal liability" for any continued action contemplating use of Stream's assets in violation of the PI Order.

Defendants continued their pattern of intimidation by having their counsel, Skadden, send a bullying letter to Mathu Rajan's administrative assistant, Amanda von Ahnen (Gonzalez), putting her "on notice" and threatening her with "personal liability" for any perceived violation of the PI Order.

101. Upon remand, the Chancery Court issued a Partial Final Judgment on behalf of Stream and against SCI on August 10, 2022 in which decision the Vice Chancellor ruled that: "Pending transfer of the Assets from [SCI] to Stream, [SCI] and all those acting in concert with it shall not use, impair, encumber, or transfer the Assets, except as necessary to maintain the Assets in the ordinary course of business and preserve their value pending transfer to Stream."

102. The Chancery Court then, in a Memorandum Opinion dated October 3, 2022, further held that: "[SCI] … has been running a business using the Legacy Stream Assets for the past eighteen months. As a result of the Supreme Court Decision, however, [SCI] currently has no equitable right to carry on that business. [SCI's] interests currently are derivative of Hawk's, and Hawk's only interest is that of a creditor."

103. Finally, on September 30, 2022, the Chancery Court issued a Mandatory Injunction Order (the "Injunction Order") in which SCI was enjoined from the following:

- "[SCI] may not use the Server Information (Stream's proprietary computer code) for any purpose other than pursuing a claim, including for any business purpose."

- "[SCI] may not use information relating to the Sample Displays for any other purpose, including for any business purpose."

- "[SCI] "may not use information relating to the Bonding Equipment for any other purpose, including for any business purpose."

- "[SCI] may not use the documentation relating to the [3D] Lenses for any other purpose, including for any business purpose."

- "As an adjunct to the mandatory relief set forth in this order, [SCI] and any persons acting in concert with it are prohibited from taking any steps to interfere with Stream's ability to recover the Sample Displays, the Bonding Equipment, the Server Information, or the Lenses…"

The Injunction Order further stated:

- "SCI shall return the Bonding Equipment to Stream within ten days."

- "[SCI] appears to contend that the Bonding Equipment is a Disputed Asset because [SCI] satisfied Stream's debt to the landlord who owned the premises where the bonding equipment was housed after Stream abandoned the premises and failed to pay rent. [SCI] can seek to recover the Bonding Equipment or the incremental value that [SCI] conferred through its general claim for unjust enrichment or through a specific claim based on the Bonding Equipment. In light of the Mandate, the first priority is to return the Bonding Equipment to Stream."

104.    As of the date of this Complaint the Injunction Order remains binding yet Defendants have still not obeyed this court order.

### 4.    SCI and Hawk Investment Holdings Limited Contempt Opinion, 225 Action, and Receivership

105.    Despite a clear mandate from the Delaware Supreme Court and an order of the Chancery Court to return Stream's assets in "title and possession, "[13] Scheme Defendants continued, and continue to the date of the filing of this Complaint, to interfere with the Debtors' business and assets.  The Scheme Defendants continued to exercise creditor self-help instead of pursuing a proper foreclosure in the SLS Lawsuit.

106.    On September 30, 2020, three months after the Delaware Supreme Court mandated the return of Stream's assets, SCI finally surrendered the shares of Technovative to Stream.  In a carefully coordinated move, Hawk purported to exercise its proxy rights and appoint Stastney as sole director of Technovative, thereby attempting to regain control of Stream's assets, only an hour later, in an effort to strip Stream of its right to "title and possession."

---

[13] Following a public announcement by SCI that it intended to sell Stream's assets rather than return them, Stream sought and was granted an emergency temporary restraining order. On August 9, 2022, the Chancery Court in the Omnibus Agreement Lawsuit stated, "[SCI] may seek to exercise any creditor's rights it possesses against Stream. [SCI] must do so based on a status quo where Stream has **title to and possession of its assets**, not a status quo in which [SCI] acquired possession based on a decision that the Delaware Supreme Court has held is erroneous."

107.    On October 3, 2022, Defendants SCI, Stastney, and Hawk were held in contempt by the Chancery Court (the "Contempt Opinion") for exercising self-help, with Stastney described by the Vice Chancellor as "the puppet master who pulled the strings."[14]

108.    On October 17, 2022, Hawk once again served notice to Stream that it was taking control of Technovative and appointing Stastney as sole director of Technovative (and thus, all of Stream's other downstream subsidiaries).    Stream denied that Hawk held such rights due to Stream's prior issuance of debt-to-conversion notices to Hawk, and Hawk filed a motion (the "225 Action") in Chancery Court, which is stayed due to Technovative's current bankruptcy.

109.    Defendants have interfered with the return of Stream's Bonding Equipment, which is currently held in a China warehouse leased by SCBV. Defendants Stastney, SCI, and Hawk claim they are not exerting influence or control over the Bonding Equipment, but Stream has been unable to access this critical asset, and Stream's CEO has been told directly by the China warehouse landlord that SCI owns the equipment, which cannot be released to Stream without the approval of "the Shanghai lawyer," who in turn stated he needs "approval from the U.S. lawyers." While Defendants' counsel claim to have no knowledge of this scheme, Stream notes that Hawk's counsel produced communication sent by Stream to the China landlord, showing a connection between Hawk and the landlord at the very least. This elaborate scheme of employing multiple lawyers as barriers to turnover continues to impact Debtors' ability to service its customers and successfully reorganize through these chapter 11 cases.

---

[14] In its Contempt Opinion, the Chancery Court wrote: "[Stastney] controls SeeCubic and Technovative, and he also controls SLS Holdings VI, LLC ("SLS"), Stream's only (alleged) secured creditor other than Hawk. Stastney caused SeeCubic to notify Hawk that the transfer was coming. To effectuate the transfer, Stastney gave instructions to SeeCubic's counsel to give instructions to himself (this time in his capacity as an officer and director of Technovative) to title the Shares in Stream's name. As planned, Hawk immediately asserted its rights to the Shares, at which point Stastney transferred title to the Shares into Hawk's name. Stastney and SLS benefitted, because SLS's rights as a secured creditor are senior to Hawk's."

110.    SCBV and Theune have been materially involved in obstructing Plaintiffs' access, inspection, and retrieval of the Bonding Equipment.

111.    SCBV and Theune, in reliance on directions from Stastney, have been materially involved in obstructing Plaintiffs' retrieval of technology demonstrators and other assets of the Plaintiffs, including 3D lens modules paid for by Stream and its associates in 2020 to fulfill the delivery requirements of Google (the "Google Lenses"). Despite several emails from Plaintiffs requesting the return of the Google Lenses from SCBV, there has been no cooperation in doing so or acknowledgement that the assets belong to Plaintiffs. SCBV has also refused to surrender phone-size, tablet-size, and 8K-resolution demonstrators to Plaintiffs, despite multiple requests and an order of the Chancery Court. Such requests and court order occurred while Theune was the sole manager of SCBV.

112.    From October 2022 to July 2023, SCBV accepted operational funding in excess of €4 million euros from SCI pursuant to a promissory note and extension thereof provided by Stastney and SCI. In exchange for such funding, SCBV has continued to engage in projects at the direction of SCI for the benefit of SCI, despite clear instructions from the Debtor that SCI has no such authority and is operating as a direct competitor to Debtors. Worse still, management of the Debtors informed Theune and other SCBV employees that SCI projects infringe third-party technology licenses obtained by Stream, and that such infringement puts Debtors at significant risk. SCBV continued to work on SCI projects to the exclusion of any of Debtors' projects, with one SCBV executive commenting: "Our boss is whoever pays us."

113.    On June 28, 2023, during the pendency of these bankruptcy cases and despite specific instructions from this Court to take no action without court approval, Defendants Stastney, SLS, SCI, and Hawk proceeded with litigation against Mathu Rajan, Stream's director and CEO, in Amsterdam Court. Defendants succeeded in having Mr. Rajan removed as director of Stream's

Dutch subsidiary companies, blocking Stream's ability to direct the research and development activities of its global staff, blocking Stream's access to technology demonstrator units historically used to generate sales and new business development, impacting Stream's ability to fulfill customer orders, and harming Stream's reputation among its investors, customers, and strategic partners.

114.    On June 29, 2023, the Amsterdam Court assigned Jasper Berkenbosch ("Berkenbosch") of the law firm Jones Day to serve as interim Independent Director of SCBV pending adjudication of legal proceedings in the United States. Stream management met with Berkenbosch in person and via Zoom on numerous occasions to inform him of various business opportunities, financial circumstances, and intellectual property issues.

115.    Berkenbosch communicated to Stream that SCBV intended to continue its work on SCI projects and enter into a contract with Hyundai Motors as the next step in an ongoing SCI automotive project. Stream warned Berkenbosch that the project would violate certain third-party licenses, including Stream's license with Rembrandt 3D Holdings Ltd. ("Rembrandt") as described below. Berkenbosch indicated that SCBV management and employees were strongly encouraging him to sign the Hyundai contract and that SCI had threatened to withhold funding guaranteed by the promissory note if SCBV did not sign the Hyundai agreement.

116.    Rembrandt sent a cease and desist letter to Berkenbosch on August 6, 2023 which detailed the license terms it had reached with Stream, the infringement SCBV was committing by engaging with SCI as a non-licensee, and the consequences faced by SCBV, Berkenbosch, and Jones Day if such infringement continued.

117.    On August 11, 2023, Berkenbosch submitted his resignation letter to the Amsterdam court, which agreed to his request effective August 18, 2023.  Stream's R&D subsidiary will be without direction at that time, due to interference by SCI, Stastney, SLS, and Hawk. These Defendants orchestrated action in the Netherlands to remove Stream's ability to

direct its subsidiary, then they subsequently encouraged SCBV – with the willing cooperation of Defendant Theune – to knowingly engage in activities that infringed intellectual property and trade secrets, creating threats of significant damage to Stream as the ultimate shareholder.

### 5.    Rembrandt Trade Secret Litigation

118.    Stream's Ultra-D technology was developed, in part, based on certain intellectual property it licensed from Philips.  Other foundational IP "building blocks" were licensed from Rembrandt.  Although it seized Stream's assets and used Stream's technology, SCI never obtained the necessary license from Rembrandt.  With Hawk purporting to control Technovative, and with SCI continuing to unlawfully use Rembrandt's intellectual property, Rembrandt filed suit against Defendant SCI, Defendant Hawk, and Technovative in the United States District Court for the District of Delaware on February 21, 2023 seeking injunctive relief (the "Rembrandt Lawsuit").[15] The Rembrandt Lawsuit against Technovative is currently stayed due to Technovative's current bankruptcy but continues to proceed against Defendants SCI and Hawk.[16]

119.    Stream has a technology license from Rembrandt which allows it to use the Rembrandt technology incorporated into Stream's Ultra-D solution. The license allows Stream's subsidiaries to use Rembrandt IP for Stream-directed projects, but the license does not allow Stream's subsidiaries to use the Rembrandt IP for their own projects or for projects that benefit third parties other than Stream. Even though Stream has communicated this limitation to SCBV on multiple occasions, SCBV continues to work on non-Stream projects using the Rembrandt IP. Worse still, SCBV refuses to even identify the projects it is working on.

---

[15] *Rembrandt 3d Holding Ltd. v. Technovative Media, Inc. et al.* (Civ. Action No. 1:23-cv-00193).

[16] *See id.* at Doc. 20.

120.    SCBV has refused to provide any details on the other projects its team of 35 employees and contractors are working on, but historically, all projects conducted at the SCBV Eindhoven, Netherlands location involved Stream's Ultra-D technology, and therefore the Rembrandt IP. With only a few engineers required for the Hyundai project referenced above, SCBV has many more engineers dedicated to other projects which can reasonably be assumed to violate Stream's license with Rembrandt.

### 6.    The Current Bankruptcy Filing

121.    Nine months from the date of the Delaware Supreme Court Opinion, still deprived of its assets and ability to operate, still without both "title and possession" as required by the order of the Delaware Supreme Court, the Debtors filed for chapter 11 protection in the United States Bankruptcy Court for the Eastern District of Pennsylvania on March 15, 2023 (the "Petition Date").

## I.    Defendants Have Damaged Stream through the Scheme

122.    Although the Defendants' scheme and actions have not been totally successful in enabling them to take over Stream, they have severely damaged Stream, its operations, its creditors, and its investors.  As described herein, SCI's improper seizure of Stream's assets, combined with its poor management thereof while in possession and control, has caused significant damage to Stream, including, but not limited to: (i) cancellation of the $3 million co-development deal with Bosch; and (ii) cancellation of the Google purchase order and the related end of negotiations for a $20 million annual supplier agreement.

123.    Under SCI control, whether through mismanagement or poor performance of SCBV, the co-development agreement with Bosch was canceled less than a year after the PI Order gave SCI control of Stream's assets, including customer contracts. Debtors learned that attempts by SCI to renegotiate terms of the agreement damaged relations with Bosch, and the subsequent failure of SCBV to deliver samples with acceptable quality ultimately led to contract cancellation.

This poor management deprived Debtors and their subsidiaries of more than $2.5 million in non-recurring engineering revenue as well as ongoing annual royalty payments on products that would have been released in the automotive market starting in 2023 or 2024.

124.    When SCI seized control of the Google relationship in December 2020 pursuant to the improvident PI Order, SCI and Stastney pressed the Google project manager for negative information it could use against Stream. In February 2021, only two months after SCI seized control and shortly before the Initial Google Samples were due for completion and delivery Google canceled the project because it was uncomfortable with SCI's focus on obtaining "dirt" on Stream rather than on running a successful project.  The Initial Google Samples have never been delivered. This poor customer management by SCI deprived Debtors of potentially $20 million in annual gross revenues that would have been generated upon approval for mass production.

125.    Additionally, on or about September 2021, Defendants caused the destruction of Stream assets when Stastney authorized Stream's contract partner in Hong Kong to destroy 500 specialty 3D lenses that could have been used to calibrate the Bonding Equipment upon reinstallation of such equipment in a new factory location.  Ignorant of their value in the manufacturing process, Stastney carelessly and casually permitted this loss to Debtors.

**J.      Defendants have Unjustly Benefited from Their Unlawful Scheme**

126.    Defendants used – and continue to use – Stream's assets as the foundation to raise capital in SCI and enrich themselves. They continue to represent that they own and/or control Stream's intellectual property, meeting with Stream's customers and potential customers, thus creating confusion in the consumer electronics and content creation industries. Such confusion continues to damage Stream, making it difficult to secure funding, customer contracts, or relationships with strategic partners. Specifically, SCI and SCBV continue to benefit from the use of Stream's property and technology in the following ways:

- SCI continues to use, without the right to do so, Ultra-D demonstration samples to secure investment and operate as a competitor to Stream.

- SCI continues to use, without the right to do so, Ultra-D demonstration samples to secure customer contracts for its subsidiary in India.

- SCI continues to direct employees of Stream's Netherlands R&D subsidiary (SCBV) to perform development services for SCI customer projects that reduce the available labor for Stream-directed projects, increasing Stream's financial burden to support its overseas R&D operations, operations that benefit Stream's competitor and violate the terms of Stream's third-party licenses with Philips and Rembrandt.

- SCI is exercising control over various Stream-owned websites and published a statement thereon that all assets of Stream are now the property of SCI, damaging Stream's credibility in the global market.

- SCBV is using Stream-owned assets and technology license rights to benefit Stream's competitors.

- SCBV is also negotiating and intends to enter into contractual relationships that financially benefit SCBV directly rather than Plaintiffs, who provided SCBV with more than $80 million in technology development funding from 2011-2020 and who control the licensed third-party technology of both Philips and Rembrandt.

127.    The individual Defendants have also been profited:

- Stastney benefited from the improper theft of Stream's assets because he owns or controls shares of SCI's stock and was named the Executive Chairman of the Board of SCI.

- Morton benefited from the improper theft of Stream's assets because he owns or controls shares of SCI's stock.

- Hawk benefited from the improper theft of Stream's assets because it owns or controls shares of SCI's stock.

- Crawford benefited from the improper theft of Stream's assets because he owns or controls shares of SCI's stock.

- Gola benefited from the improper theft of Stream's assets because he was offered a high paying position on SCI's Board of Directors.

- Gollop benefited from the improper theft of Stream's assets because he was offered a high paying position on SCI's Board of Directors.

- Kabacinski benefited from the improper theft of Stream's assets because he was offered a high paying position on SCI's Board of Directors and was made CEO of SCI and SCBV.

- "John Doe(s)" and "Jane Doe(s)" benefitted from the individuals listed above in assisting with the improper theft of Stream's assets.

- Theune benefitted from the improper theft of Stream's assets because he received a promotion with higher pay at SCBV from his co-conspirators, Defendants Stastney and Kabacinksi.

128.    The following assets of Stream's bankruptcy estate that are the subject of this action and which assets Defendants are either in unlawful possession of or are attempting to interfere with Stream's lawful use and possession, include, but are not limited to:

- Stream's Intellectual Property Rights to the Ultra-D technology in the U.S. and abroad.

- Stream's Computers (PCs and Laptops), Servers, Other Related IP, Engineering Assets, Business Data, Licenses, and Executory Contracts.

- Stream's Ultra-D demonstrators (PCs, Laptops, TVs, Phones, Tablets, Displays, Automotive, Video Streaming Boxes, and any Accessories thereto) in the U.S. and abroad.

- Stream's websites and other digital/marketing assets belonging to the Debtors' estates.

- Stream's subsidiary companies in the U.S. and abroad, including but not limited to SCBV.

- Stream's Bonding Equipment in China and the Netherlands.

- Stream's global business relationships with customers, investors, strategic partners, manufacturers, vendors, and other companies

Collectively, the assets above are referred herein as "Stream's Bankruptcy Assets".

## V.    Causes of Action

### COUNT I
### TURNOVER AND ACCOUNTING
### (Against the Scheme Defendants)

129.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

130.    Upon information and belief, Plaintiffs believe that Defendants received or made pre- petition transfers of Stream's Bankruptcy Assets, which property belongs to the Debtors' estates, including but not limited to Stream's Intellectual Property Rights to the Ultra-D technology, Stream's Ultra-D demonstrators, and use of Stream's Bonding Equipment. In addition, the Defendants have attempted to usurp Stream's ownership of its own subsidiaries by directing the workflow and preventing Stream from utilizing its own subsidiary companies such as SCBV.

131.    Additionally, Defendants and their affiliates have used Debtors' assets to generate new business relationships, investment, customer contracts, and strategic relationships that would be assets of Debtors' estates had they not been unduly deprived of their assets due to the improvident PI Order in Chancery Court. To reiterate, upon remand, following the Delaware Supreme Court reversal in 2022, the Chancery Court ordered that all assets be surrendered to Stream.

132.    Stream's Assets have been determined, via final orders in the underlying state court litigation, to belong to the Debtors' bankruptcy estates as per 11 U.S.C. § 541.

133.    By reason of the foregoing, Plaintiffs are entitled to an order, as authorized by Section 542 of the Bankruptcy Code, requiring Defendants to immediately return (or turnover) assets of Debtors' estates currently in their possession or control – including but not limited to the Bonding Equipment, technology demonstrator units of every kind, business computers, and books and records – and compel Defendants to produce an accounting of all transactions involving assets of Debtors' estates since the Petition Date and within 6 years before the Petition Date. Defendants, specifically including Stastney, SLS, SCI, Hawk, Morton, SCBV, and Theune, should be ordered

to take all necessary actions to ensure that the Bonding Equipment is returned to Stream, not Stream's subsidiary, within 10 days as directed by the Chancery Court in 2022.

134.    By reason of the foregoing, Plaintiffs are also entitled to an order requiring Defendants to petition the Amsterdam Court to reverse its decision of June 29, 2023, thereby restoring Mathu Rajan as the sole director of SCBV and Stream's other Dutch subsidiaries. Plaintiffs request that such order further require Defendants Stastney, SCI, Hawk, SLS to reimburse Stream for all costs incurred by Stream related to the Amsterdam legal court proceedings, including court costs and legal fees, and pay all fees incurred by Stream's subsidiary SCBV for services rendered by the court-appointed independent director.

135.    By reason of the foregoing, Plaintiffs are also entitled to an order requiring Defendants to surrender to Stream all customer contracts, customer and prospective customer data, investor and prospective investor data, strategic partner data, and all other assets relating to and derived from use of Debtors' assets by Defendants and their affiliates, including all content creation, conversion and special effects service contracts procured by SeeCubic India Pvt Ltd. as well as casino and automotive projects initiated by Defendants and currently being managed by SCBV.

136.    By reason of the foregoing, Plaintiffs are also entitled to an order requiring SCBV and Theune to provide Plaintiffs with details of all current SCBV activities and projects, empowering Stream to enter into or reject any and all contracts presented to SCBV, and requiring SCBV to take direction solely from Plaintiffs' management or their designees.

<u>**COUNT II**</u>
**INJUNCTIVE RELIEF**
**(Against all Defendants)**

137.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

138.    This count seeks the entry of both a temporary and permanent injunction prohibiting the Defendants from using, transferring, selling, assigning, dissipating, concealing, encumbering, impairing, or otherwise disposing of Stream's Bankruptcy Assets. Specifically Plaintiffs seek both temporary and permanent injunctions including but not limited to:

a.    Enjoining SCI, the other Defendants, and their employees, agents, or assignees from continuing to use Ultra-D demonstration samples to secure investment or customer contracts for either themselves or their subsidiaries.

b.    Enjoining SCI, the other Defendants, and their employees, agents, or assignees from continuing to use Stream's Bankruptcy Assets for their own benefit and to the exclusion of Stream.

c.    Enjoining SCI, the other Defendants, and their employees, agents, or assignees from directing or otherwise contacting employees of Stream, Stream's Netherlands R&D subsidiary SCBV, or interfere, in any manner, with Stream's operation of its business and that of its subsidiaries.

d.    Enjoining SCI, the other Defendants, and their employees, agents, or assignees from continuing to exercise control over various Stream-owned websites, including www.seecubic.com which was registered and is owned by Plaintiffs.

e.    Enjoining SCI, the other Defendants, and their employees, agents, or assignees from publishing statements that Stream Bankruptcy Assets do not belong to Stream or which damage or otherwise interfere with Stream's business.

f.    Enjoining SCI, the other Defendants, and their employees, agents, or assignees from intimidating or otherwise tortiously interfering with Stream's business relationships.

g. Enjoining SCI, the other Defendants, and their employees, agents or assignees from exercising any possession, dominion, or control over any of the Stream Bankruptcy Assets.

h. Enjoining SCBV from entering into any contractual agreements with customers, strategic partners, or any other entity without the express written approval of Stream.

139. There is a substantial likelihood that Plaintiffs will prevail on the merits of this dispute as the Plaintiffs have already obtained similar injunctive relief in the underlying state court litigation in regard to Stream's Bankruptcy Assets and against certain of the Defendants, although Defendants have ignored such orders.

140. Plaintiffs will suffer irreparable harm if an injunction is not issued in that the assets of the bankruptcy estates of the Debtors will be dissipated or diminished.

141. The threatened injury to the estates outweighs any potential harm to the Defendants.

142. The issuance of the injunction will not contravene the public's interest. There is a strong public interest in favor of granting the injunction, thereby preserving Stream's Bankruptcy Assets for administration by the Plaintiffs for the benefit of all the creditors in seeking confirmation of a chapter 11 Plan of Reorganization.

## COUNT III
### DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)
### (Against Defendants Hawk, SLS, and SCI)

143. On May 19, 2023, Hawk, as "Collateral Agent," filed Proof of Claim No. 6 in Case No. 23-10763-mdc (Bankr. E.D. Pa.).

144. On May 23, 2023, SLS filed Proof of Claim No. 9 in Case No. 23-10763-mdc (Bankr. E.D. Pa.).

145. On May 23, 2023, SCI filed Proof of Claim No. 14 in Case No. 23-10763-mdc (Bankr. E.D. Pa.).

146. On May 19, 2023, Hawk, as "Collateral Agent," filed Proof of Claim No. 1 in Case No. 23-10764-mdc.

147. On May 23, 2023, SLS filed Proof of Claim No. 2 in Case No. 23-10764-mdc.

148. On May 23, 2023, SCI filed Proof of Claim No. 3 in Case No. 23-10764-mdc.

149. Together Defendants Hawk, SLS, and SCI are all liable to the Plaintiffs pursuant to 11 U.S.C. §§ 542, 548, and 550.

150. Pursuant to 11 U.S.C. 502(d), any claims of Defendants Hawk, SLS, and SCI against the Debtors' estates must be disallowed until such time as Defendants Hawk, SLS, and SCI turnover Stream's Bankruptcy Assets to Plaintiffs' or otherwise satisfy whatever judgments are entered against them from this adversary proceeding.

## COUNT IV
## EQUITABLE SUBORDINATION
### (Against Defendants Hawk, SLS, and SCI)

151. Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

152. For the court to find that equitable subordination is an appropriate remedy, the defendant must have engaged in some type of inequitable conduct, the misconduct resulted in injury to other creditors and conferred an unfair advantage on the defendant, and equitable subordination of the defendant's claim is not inconsistent with the provisions of the Bankruptcy Code.

153. Defendants have engaged in inequitable conduct, including, without limitation, a civil conspiracy, breach of fiduciary duties, aiding and abetting breach of fiduciary duties, and breach of contract.

154.     Defendants used their positions as Stream's officers, directors, investors, or secured lenders to serve their own interests and unjustly enrich themselves.

155.     Defendants' misconduct resulted in injury to Stream's general unsecured creditors, its subsidiaries, its enterprise and going concern value, its current and prospective business relationships, including investors and strategic partners, its shareholders, its employees, and conferred an unfair advantage on Defendants.

156.     Equitable subordination is consistent with the provisions of 11 U.S.C. § 510(c).

## COUNT V
## BREACH OF CONTRACT
## (Against Defendant Stastney)

157.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

158.     A breach of contract occurs when there is a contractual obligation, a breach of that obligation by the defendant, which results in damage to the plaintiff.

159.     Stastney is a party to the Stastney Employment Agreement for which Stastney had certain contractual obligations. As an officer and director, Stastney's duties included, without limitation, the duty to not hinder Plaintiff's ability to control and/or govern Debtors and Debtors' assets.  Specifically, the Stastney Employment Agreement required Stastney to perform the duties that are customary of chief financial officer in a company and prohibited Stastney from, among other things: (i) solicit[ing], entic[ing] or induc[ing] any person who presently is or at any time during the term hereof shall be an employee of the Company to become employed by any other person, firm or corporation or to leave their employment with the Company . . . and (ii) compete with, or encourage or assist others to compete with, or solicit orders or otherwise participate in business transactions in competition with, the business engaged in by the Company.

160.    Stastney breached his duties under the Stastney Employment Agreement by, among other things, knowingly and intentionally thwarting Plaintiffs' efforts to govern Debtors and Debtors' assets, participating in a private foreclosure of Stream's assets without satisfying a core requirement of Stream's Charter, and by conspiring with others to illegally take possession of Stream's assets.

161.    As a direct and proximate result of this intentional breach, Plaintiffs have suffered damages, including, without limitation, the need to commence bankruptcy proceedings, lost profits, legal fees, and expenses.

## COUNT VI
## NEGLIGENCE
### (Against Defendants Stastney, Kabacinski, Gollop, and Gola)

162.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

163.    Negligence is found when a defendant owed plaintiff a duty of care, the defendant breached that duty, and the defendant's breach was the proximate cause of plaintiff's injury.

164.    Defendants Stastney, Kabacinski, Gollop, and Gola (the "Director Defendants") owed Plaintiffs a duty of reasonable care and loyalty in connection with their roles as directors, Vice Chairman of Stream's Board, and/or Chief Financial Officer, as well as under the applicable employment agreement.

165.    Director Defendants repeatedly breached this duty of reasonable care and loyalty to Plaintiffs by, among other things, unreasonably interfering with the Plaintiffs' governance of

Debtors, exercising control over Plaintiffs' assets, conspiring with one another to illegally take possession of Stream's assets, and interfering with Plaintiffs' efforts to govern Stream.

166.    As a direct and proximate result of these breaches, Plaintiffs have suffered damages, including without limitation, the need to commence bankruptcy proceedings, lost profits, increased legal fees and expenses.

**COUNT VII**
**TORTIOUS INTERFERENCE WITH EXISTING AND**
**PROSPECTIVE ECONOMIC ADVANTAGE**
**(Against all Defendants)**

167.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

168.    To establish a claim of tortious interference, a plaintiff must show: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional, wrongful interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages.

169.    Plaintiff had an existing economic relationship with Google, with a reasonable likelihood of entering into an agreement for Plaintiffs to provide technology to Google.

170.    Defendants had knowledge of and were aware of Plaintiffs' relationship with Google and the anticipated business relationship that would result. Defendants took purposeful actions that were designed to intentionally harm, interfere with, and disrupt the Google relationship, including triggering Stream's default and creating the Omnibus Agreement as a way to convert and appropriate Stream's assets. Also, Defendants intentionally interfered with the existing and prospective contractual and economic relationship between Plaintiffs and Google by, among other things, aiding and abetting Gola and Gollop in breaching their fiduciary duties,

converting and illegally taking possession of Stream's assets, and conspiring to steal and divert Stream's assets to SCI.

171.    Defendants' actions to interfere with the Google relationship were intentional, purposeful, and without any justification on the part of the Defendants.

172.    Defendants' interference with the Google relationship disrupted Stream's existing and prospective contractual and economic relationship and opportunities with Google. Such interference caused damage to Plaintiffs because, as a direct and proximate result of that purposeful interference, Plaintiffs were unable to pursue a deal with Google, which would have been reasonably likely to have occurred but for Defendants' interference. Further, Defendants' interference caused Google to cancel its purchase order and the related end of negotiations for a $20 million annual supplier agreement, which would have been reasonably likely to have occurred but for Defendants' interference.

173.    Plaintiffs also had an existing and prospective economic relationship with Bosch when they executed a $3 million co-development agreement with Bosch to create a 12.3" 4.5K-resolution glasses-free 3D instrument cluster for the automotive market.

174.    Similarly, Defendants were aware of Plaintiffs' relationship with Bosch and the anticipated business relationship that would result. Defendants took actions that were designed to harm, interfere with and/or disrupt the Bosch relationship, including triggering Stream's default and then creating the Omnibus Agreement to convert and appropriate Stream's assets. In addition, Defendants intentionally interfered with the existing and prospective contractual and economic relationship between Plaintiffs and Bosch by, among other things, aiding and abetting Gola and Gollop in breaching their fiduciary duties, converting and illegally taking possession of Stream's assets, conspiring to steal and divert Stream's assets to SCI, and attempting to renegotiate Stream's existing agreement with Bosch to the betterment of SCI.

175.    Defendants' actions to interfere with the Bosch relationships were intentional, purposeful, and without any justification on the part of the Defendants, and as a direct and proximate result of that purposeful interference, Plaintiffs suffered damages. Specifically, Bosch cancelled the $3 million co-development deal with Plaintiffs, which would have been reasonably likely to have occurred but for Defendants' interference.

176.    Plaintiffs also had an existing and prospective economic relationship with ToJoy when they negotiated a $50 million strategic cooperation agreement with ToJoy. Defendants were aware of Plaintiff's relationship with ToJoy and the anticipated business relationship that would result. Defendants took actions that were designed to intentionally harm, interfere with, and/or disrupt the ToJoy relationship, sabotaging the investment which would have enabled Stream to fully convert the Hawk Notes to equity and would have provided significant funding for Stream's production, distribution, and marketing activities.

177.    Defendants' actions to interfere with the ToJoy relationship were intentional, purposeful, and without any justification on the part of the Defendants, and as a direct and proximate result of that interference, Plaintiffs suffered damages. Specifically, ToJoy subsequently abandoned its proposed investment in Stream.

178.    Plaintiffs have and will continue to suffer monetary damages as a result of Defendants' interference in the Google relationship, the Bosch relationship, and the ToJoy relationship in amounts to be determined at trial.

## <u>COUNT VIII</u>
## RECHARACTERIZATION OF LOAN AS EQUITY INTEREST
### (Against Defendants Hawk and SLS)

179.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

180.    Several factors are considered when analyzing whether a claim should be recharacterized, although none of the factors are dispositive. Such factors include, but are not limited to, the intent of the parties, the presence or absence of a fixed maturity date, and the presence or absence of voting rights.

181.    The substance and character of the SLS and Hawk loans, as well as the conversion agreements, is one of an equity interest rather than a debt claim.

182.    The SLS Conversion Agreement provides, among other things, "the principal amount and accrued interest [] of all of the SLS Notes shall be converted and extinguished into securities of the company . . . ." The Hawk Conversion Agreement provides, among other things, "Hawk agrees to the extinguishment of each of the Hawk Notes by conversion on a 'first in first out' basis . . . ."

183.    In early 2018, Stream's prospective investors expressed concern about the amount of Stream's secured and unsecured debt, and it became clear to Stream's management that executing debt-to-equity conversion agreements with three of its largest creditors would be in the best interest of the Company and its shareholders. The parties intended all conversion agreements to be an equity interest. In fact, in May 2018, Intrinsyc honored the Intrinsyc Conversion Agreement and accepted equity in Stream, which further supports the fact that all conversion agreements with Defendants were signed under the same conditions and intentions—*i.e.*, with the intent of treating the loans as an equity interest.

184.    Despite the title of the loan documentation, the intent of the Plaintiffs and Defendants, as determined from the totality of the circumstances, was to convert the SLS Notes and the Hawk Notes into securities of the Company.

185.    The recharacterization of the loans from debt-to-equity interests is consistent with the policies of the Bankruptcy Code.

186.    The loans should be treated in their entirety as equity interests that rank below the claims of the Debtors' creditors.

## COUNT IX
## FRAUDULENT CONVEYANCE
### (Against Director Defendants)

187.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as is fully set forth herein.

188.    To prove a fraudulent conveyance, a plaintiff must show that a transfer is made or an obligation is incurred (1) with actual intent to hinder, delay, or defraud any creditor of the debtor, or (2) without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor was either (a) engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonable small in relation to the business or transaction or (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

189.    Since the time that any of the Director Defendants were either officers and/or directors of Stream, such Director Defendants were insiders of Stream.  Director Defendants transferred title to Stream's Bonding Equipment to SCI with the actual intent to hinder, delay, and/or defraud Debtors' creditors, to the detriment and harm of such creditors.  Further, Director Defendants' refusal to return assets which were wrongfully transferred to SCI, even after the Delaware Supreme Court invalidated such order, has interfered with Plaintiffs' ability to reorganize and pay its creditors.

190.    The transfer of the Bonding Equipment title (to the extent it was transferred) is avoidable as a fraudulent conveyance under Section 548 and 550 of the Bankruptcy Code.

191.    As a result of the transfer, Plaintiff's creditors have been harmed.

## COUNT X

## BREACH OF FIDUCIARY DUTY
### (Against Director Defendants and SLS and Hawk)

192.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

193.    To prove a claim for breach of fiduciary duty, a plaintiff must establish (1) a fiduciary relationship existed; (2) the defendant negligently or intentionally failed to act in good faith and solely for the plaintiff's benefit; and (3) the breach caused an injury to the plaintiff.

194.    Defendant Stastney owed a fiduciary duty to Plaintiff as a director, Vice Chairman of Stream's Board, and as the Chief Financial Officer.  This duty required Stastney at all times to act faithfully on behalf of Stream and to conduct himself in a manner he reasonably believed to be in the best interest of Stream. Stastney had access to and knowledge of confidential and inside information of Stream.

195.    Stastney breached his fiduciary duty when Stastney, among other things, attempted to separate key employees from Stream's management by promising the employees lucrative salary increases and bribing them to leave Stream and/or act disloyal to Stream's CEO in support of Stastney's takeover scheme; outlined and emailed a carefully choreographed plan to Crawford in preparation for Stastney's takeover scheme; and seized and attempted to assert control of Stream's assets by virtue of the Omnibus Agreement and corresponding Letter Agreement.

196.    Defendants Kabacinski, Gola, and Gollop owed fiduciary duties to Stream as directors. These duties required directors at all times to act faithfully on behalf of Stream and to conduct themselves in a manner they reasonably believed to be in the best interest of Stream. The directors had access to and knowledge of confidential and inside information of Stream.

197.    The directors breached their fiduciary duties when they, among other things, engaged in civil conspiracy to take over Stream and Stream's assets, executed the Omnibus

Agreement to transfer all of Stream's assets to SLS, Hawk, and/or SCI and to effect Defendants' goal of taking over Stream, thwarted the rights of Class A and Class B Voting shareholders under the Company Charter, attempted to circumvent the proper adjudication of the SLS Lawsuit, and seized and asserted control of Stream's assets by virtue of the Omnibus Agreement and corresponding Letter Agreement.

198.    Whether negligently, grossly negligently, recklessly, or intentionally, Stastney, Kabacinski, Gola, and Gollop failed to act in good faith and failed to perform their fiduciary duties, causing deepening insolvency and damages, and unjustly enriching themselves at the expense of the Debtors and their creditors.

199.    Defendants SLS and Hawk owed fiduciary duties to Stream and Technovative by virtue of their status as secured lenders that operated with complete control over the Debtors, including making business decisions and directing the Debtors' business operations.

200.    Defendants SLS and Hawk breached their fiduciary duties by looting the Debtors' assets, investors, customers, and IP for their own ultimate benefit.

201.    As a direct and proximate result of these breaches, Plaintiffs have suffered damages, including without limitation, the need to commence bankruptcy proceedings, lost profits, increased legal fees, and expenses.

## **COUNT XI**
## **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
### **(Against Scheme Defendants)**

202.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

203.    Aiding and abetting a breach of fiduciary duty occurs when there is the existence of a fiduciary relationship, a breach of the fiduciary's duty, knowing participation in that breach by the defendant, and damages approximately caused by the breach.

204.    Defendants SCI, SLS, Hawk, Morton, and Crawford aided and abetted breaches of fiduciary duties by Stastney, in his capacity as CFO and Vice Chairman/Director, knowing that he had a fiduciary duty and fiduciary relationship with Stream.  Defendants knew the Omnibus Agreement was orchestrated by Stastney and his allies to circumvent the proper adjudication of the SLS Lawsuit and knew that Stastney had no right to take possession of Stream's assets.

205.    Defendants acted with knowledge of Stastney's breaches of fiduciary duties and knowingly participated in those breaches by, among other things, initiating the Crawford Lawsuit, signing the illegitimate Omnibus Agreement, insisting that Stastney be named CFO of Stream, intimidating and threatening McCarthy, suggesting Stream expand its Board of Directors as part of Stastney's scheme, restricting access to the Company's servers, and seizing Stream's assets.

206.    Defendants aided and abetted breaches of fiduciary duties by Gola and Gollop in their capacities as members of the Resolution Committee, and Kabacinski, Gola, and Gollop as directors.  Upon information and belief, Defendants knew that Gola and Gollop were on Stream's Board and that Gola and Gollop owed fiduciary duties to Stream as directors, and that signing the Omnibus Agreement would breach Gola's and Gollop's fiduciary duties.

207.    Defendants acted with knowledge of Gola's and Gollop's breaches of fiduciary duties to Stream and knowingly participated in those breaches of fiduciary duties by encouraging Gola and Gollop to enter into the Omnibus Agreement, knowing that Gola and Gollop would receive compensation and stock in SCI in return for their actions (at least because Stastney, Crawford, and Morton had offered Gola and Gollop these benefits).

208.     Defendants knowingly aided and abetted the wrongdoings of Stastney, Kabacinski, Gollop, and Gola alleged herein and rendered substantial assistance to them.

209.     As a result of this conduct, Stream has been harmed.

## COUNT XII
### DETERMINATION OF SECURED STATUS, AND THE EXTENT PRIORITY OF LIENS AND INTERESTS UNDER 11 U.S.C. § 506(a)
### (Against Defendants Hawk, SCI, and SLS)

210.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

211.     Pursuant to section 506 of the Bankruptcy Code and Bankruptcy Rule 7001, this Court may determine the extent of any asserted secured claim, lien, or interest being asserted against Stream's estate.

212.     Section 506(a) provides that an allowed secured claim is only secured to the extent of the value of the secured creditor's interest in the estate's interest in such property.  In determining a creditor's secured status, a court must first determine whether the creditor has an allowed claim and then determine what portion, if any, of that can be classified as an allowed secured claim.

213.     Plaintiffs aver that many of the attachments by Hawk, SCI, and SLS as referenced herein were ineffectual, and that many of the attachments did not reach Stream's accounts receivable.

214.     Plaintiffs require a determination of the secured claims of Hawk, SCI, and SLS if any, so that it may formulate a plan of reorganization and determine if bifurcation of Defendants' claim is required.

## COUNT XIII
### RIGHT TO SET OFF UNDER 11 U.S.C. § 558
### (Against Defendants Hawk, SLS, and SCI)

215.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

216.     A Debtor may reduce a claim in accordance with Section 558 by showing that a debt is owed by the creditor to the debtor, a debt is owed by the debtor to the creditor, and the debt and claim are mutual obligations.

217.     Defendants owe a debt to Debtors in an amount in excess of $8,342,059 for legal fees and services.  The amount of debt owed by Debtors to Defendants is unknown; Debtors assert that they have fully converted the Hawk Notes to equity, and Debtors contest the amount owed to SLS pursuant to the SLS Notes.

218.     The debts and claims of Defendants and Debtors are mutual obligations. In the unlikely event that Debtors are found to owe any debt to Defendants, Debtors are entitled to a set off of such amount (and possible recoupment of some of those funds).

## COUNT XIV
### EQUITABLE DISALLOWANCE
### (Against Scheme Defendants)

219.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

220.     Equitable disallowance is an equitable remedy whereby a court may disallow a portion of the fiduciary's claim when that would produce an equitable result.

221.     Scheme Defendants have engaged in inequitable conduct, including, without limitation, a civil conspiracy, breach of fiduciary duties, aiding and abetting breach of fiduciary duties, lender liability, and breach of contract.

222.    Scheme Defendants used their positions as Stream's officer, director, investor, or secured lender to serve their own interests and unjustly enrich themselves.

223.    Scheme Defendants' misconduct resulted in injury to Stream's general unsecured creditors, its subsidiaries, its enterprise and going concern value, its current and prospective business relationships, including investors and strategic partners, its shareholders, its employees, and conferred an unfair advantage on Defendants.

224.    As a result of Defendants' inequitable conduct, Defendants' claims should be disallowed on equitable grounds as allowed under 11 U.S.C. § 105 and 510.

### COUNT XV
### OBJECTION TO CLAIM
### (Against Defendants Hawk, SLS, and SCI)

225.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

226.    On March 27, 2023, the Court issued a Notice, which established May 24, 2023 as the last date for all creditors other than governmental units to file their proofs of "claim" (as such term is defined in section 101(5) of the Bankruptcy Code). [Case No. 23-10763, Doc. 42].

227.    In the ordinary course of business, the Debtors maintain books and records (the "Books and Records") that reflect, among other things, the Debtors' liabilities and the amounts thereof owed to their creditors.

228.    The Debtors' register of claims (the "Claims Register"), prepared and provided by the Debtors' claims agent BMS Group, reflects the proofs of claim that were filed in these chapter 11 cases asserting claims against the Debtors.  The Debtors and their advisors are comprehensively reviewing and reconciling all prepetition claims, including both the claims listed on the Debtors' schedules of assets and liabilities and the Claims asserted in the Proofs of Claim (including any supporting documentation) filed in these chapter 11 cases. The Debtors are also comparing the

Claims asserted in the Proofs of Claim with their Books and Records to determine the validity of the asserted Claims.  Debtors reserve all rights to object to these proofs of claim.

229.     On May 19, 2023, Hawk, as "Collateral Agent," filed Proof of Claim No. 6 in Case No. 23-10763-mdc (Bankr. E.D. Pa.)**.**

230.     On May 23, 2023, SLS filed Proof of Claim No. 9 in Case No. 23-10763-mdc (Bankr. E.D. Pa.)**.**

231.     On May 23, 2023, SCI filed Proof of Claim No. 14 in Case No. 23-10763-mdc (Bankr. E.D. Pa.)**.**

232.     On May 19, 2023, Hawk, as "Collateral Agent," filed Proof of Claim No. 1 in Case No. 23-10764-mdc**.**

233.     On May 23, 2023, SLS filed Proof of Claim No. 2 in Case No. 23-10764-mdc**.**

234.     On May 23, 2023, SCI filed Proof of Claim No. 3 in Case No. 23-10764-mdc**.**

235.     In Case No. 23-10763-mdc (Bankr. E.D. Pa.), SLS and SCI have submitted claims that are duplicative of Hawk's Proof of Claim No. 6.

236.     For example, SLS has asserted the same liability against Stream in the same amount and priority as that filed by Hawk as "Collateral Agent."  In addition, SCI has asserted the same liability against Stream in the same amount and priority as that filed by Hawk as "Collateral Agent."  Similarly, in Case No. 23-10764-mdc (Bankr. E.D. Pa.), SLS and SCI have submitted claims that are duplicative of Hawk's Proof of Claim No. 1.  For example, SLS has asserted the same liability against Technovative in the same amount and priority as that filed by Hawk as "Collateral Agent."  In addition, SCI has asserted the same liability against Technovative in the same amount and priority as that filed by Hawk as "Collateral Agent."

237.     According to a Memorandum Opinion issued November 29, 2022 in the 225 Action, "Hawk and SLS transferred their rights as creditors to SeeCubic, thereby consolidating

those rights within a single entity." In addition, "[u]nder the Note Purchase Agreement, SeeCubic

issued notes with a face value of $117,875,781.64 to various purchasers, including notes to Hawk

with a face value of $56,293,255.13 and notes to SLS with a face value of $6,514,023. In exchange,

the noteholders received a first-priority security interest in all of SeeCubic's assets, including the

Legacy Stream Assets." *Id.* at 7-8.   In addition to the Assignment Agreement and the Note

Purchase Agreement, according to the Opinion, SCI entered into a Guarantee and Collateral

Agreement with Hawk. *Id.* at 8.

238.   With respect to the Guarantee and Collateral Agreement, the Chancery Court

stated:

> Under that agreement, SeeCubic granted Hawk a security interest in
> all of its assets, including all of its contract rights. *Id.* §§ 3, 3.1(h),
> 4.1. If an event of default occurred under the Note Purchase
> Agreement, the Collateral Agreement empowered Hawk to act as
> the "Collateral Agent" to levy on SeeCubic's assets and enforce its
> contract rights, including the rights SeeCubic received under the
> Assignment Agreement. *See id.* art. 7. The issuance of a decision
> invalidating the Omnibus Agreement constituted an event of default
> under the Note Purchase Agreement.

*Id.*

> . . .

> The Collateral Agreement appointed Hawk as Collateral Agent with
> the authority following an event of default under the Note Purchase
> Agreement to assert any rights that the note purchasers possessed
> under the Note Purchase Agreement or in the Collateral Agreement.
> Those rights included a security interest in all of SeeCubic's assets,
> which encompassed "all General Intangibles (including all contract
> rights)." Collateral Agreement § 3.1(h). The security interest thus
> extended to the enforcement rights that SeeCubic received under the
> Assignment Agreement, which in turn included SeeCubic's right to
> enforce the Hawk Pledge Agreements.

*Id.* at 22–23.

239.    Because Hawk is acting as "Collateral Agent," SLS and SeeCubic's respective claims should be disallowed to the extent they duplicate the claims filed by Hawk.  Otherwise, the claims would be *triplicated*.

240.    Moreover, Hawk's Proof of Claim No. 1 filed in Case No. 23-10764-mdc is duplicative of Hawk's Proof of Claim No. 6 filed in Case No. 23-10764-mdc.  Hawk's Proof of Claim No. 1 filed in Case No. 23-10764-mdc asserts the same liability against Technovative in the same amount and priority as that it asserts against Stream in Hawk's Proof of Claim No. 6 filed in Case No. 23-10763-mdc.

241.    Specifically, in Case No. 23-10763-mdc, (1) Hawk's Proof of Claim No. 6 seeks $178,432,069.68 (asserting a claim for $161,209,585.62 under the Hawk Notes and asserting a claim for $17,222,484.06 under the SLS Notes); (2) SLS's Proof of Claim No. 9 seeks $17,222,484.06 under the SLS Notes; and (3) SCI's Proof of Claim No. 14 incorporates by reference Hawk's Proof of Claim No. 6 filed in Case No. 23-10763-mdc and Hawk's Proof of Claim No. 1 filed in Case No. 23-10764-mdc and seeks $178,432,069.68 against Stream (a claim for $161,209,585.62 under the Hawk Notes and a claim for $17,222,484.06 under the SLS Notes) and $17,222,484.06 against Technovative (a claim under the SLS Notes).  In Case No. 23-10764-mdc, (4) Hawk's Proof of Claim No. 1 seeks a claim for $17,222,484.06 under the SLS Notes; (5) SLS's Proof of Claim No. 2 seeks $17,222,484.06 under the SLS Notes; and (6) SCI's Proof of Claim No. 3 incorporates by reference Hawk's Proof of Claim No. 6 filed in Case No. 23-10763-mdc and Hawk's Proof of Claim No. 1 filed in Case No. 23-10764-mdc and seeks $178,432,069.68 against Stream (a claim for $161,209,585.62 under the Hawk Notes and a claim for $17,222,484.06 under the SLS Notes) and $17,222,484.06 against Technovative (under the SLS Notes).  Therefore, instead of a claim for $178,432,069.68, Debtors face duplicative claims totaling at least $621,408,629.34.

242.    Therefore, Debtors respectfully request this Court enter judgment disallowing and expunging the duplicate claims.

## COUNT XVI
## EXEMPLARY DAMAGES
### (Against Scheme Defendants)

243.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

244.    Plaintiffs have demonstrated that Defendants actions satisfy the requirements needed to entitle them to an award of exemplary damages under Pennsylvania law in that they have shown that:

    a.    Plaintiffs were injured through the conduct by Defendants which amounted to willfulness and malicious acts in their scheme against Plaintiffs; and

    b.    Plaintiffs have shown a right to recover damages on the causes of actions set out above.

245.    Defendants' acts, as outlined above, exhibit the exact type of willful, and malicious behavior upon carrying out their conspiracy against the Plaintiffs.

246.    To the extent a fact finder determined that punitive damages were warranted, such damages needed only to bear "a reasonable relationship between the amount of the award and the twin goals of punishment and deterrence, the character of the tortious act, the nature and extent of the harm suffered by plaintiff, and the wealth of the defendant." *Pioneer Commercial Funding Corp. v. American Financial Mortgage Corp.*, 797 A.2d 269, 292 (Pa. Super. 2002).

247.    Defendants' conduct entitles Plaintiffs to exemplary damages in an amount to be determined court determines to be appropriate punishment for the Defendants and to serve as notice to the community that similar conduct will not be tolerated.

128073826.3                                        61

<u>COUNT XVII</u>
**MISAPPROPRIATION OF TRADE SECRETS,**
**DEFEND TRADE SECRETS ACT, 18 USC § 1832(A)(1)**
**(Against Scheme Defendants)**

248.    Plaintiff realleges and restates all prior paragraphs as if fully restated herein.

249.    As set forth above, Plaintiffs developed breakthrough glasses-free 3D display technology that they market and sell under the brand name "Ultra-D." The proprietary and trade secret information that Plaintiffs created and developed in connection with the Ultra-D products includes, but is not limited to, design files, drawings, specifications, manufacturing information, device, component, application, and configuration information (including with respect to displays for TVs, tablets, laptops, PCs, phones, automobiles, accessories, etc.), device packaging information, development roadmaps and plans, plans for the development and delivery of features and displays to individual clients, marketing plans, market analyses, future product plans and designs such as product specifications, product forecasts, definitions, research, and development, patentable technologies, source code, cost information, existing and potential business opportunities and strategies, client lists, sales and customer information, sales prospect pipelines as well as details regarding the prospects, sales playbook, marketing and sales projections, financial information, and business plans relating to existing and future products, customers, and markets (collectively, "Stream's Trade Secrets").

250.    Among Defendants' violations of Stream's Trade Secrets was its manufacture of demonstrator units containing the Ultra-D technology and subsequent presentation of those units to Marvel Studios in California, USA for the purpose of securing contracts to convert Hollywood movie content into the proprietary Ultra-D format.  Defendants also presented such demonstrators to ROKiT, a California-based company engaged in the manufacture and sale of consumer devices

that include mobile phones and tablets. Discovery will no doubt reveal further improper uses of Stream's Trade Secrets.

251.    Stream's Trade Secrets have been used in and/or were intended for use in interstate and/or foreign commerce. For example, portions of Stream's Trade Secrets were maintained securely by Plaintiffs on computers in California, USA; Dusseldorf, Germany; Eindhoven, the Netherlands; and Beijing, China. The Stream Trade Secrets also were used by Plaintiffs to create and manufacture products for potential and actual customers in the United States, including by virtue of the Ultra-D demonstration samples exhibited at the January 2012 at the Consumer Electronics Shows in Las Vegas, NV, USA and to other potential and actual customers in the United States from 2012 to 2020 and from 2022 to the date of this Claim filing (following the Delaware Supreme Court reversal of the Omnibus Agreement).

252.    Stream's Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, another person who can obtain economic value from their disclosure or use of the information. Stream's Trade Secrets also are the product of years of research and development at substantial cost to Plaintiffs. These Trade Secrets form the foundation of Plaintiffs' competitive advantages in the glasses-free 3D market, including both internationally and within the United States.

253.    Plaintiffs have undertaken efforts that are reasonable under the circumstances to maintain the secrecy of Stream's Trade Secrets. These efforts include, but are not limited to, the use of passwords and encryption to protect data on computers, servers, and repositories; limited distribution of confidential information only to key Plaintiff employees and executives and on a need-to-know basis; the maintenance of written policies and procedures that emphasize employees' duties to maintain the secrecy of Stream's Trade Secrets; and the use of confidentiality

agreements and non-disclosure agreements to require vendors, customers, partners, contractors, employees, and others with access to maintain the secrecy of Stream's Trade Secrets.

254.    Defendants Stastney, SLS, Hawk, Morton, SCI, Kabacinski, Gollop, and Gola misappropriated Stream's Trade Secrets at least by acquiring them by improper means, by unlawfully disclosing them, and/or by wrongfully using them to compete with Plaintiffs in the United States, as the examples below demonstrate.

255.    For example, Defendants Stastney, SLS, Morton, and Hawk improperly gained access to Stream's Trade Secrets in March 2020 when they seized control of Stream's computer servers in California, USA.

256.    Despite signing non-disclosure agreements with Plaintiffs, after receiving employment offers from SCI and resigning from Plaintiffs on or about June 2020, the Individual Defendants and certain other former Plaintiff employees who are now employed by SCI, retained hundreds of gigabytes of Plaintiffs' trade secret information regarding designs, functions, and implementation.  This trade secret information includes some of the most competitively sensitive and confidential information that Plaintiff possesses about its glasses-free 3D designs, and much of it was accessed and transferred during the final days of the Defendants' employment. After accepting their employment offers from SCI, these individual Defendants and former Plaintiff employees took steps to cover up the evidence of their actions, including, in some cases, destroying evidence of their misappropriation.

257.    Defendants SCI, Stastney, SLS, Hawk, Morton, Kabacinski, Gollop, and Gola gained further access to Stream's Trade Secrets in December 2020 when they seized source code held on computers in Dusseldorf, Germany, Eindhoven, the Netherlands, and Bangalore, India.

258.    In December 2020, those same Defendants seized Stream's manufacturing assets and materials in the Netherlands and China.

259.   In December 2020, those same Defendants seized Stream's business assets and sales samples located in Nevada, Pennsylvania, New Jersey, New York, and California in the USA as well as assets located in the United Kingdom, the Netherlands, Taiwan, and China. They used and continue to use Stream's Trade Secrets from 2020 to the date of filing the Complaint to compete with Plaintiffs by selling and attempting to sell the Ultra-D technology to actual and potential customers worldwide, including those in the United States, including by exhibiting Ultra-D demonstration samples in the United States.

260.   As an additional example, Defendants Stastney, SLS, Morton, Hawk, Kabacinski, Gollop, and Gola – through Defendant SCI – also sold products or attempted to sell products containing Stream's Trade Secrets to Stream's existing customers, including BBack, Inc. in California and IQH3D LLC in Florida.

261.   Also, as stated above, Defendants Stastney, SLS, Morton, Hawk, Kabacinski, Gollop, and Gola – through Defendant SCI – presented demonstrator units containing Stream's Trade Secrets to, among others, Marvel Studios in California. Attempts at business development with Marvel Studios by Defendants commenced in 2021 and continue to the date of filing this Complaint.

262.   As yet another example, Defendants SCI, Stastney, SLS, Hawk, Morton, Kabacinski, Gollop, and Gola caused Stream's Trade Secrets to be wrongfully disclosed to current and former employees of SCI, and upon information and belief, those individuals also have retained, disclosed, and/or used Stream's Trade Secrets upon their departure from SCI. Upon further information and belief, SCI and/or its agents and employees also have misappropriated Stream's Trade Secrets in other ways, but information concerning this misappropriation is uniquely within the possession of the Defendants and Defendants have taken actions to conceal

evidence regarding their conduct. Plaintiffs believe that further discovery will likely show additional misappropriation by SCI or its agents and employees.

263.    All Defendants received copies of the Delaware Supreme Court opinion of June 15, 2022 and corresponding mandate of July 1, 2022; they are aware that Stream's Trade Secrets were misappropriated and cannot properly be retained, disclosed, or used by them.  Despite the clear mandate of the Delaware Supreme Court and demands from Plaintiff to return all Stream's Trade Secrets to Plaintiffs in both title and possession, and to discontinue all use of such information and assets, Defendants have not done so.  Defendants have falsely represented that they returned all Plaintiff's confidential information and assets, yet their use of such information and assets continues despite more than a year of Plaintiffs' attempts to enforce the Delaware Supreme Court mandate to return all Stream assets in both title and possession.

264.    Most recently, Defendants Stastney, SLS, Morton, Hawk, Gollop, and Gola – through Defendant SCI – presented demonstrator units containing Stream's Trade Secrets to potential U.S. and international customers at the Consumer Electronics Show in Las Vegas in January 2023.

265.    As a direct and proximate result of Defendants' misappropriation of Stream's Trade Secrets, Plaintiffs have been injured and suffered damages in an amount to be proven at trial. As a further proximate result of the misappropriation and use of Stream's Trade Secrets, Defendants have been unjustly enriched.

266.    Defendants' conduct has been willful and malicious, justifying an award of exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

267.    Defendants' conduct constitutes transgressions of a continuing nature that are causing and will continue to cause irreparable harm to Plaintiffs for which Plaintiffs have no adequate remedy at law. Unless and until enjoined and restrained by order of this Court,

Defendants will continue to retain and use Stream's Trade Secrets to enrich themselves and divert business from Plaintiff. Plaintiff is entitled to a preliminary and permanent injunction against Defendants' actual and threatened potential violation of the Defend Trade Secrets Act.

**XVIII**
**MISAPPROPRIATION OF TRADE SECRETS,**
**PAUTSA, PA. CONS. STAT. ANN. §§ 5301-5308 (2004)**
**(Against Scheme Defendants)**

268.    Plaintiff realleges and restates all prior paragraphs as if fully restated herein.

269.    The Pennsylvania Uniform Trade Secrets Act ("PAUSTA") specifically provides that "[a]actual or threatened misappropriation may be enjoined," and further provides that " injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from misappropriation."

270.    Plaintiff enjoyed a valid property interest in Stream's Trade Secrets, including but not limited to lawful possession of the Stream's Trade Secrets and the right to enjoy the value of the secrecy of the Stream's Trade Secrets.

271.    As described above, Defendants were fully familiar with Stream's Trade Secrets. As described above, Defendants, under fraudulent circumstances, acquired Stream's Trade Secrets for their own use and then unlawfully retained them despite a Delaware Supreme Court order ordering them to return the assets in title and possession.

272.    Stream never agreed to allow any Defendant to disclose or use the Stream's Trade Secrets for any purpose.

273.    Stream had taken reasonable efforts to maintain the secrecy of the Stream's Trade Secrets, including, but not limited to, sharing the information on a limited, need-to-know basis and not disclosing it to any third parties without appropriate precautions.

274.    Stream's Trade Secrets obviously have significant economic and commercial value, representing an investment of many years and millions of dollars, and are not generally known or readily ascertainable by others.

275.    Defendants relied upon and used Stream's Trade Secrets without permission for the sole benefit of Defendants.

276.    Upon information and belief, Defendants are continuing to rely upon and use the Stream's Trade Secrets in further development of their business interests. Stream's Trade Secrets are of significant value to New Penn and are extremely important in the conduct of its business, and would be extremely valuable to Defendants, who are competitors

277.    The Pennsylvania Uniform Trade Secrets Act provides for injunctive relief in the case of an "actual or threatened" misappropriation of a trade secret. 12 Pa. C.S.A. § 5303(a). The Defendants' actions in converting and misappropriating Stream's confidential, proprietary, and trade secret information for their own gain was willful, wanton, and malicious, and was taken with reckless disregard for the rights of Plaintiffs.

278.    Defendants' improper activities, described above, were a knowing, willful, malicious, and deliberate disregard of rights and interests. Such conduct warrants an award of exemplary damages in an amount up to two times the damages awarded and an award of reasonable attorneys' fees to Plaintiffs.

279.    Plaintiffs have suffered and will continue to suffer material damage resulting from this misuse of Stream's Trade Secrets. Defendants are therefore liable to Plaintiffs for such damages.

280.    In the alternative, if Plaintiff does not constitute trade secrets within the meaning of the Pennsylvania Uniform Trade Secrets Act, which the Plaintiffs do not concede, Defendants are nonetheless liable for the wrongful conversion of such confidential and proprietary materials.

281.   The above-described actual and/or threatened conduct of Defendants is the direct and proximate cause of immediate and irreparable harm to Plaintiffs.  Defendants' actual and/or threatened actions will continue to cause Plaintiffs irreparable harm if not enjoined.

**XIX**
**LENDER LIABILITY**
**(Against Scheme Defendants)**

282.   Plaintiffs hereby incorporates the averments of the preceding paragraphs as if fully set forth herein. As set forth in detail above, Scheme Defendants acted in bad faith in causing Plaintiffs to enter into loan agreements and conversion agreements and then reneging on their agreements and promises.

283.   Scheme Defendants exercised control over Plaintiffs well outside and far greater than the typical lender-debtor relationship.

284.   Scheme Defendants actively participated in Plaintiff overtly and through a secret conspiracy beyond the domain of the usual lender.

285.   Scheme Defendants exercised control over various aspects of Plaintiffs daily business operations, as well as over its long-term management decisions.

286.   Scheme Defendants determined and controlled who Plaintiffs could employ, how employees were trained, the work that employees did, and how Plaintiffs could bill its customers for such work, which projects to complete and which to ignore, and how relationships with clients would be handled and conducted, all of which led to various lost opportunities and the loss of existing relationships and contracts.

287.   Scheme Defendants further so dominated and controlled Plaintiffs to the extent that it forced Plaintiffs to terminate its founders and managing members, key employees, and divested

the Plaintiffs of all assets, many of which it illegally clings this day, including the name of one of its subsidiaries.

288.    Scheme Defendants so dominated and exerted control over Plaintiffs that it sought to control who Plaintiffs did business with and have actively, both directly and through various agents, worked diligently to destroy every existing and future business relationship Plaintiffs had with existing and prospective investors, service professionals, industry supporters, customers, suppliers, and other financing sources.

289.    Scheme Defendants were no mere arms-length lenders to Plaintiffs.

290.    Scheme Defendants exercised such domination and control over Plaintiffs that it had duties and obligations to Plaintiffs far greater than that of a traditional lender.

291.    Scheme Defendants breached their duties to Plaintiffs by reneging on promises and agreements and otherwise acting in bad faith, and by utilizing their loans to further control Plaintiff in a manner that Scheme Defendants knew, or should have known, would greatly harm Plaintiff. Such conduct rose to the level of malicious and intentional conduct.

292.    Plaintiffs have been and continues to be harmed by Scheme Defendants breach of their duties to Plaintiffs.

293.    As a direct and proximate result of Scheme Defendant's tortious conduct, Plaintiffs have suffered damages, and will continue to suffer damages.

## <u>XIX</u>
### <u>Prayer for Relief</u>

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in its favor against Defendants:

1.      Finding and declaring that all amounts that are alleged to have given rise to a debt obligation by Debtors to Defendants be equitably subordinated to the claims of Debtors' creditors pursuant to 11 U.S.C. § 510(c) or disallowed on equitable grounds;

2.      Finding and declaring Stastney breached his employment agreement;

3.      Finding and declaring Defendants were negligent when Defendants breached their duty of reasonable care and loyalty to Plaintiffs;

4.      Finding and declaring Defendants were willful or malicious when Defendants breached their fiduciary duty to Plaintiffs;

5.      Finding and declaring Defendants tortiously interfered with Plaintiffs' existing and prospective business relationships with Bosch, Google, and ToJoy;

6.      Finding and declaring that the character and/or substance of the SLS Notes and the Hawk Notes as well as the related conversion agreements is one of an equity interest rather than a debt claim;

7.      Finding and declaring the transfers related to the Bonding Equipment are fraudulent transfers and that Plaintiffs are entitled to the recovery of the property fraudulently transferred for the benefit of the Debtors' estates, or compensatory damages in an amount to be determined at trial for the value thereof, from the direct and indirect transferees;

8.      Finding and declaring that Stastney, Kabacinski, Gola, and Gollop breached their fiduciary duties;

9.      Finding and declaring that Defendants aided and abetted Stastney, Kabacinski, Gola, and Gollop in breaching Stastney, Kabacinski, Gola, and Gollop's fiduciary duties;

10.     Adjudicating the amount of any secured claim held by Defendants, if any, under and pursuant to § 506 of the Bankruptcy Code, determining if any portion of Defendants' claims are unsecured and proving such other and further relief as the Court deems just and equitable;

11.     Finding and declaring that Plaintiff is entitled to a setoff or deduction equal to the value of settlements or payments of any amounts that may be owed by Plaintiffs to Defendants;

12.     Finding and declaring that, due to Defendants' inequitable conduct, Defendants' claims should be disallowed on equitable grounds as allowed under 11 U.S.C. § 105;

13.     Finding and declaring that Plaintiffs will not be legally liable with respect to Hawk's alleged secured debt and, therefore, disallowing Hawk's Claim No. 6 in its entirety;

14.     Finding and declaring that Defendants', namely the unidentified "John Doe(s)" and "Jane Doe(s)" as secured lenders, sought out, and employed law firms and investment banks which encouraged, and assisted in the acts against the Plaintiffs.

15.     Awarding prejudgment interest;

16.     Awarding exemplary damages in an amount to be determined by the Court based on Defendants' willful and malicious appropriation of trade secrets pursuant to applicable law

17.     Awarding damages for Defendants' trade secret misappropriation in an amount to be proven at trial;

18.     Awarding monetary recovery for any unjust enrichment caused by Defendants' misappropriation of trade secrets;

19.     Alternatively and in lieu of damages measured by any other methods, awarding a reasonable royalty for Defendants' misappropriation of trade secrets;

20.     Issuing the entry of a Preliminary and Permanent Injunction against Defendants to prevent the actual or threatened misappropriation of Plaintiffs' trade secrets;

21.     Issuing an entry of Preliminary and Permanent Injunction against Defendants SCI, SLS, Stastney, Morton, Hawk, and Crawford preventing them from providing loans, funding, or other financial assistance to SCBV since such funding encourages unlawful retention of Debtors'

assets, infringement of Debtor's proprietary and licensed technologies, and threatens to cause further damage to Debtors by infringing Debtors' third-party technology licenses.

22.     Issuing an Order directing Defendants to (i) return all of Plaintiffs' property in their possession, custody, or control and (ii) cease any access to or use of Plaintiff's trade secrets;

23.     Awarding Reasonable attorneys' fees, costs, and expenses incurred in this action; and

24.     Such other and further relief as the Court deems just and proper.

## VI.     DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

Dated: August 12, 2023            Respectfully submitted,

/s/ Rafael X. Zahralddin-Aravena
Rafael X. Zahralddin-Aravena (PA Bar No. 71510)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
550 E. Swedesford Road, Suite 270
Wayne, PA 19087
Telephone: (302) 985-6000
Facsimile: (302) 985-6001
Rafael.Zahralddin@lewisbrisbois.com

-and-

Vincent F. Alexander *pro hac vice*
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
110 SE 6th Street, Suite 2600
Fort Lauderdale, FL 33301
Telephone: (954) 728-1280
Facsimile: (954) 678-4090
Vincent.Alexander@lewisbrisbois.com

-and-

128073826.3                           73

Bennett G. Fisher (*pro hac vice*)
**Lewis Brisbois Bisgaard & Smith, LLP**
24 Greenway Plaza #1400
Houston, TX 77046
Telephone: (346) 241-4095
Facsimile: (713) 759-6830
Bennett.Fisher@lewisbrisbois.com

*Counsel to the Debtors*