UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

```
Stream TV Networks, Inc.   CH: 11 :
                                   : Case No.  23-10763
Emergency Motion For Contempt  :
Hawk Investment Holdings       :
Limited'S Emergency Motion To  : Philadelphia, Pennsylvania
Hold The Debtors In Contempt And : August 15, 2023
Impose Sanctions Filed By Hawk : 12:42 p.m.
Investment Holdings Ltd.       :
Represented By Steven Caponi   :
                               :
A) Trial Re: Emergency Motion To :
Dismiss Case. Motion Of Hawk   :
Holdings Ltd. (I) Pursuant To  :
Section 1112(B) Of The Bankruptcy :
Code Either (A)(I) To Dismiss The :
Debtors Chapter 11 Cases Or (2)  :
To Convert Such Cases To Cases   :
Under Chapter 7 Or (B) In The    :
Alternative, Pursuant To Section :
1104(A) Of The Bankruptcy Code To :
Appoint A Chapter 11 Trustee And :
(Ii) To Request Expedited       :
Consideration Pursuant To Local :
Rule 5070-I(G)Filed By Hawk      :
Investment Holdings Ltd.         :
Represented By Steven Caponi .   :
. . . . . . . . . . . . . . . . . .
```

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtor:                Vincent F. Alexander, Esq.
                               Lewis Brisbois Bisgaard & Smith
                               110 SE 6th Street, Suite 2600
                               Fort Lauderdale, FL 33301
                               954-728-1280

                               Kevin Shaw, Esq.
                               Lewis Brisbois Bisgaard & Smith
                               500 Delaware Avenue, Suite 700
                               Wilmington, DE 19801
                               302-295-9436

APPEARANCES (Continued):

For SeeCubic:                         Marley Ann Brumme, Esq.
                                      Eben P. Colby, Esq.
                                      Skadden Arps Slate Meagher &
                                      Flom, LLP
                                      500 Boylston Street, 23rd Floor
                                      Boston, MA 021116
                                      617-573-4800


For Hawk Investment Holdings          Steven Caponi, Esq.
Ltd:                                  K&L Gates
                                      600 N. King Street, Suite 901
                                      Wilmington, DE 19801
                                      302-416-7080


                                      Margaret R. Westbrook, Esq.
                                      Jonanthan N. Edel, Esq.
                                      K&L Gates LLP
                                      300 South Tryon Street
                                      Suite 1000
                                      Charlotte, NC 28202
                                      704-331-7400


For the United States                 Kevin P. Callahan, Esq.
Trustee:                              Office of The United States
                                      Trustee
                                      Robert N.C. Nix Federal
                                      Building
                                      900 Market Street, Suite 320
                                      Philadelphia, PA 19107
                                      202-934-4154


Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

INDEX

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES:

Mathu Rajan
  (By Mr. Alexander)      116

AUGUST 15, 2023                                    12:42 P.M.

THE COURT:  This is the Matter of Stream TV Networks, and there's two matters.  Actually, there was a matter scheduled for 12:00 which was the motion to hold Debtor's in contempt and impose sanctions, and then we'll follow that with the continued trial.

Counsel, before we enter our appearances, I want to make sure I have -- okay.  Let's -- we're going to start first with the motion to hold Debtors in contempt.

Counsel for the movant?

MR. CAPONI:  Good afternoon, Your Honor.  Steven Caponi from K&L Gates.  With me today is Jon Edel and Margaret Westbrook, also from K&L Gates.

THE COURT:  Mr. Edel and who else, Mr. Caponi?

MR. CAPONI:  Excuse me, Your Honor?

THE COURT:  Who else is with you?

MR. CAPONI:  Mr. Jon Edel.

THE COURT:  Uh-huh.

MR. CAPONI:  And Margaret Westbrook.  And then also sort of on my side of the aisle is Eben Colby and Marley Brumme from Skadden, Arps.  Do you want to wait -- I'm sorry.

THE COURT:  Good morning.

MR. CAPONI:  Did you want to do introductions or just want me to give --

THE COURT:  Wait a minute.  Where are they from?

MR. CAPONI:  Scadden, Arps, Your Honor.

THE COURT:  Oh, I thought I heard somebody say Laten or Lathen and I'm like, what?  Okay.

MR. CAPONI:  And then lastly, the Court probably recalls Mr. Stastney, who is SeeCubic, Inc and SLS.

THE COURT:  Okay.  Who else is here?

MR. CAPONI:  That's it with me and I'll turn it over to Mr. Vincent Alexander.

THE COURT:  Okay.

MR. ALEXANDER:  Good afternoon, Your Honor.  Vincent Alexander of Lewis Brisbois Bisgaard & Smith on behalf of the Debtors.  I'm joined in the courtroom with Kevin Shaw from Lewis Brisbois, and also Mr. Mathu Rajan who's in the courtroom at the table as a representative of the Debtors.

THE COURT:  Is Mr. Shaw here?

MR. ALEXANDER:  Mr. Shaw is here.

THE COURT:  Oh, okay.

MR. CALLAHAN:  Good afternoon, Your Honor.  Kevin Callahan for the U.S. Trustee.  We're not taking a position on the motion to compel, but I am here for the trial.

THE COURT:  Okay.  Okay.  Want to commence with your motion to compel on its motion to hold the Debtors in contempt and for sanctions, Mr. Caponi?

MR. CAPONI:  Yes, Your Honor.  Thank you very much. Just to set the table a little bit, Your Honor.  I know you're

familiar with this because we just dealt with this issue last week.  But immediately before the June hearing, the Debtor disclosed for the first time a term sheet for $300 million with a company called Jung Shang Holdings, LTD (phonetic).  And in -- during the course of that hearing, we discussed the terms sheet.

In advance of the hearing, we actually had served discovery in the Debtor.  The Debtor did not produce the documents and that led to a motion to compel which the Court granted about a week and a half ago.  And in granting the motion to compel --

THE COURT:  I don't really think I said that I granted the motion to compel.  I found that the Debtors -- that the deadline had already passed, but what I did was extend the deadline so that it could be produced but I did not find that they -- I did not grant the motion.  But I want to be clear --

MR. CAPONI:  Your Honor did not find the Debtors in contempt but required them to produce the information.

THE COURT:  Right.  By extending the deadline because I found that the deadline had already expired and so that the Debtors were not in -- were not -- had not failed to comply with the rules for production because their 30 days had expired and I said you should have requested an extension of the time period.  You didn't.  So I wasn't going to grant your motion, but I was going to sua sponte extend the deadline so that the

documents could be produced and then set a deadline by which the Debtors had to produce certain information to you, okay.

MR. CAPONI:  Much more accurately stated than I did, Your Honor.  I agree with you.

THE COURT:  Okay.

MR. CAPONI:  Just what led up to the motion that we filed and the ruling that your Court -- the Court just described was we looked into this company and the signatory on the term sheet was a Ti Li -- Mr. Ti Li, and we had -- armed with only the term sheet, contacted Jung Shang and they disavowed any knowledge of the Debtor or Mr. Li.

Now, the Court directed the Debtor to produce the contact information for the individuals with whom they negotiated the term sheet.  Separately, the Court required the Debtor produce all documents with communications with the company Jung Shang regarding the term sheet.

The Debtor produced two business cards -- three business cards within the timeframe directed by the Court, and the business cards were attached to our more recent filing at Exhibit B1.

THE COURT:  In your supplemental, counsel?

MR. CAPONI:  Excuse me, Your Honor?

THE COURT:  In your supplemental response?

MR. CAPONI:  It would be -- the supplemental -- let me get to the top of it.  Supplemental emergency motion, yes,

Your Honor.  That is Docket 344.

THE COURT:  I thought -- I must have left that on my desk.  They had pictures and stuff, right?  Oh, here it is.  I do have it.

MR. CAPONI:  So Exhibit B1, B2, and B3 are the three business cards that were produced.

THE COURT:  B1, B2, and B3, right?

MR. CAPONI:  And B1 and B2 are business cards that are written all in Chinese.  And B3 is a business card for an individual named Lang Chow (phonetic).

Your Honor, after these business cards were produced, Mr. Rajan submitted his sixth declaration, and in his sixth declaration --

THE COURT:  Hold on.  Okay.

MR. CAPONI:  And in his sixth declaration, he stated that the first two business cards that were given, B1 and B2, are for an individual named Zhe Li.  Z-H-E, space, capital L-I.

THE COURT:  A Z --

MR. CAPONI:  Z as in zebra, H-E.

THE COURT:  Uh-huh.

MR. CAPONI:  Space, capital L-I.  And that, Your Honor --

THE COURT:  That was card B1?

MR. CAPONI:  That was B1 and B2, and then they produced as Exhibit B4 and B5 as the English translations of

those two business cards.

And then in this declaration, Mr. Rajan also stated that Jang Chow is actually William Lang (phonetic), who had been previously identified as one of the two people that Mr. Rajan negotiated with.  So in the declaration he states that he negotiated with Zhe Li, who signed the term sheet, and a Jang Chow.

THE COURT:  And Jang Chow is actually --

MR. CAPONI:  William Lang, sorry.  William Lang.

THE COURT:  William Lang.

MR. CAPONI:  And William Lang, Mr. Rajan states, is now Wang Chow, and Ti Li is now Zhi Li.  The Debtor did not produce anything to substantiate these claims.  There's no business card for example that lists both the individual's two names on it.  There's no corporate document.  There's no birth certificate.  There's only Mr. Rajan's declaration?

THE COURT:  Well, will he give you his birth certificate?

MR. CAPONI:  Something to substantiate who these individuals are, but again we have the -- there's nothing that we were given, there's no document or any communication with an individual named Ti Li who signed the term sheet or William Wang whom Mr. Rajan testified he negotiated the term sheet with.

THE COURT:  Okay.

MR. CAPONI: So that is the first bit of information that we received. Upon receiving that information, I had my colleagues in my office in Beijing go to the addresses that were listed on these three business cards. And this is part of our supplement and they're -- we attached the pictures of these locations to our Exhibit D and onward.

The individuals from my office in Beijing went to the first address, which is the China Finance Urban Development business card for Zhi Li, and there's no reference at this address to Jung Shang that's on the term sheet. There's no reference at this address to a China Finance Urban Development. And there's no indication at this address that any individual named Zhi Li exists there. So we tried to contact Mr. Li at his location on the first business card, and there's nothing there.

On the second business card for Mr. Zhi Li, with a second, separate address, that business card has a company name called Guo Gang Capital, G-U-O, space G-A-N-G, space Capital. The individuals from my office went to that building. They went to that floor on that building, and there was a different company located there. No affiliation to Guo Gang Capital, and the individuals there had never heard of a Zhi Li or Ti Li or William Lang or William Chow.

We then sent individuals -- the same individuals went to the address on the business card for Wang Chow, which is

listed as Jung Ji Enterprise Group, LTD on the Poly International Plaza Zone 7, and there was no such company at that address, no such individual at that address.

Subsequent to receiving those business cards, Your Honor, we then received the -- the Court also -- so step one, the Court directed the Debtors to provides us the contact information with whom Mr. Rajan negotiated the term sheet so that we could kick the tires in this deal.  The business cards they gave us contained names that do not match with the term sheet or the prior testimony as to who negotiated with Mr. Rajan and when we sent individuals to those locations to try to verify this information, they all proved false.

We then, Your Honor, separately, Your Honor, directed the Debor to produce all communications regarding the term sheet.  The Debtors produced a large volume of information, the vast majority of it were public filings that we already had.

With regard to this term sheet, they produced a single document which was an email from an investment banker, allegedly, that had a screen shot from his cell phone of the signature page of the term sheet, and that was it.

Yesterday, in his deposition, Mr. Rajan confirmed that the Debtor has not produced any document relating to this term sheet other than that one email.  We asked the Debtor to produce the documents at us in native format so that we could look at the metadata of the documents to see when they were

created and by whom, and they produced metadata for a large portion of the documents but did not and have refused to produce the metadata for the only email related to this term sheet, nor have they provided an explanation for their refusal. And yesterday in his deposition, Mr. Rajan confirmed that that email is on his computer and is available for production, so just they're refusing to give it.

The documents, Your Honor, it was -- it seemed implausible to us that you could have a $300 million term sheet negotiated with individuals in China and there was not a single communication with those individuals in writing, not a red line, not a Chinese version translated to English, nothing. There was not a single internal email within Stream discussing this term sheet.  No emails to board members, no emails to anyone.  There's not a single communication between any lawyer for Stream or a lawyer for this other company or a businessperson for this other company, discussing this $300 million term sheet.

We raised this issue with the Debtors' counsel, that this seemed implausible, and the response was, that's correct. There's no documents.

I then queried Mr. Alexander as to who selected the documents for production, and he informed me that Mr. Rajan was permitted to review his own computer, and Mr. Rajan selected the documents that he thought his counsel should see, and that

all Mr. Alexander did was review those subset of documents to determine which ones would be produced to us.

Given the allegations of fraud directed to specifically Mr. Rajan and the shifting stories and the evidence of things not matching up, we find it improper and violative of the Court's order that Mr. Rajan was permitted to self-select with no oversight whatsoever.  And Mr. Rajan, in his deposition yesterday, confirmed in fact that he self-selected his emails and he is the only one who touched his computer to determine what should be produced.

So where does that leave us, Your Honor?  Your Honor, the Debtor put forth a filing in this Court, subject to Rule 11, counting the bona fides of this term sheet.  We've come forth with evidence that this term sheet appears to be fraudulent.  The Court ordered the Debtors to turn over information so that the Trustee's office, who also asked for these documents, and we asked for these documents, could vet what we're being told.

And I'll go back to what I said at the last hearing. The hallmark of these litigations that I've been involved with with Mr. Rajan have a pattern of Mr. Rajan being the only source of information.  It is always structured to where the only person that can validate anything is Mr. Rajan, and that's why Your Honor ordered them to turn over the contact information and then ordered them to turn over the

communications.

And I'll just summarize by saying this, the contact information we received was invalid.

THE COURT:  Well, counsel, you're telling me they're invalid, that somebody else told you, so presumably you're going to make a record of that.

MR. CAPONI:  I can -- Your Honor, we have these individuals ready to testify via Zoom.  We've been making arrangements so they can fly to Hong Kong so they can testify by Zoom.  Debtors don't oppose that as long as they get the opportunity to cross-examine.

THE COURT:  Fly to Hong Kong when?

MR. CAPONI:  They can be on a plane as soon as we tell them so they can testify on Thursday.

THE COURT:  Oh, on Thursday, okay.

MR. CAPONI:  Yes.

THE COURT:  Okay.

MR. CAPONI:  And if Your Honor, you know, it takes a --

THE COURT:  And that goes -- wait a minute.  I get that -- to me, there's two separate issues going on.

MR. CAPONI:  Okay.

THE COURT:  Okay.  One is the issue where whether they produced in accordance with my order that I issued at the end of my -- I don't know if it was reduced to writing or not,

when I ordered the Debtors to produce on August 2nd, the

deadline.  That's a second issue.

Your investigation and what you deem was a fraudulent

term sheet, that's a different -- that doesn't necessarily --

MR. CAPONI:  Agreed.

THE COURT:  Okay, so you -- so right now, we're only

talking about -- because you're saying you want to do this, you

want to do that.  But I'm trying to focus right now on whether

the Debtor failed to comply and if I'm going to sanction the

Debtor.  I get what you want to do with the other information,

and I'm not sure how that relates right now to the sanction

motion.

MR. CAPONI:  Okay.  I'll just focus it --

THE COURT:  Right.  And that's why I'm like I get

what you're saying, but what does that have to do with my --

whether I should compel -- find the Debtors to be in contempt

and failing to produce the documents I ordered them to.

MR. CAPONI:  Yes, Your Honor.  You --

THE COURT:  That's all I'm trying to separate out.

MR. CAPONI:  You ordered the Debtor to provide the

contact information for the individuals who negotiated this

term sheet.  They produced two business cards, three business

cards, none of the names match up with the term sheet or anyone

they previously identified, and when we sent individuals to

those locations to meet those people --

THE COURT:  I get all that.  Well, but --

MR. CAPONI:  -- they don't exist.  So the Debtor did not give us the contact -- strike that, Your Honor.

THE COURT:  And you want me to find that because the names aren't the same, or at least when -- you don't believe that the Debtor gave you the information and that there is some other information that they're withholding or it doesn't exist.  And if it doesn't exist, I'm not sure how I find them in for not producing some -- I mean, that's what I'm trying to round robin in my head.  Either it exists and they didn't produce it or it didn't exist and so they couldn't produce it, which both are different issues.

MR. CAPONI:  Correct.

THE COURT:  But the issues for me with the sanctions are if they produced what they had and they didn't have it or they gave you what they thought they had, I'm not quite sure what I do with that.

MR. CAPONI:  But --

THE COURT:  I get what I do with the other stuff.  I get that.

MR. CAPONI:  Your Honor, if Mr. Alexander wants to stand up and say that the information they gave us, they don't have actual contact information because these people don't exist, well, then that's a different issue.

THE COURT:  Well, and now, come on.  You really think

he's going to stand up and say that.

MR. CAPONI:  Your Honor, -- look, Your Honor, you can't negotiate a $300 million term sheet.

THE COURT:  I don't know what people can and can't do.  I --

MR. CAPONI:  Here's what I can tell you, Your Honor, you can't negotiate a term sheet and not have the contact information for the person you negotiated the term sheet with.

THE COURT:  Counsel, I get that.  I get what you're saying, but that goes to the other issue.

MR. CAPONI:  It goes to compliance with your order, out of respect --

THE COURT:  Well, no.  Counsel.

MR. CAPONI:  We don't have the contact information.

THE COURT:  But I would have to find that they had something different and didn't give it to you.  If their position is we gave you what we have and yours is like, well, whatever you have doesn't match up, I would have to find that there's some other information that they had that they didn't give to you.

MR. CAPONI:  And Your Honor, if we need to move forward with an evidentiary hearing in this point, we're prepared to do it.  But all I'm saying --

THE COURT:  Evidentiary hearing saying what?  That they had something else and they didn't give it to you?

MR. CAPONI:  Your Honor --

THE COURT:  That's two different issues.

MR. CAPONI:  Your Honor, I don't see it as two different issues, respectfully, because --

THE COURT:  I -- well, unfortunately, I do.

MR. CAPONI:  Because if they negotiated a term sheet --

THE COURT:  Uh-huh.

MR. CAPONI:  -- they -- they were having discussions with somebody and there's contact information.

THE COURT:  Okay.

MR. CAPONI:  And they have to produce valid contact information.

THE COURT:  Okay.

MR. CAPONI:  Or explain to the Court why what they gave us for some reason the building -- they all moved out the night before.  Then where's the current contact information.

THE COURT:  I don't know.

MR. CAPONI:  And excuse me, let me add this, too, Your Honor.

THE COURT:  Uh-huh.

MR. CAPONI:  Mr. Rajan testified yesterday that they are currently in negotiations over new versions of the same term sheet with the same company.  So there are currently discussions taking place.  They are not speaking to individuals

at the locations they gave us because those individuals aren't there.  So where's the information?

THE COURT:  But presumably, he gave you who he is negotiating with now.

MR. CAPONI:  No.  All we have is these cards and nobody -- we go and it's an empty building.

THE COURT:  I get that, but that's a different issue as far as I'm concerned.  Because either they gave you what they claim is the information, which you would have reason to conclude that they have some other information that they gave.  But as for the validity of that information, that's a separate issue.  That's separate.  If you say give me information and I give you what I say is the information, and you can say, well, no, they have some other information.  Now you can argue that this is what they gave me but we don't believe that that is correct.  That's a whole different subject for me because I would have to find -- and I'm understanding what you're saying, but I have to figure out because if I'm going to find that they didn't comply with my order, that they had information.  They failed to give it to you.

MR. CAPONI:  Well, Your Honor, I have -- and I can make that part in right here.

THE COURT:  Uh-huh.

MR. CAPONI:  Because we physically sent people --

THE COURT:  I get that.

MR. CAPONI:  Your Honor, let me -- if I can just play this out.  We physically sent -- let me step back this way. Your Honor required the Debtor to provide us the contact information, not for fun, but so that we could contact this company and vet this term sheet.  That was the purpose of the Court's order.  The spirit and the form of every court order. The import of your order, which allowed the Trustee -- US Trustee and us to contact these individuals to vet this term sheet.

They gave us contact information that leads nowhere.

THE COURT:  Okay.

MR. CAPONI:  And yesterday, Mr. Rajan testified that he is currently, as of yesterday, negotiating the term sheet. So he clearly is not negotiating the term sheet using the contact information he gave me because it leads to nowhere.  So either -- so they have to have something.  Either he's not negotiating a term sheet and he's lying or they have to have something, a phone number that connects, an email address that works.  It was not given to us.

THE COURT:  Well, I get the question is.  I have to assume there's a phone number.  I have to assume something, is what you want -- and I'm not -- counsel, I'm saying to me there's two separate things going on.  If he's negotiating with someone and he's claiming that it's the people that's on the card, even though you say they don't exist, then obviously I'm

going to have to hear something.

But I'm sort of like, okay, I told you to produce information.  Okay, I gave it to them, okay.  And then you say, well, whatever you gave me, I can't -- it leads to nowhere.  So the question is did you comply or not?

Now, the issue of whether it leads to nowhere, that goes to something totally different as far as I'm concerned, as to the validity of the term sheet, all these other things that I have to consider in your motion.  So I am trying to figure out what constitutes violation of my order saying produce something.

MR. CAPONI:  Well, we're --

THE COURT:  And you're saying, well, they gave us some bogus information so they didn't comply.  That's basically what you're saying.

MR. CAPONI:  I'm saying two things.

THE COURT:  Uh-huh.

MR. CAPONI:  I'm saying they gave us information that is bogus and leads to nowhere, and he testified under oath --

THE COURT:  That he has some other information.

MR. CAPONI:  -- that he's in present contact with them, negotiating a new term sheet.

THE COURT:  And he didn't give you that contact information.

MR. CAPONI:  Well, I clearly don't have it because

what he gave me, no one picked up the phone.  And presumably, somebody's picking up the phone or else he's negotiating with himself.

THE COURT:  Or is he saying he was talking with them on the phone?

MR. CAPONI:  I don't know how he was contacting them, but whatever he has, he hasn't given it to me.

THE COURT:  Right.  But so you're saying there's some other information -- that's the question, is there some other information that he has that he hasn't produced?  I can't assume they're talking on the phone.  I don't know they're communicating.  But what you're saying, whatever it is that he gave you, when you investigated, you couldn't reach these people so there's got to be some more information that he has that he hasn't given to you, because you can't reach them and he's reaching somebody, somehow.  And whatever, however he's reaching them, he hasn't given it to you.

MR. CAPONI:  Correct.

THE COURT:  Okay.

MR. CAPONI:  It should have been given to us.

THE COURT:  Okay.  I get that.  I get that.

MR. CAPONI:  Yes.  And look, Your Honor --

THE COURT:  Right.  But that -- but the issue of whether what he gave you -- initial what he gave you was correct or not, how am I supposed to know?  Even though -- I

mean, I get that you went out and vet, but the second part makes more sense to me.  The second part about you're talking to somebody and you didn't give me the info.  Where is it?  The first part, I gave you what I had and you did what you did with it, that doesn't necessarily mean they didn't give you what they had.  I don't know.

MR. CAPONI:  Correct, so --

THE COURT:  The second portion is he's talking to someone and he hasn't giving you that.  That I can understand and that goes more to failure to produce.  Failure to respond.  I get that you might not like what he gave you with the first half, because you got it and you believe it's bogus.  But that does not necessarily mean that they didn't comply by giving you what they had.

The second is a different issue because you're talking to somebody and not giving it to me, so that's not complying if you haven't given me the information.  That part, I get.  The first part, I can't necessarily just because it turns out that it was, you believe bogus, doesn't mean they didn't give you what they had.

MR. CAPONI:  Your Honor, theoretically, Mr. Rajan, you're right.  If he had said, I negotiate this term sheet three months ago.  The information I have, that's the last I spoke to them and maybe they moved out.  You're right.  There's always the possibility.

THE COURT: Right.

MR. CAPONI: But he testified yesterday that he's in present contact --

THE COURT: But that's a different issue.

MR. CAPONI: And presumably Debtors' counsel is in contact because the Debtors negotiating a $300 million term sheet.

THE COURT: I can't presume anything, just because Debtor could -- debtors often negotiate on their own and then bring it to counsel.

MR. CAPONI: It's a possibility.

THE COURT: So I can't do conjecture, counsel.

MR. CAPONI: Okay.

THE COURT: I don't -- it's not the Court's role to say what if, maybe this, maybe that. I can only go with what exists.

MR. CAPONI: Your Honor, if I could on that conjecture point.

THE COURT: Uh-huh.

MR. CAPONI: It is a debtor's obligation, when they file for bankruptcy, okay, to be a shepherd and a steward to the assets of the debtor, and that's the debtor's counsel's obligation. Mr. Alexander, for example, doesn't represent Mr. Rajan, he represents the estate.

THE COURT: Uh-huh.

MR. CAPONI:  The debtor, when you file for bankruptcy, subjects itself to transparency.  That's a hallmark of the bankruptcy process.

I understand the Court doesn't like conjecture, but the Court has to appreciate that I'm going to -- the Debtor has placed us all in a position of having nothing but conjecture because the Debtor has not been transparent at any level on here.  So yes, I don't normally like to work by conjecture, but I've got -- the information I'm given is false.  I'm not given the correct information, and then when we look to the Debtor, normally, I would say the Debtor's counsel, but what I get is the old Abbot and Costello, who's on first?  Like, well, I didn't do it.  Maybe he did it.  Maybe he did it, he did it.

THE COURT:  But --

MR. CAPONI:  And nothing comes out.  So a Debtor --

THE COURT:  Uh-huh.

MR. CAPONI:  Mr. Alexander, and I would expect the Debtors' counsel, would in response to this immediately rectify any problems.  Saying, oh, no.  I'll get you the right information.  Instead what they say is, you can't prove it.

Well, so I have to have -- I'm subject to conjecture because I've been deliberately blinded by the only people who have the information, who are under an obligation to this Court and to the Creditors to be transparent and they are clearly not.  So I apologize -- I agree, I don't like the conjecture,

but what else would this Court have me do?

THE COURT:  Well, counsel, I'm saying in the context of the motion for -- to compel this -- well and impose sanctions.  I mean, I'm sorry.  For to find the Debtor, that the Debtor is in contempt, I'm not quite sure how conject -- I get all your positions.  But I think all of that goes to the real issue, which is whether I grant the relief that we're having the hearing on.  To me, that's where all of this goes.

The other stuff about you didn't give it to me, I think you have something else, based on what you said, I believe there's some more information, that -- that is what I mean by conjecture.  The other information about either this term sheet is real or it's not, and you're going to put up your evidence to say -- and that goes to something different.  That's a whole -- and that's why I'm saying to me, it's two different things.

MR. CAPONI:  Understood, Your Honor.

THE COURT:  And so with respect to the motion that we're talking about now, which is sanctions -- impose sanctions and to find the Debtor in contempt, that's a whole different subject for me.  That's a whole different -- that does not mean that you don't get to put on evidence in the context of your hearing on your motion because ultimately -- and I get they're intertwined.  I'm not saying that they're not.  They're intertwined but I'm not quite sure -- I need to separate them

out at this point.

MR. CAPONI:  Your Honor, I fully appreciate that.  I do agree that the relief ultimately we're seeking is for the Court to take this into consideration in dealing with the other relief, but on the business parts, you got the point.  They're talking to someone.  They clearly didn't give me that information.

THE COURT:  Right.

MR. CAPONI:  The -- for the -- not a single email communication documenting anything, and Mr. Rajan was permitted by counsel to review his own computer.  I don't view that as compliant.

THE COURT:  Well, I don't know what people do in discovery.  I mean, I never -- I mean, I practiced not did litigation.  I never went and -- I mean, I told my clients what you need to give me.  I didn't go over there and look at their stuff.  You have to assume your client is giving you the information because it's your client who's producing the discovery.  Client's counsel is like this is what they gave me.  Now, counsel is running the -- the client is running the risk that they're going to be found to have not been truthful.

I'm not quite sure how you assess that against counsel because it's not -- while counsel can say, here's a direction.  This is what you need to do.  You know, usually I would say go look up, you know, do a search for these words.

Look what you can find.  I never personally went over there and supervised them unless I was doing the production and then I went over there myself and went through the documents.  And that often happened in bankruptcy when you didn't have anybody left at the debtor.  There was no staff, no anything and counsel would have to do it.

So to me, that's a little bit different than you tell your clients to do something, they give it to you, and if it turns out they didn't give you anything, I'm not quite sure how it's counsel's fault, but it's definitely going to be the client's problem.

MR. CAPONI:  Your Honor, I'm not -- I'm not saying it's counsel's fault.  Counsel has an obligation -- and I appreciate Your Honor hasn't been in practice for a while and any discovery --

THE COURT:  Well, I haven't practiced in 14 years so I don't know what the rules are and I don't know what people do now.  So I can tell you what I did.

MR. CAPONI:  We cite some caselaw in -- from within this circuit, you know, on this point.  I can tell you and I respectfully urge the Court to speak to maybe some trial court colleagues.  But in every jurisdiction I've litigated --

THE COURT:  Uh-huh.

MR. CAPONI:  -- you are not allowed -- and Delaware in particular.  It is an absolute rule.  You cannot allow a

client to self-select.  Lawyers have to take the email box and then we apply search terms and other things.

And so what I'm saying is the Debtor's counsel had an -- those emails belong to the Debtor, not to Mr. Rajan.

THE COURT:  Uh-huh.

MR. CAPONI:  Debtor's counsel had an obligation on behalf of the Debtor -- so it's not like a personal violation by Mr. Alexander, it's a violation on behalf of the Debtor, to have someone other than a single individual, Mr. Rajan, search his own computer and then tell counsel.  And we cite the case law from Young v. 7-Eleven, lawyers should not act like plotted plants and accept implausible representations from clients to no responsive documents or discovery exists.  We also cite the Red Wolf Trading v. Bia Cap Management finding counsel's failure to review and supplement production was a serious violation of the discovery orders, and its common practice in these days.

Debtors' counsel -- it is, I submit, implausible, again, we're in conjecture view because we've all been hamstrung.  It is implausible that someone negotiates a $300 million term sheet with a company in its third bankruptcy, two dismissed for bad faith, where there are secured creditors who are owed on paper hundreds of millions of dollars, and there are pending motions to convert the case or dismiss it, to think that someone invests $300 million in that situation as equity -

- as equity, and there is not a single communication, not a single email.

And counsel, respectfully, acted like a potted plant when he accepted that explanation from their client and did nothing to verify it, and that does not comply with this Court's order. I would also submit, Your Honor, to put a finer point on this, to get past conjecture.

THE COURT:  Uh-huh.

MR. CAPONI:  The single document that the Debtor produced of this term sheet was an email, as I mentioned, from the investment banker, allegedly, that contained a screen shot -- it's a -- we're going to show it when Mr. Rajan testifies, but it's a screen shot from a phone, it's not a document, that it's only the signature page of the term sheet.

So again, to reiterate that, Your Honor.

THE COURT:  Uh-huh.

MR. CAPONI:  Only document is an email with a screenshot.  But the Debtors produced in this case the actual signed term sheet.  Not a screen shot of the term sheet.  Where is the email forwarding to somebody at the Debtor the actual term sheet, the one that was filed with the Court.  Because the only one we produced, Your Honor -- when I say a screenshot, what I mean by it is it's like a picture of the term sheet, and it's actually a picture of the term sheet on the individual's phone.

So at the top of the image it has the little bars for how good your cell service is and it tells us what the battery is.  That's -- and it's a screen shot.  But they didn't produce that.  They didn't attach that and submit that to the Court. They submitted the actual document that looks like a complete, valid term sheet.  So how did that document make its way from China to the Debtor to this Court and there's no paper trial for it?  None, nothing.  Not even an envelope, allegedly, where it was mailed.

So I know there's other communications.  Mr. Alexander knows there are other communications because otherwise he would not have had the term sheet to submit to this Court.  So where are those communications?  Where is it -- there's at least one other email out there.  At least one other.  And that's demonstratively provable and we will do so.

THE COURT:  Okay.

MR. CAPONI:  So again, they didn't -- they violated the Court's order.

THE COURT:  Okay.

MR. CAPONI:  Where's the documents.  And so I think I've more than made my point.  Unless Your Honor has any questions, I will wait with bated breath for the explanations.

THE COURT:  Well, I would just -- never mind.

All right.  Mr. Alexander?  All right.  Basically counsel is saying Mr. Rajan didn't produce and you didn't

supervise him properly to make sure he complied with my order. What's your explanation?

MR. ALEXANDER:  Good afternoon, Your Honor.  Vincent Alexander on behalf of the Debtors.  I think it's important to start out in just by looking at the order and what was required of the Debtor to do in the first instance.

THE COURT:  Okay.

MR. ALEXANDER:  So if you look at the Court's order, which is at docket entry 322, it states that --

THE COURT:  Wait, I have -- wait a minute, I have to pull them up myself.  I don't have a screen.

Jon, I don't have a screen.  Could you pull them up on the screen.  I mean, this is sort of a hybrid.  Can you pull up the documents?

UNIDENTIFIED SPEAKER:  No.  Because it's not logged in.

THE COURT:  That's what I thought.  Hold on.  I've got to get on here.  Now watch, I'll -- I'm going to have to sign in 60 million times.  Who put in this many triple security things.

UNIDENTIFIED SPEAKER:  The only needs like two things.

THE COURT:  Yeah, but I have to sign in like five times.

Which documents, Mr. Alexander?

MR. ALEXANDER:  The order, Your Honor, is docket entry 322.

THE COURT:  Okay.  Everybody has that order in front of them.  Okay.  What do you want me to look at?

MR. ALEXANDER:  Section A, Your Honor.

THE COURT:  Okay, 2A?

MR. ALEXANDER:  That's correct, Your Honor, 2A.

THE COURT:  Okay.

MR. ALEXANDER:  So it required the Debtors to produce the contact information for the individuals at Zhonghseng with whom they negotiated the term sheet, and that such contact information shall include the individual or individual's name, address, phone number, and email address that the Debtor's possess.  That's what was required.

THE COURT:  Okay.

MR. ALEXANDER:  What the Debtors provided, which they thought would be an easy way to transmit the information, was they provided three business cards.  Two of the business cards were for Mr. Li, whose American name is Tai Li and Chinese name is Jai Li.  So same individual, and we advised them of that when we transmitted the information.  And the other individual is Wang Chow who goes by William Wang.

So what the Debtors provided were the names, the email address, and the phone number.  I didn't hear Mr. Caponi say that the email address was fake, that the phone number was

fake.  It seems to me he indicated he didn't get in touch with these people.  That doesn't change the fact that that's the information that the Debtors have and what the Debtors are communicating with in terms of these individuals.  So the Debtors fully complied with what was required.

THE COURT:  So that's 2A.

MR. ALEXANDER:  That's 2A, Your Honor.  And they indicated that, well, certain information on the business card was in Chinese.  And I said, well, we didn't have to provide you with the business card, but we were trying to provide you as much information as possible.  But the information that's in English was sufficient to satisfy the Court's order, which was the name, phone number, email address, okay.

THE COURT:  Okay.

MR. ALEXANDER:  The Debtors complied with what the court order required them to do.  It appears Mr. Caponi had some people do some type of investigation regarding physical locations.  We certainly would like to take the deposition of these people and see what documents they went through to come to this conclusion, because again, Mr. Caponi likes to think what he says is evidence, but it's not, right.  You have to put forth evidence.

And so that's just continued how this goes.  Just because Mr. Caponi says something doesn't make it true.  So we provided them with the information, the exact information that

the Debtors used to communicate.

THE COURT:  Okay.

MR. ALEXANDER:  So in terms of 2A, we believe the Debtors complied with what was required.  Nor do we think they made a legitimate argument as to how there was noncompliance.

And in terms of 2B, it indicated that -- it related to request number 19.  And so it says all documents and communications with Zhonghseng Group Holdings, Limited, or any affiliate thereof including but not limited to letters of intent, proposals, and diligence materials between the Debtors and Zhonghseng Group Holdings, Limited or any affiliate thereof.

Mr. Rajan has submitted, as they noted, a declaration with the Court advising how the relationship with these entities evolved over time.

So Hawk has been provided -- and they also took Mr. Rajan's deposition and Mr. Rajan testified to exactly how he initially met these individuals and that he has continued discussions with them.  And the continued discussions that they have, they've been via phone or via WeChat, okay.  And so --

THE COURT:  Via phone on the phone numbers listed on the cards?

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  Okay.  Okay.

MR. ALEXANDER:  So that is the information that the

Debtors have and that the Debtors utilize in their correspondence with Mr. Wang and Mr. Li.

THE COURT: Well, what about the -- how does -- how does the Mr. Wang and Mr. Li get the documents? How did the documents get from them to Mr. --

MR. ALEXANDER: Mr. Rajan?

THE COURT: Mr. Rajan.

MR. ALEXANDER: So what we provided them was a correspondence from Mr. Jeff Shamma (phonetic), who is not the debtor. Who is an investment banker. He provided, I believe it was, Mark Saverese (phonetic) with a copy of the executed term sheet on June 6th and subsequently that term sheet and that email was forwarded to Mr. Rajan. And so that --

THE COURT: So wait a minute. Let me see if I understand this correctly. You're saying that the term sheet -- who sent the term sheet? I mean, that's what I'm trying to figure -- I mean --

MR. ALEXANDER: It's my understanding it was sent by the individual, Mr. Jeff Shamma.

THE COURT: Okay. And then he sent it to Mr. Rajan by --

MR. ALEXANDER: He emailed it to an individual Mark Saverese, and this is in the correspondence that we provided to Hawk or brought it to their counsel. And then subsequently, it went from Mr. Saverese to Mr. Rajan.

THE COURT:  Is Mr. Saverese the person who sent the screenshot?  Is that what you're saying?

MR. ALEXANDER:  Well, I'm not quite sure what they're referring to as a screenshot.  I'll have to look at that a little more.  But it's my understanding initially Mr. Shamma may have received the executed agreement via WeChat.

THE COURT:  Okay.  Well, who drafted this thing?

MR. ALEXANDER:  Who drafted the agreement?

THE COURT:  Yeah.

MR. ALEXANDER:  Well, I believe the agreement, as indicated by Mr. Rajan's declaration, it goes back to original discussions that happened in 2022 with a different agreement.

THE COURT:  Where's that agreement?

MR. ALEXANDER:  That was produced.

THE COURT:  Okay.  Which you produced.

MR. ALEXANDER:  Right.

THE COURT:  Okay.  Now what.

MR. ALEXANDER:  I don't believe it was responded to, but in order to produce it to give them an idea of how it evolved, we provided it.

THE COURT:  Okay.

MR. ALEXANDER:  We give them -- to support Mr. Rajan's declaration of how it went from originally in 2022 to what the new agreement was in June 2023.  And so we --

THE COURT:  Okay.  So there's an agreement -- a

proposal or whatever it is in '22 between Mr. Rajan's company and who?  Who is that?

MR. ALEXANDER:  There were a couple of them in 2022. There was one with Zhonghseng Group, and I believe there may have been another one with Zhonghseng Enterprises.  I'll have to confirm the name on that one, but I believe that was the case, Your Honor.

THE COURT:  Okay.  And you gave that to their responses to the document request.

MR. ALEXANDER:  Well, not necessarily as responses, but I believe it was produced.

THE COURT:  Well, I said to produce all documents and communication with Zhonghseng Group Holdings or any affiliates regarding a letter, incident, proposal, and diligence that flowed between the Debtor and Zhonghseng.  So you produced it as what?  You gave it to --

MR. ALEXANDER:  Context of the relationship between Mister -- between Stream and Mr. Wang and Mr. Li so they could see how the relationship evolved over time.

THE COURT:  Okay.

MR. ALEXANDER:  Because we didn't want to tell them, well, there's no responsive documents.  Because what happened based on -- Mr. Rajan has testified to this is that in 2023, there was further discussion between Mr. Li and Mr. Wang, this individual Jeff Shamma, who is a broker, and Mr. Rajan had

discussions regarding --

THE COURT:  How?  Phone?  Written?  What?

MR. ALEXANDER:  There were phone discussions.  Are you talk -- you know, I just want to answer your question correctly.

THE COURT:  Right.

MR. ALEXANDER:  Are you talking about in 2022 or are you talking about in 2023?

THE COURT:  All you said is 2023 there were further discussions with --

MR. ALEXANDER:  Correct.  The --

THE COURT:  -- Zhonghseng.  Who else?

MR. ALEXANDER:  Mr. Tai Li, Mr. William Wang, and Jeff Shamma.

THE COURT:  With who?

MR. ALEXANDER:  The individual who's the broker -- or investment banker, I'm sorry, is Jeff Shamma.  I believe the last name is S-H-A-M-M-A or M-M-A-H, one of the two.

THE COURT:  Okay.  And these were by what?  Phone?  Email?  What?

MR. ALEXANDER:  I believe they were phone.

THE COURT:  Uh-huh.

MR. ALEXANDER:  And I believe Mr. Shamma also communicated with them -- when I say them, I'm referring to Mr. Li and Mr. Wang, via WeChat.

THE COURT:  Okay.  And how did he communicate with Mr. Rajan?

MR. ALEXANDER:  Are you talking about Mr. Shamma?

THE COURT:  Yes, Mr. Shamma.

MR. ALEXANDER:  Mr. Shamma would have communicated with Mr. Rajan, I believe, via email.

THE COURT:  Where are those emails?  Where are those emails at?  Emails between Rajan and this Mr. Shamma?

MR. ALEXANDER:  I'm not certain where those emails are at, Your Honor.

THE COURT:  Well, shouldn't you have at least asked him?

MR. ALEXANDER:  They're not responsive to the request.

THE COURT:  They don't have anything to do with the Zhonghseng Group.  You said that in 2023 they --

MR. ALEXANDER:  The request is communications with Zhonghseng Group.

THE COURT:  Or any affiliate thereof --

MR. ALEXANDER:  Correct.

THE COURT:  -- including but not limited to letters of intent, proposals, and diligence matters between the Debtors and Zhonghseng Group or any affiliate thereof.  So you took the position, then, that if it wasn't direct communications with Zhonghseng or any of its affiliates, then you didn't have to

produce anything in response to that number 19 request.  Is that the position you've taken?

MR. ALEXANDER:  Yes, because you have to respond to the request and there is no request for communications with other third parties.  Mr. Shamma's not an affiliate of Zhonghseng.  He's a third party.

THE COURT:  Well, let me ask you this, let me ask you this.  Out an abundance of caution, you gave them that information from 2022 because you were trying to give them some background on how the deal emerged.  Why didn't you give us the '23 even though you believe it's not responsive?  You think maybe that would have helped?

MR. ALEXANDER:  Your Honor, I don't -- I don't believe in 2023 --

THE COURT:  You just said there were further discussions in 2023 between Zhonghseng, Mr. Tai Li, William Wong, William Wyman (phonetic), and the Mr. Jeff Shamma -- S-H-A-M-M-A or A-H, and you believe that those further discussions were by phone between Mr. Shamma and these other people who are investing.  And then Mr. Shamma and Mr. Rajan, regarding either by phone or email.  What were they negotiating in 2023?

MR. ALEXANDER:  They were negotiating a new term sheet.

THE COURT:  And the --

MR. ALEXANDER:  And the only additional diligence

documents that I believe were provided were court materials which were in a data room.  And that's why -- I know counsel said he received a bunch of court filings, but that was the additional materials that -- and we provided them with an email in which I believe the data room link was sent, and then we provided them with information that was in the data room.

THE COURT:  So they were negotiating a new term sheet.  Is the new term sheet the term sheet that's been submitted to the Court?

MR. ALEXANDER:  Yes, Your Honor.

THE COURT:  Okay.  So Mr. Rajan's getting communications from Mr. Shamma regarding his negotiations with Mister -- Zhonghseng and all his Tai Li and William Wang regarding the term sheet that you -- that the Debtor had produced to the Court as being a $3 million investment, correct?

MR. ALEXANDER:  $300 million investment, but yes, Your Honor.

THE COURT:  All right.  So you take the position that because the discussions weren't directly with Zhonghseng or its affiliates, that that means that those communications and emails were nonresponsive?

MR. ALEXANDER:  Well, they are nonresponsive.

THE COURT:  No.  I asked you; you took the position they're nonresponsive and why you -- because --

MR. ALEXANDER:  That's the Debtor's position, Your Honor, is that those emails are nonresponsive because if you look at the request, it doesn't request.

THE COURT:  I guess I should have just said all documents and communications with anyone whatsoever, because that's really what the -- I don't appreciate that, Mr. Alexander.

The whole idea of why I expanded discovery was so that the opposing parties would be privy and would get the information on how this deal was negotiated.  And you and it was based on what my understanding was is that the negotiations were with the Zhonghseng Group.  At no time did you or anyone say anything about a Jeff Shamma and if you did, I don't remember.  So Mr. Shamma was acting like a brokerage from what I could gather with the Debtor on one side and the investors, the Zhonghseng Group or whoever it is that was allegedly investing over here, correct?  And you're taking the position because it wasn't directly with the investor but with a broker in between that then you didn't have to -- that this was not responsive to what I ordered you to do.  That's the position you've taken.

MR. ALEXANDER:  Your Honor, I'm not saying that those other documents exist.  I can tell you we also did reach out to Mr. Shamma and requested additional information regarding the discussions.

THE COURT:  Did he give you any?

MR. ALEXANDER:  He provided us with, you know, certain of the documents that were attach -- I'm sorry, certain of the communications via WeChat that were attached to Mr. Rajan's declaration when we were inquiring to who at Zhonghseng did he communicate with.

THE COURT:  Okay.  But he was -- what was his relationship with Zhonghseng?

MR. ALEXANDER:  It's my understanding he's an investment banker finder person.  He's trying to match two different companies, one that has money and one that needs money, and he gets a fee from whatever he ends up doing.

THE COURT:  And so you believe that that information from Mr. Shamma was not responsive to all communications and documents with Zhonghseng Group or any affiliate thereof regarding letters of intent, proposals, diligence material. You mean to tell me you didn't give Mr. Shamma any information that they relayed to Zhonghseng?  How did they --

MR. ALEXANDER:  Can you ask that question again, Your Honor?  I'm sorry.  We didn't give them information --

THE COURT:  Okay.  With any information -- if Mr. Shamma's role in this broker deal.

MR. ALEXANDER:  Transaction.

THE COURT:  You didn't give him any information that he then gave to Zhonghseng -- or however you say it,

Shawnshing.  How did he, Mr. Shamma, how did -- what information, if any, did the Debtor provide to him that he then provided to the Shawn -- to the Zhonghseng Group so that they could decide whether they would invest or not?

MR. ALEXANDER:  I don't believe that there's any information that the Debtor's provided to Mr. Shamma that wasn't produced.

THE COURT:  Okay.  And what documents were those?

MR. ALEXANDER:  I said the diligence materials that they did was they looked at the --

THE COURT:  And there's no emails from Mr. Rajan to Mr. Shamma?  How did he get the information from -- to Mr. Shamma?

MR. ALEXANDER:  It's my understanding that they had phone discussions regarding information.  And additionally, in 2022, they met in person at a hotel in Boston.

THE COURT:  Right.  But no -- so you're telling me no documents were exchanged at any time between the Debtors and the broker and that the broker would have shared -- so Zhonghseng decided to decide based on what?  Just discussions?

MR. ALEXANDER:  Discussions and the meetings that they had.

THE COURT:  Okay.  And a term sheet just showed up?

MR. ALEXANDER:  It's -- I believe it's Mr. Rajan's testimony that they had the phone discussions regarding the

terms of the term sheet.  And ultimately, when Zhonghseng executed the term sheet, they sent it to --

THE COURT:  Who prepared -- who prepared the term sheet for their execution?  It didn't just appear out of thin air.  Who prepared the term sheet?

MR. ALEXANDER:  Your Honor, I'd like to -- it evolved from the 2022 term sheet.

THE COURT:  I got on --

MR. ALEXANDER:  The 2022 term sheets were prepared I believe by Dan Rink who was in house counsel for Stream.  And we've provided the natives of those documents to Hawk.

THE COURT:  Okay.  So there was a term sheet from 2022 that Dan Rink sent to who?  Who'd he send them to?

MR. ALEXANDER:  As I said, Your Honor, they met in person regarding the term sheet.

THE COURT:  I get that, but it was reduced to writing.  How did it get to somebody to sign?  Who sent it?

MR. ALEXANDER:  I'll have to look into the 2022 term sheet, but it was my understanding it was executed in person when they --

THE COURT:  Oh, so it was executed in person.

MR. ALEXANDER:  And I'll have to go back and double check Mr. Rajan's testimony.

THE COURT:  Okay.  And then the '22 term sheet was changed or was it -- or I mean the '20 -- the new term sheet

that we're addressing today.  Is that the same from '22 or is it a different one?

MR. ALEXANDER:  It's substantially the same, Your Honor.

THE COURT:  Okay.  What do you mean substantially? So is it --

MR. ALEXANDER:  I would go through and have to do a line item.

THE COURT:  Did they resign them?

MR. ALEXANDER:  Yes, there's a new signed document.

THE COURT:  All right.  How did that new signed document get to Zhonghseng?

MR. ALEXANDER:  Jeff Shamma sent it to them.

THE COURT:  Jeff Shamma sent it to them.

MR. ALEXANDER:  That's correct.

THE COURT:  And how did Jeff Shamma get it?  Who sent it to him?

MR. ALEXANDER:  I believe it went to -- Your Honor, I can't -- I can't testify.  I can tell you what I believe and my understanding of it.

THE COURT:  I'm asking you.  I'm not going to hold you up.

MR. ALEXANDER:  My understanding is that Stream provided it to Jeff Shamma.

THE COURT:  Where is the email with Stream sending it

to Jeff Shamma?  Who sent it and when?

MR. ALEXANDER:  Your Honor, I don't have that information.

THE COURT:  Well, shouldn't Mr. Rajan have that information?  Because I told him I wanted all -- you guys, you know, you limited what I meant with affiliates.  I don't know.  Maybe you meant affiliates --

MR. ALEXANDER:  It was their document request, Your Honor.  We didn't --

THE COURT:  Who -- I -- counsel, I get that.  But I'm asking the questions now.  Who sent it to Mr. Shamma?

MR. ALEXANDER:  Your Honor, I don't know the answer to that.

THE COURT:  Okay.  All right.  And presumably, there's an email somewhere sending it to Mr. Shamma.

MR. ALEXANDER:  I'm not going to --

THE COURT:  Well, how -- unless he just --

MR. ALEXANDER:  I'm not going to presume that.  I don't know how, whether it was sent via text, whether it was hand delivered --

THE COURT:  I don't care --

MR. ALEXANDER:  -- whether it was emailed.  I don't know the -- I don't know the answer.

THE COURT:  Where's Mr. Shamma located at?

MR. ALEXANDER:  In -- on the East Coast, Your Honor.

THE COURT:  Okay.  And when was Mr. Shamma's existence disclosed?

MR. ALEXANDER:  I'm sorry, Your Honor.  Can you say that again?

THE COURT:  When was Mr. Shamma's existence disclosed to anyone?

MR. ALEXANDER:  I believe it was disclosed for the first time when we -- well -- well, I mean disclosed in this case or outside of the case.  Because I believe Hawk and SLS should have been aware of Mr. Shamma prior to this case.

THE COURT:  Okay.  So his existence was known to the parties prior.

MR. ALEXANDER:  That's my understanding.  But in this particular case, when there was actually a transmittal would have been when we produced the documents that showed the transmittal from Jeff Shamma to Mark Saverese regarding the executed term sheet.

THE COURT:  Okay.  And when was that?

MR. ALEXANDER:  Whenever the date was in Your Honor's order, August 9th.

THE COURT:  And so let me see if I understand this correctly.  You produced the information where the executed document was sent from Jeff Shamma to whom?

MR. ALEXANDER:  I believe it's Mark Saverese.

THE COURT:  Now what I don't understand is why'd you

produce that when Mr. Shamma is not Zhonghseng or an affiliate of Zhonghseng?

MR. ALEXANDER:  Because the Debtors wanted to demonstrate how they received the document.  Otherwise the response would have been no responsive documents.

THE COURT:  And you didn't think that it was -- you -- because that's really -- it is not -- if you're doing a technical reading the way you are, you don't even have to produce that.  So I'm not understanding if you produced that, why you didn't produce when the Debtor sent it to Mr. Shamma.  Or why Mr. Shamma's communications weren't included because, you know, it has to -- according to what I'm hearing from you and from what you're telling me Mr. Rajan is saying, he never negotiated directly with Zhonghseng.

MR. ALEXANDER:  That's incorrect, Your Honor.

THE COURT:  Directly?

MR. ALEXANDER:  On -- he says on the phone they had telephone discussions and he met in person in Boston.

THE COURT:  That was in '22, right?

MR. ALEXANDER:  It's the same -- it's a -- like I said, I don't believe the terms changed.  I do believe Mr. Rajan also -- if you give me a second, I can check with him but it's my understanding that they also had phone conversations regarding the 2023 term sheet.

THE COURT:  They who?

MR. ALEXANDER:  Mr. Rajan and Mr. Wang and Mr. Shamma.

THE COURT:  Okay.  All right.  And so I don't understand -- and so who was Mister -- if there was someone directly from Zhonghseng negotiating with the Debtor with Mr. Shamma in between?  Is that what you're telling me?  So there was all three of you for it?  It was Zhonghseng, Tai Li, William Wang, and Mr. Shamma that in '23, that they were all updating, renegotiating, whatever word you want to use with respect to the 2022 term sheet, right?

MR. ALEXANDER:  And Mr. -- it's my understanding, Mr. Wang did the majority of the communications as opposed to Mr. Li.

THE COURT:  And who's Mr. Wang and what's his relation -- is he a representative of Zhonghseng?  Who is he?

MR. ALEXANDER:  He is advised he's a representative of Zhonghseng.

THE COURT:  So where are the communications with Mr. Wang?

MR. ALEXANDER:  As I indicated, they were via -- any communications the Debtors had with Mr. Wang were via telephone.

THE COURT:  Okay.  And so none of these people together -- so there's no emails from Mr. Shamma or two Mr. Shamma with all these other people included.  Is that what

you're telling me?

MR. ALEXANDER:  I'm -- that's not what I'm telling you.

THE COURT:  Then what are you telling me?

MR. ALEXANDER:  And I don't believe that's what I told you.

THE COURT:  Then '23?

MR. ALEXANDER:  We have not searched Mr. Shamma's correspondence.

THE COURT:  I'm asking you to search -- no, no, no, no, no.  No, no, no.

MR. ALEXANDER:  Are you asking the Debtor or Mr. Shamma?  That's what I'm trying to understand.

THE COURT:  I'm asking whether there were any communications that the Debtor either sent, received, either by email, WeChat, or text or however, written --

MR. ALEXANDER:  Yeah.

THE COURT:  -- that included all of these people.

MR. ALEXANDER:  It's -- my understanding, the answer is no.

THE COURT:  Okay.  So you're saying that they separately, when Mr. Shamma sent information to the Debtor with respect to this deal, he did not copy the other people even though he's the broker.  He only just sent it directly to Mr. Rajan or somebody in the Debtor -- the Debtor's company?

MR. ALEXANDER:  Your Honor, that information was requested and the Debtor's advised that they do not have that information.

THE COURT:  That's not my question.  Are you telling me no such emails exist?

MR. ALEXANDER:  I've been advised there's no responsive documents.

THE COURT:  Okay.  All right.  What else?

MR. ALEXANDER:  Your Honor, I believe we've --

THE COURT:  You believe that you are responsive because there you produced the name, address, phone number, and email and with respect to the second, because it was limited to Zhonghseng Group or its affiliates, that you technically satisfied my order because you sent only the communications between Zhonghseng Group or any affiliate which were directly with the Debtor when in fact there were communications between third parties and the Debtor regarding this term sheet.

MR. ALEXANDER:  I don't know the -- I'm saying, I don't know the answer to --

THE COURT:  You just told -- no, no, no.

MR. ALEXANDER:  No, Your Honor.  That's not what I said.

THE COURT:  You just said that Mr. Shamma sent information regarding the term sheet in 2023 to either Mr. Rajan or some other party in Stream.

MR. ALEXANDER:  And we produced that one, Your Honor.

THE COURT:  What was that?  What email was that?

MR. ALEXANDER:  That was the email that had the executed term sheet.

THE COURT:  Okay.  So you're saying that was it. That was the only communications with Mr. Shamma regarding this -- regarding the term sheet, whether negotiated or not.  That this is -- that actually -- I'm trying to figure out how this possibly could have happened.

So somebody drafted the term sheet.  Who, we don't know.  And you said it was one from 2022 and it got revised. Who revised it?  I don't know and you haven't said who revised it.  Who sent it to the parties?  From what I gather, Mr. Shamma must have sent it to Zhonghseng who signed it and then he sent it to the Debtor.

MR. ALEXANDER:  That's correct.

THE COURT:  And the Debtor signed it and sent it to who?

MR. ALEXANDER:  Sent it to counsel.

THE COURT:  Did it not go back to John Xiang (phonetic)?  Who signed it when the Debtor signed the document -- or did the Debtor sign first -- which one?  The signed document.

MR. ALEXANDER:  I'd have to go back and check, but I believe that -- let me take a look at the -- the document, Your

Honor.

THE COURT: Okay, all right. So you believe that the Debtor's in compliance with A and B?

MR. ALEXANDER: We do, Your Honor.

THE COURT: Okay. All right.

MR. ALEXANDER: If you give me a second to take a look at the document. Can I just take a quick second, Your Honor, to find that one thing, and then I'll conclude with respect to this.

(Counsel confer)

MR. ALEXANDER: So I looked at the document, Your Honor, and what was transmitted. And it -- it wasn't just a signature page. There was the complete document that was attached. I believe it was attached to the email. But Zhongsheng, Mr. Lee executed on behalf of Zhongsheng Holdings LTD., and that is what was delivered via WeChat to Mr. Shamma. Mr. Shama then sent that to Mark Savarese, who was assisting, because at that point, on June 6th, Mr. Rajan was in the hospital, and so Mr. Savarese was helping facilitate getting everything finalized. And then Mr. Savarese forwarded the correspondence to Mr. Rajan and then Mr. Rajan executed the agreement while he was in the hospital.

THE COURT: And then how did he get back to where it is? Presumably, we have the uh information from Mr. Shamma to Mr. Savarese?

MR. ALEXANDER:  Well, I believe it would be a correspondence from -- I believe it was transmitted via WeChat. In terms of that --

THE COURT:  And so how did he sign it -- via WeChat? How did Mr. Rajan sign the document?  You said it was sent to Mr. Savarese, who was facilitating the agreement?

(Counsel confer)

MR. ALEXANDER:  Your Honor, Mr. Rajan executed electronically and then it would have been delivered back to Mr. Shamma, who would have corresponded with Zhongsheng regarding the fully executed agreement.

THE COURT:  So how did he sent it back Mr. Savarese?

MR. ALEXANDER:  I'm not sure if went back to Mr. Savarese or directly to Mr. Shamma.

THE COURT:  You just said it went to Savarese then to --

MR. ALEXANDER:  No, it went from -- it went from Mr. Shamma to Mr. Savarese, and then Mr. Savarese to Mr. Rajan.

THE COURT:  And how did Mr. Rajan send it back to Mr. Shamma?

MR. ALEXANDER:  It did go back to Mr. Savarese.

THE COURT:  Okay.  How did it go back?

MR. ALEXANDER:  Email.

THE COURT:  You got that email?

MR. ALEXANDER:  I'm sure we could get that -- well, I

can advise the Debtor to provide that email.

THE COURT:  Why didn't he provide it before?

MR. ALEXANDER:  It's not responsive to the request, Your Honor.

THE COURT:  Oh, okay.  So I guess --

MR. ALEXANDER:  I don't --

THE COURT:  -- I guess I lost my litigator spiel where I should have said to the Zhongsheng group, or any all persons related to his.  I don't use my litigator hat.  No, Mister -- I am annoyed.  I am extremely annoyed because all I see is -- this is litigation tactics.  This is not -- I was a litigator.  I know the games litigators play.  And I haven't done it for 14 years, okay? So when I would have drafted this and had I had my litigator hat on, I would have said, produced any information between the Zhongsheng Group, its affiliates, and any and all persons who were involved in the negotiations, drafting, transmittal, or anything to do with this term sheet.

So Mr. Caponi, she's right.  I didn't say that.  My words were not -- they were limited to a certain group.  Okay? What my intentions were that they were to include all of those things.  I didn't say that in my order now, did I, Mr. Caponi? Did I say that?

MR. ALEXANDER:  Your Honor, your order requires the Debtor --

THE COURT:  My order says what it says.

MR. ALEXANDER:  -- and these individuals are agents of the debtor, so they're included within the Debtor.

THE COURT:  Yes, but counsel, I said between the Debtor and Zhongsheng Group, and its affiliates.

MR. ALEXANDER:  Correct.

THE COURT:  I did not say the broker or any and all persons who were involved with that transaction.  Did I say that?

MR. ALEXANDER:  Respectfully, Your Honor, the Debtor is defined as the Debtor and all of its agents, which would include the Debtor's broker.  So when you say the Debtor --

THE COURT:  I get that, counsel.  And they said, we gave you the information for Mr. Shamma, the Debtor's agent. Because I did -- the Debtor's position is, we didn't deal directly with Zhongsheng.  We dealt with Mr. Shamma, who sort of was the go-between.  And that's why we don't have any emails with Zhongsheng or its affiliates because we dealt with Mr. Shamma.

MR. ALEXANDER:  And Mr. Shamma, Mr. Rajan testified, is the Debtor's investment banker --

THE COURT:  I get that, counsel.

MR. ALEXANDER:  -- which makes it the Debtor's -- when Mr. Shamma speaks the same way Mr. Alexander speaks, that is the Debtor speaking.  And so it is in the definitions in the discover request that Your Honor said, Respondent request

number 19.

THE COURT:  Well, I don't have -- all I have is number 19.  Wait a minute, whoa, whoa, whoa.  My order says specifically -- let me go back and look at my order.  Oh, wait a minute.  It is interesting.  I didn't even draft this order.  You guys drafted it and submitted it.  I thought I did it -- no, thank you.  I didn't draft the orders.  You guys drafted it and submitted.  Who drafted the orders?

MR. CAPONI:  Counsel for both parties.

MR. ALEXANDER:  They provided us with the context of 19.

THE COURT:  Okay.

MR. ALEXANDER:  It's a request from --

THE COURT:  All right.

MR. ALEXANDER:  -- that document.

THE COURT:  So I can't even say that I failed my litigator skills, not that I use them or even say I had any anymore.  So the parties drafted this order and submitted it to me, and it says what it says.

Now Mr. Caponi, you're taking -- let me put this down a minute -- to produce the Hawk and by no later the documents and communication as defined in the document request --

MR. CAPONI:  Yes.

THE COURT:  -- as requested by Hawk, all documents and communications with Zhongsheng Group or any affiliate

including, but not limited to, letters of intent, proposals and diligence materials between the Debtors and Zhongsheng Group or any affiliate thereof. And you're taking the position that the broker was the Debtor's agent, so the Debtor should have produced Mr. Shamma's communication --

MR. CAPONI: You and your, and Debtors defined in the document request means -- we reference the definition specifically for this reason -- means debtors and their agents, attorneys, representatives, predecessors, successors, subsidiaries -- we go on and on and on. And Mr. Rajan testified, Your Honor and -- I shouldn't say testified -- let me find this document here. Mr. Rajan said in his sixth declaration, this was the first time Mr. Shamma was disclosed. Mr. Rajan's declaration says virtually all communications between William Lee, Stream, and Stream's investment banker, Jeff Shamma. That was the first time it was disclosed. Mr. Rajan signed a declaration subject to perjury confirming that Mr. Shama is the Debtor's investment banker.

THE COURT: Okay.

MR. CAPONI: I've never heard of anyone with a straight face on litigation arguing that an attorney for a party or an investment banker from a party is not an agent of the party and therefore, their documents are not subject to discovery. And Your Honor, one other thing I'd like to just add -- this is a fascinating discussion. There's a pattern

here.  Every time you raise an issue, eventually it's this question, Your Honor, Mr. Alexander has answers, but we never hear from him until he's at the podium.  He never called me when we raised these issues and said, oh Mr. Caponi, here's the reason why we didn't produce anything because we have this technical definition.  We only hear about it at the podium.  Why?  It's inappropriate.

THE COURT:  It seems --

MR. ALEXANDER:  He never requested that from me in terms of Jeff Shamma, Your Honor, and dispute that Jeff Shamma is an agent with the authority to bind the Debtor.

MR. CAPONI:  Your Honor, here's Mr. Rajan's declaration.

THE COURT:  All right, whoa, whoa, whoa, whoa, whoa.

MR. ALEXANDER:  And I would, just for the record, Your Honor, if you don't mind --

THE COURT:  Uh-huh.

MR. ALEXANDER:  -- if I could just --

THE COURT:  Point to where on this --

MR. ALEXANDER:  -- give you the document number of this.

THE COURT:  Declaration is document number 326.

MR. CAPONI:  It's document number 326.

THE COURT:  326.

MR. CAPONI:  And it is footnote 2, paragraph 14.

Virtually all communications between Mr. Lee, Stream, and Stream's investment banker, with an apostrophe, Jeff Shamma at Blue Ocean Capital were conducted via WeChat at Zhongsheng's preferred method.  So --

THE COURT:  Okay.

MR. ALEXANDER:  I mean, I'll sit down until my rebuttal unless Your Honor has any other questions.

THE COURT:  No.

MR. ALEXANDER:  Thank you.

THE COURT:  So you take the position that Mr. Shamma was not covered by the definition of whose information the Debtor was required to produce in response to their request for production of documents?

MR. ALEXANDER:  That's correct, Your Honor.  The Debtors did not control Mr. Shamma.  Mr. Shamma doesn't have the authority to bind the Debtors.

THE COURT:  Well, that doesn't mean --

MR. ALEXANDER:  -- and the request requires in the possession, custody or control of the Debtors.  But he is not their agent with the authority to act on behalf of binding the Debtors.

THE COURT:  That's not -- well, is being your agent meaning that -- he was their investment broker.  So you're saying, simply because they're investment broker, they're not -- well, what were they acting as if they were their investment

broker?  Or whose -- what relationship did they have if they weren't working as their agent in connection?  And I'm using the word agent because they were representing the Debtor in this transaction.  Who were they representing?

MR. ALEXANDER:  I believe they're agnostic in the actual term.

THE COURT:  No, it says investment banker.

MR. ALEXANDER:  I understand.

THE COURT:  It says Stream's investment banker.  So were they Stream's investment banker or not?  Were they engaged by Stream to find investments?

MR. ALEXANDER:  They were engaged by Stream, but I do not believe that makes them an agent because my idea of an agent is someone that has the --

THE COURT:  Well, no --

MR. ALEXANDER:  -- authority --

THE COURT:  -- I --

MR. ALEXANDER:  -- to act on behalf and to bind.

THE COURT:  So an agent can -- but they were their representative then is what you're saying?

MR. ALEXANDER:  No, that's not what I said.

THE COURT:  Well, what were they then?

MR. ALEXANDER:  They --

THE COURT:  They were just some stranger to the transaction?

MR. ALEXANDER:  No.  They were a third party that was hired in order to --

THE COURT:  So they were a party engaged, hired by --

MR. ALEXANDER:  I agreed with you on that --

THE COURT:  All right.

MR. ALEXANDER: -- that they engaged with them.

THE COURT:  So they were engaged by the Debtor, okay.

What's your definition again, Mr. Caponi?

MR. CAPONI:  The definition of "you" means debtors and their agents, attorneys, representatives, predecessors, and successors in interest, parent subsidiaries, owner -- all other --

THE COURT:  What's represent --

MR. CAPONI:  -- all other persons acting or purporting to act on its behalf.

THE COURT:  So you're saying that when they went out and looked for investments, whose behalf they were acting on behalf of?

MR. ALEXANDER:  Your Honor, the Debtors do not control --

THE COURT:  I didn't ask -- the word "control" has nothing -- you can be a representative.  You are a representative of the Debtor.  You have control over them?  But you are a representative; are you not?

MR. ALEXANDER:  Your Honor, but in document requests,

you're required to produce documents that are under your

possession, custody, or control.

THE COURT:  Or --

MR. ALEXANDER:  The Debtors don't or --

THE COURT:  Or what?  So they're not in this -- so

you're a representative because again, I haven't done -- you

guys need to tell me this.  Is your representative deemed not

to be under your custody, control when you need documents?

MR. ALEXANDER:  Your Honor, I'm not agreeing that

they're a representative.  But what I can represent --

THE COURT:  Counsel?

MR. ALEXANDER:  -- but what I can represent to you --

THE COURT:  Oh.

MR. ALEXANDER:  -- is that we requested

communications from Mr. Shamma.

THE COURT:  All right.  Did you get them?

MR. ALEXANDER:  We did not.

THE COURT:  Okay.

MR. ALEXANDER:  Well, we got some communications from

Mr. Shamma --

THE COURT:  I --

MR. ALEXANDER:  -- but we didn't get any additional

communications.

THE COURT:  Okay.  So your position is that you did,

whether you believe he was a representative, agent or whatever,

you, in fact, went to him and asked for him for communications; did you not?

MR. ALEXANDER:  It was not in -- not in --

THE COURT:  What happened?

MR. ALEXANDER:  -- not in response to this.  It was in response to something different that was raised by Hawk.

THE COURT:  Well, counsel, they were clearly acting on behalf of Stream in connection with trying to find investors.  Now, I don't care what definition you want to use.  They were representing them and going out into the market and trying to find investors.  I'm going to have my law clerk look up what representative means.  So if that representative was -- if they were the representative, then you had an obligation, unless I'm -- it's been 14 years, so maybe I don't remember the rules.  But if I recall correctly, if somebody was acting on my behalf or my client's behalf in connection with some transaction, I had some obligation to go out and said, hey, what do you have with connection to this because you were representing me in connection with that transaction.

MR. ALEXANDER:  Your Honor, I just --

THE COURT:  And so you --

MR. ALEXANDER:  -- advised you that we reached out to Mr. Shamma and requested documents.  We don't control his documents.

THE COURT:  No, you just said --

MR. ALEXANDER:  The Debtors don't control --

THE COURT:  -- no, no, no, no, no.

MR. ALEXANDER:  -- Mr. Shamma.

THE COURT:  No.  What you just said was you asked him for the communication in connection with some other activity.

MR. ALEXANDER:  No, no, no, no, no.  That's not what I meant, Your Honor.

THE COURT:  Oh, okay.

MR. ALEXANDER:  Let me clarify.

THE COURT:  Well, you need to --

MR. ALEXANDER:  The other activity specifically relates to the June 6th, 2023 agreement.

THE COURT:  Okay.  And he only gave you what?  What specifically was your request to him?

MR. ALEXANDER:  Documents relating to the execution of the June --

THE COURT:  So only the execution, not --

MR. ALEXANDER:  No, no, no, let me --

THE COURT:  Not the --

MR. ALEXANDER:  -- Your Honor --

THE COURT:  -- other stuff?

MR. ALEXANDER:  Your Honor?

THE COURT:  Uh-huh.

MR. ALEXANDER:  We asked for documents relating to the relationship and how the June 6th, 2023 was executed.

THE COURT:  Did you ask him about how it was negotiated?

MR. ALEXANDER:  He advised it was -- the discussions occurred via WeChat.

THE COURT:  Okay.  Okay.

MR. ALEXANDER:  That's what he advised.  He said the discussions occurred via WeChat because that's the communication method -- what they do with everyone in China.

THE COURT:  And did you tell them that this is what we have and the communications between Mr. Shamma and the Debtor and Mr. Shamma Zhongsheng was all by WeChat -- was that your response?

MR. ALEXANDER:  Mr. Rajan's declaration states that.

THE COURT:  Okay.  But I asked you in your response because that declaration was just filed when you gave your response.

MR. ALEXANDER:  It was filed on the -- I'm sorry, let me check the date.  It was filed on August 8th, and your order was entered on --

THE COURT:  So this was filed before the --

MR. ALEXANDER:  Correct.  Correct.

THE COURT:  Okay.

MR. ALEXANDER:  Yes.

THE COURT:  And so did you tell them see the affidavit or see declaration in response to this as being

responsive?

MR. ALEXANDER:  No.  Again, we didn't we didn't believe it was responsive.

THE COURT:  Okay, all right.  Anything else?

MR. ALEXANDER:  Your Honor, I just wanted to touch on the -- I know it was kind of -- I don't want to say tacked on, but it was kind of tacked on at the end with respect to the investigation that supposedly been done in China.  We believe to the extent that that becomes before your Court and these individuals do want to testify, the Debtors believe that they're entitled to depose those individuals regarding the investigation and receive materials regarding their investigation.  And so we would request that to the extent they are allowed to testify via Zoom, which Mr. Caponi correctly stated, we don't object to testimony via Zoom, but we also requested the opportunity to depose them as a condition to the testimony.

THE COURT:  Okay.  And when do you propose this happen since the they're prepared -- Mr. Caponi is prepared to present them on Thursday?

MR. ALEXANDER:  We can depose them tomorrow, Your Honor, but the other --

THE COURT:  Well, that's not going to happen. They're in China -- you can't depose them.

MR. ALEXANDER:  Well, Your Honor, that's why I'm

saying this goes into the second issue is that we can't depose them based on our understanding, and this is what we filed in our response, is that if they're located in the Republic of China voluntarily or involuntarily, you're not allowed to take the deposition, and they can't sit for the deposition.

THE COURT:  Yeah, I know that.  We did our own research before ever got you guys' stuff.  I already knew the answer.

MR. ALEXANDER:  Okay.  So that's the other issue there.  So it seems like they're willing to travel somewhere to be available.  And so we would request that wherever they're going to travel where depositions are allowed or testimony, that we have the --

THE COURT:  And you guys believe it's allowed where?

MR. ALEXANDER:  I believe Hawk's counsel indicated that it may be available in Hong Kong.

UNIDENTIFIED SPEAKER:  Yes.

MR. ALEXANDER:  I believe that's what they indicated to us.

THE COURT:  And you believe that the Hague Convention and the rules with respect to testimony from -- from no emanating from China, the Hague convention says what it says. I didn't read it as draconian as what's in your memo where, you know, illegal, go to jail, or whatever.  You believe -- and I guess Mr. Caponi is going to have to tell me -- that he

believes that this doesn't apply to testimony in Hong Kong?

MR. ALEXANDER:  Your Honor, I don't know.  I think this --

THE COURT:  I'm asking Mr. Caponi for that --

MR. ALEXANDER:  Yeah, this morning I think they advised us potentially that's where they would go -- Hong Kong.

THE COURT:  Now, who are these people that they're willing to leave China and go -- never mind.

MR. ALEXANDER:  I believe they're employees of the K&L Gates law firm.

THE COURT:  Oh, the people who did the investigation?

MR. ALEXANDER:  Are -- based on what we've been advised is they work for K&L Gates.

THE COURT:  Oh, okay.  So it's K&L Gates investigators who are going to testify?

MR. ALEXANDER:  I believe they're attorneys --

THE COURT:  Oh.

MR. ALEXANDER:  -- if that's what you meant by that, Your Honor, I believe --

THE COURT:  The persons who did the investigation --

MR. ALEXANDER:  Right.

THE COURT:  -- are going to tell me what somebody told them?  Okay.  All right.  And so presumably, those attorneys can probably travel to the U.S. if they -- I don't know -- let me stop because they -- I don't know who they are.

They could -- I don't know.  They could be American citizens in China.  They could be -- I don't know.  And let me not make any assumptions.  But presumably, they will fly to Hong Kong.  Hong Kong is not subject to the same restrictions on mainland China with respect to testimony, depositions, or anything and that the Hague convention does not control.  I don't know.

All right.  But that really doesn't have anything to do with what we have spent almost two hours on right now, which is the motion to compel -- I mean the motion to find that the Debtor's in contempt and sanction the Debtor.  That's what I thought you were focusing on.

MR. ALEXANDER:  And I only addressed that at the end because it was raised, Your Honor, but that's all I have to --

THE COURT:  I get it.

MR. ALEXANDER:  -- say on that point.

THE COURT:  Okay.

MR. ALEXANDER:  Let me just look through my notes.  I don't think -- I want to say that we believe that we complied with the order that was entered by Your Honor.  We produced contact information for each of the individuals that the Debtors communicated with regarding the Zhongsheng term sheet.  We haven't heard any argument that the telephone numbers and email addresses are invalid.  And if they were, the Debtors could have looked into that, but that's the information that the Debtors use in order to communicate via WeChat.

THE COURT:  Uh-huh.

MR. ALEXANDER:  And we would request that Your Honor deny the motion.

THE COURT:  Okay.  And so you believe also that with respect to the communications regarding the negotiations, drafting, transmittal, or anything with respect to the term sheet that was signed, the most recent term sheet, that that information was transmitted by Mr. Shamma and that you have produced to Mr. Caponi's client, all of the information that Mr. Shamma has produced in connection with that transaction -- whatever you gave.

MR. ALEXANDER:  Whatever Mr. Shamma provided with regards to the transaction --

THE COURT:  That you gave to -- you mean the Debtor --

MR. ALEXANDER:  The Debtor --

THE COURT:  -- produced in response to request number 9.

MR. ALEXANDER:  That's my understanding, Your Honor.

THE COURT:  And which was in the order 2B.

MR. ALEXANDER:  Correct, 2B, because that is the way that thy complied with 2B.

THE COURT:  Okay.  All right.

Mr. Caponi, briefly.

MR. CAPONI:  Briefly, Your Honor.

THE COURT:  I'm not going to rule from the bench on this, okay?

MR. CAPONI:  Thanks, Your Honor.  Briefly.  One, no WeChats were produced in the document production.  So --

THE COURT:  Well, I don't know how -- aren't those, like, that you -- they not see?

MR. CAPONI:  Mr. Rajan attached some WeChats to his declaration, but none were produced in the document production.  So Mr. Vincent and Alexander testified they were done and allowed to WeChat.  The footnote I just pointed to Your Honor said a lot of it was done through WeChat.  No WeChats were produced -- check that box.

THE COURT:  Well, wait a minute, wait a minute.  It says the conversation between Mr. Shamma and these other three people with the WeChat because that was their preferred method of communication.  Let me look at this -- hold on.  I just want to make sure.  All communications between William, Mr. Lee, Stream, and Stream's investment banker, Jeff Shamma, were conducted via WeChat as Zhongsheng's preferred method of exchanging messages and documents.  So I understand Mr. Alexander to say that the communications were not -- that they were done by Mr. Shamma and that they were done via WeChat with Mr. Shamma and Zhongsheng and Mr. Shamma and the Debtor, and that they gave what Mr. Shamma gave them.  That's my understanding, okay?

MR. CAPONI:  I'm just saying whoever had these WeChat communications, we didn't get them.

THE COURT:  Okay.  But Mr. Alexander is saying, whatever WeChat between Zhongsheng and Mr. Shama, they didn't have -- they, meaning the Debtor, didn't have and Mr. Shamma didn't give them the information when it was requested.

MR. CAPONI:  And I think I've addressed that, Your Honor --

THE COURT:  Uh-huh.

MR. CAPONI:  -- thoroughly.  I think Your Honor's addressed that thoroughly.

THE COURT:  Uh-huh.

MR. CAPONI:  I would point to Mr. Park's testimony in this proceeding last time, page 55, line 21 to 24, discussing the term sheet.  I asked Mr. Park, "Were you involved with the negotiations regarding that?"  His answer, "I was not.  Why were you not involved with those negotiations?  That was strictly by Matthew Rajan."

THE COURT:  Okay.

MR. CAPONI:  Okay.  Mr. -- the investment banker, Mr. Shamma, was not disclosed until the first note, until the footnote that I pointed to Your Honor.  Mr. Alexander's notion that he was known to counsel, or my clients is completely untrue.  We learned about it in that footnote for the first time.  Mr. Savarese -- we only learned about him within the

last week never heard of him before.

THE COURT:  Okay.

MR. CAPONI:  He was another person apparently involved in these negotiations.  I would also, Your Honor, point out that -- if I go to this correctly -- Your Honor, the motion, the supplement that we filed --

THE COURT:  Uh-huh.

MR. CAPONI:  -- if Your Honor could look at page 17 of that supplement?

THE COURT:  Hold on, let me find it.  Okay,

MR. CAPONI:  That email -- or sorry, if you go to page -- let me make sure I'm there -- I think it's page 15 is where it starts.  You have the email from Mr. Savarese.

THE COURT:  Wait a minute.  Page 15?

MR. CAPONI:  Page 15.

THE COURT:  Wait, Hawk Investment supplement to hold the Debtor in contempt and impose sanctions.

MR. CAPONI:  Document number 328.

THE COURT:  I have 344, supplement to the emergency motion --

MR. CAPONI:  I'm sorry.  It's the original, Your Honor.  It's the motion that we filed, not the supplement.

THE COURT:  Right.  I don't have that in front of me.

MR. CAPONI:  322, is that --

THE COURT:  322?  Let me see if I have -- I don't

know if I have that -- hold on.  326 --

MR. CAPONI:  Document 328, Your Honor.

THE COURT:  328?

MR. CAPONI:  328.  328 it is near the top.

THE COURT:  Hold on.

MR. CAPONI:  Make sure I have the title correctly.
It is Hawk Investments Holdings --

THE COURT:  I got it.

MR. CAPONI:  -- Emergency Motion for Contempt.  So
it's the original motion.

THE COURT:  All right, excuse me, what page?

MR. CAPONI:  Of that document, Your Honor, it starts
on page 15.

THE COURT:  I must be in the wrong document.  You
said it was --

MR. CAPONI:  Excuse me, Your Honor?

THE COURT:  Hold on, hold on.  Hold on.  All right.
I am in document number -- document -- hold on.  You want me to
go into document 328?

MR. CAPONI:  Yes, Your Honor.

THE COURT:  Okay.  This is an emergency motion --

MR. CAPONI:  Yes.

THE COURT:  -- to hold the Debtors in contempt and
impose sanctions, okay.  It's 23 pages.

MR. CAPONI:  If we go to page 15, Your Honor?

THE COURT:  No, I must be missing something because the main document is 13 pages.  Do you want me to go to an exhibit?

MR. CAPONI:  It's the exhibit, Your Honor, yes.

THE COURT:  Oh, okay, all right.

MR. CAPONI:  It's Exhibit A.

THE COURT:  All right.  I'm there.

MR. CAPONI:  Okay.  And this is the email.  This was the only email produced related to the term sheet, and it's from Mr. Savarese.  And you can see he's forwarding an email to Mr. Rajan from below -- whoever Jeff Lorotion (phonetic) is.

THE COURT:  Well, it says Mr. Shamma worked with Jeff Lorotion Partners.  Isn't that in the footnote here?  Mr. -- he says Jeff Shamma at Blue Ocean Capital.

MR. CAPONI:  Okay.  And it says, enclosed, please find the term sheet.  And if Your Honor goes down to two more pages, you're going to see what is the screen shot.  Mr. Alexander says he doesn't know what I mean by a screenshot. And this is what I'm talking about, Your Honor.  You'll see at the very top it says Zhongsheng Group.

THE COURT:  Wait a minute.  And this is Jeff Shamma, he's a principal from Blue Ocean, so we know who he is --

MR. CAPONI:  Yes.

THE COURT:  -- and who Blue Ocean is, okay.  And then whatever on in from Zhongsheng, okay.  Okay, now what?

MR. CAPONI:  If you go down to the next page,  you'll see on page 17 --

THE COURT:  What's the page number on the exhibit? I'm at --

MR. CAPONI:  It's page 4 of 7.

THE COURT:  Four of seven, okay.

MR. CAPONI:  And you can see, Your Honor, this is the only document given to us about the term sheet.  And it has the -- on the left, at the top, it says, 1149 and then on the right, you have all the information you get on a cell phone, which is, you know --

THE COURT:  I'm looking at this.  I'm looking at -- okay, it says, zero, and then it has 1149 15 percent, blah, blah.  And it has Zhongsheng Group.

MR. CAPONI:  Right.  So Your Honor, this is a -- that information at the top --

THE COURT:  Uh-huh.

MR. CAPONI:  -- that we looked at, the 15 percent, that reflected it's a screenshot on somebody's cell phone.  So there was a -- whoever forwarded this email, took a screenshot of a phone and attached it to the email.

THE COURT:  Right, but what does Zhongsheng Group mean at the top?

MR. CAPONI:  I'm assuming that is the -- we don't know as we didn't -- they refused to give us the native

production of this.  I'm assuming it is a WeChat group, like a text group.

THE COURT:  Uh-huh.

MR. CAPONI:  But Your Honor, if you scroll down --

THE COURT:  Uh-huh.

MR. CAPONI:  -- well, so two things.  You see this is like an image -- it's not the actual document?  The document that was produced to the Court is not an image -- it's the actual document.

THE COURT:  Well, this doesn't have Mr. Rajan's signature on it.

MR. CAPONI:  That's where I was going to next, Your Honor.  So what we don't have is we don't have the signature or anything from Mr. Rajan communicating his signature back to anyone.

THE COURT:  That's what I asked.

MR. CAPONI:  I'm just saying, here we know it had to have happened, it has to exist, and it wasn't produced.

THE COURT:  Right.  So --

MR. CAPONI:  And that doesn't involve any agents or anything.  That is Mr. Rajan, on behalf of Stream, signing and committing the Debtor to a $300 million transaction --

THE COURT:  I asked --

MR. CAPONI:  -- and We don't have it.

THE COURT:  -- where was the transmittal once it was

signed.

MR. CAPONI:  We don't know.  But Your Honor asked me -- I'm getting out of supposition, conjecture, this proof, okay?

THE COURT:  Well, proof that it was sent, and we know what we have in the docket is a signed copy.

MR. CAPONI:  Correct.

THE COURT:  And we don't know how the signed copy got to somebody.

MR. CAPONI:  I don't think even Mr. Alexander has an argument for why that transmittal would not be covered by the court's order.

THE COURT:  Right, however it went.

MR. CAPONI:  However it went it'd be covered by the court's order.  So --

THE COURT:  WeChat, email, screenshot, whatever.

MR. CAPONI:  Correct.  Your Honor, I would note that Mr. Shammah -- nothing was ever filed with this Court to retain Mr. Shammah as a broker, an investment banker, or anything else.  I would further note that Mr. Park was the one who was put forward to be retained by the Debtor to act as the person to solicit investment to be testified extensively about that to the Court.  So the pattern of every time we get close, it's another person, it's another person, and there's never any connection.  And -

THE COURT:  Now, what's the date -- wait a minute. What's the date of this -- you asked me to look at the exhibit. Do we have a date when this was transmitted?

MR. CAPONI:  Well, the email --

THE COURT:  Is in June of '23.

MR. CAPONI:  -- is June 6th, 2023.

THE COURT:  Okay.

MR. CAPONI:  So Your Honor, I think we've established clearly that there are documents that were not produced for, you know, taking everything -- all explanations and definitions out of the equation.  But I'll end with this note.  The Court may have been able to better understand Mr. Alexander's explanations for how he decided what was relevant or responsive or not.  I will confess I did not follow it.  And here's the importance of it.  Again, Mr. Rajan self-selected documents. So he was told presumably what to look for, and I would submit if what he was told in any way reflects what we were told, I don't know how anybody would expect a non-lawyer, average litigant to have been given proper guidance, even if that's permissive, and it's not permissible.  But even if it was permissible.

THE COURT:  Wait a minute.  So what do you think should have happened -- that he should have just forwarded everything to counsel and counsel --

MR. CAPONI:  No, I can tell you exactly what I do,

Your Honor.  What I've done in every single case, what courts order me to do every single day.  I go to the client and say, who did you communicate with, how did you communicate, and then we apply a date range.  And we go in there, and we go into -- I have an outside vendor go in, and they go into the email box, and they take all the emails from that date range in every email account.  It then comes back into a software program, and you apply search terms.  And you say, well, who did you communicate with.  And you apply those names -- what was this called.  This is project, you know, black.  Okay, so then we apply that.  And then you come out, you search those for relevant -- counsel searches those for relevant documents and produce it.

Clients are never permitted to self-select.  They tell you -- it's like the old days, Your Honor, before electronics.  You'd go to a client's office, and you would say, where are the files related to this transaction.  And they would say, well, I keep them in this filing cabinet, and I have them in this filing cabinet.  And then the lawyer said, thank you, and the lawyers go into those filing cabinets and pull the documents out.  The lawyers never let the client go, oh, I'll tell you what you need to know.  What again do I need to look for?  Even if we could understand Mr. Alexander's explanation.

THE COURT:  Well, counsel, I don't know if I necessarily, you know, maybe I just wasn't as sophisticated.

But oftentimes, the Debtor -- oh, the Debtor -- would have the IT department go through everybody's email and search for the universe and say -- and then the IT department would search for it.  And so that wasn't necessarily -- it still was the client doing it, but their IT department.  I never went and said, well, I have to, you know, we gave you the parameters and what we need do to search for; or depending on, you know, whether the client could afford it, we just sent everything to the law firm and we pay our paralegals to go through and do that.

MR. CAPONI:  Your Honor, I use IT departments all the time to grab the universe.  Then comes -- search terms get applied, and then lawyers review for relevance.  Clients -- paper, electronic -- I've been part of the court so I can't tell you how long where that's been deemed permissible --

THE COURT:  Right.

MR. CAPONI:  -- to allow a client to self-select.

THE COURT:  But I guess you're using the word self-select.  I'm not quite sure because I'm not understanding why a debtor can't just to and grab everything, search, and then return it to attorney.

MR. CAPONI:  It --

THE COURT:  You're saying that's not what happen here?

MR. CAPONI:  Right.  What I'm saying is, Mr. Rajan did not -- Mr. Alexander or somebody from his firm did not go

to Mr. Rajan and say, give us -- export your email box from this date range.  Export to me a copy of your hard drive so that we can pull off what's -- and we can review for relevance. They allowed Mr. Rajan in the first instance to determine relevance.  So the reason Mr. Alexander can't answer your questions as to, well, did this document exist or that document exist, is because the only person who knows and the only person who looked on Mr. Rajan's laptop was Mr. Rajan.  So that's why they can't answer the questions.  See when I stand up in court, I can answer that question --

THE COURT:  Well --

MR. CAPONI:  -- because we have a methodical process that the courts require.

THE COURT:  Right, but your process is that you send it to an outside party.  What if somebody can't afford to send it to an outside party?

MR. CAPONI:  Your Honor, I don't always send it to an outside party.  I will work with the client's IT vendor.

THE COURT:  That's what I'm saying.

MR. CAPONI:  But what I don't do -- sorry.  For example, if Stream had an IT person, Mr. So and So, head of IT.

THE COURT:  Okay.

MR. CAPONI:  I would call that person and say, I need you to grab Matthew's email box from this date to this date, and I need you to send me that data.  Or occasionally, I'll

say, I need you to apply these search terms --

THE COURT:  Uh-huh.

MR. CAPONI:  -- that I'm giving you and then you export to me the results --

THE COURT:  Okay.

MR. CAPONI:  -- that I review and produce.  What happened here is Mr. Vincent said -- or somebody said to Mr. Rajan -- give us what you think we have to produce, or they gave him some explanation.

THE COURT:  Oh, we don't know what they said to him.  You're -- you don't know the detail.  He said, he went on his own computer, ran his own search terms, and produced what he thought was responsive to whatever guidance he was given.

THE COURT:  So he was given some guidance.  He just didn't pick what he was going to go look for, did he?

MR. CAPONI:  No.  Nobody oversaw what he did.

THE COURT:  Well, I don't know, but the problem is is that the interpretation of B was limited.  So in fact, he may have complied with the instructions he was given, but the interpretation of B by his counsel was, go look for any communications with Zhongsheng or its affiliate in connection with the term sheet.  And if that's the instructions, it wasn't about self-selection.  I'm just saying whether the instructions were correct because I'm hearing counsel say, well, we only thought we had to comply with this strict reading, which you

guys negotiated.  I'm not saying that was --

MR. CAPONI:  Your Honor, I would look at it differently.  I would say this.  I don't know where this train jumped the tracks --

THE COURT:  Okay.

MR. CAPONI:  -- okay?  But what we have established is that it did.  We've established today, with the help of Mr. Vincent Alexander, that there are communications that were not produced.  For example, at a minimum, the signature page where Mr. Rajan backed to the other party.  We know no negotiations were produced.  Whether that was the fault of Mr. Alexander's interpretation, whether it was the fault of Mr. Rajan for not doing a proper search, whether it was 50/50, 60/40, 90/10, is irrelevant to me.

THE COURT:  Well, it's relevant to me --

MR. CAPONI:  Well, I don't think it --

THE COURT:  -- because --

MR. CAPONI:  -- should, Your Honor.

THE COURT:  No, because if you read my -- counsel, in order for me to say that you're in contempt of my order, I have to first establish that you had my order, you understood my order -- I mean, if you look at the case law, that's what it says -- and you failed to comply with my order.  Those are the three things I have to do to get to contempt, okay?

Mr. Alexander has offered what he understood my

order, which you guys drafted, to mean.  So that's the first thing was I issued an order.  What was your understanding of my order?  And I have to concede that my order was -- the order you guys negotiated and gave to me was very narrow.  Now, I will look at, and I don't know if you've attached your definitions of what was in the original request.  I don't recall seeing those, but I'll let you give them to me.  And so then I have to say, okay, these are the instructions that you gave him.  This is what the paragraph 9 said to produce and did he comply with your request and my order.  That's how I get there.

I'm not saying that it may not be relevant for the other things, but there is a step that I have to follow.

MR. CAPONI:  Your Honor, I would expand your step to say yes, first -- and context matters.

THE COURT:  I get that.

MR. CAPONI:  We had a hearing that was prompted by a certain situation -- that's context.  Your Honor expressed verbally, before the order was drafted, specifically what the court wanted, the rationale behind it and why.  And respectfully in this situation, if the Court finds that Mr. Alexander's interpretation was reasonable --

THE COURT:  But counsel --

MR. CAPONI:  -- but I don't know if I'm ever going to get documents in litigation because --

THE COURT:  But counsel, you --

MR. CAPONI:  -- I can't do more than that.

THE COURT:  -- drafted that -- I didn't.  I said -- and I will go back and see what I said.

MR. CAPONI:  Yes.

THE COURT:  I did not say any and everybody.  I said produced the correspondence with Zhongsheng because I had no idea that there were these other parties involved.

MR. CAPONI:  Neither did we.

THE COURT:  So then how could either you or the court expect documentation that neither one of us was referring to?  That's why I'm saying this is a problem because we were focusing specifically on Zhongsheng.  We didn't reference anyone else.  Your order didn't do what you guys negotiated and submitted to the court didn't do that.  And so I could not have intended something that I didn't know exists.  And so that's why I have a problem -- not a problem.  I'm just, like, it's a problem.

MR. CAPONI:  Your Honor, I don't think it's a problem Our definitions clearly define you to cover agents.

THE COURT:  Now that's a whole different issue.

MR. CAPONI:  The exact reason you're talking about and if --

THE COURT:  All right.

MR. CAPONI:  -- look, I'll just end with this because

you have your arms firmly around the situation.  I'm not a bankruptcy court.  And if that's how a debtor can conduct itself with the transparency obligations that overlay this entire proceeding, I find it unfortunate, but I think when we get -- let's move onto the meat of this.

THE COURT:  Right, you said --

MR. CAPONI:  I think the Court knows how this debtor operates, and how it decides what it tells other people and tells the court.  And it's up to the court to define whether it's acceptable or not.

THE COURT:  Right.

MR. CAPONI:  I'll make my opinions to what I think, but beating the horse -- you know my position.

THE COURT:  And counsel, yes, debtors have obligations.  But you guys -- you guys submitted the order.  I was going to take responsibility.  I didn't draft it.  So I'm not quite sure when I say, you read my order, this is what I intended, you understood it, and you're like -- you can have -- reasonable minds can differ what they think the court meant.  At the hearing, there was no references to third parties, anybody, other than the Debtor and Zhongsheng.

MR. CAPONI:  Your Honor, respectfully --

THE COURT:  And --

MR. CAPONI:  -- I've never been in a situation where someone would say, it is reasonable.  I've never been in a

situation where someone would say a company -- forget debtor -- a company can hire an investment broker to negotiate a deal. And when they're ordered to turn over all communications with the counterparty that you have to bake in language.  And your broker and your valet and you --

THE COURT:  Counsel?

MR. CAPONI:  Everybody knows --

THE COURT:  Counsel?

MR. CAPONI:  -- that the broker, the lawyers --

THE COURT:  Counsel, you --

MR. CAPONI:  -- or agents of the party --

THE COURT:  Counsel --

MR. CAPONI:  -- with an obligation to produce.

THE COURT:  -- the issue becomes for me, your definition.  And the interpretation of that paragraph 9 has to remain in light of and in connection with your definition.  And so that's what I am telling you is that none of that, the definitions or any of those things were discussed when I said that the Debtor has to produce, and you guys gave me the order.

You guys knew the context, okay?  The order was an order that I said, do give -- produce everything in connection with Zhongsheng and the negotiation, okay?  But it did not write out the instruction.  It did not say the request for documents was in a vacuum.  So what I am hearing is Mr. Alexander saying, I read those definitions and this request to

mean X.  You're saying, I read those definitions and paragraph 9 to mean why.

MR. CAPONI:  I'm saying, in addition --

THE COURT:  And I am --

MR. CAPONI:  -- I was on the phone call.  I heard what the Court said, and I clearly understood the intent, and spirit, and purpose behind the Court's order, and that's what parties are obligated to comply with.  So yes, my understanding comports with what I think was Your Honor's understanding and any reasonable lawyer on that phone.  Maybe I'm wrong, but I would say this, Your Honor, to your point.

THE COURT:  Uh-huh.

MR. CAPONI:  Mr. Park testified the only person involved in negotiations was Mr. Rajan.  So how do we get to this -- understanding?  We got here because the Debtor's been hiding the ball.  Mr. Park testifies under oath, the only person involved is Mathu Rajan.  We then end up dealing with the Debtor.  Now it turns out the Debtor employed multiple professionals without ever seeking court approval.

THE COURT:  Which multiple other than Mr. Shammah?

MR. CAPONI:  Well, there's two individuals and Savarese.  I don't know what his role is.  But the Debtor has these individuals --

THE COURT:  Wait a minute.  What does it say in his email?  He sent it.  What does his email say?  Where is the

declaration?  Shouldn't it say on the email?  What email -- you were relying on -- is it --

MR. CAPONI:  Document 328, Exhibit A.

THE COURT:  Wait a minute.  Here, I have it, wait a minute.  Is it your document or there's or his separately?

MR. CAPONI:  Exhibit A to -- yeah, it's document 328, original motion.

THE COURT:  Oh, I have to go in here.

MR. CAPONI:  It's online.

THE COURT:  Okay, here it is.  It's from Mark Savarse724@aol.

MR. CAPONI:  Right.  So there's nothing in this to state --

THE COURT:  But you want me to say Mr. Park said the only party was involved was Mr. Rajan, correct?

MR. CAPONI:  I don't want you to say it -- he said --

THE COURT:  He said --

MR. CAPONI:  -- it here.

THE COURT:  -- that doesn't necessarily mean that he knew about Mister -- because he's not copied on these emails. How would he know who Mr. Rajan is talking to?

MR. CAPONI:  Well, to refresh Your Honor's recollection, Mr. Park was told about the term sheet by -- he testified it.  He was told by counsel of the term sheet, and he met with Mr. Rajan for 90 minutes before he testified, and he

went through a colloquy, Mr. Vincent Alexander, about the term sheet.  So I'm assuming -- and he was put up as the CFO of the company in place since April, so months before this took place.

THE COURT:  Okay.

MR. CAPONI:  I can only operate, Your Honor, and the court can only operate with what information is disclosed to -- so you're saying maybe my definitions should have been more expansive?

THE COURT:  I didn't --

MR. CAPONI:  I'm putting it in context to what I know.  I know the Debtor's CFO says the only person involved under oath in this courtroom was Mr. Rajan.  I take that at face value.

THE COURT:  But that's to his knowledge.

MR. CAPONI:  He's the CFO.  His counsel did not say that's not correct.  And then when we ask for the information, right, then how else would I know that the Debtor has a broker? Hmm. The Debtor would file a motion to employ a professional --

THE COURT:  Well, he did --

MR. CAPONI:  -- to put the entire --

THE COURT:  I did --

MR. CAPONI:  -- ever --

THE COURT:  Counsel?

MR. CAPONI:  We don't know that.

THE COURT:  Counsel, I have what I have.

MR. CAPONI:  Okay.

THE COURT:  I have what I have.  I have your definition, which I understand are document number 295, in page 26 of 40, to Exhibit --

MR. CAPONI:  Right, and I would -- oh, and by submitting, the Debtor can't keep everybody walking in the dark blind --

THE COURT:  Counsel --

MR. CAPONI:  -- and hold it against us.

THE COURT:  -- I get it, counsel.

MR. CAPONI:  Okay.

THE COURT:  I think -- I get it.  And I know what I wanted to happen, but the problem may become, and this is what you have to look at.  When someone is going to look at this, they're going to say to me, Court, what does your order say.  What does the definition say?  How did you get from A to B?  I have to be able to go from A to B.  And that's what I'm telling you.  I will look at the definitions.  Mr. Alexander says they mean this -- you say they mean that.  I'm going to figure out what I think they mean.  And if I think they mean that they should've included Mr. Shammah, Mr. Savarese, or whoever, and they weren't produced, then I'll rule the way I rule.

If I find that those definitions did not include them, then I can't say, well, you know, my order, unless I explicitly stat on the record -- that's the test.

MR. CAPONI:  Okay.

THE COURT:  The test is --

MR. CAPONI:  Fair enough, Your Honor.  Look, I don't dispute the test.  We're in your good hands.

THE COURT:  Right, okay.

MR. CAPONI:  I await your decision.

THE COURT:  All right.  I'm not ruling on this today, although we've spent most of our time.  But I'm not going until 12:00.  Let's just be clear on that.  That's not happening.  I may be able to go past, you know, like, past 5.  The question I have to figure out is, when there is the CSO and the guards, they have to get paid overtime.  I get in trouble if I keep them here.  And we're on Zoom who cares.  Not who cares -- my staff is here --

MR. CAPONI:  Right.

THE COURT:  -- but they do come on and you know, as long they don't scream at me, we're okay.  But when I'm in Court, I have other considerations -- the CSO, the budget -- other things that's not your concern.

MR. CAPONI:  Your Honor, if I could real quickly.  So I believe --

THE COURT:  Okay.  Are the parties complete in respect to this motion?  Is that what we're talking about?  I don't know what -- are you asking him if you're done with respect to this motion?

MR. CAPONI:  No, with respect to the schedule for -- the parties had talked about postponing the argument tomorrow on the motions --

THE COURT:  And then --

MR. CAPONI:  -- and picking up testimony.  I think we were just waiting -- Mr. Rajan was waiting from his doctor if he was available.  I only raise it because it may take them the time pressure off your Court to stay late.

THE COURT:  No, I will stay until 6.  I can stay until 6.

MR. CAPONI:  Okay.

THE COURT:  That's when the CSOs leave.

MR. CAPONI:  Okay.

THE COURT:  So that's what I'm saying.  I know I can stay until 6.  I just have to figure out how much trouble I'll be in if I go past 6:00.  And I'm afforded that every now and then.

MR. CAPONI:  Okay.

THE COURT:  I'm just not -- at some point, it's a habit.  So it was an unacceptable habit.

MR. CAPONI:  I don't know if Your Honor wants to take a quick break now?

THE COURT:  Yeah, let's take a break.  Come back at 3:00.  If we go to 6, that's three hours.

MR. CAPONI:  Thank you, Your Honor.

THE COURT:  Okay?  And then you guys can discuss whether in lieu of argument tomorrow, we will -- and that's scheduled for 12?

THE CLERK:  I think 11.

THE COURT:  Eleven?  That may be on a general -- wait, what's tomorrow, Wednesday?

MR. CAPONI:  Tomorrow's Wednesday.

THE COURT:  Wednesday -- I was thinking it's Thursday.  I don't know why.  Wait a minute, oh oh, that's not going to happen.

MR. CAPONI:  Okay.

THE COURT:  I have a continued hearing MVMK at noon. So you guys can't have that -- MVMK continued -- they're having -- are you in that case, Mister --

MR. CAPONI:  I'm involved, but not in the confirmation hearing, Your Honor, and I wasn't certain if it was tomorrow or next week.

THE COURT:  It's tomorrow at noon.

MR. ALEXANDER:  Friday at noon and then Wednesday at noon.

THE COURT:  Yeah, we did.  This is their motion to approve a sale they had on Friday.  I gave them an extra hearing on Friday to put up -- who the heck testified on Friday.  Mr. Khwaja (phonetic).  And then on Wednesday, is it their broker?  Somebody -- no, not the broker, the inspector.

Yeah, their inspector is testifying tomorrow at noon, so you guys won't have it anyway.

MR. CAPONI:  Okay, that's fine, Your Honor.  We'll make it work between now and --

THE COURT:  Now, I can't even give you -- I have a trial on Friday.  I have trials every day this week.  And so if you want some additional time, you're going to have to look at -- I don't even know what I have.  I have trials --

MR. CAPONI:  Your Honor, I will confer, but I am almost positive that my client is going to end this Thursday, so we get a decision, whether they have to gag -- sew my mouth shut, but we're not going past Thursday -- not us.

THE COURT:  Okay, okay, that's fine because you still -- that means you witness it --

MR. CAPONI:  If that means I can't put the people in Hong Kong on, I think there's enough in the record and will be by the time I'm done cross-examining Mr. Rajan, but I will confer.

THE COURT:  Okay.

MR. CAPONI:  We want this done.  We need an answer.

THE COURT:  Right.

MR. CAPONI:  Let's go forward.

THE COURT:  And I'm -- Mr. Callahan, I'm sorry -- you were you going to say something?

MR. CALLAHAN:  Just familiar -- Your Honor.

THE COURT:  What is before me and tell me what you think is before me because I want to make sure I'm on the same page with everybody.  What do you think -- in your motion you asked for relief from the stay --

MR. CAPONI:  Relief from -- so --

THE COURT:  -- to go back to Delaware and do a 225 litigation.

MR. CAPONI:  Dismissal.

THE COURT:  Conversion.

MR. CAPONI:  Conversion and appointment of trustee.

THE COURT:  And appointment of trustee.  Okay.  I just want to make sure that --

MR. CAPONI:  Sanctions, but that's a different motion.

THE COURT:  That's a different motion.  I'm doing that later.

MR. CALLAHAN:  Perhaps, Judge, after break, when we begin the trial, I would like to make a statement as well with respect to --

THE COURT:  What your position is?

MR. CALLAHAN:  Well, the Court -- we need to discuss.

THE COURT:  Right, that you believe that the U.S. Trustee takes a position?

MR. CALLAHAN:  We are presently neutral, and certainly the Debtor has the opportunity today, starting today,

to then state.  At the conclusion of that, we may take --

THE COURT:  Okay.

MR. CALLAHAN:  I think it's fair to say that we need some organization going forward as to what --

THE COURT:  Well, I know what's before me.  They're making a record with respect to those alternative requests.

MR. CALLAHAN:  Yes, Your Honor.

THE COURT:  So I know what I'm considering.  And they put their case on.  We now have Mr. Rajan, and I don't know if they have rebuttal witnesses, but at the end of that close of the evidence on that motion, I will either grant relief from the stay, dismiss, convert, or appoint a Chapter 11 trustee.  I could do a -- I can't dismiss or convert those.  Those two are mutually exclusive.  But what's not mutually -- well, if I dismiss, you know, the relief from stay, if I convert to you may -- from the stay because there's a conversion, but II don't know.  Sometimes when I convert, I like to have the Chapter 7 trustee come in and weigh in sometimes.  Or I could appoint a trustee and they still go to state court and you guys fight it. I don't know.  Those are the things I'm considering.

MR. CAPONI:  They'll also deny everything, Your Honor.  I just want to remind you.

THE COURT:  Of course.  Well, of course -- well, of course.

MR. CAPONI:  That wasn't part of the request, but

okay.

THE COURT:  Right.

MR. CALLAHAN:  That's what I was hoping to hear, Mr. Alexander's at least opening or at least statement with respect to how the Debtor intends to reorganize from this Chapter 11. But since the Court is aware of the --

THE COURT:  Well, I've already said to them, and they're aware of like, at the hearing either June 29th or the 2nd, I don't remember which one, I said, what is the Debtor doing -- I'm concerned.

MR. CALLAHAN:  Right.

THE COURT:  And so I thought it was at the end of June -- actually, I thought it was at the end of the August 2nd on the motion to compel.

MR. CAPONI:  You said the date -- end of the June hearing, correct.

THE COURT:  But I went back and looked at my notes, and it was the June hearing because I was trying to figure out, well, when were you on notice that I was concerned for my own purposes for timing issues.

MR. CALLAHAN:  Yes, Your Honor.  And the parties have filed lots of paper in this case.  The case was filed --

THE COURT:  I know when it was filed.

MR. CALLAHAN:  -- five months ago.

THE COURT:  Uh-huh.

MR. CALLAHAN:  And --

THE COURT:  And I know what you're going to say at the end of the call.  I know the U.S. Trustee's position.

MR. CAPONI:  The 20th.  There was an emergency motion for relief from the stay.  And I'm going to just use Hawk, but SeeCubic was also --

MR. CAPONI:  And you're seeing one participation, albeit limited by an alleged creditor, Rembrandt.

THE COURT:  Rembrandt.  Who's not here today by the way?

UNIDENTIFIED SPEAKER:  Is not.

THE COURT:  But you just didn't put your appearance?

MR. CAPONI:  Oh, I apologize, Your Honor.

THE COURT:  All right, all right, all right.

MR. CAPONI:  I'll just say again, the preparation for today's hearing, Your Honor, there was insufficient interest to form an official committee of unsecured creditors.

THE COURT:  Well, there probably aren't that many, are there?

MR. CAPONI:  Oh, there's a significant amount owed, Your Honor.

THE COURT:  Oh, okay.

MR. CAPONI:  The Court should be made aware of the --

THE COURT:  Yeah.  I mean, I don't go look at the -- I don't look at the -- I don't look at anything unless it's

brought to  my attention.

MR. CAPONI:  Well, and I think it's fair that -- and of course, Your Honor, you are the neutral party.

THE COURT:  Right.

MR. CAPONI:  You're here to preserve the integrity of the system.  I want to make sure the parties obey the statutes and the rules accordingly.  And we've taken positions in some respect, but in others, we have not.  I know that we had a discovery dispute today that lasted over two hours and hasn't been concluded.

THE COURT:  Well, it's concluded because we've got to take a break so that they can come back and give me evidence.

MR. CAPONI:  There have been motions for sanctions filed for each of the sides.  The Court said yesterday, just yesterday, the Court has made comments -- okay, so I've been in every hearing.  The Court said something -- there may be bad things on both sides.

THE COURT:  Right.

MR. CAPONI:  And we've heard that clearly, Your Honor, so --

THE COURT:  Right.

MR. CAPONI:  -- with respect to this multi-relief that's sought by Hawk, I think it's just fair to at least to outline what happens if the Court does grant relief in those circumstances.  And the --

THE COURT:  Okay.

MR. CAPONI:  -- just now, and had said previously, sort of looking at the different forms of relief, a trustee might come in and sort things out for the neutral party.  The trustee, whether it's a Chapter 11 or a Chapter   7 --

THE COURT:  Uh-huh.

MR. CAPONI:  -- has a statutory --

THE COURT:  Uh-huh.

MR. CAPONI:  -- investigating the financial affairs of the Debtor, which also includes challenging claims filed by creditors.

THE COURT:  Uh-huh.

MR. CAPONI:  So it's a two-way street.

THE COURT:  Yes.

MR. CAPONI:  And what I'm suggesting to the Court today, is that given the gridlock --

THE COURT:  Uh-huh.

MR. CAPONI:  -- the gridlock, that's apparently, it's animosity --

THE COURT:  Clear animosity.

MR. CAPONI:  -- clear animosity, a trustee in this case, is very likely will be facing -- would be just another adversary because whatever side he or she is going to take will be opposed by one of the firms.

THE COURT:  Of course.

MR. CAPONI:  So this Court -- and of course, the Court said yesterday and has hinted before, I think the quote was, I don't want this in my courtroom.

THE COURT:  Well, no, no, no.  I don't want them bickering.  I don't want the animosity.  Keep that in the hall.

MR. CAPONI:  Yes, Your Honor.

THE COURT:  That's what I was talking about.

MR. CAPONI:  But that -- substantial factor in this --

THE COURT:  Right.

MR. CAPONI:  -- Chapter 11 success.  Third Circuit has talked about it.

THE COURT:  Uh-huh.

MR. CAPONI:  But the Court has authority to stop the bickering.  The relief would be different.  But certainly, the Third Circuit has addressed that.  And so long as this continues among the parties, whether they're right or wrong, it's not going to end with --

THE COURT:  Well --

MR. CAPONI:  -- a stay necessarily.

THE COURT:  -- right.  But the ultimate goal for this case is recovery for unsecured creditors, and so that's my focus.  These people can fight it out and do whatever the heck they want with respect to their -- and they have more than competent counsels who represent their interests.  There aren't

on -- there is no committee.

MR. CAPONI:  Yes.

THE COURT:  And so that is your office's job to sort of say, okay, what about the creditors.  And that's one of the things that I have to look at is, you know, kind of figure out, you know, these two people can fight it out.  They can fight it out here, they can fight it out in Chancery Court if I sent them there.  But even if I -- well, there's all sorts of options.  And I don't know which one I'm leaning towards, but as I said, while they can sit here and bicker and have all this animosity, what they need to understand is that I am still, notwithstanding that I know one of them appears to be trying to -- in the best interest of creditors.

That's going to be a factor.  And they can fight it out, they can do whatever they want.  They can file and run up their bills or do whatever.  I'm still going to consider that as a factor, and they need to kind of tone it down a bit.

MR. CAPONI:  And I appreciate that because --

MR. ALEXANDER:  It is --

THE COURT:  Mr. Alexander, don't talk when I'm talking, please.

Go ahead, Mister --

MR. CAPONI:  That was the first time I talked about the unsecured creditors.  And I think the focal point of the Court is certainly the interest of unsecured creditors.  And

they are not participating in this case today.

Now, at the outset of this case, Hawk argued that there had been a legal issue for the court not to consider.

THE COURT:  I still have to consider.

MR. CAPONI:  Well --

THE COURT:  That's only with respect to -- not really respect to Stream because nobody's contesting that Stream had the authority to file.  It's the other Debtor that I would have to decide -- Technovative.

MR. CAPONI:  That's accurate, Your Honor, but if the Court were to abstain to and have the state court address that, the Court also has the authority to suspend the proceedings --

THE COURT:  No.  Well, nobody said any of that.  I mean, I have what's before me.  I have the relief requested by the parties.  I'll either grant the motion, deny the motion, or grant some portion.

MR. CAPONI:  Well, I think the Court does have the authority to have that addressed in the state court.

THE COURT:  Oh, I know.  I'm sure --

MR. CAPONI:  The other matter before this Court.  And that's been raised, I think, by the creditors.

THE COURT:  Yeah, but the problem with that is that then you have two debtors in limbo, and nobody's told me what's happening on our -- since the last big crisis with funding.  I was told the other company in the Netherlands is functioning

because at the end of the day, if that -- from my understanding -- if that company tanks, there is nothing for anyone.  And so I'm not quite sure whether suspension would make sense because somebody's got to be doing something with that company.  I thought somebody had taken control over that and that might have made, okay, well, somebody's in control and the assets being maintained.  But if it's not, I don't know what to do with it.  I have to figure out what I want to do.  I'm not going to say I don't.  I have to figure out.

MR. CAPONI:  Judge, one of the exhibits proposed to be used in today's hearing on behalf of the Debtor is the Debtor's plan of -- and given the argument today about a document that frankly is the linchpin of this reorganization, or at least some idea that there's money coming from somewhere, and that if it's successful, there will be orders coming from somewhere.

THE COURT:  And there's money for creditors.

MR. CAPONI:  Today is much like the confirmation hearing, and you're going to have to find things like good faith on behalf of the Debtor.  You're going to have to find some kind of ability to reorganize.  Essentially what they're going to ask for today is time to get that done.  We are a gridlock today.

THE COURT:  Right.

MR. CAPONI:  You talk about suspension, maybe that's

suspension in another -- or maybe just a synonym for what's going on here because there hasn't been progress on both sides.

THE COURT:  I know.

MR. CAPONI:  And it's because the -- is beyond everybody's control -- I get that.

THE COURT:  We get what we get.  It came in with what they came in with.

MR. CAPONI:  But we have -- so over the next two or three or two weeks -- I don't know how long the Court's willing to allow the Debtor to complete its case in chief, but certainly --

THE COURT:  Well, I thought we were ending on Thursday for everything.

MR. CAPONI:  Well, somebody just said Friday.

MR. CAPONI:  No.

THE COURT:  No, no, no.  I have another trial on Friday, huh-uh.  Nope.  And I have a trial tomorrow.

MR. CAPONI:  Well -- certainly.

THE COURT:  This is trial week.

MR. CAPONI:  I think it's just fair to keep that in mind, Judge --

THE COURT:  Uh-huh.

MR. CAPONI:  -- and it's certainly in my mind, the outline of what Hawk is asking for because what the Debtor is asking for.

THE COURT:  Well, counsel, I've always said, from the very beginning, sending you guys all back over there to state court, and I just let you stay here until you figure that out. I think I said that from the very beginning that that was an option.  I guess you're calling it abstain.  I'm not calling it.  I'm just saying.  I'm not calling and I'm just saying, you know, we do what we do here, and I need somebody to go figure something out over there.  And then, you come back and then I figure out what I'm going to do when you come back.

I said that.  So you're calling it an abstention. I'm not sure if I called it that.

MR. CAPONI:  Well, I -- you don't have to call -- you --

THE COURT:  I wouldn't call it an Abstention.

MR. CAPONI:  Well --

THE COURT:  That might just be a relief because that's part of what they're asking for, is relief to go back over there.

MR. CAPONI:  Actually, yeah, I think --

THE COURT:  Yeah.  So I didn't see that as being an extension.  I thought it --

MR. CAPONI:  Nevertheless, Your Honor, we're waiting to see what the debtor proposes, and we may take a position.

THE COURT:  Okay.

MR. CAPONI:  Thank you.

THE COURT: All right. So with that being said, we still need a break. We still need a short break. 3:00 -- 4:00 -- Mr. Alexander, you were going to say something?

MR. ALEXANDER: I was not going to say anything. I thought Your Honor was going to say --

THE COURT: Like, how much time.

MR. ALEXANDER: -- a time and then, you were going to walk out, and I was disrespecting the Court --

THE COURT: All right. All right. Let's come back at 3:30.

UNIDENTIFIED SPEAKER: Thank you, Your Honor.

THE COURT: All right.

UNIDENTIFIED SPEAKER: Good to go.

THE COURT: Court is in recess until 3:30. And I promise I won't send my law clerk out so you can stand. All right.

(Recess taken)

THE COURT: Okay. I guess we're going to continue with the hearing. The evidence with respect to the motions, unless you guys are getting ready to propose something different?

MR. ALEXANDER: No, Judge. I just think we're continuing the hearing, Your Honor.

THE COURT: All right. That's what I said. We're going to go ahead with --

MR. ALEXANDER:  Yeah.

THE COURT:  -- the continued hearing.

MR. ALEXANDER:  That's my thoughts.

THE COURT:  We're done with the motion to -- for contempt and extension.  I'll take that under advisement.  And we'll move on with the evidentiary portion of the continued hearing on the motion.

Anything, Mr. Callahan?

MR. CALLAHAN:  Yes, Your Honor.  Thank you.  Kevin Callahan again, on behalf of the U.S. Trustee.  I just wanted to add a couple points with the Court's comments.

First, the Court, I -- they said Section 305 from the bankruptcy code authorized in this extension and suspension of the proceedings, if the Court believes that to be appropriate and that would be the statutory authority.

Second is again, with respect to the relief sought by Hawk IHL.  They have sought appointments of Trustee both under section 1104 and 1112.  Your Honor has received evidence in prior hearings with respect to the operating reports filed by the debtors.  I think the Court, when they see that, and I can report to the Court based on documents the operating reports filed with the Court and the U.S. Trustee, but this debtor has no money.

There is no income for these debtors.  And of course, if the Trustee were to be appointed, typically that's to

administer assets.  And presently, there are no assets, at least tangible, liquid assets that the Trustee could use to at least engage counsel, start off -- decide whether to operate if there was an operation.  We would otherwise look for assets to liquidate.  So presently, there are no liquid assets.

THE COURT:  Uh-huh.

MR. CALLAHAN:  Third, of course, Your Honor raised the issue with the entity in the Netherlands.  And again, we had hearings on this with respect to the debtor's request to obtain financing to fund those operations.  And again, just a reminder to the Court and parties, at least from what we've heard, Your Honor, they are not debtors, and this court has no authority, has the Court previously ruled, has no authority on those operations.

And notwithstanding the concern one raises for any company that may be struggling without funds.  And that would not be within the Court's purview and certainly not within the Trustee as long as it pointed purview or responsibility to administer.  So if the Court were to consider conversion -- I'm sorry, the appointment of Trustee, that Trustee would not be accountable and --

THE COURT:  Yeah.

MR. CALLAHAN:  -- certainly not authorized.

THE COURT:  Well, yeah, I understand that.  I think my only point was that the more the part was in the context of,

if I abstained, there still is an issue with respect to this other entity, that if that entity does not survive, all of this is for not.  So that was the context of why I was referencing SeeCubic B.V.M or B.M.V.  B.M.V, because I already said in prior hearings with respect to financing.  They come in and do whatever they want.  It's not a debtor in bankruptcy.

So I would not expect in any whether this -- whether -- to the extent a Trustee was appointed 11 or 7, that that wouldn't in any way involve responsibility for that company.  The debtor doesn't have responsibility.  Neither debtor has responsibility in the terms of the in -- as part of the bankruptcy.  Now, they may have some other responsibilities that are related to their relationship with that company, but they're necessarily part and part of this bankruptcy.

MR. CALLAHAN:  Saying that, Your Honor, thank you and we await the --

THE COURT:  Right.  I'm not quite sure that -- I'm going to hear the evidence.  I'm not sure, you know, I will endeavor to move from the bench on Thursday, but I'm not promising that I will, okay?  All right.

MR. CALLAHAN:  Thank you.

THE COURT:  Thank you, Mr. Callahan.

All right, Mister -- yes, Mr. Alexander, are you ready to proceed?

MR. ALEXANDER:  The debtor is ready to proceed, Your

Honor.

THE COURT:  Okay.  All right.

MR. ALEXANDER:  Your Honor, the Debtor's called Mr. Mathu Rajan.

THE COURT:  Okay.

THE CLERK:  Raise your right hand.

MATHU RAJAN, PETITIONER'S WITNESS, SWORN

THE CLERK:  Thank you.  Make sure you speak into the mic.

THE WITNESS:  Thank you.

THE CLERK:  And could you please state and spell your name for the record?

THE WITNESS:  My name is Mathu Rajan.  It's M-A-T-H-U is the first name.  Last name is Rajan, R-A-J-A-N.

THE CLERK:  And could you state your address for the record?

THE WITNESS:  1105 William Penn Drive, Bensalem, PA 19020.

THE CLERK:  Thank you.

DIRECT EXAMINATION

BY MR. ALEXANDER:

Q   Good afternoon, Mr. Rajan.  Can you please state your name?

A   It's Mathu Rajan.

Q   Mr. Rajan, are you familiar with Stream TV Networks, Inc?

A     Yes, I am.

Q     How are you familiar with Stream?

A     That's a company that I founded a number of years ago.

Q     Do you recall when Stream was --

A     Yeah, it was --

Q     -- incorporated?

A     It was incorporated in 2009.

Q     Where is Stream's principal place of business?

A     Philadelphia, Pennsylvania.

Q     You testified that Stream was incorporated in 2009, why was Stream created?

A     Stream was created, it was a technology company.  We're looking at a different range of projects.  Some of them were in the media and entertainment space and we made the decision in 2011 to go heavily into the glasses free 3D category.  So that -- that was the main purpose behind Stream TV.

Q     Who came up with the idea to develop the technology you referred to as glasses free 3D?

A     I came up with the idea of let's go into glasses free 3D. At that time, virtual reality and 3D with glasses were -- there was a number of people working on it.  And, you know, in discussions with some of our engineers who made the decision that, you know, it would be much better to do this without having to wear the glasses or the goggles.

Q     Are you familiar with Technovative Media, Inc?

A     Yes, I am.

Q     How are you familiar with Technovative?

A     That's a subsidiary of Stream TV, 100 percent subsidiary.

Q     When was Technovative created?

A     It was 2011, mainly for tax purposes.

Q     You referenced it was created mainly for tax purposes; can you explain that?

A     Back then when we had started these companies, there was issues with double taxation in the United States for foreign sales, foreign operations.  And so, in consultation with some of the people we were working with, a corporate structure was created to make it more tax efficient, and that's how Technovative and the subsidiaries were created.

Q     What is the connection, if any, between Stream and Technovative?

A     Well, Stream is the -- the parent company of Technovative and the subsidiaries are below in the corporate structure below Technovative.  That's the main relationship between the two.

Q     What percentage of Stream -- I'm sorry.  Let me ask the question.  What percentage of Technovative does Stream own?

A     100 percent.

Q     Mr. Rajan, can you describe your educational background for the Court?

A     Yeah.  I graduated from Eastern Michigan with a degree in biology and physiology with a minor in chemistry.  And then, I

was in graduate school when I stopped to start my first business.

Q    Prior to starting Stream, had you been involved with other startups?

A    Yeah, I was involved with various startups.  Yes, that is correct.

Q    Any startups that you recall?

A    Yeah, one of them was Zero Water.  I had invented a formula when I was graduate school that purified everything out of the water.  Everything from bacteria, viruses, cysts, metal, organic chemicals, and radiological things.  I got a patent and, you know, I worked with my father then to turn it into a product and get it into mass production.  And then, we got it into all the major retail stores in the United States, like Walmart, and Home Depot, and Walgreens, and Target.  And then, we ended up just starting, like, a tv campaign and went to number two in the United States.  I had left the company and eventually it was sold to Calligan.

Q    What specifically was your role with respect to the company?

A    Originally, I was the inventor of the technology.  And then, I went into marketing and sales, and I got it into distribution.  I worked with marketing people around the United States to sort of ramp up the revenue and we got it up to number two in the states, you know, while I was still there.

Q    You indicated that Zero Water was -- or you testified that Zero Water was ultimately sold to Calligan.  What happened after that?

A    Well, Calligan is selling the product now.  They have it in retail stores.  They're advertising around the United States.

Q    And in terms of your career, what transpired after --

A    When I left Zero Water, I went into finance and then, while I was in finance what happened was, I met -- on some business trips to California, I met a team of engineers.  I was introduced by some of the chip companies there to a group of Taiwan Americans who had immigrated from Tawain.  They had started a business, and they wanted me to join them as CEO and help them with various projects and with fundraising and those things.  So I ended up going into the electronics business.  This was a number of years ago, 2009, 2010, and we decided to make the decision to go into glasses free 3D together.

Q    You testified that you're the founder of Stream, correct?

A    Yeah, that is correct.  I'm the founder of Stream TV.

Q    How did you start Stream?

A    Well, we had -- we had various projects that we were working on.  We just registered the company and that was sort of going to be the incubator for some of the ideas that we had and some things we were working on.

Q    During the early days of Stream, did you ever create any

presentations or videos for investors?

A    Yeah, we -- we made a number of presentations for investors, and we created investor videos, which we showed to, you know, various investors.

Q    What was the purpose of the videos?

A    That was just to explain the company and the operations and the opportunity in the sales and various things we were working on.

Q    Are there any specific videos that you recall making?

A    Yeah, we had a very specific investor video that we made, you know, for -- for investors, you know, to explain the company and -- and how it operated and the operations.

MR. ALEXANDER:  Your Honor, we'd like to put one of the investor videos on the screen.

UNIDENTIFIED SPEAKER:  I would object, Your Honor. I'm not -- just soft objection on relevance grounds.  I don't know how an investor video from 2009 moves the needle here at all today.  But I leave it to the Court.

THE COURT:  What's the relevance?

MR. ALEXANDER:  Well, the relevance is, it's going to explain the technology and the company and its purpose and what it's trying to restructure here in the bankruptcy case.

UNIDENTIFIED SPEAKER 2:  I think the point is, what is the company today and where are we going?  As Mr. Callahan said, the point is where are we are going tomorrow, not where

they were going in 2009.

THE COURT:  I'll allow it for what it's worth.

UNIDENTIFIED SPEAKER:  Just know -- I'm going to -- Your Honor, again, relevance.  No one disputes the technology.  No one disputes the history here.  But if the Court wants to entertain it, fine.

THE COURT:  For what it's worth.  I mean, I will give him some short, you know, leeway here.  I'm giving them short leeway.

UNIDENTIFIED SPEAKER:  That's fine, Your Honor.  Thank you.

THE COURT:  Okay.

MR. ALEXANDER:  We'll play a short clip --

THE COURT:  Okay.

MR. ALEXANDER:  -- in the video, Your Honor.

THE COURT:  Okay.  Is it here or there?

MR. ALEXANDER:  It's going to be here.

THE COURT:  Okay.  What's over there?

MR. ALEXANDER:  That's the matinee.

THE COURT:  Oh, I thought it was our old machine that hadn't been taken apart, because this is the new one.  Okay.  I can't hear it.

MR. ALEXANDER:  Yeah, it's the next volume.  I don't know.

THE COURT:  Hold on.

UNIDENTIFIED SPEAKER:  It's the -- I'm sorry.

THE COURT:  Can you pause?

UNIDENTIFIED SPEAKER:  It's the screen.  Yeah, can you pause it?

MR. ALEXANDER:  Yeah.  Yeah, hang on.

UNIDENTIFIED SPEAKER:  May I approach the --

THE COURT:  Yeah, I'll need the volume up, John.  Oh -- oh, let me see.  Once upon a time, the screen didn't work.  Okay.

All right.  Pause this, because I cannot hear it.  And if I can't hear it, I'm not -- tell me what the point is.

John, can you -- do you have any control over that?

(Video recording played at 3:00 p.m.)

BY MR. ALEXANDER:

Q    Mr. Rajan, one of the things that was mentioned in that video was Ultra D Technology.

A    Correct.

Q    Can you describe the Ultra D Technology?

A    Yeah.  What we do for our glasses free technology is different than the 3D you have in the movie theater.  It's sort of a light field technology without too complicated.  But it uses hologram principles.  It's basically a large picture in front of the device and our technology is different than everybody on the market.  We're the only ones that give, you know, a continuous picture, you know, as you move through the

zone that where the 3D quality is outstanding.

Q    And in terms of the business of Stream, right, what is the business of Stream?

A    Right now, what we -- yeah, as we've already said it's 3D without glasses.  What we -- what we do is, we have these large algorithms that we developed.  Those algorithms are placed into a chip, and we sell the chips.  And then, we also have optical designs that are put into a film, and we sell the film and that's bonded to the glass panel and then, we also get paid for the bonding when the film is joined to the panel by the device makers.  And we also sell software plugins for content companies so they can save the file in our format and play it on our device, and we get revenue share from the content owners.

Q    You previously testified that Technovative is a subsidiary of Stream.  Are there other subsidiaries?

A    Yes, there's a number of subsidiaries below Technovative. We had Global Operations as you saw in the video, and we had over 100 employees.  So a number of them would be working from the subsidiaries and some of the customer relationships were done through subsidiaries.  Some of them were done through the parent company, but it depended on the -- the customer.

Q    I'd like you to take a look at Exhibit 5 in the binder.

A    Of which one?  This one?

Q    It'll be in the large --

A    Large binder.

Q    -- binder.

A    Okay.  All right.

          UNIDENTIFIED SPEAKER:  It -- Judge.

          THE COURT:  Which one?

          UNIDENTIFIED SPEAKER:  It was in the -- yeah.

          THE COURT:  The black one?

          UNIDENTIFIED SPEAKER:  Yeah.

          THE COURT:  Okay.

BY MR. ALEXANDER:

Q    And Exhibit 5.

A    Okay.

Q    All right.

A    Okay.

Q    Do you recognize this document, Mr. Rajan?

A    Yeah, that is the corporate structure for Stream TV.

Q    Okay.

A    And we had subsidiaries in, you know, below Technovative. We had ones in the Curacel that had some of our licenses and we have -- the cooperative have the patents and then we had some engineers working in the Netherlands as we mentioned, also in China and Taiwan as well as in the UK.  And then, we had a number of other employees working in the United States.

Q    Do you believe this Exhibit 5 accurately represents the corporate structure of the debtors in your subsidiaries?

A     This was the corporate structure of the debtors.  You know, before we got into these issues -- and we are using this corporate structure right now.  Currently, we're also using some sales offices in different locations to advance the operations outside of this with some of these former employees that are helping us on our various projects.

Q     This corporate structure document was kept in the ordinary course of Stream's business?

A     Yes, it was.

Q     Okay.

        MR. ALEXANDER:  Your Honor, we'd like to move Exhibit 5 into evidence.

        UNIDENTIFIED SPEAKER 2:  No objection.

        THE COURT:  Admitted.

    (Petitioner's Exhibit 5 admitted into evidence)

BY MR. ALEXANDER:

Q     And in terms of the subsidiaries, how did Stream interact with the subsidiaries, if at all?

A     The subsidiaries are different functions.  They were doing mainly research.  Ultimately, they were doing research in the Netherlands.  The Asian subsidiaries were mainly doing sales and engineering support for manufacturing.  And the UK was doing predominantly sales.  A lot of the engineering work and production work was moved to Stream TV USA.  So over time, the electronics were being handled by Stream TV USA and the

manufacturing was being overseen by Stream TV USA, as well as our team in Beijing.  And that's currently what we're doing right now with the PO's that we have for Stream TV.  They're being processed by Stream TV USA, as well as former employees in Asia and in Silicon Valley are helping us with those purchase orders that Stream TV has acquired since the bankruptcy.

Q    You talked about -- regarding research and design entities.  Which entities were you referring to?

A    The Netherlands team was -- did the original technology just like that I used in my example in Zero Water.  I came up with the formula.  They were initially involved in productization.  But over time, you know, they were doing the electronics.  They were overseeing the production.  Overtime, you know, they were struggling to do that type of work.  So we moved those functions out into Stream TV USA as well as our Asia team.  So the electronics and the productization was handled by Stream TV USA, which is what we're doing now today.  We're the ones handling the purchase orders right now and the customers.

Q    When you refer to the Dutch team, is there a specific entity that you're referring to?

A    Yeah, it's predominantly SeeCubic B.V.  There were -- there were a couple of employees at Stream TV International.  Those employees now at Stream TV International are working with

Stream TV USA directly.  And the -- the employees in the B.V. -- in the Netherlands, they're still there.

Q    In terms of operating subsidiaries, are any of the subsidiaries operating today?

A    Yeah, they're all operating.  All of them are operating.

Q    In terms of assets of Stream, can you describe what the assets of Stream are?

A    Well, that was the question that the -- the Judge brought up earlier.  The -- so you have to split it up into sort of two pieces here, okay?  In the Netherlands, there is a patent in the cooperative.  Then, in the B.V., there is SeeCubic B.V., which is in the Netherlands.  There is, like, source code. There's lens designs.  There's some software.  There's equipment there and some short run production equipment.  That is -- that is predominantly the assets in the Netherlands.  In Stream TV USA, we developed our own code independent of the Netherlands.  Stream TV did that.  That's what we're using right now to process the orders.  Stream TV has its own lens technology.  Stream TV owns a bonding equipment that is under the control of SeeCubic Delaware right now hasn't been turned over.  There's also assets for -- there's licenses at Stream TV USA with, like, Rembrandt.  The Phillips license is under the control of Stream TV USA is hosted in the cooperative.  But the Phillips license is also controlled by Stream TV.  Just so I'm clear, the technology that Stream TV had was not home grown.

It was based on licenses from other companies and then, the Netherlands engineers put a code on top of it.  Then over time, because that code was -- was a very simplistic code that is good for, like, demonstrators.  When you wanted to turn it into a product, the code had to redone.  That work was all done by Stream TV, not by the Netherlands.  So that -- that -- we'll call it code for productization is all done in Stream TV USA.  That's -- that was what was done for the products.  In addition to that, there was other assets, such as technology demonstrators for phones and tablets.  There was this -- you know, we're going to demonstrate, here's a 4K TV.  There was units such a AK light.  There was an AK unit put together for Google.  So there was an AK program.  Then, there was a number of other products, such as automotive that Stream TV developed and there's a number of other of those type of assets that Stream TV has.

Q   You testified regarding, I believe intellectual property. Does Stream and its subsidiaries have patents?

A   Stream -- Stream has patents in the cooperative.  There are trade secrets in the Netherlands.  There's a number of trade secrets in Stream TV USA for manufacturing software algorithm development and also -- you know, also for the source code for the products.

Q   Mr. Rajan, can you take a look at Debtor's Exhibit 1?

A   Which -- which one?

Q    Exhibit 1.  Debtor's Exhibit 1.

A    Oh, Exhibit 1?  All right.  Okay.

Q    Do you recognize this document?

A    Yes.

Q    And how do you recognize this document?

A    Yeah, these are a list of patents that Stream TV owns.

Q    Does Stream keep a list of the patents in the ordinary course of business in terms --

A    Yes, it does.  Yeah.  These patents are hosted in the cooperative, but Stream TV is the upstream shareholder, so to speak.

Q    Does Exhibit 1 accurately reflect the patents lists?

A    Pretty much.  There may be, like, a little bit more than this.  But this is close -- close enough.

        MR. ALEXANDER:  Your Honor, we'd like to move, that is Exhibit 1 into evidence.

        UNIDENTIFIED SPEAKER:  Objection, Your Honor.  Mr. Rajan -- there's no testimony as to who created this document or where it came from.

        THE COURT:  Mr. Alexander?

        MR. ALEXANDER:  Mr. Rajan testified that he create -- it was kept in the ordinary course of business.  But --

        THE COURT:  I don't recall him saying that.  I missed it.

        UNIDENTIFIED SPEAKER:  I recall him saying that.  And

then if Your Honor would note that the debtors' schedules list no patents on them at all.  So I don't know where this document came from.

THE COURT:  All right.  Well, ask him some questions.

MR. ALEXANDER:  Okay.

THE COURT:  Lay your foundation, okay?

BY MR. ALEXANDER:

Q    Mr. Rajan, do you recognize this list?

A    Yeah.  This is the list of patents for Stream TV that was in the ordinary course of business, and these are the patents for Stream TV.

Q    Do you know who created this list?

A    Yeah, this list was created by our law firm in the Netherlands, Delta Patents.  That's why their logo's down at the bottom.  So they would send us these lists.

Q    And did you receive a copy of this lists --

A    Yeah.

Q    -- from Delta Patents?

A    We -- we used to get them -- yeah, we used to get them periodically.

Q    And would Stream keep this document --

A    Yeah, absolutely.

Q    -- in its records --

A    Yes.  Yes, it did.

Q    -- in the ordinary course of business?

A    Yes, it did.

MR. ALEXANDER:  So Your Honor, we'd like to move Exhibit -- Debtor's Exhibit 1 into evidence.

UNIDENTIFIED SPEAKER 3:  I'll withdraw that objection, Your Honor.

THE COURT:  All right.  Admitted.

(Petitioner's Exhibit 1 admitted into evidence)

BY MR. ALEXANDER:

Q    Can you describe the type of patents that are listed in Exhibit 1?

A    Yeah, there -- there are patents here on optical designs. There are patents here on -- there's a patent here on their form of -- without getting too complicated, one of our algorithms, the -- the rendering engine.  There's additional -- there's some patents here on manufacturing technology.  And then, there's some additional patents here on the optical designs.

Q    And where are these patents located in terms of --

A    They're -- the patents are global.  They're global all over the world.  So they -- the patents get fought globally.

Q    Other than patents, does Stream have any other intellectual property?

A    Yeah, we have trade secrets.  We have trade secrets, we have source code, we have optical designs, we have lens designs, we have manufacturing technology.  You know, we have

wide -- we have a very wide range of intellectual property
beyond this patent.

Q    In terms of trade secrets, what are the types of trade
secrets that Stream has?

A    The actual code, so the code that goes into the devices
that convert the content into the glass is free.  And then,
also, the codes that go into the designs that go into making
the lenses.  Also, we've made a number of changes to the
manufacturing process to make this particular technology.  And
there's technology for the even adjustments to the electronics
to be able to handle these algorithms and the, this type of
software.  And, you know, those are the, those are the five big
areas of the, you know, the trade secrets that we have.

Q    Mr. Rajan, I want to take a step back.  You, you've
testified that you're the President and CEO of Stream, correct?

A    Correct.

Q    How long have you been the President and CEO?

A    Since the founding.

Q    Within that role, what are your duties and
responsibilities?

A    Well, part of it, I was involved in finance and then, you
know, I was working with the various teams, predominantly the
sales team as well as the engineering teams.  And, you know,
originally, we had the Netherlands people handling the
technology and the productization.  Over time, we had to get

more involved because it took a lot of extra work to do our first production run and -- make TV.  So, I got heavily involved in both the electronics and the manufacturing.

Q    With regards to Technovative, you testified that you're also the President and CEO of Technovative, correct?

A    Correct.

Q    And what was -- how long have you been the President and CEO?

A    Since its founding.

Q    And in that role, what are your job responsibilities?

A    With Technovative, it was mainly to oversee the subsidiaries.  And I was working with the various groups that were working in the, the subsidiaries.

Q    You previously testified regarding an entity, Philips. What is Philips?

A    Okay.  So, at the, at the founding of our company, we decided to go into glasses free.  And we spent about a year-and-a-half looking at the best, you know, all the different technologies in the world.  We made the decision that we wanted to use technology that used sort of hologram principles.  And in our research of the industry, what was the best technologies for glasses free?  We found that Philips was putting a lot of money into glasses free.  They had a really big team in the Netherlands.  And at that time, Philips decided to discontinue the glasses free.  They laid off their entire team.  It was,

I forgot how many people they had.  I think it was either 75 or a hundred.  And they wanted to license their technology out to other companies to try to carry on with the project and sort of get a royalty on the technology.

And so, we went and met with Philips.  And we ended up, our team, you know, those Taiwan Americans, they ended up meeting the Netherlands engineers and recruiting them to join Stream TV.  And we subsequently hired them.

But what we did was is we got a license from Philips where they gave us their base technology in terms of software, the lens technology, a little bit of manufacturing, and then also some content, the creation tools, which our engineers used to sort of build upon that.

The licenses, though, we set up were, had change of control provisions on it.  So, if there's change of control in Stream TV, the license is disabled.  And that, also, the -- in our discussions with Philips, they were adamant that --

MR. CALLAHAN:  Objection, Your Honor.

THE WITNESS:  They were --

MR. CALLAHAN:  It's calling for hearsay; some of what Philips is adamant about or not adamant about.

MR. ALEXANDER:  Okay.

THE WITNESS:  Well, okay.  Our contract --

THE COURT:  Whoa, whoa, whoa, whoa, whoa, sir.

THE WITNESS:  So, I'm sorry, I'm sorry.

THE COURT:  Wrong.

MR. ALEXANDER:  Your Honor, I believe he can testify without referring --

THE WITNESS:  Yeah, I can testify without referring.

MR. ALEXANDER:  Oh, excellent.

THE COURT:  Whoa, whoa, whoa, you're not the Judge. I get to say what you can testify about.

So, you're, he's objecting because it's hearsay. He's about to tell us what they told him.  And you're saying he's not doing that.  It's his understanding, his description, what?

MR. ALEXANDER:  Your Honor, he's explaining what his understanding is in terms of the other entity.

THE COURT:  As long as he does not tell us what someone told him, he can describe what his understanding of the situation.  So, I'll allow it, but you cannot say what someone else told you, okay?

Go ahead.

THE WITNESS:  Okay.  Our contract with Philips, which where we got the base technology from, has a couple of caveats to it.  One is change of control.  So, if there's change of control in Stream TV, the Philips license goes away, we're not allowed to use the base technology any more.

And then number two, we are to only give have-made rights to other companies.  So, that's one of the reasons why

Stream TV sells components, we don't do sublicensing.  The Philips contract specifically prohibits sublicensing.  We have to either sell a finished product or we have to sell components. So, if we attempt to sublicense, that would be a violation of our Philips license and the Philips license would go away.  So, those are the main provisions of the Philips license, which is critical, if the Philips license is lost, then Stream TV can't use this technology any more.

BY MR. ALEXANDER:

Q    So sublicensing is not part of Stream's business model?

A    Sublicensing is not part of our business model.  It is against our licensing contracts.  We are not to sublicense with this technology.

Q    You've testified regarding an entity, Rembrandt.  What is the history between Stream and Rembrandt?

A    The history of Stream and Rembrandt was, we had met some of the folks at Rembrandt at a predecessor company.  And they, there was discussions on trying to help them with fundraising predominantly with my, my brother.  Then the discussions didn't work out with Rembrandt.  And we were, also, before that working on our own Glasses 3, 3D, and were also having discussions with Philips on a strategic relationship with Philips in parallel with our discussions with Rembrandt.  We decided, you know, to ramp up our own Glasses 3 efforts.  We couldn't work it out with Rembrandt.  And then later, in our

discussions of Rembrandt, it came out that some of our employees had worked at a predecessor company to Rembrandt called 3D Fusion.  There was a group leader for our Netherlands team by the name of Walther Roelen.  He was receiving payments from the Rembrandt Group and he was a de facto agent with representing that he was going to bring over the Netherlands team to Rembrandt.  We were told by the Netherlands people that they were --

MR. CALLAHAN:  Objection, Your Honor.

THE COURT:  Right, you can't.

MR. CALLAHAN:  Objection.

THE COURT:  You can't tell me what someone told you.

MR. ALEXANDER:  Well, he's not using it for the truth of the matter asserted, Your Honor.  He's just testifying to what he was told.  It doesn't matter whether it's true or not.

THE COURT:  Okay.

MR. CALLAHAN:  I'm not aware of that one, Your Honor, I stand --

MR. CAPONI:  Did the document that --

THE COURT:  Whoa, whoa, whoa, woah, I have to rule.

MR. CALLAHAN:  Okay, I'm sorry.

THE COURT:  First of all, a little, I'm going to ask him to repeat some things without answering that question.

Who was Walter, who?

THE WITNESS:  Walther Roelen, R-O-E-L-E-N.

THE COURT:  And he works for who?

THE WITNESS:  He worked at Stream TV in our Netherlands subsidiary.  But prior to joining Stream TV, he was working, we'll call it the Rembrandt Group.  He was receiving payment from Rembrandt.  He was a de facto agent for the Netherlands engineers.

And he represented to Rembrandt, he could bring all the engineers over to Rembrandt.  And the engineers, according to the documentation that we saw, preliminarily showed very little interaction between the Netherlands engineers and Rembrandt over time.

MR. CALLAHAN:  Excuse me, Your Honor --

THE COURT:  Okay, that's it.

MR. CALLAHAN:  Is he answering your question, or, I'm not sure if we've moved on or not?

THE COURT:  My question, no.  He was, I was trying to figure out who Walter was, Walther Roelen.  He was working for Stream in the Netherlands.  But at the same time, apparently, working for Rembrandt.

MR. ALEXANDER:  Before that, before he joined Stream.

THE COURT:  Oh, before that he was working for a predecessor of --

MR. ALEXANDER:  Rembrandt.

THE COURT:  Rembrandt, okay, and was getting paid by Rembrandt?

THE WITNESS:  Yes.

MR. ALEXANDER:  Rembrandt's predecessor, that is correct.

THE COURT:  A Rembrandt's predecessor, yeah, okay. That was all I wanted to know was who was Walter.  Alright, sorry.

Now, your question, I probably side-tracked you. What was the question?

MR. ALEXANDER:  Well, my, my original question, Your Honor, was, what was the history between Stream and Rembrandt?

THE COURT:  All right.  So, continue, but don't tell us what anybody told you.

THE WITNESS:  Correct, okay.

THE COURT:  Okay?

THE WITNESS:  So, based on the preliminary evidence that we viewed, the Netherlands engineers had a limited contact with Rembrandt.  Then, over time, because Rembrandt came to us and they were upset, and there was more due diligence and more informations exchanged between Rembrandt and Stream TV, the relationship was far more extensive than our understanding, meaning myself and the senior management of Stream TV, as to the relationship between the Netherlands engineers and Rembrandt.

Then, as time went by, and this would have been after, like this would have been like 2017, 2018, Rembrandt was

providing more information to us on the relationship between the Netherlands engineers and Rembrandt.  And it was far more extensive, again, than we understood.

Rembrandt wanted to have some type of settlement because they felt like the Netherlands engineers took trade secrets from Rembrandt and brought it to Stream TV.  There was a number of discussions.  We almost had a settlement. Rembrandt filed a lawsuit against Stream TV.

THE COURT:  Hold on.

THE WITNESS:  I'm sorry, I'm sorry.

THE COURT:  Okay.  And then there is a suit?

THE WITNESS:  Yeah.

THE COURT:  Right?

THE WITNESS:  Yes.

THE COURT:  Okay.

THE WITNESS:  And then, Rembrandt filed a suit against Stream TV.  And as I recall, I believe the original suit, they had sued the Netherlands engineers.  The lawsuit was changed to, it was against me with --

THE COURT:  Wait, whoa, whoa.

MR. CALLAHAN:  Sorry, we object.  Mr. Rajan's going off on very long monologues, and in response to very short questions.  Alex asked if Mister -- Vincent can, you know, direct examination, direct his client through it.  But it's very, it's we're having a very muddled and unclear record here.

THE COURT:  Well, I understood he was saying, describe your relationship with Rembrandt, and he's going through what happened.

MR. CALLAHAN:  I understand, Your Honor, but you, normally, you don't go through five years of what happened, and you get walked through it.  Now, we're on the litigation. I just --

THE COURT:  Okay.

MR. CALLAHAN:  Again, I think this is --

THE COURT:  I mean, I'm following it.  I'm -- not a jury.  I can follow it on this, I think.

MR. CALLAHAN:  Okay, Your Honor.

THE COURT:  Unless you think it's necessary that he, kind of, for everybody's, you know, everybody's benefit, walk him through it, walk him through it.  Just say, you know, what happened this time period, what years.  But right now, we're at a lawsuit in what year?

THE WITNESS:  I believe it was 2016 or 2017.  The lawsuit changed.  That's why it's a little bit confusing.

THE COURT:  All right, but let's, let's --

THE WITNESS:  Yeah, I was going to be --

THE COURT:  The first lawsuit?

THE WITNESS:  Yes, at first, it was originally against, as I recall, the Netherlands engineers and Stream TV. Then it was altered, where the lawsuit was against me and my

brother, who also worked at Stream TV.  And the Netherlands engineers were removed from the lawsuit.  We attempted another settlement.  We were close to a settlement deal, and then more information started coming out.

And at that time, Stream TV, one of our investors, one of our long-time investors, SLS, there, I think it was either a managing member or managing director, Shad Stastney, was, began working at Stream TV as CFO, and he's also Vice Chairman.  Rembrandt objected to my brother --

THE COURT:  Wait a minute, wait a minute, wait a minute.

MR. ALEXANDER:  Stop.

THE COURT:  Wait a minute.  Let's go through this step-by-step.

THE WITNESS:  Yeah, okay.

THE COURT:  There was litigation in 2017 filed by Rembrandt against the Netherlands, Netherland engineers and Stream.  It was amended to drop the engineers and just add you and your brother.

THE WITNESS:  Right.

THE COURT:  But who's your brother?

THE WITNESS:  My brother's name is Raja Rajan.

THE COURT:  Raja?

THE WITNESS:  Yeah, R-A-J-A, A.

THE COURT:  Okay.  And then, settlement attempted,

unsuccessful?

THE WITNESS:  Correct.

THE COURT:  Now, what happened after that?  Now, what's the next -- wait a minute.  Go ahead, ask him the question.

THE WITNESS:  Rem, Rembrandt, gave additional information.

MR. ALEXANDER:  And let me --

THE COURT:  Let him ask him some questions.

THE WITNESS:  Sorry.

BY MR. ALEXANDER:

Q    What time frame are you referring to?

A    This would have been approaching into 2018 and 2019.

Q    After the lawsuit was amended, what happened next?

A    What, more settlement talks are happening.  Rembrandt began sharing more information on the severity of the problem.  Then in 2019, what happened was, we were close to the settlement, but Rembrandt objected to my brother leading the settlement talks, as well as, because he was one of the people named in the suit.  And at that time, SLS's managing director, Shad Stastney, had joined Stream TV as CFO and vice chairman.  And he was substituted and took over the negotiations with, with, with Rembrandt.  During that time period, a lot of, a large amount of information was released from the -- Rembrandt, where the relationship was far more extensive with the

Netherlands engineers.  There was a large number of Netherlands engineers who were doing work with Rembrandt, and they were not being paid.  But Walther Roelen was their de facto agent, and Rembrandt was saying there was a large number of trade secrets that were in the Stream TV, which you're going to see, were worked on during that time period while they're at Rembrandt.  So, a settlement was reached between --

Q    Mr. Rajan, you talked about a settlement.  When was the settlement reached?

A    The settlement was reached in 2019.  Shad Stastney led the negotiations.  It was in front of a magistrate judge in New York.  A settlement was reached between Stream TV and Rembrandt, which -- and a term sheet was signed, essentially the same deal we have, roughly the same deal we have today, between Stream TV and Rembrandt.

Q    Do you recall the material terms, Mr. Rajan?

A    It was about a $5 million payment over a period of time.  And then, they also want --

THE COURT:  So, who is paying the five million?

THE WITNESS:  Stream TV.

THE COURT:  Okay, hold on.  Terms, a million payment.  Okay?

THE WITNESS:  And then, what happened, and then, also, they wanted a large number of TVs made that they could buy from Stream TV and resell with the Rembrandt name.

Our, our business model is we don't compete against brands.  We're like Intel, so, we usually put somebody else's name on the TV.  And then you'll have like a little logo for our technology and you'll see our logo when it bop, you know, when it boots up, saying powered by, you know, Altered-E (phonetic).  So, we're sort of like Intel.

So, we -- we have contract manufacturers, who will make devices and put somebody like Rembrandt's name on it.  And Rembrandt wanted TVs to sell.  They wanted a large number of TVs to sell, and other devices, but predominantly TVs.

A deal was reached.  There was discussions at the board of directors level at the, on the Stream TV deal.  You know, Shad Stastney, and the other folks on the board were really pushing for the new settlement.

You know, me and my brother were a bit taken aback, to put it bluntly, on the deal.  And then what happened was in the fall of 2019, that's when the fighting got pretty bad between Stream TV and SLS, and one other shareholder, Alastair Crawford.  The settlement deal sort of fell by the wayside.  It did.  And then, we had the omnibus transaction in 2020.  And there was a large number fighting.  Rembrandt was keeping some contact but not too much contact with us like they used to in the past.  And, and then, we lost in the Chancery Court and --

Q    Mr. Rajan, we'll --

A    Yeah.

Q    We'll get to there.  I just wanted to --

A    Yeah.

Q    -- get those material terms.

A    Yeah, okay.

Q    And, which I believe you, you answered to.  And, in terms of, you referenced, who negotiated that on behalf of Stream?

A    Shad Stastney.

Q    Are you aware if Mr. Stastney had any positions outside of Stream at the time he negotiated that?

A    I'm -- yeah, he was working at, he, he, I believe he's the managing director at SLS.  And he may be involved in some other business opportunities, but SLS was an investor in Stream TV, a lender, and had some shares.

Q    Was SLS an -- investor and lender at the time, Mr. Stastney was negotiating?

A    Yes, he was.

Q    In Rembrandt's settlement?

A    Yes, he was.

Q    But I want to talk a little bit about Stream's business model.  Now, can you describe Stream's business model?

A    Yeah, again, we, we sell chips.  We take the algorithms, put it on a chip.  We have optical designs.  We get a film made by a contract manufacturer.  We sell the film.  The film is bonded to a panel.  And then the panel, we get paid for the

bonding.  And then we also supply plug-ins for content companies where they can save their files in our format.  And we get revenue share on the content.

Q    Did Stream receive any awards for its work?

A    Yes, it received the Luminary Award from the Advanced Imaging Society.  It also received the Consumer Innovation Award for new technology, you know, because of the impressive quality of the, the technology.  And it's been recognized in the various other forums.

Q    As part of Stream's business, has it created 3D module panels?

A    Yes.  We, we've made over 5,000 units with Pegatron. That's the unit you see over there.  We've sold those all over the world.  And, you know, we've sold those all over the world, and we were getting geared up for our next production run with some modifications to that unit when we ran into the whole problem with the omnibus.

Q    Mr. Rajan, you were pointing to a --

A    It's a, that's a 65-inch 4K TV.  That's our TV in the corner, okay.

Q    Can you describe what that TV is?

A    Yeah, it's, it's a display unit.  It, it basically plays our, our content if, in a pre-converted format, if a content company uses our plug-ins to save their content.  It also auto converts all your content at home.  So you, you know, I use

that unit from home.  And at home, you can connect it to your cable and satellite service, and it will -- or your DVDs or Blu Rays, it'll auto convert it on the fly from 2D or 3D with glasses into glasses free.  And it looks great.  And I had 20 people over at my house to watch the Super Bowl on that unit, okay, so.

Q    Does the unit demonstrate the quality of the Ultra-D technology?

A    Yes, it does.

          MR. ALEXANDER:  Your Honor, we'd like to show a demonstration of the quality of the TV.

          MR. CALLAHAN:  I want to go back to, Your Honor, I question the relevance of that, and most of what I've heard.  But it's up to the -- I know the Court can take it for what it's worth.  I'm not --

          THE COURT:  What's the purpose?

          MR. CALLAHAN:  I'd like to get to 2022 or 2023?

          THE COURT:  Well, we're in 2020, what year are we in?

          MR. CALLAHAN:  I don't know.

          THE COURT:  He said he used it at the -- at the Super Bowl party.  And I'm assuming it was this year.

          MR. ALEXANDER:  Yes.

          THE COURT:  It was, was there even, in the Super Bowl?

          UNIDENTIFIED SPEAKER:  I don't know.

150

THE COURT:  No?  No, that was that the year before.

(Counsel confer)

THE COURT:  Or was that the year before?  I don't know.  I don't follow them that closely.

MR. CALLAHAN:  I just don't see the relevance, Your Honor --

THE COURT:  What's the relevance?

MR. CALLAHAN:  -- technology.

THE COURT:  What's the relevance?

MR. ALEXANDER:  Well, I think this is still the units that they're selling with respect to the purchase orders.

THE COURT:  I get that.  But why do we need to see it?  He's saying, why do we need to see what these TVs do?

MR. ALEXANDER:  Because it's, it's demonstrating what the business of Stream is.

THE COURT:  Okay, can we, do we have to see that or can you just tell -- you think we have to see it?

MR. ALEXANDER:  We -- I mean, Your Honor.

THE COURT:  Oh, okay, let's see it.  I want to see it.  I got a note from my ESR, it's like, it's pretty sharp. You should see it.

MR. ALEXANDER:  Okay, it's functioning properly, while it's functioning.

THE COURT:  Okay.  Maybe it'll give me some idea of what this fight is about because, honestly, I cannot figure out

what these guys are fighting about.  I really can't.

So, I will allow it, because it may help the Court to understand what it is that the parties are fighting over.  And not only fighting over what it is that the Debtor thinks that the Debtor can do with this.

So, I'll allow it, Mister -- have you seen this, Mr. Caponi?

MR. CAPONI:  I'll withdraw the objection, Your Honor.

THE COURT:  No, I've asked you, have you seen it?

MR. CAPONI:  No, I haven't.

THE COURT:  Well, then, we're all going to see it now.

(Video played)

THE COURT:  Would it help if I could hear what they're saying.

THE WITNESS:  And so, it, it converts all your movies, all your TV shows, all your gaming, all your applications, everything into glasses-free 3D.

(Counsel confer)

THE COURT:  Okay.  How long are we going to watch this?

MR. ALEXANDER:  That's enough.  Yeah, let's just turn that off.

THE COURT:  I think that's enough.  As, I see it, boy, that stuff is expensive.  What, is this like at on?

THE WITNESS:  Never mind.

THE COURT:  Never mind.  All right, thank you.

BY MR. ALEXANDER:

Q    Mr. Rajan, does that, what we just saw in the courtroom, did that demonstrate the 4K Ultra-D technology?

A    Yeah, that's the, that's the 4K unit.  We've sold 5,000 of those units and our customers have reordered that unit.  That's one of the orders that we -- purchase orders we gave to the Court, for that particular unit.  We received an order from one of the customers.  He bought thousands of screens from us out of the 5,000 and he's reordered over 10,000 units of that particular model.

Q    Mr. Rajan, and we, we've talked a good amount about the business of Stream, and then I want to talk a little bit about funding.  How has Stream been funded since inception?

A    Basically, when we started the company, I started raising money from investors and some bankers that I knew.  Over time, we raised over $180 million.  We received about $45 million in cash for debt.  And then the balance over 120 million something was equity that we raised from various shareholders, you know, both in the U.S. and in Europe.

Q    The equity that you just referenced, that was equity that was raised into Stream, correct?

A    Into Stream by selling shares, correct.

Q    And has Stream sold shares since its inception?

A      Yes.

Q      Is that an ordinary practice within the business of Stream?

A      Yes, it was, it was ordinary course of business, correct.

Q      This, has Stream relied on investor funding for business operations?

A      Yes, it did.  Yes, it does.

Q      In your view, is raising capital important to the business of Stream?

A      Yes.

Q      Today, are you still involved in obtaining funding for Stream?

A      Yes, I am.

Q      You, you've previously referenced an entity, SLS.  Were you referring to SLS Holding Six LLC (phonetic)?

A      Yes.

Q      What is SLS?

A      It was a hedge fund that I believe was derivative from another fund called Vicis (phonetic).  They invested in, in the Stream TV.

Q      You said they invested into Stream TV?

A      Yeah, they -- it was, it was done as a loan.  They also did get some warrants that subsequently were changed to shares.

Q      When did those investments occur?

A      They invested in 2011 and 2012.

Q    Do you recall how Stream was introduced to SLS?

A    Yeah, we were working with a banker in New York, Midtown Partners, and they knew the folks at SLS, and they introduced us.

Q    And when did that introduction occur?

A    It would have been 2011.  I believe it was 2011.

Q    You've testified that SLS made investments in Stream. Do you recall who was part of the negotiations regarding those investments?

A    I was involved, my brother was involved, and a little bit, Dan Rink and Suby Joseph on the Stream side.

Q    Do you recall who was involved on the SLS side?

A    It was Shad Stastney.

Q    Do you recall how much money SLS invested in Stream?

A    They've made two loans.  Each one was about $3 million. So, six total.

Q    What was your understanding of SLS's investment in Stream?

A    It was, it was a loan with warrants, and the warrants were eventually changed to equity.

        MR. CALLAHAN:  I'm sorry, what?

        THE WITNESS:  It, it was, it was a loan with warrants and the warrants were changed to equity.  At that time, he also got a lien on the assets, some of the, the assets of Stream. So he was, he was a secured lender.

BY MR. ALEXANDER:

Q    When you say he, who are you referring to?

A    I mean, SLS, I'm sorry, I should have said SLS, I'm sorry.

Q    Can you describe the relationship between SLS and Stream?

A    We had a very good relationship for a number of years. They were very supportive. We had a good relationship with Shad and we used to talk regularly. He knew about, you know, when we had raised money. We were trying to fix up the technology and go to production. He knew that we ran into trouble of -- a number of times with the Netherlands folks when they were trying to productize.

So, he was very supportive when the production failed, you know, when we called him and said, hey, we're this problem or that problem, he was very encouraging to the team, and, you know, trying, you know, sort of, you know, keep going forward, and that sort of thing. And we were running into a lot of difficulties when we're in the beginning of the company and also in the middle of the company, when we're running into technical problems.

Q    Did that relationship change at some point?

A    Yeah, it did change after, it was great for the first few years, we got along great. And, and he was helping us, off and on with advice. And even a couple of times, he made phone calls for us when we ran into some issues. And as we were making more and more progress, he was being very helpful. The relationship changed at, towards the end of 2018. And then it

went south in 2019.

Q    Why did the relationship change after 2018?

A    Well, let me rewind the clock.  There -- at Stream, we, we, we had two big problems, we'll say, in the beginning of the company.  You know, we liked all the Netherlands people.  They came from Philips.  They wanted to not only be the inventor, they wanted to handle the production and the electronics.  And we failed a number of times in production.  We failed a number of times in the electronics.  They didn't know how to convert their invention into a product.  They really didn't know how to follow industry standard procedure. You know, they --

Q    Mr. Rajan, when you say they, who were you referring to?

A    Well, I'm talking about the Netherlands engineers.  And they, without getting too technical, they only knew how to program in C code, which is software.  The industry uses Verilog.  They didn't understand production.  They developed their own home-grown bonding solution where we spent millions and millions of dollars on it and it utterly failed.  So, we finally got, started to get over those issues once Stream started to take over the responsibilities for both the electronics and the production.  And what happened was, we -- Shad was still sort of out -- outside the company.  Originally he was on the board, and after he made the investment in the company, he ran into some trouble with the Securities and Exchange Commission on a deal that was done prior to when he

invested in Stream TV, and there was some other litigation with some of his portfolio companies.  And it came out in the news that what happened with the SEC because of a transaction where, you know, some money exchanged hands and there was some type of disclosure issue.  I think it was 2.9 million.  And what happened was our investment bankers and our lawyers, that went into the news, so to speak, during due diligence, and he was asked to step off the board.  And our accounting firm, Deloitte, was having issues because of whatever issues he was having with the SEC.  So he left the board of directors.  Then when --

Q    When did he actually leave the board of directors?

A    It would have been like 2013.  I think it was 2013.  And then what happened was -- but he had an observation seat.  But we had a good relationship with him.  We got along great with him.  And -- and, you know, we were giving him updates, whatever.  He was giving advice.  Then over time, we had a -- a lot -- another investor who was giving us a fair amount of money.  Hawk.  He was financing us through these production problems, electronic problem.  And as we were turning the corner, unfortunately, he ran into a serious health problem.  And so we turned to Shad and some other folks to help us with fund-raising for the company.  We ran into a problem with one of our shareholders, Alastair Crawford, who's a bit of a character, and he was causing all kind of problems and, you

know, threatening the company and wanting to take over.  And he had visions of becoming CEO and all these other wonderful things.  And Shad had an observation seat.  And we -- some of the other board members took a liking to him and they invited him back to the board.  And we -- we lost our accounting firm, Deloitte.  They resigned because they said --

MR. CAPONI:  Objection, Your Honor.  Calls for hearsay.

THE COURT:  Okay.  You can't tell us what they said.  Okay.

THE WITNESS:  Deloitte resigned once he joined the board.  That's factual.  And resigned as our auditor.

And then from there, what happened was is he got more involved in the company.  He was back on the board of directors.  We were -- we had gotten the bonding issues behind us.  We were converting all the software and the hardware and creating new algorithms at Stream TV, and we had signed a deal with BOE, the number one panel company in the world, and we had just started working with Google and BOSH.  And Shad was getting more involved in the company, and he was also put in charge of keeping Alastair Crawford under control, which is never easy.

And over time, there was a disagreement on the fund-raising, specifically that banker Jeff Shamma, I don't think he sat well with -- with Shad and some of the other folks.  They

didn't like him very much.  And from that disagreement, over time Alastair and Shad sort of developed a better relationship.

And where the tension really took off was in 2018, we had asked SLS and Hawk to sign conversion agreements at Stream TV's discretion, because in 2016 and 2017, the shareholders were getting very upset.  New investors were happy that we're fixing all these technical problems and the business was taking off, but they felt the debt was getting way too big.  They -- everybody was demanding conversion agreements --

MR. CAPONI:  Objection, Your Honor.

THE WITNESS:  -- be put in place.

MR. CAPONI:  Hold on.

THE WITNESS:  So we signed conversion agreements.

MR. CAPONI:  Hold on.  Hold on.

THE WITNESS:  Sorry.

THE COURT:  Objection?

MR. CAPONI:  Hearsay.  He's testifying about everyone was demanding is about --

MR. ALEXANDER:  I believe he testified that people made demands.  He didn't say what the nature or context of the demands were.

THE COURT:  He can talk about the context.  He can't say what people told him.

MR. CAPONI:  And he actually started "People were demanding."  When you go to continue what they're demanding,

that's an out-of-court statement.

THE COURT:  Well, he can say --

THE WITNESS:  The --

THE COURT:  Hold on.

THE WITNESS:  Sorry.

THE COURT:  He -- he -- just tell us what happened. Don't tell us what anybody told you.

THE WITNESS:  Okay.

THE COURT:  Okay?

THE WITNESS:  The conversion agreements were signed because they were requisite for existing shareholders and a requisite for new investors, and also customers and vendors were making it a requisite to have the conversion agreements signed.  We signed conversion agreements.  And the -- and once they signed the BOE deal at the end of 2018, 2019 was our best year of fund-raising ever in the history of Stream TV.  Money was coming in.  It was a lot, but our spending was high because they're trying to get the electronics ready for the production run of those TVs.  So spending was high, but the fund-raising had taken off.

I had informed Hawk and SLS that we were going to convert the debt.  Hawk was very supportive, very -- and very helpful.  But it -- it didn't go well at all with SLS that we were going to convert the debt and that we were going to need to start converting.  So there was -- an argument broke out

because Stasney did not want to convert.  And he -- then it got even more tension.  He didn't want to convert and he wanted to take money out of the new money that came into the company.  Then he wanted to -- because he was CFO, he wanted to set up a sweep account where money from new investors was diverted out of Stream TV to an account under his control, and Stream TV would be put on a diet.

Obviously we -- Stream TV management was incensed because we had taken money from over 125 investors who were all told Hawk and SLS are going to convert.  And the conversion agreements, people -- everybody had copies of them, said it was at Stream TV's discretion when and if and how we convert.  And it was in their PPMs that the conversion agreements -- and there was probably about 200 to 300 investors who all had copies of the conversion agreements that were beginning due diligence.  There was over 150 I believe in the data room that were reviewing the conversion agreements.  And when he said he didn't want to convert, and then went a step further saying, "Let's take the money out of the new money coming in," that -- after we were very far down the road with a number of investors and taking money from investors, it was extremely problematic.  And that's when the relationship went south.

Then there was a proposal where there was -

BY MR. ALEXANDER:

Q    In terms of the time frame that you're talking about, you

said things went south.

A    The relationship with SLS went --

Q    When did the -- at what point --

A    2019.  Summer of 2019.  And there was a proposal from Stasney where he was going to increase his role as CFO, take over huge chunks of the operation.  I objected because, as I just said, this guy just screwed hundreds of investors and we're giving him a promotion.  That doesn't sound logical.  And then there was a big fight at the board of directors level.  Hawk Holdings ordered me to fire Bob Morton --

         MR. CAPONI:  Objection, Your Honor.

         THE COURT:  Okay.  Objection.

         MR. ALEXANDER:  It's a party statement.  Hawk's a party.

         MR. CAPONI:  He -- Hawk is not a party.  Hawk's a false entity.  He can the individual --

         THE WITNESS:  Bob Morton ordered me to fire the board of directors.

         MR. CAPONI:  Bob Morton is not Hawk.  Bob Morton is a representative of Hawk.

         THE COURT:  Well, who is Bob Morton?

         THE WITNESS:  Bob Morton, his -- 100 percent of his money's in Hawk.  And he calls all the shots.

         MR. CAPONI:  That's incorrect.

         THE WITNESS:  That is correct.

THE COURT:  Oh --

MR. CAPONI:  Hawk, Your Honor, is an entity that is owned by a trust, I believe, out of the UK or --

UNIDENTIFIED SPEAKER:  Albany Management (phonetic).

MR. CAPONI:  And it's -- it's run by Albany Management.  And the trust ultimately was funded with Mr. Morton's money years ago.  But he does not -- we've had extensive testimony about this in the Court of Chancery.  He is not -- Mr. Morton has no position at Hawk or any ability to control or direct what occurs at Hawk.

THE COURT:  Okay.  So if --

MR. CAPONI:  And no foundation has been addressed.

THE COURT:  Okay.  So I guess you can ask him what his understanding of what this guy's role was.

BY MR. ALEXANDER:

Q    What is your understanding of Mr. Morton's role at Hawk?

A    The -- the truth is --

THE COURT:  Your understanding of the truth.

THE WITNESS:  Okay.  My understanding was, from -- my initial meeting of Bob Morton I think was 2009 or 2010 when I first met him to -- all the way through -- all the through the Omnibus transaction.  And I've had thousands of conversations with Mr. Morton.  The money in Hawk in all his money.  He was playing the role of managing director, and even had that title for most of my business relationship with Hawk.  He negotiated

all the deals, investment deals.  He negotiated all the conversion agreements.  He used to call me at least once a day, sometimes two to three times a day seven days a week.  He -- and Albany Trust, it's one of those trusts you get out of a box, you know, when --

THE COURT:  Just tell me what you understand.

THE WITNESS:  Yeah.  And he basically did all the negotiations.  It was all his money.  He repeatedly said --

THE COURT:  You can't tell what he said.

THE WITNESS:  Okay.  Fine.

My understanding is he's the boss, he makes all the decisions, and he negotiated everything and was intimately involved with Stream TV.

MR. CAPONI:  Your Honor, Mr. Rajan's understanding is immaterial.  Mr. Morton has no position whatsoever with Hawk.  Hawk is a legal entity.  We provided background.  Mr. Rajan has presented his argument multiple times in multiple courts trying to claim --

MR. ALEXANDER:  Your Honor, I'm going to object because that's --

THE COURT:  Whoa, whoa, whoa.

MR. ALEXANDER:  -- outside of the scope of --

THE COURT:  All right.  So the whole --

MR. ALEXANDER:  -- the objection.

THE COURT:  -- thing is his understanding of who

Mr. Morton is.  That's his understanding.  I'm not concluding that he is.

MR. CAPONI:  It's his understanding.  I'm representing -- I'm telling you, as an officer of the court, that it is hearsay because Mr. Morton has no position whatsoever with Hawk.

THE COURT:  That doesn't mean that he can't say this is what he thought.  That doesn't mean -- you can think it's green out -- or the sky is purple.  That doesn't mean it's purple, but you may think it's purple.

MR. CAPONI:  But it does mean that he cannot testify as to what Mr. Morton said, attributing Mr. Morton's comment to Hawk under the exception that it's a party -- stated by a party --

THE COURT:  All right.  Then he can testify what Mr. Morton told him but not -- and say he understood it was for Hawk.  But he could -- his understanding could be wrong.

MR. CAPONI:  The --

THE COURT:  He can't conclude that it was for Hawk.

MR. CAPONI:  He -- again, my objection is he wants to admit his testimony, an out-of-court statement, of Mr. Morton as to what Mr. Morton told him.  That is hearsay.

THE COURT:  Okay.  That's -- if Mr. Morton is not the -- part of a party in interest, then you have to tell me how does he get the statement in.

MR. ALEXANDER:  Understood, Your Honor.

THE COURT:  Okay?  Sustained.

Go ahead.

BY MR. ALEXANDER:

Q    Did Mr. Morton hold himself out to you as a representative of Hawk?

A    Yes.

MR. CAPONI:  The same objection, Your Honor.

THE COURT:  Basis?  Basis?  Basis?

MR. CAPONI:  It's hearsay.  It's an objection. Mr. Rajan has not established that Mr. Morton is Hawk, and that his statements bind Hawk.

MR. ALEXANDER:  It doesn't -- Mr. Rajan testified that he held himself out as an agent of Hawk.

THE COURT:  Okay.  That -- okay.  So he held himself out how?  Did he tell him that?  Because then that would be an out-of-court statement.

BY MR. ALEXANDER:

Q    How did Mr. Morton hold himself out as an agent of Hawk? What actions did he take, if any?

A    He negotiated all the deals, the conversion agreements, he negotiated all the investments in Stream TV, he helped with fund-raising, he even helped with business development, and he repeatedly -- he repeated to me on a number of occasions --

THE COURT:  You can't tell me what he said.

THE WITNESS:  He -- he represented on a number of occasions it's his money --

MR. CAPONI:  Objection, Your Honor.

THE WITNESS:  -- and he's in charge.

THE COURT:  Okay.  What is your --

MR. CAPONI:  He --

THE COURT:  Right.  You can't tell me what Mr. Morton says.  But he negotiated deals -- what did he do? Negotiated --

THE WITNESS:  I --

THE COURT:  -- with who?

THE WITNESS:  I have seen documentation --

THE COURT:  Okay.

THE WITNESS:  -- where Hawk or Bob said -- where Bob represented it's his money --

THE COURT:  Wait.  Documentation in like you read something or he told you this?

THE WITNESS:  Read.  Where Bob said it's his money, where Bob said he's the boss, where Bob said he makes the decisions.  I've seen numerous documentations.  Documentation that was sent to me directly by Bob, documentation that's in the public domain.  And also --

THE COURT:  Wait --

THE WITNESS:  Also in the Chancery Court there was a warning given to Hawk --

MR. CAPONI:  Objection.

THE COURT:  Ah, ah, ah.  You can't tell me that. Nope, no, no.  If there's something you guys -- if it's on the record, you can give it to me, but --

MR. CAPONI:  I'll withdraw my objection if Mr. Vincent (sic) wants to bring in any one of these numerous documents that Mr. Rajan just testified about.  Then we'll establish the point, and we can move on.  Apparently there's numerous, numerous documents.  Let's see it.

THE COURT:  Mr. Caponi, come on.  I get that you're frustrated, but please tone it down.

MR. CAPONI:  I'm not --

THE COURT:  I --

MR. CAPONI:  I apologize, Your Honor.  I'm just -- I'm giving Mr. Alexander a way to resolve this issue.  He's bringing --

THE COURT:  But you're being a smart aleck about it, and I'm --

MR. CAPONI:  Okay.

THE COURT:  -- not appreciating it.

MR. CAPONI:  I apologize for that.

THE COURT:  Don't do that.

I think I've warned all of you guys.  I don't like that.  It just makes me annoyed and it makes me kind of jaded how I look at people.  So don't do that.

And, Mr. Alexander, I will not repeat again that this

guy just can't sit here and slow talk.  He's just having a --
you know, a little -- you know, I -- for lack of a better of
word, he's just stream of consciousness in here.  We cannot do
that.

Mr. Rajan, I'm going to tell you, do not tell me what
anybody else told you.  Okay?  I have said that several times.

And, Mr. Alexander, you need to take control over
this direct testimony without the stream of consciousness.  Ask
him some questions.  You started off with, "Tell me about your
relationship with Rembrandt," and now we're down to, I guess,
your relationship with SLS.  Can you get some time periods
from -- you know, did there come a time when the relationship
changed?  I mean, ask him if it -- you know, did that happen?

You know, I'm -- I'm over here trying to follow
what's going on.  It's not helping me.  So take control of
this.

All right.  Go ahead.

BY MR. ALEXANDER:

Q    Mr. Rajan, can you specify a point in time when, if at
all, the relationship changed from what you testified as to a
good relationship with Hawk to -- I believe you said, it turned
south or --

A    Yeah.  It --

THE COURT:  It was kind --

THE WITNESS:  You know, with SLS.

MR. ALEXANDER:  SLS.  I apologize.

THE WITNESS:  I'm sorry.  Yeah.  It started --

THE COURT:  Okay.

THE WITNESS:  -- in the beginning of 2019, then it got very bad in the summer of 2019.

BY MR. ALEXANDER:

Q    What led to that?

A    What led to that was twofold.  One, Stasney was developing a close relationship with Alastair Crawford, who wanted to take over the company.  Two, I informed everybody we're converting the debt into equity.  That was a sore spot that got everybody -- that got SLS upset, and they didn't want to do it.  That led to a huge fight over the sweep account and Stasney wanting to expand his role.  Then what happened was --

Q    When you talk about "wanting to expand his role," what do you mean by expand?

A    He wanted to expand his role beyond CFO and have more control of the operations, more control in what the company was doing.

Q    And what actions did he take to demonstrate that?

A    He had made some proposals on expanding his role.  I felt betrayed because I told hundreds of investors about the conversion agreement, and also the money was finally taking off.  We had just signed Google, we had just signed BOSH.  So -- and we had -- we were having a number of companies that were

beginning to start getting their products ready to go to market.  So we were feeling sky high.  So I felt betrayed.  Then that led to tension in the relationship.  I felt like I was stabbed in the back.  And then where it got really bad was Crawford and Stasney basically teamed up and they began systematically trying to destroy the company.

Q    You referenced an individual, Alastair Crawford.  Who is Alastair Crawford?

A    He was a shareholder in -- in Stream TV in 2013.  He raised money for us on several occasions.  He has a very bad reputation as extremely litigious.  Every company he gets involved in, he ends up in a massive lawsuit and tries to take over the company or change the direction of it.  You know, everybody calls him a walking lawsuit.

Q    Other than being a shareholder in Stream --

THE COURT:  Mr. Rajan, don't tell me what other people say.

THE WITNESS:  Okay.  Sorry.  I'm sorry.

THE COURT:  Okay?

THE WITNESS:  I'm going to do better.  Sorry.

THE COURT:  All right.

THE WITNESS:  Okay.  Sorry about that.

Yes, what was your question again?

BY MR. ALEXANDER:

Q    Other than be a shareholder in Stream, did Alastair

Crawford have any other position with Stream?

A    Yes.  He raised money for us for a commission.  And he received commissions.  He got paid.  We got into a fight with him because he brought in another broker, a big banking firm. He wanted to take half their commission.

THE COURT:  All right.  All right.  What -- what --

THE WITNESS:  And --

THE COURT:  -- does that have to do with anything?

THE WITNESS:  Okay.  Sorry, Your Honor.

MR. CAPONI:  I was about to say the same thing, Your Honor.

THE COURT:  I'm not -- come on.  Just what was your relationship?  He was a shareholder and he --

THE WITNESS:  He was a shareholder.

THE COURT:  -- raised money and received commission. Boom.

THE WITNESS:  That's it.

THE COURT:  All I need to know.

THE WITNESS:  Okay.

THE COURT:  Okay.  I mean -- well, just stick to what I need to know.  I don't need to know the side story.  They -- they're not going to help me.

THE WITNESS:  Okay.

THE COURT:  Okay?

THE WITNESS:  Okay.

THE COURT:  All right.  What's the question?  Go ahead, Mr. Alexander.  And you asked him what was his relationship with Mr. Crawford.  Shareholder, raised money for commission.

Any other relationship with him?

THE WITNESS:  No.

THE COURT:  He wasn't on the board?

THE WITNESS:  No.

THE COURT:  Okay.  All right.

All right.

MR. ALEXANDER:  I'm moving on, Your Honor.

THE COURT:  Uh-huh.

BY MR. ALEXANDER:

Q   You referenced an entity Hawk.  Is that Hawk Investment Holdings Limited?

A   Yes.

Q   Okay.  What is your understanding of what Hawk is?

A   My understanding of Hawk is it's a family trust.  It's now a family trust.  It was originally Bob Morton's investment vehicle.

Q   Did Stream have a business relationship with Hawk?

A   Yes, we did.

Q   When did that relationship begin?

A   That relationship began -- I had met Bob Morton in 2009, 2010.  That's when we began talking and trying to work

together, and all those sort of things.

Q    How was Stream introduced to Hawk?

A    I had met Bob Morton through another investor by the name of Tim Childs.

Q    As part of the initial relationship with Hawk, who was developing that relationship on behalf of Stream?

A    I -- I had met him.  I'm -- I'm the one that had the relationship with Hawk.

Q    And when you say "met him," who are you referring to?

A    Bob Morton.

Q    Yeah.  During -- and what time period was that?

A    That was from -- I -- I met him in 2009, and then we started doing things together in 2010, 2011.

Q    Was there a point in time when Hawk invested money in Stream?

A    Yeah.

Q    When did that occur?

A    Very early on.  They invested in a -- or a predecessor company to Stream.  I think Bob did that with his personal money.  And then Hawk invested.  In 2014 is when Hawk started increasing its investments in Stream TV.

Q    What were the nature of the investments you're testifying about?

A    Some of it was equity.  Then it began as -- then as he was increasing his investments, he made it as loans with warrants.

Q    You talked about some of the equity.  How much do you recall was equity?

A    Maybe about two million of it was equity.  Maybe a little bit more.  A lot of it was -- was loans.

Q    How much of Hawk's investment was loans?

A    The actual cash we received from Hawk -- roughly actual cash received by Stream TV was about 39 million.

Q    You've referenced several times conversion agreements.  Did Stream have any type of conversion agreements with Hawk?

A    Yeah.  Hawk and SLS both signed in 2018.

Q    Mr. Rajan, I'd like you to take a look at Exhibit 6.

A    Sure.

Q    Do you recognize this document?

        THE COURT:  Okay.  What -- which exhibit?

        MR. ALEXANDER:  That is Exhibit 6, Your Honor.

        THE WITNESS:  Yeah, this --

        MR. ALEXANDER:  Hold on, Mr. Rajan, please.

        THE COURT:  I see 5, 7.

        MR. ALEXANDER:  I'm hoping 6 is in between, Your Honor.  If not, I can get you a different binder.

        THE COURT:  Wait a minute.  Let me just see.  It's just twisted over.  I found it.  Okay.

BY MR. ALEXANDER:

Q    Is this the document that you're referring to when you --

A    Yes.

Q    -- referenced the conversion agreement?

A    This is the Hawk conversion agreement.

Q    What's your understanding of the conversion agreement?

A    The conversion agreement was signed in 2018.  Stream TV -- it's Stream TV's when to convert the debt into equity.  It was essentially convertible debt at Stream TV's discretion.  The conversion is tied to the actual cash received.  So if on a -- let's say one particular loan -- there was 18 loans by Hawk.  On one particular loan, let's say the actual cash received was only a million dollars, but because of prepaid interest and -- Bob used to add legal fees on there and he used to mess around with the interest rate.  Even if that $1 million actual cash received grew to, let's see say, 3, 4 million, you only needed to raise 1 million on that particular note to extinguish and then convert the note.

The way the contract works is you give a notice, you -- first you tell the party, "Hey, we're going to convert," sort of like a heads up, then you give them notices of extinguishment and conversion.  Extinguishment changes it from debt to equity.  And then conversion has to do with how much shares the -- Hawk would get for their loan.  Hawk has a say in terms of how much equity they get.  But once the notices are given Hawk is extinguished.  And so you can give notices for the 18 loans one at a time, but you shouldn't lift the liens on the -- on the Hawk loans until all the notes are extinguished

and converted.

Q    You referenced ACR, and you said that stands for actual cash received?

A    Yes.  It's actual cash received by -- from Hawk -- by Stream TV from Hawk.  And then the clock is ticking on the fund-raising in terms of the amount of money we raise from the effective date of the contract, which was January 2018.

Q    And when we talk about the ACR, is that what's in the middle column on page --

A    Yeah.

Q    -- 4:21:56 1?

A    On each one of the notes, there's an ACR, actual cash received, in terms of the amount of money that Stream TV received from Hawk.

Q    Is it your understanding that Hawk agreed to the ACR amounts listed in --

A    Yeah.  Yeah.  They -- they had them also on the notes, too.  Hawk had it on the notes.

Q    To your knowledge, is there anything in that conversion agreement that requires all of the notes to be converted at one time?

A    No.  The -- the -- you can convert one or five or six, whatever you want to do.  It's just the liens, you lift it when all of them are extinguished and converted.

Q    So was it your understanding that along the way, when

Stream raises funds, it can satisfy --

MR. CAPONI: Objection, Your Honor. Leading question. He's testifying for the witness.

THE COURT: Rephrase. Sustained. What's his understanding?

BY MR. ALEXANDER:

Q   Mr. Rajan, what is your understanding in terms of when -- in terms of timing, a note can be converted?

A   The note is converted when we give the notices to Hawk. The money that is raise, since the effective date is all cumulative, which is scored towards the conversion, and we have given extinguishment and conversion notices to Hawk to convert their debt.

Q   You also testified that -- you referenced a conversion agreement with SLS?

A   Yeah.

Q   When --

A   We --

THE COURT: Wait. Hold on. Let him answer -- ask the question. Go ahead.

BY MR. ALEXANDER:

Q   Did Stream ever enter into a conversion agreement with SLS?

A   Yeah. When we did our conversion agreement with Hawk, we also got a conversion agreement with SLS. And we -- we've

given all the extinguishment and conversion notices and stock certificates to Hawk, and Hawk doesn't have any liens on Stream TV right now.

Q    I'm referencing SLS.  Did --

A    Okay.

Q    Did Stream enter into any conversion agreements with SLS?

A    Yes.  We have a conversion agreement with SLS.

Q    All right.  Mr. Rajan, I'd like you to take a look at exhibit -- that is Exhibit 7?

A    Correct.

Q    Do you recognize this document?

A    Yes.

Q    And what is this document?

A    This is the SLS conversion agreement.

Q    And how do you recognize this as the SLS conversion agreement?

A    What did you say?

Q    How do you recognize this as the SLS --

A    Oh.  Yeah.  This is the -- this is an agreement that we had with SL -- this is an agreement we had with SLS.

Q    My question is, how do you know that this was an agreement between Stream and SLS?

A    It's -- well, it says that in the documents.

Q    Were you personally involved in the negotiation of this agreement?

A     Yes, I was involved in the negotiations of this agreement.

Q     And who signed this agreement on behalf of Stream?

A     My -- my signature is here.  There are some issues with the SLS conversion agreement.  There's some issues with the conversion agreement in terms of the --

THE COURT:  Wait a minute.  There's no question about is there some issues?  The only question is, who signed?  Is that your signature?  Or who signed on behalf of Stream?

THE WITNESS:  There --

THE COURT:  Is -- that's your signature, right?

THE WITNESS:  That is my signature.

THE COURT:  Okay.  No other question out there.

BY MR. ALEXANDER:

Q     Did you --

THE COURT:  You've got to stop ad-libbing here. You're not here for -- so you can just talk.  Answer the questions and listen to what he's asking you.  Okay?

Now, next question.

BY MR. ALEXANDER:

Q     Did you sign this document?

A     I believe this is an electronic signature.

Q     Okay.  It's your electronic signature?

A     Yes.  I believe this was an electronic signature.

Q     What happened to this conversion agreement?

A     The conversion agreement was done with SLS.  There's

issues with it because Stasney became CFO and a board member.
There's a disagreement over this conversion agreement because
the one that I negotiated was identical to Hawk.  There is --
you know, because we filed additional litigation.  There --

THE COURT:  So what's the issues with the conversion?

THE WITNESS:  We believe that the conversion
agreement was altered and is not consistent with the agreement
that we negotiated.  So there -- we believe that the conversion
agreement is still effective.  SLS believes that is not
effective.  And there's an issue with the SLS conversion
agreement.  That is going to be litigated.

BY MR. ALEXANDER:

Q    We've talked about some of the funding with regards to
Stream's operations.  And we also discussed, you know, certain
of the four Ks that, you know, Stream produced.  I want to talk
a little bit about the optical bonding equipment.

A    Sure.

Q    How did Stream initially produce the available 3Ds or
displays?

MR. CAPONI:  Objection.  Again, we've gone on for
quite a while with nothing that I think is remotely relevant to
the motions that are pending.  We now are talking about the
historical nature of bonding equipment.  We talked about
Alastair Crawford, whose name's never been mentioned in this
case before.  I -- I don't know where we're going and how this

is any way relevant to the pending motions.  They may be relevant to the plan the Debtor's trying to approve, but it's not relevant to the motions that are pending.

MR. ALEXANDER:  Your Honor, based on what Mr. Caponi said, we think that's highly relevant because that's part of what we're trying to demonstrate, is not only that the Debtor's did things in the past, which there have been allegations by Hawk and SLS that they didn't, but also what they can do going forward.  So we believe it's important and integral to the issues that are before Your Honor.

THE COURT:  So integral with respect to their -- because I guess I'm the one that set it out there.  So what the Debtor is doing that -- and I'm not quite if I'm the one who put into question the Debtor's actions as a defense or as part and parcel of what I would consider in the motion for the motion to convert or dismiss.  Actually, conversion or dismissal requires some sort of analysis about their plans. But, again, it still, how does this relate to -- I guess -- we know what the Debtor did.  You already said we made these optical bonding.  How does that in any way move the ball for me to figure out whether to grant or deny these motions, because the Debtor, you agree, the Debtor can go forward with a viable plan?  So it shouldn't be dismissed or converted, right?

MR. ALEXANDER:  Correct.  The Debtors believe that demonstrating that the Debtors have the capabilities to do

this, and assuming, as part of this process, they are getting all of their assets back as part of the plan, that demonstrates how they are able to produce and move forward.

THE COURT:  Do we need to go into the details?

MR. ALEXANDER:  Oh, I think so, Your Honor.  Because we are demonstrating how integral the bonding equipment that the Creditors have refused to give back to the Debtor is impacting.

THE COURT:  Well, all right.  And I will tell you the same thing.  You don't want to, you know, characterizing of who is what.  That they haven't -- you haven't gotten back.  I don't think I need the issues or whatever it is.  They don't have it.  I haven't figured out why, but at this point, it is irrelevant why.  They just don't have it.

So my question is, do we need to go through a whole -- I know there is an optical bond -- bonding equipment in China somewhere.  Do we just need to, like, have it where it is, what you use it for, do you need it?  I don't know whether I need a whole background on what it is, how it works.  If you are going to tell me all of that, I will tell you, I will sustain the objection because I don't think it is relevant.  It is relevant only that they had it, they used it, and they intend to use it in the future.  That works for me.  All that other stuff, I don't -- I think is irrelevant.

So I will allow him to question only what it is, have

they used it, and what they plan to do with it in the future, which should be a couple of questions --

MR. ALEXANDER:  Thank you, Your Honor.

THE COURT:  -- not this, you know, free-flowing thinking.

Okay.  Ask the question, Mr. Alexander.

BY MR. ALEXANDER:

Q    Mr. Rajan, what is the optical bonding equipment?

A    The optical bonding is the process where we take the reading lenses that we developed, and it's glued to the panel. And our electronics are also attached to the panel, and we sell that as a module to the customers.

Q    What, if anything, in the past did the Debtor use in order to perform the optical bonding?

A    The -- we -- we originally were doing a process with the Netherlands, which didn't work.  Then we went and brought in optical bonding companies.  Stream TV procured an equipment that can produce about 180,000 TVs a year, which we had got up and running.  We developed --

THE COURT:  No, no, no.  No, no, no, no.

I just want to know what you bought.  You bought an equipment that produces what?  180?

THE WITNESS:  180,000 TVs a year.

THE COURT:  Okay.  All right.  So they procured a bonding equipment that produces 180,000 TVs a year.

Next question, Mr. Alexander?

BY MR. ALEXANDER:

Q    Who did the Debtors purchase that bonding equipment from?

A    We purchased it from a company called Anuma, Anuma Corporation in Japan.

Q    What is Anuma?

A    Anuma is a company that produces the bonding equipment.

Q    I would like you to take a look at Exhibit 37, starting on -- Debtor's Exhibit 37, starting on page, I guess it would be 1 of 9.

A    Okay.  I'm at number 37.

Q    It is tab 37.  And you will just want to flip, the first one had an extra page printed.  So you want to start where it says --

A    Yeah.

Q    -- 49-1 at the top, 1 of 9?

A    Correct.

Q    Do you recognize this document?

A    Yes.

Q    Okay.  How do you recognize this document?

A    Yeah.  This is a document that Stream TV signed with Anuma Manufacturing when we purchased the bonding equipment.

Q    Were you involved in that process?

A    Yes, I was.

Q    And what was your involvement?

A    We had an engineering team, but I was speaking to the owner.  And then we had some people on our team helping to negotiate the deal.  And then I -- I signed the contract.

Q    Okay.  When was this document executed?

A    We had contracts with them in 2015 and 2017.

Q    Do you recall when this particular document was executed?

A    Yep, this one is 2015.

Q    What is it that Stream purchased from Anuma pursuant to this agreement?

A    From Anuma we got a mass production line which produces about 14,000 units a month.  And then we also got a small production line which produces about 4,000 units a month.

Q    Why did Stream decide to enter into this agreement?

A    We were -- we had to replace the bonding process that we were doing with the Netherlands, and we were confident that this group would be able to figure out the bonding.  It's a complicated technology.  And they would be able to produce it with a good yield rate, which we achieved.  We got a 96 percent yield rate with their equipment --

        MR. ALEXANDER:  Your Honor, I would like to move --

        THE WITNESS:  -- over time.

        MR. ALEXANDER:  -- that is Exhibit 37 into evidence.

        MR. CAPONI:  Sorry, I didn't hear it?

        THE COURT:  Mr. Caponi, he wants to move in 37.

        MR. CAPONI:  Yeah, I would object to moving this

exhibit in.  I don't -- the exhibit starts with a certificate of service and ends with an order, proposed order.  So --

MR. ALEXANDER:  Your Honor, to be clear, we would like to move into evidence as Exhibit 37 what was filed on the docket as 49-1, pages 1 through 9, which is the sales contract between Anuma and Stream.

THE COURT:  Well, this copy in the binder is wrong is what he is saying.  He wants what was in the docket entry 49-1, which is what?

MR. ALEXANDER:  Your Honor, I apologize.  Part of --

THE COURT:  Uh-huh.

MR. ALEXANDER:  -- 49 the other parts of document 49 were included.

THE COURT:  So you want to enter into evidence Exhibit A of document 49?

MR. ALEXANDER:  Correct, Your Honor.

Well, yes, document 49-1 at the top.

THE COURT:  Only Exhibit A though, right?

MR. ALEXANDER:  That is correct, Your Honor.

THE COURT:  And Exhibit A is nine pages?

MR. ALEXANDER:  Let's see, one, two, three --

THE COURT:  Well, that is what it says at the top.

MR. ALEXANDER:  That is correct, Your Honor.

THE COURT:  So that is 5, 6 is a blank page, 7 is something, and all of this is all 9.  So apparently, he wants

not the page that is in the exhibit, that certificate of service.  We are not putting that in.  That is page 13, I don't know what that is.  Somehow, it is on the back of page 1.  I guess when you double-side it, there is crazy stuff.

So he wants to admit into evidence the sales agreement between Stream and Anuma, pages 1 through 9, which are on the docket as 49-1, Exhibit A.

MR. CAPONI:  Your Honor, I don't have access to the docket.  I don't know what document Mr. Alexander is referring to.  I only have what is in this binder, since I can only go off of that.  And I --

THE COURT:  Okay.  So he wants to --

MR. CAPONI:  -- my objection is what it is.

THE COURT:  Right.  So he wants to admit, putting aside whatever that is, he wants page 1.  He doesn't want to admit page 13 of 13.  He wants 1, 2, 1 through 9 that is in the binder.  Let's just go with what we have, and ignore what is at the top.  He wants to admit the sales agreement, not the certificate of service, and pages 1 through 9 of Exhibit 37.

MR. CAPONI:  What I would suggest, Your Honor, if Mr. Alexander wants to submit -- I would -- if he wants to submit a correct version of the sales agreement, and just the sales agreement, and substitute it for 37, I have no objection to that.

THE COURT:  Okay.

MR. ALEXANDER:  Your Honor, we will provide the parties with an updated and corrected exhibit, Debtor's Exhibit 37, which only includes Exhibit A, which is document 49-1.

THE COURT:  And then you have some 49-2.  You don't want that in there?

MR. ALEXANDER:  No, Your Honor.  We are going to limit it solely to 49-1.

THE COURT:  So you are going to change -- give you a copy of Exhibit 37, that will be sales agreement, 9 pages.  And we don't have --

MR. CAPONI:  If that occurs, I have no objection.

THE COURT:  All right.  Admitted when you correct. You have to correct it.  Okay, Mr. Alexander?

(Debtor's Exhibit 37 admitted into evidence)

THE COURT:  Okay.

BY MR. ALEXANDER:

Q    With regards to the bonding equipment that is identified, and that is Exhibit 37, who paid for the bonding equipment?

A    Stream TV.

Q    Has Stream ever voluntarily transferred title to the bonding equipment?

A    No.

MR. CAPONI:  Objection, Your Honor.  Again, relevance.  They are trying to litigate every underlying issue in this case.  And what matters, as Your Honor pointed out, as

Mr. Callahan pointed out, this company has no sales.  What is the plan going forward?  The motions are directed to the conduct of the Debtor.  And we kept our motion focused to this conduct of the Debtor since filing the bankruptcy, and we are not discussing that issue at all.

Who paid for this and whether they transferred, I just don't see the relevance of it.

MR. ALEXANDER:  Your Honor, the relevance is we are demonstrating that it is an asset of the estate that is necessary for the Debtor, in terms of its performance in going forward.  And we would also say that 80 percent of Mr. Stastney's testimony was what occurred prior to the filing of the bankruptcy.  So for Mr. Caponi to say that it is limited to that, the Debtor would disagree.

THE COURT:  Okay.  Well, first of all.  Let's deal with the objection that you say that it is irrelevant to this matter. You are saying it is relevant because it goes to the Debtor's ability to do future performance by saying you have this is bonding equipment.  I will allow it for that.  Keep it tight.  Short.  We own it.  We still own it, and we intend to use it. Isn't that what you are trying to get across?

MR. ALEXANDER:  Your Honor, that was my question.

THE COURT:  Yeah, well, but that would be all over the place.  You are asking him -- you know, just ask the -- don't, I mean, let's just keep this short and to the point.

All right.  You paid for it.  You meaning Stream, paid for it?

THE WITNESS:  Correct.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q   Did the Debtor believe that Stream still owns that bonding equipment today?

A   Stream TV still owns the bonding equipment.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q   Is the bonding equipment necessary for the Debtor to perform and produce the optical bonding machine pursuant to its plan?

A   Stream TV, for some of our customers such as 5Star, we need the bonding equipment.  Stream TV has made arrangements for our current purchase orders --

THE COURT:  No, no, no.  Nope.  That is not the question.  The question is, is it necessary for Stream to produce its products, which is actually, yes/no.

THE WITNESS:  For some of customers, yes.

THE COURT:  Okay.  You can follow up, if you -- but no, Mr. Rajan's answer, I don't need, you know, I don't need a dissertation.

Okay.  Go ahead, Mr. Alexander.

MR. ALEXANDER:  I am trying to cut out some --

THE COURT:  I mean, I am not trying to --

MR. ALEXANDER:  I understand, Your Honor.

THE COURT:  But I just want what is relevant, and what is going to help me get where I need to go.  I have heard enough that I -- I mean, I am not new to this.  Unless you think there is something that I don't know, and that is significant that I should know, that will have some impact, by all means, let me know.  But at this point, I think I have heard almost everything.  But I haven't seen the proposed plan, because I don't look at that stuff until it is before me.

BY MR. ALEXANDER:

Q    Has Stream delivered units using the optical bonding machine to customers?

A    Yes.  We -- we manufactured and sold 5,000 units using that machine.  And this TV, in particular, was made off of that machine.

Q    Okay.  I want to talk a little bit about Stream's plan, in terms of production, going forward.

A    Okay.

Q    Does Stream intend to produce 3D optical modules or panels going forward?

A    Yes.  We receive --

THE COURT:  Ut-uh.  You intend to produce, correct?

THE WITNESS:  We intend to produce 3D modules.  We have received orders over 110,000 units so far for 3D modules

with our technology.

BY MR. ALEXANDER:

Q    Has Stream put together a plan in terms of how it is going to meet the production?

A    Yes, we have.

Q    Okay.  And what is the plan?

A    Right now, Stream TV, since we filed the bankruptcy, we have now made arrangements for a backup bonding solution, because we didn't get the Stream machine back.  So to process our orders, we are working with a company in Japan called Fujipream that has machines similar to ours, and they can --

THE COURT:  What are they called Fuji who?

THE WITNESS:  Fuji, F-U-J-I.

THE COURT:  Uh-huh.

THE WITNESS:  Dash P-R-E-M [sic].  They're in Japan. They can produce 40,000 TVs a month right away.  And with notice, they can go to 100,000 TVs.  We have been working with them for the last few weeks.  They are helping us to make samples and then do the production for most of our customers. And the --

BY MR. ALEXANDER:

Q    Mr. Rajan, when you say most of your customers, who are you referring to?

A    I'm -- I'm referring to Southern Telecom, then BOE has brought us some additional customers.  We have some other

companies who have not issued POs, but have begun working with us since we filed the bankruptcy, like Skyworth and Chunghwa Telecom, who are also buying 65-inch TVs.  Southern Telecom has indicated that they are going to increase their order from 100,000 TVs, which is $140 million in revenues to about 300,000, which would push us at about 400 million in revenue. So even though we didn't get the Stream bonding machine back and we do need it for our customer 5Star, we now have a bonding solution where we can process our orders and we have begun the production process right now, where we are putting a TV together on our own at Stream TV with our Silicon Valley Team. We're putting that together on our own, and we're beginning the process of getting the production started and beginning to generate revenue and cash flow.

Q    You referenced an entity Skyworth.  How does Skyworth fit into the Debtor's plan?

A    Skyworth is tied for number 1 in China for television sales.  They do white-label work, where they make TVs for other companies.  They provided the backlight and the mechanicals for Google.  They want to sell under their brand, and they're making TVs for other companies.  And right now, we're going to be putting samples together for Fujipream and then we're working with Skyworth to get an order out of Skyworth.  That will be in the neighborhood of about two million units, which will be significant revenue for the company.

Q    How long would it take the Debtor to produce the two million units?

A    If we're using Fujipream's bonding machine, they can produce 100,000 units a month quickly for the first 40,000, then they can go to 100,000.  They said they have the capability to get it up about five to six million TVs a year with notice.  They have an extensive bonding operation, both in China and Japan.  So we're going to be using their bonding equipment for our other customers.  For 5Star, they want the Stream TV bonding machine.  5Star ordered 10,000 units.  As soon as they get the Stream TV bonding machine returned back, they're going to increase their orders to about 75 to 100,000 units of that 4K TV that you have there.  That would put our revenues a half a billion.  And we would be generating about $150 million to 170 million in gross margin, more than enough to settle all of the liabilities.  So you know, so we have a plan on the bonding. On the electronics --

Q    Well, let's take it --

A    Yeah, okay.

Q    -- and break that out.  So in terms of the plan on the bonding, is it your belief that the Debtors will be able to satisfy the sales orders based on working in connection with Fujipream?

A    Yes.  Yes, we can.

Q    Okay.  And we are talking about electronics, so does --

what do you mean by electronics?

A    We have to take our algorithms and put them into electronics.  Extensive work was done at Stream TV in 2019 and 2020.  We have two Silicon Valley Teams, one team went with Mr. Stastney to SeeCubic.  The cheaper, faster team stayed with us, thank goodness, and they did the Google project.  They've been working on our electronics for the last few years to get us ready for production.  We've been spending money on it, even when we lost in the Chancery Court.

We got the electronics ready for production, because we know we would get the technology back.  The Silicon Valley Team is putting together TVs without the help of the Netherlands people, and they're doing that right now.  And we're in the process of putting units together.  We are starting the production.  We'll be shipping about 1,000 TVs to our customers.  And then if everything is good with the 1,000 TVs, we will be ramping it up to about 10 to 12,000 units a month.  And that will be generating significant cash flow.  We make on average, about $500 a unit.  So that will be bringing in about five to six million dollars in free cash flow quickly.  And we've also reduced our overhead at Stream TV compared to where it was in its heyday, so we'll have plenty of money to pay off liabilities.

Q    So other than production and with the optical bonding, you testified about electronics.  Is there any other component with

regards to Stream's operational plan going forward?

A    No, there's -- there's two parts.  There's the bonding, and then Stream TV has its own lenses.  We are not dependent on the Netherlands.  Stream TV has its own software, and we do our electronics.  We can make modules without the help of the Netherlands.  We really want our Stream TV bonding machine back, because of the 5Start customer.  He wants to put money into the production, a couple million bucks.  And he had a deal worked out with Chancery Court.

Q    So Mr. Rajan, if you could just --

THE COURT:  No, no, no.  You have your own software and own what else?

THE WITNESS:  We have our own lenses at Stream TV. That's the film, the film that goes on the panel.

THE COURT:  Uh-huh.

THE WITNESS:  Then we have our own electronics that Stream TV developed independent of the Netherlands people.

THE COURT:  Okay.  What does that, what do you mean, electronics, what is that?

THE WITNESS:  The back of the TV, do you see the back?

THE COURT:  All that?

THE WITNESS:  Yeah, but we have our own.  So even though the Netherlands people have not been helping as much as we want, we can go to production.

THE COURT:  So I am a little confused.  So you sell these electronics?

THE WITNESS:  We can sell electronics and also a film.

THE COURT:  Okay.  So have you got to buy them together or you sell them separately?

THE WITNESS:  No, it's together.

THE COURT:  Okay.

THE WITNESS:  They're together.

THE COURT:  Okay.  So you sell this, you put it on your TV, and you put some stuff in the front, and that is what makes it work?

THE WITNESS:  So we put -- we put -- we put the film and the electronics together.  Then it goes to a contract manufacturer, and they make the TV.

THE COURT:  Well, I don't need to know all of that. I am just asking you.  When I, what I was looking at on the TV here --

THE WITNESS:  Right.

THE COURT:  -- is comprised of just what's in the back?

THE WITNESS:  Correct.

THE COURT:  And the film that you put on the front?

THE WITNESS:  Correct.

THE COURT:  And together, that is how you have --

THE WITNESS:  The 3D.

THE COURT:  -- the 3D.  Okay.

THE WITNESS:  Yep, you have got it.

THE COURT:  All right.  I was lost.  Okay.

THE WITNESS:  No, you have got it now.

THE COURT:  I hope I wasn't the only one lost, but maybe I was.

All right.  Okay.  So you sell -- do you sell them together or you can -- can somebody just buy the back?

THE WITNESS:  No, they -- we sell them together.

THE COURT:  Okay.

THE WITNESS:  And they ship -- they ship together.

THE COURT:  Okay.  So they ship together.

And presumably, you have some software that goes in?

THE WITNESS:  Yeah, it goes inside the electronics.

THE COURT:  It goes inside?

THE WITNESS:  Yep.

THE COURT:  Okay.  Inside the TV or inside this back part?

THE WITNESS:  That would be inside those chips.

THE COURT:  Okay.  All right.

THE WITNESS:  They are the big chips, yeah.

THE COURT:  All right.

THE WITNESS:  And then that's the small ones.

THE COURT:  I think I understand now.  Okay.  I have

got it.  Okay.

And Stream TV owns its own, separate from what is in the Netherlands?

THE WITNESS:  Yeah, we made our own.

THE COURT:  You made your own?

THE WITNESS:  Yep.

THE COURT:  Okay.  Okay.

BY MR. ALEXANDER:

Q    Mr. Rajan, do you believe that going forward, Stream TV is able to operate without SeeCubic B.V.?

A    We can operate without SeeCubic B.V..  We don't want to, because they were our original inventors.  We don't want to cut them out.  We feel a moral obligation to include them, but they are really just meant to be consultants.  They're not electronics guys.  They're not production guys.

THE COURT:  So that is no, or you can operate without them?

THE WITNESS:  We can operate without them.  Yes, we can.

THE COURT:  Okay.

THE WITNESS:  All right.  Sorry.

BY MR. ALEXANDER:

Q    I want to talk a little bit about the Debtor's customers.

A    Yeah.

Q    Okay.  Does the Debtor currently have customers in which

it intends to sell its products to?

A    Yes.

Q    Okay.  Can you describe and identify to the Court who some of the customers are?

A    Yeah.  Number 1 is BOE, they're the number 1 panel company in the world.  They introduced us to a number of their customers.  They sell those big panels.  They introduced us to their customers, and those customers have become customers of Stream TV.  So the first one is 5Star.  5Star's parent company is called Marble Digital.  They bought thousands of TVs from us, spent millions of dollars.  They committed, in the negotiations with the Chancery Court and the Receiver, to put millions of dollars into the production for the Stream bonding machine.  He has ordered 10,000 of that unit that you just saw. He would like to increase his order to about 75 to 100,000 once he gets the bonding machine, which is about $140 million in revenue if he goes up to 100,000.

Now, the unit that he is ordering, there is about eight or nine other customers who will take the exact same unit.  So BOE is introducing us to all of these companies. Like, there's a company in Thailand that's making an offer this morning.  I don't know what happened.  Google wants the same thing, I think, 10,000 or 20,000 units of those.  So they will be taking the exact same unit.  It is a simple product to put together.

The next customer is Southern Telecom, which is a company that owns brands here in the United States. They're in Brooklyn, New York. They own the Brookstone brand, the Sharper Image branch, Polaroid, Westinghouse. Let me see, they also own -- they've got the Packard Bell brand from Acer. They have a headphone brand, you know, with the old Williiam Shatner kind. I forget the name. They sell in Walmart, they sell in Target. They sell all over the United States. They're a big supporter of ours and they've ordered 100,000 TVs. They're going to expand their order to about 300,000 TVs.

Then, in addition to them --

Q When you talked about, in terms of Southern Telecom, you said they are big supporters. How are they big supporters?

A Well, one, they gave an order. Two, there is a discussion ongoing where they wanted to sort of merge or acquire Stream TV or VSI last fall. Those discussions are ongoing and we've had discussions with them on also giving financial support, not just purchase orders, to the company. And those discussions are ongoing where you know, they would like to -- they would love to own our company, if they could, okay? So -- so they're -- they're a big supporter of ours. They're also going to be involved in our marketing with our content deals that we've started, since we are in the bankruptcy. And we are doing some cross-marketing and those things with Southern Telecom. But the advantage with them is that they're at 140 million in

revenue.  They're going to increase their orders by another 200, or 300,000.  And their unit is a template for several other companies, if you look at the package that we turned over to the Court, their unit and Skyworth are almost identical. The same thing with Hisense and some other brands, like, Chunghwa Telecom, which will be ordering once we get the samples from Fujipream, they'll be putting in their orders as well.

Q    And what model is this for, that --

A    We're sticking with 65 inch and 75 inch.  That's all we're doing right now.

Q    Is there an advantage for the Debtors to sticking with 65 and 75 inch?

A    Well, one, we already did it.  Two, we already have mechanicals.  We already have backlights.  We have experience doing it.  We have all of the infrastructure to do it.  We do have customers for other sizes, but we can get significant volume, over $500 million, just with sticking with 65 and 75 inch.

Q    Do you believe the Debtors will have capabilities to do other sizes as well?

A    Yeah.  We're going to do -- after we do 65 and 75, we're going to do a PC monitor and tablet.  And -- and we have a number of companies that are in negotiations with both sizes, so like Lenovo.  And we just had a big strategic meeting with

Sony in California last week for the 65 inch, Sony Television and their finance arm for the 65 inch.

Q   Are there any other customers?

A   Yeah, we -- we just got a request for a price quotation from LG, and I'm going to create a meet with the top management at Samsung.

Q   In terms of BOE, does the Debtor currently have any agreements in effect with regards to BOE?

A   Yes, we have a contract with BOE that's two parts.  One is sort of joint marketing, where they introduce us to customers. The other one is BOE provides purchase order or supply chain finance.  So for all of these orders that we're getting, they can buy and resell the modules to the customers.  So one of the questions that came up is how are we going to finance all of these orders?  They are offering to buy the lenses and the chips and resell it to the customers for us.  Obviously, they would take some of our profit.  But then we don't have to come up with the working capital to finance the lens and the chips and those things.  So they're the number 1 panel company in the world now.  They're shipping hundreds of millions of dollars of panels, and we have -- Stream TV already has a contract with BOE.

Q   Mr. Rajan, I would like you to take a look at Debtor's Exhibit 3.

A   Number 3?

Q    Do you recognize this document, Mr. Rajan?

A    Yeah, this is it.

Q    How do you recognize this document?

A    This is our contract with BOE.

Q    When you say our contract with BOE, who are you referring to?

A    Stream TV.

Q    And what is this agreement?

A    This is an agreement for between Stream TV and BOE where, one, BOE is going to introduce us to customers.  Number two, BOE and both groups agree that they won't take each other's technology, their technology is their technology, our technology is ours, which was very important with them.  And then two, they will -- there's two options for them.  One is they can buy and resell our modules, the lens and the chips.  And then two, BOE also makes TVs, not just panels.  They have a group in China, so they wanted a provision for their own sales to buy and resell the modules.  So they sell in China.  They do private label, just like Skyworth.  And then also, for their own sales, which they finance.

Then, BOE also agreed to refer us to not just the customers, but, like, vendors and suppliers.  So BOE is the one that introduced us to Google.  And BOE was helping on the Bosch deal.  And then BOE made arrangements for a contract manufacturer for Southern Telecom, just, like, two weeks ago,

which they're working together.  So BOE introduced us to them.
And those groups are working together on Southern Telecom's TV.

Q   Okay.  So -- and who signed this agreement on behalf of the Debtor?

A   I did.

MR. ALEXANDER:  Okay.  Your Honor, we would like to move Debtor's Exhibit 3 into evidence?

THE COURT:  Mr. Caponi?

MR. CAPONI:  I object, Your Honor.  This is an unsigned document.  The counterparty never signed this agreement.

THE WITNESS:  No, they -- they signed it.  They use a stamp in China.  It's the red stamp.  That's the way they sign it in China.

MR. CAPONI:  I don't think there is any question, Mr. Rajan, in front of you.

THE COURT:  All right.  Okay.  Your objection is they didn't sign it?

MR. ALEXANDER:  And our response is on page 10 of 12 at the top.  They inserted their company seal with regards to execution of the document.

MR. CAPONI:  There was no testimony as to anybody's status as to the company seal.

THE COURT:  All right.  Ask him, was it executed.

I sustain.  He said you don't have any testimony.

Ask him about.  Was it signed?  Who signed?  You only asked him if it was his signature.  It was signed by the company.

BY MR. ALEXANDER:

Q    Who is this agreement between, Mr. Rajan?

A    It is between Stream TV and BOE.  It is with BOE's factory called Hefei Optical-Electronics, HOE, okay, which is the way they do it.  They have executed the agreement.  In China, they use the company seal, especially for large transactions.  And BOE announced to the whole world they have deal which --

MR. ALEXANDER:  Your Honor --

THE WITNESS:  -- is strictly with BOE.

THE COURT:  Huh-uh.

MR. ALEXANDER:  Enough said.

THE COURT:  Okay, stop.  You can't tell us unless you know he might have an article.  He might have some announcement.  Do you have that?  You can introduce it, but you can't tell us something that somebody else did.  Nope, can't tell us.  Unless he asks you a question where it could come in out.  Figure it out, Mr. Alexander.  But he can't tell me, oh, they announced it to the world.  Is there a document or something?  I don't know.  Go ahead.

Any further questions, Mr. Caponi?  He said that that is the signature from the Chinese company and that that's how they sign their contracts.  Are you still objecting?

MR. CAPONI:  Based on that testimony, Your Honor,

I'll withdraw the objection.

THE COURT:  All right.  It's admitted.

MR. CAPONI:  And then, Your Honor, just out of curiosity, you mentioned that we would go to 6:00.  It's past that now.

THE COURT:  Oh, I didn't even know what time it was.  All right.  I'll let you go to 6:30.

MR. ALEXANDER:  Okay.  6:30?  That's fine, Your Honor.  Thank you.

THE COURT:  Yeah.  Let's go.  I wasn't even checking the time, to be perfectly honest.  I probably should be.  But I don't think I, you know, I'll get fired if I let you guys go to 6:30.  Go ahead.  But we have a hard stop.  I was trying to let him get through, hopefully we could get through his direct.  But I don't think we're going to get there.  We're not going to get there in 15 minutes, right?

MR. ALEXANDER:  No, we're not, Your Honor.

THE COURT:  Okay.  So maybe a good point to stop.  What's the next area you're going to talk about?

MR. ALEXANDER:  Well, I'm just going to finish up talking about some of the current customers.

THE COURT:  All right.  After that, we'll break.  Okay.  Go ahead.

BY MR. ALEXANDER:

Q    Mr. Rajan, this agreement which is marked Debtor's Exhibit

3, is it still effective?

A     Yes, it's effective.  We are working on BOE.

Q     How often are you communicating with BOE?

A     We are -- Stream TV has calls with BOE at least three to four times a week.  There's meetings, probably at least once to twice a week, either in China or the United States.  They help us with customers.  They help us with vendors.  They're helping us with supply chain finance.  They're ramping up more introductions and they're also working on their own sales activities.

Q     Okay.

A     And they're reestablishing our relationships with customers.  And they're -- they're going to be helping with the production as well, too.  Their engineers will be helping us with production that we're now starting.

Q     Okay.  You also referenced Google in your testimony regarding BOE.

A     Correct.

Q     What is the connection between --

        THE COURT:  Hold on one second.  I have to start another page.  Okay.  All right.  So you're asking him about Google.

BY MR. ALEXANDER:

Q     Yes.  Mr. Rajan, let me make sure we get the question, and then you can go forward.

THE COURT:  I'm sorry.  I distracted you.  Repeat the question.

BY MR. ALEXANDER:

Q   Mr. Rajan, in your testimony regarding BOE, you referenced Google.  What connection if any is there between Google and BOE?

A    In 2019, after we signed this contract with BOE, we already knew Google.  BOE introduced us to Google in the United States.  A meeting took place in the United States.  They introduced us to Google.  Google has gone heavily into the glass-free 3D space.  Google has a -- which is now public knowledge.  It's based on confidential agreements, they have a 65-inch 3D without glasses videoconference machine where they -- you can do videoconference calls in 3D without glasses. And Google and BOE -- BOE wanted us to work with Google to -- Stream TV -- to help supply this unit for Google, via we wanted to supply the panels.  So sort of a three-way relationship.  We then began working with Google after BOE introduced us to them. And we signed contracts with Google in 2019 and began working with them.

Q    What contracts did Stream sign with Google in 2019?

A    We signed several.  One was Google did extensive due diligence and Stream TV was accepted as a Google approved vendor and supplier.  They did a detailed background check on me and also a detailed background check on Stream TV.  And

then, they also analyzed our bonding process.  And we have a very complex technology.  They wanted a very simple 3D for their technology, so we sort of had a meeting of the minds.  We said we'll produce the units with their simpler technology.  But things go well, they were going to look at introducing our technology to the whole of Google.  Then we signed the contracts, began working with them.  Our Silicon Valley team was doing the electronics and our team in Taiwan as well as our team in the Netherlands was doing the lenses.  Then, we -- then Google, in the fall --

THE COURT:  Wait a minute.  Do they have a contract?  You're asking him what's their relationship?

THE WITNESS:  Yeah.  We have contracts with Google.

THE COURT:  All right.  Can you, like --

MR. ALEXANDER:  That was the question, Your Honor.  I --

THE COURT:  What was the question?

MR. ALEXANDER:  I believe the question was did Stream ever enter into any agreements with Google.

THE WITNESS:  Yes, we did.

THE COURT:  All right.  So why are we hearing all this other stuff?  Yes, we did.

THE WITNESS:  Yes, we did.

THE COURT:  All right.  Let's talk.  Where are they?  Is that next?

MR. ALEXANDER: That is next, Your Honor.

THE COURT: All right. Can we just get to that? I don't need all of the background on how many -- just they did, and here they are. Okay. Now, you want to explain them to me then, but in a vacuum, just no. Go ahead.

BY MR. ALEXANDER:

Q    Mr. Rajan, I'd like you to take a look at Debtor's Exhibit 40.

A    Which number?

THE COURT: 40.

BY MR. ALEXANDER:

Q    Four zero. Debtor's Exhibit 40. Do you recognize this document, Mr. Rajan?

A    Yes.

Q    What is this document?

A    This is the inbound services agreement for Google.

Q    How do you recognize that this is the inbound services agreement with Google?

A    They -- we had to download this from links that Google gave us.

Q    And did Stream sign this document?

A    Yeah. We have signed documents with Google.

Q    And how was it signed?

A    It was signed electronically.

Q    When you say signed electronically, what do you mean by

signed electronically?

A    Google had this elaborate system set up where you had to go into a website and sign -- sign the contract on their website.

Q    Did you go into that website?

A    Yes.

Q    Execute this contract?

A    Yes, I did.

        MR. ALEXANDER:  Your Honor, we'd like to move Exhibit 40 into evidence.

        THE COURT:  Well, where is it?  So this is the information.  Okay.  Mr. Caponi?

        MR. CAPONI:  No objection, Your Honor.

        THE COURT:  All right.  Admitted.  Okay.  Next?

    (Debtor's Exhibit 40 admitted into evidence)

BY MR. ALEXANDER:

Q    And what is the purpose of the outlined services agreement?

A    That was to get us into the Google system for payment. Payment.  Be able to receive payments and also do work for Google.

Q    Did the Debtor ever do work for Google?

A    Yeah.  We did work through 2019 and 2020.

Q    What work did the Debtor do for Google?

A    We designed a module for Google.  The electronics are done

in Silicon Valley and the lenses are handled by Taiwan and the Netherlands team.

THE COURT:  Electronics and what else?

THE WITNESS:  The lenses.  The film again.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q    Mr. Rajan, I'd like you to take a look at Debtor's Exhibit 41.  Do you recognize this document?

A    Yeah.

Q    What is this document?

A    This is -- we were to deliver to Google the first two units.  If you look at that earlier document, yeah, so these are the first two units that we were supposed to deliver to Google.  And then, if those units went well, we had to ship 200 units and then the next phase of 10,000.

Q    How do you recognize that this is the purchase order?

A    This is the purchase order that Google gave to us, yes.

Q    Okay.  Was this purchase order received in the ordinary course of Stream's business?

A    Yeah.  We accepted it.  We accepted the purchase order, correct.

MR. ALEXANDER:  Your Honor, I'd like to move Debtor's Exhibit 41 into evidence.

MR. CAPONI:  No objection, Your Honor.

THE COURT:  Admitted.

215

(Debtor's Exhibit 41 admitted into evidence)

BY MR. ALEXANDER:

Q    Did the Debtor continue with its relationship with Google after that purchase order?

A    No.  What happened was in 2020, we had the electronics finished.  We got the lenses finished.  We were going to deliver the unit in December 2020.  We lost in the chance report.  And SeeCubic came in.  They had discussions with Google.  And then, Google quit.  Then, when we won in the supreme court, we wanted to get our Google lens back from the Netherlands.  They didn't want to give it back.  And they don't want to give us the Google lens.  And we had a meeting with Google in February of this year.  They told us to make the delivery --

MR. CAPONI:  Objection.

THE COURT:  Well, can't tell me what they tell you.

THE WITNESS:  Okay.  So our understanding is we were to make the delivery.  And then, the --

THE COURT:  And you had a meeting when?

THE WITNESS:  Google.

THE COURT:  I know.  When?

THE WITNESS:  February.

THE COURT:  This year?

THE WITNESS:  Yeah.

THE COURT:  And your understanding after that meeting

was what?

THE WITNESS:  To deliver the unit that's in the purchase order.  Then Google would start discussions back up on our 65-inch.  They're also doing other sizes now for their videoconference.

BY MR. ALEXANDER:

Q    Is the screen that is referenced in the purchase order, is it completed?

A    The electronics in the panel is in our Silicon Valley team.  The lens is in the Netherlands.  The Netherlands people do not want to give it back.  Our understanding is because they do not want to displease SeeCubic of Delaware.  So they're not giving us our lens back.

Q    Does Stream still have plans to work with Google going forward?

A    As soon as we get our lens back, yes.

Q    And is the Debtor working to obtain the lens?

A    Yes.  We have been asking the Netherlands people with it. We've been working with Dutch counsel to try to get the lens back.  We have not gotten it back.

Q    What do you believe the scope of the relationship will be with Google going forward?

A    They're going to want a 65-inch.  And then also, they're going to want some other sizes.  It's a very high margin type film for us, so.  And it'll be -- it's very -- it's very easy

to do, very easy to make, and it's a very easy project.

Q    Does the Debtor have any other customers that it's working with right now?

A    Yeah.  We're working with Skyworth.  We're working with Chunghwa Telecom.  We're --

Q    Chunghwa Telecom.

A    Chunghwa Telecom is a cable TV company like Comcast is here in the U.S.  They want to sell a TV with our technology and then bundle it with their video service, just like you get a cell phone on a subscription.  They have our TV in their lobby and they're working with our engineering teams on their TV.  They want to purchase about 60,000 units.  And if that works well, we will take that model to other cable and telco operators around the globe.

Q    So you referenced Skyworth.  What was that other company you just said?

A    Skyworth.  Yeah, Chunghwa Telecom.

Q    Chunghwa Telecom.  Are they --

A    High Sense.  The other company -- I don't want to say it too loud -- is Huawei who wants to sell our TV.  And we're starting discussions with Vizio.  We've made several presentations to LG.  And I have to go to Korea soon for both LG and Samsung.  And we just made a major presentation to Sony and we have some folks helping us in Japan.

Q    And what does the Debtor intend to -- with respect to I

believe you said Vizio and LG, and making an overseas trip,

what's the purpose of the trip?

A    It is -- well, LG has already asked for quotations on

5,000 units.

MR. CAPONI:  Objection, Your Honor.

THE WITNESS:  Five million units.

THE COURT:  Okay.

MR. CAPONI:  He's speaking about -- just already

asked.  He's speaking about what someone told him out of court.

THE COURT:  Okay.  You can't tell us what they told

you.  Did they put it in writing?

THE WITNESS:  Yes.

THE COURT:  Now I have it, but.  Okay.  Mr.

Alexander, I'll sustain the objection because he can't tell me.

But you can rephrase it so that he can tell me what his

understanding is.  He's going to LG to do what?  He's going

overseas to do what at LG?  So that's what you're asking.

MR. ALEXANDER:  That was the question, Your Honor.

THE COURT:  Then what was he going over there for?

Because it got lost in and then they did this.  Just stick to

the -- this is what's causing the problem.  He adds on

information that's not responsive.  What are you going to do

with LG?  Present?  What did you say you were going over there

for?

THE WITNESS:  It is to sell them modules.

THE COURT:  Sell them modules.  Okay.  And who else you seeing while you go overseas besides LG?

THE WITNESS:  Samsung.

THE COURT:  And you're going to meet with them to?

THE WITNESS:  Sell them modules.

THE COURT:  Okay.  Okay.  All right.  Okay.

BY MR. ALEXANDER:

Q    How many modules does the Debtor anticipate proposing to sell to LG?

A    Five million.

Q    How many modules is the Debtor, if any, proposing to sell to Samsung?

A    We don't know yet.

Q    How many modules if any does the Debtor propose to sell to Vizio?

THE COURT:  To who?

MR. ALEXANDER:  Vizio.

THE COURT:  Okay.

THE WITNESS:  Well, Vizio, we don't know yet.

BY MR. ALEXANDER:

Q    Does Debtor currently have a relationship with an entity called Bosch?

A    Yes.  Well, we had a relationship with Bosch.  We're still talking to them.  But it's not as good as it used to be, no.

Q    You don't currently have any proposals out to Bosch?

A    The Bosch project has been taken over by BOE Automotive Group.  Stream TV was working with Bosch in 2020.  When SeeCubic took over, the deal fell apart and the project was canceled.  They were paying us two and -- I think it was a $2.5 million dollar development deal.  And they're paying in the neighborhood of about $400,000 a quarter.  When SeeCubic took over, there was a fight.  And the quality of the automotive sample was not good and there was fighting over pricing and terms and conditions with SeeCubic.  And so the Bosch deal fell apart.  BOE has picked up the automotive deal.  And Bosch, there's still dialog going on, but right now, they feel like they got their fingers burned.

Q    You have previously referenced an omnibus agreement.

          MR. ALEXANDER:  I'm not going into a new section, Your Honor.  This relates to customers.

          THE COURT:  All right.  Because we have 6:30.

          MR. ALEXANDER:  Okay.  I can stop.

          THE COURT:  Why don't we stop now?  Okay.  All right. We'll pick up on Thursday at -- what time are we scheduled? Noon?  1:00?

          MR. ALEXANDER:  I think it's 12:30, Your Honor.

          THE COURT:  12:30?  Okay.  All right.  I'm not sure what's going on.  You said Thursday, right?

          MR. CAPONI:  This Thursday.  Yeah, Thursday.

          THE COURT:  Yeah.  That's my Chapter 13 days.

Sometimes, they go long.  Sometimes, they're done.  Like last week, they were done at 10:30.  So if you guys are here, I will try to endeavor to start promptly at 12:30.  But if everybody is here and I can start before then, I will.  Okay?  All right.

MR. ALEXANDER:  In terms of -- I'm sorry, Your Honor.

THE COURT:  Go ahead.  In terms of?

MR. ALEXANDER:  I was going to say scheduling for tomorrow, I know the parties discussed --

THE COURT:  Right.  Unfortunately, I have another matter scheduled at 12:00, 12:30.  And I expect that that probably will go to five or six o'clock.

MR. ALEXANDER:  But we'll contact Ms. Godfrey to roll the two matters that are currently set on your eleven o'clock calendar in this case.

THE COURT:  You want to continue it to another date?

MR. ALEXANDER:  Yes, Your Honor.

THE COURT:  Okay.  That's fine.  I wish I could get -- I could guarantee you that hearing at 12:30 might go to seven o'clock because it -- never mind.  Some people just love details.  Love details.  But in any event, court is in recess until tomorrow at 10:30.  Mr. Rajan, you are under oath so you cannot discuss your testimony with Mr. Alexander.  You can talk to him, but not about testimony.

MR. ALEXANDER:  Or anybody else.

THE COURT:  Or anybody else about your testimony.

But you can talk about the weather, you can talk about anything else.  But not your testimony.  Okay?

THE WITNESS:  Okay.

THE COURT:  And that's the first thing I'm going to ask you when you come back, did you discuss your testimony with anyone?  Okay?

You guys can leave -- unless you need to take it with you.

MR. ALEXANDER:  They can take that with them.

THE COURT:  Okay.  They can take the TV.  If you want to leave your boxes, you can put them in the jury box over there.  If you want to leave your exhibits or any of that there because -- we're locking up.  Nobody is going to be in here, right?

THE BAILIFF:  No, right.  I was just wondering if they're going to -- they're taking the --

THE COURT:  Oh, they're taking that TV.

THE BAILIFF:  No, I know.  I'm just wondering what the elevators -- which elevators --

THE COURT:  If they need to go on the regular, you're going to need to put them on there.  You can use my card or somebody else's card.

THE BAILIFF:  My card will work.  All right.

THE COURT:  Yeah.  So you guys cannot get out of here.  You're trapped.  We have to let you on the elevator.

MR. ALEXANDER:  Okay.

THE BAILIFF:  I'll just walk out with you guys, do that, and I'll come back.

(Proceedings adjourned)

C E R T I F I C A T E


I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



*John Buckley*
John Buckley, CET-623
Digital Court Proofreader