UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

Stream TV Networks, Inc.   CH: 11 :
                                    : Case No.  23-10763
A) Trial Re: Emergency Motion To  :
Dismiss Case. Motion Of Hawk      :
Holdings Ltd. (I) Pursuant To     : Philadelphia, Pennsylvania
Section 1112(B) Of The Bankruptcy : August 17, 2023
Code Either (A)(I) To Dismiss The : 12:30 p.m.
Debtors Chapter 11 Cases Or (2)   :
To Convert Such Cases To Cases    :
Under Chapter 7 Or (B) In The     :
Alternative, Pursuant To Section  :
1104(A) Of The Bankruptcy Code To :
Appoint A Chapter 11 Trustee And  :
(Ii) To Request Expedited         :
Consideration Pursuant To Local   :
Rule 5070-I(G)Filed By Hawk       :
Investment Holdings Ltd.          :
Represented By Steven Caponi .    :
. . . . . . . . . . . . . . . . . .:

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                Vincent F. Alexander, Esq.
                              Lewis Brisbois Bisgaard & Smith
                              110 SE 6th Street, Suite 2600
                              Fort Lauderdale, FL 33301
                              954-728-1280

                              Kevin Shaw, Esq.
                              Lewis Brisbois Bisgaard & Smith
                              500 Delaware Avenue, Suite 700
                              Wilmington, DE 19801
                              302-295-9436

For SeeCubic:                 Marley Ann Brumme, Esq.
                              Eben P. Colby, Esq.
                              Skadden Arps Slate Meagher &
                              Flom, LLP
                              500 Boylston Street, 23rd Floor
                              Boston, MA 021116
                              617-573-4800

APPEARANCES (Continued):

For Hawk Investment Holdings       Steven Caponi, Esq.
Ltd:                               K&L Gates
                                   600 N. King Street, Suite 901
                                   Wilmington, DE 19801
                                   302-416-7080

                                   Margaret R. Westbrook, Esq.
                                   Jonanthan N. Edel, Esq.
                                   K&L Gates LLP
                                   300 South Tryon Street
                                   Suite 1000
                                   Charlotte, NC 28202
                                   704-331-7400

For the United States             Kevin P. Callahan, Esq.
Trustee:                          Office of The United States
                                   Trustee
                                   Robert N.C. Nix Federal
                                   Building
                                   900 Market Street, Suite 320
                                   Philadelphia, PA 19107
                                   202-934-4154

For Rembrandt:                    Andrew DeMarco, Esq.
                                   Devlin Law Firm, LLC
                                   1526 Gilpin Avenue
                                   Wilmington, DE 19806
                                   302-449-9010

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES: |  |  |  |  |
| Mathu Rajan |  |  |  |  |
| (By Mr. Alexander) | 19 |  |  |  |
| (By Mr. Caponi) |  | 139 |  |  |

AUGUST 17, 2023                                          12:30 P.M.

THE COURT:  Okay.  I think where we left off, before everybody enters their appearance, I think we left with the direct exam of Mr. Rajan.

Appearances, please?

MR. ALEXANDER:  Good afternoon, Your Honor.  Vincent Alexander of Lewis Brisbois Bisgaard & Smith on behalf of the Debtors.  I am joined in the courtroom with my colleague, Kevin Shaw, and the representative of the Debtors, Mr. Mathu Rajan.

THE COURT:  Okay.  And who is here for the movant?

MR. CAPONI:  Good morning, Your Honor.  On behalf of Hawk and Secured Creditors, Steven Caponi from K&L Gates.  I have with me Jon Edel, and from Skadden, Arps, we have Eben Colby, Marley Bromley.

MS. BRUMME:  Brumme.

MR. CAPONI:  Brumme.  Did I get it wrong again?  I apologize.  And we also have a client from SLS, Mr. Shad Stastney, Your Honor.

THE COURT:  Okay.  Before we get -- oh, I am sorry.

Mr. Callahan?

MR. CALLAHAN:  Thank you, Your Honor.  Kevin Callahan on behalf of the United States Trustee.

THE COURT:  Anyone else?

MR. DEMARCO:  Yes, Your Honor.  This is Andrew Demarco, Counsel for Rembrandt.

THE COURT:  I am sorry, I didn't hear your name, Counsel.

MR. DEMARCO:  Andrew Demarco, Your Honor.  May I speak?

THE COURT:  Sure.

MR. DEMARCO:  Thank you, Your Honor.  My name is Andrew Demarco from Devlin Law Firm.

THE COURT:  And you represent Rembrandt?

MR. DEMARCO:  Yes, I represent Rembrandt.

THE COURT:  Okay.

MR. DEMARCO:  And I have with me today, our rebuttal witness, Christopher Michaels.

THE COURT:  Okay.  Is there anything that we need to discuss before we reconvene with the evidence?

MR. ALEXANDER:  Good afternoon, Your Honor.  Vince Alexander on behalf of the Debtor.  There was just maybe a housekeeping-type matter I wanted to bring up for the Court.

THE COURT:  Uh-huh.

MR. ALEXANDER:  Today, I believe we intend to have Mr. Rajan with his testimony, and then there will be one rebuttal witness, Mr. Christopher Michaels.  I am not sure whether or not the Court will entertain closing argument.  The Debtors would request that we be allowed a period of time to submit post-trial briefs to Your Honor to assist in terms of coming to a resolution.  And we believe, given the turnaround

time to get the transcripts, that, you know, a two- to three-week period to submit post-trial briefs would be appropriate.

THE COURT:  And why do you think post-trial briefs are required?

MR. DEMARCO:  So we think it would be beneficial to the Court to help summarize all of the evidence and help crystallize the -- at least from the parties' points of view, in terms of the issues to be addressed.

THE COURT:  Okay.

MR. CAPONI:  Good morning, Your Honor.  Steven Caponi, for the record.  We would like to end this proceeding today and get a ruling as quickly as possible.  And we think the Court is more than up to speed on the law and the facts, and post-trial briefing instruction unnecessary.  It would only delay this further.  My only preliminary sort of question, Your Honor, would be I am not sure -- Counsel has been talking amongst ourselves about how to fit it all in today.  I didn't know if the Court had an indication of how late we would be going, so we can sort of manage ourselves?

THE COURT:  Well, I guess we owe you the half an hour from 12:30.  So I think we went to 6:30 on Tuesday, 6:30, 7:00. You know, depending on how close we are to finishing, we can go, you know, I don't think I will be -- that that will be an issue if we got to 7:00.

MR. CAPONI:  Well, I appreciate that the Court has

some flexibility.  I did not pack my pajamas, so I did not plan on staying here late.  Hopefully, we will wrap up well before then.  But thank you for the guidance.

THE COURT:  Okay.

Yes, Mr. Demarco?

MR. DEMARCO:  Hi.  I just wanted to very briefly state Rembrandt's positions on these.  Rembrandt would request post-trial briefing as well as the Debtor.  Both parties are, the Creditors, Hawk, SeeCubic, and the Debtor have had some time to put a -- to provide evidence for Your Honor, over the course of this trial.  Rembrandt has filed its opposition and will be having its rebuttal witness today.  And so we just think that the post-trial briefing would be useful to help articulate Rembrandt's position, to give it the same equal weight and time.

THE COURT:  Okay.

MR. DEMARCO:  And then finally, on the subject of timing, Your Honor.  As I mentioned, we have Mr. Michaels here today.  Rembrandt was hoping to call for his rebuttal, alongside the Debtor.  Have the Debtor bring him in rebuttal first, and have Rembrandt bring him.  However, Rembrandt has no control over how long this trial goes between cross and direct. And so we just wanted to raise that issue for Your Honor, and see if there was any way we could ensure that Rembrandt did have time to bring Mr. Michaels, seeing as we can't directly

control how long these directs and cross go.

THE COURT: Have the parties talked about taking another -- I mean, I don't know. I don't have control over how long it is going to go either.

MR. DEMARCO: If I may make a recommendation, that if it is -- or part of the solution. I know Your Honor does not wish this to go on beyond today. So if possible, if we could, perhaps, have some kind of ruling then, regarding the post-trial briefing. Because if Mr. Michaels can't be heard today from Rembrandt, we definitely would need post-trial briefing to ensure that Rembrandt's position is heard on these issues.

THE COURT: Right. While I want it to end today, you know, I don't think I would deprive parties of an opportunity to put their evidence on. But with that being said, that gives us six hours to try to get through this. It is 1:00, 7:00 is six hours. I don't know what -- I mean, you only have two witnesses. If I can complete Mr. Rajan's direct, cross-exam, I don't know how long cross-examination is going to take. And Mr. Michaels, his testimony, and then cross of him. I don't know what to tell you unless you guys can try to figure out how long you want to keep it within certain time periods. But I want to give everybody, every party, an opportunity to make their case.

MR. DEMARCO: Yes, Your Honor. That is all Rembrandt asks is that opportunity. And that is why we wanted to raise

this issue to Your Honor, just so that we didn't run up against the clock at 6:30, 7:00, and bring this issue up then.  So we just wanted to raise that now.  Thank you, Your Honor.

THE COURT:  All right.

Mr. Callahan?

MR. CALLAHAN:  Your Honor, Kevin Callahan.  We don't oppose Debtor's Counsel's suggestion, though.  And I am, my office is available throughout the evening if necessary.  Nevertheless, the Court did say on Tuesday that the Court wants this concluded by today and would not continue it beyond today unless something extraordinary occurred.  And that is fine, but I think Counsel heard that, and Counsel presumably have tailored their arguments to comply with that.

THE COURT:  Right, which means if you want to -- right.

MR. CALLAHAN:  So if Mr. Alexander could -- it might be helpful if he shared with us at least his estimated time for his case-in-chief, and Mr. Caponi for his estimated time on rebuttal, although that is difficult after hearing case-in-chief.

THE COURT:  Right.

MR. CALLAHAN:  But if the Court, I would not -- I am available tomorrow, I am available next week, if that was the conclusion.

THE COURT:  Well, tomorrow --

MR. CALLAHAN:  I think we do need to move on this, Judge.

THE COURT:  Tomorrow I have a trial.  Originally, the parties said it was only going to be legal argument.  I have now been advised that they have at least one witness.  Based on their representation, I have a commitment at 2:30 that I cannot get out of.  And then, which means I have to leave here by 2:00.  I will be back at 3:00, and could go from 3:00 to 7:00, if we need to.  Assuming that they get to through witness by 1:45, and I expect that they will, because I issued a ruling on their motion for summary judgment that pretty much is the outline of what I need.  So that would be available.

Assume --  I said 3:00.  I am not -- I can't promise I will be back at 3:00.  I am on grandma duty tomorrow, picking up someone from their last day at camp.  So you know, I can't guarantee when the bus will get there.  So I made my arrangements based on what I understood my calendar was at the time.  But I still would have a couple of hours tomorrow, like, presumably, from 3:00 to 7:00.  And then that really requires me to work out some other details --

MR. CAPONI:  Okay.

THE COURT:  -- but that would be it.

MR. CALLAHAN:  Well, Your Honor, Mr. Alexander is not asking for more time --

THE COURT:  Right.

MR. CALLAHAN:  -- to conclude his case-in-chief.  He is simply asking that there be a briefing schedule.  We are not proposing that --

THE COURT:  Right, but they also asked about arguments, and I do one or the other, I don't know.  I mean, if you want to keep it within the time, I don't see how you get all of the evidence in, and then, you know, I don't expect arguments are going to be ten minutes from each side.  They're typically long.

MR. CALLAHAN:  Your Honor, perhaps, and it is just a suggestion again, not knowing how long case-in-chief would last, to have this discussion at 5:00 or 6:00.  If we have made any progress.  Because we are aware of the Court's schedule and the packed schedule, and I am certain all of the parties want a decision sooner than later.

THE COURT:  And the Court wants to make a decision sooner rather than later.

MR. CALLAHAN:  Yes, Your Honor.  Of course.

THE COURT:  So that, you know, these issues can be resolved.

MR. CALLAHAN:  The U.S. Trustee is available whenever today, and whenever, if --

THE COURT:  Just as far as tomorrow, okay.

MR. CAPONI:  Your Honor, with regard to Counsel from Rembrandt, they already submitted briefing, so I don't think

they need additional submissions.  And with regard to Mr. Michaels, I am not sure.  My assumption was that he was going to be put up by one lawyer and then crossed.  And it sounded like the Debtor was going to put him up, and then Rembrandt wants an opportunity to put him up.  Your Honor indicated Mr. Michaels could testify on a very narrow issue.  You know, laying down a marker to the opposition that he should be examined by one of them, and then we are done.  Not -- I have never heard of a witness being examined by having multiple directs by multiple different parties.

THE COURT:  Well, I guess I it depends on what they're calling him for.  Because Mister -- the Debtor, I mean, even on that one subject, the Debtor may be calling him and want to put certain things on the record.  Whereas, Rembrandt, in connection with that, they want to put their own, you know, and it maybe makes sense for them to shares their questions, but I am not quite sure.  I typically don't allow, like, multiple Counsel to examine, but they are separate parties.  So I have to kind of -- I will think about that, because they are separate parties.

MR. CAPONI:  On that point, Your Honor, Rembrandt and the Debtor are aligned at the hip in the plan that the Debtor filed.  And in the course of the last 72 hours, we have received two new settlement agreements between Rembrandt and the Debtor.  They are clearly aligned, and they should

coordinate between themselves.

THE COURT:  Well, I can't make --

MR. DEMARCO:  Your Honor, we object to what Mr. Caponi is trying to get in right now.

THE COURT:  But I can't make them, the same way I can't make the Hawk and SLS, I mean, you guys coordinated.  One of you did one witness, and I think Mr. Colby did a different witness, because you guys coordinated.  But I can't make you coordinate.  I mean, it makes sense.  It makes it more smooth, but I can't say to a party well, because someone else wants to put him on, you can't.  And so while it might have made sense for me to try to coordinate, I can't deprive a party of their opportunity to put their witness on.  I will think about it.

MR. CAPONI:  Okay.  Just, Your Honor, I appreciate you thinking about, and that we will pick it up later.

THE COURT:  All right.

Mr. Alexander?

MR. ALEXANDER:  Very briefly, Your Honor, we will do our best to not overlap with respect to Rembrandt.

THE COURT:  Right.

MR. ALEXANDER:  We will try to expedite that process.  I don't recall Your Honor indicating that we wouldn't go past today, unless there was something extraordinary.  But our goal is to move --

THE COURT:  I might have said that, I don't recall.

MR. ALEXANDER:  I am just saying I don't recall.

THE COURT:  I don't recall either.

MR. ALEXANDER:  But we are going to move, and we are going to try and get as far as we can get.

THE COURT:  Well, you only -- so you are finishing up with Mr. Rajan's direct, right?

MR. ALEXANDER:  That is correct.

THE COURT:  You don't have any -- Mr. Caponi, you -- I can't say I am going to limit you to cross because you are going to cross-examine.  You are the only one cross-examining him, correct?

MR. CAPONI:  Yes, Your Honor.  I was going to say -- but no.  Yes, I am the only one cross-examining.

THE COURT:  Or maybe Mr. Callahan too.

MR. CALLAHAN:  Oh, no, Judge.  I am going to cross-examine.

THE COURT:  Yes, I mean from this side of the table.

MR. CAPONI:  Yes, Your Honor.

THE COURT:  With respect to SLS and Hawk.

MR. CAPONI:  Correct.

THE COURT:  That is what I meant.

Yes, Mr. Callahan, you have a right to cross-examine also.

MR. ALEXANDER:  Your Honor, would it be possible if you tilted your microphone --

THE COURT: Oh, I didn't really want it there, but --

MR. ALEXANDER: No, no, it doesn't have to be that far. But it's tough to hear at the --

THE COURT: At the table, okay. Well, at least I don't have -- I took my mask off, so now, you can hear me. That is another issue.

But that is fine. I would strongly urge the parties to try and get this matter resolved today, but I do not want to go past this week. I will think about the need for post-trial briefs, but I will tell you that we have been reviewing the evidence, looking at what is before me, and compiling it on my own, without being necessary for the parties to have to do that for us, because I didn't want to.

I wanted to try to rule from the bench. But even if I say I can't do it, call the parties and we do a telephone where I make my decision. But I want it done sooner rather than later. And when I mean later, not two, three weeks.

So I will think about that, but. And I have to go back and see how much, as I said. We review the evidence daily, looking at what is before me. I am trying -- I don't have all of it, so clearly, I can't decide yet. But I have what has been presented.

MR. ALEXANDER: And we would, you mentioned no closing and briefing. We would do it in lieu of closing argument and as quickly as the Court, if the Court wanted, we

would get the briefs to Your Honor.

THE COURT:  All right.

MR. CAPONI:  Your Honor, we would like to make -- the opportunity to make a closing argument.  We don't agree with that necessarily.  We would like the option of making a closing argument for the Court --

THE COURT:  All right.  Well --

MR. CAPONI:  -- at the appropriate time, at the end trial.

THE COURT:  Well, then we will have to see.  Because definitely, if we get to closing arguments, we may not get to finish today.  Because that was sort of what I thought they were saying is you know, we will endeavor to get this done as soon as possible.  And then if we have closing arguments, then I am not going to ask for briefs.  But if I can't get to closing arguments for time-wise, I may have to consider briefs. I want to get it done as soon as possible.

I hear you saying you want closing arguments.

MR. CAPONI:  We do.

THE COURT:  But if it is a time factor, then I have to figure out.  If we can't get the closing arguments in, during the time, I guess, you will have to come back.  I mean, either way, we are going to extend the time.  Because we are either going to have to extend the time for post-trial briefs or we are going to have to extend the time for parties to come

and argue and do closing arguments.

Let's figure that out when, at the closer we get to where we need to get.  Okay?  But I understand your position.  You want closing arguments, you don't care about briefs.

MR. CAPONI:  Well, I care, but Your Honor, that is --

THE COURT:  No, no, that is not -- no.

MR. CAPONI:  Well, you want to see everything but --

THE COURT:  No, what you said was you didn't oppose the Debtors request for briefs.  So when I say you don't care, you didn't oppose was a better word.

MR. CAPONI:  I oppose briefs, but --

THE COURT:  Right.

MR. CAPONI:  -- closing arguments is something different.

THE COURT:  Right.

MR. CAPONI:  We want that at the end of this trial --

THE COURT:  Okay.  Well --

MR. CAPONI:  -- for the Court.

THE COURT:  All right.  I don't know.  I guess I will figure it out.  I don't know if I can even get to closing arguments within the time frame that we have.  That is a whole different issue.  If we are going to get into that, I don't see how we are going to do post-trial briefs.

MR. ALEXANDER:  So --

THE COURT:  All right.

MR. ALEXANDER:  -- we would do either or, Your Honor. I don't --

THE COURT:  Okay.  We will figure it out.

All right.  Go ahead, Mr. Alexander.

MR. ALEXANDER:  Your Honor, the Debtors would like --

THE COURT:  Recall Mister --

MR. ALEXANDER:  -- to recall Mr. Rajan.

THE COURT:  All right.  Mr. Rajan, you can come back.

John, I think we -- swear him back in, just to be on the safe side.  I think we have been swearing everybody back in.

THE BAILIFF:  Please place your left hand on the Bible and raise your right hand.

MATHU RAJA, DEFENDANT'S WITNESS, RESWORN

THE BAILIFF:  Thank you.

And if would please state and spell your name for us?

THE WITNESS:  It's Mathu Rajan.  M-A-T-H-U is the first name.  Last name is Rajan, R-A-J-A-N.

THE CLERK:  And if could state your address for the Court?

THE WITNESS:  Yeah, 1105 William Penn Drive, Bensalem, PA, 19020.

THE BAILIFF:  Okay.

THE COURT:  And Mr. Alexander, before you begin, I just want to ask Mr. Rajan, at the end of the hearing on

Tuesday, I advised that you were not to discuss your testimony with anyone before today.  And did you abide by my instructions?

THE WITNESS:  Yes, I did.

THE COURT:  Okay.  All right.

You can proceed.

DIRECT EXAMINATION CONTINUED

BY MR. ALEXANDER:

Q    Good afternoon, Mr. Rajan.  On Tuesday, you brought up an entity called Bosch.  Can you tell the Court about Stream's relationship with Bosch?

A    Yeah, Bosch had approached us a number of years ago because there is demand in the automotive sector to change the dashboard into glasses-free 3D.  We agreed to work together.  A development agreement was put together.  I believe it was in the neighborhood of about two-and-a-half to three million euros.  There was some work that had to be done on the code to get it ready for automotive use.  And that was a distraction from our core business, and so we had asked Bosch to pay for it.  They had a temporary exclusive on the company.  They did start releasing funds for us.  And BOE, the panel company, was brought in to develop a new automotive panel for us.  And they shared costs with Bosch and BOE on that panel.  I think it was they were typically charging 1.4 million, and Bosch was paying half.  But that, after we lost in the Chancery Court, that

relationship fell apart with SeeCubic, and then it ended.

Q    Mr. Rajan, what -- I am going to pause you right there for a second.  You referenced an agreement with Bosch.  Did the Debtors and its subsidiaries enter into an agreement with Bosch?

A    Yes, we had an agreement with Bosch.  They gave us money.

THE COURT:  Wait, wait, wait.  Let him direct you.

BY MR. ALEXANDER:

Q    Please take a look at Debtor's Exhibit 4?  Do you recognize this document?

A    Yes.  We had negotiated a deal with Bosch.  And we had -- they wanted to sign with our Netherlands subsidiary because they were a European company.  So instead of signing directly with Stream, they signed with the -- one of our overseas subsidiaries, but I signed the contract.

Q    And when you say you signed the contract, how do you know you signed the contract?

A    I remember signing it, and my signature is on here.

MR. ALEXANDER:  Okay. Your Honor, we would like to move Exhibit 4, Debtor's Exhibit 4, into evidence?

THE COURT:  And --

MR. CAPONI:  No objection.

THE COURT:  Okay.  That is pages 1 through 5 of Exhibit -- hold on, that is another -- Exhibit 4 admitted.

(Exhibit 4 admitted into evidence)

THE COURT:  Go ahead.

BY MR. ALEXANDER:

Q    Was there every any performance -- let me strike that question.  Were there every any payments made under this agreement?

A    Yes, there were payments made.  I believe, when we were there, it was at least $400,000 had come in from them that was tied to -- some of it was just development payments, and then a portion of it was tied to specific miles -- milestones.

Q    Did Bosch ever provide Stream with a purchase order?

A    Yeah, for the payments, they had given purchase orders.

Q    Okay.  I would like you to take a look at Exhibit 48.

Do you recognize this document?

THE COURT:  Let me get there, I am sorry.

MR. ALEXANDER:  I am sorry, Your Honor.

THE WITNESS:  Yes, I do recognize it.

MR. ALEXANDER:  Can you hold on one second, Mr. Rajan?

THE WITNESS: with Sure.

THE COURT:  Okay.  Okay.

BY MR. ALEXANDER:

Q    Mr. Rajan, do you recognize what is marked as Debtor's Exhibit 48?

A    Yeah, I do recognize it.

Q    How do you recognize this document?

A     This was the paperwork that came, I believe it was their purchase order, when they were doing their payment to -- making their payment to us.

Q     Okay.

A     And they had wired the funds in.

Q     And how do you recognize that this is that document?

A     Because at the time, I had -- we had received copies in the U.S. office.

Q     Was it kept in the ordinary course of business?

A     Yes, it was kept in the ordinary course of business.

          MR. ALEXANDER:  Your Honor, we would like to move Exhibit -- Debtor's Exhibit 48 into evidence?

          THE COURT:  Any objection, Mr. Caponi, with --

          Any objection?

          MR. CAPONI:  I am sorry, Your Honor.  I said no objection.

          THE COURT:  Oh, I didn't hear you.  I am sorry.

          All right.  Admitted.

     (Exhibit 48 admitted into evidence)

BY MR. ALEXANDER:

Q     Did the Debtor deliver any products under this purchase order?

A     The -- there was development work done when we were there. Samples were given later under SeeCubic to Bosch.  The contract was interrupted by the Chancery Court ruling.  So we were --

Stream TV was out of the project.  And then SeeCubic of Delaware was directing the Netherlands people and SeeCubic of Delaware had delivered a sample to Bosch.

Q    Pursuant to this agreement?

A    Yes.

Q    Okay.  Did Bosch pay any monies to Stream under this purchase order?

A    Under this purchase order, we got paid.  But subsequently, under SeeCubic, the project stopped with Bosch.

Q    So what ultimately happened to the Debtor's relationship with Bosch?

A    It's in a bad shape.  We had -- you know, contacted both BOE and Bosch after we won in the Supreme Court.  We were informed that the automotive quality was very poor.  We -- so I subsequently saw the samples, and Stream TV had won awards for automotive quality, but the quality of the samples was very poor.  The bonding quality was very bad.  And also, there was an attempt to renegotiate terms with Bosch by SeeCubic, and Bosch quit.

        MR. CAPONI:  Objection.

        THE WITNESS:  That is my understanding.

        MR. CAPONI:  Objection.

        THE COURT:  Wait a minute.  Wait a minute.

        MR. CAPONI:  Mr. Rajan just testified that after all of the assets were turned over to SeeCubic, SeeCubic ran with

the relationship.  And now, he wants to testify about an alleged renegotiation between SeeCubic and Bosch.  He wasn't even part of the company.  It is clearly hearsay.

THE COURT:  Okay.

Your response?

MR. ALEXANDER:  Well, I am starting to lay the foundation to see if we can understand how Mr. Rajan believes he knows that information.

THE COURT:  Okay.  I will sustain the objection, and he can lay a foundation.

Go ahead.

THE WITNESS:  That's my understand of what happened.  Bosch --

BY MR. ALEXANDER:

Q   Mr. Rajan --

THE COURT:  Wait, wait, wait.  Let him ask you a question.

THE WITNESS:  With Bosch --

THE COURT:  Whoa, whoa.  There is no question.  You need to stop.  Let him ask you a question.  I know that you want to get your side of the story out.  But it is not going to advance the cause by doing a -- we are not having this free flow of just you talking.  Question, answer the question.  Try to stick and keep your answer to the question.  We don't need any additional comments.  If there -- if your Counsel believes

there is some additional information that needs to be made on the record, he will ask you.  So please try just to answer the question.

All right, Mr. Alexander.

BY MR. ALEXANDER:

Q    Is Bosch currently a customer of Stream today?

A    No, it is not a customer of Stream TV.

Q    How do you know Bosch is not a customer of Stream TV today?

A    My understanding is -- my understanding is Stream TV has to give a new automotive sample with the quality improved, which we're working on.  And then, we have some automotive brands that would like to use it.  So then we have to sort of put it back together.

THE COURT:  Mr. Rajan, question.  They are not a customer, and you need to give an improved sample.  We don't need to hear about any other automotive deals.  Okay?

THE WITNESS:  Okay.

THE COURT:  Or other companies.  Okay?

THE WITNESS:  Okay.

THE COURT:  All right.

BY MR. ALEXANDER:

Q    You referenced the automotive space.  Is the Debtor still attempting to provide its technology in the automotive space?

A    Yes, we are.  Yes, we are.

Q   Okay.  What is the Debtor doing in order to try and do that?

A   We're in the process of working on improved samples.  And then, we are discussing with some brands right now, automotive samples.

Q   Okay.  Can you share with the Court any companies that the Debtor is currently discussing that with?

A   Yeah, it's Geely, Hyundai, Nissan, Toyota.  And there's, I think, one or two more.

Q   You previously talked about optical bonding equipment, and I believe we want to touch on it. Can you take a look at Exhibit 2, do you recognize this document?

A   Yeah, that's our -- that's the Stream TV bonding machine.

Q   How do you know that that is the Stream TV bonding machine?

A   I've seen in operation several times.

Q   Okay.  And do you believe that the pictures with regards to Exhibit 2 accurately reflect the bonding equipment?

A   Yes, it does.

        MR. ALEXANDER:  Okay. Your Honor, we would like to move Exhibit 2 into evidence.

        MR. CAPONI:  No objection.

        THE COURT:  Admitted.

    (Exhibit 2 admitted into evidence)

BY MR. ALEXANDER:

Q    Is the bonding equipment standard off-the-rack equipment?

A    No, it's -- it's customized for our technology.  There was issues with the bonding with our technology, and we had to do a lot of work to customize it.

Q    Okay.  With respect to this bonding machine, was the bonding machine efficient for Stream's purposes?

A    Yes, it was.

Q    Okay.  How?

A    After we got it customized for our technology, we achieved a 96 percent yield rate, which means out of 100 units, 96 were good.  When we started the process, we were only at 5 out of 100, but that took a fair amount of work and investment.  It took us a several-year period to get it to that quality.

Q    Do you believe that once the equipment is reassembled, that the yield rate should be similar?

A    Yes, the yield rate will be similar.

Q    Okay.  You previous walked the Court through the process, you know, the bonding process.  And I believe you referenced a chip and a module, is that the finished product?

A    Yeah, for -- we -- we supply a chip and the film is bonded to the panel.  And that goes, the set, to get put into the device.  And occasionally, for small customers, we'll buy devices for them wholesale.  But essentially, it's the chip and the film.

Q    Okay.  And once you have the chip and the film, what is

the next step in the process?

A    Well, we deliver, we get paid, so.

Q    In terms of the final 3D module, are there any other steps to get a finished product?

A    Yeah, the customers, with their contract manufacturers, will put it into a device, like, a TV, like the one you saw here, and then that finishes the product.  We do give a software plugin to content companies to save their content in our format so they can play it on our screen.

Q    Does Stream perform the assembly process of the final product?

A    No, we don't do any assembly work.

Q    Okay.  How is that performed?

A    The contract manufacturer, the brands make the devices. And as I stated, we have a partner right now, our backup bonding solution, because we don't have the Stream solution, who is doing the bonding and making the film.  And then we have companies who make the chips and they ship it to the factories. We just -- we just oversee, sort of, the cash flow of the -- of the process.

Q    You referenced a partner, who is the partner?

A    The bonding, the backup bonding is Fujipream.  So we are going to -- we are using them to process our orders.  And then we have chip manufacturers who make our chips.

Q    Who are the chip manufacturers?

A    We are using Xilinx for some of the chips, and then we're using the -- we are going to also be using TSMC and MediaTek.

Q    Have you ever heard of a company called KTC?

A    KTC is a contract manufacturer.

THE COURT:  Hold on.  I am sorry, KTC?

THE WITNESS:  KTC is a contract manufacturer that BOE brought in to help make TVs for Southern Telecom, which is one of the -- Southern Telecom is one of the companies who gave us a purchase order during the bankruptcy, so.  And we've begun working with KTC.

BY MR. ALEXANDER:

Q    When did the Debtors begin working with KTC?

A    That happened just a few weeks ago.

Q    Can you describe the scope of the relationship in terms of how often do you talk to them?

A    We talk to them about two to three times a week.  KTC makes eight million TVs a year.  BOE selected them as an appropriate contract manufacturer for Southern Telecom.  Even though the order looks big from Southern Telecom, it's only 100,000 units going to 300.  BOE and Skyworth will handle the bigger customers.

Q    So in terms of Skyworth, what is Skyworth?

A    Skyworth in a big brand in China, just like LG or Samsung. They're tied for number one in China.  They're close to number one or two in all of Asia.  They also make white-label TVs for

other companies.  And they also do the mechanicals and the backlights.  We did the mechanicals and backlights for Google.  They're going to make the mechanicals and backlights for a number of these customers.  There's issues with this technology on mechanical and backlights, so you have to have specialized help.

Q    Would you consider Skyworth a potential customer or strategic partner for Stream's production?

A    They're a strategic partner, and they're also a customer.

Q    And how do they fit into streams plan going forward?

A    We're sending them -- we're working on sending them samples and then they're expected to order TVs in the two to three million unit range.  And then, they're going to help bring online two other brands, which they'll be making TVs for them as well, too, which is Huawei and some -- some other companies as well, too.

Q    Do you recall referencing a company called Cystar?

A    Yes.

THE COURT:  What's it called?

MR. ALEXANDER:  Cystar.  It's C-Y-S-T-A-R.

THE COURT:  Oh, Cystar, okay.

THE WITNESS:  Cystar is one of our strategic relationships.  Cystar was controlled or owned by Marvel Digital, which is a company that bought thousands of TVs from Stream TV, paid us millions of dollars.  They were helping to

finance the Google project until we lost in the Chancery Court. They are -- they would like to receive the Stream TV bonding machine, and they've ordered 10,000 TVs of that unit you saw demonstrated.  Their plan, once they receive the bonding machine is to increase their order to 75 to 100,000 units, which is over 100 million in revenue.  They had agreed in discussions with the Chancery Court receiver to put millions of dollars into --

MR. CAPONI:  Objection, Your Honor.

THE WITNESS:  -- the production.

MR. CAPONI:  It's hearsay.  He hasn't read --

THE WITNESS:  It's my --

THE COURT:  Whoop, whoop --

MR. CAPONI:  -- receiver.

THE COURT:  Okay.  Mr. Alexander?

MR. ALEXANDER:  Your Honor, I'll ask the witness how he knows that information.

THE COURT:  Okay.  You can ask him -- how you going to ask him how does he know -- did somebody tell him, did he read it?  I don't know.  That's what he's asking -- how does he know the information that he just was referring to.

MR. CAPONI:  Unless it's on a piece of paper, how do we learn that it's an out of court statement being offered today?

THE COURT:  Okay, but he can ask him.  That's what

I'm saying.  He has to ask him.

Okay, Mr. Alexander.

THE COURT:  No, there's no question, Mr. Rajan.

Go ahead.

BY MR. ALEXANDER:

Q    How are you aware of an agreement between -- you're referencing an agreement between Cystar and the receiver in Chancery Court.

A    No, it's between and Cystar and Stream TV.  The receiver was insisting on features --

MR. CAPONI:  Objection, clearly hearsay.

THE COURT:  All right.  Tell me, you know, did you see some papers, did he read something?  How did he figure it out?  He can't say what somebody else said out of court.  Can you tell me what you know and not what somebody else told you.  Did you review some documents and you  -- how did you get there, but you can't tell me what somebody else said.

Do you want to rephrase the question, Mr. Alexander?

MR. ALEXANDER:  Yes, Your Honor.

BY MR. ALEXANDER:

Q    Mr. Rajan, were there any discussions between -- I'll rephrase the question.  Mr. Rajan, what happened with the relationship between Cystar and stream during the pendency of the Chancery Court action?

A    Cystar was helping us, Stream TV.  They were negotiating

sort of not just the purchase order but a -- a broader sort of bonding relationship where Cystar was --

MR. CAPONI: Objection, Your Honor. It's clearly hearsay. Stream TV was under the control -- strike that -- or retract that objection. I'll let it continue.

THE WITNESS: They were negotiating with Stream TV, and I was in the discussions with Stream -- for Stream TV. They were negotiating a broader bonding relationship which Stream TV agreed to bonding facilities would be set up throughout Asia. And the reason why I know what the receiver wanted --

MR. CAPONI: Objection, Your Honor.

THE WITNESS: -- on the email chain --

MR. CAPONI: It's hearsay.

THE WITNESS: -- I'm on the email chain.

MR. CAPONI: An email is still an out of court statement getting off of the truth of the matter asserted. Emails' not here. He's relaying a conversation.

MR. ALEXANDER: Mr. Rajan is testifying to what the effect on him was in terms of the communication he received, which is not hearsay.

MR. CAPONI: I would say he's not. He wants to say what the receiver and this other company agreed to or were negotiating, not bring in the receiver or bring in the party would be the answer.

MR. ALEXANDER:  Mr. Rajan had indicated he was part of the negotiations and he had referenced a specific statement that was made.

MR. CAPONI:  An out of court statement is an out of court statement made by Mr. Rajan.  It's a statement made by anyone else in the world.  It doesn't matter that he heard it.  The minute he's talking about what someone else said or what he heard someone else speak, that is a hearsay statement, black letter.

MR. ALEXANDER:  He hasn't referenced what statement he's referring to.

MR. CAPONI:  Mr. Rajan is testifying about what negotiations were taking place between the receiver and this other party.  That's hearsay.  Mr. Alexander has not proffered an exception.

MR. ALEXANDER:  Your Honor, Mr. Rajan is testifying to his personal knowledge in terms of what he's aware of, in terms of -- he said he was on email communications.

THE COURT:  Okay, but he was relying on emails that are not in evidence.  But he can -- I mean --

MR. ALEXANDER:  He can testify as to --

THE COURT:  His understanding.

MR. ALEXANDER:  -- his understanding --

THE COURT:  But he can't say, I looked at some emails.  He can't say, well, because -- I mean, you can -- you

can tell me what your understanding is, but you can't say, well, my understanding is these emails.  My understanding is, you know, I spoke with so and so and my understanding -- you can't tell me what somebody told you, but you can tell me what you understood the -- you know, you understand the relationship between, Cystar and Stream based on his discussions.  He's not saying these are the discuss -- this is how I came to my conclusion that that either they have a relationship now or they don't have a relationship now.  So if he's saying, based on my understanding of what happened, this is what I think occurred, but he can't tell me what was going on between the specifics between the receiver and I guess this Cystar.

          MR. CAPONI:  I agree with that, Your Honor.

          THE COURT:  But he can tell me, this is what I think happened.  He can tell me that part, but he can't say, I saw some emails, and I concluded from my emails.  He can just say, based on my involvement, this is what I think happened.  All right.

          Mister -- all right.  Did you hear what I said, Mr. Alexander?

          MR. ALEXANDER:  I did, Your Honor.

          THE COURT:  All right.  So let's try to keep within those parameters.

          Mr. Rajan, again, you cannot say, I looked at some emails, and I concluded.  I talked to the receiver, or I know

36

the receiver was talking, and somebody else told me what the receiver said.  You can say, I was aware of the situation, and based on my understanding of the situation, this is what it is.  Now, counsel may object saying, well, I don't know what you're relying on, but you can't tell me anything else that somebody else told you or something else that you looked at, okay?

MR. ALEXANDER:  No, but the evidence is what his understanding is.  The evidence --

THE COURT:  No, his evidence was, I saw some emails.  That's not his understanding, okay, so limit it to, you know, I know there was discussions, or I know there was something going on, and I understand this is what happened.  But he can't say, I saw some emails, or I talked to the receiver, or I talked to Cystar with respect to the specific information relating to some sort of  negotiation between the receiver and Cystar because that's what he's talking about, and how would he know that unless he saw something, or he just had some understanding because he was directly involved.  That -- I was directly involved, and I understand this is what happened, okay?

You can't tell me that you looked at some emails.  You can't tell me what somebody else told me [sic].  You can tell me what you knew from your direct involvement -- that I think you can tell me, okay?  All right.  Rephrase it.

BY MR. ALEXANDER:

Q    What was your understanding of the relationship between

Stream, Cystar, during the receivership when the receiver was in place?

A    My understanding that a deal was reached where Cystar is going to host the Stream bonding machine.

MR. CAPONI:  Objection, Your Honor.

THE COURT:  Okay.

MR. CAPONI:  This is hearsay testimony, and that Mr. Rajan is testifying about what another company, Cystar, allegedly agreed to do with the receiver.  That is either in writing and potentially that writing is not hearsay, but there's no writing before this Court.  So all that's being conveyed to this Court is an out of court statement in some form or fashion Mr. Rajan heard.  Because you can't place an order --

MR. ALEXANDER:  Mr. Rajan is testifying as to how he got there, and he hasn't been able to.

MR. CAPONI:  For Mr. Rajan to say, so and so is going to order three million TVs, or so and so is going to do something, that party has to convey that either in writing or verbally, and that's hearsay.  The fact that he doesn't want to say, they told me, or you don't get around hearsay by just saying, Judge Coleman is going to eat lunch at, you know, Potbelly's on Thursday.  Well, the fact that you leave out she told me, clearly, you say she told me she's going to do that, it's hearsay.  It's still hearsay.  It's an out of court

statement. There's no representative from this company saying, we want to order TVs. There's no writing or contract that would be a business record that would qualify as an exception to the hearsay rule. This is just Mr. Rajan for a day and a half now, regurgitating --

MR. ALEXANDER: Your Honor, I'm going to object.

MR. CAPONI: -- out of court statements without any evidentiary exception to the hearsay rule.

THE COURT: Well, you've objected, and I said what I ruled on it, your response. His response is that he's relying on an out of court statement made and offering to the Court for the truth of the matter that there was some sort of deal between the receiver and Cystar.

MR. ALEXANDER: Mr. Rajan has not testified how he knows that information. So he needs to testify. And if it's insufficient, the Court can strike the testimony.

THE COURT: Fine. Well, let him lay a found on how he knows. Does he know from -- he's saying he doesn't know from an out of court statement, he doesn't know from the emails, and he doesn't know from something somebody told him.

MR. ALEXANDER: That's not what we said. I want to know why Mr. Rajan's testifying to what he's testifying to, and the only way we can figure that out is if he testifies.

MR. CAPONI: I don't understand that logic. For example, if Mr. Rajan were to say, we're in the process of

building 10,000 TVs for Steve Caponi, he can say that.  But what he can't say is, Steve Caponi's going to want another 10,000 TVs.  That's an out of court statement because he's speaking for me, not for himself.

MR. ALEXANDER:  Right.

MR. CAPONI:  And that's what I'm objecting to.  If he wants to testify as to what he is doing or Stream is doing, that's not hearsay.  The minute he starts referring to what other people want, have asked for, that's all hearsay unless it falls within an exception, and no exception has been offered.

THE COURT:  Okay.

MR. ALEXANDER:  One of the exceptions, Your Honor, is we can say what the effect on the company was with regards to the statement that's an exception not the hearsay rule.

THE COURT:  What?

MR. ALEXANDER:  Present session pressure in terms of what he's dealing with.

MR. CAPONI:  It's not a present session pressure, Your Honor.

THE COURT:  And the present session pressure is what?

MR. ALEXANDER:  Well, I'm trying to get him to testify what it is.

MR. CAPONI:  Your Honor, in the interest of time, we're here today to find out what this estate is doing.

MR. ALEXANDER:  Your Honor, I'm going to object.

MR. CAPONI:  The --

THE COURT:  Wait a minute -- wait --

MR. ALEXANDER:  He either has an objection to the question or he doesn't.

THE COURT:  Wait.

MR. ALEXANDER:  Mr. Caponi can't continually just argue that he's doing -- he's not testimony.

MR. CAPONI:  That's fine, Your Honor.

MR. ALEXANDER:  If he would like to testify --

MR. CAPONI:  I -- my objection.

MR. ALEXANDER:  -- then he could put himself on the witness list --

THE COURT:  All right, the two of you.  I told you --

MR. ALEXANDER:  -- And you could put him up there.

THE COURT:  -- the two of you on Tuesday, I'm getting a little not happy with either one of you.  I see the body language between the two of you.  I see -- I know you guys are some litigators.  You're used some jabbing and all.  No.  I'm telling you now.  You keep your objections to the point, Mr. Alexander.  I know that you don't like his objection, but they have merit.  You can't just say, well, this is -- in other words, I'm going to sustain your objection.

MR. ALEXANDER:  Yes, Your Honor.

THE COURT:  Keep your objection to the point.  I don't need the commentary from either one of you.  And if I

keep hearing it, there are going to be consequences.  I'm trying to give everybody an opportunity to make their case.  I don't know what you guys did in Chancery Court.  I don't know what you did in District Court.  I don't know what you did anywhere else.  But to the extent you're bickering, I'm not having it.  I had seven kids.  I know when people are acting in my estimation as bickering kids.  And I've been very -- I was very adept at being able to work through that with them, and I don't want to have to treat the attorneys the same way I did with my bickering children.  So I'm going to say for the last time, keep the commentary out.  I get your question.  I'm sustaining the objection.  Let's move on.

I get that either -- I still don't know what their relationship is because last I heard they were negotiating a deal to Debtor and Stream, and I don't know where they are today.  You need to get me my answer.  Go ahead.

Go ahead, Mr. Alexander.

BY MR. ALEXANDER:

Q    What was the relationship between Stream and Cystar during the Chancery Court litigation?

A    Cystar had agreed to --

MR. CAPONI:  Objection, Your Honor.  Again, he's speaking -- hearsay.  He's speaking about what Cystar agreed to.  That's a statement by Cystar.

MR. ALEXANDER:  It doesn't need to be true, Your

Honor. If Mr. Rajan can testify as to what his understanding and belief is in terms of what it was. It's not being offered for the truth of the matter being asserted. That's not hearsay.

THE COURT: Okay. He -- you asked him what was his understanding of the relationship with Cystar --

MR. ALEXANDER: Correct.

THE COURT: -- doing what again?

MR. ALEXANDER: Your Honor, the Chancery Court litigation between Stream and Cystar during the Chancery Court litigation.

THE COURT: Okay. And I think he can say, we were in negotiations, but he can't tell me what those terms or what -- that was their relationship we were negotiating. Is that what he said?

MR. CAPONI: He said, Cystar agreed to -- and that's when I objected.

THE COURT: Okay. So we were --

MR. ALEXANDER: Whether that's true or not doesn't -- if he can testify as to what his understanding is. Hearsay means you have to offer it for the truth of the matter asserted. I'm offering it as to what his understanding was.

THE COURT: That they were negotiating a deal, and they came to some agreement to --

MR. ALEXANDER: He can testify to that.

THE COURT:  It is, but he can't tell me the details.

MR. ALEXANDER:  He can tell you the details, Your Honor, and if they're not --

THE COURT:  No, because --

MR. ALEXANDER:  -- because his testimony is what his understanding is.  You can give it whatever weight you want in terms of how you value what his understanding is.

THE COURT:  Right, but he can't tell me what someone else did out of court.  His -- we negotiated an understanding, and we reached a deal.  Okay.  But the detail -- what is he offering them for.  Why do I need to even know the detail other than we negotiated, and we reached a deal.  Did the deal go through, yes, no?  That's all he needs -- I don't think --

MR. ALEXANDER:  But that's not a hearsay objection, Your Honor.  He can testify as to what his understanding --

THE COURT:  But he can't testify regarding the details of what was negotiated because where is -- that is -- is that available to be in the court today?

MR. ALEXANDER:  We don't believe that is a criteria with regard to hearsay in terms of whether or not that information is available to be --

THE COURT:  Well, it's an out of court statement.

MR. ALEXANDER:  It isn't an out of court statement, Your Honor.

THE COURT:  Well, counsel, they negotiated a deal.

The terms of the deal, those terms are -- are they here today as a party, or are they here in the form of a document?  They are details or facts that were out of court and you're going to tell me he knows it from emails, he knows it from documents, he knows it from discussions.  So if he knows it from evidence that is not in the court, and so that is out of court.  You're saying he's not offering for the truth of the matter, well, what is he offering it for?

MR. ALEXANDER:  To demonstrate to what his understanding was at the time.  It's not a hearsay objection.  If there's another objection, we'll deal with it, but it's not hearsay.

THE COURT:  Mr. Caponi?

MR. CAPONI:  Your Honor, I think Mr. Alexander has it backwards.  I've raised the hearsay objection -- it is hearsay.  If Mr. Alexander needs to either explain why it is not hearsay, or it falls into a hearsay exception, but I have made a hearsay objection to what is on its face, hearsay.

THE COURT:  And you believe it's on its face hearsay because?

MR. CAPONI:  As Mr. Rajan is testifying about statements that are made out of court and that do not fall within any hearsay exception.

MR. ALEXANDER:  Your Honor, it's not hearsay in the first instance because we're not offering it for the truth of

the statement.  We're offering it in terms of what Mr. Rajan's understanding is.  Whether his understanding is correct or not is a totally different issue.

THE COURT:  He can tell me what his understanding is of what the relationship is, no details.

So answer the question.  What was your relationship with Cystar during the course of the Chancery Court litigation. Isn't that the question?  What was your relationship?

THE WITNESS:  Stream TV agreed to have Cystar host the bonding machines and run the production for Stream TV in addition to other options for bonding.  And Stream TV agreed to supply 10,000 of the --

THE COURT:  You just agreed to some sort of agreement.  I think the issue of how much and all of those details are out.  Okay.  So there was an agreement between the parties where Stream TV would supply certain equipment and Cystar would host something, correct?

THE WITNESS:  The equipment --

THE COURT:  Okay.

THE WITNESS:  -- and operate it.

THE COURT:  All right.

BY MR. ALEXANDER:

Q   Does Stream currently have a relationship with Cystar?

A   Yes.  We have a very good relationship with Cystar.

Q   I'd like you to take a look at Exhibit 18.  Do  you

recognize this document?

A    Yes, I do.

Q    What is this document?

          THE COURT:  Let me get there.  Okay.

          THE WITNESS:  This is a purchase order from Cystar

for 10,000 units, roughly $14 million.

BY MR. ALEXANDER:

Q    Are you on Exhibit 18?

A    I think so.

Q    It should say --

A    No, no, I'm sorry.  No that's -- yeah, that's right. Yeah,

this is a purchase order -- on Exhibit 14 or 18?

Q    On 18.

A    Okay.  Yeah, this is a purchase order.

Q    Who are the parties to the purchase order?

A    This is Visual Semiconductor and Stream TV.

Q    And how do you recognize that this is a purchase order

between Visual Semiconductor and Stream?

A    I signed it.

Q    Was this purchase order kept in the ordinary course of

Stream's business?

A    Yes, it was.

Q    Okay.  Do you recall when this purchase order was

executed?

A    It was in March of this year.

MR. ALEXANDER:  Your Honor, we'd like to move Exhibit 18 into evidence.

MR. CAPONI:  No objection.

THE COURT:  Admitted.

(Exhibit 18 admitted into evidence)

BY MR. ALEXANDER:

Q    What is being sold pursuant to this purchase order?

A    We're supplying the -- the film and the chip and then we are receiving TVs from a contract manufacturer wholesale and delivering that to Cystar, which is what we did for that TV that you saw -- the TV that you saw demonstrated on Tuesday. It's the same unit, too.  They're getting the same unit.

Q    Are there any related purchase orders between -- are there any purchase orders related to this purchase order between VSI and Stream with regards to end customer?

A    Yes, it's for Cystar.

Q    Mr. Rajan, I'd like you to take a look at Exhibit 20.

A    Okay.

Q    Do you recognize Exhibit 20?

A    Yes, I do.

Q    Okay.  What is Exhibit 20?

A    That is the purchase order from Cystar.

Q    Mr. Rajan, you see that there's information that's redacted.  Do you know what information is redacted?

A    Yeah, that's Cystar's name and logo and also their company

seal's redacted.

Q    And when you received -- or did you receive this purchase order?

A    Yes, I did.

Q    Okay.  When was it received?

A    That would have been --

MR. CAPONI:  Objection, Your Honor.  Mr. Rajan's here testifying on behalf of the Debtor, Stream, and this is a purchase order from some company to Visual Semiconductor.  And so I guess, if could just clarify whether Mr. Rajan is testifying as Visual Semiconductor or whether he's testifying as the Debtor because if it's the Debtor, then this is a hearsay statement.  This is not a contract with the Debtor.  This would be an out of court statement by two other companies, neither of which are here in the courtroom today.

THE COURT:  Okay.

MR. ALEXANDER:  Your Honor, he's testifying as Mr. Rajan.  You don't have to identify on whose behalf a witness is testifying, but he's testifying from his personal knowledge as a personal witness.  He's not testifying as a corporate representative, although his testimony will be binding on Stream.  He can testify to his personal knowledge.

THE COURT:  But how is he going to testify regarding a document because that is hearsay, and you have to -- what exception is he relying on?

MR. ALEXANDER:  Business record exception.

THE COURT:  Whose business record?

MR. ALEXANDER:  He can testify that this is a business record of VSI.

THE COURT:  Okay.  And how does he know?  You have to lay a foundation.  What's his relationship to VSI?  How does he know what's kept?

MR. ALEXANDER:  He already testified.  I'll ask him the questions again.

THE COURT:  Right.  I don't recall.  You're going to lay a foundation as to how he would know that this is kept as business record at VSI.

MR. CAPONI:  I'm fine with that, Your Honor, but if we could just get clarify -- make sure that I understood this and that Mr. Rajan is testifying -- the Debtor has called Mr. Rajan to testify as Mr. Rajan, not as a representative of Stream; is that correct -- of the Debtor?

MR. ALEXANDER:  Mr. Rajan is on the Debtor's witness list.  He's testifying regarding his testimony here today, right?

THE COURT:  Right, but was he identified as a representative of the company?

MR. CAPONI:  That was my understanding, and that's what I'm trying to understand.  When he chooses the word, he's testifying, we do this -- we do that, my assumption has been

that this is the representative of the Debtor, that he's referring to Stream.  But now, I think the "we" means the royal "we", we --

THE COURT:  Whoa, whoa, whoa --

MR. CAPONI:  -- VSI.  I'm not sure -- record is what I'm saying.

MR. ALEXANDER:  Your Honor, Mr. Caponi's free to cross-examine Mr. Rajan on his testimony if he would like.  Mr. Rajan is listed as on the Debtor's witness list.  You're not required to identify in what capacity.

THE COURT:  Well you didn't ask for a representative --

MR. ALEXANDER:  It's not -- he's testing as Mr. Rajan.

THE COURT:  -- which would have been in the -- when he did his deposition.

MR. ALEXANDER:  Right -- deposition though.

THE COURT:  I know, but -- never mind.  I can understand if he was the designee why you would think he is playing the same role.  I guess the question is what role is he playing.  And they're saying, we never identified -- he's just a witness on behalf of the Debtor.  We didn't say he was here as the Debtor's representative.  That's what he's saying.

MR. CAPONI:  And I'm not --

MR. ALEXANDER:  I'm saying that his testimony is in

support of the Debtor.

THE COURT:  Oh, I get it.  I get it is in support of the Debtor, the same way as you can call Mr. Michaels, and he will be in support of the Debtor.  I guess Mr. Michaels is a representative of Rembrandt, and he's going to be -- all right.

MR. CAPONI:  I'm not saying Mr. Rajan doesn't have executive positions with the Debtor -- he does.  That's how he knows the information -- testify.

THE COURT:  All right.  Just tell me how does he know about this document because it's --

MR. ALEXANDER:  It's --

THE COURT:  Wait a minute.  This document is between -- it's addressed to Mr. Rajan, okay, so he is one of the persons on -- well, he's on here, and it's accepted by somebody -- I don't know who that is.  But in any event, that document has to get in under some sort of exception.

MR. ALEXANDER:  It's a business record, Your Honor.

THE COURT:  All right.  And that's what I'm saying. You've got to lay a foundation --

MR. ALEXANDER:  Okay.

THE COURT:  -- as to whose business record, and how would he know.  Is that what he has to do?  If it's --

MR. CAPONI:  Yes, Your Honor.  That addresses the immediate issue.  I have a different concern regarding capacity, with I'm happy to deal with once his question is

answered or later.  But I think for the record, we need to know -- and I'm entitled to know -- if Mr. Alexander -- so for example, Mr. Rajan's repeatedly testified as we.  The assumption -- to me, "we" is referring to the Debtors, the "we."  If the "we" is somebody else because he's not here speaking for the Debtor -- and I understand he's in support of the Debtor, but he's not a Debtor representative, then the "we" seems something else.

THE COURT:  Well, he said he has various companies.  There was Stream, there was Technovative.  There was all these other -- on that chart.  There's all these different subsidiaries.  So "we" could have meant all of those.  I think maybe we need to clarify who "we" is.

MR. CAPONI:  And I understand.  So if there's an ambiguity, that's Mr. Alexander's to clean up.  I just -- all I'm asking is if I can get clarity from --

THE COURT:  Who --

MR. CAPONI:  -- the Debtor's perspective.

THE COURT:  Well, you can get it on cross.  Let's move on.

MR. CAPONI:  Okay.

THE COURT:  Ask him about this document.

BY MR. ALEXANDER:

Q    Mr. Rajan, do you have any connection to the entity, Visual Semiconductor, Inc.?

A    Yes.

Q    What is your connection?

A    I'm the founder of VSI, which was founded during the time period Stream TV was stopped because of the Chancery Court ruling.

Q    What is -- did you have any involvement with what's marked as Exhibit 18 -- I'm sorry -- Exhibit 20?

A    Exhibit 20?  Yes.

Q    What was your involvement?

A    I had numerous discussions with the management team at Cystar, and they had issued the purchase order.

Q    Mr. Rajan, do you know why this document was submitted redacted?

A    Stream TV has an issue with the protection of its investors and customers with SeeCubic.  You know, we've incurred tremendous amount of damage since we went to a Chancery Court.

THE COURT:  Oh, so you're concerned about confidential information being disseminated, correct?

THE WITNESS:  Correct.

BY MR. ALEXANDER:

Q    Was there an unredacted -- when VSI received this document, was it unredacted?

A    Yes.

Q    Okay.

MR. ALEXANDER:  Your Honor, we'd like to admit the unredacted version of Exhibit 20.  May I approach?

THE COURT:  Hold on, hold on.

MR. CAPONI:  I object, Your Honor, to the only exhibits that was produced or put on a list was the one that's in the binder.  The unredacted one, Mr. Alexander handed it to me for the first time this morning.  If they wanted to rely upon the unredacted one, they should've given us the document in time for us to be able to meaningfully use it.  And I think that should be limited to what they disclose and identified in this case.

MR. ALEXANDER:  Your Honor, the names of the individuals on these purchase orders were revealed in July when the Debtors filed their plan identifying the --

THE COURT:  so what's redacted that you want to now put into evidence?

MR. ALEXANDER:  He testified regarding the name and company seal.

THE COURT:  Okay, so you want to put into evidence the unredacted that just has the name of the company because you don't want them to know the name of the company?

MR. ALEXANDER:  Well we didn't until the plan was filed, and then the plan was filed.  And so --

THE COURT:  So that --

MR. ALEXANDER:  -- for disclosure.

THE COURT:  So why didn't that just get included as opposed to the redacted?

MR. ALEXANDER:  The exhibit list was filed prior to the filing of the plan.

THE COURT:  Okay.  So he's saying that that information would -- because you seem surprised you didn't have it, you don't know about it.  He's saying that the exhibit list was provided before the plan was filed.  And this specific purchase order?

MR. ALEXANDER:  The information is included in the plan.

THE COURT:  Is already in the plan.

MR. ALEXANDER:  And disclosure statement.

THE COURT:  And disclosure statement.

MR. CAPONI:  Your Honor, again, this was a redacted document.  I didn't see the unredacted until the first time today.  No one has explained to us, prior to today, what was behind these black marks here.  The name of the individual who signed this was redacted.  That was not previously disclosed. I have no objection to the exhibit that was identified by the Debtor being admitted into evidence.  I see no basis, and I object to the substituting of this exhibit with a clean version that was given to me this morning.  And if Mr. Alexander was correct and all this information was disclosed in July, why am I just getting the unredacted document an hour ago?

THE COURT:  I asked that question already.

MR. ALEXANDER:  Your Honor, the issue is notice.  Did they have notice of the information.  And they are suffering no prejudice because they had notice in July regarding the information that's on this exhibit.

THE COURT:  All right.  I'll reserve on this one.

MR. ALEXANDER:  Thank you, Your Honor.

THE COURT:  Okay, I'll reserve.  Okay, and I'll let you guys know what it is.  And he's testifying regarding -- I don't know what to say.

All right, go ahead, Mr. Alexander.

BY MR. ALEXANDER:

Q    What is being sold pursuant to Exhibit 20?

A    It's TVs.  It's the film and chip in the TVs.

Q    And how many TVs are being sold?

A    Ten thousand TVs, 14 million dollars' worth.

Q    Did you say the total revenue would be $14 million?

A    Correct.

THE COURT:  So wait a minute.  He also said chips and something.  He said chips and then he said TVs.  What is he selling?

BY MR. ALEXANDER:

Q    Mr. Rajan, are you selling a completed -- is VSI selling a completed product to Cystar?

A    Yes.  We're buying it wholesale from the contract

manufacturer.

THE COURT:  So the answer is you're selling a completed TV?

THE WITNESS:  Correct.

THE COURT:  I don't need to know who you're buying it from or any of that.  You're just selling -- because I heard him say chips and bonds and then TV.  Okay.  All right.  I get it.

Okay.  Go ahead.

BY MR. ALEXANDER:

Q    What are the Debtor's plans with regards to its relationship with Cystar going forward?

A    The plan is to work with them to expand and bonding operation.  And then also, they're looking to -- Stream TV is looking with Cystar to expand the number of TVs.  And Stream TV has knowledge of -- that there also looking at other side --

MR. CAPONI:  Objection, Your Honor.

THE COURT:  Okay.

MR. CAPONI:  Hearsay.

THE COURT:  You can't tell me what you -- somebody else -- how we -- somebody had to tell you that, right?  So you want to -- I sustained.  You want to -- for the future, you want to expanding the bonding relationship with Cystar.  You want to expand the number of TVs you sell to them, you sell to Cystar?

THE WITNESS:  Yes, and also additional sizes besides 65 inch.

THE COURT:  And so, expand the number of TVs in the size of the TVs that are sold to Cystar?

THE WITNESS:  The number of products.  Correct.

THE COURT:  And what other products you said --

THE WITNESS:  They want to piece --

MR. CAPONI:  Objection, Your Honor.  Hearsay.

THE COURT:  No, no.  What else do you want to sell them?

THE WITNESS:  We want to sell them a PC monitor.

THE COURT:  PC monitor.  Okay.  And when you say PC monitor, you mean with the bonding on it?

THE WITNESS:  Yes.

THE COURT:  Bonding is the chip?

THE WITNESS:  Correct.

THE COURT:  You mean the chip?  Okay.  I think I have an idea how this works, I think.  Okay.  All right.

Go ahead, Mr. Alexander.

BY MR. ALEXANDER:

Q    How far back does this relationship date?

A    Stream TV sold its first TV to Cystar and Marvel Digital in 2013.  It's a 10-year relationship.

Q    With regards to this relationship, how is the optical bonding equipment -- Stream's optical bonding equipment

important to the relationship with Cystar?

A    Yes, it is.

Q    Why is it important to Stream's relationship with Cystar?

A    Stream TV was working with Cystar on doing the bonding since 2020, during the time of the Omnibus.  And they've been patiently waiting since then to get the bonding machine. Stream TV was supposed to give the bonding machine in July of last year, when we one in the Supreme Court.  And they've been waiting ever since to get the bonding machine.

Q    What is your understanding of the current status of the bonding equipment?

A    My understanding of the bonding machine is it's currently under control of SeeCubic of Delaware.  And there is a Shanghai law firm that is giving instructions to the landlord in China. And my understanding is the SeeCubic lawyers are controlling the movement of the equipment.

Q    Are you aware of any orders that were previously entered requiring the return of the bonding equipment?

A    Yes.  I believe there was three orders in the Chancery Court ordering the return --

        MR. CAPONI:  Objection, Your Honor.  Hearsay.  He wants to speak to an out-of-court statement.

        THE WITNESS:  In an order from the Court of Chancery.

        THE COURT:  Okay.  So there's -- he can tell me there's three orders in the Chancery Court.  Guess what -- he's

testifying regarding those orders as opposed to just presenting

the orders themselves. That's your position, Mr. Caponi?

MR. CAPONI: Correct, Your Honor. And I believe at

the last -- to be consistent with the Court's prior ruling is

when Mr. Alexander was objecting to my using court decisions.

This court -- it presented with the order to potentially take

it -- read it under the judicial notice exception, as the Court

has previously. And I would not object to that, but I think --

no. I'll just throw that out there.

THE COURT: All right.

MR. ALEXANDER: Your Honor, during that entire

testimony from Mr. Stastney, they were permitted to elicit

information as to what his understanding was.

THE COURT: Okay.

MR. ALEXANDER: And I'm asking Mister --

THE COURT: So you believe Mister -- I allow Mr.

Stastney to testify regarding his understanding of orders?

MR. ALEXANDER: And I believe that you indicated

you'll take it -- it's his understanding. I'll take it for

whatever it's worth.

THE COURT: Did I do that?

MR. ALEXANDER: If that's not your ruling, Your

Honor, then we'll move on to the next question.

THE COURT: I mean if I did it in the past, I'll do

it now. I mean I can't do it for one and not the other.

MR. ALEXANDER:  Right.

THE COURT:  And I don't recall.  Anybody recall?

MR. CAPONI:  I don't recall, Your Honor.

THE COURT:  I tend to say I'll take things for what it's worth.

MR. ALEXANDER:  Well, maybe that was the language, Your Honor.  I wasn't trying to direct quote you.

THE COURT:  I'm not saying that you were.  I'm like -- you know, there's three orders in Chancery Court.  I'll allow it for what it's worth.

Mr. Caponi, you can cross-examine on it.  Either there was three to -- saying it had to be returned or -- or his understanding that there was orders saying that it had to be returned.  He didn't even have to tell me it was from his orders.  His understanding, it has to be returned.  But his comment about under control of all these other people, that I don't need to understand -- I don't need to hear, because that seems to be to be argument.

So, Mr. Rajan, keep your -- I get it's your opinion who's controlling or who's what.  But right now, my understanding from your testimony and the evidence is that it's over in China somewhere and it hasn't been released by the landlord, correct?  The bonding equipment.

THE WITNESS:  Well, I --

THE COURT:  That's my understanding that that's what

he's testifying.  And your question to him is where is it now.

It's still in China, correct?  Isn't that what he's testifying?

MR. ALEXANDER:  He has to testify to that.

THE COURT:  Right.  But I don't need to know who's controlling.  That's where it is.  I don't know -- all right.

Your understanding is that there were orders directing the return.  That's your understanding?

THE WITNESS:  Correct.

THE COURT:  All right.  I'll allow it for what it's worth.  Don't tell me what the order said or any of that.

BY MR. ALEXANDER:

Q    Was the bonding equipment ever returned to Stream?

A    No.

Q    There's -- you previously testified regarding the company Southern Telecom.  Does Stream have a relationship with Southern Telecom?

A    Yes.

Q    What is Stream's relationship with Southern Telecom?

A    Southern Telecom wants to sell TVs with --

MR. CAPONI:  Objection, Your Honor.  Hearsay.  He's testifying to what Southern Telecom wants to do.  It's an out-of-court statement.

THE COURT:  Tell me what your relationship is.  What are you doing to do from them -- for them?  What are you going

to sell to them?  You're going to sell something?  You're going to sell the bonding and the chip?  You're going to produce -- you have a relationship where you want to produce TVs?  Tell me what your relationship is, not what they want but what you understand.  They're a potential customer that we're going to sell to.  They're a customer we have an agreement with.  Or they're a customer that we're trying to get.  What's your relationship?

THE WITNESS:  Stream TV has agreed to apply the chip and the film and TVs from KTC to Southern Telecom with our technology in it.

THE COURT:  So TVs, chips.  And then sell TVs with chips and what else?

THE WITNESS:  And the film.

THE COURT:  And the film.  Okay.  And you're selling KTC TVs and -- TVs?

THE WITNESS:  With Southern Telecom's name on it.

THE COURT:  So they're a customer?

THE WITNESS:  Correct.

MR. ALEXANDER:  May I proceed, Your Honor?

THE COURT:  Yes.

BY MR. ALEXANDER:

Q   Mr. Rajan, I'd like you to take a look at Exhibit 19.  Do you recognize this document?

A   Yes.  This is this document.  This is a purchase order for

100,000 TVs.

Q    Who are the parties to the agreement?

A    VSI and Stream TV.  And it's for $126 million.

Q    How do you recognize this document?

A    I signed it and received it.

Q    And this document is kept in the ordinary course of Stream's business?

A    Yes, it is.

        MR. ALEXANDER:  Your Honor, we'd like to move Exhibit 19 into evidence.

        MR. CAPONI:  No objection to this exhibit.

        THE COURT:  All right.  It's admitted.

    (Exhibit 19 admitted into evidence)

BY MR. ALEXANDER:

Q    Are there any related purchase orders to what's been marked as Exhibit 19?

A    Yes.

Q    Okay.  What related purchase order is there?

A    There is a purchase order from Southern Telecom for $140 million.

Q    Mr. Rajan, I'd like you to take a look at Exhibit 21.

A    Yes.

Q    Do you recognize this document?

A    Yes, I do.

Q    What is this document?

A    This is the purchase order from Southern Telecom for 100,000 TVs, and it's $140 million.

Q    And who are the parties to this agreement?

A    Southern Telecom and VSI.

Q    Okay.  Do you recall who executed this agreement on behalf of Southern Telecom?

A    The president of the company, Terry Ayell (phonetic).

Q    You said Mr. Ayell is the president of the company?

A    Yeah, he's the president.

        MR. ALEXANDER:  Your Honor, we'd like to move Exhibit 21 into evidence.

        MR. CAPONI:  No objection, Your Honor.

        THE COURT:  Admitted.

    (Exhibit 21 admitted into evidence)

        MR. ALEXANDER:  And then we're going to go through the same process here, Your Honor.

BY MR. CAPONI:

Q    Mr. Rajan, what information is redacted from Exhibit 21?

A    The name of Southern Telecom and the -- not the signature but the printed name for Terry Ayell.

Q    And but the signature of Mr. Ayell is on the document, correct?

A    Yes, his signature is there.

Q    When VSI received this document, was it unredacted?

A    It was unredacted.

MR. ALEXANDER:  Your Honor, we'd like to move the unredacted version of Exhibit 21 into evidence.

THE COURT:  Any objection?

MR. CAPONI:  Same objection, Your Honor.

THE COURT:  All right.  You're going to be -- wait a minute.  Exhibit what, 21?

MR. CAPONI:  21.

THE COURT:  Oh.  Why did I write admitted?  I admitted 19.  All right.  I'm reserving on 21.  I also reserve not on -- back up.  I reserve on the --

MR. CAPONI:  Unredacted.

THE COURT:  -- unredacted.  There was no objection to the admission of the redacted?

MR. CAPONI:  Correct.

THE COURT:  Okay.  Okay.  Let me make sure I wrote that down correctly on the last one.  The other one, the unredacted, was Number 20 -- Exhibit -- Debtor's Exhibit 20, which was a purchase order from Cystar that was redacted.  I reserve on the unredacted.  So I'll go back and look at this and -- okay.  All right.  Go ahead.

BY MR. ALEXANDER:

Q    And what is being sold pursuant to this purchase order, which was marked as Exhibit 21?

A    Just give me one second here.  The chip and the film and the TV from KTC.

Q    Who would that be supplied to?

A    Southern Telecom.

Q    What do you believe the total purchase price will be?

A    It's $140 million.

Q    Of the $140 million, how much is it anticipated that Stream will receive?

A    Stream is going to be about $40 million from this purchase order.

Q    And Exhibit 21, that corresponds with Exhibit -- what we marked as Exhibit 19.

A    Yes.

Q    Okay.  And what's the total purchase price for Exhibit 19?

A    This is $126 million.  Do I have the right exhibit?

Q    Yes.

A    Okay.

Q    And that's the amount -- and what does that $126 million reference?

A    That is the revenue for Stream TV.

Q    The total revenue?

A    Total revenue for that purchase order.

        THE COURT:  Wait a minute.  Who is the purchase order from?  Who's that purchase order -- it's VSI Attention Stream, and that's from who?  I'm confused.

BY MR. ALEXANDER:

Q    Mr. Rajan, can you explain to the Court the flow of the

purchase orders?

THE COURT:  Oh, okay.  Never mind.  I see it.

MR. ALEXANDER:  Okay.

THE COURT:  Never mind.

MR. ALEXANDER:  Strike that question.

THE COURT:  All right.

BY MR. ALEXANDER:

Q    Other than Cystar and Southern Telecom, does Stream have any other customer interest?

A    Yes, we have other customer interest.

Q    Okay.  Before we go there, does -- other than the purchase order, has there been any other agreements with Cystar or understandings with Cystar regarding other TV models?

MR. CAPONI:  Objection, Your Honor.  It's going to call for hearsay.  It's an out-of-court -- an agreement is, by definition, an out-of-court statement being offered for the truth of the matter asserted.

MR. ALEXANDER:  Your Honor, I'm not asking what statements were made.  I'm asking if he's aware of any other agreements.  It's --

THE COURT:  All right.  He can say yes, there's other agreements.

THE WITNESS:  Yes.

BY MR. ALEXANDER:

Q    I'd like you to take a look at Exhibit 44.  Do you

recognize Exhibit 44?

A     Yes, I do.

Q     How do you recognize Exhibit 44?

A     It's from Cystar.

Q     And who was it delivered to?

A     It was delivered to me.

Q     Is this document kept in the ordinary course of business?

A     Yes, it is.

Q     Was it received in the ordinary course of business?

A     Yes, it is.

Q     And what exactly is this document?

A     This is a letter that I received from Cystar where they would like to -- where Stream TV is going to supply one million 21-and-a-half inch PC monitors.

          MR. ALEXANDER:  Your Honor, we'd like to move Exhibit 44 into evidence.

          MR. CAPONI:  Your Honor, I object to the document as -- if Mr. Alexander can clean up -- when we talked about a business record, Mr. Rajan just said I received it, but I don't know in what capacity or what company.

          THE COURT:  Yeah, I saw that.  It just says chief executive officer.  As discussed, we would like to get one million.  From who?

          MR. ALEXANDER:  I can --

          THE COURT:  Ask him that.

MR. ALEXANDER:  -- help clean that up, Your Honor.

THE COURT:  All right.  Go ahead.

BY MR. ALEXANDER:

Q    Is this receipt -- which company was this letter directed to, Stream or VSI?

A    Stream.

MR. CAPONI:  I have no objection to its admittance, Your Honor.

THE COURT:  Okay.

(Exhibit 44 admitted into evidence)

BY MR. ALEXANDER:

Q    Mr. Rajan, I'd like you to --

THE COURT:  Wait a minute.  Okay.  All right.  Go ahead.

BY MR. ALEXANDER:

Q    And does the Debtor believe it has the capabilities to create 21-and-a-half inch 3D glasses, free displays?

A    Yes.

Q    Does the Debtor intend to produce 21-and-a-half inch 3D free glasses display?

A    Yes, we do.

Q    Does the Debtor intend to supply them to Cystar?

A    Yes, we do.

Q    Mr. Rajan, I'd like you to take a look at Exhibit 45. Do you recognize this document?

A    Yes, I do.

Q    How do you recognize this document?

A    This is a letter from one of our customers.

Q    Did you receive a copy of this letter?

A    Yes, I did.

Q    In what capacity did you receive a copy of this letter?

A    For Stream TV and its CEO.

Q    Was it received in the ordinary course of Stream's business?

A    Yes, it was.

Q    Was it maintained in the ordinary course of Stream's business?

A    Yes.

         MR. ALEXANDER:  Your Honor, we'd like to move Exhibit 45 into evidence.

         THE COURT:  Any objection?

         MR. CAPONI:  No objection, Your Honor.

         THE COURT:  Admitted.

    (Exhibit 45 admitted into evidence)

BY MR. ALEXANDER:

Q    And what is your understanding of Exhibit 45?

A    My understanding is this customer would --

         MR. CAPONI:  Objection, Your Honor.  And it's calling for hearsay.

         MR. ALEXANDER:  But the document has been admitted

into evidence.

THE COURT:  He's asking him what is on it.

MR. CAPONI:  It's my understanding -- I thought he was testifying about he understands to be the customer's understanding.  That's hearsay.

THE COURT:  No.  He's saying his understanding is that the customer, based on this, wants to buy X.  No, he's going to -- that's what I understand he was going to say.

MR. CAPONI:  Then I misunderstood, Your Honor.  I apologize.

THE COURT:  All right.  Go ahead.

THE WITNESS:  My understanding is Stream TV will supply 1,000 of the 65-inch unit that you saw.

THE COURT:  Okay.  The TVs or?

THE WITNESS:  Yeah, the TVs.

THE COURT:  With all the stuff?

THE WITNESS:  With all the stuff.

THE COURT:  Okay.  I'm saying stuff.  That's just so unprofessional.  But 65-inch TVs with the -- with the film --

THE WITNESS:  And the chip.

THE COURT:  -- and the chip?

THE WITNESS:  Yes, correct.

THE COURT:  Okay.  All right.

BY MR. ALEXANDER:

Q    When did Stream receive this letter?

A     Late last year.

Q     Does the Debtor still have a relationship with -- oh, let me take a step back.  Who is the customer with regard to this letter?

A     The customer is IQH.

Q     Does the Debtor still have a relationship with IQH?

A     Yes, we do.

Q     Does the Debtor still intend to supply glasses free 3D displays to IQH?

A     Yes, we do.

Q     How recently has the Debtor has discussions with IQH?

A     I believe a few weeks ago.

Q     Mr. Rajan, I'd like you to take a look at Exhibit 46, Debtor's Exhibit 46.

A     What number?

Q     46.  Do you recognize this document?

A     Yes, I do.

Q     How do you recognize this document?

A     This is a customer of ours.  This is a customer of Stream TV.  They've bought hundreds of units.

Q     Was the document sent to you?  Did you receive a copy of this document?

A     Yes, I did.

Q     In what capacity did you receive a copy of this document?

A     As CEO.

Q    As CEO of what company?

A    Stream TV.

        MR. ALEXANDER:  Your Honor, we'd like to move Exhibit 46 into evidence.

        MR. CAPONI:  No objection, Your Honor.

    (Exhibit 46 admitted into evidence)

BY MR. ALEXANDER:

Q    I believe you just testified that you've sold hundreds of units to this customer.  Who is VBAC Inc. (phonetic)?

A    They're a customer of ours in Las Vegas that had taken that 65-inch, and then they retrofit it with additional accessories and then resell it.

Q    Does the Debtor currently have a relationship with VBAC Inc.?

A    Yes, we do.

Q    Does the Debtor still intend to deliver 65-inch glasses free 3D displays to VBAC Inc.?

A    Yes.  They want about 400 units a year.

Q    You know, I didn't ask you.  What is IQH?  What type of company is that?

A    They do 3D without glasses.

Q    Do you know where they're located?

A    Florida.

        THE COURT:  Where?

        THE WITNESS:  Florida.

BY MR. ALEXANDER:

Q    When is the last time you had discussions with VBAC Inc.?

A    Last week.

Q    Where is VBAC Inc. located?

A    I believe Las Vegas.  Also, in California.

Q    Mr. Rajan, I'd like you to take a look at Exhibit 47.  Do you recognize this document?

A    Yes, I do.

Q    How do you recognize this document?

A    These are -- this is one of our customers who's requesting samples.

Q    Did Stream TV Networks Inc. receive a copy of this document in the ordinary course of its business?

A    Yes, we did.

Q    Is this document maintained in the ordinary course of Stream's business?

A    Yes, it is.

        MR. ALEXANDER:  Your Honor, we'd like to move Exhibit 47 into evidence.

    (Exhibit 47 admitted into evidence)

BY MR. ALEXANDER:

Q    Mr. Rajan, who is Sunny Hill Technology Limited?

A    Sunny Hill Technology is a sales company under the control of Marvel Digital.

Q    What is Marvel Digital?

A    Marvel Digital is also the company that controls Cystar.

Q    Okay.  And what is the agreement between Stream and Sunny Hill?

A    Sunny Hill is focused on other size products.  They do a little bit of 65, but they also do a wide range of other sizes.  So that's why they're requesting the samples.  And those are the samples we didn't get back from SeeCubic yet.

Q    And when was this letter dated?

A    March 21st, after we filed the bankruptcy, they sent us a letter asking for those samples.

Q    And where is Sunny Hill Technology Limited located?

A    I believe they work out of Hong Kong.

Q    And does the Debtor intend to provide the requested sample to Sunny Hill?

A    As soon as we get them back from SeeCubic, yes.

Q    Specifically, what samples will be provided?

A    They requested the -- I'm sorry.  One second.  They requested a 10-inch tablet, a smartphone, a 65-inch AK monitor.  We left our AK backlights in the care SeeCubic, and then also a PC monitor.  There's a laptop sample and then the automotive samples.

Q    Do you believe all of those are property of the Debtor's estate?

A    Yes, they are.

Q    Does the Debtor have plans to expand its relationship with

Sunny Hill?

A    Yes.  Once they receive the samples, then they'll begin working on those products and procuring customers.

Q    You previously testified about a company called VOE.  Does the Debtor, Stream, still have a relationship with VOE?

A    Yes, we do.

Q    What is the relationship?

A    Well, it's several fold.  Once is the -- they are referring us to customers and bringing customers.  Like I had mentioned earlier, they had introduced us to Google and a number of other brands currently, right now, especially smaller customers as well.   Then VOE also makes devices just KTC and Skyworth.  So they private label for other companies.  In addition to that, they supply purchase order finance for Stream TV orders.  So these big orders we're getting, they help to purchase the components and finance the cash flow of the projects.  They also supply panels to a number of these customers.  And then also, you know, there's also discussions on investment and that sort of thing.

Q    You referenced purchase order financing.  Can you explain what you mean by that?

A    Okay.  So you -- there's -- for an example, there's a $140 million purchase order here.  The money would come from a purchase order financer such as a BLE, where they pay for all the components in the device and make arrangements of all the

78

vendors in the supply chain, like the chip and the film and the power supply and the remote.  Make sure that those vendors are taken care of financially.  And they carry the purchase order until payment is arrived by the ultimate customer.  And since we're a vendor, we would get paid earlier.  So -- instead of having to wait for the final customer to get paid, we get paid earlier in the cycle.  So that improves our cash flow dramatically.  And also, we don't have to come up with funds for these large orders.  And you know, we don't have to sell equity to finance these large orders.

Q    So do you believe these types of orders are beneficial to Stream?

A    Yes, absolutely.  Purchase order finance.  Correct.

Q    We'll get into more detail in a little bit.  But how does Stream -- are you aware that Stream filed a disclosure statement and plan in this case?

A    Yes, I am.

Q    How does Stream intend to fund its plan and subsequent exit from bankruptcy?

A    Well, okay.  There's a couple things there.  One is for the purchase orders.  Stream TV has purchase order finance from VOE.  Then for the plan sponsor for the Stream reorganization, it is VSI, who reached a dead last week for financing for Stream TV.  So currently, right now, we'll be receiving 31-and-a-half million to reorganize Stream TV.

MR. CAPONI:  Objection.  The plan and disclosure statement were not listed as an exhibit.  We were not given -- I mean this is not the hearing -- I don't mind if they want to touch on it generally.  But we're getting into detail about specific numbers and relationships, none of which were disclosed or part of this proceeding.  I object.

MR. ALEXANDER:  Okay.  Your Honor, I'll wait till later, but Exhibit -- that is -- Exhibit 38 is the disclosure statement and plan.  And that's on our exhibit list.  So if he's arguing about foundation, I'll just wait till I get into the plan and discuss that.  So --

MR. CAPONI:  There was no discovery taken into this plan, Your Honor.  And --

THE COURT:  He listed it as an exhibit and then he was going to talk about -- going to -- was going to offer it. So if you didn't take discovery -- I mean he can say here's the plan.  This is what it says.  It says what it says.  But he already listed it.  So I'm not understanding why -- you want him to introduce it now and ask him about it?  I mean he already -- he listed it.  I don't know what to tell you.

MR. CAPONI:  I'll withdraw the objection, Your Honor.

THE COURT:  All right.  Go ahead.

BY MR. ALEXANDER:

Q    You referenced VSI and previously testified that -- with your connection to VSI.  But what is VSI?

A     VSI is a company that I founded -- when Stream TV lost in Chancery, unfortunately, Stream TV was blocked from using the Stream TV name, having Stream TV bank accounts, or anything to do with Stream TV.  So we had to set up another company to take care of the employees.  Sixty-five percent of them stayed with me.  Over -- almost 50 people.  They didn't want to go to SeeCubic.  Then we had to maintain the Stream TV supply chain and vendors.  Some of them were upset and needed money.

MR. CAPONI:  Your Honor, hearsay.

THE WITNESS:  Stream TV.

THE COURT:  Hold on.  He's objecting.  He said they were upset.

MR. CAPONI:  Sorry?

THE COURT:  He said that some of them were upset.

MR. CAPONI:  He already -- he's straying into the employees don't want to go, the vendors are upset.  That's hearsay.  It's an out-of-court statement that --

THE COURT:  Well, I'm not quite sure how the vendors are upset is a -- did he observe that?  I mean you can look -- I don't know that that's a present tense -- never mind.  I'm not making any response.

His objection is that -- he's objecting to him saying that the vendors were upset.

THE WITNESS:  Well, they yelled at me.

THE COURT:  Whoa.

THE WITNESS:  Okay.

THE COURT:  Okay.  Your response?

MR. ALEXANDER:  My response is that doesn't -- that's not an out-of-court statement that he's testifying to.  I mean it's based on Mr. Rajan's personal impression as to the situation.  Whether that's true or not, it's for another day.  But his perception is that it was -- that they were upset.

MR. CAPONI:  Your Honor, upset, either I visually saw someone being physically upset, that's not an out-of-court statement.  If that's what he's saying, that's fine.  If it's they verbalized to me they're upset, that's an out-of-court statement.

THE COURT:  When somebody yells at you, they may be yelling for various reasons.  Your present sense is observing.  So I'm going to allow it, that they --

MR. CAPONI:  Oaky.

THE COURT:  -- yelled at him.  Okay.  And he believed that, based on that, they were upset.  You kept 55 percent of the employees.  Don't tell me what any of your employees told you.  You know, 65 percent elected to stay and not go.  And I've thought of the word maintain, but I'm not sure why that was.  Oh.  You wanted to maintain the customers you said?

MR. ALEXANDER:  I believe he testified supply chain.  I --

THE COURT:  Maintaining the supply chain.  Okay.

THE WITNESS:  VSI had to supply all the vendors.

THE COURT:  You just wanted to maintain the supply chain is all I needed to know.  And that you observed that some of the customers or is it suppliers?

THE WITNESS:  Stream TV had -- I'm sorry.  VSI had to maintain Stream TV suppliers and creditors for use for future production.  And then, VSI had to pay to work on Stream TV's electronics, which was abruptly stopped by the omnibus.

THE COURT:  Okay.  We don't need all that extraneous.

THE WITNESS:  Okay.

THE COURT:  And you had to pay to work on what?

THE WITNESS:  The electronics.  The chip.

THE COURT:  All right.

THE WITNESS:  So VSI was set up to maintain the Stream TV infrastructure during Stream TV's hiatus until we won in the Supreme Court and through this process now while we're reorganizing Stream TV.

BY MR. ALEXANDER:

Q    And what is your current role with VSI, if I may?

A    I'm the founder.

Q    What's your current role with VSI?

A    I am the CEO of VSI.  But VSI has set up an independent committee that has taken over a number of my functions such as fundraising and --

THE COURT:  Wait a minute.  Wait a minute.  What's

your current role? You're the founder and CEO, you said?

THE WITNESS: Yeah. I'm founder and CEO. But my duties as CEO have been curtailed. It's been turned over to an independent board at VSI. And they take care of all the negotiations on sales deals and investments. And a number of the shareholders have taken over the fundraising function. I turned over leads and a number of the shareholders are negotiating and thankfully closed a deal last week on financing.

THE COURT: Okay. So you're currently the founder and CEO, but some of your duties have been turned over to an independent committee, right?

THE WITNESS: Yes. And some of the shareholders.

THE COURT: Okay. Okay.

BY MR. ALEXANDER:

Q   Mr. Rajan, you testified VSI is intended to be the plan sponsor?

A   Yeah. VSI is the plan sponsor. That is correct.

Q   Are you familiar with an entity Zhongsheng Group Holdings Limited?

A   Yes, I am.

Q   Okay. Who is Zhongsheng?

A   Zhongsheng is a company that was associated with Zheng Zhou, who's predecessor company was Tojoy, who was -- Stream TV was trying to take investment in 2020.

THE COURT:  Now wait a minute.  Let's slow down a bit.

THE WITNESS:  Okay.

THE COURT:  Zhongsheng is associated with Zheng Zhou?

THE WITNESS:  Zheng Zhou, correct.

THE COURT:  Zheng Zhou, who's predecessor was who?

THE WITNESS:  Tojoy, T-O-J-O-Y.

THE COURT:  Okay.

THE WITNESS:  And in 2019 and 2020, Stream TV was planning on receiving a $75 million investment from Tojoy.  And should I continue?

So and with had reached the closing document stage.  We were -- they had done extensive due diligence on Stream THE COURT for several months.  And then once the committee got approved, we had reached closing document stage in April of 2020.  And that deal was run by Hawk Holdings.

THE COURT:  Was it closed, not closed?  We don't need the commentary.

THE WITNESS:  It was -- it was not closed.

THE COURT:  I was --

THE WITNESS:  It stopped four days before the closing.

THE COURT:  What stopped?

THE WITNESS:  The Tojoy deal was stopped four days before the closing.

BY MR. ALEXANDER:

Q    Why was the Tojoy deal stopped four days before the closing?

A    A representative of Hawk Holdings told them to stop.

        MR. CAPONI:  Objection, Your Honor.

        THE COURT:  Okay.  You can't tell me what somebody told them.

BY MR. ALEXANDER:

Q    What is your understanding, Mr. Rajan, as to why the deal stopped?

A    My understanding was Hawk Holdings --

        MR. CAPONI:  Objection, Your Honor.

        THE COURT:  Let him finish the answer.

        THE WITNESS:  My understanding was Hawk Holdings told Tojoy to stop the investment.

        THE COURT:  There you go.  You can't tell them what somebody else told.

        THE WITNESS:  Okay.

        THE COURT:  You understanding is that they were instructed to stop?

        THE WITNESS:  Correct.  My understanding was Tojoy was told to stop.

        THE COURT:  Okay.

BY MR. ALEXANDER:

Q    Do you have an understanding of who was involved in that

process?

A   William Wong (phonetic) was involved in the process for Tojoy.  And also another associate, Jonathan -- I can't pronounce his last name -- from Tojoy.

THE COURT:  Jonathan somebody.

THE WITNESS:  Yes.  It's a long name.

THE COURT:  Of Tojoy was involved in the process with?

THE WITNESS:  Tojoy.

THE COURT:  With Stream?

THE WITNESS:  Correct.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q   I believe your testimony was that deal stopped in April 2020.  At any point after that, did the relationship with Tojoy end?

A   Yeah.  We -- we maintained our relationship.  We gave them periodic updates as to what was happening with Stream TV.  And then, we were contacted in the spring of -- late spring, early summer of 2022, before the Supreme Court ruling in Delaware. William had gone to a --

THE COURT:  Whoa, whoa, whoa.  I don't need the commentary about this.  Just tell me the contact, you maintained it.  You gave them updates and they contacted you in spring or summer of 2023.

THE WITNESS:  Of 2022.

THE COURT:  Of '22.

BY MR. ALEXANDER:

Q    What was the result of those contacts, if anything?

A    Yes.  William had gone to a new company, Zhongsheng.  And they have $1 trillion RMB under management.  We resumed negotiations on an investment from William's new company into our project.  At that point, we were still blocked from using the Stream TV name.  So he -- William gave a term sheet from Zhongsheng into VSI because we were still -- had not won yet in the Supreme Court, so we were banned from using the Stream TV name.

Q    And did that --

THE COURT:  What did he give?

THE WITNESS:  Zhongsheng gave a term sheet to VSI because Stream TV was still under restriction by the Chancery Court for a significant investment of about $300 million into VSI.  William and Zhongsheng gave the term sheet.

BY MR. ALEXANDER:

Q    Did you maintain a relationship after that term sheet in 2022?

A    Yes.  William and some of his colleagues flew into the United States to meet with us.  And they were staying in Boston.  They were trying to buy some other companies.  He was doing due diligence in Boston.  And he came after we won in the

Supreme Court and was doing due diligence through the summer. And he was making significant changes to the deal terms throughout the summer.

Q    What was the result of those negotiations in the summer of 2022?

A    Yeah.  William wanted -- I'm sorry.  Stream TV and VSI were hoping for an equity investment.  Then, into the U.S. company.  And then, we were expecting an investment in Chinese currency in the Chinese subsidiary.  Then, we were expecting a strategic relationship with a large city in China called Qingdao to set up bonding facilities throughout China.  So he was making changes on the deal terms and there was discussions with the headquarters, because they kept making changes to the deal terms.

Q    And you referenced Boston.  Was there a meeting that took place in Boston?

          THE COURT:  Wait a minute.  You were expecting a strategic relationship with a city?  What city?  What city?

          THE WITNESS:  Yes.  It's a city called Qingdao.  In Asia, the city governments give money for manufacturing companies.  So money would have been supplied for bonding facilities throughout China.

          THE COURT:  Okay.  I'm sorry.  I interrupted your flow.  Go ahead, counsel.

          MR. ALEXANDER:  It's okay, Your Honor.

BY MR. ALEXANDER:

Q    You were talking about a meeting in Boston.

A    Correct.  There was numerous meetings in Boston.

Q    Okay.  When did these meetings take place?

A    All through the summer and the fall of 2022.

Q    Who attended these meetings?

A    I attended.  William had some colleagues on his side.
Also, there was an investment banker, Jeff Shammah.  Some
people on both sides participated telephonically.

Q    How long did these meetings last?

A    Usually, they were about, like, two -- two hours or so.
Two and a half hours.

Q    Do you recall the total hours of meeting time?

A    Face-to-face, it would have been well over 20, probably 30
hours.

Q    And you said William Wong was in attendance at these
meetings?

A    Yeah.  He ran the meetings.

Q    Does Mr. Wong go by any other names, to your knowledge?

A    He has a Chinese name.  It's -- it was on that business
card that we gave to K&L Gates.  Don't ask me to pronounce it.
Wang -- Wang Cho, I think it is.  Yeah.

Q    Was there a final result from those meetings?

A    Yeah.  In November, we had finally reached deal terms.
And at that time, right before signature, William said

90

he -- instead of Zhong Zhou, he wanted to put --

MR. CAPONI:  Objection, Your Honor.

THE COURT:  Okay.

MR. ALEXANDER:  Okay.

MR. CAPONI:  Sorry.

THE COURT:  Wait.

THE WITNESS:  Sorry.

MR. ALEXANDER:  I'll rephrase the question.

BY MR. ALEXANDER:

Q    Did the party to the -- who was the initial party -- who were the initial parties to the agreement?

A    It was Zhong Zhou and VSI.

Q    Did the parties ever change?

A    Yes.

Q    Who did they change to?

A    Well today, it is VSI.  But the other side, it was changed to Zhongsheng.  The -- it's the S-C-H-E-N at the end.

THE COURT:  Wait, spell that.  S-C --

MR. ALEXANDER:  Zhongsheng is Z-H-O-N-G-S-H-E-N-G.

THE COURT:  All right.  Are we pronouncing it correctly?

MR. ALEXANDER:  Zhongsheng?

THE COURT:  He's pronouncing it differently.

MR. ALEXANDER:  Well, there's two entities.  Zhong Zhou --

THE COURT:  All right.

MR. ALEXANDER:  And Zhongsheng.

THE COURT:  Well, I mean --

MR. ALEXANDER:  That's my -- I'm not Mandarin -- or I'm assuming it's Mandarin.  I don't know.

THE COURT:  All right.  So yeah, I have Zhong Zhou and VSI were the original parties.  And then, the parties were Zhongsheng and VSI.  But he's pronouncing it differently than --

MR. ALEXANDER:  Well, I know that's how it's spelled, so we can just go with the spelling.

THE COURT:  Okay.  Okay.

BY MR. ALEXANDER:

Q    Mr. Rajan, do you have an understanding as to why the names changed?

A    Yeah.  The name was changed to Zhongsheng, as you guys pronounce it, sheng, in Douyin.  And my understanding, it was done because there were investors trapped in the Chinese company --

MR. CAPONI:  Objection.  Calling for hearsay.

MR. ALEXANDER:  Your Honor, we're not offering it for the matter of the truth being asserted.  We're offering it to why Mr. Rajan had an understanding and believed that the name was changed.  Whether that's true or not is irrelevant.

MR. CAPONI:  Your Honor, it's being offered the truth

of the matter asserted.  The counterparty to the contract name changed, and he's explaining why.

THE COURT:  Well --

MR. ALEXANDER:  His understanding as to why, that doesn't need to be true.  We're not offering and saying it's true.  We're indicating that he believed --

THE COURT:  I'll allow it for what it's worth.  Why do you think it was changed?  What was your understanding why it was changed?

THE WITNESS:  My understanding was that a number of Chinese investors from Zheng Zhou were trapped in the Chinese Zhongsheng in the city of Douyin.  And the investors did not have liquidity for their shares and they would like to get shares in our company so they could eventually get liquidity at some point, assuming Stream did well and was able to sort of exit the investment.

THE COURT:  Okay.  All right.

BY MR. ALEXANDER:

Q    And you referenced two entities, Zhongsheng and Zhong Zhou.  Are they separate entities?

A    They're separate entities, correct.

Q    After that relationship in -- you said that was the summer/fall of 2022?

A    November of 2022.

Q    November 2022.  What happened to the relationship with

Zhongsheng and Zheng Zhou?

A    William went back to China.  And we did what they call -- not Zoom calls.  They don't have Zoom in China.  They use a different service called Lark or something.  And we were doing video calls over the internet with William to discuss the deal terms and update him on what was happening, because things were happening with Stream TV legally.  And we did calls with him from his offices in China at the Zheng Zhou Group.  And we had some personnel in his offices at that time.  And we saw him in his office in China.

Q    And you referenced Zheng Zhou offices in China.  Who from Stream was at the Zheng Zhou office in China?

A    It was a person by the name of Ling.  And also I believe -- Ling, L-I-N-G.  Also another person.  I believe it was Mr. Liu and another person by the name of Lizzy that were in Beijing at the time.  And some of them were in the offices at Zheng Zhou.

        MR. CAPONI:  Objection, Your Honor.  Mr. Rajan was not at this meeting or at this location.  So when he's testifying who these people -- that these people were in an office and who they met with and who they spoke with is all hearsay.

        THE COURT:  Well, he said that they were on video calls with Mr. William.  He saw him in his office.  And also present at that time -- at that time, as I understood

it -- were Mr. Ling, Mr. Liu, and Lizzy.  That was the concept, unless he's talking about a different meeting.

MR. ALEXANDER:  It's the same meeting, yes.

THE WITNESS:  I attended the meeting.

THE COURT:  He said he was on video and saw these people.

MR. CAPONI:  I have no issue with him saying who attended the meeting.  It's when Mr. Rajan goes on to say, and they were in those offices -- these individuals were in those offices and saw this individual there.  He doesn't know.  He wasn't there.  He only saw what he saw on the video.

THE COURT:  He said he saw these people on the video.

MR. CAPONI:  I'm fine with that.

THE COURT:  That's what he said.

MR. CAPONI:  I thought he went beyond that.  But if that's where we're sticking, I'm fine with that, Your Honor.

THE COURT:  Well, that's what I thought he said.

THE WITNESS:  I saw the offices on the video and I believe there are photographs.

THE COURT:  All right.  Did you see these other people in the office?

THE WITNESS:  Yes.

THE COURT:  All right.

THE WITNESS:  And I saw the photographs.

THE COURT:  Okay.

THE WITNESS:  From the offices.

THE COURT:  Okay.  But you were on a video call with Mr. William.  And you saw Mr. William and there for Stream was Ling, Mr. Liu, and Lizzy?

THE WITNESS:  Correct.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q   How did the relationship continue to evolve if at all?

A   We were giving updates.  What happened was William was promoted to the board of a new artificial intelligence and information technology fund from Zheng Zhou.  And Mr. Lee, his boss was I believe the CEO or managing director of the same fund.  So they -- and then, two, we, you know, we had -- Stream TV had filed for bankruptcy.  Unfortunately, I got injured on a business trip and very sick and was in the hospital.

And we told them that, you know, we needed to go forward.  And they were going as fast as they could and they were going to be coming to the United States shortly.  And he issued another term sheet, this time in the name of Stream TV. But it was identical to the November term sheet.

Q   And Mr. Rajan, you referenced a term sheet.  I'd like you to take a look at Exhibit 32.

THE COURT:  Well, wait a minute.  Before we go on, my notes are a little cryptic.  William was promoted to a new position in the same company, new company?

THE WITNESS:  A subsidiary of Zheng Zhou, I believe.

THE COURT:  And his boss, Mr. Lee, what about Mr. Lee?

THE WITNESS:  Yeah.  He's also in that new fund.

THE COURT:  Okay.

MR. CAPONI:  I don't see Number 32 here.

THE COURT:  What number?

MR. ALEXANDER:  32.

MR. CAPONI:  I'm sorry, I couldn't hear Your Honor, but you had asked a question and Mr. Rajan responded a subsidiary of Zheng Zhou, I believe.

THE COURT:  Yeah.  He was promoted to a new position in a subsidiary of Zheng Zhou.  And I said what happened to Mr. Lee?  He said he's also in the new fund.

MR. CAPONI:  Sorry.  Thank you, Your Honor.

THE COURT:  Okay.  What are we looking at, Mr. Alexander?

MR. ALEXANDER:  Debtor's Exhibit 32.

MR. CAPONI:  Correct.

BY MR. ALEXANDER:

Q    Do you recognize this document?

A    Yes, I do.

Q    How do you recognize this document?

A    This was a term sheet that William sent to Stream TV.

Q    Is this your signature on this term sheet?

A    Yes, it is.

MR. ALEXANDER:  Your Honor, we'd like to move Exhibit 32 into evidence.

THE COURT:  Any objection?

MR. CAPONI:  No, Your Honor.

THE COURT:  Admitted.

(Exhibit 32 admitted into evidence)

MR. CAPONI:  Well, sorry.  Your Honor, I have no objection as to the document being admitted.  But as the Court is well aware, we question the authenticity of this document.

MR. ALEXANDER:  Your Honor --

MR. CAPONI:  We're not stipulating to that.

MR. ALEXANDER:  It's admitted.  I'm not sure why he continues to get to testify --

THE COURT:  All right.  So it's admitted --

MR. CAPONI:  -- testifying.

THE COURT:  You object to the admission.  He's admitting it as a business record, correct?

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  Are you objecting on the basis that it's not admissible as a business record?

MR. CAPONI:  That, I am not.

THE COURT:  All right.  It's admitted as a business record.  You can ask him any questions you want with respect to this document and whether you agree that it's valid or not.

That is not the basis for your objection.  And you can ask him questions and you can argue about that.  But that's not where we are right now.  Okay?

All right.  Go ahead, Mr. Alexander.

BY MR. ALEXANDER:

Q    All right.  Mr. Rajan, I'd like you to take a look at Exhibit 33.

A    Yes.

Q    Are you familiar with this document?

A    Yes.

Q    And what is this document?

A    This is a subscription agreement that was put together for William.

Q    And how do you recognize this document?

A    Yeah, I recognize the document.

Q    I said how do you recognize the document?

A    I remember that even though I was in the hospital, I remember there were discussions on this document.

Q    Okay.  And has this document been kept in the ordinary course of Stream's business?

A    Yes.

MR. ALEXANDER:  Your Honor, we'd like to admit Exhibit 33.

THE COURT:  Any objection?

MR. CAPONI:  No, Your Honor.

THE COURT:  Admitted.

(Exhibit 33 admitted into evidence)

BY MR. ALEXANDER:

Q   With regards to the documents, are these documents related?

A   Yes.

THE COURT:  What documents?

THE WITNESS:  One is a term sheet, the other is a subscription agreement.

BY MR. ALEXANDER:

Q   But the subscription agreement relates to the term sheet?

A   Yes.

Q   And how was the investment supposed to come?  Was it a lump sum, multiple investments?

A   No, it's in tranches.

Q   And what were the tranches?

A   Well, approximately about like $15 million tranches.

Q   Okay.  And if you look at Exhibit 32 --

A   Which one?

Q   32.  Still the term sheet we're on.  Does that reference the total amount?

A   Yes, it is.

Q   And what was that amount up to?

A   It was about 300 million.  It was 300 million.

Q   Are you aware who negotiated the terms of the deal between

Stream and Zhongsheng?

A    The terms were agreed last November.  The names were just simply changed.

Q    Okay.  Is it your testimony that this term sheet, dated Jun 6, 2023, is the same terms as what was previously negotiated?

A    Correct.

Q    Do you remember who was involved in the negotiations?

A    Last November, it was myself and it was William.

         THE COURT:  Wait, who?

         MR. ALEXANDER:  William.

         THE WITNESS:  William Wang.  And then also his boss, Mr. Lee, was involved.  There were some other folks in the offices that were involved.  And then also Jeff Shammah was involved as well, one of our brokers.

BY MR. ALEXANDER:

Q    And is the Debtor still involved in discussions with Mr. Wang, Mr. Lee, and Zhongsheng?

A    Yes.  They're -- my understanding is, is that they're -- in the United States, they're buying companies and --

         MR. CAPONI:  Objection, Your Honor.  It's hearsay.

         MR. ALEXANDER:  Whether they're actually here or not is immaterial.  It's what Mr. Rajan's understanding is in terms of what his understanding is.  So it doesn't need to be true.

That's not what we're putting it up for.

THE COURT:  I guess you can ask him what's the basis for his understanding.  Is it something somebody told him?  Is it something he knows?  How does he -- what's the basis for his understanding?

THE WITNESS:  I'm --

THE COURT:  Nope.  Ask him the question.

BY MR. ALEXANDER:

Q    What's the basis of your understanding?

A    I have an appointment with them this weekend in Boston and they're working on changing the deal terms --

THE COURT:  Wait a minute.  You have an appointment in Boston with who?

THE WITNESS:  With William.

THE COURT:  Okay.

THE WITNESS:  And I'm not sure if Mr. Lee is there. He may be there.  And then, Stream TV will be working on changing the deal terms for the new artificial intelligence fund and technology fund that they have.

THE COURT:  Okay.  So you're meeting with them in Boston to work on the deal?

THE WITNESS:  Yes.

THE COURT:  All right.  I'll allow it, sir.  That is based on --

MR. CAPONI:  No objection to that answer.

THE COURT: Okay. Go ahead.

BY MR. ALEXANDER:

Q   And if Stream has got these non-binding agreements with Zhongsheng, why is VSI the plan sponsor?

A   Because VSI has already closed the deal. Zhong Zhou is a large amount of money and right now, the plan is 31.5 million with some extra money for backstop on the plan to reorganize Stream. VSI is doing a $20 million corporate bond and a $25 million corporate bond, but only 35 goes to VSI and, you know, as we heard today in the court, everybody wants Stream to move faster. So VSI was able to secure faster money.

For the larger money, we have VSI is in discussions with several large equity partners --

MR. CAPONI: Objection.

THE COURT: Can't tell me what VSI --

MR. CAPONI: I have a separate objection, Your Honor. I believe Mr. Rajan is now testifying about the VSI financing that occurred last week that this Court excluded.

THE COURT: Well, I said at that point, he couldn't tell me about it unless he gave me a foundation. So I didn't really exclude it. I sustained your objection. I said don't tell me what somebody else told you. So if he had been --

MR. ALEXANDER: There was nothing excluded prior, Your Honor.

THE COURT: No, I just sustained your objection. I

said don't tell me about VSI because he was saying, oh, they did this, they did that.  But there was no context.  I don't know.  Maybe he knows from his own personal involvement what happened.  But I don't know if he did because he said it was an independent commission.  Never mind.  Respond.  So I'm --

MR. ALEXANDER:  Your Honor, maybe he can clarify as to which part of the testimony is hearsay and I'll respond.

THE COURT:  All right.  He's objecting to all of it.  But you tell me what you're objecting to.

MR. CAPONI:  Well, I was saying at this point, I don't recall the question.  Can he re-ask the question and we'll pick it up from there?

THE COURT:  All right.

BY MR. ALEXANDER:

Q    I think the initial question was why is VSI acquiring funds, sir?

THE COURT:  Right.

BY MR. ALEXANDER:

Q    As opposed to Zhongsheng?

A    It was for speed of money.  So VSI has a deal, and so Stream can receive the money faster.

MR. ALEXANDER:  Your Honor, I'm going to go into another section.  I'd like to take a break.

THE COURT:  Okay.  Let's come back in -- it's 3:15.  3:30.  I will endeavor to be here at 3:30.  It's just every

time I go in, somebody grabs me for something else and I get sidetracked.

All right.  Court is in recess until 3:30.

(Recess taken)

THE COURT:  Okay.  All right, Mr. Alexander.

MR. ALEXANDER:  Thank you, Your Honor.

BY MR. ALEXANDER:

Q    Mr. Rajan, there's been some testimony regarding --

MR. ALEXANDER:  Are you ready to proceed, Your Honor?

THE COURT:  Yes.  All right.  You may proceed.

BY MR. ALEXANDER:

Q    You've referenced an omnibus agreement.  What was the omnibus agreement?

A    The omnibus agreement was an attempted sort of private foreclosure.

Q    What was the result of the omnibus agreement?

A    The omnibus agreement was overturned by the Supreme Court --

Q    No, Mr. Rajan.  I think I was asking a little bit of a different question.  What was the effect of the omnibus agreement?

A    Oh, the effect of the omnibus agreement was our shareholders from Stream TV were transferred to another company, SeeCubic of Delaware.  And the vendors, 125 vendors, unsecured vendors, were skipped over and their debt was left

inside Stream TV.

Q    What happened to the assets of Stream?

A    The -- the --

Q    Let me ask it differently, Mr. Rajan.  Did Stream retain its assets after the omnibus agreement?

A    Stream TV had the assets after the omnibus.  My understanding is people were --

THE COURT:  No, no, no, no, no.  This is a question of after the omnibus agreement was entered, did Stream TV retain its assets.  Is that what you're asking?

MR. ALEXANDER:  That was the question, Your Honor.

THE COURT:  Yeah.

THE WITNESS:  At the time of the --

THE COURT:  Yes or no, did they retain their assets after the agreement?

THE WITNESS:  Yes.

BY MR. ALEXANDER:

Q    Was there a point in time when Stream's assets were transferred to another entity?

A    After the Chancery Court ruled --

THE COURT:  No, no, no.  At the time the omnibus -- what is it called?  Omnibus agreement was issued.  Following that agreement, what happened to the assets of Stream?  We're not talking about --

MR. ALEXANDER:  Pursuant to the agreement.

THE WITNESS:  The assets were transferred to SeeCubic.

BY MR. ALEXANDER:

Q    Were liabilities transferred to SeeCubic?

A    No.  The liabilities stayed in Stream TV.

Q    How was Stream TV impacted by the omnibus agreement?

A    Stream TV lost all of its customers, lost 30 percent of its employees, and Stream TV had to deal with all the 125 vendors that were left behind.

Q    Do you recall the date of the omnibus agreement?

A    I believe it was May 6, 2020.

Q    Is the omnibus agreement still valid today?

A    No, it's not.

Q    Why is it not valid?

A    The Supreme Court ruled it violated our company charter. And the transaction was reversed and the ruling in the lower court was vacated.

Q    At the time of the omnibus agreement, what were the amount of Stream's liabilities that were not transferred?

A    It was about $16 million.

Q    Did Stream have the ability to repay its liabilities if it had no assets?

A    No, it did not.

Q    You just testified that the omnibus agreement, did you say it was vacated?  Or what did you say happened?

A     The lower court ruling, 82-page opinion, was vacated by the Supreme Court.

Q     Okay.  And in your view, what should have been the effect of that?

A     The 82-page opinion should not be used for any legal purpose whatsoever.

Q     What about Stream's assets?

A     Stream's assets were to be returned back to Stream TV.

Q     Were Stream's assets ever returned to Stream TV?

A     Stream's assets were not returned.

Q     What assets were never returned to Stream TV?

A     There -- it was the bonding machine.  The -- there was a number of phone and tablet samples.  There was a number of high end, we'll call them AK-lite TVs, which were not returned. There was also automotive samples.  There were laptop samples. The company emails were not returned.  Company software was not returned.  The company laptops were not returned.  In addition to the emails not being returned, the company server with all records were not returned.  There was some engineering equipment that also was not returned, some broadcasting tools, the streaming tools, a number of demonstrators also all customer relationships that happened in the interim period were supposed to be turned over back to Stream TV in exchange for unjust enrichment claims.  Those were never turned back.  Also, some additional records that were created using Stream TV

assets were supposed to be turned over.  Those were never turned over as well too.

Q   When you say they were not turned over, who did not return the assets?

A   SeeCubic of Delaware.

Q   Did the Debtor, Stream, or Technovative ever have any agreements with SeeCubic of Delaware?

A   No.  There's no contract between SeeCubic of Delaware and Stream TV.

Q   Okay.  Is SeeCubic, Inc. recognized as a creditor on either Stream or Technovative's books and records?

A   No, it is not.

THE COURT:  Hold on.  Are you asking him about SeeCubic Delaware?

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  All right.  And then you said SeeCubic, Inc.  Are they different?

MR. ALEXANDER:  SeeCubic.  I'm sorry.  Let me clarify.  I was using them as the same.

THE COURT:  Okay.  So there's no contract with the Debtors and SeeCubic Delaware is the testimony?

MR. ALEXANDER:  That was his testimony.

THE COURT:  All right.  Now I'm sorry.  I just was confused about the next SeeCubic you referenced.  Okay.

BY MR. ALEXANDER:

Q    Is SeeCubic, Inc. of Delaware, a creditor on the books and records of Stream or Technovative?

A    SeeCubic of Delaware, no.

Q    At the beginning of your testimony you referenced intellectual property license with Rembrandt.  When did Stream obtain that license?

A    2019.

Q    Can you describe how that license came about?

A    Rembrandt was a -- had a predecessor company called 3D Fusion which transferred its claims to Rembrandt.  A number of our engineers were doing work.

          THE COURT:  Hold on.

          THE WITNESS:  Sorry.

          THE COURT:  So Rembrandt's predecessor was who?

          THE WITNESS:  Called 3D Fusion.

          THE COURT:  Okay.

          THE WITNESS:  And a number of the engineers that work for Stream were doing work at the Rembrandt predecessor company.  And their relationship was far more extensive than Stream TV's understanding of their relationship.  There was far more NDAs signed by the engineers and Rembrandt's companies. And the engineers did far more work at Rembrandt than we under -- Stream TV understood during their time there and it was far more extensive.  And then Rembrandt --

BY MR. ALEXANDER:

Q    Hold on.  So that was a -- an investigation that Stream did into that?

A    Rembrandt.

MR. CAPONI:  Your Honor, Mr. Rajan testified at length about this yesterday or the last day we were here, and so I question the relevance and given the time why we're retreading testimony that's already occurred.

MR. ALEXANDER:  We disagree that this testimony was already in this space.

THE COURT:  He did when he was answering questions say that they had some investigation and there was Rembrandt had issues.  And I wasn't quite sure what came first.  Were the engineers working for the 3D Fusion then Rembrandt and rent to Stream or did they -- that I'm a little unsure of, so I --

MR. ALEXANDER:  Let me break down the question.

THE COURT:  -- would allow for that, but the rest, I think he already talked about in his investigation it revealed that they had far more extensive relationships and all.  That, eh definitely did.  I just don't know how and who came first.  So if you can tell me that, that might -- I don't know what the relevance right now, but I'll figure it out.  Go ahead just with respect to that, okay.

BY MR. ALEXANDER:

Q    Mr. Rajan, you referenced a few different companies, okay, with respect to Rembrandt, Stream, 3D.  Can you explain the --

how the relationships evolved one at a time?

A    Our engineers were working at we'll call it the Rembrandt companies before they came to Stream TV.

Q    And which companies were those?

A    That was Rembrandt and 3D Fusion.

Q    And was it your testimony that Rembrandt or is it your testimony that Rembrandt is a successor to 3D Fusion?

A    Yes, it is.

Q    Is the Rembrandt license assignable?

A    No, it is not.

Q    I want to talk about the bankruptcy filings in this case. Do you recall when Stream filed its bankruptcy petition?

A    Yeah.  It was in March of this year.

Q    Okay.  Can you take a look at Exhibit 30, please?

        THE COURT:  Which number?

        MR. ALEXANDER:  Thirty.

BY MR. ALEXANDER:

Q    Mr. Rajan, I'd like you to take a look at pages 1 through 5.

A    Okay.

Q    It starts with voluntary petition.  Do you recognize this document?

A    Yes, I do.

Q    And how do you recognize this document?

A    This is our original filing and it came to me and it has

my -- sorry, here.  It came to me.  It was sent to me.

Q    Did you sign this document?

A    Yes.  Yes.

Q    Okay.  Mr. Rajan, I'd like you to take a look at page 6, 7, and 8, titled Stream TV Networks, Inc. Corporate Resolution. Do you recognize this document?

A    Yes, I do.

Q    Okay.  How do you recognize this document?

A    This was a corporate resolution that Stream TV did.

Q    And how do you recognize this document?

A    It came to me and I signed it.

Q    Okay.  And lastly, I -- well, I'd also like you to take a look at pages 9 through 11.  Do you recognize this document?

A    9 through 11 on which?

Q    9 through 11.

        THE COURT:  At the top?  What are you using for the reference, Mr. Alexander?

        MR. ALEXANDER:  It's 9 through -- it's page 9 at the top and it says Official Form 204.

        THE COURT:  Okay.  So you're using the document page 9 of 13, starting there?

        MR. ALEXANDER:  Yeah.  That's correct, Your Honor. Nine of --

        THE COURT:  Oh, okay.  Yeah.  Okay.

        THE WITNESS:  Yes.

BY MR. ALEXANDER:

Q    Do you recognize this document?

A    Yes, I do.

Q    Okay.  What is this document?

A    these are the unsecured creditors and all -- yeah.  These are the unsecured creditors.

Q    Is it all the unsecured creditors?

A    No.  There's more.  There's 125 unsecured creditors.

Q    Okay.  Did you assist in the preparation of this document?

A    Yes, I did.

Q    Okay.  I'd like you to take a look at page 12 of 13.  It's titled Statement of Corporate Ownership.  Do you recognize that document?

A    Which exhibit?

Q    It says 12 of 13 at the top.

A    Oh, okay.  Sorry.

Q    Yeah.

A    What's the exhibit number again?

Q    It's -- well, we're in tab 30.

A    Okay.

Q    And it will say page 12 of 13 at the top.

A    Yeah.  Okay.

Q    Okay.  And do you recognize this document?

A    Yes, I do.

Q    Okay.  And if you look at the last page, 13 of 13, the

declaration under penalty of perjury.

A     Yes.

Q     Is that your signature at the bottom?

A     Yes, it is.

Q     Do you recognize that --

THE COURT:  I'm sorry, Counsel.

THE WITNESS:  Yes.

THE COURT:  I'm sorry.  I got a little distracted.
So you're referring to page 13 of 13 now?

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  Okay.

MR. ALEXANDER:  Your Honor, we'd like to move Exhibit
30 into evidence.

MR. CAPONI:  No objection.

THE COURT:  Okay.  30 is admitted.

     (Exhibit 30 admitted into evidence)

THE COURT:  And that's all the pages.  Well, they're
broken down.

MR. ALEXANDER:  One id Debtor's Exhibit 30.

THE COURT:  Page 1 through 13, right, at the top?

MR. ALEXANDER:  That's correct.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q     Mr. Rajan, could you take a look at tab 31?

MR. CAPONI:  Your Honor, if it helps to move this

along, I'll stipulate to the admission of Exhibit 31.

THE COURT:  Okay.  Mr. Alexander, he'll stipulate to the admission of Exhibit 31.

MR. ALEXANDER:  Great.

THE COURT:  Okay.  Admitted.  And it's pages what through what?

MR. ALEXANDER:  It'll be pages 1 through 12.

THE COURT:  Okay.

(Exhibit 31 admitted into evidence)

THE COURT:  Okay.

BY MR. ALEXANDER:

Q    Do you recall whether Stream or Technovative filed their bankruptcy petition first?

A    Stream filed first.

Q    When Stream filed its bankruptcy petition, what petition, if any, did you hold at Stream?

A    I was the CEO and also a board member.

Q    Okay.  When Technovative filed its bankruptcy petition, what position, if any, did you hold at Technovative?

A    I was the sole board member of Technovative.

Q    As the sole director of Technovative, did you have the authority to file the bankruptcy petition on behalf of Technovative?

A    Yes, I did.

Q    There was a corporate resolution which is page -- starting

at page 6 of 12 in Exhibit 31.  Other than that resolution, were there any other resolutions that -- well, let me take a step back.  At the time of the bankruptcy filing who was the shareholder of Technovative?

A    Stream TV.

Q    At the time of the Technovative bankruptcy filing, did Stream execute any other resolutions prior to Technovative's filing?

A    I mean, it had its resolution for the bankruptcy.

Q    Okay.  Other than that resolution, were there any other ones?

A    Yeah.  It also removed all the directors and put me in as director.

Q    Okay.  Why did Stream and Technovative file for bankruptcy protection?

A    We filed for bankruptcy protection, Stream and Technovative filed for bankruptcy protection because it wanted to pay off all the liabilities and clean all the liabilities off of the balance sheet, reorganize the company so we can process these orders from customers.  Also, we have some assets that were not given back that were owed to Stream TV.  We wanted to pick up those assets and then emerge from bankruptcy free and clear of the liabilities and, you know, and move forward with the business.

Q    Okay.  In terms of a form, you know, what did the Debtors

think that they'd be able to accomplish for all interested parties during bankruptcy?

A    Well, one, we can clean up the liabilities for the unsecured claims that are allowed in the bankruptcy, and also we have strategic vendors that we need for -- that are also unsecured that we use in production.  We wanted to clean up their liabilities.  Furthermore, there were some secured claims.  We wanted to get that out of the way as well too.  And then also by cleaning that up we would be able to also process our orders and, you know, be able to expand the business and take advantage of our business opportunity.

Q    Was there any litigation pending at the time Stream filed?

A    Yeah.  There was litigation in the chancery court.  There was some lawsuits regarding shareholder actions.  And there was some litigation in the -- I'm sorry -- in the superior court with SLS.  And, you know, there was a couple of other litigations.  We wanted to consolidated.  Stream had some litigations against some other folks.  We wanted to consolidate all that into the district court and the bankruptcy court into one venue.

Q    I want to talk a little bit now about the activities during the bankruptcy cases.

A    Yeah.

Q    We've talked about some financing before, but have the Debtors engaged in -- I want you to describe the fundraising

and financing efforts since the petition date.

A   Since the petition date we've engaged with a number of financial firms.  The efforts have been sort of divided up.  So Thomas Park is dealing with a number of investors like Sandleton (phonetic) and the number of traditional DIP financers.  Also, Stream TV was engaged with some investors prior to the bankruptcy.  We now are bringing those folks into discussions on the bankruptcy and then also we turned to VSI for held and VSI has closed investment and is engaged in a number of financial firms like General Atlantic and Sony's financial arm and a number of other big equity players to help Stream TV not to just reorganize it, also to expand and exit the bankruptcy.

Q   You referenced Thomas Park.  Is that the Debtor's CFO?

A   Yes, he is.

Q   And do you recall when the Debtors retained Mr. Park?

A   Yeah.  That was back in April.  It was in the April, May time period.

Q   And when the Debtors engaged Mr. Park, how did the transition go in terms of onboarding?

A   It was going well in the beginning.  Unfortunately, I got hurt and I've been in the hospital for three months.  So I just got out a week ago, so that slowed that down dramatically during that three month period, but it's picking up now. Thomas Park is involved in the -- he's working with VSI on this

31 million plus the backstop and he's working with them right now on the closing and the funds and all that sort of thing.

Q    You referenced that, some health issues and the hospital. When were you admitted to the hospital?

A    I was injured on a business trip and got -- and ran into some serious health issues in early May overseas.  And then I did fly back to the U.S. and was admitted into the hospital and I just got out about a week ago.

Q    Since the petition date, have the Debtors engaged in negotiations with creditors regarding the claims asserted in this case?

A    Yeah.  We have discussions with the -- with SeeCubic. And, you know, we considered Hawk Equity, but we had discussions of Hawk.  We've been -- over the last three years, we maintained relationship with the unsecured vendors, so they've been calling us, you know, once we filed the bankruptcy and they've been updating us.  And a number of them are doing deals like credit agents, so we've been having discussions with all the unsecured.  And we've had discussions with some of the critical trade vendors that we used for production.

Q    You referenced SLS and I think you said SeeCubic.  Have the Debtors made any -- and I'm not asking for terms.  Have the Debtors made any settlement proposals to these entities?

A    Yes.  We made settlement offers to SLS and Hawk and they were rejected.

Q    In terms of marketing and sales efforts, have the Debtors done any marketing and sales efforts during this case?

A    Yes.  We attended trade shows.  We're also involved in a number of content deals.  So we're making arrangements for cross-marking with a number of -- I'm under strict NDA, but we're making arrangements for large marking efforts with various large content companies and sports leagues to promote technology in conjunction with our hardware partners.

Q    When you said content deals, what do you mean?

A    I can't reveal the name of the sports leagues --

Q    I'm sorry, Mr. Rajan.  My question wasn't clear.  In terms of the term, content deal, what is a content deal?

A    We are getting paid through a revenue share relationship with some content partners.  We're looking to do the worlds glasses free broadcast in November with a major sports league and we have marketing plans being put together between the sports leagues and our hardware partners.  I'm under a very, very strict NDA, but they're also begun due diligence on Stream TV and VSI for an investment and bringing in additional investment for us.  So we're developing a true partnership with a number of content companies.  That all started after the bankruptcy.

Q    Have you guys attended any trade shows?

A    Yes.  We've attended trade shows in Asia and presented to a number of big electronics companies that --

Q    The purpose of attending the trade shows is?

A    One was to give people an update.  They hadn't seen us in a while.  And we met with a number of our former customers and then we also met a number of new customers.  And a number of them now are negotiating purchase orders with us.

Q    You referenced customers.  Have you had customer meetings since the petition date?

A    Yeah.  We've had probably 100 customer meetings since the -- over 100 customer meetings with customers in Asia, the U.S., Europe, Middle East since the petition date.

Q    Raja, I'd like you to take a look at Exhibit -- Debtor's Exhibit 35.  Do you recognize this document?

A    Yes, I do.

Q    How do you recognize this document?

A    It's a distribution agreement between VSI and Stream.

Q    Did you sign this agreement?

A    Yes, I did.

Q    Is this agreement maintained in the ordinary course --

A    Yes, it is.

Q    -- in the business?

A    Yes.

        MR. ALEXANDER:  Your Honor, We'd like to move Exhibit 35 into evidence.

        THE COURT:  Any objection?

        MR. CAPONI:  No objection, Your Honor.

THE COURT:  I'm the only one allowed to fall asleep, which I thought I was.  All right.  Go ahead.

(Exhibit 35 admitted into evidence)

BY MR. ALEXANDER:

Q    Who negotiated this document?  Well, let me take a step back.  You said it's a distribution agreement.  Who are the parties to the distribution agreement?

A    VSI and Stream.

Q    Who negotiated this document on behalf of Stream?

A    I did.

Q    Who negotiated this document on behalf of VSI?

A    Joe Corso.

Q    What is VSI providing to Stream under the distribution agreement?

A    It's providing sales support, distribution support, purchase order financing to help Stream TV through this reorganization period as part of this deal that Thomas Parks is helping us with with VSI.  They also got -- besides VOE, supply chain finance from VSI in addition to the money for the reorganization plan.  So, but this contract sunsets, so it's just during the period where Stream TV is trying to sort of transition back up.  So VSI is going to help with the distribution and sales support and supply chain finance to help with these POs.  But it does sunset once Stream is, you know, moving along nicely.  Then Stream can do its own thing.

Q    How much is Stream paying VSI for those services?

A    Ten percent on the purchase order.

Q    Has Stream ever attempted to obtain purchase order financing in the past?

A    Yeah.  Stream has obtained purchase order financing and has attempted in the past, yes.

Q    Okay.  From who did Stream attempt to or obtain purchase order financing from in the past?

A    Well, Bank of China.  Also, there's some purchase order finance companies in Taiwan, a number of those folks, and then there's some companies here in the states as well.

Q    What did those companies charge in terms of their purchase order financing?

A    Thirty percent on an annual rate.

Q    Okay.  And how did that compare to what VSI is charging?

A    VSI is getting 10 percent.

Q    Are there any other benefits that Stream obtains by this distribution agreement?

A    Yeah.  It's reducing its cost during the ramp up phase and sort of offloading it on to VSI so Stream TV can generate free cash faster and get back on its -- you know, get back in expansion mode quicker.

Q    Do you believe that entry into the distribution agreement with VSI is in the best interest of the Debtor?

A    Yes, it is.

124

Q    Has Stream sought -- are you aware of Stream filing a motion with the court for approval of this agreement?

A    Yes, I am.

Q    Have they?

A    I believe so, yes.

Q    In terms of the bankruptcy case itself, how is Stream funded?

A    Stream TV, since the bankruptcy, has -- well, has about $1.4 million was spent since the beginning of the bankruptcy to date and its expenses were paid by VSI.

Q    What was that money spent on?

A    It was spent on payroll.  It was spent on strategic vendors.  It was spent on the electronics.  It was spent on getting things ready for production.  And it was mainly cost to get ready for the shipments of the product and also the 45 employees who stayed at Stream have been providing services for Stream around the globe.  We have personnel all over the globe.

Q    When you say employees, do you mean employees in the sense of like a W-2 or are you referring to like contractors?

A    They used to be W-2 when they were at Stream.  Then Stream went down.  They went to 1099.  And now -- I was out for three months.  We got our Stream TV bank account.  They're going to be being paid out of the Stream TV bank account, so we're paying them out of Stream.

Q    Were there any issues in opening that DIP account?

A     Yeah.  When I was in the hospital the bank refused to bring the papers and let me sign in the hospital.  They insisted that I come into the branch.  So during that time period VSI paid the bills directly.  We have a record of all of it.  It was all Stream TV expenses.  And now since I got out of the hospital, I got my appointment with the bank.  We got the bank account open.  And now money will be flowing through the Stream TV DIP account and the expenses and the payroll will be paid directly by Stream TV.

Q     In terms of that money, are there any agreements between VSI and Stream?

A     Yeah.  Stream TV has a number of pre-petition agreements as well as post-petition.

Q     In terms of pre-petition agreements, what pre-petition agreements?

A     There's still -- off the top of my head, I think it's like another two million or three million.  I'm not -- I've got to go back and check, but there's still unused subscriptions that Stream is collecting right now.  And then we have a subscription for the reorganization plan already in place.

Q     So just so I understand, you're saying there is pre-petition subscription agreements and then you referred to a post-petition one.

A     Mainly for the reorganization plan.

Q     Oh, for the plan of reorganization.

A    Yeah.  The reorganization plan.  That's already in place.

Q    You referenced a plan.  I'd like for you to take a look at Exhibit 38.

A    Which number?

Q    38.

THE COURT:  Counsel, can you just hold on one second? I apologize.  You can continue.

MR. ALEXANDER:  Thank you.

BY MR. ALEXANDER:

Q    Mr. Rajan, are you at Exhibit 38?

A    Yeah.

Q    Okay.  Do you recognize this document?

A    Yeah.  This is our plan for Stream TV reorganization.

Q    Is it just the plan?

A    And it's also the disclosure statements.

Q    Okay.  And how do you recognize this document?

A    This is what was negotiated among the various parties.

Q    Okay.  Were you involved in those negotiations?

A    Yes, I was involved.

MR. ALEXANDER:  Okay.  Your Honor, we'd like to move Exhibit 38 into evidence.

THE COURT:  And that's the plan and disclosure statement?

MR. ALEXANDER:  That's correct, Your Honor.

MR. CAPONI:  No objection.

THE COURT:  Any objection, Mr. Caponi?

MR. CAPONI:  Is that the document that was filed with the bankruptcy court?

THE COURT:  Yes.

MR. CAPONI:  Thank you.  No objection.

THE COURT:  Anyone --

MR. ALEXANDER:  It's document 293, but that is Exhibit 38.

THE COURT:  Any objection, Mr. Caponi?

MR. CAPONI:  No, Your Honor.  I'm fine with it.

THE COURT:  I'm sorry.

MR. CAPONI:  No problem.

THE COURT:  I must be losing my hearing over here.

(Exhibit 38 admitted into evidence)

BY MR. ALEXANDER:

Q    You've testified that you were involved in the negotiation of this disclosure -- well, disclosed statement and plan.  Who else from the Debtors other than counsel participated with this document?

A    Rembrandt participated, Cystar.

Q    Well, in terms of -- my question was related to the Debtor.  So who on behalf of the Debtor also participated in the --

A    Oh, I mean, there were a number of people on the Debtor's side who were helping like Dan Rankin, also Bud Robertson and

C.B. Joseph (phonetic).  There was a number of people on the

Debtor's side that were helping.

THE COURT:  And who?  I heard Dan Rankin.

BY MR. ALEXANDER:

Q    Okay.  Were they with VSI or they were with the Debtor?

A    Okay.  Now, on my side it was Matthew Rajana.  I

participated.

Q    And who signed the claim?

A    I signed it.

Q    Can you take a look at page -- sorry, Your Honor.  Bear

with me a moment.

A    Now which page?

Q    I'm getting there.  I'm sorry.  Bear with me one second.

So on two -- at the top, it will say 293-1 and it will say

Exhibit A, Plan, page 69 of 69.

A    Sixty-nine of one fifty eight?

Q    No.  It's -- so you go next over because the plan is an

attachment to the disclosure statement.

A    Okay.  Yeah.  Okay.

Q    Okay.  It was --

A    Which page?

Q    293-1 at the top.

A    All right.

Q    It will say page 69 or 69.  Are you there, Mr. Rajan?

A    Almost.

MR. ALEXANDER:  Your Honor, may I approach to help the witness?

THE WITNESS:  Yeah.  Okay.  Yeah.  I'm here.

THE COURT:  Yes.

BY MR. ALEXANDER:

Q   Okay.  Does that refresh your recollection?

THE COURT:  Did you find it?

THE WITNESS:  Yeah, I found it.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q   In terms of who signed on behalf of the Debtors?

A   Yeah.  It's Thomas Park.

Q   Okay.  And who is Thomas Park again?

A   He is the CFO.

Q   Okay.  Other than the Debtors, what other parties were involved in the negotiation of the proposed plan?

A   Rembrandt, Cystar, also Southern Telecom.  VSI was involved.  And Thomas Park was involved, as well.

Q   Okay.  To your knowledge, were any of those parties represented by counsel?

A   Yeah.  I -- I believe that Rembrandt and -- Rembrandt and VSI had counsel.

Q   Do you recall who represented Rembrandt?

A   The gentleman in the back.  I forgot his name.  Yeah. Right there.

Q    You're pointing to Mr. Chris Michaels?

A    Chris Michaels.  Chris Michaels.  Yeah.

Q    Do you recall who represented VSI?

A    A law firm, Akerman.

Q    Okay.  And did you negotiate any of the plan documents on behalf of VSI?

A    No.  No.

Q    Who negotiated on behalf of VSI?

A    They had an independent committee.

Q    Why was an independent committee formed?

A    As we entered the bankruptcy, I -- I -- once we entered the bankruptcy, I stepped away from a lot of my duties at VSI. So they took care of the, like, reorganization plans and contracts.  And then the shareholders took over a lot of the fundraising.

Q    Are you on the independent committee?

A    No.  I'm not on the independent committee.

Q    Who was on the independent committee?

A    It's Joe Corso (phonetic), Tom Sago (phonetic), and Dan Rank (phonetic).

        THE COURT:  Okay.  And who is it?  Joe Corso?

        THE WITNESS:  Tom Sago, and Dan Rank.

        THE COURT:  Okay.

BY MR. ALEXANDER:

Q    Mr. Rajan, I'd like you, if you still have your book open,

to flip to 293-2 of Debtor's Exhibit 38.

A    Okay.  What -- which exhibit again?

Q    Restructuring support -- it's in 38.

A    38.  Okay.

Q    That was Exhibit B to the disclosure statement.  It will say restricting support agreements, 293-2, at the top.

THE COURT:  It should be right after the document you were looking at.

THE WITNESS:  Okay.  Yeah.  Okay.

BY MR. ALEXANDER:

Q    Do you see the document that says Chapter 11, restructuring support agreement?

A    Correct.

Q    Okay.  Who were the parties to the restructuring support agreement?

A    That was VSI and -- and the -- and the Debtors.

Q    Anybody else?

A    Let me see here.  No.  Those are the -- those are the parties.

Q    Okay.  If you can take a look at page 3 of 50.  Does that refresh your recollection as to whether there were any other parties?

A    Yeah.  One second.  Yeah.  It's also Rembrandt and Stream TV.

Q    Okay.  Was it important for the Debtor to enter into this

restructuring support agreement?

A    Yes, it was.

Q    Okay.  And why?

A    That was to make sure that there was, you know, financial support and other support to get through the -- to get through the reorganization process.  Rembrandt has a very large claim.  So that was critical, as well.  And we needed financial and other support to get the reorganization done.

Q    And you referenced Rembrandt's claims -- large claim.  Have there been discussions with Rembrandt regarding their claim?

A    Yeah.  They had a settlement.  And through the ordinary course of work -- business, it was consummated for the reorganization.  And there were some additional features added to it to have Stream TV protected going forward with blocking rights on the technology.

Q    Uh-huh.  Is that agreement incorporated into the plan?

A    The -- the original settlement has it incorporated.

Q    Can you describe the structure of the proposed plan?

A    Yeah.  So basically, to make it simple, we have, you know, the allowable claims for SLS.  We're looking to pay off Stream TV.  And --

Q    Well, let's take -- let's start high level first in terms of, you know, what's underpinning the plan in terms of the funding?

A    Oh, okay.  Yeah.  So VSI is supplying 31 and a half million dollars.  There's also additional money for backstop for the rights offering because there's a rights offering including.

Q    You referenced a rights offering.  What is the rights offering?

A    The -- well, after you get past the taking care of the liabilities, VSI has 90 percent of the equity.  And then there's a rights offering for five percent of the equity of the new company for the Stream TV shareholders.  They can participate up to five percent of what they have in Stream.  There's also an additional five percent that's set aside for the vendors.  And in the rights offering, if that five percent is not taken up, then VSI supports -- gives additional funds to take up that five percent.

Q    Okay.  What treatment does the plan provide for administrative claims?

A    It's funded through the plan.  There's a couple million dollars budgeted for administrative costs.

Q    How will they be paid?  In full?  In part?

A    They're paid -- they're paid in full in cash.  Paid in full.

Q    And is that allowed claims?

A    Yeah.  It's all allowed claims.  It's only allowed claims.

Q    What treatment does the plan -- the proposed plan provide

for secured claims?

A    If -- well, there's -- there's an allowed claim for SLS. We'll pay the allowed claim.  Then Hawk, our -- you know, our position is is that it's been converted.  They've received their shares.  There's no liens on Stream TV right now by Hawk.

Q    So under the proposed plan --

A    No.  Hawk -- Hawk has received equity.

Q    I just want to -- I'm sorry, Mr. Rajan.  I just wanted to clarify.  So under the proposed plan, allowed secured claims, whoever holds them, will be paid in full?

A    Yeah.  If it's allowed secured claims.

Q    Okay.  Have the Debtors objected to any claims that were filed as secured?

A    Yeah.  We've objected to Hawk's filing and SLS' filing and SeeCubic's filing.

Q    How do the Debtors intend to account for -- assuming claim objections are not resolved, how do the Debtors intend to account for SLS' filed claim?  Well, let me take a step back. Do you recall how much SLS filed a claim for?

A    I believe it was 17.2 million.

Q    How do the Debtors intend to account for that claim if the claim objection isn't resolved under the plan?

A    It will be reserved.

Q    How do the Debtors intend to treat Hawk's claim under the plan?

A    Well, as part of the plan confirmation, we'll go through the -- the conversion issues.  And you know, we'll -- and if there's any allowable left, we can get it sorted out.

Q    Do the Debtors have unsecured claims?

A    Yes.  We do.

Q    Approximately how many?

A    125.

Q    And in terms of a dollar amount, what's the range of the unsecured claims?

A    The -- well, I mean, they range in amounts among different sizes.  But it's close to -- right now it's grown since the omnibus.  So it's around 20 million.

Q    Do the Debtors still need to vet those claims?

A    Yes.  There still has to be some vetting on those claims.

Q    Okay.  And you referenced approximately 20 million.  Does that include what Rembrandt filed as a proof of claim?

A    No.  Rembrandt is separate from that.  They have a very large claim.  We have a settlement with Rembrandt on a go forward.  Their claim is 1.2 billion or so.

Q    You believe Rembrandt filed a proof of claim for 1.2 billion?

A    Yes.  They did.

Q    Okay.  And in terms of treatment for unsecured claims, under the plan, what's the proposed treatment?

A    We have offered 50 cents on the dollar.  And also, they

can participate if they want to -- by not taking money, they can also participate in that five percent equity pool.

Q    And is that part of the rights offering?

A    Yes.  Correct.

Q    Okay.  Is it important to the Debtors that unsecured creditors receive distributions under the plan?

A    Absolutely.  Yeah.  We -- we use a number of them for production.

Q    Can you name a few?

A    Yeah.  There's -- there's Anuma.  There's Cadence.  There's Synopsis (phonetic).  There's Catapult -- I'm sorry, Metro Graphics.  There's a number of marketing relationships there like IMG and others.  There's a list of about -- there's also, I'm sorry, HDMI.  And there's also Erason (phonetic).  A number of things that are used in the electronics.

Q    What types of services do they provide for the Debtor?

A    Mainly they're vendor -- most of those are vendors as part of the supply chain.  And then some of them are helping us with like content deals.

Q    And in terms of equity, how does the plan treat equity?

A    Well, there's going to be new equity in the Stream.  New Stream, so to speak.  There's a large waterfall in the unsecured because of Rembrandt.  And so the shareholders can participate though in the rights offering after we take care of the unsecured.  We don't want to break the absolute priority

rule.  So but again, they can participate in the rights offering.

Q   And you referenced participate in the rights offering.  So is it your understanding that the plan does not provide old equity -- anything on account of their old equity?

A   No.  They -- they buy into the rights offering.

Q   So that would be new cash?  That would have --

A   That would be new cash.  Yeah.

Q   How does Cystar factor into the plan?  You referenced them as one of the parties that were negotiated with.

A   Yeah.  They're helping us with -- one, obviously, they're giving us purchase orders.  They're putting money into the bonding -- you know, the supply chain for the bonding.  And helping us actually to process orders.  And bringing us customers and those things.  Same thing as Southern Telecom is giving us, purchase orders.  And also, they're heavily involved in joint marketing programs.

Q   Do the Debtors intend to move forward with the proposed plan?

A   What did you say?

Q   Do the Debtors intend to move forward with the proposed plan?

A   Yes, yes.  We're moving forward.  Already starting production.

Q   All right.  Do the Debtors need SeeCubic B.V. in order to

execute the plan that's on file?

A   We don't need them for the execution of it.  We'd like to include them for more reasons.  But no, we don't need them for execution.  We have our own electronics, our own bonding.  And we're expanding our team right now.  We're actually going to be hiring more people and bringing them in.

Q   In terms of -- are you familiar with the term "liquidation"?  Liquidation, are you familiar with that term?

A   Yes.

Q   Is Stream worth more in a liquidation in your view, or a reorganization as a going concern?

A   No.  If you -- if you did a forced liquidation, the number would be lower.  It would be lower if you did a forced liquidation.

Q   Do you believe in a forced liquidation unsecured creditors would get anything?

A   They'll get zero.  They already got zero under the omnibus.

Q   Okay.  If the bankruptcy cases were dismissed, what do you believe would happen to the unsecured creditor claims?

A   They -- they would lose all their money.  And --

Q   Strike that question.  In your view, is the Debtors' best path forward to pursue this plan?

A   Yes.  It's absolutely the best path forward.  We're receiving more and more orders, and we have content deals, and

we have projects that are coming up in November and December.

Big ones.  So yes, we need to move forward.

MR. ALEXANDER:  Okay.  Your Honor, I'd like to just take a look over my notes and I may be done with Mr. Rajan.

THE COURT:  Okay.

MR. ALEXANDER:  Your Honor, may I just go talk with my colleague?

THE COURT:  Sure.  Five minutes?

MR. ALEXANDER:  Five minutes.  Thank you.

THE COURT:  All right.  You know what, make it ten. I really need to -- I'm not feeling well.  So let's take ten minutes.  The Court is in recess until 4:45.  Thank you.

(Recess taken)

THE COURT:  Please be seated.  All right.  Mr. Alexander, do you have any remaining questions for direct for Mr. Rajan?

MR. ALEXANDER:  Your Honor, we do not have any further questions on direct for Mr. Rajan.

THE COURT:  All right.  Cross-examine?

MR. CAPONI:  Thank you, Your Honor.  Steve Caponi from K&L Gates, again, for the record, on behalf of the secured creditors and Hawk.

                    CROSS-EXAMINATION

BY MR. CAPONI:

Q    Good evening, Mr. Rajan.

A     Good evening.

Q     You and I have gone through a number of examinations, most of them in depositions where the questions and answers are more open ended.  I'm going to try to focus on yes or no questions.  And if you could do your best to give me yes or no answers, I'd appreciate it so we can move this along.  Before I get into my outline, your -- during your testimony, you mentioned a, you know, number of companies, Sony, LG, Google, all these automotive companies, et cetera, that -- your testimony was that they are extremely interested in Stream TV, correct?

A     Correct.

Q     And when you add up the total value of those relationships that you anticipate, what's the value you put on those relationships?

A     The enterprise value of the company?  I -- I'm not quite sure.

Q     Of all these companies that you claim want to buy televisions from Stream, what is the value of all that prospective business that you testified about?

A     Oh --

          MR. ALEXANDER:  Objection.  Calls for speculation.

          MR. CAPONI:  I'm asking him the value of the business orders that he testified about coming into his company.  I don't think that calls for speculation.

          MR. ALEXANDER:  Mr. Caponi specifically said

"prospective", which is in the future.  So it's speculation by its very nature.

THE COURT:  Just rephrase the question.

BY MR. CAPONI:

Q   Mr. Rajan, you testified and you drew out during your testimony that LG wants to buy maybe 5 million TVs, and this company wants to buy 100,000 TVs.  Do you remember all that testimony?

MR. ALEXANDER:  Objection.  Mischaracterizes his testimony.

MR. CAPONI:  He can tell me if he disagrees or he doesn't remember.

THE COURT:  No.

MR. ALEXANDER:  Well, no.  The objection --

THE COURT:  The objection is that you're mischaracterizing his testimony that all these people want to buy TVs.

BY MR. CAPONI:

Q   Let's try this again.  Mr. Rajan, can you put for this Court a value -- the anticipated value on all those relationships that you've testified about during your direct examination?

MR. ALEXANDER:  Objection.  Still calls for speculation.  He asked anticipated value.

MR. CAPONI:  The question was can he put a value.

That's a yes or no question.

MR. ALEXANDER:  He's saying anticipated.

THE COURT:  You said -- how about -- how about -- he testified that he was going to have this from this one, this from that one.  How much is that total?  Isn't that what you're trying to figure out?

MR. CAPONI:  That's what I'm asking.  The total.

THE COURT:  Yeah.  But you didn't -- you -- I think just be a little more specific.  Like, you testified that Sky whatever was going to buy X amount of TVs.  I think that's what he -- I think you need to just sort of be a little more specific as to all the parties because there is testimony.  I get what you're asking.  I think it may just have to be you testified that these parties were going to buy, name all the parties, how much does that total.  Isn't that what you're asking him?

MR. CAPONI:  Yes.  I'm asking -- yes, Your Honor.  I think my question is well within bounds to ask this witness if he has an idea as to the total value of the relationships that he testified to at length.  Either the answer is he has a value, or he's going to tell me he has no idea.

THE COURT:  Well --

MR. CAPONI:  That's all I'm asking.

THE COURT:  Okay.  When you say all the entities he has relationships with, I think you need to --

MR. CAPONI:  The ones he testified to is what I'm asking about.  He testified.

THE COURT:  Relationships for purchases because he testified he had relationships with a lot of -- okay.  So that's what I'm saying.

MR. CAPONI:  All right.

THE COURT:  Just tighten the question up.

MR. CAPONI:  Sure.

BY MR. CAPONI:

Q   Mr. Rajan, you on your direct examination testified about a number of companies that you -- from whom you anticipated purchases of product from Stream, correct?

A   Stream?  I'm still not clear on your question.  Stream TV has received purchase orders.  And there are a number of companies -- if you're talking about this TV category -- that we're working with to procure purchase orders we hope for, you know, over a certain time period.

Q   And what is the anticipated value of those relationships as you sit here today?

MR. ALEXANDER:  Objection, Your Honor.  It still calls for speculation.

THE COURT:  How about anticipated value -- can you use another word other than "anticipated value"?

BY MR. CAPONI:

Q   What is the value the Debtor places on those

relationships?

A    I mean, for the TV category we can comfortably get the revenues over two billion.

THE COURT:  Two what?

BY MR. CAPONI:

Q    How much?

A    Two billion.

Q    Two billion dollars?

A    Over time.

Q    Okay.  So it's the Debtor's -- your testimony that you feel comfortable that Stream can reach revenue of two billion dollars in the television category?

MR. ALEXANDER:  Objection.  Mischaracterizes his testimony.  He's stating whether he feels comfortable with -- I mean, just stick with the testimony.

MR. CAPONI:  Again, Your Honor, I think the witness can tell me himself if he thinks --

MR. ALEXANDER:  No.  That's the whole point of counsel.  Counsel's here to object.

THE COURT:  All right.  He's objecting because what?

MR. ALEXANDER:  It mischaracterizes his testimony.

THE COURT:  Okay.

MR. ALEXANDER:  He never used the word comfortably in any other testimony.

THE COURT:  All right.  Just use another word.

BY MR. CAPONI:

Q    Let me try it this way.  Of all the companies you named in your direct examination, how many of them are in the courtroom today?

A    They're not in the courtroom.

Q    How many were in the courtroom when we were here in the first week of -- of this hearing in June?

MR. ALEXANDER:  Objection, Your Honor.  That's irrelevant.  That's not relevant to anything before the Court.

MR. CAPONI:  It's relevant, Your Honor, because the Debtor testified about these relationships to create the impression that it has these relationships.  I think whether or not those -- we're talking about companies that are going to spend allegedly billions of dollars.  The fact that none of them are here I think is relevant.

THE COURT:  I'll allow it for what it's worth.  Go ahead.

BY MR. CAPONI:

Q    Were any of those companies at the prior hearing, Mr. Rajan?

A    I don't think so.

Q    Have any of those companies entered an appearance in this bankruptcy estate since it's been filed?

A    They have not entered an appearance.  No.

Q    Have any -- and the Debtor has not come forward with a

single term sheet or financing document on behalf of any of those companies that you testified about, correct?

A    The Debtors did not -- the Debtors have not submitted to the Court a term sheet.  No.

Q    Okay.  So these companies, just limiting it to the TV category, that you anticipate may purchase 2 billion dollars from Stream, did not see the need to even send a representative to monitor these proceedings, correct?

MR. ALEXANDER:  Objection, Your Honor.  It calls for speculation.  It asks Mr. Rajan to determine why another party who is not here did or did not decide to come into the case.  And it also has no foundation for what he's asking.

THE COURT:  Response?

MR. CAPONI:  I'm not asking him to talk about anybody else's state of mind.  Although I will note that Mr. Alexander noted that his client is permitted to talk about other people's state of mind.  I'm simply asking --

THE COURT:  Listen.  I don't want to hear this.  Just respond to his -- you know, you guys can do this cat and mouse if you want.  His argument -- his objection is --

MR. CAPONI:  Okay.

THE COURT:  -- that you're asking him to speculate.

MR. CAPONI:  Let me -- I'm going to withdraw the question.

THE COURT:  All right.  Keep going.

BY MR. CAPONI:

Q   With regard to the relationships that you testified about in your direct examination, am I correct, there's not a -- the Debtor is not able to put forth a single witness to substantiate those relationships, other than yourself, correct?

MR. ALEXANDER:  Objection, Your Honor.  That mischaracterizes -- I mean, it mischaracterizes his testimony.  And there's a lack of foundation for what he's even asking.

THE COURT:  Okay.  He said not able.

MR. CAPONI:  Excuse me?

THE COURT:  You said the Debtor is not able.

MR. CAPONI:  Okay.  The Debtor -- I'll rephrase that.

THE COURT:  Rephrase that.

BY MR. CAPONI:

Q   Of all the companies -- all the relationships that you testified about on direct examination, the Debtor has not put forth any witness, other than yourself, to substantiate those relationships, correct?

A   We put forward witnesses that got rejected.

THE COURT:  Woah, woah, woah, woah.  It's a yes or no.  Have you or have you not put forth witnesses?

THE WITNESS:  Yeah.  We put forward witnesses.  They got rejected.

BY MR. CAPONI:

Q   Excuse me?

A     We put forwarded witnesses.  They got rejected for other relationships.

Q     In this proceeding, Mr. Rajan, the Debtor has not put forth any witness, other than yourself, to substantiate those relationships, correct?

MR. ALEXANDER:  Objection, Your Honor. Mischaracterizes his testimony.

THE COURT:  Well, he already asked and answered.  He said that he believes that they did put forward and they were rejected.  Ask him what he means by that.

MR. CAPONI:  Okay.

THE COURT:  I mean, I heard what he said.  I don't --

MR. CAPONI:  Okay.  Your Honor --

THE WITNESS:  So -- so --

BY MR. CAPONI:

Q     Mr. Rajan, with regard to all those business relationships with all those potential customers, the Debtor has not put forth in this proceeding a single representative from one of those entities to substantiate your testimony, correct?

A     We did not put forward witnesses.  No.

Q     Thank you.

THE COURT:  Okay.

BY MR. CAPONI:

Q     Throughout your testimony -- strike that.  You're sitting here, Mr. Rajan, it is my understanding, testifying in your

capacity with Stream, your individual capacity, and your capacity with VSI; is that correct?

MR. ALEXANDER:  Objection, Your Honor.

THE COURT:  Basis?

MR. CAPONI:  Excuse me, Your Honor?

MR. ALEXANDER:  That's not what Mr. Rajan testified.

THE COURT:  I said -- I asked him his basis for his objection.

MR. CAPONI:  Okay.  Sorry.

MR. ALEXANDER:  It's a mischaracterization of the testimony.

MR. CAPONI:  I'm asking the witness if my characterization is correct.  That's the point of the question.

THE COURT:  Right.  I'll allow it for what it's worth.  Ask him -- repeat the question.  I understood the question.

BY MR. CAPONI:

Q   Mr. Rajan, when you were up here testifying on your direct examination, am I correct that you were testifying in your individual capacity, your capacity with VSI, and your capacity with the Debtors?

A   That's incorrect.

Q   Okay.  In what capacity or capacities have you been testifying in?

A   For both the Debtors and as an individual.

Q    Both the Debtors and what was the second one?

A    Individual.

Q    Can you speak closer to the microphone, Mr. Rajan?

A    Individual.

Q    It's your testimony that you did not at all today testify on behalf of VSI?

A    I didn't testify for VSI.  No.

Q    Okay.  So any testimony -- strike that.  Okay.

MR. CAPONI:  Your Honor, if Mr. Edel could give the witness a binder.

THE COURT:  Okay.  There's a new binder?  Wait.  You have to hand that -- do we have that binder that he wants to hand up?  Those -- those --

MR. EDEL:  I have one for you as well, Your Honor.

THE COURT:  Oh okay.  So we do -- all right.  Hold on.  I have to make some space here.  All right.  So is this this or is this something else?

MR. CAPONI:  These are something else.

THE COURT:  These are not the binders I have over here?

MR. CAPONI:  If they're from the last hearing --

THE COURT:  Yes.

MR. CAPONI:  -- we have some of the documents from the last hearing that we'll be using in these binders, as well, for ease.

151

THE COURT:  So I can clear this?

MR. CAPONI:  But we may -- at some point, we may reference those for rebuttal.

THE COURT:  Okay.

MR. CAPONI:  I think it would be safe to move those out of the way though.

THE COURT:  Okay.  Jonathan, just give us one minute. Can you help me put these over here?  All right.  I'm good. And then that's a set for me, right?  Okay.  Hold on one second.  Okay.  All right.

MR. CAPONI:  May I continue?

THE COURT:  Yes.

BY MR. CAPONI:

Q   Mr. Rajan, during your direct examination, you frequently used the phrase, "we".  Who is the, "we"?

A   We as our collective group that is working on this project.  That's me, the companies, Stream TV and Technovative, and the Stream TV employees that are doing work on behalf of this project, our vendors, and our customers.  We view it as a team effort.

Q   And does the "we" include VSI?

A   VSI is also helping us, too.  That is correct.

Q   So when you say "we", you're also -- it could refer to Stream, it could also refer to VSI?

A   It could.  But for my testimony today, I separated it.

Q    And how did you separate it during your testimony today?

A    I gave only, you know, a portion of the information that I understand about VSI.  And it was all from what I heard representing Stream.  They have an independent committee.  And they have people that are taking care of the fundraising and all those things.

Q    So Mr. Rajan, I want to ask you, when you were testifying that, "we have employees" and "we have offices" and "we have vendor relationships", who constitutes the we that you were testifying about?

A    That is Stream TV.

Q    And it's not VSI, or that includes VSI?

A    That is -- that is Stream TV.  VSI has relationships.  But it's Stream TV that has the relationships.

Q    So just to be clear, when we go -- if we go back and look at this transcript, every time you use the word "we", you were referring --

A    You can view it as --

Q    -- strictly to Stream TV?

A    The collective Stream TV group.  Yes.

Q    And what is the collective Stream TV group?

        MR. ALEXANDER:  Your Honor, objection.  Asked and answered.  He already explained to him what the collective group was.

        THE WITNESS:  I believe I answered that in my

previous --

THE COURT:  Woah, woah.  You don't get to -- the response is already asked and answered.

MR. CAPONI:  I don't believe that I've asked.  And I don't believe that he's answered it.

MR. ALEXANDER:  The specific question that he asked was specifically answered.  He asked him what consisted of the we, who is the Stream group.  And Mr. Rajan testified that the Stream group consisted of Stream, the Stream employees, the Stream relationships.  That was his testimony.

MR. CAPONI:  The first time he used the Stream group was right on the last answer, which prompted my follow-up question.

THE COURT:  I'll allow it for what it's worth.  Go ahead.

BY MR. CAPONI:

Q    Who constitutes the Stream group?

A    As I answered previously, it's Stream, the Stream employees, the Stream vendors, the Stream customers, the Stream companies.  It's a collective effort.

Q    And yes or no, does the Stream group include VSI?

A    For the purposes of my testimony today, it does not.  I separated --

Q    Thank you.

A    -- VSI, even though VSI is helping.

Q    Mr. Rajan, you just in your answer there were referring to the Stream employees.  But Stream has no employees, correct?

A    Stream has employees as of yesterday.

Q    So prior to yesterday, Stream had no employees?

A    No.  Stream had 125 employees at the time, you know, when we went through the whole -- Stream has historically had employees for the last 13 years.

Q    From the filing of the bankruptcy up until yesterday, Stream had no employees, correct?

A    Stream had contractors who are doing work for them currently.  And now, they have now been moved over since we finally got a bank account open.  They -- they have been moved.

Q    Mr. Rajan, in front of you is a binder.  If you'd look at it.  It's a witness exhibit binder.  If you could turn to Exhibit 4.

A    Binder number 1?

Q    You'll see on the front of the binder it says, "Mathu Rajan, witness exhibit binder 1".

A    Okay.

Q    And if you'd go to Exhibit 4.

A    Okay.  Yeah.

Q    This is your first day declaration.  Do you recognize this document?

A    Yes.

Q    And if you'd turn to page 31 of the document.  Is that

your signature?

A    Yes.

Q    And you did in fact sign this declaration under penalty of perjury, correct?

A    Yes.

Q    If you'd turn to paragraph 94 on page 25.

A    Paragraph 95?

Q    Paragraph 94 on page 25.

A    Paragraph 94.

Q    And if you'd look at paragraph 94.  It says, "SeeCubic, Hawk, SLS, Stastney, and Morton have abused the Chancery Court, which has allowed them to unlawfully seize, retain, and use the Debtors' assets."

MR. ALEXANDER:  Your Honor, I'm going to object to this line of questioning with respect to this.  Is he admitting to this into evidence?  Why is he reading from a document?

THE COURT:  He gets to ask the question.  I guess the question --

MR. ALEXANDER:  Well, he's already reading the question into the record.  He's reading the statement that was made.

THE COURT:  So you believe the question is rel -- you're objecting on the basis of relevance?

MR. ALEXANDER:  I'm objecting on what he's reading as hearsay.  And also, it's outside of the scope of his direct

examination.

THE COURT:  Of your direct examination, right?

MR. ALEXANDER:  Him, meaning Mr. Rajan.

THE COURT:  Mr. Rajan.  Okay.  All right.  He's objecting on the basis of that it's outside the scope and that you are reading it into the record as opposed to asking Mr., I guess, Rajan to read it and question him about it.

MR. CAPONI:  Your Honor, I'm not limited to the scope of Mr. Alexander's direct.  We listed Mr. Rajan as our own witness.

THE COURT:  So are you calling him as your witness now on cross?  I mean, what are you doing?  I get that you listed him as your own witness.  Is he being offered now as your witness or are you cross examining him as Mr. -- as the Debtors' witness?  I get that you can call somebody as your witness.  But when are they being offered as your witness?  I think there's a distinction.  At least I think there is.  I think there's a --

MR. CAPONI:  Your Honor, I don't think I'm limited to the scope of Mr. Alexander's direct examination in examining Mr. Rajan.

MR. ALEXANDER:  We disagree.  I mean, it was a direct examination.  They're cross examining him.  So they're limited to the scope of direct.  That's the rules.

MR. CAPONI:  Not when you call -- list the person as

your own affirmative witness, which we did, as well.

MR. ALEXANDER:  It's how they're called.  Not how they're listed.

MR. CAPONI:  We agreed with counsel --

MR. ALEXANDER:  You did not.

MR. CAPONI:  -- that we would call each witness once.

THE COURT:  Well, that's a different story.

MR. CAPONI:  And they would be proffered by the party who controlled the witness.

THE COURT:  Well, if you agreed that he would be called once, that's a different story because typically, how this works -- and you know, maybe -- maybe I don't know -- maybe I don't understand it.  But from my experience, unless the party who is -- the parties have agreed that they're going to be -- you're offering the witness and the testimony is going to be put in respect to both parties who have called them, typically, one party will call and they'll do theirs.  And then the other party who wants to call them as their witness will call them as their witness as either adverse or as a cross. But people try to streamline that and say, we'll call them once and then we'll just have all of the testimony.

Now, is it your position that that's what the parties agreed to?

MR. CAPONI:  Yes, Your Honor.  And that's exactly what has transpired with every witness in this hearing up until

right now.

MR. ALEXANDER:  Your Honor, we disagree.  There was a specific discussion regarding Mr. Park.  Mr. Caponi specifically asked me would I like to call Mr. Park as my witness and give him the opportunity to cross.  And I said yes.  There was never a discussion regarding any other witness.

THE COURT:  Well, how many witnesses have we had?

MR. CAPONI:  Two.

MR. ALEXANDER:  Mr. Stastney.

THE COURT:  And Mr. Park.

MR. CAPONI:  Right.

MR. ALEXANDER:  And Mr. Park.

THE COURT:  And there's Mr. --

MR. ALEXANDER:  And specifically with Mr. Park, there was that question because Mr. Park was listed on both witness lists.

THE COURT:  And so you're saying you didn't agree to that?

MR. ALEXANDER:  I did not agree to that.

THE COURT:  So they're going to have to call him as their witness at the end of your case when they put on -- for the interviewer -- they have already -- hold on.  The moving parties have offered all of their witnesses, have they not, other than rebuttal?

MR. CAPONI:  Correct.

THE COURT:  And so they didn't call Mr. Park -- or Mr. Rajan in their case-in-chief.  So now they're limited to your calling him as your witness.  Is that your position?

MR. ALEXANDER:  My position is we have put Mr. Rajan up for direct examination.  And their testimony -- or their examination is limited to cross.

THE COURT:  And he -- and you say that you didn't agree that it would be any different than -- typically, you examine and you bring -- all right.  So you say there's an agreement.  He says there's not.  Correct?

MR. CAPONI:  Correct, Your Honor.

THE COURT:  All right.

MR. ALEXANDER:  And we did not -- we made it very clear at the end of our case -- not the end of our case.  We made it very clear that we were going to examine Mr. Rajan.  We didn't close our case because Mr. Rajan was unavailable as a witness, as the Court's aware, until the Debtors' produced him here on Monday -- or Tuesday.

THE COURT:  So you want him to limit and then call him back as their witness?  I mean, that's what it sounds like if you're right that you didn't agree that he would be called except in -- as his capacity as your witness.  And that if they want to put anything other than beyond your direct, they have to call him in their case-in-chief, which they said -- which Mr. Caponi said they left open.

MR. ALEXANDER:  That was our position.  He was our witness that we were putting up.

THE COURT:  Right.  And my question is, Mr. Caponi says let's just do this all at once where you question him on direct and we do the questions that we would have done had we called him as our witness in our case-in-chief.  We reserved that right to do that.

MR. ALEXANDER:  Uh-huh.

THE COURT:  You're saying you want it done in two steps?

MR. ALEXANDER:  Who gets to -- well, maybe we can talk about the process.  Who gets to -- you're going to do one examination and then I get a redirect and then you're done?

THE COURT:  No.

MR. ALEXANDER:  No?

THE COURT:  Because --

MR. ALEXANDER:  So what are we -- so who gets to go last, Your Honor?

THE COURT:  Okay.  So this is how this would have worked, okay, if we didn't do kind of this joining.  Mr. Caponi would have called him as his witness in his case-in-chief, which he didn't get to do because he was unavailable.

MR. ALEXANDER:  Understood.

THE COURT:  Then he would have had his questions with respect to his case-in-chief.  You would have been able to --

I'm assuming he was going to call him as cross. I don't know. Probably. And then you would have been able to do your examination. And then they would have been able to re -- even though I'm calling it recross, but -- and then that would have been with respect to their testimony, their testimony or evidence that they were trying to elicit with Mr. Rajan. Okay.

Then, when you did your case, you would have done just what you just did. Mr. Caponi would get to cross. And then you would get to redirect.

Now we're combining it. So now with respect to the matters that are not your direct testimony, he's calling him as his witness. You get to examine him with respect to that portion. And then he goes last. But with respect -- wait a minute. So with respect to your portion of the direct -- I mean, I don't know how this is going to work.

MR. ALEXANDER: How can we separate it out? So he's going to limit himself to non-leading questions? And I mean, he's already gone by that.

MR. CAPONI: Your Honor --

THE COURT: How about we just do this. This will just make it easier.

Mr. Caponi, you examine him on the direct. And then you call him back as your witness and you go -- because now I've got to figure out what was part of the direct, what was part of your case. And now we're getting complicated simply

because unless some -- you guys got an agreement.  Now I'm hearing there's no agreement.

MR. ALEXANDER:  Can we talk for a couple minutes and see if we can come to an agreement?

THE COURT:  Yeah.  You guys figure this out.  You've got a few minutes.  I'm not moving because every time I move, I never come back in the same time.  All right.  Hold on.

(Recess taken)

THE COURT:  All right.  Have the parties been able to work this out?

MR. ALEXANDER:  I'll wait for Mr. Caponi's confirmation.  But I believe Mr. Caponi's going to ask his questions and we'll be able to redirect.

THE COURT:  Okay.  Great.  Because I was going to have to cite Federal Rule 611(b) to you guys and said what it said.  And now I'm glad.  Okay.  Let's go.

BY MR. CAPONI:

Q    All right.  Mr. Rajan, going back to your declaration in paragraph 94.

A    Okay.  Yeah.

Q    You have that?

A    Yeah.  I have it.

Q    Okay.  Again, it says,

"SeeCubic, Hawk, SLS, and Stastney, and Morton have abused the Chancery Court, which has allowed them to

163

unlawfully seize, retain, and use the Debtors' assets. The Debtor has incurred millions of dollars in legal fees and suffered significantly greater damage being deprived of its assets. The irreparable harm has necessitated the Debtors and its primary subsidiary, Technovative, to seek Chapter 11 relief."

Did I read that correctly?

A    Yes. That is correct.

Q    And this is -- again, this is your sworn statement explaining as to why the Debtor -- Debtors filed bankruptcy, correct?

A    One of the reasons.

Q    Thank you. Mr. Rajan, do you recall testifying on direct examination that the Debtors' have extensive intellectual property assets?

A    Yes.

Q    Okay. Is it a true known fact that Debtors' have no intellectual property assets, no patents?

A    I don't -- I don't understand. We have 100 patents.

Q    You said, "We have 100 patents." Who is we?

A    The Stream TV Group.

Q    Stream TV and the Debtors, which is Stream TV and Technovative, they don't hold any patents, correct?

A    Stream TV -- okay. Let's -- let's be very specific here. There's patents. And when you say IP, I view IP as a very

broad category.  That includes trade secrets and a whole host

of other things.  So let's be specific.  If you're referring to

the patents, the Stream TV patents are held in our subsidiary

Alternety (phonetic) Cooperative, which is owned by Stream TV.

Q    Okay.  But the Debtor, Stream TV, and the other Debtor,

Technovative, do not hold any patents, correct?

A    They do not have patents.  No.

Q    So in your direct testimony when you spoke about "we"

holding and owning a number of patents, you were referring to

the patents held by entities that are not Debtors in this

court, correct?

A    They are not Debtors in this court.  No.

Q    Turning to your customers, you testified regarding

Skyworth, Chunghwa, Telecom, LG, Huawei, Vizio, Samsung, and

Sony, correct?

A    We have customers that have issued POs.  And we have --

THE COURT:  Huh-uh.

THE WITNESS:  Okay.  They are customers we are --

THE COURT:  No.

THE WITNESS:  -- in discussions with.  Correct.

THE COURT:  Yes.  Yes or no.

THE WITNESS:  And working with.

BY MR. CAPONI:

Q    And those companies I just listed, the Debtor has not put

forth a binding contract -- sales contract with any of those

entities, correct?

A    We are not at a contract stage yet.  No.

THE COURT:  Which entities again, Mister --

MR. CAPONI:  The names were Skyworth, Chunghwa, Telecom, LG, Huawei, Vizio, Samsung, and Sony.

BY MR. CAPONI:

Q    And with regard to the auto manufacturers, Hyundai, Toyota, Nissan, the Debtors do not have any binding contracts for the sale of product to those entities either, do they?

A    It was Honda.  Not Hyundai.  But we don't have contracts. No.

Q    You testified that you have contracts with -- that Debtors have contracts with BBEC (phonetic) and Cystar, correct?

MR. ALEXANDER:  Objection.  Mischaracterizes his testimony.

MR. CAPONI:  I don't think I'm mischaracterizing.  I think I accurately testified --

THE COURT:  Well, what --

MR. CAPONI:  -- characterized his testimony.

THE COURT:  -- specifically are you referring to as a mischaracterization?

MR. ALEXANDER:  He said they have contracts with those entities.  That's not his testimony.

MR. CAPONI:  If I'm -- again, he's free to tell me I'm wrong.  That's the point of the question.

166

MR. ALEXANDER:  Your Honor, that's not how objections work.  We object because he mischaracterizes.  And it's up to him to fix it.

THE COURT:  All right.  So --

MR. CAPONI:  Well, I disagree that it's a mischaracterization.

THE COURT:  Hold on.  He never testified they had contracts, did he?  So if he never testified that he -- you testified that they had contracts.  And if they didn't, then I would say it's a mischaracterization of what he said.  Not exactly the question that -- so just rephrase it.

Did they have -- what was the relationship?

BY MR. CAPONI:

Q    Mr. Rajan, does the Debtor -- do the Debtors have contracts with BBEC and Cystar?

A    I believe that we do.

Q    Okay.  So to make sure that I characterize your testimony correctly, it is the Debtors' position that it has contracts with BBEC and Cystar, correct?

MR. ALEXANDER:  Objection.  That's a compound question.  Break it up.

MR. CAPONI:  Your Honor, respectfully --

MR. ALEXANDER:  It's a different answer for each one.

MR. CAPONI:  -- there are objections of matter and then there are objections that are just --

THE COURT:  Well, all of you guys -- none of your objections as far as I'm concerned matter, if I'm going to be frank about the matter.  I'm not a jury.  I have not -- I have been around the block more than I want to admit.  So I get this stuff.  If you guys want to get into an argument every time a question is asked and object and then we have to spend five, six minutes, we're never going to get through this.

So Mr. Alexander, I get maybe you're doing payback for Mr. Caponi.

MR. ALEXANDER:  There's no payback, Your Honor.  One was a letter and one was a PO.  They're different.

THE COURT:  All right.  So --

MR. ALEXANDER:  So it's -- he's incorrect.

THE COURT:  All right.  Let's break them up.

BY MR. CAPONI:

Q    Okay.  You have a -- the Debtor believes it has a contract with BBEC, correct?

A    That was not submitted in evidence into the Court.

THE COURT:  No.  That's not the answer.  Yes or no?

THE WITNESS:  I believe that we do.

BY MR. CAPONI:

Q    And does the Debtor believe it has a contract with Cystar?

A    I believe we do.

Q    And was the contract with BBEC submitted to the Court?

A    I don't think it was.

Q    And was the contract with Cystar submitted to the Court?

A    I believe we have multiple contracts with Cystar.  We gave a purchase order as evidence.  And in the business world, a purchase order is a contract.  And we also have other contracts with Cystar.

Q    And when did the Debtor enter into the purchase order with BBEC?

A    I believe it was last year.

     (Counsel confer)

BY MR. CAPONI:

Q    Mr. Rajan, in front of you you should have a document at the bottom that is Bates stamped CR-27.  Do you see that?

A    Where?

Q    CR-27.  A document with a Bates stamp of CR-27.  Do you see that?

A    No.  In here?  In here?

Q    It's in your hand.

A    CR- --

          MR. ALEXANDER:  Your Honor, can you give us a second to obtain that document?

          THE COURT:  Do you have the document?

          THE WITNESS:  Oh, okay.  All right.

BY MR. CAPONI:

Q    Mr. Rajan, I apologize.  If you could take a look at CR-33.

MR. ALEXANDER:  Your Honor, I'd like to pause so we can get a copy of the document.

THE COURT:  You don't have it?

MR. ALEXANDER:  I do not.

THE COURT:  CR-33?

MR. CAPONI:  Yes, Your Honor.

THE COURT:  It's the one pertaining to --

MR. CAPONI:  And Your Honor, while we're waiting for the copy, I would like to move into evidence Exhibit 4, which is Mr. Rajan's declaration.

THE COURT:  Is there any objection?

MR. ALEXANDER:  Enter the declaration?

THE COURT:  Yes.

MR. ALEXANDER:  The declaration is hearsay.

THE COURT:  What?

MR. ALEXANDER:  The declaration is hearsay.

THE COURT:  Okay.  And why is it hearsay?

MR. ALEXANDER:  Because it's an out of court statement.

THE COURT:  Yeah.  But he -- all right.  Response?

MR. CAPONI:  I'd say admission by a party opponent.

MR. ALEXANDER:  Mr. Rajan is not a party.

MR. CAPONI:  Mr. Rajan is certainly the representative of the Debtor.  He signed this as the -- in his capacity as the representative of the Debtor.  It's a statement

of the Debtor.

THE COURT:  Mr. Alexander?

MR. ALEXANDER:  We made our objection, Your Honor.

THE COURT:  Overruled.  Go ahead.

MR. CAPONI:  All right.

THE COURT:  Wait a minute.  I have to admit it.

MR. CAPONI:  Okay.

THE COURT:  And that was CR what?

MR. CAPONI:  4.

THE COURT:  4.  Wait a minute.  Let me go back in my notes and put admitted, so when I get back to my notes, I know what I admitted and did not admit.  Okay.  Admitted.  All right.  All right.  And now we're looking at CR-33.  Not 27.

(Exhibit 4 admitted into evidence)

MR. CAPONI:  Of course, Your Honor.  33.

THE COURT:  Which is -- okay.

BY MR. CAPONI:

Q    Mr. Rajan, I'm handing you Exhibit 33, which is the Schedule G for the Debtor, Stream TV Network, Inc.  And it's a listing of executory contracts and unexpired leases.  Do you have that document?

A    Yes.

Q    And it's only three pages, so feel free to look through it.  But am I correct that BBEC and Cystar are not listed on this Schedule G as being executory contracts of the Debtor?

A     Yeah.  I don't see them listed.

Q     So your -- although you testified that you believe you had a contract with BBEC that was entered into last June --

A     Last year.

Q     -- the contract's not listed on this schedule of executory contracts, correct?

          MR. ALEXANDER:  Your Honor, asked and answered.  It's argumentative.

          THE COURT:  Wait a minute.  What was the answer?  That he didn't see it?  Yes, it's not on there?

          THE WITNESS:  Yeah.  It's not on there.

          MR. CAPONI:  Thank you.  And again -- well --

     (Counsel confer)

          MR. CAPONI:  Just one second, Your Honor.

BY MR. CAPONI:

Q     In front of you, the Debtors' Exhibit 45, Mr. Rajan.  If you could take a look at that.  That was a --

          THE COURT:  Debtors' exhibit?

BY MR. CAPONI:

Q     -- letter you testified about from IQH3D.

          THE COURT:  Debtors' Exhibit 45?

          MR. CAPONI:  Debtors' Exhibit 45.

BY MR. CAPONI:

Q     Do you have that exhibit, Mr. Rajan?

A     Yes.

Q    And this is a letter that you say reflects a current relationship with IQH3D?

A    Yeah.  I believe so.

MR. CAPONI:  Your Honor, I have an exhibit I'd like to -- a document I'd like to show the witness.  If I may approach?

THE COURT:  Is it being marked?

MR. CAPONI:  I'm not sure if it's going to be marked. I'd like to see if the witness is familiar with the document or not.

MR. ALEXANDER:  Your Honor, we object.

THE COURT:  You have to mark it.

MR. ALEXANDER:  We don't know what the document is.

THE COURT:  Have you showed it to counsel?  Have you marked it?  You can't just show him something that's not marked.

MR. CAPONI:  Okay.  I'll be happy to mark it.

THE COURT:  And you can't show it to him unless you're trying to refresh his recollection.

MR. CAPONI:  Okay.  This will be Exhibit 248.

THE COURT:  Okay.  So hang on.

MR. ALEXANDER:  Your Honor, we object.  This wasn't on the witness list prior to today.

MR. CAPONI:  It's a rebuttal exhibit, Your Honor.  It doesn't have to be disclosed.

THE COURT: Are we doing rebuttal now? Are we doing all this together? I mean --

MR. CAPONI: Both sides agreed rebuttal exhibits did not have to be disclosed because you're not going to know what you're calling until the witness testifies.

THE COURT: Are we doing rebuttal now?

MR. CAPONI: My opinion was --

THE COURT: Are we doing -- I get that we -- I mean, I thought you were doing an examination of him as if you were calling him as your witness because you guys were going to do it all at once. Is this impeachment or you're saying rebuttal? I mean, I don't understand.

MR. CAPONI: It's -- well, this is impeachment, Your Honor.

THE COURT: Oh.

MR. CAPONI: But it's part of our rebuttal case. But yes, it's impeachment.

THE COURT: All right. Mr. Alexander?

MR. ALEXANDER: Your Honor, we object. This document's not identified to Mr. Rajan. He's never seen the document. I mean, there's no basis to impeach Mr. Rajan on a document that was not sent to him and he's not copied on.

THE COURT: Well, unless he's going to impeach him and it relates to this letter here.

MR. ALEXANDER: Well, you can only impeach someone

with their prior testimony and their documents.  This is not what this is.

MR. CAPONI:  No.  Your Honor --

MR. ALEXANDER:  Mr. Rajan's name is not on this document.  It's not directed to Mr. Rajan.  So you can't impeach him.  You can impeach someone with prior testimony.  There's nothing there.

MR. CAPONI:  Your Honor, you're not limited to prior testimony for impeachment purposes.  I would like -- I mean, I'm unaware of any rule or case that stands for that authority.

THE COURT:  Mister --

MR. ALEXANDER:  Mr. Rajan's not on this document.

THE COURT:  Well, he can ask him.  And then he's going to say, I don't know, I haven't seen it.  Bye.  What's he going to do with it if he has never seen it?  What's he going to do with it?

MR. ALEXANDER:  Well, if he asks him if he's never seen this, then he should have no questions after that.  And it should not come into evidence.

THE COURT:  So mark it and ask him if he's seen it.

MR. ALEXANDER:  Well, it shouldn't be marked yet, Your Honor, because it's not coming in.

MR. CAPONI:  Your Honor, it's -- impeachment doesn't have to be -- you don't have to enter every document you use with a witness into evidence.

THE COURT:  I get that.

MR. ALEXANDER:  Well, he can't even authenticate this document.  So we object on authentication.

THE COURT:  But we haven't gotten there yet.

MR. ALEXANDER:  Okay, Your Honor.

THE COURT:  Okay.  So my thing is if you're going to show him a document, and even -- I want it marked even if it's not admitted.  If we have to go back I'm going to say what was he talking about.

MR. CAPONI:  Understood.

THE COURT:  So you --

MR. CAPONI:  It's Exhibit 248.

THE COURT:  Right.  And you can ask him about it.  If he doesn't recognize it, I mean, I don't know what you're going to do.  Show it to him.

Woah, woah, woah.

MR. CAPONI:  What's wrong?

THE COURT:  Give it to Jon.  Jon is the keeper of the documents and hands them up.  Okay.

Any objection to me seeing this before he --

MR. ALEXANDER:  We do object, Your Honor.

THE COURT:  Oh, can't see it.  All right.  Hold on to it for me, Jon.  All right.  Ask him a question.

BY MR. CAPONI:

Q    Mr. Rajan, Exhibit 45 is signed by Loyal Haylett --

MR. ALEXANDER:  Objection, Your Honor.  He needs to ask him if he recognizes the document before he can put any testimony into the record in terms of what it is.  That's how it works.

THE COURT:  All right.  Mr. Caponi?

MR. CAPONI:  Your Honor, I'm on Debtors' Exhibit 45.  So I'm not sure what the objection --

MR. ALEXANDER:  I apologize.

MR. CAPONI:  -- is based for -- based on.

THE COURT:  Oh, okay.

MR. ALEXANDER:  I thought he was on 248, that he just gave us.

THE COURT:  Okay.  We're not talking about 248?

MR. CAPONI:  Not yet.  I'm getting there.

THE COURT:  Then why is it before the witness?

MR. CAPONI:  I'm about to ask him a question about it.  But I'm laying a foundation.  I asked a question about the letter.

THE COURT:  Okay.  Take that back.  Take that back.  Ask him some questions.  After you're finished, then you hand him this.  And then you ask him a question.  Okay.

BY MR. CAPONI:

Q    Mr. Rajan, Debtors' Exhibit 248 was signed by --

A    Can I have it back?

Q    -- Loyal Haylett, founder and chairman of IQH3D?

THE COURT:  What did you just give him?

THE WITNESS:  He just said 248 again.

THE COURT:  All right.

MR. CAPONI:  No.  It's -- we're on 45.

THE COURT:  We're on 45.

THE WITNESS:  Oh, we're on --

THE COURT:  Take that back.  What are you ask -- you're asking about Debtors' Exhibit 45?

THE WITNESS:  Oh, Debtors' exhibit.

THE COURT:  Go back in that book and pull out Debtors' Exhibit 45.

THE WITNESS:  There's got to be an easier way than this.  Okay.  Yes.

THE COURT:  All right.  So let's ask him some questions about Exhibit 45.

BY MR. CAPONI:

Q    This document from IQH3D is signed by Loyal Haylett, founder and chairman of IQH3D, correct?

A    Yes.

Q    And it's directed to you, Mathu Rajan, correct?

A    Yes.  It is.

Q    Okay.  Now, if you'd turn to what is marked as Exhibit 248.

A    Sorry.  Okay.

Q    Do you have Exhibit 248?

A    Yes.  I have it.

Q    What is the letterhead on this document?

MR. ALEXANDER:  Objection, Your Honor.  He needs to ask him if he recognizes the document before he can ask him any questions on it.

MR. CAPONI:  Your Honor --

MR. ALEXANDER:  He's trying to get things into the record, which is impermissible.

THE COURT:  All right.

MR. CAPONI:  Your Honor, you may impeach a witness with the proverbial ham sandwiches, they say.  Mr. Rajan does not need to be personally familiar with the document.

MR. ALEXANDER:  But he's trying to -- before he authenticates the document, he's trying to get the description and what's on the document into evidence.  You need to authenticate --

THE COURT:  All right.  Let's wait a minute.

MR. ALEXANDER:  -- before you can go to the next step.

THE COURT:  In impeachment, you have to authenticate a document before you can impeach.  He's saying you have to authenticate first, and then you ask the question.  Your position is, Mr. --

MR. CAPONI:  You do not.  You only need to authenticate if you're going to move it into evidence.  You do

not need to authenticate a document that you're using solely

for impeachment purposes, which is what I'm doing. And again,

I would just suggest that if we're -- that Mr. Alexander cite

the rule that he's referring to so we can respond to the rule

and not argument.

THE COURT: Well, none of you guys responded to any

rules earlier. So now we're going to change the rules? Come

on, guys. It's late in the day. And I'm not for it today.

MR. ALEXANDER: Your Honor, you don't get to pick

whatever documents you want and bring them in and try to

impeach somebody.

THE COURT: All right. What rule -- what rule are --

you look.

MR. ALEXANDER: I'm going to look at the --

THE COURT: You guys look up the rules.

MR. ALEXANDER: I'm going to take a look.

THE COURT: All right. I'm sure my law clerk are

looking up the rules, too.

MR. ALEXANDER: Okay.

THE COURT: Well, I'm not going to be looking them

up. When you tell me the rule, we're going to look. That's

not our job to look at the rules. Okay. Impeachment. What's

in -- what governs impeachment? Federal Rule of Evidence and

what? Because there are some exceptions. And there are some

exceptions that differ in criminal versus civil. So you need

to do impeachment for -- because there's a lot of things you can do in civil you can't do in criminal court.

Are you talking about 806?  Okay.  What are we -- what rule are we -- rules are we talking about?  You say, Mister -- you're objecting because you say that in order to impeach him, he has to have him recognize -- he has to authenticate the document.  Mr. Caponi says no, you don't. Correct?

MR. ALEXANDER:  Well, I'm looking at the impeachment rule 608, and I don't --

THE COURT:  You mean 806?  Or is it 608?

MR. ALEXANDER:  I can look at 806, as well.

THE COURT:  Well, what does 608 say?  You guys are testing me.  A witness character for truthfulness or untruthfulness.  Is that what we're talking about, Mr. Caponi? "Any party, including the party that called the witness, may attack the witness' credibility."  I'm not sure whose witness he is.  But it doesn't matter.  Okay.

MR. ALEXANDER:  I don't see anything in 608 which indicates that you can use an inadmissible document to impeach.

THE COURT:  Okay.  Reputation or opinion evidence. Specific instances of conduct.  Except for a criminal conviction --

MR. CAPONI:  Your Honor?

THE COURT:  Yes?

MR. CAPONI:  I want to make sure we're reading this case right.  So it's Carriger v. Stewart, 132 Fed3d 463 --

THE COURT:  Uh-huh.

MR. CAPONI:  -- 1997.  It says, "Evidence can be used to impeach a witness --

THE COURT:  Wait a minute.  Woah.  Let him look it up.  What's the -- what case is it?  In Re: what?

MR. CAPONI:  It's 132 -- it's Carriger, C-A-R-R-I-G-E-R v. Stewart, 132 Fed.3d 463.  All right.  Circuit 1997.  "Evidence can be used to impeach a witness even if the evidence is not admissible."

THE COURT:  Okay.  But I guess, even if -- so he's saying it's not admissible, meaning it doesn't have to be authenticated?

MR. ALEXANDER:  You still have to authenticate it.  There's no one here to authenticate.

THE COURT:  1997, you said?

MR. CAPONI:  Yes, Your Honor.

THE COURT:  How about we pass this for now.  I mean, is this going to be a whole line of questioning because I need to --

MR. CAPONI:  Okay.  We'll come back.

THE COURT:  Okay.  We'll come back to this.  Okay.  All right.

Hold on to that document, Jon.

All right.  Go ahead.

BY MR. CAPONI:

Q    Mr. Rajan, if you could turn to Debtors' Exhibit 47.  Let me know when you're there.

A    Yes.

Q    This is the letter that you testified about regarding Sunny Hill, correct?

A    Correct.

Q    And am I correct this is not a contract for sale of any product by Stream to Sunny Hill?

A    No.  This is a request for samples.

Q    Thank you.  And I believe you testified regarding a relationship with Google, correct?

A    Yes.  I did.

Q    Okay.  If you could turn to Exhibit 40 -- Debtors' Exhibit 40.

A    Yes.

Q    And this is the agreement with Google that you testified about in direct examination, correct?

A    Correct.

Q    And I believe you testified that you have continued this agreement with Google to the present day; is that correct?

        MR. ALEXANDER:  Objection.  Mischaracterizes testimony.

        THE WITNESS:  We have a contract with --

THE COURT:  He's objecting that is mischaracterizes his testimony.

MR. ALEXANDER:  Right.

THE COURT:  And why do you believe it mischaracterizes?

MR. ALEXANDER:  I don't believe that Mr. Rajan testified to what Mr. Caponi stated in terms of this contract.

THE COURT:  Continuing --

MR. ALEXANDER:  Continuing through today.

MR. CAPONI:  I believe he did testify to that.  And that's why I'm asking him whether --

THE COURT:  Now does that force you to go back and look what he said about --

MR. ALEXANDER:  He could --

THE COURT:  Well, no, you can't say something and --

MR. ALEXANDER:  Well, I can withdraw the objection, Your Honor.

THE COURT:  All right.  Are you withdrawing it?

Go ahead.

BY MR. CAPONI:

Q    Mr. Rajan, you testified that -- just a second ago, you said that you have -- Stream has a contract with Google, correct?

A    Stream TV signed a contract with Google.  Correct.

Q    And is this the contract that you're referring to, the one

we're looking at, Exhibit 40?

A    Yes.

Q    Yes?

A    Yeah.

Q    Thank you.  If we look at this document on the first page, it has the effective date of June 18, 2020, correct?

A    Correct.

Q    If we can turn back to your first day declaration, which is CR Exhibit 4.

THE COURT:  Hold on.

MR. CAPONI:  4.  Hold on.

BY MR. CAPONI:

Q    Let me know when you're there.

A    I don't think I have it.

THE COURT:  It's in the big -- what is binder one.

THE WITNESS:  It's in binder.

THE COURT:  They are -- CR -- it says Matthew Rajan, witness exhibit binder one, down at the bottom.  Do you see that binder?

BY MR. CAPONI:

Q    It's the first date declaration --

A    Yeah.

Q    -- we looked at earlier.

A    Yeah.  Okay.

Q    Okay . If you turn to paragraph 75 and go to page 21, 1,

2, 3, lines from the top.  You'll see where you state he pressed Google to inform him of any such contact.  And after consulting with its internal legal team, Google canceled the ultra D project in February 2021, only two months after the project was removed from the Debtor's control.  You see that?

A    Yeah.

Q    So the contract that you testified about with Google from June 18, 2020, your first day declaration confirms was canceled by Google in February 2021, correct?

A    The project was canceled.

Q    That means the contract was canceled as well, correct, Mr. Rajan?

A    We never heard from Google other than inviting us back --

THE COURT:  Yes or no.  Was the contract canceled?

THE WITNESS:  I don't know.  That's the answer.  I don't know.

BY MR. CAPONI:

Q    So you still have a relationship with Google, but you've never heard from Google since they canceled the project.  Is that your testimony?

A    No.  We have --

MR. ALEXANDER:  Objection.  Argumentative.

THE COURT:  All right.  I'm going to allow the question.  So restate the question.

MR. CAPONI:  Sure.

BY MR. CAPONI:

Q    Mr. Rajan, you testified that you have a relationship with Google currently.  But then you just told me that since Google terminated this -- your project in 2021, you haven't heard from Google; is that correct?

A    Incorrect.

Q    Sorry?

A    Incorrect.  We've heard from Google.  We had a meeting in February.  They invited us back.

Q    As you presently sit here today, the Debtor does not have a contract with Google, correct?

A    I don't know what the status is with Google.  They invited us back.  We haven't been able to return because you're holding our sample.  We'll find out when we get our sample back from you.

Q    But is your -- you take the position that the statement in your declaration, of paragraph 75, that Google canceled the ultra D project in February 2021 remains valid, a valid statement?

A    They have -- yeah, they've stopped the project.

Q    If you go back to Debtor's Exhibit 40, the Google agreement.  Go to section 11.

        THE COURT:  Okay.  Where are we at?

        MR. CAPONI:  Debtor's Exhibit 40.

        THE COURT:  Hold on.  Okay.  Where are we at?

BY MR. CAPONI:

Q    And if you go to section 11.4, which is 10 pages back from the beginning.  They're not numbered, but it's 10 pages back from the beginning, section 11.4.  Effects of termination.  Let me know when you get there.

A    I'm there.

Q    Are you there yet, Mr. Rajan?

A    Yeah, I'm here.

Q    Okay.  If you look in section 11.4A, and you go down to the last sentence, it says termination of the ISA terminates all outstanding purchase orders and SOWs and all licenses that Google granted under the agreement, including section 5.1, Google background IP and development IP.  Did I read that correctly?

A    That is correct.

Q    Any reason to dispute that termination by Google of the agreement terminates all outstanding purchase orders and SOWs?

A    Yes.

Q    You do have a basis to disagree with that?

A    Yes.

Q    And what's your basis?

A    Because it terminated because SeeCubic had it.

THE COURT:  No.

THE WITNESS:  When Stream TV had it, they invited us back.

BY MR. CAPONI:

Q    But you have not executed any new separate agreement with Google since you've been, quote-unquote, invited back, correct?

A    No.  I'm waiting for you to give me the sample back.

Q    Now if you could take a look at Debtor's Exhibit 3.

THE COURT:  Which exhibit?

MR. CAPONI:  3, Your Honor.

BY MR. CAPONI:

Q    Mr. Rajan, this is the mutual supply and joint marketing agreement.  And I believe you testified that counterparty is BOE; is that correct?

A    Yes, and Hefei Optical Electrical too, HOE.

Q    And am I correct the date of this agreement is in -- for the year is 2018?

A    That is correct.

Q    Okay.  And am I -- I'm also correct that this document does not bind BOE to purchase any televisions, film, or chips, or products from Stream, correct?

A    No.  It's to give purchase order finance.

Q    So I am correct that this document does not bind BOE to purchase any product from Stream, correct?  Let me try to rephrase again, Mr. Rajan.  You were agree with me that this contract that we're looking at does not bind BOE to purchase any product from Stream, correct?

A    It binds them to get purchase order finance.  I think

we're confused here how it works.

Q    I'm not confused, Mr. Rajan.  My question is does this agreement require BOE to purchase any products from Stream?

A    If it provides finance.

Q    And I think you testified that BOE agreed to provide supply chain financing, correct?

A    Correct.

Q    Where in this document does BOE agree to provide supply chain financing?

A    Article 4.  Also article 5.

        THE COURT:  Wait a minute.  Wait a minute.  I'm not really on that page.  Hold on.

BY MR. CAPONI:

Q    Anywhere else, Mr. Rajan?

        THE COURT:  And you're saying article what?

        THE WITNESS:  Article 4, article 5, and also -- it's also slightly touched upon in article 10.

BY MR. CAPONI:

Q    Specifically what language in article 4, in your understanding, obligates BOE to provide supply chain financing?

A    Party A agrees to pay party B ODMC for 3D kits.  And party B agreed to provide party A the 3D kits pursuant to the terms and conditions agreed to from the parties.

Q    Anywhere else in article 4 that supports the -- your understanding that BOE has a obligation to provide supply chain

financing?

A    Yeah, 4.2, 4.3.

Q    Specifically which language, Mr. Rajan, in 4.2?

A    The entire paragraph.

        MR. ALEXANDER:  Your Honor, I'm going to object to the extent that he's asking for a legal conclusion.

        THE WITNESS:  The entire paragraph.

        THE COURT:  I mean it's --

        MR. ALEXANDER:  Mr. Rajan is not an attorney.

        MR. CAPONI:  I'm simply asking for his understanding, Your Honor.  He testified that this agreement obligates him to provide supply chain financing.

        THE COURT:  Right.  And he's says he believe it's in 4.1, 2, and 3.

        MR. CAPONI:  I'm simply asking which aspects of those provisions he's relying upon for that, his conclusion, his understanding.

        THE COURT:  You may answer the question.

BY MR. CAPONI:

Q    Mr. Rajan, specifically where in section 4.2 does it obligate BOE to provide supply chain financing?

A    Right here.  Party A -- parties agree Party B will engage with Party A to develop a backlight.  Party B will pay Party A development fees to the backlight.  Party B will provide technical specifications for Party A or a supplier appointed by

Party A such backlight supported by Party B used to process the 3D kits for making a module.  Specific amount and development fees and development with subject to further discussions.

Q    And my understanding, from your testimony, Mr. Rajan, that supply chain financing is one where a customer orders product from Stream and, in this case, BOE would pay Stream on that purchase order, and then Stream would repay BOE once the ultimate customer pays Stream.  Is that how it works?

A    Correct.  That's what -- that was in 4.1  Pays ODMC for processing 3D kits, and Party B agrees to provide Party A the 3D kits according to the terms and conditions.

Q    And 4.2, we go back to that.  It says part -- you -- it says Party A agrees to -- the parties agree Party B will engage Party A to develop the BLU.  And Party B will pay Party A development fees for the development of BLU.  Did I read that correctly?

A    Correct, for the backlight.

Q    Okay.  And in this contract, am I correct that Party A is BOE?  So this language here obligates Stream to pay BOE for a backlight?

A    For the development of the backlight not for the components.

Q    And you're -- it's your understanding that Stream paying BOE, pursuant to section 4.2, constitutes supply chain financing?

A    We're confused again.  Okay.  4.1, they pay for the supply chain.

Q    No.  4.2, Mr. Rajan.

A    4.2, if we use their backlight, we pay them for a development fee.

Q    And it's your testimony that section 4.2, that arrangement you just mentioned is -- constitutes supply chain financing?

A    Okay.  That's not part of the supply chain.

        MR. ALEXANDER:  Objection.  Mischaracterizes his testimony.

        THE COURT:  Hold on.  He --

        MR. ALEXANDER:  The document says what the document says, Your Honor.  I don't understand why we keep going down this line of questioning.

        THE COURT:  He wants his understanding.  He pointed to where he was.  He said why it is.  Let's move on.  I already have -- we have his testimony.  He already said what he thinks it is.  It says what it says.  Okay.  Move on.

BY MR. CAPONI:

Q    If you could turn to the Debtor Exhibit 18.  Strike that. Can you turn to Exhibit 20?  And then also look at Exhibit 21 while we're at it.

A    Exhibit 20?

Q    Exhibit 20, Debtor's Exhibit 20, which is the redacted purchase order.

A    Correct.

Q    And then Exhibit 21, which is another redacted purchase order?

A    Correct.

Q    Am I correct, Mr. Rajan, in connection with this proceeding, the only two purchase orders that the Debtors have produced are what we're looking at, is Exhibit 20 and Exhibit 21?

A    Correct.

Q    Okay.  And both these purchase orders are with VSI, correct?

A    Yes.

Q    And VSI is a company that you control 70 percent of the voting authority for, correct?

A    Yes, I have voting rights.

Q    And you still hold that voting authority?

A    Yes, I have it.

Q    So even though there may -- whether or not there was a independent committee appointed, you still control 70 percent of the voting authority of VSI, correct?

A    I'm not sure, because there's an independent committee set up.  So I'm not sure how that impacts my voting rights.

Q    Do you have any reason to believe that you lack or gave away your voting authority in VSI?

MR. ALEXANDER:  Object, Your Honor.  It's calling for

a legal conclusion.

THE WITNESS:  I'm not sure.

THE COURT:  You're not sure.  I'll allow it.  He doesn't know.

BY MR. CAPONI:

Q   Okay.  So just to recap on the customer piece, Mr. Rajan. Of all the entities that you referenced in your testimony, the only ones -- the only purchase orders the Debtors admitted into evidence here are tabs 20 and 21 in that binder, correct?

MR. ALEXANDER:  Your Honor, I'm going to object. It's asked and answered.  Argumentative.  Mr. Caponi has indicated he wants to move and get out of here, but he keeps asking the same questions over and over.

THE COURT:  I'll sustained.  You've already asked him if those were the only ones, and he said yes.  Let's move on.

BY MR. CAPONI:

Q   Mr. Rajan, you're aware, I presume, that the Debtor filed an application to retain Jung Ho Park as the CFO of the Debtors, correct?

A   Yes.

Q   You're aware that Mr. Park testified during the hearing for this court on June 29th, correct?

A   Yeah, I believe so.

Q   And you're aware that during his testimony, Mr. Park testified that the Debtors do not have the infrastructure, the

employees, the material, capacity, or the cash to fulfill any purchase orders?

A    I'm not aware of him saying that.

Q    Do you have any reason to dispute Mr. Park's testimony?

A    I'm not aware that he said it, but that's not our current status right now.  No.

Q    Was that the status of the Debtor as of June 29th?

A    That was the not the status of the Debtor on June 29th.

Q    Okay.  So then you disagree with Mr. Park's testimony?

A    That is incorrect.

Q    Mr. Rajan, if you could turn to Exhibit 245, which would be --

THE COURT:  Who's, the Debtor or creditor?

MR. CAPONI:  This would be the creditor's, CR 245.

THE COURT:  And that -- which binder is that in, binder 1 or 2?

UNIDENTIFIED SPEAKER:  It might be 3.

(Counsel confer)

THE COURT:  Which number are you looking for?

MR. CAPONI:  245.

(Counsel confer)

THE COURT:  Oh.  It's one of the separate -- it's the monthly operating report.  Oh, wait.  245.  Go ahead.

BY MR. CAPONI:

Q    Do you have that exhibit, Mr. Rajan?

A    Yes.

Q    Okay.  And this is the monthly operating report --

A    Correct.

Q    -- debtor's.  And if you go to page 9, am I correct that's your signature at the bottom, your electronic signature?

A    Page 9?

Q    Yes.

A    That's not an electronic signature.  It's an S.

Q    So is it your testimony you do not sign on behalf of the Debtor's this monthly operating report?

A    I didn't physically sign it, no.  I was in the hospital.

Q    This signature on this -- this S -- slash S with Mathu Rajan.

A    That is to represent me, yes.

Q    Was that put on with your permission?

A    Yeah, I told them to put it on.

Q    So you signed this document, subject to the penalty of perjury language that's right above the signature, correct?

A    Yeah, that is correct.

Q    If you turn back to first page --

A    Yes.

Q    -- under debtor's full-time employees, what's the number to the right?

A    Which page?

Q    The very first page.  On the monthly operating report four

lines down, it says Debtor's full-time employees current.

A    It says zero.

Q    And then the next one says debtor's full-time employees as of the date of order for release.  What's that number?

A    Zero.

Q    And if you turn to the next page.  And under cash balance beginning of month, what's the number?

A    It says $2300.

Q    Excuse me?

A    It says $2300.

Q    Okay.  And what is the total receipts for the Debtor as of that point in time?

A    It says zero.

Q    All right.  So let's turn to Exhibit 227, which is the next monthly operating report.

A    Okay.  Where do I find that?

Q    Number 227, May 21, 2023.

        THE COURT:  Wait a minute.

BY MR. CAPONI:

Q    Monthly operating report.

        THE COURT:  Counsel, I don't have it.

        THE WITNESS:  I don't have it.

        MR. CAPONI:  It's in the binder, Your Honor.

        THE COURT:  Oh, it's in the binder?

        MR. CAPONI:  It's in the binder.

THE COURT:  Which binder.

MR. CAPONI:  It's CR -- the binder that CR 222 to 230.

THE COURT:  Give me 1, 2, 3.  What binder?

MR. CAPONI:  Binder number 2.

THE COURT:  Okay.  There's a whole lot of them.  227.

BY MR. CAPONI:

Q    Do you have that, Mr. Rajan?

A    Not yet.  You want me to go to --

THE COURT:  Wait a minute.  I'm trying to get there.

MR. CAPONI:  227.

THE WITNESS:  Yeah.

BY MR. CAPONI:

Q    Do you have that, Mr. Rajan?

A    Yes.

Q    Okay.  If you got to page 9, again, is that your signature?

A    Yeah, that's with an S.

Q    And again, it's signed subject to penalty of perjury?

A    Yes.

Q    If you go back to the first page, we're going to look at the same exact lines.  If you could tell me what number is next to debtor's full-time employees current?

A    It says zero.

Q    And what it is next to debtor's full-time employees after

the date of order of release?

A    It says zero.

Q    You go to the next page.  What is the Debtor's cash balance in this report?

A    It says 2,300.

Q    And what is the number next to total receipts?

A    2,300.

Q    Under current month?

A    It says zero.

Q    Thank you.  If you'd go to 2 -- the next exhibit, which is 228, which is the June monthly operating report.  And we'll do the same thing.  We'll start with page 9.  If you can tell me if that's your signature.

A    Yeah, that's my electronic signature.

Q    That's your signature, correct?

A    Correct.

Q    And if we go back to the first page.  What does the Debtor put down for the number of full-time employees?

A    It says zero.

Q    And what did the Debtor put down for the number of full-time employees after the date of the order of release?

A    Zero.

Q    If you turn to the next page.  Can you tell me what the cash balance is for the current month?

A    1756.

Q    And what's the total receipts for that month for the Debtor?

A    Zero.

Q    Am I correct, the Debtor has not yet filed its monthly operating report for July, correct?

A    Correct.

Q    Mr. Rajan, you testified, again, in response to Mr. Alexander and myself, that VSI has -- or sorry -- the Debtors have had employees in Asia and elsewhere since the petition date working on projects for the companies, correct?

A    Yeah.  We had former employees doing contracting work for Stream TV.

Q    But again, in all monthly operating reports, the Debtor indicated it had no employees, correct?

        MR. ALEXANDER:  Objection.  Mischaracterizes the report.

        THE WITNESS:  It has --

        THE COURT:  I'm sorry.  What's your objection?

        MR. ALEXANDER:  Well, it says full-time employees.

        THE COURT:  Where's it say -- oh.  Is that what the report says?

        MR. ALEXANDER:  I mean unless he has a different report than me.

        MR. CAPONI:  I'm not sure I understood what the objection was.

THE COURT:  His objection is that you testified that they had no employees, but it says -- it says full-time employees.

THE WITNESS:  It doesn't say contractors.

BY MR. CAPONI:

Q    The Debtor has no -- I mean the monthly operating reports, it's indicated it has no full-time employees, correct?

A    Correct.  It doesn't say contractors.

Q    And the reason you don't identify the contractors in the monthly operating reports is because they're independent contractors in your mind, correct?

A    Yeah, because the specific line there, it says full-time employees.

Q    So it's your testimony that all of the employees that work for Stream are part-time employees?

MR. ALEXANDER:  Objection.  Mischaracterizes his testimony and argumentative.

THE WITNESS:  They were --

THE COURT:  Whoa.  Whoa.  He's objecting.  His testimony wasn't that they were part-time.  His testimony is that they were contractor.  So that's what you just asked him. He didn't say that.  So I'm going to sustain the objection. That's not what he said.  So rephrase the question.

MR. CAPONI:  Okay.  I'll ask this question.

BY MR. CAPONI:

Q    Mr. Rajan, why are all these employees not identified on the Debtor's monthly operating reports?

MR. ALEXANDER:  I'm going to object. Mischaracterizes the testimony.  There's no foundation for what he's saying.

THE COURT:  Okay.

MR. ALEXANDER:  He just continues to ask the same question and he does his own testimony.

THE COURT:  Okay.  This is the issue.  He never testified that they were employees.  So your question is why were these employees not listened when his testimony is that they're contractors.  So I understand you can ask why weren't the contractors listed, but you can't recharacterize his description of them as contractors to be employees, because they're different.  So I will sustain the objection.  Rephrase your question.

BY MR. CAPONI:

Q    Mr. Rajan, why does the Debtor's monthly operating reports not indicate that it is paying -- that there are full-time -- there are individuals working for the benefit of the Debtor who are under a contract arrangement?

A    Because I was in the hospital for three months.  And we just got our bank account open.  The contractors are being moved to the Stream TV payroll.  And you'll see more clarification on Monday night or Tuesday morning on the

operating report on -- now that the Stream bank account is finally open.  Unfortunately, they forced me to go into the branch, but it's open.  So you'll see the employees and also money flowing through the Stream TV bank account.

Q   So though the Debtors filed this bankruptcy in April, to date, it has never disclosed, am I correct, that it was -- it had retained contract employees all over the globe to do work for the estates?

A    That is correct.  It was an oversight.  It'll be revised on Monday and Tuesday.

Q    And those contract employees are contract 1099 -- 1099 independent contractors, correct?

MR. ALEXANDER:  I'm going to object. Mischaracterizes and uses words that are confusing.  He uses contractor and employee in his question.

THE WITNESS:  They used to be.

THE COURT:  Wait a minute.  You don't answer.

What's the objection again?

MR. ALEXANDER:  They're either contractors or they're employees.

THE COURT:  All right.  Can you guys -- I can't focus here, and I have a really bad migraine.  So let's try to -- I'm trying to focus.

What is your objection?

MR. ALEXANDER:  My objection is --

THE COURT:  Yes, your objection.

MR. ALEXANDER:  -- the question is misleading because he uses contractor and employee in the same question.  You're either a contractor or you're an employee.  You're not both.

MR. CAPONI:  Mr. Rajan testified repeatedly throughout his examination by Mr. Alexander we have an employee, an employee there, and employees all over the globe.  I hardly think my using the same lexicon that he was using it should be confusing.

THE COURT:  Okay.  So I get that that's what he said.  So now he's clarified that they're contractors.  So -- and there's a difference.  So let's try to keep that --

MR. CAPONI:  Sure.

THE COURT:  -- separate.  So what was your -- what was your objection to the question?

MR. CAPONI:  Let me rephrase the question.

BY MR. CAPONI:

Q    Mr. Rajan, these individuals that we're referring to that are doing work for Stream, up until yesterday, they were 1099 independent contractors, correct?

A    Correct.

Q    And the party with whom -- for whom they were a 1099 employee was VSI, correct?

A    Was VSI doing work for Stream.  Correct.

Q    But on the 1099, those individuals were independent

contractors for VSI, correct?

A    Correct.

Q    And VSI paid those independent contractors, correct?

A    Yes, it did.

Q    And then VSI, for every dollar that it spent paying for those independent contractors would then receive stock in Stream, correct?

A    Correct.

Q    And that stock was given pursuant to subscription agreements, correct?

A    That is correct.

Q    And you had subscription agreements that were in place prepetition, correct?

A    Correct.

Q    And you have entered into more than one subscription agreement post-petition, correct?

A    That is correct.

Q    And Stream has been paying all of the expenses of the Debtors since they filed for bankruptcy, correct?

A    You mean VSI.

Q    VSI has been paying all the expenses of the Debtor since filing a bankruptcy, correct?

A    Yes, that is correct.

Q    And for all the money that VSI spends, it receives an allotment of stock in Stream, correct?

A     That is correct.

Q     And again, that stock for the payments is pursuant to subscription agreements, correct?

A     Yeah, that's correct.

Q     And many of those subscription agreements were executed or entered into post-petition, correct?

A     Some are -- right now it's still pre-petition.  There is some post-petition, but we're still using up the pre-petition.

Q     You've entered into post-petition subscription agreements with VSI, whereby VSI receives shares in Stream in exchange for paying expenses of Stream, correct?

A     Correct.

        MR. ALEXANDER:  Objection.  Mischaracterizes the testimony.

BY MR. CAPONI:

Q     Thank you.  And to date --

        THE COURT:  He's already answered.  He said there were some that were post and some that were pre, and they're still operating under the pre.  I heard what he said.

        MR. ALEXANDER:  Okay.

BY MR. CAPONI:

Q     And you have paid -- Stream has given VSI millions of dollars -- millions of shares of Stream stock post -- since the filing of this bankruptcy, correct?

A     I don't think it was millions of shares.  I don't know the

exact number, but I'm -- I don't know the exact number.

Q    If you could take a look - if I can -- at CR Exhibit 231, which is your deposition transcript.

THE COURT:  Which binder is that in?  Is that 3?

THE WITNESS:  Which binder?

THE COURT:  Is that binder 3?

MR. CAPONI:  It's -- it should be in --

THE COURT:  I think it's 3, because 230 is the --

UNIDENTIFIED SPEAKER:  231.

THE COURT:  That's got to be --

(Counsel confer)

MR. ALEXANDER:  Your Honor, before you look at the document, I think they need to demonstrate why you get to look at it.

THE WITNESS:  Exhibit 231, where is it?

THE COURT:  Okay.  He's going to -- hold on.

BY MR. CAPONI:

Q    3.

A    Okay.  Thanks.

THE COURT:  Hold on.  You said before who looks at it, what has to happen?  You're going to ask him a question --

MR. ALEXANDER:  Well, I'm going to object because it's hearsay.  Is he impeaching him with prior testimony?  I'm uncertain what he's doing.

THE COURT:  All right.  Object.

MR. CAPONI:  I'm impeaching him with prior testimony.

THE COURT:  Okay.  That's what you're trying to do.

BY MR. CAPONI:

Q    Which --

THE COURT:  Wait a minute.  You may go ahead.  You may proceed.  All right.  Where -- hold on.  I have to get the binder.  I have all these binders over here.  I don't have anybody helping me get these binders.  I'm on my own over here.  Okay.

BY MR. CAPONI:

Q    Do you have Exhibit 231, Mr. Rajan?

A    231.  Okay.  One second.

Q    Which is your deposition transcript.

A    One minute.  Binder 3, first exhibit in binder 3, which is 231.  Okay.

Q    When you get to your transfer, Mr. Rajan, we're going to page 129, 1-2-9.

A    Which page?

Q    129.

THE COURT:  At the top.

BY MR. CAPONI:

Q    Are you there, Mr. Rajan?

MR. ALEXANDER:  Was there a line and page number?  I didn't hear.

THE WITNESS:  Yeah.  I'm there.

BY MR. CAPONI:

Q    And we're going to go down to line 15.  And speaking of these subscription agreements, my question to you was, do you know how many shares of Stream would be issued -- how many shares Stream would be issuing in connection with this transaction?  And you answered, "I mean, it's the normal.  I don't know the exact amount.  Probably like 20, 30-million shares maybe."  Did I read that correctly?

A    Yeah.  That is for the plan confirmation.

Q    It's your testimony as we're sitting here today that you were referring to the plan confirmation?

A    Yeah.  That -- you were asking about the plan confirmation I thought at that time.  So it's 30-millon -- 31 million at like a dollar something or some price.  So that's how the numbers came up.

Q    So if you could turn to the prior page, page 128, line 14. My question, "What were you -- in connection with this financing, what are you referring to?"

"A  VSI and Stream had subscription agreements."

"Q  And when was the subscription agreement executed?"

"A  Some of them were pre-petition.  Some of them were post-petition."

Then that continues on to page 15.  Is it still your testimony that --

MR. ALEXANDER:  I'd object as an improper impeachment.

BY MR. CAPONI:

Q   -- the pre-petition and post-petition --

THE COURT:  Wait a minute.  He's objecting.  He said that it's improper impeachment?

MR. ALEXANDER:  It's improper impeachment.  He asked him a question and it's not the same as what's in the testimony.

MR. CAPONI:  Yes, Your Honor.  But I -- the question I asked Mr. Rajan in his deposition deals with the subscription agreements that were pre and post-petition dealing with this financing.  And Mr. Rajan tried to change his answer by saying --

MR. ALEXANDER:  I'm going to object to his characterization --

MR. CAPONI:  Can I finish?

MR. ALEXANDER:  -- of what was said and what wasn't.

MR. CAPONI:  That I was speaking about a different transaction.

THE COURT:  Well, he's not --

MR. CAPONI:  So I'm impeaching his testimony that it's a different transaction.

THE COURT:  Hold on.  He said that he understood that it was in connection with the plan.  And so you're saying to

him this is what -- he said once they said they had committee approval and that sort of thing.  I don't know what that means. So he said what he said.  And he's going to ask him is it still his testimony that it was in connection with the plan.

MR. CAPONI:  No.  I'm impeaching him on --

THE COURT:  Right.

MR. CAPONI:  I'm impeaching him on that statement he just gave me.

THE COURT:  Okay.

BY MR. CAPONI:

Q    So again, Mr. Rajan, if you go back to page 128.  And I'm asking you, "Q And when was the subscription agreement executed?"

Your answer was, "A Some of them were pre-petition and some of them were post-petition."

Did I read that correctly?

A    That is correct.

Q    Okay.  So that would not be plan financing?

A    No.  That's wrong.

Q    What I'm talking about right here on page 128, correct?

A    No.  The post-petition -- there's a post-petition subscription agreement for the plan.

Q    And the pre-petition subscription agreement, is that for the plan?

A    No.  That's not for the plan.

THE COURT:  All right.  So I get it.  Okay.

MR. CAPONI:  I'm moving on, Your Honor.

THE COURT:  All right.

BY MR. CAPONI:

Q    And it's your testimony at your deposition, correct, that Stream -- or VSI is paid about 1 and a half to $2 million in expenses for the estates, correct?

A    Since we filed bankruptcy, correct.

Q    And in exchange for that money, you receive shares in Stream?

THE COURT:  How much?

THE WITNESS:  About 1 and a half to two million roughly.  Well, we're going to revise the operating reports on Monday.

THE COURT:  Wait, wait.  So you -- no, no.  The question was how much did they advance.  And you said 1 and a half to two million?

THE WITNESS:  It's about one and a half to two million.

THE COURT:  Is that post-petition?

THE WITNESS:  Since -- yes.  Since the bankruptcy was filed to today.

THE COURT:  Okay.  All right.

BY MR. CAPONI:

Q    Mr. Rajan, if we can go back -- oh, hold on.  And the --

you're issuing -- Stream is issuing shares to VSI every week or two since the bankruptcy filed, correct?

A    Yes.  That is correct.

Q    And post-petition, you negotiated the pricing that would be given, how many shares Stream would receive -- sorry, VSI would receive in exchange for paying for expenses, correct?

A    Correct.

Q    And Joe Corso negotiated those -- that pricing on behalf of VSI, correct?

A    The pre-petition was Joe Corso.  Post-petition there was overlap with the independent committee and they have a law firm.

Q    And if you could turn to page 79 in your deposition.

A    Oh, I'm sorry, I put it down.  Exhibit what one?

Q    The same one we were just in.

A    Binder 3, right?

Q    231.

A    Okay.  Which page?

Q    And we are going to page 79.  Go to line 8.  My question, "Well, I'm focused on the post-petition.  Not pre-petition. Post-petition, who negotiated the pricing that VSI is receiving, you know, in shares?"  "A I did Stream.  Joe Corso did VSI."  You see that?

A    Correct.

        THE COURT:  Page 79, right?

MR. CAPONI:  Page 79, Your Honor.  Line 8 to 13.

THE WITNESS:  Correct.

BY MR. CAPONI:

Q    So Joe Corso is the one who negotiated for VSI the price
of the shares they would receive from Stream in exchange for
paying Stream's expenses, correct?

A    For some of them.  There was -- there's a little bit of
overlap.  We used some of the subscription.

Q    All right.  So if we could turn to -- back to the
operating reports.  I take that back.  I'm being redirected.

MR. CAPONI:  One second, Your Honor.

THE COURT:  Uh-huh.

BY MR. CAPONI:

Q    Let's go back to the monthly operating reports.

A    Which exhibit?

Q    Exhibit 245.

A    Which -- which binder?

Q    It's 245.

THE COURT:  Which binder are we going to?

MR. CAPONI:  245 is the loose one.

THE COURT:  Okay.  Hold on.  I have to find it.  245.
44.  All right.  I have it.

(Counsel confer)

BY MR. CAPONI:

Q    Let me know when you're there, Mr. Rajan.

A     I am here.

Q     Okay.  If you go to the monthly operating report and you turn to the second page and you go to line item 8, you see that?

A     Yes.

Q     It says, "Disbursements made by third-party for the benefit of the estate."  What's the number?

          THE COURT:  Wait a minute.  Where are we?

          THE WITNESS:  I don't -- I don't see that.

          MR. CAPONI:  In the monthly operating report, Your Honor.

          THE COURT:  Wait a minute.  Which one?

          MR. CAPONI:  Cash receipts and disbursements.

          THE COURT:  Cash receipts.  Oh, E.

          MR. CAPONI:  E.

          THE COURT:  E.  Okay.

BY MR. CAPONI:

Q     Disbursements made by third-party for the benefit of the estate.  What's that number there?

A     It says zero.

Q     Okay.  And if you go down to A, total cash sales price -- under part 3, excuse me.  Total cash sales price for assets sold, transferred outside the ordinary course of business. What's that number?

          THE COURT:  3A, counsel?

MR. CAPONI:  3A.

THE WITNESS:  3A.  It says zero.

BY MR. CAPONI:

Q   Zero.  And if you go down to part 4A, gross income/sales (net of returns and allowances).  What's that number?

A    It says zero.

Q   Now, if you'd go to part 6, which is on page 8, section A. Post-petition income taxes accrued (local, state, and federal). What's the number next to that?

THE COURT:  Which part?  We're on 6?

MR. CAPONI:  Subsection 6.  Post-petition taxes.

THE COURT:  Hold on.

MR. CAPONI:  On page 8.

THE COURT:  Okay.

BY MR. CAPONI:

Q   What's that number, Mr. Rajan?

A    It says zero.

Q   Okay.  And to complete, let's turn to Exhibit 227.

THE COURT:  And is that Creditor 227?

MR. CAPONI:  227 is the May monthly operating reports.

THE COURT:  That's in the binder?

MR. CAPONI:  It's binder 2.

THE COURT:  And that is what?

MR. CAPONI:  And we're going to look at the same

provisions, Your Honor.  Starting with --

THE COURT:  Hold on.

MR. CAPONI:  -- section -- part 1.

THE WITNESS:  What's the number?

MR. CAPONI:  227.

THE COURT:  And what is 227 again?

MR. CAPONI:  May operating report, Your Honor.

BY MR. CAPONI:

Q    Are you there, Mr. Rajan?

A    Yeah.  I'm here.

Q    Yes?

A    Yeah.  I'm here.

Q    Okay.  So under section E, disbursements made by third party for the benefit of the estate.  What's the number?

A    One second here.

THE COURT:  What part?  E?

MR. CAPONI:  It's part 1, subsection A.

THE COURT:  Right.  You've got to tell him.

BY MR. CAPONI:

Q    And what's the number, Mr. Rajan?

A    It says zero.

Q    And part 3, section A, total cash sales price for assets sold, transferred outside the ordinary course of business.  What's the number?

A    It says zero.

Q    And part 4A, gross income, sales, net of returns, and allowances.  What's that number?

A    It says zero.

Q    If you'd turn to the very next page.  You'll see that it says professional fees and expenses and II says BMC Group.  Do you see that?

A    Yeah.

Q    And it says, "Paid cumulative".  What's that number?

A    2,500.

Q    And that was paid by VSI, correct?

A    At the beginning of the case I think it was.

Q    Excuse me?

A    At the beginning of the case.

Q    Okay.  So -- fine.  Let's go to the next report, which is 228.  Exhibit 228, which is the June 30th, 2023 monthly operating report.  And the same -- we're going to look at the same provisions.  We're going to look at part 1, subsection E, where it says disbursements made by third party for the benefit of the estate.  What's the number?

A    It says zero.

Q    And if we go down to part 3, subsection A, total cash, sales price for assets sold, transferred outside the ordinary course of business.  What's the number?

A    It says zero.

Q    And part 4, gross income sales -- part 4A, gross income,

sales, net of returns, and allowances.  What's the number?

A    It says zero.

Q    Okay.  And again, if we look over at the next page, professional fees and expenses, it refers to the BMC Group at II.  And according to your testimony, you indicate that VSI early in the bankruptcy paid BMC Group 2,500 dollars for Stream, correct?

A    Correct.

Q    Okay.  Why are the other 1.5 to $2 million in expense payments made by VSI for the benefit of the Debtor not disclosed in these monthly operating reports the way you disclosed the payment made to BMC?

A    It was an oversight.  And it will be revised on Monday -- Tuesday with the next report.

Q    Mr. Rajan, you're the -- in charge of Debtors that have zero income.  And it's your testimony that you forgot to mention that the estate had incurred $2 million of expenses that were paid for by another company that you control?

        MR. ALEXANDER:  Objection, Your Honor.  It's argumentative.

        THE COURT:  I'll allow it for what it's worth.

        THE WITNESS:  I was in the hospital for three months.  So -- and we couldn't open the account.  And we just got it opened.  And it will be revised on Monday with all the details.

BY MR. CAPONI:

Q    Mr. Rajan, if we'd go to the first page of the monthly operating report of the exhibit we're looking at, 228.

A    Which one again?

Q    The first page of this monthly operating report, the June report.

A    What's the tab?

Q    Exhibit 228.

A    228.  Okay.

        MR. CAPONI:  Bless you, Your Honor.

        THE COURT:  Thank you.

BY MR. CAPONI:

Q    My question, Mr. Rajan, is are you the only one involved with the Debtors that was aware that VSI had paid between 1.5 and 2 million dollars of Stream's expenses during the course of the bankruptcy?

A    No.  I'm not the only one.  No.

Q    So the fact that you were in the hospital, there were other individuals who possessed the information and it could have then been included in this monthly operating report, correct?

A    It could have been included.  Yes.

Q    And if we look at the front of the operating report, it says it's signed by a Bennett G. Fisher.  Do you see that?

A    Yeah.

Q    Was Mr. Fisher aware that VSI had been paying Stream's

expenses during the course of the bankruptcy?

MR. ALEXANDER:  I'm going to object.  It calls for speculation in terms of what another party who's not testifying may or may not have been aware of.

MR. CAPONI:  I don't believe it calls for speculation, Your Honor.  This individual signed on behalf of the Debtor.  Mr. Rajan is the principle and sole employee of the Debtor.

THE COURT:  Well, just because he signed you want me to assume that he knew about this -- these payments?

MR. CAPONI:  I'm simply asking Mr. Rajan.  That's the question.

THE COURT:  He said --

MR. CAPONI:  Does he know whether the individual knows.

THE COURT:  And he's objecting on the basis that you're asking him to say what somebody else knew.

MR. CAPONI:  I'm asking Mr. Rajan whether he knows if this individual was aware of these payments.  He could tell me he's not aware --

THE COURT:  Okay.  I'll allow it for what it's worth.

MR. CAPONI:  -- or that he is aware.

MR. ALEXANDER:  Well, he changed his question, Your Honor.  That's not the question he asked.

THE COURT:  I know.

BY MR. CAPONI:

Q    Mr. Rajan --

A    I -- I was in the --

Q    -- do you know if Mr. Fisher was aware of these payments?

A    I was in the hospital.  I don't know what communication happened between the third parties.

Q    Do you know who Mr. Fisher is?

A    Yeah.  I know who he is.

Q    Who's Mr. Fisher?

A    He's an attorney.

Q    Okay.  And he's an attorney for whom?

A    Lewis Brisbois.

Q    Who does Lewis Brisbois represent in this case?

A    Stream TV.

Q    Okay.  And you're the chief executive of Stream TV, correct?

A    Yes.

Q    And you direct counsel for the Debtor, correct?

A    Correct.

Q    So Mr. Fisher's not some third party.  He's counsel that you direct, correct?

          MR. ALEXANDER:  I'm going to object.

          THE WITNESS:  At that time I had --

          THE COURT:  Wait.  What's your objection?

          MR. ALEXANDER:  My objection is that it's -- A, it's

argumentative.  And B, he's asking a legal conclusion in terms of what the role and capacity of Mr. Fisher is with regard to executing this document.

THE COURT:  No.  The question was if he direct his counsel.  I'll allow it.

MR. ALEXANDER:  I didn't object to that question.

THE COURT:  Excuse me?

MR. ALEXANDER:  I didn't object to the question where he asked him does he direct his counsel.

THE COURT:  What question are you objecting to?

MR. ALEXANDER:  It was the second question when he was asking him about what Mr. Fisher should have been doing with respect to vis-à-vis the Debtor.

THE COURT:  Repeat the question.  What was your question?

BY MR. CAPONI:

Q    To lay the groundwork since I think we got off track a little bit, Mr. Rajan, when I asked you whether Mr. Fisher was aware of the payments being made by VSI, I believe your testimony was something to the effect of I'm not aware of conversations between third parties.  Did I get that right?

A    I don't know.  I was in very little contact with a number of people during this time period.  So I don't know what conversations took place, who knew what.  Most likely they didn't know because it's not in here.

Q    When did you go into the hospital?

A    First week of May.  I think it was May 3rd or 4th.  I left
the hospital, flew from the Middle East to the United States.
And then was admitted at University of Pennsylvania right away.
And I just got out a week ago.

Q    So Mr. Rajan, you would agree with me that whether it be a
creditor, the Court, or the U.S. Trustee's Office looking at
the Debtors' monthly operating reports, there would be nothing
to indicate that the Debtor was incurring expenses of 1.5 to 2
million dollars and that those expenses were being paid by your
-- another company you controlled, correct?

A    That is correct.  It was an oversight.  And we'll have it
fixed on Monday and Tuesday.

Q    And when did you realize this was an oversight, Mr. Rajan?

A    When I got out of the hospital.

Q    And you're aware, are you not, Mr. Rajan, that the Debtors
had filed a motion with the Court seeking approval to give --
to issue shares to VSI in exchange for Stream paying expenses,
correct?

A    Correct.

Q    And you were at the hearing that took place before this
Court on April 24th, 2023, where the Debtor was seeking
permission to sell shares of Stream to the sister company, VSI,
correct?

A    I don't believe that was the topic of the hearing.

Q    The question was were you at the hearing, that April 24th hearing, Mr. Rajan?

A    I was at an April hearing.  But I don't believe that was the topic.

Q    Okay.  So let's turn to tab 62 in witness binder number 1. Sorry, tab 70.  I'm looking at it backwards.  In binder number 1.  Are you there, Mr. Rajan?

A    Yes.

Q    Okay.  If we look at the first page, it's United States Bankruptcy Court for the District of Pennsylvania dated April 24th, 2023.  And if you'd then turn to page 4.

A    Page 4.

Q    Line 4.  Your counsel, Mr. Zahralddin says, "Yes, Your Honor."

        THE COURT:  Wait a minute.  Page 4?

        MR. CAPONI:  Line 4.

        THE COURT:  Okay.

BY MR. CAPONI:

Q    "Yes, Your Honor.  Mr. Mathu Rajan, who is the CEO is here and ready to answer questions and put on direct testimony should Your Honor allow it."  Did I read that correctly?

A    Yeah.  That is correct.

Q    So you agree with me you were at the hearing?

        MR. ALEXANDER:  Your Honor, I'm going to object. It's improper impeachment.

THE COURT: Well, it's not an impeaching. It's refreshing his recollection. He said he didn't recall being there.

MR. ALEXANDER: No. He said he didn't recall that that was the scope of what was being addressed at the hearing.

THE COURT: Okay.

MR. ALEXANDER: He said a hearing did take place. He disagreed with what was -- with what Mr. Caponi indicated was being heard.

MR. CAPONI: If I could get to step two, that's where the refreshing of recollection and impeachment comes in.

THE COURT: Okay. Well, I don't know what you're impeaching. But --

MR. ALEXANDER: But there's no impeachment because he said he didn't recall. So you have to have affirmative testimony in order to impeach.

THE COURT: So you're refreshing he was there. And you're going to say what was said, do you recall?

MR. CAPONI: And I'm going to get to the part where he says, I don't recall that subject being discussed at the hearing. I'm just simply establishing he's at -- that I'm reading the right transcript.

THE COURT: No, no, no, no.

MR. ALEXANDER: He said impeachment.

THE COURT: You said impeachment. You're not

impeaching.  You're refreshing.  You were there and this is what was discussed?

MR. CAPONI:  Sorry.  Yes.  It's refreshing his recollection.  Yeah.  I agree, Your Honor.

THE COURT:  Not impeachment.

MR. CAPONI:  Correct.

THE COURT:  Okay.

MR. CAPONI:  Correct.

THE COURT:  All right.  Let's just be precise people. Go ahead.

BY MR. CAPONI:

Q    So Mr. Rajan, again, just to -- before we go to the next step of refreshing, you agree with me that according to this transcript you were at this April 24th, 2023 hearing, correct?

A    Yes.  I was at the hearing.

Q    Okay.  And if you could turn to page 31.

A    Page 31.  Okay.  Yes.

Q    And if you'd look at line 11.  The Court says --

MR. ALEXANDER:  Your Honor, I'm going to object. It's improper refreshing of recollection.  When you refresh a recollection, you don't read the transcripts.  You have -- you identify the part you want to read.  The client reads -- the witness reads it to themselves.  And then they can ask the question again.

BY MR. CAPONI:

Q    Mr. Rajan, read line 11.

MR. ALEXANDER:  Not out loud.

BY MR. CAPONI:

Q    To line 21.

THE COURT:  11 through what, counsel?  11 through what, Mr. --

BY MR. CAPONI:

Q    Does that refresh your recollection, Mr. Rajan, that at this hearing you attended, the parties were discussing with the Court whether the Debtor could sell its shares to VSI?

A    Yes.

Q    And Mr. Rajan, were you aware -- do you recall at that hearing the Court warned the Debtors not --

MR. ALEXANDER:  Your Honor, I'm going to object. What he's saying is hearsay in terms of what he -- he's asking if he remembers what the Court said at a particular hearing.

THE COURT:  Why don't you just direct him to the transcript and read what I said?

MR. CAPONI:  Well, I'm happy to.  I was told I can't direct him to the transcript.

MR. ALEXANDER:  Well, because he's not refreshing his recollection on anything.  He needs to ask a question properly. And then Mr. Rajan can say whether or not he can answer it.

THE COURT:  Okay.

MR. ALEXANDER:  You don't need to skip steps.

MR. CAPONI:  That's what I'm doing, Your Honor.  I'm asking him if he recalls the Court's statements to the Debtor. And if he tells me he doesn't recall it, then we'll go to the transcript and refresh his recollection.

THE COURT:  All right.  Ask him the question.

MR. CAPONI:  Sure.

BY MR. CAPONI:

Q   Do you recall at that hearing, Mr. Rajan, the Court informed the Debtors that they should not be selling shares in Stream to VSI without the Court's prior approval?

MR. ALEXANDER:  I'm going to object.

THE COURT:  Basis?  Basis?

MR. ALEXANDER:  He's trying to get a hearsay statement into the record.

THE COURT:  Mr. Caponi?

MR. ALEXANDER:  He's asking -- he's asking Mr. --

MR. CAPONI:  I don't think --

MR. ALEXANDER:  He's asking Mr. Rajan what the Court said.

THE COURT:  No, no, no.  He asked him do you recall what the state -- what the Court said.

MR. ALEXANDER:  Well, then there's a lack of foundation.

THE COURT:  Okay.  Let's lay the foundation.

MR. CAPONI:  I don't know what other foundation I can

lay, Your Honor.  He was at the hearing.  This was a topic covered.  They were seeking approval.  I'm asking him if he recalls the outcome.

THE COURT:  Was he there the whole time?  How about you ask him that.

MR. CAPONI:  Sorry, Your Honor?

THE COURT:  Never mind.  Just lay a foundation.  Yes, he was there.

BY MR. CAPONI:

Q    Mr. Rajan, do you recall the Court's --

THE COURT:  Woah, woah.  He was at the hearing.  Ask him was he there the whole time, did he leave.

MR. CAPONI:  Oh, sorry.

BY MR. CAPONI:

Q    Were you there the entire proceeding, Mr. Rajan?

A    Yes.  I was there.

Q    Okay.  So you heard everything the Court had to say during that proceeding?

A    Yes.  I did.

Q    And do you recall the Court's decision/guidance given to the Debtor with regard to its request on this motion that was being heard at the hearing regarding the sale of shares by Stream to VSI?

MR. ALEXANDER:  I'm going to object because it mischaracterizes what was at the hearing.

THE COURT:  Okay.  What are you objecting to?

MR. ALEXANDER:  Well, I'm objecting because Mr. Caponi is testifying.  And there is no foundation for his question and the facts that he's attempting to assert.  And it mischaracterizes what the Court discussed, which is hearsay to the extent that it tries to come in.

THE COURT:  Response?

MR. CAPONI:  Responding to -- it's a general question.  I'm asking Mr. Rajan if he recalls --

THE COURT:  Not if he --

MR. CAPONI:  -- the outcome of what happened at the hearing.

MR. ALEXANDER:  That wasn't his question.

THE COURT:  Do --

MR. ALEXANDER:  He adds extra words in the testimony that he wants to elicit in his question where there's no foundation for that in the first place.

THE COURT:  Okay.

MR. ALEXANDER:  So we object.

THE COURT:  Let's just keep it tight.

BY MR. CAPONI:

Q    Do you recall the Court's ruling on the Debtors' request at this April hearing to sell shares of Stream to VSI?

MR. ALEXANDER:  I'm going to object.  There was no ruling on the 24th.

MR. CAPONI:  I believe there was a ruling, Your Honor.  He can believe it's not a ruling.  He can deal with it in redirect.

THE COURT:  No, no, no, no.  You can't characterize something that is or is not.  You can believe anything you want.  Either I ruled or I didn't.  He's saying I didn't rule. I said I didn't rule.  Just ask him do you recall what the Court said.

BY MR. CAPONI:

Q   Okay.  Do you recall what the Court said with regard to the Debtors' request to sell shares to VSI?

A    I do recall what the Court said that day.  And I was also on another phone call with the Court where the Court said if you have pre-petition, go collect it.  And I believe there was a hearing scheduled on this topic for an actual ruling regarding post-petition, post-petitions tied to the plan.  And that's confirmation anyway.  So --

Q   At the hearing, you do recall the Court's -- what the Court had to say on this topic, correct?

A    On that particular day.  Yes.

Q   And did you hear the colloquy between the Court and your counsel, Mr. Zahralddin, regarding what would happen if the Debtors sold shares without the Court's ability to scrutinize -- to VSI without the Court's ability to scrutinize the transaction in advance?

MR. ALEXANDER:  Objection, Your Honor.

THE COURT:  Basis?

MR. ALEXANDER:  It mischaracterizes the hearing. Calls for hearsay.

MR. CAPONI:  Your Honor, I'm happy just to read the transcript.  And we can go around with the --

MR. ALEXANDER:  HE can't.  It's hearsay.

THE COURT:  You can't.

MR. ALEXANDER:  That's the problem.  It's hearsay.

THE COURT:  You have to ask the question first.  If he doesn't recall, then you refresh his recollection.  So the question is do you recall -- what if anything --

BY MR. CAPONI:

Q    What if anything do you recall about a colloquy between --

THE COURT:  Hold on.  No, no, no, no.

MR. CAPONI:  Okay.

THE COURT:  What if anything do you -- what do you recall that the Court said, if anything -- what the Court said, if anything, would happen if the shares were sold?

MR. ALEXANDER:  Your Honor --

MR. CAPONI:  That question --

MR. ALEXANDER:  -- that question is still hearsay. That would be what the Court said.

THE COURT:  No.  Do you recall what the Court said.

MR. ALEXANDER:  I'll just --

THE COURT:  Okay.

MR. ALEXANDER:  I'll withdraw my hearsay objection --

THE COURT:  Right.

MR. ALEXANDER:  -- to that question.

THE COURT:  Right.

MR. CAPONI:  That's not my question, Your Honor.  My question is this.

BY MR. CAPONI:

Q    Do you recall what your counsel had to say with regard to what would happen if the Debtor sold shares of Stream to VSI without coming to the Court first for approval?

MR. ALEXANDER:  Your Honor, I'm going to object.  That's hearsay, as well.

MR. CAPONI:  That's an admission by a party opponent.

THE COURT:  Admission?

MR. ALEXANDER:  There's no admission.

THE COURT:  You're asking him what I said.

MR. CAPONI:  No.  I asked him what Mr. Zahralddin, his counsel said.  Does he recall what his counsel said the Debtor understood would be the repercussions.

THE COURT:  No.  That wasn't your question.

MR. CAPONI:  That was my question.

THE COURT:  Your question was do you recall what the Court said to your -- now you're rephrasing.  You restated it. Come on.

235

MR. CAPONI:  Your Honor, then I -- to be clear, I'm not asking about anything that has to do with the Court.  I'm asking Mr. Rajan if he recalls what his counsel said it understood would be the consequences if the Debtor sold shares in Stream to VSI without Court approval.

MR. ALEXANDER:  Your Honor, that calls for speculation.  He's asking what his counsel understood at the hearing.

MR. CAPONI:  What his counsel said at the hearing.  It's in the transcript.

MR. ALEXANDER:  That's hearsay, as well, Your Honor.

MR. CAPONI:  It's not speculation.

THE COURT:  Okay.  You guys --

MR. CAPONI:  Your Honor --

THE COURT:  Hold on.  What he understood -- how does he know what was in his mind?  The question is -- you want to know what his counsel said to the Court in response to my statements regarding the sales of the shares?

MR. CAPONI:  Correct.

THE COURT:  All right.

MR. ALEXANDER:  I'm still objecting that that's hearsay.

THE COURT:  Okay.  It's hearsay because --

MR. ALEXANDER:  It's an out of court statement.

MR. CAPONI:  Actually, it's an in court statement.

MR. ALEXANDER:  That can't be admitted for the truth.  It's not presented or elicited in this hearing -- in this trial.  It's an out of court statement.

THE COURT:  Response?

MR. CAPONI:  Your Honor, A, it's an in court statement.  And B, it's a statement by a party opponent.  It's the representative of the Debtor speaking for the Debtor.  Therefore, it's an admission.  And it's by definition not hearsay under the Federal Rules of Evidence.

THE COURT:  It's party admission because it's a statement made by the Debtor's representative with respect to this issue, isn't it?

MR. CAPONI:  Correct.  It's not hearsay.

THE COURT:  Well, you're asking him does he recall what is it his counsel said to the Court?

MR. CAPONI:  Yeah.  That's the first thing is does he recall.  We haven't even gotten to the statement.  I'm just simply asking if he recalls the statement.

THE COURT:  What statement, if any.

MR. CAPONI:  What statement, if any.

THE COURT:  I'll allow it for what it's worth.

BY MR. CAPONI:

Q    Do you recall, Mr. Rajan?

A    Where in the transcript?

THE COURT:  No, no.  No transcripts.

THE WITNESS:  Oh, by recollection?

THE COURT:  Uh-huh.

THE WITNESS:  I remember the dimes to donut comment. But that's about it.

BY MR. CAPONI:

Q   Okay.  So let's -- if you could take a look at the transcript.

THE COURT:  Oh, you just read that.  You just read it because it says dime to donuts because I just read it and it says that.  Okay.

THE WITNESS:  Sorry.  I got caught.

THE COURT:  You just read it.  I know.

BY MR. CAPONI:

Q   So if you could go to page 31 and read lines 16 to 24.

THE COURT:  What page?  31?

MR. CAPONI:  Lines 16 to 24.

THE WITNESS:  On page 31?

MR. CAPONI:  Page 31.

THE WITNESS:  Which line?

THE COURT:  In Exhibit 70, right?  Is that the one we're in?

BY MR. CAPONI:

Q   Let me know when you've finished reading that.

A   I'm on page 31.  What am I looking for?

Q   31, lines 16 to 24.

A     Yes.

Q     Does that refresh your recollection as to what Mr. -- your counsel had to say in response to the Court's concerns regarding the sale of shares of VSI to Stream?

A     This -- that's about what the Court said.

THE COURT:  No.  There --

BY MR. CAPONI:

Q     Line 22 specifically --

A     Oh, line 22.  Okay.

MR. ALEXANDER:  Your Honor, we're going to object. If he wants to refresh his recollection, then Mr. Rajan should be entitled to read the entire statement by Mr. Zahralddin to the extent it refreshes his recollection.

THE COURT:  All right.  It goes on to the next page. So let's go to page -- I guess I cheated and went to the next page.  Page 32, line 1 is the conclusion of what was said by Mr. Zahralddin.  So read to the next page.

THE WITNESS:  Okay.  So --

THE COURT:  Start --

THE WITNESS:  Yeah.

THE COURT:  I said something.  But he actually asked you does it refresh what Mr. Zahralddin.  So he really should only be starting with Mr. Zahralddin's statement.  It's not his statement.  So start with 22 to the next page, line 1.

THE WITNESS:  Okay.  Yeah.  I've read it.  What's

your question?

BY MR. CAPONI:

Q    Does that refresh your recollection as to what your counsel had to say?

A    Yeah.  It refreshes my recollection.

Q    And your counsel acknowledged on behalf of the Debtors that there would be great consequences if the Debtor sold -- or entered into transactions with VSI for the sale of Debtor stock to VSI, correct?

MR. ALEXANDER:  Objection.

THE COURT:  Hold on.

MR. ALEXANDER:  Mischaracterizes what the statement was.  Mr. Caponi, again, is attempting to testify.

THE COURT:  Just wait.  So it says -- it says what it says.  It just says, in all fairness, we're coming to you because we know there are great consequences to not getting permission from the Court.  So even when things are in the ordinary course, people come to you to get permission.  And that's what you do.  Okay.

BY MR. CAPONI:

Q    Are you aware of the statement the Court --

A    Can I -- can I respond?  Am I allowed to respond now?

THE COURT:  Yes.  You -- that's what he said, right?  Okay.

THE WITNESS:  No.  That's not what he said.  That's

wrong.  You misread the statement.

THE COURT:  All right.

THE WITNESS:  He was talking about the status of the Netherlands.  And they were warned by the Court to stop doing expedited hearings.

THE COURT:  All right.

BY MR. CAPONI:

Q    I'm happy to now --

A    You misread the statement.  You mischaracterized the statement.

THE COURT:  Are we reading the wrong --

MR. ALEXANDER:  Your Honor, if he -- he did his answer.  So if it doesn't refresh his recollection, then we need to move on.  That's how refresh your recollection works.  You don't get to keep reading the statement.

MR. CAPONI:  I'm impeaching the witness.

THE COURT:  All right.  I think he read --

MR. ALEXANDER:  You can't impeach the witness on something he doesn't recall.

MR. CAPONI:  He said he did recall.  I asked him if it refreshed his recollection.  He said it did.  I then asked him --

THE COURT:  Did it refresh his recollection of what his counsel said?  Okay.  Now what?

MR. CAPONI:  Now the question --

MR. ALEXANDER:  You can't impeach him with not his own words, Your Honor.

THE COURT:  But he just said --

MR. ALEXANDER:  It's improper impeachment.

THE COURT:  He just said, I didn't remember what he said.  And now you said, does this refresh.  He said yes.  Now what?

BY MR. CAPONI:

Q    Now the question is, do you recall that your counsel acknowledged that there would be great consequences if the Debtor sold stock to VSI without first coming and getting Court approval?

MR. ALEXANDER:  Your Honor, objection, again.  It mischaracterizes what the exact lines are that he's attempting to do.

MR. CAPONI:  Your Honor, I don't think I mischaracterized it.  But again, I think Mister --

MR. ALEXANDER:  The Court --

MR. CAPONI:  -- Alexander --

THE COURT:  No, no, no, no.

MR. ALEXANDER:  -- read from the document.

THE COURT:  Wait a minute.  Wait a minute.

MR. ALEXANDER:  And it says, "To the extent and if permission is required, even when things are permitted, you still come."  That's what it says.  Mr. Caponi's cutting off

the rest of it.

THE COURT:  Right.  Okay.

MR. ALEXANDER:  He didn't read the whole statement.

MR. CAPONI:  I have no issue with that.

THE COURT:  This is what it says.  Okay.  What it said is he acknowledged that there are great consequences for not getting permission from the Court.  But people come even when it's ordinary.

BY MR. CAPONI:

Q    All right.  Mr. Rajan, did you understand that your counsel had made the statement that the Court just referenced?  All I'm asking is if the Debtors' executive was aware of his counsel's statement that there was some -- under whatever circumstances, there could be great consequences.  That's all I'm trying to understand.

A    I don't --

MR. ALEXANDER:  I'm objecting.  That's not --

THE WITNESS:  -- even understand what you're saying.

MR. ALEXANDER:  That's not what it says.  He keeps trying to testify what it says.  It says what it says.  If he's trying to ask him if he recalls that, read the statement.  If he recalls it, it's yes or no.  Then you move on.

THE COURT:  Okay.

MR. CAPONI:  And I'm happy to read the statement and ask him if he recalls it.

THE COURT:  He already read it.  Huh-uh.  He read it. He said he recalled his counsel saying it.  Okay.  Now what? What's the next question?

BY MR. CAPONI:

Q    So Mr. Rajan, following that hearing, the Debtor has entered into multiple subscription agreements with VSI for the transfer of stock of Stream to VSI, correct?

MR. ALEXANDER:  Objection.  Mischaracterizes testimony.

THE COURT:  Okay.  Why does it -- how does it mischaracterize?

MR. ALEXANDER:  Because Mr. Rajan testified that all funds that have been delivered were based on pre-petition agreements.  And the only one post-petition was with respect to the plan.

MR. CAPONI:  I'm not characterizing his testimony. I'm making a statement and asking if you agree with it or not. I didn't say he testified.

THE COURT:  No, no, no, no.  You said that your -- his -- he testified or he -- that's not what he said.  You can't just propose that he said something that he didn't say. Rephrase the question.

MR. ALEXANDER:  Your Honor --

MR. CAPONI:  Again, I did not qualify it as his statement.  But I will rephrase it to make sure we're

abundantly clear.

THE COURT:  All right.

BY MR. CAPONI:

Q   Mr. Rajan, despite your counsel's statement at this hearing, the Debtors have entered into multiple subscription agreements with VSI regarding the sale of stock from Stream to VSI without getting Court approval, correct?

MR. ALEXANDER:  Objection, Your Honor.  It mischaracterizes facts in evidence.  And it also mischaracterizes his prior testimony.

MR. CAPONI:  Again, Your Honor, I think I was abundantly clear.  I was not characterizing his testimony.

MR. ALEXANDER:  You weren't.

THE COURT:  Hey, come on, guys.  You basically asked him that what his counsel said, that there are great consequences to not getting permission.  He agreed that there are.  But even when things are in the ordinary course, people come to get permission.

MR. CAPONI:  Correct.

THE COURT:  So --

MR. CAPONI:  Now my question is, having heard that --

THE COURT:  Uh-huh.

MR. CAPONI:  -- after having heard that --

THE COURT:  Uh-huh.

MR. CAPONI:  -- the Debtor, nonetheless, entered

into --

THE COURT:  But you can't put in the nonetheless because the way this said is that there are consequences and people come --

MR. CAPONI:  Take out nevertheless.  Having heard Mr. Rajan -- your counsel's statement -- after having heard your counsel's statement, the Debtor entered into multiple subscription agreements with VSI regarding the transfer of shares in Stream to VSI without first getting Court approval, correct?

MR. ALEXANDER:  I'm going to object.

THE COURT:  Nowhere in here did the Debtors' counsel concede that the subscriptions in issue were out of the ordinary course that required Court approval.

MR. CAPONI:  I'm not saying that, Your Honor.

THE COURT:  But that's the assumption you want him to make.

MR. CAPONI:  All I'm -- no.

THE COURT:  You want him to -- you said that in spite of not coming to the Court for approval -- he just says, not coming to you, we know there are great consequences.  Even when things are in the ordinary course, people come to you.

MR. CAPONI:  All right.  Let's broaden it out, Your Honor.

THE COURT:  Okay.

BY MR. CAPONI:

Q    After attending the April 4th hearing and hearing everything that everyone had to say, subsequent to that, the Debtor entered into multiple subscription agreements with VSI for the transfer of shares without first getting Court approval, correct?  Mr. Rajan, answer, please.

THE COURT:  Wait a minute.  I'm the one that directs him to answer.  Not you.

MR. CAPONI:  I'm sorry.

THE COURT:  Mr. Rajan, can you please answer the question?

THE WITNESS:  Yes.  We have post-petition subscriptions.  That is correct.

BY MR. CAPONI:

Q    And they were entered into without getting -- first receiving Court permission, correct?

A    We haven't received Court permission for the reorganization plan.  No.  Not yet.

Q    There's a motion pending by the Debtors, seeking permission to approve post-petition subscription agreements, correct?

A    Yeah.  I believe there's a hearing scheduled.  Correct.

Q    Okay.  And the subscription agreement you've entered into post-petition were in addition to whatever subscription agreement were entered into in connection with the plan,

correct -- the proposed plan, correct?

A    I'd have to check.  There might be.  I'm not quite sure.

Q    Okay.  Well, let's look at your deposition.

A    There is pre-petition for sure.

Q    Let's look at your deposition on page 141.

THE COURT:  Where are we at?

MR. CAPONI:  That would be Exhibit 31 -- 231.  Excuse me, 231.

THE COURT:  Counsel, we're going to stop soon and try to figure out where we're going.  It's 7:30.  And --

THE WITNESS:  What?  Where is it?

BY MR. CAPONI:

Q    Exhibit 231.  If you go to page 141.

THE COURT:  Wait a minute.  What binder?

THE WITNESS:  Which binder?

THE COURT:  Wait a minute.  Binder what?

MR. CAPONI:  It is binder --

THE COURT:  2, right?

MR. CAPONI:  Binder 3.

THE COURT:  3?

MR. CAPONI:  3.

THE COURT:  Wait a minute.  I'm in the wrong one. Binder 1, 2 -- this is the first time we're going in 3.

MR. CAPONI:  No.  We've used it before, Your Honor. We used his deposition transcripts.

THE COURT:  Why did I think it was in 2?  All right.
All right.  Here we go.  Which page are we going to?

MR. CAPONI:  Page 141.

THE COURT:  Page 141.

BY MR. CAPONI:

Q    And we'll start with line 1.

A    231?

Q    141.  Page 141.

A    In Exhibit 231?

Q    Exhibit 231.  Page 141.

THE COURT:  The first page on that one.  You'll see
the deposition there.  Reliable transcript.  All right.  So
what's -- where are we at?  Page 141.  What line, Mr. Caponi?

MR. CAPONI:  Starting at line -- we're going to go
line 1 to 18.  But we'll just start with line 1.

BY MR. CAPONI:

Q    Are you there, Mr. Rajan?

A    Yes.

Q    So my question to you was, "So you're saying there were
multiple subscription agreements between VSI and Stream whereby
VSI commits to giving Stream money on an as requested basis?"
And what did you answer?

A    "Yes.  That's correct."

Q    And then I said, "And Joe Corso approved those with your
power of attorney?"  And the response was what?  Can you read

that?

MR. ALEXANDER:  Your Honor, I'm going to object as improper impeachment.

THE COURT:  And what was the question that led us to his deposition?

MR. CAPONI:  I had said to Mr. -- I had asked -- what led to this was my question that the Debtor has entered into multiple subscription agreements post-petition in addition to whatever has been entered into in connection with the proposed plan.  Mr. Rajan said that he didn't recall, he wasn't sure.  And so I'm --

MR. ALEXANDER:  That's not his --

THE COURT:  I thought his answer --

MR. ALEXANDER:  That wasn't his answer.  And that's not impeachment.

THE COURT:  His answer was yes, we did.

MR. CAPONI:  No.  I asked him -- that was not his answer, Your Honor.  But I'm -- if he wants to tell me that, I'll ask it again.  If he wants to tell me yes, I'll move on.

THE COURT:  Okay.  I must be missing stuff or I'm getting confused in my writing.  Okay.

MR. CAPONI:  He, Your Honor, acknowledged that there were post-petition.  And my follow-up question was, "And there were subscription agreements post-petition separate from the plan in addition to whatever was done in connection with the

plan?"  And that's where he said he didn't recall.  But I'll
ask the question again.

THE COURT:  Okay.  Just ask him again.

MR. ALEXANDER:  But Your Honor, if he doesn't recall,
that's not impeachment.  If you don't recall something, you
don't get to --

THE COURT:  He wants to refresh his recollection.

MR. ALEXANDER:  But then he can't read it.  Like, I
don't know what --

THE COURT:  He has to read it if you want to
refresh --

MR. ALEXANDER:  Exactly.  But I don't know what Rules
of Evidence are --

THE COURT:  Okay.

MR. CAPONI:  I'd be happy to start, Your Honor.

THE COURT:  Okay.

MR. CAPONI:  I understand you don't have to like the
testimony.  But --

THE COURT:  No.  But that's not the point.  The
point --

MR. ALEXANDER:  The way that you're asking questions
and the objection.

THE COURT:  All right.

MR. ALEXANDER:  We need to follow the Rules of
Evidence.

THE COURT:  No, no, no, no.  You guys talk to me. You don't talk to one another.  Mr. Alexander, cut it out.

All right.  Mr. Caponi, he said he doesn't recall. Okay.  The way you refresh recollection is you ask the witness to read it.  You don't read it.  He reads it.  And then you ask him, does that refresh --

MR. CAPONI:  I'll start over, Your Honor.

THE COURT:  All right.  Let's start all over.

BY MR. CAPONI:

Q   Mr. Rajan, do you agree with me that the Debtor has entered into these subscription agreements post-petition about every two weeks or so, correct?

THE COURT:  Not reading -- you shouldn't be --

BY MR. CAPONI:

Q   Mr. Rajan, don't look at the deposition.

THE COURT:  You're not supposed to be reading.  Don't read.  Don't read.

THE WITNESS:  Oh, sorry. I don't -- I don't recall that.  I recall money.

THE COURT:  What --

BY MR. CAPONI:

Q   So let's take a look at the --

THE COURT:  Wait a minute.  What was the question?

BY MR. CAPONI:

Q   -- the deposition transcripts.

THE COURT:  Hold on.  What was the question you don't recall?  Can you repeat the question?

BY MR. CAPONI:

Q    The question is, Mr. Rajan, since filing the bankruptcy petitions for the Debtors, the Debtors have entered into subscription agreements with VSI whereby VSI gets shares of Stream in exchange for paying Stream's expenses.  You've entered into those agreements every two weeks or so, correct?

A    No.

Q    Okay.

A    We get -- we get money every -- we get money.

Q    Take a look at page 141 of your deposition transcript. And we're going to start at line, again, 1.

THE COURT:  Wait.  You're on page 141?

MR. CAPONI:  141.

THE WITNESS:  And I -- I said in here, I said I have to check on that.

THE COURT:  Woah, woah, woah.  There's no question. Now he can read it because he's not trying to --

MR. ALEXANDER:  No.  He's reading it out loud, Your Honor.

THE COURT:  But he's not trying to refresh his recollection.

MR. CAPONI:  Now I'm impeaching.

THE COURT:  He's impeaching him because he said no,

that's not true.  The answer was no.  Now he's impeaching him.  Let's --

MR. ALEXANDER:  All right.  You got one right.

THE COURT:  Listen the two of you.  Cut it out.  Both of you, I don't like this.  You're being snarky.  He's being snarky.  I'm telling you, if I have to say something to the two of you again, I'm going to have to tell you like I tell my kids, consequences.  And you're not going to like them.  Cut it out.

MR. CAPONI:  Yes, Your Honor.

THE COURT:  Now, it is late and I'm getting cranky.  So let's finish this one and we're going to have to figure out where we're going after that -- after this question.  Go ahead.

BY MR. CAPONI:

Q    Mr. Rajan, would you go to line -- again, we'll start with line 1.  Well, you can read line 1 and your answer in line 5.  You already did that.  We'll move on.  I'll go line 6.  And my question was, "And Joe Corso approved those with your power of attorney?"  Can you read your answer out loud, please?

A    Where, line 8?

Q    Line -- starting at line 8.  Your answer.

A    I said, "Now there's an independent committee doing it."

Q    And my next question was, "And when was the last one entered in to?"  Can you read your answer?

A    It --

THE COURT:  You can read it.

THE WITNESS:  It says, "I've got to --" -- "When was the last one entered in to?"  I said, "I've got to check on that.  It would have been a few weeks ago."

BY MR. CAPONI:

Q   Okay.  And then my next question was, "And before that, like, are these subscription agreements entered in to how frequently?"  And what's your answer?

A   "Every two weeks or so."  But this was referring to pre-petition.

THE COURT:  Just read --

BY MR. CAPONI:

Q   Mr. Rajan, can you just answer -- read your testimony?

THE COURT:  -- the answer.  Just read the answer.  Okay.

THE WITNESS:  It says, "Every two weeks or so."  But that's referring to pre-petition.

BY MR. CAPONI:

Q   Thank you, Mr. Rajan.

THE COURT:  Strike that.  Okay.  There's no question.  And that's your answer.  Okay.  All right.

BY MR. CAPONI:

Q   Mr. Rajan, it's your testimony that the subscription agreement that you entered in to every few weeks were pre-petition, not post-petition?

A    The ones that were done frequently were pre-petition.

Q    Okay.  So let's go to page 140 of your transcript, right before we get to the testimony we just saw.

THE COURT:  Where are we going again?

MR. CAPONI:  Page 140.

THE COURT:  Uh-huh.  What line?

BY MR. CAPONI:

Q    And read line -- and lines 20 to 22.  And answer my questions regarding the subscription agreement.  You said, "It was varying amounts.  We went to the old subscription agreements first before we went to the newer subscription agreements."

A    Yes.  Correct.

Q    That prompted my question, "And what are you referring to by subscription agreements?"

A    "Subscription agreements."

Q    Your answer was, "Subscription agreements."  And then we turn the page to 141.  And that's what preceded the prior testimony we read, correct?

A    Correct.

MR. CAPONI:  Okay.  Thank you.

THE COURT:  All right.  All right.  We're going to have to stop here.  It's 7:30.  You know, for whatever reason we didn't get to the end of Mr. -- unless you're telling me -- I know though -- I don't think you're anywhere near finishing

Mr. Rajan, are you?

MR. CAPONI:  No.  We have quite a bit more to go, Your Honor.

THE COURT:  And then we have Mr. Michaels.

MR. ALEXANDER:  And we have redirect, Your Honor.

THE COURT:  And then we have -- okay.  Now, what --

MR. ALEXANDER:  And then we have Mr. Callahan.

THE COURT:  And then we have Mr. Callahan.

MR. ALEXANDER:  Your Honor, my cross should take no more than -- I'm going to say 20 to 30 minutes.  And you don't have to double that.

THE COURT:  Right.  But they have -- they meaning Mr. Caponi, says he has much more for Mr. Rajan.

MR. CAPONI:  Yes.

THE COURT:  And the Debtor has redirect.  And much more means more than the time I want to be here, which is -- you know, it's 7:40 right now.  35, almost 40.  We're not going to 9, 10:00.  I'm not doing that today.

So what are the parties -- I probably shouldn't even tell you this.  But my hearing tomorrow settled.  That means I have some time for tomorrow.  I'm going to regret telling you guys this.  And it was a Zoom trial.  So none of my -- you know, all of my law clerks are, you know, not going to be here tomorrow because I said -- you know, not here physically.  You know, so --

MR. CAPONI:  Your Honor, I'm unavailable tomorrow.

THE COURT:  You're unavailable tomorrow?

THE WITNESS:  I have surgery.

MR. CAPONI:  I have a plane at 5 a.m. tomorrow heading back.

THE COURT:  Lucky you.

MR. CAPONI:  I know, because I have an obligation with my kids where I have to take them to their school orientation.

THE COURT:  Well, I was at the airport at 3:45 this morning.  So good luck to you.  They don't open the gates until --

MR. EDEL:  And Your Honor, unfortunately, I'm not here either, so I couldn't stand in because I have another matter with Judge Goldblatt that we're trying to resolve in a different --

THE COURT:  Well, what do you guys want to do?  We can do -- I mean, I did this in person because we have all these documents.  And I don't know how much -- you know, I had -- just had a hearing that had the same, like, amount.  But they were on a thumb drive, so they were easy to pull up.  So what do you guys want to do?

MR. EDEL:  When is Your Honor's next availability.

THE COURT:  All right.  Free day tomorrow.  What are we -- hold on.  All right.  Hold on.  Let's see.  Are we

talking about next week?

MR. CAPONI:  I think that would make sense.

THE COURT:  Well, Tuesday is out because it's the first day of school.  And I -- and so counsel, I will tell you this.  You know, once school starts, my availability past 3:00 to 4 becomes -- my grandson is autistic.  So there's no way I'm not going to go get him from school.  So I have to work on that.

THE CLERK:  21 and 25, I don't have anything.  Do you have anything?

THE COURT:  On the when?

THE CLERK:  The 21st and 25th.  Do you have anything on your end?

THE COURT:  That's Monday.  Yes.  I do have -- it's his first day of school on Monday.  And then there's a parent orientation.  Then Tuesday is out because we have an appointment that took us a year to get with his VVP -- whatever the pediatrician is.  That's out.  The 23rd, that would only be a half a day.

MR. ALEXANDER:  We have mediation on the 23rd.

THE COURT:  24th, I don't see anything.  And the 25th, again, I skipped my last dental for a hearing.  I'm not -- maybe the 25th.  I can see if I can reschedule my dental appointment.

MR. CAPONI:  I'm available on the 25th.

THE COURT:  I just can't promise because I canceled the last one.

THE CLERK:  The 28th?

THE COURT:  On the 28th --

MR. CALLAHAN:  25th is fine with U.S. Trustee.

MR. CAPONI:  The 28th is Monday.

THE COURT:  Yeah.  Mondays are pretty good.  Mondays and Fridays are reserved for all day trials.

MR. CAPONI:  I could do the 25th or the 28th.  If we have a full day, to the extent that works.

THE COURT:  Yeah.  Maybe we could start at like 10:00.

MR. ALEXANDER:  Your Honor --

THE COURT:  The 28th, all day.  The 29th, out.  I mean, that's a half a day.  The 30th, I don't know what my -- Ms. Godfrey's not on here.  I usually --

THE CLERK:  They have something on the 30th.

THE COURT:  They have something?

THE CLERK:  Something else.

MR. CAPONI:  Do we have a back to back on the 28th and 29th?

THE COURT:  I have the 28th.  The 29th, I could do a half.  But I'd have to stop by 5:30.

MR. ALEXANDER:  Your Honor, I would propose that we do the 28th and the 29th, even half day, and have closing

arguments or whatever wrap up we want to have on the 29th.  So we --

THE COURT:  We could do that by Zoom.  You don't even have to be here.

MR. ALEXANDER:  I'd like to just get it in the can so we're done by the -- again, I'd like to be -- we want to get this thing done on our end.

THE COURT:  You?

MR. ALEXANDER:  I know you do, too.  But --

THE COURT:  I thought this was going to be an easy, quick, done.  My secretary who is retired is asking me, you still have that Stream case?

Okay.  So the 25th -- wait a minute.  What did I say?  The 25th, which is a Friday, I could do a half a day.  That's subject to me trying to reschedule my dental appointment, which I figure I'll probably just give it up.  That's all day if I can do that.

MR. CAPONI:  The 25th or the 28th, Your Honor?

THE COURT:  The 25th is a Friday.  If I can, that would be all day.

MR. CAPONI:  Would that be Zoom or in person?

THE COURT:  It would be in person.

MR. CAPONI:  I think all day is enough time that we can do closing.

THE COURT:  And then on the 28th, I definitely have

all day.

MR. CAPONI:  Your Honor, I would prefer the 28th and the 29th, so I don't have to fly in and stay the entire weekend.

THE COURT:  Okay.  You don't like Philadelphia?

MR. CAPONI:  I love Philadelphia.

MR. EDEL:  He has kids.

THE COURT:  Yeah.  I get it.  I'm back in that mode again.  I thought I was way past that.

MR. EDEL:  And Your Honor, he tells me he likes his kids.

THE COURT:  I love my grandson.

MR. CAPONI:  I just want them to like me, too.

THE COURT:  All right.  So the 28th.  The 29th, we could have.  I don't know what my calendar looks like for the 29th.  I don't know anymore because Carol used to put everything on here.  And it's not --

MR. ALEXANDER:  The 28th, what time would we start, Your Honor?

THE COURT:  I'll try to start at --

MR. ALEXANDER:  9?  8?

THE COURT:  I have to do 10.  I've got to get him into school.  It has to be 10:00, unless somebody wants to volunteer to take him to school.  It's 10:00.

MR. EDEL:  If it's take him to school or come d, I

might be able to help you out.

THE COURT:  Not that school.  It's a normal school -- charter school in Philadelphia.  So I don't think you want to go there.  So the 28th, Monday the 28th, I have all day.  The 29th, I have until 5:30.  I just don't know when we would start.

MR. CAPONI:  Your Honor, my anticipation is if we have most of the day on Monday, that's more than enough time to get Mr. Rajan.

THE COURT:  I just have to also make arrangements so that I don't have to leave at 3 and come back.

MR. CAPONI:  Okay.

THE COURT:  So I have to make sure that's covered so I can be here from like 10 to 7.

MR. CAPONI:  That should be more than enough.

THE COURT:  And then the next day say from 12 to 6, again, I have to get coverage for those two days.

MR. CAPONI:  Okay.

THE COURT:  That gives you guys -- 10 to 7 is ten hours.  And then another -- that's like 13.

MR. ALEXANDER:  I think that should be plenty.

MR. CAPONI:  Yeah.

THE COURT:  And that will be with Mr. Rajan's testimony, redirect, Mr. Michaels, any rebuttal witnesses, closing arguments.  And then I'm not -- I -- you know, talking

to my law clerk and going over our notes, I'm not quite sure where I am because I thought I was in a good place where I could go through everything.  I'm not quite sure yet.

MR. CAPONI:  Okay.  Will you be able to let us know prior to the 28th whether you want to do closing arguments, briefs, or a combination of the two?

THE COURT:  Well, Mr. Callahan is asking for closing arguments.

MR. CALLAHAN:  I just don't want to have -- I want to reserve the right for briefs.  But I think it's appropriate to frankly, personally, for the Court, make closing arguments.

THE COURT:  All right.

MR. CAPONI:  If it's read enough and heard enough, closing arguments should be sufficient here.

THE COURT:  All right.

MR. CAPONI:  I don't think we need briefs.  We can only drag this thing out two, three, four more weeks than it needs to be.

MR. ALEXANDER:  We requested briefs.

THE COURT:  Right.  And then I will figure out, once I hear the closing arguments, whether I need briefs.

MR. CAPONI:  Right.  Good.

THE COURT:  I don't know if I do.  I don't know.  If I don't have closing arguments, I clearly need briefs.  But if I do have closing arguments, I'm not sure whether I will

need -- I don't know yet.

MR. CAPONI:  That's fair enough, Your Honor.

THE COURT:  So I will let the parties know.  So the 28th at 10:00, all day.  And then I'll let the parties know what time on Tuesday because I don't have my calendar.  I anticipate I always have an 11:30.  But I don't know what's on.  I don't know.  The 28th -- I mean the 29th.

THE CLERK:  The 29th, I probably have it right here.

THE COURT:  Yeah.  But I could sometimes -- okay.  Let's just be safe for the 12:00 on the 29th.  And I can't promise we'll start promptly because I had a hearing, you guys, that was supposed to start at 12 on Wednesday.  And I didn't finish the list.

All right.  So this is where we are.  I'll see everybody back here on Monday the 28th at 10:00, with a continued hearing on the 29th at 12:00.  Okay.

MR. CAPONI:  Thank you, Your Honor.

THE COURT:  And counsel, if you're going to do closing arguments, I would really like if you had some details for me because otherwise, I'm going to need briefs.  Because if it doesn't help me --

MR. ALEXANDER:  When you say detailed, do you mean the --

THE COURT:  I don't know how you're going to -- well --

MR. ALEXANDER:  Do you want PowerPoint?  What's Your Honor's preference?

THE COURT:  Whatever you guys will give me that will say this was, you know, the testimony, this is whatever it is.  I'm not.  That's what I just said.  I don't know how you're going to do that.  You're going to just have it the day before.  Maybe you size up -- you get everything ready, except what you had today.  I don't know.  I don't know.  I don't have to litigate anymore.

MR. CALLAHAN:  We'll figure it out, Your Honor.

THE COURT:  You guys can -- you're all smart.  You're very smart, competent, well-experienced -- all right.  So Jon, we are -- Mr. Rajan, you still can't talk to Mister -- anyone regarding your -- for two weeks.  You can talk to them but you can't talk to them about your testimony.

MR. RAJAN:  Okay.

THE COURT:  Okay.  So you can step down.  Court is adjourned until Tuesday at -- Tuesday, whatever -- what's Tuesday?  What's Tuesday?  22nd at 10:30.

(Proceedings adjourned)

C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_John Buckley_____

John Buckley, CET-623
Digital Court Proofreader