UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

```
                                        :
IN RE:                                  : Case No.  23-10764
                                        :           23-10763
STREAM TV NETWORKS, INC.   CH: 11 :
                                        : Philadelphia, Pennsylvania
A) Trial Re: Emergency Motion To  : June 28, 2023
Dismiss Case. Motion Of Hawk      : 10:38 a.m.
Holdings Ltd. (I) Pursuant To     :
Section 1112(B) Of The Bankruptcy :
Code Either (A)(I) To Dismiss The :
Debtors Chapter 11 Cases Or (2)   :
To Convert Such Cases To Cases    :
Under Chapter 7 Or (B) In The     :
Alternative, Pursuant To Section  :
1104(A) Of The Bankruptcy Code To :
Appoint A Chapter 11 Trustee And  :
(Ii) To Request Expedited         :
Consideration Pursuant To Local   :
Rule 5070-I(G)Filed By Hawk       :
Investment Holdings Ltd.          :
Represented By Steven Caponi .    :
. . . . . . . . . . . . . . . . . .
```

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtor:                 Rafael X. Zahralddin, Esq.
                                Lewis Brisbois
                                500 Delaware Avenue, Suite 700
                                Wilmington, DE 19801
                                302-985-6004

                                Bennett G. Fisher, Esq.
                                Lewis Brisbois Bisgaard & Smith
                                24 Greenway Plaza, Suite 1400
                                Houston, TX 77046
                                346-241-0495

                                Vincent F. Alexander, Esq.
                                Lewis Brisbois Bisgaard & Smith
                                110 SE 6th Street, Suite 2600
                                Fort Lauderdale, FL 33301
                                954-728-1280

| | |
|---|---|
| For SeeCubic: | Marley Ann Brumme, Esq.<br>Eben P. Colby, Esq.<br>Skadden Arps Slate Meagher &<br>Flom, LLP<br>500 Boylston Street, 23rd Floor<br>Boston, MA 021116<br>617-573-4800 |
| For Hawk Investment Holdings Ltd: | Steven Caponi, Esq.<br>K&L Gates<br>600 N. King Street, Suite 901<br>Wilmington, DE 19801<br>302-416-7080 |
| | Thomas L. Warns, Esq.<br>K&L Gates LLP<br>599 Lexington Avenue<br>New York, NY 10022<br>212-536-3901 |
| | Margaret R. Westbrook, Esq.<br>Aaron Rothman, Esq.<br>Jonanthan N. Edel, Esq.<br>K&L Gates LLP<br>300 South Tryon Street<br>Suite 1000<br>Charlotte, NC 28202<br>704-331-7400 |
| For the United States Trustee: | Kevin P. Callahan, Esq.<br>Office of The United States<br>Trustee<br>Robert N.C. Nix Federal<br>Building<br>900 Market Street, Suite 320<br>Philadelphia, PA 19107<br>202-934-4154 |
| For Rembrandt 3D Holding Ltd.: | Andrew Peter Demarco, Esq.<br>Devlin Law Firm LLC<br>1526 Gilpin Avenue<br>Wilmington, DE 19806<br>302-449-9010<br>Chris Michaels |

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES:

Shadron Stastney
  (By Mr. Colby)           20
  (By Mr. Alexander)              133

JUNE 28, 2023                                              10:38 A.M.

THE BAILIFF:  All rise.  Court is in session.

THE COURT:  Okay.  This is in Stream technology and -- oh, wait a minute -- Stream TV Networks, Inc., and it is the continued hearing on the motion to dismiss the case and motion for relief from stay.

Counsel, if you please enter your appearance on the record.

MR. ALEXANDER:  Good morning, Your Honor.  Vincent Alexander of Lewis Brisbois Bisgaard & Smith.

THE COURT:  One second, Counsel.

Also, you have with you, Mr. Alexander?

MR. ALEXANDER:  Mr. Zahralddin will be joining us. He is on his way.  And on the telephone, we have Mr. Bennett Fisher, who's in Lewis Brisbois's Texas office.

THE COURT:  Okay.

MR. ALEXANDER:  And Mr. Park will also be joining us as well in -- in person.

THE COURT:  What's Mr. Park's first name?

MR. ALEXANDER:  Well --

THE COURT:  All right.  Mr. Park.

MR. ALEXANDER:  No.  I was going to say because it's -- I would probably misspell his legal first name.

THE COURT:  That's fine.  I have been putting everybody else's first name.

MR. ALEXANDER:  He goes by "Tom".

THE COURT:  Okay.  Who's here for the Movant?

MR. COLBY:  Good afternoon, Your Honor.  Eben Colby and Marley Brumme from Skadden Arps and Mr. Shad Stastney from SeeCubic.

(Audio cuts out)

UNIDENTIFIED SPEAKER:  All represent Hawk Investments --

THE COURT:  And who's on the telephone?

UNIDENTIFIED SPEAKER:  Aaron Rothman.

THE COURT:  And you're representing Hawk, collateral agent; correct?  Right, Mr. Caponi?

MR. CAPONI:  Yes, Your Honor.

THE COURT:  Okay.  Who else is here in the courtroom?

MR. CALLAHAN:  Yes, Your Honor.  Kevin Callahan on behalf of the United States Trustee.

THE COURT:  I see a gentleman all the way in the back.

Are you appearing or are you just observing?

UNIDENTIFIED SPEAKER:  Not appearing --

THE COURT:  Of SLS?  All right.  Who do we have on the telephone?

AUTOMATED RECORDING:  All participants are now in interactive talk mode.

MR. MICHAELS:  This is Chris Michaels for Rembrandt

3D Holding, Limited.  I'm joined by Neil Wallace and the CEO of the company, Stephen Blumenthal.

THE COURT:  Okay.  So three people who are -- one -- two counsel, one representative; correct?

All right.  Who else is on the telephone?  I already have Mr. Fisher for the debtor.  Anyone else?

MR. FISHER:  Yes, Judge.  Thank you.  Judge, I can barely hear you.

THE COURT:  Can you hear me now?

MR. FISHER:  A little bit better.

THE COURT:  And who is this?

MR. FISHER:  Oh, this is Bennett Fisher.

THE COURT:  Okay.  Anyone else on the telephone?

MR. JACKSON:  Yes.  This is Troy Jack- --

THE COURT:  Okay.  Who do we have?

MR. JACKSON:  Troy Jackson.

THE COURT:  And, Mr. Jackson, you represent someone or what is your role in this?

MR. JACKSON:  I am the debtor.

UNIDENTIFIED SPEAKER:  Really?

THE COURT:  Do we have another matter?

COURT RECORDER:  This is the court recorder. Mr. Jackson, can you repeat that?  Did you say lender?

THE COURT:  He said debtor.

MR. JACKSON:  Debtor.

THE COURT:  What's --

COURT RECORDER:  Pro se?

THE COURT:  What case are you here for, Mr. Jackson?

MR. JACKSON:  23-11 -- 11377.

THE COURT:  And what time was your hearing scheduled for?

MR. JACKSON:  1:00.

THE COURT:  Are you in the right courtroom?  What judge are you before?

MR. JACKSON:  Madeline Coleman, I think it is.

THE COURT:  That's me but I don't have your case.

John, can we pull up the docket?  Who's your counsel?

MR. JACKSON:  I don't have a counsel.

THE COURT:  Okay.  And what is your -- what were you expecting to have a hearing on today?

MR. JACKSON:  They said that I had to have a 341 meeting.

THE COURT:  Oh, that's with the U.S. -- the Chapter 7 -- you have a Chapter 7?  That's a Chapter 7 trustee.  That's a different number that you need.

I don't -- do we know the numbers?  I don't --

MR. JACKSON:  No.  It's 13.

THE COURT:  It's a 13?  Okay.  So it's with a Chapter 13 trustee.

Do we have the information for the Chapter 13

trustee?

COURT RECORDER:  Hi, Mr. Jackson.  I think you should call -- do you have a pen there?

MR. JACKSON:  Yes, sir.

COURT RECORDER:  Try 877-462-5504.  And it's going --

MR. JACKSON:  5504?  5504?

COURT RECORDER:  Right.  And it's going to ask for a pass code.  4150081.

MR. JACKSON:  0081.  I have 877-462-5504, pass code of 4150081?

COURT RECORDER:  Correct.

MR. JACKSON:  Thank you, Your Honor, for your time. Sorry to be a bother.  I am out of the call.

THE COURT:  That's okay.  All right.  Thank you, Mr. Jason.  All right.

Anybody else on the phone?

MR. DEMARCO:  Yes, Your Honor.  This is Andrew Demarco, counsel for Rembrandt.

THE COURT:  Anyone else in connection with this matter on the telephone?  Is that everybody, John?  Okay.

All right.  Before we begin, I kept --

AUTOMATED RECORDING:  All participants are now in listen-only mode.

THE COURT:  There's a couple of, I'm not going to say housekeeping matters but two matters that I think I --

yesterday that we discussed and I want to go back to.  The first was the issue as to who was proceeding in terms of prosecuting the motions.

And I just want to explain why I was a bit confused.  Because typically when you file a motion, the party who files the motion prosecutes the motion.  And then anybody who is supporting that, then they do -- they'll participate.  Typically, the mover's counsel will go first, and then if there's any additional direct testimony that the party who's supporting, they will go forward.  So in this case you guys did it a little different and the moving party was not a party who was going forward with the evidence.  It was actually the party who was supporting the motion.  So that was a bit -- one of the reasons for my confusion as to who was representing who and how this matter was being prosecuted.

So that's simply like something that I should have been advised of because I was expecting the moving party to be the party prosecuting the motion.  Not saying that you can't do it the way you did it, but that explains the Court -- the bit of the confusion on the part of the Court as to who and how we were proceeding yesterday.

Now, there was also an evidentiary matter that I said I wanted to review and I probably would talk about today, and that was the issue of the admission of the transcript.  And if I recall correctly, there was a request that the transcript of

the hearing that was conducted in the Delaware court with respect to the motion to dismiss for bad faith the debtor's initial bankruptcy filing.  And I said that it was admissible as a -- on -- two exceptions that were articulated was that this was an exception on the 201, and it was, I think later, as a -- a public record.

Is that -- am I correct on the two bases that you said they were admissible, Counsel?

MR. COLBY:  Your Honor, I believe the second rule we cited was 803(6), which is a business record exception --

THE COURT:  Business record?

MR. COLBY:  -- would apply here.

THE COURT:  Okay.

MR. COLBY:  Yeah.  A record of a regularly-conducted activity.

THE COURT:  Well, I don't think so, but in any event, with respect to the Rule 201, I said that I would admit it and that it would be -- I would look at it simply as being filed on the docket and as being something that was on the record in that court.

And after review, I think -- my review of the case law, my ruling stands that it is admissible but only for the purpose of finding that it was on the docket and that -- it was on the docket and that it was filed, not for my ability to read the entire transcript, which I don't think is the purpose of Rule 201.

With that being said, Rule 201 -- and I'm going to make sure I'm citing to the correct rule because you said a business record and that's not a business record is -- is definitely not applicable to the Court, and it's intended to something else.  I thought you were referencing the 803 -- 803(8) as an exception, as the public records exception. I thought that's what you said but I guess I misunderstood.

But with respect to Rule 201 -- make sure I'm citing to the correct rule, because I have my own notes here. Judicial notice.  Judicial notice, I am allowed to take notice of, to accept a document as judicial notice when it -- it provides to the Court an understanding of the -- of the resolution, the status, and the disposition of a matter.  It does not allow me to go and read the underlying facts on how the Court came to that decision.

So with respect to the -- and more importantly, I'm not quite sure why I would read the entire thing in any event. The only thing that I need to know is what was the Court's ruling.  And I understand that the order that this was meant to -- I'm going to use the word "supplement," but the order in which the Court dismissed the case and granted the motion does not set forth the reason.

So I think the only thing -- the only thing that I could look at in the transcript of the hearing is the line where the judge says, I am dismissing it for bad faith.

Anything else I cannot.  And I will not.  So -- and more importantly, it serves no purpose.  It doesn't do anything because I still have to make my independent determination.  I also find it would be highly prejudicial.

And so for that reason, I will admit the transcript on the Rule 2 -- 201 and take judicial notice.

But, Counsel, you need to tell me the specific line in the transcript where the judge says, I'm dismissing it for bad faith.  That is it.  Because it -- it -- it tells the Court the status and the basis.  Other than that, I'm not reading it. I don't think I can.  I think it goes beyond judicial notice. So that's it.

Mr. -- anybody have any comment with respect to that?

MR. CAPONI:  Your Honor, it's not a comment on that issue but, Judge, the first issue about prosecution of the case, just -- Mr. Alexander and myself discussed so I want to make sure you're aware, Mr. Colby is going to finish with Mr. Stastney.  He'll be crossed.  And then Mr. Alexander's going to call Mr. Park as his witness.  So Mr. Park is up and down once.  He's going to put him up, I'm going to cross him, and then he'll be done.

THE COURT:  So are you going to call him as of cross?

MR. CAPONI:  Excuse me, Your Honor?

THE COURT:  You're not going to call Mr. Park as a cross?  You're going to have Mr. Alexander go forward with

his --

MR. CAPONI:  Yeah.  We listed him as a witness, but for efficiency purposes, we thought it made more sense for Mr. Alexander to put him up affirmatively, get out his background, and then we'll cross him.  So I just wanted to --

THE COURT:  Well, isn't there some assumption that you've made your case, and that's going to say that they did?

MR. ALEXANDER:  Well, we're not admitting that they made their case, Your Honor.

THE COURT:  Okay.  You just want to do it for efficiency purposes?

MR. CAPONI:  Yes.

MR. ALEXANDER:  Correct, Your Honor.

THE COURT:  Okay.  That's fine.

MR. ALEXANDER:  It's not going to affect the burden.  We're still going to move and say they didn't meet their burden.

THE COURT:  Of course you are.

MR. CAPONI:  That's just for efficiency but I want to let Your Honor know.

THE COURT:  Yeah, that's fine.  Because then if you did that, I would be wondering why we were doing it in that way.  As long as I know in advance on how we're proceeding, I think we won't waste an hour on my trying to understand why we're doing what we're doing.

But with respect to the transcript, I think this clarifies my -- because what I said was I'll have a judicial notice but I'm not reading it.  And I still stand by it.  I don't think that judicial notice -- it only allows me to take notice of what is the disposition status of a matter.  And in this case, it was dismissed on a motion for bad faith.  The Court issued that order.  And the only thing in that transcript that would help this Court, a certain status disposition or what occurred, is the Court's statement as to why it was dismissed.  Other than that, the rest, I don't think I can read or look at because that does not constitute judicial notice.  And I also think it's highly prejudicial.

So with that said, Counsel, you can -- and more importantly, I see this no different than if someone was offering deposition testimony.  You can't just say, here, read the deposition.  You have to tell me specifically what portion you want the Court to read.  I would never read an entire deposition.  And in the same vein, with respect to a transcript.  I mean, and there are some further cases that I was prepared to discuss, but they don't go through 803(6), and I don't think this meets the business record exception either.

Anybody have any comments?  Mr. Alexander?

MR. ALEXANDER:  My only comment, Your Honor, would be that prior -- we -- judicial notice, we're required the opportunity to see exactly what is being taken judicial notice

of.

THE COURT:  Yes.  And so am I.

MR. ALEXANDER:  And we would like to see it.

THE COURT:  Well, yes. They have to -- you know, I --

MR. ALEXANDER:  I'm reserving the right to say it might be outside and over the scope of what you're allowing so that's --

THE COURT:  Fine.  I'm looking for something that says I'm dismissing this for -- one line.  Dismissing this for bad faith and granting the motion.  More than that, I'm not looking at it.  And I want to be quite clear.  Unless it tells me the status, the scope, or what -- and what the disposition was, I am not -- I'm not going to look at anything else.

So, yes, not only that.  The rules say you're supposed to -- in judicial notice, you're supposed to give the Court a copy of what it is or some documentation of what it is that you want me to take judicial notice of.  I just don't go look for it.  And the case is pretty clear about that also.

So with respect to that, you will -- I will allow you to give me that portion.  Clearly, you have to share it with Mr. Alexander.  And if there is some dispute that it goes beyond what I'm allowed to, then I'll figure that out.  Okay?

MR. COLBY:  Understood.

MR. ALEXANDER:  No, I understand, Your Honor.  Thank you.

THE COURT:  I'm going to get that and then you're going to designate that as whatever, instead of the entire transcript, which you have designated as CR7 -- no, that's -- that's -- that's not 75.  That is --

MR. COLBY:  I believe the transcripts were 74 and 75.

THE COURT:  74 is the one we're talking about; correct?

MR. COLBY:  We moved -- we moved and your ruling yesterday applies to both 74 and 75.  One is the dismissal of the chapter 11 and 1 is the --

THE COURT:  Well, with respect to the 75, which is the involuntary --

MR. COLBY:  Yes.

THE COURT:  -- same thing.

MR. COLBY:  Same thing.

THE COURT:  The same thing.  And that's only -- I'm not even quite sure why I would, if there's an order dismissing or granting the motion to dismiss the involuntary.  I'm not reading anything with respect to the Court's rationale.  None of that is judicial notice.  So if you want to give me -- I mean, to the extent you aren't giving me the order that says which -- did you ask me to take judicial notice of the order dismissing the Chapter 7 case?

MR. COLBY:  We did.

THE COURT:  Then --

MR. COLBY:  22, I believe.

THE COURT:  Just a second.  Did we talk about 22?

COURT RECORDER:  CR22, Your Honor.

THE COURT:  All right.  And CR22, which we already talked about.  Did the court -- the court just said it's dismissed with prejudice.  I don't quite sure why I would even need the transcript on -- is it going to tell me something different than what you said here?

MR. COLBY:  Well, it's the same -- it's really the same situation as the voluntary position.  There's an order that says it's dismissed and then there is -- I think in each there's probably one line that would give you that rationale.

THE COURT:  Well, no, I don't think so.  Because the order dismissing the Chapter 11 said for the reasons stated on the record.  And that is why I think I need to go and look and say, well, what was stated on the record?

MR. COLBY:  Right.

THE COURT:  I'll take -- and it provides the Court with a -- more information with report to the -- unless you're telling me this is saying something different.

MR. COLBY:  In 22 --

THE COURT:  Uh-huh.

MR. COLBY:  -- the involuntary dismissal of the involuntary case --

THE COURT:  Uh-huh.

MR. COLBY:   -- it also says for the reasons set forth on the record by the Court on June 10th.

THE COURT:  Okay.

MR. COLBY:  So it's the same situation --

THE COURT:  And -- and unless she -- but it just says for bad faith.  Are you going to tell me it says bad faith in the same thing, in the same vein in that transcript?

MR. COLBY:  Yes.

THE COURT:  Okay.  Mr. Alexander?

MR. ALEXANDER:  Your Honor, I think the one line in the first transcript where the Court dismisses it, it says for reasons discussed, and then it just says the case is dismissed without prejudice.

THE COURT:  Well --

MR. ALEXANDER:  In the transcript.  That's what I'm saying.  Even -- that's with the transcripts.

THE COURT:  Well, if that's what the -- I don't know. I only want what she said.  I don't want any discussion.  It is what it is.  I don't -- I haven't looked at the transcript. I'm not about to go look at the transcript.  If they're going to say she says it's dismissed for bad faith, fine.  If she didn't -- I don't know how to get there without me --

MR. COLBY:  We'll find a very concise excerpt --

THE COURT:  Yes.  And when you share that with Mr. Alexander --

MR. COLBY:  We'll share it with Mr. Alexander.  We won't take up your time with it.

THE COURT:  Right.  But I want -- I want this -- because somebody's not going to like what I have said and they're likely going to appeal so I want to make this clear on what my rulings are, which are within the Court's discretion.  The only problem comes when you -- when you admit hearsay.  And at this point, you know, it's judicial -- it -- the only issue is judicial notice.  And since it's not 803, it's 803(6) business -- I don't think this even meets business records.  So I'm denying on that also.  And there's no hearsay issue, at least not in terms of what is being offered or what is -- what is the Court being asked to take judicial notice of.  Okay?

MR. COLBY:  Understood.

THE COURT:  Okay.  With that said, I think we left off with Mr. Stastney testifying.  And we're going to resume his testimony; correct?

MR. COLBY:  Correct.

THE COURT:  Okay.  Now we need to -- we need to remind him -- do we need to swear?  I don't think we released him.  We just said you remain under oath, don't discuss.

UNIDENTIFIED SPEAKER:  The --

THE COURT:  Okay.  All right.  I don't think we need to swear him back in because he was never released.  All right.

SHADRON STASTNEY, PREVIOUSLY SWORN

DIRECT EXAMINATION (RESUMED)

BY MR. COLBY:

Q    Good afternoon, Mr. Stastney.

A    Good afternoon.

Q    Before we pick up where we left off, I just want to go back over one thing that I -- that I think I missed.  Do you recall I had asked you about the form of Hawk's investments in Stream?

A    Yes.

Q    And you testified about the debt investments?

A    Yes.

Q    Was Hawk or is Hawk also -- let me start that over again. Did Hawk also make any equity investments in Stream?

A     I believe they also received equity with some of their investment.

Q    Okay.  Thank you.

          MR. COLBY:  A little more -- a little more cleanup just on the document side.  I'd like to take a look at -- this is a -- this is a -- it's a big, thick document.  I only want for a very limited purpose so I'll try to do this in as efficient a way as possible.  It's CR54.  It is the Hawk proof of claim.  I don't much care about the proof of claim component of it.

          THE COURT:  So --

MR. COLBY:  I just want to move it in for the -- it has the pledge agreements and the security agreements attached, and I just want to put those in.

THE COURT:  So you want --

MR. COLBY:  I'm going to ask Mr. -- yeah.  I'm just --

THE COURT:  So you're going to --

MR. COLBY:  -- road-mapping here.

THE COURT:  You're going to ask Mr. Stastney to look at that proof of claim?

MR. COLBY:  Correct.  Specifically at the attachment.

THE COURT:  All right.  Mr. -- you're looking puzzled.

MR. ALEXANDER:  Well, because Mr. Stastney didn't sign the proof of claim.

THE COURT:  Well, I think he wants him to look at the attachments to the proof of claim.

MR. ALEXANDER:  Correct -- specifically with respect to the documents and not the proof of claim itself.

MR. COLBY:  Yes.

THE COURT:  That's what he said.

MR. COLBY:  Just because it's an organized set of those -- of those agreements.

THE COURT:  As opposed to just pulling them out and separately marking them.

MR. COLBY:  Exactly.

MR. ALEXANDER:  So it's just going to be one composite exhibit?

THE COURT:  No.  He just wants to use as the exhibit to the proof of claim.

MR. COLBY:  Yeah.

MR. ALEXANDER:  I guess I'll see what you got -- so we want --

MR. COLBY:  Let's take a look at -- let's take a look at CR54.

THE COURT:  Okay.

MR. COLBY:  It's in its own binder.

THE COURT:  In its own --

MR. COLBY:  I've got a copy for you.

THE COURT:  Oh, okay.

MR. COLBY:  It's voluminous, Your Honor, which is why we didn't --

THE COURT:  Okay.  And so you only want Mr. Stastney to look at a certain portion of that proof of claim.

MR. COLBY:  Correct.

THE COURT:  Okay.  Okay.  Okay.  Do you have -- well, let's see.  I'm going to put it on here.  Hold on.

THE WITNESS:  You'll tell me when it's okay to look?

THE COURT:  Yes.

THE WITNESS:  Okay.

THE COURT: I'll tell you when it's okay to look.

CR54. So what I'm assuming is counsel could have just pulled all those documents out and attached them as --

MR. COLBY: Yeah.

THE COURT: -- instead of doing that, just use the proof of claim?

No. He can ask him if he seen them.

MR. COLBY: I -- I will.

THE COURT: Well, Mr. Alexander, you can -- I mean, I could say no and just pull them all apart.

MR. ALEXANDER: It has nothing to do with pulling them apart.

THE COURT: Okay.

MR. ALEXANDER: I'll reserve all my objections whether he's the appropriate witness to admit those documents.

THE COURT: Well, they're not -- yeah, those documents separately from the proof of claim. I don't think he wants the proof of claim. I think he wants to question him on the attachments to the proof of claim. And whatever you have with respect to his knowledge, ability, whatever, to authenticate, whatever, testify, all of those are the same.

So are they marked on this? How are we supposed to -- because this says proof of claim and there's a number of pages. So you need to direct him to what page --

MR. COLBY: I will.

THE COURT:  -- you are -- okay.  Let's proceed.

BY MR. COLBY:

Q    So, Mr. Stastney, using the page numbers at the -- at the top of the page, ones from the PACER docketing system, you see it says "Main Document"?  We're looking at the very first page.

A    I do.

Q    Okay.  And then if you flip forward about 15 pages, you get to Exhibit A?  You see that?

A    I do.

Q    Okay.  And so -- and Exhibit A -- and then there's Exhibit B --

THE COURT:  Wait a minute.  So Exhibit A -- can you just use page numbers, Counsel?

MR. COLBY:  Sure.

BY MR. COLBY:

Q    So Exhibit A is 256 pages?

THE COURT:  No.  Where on the top of this docket do you want him to go?  It's page 10 of 256.  Where do you want him to go?

MR. COLBY:  I'm on page 2 -- or page 1 of 256 right now.

THE COURT:  Okay.  You're on page 1, which is the -- okay.  Which is page 1 of 256.  Let me back up.  So the first is 15 of 15, and then Exhibit A starts at 1 of 256 --

MR. COLBY:  Correct.

THE COURT:  -- is where you are.

MR. COLBY:  Yeah.

BY MR. COLBY:

Q    And do you see, Mr. Stastney, this is a document titled "Promissory Note"?

A    I do.

Q    Okay.  And in the following 255 pages, if you just take a minute, take a look at these documents.  Tell me if you recognize what these are.

THE COURT:  Do you want him to flip through 255 pages?

MR. COLBY:  I'm trying to do is this as efficiently as possible --

THE COURT:  Counsel, how about we go from, you know, once -- I'm assuming there's some other documents other than the --

MR. COLBY:  Just for Your Honor's benefit so you know where we're going here and why I'm trying to do it this way, Exhibit A are all of the Hawk notes.

THE COURT:  All right.

MR. COLBY:  And so I'm just going to ask him to look, see if he recognizes them.

THE COURT:  Well, why don't we do them one by one, Counsel?  Because that's confusing to me.

MR. COLBY:  Well, there are -- if we're going to do

it that way, then maybe I'll come back and do this later in the day because there are, between the Hawk notes, the security agreements, and -- and pledge agreements, the SLS notes, SLS pledge agreements, SLS guarantees, SLS pledge agreements, it's quite a stack of documents.  So we can do them then as a group or we could do them individually.

THE COURT:  Or you can consult with counsel and decide whether you'll stipulate that these are the documents.

MR. COLBY:  Be happy to do that as well.

THE COURT:  Because unless they're contesting that these are the documents, I'm not quite sure why you guys can't stipulate --

MR. COLBY:  Your Honor -- Your Honor, yesterday the debtor objected to documents that the debtor filed so --

THE COURT:  So what does that have to do with anything?  It doesn't have to do with anything with respect --

MR. COLBY:  Okay.

THE COURT:  -- to these documents.

MR. COLBY:  We'll try and work that out and see if there's a more --

THE COURT:  Efficient way to do it.

MR. COLBY:   -- more efficient way to do it.

THE COURT:  Okay.

MR. COLBY:  Good.  Okay.

BY MR. COLBY:

Q    Now let's get going, Mr. Stastney.  When we left off

yesterday, I think we just talked about the court of chancery

having entered an order that -- that prevented the -- creditors

from exercising their creditors' rights for a period of ten

days.  Do you recall that point in time we were talking about?

A    I do.

Q    Okay.  All right.  Are you familiar with what the parties

have referred to as -- and just for the Court's benefit, remind

us all when that was, time period?

A    Approximately October 1st of 2022.

Q    Okay.  And are you familiar with what the parties have

referred to as the 225 action?

A    I am.

Q    Have you had a role in the 225 action?

A    Yes.

Q    What is your role?

A    I'm overseeing and managing that litigation on behalf of

SeeCubic.

Q    Okay.  And just remind us what you do in that capacity of

overseeing litigation?

A    Again, you know, selecting counsel, discussing and

selecting strategy, reviewing both pleadings and findings, and

generally monitoring the status of the --

Q    Okay.

A    -- of the action.

Q    And in that capacity, did you review the actions of the Court?

A    I did.

Q    Now, what is the 225 action?

A    The 225 action is a suit brought in Delaware chancery court by Hawk to clarify who the appropriate directors of Technovative, Inc. are.

Q    Okay.

          THE COURT:  To clarify what?

          THE WITNESS:  Who the appropriate directors.

          THE COURT:  Of who?

          THE WITNESS:  Technovative, Inc.

BY MR. COLBY:

Q    And why is the issue of who are the appropriate directors of Technovative important, if it is?

A    It's critical to being able to manage the subsidiaries beneath Technovative and to be able to continue to fund those subsidiaries.

Q    Okay.  I'll come back to that later, but for now, how -- do you have an understanding as to how there came to be a dispute about who was the appropriate director of Technovative?

A    Yes.

Q    How did that come about?

A    After the end of the non-action period that Judge Laster

ordered in around about October 15th, Hawk exercised its proxy rights under its notes, and Stream refused to recognize those rights to appoint the directors of Technovative and to have the shares registered in Hawk's name.

Q    Okay.

MR. ALEXANDER:  I'm going to object to lack of foundation and he's speaking on behalf of Hawk.

MR. COLBY:  We've been over this a number of times and the fact that Mr. Stastney has testified repeatedly about his role in supervising these litigations, which this is certainly a germane part of, and in enforcing the rights through the whole colloquy we had yesterday of in his position at SeeCubic of both Hawk and SLS.

THE COURT:  Well, he said Hawk, but at this point I don't know if Hawk is who.  Is Hawk his collateral agent?  Is Hawk it's on individual right which apparently being retained when they -- Hawks and SLS assigned their rights to SeeCubic?  What Hawks?  So it would be important to know --

MR. COLBY:  Sure.

THE COURT:  -- what Hawks so that Mr. Alexander's objection hat he's talking about Hawks, but what Hawk?  How does he --

MR. COLBY:  Sure.

THE COURT:  You need to file -- do a foundation as to who you're talking about.

MR. COLBY: Okay. I think, Your Honor, that objection though presumed we're just talking about familiarity with the underlying issue.

THE COURT: But he said he knew it in his capacity as the -- as -- actually, he said he was overseeing and managing the litigation selecting counsel. I don't think he said who he was doing it for.

UNIDENTIFIED SPEAKER: And, Your Honor, the objection related to actions that happened prior to any litigation because he asked what happened and how the litigation started in the first place. So it wasn't related to the litigation. It was prelitigation.

THE COURT: So you need just -- I'll sustain. You need to give me a better foundation.

BY MR. COLBY:

Q   Sure. Mr. Stastney, were you personally involved in the issue regarding who's the appropriate director of Technovative prior to the litigation actually being filed?

A   Yes.

Q   How were you involved?

A   As my role as chairman and CEO of SeeCubic I was working with Hawk as collateral agent to ensure that the assets of SeeCubic, Inc., which include the Hawk debt, were adequately protected.

Q   How else are you involved, if at all?

A    I've been involved with the reviewing all of the filings, preparing facts as necessary, strategy.  I was involved with pleadings, filings, decisions.

Q    Okay.  Prior to the litigation being filed though, did you have any involvement in the issue of who was on the board or who should be on the board of Technovative?

A    Yes.  I was the director that was proposed and accepted by Hawk to be the director of Technovative.

Q    Okay.  And in the course of both your role at SeeCubic and potentially being the director of Hawk were you involved in -- were you personally involved in the means by which Hawk attempted to appoint you to be the director of Technovative?

A    Yes, I was.

          MR. ALEXANDER:  Your Honor.

          MR. COLBY:  Personally involved.

          MR. ALEXANDER:  I'm going to object.  I think he's leading him through every single one of these questions in trying to get to where he wants.

          MR. COLBY:  Were you involved?  How were you involved?

          MR. ALEXANDER:  Another question.

          MR. COLBY:  He said he was involved.

          THE COURT:  Counsel, I mean -- Counsel, yes, they're leading, but he's going to get to the answers.  Just --

          MR. ALEXANDER:  Maybe.

THE COURT:  All right.  Well --

MR. ALEXANDER:  No object -- I withdraw the objection.

THE COURT:  All right.  But no leading questions. Come on.  All right.

BY MR. COLBY:

Q    Mr. Stastney, based on that familiarity -- based on -- sorry.  Based on that involvement, are you familiar with the series of events that led to the 225 action being filed?

A    Yes, I am.

Q    Please tell us what those were.

A    The 225 action followed the period of time that we previously discussed, which where V.C. Laster had required that Stream be given outright ownership all of the shares of Technovative and all of the property underlying Technovative required that the secured creditors not be allowed to exercise any of their rights.  And upon the end of that period they said that the secured creditors would be allowed to exercise that right.

Q    Okay.  And what happened at the end of that period?

A    The secured creditors exercised their rights including the proxy rights held originally by Hawk, exercised by Hawk as collateral agent to name the board of Technovative and to have the shares of Technovative registered in its name.

Q    Okay.  The proxy right, where does that exist?  Where does

it come from?

A    In many of the security agreements that Hawk has underlying its debt listing.

Q    Okay.  If you could take a look at Volume 1 of your exhibit book.  And yeah.  If I might, Your Honor, I'm just going to take back this proof of claim and all this other stuff and just get it out of his way so we can --

THE COURT:  Yeah.  Well, I was having trouble trying to figure out where I was putting.  It went over there.

MR. COLBY:  I can take yours too.

THE COURT:  No.  It's over there.  It's out of the way.

BY MR. COLBY:

Q    All right.  So Volume 1, I think right in the front there is an exhibit labeled 16-6.

THE COURT:  Hold on.  Volume 1.  Wait a minute.  All right.

MR. COLBY:  It's the very first tab, Your Honor.

THE COURT:  All right.  DI66.

MR. COLBY:  Correct.

THE COURT:  All right.

BY MR. COLBY:

Q    Mr. Stastney, can you take a look at --

THE COURT:  And that is Exhibit Number what?

MR. COLBY:  Well, it's from the docket, Your Honor.

34

And we didn't specifically put exhibit numbers on all the docket entries.  We identified them categorically on our list, so it's identified as docket entry 16-6, but it's not -- it doesn't have a separate exhibit number.  So I would --

THE COURT:  So how are we going to keep this straight for the record?

MR. COLBY:  We --

THE COURT:  Because all the docket entries are going to just be docket entries?  A docket -- I?  What's the I for?

MR. COLBY:  Okay.  So we could give it a new exhibit number, 154, which I believe is unused.

THE COURT:  All right.  So John is giving 154 is going to be comprised of certain docket entries.  Okay.

MR. COLBY:  Yeah.

THE COURT:  And that would be using CR 154?

MR. COLBY:  Yes, Your Honor.

THE COURT:  154.  I'm listing a group of docket entries.  Okay.  And now, one of those items on the CR 154 is docket entry 16-6.  Okay.  Let me make sure because apparently and I missed it yesterday when I thought I heard Mr. Stastney say that the contributions were one million, one million, apparently I heard wrong because he said three.  I wrote down the wrong thing, so I want to make sure I'm not doing that today.  16-6, Counsel?

MR. COLBY:  Correct, Your Honor.

THE COURT:  All right.  Which has an Exhibit in front of it, but I'll --

MR. COLBY:  Yeah.  On the docket it is an exhibit too.

THE COURT:  Okay.  That's fine.

BY MR. COLBY:

Q    Mr. Stastney, if you go to page 2, do you recognize that document?

A    I do.

Q    How do you recognize it?

A    Both in my role as CFO of Stream and in my role as CEO of SeeCubic, it was relevant information.  With Stream, it was an obligation of Stream.  With SeeCubic, it was one of the assets that SeeCubic owned.

Q    Okay. And what is the document that the -- the document that begins at page 2?

A    It's the promissory note for six million British pounds payable from Stream TV Networks to Hawk Investment Holdings, Ltd.

Q    Okay. And if you go to page -- if you go to page 23, do you recognize this document?

A    I do.

Q    How do you recognize it?

A    Well, my role as CFO of Stream it represented an obligation of Stream, and in my role as CEO so SeeCubic, it

represented an asset of SeeCubic.

Q    Okay.  And what is the document that begins on page 23?

A    This is the security agreement between Stream TV Networks and Hawk Investment Holdings providing security with respect to the six million British pound note.

Q    Okay.  And take a look at page 33.  Do you recognize that document?

A    I do.

Q    On what basis?

A    Both in my role as CFO of Stream TV Networks and in my role as CEO of SeeCubic, it represented either an obligation for Stream or an asset for SeeCubic.

Q    Okay.  And what's the document that begins at page 33 of Exhibit 154?

A    This is a pledge agreement pledging the shares of certain company stocks to Hawk by Stream in support of the six million British pound note.

Q    Okay.  Which company's stock?

A    So Stream TV Networks here is pledging the stocks of Technovative Media, Inc., a Delaware corporation, Alter D Ventures CD (phonetic), ACD under the laws of the Netherlands, Alter D Cooperative UA, a UA under the laws of the Netherlands.

Q    Okay.  And at the end of the day yesterday we have a conversation about sort of the corporate structure.  And it might be helpful for the Court if you could just place those

entities in the context of that discussion that was had yesterday afternoon.

A    Sure.  So Technovative is the top level subsidiary of Stream and --

THE COURT:  Hold on.  Let me get to the next page. Just hold on one second.

THE WITNESS:  Okay.

THE COURT:  Okay.  Okay.  Go ahead.

BY MR. COLBY:

Q    Go ahead, Mr. Stastney.

A    Yeah.  Technovative is a top level subsidiary underneath Stream.   And Alter D and Alter D Cooperative are subsidiaries under Technovative.

Q    Okay.  These documents, these agreements that we looked at, are they the only such agreements that exist between Hawk and Stream?

A    No, they are not.

Q    Okay.  This is an example?

A    This is an example of the roughly 18 notes and attached agreements between Hawk and Stream.

Q    Okay.  All right.  If you could then take a look at the pledge agreement, so the agreement that pledges the stock, a few minutes ago when you were describing the genesis of the 225 action you referred to a proxy right.

A    Correct.

Q     Does that exist anywhere in this document?

A     Yes, it does.

Q     Show us where it is.

A     I believe that's -- the rights and remedies of Hawk are listed in paragraphs six and seven.

Q     Okay.  And can you just identify for us what -- where in there, if there's a specific portion that contains the proxy right you described?

THE COURT:  Well, could you give us a page number?

MR. COLBY:  Sure.  Yeah.  So we're at paragraph --

THE COURT:  What page number?

MR. COLBY:  Thirty-five.

THE COURT:  Page 35 of 41 and you're talking about paragraphs 6 and 7?

THE WITNESS:  I'm sorry, five, six, and seven.  My apologies.

THE COURT:  Okay.

BY MR. COLBY:

Q     Okay.  And if you could just point us to the language you referred to as proxy right.

A     The proxy rights of Hawk exist in -- the proxy right is in paragraph six, I believe.

Q     Okay.  Where?  Well, what's the key language?

A     The first -- in lines 3 and 4, may I read here?

THE COURT:  Yeah.  Okay.

THE WITNESS:  If an event of default shall occur and be continuing subject to the right of the SLS, Hawk shall have the right to have any or all shares of pledged interests registered in its name or the name of its nominee and Hawk or its nominee may thereafter exercise all voting, related, and other rights pertaining to such pledged interest at any meeting of members or shareholders of an issuer or otherwise.

BY MR. COLBY:

Q    Okay.  It goes on.

A    It goes on.

Q    We won't make you read the whole thing.  Okay.  So just tell us -- okay.  So just tell us how that language fit into the genesis of the dispute that became the 225 action.

A    Of course.  After the expiration of the non-action period that Judge Laster had ordered with respect to the secured creditors, the Hawk, as collateral agent, exercised its right to re-register the shares in its name and take those voting interests.

Q    Which shares?

A    The shares of Technovative, Inc.  And named me as director.

Q    Okay.  Did Hawk take title, ownership, of the shares?

A    Hawk did take title.

Q    I'm sorry.  I could hear.

A    Hawk did take title to the shares.

Q    Title to the shares?

A    It provided notice that it was taking title to the shares.

Q    Okay.  Sorry, just to clarify.  Title or voting?

A    I believe it -- I'm sorry.  Not title.  Voting and registration, yes.

Q    Okay.  Okay.  And what did it do with those voting rights?

A    It passed a motion as 100 percent owner to name me as -- to remove Matthew as director and name me as director.

Q    Okay.  Okay.  If you could look at volume two of your exhibits, and in particular, CR-11.  And there's one page. It's just a cover page.  This is the 225 action, but really I'm using -- just want you to look at the exhibit that is contained at CR-11, what was an attachment to that complaint.  And it's a letter dated October 17, 2022.  Do you see that?

A    I do.

Q    Okay.  Do you recognize that document?

A    I do.

Q    What's the basis of your familiarity with it?

A    I was provided a copy of this document by Albany Trustees who filed it on behalf of Hawk Investment Holdings.

Q    Okay.

        MR. COLBY:  I would move to admit CR-11, the excerpt, CR-11.

        THE COURT:  The whole letter?

        MR. COLBY:  Yes.

THE COURT:  Oh, wait a minute.  You mean the first page, the entire portion with the --

MR. COLBY:  Yeah.

THE COURT:  -- amended complaint --

MR. COLBY:  The letter.

THE COURT:  -- the cover sheet and the letter?

MR. COLBY:  Yep.  And the --

THE COURT:  And there's also --

MR. COLBY:  There's an attachment, a written consent, that was sent with the letter.

MR. ALEXANDER:  Your Honor, I'm not following all the documents that he says are in CR-11.

THE COURT:  He said in CR-11, one is the cover sheet of the first page of the verified complaint that was filed for the 225 action.  The second page is a letter dated October 17 that included in the letter, my understanding that the letter was a written consent -- I'll just shorten it.  And attached with the letter was also written consent.  That's it.  Written consent executed by Philip Hot Roscoman (phonetic).  I don't know what that is.  For Albany directors, limited sole director.

MR. ALEXANDER:  But they're -- are they trying to admit the first page?  I don't have a --

THE COURT:  That's what I was like what do we need the first part?

MR. COLBY:  Yeah.  I'm happy to take the first page right out and just admit -- seek to admit the letter and the written consent, October 17, 2022 letter from -- to Stream TV and Technovative from Hawk Investment Holdings, and then the written consent that was included with the letter.

THE COURT:  All right.  So the letter and its attachments.

MR. COLBY:  Yeah.  That's the easiest way to do it.

THE COURT:  Okay.

MR. ALEXANDER:  And I think that's clear, right.  I don't think that's --

THE COURT:  Okay.  Letter to Stream and attachment with attached consent.  Okay.  All right.  He said he doesn't object to the admission of CR-11 --

MR. COLBY:  Thank you.

THE COURT:  And CR-11 is admitted.

     (Plaintiff's Exhibit CR-11 admitted into evidence)

MR. COLBY:  Thank you.

BY MR. COLBY:

Q    So, Mr. Stastney, just in plain English, what is this?
What are these two documents in CR-11?

A    These documents are Hawk -- Hawk's exercise of that proxy right.

Q    Uh-huh.

A    And notification to Stream TV Networks that they are

exercising their proxy right.

Q    Okay.  And what's the consent that's included?

A    The consent is the written action that I referred to earlier of sole shareholder by which they removed Matthew Rajan as a director and named me as a director of Technovative.

Q    Okay.  And just point us to where you were named as a director of Technovative.

A    Sure.  It is on the first page of the written consent, paragraph Roman numeral II, removal and election of directors.

THE COURT:  Counsel, hold on one second.

MR. COLBY:  Yep.

THE COURT:  All right.  So you said that in the consent is where, Counsel?  What page?  I mean, what paragraph?

THE WITNESS:  Paragraph II, Roman numeral II.

THE COURT:  Roman numeral II, label removal and election, correct?

THE WITNESS:  Correct.

THE COURT:  Okay.

BY MR. COLBY:

Q    Okay.  So, Mr. Stastney, what happened, if anything, after Hawk sent this notice and the written consent?

A    I believe Stream refused to acknowledge it.

Q    Okay.  And what, if anything, happened after that?

A    Hawk filed, as collateral agent, filed the 225 action.

Q    Okay.

A    To enforce.

Q    Okay.  As of the filing of the 225 action, or really, as of the October 17th letter, who do you believe comprised the board of Technovative?

A    I believe I do.

Q    Is it significant in any way who is the director of Technovative?

A    It is, very.

Q    How so?

A    The director of Technovative, because of where it sits in the structure of the subsidiaries at the top is therefore allowed to name the directors of all the lower level subsidiaries.  And that is critical for management of those businesses to preserve the collateral, and almost more importantly, funding of those businesses to preserve the value.

Q    Okay.  You said management.  It's important because of management of subsidiaries and preserving the collateral.  Could you explain a little more what you mean by that?

A    Of course.  In order -- this business is a non-revenue producing operating business.  There are things that need to be done in order to preserve the value.  It's fortunately or unfortunately not a gold mine where you can just lock the doors.  It is a business.  It has to keep running to preserve its value and it has to keep running productively where things that are getting done are things that need to get done to move

45

the process forward of commercializing the technology. That has to continue if there's going to be any value retained in the subsidiary.

Q   Okay. And you referenced funding. What are you referring to there?

A   Unless there is clarity over the management of the business, who was in charge and what's being done, it will be impossible to get investors, lenders, to put money into the company to enable it to do the things that I just listed.

Q   Okay. Why is that?

A   Because no investor is going to invest in a company where they don't know who's in charge and don't know how the money is going to be spent.

Q   Is the issue of who's on the board relevant to funding in any other way?

A   Well, that's essentially -- it's in order to just simply authorize the documents for funding, they --

Q   They do that?

A   Any investor or lender is going to require as a condition to closing that there's someone authorized by the entity to sign the documents or agree to repay or issue the stock.

Q   Okay.

A   And if that's not true, they won't fund.

Q   Okay. Okay. How long has the 225 action been pending?

A   Since shortly after October 17, 2022.

Q    So about nine months?

A    Correct.

Q    All right.  Has it been costly to litigate?

A    Very.  No offense.

Q    If we could take a look, please, at CR-6, which is an already admitted exhibit.  It's in volume 1 of your binder. And it's the docket from the Chancery Court 225 action.

THE COURT:  CR what, Counsel?

MR. COLBY:  Six.

THE COURT:  For --

MR. COLBY:  Volume 1.  I'm sorry.  I switched you back to volume 1, Your Honor, and I failed to mention that. We're going back to volume 1.

THE COURT:  Volume 1.

THE WITNESS:  You said CR-6?

MR. COLBY:  Correct.

THE COURT:  CR-6, okay.

BY MR. COLBY:

Q    Are you there, Mr. Stastney?

A    I am.

Q    Okay.  And if you could just take a look at that.  It goes in reverse chronological order, but if you go down to the third page.

A    Okay.

Q    Do you see the entries on March 12th?

A     I do.

Q     What event do those represent?

A     Those represented the pretrial briefing by the parties.

Q     Okay.  So a 225 action pretrial briefing, March 12, 2023?

A     That's correct.

Q     Okay.  And based on your involvement in the 225 action that you previously testified about, do you recall at what stage the action was when the debtors here filed for bankruptcy?

A     Yes.

Q     What stage was it?

A     It was fully briefed.  There had been an agreement as to the form of the hearing that was going to take place, and that hearing was scheduled for March 23rd.

Q     Okay.  Were there any other proceedings that were to take place prior to -- from the pretrial briefs to when the hearing was supposed to take place on March 23rd?

A     Not that I'm aware of.

Q     And what is your understanding of what was to occur on March 23rd?

A     The final topics to be decided were to be argued in front of Vice-Chancellor Lassiter.

Q     Do you recall what form that proceeding was supposed to be?

A     I believe it was going to be an oral argument on the

papers.

Q    If you could flip to the next tab in the same binder, CR-7.  This one was also already admitted yesterday.  And it's the pretrial order in the 225 action.

MR. ALEXANDER:  Your Honor, I --

MR. COLBY:  Do you recognize this document?

THE COURT:  I don't --

MR. ALEXANDER:  I don't remember this being --

THE COURT:  I don't remember CR-7.

UNIDENTIFIED SPEAKER:  Yeah.  We talked about it earlier.

THE COURT:  We talked about it.  Was it admitted?

UNIDENTIFIED SPEAKER:  As judicial -- I mean --

THE COURT:  Well, let me go back to my notes.  Let me go back to my notes.  I don't recognize it, but that doesn't mean anything.

MR. COLBY:  We didn't spend a lot of time on it.

THE COURT:  No.  You said -- no.  This is what you said -- then you say Exhibit CR-3 was collateral estoppel and then CR-6 was the 225 docket.  And then CR-7 was the pretrial order.  And then CR-144 and 146.  And I think we definitely admitted CR-3.  I said CR-6 was admissible.  Let me go back to when you talked about it.  I think I started talking about what we were going to admit.  I've got my days all mixed up here.  Wasn't that one of the things we talked about?  Either because

I started off saying, okay, I was a little annoyed about some things and we started talking about what we were going to admit, Mr. Alexander, and I think we got hung up on that judicial notice for the transcript, I think, as well.  Proof of claim.  No, that was -- wait.

MR. ALEXANDER:  Your Honor, it was -- if it was admitted, it was for judicial notice purposes only, so the --

THE COURT:  Right.

MR. ALEXANDER:  -- witness shouldn't be reading from the document.

MR. COLBY:  Well, I mean it's --

MR. ALEXANDER:  He needs to have the Defendant testimony.

MR. COLBY:  Okay.  So we --

THE COURT:  So it was admitted under judicial notice, right?

MR. COLBY:  Okay.  I'm happy to lay a foundation and seek further admission.

BY MR. COLBY:

Q    Mr. Stastney, do you recognize this document?

A    I do.

Q    Have you --

THE COURT:  Wait a minute.

MR. COLBY:  Okay.

THE COURT:  Let me go back because now I'm looking at

my notes and why don't I have notes from yesterday about when we talked about what we were going to admit because they must be out of order or something.  And, John, you have that yesterday we talked about that yesterday, right?  About particular certain items that I wasn't --

UNIDENTIFIED SPEAKER:  I wrote the same numbers down. I don't have --

THE COURT:  Right.  We had CR-3 was collateral estoppel.  CR-6 was 225.  CR-7 was a pretrial and then the two proofs of claim and then the monthly operating reports.  So they were all under judicial notice, correct?

MR. COLBY:  Correct, Your Honor.

THE COURT:  And that was with Mr. Caponi, right?

MR. COLBY:  Yeah.  And I'm happy to --

THE COURT:  Right.

MR. COLBY:  -- lay additional foundation and offer you additional basis for admission.

THE COURT:  Okay.  Hold on.

MR. COLBY:  Okay.  So, Mr. Stastney --

THE COURT:  Wait, Counsel.  So CR-6, which was the 225 litigation which we already talked about was admitted for judicial notice, Mr. Alexander, and he already testified regarding that, but it was only --

MR. ALEXANDER:  I'm saying it was admitted for judicial notice purposes, but that doesn't mean the witness

gets to review it and testify from the document.

THE COURT:  We already did, I'm saying with respect to CR-6 --

MR. COLBY:  CR-6 was just the docket.

MR. ALEXANDER:  CR-6 was the docket.

THE COURT:  Five was again --

MR. COLBY:  Right.

THE COURT:  Right.  When he --

MR. ALEXANDER:  So he just read something that was listed on the docket.  There's no facts on there.

MR. COLBY:  That's a fact.

THE COURT:  Okay.  Okay.  So never mind.

MR. COLBY:  I asked him if he was familiar with the document.

MR. ALEXANDER:  All right.  Your Honor, I haven't laid an objection, so I'm asserting to the -- I mean, to the extent he's trying to testify that something in this document should be factual to --

THE COURT:  With respect to CR-6, he already said that something in the docket was factual.

MR. ALEXANDER:  He said that what was an entry on there exists as an entry.

THE COURT:  Okay.  And you're saying that you don't have any objection to him reading what was on the docket?

MR. COLBY:  Yeah.

THE COURT:  Okay.

MR. COLBY:  I guess it would be helpful to know if there is a genuine objection to the fact that briefs were filed in another case?  Is that what we have an objection to?

THE COURT:  Counsel, don't use the word genuine.  You guys all try to flavor it.  Don't do that.  He has an objection to the fact that Mr. Stastney read the docket that there was briefs filed on the 12th of -- on March 12th, and that there was a hearing scheduled for March 23rd.  And no other actions were pending based on what was -- I don't know if that was on his --

MR. ALEXANDER:  So I don't agree.  Yes, I do have an objection to all of that.  Was there a hearing scheduled for the 23rd?  We don't object to that.

THE COURT:  Okay.  And you don't object to the pretrial briefs being filed?

MR. ALEXANDER:  Well, we -- no.  Well, some briefs were filed, but we object.  I mean, he can testify to that, but I'm not --

THE COURT:  Well, you testified that --

MR. ALEXANDER:  -- stipulating that that's a fact, that it was completed briefing because we dispute that.

THE COURT:  All right.  So he's -- this is the problem we have.  He's testifying regarding the docket, okay.

MR. ALEXANDER:  I don't have an issue with the

docket.

THE COURT:  Right.  But he also testified that there was nothing else pending.

MR. ALEXANDER:  That's his opinion.

THE COURT:  Okay.  And you're not objecting to the --

MR. ALEXANDER:  And if that's what he believes, no, I'm not objecting to what he believes.

THE COURT:  Okay.

MR. ALEXANDER:  But I don't think he can review a document and then testify from the document and from an evidentiary standpoint to put facts in the record.

THE COURT:  Okay.  So you're -- you're not objecting to his reading the docket and what it says?

MR. ALEXANDER:  The dockets.

THE COURT:  Yes.  And he also testified that there was no other action pending.

MR. ALEXANDER:  That's his belief.  That's fine.

THE COURT:  Okay.

MR. ALEXANDER:  I mean, we dispute that.

THE COURT:  Okay.

MR. ALEXANDER:  But that's his belief.

THE COURT:  Okay.  But that's separate and apart from his testimony regarding what's on the docket, his belief.

MR. ALEXANDER:  Yeah.  But I can't control that part.

THE COURT:  I know that, Counsel.

MR. ALEXANDER:  But I'm saying his testimony cannot be instructed or directed by this document.

THE COURT:  I get that, Counsel.  What I'm trying to figure out is that now we're at the pretrial order and you're saying you're objecting to the pretrial order on what basis?

MR. ALEXANDER:  The pretrial order is hearsay.

MR. COLBY:  It's signed by the counsel for the debtor, Your Honor.

THE COURT:  Well, I took judicial notice of it, did I not?

MR. ALEXANDER:  You did.

THE COURT:  And all I can say it's okay it's on the -- again, I can take it for status purpose, whatever.  What do you -- what's your objections?  One, it's judicial notice.  He's already testified, I guess, how he knew about it.  So you're not objecting on the basis that he has knowledge of the pretrial order.  You're objecting on the basis that it's hearsay.  It's been --

MR. ALEXANDER:  Well, the pretrial order, it depends on how he's trying to use it.

THE COURT:  Okay.

MR. ALEXANDER:  To make it hearsay.

THE COURT:  Okay.  I can take judicial notice of things on the docket and what they say.  That's it.  Is that your position, that that's all I can do with it and if they're

55

trying to read something else or say something else or whatever other than strictly what it's saying that he can't testify about it? I'm not --

MR. ALEXANDER: He can testify from his knowledge, what he believes it is, but this document was admitted solely for judicial notice.

THE COURT: Okay.

MR. ALEXANDER: So why are we going through it again?

THE COURT: All right. So Mr. Counsel for SeeCubic. I'm getting the names messed up here.

MR. COLBY: It's okay. I'm Colby.

THE COURT: I was going to say Mr. Molby, but it's Colby.

MR. COLBY: Yeah. That's all right.

THE COURT: His objection is that this is -- it's only admitted for the purpose of judicial notice and that that is the -- that's a different purpose, and that to the extent he's going to -- Mr. Stastney is going to testify regarding the contents of what it says is hearsay. Now, you can have, and I have had in some of the cases, a case I was actually going to talk about, but it was unrelated because we didn't go under the 8036. We went on the 8, business records, that those things can be hearsay. That counts as --

MR. COLBY: Yeah.

THE COURT: -- matters in a judicial notice --

documents that can be admitted under judicial notice, just because they're admitted under that does not necessarily satisfy the hearsay rule.

MR. COLBY:  Yeah.  And so I've got a couple of basis, I think.

THE COURT:  Okay.

MR. COLBY:  And I will just make a brief proffer to the extent that it can help mitigate some of the objections. The brief proffer is I simply want to establish the timing and status of the 225 action and, you know, the timing and status of case events.  So I think it's admissible under the judicial notice rule for those purposes.  And I'm happy to provide case citation for that.  Additionally --

THE COURT:  Uh-huh.

MR. COLBY:  -- the pretrial order is not hearsay because it is an opposing party's statement.  It's being offered against Stream TV.  It was made by Stream TV and by a person authorized to make a statement on the subject.  It was signed by Stream TV's lawyers.  And so, therefore, that statement is not hearsay.  That falls under 801(d)(2). Statements that are not hearsay and opposing party statements. It's signed by Stephanie Dallaire, counsel for Stream TV Networks.  And I'm simply want to use it to establish --

THE COURT:  Wait a minute.  Where is it signed? What --

MR. COLBY:  Page 25.

THE COURT:  Oh, 25.  All right, Mr. -- wait.  Is that the two basis?  You're saying one is the established timing and status?

MR. COLBY:  Correct.

THE COURT:  And events in the case.  And that it's not -- to the extent that it doesn't satisfy, assuming that it does satisfy the judicial -- which I already said I'll take judicial notice, that notwithstanding, if the contents are not hearsay because the document itself was signed by counsel for the party for whom it's being offered against.

MR. COLBY:  Correct.

THE COURT:  It's a party statement.  All right, Mr. Alexander.  He said he only wants to use it for the time, timing and status of the case, which you're allowed to do under judicial --

MR. ALEXANDER:  Yeah, but that --

THE COURT:  Okay.  But now we're talking about --

MR. ALEXANDER:  Objection to using it for just advising, but I mean to the extent they're trying to use any statement in there against Stream, I don't believe they are all statements against Stream because it --

THE COURT:  Okay.

MR. ALEXANDER:  They're not.  I mean, there's disputed issues in here.

MR. COLBY:  Which if I were to be using it for that purpose, and I'm not --

MR. ALEXANDER:  Okay.

MR. COLBY:  -- it would be a statement that there are disputed issues.  We're not trying to establish that we win on whatever those disputed issues were.  It would be helpful to move this proceeding along if the objections were lodged against how I was actually going to be using a document, not on speculation or not knowing how it may possibly be.

THE COURT:  Well, it's not about that.  He's objecting on the grounds that this was only admitted on judicial notice and that discussing and asking Mr. Stastney questions about the content is hearsay.  I'm on -- I don't think that that --

MR. COLBY:  Can I --

THE COURT:  -- that that's speculation.  That's -- I think it's hearsay.

MR. COLBY:  But because it's signed by Stream TV --

THE COURT:  But that's your response, Counsel.  He's allowed to raise his objection the same way you're allowed to respond.  Again, I don't know what the -- you know, whatever you guys, you know, leave that outside, please.  I don't -- that doesn't do anything for me where people get snarky with each other and that's what I see is going on.  That just --

MR. COLBY:  Apologies, Your Honor.

THE COURT: You saw my temper yesterday. I have a temper. I try to keep it under control. Yesterday I didn't do too good a job. And the Court often sometimes the same way will kind of think ahead and I'm trying not to do that, to suggest what he's trying to do. But I do some time, I mean, I -- this isn't my first go at this, okay.

All right. So, Mr. Alexander, you had said that, yes, this is judicial notice, but Mr. Colby's response was that this is only as to the timing and the status, which is allowed on the judicial notice. And even if it isn't, and even if it satisfy and it -- even judicial notice does not in and of itself say that everything contained in it may not be hearsay. He's saying it's not hearsay because it was signed by Stream's representative and that when they signed this they -- whatever is in here, they -- it's a statement by them, by Stream, okay. That's his response.

What are -- your response is what? I think with respect to timing, status of case, okay --

MR. ALEXANDER: I don't have any further response, Your Honor.

THE COURT: Okay. Well, I'm going to overrule the objection. Go ahead.

MR. COLBY: Thank you. Thank you, Your Honor.

BY MR. COLBY:

Q   And really just in addition to, we'll look at two things,

Mr. Stastney.  Let's go to page 24.  Do you see the section, estimated length of trial?

A    I do.

Q    What's that?

A    That is the agreement on how long the parties expect the trial to last.

Q    Okay.  Thank you.  And do you see on the next page, the section titled pretrial conference?

A    I do.

Q    What's that?

A    That is a statement that the pretrial conference has been scheduled for March 16, 2023.

Q    Okay.  And do you recall the date that the debtor filed here -- debtor here filed for bankruptcy?

A    March 15, 2023.

Q    Okay.  Okay.  And do you recall whether or not the parties had reached an agreement -- sorry.  I believe I had already testified that the parties had reached -- let me take that -- let me start that all over again.  I believe you testified a few minutes ago that that hearing in the Chancery Court was to be argued on the papers, no live witnesses.  Do you recall that?

A    I do.

Q    And do you recall how it came to be that that was the way that hearing was going to go?

A     I believe it was by agreement between the parties.

Q     Okay.  All right.  To your knowledge, Mr. Stastney, had the Court of Chancery issued any rulings in this 225 action before the scheduled trial?

A     Yes, it had.

Q     What rulings do you recall?

A     I recall an initial ruling around matters that were subject to collateral estoppel, a ruling to a challenge by the -- by Stream TV to that ruling, and a ruling on issues of standing.

Q     Okay.  If you could take a look at CR-3 in your volume 1 binder, please.

          THE COURT:  Am I in volume 1?  Okay.  And you're looking for CR-3.  Okay.

          MR. COLBY:  Correct.

BY MR. COLBY:

Q     Do you recognize this document, Mr. Stastney?

A     I do.

Q     What is it?

A     It's a memorandum opinion issued by Vice-Chancellor Laster in the 225 action.

Q     How are you familiar with it?

A     Both received copies from counsel in my role overseeing litigation and I believe it was available on PACER Monitor as well.

Q   Okay.  And you referenced that an issue here, collateral estoppel.  Do you recall what the factors were that the Court concluded Stream TV was collaterally estopped from relitigating in the 225 action?

MR. ALEXANDER:  Your Honor, I'm going to object. He's trying to get into the opinion of a court.  The opinion itself is not evidence.

MR. COLBY:  I'm asking if Mr. Stastney recalled and I believe this is another judicial notice issue that we've already addressed yesterday.

MR. ALEXANDER:  We didn't address judicial notice of this document.

THE COURT:  We didn't address this one.

MR. COLBY:  Not the particular document, but it --

THE COURT:  Right.  But I don't know of -- this is an unpublished opinion right at the top, unpublished opinion, so I don't know what an unpublished opinion is supposed to mean in terms of judicial notice.  I can notice it was issued, but again, do you think I'm reading that?  I don't think you get a -- I'm not quite sure how that goes to the -- I can read it and say at the end, what did he say at the end, that what?

MR. ALEXANDER:  This is a non-final order too, Your Honor.

MR. COLBY:  Well, it is what it is and that's also what I'm trying to establish.

THE COURT:  Well, you're trying to establish and you want him to testify.  You're doing more than that.  You're asking him to look at this document and then asking him what it is and then saying, "Do you recall?"  Does he recall from the document or does he recall --

MR. COLBY:  No.  No.  I asked -- I'm sorry, Your Honor.  I didn't intend to do it that way.  I asked him if he recognized the document.

THE COURT:  Then what's the -- okay.  And what's the purpose of this?

MR. COLBY:  Now I'm asking him if he recalled the collateral, and he hasn't answered the question, but if he recalled, Mr. Stastney as a fact witness, recalled what the issues were that the Chancery Court concluded Stream was collaterally estopped from relitigating in that case.

THE COURT:  Independent of this?

MR. COLBY:  Yes.  I'm asking him independently do you recall.

THE COURT:  Well, then why are we talking about this?

MR. COLBY:  I'm asking him if he recalls.

THE COURT:  But, Counsel, you started with look at this document.  Do you recognize it?  Tell me what it is.  And then what was your -- his understanding of the document, his what?

MR. COLBY:  No.  No.  I'm asking him if he recalls.

MR. ALEXANDER:  Your Honor, but they're putting -- if they're trying to refresh his recollection, then he shouldn't -- I mean, you can't do that with --

THE COURT:  Counsel, I'm a little confused because you started off with this document and then you show, you asked him to look at it.  And then after he looked at it, you asked him does he recall or understand, so I'm a little confused what you were trying to do here.

MR. COLBY:  Well, first of all, Your Honor, I believe this is a document that yesterday you did say you could take judicial notice of.

THE COURT:  I can take judicial notice that it was issued.

MR. COLBY:  Okay.

THE COURT:  That's it.  I don't take judicial notice that I'm going to read it.

MR. COLBY:  And so I think given that it's already of the opinion --

MR. ALEXANDER:  But this one's not on the docket.

MR. COLBY:  -- is a -- we talked about CR-3 yesterday.  It was among the things -- at least, my understanding was it was among the things that the Court concluded it could take judicial notice of.

THE COURT:  I concluded it could be judicial notice because I understood it was on the docket, not that it was a

published -- okay.  Then I guess we're going to have revisit my decision to admit 3.  Let's go back because this was judicial notice on your -- you know what?  I think I need to step back a little bit because when I admitted those documents on CR, the various documents that we talked about, if I recall correctly.  And you know what?  My days are getting a little blurred here.

When we talked about those documents, the CR, that was on the -- was that on the 26th or the 27th?  John?  Am I confusing myself.

UNIDENTIFIED SPEAKER:  The 26th.

THE COURT:  Right.  And if I recall correctly, they were with Mr. Caponi, were they not?  Right, Counsel?

MR. COLBY:  Correct.  Yep.  They were.

THE COURT:  And then we talked about judicial notice as being those things on the docket that I could take judicial notice of and that was the argument, that they were on the docket and that they went to the -- and they even gave me a fancy little memo on what I can take judicial notice.  Where's my little memo at?  Oh, I think I took it in chambers.  About what judicial notice is.

So now I think that when we had all those discussions, that those were items on the docket, they were things that told the Court to status, the -- and what occurred in the case, not that I could read them because already what I said, I cannot read them.  So you're asking me to take -- so

when I said I was taking judicial notice of CR -- what is now CR -- I'm talking CR-3.  You believe I can take judicial notice of an unpublished opinion that is -- is it on the docket?  So where does it meet the judicial notice?

MR. COLBY:  Yes.  So it's on the docket.

THE COURT:  Okay.  Where at on the docket?  On the docket in the -- what docket?  The 225 docket?

MR. COLBY:  Correct.

THE COURT:  Okay.  And the whole time we never even -- if I recall, even talked about 225.  My understanding was all of this has to do with things on the docket for the bankruptcy Court.  And maybe my recollection is wrong, but okay.  So it's on the docket on the 225 action, which you believe is CR-6?  5?

MR. COLBY:  I believe the docket is 6.

THE COURT:  6, John?  John, I though 6.  You said 5.  Okay.  What do we have it as?

UNIDENTIFIED SPEAKER:  I have something, CR-5.  I have the 225.

THE COURT:  That is docket -- 5 is actually -- I don't have a -- I don't see -- I have a 6, a 6, a 7, a 15.  I'm not quite sure what we're referring to.  And we had another one, Exhibit 154, that was a combination of docket entries.

MR. COLBY:  6 we just looked at.

THE COURT:  Right.  Well, I just want to make sure he

has this.

MR. COLBY: Oh, okay. Yeah.

THE COURT: 6 was the docket entries from the 225 litigation. Okay.

MR. COLBY: And it's a November 29th opinion.

THE COURT: Okay. But, Counsel, again, I was a bit confused that you asked him to look at the unpublished opinion, and I'm not quite -- and then the next was what is your understanding? Based on what? The review of that or based on his own independent knowledge.

MR. COLBY: Okay.

THE COURT: That's why I think you're confusing the record because you asked him to look at this thing.

MR. COLBY: Correct.

THE COURT: And so I -- so is it refreshing his recollection or I don't understand why you asked him about it.

MR. COLBY: I was just asking him if this was the collateral estoppel opinion that had previously been discussed in this proceeding.

THE COURT: Okay.

MR. COLBY: I apologize if that was confusing. Then I asked him for his independent memory of what was collaterally estopped as found in this opinion. I would also note regarding this ability now just a couple of things. It is noted as an unpublished opinion, but the overwhelming of decisions in the

Chancery Court are unpublished.  They are nonetheless binding law under Delaware law in Delaware.  I understand it's not binding on you, but it's slightly different than some other things.

THE COURT:  Well, let's back up.  Unpublished opinions, at least in this circuit, means something.  So it's my -- my view of unpublished opinions are from looking at it as how it applies here.  I do not know what Delaware rules say with respect to unpublished opinions, so when I said it's an unpublished opinion, it's from my perspective of unpublished opinions in the federal system, and in particular, the Third Circuit, so if it is different in Delaware, then you can tell me how it's different and what because here you can't cite to an unpublished opinion.

MR. COLBY:  Right.

THE COURT:  It doesn't mean anything.

MR. COLBY:  In Delaware --

THE COURT:  Yes.  In Delaware, what does it mean?

MR. COLBY:  Unreported opinions are precedent in Delaware.

THE COURT:  Okay.

MR. COLBY:  Under Delaware Superior Court Rule 14(b) -- sorry -- Supreme Court Rule 14(b)(vi), so V-I, 4, and 14(g)(ii).

THE COURT:  Right.  So they serve as precedent to the

court who, I'm assuming either other Chancery because there's well --

MR. COLBY:  Right.

THE COURT:  -- all the courts, lower courts, Chancery Court, but what does that mean in terms of for me?

MR. COLBY:  It's obviously not binding on you, Your Honor, but it is -- unpublished opinions within Delaware are treated a little bit differently.

THE COURT:  Well, but it also means how do -- it also affects judicial notice.

MR. COLBY:  Right.

THE COURT:  Because if it's in the federal system, I can't.

MR. COLBY:  Right.

THE COURT:  And so we didn't go into that in depth. There was no objection.  And I don't think we specifically went down the issue because I think I understood it to be part of the docket in --

MR. COLBY:  The Chancery Court, the 225.

THE COURT:  No.  Actually, I thought it was part and parcel of -- yeah, the 225, right.

MR. COLBY:  Yeah, the 225.

THE COURT:  Right.  That's right.

MR. COLBY:  I would also call -- Your Honor, just for the sake of the exercise call your attention to a Third Circuit

opinion that bears on this.  And that case says similarly, "It is not seriously questioned that the filing of documents in the case record provides competent evidence of certain facts, that a specific document was filed, that a party to the certain position, that certain judicial findings, allegations, or admissions were made.

THE COURT:  Uh-huh.

MR. COLBY:  And that's all I think.

THE COURT:  And that's what judicial notice is for.

MR. COLBY:  Yes.

THE COURT:  Those specific things.  The Court's reasoning in all of that, I don't get to look at.

MR. COLBY:  Correct.

THE COURT:  And so that's why I was confused as to what was the significance of this unpublished opinion other than that the judge found that collateral estoppel, which is the only thing that I would take judicial notice of.  And, again, it was followed by, "Mr. Stastney, look at this.  Now tell me what do you recall."

MR. COLBY:  Okay.

THE COURT:  And so, to me, that followed some line of reasoning, at least from my perspective, of what exactly you were doing.

MR. COLBY:  Okay.

THE COURT:  So now you're saying you just showed it

to him to show it to him?

MR. COLBY:  Well, I wanted to establish that this was the decision that we all had been talking about and that had been admitted on a judicial notice basis.  And then I was asking Mr. Stastney about his independent recollection.

THE COURT:  All right.  So it's already been admitted.  We don't need him to say anything about it.

MR. COLBY:  Okay.  Well --

THE COURT:  That's what I'm confused about.

MR. ALEXANDER:  Your Honor, I'd like to just clarify one issue.  There's a difference between evidence and precedential value of an opinion.  They're two totally separate things.

THE COURT:  I know.

MR. ALEXANDER:  Precedential value means you can cite to it in some legal argument later as opposed to what the legal proposition of the legal holding was.  That doesn't mean you get to take the opinion and insert it into evidence.

THE COURT:  I didn't say -- I said I --

MR. ALEXANDER:  That's the -- but I'm just saying that's the argument that they're making in terms of here.

THE COURT:  No.  I understand their argument to be that under judicial notice which allows me to say what the status of the case was, what happened, and the outcome.  I don't get to read the rationale as to how the judge got there.

MR. ALEXANDER:  I just want him to ask Mr. Stastney what he personally knows without having him review these documents.  That's it.  He can testify or he's here to testify.

THE COURT:  Okay.

MR. COLBY:  Okay.

MR. ALEXANDER:  All right.

THE COURT:  So, Counsel, if the document is already admitted and Mr. Stastney isn't going to testify regarding that document or he's not going to say his testimony is based on a review of that document, I would question why are we even asking him.  I think that's what's causing the problem.

MR. COLBY:  Well, two reasons, Your Honor.  I think that there is a portion of the opinion that does precisely what judicial notice is allowed for.

THE COURT:  Uh-huh.

MR. COLBY:  It states a finding of the Court.  It doesn't get into the rationale.  It just sort of states the finding of the Court.

THE COURT:  Uh-huh.

MR. COLBY:  So I think it's usable for that purpose.

THE COURT:  Well, with him --

MR. COLBY:  But I'm asking, again, Your Honor, this all feeds into kind of the bad faith nature of the -- of what we contend to be the bad faith nature of the filing here.  But I'm asking Mr. --

THE COURT:  Counsel, if you think that I'm going to take Judge Laster's decision and somehow equate that to bad faith here --

MR. COLBY:  No.  No.

THE COURT:  That's what you just said.  You said it all feeds in to the bad faith that we're alleging here.

MR. COLBY:  Correct.

THE COURT:  And I -- and that has -- I don't care what was the basis for Judge Laster's decision.  I'm sure they were correct.  They don't feed into anything.  And so I want to make it clear for the record that because I accept something as I'm going to take judicial notice, I'm only -- and I already have accepted it under the judicial notice.  You offered it.  I accepted it.  I'm not quite sure why we're going down that road again because it's already accepted and with the limitations that I already established.  Why we need to go down that road again?  Because you're saying it was to point out something specific.  That's argument counsel makes.  That has nothing to do with Mr. Stastney and we've wasted enough time.  Mr. Alexander says he doesn't object to you asking as to his personal recollection.  Let's move on.

MR. COLBY:  That's the pending question, I believe.

BY MR. COLBY:

Q    Mr. Stastney, do you recall what issues the Chancery Court found that Stream TV was collaterally estopped from

relitigating in the 225 action?

A     I believe many.  I'm not sure I recall all, but yes.

Q     Which do you recall?

A     I recall that the collateral estoppel opinion applied to the fact that Hawk had a secured debt in stream, the fact that Stream had defaulted on that debt, the fact that Hawk had valid secured creditor rights, the fact that Stream had not converted Hawk's debt as of November 2021, and the fact that Stream would need to raise new equity to convert Hawk's debt.

Q     Okay.  Do you have any recollection whether or not those -- the resolutions of those issues that you just described, do you have any recollection as to whether or not they were interim or interlocutory orders, final orders, anything like that?  Do you recall the status of how those issues were resolved?

MR. ALEXANDER:  Your Honor --

THE COURT:  He -- never mind.

MR. ALEXANDER:  Just go.  No objection.

THE COURT:  Okay.

BY MR. COLBY:

Q     Do you recall?

MR. ALEXANDER:  Well, I have an objection.  I don't -- it's not independent.  I mean, he's leading him to try and get him to say the exact same thing that's not supposed to come in.

MR. COLBY:  That's a very open-ended --

THE COURT:  Well, first of all --

MR. ALEXANDER:  It wasn't an open-ended question. You specifically asked him looking at the order what specific things he remembers from it.  Just ask him what he remembers. He completed his testimony from what he remembers.

THE COURT:  A leading question is one that suggests the answer, okay.  And in your question you asked him, "Do you recall if it was interlocutory, whether it was," -- what was the other question?  So it has to be one of those answers. That's leading.  But the more important is -- more important is and Mr. -- never mind.  You didn't object to, you know, didn't even know what that is, but never mind.  You didn't object on that basis.  The only thing you said is that it was leading and I believe it is.  So rephrase your question.

BY MR. COLBY:

Q    Do you recall what the status of the resolution of those issues was?

A    Yes.

Q    What was it?

A    The collateral estoppel order found that those matters were collaterally estopped because they had been finally adjudicated prior to the collateral estoppel order.

Q    Okay.  In your testimony yesterday where you were kind of walking through the chronology of litigation and control of the

company, you referenced a receiver.  Do you recall that?

A     I do.

Q     Okay.  And I want to ask you a couple of questions about the period of time in which that receiver was in place.  And if you could just remind the Court what that period of time was.

A     From late October of 2022 until March 15, 2023.

Q     Okay.  And did you have any interaction with the receiver?

A     Yes.

Q     How or why?

A     In two ways.  Number one, there was an initial period of bringing the receiver up to speed on what the customer was. Number two, we agreed to provide funding to the subsidiaries, particularly SeeCubic BV during this time period.  And we negotiated documentation with the receiver for that purpose. And number three, the way the company operated under the receiver was that both SeeCubic, Inc. and Stream were to propose projects, work, for SeeCubic BV to do.  The receiver was going to fully vet those proposals and then he would ultimately determine what the people at SeeCubic BV worked on.

Q     Okay.  Taking the first of two, those two issues or the business issues, could you describe what you did in that regard with respect to the receiver?

A     So SeeCubic, Inc. proposed several projects for the receiver's vetting and approval for SeeCubic BV to work on. And those projects were ultimately accepted and were worked --

Q     Okay.

A     -- on by SeeCubic BV

Q     Sorry.  And to your understanding, who ultimately owned SeeCubic BV during this time period?

A     Stream TV Networks did.

Q     Okay.  You were still working with them on those projects you just described despite their ownership?

A     Correct.

Q     And do you have any understanding as to whether or not that work -- well, sorry.  Let me ask a more open-ended question.  What's the status of that work today?

A     It's ongoing.

Q     At a high level, what's the -- at a very high level, what's the nature of the work?

A     Because of the stage where the company is, what's happening now is that SeeCubic BV is undertaking what we call proof of concept projects for customers to create effectively a prototype of what that customer might want to purchase if it's an end user or a sale if it's an intermediary.

Q     Okay.  Turning to the funding issue, could you just tell the Court a little bit more about your interactions with the receiver on funding?

A     Of course.  Again, at the outset of when the receiver was put in place, the receiver offered both SeeCubic and Stream the opportunity, ability, to fund SeeCubic BV  Stream refused and

SeeCubic BV said that we would so long as we had a binding

document that would -- debt document that would allow us to

lend money directly to SeeCubic BV with security potentially,

with the security of a signer.  Excuse me.

Q    Okay.  So who has been funding SeeCubic BV during the

period of the receiver?

A    Only SeeCubic, Inc.

Q    Only --

A    Only SeeCubic, Inc.

Q    Okay.  And I believe you described a note process.  Could

you tell us a little bit more about how that worked?

A    The reason the receiver was put in place in the first

place is because there was a dispute over who the director at

SeeCubic was.

Q    Right.

A    And just as there was a dispute over who the director at

Technovative was.  And so Vice Chancellor Laster decided that

given the animosity between the parties, they weren't likely to

be able to work together well and that he would put a receiver

in place to oversee Technovative and its subsidiaries.  Because

there was a dispute over who the director was at SeeCubic BV,

the receiver determined the best course would be to have the

note signed by himself and both disputed directors, myself and

Mathu Rajan.

Q    Okay.  And your -- is the receiver still in place?

A    He is not.

Q    Do you recall when he was displaced?

A    Not exactly, but effectively March 15, 2023.

Q    All right.  And how -- what's happened with the funding of SeeCubic BV since the displacement of the receiver?

A    There was some additional capacity left under the note that we had negotiated with the receiver in October and SeeCubic, Inc. has taken the position that we can continue to fund under that note until it's exhausted.  The capacity under that note was just exhausted two weeks ago.  And so at this point we have no way to legally fund SeeCubic BV

Q    Okay.  Since the displacement of the receiver, based on your involvement, what role, if any, has the debtor, Stream TV, had in the funding of SeeCubic BV?

          THE COURT:  Since when, Counsel?

          MR. COLBY:  Since the displacement of the receiver.

BY MR. COLBY:

Q    Mr. Stastney testified when the receiver was in place everybody had to sign because of the ambiguity about the control, but since that time.

A    We've made several attempts, including in front of this Court, to have a new note put in place or additional capacity agreed to and no capacity has been agreed to and Stream has provided no funding.

Q    Okay.  So we've made several attempts.  Just tell us what

happened.

A     Either the proposal to increase capacity was refused by Matthew, by Stream, or a promise was made to provide funding by Stream in lieu of accepting that increase.  That never came.

Q     Okay.  Okay.  Based on your involvement sitting here today, what is -- does SeeCubic BV have any funding lined up?

A     It does not.

Q     Why not?

A     Because SeeCubic BV has no capacity to enter into an agreement by which it could agree to fund, agree to be funded.

Q     Yeah.  What do you mean by that, no capacity?

A     The receiver is gone.  The two disputed directors, one of the two won't agree to funding or additional funding, and therefore there's no clear evidence as to who's authorized to even agree to be funded.

Q     Is there any relationship between the issue that you just described on the 225 action?

A     Absolutely.  And that's if the 225 action is what was intended to provide clarity as to who was the director of Technovative, and therefore, who was going to be the director of the subsidiaries.

Q     Is there any connection between that funding issue that you just described and the motions that are in front of the Court here today?

        MR. ALEXANDER:  Your Honor, I'm going to object.

This calls for legal conclusions as to what the impact of what a ruling may have on foreign entities.

MR. COLBY:  No, it doesn't.

THE COURT:  Counsel, that's not a response.  A response is you saying there's a legal conclusion.  Is there a legal conclusion?

MR. COLBY:  No.  It's not a legal conclusion.  Mr. Stastney is responsible, at least in part, for the -- you know, the litigation on our side and has described a funding crisis as SCDV that he thinks he said could be addressed through the 225 action.  I'm asking if that's relevant to the issues in his mind before the Court today.

THE COURT:  Was that the exact question?

MR. COLBY:  I'm paraphrasing it for you because I'm indirectly speaking to you arguing with Mr. Alexander.

THE COURT:  Well, I understand that, Counsel, but I don't -- he was objecting to your specific question.

MR. COLBY:  Yeah.  But --

THE COURT:  So I'm -- while you have characterized it, is that what you specifically asked him?

MR. COLBY:  Yeah.  My question was is --

THE COURT:  Just rephrase the question.  Just rephrase.

BY MR. COLBY:

Q    Sure.  Mr. Stastney, is there any connection between the

funding situation that you just described and, to your

understanding, the motions that are in front of the Court here

today?  Is there any connection?

A    Yes.

Q    What is it?

A    To the extent that these motions are resolved in a way

that provides clarity under the 225 action as to: 1) that it's

occurring; and 2) who the director is going to be, it provides

clarity as to the issues that are preventing funding at

SeeCubic BV.

MR. ALEXANDER:  Your Honor, I'm still going to object

and move to strike.  That was exactly a legal conclusion as to

what the impact will be.

MR. COLBY:  I'm asking his understanding.

MR. ALEXANDER:  Well, then it's not relevant.

MR. COLBY:  I'm happy to explain the relevance, Your

Honor.

MR. ALEXANDER:  If he wants the facts out, get the

facts out, but the conclusion is to let it happen.  It's a

legal conclusion.

THE COURT:  It's my conclusion.  I'll allow it for

what it's worth, Counsel, for what it's worth.

MR. COLBY:  Your Honor.

THE COURT:  Go ahead.

MR. COLBY:  Appreciated.

THE COURT:  Never mind.  Go ahead.

BY MR. COLBY:

Q    Okay.  Mr. Stastney, given your experience you've testified about at length, your experience with SeeCubic BV, and with the funding issues, do you, from a business perspective, have a view as to whether there's any impact from to the business from not resolving the 225 action in the manner that you just described?

A    Yes.  Without some resolution around who the appropriate directors are or who's authorized to fund or receive funding at SeeCubic, BV, the issues are already critical at SeeCubic, BV.  No funding has been allowed for several weeks since we exhausted our capacity under the note and that's going to go from critical to irreversible very soon.

Q    Well, how?  What do you mean by that?

A    There is no more way to fund payroll.  There is no way to fund tax payments which are overdue and critical.  There is no way to fund contractor payments who do a significant amount of the work on behalf of the entity.  There is no way to fund anything that's needed to keep a business running.  And if payroll is missed, that means that all of the employees who are a significant amount of our intellectual property lists are no longer employed and no longer have their non-compete agreements.  And that essentially eviscerates the value of the company.

Q    Okay.  You've been in the courtroom for the past couple of days.  You've heard references to a Rembrandt Technologies, correct?

A    Correct.

Q    All right.  What -- who's Rembrandt as far as you know?

A    Rembrandt is another company that, in the 2010 or 2011 timeframe, was attempting to develop a glasses free technology that -- and was talking to the some of the same people that Stream TV was talking to, to do so, and ultimately, was not involved in an arrangement with Stream TV Networks at the time and has since sued Stream TV on two bases.  Number one, intellectual property violation, which was dismissed.

Q    I just want to pause you for a second, because there has been some reference to another litigation over the course of these proceedings.  Is that the one that you're referring to?

A    I believe that's a new litigation.

Q    Okay.  So are there more than one?

A    Yes.

Q    Which one are you talking -- orient us all as to the one you're talking about.

A    So there was a claim for intellectual property violation filed in the 2012/13/14 timeframe that was dismissed.  At the same time, there was a claim for a violation of a nondisclosure agreement filed against Stream and several employees and principals including Mathu and Roger Rajan that continued

past --

THE COURT:  A what?

THE WITNESS:  Violation of a nondisclosure agreement, confidentiality agreement.

THE COURT:  Okay.

THE WITNESS:  That was originally filed against Stream and a number of Stream employees and directors, and ultimately continued only as to Stream, Mathu Rajan, and Roger Rajan.

BY MR. COLBY:

Q    Okay.  And so, what's the status of that, the patent claim -- suit?

A    That was dismissed, I think, 2017.

Q    Okay.  How do you know all this?

A    Because in my work as CFO of Stream, I was dealing with this issue with Rembrandt.

Q    Got it.  Okay.  So the patent case was dismissed.  There was a continuing NDA claim.  What happened with that NDA claim?

A    In 2018 and into 2018, there were discussions, settlement discussions with Stream and Rembrandt at the district court, in which -- the New York District Court, in which I participated. Never finalized.  The case continued into 2020 until it was settled by Stream and Rembrandt in 2021, the same day as the Chapter 7 bankruptcy was filed.

Q    Okay.  So the -- and that's the NDA claim?

A      That's the NDA claim.

Q      And it was settled when?

A      The same day as the Chapter 7 bankruptcy was filed.

Q      The involuntary?

A      Correct.

MR. ALEXANDER:  I'm sorry, Your Honor.  I didn't hear his last question.

THE COURT:  His last question is when was the -- he said, in 2021, that there was a settlement between Rembrandt and Stream.

MR. COLBY:  Okay.

MR. ALEXANDER:  Your Honor, I was going to say --

MR. COLBY:  Just the facts.

MR. ALEXANDER:  Yeah.  I just didn't hear what you were asking, because --

THE COURT:  Well, he was --

MR. ALEXANDER:  -- I was hearing --

THE COURT:  Never mind.  Never mind.

MR. ALEXANDER:  Okay.

THE COURT:  In '21, right?

THE WITNESS:  In '21, on the same day as the involuntary filing.

THE COURT:  He -- well, never mind.

MR. COLBY:  Okay.

BY MR. COLBY:

Q    And Mr. Stastney, you heard a reference -- you referenced another litigation.

A    Yes.

Q    What's that?

A    Rembrandt, several months ago, filed a new intellectual property violation lawsuit in federal district court against, I believe, Stream, Technovative, Hawk, and SeeCubic Inc.

Q    Okay.

THE COURT:  With SeeCubic Inc. you said?

THE WITNESS:  Uh-huh.

THE COURT:  All right.

BY MR. COLBY:

Q    Okay.  And why would Rembrandt bring it -- this claim to -- do you have any understanding as to why Rembrandt would bring this claim against Technovative?

MR. ALEXANDER:  Your Honor, I'd object.  That's --

BY MR. COLBY:

Q    Do you have any understanding?

A    Technovative holds no intellectual property and is not an operating entity.  So it wouldn't be doing anything to violate intellectual property.

Q    Okay.

A    So --

Q    Go ahead.  Okay.  Do you have any observations with respect to Rembrandt and Stream and the Stream bankruptcies?

MR. ALEXANDER:  Your Honor, I'm going to object, I mean, in terms of the foundation, in terms of how he -- anything with respect to --

MR. COLBY:  I'm asking -- sorry.  Please --

THE COURT:  Observation or opinion?

MR. COLBY:  Observation.

BY MR. COLBY:

Q    Do you have any observations?

MR. ALEXANDER:  Okay.

THE COURT:  Counsel, I think you need to narrow that. About what bankruptcy?  All the bankruptcies, this bankruptcy? Which one?

MR. COLBY:  Well, let me ask one more question, and then I'll get to that one.

BY MR. COLBY:

Q    Mr. Stastney, have you observed whether or not Rembrandt has a role with respect to the Technovative bankruptcy?

A    I have.

Q    What's that?

A    Rembrandt's newly filed claim is the only debt listed on the creditor statement of Technovative.

Q    Okay.  Does that make any sense to you?

A    That makes no sense to me.

Q    Why not?

A    Because Technovative --

MR. ALEXANDER:  I'm going to object.  I mean this is irrelevant.  This has no relevance to any of the issues that we're dealing with.

THE COURT:  Okay.  He's objecting on relevance.  What's the relevance?

MR. COLBY:  The relevance goes to what we contend is the bad faith nature of the filing in the following way.  Mr. Stastney, as a person who's been involved in the business and involved in the Rembrandt litigation, doesn't see --

THE COURT:  Well, he was involved -- is he still involved in the 20 -- you know, action that was in 20 -- 2021?

MR. COLBY:  His company is named as a defendant, he testified.

THE COURT:  Well, is he still involved?  You can be named as a --

MR. COLBY:  I can ask Mr. Stastney.

BY MR. COLBY:

Q    Are you involved in the litigation of 2021?

A    Yes.  Yes.  I'm overseeing and managing that litigation on behalf of SeeCubic Inc.

THE COURT:  And it's still pending?

THE WITNESS:  It's still pending.  Mr. Michaels mentioned it on the call yesterday.

BY MR. COLBY:

Q    And so --

MR. ALEXANDER:  That's a different litigation.

MR. COLBY:  Yes.  He's talking about both.

THE COURT:  Well, I'm talking about the one that was settled in 2021.

MR. COLBY:  Yes.  He said he was --

THE COURT:  That's still pending?

THE WITNESS:  No.  Sorry.  No.

THE COURT:  All right.

THE WITNESS:  No, sorry.  The one that was settled in '21 I was -- was the one I was involved in earlier when I was at Stream.

MR. ZAHRALDDIN:  Your Honor, just one point if I may.  The Heartland decision from the U.S. Supreme Court indicated that all patent cases had to be filed in their place of incorporation.  So during that first dispute, which was a patent and trade secret dispute, which is what implicates a nondisclosure, the case was dismissed --

THE COURT:  Okay.  We're going --

MR. COLBY:  Yeah.

MR. ZAHRALDDIN:  -- without prejudice to move it to Delaware.

THE COURT:  That's fine.  I don't -- you can ask him that.

MR. COLBY:  Yeah.  I don't know why -- I don't know why Mr. Zahralddin is making legal argument about another case.

I'm simply -- I'd like to --

THE COURT:  The -- asking him about it.  I guess he figured he would -- wanted to be clarified.  But you can ask him now.

MR. COLBY:  Well, they --

MR. ZAHRALDDIN:  It was in response to you, Your Honor.  It was in response to your question, Your Honor.  I'm sorry.

BY MR. COLBY:

Q   So the -- Mr. Stastney, do you have any observations with respect to Rembrandt and the Stream involuntary bankruptcy and the Technovative bankruptcy?

MR. ALEXANDER:  Your Honor, same objection.  I mean he didn't explain how that's relevant.  The facts -- he can develop whatever facts he wants to get out, but his opinion -- I mean that's what he's asking for.  Observation is equivalent with an opinion.

MR. COLBY:  It's not.  An observation is a factual observation.

MR. ALEXANDER:  Well, what --

THE COURT:  And based on the facts, he's what?  He's giving us his observation or his opinion?

MR. COLBY:  His observation.

THE COURT:  Okay.  And he's observing and coming to some conclusion?

MR. COLBY:  He --

THE COURT:  Counsel, using the word observation is not going to change it to -- going to make it not an opinion. He can say what his observations were.  I observed that this happened, this happened, and this happened.  But he tell me what he believes the consequences of that is.

MR. COLBY:  Understood.

THE COURT:  And that's what he's doing.  And so, I want to make it clear.  You can ask him what he observed, what did he see, but he cannot tell me what his opinion is of those observations.  So I think we need to clarify --

MR. COLBY:  I --

THE COURT:  -- that, okay?

MR. COLBY:  I appreciate the clarification.  It's all I intend to ask for.  I trust the witness will do his best to limit just to an observation and nothing --

THE COURT:  He was doing more than that.

MR. COLBY:  We will -- okay.

THE COURT:  So let's make it clear that he can say I observed this happened, this happened.  As to the consequences of that, that's his opinion.

MR. COLBY:  Understood.

THE COURT:  That's not allowed, okay?

MR. COLBY:  Yes.

THE COURT:  All right.

BY MR. COLBY:

Q    Mr. Stastney, what are your observations with respect to Rembrandt and the Stream involuntary bankruptcy and the current Technovative bankruptcy?

A    As to Rembrandt and the previous involuntary bankruptcy, I observed that the settlement agreement between Stream and Rembrandt was entered into on the same day as the Chapter 7 bankruptcy was filed.  And Rembrandt was, in fact, the third necessary unsecured creditor to file that claim.

As to the new lawsuit filed in 2022 --

THE COURT:  Well, he asked you about bankruptcy.

MR. COLBY:  Yes, I asked about Rembrandt and the bankruptcy.

THE COURT:  But now he's talking about litigation.

MR. COLBY:  Correct.  And that is an -- that is part of his observation with respect to the Technovative bankruptcy.

THE WITNESS:  So with respect to the Technovative bankruptcy --

THE COURT:  Okay.

THE WITNESS:  -- I observed that Rembrandt having not refiled its patent lawsuit, despite the fact that it could for several years, refiled that --

MR. ALEXANDER:  Your Honor, I'm going to object.  That's not --

THE COURT:  I'm going to strike that.  How does he

know that?  That's --

THE WITNESS:  I mean because --

THE COURT:  Don't give me your opinion of what you think is true or some legal action.  Just your observation.

THE WITNESS:  I apologize -- I was --

THE COURT:  I don't need -- I think we need a break, because I'm getting a little --

MR. COLBY:  Understood.  If we could --

THE COURT:   -- a little --

THE COURT:  -- finish, then I'll -- we'll take a break.

THE COURT:  All right.  We'll finish this and we take a break.  Okay.  So Technovative -- you believe that Rembrandt did not refile a patent.  You've observed that, right?

THE WITNESS:  Rembrandt did refile its patent claim.

THE COURT:  Did refile it.  Okay.

THE WITNESS:  From 2017.  Had not previously filed against Technovative the last time.  Did file against Technovative this time.

THE COURT:  What time?

THE WITNESS:  2022, prior to the -- prior to the -- sorry, 2023.  I'm in last year.  Prior to the Technovative bankruptcy.  And that --

THE COURT:  So wait a minute.  When did they -- you said they refiled in '22 or '23?

THE WITNESS:  '23.  Sorry.

THE COURT:  Okay.

THE WITNESS:  I'm in the wrong year.

THE COURT:  Did he file in '22?

THE WITNESS:  In '23.

THE COURT:  '23 prior to the --

THE WITNESS:  Right, and refiled both against Stream and Technovative, where previously they had only filed against Stream.

THE COURT:  In what?  There was two actions.  I'm --

THE WITNESS:  In the patent infringement action, the previous action.

THE COURT:  Stream and Technovative in the patent?

THE WITNESS:  In the 2023 patent infringement action.

THE COURT:  And what was the other one?  I'm sorry. I couldn't understand.  Was filed in 2023?  Is it a patent or --

THE WITNESS:  Patent.  That's the --

THE COURT:  Both of them are the same?

THE WITNESS:  There's only one suit filed by Rembrandt in 2023, and that's the patent infringement action.

THE COURT:  Okay.  Against Technovative and Stream.

THE WITNESS:  And Stream.

THE COURT:  Okay.  Okay.

BY MR. COLBY:

Q    Okay.  Any other -- I'm not sure you're finished?

A    I hadn't quite finished.

Q    Yeah.

A    The only other observation was that the only creditor listed on Technovative's bankruptcy filing was the pending lawsuit from Rembrandt.

Q    Okay.  Thank you.

        MR. COLBY:  Good time for a break, Your Honor.

        THE COURT:  Yeah.

        MR. ALEXANDER:  Your Honor, can we -- the exhibits that he wanted to look at, show me those, because I think we could probably stipulate to the --

        THE COURT:  Yeah.  Those ones that are attached to the proof of claim, right?

        MR. ALEXANDER:  Correct.

        MR. COLBY:  Yes.

        THE COURT:  Counsel, I apologize.  I'm a little testy.  I'm hangry.  So I need to go get something to eat.  I was -- at 2:30, I could tell I was getting hangry.  So I apologize for being a little short.

        All right.  Court is in recess.  Let's come back at 3:30.  That gives -- well, that should be enough time to get something to eat.  All right.  Thank you.

    (Recess taken)

        THE COURT:  Okay.  We left off with Mr. Stastney

testifying regarding the -- his observations regarding the relationship, I guess, between Rembrandt and Stream TV.

MR. COLBY:  Correct.

THE COURT:  All right.

MR. COLBY:  Done with that topic, Your Honor.

THE COURT:  Okay.

BY MR. COLBY:

Q    I want to circle back and just tie off one thing on the funding issues that we talked about a few minutes ago, Mr. Stastney.  What plans does SeeCubic Inc. have for the operating subsidiaries, SeeCubic BV, of its -- Hawk were to prevail on the -- were to prevail on the 225 and you were to be the board member of Technovative?

A    We would immediately enter into a new note that would allow us to continue to fund all of SeeCubic BV's requirements.

Q    Okay.  And what plans do you have, if any, for operating the business?

A    We would continue to operate the business in such a way that it would preserve or increase the value of the collateral pending the disposition of the bankruptcy case.

Q    Okay.  Does SeeCubic Inc. or any of the other secured creditors, to your knowledge, have any plans to sell Stream assets if you were to prevail in the 225?

A    No.  Even if we thought it would be permitted, which I don't think it would, we wouldn't.  Our plan is to operate the

business.

Q   Okay.  Thank you.  So we talked a little bit today, yesterday, about SeeCubic BV.  And are you familiar in the capacities that you've testified about with the development of the technology that is being worked on at SeeCubic BV?

A   Yes.

Q   And what's the basis of your knowledge?

A   Having been involved with the company since 2011 and seeing the development of the technology over time as a board member, as a CFO, and most recently as the chairman and CEO of SeeCubic when it owned those subsidiaries.

Q   Okay.  And sitting here today, are you familiar with the status of the technology at SeeCubic BV?

A   I am.

Q   And are you familiar with the status of the commercialization effort that -- of the technology at the SeeCubic BV?

A   I am.

Q   And we don't need anything too technical.  But if you could describe for the Court what the technology is?

A   Sure.  At its core, SeeCubic's technology is a glasses free 3D technology, which allows our partners to essentially turn their plain 2D devices, whether it's phones or laptops, or televisions, into devices which are capable of showing both 2D content and 3D content.

99

Q    How does it do that?

A    There are two key components to the technology.  One is a lens which has to be bonded onto the front of the screen, which gives us the ability to direct the pixels in a way that creates the effect.  And the other is software, a rendering engine, which does that direction eventually.  It tells the pixels where to go to create the effect.

Q    Okay.  Historically, what products has SeeCubic BV produced?

A    It has not produced any commercial products.

Q    What do you mean by commercial products?

A    Nothing that's been sold into retail or in a commercial capacity.

Q    Okay.  Has it produced these types of glasses free 3D units that you just described?

A    It has.

Q    Okay.  When?

A    It's always produced its own demonstration units.  So it's had the produce one or two units here or there to demonstrate the quality of the technology.  And it also undertook a production of essentially 2000 demonstration units from 2013 to 2007.

Q    What do you mean by a production  of?

A    In order to work through what would be required to produce a higher number of units at a higher speed, Stream TV

produced -- decided to produce a couple of thousand units with a partner in Taiwan to improve the process.

Q    Okay.  And how long did that take?

A    It took the better part of three-and-a-half years.

Q    I'm sorry.  How many years?

A    Three-and-a-half.

Q    Three-and-a-half.  And how -- was there any cost associated with that production run?

A    Yes, including all of the necessary -- yeah.

THE COURT:  Who did with the Taiwan company?

BY MR. COLBY:

Q    Yeah.  Just describe -- break apart that production run a little bit.

THE COURT:  No, no, no.  Just my question.

MR. COLBY:  Oh.

THE COURT:  You said there was a production run of 2000 units.  And 3D BV started with a partner in Taiwan and it took three-and-a-half years.  Is that right?

MR. COLBY:  Yeah.

THE WITNESS:  Correct.

MR. COLBY:  That might be --

THE COURT:  All right.

MR. COLBY:  And it might be helpful to clarify.

BY MR. COLBY:

Q    Stream TV -- any particular part of Stream TV?

A     Well, SeeCubic BV --

Q     SeeCubic BV.

A     Yeah.

Q     -- work with them.

A     Yes.

Q     Okay.  So the production of demonstration units and the test run of 2000 units, who built those units?  Who at Stream built those units?

A     SeeCubic BV is the one that supplied all the technology to the partner --

Q     Okay.

A     -- in Taiwan who actually built the units.

Q     Okay.  Who was the partner in Taiwan?

A     That's a large what's called on OEM, or original equipment manufacturer, called Pegatron, P-E-G-A-T-R-O-N.

Q     And tell us, if you would, about any cost associated with that production run.

A     The total cost of that effect, including the equipment necessary to do it, was approximately $30 million.

Q     Okay.  Why did it cost $30 million to produce 2000 units?

A     Because -- largely because Stream was doing this itself. It didn't have the benefit of a larger partner who could source materials more efficiently and who could create a more efficient production process.

Q     Just give us a sense of what some of the production

process entails.

A    Made to order bonding equipment was purchased from a partners.  And that bonding equipment had to be moved to Pegatron, incorporated in their process, used to produce the units along with lenses and development of electronics and everything else needed for the unit.

Q    Okay.  What -- aside from the equipment, what work has to be done in order to build these 2000 units?

A    A lens has to be designed.  A lens has to be made.  And then multiple lenses have to be made, as many as are needed. The is a -- initially, a significant design process that usually takes 9 to 12 months to design the unit.  Then you have to order the lens.  The lens usually takes three to four months.  And then the unit has to be assembled, and that takes another three to four months.

        MR. COLBY:  Okay.  I would like to take a look at Exhibit CR64.  I'd like to see if we can introduce a bunch of exhibits and then ask bunch of questions.  I'll lay the foundation.  We'll do everything we need to do.  But with the Court's permission, I think it'd be more efficient to just get them all in the record and then proceed with the questioning. So --

        THE COURT:  Okay.

        MR. COLBY:  -- just to give you a sense of where I'm going so that we're not unnecessarily wrangling with each

other, it's 64, 65, 66, and 57.  These are the purchase orders that we've heard a lot about in this case.  They're signed by Stream.  So I think they're admissible as party statements and non-hearsay.  We're also not offering them for the truth of what's asserted.  So I think they're admissible on that basis. But if anyone disagrees, I'm sure they'll let me know.

MR. ALEXANDER:  I have no objection to the purchase orders.

THE COURT:  Okay.  64 -- I mean you still have to establish whatever you're --

MR. COLBY:  Yeah, of course.

THE COURT:  You're offering them as a party statement, the purchase order, right?

MR. COLBY:  Yeah.  I mean the purchase orders are signed -- supposedly signed by Stream TV, among other things.

MR. ALEXANDER:  I mean I don't believe it's a party statement, but I'm not -- we don't -- we're not objecting.

THE COURT:  Well, if it's not a party statement, you have to lay a foundation though.  I mean you just can't say -- a statement against interest.  I'm not sure how this is a statement -- I mean a party statement -- just because somebody signed something doesn't make it a party statement.  It has to be a statement against interest, doesn't it  So it's sort of -- let's go to party -- let's go through this.

MR. ALEXANDER:  Your Honor, I'm stipulating to it.  I

think it would be a business record.

THE COURT:  Yes.

MR. ALEXANDER:  If he wants to do a different one, but I'm --

THE COURT:  But you're not objecting?

MR. ALEXANDER:  No.

THE COURT:  And you don't think he needs to lay a foundation for it, because it is not a statement against interest.  He's got to lay a foundation as to authenticity or somebody with knowledge of this.  But you're stipulating that it's a business record?

MR. ALEXANDER:  If he'd like -- if they are acknowledging that it's authentic and that -- then we're good.

MR. COLBY:  I'm not -- I would like to -- I actually don't think it's hearsay, Your Honor, because I'm not offering it for the truth of the matter asserted.  But --

THE COURT:  What are you offering it for?

MR. COLBY:  I think they can't contest -- I don't think Stream can contest the -- well, I'm offering it --

THE COURT:  If you don't them to contest, so that means it's truthful.  Counsel, come on now.  I'm trying to be patient.  I ate.  I'm pretty good.  But what exactly is it that you're offering these for then?

MR. COLBY:  So the purchase orders purport to oblige for -- set forth the production of units and a --

THE COURT:  Okay.

MR. COLBY:  -- significant number of units.  And I intend to ask Mr. Stastney, based on his understanding of the current technology, what his observations are about these purchase orders.

THE COURT:  Counsel, observation does not delineate opinion.

MR. COLBY:  Well, we might as well front the issue, Your Honor, because it's going to come up anyway.  I think this is also the testimony, and then is a proffer, is also admissible as lay opinion.

THE COURT:  Lay opinion?

MR. COLBY:  Yes, under 701.

THE COURT:  Oh.  So you believe he has -- he can offer it as lay opinion.

MR. COLBY:  Yes, on multiple --

THE COURT:  Okay.  Under 702.

MR. COLBY:  -- multiple bases.

THE COURT:  Okay.  Let's just cut to the chase now.

MR. COLBY:  Yeah.

THE COURT:  All right.

MR. COLBY:  So I think --

THE COURT:  SO you're say -- so a lay opinion is rationally based on the witness perception.

MR. COLBY:  Uh-huh.

THE COURT:  So presumably, the perception you laid is how long -- how he knew how much it -- long it took and how much the cost is.

MR. COLBY:  And his current -- his knowledge of the current status of the technology.

THE COURT:  Okay.  And that -- well, his understand -- I mean do we know what Stream has or doesn't have?

MR. COLBY:  Well, so, if --

THE COURT:  If you're going to -- okay.

MR. COLBY:  I'm simply going to ask him whether or not he thinks --

THE COURT:  I know what you're going to ask him.

MR. COLBY:  -- SeeCubic BV, Stream --

THE COURT:  Okay.

MR. COLBY:  I won't get into what they've argued about, what they can do outside of that, but I'll --

THE COURT:  Basically, I know what you're going to ask him.  Here it is.  Do you think they can do this based on your understanding of how long it took for the other people to do it?

MR. COLBY:  Same people, but --

THE COURT:  Whoever.

MR. COLBY:  Yeah.

THE COURT:  Any objection to any of that?

MR. ALEXANDER: No. He can give -- he can state that, Your Honor.

THE COURT: All right. So let's just go.

MR. COLBY: Okay.

BY MR. COLBY:

Q So --

THE COURT: That's with 64. What's 65, is another alleged purchase order?

MR. COLBY: That --

THE COURT: 67?

MR. COLBY: 64 through 67.

THE COURT: Through 67?

MR. COLBY: Yes. 64, 65 --

THE COURT: 66 --

MR. COLBY: -- 66 and 67.

THE COURT: And, Mr. Alexander, you stipulate that these are purchase orders that were entered into -- or at least they have -- that they say what they say and that's the orders that they're --

MR. ALEXANDER: They're moving these into evidence?

THE COURT: Uh-huh.

MR. ALEXANDER: He can move them into evidence.

THE COURT: You're not objecting?

MR. ALEXANDER: I'm not.

THE COURT: And you don't think they need to lay a

108

foundation.  I get it.

MR. ALEXANDER:  I'm not objecting to it.

THE COURT:  All right.  Let's go.  Let's start with 64.

BY MR. COLBY:

Q   Okay.  So, Mr. Stastney, take a look at the four exhibits, 64, 65, 66, and 67, and tell me if you recognize them.

A   Yes, I do.

Q   Okay.  Where have you seen them before?

A   I believe these are the purchase orders filed in this bankruptcy case by the debtor.

Q   Okay.  And if possible, I'd like to call your attention specifically to 65.  Are you there?  Let me know when you're there.

A   Okay.  I'm here.

Q   Okay.  And a couple of questions about this.  First of all, who's it between?

A   It's between Visual Semiconductor Inc. and Stream TV Networks Inc.

Q   Okay.  And do you have an understanding as to what Visual Semiconductor Inc. is?

A   I believe it's an entity that's owned or controlled by Mathu Ragan.

Q   And do you see the Visual Semiconductor Inc., 1105 William Penn Drive?  Do you recognize that address?

A    I do.

Q    What is it?

A    I think that is the address at which Mathu's parents live. And I think he lives there as well.

Q    Okay.  And how many units is this purchase order for?

A    This appears to be for 100,000 units.

Q    And that number, 100,000 units, what observations do you have with regard to --

THE COURT:  Counsel, 100,000?

MR. COLBY:  100,000.

THE COURT:  Am I on the right one?

MR. COLBY:  65 is 100,000.

THE COURT:  Oh.

MR. COLBY:  64 is 10,000.

THE COURT:  Okay.  So we've moved to 65?

MR. COLBY:  Yes, Your Honor.

THE COURT:  Okay.  All right.

BY MR. COLBY:

Q    So 100,000 units you said, Mr. Stastney?

A    That's correct.

Q    Okay.  And what are your observations regarding that number of units to be produced by Stream TV?

A    Well, to start with, it's roughly 50 times as many units as Stream has ever produced before.  And nowhere does Stream currently have the capacity -- nowhere does SeeCubic BV

currently have the capacity to do this.

Q    Okay.   Anything else about manufacturing 100,000 units?

A    Just the given how much was spent on the previous run, doing 100,000 will require a tremendous amount of capital to produce.

Q    What do you mean by that?

A    All of the materials, all of the engineering that needs to be done, since this is not a unit that Stream has actually produced before as it's laid out here, and also materials have to be sourced before production can begin.

Q    Okay.   Do have a view regarding the amount of time it might take based on your experience with SCBV technology, how long it might take to produce 100,000 units?

A    So this unit would have to be sourced, would have to be -- the materials would have to be sourced.   It would have to be designed, because although Stream and SeeCubic BV have done 65-inch 4K units before, they've never done 120 hertz unit.

Q    What do you mean by that?   Where do you see that?

A    In the description of the product.

Q    Yeah.   That's the 120Hz?

A    Yeah.   And that's -- yeah, 120Hz is 120 hertz, which is the refresh rate of the unit.   So that's how many times a second the picture refreshes.   The higher the better.   That's never been done.   So there will be engineering time that has to go in upfront.   And currently, SeeCubic BV has capacity to do

two or three units a week.  So capacity to produce would have to be somewhere.  Even the bonding equipment that is in dispute in this case can only 10,000 a year.

Q    Okay.  Sorry.  Just orient us as to what bonding equipment you're talking about there.

A    So the bonding equipment that was used to do the original 2000 units in 2017 then sat at Pegatron until 2019 or 2020 because of nonpayment.  It was moved to a warehouse where it say for two more years until it had to be repurchased by SeeCubic Inc. for nonpayment.  That equipment would have to be repaired, set up, qualified in order to produce these units.

Q    Okay.  And you said there's a limit?

A    Ten -- the way it's -- for 65-inch screens or larger screens, it can only do 10,000 a year.

Q    So using that equipment, how long would it take to satisfy this purchase order?

A    Roughly 10 years.

Q    And that's just the production part?

A    Correct.

Q    Right.  Okay.  Do you see the -- do you see a price listed here?

A    I do.

Q    And what's the price?

A    $1,260 per unit.

Q    And what's your view about that price for 65-inch 4K

units?

A     Number one, it's much, much lower than what was spent in the previous run.  So the previous run was something like 10,000 per unit.

Q     Per unit?

A     Per unit.  And this is 1,260.  My second observation is I have no idea how they got that number.  Because SeeCubic BV has done no sourcing, no design work yet to determine what would actually go into this unit.  So it's a mystery.

Q     Okay.  And see a delivery date down under the description?

A     Yes, 90 days after receipt of deposit.

Q     What's your view regarding that as a delivery date of these units?

A     It's impossible.

Q     Do you see it says, "partial shipment allowed", do you see that?

A     I do.

Q     What's your view with regard of whether a partial shipment of units can be done in 90 days?

        MR. ALEXANDER:  Your Honor, I've given him a lot of leeway in terms of what he can testify to and I believe no he's getting into more than just what his experience is because he testified that he hasn't had experience with these types of screens before.

        MR. COLBY:  He didn't testify to that at all.

MR. ALEXANDER:  I think he did testify to that.

MR. COLBY:  I think he did testify, he said they never created those types of screens.

THE COURT:  Right.

MR. ALEXANDER:  Your Honor, he testified that the See -- all he is saying that SeeCubic BV which all the parties have conceded in this bankruptcy that's where the technology lives, that's where the no how lives, and all of those things he is saying we haven't done that before.

MR. COLBY:  We haven't conceded firmly, to be clear.

MR. ALEXANDER:  Firmly established that is familiarity --

THE COURT:  So all this is based on what he believes SeeCubic BV can do.

MR. ALEXANDER:  Correct.

THE COURT:  And that's all it's worth is what he thinks SeeCubic BV.  Okay.  Mr. Alexander, what is your objection because he's saying that he -- based on his experience he thinks that it's going to take whatever based on prior experience?  I mean, they're not doing it so he's only telling you what he thinks is going to happen.

MR. ALEXANDER:  Well, I thought his testimony, Your Honor, was that they haven't produced these types of screens before.

THE COURT:  Exactly.

MR. ALEXANDER:  Then what would be his basis for how they would produce these screens?

MR. COLBY:  I'd like to --

MR. ALEXANDER:  With respect to the other stuff, I'd --

MR. COLBY:  I can respond to that.

MR. ALEXANDER:  -- let him testify so that was my objection.

THE COURT:  All right.  What's your response?

MR. COLBY:  The response is he also testified that because they had not made a 120 hertz refresh screen before that there is engineering work that would have to go into figuring out how to do that.  That all feeds into -- it doesn't mean you can't say how long it would take to do this, it says -- it feeds into the understanding of how long it would take to do that.

THE COURT:  Right.  It's his -- it's only his understanding that if they had to produce this based on his prior experience -- it's a year's worth of engineering, two to three months resourcing, two to three months for producing the actual screen.  I think what I -- I got a little timeline about a year and a half.

MR. ALEXANDER:  But it's not a SeeCubic BV purchase order.

THE COURT:  My understanding is that this is based on

SeeCubic BV providing this to Stream.

MR. ALEXANDER:  That's not what the purchase -- okay, if that's his understanding.

THE COURT:  That's his understanding from --

MR. ALEXANDER:  Understood.  Okay.

THE COURT:  -- well, you can come up here and show me that Stream has another source, okay?  This is just his opinion or his lay testimony based on what his --

MR. ALEXANDER:  Belief.

THE COURT:  -- experience is with SeeCubic.

MR. ALEXANDER:  That's correct.

THE COURT:  That's all it -- that's all it means to me.

MR. ALEXANDER:  Understood.

THE COURT:  Okay?  All right.

MR. COLBY:  Okay.  And sorry, I'm not sure if he -- did we get an answer on the 90 days?  I think we did.

THE COURT:  He's just saying based on his experience --

MR. COLBY:  Correct.

THE COURT:  -- with the production, with SeeCubic BV in the -- the run that they did and how long it takes, if it's the same process, he believes that's how long -- that doesn't necessarily -- it's just what he thinks.  And I don't know what you guys I'm going to do with that, but -- it is what it is.

Go ahead.

MR. COLBY:  Okay.

BY MR. COLBY:

Q    And Mr. Stastney, do you see the signatures down at the bottom?

A    I do.

Q    And who signed on behalf of the Stream TV Networks?

A    I believe it's Mathu Rajan.

Q    And who counter signed on behalf of Visual Semiconductor Inc.?

A    It says Mark Sabarese (phonetic) under limited power of attorney.

Q    Do you know who Mark Sabarese is?

A    Mark Sabarese was a very small shareholder of Stream TV.

Q    Do you have any understanding as to why he would be counter signing this document on behalf of VSI? Do you have any understanding?

A    I do not.

Q    One more question about the product description, you referenced it being 4K, what is that a reference to?

A    That's the resolution of the underlying panel.

Q    Okay.

THE COURT:  That's the what?

THE WITNESS:  Resolution.

THE COURT:  Of what?

THE WITNESS:  The underlying panel, the TV panel or -- that underlies it.

THE COURT:  Okay.

BY MR. COLBY:

Q   All right.  Let's take a look at 67.  And 67 is blacked out, the counter party is blacked out; do you see that?

A   Correct.

Q   Okay.  Do you have an understanding based up your involvement in this bankruptcy as to what may be the counter party that's blacked out on this docket?

A   I do not.

Q   Okay.  And are you familiar with what Stream TV is represented it to be in this bankruptcy?

A   I believe they have represented it to be a blue chip company.

Q   Okay. All right.  So do you see here this purchase order -- do you see the product description?

A   I do.

Q   And it references -- well, so first of all, how many units is this for?

A   Also 100,000.

Q   Hundred thousand, okay.  And what's the product that's being offered?  That's the subject of this purchase order?

A   A 65 inch 8K 3D Glasses free display.

Q   And what's your observation of that description?

A    That is a completely different unit than the unit that we was referred to in the -- in the previous purchase order that we looked at.

Q    Why?

A    Because the resolution of the screen changes everything about the product from lens design to rendering to electronics.

Q    Okay.  So these two purchase orders aren't even for the same product?

A    They are not for the same product.

Q    All right.  You testified regarding the 100,000 units of 4K, the 100,00 units of 4K screens with regards to the amount of time and cost of producing them; do you recall that testimony?

A    I do.

Q    Okay.  What are your observations with regards to producing 100,000 units of 8K units?

A    It's going to be similar in terms of timeframes and cost more.

Q    Mr. Stasteny, in the course of your work at or with SeeCubic BV have you entered into contracts with counter parties regarding the development of glass three -- glasses free 3D technology?

A    We have.

Q    And are you familiar with the way that normally works?

A    I am.

Q   Okay.  Let's take a look at the terms of this agreement,
first of all, under shipping instructions; do you see that?

A   I do.

Q   There's terms of payment and date of delivery.  What do
you observe about those?

A   The terms of payment is 1060, which usually means Net 60,
so within 60 days, the first payment --

THE COURT:  Wait -- oh, okay, that's the shipping,
it's under the shipping, okay?

THE WITNESS:  Yes.

Terms of payment is N60, which usually means Net 60,
payment within 60 days of signing the agreement.  Date of
delivery is ASAP, which I've never seen in a purchase order
before.

BY MR. COLBY:

Q   Okay.  What types of terms would you -- have you seen in
the purchase orders for this technology?

A   Every contract we've entered into has been very precise in
terms of payment, number one being spread over a significant
period of time including not fully paid until completion.  Date
of delivery, there would be typically several threshold times
where something had to be viewed and approved by a customer
before you were able to go to the next stage.  And in no cases
is the date of delivery going to be after payment is fully
received.  Just no chance.  So none of this is familiar to me.

Q    Okay.  Well, what's the amount of money this purchase order is supposedly for?

A    $140 million total price.

Q    Do you have an observation regarding that amount of money and the payment terms that you just talked about -- the ordinary practices you just talked about?

A    Well, your -- we've never signed a contract this big, but the payment terms that I talked about, the very specific ones were for contracts in the $100,000 to $500,000 range and that was the level of specificity required for that amount of money.

Q    So what would you expect to see for a $140 million contract?

A    A lot of care being taken.

Q    And do you see down below shipping and handling and warranty -- sorry, there's a few more categories of terms down below, shipping and handling, warranty, and then terms and conditions.  Do you see that terms and conditions?

A    I do.

Q    And what are you observations regarding those terms and conditions?

A    It refers to the purchase order being contingent on final inspection and meeting quality and expectation levels to be detailed on a specification document, which I don't see here. And I also see that it says the purchase order is subject to final costing to be agreed upon prior to start for production.

Q    Okay.  So what are your observations regarding those terms?

A    Well, the -- if the first one essentially says that the parties haven't agreed on what's going to be produced yet.

Q    No --

MR. ALEXANDER:  I'm going to object.  He's attempting to interpret --

MR. COLBY:  No.  I'm asking him his opinion.

MR. ALEXANDER:  -- legally in terms of what the contract terms are.

THE COURT:  It says what it says.

MR. COLBY:  Correct.

THE COURT:  And you're asking him to interpret what it says?

MR. COLBY:  No, I'm asking him whether or not that is how it relates to what he has explained in his experience of the ordinary practices.

THE COURT:  That's not what he said.

MR. COLBY:  Okay.

THE COURT:  He said something different.  It seems to me that it's not final.  That's what he said, and is contingent on final inspection.

MR. COLBY:  Yeah.

THE COURT:  So he's basically saying he does something different, but he can't tell me that, you know --

he's concluding it's not a final decision.  So that's his

opinion, I guess his lay opinion as you're saying as to whether

this is normal or something, but the thing says what it says.

So --

MR. COLBY:  Correct.

THE COURT:  -- I'm not understanding what exactly

you're asking him to give his opinion about.

BY MR. COLBY:

Q    Mr. Stastney, based on your contracting experience for

this technology and this type of technology, what type of

information is typically included in a contract regarding

quality and expectation levels or specifications?

A    The -- exactly what's going to be produced and exactly

what the quality will be are specified at the time of the

contract.

Q    Okay.  And if those terms have not been delivered -- if

those terms have not been specified, do you consider SCBV

obligated to deliver a particular product?

A    The problem would be that even if it were obligated to,

which I don't think it would be, he -- we don't know what to

build.  We don't know what we're making.

Q    Okay.  Would you expect based on your experience to see

that detailed in a contract for $140 million?

A    Absolutely.

Q    There's also a line about subject to final costing.  Do

you see that?

A    I do.

Q    Based on -- what is final costing based on your understanding of practices in the industry?

A    The final costing is a quote that's provided to purchasers before they sign contracts because if you don't have final costing then you don't know what you're going to paying.

Q    And you talked a few minutes ago about sourcing and design and those sorts of things.  Does that relate at all to the -- this notion of costing?

A    Absolutely.  Once you have the product designed only then can you actually source and cost the materials that go in.

Q    Okay.  And have you ever seen a -- have you ever seen a binding contract that didn't include specifications for costing?

A    I have not.

Q    You referenced a few minutes ago the Stream TV claim that the counter parties to these purchase orders I'm going to reference to CR 67, which we just looked at and then there's another one with the counter party blacked out, that's CR 66, that's for 10,000 units.  You heard those referred to as blue chip companies.  What's your understanding that Stream claims those to be blue chip customers, blue chip companies; what's your understanding of what that term blue chip means?

A    Highly sophisticated, large, consumer electronics

companies.

Q    And based -- have you had interaction with blue chip electronics companies?

A    Yes.

Q    Have you done contracting with blue chip electronics companies?

A    Yes.

Q    What's your observation about these purchase orders relative to your experience contracting with blue chip electronics companies?

A    They are a 20th of the information and don't contain any of the critical information we would need to actually fulfill an order.

Q    Okay.  Over the course of your dealings with Stream TV have you heard previously representations of potential deals --

A    Yes.

Q    -- for the company?

A    Yes.

Q    What have you heard before?

A    Over the ten years that I was involved with Stream we were routinely told that there were very large deals with customers or strategic partners right around the corner.

Q    Who told you that?

A    Mathu Rajan.

Q    Can you recall any specific examples?

A    Sure, there deals with Apple, there were deals with Samsung, there were deals with pretty much every consumer electronics company you can name.

Q    Did any of those deals come to fruition?

A    None.

Q    Were you -- did you have a view regarding the accuracy of those representations?

A    I believed they were inaccurate.

MR. ALEXANDER:  Objection.  Foundation.  I mean, if you can --

THE COURT:  What representation?

MR. ALEXANDER:  And did he have --

MR. COLBY:  He described the representations that there was always some big deal right around the corner --

THE COURT:  Okay.

MR. COLBY:  -- from Mr. Rajan.

THE COURT:  Okay.

MR. COLBY:  And he -- so I don't understand what the objection is?

MR. ALEXANDER:  Well, the objection's --

THE COURT:  Because --

MR. ALEXANDER:  -- foundation, speculation.

THE COURT:  You asked the question.  He's saying the specu -- they'd be inaccurate.

MR. COLBY:  Yeah.

THE COURT: And so I guess he's like, oh what is the reason for you -- for his conclusion to say that it was inaccurate.

MR. COLBY: Yeah, I was just about the ask that.

THE COURT: Okay. Ask him.

BY MR. COLBY:

Q    What is the basis for your conclusions that those representations were inaccurate?

A    We were told that deals were going to happen very soon and none of them ever happened.

Q    Anything else?

A    No.

Q    How about, you know, we talked a little bit yesterday about institutional investors. Do you recall that?

A    I do.

Q    And -- well, actually let me back up. Let's stay on the consumer electronics, you know, part. Did you -- or are you familiar with any efforts undertaken to verify the accuracy of those representations?

A    Yes.

Q    Any come to mind?

A    Efforts were made by several -- by us, and by several institutional investors to try to verify the claims that were being made.

Q    And to your knowledge was that ever verified?

MR. ALEXANDER: Object -- object to hearsay to the extent he heard from a third party.

MR. COLBY: Yep, we went through all this yesterday, I believe, Your Honor. Mr. Stastney's when he was at Stream TV, Mr. Stastney's involvement in attempting to garner -- attempting to garner institutional investment and the reasons why that didn't occur.

THE COURT: Okay. But he also is objecting to what third parties told him.

BY MR. COLBY:

Q    Well, I'm going to ask you, Mr. Stastney, based upon your own firsthand observations.

A    Sure.  Yes, we attempted to verify certain claims.

Q    Okay.  Can you think of any examples?

A    Yes.  The relationship with BOE.

Q    What's BOE?

A    BOE is a huge Chines panel maker, manufacturer, otherwise known as Beijing Optical and Electric.

Q    Okay.  And what was the representation and what was the inquiry unit?

A    There was a claim that there was a strategic partnership with BOE --

MR. ALEXANDER: Object to hearsay.

MR. COLBY: No, that's not --

MR. ALEXANDER: We just have to look at the

representation by BOE to him was.

THE COURT:  No, he didn't --

MR. ALEXANDER:  If I misheard your question, I --

THE COURT:  Right.  He said that there was a representation that there was a relationship with BOE.

MR. COLBY:  Uh-huh.

THE COURT:  Okay.  And the representation was with respect to those other representations that were (indiscernible) made by Mister --

MR. COLBY:  Rajan.

THE COURT:  -- Mathu Rajan, right?  I mean, stating with respect to that can you detail -- he said efforts were made to confirm those.  And he said well, can you give me -- and he said one of those was (indiscernible) relationship with BOE.  And now he's saying his efforts that he made to confirm the relation with BOE; that's how I'm understanding it.

MR. COLBY:  That's correct, Your Honor.  The representation from Mr. Rajan is certainly not being offered for the truth of --

THE COURT:  I didn't -- he just said he thought it was --

MR. COLBY:  Well, that's the only statement by another that was incorporated in that question.

THE COURT:  I think he thought that he was -- he said something else.  Correct, Mr. Alexander?

MR. ALEXANDER:  I thought he was referencing a statement by BOE to Mr. Stastney.

THE COURT:  Right.  Okay.  Go ahead.

BY MR. COLBY:

Q   Yeah, so what inquiry did you make and what were you able to verify with respect to the BOE, the supposed BOE relationship?

A   Both that the relationship was not what is was purported to be.  It didn't cover the topics that purported really recover at least not all of them, number one.  And number two that a specific press conference that Stream TV attending that had supposedly been organized by BOE was in fact organized and paid for by Stream for the purpose of making it appear that I had been organized and paid for by BOE.

Q   And so was there a strategic partnership with BOE based upon your inquiry?

A   There was, but it was not what had been represented.

Q   Okay.  And --

THE COURT:  When was all of this?  That would be good to --

BY MR. COLBY:

Q   Yeah, what -- do you recall when this BOE situation was?

A   I do. From --

THE COURT:  When was that?

THE WITNESS:  From August of 2018 that's when I think

the strategic agreement was purportedly signed, until December

of 2019 when the press conference occurred.

THE COURT:  Okay.

MR. COLBY:  Okay.

BY MR. COLBY:

Q    We talked a little bit yesterday about institutional

investors; do you recall that?

A    I do.

Q    And you talked about -- I think you said that Stream had

never garnered an investment from an institutional investor; do

I recall that correctly?

A    You do.

Q    Have there ever been any representations made by Mr. Rajan

regarding institutional investors?

A    Yes, there have.

Q    And do you have a view regarding the accuracy of those

representations?

A    Over the years it was represented many times that many

different institutional investors were also just about to

invest and none of them ever occurred.

Q    Can you think of any examples?

A    Yes.  There was a representation that SoftBank would

invest.

Q    What's SoftBank?

A    SoftBank is the $200 billion Japanese technology investor.

Q    Okay. And did you inquire -- did you investigate whether or not SoftBank was about to invest in Stream TV?

A    I did.

Q    And what did you determine?

A    That not only --

MR. ALEXANDER:  Your Honor, I'm going to object to foundation.  I mean, he's not explaining what he did in order to investigate because if his conclusion is based on what third parties represented to him --

THE COURT:  All right.

MR. ALEXANDER:  -- it's hearsay.

MR. COLBY:  If he says somebody told him something --

THE COURT:  Or he needs to lay a foundation --

MR. COLBY:  Sure.

THE COURT:  -- what he did.

MR. COLBY:  Yeah.

BY MR. COLBY:

Q    What did you do to investigate the claim that SoftBank was about to invest, Mr. Stastney?

A    I tracked down and called the signer of the term sheet that purported to show that they were going to invest.

Q    Okay.  And was SoftBank going to invest?

MR. ALEXANDER:  Objection, Your Honor.  It's hearsay.

THE COURT:  Okay.  You might want to rephrase it.  I don't know, maybe he answered.  I don't know.

MR. COLBY:  Well, that's why I asked -- I didn't ask him what the person said.  I asked --

THE COURT:  Oh.

MR. COLBY:  -- Mr. Stastney based on his experience as -- at Stream --

THE COURT:  No, no, no.

MR. COLBY:  -- was SoftBank -- did SoftBank -- was SoftBank going to invest.

THE COURT:  No, he said track down and he called the purported person who signs.  And then he said they weren't going to invest.  So --

MR. COLBY:  So I think you can know, Your Honor, that somebody's not going to invest two ways.  One is they can tell you; two, has the supposed counter party to that investment.  It just isn't coming to fruition.  It's just not happening.

THE COURT:  Well, then how did he conclude that they weren't going to?  How about you ask him that.

BY MR. COLBY:

Q    How did you conclude that SoftBank wasn't going to invest?

A    Well, first it wasn't SoftBank.

Q    What do -- so what do you mean by that?

A    This was a company, an entirely different much smaller fund that had previously called themselves SoftBank until the big SoftBank came along and they said we don't call ourselves that anymore; that's number one.  And number two --

MR. ALEXANDER:  Your Honor, objection.  That's hearsay as well.  I mean, how does he know that?

BY MR. COLBY:

Q    How do you know that Mr. Stastney?

A    Because the term sheet did not have SoftBank, the main SoftBank on it.  And that was a red flag.

Q    Okay. And so, just to be really clear, the -- who did Mr. Rajan represent was going to invest in Stream?

A    SoftBank, the $200 billion Japanese technology company.

Q    Big Softbank?  You just reference the term sheet.

A    Uh-huh.

Q    What was the term sheet?

A    The term sheet is what were shown as evidence that the big SoftBank was going to invest.

Q    Okay.  And what parties actually signed the term sheet?

A    Stream TV.

Q    Yes.

A    And an entity that was not the big SoftBank.

Q    Okay.  That was the entity that used to call itself SoftBank, correct?

THE COURT:  Well, counsel.  He just said it had a different name.  I'm trying not to interject.

What was the name on the contract?  Did it have a different name other than SoftBank?

MR. COLBY:  I believe, Your Honor, what he said was

that -- well, I -- I'll have to have Mr. Rajan explain, but --

THE COURT:  Right.  Who was on the contract?

THE WITNESS:  I don't recall.  The name, something like SB Fund.

THE COURT:  Okay.  So the name SoftBank wasn't on there?

THE WITNESS:  Correct.

THE COURT:  Okay.

BY MR. COLBY:

Q    And was SB Fund part of big SoftBank?

A    No relation.

Q    Okay.  And who is -- which SoftBank was Mr. Rajan telling people were going to invest?

A    The big one.

Q    Okay.  And the term sheet was binding?

A    It was non-binding.

Q    Did this other company ever invest?

A    They did not.

Q    You testified yesterday, Mr. Stastney about the other investors in the Stream, the individual investors; do you recall that pool of people?

A    I do.

Q    Okay.  Based on your experience is there any connection between like institutional -- and you talked yesterday about institutional investors and what they bring to the table, is

there any connection between institutional investors based on your experience and individual investors?

A    Yes.

Q    Okay.  And what's that nexus if any?

A    Individual investors take a great amount of comfort from the fact that an institutional investor has either already invested or is about to invest and has vetted the company.

Q    Okay.  And what were your observations regarding the types of representations by Mr. Rajan about institutional investors and Stream's individual investors?

A    The representations were typically made to prospective individual investors to encourage them to invest.

Q    Why would the looming -- why would a potential looming institutional investment impact, in your experience, the decision making about whether or not to invest by an individual?

        MR. ALEXANDER:  Your Honor, I'm going to object.  I mean, this is -- it's not relevant what he thinks as to whether or not an institutional investor would invest.

        THE COURT:  Oh, no -- he --

        MR. COLBY:  That's not what's the question.

        THE COURT:  The question is --

        MR. COLBY:  What is irrelevant.

        THE COURT:  -- what he thinks an individual investor would do if they thought an institutional investor was

involved.  In his experience does it make them more willing to invest.  That's his experience.  That's all he's telling me.

MR. ALEXANDER:  But he's done a lot of the experience telling and if it's not relevant, you just because --

THE COURT:  I mean it's his experience.  I don't know what the purpose is either, but I mean, he --

MR. COLBY:  The -- for two reasons --

THE COURT:  Wait a minute.

MR. COLBY:  I'm sorry, Your Honor.

THE COURT:  By the way, if you guys see me writing this, to my law clerk to give me some, you know, I may have questions and he's getting research for me.  So I don't want you to think I'm just on this phone doing nothing or I don't know, playing (indiscernible) or something.

MR. ALEXANDER:  Words with friends.

THE COURT:  Or solitaire or whatever.  My favorite game is solitaire but that takes a little more concentration. Okay.  So that was his -- in his observations and his experience while he was at Stream that he believes in his experience that having institutional investors impacted whether individuals would invest or not.  That's his opinion.  Okay? I'll allow it for what it's worth.  Go ahead.

THE WITNESS:  So there were two ways that institutional investors would take comfort from that or --

MR. COLBY:  Sorry --

THE COURT: You mean, individuals.

THE WITNESS: Sorry. Individual investors would -- that would be appealing to them. One is, it would represent a reduction of risk because the company would presumably have been vetted by the institutional investor. And it could also represent an opportunity because typically speaking when the big institutional investor invests in your company, the valuation goes up.

BY MR. COLBY:

Q    Mr. Stastney, are you aware that -- you've been here in the courtroom, you're aware that Stream filed a motion regarding a stock sale for $300 million of equity in Stream?

A    I am aware.

Q    Okay. So based on your past experience at Stream, your experience as an investor in Stream, and your experience as an investor more generally, does that investment make any sense to you?

A    It makes no sense.

Q    Why not?

MR. ALEXANDER: I'm going to object as well, Your Honor. I mean, he's giving opinion testimony on investors views now, too?

THE COURT: In his opinion it makes no sense. I'm not quite sure what they think I'm supposed to do with that. That's his opinion.

MR. ALEXANDER:  I know, but we're trying to move it along and someone's asking him questions about his opinion.

THE COURT:  I'll allow it again for what it's worth. It's his opinion what he thinks someone else would do based on what he's done.  I don't see how he speaks for all investors, but it's his opinion, his lay opinion.  I mean, I don't know what I'm supposed to do with that, but I'm sure somebody's going to tell me.  Go ahead.

THE WITNESS:  It makes no sense to me.

BY MR. COLBY:

Q    Why not?

A    Multiple reasons.  Number one, $300 million is a multiple of all the money Stream raised over its life from 2010 to 2020 before it was in bankruptcy and before it had any of these issues.  Number two, the proposal to do has equity makes no sense because number one, it's a bankruptcy going on where there's a lot of debt that's still at issue.  And number two, the rights that the stockholder got don't make any sense in the light of Stream's capital structure where there's a high vote stock that would not -- would ensure that they didn't have control over where their money was spent.

Q    What do you mean that, the capital structure?

A    The series, the class B common stock which has the high vote and is controlled by the Rajan brothers.

Q    Okay.

MR. COLBY:  I don't have any further questions for Mr. Stastney at this time.

THE COURT:  Okay.  Cross in a minute.

You're the only one, right?  No other supporters are going to ask anybody -- well, you're the person in support of the motion.  So this is the only testimony at this point that's being offered in support of the motion, correct?

MR. COLBY:  Correct.  And --

THE COURT:  And from this -- no, from Mr. Stastney. I know you guys have other stuff.  I mean, Mr. Stastney.

Mr. Alexander, you want to commence your cross-examination?

MR. ALEXANDER:  How late are we going to go today, Your Honor?

THE COURT:  I mean, we can go late, but I have to make some --

MR. ALEXANDER:  Well, I'm just asking just so I can plan --

THE COURT:  I mean, we could probably go until 7 maybe.  That give you about -- oh, wait a minute, it's quarter to 5?  Oh, time flies when you're having fun.  So I mean, I know we're not going to stop at 5 because that's 15 minutes from now unless you want to just pick up tomorrow.

MR. ALEXANDER:  What time can we start tomorrow, Your Honor?

Case 23-10763-djb   Doc 378   Filed 08/28/23   Entered 08/28/23 10:36:27   Desc Main
Document      Page 140 of 221

THE COURT:  The problem is it's Thursday.  I have an 11:00 -- I have a 9 -- it's my Chapter 13 days, which means the trustee comes in at 9:30.  I come in at 11.  It depends -- I have no -- sometimes I come and I'm done at 11:05, sometimes I come on and I'm done at 1:00.  We're scheduled for 12:30 tomorrow, but I can see that we're going to need some more time unless you guys tell me you're going to wrap this up by tomorrow, I'm looking at adding some extra days here.  And I didn't give you all day Friday because you said we were going to wrap it up and I already have a trial scheduled -- that I just scheduled for Friday.

Mr. Callahan, are you involved in that case?  I don't even know -- do you know what?

MR. CALLAHAN:  Actually -- but there is --

THE COURT:  I just got a letter from the defense attorney.  I don't know how I go forward with that if he's going to plead the Fifth?

MR. CALLAHAN:  Does the other parties want to go forward?

THE COURT:  They can want what they want, but if it's -- you know, I don't know.  I don't know because I just read the letter in my break and now I have to go figure what happens when the party wants to plead the Fifth.  What the heck do I get to do?  I don't know.

MR. CALLAHAN:  My office will not be participating.

THE COURT:  You won't be participating, but that scheduled for -- I just scheduled that for Friday morning.  I just go the letter from defense counsel.  You got it too.  I guess, you know I thought my law firm I was all over, but apparently not.  I'm going to be researching this tonight and all -- you know, in between this trial of what does that mean.  And the only that's on tomorrow is the request to continue the hearing that are scheduled pending I guess, his own -- was he arraigned?  Do you know if he was arraigned.

MR. CALLAHAN:  He's in --

THE COURT:  He's incarcerated.  I know that, but I think he had not been arraigned yet.  I don't know.  And all of that is to say that if I don't have the hearing on Friday we can take Friday.  Mr. Alexander?  Mr. Colby?

MR. COLBY:  You're okay --

THE COURT:  No, no.  What I'm saying is that you asked me -- we're not going to finish this tomorrow unless you're telling me --

MR. ALEXANDER:  I think there's a possibility we could finish tomorrow.

THE COURT:  You think you're going to finish tomorrow?

UNIDENTIFIED SPEAKER:  I believe, Your Honor, one thing the parties may be at agreement on is intent to try to get done tomorrow.

THE COURT:  Well, intent -- when attorneys tell me two hours, I say four.  You say four, I say eight.

UNIDENTIFIED SPEAKER:  There may be an alignment of interest here unlike that other situation.

THE COURT:  Well, tomorrow we're starting at 12:30.

MR. ALEXANDER:  There's no way we could do the earlier before the Chapter 13?  Do you take a break?

THE COURT:  They start at 9:30.  They're in here at 9:30.

MR. ALEXANDER:  Oh, they're actually in here?  I'm sorry.

THE COURT:  You got it.  Doesn't the trustee come in here at 9:30?  I don't know.  My staff is there though.

UNIDENTIFIED SPEAKER:  (Indiscernible) at 9:30 and then at 11:00.

THE COURT:  Right but their part -- my staff participates in the 9:30.  They have to record it and do whatever and then we have the 11:00 that I participate in and then I'm free, but what I'm saying is that if we cannot finish tomorrow and we needed to go into Friday, there may be a possibility that we could then have at least most of Friday.  I don't know what they're going to -- I don't know what I'm doing on Friday.  So I just was trying to figure as a backup how late we go tomorrow.  We're already at 5:00.

UNIDENTIFIED SPEAKER:  A ten-minute break and stay

until 6.

MR. CALLAHAN:  I don't have the docket of that matter.

THE COURT:  Uh-huh.

MR. CALLAHAN:  But I understand that the hearing the Court scheduled is in an anticipation of the hearing scheduled later.

THE COURT:  Right.  But as an initial matter, the Debtor is asking that I continue the scheduled hearing --

MR. CALLAHAN:  That's tomorrow, yes.

THE COURT:  -- because he's incarcerated.  I don't -- in addition to which his defense counsel is now saying he's going to plead the Fifth.  So I have two issues.  One, he's unavailable, he's incarcerated and two, is defense counsel sent you the letter that apparently he sent to me saying that he's just been appointed and he's going to plead the Fifth.

MR. CALLAHAN:  Perhaps Your Honor maybe, well, I know the creditors and other parties may not be aware of that letter.  Well, actually, they are.  They were copied.

THE COURT:  I'm pretty -- I hope so, because you sent it to me and I'm sure he --

MR. CALLAHAN:  Actually, if the Court were to schedule a telephonic conference early in the morning tomorrow, we would need participation to see if --

THE COURT:  We can't -- my staff, I don't -- where am

I going to do it at?  My staff is going to be recording something else.

All of that is to say that -- one of two things. We're going to have to plan to go at least until 7:00 tomorrow, because there's no way I can fit it in.  And when I scheduled this, I knew the parameters of my schedule which is why I made them in the afternoon.  Are you guys aim on using some part on Friday?  Some portion?  Then wrap it up.  Otherwise, I don't know what to tell you.

MR. COLBY:  Yeah, I mean, our -- our belief, for what it's worth, is if we -- if we can push a little bit through today, then our intent and our hope would be that we can wrap it up tomorrow.

THE COURT:  Okay.

MR. COLBY:  And especially if we have a little slippage at the end of the day tomorrow too, but --

THE COURT:  All right.

MR. COLBY:  -- we won't crowd your Friday.

THE COURT:  Mr. Alexander?

MR. ALEXANDER:  No, I mean, my thinking was I just didn't want to break up this cross-examination.

THE COURT:  Right.  I get that.  And so tomorrow is Thursday.

MR. ALEXANDER:  And I don't believe Mr. Park's testimony is going to take -- I know from our side, it'll

probably take --

THE COURT:  So the only other witness after Mr. Stastney is going to be Mr. Park?

MR. COLBY:  Uh-huh.

THE COURT:  Okay.  So this, then, this leaves Mr. Alexander to cross-examine Mr. Stastney.

MR. COLBY:  Correct.

THE COURT:  And then Mr. Park's testimony, which you don't believe is -- how long you think your -- well, you're going to do direct for him.

MR. ALEXANDER:  I'm going to do direct, and I think the direct will be an hour to an hour and fifteen minutes, max.

THE COURT:  And who's cross-examining?  You?

MR. CALLAHAN:  I'd rather think cross-examine, hour, hour, and a half.

THE COURT:  So now we're at three hours.  And then we still have to have his cross examination of Mr. Parks, which is how long is -- I mean, of Mr. Stastney.  How long you think that's going to take.

MR. ALEXANDER:  Stastney.

MR. COLBY:  Your Honor, that's -- I mean, while Mr. Stastney's here on the stand, if we've got some -- a little extra time tonight, I think we should get started.

THE COURT:  I have to go make some arrangements about that.

MR. COLBY:  Understood.

THE COURT:  I have to figure out -- and tomorrow is definitely going to be -- I need to make arrangements for Thursday or whatever.

All right.  So how about let me take a ten minute break to see if we can go until 7:00.  That's two hours.

MR. ALEXANDER:  7:00?

THE COURT:  Tonight.

MR. ALEXANDER:  Okay.

THE COURT:  I don't know.  I have to see if that's possible.

MR. ALEXANDER:  Yeah.  I mean, like I said, my concern is just I didn't want to break it up.

THE COURT:  Right.

MR. ALEXANDER:  But I understand.

THE COURT:  So we start -- that's two hours today.

MR. ALEXANDER:  Well, I won't finish in two hours.

THE COURT:  Oh, I know you're not.  That's why I know if we did this tomorrow, there's no way we'll finish because you're only going -- from even we went from 12:30 until 7:00, we would be pushing it.  And I definitely have to figure out for tomorrow because I don't know if I can go past 5:00 tomorrow.

Okay.  I'm going to endeavor to be back here in ten minutes, unless I start talking to my law clerk and now, I'm

going to go over.  So that's really what I'm doing is trying to

figure out what I'm -- what work I need to depart to and what

other work I have in addition to this, which is if you heard my

counsel with Mr. Callahan, there's another issue that I have to

deal with.  So 5:00.

     (Recess taken)

          THE COURT:  Well, that was a prompt 5:00.  It's a

little longer than I thought.  I had to track down some people.

So we can go to 7:30 if that works for people.  Okay.  All

right.  All right, Mr. Alexander, you may proceed with your

cross-examination.

                    CROSS-EXAMINATION

BY MR. ALEXANDER:

Q    How are you, Mr. Stastney?

A    How are you?

Q    Just a little more background before we get started.  You

have a law degree, correct?

A    I do.

Q    And you received your law degree in 1994?

A    That's correct.

Q    And currently, you're admitted to practice in New York,

correct?

A    Correct.

Q    But you're not a practicing attorney?

A    Correct.

Q    And in terms of your practice, were you ever an attorney licensed in the Netherlands?

A    I was not.

Q    Are you an expert on Netherlands law?

A    I am not.

Q    You're not an expert on Netherlands corporate law?

A    Only in so far as it impacted my role as a director there.

Q    The question is are you an expert on Netherlands corporate law.

A    I knew what I needed to know to serve as a director there.

Q    Did you ever take any classes on Netherlands law, corporate law?

A    No.

Q    And you don't have any degrees with respect to Netherlands corporate law, correct?

A    I do not.

Q    In terms of SeeCubic, Inc, as of today, you're that chairman and CEO, correct?

A    Correct.

Q    And you've held the title of chairman or CEO since SeeCubic, Inc's inception, right?

A    Correct.

Q    And in terms of SLS, how long have you been a managing member?

A    Since its inception.

Q   And when was the inception of SLS?

A   2011.

Q   And we also talked about your connection to Stream.  Do you recall that?

A   I do.

Q   You were recently a director from 2011 through 2014?

A   Correct.

Q   You subsequently served as a director from approximately September 2018 through January of 2020, correct?

A   Correct.

Q   And your CFO tenure was from December 1st, 2018, through January 20th of 2020, right?

A   Sounds correct.

Q   I believe it was yesterday when your direct testimony started.  You left with a settlement agreement with the SEC, do you recall that?

A   I do.

Q   That settlement agreement related to your employment at Business Capital, correct?

A   Vicis Capital, yes.

Q   Vicis Capital.

        THE COURT:  How do you spell that?

        THE WITNESS:  V-I-C-I-S.

        THE COURT:  V-I-C-I-S.  So not vices, like vice. Vicis Capital.

MR. ALEXANDER:  This is -- but it's --

THE WITNESS:  Vicis.  We pronounced it vices.

THE COURT:  Yeah, I thought it was like Vices like vice -- V-I-C-E.

THE WITNESS:  Okay.

MR. ALEXANDER:  V-I-C-I-S.

THE COURT:  V-I-C-I-S, not V-I-C-E-S.

THE WITNESS:  Yeah, correct.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q   Vicis was a registered investment advisor, correct?

A   Correct.

Q   You were the -- one of the founders of Vicis Capital, correct?

A   Correct.

Q   And you served as its COO and head of research since its inception in 2004, correct?

A   Correct.

Q   And as part of that role, you were responsible for directing, overseeing, and managing a liquid investments, correct?

A   Correct.

Q   And in the SEC settlement that we discussed that action involved allegations that you breached a fiduciary duty to investors, you failed to disclose a material conflict of

interest, and engaged in an undisclosed principal transaction, right?

A   I don't believe the breach was to investors.  I believe I owed the obligation to the trustee.  But other than that, largely correct.

THE COURT:  Okay.  So what -- what was --

MR. ALEXANDER:  Let me rephrase it.  I'll break it down too to make it follow a little easier.

BY MR. ALEXANDER:

Q   The FEC action involved allegations that you breached a fiduciary duty to a trustee of a fund.

A   That's correct, the allegation did.

Q   The allegations were also that you failed to disclose a material conflict of interest?

A   I failed to disclose a principal transaction, yeah.

Q   Well, in the allegations were that you engaged in an undisclosed principal transaction, right?

A   Correct, uh-huh.

Q   And the SEC alleged that you personally received over $2.7 million from the undisclosed principal transaction, correct?

A   That's correct.

Q   As a result of that settlement agreement that was discussed, the SEC entered a cease-and-desist order against you in September 2013, correct?

A   That was part of the settlement, correct.

Q    So the SEC did enter that order, correct?

A    I believe so.

Q    And as a result of that, you were barred from association with any investment advisor, broker, dealer, municipal security dealer, or transfer agent, correct?

A    For a period of 18 months.

Q    I'm just asking my question.  Is the -- is it yes that you were barred from association in investment advisor, broker, dealer, municipal situated dealer, or transfer agent?

A    Yes, I was barred, but subject to reapplication after 18 months.

Q    You were also required with a discouragement of $2,033,710.46 and a prejudgment interest of $501,385.06, right?

A    I don't remember the exact numbers, but that sounds approximately correct, yeah.

Q    So approximately $2.7 million?

A    Correct.

Q    You were also required to pay a $375,000 monetary penalty, is that correct?

A    That's correct.

        THE COURT:  Hold on.  I'm trying to write all this down.

        MR. ALEXANDER:  I was just trying to go quick, Your Honor, but I'm going to slow down.

        THE COURT:  Slow down.  297 -- 2.7 million total plus

what?

BY MR. ALEXANDER:

Q    You were also required to pay a $375,000 monetary penalty, right?

A    I believe that's correct.

Q    And you're familiar with the financial industry regulatory authority also known as FINMA, correct?

A    I am.

Q    And FINMA works under the supervision of the SEC?

A    I don't know the exact relationship, but.

Q    But FINMA's goal is to enforce rules governing the ethical activities of registered broker dealer firms and registered brokers in the U.S.  That's your understanding?

A    I don't know their exact role.

Q    But you do know that as a result of the SEC order that was entered, you were barred by FINMA, correct?

A    For a period of 18 months, yeah.

Q    And that prohibited you from being associated with any FINMA member in any capacity, correct?

A    Except for Vicis Capital.

Q    Well, your only affiliation with Vicis Capital was not -- you could no longer do investment advising with Vicis Capital correct?

A    I was doing exactly what I was doing before with Vicis Capital.

Q    In terms of with the SEC?

A    Yes.  The SEC rule permitted me to do exactly what I was doing with Vicis Capital before the order.

Q    And in terms of the disbarment, that occurred in 2013?

A    I've never been disbarred.

Q    Barred from -- I thought you just testified that FINMA -- you were barred by FINMA.

A    Maybe, so I don't think it's called a disbarment.  BVC -- the settlement -- the settlement agreement was entered into in September of 2013.

Q    And as of today you haven't sought reentry with respect to FINMA, correct?

A    That's correct.

Q    And so that 18-month period would have lapsed sometime in 2014, correct?

A    That's correct.

Q    So the last nine years, you still have not sought to reapply with FINMA?

A    I have never been affiliated with an entity for which that would be required, so no.

Q    Let me talk a little bit about, you know, I'll get into the details a little more.  But when we're talking about the SLS proof of claim that was filed in this bankruptcy case.  Do you recall that testimony?

A    Yes.

Q    And I believe you testified that SLS invested approximately $6.35 million in Stream, correct?

A    That's correct.

Q    And that was broken up into a $3 million loan, a second $3 million loan, and then $350,000 in terms of stock purchase, is that accurate?

A    Common stock purchase, correct.

Q    And SLS filed a proof of claim in this bankruptcy case with Stream, correct?

A    Correct.

Q    Are you aware if they filed a proof of claim in the case with Technovative?

A    I believe they did.

Q    What's the basis for SLS's claim against Technovative?

A    I believe Technovative was a guarantor of Stream's obligations under SLS's documents.

Q    Which documents?

A    It's loan documents.

Q    Any particular loan documents?

A    The loan documents governing both $3 million loans.

Q    So you believe that Technovative guaranteed the obligations in terms of the repayments of the loans between Stream and SLS?

A    I believe so.

Q    Is that your testimony?

A    Yes.

Q    Have you seen documents with respect to a guaranty?

A    I believe so.

Q    You have those today -- let me ask a different question. What authority did you have to file that -- or did you file the proof of claim?  Did you sign the proof of claim on behalf of SLS?

A    I did.

Q    And what authority did you have to file that proof of claim?

A    As managing member of SLS Holdings 6.

Q    And as of today, you believe that the SLS claim is slightly in excess of 17 million?

A    That's correct.

Q    Does SLS own that debt?

A    SLS owns the debt.

Q    Do you believe that only one party can be repaid for that debt?

A    I believe that the Debtor only has to repay that amount once.

Q    Well, if SLS owns the debt, why would Hawk also file a proof of claim for the same debt?

A    Hawk's proof of claim relates to its claim for SLS's debt as collateral agent for SeeCubic, Inc.

Q    How can both parties file the same proof of claim.

A    I was advised by counsel to file the proof of claim.

Q    And so you have no independent outside of advice of counsel as to why two entities are seeking payment for the exact same claim?

A    I do not.

Q    You do realize those claims were filed under penalty of perjury?

A    I do.

Q    Did you have discussions with Hawk before they filed the claim on behalf of SLS?

A    I did not.

Q    And it's your position that you direct Hawk in terms of its actions that it can take?

A    No.

Q    So your testimony isn't that you have SeeCubic direct Hawk with respect to the collection of its claims and the collateral?

A    Not since SeeCubic has defaulted on its debt to Hawk and Hawk is now acting in its capacity as collateral agent.

Q    So can Hawk independently go after and seek payment from Stream outside of SLS?

A    I don't understand the question.

Q    Well, I'm just trying to understand how two people can file the same claim for the same dollar amount.  One claim has to be right and one claim's wrong.  So I'm trying to understand

who has the proper claim.

A    I don't know if that's true.  Again, I was advised by counsel that it was appropriate to file a claim.

Q    You made some testimony that it's, you know, difficult to get -- or I believe it was difficult to get investments in Stream because of the controlling interest of the Rajans.  Was that your testimony?

A    Not quite.

Q    No.

A    It was difficult to get institutional investments.

Q    Right.  But that was not an issue for SLS Investing in putting money into Stream, correct?

A    No.  SLS was definitely not an institution.

Q    Well, that wasn't my question.  I said it wasn't an issue that controlling interest for SLS to invest in Stream, correct?

A    Incorrect.  It would have been, but that controlling interest didn't exist when SLS invested.

Q    Okay.  When do you believe that controlling interest existed?

A    Staring some time in 2013.

Q    You talked about that SLS's debt is secured, is that correct?

A    Yes.

Q    What is it secured by?

A    All of the assets of Stream TV Networks, Inc, and its

subsidiaries.

Q    What's included in that?

A    All of the assets.

Q    Well, can you detail the assets that you believe SLS has a security interest in with respect to Stream?

A    I don't have a list of all of Stream's assets.

Q    Well, can you list any assets that you believe you have a security interest in?

A    Of course.  The stock of Technovative, the stock of the subsidiaries that existed at the time of the SLS note at the very list.  Any real or personal property owned by Stream.

Q    What real or personal property do you believe Stream owns?

A    Well, the -- technology, materials, the bonding equipment.

THE COURT:  You said bonding equipment?  What is --

THE WITNESS:  The technology that they have, the materials that they have.

BY MR. ALEXANDER:

Q    With respect to the proof of claim, you would agree that if Stream paid the value of the claim that was filed, then Hawk outside of SLS would no longer have a claim, correct?

A    I believe we discussed this in our deposition.  I don't know if that's the only thing that's required, but that is certainly the main thing that's required.

Q    Did SLS put anything else in their proof of claim?

A    Did not.  It said not less than the number amount on the

proof of claim.

Q    Well, let's talk about the number on the proof of claim.
What else would be included on the proof of claim number?

A    Certainly interest since the claim was filed and any
expenses or other items that are allowed under the security
documents that would be valid.

Q    What other expenses are allowed?

A    I don't know off the top of my head.

Q    Okay.

A    I would refer to the security documents and ensure that
they'd all been paid.

Q    But you don't know today whether or not there are any
other expenses that SLS is owed?

A    I do not.

Q    And there weren't any additional ones included in the
proof of claim, correct?

A    The proof of claim is what it is.

Q    And that's the proof of claim that you filed for a little
over $17 million?

A    That's correct.

Q    Then my question again is if a proof of claim dollar
amount is paid, plus no other interest and expenses are owed,
would you agree that SLS no longer has a claim?

A    I believe the Debtor has the right to pay that amount.

Q    And SLS would be required to accept that amount?

A    I believe so, so long as that's what the rest of the SLS document said.

Q    Well, what else would the SLS document say about not accepting money?

A    I don't know.  I'd -- off the top of my head, I can't think of anything, but I don't know.

Q    But they're your documents, correct?

A    They are.  All 200 pages of them.

Q    Correct.

A    I don't know.

Q    But sitting here today, you can't think of any other reason why if SLS is paid its debt, they would still have a claim.

A    You're correct.

Q    In terms of the security interest, what was done -- do you understand what perfecting the security interest means?

A    I do.

Q    What was done in order to perfect the security interest?

A    I believe UCC financing statements were filed.

Q    And initially, with respect to the assets -- strike that. What do you believe the value of the assets are that you previously discussed in your testimony today?

A    I don't know exactly what the value of those assets are.

Q    Well, your testimony from your -- or the statements from counsel for Hawk indicated that it was worth less than what's

owed. Do you agree with that?

A I think that's generally -- I think that's probably true, yes.

Q Okay. So approximately what do you believe they're worth?

A Less than what's owed. Less than 200 some million dollars, I believe.

Q And what are you basing that on?

A The general perception of the marketplace and specific knowledge about what SeeCubic BV does and where it is in its development process.

Q But SLS has no direct loans with Technovative, correct?

A SLS has no direct loans with Technovative.

Q In terms of SeeCubic, SeeCubic never entered into any loan with Stream, correct?

A SeeCubic never loaned Stream any money -- never loaned Stream any money, correct.

Q SeeCubic never loaned Technovative any money, correct?

A That's correct.

Q But you're aware that SeeCubic filed a proof of claim in this bankruptcy case as well, correct?

A I am.

Q And SeeCubic believes that it's owed money from Stream because of money that SeeCubic invested into some of its subsidiaries?

A And also that money that SeeCubic spent improving the

value of the assets during the time that it owned them, yeah.

Q    But there was never any complication where Stream agreed to pay any money to SeeCubic, correct?

A    That's correct.

Q    And Technovative never agreed to pay any money to SeeCubic, correct?

A    I don't know how that's different than the previous question.

Q    I believe the previous question was Stream.  If it wasn't I'll resay it again.  Stream never agreed to pay any money to SeeCubic, correct?

A    Not to my knowledge, it did not.

Q    And we're talking about SeeCubic, Inc.

A    Correct.

Q    Technovative never agreed to pay any money to SeeCubic, Inc, correct?

A    Correct.

Q    During your testimony, you referenced that you believed Hawk also had a claim against Stream, correct?

A    Correct.

Q    And I believe you testified that that -- you believe that claim was in excess of $100 million, correct?

A    I believe in excess of $160 million, yeah.

Q    And you testified that you're familiar with the Hawk documents with Stream, correct?

A     Yes, generally.

Q     So you're familiar that there's a conversion option in the Hawk loan documents, correct?

A     No, that's not correct.

Q     Not correct.

A     There's no conversion option in the Hawk loan document.

Q     Is there a conversion agreement between -- there's a conversion agreement between Hawk and Stream, correct?

A     Correct.

Q     And if certain criteria are met, then the Hawk debt is converted to equity, correct?

A     I think that's subject to interpretation, but generally speaking, that was the intent of the agreement.  That if certain criteria were met, the Hawk debt would convert to equity.

Q     And as of today, the Hawk debt is still convertible, correct?

A     I think that's open to legal interpretation.  I'm not qualified to make that statement.

Q     You're not qualified based on your review of all the documents, and you're the collateral agent -- I'm sorry, SeeCubic directs the collateral agent.  You said you've reviewed the loan documents.  But now you're sitting here today, and you don't know if part of what SeeCubic's collateral is can be converted to equity in Stream?

MR. COLBY:  Objection, Your Honor, which I would withdraw if Mr. Alexander wants to ask him what his understanding is as opposed to what the answer to the legal question is.

THE COURT:  Wait, you're saying you're asking him for legal as opposed to his understanding.

MR. COLBY:  Or his position, either would work.

THE COURT:  Rephrase the question.  We're not going to spend 50 hours debating, so.

BY MR. ALEXANDER:

Q    Do you believe that the Hawk debt can be converted as of today?

A    My belief is that it is still subject to proceedings in Delaware Chancery Court to determine that.

Q    So the issue in the Delaware Chancery Court is not whether the debt can be converted.  It's whether or not the debt was converted, correct?

A    Incorrect.

Q    So what are the issues -- so you believe one of the issues that's being addressed in the chancery court is whether or not at a base level the documents have a conversion right -- or I'm sorry, a convertible right?

A    I believe that what the document originally said is not subject to debate.  But I believe what's been decided so far in the chancery court is that it was not converted as of November

2021, that new equity needed to be raised for it to be converted, and therefore whether and what's required for it to be convertible is still open to the decision of the Delaware Chancery Court.

Q    Well that's -- those are two different issues.  I mean, my question is do you believe that the Hawk debt can be converted to equity in Stream as of today?

A    I don't believe that it can, no.

Q    Do you remember the discussion about what we call the omnibus agreement?

A    I do.

Q    And you testified that SeeCubic was formed to take the assets of Stream pursuant to the omnibus agreement, correct?

A    That's correct.

Q    And in terms of the original draft of the omnibus agreement, that was drafted by attorney that is Scadden (phonetic), correct?

A    No.

Q    No.

A    That's not correct.

Q    Okay.

A    The omnibus agreement was based on a draft document from Scadden, but that document was not the omnibus agreement and was never purported to be the omnibus agreement.  It was something that was modified for a different purpose.

Q    Yeah, I just asked a question and --

A    I'm trying to answer.

Q    Yes, and --

MR. COLBY:  Just -- if he could just let the witness finish answering the question.

MR. ALEXANDER:  But only if he answered the question I asked.

THE COURT:  The question was was the draft -- I think he said initial draft of the omnibus agreement drafted by Scadden, yes or no and he said no.

MR. COLBY:  Okay.

THE COURT:  But then he elaborated.

MR. COLBY:  Okay.

THE COURT:  So it's a yes or no.  So no, it was not.

BY MR. ALEXANDER:

Q    And what was the final date of the omnibus agreement?

A    I don't recall if it was May 6th of May 9th of 2020.

Q    Does May 6th of 2020 ring a bell?

A    That's one of the two choices.  I think that sounds right.

Q    But the drafting of that omnibus agreement began while you were still employed as the CFO of Stream, correct?

A    No.

Q    No, there was no drafting of an omnibus agreement prior to you leaving Stream as the CFO?

A    May I elaborate?

THE COURT:  What -- yes or no --

MR. ALEXANDER:  My question was --

THE COURT:  Yes or no, and then I guess --

THE WITNESS:  Say it that way, no.

BY MR. ALEXANDER:

Q    Prior to you leaving Stream as the CFO, you began negotiating with Stream employees to work for a new company, correct?

A    Incorrect.

Q    Incorrect.  So your testimony is you never negotiated with any Stream employees prior to leaving Stream to work for a new company?  Is that your testimony here today?

A    That is my testimony here today.

Q    Your testimony -- so you never negotiated with Alastair Crawford for a position at the new company while you were still at Stream?

A    Alistair Crawford is not and never was an employee of Stream.

THE COURT:  Who?

THE WITNESS:  Alastair Crawford.  A-L-A-S-T-A-I-R.

THE COURT:  A-L --

THE WITNESS:  A-S -- he's British.  You have to forgive them.  T-A-I-R.

THE COURT:  No E on the end?

THE WITNESS:  No.

THE COURT:  Alastair Crawford?

THE WITNESS:  Yes.

BY MR. ALEXANDER:

Q    You received a draft of what led to the omnibus agreement while CFO at Stream, correct?

A    No.

Q    In terms of your time at Stream, you said it ended in 2020, correct?

A    That's correct.

Q    And within two months of resigning from the board of Stream, you attempted to effectuate the transfer of all Stream's assets to SeeCubic via the omnibus agreement, correct?

A    I believe it was more like four months.

Q    But your -- your last day at Stream was January 30th, 2020, correct?

A    Correct.

Q    And so I guess we can do the date calculation.  But it -- May 6th ended up being the date, so a little over three months.

A    Three.  Between three and four months.

Q    Okay.

A    Correct.

Q    And at the time you executed the omnibus agreement in that it required the approval of Stream's Class B members, correct?

A    Incorrect.

Q    So you were unaware of the approval rights of the Class B

members at the time the omnibus agreement was executed?

A    We did not believe that given the transaction the omnibus agreement contemplated that the Class B share approval was required.

Q    But you did testify -- it's your understanding that the basis of the supreme court ruling invalidating the omnibus agreement with the failure to obtain the approval of Rajans as Stream's Class B stockholders, right?

A    That's correct.

Q    I believe you also testified that there were two alleged independent directors that executed the omnibus agreement on behalf of Stream, right?

A    I don't think we talked about that, but I believe that there were.

Q    And their names were Asaf Gola and Kevin Gollop, correct?

THE COURT:  Who?

BY MR. ALEXANDER:

Q    Did I say their names correctly?

A    Not quite, but it's close enough.

THE COURT:  What were their names?

THE WITNESS:  Asaf, A-S-A-F.

THE COURT:  Asaf.

THE WITNESS:  Gola, G-O-L-A.

THE COURT:  Yeah, I wrote those down.

THE WITNESS:  You did before?  And Kevin Gollop, G-O-

L-L-O-P.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q   And they did not join the Stream board until March of 2020, correct?

A   I believe that's correct.

Q   So within two months of the execution of the omnibus agreement, that's when they joined the board of Stream, correct?

A   I believe that's correct.

Q   And after the omnibus agreement was executed, Mr. Gola and Mr. Gallop both became consultants for SeeCubic, Inc, right?

A   That's correct.

Q   You talked about discussions, or I asked you about discussions with Alastair Crawford and you indicated he was not a Stream employee, correct?

A   That's correct.

THE COURT:  What's his name again?  Alastair?

THE WITNESS:  It's A-L-A-S-T-A-I-R, Crawford.

THE COURT:  And you said he's English, that's why it's spelled Alastair.  Okay.  All right, go ahead.

BY MR. ALEXANDER:

Q   Kaushiek, and I might mess this name up too just as badly, but you can correct me if I'm wrong.

A   Is it Banerjee?

Q    Was an employee of Stream, correct?

A    Banerjee was an employee.

THE COURT:  What was the name?

THE WITNESS:  Kaushiek.

THE COURT:  Kaushiek, what?

THE WITNESS:  Banerjee.  B-A-N-E-R-J-E --

THE COURT:  N-E-R --

THE WITNESS:  J-E-E.

THE COURT:  Banerjee.  Kaushiek Banerjee.  Okay.

THE WITNESS:  That's right.

THE COURT:  He was an employee and Mr. Crawford was not an employee.

THE WITNESS:  That's correct.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q    You had discussions with Mr. Banahee --

A    Banerjee.

THE COURT:  Banerjee.

MR. ALEXANDER:  Banerjee, there we go.

BY MR. ALEXANDER:

Q    Banerjee prior to you leaving as CFO regarding your new company, correct?

A    Incorrect.

Q    Okay.  So your testimony today is you didn't have any discussions with Mr. Banerjee regarding you leaving as CFO and

new employment with a company once you left Stream?

A    That's correct.

Q    All right.  We're going to go for another name here and you can help me out.  You had discussions with Srikanth Melam regarding you leaving and new employment after you left Stream with your new company, correct?

A    I don't believe so, no.

THE COURT:  Can somebody spell that name for me?

MR. ALEXANDER:  S-R-I --

THE WITNESS:  I can't even spell that one.

THE COURT:  S-R-I --

MR. ALEXANDER:  K-A-N --

THE COURT:  K-A-N, that's one word?

MR. ALEXANDER:  T-H.  that's one word.

THE COURT:  Okay.  That's the whole name?

MR. ALEXANDER:  No, Melam.  M-E-L-A-M.

THE COURT:  That's a female or male?  Mr. Melam.

THE WITNESS:  I think it's Mr., I believe.

THE COURT:  All right, I'm going by Mr. Melam.  We're not going to do that first name.

THE WITNESS:  It's a man.

THE COURT:  Okay.  Mr. Melam.  Is an employee and no discussions or not an employee?

MR. ALEXANDER:  I'm going to ask --

THE COURT:  Oh, I'm sorry.

MR. ALEXANDER:  -- that next question now in terms of --

THE COURT:  I'm writing my notes ahead.  I'm sorry. I'm getting ahead of myself.  Go ahead.

BY MR. ALEXANDER:

Q    Mr. Melam was an employee of Stream, correct?

A    I don't know.

Q    Okay.  In reference to that, you had an extensive litigation with respect to the omnibus agreement, correct?

A    Correct.

Q    And you also testified that you believed it was a litigation tactic when Stream filed bankruptcy to stop the omnibus litigation from proceeding, correct?

A    Correct.  The first bankruptcy, 2021.

Q    The --

A    Not this bankruptcy.

Q    -- voluntary bankruptcy previously that was filed by Stream.

A    In February of 2021.

Q    Correct, in February of 2020.

A    Correct.

Q    But ultimately Stream's view of the invalidity of the omnibus agreement was correct, right?

A    It's argument with the supreme court was successful.

Q    Uh-huh.  So Stream prevailed with respect to the omnibus

agreement being declared invalid, correct?

A    That's correct.

Q    And as part of that, all of the fund -- or lower court decision was reversed and vacated, correct?

A    I believe that's correct.

Q    So the fact that you viewed it as a litigation tactic, Stream was correct in the fact that what was done to Stream was improper, correct?

A    Incorrect.  That's not -- those two things are two completely separate things.

Q    They separate things?

A    Whether or not Stream ultimately prevailed, which it did, doesn't say anything about whether the bankruptcy filing was at that time a litigation tactic to prevent the chancery court from reaching a conclusion that could ultimately have been challenged in the supreme court.  All it did was delay that. So it was --

Q    The parties have a right to file bankruptcy, correct?

A    Beg your pardon?

Q    Parties have a right to file bankruptcy, correct?

A    Absolutely.

Q    And Stream exercised its right to file bankruptcy, correct?

A    Parties have a right to file bankruptcy.  If that bankruptcy is --

Q     So my question was --

A     Parties have a right to file bankruptcy so long as that -- they don't have an unfettered right to file bankruptcy.  They have a right as defined in the bankruptcy code.

Q     I just wanted to go back to one point when cease and desist was entered with respect to you.  After that, that's when you left the board of Stream, correct?

A     It would be the first time in 2014.

Q     In 2014?

A     Uh-huh.

Q     And that was a result of some of the outside professionals indicating that it would be difficult for Stream to raise money because of that, correct?

A     That's correct.

MR. ALEXANDER:  Your Honor, I have to apologize.  We submitted our exhibits electronically and one of them was the wrong exhibit.  It was marked as Exhibit 14.  So if I may approach?

THE COURT:  Okay.  So do you have binders or --

MR. ALEXANDER:  I have binders, but it's not in this binder --

THE COURT:  Okay.

MR. ALEXANDER:  -- because it was the incorrect document that was in the binder.

THE COURT:  Okay.

MR. ALEXANDER:  But this document is listed on Stream's exhibit list as document 14.

THE COURT:  But it's the wrong 14?

MR. ALEXANDER:  Well, the title is correct.

THE COURT:  Right, but the wrong attachment?

MR. ALEXANDER:  But it's the wrong attachment.

THE COURT:  Okay.  So now, I don't have anything, so --

MR. ALEXANDER:  No.  I understand.  That's what I asked if I could approach.

THE COURT:  Okay.  You can, I guess -- we haven't -- yes.  You're going to mark it as --

MR. ALEXANDER:  Well, I was going to give one to the witness.

THE COURT:  One to the witness and one presumably for me.

MR. ALEXANDER:  To the extent that we move forward with it.

THE COURT:  All right.

THE COURT:  So mark that as Exhibit -- well, it doesn't what he submitted.  We only go with what we use in court because I have all these binders over here.  They don't mean -- I'm giving them back if they don't get admitted.  So it doesn't matter what you --

MR. ALEXANDER:  You can hold on to it for a second.

I'm not going to give it to him yet.

THE COURT:  I don't get it either?

MR. ALEXANDER:  Correct.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q    Mr. Stastney, you're familiar with the term private placement or memorandum or PPM, correct?

A    Yeah.

Q    What is a PPM?

A    Generally, it's the description of the company that's given to prospective investors.

Q    And as part of SeeCubic's business operations, it sends out PPMs, correct?

A    Generally, uh-huh.

Q    And you are involved in the process of SeeCubic Inc., sending out its PPMs, correct?

A    I have been at times.

Q    SeeCubic sends out PPMs to people who have invested or are considering investment in SeeCubic, correct?

A    Generally considering, yeah.

Q    And you believe that information contained in SeeCubic's Inc.'s, PPMs is accurate when it is sent out, correct?

A    As much as possible, yes.

Q    Handing you what's marked as Debtor's Exhibit 14.  Do you recognize this document?

A    This seems to be a private place and memorandum from --
sorry, it's close to the month, from June of 2020.

Q    And this would have been one of the SeeCubic documents
that would have been sent out to prospective investors,
correct?

A    In June of 2020.

Q    Correct, in 2020.

A    Uh-huh.

THE COURT:  20 or 20 -- oh.

THE WITNESS:  2020, 2-0-2-0.

THE COURT:  Yeah, I see up here.  PPM equity on 6/20.
That's what we're talking -- see up in the corner underneath
the docket information?

MR. ALEXANDER:  Yes, Your Honor.

THE COURT:  So it's June 2020 or is it '21?  Again,
I'm -- I may be hearing wrong.  Okay.

THE WITNESS:  It might be me.

THE COURT:  I don't know, no.

BY MR. ALEXANDER:

Q    Mr. Stastney, this was no doubt in June of 2020, correct?

A    I don't know if this was every sent out, but this appears
to be a PPM from June of 2020.

Q    From June of 2020?

A    Uh-huh.

MR. ALEXANDER:  Okay.  Your Honor, I'd like to move

this document into evidence.

MR. COLBY:  No objection, Your Honor.

THE COURT:  All right, admitted.

(Debtor's Exhibit 14 admitted into evidence)

BY MR. ALEXANDER:

Q    In terms of the PPMs, you indicated that you believe they're accurate when they're sent out, correct?

A    Yes.  The ones that are sent, we believe they're accurate.

Q    And do you also believe that SeeCubic, Inc., represented in its PPMs that it did not have the assets of Stream, then it would not be able to continue as a going concern?

A    I'm sorry, I didn't understand that question.

Q    In SeeCubic, Inc.'s, PPMs, it represented that if it did not have the assets of Stream, then SeeCubic, Inc., would not be able to operate as a going concern, correct?

A    I don't know.  I'd have to look.

Q    But if that's in that document, you believe that's accurate, correct?

A    I believe that would have been accurate at the time in June of 2020.

Q    At the time of the PPMs?

A    Correct.

Q    During your time with Stream, I believe you also testified that you had an employment agreement with Stream, correct?

A    Correct.

Q    And you entered into that agreement on or about December 1st, 2018?

A    That sounds correct.

Q    And you testified that you served as CFO until January 30th of 2020, correct?

A    That's correct.

Q    And you made the decision, you talked about that you made the decision to no longer be CFO as of January 30th, 2020, correct?

A    As of January 30th, 2020, I notified Stream that I felt I'd been constructively terminated as CFO because I wasn't being given any of the information I needed, wasn't being allowed to do my job.

Q    You resigned as CFO of Stream as of January 30th, 2020?

A    I didn't resign.  I took a position that I was constructively terminated.

Q    Okay.  And then once -- after you left, within -- we talked about this, you created SeeCubic, Inc., correct?

A    Four months later, yes.

Q    Four months later you created SeeCubic, Inc.  And you are shareholder of SeeCubic too, correct?

A    Correct.

Q    And SeeCubic's business was to take Stream's assets, including its subsidiaries and technology and commercialize the technology, correct?

A    It was to receive the assets from the omnibus agreement and continue to progress the business to commercialization.

Q    So if the omnibus agreement was invalid, then the purpose of that would no longer exist, correct, based on that?

A    Yes. If there was no way for SeeCubic to get the assets of Stream, it wouldn't have a purpose at that time.

Q    You're aware that your employment agreement contained a noncompete provision, correct?

A    I am.

Q    And it was for the term of the employment plus three years, correct?

A    Correct.

Q    In fact, you were not allowed to compete with or encourage others to compete with the business that Stream engaged in at the time during your employment, correct?

A    Correct.

Q    Stream and SeeCubic are in the same line of business, correct?

A    Not at the same time.  They operate the same assets, but they can't both be doing it at the same time, so.

Q    They both exist today, correct?

A    But they're not competing because it's ultimately the same technology.

Q    My question was do they both exist today?

A    They do both exist today.

Q    And Stream still existed even after the omnibus agreement, correct?

A    Correct.

Q    And when you went to SeeCubic, you began operating the same business that Stream operated, correct?

A    The same line of business, correct.

Q    You were violating your noncompete and causing damage to Stream, correct?

A    Incorrect.  A noncompete was waived by Stream in a subsequent settlement agreement whereby they paid me back wages and we settled the matter of my employment.

Q    You testified to that in terms of the 225 action that prior to that commencing, Hawk sent a, I believe it's a notice to Stream indicating it was exercising certain rights under its documents; do you remember that testimony?

A    I believe there was a document I looked at and I believe there was a letter.

Q    Okay.  Do you still have the previous exhibits that we looked at?

A    I do.

Q    Okay.  And your testimony was that Hawk sent that in its capacity as collateral agent, correct?

A    I believe that's one of the capacities.  I don't recall exactly.

Q    I want you to look at what's marked as CR11.

THE COURT:  You mean the first book, that --

MR. ALEXANDER:  It is in the Stastney Direct Examination Volume II.

THE COURT:  Okay because it doesn't have a little in the front.  It's Volume II.  I have one.  That's the only -- I have.  Legal -- all right.  We're looking at what, counsel, CR11?

MR. ALEXANDER:  Are you there, Your Honor?

THE COURT:  Yes.  And the first page of CR11 was not admitted.  Only starting with a letter of October 17th was admitted, okay.  Hold on.  All right, CR11.  Are you there, Mr. Stastney?

THE WITNESS:  I am.  Thank you.

BY MR. ALEXANDER:

Q    There's no reference to Hawk as collateral agent in that letter, correct?

A    I would have to read it.

Q    Please do.

A    I don't see any reference to collateral agent, no.

Q    There's no reference to SLS in that letter, correct?

A    There is a reference to SLS in the third paragraph at the very bottom.

Q    Oh, in terms of -- let me rephrase my question.  There's no letter that this letter is being sent on behalf of SLS, correct?

A    I don't see any reference that it is, no.

Q    And you testified that Stream never accepted the request of Hawk in this letter, correct?

A    Not expect to the shares.  I don't recall exactly what was communicated.  But yeah, they have denied that it was effective.

Q    They denied the letter was effective; is that your testimony?

A    No.  They denied that the -- they declined to implement that the proxy right that Hawk asserted.

Q    And Hawk requested that the shares that Stream owned in Technovative, be transferred into the name of Hawk, correct?

A    Registered in the name of Hawk.

Q    Registered in the name of Hawk?

A    Correct.

Q    Stream never registered its shares in Technovative in the name of Hawk, correct?

A    Not to the best of my knowledge.

Q    Hawk never had, during this time period, possession of the shares in Technovative, correct?

A    I don't know.  Not to the best of my knowledge.

Q    You're unaware of what collateral Hawk would have had in its possession at the time it sent this letter on October 17th, 2022?

A    I'm unaware of whether Hawk held any physical shares at

that time.  I don't know.

Q    And you referenced during your testimony that you believe section six of the pledge agreements authorized Hawk to send this letter, correct?

A    That's correct.

THE COURT:  Counsel, I'm sorry.  You said paragraph six of the pledge agreement?

MR. ALEXANDER:  Correct.

THE COURT:  Do you want him to --

MR. ALEXANDER:  I'm going to pull up -- it's CR154. It was one of the documents that we marked.

THE COURT:  If they weren't pre-marked --

MR. ALEXANDER:  It was marked CR154.

THE COURT:  Is that in Volume II, 154?

MR. ALEXANDER:  I'm sorry, it'll relate to a different tab number, Your Honor.

THE COURT:  Yeah because I don't see a 154 in there. I'm -- the middle?

UNIDENTIFIED SPEAKER:  Volume I, 16-6.

MR. ALEXANDER:  Yes.

UNIDENTIFIED SPEAKER:  Same page as CR154.

THE COURT:  Oh, which is in the first volume, right? Right?

UNIDENTIFIED SPEAKER:  Volume I, 16-6.

THE COURT:  Yes.  I want volume -- Exhibit 154 is

comprised of VI60-6VI1836 (sic), and that's it.

MR. ALEXANDER:  That is correct, Your Honor.

THE COURT:  Okay, CR01.  That's why I was confused.
I'm looking for the number.  It's actually in Volume I and it's
the first -- what would have been the first exhibit in there of
the CR154, Volume I, which I have to go look for it.  All
right.  And it's on the VI which one?

MR. ALEXANDER:  It's going to be page 35 of 41 at the
top.

THE COURT:  Which one?  VI 16-66?  I mean --

MR. ALEXANDER:  16-6.

THE COURT:  So we -- and what page?

MR. ALEXANDER:  35 of 41.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q   Okay.  Is that the provision you're referring to?

A   I'm sorry.  Is what the provision I'm referring to?

Q   Page 35 of 41, paragraph 6.  This is the rights of Hawk.
Is that the provision that's being cross referenced in the
October 17th, 2022 letter?

A   I believe so.

Q   But there's nothing in that provision that indicates that
Hawk, without the pledged interest being registered in his
name, can exercise any voting rights, correct?

A   I -- I can read what it says.

Q    But do you see anything in there that says that it can exercise the rights without having the pledge interest registered in its name or the name of its nominee?

A    I -- I would -- I would just have to defer to the -- to the drafting.  I don't know what's included or not included.

Q    Well, I'm asking you to look at it and tell me.

A    I -- I'd have to just defer to the plain language, which I'm happy to recite.

Q    Well, I'm not asking you to recite the plain language. There's no language in here that allows Hawk, in this paragraph 6, to exercise voting rights until after it's registered in its name or its nominee, correct?

A    I -- I -- I'd have to -- again, I'm -- I'm not going to -- that sounds like a legal conclusion you're asking me for.  I can read what the language says.  I can tell you what I think it says.  That's all I can do.

Q    Do you believe the language says what it says, correct?

A    I think it says what it says.

Q    It says what it says?

A    Uh-huh.

Q    Okay.  And you're unaware of Hawk having possession of the shares in Technovative, prior to October 17th, 2022, correct?

A    Yeah.  I don't know if they did or did not.

Q    But on the exact same day that you sent this letter or Hawk sent this letter, it filed the 225 action, correct?

A    I don't know if it was the same day or -- or later, but based on the letter, yes.

Q    You don't recall the 225 action being filed on October 17th of 2020?

A    I don't recall the date the 225 action was filed.

Q    In terms of the 225 action itself, I think there was -- you discussed what you believed to be the status of that case, correct?

A    I didn't understand that -- I'm sorry.

Q    During your direct testimony, you testified regarding what you believe the status of the 225 case to be at the time this bankruptcy was filed, correct.

A    Correct.

Q    But at the time this case was filed, the final briefing was not completed, correct?

A    In the 225 action?

Q    The 225 action.

A    I think the pretrial briefing had been done.

Q    I'm saying the trial briefing.

A    Oh, I don't know --  don't know.  I believe -- I believe everything had been done.

Q    But there was no trial date set, correct?

A    I believe the trial date was set for March 23rd.

Q    But you said that -- testified that March 23rd was the pretrial date.

A     No.  The pretrial --

Q     That wasn't your testimony?

A     No, I don't believe so.

Q     Okay.  But there was no pretrial order entered in that case, correct.

A     I believe we looked at the pretrial order.

Q     So that order wasn't signed by the judge?

A     I don't know.  I don't know whether it was or was not.

Q     But the order that you previously looked at was not -- the exhibit isn't signed by the judge.

          THE COURT:  Show him the exhibit.

          THE WITNESS:  I'd have to look at it.

          MR. ALEXANDER:  Give me a second, Your Honor, to pull the exhibit, please.

     (Court and clerk confer)

BY MR. ALEXANDER:

Q     Flip to page 25.  Not executed by the judge, correct?

A     That's correct.  This is not signed by the judge.

Q     And can you see at the top where it says a pretrial conference has been scheduled for March 16th, 2023 at 3:15 p.m.?

A     I do.

          THE COURT:  In where?

          MR. ALEXANDER:  At the top of that same page, 25.

          THE COURT:  Oh, okay, so it's -- it's not signed --

the one that this exhibit is not signed.

MR. ALEXANDER:  The exhibit is not signed.

THE COURT:  You're acting like I didn't see that already, but nobody asked --

MR. ALEXANDER:  Right.

THE COURT:  And you're asking him to go at the paragraph 13 because --

MR. ALEXANDER:  Just with respect to the pretrial conference, Your Honor.

THE COURT:  Uh-huh.

MR. ALEXANDER:  The pretrial conference is scheduled for March 16th at 9 -- or 3:15 p.m.  9:15, sorry.

THE COURT:  No, it says 3.

UNIDENTIFIED SPEAKER:  It's 3:15, correct.

MR. ALEXANDER:  3:15.

THE COURT:  I don't think none of us can read --

MR. ALEXANDER:  It's getting late, Your Honor.

THE COURT:  Okay.

MR. ALEXANDER:  I feel like the air cut off again. Yeah.

THE COURT:  Is it?

UNIDENTIFIED SPEAKER:  Yeah.  That's why you don't hear the white noise anymore.

THE COURT:  Aren't we paying the rent?  I guess we start -- they turn it off.

BY MR. ALEXANDER:

Q   We talked about the letter that was sent on October 17th, 2022.  And you previously also testified that at least you don't believe Hawk or SLS has any intention of selling the assts, correct?

A   That's correct.

Q   Yet, two days after the October 17th, 2022 letter was sent, Hawk issued an Article 9 UCC sale notice, correct?

A   Correct.

Q   And you know, where the Article 9 UCC sale indicates there would be a sale of collateral, correct?

A   Correct.

THE COURT:  Wait a minute, when did this happen?

MR. ALEXANDER:  October 17th, 2022.

THE COURT:  The same date as the letter?

MR. ALEXANDER:  Two days after the letter.

THE COURT:  The letter's the 17th, so October 19th?

MR. ALEXANDER:  Yes.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q   So at that time, Hawk intended to sell the collateral of Stream, correct?

A   At that time, which was before this bankruptcy proceeding was filed.  That was the intent.

Q   You also testified with respect to Pegatron; do you

remember that?  Did I get that name correct, Pegatron?

A     You did, and I did, yes.

Q     Okay.  However, that was a contract between Stream and Pegatron, correct?

A     That could be.

Q     That was a contract with SeeCubic BV, correct?

A     I don't -- I don't recall.

Q     So the benefits of the production of the 5,000 65K screen TVs would've been to Stream, correct?

A     Yes.

Q     And to your knowledge, that contract was fulfilled, correct?

A     I believe so.

Q     So Stream did make some sales prior to the bankruptcy filing, correct?

A     Correct.

          THE COURT:  Which bankruptcy filing?

          MR. ALEXANDER:  Prior to this bankruptcy filing.

          THE COURT:  Uh-huh.

          MR. ALEXANDER:  That deal with Pegatron did not occur post-petition.  It occurred --

          THE COURT:  No, there's a couple of them.  I'm just trying to figure out which bankruptcy --

          MR. ALEXANDER:  Understood, Your Honor --

          THE COURT:  -- prior to this bankruptcy.

MR. ALEXANDER:  This bankruptcy filing.

BY MR. ALEXANDER:

Q    If you could look at CR-64, Mr. Stastney?  The purchase order dated March 20th, 2023.  Are you there?

A    I am.

Q    You didn't have any involvement with this purchase order, correct?

A    No.

Q    You didn't negotiate the terms of this purchase order?

A    Correct.

Q    You didn't discuss this purchase order with Stream?

A    Correct.

Q    And so you have no knowledge of how this purchase order came about, correct?

A    Correct.

Q    Look at CR-65.

A    Okay.

Q    This is a $126 million purchase order dated April 11th, correct?

A    That is correct.

Q    Again, you had no involvement with the negotiation of this purchase order, correct?

A    That's correct.

Q    You didn't discuss this purchase order with Stream?

A    That's correct.

Q    You've had no discussions with Stream on how this purchase order would be fulfilled?

A    That's correct.

Q    You have no knowledge of how Stream intends to fulfill this purchase order, correct?

A    That's correct.

Q    So everything you testified to was just speculation in terms of what you thought may happen, correct?

A    It was my experience as to what would be required for us to deliver.

Q    Well, I'm talking about this particular agreement though. You had no dealings with this agreement?

A    None.

Q    So you have no personal knowledge with respect to how this agreement came about --

A    Correct.

Q    -- nor do you know how Stream is going to fulfill this agreement, correct?

A    I have no idea how Stream is going to fulfill this agreement --

Q    Right.

A    -- none whatsoever.

Q    When you say "us," who are you referring to?

A    SeeCubic, Inc., and SeeCubic B.V.

Q    Let's go to CR-66.  Are you there?

A     I am there.

Q     Okay.  Again, this is another purchase order for $14 million.  You didn't have any involvement with the negotiation of this document, did you?

A     I did not.

Q     You didn't discuss this document with Stream?

A     I did not.

Q     You weren't part of any of the negotiations with respect to this document?

A     That's correct.

Q     You have no personal knowledge regarding this document, correct?

A     That's correct.

Q     Draw your attention to CR-67.  It's a $140 million purchase order.  Again, you were not involved with the negotiation of this purchase order, correct?

A     Correct.

Q     In fact, you don't have any involvement with Stream, correct?

A     Correct.

Q     You weren't a negotiating party with for this document?

A     That's correct.

Q     You didn't discuss this document with Stream?

A     That's correct.

Q     And you have no personal knowledge regarding this

document?

A     That's correct.

Q     So all of your testimony was based on what you believed SeeCubic B.V. could do, correct?

A     What I believe would be necessary to deliver this type of order.

Q     Based on SeeCubic, Inc. working with SeeCubic B.V., correct?

A     Correct.

Q     And when you were at Stream, you did not negotiate any purchase orders, correct?

A     There were very few, if any, purchase orders when I was there.

Q     Did you negotiate any purchase orders when you were at Stream?

A     No.

Q     And during your tenure -- when you were CFO or a board member, you were not involved with production in 2016, '17 or '18, correct?

A     That's correct.

Q     And you weren't involved with Stream's sale of TVs in 2020 after you left Stream, correct?

A     That's correct.

          THE COURT:  Whoa, slow down.  So 2016, '17, '18, you're not involved in production was the question?

MR. ALEXANDER:  Correct.

THE COURT:  And then, what was the next question -- I'm sorry.

BY MR. ALEXANDER:

Q    You were not involved with Stream TV's sale of its TV in 2020 after you left Stream, correct?.

A    That is correct.

Q    And in terms of production and the bonding equipment, you testified that you believe they could only produce 10,000 units per year, correct, with respect to the 65K screens?

A    Correct.

MR. ALEXANDER:  Your Honor, can I take a brief break to just kind of consolidate a couple of things here to try to maybe speed it up some?

THE COURT:  You can take all the time you want.

MR. ALEXANDER:  Thank you.

THE COURT:  Counsel, I've got a question.  Is the courtroom temperature okay?

MR. ALEXANDER:  I'm hot.  I don't know what other people --

THE COURT:  Oh, okay.  You are hot.

MR. ALEXANDER:  Just because I'm standing up.

THE COURT:  Somebody else is listening to this -- oh, we are hot.  Okay, so hopefully we'll get some air.

MR. ALEXANDER:  Okay.  I'll take 10 minutes real

quick to try to consolidate a few things.

THE COURT:  Okay.  All right.  Ten minutes on recess.

(Recess taken)

THE COURT:  All right.  Where are we, Mr. Alexander with your cross-examination.

MR. ALEXANDER:  I was going to start talking about a new issue, I believe.

THE COURT:  Okay, all right.

BY MR. ALEXANDER:

Q    Mr. Stastney, you testified regarding Rembrandt 3D in a settlement that was entered into them with Stream, correct?

A    Correct.

Q    And in fact, the -- Stream originally entered into a term sheet settlement with Rembrandt in 2019, correct?

A    A non-binding term sheet.

Q    And you were part of the negotiations on behalf of Stream on that term sheet, correct?

A    I was.

Q    And you initiated the pages of that term sheet, correct?

A    Of the non-binding term sheet, yes, uh-huh.

Q    And that term sheet served as the basis for the Ultimate settlement in 2021, correct?

A    I don't know what that settlement entailed.

Q    Well, you're unaware of what the settlement was in 2021?

A    That's correct.

Q   So if I told you it was the substantially same terms, you would have no knowledge of what was in it, correct?

MR. COLBY:  Objection, Your Honor.  That's asking for speculation.  Mr. Vincent objected to a similar question of mine.  You need to show him the document or ask him what he knows, but not throw trial balloons out there for a witness to take shots at.

MR. ALEXANDER:  Your Honor, I asked him if he would have any knowledge of the statement I made with respect to the agreement.

THE COURT:  I'm going to allow it for what it's worth.  Go ahead. Go ahead.  Restate the question, Mr. Alexander.

MR. ALEXANDER:  I'm going to do my best, Your Honor.

THE COURT:  Okay.

MR. ALEXANDER:  Well, I can just ask a different question.

BY MR. ALEXANDER:

Q   Do you have any knowledge that the terms of the 2021 agreement were the same as what you negotiated in 2019?

A   I don't know the terms of the 2021 agreement.

Q   After the entry into the settlement term sheet with Rembrandt, though, you negotiated additional modifications for the timing of delivery of certain timelines under the agreement, correct?

A    I don't recall.

Q    So you don't recall the negotiations after the settlement term sheet in 2019?

A    I do not.

Q    You're aware that Stream had an investment banking agreement with Rufena Capital, correct?

A    Yes.

THE COURT:  What's it called?

BY MR. ALEXANDER:

Q    R-U-F-E-N-A Capital, C-A-P-I-T-A-L.

A    Okay.

Q    And they had that agreement in 2020, correct?

A    I don't know exactly when it was.

Q    Did they have the agreement when you were employed as CFO?

A    I don't believe so.  No.

Q    SeeCubic, Inc. also engaged Rufena capital, correct?

A    Yes.

Q    And SeeCubic engaged Rufena Capital in at least as early as March of 2020, correct?

A    Incorrect.

Q    In March of 2020, Rufena Capital put together a -- for you, correct, relating to a new Stream?

A    Not for me.  No.

Q    Not for you personally or not for one of your companies?

A    Not for me and not for SeeCubic.

THE COURT:  A -- for what?

MR. ALEXANDER:  For a new company relating to Stream.

BY MR. ALEXANDER:

Q    Did you have any discussions with Rufena Capital in March of 2020 regarding making a new Stream that no longer had the Rajan's involved with it?

A    No.

Q    Did you have any discussions with Rufena Capital after the March 2020 period with respect to a new Stream?

A    Only when they were considering to be retained by SeeCubic much later.

Q    And it's your testimony that that was not in March of 2020?

A    That's correct.

Q    Mr. Stastney, I want to go back to your discussion regarding the debt structure with respect to a relationship between Hawk and SLS and Stream and also SeeCubic.  Okay.  I believe your testimony was that SeeCubic, Inc. has investors in SeeCubic, Inc. and their collateral are the claims that Hawk and SLS have against Stream; is that correct?

A    Generally, yes.

Q    So if Hawk -- I'm trying to ask it a different way.  If the Hawk claim -- if the SeeCubic -- I'm sorry.  If the SLS claim is satisfied in this bankruptcy case, okay, and the investors would no longer have any security, correct with

respect to SLS?

A    I -- I don't believe that's correct.  The investors would have the proceeds of the SLS.

Q    Understood.

A    What was always promised was that the investors in SeeCubic would get whatever SLS or Hawk ultimately got.

Q    Would that be sufficient to satisfy the claims of the money that they put into SeeCubic, Inc.?  Would that be sufficient to satisfy the money that they put into SeeCubic, Inc.?

A    Sorry.  Would what be sufficient?

Q    If the SLS claim were paid by Stream?

A    The SLS claim in and of itself would not be sufficient. No.

Q    And if the Hawk claim is converted to equity, then there would be no additional funds that could flow to any of the investors based on Stream assets, correct?

A    If the Hawk debt were converted to equity, then SeeCubic would own the shares that Hawk received.

Q    Then it would own the shares?

A    Correct.

Q    And if those shares were extinguished in the bankruptcy case, then there would be no additional value that would flow to SeeCubic, Inc., correct?

A    I -- I don't know.  I -- I don't know the answer to that

question.  It seems a little more complicated than it appears.

Q    Well, answer to the best you can.

A    I don't know.

Q    So if no money came from Hawk's debt to SeeCubic, you don't know if there would be money that would flow to SeeCubic, Inc's investors?

A    I don't believe that was the question.  You asked me something about whether something would be extinguished in bankruptcy and -- and --

Q    Well, correct.  So if Hawks' claim was converted to equity and equity were extinguished in this Stream bankruptcy case, then there would be no money flowing to SeeCubic, Inc. with respect to the Hawk claim against Stream, correct?

MR. COLBY:  Objection, Your Honor.  To the maybe if I could so I'm not interrupting have a standing objection to this line of inquiry regarding asking -- the defense asking for legal conclusions if he's asking for Mr. Stastney's understanding or things like that, you know, maybe that's different.  But if he's asking for the answer to the legal questions, I would object to that.

THE COURT:  Okay.  He says your questions are asking for a legal conclusion.

MR. ALEXANDER:  Oh, I disagree.

THE COURT:  I get that.  But what --

MR. ALEXANDER:  It's not a legal conclusion.  It's

either money is there to pay it or money is not.  That's not

legal.  I'm not asking if there's some legal theory.

Mr.  Stastney --

THE COURT:  Wait a minute.  Wait a minute.  I didn't

rule yet.  Hold on.  Hold on.

MR. ALEXANDER:  I'm sorry, Your Honor.  It's getting

late.

THE COURT:  Rephrase it because I'm not seeing it as

if the debt's extinguished, is there any money to pay?  It

doesn't matter where it happens if it's extinguished by paying.

I don't know if it's even valid.  I don't know.  I don't think

they're challenging the security.  But if they challenge

whether it was secured and deemed unsecured, they're not doing

that.  But I get what you're asking.  Go ahead.  Go ahead.  You

were going to rephrase it, I think.

MR. ALEXANDER:  I'm going to try to rephrase it to

the best I can.

THE COURT:  Uh-huh.

BY MR. ALEXANDER:

Q    If no money is paid on account of equity -- let me ask it

a different way.  If Stream converts Hawk's debt to equity in

this bankruptcy case and equity is wiped out.  Do you

understand what wiped out means?  No payments on equity.

A    Yeah.

Q    Then would any money flow to SeeCubic, Inc. as a result of

the Hawk claim against Stream?

A    If no money comes in to SeeCubic from Hawk's claims, then it can't pay any money to its investors.

Q    I want go back to the omnibus agreement real quick.  When the omnibus agreement was executed, the unsecured debt remained with Stream, correct?

A    That's correct.

Q    SeeCubic, Inc. took the assets but didn't take any of the unsecured liabilities, correct?

A    Those were the terms of the omnibus agreement.

Q    So the goal was for SeeCubic to take all the good and leave the bad behind with Stream, correct?

A    Incorrect.

Q    Incorrect.

A    SeeCubic also took all the shareholders.  So diluted themselves by taking all of Stream's shareholders with them, too.

Q    But it left all the unsecured creditors without any avenue for repayment?

A    Otherwise it would have left all the shareholders with nothing.

Q    So my question is it left all the unsecured creditors without a source for repayment, correct?

A    Actually, as the omnibus agreement was originally written, there was going to be --

THE COURT:  Yes or no.

BY MR. ALEXANDER:

Q    That wasn't the question.

A    No.

THE COURT:  What was the question again?  I mean, the question was if you left all of the --

MR. ALEXANDER:  let me ask it again so we can have a clear record, Judge.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q    Based on the omnibus agreement, there was no provision for the repayment of any of the unsecured creditors that remained at Stream, correct?

A    Incorrect.

Q    Okay.  After the omnibus agreement SeeCubic, Inc. did not pay the unsecured creditors of Stream, correct?

A    Correct.

Q    As part of the -- did you ever send emails to investors of SeeCubic regarding the decision of the Delaware Supreme Court and the impact that would have on their investments?

A    I believe so.  I don't recall.

Q    So sitting here today, you don't personally recall sending any updates to the investors regarding the Supreme Court's reversal of the omnibus agreement?

A    I don't recall the specific update.  I suspect that I

would have.  That's something that was material.

Q    You believe that would have been something material with regard to investing, correct?

A    Correct.

Q    Do you consider yourself an investment advisor?

A    I do not.

Q    Are you aware that the Investment Act of 1940 defines an investment advisor is any person who, for compensation, engages in the business of advising others either directly or through publications or writings as to the value of securities or as to the advisability of investing in, purchasing, or selling securities or for compensation and as a part of a regular business issues or promulgates analysis or reports concerning securities?

A    That sounds correct.

Q    You testified regarding the bonding equipment and when I'm referring to the bonding equipment, I'm referring to Stream bonding equipment.  Do you remember that testimony?

A    I do.

Q    And that bonding equipment is currently located in China, correct?

A    To the best of my knowledge.  Yeah.

Q    And pursuant to the orders in Delaware, the Supreme Court order, that bonding equipment was supposed to be returned to Stream, correct?

A    I think that was interpreted by Vice Chancellor last year in terms of what exactly had to be done.

Q    So you don't recall it being required to be returned to Stream?

A    I don't recall the Delaware Supreme Court opinion specifically referring to the bonding equipment.

MR. COLBY:  Objection, Your Honor.  Just to the extent that Mr. Alexander is asking questions about the substance of Chancery Court orders, I understand his position now to be that those are permitted to be entered into evidence here.  I'd like some clarification on that.

THE COURT:  Well, what orders?  He's asking him about the orders the same way you did.

MR. ALEXANDER:  I asked him what he recalled.

MR. COLBY:  Okay.  Fair enough.

THE COURT:  You guys all want to play the recall your understanding what do you know.  Play those games if you want.

MR. COLBY:  As long as we're just asking about the circumstances, I understand.

THE COURT:  He asked him what did he recall was supposed to be returned.  And he said you didn't know.  Okay.

BY MR. ALEXANDER:

Q    Do you also understand that with respect to the bonding equipment, the way Stream currently has its business model, it requires access to bonding equipment, correct?

A     I don't know.

Q     Since the bankruptcy filing, you've not had any direct or indirect communication with regards to the landlord where the bonding equipment is being held in China, correct?

A     I've not had any direct communication.

Q     I said or indirect communication.

A     We may have seen some of the same emails.  But I had no direct communication with them.

Q     And you haven't instructed any representatives or agents of SeeCubic, Inc. with respect to the bonding equipment?

A     Correct.

Q     And you haven't instructed anybody at SeeCubic B.V. with respect to the binding equipment since this bankruptcy was filed, correct?

A     Correct.

Q     And it's your testimony that you have not had any involvement with the optical bonding equipment since this bankruptcy case was filed, correct?

A     Other than understanding the situation with it and the argument over it, no.

Q     Plan going forward is to be a manufacturer and you would agree that a bonding equipment or machine is required, correct?

A     Not correct.

Q     So you believe you can manufacture without having a bonding machine?

A     Yes.

Q     You would agree that the lens has to be bonded to the panel, correct?

A     Yes.

Q     And one way to do that would be to use a or use the optical binding machine, correct?

A     That is one way to do it.

Q     Do you recall being held in contempt by Judge Laster for failing to or for in the Delaware Chancery Court?

A     I do.

Q     And he considered, do you recall being called a puppet master for organizing a scheme where Stream did not get all of its assets back?

A     I do.

Q     And to this day Stream still doesn't have all of its assets returned from SeeCubic, Inc., correct?

A     I don't know.

Q     So you don't know if SeeCubic, Inc. returned all of Stream's assets to Stream?

A     SeeCubic, Inc. returned everything that it thought it had.

Q     That it thought it had?

A     That it believes it had or ever had.

Q     But SeeCubic didn't return any assets that it modified that were previously Stream assets, correct?

A    Correct.

Q    But those assets use Stream technology, correct?

A    Correct.

Q    And those are still currently in the possession of SeeCubic, Inc., correct?

A    Correct.

Q    And SeeCubic, Inc. has refused to deliver those to Stream, correct?

A    SeeCubic, Inc. doesn't believe those are covered by the orders.

Q    Well, my question was they refused to deliver them?

A    Correct.  Because we don't believe they were covered by the orders.

Q    Okay.  But those assets have Stream technology in them, correct?

A    They do.

Q    And does SeeCubic have a license to use that technology?

A    It does.

Q    Directly from who?

A    SeeCubic B.V.

Q    Who at SeeCubic B.V. granted that license?

A    Whoever normally grants those licenses.  I don't know.

Q    How do you know that exists?

A    Because we always obtain licenses for everything that we use.

Q     Who did you obtain it from?

A     SeeCubic B.V.

Q     Who at SeeCubic B.V.?

A     There's a process that's an automated process.

Q     You're sitting here today you don't recall who you obtained that from, correct?

A     I don't.

Q     Do you recall in 2021 Hawk advising that they had no interest in engaging in any settlements that would result in the Rajan's having any control and involvement with an entity going forward?

THE COURT:  In what?

MR. ALEXANDER:  With an entity going forward.

MR. COLBY:  Objection, Your Honor.  I actually don't know exactly what this refers to.  But typically settlement dialogue is conducted under a agreement that it's inadmissible under Federal Rule of Evidence 408.  I just don't know.  I don't have enough factual background to know what's implicated here.  But that's --

MR. ALEXANDER:  This is the opposite of that because they said they won't have part of no settlement.

THE COURT:  Wait a minute, wait a minute, wait a minute.  Was the question about a settlement agreement or --

MR. ALEXANDER:  The question was whether or not they advised that they would be part of no settlement going forward

if the Rajan's are involved.

MR. COLBY: And my objection was that settlement discussions are typically conducted under Rule 408. I don't know the factual background. I don't know if that was --

THE COURT: So the settlement agreement on the 408, whose settlement? Isn't it we have to figure out whose settlement agreement you're talking about?

MR. COLBY: My question is whether or not this took place pursuant to two discussions. It's a question. I don't want to get in Mr. Vincent's way. It's a question as to whether or not these discussions took place in the context of or pursuant to agreement between counsel that it was a Rule 408 settlement discussion.

THE COURT: What counsel? He needs to give us some background.

MR. COLBY: Yeah, I don't -- I just don't know. I have settlement discussions in evidence and I --

THE COURT: But typically the settlement discussions are between the two parties and one party is trying to use it.

MR. COLBY: I know. I don't know.

THE COURT: Right. That's why I'm like, what's settlement? Who's --

MR. COLBY: I just want to flag the issue.

THE COURT: Okay. So you need to give us some background, Mr. Alexander, because I was like --

MR. ALEXANDER:  I'll take a look and try and find because it was from a transcript.  So let me -- if you give me, I'll take a look and find it.

THE COURT:  It was from a transcript?

MR. ALEXANDER:  It was from a transcript.  Okay.  So from --

THE COURT:  From a hearing?

MR. ALEXANDER: --  May 25th, 2021, in one of the bankruptcy hearings.  But I'll table that for now.

THE COURT:  Right.  You can see your -- right.

MR. ALEXANDER:  I will pull the transcript.

THE COURT:  Okay.

MR. COLBY:  Yeah, Your Honor.  If it came from a transcript, I'm fine.  Go ahead and ask the question.

THE COURT:  Right.  But he said --

MR. ALEXANDER:  Well, now I'm going to find it.

THE COURT:  He wants to find it first.

MR. ALEXANDER:  I'm going to need it.

THE COURT:  He wants to read it and ask him about it, which makes it easier for the record.

MR. ALEXANDER:  Understood, Your Honor.  So I'll withdraw that question for now.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q    I want to go back to the licensing issue for a second.

What's your understanding of what authority SeeCubic B.V. has to license?

A   SeeCubic B.V. has traditionally since when Stream originally owned the assets been the one that issued licenses for the technology.

Q   So is it your testimony that your understanding of why you believe SeeCubic B.V. could give a license to SeeCubic, Inc. is because you believe that's the way it worked in the past?

A   That's the way it worked in the past.

Q   Is that the only basis for that?

A   It is.

Q   Okay.  And so currently, SeeCubic, Inc. does not own the optical bonding equipment in China, correct?

A   That's correct.

Q   SLS does not own the bonding equipment in China?

A   That's correct.

Q   Hawk does not own the optical binding equipment in China?

A   That's correct.

Q   Are you aware -- withdraw that.

MR. ALEXANDER:  Your Honor, I have maybe two last topics.

THE COURT:  And you're done?  You said it was two hours for him.  It's not even an hour.

MR. ALEXANDER:  Well, just give me one.

THE COURT:  I mean, you can have as much time as you

want.

MR. ALEXANDER:  No, I understand, Your Honor.

THE COURT:  You can just finish up for whatever you want to finish tonight and then that means you can go back and read and then we can finish up tomorrow.

MR. ALEXANDER:  Let me do one more topic and then I'd like to go over my notes and then I think we could --

THE COURT:  I think what I would suggest is we do you one more, we stop.  That way you can go figure out tonight what else, if anything, you have with respect to Mr. Stastney.  It may not be anything but that way we don't have to stop for you to do that and you have all until 12:30 tomorrow to figure that out.

MR. ALEXANDER:  Okay.

THE COURT:  Go ahead.

BY MR. ALEXANDER:

Q    Mr. Stastney, you've previously been involved in several litigations, correct?

A    Correct.

Q    And you previously testified here that you don't believe SLS or Hawk are predatory lenders, correct?

A    Correct.

Q    But you were sued by a company, *Telestrata v. NetTALK Stastney* a Southern District of Florida case in 2014, correct?

A    Correct.

Q    And you were sued in that case for breach of fiduciary duty, correct?

A    Correct.

THE COURT:  What was the name of it?

MR. ALEXANDER:  Telestrata v. NetTALK v. Stastney, which was a Southern District of Florida case in 2014.

THE COURT:  Okay.  Go ahead.

BY MR. ALEXANDER:

Q    It was alleged that you unlawfully took control of the company to the detriment of the shareholders and its authorized directors.  Do you remember that?

A    I do.

Q    Okay.  And that was settled, correct?

A    It was.

Q    And you were also sued in that same year in the *OptimizeRx v. Stastney* case.  Do you recall that case?

A    I do.

Q    And that was a claim for declaratory relief involving a dispute over some stock that you thought you were owed, correct?

A    Correct.

THE COURT:  Was it Stastney v. OptimizeRx or --

MR. ALEXANDER:  OptimizeRx v. defendant, Stastney.

THE COURT:  Okay.  Okay.

BY MR. ALEXANDER:

Q    And in that case, you were demanding that the company issue stock in the -- for work that the company alleged was performed after employment there, correct?

A    Correct.

THE COURT:  Oh, that was a declaratory.  Okay.

MR. ALEXANDER:  I'm sorry, Your Honor.

THE COURT:  That was a declaratory judgment action you said.  The Optimize was declaratory judgment?

MR. ALEXANDER:  It was a claim for declaratory relief.

THE COURT:  Uh-huh.

BY MR. ALEXANDER:

Q    That case was settled, too?

A    Correct.

THE COURT:  What year was that?

MR. ALEXANDER:  I believe it was 2014.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q    And other litigation you were involved in is you were sued by one of your drivers for firing them, correct?

A    Correct.

Q    And you also settled that case, too?

A    Correct.

Q    And you've had several litigations revolving around corporate issues and stock issues, correct?

A    Yes.  That didn't describe all of those.  But yes.

MR. ALEXANDER:  Your Honor, that's what I have for right now and I'd like to break right there.

THE COURT:  Okay.  We'll see you folks tomorrow.

MR. ALEXANDER:  And then hopefully finish it up very quickly tomorrow and then we can move on to Mr. Park.

THE COURT:  Well, then they'll redirect.

MR. ALEXANDER:  I'm sorry.  They'll have an opportunity for whatever they need to do.

THE COURT:  Okay.  All right.  Mr. Stastney, you'll remain under -- I can't even think of the word I want to us.  You cannot discuss your testimony with your counsel.  All right.  Court is adjourned until tomorrow at 9:30 and the trial is adjourned until tomorrow at 12:30.  All right.  Thank you.

(Proceedings adjourned)

C E R T I F I C A T E


I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.



_John Buckley_____
John Buckley, CET-623
Digital Court Proofreader

*TheRecordXchange*
www.trxchange.com · (800) 406-1290