UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: | : Case No.  23-10763 |
| STREAM TV NETWORKS, INC.   CH: 11 | : |
| A) Trial Re: Emergency Motion To Dismiss Case. Motion Of Hawk Investment Holdings Ltd. (I) Pursuant To Section 1112 (B) Of The Bankruptcy Code Either (A)(1) To Dismiss The Debtors Chapter 11 Cases Or (2) To Convert Such Cases Under Chapter 7 Or (B) In The Alternative Pursuant To Section 1104(A) Of The Bankruptcy Code To Appoint A Chapter 11 Trustee And (Ii) To Request Expeditated Consideration Pursuant To Local Rule 5070-1(G) Filed By Hawk Investment Holdings Ltd. Represented By Steven Caponi. | : Philadelphia, Pennsylvania : September 22, 2023 : 10:57 a.m. |
| B) Emergency Motion For Relief From Stay Filed By Hawk Investment Holdings Ltd. Represented By Steven Caponi. | : |
| C) Motion To Approve Debtors' Expedited Motion For Authority To Take Certain Actions In The Ordinary Course Of Business Filed By Stream Tv Networks, Inc., Technovative Media, Inc. Represented By Rafael X. Zahralddin | : |
| D) Motion To Approve Employee Obligations Filed By Stream Tv Networks, Inc., Represented By Rafael X. Zahralddin | : |

. . . . . . . . . . . . . . . . . .

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                      Vincent F. Alexander, Esq.
                                     Kevin Shaw, Esq.
                                     Lewis Brisbois Bisgaard & Smith
                                     110 SE 6th Street, Suite 2600
                                     Fort Lauderdale, FL 33301
                                     954-728-1280


For Hawk Investment Holdings         Steven Caponi, Esq.
Ltd:                                 K&L Gates
                                     600 N. King Street, Suite 901
                                     Wilmington, DE 19801
                                     302-416-7080


                                     Thomas A. Warns, Esq.
                                     K&L Gates LLP
                                     599 Lexington Avenue
                                     Suite 1000
                                     New York, NY 10022
                                     212-536-3901


For SeeCubic, Inc.:                  Eben P. Colby, Esq.
                                     Marley Ann Brumme
                                     Skadden Arps Slate Meagher &
                                     Flom, LLP
                                     500 Boylston Street, 23rd Floor
                                     Boston, MA 021116
                                     617-573-4800


For the United States                Kevin P. Callahan, Esq.
Trustee:                             Office of The United States
                                     Trustee
                                     Robert N.C. Nix Federal
                                     Building
                                     900 Market Street, Suite 320
                                     Philadelphia, PA 19107
                                     202-934-4154


For Rembrandt:                       Andrew Peter Demarco
                                     Devlin Law Firm, LLC
                                     1526 Gilpin Avenue
                                     Wilmington, DE 19806
                                     302-449-9010



Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES: | | | | |
| Christopher Michaels | | | | |
| (By Mr. Alexander) | 23 | | | |
| (By Mr. Colby) | | 43 | | |
| (By Mr. Demarco) | | | 165 | |

*TheRecordXchange*
www.trxchange.com · (800) 406-1290

SEPTEMBER 22, 2023                                      10:57 A.M.

THE COURT:  You may be seated.  All right.  Again, good morning, counsel.  This is the matter of Stream TV and Technovative.  We're here on two matters.  Can you hear me?  Apparently not.  On two matters.  One is a motion for relief from stay and one is a motion to dismiss case or in the conversion or in the alternative, appointment of a trustee.  Counsel for the movants?

I'm sorry.  Perhaps you didn't hear me because I think my mic was turned off.

MR. CAPONI:  I heard Your Honor.  I was just -- we switched up roles.  So the movant is Steve Caponi from K&L Gates on behalf of Hawk in its capacity as collateral agent and for the secured creditors.  And with me today is Thomas Warns, also from K&L Gates.  And then, also here today for SeeCubic is the team from Skadden, which is Eben Colby and Marley Brumme, which I'm sure I got wrong again.  Closer.

THE COURT:  Okay.  So we have Mr. Caponi and Thomas Warns.

MR. CAPONI:  Warns, from K&L Gates.

THE COURT:  And you are for?

MR. CAPONI:  Hawk.

THE COURT:  Hawk.

MR. CAPONI:  As collateral agent.  And the secured creditors.

THE COURT:  Okay.

MR. CAPONI:  And I'll let Mr. Colby introduce himself.

MR. COLBY:  Good morning, Your Honor.  Eben Colby from Skadden Arps on behalf of SeeCubic along with Marley Brumme.

THE COURT:  Okay.  Any other persons or attorneys here for the movants?

All right.  Who's here for the Debtors?

MR. ALEXANDER:  Good morning, Your Honor.  Vincent Alexander of Lewis Brisbois Bisgaard & Smith on behalf of the Debtors.  I'm joined in the courtroom today with Attorney Kevin Shaw.

THE COURT:  Okay.  Okay.  Counsel?

MR. DEMARCO:  Good morning, Your Honor.  My name is Andrew Demarco from Devlin Law Firm, here for Rembrandt.

THE COURT:  Okay.  Thank you.

MR. CALLAHAN:  Good morning, Your Honor.  Kevin Callahan on behalf of the United States Trustee.

THE COURT:  Okay.

MR. DEMARCO:  I apologize, Your Honor.  I do have one other note, is that Chris Michaels is also in attendance today.

THE COURT:  And he's co-counsel or a witness?

MR. DEMARCO:  Today, he will be acting as a witness.

THE COURT:  Okay.  Okay.  Anyone else who's entering

their appearance in this matter?

All right.  If I recall correctly, where we left off was Mr. Rajan was testifying and was going to be cross-examined, Mr. Alexander?

MR. ALEXANDER:  Your Honor, that's correct.  We did leave off with Mr. Rajan when he was being cross-examined by the movants.  And a note was filed on the docket late last night indicating that Mr. Rajan will be finishing his testimony on Monday.

THE COURT:  Okay.  Apparently, I didn't see that. Did you see that note?  No.  Counsel, in the future, please send all copies to my courtroom deputy because we don't necessarily get everything that's on the docket.  I know there was a letter yesterday from Mr. Caponi that we did receive.

MR. ALEXANDER:  That is the letter.

THE COURT:  Oh, in that letter, it references?  Oh, I didn't see that.  Apparently, I didn't.  All I focused on --

MR. ALEXANDER:  I'll let Mr. Caponi speak to the letter.

THE COURT:  Right.  The only --

MR. ALEXANDER:  But it was based on agreement and discussions.

THE COURT:  Right.  Right.  The only thing that I apparently focused on was whether there was going to be solely closing arguments or closing arguments and briefs.  And from my

perspective, only briefs and no closing arguments.  That's sort of what I focused on, and that 3:30 deadline.  So I apologize.  That's sort of what I was looking at.  And you're saying it was in that letter?  I guess I apparently -- that wasn't a focus of my attention.  Okay.

MR. CAPONI:  Yes, Your Honor.  No problem.  The letter mentioned that Mr. Rajan was having a treatment today, so the plan is he will go Monday and we're going to deal with the Rembrandt witness with the Court's permission this morning.  I think that's the only thing on today's calendar for today.

THE COURT:  Oh, okay.  And then, Mr. Callahan, you were standing up?

MR. CALLAHAN:  I was about to just comment on Mr. Caponi's letter, Your Honor, if I may.  But unless you had some -- Your Honor, we received the letter and certainly read it.  And I'm glad the Court saw it.  I would comment that we did receive all correspondence back and forth with respect to the scheduling.

THE COURT:  Right.  I obviously didn't see that.

MR. CALLAHAN:  Well, I think it is important to note, and Mr. Caponi and Mr. Alexander can echo this or disagree, but I think the interest of the parties is that we definitely close the record at 3:30 on Monday afternoon.  The record will be closed.

Now, the Court has just indicated perhaps that the

Court does not necessarily need closing arguments.  If the Court finds that, that's fine.  If the Court does feel that that's necessary or that briefs closing remarks be filed, that's fine, too.

But certainly, I think the request or comment was that there be an hour posed for each side.  And just to the extent that we don't have a dog in that fight, but nevertheless, we think an hour would probably be too much and a half hour at most for each party, if the Court were to consider that necessary.

THE COURT:  Right.  I mean --

MR. CALLAHAN:  If not, perhaps a closing brief of a limited scope or limited pages, so to speak, within two days, if that's something that the Court would --

THE COURT:  Well, I will be perfectly honest.  I don't want both.

MR. CALLAHAN:  Okay.  Okay.

THE COURT:  I do not want closing arguments and briefs.  I will tell you that.  That is not what I'm doing. It's either one or the other.  And I'm not inclined to be -- I'm not inclined that it's going to be the Court's responsibility to go parse to hearings that span three months.

And then, I, you know, I have an idea where I'm going with this, I will tell you.  But I need to be able to look at all of the, you know, what was in the record.  The last thing I

want is someone saying that my decision is not supported by the record.  And at the end of the day, somebody is not going to like my decision.  Let's call it.  There's going to be a winner and there's going to be a loser in this case, in the matters that are before me.  Somebody is going to prevail and somebody will not.

MR. CAPONI:  I think that's the one thing we can all agree on.

THE COURT:  We can all agree on that.  And at the end of the day, somebody is going to not agree with what I decide.  And if there is an appeal of that, because that's considered a final decision at least with respect to stay relief, if somebody wants to, that will get a -- unless I order otherwise, it gets a 14-day hold.  Then, somebody appeals and then I have to go back and justify my decision without looking at the record.  So that's why I'm telling you I'm not inclined to rely solely on oral arguments.  But I also am not inclined to say we get months to do this, we get weeks to do this, or we come back for oral arguments.  Not happening.

MR. CAPONI:  Your Honor, you know, Mr. Colby can correct me if he disagrees, but from our perspective, we're happy to proceed in whatever way is most efficient, you know, helps the Court.  If you want to hear my argument, I'm happy to give it.  If you want my brief instead, I'm happy to give it.

My only request would be if you could let us know

today.  And that we put a very tight timeframe on if you want to brief, when that's due so that we can, you know, be working that over the weekend.  But you know, Mr. Callahan, if you want it Monday when we close, you want it Tuesday or Wednesday, we'll have the horses to get it done.  I just need to know which path you want me to go down.

THE COURT:  All right.  I mean, I am not going to tell the parties if you really want to do oral arguments, you can do them.  But they're not going to help me.  I will be perfectly -- I'll still have to go back and say -- I have my recollection of the facts.  And based on what I'm, you know, what I'm recalling, some of them may not be correct of my own recollection.  So if I say you want to do oral arguments, I'm going to need some written --

MR. CAPONI:  Okay.

THE COURT:  -- written briefs in support of how I make my decision.  And it's going to be pretty quick.  I'm not talking about months.  I'm not talking about weeks.  And we definitely don't need to come back here for oral arguments.  I can read.

MR. ALEXANDER:  Your Honor, just so you know, what the Debtor had proposed was seven business days from the close to have whatever filed.  And if the Court had questions, the Court could schedule something.  If the Court didn't, then the seven business days would be --

THE COURT:  So we close on Monday.  Monday.  You guys, if you can get until five o'clock and you don't need -- yeah.

MR. CALLAHAN:  I think the projection was 3:30 and I'd like the parties to all hold themselves to that and the Court to enforce that.

THE COURT:  I'm not going to -- Mr. Callahan, if lawyers tell me 3:30, I always add an hour on.  We can go to five o'clock.

MR. CALLAHAN:  Judge, that's why a hard stop is appropriate.  Because now we're here, months of hard stops.

THE COURT:  Well, we're not.  No.  Let's be clear. Monday is it.  There is no testimony past Monday.  We're closing the record on Monday.  Whether it's 3:30 or five o'clock, record is closed.  We're not.  We're not going past that.  In order to go past that time period for the evidentiary record, the parties would have to consent or this Court would have to find circumstances that would warrant going beyond that time period.

Right now, I know for sure Mr. Caponi and Mr. Colby's clients are not consenting.  So that would require me to make some sort of finding and I don't see anything today that would warrant not closing the record on Monday.  I don't see -- look, anything is possible.  You know?  I could have another car accident.  No, let me not say that.  Somebody else could hit me

again.

MR. CAPONI:  Let's hope not.

THE COURT:  Let's not go there.  But absent some extraordinary circumstances, we're closing this record on Monday.  This record is being closed.  If you're saying seven business days, what's that?

THE CLERK:  No driving this weekend.

THE COURT:  I'm going to visit Carol.

THE CLERK:  Oh, okay.

THE COURT:  I'm going to visit her again.  Let's hope nobody hits me again.  So seven business days, what does that calculate to?  Monday, October 4th.

MR. CAPONI:  Your Honor, if we finish Monday -- so I think we were starting off with unprecedented agreement here. I think we're all fine with no oral argument.  We'll go right into briefing if that's what Your Honor wants.  If we can keep it, you know, the briefings closed within a week, I'm fine with that and Mr. Alexander and I can work out, you know, the schedule.

THE COURT:  Right.  And unless the parties think they're -- I mean, I've heard enough.  I don't know what oral arguments would do.  You guys are both -- and everyone involved here are very learned and competent counsel.  I'm sure you can get me some briefs that will allow me to figure out what my decision should be based on.

I don't think I'm going to need oral arguments unless this is some novel issue, and I don't see any.  It's either I'm granting relief on one hand, which is a separate issue, to go back to Chancery Court for limited purposes, which I was pretty clear what those are, and whether -- well first of all, I'm not quite sure if I -- and I'm not saying that's the decision.  So I don't want anybody to think that that's where I'm going.  Okay?

But assuming I said, well, I'm dismissing this case, do I even need to rule on the motion for relief?

MR. CAPONI:  Your Honor, as I understand it, you want briefing that is -- our job is to be less argument in the brief and more directing you to where in the record supports our position?

THE COURT:  Right.  Whether support in your case, relief.

MR. CAPONI:  Right.

THE COURT:  Who filed the motion to dismiss?  Both of you, but --

MR. CAPONI:  Yeah.

THE COURT:  Okay.

MR. CAPONI:  Our side.

THE COURT:  Our side.  Well again, Mr. Colby addressed specific portions of both of those motions.  And I think there was a joinder or something.  So I get that.

So the first relief would be whether I dismiss, convert, or appoint a trustee. That's the first matter. Because clearly, if I dismiss, I don't need to get to the motion for relief. And maybe I do and maybe I don't. If I convert to a Chapter 7, then maybe I would still have to get to the motion for relief because then, we'd have a trustee who says, hey, I agree, don't agree. Don't grant them relief. Sometimes I do that, sometimes, I don't.

If I appoint another Chapter 11 trustee, that's still doesn't get me to the relief issue. So that's the first order of business. Assuming I don't dismiss, then I will address the motion for relief. I'm not saying that I am. I don't want anybody to say that that's where I'm going. And then, I want you to I guess address first why I should dismiss, convert, or appoint a Chapter 11 --

MR. CAPONI: So just a logical decision tree and back it up with citations to the record.

THE COURT: Right. Right. To the record so then I -- you know, we have our own notes, my own whatever. And you know, but I want to be able to -- I don't want to have to go peruse the docket and the record in support of my decision. I'm going to have you guys do that.

MR. CAPONI: Your Honor, I'm with you. I'm sympathetic. That's why Mr. Warns is here.

THE COURT: Oh, you have somebody.

MR. CAPONI:  But I think we understand.  I'll work with Mr. Vincent.  We'll hammer out within the, you know, week from the closing of Monday how we get that brief submitted and --

THE COURT:  Right.  And Monday would be the -- John, the 3rd, the 2nd?

THE CLERK:  2nd.

THE COURT:  The 2nd of October.

THE CLERK:  Monday.

THE COURT:  Oh, we're in October already?  All right. Okay.

THE CLERK:  And we'll work with Mr. Callahan and Rembrandt as well in terms of the --

THE COURT:  Okay.

MR. CALLAHAN:  Your Honor, may I follow up with one point?  And I've stated this before on behalf of the United States Trustee.  And again, it's Kevin Callahan.  Certainly, some complicated issues here with respect to the various forms of relief that are requested.  But if the Court was to entertain or grant the motion for relief from the automatic stay, I mentioned before the Section 305 gives the Court the authority to suspend the proceedings.

So in the hypothetical example, only hypothetical at the moment, if the Court were to grant relief from the automatic stay, you would still have the -- I'm sorry, the

Stream TV case in its current posture as a Chapter 11.  There is ample authority for this Court to exercise 305 relief in such a way that would suspend the case while other issues are litigated in the state court.

Your Honor, we have precedent in the Eastern District from a case called In Re: Mazzacone, 183 BR 402, decided by Judge Scholl (phonetic) some years ago about a dispute with some very similar facts to the case here.  And what the Judge did was suspend the proceedings, although did exercise some monitoring of the case through the means of filing operating reports or holding status hearings about the pendency of both the state court litigation and the present operation of the case.  That decision, by the way, was affirmed by the district court, Judge Reed (phonetic), at 200 BR 568.  So while we are not endorsing that as a relief --

THE COURT:  Well, who's asking for that relief?  Am I supposed to --

MR. CALLAHAN:  Nobody has asked for it.  In fact, Judge Scholl --

THE COURT:  So I should sua sponte do it?

MR. CALLAHAN:  Judge Scholl did it sua sponte to deal with the dispute, and it was affirmed by the district court.

THE COURT:  Okay.

MR. CALLAHAN:  Because the same circumstances.  There was a question about whether the case should be converted or

dismissed or the Debtor in possession wanted to remain as a debtor in possession. So with all that conflict, such as present here, that that could be a viable alternative. Because if the Court --

THE COURT: Well, I think that may be viable with respect to perhaps Technovative. But I don't think anybody is challenging whether Stream had the authority to file or whether they should be here because at the end of the day, what's going to happen in Chancery Court, from my perspective. And this is my perspective from what I have heard in the record. What is going to happen is that with respect to Technovative, the vice chancellor will determine who is the appropriate board member with respect to -- that's the 225 action.

Who is the appropriate board member and whether the Technovative bankruptcy was properly authorized. That's not going to happen with Stream. What is going to also happen, from my understanding, is that from my understanding is there's going to be some litigation with respect to what exactly the secured -- and I'm going to say secured creditors because that's what they're alleging they are. Whether they are in fact secured creditors or whether they're equity holders in the Stream matter. Whether the debt was converted to equity.

That's going to be decided over there. Okay? All that will do is because they still, at the end of the day, whether the secured creditors are secured creditors or whether

they are equity is going to affect what kind of plan Stream will be allowed to have here.  That's what's going to happen.  And with respect to Technovative, whether they should be a debtor here or not.

But at the end of the day, what I see as the real dispute here is who owns this technology that everybody is fighting over.  And Rembrandt takes the position it's theirs.  The Debtor says they have a license.  SeeCubic say they have one.  That is an asset that Stream believes is theirs and assuming that, you know, that that bankruptcy continues, that's going to be the ultimate issue.

And I'm not sure what I need to do.  Actually, that's sort of what my whole overall arching thought was before I came out here.  And my discussions were where are we going?  Irrespective of what I ultimately decide.  This is what the ultimate dispute is, is who owns this.  And the Debtor, at least the Debtor Stream, from my recollection, and I could be wrong how I'm recalling this, is that they have some sort of agreement with Rembrandt that it belongs to those two parties.

I don't know who's owner.  I'm not going to say who owns it.  But there's some sort of relationship that does not include SeeCubic.  And ultimately, that's going to have to be decided.  What I will do while the other parties, assuming I say you go to Chancery Court and fight that out, somebody has to decide that issue of who's the board member, whether they're

converted to debt or equity.

That has to be decided by somebody.  And that ultimately, once that's decided, this bankruptcy is -- assuming it stays here, that's the dispute.  That is the dispute that ultimately has to be resolved in order for either one or two of these Debtors to emerge from bankruptcy as a reorganized debtor.  That's how I see this.

So I'm not quite sure, to answer your question -- or your suggestion, Mr. Callahan, whether suspension gets me there or whether I still need these parties to continue.  Because ultimately, whatever happens, somebody is going to have to try to figure this out.  Either the parties are going to work together or they're going to continue to fight.

And at the end of the day, from my perspective, if they don't start working together, this technology is going to go poof and nobody is going to get anything.  But that's just my viewpoint.  I can't tell parties what to do.  I can't tell parties how to settle.  But from a practical matter, that's how I see this case.

So that will play into whether I think we need to sua sponte put this in suspense or not.

MR. CAPONI:  Appreciate your guidance, Your Honor.  I think your comments and Mr. Callahan's suggestion can all be addressed in the parties' briefing.

THE COURT:  Right.  Well again, nobody has asked for

suspension.  I don't know whether I'm going to do that or not. You know, I don't want this -- you know, I don't want to leave this matter for somebody else.  I mean, this thing is going to be -- I've had a case that spanned seven, eight years.  I'm not -- I won't be here in seven, eight years.  I can tell you that.  You know, my term is up in April.  We'll see.

So this is something I would like to have, you know, have some overarching understanding of what is going on in this case and what my expectations are and how I am looking at this.

MR. CALLAHAN:  Understood, Your Honor.

THE COURT:  Okay?  So hopefully, that gives the parties some idea of what I'm looking for, what I hope to achieve, at least from the Court's perspective.  You guys all have your own perspective and I don't need to know on what the ultimate -- but you know, from an overview, I think that's really what this is all about.  This is what the case is about and this is ultimately how it's going to play out.

MR. CALLAHAN:  Thank you, Your Honor.

THE COURT:  Okay?  With that being said, we're going to start.  Is there anything else?

MR. DEMARCO:  The point is a little past.  I just wanted to note that Rembrandt was agreeing that the briefing would be fine and as long as Rembrandt can file a brief on its position.

THE COURT:  Mr. Callahan said he doesn't have a

position in this, so I'm not expecting a brief from him.  So I'm expecting a brief from the moving parties, the Debtor, and I think Rembrandt filed a joinder in support of the Debtor?

MR. DEMARCO:  We filed an opposition to the motion to dismiss.

THE COURT:  Right.  So you're opposing.  And I know there's joinders here, there's oppositions, there's all sorts of different positions.  But I will say you're on this side.  So you get to submit.  I mean, the parties are -- obviously, this party is the movant and you --

MR. ALEXANDER:  We'll figure that out.

THE COURT:  -- and you're both on the side of the parties opposing the movants.  So everybody gets to file.  Everybody, meaning all the parties in support, all the parties in opposition, get to file some document, a brief in support of their respective positions.

MR. DEMARCO:  Thank you, Your Honor.  I just wanted that clarification.

THE COURT:  Okay.  So with that being said, Mister --

MR. CAPONI:  Right into the witness, Your Honor.  I think that's the next order of business.

THE COURT:  Okay.  And now that I've eaten up an hour of what we could gain on Monday, we can go ahead.

You know, right before we start, I need to take a five-minute break before we start with the witness.  That way,

I don't -- I think we can go -- how long do we plan for the witness to -- testimony?

MR. ALEXANDER:  Your Honor, we believe the direct examination will be 60 to 80 minutes.

THE COURT:  And cross?  Double.

MR. COLBY:  The same or less.

THE COURT:  All right.  So okay.  I need just five minutes and I promise to try to keep it to five minutes.

All right.  Court is in recess until 11:30.

(Recess taken)

THE COURT:  Please be seated.  All right.  I'm operating on attorney time.  It's actually five tripled.  I apologize.  Okay.  All right.  Let's call your witness.

MR. ALEXANDER:  Your Honor, the Debtors call Christopher Michaels.

CHRISTOPHER ALLEN MICHAELS, DEBTOR'S WITNESS, SWORN

THE CLERK:  Thank you.  If you can please state and spell your name for the record.

THE WITNESS:  Christohper Allen Michaels, C-H-R-I-S-T-O-P-H-E-R, A-L-L-E-N, and Michaels, M-I-C-H-A-E-L-S, with an S at the end.

THE CLERK:  And would you please state your address for the record?

THE WITNESS:  12417 Country Day Circle, Circle is abbreviated C-I-R, Fort Meyers, Florida 33913.

THE CLERK:  Thank you.

THE COURT:  You may proceed.

DIRECT EXAMINATION

BY MR. ALEXANDER:

Q    Good morning, Mr. Michaels.

A    Good morning.

Q    Mr. Michaels, do you go by any other names?

A    Chris.

Q    Mr. Michaels, can you please describe your educational background?

A    I have, well, a degree in chemistry from Bucknell University, a law degree from Syracuse College of Law.  I studied inventory and production at Stanford, engineering for a bit, and then switched over to an MBA in finance and operations and information management from the Wharton School here at the University of Pennsylvania.

Q    Do you have any connection with any of the parties in this case?

A    Yes.  I am an attorney for and executive of Rembrandt 3D Holding Limited.

Q    And as your role as attorney and -- well, let me take a step back.  How long have you been an attorney for Rembrandt?

A    For Rembrandt 3D Holding Limited, I have been an attorney since 2018, when I appeared -- then they entered mediation in the Southern District in New York.  But I've known the founder

for 30-plus years.

Q     You also testified that you are an executive with Rembrandt 3D?

A     Yes.

Q     In what capacity?

A     I am a chief financial officer.  And that switch, I believe was made in 2021-ish.

Q     You referenced a mediation.  Are you familiar with the other parties in this case?

A     Yes.

Q     And which parties are you familiar with?

A     Most notably, Stream TV Networks Inc. was the opposing party in the Southern District of New York litigation.  And we have become familiar with SeeCubic Inc. and Hawk Investment Limited through this action primarily.  And prior, when the omnibus agreement was being litigated.

Q     Are you familiar with the proceedings in this case?

A     Yes.

Q     What is your familiarity with the proceedings in this case?

A     Primarily representing Rembrandt as a creditor and as a party that is working with Stream as a licensor of technology under the settlement agreement.  And we're -- I've been representing Rembrandt's interests in that capacity.

Q     Were you involved in this case when Mister -- I want to

say Mr. Stastney.  I'm referring to Shadron Stastney.  Were you involved in this case when Mr. Stastney did his testimony in this case?

A    Yes.  I was on the phone listening in.

Q    And when you were listening in to the testimony, did you have any general issues with the testimony?

A    Yes.  I noted a number of inaccuracies from his statements with respect to Rembrandt.

Q    You referenced statements and what you viewed as inaccuracies, so I want to talk a little bit about that.  Do you recall Mr. Stastney talking about the litigation between Rembrandt and Stream that occurred in what was the 2012, 2013, 2014 timeframe?

A    I remember he stated that it occurred in that timeframe when in fact, it had not.

Q    When did it actually occur?

A    So the original action was commenced in state court in 2016.  It was removed to federal court in 2017.

Q    Was there anything else that jumped out to you with regard to the testimony?

A    Yes.  In addition, he mentioned that a portion of the case related to patents was dismissed on the merits and it was a venue issue that occurred after the Supreme Court decided T.C. Heartland, which basically said that -- held that for patent infringement cases, defendants needed to be sued only where

they had an office and/or where they were incorporated.  And

that meant we had to sue in Delaware, not Southern District of

New York, for the patent claims.

Q    So the dismissal of that case was not --

A    Was purely on venue issues.  Us and hundreds of other --

Q    Michaels, just so we get a clean --

A    Sorry.

Q    -- record, let me just finish the question and then you

can do it.  Or else when we actually do order the transcript,

it's not going to match up.  In terms of that case in the

Southern District of New York, was it dismissed on the merits?

A    No.

Q    No.  Why was it dismissed?

A    It was dismissed after the Supreme Court made the T.C.

Heartland decision.  Stream did not have a bona fide office nor

were they incorporated in New York.  So our only two options

for venue at that point were Philadelphia or Delaware.

Q    And did that litigation pertain to violation of an NDA?

A    The litigation in the Southern District of New York was

then restricted to two agreements, that one of which was an

NDA.

Q    What was the main thrust of that case?

A    Rembrandt's predecessor, 3D Fusion, Inc., had voluntarily

transferred information to Stream and had been working with a

team in Einhoeven in 2010.  And Stream proceeded not to

consummate the transaction between the parties and went ahead and hired -- we found out later, hired the engineering team from Einhoeven and used the trade secrets to create 3D no-glasses TVs.

Q    How did the New York litigation resolve?

A    The New York litigation resolved through a settlement agreement negotiated between Stream TV represented by Shadron Stastney and Rembrandt's team before a -- with a mediation before Magistrate Parker.  That was finally consummated in a fully signed settlement agreement in 2021.

Q    And in terms of that settlement you just referred to, what was Mr. Stastney's involvement?

A    In 2019, Mr. Stastney was the chief financial officer of Stream.  And the Rembrandt parties had requested a party that could fully bind Stream TV Networks to appear at the mediation. They were ordered to provide such a person, and that was Shadron Stastney.  That was the first time I met him.  That was in April of 2019.  And we in fact were able to come to an agreement.

        MR. ALEXANDER:  Your Honor, may I approach the witness?

        THE COURT:  Yes.  Is there a document that's marked or that's --

        MR. ALEXANDER:  I just handed it to Mr. Colby.  We will mark it.

THE COURT:  So hand it to the ESR.  He'll mark it and hand it to the witness.

THE WITNESS:  Thank you.

BY MR. ALEXANDER:

Q    Mr. Michaels, do you recognize this document?  It's titled Term Sheet for Development, Supply, and License Agreement between Steam TV Networks, Inc. and Rembrandt 3D Holdings, Limited, dated April 9, 2019?

A    Yes, I do.

Q    How do you recognize this document?

A    This is the document that I was personally present for and negotiated with Stream in a mediation before Magistrate Parker.  The handwriting and markouts were made by Neal Kronley, an attorney with DLA Piper representing Stream.

THE COURT:  Who made those?

THE WITNESS:  Neal Kronley.  I believe it's spelled N-E-A-L, Kronley, K-R-O-N-L-E-Y.

BY MR. ALEXANDER:

Q    Does this document appear true and correct to the best of your knowledge?

A    Yes, it does.

MR. ALEXANDER:  Your Honor, we'd like to move Rembrandt Exhibit 1 into evidence.

MR. COLBY:  No objection.

THE COURT:  Okay.  Admitted.

(Petitioner's Exhibit 1 admitted into evidence)

BY MR. ALEXANDER:

Q    Mr. Michaels, who signed this document for Stream?

A    Shadron Stastney.

Q    How do you know that?

A    I was there when he did so and watched him sign it.

Q    Now, I want to talk a little bit about kind of the terms of this term sheet.  What are the critical components of this term sheet?

A    From Rembrandt's perspective, the critical components for us were to have our intellectual property respected and subject to the license.  The most important financial business component were the supply of the TVs.  And those were valued at roughly $1.2 billion by Shadron Stastney.  He was their CFO and represented to us how much value that was carrying.  And then of course, there was a cash component as well.  But those are the salient terms.

Q    What licenses were involved with this agreement?

A    So the -- in Section 9, Rembrandt granted the Stream party only a license to the Rembrandt technologies listed in Schedule A, which listed a number of trade secrets, referenced patents, and trademarks.  And Stream granted back Rembrandt a license to the technology included in the TVs that Rembrandt was going to be buying.

Q    What was the significance of these two licenses as you

understood them at the time?

A    Absent such a license, Rembrandt has -- like any intellectual property owner has the right to exclude others from using their technology.  That's the basic right under patents, trademarks, copyrights, and to some extent, trade secrets.

Q    And in terms of the two -- did you reference a Philips license?

A    I have not in this context.

Q    So were there any other licenses kind of involved in the negotiations with Stream?

A    Yes.  Originally, 3D Fusion had negotiated a license to a very large portfolio of patents with Philips.  And that was part of our discussions -- or 3D Fusion's discussions with Stream, that this was a critical license --

THE COURT:  That it was what?

THE WITNESS:  A critical license for the 2D-plus depth technology that allows a TV to have 3D effect without the user needing to wear glasses.  3D Fusion had taken a license to their technology.  It included source code and trade secrets.  And we were then able to make improvements under that license.

But we did not have the right to grant anybody else licenses, so it was important during our negotiations that we confirm that Stream had also taken a Philips license and was therefore able to provide the TVs that we were negotiating for.

I mean, absent that, we would have both been infringing.

BY MR. ALEXANDER:

Q    So to Rembrandt 3D, what was the importance of both licenses?

A    Without a license from Philips, Stream would not have been able to provide any of the consideration that we were offering. Maybe some cash, but we wanted -- our ultimate goal was to get a TV that had the appropriate technology rights that could be sold widely in the marketplace.  Within the first minutes of negotiations in mediation, we asked about a Philips license and whether they had one.  And it was quickly confirmed that they did.  So we ultimately went forward.  In fact, at one point, I think it's spelled out that we'll pay the royalties based on the TVs that we'll order in order to make sure that they were actually covered.

Q    What does the Rembrandt technology bring to Stream?

A    So when Philips originally developed the technology, they had a number of problems with what's called ghosting and artifacts.  You could see a 3D effect, but you'd see a shadow image, or referred to as a ghosting image.  And Rembrandt figured out ways to manipulate the image and the controls within the hardware dynamically, meaning as opposed to keeping them static, they changed those settings that removed those problematic artifacts in the images.  And so that, all of a sudden, you had a very clean picture that looked very good for

consumption by public, either for an advertising utilization or for entertainment, for consumer TVs.

MR. ALEXANDER:  Your Honor, may I approach?  It's an exhibit.

THE COURT:  Is there another -- hand that to Mister -- I'm sorry, to the ESR, to John.

MR. ALEXANDER:  This will be marked as Rembrandt Exhibit 2.

BY MR. ALEXANDER:

Q    Mr. Michaels, do you recognize this document?

A    Yes, I do.

Q    What is this document?

A    This is the final version of the settlement agreement executed in 2021 between Stream and Rembrandt.

Q    How do you recognize this document?

A    I largely prepared the document and was a witness to the execution by my client and received the executed copy back from Stream's counsel when it was signed.

Q    What's marked as Rembrandt Exhibit 2, does it adequately and accurately represent the settlement agreement?

A    Yes.

MR. ALEXANDER:  Your Honor, we'd like to move Rembrandt Exhibit 2 into evidence.

MR. COLBY:  No objection, Your Honor.

THE COURT:  Admitted.

(Petitioner's Exhibit 2 admitted into evidence)

BY MR. ALEXANDER:

Q    You referenced that this was, I believe the term was

reaffirmation.  What is it a reaffirmation of?

A    The -- this took the term sheet and put it into full

agreement form.  We added some exhibits relative to Stream's

standard products, for example.  And we modified some of the

timeframes to provide greater flexibility to Stream in terms of

supplying what they needed to under the license and supply

agreement.  But other than that, the financial terms are

identical.

Q    And when you say the financial terms are identical,

identical to the term sheet that --

A    The term sheet --

Q    -- Stastney negotiated on behalf of Stream?

A    Yes.

Q    Was there a license granted pursuant to what we've marked

as Rembrandt Exhibit 2?

A    Yes.  In the Section 9 and Section 10.  In Section 9,

Rembrandt grants a license specifically to Stream and Stream

grants a license specifically to Rembrandt.

Q    Is the license that Rembrandt 3D granted to Stream

exclusive?

A    No.  It's a non-exclusive license.

Q    Is the license that Rembrandt 3D granted to Stream

transferrable?

A     No.

Q     To your knowledge, what would happen if another entity other than Stream were to assume the license?

A     They could seek Rembrandt's permission for that assumption.  But generally, it's not -- non-exclusive licenses are very rarely assigned.  You would typically just approach the owner of the technology to get a new license under similar terms.

Q     If another entity were to pick up this license, would it be functional?

A     The license in and of itself is very dependent on use of the Philips technology.  For example, all of the trade secrets reference that it's applicable -- it was improvements made to the 2D-plus depth technology developed originally at Philips. So in and of itself, it is highly reliant on all the technology that came before it.  Arguably, the electrical grid and everything else would also apply.  But it is a very -- it covers a very specific technology improvement that's made by Rembrandt.

Q     What is the value to that license, not in terms of a dollar amount, but in terms of a use?

A     We frequently talk about the if you don't want to use it, take it out type approach, right?  There was the Philips technology before Rembrandt came along and Philips couldn't

35

sell it to anyone.  I mean, they ended up just licensing it out to companies like Rembrandt who made improvements that made a watchable product.  There are tons of editorial reviews of the technology that Rembrandt demonstrated on its own.  And then later, what the Ultra-D technology looks like.  And it's a beautiful image relative to what Philips had accomplished.

Q    Does Rembrandt have any concerns if the license that was granted pursuant to Rembrandt Exhibit 2 were assigned or otherwise sold or transferred in this bankruptcy case or outside of the bankruptcy case?

A    Absolutely.  We would be very protective of our technology leaving countries that have fairly robust IP protection.  We would not be interested in our technology heading to India, China, places with rampant IP theft.  Europe tends to be pretty good.  And in all of our litigation and back and forth with Stream, it is our understanding that the Einhoeven engineers and the Stream group were very protective similarly of keeping all of their source code and all of their technology well protected within their entity. So yes, they were misappropriating it by using our technology without our permission, but they had not told anybody else about it.  They wanted to -- likewise, they wanted to keep their technology secret just like we did.  And we had willingly given it to them.  It was -- the issue we had is that they were using it without compensation, right?  Not that they were -- not that

they had it in the first place.

Q    If the license were to be sold, would an entity other than Stream be able to make TVs using this technology?

A    If the -- if the assets of Stream were sold, it would not convey a license to the Rembrandt technology.  And we're talking about technology that was embedded in all of the Stream development from 2010 forward.  They're basically -- and our license -- or excuse me, our contracts from back in 2010 specifically provided that all improvements to our technology were going to be owned by Rembrandt, parsing out what if anything that Stream owned that wasn't an improvement to Rembrandt technology would be a lot of fun for patent attorneys but probably very tedious and very time-consuming to go forward.  So a license made sense to everybody as long as the technology was being maintained in a confidential manner.

Q    You started out your testimony when we were talking about the New York litigation that you believe certain of the testimony by Mr. Stastney was inaccurate.

A    Yes.

Q    What aspects of his testimony did you find inaccurate?

A    The -- he referenced the wrong timeframes for the case. He referenced the contracts at issue in the case incorrectly. He stated the nature of the dismissal of the patent side of the action incorrectly.  And I think he largely mischaracterized whether a Rembrandt license was needed to proceed.  He was very

well aware of the value associated with it because he was the one arguing that Rembrandt should accept the agreement, the nature that it was a $1.2 billion agreement. To suggest that a well-educated chief financial officer of a company would sign a deal worth $1.2 billion unless he needed to, I think was a very inaccurate characterization of the discussions. He did -- he performed his best -- as I would characterize it, he performed his duty as an officer of Stream to find a deal that was workable and made financial sense for them. It was a lot of value being conveyed to Rembrandt but we had a very valuable claim and a very high likelihood of success.

Q    Prior to 2016, you said there was a state court action. Was there any litigation by Rembrandt against Stream?

A    Not prior to the 2016 action. You know, for the longest time, Stephen Blumenthal wasn't aware, or at least as far as what he's relayed to us, wasn't even aware that Stream had continued to use the technology. Companies sign NDAs all the time and 99.99 times out of 100, they honor them, right? We had -- so we were -- it was only when we learned -- I believe it was at a conference that Steve saw one of the former Einhoeven team sitting, you know, in the Stream booth, that he was stunned that that had happened.

Q    You testified what you believe are some inaccuracies. Why do you believe it's important to address these issues?

A    I think the primary issue that we will all benefit from in

this proceeding is to accurately understand what Stream needs in order to have a going concern value and to create the most value in the bankruptcy estate.  The concept of taking a portfolio of technology developed partly at Philips, partly at Rembrandt, partly at Stream, and then starting to carve it up and sell it off piecemeal is like taking a Ferrari and deciding to go at it with a blowtorch and start trying to cut out the engine that is Philips, and the transmission that was Rembrandt, and saying hey, we got this pretty red car, right? Pay me $250,000 for it and you've probably got $200 worth of scrap metal.  That's what's about to happen.  This company has value in the technology portfolio that it has created.  The licenses from Philips and Rembrandt connected with their own technology that is worth far more collectively in its whole than any of the individual parts.  And it's not even clear that you could put the parts back together.  Somebody would have to go reacquire a license from Philips, a license, you know, the technology rights to Stream, and a license from Rembrandt.

And we don't have to give that license.  I mean, we can decide whether, you know, we may have our own desires and needs at that point and we wouldn't have to grant that license, which would effectively render the technology worthless.  A Chapter 7 sale of assets, the only bidder, I mean, that would have the right to come in and buy these assets is Rembrandt.  I mean, good for us, but not likely to create much value in the

bankruptcy estate.  I mean, we would be the only one to walk away with clear technology rights going forward.

Q    There was discussion in Mr. Stastney's testimony about a Stream involuntary bankruptcy and Rembrandt 3D's involvement with that.  Do you recall that testimony?

A    I do.

Q    And what was your impression of that testimony?

A    I think he characterized Rembrandt's purposes in doing -- in initiating that involuntary bankruptcy inaccurately.  I mean, he would have no way of knowing why we were doing what we were doing.  In addition, he found significance to the fact that we signed the license agreement and then either the same day or next day, filed the bankruptcy, the involuntary bankruptcy petition.  Which, that was accurate in terms of timing.  But that we precisely did that immediately after the license because we now had a clear -- we didn't want to litigate the contractual issues that were heading back to the Southern District of New York of enforcement of the agreement in the bankruptcy proceeding.  So we finalized that agreement.  And then yes, we -- as a creditor, we sought to seek keeping the company together.

Q    Is Rembrandt a licensor?

A    Rembrandt is a licensor of the technology.  It's also a licensee of a lot of technology.  But in addition, even in the settlement agreement, we were receiving the rights to some of

the technology that Stream had for content manipulation.  That was important to us.

Q    Has Rembrandt ever had discussions with either Hawk or SeeCubic regarding licensing?

A    Absolutely.  Back in 2020, 2021, when we first became aware of the omnibus agreement, and when we first became aware of a shareholder derivative action.  I don't recall which order, but I reached out to the attorneys representing the parties in each of those cases.

Q    And why was that?

A    If a party -- I mean, generally speaking, a secured lender who was coming in to take the assets of the underlying entity, we wanted to make them aware of our license and to discuss whether we would consent to an assignment and under which terms so that the technology could be kept together and keep the value intact.

Q    Was a license ever offered to Hawk or SeeCubic by Rembrandt 3D?

A    Several times to each entity.

Q    Did Hawk or SeeCubic ever take Rembrandt 3D up on that offer?

A    There is no executed license.  I'm happy to discuss what Rembrandt offered because we're in control of that information.  But under many of those discussions, we're under Rule 408.  And so I don't feel it's appropriate for me to talk about how they

responded.

Q    No, my question was did they ever --

A    They have not taken a license.

Q    -- take you up on those licenses?

A    They have not.  They have not exercised -- to our knowledge, they have not gotten a license from us or from Philips.

Q    And you've testified with regard to Philips and Rembrandt and the various licenses.  What is the interconnection between the two in terms of Stream's business?

A    In terms of Stream's business, the Philips technology, and I believe it's up to 1,300-plus patents, a bunch of software, trade secrets, and know-how that is exchanged by Philips when you take a license from them.  And Rembrandt has made improvements above and beyond that technology, but we're very reliant on the Philips license.  So as I was saying, we wanted to make sure that Stream was current on its Philips license to proceed forward.  And so there's basically technology that has been added like Rembrandt did by Stream, and they altered the product.  During our first mediation session, we asked for prototypes so we could put a -- we sent it around to different parts of the country so our technical team could put it through its paces.  It's fantastic.  I mean, the Ultra-D technology at taking -- to be blunt about it -- quite poorly prepared content and converting it to very good-looking 3D is -- is amazing.

And they have definitely added something to the pool. It's way better than what Philips had prepared. It's way better than what Rembrandt had prepared. Now don't get me wrong, we -- we did some great technology work. But it's very much we could tell based on the improvements that we had worked on with the Eindhoven team, which isn't surprising, given it's the same people. I mean, to be clear, the Eindhoven team were Phillips employees. Phillips got rid of its program. Rembrandt hired a number of the Phillips engineers -- excuse me -- 3D Fusion  hired them. And then they left 3D Fusion. They went to go work for Stream. Technically, I think they're all working for SeeCubic B.V., but it's the same people, right. And at various times, you know, they -- they have definitely made improvements to the technology that is valuable as a package.

Q    When you say, they've made improvement Stream --

A    No, I'm sorry. The -- the engineers that have worked on this. That includes Steve Rem -- Steve Blumenthal, from Rembrandt, that the -- the engineers that are largely based in Eindhoven, have really made some improvements over the last decade.

MR. ALEXANDER: Your Honor, I have no further direct questions for Mr. Michaels. Just so the Court is aware, Rembrandt 3D is Mr. Demarco's client and so Mr. Demarco will defend the cross-examination.

THE COURT:  Okay.

MR. ALEXANDER:  Thank you.

CROSS-EXAMINATION

BY MR. COLBY:

Q    Good afternoon, Mr. Michaels.

A    Good afternoon.

Q    My name is Eben Colby.  I represent SeeCubic.  We've spoken before.

A    Yes.

Q    I took your testimony.  Do you recall that, correct?

A    Yes.

Q    Mr. Michaels, the Debtor Stream has a license to use Rembrandt's intellectual property, correct?

A    Yes.

Q    And Rembrandt isn't taking the position, in these bankruptcy proceedings, that Stream TV, the Debtor, is violating any of its intellectual property rights, correct?

A    We're taking the position they need the license and have a license.  So --

Q    Are you taking the position that they're violating -- that Stream TV, the Debtor, is violating any of your intellectual property rights?

A    We are not.  The -- the -- your language is not how a patent attorney would -- would ask the question or answer it, but I -- I tried to be as clear as I could in my answer.

Q    Sure.  And maybe we should clarify that a little bit.  And when I say, "violating intellectual property rights", I'm referring broadly to a more traditional patent infringement claim --

A    Uh-huh.

Q    -- or also something like a trade secret claim.  Do you understand that?

A    Yes, I do.

Q    Okay.  And can we use that terminology to refer to the --

A    The -- the distinction that I'm drawing, is it's very possible for a party to be using -- they could be selling popsicles, which is not covered at all by our technology.  Or they can be selling no glasses 3D, which is -- and but for a license, they would be -- and there would be a potential for an infringement action.

Q    Right.  And I'm asking whether or not, in this case --

A    Uh-huh.

Q    -- you are taking the position that Stream TV, the Debtor, is violating any of Rembrandt's intellectual property rights?

A    They have a license.

Q    Are you taking the position, in this case --

A    I'm taking the position --

Q    I'm sorry.  We -- only one at a time.  Question then answer.  And I'd appreciate a direct answer to my question.  Are you taking the position, in this bankruptcy, that Stream

TV, the Debtor, is violating Rembrandt's intellectual property rights?

A    We are not.  I'm not aware of a argument in litigation or a claim of violation.  It -- it -- it's infringement or a misappropriation claim that -- that you -- you're adding a term to the -- that isn't a thing.  I'm happy to answer the question as directly as I can, but I mean, there's a -- but there are causes of action related to intellectual property that -- that don't include violation.

Q    Okay.  And are you -- are you  making a claim, in this bankruptcy, against Stream for any of those causes of action?

A    No, we are not.  They have a license.

Q    All right.  Is it fair to say that your concern -- strike that.  I'll start that question over again.  Your concern, in this bankruptcy, is that the secured creditors might, in the future, be using technology that infringes on Rembrandt's intellectual property, correct?

A    Both in the future and currently, yes.

Q    Okay.  And that's the basis of Rembrandt's opposition to the motion to dismiss this bankruptcy, correct?

A    That is one of the reasons among many.

Q    Okay.  Now, no court has ever adjudicated whether the secured creditors are actually infringing on Rembrandt's intellectual property, correct?

A    The court in Delaware rendered a decision based on a

preliminary injunction and it is what it is.  It's -- it's a matter, you know, with the record.

Q    I'm ask --

A    And I would argue that that's an adjudication.  So I -- I -- I believe you're saying it didn't occur, but it did.

Q    No.  Mr. Michaels, I want to be very precise here.

A    Okay.

Q    Well, let's follow up on your answer.  Did the court in Delaware grant the injunctive relief that Rembrandt was seeking?

A    It did not.  It said that the irreparable harm could be satisfied with the license from Rembrandt.

Q    Right.  So the -- Rembrandt's request for an injunction was denied, correct?

A    Rembrandt's request for an injunction was denied.

Q    Okay.  And no court has ever rendered a final judgment that the secured creditors are actually infringing on Rembrandt's intellectual property, correct?

A    I believe that is an accurate statement.

Q    That is an accurate statement, correct?

A    Yes, you used the word "final judgment".  I don't --

Q    Okay.  So just so the record is clear, because I couldn't quite hear whether you said --

A    Okay.

Q    -- an accurate or inaccurate.  It is -- it is --

A    I apologize.

Q    -- no court has ever rendered a final judgment that the secured creditors are actually infringing on Rembrandt's intellectual property, correct?

A    Correct.

Q    And in fact, Rembrandt is currently litigating intellectual property claims against the secured creditors in the district of Delaware, correct?

A    Yes.

Q    And that action is ongoing, correct?

A    Yes.

Q    I'm going to ask a couple of questions about an entity called Technovative.  Are you familiar with the entity called Technovative?

A    Yes.

Q    And do you understand that an entity named Technovative is a Debtor in this case?

A    Yes, in the combined case, not against -- I don't know that it's -- there's two cases -- Stream and Technovative.

Q    Correct.  Technovative is a Stream subsidiary, correct?

A    To the best of my knowledge.  I -- I have no direct knowledge of that one way or the other.

Q    Okay.  You understand, also, that Technovative is a holding company, correct?

A    Again, other than what people have represented in court, I

don't have any firsthand knowledge.

Q    That's your understanding --

A    It is my understanding, but --

Q    Just let me get all of the question out first, if you don't mind.

A    Sure.

Q    Rembrandt -- let me back up.  With Mr. Alexander, you discussed the settlement agreement between Rembrandt and Stream TV, correct?

A    Yes.

Q    Rembrandt does not claim that Technovative owes it anything under the settlement agreement, correct?

A    I don't believe we have made a claim that Technovative owes us anything under the settlement agreement, to the extent that they have intellectual property that was provided to Stream under the settlement agreement.  They -- they owe obligations under that.

Q    I'm not -- I'm not asking for your speculation, Mr. Michaels.  I'm asking a very direct question.  Does Rembrandt claim that Technovative owes it anything under the settlement agreement?

A    So I'm trying to give you a very specific answer to that. The -- and as I was referencing earlier, that Stream had rights to technology, that it is our understanding, have been transferred to Technovative and to Technovative subsidiaries.

Either that transfer by Technovative, from technology received by Stream, has zero protection under the license or it was subject to the -- to the license agreement itself.  So the -- the only reason that SeeCubic B.V., Technovative, et cetera, have any right to be in possession of Rembrandt's technology is through the settlement agreement.

Q    Mr. Michaels, the settlement agreement that you discussed with Mr. Alexander, Technovative is not a party to that, correct?

A    Technovative is not a party to that agreement.

Q    Okay.  And that agreement obligates Stream TV to pay certain money to Rembrandt, correct?

A    Yes.

Q    That agreement does not require Technovative to pay any money to Stream TV, correct?

A    That settlement agreement --

Q    I'm sorry to Rembrandt -- to Rembrandt.

A    The settlement agreement does not require Technovative to pay money directly to Rembrandt.

Q    Okay.  And the settlement agreement requires Stream to give Rembrandt certain warrants?

A    Yes.

Q    Correct?  Technovative is not obliged, under that settlement agreement, to give Stream TV any warrants, correct?

A    Correct.

Q    And that agreement -- settlement agreement requires

Stream TV to sell at cost televisions to Rembrandt, correct?

A    Yes.

Q    That agreement doesn't require Technovative to sell

televisions to Rembrandt at cost, does it?

A    Other than through Stream, no, they do not.

Q    Rembrandt has never -- well, let me -- let me ask this.

Has Rembrandt ever provided -- sorry, strike that.  Has

Technovative ever provided any services to Rembrandt directly?

A    Not that we're aware of.

Q    Are you aware of any other contract between Technovative,

the legal entity, and Rembrandt?

A    No.

Q    Now, switching over to Technovative's bankruptcy here --

A    I -- I apologize.  I believe that there is an NDA between

the parties that was negotiated with counsel for both entities.

So I believe that might also apply.

Q    Oh.

A    I mean, that might be a -- that might be a --

Q    Give me a month time frame of this NDA that you're talking

about?

A    I think it was this year March after the bankruptcy

petition was filed.

Q    Okay.  So you entered into a contract with Technovative,

which is a Debtor in this court, after the bankruptcy was

filed?

A    The -- yeah, I mean, I'm pretty sure the contract was -- I mean, in fact, I'm sure the contract was after the bankruptcy petition was filed as an NDA, so we could share information.

Q    Are you aware of whether or not anybody ever sought the permission of this Court to enter into that contract?

A    I'm not aware.

Q    Did anybody ever mention to you, in the course of negotiating that contract, getting the court's approval to enter into it?

A    I don't recall if anybody mentioned it one way or the other.

Q    You understand that Technovative's only identified Creditor, in this bankruptcy, is Rembrandt, correct?

A    I've read that in the papers. Yes.  I -- I do not know if other Creditors have filed -- I haven't checked to see if any Creditors have filed claims or anything like that, so --

Q    Okay.  And you recall, I took your deposition on August 16th?

A    The -- yes, I don't remember the exact day, but, yeah.

Q    And do you recall that at the time of your deposition, you didn't know whether or not Rembrandt had filed a proof of claim, as to Technovative?

A    Vague recollection of that, but I -- and I -- I don't know if we filed anything in the Technovative side of the case.

Q    Okay.  Now let's just talk about the basis of Rembrandt's claim against Technovative in this -- in this -- in Technovative's bankruptcy.  The basis of Rembrandt's claim against Technovative, in this bankruptcy, is based on an alleged violation or an alleged infringement on Rembrandt's intellectual property, correct?

A    Yes, that's a short description, but, yes, that would be accurate.

Q    Okay.  Now, you earlier testified that Technovative is a holding company, correct, to your understanding?

A    To the best of my understanding, yeah.  That -- but that's based entirely on reading papers filed by others, so --

Q    Okay.  Are you aware of anything that Technovative specifically is doing that infringes on Rembrandt's intellectual property?

A    Yes.

Q    What is Technovative doing?

A    It is our understanding that they are in possession of our trade secrets.  Our -- what are -- the provisions in the software that was created in technology owned by Rembrandt and are not subjecting themselves to the settlement agreement that would give them permission to have those materials.

Q    And when you say Technovative is in possession, what you mean is, other subsidiaries of Stream, below Technovative, are in possession?

A    No, I do not mean that.

Q    What --

A    To -- to our understanding, Technovative has possession of those materials.  So, no, I do not understand it in any way, shape, or form, the way you're describing it.  I -- I --

Q    Mr. Michaels, tell me what specific facts that understanding is based on?

A    The -- we developed that understanding from reading the court papers back and forth between SeeCubic and Stream.  And we have spoken to Stream executives and explained and asked what the Technovative has and does not have.  And we've asked, of course, what the subsidiaries have and do not have, with respect to our materials.

Q    Okay.  And let me -- let me ask this.  Who at Technovative has these materials?

A    At least Shadron Stastney and Mathu Rajan.  Both have them and plus it is our understanding, everybody who is considered being Ian -- is it Ian Liston?  I think he was the appointed receiver, in that case.  We reached out to him.  And we received no denial certainly.  And, you know, our understanding, from him, is that they were -- he was well aware of Rembrandt, after we reached out to him.  So I think those three individuals.  I don't know who else, but that seems to be fairly sufficient, given that I think they are the entirety of the directors of potential for Technovative.

54

Q    Mr. Michaels, do you recall I took your testimony in the deposition in August, correct?

A    I -- I recall we had -- there was a deposition, if that's --

MR. COLBY:  Your Honor, if I might show Mr. Michaels his deposition transcript?

THE COURT:  For -- go ahead, Counsel.

MR. COLBY:  I'm receiving an answer here that's inconsistent with the deposition.

MR. DEMARCO:  No, it's not, but I understand.  What part of this will you be referring to?

MR. COLBY:  Sure.  Page 30, line 12.

May I, Your Honor?

THE COURT:  You can hand it to the -- to John.  He will hand it and you can direct the witness to what portion of the deposition you'd like him to look at.  I'm assuming it's for impeachment purposes or something.  All right. Give -- hand it to him -- hand it to John.

John, hand it to -- Counsel, you have -- you're standing up.

MR. DEMARCO:  Yes, Your Honor.  I just want to object to an improper impeachment.  It's not quite how it -- this might be how refreshing recollection works, but I'm not aware this is how an impeachment is achieved.

THE COURT:  I don't know what's going -- that's why

I'm, like, trying to figure out what does he want to do.  I'm looking.  So you -- what do you want to -- I assume that.

Wait, John.

What are we doing here?

MR. DEMARCO:  Well, Your Honor, my understanding for an impeachment is to, you know, address the prior inconsistent statement, not provide it to the witness to read, but if he wishes to refresh Mr. Michael's recollection --

MR. COLBY:  That's fine.

MR. DEMARCO:  -- then that can certainly --

MR. COLBY:  That's fine.

THE COURT:  Okay.  What are we doing? I

MR. COLBY:  I'm happy to -- I'm happy to do it -- happy to do it either way.

THE COURT:  Wait.  No, no, Counsel.  It's not either way.  You're either refreshing his recollection or you're impeaching him.

MR. COLBY:  No, that's fine.

THE COURT:  Which one you doing?

MR. COLBY:  I will impeach him.

THE COURT:  All right.  Then there's a process for that, that you have to follow to impeach.  And what are you -- you're saying he's not using the proper process?

MR. DEMARCO:  I believe we were in agreement, as to what the proper process is, and if you're going to be reading

it, rather than having him look at this?

MR. COLBY:  Yes.

MR. DEMARCO:  Okay.

MR. COLBY:  I will read it.

MR. DEMARCO:  Got you.  Just making sure we're on the same page there.

THE COURT:  All right.  So give -- so give it back. That's what I was, like, I was trying to figure out myself, but I just -- whatever.  I guess I need to just stop and let the parties go.  Go ahead, Mr. Colby.

MR. COLBY:  All right.

BY MR. COLBY:

Q    So do you recall when I took your testimony -- sorry.  Let me start that over again.

Mr. Michaels, in your deposition, I asked you, "So Mr. Michaels, you are -- do I understand correctly that the basis for your claim against Technovative is that it owns the subsidiaries that you allege are engaging in infringing activity, is that right?"

Your answer was,

"I believe I had said that it's about ownership and it's about management and control of those entities.

And that -- that in and of itself is not a problem.

The problem is that the subsidiaries are co-acting with SeeCubic and Hawk to provide activities -- I

mean to conduct infringing activities and misappropriation of our technology, outside of any have-made style analysis to Stream.  Those projects were for SeeCubic and not flowing back to the entity that was in the position to actually pay us what we were owed."

MR. DEMARCO:  Objection, Your Honor.  I guess move to strike.  I fail to see an inconsistency here.

THE WITNESS:  Me too.  Sorry.

THE COURT:  You don't get to say anything.  I mean, he can ask him and I can figure out what he thinks is an inconsistent statement.  You believe it's not and you're objecting on that basis?

MR. DEMARCO:  Well, fair enough, Your Honor.  We could certainly ask, but in that case, I just ask what question there was.  We've read the statement.

THE COURT:  Well, he read the statement.  Now, you object before he even asked the question.  Let him ask the question.

MR. DEMARCO:  Yes, Your Honor.

THE COURT:  Okay.  And what's the question, Mr. Colby?

BY MR. COLBY:

Q   Okay.  So is it still your testimony, Mr. Michaels, that the -- that there was infringing activity that was taking place

at the Technovative level, as opposed to because of Technovative's ownership of subsidiaries?

A    It is my testimony that Technovative is absent the license from Stream infringing and misappropriating; and two, that the part of those actions that leads to that is both the possession of our trade secrets by Technovative, but certainly, the activities referenced in the -- the clause you just read, and the nature of a bunch of Stream -- or excuse me -- Technovative subsidiaries running around offering to do work for different entities, other than Stream, and the people that actually owe us the license. The Stream license provides for Stream to have products manufactured.  That's fully contemplated and expected. What is not contemplated is that those people that are manufacturing products for Stream are then going to go out and license and sell products to additional parties.  The -- the entire nature of a non-exclusive license is we get to go license those other entities. That's how Phillips license. That's how Microsoft licenses copies of Word, you know, et cetera.  You know, you don't have the right to go start transferring copies of Skadden's licenses to Microsoft Word to KL Gates, right?  I mean, you can't resell that.  They get -- they get to go to KL Gates and sell their license to Word all over again. It's the same thing here.

Q    Mr. Michaels, there's been no final judgment by any court that Technovative has violated any of Rembrandt's intellectual

property, correct?

A    Final judgment, no.

Q    Now, we talked a little -- a few minutes ago about the claim that Rembrandt has filed in the district of Delaware?

A    Yes.

Q    And that's a trade secret case; is that correct?

A    Yes.

Q    All right.  Rembrandt has named Technovative as a Defendant in that district of Delaware trade secret case, correct?

A    Yes.

Q    That case is stayed, as to Technovative, right now, correct?

A    Yes.

Q    And if this bankruptcy were dismissed -- if Technovative's bankruptcy were dismissed, Rembrandt would continue to litigate its trade secret claims against Technovative in the Delaware case, correct?

A    Yes.

Q    I want to go back to --

A    Actually, I -- the -- the -- that answer depends on what actions Technovative was taking at that time and whether or not they were still owned by Stream and the -- its subsidiaries stopped performing the actions that we were concerned about.

Q    I want to go back to the New York litigation that you

testified about --

A    Uh-huh.

Q    -- with Mr. Alexander.  That case involved patent infringement claims, correct?

A    That was a portion of that case. yes.

Q    And those patent infringement claims were dismissed, correct?

A    Yes.

Q    And Rembrandt never refiled those patent infringement claims, correct?

A    We have not.

Q    And the mediation, in 2019, that you testified about earlier, that was to resolve the remaining claims in the case?

A    No.  It was the -- we offered that and Stream came back with, we -- we want to settle everything.  We want a patent license as well.

Q    Okay.  Those negotiations resulted in the signing of the term sheet that you looked at with Mr. Alexander, correct?

A    Yes.

Q    That's Exhibit Rembrandt 1.  After Stream signed that term sheet in 2019, it took the position, until it signed the settlement agreement you testified about in 2021, that that term sheet was nonbinding, correct?

A    At one point, they took that position, but for months after the April meeting, we were negotiating back and forth

exchanging drafts. We met again with Shadron Stastney in -- in July. Mark Coleman, director of Stream at the time, and I believe current director of SeeCubic, met with us asking for modifications that basically got incorporated eventually, but the related to the timing of performance.

Q Right. And but at some point in time, some months after the term sheet was signed, Stream began taking the position that it was nonbinding, correct?

A At some point thereafter, yes. I don't remember exactly when that was. I don't remember whether that was after or before what we later became aware of, in terms of the omnibus agreement, but, yeah.

Q And after that point in time, when Stream changed its position, Rembrandt and Stream engaged in additional legal proceedings about whether or not that term sheet was binding and enforceable, correct?

A Yes.

Q And in those legal proceedings, Stream was fighting against being held to the terms of that term sheet, correct?

A Yes.

Q Okay. And then at some point, Stream reversed its position again and engaged in discussions about the term sheet that culminated in the settlement agreement that you talked about with Mr. Alexander this morning, correct?

A Yes, but we continued conversations about reaching

62

settlement were continuing basically the whole time even during the pendency of that particular set of motions to enforce it on its face.

Q    Right.  And those conversations that led to the settlement agreement, to the best of your recollection, began around April of 2021, correct?

A    No, I -- I would say, as I mentioned earlier, we were pretty much in constant discussion with Stream, from 2018, in the beginning of the mediation, throughout at -- and our settlement discussions broke down because they were basically saying they didn't have the money to pay us.  You know, their shareholders were coming after them.  Their, you know, CFO and, you know, run -- trying to run away with the company, et cetera, et cetera.  And we got frustrated and, yeah, we brought a motion.  I mean, they filed their papers against us and then I think, you know, at some point, minutes to hours later, we received a call saying, hey, hey, we still want to negotiate a deal.  You know, we just -- we can't pay -- we -- we need time -- we need more time to pay you.  We're part of the discussion.  So I don't remember the exact sequence, but it was a, yeah, we got to do this in court, but we still want to make a deal, was the discussions with Stream leading up to -- I mean, the bankruptcy stay.  I mean, we -- we were talking about putting them into involuntary bankruptcy as opposed to filing that motion in the Southern District.  And we wanted -- we

figured it would be a better -- we were in a better position to file an involuntary petition with the final adjudication in the Southern District.  So that we -- that's why we decided to pursue that action at the time.

Q    Mr. Michaels, in April of 2021, you sent out a series of emails to folks who were involved in the omnibus agreement litigation, correct?

A    Yes.

Q    And in April of 2021, and at some point following you sending out those emails, you got a call from Mr. Zahralddin, Stream's Bankruptcy Counsel, correct?

A    Yes, that was the first time we had heard from him.

Q    Right.  And when Mr. Zahralddin -- and you negotiated the finalization of that settlement agreement with Mr. Zahralddin, after he reached out to you, following those emails you sent in April of 2021, correct?

A    Yes.

Q    Okay.  And those conversations with Mr. Zahralddin, that led to the signing of the settlement agreement, that was when Stream's first bankruptcy was still ongoing in the Delaware Bankruptcy Court, correct?

A    Yes.  But likewise, we were in virtually constant communication after that first phone call.  And it wasn't just him.  It was a group of patent attorneys and they were trying to fully vet the claim to figure out whether or not, you know,

what this was about.

Q    Right.  And that first phone call occurred, to the best of your recollection, in April of 2021, when Stream had ongoing bankruptcy proceedings in the district of Delaware, correct?

A    I don't recall whether we spoke prior to the start of the bankruptcy or -- or after.  I don't remember whether -- when that first bankruptcy started.  I know I sent out a series of letters and that's what he responded to.  So if -- if you have a record that shows the bankruptcy was filed prior to you receiving that email from me, and Hawk receiving my -- I mean, I basically sent the same -- largely the same email to everybody involved.

Q    Right.  And you came -- you came to -- you came to terms on that final settlement agreement, while Stream's first voluntary bankruptcy petition was ongoing, correct?

A    Basically, Rembrandt's position throughout was we were sticking with the April 2019 terms and you could -- we were basically in a take it or leave it position.  So I don't know that you would say that we came to terms.  It was Rembrandt saying this is what we will agree to if that works for you.  It works for us, right.  We're not trying to get any more or any less than what we negotiated for.

Q    Mr. Michaels, when I took your deposition in August, did you testify that you largely claimed (sic) to terms at the point in time that, to the best of your recollection, the

voluntary bankruptcy had not been dismissed?

A     I -- I don't recall that specific testimony.  I'm testifying again as to what happened.  I -- the -- we came to terms when the settlement agreement was signed is -- is one way of looking at it, but it's virtually identical terms to what we negotiated in April 2019.  I think we've said that over and over again in our papers and I say it again today.  I don't think I said anything different than that in my deposition.  I may have worded it differently, but it -- we -- it's all the same thing.

          MR. COLBY:  Now I will refresh the witness's recollection, Your Honor.

          THE COURT:  Okay.  And we are -- let me just get to the right page and I'll show Mr. Demarco here.

          MR. COLBY:  Do we mark this, Judge?

          THE COURT:  No.  I don't need to see it.  You show it to him.  He reads it.  He hands it back.  And he reads it to himself.  What do you want him to read?

BY MR. COLBY:

Q     So, Mr. Michaels, if you could look at page 58, line 5, through 59, I believe it's line 10.

          THE COURT:  What page -- what lines, page 58, line what?

          MR. COLBY:  5.

          THE COURT:  Through?

MR. COLBY:  59, line 10.

THE WITNESS:  Okay.  Yeah.

BY MR. COLBY:

Q   Okay.  You finished reading it?  Does that refresh your recollection?

THE COURT:  Wait a minute.  He's still reading.

THE WITNESS:  No, no.  I've read it.

MR. COLBY:  No, he said he was done.

THE COURT:  Are you done?

THE WITNESS:  Yeah.  Yes, I am.

THE COURT:  Well, hand it back.  Okay.  Well, he was looking -- well, he was reading something.  I don't know if it was beyond what you told, but he was still reading when I looked over there.

THE WITNESS:  You put a box of cereal in front of me and I'm going to read it.  And I just kept reading.

THE COURT:  Okay.

THE WITNESS:  But, yeah.

THE COURT:  All right.

BY MR. COLBY:

Q   Mr. Michaels, does that -- does that refresh your recollection that you largely came to terms on the final settlement agreement, to the best of your recollection, while the voluntary bankruptcy was pending?

A    It refreshes my recollection of what I said.  I -- I

believe, even in what you had me read, I was unclear as to exactly when that was and I dated it by the April 6th letters. I knew that I sent out a group of letters.  I talked to all the parties after I sent those.  That's the first time that I talked to Stream's bankruptcy counsel and from them forward. And then I do not know exactly what terms were discussed and when relative to dismissals of bankruptcies or re-filings --

Q    Yeah.

A    -- other than, what I previously testified to, is that as soon as we had an executed agreement, we then filed the involuntary petition.

Q    Right.  Well, we'll get to that.

A    Uh-huh.

Q    But the question, just to make the record clear, the best of your recollection is that those conversations that led to the final -- sorry, I'll start that over again. The best of your recollection is that you largely came to terms on the final settlement agreement after you sent the April notes --

A    Yes.

Q    -- and to the best of your recollection prior to Stream's voluntary bankruptcy being dismissed?

A    It's that last portion that -- because we had filed the -- the -- we signed the final agreement and the next day filed the involuntary, which would not have been possible if the voluntary petition had not been signed.  The terms, as I've

also referred to, in terms of coming to final terms, was something negotiated in April of 2019.  And our position was take it or leave it.  At some point, Stream said we'll take it. I don't remember when that was relative to various bankruptcy cases.  I don't -- if -- I don't believe I said anything different during my deposition.

Q    I'm not asking about the executed version.

A    Okay.

Q    That's something that we can establish by looking at that document.  The conversations with Stream's bankruptcy counsel --

A    Yes.

Q    -- that led up to that began in April of 2021, when Stream's voluntary bankruptcy was still pending, correct?

A    Yes.

Q    Okay.  Now, let's take a look at the settlement agreement. It's marked as Rembrandt Exhibit 2.  And you testified about the terms earlier with Mr. Alexander, so I won't go through them in detail, but if we look at paragraph 15 --

A    Yes.

Q    -- paragraph 15 describes -- I'm sorry -- paragraph 15 obligates Stream to make certain cash payments, correct?

A    Yes.

Q    It obligated Stream to make a cash payment immediately and then certain monthly fees over time, correct?

A     Yes.

Q     And if we look at paragraph 6, it describes various Stream
TV products that Rembrandt has the right to purchase from
Stream TV, correct?

A     Yes.

Q     And by and large it, it enables Rembrandt to purchase
those TVs at cost, correct?

A     Yes.

Q     All right.  Now, Stream has never made any of those cash
payments to Rembrandt, correct?

A     It has not.

Q     And Stream has never delivered a single one of those TVs
to Rembrandt, correct?

A     No.  No, I'm sorry.  Your statement is incorrect.  As I
stated earlier, we received a number of prototype units in the
original case.

Q     In the original case?

A     Right.  I mean, is -- this was settling.  So some of those
TVs we had received.

Q     Okay.  And but it hasn't -- how many TVs?

A     I mean, I think it's three.

Q     Okay.

A     So it's --

Q     And has Rembrandt resold those?

A     Oh no, no, no, no, no.  Those are -- we use for internal

purposes.

Q Those are prototypes for your technological and other purposes, correct?

A Yes.

Q So you referenced a couple of times Stream's Chapter 7. I mean -- yeah, Chapter 7 bankruptcy -- the involuntary bankruptcy.

A Yes.

Q Rembrandt is one of the three Creditors that put Stream into involuntary bankruptcy in May of 2021, correct?

A Yes.

Q And that petition was filed on May 23rd, 2021, correct?

A Yes. Right. That's my best of my -- I think that's a day or two after the signature of this agreement. That's how I -- I don't know -- I don't have a specific recollection of when it was filed, other than it being a day or so after this one -- after this agreement.

Q Okay.

MR. COLBY: Your Honor, I've got exhibits that we may use with Mr. Michaels in a binder. I'd like to hand it up so we don't have to serially do the documents if that's okay. I know you have a number of binders in front of you. I was trying to make it easier on you, not harder.

THE COURT: So all the -- I mean, I don't have an issue with having the binders, unless one of the

parties -- opposing parties object.

MR. DEMARCO:  No objection, as long as I can have a copy of one of the binders.

MR. COLBY:  Yeah.  Okay.  It's only one binder though, Your Honor.  So you won't have to go back and forth between two.

THE COURT:  Oh, great.  Thank you.  All right.  So here you're going to hand in the binder.  You don't look at anything until he directs you where --

MR. COLBY:  Yeah.

THE WITNESS:  Understood.

MR. COLBY:  I'm not certain we'll --

THE COURT:  Okay.

MR. COLBY:  -- use all of these.  So we'll go one at a time.

THE COURT:  Right.

MR. COLBY:  Some -- so for the Court's convenience --

THE COURT:  Right.  What we'll do, John, is just give him the binder.  And then he'll just direct him to the -- there's numbers in the binder?  Are they individually marked or how are they marked?

MR. COLBY:  So again, in an effort to make it easy, documents that before today had already been admitted are behind tabs that have their exhibit number.  So for example, tab 7 has been marked as Exhibit 7.  It's the involuntary

bankruptcy petition.

THE COURT:  Which has already been previously marked.

MR. COLBY:  Right.

THE COURT:  Okay.  So the --

MR. COLBY:  The ones --

THE COURT:  Right.

MR. COLBY:  -- that have not been previously marked are behind letter tabs to avoid confusion with exhibit numbers.

THE COURT:  So we're going to call them --

MR. COLBY:  We will give them --

THE COURT:  -- Exhibit A.

MR. COLBY: No, Your Honor.

THE COURT:  No?

MR. COLBY:  We will give them Rembrandt exhibit numbers.

THE COURT:  Okay.  All right.  So they're -- but Rembrandt has its own D1 and 2.

MR. COLBY:  Right.

THE COURT:  So but they're not going to be Rembrandt's document or being introduced by Rembrandt.  So it might be a little confusion if we call them Rembrandt something-something.

MR. COLBY:  Okay.  Fine.  We could do it --

THE COURT:  So we can call them --

MR. COLBY:  We could do CR, which are how we've been

doing our exhibits.

THE COURT:  Yeah.  We can use -- yeah, we'll be Creditor Rembrandt.

MR. COLBY:  Yep.  Fine.  We can do that.

THE COURT:  Okay.  CR Rembrandt.

MR. COLBY:  Yep.

THE COURT:  Okay.

MR. COLBY:  We'll do CR.  And those -- I think we're picking up at Exhibit 258, when we get to it, but that's fine.  That's a better way to do it.

THE COURT:  Okay.  All right.  So C7 -- but 7 in this binder has already been introduced with all the exhibits attached to it -- A through -- no?

MR. COLBY:  No, those are -- those are documents that have not been exhibits yet.

THE COURT:  All right.  Well, what's the relevance of 7?  Because I'm confused.

MR. COLBY:  So 7 is -- has been marked already --

THE COURT:  Oh, okay.

MR. COLBY:  -- as CR7.

THE COURT:  And then DE and all those other things are different exhibits?

MR. COLBY:  Ones we will be --

THE COURT:  So why wasn't 7 first and then -- never mind.  Okay.

MR. COLBY:  They're in chronological order, Your Honor.

THE COURT:  Yeah, but it would have made sense for 7, which was created -- and then A, B, C, D, because 7 in the middle made me believe that 7 -- the attachments went with 7, but okay.  Now that you've explained it, I'm fine.  Okay.

MR. COLBY:  Okay.

BY MR. COLBY:

Q    So if we could take a look at tab 7, Mr. Michaels.

THE COURT:  Okay.  So -- and that was previously marked as what?

MR. COLBY:  CR 7.

THE COURT:  Okay.  So we're looking at CR 7, which is in the binder under the seven 7.

MR. COLBY:  Right.

THE WITNESS:  And mine is -- it's the involuntary petition?

BY MR. COLBY:

Q    Correct.

A    Okay.

Q    So that was my next question.  Mr. Michaels, do you recognize this document?

A    Yes.

Q    All right.  And what is it?

A    This is a copy of the involuntary petition that Rembrandt

and two other creditors filed back in 2021 against Stream TV

Networks, Inc.

Q    It was filed on May 23rd, 2021, correct?

A    Yes, it appears so.

Q    And that's the same day that the settlement agreement,

marked as Rembrandt 2, is dated, correct?

THE COURT:  I guess he would have to look at

Rembrandt 2 to answer that.

THE WITNESS:  Yeah, I'm looking -- I'm looking at

Rembrandt 2.  I'm looking for the signature page.

THE COURT:  Oh, okay.

THE WITNESS:  Let's see, Exhibit A.

THE COURT:  Are there signature pages?

MR. COLBY:  There are.  It's at the end of the main

document before some of the --

THE WITNESS:  Before the warrant agreement.

MR. COLBY:  -- exhibit, so it's sort of in the middle

of the pages.

THE WITNESS: Yep.  Yes.

BY MR. COLBY:

Q    Right.

A    May 23rd.

Q    May 23rd.  So the settlement agreement and the involuntary

petition were signed and dated on the same day, correct?

A    Yes.

Q    And the basis of Rembrandt's claim, as a Creditor, in the involuntary Chapter 7 petition, was the settlement agreement dated that same day, correct?

A    Yes.

Q    This morning, Mr. Michaels, you testified that the value of that term sheet in 2019, when it was signed, was 1.2 billion?

A    Yes, and more because of the cash payments and TVs --

Q    Okay.

A    -- but that's --

Q    Okay.  And so if you take a look at the Chapter 7 involuntary bankruptcy petition, and you go to page 3.

A    Yes.

Q    Rembrandt, at that time, valued the settlement agreement with Stream TV for 1.5 million, correct?

A    It was the first payment under the settlement agreement, yes.

Q    Right.  And so the settlement agreement was the basis of your claim against Stream TV in the involuntary bankruptcy, correct?

A    Yes.

Q    And you valued that at $1.5 million, at the time you filed the involuntary petition, correct?

A    We valued the payment due under the settlement agreement as the settlement agreement provided at 1.5.

Q    Right.   The -- and the purpose of the form -- the value
that you ascribed to that settlement agreement, in May of 2023,
was $1.5 million, correct?

A    No, I don't believe that is correct.  I think the value
that we put as our claim that was presently held against Stream
was 1.5 million in an involuntary bankruptcy, where we were
planning on bidding for the company.  So we would have been
providing ourselves the TVs.  So we -- at that point, we
expected full performance of provision of the TVs.

Q    And the purpose of the form that you filed with the
bankruptcy court in 2021 is to -- is to inform the court of the
value of the claim that you believe you have against that
debtor, correct?

A    Yes.  I'm not a bankruptcy attorney, but --

Q    And the value -- and the value you ascribed to that, on
May 23rd, 2021, was $1.5 million, correct?

A    It's the value we ascribed to the first payment that was
due, which is right in the terms of the settlement agreement.
I don't believe that the words "settlement agreement" and a
number fully characterize what is a, you know, voluminous
agreement.  And or did we attempt to do that.  We -- I believe
we attached a copy of it at the time, but that -- I -- I -- I
think two words in a nature of petitioner's right does not
waive any of our other rights under the agreement.

Q    I just -- if you could give a direct answer to the

question.  The value that you -- I'm sorry -- the amount of the claim that you filed against Stream, in May of 2021, was $1.5 million, correct?

MR. DEMARCO:  Objection, Your Honor, on two grounds.  First, asked and answered.  And second, I've allowed this to go on for some time, but I fail to see the relevance.  What material fact does this make more or less probable regarding the motion to dismiss?

THE COURT:  I'm going to sustain because he's already answered three times what it was and what it was for you.  You might not like his answer, but that's what he said.  It was for 1.5 -- $1,528,000 and it represented the first payment due under the -- under the settlement agreement.  They planned on bidding for it, so he didn't include the other amount and it was only for the amounts due at the time.  Move on.

MR. COLBY:  Okay.

THE COURT:  Now, wait a minute.  He also is objecting on relevancy, on how is this relevant to the motion to dismiss or motion for relief?  Both motions, I'm assuming we're addressing.  Or is this only for the motion to dismiss, Mr. Colby?

MR. COLBY:  Yeah.  So the Debtor and Rembrandt have raised as a defense to those motions, the inherent value of both Stream and this supposed -- the supposed value of this settlement agreement.  This is a statement by Rembrandt about

how it valued that settlement agreement.

THE COURT:  And he gave you an explanation that you don't like.  I don't know what I'm going to do with it, but that's how he valued it.

MR. COLBY:  That's fine, but it's plainly relevant.

THE COURT:  Right.  I think about the -- he says it is relevant.  I agree it's relevant but --

MR. COLBY:  Okay.

THE COURT:  -- his explanation is his explanation.

MR. COLBY:  That's fine.

THE COURT:  What am I going to do with it?

MR. DEMARCO:  Yes, Your Honor.

THE COURT:  All right.  I'll allow it.  Continue.

MR. COLBY:  Sure.

BY MR. COLBY:

Q    So if we could, Mr. Michaels, let's go to tab I in the binder.

THE COURT:  So that's Creditor Rembrandt I?

MR. COLBY:  It is  tab I in the binder.  I would like to introduce it, but I need to lay the foundation first.

THE COURT:  Well, we got to mark it first.

MR. COLBY:  That's -- yeah.  And so I will market --

THE COURT:  What are we marking it as?

MR. COLBY:  We will mark it as CR258.

THE COURT:  Okay.  So we're not calling this

Rembrandt anything.

MR. COLBY:  Right.  We're just going to continue with the Creditor's exhibit numbering.

THE COURT:  Oh, okay.  That's not what I understood, but that's fine.  Okay.

MR. COLBY:  Yeah.  All right.  All right.  So and that is I in the binder?

MR. COLBY:  Yeah.

THE COURT:  John, when we -- if this is admitted, it'll be admitted as 258.  Okay.  Creditor 258.  Okay.  I'm marking mine as Creditors 258.  Okay.  Go ahead.  You want -- he wants --

BY MR. COLBY:

Q    Mr. Michaels, do you recognize this document?

A    Yes.

Q    What is it?

A    This is a copy of the proof of claim filed by Rembrandt in the present case or cases?

Q    All right.  And are you familiar with this document?

A    Yes, I am.

Q    Yeah.  Are you familiar with it in the course of your duties at and for Rembrandt?

A    Yes.

Q    Does this appear to be a accurate copy of that proof of claim?

A     Yes.

MR. COLBY:  I'd like to move to admit it in the evidence as Exhibit 258.

MR. DEMARCO:  No objection, Your Honor.

THE COURT:  Admitted.

(Respondent's Exhibit 258 admitted into evidence)

BY MR. COLBY:

Q     Now, on this form, there's a box numbered 1, right in the middle of the first page.  Do you see that?  I'm sorry.  Box number 2, in the middle of the --  of the first page.  Do you see that?

A     You're referring to basis for claim?

Q     Basis for claim, correct.  And the basis for the claim is the settlement agreement with the Debtor dated May 23rd, 2021, correct?

A     Yes.

Q     That's the same settlement agreement that was the basis of the Chapter 7 involuntary petition, correct?

A     Yes.

Q     And do you see box number 1, amount of claim as of date case filed?

A     Yes, I do.

Q     And the number there is $1.2 billion, correct?

A     Yes.

Q     And that's notwithstanding that it's based on the same

settlement agreement that Rembrandt previously valued at $1.5 million?

A    That's explained in the attached declaration to that document, as to how we arrived at that value.  So it's --

Q    Right.

A    -- they're 100 percent consistent.

Q    Right.  We're going to -- we're going to get to that.  The $1.2 billion number is based on the value -- the overall value of the settlement agreement that allows Rembrandt to buy Stream TVs at cost and resell them correctly -- correct?

A    Yes.  It's all of the things, in addition to other things that are listed in the attached declaration, which --

Q    Cash payments and those sorts of things?

A    Right.

Q    Yeah.  Sorry, I spoke over you and I'm trying not to do that.  Right.  But is it fair to say that the bulk of that $1.2 billion value comes from the potential reselling of Stream TV TVs?

A    Actually, no.  It is the purchase of those TVs from Stream at a value severely discounted from what other people could purchase for them.  If our desire was to wall a warehouse with all those TVs and watch them ourselves, we'd still pay $500, $400 dollars a TV less than others would have paid.

Q    Okay.  That value comes from -- regardless of what you choose to do with those TVs, that value comes from the

difference between the price you were able to purchase them at

and the price that others would have to purchase them at?

A    Yes.

Q    Okay.  And the way for you to turn that value into money

in Rembrandt's pocket would be to resell them correctly --

correct?

A    That is one of the ways.  We actually -- we're largely

planning to maintain ownership of the TVs.  Potentially, we

have a -- you can see it on our website, a 3D in a box, where

we rent those TVs for trade shows.  We -- our main business

model is going to be 3D advertising, as one of our primary

areas.  So it's much more of a lease type situation.  Even in

the medical markets, we're looking at providing the entire

system and maintaining ownership of it and licensing it out.

So we don't -- sales might be part of what we're doing, but

largely it's more of a leasing, pay as you go type operation.

Q    Rembrandt has never sold a Stream TV product, correct?

A    Rembrandt has never sold a Stream TV product.  All of our

product sales have been made by other manufacturers.

Q    Okay.  And Rembrandt has never licensed a Stream TV to

somebody else -- the use of a Stream TV to somebody else?

A    We've allowed other people to view it.  We've included the

limited license to use for evaluation type things.  So

technically, yes, but nothing of -- we're -- we're not -- it's

not a profit operation.

Q    Rembrandt has never leased a Stream TV to somebody else, correct?

A    No, we've never leased.  We have never leased a TV, so --

Q    All right.

A    -- not a Stream TV.

Q    Now, you're here testifying today on behalf of Rembrandt 3D Holdings, correct?

A    Yes.

Q    Is there another Rembrandt entity?

A    Yes.

Q    What's that entity?

A    Rembrandt 3D Corp.  It's a Delaware corporation.

Q    Okay.  And Rembrandt 3D Corp. -- let me backup. Rembrandt 3D Holdings is a holding company, correct?

A    Yes, it owns the intellectual property and -- of 3D Fusion, formally 3D Fusion.

Q    Rembrandt 3D Holdings earns money by receiving licensing fees for Rembrandt's technology, correct?

        MR. DEMARCO:  Objection, Your Honor.  Outside the scope of direct.  Where are we -- where are going with this?

        MR. COLBY:  It has to do with, again, the value of this supposed deal is in Rembrandt's role in the market as a commercial operator.  And this is very relevant to Rembrandt's role in the market as a commercial operator, whether or not it has in the past or has the ability to actually sell three

million Stream TV's.

THE COURT:  What does that have to do with this case?

MR. COLBY:  If the answer to that question, Your Honor, is it has nothing to do with this case, then there's no reason for Mr. Michaels to be here, arguably --

THE COURT:  What?

MR. COLBY:  -- we've been saying that along.

MR. DEMARCO:  Your Honor --

THE COURT:  I have no idea what that means.

MR. COLBY:  Because, Your Honor --

THE COURT:  What their position is, it's outside the scope of direct.  That's number one.  And Mr. Michaels testimony relates to Rembrandt, presumably for two reasons. He's testifying to rebut Mr. Stastney's testimony with respect to the settlement agreement, which is what his purpose was.

And I don't know how we got into their claim, because I'm not sure what was -- he was being presented to -- I guess in support of not dismissing because they have a valid claim against Stream and against Technovative?  Is that where we're going with this?  Because I'm not sure what -- I have no clue. I'm just trying to listen and figure out what the heck this has to do with anything.

MR. COLBY:  Your Honor, the relevance of this particular line of questioning is the Rembrandt and the Debtors have clearly put into play Rembrandt's ability to buy these

tv's.  If Rembrandt can't buy these tv's, then the settlement agreement has no value.  And this line of inquiry is directly related to Rembrandt's ability to actually buy these tv's.

THE COURT:  And what does that mean for dismissal?  I mean, I'm doing -- playing count for me?  What am I doing here?

MR. DEMARCO:  Your Honor, if I may?

THE COURT:  Yes, you may.

MR. DEMARCO:  So as Your Honor pointed out, we brought Mr. Michaels up here to testify about two things.  To rebut the testimony of Mr. Stastney.  And as part of that, as Your Honor noted, it comes to the value that Rembrandt's technology brings to streaming.

Specifically, as we've heard Mr. Michaels testify, the -- having Stream and Phillip's license together brings a product that Stream can bring to market that is inherently valuable.  Breaking that technology up makes it significantly less, ala the Ferrari analogy we've heard.

THE COURT:  Okay.  I got it.

MR. DEMARCO:  I fail to see how bringing in a entity not -- has not filed anything to this bankruptcy and going into this profit motive and the purchase of this sale, I'm failing to see how that has any relation to the filings that we're here to talk about today, or the testimony of Mr. Stastney.

THE COURT:  Well, I -- they're saying they shouldn't -- I should dismiss the case because I guess the Debtor has no

Case 23-10763-djb   Doc 426   Filed 09/27/23   Entered 09/27/23 11:32:22   Desc Main
Document      Page 87 of 179
87

value or it's whatever.  And I am not quite sure -- I -- I'll allow it for what it's worth, if anything, but only on a limited basis.  Because I am not -- first of all, he never testified regarding -- at least this is the first time I've heard about -- did you testify earlier about this Rembrandt 3D Corp?

THE WITNESS:  I don't believe so.

MR. DEMARCO:  He did not, Your Honor.

THE COURT:  So I'm not quite sure why we're even talking about them.  I know he talked about Rembrandt 3D Holding.  We've talked about the settlement agreement and the term sheet.  But I'm not quite sure that he testified anything about performance under that.  So how we're getting to that, I don't know.

And you're objecting saying it's beyond the scope and it's irrelevant.  And he's saying, you agree it's beyond the scope.  I get that.  But he's saying that it's relevant.

MR. COLBY:  Well, I don't necessarily agree it's beyond the scope, Your Honor, because again, the value that supposedly has been ascribed and was discussed extensively on direct and that the Debtor has put into play.  Both the value of this deal and the value of the Debtor and its ability to reorganize, all hinges upon the ability to resell the tv's.

THE COURT:  Well, no, no, no, no.

MR. COLBY:  This is directly relevant, Your Honor.

*TheRecordXchange*
www.trxchange.com · (800) 406-1290

THE COURT:  His testimony about the one billion was that Mr. Stastney put that value.  That's what he said and that they use Mr. Stastney's one billion as the value.  So I don't know what that --

MR. COLBY:  And --

THE COURT:  -- how that's going to help me.

MR. COLBY:  I can -- maybe a few questions will help clarify that.

THE COURT:  Okay.

MR. COLBY:  Okay.  Mr. --

THE COURT:  I'll allow it for what's -- yes, counsel?

MR. DEMARCO:  Oh, yes.  I just -- would Your Honor allow me to renew that objection if we continue to stray a little further afield than where we're going.

THE COURT:  Right.  I'm going to keep it tight to, you know, you believe this is the settlement.  You're talking about the settlement agreement.  What the terms are, what they anticipated, and how this is going to work.  That's fine.  I'll allow it for that.

MR. COLBY:  Okay.

THE COURT:  But all this other stuff, I'm not quite sure how that even relates.

Go ahead.

MR. DEMARCO:  Yes, Your Honor.

BY MR. COLBY:

Q    Mr. Michaels, the 1.2-billion-dollar value, did Mr. Stastney directly say that the value of this deal, or did you -- let me just ask that question.  Did he directly say 1.2 billion dollars?

A    He said $400 per tv and we're giving you x number of tv's. He did not complete the multiplication problem.  Everybody in the room knew of 1.2 billion dollars.

Q    Okay.  So and that -- and your testimony is that that occurred in 2019?

A    It occurred multiple times in 2019 during our meetings for mediation when Shadron Stastney was acting as chief financial officer of Stream.

Q    And that was before you put the 1.5-million-dollar value on Rembrandt's claim in 2021?

A    It was -- his testimony was in 2019.  So yes, 2019 is before 2021.

Q    Okay.  So -- and the -- the -- to the extent that Rembrandt sells 3D technology, it does that through Rembrandt 3D Corporation of Delaware?

A    Not completely.  That -- that is one of the potential and likely partners with 3D Holding Limited.  There are a number of applications of these displays that are things that we are planning to partner with other large entities to manufacture. And so, in that case, it would not Rembrandt 3D Corp.

Q    Okay.

THE COURT:  So wait.  What's the answer?  The -- what was the question?  Was --

MR. COLBY:  The question was whether --

THE COURT:  -- whether the license are through 3D Corp?  Rembrandt 3D Corp or Rembrandt 3D Holdings?  I --

MR. COLBY:  Just trying to establish -- basically, I think we established that the licensing is done through 3D Holding, is that correct --

THE WITNESS:  Yes.

MR. COLBY:  -- Mr. Michaels?

THE COURT:  Okay.

MR. COLBY:  And the sale of hardware is done through Rembrandt 3D Corp of Delaware.  That's all I'm trying to establish.

THE COURT:  Well, that didn't come clear to me.  You guys all know this already, but I don't.

THE WITNESS:  And --

THE COURT:  So your testimony is that the licenses are done through which company?

THE WITNESS:  Rembrandt 3D Holding Limited.

MR. COLBY:  Okay.

THE COURT:  Hold on.  3D, which one?

THE WITNESS:  Holding Limited.  Then, Nevis Corporation.

THE COURT:  Holding Limited, no -- AKA Nemis?

THE WITNESS:  N-E-V-I-S.  It's a country.  It's --

THE COURT:  Oh, Nevis?

THE WITNESS:  It's the country it's incorporated in.

THE COURT:  Okay.  And then -- and the sale of the hardware is through who?

THE WITNESS:  Rembrandt 3D Corp.  But I also clarified that sale of hardware may be through other companies licensed by Rembrandt 3D Holding Limited, which is in fact why it's incorporated outside the U.S.

MR. COLBY:  Okay.

BY MR. COLBY:

Q    And Rembrandt 3D Holding Corp is the Delaware entity, right?

A    Yes.

Q    Okay.  And Rembrandt 3D Holding Corp is an operating business that sells hardware, correct?

A    Yes.

Q    All right.  I would like to go to Tab K and mark it as Exhibit 259.

MR. COLBY:  And I think -- I'm going to ask the witness a couple of questions about this.  But I believe this document is admissible on the bases that are not dependent upon the witness's testimony.

THE COURT:  And that would be what?

MR. COLBY:  It's a public record.  So it is the -- it

is a document reflecting the activity of the Secretary of State of Delaware.  He has a legal duty to report this information and has done so.  And so, it is 8038.

MR. DEMARCO:  Your Honor, this is the first I'm seeing of this document.  This was not provided to us, I believe, in the witness list.

MR. COLBY:  It's a public record.

THE COURT:  But it's not about it's a public record. It's what you plan to introduce.  Public record or not.

Are you objecting?

MR. DEMARCO:  On that and some -- perhaps some other grounds as well, yes.  Grounds of outside the scope as well. Relevance.  I don't understand why this incorporation for the -- or the change to DaVinci 3D to Rembrandt 3D Corp.  I fail to see the relevance there.  But let's start with, this was not provided to us, and then we'll deal with scope and relevance after that.

THE COURT:  Counsel, he said you didn't provide it to him prior to now.

MR. COLBY:  Yeah, Your Honor, this is a public record.

THE COURT:  I get that, counsel.  But --

MR. COLBY:  Yeah, no, no, I know.  And --

THE COURT:  But why wasn't it provided prior to today?

MR. COLBY:  In large part, just due to the timing of the deposition, Mr. Michaels testimony.  This is also in which he testified in his deposition about 3D Holding Corp.  We went off and did some research on that.

THE COURT:  Well, you had it before today, did you not?

MR. COLBY:  I did have it before today, Your Honor.

THE COURT:  So why didn't you give it to them before today if you had it before today?

MR. COLBY:  If you are not inclined to admit it due to that lack of provision, I think it's also useable for impeachment purposes.

THE COURT:  Right.  Doesn't have to -- counsel, he said he can use it for impeachment.

MR. DEMARCO:  If it's going to be used for impeachment, we're going to need to lay that foundation, Your Honor.  I -- but --

MR. COLBY:  Okay.  So I did lay the foundation.

THE COURT:  Okay.

MR. COLBY:  Mr. Michaels just testified that SeeCubic Corp of Delaware --

THE COURT:  SeeCubic?

MR. COLBY:  I'm sorry.  Mr. Michaels --

THE COURT:  All right.  Now, I know I'm listening and I'm not --

MR. COLBY:  Mr. Michaels just testified -- I need another sip of coffee.  Mr. Michaels just testified that Rembrandt 3D Corp of Delaware is an operating entity that sells hardware, and this document impeaches that testimony and I'm happy to go through why.

THE COURT:  Okay.  Go ahead.  I mean --

MR. DEMARCO:  I'll renew my --

THE COURT:  -- this document doesn't say what it sells or anything, but --

MR. DEMARCO:  Yes, Your Honor.  I'll renew my objection, I guess when we get that.

MR. COLBY:  You can close --

THE COURT:  Wait a minute.  Don't do anything yet. Your objection is that what?

MR. DEMARCO:  No, no.  I said I will renew my objection when we get there.  But we'll see where he's going with this --

THE COURT:  Okay.

MR. DEMARCO:  -- I suppose --

MR. COLBY:  And you can --

MR. DEMARCO:  -- for now.

THE COURT:  Go ahead.

BY MR. COLBY:

Q   I'll read it, you can close the book, Mr. Michaels.

THE COURT:  Wait a minute.  Why are you going to read

it?  On what basis?  How -- you're not going to show it to him?
You're not going to --

MR. COLBY:  I'm happy to show it to him, too.  I just
-- the way we did impeachment last time was I read it out loud.
But I --

MR. DEMARCO:  But --

MR. COLBY:  -- mean, I can just show it to him.

MR. DEMARCO:  -- well, yes, Your Honor, because
impeachment is, you know, prior --

THE COURT:  All right.  Okay.  Yes, read it.  I
wasn't sure what he was doing.  Okay.

MR. COLBY:  Right.  So --

THE COURT:  Well, my -- I'm sorry, go ahead.

MR. DEMARCO:  Apologies, Your Honor.  The concept of
the impeachment is to impeach with a prior inconsistent
statement.  What's the statement that is allegedly being
impeached?

MR. COLBY:  The statement that Mr. Michaels just made
that Rembrandt 3D Corp is an operating company that sells 3D
hardware.

MR. DEMARCO:  I understand now, Your Honor.  I'll
renew my objection.  Where we -- where we see where we go with
this.

THE COURT:  Okay.  I'll allow it for what it's worth.
I mean, I don't know what this has to do with any of what I'm

trying to do, but --

MR. COLBY:  I would love to --

THE COURT:  All right.

MR. COLBY:  -- do that right now.

BY MR. COLBY:

Q    Mr. Michaels, the Secretary of State of Delaware has certified -- as stated, "I do hereby further certify that the aforesaid corporation," -- let me -- actually, I'm going to read the whole thing.

"And I do hereby further certify that a said DaVinci 3D Corp filed a certificate of amendment changing its name to Rembrandt 3D Corp on the 10th day of January, AD 2013, at 2:06 p.m.  And I do further certify that the aforesaid corporation is no longer in existence and in good standing under the laws of the State of Delaware having become inoperative and void the 1st day of March, AD 2021, for nonpayment of taxes."  Is it still your testimony that Rembrandt 3D Corp of Delaware is an operating company?

A    Yes, to the best of my knowledge, we're operating. Apparently, we have something we need to clean up in -- in Delaware.  But I -- we are -- a group of people are actively participating and until this moment, did not know -- or until I think you -- that we were -- had -- had anything to do with regard to tax payments in Delaware.  But it will be taken care

of.

Q    Are you aware --

A    Or reinstated.

Q    Are you aware that the State of Delaware says that Rembrandt 3D Corp is no longer operating because it owes taxes in the amount of $400,000.

A    I'm aware you read that.

MR. DEMARCO:  Objection, Your Honor.

THE COURT:  Where does it say that at?

MR. COLBY:  I'm happy to do --

THE COURT:  Where does it say any -- counsel, where does it say anything about $400,000?

MR. COLBY:  That's another document.  I'm happy to continue the impeachment with the additional document.

THE COURT:  Okay.

MR. DEMARCO:  But how long is this impeachment going to -- I'm failing to see a -- where this is going, how this is relevant, what statement this is impeaching.

THE COURT:  That they're operating.  He believes they're operating under Delaware.  It says they're nonoperative for failing to pay taxes.  It had some legal consequences.  But it is what it is.  Okay.  So they said it was non -- inoperative and void for nonpayment of taxed.

MR. COLBY:  Right.

THE COURT:  Okay.

BY MR. COLBY:

Q    If we go to Tab L?

A    Okay.

Q    Tab L is an annual report of Rembrandt 3D Corp.

THE COURT:  What are we making this?  CR what?

MR. COLBY:  Nope.

THE COURT:  Nothing?

MR. COLBY:  This is --

THE COURT:  Oh, this --

MR. COLBY:  -- impeachment.

THE COURT:  -- is just impeachment.  Go ahead.

BY MR. COLBY:

Q    And that annual report says that the amount due -- overdue tax, penalty, and interest for Rembrandt 3D Corp is $402,951.60.

MR. DEMARCO:  Objection, again, Your Honor.  This isn't the creditor company either.  This is -- what relevance does this have?

THE COURT:  I don't know.

MR. COLBY:  I'm impeaching his testimony that they're an operating company.

THE COURT:  Well -- okay.

MR. COLBY:  I would also submit, Your Honor, that these documents are admissible as -- under judicial notice.

THE COURT:  Judicial notice?

MR. COLBY:  Yes, under 201.  A corporation status based on Secretary of State records can be taken judicial notice of.

THE COURT:  Okay.

MR. COLBY:  And I'm happy to provide citations.

THE COURT:  Counsel, I mean, I -- counsel, they may be inoperative for the State.  But that wasn't what you asked him.  You asked him whether they were operating.  And operating has different meanings.  So I'm just going to leave it at that.

MR. COLBY:  Okay.

THE COURT:  Okay.  And you believe that I can -- you don't think I can take judicial notice of their status as an operating company under the laws of Delaware?

MR. DEMARCO:  I would simply note, Your Honor, that the Rules -- under the Rules of Evidence to be relevant, it needs to make a material fact of issue more or less probable. I fail to see what material fact this non-creditor company makes more or less probable.  But Your Honor is aware of that at this point.  That objection is --

THE COURT:  I'll allow it for what it's worth.

MR. DEMARCO:  Yes, Your Honor.

THE COURT:  I'll allow it for what it's worth.  And you objecting to it being admissible under Rule 201 -- what did you say, counsel?  That I can take judicial notice of a company of a --

MR. COLBY:  It's just 201.

THE COURT:  All right.  That I can take judicial notice of a -- where's my rule book?

MR. COLBY:  Corporations' status based on Secretary of State records.  And I have some case citations we can submit, too.

THE COURT:  Okay.  And you believe that these are -- these are the records.  Do they -- do you just give me the records?  Do you just -- do you have to be -- give me a certain -- do you have to give me just anything?  Do they have to be printed?  Do they have to be certified?  What?

MR. COLBY:  Yeah, it's -- it is accuracy can be accurately and readily determined.  The document --

THE COURT:  Well, how am I going to do that?

MR. COLBY:  The document at Exhibit Tab K is -- has an authentication number --

THE COURT:  Okay.  It says I can verify this certificate online.  Okay.  I get that one.

MR. COLBY:  Right.

THE COURT:  What about L?  Does L say anything about the same thing?

MR. COLBY:  It is -- it does not say that.  But the same rationale applies.

MR. DEMARCO:  Your Honor, if I may?  It says you may certify this online.  This is not a certified copy.  It is not

actually certified.

THE COURT:  Well, he's saying --

MR. DEMARCO:  And nor --

THE COURT:  -- that I -- that was the question.  Do you have for me to take a notice of public records, what is the requirement under the rule?  Do you have to give me a certified copy of the public records or you can just give me a copy?

MR. COLBY:  Right.  I can just give you a copy.

THE COURT:  And where does it say that, because I -- and I'm only telling you from when I practiced, I always have certified copies of public records.  But I don't know if that was just because I was --

MR. COLBY:  No --

THE COURT:  -- over ambitious or what.  Where does it tell me that at?

MR. COLBY:  I would point you, Your Honor, to case cite from the Eastern District of Pennsylvania.

THE COURT:  And what does it say?

MR. COLBY:  *Stein v. Matheson*, 539 F. Supp. 3d 463.

THE COURT:  Hold on.  You're going too fast.  What is it?

MR. COLBY:  539 F. Supp. 3d 463.  And the Eastern District of Pennsylvania.

THE COURT:  Okay.  F. Supp. 3d., and what's the case number?

MR. COLBY:  463.

THE COURT:  Okay.  And that's from a district court?

MR. COLBY:  Yes, Eastern District of Pennsylvania.

THE COURT:  Uh-huh.

MR. COLBY:  Where the Court takes judicial notice of corporation's records accessed through the business search tool on the California Secretary of States website.

THE COURT:  Okay.

MR. COLBY:  And I give you, you know, rather than read them out loud, we're happy to hand up a list of additional similar citations.

THE COURT:  Okay.  Counsel, have you seen that?  And I'm -- presumably, all of this was shared with you prior to the -- today?

MR. DEMARCO:  No, Your Honor.

THE WITNESS:  Never seen it.

THE COURT:  Not you.  Counsel, we don't do stuff by surprise, okay?  The whole point of it was so that he could be in a position to address it and the -- but -- was this intentional so that they wouldn't be able to address it or wouldn't be prepared?  I don't like that.

MR. DEMARCO:  Your Honor, this is the first time I'm --

THE COURT:  This should have been shared, so that the -- both counsel and the witness would have at least some

inkling of what this was about.  The fact that it wasn't shared, I'm very unhappy.  I don't like trial by ambitious.  We don't do that.

Now, the next thing I'm going to know is Mr. -- counsel here is going to want to bring a witness to address that because he said he doesn't know, he doesn't know anything about it, and now, do we have to get another witness from the company to come in here and tell me about it?  This should have all been outlined before we got here today.

Now, that's a different issue, that it wasn't produced prior to today.  And you clearly had it prior to today, because you have your little binder and you didn't tell me, unless you put that binder together this morning.

MR. COLBY:  8:00 a.m., Your Honor.

THE COURT:  But you had it, you ordered it.

MR. COLBY:  Correct.

THE COURT:  Wait a minute.

MR. COLBY:  Correct.

THE COURT:  You know what?  I can easily figure this out myself.  You went and let's see.  This was -- well, I don't know when this was printed.  Well, date -- the authentication date was 8/28/23.  Does that mean that's when you got it?

MR. COLBY:  That may be, Your Honor.  I don't recall specifically.

THE COURT:  So you had it since August 28th, and you

didn't share it?  And the second L was printed when?  What's it tell me?

MR. DEMARCO:  The 20th at 10:10.

THE COURT:  9/20, okay, at 10:10.  So you had enough time to share it.  I'm not -- you know, what I'm going to do with it?  I don't know.  Does that mean now we're supposed to close this hearing on Monday at -- or whatever the next date at 3:30.  Now what?  Because that -- you didn't give it to him and you want me to do something with it.  And if I'm going to do something with it, it's only fair that they be able to address it.  I can't just have this in a vacuum.  So I don't -- you guys better figure that out.

MR. DEMARCO:  Your Honor, if I may?  If we were to strike this line of questioning, that would resolve this entire issue, because then we -- then Rembrandt does not need to bring additional witnesses.  This -- we've already had dubious questions about the relevance of this information anyway.

THE COURT:  I get why they believe it's relevant, because they believe that, I guess, the case should be dismissed because I guess it has no -- I don't know.  I can see the line of reasoning.  But I'm not -- I don't know what I'm going to do with it at this point.

Okay.  They -- you know, I'm not quite sure.  I'm going to reserve -- I think I've reserved a couple of times on admission of -- well, it's not even admission, because he's not

trying to admit -- well, he said it could be admitted on judicial notice.

So you're using it -- you're offering this to -- you said to impeach that it was an operating company and you're saying, okay, it's not an operating company because it's not recognized as -- by Delaware as an operating company.  And operating can mean two different things.  Operating for the state or operating where you're doing business.  Well, I mean, maybe doing it without being formally recognized.  That's two different issues.

And so, I'm not sure how this impeaching his testimony if he said they were operating and you didn't him what he -- and he said, yeah, we're selling stuff.  How does that impeach that he's selling -- that they're operating by selling products?

MR. COLBY:  The impeachment is, Your Honor, in order to be an operating company and do business, you have to be appropriately licensed and they're not.

THE COURT:  Did you ask him that?  Did you ask him what his definition of operating was?

Counsel, it is what it is.  I get what you want to do with it.

MR. COLBY:  I'm happy to move on.

THE COURT:  Let's move on and I'll figure out what I'm -- if anything, I'm going to do with that.

MR. DEMARCO:  Yes, Your Honor.

THE COURT:  Okay.

Are there any other documents that you have not shared that you plan on introducing or eliciting testimony regarding?

MR. COLBY:  I do not believe so, Your Honor.

THE COURT:  All right.

And then, counsel, to the extent that you have elicited testimony, and you believe I should consider it, I only have to fairly -- it's only fair that they get an opportunity to figure out if it -- what, if anything, they want to rebut that.

MR. DEMARCO:  Yes.

THE COURT:  You may not -- you may not care.  I don't know.  But I'm just telling you, we can't have surprises, if you guys want to end this by 3:30 on the last day of the hearing.

All right.  Let's go.  Continue, Mr. Colby.

MR. COLBY:  Okay.

BY MR. COLBY:

Q   Mr. Michaels, Rembrandt doesn't have the financial resources to finance the production of the tv's that it's supposed to get under the settlement agreement, correct?

A   No, that's not correct.

THE COURT:  Which Rembrandt are we talking about?

MR. COLBY:  Either.

THE COURT:  Well, that -- okay.  You have to be specific.

MR. COLBY:  Rembrandt is --

THE COURT:  Whoa.  I shouldn't be asking which Rembrandt.  It's up to you.  You should have said either or named one.

Okay.  Counsel, I mean, I like to look at my notes and I'm going to be confused and I'm easily confused as you can see.  So let's be specific here.

MR. COLBY:  Mister -- I'll withdraw the question and try a slightly --

THE COURT:  Okay.

MR. COLBY:  -- different one.

BY MR. COLBY:

Q   Rembrandt 3D Holdings doesn't currently have the cash resources to finance the production of Stream TV's, correct?

A   I do not believe that your statement is correct.  I stated in our depositions and during our mediation that we had the resources we need to be able to structure the deals to purchase the tv's.  Pretty much --

Q   Okay.

A   -- every single one of our sales is by a customer who pays in advance and or a joint development agreement and we have, you know, I think over a thousand sales of that history.  Our

products and our technology is available in the Frank Lloyd

Wright Museum.  You can go to the Pittsburgh Airport.

THE COURT:  All right, all right.  That's far, far.

Let's just answer the question.

BY MR. COLBY:

Q    Mr. Michaels --

A    Uh-huh.

THE COURT:  He said it's not correct.

BY MR. COLBY:

Q    Outside of money that Rembrandt may receive from

customers, itself does not have the cash resources to finance

the production of Stream -- a meaningful volume of Stream TV

products, correct?

A    So you put it correctly in the sense that you said to

finance, but then came to the wrong conclusion.  We have

exactly the resources we need to finance the purchase of

millions of TVs.

Q    Do you have the cash resources to --

A    In no circumstance are we fronting the cash.  That is not

our business model and hasn't been for decades.

Q    Rembrandt 3D Holdings bank account balance is currently

low, correct?

MR. DEMARCO:  Objection, Your Honor.  Again,

relevance here.

MR. COLBY:  Same relevance.

MR. DEMARCO:  Beyond the scope.

THE COURT:  Which is what?  What is the relevance?  I'm --

MR. COLBY:  That this supposed deal that has all this value and is going to result in the sale of TVs doesn't have any real money behind it.  That's the relevance.

THE COURT:  And what does that have to do with what I need to do?  At least for the Motion for Relief.

MR. COLBY:  It has to do with the Debtor's ability to reorganize.  This whole deal -- this whole settlement agreement has been put forth as either reflecting an ability to sell millions of TVs, reflecting an ability to get financing, or reflecting some value to the entity or to the technology and there is no money behind it.

THE COURT:  I thought he was a rebuttal witness.  Rebuttal.  They're not in the support of their case in the chief.  It was their rebuttal that Mr. Stastney's testimony was incorrect and what was the second purpose for it?

MR. DEMARCO:  He was testifying as to the importance of Rembrandt's intellectual property or the business of the Debtor and how that might be affected by the Motion to Dismiss.

THE COURT:  And that you couldn't separate it out?

MR. DEMARCO:  Yes, Your Honor.

THE COURT:  And that it had some value as a whole?

MR. DEMARCO:  Yes, Your Honor.

MR. COLBY:  And also, the value of the settlement agreement was put a 1.2 billion dollars for TVs that haven't been manufactured.

THE COURT:  Yes, but the relevance was --

MR. COLBY:  They've never received on.

THE COURT:  -- that they had a settlement agreement. I'll allow a little more and that's it, because I --

MR. COLBY:  But --

THE COURT:  -- already know what I wanted for and I'm not sure -- you guys can waste your time if you want.  I get what your point is, is that -- but I don't -- this was a rebuttal.  This wasn't in support of their case in chief and you're now talking about their case in chief, which was not what the rebuttal was for.  I don't get it.  But go ahead.

MR. COLBY:  Okay.

BY MR. COLBY:

Q   Mister -- just to finish that off.  Rembrandt 3D Holdings current bank account balance is low, correct?

A   That's a relative term.  It's exactly what we need to sell our TVs to LG, to any of our partners in hotels, airports, etc., who pay us in advance, and we strike our deal to -- to get the TVs covered out of that.  We had reached out -- we wrote --

THE COURT:  That's -- we don't need all that.

THE WITNESS:  Okay.

THE COURT:  Exactly what we need to sell and provide products.  Is that what you're answering?  You said low means what?  Because he has to define low.  Mr. Colby?

MR. COLBY:  Yes, Your Honor.  I suppose in this instance, I will refer to Mr. Michaels, I guess we'll do it as --

THE COURT:  Do you want to refresh his recollection as to what he testified --

MR. COLBY:  I'm deciding whether --

THE COURT:  -- low meant?

MR. COLBY:  I'm deciding -- no, I'm deciding whether it's impeachment or refreshing his recollection.  I think it's impeachment.

THE COURT:  How you going to impeach when he doesn't --

MR. COLBY:  Because I asked virtually the same question in his deposition, Your Honor, and he gave me the answer that the bank account balance was low.  And now sitting here today, he's trying to change that answer.

THE COURT:  No.  He said low.  What does low mean?

MR. COLBY:  But the witness will not just directly answer the question.  He said low previously.  I'm simply asking him to confirm that testimony here in court, so it goes in the record and he's trying to avoid doing so.

MR. DEMARCO:  Your Honor, Mr. Michaels answered the

question that was asked.  If he wants to ask a different question then opposing counsel can ask a different question.

THE COURT:  Well, he said it's -- what do you mean by low?  And that was back then.  And you guys never defined low back then.  And low today may mean something different than low when he did his deposition.  You guys need to be a little more precise with your terms, but that's just me. I got the answer. You can refresh his recollection.  You can ask him -- you know what, I'll let you impeach him with the question.  Go ahead.

BY MR. COLBY:

Q   Mr. Michaels, in your deposition, I asked you the question does Rembrandt currently have the cash resources to finance the production of Stream TV, any meaningful volume of Stream TV products?

THE COURT:  No, no, no.  You impeaching him on the word low.  Now, let's stick to that.

MR. COLBY:  Answer.  I think it's appropriate to read the question and the answer.

THE COURT:  Well, I get to say what's appropriate counsel.  And I'm getting annoyed at this point.  Okay --

MR. COLBY:  Answer --

THE COURT:  -- so you don't go until I tell you to go.

MR. COLBY:  Sorry, Your Honor.

THE COURT:  All right.  And I have been -- you know,

I think I've been pretty good today because I usually get -- I get annoyed pretty quickly and I'm working on that. But we're going far a field of what I need. If you guys want to -- I get you guys all want to make a record because somebody is going to appeal, make your record. But if you want to waste your time, you can go right ahead because I know what I'm going to look at and not look at. And if it's not relevant to what my decision is, I'm going to state specifically in my decision it was not relevant. But in any case, he's saying that he -- and he does need to read the question about the answer. And the answer was -- ask the question. Let him read the question.

BY MR. COLBY:

Q    The question was: "Q    Does Rembrandt currently have the cash resources to finance the production of Stream TV, any meaningful volume of Stream TV products?

A    Rembrandt 3D Holding Limited would need -- so the -- yes. If you want to count the fact that it asks its customer to pay for them, it does not. It's bank account balance is low."

        THE COURT:  Okay.

BY MR. DEMARCO:

Q    Is that still your testimony today, Mr. Michaels?

A    I appreciate you think you see a difference between those, my answer today and then. I think I'm answering it the same way. We rely on our customers that 100 percent of the time pay in advance in and out of any bankruptcy filings or that's just

our business model.  So we need precisely zero dollars in our bank account to function as a company.  And I remind you --

THE COURT:  You don't remind him of anything.

THE WITNESS:  Fair enough.

MR. COLBY:  Thank you, Judge.

THE COURT:  All right.  I got enough.  Keep going.

MR. COLBY:  I'm moving on, Your Honor.

THE COURT:  All right.

BY MR. COLBY:

Q    Okay.  The -- just to tie that off, Mr. Michaels.  That valuation for the settlement agreement is based upon a belief that Rembrandt will be able to go out and sell or lease the $3 million or so Stream TV TV's that it is able to buy at cost under the settlement agreement, correct?

A    Yes or work with others to do so, yes.

Q    Okay.  But not based on a specific track record of having sold Stream TV TV's in the past because it hasn't sold any such TV's, correct?

A    We sold our own products though and we have a track record of that.

Q    Okay.  But to directly answer the question.  It's not based on past sale of Stream TV products, correct?

A    It is not based on past sales of specific Stream TV products.  It is based on our experience in the industry selling these very -- this very technology.

Q    Okay.  And -- okay.  The settlement agreement that we've been talking about, Mr. Michaels, that has been amended, correct?

A    Yes.

Q    And that settlement amendment is between Rembrandt and Stream TV, correct?

A    And the Rajan's individually.  All the parties to the original settlement agreement signed it.

Q    Okay.  And that agreement, that amendment to the settlement agreement with Stream TV was entered into while this bankruptcy was pending, correct?

A    Yes.

Q    I'd like to go to the binder.  It's 246.  They're in chronological order, so it's all the way in the back.

        THE COURT:  Oh, I see it.  Okay.

        MR. COLBY:  This, I believe, has already been admitted.  No, I'm sorry.

        THE COURT:  No.  I don't recall seeing this, no.

        MR. COLBY:  Okay.  Two -- we had previously numbered it and disclosed it, Your Honor, as 246.

        THE COURT:  Okay.

BY MR. COLBY:

Q    Mister -- if everybody's there, Mr. Michaels, tell me when you've had a chance to review this please.

A    I've reviewed it.

Q    Okay.  Do you recognize this document?

A    I do.

Q    You're familiar with it?

A    Yes.

Q    How are you familiar with it?

A    I drafted it and received the execution copies.

Q    Okay.  What is this document?

A    It is an amendment of the terms to the May 2021 settlement agreement.  It modifies some of the timing of payments.  And it modifies the payments in accordance with the four or five years of negotiations between the parties where Rembrandt has said it expects the net present value of the 2019 agreement to be maintained.  And it resolved the question of the obligation of Stream's payment and reimbursement of Rembrandt's legal fees for enforcing the agreement if it became necessary.  So it resolved those claims.  And this was done -- and I believe it was in advance of the filing of Stream's disclosure statement/plan so the parties could plan going forward.

         MR. COLBY:  Thank you.  A little housekeeping.  I would seek to admit this document into evidence as CR246.

         THE COURT:  Any objection, counsel?  He said he gave it to you in advance, so you had it.

         MR. DEMARCO:  No objection, Your Honor.

         THE COURT:  Okay, admitted.

    (Interested Party's Exhibit 246 admitted into evidence)

BY MR. COLBY:

Q    Mr. Michaels, this settlement agreement between Rembrandt and the Rajan's and Stream TV is dated August 12th of 2023, this year, correct?

A    Yes.   That's the date of the document.

Q    So it was entered into during the pendency of this bankruptcy, correct?

A    Yes.

Q    With the Debtor Stream TV, yes?

A    Yes.  And among the other parties on it, right.

Q    And the amendment to the settlement agreement, this amendment to the settlement agreement obligates Stream to pay a specific amount of damages to Rembrandt for collection costs and interests, correct?

A    Yes.

Q    And what's that amount?

A    The --

THE COURT:  Well, can we just look where's it at in the document?  We don't need him to guess.  Where's it at?

MR. COLBY:  Well, that's what I'm trying to get to is what his view is of where that obligation lies.  But we can go through it and --

THE COURT:  Well, you can ask him to point it out and to show you in the document.

BY MR. COLBY:

Q    Where is that in the document, Mr. Michaels?

A    So in section A1 references the legal fees.

Q    Okay.

A    And in section CD I believe is where it references the interest rate.

Q    You're saying A2D.  So the very top of the second page, correct?

A    Yes.  I'm sorry A --

THE COURT:  So section 1, A1 for attorney's fees?

THE WITNESS:  Uh-huh.

THE COURT:  And where else is the next one?

THE WITNESS:  A2D.

THE COURT:  Interest.

BY MR. COLBY:

Q    Okay.  So Rembrandt's view is that Stream had, pursuant to the first settlement agreement, an obligation to pay Rembrandt's cost of collection and attorney's fees?

A    Yes.

Q    Okay.  And this agreement creates a specific liability for Stream for those two categories of Rembrandt's damages?

MR. DEMARCO:  Objection, Your Honor.  Again, the scope.

THE COURT:  I'll allow it for what it's worth.

MR. DEMARCO:  I'd also, I'd like to add one for asking-requesting a legal conclusion.

MR. COLBY:  I'm asking for his understanding.

THE COURT:  Okay.  Repeat the question.

BY MR. COLBY:

Q    Sure.  I'll actually -- I'll withdraw that question.  Your understanding, Mr. Michaels, is that this settlement agreement creates an obligation for Stream TV to specifically pay the amount that is described in A1 and the interest rate that is in A2D, correct?

A    Yes.

Q    With whom did you negotiate this amendment to the settlement agreement?

A    The -- I believe our conversations were a mix of counsel for Stream, counsel for VSI, and some of the principles for Rembrandt, VSI, and Stream.

Q    When you say counsel for Stream, who specifically are you referring to?

A    Rafeal.

Q    Is that Mr. Zahralddin?

A    Yes.

Q    And at any point did those -- in those discussions, did anyone raise whether or not Stream TV needed to get court approval to enter into this agreement creating these obligations while it was in this -- in bankruptcy in this court?

MR. DEMARCO:  Objection, Your Honor.  Hearsay or

calls for the witness to relay hearsay.

THE COURT:  Counsel?

MR. COLBY:  I'm not offering -- if the answer is yes or no -- if the answer is no, there's no hearsay.  If the answer is yes, I'm not offering it for the truth of the matter. I'm just offering --

THE COURT:  What are you offering it for?

MR. COLBY:  -- for the fact that it was said or not.

MR. DEMARCO:  What is the relevance of the fact that it was said, Your Honor?  I would change my objection to not circumstance, to relevance.

MR. COLBY:  It goes to the Debtor's conduct of the bankruptcy, which is a factor in the dismissal.

THE COURT:  Counsel, this is well beyond what Mr. Michaels was testifying regarding.  Which as a rebuttal witness for Mr. Stastney and for the belief that the product was worth more together as opposed to breaking it up.  You have now taken the opportunity to try to take it way beyond what he was offered for.  Now, if you want to call Mr. Michaels as a witness in support of your motion, that's what should have happened.  This isn't a free for all where you now get to go outside of nothing that he testified for, nothing that he was offered for.  You have now taken that as a opportunity to go and provide further support for your motions.  That is not what he was called for.

Now, if you want to call him or reopen your case in support of all of these things you allege they did, that is all fair and well.  But that is not what he was called for.  So I'm a little concerned that yes, all of these things may have happened.  They may be, but you don't get them in this way.

MR. COLBY:  Your Honor, if I might? It's also -- there was extensive testimony this morning about the settlement agreement.  This is an amendment to that settlement agreement.

THE COURT:  Okay.

MR. COLBY:  So it certainly falls within the scope of what was addressed this morning.

THE COURT:  Counsel?

MR. DEMARCO:  Your Honor, can I address that because he's referring specifically to the prior testimony?

THE COURT:  Uh-huh.

MR. DEMARCO:  But the prior settlement agreement was only referenced in -- with regards to the dealings with Mr. Stastney.  Mr. Stastney has had no dealings with regards to any amendment.  So it's way outside of the scope in terms of what happened at that particular time, which is what Mr. Michaels testified about and was testifying to.  So what may have happened after the fact, you know, is wholly irrelevant and is outside of the scope of the initial examination.  And is, obviously this, I guess, cross is taking even longer than the initial direct that we did.  So, I mean, I find it odd that,

you know, he's not limiting it to the issues that are actually at issue.

THE COURT:  SO their position is he was offered -- that settlement agreement was offered simply to counter Mr. Stastney's testimony regarding the terms; when it occurred, what happened, and what they provided for.  Now he said that that term sheet, which Mr. Stastney participating in, resulted in the settlement agreement.  And now you're saying, well, there was also an addition to the settlement agreement that was an amendment.  So I'm not quite sure -- I get why you want it in.  I get that.  But the question is, is this beyond what the rebuttal witness was offered for and whether the door was opened for this line of testimony or questioning.  You asked Mister -- I'm blanking on names.  It's getting late.  Yes, counsel?

MR. DEMARCO:  Yes.  Mr. Demarco, Andrew DeMarco, Your Honor.  Yes, we do believe this is beyond the scope for all the reasons Your Honor had mentioned.  And for that reason, we do seek to strike this entire line of testimony.  This is being offered well beyond the procedure.

And then finally, Your Honor, as one other matter that's been brought to my attention that there was an NDA that was mentioned in so far as any of the discussions regarding this are considered -- if Your Honor does consider admitting any of this line --

THE COURT:  What NDA?  Who has an NDA?

MR. DEMARCO:  I'm sorry.  An NDA regarding the settlement agreement to Rembrandt and Stream.  Any testimony regarding the content of those discussions would violate that NDA and confidentiality, which is another consideration.  But first, let's deal with the scope issue.  And as Your Honor said, as Your Honor noted, this testimony that Mr. Micheals brought in was simply to rebut Mr. Stastney's testimony that -- about where he downplays in importance of Rembrandt's intellectual property and its importance to the Debtor.  That was how this all came about and that's why this information was here.  That's why Mr. Micheals was called.

THE COURT:  Well, the question for me is whether by introducing the settlement agreement the door was opened for discussions regarding beyond that.  And I have to -- so that's the only issue for me.  Because if it's going beyond -- if you open the door, you open the door.  The question that I have is that what did he testify regarding the settlement agreement.  And all he said was that the -- if I recall correctly, was that the settlement agreement was reduced to writing the term sheet that had been negotiated with Mr. Stastney.  That was it.  And there was no testimony at least -- I have to go -- I'm going to go back and look at my notes.

MR. COLBY:  Your Honor, if I might.  There was also testimony about the value of the technology as a complete

package.  The settlement agreement includes the licenses that Mr. Michaels testified about.  It includes the purchase and sale or lease or whatever of the televisions.  He testified about payments that were going to be made.  The scope and the specific terms of the settlement agreement have been all over the record during the direct testimony.

THE COURT:  There was nothing in the testimony other than there was nothing about the specific terms about payment of attorney fees, payment of interest.  None of those things were testified about on direct.  Now, you get to ask him about the settlement agreement.  You now want to bring another document that he never testified to on direct and to which he never testified to regarding the terms of the attorney fees or regarding the terms of the interest.  And I'm not sure of the -- I get you want in the record that they entered into an agreement post-petition.  I get it.  I know that's what you want it for.  But whether it is something that you need to get on his testimony or something that you needed to do.  Because you deposed him.  You knew about this.  This amendment you obviously knew about you produced.

So I have to think about this.  And what I'm going to do is I'm going to take a few minutes because I don't want to waste time.  If you were allowed to ask him those questions, I'm going to allow it.  If I think it's beyond and it shouldn't, I'm not.  But I have to really sort of think back

and go look at my notes and figure out what I want to do.

MR. DEMARCO:  Sure.

MR. COLBY:  Your Honor, the current question that prompted this objection had to do with the --

THE COURT:  Whether he was advised whether you needed anybody --

MR. COLBY:  Yeah.  Whether anybody brought that up. I'm happy to withdraw that question.

THE COURT:  But it was more than that.  They're objecting to the whole line of questioning about this.

MR. COLBY:  Well, they are now.  They weren't at the time.

THE COURT:  Well they -- no, he objected to the very beginning about this, all of this about the relevancy and about beyond the scope starting with the information from the Department of State for Delaware regarding the corporate -- all of this.  They were like all of this is -- what's the relevance?  They've been asking about relevance and beyond the scope for quite some time.  And so, I need to sort of figure out where I want to cut this off at.  I get what you want to put in the record.  I get it.

MR. COLBY:  If you're going to take a break, Your Honor, to --

THE COURT:  I want to sort of look at my notes.

MR. COLBY:  Yeah, to think about it.  I have one

other document that I suspect is going to raise similar issues. I'm happy to --

THE COURT:  What is that other document?

MR. COLBY:  So on August 14th of 2023, Stream entered into an agreement that, among other things, obliged it to pay -- it made Stream jointly and severally liable for a potential payment of $3.6 million to Rembrandt.

THE COURT:  Okay.

MR. COLBY:  And -- again, this is --

THE COURT:  And is that related to -- is this anyway related to the settlement?

MR. COLBY:  If I could finish explaining, Your Honor.

THE COURT:  Uh-huh.

MR. COLBY:  The -- it also restricts Stream's ability, or anyone else's, to license Rembrandt Technology to a number of different entities.  That agreement was entered into for the purpose -- I'm sorry, I'll take that back.

THE COURT:  You don't know what purpose.

MR. COLBY:  That agreement --

THE COURT:  You think you know the purpose.  It could be what you think, but it could be something else.

MR. COLBY:  That agreement has -- that agreement goes to Mr. Michaels' testimony about the value of the technology and the knowhow and the trade secrets as a complete concern versus something that is partitioned.  The licensing covenant

prevents that complete Ferrari from taking -- from being able to exist. Because it says that the Rembrandt license can't go to secured creditors. It can't even go to -- Your Honor, it can't even go to Stream's own subsidiaries.

THE COURT: Well, they had a -- counsel. Their original agreement said what it said. Their position is that it couldn't be licensed under the original agreement. And so, I don't know what the purpose of all this other stuff was. But my understanding is the original agreement was that it could only -- and the settlement agreement said who it could license, who it couldn't license. I don't care what all this other nonsense is, whatever they're trying to do. Whether that will -- whatever it is they're trying to do. Whether that means anything at all.

Because the only thing that existed at the time of the filing was the original settlement agreement, which according to his testimony -- and I don't know what anybody else's testimony is. Ms. Stastney's testimony was X, his is Y. His, meaning Mr. Michaels' testimony, is that all of the terms of the original settlement agreement and the term sheet negotiated by the parties during the district court litigation was that only Stream could license it and Stream couldn't give it to anybody else.

What does that mean? I don't know. At this point I don't have to address it. What this other stuff does or

doesn't do doesn't mean diddly for this court right now.  All that means for me right now is what existed at the time.  So all this other stuff -- I'm not going to get into.

MR. COLBY:  That's helpful, Your Honor.

THE COURT:  I'm not going to get to it.  Because what this seems to be to me is they had filed a proof of claim. They did all sorts of stuff in connection with the proof of claim, which means a whole kind of different disclosures when you settle proofs of claims.  I don't know what you need to disclose.  I don't know what you are.  I don't know whether they were supposed to come here and get court approval.

None of that I am going to consider except that you want me to say that they're acting in bad faith.  And if you want that, you should have brought it in your case in chief. You're not going to get it in on rebuttal unless they open the door.  And I got to go figure out did they or did they not.

MR. COLBY:  Sure.

THE COURT:  Okay.

MR. COLBY:  If it's helpful, I believe we also, you know, designated as witnesses any witnesses that were designated by the other party.  So I think arguably this includes Mr. Michaels in our case in chief.  I do think that the conduct of the --

MR. DEMARCO:  Your Honor, if I may?  Opposing counsel's case in chief is long closed.

THE COURT:  He can give you a rebuttal.

MR. COLBY:  Or as a rebuttal witness, but it's still relevant to the motions.  The motions --

THE COURT:  It's relevant.  But counsel, you're not going to get it in through the backdoor.  You're either going to open your case in chief or you're going to offer him as a rebuttal and you -- this isn't something that you just found out today.  You should have discussed this with Mr. Michaels, told him what your intentions were with respect to Mr. -- I mean, with Mr. DeMarco with respect to Mr. Michaels.  We intend to show all these other things.  Did he share this?  I'm assuming he shared the amendments with you.

MR. COLBY:  It's their document, Your Honor.

THE COURT:  I don't care if it's their document.  Did you tell him you were going to use it, that you were going to use the licensing covenant?

MR. COLBY:  It's on our list.

THE COURT:  It's on their list, counsel.

MR. COLBY:  Yeah.

MR. DEMARCO:  No, both of them aren't on there.

MR. COLBY:  No.  Your Honor, the licensing covenant was something that was just emailed to us the --

THE COURT:  When?

MR. COLBY:  Right before the -- right before when we were last here for hearing in mid-August.

THE COURT:  Okay.  And it's now in mid-September.

MR. COLBY:  And so, and I guess if we're going to talk about the fundamental fairness, Your Honor, we have a persistent issue with on the eve of hearings, having these --

THE COURT:  This wasn't the eve.

MR. COLBY:  -- new --

THE COURT:  This is a month ago.

MR. COLBY:  It was, Your Honor, on the eve of -- last time it was on the eve of Mr. Michaels' deposition.

THE COURT:  But it wasn't on the -- okay.  But it wasn't on the eve of this hearing.  Plus counsel, we had a status.  You guys asked for a status, for a telephone conference so that we could outline the scope of this hearing and what would be offered and who and what.  It would have not -- it would have been helpful had you said in addition to having to question Mr. Michaels on his testimony, we intend to use -- to introduce some additional documents that have been recently provided.

Put them on notice that you wanted to do something with these documents and do something with them.  I'm not saying you couldn't have.  I'm just saying that if you open this door, I don't want to hear anything about this thing ending on Wednesday.  You guys have brought this on yourself.

MR. COLBY:  Fair enough, Your Honor.

THE COURT:  You knew this.  You should have -- I

don't know what the problem is.  I don't know if you guys are personally invested in this.  I know often, I'm not saying that you are, but sometimes lawyers get so involved and they have their righteous indignation that the other party is awful people and sometimes they let -- and I'm speaking from experience, okay.  So I'm not accusing you guys of anything that I probably have not done myself.  I just get to be on the other side and see how it plays out and say, well, that was dumb on my part to engage in that.  So now I'm demanding something different.  I'm not saying it's good, bad or I'm not chastising anybody.  But often what happens is people get personally invested and they somehow -- because I get -- I understand and I see what's been going on and I see, you know, I'm going to say gamesmanship and you guys can take it for what it's worth.

And I'm not, you know, I'm not going to hold myself as an expert.  But I've been here long enough to know what I see what I see.  I sort of know where I'm going with this if anybody hasn't figured that out.  I already sort of know where I'm going.  So you guys can prolong this.  You can do whatever you need to do, you think.  I get you want to make your record. I get you want me to know what this -- but the whole thing is, yes.  If you want to get it in, figure out how to get it in, okay.

MR. COLBY:  Understood, Your Honor.  Hearing your

perspective is very helpful.  I think you said you want to think about it for a little bit.

THE COURT:  Yeah.  Give me a few minutes to think about this.

MR. COLBY:  I think we'll talk about it.

THE COURT:  Right.  And you guys talk about it, and you may be able to stipulate, or I may say, okay, I'll allow it and I'll give it whatever weight I'll reserve.  But I think it makes sense for me to kind of think about it right now because if I'm going to allow it, I'm going to allow it.

MR. COLBY:  Yeah.

THE COURT:  I don't want to allow it and then at the end of it say, oh, I'm not allowing it and I'm not considering it.

MR. COLBY:  I would -- with respect to, you know, providing notice about potential questions regarding the licensing covenant.  It was not on our exhibit list.  It came in much more recently.  I concede, I did not specifically reach out and say we're going to ask about this today.

THE COURT:  And here it is.

MR. COLBY:  Right.  It was provided to us and then was the subject of a lot of questioning at Mr. Michaels' deposition.  It's no surprise to anybody.  So to the extent that's relevant to you --

THE COURT:  Right, so right.  And if it isn't like

surprise then --

MR. COLBY:  Yeah, no.   This is --

THE COURT:  -- that's different.  But the other --

MR. COLBY:  -- not --

THE COURT:  -- documents were surprised.

MR. COLBY:  Neither of these documents --

THE COURT:  And the amended agreement was not a surprise, correct?

MR. COLBY:  Right.

THE COURT:  Did you ask him questions about it at his deposition?

MR. COLBY:  Correct.  Correct.  Both of them -- they were provided to us by Stream --

THE COURT:  Right.

MR. COLBY:  -- then we asked questions.  So I don't think there's any element of surprise like we didn't know this existed.

THE COURT:  The question is more relevance for that.

MR. COLBY:  Right.

THE COURT:  Okay.

MR. DEMARCO:  Your Honor, and outside the relevance too, you have to consider the fact that whether the documents relevant and whether Mr. Micheals should be testifying regarding the documents, which his testimony was limited to the rebuttal testimony.  Those are two separate issues.

THE COURT:  I already said that.

MR. DEMARCO:  Okay.

THE COURT:  That's their case in chief. And whether they want to call him as a rebuttal, I don't know, a rebuttal --

MR. DEMARCO:  You can't rebut yourself.

THE COURT:  I don't know.  A rebuttal to your rebuttal.  I don't know.  I don't know what to tell you.  They can call a rebuttal to your witness.  Well, I guess rebuttal to Mr. Rajan's testimony because he's the only witness they called in their case in chief because he's --

MR. COLBY:  Michaels, I believe, is --

THE COURT:  Well, Mr. Michaels is being called, I understood, solely as a rebuttal witness.

MR. COLBY:  Oh, I understand the distinction.  Yes, Your Honor.

THE COURT:  He's solely a rebuttal, and so I'm not quite sure if he's rebutting Mr. Stastney's testimony, how we get to this other stuff.

MR. COLBY:  Right.

THE COURT:  Other than if they open the door by the rebuttal testimony, open their door to additional questions regarding his testimony.

MR. COLBY:  Understanding how you're looking at it, I think our first argument, if we were writing a brief, would be

that because of all the testimony we talked about today regarding value collectively, regarding, you know, the $1.2 billion regarding all of those sorts of things.

THE COURT:  Right.

MR. COLBY:  So, for what it's worth, that's --

THE COURT:  All right.  Anything you want to --

MR. DEMARCO:  Yes, Your Honor.  Rembrandt's response to that is simply, you know, we opened no door to that particularly as Mr. Michaels was called as a rebuttal to Mr. Stastney's testimony to talk about the terms in terms what what Mr. Stastney was aware of at the time that he signed this document and at the time that he was testifying here in front of Your Honor.  So that's about -- if the door was opened, it was opened that far and no further.

THE COURT:  And then you mentioned an NDA.  What's that about?

MR. DEMARCO:  Yes, Your Honor.  The discussions between the parties regarding the amendment are subject to a non-disclosure agreement.  And discussions about our testimony regarding the discussions they had during that would, as I understand, be a violation of that NDA, so.

THE COURT:  So you believe in Mr. Michaels' testimony, although it is usually some exceptions.  I don't know.  I don't have the NDA.  So, you guys talk about that. We're going to be in recess.  I promise I will try to stick to

ten, to come back at 3 -- 2:45.  But, you know, I'm guilty as attorneys.  I take more time than --

MR. ALEXANDER:  You said 2:45.

THE COURT:  I mean 2:45.  It's almost 3:00.

MR. ALEXANDER:  Okay.  Thank you.

THE COURT:  I apologize.  Not 3:45.  That's an hour and something.  All right.  Court is in recess.

MR. COLBY:  Thank you, Your Honor.

(Recess taken)

THE CLERK:  All rise.

THE COURT:  Okay.  Please be seated.

All right, Counsel.  This is where I am.  Let me just make sure I have my correct citation.  So, Rule 611(b), which I'm trying to pull out for everybody here, says -- make sure I have it.  It says cross-examination should not go beyond the scope, the subject matter of the direct examination and matters affecting the witness' credibility.  The Court may allow inquiry into additional matters as if on direct examination, which goes to my issue, which is you're limited to the scope of the direct, but what I heard from you, Mr. Colby -- and correct me if I'm wrong -- was that the information that you're seeking to cross-examine Mr. Michaels on is information that you only recently received and was not available when you did your case-in-chief.  Not the stuff with the state because you could have gotten that.

MR. COLBY:  Right.

THE COURT:  But with respect, you said only after the last hearing did you get the amendment to the settlement agreement and the licensing covenant.  Is that correct?

MR. COLBY:  I'm not sure.  If that's what I said, I didn't intend to.

THE COURT:  Okay.

MR. COLBY:  I think -- and we went back and checked because the history -- so the history is that the amendment so dated August 12th.

THE COURT:  Uh-huh.

MR. COLBY:  The licensing covenant is dated August 14th.

THE COURT:  Uh-huh.

MR. COLBY:  The licensing covenant was emailed to us on the 14th when it was signed.

THE COURT:  Okay.  Hold on.

MR. COLBY:  And that --

THE COURT:  I've got to get my little notes out.

MR. COLBY:  Okay.  Yeah.  I'm happy to go through it very slowly.

THE COURT:  Okay.  Hold on.  Okay.  Am I on a new page?

THE CLERK:  Yes.

THE COURT:  All right.

MR. COLBY:  Want me to start from the beginning?

THE COURT:  Okay.  So the licensing agreement you said was emailed on the day it was signed.

MR. COLBY:  Yeah.  The 14th.  We provided a supplemental exhibit list on August 15th.

THE COURT:  Okay.  So supplemental exhibit list.  Uh-huh.

MR. COLBY:  On the 15th.

THE COURT:  August 15th, okay.

MR. COLBY:  Which included the licensing agreement.

THE COURT:  Okay.  Okay.

MR. COLBY:  All right.  On the 16th, so these were given to us just before Mr. Michaels' deposition.  The 16th was Mr. Michaels' deposition.

THE COURT:  Okay.

MR. COLBY:  In the deposition he mentioned the amendment for the first time.

THE COURT:  Okay.

MR. COLBY:  We asked for the amendment in the deposition.

THE COURT:  Uh-huh.

MR. COLBY:  And later that day, Mr. Demarco emailed it to us.

THE COURT:  8/16, right?

MR. COLBY:  On 8/16.  Correct.

THE COURT:  Okay.

MR. COLBY:  I asked questions about it in the deposition, but I didn't have the document in front of me.

THE COURT:  Okay.

MR. COLBY:  Okay.  I believe we had hearing days on -- right -- on the 15th and the 17th.  We did Mr. Michaels' deposition in between those two hearing days.

THE COURT:  And that was your case-in-chief or that was Mr. Rajan's?

MR. COLBY:  That was -- well, so we named Mr. Rajan as a witness in our case-in-chief.

THE COURT:  Uh-huh.

MR. COLBY:  And we identified -- we put a generic entry on our witness list for witnesses that were identified by the other parties.  In that case-in-chief, I believe -- and this is more Mr. Caponi's department than mine -- I believe is still open because Mr. Rajan is still testifying.

THE COURT:  Okay.

MR. COLBY:  So that, I think, is the full --

THE COURT:  And I think the reason we're sort of getting out of -- at least I'm getting out of focus is that we called a rebuttal witness first --

MR. COLBY:  Yes.

THE COURT:  -- without closing the case-in-chief.

MR. COLBY:  Correct.  Yeah.

THE COURT:  Okay.  All right.

MR. COLBY:  Yeah.  I was a bit turned around on that as well.

THE COURT:  Because I thought your case-in-chief was closed.

MR. COLBY:  Right.

THE COURT:  When, in fact, it is not, okay, which means sort of what I was thinking in any event is that I would allow you to cross-examine Mr. Michaels regarding his direct testimony, but call him as a direct with respect to these other issues.  So they're -- and that's why I kept saying, well, if you wanted to, your case is closed.  You could have, and you didn't have it and you only recently received it.  There would have been nothing that would have, had you said, let's open my case-in-chief because I didn't have this at the time.

MR. COLBY:  Right.

THE COURT:  I would have said, okay, you didn't have it.  How could you present it?  You can.  But your case-in-chief isn't closed, which means you can finish up your cross-examination and call him as a witness on direct, which is what Rule 611 allows me to do.  But what it doesn't allow me to -- because there's a Third Circuit case that says I can't just let you go beyond the scope of direct.

MR. COLBY:  Right.

THE COURT:  Even with that little caveat.

MR. COLBY:  I think -- understood and appreciate that, Your Honor.  I believe the way we had been proceeding so far here though is people get up and testify once in sort of whatever capacity they're ultimately called.

THE COURT:  Yes.  And that -- right.  I'm not saying you recall him.

MR. COLBY:  Right.

THE COURT:  You just have to say, okay.

MR. COLBY:  Right.

THE COURT:  Because then there's a whole set of different rules if you're calling him as a direct.

MR. COLBY:  Right.  Well, I guess my question, my -- and I might, before I make a final decision on what I understand to be the option on the table, I want to confer with co-counsel.  I guess a question for the Court is I really only have a handful of additional questions.  If as we submit the door was opened to these -- only to the extent I've gone so far to sort of these subject matters, then I don't see need to also call Mr. Michaels as a direct witness.

THE COURT:  Uh-huh.

MR. COLBY:  I would just try to finish the cross-examination quickly and be done.

THE COURT:  I think you went beyond the direct because initially at the very beginning Mister --

MR. ALEXANDER:  Demarco.

THE COURT:  No.

MR. ALEXANDER:  Alexander.

THE COURT:  Mr. Alexander said we're here today. We're offering him for these two purposes.  And then he tailored his questions to those two purposes, one which was about Mr. Stastney's testimony.  And I think -- I forgot what the second one was, but there was two.  And he asked the questions about, well, what happened?  What was it about?  What was it -- now, he did ask him the questions about and he did testify that this thing was like a -- what kind?  A Corvette, Ferrari?  Which kind of car?  Which one?  Neither of which I have or will ever own, but he talked about --

MR. COLBY:  The Ferrari.

THE COURT:  -- the red -- I knew it was red.

MR. COLBY:  Yes.

THE COURT:  That's a midlife crisis, and not a woman midlife crisis car.

MR. COLBY:  I assumed that's what you were driving in your accident, Your Honor, speeding around in the --

THE COURT:  No.  Somebody -- no.  We're at a stop light and some guy apparently who originally told us, which is really irrelevant, but I'm going to talk about it anyway.  We were on the way to visit someone who's very ill.  And the guy comes from behind and he just rams us.  And we're like, "Oh, my God.  You know, we're on our way to the hospital."  And he's

like, "Oh, I'm on my way to the hospital too."  So, sympathy.
What does he tell the police?  We're coming from the racetrack.
So he must have been trying to get away quick because he had
spent all his money.  I don't know what the issue was, but no,
I was not in a red Ferrari.  That is what -- they don't pay me
enough money.  I'm not a well-paid, high priced lawyer from DLA
Piper or from -- which firm are you?

            MR. COLBY:  Skadden and K&L Gates.

            THE COURT:  Skadden and K&L Gates, no.  And from your
firm too and yours.  I'm not.  We're lowly paid people.  I
don't have that.  But in any event, I believe that when they
talked -- what he said the testimony was regarding and Mr.
Michaels testified regarding what that Mr. Stastney's
representations regarding that was wrong, that this was the
term sheet.  The term sheet had been the -- and that the term
sheet was then reduced to writing and this is what it said.

            MR. COLBY:  Right.

            THE COURT:  And so anything else is, in my -- from my
view, beyond that.  To the extent you want to say, well, that's
really not the settlement agreement.  There's other things
going on.  I get it.

            MR. COLBY:  Yeah.  Well, Your Honor, appreciate that.
Thank you.  The point about value that was testified about
though I believe is -- was a door that was opened and it is not
an unlimited one, but wide enough to permit inquiry into sort

of the how realistic that value is.  So whether you're using the Ferrari analogy or the value of the settlement or anything like that.

THE COURT:  And Counsel, I get it, but what's the return on that from my perspective?

MR. COLBY:  Sure.

THE COURT:  What is it that you think it will aid the Court with?  It's definitely not with respect to the motion for relief.

MR. COLBY:  No.  Correct, Your Honor.

THE COURT:  But with respect to dismissal, conversion, or appointment of a Chapter 11 trustee, what's the return that you're going to get from this line of inquiry?

MR. COLBY:  Okay.  So the relevance of that, so in terms of a rebuttal.

THE COURT:  I know what you think the relevance is and I get it.

MR. COLBY:  Yeah.  It's -- I mean, I think we're in agreement.  So just to lay it out there.  I think we're in agreement that if we wanted to put it on as part of our case-in-chief, we could because it goes to the ability of the Debtor to reorganize and that sort of thing.  In terms of a rebuttal, there was testimony about the value of the technology.  And I think that that, like I said, sort of opened the door to the questions about how you might sort of get to that value or

whether or not it's feasible to get to that value.

THE COURT:  But you went beyond that.  You didn't go just to how do you get to the value.

MR. COLBY:  Yeah.  Whether or not it's feasible to get to that.

THE COURT:  But he wasn't even --

MR. COLBY:  Does it really have that value?  I mean, I can say --

THE COURT:  But does it really matter for me?  I mean, you guys need to think about what's the return on this -- on what am I going to be looking at.

MR. COLBY:  Understood.

THE COURT:  And I get it.  I get exactly what.  The questions regarding when it was signed, were you advised, how does that go to value?  That has nothing to do with value. That has everything to do --

MR. COLBY:  Understood.

THE COURT:  -- with whether that was court approved or not.

MR. COLBY:  Yep.

THE COURT:  That's beyond anything that has to do with value.

MR. COLBY:  Totally understand that, Your Honor. You're right.  That would be something that would be part of our case-in-chief, but not a specific rebuttal.

THE COURT:  Right.  And whether they amended the licensing covenant to sort of put restrictions that they already believe exist.  I'm not sure what that's going to do for me either.

Now, with respect to the value, okay, you -- I get that some of the questions may be how you assess value.  And to me, value is there is X amount of TVs that you said you were getting that Mr. Stastney came with and said there were 400.  He didn't finish the math, but everybody understood it to be that number.  I get the question.  Well, can they really produce that and can they get to that number and how do you value it?

MR. COLBY:  Okay.  So --

THE COURT:  I get all that, but that other stuff -- and I'll give you a chance, Mr. Demarco.

MR. COLBY:  On the licensing covenant, the -- it ties to the value because by restricting the universe of who could use this Rembrandt license to just -- effectively just Stream, not the subsidiaries.

THE COURT:  Isn't that what the original said, that it was only for Stream?  See, that's what I don't get.  You guys want me to find that it was something different rather than just a expansion of what -- so I would have to go and say, the original agreement said this.  The value was based on that.  You know, have I looked at the agreements you guys just got?

Obviously not in detail, but the testimony is that it was only limited to Stream's use and nobody else.  I don't know.  Maybe it said Stream and its company.  I don't know what it said, but that's the testimony.

Now, if you want to ask him that did -- does this somehow change the terms and now changes the value, I get it, but all this stuff about when it was -- I don't want to hear all of that except maybe on direct because you want to make a point with that.  I get the point you want to make.  I don't know whether it's going to make a difference or not, but.

MR. COLBY:  Okay.  Well, accepting -- I obviously have a different view, but if I accept the premise that it is a memorialization of the way Mr. Demarco thinks the license was going to -- has worked all along.  Perhaps if I could just authenticate the document, move it into evidence and then I would move on, then that would be fine with me on the licensing covenant.  I have a couple of other questions, but on the licensing covenant.

MR. ALEXANDER:  Your Honor, just to be clear on the licensing covenant, you wouldn't ask him any questions about it?  You just want it admitted into evidence?

MR. COLBY:  Yeah.  I'm fine with doing that.

UNIDENTIFIED SPEAKER:  As far as Rembrandt is concerned.

MR. ALEXANDER:  The Debtor does not object to you

admitting that document into evidence.

MR. COLBY:  Okay.

MR. ALEXANDER:  As long as you're not asking questions to Mr. Demarco about it.

THE COURT:  Okay.

MR. COLBY:  I wouldn't ask Mr. Demarco.

MR. ALEXANDER:  I'm sorry.  Mr. --

MR. DEMARCO:  You could ask me all the questions.

MR. COLBY:  I've been doing it all day.

MR. ALEXANDER:  Yeah.  Mr. Demarco.

THE COURT:  All right.  So that was easy.

MR. COLBY:  Yeah.  Yeah.

THE COURT:  So which is marked as 222.

MR. COLBY:  Two, yeah.  Yep.

THE COURT:  That's admitted for whatever purpose you want to.

(Creditor's Exhibit 222 admitted into evidence)

THE COURT:  And that is in your case-in-chief?

MR. COLBY:  Well, Your Honor, I just -- I don't know that it matters to me at this point in time if it's in evidence.

THE COURT:  It's admitted.

MR. COLBY:  Correct.

THE COURT:  And I'll do with it whatever weight, if any, I give to it.

MR. COLBY:  Right.

THE COURT:  I'm not saying I won't.  I won't say I will.  Okay.  So 22.  Hold on.  John, we're writing this Creditor 222, which is the licensing covenant dated August 14, 2023, is admitted.

Okay.  All right.  Now, where does that leave us?  And, Mr. Demarco, you stood up.  Was that with respect to just my overall comments or my --

MR. DEMARCO:  I think we've touched on a lot of issues.  I'll narrow what I'm going to be speaking about to just on the issue of value.  I just wanted to clarify for Your Honor.  My understanding of Mr. Michaels' testimony on the direct regarding the value of this intellectual property to the Debtor was along the lines of that Ferrari comment, the idea that it's worth more together than if it is if it would be struck for parts.  I don't believe any explicit value was given for that.  That was all elicited -- all this talk about the amount TVs are worth and all that, that was all elicited on cross.  And so as far as, you know, Rembrandt is concerned, the amount of door that was opened was to the value of the IP, not all this talk about the value of the TVs and what that might be worth.

THE COURT:  Well, I guess position is while he may have testified simply about that provision, you admitted the agreement, so you opened the door for questions about the

agreement, but only about the agreement.  Not about the performance, only what it said.  And you went well beyond that.  You started asking him questions that had to do well beyond what this agreement was.  You could have asked how many TVs, how did you come?  You know, I'm not quite sure if it should have gone beyond that.

MR. DEMARCO:  Right.

THE COURT:  But there's a way to remedy that by just asking him the questions that -- I'm not going to have you re-ask them.

MR. COLBY:  Right.

THE COURT:  I just have to be clear.  I want to make sure that the record is clear of what was redirect.  I mean, what was cross on direct and what is as a rebuttal witness and what is direct in support of your case.

MR. COLBY:  Right.  So, Your Honor, with respect to the questions about how it was negotiated and Court approval, I --

THE COURT:  Oh, you mean on these things?

MR. COLBY:  Yeah.  On the agreements and that sort of thing.  Those don't relate to value and so would not be part of the rebuttal, the cross.

THE COURT:  Cross on rebuttal.  That's out.

MR. COLBY:  That would have be part of direct.  That would have to be part of direct.  With respect to the selling

of TVs, ability to sell TVs, I don't think the distinction that Mr. Demarco is trying to make really holds much water.  The value of the technology is only, you know, is related indisputably to the ability to actually commercialize it and receive some money in exchange for products that use the technology.  So I do think the questions about can you sell the TVs, have you sold any TVs, all those sorts of things, are very relevant to the value of the technology.

THE COURT:  But it was the value to Rembrandt. Rembrandt valued that agreement at 1.5 some billion dollars. It wasn't the value to the Debtor.  It was the value to Rembrandt.  I don't care what Rembrandt valued it as.  He never said what the value was to the Debtor.  His testimony was that one point whatever billion, trillion, whatever dollars we came up was how it was valued to us.

MR. COLBY:  Respectfully, Your Honor, his testimony was that that value was the assembly of all the parts. Rembrandt, he testified, has contributed one component to that having to do with the ghosting problem.  So any testimony about the value of the assemblage of the parts is necessarily value about Stream.  In fact, Mr. Demarco --

THE COURT:  No, it's not.

MR. COLBY:  Mr. Demarcos -- I mean, Mr. Michaels said --

MR. DEMARCO:  Well, you did it.

MR. COLBY:  Mr. Michaels said that the reason why they were here in this bankruptcy, the reason why they filed the involuntary is -- was because they were driven by that what they view to be the potential value of Stream, of the Debtor.

THE COURT:  No, no, no, no.

MR. COLBY:  He testified to that, Your Honor.

THE COURT:  He testified that they put him in involuntary because they were going to credit bid and take over the company and then they would have access to make the 400,000 TVs or how many ever TV at $400, that they would product it themselves.  And that he attributed the $1 billion value to Rembrandt based on their ability to get the TVs from Stream at $400.  I don't care what is valued to Rembrandt, no offense to Rembrandt.  But all Rembrandt was saying that this settlement agreement was based on their ability to get TVs from the Debtor at $400 and that based on their ability to do that, they still needed the Debtor's TVs, they needed the Phillips portion, and they needed their own to be able to sell it to someone else. The billion dollar value was on the TVs that Stream would give to them.  Simple.  That's it.  So whether Stream can produce the TVs and they can get their money is irrelevant to my determination because if they can't get the TV, I guess they just won't get -- make the profit or whatever it is that they plan on doing.  But it has no relevance to anything for me other than, yes, maybe they can't produce the 400 TVs, but

there was no testimony about whether Stream had the ability, at least not from this witness.

The ability to -- all they're saying is that we want X amount of TVs at $400.  So far we've gotten three prototypes, but that's how we can to our value.  When you asked him about his proof of claim, he said our proof of claim was built on the numbers that we had in our settlement agreement and our original number in the involuntary was based on what they owed us at the time.  Again, it doesn't do anything for me with respect to the testimony that was supposed to be regarding: 1) the settlement agreement and Mr. Stastney's testimony.  The value that they attributed was based on Stream giving them 400 TVs at $400 a pop.

Now, you could have asked him, well, if they don't give you the TVs at $400, you know, then they can't get -- you'll have a claim for that, but that's it.  All the other stuff, their value is on clearly $400, X amount of TVs. Anything else is beyond his testimony.  You want him -- what you're trying to elicit is it doesn't have the value, and maybe it doesn't, but what do I -- this is Rembrandt's problem.  It's not the Debtor.  And so that testimony does nothing for me and it's well beyond what he testified regarding.

MR. COLBY:  Okay.

THE COURT:  Okay.

MR. COLBY:  Fair enough, Your Honor.  I understand

that and I think that the reason for it was, again, sort of in response to the overarching claims that have been made here. The motion to --

THE COURT:  But that claim -- but, again, their claim --

MR. COLBY:  I have a --

THE COURT:  But let me back up a bit.

MR. COLBY:  Yeah.

THE COURT:  Their claim is not at issue.  Their filing, their claim is not at issue --

MR. COLBY:  Understood.

THE COURT:  -- on their testimony.  He never testified about the proof of claim.  He never testified about the -- none of that had anything to do with anything about that agreement and how they calculate other than I guess you're saying, well, you said it was a billion dollars or something and why didn't your proof of claim reflect that, although I'm not quite sure how that helped me in any event.  But I get that portion, but anything else --

MR. COLBY:  Okay.

THE COURT:  -- is beyond.

MR. COLBY:  If I might since my decision is going to bind our co-parties here, co-creditors.

THE COURT:  Do you want to discuss it?

MR. COLBY:  If I -- yeah.  Yeah.

THE COURT: Well, wait a minute. Before you do that, I want to hear from Mr. Demarco. Since we keep invoking his name, I will properly invoke him.

MR. DEMARCO: Thank you, Your Honor. You know, in the interest of trying to resolve this issue, I think Your Honor has found the crux that the value to Rembrandt distinct from the value to the Debtor, and the testimony regarding the value to Rembrandt, if we constructively make that part of their case-in-chief, that should resolve that problem as long as it's not tied to the -- this rebuttal in any way and not expanded on further today.

THE COURT: Okay. So he's saying that he agrees that as long as the information regarding the value to Rembrandt now and with respect to what else?

MR. DEMARCO: The -- all this value to Rembrandt, all those TVs, if that's put constructively in their direct -- their case-in-chief rather, I should say.

THE COURT: Right. Which is still open.

MR. DEMARCO: Right. And not proceeded on further today because that would have to occur during their case-in-chief. This is still their rebuttal. As long as we keep those distinct and separate.

THE COURT: Right. And that's what I was saying. If he says, okay, this is all my rebuttal and I want to call him direct and get his testimony, direct testimony, in support of

our case-in-chief, which it would support their position that this case should be dismissed because there's no value or Chapter 11 Trustee because look at what they're doing, blah, blah.  I get what all this is for.  It's just not appropriate to bring it up now.  So yes, Mister --

MR. ALEXANDER:  Alexander.

THE COURT:  -- Alexander.

MR. ALEXANDER:  Just two points.  One, their case-in-chief is only open as to Mr. Rajan, so that it was not cart blanche open.

THE COURT:  I get that.

MR. ALEXANDER:  I mean, so they'd have to reopen it. And the other thing too is what -- it's just misleading testimony because the Debtor is seeking approval of all these agreements through its plan, which is on file with the Court, so.

THE COURT:  Well, you can point that out.

MR. ALEXANDER:  You know, but that's what I'm saying. It's just going down a path that it's -- Mr. Michaels doesn't know that and --

THE COURT:  Okay.  But the other point that I was making is that if they were -- they, meaning the movants, did not have an opportunity to make it part of their case-in-chief, they didn't know about it, I would open it.

MR. ALEXANDER:  But do they just want these two

documents in the record and then we can move on?  I mean, is that what they're looking to do?  I mean, I --

MR. COLBY:  So, having conferred, we may be able to get to a resolution here.

THE COURT:  Uh-huh.

MR. COLBY:  So, yes, I did want to get the licensing covenant into the record.  I think we've accomplished that.

THE COURT:  Uh-huh.

MR. COLBY:  After that, based upon the explanation of the Court's views of sort of what Mr. Michaels testified about this morning, we would be content to simply consider today's testimony to be rebuttal.  And if that means that you disregard some of those questions that you identified, we're okay with that.  We would be fine if today's exercise was one just of rebuttal.

THE COURT:  Okay.  And anything that I deem outside of rebuttal --

MR. COLBY:  Correct.

THE COURT:  -- I do not consider.

MR. COLBY:  Correct.

THE COURT:  Okay.  Does that mean you plan on calling him as direct?

MR. COLBY:  No.

THE COURT:  Okay.

MR. DEMARCO:  That's amenable to Rembrandt, I think.

THE COURT:  Okay.

MR. COLBY:  Okay.  So then just a couple more questions.

THE COURT:  Oh, look at that.

MR. COLBY:  It has nothing to do with agreements or settlements --

THE COURT:  Okay.  All right.

MR. COLBY:  -- or anything.

BY MR. COLBY:

Q    So, Mr. Michaels, just a couple -- I want to be clear about sort of the technology, and by that, I don't mean I want a really deep technological explanation.  But the -- when you talk about the technology or the UltraD technology, is it correct that that is kind of a range of -- is comprised of a range of patents, trade secrets, know how, and that type of intellectual property?

A    So the UltraD is a trademark of Stream or one of the Stream entities, not --

Q    Right.

A    Not Rembrandt.  So I'm not sure we're in a position to define it.  But my understanding, and there's websites that, you know, show it as -- that it's a combination of hardware --

Q    Yep.

A    -- firmware, and content media management.

Q    Okay.

THE COURT:  Hardware and what else?

THE WITNESS:  Content, media management or modification.

THE COURT:  Okay.

BY MR. COLBY:

Q    And  Rembrandt doesn't claim to own all of that intellectual property, does it?

A    We have not made any claims to owning the prior Phillips technology, but we do believe any and all improvements to the Rembrandt technology.  And we lack knowledge as to what else might be added.

Q    Okay.  And when you say any, when you say the Rembrandt technology, do I understand that of all of the technology that goes into the glasses free 3D technology that we've been talking about, Rembrandt has one piece of that that does certain things for that, contributes certain things to that technology, correct?

A    Yes.

Q    Okay.  And you described that earlier when you talked about the ghosting problem, correct?

A    Yes.

Q    But you're not making a claim as to the rest of the technology that that infringes on -- let me strike that, strike that question.  So sitting here today do you have any firsthand knowledge -- let me back that up.  That -- are you familiar

with an entity called SeeCubic, B.V.?

A    Yes.

Q    Okay.  That's the -- you referred to that earlier as the people working in Eindhoven.

A    Yes.

Q    All right.  And that's in the Netherlands?

A    That's my understanding, yes.

Q    All right.  And sitting here today, are you aware of whether SeeCubic, B.V.'s current UltraD technology actually uses any of that Rembrandt technology that you talked about earlier?

        THE COURT:  No answer because -- go ahead.

        MR. DEMARCO:  Objection.  Scope.

        THE COURT:  Relevance?

        MR. COLBY:  Yeah.  Scop and relevance.  I mean, this gets to the Ferrari analogy.  His testimony is that it's only valuable to the extent it uses Rembrandt technology.  I'm asking if he knows whether or not they still use the Rembrandt technology.

        THE COURT:  Who still uses the Rembrandt?  The Stream?

        MR. COLBY:  SeeCubic, B.V.  Yeah, Stream, SeeCubic, B.V.

        THE COURT:  Is Stream SeeCubic?  I thought they were separate.

MR. COLBY:  SeeCubic, B.V. is the Dutch subsidiary. It's --

THE COURT:  Of Technovative?

MR. COLBY:  Of Technovative and ultimately of Stream.

THE COURT:  Okay.  So I'm not understanding.

MR. COLBY:  So SeeCubic of Delaware, as you'll recall, that's --

THE COURT:  Oh --

MR. COLBYL  -- right?

THE COURT:  I know who the -- Counselor, I know who the players are.

MR. COLBY:  Okay.  So SeeCubic, B.V.

THE COURT:  I'm not understanding the relevance of this question --

MR. COLBY:  The testimony --

THE COURT:  -- to the value to who?  The Debtor?  How does that help me?

MR. COLBY:  Sure.  The value of the technology, the Ferrari analogy that Mr. Michaels used earlier.

THE COURT:  Okay.

MR. COLBY:  He said that you only maximize that value if, among other things, you include the Rembrandt technology.

THE COURT:  Okay.

MR. COLBY:  My question is whether or not he has firsthand knowledge of if SeeCubic, B.V. is actually still

using any of that Rembrandt technology.

THE COURT:  And what is the relevance of whether they are or are not?

MR. COLBY:  Because if they are not --

THE COURT:  You want on the record that he thinks they're not, and I'm not allowing that.  This is just -- Counsel, quit with the fishing, okay.  It doesn't -- I don't care if SeeCubic is or is not using the technology.

MR. COLBY:  Okay.

THE COURT:  Okay.

MR. COLBY:  Based on that, I withdraw the question, Your Honor.

THE COURT:  All right.

MR. COLBY:  And I don't --

THE COURT:  Have any more?

MR. COLBY:  -- have any further at this time.  Thank you.

THE COURT:  Redirect, re-whatever?

MR. DEMARCO:  Your Honor, if I may get about five minutes to determine the extent of that redirect.  I, as of right now, suspect that it would be fairly short, but I would like to confirm that, so and have some time to review my notes.

THE COURT:  Right.  And, Mr. Colby, I apologize for losing my patience, but --

MR. COLBY:  Oh, no.  Not at all.

THE COURT: -- I apologize. I've been working to try to be calm here. I think I've been pretty good except for twice today, but I'm getting a little frustrated because I get -- and I'm going to say this for everybody. You want to make a record. I'm only going to look at things that help me get where I need to go.

MR. COLBY: Well, Your Honor, there's no need to apologize because it's very helpful for us no matter how the message is delivered to know what you care about.

THE COURT: What I care about? I don't care if they are because it will not --

MR. COLBY: Right.

THE COURT: Listen, that is something you guys are going to care about --

MR. COLBY: Right.

THE COURT: -- either in your District Court -- because there is litigation in Delaware that --

MR. COLBY: Correct.

THE COURT: -- has nothing to do -- well, I think maybe the Debtors, one of the Debtors or maybe both of the Debtors are defendants. I don't know. But ultimately, I will tell you Stream is asserting that the license belongs to them. It is property of the estate that has -- assuming that it is. I don't know if it is. I don't know if it isn't. But that determination will have to be made whether Technovative is here

or not.  You guys -- whether this bankruptcy is here or not --

MR. COLBY:  Understood.

THE COURT:  -- you guys are going to be litigating who owns this license, who owns what, whether you were allowed to use it, not allowed to use it.  I would suggest -- I would suggest you all guys get in a room and try to work it out, but I -- that's me.  I can't tell you what to do, but that's what I'm saying, that it's not going to help me determine anything with whether this case stays here or not because that issue remains whether they're a debtor in bankruptcy or a defendant in district court litigation.  It only affects me is if they stay here and I determine if it's property of the estate.  Somebody has to determine that, but since you guys are litigating it, probably -- it likely would not be me, but, you know, that's my jurisdiction, but I'll figure it out.

So, with that being said, you can get -- tell me.  I'm not going to move because every time I go out, I get a whole series of questions and, you know, cases I'm looking at and then I get astray.  So I'm going to just sit right here, okay, while you decide what you need to do.

(Recess taken)

THE COURT:  Mr. Demarco, since we've been invoking your name all afternoon, all day.

MR. DEMARCO:  I do like hearing the sound of my name, Your Honor.

THE COURT:  Yes.

MR. DEMARCO:  So, Your Honor, Rembrandt does have redirect (sic).

THE COURT:  Okay.

MR. DEMARCO:  I do not wish to jinx it by saying I hope it will be short, but here we are.

THE COURT:  Well, I always say short and it goes twice as long, so okay.

REDIRECT EXAMINATION

BY MR. DEMARCO:

Q    So, good afternoon, Mr. Michaels.

A    Good afternoon.

Q    So you -- on direct you testified that you were negotiating terms with Mr. Stastney.  Is that right?

A    Yes.

Q    Did you -- I believe you also mentioned that one of the considerations is whether Stream had a license with Phillips. That was part of the discussions.  Was it something Rembrandt looked at?

A    Yes.

Q    All right.  Does the combination of the Phillips license and the Rembrandt license provide any specific advantages to the Debtor?

A    Absolutely.  They have -- I think all of our technology relies on the Phillips license.  And then we believe the later

developments by Stream were built off the Rembrandt technology.

Q    Could the Debtors create that same UltraD technology without that particular combination?

A    Well --

MR. COLBY:  Objection, Your Honor.  This is another version --

THE COURT:  Whoa, whoa.  This is beyond -- this is beyond -- well.

MR. COLBY:  I was not permitted to ask about --

THE COURT:  Right.  I'm already writing.  Now, wait a minute.  Wait a minute.  Are we going down the same road?

MR. DEMARCO:  Your Honor.

THE COURT:  You can ask him about negotiations with Mr. Stastney.

MR. DEMARCO:  Yes.

THE COURT:  And he did testify that the Phillips license was required and that it went into it, but anything else is beyond the scope of -- because redirect is supposed to address issues that were raised on cross.  And I did not allow anything about, you know, he said it's the Ferrari.  Okay.  We could ask about the Ferrari, but that -- I think you're going beyond.  So let's keep --

MR. DEMARCO:  Yes, Your Honor.  I had no intention to go beyond the Ferrari.

THE COURT:  All right.

MR. DEMARCO:  The concept was simply to ask would the Ferrari be exigent.  So then I will withdraw then then.

BY MR. DEMARCO:

Q    So, Mr. Michaels, did Rembrandt 3D have a claim again -- sorry.  This is regarding the -- let me rephrase that.  Mr. Michaels, do you remember providing testimony on cross regarding the involuntary bankruptcy?

A    Yes.

Q    And particularly, Mr. Stastney testified about that as well.  Do you recall that?

A    Yes.

Q    Did Rembrandt 3D have a claim against Stream prior to the date of the involuntary bankruptcy and Rembrandt's agreement with Stream?

A    Yes.  We had the Southern District New York action that was pending at the time.

Q    Okay.  Are you aware that Stream seeks approval of the amended settlement agreement with Rembrandt as part of their Chapter 11 plan?

A    I'm aware of it.  Yes is the short answer.

Q    Now --

THE COURT:  Mr. Demarco.

MR. DEMARCO:  I believe that was raised on the cross.

THE COURT:  I thought we weren't going to in any of that.

MR. COLBY:  Yeah.  Again --

THE COURT:  You were asking and --

MR. DEMARCO:  Oh.

MR. COLBY:  -- I wasn't -- it did come up, but I think --

MR. DEMARCO:  Oh, was that -- okay.

THE COURT:  Right.  I'm not -- you believe anything beyond that, I'm not considering.

MR. DEMARCO:  Okay.

THE COURT:  Here's the agreement.  That's it.

MR. DEMARCO:  Okay.

THE COURT:  Now, if there's going to be argument that they didn't seek Court approval, you're going to mention that and then I get that that might be a subject, but you're saying you're not going to address that, right, Mr. Colby?  Other than that it exists?

MR. COLBY:  I think we will have considered my questions with Mr. Michaels about that today to have been out of bounds.

THE COURT:  Outside.  Right.

MR. COLBY:  Correct.

MR. DEMARCO:  And that's --

THE COURT:  And there will be --

MR. COLBY:  I can't speak for what's going to happen over the remainder of this hearing.  There's still testimony on

Monday, but I just, for the purposes of Mr. Michaels' testimony, that we are considering that to have been outside the --

MR. DEMARCO:  I was unclear.

THE COURT:  You can ask Mr. Rajan that and you can get to do something then, okay.

MR. DEMARCO:  I was unclear on that point, Your Honor.  In that case, I'll withdraw that question.

THE COURT:  Yes.

BY MR. DEMARCO:

Q    This is -- Mr. Michaels, do you remember discussing what the Rembrandt technology accomplishes, what it does?

A    Yes.

Q    Does the Rembrandt technology provide any benefits beyond the ghosting and artifacting that you discussed?

A    Yes.

Q    What are some of those additional benefits of the Rembrandt technology?

A    So the -- some of the visual impact of the 3D image can be greatly enhanced.  And many of the attempts to create 3D content would be self-limited to try to avoid those ghosting and artifacts, but because you -- because the Rembrandt technology takes things that were held as static settings and makes the variable, it allows the envelope to be pushed, so to speak.  The impact of the 3D comes further out on away from the

screen and further back. Screen forward or screen back is how that's referred to. And basically it takes the governor off of a typical car. It allows a Ford Escort to go 130 miles an hour rather than 60 downhill.

Q    Finally, Mr. Michaels, you testified on cross-examination that current patent infringement and potential patent infringement were some of the reasons for the opposition to the motion to dismiss. What are some of the reasons for Rembrandt's opposition to the motion to dismiss?

A    The primary is that for the motion to dismiss the Technovative case is that --

Q    Let's talk --

THE COURT: I think it's to dismiss all of them. I don't know.

THE WITNESS: Yeah. The main issue that Rembrandt has is this is the -- what we're referring to as the Ferrari, the technology package that exists beforehand. Even if the intent is to sell off pieces of the company to pay back creditors, the technology package as a whole is worth far more than broken up into parts. And in a Chapter 11 case, I think there are bidders, including Rembrandt, that would be interest in bidding with a plan, but right now there's an exclusivity period. We can't submit a plan, right? We announced from the get-go that we would if Stream's funding wasn't there. We believe that other potential partners would do so. There are

many other display manufacturers out there that I think would be interested like Rembrandt in the totality rather than just broken up pieces.

MR. DEMARCO:  Okay.  Your Honor, I've got nothing further.

THE COURT:  Any redirect limited -- I mean, recross limited to those questions?

MR. COLBY:  Nothing from us, Your Honor.

THE COURT:  Okay.  All right.  Anything further for Mr. Michaels?

MR. DEMARCO:  Not from Rembrandt, Your Honor.

THE COURT:  Not from --

MR. ALEXANDER:  Not from the Debtors either, Your Honor.

THE COURT:  Mr. Callahan, I didn't ask if you had any questions, but you said you didn't have any?

MR. CALLAHAN:  None, Your Honor.  Thank you.

THE COURT:  You didn't have -- you weren't taking any position on it.

MR. CALLAHAN:  Thinking about that Ferrari.

THE COURT:  What about that Ferrari?  You want one?

MR. CALLAHAN:  I'm a government employee, Judge.

THE COURT:  Well, you're like me.  We're not getting that.

MR. COLBY:  No.  He said he has two of them already.

THE COURT:  Oh, you have?  Yeah.  Sure.  Pictures on the wall, right?

MR. CALLAHAN:  Pictures.

MR. DEMARCO:  Do you want me to ask Mr. Michaels to step down then?

THE COURT:  Yes.  You can step down and I guess that would be with respect to rebuttal.  And then, because we took him out of --

MR. DEMARCO:  Yes, Your Honor.

THE COURT:  -- out of order, the next thing would be then is to continue with the case-in-chief with Mr. Rajan on the next hearing date.

MR. DEMARCO:  In cross, yes.

THE COURT:  Which would be he's being cross-examined, right?

MR. DEMARCO:  Correct.

MR. COLBY:  Correct.

THE COURT:  All right.  And I apologize.  As I said, I looked at the letter and the only thing I was sort of focusing on what Greece and not even the evidence.  When's the next hearing?  The next hearing is on Monday, right, at 10:30?

MR. COLBY:  Monday at 10:30, Your Honor.

THE COURT:  Yeah.  Okay.  I thought it was Monday, but I just wanted to make sure.

MR. COLBY:  Yes.

THE COURT:  Anything further with respect to testimony for today?

MR. CAPONI:  Housekeeping issue, but nothing with the testimony.

THE COURT:  Okay.  Yes, Mr. Caponi.

MR. CAPONI:  Your Honor, in advance, Mr. Rajan is going to conclude, we note that the Debtor's most recent monthly operating report was due several days ago.  It still has not been filed.  And we would like to have that filed by Sunday so we can have it to cross-examine Mr. Rajan as opposed to getting it after he is off the stand.

MR. ALEXANDER:  Your Honor, it will get filed when it gets filed.  And, you know, I understand his request and we'll do what we can to comply with the deadline that we're required to do.

THE COURT:  I guess you're asking me to compel them to file?

MR. ALEXANDER:  Well, there's nothing on file to do that and it would be improper to.

THE COURT:  Right.  I mean, that's --

MR. ALEXANDER:  Your Honor, we understand what the rules are and the Debtors are working to comply to get that done.

MR. CAPONI:  To be specific --

THE COURT:  Uh-huh.

MR. CAPONI:  -- Mr. Rajan testified we identified a number of discrepancies in monthly operating reports.  Mr. Rajan testified that --

MR. ALEXANDER:  Your Honor, I would object because there's nothing --

MR. CAPONI:  Excuse me.  Can I finish, Mr. Vincent Alexander?

MR. ALEXANDER:  Well, I'm objecting because I don't believe this should be part of any record heard by the Court.  There's nothing pending.  This isn't a housekeeping matter.  They're doing a substantive request to the Court.  And if Your Honor is going to consider that substantive request, then we would just ask for an opportunity to respond.

MR. CAPONI:  He can respond.

THE COURT:  Well, wait a minute.  Wait a minute.  Wait a minute.  First of all, that's in Mr. Callahan's -- that's in Mr. Callahan's wheelhouse, monthly operating reports.

MR. CALLAHAN:  Judge, we are -- we will take whatever action we deem appropriate, but it's not in the context of this hearing.

THE COURT:  I get that and you haven't filed anything.

MR. CALLAHAN:  That's correct.

THE COURT:  And so that wouldn't necessarily come before me until somebody files something compelling them to

file it.  And I don't see how I get to just do that on the fly.

MR. CAPONI:  Well, Your Honor, I'm happy for you to tell me no, but if I could just make my record for whatever it's worth.  And that is Mr. Rajan testified about these reports.  There were discrepancies.  He said it would be corrected.  He had talked about a new bank account that we would see on the new report.  And he's -- my last day to get him is on Monday and the Debtor is statutorily well beyond its period.  And if the Court --

THE COURT:  Beyond --

MR. CAPONI:  -- wants to say there's nothing the Court can do, I would just say the Court -- and we're going to ask the Court to take into consideration that this information was withheld from us and therefore unable to examine the witness.

THE COURT:  Whoa, whoa, whoa, whoa.

MR. ALEXANDER:  Your Honor, we'd ask you to strike everything Mr. Caponi said.  I think we've done well today without all the rhetoric and then as soon as he stands up it just begins immediately.

THE COURT:  Okay.  The bottom line is, Mr. Caponi, I do not take kindly to your assertion, whether you intended it or not, that the Court would not undertake its responsibility to ensure that the Debtor is complying with its statutory requirements.  There are deadlines for filing monthly operating

reports.  Debtors often do not make that deadline.  That then falls to the U.S. Trustee's Office who oversees these filings to take whatever they deem is appropriate action.  I do not know and I have never inquired whether a debtor failed to file on the deadline, whether the trustee will automatically file something.  If I recall, when I've seen them is when they haven't done numerous ones or well beyond the deadline.  I have never been presented with a request to compel when they are a few days late, okay.

So, with that being said, I think it would be inappropriate for me to address the matter that is not properly before me.  You can note that it didn't file it.  You can note that because it's not there that you don't have the information.  You can note that the Debtor didn't -- whatever it is that the Debtor is supposed to be doing, the Debtor isn't doing in your estimation.  But you cannot, and I do not accept that I'm somehow not forcing the Debtor to do something that is: 1) has not been brought in terms of a motion to compel or anything else, which is actually done by the U.S. Trustee.  I don't know.  Maybe creditors can file motions too.  I don't know.  I've never seen one.  So I don't take kindly to that. And so --

MR. CAPONI:  Well, Your Honor, I'm not accusing the Court of not doing stuff.  I'm simply making a request and I fully appreciate the Court wants to deny it.

THE COURT:  Denied.

MR. CAPONI:  Fine.

THE COURT:  Mr. Caponi, I'm going to give you a little advice.  Get rid of the attitude.  It doesn't help.  It doesn't help.  It doesn't help at all.  All it does -- all it does, it makes the Court look at people differently.  And so I -- and not that I would ever, ever make my decision based on your demeanor, because to be honest, if that played in it, it would not be good for you.  So table it.  That's all I'm going to say for today.

Anything further from anybody?  And I will -- and Mr. Caponi, I will temper that with I understand your frustrations.  I understand you have been in this case for a long time.  I understand you know what -- how this transpires, so I understand your frustration.  Just please keep it below the surface, okay.

MR. CAPONI:  I thought it was, Your Honor.  I apologize if it wasn't.

THE COURT:  Because you're not.  You're not.  Okay.

So, with that being said, unless there is anything else with respect to this matter today, Court is adjourned until Monday at 10:30, okay.  And if there is anything else that the parties think that we need to address before we begin with the testimony, please don't wait until 9:55 on Monday to file it or to send an email.  I do not want my staff working

over the weekend.  I do, but and I know that Ms. Godfrey reads emails when she shouldn't, but if there is an emergency, please try to do it early or late today or early Monday morning or Sunday night when she can read it first thing in the morning, okay.  Thank you.

MR. CAPONI:  Thank you, Your Honor.

THE COURT:  All right.

MR. DEMARCO:  Thank you, Your Honor.

(Proceedings adjourned)

C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


*John Buckley*
John Buckley, CET-623
Digital Court Proofreader