UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| | : |
| IN RE: | : Case No.  23-10763 |
| | : |
| STREAM TV NETWORKS, INC.   CH: 11 | : |
| | : Philadelphia, Pennsylvania |
| A) Trial Re: Emergency Motion To | : September 25, 2023 |
| Dismiss Case. Motion Of Hawk | : 10:58 a.m. |
| Investment Holdings Ltd. (I) | : |
| Pursuant To Section 1112 (B) Of | : |
| The Bankruptcy Code Either (A)(1) | : |
| To Dismiss The Debtors Chapter 11 | : |
| Cases Or (2) To Convert Such | : |
| Cases Under Chapter 7 Or (B) In | : |
| The Alternative Pursuant To | : |
| Section 1104(A) Of The Bankruptcy | : |
| Code To Appoint A Chapter 11 | : |
| Trustee And (Ii) To Request | : |
| Expeditated Consideration | : |
| Pursuant To Local Rule 5070-1(G) | : |
| Filed By Hawk Investment Holdings | : |
| Ltd. Represented By Steven | : |
| Caponi. | : |
| B) Emergency Motion For Relief | : |
| From Stay Filed By Hawk | : |
| Investment Holdings Ltd. | : |
| Represented By Steven Caponi. | : |
| C) Motion To Approve Debtors' | : |
| Expedited Motion For Authority To | : |
| Take Certain Actions In The | : |
| Ordinary Course Of Business Filed | : |
| By Stream Tv Networks, Inc., | : |
| Technovative Media, Inc. | : |
| Represented By Rafael X. | : |
| Zahralddin | : |
| D) Motion To Approve Employee | : |
| Obligations Filed By Stream Tv | : |
| Networks, Inc., Represented By | : |
| Rafael X. Zahralddin | : |
| . . . . . . . . . . . . . . . . . . . | |

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtor:                    Vincent F. Alexander, Esq.
                                   Kevin Shaw, Esq.
                                   Lewis Brisbois Bisgaard & Smith
                                   110 SE 6th Street, Suite 2600
                                   Fort Lauderdale, FL 33301
                                   954-728-1280

                                   Rafael X. Zahralddin, Esq.
                                   Lewis Brisbois
                                   500 Delaware Avenue
                                   Suite 700
                                   Wilmington, DE 19801
                                   302-985-6004

For Hawk Investment Holdings       Steven Caponi, Esq.
Ltd:                               K&L Gates
                                   600 N. King Street, Suite 901
                                   Wilmington, DE 19801
                                   302-416-7080

                                   Margaret Westbrook, Esq.
                                   300 South Tryon St., Suite 1000
                                   Charlotte, NC 28202

                                   Thomas A. Warns, Esq.
                                   K&L Gates LLP
                                   599 Lexington Avenue
                                   Suite 1000
                                   New York, NY 10022
                                   212-536-3901

For SeeCubic, Inc.:                Eben P. Colby, Esq.
                                   Marley Ann Brumme
                                   Skadden Arps Slate Meagher &
                                   Flom, LLP
                                   500 Boylston Street, 23rd Floor
                                   Boston, MA 021116
                                   617-573-4800

For the United States              John Schanne, Esq.
Trustee:                           Office of The United States
                                   Trustee
                                   Robert N.C. Nix Federal
                                   Building
                                   900 Market Street, Suite 320
                                   Philadelphia, PA 19107
                                   202-934-4154

For Rembrandt:                    Andrew Peter Demarco
                                  Devlin Law Firm, LLC
                                  1526 Gilpin Avenue
                                  Wilmington, DE 19806
                                  302-449-9010


Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

INDEX

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **WITNESSES:** | | | | |
| Mathu Rajan | | | | |
| (By Mr. Alexander) | | | 149 | |
| (By Mr. Caponi) | | 13 | | |

SEPTEMBER 25, 2023                                      10:58 A.M.

THE BAILIFF:  All rise.

THE COURT:  Good morning.

MR. CAPONI:  Good morning, Your Honor.

MR. DEMARCO:  Good morning, Your Honor.

THE COURT:  Please be seated.  Okay.  This is Stream TV and Technovative cases with hearings on.  I thought for today we had four matters listed when I looked at the list. Eileen, are you on?

THE BAILIFF:  Yes, she is.  There's an A, B, C, and D, yeah.

THE COURT:  Yeah.  We have four matters listed for today.  We had a continued hearing on the motion for relief from stay, motion to dismiss or in the alternative, appointment of a Chapter 11 trustee, dismissal conversion of --

THE BAILIFF:  And Eileen is on if you want to ask her.

THE COURT:  All right.  And Eileen, what are the other two matters that are listed?

THE CLERK:  It's a motion to approve debtor's expedited motion for authority to take certain actions in the ordinary course of business by Stream TV.  That's the C matter. And the last matter is motion to approve employee obligations by the debtor.

THE COURT:  Okay.  All right.  Let's have appearances

for the movant on the first two matters.

MR. CAPONI:  Good morning, Your Honor.  Steven Caponi from K&L Gates on behalf of the secured creditors.  With me is Tom Warns from K&L Gates and Margaret Westbrook, also from K&L Gates.  And then in the back, as always, is Mr. Colby and Ms. Marley Brumme from from Skadden Arps on behalf of SeeCubic, Inc.

THE COURT:  Yes.

MR. ALEXANDER:  Good morning, Your Honor.  Vincent Alexander of Lewis Brisbois Bisgaard & Smith on behalf of the debtors.  I'm joined in the courtroom with my partner, Rafael Zahralddin, and my associate, Kevin Shaw.  And we also have the debtor's representative, Mr. Mathu Rajan, who will be the witness today.

THE COURT:  So it's you, Mr. Zahralddin, and Kevin Shaw?

MR. ALEXANDER:  Mr. Shaw, S-H-A-W.

THE COURT:  Right.  So the three of you?

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  Okay.  They're the debtors.  And here -- and that's it for the debtors?

MR. ALEXANDER:  That's correct, Your Honor.

THE COURT:  All right.  Counsel.

MR. DEMARCO:  Good morning, Your Honor.  It's Andrew Demarco from Devlin Law Firm here on behalf of Rembrandt.

THE COURT: Anyone else entering their appearance in this matter?

MR. SCHANNE: Good morning, Your Honor. John Schanne on behalf of the United States Trustee. I am covering for my colleague, Mr. Callahan today. Thank you, Your Honor.

THE COURT: All right. Counsel, you can sit. Mr. Callahan usually sits at counsel's table, but you don't have to.

MR. SCHANNE: Thank you, Your Honor.

THE COURT: You're just observing?

MR. SCHANNE: Yes, ma'am.

THE COURT: All right. UST. I was wondering where Mr. Callahan was. I looked and saw the empty seat.

Okay, Counsel. Before we begin, you heard me say that there are four matters listed on the Court's hearing list for today. What is the status of C and D, which is the two motions filed by the debtors?

MR. ALEXANDER: Your Honor, the status of those motions is they are still pending. And at the end in the close of the evidence today, we would like to discuss getting those matters set to --

THE COURT: Another date?

MR. ALEXANDER: -- be heard.

THE COURT: Okay. All right. I mean, we can do that. Well, if you want to do it at the close, that's fine.

MR. ALEXANDER:  We can just --

THE COURT:  We can do it right now.

MR. ALEXANDER:  I mean, just because I'd like to get the --

THE COURT:  Let's -- all right.  Let's get the --

MR. ALEXANDER:  -- evidence closed and then we can discuss scheduling on those two matters.

THE COURT:  And scheduling on a briefing deadline, okay.

MR. ALEXANDER:  Correct.  I think we've agreed on a schedule in terms of the briefing deadlines.

THE COURT:  Okay.

MR. ALEXANDER:  I think maybe the only issue -- I know Your Honor had -- and I haven't had a chance to discuss this with opposing counsel, but Your Honor mentioned possibly page limitations and we haven't discussed.

THE COURT:  No.  I didn't mention page --

MR. ALEXANDER:  Okay.

THE COURT:  I issued -- I think the discussions were the order in which the arguments would be addressed.  I think Mr. Caponi suggested first would be dismissal, and then if it's not dismissed, then addressing the -- well, dismissal, conversion, or appointment of a Chapter 11 trustee.  And then because if the case is dismissed, I don't need to address the issue of relief from the stay.  If I don't dismiss the case,

then I'll go in relief.  So I wanted it addressed in that order.  That was the only thing I said.

MR. ALEXANDER:  Oh, that was the only order, okay.  And we discussed --

THE COURT:  Yeah.  I don't recall page limitations.

MR. ALEXANDER:  Okay.  We discussed deadlines.

THE COURT:  Okay.

MR. ALEXANDER:  We said there would be one week from today for each side to submit their briefs.

THE COURT:  Briefs.  Uh-huh.

MR. ALEXANDER:  And to the extent there was a response --

THE COURT:  Okay.

MR. ALEXANDER:  -- the parties would have two days.  So that would take you to the Wednesday.

THE COURT:  So one week from today would be October 2nd, 3rd, Eileen?

THE CLERK:  October 2nd, it would be.

THE COURT:  And then that would be deadline for post-trial briefs.  And the parties agreed upon a two day reply.

MR. ALEXANDER:  Well, depending on how you look at it, response, reply.

THE COURT:  I look at it reply.

MR. ALEXANDER:  Okay.  Well, then reply.

THE COURT:  Reply two days later, which would be

October 4th.

THE CLERK:  Correct.

THE COURT:  What day of the week is that, Eileen?

THE CLERK:  That's a Wednesday, Judge.

THE COURT:  Guys, why don't you all just take until Friday, October the -- what's that Friday, Eileen?

THE CLERK:  That would be the 6th, Judge.

THE COURT:  The 6th?

THE CLERK:  Uh-huh.

THE COURT:  That way it will give you until the end of the week.

MR. ALEXANDER:  Okay.

THE COURT:  All right.  Is that the agreed upon date, Mr. Caponi or Mr. Colby?

MR. COLBY:  Yes, Your Honor.  We actually had agreed on Wednesday, just to keep this as tight as possible.

THE COURT:  Right.  But I will tell you I have hearings.  I'm not going to get to it until Friday probably, so I'll give you guys the extra days.

MR. ALEXANDER:  Thank you, Your Honor.

THE COURT:  All right.  Now, if I recall, we were continuing with the case-in-chief for the moving parties on the A and B matter, and that the witness for today was the cross-examination of Mr. Rajan.

MR. ALEXANDER:  Correct, Your Honor.

THE COURT:  Is that correct?

MR. CAPONI:  That's correct.

THE COURT:  All right.  All right.  You want to call him and then we need to swear him back in.

MR. CAPONI:  Yes.  Call Mr. Rajan to the stand.

THE COURT:  All right.  Let me ask you before we begin.  Am I going to be looking at any of these documents and which one of these?

MR. DEMARCO:  There's --

THE COURT:  I know.  Which one?

MR. CAPONI:  The ones Mr. Rajan all had his name written on it, Mathu Rajan, and it's exhibit binders 1 through 4, I believe, Your Honor.

THE COURT:  Are these the -- these here?

THE BAILIFF:  This is a new one.

THE COURT:  This is a new one, okay.  That one.

THE BAILIFF:  There's one.

THE COURT:  We'll just name it.

THE BAILIFF:  Yeah.  I think it's this pile here.

THE COURT:  This pile here?

THE BAILIFF:  Yeah.

THE COURT:  Can we move this pile then over?

THE BAILIFF:  I just never know when they're going to come back.

THE COURT:  Counsel, we're not going to go in any of

the others, are we?  Other than the ones that have Mr. Rajan's name on them.

THE BAILIFF:  CR exhibits.

MR. CAPONI:  Not that I'm aware of, no.

THE COURT:  All right.  It just is --

MR. CAPONI:  Everything that we're going to use are in the four binders with Matt -- Mr. Rajan's name on it.

THE BAILIFF:  And that's these three and this is the one.

THE COURT:  Okay.  And so I don't need this one right here either.  This is just too much.  Hold on.  All right.  Did we swear him in?

THE BAILIFF:  Place your left hand on the bible. Raise your right hand.

MATHU RAJAN, PETITIONER'S WITNESS, SWORN

THE BAILIFF:  Could you please state and spell your name for the record?

THE WITNESS:  Mathu Rajan, M-A-T-H-U R-A-J-A-N.

THE BAILIFF:  Okay.  And if you could please state your address for the record.

THE WITNESS:  1105 William Penn Drive, Bensalem, PA 19020.

THE BAILIFF:  Thank you.

MR. CAPONI:  Okay.  All right.  Thanks.  Mr. Rajan, can you pull that microphone, if you don't mind, down, so we

can hear you?  Thank you.

Is it okay to proceed, Your Honor?

THE COURT:  Yes, you may.

MR. CAPONI:  All right.  Thank you.

CROSS-EXAMINATION

BY MR. CAPONI:

Q    Mr. Rajan, I want to pick up.  This is continuation of your examination that started about a month ago.  I want to pick up and cover a couple of topics that we previously touched upon.  Specifically, I want to start with the debtor's employees and operations.  I'm correct that Mr. Park was retained by the debtors, at least has been acting as the CFO of the debtor since April of this year, correct?

A    That is correct.

Q    Okay.  And are you aware that Mr. Park testified in this proceeding in his capacity as the acting CFO of the debtors?

A    Yes, I am aware.

Q    And were you aware that Mr. Park testified that the debtors had no full-time employees?

A    Yes.  I'm aware that he did testify to that.

Q    And are you aware that Mr. Park also testified that the debtors did not have the infrastructure, the employees, the material, capacity, or the cash to fulfill purchase orders?

A    Uh-huh.  Yeah.  I'm aware that he said that.

Q    Okay.  And am I correct that you disagree with Mr. Park's

testimony?

A    Mr. Park's testimony was incorrect.

Q    Thank you.  And you previously testified that VSI has been paying the expenses of the debtors during the pendency of this bankruptcy somewhere in the range of $1.5 to $2 million, correct?

A    Last month it was at 1.5 million.  It's now over two million.

Q    And do you recall in your -- when you were here last, we went over the monthly operating reports for the debtor?

A    Correct.

Q    And the monthly operating reports you testified did not list any employees, correct?

A    Correct.  I testified that the monthly operating reports were incorrect.  I was in the hospital at that time.

Q    And you testified, Mr. Rajan, that the operating reports reflected or failed to reflect that VSI was paying the expenses of the debtor, correct?

A    Correct.  That is correct.

Q    Okay.  And during your testimony, as you told me on three separate occasions, that those monthly operating reports would be corrected by the following Monday.  Do you recall that?

A    Yes.  The operating reports are supposed to be corrected.

Q    Okay.  And as we sit here today, amended or altered monthly operating reports have not been filed, have they?

A    I believe monthly operating reports have been prepared and they're going back and forth with the trustee.

Q    So when we last spoke, Mr. Rajan, you were testifying on a Friday.  And you said that by three separate times during your testimony, that by that Monday corrected operating reports would be filed, correct?

A    Correct.

Q    And we are over a month since you last testified, correct?

A    I don't know if it's quite a month, but close, yeah.

Q    Okay.  And as you sit here today, no corrected monthly operating reports have been filed, have they?

A    I don't believe they've been filed yet.  No.

Q    Thank you.  All right. Mr. Rajan, if you could take a look at Exhibit 249.

        THE COURT:  Which binder is that, Counsel?

        MR. CAPONI:  Which would be actually Debtor's Exhibit 5.  And it's listed as CR 249.  It will be in binder --

        THE MARSHAL:  Are those the debtor's exhibits?

        MR. CAPONI:  Yeah.

        THE COURT:  Debtor's?  Oh, gees.  We've got to find them too.

BY MR. CAPONI:

Q    Despite my -- gives them some of the debtor's binders.

        THE COURT:  Okay.  So, yeah.  So now the ESR, John, you're going to have to look for them to, right, to hand up to

the witness?  All right.  Do you have them?  They would have been -- were they previously marked and entered into evidence, Counsel?  Were they previously marked and entered -- introduced into evidence or?

MR. CAPONI:  Yes, it was, Your Honor.

THE COURT:  Okay.  And they were what?

MR. CAPONI:  It was, again, Debtor's Exhibit 5.  It's the chart that looks like this.

THE COURT:  Hold on because we didn't prepare to use those.  Let me take a look.  They're Debtor's Exhibit what?  Debtor's what number?

MR. CAPONI:  Exhibit 5.

THE COURT:  All right.  I have --

MR. CAPONI:  One five.

THE COURT:  I have --

MR. CAPONI:  Or 5.

THE COURT:  -- Debtor's Exhibit here.  Yeah.  I have them.  Do you have them to show the witness?  I can't give him mine because I'd probably just throw it on him.  All right.  Okay.  So we're looking at D5?

MR. CAPONI:  Yes.

THE COURT:  Okay.

MR. CAPONI:  Thank you, Your Honor.

THE COURT:  All right.

BY MR. CAPONI:

Q    Mr. Rajan, do you have Exhibit 5 in front of you?  It's the chart.

        THE COURT:  John, did you give him D5?

        THE CLERK:  Yes.

BY MR. CAPONI:

Q    Okay.  And, Mr. Rajan, you previously had testified that this is the -- this chart reflects the corporate structure of Stream, correct?

A    Correct.

Q    And you testified when you were here last that Stream employs approximately 45 people providing services across these various entities, correct?

A    No.  That's not my testimony.

Q    Does Stream employ approximately 45 people?

A    Yes.

Q    Currently?

A    Yes.

Q    Okay.  And they have during the course of this bankruptcy?

A    Correct.

Q    And are they employed outside in some entity other than one that's listed here in Exhibit 5?

A    Yes.

Q    What entity then does the debtor possess that's not listed on Exhibit 5 that these people work for?

A    The employees were in some of these entities when the

omnibus was done.  They left those entities and began doing

direct work for Stream TV, not through the subsidiaries.

There's still people working in some of the subsidiaries, but

Stream went and was working directly with employees when the

omnibus happened in the Chancery Court and was working directly

with the employees outside of the corporate structure.

Q    I'm focused, Mr. Rajan, during the pendency of this

bankruptcy.  Which entity did these employees work for?

A    Stream TV in Delaware.

Q    Thank you.  And you previously testified that the monthly

expenses associated with these employees is approximately

$170,000, correct?

A    Correct.

Q    And --

          THE COURT:  I'm sorry.  For what time period?  170

for what?  What was the question?

          MR. CAPONI:  Per month.

          THE COURT:  Month, okay.

          MR. CAPONI:  During the pendency of the bankruptcy.

BY MR. CAPONI:

Q    Mr. Rajan, you would agree with me that the debtors have

not produced, however -- or sorry.  Let me go back.  And it's

your testimony up until very recently these employees were 1099

independent contractors with VSI being paid for VSI, but doing

work for Stream, correct?

A    Correct.

Q    Okay.  And you would agree with me that the debtors have not produced a single 1099 form for any one of these employees, correct?

A    No.  That's not correct.  Since I got out of the hospital, I believe that now Stream is giving 1099s to people.

Q    So, Mr. Rajan, in connection with this case here --

A    Yeah.

Q    -- Stream has not produced to the Court, to the secured creditors, or the U.S. Trustee, a single 1099 to support your testimony that these employees --

A    No.  That will be in the MOR.

Q    -- have been working for Stream, correct?

A    No.  That will be in the revised MORs.

Q    Excuse me.  Mr. Rajan, if you could let me finish my question before you start the answer.

        THE COURT:  Oh, whoa, whoa, whoa, whoa.

        MR. CAPONI:  This would be good.

        THE COURT:  Whoa, whoa, whoa.  This is how this is going to work.  Mr. Rajan, he asks the questions.

        THE WITNESS:  Right.

        THE COURT:  You let him finish.

        THE WITNESS:  Okay.

        THE COURT:  You don't interrupt him.

        THE WITNESS:  Okay.

THE COURT:  He lets you answer and he doesn't interrupt you.

THE WITNESS:  Got it.  Okay.  Got it.

THE COURT:  Okay.

THE WITNESS:  Very clear.

THE COURT:  This is how this is to go.

THE WITNESS:  Sorry about that.  Okay.

THE COURT:  Let him ask you a question.  Go ahead, Mr. Caponi.

BY MR. CAPONI:

Q    Again, Mr. Rajan, the debtor has not produced in this bankruptcy a single 1099 for any one of these employees, correct?

A    You mean on the docket?  No, not yet.  It will be, but not yet.

Q    And the debtor has not produced an organizational chart in this case showing who these employees work for or to whom they report, has it?

A    Not yet, but we will be.

Q    And the debtor has not produced a single W-2 or copy of a paycheck or a paystub reflecting that any one of these employees have been paid, has it?

A    Not yet, no.

Q    So, as we sit here today, Mr. Rajan, you would agree with me that when trying to determine whether or not Stream actually

has any employees, the only evidence we have is your testimony that it does and Mr. Park's testimony as the CFO saying that it does not, correct?

A    That is correct.

Q    But to the extent there are any documents that would support your testimony, they would be in the possession of the debtors, correct?

A    Yes.  They're in the possession of the debtors.

Q    All right.  I want to focus on the payment of bills, Mr. Rajan, by VSI.  And specifically, I'd like to focus on the mechanics which we discussed in your deposition.  So, as I understand it, approximately two times a week, Amanda Gonzalez for Stream informs Subbe Joseph at VSI how much money is needed by Stream to pay its bills, correct?

          THE COURT:  Who from Stream?

          MR. CAPONI:  Amanda Gonzalez informs Subbe Joseph of VSI.

BY MR. CAPONI:

Q    Is that correct?

A    Yeah.  That's correct.

Q    And you approve that request on behalf of Stream, correct?

A    Correct.

Q    And Ms. Gonzalez informs VSI of who needs to be paid and how much they need to be paid, correct?

A    Yeah.

Q    And then presumably this is in writing?

A    Yeah.  They communicate in writing.

Q    And do you know if it's an email or how it's transmitted?

A    I'm not exactly sure, but they communicate.

Q    Okay.  And then at the VSI side, your mother, who is the accountant for VSI, presumably pays these expenses, correct, directly to the particular vendors?

A    She initiates the wire transfer.

Q    And am I correct that your mother then sends back or someone at VSI sends back to Stream evidence that these payments were made?

A    Correct.

Q    And in exchange for these payments, VSI receives stock in Stream pursuant to subscription agreements, correct?

A    That is correct.

Q    And as we sit here today, Mr. Rajan, am I correct the debtors have not produced a single subscription agreement, correct?

A    No.  I don't think that's correct.

Q    Are you aware of the debtor producing in this case a copy of a subscription agreement whereby VSI received stock in Stream in exchange for paying Stream's expenses?

A    Yeah.  I believe it's been produced.

Q    Excuse me.

A    I believe it's been produced.

Q    Do you know when it was produced, Mr. Rajan?

A    I'm not sure, but I believe it was already produced in the case.

Q    Okay.  And you have no produced the debtor's single document or single one of these communications from Ms. Gonzalez to VSI requesting payment or identifying the payees or the amounts, correct?

A    I didn't produce it, no.

Q    And that's despite Ms. Gonzalez sending these requests twice a week during the pendency of this bankruptcy, correct?

A    Correct.

Q    And not a single vendor invoice, bill, or correspondence demanding or substantiating the need for payment has been produced in this case either, has it, Mr. Rajan?

A    No.  I'm not sure.  I believe they may have been produced

Q    And you haven't produced a single copy of any document from your mother, the accountant for VSI, substantiating that the payments were actually made, have you, Mr. Rajan?

A    Not yet.  They'll be in the MORs.

Q    So, Mr. Rajan, if we go two requests per week and this bankruptcy has been ongoing for roughly 27 weeks, so that's 54 separate requests from Ms. Gonzalez asking for payment and 54 separate requests from your mother substantiating the payment. And you would agree with me, none of those have been produced in this bankruptcy?

MR. ALEXANDER:  Your Honor, we object to lack of foundation for the question.  He hasn't set a foundation that a request has ever been made for those documents.

MR. CAPONI:  I'm not sure about the objection.  The foundation for the witness is that Ms. Gonzalez makes these requests in writing twice a week and that they are responded to twice a week, so I think I've laid the foundation.

THE COURT:  Well, the question if I recall was that none of those -- which you believe was 54 separate requests and payments, proof of that has never been produced in this case.

MR. CAPONI:  I don't agree with that in being it's not relevant to my question that whether the -- well, I'm not accusing Mr. Rajan of violating a discovery order.

THE COURT:  I didn't -- that's not what his objection is.

MR. CAPONI:  Yeah.  I'm responding to the objection. My point of my question is not -- this is not about violating a discovery order.

THE COURT:  Mr. Alexander, he said --

MR. ALEXANDER:  Oh, his question is just generally has the debtor voluntarily produced documents that have never been requested or required to be produced?  Is that his question?

THE COURT:  Well, I don't know whether the -- your objection is that he's never established that he was required

to produce them.

MR. ALEXANDER:  Correct, Your Honor.

THE COURT:  I don't think his question is were you required to produce them.  His question is have you ever produced them in this case.  That's his question.  You're objecting to that?

MR. ALEXANDER:  I did object, yes.

THE COURT:  And the basis for the objection is?

MR. ALEXANDER:  I believe there is a lack of foundation to ask that question regarding production.

THE COURT:  To the lack of -- not violation of any order.  His objection is there was no foundation that he was required to produce this.

MR. CAPONI:  Lack of foundation, Your Honor, doesn't go to the merits of the question.  The lack of foundation as an objection goes to I am making an assumption that hasn't been grounded.  An objection would be something along the lines of the question lacks relevance, which is not the objection when it comes to --

THE COURT:  Well, you can always -- you can always object on foundation.  Your response is that there is a foundation.

MR. CAPONI:  Yes.

THE COURT:  Mr. Alexander, he said he laid a foundation by asking him about the invoices, the times, and

that was -- that's sufficient.  Why do you believe it's not?

MR. ALEXANDER:  Well, our objection is that the question presupposes that there was a request.  And so we believe that there's been no foundation to demonstrate that there was a request made.

THE COURT:  Overruled.  Continue.

MR. CAPONI:  Thank you, Your Honor.

BY MR. CAPONI:

Q    So, Mr. Rajan, getting back to my question, despite 54 separate requests going to VSI and 54 coming back, not a single one has been produced in this case, correct?

A    No.

Q    No, I'm wrong or no, they haven't been produced?

A    They haven't been produced yet.

Q    Thank you.  Similarly, the debtor has not produced a single document whereby it identifies how many shares of Stream stock have been awarded to VSI, correct?

A    I believe that's already been produced.

Q    I'm sorry.  I couldn't hear you, Mr. Rajan.

A    I believe that's already been produced.

Q    And when was that produced, Mr. Rajan?

A    I'm not sure, but you -- everybody should have copies of it.

Q    And what would that document look like, Mr. Rajan, or documents?

A    The subscription agreements, I sent it to you and Hawk. You have a copy of it.  I have the emails where I sent it to you.

Q    Let's take a look, Mr. Rajan, at CR228, which is the June monthly operating report.

THE COURT:  All right.  Is that in --

MR. CAPONI:  That's in binder 2, Your Honor.

THE COURT:  Okay.  CR22 --

MR. CAPONI:  Binder 3.  This is binder 1.

THE COURT:  Binder 2.  Yeah.

MR. CAPONI:  I'll change that, Your Honor.  I'm sorry.

BY MR. CAPONI:

Q    Mr. Rajan, let's go to Exhibit 255, which is the monthly operating report for the month ending July 31st.

THE COURT:  That's another binder, John.

THE CLERK:  It's in binder 4?

THE COURT:  I don't know.

MR. CAPONI:  Sorry, Your Honor.

THE COURT:  Okay.  We're going to play musical binders here.  Okay.  That's the debtor's binders over here. And this is binder which one?

MR. CAPONI:  Four.

THE COURT:  Okay.  And that's CR which one?

MR. CAPONI:  255.

BY MR. CAPONI:

Q    Do you have that exhibit, Mr. Rajan?

A    All right.

        THE COURT:  Did you give him that one, John?  Okay.

BY MR. CAPONI:

Q    Do you have that exhibit, Mr. Rajan?

A    Yes.

Q    Okay.  And if we look at the first page, this is the monthly operating report for the period ending July 31, 2023.  And if you could turn to page 9.

        THE COURT:  Nine here at the top, Mister --

        MR. CAPONI:  At the very bottom of the page, it has a -- at the center bottom of the page.

        THE COURT:  Right.

        MR. CAPONI:  Those numbers.

        THE COURT:  And this says page -- at the top -- 9 of 12.

        MR. CAPONI:  Yeah, 9 of the -- sorry.  It's 9 on both.  Yes, Your Honor.

        THE COURT:  Okay.  Okay.  I just want to make sure there's not --

        MR. CAPONI:  Yeah.

        THE COURT:  -- two different nines.

BY MR. CAPONI:

Q    Mr. Rajan, this is your electronic signature on this

monthly operating report, correct?

A    Correct.

Q    Okay.  And if we go back to the second page of the report, page 2, part 1, cash receipts and disbursements.  And under sub --

THE COURT:  Wait a minute.  Hold on, Counsel.  Let me get there.  What page are we on?

MR. CAPONI:  Page 2, Your Honor, part 1, section E, as in Edward.

BY MR. CAPONI:

Q    Mr. Rajan, when it says disbursements made by third party for the benefit of the estate, what's the number on the current month?

A    I think it says zero.

Q    It says current month.  Do you see that number to the right of what I just read?

THE COURT:  Wait a minute, Counsel.  I'm a little slow on the uptick.

THE WITNESS:  Which letter?

THE COURT:  Hold on.  Hold on, Mr. Rajan.  So we're page 2.

MR. CAPONI:  Page 2.

THE COURT:  Page 2 of 9.  Part what?

MR. CAPONI:  1E.

THE COURT:  1.  I have 9F, 1E.

MR. CAPONI:  1E.

THE COURT:  Okay.  All right.  I'm there.

BY MR. CAPONI:

Q    It says disbursements made by third party for the benefit of the estate.  And then over to the right a little bit, Mr. Rajan, is two columns, current month and cumulative.  Can you read me the current month number?

A    What's the exhibit number?  I think I'm on the wrong one. 225, right?

THE COURT:  No.  We're no --

BY MR. CAPONI:

Q    Do you see the number, $750,813, Mr. Rajan?

THE COURT:  Wait a minute.  He's on the -- he said he's on 225.

MR. CAPONI:  225.

THE COURT:  Aren't we supposed to be on 2 --

MR. CAPONI:  Exhibit 255.

THE COURT:  55.

MR. CAPONI:  Mr. Rajan, 255.

THE COURT:  John, we gave him the right book?  All right.

BY MR. CAPONI:

Q    Are you on Exhibit 255, Mr. Rajan, or do you need some assistance?

A    Yeah, I'm here.

Q    Okay.  So do you see page 2, part 1, subsection E?

A    Correct.

Q    And the number for the current month under disbursements made by third party for the benefit of the estate, am I correct, is $750,813?

A    Correct.

Q    And the cumulative, meaning from the beginning of the bankruptcy to the filing of this report, was $750,313?

A    Correct.

Q    Okay.  Mr. Rajan, you just testified a few minutes ago that as of the last time you testified in August VSI had paid approximately $1.4 million on the benefit -- for the benefit of the estate, correct?

A    Correct.

Q    So why is this number roughly half of the amount that you just testified --

A    Because --

Q    VSI had paid?

          THE COURT:  Let him finish.  Let him finish the question.  Not you, him.  He was about to answer.

          THE WITNESS:  Are you done with the question?

BY MR. CAPONI:

Q    Are you asking me to repeat the question?

A    No.  Are you done with the question?

Q    I'm done the question.

A     Yeah.  This is only through July.  I testified in August.
At our current spending, we'll be up to almost $3 million by
the end of October.

Q     So is it your testimony, Mr. Rajan, that as you sit here
today VSI has paid over $2 million for the benefit of Stream,
correct?

A     Yes.  Almost $2 million, correct.

Q     And that as of the end of July, that number was only
$750,000 --

A     It was roughly --

Q     -- correct?

A     -- about 750, correct.  It was about 750.

Q     So the debtor has spent -- has borrowed or -- let me
strike that.  VSI has paid over $1.3 million between August 1
and today for the benefit of Stream.  Is that your testimony?

A     Yes.  That's correct.  It's almost 1.3 million.

Q     Mr. Rajan, you previously testified that the debtors have
retained an investment banker who worked on behalf of Stream to
negotiate the transaction with Zhongshi (phonetic) involving
Zhongsheng that was memorialized in the Zhongsheng term sheet,
correct?

A     Correct.

Q     And the individual that was retained, his name is Jeff
Shamma, correct?

A     Correct.

Q    And Mr. Shamma is an investment banker, correct?

A    Correct.

Q    And, Mr. Rajan, am I correct that the debtor never filed an application or sought court approval to retain Mr. Shamma to serve as an investment banker on behalf of the debtor, has it?

A    No.  We have not filed an application for him.

Q    And Mr. Shamma's firm that he works for or company that he owns is called Blue Ocean Capital, correct?

A    Correct.

Q    And the debtor never sought or obtained approval from this Court to retain Blue Ocean Capital, correct?

A    No.  We have not filed yet.  No.

Q    Mr. Rajan, I want to focus now on the debtor's relationship with Rembrandt.  And if you could take a look at CR222, which is in binder 2.

         THE COURT:  This is binder 4.  Which binder we're in, Mr. --

         MR. CAPONI:  Binder 2, document 222.

         THE COURT:  Binder 2, 222.

BY MR. CAPONI:

Q    Are you there, Mr. Rajan?

A    Yeah.

Q    Okay.  This document is titled licensing covenant, August 14, 2023.  If you turn to the last page, is that your signature on behalf of Stream TV Networks, Inc.?

A    Yes, it is.

THE COURT:  Wait.  Where are we at, Counsel?  Which page?

MR. CAPONI:  The last page, Your Honor.  It's a --

THE COURT:  Page 4?

MR. CAPONI:  Page 4 of 4, yes.

BY MR. CAPONI:

Q    And on each one of these pages, Mr. Rajan, next to Stream, that's your signature or initials?

A    Yes.

THE COURT:  Well, that's nice music, but please turn it off.

BY MR. CAPONI:

Q    And the date that this document was signed, Mr. Rajan, is August 14, 2023.  Is that correct?

A    Yeah.

Q    Is that, in fact, the date it was signed?

A    Yeah.  I believe it was signed in August 14th.

Q    And that date, August 14th, that was the date that you were deposed in this case, correct?

A    I don't remember what day I was deposed.  Probably.

Q    Okay.  Well, we can nail that down.  If you can turn to CR231, which is in binder 3.  This cover page for your deposition transcript.  Do you see that, Mr. Rajan?

THE COURT:  Wait a minute.  What number, Counsel?

MR. CAPONI:  Excuse me, Your Honor.

THE COURT:  What number?

MR. CAPONI:  231.

THE COURT:  Okay.

BY MR. CAPONI:

Q    Mr. Rajan, do you see where it lists the date of your deposition as August 14, 2023?  Are you with me, Mr. Rajan?

A    No.  Which is the number again?

Q    231.

THE COURT:  And we're in binder 3.

THE WITNESS:  In binder --

THE COURT:  Binder 3.

THE WITNESS:  Okay.

BY MR. CAPONI:

Q    Are you at that exhibit?

A    Yes.

Q    And this is your -- it says transcript of the testimony of Mathu Rajan.  Do you see that?

A    Yes.

Q    And the date is August 14, 2023, correct?

A    Correct.

Q    Okay.  So your deposition was taken on the same date that the licensing agreement --

UNIDENTIFIED SPEAKER:  I'm sorry, Your Honor.  I'm just going to shut down my computer.

MR. CAPONI:  That we looked at.

THE COURT:  Wait.  Counsel, hold on.

UNIDENTIFIED SPEAKER:  I thought I had it muted.

THE COURT:  All right.  Let's turn it off.  Hold on.

UNIDENTIFIED SPEAKER:  Sorry.

BY MR. CAPONI:

Q    I'll ask him again.  Mr. Rajan, your deposition then was taken on August 14th, which is the same date that the licensing covenant was executed with Rembrandt, correct?

A    Correct.

Q    Were you -- when was that document, this licensing agreement covenant executed, before or after your deposition?

A    I'm not sure.  Other people in the office were taking care of it.  And I had signed off on the agreement earlier, so they may have used my electronic signature, so I don't exactly now.

Q    Mr. Rajan, I'm asking not when you approved it.  I'm asking you when you physically signed this document.

A    I didn't physically sign.  It's an electronic signature.

Q    So it's your testimony that the signature on page 4 is an electronic signature?

A    That's electronic.

Q    Excuse me.

A    That's electronic.

Q    And it's your testimony that where it says -- it looks like Matthew next to Stream on each page, it's your testimony

is that's an electronic signature as well?

A    Yeah.  Those were all electronic.

        THE COURT:  Wait.  Where are we at?  Are we back on - - what are we back on?

        MR. CAPONI:  Exhibit 222.

        THE COURT:  Binder?

        MR. CAPONI:  Binder 2.

        THE COURT:  Hold on.  Hold on, Counsel.  Okay.  So we're back on 222.

        THE WITNESS:  Which page?

        MR. CAPONI:  You're already on that exhibit, Mr. Rajan.  That's the licensing agreement, licensing covenant.

        THE COURT:  Well, what --

        THE WITNESS:  These are electronic.

        THE COURT:  So we're going back to 222?

        MR. CAPONI:  To 222.

        THE WITNESS:  These are --

        THE COURT:  So, Mr. Rajan, wait a minute.

        THE WITNESS:  Sorry.

        THE COURT:  You're going back to 222 because we were on 231 or something, so we're back to 222.  Go back and he's asking you a question about the signatures.

BY MR. CAPONI:

Q    Are you back on Exhibit 222, Mr. Rajan, the licensing covenant?

A    Correct.

Q    If we go to the last page, we see the three signatures. Your testimony is that that signature was not written by you, but it's a computer generated signature?

A    Correct.  That's computer.  And the ones down at the bottom are computer.

Q    And if you look at the initials on the bottom where it says Stream --

A    That's computer.

Q    -- you're saying that's computer generated as well?

A    Correct.

Q    And you don't recall whether this document was executed before or after your deposition, correct?

A    It was probably before the deposition or probably that morning.

Q    Mr. Rajan, I'll represent to you that this document was produced to me by your counsel immediately after your deposition.

A    Yeah.  It may have happened during the deposition.  I don't know.

Q    Can you -- do you have an understanding as to why this document was not produced to secured creditors counsel until after you concluded your deposition?

        MR. ALEXANDER:  I'm going to object to the extent it calls for attorney-client communications in terms of why a

document was produced or not produced by the debtor.

MR. CAPONI:  If he cannot answer the question because it requires a privileged answer, I'm okay.  He can tell me that, but if there's a non-privileged answer, I would like to hear it.

THE COURT:  Mr. Alexander, he's saying that Mr. Rajan has to assert attorney privilege.

MR. CAPONI:  No, I'm not saying that, Your Honor. I'm saying I'm asking him a question.  There may be a non attorney-client privileged answer, and if so, I'd like -- I'm okay to hear it.  If it requires a disclosure of privilege, then someone can make that representation.

THE COURT:  That's the objection.

MR. ALEXANDER:  I'm going to object and instruct the witness not to answer based on attorney-client privilege.

THE COURT:  All right.  Then that's his response. Okay.

BY MR. CAPONI:

Q   All right, Mr. Rajan.  Let's just stick with Exhibit 222 and look at these licensing covenants, some of the terms.  Now if we look at --

A   Which exhibit?

THE COURT:  222.

MR. CAPONI:  222.

THE COURT:  We're still on that one.  We haven't

moved on.

THE WITNESS:  And which binder?

MR. CAPONI:  Binder 2.

THE COURT:  Binder 2.  And it's the first --

THE WITNESS:  Okay.  222, okay.

THE COURT:  Right.  And it's the first exhibit --

THE WITNESS:  First one.

THE COURT:  -- in binder 2, okay.

BY MR. CAPONI:

Q    Are you there, Mr. Rajan?

A    Yeah.

Q    Now if you look at the first paragraph, you can see that
Stream Networks TV.

THE COURT:  Counsel, what page are we on?

MR. CAPONI:  The first paragraph of that document.

THE COURT:  Page 1?

MR. CAPONI:  Page 1.

THE COURT:  Yes.  Okay.  Let's go to page 1.

BY MR. CAPONI:

Q    Mr. Rajan, the first paragraph, I'm correct, it's Stream
Networks, Inc. and Visual Semiconductor, Inc. are referred to
collectively as the VSI parties in this document, correct?

A    Yes.

Q    And they are referred to jointly and severally as the VSI
parties, correct?

A    Jointly and severally, yeah.  I don't think it's separately, but severally.

Q    Okay.  If you turn to page 2 of this document, and we look at, under Section C, Charlie, 1, it says the VSI parties agree to pay Rembrandt a total payment of $3,600,000.  Do you see that?

A    Correct.

Q    And that means that the debtor is joint and severally obligated with VSI to make that payment, correct?

A    Correct.

Q    And VSI -- or excuse me -- Stream has not or did not seek before executing this document, approval from the Court to obligate itself to make a $3.6 million payment to Rembrandt, did it?

A    Yes, it did in the reorganization plan.  It's in there.

Q    Other than the disclosure statement that attached to reorganization plan, are you aware of any motion by the debtor that was made and granted by the Court authorizing the --

A    It's --

Q    -- debtor meaning giving the Court's permission to bind the debtor to make a $3.6 million payment to Rembrandt?

A    It was in the reorganization plan and a motion has been filed with the Court for the reorganization plan.  Rembrandt is in the unsecured section.

Q    Mr. Rajan --

A    All of this is in the unsecured section in the reorganization plan that Stream filed.

Q    And you would agree, Mr. Rajan, the Court has not granted that motion or approved your reorganization plan, correct?

A    We don't have a reorganization plan approved yet.  We hope so, but we don't yet.

Q    And if you look further down this page in paragraph C1, it says that the first payment is to be made on September 1, 2023.  Do you see that?

A    Correct.

Q    And you agree with me, again, you do not have a motion approved by the Court authorizing the debtor to have made a payment on September 1, 2023, correct?

A    No.  We don't have approval yet, no.

Q    Okay.  Okay.  I want to look at the nonpayment terms of this agreement.  And my understanding based on the testimony from Rembrandt -- Mr. Rajan, you can tell me if you agree with this -- is that this document is executed because Stream and Rembrandt believe that it was important for the reorganization and future of Stream to have access to Rembrandt's intellectual property, correct?

A    Correct.

Q    And prior to this document, Stream had already signed a non-exclusive license to access the intellectual property from Rembrandt, correct?

A    In a prior agreement, correct.

Q    Now, if we go to the sixth whereas clause on page 1.

THE COURT:  Where are we, Counsel?

BY MR. CAPONI:

Q    The sixth whereas clause, Your Honor, on page 1.  So it's
the whereas clause that starts, the VSI parties would like to
enter into licensing covenant.

A    Correct.

Q    With Rembrandt to prevent certain lenders, creditors, and
shareholders of Stream from attempting to commercialize the
technology and products developed by Stream.  Did I read that
correctly?

A    That is correct.

Q    Okay.  So Stream, prior to entering this covenant, and the
obligation to pay $3.6 million, already was licensed to use
Rembrandt's technology, correct?

A    Correct.

Q    And the purpose of this document was Stream had requested
that Rembrandt refuse to license that technology to anyone
other than VSI and Stream in exchange for an additional payment
of $3.6 million, correct?

A    Correct.

Q    And if you look at Section B of the licensing agreement
and restriction number 2.

THE COURT:  Hold on, Counsel.

MR. CAPONI:  Which is on page 2.

THE COURT:  Counsel, hold on.  All right.  I'm sorry.
You want him to go to page 2 what?

MR. CAPONI:  Page 2 of the agreement, Your Honor,
Section B2, B, as in boy.

THE COURT:  Okay.  I'm there.  Are you there, Mr.
Rajan?

THE WITNESS:  Yep.  I'm there.

THE COURT:  Okay.

BY MR. CAPONI:

Q    And this section starts saying, "Accordingly, Rembrandt
hereby confirms that it shall not issue a license of any kind
for its Rembrandt IP as defined in this settlement to any of
the following."  And then it lists A through H.  Do you see
that?

A    Correct.

Q    Okay.  And on this list are the secured creditors for this
case, correct?

A    Correct.

Q    And it would also apply to any entities owned or
controlled or that the secured creditors are an investor in,
correct?

A    Correct.

Q    And it also, if we look at H, applies to any current or
former subsidiary of Stream, correct?

A    Correct.

Q    So Rembrandt, through this document, has agreed that it will only license its technology to the debtor so long as the debtor is owned by VSI, correct?

A    No.

Q    Let's go to --

A    I don't think that's correct.

Q    If we go to -- one second here -- the fifth whereas clause on the first page, so fifth whereas on page 1.  It says,

"The VSI parties understand that the current settlement agreement includes a non-exclusive license from Rembrandt to Stream.  The VSI parties want the plan for reorganization to have an optimal chance of success and to ensure that it is clear that the VSI parties will have the sole right to commercialize the technology and products developed by Stream among the lenders, creditors, and shareholders of Stream."

Did I read that correct?

A    That is correct.

Q    Okay.  So, by entering into this agreement, Rembrandt, VSI, and Stream want to maximize the chance that a proposed plan of reorganization would be approved.  And that plan has VSI owning Stream and/or its assets, correct?

          MR. ALEXANDER:  I'm going to object.  It's --

          THE WITNESS:  No.

MR. ALEXANDER:  -- compound.

THE COURT:  Wait, wait, wait.

MR. ALEXANDER:  It's compound in terms of the questions it asks, and it also mischaracterizes the document.

THE COURT:  Okay.

MR. CAPONI:  I'm not sure which document I'm mischaracterizing, this one or the plan?

THE COURT:  The plan.

MR. CAPONI:  The plan.

THE COURT:  I'm assuming that's what you mean.

MR. ALEXANDER:  Well, he's actually mischaracterizing both documents.

THE COURT:  Okay.

THE WITNESS:  I don't understand.

THE COURT:  Whoa, whoa, whoa.  I have to rule on that.

MR. CAPONI:  All right.  I'll start over, Your Honor.

THE COURT:  Let's start over.

BY MR. CAPONI:

Q    So, Mr. Rajan, it's clear from this fifth whereas clause, correct, that one of the purposes of this licensing covenant is to enhance the likelihood that VSI parties plan of reorganization succeeds, correct?

A    The reorganization plan succeeds, correct.

Q    And who, if that reorganization plan is successful, who

becomes the owner of VSI and its assets?

A      VSI owns VSI.

Q      Sorry.  Who becomes the owner of Stream's assets and through the reorganization plan, Mr. Rajan?

A      Stream owns Stream's assets.  VSI, in the reorganization plan, gets 90 percent equity, but Stream owns Stream's assets.

Q      Okay.  So via the reorganization plan VSI, if it succeeds, will own 90 percent of Stream's equity?

A      Equity, correct.

Q      Okay.  And you and your family own the majority of the equity in VSI?

A      No.  Economic stock of only 3 or 4 percent.

Q      You own the voting control of VSI, you and your family, correct, Mr. Rajan?

A      Right.  But at the beginning of this case an independent board is put in to take over.

        THE COURT:  Oh, well, just answer the question.  His question was --

BY MR. CAPONI:

Q      You own -- you and your family own the voting control of VSI, correct?

A      We own a voting control --

Q      Thank you, Mr. Rajan.

A      -- that has been neutralized.

Q      And you are --

MR. ALEXANDER:  Your Honor, I'd like --

THE COURT:  Wait a minute.  Wait a minute.

MR. ALEXANDER:  Your Honor, I'd like Mr. Rajan to be able to finish answering the question.  He was midsentence and Mr. Caponi went on to another question.  So I'd like for him to have the opportunity to finish his answers.

THE COURT:  I will allow him to finish.  He allows you to put your question.  You allow him to answer.  You can move to strike.  You can do whatever, but let him answer.  What was your answer?  Yes, you and your family own voting control of VSI and?

THE WITNESS:  And my voting control has been neutralized in VSI by an independent board which has taken over VSI.

BY MR. CAPONI:

Q    But you still -- you and your family still maintain the majority voting control of VSI, correct?

A    We have voting shares.  That is correct.

Q    That has majority voting control of VSI, correct?

A    It does not have control of the company now.

Q    Is your testimony that your family does not own shares that give it the majority voting control of VSI?

A    We own voting shares that have been neutralized by an independent board, and the independent board has taken over VSI.

Q    Has your family assigned away its voting rights in VSI?

A    I still have neutered shares.

Q    Mr. Rajan, I'm not asking if you have neutered shares.
I'm asking did your family and you assign away, give somebody
else the voting rights that are reflected in the stock that you
own in VSI?

A    We've transferred power to the independent board, yes.

Q    That's not what I asked you, Mr. Rajan.  You have shares
in the company --

A    We have shares.

Q    -- that give -- excuse me.

          THE COURT:  Wait a minute.  Let him finish.  Come on.

BY MR. CAPONI:

Q    You have shares in the company and those shares have
certain voting rights inherent in those shares, correct?

A    Correct.

Q    And prior to this board you're speaking of, those shares
gave your family voting control over VSI, correct?

A    Prior to the board, yes.

Q    My question is a very specific question.  Has your family
or you assigned away the voting rights attributed to that stock
to a third party?

A    No.

Q    Thank you.  So, picking up where we left off on this fifth
whereas clause, the purpose of this covenant is to enhance the

likelihood that the plan is approved, correct?

A    It is to --

THE COURT:  And which one?  Wait a minute.  Which one are we on?

MR. CAPONI:  We're on the fifth whereas clause.

THE WITNESS:  It is saying --

MR. CAPONI:  It reflects --

THE COURT:  Okay.  The whereas the VS parties understand?

MR. CAPONI:  I'm sorry.  I -- excuse me, Your Honor.

THE COURT:  That the party that start -- paragraph, whereas, the VS --

MR. CAPONI:  Yes.

THE COURT:  Yes.  Okay.  Whereas number 5.

BY MR. CAPONI:

Q    And this whereas clause reflects that the purpose of this licensing covenant was to increase the likelihood that the proposed plan of reorganization gets approved, correct?

A    No.  It's to increase the chances of the plan of success.

Q    Success.  And --

A    If the reorganization plan is successful that we have a successful company, that is what the purpose of it is.

Q    Right.  And that success would look like VSI owning 90 percent of the equity in Stream?

A    No.  The success is because there are other companies

using the Stream TV technology.  Stream TV believes this is illegal and we're stopping the use of our technology by companies who do not own our technology, specifically, SeeCubic of Delaware, to stop the use of our technology to compete against us.  You are currently competing against us and we're stopping it.  Even though we're in the bankruptcy, you're openly competing against our company using our technology illegally.  That is the purpose of this, to stop your use of our -- illegally, our technology.

Q    Mr. Rajan, this agreement -- strike that.  If the plan is approved, VSI will own 90 percent of the equity, correct?

A    Correct.

MR. ALEXANDER:  Objection, Your Honor.

MR. CAPONI:  So --

MR. ALEXANDER:  He's asked and -- objection, Your Honor.  Asked and answered.  So I'd like to move on.  He's answered that question at least four times now.

THE COURT:  Well, twice, not four.

MR. ALEXANDER:  Well.

THE COURT:  Asked and answered.  Sustained.  Let's move on.

MR. CAPONI:  That's fine.

BY MR. CAPONI:

Q    So, Mr. Rajan, and pursuant to this licensing agreement, if the Court determines that Stream's assets should be sold at

auction through this bankruptcy, if any of the secured creditors or any entity associated with those secured creditors were to win the auction, Rembrandt would be precluded from giving those winners of the auction a license in its technology, correct?

MR. ALEXANDER:  Objection.  Calls for a legal conclusion with regards to the document.

MR. CAPONI:  I don't think it -- he signed the document, Your Honor.  I'm asking his business understanding.

MR. ALEXANDER:  That was not the question, Your Honor, so I'm going to object to the question as phrased.  He asked for a consequence or what may happen if a certain act occurred, and that's a legal conclusion in terms of --

THE COURT:  Sustain.  Rephrase.

BY MR. CAPONI:

Q   Mr. Rajan, if anyone other than VSI ends up owning the assets of Stream pursuant to this covenant, Rembrandt would be precluded from giving that company a license to its technology, correct?

MR. ALEXANDER:  Objection.  Still calls for a legal conclusion.

MR. CAPONI:  Your Honor, he signed the document.  It may have a legal implication, but he is a businessperson and I'm asking for his business understanding.

MR. ALEXANDER:  That's not the question.  He didn't

ask him for his business -- I'm not going to tell Mr. Caponi how to ask a question, but he didn't ask him what his business understanding is of the document.

THE COURT:  Sustained.  You're asking him to make a legal conclusion.  Rephrase.

BY MR. CAPONI:

Q    Sure.  Mr. Rajan, is your business understanding correct that if a party other than VSI acquires the assets of Stream, Rembrandt, pursuant to this licensing covenant, is precluded from giving that entity a license to its technology, correct?

A    Under a Chapter 7 sale or an Article 9 sale in the Chancery Court your clients can't use the technology.  And if there's change of control, all of our licenses are revoked. You won't be able to use the technology then either.  The only company that can use this technology is Stream TV at this moment.

Q    Turn to the settlement agreement, Exhibit 252.

THE COURT:  What binder are we in now?  What binder, Mr. Caponi?

MR. CAPONI:  I'm looking for that information, Your Honor.

THE COURT:  Oh, okay.  Sorry.

MR. CAPONI:  No problem.  Found it.

THE COURT:  What number are we looking for?

MR. CAPONI:  252.

MR. ALEXANDER:  252.  Which binder?

THE COURT:  It's not 4 and it's not 2.

MR. ALEXANDER:  And it's not in this one either.  I think it's Number 4.

THE COURT:  Well, it's not in 1, 2, 3, or 4.  Well, wait a minute.  Maybe it's in 4.  I don't even know.  252?

MR. ALEXANDER:  252.

THE COURT:  Well, it's not in 4.

MR. ALEXANDER:  It's not in 4.

THE COURT:  It's not in 3.  Oh, ya, ya.  It's one that's not in any binder.

MR. ALEXANDER:  It's not in a binder?

MR. CAPONI:  Correct.

THE COURT:  All right.  All right.  Number what?  CR -- what number?  252.  Not in binder.  We're looking for this. We know it's not in the binder.  Okay.

BY MR. CAPONI:

Q    Mr. Rajan, do you have this Exhibit 252 before you?

A    Yeah.

Q    It starts with an email from Andrew Demarco --

A    Yeah.

Q    -- to Eban Colby.

A    Yes.

Q    Dated August 16, 2023.  Do you see that?

A    Yes.

55

Q    And if we go to the next page, if we actually go to the

last page, you're going to see a series of signatures.

A    Yes.

Q    Is that your signature under Stream TV Networks?

A    Yes.

Q    Okay.  And is that an electronic signature or regular

signature?

A    That's electronic.

Q    All right.  And if we go to the first, the second page of

this document -- or actually, if you stay where you were, this

document was signed on August 12, 2023, correct?

A    Yeah.  That's the date on here.

Q    Okay.  Is that a yes, Mr. Rajan?

A    Yes.

Q    Okay.  And if we go to the -- I think we previously

established that your deposition took place on August 14th,

correct?

A    Correct.

Q    Okay.  Do you know why, Mr. Rajan, if you have a non-legal

answer or a non-privileged answer, why this document was

executed on August 12th, but not produced until after your

deposition on August 16th?

        MR. ALEXANDER:  I'm going to object to the -- Mr.

Rajan answering the question because it will require the

disclosure of attorney-client privileged communications.

THE COURT: Are you instructing him not to answer?

MR. ALEXANDER: I am, Your Honor.

THE COURT: Okay.

MR. CAPONI: We're done with that document then, Mr. Rajan.

THE COURT: Okay. And wasn't this produced by Mr. Demarco? Never mind. Never mind. Okay.

BY MR. CAPONI:

Q    We're going to move on to, Mr. Rajan, you can look at Exhibit 229.

THE COURT: This is Binder 2, Counsel?

THE CLERK: That's in Binder 2.

THE COURT: Counsel, how about when we start please tell us what binder?

MR. CAPONI: Sorry, Your Honor. That's not in my outline.

THE COURT: Wait.

MR. CAPONI: But I will try my best.

THE COURT: It's in 229, you said, right?

MR. CAPONI: 229 in Binder 2.

THE COURT: Okay. Okay. And what if your colleague can at least tell you when you get ready. Somebody can tell you what binder, it will make our lives easier so I don't have to have my binders falling all over the place. All right. Are you there, Mr. --

BY MR. CAPONI:

Q    Are you at Exhibit 229, Mr. Rajan?

A    Yes.

Q    Okay.  And this is the amended ordinary course motion filed by the debtors, correct?

A    Correct.

Q    And if you turn to what would be page 5, there's a term sheet.  Let me know when you're at that term sheet.

THE COURT:  Page 5?

MR. CAPONI:  It's after the page number 4 at the bottom and the top, so it would be --

THE COURT:  5 of 18?  5 of 18 at the top and 5 at the bottom.

MR. CAPONI:  No, Your Honor, there's no -- at the top, it says 1 of 2.

THE COURT:  All right.  I'm on the wrong --

MR. CAPONI:  After page 4.

THE COURT:  Okay.  It says page 4.  Wait a minute. Page 1, 2, 3.  Okay.  And then we have another page 1 of 2. Which one?

MR. CAPONI:  That's it.

THE COURT:  Okay.

MR. CAPONI:  It says term sheet at the top.

THE COURT:  Okay.  So you want term sheet, which is actually 1 of 2, an exhibit to this because if you go further,

there's going to be some page 5s down at the bottom.  That's
why I want to make sure we're talking about the right number.
So page 1 of 2.

MR. CAPONI:  Right.

THE COURT:  Term sheet.

BY MR. CAPONI:

Q    Are you at the term sheet, Mr. Rajan?

A    Yes.

Q    And I'm going to walk through this document a little bit
here.  And the -- under this document, the issuer is the Debtor
Stream TV Networks, correct?

A    Correct.

Q    And the investor is Zhongsheng Group Holdings LTD,
correct?

A    Correct.

Q    And that Zhongsheng is located at the address at 20, Hequ
Street, in the Dalian District of China, correct?

A    Correct.

Q    I won't try to butcher the names by reading it, but the
full address is on this document under -- enlisted under
investor, correct?

A    Correct.

Q    Okay.  And the term sheet is for an investment in Stream
of up to $300 million of common stock, correct?

A    Correct.

Q    And you signed this document, correct?

A    Correct.

Q    Well, you signed it on behalf of Stream, at least, correct?

A    Correct.

Q    And then it was signed -- well, let me ask you, if you go to the second page, under the sign -- under the Zhongsheng Group Holdings, there's this odd line.

THE COURT:  I mean, where are we at?  What page, Counsel?

MR. CAPONI:  We're on the second page of that document, Your Honor.

THE COURT:  Okay.  So page 2 of 2.

MR. CAPONI:  2.  And there's a signature for Stream Networks.

BY MR. CAPONI:

Q    And that's you, Mr. Rajan?

A    Correct.

Q    And what's next to it, that line, do you know what that line represents?

A    That's the signature.

Q    So that's Mr. Te Li's signature?

A    Correct.

Q    And again, I think I may have asked you -- well, let me ask you this again.  There's no one in this courtroom here

today on behalf of Zhongsheng, correct?

A    No.

Q    And there's no -- Mr. Te Li is not here, is he?

A    No.

Q    And you're aware that we have been -- we, being the Secured Creditors or counsel of the Secured Creditors, have been questioning whether this transaction is a legitimate transaction in this bankruptcy, correct?

A    You've raised some questions.  Yeah, correct?

Q    Okay.  And you are aware that we've raised questions that we think that Mr. Te Li may not exist, correct?

A    No, I didn't know you didn't think he didn't exist.

Q    I'll take that back then.  Fine, Mr. Rajan.  So representatives of Zhongsheng have been in the United States in the month of August, correct?

A    No, they -- they delayed their trip.

Q    So when you last testified, you testified on a, I think, a Thursday and said you were meeting with them that weekend in Boston, correct?

A    Correct.

Q    And it's your testimony that they now did not show up in Boston?

A    They've delayed their trip to next month.

Q    Okay.  So now they're not going to be in the United States until next month?

A    Correct.

Q    So when you testified at your -- the last time you were here, that it was your understanding that they were currently in the United States buying companies, you were incorrect?

A    That is incorrect.  They called and said they had to postpone the trip.  And they moved it to next month.

Q    And did you ask the representatives of Zhongsheng to maybe come to the United States a little early so they could appear and support your testimony in this proceeding?

A    No, I didn't ask them to come.  I didn't ask them to change their travel plans, no.

Q    All right.  Mr. Rajan, I'm going to focus on the diligence -- due diligence, regarding this transaction.  It's your position the Zhongsheng Group Holdings Limited is a subsidiary of Zhongzhi Enterprise Group, correct?

THE COURT:  Subsidiary of who?

MR. CAPONI:  Zhongzhi.  So that would be, Z-H-O-N-G-Z-H-I, Enterprise Group.

BY MR. CAPONI:

Q    Did I get that correct, Mr. Rajan?

A    No.  It's my -- Stream TVs understanding that Zhongsheng in Dalian, Zhongzhi is a shareholder in Zhongzhi in Dalian.

Q    And Zhong -- your -- was your testimony, in your deposition, that Zhongzhi -- that excuse me -- Zhongsheng is effectively a wholly owned subsidiary, controlled subsidiary of

Zhongzhi, correct?

A     I don't know if it's a wholly owned and controlled subsidiary.  I believe they're a shareholder in Zhongsheng in Dalian.

THE COURT:  Wait a minute.

BY MR. CAPONI:

Q     And it was your testimony that --

THE COURT:  Hold on, Counsel.  You guys know what you're talking about.  I'm a little lost here.  Okay.

MR. CAPONI:  All right.  Let me step back.  So --

THE COURT:  Subsidiary of who?  Of Zhongzhi --

MR. CAPONI:  Zhongzhi.

THE COURT:  -- Enterprise.  And he said they're not.

MR. CAPONI:  Zhongzhi.

THE COURT:  Zhongzhi.  Somebody in doubt -- two companies or something.  Zhongsheng.  I'm sorry if I confused you.

BY MR. CAPONI:

Q     So, Mr. Rajan, is your testimony that Zhongsheng Group Holdings Limited is basically of subsidiary of Zhongzhi Enterprise Group, correct?

A     No, I believe that Zhongzhi is an investor in Zhongsheng in Dalian.  I believe they're -- they're a significant shareholder.  I don't know about a wholly owned subsidiary. That I'm not sure.

Q    Mr. Rajan, if you could turn to your deposition

testimony --

A    Yeah.

Q    -- which is at Exhibit 231 --

          THE COURT:  Binder?

BY MR. CAPONI:

Q    -- in binder 3.

          THE COURT:  That's a question or a statement?  230 in

binder 3?

          MR. CAPONI:  Yes.

          THE COURT:  Binder 3, 231.  Okay.

BY MR. CAPONI:

Q    And I'm looking at page 11 to 12 of your deposition

transcript.  Are you there, Mr. Rajan?

A    Correct.

          THE COURT:  Okay.  Wait.  I'm not there.

BY MR. CAPONI:

Q    And if you go to page 11, we're going to start at line 23.

My question to you was:  "Yes, I am, Mr. Rajan.  I'm hoping you

can help me out."

          THE COURT:  Oh, wait a minute -- wait a minute.

Where are you at on page 11?

          MR. CAPONI:  Line 23.  Page 11.

          THE COURT:  Okay.  All right.

BY MR. CAPONI:

Q    I said, "Yes, I am, Mr. Rajan.  I'm hoping you can help me out.  So Zhongsheng Group Holdings, LTD, quote the investor in this term sheet, you see that?"  You say, "Yes."  I ask you, "Who owns that company?"  You responded, "That Zhongzhi is saying representing in the meetings and in the text message that -- that -- that is basically a subsidiary of their company, that they are a major investor in that company and they say that they could do deals on behalf of the Dalian company." Did I read that correctly?

A    Yeah, that is correct.

Q    Thank you.  All right.  So this term sheet, on Exhibit 229, does not list as the investor Zhongzhi, does it?

A    No.  Well, it's -- no.

Q    Okay.  And it's your testimony that you negotiated this term sheet with representatives of Zhongzhi, who represented to you, that they had authority to speak on behalf of the Zhongsheng, the investor listed in this term sheet, correct?

A    In Dalian, correct.

Q    And you agree with me, Mr. Rajan, you never received any legal documentation substantiating a claim that Zhongzhi has the authority to bind the signatory to this term sheet, correct?

A    No.  I just received messages from them.

Q    So you received WeChat statements from employees from Zhongzhi, but you never received any kind of legal

documentation, a board resolution, or a contract, or a power of attorney, or something similar, to substantiate the claim that Zhongzhi could bind Zhongsheng to this term sheet, correct?

A    Correct.

Q    And with regard to this bankruptcy, similarly, the Debtor has not produced any board resolutions or shareholder resolutions or any document filed with a government authority indicating that Zhongzhi is an investor in Zhongsheng and has an authority to bind the company, correct?

A    A board resolution?  No, they didn't give me a board resolution.  No.

Q    And you believe Zhongzhi is an investor in Zhongsheng, correct?

A    In Dalian, correct.

Q    But you've never seen a cap table for Zhongsheng, correct?

A    In Dalian, no.

Q    And you don't know the name of a single one of Zhongsheng's investors or shareholders, correct?

A    Zhongsheng's shareholders?  Yeah, I know some of the shareholders.

Q    Mr. Rajan, let's take a look at your deposition.  Again, we're going to go to page 52.

A    Which exhibit number again?

Q    Exhibit -- binder 3.  It's Exhibit 231.  And we're going to go to page 52.  Let me know when you're there, Mr. Rajan.

A    I see Exhibit 230.

Q    Exhibit 231.

THE COURT:  You should --

THE WITNESS:  In binder 2?

BY MR. CAPONI:

Q    It's at binder 3.

THE COURT:  Wait a minute.  We're in binder 2.

MR. CAPONI:  The deposition transcript, Your Honor, is in binder 3.

THE COURT:  Binder 3.  Well, whose deposition is this?  Okay.  I'm on the wrong one then.  Okay.  Binder three, you said?

MR. CAPONI:  Binder 3, Exhibit 231.

THE COURT:  Okay.  Exhibit -- okay.  Binder 3, 231, page 52.  Okay.

MR. CAPONI:  And specifically, Your Honor, I'm going to start at line 21.

THE COURT:  Hold on.

BY MR. CAPONI:

Q    Are you there, Mr. Rajan?

A    Which page?

Q    Page 5-2, 52.

THE COURT:  Which line?

MR. CAPONI:  Line 21.

BY MR. CAPONI:

Q    Are you there, Mr. Rajan?

A    No.

Q    Let me know when you get there.

A    Line 21?

Q    Line 21.  It starts, "So to be clear".  Are you there, Mr. Rajan?

A    Yes.

Q    Okay.  So my question to you was, "So to be clear, then, you cannot name for me the -- or identify for me the name of a single shareholder of Zhongsheng Group holdings, LTD, which is the co-signatory to this term sheet, correct?"  If we turn to the next page, page 53, line 1, your answer was, "The specific name I cannot give you, other than they said Zhongzhi Group has money in this company through some of their portfolio companies." Did I read that correctly?

A    Yeah.  I can't -- I can't pronounce the other names.  I mean, I do know some names, but I've got to look it up and figure out to pronounce for you.

        MR. ALEXANDER:  Your Honor, I'm going to object and move to strike as improper impeachment.  There's nothing -- there's no inconsistent statements.

        THE WITNESS:  I don't know how to pronounce the name.

        THE COURT:  Whoa, whoa, whoa, whoa, whoa, whoa, whoa. He's objecting and said as an improper impeachment because there's no --

MR. ALEXANDER:  Inconsistent statement.

THE COURT:  No inconsistent statement.

MR. CAPONI:  I asked Mr. Rajan if -- did he agree with me that he was unable to identify a single shareholder of the company.  And his testimony here was he could.  And his testimony in the deposition, as we just read, says he agrees with me that he cannot.  So I think that's inconsistent.

THE WITNESS:  I cannot pronounce --

THE COURT:  No, no, no, no, no.  It says the specific name I cannot give you.  There may have -- they didn't get into that level and if they did give me the name, I would have difficulty pronouncing it, but they didn't give me the names of all of those companies.  No.  Do you see that answer, Mr. Alexander?  You're saying that's not inconsistent.

MR. ALEXANDER:  It's not inconsistent because he says that they said that Zhongzhi has the money and it may have been a direct investment in the company.  And he does know some --

THE COURT:  Well, that wasn't --

MR. ALEXANDER:  -- names and he can't say the name because it's in a foreign language and he'd have difficulty pronouncing it.

THE COURT:  Well, his answer here was, yes, I do know the names.  And his answer is the specific name I cannot give you.  That was --

MR. ALEXANDER:  But it's with the caveat --

MR. CAPONI:  That's the inconsistency, Your Honor.

MR. ALEXANDER:  -- other than they said Zhongzhi Group has money in this company.  So Zhongzhi would be the investor.

MR. CAPONI:  I think Mr. Alexander is arguing.

THE COURT:  I'll allow it for what it's worth.

MR. CAPONI:  No, what I'm saying is I think he's arguing, but the point being the --

THE COURT:  I'll allow it for what it's worth.

MR. CAPONI:  Thank you, Your Honor.

THE COURT:  Overruled.

MR. CAPONI:  Let's move on.

THE COURT:  Move on.

BY MR. CAPONI:

Q    And, Mr. Rajan, you don't know how many investors there are in Zhongsheng, the signatory to this term sheet, correct?

A    How many shareholders they have?

Q    Correct.

A    I don't know the exact number of shareholders are.

THE COURT:  And this is Zhongsheng, right?

MR. CAPONI:  Zhongsheng, yes, Your Honor.

THE COURT:  Okay.

BY MR. CAPONI:

Q    And again, the signatory to this term sheet is Zhongsheng, the Dalian companies, as you refer to it, correct?

A    Correct.

Q    Okay.  And you have not received any financial information for Zhongsheng, the signatory to this term sheet, correct?

A    I'd have to go back and check.  I'm not sure.

Q    Okay.  Well, let's go look at your deposition, Mr. Rajan. We'll turn again back to binder 3, Exhibit 231.  And this time we're going to go to page 40.  Let me know when you're there.

A    Yes.

Q    You there, Mr. Rajan?

A    Correct.

Q    Okay.  Page 40, line 2, is my question to you.  "Mr. Rajan, did you receive any financial statements -- financial documents, at all, for the Zhongsheng Group Holdings, LTD investor located in Dalian, that's on this term sheet?"  Your answer, "No, I got information on Zhongzhi.  They showed me on their website, they had over one trillion in R and B under management." Did I read that correct?

A    Correct.

Q    So as of your deposition, you would agree with me, you had not received any financial information related to the entity that signed this $300 million term sheet?

A    When was the deposition?

Q    August 14th.

A    No.  Deposition wasn't August 14th.

Q    Excuse me, Mr. Rajan?

A    The deposition wasn't August 14th.

Q    Well, I'm sure I thought was your question to me.  When was your deposition.

A    At the time of the deposition, I don't think I got information.

Q    Well, this way, Mr. Rajan, did I read your testimony correctly?

A    The testimony, not deposition -- sorry.  Okay.  Testimony. No, I don't think at that time I had received information.

Q    Okay.  And so, Mr. Rajan, at least at the time of your deposition, you were unable to tell me what the gross revenues for Zhongsheng were in 2022, correct?

A    Yeah, for my testimony, I don't think I knew what the revenues were.

Q    And you weren't able to tell me what the gross revenues for this company were in 2021 either, were you?

A    No.

Q    And you weren't able to tell me the net revenue in 2022 or 2021 for the signatory to this term sheet, correct?

A    The exact amount, no.

Q    And you testified that you believe Zhongsheng, the signatory on this term sheet, is in the automotive business most likely a dealership, correct?

A    Correct.

Q    But you don't know, or at least at the time of your

deposition, you were unable to tell me how many dealerships Zhongsheng operated, correct?

A    The exact amount, no.

Q    And you were unaware of what brand of cars these dealerships purportedly sold, correct, Mr. Rajan?

A    No, I didn't know the exact brand.  No.

Q    So at your deposition, you didn't identify for me any brands that you believe Zhongsheng sold, correct?

A    No.

Q    No, you were unable to identify for me or, no, I was wrong?

A    Correct.  I identify for you.

Q    Thank you.  And in fact, you never spoke with anybody in senior management at Zhongsheng, the signatory to this $300 million term sheet, correct?

A    No, I only spoke to William and Mr. Li.

Q    And Mr. Li did not work for Zhongsheng, the signatory to this term sheet, correct?

A    No.  Since the testimony, he's saying he is working for them in Dalian.

Q    All right.  So let's turn to page 56 of your deposition, which again is binder 3, Exhibit 231.  And this time we're going to go to page 56.  You there, Mr. Rajan?

A    Yeah, I'm here.

Q    Okay.  Line 8, "Did you speak with anybody who's an actual

senior executive with the Zhongsheng Group Holdings, LTD?

Answer, "In China, no.  I didn't speak to anybody in China.  I spoke to William and Mr. Li, who said they can speak on their behalf." Did I read that correctly?

A    Correct.

Q    Thank you.

MR. ALEXANDER:  Your Honor, I'm going to object.  I mean, there's nothing inconsistent.  That's his exact testimony today.

MR. CAPONI:  It's inconsistent, Your Honor, in that I asked Mr. Rajan if he had spoken to any senior executives at the company.  Today he told me he did, that Mr. Li was a senior executive.  In his deposition he said, no, he didn't.  And that he spoke to Mr. William and Li, who said they could speak on behalf of the company.

THE COURT:  No, he said since his deposition --

MR. CAPONI:  Since?

THE COURT:  -- since his deposition, they have represented that they are -- have some interest or representation for Zhongsheng.

MR. CAPONI:  I'll let that -- fine, Your Honor.

THE COURT:  Then I'll have to sustain that.  I'm pretty good at writing and trying to follow.  So I sustain the objection.  Go ahead.

MR. CAPONI:  Sure.

74

BY MR. CAPONI:

Q    Mr. Rajan, I'm going to move forward into discovery in this case.  So you're aware that the court entered a discovery order requiring the Debtors to produce certain documents related to this transaction with Zhongsheng in this term sheet, correct?

A    Correct.

Q    And you were involved in the process of the document collection, correct?

A    Correct.

Q    And you personally did the searches for communications and documents from the computers within your custody, correct?

A    Correct.

Q    And that includes all the emails that would have been on your computer, correct?

A    Correct.

Q    And also includes all your text messages, correct?

A    Correct.

Q    And it includes your WeChat messages, correct?

A    Correct.

Q    And you testified previously that WeChat was Zhongzhi's preferred method of communications, correct?

A    Correct.

Q    Mr. Rajan, you didn't produce, in this case, a single WeChat message memorializing the negotiations for this term

sheet that we were looking at with Zhongzhi, correct?

A    I've produced evidence on the negotiations of the term sheet.

Q    Is your testimony, Mr. Rajan, that you produced WeChat messages memorializing the actual negotiation over this term sheet?

A    I don't know if it was WeChat or not.  I know I did produce stuff on the negotiations.

Q    I'm asking you specifically about WeChats, Mr. Rajan.

A    I don't remember.

Q    Do you know whether or not you produced any WeChat messages -- let me ask you this question.  I'll strike that one.  As you sit here today, do you have WeChat messages between you and any representative Zhongzhi discussing the negotiations over this term sheet?

A    I don't know if it was WeChat or if it was photographs and these various programs.

Q    Now you've testified that WeChat was their preferred method of communication, correct?

A    Method of communication, yes.

Q    Okay.  Do you have any WeChat communications with anyone from Zhongzhi or Zhongsheng discussing the negotiations over this term sheet?

            MR. ALEXANDER:  Objection.  Asked and answered.

            THE COURT:  He said he didn't remember.

THE WITNESS:  Changes to the --

THE COURT:  Wait, wait.  He said he didn't remember so I'm going to sustain the objection.  He said he didn't remember if he had WeChat discussions with -- well, he said with --

MR. CAPONI:  Zhongzhi.

THE COURT:  Zhongzhi, but he didn't ask him about the signature.

MR. ALEXANDER:  Zhongsheng and Zhongzhi.

THE COURT:  Right.  He said he didn't recall if he had any with Zhongzhi.  I don't think he asked about Zhongsheng originally.

MR. CAPONI:  Right.

THE COURT:  I don't recall.

MR. ALEXANDER:  I thought he did, but the record --

THE COURT:  Right.  Will reflect.  It's already answered as to the entity he said he was negotiating with, with respect to the entity who signed, I don't have any notes that he said he did not have WeChat, but he didn't have any.  Never mind.

MR. CAPONI:  The record is fine the way it is, Your Honor.

THE COURT:  Let's move on.

MR. CAPONI:  I'm moving on.

THE COURT:  Let's move on.

BY MR. CAPONI:

Q    Mr. Rajan, this term sheet, I believe you previously testified, when you were here, that there were no red lines, evidencing changes in the term sheet because it was effectively the same term sheet that VSI had entered into with Zhongsheng in 2022; is that correct?

A    When I received it, it would not have been with red lines. What they did with the banker, in terms of changes and discussions, I'm not completely privy to all of it.  So when I got it, it didn't have red lines, but they may have been going back and forth and having discussions on all those things.

Q    But it's your understanding that the term sheet that we're looking at here was identical to the November term sheet between VSI and Zhongsheng?

A    I wouldn't quite say identical, but very, very close.

          THE COURT:  Okay.  The November term sheet between who?

          MR. CAPONI:  VSI and Zhongsheng.

BY MR. CAPONI:

Q    Mr. Rajan, when you were entering into this term sheet, you agreed to sell stock up to -- $300 million worth of stock to Zhongsheng, what value did you place on the company?

A    They had agreed to a $600 million pre-money.

Q    Okay.  So if we look at this term sheet, which is Exhibit 229, in binder 2.  Let me know when you're there, Mr. Rajan.

A    229?

Q    Yeah.

        THE COURT:  It's the last document in binder 2.

        THE WITNESS:  Okay.  Yeah.

BY MR. CAPONI:

Q    Are you there?

A    Yeah, I think so.

Q    Okay.  If you go down to the amount, do you agree with me, this -- the amount is for $300 million?

A    On -- on number 3?  Are you on the second -- are you on page 2?

Q    It says, "Issuer investor amount.  Investor will invest US dollars, 300 million."  Did I read that correctly?

A    Yeah, on page 2, right?

        THE COURT:  Page 1 of 2.

BY MR. CAPONI:

Q    Page 1 of 2.  It's the term sheet, Mr. Rajan.  The one you executed.

A    Exhibit 229, right?

A    Exhibit 229.  If you turn back to past page 4 at the bottom, you'll see the term sheet, which we went over that you signed.

Q    Okay.

Q    Do you see that?

A    Right.

Q    The amount that's being invested is 300 million, correct?

A    Right.

Q    And the valuation is -- sorry -- under valuation, if they invest the 300 million, they'll get 35 percent of the stock equity of the class A common stock of Stream, correct?

A    Correct.

Q    And that was at a $600 million pre-money valuation, correct?

A    Correct.

Q    Okay.  And this term sheet -- well, actually, let's -- let me get to the next one.  If we go to Exhibit 238.

        MR. ALEXANDER:  Which is in which binder?

        MR. CAPONI:  Binder 3, Exhibit 238.

BY MR. CAPONI:

Q    And you should keep the exhibit -- the binder -- you should keep 229 available to you, because I'm going to ask -- compare these two documents, Mr. Rajan.  So please don't --

        THE COURT:  Okay.  So we're on binder 3, 238.

        MR. CAPONI:  238.

        THE COURT:  Okay.

        MR. CAPONI:  And I'm going to compare that, Your Honor, to Exhibit 229, in binder 2.

        THE COURT:  Okay.

BY MR. CAPONI:

Q    And let me know when you're at 238, Mr. Rajan.

A    Yes.

Q    Okay.  And this is the term sheet between Zhongsheng and VSI that was executed in 2022, correct?

A    Right.

Q    And it's your testimony that the term sheet with Stream and Zhongsheng is effectively, other than changing the names, it didn't change any of the material terms of the term sheet, correct?

A    No, no, no.  There's -- there's confusion again.

MR. ALEXANDER:  I'm going to object.  It mischaracterizes the testimony.

THE COURT:  He said it was substantially the same, not identical.

THE WITNESS:  There's -- there's --

THE COURT:  Wait a minute.  What your objection?  He said there were some -- there was substantially the same, but not identical in his prior testimony.  So what's your --

MR. ALEXANDER:  But I also believe his prior testimony referenced a November agreement.

THE COURT:  Well, this is a November agreement.  November 1st agreement.  Okay.

MR. ALEXANDER:  This one says September.

THE COURT:  Wait a minute.  What -- wait a minute.  Where am I at?  This one says September?

MR. ALEXANDER:  Are you -- are we on document 238?

THE COURT:  Oh, it was executed on September.  Yes.

MR. ALEXANDER:  And I believe his testimony said November.

THE COURT:  Oh, okay.

THE WITNESS:  There's --

THE COURT:  Whoa, whoa.  No answer -- no question.

THE WITNESS:  Okay.  Let's see when he said it was, hold on.  Oh, Lord.

MR. CAPONI:  Your Honor, Mr. Rajan, in his testimony, Mr. Alexander is correct, mentioned November.  So let me try to clean that up.

THE COURT:  Okay.  Hold on.

BY MR. CAPONI:

Q   Mr. Rajan --

THE COURT:  Hold on, Counsel.  Let me get some -- I'm writing my notes so I can follow along.  Go ahead.

BY MR. CAPONI:

Q   Mr. Rajan, you mentioned a November term sheet between VSI and Zhongsheng in your testimony.  Did you -- were you referring to this September term sheet that we see here at Exhibit 238?

A   No.

Q   Is there another term sheet, other than this one we're looking at, at 238?

A     Yeah.   They gave three term sheets to VSI in 2022.

Q     Mr. Rajan, do you know why this term sheet 238 was produced, but this November term sheet you're referring to has not been produced?

A     I don't know.

Q     Sorry.  Can you move the microphone?  I couldn't hear you, Mr. Rajan.

A     I don't know.  I've turned it over.  They gave another term sheet just for setting up a bonding operations to help with just manufacturing and supply chains, separate from having equity in, you know, VSI or Stream TV.  So this was regarding manufacturing, not -- not just being like a traditional equity type investor.

Q     And just to --

A     So they -- they gave three term sheets to VSI in 2022.

Q     That's fine, Mr. Rajan.  Do you know why the other two term sheets were not produced, but this one was?

A     I believe I turned it over.  I don't know.

Q     Thank you, Mr. Rajan.

        MR. CAPONI:  Your Honor, could we take a -- maybe a 10-minute break for --

        THE COURT:  Okay.  Let me just ask.  He said there was three.  What were the two manufacturing, one investor?

        THE WITNESS:  One -- one is manufacturing, two as investors.

THE COURT:  Oh, okay.

THE WITNESS:  Just as regular investor.

THE COURT:  Okay.  I had them backwards.  Okay.  You want a break, Counsel?

MR. CAPONI:  Yes, if you could, Your Honor.

THE COURT:  Yes.  How about we -- it's 12:45.  How about we come back at 1?

MR. CAPONI:  That's fine, Your Honor.

THE COURT:  All right.

MR. CAPONI:  I'm almost there, so --

THE COURT:  That's fine.  Court is in recess until 1 o'clock?

MR. CAPONI:  Thank you, Your Honor.

THE COURT:  Thank you.

(Recess taken)

THE BAILIFF:  All rise.

THE COURT:  Be seated.

Okay.  Mr. Caponi, you may continue with your cross-examination of Mr. Rajan.

MR. CAPONI:  Thank you, Your Honor.

BY MR. CAPONI:

Q   Mr. Rajan, I'm still -- we left off with the Zhongsheng term sheet.  And we're going to move on from there -- pick up there.  So to set the stage for my next question, again, it's your position that the Zhongsheng executed this term sheet is a

privately held company and not a publicly held company listed on the Hong Kong  Stock Exchange, correct?

A    Correct.

Q    Okay.  And you -- again, you testified earlier, you're aware that Mr. Park testified in this proceeding?

A    Yes.

Q    And are you aware that Mr. Park testified, in response to direct questions from Mr. Alexander, that the Zhongsheng that signed his term sheet was the publicly traded Zhongsheng listed on the Hong Kong Stock Exchange?

A    No, I wasn't aware of that.

Q    Okay.  Well, let's take a look at Exhibit 226, which is a transcript from the June 29th hearing, where Mr. Park testified.

A    Which -- which binder?

Q    That would be in binder 2.  So binder 2, Exhibit 226.  And we're going to go to page 55.

        THE COURT:  Wait a minute.  We're in binder 2, 226. And what page are we going to, Counsel?

        MR. CAPONI:  55, Your Honor.

BY MR. CAPONI:

Q    Are you there, Mr. Rajan?

A    Yes.

Q    And if you go to line -- starting at line 14.

A    Which page?

Q     Page 55.

THE COURT:  Which line?

BY MR. CAPONI:

Q     One second, Mr. Rajan.  If we start at line 5, I said, Have you heard of the company called Zhongsheng", which is the phonetic pronunciation for Group Holdings, LTD.  Mr. Park answered, "Yes."  "What is your understanding of Zhongsheng Group Holdings LTD?"  Mr. Park answered, "It's a publicly traded entity on the Hang Seng Index of Hong Kong. Predominantly their business is auto dealerships.  It appears to be on the high end and they -- they have multiple holding companies -- companies underneath that as well."

Did I read that correctly, Mr. Rajan?  Mr. Rajan?

A     Are you referring to his testimony?

Q     Yeah.  Did I read that correctly?

A     Yeah, I think you did.

Q     Okay.  So when asked about a signatory to this term sheet, Mr. Park, the acting CFO testified that it's a publicly traded company on the Hang Seng Index in Hong Kong.  Am I correct that you disagree with that?

A     Yes, I disagree with it.  He's new to the company.  He wasn't involved in it.  And he's getting up to speed on things in the company, but he wasn't involved in the term sheet so that his testimony is incorrect.

Q     Are you aware of any steps taken by the Debtor or Debtor's

counsel to correct this testimony and indicate that Mr. Park

was incorrect when identifying Zhongsheng as being the publicly

traded company and not a privately held company?

A    Since I've gotten out of the hospital, I've spoken to Mr.

Park.

Q    Okay.  Has -- are you aware of any steps taken by the

Debtor, either through a letter to the court, amended

testimony, or recalling Mr. Park, to correct this statement by

Mr. Park?

A    I'm not aware of that, no.

Q    Mr. Rajan, you're aware that after Mr. Park testified, the

Secured Creditors attempted to contact Zhongsheng, which

subsequently led to a motion to compel?  Are you aware of that?

A    I believe that you contacted the wrong company.

          THE COURT:  No, no, no, no, that's not the question.

          MR. CAPONI:  Well, actually it goes into the -- Your

Honor.

BY MR. CAPONI:

Q    And you submitted a declaration, your sixth declaration,

in which you state under oath that when we were told by

Zhongsheng, the publicly traded company, they never heard of

Stream, that's not surprising because we contacted the wrong

company, correct?

A    Yes, you contacted the wrong company.

Q    And it's your position that we should have contacted the

privately held company, Zhongsheng and not the publicly held company, Zhongsheng?

A    Correct.

Q    Even though both companies have the same name and are in the same business of car dealerships, correct?

A    I don't believe they're in the same business.

Q    So we went through -- well, the Zhongsheng that you're aware of, they're in the auto dealership business, correct? You testified about that a few minutes ago.

A    Correct.

Q    Okay.  And Mr. Park testified that the publicly traded company is also in the automotive dealership business, correct?

A    It -- it is my belief that the Hong Kong company is just a holding company.  It's not in the dealership business.

Q    And the privately held Zhongsheng company, it's your position is located at 20, Hequ Street, in the Dalian District of the People's Republic of China, correct?

A    Correct.

Q    And that's the address -- that 20, Hequ Street, that's listed on the term sheet, correct?

A    Correct.

Q    Now, let's turn to Exhibit 243.

A    Which binder?

Q    Which would be in binder 3.

THE COURT:  Hold on, counsel.  I've got to move some

things around.

MR. CAPONI:  So 243 in binder 3.

THE COURT:  Hold on.  Binder 2.  Binder 3.  What number?

MR. CAPONI:  243.

THE COURT:  Okay.

MR. CAPONI:  Are you there, Your Honor?

THE COURT:  I'm there.

MR. CAPONI:  Okay.

BY MR. CAPONI:

Q    Mr. Rajan, are you at 243?

A    Yes.

Q    Okay.  And this is the Debtor's response in opposition to Hawk's motion to compel discovery, the same motion you submitted your sixth declaration in connection with, correct?

A    Yeah.

Q    All right.  And if we turn to paragraph 10, on page 4. And on paragraph 10, on page 4, your counsel states, "On July 10th, 2023, Counsel for Hawk requested from Debtor's counsel contact information for Zhongsheng and confirming that it will make any and all witnesses it intends to call available for a deposition at least five days before the hearing."  And cites as Exhibit A.  Then it goes on to paragraph 11 to say, "On July 12th, Debtor's counsel provided an address for Zhongsheng and agreed to make available any witness the Debtors intend to call

at the continued trial."  And again refers to Exhibit A.  And

that's what I'd like to turn to now, which is right after page

12 of this document. You'll see what's listed as Exhibit A.

Are you at Exhibit A yet, Mr. Rajan?

A    Correct.

Q    Sorry?

A    Yeah.

Q    Is that, yes, Mr. Rajan?

A    Yes.

Q    Okay.  Sorry.  You're just speaking down.  It's hard to

see.  So this is an email from Mr. Alexander to myself, dated

July 12th.  And if you look at the second paragraph, it says,

"An address for Zhongsheng is Number 44, Binhai East Road,

Zhongshan District, Dalian and L-I-A-O-N-I-N-G.  I won't even

try to pronounce that.  Do you see that?

A    Correct.

Q    And, Mr. Rajan, I'm correct, that's the -- one of the two

addresses that appear on the website for the publicly traded

Zhongsheng Holdings company --

        MR. ALEXANDER:  I'm going to object --

BY MR. CAPONI:

Q    -- correct?

        MR. ALEXANDER:  -- to a lack of foundation.

        THE COURT:  Objection.  Foundation.  Wait a minute.

He's objecting to -- where's the foundation for that?

MR. ALEXANDER:  For the information relating to what's on their website.

MR. CAPONI:  I'm simply asking him if he knows.  He may -- may or may not know if I'm correct.  And I'll go from there.

MR. ALEXANDER:  Same objection, Your Honor.  He's presupposing evidence.  I mean, if he's saying that he doesn't know, then there's no relevance to his question.  There's no foundation.

THE COURT:  Just lay a foundation.

BY MR. CAPONI:

Q    Mr. Rajan, as you noticed by this email, I had previously asked Mr. Alexander to give me the contact information for the Zhongsheng that was a signatory to the term sheet.  And this email we're looking at, is Mr. Alexander responding to my specific question, "Give me the contact information for the company that signed the term sheet."  And you agree with me, this is the address he gave me in response, correct?

A    Yeah, according to this exhibit, yeah, that's what he gave you.

Q    Do you know from where Mr. Alexander obtained this address?

A    They have multiple addresses so I don't know which one he  -- I don't know where he got it from.

Q    So when you say they have multiple addresses, who are you

referring?

A      Zhongsheng.

Q      The privately or publicly held company?

A      The private.

Q      The privately held company, it's your testimony now has multiple addresses?

A      Yeah, they have multiple offices.

Q      Okay.  And when you've always referred to them as the Dalian company though, correct?

A      Yeah, this address is also Dalian.

Q      All right.  And it's your testimony that the privately held company Zhongsheng, that's in the auto dealer business, has -- operates out of the address that's on the term sheet, as well as operates out of the address that Mr. Alexander gave me?

        MR. ALEXANDER:  Object.  It mischaracterizes his testimony.

        MR. CAPONI:  I don't think I -- I'm sorry.  I'm not sure where I mischaracterized.

        THE COURT:  He never testified that they operate out of Binhai East Road --

        MR. CAPONI:  Okay.

        THE COURT:  -- Zhongshan.  He said they had multiple. He never said this was one.  I'll sustain.

        MR. CAPONI:  Fair enough, Your Honor.

BY MR. CAPONI:

Q    Do you know whether Zhongsheng, the privately held company, operates out of this address provided by Mr. Alexander?

A    They -- they have multiple offices all over China.  Which ones they specifically operate out of, I'm not sure.

Q    All right.  So my question was more specific.  Do you know if they operate out of this address?  Yes or no.

A    I don't know.

Q    Mr. Rajan, if you could turn to Exhibit 239, which should also be an exhibit -- or binders 3.

A    239?

Q    239.  In Binder 3.  Are you there, Mr. Rajan?

A    Yeah.

        MR. ALEXANDER:  I'm sorry.  Mr. Caponi, what was the exhibit number again?

        MR. CAPONI:  239.

        MR. ALEXANDER:  Thank you.

BY MR. CAPONI:

Q    And this is the screenshot of the web page for Zhongsheng Group Lifetime Partner -- or sorry -- Zhongsheng Group.  Do you see that, Mr. Rajan?

        MR. ALEXANDER:  I'm going to object.

        THE COURT:  Basis?

        MR. ALEXANDER:  No foundation for this document.

        MR. CAPONI:  Your Honor, I'm going to -- the

foundation is the two addresses that were given to us for the addresses of Zhongsheng, the private held company are listed on this page.  And I want to ask Mr. Rajan a question about those two addresses.

MR. ALEXANDER:  That doesn't establish foundation for the document.  I understand the --

MR. CAPONI:  The foundation is the two addresses that I was given that are listed on this web page with the same name and the same company.

THE COURT:  That's fine -- all fine and well, but I understand what his objection is.  You want him to look at a document whose foundation you have not established.  That's what he's saying.  You want to use a document that somebody has to identify.  Somebody has to do --

MR. CAPONI:  Sure.

THE COURT:  -- something with.

MR. CAPONI:  Your Honor, what I'm going to do is then I'm going to actually pull up, with the Court's permission, the actual website and I will note for the Court that with respect to authenticity, I carry a slight burden, a merely prima facie showing of competent evidence to support the authentication. That's United States v. Turner, 718 f.3 226, 3rd Circuit.  And the standard does not require that the proponent of the evidence rule out all possibilities inconsistent with authenticity.  And the courts have routinely applied that

holding to permit a court to observe that when someone goes on

to the internet and types in and goes to a company's website

that that, in fact, is the information that is available to the

public.  And that's what I'm going to do.

MR. ALEXANDER:  Your Honor, I'd like the case cite

and we'd like an opportunity to take a look at --

THE COURT:  And did that case specifically address

the court in a trial allowing counsel to pull up information on

the internet?  See if counsel's -- because the last case you

guys gave me about -- what was it about?  A judicial notice of

Secretary of State, that was the court taking its own judicial

notice.  Nobody asked them to.  So that's a bit different when

somebody asks me to take it, whether I'm required to do so.

And I have a different -- and so I want to see the case because

everybody --

MR. CAPONI:  The --

THE COURT:  -- I'm not -- I'm just saying that

everybody gives me cases that may say something, but I need to

know context.  And I'm not saying this case doesn't say it.  I

want to see -- give me the case.  What's the case?

MR. CAPONI:  So, Your Honor, the first case I

cited --

THE COURT:  Uh-huh.

MR. CAPONI:  -- as well as United States v Blanchard,

867 F.3d 1.

THE COURT:  Wait a minute.  867?

MR. CAPONI:  F.3d 1.

THE COURT:  Uh-huh.

MR. CAPONI:  1st Circuit, 2017.

THE COURT:  This is 3rd Circuit.

MR. CAPONI:  3rd Circuit was the first case I cited, which is --

THE COURT:  Wait a minute.

MR. CAPONI:  -- United States v. Turner.

THE COURT:  Wait a minute.  Who's US v. Blanchard? Is that what you said?

MR. CAPONI:  Blanchard.

THE COURT:  Blanchard.

MR. CAPONI:  Yes.

THE COURT:  Okay.  And that's the 867 F.3d 1?

MR. CAPONI:  Yes.  A 2017, 1st Circuit.

THE COURT:  Oh, that's the 1st Circuit?

MR. CAPONI:  1st Circuit.

THE COURT:  Okay.

MR. CAPONI:  The first case I cited, United States v. Turner, 718 F.3rd 226, 2013, it's the 3rd Circuit.  Those two cases address the low bar of authenticity.  And then the cases I'm going to give Your Honor citations now, specifically state that a court can take judicial notice of a website --

THE COURT:  Here we go.

MR. CAPONI:  -- under FRE201, to the extent that it demonstrates what information was in the public realm.  And those citations are, Makeff, M-A-K-E-F-F v. Trump University, 715 F.3d 254.  That's the 9th Circuit, 2013.  There's Dorian Precision Systems, Inc. FAAC, Inc., 423 F.Supp 173, Southern District of New York, 2006.  And lastly, Piper v Talbots, Inc., 507 F.3rd 339, District of Mass, 2020.

THE COURT:  Okay.  And, Counsel, do any of these involve how, because my understanding of judicial notice is that when you ask the court to take judicial notice of something, you provide that document to the court.  And the only thing the court takes judicial notice of is what it -- what was filed.  I don't give anything as to the -- this is what it filed.  This is what it says.

As to the truth -- for instance, if you -- if you ask me to take judicial notice -- and I can sua sponte take judicial notice of matters on my own docket.  All I take judicial notice of is, here it's file and it says what it says. But as to the truth of the matter, I don't know.  I don't -- it just says what it says.

But my question is, when it's matters that are not the court taking its own judicial notice or a court or a party asking the court to take judicial notice, what are the obligations, with respect to that?  Do you give me a copy?  I mean, a certified copy addresses everything, but am -- are you

supposed to give me a copy so that I can have it?  Or am I allowed to go on the internet and look at it?  Do these things say I can go on the internet in the middle of a trial?  Or did they say this is what I've done and you -- somebody comes on here and they --

MR. CAPONI:  Your Honor, let me step back.  I want to show the website to Mr. Rajan, as part of my cross-examination, to test the veracity of his testimony.

THE COURT:  Uh-huh.

MR. CAPONI:  The challenge to the document would be if it's hearsay, which it is not, because I'm not admitting for the truth of the matter of asserted.  I'm not admitting it to show that, in fact, this company operates at these locations. I'm admitting it to show that if one goes on the internet, this is the information you receive back.

THE COURT:  But it's for the truth of the matter that that's what you get back.

MR. CAPONI:  The truth of the matter would be what the document says, which would be the addresses on the document.  I'm not offering it for that.  I'm not asking this court to assume that the company operates at these addresses. What I'm asking the court to permit is for me to demonstrate that if one were to go in and type in this company, Zhongsheng, the publicly held company, that its website comes up and the publicly held company's website list as its two business

locations, the two addresses the Debtor gave me.

THE COURT:  Okay.  But the point of the question I'm asking you is, how do you get the court to recognize or exercise judicial notice?  What is the process?  Do you have to give the -- can you do it by in the middle of the trial, saying let's go on the internet?  Did any of these cases involve, let's go on the internet --

MR. CAPONI:  I'm getting there, Your Honor.

THE COURT:  -- as opposed to -- so --

MR. CAPONI:  Yes.  I understand your question.

THE COURT:  Okay.  And which --

MR. CAPONI:  So I've overcome hearsay.  Then goes to authenticity.

THE COURT:  Well, assuming -- well, Mr. Alexander --

MR. CAPONI:  Well, I'm going to -- for purposes of my --

THE COURT:  -- argument --

MR. CAPONI:  -- presentation here, I'm assuming we've overcome hearsay.  And then that then takes us to the document.  The only basis to keep it out would be authenticity.  I've cited the case -- the 3rd Circuit case and the 1st Circuit case that says there's a very low bar to authenticity covering websites.  And the question is, are there distinctive characteristics and the like, the appearance, content, substance, internal patterns, or other distinctive

characteristics of the item that taken together with all the circumstances suggest that I've met my low bar of authenticity.

And I think when we go on the website, all those -- and what's on this page, all those --

THE COURT:  Right.  Why do we have to go on the --

MR. CAPONI:  -- are checked.  And then that goes to, if Your Honor is not convinced with that, then the last set of cases, which would be the fallback position, goes to judicial notice.  And in those cases, at least one of those cases -- I'll ask Mr. Warns to tell me which one -- the court actually discussed using the website in the courtroom and said that was preferable because then the jury could see exactly what --

THE COURT:  Well, that's a jury.

MR. CAPONI:  -- someone going on the internet would see.

THE COURT:  That's a jury.  And I don't mean to --

MR. CAPONI:  Well, I mean, Your Honor would be the same thing.

THE COURT:  Well --

MR. CAPONI:  You're asking me how it worked and that's how it worked in that case.

THE COURT:  Okay.  And this was the court asking or the parties asking, because the court can exercise however that court preferred to do it.

MR. CAPONI:  The parties, Your Honor.

THE COURT:  Yeah, the parties asked the court to go and look on the website?

MR. CAPONI:  The parties -- and in the cases that I cite here, were introducing the website on their own initiative in court --

THE COURT:  As opposed to printing out what you have in the binder?

MR. CAPONI:  Well, they -- both, I mean you're asking me mechanically.  And at least one of the cases they actually discuss -- the court discusses why it prefers to see it live in court.  I brought -- I got it both ways.  I can give the paper copy or I can go on the internet right now and show Your Honor.  So I'm covering my -- trying to cover my bases both ways.

THE COURT:  Right.  Okay.  Okay.  I understand.  Mr. Alexander, why can't the -- at least with respect to the -- if you don't think that the paper, what's listed at 239 is appropriate, well, that's so -- and he said he addressed the hearsay exception because he's not offering it for the truth of the matter.

MR. ALEXANDER:  Who is the witness though that's getting this information in?  Mr. Caponi is not a witness.  So what witness is getting this information in?  It's just -

THE COURT:  Well, he's asking judicial --

MR. ALEXANDER:  -- he's looking at it in a vacuum.

THE COURT:  No.  He's asking me to take judicial notice, which means you don't need a witness to identify it. You're asking the court to take judicial notice of either the document that that was produced.  I know who produced it.

MR. ALEXANDER:  Well, then it's not -- who -- it's not self-authenticating and it's hearsay.  He hasn't outlined a non-hearsay exception.

THE COURT:  Well, he's saying it's non-hearsay because he's asking me to --

MR. ALEXANDER:  Well, then it's not relevant.

THE COURT:

MR. CAPONI:  -- but it is hearsay.

MR. ALEXANDER:  Okay.

THE COURT:  But it meets the hearsay exception under judicial notice, by asking me to take judicial notice of it.

MR. ALEXANDER:  You can't take judicial notice of --He wants you to take judicial notice to say -- to establish that these are the facts of this is what the address. I understand what he may be telling you, but there's no other reason why it would be relevant.  What's the relevance of this information, if he's not using it to demonstrate that that is the address of the company.  There's no relevance.

MR. CAPONI:  Your Honor --

THE COURT:  Okay.

MR. CAPONI:  -- the -- just to clarify, my primary

argument is not judicial notice.  My primary argument is I don't -- I have -- I'm entitled to show the witness any document that's an authentic document that has relevance. That's the standard.

THE COURT:  Okay.  And you're saying it's authenticate --

MR. CAPONI:  I'm saying, I am -- this is -- this -- under 904 -- excuse me -- 901(b)(4) --

THE COURT:  Hold on.  901 --

MR. CAPONI:  -- for the cases I cite --

THE COURT:  Uh-huh.

MR. CAPONI:  -- stand for the proposition that there is a low bar to authenticity.  It can be met if you can show distinctive characteristics and the like, which deal with appearance, content, substance, et cetera, which I believe I make that because you can pull up the website and see it is distinctive.  The appearance -- it is put out there by this company to match its brand.

THE COURT:  And how are we going to do that?  Because --

MR. CAPONI:  Okay.  And then once I get -- since I have dealt authentication and I'm entitled to use it with a witness, I'm not asking whether or not there's -- I ultimately try to admit it in the evidence that would then be -- maybe I ask the court to take judicial notice, but I'm entitled to

impeach this witness's testimony with documents that I don't move into evidence.

THE COURT: Well, impeach what? Because he said they have multiple addresses. You asked him -- he's not contesting that this isn't their address. You asked him how did -- where did Mr. Alexander get it from. He said he didn't know, but he never said that he did believe --

MR. CAPONI: It impeaches it this way. Mr. Rajan has said that the company that signed this term sheet is the Zhongsheng Group Holdings LTD located at the address on the term sheet, as well as Mr. Alexander represented that that same company is located at the address in his email.

THE COURT: What you want to establish is that this is the public company's address, that's what you want to prove.

MR. CAPONI: What I'm going to show -- what this website would show, Your Honor, is that both of those addresses are the address listed on the publicly traded company's website. So that goes directly to Mr. Rajan's testimony, when he says that the signatory to the term sheet that is listed at that address is not the publicly traded company, this website will show that that address is, in fact, the publicly traded company -- not the publicly traded company, privately held company.

THE COURT: But he's never testified that this may not be the address of the publicly or the private. He's saying

that the private Zhongsheng has multiple addresses.  And so I get what you want to do.  I'm just not quite sure if this is the way to do it, but -- and for more importantly, how are we going to get on the internet?

MR. CAPONI:  We're already on it.

THE COURT:  John, are we go -- were we going on there?

THE CLERK:  It's on.

THE COURT:  Okay.

MR. ALEXANDER:  Your Honor, I don't believe any of the cases indicate that it's self-authenticated.  So if it's not self-authenticating, you need a witness to authenticate it.

THE COURT:  I  mean --

MR. ALEXANDER:  Who is that witness?

THE COURT:  -- generally what happens is one of the attorneys come up and they said I did a search and this is what I got, blue, blue, and they authenticate it.  And then we ask them questions.  I'll be honest, this is the first time -- it's the first time, where I've heard a witness being asked to -- me being asked to authenticate a document that I don't know who produced.  But he's saying we can't do it that way.  Let's go on the internet and then you can -- the court can -- he can authenticate it by looking on the internet and saying this is the addresses that they have, but I'm not quite sure how this is impeaching because he never said that this wasn't the

address of the public.  He said there's multiple.  I don't know.  I have to --

MR. CAPONI:  On the impeaching point, let me be more precise.  Mr. Rajan has said that a privately held company named Zhongsheng Holdings Group LTD that's in the car dealership business, operates out of this address in the Dalian Province.

THE COURT:  Which address?

MR. CAPONI:  The 20, Hequ.

THE COURT:  Okay.

MR. CAPONI:  Which is on the term sheet.

THE COURT:  Uh-huh.

MR. CAPONI:  And if you go on to the website of the publicly traded company, with the exact same name, and the exact same line of business, it lists the exact same address.

THE COURT:  Okay.

MR. CAPONI:  I would submit, Your Honor, it's for the court to make a credibility determination, as to whether or not Mr. Rajan's story is believable that you have two companies with the same name in the same line of business in the same address, but are completely unaffiliated with one another or not.  But the ultimate credibility determination or conclusion the court reaches doesn't go to whether I'm not -- whether I'm allowed to ask the question and the court based on the answer can judge what weight it does or doesn't want to give the

testimony and the witness.

MR. ALEXANDER:  Your Honor, I agree that the court gets to determine credibility issues, but that doesn't relieve the party who's attempting to introduce evidence from their burden of demonstrating that it's appropriate that they introduce it.

THE COURT:  Okay.

MR. ALEXANDER:  It's hearsay.  No one is here authenticating it.  And if they try to put up a witness, they didn't disclose that witness or do it.

THE COURT:  Well, I think --

MR. ALEXANDER:  So they have multiple issues.

THE COURT:  -- what he's saying is that it is authenticated by these cases that say authentication is a low bar and that all you can do is that you can look at whatever he was quoting as a means for --

MR. CAPONI:  901(b)(4), Your Honor.

THE COURT:  Right.

MR. ALEXANDER:  But who's the witness?  Who's authenticating it?

THE COURT:  He's saying you don't --

MR. CAPONI:  You don't need a witness.

MR. ALEXANDER:  It's not self-authenticated.  There's nothing in these cases that I saw that said it's self-authenticated.  And if there is a case, just give us a chance

to take a look at it.

THE COURT:  So in all of those cases, was there a witness?  Was there a witness?

MR. ALEXANDER:  We can take a look, but this is the first time we're hearing of this.

THE COURT:  Okay.  I don't know the answer.

MR. CAPONI:  And this website well over a month ago.  It's been in this exhibit binder for a long time.

THE COURT:  All right.  Counsel.

MR. ALEXANDER:  And you didn't give us any of the research that you're talking about in court.

MR. CAPONI:  Well, I'm not -- excuse me --

THE COURT:  All right.  What did I tell the two of you?  Now, we've been doing good today.  We've been doing good --

MR. CAPONI:  Your Honor --

THE COURT:  Whoa, whoa, whoa.  Let me finish.  I'm not having what I had on Friday.  I have told the both of you, if you have some comments, you direct them to me.  You don't direct them to one another.  I want to keep it that way.  You each get an opportunity to speak.  Do not interrupt any -- each other.

I get what you want to make your point.  One at a time.  The only person in this courtroom who gets to interrupt anyone is me.  I think I've said that over several times.

We're going to keep this under control.  No bicker -- because I see this as bickering between the two of you.  You can make your point without interrupting, not talking over.  I have said with respect to this issue, I am not sure.

So that we can do one of two things.  If you have another line of questions for Mr. Rajan, you can do that and then I'll take a brief recess to go look at this specific case.

MR. CAPONI:  This is the -- this is the end of the show, Your Honor.  So we might as well take a break.

THE COURT:  All right.  We'll take a 15-minute break.

MR. ALEXANDER:  Your Honor, during the break, can -- whichever specific case they believe supports this self-authenticating --

THE COURT:  Well, they have copies, they can let you read them.

MR. ALEXANDER:  -- if they could let me know, then we'll take a look at that.

THE COURT:  I am pretty sure that someone, at least on my end, have already pulled these cases out and I'm going to go look at them.  So that's where I'm headed to.

And again, Mr. Caponi, you are relying on federal rule of evidence what?

MR. CAPONI:  For authentication, Your Honor, it would be 901(b)(4).  Let me get my glasses and make sure I'm reading that right, 901(b)(4).

THE COURT:  Okay.

MR. CAPONI:  Distinct characteristics and the like is the title of (b)(4).

THE COURT:  Okay.  All right.  Mr. Rajan, you are not to talk to anyone about your testimony.  You can talk about the weather.  You can talk about anything, not your testimony.

MR. CAPONI:  How much time are we going, Your Honor.

THE COURT:  I'm sorry?

MR. CAPONI:  For the break, how much time are we going to take?

THE COURT:  Well, I really said 15, but why don't we come back at 2:00?  That gives me enough -- because invariably, I start looking at these cases.  I have discussions and then they run over.

MR. CAPONI:  No problem, Your Honor.  Thank you.

THE COURT:  So let's come back at 2.  Court is in recess until 2:00.  Okay.

    (Recess taken)

THE BAILIFF:  All rise.

THE COURT:  Be seated.  And as usual, my research took a little longer than I -- a lot longer than I anticipated.  But I found a Third Circuit case, Victaulic Company v. Tieman, T-I-E-M-A-N, and it is at -- what's the cite on this?  499 F3d 227, 2007.  And in reversing a district court case taking -- having to do with information relating to a website, the court

says that, "Information on the internet is not self-authenticating.  In order to hold and relying on the case of United States v. Jackson, which is 208 F3d 633,638, Seventh Circuit 2000, holding that information from the internet must be properly authenticated." and to be admitted.

And it relied on In Re Homestore.com, Inc. Securities Litigation, 347 F Supp. 2d 76978283.  It says that to be authenticated, some statement -- and if you look at the case that it relied on, which was the In Re Homestead -- all right, what did I do with that?  Did I leave that one?  Well, In Re Homestore says that in order to authenticate -- all right I have -- in order to authenticate document information from the internet -- where's my little page at -- 782.  Now I know we just highlighted this.  This is how you authenticate.  Hold on. That you have to authenticate it by some statement or affidavit from someone with knowledge is required.

And the reason the court said that is because they noted -- oh, here it is right here.  I missed it.  It says that in order to -- these documents, although the documents had the URL address and date stamp, they are in proper -- they were improperly authenticated by the plaintiff decorations.  You have -- the website do not bear the indicia of reliability demanded for other -- this has to be with self-authentication because clearly they weren't.  "To be authenticated, some statement or affidavit from someone with knowledge is required.

For example, that companies webmaster or someone else with personal lodge would be sufficient."

So the court finds that the exhibits are not properly authenticated and while they were inadmissible.  So from the from the Third Circuit saying that information regarding a website has to be properly authenticated and this is how you authenticate it based on that case -- that court citation of In Re Homestead, you need to bring a witness or you need to have somebody to pursue.  That's the first thing is authentication.

So while authentication on the 901(b)(4) may have a low standard, you still have to follow the process.  And the process, according to the Third Circuit, is you have to have a witness or somebody that can do something with the information so that I can rely on the -- I guess to make it reliable. That's how you authenticate it.  So I find that you need a witness to authenticate the document listed at Exhibit 239 or even to authenticate the website.

So that leaves you with what's your other option because I cannot say that you've authenticated it.  And if you all haven't -- and it's not self-authenticating I can't admit it on the 901(b)(4).  I think it was -- was it (b)(4) or (b)(2)?  (b)(4).

MR. CAPONI:  (b)(4).

THE COURT:  All right.  Now that leaves us with the next one.  What's your next basis that you believe that I can

look at this?

MR. CAPONI:  One second, Your Honor.

THE COURT:  Uh-huh.

MR. CAPONI:  It will be judicial notice, Your Honor, and that will be the cases that I cited Dorian Precision Systems and Piper v. Talbots.

THE COURT:  Okay.  Well, let me tell you what the Third Circuit's said in the exact same case that I just cited. It says, "We allow judicial notice only from services not reasonably subject to dispute.  Anyone can purchase an internet address.  And so without proceeding to discovery or some other means, it is premature to assume that a webpage is owned by a company because its trade name appears on the website."

It says that it is improper to take judicial notice because judicial notice relies on reasonable -- that is not subject to dispute, reasonably subject to dispute.  And in that case, it reversed the district court for taking judicial notice of a website without having someone else.  And so it said it was an improper improper use of judicial notice.  So I can't even do it under that Counsel.

I mean, if you have a witness that want to come up here and authenticate it, you -- assuming that you can do that, but I can't -- it's not authenticated.  And I can't take judicial notice because it's not reasonably reliable.  I mean, they go into a lot of reasons.  "Thus court should be wary of

finding" judicial note -- "judicially noticed facts in private corporate websites, and that generally are not the" sorts of -- "sources whose accurately can" reasonable -- accuracy can "reasonably be" questioned -- "not questioned and admissible on the 201(b)."  So I can't admit it for -- it's not authenticated.  And I can't take judicial notice.  At least that's what the Third Circuit has told me in this case.

MR. CAPONI:  All right.

THE COURT:  All right.  Counsel, so what are we going to do here?

MR. CAPONI:  Exhibit 254.

THE COURT:  254.  Okay.  And that is in binder --

MR. CAPONI:  4.

THE COURT:  Binder 4, Exhibit 254.  Binder --

MR. CAPONI:  4.

THE COURT:  4?  4?  I'm in Binder 3, it's got to be in 4.  Where am I at?  Oh, Binder 4.  All right.  Binder 4, 254.  Okay.

MR. ALEXANDER:  Your Honor, we object to this document for lack of foundation, hearsay, lack of authenticity.

MR. CAPONI:  Your Honor, with respect to foundation, it goes to the same issue.  I'm going to challenge Mr. Rajan's testimony regarding the address of the company on the term sheet with regard to authenticity.  I have a certified which came in late last week, the certified public copy from the

equivalent of the SEC of Hong Kong of this document, which is the annual report that's filed with the company.  We've previously made the document of the annual report noticed to the other side, but we just got in this funky, certified copy. So I think I've dealt with authentication on that grounds.

THE COURT:  And you shared that with counsel?

MR. CAPONI:  Yeah, we send them a copy of this one Friday.

MR. ALEXANDER:  We've never received any copies of certification.  They let us know that the document was there. But I think Mr. Caponi just indicated they did not.

MR. CAPONI:  It's the same document, Your Honor, and just has a certification stamp on the top of it.  We only had received one from the company.  May I approach, Your Honor?

THE COURT:  Oh, yes.  Well, wait.  Show it.  You have it?

MR. CAPONI:  I'm looking at it now.

THE COURT:  Okay.  Let him look at it first, then you can hand it up.  But if it's a certified copy of a public -- certified, what am I supposed to do with a -- it's no different if you've got a certify copy from the Secretary of State of Delaware, is it?

MR. ALEXANDER:  Well, I still think you need to demonstrate -- a witness needs to demonstrate how they got the certified copy.

MR. CAPONI:  I don't believe that indicates --

THE COURT:  I don't know.  When you have a certified document, I think it meets the exemption somewhere.  There's an exception for certified copies of something.

MR. CAPONI:  Certified copies are 902(4)(A).

THE COURT:  Wait a minute.  I left my little -- did I leave my book?  No.  I took it in the -- I took it in the -- yes.  That much I know.  Certified copies you don't have to worry

MR. CAPONI:  Yeah.  902(4)(A) it's their evidence that is self-authenticating.  And a certified copy from a --

THE COURT:  Right.

MR. CAPONI:  -- like the SEC Delaware Secretary of State is self-authenticating.

THE COURT:  Right.  That's why I didn't -- that much I know.  Okay, that's 902(a) what?

MR. CAPONI:  4.

MR. ALEXANDER:  4.

THE COURT:  Okay.  Well, let me just wait for my little rule book.  I had two of them.  Ones missing and I took one in -- oh, here's my other one.  Hold on.  Oh, that's my rule book.  Did I leave it on the desk?  Thank you.  902(4)(A).  Certified copies of public record.  "A copy of an official record, or a copy of a document that was recorded or filed in a public office as authorized by law.

"If the copy is certified as correct by the custodian or other person authorized to make the certification or a certificate that complies with rule 9021(a)(2) or (3), a federal statute" -- well, we know it's not that -- "a rule prescribed by the Supreme Court" -- we know it's not that -- "9021(2) and (3) is domestic public documents that are sealed and signed."  We know it's not that.

"Domestic public documents."  We know it's not that. "Foreign public documents.  A document that purports to be signed or attested by a person who is authorized by a foreign country's law to do" something -- "to do so".  "The document must be accompanied by a final certification that certifies the genuineness of the signature and official position of the signer or attester or of any foreign official whose certificate of genuineness relates to the signature or attestation or is in a chain of certificates of genuineness relating to the signature or attestation.

"The certification may be made by a secretary of the U.S., of counsel, consular agent of the United States or diplomatic or consular official of the foreign country assigned or accredited to the U.S. if all parties have given a reasonable opportunity to investigate the documents authenticity and accuracy," the call for -- "may for good cause either order that it be treated as presumptively authentic without final certification, or allow it to be evidenced by an

attested summary with or without final certification."

So this is a foreign public document, is it not?

MR. CAPONI:  It is.

THE COURT:  Okay.  And it purports to be signed or attested by a person who was authorized by a foreign country's law to do so?

MR. CAPONI:  Yes.  It says, "I certify this a true and correct copy of the document referenced" da, da, da, da, da -- "kept in the register of the company registry.  And Ms. Helen Tang register of companies Hong Kong Special Administrative Region 28th of August 2023."

THE COURT:  Okay.  Counsel.

MR. ALEXANDER:  I'm just trying to understand which -- because they just handed us a certification, but what does this relate to?

MR. CAPONI:  The certification is the certification of the 2021 annual report of Jiang Xiang Group Holdings Limited the publicly traded company.

THE COURT:  And that's what that says?

MR. ALEXANDER:  But it's not attached to this certification that we have.  What -- is that what you guys have?  Is it a full and complete set of what's being --

MR. CAPONI:  Yeah.  It's a full and complete set.

MR. ALEXANDER:  Okay.

MR. CAPONI:  You don't have one copy of it?

MR. ALEXANDER:  Your Honor, we're just asking to see what it is.

MR. CAPONI:  Yeah.  I know.

MR. ALEXANDER:  And if they qualify for the exception.

THE COURT:  It does, but you got to give him everything.

MR. CAPONI:  Well, we only have the one original.

THE COURT:  But he can look at it.

MR. CAPONI:  Yeah, I know.  I'm fine.  I have no issue with that.

THE COURT:  Okay.

MR. CAPONI:  It's just the same as this one.  It's just --

THE COURT:  Yeah, but how do we know?

MR. CAPONI:  Oh, that's fine with me.

THE COURT:  Counsel, counsel.

MR. CAPONI:  The only page I'm really looking at is page 3 of the document.

THE COURT:  Page 3 of the -- well, it's --

MR. ALEXANDER:  That helps, Your Honor.

THE COURT:  Okay.  So when the certification came from the person that signed the certification, it came with that, but what I can see from here is blue -- that blue document with all of those things attached to it.

MR. CAPONI:  Correct.

THE COURT:  Okay.  So you hear that, Mr. Alexander?

MR. ALEXANDER:  Our only remaining objection would be that we didn't -- we weren't provided reasonable opportunity to determine the authenticity and inspect and evaluate the certification.  I think the rule requires reasonable opportunity.

THE COURT:  Oh, Lord.  Okay.  Well, I think it says, "If all parties have been given a reasonable opportunity to investigate, the court may for good cause either order that it may be treated as presumptively authentic without final certification" -- he's not asking me to do that -- "or allow it to be evidenced by attested summary with or without final certification."  So I don't think anybody is saying this isn't the final certification, are they?

MR. ALEXANDER:  We don't know what it is.  We haven't had a chance to -- we just got it ten minutes ago.

THE COURT:  Well, do you want some time to look at it?  I'll give you time to look at it.

MR. ALEXANDER:  No, it says investigate, Your Honor.  So that means we would need an opportunity to determine if it is what it is.  But which page did you say you're only looking to do?

MR. CAPONI:  Page 2.

MR. ALEXANDER:  Page 2.  If it's only related to page

2, Your Honor, we have no objection.

THE COURT:  Okay.  So can I have the documents handed up to the court?  No, just page 2 and the certification.

MR. CAPONI:  Which is the same as page 2 of --

THE COURT:  All right.

MR. CAPONI:  -- Exhibit 254.

THE COURT:  All right.  Well, hand me up the certification so that I can rule they're not objecting that it be a certified copy of a foreign document on the 902(a) -- 902(a)(3).  That it's a public -- well, actually it's a foreign document.  It says if the copy is certified by either 902(4)(b) which is relying on 902(3_ -- 90 -- yes, 902(3).  All right.  Hold on, John.  All right.

THE CLERK:  Just the whole thing.

THE COURT:  No, I just need the blue.

THE CLERK:  You just want the top page, right?

THE COURT:  All right.  We see the delivery in chambers that was directed to Mr. Zahralddin that got my name on it, but don't open it.

THE CLERK:  Do we keep the whole file for --

THE COURT:  Yes, you have to keep that together.

THE CLERK:  And do you want to call this something?

THE COURT:  I just want to look at that.

THE CLERK:  You need to label to that one?

THE COURT:  Yes, we need to -- it is Exhibit 2 --

THE CLERK:  Exhibit 254.

THE COURT:  Right.  Which is this document here because that's what was authenticated and only page 2.  So we have the company's registry electronic services.

THE COURT:  Where's the certifications?  I only need two.

MR. CAPONI:  Your Honor, the actual certification is in the back of each of the pages of the document.  Not that blue thing.

THE COURT:  Well, give me page 2 then.

MR. CAPONI:  There's a stamp on the back of each page.

THE COURT:  Right.  Okay.  So then I don't need them all.

MR. CAPONI:  You don't.  No.

THE COURT:  I just need page 2.  All right.  So we only need -- we don't want all of those documents.  We only want page 2.

THE CLERK:  All right.  The one that says contents?

THE COURT:  No.  Why don't you give it to counsel and he could tell you which one.

MR. CAPONI:  That is it.

THE COURT:  Okay.  So we don't need the blue.  I thought the certification was on the blue.

MR. CAPONI:  I would -- you may want to take the

first page so you know what it refers to, but yes, Your Honor.

THE COURT:  All right.  Well, who interpreted this?

MR. CAPONI:  It's bilingual, Your Honor.  It's both in English and in --

THE COURT:  So the original came with both --

MR. CAPONI:  This all came originally.  Yeah.

THE COURT:  -- the Chinese -- okay.  That -- okay.

MR. CAPONI:  It came bilingual.

THE COURT:  It came by what?

MR. CAPONI:  Bilingual.  Both our languages.

THE COURT:  I didn't hear that.  I didn't hear the bilingual.  Okay.  I certified this is a true copy of the document.  Reference number page 3 of 370.  It's actually page 3.

MR. CAPONI:  Okay.

THE COURT:  This is what it says on the back.

MR. CAPONI:  Yes, that's true.

THE COURT:  Of 370 kept and registered at the companies registry.  Ms. Helen Tang register of companies Hong Kong Special Administrative Region.  That's a little odd -- I'm just feeling it for -- okay.  And on the front, it has corporate information.  And okay.  So tell me what you want me to take that you are authenticating which is?

MR. CAPONI:  I'm looking at the address on our corporate headquarters.

THE COURT:  Which is corporate headquarters?

MR. CAPONI:  Yeah.  Which is 20 Poppa (phonetic) Street.

THE COURT:  We're not even going to try.

MR. CAPONI:  I'm not going to try.

THE COURT:  I'm not.  Okay.  So it's the corporate address.  Okay.  Corporate address.  Okay.  Okay.  So now that has been authenticated.

What are we doing, Mr. Caponi?  And you have two of them that you referred to.  Are you looking for the term sheets?  Is PRC provenance?

MR. CAPONI:  People's Republic of China, I believe.

THE COURT:  Oh, okay.  What's Dalian (phonetic) on this?  Oh, district Dalian.  Okay.  I don't know what it means.  I'm not even going to try.  All right.

John, we are going to admit as a certified public document, page 2 of Exhibit 254.  The rest of you can give them back.  I don't want them.

THE CLERK:  That's off the top?

THE COURT:  Yes.

THE CLERK:  And this.

THE COURT:  Yes.

THE CLERK:  And that's it.

THE COURT:  That's it.

MR. CAPONI:  Your Honor, it's technically page 3, as

you pointed out.

THE COURT:  Did we --

MR. CAPONI:  Yeah.  Yeah.

THE CLERK:  Because it looks like one.

THE COURT:  Yeah.  I don't know what they -- it says on the back page 3.  I'm going from what the document says.  So it's self-authenticating page 3 of Exhibit 250 -- page 3 only. Because that's only one.  I don't need to look at the rest of this, right?  Get it right there.

THE CLERK:  You're sure?

THE COURT:  Thank you, counsel.  Give it right back because I don't want that.  All right.  Mr. Caponi, now that you have authenticated as a public record, that page, which may be -- what is it?  It's 254 --

MR. CAPONI:  254 Your Honor, and a binder --

THE COURT:  In Binder 4.

MR. CAPONI:  4.

THE COURT:  Okay.  I hadn't even -- unless there was an -- okay.  It's -- and it says Page 2 on here.

MR. CAPONI:  Correct.

THE COURT:  But on the document that has been authenticated it's page 3.  Okay.

MR. CAPONI:  Mr. Rajan, if you could turn to Binder 4, Exhibit 254.

THE COURT:  Why don't we just hand him the document.

MR. CAPONI:  Okay.

THE COURT:  We kept it.

MR. CAPONI:  Oh, if you can hand it, that will be great.  That makes it easier.

THE COURT:  I told you under the blue right here.

MR. CAPONI:  Uh-huh.

THE COURT:  We're marking it as Exhibit 254.  Okay.  Now.

BY MR. CAPONI:

Q    Mr. Rajan, do you have the document you were just handed?

A    Yes.

Q    And if you look under this is the -- as the Court noted a portion of the annual report for Zhang Xiang holdings, Ltd. And under corporate headquarters am I correct address is number 20 Poppa Street, Xiang Cal district, Dalian PRC.

A    Correct.

Q    And that's the same address that's on the term sheet that you say is signed by the Xiang Shang, the privately held company, correct?

A    Correct.

Q    Okay.  So it's your testimony that there are two Zhang Xiang Holding Ltd. companies, both in the automotive business, both at the same address in Dalian.  But two different companies

A    No.

MR. ALEXANDER:  Objection.  Mischaracterizes his testimony.

MR. CAPONI:  I'm not sure what they perceived he mischaracterized?

MR. ALEXANDER:  I don't think he ever --

THE COURT:  I don't think he ever testified that there was a public and a private.  He said he believes the private with that address.

MR. ALEXANDER:  Okay.

THE COURT:  Just sustain.  Rephrase.

MR. CAPONI:  Sure.  So --

THE COURT:  Rephrase it, counsel.

BY MR. CAPONI:

Q    So Mr. Rajan, how do you explain then that the privately held Zhang Xiang Holdings Group Ltd. in the automotive business has the same address as this publicly traded company that's in the automotive business with the same name of the document we just handed you.

MR. ALEXANDER:  I'm sorry, was the question done?  I apologize.

THE COURT:  How does he explain that the privately held --

MR. ALEXANDER:  No, my objection is speculation.

THE COURT:  Okay.  He says he's called for speculation.

MR. CAPONI:  Because he has an explanation or he doesn't.  If he doesn't have an explanation, then he's not speculating on anything.  He's going to say I don't have an explanation.

THE COURT:  He may say, I don't know.

MR. CAPONI:  That's a fine answer.

THE COURT:  I'll allow it for what it's worth.

Mr. Rajan, do you know why -- restate the question?

THE WITNESS:  You want me to restate?

THE COURT:  No, no, no.  You don't restate.  Mr. Caponi restate.

THE WITNESS:  Oh, I'm sorry.

BY MR. CAPONI:

Q   So Mr. Rajan, if we can go to your --

MR. CAPONI:  Okay.  Sorry.  I have to restate the question I was told?

THE COURT:  Yes.

MR. CAPONI:  Okay.

THE COURT:  What would you do without me?

MR. CAPONI:  I'll withdraw that question and let's just go to your sixth declaration.

THE COURT:  What exhibit is this?

MR. CAPONI:  That's Exhibit 237.

THE COURT:  Binder --

MR. CAPONI:  Should be in binder --

THE COURT:  3?

MR. CAPONI:  Binder 3.

THE COURT:  I don't know.  That's a question.  That is not a statement.  237 in Binder 3.

MR. CAPONI:  Are you there, Mr. Rajan?

THE WITNESS:  Yes.

MR. CAPONI:  Are you there, Your Honor?

THE COURT:  Yes, I'm there.

MR. CAPONI:  Okay.  Sir, would you turn to paragraph 19.

BY MR. CAPONI:

Q    And Mr. Rajan, again, this declaration that you submitted was filed in response to a motion to compel filed by the secured creditors indicating they had attempted to contact Zhang Xiang and that company, the publicly traded -- that company we contacted, said it did not know or heard of Stream. And then I want to focus on paragraph 19.  And you respond by saying,

"The ZEG Global Group has many operating companies, some public and some private, each worth many millions or hundreds of millions of dollars.  It appears that Hawk in its supplement to motion to compel discovery and oppose sanctions for failure to comply, conducted a cursory research on the publicly traded Hong Kong corporate entity Zhang Xiang rather

than the privately held Zhang Xiang which is in the

People's Republic of China company."

Did I read that right?

A    Yes, you read it correct.

MR. CAPONI:  Okay.  So only after Hawk filed a motion to compel -- strike that.

MR. ALEXANDER:  Your Honor, I'm going to move to strike that last.  I don't know if he's trying to impeach him. There was nothing inconsistent with his prior declaration.

MR. CAPONI:  I was not impeaching him.  I was going to ask him questions about his declaration, and I was pointing out the provision I'm going to ask him questions about.

THE COURT:  So you're not trying to impeach him?

MR. CAPONI:  At least not yet.

THE COURT:  Okay.

MR. CAPONI:  So --

THE COURT:  Is this filed?

MR. ALEXANDER:  -- what is the -- okay.  This isn't admitted into evidence.  So that's why I'm trying to understand what he's using this for.

MR. CAPONI:  If it hasn't been admitted into evidence, I'd like it admitted into evidence as a admission by a party opponent.  It's Mr. Rajan's declaration and therefore, it's not hearsay.

THE COURT:  Counsel, you want the affidavit admitted

into evidence as CR, what's your last number?  Oh, it's 237.

Never mind.

MR. CAPONI:  237.

THE COURT:  Admitted into evidence as a party

admission.

MR. CAPONI:  Thank you, Your Honor.

THE COURT:  Wait a minute.

MR. CAPONI:  Oh.

THE COURT:  I'm asking --

MR. CAPONI:  Oh.

THE COURT:  -- to respond.

Mr. Alexander?  Any response, counsel?

MR. ALEXANDER:  There is.  I'm just looking at the

document, Your Honor, to see everything that comprises this.

THE COURT:  Oh, I'm sorry, because I moved it to talk

to Taylor.

MR. ALEXANDER:  And so they're moving.  They're

attempting to move the entire 237 into evidence?  Is that my

understanding?

THE COURT:  Right.  It's a statement against interest

or party admission rather.  Party admission.  Not a statement

against -- party admission.  And that is -- what rule is that

against, counsel?  It's an exception to the hearsay rule.

MR. CAPONI:  801.

THE COURT:  801.

MR. ALEXANDER:  There's just a lot of pages.  So I'm just flipping through the pages.

THE COURT:  That's fine.

MR. ALEXANDER:  No objections, Your Honor.

THE COURT:  Okay.  Go ahead.

MR. ALEXANDER:  Just to be clear, its creditors 237.

THE COURT:  Yes.  Which is the 237, which is the declaration of Matthu Rajan in supportive debtors opposition to Hawks motion to -- I'm shortening it -- to motion to compel discovery.

MR. ALEXANDER:  With all the exhibits, correct?

THE COURT:  All right.  So 801(d)(2)?

MR. CAPONI:  Excuse me, Your Honor?

THE COURT:  801(d)(2) you're moving as a --

MR. CAPONI:  Yes.  I'm moving -- I'm only moving in pages 1 to 7 which are the admission by the party opponent. The rest of it are exhibits.  I have no idea --

THE COURT:  Okay.

MR. CAPONI:  -- their authenticity or anything else

THE COURT:  So pages 1 through 7.  Okay.

MR. ALEXANDER:  Your Honor, we would object because we think you have to admit the entire document that contains the statements.

MR. CAPONI:  The exhibits are not Mr. Rajan's statements.  They're just --

THE COURT:  Well, he attached them, didn't he?

MR. ALEXANDER:  They're attached to his declaration are attached.

MR. CAPONI:  They're attached, but they're not his statement.  They're not authenticated.

THE COURT:  So you don't --

MR. CAPONI:  I'm not asking any questions about those attachments.

THE COURT:  So you only want to as a party admission, I mean, a party -- party admission, paragraphs 1 through 7 of this document?  That's the only --

MR. CAPONI:  Pages.

THE COURT:  -- pages 1 through 7 is the only portions that he believes is a party admission on the rule 801(d)(2).  Correct?

MR. CAPONI:  Correct.

THE COURT:  Well, yeah.  I mean, I can't make him want to admit something he don't want to, Mr. Alexander.  He's only looking at certain portions that he is asking to be admitted on -- as an exception to the hearsay which is pages 1 through 7.  He doesn't want the rest, because presumably, they would not meet that exception because they don't -- he doesn't say Mr. Rajan said anything about these things.

MR. ALEXANDER:  Okay.  But then if you look at paragraph 20, it says attached to this declaration are copies

of WeChat communications Exhibit F and the previously footnoted exhibits.

THE COURT:  Paragraph what?

MR. ALEXANDER:  The statement is the -- relating to the exhibit.

MR. CAPONI:  But the exhibit itself is -- does not satisfy any hearsay exception and isn't authenticated and I'm not asking questions about it.

THE COURT:  So let's back up.  So in order for that document to be -- the attached exhibits to be -- because you can attach documents to a declaration and in his declaration, what did he say with respect to those documents?  What paragraph?

MR. ALEXANDER:  Well, multiple paragraphs reference the exhibits.

THE COURT:  And what does he say about them?

MR. ALEXANDER:  He says that the exhibits are evidence in his relationship with various parties.

THE COURT:  Okay, and you believe that the entire document because it's a statement against interest even with -- party admission rather, admission and that his admission also was with respect to these documents?

MR. CAPONI:  I would say the documents are inadmissible on their face, and I'm not proffering them, but if that --

THE COURT:  Let's just admit --

MR.  CAPONI:  -- creates heartburn --

THE COURT:  -- the whole document's admitted -- all of 237 admitted, okay, because his party admission admitted regarding the documents.  So let's take everything.  You don't have to ask him questions, but it's all admitted.

(Exhibit 237 admitted into evidence)

THE COURT:  Go ahead.

BY MR. CAPONI:

Q    So Mr. Rajan, going back, we previously talked about Mr. Park testified in his testimony, in this courtroom, that Zhongsheng that signed the term sheet was the publicly traded company, and you disagreed with that, correct?

A    Correct.

Q    And then subsequent, as referenced by your paragraph 19 of your declaration, my client contacted the publicly traded company, which disavowed any knowledge of Stream, and you explained in paragraph 19 that was because we were calling the wrong Zhongsheng company, correct?

MR. ALEXANDER:  Your Honor, I'm going to object to the lack of foundation with the question regarding what his company may or may not have done.  There is no record of evidence what they may or may not have done in terms of other entities.

MR. CAPONI:  I'm not sure if I follow the objection.

THE COURT:  He's saying that you said that when your company did X, whatever is --

MR. CAPONI:  Okay, I'll rephrase that.

BY MR. CAPONI:

Q    So Mr. Rajan --

THE COURT:  Yeah, let's rephrase.

BY MR. CAPONI:

Q    You filed a declaration in opposition to a motion to compel, and in that motion to compel, it states that efforts were made to contact Zhongsheng, and they said they didn't -- they never heard about Stream and that's what prompted you to file this declaration, in particular, paragraph -- your statement in paragraph 19, correct?

MR. ALEXANDER:  I'm going to object.  There's still a lack of foundation.

MR. CAPONI:  I don't see the lack of foundation, Your Honor.

MR. ALEXANDER:  The motion to compel is in of record, and you haven't even asked --

MR. CAPONI:  His declaration specifically says it's in response to the motion to compel.

THE COURT: Okay, but he's saying that --

MR. ALEXANDER:  Contents of it.

THE COURT:  Counsel, just -- the motion to compel and give me the paragraph.  That makes my life easier.

MR. CAPONI:  The paragraph of what, Your Honor?

THE COURT:  The motion to compel.

MR. CAPONI:  The --

THE COURT:  Let's get it out.

MR. ALEXANDER:  Your Honor, the motion to compel is not of record with respect to --

THE COURT:  Well, he's going to put it in.

MR. ALEXANDER:  Through who?

MR. CAPONI:  Mr. Rajan.

THE COURT:  Well, no.

MR. ALEXANDER:  The -- didn't draft it.

THE COURT:  It's on the docket, isn't it?

BY MR. CAPONI:

Q   If you could look at Exhibit 242, Mr. Rajan, in binder 3.

THE COURT:  242, binder -- which binder?

MR. CAPONI:  Three.

THE COURT:  Okay, we're still in binder 3.

BY MR. CAPONI:

Q   Are you there, Mr. Rajan?

MR. ALEXANDER:  Your Honor, we object.  You can't admit your own document as evidence.  It's --

MR. CAPONI:  I'm not aware of a rule for that one.

THE COURT:  Counsel, I'm going to allow him to lay a foundation and show Mr. Rajan the document because what I suspect he's going to say, when you filed -- you're going to

ask him if he saw it, and his response in reference to what he saw.  Is that what you're asking him?

MR. CAPONI:  That's what I would ask.

THE COURT:  It's overruled.  Go ahead.

BY MR. CAPONI:

Q    Mr. Rajan, is that Exhibit 242?

A    Yes.

Q    Excuse me?

A    Yeah, 242?

Q    Yes?  242 in the binder 3.

A    Okay.

Q    And this is Hawks Investment Holdings Ltd.'s motion to compel discovery and imposed sanctions for failure to comply.  Am I correct that you read this document?

THE COURT:  Well, let's ask him if he read it -- if he's seen it.

BY MR. CAPONI:

Q    Well, my question is did you read it prior to submitting your declaration.

THE COURT:  Okay.

THE WITNESS:  Yeah.  We looked at your --

BY MR. CAPONI:

Q    Can you speak up -- the microphone, Mr. Rajan, if you could --

A    Yes.

Q    Okay.  So in this document, Mr. Rajan, do you recall -- we can point you to the specific paragraphs if you need it, but do you recall that in this document, Hawk alleges that it took efforts to contact Zhongsheng, the publicly traded company, and that that company said it never -- had not done business with Stream.  Are you aware of that?  It's in this document as an allegation.

A    Yes.

Q    Okay.  And in your declaration a paragraph 9 --

        MR. CAPONI:  Oh, before I go on, Your Honor, I'd like to admit Document 242 into evidence.

        THE COURT:  Counsel?

        MR. ALEXANDER:  Can you repeat the question, please?

        THE COURT:  He wants to admit 242 because Mr. Rajan said he's read it, he saw it and so --

        MR. ALEXANDER:  We still object.  It's not Mr. Rajan's document -- it's not the Debtor's document.  They're trying to admit their own document as evidence.  It's not a party -- you can't admit your own statement as a party statement.

        THE COURT:  Okay.

        MR. CAPONI:  Your Honor, the document's not being admitted for the truth of its content.  It's been admitted to memorialize that Mr. Rajan read it and if formed the basis of his declaration.

THE COURT:  So it doesn't even need to be admitted?

MR. CAPONI:  It needs to be admitted, but it's not a hearsay document.  The witness authenticated the document and testified that he read it.

THE COURT:  Well, he's saying this is the document.

MR. ALEXANDER:  No, the witness did not authenticate the document, Your Honor.

THE COURT:  He just said he read it.

MR. CAPONI:  He said he read this document, and it formed the basis of his declaration.  That's authenticating this document for purposes of its admission to show that when his declaration says I'm responding to this document, that this is the document that this declaration is referring to.  And you know, I agree with Your Honor on the time.  I don't think objections like this -- cause, but --

THE COURT:  Well, that's not the point.  They have to make their record.  Go ahead.  And I'll let you do the same.

What's the basis, Mr. Alexander?

MR. ALEXANDER:  The basis is if they're not using it for the truth of the matter asserted, then it's not relevant to the case itself because what's the basis for the document?  I mean, they can't use it to prove the contents that are in the document.  And Mr. Rajan can't authenticate Hawk's document.  I mean there's no --

THE COURT:  Any other way --

MR. ALEXANDER: -- foundation for the ==

THE COURT: -- this can get admitted?

MR. CAPONI: Excuse me, Your Honor?

THE COURT: Any other way this can get admitted?

MR. CAPONI: No. This document squarely comes in. It's not -- this witness authenticated this document by saying this is the document that I read when creating -- and I was responding to in my affidavit. It comes in to complete the record. If whatever uses I have for it have to be within the rules, but right now, I'm not using it for anything related to hearsay. The fact that Mr. Alexander doesn't like the document -- I didn't ask Mr. Rajan to file a declaration responding and characterizing this document -- he chose to.

THE COURT: Well, his objection is that you want to authenticate your document. So when you authenticate a document and for instance, it was an email, and he wasn't copied on it, but he saw the email, could he authenticate it?

MR. CAPONI: Yes.

THE COURT: That he saw it?

MR. CAPONI: Yes. If I saw an email, and I reacted to that email, and you say, is this the email that you saw that caused you to go over and smack Mr. Warns in the back of the head, I authenticated that email.

THE COURT: I'm not sure whether you authenticated it, but I saw it. Authenticate means that it was accurate,

it's all of this and this.  It means this is the document I read.  It does not mean that -- I read it.  Whether this what was on file -- I don't know.

MR. CAPONI:  I'm not asking what was on file.  I'm simply asking if this is what he read, and this is what he filed his declaration and response to, and he answered yes.  I mean, I'm not sure what more I can do other than that.

MR. ALEXANDER:  You can't use the statements that are in the document to prove the truth of any of these statements.  These statements --

THE COURT:  Well, he's not asking --

MR. CAPONI:  I was doing that -- I admit it.

THE COURT:  -- wait a minute.

MR. CAPONI:  Sorry.

THE COURT:  He's not asking --

MR. ALEXANDER:  He's asking to admit it for all purposes.

THE COURT:  No, he's asking him, is this what you read.  Yes, this is what I read.  And did you file a affidavit in response to what you read.  Okay?  And the only thing that would be admissible is the paragraph that he said he read because this is what I read; this is the document I read.  I don't even know, you guys.  I mean, no offense, I don't take judicial notice of what's filed in the docket.  It says the heck what it says.  I mean, I don't know why we're wasting all

this time.

MR. ALEXANDER:  Your Honor, because judicial notice allows you to take that it was said, but it does not allow you to attribute any weight to the statements that are in there.

THE COURT:  A judicial notice allows me to take judicial notice of what is filed of record.  It does not mean that I say I give any weight to this is what it said -- that's it.  And that's all he's asking him, is this what you read and is this what it said -- that's it.  That's the only weight I'm giving it is paragraph -- what paragraph.  Was it paragraph 19?

MR. CAPONI:  Paragraph 19 of his declaration -- Mr. Rajan's declaration.

THE COURT:  No, what about paragraph you wanted to ask him about that he read.

MR. CAPONI:  Well, Your Honor, I don't know what paragraph Mr. Rajan read --

THE COURT:  Well, then --

MR. CAPONI:  -- when responding to paragraph 19?

THE COURT:   -- why don't you ask him?

BY MR. CAPONI:

Q   Mr. Rajan, did you read the entire document of Exhibit 242 before you responded --

A   I don't remember.

Q   -- to that declaration?

A   I don't remember.

Q     So therefore, you're not going to recall which specific paragraph you read; is that correct?  Is that correct?

A     What's your question?

Q     You're not going to recall then for me, which specific paragraph in Exhibit 242 you read that prompted you to make the statements you do in paragraph 19 of your declaration; is that correct?

A     Yeah.  I don't remember which specific paragraph.

THE COURT:  Okay, so he read the document, and in response to the document, he prepared his declaration.

And Mr. Alexander, your position is that this can't be admitted because even though he said he read it, it's not his document?

MR. ALEXANDER:  Correct, Your Honor.  You can't just admit documents because you happen to read them.  Then you could just go read any document and then just get it into the record for evidence.  That's not how it works.  You still need to satisfy all listed requirements to get the document admitted.

MR. CAPONI:  But I'm not hearing Mister --

MR. ALEXANDER:  Mr. Rajan isn't the custodian --

MR. CAPONI:  -- Alexander identify what requirement has not been met.

THE COURT:  All right.  Answer that question.  He said, what requirements has not been met.

MR. ALEXANDER:  It's hearsay.

MR. CAPONI:  I'm not admitting it for the truth of the matter asserted.  I'm admitting it solely to lay the foundation that this is what Mr. Rajan read and when he was responding to paragraph 19 in his declaration.

THE COURT:  All right.  The brains behind you just gave you a paper.  What did he say?  Oh, now he doesn't want to tell me?  Is it a case you cited -- what?  Okay.  I'll allow it for what it's worth, and I'll admit it for what it's worth.

MR. CAPONI:  Thank you, Your Honor.

THE COURT:  Let's move on.

MR. CAPONI:  Okay.

BY MR. CAPONI:

Q   So Mr. Rajan, I think where we were was Mr. Park testifies that Zhongsheng is the publicly traded company.  My client files a motion to compel saying it contacted the company, and it had not heard of Stream.  And you then, am I correct, submitted your declaration in paragraph 19 and explained that the reason the publicly traded company hadn't heard of Stream is because you, in fact, were doing business with the privately held company, Zhongsheng; is that correct?

A   Correct.

Q   Okay.  And that Zhongsheng company, the privately held company, is -- place of business is at the address listed on the term sheet, correct?

A      Correct.

A      And that address on the term sheet is the same address that's on the document that we showed you that the publicly traded Zhongsheng company lists as its principal place of business, correct?

A      What document?

Q      The document you were handed.  It's just that blue page and the page behind it.

A      This?

Q      Do you have that in front of you?

A      Yes.

            THE COURT:  254.

            MR. CAPONI:  Yeah.

            THE WITNESS:  Okay.

BY MR. CAPONI:

Q      And so the publicly traded company, Zhongsheng Group Holdings, Ltd., lists as one of its principal places of business, the same address as what's on the term sheet --

A      They're --

Q      -- that you say is executed by the privately --

A      Yeah, they're --

Q      -- held company.

A      -- they're listing the Dalian address, not the Hong Kong address --

Q      Sure.

A    -- which is who you called.

Q    Well, the Dalian address.

A    Right.  They listed a Dalian address, but you called the Hong Kong address.

Q    So let me rephrase that.  The publicly traded company, Zhongsheng Group Holdings Ltd., in its certified public filing, lists as one of its principal places of business, the same Dalian address that we see on this term sheet executed by Zhongsheng Group Holdings Ltd., correct?

A    Yes.  They list the Dalian address, and you called the Hong Kong address.

THE COURT:  Okay.

BY MR. CAPONI:

Q    So Mr. Rajan, do you have an explanation for how it is that we have two companies with the exact same name in the exact same line of business, operating at the exact same address in China, but you believe one is privately held and the other is publicly held?

A    Yes.  I -- I've explained that to you before.  I can do it again.

Q    I'd love to hear it.

A    Okay.  The way it works in China is if you want to do business in China, you need a company in China where you do all your operations.  And what Stream TV believes from its understanding, is some of the shares from the China company

were put into a Hong Kong company, traded on the Hong Kong Stock Exchange.  The Hong Kong Exchange company is just a holding company, and Zhongsheng has shares and investments in the private company and no liquidity because they don't have no shares in the Hong Kong company.  They wanted shares in Stream TV because we have all these POs, on the hope that we could eventually get Zhongsheng some liquidity.  They're two separate companies.

Q    Okay -- make sure I understood your explanation.  They're two separate companies with the same name and the same line of business purportedly operating out of the same location, correct?

A    No.  Okay, you have --

THE COURT:  Wait a minute.  And that's not what he said.  He said that they're different.  Who's going "ugh?"  Come on.

MR. ALEXANDER:  It was not me, Your Honor.

THE COURT:  It wasn't me.

Okay, can we break the question down?

MR. CAPONI:  Sorry, Your Honor?

THE COURT:  May be breaking it down might help, but he's already said no, I don't know what else you want to ask him.

MR. CAPONI:  I'm good Your Honor.  I'm done.

THE COURT:  You're done?

MR. CAPONI:  I'm done.

THE COURT:  All right.

Redirect.

MR. ALEXANDER:  We do have redirect, Your Honor.

THE COURT:  All right.

Do we need a break?  We've had a enough breaks, but if you want one, I'll give you a chance for a quick -- a quick --

THE WITNESS:  Yeah, can I go get some water?

THE COURT:  Do you need some water?

THE WITNESS:  Yeah, if you don't mind.

THE COURT:  Let's take --

MR. CAPONI:  Can we bring him?

THE COURT:  All right.  We'll take a 10 -- I will be back here at 3:30.

MR. CAPONI:  Okay.

THE COURT:  Actually, I may not even move.

MR. CAPONI:  By 3:30.

THE COURT:  3:30.

(Recess taken)

THE BAILIFF:  All rise.

THE COURT:  You may be seated.

All right, Mr. Alexander, you can proceed with redirect.

MR. ALEXANDER:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. ALEXANDER:

Q     Good afternoon, Mr. Rajan.

A     Hi.  Can you hear me?  Okay.

Q     Mr. Rajan, do you know where Rembrandt is located?

A     I believe New York.

Q     What is Rembrandt's place of incorporation?

A     I believe Delaware and also Nevis (phonetic) or something like that.

Q     Does Rembrandt have an ownership interest in Stream as of today?

A     As of today, no.  As of today, no.

Q     Does Rembrandt have an ownership interest in VSI?

A     As of today, no.

Q     Does Stream have an ownership interest in Rembrandt?

A     No.

Q     Does Stream have an ownership interest in VSI?

A     Stream does not have an ownership in -- in VSI, no.

Q     Does VSI have an ownership interest in Rembrandt?

A     VSI does not have an ownership interest in Rembrandt.

Q     To your knowledge, are any of the directors or officers of Stream officers or directors of Rembrandt?

A     No.

Q     To your knowledge, are any directors or officers of Technovative directors or officers of Rembrandt?

A      No.

Q      To your knowledge, are any directors or officers of VSI directors or officers of Rembrandt?

A      No.

Q      Are any directors or officers of Rembrandt directors or officers of Stream?

A      No.

Q      Are any directors or officers of Rembrandt directors or officers of Technovative?

A      No.

Q      Are any directors or officers of Rembrandt directors or officers of VSI?

A      No.

Q      You testified that Stream has entered into a settlement agreement with Rembrandt that is incorporated into the reorganization plan.  Based on the present lack of overlapping ownership and management interest between these entities, do you believe these were arm's length transactions by separate entities?

A      Yes.

Q      Do you believe Stream and Rembrandt have a business justification for wanting the Debtors to succeed in these Chapter 11 cases with the plan of reorganization?

A      Yes, we do.

        MR. CAPONI:  Objection, Your Honor.  He can feel free

to speak for himself, but unless he has an ability to speak for Rembrandt, that would be hearsay.

MR. ALEXANDER:  But Your Honor, I asked him what his belief was -- I didn't ask him what Rembrandt believes.

MR. CAPONI:  Also he's trying to testify on behalf of -- there's been no foundation for what his belief in or what conversations if he's ever even spoken to anybody at Rembrandt. So I'm not sure where there's a foundation, and it's also hearsay.

MR. ALEXANDER:  Your Honor, I'm asking if he -- Mr. Rajan -- believes that there's a business justification for Stream and Rembrandt to enter into these agreements to succeed with the plan.  I'm not asking him for what Rembrandt's beliefs are.  I'm asking Mr. Rajan for his individual beliefs.  So the foundation is --

MR. CAPONI:  I misunderstood the question.  If the question is does Mr. Rajan believe that Stream has a business justification, I'm fine with that, but if he's asking for what Rembrandt, whether or not it has a business justification --

THE COURT:  No.  He's --

MR. CAPONI:  -- I would call for hearsay.

THE COURT:  -- he's asking him what his belief is, which is not -- it's no different than what is your understanding, what he believes.  I'll allow it for what it's worth.  Go ahead.

THE WITNESS:  The answer's yes.

BY MR. ALEXANDER:

Q    Why?

A    The reason is Stream TV made TVs in the past.  Rembrandt has purchased some TVs from Stream TV in the past so they would like to have additional TVs they've run out of --

MR. CAPONI:  Objection, Your Honor.  He's testifying as to what Rembrandt would like to do.  It calls for hearsay.

MR. ALEXANDER:  Your Honor, it's not hearsay because Rembrandt has actually testified to that in this courtroom. So --

THE COURT:  Well, then you can ask him, then you lay a foundation.  Were you here when he testified -- did he ask?

MR. ALEXANDER:  Well --

MR. CAPONI:  Even if Rembrandt testified, he can discuss that with Rembrandt.  It's not for Mr. Rajan to testify or retestify on behalf of Rembrandt.

THE COURT:  Well, I'll allow it for what it's worth if you ask to lay a foundation, the same way you asked him about what Mr. Park testified and what he believed that Mr. Park was wrong.  I'll allow it on the same grounds.  You can ask him but lay a foundation.  Was he here -- well, he wasn't here.  I don't know how he's going to do that but go ahead.

MR. ALEXANDER:  I'm going to rephrase the question, Your Honor.

THE COURT:  Uh-huh.

BY MR. ALEXANDER:

Q    Why do you believe there's a business justification for Stream?

A    Stream TVs supplied TVs and sold TVs to Rembrandt in the past.  Stream TV is going to be selling TVs right now to Rembrandt -- additional TVs to Rembrandt.

Q    Do you recall you and Mr. Caponi had a discussion about BOE?

A    Correct.

Q    Okay.  I'd like you to take a look at Debtors' Exhibit 3.

THE COURT:  Is that a binder or -- how many binders did Debtors have?  D1 through -- what are we looking at?

MR. CAPONI:  What document are we referring to?

MR. ALEXANDER:  Debtors' Exhibit 3.

MR. CAPONI:  You referred to it as something.  I didn't hear what you referred to.  POE?

MR. ALEXANDER:  No, BOE.

MR. CAPONI:  BOE.

MR. ALEXANDER:  Yes.

THE COURT:  I don't know what that means, but I'm sure somebody will tell me.

THE WITNESS:  Which exhibit?

BY MR. ALEXANDER:

Q    Three.  It's titled, Mutual Supply and Joint Marketing

Agreement.

A    Correct.

THE COURT:  BOE.  Where we at on exhibit what?  D what?

MR. ALEXANDER:  D3.

THE COURT:  D3.  Okay.  Oh.

BY MR. ALEXANDER:

Q    Under what scenario, if any, is Stream required to purchase anything from BOE?

A    If Stream TV uses BOE's backlight, Stream TV should pay the setup fees for the backlight, but BOE is supplying supply chain finance for Stream TV's purchase orders.

Q    So is it fair to say that if Stream TV does not use the molds or the materials for the backlight, then there's nothing for Stream to purchase under that agreement from BOE?

A    Correct.  If we use somebody else's backlight, we don't have to pay fees for molds to BOE.  Then BOE would just be supplying finance for our purchase orders from, like, Cystar and Southern Telecom.

Q    How does that purchase order financing work between Stream and BOE?

A    BOE he would pay for the -- the components like the chips on the lenses, and the TVs, and the backlights, and it would get it to the contract manufacturer who makes the TVs for Cystar or Rembrandt or Southern Telecom and then it gets

shipped to those companies, Cystar or Rembrandt, or Southern Telecom's customer.  So in the case of Southern Telecom, it would go to, like, a Walmart or a Best Buy.

Q    Can you clarify for the Court the process for Stream obtaining a purchase order?

A    Yeah.  Well, we have given samples to both Cystar and BOE, and -- I'm sorry, Cystar and Rembrandt and also Southern Telecom, and they've taken those units, tested them, and we've received over $160 million in purchase orders, which is now going to be increasing.  And BOE will be supplying the -- financing the supply chains -- financing the PO's.

        THE COURT:  Who were those companies?

        THE WITNESS:  Cystar, then Southern Telecom, and then also Rembrandt is going to be buying TVs as well, too.  And BOE finances those purchase orders.

        THE COURT:  Okay -- I'm sorry.

BY MR. ALEXANDER:

Q    We just discussed a few of the purchase orders.  What is the value of the Southern Telecom purchase order?

A    I believe it's 140 million.

Q    With regards to the Southern Telecom, once the Debtor produces the 3D displays for Southern Telecom, is Southern Telecom obligated to purchase the units?

A    Yeah, yeah.  It's a binding -- it's a binding purchase order from Southern Telecom and Cystar both.

Q    What is the value of the Cystar purchase order?

A    Currently, it's 14 million, but Stream TV believes it's

going to be increased to about 75 million.

Q    Once the Debtor produces the 3D displays for Cystar,

pursuant to the purchase order, is Cystar obligated to purchase

the units?

A    Yeah, absolutely.

Q    There's been a lot of discussion regarding -- referring to

Hawk and SLS as secured creditors.  Do you believe Hawk is a

secured creditor of Stream?

A    Hawk is not a secured creditor.  Hawk was converted.  The

stock certificates were mailed to Hawk.  There's no UCC filings

on Stream TV by Hawk Holdings right now.

Q    What did you say was mailed?

A    Stock certificates were mailed.  Hawk was paid through

shares.  They've already been paid.

Q    When were those stock certificates mailed?

A    It was -- they were mailed back in August.  And on SLS,

there's claim objections on their claim.  So we believe we'll

be a recipient of cash from SLS when the process is over.

Q    To your knowledge, was Hawk's approval necessary for

Stream to convert the Hawk debt?

A    The conversion agreement, Stream TV is the decider on the

extinguishment and the conversion.  Hawk can ask for additional

shares, but in terms of their lender position, it's over.

Q    You referenced UCC statements.  When were those -- I think you said terminated?

A    In August.

Q    Of what year?

A    2023.

MR. CAPONI:  Objection, Your Honor.  I don't see what the relevance is.  We're not litigating the validity of the secured debt or of whether it was converted or not.  That's what the 225 action was for.

THE COURT:  I understand that.  What's the relevance, counsel?

MR. ALEXANDER:  Well, the relevance is they've continually referred to Hawk as a secured creditor, and we're explaining that they're not a secured creditor.  So this is --

THE COURT:  Oh, from your position --

MR. ALEXANDER:  -- in response -- yes, from our position.  I mean, this Court will ultimately decide whether they're a secured creditor or not.

THE COURT:  Well, I guess if I sent you back to Delaware, they would decide whether the Hawk was converted to equity, right?  Is that an issue before --

MR. ALEXANDER:  That may be an issue, but they still have to come before this court to deal with the claim objective process, which has already been underway.

THE COURT:  Well, let me back up.  SLS has never

asserted that they were a secured creditor, right?

MR. CAPONI:  SLS is a secured creditor.

MR. ALEXANDER:  I believe SLS has also asserted that.

THE COURT:  Okay.

MR. CAPONI:  But Your Honor, to help speed things along, I'll concede that the Debtor disagrees with that.  I don't why we need to put any evidence in or take up time.  It's not germane to this proceeding.

MR. ALEXANDER:  We disagree.  And if he stops referring to his client as a secured creditor, then --

THE COURT:  Well, why would he stop?  It's a disagreement.

MR. ALEXANDER:  So why would I stop asking questions about a statement that was made during his cross-examination?

THE COURT:  Well, I get that counsel, but what is the -- I get it may not be relevant to the motion for relief, but it would be relevant to the motion to dismiss, the motion to convert, or the motion to appoint a Chapter 11 trustee.

MR. ALEXANDER:  And it relates to the plan that's already on file as well and -- because one of the requirements that we need to do in order to defeat their motion to the extent they meet their burden, which we don't think they do, is demonstrate that there is a plan, and there's a reasonable chance of succeeding.

MR. CAPONI:  Your Honor, there was no relevance to

159

whether or not my clients are secured creditor or creditors. The Court has already found we met our burden on the motion. The burden's on the Defendant.

THE COURT:  I didn't find anything.  I just --

MR. CAPONI:  At the first hearings, Your Honor found that the burden shifted.

THE COURT:  Right, the burden shifted.

MR. CAPONI:  I established my prima facie.  Whether my client is a secured creditor or not is not a defense to the issues that are raised in the motion.

THE COURT:  Well, they may be a defense to the motion to dismiss because you're saying that you actually dismissed on various grounds.  And one of the grounds, I think, and don't hold me to this because I haven't read the motions again, was that they can't successfully reorganize, right?  Isn't that one of your motion -- in the motion?

MR. CAPONI:  I couldn't hear, Your Honor.

THE COURT:  Oh, that they can't successfully reorganize?

MR. CAPONI:  Yeah, that has nothing to do with whether or not we're secured debt or not secured debt.

THE COURT:  Well, it does whether they can successfully reorganize.  They get to put the position that we can successfully reorganize because these people aren't secured creditors.

160

MR. CAPONI:  What then, Your Honor, I would say this is redirect.  They put Mr. Rajan up as an affirmative witness. They didn't cover this with them.  I crossed him -- I didn't cover this with him.  I'm not sure why it's coming up now.

THE COURT:  Well, they filed their opposition to your motion and presumably miss -- they put him up for all responses.  So I guess the question is this is redirect, and he's saying I didn't talk or ask anything other than, I guess, you're saying -- what I hear him saying is that during the course of your cross-examination, you referred -- you and I guess Mr. Colby -- referred to Hawk and SLS as secured creditors in your cross, and they want to address that issue where you called them secured creditors in your cross-examination.

MR. CAPONI:  All right.  Mr. Rajan -- if you must ask Mr. Rajan on whether he agrees or not, I think he's done that. To the extent that they want to put on a case to establish we're not, I think that's far afield of what any -- referring to my clients by their proper title and classification.

THE COURT:  Well, they filed a claim objection, so once you file it, you don't have an allowed claim of anything secured or unsecured.  They objected, so I don't know what they are at this point because once this file is prima facie allowed, once there's an objection now, I don't know what -- until that's resolved, I don't know what they are -- secured,

161

you're asserting secured -- they're saying unsecured.  ,

MR. CAPONI:  Okay.

THE COURT:  That's where we are.

MR. ALEXANDER:  We're not saying it's unsecured.

THE COURT:  Well, with respect to Hawk, you're saying their equity.  Are you saying SLS is an equity holder, too?

MR. ALEXANDER:  They may be, Your Honor.

THE COURT:  Oh, okay.  Well, I'll allow it for what only with respect --

MR. ALEXANDER:  They may have no claim based on the claim objection, so --

THE COURT:  Okay, but you -- I'll allow it with respect to the motion to dismiss and their ability to reorganize.  Keep it tight, Mr. Alexander.  That's only that you want to say we believe we can have a plan because these people are equity holders, and this is why we believe it, or they're unsecured, or they don't have any claim, and this is it.  And that supports why we would be successful.  I don't need a whole litigation that -- on the 225. I don't need that, but I'll allow it for that purpose.  All right?

MR. ALEXANDER:  Your Honor, my last question was relating to the termination of the liens, and then I'm moving on to a different topic.

THE COURT:  All right.  So he said in August 2023. Okay, move on.

You guys, I think you all enjoy the fight more than anything. Go ahead.

BY MR. ALEXANDER:

Q   Mr. Rajan, I'd like to draw your attention to CR255. That's the monthly operating report that you discussed.

THE COURT:  In what binder?

MR. ALEXANDER:  It's in the witness -- Mathu Rajan Witness Exhibit Binder 4.

THE COURT:  Okay, and it's document number 255?

MR. ALEXANDER:  Correct.

THE COURT:  Four, oh, right in front of me.  Okay.

THE WITNESS:  What's the number?

BY MR. ALEXANDER:

Q   255.

THE COURT:  Binder 4.

BY MR. ALEXANDER:

Q   Are you there Mr. Rajan?

A   Yeah, I'm here.

Q   Okay.  And Mr. Caponi asked you about, if you look at Part 1, Subsection E, there's a number there, 750,813?

A   Correct.

Q   Can you explain what that is?

A   That's money for payroll.  That's money for electronics to get ready for production.  Also, we had to get a backup funding deal put in place so we can get the production started on the

TVs.  So it's mainly operational expenses to get things started.

MR. ALEXANDER:  Your Honor, I'd like to approach.

MR. CAPONI:  Objection, Your Honor.  I object to this exhibit.

THE COURT:  Okay.

MR. CAPONI:  This exhibit was just given to us about 15 minutes ago --

THE COURT:  Okay.

MR. CAPONI:  -- for the first time, and we've never seen it before.

THE COURT:  Yes, counsel.

MR. CAPONI:  It was not produced in discovery, and it seeks to sort of sub rosa amend the monthly operating reports, which have not been done.  So Your Honor could take a look at them so we know what we're talking about, but I object to both of these documents.

THE COURT:  Okay, Mr. --

MR. ALEXANDER:  Yeah, first off, it's a rebuttal exhibit based on the testimony that they elicited based on this section of the report.  We did give it to them very early this morning once we -- we received exhibits from them on Friday evening, and one of the exhibits was the monthly operating report, indicating that they intended to use it, and so this was in response to that.  So we believe it's a rebuttal exhibit

that we can use with Mr. Rajan.

MR. CAPONI:  Your Honor, last Friday, or excuse me, the last time we had a hearing, Mr. Eben Colby tried to cross-examine Rembrandt's witness with Rembrandt's own licensing agreement, and the Debtor was able to exclude by saying Your Honor doesn't believe in sandbagging because it hadn't been given in advance.  These documents -- I examined Mr. Rajan over a month ago.

THE COURT:  Uh-huh.

MR. CAPONI:  These documents were produced as part of almost 3,000 pages sent at 2:40-something this morning with no advance notice -- no explanation for why.  These documents were buried in thousands of pages.  And if the Debtor wanted to -- what these doctors purport to do is justify the money VSI has paid, they should have amended their monthly operating reports the way they're required.  Instead, they're trying to bringing [sic] in it this way, which is classic sandbagging.  This is not a rebuttal exhibit.  This is something we've been talking about for months.

MR. ALEXANDER:  Your Honor, we disagree that the 750 -- Mr. Caponi talked about it this morning -- the $750,000 number on the monthly upper reports.

THE COURT:  So is the 750,000 just an explanation of what it is comprised of?

MR. CAPONI:  Yes, just like they're trying to detail

now all the questions I asked Mr. Rajan a month ago.

THE COURT:  Well, why can't he just ask him?  Why can't he just ask him, "Do you know what the 750 is and can you break it down?"  I mean, it's the same they because you did ask him about the 750.  He's entitled to ask him what it's comprised of.

MR. CAPONI:  If he wants to ask him what it's comprised of, I object to these documents coming in.

MR. ALEXANDER:  There's no --

MR. CAPONI:  One was just created two days ago.

THE COURT:  Okay.

MR. ALEXANDER:  Well, that's because it's a new document, so --

MR. CAPONI:  The other one is created -- the other one's dated July 25th, and this is the first I'm seeing of it.

THE COURT:  Okay.  All right.  You can ask him -- why don't you -- because this is the problem I have.  For rebuttal evidence, you really don't have -- you've given it in advance.  But if it's rebuttal, even if we had my rules, if we were doing this in Zoom, I would have said, identify everything.  The only thing I don't restrict is rebuttal because you don't know what rebuttal is until what you need to rebut.  But if you produced this in July -- you said one was in July, right?

MR. CAPONI:  Dated July.

THE COURT:  July I'm not quite sure you wouldn't have

produced in July.  A document from two days ago and it's made in rebuttal, it's a little different.

MR. CAPONI:  Furthermore, Your Honor --

MR. ALEXANDER:  It's made in rebuttal because that's when the period ended for the report to be generated.

THE COURT:  Oh wait a minute, he said it was done in July.

MR. CAPONI:  The date of this document --

MR. ALEXANDER:  No, there's two different --

MR. CAPONI:  -- is July 25th.

MR. ALEXANDER:  There's two --

THE COURT:  What?

MR. CAPONI:  The date is July 25th of this document.

MR. ALEXANDER:  Mr. Caponi was referring to two separate documents.

THE COURT:  All right, so that's what I'm saying.

MR. ALEXANDER:  Right now, I'm working on -- I only referenced one document which is dated July 25th, 2023.  We provided it earlier this morning in response to the monthly operating report that they submitted that they wanted to ask questions about with respect to Mr. Rajan, and they sent that to us Friday evening.  So we worked to see, okay, based on that evidence that they're trying to get in and ask questions about, do we have any rebuttal evidence to that, and that's why this came up.  And so that's our basis for doing this.  We gave it

to them early this morning, and now we're using it.  And because we believe it just came up, there couldn't have been a notice requirement.

MR. CAPONI:  Your Honor, I'd also note again, I don't think you can fairly say you gave me a document.  It's 2 pages sandwiched in 3,000 pages with no expiration at 3:00 in the morning.  But putting that aside, this is a document based on its face is a letter from Visual Semiconductor.  Mr. Rajan has testified extensively that he has no control over Visual Semiconductor.  It is operated by this management committee so there's no one here to authenticate this document.

THE COURT:  Well, why don't --

MR. ALEXANDER:  But we disagree with that because there's a foundation and if it's received --

THE COURT:  Well, let's let him lay his foundation.  If it's rebuttal to something that you did this morning and that you told them on Friday, I'll allow that, but only with respect to what the 750 is.  I don't know if it helps me or not, but if you -- you told him you were going to do that Friday -- and you did -- when should they have given you their rebuttal information?  You're saying they gave it to you yesterday, Sunday?

MR. ALEXANDER:  Well, we gave it to him early this morning.  I think he said 2:30 is when they received it.

MR. CAPONI:  Your Honor, this document is dated --

the one that has a 750 -- is dated from July 25th, 2023.

THE COURT:  I get that, but counsel I get that.  But if they had not -- were not going to offer it to rebut what you did, then that's the difference between rebuttal and direct. If it's rebuttal, it means exactly what it says.  We're rebutting -- we didn't have any idea you were going to do this, and now we want to rebut it.  I'll allow it for what it's worth, providing he can put -- he's still got to go through his paces to get it in.

Yes, Mister --

MR. ZAHRALDDIN:  Your Honor, I just wanted to add a little bit of color to this so you understood.  This is Rafael Zahralddin for the record, for the Debtor.  We did receive it late on Friday.  People who are observant, Mr. Fisher, who's been working on these documents with the U.S. Trustee and with VSI to get the reconciliation, is observant.  We then have Yom Kippur, which is today.  Mr. Fisher also contracted COVID over the weekend.

THE COURT:  Well, I hope he's not here, right?

MR. ZAHRALDDIN:  No, no, he's not here -- he's not here.  Mr. Rajan particularly doesn't want him to be here.  So for these reasons, we weren't trying to sandbag anybody.  We received these, we tried to get through.  By the time sundown came during the holiday, Mr. Fisher called us and told us he had gotten COVID on Sunday.  So we got these out as quickly as

possible and that's why they came out at, you know, in the middle of the night because we were trying to prepare --

THE COURT:  But that's not -- the point of the matter is, it's rebuttal.

Yes, ma'am.

THE COURT:  And rebuttal is allowed to rebut, and you give it to the opposing party as soon as possible.  If you guys looked at my order on Zoom and when we had Zoom in trials, I said produce everything in advance but rebuttal documents because they're not -- you could use them except if you use them to rebut.  Now, some people take different positions, but I'll allow it for rebuttal, provided he can make his -- he meets all the requirements to get the document in.  So let's start with that first.  And it's limited to rebutting the 7 -- the 750.  I don't think he's going to -- unless he tries to go outside of that, we're going to have a problem.  All right.  So we'll mark that as -- what are we marking this?  What are we marking this?

UNIDENTIFIED SPEAKER:  D49.

THE COURT:  D49, all right.  Now you're going to have to lay a foundation and everything else.  And if you don't, you don't --  if you do, you do.  Guys, it's 4:00.  Do you want to -- I don't mind going past 5, but I thought we were wrapping this up.  And to be perfectly honest, I think we wasted 45 minutes on the admissibility on the IP, particularly when we

had a certified copy.  But I'm going to leave that where it is.

All right, go ahead.

BY MR. ALEXANDER:

Q    Mr. Rajan, I've hand (sic) you a letter.  It's dated July 25th, 2023.  Do you recognize this document?

A    Yes.

Q    How do you recognize this document?

A    This is a statement of expenses.

Q    Is this document kept in the ordinary course of Stream's business?

A    Yes.

Q    Was this document received on or about July 25th, 2023?

A    Yes.

MR. ALEXANDER:  Your Honor, we'd like to move Debtor's Exhibit 49 into evidence.

THE COURT:  Mr. Caponi, do you want --

MR. CAPONI:  Your Honor, I object.

THE COURT:  Uh-huh.

MR. CAPONI:  This document was prepared in the course of litigation doesn't constitute a business record.  Mr. Rajan is not on this document.  Mr. Rajan has no idea as to who created the second page of the document, which would be facts -- figures being offered for the truth of the matter asserted. It makes it hearsay.

MR. ALEXANDER:  Your Honor, a business record, you

just need to demonstrate that you keep it in the ordinary

course of your business, which we've demonstrated.  Mr. Rajan

is the CEO and president of Stream, and they received this

document --

THE COURT:  Lay a better foundation.

MR. ALEXANDER:  -- in the ordinary course of

business.

THE COURT:  Just lay a better foundation for me to

determine whether this meets the business record exception,

okay?

BY MR. ALEXANDER:

Q    Are Stream and BSI currently parties to subscription

agreements?

A    Correct.

Q    Pursuant to that arrangement, does VSI provide Stream with

documentation regarding the expenses that it pays on behalf of

Stream?

A    Correct.

Q    Was this document provided in the context of that

relationship?

MR. CAPONI:  Objection, Your Honor.  These are all

leading questions.

THE COURT:  I know.  Counsel, don't testify.  Ask him

a question.  Why was it provided, who was provided to, did you

see these, I mean you guys want to waste your time -- I don't

know what to tell you. I'm very upset we already wasted 45 minutes on a certified document that could have just been offered. But I learned something today about IP and Internet, so it wasn't wasteful for the Court, but it was a waste of time. So can we just get to this? Ask him the right questions that can establish the business record, and if you can, I'll allow it -- if you can't, I won't.

BY MR. ALEXANDER:

Q    Mr. Rajan, why was this document provided to Stream?

A    For business records.

Q    In the context of the relationship between VSI and Stream, why was this document provided?

A    It was to show the expenses and the monies that were paid for VSI paid for Stream TV.

Q    Is that an ordinary act --

A    It's an ordinary course of business, yes.

Q    Let me finish --

A    They do it regularly.

Q    -- the question, Mr. Rajan.

THE COURT: Let him finish and ask him, you know, I don't want to do the questions myself, so just go ahead. Sometimes I get frustrated and just do it myself. I'm trying, and I have been very good about not doing this during the course of this hearing, so -- and I'll let you guys make your case, but I'm getting frustrated here. Go ahead.

BY MR. ALEXANDER:

Q    When the document was received by Stream, was it received in the ordinary course of Stream's business?

A    Yes.

Q    How was the document maintained -- or is this document maintained as part of Stream's records?

A    Yes, it is.

Q    And you are the CEO and president of Stream?

A    Correct.

MR. ALEXANDER:  Your Honor, we'd like to move Debtor's Exhibit 49 into evidence.

MR. CAPONI:  No objection.

THE COURT:  All right, admitted as a business record exception.

(Defendant's Exhibit D49 admitted into evidence)

THE COURT:  Go ahead.

BY MR. ALEXANDER:

Q    Mr. Rajan, there was discussion regarding the $750,000 on the monthly operating report, which is 255.  Can you describe to the Court how that 750,000 number came about?

A    Yeah.  We spent money on our engineers and employees to -- we're getting geared up to make TVs, so we're working on electronics and getting the bonding set up with our bonding partners to start producing the TVs --  the $160 million in orders we talked about.

Q    And with respect to the $750,000, what, if anything, did VSI receive Objection, leading.  In exchange?

A    VSI has got shares in Stream TV.

Q    And is that the 10,011 shares referenced in the letter?

MR. CAPONI:  Objection, leading.

THE WITNESS:  Yeah, yes.

THE COURT:  Sustained.  How many shares did he get?

BY MR. ALEXANDER:

Q    How many shares did VSI receive in exchange for the --

A    About 10,000.

Q    -- $750,000 --

A    About 10,000 -- about 10,000.

Q    In what period of time did the $750,000 cover for the expenses of Stream?

A    It was after we filed in the bankruptcy, so it was expenses over the summer.

Q    Do you know the dates of this?

A    From March to July.

Q    Has VSI been providing additional reporting to Stream after this letter was provided?

A    Yes.

Q    What other documents, if any, has VSI provided to Stream?

A    VSI has given additional financing after June 30th of this year.  It's getting geared up now for the production.  There's going to be heavy expenses in October, November.  VSI is giving

reporting on some content deals we have starting in November.

And then VSI is going doing documents right now and has given

documents to Stream TV for --

MR. CAPONI:  Objection, Your Honor.  This is all

testimony about what VSI's doing.  There's no foundation for

how he knows what VSI's doing.

THE WITNESS:  Stream TV received it.

MR. CAPONI:  He's not VSI.

THE COURT:  Response?

MR. ALEXANDER:  He's an officer of VSI, Your Honor.

MR. CAPONI:  He testified previous repeatedly has no

management control over VSI because they put into place an

independent board to remove him and his family from having

control over the company.

MR. ALEXANDER:  Decision-making.  He never testified

that he does not receive information.

MR. CAPONI:  If the Debtor's position is --

THE COURT:  I'm just trying to figure out what is the

relevance of this?

MR. CAPONI:  If the Debtor's position is that Mr.

Rajan is simultaneously -- is CEO of managing Stream and

simultaneously operating VSI, then I will withdraw my

objection.

MR. ALEXANDER:  He can keep his objection then even

though it doesn't have any merit, and it should get overruled,

but that's not what we're stating.  Just because he doesn't have control over decisions does not mean he's not apprised of what's happening.  He just can't comment or make any decisions with respect to it.  He's siloed off from the decision-making process.

MR. CAPONI:  If he's apprised, then he's speaking hearsay.  If he's -- then, if he's running VSI, and he's testifying on behalf of VSI, then maybe it's not hearsay.  But what he's been told by people here at VSI is hearsay.

THE COURT:  In his role as what?

MR. CAPONI:  I mean, Your Honor, what I'm saying is Mr. Rajan is the Debtor -- if Debtor's counsel's arguing and Mr. Rajan, when he's speaking from first-hand knowledge, VSI, meaning he is doing these things, he can testify about that, and he's also doing these things on behalf of Stream.  But you can't say, I'm involved with VSI -- others are doing things, and they told me this.  Well, that's hearsay.  VSI is not a party, and he's not on the stand testifying as VSI.

THE COURT:  So that's, I guess, Mr. Alexander, you have to clarify how he's testifying.  Is he saying as an owner I'm apprised of what's going on or is he saying that his -- I mean, I guess --

MR. ALEXANDER:  He's still an officer, Your Honor.

THE COURT:  Okay.  And as an officer, he has this information as an officer that he's being -- and he's speaking

in that capacity is what Mr. Caponi is saying, correct?

MR. CAPONI:  Yeah -- yes, Your Honor.  I mean, unless he was personally involved in it, he is not here as a corporate representative.  Unless he was personally involved in these events,  they're hearsay.  Even if he was informed as an officer --

THE COURT:  Uh-huh.

MR. CAPONI:  -- okay, it still -- it's a statement, right?  Statements by a party opponent are admissible.  Your own out-of-court statements are not admissible -- They're still hearsay.  So if someone at VSI told Mr. Rajan something, no matter what capacity he was told it, that is a hearsay statement when trying to be admitted by the Debtor/VSI.  It's hearsay.

THE COURT:  Don't --

MR. ALEXANDER:  We disagree with his characterization of what hearsay is.

THE COURT:  Well, I get it, but what's the basis?  He's saying is hearsay --

MR. ALEXANDER:  It's --

THE COURT:  -- it's an out-of-court statement made by VSI and you're offering it for the truth of the matter.

MR. CAPONI:  Correct.

THE COURT:  Response?

MR. ALEXANDER:  The response is that he's testifying

as to his present sense impression in terms of what's happening at VSI based on his role and capacity as a director of VSI.

THE COURT:  Present sense?

MR. ALEXANDER:  I mean, otherwise, you'd always have --

THE COURT:  Present sense.  Now I have to look up present sense.

MR. CAPONI:  And I would say it's not present sense because it's being relayed to him.  There's no presence about this sense.  He's trying to testify about out-of-court statements.

THE COURT:  Unless he's asking has he seen documents, has he seen things.  I mean, this is his own information and not a -- now, do we have to put the documents in.

MR. ALEXANDER:  What is the specific statement, though, that we're objecting to hear?

THE COURT:  Which is that someone from VSI told him what they were trying to plan for October and November.

MR. CAPONI:  Correct.

THE COURT:  And he's saying that that is a statement made by VSI out-of-court that can't be tested because no one from VSI is here.  And whether they told him that in his capacity as an officer or not, it is still something that you either have to lay the groundwork for or do something, lay a foundation, something.  And I'm not even sure what the

relevancy is, but somebody's going to tell me what the relevance is.  So response from Mr. Caponi -- that is a hearsay statement.  And tell me why it's not.

MR. ALEXANDER:  Your Honor, it's not a hearsay statement because Mr. Rajan receives corporate information in his capacity as an officer of VSI, and he can testify as to the information in business dealings with regards to VSI, regardless of whether or not he is permitted to act on those decisions or is involved in the actual decision-making process. I mean otherwise, you'd never be able to -- you'd have to get 100 people from a company to testify about his business dealings.

MR. CAPONI:  Your Honor, we would have a 30B6 witness who is a corporate designee that can testify --

MR. ALEXANDER:  But you don't --

MR. CAPONI:  -- on behalf of a company.

MR. ALEXANDER:  We don't need 30B6 witnesses at trial.

MR. CAPONI:  Mr. Rajan -- excuse me -- Mr. Rajan, regardless of how he received information, is an out-of-court statement.

THE COURT:  What's his understanding?  Don't tell me what anybody told you.  What's your understanding.  How come we just can't get to what's your understanding of what's going to happen next?  And don't tell me what anybody else told you.

Just tell me what your understanding is.  And again, I don't'

see the relevance, but if you want to waste our time on this go

ahead.  Ask him what's his understanding of what's next for

October and November, and don't tell me what anybody told him.

BY MR. ALEXANDER:

Q    Mr. Rajan,  what's your understanding of the next steps

that will be taken --

A    Okay.

Q    -- in October and November?

A    Stream TV's understanding, and Stream TV's received

reports on additional expenses that VSI paid for in July and

August, and now is paying in September -- is going to pay

additional expenses in --

         MR. CAPONI:  Objection, Your Honor.

         THE WITNESS:  -- October and November.

         MR. CAPONI:  I think we went down this road because

we were talking about the $750,000, and now we're talking about

expenses completely unrelated to the $750,000, to which I

didn't question Mr. Rajan.

         THE COURT:  Well, if I recall his testimony, was that

his testimony was that it was 750,000, and it was now up to 1.5

based on additional payments that were made in August and

September.

         MR. CAPONI:  Yeah, but I didn't question Mr. Rajan on

the nature of those payments what they made up, et cetera.

THE COURT:  But he did testify about it, did he not?

MR. CAPONI:  That's fine, Your Honor.

THE COURT:  I don't know what this is for, but I'll allow it for what it's worth.  Go ahead.

MR. ALEXANDER:  Okay.

BY MR. ALEXANDER:

Q    Did you receive in writing with regards to expenses for July --

A    Yes.

Q    -- and August?

A    Yes.  We did -- Stream TV did receive in writing for expenses -- expenses coming up because Stream TV has now begun the process of making TVs.  Stream TV also has content deals coming online in November, which VSI is financing, and Stream TV is working with VSI on now receiving financing for the reorganization plan to reorganize the debt.

MR. ALEXANDER:  Your Honor, may I approach?

THE COURT:  If this is about financing, I don't recall Mister --

MR. ALEXANDER:  It's about the July and August monies that Mr. Rajan just testified about.

MR. CAPONI:  I object to the document, Your Honor. We didn't receive the use until nearly 4 a.m. this morning. And the issue of lack of backup or explanation as to VSI payments of the Debtor.  We discussed this at length a month

ago in my cross-examination. We went through each of the monthly operating reports and discussed that there was no detailed backup. Mr. Rajan said they would be updated within days, and here we are at 4:00 the evening before, they want to now hand me this document and admit it into evidence. I object to it.

THE COURT: Okay.

MR. ALEXANDER: Your Honor, the document's dated September 23rd, 2023 so that's when the Debtor received it. And once we received it, we provided it to opposing counsel.

MR. CAPONI: Your Honor, Mr. Rajan -- this is a farce. You can't have Mr. Rajan say -- Mr. Alexander say the Debtor just received this from VSI like VSI is some unknown company. VSI is the same man as sitting in that chair who's Stream. And the testimony was by Mr. Rajan that every two weeks, someone from Stream sends a detailed report to VSI explaining what money needs to get paid and why. So the debtor didn't need to wait for VSI to send this letter back. The debtor could have produced and given to us, and examined Mr. Rajan on the correspondence Mr. Rajan just testified, the detail went from Stream to VSI. This is classic sandbagging.

MR. ALEXANDER: Your Honor, this document was created on September 23rd, and it relates to the shares that VSI receives in exchange for the money that they provide to Stream to pay its expenses. So VSI is the one that does that

accounting and requests the amount of shares based on the subscription agreements.

THE COURT:  Just ask him the questions without the documents.  He seems to know this stuff off the top of his head.

MR. CAPONI:  Surprising.  I agree, Your Honor.  I'm fine with that without going into the document.

THE COURT:  All right.  Just ask him.

BY MR. ALEXANDER:

Q   Mr. Rajan, do you know how much in expenses during July and August 2023 VSI paid on behalf of Stream?

THE COURT:  In what month?

MR. ALEXANDER:  July and August of 2023.

THE WITNESS:  It would've been over 200, about -- about, like, 150, another 200,000 or something like that.

BY MR. ALEXANDER:

Q   Do you know how many shares, if any, VSI would've issued to Stream?

A   It was probably, I'm going to guess, about 70 to 80,000 -- something like that.

Q   But sitting here today, you don't recall the exact numbers?

A   No, I don't recall the exact number, no.

THE COURT:  Never mind.

BY MR. ALEXANDER:

Q    Is there anything that would refresh your recollection?

A    There's reports that we have.

MR. ALEXANDER:  Your Honor, may I approach?

MR. CAPONI:  I object, Your Honor.  These reports, again, this is classic -- you can't -- this company, VSI and Debtor are the same thing.  For Mr. Alexander to suggest that they're different and to try to get in through the back door documents that should have been produced and information --

THE COURT:  Well, he's --

MR. CAPONI:  -- that should have been in the monthly operating reports and then to drop them on me as part of 3,000 documents at 4:00 in the morning is completely improper, and I will note again that Mr. Alexander objected to Mr. Colby using Rembrandt's witness, Rembrandt's own document, claiming he didn't have sufficient advance notice about it.

THE COURT:  Well the --

MR. CAPONI:  I had no notice of this --

THE COURT:  But the point of --

MR. ALEXANDER:  It wasn't a rebuttal.

MR. CAPONI:  -- it's not even my document.

THE COURT:  But the point of the matter is with respect to Mr. Colby, he'd had those documents for quite some time and did not identify or share them.  If he wants to use them to refresh his recollection because he's guessing how many -- that's it.  He's not admitting the document.  All he will do

-- because he's already testified he believes it's this amount. He believes it's 70 to 80,000 shares, but he's unclear.  So his testimony is already there.  He can use it, and handed out, look at it, does it refresh his recollection.  Again, I don't know what this for, what we're approaching 4:30.  He shows it to him, refresh his recollection, I don't know what you guys think I'm going to do with this, but --

MR. ALEXANDER:  Your Honor, it's relating to the Debtor operating in the bankruptcy in terms of how it's -- its relationship with VSI and how the expenses are being paid.

THE COURT:  Well, to the extent he said, I don't recall, and maybe I'm missing it, did Mr. Caponi ask anything about -- did you ask him about the subscriptions and how much, and all of that -- did you?

MR. CAPONI:  No.  I did not, Your Honor.

MR. ALEXANDER:  I disagree with that.  There was an inquiry regarding whether subscription agreements were entered into between Stream and VSI and when they were entered into.

MR. CAPONI:  I did not ask him any details about the subscription agreements.  I simply asked if the subscription -- I had Mr. Rajan confirm that the subscription agreements had not been produced.  But so having never seen a subscription agreement, I wouldn't even know what questions to ask about it. I don't even know if it's one page or 10 page or what it possibly would say.

THE COURT:  Well --

MR. CAPONI:  I just had him confirmed it's never been produced.

THE COURT:  Okay, but --

MR. ALEXANDER:  And there was no requirement to produce them, and we didn't admit them into evidence.

THE COURT:  All right, all right, all right.

MR. ALEXANDER:  I would like to take the document back because he's already -- I believe he's reviewed it.

THE COURT:  I'll allow it for what it's worth but keep this to direct.  Now I've got to go back and look through all my notes to see what he asked him about.  But once you ask him about the subscriptions, you open the door to ask other stuff.  That's the problem.  And you guys want -- I don't know what you -- I don't know.  And I'll be perfectly honest with you.  I'm getting at my capacity for the day, and I don't want to have a repeat of what we had on Friday.

MR. ALEXANDER:  Your Honor, I don't --

THE COURT:  I'm just telling --

MR. ALEXANDER:  -- more in terms of questions.

THE COURT:  -- you guys where I am.  You know, my patience starts to wane at a certain point a little more than usual.  So I'm just pointing out you guys wanted to close today -- end today.  We may have to go late, but you may not, you know, you're going to have one hangry judge because I haven't

Case 23-10763-djb   Doc 427   Filed 09/27/23   Entered 09/27/23 15:14:51   Desc Main
Document     Page 187 of 203

eaten today.  So if you're going to go --

MR. ALEXANDER:  Your Honor, I'll be wrapping up shortly.

THE COURT:  Wait a minute.  I'm not telling you have to.  I'm going to give everybody a chance to finish this up today.  But I will tell you if we're going to go, I have to stop and eat because I'm going to be hangry, and I'm not nice when I'm hangry, and you guys already seen that.  Okay?  So go ahead, take what time you need, but --

MR. CAPONI:  Your Honor, on that point, you know, I would suggest is if Mr. Alexander thinks he's going to be a little while, let's just take the break and get Your Honor and us some food and then reconvene.  I think that's better than pushing the limits, having been there on Friday.

THE COURT:  You don't -- you guys have already seen what the limits will get you.

MR. CAPONI:  I've seen, and I don't want to get anywhere near the limit, so if you were going to be a while, let's take a break.

THE COURT:  How long do you think you're going to be?

MR. ALEXANDER:  I think I can wrap up the questioning in 30 minutes, Your Honor.

THE COURT:  All right.

MR. CAPONI:  All right.

THE COURT:  All right.  That's 5:00.  I think I can

*TheRecordXchange*
www.trxchange.com · (800) 406-1290

last a little longer, but I'm warning y'all, I'm waning down.

Go ahead.

BY MR. ALEXANDER:

Q    Mr. Rajan, does that refresh your recollection as to how much in expenses VSI paid on behalf of Stream?

A    Yeah.

Q    How much did VSI pay on behalf of Stream --

A    300 and --

Q    -- in the months of July --

THE COURT:  Let him finish the question.

BY MR. ALEXANDER:

Q    -- and August of 2023?

A    382,000.

Q    How many --

THE COURT:  Is that total or --

THE WITNESS:  Additional in July and August.

THE COURT:  To combine?

THE WITNESS:  Yeah.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q    Do you recall how many shares VSI received in exchange for those monies?

A    Oh, about 5,000 shares.

Q    Does Stream currently have any full-time, W-2 employees?

A    Not W-2 yet -- not yet.

Q    There was a discussion with Mr. Caponi regarding a April 14th, 2023 licensing agreement between Stream and Rembrandt. Prior to entering into that August licensing agreement, was the license between Stream and Rembrandt assignable?

THE COURT:  Wait a minute, wait a minute.  I thought we said April?

THE WITNESS:  August.

THE COURT:  No, no, I'm asking Mr. --

MR. ALEXANDER:  We can pull it up.  It's CR222.

THE COURT:  Yeah, how about we do that because I'm writing the wrong stuff.  CR -- which one?

MR. ALEXANDER:  222.

THE COURT:  Is in binder?

MR. ALEXANDER:  It's in Matthu Rajan Witness Exhibit Binder 2.

THE COURT:  All right.  CR -- what counsel?

MR. ALEXANDER:  222.

THE COURT:  222.  What binder?

MR. ALEXANDER:  It's Binder 2.

THE COURT:  Oh, okay.  Okay.  Are you there?

THE WITNESS:  Yeah, I'm there.

THE COURT:  All right.  Go ahead.

MR. ALEXANDER:  You need me to repeat the question, Your Honor?

THE COURT:  Yes.

BY MR. ALEXANDER:

Q    Prior to entry into this licensing covenant that's dated August 14th, 2023, what is your understanding as to whether the Rembrandt Stream License was assignable?

A    All -- all licenses, Rembrandt Licenses and all licenses in Stream have change of control blocks on it and they're not assignable.

Q    After entry into this licensing covenant dated August 14th, 2023, what is your understanding as to whether or not the Stream Rembrandt License was assignable?

A    If there -- you can't assign it.  If there's change of control, like, an 11 trustee or Chapter 7, the technology can't use it.

Q    There was some questions regarding your signature on this document.  And I believe your testimony was, it was an electronic signature?

A    Correct.

Q    Can you explain what you mean by that?

A    We have, like, a JPEG file where you can put my signature on the document.  It's kept in the office in ordinary course of business, and it's only used in my permission.

Q    On this document, was it used with your permission?

A    Yeah.

MR. ALEXANDER:  Just going over my notes here, Your Honor.

THE COURT:  That's fine.  As I said, I'm not rushing anybody.  I'm just telling you the parameters if we have to go late, what those parameters are.  That's it.

MR. ALEXANDER:  No intention to go late.

THE COURT:  Okay.

BY MR. ALEXANDER:

Q    Mr. Rajan, I'd like you to take a look at Creditors Exhibit 229.  Specifically the time sheet starting on, it'll say page one of two at the top.

A    Yeah.

Q    Do you know if this was a binding or nonbinding term sheet?

THE COURT:  Wait a minute.  Where are we at?

MR. ALEXANDER:  We are on Creditors Exhibit 229.  Page --

THE COURT:  Oh, on the page one and two.

MR. ALEXANDER:  Page one of two.  It'll say Doc 258-1 at the top.

THE COURT:  Okay.

THE WITNESS:  It's -- it's nonbinding.

BY MR. ALEXANDER:

Q    Currently, is this term sheet necessary for the debtor to implement the Chapter 11 plan and disclosure statement that are currently on file?

A    No.  Stream TV is receiving financing from VSI.  And VSI

has deals with investors and is supplying cash to get all the unsecured and liabilities paid off.

Q   In terms of, what I'll call the current debt, you know, of Stream, with respect to moneys that came into Stream.  Well, let me ask a different question.  We talked about Rembrandt's -- during your cross, Rembrandt's claim, you know, that was filed, you know, in this --

A   Correct.

Q   -- bankruptcy case.  Other than Rembrandt, you know, what other claims exist?

A   We have unsecured debt.  We're offering $0.50 on the dollar. That works out to be 8 million dollars approximately --

MR. CAPONI:  Objection, Your Honor.  I did not question Mr. Rajan at all about the -- what was being paid out under the plan or who was receiving money under the plan.

MR. ALEXANDER:  Your Honor --

MR. CAPONI:  That's outside the scope of direct -- or my cross, excuse me.

MR. ALEXANDER:  Your Honor, they asked Mr. Rajan about the plan that was filed.  So this is a question that relates directly to the plan.

THE COURT:  You're asking questions about --

MR. CAPONI:  My only question with the plan, Your Honor, was who would control Stream if the plan was implanted, and he said VSI.  I didn't get into any of the mechanics of the

plan or who was getting paid what or how it was being financed or anything along those lines.  My question related to the licensing agreement, which the licensing agreement covenant, the question, just to refresh the Court's recollection, has a provision that if any one of these people get the assets, they don't get a license.  So I was confirming Mr. Rajan that VSI is one of the people excluded from that.  So I didn't get into the mechanics of the plan.

THE COURT:  I didn't --

MR. ALEXANDER:  I don't believe that accurately describes the testimony, but --

MR. CAPONI:  It does.

THE COURT:  My notes -- I don't recall any questions of -- well --

MR. ALEXANDER:  Your Honor, if you believe it's outside the scope, I'll ask a different question.

THE COURT:  I'll sustain the objection, because I don't recall any details about the plan, other --

MR. ALEXANDER:  Okay.

THE COURT:  -- than the plan was filed.  I do recall that the approval of the licensing agreement, Document 222, was part of the plan.  He did testify regarding that.  That was it.  So sustained.

MR. CAPONI:  Thank you, Your Honor.

THE COURT:  All right.

BY MR. ALEXANDER:

Q    Speaking of that licensing amendment, Mr. Rajan, what is your understanding as to why that was entered into?

A    The licensing amendment was entered into as part of the reorganization plan.  And we have a settlement with Rembrandt worked out as part of the reorganization plan.  They'll be paid out along with the unsecured creditors.

Q    And there was discussion about whether or not the debtors have already sought and received a final order approving that. Do the debtors -- are the debtors seeking approval of that through their plan?

A    Yes, we -- we're hoping for approval on our plan, which would include the Rembrandt settlement, as well as paying out the unsecured creditors and any allowable claims from some of the other folks.

        MR. ALEXANDER:  Your Honor, may I just confer with me co-counsel for a minute?

        THE COURT:  Yes.

    (Counsel confer)

BY MR. ALEXANDER:

Q    Mr. Rajan, we talked about Jan Jang(phonetic) and I believe you testified that that's not a component with regards to the plan itself.  You know, how does the debtor intend to fund the plan?

A    The -- Stream TV has already signed paperwork with VSI and

VSI's been supplying cash to Steam TV since the bankruptcy was filed and right now, we have purchase order financing from both BOE and one of VSI's investors for all the PO's.  Then for the liabilities, Stream TV already has a dela with VSI and VSI has done deals with investors and is doing additional deals right now to pay off the unsecured creditors and Rembrandt and then any of the allowable claims, whatever's left of the allowable claims to cleanup the balance sheet on Steam TV.

Q    Is there any particular mechanism for that?

A    VSI is giving -- I'm sorry, Steam TV is giving VSI shares. And then we have to get court permission to pay off the liabilities and get out disclaimer statement approved so we can start paying the unsecured people.

MR. ALEXANDER:  Your Honor, I have no further questions for Mr. Rajan.

THE COURT:  Okay.

Recross?

MR. CAPONI:  We're good, Your Honor.

THE COURT:  Oh, good.  All right.  Does --

MR. CAPONI:  I'm not going to press my luck.

THE COURT:  Oh, I'm not going to yell today.  I'm just -- I'm a little nauseated, but I'm good.  I haven't reached my breaking point.

Anything further than the parties want to submit in support of the -- I think your opposition, Mr. Alexander, we

admitted everything as we went along, correct?

MR. ALEXANDER:  Correct.

THE COURT:  And Mr. Caponi, this was actually -- we did it a little out of order.  But this was part of your case in chief.  Do you have anything else that you are submitting, you meaning the moving parties, in connection with their case in chief?

MR. CAPONI:  No, Your Honor.

THE COURT:  Okay.  So you rest?

MR. CAPONI:  We rest.

THE COURT:  And --

MR. CAPONI:  But the only thing we need to do, Your Honor, is we've -- on several occasions, we have sent the debtor the list of what we deem to -- we understand to be the admitting exhibits, so we can give that to the Court.  We haven't heard back yet.  But once that's given, then, you know, I don't anticipate any problems.  But the --

THE COURT:  You mean, what was --

MR. CAPONI:  -- we rest other than that.

THE COURT:  -- admitted?

MR. CAPONI:  What was admitted, yes.

THE COURT:  You can get that from -- we don't need it.  You can just ask John.

MR. CAPONI:  Okay.

THE COURT:  John has a list.

Right, John?

MR. CAPONI:  All right.  That's --

UNIDENTIFIED SPEAKER:  I have a list. I'm not sure --

MR. CAPONI:  Well --

UNIDENTIFIED SPEAKER:  -- admitted today.

THE COURT:  Admitted today was, let me see what was admitted.  Maybe we can -- well, why don't you guys --

MR. ALEXANDER:  Would it be possible for us to provide the Court with what we believe --

THE COURT:  I was --

MR. ALEXANDER:  -- is the list.  And then --

THE COURT:  -- just getting ready to say that.

MR. ALEXANDER:  -- Your Honor can determine.

THE COURT:  You can submit a list.  You don't even have to do it together.

MR. CAPONI:  Okay.

THE COURT:  Just each submit a list what you believe.  We'll go look at all documents and then presumably --

MR. CAPONI:  That's fine.

THE COURT:  -- we'll be able to do that, because you guys have until next -- when are we submitting these --

MR. CAPONI:  Friday.

THE COURT:  -- Friday for these briefs.

MR. CAPONI:  Oh, sorry.  A week from today.

THE COURT:  Today for the briefs.

MR. CAPONI:  A week from today.

THE COURT:  And then Friday --

MR. CAPONI:  Friday.

THE COURT:  -- for, unless you want until Friday and Friday?

MR. CAPONI:  No, no.  Monday, Friday.  And with that, we rest, Your Honor.

THE COURT:  Okay.  So Monday we start it off with the hearing, setting the deadlines.  The briefs are due -- simultaneous briefs, post-trial briefs are due -- where am I at?  I started off on September 25th when it was the 22nd.  So that ought to tell me where I'm at.

MR. ALEXANDER:  Today's the 25th, I believe.

THE COURT:  It is the 25th?  Then why did I go back to the --

MR. ALEXANDER:  I think Friday was the 22nd.

MR. CAPONI:  22nd.

THE COURT:  Well, I went back to September 22nd.  Okay.  Hold on.  September --

MR. CAPONI:  You're just making me think I had to redo my flight.

THE COURT:  I just have my own dates in here.  Rembrandt.  Wait a minute.  Section --

MR. ALEXANDER:  Well, Rembrandt was on the 22nd, Your Honor.

THE COURT:  I know.  We give it two -- all right.  Then I -- I have a date that started --

MR. ALEXANDER:  Your Honor, may Mr. Rajan be excused?

THE COURT:  Yes, you may step down.  No -- everybody's finished with this witness, correct?

MR. CAPONI:  Yes, Your Honor.

THE COURT:  You may step down.

Hold on.  September -- oh, Lord.  Hold on.

MR. CAPONI:  Are you looking for the briefing dates, Your Honor?

THE COURT:  I'm looking for my dates that started out today as September 25th.  And then I changed them to the 22nd.

Oh, okay.  Today was September --

MR. ALEXANDER:  So it's October 2nd and October 6th, would be the two dates.

THE COURT:  Yes, October 2nd deadline for post-trial brief.  October 6th for replies.  You said --

MR. ALEXANDER:  Your Honor, I'd just like the record to reflect that Mr. Caponi and I just agreed on those two dates.

THE COURT:  Oh, my God.

MR. ALEXANDER:  That's that what was set.  It took a while.

MR. CAPONI:  Right.  Took three months.

THE COURT:  Today is the 20 --

MR. ALEXANDER:  5th.

THE COURT:  Yeah, I started off on the 26th.  And then -- so I did not make today, I have the 25th all for today.  My first date was the 26th and then I corrected it.  I did not have the 22nd.  So when I started on my first date, we have C & D. Mr. Alexander, you needed to get a date on the C & D matters.

MR. ALEXANDER:  Yes, and we'll send an email to your --

THE COURT:  Yeah, send one to Ms. Godfrey.  We'll work something out for a deadline, for a hearing.  And then, October 2nd deadline for post-trial.  October 6 is replies. You're saying response, but I call them replies.

MR. CAPONI:  We'll do it -- we'll title --

THE COURT:  And then --

MR. CAPONI:  -- it however Your Honor --

THE COURT:  All right.

MR. CAPONI:  -- titles it.

THE COURT:  Just reply, because you're only replying -- and let me just be clear.  Reply is only to matters that were not originally addressed in the post-trial briefs that you believe that your opponent said, and you want a reply to that. Not --

MR. CAPONI:  Only responding to the prior filings.

THE COURT:  Right.  You're only responding to that portion.  You're not rearguing your or re whatever your

position.  It's just only in reply, response, whatever words you want to use, to the opposing party's specific representations that you want to address.

MR. CAPONI:  Correct.

THE COURT:  Okay.  Now, you want to also submit a list of what you believe are the -- all the documents that were admitted.  Monday -- oh, wait.  Today is Monday.  Wednesday?

MR. ALEXANDER:  Yeah --

MR. CAPONI:  Wednesday's fine.

MR. ALEXANDER:  -- we're going to have a call tomorrow to go over --

THE COURT:  Wednesday or late tomorrow, no later than Wednesday, because you're cutting into getting these post-trial briefs to me on the 2nd.

MR. CAPONI:  Understood.

THE COURT:  I mean, you can start writing.  But if you guys want to argue, you're going to argue about whether something was or was not, call Ms. Godfrey and I'll deal with it immediately.

MR. CAPONI:  Okay.

THE COURT:  So that we're not putting off the briefs.

Okay.  Anything further that anybody thinks I need to hear?

MR. CAPONI:  No, Your Honor.

THE COURT:  All right.

Thank you, counsel.  And I look forward to receiving your briefs.

MR. CAPONI:  Thank you, Your Honor.

THE COURT:  All right.  Court is in recess.  I mean, court is adjourned, rather, until tomorrow at 10:30.

(Proceedings adjourned)

C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*John Buckley*
_____
John Buckley, CET-623
Digital Court Proofreader

*TheRecordXchange*
www.trxchange.com · (800) 406-1290