**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: | Chapter 11 |
| STREAM TV NETWORKS, INC.,[1] | CASE NO.: 23-10763 MDC |
| Debtor, | |
| and | Chapter 11 |
| IN RE: | CASE NO.: 23-10764 MDC |
| TECHNOVATIVE MEDIA, INC., | (Joint Administration Pending) |
| Debtor. | |

**HAWK INVESTMENT HOLDINGS LTD.'S POST-HEARING**
**BRIEF IN SUPPORT OF (1) MOTION FOR RELIEF FROM STAY AND**
**(2) MOTION TO DISMISS, CONVERT, OR APPOINT A CHAPTER 11 TRUSTEE**

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

**TABLE OF CONTENTS**

**Page**

STATEMENT OF FACTS ............................................................................................ 2

    A.    Stream Defaulted On Its Secured Debt to Hawk and SLS .................................. 2

    B.    Stream Enters Into the Omnibus Agreement ..................................................... 4

    C.    The Prior Bankruptcy Actions ............................................................................ 5

    D.    The Summary Judgment Order and Delaware Supreme Court Opinion ............. 7

    E.    Hawk Exercises Its Secured Creditor Rights ..................................................... 8

    F.    The 225 Action ................................................................................................... 9

    G.    Stream Files for Bankruptcy to Avoid a Ruling in the 225 Action ..................... 12

    H.    SCBV Contains Stream's Meaningful Assets .................................................... 13

    I.    The Debtors' Operations as Debtors-in-Possession ......................................... 14

        1.    The Evidentiary Record ............................................................... 15

            (i)    The Debtors Have No Expenses ..................................... 15

            (ii)    The Debtors Have No Revenue ...................................... 18

            (iii)    The Debtors Have No Financing Sources ..................... 19

        2.    Mr. Rajan's Alternate Reality ...................................................... 20

            (i)    The Debtors Alleged Substantial Operating ................. 20

            (ii)    The Debtors Have Financing ......................................... 22

            (iii)    Mr. Rajan's Alternative Reality Is Not Supported by Evidence ......................................................................... 23

    J.    Stream Has Repeatedly Ignored Obligations to this Court and its Creditors ...... 24

    K.    Stream Has Repeatedly Engaged in Bad Faith Litigation Tactics and Gamesmanship ................................................................................................. 27

    L.    Zhongsheng Term Sheet .................................................................................. 29

        1.    Hawk Investigates The Zhongsheng Term Sheet ....................... 29

        2.    All Evidence Suggests the Zhongsheng Term Sheet is Fraudulent ......... 32

    M.    Mr. Rajan Is a Faithless Fiduciary to the Debtors—All Roads Lead to VSI ....... 34

REQUESTED REMEDIES ........................................................................................ 40

    A.    Options and Decision Tree ............................................................................... 40

    B.    Hawk's Requested Remedy .............................................................................. 41

ARGUMENT ............................................................................................................. 42

# TABLE OF CONTENTS

**Page**

A.    The Court Should Order Conversion of these Chapter 11 Cases to Chapter 7 ................................................................................................................ 42

    1.    Statutory "Cause" .......................................................................... 43

        (i)    Evidence Establishes Conversion Is Justified – Substantial Losses with No Ability to Rehabilitate ...................................... 44

            (a)    The Debtors Are Incurring Substantial Losses ................................................................. 45

            (b)    The Debtors Have No Operations to Rehabilitate and Have Demonstrated No Intention to Do So ............................................... 46

        (ii)    Evidence Establishes Conversion Is Justified – Gross Mismanagement ......................................................... 47

            (a)    Mr. Rajan Has Breached His Fiduciary Duties ................................................................. 48

            (b)    The Debtors have Ignored Their Disclosure Obligations ........................................................ 51

            (c)    The Debtors have Engaged in Gamesmanship ................................................................ 54

            (d)    The Debtors Have Fraudulently Fabricated Documents ........................................................... 56

    2.    Judicially-Created "Cause" – Bad Faith ................................. 57

        (i)    Evidence Establishes Conversion Is Justified – Bad Faith Litigation Tactic ..................................................... 58

    3.    The Court Should Convert Rather than Dismiss the Chapter 11 Cases ...................................................................................... 61

B.    Relief from Stay to Conclude the 225 Action is Warranted ................................ 62

C.    If the Court Declines to Convert the Chapter 11 Cases, the Court Should Dismiss the Chapter 11 Cases with Prejudice ...................................... 64

D.    If the Court Declines to Convert or Dismiss the Chapter 11 Cases, It Should Appoint a Chapter 11 Trustee ................................................. 64

    1.    Fraud, Dishonesty, or Incompetence ....................................... 64

    2.    Gross Mismanagement .............................................................. 65

    3.    Conflicts of Interest and Creditor Confidence ........................ 67

    4.    Best Interest of the Creditors .................................................... 68

CONCLUSION ................................................................................................... 69

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 1121 Pier Village LLC*,
635 B.R. 127 (Bankr. E.D. Pa. 2022) ....................................................................43

*15375 Mem'l Corp. v. BEPCO, L.P.*,
589 F.3d 605 (3d Cir. 2009)...........................................................................42, 44

*In re Ancona*,
No. 14-10532, 2016 WL 7868696 (Bankr. S.D.N.Y. Nov. 30, 2016) ....................64

*Domiano v. Domiano*,
442 B.R. 97 ...............................................................................................48, 51

*In re Embrace Sys. Corp.*,
178 B.R. 112 (Bankr. W.D. Mich. 1995)................................................................67

*Hawk Inv. Holdings Ltd. v. Stream TV Networks, Inc.*,
No. 2022-0930-JTL, 2022 WL 17258460 (Del. Ch. Nov. 29, 2022), ........................... *passim*

*In re 3 Ram, Inc.*,
343 B.R. 113 (Bankr. E.D. Pa. 2006) ....................................................................45

*In re Ramreddy,. Inc.*,
440 B.R. 103 (Bankr. E.D. Pa. 2009) ....................................................................47

*In re Sharon Steel Corp.*,
871 F.2d 1217 (1989)............................................................................................66

*In re Marvel Entertainment Grp., Inc.*,
140 F.3d 463 (3d Cir. 1998)............................................................................64, 67

*Nestor v. Gateway Access Solutions, Inc.*,
374 B.R. 556 (Bankr. M.D. Pa. 2007) ....................................................................43

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.*,
384 F.3d 108 (3d Cir. 2004)...................................................................................57

*Santa Fe Minerals, Inc. v. BEPCO, L.P.*,
386 B.R. 548 (Bankr. D. Del. 2008), rev'd on other grounds, 400 B.R. 420 (D.
Del. 2009) .............................................................................................................44

*In re Stream TV Networks, Inc.*,
Case No. 21-10433-KBO (Bankr. D. Del. Feb. 24, 2021).........................................6

*In re Stream TV Networks, Inc.*,
No. 21-10848-KBO (Bankr. D. Del. May 23, 2021) ...............................................................7

*In re Stream TV Networks, Inc. Omnibus Agreement Litig.*,
283 A.3d 1183 (Del. Ch. 2022)...........................................................................................10

*In re Stream TV Networks, Inc., Omnibus Agreement Litig.*,
C.A. No. 2020-0766-JTL (Del. Ch. 2020) ..................................................... *passim*

*In re Stream TV Networks, Inc. Omnibus Agreement Litig.*,
No. 2020-0766-JTL, 2022 WL 4491925 (Del. Ch. Sept. 28, 2022) .........................................9

*Stream TV Networks, Inc. v. SeeCubic, Inc.*,
250 A.3d 1016 (Del. Ch. 2020)............................................................................... *passim*

*Stream TV Networks, Inc. v. SeeCubic, Inc.*,
279 A.3d 323 (Del. 2022) .................................................................................... *passim*

*In re Vascular Access Ctrs., L.P.*,
611 B.R. 742 (Bankr. E.D. Pa. 2020) ...................................................................................59

## Statutes

8 Del. C. § 225 ........................................................................................................ *passim*

8 Del. C. § 272 ...............................................................................................................8

11 U.S.C. § 362..............................................................................................................62

11 U.S.C. § 1104 ................................................................................................... *passim*

11 U.S.C. § 1112(b)(4) ...........................................................................................42, 43, 44

Hawk Investment Holdings, Ltd. ("Hawk"), as Collateral Agent[2] for the secured noteholders of SeeCubic, Inc. ("SeeCubic"), a secured creditor of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative" and, together with Stream, the "Debtors") in the above-captioned chapter 11 cases (together, the "Chapter 11 Cases"), by and through its undersigned counsel, K&L Gates LLP, respectfully files this brief (the "Brief") in support of the (I) *Hawk Investment Holdings Inc.'s Emergency Motion for Relief from the Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code* [Docket No. 16] (the "Stay Relief Motion") and (II) *Motion of Hawk Investment Holdings Ltd. (I) Pursuant to Section 1112(b) of the Bankruptcy Code Either (A) (1) to Dismiss the Debtors' Chapter 11 Cases or (2) to Convert such Cases to Cases under Chapter 7 or, (B) in the Alternative, Pursuant to Section 1104(a) of the Bankruptcy Code to Appoint a Chapter 11 Trustee and (II) to Request Expedited Consideration Pursuant to Local Rule 5070-1(g)* [Docket No. 83] (the "Conversion Motion" and with the Stay Relief Motion, the "Hawk Motions").[3]

The Court held hearings on the Hawk Motions over the course of several months, commencing with a four-day hearing on June 26 through 29 (the "June Hearings"), which was continued to August 15 and 17 (the "August Hearings"), which was again continued to September 22 and 25 (the "September Hearings," and together with the June Hearings and August Hearings, the "Hearings"). Throughout the Hearings, Hawk introduced evidence and elicited testimony

---

[2] In connection with the Omnibus Agreement (defined below), Hawk and SLS entered into a series of transactions wherein (1) Hawk and SLS assigned certain of their rights as secured creditors of Stream to SeeCubic, (2) SeeCubic issued notes to Hawk and SLS that were secured by all of SeeCubic's assets, and (3) SeeCubic entered into a collateral agreement that allowed Hawk to act as the "Collateral Agent" to levy on SeeCubic's assets and enforce its contract rights, including the rights SeeCubic received via assignment from Hawk and SLS. The Delaware Supreme Court decision invalidating the Omnibus Agreement constituted an event of default under the relevant agreements by and among Hawk, SLS, and SeeCubic that permits Hawk to act as Collateral Agent for the secured noteholders of SeeCubic. *See Hawk Inv. Holdings Ltd. v. Stream TV Networks, Inc.*, No. 2022-0930-JTL, 2022 WL 17258460, at *4 (Del. Ch. Nov. 29, 2022), *reargument denied*, No. 2022-0930-JTL, 2022 WL 17661578 (Del. Ch. Dec. 14, 2022).

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Hawk Motions.

sufficient to justify the granting the remedies requested in the Hawk Motions. Hawk files this Brief in order to outline Hawk's suggested remedy and provide citations to the record supporting request.

## STATEMENT OF FACTS

The following facts have been conclusively established by the evidence[4] adduced during the Hearings:

### A.    Stream Defaulted On Its Secured Debt to Hawk and SLS

Stream was formed as a company to research and develop technology allowing users to watch visual media in 3D without the need for special glasses.[5] Stream created Technovative, a wholly-owned subsidiary, as a holding company which directly and indirectly owns the operating subsidiaries.[6] Stream always was and still is a non-operating entity, whose value comes almost entirely from the equity it owns in Technovative.[7] Technovative in turn directly or indirectly holds various subsidiaries including SeeCubic B.V. ("SCBV") an operating subsidiary located in the Netherlands.[8] SCBV and Stream's other indirect subsidiaries (collectively the "Operating Subsidiaries") own the entirety of the intellectual property forming the backbone of the value in the Debtors' business operations.[9]

---

[4] Several of the exhibits introduced during the Hearings are also included as pleadings listed on the docket. For the convenience of the Court, this Brief will refer to any evidence included on the Court's docket by its electronic filing number—"ECF No. __"—and any evidence not so available by reference to its Exhibit Number—"CR-__" or "Debtor-__."

[5] See Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Chapter 11 Petition, Supporting Emergency Relief, and First Day Motions [ECF No. 48], ¶ 6 [hereinafter, the "First Day Declaration"].

[6] See id. at ¶ 22.iv; see also Corporate Organization Chart [Debtor-5].

[7] Corporate Organization Chart [Debtor-5].

[8] See First Day Declaration [ECF No. 48], at ¶ 22.viii.

[9] See August 17, 2023, Hearing Transcript [ECF No. 370] (Rajan), at 163:22–164:7 [hereinafter, the "August 17 Transcript"]; see also Patent Portfolio [Debtor-1] (reflecting on the top of each page under "Client" that all intellectual property is owned by the Debtors' subsidiaries rather than the Debtors and their estates).

Mathu Rajan currently controls—and, save for an extremely brief period described below, has always controlled—Stream via equity he directly and indirectly controls. He is also the CEO of Stream and Technovative.[10]

From 2012 to 2020, SLS Holdings VI, LLC ("SLS" and, together with Hawk, the "Secured Creditors") and Hawk separately executed a series of promissory notes with Stream. SLS is the senior secured creditor of Stream.[11] Between August 8, 2011 and May 29, 2012, SLS loaned approximately $6,000,000 to Stream pursuant to five promissory notes (the "SLS Notes").[12] Hawk is the junior secured creditor of Stream.[13] Between 2014 and 2020, Hawk loaned more than £50 million and $1.33 million to Stream via 18 promissory notes (the "Hawk Notes").[14] In connection with the Hawk Notes and the SLS Notes, Stream granted the Secured Creditors' security interests in the "Collateral," which is defined to encompass essentially all of Stream's assets—including its equity interests in Technovative.[15] Neither the Hawk Notes nor the SLS Notes have been satisfied, and both sets of Notes remain outstanding.[16] By no later than February 2020, Stream defaulted on its payment obligations under the Hawk Notes and SLS Notes.[17]

---

[10] *See* April 14, 2023, Hearing Transcript [ECF No. 123] (Debtors' counsel), at 7:18–19 [hereinafter, "April 14 Transcript"]; First Day Declaration [ECF No. 48], at ¶22(i) ("Akshaya Holding, LLC ("Akshaya") and Mathu Rajan together own approximately 19.27 million shares of the Debtor Class B Voting Stock (or 71.5%) and 7.5 million shares of the Class A Common Stock of the Debtor (or approximately 8.8%), providing for an overall 56.4% voting control of the Debtor. Mathu Rajan is a 40% owner of Akshaya but has 100% voting control.").

[11] *See* First Day Declaration [ECF No. 48], at ¶ 25.

[12] *See id.*

[13] *See id.* at ¶ 26.

[14] *See id.*

[15] *See id.* at ¶¶ 25–26; *see also* June 28, 2023, Hearing Transcript [ECF No. 378] (Stastney), at 36:17–37:15 [hereinafter, the "June 28 Transcript"].

[16] *See Hawk Inv. Holdings Ltd. v. Stream TV Networks, Inc.*, No. 2022-0930-JTL, 2022 WL 17258460, at **14–15 (Del. Ch. Nov. 29, 2022) [hereinafter, the "Collateral Estoppel Opinion"].

[17] *See* Delaware Supreme Court Opinion, 279 A.3d 323, 327 (Del. 2022) [hereinafter, the "Delaware Supreme Court Opinion"].

As a result of prior litigation between the parties concerning the defaults, the Delaware Court of Chancery found certain facts have been conclusively determined and were upheld by the Delaware Supreme Court; therefore, those facts are entitled to collateral estoppel effect.[18] Specifically, Stream is collaterally estopped from challenging the fact that: (i) the Notes are valid and binding obligations of Stream; (ii) Stream is in default under the Notes; (iii) Hawk may exercise certain rights as a secured creditor; (iv) as of November 10, 2021 the Notes had not been converted or satisfied; and (v) any conversion of the Notes must be supported by "new money" and must occur after November 10, 2021.[19] The Delaware Court of Chancery also determined that Stream is collaterally estopped from arguing that its defaults under the SLS and Hawk Notes were "manufactured" by the Secured Creditors as part of a conspiracy.[20]

## B.   Stream Enters Into the Omnibus Agreement

After Stream defaulted on the Hawk Notes and SLS Notes, the Rajans appointed four independent, outside directors to Stream's Board in an effort to avoid a foreclosure.[21] Eventually, the Secured Creditors decided to pursue a "friendly foreclosure" on the Collateral.[22] To consummate this transaction, in May 2020, Stream, the Secured Creditors, and fifty-two of its stockholders entered into the Omnibus Agreement.[23] Through the Omnibus Agreement, Stream would transfer all of its assets to a newly formed entity, SeeCubic, controlled by the Secured Creditors.[24] In exchange, and upon the satisfaction of certain conditions, the Secured Creditors

---

[18] *See* Collateral Estoppel Opinion, 2022 WL 17258460, at **14–16.

[19] *See id.* at **14–15.

[20] *Id.* at *17.

[21] *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1024 (Del. Ch. 2020).

[22] *See* Collateral Estoppel Opinion, 2022 WL 17258460, at *3.

[23] *See* Delaware Supreme Court Opinion, 279 A.3d at 327–28.

[24] *See id.* at 328.

agreed to extinguish their claims against Stream.[25]  The Omnibus Agreement was negotiated and approved by the outside directors of Stream, who specifically negotiated for Stream's shareholders to receive equity in SeeCubic.[26]  Without the Omnibus Agreement, Stream's creditors would have foreclosed on Stream's assets, leaving its equity investors with nothing, or Stream would have filed for bankruptcy, and its equity investors likely would have been wiped out.[27]

After the Omnibus Agreement was executed, Mathu Rajan reasserted control over Stream and removed the outside directors using a stockholder consent which the Court of Chancery found the Rajans had backdated.[28]  In September 2020, Stream filed suit against SeeCubic in the Delaware Court of Chancery, styled as, *In re Stream TV Networks, Inc., Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL (Del. Ch. 2020) (the "Omnibus Agreement Litigation").  Mathu Rajan's goal in initiating the Omnibus Agreement Litigation was to invalidate the Omnibus Agreement by any means possible and to reclaim control of the Collateral.[29]

## C.    The Prior Bankruptcy Actions

During the course of the Omnibus Agreement Litigation, it became apparent to Mr. Rajan that the Court of Chancery would rule against him, prompting him to engage in bad faith and fraudulent survival tactics.  For example, as part of the Omnibus Agreement Litigation, Mr. Rajan backdated the shareholder consent, purporting to show that the independent directors had been removed from their positions prior to approving the Omnibus Agreement.[30]

---

[25] *See id.*

[26] *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1025 (Del. Ch. 2020).

[27] *Id.* at 1025–26.

[28] *Id.* at 1026.

[29] *See* Delaware Supreme Court Opinion, 279 A.3d at 329 n.13.

[30] *See id.*; *see also* June 27, 2023, Hearing Transcript [ECF No. 303] (Stastney), at 97:15–98:2 [hereinafter, the "June 27 Transcript"].

When that failed, on February 24, 2021—only days before the Court of Chancery was poised to make a ruling adverse to Stream on a pending motion for summary judgment —Mr. Rajan caused Stream to file a voluntary chapter 11 bankruptcy petition. *See In re Stream TV Networks, Inc.*, Case No. 21-10433-KBO (Bankr. D. Del. Feb. 24, 2021) (hereinafter, the "Voluntary Bankruptcy Action").[31]  Though the Voluntary Bankruptcy Action stayed the Omnibus Agreement Litigation, the Delaware Bankruptcy Court ultimately dismissed the case as having been filed in bad faith, reasoning:

> [T]he weight of the evidence, including the timing of the filing days before the Chancery Court was to enter a mandatory injunction permanently enjoining the debtor from laying claim to substantially all of Stream's assets, indicates that Mr. Rajan's primary purpose for filing this petition was to gain a tactical litigation advantage that is a part of a continued pattern of effort to nullify, undermine, and/or interfere with the omnibus agreement, vitiate the purpose and effect of the Chancery Court's order, and to maintain ownership and control over the assets of the debtor for his own benefit.[32]

The Bankruptcy Court considered the timing and context of the petitions, as well as the debtor's proposals to have Mr. Rajan's other businesses acquire the assets as post-petition lender.[33]

Indeed, Judge Owens exposed Mr. Rajan's plan to use a separate entity, Visual Technology Innovations, Inc. ("VTI"), in a scheme that parallels Mr. Rajan's current efforts to siphon Stream's assets to VSI. Based on a full factual record, Judge Owens concluded:

> It is clear, through documentary evidence, that Mr. Rajan intended to use a Stream bankruptcy as a mechanism by which he could, via Stream, regain the Ultra-D assets from the secured lenders and then through VTI obtain them at a fraction of what he believed was the assets' value.[34]

---

[31] *See* Voluntary Petition [CR-17].

[32] May 17, 2021 Hearing Transcript [CR-74], at 13:16–14:1; *see also* Order Dismissing First Bankruptcy Case [CR-18] (dismissing case "for the reasons set forth on the record on May 17, 2021").

[33] *See* May 17, 2021 Hearing Transcript [CR-74], at 13:16–14:1.

[34] May 17, 2021 Hearing Transcript [CR-74] (Delaware Court), at 14:25-15:4; *see also* VTI Proposed Senior DIP Credit Facility Term Sheet for Stream TV Networks [ECF No. 16, Ex. K].

Undeterred, on May 23, 2021, three of Stream's unsecured creditors filed an involuntary Chapter 7 bankruptcy petition on Stream's behalf. *In re Stream TV Networks, Inc.*, No. 21-10848-KBO (Bankr. D. Del. May 23, 2021) (the "Involuntary Bankruptcy Action" and, together with the Voluntary Bankruptcy Action, the "Prior Bankruptcies").[35] One of the petitioning creditors was Rembrandt 3d Holdings Ltd. ("Rembrandt"), which became a creditor of Stream on the same day it signed onto the Involuntary Bankruptcy Petition.[36] Nevertheless, ultimately, the Delaware Bankruptcy Court again dismissed the Involuntary Bankruptcy Action as having been orchestrated by Mr. Rajan in bad faith in order "to circumvent my dismissal order, [and] gain some sort of litigation leverage over the secured lenders."[37] In dismissing the Involuntary Bankruptcy Action, the Delaware Bankruptcy Court imposed a twelve-month ban on Stream re-filing for bankruptcy.[38]

## D.    The Summary Judgment Order and Delaware Supreme Court Opinion

After the dismissal of the Bankruptcy Actions, the Omnibus Agreement Litigation was able to progress. As Mr. Rajan feared, in September 2021, the Court of Chancery entered its final summary judgment order (the "Chancery Summary Judgment Order"), which found that the Omnibus Agreement was valid and permanently enjoined Stream from interfering with the implementation of the Omnibus Agreement.[39] Stream immediately appealed the Chancery Summary Judgment Order, alleging that the Court of Chancery erred in finding the Omnibus Agreement enforceable "because Stream's unambiguous certificate of incorporation … required

---

[35] *See* Involuntary Petition [CR-20].

[36] *See* June 28 Transcript [ECF No. 378] (Statney), at 85:21–86:7.

[37] *See* June 10, 2021 Hearing Transcript [CR-75] (Delaware Court), at 63:20–64:6; *see also* Order Dismissing Involuntary Chapter 7 Case [CR-22] (dismissing "for the reasons set forth on the record by the Court on June 10, 2021").

[38] *See* Order Dismissing Involuntary Chapter 7 Case [CR-22].

[39] *See* Delaware Supreme Court Opinion, 279 A.3d at 335.

the approval of Stream's Class B stockholders."[40]   On appeal, the Delaware Supreme Court overturned the Chancery Summary Judgment Order solely on the narrow legal basis that the Omnibus Agreement itself was not approved by Stream's Class B stockholders.[41]

On remand, the Delaware Court of Chancery ordered the parties to unwind the Omnibus Agreement, but affirmed the Secured Creditors' rights remained intact.  In so doing, the Court of Chancery stated, "[t]he court believes that the [] secured creditors' rights are strong and may well result in Stream having to transfer the Legacy Stream Assets [*i.e.*, the Collateral] back to SeeCubic in its capacity as Hawk's designee and agent."[42]

### E.    Hawk Exercises Its Secured Creditor Rights

In accordance with the Supreme Court's decision, on August 10, 2022, the Court of Chancery directed SeeCubic to transfer legal title of the Collateral to Stream in order to fulfill the Delaware Supreme Court's mandate.[43]   Because all of the operating assets existed within the Operating Subsidiaries, the Court of Chancery held that the most efficient route to effectuate the turnover of the Collateral to Stream was by SeeCubic returning the equity of Technovative to Stream.   That (briefly) gave Stream direct and indirect control of the Subsidiaries and the Collateral.[44]   Once again, the Court of Chancery noted that the Secured Creditors retained their rights as Secured Creditors, including with respect to their rights to foreclose on the Collateral.[45]

---

[40] *Id.* at 325.

[41] *See id.* at 355. Contrary to Debtors' repeated and baseless assertions, the Omnibus Agreement was never declared "illegal" by the Delaware Supreme Court.  Indeed, the Delaware legislature has actually recently amended 8 *Del. C.* § 272 in response to the Delaware Supreme Court Opinion to directly codify the right of secured creditors to enter into a friendly foreclosure-style transaction with just director approval.

[42] *In re Stream TV Networks, Inc. Omnibus Agreement Litig.*, No. 2020-0766-JTL, 2022 WL 4491925, at *4 (Del. Ch. Sept. 28, 2022).

[43] *See* Collateral Estoppel Opinion, 2022 WL 17258460, at *4.

[44] *See id.* at *5; *see also* June 28 Transcript [ECF No. 378] (Stastney), at 32:14–21.

[45] *See* Collateral Estoppel Opinion, 2022 WL 17258460, at *5.

F.    **The 225 Action**

Consistent with its Secured Creditor Rights, on October 17, 2022, Hawk issued a Proxy Notice[46] exercising its right to remove Mathu Rajan as the sole director of Technovative, replacing him with Shad Stastney.  Stream refused to comply with the Proxy Notice and related Marshaling Directive, claiming Stream had converted the Hawk Debt into equity pursuant to the Conversion Agreement, that Hawk no longer possessed Secured Creditor rights, and that Mr. Rajan was the sole director of Technovative.[47]  That same day, Hawk filed a Complaint in the Delaware Court of Chancery seeking relief under 8 *Del. C.* § 225—*i.e.*, the Delaware statute specifically tailored to resolve disputes over the makeup of corporate boards (the "225 Action").[48]  The 225 Action sought to settle the dispute over whether Mr. Stastney was validly appointed as the sole director of Technovative as of October 17, 2022.

On October 20, 2022, the Court of Chancery ordered Technovative to operate according to the "status quo" (the "Status Quo Order") and appointed the Receiver to operate Technovative on a day-to-day basis.[49]  The Status Quo Order noted there was a "bona fide dispute over the composition of the board of directors of [Technovative]" and that "Section 225 exists to address precisely this type of dispute."[50]  The Status Quo Order further explained that the Court of Chancery "customarily enters an interim status quo order in a Section 225 proceeding that limits the entity to operating in the ordinary course of business."[51]

---

[46] *See* June 27 Transcript [ECF No. 303] (Statney), at 64:21–65:19.

[47] *See* June 28 Transcript [ECF No. 378] (Stastney), at 43:22–24.

[48] *See* First Day Declaration [ECF No. 48], ¶ 91.

[49] *See* Status Quo Order [CR-1], at ¶¶ 6 & 11.

[50] *See id.* at ¶¶ 1–2.

[51] *Id.* at ¶ 5.

On October 21, 2022, the Court of Chancery issued the Receiver Order, outlining the Receiver's duties and obligations.[52]  Specifically, it states that the Receiver "shall use his best efforts, and the authority granted herein, to ensure that [Technovative] operates in the ordinary course of business and does not take any actions outside of the ordinary course of business."[53]  The order then outlined the scope of the Receiver's authority to include "all power and authority afforded to the Board under Section 141 of the Delaware General Corporation Law…."[54]  The Status Quo Order specifically stated that Technovative could not take the following actions, without court approval, because they were outside the ordinary course of business: "…(f) the issuing, selling, distributing, authorizing, establishing, creating, changing, or disposing of any securities of, or interest in securities of, [Technovative]…(n) filing a bankruptcy petition…."[55] The Court of Chancery appointed Ian Liston as the Receiver of Technovative.[56]  Because Technovative owned and controlled all of the Operating Subsidiaries, including SCBV, the Receiver controlled Stream's operating assets.[57]  While the Receiver was in place, SeeCubic funded SCBV, because Stream and Mathu Rajan were unable to do so.[58]

On November 13, 2022, Hawk moved for summary judgment in the 225 Action on the issue of Stream's default under the Hawk Notes and sought a ruling that Stream was collaterally estopped from re-litigating several issues pertinent to the 225 Action.[59]  On November 29, 2022, the Court of Chancery issued the Collateral Estoppel Opinion and confirmed that based on the

---

[52] *See* Order Regarding Receiver Pendente Lite [CR-2], at ¶ 1 [hereinafter the "Receiver Order"].

[53] *Id.* at ¶ 4.

[54] *Id.* at ¶ 5.

[55] *See* Status Quo Order [CR-1], at ¶ 7.

[56] *See id.* at ¶ 11.

[57] *See* June 28 Transcript [ECF No. 378] (Stastney), at 76:12–21.

[58] *See id.* at 77:22–78:9.

[59] *See* Collateral Estoppel Opinion, 2022 WL 17258460, at *1.

final judgment issued by the Delaware Supreme Court, Stream was collaterally estopped from challenging the following findings:

1.      the Hawk Notes are valid and binding obligations of Stream;

2.      Stream is in default under the Hawk Notes;

3.      Hawk may exercise the Secured Creditor Rights—including Hawk's proxy rights;

4.      as of November 10, 2021, the Hawk Notes had not been converted or satisfied; and

5.      any conversion of the Hawk Notes must be supported by "new money" which had not occurred as of November 10, 2021.[60]

The Collateral Estoppel Opinion proved Hawk's *prima facie* case and effectively limited the open questions in the 225 Action to Stream's affirmative defenses, which formed the bulk of the parties' discovery and pleadings.[61]   Ultimately, it became clear that Stream's only real affirmative defense was to claim that it had converted the Hawk Notes under the Conversion Agreement, which Stream could only do if it had raised "new money" through investments sufficient to cover the net amounts funded under the Hawk Notes after November 10, 2021.[62] Similar to the posture in the Omnibus Agreement Litigation before the bad faith bankruptcies, the Court of Chancery was close to resolving all of the issues in the 225 Action.

As mentioned above, Stream has never been an operating company, and the Omnibus Agreement left Stream without any assets.[63]   While the Omnibus Agreement was operative, Technovative, and all of the Operating Subsidiaries, like SCBV, were under the control of SeeCubic.  Following the Delaware Supreme Court Opinion, Stream had control of Technovative

---

[60] *Id.* at **14–15.

[61] *See id.* at *17.

[62] *See id.*

[63] *See* First Day Declaration [ECF No. 48] at ¶ 72.

and the Operating Subsidiaries for a period of approximately two weeks before a Receiver was
appointed for Technovative.  Thus, between May 2020 and October 2022, Stream had control over
the Operating Subsidiaries for just two weeks; but by the time Stream filed its third bankruptcy
Stream's assets were under the control of the Receiver.

### G.    Stream Files for Bankruptcy to Avoid a Ruling in the 225 Action

After the entry of the Collateral Estoppel Opinion, the parties continued apace toward trial,
and the 225 Action was on the brink of a resolution.  The parties had finished discovery, submitted
a Pre-Trial Order,[64] submitted opening pre-trial briefs,[65] and had agreed to proceed to a one-day
trial on a paper record which was scheduled for March 23, 2023.[66]  On March 16, 2023, the parties
were scheduled to appear before Vice Chancellor Laster for a pre-trial conference.[67]  As this Court
is aware, the above-captioned bankruptcy cases were initiated on March 15, 2023.[68]  In explaining
the genesis of the Chapter 11 Cases, Mr. Rajan expressly stated in his First Day Declaration that
the bankruptcy filings were "necessitated" by the Court of Chancery allowing the Secured
Creditors "to unlawfully seize, retain, and use the Debtor's assets…."[69]  In that declaration, Mr.
Rajan also laments that the Status Quo Order "allowed [SeeCubic] to retain possession of the
Debtor's assets pending adjudication of the [225 Action]," and the "Receiver [similarly] has
allowed SeeCubic to retain and even take possession of certain Debtors assets…."[70]

---

[64] See Pre-Trial Order [CR-7].

[65] See 225 Action Docket [CR-6], dkt. nos. 179 and 180.

[66] See June 28 Transcript [ECF No. 378] (Stastney), at 47:2–48:1.

[67] See Pre-Trial Order [CR-7], at 25; 225 Docket [CR-6], dkt. no. 187.

[68] See Petitions [Debtor-30 & Debtor-31].

[69] First Day Declaration [ECF No. 48], ¶ 94.

[70] Id. at ¶ 92–93.

While inaccurate as evidenced by the record in the 225 Action, the foregoing statements are the only bases the Debtors have articulated for commencing these Chapter 11 Cases. After 200 days, the evidence and the docket in these cases has not demonstrated any other impetus for the bankruptcy filings. The Debtors had no other creditors pursuing them, as demonstrated by the fact that Schedules D and E/F reflect *no* debts that have arisen after 2021 and no other credit agreements with imminent defaults,[71] and no operations to stabilize, as demonstrated by their Monthly Operating Reports reflecting no business activity.[72] This is not surprising, since Stream is mainly a holding company. The only value in Debtors' estate lies beneath Technovative in the non-debtor Operating Subsidiaries. The Operating Subsidiaries, and SCBV in particular, have value and are worth preserving, as described in further detail below.

The only purpose of initiating the Chapter 11 Cases was the imposition of the automatic stay in order to interrupt the 225 Action and frustrate the Secured Creditors—which the Debtors have a documented history of doing.[73]

## H.    SCBV Contains Stream's Meaningful Assets

SCBV is effectively the only operating company below Stream in its corporate family.[74] Stream, Technovative, and all the companies between Technovative and SCBV are essentially holding companies.[75] SCBV has the employees that actually perform research and development on behalf of Stream.[76] As this Court observed, SCBV is a substantial asset that is indirectly owned

---

[71] *See* Stream Schedule D [ECF No. 53]; Stream Schedule E/F [ECF No. 54].

[72] *See* March [ECF No. 223], April [ECF No. 224], May [ECF No. 253], June [ECF No. 253], July [ECF No. 399] Monthly Operating Reports.

[73] *See supra*, Statement of Facts § C.

[74] June 27 Transcript [ECF No. 303] (Stastney) at 174:19–22.

[75] *See id.* (Stastney) at 174:3-11.

[76] *See id.* (Stastney) at 58:12-25; *see also* March Monthly Operating Report [CR-41] (showing no employees at Stream).

by Technovative.[77] For that reason, the Secured Creditors financed SCBV both during the time when the Omnibus Agreement was in place and during the pendency of the 225 Action.[78] While Mathu Rajan repeatedly claimed Stream would fund SCBV, it did not do so, and the Receiver relied on the Secured Creditors.[79] This is not surprising, given that Stream filed for bankruptcy in March 2023 with just $2,363 in its bank account.[80]

This pattern has continued into the present. While Mathu Rajan testified in April 2023 that SeeCubic BV was "important" for Stream and worth hundreds of millions of dollars to Stream,[81] Stream has not financed SCBV, and has forced the Secured Creditors to once again fill the gap to save the company. Mr. Rajan has fiduciaries duties to SCBV, but he completely ignored them (despite Mr. Rajan's fantastic claims that he is raising millions of dollars through VSI).[82]

## I.     The Debtors' Operations as Debtors-in-Possession

At trial, the parties introduced evidence that created two diametrically opposed views of the Debtors. The Secured Creditors, supported by extensive documentary and testimonial

---

[77] April 24, 2023, Hearing Transcript [ECF No. 178] (Court), at 82:2-4  [hereinafter, the "April 24 Transcript"]; *see also* April 25, 2023, Hearing Transcript [ECF No. 179] (Rajan) at 35:17-36:14 [hereinafter, the "April 25 Transcript"] ("Q: What value, if any, do the Stream subsidiaries, including SeeCubic BV add to Stream? A: Are you talking in terms of the monetary value or are you talking about operational value or both? Q: Both. A: In terms of monetary value, it's worth hundreds of millions of dollars to Stream TV's valuation. The assets over there would be worth easily hundreds of millions of dollars. In terms of operational value, they are helpful in terms of preparing -- helping with assisting our teams in Silicon Valley for preparation of the electronics. You know, the work is done by our electronics team, the programming. For our business model is for the -- is done in Silicon Valley. They mainly do assistant work. They also do design work for the lenses. They also do consulting work for quality control on the bonding machines. The bonding machines are mainly handled by Stream TV USA and our team in Asia. The mechanicals and all those things are handled by our team in Asia and those things. We also have a lens team in the United States. So they'll be working with the Netherlands team on lenses. The software things have been moved to United States in terms of the content teams. Q: Is it important for Stream to preserve SeeCubic BV? A: Absolutely.").

[78] June 27 Transcript [ECF No. 303] (Stastney) at 66:3–13; June 28 Transcript (Stastney) at 76:3–19.

[79] June 28 Transcript [ECF No. 378] (Stastney) at 77:20-78:9.

[80] March Operating Report [CR-41].

[81] April 25 Transcript [ECF No. 179] (Rajan) at 35:17-36:14.

[82] See June 28 Transcript [ECF No. 378] (Stastney), at 77:22–78:9.  Stream and Technocative have even taken the usual step of suing their own subsidiary in the Adversary Proceeding.  *See Stream TV Networks, Inc. et al. v. Shardon L. Stastney, et al.*, Case 2:23-mc-00135-KSM.

evidence—including from Debtors' themselves—demonstrated conclusively that Debtors have no operations, no employees, no financing, and no future. Debtors, seeking to counter this evidence, presented only Mathu Rajan's entirely uncorroborated testimony that seeks to create the illusion the Debtors have substantial operations, employees, customers, purchase orders, and the like. But the evidence adduced at trial, as well as the lack of evidence, exposed Mr. Rajan's tale as a farce. All of the evidence—save for Mathu Rajan's uncorroborated and self-serving testimony—reflects the reality that Stream is an empty holding company with no operations or assets. Mathu Rajan's alternate reality claiming otherwise is pure fiction that should be dismissed.

1.    *The Evidentiary Record*

Any entity that claims to have operations will be able to provide evidence of at least two of three factors. The first factor is expenses. The existence of "operations" requires one to incur expenses to fund the operations. The second and third factors are "debt" and "income." An operating company must have one or both of debt or income to pay its expenses. In this case, the record is clear, as evidenced in part by the Debtors' Monthly Operating Reports filed under penalty of perjury, the Debtors have no expenses, no debt, and no income during the pendency of these bankruptcies. In this case $0 + $0 + 0 = 0 operations.

(i)    <u>The Debtors Have No Expenses</u>

The record shows that the Debtors have incurred no operating expenses during the course of these Chapter 11 Cases—the monthly operating reports filed under penalty of perjury include none of the hallmarks of an operating business. For example, the reports reflect Debtors' bank accounts are decreasing month-to-month, but only for nominal amounts for bank fees.[83] Similarly,

---

[83] *See* April Monthly Operating Report [ECF No. 224]; May Monthly Operating Report [ECF No. 253]; June Monthly Operating Report [ECF No. 300], Part 1, line d.

the operating reports also show the Debtors have no employees.[84] They also reflect no payments

by third parties on the Debtors' behalf.[85]  This information is wholly inconsistent the suggestion

that the Debtors have ongoing operations.

Moreover, the Debtors' proposed Chief Financial Officer—Thomas Park—confirmed the

veracity of the Debtors monthly operating reports.  On June 29, 2023, Mr. Park testified that Stream

did not have the "infrastructure, the employees, the material, capacity, or the cash" to fulfill the

purported purchase orders that Stream has procured (discussed below).[86]  Mr. Park also testified

that he and Mr. Rajan are the only two employees of Stream (though neither is listed on the

monthly operating reports).[87]

Mr. Park also testified that the Debtors have no income or operations.[88]  The paper record

confirms Mr. Park's testimony that the Debtors have no customers.  Though the Debtors purport

to have produced purchase orders demonstrating customers, the purchase orders are all with Visual

Semiconductor, Inc. ("VSI")[89]—Mr. Rajan's other business entity.[90]  This is a clear conflict of

interest.

Just as important as the evidence in the record, there is also evidence conspicuously missing

from the record that one would expect to see for an operating company.  With respect to employees,

the Debtors have produced no employment agreements, tax forms, pay stubs, or any other evidence

---

[84] *See id.* at pg. 1.

[85] *See id.* at Part 1, line e,

[86] June 29 Hearing Transcript [ECF No. 305] (Park), at 103:15–18 [hereinafter, the "June 29 Transcript"].

[87] *Compare id.* (Park) at 98:17–20 (stating Mr. Park and Mr. Rajan are the only employees), *with* March [ECF No. 223], April [ECF No. 224], May [ECF No. 253], June [ECF No. 253] Monthly Operating Reports (each reflecting zero employees).

[88] June 29 Transcript [ECF No. 305] (Park), at 98:25-99:2.

[89] *See* $14 Million Purchase Order [Debtor-20]; $140 Million Purchase Order [Debtor-21].

[90] *See* August 17 Transcript [ECF No. 370] (Rajan), at 80:1–6.

substantiating the existence of employees.[91]  Moreover, the Debtors have provided no binding purchase orders or contracts with third parties, no supplier agreements, no evidence of negotiations, and no receipts demonstrating expenditures to fund the same.  Most damningly, noe of Debtors' alleged employees or customers made an appearance on the record, filed any pleadings in support of the Debtors' motions, or appeared at any hearings.  This evidence is simply non-existent as confirmed by Mr. Rajan's testimony.

The complete lack of operations and employees is consistent with other aspects of the Chapter 11 Cases, including that the Debtors failed to file any of the suite of anticipated "first day" pleadings debtors in Chapter 11 routinely file in order to stabilize operations and ensure the businesses continually during the transition into Chapter 11.  Without operations or employees, there was simply no reason for a Critical Vendor Motion, an Employee Motion, or a Cash Management Motion, respectively. With respect to the employee obligations, the Debtors did file a motion to approve certain employee expenses,[92] but the Court denied this request explaining that it was "not a wage motion," because it sought authority "to go back to rehire people."[93]  In other words, the Debtors did not file any motions seeking to compensate employees in the ordinary course (and in fact Stream filed a motion to hire VSI employees).[94]

---

[91] *See* September 25, 2023, Hearing Transcript [ECF No. 427] (Rajan), at 20:24-21:8 [hereinafter, the "September 25 Transcript"] (Q: So, as we sit here today, Mr. Rajan, you would agree with me that when trying to determine whether or not Stream actually has any employees, the only evidence we have is your testimony that it does and Mr. Park's testimony as the CFO saying that it does not, correct? A: That is correct. Q: But to the extent there are any documents that would support your testimony, they would be in the possession of the debtors, correct? A: Yes. They're in the possession of the debtors.").

[92] *See Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay (I) Prepetition Employee Obligations, (II) Prepetition Withholding Obligations, (III) Post-Petition Employee Obligations in the Ordinary Course* [ECF No. 134] [hereinafter, the "Employee Motion"].

[93] *See* April 24 Transcript [ECF No. 178] (Court), at 17:23–24.

[94] [ECF No. 134].

Notwithstanding the foregoing, there is evidence in the record that the Debtors have incurred expenses—but such expenses relate solely to the administration of the estates and do not relate to operations.  For example, the Debtors obtained authority to retain and pay their counsel, Lewis Brisbois Bisgaard & Smith, LLP.[95]  Though the Debtors have generated no income and have less than $2,000 in their bank accounts, as of May 31, 2023, the Debtors owed Lewis Brisbois approximately $750,000.[96]  And the retainer to Lewis Brisbois was paid by Rajan's affiliated company, VSI.  Moreover, the Debtors have sought to employ Mr. Park, with a request to pay his salary dating back to May 1, at a rate of $3,250 per week—or a total of $71,500 as of the date hereof.[97]  Additionally, the Debtors have filed other motions attempting to further indebt the estates which the Court has either denied or failed to approve.[98]  These expenses, however, do not substantiate operations—only the general inefficiencies of the estates and improper management by the Debtors.

(ii)    The Debtors Have No Revenue

The record also demonstrates the Debtors have no revenue.  The Debtors filed for bankruptcy with only $2,363 in their bank accounts and no monthly revenue to report.[99]  This state of affairs did not change over the course of the Chapter 11 Cases, at least through the end of June 2023, with each successive Monthly Operating Report showing a declining bank account amount

---

[95] *See Order Granting Debtor's Application to Employ and Retain Lewis Brisbois Bisgaard & Smith LLP as Counsel to the Debtors and Debtors-in-Possession* [ECF No. 185].

[96] *See* June 29 Transcript [ECF No. 305] (Park), at 99:3–6.

[97] *See Application of the Debtors for Entry of an Order Authorizing the Debtors to Retain Thomas Jung Ho Park as Chief Financial Officer to the Debtors* [ECF No. 298], at ¶ 13(b).

[98] Such additional motions, include the *Debtors' Expedited Motion for Entry of Interim and Final Orders Authorizing Debtors to Take Certain Actions in the Ordinary Course of Business* [ECF No. 135] [hereinafter, the "OCB Motion"] and the Employees Motion [ECF No. 134], each of which would have obligated the Debtors' estates to expend funds on behalf of non-debtor third parties (namely, SCBV).

[99] *See* March Monthly Operating Report [ECF No. 223].

(down to $1,724 due to bank fees) and no incoming revenue.[100] This is unsurprising, as historically the Debtors never had operations nor have they ever generated revenue.[101] Nothing has changed since the filing of these Chapter 11 Cases.  Once again, the evidentiary record is also completely devoid of any information indicating the existence of revenue generation.  The Debtors have produced no receipts, no bank statements, and no financial statements/documentation demonstrating that they have generated revenue during the course of these Chapter 11 Cases.  This dearth of evidence is consistent with the reality of the Debtors history—there are no operations to generate such revenues, and the Debtors served merely as holding companies for the Operating Subsidiaries.

(iii)    <u>The Debtors Have No Financing Sources</u>

The evidence also demonstrates the Debtors have raised no capital from financing sources during the course of these Chapter 11 Cases.  Once again, the Debtors' monthly operating reports from the Petition Date through the month of June show the Debtors' cash balance in their bank accounts *decreased* month-over-month, meaning that no cash came into the Debtors' bank accounts from any source.[102]  Moreover, those same monthly operating reports also listed no disbursements made by third parties for the benefit of the estate.[103]  Though the Debtors filed two motions seeking approval to incur financing earlier in the case,[104] the Court declined to authorize

---

[100] *See* March [ECF No. 223], April [ECF No. 224], May [ECF No. 253], June [ECF No. 253] Monthly Operating Reports.

[101] *See supra*, Statement of Facts § A.

[102] *See* March [ECF No. 223], April [ECF No. 224], May [ECF No. 253], June [ECF No. 253] Monthly Operating Reports, at Part 1, line d.

[103] *See* March [ECF No. 223], April [ECF No. 224], May [ECF No. 253], June [ECF No. 253] Monthly Operating Reports, at Part 1, line e.

[104] *See* OCB Motion [ECF No. 135]; *Debtors' Motion Pursuant to 11 U.S.C. §§ 105 and 364 for Entry of Interim and Final Orders: (1) Authorizing the Debtors to Obtain Post-Petition Unsecured Financing to Fund Debtors' Foreign Subsidiaries; (2) Modifying the Automatic Stay; and (3) Setting Final Hearing* [ECF No. 156].

such financing (which came from an insider, VSI), at least in part, because the Debtors were not proposing to use the financing to fund *their* operations, but sought the financing to fund *SCBV's* operations.[105]   Thus, the only financing the Debtors have sought to date was actually for the Debtors to incur debt to fund their operating subsidiaries rather than the Debtors themselves.

The record is also devoid of any evidence of a financing having occurred.   There is no formal motion on the docket for financing (aside from that discussed above); the Debtors have produced no financing agreements or negotiations; and the Debtors' monthly operating reports are bereft of any evidence of cash flows into the estates.   There simply is no evidence of any financing on the record that could support operations.

>       2.       *Mr. Rajan's Alternate Reality*

The foregoing evidence establishes the Debtors have made no progress in these Chapter 11 Cases to date and that the Debtors have no operations to rehabilitate.   In fact, at the conclusion of the June Hearings, the Court noted, "I'm a little concerned about the direction of this case here. And as far as this docket, nothing's happened…."[106]   Realizing the lack of progress was proving fatal, Mr. Rajan decided to create an illusion that Stream has substantial operations and employees through his testimony, as well as the July monthly operating report.   This narrative is decidedly the opposite of the facts set forth above and unlike the facts above, is completely unsupported by credible evidence.

>       (i)       <u>The Debtors Alleged Substantial Operating</u>

According to Mr. Rajan's new narrative, the Debtors have substantial and ongoing business expenses.   Specifically, according to Mr. Rajan, the Debtors allegedly secured over $150 million

---

[105] *See* April 25 Transcript [ECF No. 179] (Court), at 248:25–249:4.

[106] *Id.* (Court) at 167:4–5.

in purchase orders[107] and negotiated several strategic partnerships from several of the largest companies in the world.[108] Moreover, the Debtors were in the process of scheduling meetings and negotiating details for nearly a dozen other companies including Samsung, Sony, LG, Nissan, Toyota, and Honda, to name only a few.[109] Mr. Rajan testified that in the television sector alone, these relationships could "comfortably get the [Debtors'] revenues over two billion [dollars]."[110]

To fill these orders, Mr. Rajan testified the Debtors had approximately 50 employees working around the world, including out of their Silicon Valley and Asian offices.[111] These employees were processing the purchase orders[112] as well as assembling and manufacturing televisions and demonstrator units.[113] According to Mr. Rajan, this was not a new development. Based on his testimony, the Debtors had operations and employees throughout the course of the Chapter 11 Cases dating back to the Petition Date.[114] Mr. Rajan testified that over the course of the Chapter 11 Cases, these operations had resulted in approximately $2 million in operating expenses—all of which were being satisfied by VSI.[115] Shortly after Mr. Rajan testified about these relationships and expenses, the Debtors filed the July Monthly Operating Reports, which,

---

[107] *See* $14 Million Purchase Order [Debtor-20]; $140 Million Purchase Order [Debtor-21]; September 25 Transcript [ECF No. 427] (Rajan), at 155:4-20.

[108] *See* August 15, 2023, Hearing Transcript [ECF No. 367] (Rajan), at *passim* [hereinafter, the "August 15 Transcript"].

[109] *See id.* (Rajan) at 140:2–11.

[110] *See* August 17 Transcript [ECF No. 370] (Rajan), at 144:2-3.

[111] *See* September 25 Transcript [ECF No. 427] (Rajan), at 18:7–9; *see also* August 15 Transcript [ECF No. 367] (Rajan), at 127:2–7.

[112] *See* September 25 Transcript [ECF No. 427] (Rajan), at 18:7–9.

[113] *See* August 15 Transcript [ECF No. 367] (Rajan), at 196:10–16.

[114] *See* September 25 Transcript [ECF No. 427] (Rajan), at 200:7–12.

[115] *See id.* (Rajan) at 14:3–8.

departing from all prior operating reports, included payments allegedly made by a third party (*i.e.*, VSI) on behalf of the estate, totaling $750,813.[116]

(ii)    The Debtors Have Financing[117]

Under Mr. Rajan's narrative of the facts, the Debtors are flush with financing.  Whether through the cash infusions directly from VSI or a purported $300 million term sheet with a Chinese investor, the Debtors have had no issues raising money throughout these Chapter 11 cases.  Mr. Rajan testified (and the July Monthly Operating Report indicated) that the Debtors apparently obtained financing through VSI.[118]  In exchange for this alleged financing, VSI is apparently receiving equity in Stream from previously undisclosed prepetition subscription agreements, as well as, unauthorized postpetition subscription agreements (as discussed further below).[119]  In support of this testimony, the July Monthly Operating Report includes a schedule that purports to provide a high-level itemization of these expenses VSI has satisfied on the Debtors' behalf.[120]

Moreover, the Debtors allegedly have at least four traditional financing sources interested in providing post-petition financing and at least four more entities interested in investing in the Debtors.[121]  These lenders apparently remain interested in the Debtors' business, but the Debtors have determined that having the investors pursuing financing through an equity investments in VSI is the best alternative.[122]

---

[116] *See* July Monthly Operating Report [ECF No. 399], Schedule 1.

[117] Despite some conflicting testimony, the Debtors appear not to dispute that they have not generated any revenues from these operations, and even their recent monthly operating reports do not purport to demonstrate any such revenues.  *See* July Monthly Operating Report [ECF No. 399].

[118] *See* September 25 Transcript [ECF No. 427] (Rajan), at 14:3–8.

[119] *See* August 17 Transcript [ECF No. 370] (Rajan), at 205:5–17.

[120] *See* July Monthly Operating Report [ECF No. 399], Schedule 1.

[121] *See* June 29 Transcript [ECF No. 305] (Park), at 53:9–16.

[122] *See id.*

22

Finally, and as discussed in depth below, the Debtors assert that they have a Chinese investor poised to invest up to $300 million in the Debtors' businesses during the course of these Chapter 11 Cases, notwithstanding the bankruptcy.[123]  This term sheet is discussed in detail below,[124] Mr. Rajan testified that the investor remains interested in the Debtors and he has meetings scheduled with the investor in the near future to further refine the term sheet.[125]

(iii)    Mr. Rajan's Alternative Reality Is Not Supported by Evidence

As is apparent from the foregoing sections, there is a direct conflict between what the evidentiary record demonstrates and Mr. Rajan's narrative.

Importantly, there is no supporting documentation for *anything* in Mr. Rajan's testimony. The Debtors have produced no receipts or invoices in support of production activities; they have produced no 1099s, W-2s, or paystubs for any of the purported employees; they have produced no agreements or negotiations with their purported customers; and they have not even produced documentation evidencing the Debtors' alleged bi-weekly requests for funding to VSI.[126] There simply is no evidence substantiating Mr. Rajan's testimony, and even Mr. Rajan's testimony is unclear, because he routinely conflates the Debtors, the Operating Subsidiaries, and VSI. Specifically, Mr. Rajan testified that his use of the term "we" during testimony related to "our collective group…me, the companies, Stream TV and Technovative…. VSI is also helping us, too."[127]  For any of the foregoing supposed expenses and financing activities, the Debtors would necessarily have receipts or payment confirmations evidencing that they have occurred.  No such evidence is in the record, because Mr. Rajan has lied.

---

[123] *See* August 17 Transcript [ECF No. 370] (Rajan), at 99:10–24.

[124] *See infra*, Statement of Facts § L.

[125] *See* August 17 Transcript [ECF No. 370] (Rajan), at 100: 17–101:11.

[126] *See* September 25 Transcript [ECF No. 427] (Rajan), at 26:9–12.

[127] *See* August 17 Transcript [ECF No. 370] (Rajan), at 151:14–22.

Comparing Mr. Rajan's testimony to the evidence in the record, it is clear that his testimony should be discounted entirely. The Debtors have not produced a single shred of substantiating evidence for any of the foregoing transactions—they are supported by Mr. Rajan's testimony and his testimony alone.[128] To the extent the Court considers any of Mr. Rajan's testimony credible, it would actually demonstrates his bad faith and gross mismanagement of these estates. If the Court believes Mr. Rajan, it would mean that Mr. Rajan has worked nearly exclusively for VSI throughout the course of these Chapter 11 Cases in order to obtain purchase orders for VSI, obtain financing for VSI, and generally establish operations at VSI in competition with the Debtors..

## J.    Stream Has Repeatedly Ignored Obligations to this Court and its Creditors

During these Chapter 11 Cases, and as exposed during the Hearings, Stream has repeatedly flouted its disclosure obligations to this Court. The Debtors have routinely (a) failed to disclose purportedly material transactions, (b) refused to update conflicting and knowingly incorrect information on sworn documents, and (c) failed to request authority to enter into postpetition agreements. Such disclosure obligations are of paramount importance during Chapter 11 Cases to ensure the all parties and stakeholders are properly apprised of proposals and developments in the cases. The Debtors' consistent failures to comply with these requirements are inexcusable.

For example, during the August Hearings, it was first revealed by Mr. Rajan that VSI had allegedly paid $2 million dollars on behalf of Stream, notwithstanding the operating reports reflecting $0 having been spent by third parties on behalf of the Debtors.[129] According to Mr. Rajan, VSI was regularly making payments on behalf of Stream in exchange for stock in Stream, but Stream did not disclose any of this information in its Monthly Operating Reports.[130] Mr. Rajan

---

[128] *See* August 17 Transcript [ECF No. 370] (Rajan), at 145:19–146:4.

[129] *See* August 17 Transcript [ECF No. 370] (Rajan), at 205:21–23.

[130] *Id.* (Rajan), at 205:5–11.

explained this lack of disclosure was merely an "oversight," and claimed the Debtors were in the process of preparing amended operating reports that would be filed the following week.[131]

Over two weeks later, Debtors filed a monthly operating report (for July) which reflected only $750,813 having been expended by VSI on behalf of the Debtors—none of which was purportedly expended during the month of July.[132]  Instead, the July Monthly Operating report included a schedule purporting to provide a breakdown of the expenses VSI had advanced on the Debtors behalf during the *previous* months of the Chapter 11 Cases, which the report then claimed had been expended during the month of July.[133]  Thus, all of the operating reports on the docket are currently factually inaccurate—and knowingly so—and remain so as of the date of this brief.

Additionally, the Debtors have allegedly entered into several post-petition agreements without obtaining approval first from the Bankruptcy Court.  For example, in connection with the payments VSI is allegedly making on behalf of the estates, the Debtors purportedly executed subscription agreements with VSI.[134]  Interestingly, the Debtors previously sought approval to sell stock to VSI on a post-petition basis—which the Court declined to grant—and, during the hearing on the matter, the Debtors definitively represented to the Court that they were *not* selling shares to VSI.  Apparently this statement was untrue.[135]

---

[131] *Id.* (Rajan), at 219:13–14.

[132] *See* July Monthly Operating Report [ECF No. 399], Schedule 1 (disclosing third party payments by VSI purportedly for the Debtors' benefit in the amount of $86,526.38 for March 2023, $297,793.54 for April 2023, $198,342.77 for May 2023, and $168,150.22 for June 2023).

[133] *Compare* July Monthly Operating Report [ECF No. 399], Part 1(e) (disclosing third party disbursements for the benefit of the estate in the amount of $750,813 for July 2023), *with id.* at Schedule 1 (showing the breakdown of the $750,813—none of which was disbursed in July 2023).

[134] *See* August 17 Transcript [ECF No. 370] (Rajan), at 205:5–17.

[135] *See* April 24 Transcript [ECF No. 178] (Debtors' counsel), at 28:12–15 (Court: "Counsel, did they sell shares post-petition?"  Debtors' Counsel:  "Have they sold shares post-petition?"  Court: "Uh-huh."  Debtors' Counsel: "No, we're waiting for approval for this motion…."); id. (Court) at 31:16–21 ("I'm not quite sure how that's [i.e., selling stock] ordinary course to begin with, which is why I know you would have never done it without coming to this court because, you know, you can't do it."); *see also* August 17 Transcript [ECF No. 370] (Rajan) at 125:14-126:1 (admitting Stream has pre and post-petition subscription agreements in place).

Similarly, the Debtors recently revealed they had executed two agreements with Rembrandt—a Licensing Covenant[136] and a Settlement Amendment.[137]   The Debtors have filed neither of these documents with the Court or subjected them to scrutiny by any interested parties, despite the fact that the Licensing Covenant and Settlement Amendment purport to obligate the Debtors to pay Rembrandt $3.6 million and $2.36 million, respectively.[138]   Though the Debtors have argued these are each incorporated into their Draft Plan (as defined below), neither is conditioned on approval of the Draft Plan; the Draft Plan in fact does not reference the License Covenant; and the License Covenant expressly contemplates surviving after a failure to obtain plan approval.[139]

In addition to the foregoing, the Debtors also represented that they have postpetition agreements with (a) Jeff Shammah and/or Blue Ocean Capital for investment banking services;[140] Fuji Prem for optical bonding services;[141] and customer contracts with BOE;[142] and Google.[143] None of the foregoing agreements have been reviewed by any party in interest, yet they purport to require the Debtors to expend estate funds (that are non-existent) in order to fulfill the Debtors' obligations.

---

[136] Licensing Covenant [CR-222].

[137] Settlement Amendment [CR-246].

[138] *See* License Covenant [CR-222], at C.1; Settlement Amendment [CR-246], at A.2.

[139] *See* Licensing Covenant [CR-222], at C.5.

[140] *See* September 25 Transcript [ECF No. 427] (Rajan), at 32:17–33:6.

[141] *See* August 17 Transcript [ECF No. 370] (Rajan), at 28:21-24.

[142] *See id.* (Rajan) at 200:25–14. Mr. Rajan also testified this document was from 2018. *Id.* (Rajan) at 183:21-184:7.

[143] *See id.* (Rajan) at 201:22–25. Mr. Rajan also testified this document was from 2018. *Id.* (Rajan) at 188:9-15.

K.      **Stream Has Repeatedly Engaged in Bad Faith Litigation Tactics and Gamesmanship**

During the pendency of these cases, the Debtors have repeatedly engaged in bad faith litigation tactics, including manufacturing emergency filings, consistently refusing to disclose pertinent information in a timely fashion, and likely committing fraud.

The Debtors made it a habit during these Chapter 11 Cases of waiting until the last minute to request relief and provide pertinent disclosures.  In fact, nearly every one of the Debtors' filings during the first few months of these cases were on an "emergency" basis, including one instance where the Debtors waited to request funding to maintain operations at SCBV.[144]  There, the Court specifically found that the Debtors manufactured the emergency by refusing to pursue traditional post-petition financing, accessing existing financing options, and delaying their request to have VSI provide funding through stock sales until days before certain obligations came due.[145]

Second, the Debtors have routinely waiting until the day before a dispositive hearing to reveal allegedly material documentation and information.  For example,

- April 14 Hearings – One day prior to the initial hearing on the Hawk Motions, the Debtors first disclosed the alleged Purchase Orders.[146]

- June Hearings – One business day prior to the June Hearings, the Debtors filed a Term Sheet (the "Zhongsheng Term Sheet"), with Zhongsheng Group Holdings Ltd. ("Zhongsheng") purporting to demonstrate Zhongsheng's intention to invest up to $300 million in the Debtors.[147]  The Zhongsheng Term Sheet is dated June 6, 2023, but the Debtors waited to disclose it until June 23, 2023.[148]

---

[144] *See* OCB Motion [ECF No. 135].

[145] *See* April 24 Transcript [ECF No. 178] (Court), at 22:18–23.

[146] *Compare Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Motions for Entry of an Order: (1) Enforcing the Automatic Stay; (2) Directing the Turnover of Property of Debtors' Estate; and (3) Imposing Sanctions for Willful Stay Violations* [ECF No. 114], *with Order Granting Expedited Hearing on Motion to Dismiss* [ECF No.87].

[147] *Compare Amendment to Debtors' Expedited Motion for Entry of Interim and Final Orders Authorizing Debtors to Take Certain Actions in the Ordinary Course of Business* [ECF No. 258] (the "Amended OCB Motion"), *with Notice of Hearing* [ECF No. 207].

[148] *Compare* Amended OCB Motion [ECF No. 258] (dated June 23, 2023), *with id.* at Ex. A (dated June 6, 2023).

- August Hearings:

    o One day before the August Hearings, during oral argument with respect to Hawk's Motion in Limine [ECF No. 340], the Debtors represented to the Court that VSI had purportedly closed a $100 million financing.

    o Additionally, the Debtors disclosed the Rembrandt Licensing Covenant [CR-222] on the evening of August 14, 2023, only a few hours *after* Mr. Rajan's deposition had concluded,[149] and they disclosed the Settlement Amendment [CR-246] two days later on August 16, 2023.[150]

- September Hearings – Shortly after 3:00 a.m. (ET) on Monday, September 25, 2023, the Debtors sent thousands of pages of documents to Hawk purporting to be "rebuttal exhibits," include two UCC Termination Statements that the Debtors apparently filed purporting to terminate Hawk's recorded liens improperly and without authority.

The Debtors' bad faith litigation tactics have even continued *within the last week*. After the Hearings concluded and when the parties should have been focused on drafting their Post-Hearing Briefs, the Debtors decided to move for a temporary restraining order and permanent injunction in the Adversary Proceeding in the District Court.[151] Stream's request was completely baseless for numerous reasons. The District Court summarily denied the motion on the grounds that it had no jurisdiction since it had not decided to withdraw the reference to this bankruptcy court.[152] It was simply another example of Stream trying to avoid a pending adverse ruling by judge shopping.

---

[149] *See* September 25 Transcript [ECF No. 427], at 36:7–39:7 (discussing Mr. Rajan's deposition on August 14, and why the Licensing Covenant was not produced until after his deposition had concluded); *see also* Licensing Covenant [CR-222].

[150] *See id.* at 55:15–56:3 (discussing Mr. Rajan's deposition on August 14, but the Settlement Amendment not being produced until August 16, despite being executed on August 12); *see also* Settlement Amendment [CR-246] (dated August 12, 2023).

[151] *See Stream TV Networks, Inc. et al. v. Shardon L. Stastney, et al.*, Case 2:23-mc-00135-KSM, ECF No. 13. As this Court is aware, after insisting throughout this bankruptcy that this Court needed to decide the validity of Stream's secured debt and a host of related issues, and filing an Adversary Complaint against SLS, Hawk, SeeCubic, Mr. Stastney (among others) advancing its specious arguments, Stream moved to withdraw the reference to this Court as it relates to the Adversary Complaint. That motion remains outstanding (and contested) in the District Court.

[152] *See Stream TV Networks, Inc. et al. v. Shardon L. Stastney, et al.*, Case 2:23-mc-00135-KSM, ECF No. 14, n.1.

L.      **Zhongsheng Term Sheet**

One of the foregoing "surprises" merits additional attention, as it demonstrates the type of

tactics Mr. Rajan has displayed during this case and throughout the parties' dispute—namely,

commit fraud by fabricating evidence.  After learning of the existence of the Zhongsheng Term

Sheet, Hawk conducted an in-depth investigation into the bona fides of the agreement, which the

Debtors attempted to thwart every step of the way.  In the end, however, the evidence presented

clearly establishes the Zhongsheng Term Sheet is a fraud.  The following sections explain this

investigation and the resulting conclusions in turn.

1.      Hawk Investigates The Zhongsheng Term Sheet

As noted above, on the eve of the June Hearings, Stream produced the Zhongsheng Term

Sheet in which Zhongsheng supposedly evidenced its intent to invest $300 million in Stream.[153]

The term sheet is signed by "Tea Lee" as a "Managing Director" of Zhongsheng, and was

purportedly executed on June 6, 2023, though inexplicably it was not produced to Hawk until June

23, 2023.[154]

Though the Court did not consider the Term Sheet during the June Hearings because it was

filed one business day before the hearing, Mr. Park testified about the term sheet while on direct

examination in his role as proposed CFO of the Debtors.  Mr. Park testified that Zhongsheng "is a

publicly traded entity on the Hang Seng Index of Hong Kong.  Predominantly, their business is

auto dealerships.  It appears to be on the high end."[155]  In responding to a question from Debtors'

counsel of whether Mr. Park was "aware that Stream filed … a term sheet with [Zhongsheng]

Group Holdings Ltd. [in the Chapter 11 Cases]," Mr. Park responded, "[t]hat is correct," but he

---

[153] *See* Amended OCB Motion [ECF No. 258], Ex. A.

[154] *See id.*

[155] *See* June 29 Transcript [ECF No. 305] (Park), at 55:10–12.

clarified that he was not involved in the negotiations, testifying, "[t]hat was strictly by Mathu Rajan."[156]

After the Hearing, Hawk instituted its own investigation into the Zhongsheng Term Sheet given its timing and the suspect nature of the proposed transaction, as it would seem unwise for a company to invest $300 million into common stock of a company in bankruptcy. Hawk requested information from Debtors' counsel about Zhongsheng and contact information for Mr. Lee, Debtors' counsel only provided a street address in China.[157] In the meantime, Hawk had contacted the investor relations team for Zhongsheng, who denied any knowledge of the Zhongsheng Term Sheet or the Debtors. Hawk, thereafter, sought an order compelling the Debtors to turnover this information and noted that Hawk's initial investigation indicated the Zhongsheng Term Sheet was fraudulent.[158] The Court denied Hawk's motion to compel but nevertheless ordered the Debtors to comply with certain document requests related to Zhongsheng, including all negotiations surrounding the Term Sheet and contact information for the Debtors' contacts at Zhongsheng.[159]

With respect to the contact information, on August 7, 2023, the Debtors produced three business cards in Chinese for the two individuals who allegedly represented Zhongsheng in the negotiations of the Zhongsheng Term Sheet. One of the individuals was named "Zhe Li" and the other was named "Wang Chao," neither of whom worked for Zhongsheng. The next day, on August 8, 2023, the Debtors filed the Sixth Rajan Declaration, wherein Mr. Rajan declared that "Zhe Li" was "Tea Lee" and "Wang Chao" was "William Wang" (who was another individual the

---

[156] *See id.* at 55:16–24.

[157] *See Debtors' Response in Opposition to Hawk Investment Holdings Limited's Motion and Supplement to Compel Discovery and Impose Sanctions for Failure to Comply* [ECF No. 311], at Ex. A.

[158] *See Hawk Investment Holdings Limited's Motion to Compel Discovery and Impose Sanctions for Failure to Comply* [ECF No. 295].

[159] *See Order Denying Hawk Investment Holdings Limited's Motion to Compel Discovery and Impose Sanctions for Failure to Comply, Extending Discovery, and Order Disclosure of Information* [ECF No. 322], at ¶ 2.

Debtors had disclosed as a purported contact at Zhongsheng).[160]  In this declaration, Mr. Rajan alleged that Hawk had contacted the wrong "Zhongsheng" entity, and claimed that the Zhongsheng Term Sheet was with a private company named Zhongsheng Group Holdings Limited, rather than the public company by the exact same name that Hawk had investigated.[161]  This affidavit directly conflicted with Mr. Park's testimony during the June Hearing.

The following day, on August 10, 2023, the Debtors produced the documentation ordered by the Court relating to the negotiations of the Zhongsheng Term Sheet, which included only one responsive document that was a screenshot of an unexecuted signature page of the term sheet from an individual named Jeff Shammah.[162]  The Debtors did not provide a single draft of the agreement, a single redline of the agreement, or a single communication with any individual purporting to represent Zhongsheng in the negotiations surrounding the Zhongsheng Term Sheet.  Debtors clearly withheld at least one responsive document—the Zhongsheng Term Sheet that they produced was signed by Mr. Lee, but not Mr. Rajan.[163]  Clearly, Mr. Rajan at least had one additional communication that he did not produce, as he had to execute the document and email it back to the alleged representatives of Zhongsheng with whom he was negotiating.  .

During his cross-examination, Hawk questioned Mr. Rajan about some of these discrepancies.  First, Mr. Rajan disclaimed Mr. Park's testimony that Zhongsheng was a publicly held company, stating, "Yes, I disagree with [Park's testimony].  He's new to the company.  He wasn't involved in it.  And he's getting up to speed on this in the company, but he wasn't involved

---

[160] *See Declaration of Mathu Rajan in Support of Debtors' Opposition to Hawk Investment Holdings Limited's Supplement to Motion to Compel Discovery and Impose Sanctions for Failure to Comply (Docket No. 307)* [ECF No. 326], at ¶¶ 5, 14 [hereinafter, the "Sixth Rajan Declaration"].

[161] *See id.* at ¶ 19.

[162] *See* Zhongsheng Term Sheet Screenshot [CR-230].

[163] *See id.*

in the term sheet so that his testimony is incorrect."[164]  Second, Mr. Rajan testified that although

neither Mr. Wang or Mr. Lee were employed by Zhongsheng, they represented to him that they

had authority to bind Zhongsheng.[165]  Mr. Rajan, however, obtained no documentation

substantiating that fact, nor had he conducted any diligence whatsoever with respect to

Zhongsheng.[166]  He had obtained no financial statements or records of Zhongsheng, no

capitalization table for Zhongsheng, or any other pertinent information.[167]  He could not even

identify the types of cars the company sells.[168]  Finally, Mr. Rajan again reiterated that Hawk had

investigated the wrong company.[169]  He maintained this position even after Hawk produced the

annual report of Zhongsheng (the publicly traded company) identifying its headquarters as, "No.

20 Hequ Street, Shahekou District, Dalian, PRC," which is the exact same address identified as

the address of the investor on the Zhongsheng Term Sheet.[170]

> 2.    <u>All Evidence Suggests the Zhongsheng Term Sheet is Fraudulent</u>

Based on the forgoing timeline and evidence, the record establishes that the Zhongsheng

Term Sheet was a complete fabrication, based on at least the following.

Mr. Rajan was apparently the only person involved in the negotiations of the Zhongsheng

Term Sheet, and he excluded even Mr. Park, despite Mr. Park being proposed to serve as CFO of

the Debtors and being tasked with fundraising for approximately 36 days prior to the execution of

---

[164] *See* September 25 Transcript [ECF No. 427] (Rajan), at 85:21–24.

[165] *See id.* (Rajan) at 64:14–18.

[166] *See id.* (Rajan) at 64:19–65:11.

[167] *See id.* (Rajan) at 69:15–71:20.

[168] *See id.* (Rajan) at 71:21–72:6.

[169] *See id.* (Rajan) at 86:19–87:3.

[170] *Compare* Zhongsheng Term Sheet [CR-229, Ex. A], *with* 2021 Annual Report of Zhongsheng Group [CR-254], at 2.

the document.[171]   The Debtors produced no witness besides Mr. Rajan to substantiate the document, even after Hawk alleged it was fraudulent.   The "contacts" with whom Mr. Rajan allegedly negotiated the Zhongsheng Term Sheet are not affiliated with Zhongsheng.[172]   The Debtors have produced no negotiations, communications, or drafts of the documents, even after compelled to do so, other than one screenshot of a document that is not countersigned.[173]

The Debtors could not keep their story straight with respect to who negotiated the Zhongsheng Term Sheet opposite Mr. Rajan.   The individual(s) with whom Mr. Rajan negotiated the Zhongsheng Term Sheet evolved from (i) "Tea Lee" to (ii) "Tea Lee" and "William Wang" to (iii) "Zhe Li" and "Wang Chao," without any verification that the individuals were the same or explanation for why these individuals' "real" names had not been previously disclosed.[174]   Mr. Rajan also testified that he never verified that anyone from Zhongsheng had authority to execute the Term Sheet, but was simply informed during a phone call with the investor's alleged in-house counsel, that Tea Lee had the requisite authority.[175]

Similarly, Mr. Park testified on *direct* examination that Zhongsheng was a publicly traded company on the Hang Seng stock index in Hong Kong, yet Mr. Rajan testified and submitted declarations that it is a privately held company.[176]   Despite Mr. Rajan's statements to the contrary, the "public" Zhongsheng's corporate headquarters are located at the exact same address as that included on the Zhongsheng Term Sheet—both "No. 20 Hequ Street, Shahekou District, Dalian,

---

[171] *See* June 29 Transcript [ECF No. 305] (Park), at 55:21–24.

[172] *See* Sixth Rajan Declaration [ECF No. 326], at ¶ 14.

[173] *See* August 15 Transcript [ECF No. 367] (Debtors' counsel), at 49:21–50:5; *see also id.* (Court) at 57:9–12 ("No, Mister - - I am annoyed.  I am extremely annoyed because all I see is - - this is litigation tactics…. I know the games litigators play.").

[174] *See* August 15 Transcript [ECF No. 367] (Debtors' counsel), at 33:16–22.

[175] *See* Sixth Rajan Declaration [ECF No. 326], at ¶ 17.

[176] *Compare* June 29 Transcript [ECF No. 305] (Park), at 55:21–24, *with* September 25 Transcript [ECF No. 427] (Rajan), at 83:24–84:3.

PRC."[177]  Mr. Rajan's explanation for this coincidence is that apparently there is a publicly traded company named Zhongsheng Holdings Group Limited with headquarters at this address, and the private company he negotiated with has the exact same name and exact same address.[178]  This "explanation" is clearly not credible. This conclusion is supported by counsel for Debtors refusing to correct the record by recalling Mr. Park to testify accurately. The Zhongsheng Term Sheet is of course a complete fabrication, and as though waiving the white flag, Mr. Rajan downplayed the Zhongsheng Term Sheet on the last day of the September Hearings and testified that it was a "non-binding" term sheet which Stream didn't even need.[179]

**M.    Mr. Rajan Is a Faithless Fiduciary to the Debtors—All Roads Lead to VSI**

Under Hawk's version of the facts (as borne out by the evidence in the record—or lack thereof), Mr. Rajan is a faithless fiduciary who has filed these cases in bad faith in order to park behind the automatic stay while he absconds with the Debtors' assets in his other business entity—VSI.  Under Mr. Rajan's version of the facts, the "Debtors" are operating, but all of their operations are proceeding through VSI pursuant to concealed arrangements and agreements, with VSI capturing all of the corporate opportunities and upside.  Even if Mathu Rajan's fictitious alternate reality were true, all Debtors have managed to prove is that Mr. Rajan has grossly mismanaged the bankruptcy estates by funneling all business and opportunities to VSI.  Under either scenario, Mr. Rajan is mismanaging these Chapter 11 Cases by his brazen conflicts of interest and self-dealing.

---

[177] *Compare* Zhongsheng Term Sheet [CR-229, Ex. A], *with* 2021 Annual Report of Zhongsheng Group [CR-254], at 2.

[178] *See* September 25 Transcript [ECF No. 427] (Rajan), at 146:22–147:8.

[179] *See id.* (Rajan), at 191:20.

1.    <u>Hawk's Allegations—Attempting to Abscond with Assets</u>

Mr. Rajan's goal from the start of these cases was to stop the 225 Action in order to formulate a plan by which VSI would be able to acquire the Debtors' assets freed from the burden of the Secured Creditors' liens.  This was, in fact, the same plan he sought to implement during the Prior Bankruptcy Cases, with the only difference being that he previously attempted to funnel the Debtors' assets into his other company, VTI.[180]  Astutely, this Court recognized early in these Chapter 11 Cases that Mr. Rajan had direct conflicts of interest, admonishing the Debtors that, "[Mr. Rajan]'s on all sides of these deals, and in his position, he has a fiduciary obligation to each and every one of those entities….  I don't know who's interests [Mr. Rajan]'s promoting at this point.  Is it Stream?  Is it SeeCubic BV?  Is it VSI?"[181]    Undeterred, however, the evidence has shown that Debtors continued to pursue only insider transactions to date, and such insider and conflicted transactions remain the focal point of the Disclosure Statement (as defined below), Draft Plan, and proposed financing options.  These proposals and other actions taken by the Debtors during the course of these Chapter 11 Cases have demonstrated Mr. Rajan's abject abandonment of the Debtors' estates in order to accomplish this transaction for VSI's benefit.

Specifically, in April, the Debtor sought approval of a *sub rosa* plan by requesting authority to enter into several transactions purportedly in the ordinary course of business with VSI.  These proposals included the sale of Stream's equity to VSI to finance the estates and entry into a worldwide, perpetual, exclusive licensing and distribution agreement with VSI that would provide VSI with access to all of Streams' technology and "know how," entitle VSI to a portion of Stream's revenue, and yet burden Stream with a variety of unexplained costs.[182]  Contemporaneously with

---

[180] *See supra*, Statement of Facts § C.

[181] April 25 Transcript [ECF No. 179] (Court), at 248:12–24.

[182] *See* OCB Motion [ECF No. 135], at ¶ 13–14, 22–27.

this request, the Debtors explained they planned to pursue a stock exchange merger of VSI and Stream after the conclusion of the Chapter 11 Cases, with VSI as the resulting business.[183] Ultimately, the Court declined to grant this relief, noting that it would not make any decision resulting in a "fait accompli."[184]

In July, however, the Debtors made essentially the same proposal as part of their Draft Plan (which they attached to a Disclosure Statement).[185]  As filed, the Draft Plan proposes to provide VSI with 90% of the Debtors' equity for its participation as Plan Sponsor and financier—to the tune of $35 million.[186]  Using this equity in the Debtors, VSI and the Debtors would once again merge pursuant to a stock exchange transaction, leaving VSI as the surviving entity.[187]  The Disclosure Statement and Draft Plan on the docket, however, are not confirmable in their current state, as they are riddled with inconsistencies, mismatched terms, and entirely blank provisions.[188] To date, the Debtors have not sought approval of the Disclosure Statement, so they appear to have filed it to attempt to maintain exclusivity.  The Debtors have not disclaimed the transactions and proposals in the Draft Plan, so it appears to reflect their ultimate strategy for these Chapter 11 Cases.[189]

---

[183] *See* Employee Motion [ECF No. 134], at ¶ 21.

[184] *See* April 24 Transcript [ECF No. 178] (Court), at 33:18–19.

[185] *See Disclosure Statement for Joint Plan of Reorganization of Stream TV Networks, Inc. and Technovative Media, Inc. Pursuant to Chapter 11 of the Bankruptcy Code* [ECF No. 293] [hereinafter, the "Disclosure Statement"]; Exhibit A, Disclosure Statement [ECF No. 293-1] [hereinafter, the "Draft Plan"].  It is important to note that no Plan of Reorganization was actually filed on the docket by the expiration of the exclusivity period, July 13, 2023, and that the Debtors' motion to extend the exclusivity period has not been granted.

[186] *See* Draft Plan [ECF No. 293-1], at 9.01(a).

[187] *See* Employee Motion [ECF No. 134], at ¶ 21.

[188] *See, e.g.*, Disclosure Statement, §§ I.A (omitting details about the Restructuring Agreements), VI.C (including blank milestones), and XIV.C.1(b) (omitting a Liquidation Analysis).

[189] *See* August 17 Transcript [ECF No. 370] (Rajan), at 78:14–25.

Worse yet, Mr. Rajan has caused the Debtor to take steps to render the Draft Plan (or some other plan with VSI being the ultimate purchaser of the Debtors' assets) the only option.  For example, Mr. Rajan testified that he signed a License Covenant on behalf of Stream with Rembrandt which bound Stream to pay Rembrandt up to $3,600,000.[190]  The sole "benefit" to the Debtors in exchange for this payment—as Mr. Rajan admitted—was to prevent Rembrandt from granting a license of its intellectual property to certain parties, including the Secured Creditors, SCBV, and related parties.[191]  As Mr. Rajan explained, this restriction was "to ensure that it is clear that the VSI Parties will have the sole right to commercialize the technology and products developed by Stream to the exclusion of the lenders, creditors, and shareholders of Stream."[192]  In other words, Mr. Rajan caused the Debtors to agree to pay millions of dollars in order to hamstringing the Debtors' ability to pursue potentially value-maximizing transaction from anyone other than VSI, and again seeking to hinder, delay and thwart efforts of his creditors to recover the funds owed to them.

Though Mr. Rajan has recently testified that VSI now has an independent board of directors, there is no evidence to substantiate this claim.  There have been no records produced by VSI demonstrating that an independent board has been empaneled, and no member of the independent board has appeared in these cases in order to support any of the proposals to date.[193]  Indeed, VSI has yet to participate directly in any aspect of these Chapter 11 Cases, despite its

---

[190] *See* License Covenant [CR-222], at § C.1.

[191] *See id.* at § B.2.

[192] *Id.* at fifth "whereas" clause.

[193] In fact, Mr. Rajan has testified that Joe Corso, Tom Sago, and Dan Rink are on the independent board (*see id.* (Rajan) at 130:19–20), but Joe Corso is still signing documents on behalf of VSI under a purported limited power of attorney from November 2022 rather than as a member of the independent board.  *See, e.g.*, Licensing Covenant [CR-222], at pg. 4; Settlement Amendment [CR-246], at pg. 3.  Importantly, Stream has not produced this limited power of attorney as part of these Chapter 11 Cases nor during the 225 Action, so there is no evidence it exists.

pivotal role proposed in these cases, because Mr. Rajan is VSI.  Finally, notwithstanding any purported independent board, Mr. Rajan still maintains the controlling interest of VSI,[194] and, as witnessed just last week, Mr. Rajan attempted to testify as an officer of VSI in order to introduce evidence on VSI's behalf.[195]  Mr. Rajan *is* Stream, but he is also *VSI*—and it has become apparent that he has completely prioritized VSI to the Debtors' expense.

The foregoing actions, proposals, and transactions are not indicative of the Debtors operating in good faith in order to maximize the value of their estates for the benefit of their creditors.  Instead, they demonstrate a fatal conflict of interest and refusal to pursue transactions for any party's benefit other than Mr. Rajan.

2.    <u>Mr. Rajan's Allegations—Corporate Opportunities and Shadow Estates</u>

Even if the Court considers Mr. Rajan's testimony as true relating to the purchase orders, employees, operations, and strategic partnerships, that still would not salvage the Debtors cases, as ***<u>all of these relationships are with VSI rather than the Debtors</u>***.  As noted above, Hawk is skeptical that these facts are true; however, such an arrangement with VSI would be unsurprising, given the Debtors' proposals with VSI during the pendency of these cases as outlined above. Taken together, such allegations demonstrate that Mr. Rajan is a faithless fiduciary who has transitioned all corporate opportunities to VSI at the expense of the Debtors and is essentially running shadow bankruptcy estates outside of the purview of the Court.

According to Mr. Rajan's own testimony, everything he states the "Debtors" have accomplished to date are actually with VSI.  All of the purported Purchase Orders are with VSI.[196]

---

[194] *See id.* (Rajan) at 193:13–15.

[195] *See* September 25 Transcript [ECF No. 427] (Debtors' counsel), at 175:4–10 (responding to a hearsay objection to Mr. Rajan testifying about VSI's internal affairs, with Debtors' counsel explaining, "[h]e's an officer of VSI, Your Honor.").

[196] *See* $14 Million Purchase Order [Debtor-20]; $140 Million Purchase Order [Debtor-21].

All of the employees are with VSI.[197]  All of the purported financing is going into VSI.[198]  The Draft Plan proposes VSI acquire 90% of Stream's equity.[199]  In other words, according to the Debtors' version of the facts, the vehicle to do business going forward is VSI—not the Debtors. There is simply no evidence demonstrating that the Debtors are obtaining any benefits from these transactions.

To accomplish this "shadow estate," the evidence has also shown that Mr. Rajan bound the Debtors to a perpetual, exclusive, worldwide distribution and licensing agreement to VSI.[200] Mr. Rajan then executed supposed purchase orders with VSI, where VSI purported to accept orders on behalf of Stream in an arrangement that ultimately netted VSI a 10% cut of each purchase order and placed certain obligations on Stream for costs that may be incurred by VSI.[201]  It is unclear what benefits VSI provided to the Debtors as part of this relationship—the technology and products are allegedly the Debtors' property; the employees at VSI are allegedly being paid on behalf of the Debtors; and Mr. Rajan was able to negotiate the purchase orders on behalf of either VSI or the Debtors, but he chose VSI.   In other words, Mr. Rajan is diverting corporate opportunities away from the Debtors and directing business into to another entity he controlled in order to place the Debtors' (alleged) resulting revenues into an entity unencumbered by the Secured Creditors' debts.

---

[197] *See* August 17 Transcript [ECF No. 370] (Rajan), at 80:1–6.

[198] *See id.* at 83:6–9.

[199] *See* Draft Pln [EF No. 293-1], at § 9.01(a).

[200] *See* OCB Motion [ECF No. 135], Ex. C, at first "whereas" cause.

[201] *See* Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Motions for Entry of an Order: (1) Enforcing the Automatic Stay; (2) Directing the Turnover of Property of Debtors' Estate; and (3) Imposing Sanctions for Willful Stay Violations [ECF No. 114], at ¶ 12; *see also* Purchase Orders [Debtor-18 to Debtor-21] (showing purported purchase orders from third parties to VSI and then mirrored orders between VSI and Stream at 90% the price of the third party purchase orders).

Indeed, Mr. Park shockingly admitted on the stand that he was tasked with raising money for *VSI, not Stream*, even though he was purportedly the acting CFO of Stream and proposed to be compensated by the estates.[202]  As Mr. Park described it, he and Mr. Rajan discussed VSI and Stream as though they were one in the same, and that there "wasn't a bifurcation or delineation between Stream as a legal entity versus VSI as to what I was raising capital for."[203]  It appears Mr. Rajan had similarly been involved in fundraising efforts for VSI until only recently, as he testified that he "turned over leads and a number of shareholders [of VSI] are negotiating" fundraising options.[204]

In other words, if any of Mr. Rajan's testimony is true regarding the alleged operations, employees, and business relationships, the record establishes that he completely abdicated his duties to these estates in an effort to benefit VSI and is only now trying to recast such transactions for the Debtors' benefit after the Court noted the cases' lack of progress.

## **REQUESTED REMEDIES**

### A.    **Options and Decision Tree**

The Court has before it a menu of options from which it may fashion relief.  The Hawk Motions include the Stay Relief Motion, which requests the Court grant Hawk relief from stay to conclude the 225 Action, and the Conversion Motion, which requests the Court convert or dismiss the Chapter 11 Cases or appoint a trustee in the alternative.  Each of the Hawk Motions requests relief with respect to each of the Debtors.

If the Court grants dismissal with respect to either entity, the Court does not need to reach the question of whether it should grant the Stay Relief Motion with respect to such dismissed

---

[202] June 29 Transcript [ECF No. 305] (Park), at 75:24–76:5; *id*. at 89:15–24.

[203] *See id.* (Park) at 89:15–24.

[204] August 17 Transcript [ECF No. 370] (Rajan), at 83:5–9.

entity.  The Court then would merely have to determine if the Debtors' conduct justifies a ban on
re-filing.  The Court's dismissing (or not) of either or both of the Debtors does not impact the other
Debtor's case, and the Court would still need to make determinations as set forth below.

Unless the Court has dismissed the case, the Court must consider whether to convert such
case(s) to Chapter 7 or appoint a Chapter 11 trustee.  Regardless of which of these alternatives the
Court selects, it would then also have to determine whether to grant the Stay Relief Motion.

Each of these options is independent of the other, and the Court may choose any option
regardless of what occurs in the other case.[205]

## B.    Hawk's Requested Remedy

Hawk has established that it is entitled to all of the remedies explained above. Hawk
respectfully requests that the Court fashion a remedy that provides the most expeditious path to a
solution that offers finality for all parties.  Given the parties' past dealings and aggressive litigation,
half-measures will only prolong this dispute to the detriment of all parties involved and potentially
render the technology obsolete.

Hawk believes the best path forward includes (a) granting Hawk relief from stay to
conclude the 225 Action before the Delaware Court of Chancery, and (b) converting both of Stream
and Technovative's bankruptcy cases to cases under Chapter 7.  This remedy would allow a
Chapter 7 trustee to become acquainted with the parties, the Chapter 11 Cases, and the estates'
assets while Hawk and the Debtors conclude the 225 Action with the Chapter 7 trustee involved
on the Debtors' behalf.  The Court would retain jurisdiction over the Debtors to ensure no parties
attempt trickery or deception.  Once the 225 Action concludes, the parties can return to this Court
knowing (a) the ownership structure of Technovative and whether its case is properly filed, (b) the

---

[205] Both Debtors are parties to the 225 Action. Therefore, the stay must be lifted as to both Debtors in order to pursue
the 225 Action.

amount of the Secured Creditors' liens, and (c) the mechanism for any future conversion rights of Stream of the Hawk Obligations, and what assets remain with the Debtors' estates for the trustee to administer.

Hawk requests the Court grant conversion of the Chapter 11 Cases over the alternatives, because of the efficiencies created by removing Mr. Rajan from managing the Debtors while the Court continues to provide oversight over the cases. As explained above, Mr. Rajan has operated the Debtors in a manner to leave the estates completely illiquid, so there would be no funds available to a Chapter 11 trustee. To the extent the Court believes Mr. Rajan with respect to operations, even the Debtors' acknowledge they have generated no revenues and have no money in the bank, and all such funding resides at non-Debtor VSI (if at all). Conversely, a Chapter 7 trustee would require a less robust investigation, could recover a commission from the liquidation of the Debtors' assets.

## **ARGUMENT**

### A.    **The Court Should Order Conversion of these Chapter 11 Cases to Chapter 7**

As applicable here, there are three bases under section 1112(b) pursuant to which the Court can order conversion of these Chapter 11 Cases—two statutorily defined "causes" and one judicially-created additional "cause." Section 1112(b)(4) statutorily defines "cause" in, relevant part, to include, "(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; [and] (B) gross mismanagement of the estate….".[206] Moreover, the Third Circuit has created an additional cause for dismissal under section 1112(b)— *i.e.*, when the debtor files their petition in bad faith.[207]

---

[206] 11 U.S.C. § 1112(b)(4).

[207] *See 15375 Mem'l Corp. v. BEPCO, L.P. (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618 (3d Cir. 2009) ("Chapter 11 bankruptcy petitions are subject to dismissal under § 1112(b) unless filed in good faith, and the burden is on the bankruptcy petition to establish good faith.").

When a movant establishes that "cause" under any of the foregoing theories by a preponderance of the evidence, a court "shall" dismiss or convert the case (or appoint a Chapter 11 trustee) depending on which alternative is in the best interest of the creditors and the estate.[208] Once a movant establishes such cause, the burden shifts to the opposing party to show why the requested relief would not be in the best interests of the estate and its creditors.[209]

In this case, the evidence demonstrates (and the Court has found)[210] that Hawk has carried its burden in establishing that cause under any of the applicable alternatives exists as set forth below.  The only remaining question was (and is) whether Debtors could carry their burden to rebut the substantial evidence presented by Hawk during the Hearings. The Debtors, however, have failed to do so.

    *1.*    *Statutory "Cause"*

As noted above, subpart (b)(4) of section 1112 provides a non-exhaustive list of events constituting "cause" for the purposes of dismissal or conversion.  In relevant part, this list includes, "(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; [and] (B) gross mismanagement of the estate…."[211]

First, statutory "cause" including a substantial or continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation requires the movant establish both of these elements—*i.e.*, (a) substantial and continuing losses ***and*** (b) inability to rehabilitate—by a preponderance of the evidence.[212]  Moreover, "rehabilitation" means something more specific

---

[208] *See In re 1121 Pier Village LLC*, 635 B.R. 127, 137 (Bankr. E.D. Pa. 2022).

[209] *See id.*

[210] *See* September 25 Transcript [ECF No. 427], at 159:5–7 (MR. CAPONI:  "At the first hearings, Your Honor found that the burden shifted."  COURT:  "Right, the burden shifted.")

[211] 11 U.S.C. § 1112(b)(4).

[212] *See Nestor v. Gateway Access Solutions, Inc. (In re Gateway Solutions, Inc.)*, 374 B.R. 556, 562 (Bankr. M.D. Pa. 2007).

than "reorganization" and requires the debtor to prove a viable business plan for the continuation of the business into the future.[213]

Second, statutory "cause" for gross mismanagement requires the movant establish that the debtors have mismanaged the *estate* and considers only post-petition activities, including considering disregard of fiduciary duties and failure to comply with requirements of the Bankruptcy Code. *Gateway Access*, 374 B.R. at 565–66.

At the outset an additional note is due. As detailed above, the evidence adduced at trial establishes that the Debtors have no operations, employees, or financing arrangements. Such lack of operations strikes directly at the heart of whether the Debtors can rehabilitate their operations. If, however, the Court finds Mr. Rajan's testimony regarding alleged arrangements with VSI are in fact true, the evidence would reflect that the Debtors have engaged in gross mismanagement in some manner—either by concealing substantial operations of the Debtor or by Mr. Rajan engaging in blatant self-dealing as a faithless fiduciary. In any event, the below analyzes both alternatives, but Hawk considers Mr. Rajan's testimony wholly incredible and asserts, it should be ignored.

(i)    Evidence Establishes Conversion Is Justified – Substantial Losses with No Ability to Rehabilitate

The record evidence establishes "cause" exists under section 1112(b) because the Debtors' estates are suffering losses and diminution to their values, without a reasonable likelihood of rehabilitation for either of the Debtors. *See* 11 U.S.C. § 1112(b)(4)(A). As demonstrated above, the Debtors are incurring substantial losses during these Chapter 11 Case, and they have never had any operations, as all of their value lies in the Operating Subsidiaries. The evidence shows that

---

[213] *See Santa Fe Minerals, Inc. v. BEPCO, L.P. (In re 15375 Mem'l Corp.)*, 386 B.R. 548, 552 (Bankr. D. Del. 2008), rev'd on other grounds, 400 B.R. 420 (D. Del. 2009).

the Debtors have no operations, no expenses, and no sources of financing[214]—zero operations less zero expenses plus zero financing always reflects zero operations.  To the extent, however, that Mathu Rajan has testified that there are substantial operations present, none of this is taking place at the Debtors—all of it is taking place at the VSI level, where Mr. Rajan is actively trying to siphon off Stream's assets and corporate opportunities.  Thus, even if Mr. Rajan's testimony were credible, it still establishes that the Debtors have no possibility to rehabilitate.

(a)     The Debtors Are Incurring Substantial Losses

Because the Debtors are each holding companies, the inquiry as to losses can end here.  As one court in the Eastern District of Pennsylvania noted, "where the debtor is not an operating company … but merely holds an intangible asset, the loss or diminution prong of § 1112(b)(4)(A) is not relevant…."[215]  Despite Mr. Rajan's empty claims, there is no evidence demonstrating any operations of Stream—pre- or post-petition.  Given that Debtors have no operations, it is not surprising then that the Debtors' own filings prove that the estates are suffering catastrophic losses—sinking *deeper* into the red during the course of these Chapter 11 Cases by approximately $7 million as detailed below.

Specifically, the evidence demonstrates that the Debtors incurred *at least* $7 million in administrative expenses (both approved and proposed) during the course of these Chapter 11 Cases.  Mr. Park testified that the Debtors had incurred an additional $750,000 of legal fees by the end of May 2023.[216]  The Debtors have also proposed to retain Mr. Park and have requested authority to pay his salary dating back to May 1, at a rate of $3,250 per week[217]—for a total of

---

[214] *See* March [ECF No. 223], April [ECF No. 224], May [ECF No. 253], June [ECF No. 253] Monthly Operating Reports.

[215] *See 3 Ram, Inc.*, 343 B.R. at 118 n.14.

[216] June 29 Transcript [ECF No. 305] (Park), at 99:3-6.

[217] *Id.* at 87:6-9 (Park).

$71,500 as of the date of this Brief.  Finally, the Debtors recently disclosed two documents Stream signed purportedly obligating it to pay Rembrandt up to $6 million, though the Debtors have not yet sought authority to enter into these agreements.[218]

The evidence shows the Debtors have generated no income, nor have they secured any post-petition financing.  Accordingly, the facts in the record demonstrate that the Debtors have no more than $1,724 in cash on hand with no approved financing activities or operations to generate income, yet the estates have incurred (or are proposed to incur) nearly $7 million of expenses since the Petition Date.  The Debtors' estates have collapsed into administrative insolvency, and there appears no means by which the Debtors can escape.

> (b)    The Debtors Have No Operations to Rehabilitate and Have Demonstrated No Intention to Do So

The Debtors have no operations to reorganize.  As set forth above, the evidence in the record establishes that the Debtors have no operations, no employees, and no revenues.[219] Moreover, they have apparently abandoned SCBV, which was their primary operating entity and represented the bulk of the value of the Stream business enterprise (*i.e.,* the corporate family).[220] Conversely, even if the Court believes the Debtors' narrative about their supposed operations, the evidence that is available shows those operations are all at VSI.  So the Debtors still have not established that they have any business to rehabilitate.  In fact, the Debtors have conceded that there are no revenues on their Monthly Operating Reports, and Mr. Rajan has not alleged otherwise.[221] Without operations, the Debtors cannot propose a business plan or establish that they will have any operations in the future, so they are *per se* unable to rehabilitate.  Similarly, even if

---

[218] License Covenant [CR-222]; Settlement Amendment [CR-246].

[219] *See supra*, Statement of Facts § I.1.

[220] *See supra*, Statement of Facts § H.

[221] *See* July Monthly Operating Report [ECF No. 399], at Part 1, line b.

the Court accepts Mr. Rajan's representations that VSI has been paying hundreds of thousands (if not millions) of dollars on behalf of the Debtors (thus the Debtors have operations to rehabilitate), the Debtors still fail to carry their burden, because all such operations are with VSI.[222]

More importantly, regardless of whether the Court believes the evidence or Mr. Rajan's testimony, the evidence shows that since the start of these Chapter 11 Cases, the Debtors' sole efforts have been directed at ensuring that Mr. Rajan retains control of the Debtors' assets through an arrangement with VSI and Rembrandt.  Such proposals cannot meet the standard of "rehabilitation," because the proposals do not anticipate the Debtors' continuing operations.  The Debtors have introduced no evidence in the nature of business plans or financial projections for the Debtors—indeed, there is no need to engage in such projections or plans, because all of the operations and business would be going through VSI.

Therein lies the rub.  The problem the Debtors face is that Mr. Rajan refuses to consider any restructuring alternative that would result in his losing control over the Debtors' assets.  Therefore, the Debtors are unable to propose a confirmable plan under parameters that result in Stream existing as an operating business, otherwise the Secured Creditors' interest would endure.  Failing to demonstrate an ability or willingness to consider restructuring alternatives—traditional financing, third party investments, etc.—the Debtors are simply unable to propose a confirmable plan that provides for the rehabilitation of the estates.[223]  Accordingly, cause exists under section 1112(b) to convert these cases.

(ii)    <u>Evidence Establishes Conversion Is Justified – Gross Mismanagement</u>

---

[222] It is important to note that if the Court makes this determination, it must also inherently find that the Debtors grossly mismanaged their estates by failing to disclose these operations, employees, and expenses for nearly six months (as discussed below).

[223] *See Ramreddy*, 440 B.R. at 115 ("[W]hen a Chapter 11 debtor has no intention or ability to reorganize … a debtor [should] not be permitted to remain in bankruptcy simply in order to enjoy the protections of the automatic stay.") (internal citations omitted).

Similarly, the evidence adduced during the Hearings definitively establishes that the Debtors have grossly mismanaged these estates. Debtors-in-possession owe fiduciary duties to their estates and the creditors in exchange for the broad powers and protections endowed on them by the Bankruptcy Code.[224] As such, mismanagement may include a debtor's management's breach of such fiduciary duties and failure to comply with the requirements of the Bankruptcy Code, including seeking approval of post-petition lending/borrowing,[225] and failure to keep the court and parties in interest apprised of the debtor's operations.[226]

The Debtors' bad faith intentions in initiating the Chapter 11 Cases have permeated the rest of the proceedings, manifesting in (a) gross violations of fiduciary duties and conflicts of interest, (b) lack of candor to the Court and interested parties, (c) blatant gamesmanship, and (d) likely fraud. This Court understood early that Mr. Rajan had direct conflicts of interest[227] It is no surprise, given these glaring conflicts of interest, that the Debtors' estates have been grossly mismanaged.

(a)      Mr. Rajan Has Breached His Fiduciary Duties

Under either Hawk's theory of the facts or Mr. Rajan's theory, the evidence supports a finding of gross mismanagement, because either (a) Mr. Rajan has caused these cases to fester, incurring millions of dollars in administrative expenses, while he pursues his own interests in having VSI acquire the assets, or (b) he has siphoned all corporate opportunities of the Debtors to VSI in order to set up a shadow business, while intentionally concealing these transactions.

---

[224] *Gateway Access*, 374 B.R. at 565.

[225] *See Domiano v. Domiano (In re Domiano)*, 442 B.R. 97, 105 Bankr. M.D. Pa. 2010) ("Failure of a debtor to properly report income and expenses constitutes evidence of 'gross mismanagement' under § 1112(b)(4)(B).").

[226] *See Gateway Access*, 374 B.R. at 566 ("The court finds that entering into unapproved, unauthorized corporate borrowings on 'oral terms' is evidence of gross mismanagement of the estate.").

[227] April 25 Transcript [ECF No. 179] (Court), at 248:12–24.

Regardless, Mr. Rajan is a hopelessly conflicted and faithless fiduciary leading to a gross mismanagement of these estates.

Mr. Rajan's breaches of his fiduciary duties include:

- Entering into a perpetual, exclusive, worldwide distribution and licensing agreement to VSI;[228]

- Seeking to hire several employees of VSI;[229]

- Merging VSI and Stream by a stock exchange after confirmation of a plan;[230]

- Executing supposed purchase orders with VSI, and using VSI as the intermediary with the purported purchasers;[231] and

- Using VSI as the "Plan Sponsor" to receive 90% of the Debtors' equity under the Draft Plan.[232]

Moreover, if the Court accepts Mr. Rajan's assertions that the Debtors have operations that VSI funded through the Chapter 11 Cases, the Debtors have engaged in several additional self-interested transactions, including:

- Financing the cases by selling Stream's Stock to VSI on a post-petition basis;[233]

---

[228] Debtors' Exhibit 35 [ECF No. 135-3].

[229] August 17 Transcript [ECF No. 370] (Rajan), at 154:8-12 ("Q: From the filing of the bankruptcy up until yesterday, Stream had no employees, correct? A: Stream had contractors who are doing work for them currently. And now, they have now been moved over since we finally got a bank account open. They -- they have been moved.").

[230] *See Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay (I) Prepetition Employee Obligations, (II) Prepetition Withholding Obligations, (III) Post-Petition Employee Obligations in the Ordinary Course* [ECF No. 134] (the "Employee Motion"), at ¶ 21 ("VSI and Stream are in negotiations for VSI to serve as Debtors' bankruptcy plan sponsor, subject to approval of the Bankruptcy Court. As part of the Debtor's reorganization plan negotiations, VSI and Stream hope to execute a business combination of both entities through a stock exchange….").

[231] Debtors' Exhibits 18 through Debtors' Exhibit 21; August 17 Transcript [ECF No. 370] (Rajan), at 46:15-16.

[232] *See* Draft Plan [ECF No. 293-1],at § 9.01(a).

[233] August 17 Transcript [ECF No. 370] (Rajan), at 205:21-206:1 ("Q: VSI has been paying all the expenses of the Debtor since filing a bankruptcy, correct? A: Yes, that is correct. Q: And for all the money that VSI spends, it receives an allotment of stock in Stream, correct? A: That is correct.").

- Utilizing VSI's employees to do work on behalf of the Debtors without Court approval;[234] and

- Executing Subscription Agreements and selling shares to VSI during the course of the Chapter 11 Cases as payment for the Debtors allegedly using these employees.[235]

Such extensive and continuous conflicts of interest belie any suggestion that the Debtors are exercising their fiduciary duties for the benefit of the estates and their creditors.

More than merely engaging in self-interested transactions, the Debtors have purported to take steps that affirmatively limit their options during these bankruptcy cases and *decrease* the potential value to be derived from their assets. For example, the Debtors purportedly signed the Distribution Agreement, which grants VSI a worldwide, perpetual, exclusive license to use the Debtors' intellectual property.[236] Similarly, the Debtors have recently produced the Rembrandt License Covenant, pursuant to which the parties expressly sought to limit the ability of certain parties to utilize and monetize the Rembrandt IP and try to steer the Rembrandt IP solely into VSI.[237] Each of these agreements is designed specifically to *limit* the potential avenues to capitalize on the Debtors' assets—inherently reducing the assets' value. There is simply no business justification for executing these types of agreements other than attempting to limit potential restructuring alternatives—including those that may provide more value to stakeholders—which inherently means the Debtors are not exercising their fiduciary duties to the estates.

---

[234] August 17 Transcript [ECF No. 370] (Rajan), at 204:18–24 (Q:  "Mr. Rajan, these individuals that we're referring to that are doing work for Stream up until yesterday, they were 1099 independent contracts, correct?  A:  Correct.  Q:  And the party with whom - - for whom they were a 1099 employee was VSI, correct?  A:  Was VSI doing work for Stream.  Correct.")

[235] August 17 Transcript [ECF No. 370] (Rajan), at 204:22-205:11.

[236] Debtors' Exhibit 35 [ECF No. 135-3].

[237] *See* Licensing Covenant [CR-222]; *see also* September 25 Transcript [ECF No. 427] (Rajan), at 43:18–22 (Q:  "And the purpose of this document was Stream had requested that Rembrandt refuse to license that technology to anyone other than VSI and Stream in exchange for an additional payment of $3.6 million, correct?"  A:  "Correct.").

While Mr. Rajan has pursued these conflicted and improper transactions, the estates have suffered to the tune of over $7 million—money coming directly out of the creditors' pockets and providing only value to Mr. Rajan, either in seeking to abscond with the assets or in redirecting business opportunities away from the Debtors.  There is no argument that incurring such administrative expenses in the pursuit exclusively of strategies that benefit insiders can possibly comply with Mr. Rajan's fiduciary duties.

(b)      The Debtors have Ignored Their Disclosure Obligations

Part and parcel of a debtors' fiduciary duties during the course a bankruptcy case is a debtor's duty of candor to the court and its stakeholders.  The hallmark of a bankruptcy case is transparency and disclosure, and a debtor's failure to fulfill such obligations is evidence of mismanagement.[238]

Once again, considering the two theories of the evidentiary record, if the Court believes Hawk's evidence, the Debtors have failed to comply with their disclosure requirements by purporting to execute several postpetition agreements without court approval.  Conversely, if the Court believes Mr. Rajan's testimony, Hawk's case is stronger yet.  In addition to executing postpetition agreements without authority, under Mr. Rajan's testimony, the Debtors also concealed prepetition assets, failed to make complete disclosures on their monthly operating reports, and failed to fix known errors on their monthly operating reports.

Assuming Mr. Rajan's testimony is true, the Debtors have *admitted* that they have executed no less than seven postpetition agreements without ever seeking Court approval for any of them, including:

---

[238] *See Domiano*, 442 B.R. at 105.

- Postpetition Subscription Agreements with VSI;[239]

- Rembrandt Licensing Covenant;[240]

- Rembrandt Settlement Amendment;[241]

- Engagement of Jeff Shammah or Blue Ocean Capital;[242]

- Arrangement with Fuji Prem;[243]

- Purported Customer Contract with BOE;[244] and

- Purported Customer Contract with Google.[245]

Such a brazen failure to request court approval for such important and material documents to the Chapter 11 Cases demonstrates gross mismanagement and the Debtors' intentional concealment of these agreements to avoid scrutiny.

Additionally, Mr. Rajan's testified, the Debtors have concealed much more than merely postpetition agreements—they have concealed estate assets, financing arrangements, and postpetition operations and disbursements as well. For example, after inadvertently disclosing the

---

[239] Debtors' counsel lied directly to the Court about this point. *See* April 24 Transcript [ECF No. 178] (Debtors' counsel), at 28:12–15 (Court: "Counsel, did they sell shares post-petition?" Debtors' Counsel: "Have they sold shares post-petition?" Court: "Uh-huh." Debtors' Counsel: "No, we're waiting for approval for this motion…."); id. (Court) at 31:16–21 ("I'm not quite sure how that's [i.e., selling stock] ordinary course to begin with, which is why I know you would have never done it without coming to this court because, you know, you can't do it."); *see also* August 17 Transcript [ECF No. 370] (Rajan) at 125:14-126:1 (admitting Stream has pre and post-petition subscription agreements in place).

[240] Though the Debtors claim these are incorporated into the Draft Plan, no provision of the Draft Plan provides for the execution of the License Covenant, and the Licensing Covenant specifically contemplates the Draft Plan not being approved and it remaining effective. See Licensing Covenant [CR-222], at C.5 ("If the VSI Parties make all 12 monthly payments but no bankruptcy plan has been approved, the covenant shall remain in full force…."). Moreover, no part of the Draft Plan discloses the terms of the Settlement Amendment sufficiently to enable any party to assess the propriety thereof.

[241] *See* Settlement Amendment [CR-246].

[242] September 25 Transcript [ECF No. 427] (Rajan), at 32:17-33:6.

[243] August 17 Transcript [ECF No. 370] (Rajan), at 28:21-24.

[244] *Id.* (Rajan) at 200:25–14 (Q: "Does the Debtor currently have customers in which it intends to sell its products to?" A: "Yea. Number 1 is BOE…. They introduced us to their customers, and those customers have become customers of Stream TV.").

[245] *Id.* (Rajan) at 201:22–25.

existence of prepetition subscription agreements during a hearing on April 24, 2023,[246] the Debtors

nevertheless failed to revise their Schedules and Statements of Financial Affairs to reflect such

agreements, suggesting Mr. Rajan lied.  As of the August Hearings, however, the Debtors are now

affirmatively stating that such prepetition subscription agreements not only exist, but that the

Debtors have been using them to financing the Chapter 11 Cases to date.[247]  The Debtors have

apparently been doing so without amending their Schedules and Statements of Financial Affairs

or disclosing any of these third-party advances by VSI on their monthly operating reports.  Though

Hawk questions whether this arrangement exists, if it does, it was completely concealed.

Indeed, if any of these claims by Mr. Rajan were real, there would be ample documentary

evidence, created in real time, to back it up—emails, wire transfers, copies of checks. But these

things either do not exist, or were intentionally withheld. Instead of amending the operating reports

and including documentary evidence, the Debtors filed their July Monthly Operating Report,

which included an alleged breakdown of amounts advanced by VSI on a monthly basis.[248]  The

---

[246] April 24 Transcript [ECF No. 178], at 43:5-18 (MR. ZAHRALDDIN: "Your Honor my client just called me, and he's happy to speak to you and confirm this. But there were subscription agreements that were done prepetition, and he indicates that there is money in the accounts that can pay these much smaller amounts that are just wages. So we could make the payment and get it done today. THE COURT: No, because you're telling me -- now you're telling me something that wasn't disclosed. All of a sudden there's money from subscriptions that were not disclosed? MR. ZAHRALDDIN: Let me make sure it was disclosed. Mr. Fisher, do you know if we have any disclosures in the schedules? MR. FISHER: No, they're not on the schedules.").

[247] August 17 Transcript [ECF No. 370] (Rajan), at 125:10-20 ("Q: In terms of that money, are there any agreements between VSI and Stream? A: Yeah. Stream TV has a number of pre-petition agreements as well as post-petition. Q: In terms of pre-petition agreements, what pre-petition agreements? A: There's still -- off the top of my head, I think it's like another two million or three million. I'm not -- I've got to go back and check, but there's still unused subscriptions that Stream is collecting right now. And then we have a subscription for the reorganization plan already in place.").

[248] Even this shorthand attempt at cleaning up the docket is incorrect, however, as the July Monthly Operating Report indicates that VSI paid approximately $750,000 on the Debtors' behalf during the month of July 2023, but the Schedule providing the breakdown of such expenses does not include *any* amounts for the month of July.

Additionally, the July Monthly Operating Report suggests VSI had advanced only $750,000 on behalf of the Debtors (that can be accounted for), yet Mr. Rajan's testimony alleges VSI has advanced the Debtors $1.5 million to $2 million over the course of the Chapter 11 Cases.  Though the Debtors have not filed their August Monthly Operating Report as of the date hereof, they produced information to Hawk that is not in evidence demonstrating only an additional $382,818 in expenses purportedly by VSI or the months of July and August 2023.  Thus, the Debtors' documentation

Debtors provided no support or additional detail other than this single page attached to the July Monthly Operating Report purporting to show where the Debtors (or VSI) expended these funds. Accordingly, to date, the Debtors' monthly operating reports for the months of March through June 2023 each show no employees, no operations, and no monies paid by third parties on behalf of the estates, despite the Debtors' allegations to the contrary and directly conflicting information included in the July report.[249]  Thus, every one of the monthly operating reports were incorrect when the Debtors filed them, and remain incorrect today.

Such lack of honest and complete disclosures is damning to any bankruptcy case, as the ability of the Court, United States Trustee, and creditors to trust the information the debtors have provided is complete, accurate, and timely is imperative.[250]  In this case, the Debtors' failure to provide such forthright disclosures demonstrates their gross mismanagement of the estates.

(c)      The Debtors have Engaged in Gamesmanship

The Debtors' refusal to be candid to the parties in interest has also manifested itself in blatant gamesmanship, with the Debtors refusing to participate in these Chapter 11 Cases in good faith and consistently making disclosures and requests for relief at the proverbial "eleventh hour." For example, the Debtors manufactured emergencies during the course of these Chapter 11 Cases, including by refusing to pursue traditional postpetition financing and delaying its original request to have VSI provide funding through stock sales until days before certain obligations came due.[251]

---

only even purports to substantiate VSI advancing approximately $1,133,631.  Mr. Rajan's testimony is either incorrect or VSI has advanced an additional $900,000 to the Debtors that cannot be accounted for.

[249] *See supra*, Statement of Facts § H.1.

[250]  *See Gateway Access*, 374 B.R. at 566 ("The court finds that entering into unapproved, unauthorized corporate borrowings on 'oral terms' is evidence of gross mismanagement of the estate.").

[251] April 24 Transcript [ECF No. 178], at 29:13-17 ("THE COURT: No, it wasn't -- it was not…Counsel--it was not an emergency.").

54

Similarly, the Debtors have reliably delayed disclosing material documentation and information until the eve of every Hearing on the Hawk Motions.  For example:

- April 14 Hearings – ***One day*** prior to the initial hearing on the Hawk Motions, the Debtors first disclosed the alleged Purchase Orders.[252]

- June Hearings – ***One business day*** prior to the June Hearings, the Debtors filed a Term Sheet (the "Zhongsheng Term Sheet"), with Zhongsheng Group Holdings Ltd. ("Zhongsheng") purporting to demonstrate Zhongsheng's intention to invest up to $300 million in the Debtors.[253]

- August Hearings –

  o ***One day*** before the August Hearings, during oral argument with respect to Hawk's Motion in Limine [ECF No. 340], the Debtors represented to the Court that VSI had purportedly closed a $100 million financing.

  o Additionally, the Debtors disclosed the Rembrandt Licensing Covenant [CR-222] on the evening of August 14, 2023, only ***a few hours after*** Mr. Rajan's deposition had concluded,[254] and they disclosed the Settlement Amendment [CR-246] ***two days later*** on August 16, 2023.[255]

- September Hearings – Shortly after ***3:00 a.m. (ET) on the day of*** the September 25 hearing, the Debtors sent several documents to Hawk purporting to be "rebuttal exhibits," including two UCC Termination Statements that the Debtors apparently filed purporting to terminate Hawk's recorded liens improperly and without authority.

Such selective and strategic disclosure of information has been intentional and is an obvious example of mismanagement of these estates by the Debtors.

---

[252] *See* ECF No. 98, ¶ 15 and Ex. A.

[253] ECF No. 238; CR-229, Ex. A.

[254] *See* September 25 Transcript [ECF No. 427], at 36:7–39:7 (discussing Mr. Rajan's deposition on August 14, and why the Licensing Covenant was not produced until after his deposition had concluded); *see also* Licensing Covenant [CR-222].

[255] *See id.* at 55:15–56:3 (discussing Mr. Rajan's deposition on August 14, but the Settlement Amendment not being produced until August 16, despite being executed on August 12); *see also* Settlement Amendment [CR-246] (dated August 12, 2023).

(d)      The Debtors Have Fraudulently Fabricated Documents

Finally, and most egregiously, Hawk established that, with respect to the information that the Debtors have disclosed, it is wholly untrustworthy—if not abjectly fraudulent. As noted above, one of the Debtors' "surprises" was the disclosure of the Zhongsheng Term Sheet the business day before the June Hearings. Given the suspicious nature of the terms and timing of its disclosure, Hawk investigated the Zhongsheng Term Sheet and has demonstrated that it has been fabricated by Mr. Rajan in order to defraud the Court and the Debtors' stakeholders.[256] The Debtors' continuously changing story and contradictory statements, inability to produce any negotiations or redlines, and inability to substantiate any portion of the Zhongsheng Term Sheet demonstrates that it is fraudulent.

The Debtors' intentions in introducing the Zhongsheng Term Sheet are clear—they sought to introduce a document purporting to demonstrate substantial and material financial interest in the Debtors on the day prior to the June Hearings (*i.e.*, the first substantive hearing on the Hawk Motions). If the Court thought a company was interested in investing $300 million in the Debtors, the Court may be less likely to grant the relief requested in the Hawk Motions. Thereafter, because the Zhongsheng Term Sheet was non-binding, the Debtors would walk away from it without recourse claiming the deal fell apart—an approach that Mathu Rajan utilized again and again to mislead investors during the 14 years of Stream's existence. The Debtors apparently did not expect Hawk to actually investigate the veracity of the term sheet, prompting them to scramble to defend their actions and leading to more lies, discovery gamesmanship, and yet more lies.[257] Now these

---

[256] *See supra*, Statement of Facts § L.

[257] *See id.*

lies have been exposed definitively.  Such blatant lies and duplicitous actions clearly demonstrate gross—if not criminal—mismanagement of the estates.

The evidence demonstrates the Debtors' gross mismanagement of these estates.  The Debtors have ignored their fiduciary duties, refused to provide full and consistent disclosures, engaged in gamesmanship, and likely committed fraud during the course of these Chapter 11 Cases.  It does not matter whether the Court believes Mr. Rajan's testimony or the other evidence in the record—in either circumstance, the Debtors have engaged in abjectly gross mismanagement of their estates.  The Debtors have failed to be transparent, provide disclosures, or comply with their obligations under the Bankruptcy Code—in other words, they have grossly mismanaged these estates.

2.      *Judicially-Created "Cause" – Bad Faith*

For the judicially-crafted "cause" standard, cases may also be converted if the court determines the debtors filed the petitions in bad faith.  The Third Circuit identified two elements for a "good faith" bankruptcy filing, "which ensure[] that the Bankruptcy Code's careful balancing of interests is not undermined by the petition—the filings must serve a "valid bankruptcy purpose" and the filings must not be "merely to obtain a tactical litigation advantage."[258]

Courts have held that a "bad faith" litigation tactic may be discerned based purely on the facts and circumstances surrounding the filing.  If, however, intent is not readily apparent from the facts, courts also consider the "totality of the circumstances" in deciding whether a debtor has filed its petition in bad faith. As discussed below, the totality of the circumstances indicates bad faith on the part of Debtors.

---

[258] *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 119–20 (3d Cir. 2004).

(i)    Evidence Establishes Conversion Is Justified – Bad Faith Litigation Tactic

The Debtors admittedly commenced these Chapter 11 Cases as a litigation tactic in order to avoid an anticipated adverse ruling in the 225 Action.  The context within which the Debtors commenced the Chapter 11 Cases, as well as their conduct and statements made during the course of the Chapter 11 Cases, establish that the Debtors filed these Chapter 11 Cases as a bad faith litigation tactic.[259]

The context and timing of the Petition is damning.  The Petition Date was merely eight days prior to the scheduled dispositive hearing in the 225 Action, for which the parties had already submitted opening briefs and were preparing for the final pretrial conference the following day.[260]  Moreover, there was no other impetus for the filing of the petitions.  The only benefit of initiating the Chapter 11 Cases was the imposition of the automatic stay in order to interrupt the 225 Action and frustrate the Secured Creditors.  This timing alone is sufficient for the Court to reach the conclusion that the 225 Action was the reason for the filing—and, therefore, is *per se* bad faith.  Mr. Rajan even confirmed the 225 Action was the reason for the filing when he declared the cases were "necessitated" by the Chancery Court allowing the Secured Creditors "to unlawfully seize, retain, and use the Debtor's assets…."[261]  This statement directly supports Mr. Rajan's bad faith intentions to commence these cases to obtain a tactical litigation advantage.

In addition to Mr. Rajan's statements, the Court can also infer the Debtors' bad faith impetus from their past conduct.  The Debtors had twice previously filed bankruptcy petitions in order to thwart the entry of a court order adverse to their interests, each of which the Bankruptcy

---

[259] *See supra*, Statement of Facts § G.

[260] *See* Petitions [Debtor-30; Debtor-31] (dated March 15, 2023); Pre-Trial Order [CR-7], at pp. 24 ("The Court has scheduled this matter for trial for one day on March 23, 2023, commencing at 9:15 a.m."), 25 (stating the "pre-trial conference has been scheduled for March 16, 2023"); 225 Action Docket [CR-6], at 2 (discussing status of Pretrial Order and Pretrial Conference set for March 16, 2023).

[261] First Day Declaration [ECF No. 48], ¶¶ 90–94

Court dismissed for having been filed as a bad faith litigation tactic.[262]  In so ruling, the Bankruptcy Court considered the timing and context of the petitions—as well as the debtor's proposals to have Mr. Rajan's other businesses acquire the assets as postpetition lender—and determined that the only basis for the Debtors' prior bankruptcy filings was to derail the state-court litigation and to allow Mr. Rajan to abscond with the assets.[263] Finally, the Debtors have articulated no good faith basis for initiating the bankruptcy cases.   Evidence Establishes Conversion Is Justified – Totality of the Circumstances

Moreover, the Third Circuit has a fourteen-factor totality of the circumstances test to evaluate whether a filing was made in bad faith.[264] Under the Third Circuit's test, *twelve* of the fourteen factors favor such a finding:

1. Previous Bankruptcy Petitions – As stated above, the Debtors have filed two prior bankruptcy cases, both of which were dismissed as bad faith filings.[265]

2. Prepetition Improper Conduct – The Debtors (and Mr. Rajan, in particular) have engaged in improper prepetition conduct, including initiating two prior bankruptcy cases that were dismissed for bad faith,**[266]** backdating corporate documents,**[267]** and alienating their primary operating subsidiary comprising of the primary value of the Debtors' business.**[268]**

3. Evasion of Court Orders – The Debtors filed the Petitions specifically to avoid several orders and findings that the Court of Chancery had made with respect to the parties' relationships and rights with respect to Technovative, including the

---

[262] *See supra*, Statement of Facts § C.

[263] *See id.*

[264] *See In re Vascular Access Ctrs., L.P.*, 611 B.R. 742, 762–63 (Bankr. E.D. Pa. 2020) (quoting *DCNC*, 407 B.R. at 662).

[265] *See supra*, Statement of Facts § C.

[266] *See id.*

[267] *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 329 n.13 (Del. 2022) ("[T]he Court of Chancery concluded that the evidence demonstrated that the Rajan brothers executed the May Stockholder Consent later, and possibly during the evening of May 8 or on May 9, and then backdated the document to May 6 in an effort to preempt the Omnibus Agreement.").

[268] *See* April 25 Transcript [ECF No. 179] (Rajan), at 127:13–17 ("[Patrick Theune at SCBV] did not provide financials.  The BV was not cooperating [with the Debtors] … because [SeeCubic] was providing the financing.  The BV was not helping with … our purchase orders, or any of the things that Stream TV needs to generate cash flow.")

Status Quo Order, the Receiver Order, and the Collateral Estoppel Order (specifically related to its finding about the Secured Debt and requirements for conversion).[269]

4.      Few Debts to Non-Moving Creditors – No other creditors are active in these Chapter 11 Cases[270] and any debts to such creditors relate back to 2021 or earlier. There are no other contemporary creditors and none have expressed any interest in these Chapter 11 Cases, and the United States Trustee could not even organize an unsecured creditors committee.

5.      Filed on the Eve of Foreclosure – Debtors commenced these Chapter 11 Cases on March 15, 2023—*i.e.*, the day before the pretrial conference in the 225 Action and eight days before the dispositive trial in the 225 Action, which would have determined the Secured Creditors' rights to vote the Technovative equity.[271]

6.      Foreclosed Property is a Major Asset – The impact of the 225 Action would be to determine whether the Secured Creditors had the right to appoint the board of Technovative, which operates as a holding company for all operating subsidiaries, so the control of Technovative represents the majority of the value of the enterprise.

7.      No Ongoing Business/Operations – All reports that the Debtors have filed with the Court to date demonstrate no ongoing operations, revenue, or employees for either of the Debtors.  The Debtors' proposed CFO confirmed the Debtors' lack of operations in his testimony before the Court.[272]

8.      No Possibility to Reorganize – The Debtors still have no operations to reorganize, as they have no employees and very few assets.  Though the Debtors filed the Draft Plan as a purported plan of reorganization, the proposal is not confirmable as proposed because it is littered with blanks, does not address the Secured Creditors' claims, and proposes an insider transaction that is not confirmable.

9.      Insufficient Income to Operate – The Debtors have no operations, revenue, or employees.  The Secured Creditors have funded the operations of the Operating

---

[269] *See* June 26, 2023, Hearing Transcript [ECF No. 302] (Debtors' counsel), at 100:17–102:21 (arguing that once Stream filed for bankruptcy the Receiver would have had to turn over to Stream the stock of Technovative, providing authority to file Technovative as well).

[270] While Rembrandt has appeared in these cases, thus far Rembrandt has not been pursuing the Debtors, but instead has been pursuing the Secured Creditors, and the Debtors have offered Rembrandt incentives to go along with the Debtors' strategy in these Chapter 11 Cases—including agreeing to pay them millions of dollars in unauthorized post-petition agreements over the past few months.  *See* Rembrandt Licensing Covenant [CR-222] & Rembrandt Settlement Amendment [CR-246].  As such, Rembrandt has established itself to be a beneficiary of the Debtors rather than a creditor.

[271] *See supra*, Statement of Facts § G.

[272] *See supra*, Statement of Facts § I.1.

Subsidiaries to date,[273] and according to Mr. Rajan, to the extent any operations are occurring, such operations are with Mr. Rajan's other company—VSI.[274]

10.   No Pressure from Non-Moving Creditors – The Debtors were non-operational as of the Petition Date and there is no evidence that they were pursued by any other creditors that prompted the filing.

11.   Actually a Two-Party Dispute – The Debtors have engaged hostilely toward one class of creditors—the Secured Creditors. There are no other extensive debts owed to any other creditors and no creditors were pursuing the Debtors as of the Petition Date.

12.   Filed Solely for the Automatic Stay – As explained above, the only other purpose in instituting the Chapter 11 Case was to obtain the protections of the automatic stay in order to disrupt the 225 Action.[275]

Considering the totality of the circumstances, there is no good faith basis for the Debtors to have filed these cases—the Debtors merely sought to frustrate the Secured Creditors to ensure Mr. Rajan retained control of the assets of the Debtors.

*3.   The Court Should Convert Rather than Dismiss the Chapter 11 Cases*

As noted above, Hawk's primary request is for the Court to convert the Chapter 11 Cases to cases under Chapter 7 at this time, rather than dismissal of the cases. As is relevant here, factors the courts may consider for assessing the best interests of the creditors and estate, include (i) whether the debtor would simply file another case after dismissal, (ii) the ability of the Chapter 7 trustee to reach assets of the debtor for the benefit of creditors, (iii) whether conversion or dismissal would maximize the estate's value as an economic enterprise, and (iv) whether the debtor had engaged in misconduct and the creditors' interests are in need of protection.[276]

---

[273] *See supra*, Statement of Facts § H.

[274] *See supra*, Statement of Facts § I.2.

[275] *See supra*, Statement of Facts § G.

[276] *See* 7 Collier on Bankruptcy ¶ 1112.04[7].

Given the Debtors' and Mr. Rajan's propensity to engage in relentless delay and distraction tactics, Hawk believes the Bankruptcy Court's continued oversight of these cases is in the best interest of all parties. Of the factors courts consider in weighing whether to grant conversion or dismissal, all militate in favor of dismissal. Specifically, (a) the Debtors have a demonstrated history of serial filings, considering this is Stream's third bankruptcy in three years; (b) there may be avoidance actions available to the estate based on the insider nature of several of the Debtors' proposals to date; (c) the estates will not be affected by either conversion or dismissal as both options will likely conclude with a sale of the Debtors' equity in the Subsidiaries; and (d) conversion is necessary to ensure Mr. Rajan's ability to abscond with assets or engage in further bad faith litigation tactics is curtailed.

Until the Court of Chancery has definitively determined that the Secured Creditors have properly exercised their valid pledge rights and control Technovative, the risk of Mr. Rajan obtaining control outside of the scrutiny of a court is simply too great. Accordingly, the Court should convert the cases and curtail Mr. Rajan's influence immediately.

## B.      Relief from Stay to Conclude the 225 Action is Warranted

As described in detail in Hawk's Motion for Relief from the Automatic stay,[277] Hawk has demonstrated that relief from the automatic stay is warranted under 11 U.S.C. § 362(d). Debtors have been unable to meet their burden to prove that "cause" does not exist to modify the automatic stay and allow Hawk to proceed with the 225 Action.

Resolution of the 225 Action will determine (1) the amount and priority of the claims in respect of the Hawk Notes and the SLS Notes, (2) the validity of the liens securing the Hawk Notes and the SLS Notes, (3) the resolution of any available defense(s) to the Hawk Notes and the SLS

---

[277] [ECF No. 16].

Notes, and (4) the requirements for any potential future conversion of the Hawk Notes—all critical to the resolution of these Chapter 11 cases.[278]   These questions have permeated the Chapter 11 Cases to date, as they must be answered prior to any actual relief being accorded to the Debtors under the Bankruptcy Code.  Judicial economy favors having these questions resolved in the Court of Chancery.

The evidence introduced during the Hearings further bolstered the case for granting relief from the automatic stay. As Mr. Stastney testified, the 225 Action was a week away from trial on the merits when Stream and Technovative filed for bankruptcy in this Court.[279]   The parties had already spent all of the necessary time and resources to prepare for the one-day trial on March 23, 2023.[280]   The parties have already incurred significant costs over the course of six months— including multiple depositions, producing and reviewing thousands of pages of document discovery, numerous hearings and rulings from the Court of Chancery, and the finalization of pretrial briefing.[281]   All of this would need to be re-done were litigation on those issues to restart in this Court.   Relitigating issues in this Court that could be quickly decided in the Court of Chancery will only further reduce the value of the Debtors' assets and the technology held by its subsidiaries.[282]   Thus, relief from the automatic stay is warranted.

---

[278] *See supra*, Statement of Facts § F.

[279] *See supra*, Statement of Facts § G.

[280] *See* June 28 Transcript [ECF No. 304] (Stastney), at 47:2-48:1; Pre-Trial Order [CR-7], at 24; 225 Docket [CR-6], dkt. no. 187.

[281] *See* June 27 Transcript [ECF No. 303] (Stastney), at 45:24–46:6. In addition, Debtors' counsel in the 225 Action, McCarter & English LLP, filed a Proof of Claim with this Court asserting a claim against Stream for $2,859,902.63. *See* McCarter Proof of Claim [CR-144; Stream Claim No. 12].

[282] *See* June 28 Transcript [ECF No. 304] (Stastney), at 82:2–10; 83:3–25.

**C.    If the Court Declines to Convert the Chapter 11 Cases, the Court Should Dismiss the Chapter 11 Cases with Prejudice**

As noted above, if the Court determines that Hawk has carried its burden under section 1112(b), it has the discretion to either convert the cases to cases under Chapter 7 or dismiss the cases entirely.  The evidence demonstrates that Hawk met its burden under section 1112(b), so if the Court is not inclined to grant Hawk the request detailed above (, Hawk requests in the alternative the Court dismiss both of the Chapter 11 Cases in their entirety.

**D.    If the Court Declines to Convert or Dismiss the Chapter 11 Cases, It Should Appoint a Chapter 11 Trustee**

If the Court is not inclined to grant Hawk relief under section 1112(b), the evidence also supports the appointment of a Chapter 11 trustee.  If the Court determines appointment of a Chapter 11 trustee is proper, Hawk requests the Court appoint such trustee in both cases and couple such relief with a grant of relief from stay for Hawk to conclude the 225 Action.

Section 1104 of the Bankruptcy Code governs the appointment of a Chapter 11 trustee. Section 1104(a) provides that a court, after notice and a hearing shall appoint a Chapter 11 trustee for cause, including "fraud, dishonesty, incompetence, or gross mismanagement" or "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate…." 11 U.S.C. § 1104(a).  The burden is on the movant to present evidence to establish such cause by "clear and convincing evidence."[283]

*1.    Fraud, Dishonesty, or Incompetence*

Whether cause exists based on the existence of fraud, dishonesty, and incompetence of a debtor's management requires a fact-intensive analysis of management's behavior.[284]  Here, the evidence adduced at the Hearings demonstrates that Mr. Rajan has an established track record of

---

[283] *See In re Marvel Entertainment Grp., Inc.*, 140 F.3d 463, 473 (3d Cir. 1998).

[284] *See In re Ancona*, No. 14-10532, 2016 WL 7868696, at *9 (Bankr. S.D.N.Y. Nov. 30, 2016).

acting fraudulently and dishonestly in his position as manager of the Debtors.  Whether he is abusing the bankruptcy process, engaging in insider transactions, hindering and delaying the efforts of legitimate creditors, or outright fabricating evidence, Hawk has established that Mr. Rajan utterly lacks integrity and trustworthiness—he is a demonstrated liar.

As such, Hawk reincorporates the facts set forth above with respect to the Debtors' prior bad faith bankruptcy filings, self-interested and conflicted transactions and proposals, conflicting statements/testimony/documentation and incomplete disclosures, and history of fabricating documents—including the backdated corporate consent, the Zhongsheng Term Sheet, and potentially the documents purporting to substantiate the Debtors' supposed operations (if the Court concludes Mr. Rajan is not credible).[285]  These actions collectively justify the appointment of a Chapter 11 trustee and establish by clear convincing evidence that Mr. Rajan cannot be trusted as the steward of these Chapter 11 Cases.

In short, Mr. Rajan's actions over the course of the dispute between the parties clearly demonstrate that he is wholly untrustworthy and is willing to do anything to retain the Debtors' assets for his own benefit and obtain a tactical advantage over anyone that threatens that goal.[286]

### 2.    *Gross Mismanagement*

With respect to what constitutes "gross mismanagement" under section 1104, the standards are similar to those for mismanagement under section 1112(b) noted above, however, the mismanagement may relate to either prepetition or post-petition mismanagement of the debtors'

---

[285] *See supra*, Statement of Facts § L; *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 329 n.13 (Del. 2022) ("[T]he Court of Chancery concluded that the evidence demonstrated that the Rajan brothers executed the May Stockholder Consent later, and possibly during the evening of May 8 or on May 9, and then backdated the document to May 6 in an effort to preempt the Omnibus Agreement.").

[286] *See, e.g., Hawk Inv.*, 2022 WL 17258460, at **16–17 (noting Stream's use of "slippery language, which Stream has a history of deploying" and Stream's "wily ways with words").

affairs.[287]   In this case, the evidence also shows that Mr. Rajan has a history of gross mismanagement of the Debtors' affairs—both before and during the pendency of the Chapter 11 Cases.   Hawk incorporates the foregoing discussion of Mr. Rajan's mismanagement of the estates,[288] but Mr. Rajan's mismanagement of the Debtors' affairs did not commence on the Petition Date.  Mr. Rajan's prepetition actions and mismanagement of the Debtors provide further bases for the Court to appoint a trustee.

Stream was founded in 2009 and to this day remains a pre-revenue, development-stage enterprise with no income and only prototype technology.[289]  Despite the infusion of tens of millions of dollars over a period of nearly a decade with full support of the Secured Creditors and other investors, the Debtors utterly failed to monetize the underlying technology.  This failure resulted in the Debtors defaulting on tens of million dollars of secured debt obligations, failing to fund payroll on multiple occasions, failing to pay over $16 million in trade debt, becoming debtors or proposed debtors in three separate bankruptcy filings, and failing to protect their interest in the intellectual property representing the flagship technology of the business.[290]  To say Mr. Rajan's stewardship has been a failure is a gross understatement.

Importantly, the Secured Creditors are not alone in their pessimism about Mr. Rajan's ability to manage the business—Mr. Rajan has lamented during the course of these Chapter 11 Cases that the Debtors' own subsidiary "was not helping with … [the Debtors'] purchase orders,

---

[287] *See Sharon Steel*, 871 F.2d at 1227–28 (considering both pre- and post-petition conduct of the debtors' management).

[288] *See supra*, Statement of Facts § I.

[289] *See supra*, Statement of Facts § A.

[290] *Stream TV*, 279 A.3d at 327 n.6.

or any of the things that Stream TV needs to generate cash flow."[291]  In fact, SCBV—the Debtors'

most valuable subsidiary—has mutinied against Mr. Rajan to the point that the Debtors have

named SCBV and one of its managers as two defendants in the Adversary Proceeding.[292]  This is

a resounding rebuke of Mr. Rajan's leadership and management by the parties most familiar.

    3.    *Conflicts of Interest and Creditor Confidence*

Courts have also found that "cause" exists for appointment of a trustee in other situations

under section 1104.  For example, courts have found that conflicts of interest on behalf of the

debtors' insiders and intense, irreconcilable acrimony between a debtor's management and lenders

may justify appointment of a Trustee.[293]  Other cause also exists for appointment of a trustee as

well.  As detailed above, Mr. Rajan has consistently been a faithless fiduciary, and his self-

interested and self-dealing ways has led to irreconcilable acrimony with several of the Debtors'

stakeholders.[294]

Relatedly, the parties' sordid and acrimonious past alone justifies removing Mr. Rajan and

appointing a Chapter 11 trustee.  Hawk will not belabor the point, as the Court is intimately—and,

at times, frustratingly—aware of the contempt that can manifest between the parties during

hearings and in pleadings.  Courts within the Third Circuit have appointed a Chapter 11 trustee

when an impasse arises between the lenders and a debtor's management to the point the parties

have no chance at cooperating during the cases.  If ever there were cases where the parties' inability

to work together towards a resolution justified trustee appointment, this would be the case.

---

[291] *See* April 25 Transcript [ECF No. 179] (Rajan), at 127:13–17 ("[Patrick Theune at SCBV] did not provide financials.  The BV was not cooperating [with the Debtors] … because [SeeCubic] was providing the financing.  The BV was not helping with … our purchase orders, or any of the things that Stream TV needs to generate cash flow.").

[292] *See* Complaint, at ¶¶ 33, 34.

[293] *See In re Embrace Sys. Corp.*, 178 B.R. 112, 128–29 (Bankr. W.D. Mich. 1995) (conflicts of interest); *Marvel*, 140 F.3d at 472–73 (acrimony).

[294] *See supra*, Statement of Facts § M.

4.      *Best Interest of the Creditors*

Finally, section 1104(b)(2) also authorizes the court to appoint a Chapter 11 trustee when doing so is "in the interests of creditors, any equity security holders, and other interests of the estate…." To demonstrate appointment of a trustee is in the best interests of these constituencies, the movant must establish that the benefits of such appointment outweigh the costs. The benefits to be gleaned are determined on a case-by-case basis, but the costs generally include considerations of (i) the trustworthiness of the debtor's management, (ii) the debtor's historical performance and prospects of rehabilitation, and (iii) whether confidence in management has been eroded.[295] Importantly, courts have held that a movant must establish that appointment of a trustee is in the best interests of *all* of the constituencies listed in the provision and not merely in the interest of the creditors.[296]

Considering these factors, the "costs" of appointing a trustee here are effectively nil. Specifically, Mr. Rajan is wholly untrustworthy and a poor manager of the Debtors and their businesses; the Debtors' historical performance of reorganizing and paying creditors has been abysmal; there is no realistic prospect of rehabilitation if Mr. Rajan remains in control; and stakeholder confidence in Mr. Rajan has clearly eroded to a point that cannot be resuscitated.

Accordingly, allowing Mr. Rajan to remain in control of the Debtors will harm all stakeholders, as he will certainly continue pursuing deals for his benefit rather than for the estates. For example, Mr. Rajan's deals and arrangements to date have operated to limit the Debtors' options in reorganizing their estates—effectively, any option that does not involve VSI is excluded from consideration.[297] Such a narrow-minded approach is aimed at the wrong goal—i.e., retaining

---

[295] *See* 7 Collier ¶ 1104.02[d][ii].

[296] *See id.* ¶ 1104.02[d][i].

[297] *See supra*, Statement of Facts § M.

control of the assets—and will almost certainly result in a detrimental outcome to the Debtors' creditors.

Conversely, by removing Mr. Rajan, a Chapter 11 trustee can ensure that the Chapter 11 Cases proceed to conclusion expeditiously and appropriately. A Chapter 11 trustee would ensure that employees are paid and assets are not wasting due to a lack of funding (or only pursuing funding from insiders). A Chapter 11 trustee would pursue a strategy for the benefit of all interested parties and not just Mr. Rajan. And, a Chapter 11 trustee would neuter Mr. Rajan's ability to abuse the Chapter 11 process to further his own goals.

In short, there is little downside and tremendous upside to the removal of Mr. Rajan. Accordingly, it is in the best interest of all parties (other than existing management and their comrades) for the Court to appoint a Chapter 11 trustee in these Chapter 11 Cases.

## CONCLUSION

Accordingly, Hawk respectfully requests that the Court convert the Chapter 11 Cases to cases under Chapter 7 and grant Hawk relief from stay to conclude the 225 Action. If the Court believes that the best interest of creditors is to dismiss the cases, however, Hawk requests the Court dismiss the Debtors' Chapter 11 Cases with prejudice or, in the alternative, appoint a Chapter 11 trustee to act in the interests of all creditors.

Dated:  October 2, 2023              **K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 91881)
Megan E. O'Connor
K&L Gates LLP
600 King Street, Suite 901
Wilmington, DE 19801
Telephone: (302) 416-7000
Facsimile: (302) 416-7020
Email: steven.caponi@klgates.com
         megan.oconnor@klgates.com

Margaret R. Westbrook
Aaron S. Rothman
Jonathan N. Edel
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Telephone:  (704) 331-7400
Email:  margaret.westbrook@klgates.com
         aaron.rothman@klgates.com
         jon.edel@klgates.com

Thomas A. Warns
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022
Telephone:  (212) 536-3900
Email: tom.warns@klgates.com

*Attorneys for Hawk Investment Holdings Ltd.*