## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,[1]<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |

| | |
|---|---|
| In re:<br><br>Technovative Media, Inc.,<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |

**DEBTORS' POST-TRIAL BRIEF IN (I) OPPOSITION TO MOTION
OF HAWK INVESTMENT HOLDINGS LTD. PURSUANT TO SECTION 1112(b)
OF THE BANKRUPTCY CODE EITHER (A)(1) TO DISMISS
THE DEBTORS' CHAPTER 11 CASES OR (2) TO CONVERT
SUCH CASES TO CASES UNDER CHAPTER 7 OR, (B) IN
THE ALTERNATIVE, PURSUANT TO SECTION 1104(a) OF
THE BANKRUPTCY CODE TO APPOINT A CHAPTER 11 TRUSTEE;
AND (II) IN OPPOSITION TO EMERGENCY MOTION FOR RELIEF
FROM STAY FILED BY HAWK INVESTMENT HOLDINGS, LTD.**

Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc. ("Technovative" and, collectively with Stream, the "Debtors"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), and file this post-trial brief (the "Brief")[2] in further opposition to the *Motion of Hawk Investment Holdings Ltd. (I) Pursuant to Section 1112(b) of the Bankruptcy Code Either (A)(1) to Dismiss the Debtors' Chapter 11 Cases or (2) to Convert Such Cases to Cases Under Chapter 7 or, (B) in the alternative, Pursuant to Section 1104(a) of the Bankruptcy Code to Appoint a Chapter 11 Trustee* (the "Dismissal Motion") [D.I. 83] filed by Hawk Investment

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (…4092) and Technovative Media, Inc. (…5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

[2] The Court conducted a trial on the Dismissal Motion (as that term is defined herein) and the Stay Relief Motion (as that term is defined herein) on June 26-29, 2023, August 15 and 17, 2023, and September 22 and 25, 2023.

Holdings Ltd ("Hawk") and the *Emergency Motion for Relief from Stay* (the "Stay Relief Motion")

[D.I. 16], and respectfully state as follows:

## PRELIMINARY STATEMENT

On March 15, 2023 (the "Petition Date"), the Debtors commenced these cases in order to obtain the "breathing room" necessary to restructure their indebtedness, de-lever their balance sheets, obtain financing, and complete recovery of Estate assets which should have been returned to the Debtors months ago by Hawk and related parties. A mere three weeks after the Debtors commenced these Chapter 11 Cases, Hawk filed the Dismissal Motion seeking to dismiss or convert these cases or, alternatively, for the appointment of a chapter 11 trustee. At the time Hawk filed the Motion, no grounds existed to grant the relief sought in the Dismissal Motion, and the Dismissal Motion was merely filed to frustrate the Debtors' reorganization efforts. Hawk could not then, and cannot now, meet the very high standard against which its Dismissal Motion is measured.

From the beginning, it has been Hawk's contention that "cause" exists for dismissing these Chapter 11 Cases, pursuant to 11 U.S.C. § 1112(b)(4)(A). This contention fails because Hawk has not satisfied its burden of establishing an "absence of a reasonable likelihood of rehabilitation." Whether a "reasonable likelihood of rehabilitation" exists depends on whether the Debtors can formulate within a reasonable amount of time a reasonably detailed business plan. Throughout the course of these proceedings, particularly through the testimony of Mathu Rajan and the Debtors' filed disclosure statement and plan of reorganization, the Debtors have demonstrated their reasonable path forward to a meaningful reorganization. The Debtors have presented ample evidence supporting their path to reorganization and that these proceedings are necessary to preserve enterprise value, the Debtors as a going-concern, and providing significant value to

130046701.8

creditors. The facts elicited during trial do not provide support for Hawk's argument of any substantial or continuing loss to or diminution of the estate. Indeed, Hawk's argument amounts to little more than high dudgeon and is supported only by vague gestures and innuendo. Hawk, therefore, cannot sustain its burden under § 1112(b)(4)(A).

Hawk's contention that "cause" exists for dismissal, pursuant to 11 U.S.C. § 1112(b)(4)(B), fails because Hawk has not satisfied its burden of establishing gross mismanagement of the Debtors' estate. Gross mismanagement must relate to post-petition conduct, and the Motion and the testimony on the record do not identify any post-petition conduct rising to the level of gross mismanagement.

Hawk's contention that "cause" exists for dismissal, pursuant to 11 U.S.C. § 1112(b)(4)(D), also must perforce fail because Hawk has failed to satisfy its burden of establishing the unauthorized use of cash collateral substantially harmful to one or more creditors. In fact, Hawk failed to set forth any evidence of a single instance of the unauthorized use of cash collateral. With the simple reason being that no unauthorized use of cash collateral existed at the time Hawk filed the Dismissal Motion or anytime thereafter.

Hawk makes the alternative argument that cause exists for the extraordinary remedy of appointing a chapter 11 trustee based on either gross mismanagement or incompetence. This argument also fails. As the testimony of Mr. Rajan and others has demonstrated, the Debtors' financial problems are largely the result of an improper order entered against Stream by the Delaware Chancery Court, which improperly deprived Stream of its assets – this improper order was ultimately overturned on appeal by the Delaware Supreme Court. As made clear during the trial, the Debtors have management in place, Mr. Rajan and CFO Thomas Park, with the relevant

skill and experience necessary to guide the Debtors through these Chapter 11 Cases and ultimately seek approval of the Debtors' plan of reorganization.

Finally, Hawk has gestured towards the fact that the Debtors have failed to maintain a strict adherence to their postpetition reporting obligations and filings related thereto. This argument seems to be aimed at questioning the legitimacy of the postpetition operations of the Debtors and further cast aspersions on the propriety of these Chapter 11 Cases. There is little merit to this argument nor is it even Hawk's argument to make. It is the purview of the United States Trustee (the "UST"), who has not made any filings related to the Debtors' postpetition reporting obligations.

Hawk's various arguments lack merit. None more so, perhaps, than Hawk's argument that these Chapter 11 Cases were filed in bad fad faith. The Debtors filed these Chapter 11 Cases in good faith and out of necessity in order to ensure that they could reorganize and provide equitable treatment to all of their creditors and interested parties, including the Debtors' unsecured creditors, whose claims are worth approximately $20 million (excluding Rembrandt 3D Holding Ltd.'s $1.2 billion filed proof of claim). Significantly, and indicative of the good faith basis on which these Chapter 11 Cases were filed, is the fact that the Debtors intend to pay any valid secured claims in full and substantial distributions to unsecured creditors. The testimony provided to this Court during trial demonstrates that the Debtors have valid reorganizational purposes for commencing these Chapter 11 Cases.

The Stay Relief Motion similarly lacks merit.  It is premised on baseless accusations that the Debtors are damaging the value of the Estate and that stay relief is necessary in order to provide value to Hawk and SLS. These contentions are disingenuously framed to cast aspersions on the Debtors, who have been operating according to the demands of the Chapter 11 of the United States

4

Code and the orders of this Court. Furthermore, the Debtors have been diligently working to secure additional financing and preserve going-concern value in order to effectively reemerge from bankruptcy and provide value to *all* creditors – not merely Hawk and SLS.

Based on the evidence produced at trial, the Dismissal Motion and the Stay Relief Motion should be denied in their entirety, and these Chapter 11 Cases should be allowed to proceed, affording the Debtors the opportunity to seek approval of their disclosure statement and confirmation of their proposed plan of reorganization[3] that will benefit all parties.

## ARGUMENT

## I.   Technovative's Bankruptcy Petition was Validly Filed Because Mathu Rajan Had the Authority to Execute the Technovative Petition[4]

1.    Hawk has repeatedly argued that Mr. Rajan did not have authority to file a bankruptcy petition on behalf of Technovative because the Court of Chancery expressly prohibited Technovative from engaging in such conduct and exclusively empowered a Receiver to file for bankruptcy.[5] *See* Motion, at 49-50. Hawk is incorrect. First, Hawk is not correct on the facts, the orders entered by the Chancery Court prohibited even the Receiver from filing for bankruptcy protection. Filing for bankruptcy was out of the "ordinary course" as defined in the order and the Receiver was prohibited from allowing or engaging in any action outside the ordinary course. Second, a state court's receivership appointment that restrains an entity from filing for bankruptcy

---

[3] On July 13, 2023, Debtors filed their Disclosure Statement [D.I. 293].

[4] The Debtors also incorporate the arguments asserted in their *Brief in Opposition to Motion of Hawk Investment Holdings Ltd. Pursuant to Section 1112(b) of the Bankruptcy Code Either (A)(1) to Dismiss the Debtors' Chapter 11 Cases or (2) To Convert Such Cases to Cases Under Chapter 7 or, (B) in the alternative, Pursuant to Section 1104(a) of the Bankruptcy Code to Appoint a Chapter 11 Trustee* [D.I. 196].

[5] As discussed below, Hawk's reasoning is flawed as the Receiver itself has also been barred from filing a bankruptcy petition by the Chancery Court.

130046701.8

"is an intolerable abuse" and invalid as a matter of law. *See In re Kreisers, Inc.*, 112 B.R. 996, 1001 (Bankr. D. S.D. 1990).

2. The Supremacy Clause of the United States Constitution and federal preemption jurisprudence prevent a state Court from restraining an entity's ability to file for bankruptcy. The United States Constitution article VI states, in pertinent part, "This Constitution, and the Laws of the United States…shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI. This Article "requires a state action be declared unenforceable where valid federal legislation preempts state authority." *Kreisers*, 112 B.R. at 998. Article I, §8, Clause 4 of the Constitution provides, in pertinent part, that "Congress shall have Power… To establish…uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. Art. I, §8. Congress uniformly legislates bankruptcy matters, and the federal bankruptcy courts have exclusive jurisdiction to adjudicate these matters. *Kreisers*, 112 B.R. at 999 (citing 11 U.S.C. §101, *et seq.* and 28 U.S.C. §1334).  As such, Congress and the federal bankruptcy courts "maintain exclusive jurisdiction of deciding who can and cannot be a bankrupt." *Id.*; *see also* 11 U.S.C. §§ 101(9), 109(d) (a corporation is a person and a person may be a debtor under chapter 11).

3. The federal bankruptcy courts routinely hold that terms of a state receivership proceeding cannot dictate the availability of federal bankruptcy relief. *See In* re Orchards Vill. Invs., LLC, 405 B.R. 341, 349 (Bankr. D. Or. 2009) (rejecting argument that debtor's bankruptcy filing must be dismissed because it had no authority to file under the terms of the Appointment Order); *In re Corporate & Leisure Event Prods.*, 351 B.R. 724, 730 (Bankr. D. Ariz. 2006) (finding that debtor could file chapter 11 petition notwithstanding state court receivership order barring

6

officers and directors from filing for bankruptcy); *Kreisers*, 112 B.R. at 1000 (corporation's officers and directors could pass resolution to file bankruptcy despite contrary state court order in pending receivership proceeding); *In re Donaldson Ford, Inc.*, 19 B.R. 425, 429 (Bankr. N.D. Ohio 1982) (debtor not prohibited from filing due to a state court ordered "blanket receivership injunction," which enjoined all persons from disturbing the receiver's possession or prosecuting actions against the estate); *see also Jordan v. Indep. Energy Corp.*, 446 F. Supp. 516, 530 (N.D. Tex. 1978) (holding that an injunction limiting access to bankruptcy courts is not in the public interest); *Sino Clean Energy, Inc. v. Seiden*, 565 B.R. 677, 683 (Bankr. D. Nev. 2017) (holding that while state courts may prevent *certain directors* from filing for bankruptcy, a state court cannot prevent *a corporation itself* from filing); *Struthers Furnace Co. v. Grant*, 30 F.2d 576, 577 (6th Cir. 1929) (pendency of a receivership does not ordinarily prevent the filing of a voluntary petition); *In re Westlake Prop. Holdings, LLC*, 606 B.R. 772, 778 (Bankr. N.D. Ill. 2019) ("a party may not use a state court injunction to support dismissal of a bankruptcy proceeding; only federal courts hold the remedies to challenge the filing of a bankruptcy petition."); *In re Medifacts Int'l., Inc.*, 2007 Bankr. LEXIS 5093, at *3, 2007 WL 521917, at *1 (Bankr. D. Del. Feb. 8, 2007) ("Since a state court clearly has no jurisdiction to interfere with a commenced bankruptcy proceeding, it seems to me to equally follow from the rationale discussed in these cases, that a state court would not have any authority to enjoin the filing of a petition."); *Esopus Creek Value L.P. v. Hauf*, 913 A.2d 593, 604 (Del. Ch. 2006) (holding that the Supremacy Clause and federal preemption jurisprudence prevent it from issuing an order enjoining defendant from filing a bankruptcy petition).

4.      In accordance with the above authorities, Technovative was undoubtedly authorized to file the bankruptcy petition. Under 11 U.S.C. § 109(d), a corporation, such as

Technovative, may be a debtor under chapter 11. Neither the Chancery Court's injunction nor the pendency of the state receivership can bar Technovative's filing of an otherwise permitted bankruptcy. *See Kreisers, Inc.*, 112 B.R. at 1000. To hold otherwise would be "fundamentally inconsistent with the constitutional grant to Congress of the right to enact uniform laws on the subject of bankruptcy." *Orchards Vill.*, 405 B.R. at 349.

5.      Technovative was also authorized to file the bankruptcy petition, given that "[r]eorganization policy generally favors turnover of business assets to the debtor in a chapter 11 case."   *See Id.* at 352 (citing 5 *Collier on Bankruptcy* § 543.05 (15th ed. rev. 2009)).  Pre-Code legislative history made explicit that a bankruptcy case would ordinarily supersede a state receivership and that a state receiver would ordinarily be required to turn over the estate assets to a debtor in possession or trustee. *See Corporate & Leisure* , 351 B.R. at 732.

6.      Furthermore, Section 543(b)(1) of the Bankruptcy Code provides as a matter of default that pre-petition receivers must turn over estate property to a debtor in possession or trustee, stating that a state court receiver "shall…deliver to the trustee [or debtor-in-possession] any property of the debtor held by or transferred to" such receiver.  *See Orchards*, 405 B.R. at 347 (quoting 11 U.S.C. § 543(b)(1)). Bankruptcy courts, however, have discretion under Section 543(d)(1) to waive that requirement if the interests of creditors would be better served by continuing the receiver in possession.  *See Orchards*, 405 B.R. at 352 (citing 11 U.S.C. § 543(d)(1)).  "The express powers to excuse turnover or abstain" allow a bankruptcy court to determine the equities "based on the facts of each individual case, and provide a more sensible and fact-based resolution than any bright-line test of corporate authority or race to the courthouse could provide." *Corporate & Leisure*, 351 B.R. at 733.

8

7.      Accordingly, "in light of the general turnover and accounting requirements for 'custodians' in § 543," among other things, courts have concluded "that a state court receivership proceeding cannot be used to preclude a debtor from seeking federal bankruptcy protection, in spite of the broad authority granted to receivers in their appointment orders." *Orchards Vill. ,* 405 B.R. at 349; *see also Corporate & Leisure*, 351 B.R. at 732-33.

8.      Technovative undoubtedly had authority to file its bankruptcy petition and, as such, Hawk's arguments to the contrary fails.

## II.      There is No Basis to Dismiss or Convert These Chapter 11 Cases to Chapter 7

9.      Section 1112(b) of the Bankruptcy Code provides, in pertinent part, that a court shall dismiss a chapter 11 case or convert such case to a case under chapter 7 for cause. Hawk argues that there is "cause" to do so here because of (i) a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," 11 U.S.C. § 1112(b)(4)(A), (ii) "gross mismanagement of the estate," *id.* § 1112(b)(4)(B), (iii) "unauthorized use of cash collateral substantially harmful to 1 or more creditors," *id.* § 1112(b)(4)(D), and (iv) bad faith. Hawk failed to set forth adequate evidence at trial to support dismissal or conversion of these Chapter 11 Cases, and  the Court should reject Hawk's arguments and deny the Dismissal Motion.

10.      Courts have recognized that "[c]onversion or dismissal of a Chapter 11 case is a drastic measure and the burden is on the movant to prove the relief requested is warranted and not premature."[6]  Hawk fails to meet this heavy burden here, especially in light of the fact that these

---

[6] *In re Dark Horse Tavern*, 189 B.R. 576, 580 (Bankr. N.D.N.Y. 1995); *see also Carolin Corp. v. Miller*, 886 F.2d 693, 700 (4th Cir. 1989) ("We begin consideration of this question by observing that this power [pursuant to section 1112], while essential to proper administration of Code policies and implicit in the statute itself, is obviously one to be exercised with great care and caution. Decisions denying access at the very portals of bankruptcy, before an ongoing proceeding has even begun to develop the total shape of the debtor's situation, are inherently drastic and not lightly to be made.").

cases remain at an early stage, and given the Debtors' actions in these cases to date in terms of, *inter alia*, attempting to recover all property of the estate that was impermissibly taken prepetition, obtain debtor in possession and exit financing, and negotiate purchase orders with customers for deals in excess of $130 million in anticipated revenue. The Debtors intend to move expeditiously through these cases in order provide favorable treatment to each class of creditors.

### A.    These Cases Should Not Be Dismissed or Converted Under Section 1112(b)(4)(A)

11.    Hawk cannot establish that these cases should be dismissed or converted for "cause" under § 1112(b)(4)(A). Section 1112(b)(4)(A) provides that "cause" for dismissal includes "[s]ubstantial or continuing loss to or diminution of the estate *and* the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A) (emphasis added).

12.    Because § 1112(b)(4)(A) is in the conjunctive, Hawk has the burden of establishing both prongs in order to obtain dismissal or conversion. *See In re EnCap Golf Holdings, LLC*, Case No.: 08-18581(NLW), 2008 Bankr. LEXIS 2774, at *26 (Bankr. D. N.J. Sept. 4, 2008) ("This basis for dismissal is conjunctive and requires not only a consideration of whether a debtor is suffering continuing losses but whether the debtor's business prospects justify continuing the Chapter 11 case."); *see also In re Salem Consumer Square OH LLC*, 629 B.R. 562, 572 Bankr. W.D. Pa. 2021) (noting that to demonstrate that dismissal or conversion is appropriate under § 1112(b)(4)(A), a party in interest must establish both prongs under the statute.). As the movant, Hawk bears the burden of demonstrating "cause" by a preponderance of the evidence. *In re Salem Consumer Square OH LLC*, 629 B.R. at 572. For the reasons set forth below, Hawk cannot meet its burden for dismissal or conversion under § 1112(b)(4)(A).

i.    <u>Hawk Cannot Establish the Absence of a Reasonable Likelihood of Rehabilitation</u>

13.    Hawk cannot demonstrate "the absence of a reasonable likelihood of rehabilitation." Hawk bears the burden of showing that rehabilitation of the Debtors is highly unlikely.  Rehabilitation does not require that the debtor show that it will confirm its plan; it merely requires a showing that the debtor can reestablish the business. 7 Collier on Bankruptcy ¶ 1112.04(6)(a)(ii); *see also In re AdBrite Corp.*, 290 B.R. 209, (Bankr. S.D.N.Y. 2003). Courts have held that:

> [t]he rehabilitation standard under § 1112(b)(4) is not whether the debtor can confirm a plan, but whether the debtor can be put back in good condition and reestablish on a sound basis. Rehabilitation is the restoration of a business' viability and depends on whether the debtor can formulate within a reasonable amount of time a reasonably detailed business plan.

*In re 221-06 Merrick Blvd. Assocs. LLC*, Case No.: 1-10-45657-jbr, 2010 Bankr. LEXIS 4431, at *5-6 (Bankr. E.D.N.Y. Dec. 3, 2010) (citations omitted). As such, where debtors take steps and set forth a reasonable business plan to be "put back in good condition," courts will not dismiss a petition under 11 U.S.C. § 1112(b)(4).

14.    Here, the Debtors have such a plan. *See Disclosure Statement for Joint Plan of Reorganization of Stream TV Networks, Inc. and Technovative Media, Inc[.] Pursuant to Chapter 11 of the Bankruptcy Code* [D.I. 293] (the "Disclosure  Statement");[7] *see also* Debtors' Tr. Exs. 18-20 (purchase orders for VSI); *see also* September 25, 2023 Hearing Transcript, 41:15-42:6 (where Hawk's counsel acknowledges there is a plan of reorganization pending approval by the Court) (the "9/25 Transcript").  Hawk's bald assertions to the contrary lack any merit or factual support.  *See* 9/25 Transcript, 41:15-42:6.  Stream is, and was, an operating entity capable of producing 4K 65-inch glasses-free 3D displays, not merely a holding company. *See id. See also*

---

[7] The plan for reorganization for both Stream and Technovative attached to the Disclosure Statement is the "Joint Plan."  The Disclosure Statement is also Debtors' Tr. Exh. 38.

130046701.8

Debtors' Tr. Exs. 18 (purchase order with VSI for ten thousand units, totaling $12,600,000.00) and 19 (purchase order with VSI for one hundred thousand units, totaling $126,000,000.00). The Debtors' Plan is based on a combination of a sale of shares to VSI, and revenues generated from the sales of 4K 65-inch glasses-free 3D displays to previous and new customers. *See* 9/25 Transcript, 32:3-7 (discussing payments made by VSI on behalf of the Debtors); *see also Disclosure Statement*, 37 (VSI has committed $35 million to fund the Debtors' bankruptcy and to enable reorganization). The Debtors' communications with existing shareholders, such as VSI, will aid in the reorganization of the Debtors and provide long-term shareholder value. *See* 9/25 Transcript, 47:3-9;[8] *see also* 9/25 Transcript, 9:20-25 (noting that the plan of reorganization will involve VSI owning 90% of Stream's equity, but Stream will control its own assets); *see also* 9/25 Transcript, 31:10-32:3 (VSI is supporting the Debtors' operations and expenses). As such, the Debtors are not incurring additional expenses as they ramp up production. 9/25 Transcript, 155:6-11 ("[W]e have given samples to . . . Cystar and Rembrandt and also Southern Telecom, and they've taken those units, tested them, and we've received over $160 million in purchase orders . . . . BOE will be . . . financing the POs"). The Debtors will be seeking financing specifically for the component development and materials required for production of the 65-inch glasses-free 3D displays, for operational costs in these Chapter 11 Cases, and for potential implementation of a plan of reorganization when confirmed by the Court. *Id*.

15.    VSI has provided critical support for the Debtors, including disbursing $750,813.00 on behalf of the Debtors prior to the end of June 2023, in exchange for shares in Stream. *See id*. 31:3-32:3; *see also Disclosure Statement*, 37 (negotiations with VSI have resulted "in a $35 million

---

[8] "The VSI parties understand that the current settlement agreement includes a non-exclusive license from Rembrandt to Stream. The VSI parties want the plan for reorganization to have an optimal chance of success and to ensure that it is clear that the VSI parties will have the sole right to commercialize the technology and products developed by Stream among the lenders, creditors, and shareholders of Stream."

130046701.8

commitment by VSI to fund the Debtors' bankruptcy"); *see also* Debtors' Tr. Ex. 49.  The Debtors' financing options should provide the Debtors with sufficient liquidity to make it through confirmation of a plan.  *See Disclosure Statement*, 36-37.  *See also* Debtors' Tr. Exs. 18-19 (purchase orders with VSI). The financing may result in either substantial payments being made to SLS (and potentially Hawk upon a determination of its claim) in these cases or the debt being rolled up into the financing and SLS (or any successor) no longer participating in these Chapter 11 Cases.  *See Disclosure Statement*, 52 (discussing treatment of secured claims); *see also* 9/25 Transcript, 160:20-161:7 ("[SLS] may be [a shareholder], your honor").

16.    As for the purchase orders, Stream has secured two significant post-petition orders totaling $138,600,000 in gross revenues. Both orders are from VSI. Order #1, dated March 20, 2023, details the purchase commitment for 10,000 4K 65-inch digital signage units at a unit cost of $1,260 for a total of $12,600,000 for end customer Cystar International Limited, and Order #2, dated April 11, 2023, details the purchase commitment for 100,000 8K 65-inch units at a unit cost of $1,260 for a total of $126,000,000 for end customer Southern Telecom. *See* Debtors' Tr. Exhs. 18-20.  The Debtors have also received letters of intent from IQH3D and BBack, Inc. for more than 1,000 65: 4K displays.  *See* 9/25 Transcript, 156:1-7 (the current value of the Cystar purchase order is around "14 million, but Stream TV believes it's going to be increased to 75 million.").

17.    In addition to the 10,000 units ordered by Cystar, the company has committed to put "millions of dollars into the production for the Stream bonding machine." *See* Transcript of August 15, 2023 Hearing, 201:5-14. Additionally, Cystar would like to increase its order to seventy five thousand or one hundred thousand units once Stream receives the Bonding Equipment, which would generate approximately one hundred and forty million dollars in revenue for Stream. *Id.* at 201:14-17.  Moreover, there are approximately "eight or nine other customers" willing to purchase

13

the same units as Cystar.  *Id*. at 201:18-20.  Cystar has had a relationship with Debtors for ten

years and was actually the first purchaser of Stream's television. Transcript of August 17, 2023

Hearing (the "8/17 Transcript"), 58:22-23. Cystar has been waiting for access to the Bonding

Equipment since 2020. *See* 8/17 Transcript, 59:4-9. Cystar has also requested that Stream provide

it with one million 21.5 inch PC monitors with the Ultra D technology. *See* Debtors' Tr. Ex. 44;

*See also* 8/17 Transcript, 69:12-14; 70:16-23.

18.    With regards to Southern Telecom, the company owns "the Brookstone brand, The

Sharper Image [brand], Polaroid, Westinghouse . . . . and Packard Bell.  *Id*. at 202:1-5. Southern

Telecom is interested in working with stream and expanding its order from 100,000 units to

"300,000 TVs."  *Id*. at 202:8-10.

19.    Sunny Hill Technology is a sales company under the control of Marvel Digital

which has requested, postpetition, samples of Stream's products, 10-inch tablet, a smartphone, and

a 65-inch 8K monitor. *See* Debtors' Tr. Ex. 47.  Debtors have also been in discussions with Geely,

Hyundai [transcription error – Mr. Rajan said "Honda"], Nissan, Toyota, and other companies

regarding automotive samples with the Ultra D technology. *See* 8/17 Transcript, 26:3-9.

20.    Assets never returned to Stream by SeeCubic after the invalidation of the Omnibus

Agreement were 8K-lite TVs, automotive samples, laptop samples, Stream's company emails,

Stream's company laptops, and a number of phone and tablet samples. *See id*. at 107:11-17.

Despite Hawk and other parties' attempts to impair the Debtors' ability to reorganize, since the

Petition Date, Stream has had meetings with approximately 100 customers in Asia, the U.S.

Europe, and the Middle East. *See id*. at 121:8-10.

21.    Once the Bonding Equipment, which has the capacity to produce approximately

180,000 units annually, is reassembled and installed, small bonding runs can commence to test the

equipment, ramping up toward mass production as soon as possible to fulfill the purchase orders and generate substantial revenue for the Debtors. *See* 8/15 Transcript, 184:8-25 (Stream "procured bonding equipment that produces 180,000 TVs a year"). Despite this, while Stream is still coordinating the retrieval and setup of its Bonding Equipment, which Stream has been prevented from obtaining as the result of stay violations committed by Hawk, SeeCubic and its principals, and SCBV, Stream has made arrangements for a backup bonding solution with Fujipream, a Japanese Company. *Id.* at 193:7-11. Fujiprem can produce 40,000 of Stream's televisions per month right away and, with notice, the company can produce up to one hundred thousand televisions per month. *Id.* at 193:16-17. Additional short run production can be done through SCBV. Transcript of June 28, 2023 Hearing (the "6/28  Transcript") at 101. In addition to Fujipream serving as the Debtors' back up bonding solution, the Debtors are going to use Xilinx to help manufacture chips for the Stream display panels. *See* 8/17 Transcript, 28:22 – 29:3. Stream also began working with KTC, a contract manufacturer that makes 8 million TVs per year, to assist in making TVs for Southern Telecom. *See* 8/17 Transcript, 28:22-29:3. Stream has been working with Skyworth, which is a big brand in China, and Stream is working on sending Skyworth samples and Stream expects Skyworth to order televisions in the 2 to 3 million unit range. *Id.* at 45:9-11.

22.    The Debtors have demonstrated that they have taken meaningful steps to be "put back in good condition" and have formulated "a reasonably detailed business plan," as required by 11 U.S.C. § 1112(b)(4). For example, the Debtors have already, *inter alia*, confirmed the readiness of Silicon Valley product engineers who will create the low-cost computer chips for 3D image rendering; conducted initial negotiations with TSMC, a foundry that will manufacture the computer chips; confirmed the support of the bonding equipment manufacturer to supervise reassembly and recommencement of optical bonding production; and conducted initial

negotiations with television manufacturer Skyworth in China to provide "white label" manufacturing and assembly support for the Debtors' products. *See, e.g.*, 9/25 Transcript, 173:21-25.

23.     Finally, a finding that there is no reasonable likelihood of rehabilitation is most often made in the context of Chapter 11 cases where debtors have been languishing in bankruptcy for years with no clear path forward. Often they will have tried and failed to confirm a plan, sometimes more than once. *See In re Herb Philipson's Army*, Case No. 18-61376 (DD), 2019 Bankr. LEXIS 3831 (Bankr. N.D.N.Y. Dec. 19, 2019); *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 517–19 (8th Cir. 2004). In that context, it is understandable that a court may want to avoid the additional expense of preparing a plan and disclosure statement and a subsequent solicitation, all the while as the debtor's inability to meet current expenses is deepening. These Chapter 11 Cases are less than seven months old, and the Debtors have filed their Disclosure Statement, which includes the Debtors' plan of reorganization.  *See* D.I. 293; *see* Hawk's Tr. Ex. 79. It would be extraordinary under the circumstances to deprive the Debtors of the opportunity to prosecute their proposed plan, especially given Debtors' intention to satisfy all administrative claims and valid secured claims and make substantial distributions to unsecured creditors, many of who the Debtors will also utilize in their business going forward. *See, e.g.*, 9/25 Transcript, 194:8-15 (discussing payments to creditors upon reorganization); 194:25-195:8 ("Stream TV already a [deal] with VSI and VSI has done deals with investors and is doing additional deals right now to pay off the unsecured creditors and Rembrandt and then any allowable claims").

24.     Hawk's argument that the Debtors do not have a reasonable likelihood of rehabilitation, therefore, must fail.

    ii.     <u>This Court Need Not Reach the Issue of, and Hawk Cannot Show, Substantial or Continuing Loss or Diminution of the Estates</u>

130046701.8

25.    Since § 1112(b)(4)(A) is conjunctive, and Hawk cannot demonstrate the absence of a reasonable likelihood of rehabilitation, this Court need not address Hawk's argument under the other prong of § 1112(b)(4)(A) – "[s]ubstantial or continuing loss to or diminution of the estate." Accordingly, this Court should reject Hawk's argument that these Chapter 11 Cases should be dismissed or converted under § 1112(b)(4)(A).

26.    Assuming that the Court determines that Hawk *did* establish the absence of a likelihood of rehabilitation —which it did not establish during trial— Hawk cannot show continuing losses or diminution of the estates. *See, e.g.*, 9/25 Transcript *generally*, 6/28 Transcript (no testimony of damage to the Estate provided). As has been established, the Debtors are not incurring additional operating expenses as VSI is making disbursements on behalf of Stream. *See* 9/25 Transcript, 32:1-7 ("At our current spending we'll [VSI's contributions] be up to almost $3 million by the end of October"). Hawk has argued that substantial losses are occurring because of administrative expenses, additional interest accruing on purported secured debt, and debts at the Debtors' subsidiaries, primarily SCBV, but has managed to elicit *no* testimony supporting its contentions. *See, generally* 9/25 Transcript.

27.    First, Stream is not a mere holding company. While it is true that Stream holds 100% of the stock of Technovative, Stream previously had business operations prior to the bankruptcy cases and the improper entry of an order by the Chancery Court upholding the Omnibus Agreement. *See, e.g.*, 9/25 Transcript, 17:23-18:6 (after the Chancery Court Order, "[the Employees] began doing direct work for Stream TV, not through the subsidiaries. There's still people working in some of the subsidiaries, Stream went and was working directly with employees"). Also, Stream is engaged in business operations postpetition, as it has entered into purchase orders with VSI. *Id*. at 171:12-18 (Stream and VSI have a subscription agreement);

172:9-173:4 (discussing business relations between VSI and Stream in the ordinary course of Stream's postpetition business operations). The Debtors previously filed a motion with the Court seeking approval of the entry into a distribution agreement with VSI, who currently has an agreement with end users. *See* Debtors' Tr. Ex. 35 (distribution agreement with VSI). The Debtors believe the distribution agreement is beneficial to the Estates because VSI can provide support to the Debtors in terms of funding, customer contacts, technical know-how in the areas of electronics productization, translating computer software and hardware code, designing chips for use in end-user products, and integration of those chips into end-user products. *See id*. *See also* 9/25 Transcript, 170:25-171:18. Moreover, Stream is in the process of relocating its Bonding Equipment to a new facility in China where Stream can reassemble the Bonding Equipment and begin the process of ramping up for mass production. *See, e.g.*, 6/28 Transcript, 101:8-17. Stream already has the purchase orders, and there is plenty more customer demand, Stream now just needs to produce sufficient displays to satisfy the market need. *See* Debtors' Exhibit 18-20.

28.     Second, because conversion or dismissal is a drastic measure, courts require more than ordinary course administrative costs to establish "substantial" or "continuing" loss for the purposes of § 1112(b)(4)(A). *See Nester v. Gateway Access Solutions, Inc. (In re Gateway Access Solutions, Inc.)*, 374 B.R. 556, 562-563 (Bankr. M.D. Pa. 2007) (discussing the rare moments where substantial ongoing losses and diminution of an estate would support converting a bankruptcy case from Chapter 11 to one under Chapter 7). For example, the Hawk Parties have made it difficult for the Debtors to operate; they have failed to return business computers and data, technology demonstrator samples, access to historical email archives, and certain websites. Moreover, the actions taken by Hawk, Seecubic, and SLS total *more than thirty* major filings, roughly *eight percent* of the entire docket, and other parties in this case have unnecessarily driven

up the costs of this bankruptcy case, including the administrative expenses. *See* 9/25 Transcript, 14:3-8 (noting bankruptcy expenses and litigation costs); 9/25 Transcript, 50:25-51:9 (noting SeeCubic Delaware's failure to turn over demonstrator units and related actions); June 26, 2023 Hearing Transcript, 212:2-8 (same);.

29.    Third, as for interest accrual on any outstanding secured debt, the Debtors are well aware that interest may be accruing. It is for this reason that the Debtors are very interested in generating cash flow as described herein and also exploring financing options to address this issue.

30.    Finally, there is no current funding need at any of the Debtors' subsidiaries, including SCBV, as that has been addressed by SeeCubic with the agreement of Mr. Rajan.

31.    Hawk cannot identify any loss of diminution occurring in this case.

### B.    Hawk Cannot Demonstrate Gross Mismanagement

32.    Hawk also has not shown that there is cause for dismissal or conversion based on "gross mismanagement." Importantly, for gross mismanagement to constitute grounds for conversion or dismissal "the alleged gross mismanagement must occur post-petition." *In re Unique Tool & Mfg. Co.*, 2019 Bankr. LEXIS 3365 *32 (Bankr. N.D. Ohio, Oct. 29, 2019). For example, Courts have found "gross mismanagement" where a debtor in possession fails to seek court approval before taking certain actions outside the ordinary course of business, such as paying prepetition debts or incurring debt, where debtors file monthly reports without closely monitoring them, and where the business lacks effective management postpetition. *See In re Creech*, 538 B.R. 245, 251 (Bankr. E.D.N.C. 2015) (collecting cases); *see also In re Nicholson Holdings, Inc.*, 497 B.R. 430, 433 (Bankr. E.D. Pa. 2013) (finding "cause" where debtor used DIP facility proceeds to "buy an array of items which appear unrelated to the debtor's business"); *In re Congaree Triton Acquisitions, LLC*, 492 B.R. 843 (Bankr. D.S.C. 2012) (finding "cause" where debtor misplaced

significant estate assets); *In re Rent-Rite Super Kegs West Ltd.*, 484 B.R. 799 (Bankr. D. Colo. 2012) (finding "cause" where debtor used estate assets to engage in criminal drug operations). Hawk fails to identify any purported acts by the Debtors of "gross mismanagement" post-petition. Indeed, the only mismanagement alleged in the Motion is the Debtors' purported failure to fund its subsidiaries and the mere filing of these Chapter 11 Cases "on the eve of litigation."

33.    It is disingenuous for Hawk to argue that the Debtors are not funding their subsidiaries. *See* 9/25 Transcript, 194:20-195:13 (discussing funding).  Hawk argued in the Motion that it and SeeCubic would not fund any of the Debtors' subsidiaries. Yet, when the Debtors filed a motion with the Court seeking permission to obtain funding for the subsidiaries, the proposed funding was met with extreme resistance requiring an 8-hour evidentiary hearing. *See generally*, April 25, 2023 Hearing Transcript (the "4/25 Transcript"). The Court denied the Debtors' request to fund SCBV, and the funding for SCBV was ultimately made by SeeCubic under a facility that SeeCubic argued was already available to SCBV.  *Id.* at 257-261 (The Court also denied Hawk's request to fund SCBV). Mr. Rajan, after the hearing on the Debtors' motion to approve financing, agreed to SeeCubic's funding of SCBV, and SeeCubic has advised that it has made funding available to SCBV for approximately the next two months. *See* 9/25 Transcript, 194:20-195:13. Thus, there is currently no funding issue at SCBV. Also, the Court advised that if a future funding issue does arise, then the parties can bring the matter back before the Court, and the Court will reevaluate the matter at that time. *See* 4/25 Transcript, 259-260.

34.    Moreover, the Debtors are in the process of seeking Court approval of the retention of Thomas Park as chief financial officer who is assisting the Debtors by providing independent oversight of Debtors' finances and internal systems, implementing improved tracking and management processes, resolving delinquent filings to government agencies, reviewing due

diligence materials, securing additional capital, developing the plan of reorganization, implementing the plan of reorganization, and guiding the Debtors' through and out of bankruptcy. *See* 6/29 Transcript, 49:22-51:4 (Discussing Mr. Park's experience with raising capital and navigating complex capital markets). Mr. Park is a banking executive with 20 plus years of broad senior level experience in digital payments/capital markets/treasurer/compliance experiences. *See* 9/25 Transcript, 13-14; *see* 6/29 Transcript, 43 ("I've currently been the CFO [for Stream] until further approved by the courts"). Mr. Park currently is a partner at Penton Partners SP, a leverage buyout firm based in Warsaw, Poland. *See* 6/29 Transcript, 49:1-3. Mr. Park provides another layer of independence to the Debtors' management team. *See id*. 47:15-49:6 (discussing his extensive work experience as a CFO across varying industries); *Id*. 56:14-17 (Mr. Park explaining he has significant experience raising funds in distressed situations).

35.     Because Hawk has failed to substantiate with evidence any postpetition actions that constitute gross mismanagement, the Motion should be denied on this ground as well.

### C.     Hawk Cannot Identify the Use of Any of Its Cash Collateral Warranting Dismissal Under § 1112(b)(4)(D)

36.     In the Dismissal Motion, Hawk argues that cause exists to dismiss or convert the Chapter 11 Cases because the Debtors do not have authority to use the "Secured Creditors'" cash collateral. Despite making this bold statement, Hawk failed to identify any "cash collateral" that the Debtors have impermissibly used. To date, the Debtors have not used any cash collateral, and Hawk failed to present any evidence to the contrary. Indeed, Mr. Rajan testified that the Debtors' postpetition operations are being funded in the bankruptcy cases by VSI, who pays the Debtors' expenses in exchange for shares in Stream. *See* 9/25 Transcript, 194:20-195:13. Also, any purported security interest of Hawk does not apply to any property acquired post-petition by the Debtors, *i.e.*, the purchase orders or 4K displays or related products created post-petition. *See* 11

U.S.C. § 552(a); *see also In re Wynnewood House Assoc.*, 121 B.R. 716, 727 (Bankr. E.D. Pa. 1990) (noting that section 552(a) generally invalidates prepetition security interests in postpetition estate property).

37.    As such, Hawk's argument that the Chapter 11 Cases should be dismissed or converted because the Debtors are using the "Secured Creditors'" cash collateral without authorization causing the "Secured Creditors'" substantial harm is without merit and provides no basis for dismissal of these Chapter 11 Cases.

### D.    The Debtors Filed Their Petitions in Good Faith

38.    Hawk also contends that these Chapter 11 Cases should be dismissed or converted for cause under § 1112(b) of the Bankruptcy Code because they purportedly were filed in bad faith. Hawk failed to prove this contention because it is simply untrue, and the Debtors have elicited significant testimony that the Chapter 11 Cases were commenced for valid reorganizational purposes and in good faith. *See, e.g.*, 9/25 Transcript, 150:14-24 (discussing the agreement with Rembrandt to assist with the reorganization); *see also* Transcript of Hearing held August 15, 2023, 193:24-194:14 (Mathu Rajan's testimony regarding purchase orders and interactions between the Debtors and various companies worldwide for sale of the Debtors' products).  Mr. Rajan testified that "Stream and Technovative filed for bankruptcy protection because it [sic] wanted to pay off all the liabilities and clean all the liabilities off of the balance sheet" and "reorganize the company so we can process these orders from customers."  8/17 Transcript, 116:14-20. Another reason for the bankruptcy filings was that "[Stream] had some assets that were not given back that were owed . . . . we wanted to pick up those assets and then emerge from bankruptcy free and clear of the liabilities and, you know, and move forward with the business." *Id*. at 202:20-24.

39.      "[O]nce a debtor's good faith is appropriately put at issue, it is the burden of the

debtor to produce evidence of good faith."  A debtor's good faith is "at issue" if a party (i) "call[s]

into question [the] debtor's good faith, and" (ii) "put[s] on evidence sufficient to impugn that good

faith . . . ." *Tamecki*, 229 F.3d, at 207 n. 2 ("We hold merely that in this case where the trustee has

called into question debtor's good faith, and put on evidence sufficient to impugn that good faith,

the burden then shifts to the debtor to prove his good faith.").

40.      The Third Circuit has identified two essential elements for a "good faith"

bankruptcy filing. First, the bankruptcy petition must "serve[] a valid bankruptcy purpose."

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express,

Inc.)*, 384 F.3d 108, 120 (3d Cir. 2004). Second, the bankruptcy cannot be filed merely to obtain

tactical litigation advantage." *15375 Mem'l Corp. v. BEPCO, LP (In re 15375 Mem'l Corp.)*, 589

F.3d 605, 625 (3d. Cir. 2009) (citation omitted). In determining whether a filing was made in bad

faith, courts in the Third Circuit have also considered whether the following factors are present:

(a) single asset case; (b) few unsecured creditors; (c) no ongoing business or employees; (d)

petition filed on eve of foreclosure; (e) two-party dispute that can be resolved in pending state

court action; (f) no cash or income; (g) no pressure from non-moving creditors; (h) previous

bankruptcy petitions; (i) prepetition conduct was improper; (j) no possibility of reorganization; (k)

debtor formed immediately prepetition; (l) the debtor filed solely to create automatic stay; and (m)

the subjective intent of the debtor (collectively referred to as the "*Primestone* factors"). *See In re

JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 298-99 (Bankr. D. Del. 2011) (*quoting

Primestone Inv. Partners v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.)*, 272 B.R.

554, 557 (D. Del. 2002).

130046701.8

41.      Here, the evidence at trial established that virtually none of the *Primestone* factors are present. This is not a single asset case because, *inter alia*, the Debtors own the Bonding Equipment,[9] the 100% stock interest in Technovative, and a licensing agreement with Rembrandt,[10] and Stream is an operating entity.[11] *See* Transcript of August 15, 2023 Hearing, 118:2-5 (Stream owns one hundred percent of Technovative stock). The Debtors have multiple unsecured creditors with debts listed on Debtors' schedules in the amount of approximately $20 million. *See* 9/25 Transcript, 192:9-12 (noting that the Joint Plan will provide a fifty percent recovery for unsecured creditors, whose claims nominally total $16 million). The Debtors have an employee, Mr. Rajan, who is primarily responsible for conducting the business, which includes, *inter alia*, obtaining purchase orders, managing the Debtors' subsidiaries, maintaining and expanding customer contacts, developing strategic relationships for manufacturing, developing supply chain support, and liaising with Debtors' current and prospective investors. *See* Debtors' Exhibits 18-20; *see also* 9/25 Transcript, 154:8-155:3 (discussing purchase orders). While there was litigation pending prior to the Petition Date, the litigation was not a foreclosure proceeding. *See* 6/26 Transcript, 63:2-13 (discussing the fact that the 225 litigation is *not* a foreclosure action). The 225 litigation related to a determination of the proper board for Technovative.  *Id*. To be clear, no evidence exists that Hawk or any other party *foreclosed* on any of the Debtors' assets prior to the Petition Date. The Debtors were also involved in litigation with Rembrandt regarding intellectual property issues and a settlement agreement. *See* 9/25 Transcript, 194:2-15 (discussing

---

[9] *See* Debtors' Tr. Ex. 40 (Linuma Agreement); *see also* 9/25 Transcript, 173:21-25 (noting that Debtors own the bonding equipment).

[10] *See, e.g.*, 9/25 Transcript,190:2-13 (discussing licensing agreement with Rembrandt and its non-assignability).

[11] *See, e.g.*, 9/25 Transcript, 150:14-152:6 (testimony of Mr. Rajan noting that Stream is an operating entity).

130046701.8

litigation with Rembrandt and the ensuing settlement agreement that is a part of the reorganization efforts).

42.     With regards to previous bankruptcy filings, only Stream previously filed a chapter 11 bankruptcy case, which was ultimately dismissed. Mr. Stastney himself agreed that the dismissal was primarily based on the now invalidated Omnibus Agreement which improperly divested Stream of its assets. *See, e.g.*, Transcript of June 28, 2023 Hearing, at 115:7-13. The judge specifically noted that Stream was free to commence another bankruptcy case, assuming it had assets—which it has Hawk Exhibit 74, p. 19-20 ("I would expect that any future [bankruptcy] filing would occur after the completion of the Chancery Court litigation"). The Hawk Parties have failed to set forth any evidence that the Debtors and Stream's principal, Mr. Rajan, have engaged in any improper prepetition conduct. Indeed, the record taken as a whole demonstrates that the actions taken prepetition were to preserve the value of all of Debtors' assets for the benefit of all creditors, not a limited two.  This is consistent with the Joint Plan which the Debtors have proposed in these Chapter 11 Cases. As discussed above the Debtors have detailed their plan for a reorganization.  *See Disclosure Statement*, 44-46 (discussing restructuring support agreement and reorganization plans); *see also*, 9/25 Transcript, 155:4-15 (discussing supply plans and purchase orders); *see also* Debtors' Tr. Exs. 18-20. The Debtors were not formed immediately prior to the petition.  *See* 6/29 Transcript, 18:1-7 (noting that Stream and Technovative, along with SeeCubic, Inc., were all formed on or before June of 2020). The Debtors' filings were motivated by plausible and legitimate reorganization purposes and were not motivated solely by the automatic stay.

43.     These Chapter 11 Cases were filed, and are being administered, in good faith. The bankruptcy filing has afforded the Debtors much needed breathing room in order to formulate and

begin executing upon a viable plan of reorganization within the statutory timeframe which has already been filed that will provide a benefit to all creditors.[12]

### III. <u>There Is No Basis for the Appointment of a Trustee Under Section 1104</u>

44.    As an alternative to dismissing or converting a case under section 1112 of the Bankruptcy Code, Hawk requests that the Court appoint a trustee under section 1104(a) of the Bankruptcy Code, on the basis that there has been "gross mismanagement" or "incompetence" either before or after the commencement of these chapter 11 cases. For the reasons set forth below, this alternative relief should also be denied.

45.    The appointment of a trustee is an extraordinary remedy, and a strong presumption exists in favor of continuing a debtor-in-possession in control and management of its estate. *See In re Fisher & Son, Inc.*, 70 B.R. 7, 8 (Bankr. S.D. Ohio 1986).  "The presumption arises from a belief that the debtor and current management are generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate." *In re La Sherene, Inc.*, 3 B.R. 169, 174 (Bankr. N.D. Ga. 1980). Moreover, the factors used to determine gross mismanagement vary depending on the facts of the case, but often include elements that "hint at fraud, in addition to negligence." *In re Sundale, Ltd.*, 400 B.R. 890, 907 (Bankr. S.D. Fla. 2009) (denying appointment of trustee, despite creditors' lack of confidence in current management and

---

[12] To the extent the Court finds "cause" exists to either dismiss or convert these cases, then the Debtors believe that "unusual circumstances" under §1112(b)(2) exist warranting denial of dismissal or conversion. Among other things, the Debtors have been on a two plus year saga to regain possession of their assets which were wrongfully taken, and this bankruptcy process is allowing the Debtors a single forum to resolve all of their issues and regain possession of their assets which will help form the basis for a confirmable plan. This forum is most beneficial to all of the Debtors' creditors and interested parties and the plan that the Debtors intend to propose will pay secured creditors and provide a substantial distribution to unsecured creditors. This bankruptcy will maximize recovery for all parties, and will certainly be less expensive than having a chapter 7 or chapter 11 trustee appointed who will only add another layer of expense without the intimate knowledge of Debtors' current professionals.

debtors' underperformance compared to others in market). Similarly, incompetence contemplates a showing of a lack of business acumen and ability.[13]

46.     Here, there is no basis to appoint a chapter 11 trustee as Hawk cannot show gross mismanagement, fraud, or negligence. The Debtors' current management consists of Mr. Rajan who is an experienced businessman who has founded and co-founded numerous successful business ventures and technologies. Mr. Rajan is intimately familiar with the Debtors' businesses and the related technology and is best situated to help lead the Debtors through these bankruptcy cases. *See generally* 9/25 Hearing Transcript. Additionally, as described above, the Debtors hired Mr. Park as CFO to add another layer of an independent director with vast banking experience and are awaiting a hearing on the approval of Mr. Park's retention application.  *See* 9/25 Transcript, 13:7-13.

47.     Hawk's alternative request to appoint a chapter 11 trustee should be denied for all of the reasons stated herein.

## IV.     The Hawk Parties' Request for Stay Relief is Unwarranted

48.     Since the filing of these Chapter 11 Cases, Hawk and related parties, including Mr. Stastney, SeeCubic, SeeCubic B.V., SLS Holdings VI LLC, and Patric Theune, have taken numerous actions to hinder Debtors' ability to effectively reorganize.  These actions have included, but are not limited to (i) violating the automatic stay, (ii) failing to turn over valuable and integral property of Debtors' Estates, including an optical bonding machine located in China, and (iii)

---

[13] *See In re Mako, Inc.*, 102 B.R. 809, 812 (Bankr. E.D. Okla. 1988). Though there does not appear to be a uniform standard with respect to what constitutes "incompetence" for the purposes of section 1104, courts have grounds for appointment of a trustee based on incompetence where a debtor's management or board lacked relevant experience for the position, *Matter of Warwick Park, Inc.*, 100 B.R. 179, 180 (Bankr. D. Del. 1989), where management lacked financial sophistication and did not appreciate the need for additional expertise, *In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 175 (Bankr. D. Colo. 1990), where management failed to maintain financial books and records, *In re U.S. Commc'ns of Westchester, Inc.*, 123 B.R. 491, 495 (Bankr. S.D.N.Y. 1991), or where management was "unwilling or incapable" of fulfilling its fiduciary duties, *In re Celeritas Techs., LLC*, 446 B.R. 514, 520 (Bankr. D. Kan. 2011).

interfering with the operation of Debtors' subsidiaries in the Netherlands. Debtors view these actions as willful given that the parties are fully aware of the bankruptcy filing and the implications of the automatic stay. Debtors have sought relief with the Court to address these issues.

49. While Hawk acknowledges that the automatic stay applies to the 225 Action, Hawk fails to articulate the exact relief and specific matters that it seeks to pursue in the 225 Action should stay relief be granted. Hawk references a determination of claim status and total claim amounts, but fails to acknowledge that those are only tangential issues to be addressed in the 225 Action. As noted above, the ultimate relief sought in the 225 Action is for the Chancery Court to authorize Hawk to proceed with the exercise of purported creditor's rights, including the exercise of control of Debtor Technovative and the subsequent sale of all of Debtors' subsidiaries' assets as part of the Article 9 Sale. As a result of this ambiguity in the relief sought by Hawk, it is worth noting that the automatic stay not only applies to the continuance of the 225 Action, but also applies to the exercise of the ultimate relief sought by Hawk in the 225 Action.

50. Indeed, a debtor's bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The definition of property of the estate is interpreted broadly, and 'every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of Section 541.'" *Geltzer v. Soshkin (In re Brizinova)*, 588 B.R. 311, 326 (Bankr. E.D.N.Y. 2018) (quoting *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008)) (brackets and quotation marks omitted).

51. "The broad definition of property of the estate clearly encompasses a debtor's interest in another corporation's stock." *Id.* (quotation and brackets omitted). Moreover, corporate governance rights that are part and parcel with such equity interests also fall under section 541.

*See, e.g.*, *See Walro v. Lee Grp. Holding Co., LLC (In re Lee)*, 524 B.R. 798, 804 (Bankr. S.D. Ind. 2014) (finding debtor's voting rights in limited liability company were property of the estate).

52.     It is without question that Hawk cannot interfere with Stream's exercise of such rights, as it would violate the automatic stay thereby rendering any declaration from the Chancery Court on the issue of Hawk's pre-petition rights with regards to the voting of the Technovative stock, if any, moot. *See* 11 U.S.C. §§ 362(a)(3) (prohibiting "any act to . . . to exercise control over property of the estate"), 362(a)(4) (prohibiting "any act to create, perfect, or enforce any lien against property of the estate"). To the extent there is a dispute over estate property, it is this Court—not the Chancery Court—that should determine whether Stream or Hawk possesses the rights over the Technovative stock and corresponding voting rights.  *See In re Continental Airlines*, 138 B.R. 442, 445 (D. Del. 1993) (the determination of what constitutes property of the debtor's estate is one of the core proceedings arising under Title 11 and is inherently an issue to be determined by the bankruptcy court).

53.     "The Bankruptcy Code authorizes bankruptcy courts to grant relief from the automatic stay for 'cause.'" *Del. Tr. Co. v. Energy Future Intermediate Holding Co. LLC (In re Energy Future Holdings Corp.)*, 533 B.R. 106, 117 (Bankr. D. Del. 2015) (quoting 11 U.S.C. §362(d)(1)). "Courts are to determine 'cause' based on the totality of the circumstances in each particular case." *Id.* (citing *In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997)). Courts in this District apply a three-pronged test to determine whether cause exists for granting relief from the automatic stay to continue in another forum: (1) whether the debtor or the estate will be greatly prejudiced by continuation of the litigation in the other forum; (2) whether the hardship to the non-debtor party outweighs the hardship to the debtor; and (3) whether probability of prevailing on the merits favors the non-debtor. *See In re Tribune Co.*, 418 B.R. 116, 126 (Bankr. D. Del. 2009) (citations

omitted); *see All Am. Plazas, Inc. v. Petro Franchise Sys., LLC (In re All Am. Props.)*, No. 1:10-bk-00273MDF, 2010 Bankr. LEXIS 1286, at *7 (Bankr. M.D. Pa. Apr. 15, 2010).

54.    The burden under Section 362(g) of the Bankruptcy Code only shifts to the debtor once the liftstay applicant makes out a *prima facie* case for stay relief. *Id.* (citing *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006) *aff'd*, 359 F. App'x 352 (3d Cir. 2010)). "A *prima facie* case requires a showing by the movant of 'a factual and legal right to the relief that it seeks.'" *Id.* (quoting *RNI*, 348 B.R. at 299) (additional quotation omitted). "Failure to prove a *prima facie* case requires denial of the requested relief." *Id.* (citing *RNI*, 348 B.R. at 299). "To apply section 362(g)(2) differently would force the debtor to prove a negative, that no cause exists." *Id.* (quoting *In re Rexene Products Co.*, 141 B.R. 574, 577 (Bankr. D. Del. 1992)).

55.    Hawk has failed to make a *prima facie* case for stay relief under all three of the relevant factors. Accordingly, no burden should shift to Debtors, but even if it did, Debtors carry their burden.

56.    Allowing Hawk to proceed with the 225 Action would greatly prejudice Debtors and the Estates. The purpose of the automatic stay is three-fold: (1) prevent certain creditors from gaining a preference for their claims against the debtor; (2) to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, (3) to avoid interference with the orderly liquidation or rehabilitation of the debtor. *See In re Rexene Prods., Co.*, *supra*, 141 B.R. at 576. Affording Hawk stay relief would be counter to the very purpose of the automatic stay.

57.    It is unquestioned that Hawk seeks to pursue the 225 Action in an effort to wrest control of Technovative's management from Stream so that Hawk can insert its own director, Mr. Stastney. Upon inserting its own director, Hawk intends to effectuate a sale of Technovative's

downstream subsidiaries' assets, consisting primarily of Debtors' intellectual property which are necessary for Debtors to manufacture their glasses free 3D display and Ultra-D™ technology. Mr. Stastney would be looking out for the interests of Hawk, whereas the Debtors, fiduciaries of the Estates under the watch of the Court, are required to operate for the benefit of all interested parties. Should Hawk succeed in the 225 Action, it would cause irreparable harm to Debtors because they could lose through the Article 9 sale the very assets that are necessary to effectuate an orderly reorganization process that is already underway as evidenced by the approximately $12 million purchase order that Debtors have obtained since the Petition Date. Without the intellectual property of its subsidiaries, Debtors will have difficulty fulfilling the purchase orders which will negatively impact Debtors' ability to fund a plan and make distributions to creditors. Essentially, an adverse ruling in the 225 Action would paralyze Debtors in these Chapter 11 Cases. *See, e.g., In re Morysville Body Works, Inc.*, (Bankr. E.D. Pa. 1988) (denying creditor's request for stay relief because granting §362 say relief would have completely destroyed debtor's chances of a successful reorganization). Also, the value of the intellectual property that Hawk seeks to obtain via the Article 9 Sale is, by Hawk's own valuation, estimated to be at least $500 million. Hawk seeks to steal Debtors' assets for its own benefit and to the detriment of all other parties.

58.     Also, Hawk's argument that Debtors' asset will decline in value if stay relief is not granted is unsubstantiated. Indeed, if Debtors' assets have any decline in value, it will be the result of the actions directed against Debtors by Mr. Stastney who is unabashedly interfering with Debtors' operation of their subsidiaries in the Netherlands, directing parties not to cooperate with Debtors in retrieving their optical bonding equipment in China, and otherwise refusing to return Estate property to Debtors. Debtors have already sought relief from the Court to remedy these actions. Debtors' actions in the bankruptcy case thus far have resulted in obtaining a substantial

purchase order that would be more than sufficient to satisfy any claim on the SLS Notes, and Debtors intend to obtain more purchase orders once Mr. Stastney and his entities cease interfering with Debtors' reorganization efforts and Debtors regain possession of all of their assets which they are working tirelessly to achieve.

59.     Further, now that the Debtors have filed the Chapter 11 Cases, they will be operating under this Court's supervision, and all interested parties, including Hawk, will enjoy the privileges and protections granted to creditors under the Bankruptcy Code.

60.     Finally, Hawk will not be able to prevail under the third factor. Hawk argues that Debtors filed these Chapter 11 Cases "as part of a baseless gambit" to avoid the trial in the 225 Action. To the contrary, Debtors believe that they would prevail in the 225 Action and have strong defenses to the 225 Action.  However, Debtors still remain without their assets which the Delaware Supreme Court ordered should have been returned to Debtors almost a year ago. Even the Chancery Court acknowledged that Debtors required possession of their assets to satisfy creditor claims. Hawk and its related parties have done everything possible both pre- and post-petition to hinder Debtors' efforts to regain possession of their assets and prevent Debtors from obtaining customer purchase orders.  As evidenced by Debtors' schedules, Debtors have other claims that they need to address aside from their issues with Hawk and bankruptcy was the most logical forum to address all issues and allow Debtors' to formulate a path forward.

61.     As for the 225 Action, any claims relating to the SLS Notes fail because Hawk's purported prosecution of those contracts in the 225 Action constitutes the tort of champerty and maintenance, and Hawk advanced no evidence of the amount of the SLS Notes to a sum certain, or the continued enforceability of that debt as against Stream,

because Hawk declined to participate in discovery in good faith.  Thus, Hawk is the wrong party to prosecute the SLS Notes and Hawk failed to put forth evidence substantiating the SLS Notes.

62.    With regards to the Hawk Notes, Debtors have asserted that Hawk does not have the right to exercise any voting rights under the Hawk Notes or related Pledge Agreements because, *inter alia*, all of the Hawk Notes have been converted from debt to equity.  There is no dispute that the Hawk Notes are convertible.  And, Debtors provided all appropriate notices for conversion as required by the Conversion Agreement.  Therefore, Hawk will likely not succeed on the merits of the 225 Action.  Additionally, as noted above, to the extent that Hawk could exercise any voting rights of Stream's 100% stock ownership interest in Technovative pre-petition—which it could not—the Chancery Court cannot provide Hawk with the relief that it seeks because the Technovative stock and voting rights are clearly property of Stream's bankruptcy estate.

63.    Accordingly, Hawk cannot demonstrate any likelihood of success on the merits of the 225 Action, and this factor also weighs against lifting the stay.

## CONCLUSION

Hawk failed to meets its burden in the Dismissal Motion by failing to demonstrate that these Chapter 11 Cases should be dismissed or converted or that a trustee should be appointed. To the contrary, the trial record establishes that the Debtors filed these Chapter 11 Cases in good faith with an eye towards a successful reorganization. Despite Hawk and the related parties' best efforts to hinder the Debtors' efforts and abscond with the Debtors' assets, the Debtors have been able to, *inter alia*, obtain purchase orders for approximately $130 million and file a disclosure statement and related plan which will be funded by VSI. As a plan proponent, VSI will contribute approximately $35 million and receive 90% of the equity in the reorganized Debtor, with allowed administrative expense claims being paid in full, allowed secured claims paid in full, unsecured

130046701.8

creditors receiving a 50% distribution on their allowed claims or having the opportunity to participate in a rights offering for stock in the reorganized Debtor, and equity holders having the opportunity to participate in a rights offering for stock in the reorganized Debtor. The Debtors clearly deserve to be debtors-in-possession and have set forth a plan which will allow them to exit these bankruptcy cases while providing for the claims of all interested parties.

Likewise, Hawk failed to meet its burden on the Stay Relief Motion. No cause exists for granting stay relief to allow Hawk to return to the Delaware Chancery Court in a proceeding which Hawk is merely using as a creditor rights' remedy. This Court can, and should, resolve all issues that Hawk seeks to have addressed by the Delaware Chancery Court, and the Bankruptcy Court is the most equitable forum to not only address Hawk's claim, but the claims of all other creditors and interested parties who would be disenfranchised by the 225 action in the Delaware Chancery Court.

The complete trial record demonstrates that the Court should deny the Dismissal Motion and the Stay Relief Motion.

Date: October 2, 2023                    Respectfully submitted,

                                         /s/ *Rafael X. Zahralddin-Aravena*
                                         Rafael X. Zahralddin-Aravena (PA Bar No. 71510)
                                         **LEWIS BRISBOIS BISGAARD & SMITH, LLP**
                                         550 E. Swedesford Road, Suite 270
                                         Wayne, PA 19087
                                         Telephone: (302) 985-6000
                                         Facsimile: (302) 985-6001
                                         Rafael.Zahralddin@lewisbrisbois.com

                                         -and-

                                         Vincent F. Alexander (admitted *pro hac vice*)
                                         **LEWIS BRISBOIS BISGAARD & SMITH, LLP**
                                         110 SE 6th Street, Suite 2600
                                         Fort Lauderdale, FL 33301
                                         Telephone: (954) 728-1280

130046701.8

Facsimile: (954) 678-4090
Vincent.Alexander@lewisbrisbois.com

-and-

Bennett G. Fisher (admitted *pro hac vice*)
**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
24 Greenway Plaza, Suite 1400
Houston, TX 77046
Telephone: (346) 241-4095
Bennett.Fisher@lewisbrisbois.com

*Counsel to Debtors*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on October 2, 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day by transmission of Notice of Electronic Filing generated by CM/ECF on all parties who are authorized to receive electronically Notice of Electronic Filing in this bankruptcy case.

/s/ *Rafael X. Zahralddin-Aravena*
Rafael X. Zahralddin-Aravena

130046701.8