## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | Chapter 11 |
| STREAM TV NETWORKS, INC.,[1] | CASE NO.: 23-10763 MDC |
| Debtor, | |
| and | Chapter 11 |
| IN RE: | CASE NO.: 23-10764 MDC |
| | (Joint Administration Pending) |
| TECHNOVATIVE MEDIA, INC., | |
| Debtor. | |

### HAWK INVESTMENT HOLDINGS LTD.'S POST-HEARING REPLY BRIEF IN OPPOSITION TO DEBTORS' POST-TRIAL BRIEF IN (I) OPPOSITION TO MOTION OF HAWK INVESTMENT HOLDINGS LTD. PURSUANT TO SECTION 1112(B) OF THE BANKRUPTCY CODE EITHER (A)(1) TO DISMISS THE DEBTORS' CHAPTER 11 CASES OR (2) TO CONVERT SUCH CASES TO CASES UNDER CHAPTER 7 OR, (B) IN THE ALTERNATIVE, PURSUANT TO SECTION 1104(A) OF THE BANKRUPTCY CODE TO APPOINT A CHAPTER 11 TRUSTEE; AND (II) IN OPPOSITION TO EMERGENCY MOTION FOR RELIEF FROM STAY FILED BY HAWK INVESTMENT HOLDINGS, LTD.

Hawk Investment Holdings, Ltd. ("Hawk"), as Collateral Agent[2] for the secured

noteholders of SeeCubic, Inc. ("SeeCubic"), a secured creditor of Stream TV Networks, Inc.

("Stream") and Technovative Media Inc. ("Technovative" and, together with Stream,

the "Debtors") in the above-captioned chapter 11 cases (together, the "Chapter 11 Cases"), by and

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015).  The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

[2] In connection with the Omnibus Agreement (defined below), Hawk and SLS entered into a series of transactions wherein (1) Hawk and SLS assigned certain of their rights as secured creditors of Stream to SeeCubic, (2) SeeCubic issued notes to Hawk and SLS that were secured by all of SeeCubic's assets, and (3) SeeCubic entered into a collateral agreement that allowed Hawk to act as the "Collateral Agent" to levy on SeeCubic's assets and enforce its contract rights, including the rights SeeCubic received via assignment from Hawk and SLS. The Delaware Supreme Court decision invalidating the Omnibus Agreement constituted an event of default under the relevant agreements by and among Hawk, SLS, and SeeCubic that permits Hawk to act as Collateral Agent for the secured noteholders of SeeCubic. *See Hawk Inv. Holdings Ltd. v. Stream TV Networks, Inc.*, No. 2022-0930-JTL, 2022 WL 17258460, at *4 (Del. Ch. Nov. 29, 2022), *reargument denied*, No. 2022-0930-JTL, 2022 WL 17661578 (Del. Ch. Dec. 14, 2022).

through its undersigned counsel, K&L Gates LLP, respectfully files this brief (the "Brief") in response to *Debtors' Post-Trial Brief in (I) Opposition to Motion of Hawk Investment Holdings Ltd. Pursuant to Section 1112(b) of the Bankruptcy Code Either (A)(1) to Dismiss the Debtors' Chapter 11 Cases or (2) to Convert such Cases to Cases under Chapter 7 or, (b) in the Alternative, Pursuant to Section 1104(a) of the Bankruptcy Code to Appoint a Chapter 11 Trustee; and (II) in Opposition to Emergency Motion for Relief from Stay Filed by Hawk Investment Holdings, Ltd.* [Docket No. 432] (the "Debtors' Post-Trial Brief") and *Rembrandt 3D Holding Ltd's Post Trial Brief in Support of Opposition to Hawk Investment Holdings Ltd.'s Motion to Dismiss the Debtors' Chapter 11 Cases or to Convert the Cases to Cases under Chapter 7 or in the Alternative to Appoint a Chapter 11 Trustee* [ECF No. 430] (the "Rembrandt Post-Trial Brief," and, together with the Debtors' Post-Trial Brief, the "Post-Trial Briefs").

On the same day the Debtors and Rembrandt filed the Post-Trial Briefs, Hawk also filed *Hawk Investment Holdings Ltd.'s Post-Hearing Brief in Support of (1) Motion for Relief from Stay and (2) Motion to Dismiss, Covert, or Appoint a Chapter 11 Trustee* [ECF No. 431] (the "Hawk Post-Trial Brief"),[3] which Hawk incorporates entirely herein by reference.  Hawk files this Reply Brief further support of the Hawk Post-Trial Brief and in opposition to the Post-Trial Briefs, and respectfully states as follows.

## PRELIMINARY STATEMENT

The Debtors' Post-Trial Brief whines that Stream had significant business operations, but it has been thwarted by the "improper" entry of an order upholding the Omnibus Agreement, and by the actions of Hawk. The reality is far simpler. Stream—and specifically Mathu Rajan—have failed to create a business that can service its debt, much less generate a return to its investors.

---

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Hawk Post-Trial Brief.

Since 2009, Stream has raised approximately $160 million from third party investors.[4] This included tens of millions of dollars loaned by the Secured Creditors. Mathu Rajan has taken eleven years and over $160 million of other people's money, and he has failed to build a viable business. In that eleven-year span, Stream managed to produce just 5,000 TVs via its Dutch subsidiary, SCBV, and has never had any meaningful revenue. Stream claims that it has not been able to control its assets for two-plus years because of an order entered by the Court of Chancery and because of Hawk's actions, Stream's bill for failing to repay tens of millions of dollars in secured debt is finally coming due.

Every basis claimed by Debtors for this bankruptcy is a sham. Debtors claim that they needed "breathing room" to restructure, but the context and timing of the Petition reveal it was only filed to obtain breathing room from the 225 Action, which was a week away from liquidating the Debtors' obligations to the Secured Creditors. Debtors claim that they needed to "de-lever" their balance sheet, but that claim is unpersuasive; to the extent the Debtors still argue that they had converted Hawk's secured debt, that would have been resolved in the 225 Action that Debtors have desperately tried to avoid. Debtors claim that they need to obtain financing, but Mr. Rajan has transparently admitted that all fundraising (if it has to even take place) has been undertaken by VSI, Mr. Rajan's side hustle.

In short, Debtors' Post-Trial Brief offers more of the same typical excuses that Mr. Rajan has offered over the last three years. These excuses all fall flat. For the reasons stated below and in the Hawk Post-Trial Brief, the Motions should be granted and Mr. Rajan should no longer remain in control of these companies.

---

[4] *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1023 (Del. Ch. 2020).

## ARGUMENT

### A.    The Debtors Have No Operations

#### 1.    The Debtors Have No Operations Nor A Likelihood of Rehabilitation

The Debtors and Hawk appear to agree in large part that the two primary issues for this Court to consider are whether Stream has operations, and whether the Debtors have grossly mismanaged the bankruptcy estates.  The parties even agree to a large extent on many of the facts, as the Debtors did not appear to refute the documentary evidence presented by the Secured Creditors. However, the parties have presented diametrically opposed characterizations of the evidence of the two primary issues. But Debtors' spin on the facts presented at the Hearings is not credible. Debtors are a defunct entity without funding, operations, or anything to rehabilitate. The evidence instead reveals that Debtors have systematically conducted this bankruptcy to benefit VSI.

In Debtors' Post Hearing Brief, they rely principally on two main pieces of "evidence" to support the contention that Stream has operations: Mathu Rajan's testimony, and two purchase orders between Stream and VSI.[5] Neither piece of "evidence" should be given any weight.

First, Mr. Rajan's testimony is simply not credible. There is no documentary evidence that Stream is able to produce any TVs or even that Stream has any employees.[6] Likewise, none of the supposed end customers that will ultimately receive TVs from Stream (via VSI) have come to back up the validity of these purported agreements. Mr. Rajan's testimony about Stream's ability to

---

[5] *See* Debtors' Post Hearing Brief, ¶ 14 (citing to Mr. Rajan's testimony and Purchase Orders with VSI [Debtor-18 & Debtor-19]).

[6] The Monthly Operating Reports, submitted under penalty of perjury by Mr. Rajan, state Stream has no employees. See March [ECF No. 223], April [ECF No. 224], May [ECF No. 253], June [ECF No. 253], July [ECF No. 399] Monthly Operating Reports.

fulfill these purchase orders is directly contradicted by the testimony of Stream's acting CFO,

Thomas Park:

> Q: Stream, the Debtor, as you sit here today, does not have the infrastructure, the employees, the material, capacity, or the cash to fulfill these purchase orders, correct
>
> A: Yes.
>
> Q: So just to be clear, when you say yes, yes, you agree with me that Stream does not have the capacity to fulfill the purchase orders, correct?
>
> A: Yes.[7]

Second, the Purchase Orders are not worth the paper they are printed on. As Debtors admit,

"[b]oth orders are from VSI."[8] Stream claims that "negotiations with VSI have resulted in a $35

million commitment by VSI to fund the Debtors' bankruptcy,"[9] but this self-dealing promise does

not have any documentary evidence to support it. Stream produced two purchase orders between

VSI and third-parties, but those purchase orders are redacted, making it impossible for Hawk to

conduct any due diligence.[10] Mathu Rajan has identified "Cystar" and "Southern Telecom" as

customers, but no representatives from either company testified at the Hearings or were even

identified by Debtors. Stream also alleges that it received "letters of intent from IQH3D and

BBack, Inc. for more than 1,000 [TVs],"[11] but the Debtors never produced—nor even alleged they

have—any binding agreements with respect to this purported interest.  It is all simply testimony.

---

[7] June 29, 2023, Hearing Transcript [ECF No. 305] (Park), at 103:15–22 [hereinafter, the "June 29 Transcript"].

[8] Debtors' Post-Trial Brief, ¶ 16.

[9] *Id.* at ¶ 15.

[10] *See* Redacted Purchase Orders [Debtor-20 & Debtor-21]. In addition, on their face, the purported Purchase Orders bear indicia of inauthenticity. First, Stream is inexplicably selling 65-inch 4K and 8K TVs at the exact same price. In addition, the "back-to-back" purchase orders do not match up. For instance, Southern Telecom is allegedly buying 100,000 8K TV units from VSI, but VSI is purchasing 100,000 4K units from Stream. *See* Debtors-19 and Debtors-21.

[11] Debtors' Post-Trial Brief, ¶ 16.

The Debtors are clearly conflating VSI with Stream. Mr. Park explicitly testified "There wasn't a bifurcation or delineation between Stream as a legal entity versus VSI…".[12] Mr. Park and Mr. Rajan claimed that VSI was paying all of Stream's expenses during the bankruptcy.[13] VSI has allegedly hired workers, though Mr. Rajan contends that they "work for Stream."[14] Stream sought to hire Mr. Park to serve as CFO, but he admitted in Court that he is in part raising money for VSI.[15] Mr. Rajan has openly admitted that VSI (another entity he controls) is where all of the action truly takes place, as investors and customers are negotiating with VSI, not Stream.[16]

Ultimately, none of this should be surprising. The playbook of a confidence man revolves around the control of information—if you are the only source of information, it allows you to create whatever illusion you desire. What became clear during the Hearings is that absolutely everything the Debtors do revolves around Mathu Rajan's words alone. Purchase orders must be redacted in order to obscure the buyers.[17] Representatives for those buyers are not brought into court.[18] The individuals, contact information, and even the entity behind a $300 million term sheet

---

[12] June 29 Transcript (Park), at 89:21–22.

[13] *Id.* at 104:5–9. (Q: To the extent that debtor is incurring expenses and fees that are being paid, they're being paid by Mr. Rajan's other entity, VSI, correct? A: Yes."); September 25, 2023, Hearing Transcript [ECF No. 427] (Rajan), at 14:3-8 [hereinafter, the "September 25 Transcript"] ("Q: And you previously testified that VSI has been paying the expenses of the debtors during the pendency of this bankruptcy somewhere in the range of $1.5 to $2 million, correct? A: Last month it was at 1.5 million. It's now over two million."). Notably, no documents to substantiate these expenses, or payments by VSI, have ever been disclosed.

[14] September 25 Transcript [ECF No. 427] (Rajan), at 18:22–19:1 ("Q: And it's your testimony up until very recently these employees were 1099 independent contractors with VSI being paid for VSI, but doing work for Stream, correct? A: Correct.").

[15] June 29 Hearing (Park) [ECF No. 305], at 75:10–76:5.

[16] September 25 Transcript [ECF No. 427] (Rajan), at 194:25–195:8 ("Stream TV has already signed paperwork with VSI and VSI's been supplying cash to Stream TV since the bankruptcy was filed and right now, we have purchase order financing from both BOE and one of VSI's investors for all the PO's. Then for the liabilities, Stream TV already has a [deal] with VSI and VSI has done deals with investors and is doing additional deals right now to pay off the unsecured creditors and Rembrandt….").

[17] Redacted Purchase Orders [Debtor-20 & Debtor-21].

[18] August 17, 2023, Hearing Transcript [ECF No. 370] (Rajan), at 148:16–20 [hereinafter, the "August 17 Transcript] ("Q: Mr. Rajan, with regard to all those business relationships with all those potential customers, the Debtor has not

must be concealed.[19]  The CFO must be kept in the dark about what the Debtors are really doing.[20]

Receipts, invoices, and emails cannot be produced.[21]  Those steps are necessary to make Mathu

Rajan the only source of critical information, and make it as difficult as possible to untangle Mr.

Rajan's yarns. The testimony of any third parties, and contemporaneous documentary evidence

cannot be allowed into evidence because it may challenge Mr. Rajan's manufactured narrative.

And if one tale starts to fall apart, Mr. Rajan can craft another, and repeat the process anew,

knowing that he can buy time and force his Secured Creditors to expend precious resources.  These

tactics are the classic example of a debtor seeking to hinder, delay, and defraud creditors which

the Bankruptcy Code does not tolerate.

When Hawk moved to compel documents related to a *$300 million* term sheet for Debtors

for instance, Debtors produced just a single document, a screenshot of a signed copy of the term

sheet.  Debtors' tactics force this Court to believe one of the following two scenarios: either helpful

documents supporting the Zhongsheng Term Sheet were withheld by Debtors, or that they simply

do not exist. The obvious conclusion is that those documents do not exist. Now that the doubts

about the Zhongsheng Term Sheet have proved impossible to quell, Debtors simply abandoned it,

not mentioning it once in the Debtors' Post-Trial Brief.

Mathu Rajan's long-running scheme, however, is finally coming to a close. The Hearings

have revealed the truth, and exposed Mathu Rajan's increasingly desperate deceptions. The

Debtors are a holding company with no operations and no prospects. Even in the fantasy world

created by Mathu Rajan, all of the supposed "operations" that Stream has are actually taking place

---

put forth in this proceeding a single representative from one of those entities to substantiate your testimony, correct?
A: We did not put forward witnesses. No.").

[19] *See* Hawk Post-Trial Brief, Statement of Facts § L.

[20] June 29 Transcript [ECF No. 305] (Court), at 179:25–180:8.

[21] September 25 Transcript [ECF No. 427] (Rajan), at 74:2–75:17.

at VSI.[22] The reality is that Stream has never been an operating company--it has always been a

holding company.[23] Bankruptcy is a place to reorganize a business, not to start one from scratch.[24]

Debtors admitted in Debtors' Post-Trial Brief that they are using this bankruptcy to create a

business, not reorganize one.[25] They should be held to that admission.

## B.   The Debtors have Grossly Mismanaged these Estates

As described in pain-staking detail in the Hawk Post-Trial Brief, this case is a paradigmatic

example of gross mismanagement of a bankruptcy estate. Without a hint of irony, Debtors boldly

cite to *In re Creech* for the proposition that "Courts have found 'gross mismanagement' where a

debtor in possession **fails to seek court approval before taking certain actions outside the**

**ordinary course of business, such as paying prepetition debts or incurring debts, where**

**debtors file monthly reports without closely monitoring them, and where the business lacks**

**effective management postpetition**."[26] Debtors' own evidence confirms that Debtors have

grossly mismanaged the estates in all three respects.

### 1.   *Debtors Have Acted Outside the Ordinary Course, without Court Approval*

Debtors have repeatedly operated outside the ordinary course of business during this

bankruptcy without bothering to ask the Court to approve its actions. Despite having motions on

file to obtain court approval to do so, and despite knowing those motions have not been approved,

Mr. Rajan and Mr. Park have both testified that Stream has been issuing stock to VSI roughly

---

[22] Every single transaction between the Debtors and VSI is self-dealing. Mathu Rajan is the CEO and controlling shareholder of VSI.  *See* September 25 Transcript [ECF No. 427] (Rajan), at 49:14-23; August 17 Transcript [ECF No. 370] (Rajan), at 82:22.

[23] Hawk Post-Trial Brief, Statement of Facts § I.

[24] *In re KLMKH, Inc.*, No. 22-30232, 2022 WL 4281478, at *6 (Bankr. W.D.N.C. Sept. 14, 2022) ("In sum, it appears the Debtor used this bankruptcy case to start its business, instead of reorganizing, which is not a proper bankruptcy purpose.").

[25] *See* Debtors' Post-Trial Brief, ¶ 43, n.12.

[26] *See id.* at ¶ 32 (emphasis added).

twice per week to pay back VSI for funding Stream's expenses.[27] This is also blatantly self-dealing, given Mr. Rajan's role as CEO of both companies and controlling stockholder.

Without Court approval, Stream has also executed agreements outside the ordinary course of business, such as a worldwide, perpetual, exclusive licensing agreement with VSI.[28] Perhaps most egregiously, Stream entered into the Licensing Covenant with Rembrandt obligating Stream to make a $3.6 million payment to Rembrandt for the sole purpose of receiving Rembrandt's promise not to license any of Rembrandt's purported IP to SeeCubic (or any other entity affiliated with the Secured Creditors).[29] Tellingly, Debtors do not address this agreement in Debtors' Post-Trial Brief, likely because they know it is indefensible, and demonstrates a finding of gross mismanagement under *In re Creech*.

2.    *Debtors Have Failed to File Typical Motions/Make Proper Disclosures*

The Debtors have also admitted that they have filed multiple misleading monthly operating reports. Significantly, not only did Mr. Rajan testify that the Monthly Operating Reports are incorrect, the Debtors have failed to correct them for several months, despite Mr. Rajan testifying that Debtors know they are incorrect:

> Q: And do you recall in your -- when you were here last, we went over the monthly operating reports for the debtor?
>
> A: Correct.
>
> Q: And the monthly operating reports you testified did not list any employees, correct?
>
> A: Correct. I testified that the monthly operating reports were incorrect. I was in the hospital at that time.

---

[27] *See* August 17 Transcript [ECF No. 370] (Rajan), at 205:5–11; June 29 Transcript (Park) at 104:5–9.

[28] *See* OCB Motion [ECF No. 135], at ¶¶ 13–14, 22–27.

[29] License Covenant [CR-222].

Q: And you testified, Mr. Rajan, that the operating reports reflected or failed to reflect that VSI was paying the expenses of the debtor, correct?

A: Correct. That is correct.

Q: Okay. And during your testimony, as you told me on three separate occasions, that those monthly operating reports would be corrected by the following Monday. Do you recall that?

A: Yes. The operating reports are supposed to be corrected.

….

Q: As you sit here today, no corrected monthly operating reports have been filed, have they?

A: No, I don't believe they've been filed. No.[30]

In other words, Debtors have filed false operating reports, have admitted to doing so, and still have not filed correct operating reports. This is clearly gross mismanagement, and far more troubling than "failing to monitor" the monthly operating reports, which the court in *In re Creech* (cited by Debtors) identified as gross mismanagement.[31]

Likewise, Debtors have not filed any of the motions that are typical in bankruptcy that allow a company to continue operating, provide funding to the company, and maximize recovery of the creditors.[32] Instead, Debtors only appear interested in pursuing insider transactions and taking actions designed only to thwart the rights of the legitimate creditors.[33]

3.    *Debtors Lack Effective Management Postpetition*

Debtors do not have effective management, another telltale sign of gross

---

[30] September 25 Transcript [ECF No. 427] (Rajan), at 14:9–15:12.

[31] *See Nester v. Gateway Access Solutions (In re Gateway Access Sols., Inc.)*, 374 B.R. 556, 565 (Bankr. M.D. Pa. 2007) ("A debtor-in-possession has a duty to keep the Court and its creditors informed about the status and condition of its business.") (internal quotations and citations omitted).

[32] *See* Hawk Post-Trial Brief, Statement of Facts § I.1.i.

[33] *See id.* at Argument § A.1.ii.a (identifying at least seven postpetition agreements Stream entered into without Court approval).

mismanagement.[34] Mathu Rajan has been the CEO of Stream since 2009, and in that time, Stream has never posted a profit or even commercialized its business; Stream defaulted on tens of millions of dollars of secured debt, *before* the Omnibus Agreement was entered into;[35] Stream has filed for bankruptcy twice and been placed in involuntary bankruptcy once;[36] and Mathu has been sued by investors for fraud.[37]

Debtors, realizing that Mathu Rajan is a failed businessmen plagued by implacable conflicts of interest have tried to create a veneer of legitimacy by hiring Thomas Park. But Mr. Park is clearly just a figurehead—Mr. Rajan directly contradicted Mr. Park's testimony regarding Zhongsheng,[38] the Debtors' employees,[39] and the Debtors' operations,[40] and Mr. Park has played no role whatsoever in negotiating any of the supposed deals that Mr. Rajan has procured with third parties.[41] Mr. Park's testimony culminated with this Court's observation that "Mr. Park really has no information..."[42]

---

[34] *In re Gateway*, 374 B.R. at 564 ("Failure to maintain an effective corporate management team has been held to constitute gross mismanagement.").

[35] *See Hawk Inv. Holdings Ltd. v. Stream TV Networks, Inc.*, No. 2022-0930-JTL, 2022 WL 17258460, at **14–15 (Del. Ch. Nov. 29, 2022) [hereinafter, the "Collateral Estoppel Opinion"].  As noted in the Collateral Estoppel Opinion, the Court's finding that Stream had defaulted on its secured debt was not appealed or overturned by the Delaware Supreme Court, and they incorporated that in their opinion overturning the Omnibus Agreement. *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 327 (Del. 2022) ("[B]y the end of February 2020, Stream had defaulted on the SLS Notes and Hawk Notes.").

[36] *See* Hawk Post-Trial Brief, Statement of Facts § C.

[37] *See* Mark L. Bunce v. Visual Technology Innovations, Inc. and Mathu Rajan, Case 2:23-cv-01740 (E.D. Pa.).

[38] *See* September 25 Transcript [ECF No. 427] (Rajan), at 85:21–24.

[39] *Id.* (Rajan) at 20:24–21:8 ("Q: So, as we sit here today, Mr. Rajan, you would agree with me that when trying to determine whether or not Stream actually has any employees, the only evidence we have is your testimony that it does and Mr. Park's testimony as the CFO saying that it does not, correct? A: That is correct.").

[40] *Id.* (Rajan) at 13:21–14:2 ("Q: And are you aware that Mr. Park also testified that the debtors did not have the infrastructure, the employees, the material, capacity, or the cash to fulfill purchase orders? A: Uh-huh. Yeah. I'm aware that he said that. Q: Okay. And am I correct that you disagree with Mr. Park's testimony? A: Mr. Park's testimony was incorrect.").

[41] *See, e.g., id.* (Rajan) at 85:21–24; June 29 Transcript [ECF No. 305] (Park), at 55:21–56:9.  Mr. Park is also not involved in preparing the monthly operating reports.  *See* June 29 Transcript [ECF No. 305] (Park), at 95:20–96:4.

[42] June 29 Hearing [ECF No. 305] (Court), at 179:25–180:8 ("[T]his is for Mr. Alexander. I think you also need to, when we have a new hearing with respect to how this case is proceeding, I'm going to need some testimony on funding

4.    *Debtors Have Not Funded SCBV*

Debtors' ridiculously claim that "there is no current funding need at any of the Debtors' subsidiaries, including SCBV, as that has been addressed by SeeCubic with the agreement of Mr. Rajan."[43] As this Court recalls, Debtors filed an emergency motion in April to fund SCBV by engaging in an insider transaction with VSI, which the Court denied.[44] Debtors essentially argue that because SeeCubic has stepped up to provide funding for SCBV, and preserve the only asset of value underneath Stream, that Mr. Rajan has responsibly managed and preserved the value of SCBV. The reality is that SeeCubic has bailed out Stream and Mr. Rajan, and only because SeeCubic does not want the value of the Collateral to its secured loans to evaporate.

5.    *Debtors Have Abandoned Zhongsheng Term Sheet*

Finally, Debtors have either misled Hawk and this Court, or have grossly mismanaged the bankruptcy estates with respect to the Zhongsheng Term Sheet, as it is either entirely fraudulent or Mr. Rajan has refused to accept $300 million in free money so that VSI can instead finance the estates and take the assets  Either way, there is clear mismanagement.

In the Hawk Post-Trial Brief, Hawk goes into great detail explaining why the Zhongsheng Term Sheet is fraudulent.[45]  Hawk reiterates this argument and explanation here, as the Zhongsheng Term Sheet has all the hallmarks of being a fabrication, and the Debtors' intentionally mislead this Court and its interested parties.  This type of fraud is clearly gross mismanagement.

Even if the Zhongsheng Term Sheet was genuine, however, it still demonstrates Mr. Rajan's mismanagement of the estates.  The Zhongsheng Term Sheet purports to be a non-binding

---

and how this is really going, and who knows what. Because apparently Mr. Park really has no information, and if I -- I'm going to need from -- if I don't get it, it is what it is. I'm just telling you guys what the lay of the land [is], okay?").

[43] Debtors' Post-Trial Brief, ¶ 30.

[44] *See* OCB Motion [ECF No. 135] and Employee Motion [ECF No. 134].

[45] *See* Hawk Post-Trial Brief, at Facts § L.2.

expression of interest by a third-party investor to invest $300 million into Stream in exchange for 35% of Stream's Class A Common Stock.[46]  Notwithstanding the availability of this investment, in the Draft Plan, the Debtors have spurned Zhongsheng's purported interest in order to have insider, VSI, serve as plan sponsor.  As filed, the Draft Plan proposes for VSI to provide up to $35 million in investments into the Debtors in exchange for 90% of the reorganized debtors' equity.[47]

Though Mr. Rajan maintains that Zhongsheng remains interested in investing in the Debtors' businesses, he claims that the Debtors do not need Zhongsheng's investment, because VSI has (a yet-unsubstantiated) $35 million to invest in the Debtors now.[48]  In other words, instead of waiting a few weeks for an investor to allegedly provide a ***$300 million*** investment for only a ***35%*** share of the company, Mr. Rajan has opted to pursue an investment from his other company, VSI, of ***$25 million*** (*i.e.*, nearly 1/10[th] that amount) for a ***90%*** share of the company (*i.e.*, nearly three times the equity share).  In other words, if the Zhongsheng Term Sheet is genuine, Mr. Rajan has robbed these Debtors and their estates of $736.4 million in order to ensure that his other company, VSI, obtains voting control over the Debtors.[49]  This would demonstrate a clear conflict of interest that the Court cannot overlook.

Nevertheless, Hawk still maintains that the Zhongsheng Term Sheet was fabricated in order to provide the illusion of interest by creditors and distract these proceedings.  It is not surprising to Hawk that after it conclusively demonstrated at the Hearings that the Zhongsheng Term Sheet was hollow, the Debtors have apparently abandoned it as a potential source of funding.  As

---

[46] *See* Amended OCB Motion [ECF No. 258].

[47] *See* Draft Plan [ECF No. 293-1], at § 9.01(a).

[48] *See* August 17 Transcript [ECF No. 370] (Rajan), at 101:16–102:11.

[49] Using the numbers included in the Zhongsheng Term Sheet, Zhongsheng apparently considers the Debtors' businesses worth approximately $857.1 million (*i.e.*, $300 million / 0.35).  If these numbers are true, Mr. Rajan is selling an interest in the Debtors valued at $771.4 million to his other company for only $35 million—representing an "insider discount" of more than 95%.

explained above, once evidence beyond Mr. Rajan's testimony is introduced, the house of cards

begins to fall.  In reality, it never was a potential source of funding.  If it was, however, Mr. Rajan

has robbed these estates of hundreds of millions of dollars for his own personal benefit.

**C.      It Is Impossible to Tell if the Debtors Have Misused Cash Collateral Because They
Have Refused to Make Adequate Disclosures**

The Debtors are correct that Hawk has been unable to identify any cash collateral that the

Debtors have used without Hawk's permission, but that is simply because the Debtors have refused

to comply in good faith with their reporting obligations and have fraudulently concealed financing

transactions.

In the Conversion Motion, the basis for Hawk's argument with respect to cash collateral

was the Debtors' lack of operations and financing to sustain these Chapter 11 Cases.[50]  The Debtors

now allege that they have robust operations funded by the sale of equity to VSI.  To date, the

Debtors have not produced any records or documentation evidencing these purported transactions.

Hawk is skeptical of these allegations, and if they are false, the Debtors must be using Hawk's

cash collateral, as they have no other financing.  Alternatively, if they are true, any such investment

by VSI may still constitute Hawk's cash collateral.[51]

The Debtors cannot conceal financing transactions for months, refuse to produce any

substantiating documentation related to the same, and assert that Hawk cannot point to a specific

instance of the Debtors using their collateral without authorization.  It is undisputed that the

Debtors do not have authority to use Hawk's cash collateral.  If the Debtors have used any cash

---

[50] *See* Conversion Motion, A.2(iii).

[51] *See Domiano v. Domiano (In re Domiano)*, 442 B.R. 97, 105 (Bankr. M.D. Pa. 2010) (finding that a debtor's failure to disclose income and expenses constituted gross mismanagement of the estate).

whatsoever to fund their supposed operations to date, they inherently have engaged in the unauthorized usage of Hawk's cash collateral, justifying conversion.

## D.      Appointment of a Trustee Is Warranted

In the Post-Trial Briefs, the Debtors and Rembrandt expend only three paragraphs contesting Hawk's evidence under section 1104 justifying the appointment of a Chapter 11 trustee—two of which focused entirely on the evidentiary standard of the test.[52]  The only real argument proffered by the Debtors is that the Debtors' management—including Mr. Rajan and Mr. Park—is capable, experienced, and trustworthy.

First, as Hawk has stressed throughout the Hawk Post-Trial Brief, Mr. Rajan is not capable or trustworthy as a steward of these Chapter 11 Cases, so it will not be belabored here. Additionally, however, Mr. Rajan has not established himself as the party "best situated" to help lead the Debtors through these Chapter 11 Cases.[53]  As noted above, Mr. Rajan had sole control over the Debtors for over a decade, resulting in the Debtors squandering tens of millions of dollars of investments,[54] defaulting on their secured debts,[55] failing to monetize the technology,[56] and filing for multiple bankruptcies.[57]  This track record wholly fails to establish that Mr. Rajan is a capable businessman best positioned to navigate the bankruptcy process—indeed, it proves the opposite.

---

[52] *See* Debtors' Post-Trial Brief, at ¶¶ 44–46.

[53] *Id.* at ¶ 46.

[54] *See Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Chapter 11 Petition, Supporting Emergency Relief, and First Day Motions* [ECF No. 48], ¶ 25.

[55] *See Collateral Estoppel Opinion*, at **14–15 (Del. Ch. Nov. 29, 2022).

[56] *See* June 28, 2023, Hearing Transcript [ECF No. 378] (Stastney), at 99:10–15 [hereinafter, the "June 28 Transcript"].

[57] *See* Hawk Post-Trial Brief, at Statement of Facts, § C.

Additionally, the Debtors have proposed to hire Mr. Park as CFO "to add another layer of an independent director with vast banking experience," but the record to date has established that Mr. Park is an empty suit that even Mr. Rajan says is untrustworthy.[58]  To date, the entirety of Mr. Park's testimony during the June 29 Hearing has been disputed directly by Mr. Rajan and/or the Debtors' recent filings.  Mr. Park stated the Debtors have no employees;[59] Mr. Rajan says the Debtors have dozens of employees.[60]  Mr. Park testified that the Debtors have no operations or ability to fulfill purchase orders;[61] Mr. Rajan says that the Debtors are currently filling purchase orders and have robust operations.[62]  Mr. Park says that Zhongsheng is a publicly traded company on the Hang Seng index of Hong Kong;[63] Mr. Rajan testifies that Zhongsheng is a private company located in Dalian, China.[64]  The Debtors cannot simultaneously rely on Mr. Park's testimony as evidence of the Debtors' ability to manage these estates in a clear, transparent, and coherent manner, while simultaneously asserting "his [Mr. Park's] testimony is incorrect."[65]

In summation, operating as a debtor-in-possession demands candor and transparency,[66] neither of which Mr. Rajan has established himself capable of providing.  Mr. Rajan's leadership has led directly to defaults on millions of dollars of secured debt and three bankruptcies.  Moreover,

---

[58] *See, e.g.*, September 25 Transcript [ECF No. 427] (Rajan), at 13:21–14:2; *id.* at 85:17–24.

[59] *See* June 29 Transcript [ECF No. 305] (Park), at 98:11–16.

[60] *See* September 25 Transcript [ECF No. 427] (Rajan), at 18:7–9; *see also* August 15, 2023, Hearing Transcript [ECF No. 367] (Rajan), at 127:2–7 [hereinafter, the "August 15 Transcript"].

[61] *See* June 29 Transcript [ECF No. 305] (Park), at 103:15–22.

[62] *See* August 15 Transcript [ECF No. 367] (Rajan), at 196:2–9.

[63] *See* June 29 Transcript [ECF No. 305] (Park), at 55:5–13.

[64] *See* September 25 Transcript [ECF No. 427] (Rajan), at 83:22–84:3.

[65] *Id.* (Rajan) at 85:24.

[66] *See In re Gateway*, 374 B.R. at 565 ("A debtor in possession is vested with significant powers under the provisions of the Bankruptcy Code.  As is often the case, those powers come with certain responsibilities.  Significant, a debtor in possession owes a fiduciary duty to its creditors.  A debtor-in-possession has a duty to keep the Court and its creditors informed about the status and condition of its business.") (internal quotations and citations omitted).

the Debtors must make up their minds with respect to Mr. Park—either he is an experienced and trustworthy business man with a real role in the Debtors' business, or he is an uninvolved prop that Mr. Rajan can contradict whenever convenient.  Either way, the record establishes Mr. Rajan's incompetence as manager of the Debtors.

## E.      Relief from Stay Is Warranted

Related to the Stay Relief Motion, the Debtors cite to the wrong legal standard from the District of Delaware in the case *In re Tribune Co.*,[67] which has not been adopted by the Eastern District of Pennsylvania in any cases the Debtors have cited.  Instead, the proper test is the totality of the circumstances test outlined in *In re Chan*,[68] pursuant to which Hawk has already established its right to obtain relief from stay,[69] and related to which the Debtors have *wholly failed to respond*. Nevertheless, even under the Debtors' preferred standard, they still fail.

First, there is no prejudice to the estates by allowing the 225 Action to proceed in the Court of Chancery, as the 225 Action provides the proper mechanism and the Court of Chancery is the proper venue to resolve the issues at bar.  There is no prejudice to the Debtors for the Delaware Court of Chancery to answer these questions, pursuant to the Delaware statute specially created for this purpose, as part of an action in which all parties have fully participated.  Second, hardship to Hawk is substantial considering the resources Hawk has already expended in the various forums the Debtors have instituted these actions (including the Adversary Proceeding in connection with these Chapter 11 Cases).  Hawk has spent millions of dollars pursuing repayment of the loans it

---

[67] 418 B.R. 116 (Bankr. D. Del. 2009).

[68] 355 B.R. 494, 499–500 (Bankr. E.D. Pa. 2006); *see also In re Stone Res., Inc.*, 482 F. App'x 719, 722 (3d Cir. 2012) (holding that bankruptcy courts examine the totality of the circumstances when determining whether to grant relief from stay).

[69] *See generally* Stay Relief Motion; Hawk Post-Trial Brief, at Argument § B (articulating why Hawk is entitled to relief from the automatic stay).

unquestionably made to the Debtors and on which they defaulted.[70]  Redoing this litigation again

is unquestionably prejudicial to Hawk.  Finally, Hawk is clearly more likely to succeed in the 225

Action or the Debtors would not have initiated these Chapter 11 Cases.  The entirety of the

"prejudice" the Debtors allege they will suffer presupposes that they will lose the 225 Action.[71]  If

they truly believed they would prevail in the 225 Action, they needed only to participate in the

one-day bench trial and wait a few weeks for the Court of Chancery to rule.[72]  It is obvious why

they did not do so.

## F.    The Debtors Did Not File These Cases in Good Faith

The Debtors assert that the filing has "afforded the Debtors much needed breathing

room,"[73] but they have not answered the next logical question—"from what?"  The answer is

simple: "from the 225 Action and the impending determination of the continued existence of their

secured obligations."  In other words, the Debtors filed these Chapter 11 Cases solely to impose

the automatic stay and derail the 225 Action—a *per se* bad faith basis.

The Debtors claim the "breathing room" allowed them to obtain purchase orders and

financing; however, the Chapter 11 process is not the proper forum to obtain financing and

purchase orders for the first time in order to *start* a business—it is a forum to rehabilitate a

business.[74]  Moreover, as argued extensively in the Hawk Post-Trial Brief, all of these benefits

---

[70] *See* June 28 Transcript [ECF No. 378] (Stastney), at 46:1–6.

[71] *See* Debtors' Post-Trial Brief, at ¶¶ 56–57 (arguing granting relief from stay would deplete the Debtors' assets and provide a "preference" to Hawk by allowing Hawk to "wrest control of Technovative's management away from Stream").

[72] In fact, if the Debtors actually believed they would succeed in the 225 Action, that provides another basis for Mr. Rajan's gross mismanagement of the Debtors.  The Debtors also spent millions of dollars litigating the 225 Action and now seek to restate the process before this Court (or the District Court).  Such a decision to file for bankruptcy if they believed they were going to win the 225 Action would constitute such blatant corporate waste, it would constitute a breach of fiduciary duties.

[73] Debtors' Post-Trial Brief, at ¶ 43.

[74] *See In re Palmetto Interstate Dev. II, Inc.*, 653 B.R. 230, 245 (Bankr. D.S.C. 2023) (finding that cause existed under section 1112 to dismiss a debtor's case, noting "Debtor is not operating" and "bankruptcy is not a place to start a

actually accrued *to VSI*, not the Debtors, and the Debtors have provided no evidence to the contrary.

Then, of course, one final question remains—what good faith basis did the Debtors provide with respect to Technovative?  The Debtors have presented not a single shred of evidence that Technovative has any good faith basis for being in bankruptcy—no operations, no liabilities, no assets, no business prospects.  If nothing else, the Debtors have conceded that Technovative's case should be dismissed.

## G.    Technovative's Authority to File Should Be Resolved by the Court of Chancery

Finally, the Debtors are incorrect that Mr. Rajan had authority to file Technovative's chapter 11 petition, as they are focused on the wrong facts.  The Debtors' only true argument is that upon Stream's filing for bankruptcy, the Receiver was obligated to turnover control of Technovative by operation of section 543 of the Bankruptcy Code, causing the "managerial" interests in Technvoative to revert back to Stream and Mr. Rajan as the sole member of Technovative's board.

This argument presupposes that the right to control Technovative was property of Stream's estate and had not been divested by Hawk's delivery of the Proxy Notice on October 17, 2022.  To the contrary, under Delaware law, "voting" rights and "economic" rights of equity are separate property rights that can be bifurcated.[75]  If a debtor is divested of the voting rights in its subsidiary prior to its filing a petition for bankruptcy, then such voting rights do not become property of the

---

business"); *see In re KLMKH, Inc.*, No. 22-30232, 2022 WL 4281478, at *6 (Bankr. W.D.N.C. Sept. 14, 2022) ("In sum it appears the Debtor use this bankruptcy case to start its business, instead of reorganizing, which is not a proper bankruptcy purpose.").

[75] *See CII Parent, Inc.*, No. 22-11345 (LSS), 2023 WL 2926571, at *9 (Bankr. D. Del. Apr. 12, 2023) (analyzing the various ownership rights that come along with ownership of equity interests and finding that they can be severed from each other).

debtor's estate.[76]  Here, Hawk claims that upon its delivery of the Proxy Notice, Stream was divested of its right to exercise control over the composition of Technovative's board—Stream disagrees.  This is the precise question the Court of Chancery was poised to answer in the 225 Action and provides further justification for granting relief from the stay to allow it to do so.

This Court cannot make the determination of whether Technovative's filing was ultra vires until it determines this underlying question—including if any of the Debtors' myriad defenses are valid.  The Court of Chancery had been fully briefed, was familiar with the facts, is an expert in the various state law matters at play, and is poised to rule on these questions after a one-day bench trial.  It is the proper venue to make this determination.

## <u>CONCLUSION</u>

Accordingly, Hawk respectfully requests that the Court convert the Chapter 11 Cases to cases under Chapter 7 and grant Hawk relief from stay to conclude the 225 Action.  If the Court believes that the best interest of creditors is to dismiss the cases, however, Hawk requests the Court dismiss the Debtors' Chapter 11 Cases with prejudice or, in the alternative, appoint a Chapter 11 trustee to act in the interests of all creditors.

---

[76] *See id.* **9–10 (finding that a proxy notice provided advanced notice of a debtor's divestiture of its rights to vote the equity of its subsidiary—as opposed to being divested of the economic interest in the shares—under Delaware law, and determining that such voting interests therefore did not become property of the estate)

Dated:  October 6, 2023

**K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 91881)
Megan E. O'Connor
K&L Gates LLP
600 King Street, Suite 901
Wilmington, DE 19801
Telephone: (302) 416-7000
Facsimile: (302) 416-7020
Email: steven.caponi@klgates.com
         megan.oconnor@klgates.com

Margaret R. Westbrook
Aaron S. Rothman
Jonathan N. Edel
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Telephone:  (704) 331-7400
Email:  margaret.westbrook@klgates.com
         aaron.rothman@klgates.com
         jon.edel@klgates.com

Thomas A. Warns
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022
Telephone:  (212) 536-3900
Email: tom.warns@klgates.com

*Attorneys for Hawk Investment Holdings Ltd.*