UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: | : Case No.  23-10763 |
| STREAM TV NETWORKS, INC.   CH: 11 | : ADV. No.  23-00057 |
| A) Motion To Approve Employee Obligations Filed By Stream Tv Networks Inc., Technovative Media, Inc., Represented By Rafael X. Zahralddin . | : Philadelphia, Pennsylvania : November 15, 2023 : 12:03 p.m. |

IN RE:                      : Case No.  23-10763
                                   :
STREAM TV NETWORKS, INC.   CH: 11 : ADV. No.  23-00057
                                   :

A) Motion To Approve Employee : Philadelphia, Pennsylvania
Obligations Filed By Stream Tv : November 15, 2023
Networks Inc., Technovative : 12:03 p.m.
Media, Inc., Represented By :
Rafael X. Zahralddin . :

B) Motion Of The Debtors For :
Entry Of An Order Authorizing The :
Debtors To Enter Into An :
Employment Agreement With Thomas :
Jung Ho Park As Chief Financial :
Officer To The Debtors Filed By :
Stream Tv Networks Inc., :
Technovative Media, Inc., :
Represented By Rafael X. :
Zahralddin . :

C) Motion To Extend Exclusivity :
Period For Filing A Chapter 11 :
Plan And Disclosure Statement :
Filed By Stream Tv Networks Inc. :
Represented By Rafael X. :
Zahralddin . :

D) Application For Compensation :
(First Monthly) Compensation And :
Reimbursement Of Expenses Of :
Lewis Brisbois Bisgaard And :
Smith, Llp Counsel For The :
Debtors For Rafael X. Zahralddin, :
Debtor'S Attorney, Period: :
3/15/2023 To 04/30/2023, Fee :
$380382.00, Expenses $3476.00. :
Filed By Rafael X. Zahralddin :
Represented By Self. :

E) Application To Employ Thomas :
Jung Ho Park As Chief Financial :
Officer Filed By Technovative :
Media Inc., Stream Tv Networks, :

Inc., Represented By Rafael X.      :
Zahralddin .                        :
                                    :
F) Motion For Sanctions For         :
Violation Of The Automatic Stay     :
Filed By Stream Tv Networks, Inc. :
Represented By Rafael X.            :
Zahralddin .                        :
                                    :
. . . . . . . . . . . . . . . . . .

               BEFORE THE HONORABLE MAGDELINE D. COLEMAN
                    UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtor:                Rafael X. Zahralddin
                               Lewis Brisbois Bisgaard & Smith
                               500 Delaware Avenue, Suite 700
                               Wilmington, DE 19801
                               302-985-6004


For Hawk Investment Holdings   Steven Caponi, Esq.
Ltd:                           Margaret Westbrook, Es1.
                               K&L Gates
                               600 N. King Street, Suite 901
                               Wilmington, DE 19801
                               302-416-7080


For SeeCubic, Inc.:            Eben P. Colby, Esq.
                               Skadden Arps Slate Meagher &
                               Flom, LLP
                               500 Boylston Street, 23rd Floor
                               Boston, MA 021116
                               617-573-4800

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

NOVEMBER 15, 2023                                        12:03 P.M.

THE BAILIFF:  All rise.

THE COURT:  Good afternoon.

MR. ZAHRALDDIN:  Good afternoon, Your Honor.

THE COURT:  Okay.  Hold on one second, counsel.

MR. ZAHRALDDIN:  Sure.

THE COURT:  All right, counsel, this is the Stream TV Technovative matter and currently, there are five matters listed, six matters listed for today.

Counsel for the Debtor?

MR. ZAHRALDDIN:  Morning, Your Honor.  Rafael Zahralddin from Lewis Brisbois Bisgaard & Smith for the Debtors.  Can we begin with the disputed fee application, because I believe that one doesn't require any sort of other documents, et cetera?

THE COURT:  Is a legal argument or is it --

MR. ZAHRALDDIN:  Legal argument, yes.

THE COURT:  Well --

MR. ZAHRALDDIN:  Or would -- I -- we got a call this morning from your courtroom deputy indicated that you wanted to just hear legal argument and hand up of documents.  We do have --

THE COURT:  Right.  But I guess what sort of -- this was not listed as a trial matter.

MR. ZAHRALDDIN:  Correct.

THE COURT:  And so, when someone called my courtroom deputy and said, do we have to appear in person, the response is, is if you -- which is her standard response, if you anticipate evidence, then you need to come in.  Okay.  And so, I'm assuming that's why all of you are here was because you anticipate putting some evidence in.

MR. ZAHRALDDIN:  When we scheduled this over -- I can't remember how long ago, Ms. Godfrey gave us, we scheduled it with the assumption that we may need witnesses and she asked me at that time.  We actually noticed it that way --

THE COURT:  And I don't --

MR. ZAHRALDDIN:  -- but which is --

THE COURT:  -- why, because I had a trial scheduled at 1:00.  There's no way this would have gone from 11:30 to 1.  The Trujillo -- Truji -- yeah.  It settled, but it was scheduled for 1:00.

MR. ZAHRALDDIN:  I'm not sure, Your Honor.

THE COURT:  So I don't know -- so on my calendar, I didn't even have Stream as a evidentiary matter, when I looked at my calendar, but the answer -- if you guys call and ask her -- and I was discussing it with my staff about the notice that's on the website and it's not clear what that means.  It just says the -- if you -- if you evidence (sic), you have to come in and actually, they're saying all hearings, but my position is, unless it's here -- evidence, you don't have to

come in here.  So --

MR. ZAHRALDDIN:  We'll make sure to do that next time, Your Honor.  We --

THE COURT:  So -- yeah, unless we have an actual trial, where -- because if we're going to have a trial or we're going to have -- take evidence, it's always going to be not in the connection with a -- with my hearing list because there's no way I can do my hearing list and get evidence in.  And it also -- if it takes more than 30 minutes, I'm not hearing in any way.

MR. ZAHRALDDIN:  I hear you.

THE COURT:  So I think there's a lot of just kind of miscuing today and I hate that everybody had to travel here, but unfortunately, I have a hard stop at 1:00.

MR. ZAHRALDDIN:  Okay.

THE COURT:  So that's not -- I can't even go beyond that.

MR. ZAHRALDDIN:  Your Honor, which matters do you have?  Because I think the only matters we have up right now that the Debtors had noticed were the disputed fee application, exclusivity, an employee motion, the retention of Thomas Park as the CFO and then our enforcement of the stay, which I think was the genesis of why we scheduled this hearing because it had been in abeyance for quite some time and you directed us in court to set the hearing for that, which we did.

MR. ZAHRALDDIN:  So this is what I have.  I have A, the A matter is the employee motion, where they wanted to pay some prepetition wages and the B and E matter were the Park retention motions.  The C matter was the exclusivity motion. The D matter is the fee application and the F --

MR. ZAHRALDDIN:  Okay.

THE COURT:  -- is the stay violation.

MR. ZAHRALDDIN:  Okay.

THE COURT:  So what I had thought that this -- what I would definitely be able to hear was exclusivity.  That's simply a legal argument.  With respect to the fee application, to the extent there was some objection, there was no way I was going to look at that, if there's objections.  With respect to the -- so let me -- exclusivity, I thought was on the table today.

MR. ZAHRALDDIN:  Uh-huh.

THE COURT:  The employee motion, I'm not even sure because that seems so old and it -- when I read it, it didn't make any sense to me.  The fee application I didn't think would be on because there is a dispute.  The stay violation I didn't think was on because I was going to have to take some evidence, unless the parties relied on some other record.  And the B and E, Park retention -- so the only thing I thought we might get to today was the exclusivity motion and maybe the Park motion, if it didn't require evidence.

MR. ZAHRALDDIN:  Well --

THE COURT:  If it did, then the employee motion.  Those two are only legal arguments.

MR. ZAHRALDDIN:  Your Honor, I -- let me see if I can illuminate a little bit on this.  I would like to see the fee application heard.  If Your Honor wishes to have a hearing on the only two line items that were discussed, which were -- opposing counsel had an issue with the fact that we prepared a cash management motion, which we discussed with the U.S. Trustee.  And then we also had a second noticing motion, both of which we put aside because we had other things we needed to get done.

We wanted to see how many parties filed proofs of claim, how many did -- so those amount to, I think roughly from memory, under $10,000, but I would like to get a determination on the rest of the fee app, which doesn't have a specific objection to it, other than there were broader objections that we believe warrant -- because honestly, there are clear indications on the record of where we're getting paid, the benefit to the estate.

I've never had anyone argue that you shouldn't get paid because we don't like the result or we don't believe that you are -- I mean, we're a fiduciary.  We have obligations.  So I would like to at least get something on that.  We've been waiting quite some time past --

THE COURT:  When did you file this fee application?

MR. ZAHRALDDIN:  We filed it at least 30 days ago.  I have to double-check.

THE COURT:  So that's -- so you have a hearing within 30 days and you say you've been waiting long?  You filed this September -- when Mr. Caponi filed his objection on September 26th.

MR. ZAHRALDDIN:  So it would have been 14 days prior to that is when we filed it.

THE COURT:  Yes, but I wouldn't have scheduled a hearing.  First of all, we wait 14 days for them to respond.  I think a fee application, it may be seven days.  I don't know how long it is.

MR. ZAHRALDDIN:  It's 14, Your Honor.

THE COURT:  And then -- so we wouldn't have done anything with this for 14 days and once a objection is filed, which is September 26th, I think, Mr. Caponi, you filed your objection.  We would have filed a hearing of first listing on this now, maybe October.  If you did it September, we would have scheduled a hearing 30 days ago.  So --

MR. ZAHRALDDIN:  I think that's what we did, but --

THE COURT:  Right.  So I don't see how this is -- you've been waiting quite some time.  This is only the -- I haven't even had a first hearing on this.

MR. ZAHRALDDIN:  Okay.

THE COURT:  Got continued.  Okay.  So --

MR. ZAHRALDDIN:  Well, Your Honor, we'll --

THE COURT:  -- so if I'm going to hear specific objections and I need some testimony, there's no way I'm doing that today, but I have to hear from Mr. Caponi, who stood up.

MR. ZAHRALDDIN:  I'd like to cover the other ones first before Mr. Caponi comes, if you don't mind.

THE COURT:  Well, no, let's do one at a time because then I'm a bit confused today.

MR. ZAHRALDDIN:  Go ahead. Go ahead.

THE COURT:  So Mr. Caponi, what's your position with respect to the fee application?

MR. CAPONI:  Your Honor, we filed an emergency motion to hold all of this in abeyance.  I just want to mention that was on the list.

THE COURT:  Yeah.  Well, obviously I'm not granting that because I'm saying I'm going forward with -- and I forgot that, that wa -- I apologize.  I -- with respect to holding things in abeyance, there was a reason why I'm not going to do that.  That fee application is going to be addressed no matter what I decide, no matter what I decide, whether I decide to grant your motion, whether I decide to appoint someone, whether -- doesn't matter what I do, the fee application has to be addressed.  So I wasn't going to put that in abeyance.

With respect to the exclusivity motion, I may not --

it expired yesterday, by the way.  So I need to figure out -- let's at least continue some deadlines.  It doesn't mean anything, because my ruling isn't going to have any effect on that imme -- I mean, until I rule.  So that one, I said, no, I'm going to go forward with that.

The Park retention motion, I wasn't quite sure about that because the Debtors are con -- the Debtor, at least with respect to Stream, there's no issue that Stream has the authority to file.  The issue is whether they should be here, whether it's a good faith filing or whether you should just -- I should dismiss, convert or whatever.  So to the extent they continue to operate, I need to figure out do they need Mr. Parks.  So that one was on the table.

The employee motion, same thing.  I don't know.  Do they need the employees?  Do they even have employees?  So that one I said would stay on the table, so that was the reason why I did not think it made sense.  And with respect to violation of the stay, even if I dismissed their case, the Third Circuit has said you can continue and keep the case open to address violations of the stay.

So again, I would ha -- all of these things are things I have with the exception of perhaps the employment motion and the Park retention, no matter what I decide, I have to deal with those.  So that's why I didn't want to stay those.

MR. CAPONI:  We're -- look, we're -- obviously prefer

to stay and all will stay whatever the Court wants to stay and we'll address whatever the court wants to address.

THE COURT: Right.

MR. CAPONI: But there is a -- I don't want to interject, but there are, I think some news I'd like to impart upon the Court that may impact how the Court wants to handle all of this, but I'd like to address that early on, but I don't -- if you want to continue.

THE COURT: Well, no, if you think it emp -- what is it?

MR. ZAHRALDDIN: I have no idea what this news is, because we haven't been told.

THE COURT: Well, did you share it with opposing counsel?

MR. CAPONI: No, I'm sharing it with everybody right now.

THE COURT: Mr. Caponi, come on.

MR. CAPONI: Your Honor, it has nothing to do with you. I'm not making a motion. I'm just imparting information.

THE COURT: But don't you think it would make sense to impart it to everybody before you share it with the Court? Because then you catch them off guard. I don't know how they're going to respond. I don't care when you tell me.

MR. CAPONI: Okay. And Your Honor --

THE COURT: Go ahead. What is the --

MR. CAPONI:  Go ahead.

THE COURT:  go ahead.

MR. CAPONI:  As the Court's been aware, my client -- I -- look, I represent Hawk --

THE COURT:  Uh-huh.

MR. CAPONI:  -- as secured lender, who speaks on behalf of a lot of the investors.  As the Court's aware, those investors have been paying for Stream and its assets long before the bankruptcy for, you know, many years.  The burn rate is substantial.  And you know, the Court -- we've been down that road.  I'm not going to rehash it.

THE COURT:  Uh-huh.

MR. CAPONI:  The -- when the bankruptcy was filed, the advice we give our clients was bankruptcy provides certainty, transparency, oversight and there are some benefits to being in bankruptcy.

THE COURT:  Uh-huh.

MR. CAPONI:  We filed our motions, you know, the motions the Court referenced regarding the appointment of a trustee, et cetera, at the beginning of this case.  This case has been pending for -- or those motions for around eight months.  We had hoped that -- and during the pendency of that -- of this proceeding, Your Honor, my client has continued to fund and support SCBV, which is the only thing of value.

THE COURT:  Uh-huh.

MR. CAPONI:  As Your Honor's noted, Mr. Callahan's noted, there must be some value here.  People are paying for it for it.

THE COURT:  They're fighting for it.

MR. CAPONI:  Right.  Absolutely, Your Honor.  The factoring into our -- now my client's analysis and the investor's analysis were that the benefits of the bankruptcy, transparency, oversight, et cetera, would streamline the process and that the Debtor would act rationally and want to get these gating issues resolved.  As the Court has noted, there's been a tremendous expenditure of resources.  The resources that my clients have been forced to bear to what we view as a very disorganized estate that has not been focused on emerging but focused on basically a blood feud by Mr. Rajan.

The resources that we're spending here are resources that are not available to support the collateral.  And I'm just make -- you know, because of this issue, my clients are done.  So there's funding that's due towards -- in the next few weeks of SCBV around $1.2 million.  The secured lenders are no longer supporting the collateral and wanted to -- in the Sanche court (phonetic), but because we have been and because I think everyone has been reliant upon that collateral being preserved on my client's nickel, since that --

THE COURT:  They're not -- right.

MR. CAPONI:  -- we're going off that cliff, I wanted

to make sure that no one said we surprised anybody.

THE COURT:  Okay.

MR. CAPONI:  But I got the instructions the other day --

THE COURT:  Uh-huh.

MR. CAPONI:  -- to let everyone know that as long -- you know, we're done.  If -- my clients have not authorized me to make, you know, counter proposals or anything.  All I know is as long as Mr. Rajan is in charge of this estate --

THE COURT:  Right.

MR. CAPONI:  -- we can no longer fund into a blackhole in this abyss with the burn rate that we've been experiencing --

THE COURT:  Right.

MR. CAPONI:  -- and so the return on investment, whatever value is there --

THE COURT:  The ROI is not there.

MR. CAPONI:  The ROI is lo -- Elvis has left the building, as you would --

THE COURT:  All right.

MR. CAPONI:  -- say, Your Honor.

THE COURT:  And counsel, what does that mean?  With you saying that, I will be perfectly honest.  We have devoted and have been devoting all of our time to resolving those outstanding motions.

MR. CAPONI:  Yeah.

THE COURT:  Does that mean you guys don't want a ruling and we can -- are you not --

MR. CAPONI:  No, Your Honor.

THE COURT:  -- you're withdrawing those?

MR. CAPONI:  No, Your Honor.  My clients are going to continue to vigorously enforce or secure creditor rights.

THE COURT:  Okay.

MR. CAPONI:  If the Debtor can preserve the assets, great, we'll take them at the end using our secured creditor rights.  If they burn to the ground, we'll sift through the ashes for whatever value is left.  I just, again, want to make sure that everyone is aware --

THE COURT:  So --

MR. CAPONI:  -- that this unofficial, you know, if you want to call it -- Ms. Westbrook's going to stab me -- dip financing, it's not that --

THE COURT:  Right.

MR. CAPONI:  -- but we've been supporting this of funds in one fashion --

THE COURT:  Advancement --

MR. CAPONI:  -- other (sic).

THE COURT:  -- of funds.

MR. CAPONI:  It's been of funds.  And as Your Honor noted, the ROI, these investors given the -- and not -- this is

not a knock on the Court.  This is just, you know, had the Debtor --

THE COURT:  This is how it played out, which --

MR. CAPONI:  Yeah.  It's how it played out --

THE COURT:  -- you know, with us trying to sift through all of the various motions, which for whatever reason got heard when they got heard.

MR. CAPONI:  Yeah.  And Your Honor, if -- the money that was going to us, my clients weren't paying us, they'd be -- it'd be available for the -- this investment, but when you add it all together, the ROI evaporated.  So I just want to impart that on the Court for whatever --

THE COURT:  Right.

MR. CAPONI:  -- it's worth.

THE COURT:  I thought it was some decision somewhere.

MR. CAPONI:  No.  No.  It's just, again, because I think --

THE COURT:  So when's the next money due and when is it not --

MR. CAPONI:  About two weeks.

THE COURT:  Two weeks.

MR. CAPONI:  $1.2 million and you know, as we've said all along --

THE COURT:  So you're telling me I have two weeks to get a decision in here?

MR. CAPONI:  That's cash, right, that's due, not promises.  And again, in transparency, I'm not a Dutch lawyer, but my understanding is because a big chunk of that money or tax payments, that quickly thereafter, we would expect an insolvency of SCBV in the Netherlands, not initiated by us, but we think that's just a natural consequence.

THE COURT:  No, well, that's their -- they operate different from us.

MR. CAPONI:  Yeah, I mean, I think that's just a natural consequence, but --

THE COURT:  Okay.

MR. CAPONI:  -- Mr. Colby, did I miss something or say something wrong?

THE COURT:  Mr. Colby?

MR. COLBY:  No.  If I might, though --

THE COURT:  Yes.

MR. COLBY:  -- Your Honor, on behalf of SeeCubic, which by virtue of raising money from its investors has been also bearing a significant burden of this ongoing funding. The -- echo everything Mr. Caponi said, particularly with respect to what we told our clients would be potentially the benefits of this --

THE COURT:  Which have not come to fruition.

MR. COLBY:  -- process.

THE COURT:  I get it.

MR. COLBY:  Yeah.  And I really, really struggled with how to present this to the Court because we didn't want any of it to be perceived as a slight to the Court for this not moving along.  We understand we're all a victim of circumstances.  But the -- you know, absent, starting to see some of those perceived benefits of bankruptcy --

THE COURT:  Uh-huh.

MR. COLBY:  -- the willingness to continue in an indefinite sort of limbo is -- has faded, and the issue, to be completely candid, is that absent a decision on those dating issues, those early motions, the longer that process played out, the more effectively it became akin to denying the motions, because we're here doing all this other stuff that we think shouldn't be done and has proven to be incredibly costly.  The Court, I think, just identified a potential solution.  And as a former clerk, I know how these things tend to trickle down.

THE COURT:  Right.  And instead of being in -- because I have two law clerks.  One you never see, who's actually working on all of this --

MR. COLBY:  Yeah.

THE COURT:  -- and one who takes notes and you know, there's like three or four of them working on this --

MR. COLBY:  Yeah.

THE COURT:  -- and if you're telling me you're done

and this is it and I don't have to decide --

MR. COLBY:  No.

THE COURT:  -- no, that would be great because we have all -- we have a lot of other matters under advisement that people have gotten pushed back --

MR. COLBY:  Yeah.

THE COURT:  -- because we're focusing on this.

MR. COLBY:  No.  I was -- where I was headed was quite the opposite of that and I was trying to do it as diplomatically as possible.

THE COURT:  And say, can you rule as soon as possible, Judge?

MR. COLBY:  Yes.  I mean, the -- just the nuts and bolts of it are that there's significant amounts due at the end of the month.  There's no current appetite to do that.

THE COURT:  Right.

MR. COLBY:  I can't make any promises that we can change minds, but the practicalities of it as a result of the Thanksgiving holiday is ordinarily the process of collecting the money and all -- moving it around and all those things would have to be done by like the 22nd in order to get it done by the end of the month.  These are not like vendor bills, where you can get a couple of days here and there.  It's the tax authorities, it's payroll and the consequences.  So what we've -- that's something that could potentially, you know,

unlock this problem.

THE COURT:  Counsel, if you're asking me -- you're going to have a decision by the 22nd, no way.

MR. COLBY:  Okay.

THE COURT:  That's not -- we're not -- because we keep getting stopped for other matters --

MR. COLBY:  Right.

THE COURT:  -- and that we have to now -- which is why I was not prepared to really do much with these things because now that means that the resources that we are devoting to trying to get out our -- my decision is now being address with -- I mean, I have other matters.  Don't get me wrong.

MR. COLBY:  Of course.  Of course.  And --

THE COURT:  You know, but my goal, to be perfectly honest was, you know, the middle of December to the end for a decision.  I'm not going into the New Year without this being decided.  I will tell you that.  So my goal was to have this -- presumably, unless I have some other, you know, matters that take up the time, that was our ultimate goal was the middle of December, end of the year.

MR. COLBY:  That's --

THE COURT:  That's where I am.

MR. COLBY:  -- helpful.  And I don't know --

THE COURT:  Hey, I'm not -- you --

MR. COLBY:  -- that that's going to --

THE COURT:  -- your clients can make their own decision --

MR. COLBY:  Yeah.

THE COURT:  -- based on what they want, but I did not plan to go into the new year with this as a matter under advisement.

MR. COLBY:  Yeah.

THE COURT:  Not because I want to start off the new year without that, but it just made more sense to have a decision by the end of the year.  And I'll be honest, there are attorneys who will tell you I'm notorious on December 31st issuing a decision and so you guys can deal with it next year.  So --

MR. COLBY:  Oh.

THE COURT:  -- and big decisions.  So that was my goal.  I'm -- you know, again, you know, having mini trials and trials, it cuts into our ability --

MR. COLBY:  Totally.

THE COURT:  -- to rule by that --

MR. COLBY:  Totally understand.  It takes up all of our time, right?  So we very much understand the dynamic there.  And just, again, in the spirit of being really upfront about this because the consequences are serious.  You know, the fact that we were here today dealing with these motions was somewhat of a precipitating event.  It's this view that we have with the

investors of why are we talking about, you know, retaining Park
when we -- you know, we want a decision on whether or not there
should be a trustee or those sorts of things.  So it's a little
beyond our ability as lawyers to control there.

THE COURT:  You have clients.  I -- you know --

MR. COLBY:  Yeah.

THE COURT:  -- I know what it is to have clients, but
the point of the matter is, at least with respect to today,
there really was no need for anybody to come in here.

MR. COLBY:  Understood.

THE COURT:  And there -- so therefore, this has just
been -- be perfect -- at least from the Court's perspective, a
big boondoggle for today, because I have a personal matter that
is very important to me today.

MR. COLBY:  Well, we wanted to --

THE COURT:  And I just really don't want to go past a
certain time period.

MR. COLBY:  That's fine.  We just happened to be here
because we wanted to raise this issue anyway and it's probably
better raised in person than via a letter or something or --

THE COURT:  Or by phone --

MR. COLBY:  Something that --

THE COURT:  Or by Zoom.

MR. COLBY:  Or by phone.  Right.  Just the on the
consequences, to be a little more --

THE COURT:  Uh-huh.

MR. COLBY:  -- specific.  They are serious and they get at issues we've been spending a lot of time on recently.

THE COURT:  Uh-huh.

MR. COLBY:  So for example, if the employees in the Netherlands aren't paid -- and I'm definitely not a Dutch lawyer, but the consequences of that is they can leave, they can seek employment elsewhere and they're not bound by the terms by any sort of noncompetition terms.  So, whereas I think there's been a lot of frankly pretextual claims about leakage of trade secrets and things that we've been litigating on a parallel track, this presents potentially a genuine concern about that.

And if the employees leave, it may be very hard, if possible at all, to get them back.  Similarly, unpaid employees can, to my understanding, force of bankruptcy.  So we could have a bankruptcy or liquidation or something like that at the Dutch level in the Netherlands very soon.  And then finally, as I think you've heard --

THE COURT:  Which may be more beneficial to your clients.  Let's be honest.  Go ahead.

THE CLERK:  I --

THE COURT:  Go ahead.

MR. COLBY:  Yeah.  And then, finally, you know, the the company there has had some longstanding outstanding taxes

due.  They're on a payment plan, but if the scheduled payments are missed, the Dutch authorities can demand immediate payment of all of it, not just the payment that was missed.  That's like another two million Euros.  And so that is an additional thing that could very quickly tip those entities into an involuntary bankruptcy proceeding.

So the consequences are quite serious.  The decision was not taken lightly, but absent some meaningful, you know, steps forward that I think we've been working towards and in some clarity along the lines of what --

THE COURT:  That's not to say that your client may -- I mean, I have not made a decision yet.  I'm still weighing the facts.  Sort of have an idea where I'm going, but I haven't decided, so that's to say maybe your clients may not like my decisions.  Maybe they may love my decision.  I don't know what my decision is yet, so I'm not quite sure whether it's going to make a difference one way or another.

MR. COLBY:  They're not make -- yeah, not making any assumptions in that regard.

THE COURT:  No.  No.  I'm say -- no.  What I'm saying is that they're saying, you know, absent some sort of decision, which we haven't gotten, we have to make this call.

MR. COLBY:  A decision would be -- right.  A decision would give them --

THE COURT:  Better --

MR. COLBY:  -- a view as to how to the next --

THE COURT:  How do you want -- a better view --

MR. COLBY:  -- step of the process.

THE COURT:  Right.

MR. COLBY:  So it would, in fact, be an informed decision, rather than this, you know, kind of state of purgatory that they're living in at the moment.  So --

THE COURT:  Okay.

MR. COLBY:  -- it's -- they've just had enough and can't continue to, you know --

THE COURT:  I get it.

MR. COLBY:  -- write those checks.

THE COURT:  I get it.  I get it.  Okay.  So what you're saying is that by December 1st, there will be no money --

MR. COLBY:  Correct.

THE COURT:  -- with respect to funding the -- because they're not on the Debtor directly.  They're not --

MR. COLBY:  Correct.

THE COURT:  -- or not -- or technically because really, they're not even at the operational level.  You're down at the operational level of the subs.

MR. COLBY:  Of the subs, right.

THE COURT:  Who are not in bankruptcy.

MR. COLBY:  They are not in bankruptcy.  It's

pursuant to that note we talked about back in --

THE COURT:  Right.

MR. COLBY:  -- April.

THE COURT:  Your claims against those and whatever --

MR. COLBY:  But it's --

THE COURT:  -- get -- maybe you guys can go ha -- never mind -- hash all that out in bankruptcy in the Netherlands, but it is what it is.

MR. COLBY:  Gotta help us, Your Honor.

THE COURT:  I don't think you can avoid --

MR. COLBY:  Gotta help us.

THE COURT:  I don't think you can avoid, even with a bankruptcy in the Netherlands, ultimately, the ownership issue.

MR. COLBY:  Oh, yes.

THE COURT:  That has to be resolved some way.

MR. COLBY:  Yeah.  I mean, look, our -- the secured creditor status as secured creditors here isn't going to change, but the financing of the entities --

THE COURT:  The asset.  The --

MR. COLBY:  -- where I think the parties think there's real value, that something that's been happening on sort of an unofficial basis and it just -- there's no appetite for them to continue that right now.

THE COURT:  Okay.

MR. COLBY:  Thank you.

THE COURT:  All right,  Mr. Zahralddin, you've heard all that.

MR. ZAHRALDDIN:  I did, Your Honor.

THE COURT:  Uh-huh.

MR. ZAHRALDDIN:  It's never an easy thing.  Your Honor, I would like to address one thing.  Maybe we can deal with the employee motion.  We submitted a revised order --

THE COURT:  For which one?

MR. ZAHRALDDIN:  For the employee motion.  And --

THE COURT:  The employee motion?

MR. ZAHRALDDIN:  Yes, ma'am.  We --

THE COURT:  Well, I'm a little confused on that one.

MR. ZAHRALDDIN:  Well, I'd like to explain it to you --

THE COURT:  Uh-huh.

MR. ZAHRALDDIN:  -- if you'd like.  So when we first started, we were trying to get our arms around -- we don't have any of the books and records.  Many of them are still kept in the SeeCubic BV servers and also in other servers or in laptops.  There's all kinds of historical data.  So we filed this as a typical motion to try to keep our employees and our independent contractors together.  Since that time, we've been able to parse all that out.

And our big issue that remains because Mr. Rajan was the only employee that would have straddled the petition date,

so he has decided to waive any sort of priority or anything that would have accrued pri -- right before the petition date and then maybe was in transit.  So he's -- we've taken that out of the order.  We really simply need the order, so we can go back and make sure we have authority from the Court to assess and we'll work with the US Trustee.  We've,  you know, briefly discussed these issues with him, assess if there were any issues when the takeover scheme occurred after the omnibus because you know, about 30 percent of the employees went over to SeeCubic, the new co.  The rest were kind of in limbo, ended up with VSI, but there was still probably withholding potentially that was left over, so we want to just be able to go sort that out.

THE COURT:  What does that have -- I mean, first of all, employees under the code goes back how far?  So those employees were not -- they would not have a claim as employees because they would be outside of the time period.  So I'm trying to figure out how this is --

MR. ZAHRALDDIN:  It's not the claim for the -- they would have a claim to withholding, which is not property of the estate and so we wanted to at least invest --

THE COURT:  Well, wouldn't they just have a regular claim?

MR. ZAHRALDDIN:  Not for withholding.  It's not property of the estate, so we have to look at the taxing

authorities.  We just --

THE COURT:  But it still --

MR. ZAHRALDDIN:  -- wanted authority to handle that.

THE COURT:  -- even if it's, you know, the withholdings that you took from their paychecks is what you're talking about.

MR. ZAHRALDDIN:  Well, or that were swept by SeeCubic when they took all the cash out of the account.

THE COURT:  Well, what is that -- so how does that author -- why am I authorizing you to pay anybody for anything?

MR. ZAHRALDDIN:  We're not asking for payment.  We took those provisions out.  We're asking --

THE COURT:  Well, what are you asking for?

MR. ZAHRALDDIN:  We're asking to investigate and review and if there is property of the estate that -- if there's property of these employees that are not property of the estate, we want to sort that out, work with the US Trustee and get that sorted out.

THE COURT:  So what am I --

MR. ZAHRALDDIN:  That's a liability.

THE COURT:  So -- but this isn't what this order -- what this motion was was --

MR. ZAHRALDDIN:  We removed any payment of prepetition amounts, other than something that wasn't property the estate and we simply asked for the course comfort order

piece of it.  That's really all that's in the new order.

THE COURT:  Well, that wasn't what was in the motion, so what's before me is something -- what you're asking me --

MR. ZAHRALDDIN:  It --

THE COURT:  -- for is something that -- did you tell the other si -- when I say the other --

MR. ZAHRALDDIN:  Ma'am, it was in the motion.  We defined withholding liabilities as part of it -- it was in the motion.

THE COURT:  Where?

MR. ZAHRALDDIN:  Yes, ma'am.

THE COURT:  Tell me where because I read this motion and according to what I understood, you were asking -- where are my notes?  On this employee motion, you asked for a couple of things.  You asked for a motion to pay the employees of SeeCubic BV, which apparently you're not asking me anymore. The United States -- in the United States, you were seeking to rehire nine Stream employees that purportedly left after the Chancery Court's omnibus decisions and are now employed by VSI.

And in connection with rehiring them, you seek to pay those employees approximately 30k in prepetition wages.  I don't even know how that works because they won't even fit in the A4 calculation.  They wanted to pay independent servicers approximately 30K for prepetition amounts.  And then you want -- in ongoing, you wanted 10k per month post-petition.

MR. ZAHRALDDIN:  No, Your Honor.  We revised that based upon the passage of time.  We filed the notice with a revised order.  We put a blackline against the order.  That was filed at Docket Number 474.  And we have curtailed and pared down what we're asking for.

THE COURT:  But what I told, the Netherlands is out.  The stuff for the U.S. is out that.  You had them divided by Taiwan.  You wanted to rehire three employees and that you wanted to pay them post-petition payroll, which that's a different issue.  I'm not quite sure, you know, is this ordinary course.  I don't know.

MR. ZAHRALDDIN:  We simply indicate this was the relief we asked for.  Continue to honor and pay all pre-petition employee obligations, the ordinary course of business they come due.  The only employee obligation that remains, because there was only one employee, Mr. Rajan, would be any withholding from prior employees.  That was one of the defined terms that is encompassed by employee obligations.  We asked to honor and continue any programs and practices with respect to employee obligations that were in effect as of the petition date.

Those are simply going to be medical.  We want to have continuity in any sort of medical or perhaps there may be a retirement account, et cetera.  We just need to sort that out.  We're not asking to pay prepetition amounts.  We're just

saying we'd like an order to move forward on this.  And we --

THE COURT:  Move forward on what?

MR. ZAHRALDDIN:  We have employees that have been hired and are coming over already and we have existing health plans that we want to integrate them into.

THE COURT:  So wouldn't you have to file a motion to assume or continue to the health plans?  I don't see that in here.  I don't even --

MR. ZAHRALDDIN:  No.  We had them on prior health plans in VSI.  Now we're opening up new health plans in the ordinary course at Stream.

THE COURT:  So what do you need my approval for, for ordinary course?

MR. ZAHRALDDIN:  I can take all the ordinary course out and then we want to be able to deal with the issue of investigating and getting the --

THE COURT:  Who's -- why do you need my approval to investigate anything?  Aren't you obligated to do that notwithstanding --

MR. ZAHRALDDIN:  We are obligated to do that, but again --

THE COURT:  So --

MR. ZAHRALDDIN:  -- this is what we asked for at the very beginning --

THE COURT:  Well --

MR. ZAHRALDDIN:  -- because there was more uncertainty.

THE COURT:  -- you can -- there's nothing wrong with asking --

MR. ZAHRALDDIN:  Okay.

THE COURT:  -- but whether I'm giving is a whole different.

MR. ZAHRALDDIN:  Your Honor, if -- that's fine.  If you believe these are in the ordinary course, we will withdraw the motion.

THE COURT:  Well, no.  I'm asking you do you believe because obviously you asked me, do you thi -- I mean --

MR. ZAHRALDDIN:  I do believe that these are in the ordinary course, ma'am.

THE COURT:  All right.  That then Mr. Caponi, did you guys file an objection to that?

MR. CAPONI:  We did, Your Honor.

THE COURT:  And what was your objection?

MR. ZAHRALDDIN:  They don't want the case to go forward.  That's all.

THE COURT:  Well, we already know that.

MR. CAPONI:  We objected to what they filed.  I'm -- like what I'm hearing here is like bizarro land.  I'm not sure exactly how to respond, but --

THE COURT:  You guys in these -- you guys love to

like, use these colorful -- you use bizarro. He uses -- what was the word that he said that I think I've heard through the pleadings, through the -- I can't think I can't think of the word that the Debtor believes that your clients did to them. I don't know what the --

MR. CAPONI: I mean, Your Honor --

THE COURT: -- whatever it is, but you guys love some colorful language here.

MR. CAPONI: I'm a colorful person, but we have -- I'm grounded by reality and unfortunately, I view this as not -- I'm being asked to ignore reality. The -- Stream did not exist as a result of the omnibus order.

THE COURT: They existed, but they didn't operate.

MR. CAPONI: They -- right. I mean, I mean, no employees, no operations, no bank accounts. They immediately then come into bankruptcy and I'm hearing about we want to rehire employees because they were owed money. They last work for Stream three years ago at the latest. Health plans would have been three years ago. We're bringing stuff over from VSI, so you want to do something with Mr. Rajan's -- an insider's controlled entity with no disclosure and we're getting this, I filed one motion but now on the eve of the hearing, I got a different order.

And do I think that starting a health plan for a company that never had a health plan as ordinary course? No.

How could it be?  The ordinary course of Stream, before it filed this bankruptcy, was a piece of paper.  It had no assets or anything.  And we see from the monthly operating reports, no employees, no income, no revenue, no contracts.  So that's why I say bizarre.  I know the Debtor can stand up here and say we've got this great organization going, but history and the documents say that's doesn't exist.

THE COURT:  Right.

MR. CAPONI:  So my response is this doesn't make any sense.

THE COURT:  Well, I was a little -- not -- I'm not going to use the word does not make a little, but I was confused because if the Debtor didn't have any of these things prepetition, I'm assuming that's why they were asking me to authorize them to start this post petition, because ordinary course means you continue as you operated prepetition, which is why I thought that this is why you filed this because there was no employees, no benefits, no any of those things prepetition.

MR. CAPONI:  Yes.

THE COURT:  And so you're not continuing on a ordinary course.  You're starting something new.  Now, you may have had it prepetition years ago, but prepetition immediately before the bankruptcy did not exist.  So you now need some ability to say we didn't have this prepetition.  We want to start it now.  And what I'm hearing is you said three years

ago -- I don't know if Mr. Zahralddin agrees with you or not, but it did not.  There were no employee plans, there were no employees, there were -- there was nothing at the time the bankruptcy was filed.

So from my perspective, I thought this is why this was being filed because you cannot make an ordinary course.  I mean, you could make that this is what these companies do in the ordinary course and therefore we want to just do what these companies do.  But when you start bringing in, we want to continue something that they had, that didn't exist, so how I'm going to continue something that did not exist?

MR. CAPONI:  And then the Debtor stands -- counsel stands up and says, you asked, is this ordinary course?  I don't know.  What do you think?  Maybe.  Yeah, we think it's ordinary course.  So you can start a plan.  I mean, it's actually funny, because this morning, my wife called me to say we have to sign up for our health care plan.

THE COURT:  Yes.  It started yesterday.

MR. CAPONI:  Right.  There's nothing ordinary course about even resigning up for the plan I had last year.  It is like a painful exercise --

THE COURT:  Well, if you --

MR. CAPONI:  -- let alone if I was inventing a new one.

THE COURT:  -- don't sign up, some things are

automatic.  Some you get terminated.

MR. CAPONI:  Yeah.  And --

THE COURT:  I've got to do mine, too.

MR. CAPONI:  So the Debtor's funding through an insider transaction with no disclosure that they consider that ordinary course.  And that's why I say bizarre.

THE COURT:  Well, that's not be -- that's a whole --

MR. CAPONI:  No, it's not, but --

THE COURT:  -- different issue.

MR. CAPONI:  -- the Debtor's --

THE COURT:  Right.

MR. CAPONI:  -- the Debtor's view of what constitutes ordinary course appears to be whatever we feel like doing.  Mr. Zahralddin just said we're onboarding employees now.  Well, for eight months, they had no employees and now they're onboarding without court approval.  Apparently they think hiring employees is ordinary course.

THE COURT:  Well, the whole thing is how does a company operate without employees?  And do you need to come and say we want to hire employees because we want to continue to operate?  I don't think there's anything out of the -- that would say that's not ordinary course to hire employees.  We --

MR. CAPONI:  When you never had them, it's not ordinary course.

THE COURT:  Well, but they did have them and so --

and it doesn't make any sense to say a company is supposed to operate without employees.  I mean -- and so you look at as a whole.  Is it ordinary course for a company to employ employees?  I think that -- how else you function.  But what I don't think is ordinary course, to say, well, we had this in the past, so now we want to give it to them now.

MR. CAPONI:  Well, Your Honor, you hit the point and this is -- you know what -- you're coming at it from the left side or the right side.  We come at it from the right side, which is a Chapter 11 is to reorganize a company.

THE COURT:  Uh-huh.

MR. CAPONI:  The Debtor comes at it and the Chapter 11 is where I get to form and build a company.  And we think the fact that you've never had them is why we filed our motion in the first place.  To ignore that and -- where we -- this is where we just fundamentally disagree with the Debtor.  This is not where you come to raise money for the first time, hire employees.  I don't care what you did ten years ago.  It's what you're doing, you know, what you did prior to the bankruptcy.

THE COURT:  Well, but the difference is, and we have to take into consideration why the Debtor did not have employees.  It did not have employees because the Chancery Court made a certain decision and then that decision was reversed.  So I can't ignore that the Debtor now wants to start -- once that decision was overturned or whatever

happened, say we want to go back to the status quo.  Is the status quo ante?

MR. CAPONI:  Status quo ante.

THE COURT:  Oh, look at that, looking at my daughter's study for the Bar.  Because tell me I don't know that off the top of my head.  But so what their -- so I understand from their perspective is, but for that erroneous and in their opinion, erroneous.  I think they used some other word.  I don't think they say stole, but equates to that.  I -- whatever.  But putting that in perspective, if that is undone by when the Supreme Court of Delaware said, no, you shouldn't have done that and it shouldn't have been whatever it is.  The Debtor no longer able to be in control and function.

I can't say, well, the Debtor, the Debtor is coming into bankruptcy and saying this is what happens.  We want to get back to where we were.  We want an opportunity to build, to save the company and we're saving the company in the context that somebody took everything, when they shouldn't have.  They, meaning the Court made an erroneous decision and so if you go back to where we were without that erroneous decision, we had a company that was operating and we just want to do that again.

MR. CAPONI:  Well, Your Honor, except for Mr. Rajan has testified and everyone's acknowledged, Stream was always a holding company and remains a holding company.

THE COURT:  Okay.

MR. CAPONI:  Everything that operated was way below it.  It never had employees.  And the --

THE COURT:  So that's a whole --

MR. CAPONI:  -- Supreme Court of Delaware and the Court of Chancery -- you know, again, apples or oranges.  It's like, oh, you took the company from us.  We were harmed.  Well, only because everyone found and the Supreme Court affirmed you borrowed money and never repaid.

THE COURT:  Oh --

MR. CAPONI:  It's called natural consequences.

THE COURT:  Okay.  I get that, but --

MR. CAPONI:  I'm not paying your bills.

THE COURT:  -- we -- what we're focusing on right now is that what I'm hearing you say is they never had any employees, so why are you going to come and ask me for authority to pay employees?  Either they did or they didn't.

MR. CAPONI:  Right.  It was always a holding company.  And --

THE COURT:  So who are these people that left and didn't work anymore?

MR. CAPONI:  It -- it's --

THE COURT:  That's what I'm saying.

MR. CAPONI:  It's --

THE COURT:  Now I'm getting into evidence and I can't do this.

Yes, Mr. Zahralddin?

MR. ZAHRALDDIN:  Your Honor, okay, it's almost 1:00.

THE COURT:  Well, we're going to --

MR. ZAHRALDDIN:  I simply asked for -- look, from the very beginning, we're supposed to have an automatic stay. There's nothing in Fulton that says that they are allowed to keep things.  It only says that they're not penalized for those.  We have plenty of Circuit Court opinions that we've cited that indicate that not even adequate assurance do we have to wait for.  They have to turn everything over.  We don't have books and records.

We don't have anything to go back.  So, yes, we have had independent contractors working.  We filed a plan.  We have investors.  We have orders.  We have all of these things.  I'm asking for a CFO.  I keep getting complaints about we're not filing these things.  We don't have -- we're not getting our monthly operating reports done, et cetera.  It's one person with independent contractors.  I need employees to come in.

THE COURT:  So you need --

MR. ZAHRALDDIN:  I need a CFO.

THE COURT:  So you need me to tell you that in order for this company to operate, you need employees?

MR. ZAHRALDDIN:  We --

THE COURT:  What I'm struggling is, I'm not -- anything that is not.  If they have claims against the estate,

they assert the claim.  I don't know if they have withholding claims.

MR. ZAHRALDDIN:  And --

THE COURT:  I'm not entering an order without any evidence, without -- you know, if you believe that this company needs employees to operate, I will say on the record that's ordinary.

MR. ZAHRALDDIN:  Okay.

THE COURT:  You go employ people.

MR. ZAHRALDDIN:  Absolutely.  Thank you, Your Honor. We will move --

THE COURT:  But with respect to me approving how much you pay, you know, I don't know.  The Debtor didn't have any employees at the time.  Did they?  Yes, Mr. Caponi?

MR. CAPONI:  They -- this is Document 48.  This is the first day declaration filed by the Debtors and counsel here.  Quote,

"Stream.  Ashkaya (phonetic), Technovative USA, Media Holdings, Ultra D Ventures, Ultra D Cooperative and Technology Holdings are holding companies.  Stream TV International and SCBV are operating companies."

So this is the De -- this is, again, when I say about a little bit of a bizarro land.  The Debtor files a document acknowledging it's a holding company and then starts filing all kinds of motions saying I need to rehire people --

43

MR. ZAHRALDDIN:  Your Honor --

MR. CAPONI:  -- and contradicting its own first day declaration.

MR. ZAHRALDDIN:  -- as Mr. Caponi brings up often, this was done on the eve of a trial.  We received this file more -- no more than ten days beforehand with -- even though I'd been at a prior firm, we were involved for a few weeks, I had no knowledge, nor did anyone at my firm of the voluminous activity that occurred below.  We knew there was an emergency. We filed what we filed, then we struggled and put together books and record -- schedules and statements without books and records.

So Mr. Caponi can say all he wants about, you know, things that we said back then.  We have updated our schedules. We're in the process, after working with the US Trustee and continuing to update schedules, MORs, et cetera.  And we have employees we want to bring on.  I can withdraw that motion.  I appreciate what you said on the record.

I would like to get Mr. Park put onboard because we've now filed two motions to employ him.  We worked with the US trustee, got him retained as a three -- under three -- or got him an application under 330.  And we would like to bring that to fruition.  We have a -- any concerns that were placed in the original objections about him will be addressed when he gets paid under a fee application process.

We need to bring someone else in who can, who can get up to speed and act.  He has been looking at projections and doing work for free this entire time, but he will not get paid one red dime, one red cent, excuse me or one silver dime.

THE COURT:  Silver dime.

MR. ZAHRALDDIN:  Right.  One silver dime, until you approve it.  So we would like to have that relief.  We now also have a -- Mr. Stastney, right after Mr. Rajan testified that the SeeCubic website and name were of the Debtors and had been taken during the aftermath of the Chancery Court.  He went and filed an application two -- how many days later?

UNIDENTIFIED SPEAKER:  Two.

MR. ZAHRALDDIN:  With the trademark office and he cited the reason that he had rights to that, the invalidated omnibus agreement, which was also attached to an earlier application.  I --

THE COURT:  And all of this, I don't know.  All of this -- all I can tell you is --

MR. ZAHRALDDIN:  It's in our papers.

THE COURT:  -- I will tell you, I am very concerned about the evidence that I have seen with respect to that website.  I don't know whose client -- Mr. Stastney's counsel isn't here.  At least, I haven't seen him.  I haven't seen anybody here, but if you think I'm not concerned about that, everybody better rethink that situation.  I saw what I saw.

That caused me some concern.

MR. ZAHRALDDIN:  And again, Your Honor, it is -- we've talked to our trademark folks.  If you file a falsified trademark application --

THE COURT:  I don't want to hear any of that.  I already told you what my concern is --

MR. ZAHRALDDIN:  Okay.  I understand.  Noted.

THE COURT:  -- and I don't know who owns it.  The Debtor says they own it.  It was -- it trademarked to somebody. I don't know who it was tradmar --

MR. ZAHRALDDIN:  Well, the only rationale --

THE COURT:  All I'm telling you --

MR. ZAHRALDDIN:  Yeah.

THE COURT:  -- is if it wasn't trademarked to SeeCubic, Inc, and they -- I saw -- it said what it said.  I'm, and I'm not sure --

MR. ZAHRALDDIN:  But what --

THE COURT:  -- said what it said.  I'm just telling people, if it doesn't belong to you and you're using it, you got consequences --

MR. ZAHRALDDIN:  And those --

THE COURT:  I don't know what --

MR. ZAHRALDDIN:  And the consequence --

THE COURT:  -- they are, but counsel --

MR. ZAHRALDDIN:  I hear you.

THE COURT:  I'm telling you, I have to -- as I said, I have a very -- a personal matter that is very dear to me --

MR. ZAHRALDDIN:  I understand, Your Honor.

THE COURT:  -- that I have --

MR. ZAHRALDDIN:  I understand.

THE COURT:  -- to -- I have to be at.  And I'm supposed to be there by 1:00, so I was actually going to start in there like where are you.  And it's going to take me a little bit to get to the cemetery, so I really need to --

MR. ZAHRALDDIN:  I understand, Your Honor.  Your Honor, I -- can I -- is it possible to talk to Ms. Godfrey and reschedule some of these matters?  I'll withdraw the ones that we believe --

THE COURT:  Right.  Withdraw the ones with respect to Mr. Park, reschedule.  We can --

MR. ZAHRALDDIN:  You mean withdraw --

THE COURT:  I would love to tell you --

MR. ZAHRALDDIN:  -- the employees, right?

THE COURT:  Right.  And I would love to say we can do this by telephone, but if I'm going to get evidence, if you guys stipulate to some stuff and say, I -- you know, you can -- what I have done and I don't know how I could do it on this, is I have -- I'm in the courtroom.  It says it has to be open to the public.

MR. ZAHRALDDIN:  Uh-huh.

THE COURT:  So I'm here because actually when I went to get a permit yesterday, I was talking to the guard and he was like, you know, I said, I work in the cour -- I don't like to tell people.  But anyway, and he's like, you know, anyway, he's trying to do something.  He said, well, can I come in there?  I said it's open to the public.  You can just walk in.  That's the idea.  But yesterday I did allow counsel to appear by Zoom, but I don't know how many people we could get on here.

Not many right, John?

UNIDENTIFIED SPEAKER:  Well, it just starts to get confusing, if they need to see people this way.

THE COURT:  Right.

UNIDENTIFIED SPEAKER:  But yesterday was convenient, because it was one attorney facing one witness --

THE COURT:  Right.

UNIDENTIFIED SPEAKER:  -- and you.

THE COURT:  So that means if the parties can work it out that only some people come in the courtroom and some are on the Zoom, I'm amenable to that.

MR. ZAHRALDDIN:  I have no pro -- for example, if Ms. Westbrook doesn't want to travel from North Carolina or if Mr. Colby doesn't want to travel down.  Mr. Caponi, he's out of luck, since he's here around with us, but --

THE COURT:  He's -- you're in New York, right?

MR. ZAHRALDDIN:  No, he's --

MR. CAPONI: Wilmington, Your Honor.

MR. ZAHRALDDIN: Wilmington.

MR. CAPONI: I'm Delaware.

MR. ZAHRALDDIN: Yeah. He's Delaware.

THE COURT: Oh. Why did I think you were from New York?

MR. CAPONI: Delaware County to Delaware, so I didn't go very far.

MR. ZAHRALDDIN: It's his sharp suit that you think is from New York.

THE COURT: I don't -- I -- never mind. Well, I guess I have to take you out of that perception of New York. Never mind. So yes, so if you want to appear and we can figure that out, I'm amenable to that.

MR. ZAHRALDDIN: Okay.

THE COURT: So let's reschedule. Why don't you withdraw what you need to withdraw, reschedule. I don't know what my ca -- I had a trial schedule at 1:00 today. They settled. So I never know even though I have things scheduled, what -- Eileen, what do we have?

THE CLERK: For another hearing in this case, Judge? Let's see --

THE COURT: So why don't we do this? Why don't you reach out to the parties, because I really do have to -- it's a 15 minute drive minimum for me to get where I'm going. Why

don't you get some dates?  Send them to Mr. Zahralddin, Mr. Caponi, Mr. Colby.

MR. ZAHRALDDIN:  And I can't remember from Alex -- and then Mr. Wright, I think would be the round off the --

THE COURT:  I don't recall.  I know he's not here --

MR. ZAHRALDDIN:  Right.

THE COURT:  -- only because I know the players.  So why don't you do that and then we'll set a date as soon as possible.  If the parties can streamline what is in dispute, then you can submit a stipulated -- of undisputed facts and then disputed facts, that will streamline everything.  People don't have to come in from flying from wherever you're flying in from.  Although I'm happy to see you, I think it's a more efficient use of everybody's time.

MR. ZAHRALDDIN:  Yes.  And Your Honor --

THE CLERK:  Judge?

THE COURT:  Yes.

MR. ZAHRALDDIN:  Sorry.  Go ahead, Ms. Godfrey.

THE CLERK:  We have a hearing on Monday the 27th on the adversary, the motion for preliminary injunction.

THE COURT:  A continued hearing on that?

MR. ZAHRALDDIN:  Yes, ma'am.

THE CLERK:  It's a trial, correct.

THE COURT:  And --

THE CLERK:  It is actually in -- trial.

THE COURT:  Can we do all of those at the same time?  I don't know.

THE CLERK:  I guess that's a question for counsel.  Can we?

THE COURT:  What did you say?

(Court and clerk confer)

THE COURT:  So we have the 27 and the 28 is what you're saying?

THE CLERK:  I don't know if we have the 28th --

THE COURT:  Do we have the 20 --

THE CLERK:  We have the 27th.  I don't have them -- let me see.  Do I have the 28th?  I don't have them on for the 28th, but we could probably put them on in the afternoon at 12:30.

THE COURT:  All right.  So why don't you guys consult?  I really do have to adjourn for the day.  Okay.  So reach out to Ms. Godfrey.  We'll try to work this out.  I think -- I think we had closed the record on the preliminary.  I can't even think right now.  Have we closed the record?

THE CLERK:  Yeah.

MR. ZAHRALDDIN:  I don't think so.  I think we had --

THE CLERK:  Yeah.

MR. ZAHRALDDIN:  -- continued cross.  I can't remember on who.  Mr. Colby, do you know?

MR. COLBY:  We have rebuttal.

MR. ZAHRALDDIN:  Yeah.  Mr. Michaels has also not been put up yet.

MR. COLBY:  Yeah.  So there -- I think a couple of witnesses left.

THE COURT:  Right.  And hopefully I'll get some answers on that website in the rebuttal.  I'm looking for that because it's --

MR. COLBY:  I'm anxious to tell you, but I won't do it right now.

THE COURT:  Right.  I definitely -- as it caused some concern.  I have not concluded anything yet.  Just simply saying it's a cause for concern.

MR. ZAHRALDDIN:  Your Honor, I know you have to run. I do have two things I have to quickly address.

THE COURT:  Uh-huh.

MR. ZAHRALDDIN:  I would like to get some sort of finality on our fee apps.  I'd like you to please, if --

THE COURT:  I'm not doing that.  I --

MR. ZAHRALDDIN:  No, no, no.  Not today.  Not today. But I need to get some sort of finality because we are happy to address any sort of actual real -- I've never seen an objection like this.  I'd like to have you take care of it, because this type of blanket objection is exactly what the Supreme Court in Sarco said would be a problem.  People would weaponize the fee application process.  We may have a disagreement as to which

way the case should go, but that should not mean --

THE COURT:  Well, then --

MR. ZAHRALDDIN:  -- denying fees.

THE COURT:  -- guys, give me some briefs on that issue.  If you believe it's a general objection that doesn't have any merit and why I shouldn't consider it, then give me some -- when we have a hearing, maybe a day before, two days before, some brief on that.

Counsel?

MS. WESTBROOK:  Your Honor, Margaret Westbrook.  I disagree that we had general.  We made very specific objections about who's paying the fees and the disclosure of that.

THE COURT:  Okay.

MR. ZAHRALDDIN:  And we had a response that laid out --

THE COURT:  Right.

MR. ZAHRALDDIN:  -- everything in the docket that says that.  So we have briefed that issue.

THE COURT:  So I think --

MS. WESTBROOK:  And it's in contradiction to the supplemental disclosure that the Debtors made with respect to their retention, that no other third party was paying their fees.  So I really don't -- I'm really concerned about the resources entailed in filing a whole nother (sic) brief on that when I feel like --

THE COURT:  Well, then you just come ar --

MS. WESTBROOK:  -- that's pretty well spelled out.

THE COURT:  -- you just come argue.  And -- but if the party -- and you know, I will -- I mean, we actually go through all of these and I -- we identify the I -- the issues that we think -- you know, I don't know what people are really going to -- I can only look at what your papers say and try to be prepared, but sometimes I get things that are not even on there.  So if you believe that you're going to come and just argue that we need to argue before we even get to the merits of the time.  So everybody believes it's just legal argument?

Mr. Caponi, You stood up --

MS. WESTBROOK:  I think it's a legal and disclosure issue.

THE COURT:  Okay.

MR. ZAHRALDDIN:  Okay.  Your Honor, we have disclosed.  We followed the rules here, right.

THE COURT:  All right.  Woah, woah, woah, woah.  We're not arguing that today.

MS. WESTBROOK:  And a disinterested issue.

MR. ZAHRALDDIN:  I --

THE COURT:  All right.  So --

THE CLERK:  Judge, this is Eileen again.  On the adversary action, there's a couple motions to dismiss that have been filed, but counsel has not filed -- they filed a notice

but did they not schedule it for a hearing.

THE COURT:  All right.  This is what we're going to do.

MR. ZAHRALDDIN:  We're waiting on your order for that, Your Honor --

THE COURT:  Right.

MR. ZAHRALDDIN:  -- for the scheduling.

THE COURT:  Because typically we -- you file, we schedule a hearing date and we give it out.  This is not one that automatically you can call online.

MR. ZAHRALDDIN:  We didn't set those.  Those were --

THE COURT:  Right.  You can't --

MR. ZAHRALDDIN:  Yeah.

THE COURT:  -- because it doesn't -- it's not like you can go on the line and get it.

MR. ZAHRALDDIN:  Understood.

THE COURT:  So this is --

MR. ZAHRALDDIN:  We followed that rule.

THE COURT:  -- what we're going to do because I really do have to go.  We are going to get some dates and then we'll sort out what we're going to hear.  Okay?  Because some of this, you know, payment of fees and all, I mean, I don't know the rush for that except I guess you want it before the end of the year.  Everybody does.  I get it.  I practiced once.  I don't know if I need to get to -- there -- I mean, to be

perfectly honest, the fee application was one that I said, I'm not even dealing with today.

That was one I'm like, no, that's off the table.  And the only two that I really thought would be on the table was the Mr. Park's and exclusivity.  Those were the only two I thought I was going to get to today, none of which I have.  Exclusivity terminated yesterday, but I don't see anybody running around trying to -- or express any interest, except I, think Rembrandt said they might file one.  We are where we are.

MS. WESTBROOK:  We agree it's expired as well, Your Honor.

THE COURT:  It expired yesterday.

MR. ZAHRALDDIN:  We -- Your Honor --

THE COURT:  But that --

MR. ZAHRALDDIN:  We think it's extended to whenever you continue it to, so we can get a decision, at least.

MS. WESTBROOK:  I don't think that's the rule in the Third Circuit, Your Honor.

THE COURT:  I -- we looked at that yesterday and from what I determined it, it terminated.  Doesn't mean I can't extend it.

MR. ZAHRALDDIN:  Correct.

THE COURT:  Or that I can't make it beyond yesterday. It just means that if somebody goes and files before I issue an order, they have the right to do so.  It's not like under 11-

29.  With small businesses, it specifically says an order has to be entered prior to the termination of exclusivity.  That rule doesn't apply and it doesn't say that and I think it means something.  So with that said --

MR. CAPONI:  If you need to go, Your Honor, we're figure this out amongst ourselves.

THE COURT:  You'll figure -- okay.  That concludes that matters that are scheduled before the Court today and court is adjourned until tomorrow at --

THE CLERK:  9:30.

THE COURT:  -- 9:30.  Okay.  Tomorrow is Thursday.

MR. CAPONI:  Thank you for your time, Your Honor.

THE COURT:  All right.  Yes.  All right.  Thank you.  It's the second the second anniversary of my daughter's death, so --

MR. CAPONI:  Sorry to hear that, Your Honor.

UNIDENTIFIED SPEAKER:  Sorry to hear that.

THE COURT:  -- I'm real anxious to get there.  Thank you.

(Proceedings adjourned)

C E R T I F I C A T E


I hereby certify that the foregoing is a true and
correct transcript from the electronic sound recording of the
proceedings in the above-entitled matter.



*John Buckley*
John Buckley, CET-623
Digital Court Proofreader