**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,<br><br>　　　　　Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,<br><br>　　　　　Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered)[1] |

# <u>MEMORANDUM</u>

## I.    INTRODUCTION

Before the Court for disposition are two motions by Hawk Investment Holdings Ltd. ("Hawk").  The first motion (the "Hawk Stay Relief Motion")[2] seeks relief from the automatic stay in order to proceed with an action in the Delaware Court of Chancery (the "Delaware Chancery Court") seeking relief pursuant to §225 of Title 8 of the Delaware Code (the "Section 225 Action") against debtors Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative", and together with Stream, the "Debtors").  The second motion (the "Section 1112/1104 Motion") seeks an order, pursuant to §1112(b) of the United States Bankruptcy Code, 11 U.S.C. §§101, *et seq.* (the "Bankruptcy Code"), converting the Debtors' chapter 11 bankruptcy cases to cases under chapter 7 of the Bankruptcy Code or dismissing them, or

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned cases.  Bankr. Docket No. 81.

[2] Bankr. Docket No. 16.

alternatively, appointing a trustee to administer the Debtors' bankruptcy cases pursuant to §1104(a) of the Bankruptcy Code.

For the reasons set forth herein, the Court will (i) grant the Section 1112/1104 Motion to the extent it seeks the appointment of a trustee to administer the Debtors' chapter 11 bankruptcy cases, and (ii) grant the Hawk Stay Relief Motion to permit the Section 225 Action to proceed, as set forth below.

## II.    RELEVANT PROCEDURAL AND FACTUAL BACKGROUND[3]

The history of the Debtors, their relationship with their creditors, and, in particular from the Court's perspective, the events during these bankruptcy cases, are convoluted, and for the most part, riddled with strife.  The docket in the Debtors' main case spans over 500 entries, telling a story of near-endless conflict.[4]  The Court has spent an inordinate amount of time dealing with expedited motion practice, emergency hearings, and drawn-out contested matters. While the Court does not typically summarize the major activity in a case in order to explain a decision, here it believes a lengthy summary is necessary in order to paint the picture of the acrimony, relative lack of progress, and overlapping and simultaneous controversies these cases have endured over the nearly ten months they have been pending.  Set forth below, therefore, is a summary of the major events not only that led to the Debtors' bankruptcy cases, but also that have transpired before this Court since the Debtors filed their bankruptcy petitions.

---

[3] The factual background recited herein is drawn from various pleadings filed on the docket as well as the testimony and evidence adduced at Trial (as defined *infra*).  The Court notes, however, that to the extent such facts as set forth in the parties' various pleadings are disputed, such disputes are irrelevant to the Court's resolution of the pending motions, as the Court has drawn its conclusions from the record at Trial and the procedural history of these cases.

[4] This does not even account for the approximately 120 docket entries in the adversary action the Debtors filed in August 2023 against various parties, discussed *infra*.  *See* Adv. Pro. No. 23-00057.

## A.    Pre-Petition Events

### 1.    Formation of the Debtors

Stream was founded in 2009 by Mathu Rajan ("Mr. Rajan") and Raja Rajan (together with Mr. Rajan, "the Rajans").  The company was founded to develop and commercialize a proprietary technology for viewing three-dimensional content without the need for 3D glasses or goggles ("Ultra-D").  Stream created Technovative, a wholly owned subsidiary, which in turn directly or indirectly owns various subsidiaries, including SeeCubic B.V. ("SCBV"), an entity formed under the laws of the Netherlands and which functions as the primary research and development engine for the business.[5]  Together, these subsidiaries own and hold rights in technology including Ultra-D.  Stream's Ultra-D technology was developed, in part, based on certain intellectual property, including a portfolio of glasses-free 3D patents licensed from Koninklijke Philips Electronics ("Philips").  Stream also has a technology license from Rembrandt 3d Holding Ltd. ("Rembrandt"), which allows it to use the Rembrandt technology incorporated into Stream's Ultra-D products (the "Rembrandt Licensing Agreement").

### 2.    Funding from SLS and Hawk

From 2011 to 2020, Stream's senior secured creditor, SLS Holdings VI, LCC ("SLS"), loaned Stream $6 million through a series of secured promissory notes (the "SLS Notes").  In return, Stream pledged all of its assets, and the assets of its wholly-owned subsidiaries, as security for the SLS Notes. Stream and SLS executed a security agreement which authorized SLS to take control of Stream's assets to satisfy the SLS Notes in the event Stream defaulted. Between 2011 and 2014, Shadron Stastney ("Mr. Stastney"), the principal of SLS, served as an outside director of Stream.  He rejoined the board as Vice Chairman in 2018 in a strategic role

---

[5] *See* Exhibit D-5.

until resigning in January 2020.

Between 2014 and 2020, Stream's junior secured creditor, Hawk Investment Holdings Limited ("Hawk"), loaned Stream more than £50 million through a series of junior secured notes (the "Hawk Notes", and together with the SLS Notes, the "Notes").  Subject to the senior security interest held by SLS, Stream pledged all of its assets as security for the Hawk Notes and executed a security agreement that authorized Hawk to take control of Stream's assets to satisfy the Hawk Notes if Stream defaulted.  On January 29, 2018, Stream entered into a conversion agreement with Hawk, whereby the parties agreed to terms pursuant to which Stream would be permitted to convert the outstanding portion of the Hawk Notes to Stream equity (the "Hawk Conversion Agreement").  Stream and SLS contemporaneously entered into a parallel agreement with respect to conversion of the SLS Notes to Stream equity (the "SLS Conversion Agreement" and together with the Hawk Conversion Agreement, the "Conversion Agreements").

### 3.    Omnibus Agreement

In March 2020, Stream was notified it was in default under the SLS and Hawk Notes.  In May 2020, Stream, Hawk, SLS, and 52 of its stockholders entered into an Omnibus Agreement whereby Stream would transfer all of its assets to a newly formed entity, SeeCubic Inc. ("SeeCubic"), and in exchange, SLS and Hawk would no longer pursue a foreclosure, and their claims under the Notes would be entirely extinguished.  Mr. Stastney, who by then had left Stream, formed SeeCubic as a Delaware corporation to acquire Stream's assets pursuant to the Omnibus Agreement.

### 4.    Litigation Over the Omnibus Agreement

In September 2020, Stream filed suit against SeeCubic in the Delaware Chancery Court to invalidate the Omnibus Agreement.  Both Stream and SeeCubic moved for preliminary

injunctions whereby Stream sought to prevent SeeCubic from taking any actions to enforce the

Omnibus Agreement, and SeeCubic sought to compel Stream's compliance therewith.  In

December 2020, the Delaware Chancery Court issued an opinion finding that SeeCubic was

entitled to injunctive relief and barring Stream from failing to comply with the Omnibus

Agreement.  In September 2021, the Delaware Chancery Court granted SeeCubic's motion for

summary judgment (the "Summary Judgment Order"), declaring the Omnibus Agreement to be

valid and entering a permanent injunction preventing Stream from interfering with the

agreement.

In November 2021 Stream appealed the Delaware Chancery Court's ruling,[6] alleging that

the Delaware Chancery Court erred because Stream's unambiguous certificate of incorporation

required the approval of Stream's Class B stockholders for Stream's entry into the Omnibus

Agreement.  In June 2022, the Delaware Supreme Court vacated the Summary Judgment Order

on the grounds that the Omnibus Agreement was invalid without the approval of Stream's Class

B Stockholders.  The Delaware Supreme Court also found that (1) Hawk was a secured creditor

of Stream, (2) Stream had pledged all of its assets as security for the more than $50 million

Hawk lent to Stream, and (3) the Hawk Notes were executed in conjunction with security

agreements authorizing Hawk to take control of Stream's assets to satisfy the Hawk Notes if

Stream defaulted.

On remand, in September 2022, the Delaware Chancery Court ordered the parties to

unwind the Omnibus Agreement but confirmed that Hawk's and SLS's rights remained intact.

---

[6] On November 10, 2021, the Delaware Chancery Court issued an Order Entering Partial Final Judgment
Under Rule 54(b) (the "Partial Final Judgment Order"), effectively making the rulings in the Summary
Judgment Order final in order to permit appeal, finding that even though SeeCubic's conversion claim
remained unresolved, there was "no risk that after addressing [whether the Omnibus Agreement was
valid] on appeal, the Delaware Supreme Court might have to revisit the same issue in an appeal from a
final trial-level adjudication." *See* First Day Declaration, at Exhibit X.

In its opinion, the Court held that because the Omnibus Agreement did not validly transfer legal

title of Stream's assets to SeeCubic and that SeeCubic would be required to transfer back to

Stream the equity placed in the operating subsidiary, Technovative.

### 5.    Stream's Prior Bankruptcies

While the Omnibus Agreement litigation was playing out, on February 24, 2021, Stream

filed a voluntary chapter 11 bankruptcy petition in the United States Bankruptcy Court for the

District of Delaware (the "Delaware Bankruptcy Court").  On May 17, 2021, the Delaware

Bankruptcy Court dismissed the case as a bad faith filing.  After dismissal, on May 23, 2021,

three of Stream's purported unsecured creditors, including Rembrandt, filed an involuntary

Chapter 7 bankruptcy petition against Stream.  On June 10, 2021, the Delaware Bankruptcy

Court again dismissed the involuntary bankruptcy action as a bad faith filing, and imposed a

twelve-month bar on Stream re-filing for bankruptcy.

### 6.    Mr. Rajan's Formation of VSI

Mr. Rajan formed Visual Semiconductor, Inc. ("VSI") in 2022, purportedly as a vehicle

to raise new capital and support Stream.  Upon formation, Mr. Rajan was the CEO of VSI.  Mr.

Rajan and members of his family are minority economic shareholders in VSI but have the

majority of voting stock.

### 7.    The Proxy Notice, Marshaling Directive and Section 225 Action

On October 17, 2022, after ownership of the Technovative shares was transferred to

Stream, in furtherance of the unwinding of the Omnibus Agreement, Hawk issued a Proxy

Notice, purportedly pursuant to its rights under the Hawk Notes, to remove Mr. Rajan as the sole

director of Technovative and replace him with Mr. Stastney. Hawk further directed Stream to

marshal its collateral to prepare for a sale under the Uniform Commercial Code in order to

satisfy the outstanding indebtedness (the "Marshaling Directive").  Stream refused to comply

with the Proxy Notice and Marshaling Directive, arguing that it had converted Hawk's secured

debt to Stream equity pursuant to the Hawk Conversion Agreement, and therefore Hawk no

longer possessed secured creditor rights pursuant to which it could issue the Proxy Notice or the

Marshaling Directive.

On the same date, Hawk responded by filing the Section 225 Action to resolve whether

Hawk validly appointed Mr. Stastney as the sole director of Technovative as of October 17,

2022.  On October 20, 2022, the Delaware Chancery Court entered an order providing that,

pending resolution of the Section 225 Action, Technovative was to operate according to the

status quo, and by separate order, appointing a receiver to operate Technovative on a day-to-day

basis (the "Receiver").

On November 13, 2022, Hawk moved for summary judgment in the Section 225 Action

on the issue of whether Stream defaulted under the Hawk Notes.  On November 29, 2022, the

Delaware Chancery Court issued a decision finding that, notwithstanding the Supreme Court

Opinion's reversal of the legal determination that the Omnibus Agreement was valid, the

underlying factual findings were undisturbed, such that Stream was collaterally estopped from

challenging whether (1) the Notes are valid and binding obligations of Stream; (2) Stream is in

default under the Notes; (3) Hawk may exercise the "Secured Creditor Rights" under the Notes,

including issuance of the Proxy Notice; (4) as of November 10, 2021, the Hawk Notes had not

been converted or satisfied; and (5) any conversion of the Hawk Notes must be supported by new

money, which had not occurred as of November 10, 2021 (the "Collateral Estoppel Opinion").

Trial in the Section 225 Action was scheduled to commence on March 23, 2023, but was

stayed by the filing of the Debtors' instant bankruptcy petitions.

### B.    Debtors' Pending Bankruptcy Cases

### 1.    The Filing of the Petitions

The Debtors each filed voluntary bankruptcy petitions (each, a "Petition" and together, the "Petitions") under chapter 11 of the Bankruptcy Code on March 15, 2023.[7]  Notwithstanding the dispute to be litigated over who is the rightful director of Technovative, Mr. Rajan signed both Stream's Petition and Technovative's Petition as Director.[8]  The Corporate Resolutions attached to each of the Petitions identified Mr. Rajan as a Director, Secretary and Chief Executive Officer of Stream and Technovative, respectively, and he executed the Corporate Resolutions as Secretary of each entity.

Attached to Stream's Petition was Official Form 204, setting forth a list of its 20 largest non-insider unsecured creditors.  Those creditors held purported claims totaling over $14 million.[9]  Attached to Technovative's petition was its Official Form 204, which listed only Rembrandt, with a claim purported claim of $10,000,000.00.

### 2.    Hawk's Stay Relief Motion

Less than one week after the Petitions were filed, on March 20, 2023, Hawk filed the Hawk Stay Relief Motion.  Hawk seeks relief from stay to proceed with the Section 225 Action against the Debtors in the Delaware Chancery Court.  Hawk argues the Section 225 Action was

---

[7] Bankr. Docket No. 1; Bankr. Case No. 23-17064, Docket No. 1.

[8] On May 4, 2023, Stream filed an amended bankruptcy Petition, executed by Mr. Rajan as CEO and Director.  Bankr. Docket No. 186.  The amended Petition made two changes to the initial Petition.  First, it responded in the affirmative to Question 12, asking whether the debtor owns or has possession of any real property or personal property that needs immediate attention, and by attachment references the Bonding Equipment (defined *infra*) located in China.  Second, in response to Question 15 regarding its estimated assets, it reduced the range of value from $500,000,001-$1 billion to $100,000,001-$500,000,000.

[9] On April 12, 2023, the Office of the United States Trustee (the "U.S. Trustee") filed a statement stating that an unsecured creditors' committee had not been appointed due to lack of response from unsecured creditors regarding serving on a committee.  Bankr. Docket No. 100.

days away from trial when the Petitions were filed, and the Delaware Chancery Court is already

intimately familiar with the dispute between Hawk and the Debtors and the governing Delaware

law.  Hawk asserts that the Section 225 Action will resolve issues of state law that, while

fundamental to the Debtors' bankruptcy cases, are most efficiently and appropriately resolved by

the Delaware Chancery Court, including (i) who was the rightful director of Technovative pre-

petition, and therefore whether Technovative's bankruptcy filing was authorized (the

"Technovative Director Issue"), and (ii) whether Stream's secured debt to Hawk was converted

to equity pre-petition (the "Debt Conversion Issue").[10]

On April 5, 2023, the Debtors objected to the Hawk Stay Relief Motion (the "Debtors'

Stay Relief Objection").[11]  The Debtors argue that Hawk's purpose in prosecuting the Section

225 Action is to obtain a declaration that it can exercise rights as a purported secured creditor of

Technovative, enabling it to conduct a sale of Technovative's assets under Article 9 of the

Uniform Commercial Code (and "Article 9 Sale").  The Debtors argue that even if Hawk were to

obtain such a declaration, it would be prohibited by the automatic stay from exercising any such

rights absent further stay relief, and that such a sale would eviscerate the Debtors' primary

assets, consisting of intellectual property held by their subsidiaries.  Rembrandt filed a joinder to

the Debtors' Stay Relief Objection.[12]

On April 14, 2023, the Court held an initial hearing on the Hawk Stay Relief Motion and

---

[10] Hawk argues that rulings by the Delaware Chancery Court will "result in a complete resolution of
issues surrounding (1) the amount and priority of the claims in respect of the Hawk Notes and the SLS
Notes, (2) the validity of the liens securing the Hawk Notes and the SLS Notes, (3) the resolution of any
current defense to the Hawk Notes and the SLS Notes, and (4) the requirements for any potential future
conversion of the Hawk Notes," which Hawk asserts are "all critical to the resolution of these Chapter 11
cases."  Hawk Stay Relief Motion, at 21.

[11] Bankr. Docket No. 78.

[12] Bankr. Docket No. 101.

9

determined that disputed facts would require an evidentiary trial.  That trial (the "Trial") was

initially scheduled to commence on May 22, but was then rescheduled to June 26.

### 3.    Debtors' Stay Violation Motion

On March 28, 2023, the Debtors filed an emergency motion seeking enforcement of the

automatic stay (the "Stay Violation Motion")[13] and imposition of related sanctions against

SeeCubic and SCBV, as well as certain entities and individuals purportedly acting on their behalf

(the "SeeCubic Parties").  In general, the Debtors asserted that SeeCubic and SCBV were

exercising possession and/or control over certain bonding equipment (the "Bonding Equipment")

of the Debtors located at a warehouse in China, which the Debtors asserted was essential to their

ability to receive client orders and commence production of their Ultra-D products.  The Stay

Violation Motion asserted that SeeCubic and SCBV, at the direction of Mr. Stastney, were

interfering with the Debtors' repossession and relocation of the Bonding Equipment, in violation

of the automatic stay and the Delaware Supreme Court's decision directing the unwinding of the

Omnibus Agreement.  The Stay Violation Motion also asserted that SeeCubic and SCBV, at the

direction of Mr. Stastney, were exercising possession and control over other Stream assets (the

"Other Stream Assets"), including Ultra-D demonstrator samples, engineering assets, laptops,

and intellectual property and software, in violation of the automatic stay.

On April 5, 2023, the Debtors filed an amended stay violation motion (the "Amended

Stay Violation Motion").[14]  In addition to their assertions regarding SeeCubic and SCBV's

interference with and control over the Bonding Equipment and Other Stream Assets, the Debtors

asserted that Mr. Stastney, SLS, SeeCubic, and Hawk had initiated proceedings in Amsterdam

---

[13] Bankr. Docket No. 49.

[14] Bankr. Docket No. 76.

"to take certain measures preventing Debtors from managing its subsidiaries." The Debtors sought a directive from the Court that the SeeCubic Parties' possession and control over the Bonding Equipment and Other Stream Assets was to cease, and such estate property was to be turned over to the Debtors.[15]

On April 7, 2023, Debtors filed a supplement to the Amended Stay Violation Motion (the "Stay Violation Supplement"),[16] asserting that Mr. Stastney, SLS, SeeCubic, and Hawk had filed a joint legal action (the "Amsterdam Action"), apparently different from the summary proceeding described in the Amended Stay Violation Motion, seeking the removal of Mr. Rajan as a director and CEO of Stream's Dutch subsidiaries, in further violation of the automatic stay.

On April 12, 2023, SeeCubic objected to the Stay Violation Motion and the Amended Stay Violation Motion,[17] asserting that the Bonding Equipment and Other Stream Assets were not property of Debtors' estates, and even if they are, mere possession did not constitute violation of the automatic stay because it does not apply to the non-debtor Dutch subsidiaries. Hawk filed a joinder in support of SeeCubic's objection.[18]

The Court held an initial hearing on the Stay Violation Motion on April 14, 2023. With respect to the portions of that motion related to the Other Stream Assets and the Amsterdam Action, the Court reserved ruling pending additional information and evidence.[19] With respect to the Bonding Equipment, on July 13, 2023, the Court entered an order appointing my colleague,

---

[15] The Amended Stay Violation Motion did not seek specific relief with respect to the Amsterdam proceedings that were assumedly the reason for the amendment.

[16] Bankr. Docket No. 90.

[17] Bankr. Docket No. 105.

[18] Bankr. Docket No. 106.

[19] The Debtors followed with another emergency motion on April 18, 2023, seeking withdrawal of the Amsterdam Action in advance of a scheduled April 20 hearing in the Netherlands. Bankr. Docket No. 125. The Amsterdam court, however, thereafter postponed the scheduled hearing.

Judge Mayer, to mediate that dispute.[20]  To the Court's knowledge, this dispute remains in mediation.

### 4.    Hawk's Section 1112/1104 Motion

On April 6, 2023, Hawk filed the Section 1112/1104 Motion.  As noted *supra* and discussed in greater detail *infra,* the motion seeks either conversion or dismissal of the Debtors' bankruptcy cases pursuant to §1112(b) of the Bankruptcy Code, or alternatively, the appointment of a chapter 11 trustee to administer the Debtors' bankruptcy cases pursuant to §1104(a) of the Bankruptcy Code.

With respect to conversion or dismissal, Hawk argues that there are three statutorily-grounded bases for converting or dismissing the cases under §1112(b) of the Bankruptcy Code. First, Hawk argues there has been substantial and continuing loss to the Debtors' bankruptcy estates without likelihood of rehabilitation, as contemplated by §1112(b)(4)(A).  Second, Hawk argues there has been gross mismanagement of the estates, as contemplated by §1112(b)(4)(B). Third, Hawk argues the Debtors have engaged in the unauthorized use of cash collateral, as contemplated by §1112(b)(4)(D).[21]  In addition to these statutory grounds for finding cause to convert or dismiss, Hawk argues the Debtors lacked good faith in filing their bankruptcy cases, providing an alternate grounds for dismissal under §1112(b).  Finally, Hawk argues that Technovative's bankruptcy filing was unauthorized because Mr. Rajan was replaced as a director of Technovative prior to its Petition being filed, and therefore could not have authorized the filing on behalf of the entity.  After asserting that multiple grounds exist for conversion or dismissal, Hawk argues in the Section 1112/1104 Motion that the Court should dismiss the

---

[20] Bankr. Docket No. 294.

[21] As discussed *infra,* Hawk did not address the unauthorized use of cash collateral in its post-trial brief, and therefore the Court understands Hawk to no longer be asserting this basis for conversion or dismissal.

Debtors' cases with prejudice, rather than convert them, because it would alleviate any fears of the Debtors refiling, the Debtors are non-operational, and the both conversion and dismissal will likely conclude with the sale of the Debtors' equity in their subsidiaries.[22]

With respect to the appointment of a chapter 11 trustee, Hawk asserts that even if the Court is not inclined to convert or dismiss the Debtors' cases, cause exists to appoint a trustee based on the Debtors' pre- and post-petition history of fraud, dishonesty, incompetence, and gross mismanagement of the Debtors' businesses.  Hawk further argues that Mr. Rajan has engaged in self-dealing for the benefit of VSI that has led to irreconcilable acrimony between the Debtors' management and several stakeholders.

On May 8, 2023, the Debtors filed an opposition to the Section 1112/1104 Motion (the "Debtors' Section 1112/1104 Opposition").[23]  Rembrandt also filed an opposition to the Section 1112/1104 Motion (the "Rembrandt Section 1112/1104 Opposition").[24]

As was the case with the Hawk Stay Relief Motion, the Section 1112/1104 Motion was scheduled to be heard at the Trial commencing on May 22, and subsequently rescheduled to June 26.

### 5.    Debtors' Expedited Motion to Approve Employee Obligations

On April 21, 2023, the Debtors filed an expedited motion (the "Employee Obligations

---

[22] As discussed *infra,* since filing the Section 1112/1104 Motion, Hawk's position has evolved, in that it now seeks conversion of the Debtors' cases rather than dismissal.

[23] Bankr. Docket 196.  The Debtors filed an initial response to the Section 1112/1104 Motion on April 10, 2023, *see* Bankr. Docket No. 94, based on and contesting Hawk's request that the motion be heard on an expedited basis.  The Court held an initial hearing on the motion on April 14, 2023, at which time it set a briefing schedule and a trial date.  The Debtors' Section 1112/1104 Opposition was filed in accordance with that briefing schedule.

[24] Bankr. Docket No. 193.

Motion")[25] seeking authority to make certain payments the Debtors characterized as employee obligations.

First, the Debtors sought authority to pay various obligations in connection with the employees of SCBV, including payroll, taxes, paid leave, benefits payments, etc.[26]  According to the motion, there were 28 full-time, salaried employees of SCBV at the time of filing.  The Debtors claimed that there were no pre-petition amounts owing to these employees, but that post-petition payroll was about $180,000 per month.  The motion also sought to pay (a) six independent contractors $193,000 for pre-petition services, as well ongoing post-petition fees of $46,000 per month, (b) post-petition payroll taxes of $149,000 per month, (c) payroll processing fees of $9,000 per month, and (d) pension contributions of $43,000 per month.  The Debtors also sought to pay approximately $20,000 in pre-petition reimbursable business expenses to SCBV employees.

The Employee Obligations Motion, however, sought additional relief unrelated to current employee and independent contractor obligations.  It also sought authority to re-hire nine U.S.-based Stream employees that purportedly left after the Delaware Chancery Court's Omnibus Agreement decision in 2020, and who are now employed by VSI.  In connection with re-hiring them, the Debtors sought to pay those employees approximately $30,000 in pre-petition wages owed (subject to the $15,150 cap on pre-petition wages under §507(a)(4)).  The Debtors also sought to pay certain independent service providers both pre-petition amounts owed, in the amount of approximately $30,000 owed to one provider, and ongoing post-petition amounts of approximately $10,000 per month.  The Debtors further sought to pay the re-hired employees'

---

[25] Bankr. Docket No. 134.

[26] The motion required expedited treatment because the post-petition compensation Debtors sought to pay SCBV employees was coming due just four days later, on April 25.

post-petition payroll taxes of approximately $10,000 to $12,000 per month, as well as the pre-petition payroll taxes owing as necessary, up to $178,000.  The Debtors also sought to reinstate their paid leave program and benefit plans at a cost of approximately $23,000 per month, as well as pay approximately $267,000 in unreimbursed pre-petition business expenses.

In addition to the U.S.-based former Stream employees, the Debtors also sought to re-hire three Taiwan-based Stream employees who purportedly left after the Delaware Chancery Court's 2020 Omnibus Agreement decision as well, and who are also now employed by VSI.  In connection with these former employees, the Debtors sought authority to pay post-petition payroll costs of $7,000 and medical plan costs of about $3,000, but did not believe there were any pre-petition amounts owed.  The Debtors also sought authority to pay approximately $3,000 in unreimbursed pre-petition business expenses.

Finally, the Debtors stated that they had been using 15 independent contractors in China for various services through an entity called ST4M, Inc.  The Debtors sought authority to establish a Beijing-based subsidiary to employ these 15 individuals as full-time employees.  The gross payroll would be approximately $22,000 monthly, and the Debtors would also be required to pay approximately $29,000 quarterly for a state-sponsored health-plan.

As discussed *infra*, the Court held an emergency hearing on the Employee Obligations Motion on April 24, but limited its consideration to whether and what payments to current SCBV employees were needed on an expedited basis.

###### 6.    Debtors' Expedited Stock Sale Motion

On the same day that they filed the expedited Employee Obligations Motion, the Debtors filed an expedited motion for authority to sell up to $10 million in unissued shares of Stream's

Class A common stock to VSI to fund their post-petition operations (the "Stock Sale Motion").[27]

The Stock Sale Motion represented that VSI, formed by Mr. Rajan as a vehicle to raise new

capital for Stream and to support Stream while fighting the transfer of Stream's assets pursuant

to the Omnibus Agreement, had made pre-petition strategic investments in Stream, in addition to

having engaged key Stream employees.  Per the Stock Sale Motion, VSI was prepared to fund

the Debtors' post-petition product development and supply chain, but "as compensation for this

support" Stream had entered into an exclusive distribution agreement (the "Distribution

Agreement") whereby VSI would accept orders from and make delivery to third-party

customers, issue a purchase order to Stream for 90% of the value of the third-party order, and

retain the 10% difference as "margin for funding technical, business, and sales development."

The Debtors represented that VSI would also assist with "productization of electronics," and

asserted that the 10% fee was "industry standard for distribution agreements."

Together with the Debtor's expedited Employee Obligations Motion, the Court held an

emergency hearing on the Stock Sale Motion on April 24, as discussed *infra.*

### 7. Debtors' Emergency Financing Motion and Seecubic's Proposed Alternative Funding

As will be discussed in further detail *infra,* on April 25, 2023, the Debtors filed an

emergency motion for the approval of debtor-in-possession financing from VSI as an alternative

to the proposed sale of stock to VSI, in order to fund the SCBV payroll obligations coming due

the following day.[28]  On the same day, SeeCubic filed an alternative funding motion that would

have compelled SCBV, or alternatively the Debtors, to borrow under an existing line of credit

from SeeCubic that had been put in place while the Receiver was managing Technovative and its

---

[27] Bankr. Docket No. 135.

[28] Bankr. Docket No. 156.

subsidiaries, including SCBV.[29]  Later that day, the Court held an eight-hour emergency hearing
on the alternative funding proposals that ended at approximately 11:00 p.m., after which it
determined that neither proposal would be approved.

### 8.    Debtors' Motion to Retain Thomas Park as Chief Financial Officer

On June 14, 2023, the Debtors filed a motion seeking authority to enter into an
employment agreement with Thomas Jung Ho Park ("Mr. Park") as Chief Financial Officer to
the Debtors (the "Park Retention Motion").[30]  The Debtors asserted in the Park Retention Motion
that, given their need to raise capital and the complexity of their businesses and structure of their
debt, it was necessary to have an experienced CFO to support the Debtors' financial operations
and successfully navigate the Debtors' businesses during their Chapter 11 cases and post-
emergence from bankruptcy.  Although the Debtors asserted that their entry into the employment
agreement with Mr. Park was within the ordinary course of their business, and therefore did not
require approval of the Court, after discussions with the United States Trustee the Debtors filed a
revised motion to employ Mr. Park on July 18, 2023.[31]

On July 25, 2023, Hawk filed an objection to the Park Retention Motion. In its objection,
Hawk argued that the Debtors neither provided a basis justifying the need for Mr. Park's
employment nor have the Debtors established that Mr. Park is not a disinterested person for the
purposes of §327 of the Bankruptcy Code. A hearing on the Park Retention Motion was
originally scheduled for August 16, 2023, but has been continued a number of times to allow for
Trial and other more pressing contested matters to go forward.

---

[29] Bankr. Docket No. 155.

[30] Bankr. Docket No. 234.

[31] Bankr. Docket No. 298.

9.    **Debtors' Motion to Continue Trial Due to Mr. Rajan's Hospitalization**

On June 16, 2023, the Debtors filed an expedited motion to continue the Trial on the

Hawk Stay Relief Motion and the Section 1112/1104 Motion, scheduled to commence on June

26.[32]  The Debtors represented that Mr. Rajan was hospitalized after suffering a recent injury,

and upon his medical provider's instruction, would be unable to participate in or attend Trial,

whether remotely or in-person, nor would he be able to attend, remotely or in-person, his

deposition.  The Debtors therefore sought a continuation of the commencement of Trial for 45

days to allow Mr. Rajan to recuperate sufficiently to participate.  Hawk objected to the

continuation request, citing the prejudice a further delay would cause, and asserting that Mr.

Rajan's absence would not affect the outcome to the extent the pending motions entailed strictly

legal issues, as opposed to factual issues requiring testimony from Mr. Rajan.   On June 21,

2023, the Court held an expedited hearing on the Debtors' continuance request, at which time it

determined that Trial would proceed on June 26 to allow the parties to commence with the

presentation of evidence, but that Trial would need to be continued to allow Mr. Rajan to

recuperate sufficiently to be deposed and testify.

Trial then commenced from June 26 to June 29, and was subsequently continued on

August 15 and 17, and again on September 22 and 25, to permit Mr. Rajan's recuperation and

participation.

10.    **Debtors' Amendment to Stock Sale Motion**

On June 23, 2023, the Debtors filed an amendment to their Stock Sale Motion (the "Stock

Sale Motion Amendment").[33]  The Debtors informed the Court that they had continued to

---

[32] Bankr. Docket No. 236.

[33] Bankr. Docket No. 258.

explore the sale of Class A common stock of Stream to third parties, one of which was a Chinese company named Zhongsheng Group Holdings Ltd. ("Zhongsheng").  As a result, the Debtors had entered into a non-binding term sheet with Zhongsheng on June 6, 2023 (the "Zhongsheng Term Sheet"), pursuant to which Zhongsheng would invest $300 million in Stream through the purchase of Stream Class A shares.

As discussed in further detail *infra*, a wave of motion practice followed the Stock Sale Motion Amendment, and it later became one of the primary issues in the Trial.

### 11.   Debtors' Adversary Proceeding and TRO Motion

On August 12, 2023, with the resumption of Trial days away and in the midst of contested hearings regarding discovery over the Zhongsheng Term Sheet, the Debtors filed an adversary action ( the "Adversary Action") against a host of parties, including, among others, Hawk, SLS, SeeCubic, and Mr. Stastney (collectively, the "Defendants).[34]  In their Complaint in the Adversary Action, the Debtors allege that the Defendants have engaged in an effort to (a) sabotage the Debtors' exercise of certain debt-to-equity conversion rights held against the secured debtholders, (b) vitiate the Debtors' recapitalization, which would have rendered certain Defendants' debt instruments obsolete; (c) restrict and/or interfere with the Debtors' ability to raise funds and sell products, and (d) use their status as secured lenders to deny Stream the assets and other business resources essential to its successful reorganization.

On September 1, 2023, the Debtors filed a motion in the United States District Court for the Eastern District of Pennsylvania (the "District Court") to withdraw reference of the Adversary Action from this Court.[35]  The Debtors followed that on September 28, 2023 with an

---

[34] Bankr. Docket No. 335; Adv. Pro. Docket No. 1.

[35] On November 16, 2023, the District Court denied the Debtors' request to withdraw the reference.  *See* Case No. 23-mc-135, at Docket No. 18.

emergency motion in the District Court (the "TRO Motion") for a temporary restraining order, preliminary injunction, and permanent injunction. The District Court denied the motion on the grounds that it was not properly filed in the District Court absent withdrawal of the reference of the Adversary Action. Therefore on September 30, 2023, the Debtors refiled the TRO Motion in the Adversary Action before this Court.[36]

By the TRO Motion, the Debtors assert that Mr. Stastney testified in mid-September in the Amsterdam Action, during which he admitted that SeeCubic is in direct competition with Stream, and is currently working with twelve or thirteen customers using the Ultra-D technology developed by Stream. Stream alleges that this action by SeeCubic puts its technology licenses with Philips and Rembrandt at risk because they strictly prohibit sub-licensing. The Debtors further argue that SeeCubic's unauthorized use of the Philips and Rembrandt technology, as embedded in Stream's technology, violates the Philips and Rembrandt licenses and presents the potential of irreparable harm to Stream should Philips and Rembrandt decide to revoke their respective licenses.

The Court held a contested evidentiary hearing on the TRO Motion over the course of multiple days in October and November, after which the Court provided the parties certain dates in December that were available for the conclusion of the hearing, and directed that they confer regarding their mutual availability. The parties thereafter advised the Court that they had agreed to postpone continuation of the TRO hearing, as well as multiple other matters that were scheduled for hearing in December, until late January or early February to pursue settlement discussions. On December 14, the Court held a status hearing with the parties to discuss the impact of the proposed continuation on the status of the TRO hearing. The Court determined

---

[36] Adv. Pro. Docket No. 27.

that the entry of a limited temporary restraining order was warranted, based strictly on the evidence presented at the TRO hearing to that point and in light of the lengthy delay that continuation of the hearing would cause to the Court's final resolution of the matter. The Court directed Debtors' counsel to prepare an agreed form of order reflecting the Court's ruling at the status hearing. Indicative of the acrimony that has stalled progress in this case at nearly every turn, the parties subsequently advised the Court that they were unable to reach agreement regarding the terms of a proposed order. The Court therefore prepared an Order consistent with its ruling at the December 14 status hearing, which was entered on January 4, 2024.[37]

### 12.    Trial on the Pending Motions

Commencing on June 26, the Court held Trial over eight days, concluding on September 25. During the Trial, the Court heard testimony from Mr. Stastney, Mr. Park, Mr. Rajan, and Christopher Michaels of Rembrandt. Approximately 130 exhibits were admitted into evidence.[38]

### 13.    The Parties' Positions After Trial

At the Court's direction, Hawk, the Debtors, and Rembrandt submitted post-trial briefs (each a "Post-Trial Brief") setting forth their positions in light of the evidence presented at Trial.[39]

### a.    The Section 1112/1104 Motion

---

[37] Adv. Pro. Docket No. 119.

[38] The transcripts of the Trial span nearly 2,000 pages, which is merely a fraction of the pages of transcripts that have accumulated from all of the contested hearings the Court has had to hold in these cases.

[39] Although Rembrandt submitted post-trial briefing in opposition to the two pending motions, the arguments therein relate largely to Rembrandt's history with the Debtors and its position with respect to the Rembrandt license. Although the Rembrandt license is a central feature of these cases, it does not factor into the Court's analysis below regarding whether conversion, dismissal, or appointment of a trustee is warranted and whether cause exists to grant Hawk stay relief for resolution of the Technovative Director Issue and the Debt Conversion Issue. The Court therefore will not summarize Rembrandt's arguments here.

Hawk argues that the Court should order conversion of the Debtors' cases to chapter 7 for any of three independent reasons.[40]

First, Hawk argues that the evidence established that conversion is warranted under §1112(b)(4)(A), based on the substantial or continuing losses to the Debtors' estates and no reasonable prospect at rehabilitation.[41]  According to Hawk, the record evidence established that the Debtors are incurring substantial losses during the pendency of these cases in the form of accruing administrative expenses and post-petition payment obligations to Rembrandt, without any offsetting revenue, and have no reasonable likelihood of rehabilitation because they have never had any operations, as all of the value lies in their non-debtor operating subsidiaries (and to the extent Mr. Rajan testified regarding the Debtors' operations, these are actually taking place at the VSI level).

Next, Hawk argues that the evidence established conversion is warranted under §1112(b)(4)(B), based on the Debtors' gross mismanagement of the estates.[42]  Hawk argues that the evidence at Trial established the Debtors' gross mismanagement in a number of ways: (a) Mr. Rajan's breach of his fiduciary duties and conflicts of interest; (b) the Debtors' lack of

---

[40] In its Post-Trial Brief, Bankr. Docket No. 431, Hawk does not address its argument in the Section 1112/1104 Motion that conversion or dismissal is warranted under §1112(b)(4)(D), based on the Debtors' unauthorized use of cash collateral.  *See* Hawk Post-Trial Brief, at 42 (arguing that there are three bases under §1112(b) under which the Court can order conversion here: (i) substantial or continuing loss or diminution of the estate and absence of reasonable likelihood of rehabilitation under §1112(b)(4)(A); (b) gross mismanagement of the estate under §1112(b)(4)(B); and (c) lack of good faith in filing the Petitions).  In its Post-Trial Reply Brief, Bankr. Docket No. 436, Hawk acknowledges that it has not identified any cash collateral the Debtors used without permission, but attributes that to the Debtors' failure to adhere to their financial reporting and disclosure obligations.  *Id.* at 14. While the Court is not clear that Hawk is even advancing this basis for conversion or dismissal given its omission from the Hawk Post-Trial Brief, Hawk's concession in its reply brief seems to end the inquiry, and the Court therefore does not address it further herein.

[41] Hawk Post-Trial Brief, at 44-47.

[42] *Id.* at 48-57.

candor to the Court and interested parties; (c) the Debtors' "blatant gamesmanship" in their requests for relief in this Court and the litigation that has ensued; and (d) likely fraud in the fabrication of a purported funding transaction.

Finally, Hawk argues that the evidence established conversion is warranted based on the Debtors' bad faith in commencing these cases.[43]  Hawk argues that the timing of the Debtors' Petitions alone establishes *per se* bad faith because they were filed on the eve of trial in the Section 225 Action as a bad faith litigation tactic.  Hawk further argues that under the totality of the circumstances test used in the Third Circuit, twelve of the fourteen factors used support a finding of bad faith.

Hawk argues that conversion of the Debtors' cases, rather than dismissal, is warranted so that the Court may continue to oversee them but curtail Mr. Rajan's influence in administering them.[44]  Barring conversion, Hawk argues that dismissal is appropriate because the existence of cause has been established under §1112.  If, however, the Court is not inclined to either convert or dismiss, Hawk argues the evidence establishes that appointment of a trustee is proper based on Mr. Rajan's pattern of fraud and dishonesty in managing the Debtors, his gross mismanagement not only of the estates, but also of the pre-petition Debtors, and the conflicts of interest between Mr. Rajan and his roles with and interests in the Debtors and VSI that have revealed themselves through the administration of these cases.[45]  Hawk argues that the costs of appointing a trustee "are effectively nil" because Mr. Rajan's administration of the estates to date has been so

---

[43] *Id.* at 57-61.

[44] *Id.* at 62.  The Court notes Hawk's request for conversion rather than dismissal represents a change from its preference for dismissal with prejudice as stated in the Section 1112/1104 Motion, but is consistent with the evolved position Hawk took in its pre-trial brief filed in May.  *See* Bankr. Docket No. 195, at ¶¶23 to 42.

[45] *Id.* at 64-67.

harmful to creditors' prospects for recovery.

The Debtors argue that Hawk has failed to establish by a preponderance of the evidence that cause exists for conversion, dismissal, or the appointment of a trustee.[46]

First, the Debtors argue the evidence does not establish the absence of a reasonable likelihood of rehabilitation. The Debtors assert that their proposed plan of reorganization,[47] the post-petition purchase orders they have procured, and Mr. Rajan's testimony at Trial regarding expected revenues to be generated from new and existing Stream customers belie Hawk's narrative of a non-operating entity that has no ability to rehabilitate.[48] Moreover, the Debtors argue, the evidence does not establish substantial or continuing loss to the estates because operating expenses are being funded by VSI in exchange for Stream shares.[49]

The Debtors also argue that the evidence does not establish gross mismanagement of the estates supporting conversion or dismissal. The Debtors assert that their efforts to obtain financing from VSI to fund operations pursuant to the Debtor DIP Motion were the subject of "extreme resistance" that ultimately resulted in the Court declining to approve the financing, and that they have retained Mr. Park to provide independent oversight of the Debtors' post-petition finances and internal systems, thereby buffering management of the estates with "another layer of independence to the Debtors' management team."[50]

With respect to Hawk's argument that the Petitions were filed in bad faith, thereby providing another basis for conversion or dismissal, the Debtors argue that the cases were filed to

---

[46] Debtors Post-Trial Brief, Bankr. Docket No. 432, at 2-3.

[47] *See* Bankr. Docket No. 293.

[48] Debtors Post-Trial Brief, at 11-16.

[49] *Id*. at 17-19.

[50] *Id.* at 19-21.

provide breathing room and to develop a plan of reorganization, not as a litigation tactic solely

for purposes of staying the Section 225 Action.[51]

Just as they argue there is no basis for conversion or dismissal, the Debtors argue there is

no basis for the appointment of a trustee.  The Debtors cite Mr. Rajan's experience as a

businessman, his intimate familiarity with the Debtors' business and related technology, and the

post-petition retention of Mr. Park as reasons for finding that the Debtors' estates are better

administered by current management.[52]

### b.    The Hawk Stay Relief Motion

Hawk argues that cause exists to grant relief from stay to allow the Section 225 Action to

proceed because its resolution "will determine: (1) the amount and priority of the claims in

respect of the Hawk Notes and the SLS Notes, (2) the validity of the liens securing the Hawk

Notes and the SLS Notes, (3) the resolution of any available defense(s) to the Hawk Notes and

the SLS Notes, and (4) the requirements for any potential future conversion of the Hawk Notes –

all critical to the resolution of these Chapter 11 cases."[53]  Relying on Mr. Stastney's Trial

testimony regarding the late stage at which the Section 225 Action was when the Petitions were

filed, the expenses that had been incurred getting to that point, and the extensive discovery that

had been undertaken, Hawk argues that a quick resolution by the Delaware Chancery Court

would be efficient and conserve judicial and estate resources.

The Debtors, in response, argue that relief from stay is not warranted.  The Debtors first

argue that Hawk has failed to articulate the exact relief and specific matters that it seeks to

---

[51] *Id.* at 22-26 (arguing that "virtually none" of the factors set forth in *Primestone Inv. Partners v. Vornado PS, L.L.C. (In re Primestone Inv. Partners L.P.),* 272 B.R. 554, 557 (D.De. 2002) for analyzing whether a filing was in bad faith are present here).

[52] *Id.* at 27.

[53] Hawk Post-Trial Brief, at 62-63.

pursue in the Section 225 Action.[54]  Furthermore, they argue, the ultimate relief sought in that

action is to authorize Hawk to exercise rights under the Hawk Notes and the SLS Notes,

including pursuit of an Article 9 Sale of their purported collateral.[55]  Hawk cannot do so, the

Debtors argue, without resolution of the dispute regarding Stream's rights in connection with

ownership of 100% of Technovative shares, which are undisputedly estate property and therefore

subject to resolution by this Court rather than the Delaware Chancery Court.[56]  The Debtors

further argue that allowing the Section 225 Action to proceed would greatly prejudice the

Debtors by allowing Hawk to move forward with its plans to effectuate a sale of downstream

assets, thereby inflicting irreparable harm on the Debtors' ability to effectuate an orderly

reorganization process.  The Debtors also argue that they have strong defenses in the Section 225

Action, militating against relief.

## III.    DISCUSSION

### A.    Cause Exists and It Is In the Best Interest of Creditors and the Estates at This Stage to Appoint a Chapter 11 Trustee

#### 1.    Legal Standard for Dismissal or Conversion Under §1112(b)

Section 1112(b)(1) of the Bankruptcy Code sets forth the Court's power to convert or

dismiss a chapter 11 bankruptcy case:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or examiner is in the best interests of creditors and the estate.

11 U.S.C. §1112(b).  The movant bears the initial burden to demonstrate cause by a

---

[54] Debtors Post-Trial Brief, at 28.

[55] *Id.*

[56] *Id.* at 29.

preponderance of the evidence, and once shown, the burden shifts to the debtor to establish an

exception under §1112(b)(2).[57] *In re Dr. R.C. Samanta Roy Institute of Science Technology,* 465

Fed. Appx. 93, 96-97 (3d Cir. 2011) ("[O]nce cause is found, the burden shifts to the opposing

party to show why dismissal or conversion would not be in the best interests of the estate and the

creditors."); *In re Mann Realty Assocs.,* 2019 WL 4780937, at *6 (M.D. Pa. Sept. 30, 2019)

("After cause is established, the burden shifts to the opposing party to identify unusual

circumstances that suggest conversion would not be in the best interests of the estate and its

creditors, and that there is a reasonable likelihood that a reorganization plan will be confirmed in

a reasonable time."); *In re Vascular Access Centers, L.P.,* 611 B.R. 742, 761 (Bankr. E.D. Pa.

2020) (citing cases).

The Bankruptcy Code sets forth a non-exclusive list of circumstances that constitute

"cause" for conversion or dismissal.  11 U.S.C. §1112(b)(4).  As discussed *supra,* Hawk's Post-

Trial Brief focuses on two of these circumstances: (A) substantial or continuing loss to or

diminution of the estate and the absence of a reasonable likelihood of rehabilitation; and (B)

gross mismanagement of the estate.

A motion filed under §1112(b) necessitates a two-step analysis: (1) to determine if cause

exists to either dismiss the case or convert it to chapter 7, and (2) if so, which option is in the

best interests of creditors and the estate (unless appointment of a trustee under §1104 is in the

best interests).  *Camden Ordnance*, 245 B.R. at 798.  In considering whether to convert or

---

[57] Section 1112(b)(2) provides that the court may not convert or dismiss a case if the court finds and
identifies unusual circumstances establishing that converting or dismissing the case is not in the best
interests of creditors and the estate and the debtor or a party in interest establishes (1) there is a reasonable
likelihood a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) or,
if not applicable, within a reasonable period and (2) the grounds for converting or dismissing the case
include an act or omission of the debtor other than under paragraph (4)(A) for which there exists a
reasonable justification for the act or omission; and that will be cured within a reasonable period of time
fixed by the court.

dismiss, a bankruptcy court may consider a variety of factors, including:

(1)     whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal;

(2)     whether there would be a loss of rights granted in the case if it were dismissed rather than converted;

(3)     whether the debtor would simply file a further case upon dismissal;

(4)     the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors;

(5)     in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise;

(6)     whether any remaining issues would be better resolved outside the bankruptcy forum;

(7)     whether the estate consists of a "single asset";

(8)     whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests;

(9)     whether a plan has been confirmed and whether any property remains in the estate to be administered;

(10)    whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns; and

(11)    consideration of the effect of dismissal under §349 of the Bankruptcy Code.

*In re Ramreddy, Inc.,* 440 B.R. 103, 115 (Bankr. E.D. Pa. 2009) (citing 7 COLLIER ON

BANKRUPTCY ¶1112.04[6]).

Although §1112(b)(4)'s enumerated circumstances constituting cause are wide-ranging, a

court may consider other factors as they arise and may use its equitable powers to reach an

appropriate result in individual cases.  *In re Camden Ordnance Mfg. Co. of Arkansas, Inc.,* 245

B.R. 794, 798 (E.D. Pa. 2000) (quoting *Mechanical Maintenance, Inc.,* 128 B.R. 382, 386 (E.D.

Pa. 1991)).  For example, it is well-settled that a debtor's inability to achieve confirmation of a

plan, by itself, provides sufficient cause for dismissal or conversion of a chapter 11 case. *See, e.g., 1121 Pier Village LLC,* 635 B.R. at 137 n.14; *In re 3 Ram, Inc.,* 343 B.R. 113, 117 n.14 (Bankr. E.D. Pa. 2006).

Importantly, good faith is an implicit requirement in the filing of a chapter 11 bankruptcy case, and a case not filed in good faith is subject to dismissal under §1112(b). *See, e.g., In re SGL Carbon Corp.,* 200 F.3d 154, 160 (3d Cir. 1999) (chapter 11 petitions are subject to dismissal unless filed in good faith); *In re DCNC North Carolina I, LLC,* 407 B.R. 651, 661 (Bankr. E.D. Pa. 2009) (citing *SGL Carbon*). The debtor bears the burden of proving good faith. *Id.* (citing *In re PPI Enterprises (U.S.), Inc.,* 324 F.3d 197, 211 (3d Cir. 2003)). In the business bankruptcy context, the preservation and rehabilitation of a going concern or the maximizing of the value of a debtor's estate for the benefit of creditors through an orderly liquidation are valid bankruptcy purposes supporting a finding of good faith. *Id.* (citing *In re Integrated Telecom Express, Inc.,* 384 F.3d 108 (3d Cir. 2004)); *In re Team Systems International LLC,* 640 B.R. 296, 311 (Bankr. D. Del. 2022) ("The ultimate touchstone is whether the case is being used to accomplish one of the basic purposes of chapter 11 – to preserve a going concern and/or to maximize the property available to satisfy creditor claims."). Whether a case should be dismissed for lack of good faith is committed to the discretion of the bankruptcy court, and the determination is a fact-intensive inquiry based on the totality of the circumstances. *Id.* at 662 (citing *Integrated Telecom*). The inquiry is facilitated, however, by factors courts use, the presence of which suggests a case was not filed in good faith:

(1)    the debtor has few or no unsecured creditors;

(2)    there has been a previous bankruptcy petition by the debtor or a related entity;

(3)    the prepetition conduct of the debtor has been improper;

29

(4)    the petition effectively allows the debtor to evade court orders;

(5)    there are few debts to non-moving creditors;

(6)    the petition was filed on the eve of foreclosure;

(7)    the foreclosed property is the sole or major asset of the debtor;

(8)    the debtor has no ongoing business or employees;

(9)    there is no possibility of reorganization;

(10)    the debtor's income is not sufficient to operate;

(11)    there was no pressure from non-moving creditors;

(12)    reorganization essentially involves the resolution of a two-party dispute;

(13)    a corporate debtor was formed and received title to its major assets immediately before the petition; and

(14)    the debtor filed solely to create the automatic stay.

*Id.* (citing *In re SB Properties, Inc.,* 185 B.R. 198, 204 (E.D. Pa. 1995)).

As discussed *supra,* the preservation and rehabilitation of a going concern is a valid bankruptcy purpose supporting a finding of good faith, and the determination of whether a case should be dismissed for lack of good faith is a fact-intensive inquiry based on the totality of circumstances.

>    **2.    It Has Been Established by a Preponderance of the Evidence and the History of These Cases that Current Management's Actions and Inactions Constitute Gross Mismanagement of the Estates**

Section 1112(b)(4)(B) provides that cause for conversion or dismissal exists where there has been gross mismanagement of the estate. 11 U.S.C. §1112(b)(4)(B). A debtor-in-possession owes a fiduciary duty to its creditors, and gross mismanagement is a breach of that duty. *In re Ozcelebi,* 639 B.R. 365, 388 (Bankr. S.D. Tex. 2022). Section 1112(b)(4)(B) focuses on the conduct of the *estate's* affairs, not the pre-petition debtor's, and requires that the mismanagement

be gross in character, meaning that it is "'glaringly noticeable usually because of inexcusable

badness or objectionableness.'"  *In re 210 West Liberty Holdings, LLC,* 2009 WL 1522047, at \*5

(Bankr. N.D. W.Va. May 29, 2009) (citing *Webster's Ninth New Collegiate Dictionary* 538

(1991)); see also *Ozcelebi,* 639 B.R. at 388 ("[W]hile 'gross mismanagement' is not defined by

the Bankruptcy Code, Black's Law Dictionary defines 'gross' as 'beyond all reasonable

measure; flagrant.' Given the plain language, a debtor's mismanagement must be beyond all

reasonable measure.").

The above summary outlining the major activity in these cases, which have been pending

for months, evidences the acrimony and overall lack of progress that has plagued these cases

from their inception.  Rather than moving expeditiously toward confirmation of a

reorganizational plan that addresses creditor claims and formulates the Debtors' operations

moving forward, these cases have stalled at virtually every turn.  The Court has expressed its

concern with the cases' lack of progress and direction on multiple occasions.  Furthermore, the

evidence at Trial on the pending motions crystalized the Court's primary and urgent concern

with the administration of the Debtors' cases to date, *i.e.,* the plans, trustworthiness, and

motivations of Mr. Rajan in his role as, for all intents and purposes, the singular figure in the

Debtors' management.  There are many examples, large and small, that highlight (a) the Court's

lack of faith in Mr. Rajan's ability or willingness to act consistent with the fiduciary duties the

Debtors owe their creditors and the Court, (b) the relatively directionless nature of these cases to

date, and (c) the entrenched acrimony between the Debtors, Hawk, SLS, and SeeCubic that has

permeated the cases and driven nearly all activity to date.  The Court discusses the most glaring

examples below.

a.    **All Indications Are That the Purported $300 Million
Transaction with Zhongsheng Was Not Real**

From the early days of these cases, the Court repeatedly raised concerns about how the

Debtors were being funded.  Although the Debtors attempted to answer that question in part with

an ill-conceived emergency financing through the sale of stock to VSI, they later proposed a

$300 million transaction for the sale of Stream Class A stock to Zhongsheng.  That transaction

was suspect from the start given its timing on the eve of Trial, lack of detail, and non-binding

nature, but the dearth and opacity of information the Debtors provided about it at Trial when

pressed, together with their abandonment of the proposed transaction, leads this Court to believe

it never truly existed, and either embellished or fabricated to portray the Debtors' cases and

operations as sufficiently progressing.

 The Debtors filed the purported Zhongsheng Term Sheet on the evening of June 23, i.e.,

the Friday prior to the start of the Trial on the pending Hawk Motions.[58]  That term sheet, which

states that it is non-binding, provides that Zhongsheng will invest $300 million in exchange for

Class A Common Stock in Stream, resulting in Zhongsheng holding a 35% equity stake in

Stream.[59]  Attached to the Term Sheet was a draft Subscription Agreement providing for

Zhongsheng's purchase of the Stream shares, with an initial $15 million tranche to be sold by an

unspecified date in July 2023, and the balance of the sale to occur by December 31, 2023.

According to the Debtors, they intended to use the first $30 million received from the sale of

---

[58] The Term Sheet was filed as an attachment to a two-page pleading styled as an amendment to the Stock
Sale Motion.  Incredibly to the Court, the Debtors stated their position therein that they believed the relief
sought by the Stock Sale Motion was broad enough to cover the sale of $300 million in Stream shares to
Zhongsheng, but were filing the amendment out of an abundance of caution.  The Court questions
whether the post-petition sale of $300 million in equity in a debtor could ever be covered under an
ordinary course of business concept, but it is enough to say that it certainly is not here.

[59] *See* Bankr. Docket No. 258-1.

Stream's Class A shares to fund their operations through confirmation.  As such, the Zhongsheng transaction was to fund the Debtors through the issuance of Stream securities rather than the incurrence of debt.

The authenticity of this transaction, however, quickly began to grow murky, particularly in light of the amount of the purported investment and its importance to the Debtors' cases.  Mr. Park testified at Trial less than a week later, on June 29, that he understood Zhongsheng to be a publicly traded entity on Hong Kong's Hang Seng Index, involved in the high-end auto dealership business but with a finance arm as well.[60]  Mr. Park wanted to make clear, however, that he was not involved in any negotiations with Zhongsheng related to the Term Sheet, despite serving as CFO and being tasked with raising capital for the Debtors.  Instead, the negotiations were handled by Mr. Rajan, and Mr. Park had not discussed the proposed deal with Mr. Rajan notwithstanding its enormous size and implications for the Debtors' finances.[61]

Following Mr. Park's testimony, Hawk sought more information about the Zhongsheng Term Sheet through discovery, and ultimately filed a motion to compel the Debtors to produce information sufficient to permit Hawk to depose a Zhongsheng representative about the purported transaction (the "Motion to Compel").[62]  By the Motion to Compel, Hawk made clear that it sought the information in order to, among other things, "evaluate the veracity of the Term Sheet."[63]  Although the Court denied the Motion to Compel, it entered an order (the "Discovery

---

[60] June 29, 2020 Hearing Transcript, 55:5 to 55:15.

[61] *Id.* at 55:21 to 56:9.  The idea that Mr. Park, as CFO, would not even discuss the proposed deal with Mr. Rajan, let alone be involved in the negotiations, is indicative of its specious nature, or otherwise speaks to the marginal role Mr. Park plays with the Debtors despite Mr. Rajan being their only other employee.

[62] CR-242.

[63] *See* Motion to Compel, at ¶17.

Order")[64] directing the Debtors to produce contact information for the individuals at Zhongsheng who negotiated the Zhongsheng Term Sheet, as well as documents and communications with Zhongsheng or any affiliate of Zhongsheng "including but not limited to letters of intent, proposals, and diligence materials between the Debtors and Zhongsheng Group Holdings Ltd. or any affiliate thereof."  After the Discovery Order was entered, Mr. Rajan submitted a Declaration in support of the legitimacy of the Zhongsheng Term Sheet (the "Zhongsheng Declaration").[65]  It is unnecessary to fully summarize the Zhongsheng Declaration, but in it Mr. Rajan states, *inter alia,* that (a) the Zhongsheng Term Sheet was the product of negotiations with William Wang and Tea Lee, both of Zhongzhi Enterprise Group ("ZEG"), an affiliate of Zhongsheng, and (b) contrary to Mr. Park's testimony, the Zhongsheng entity that is party to the Zhongsheng Term Sheet is a privately held company of the People's Republic of China, and is not the Zhongsheng entity publicly traded on the Hong Kong stock exchange.[66]

What came next was a motion by Hawk to hold the Debtors in contempt for failing to produce the information and documents required by the Discovery Order (the "Contempt Motion").[67]  Hawk alleged in the Contempt Motion that the Debtors only produced business cards in Mandarin for William Wang and Tea Lee, and that of the 4,300 pages of mostly unresponsive documents produced, only one document related to the Zhongsheng Term Sheet: a mobile phone or tablet screenshot of the Term Sheet's signature block, purportedly signed by Tea Lee on behalf of Zhongsheng, which was emailed from Jeff Shammah ("Mr. Shammah") of

---

[64] Bankr. Docket No. 322.

[65] CR-237.

[66] Although the Declaration is not entirely clear, the Court reads it to say that both the publicly-traded Zhongsheng and the privately-held Zhongsheng are affiliates of ZEG.

[67] Bankr. Docket No. 328.

Blue Ocean Partners Ltd.[68] to a Mark Savarese,[69] who then forwarded it to Mr. Rajan. Hawk argued that the Debtors' failure to produce any communications or other documents related to the Zhongsheng Term Sheet violated the Discovery Order and the Debtors' obligations under the federal discovery rules. The Court heard the Contempt Motion at the start of the continued Trial on August 15, but took the matter under advisement in order to proceed with evidence.[70]

Mr. Rajan testified in August at the continued Trial that the Zhongsheng Term Sheet evolved from a November 2022 term sheet Zhongsheng had entered into with VSI, and that once Stream filed for bankruptcy the parties simply agreed to revise the agreement to make Stream, rather than VSI, the counterparty.[71] During his cross-examination in September, however, Mr. Rajan was pressed on the legitimacy of the Zhongsheng Term Sheet. The Court found his testimony regarding his dealings with Zhongsheng difficult to believe. For example:

- Although Mr. Rajan had stated on direct examination in August that he was meeting with William Wang in Boston that weekend to work on the Zhongsheng transaction,[72] by his cross-examination in September he testified that Zhongsheng's trip was delayed and would be occurring in October.[73] Mr. Rajan gave no explanation for why the trip was delayed, and admitted he did not ask anyone from Zhongsheng to testify in support of the transaction's authenticity. In

---

[68] Mr. Rajan testified that the Debtors retained Mr. Shammah, an investment banker, post-petition to negotiate the transaction with Zhongsheng, but acknowledged that no court approval for the retention was sought or granted. *See* September 25, 2023 Hearing Transcript, at 32:17 to 33:12.

[69] As will be discussed *infra,* Mr. Savarese evidently holds a role with VSI, but none with the Debtors of which the Court has been made aware.

[70] Bankr. Docket No. 354.

[71] See August 17, 2023 Hearing Transcript, at 88:4 to 95:20; 99:25 to 100:7.

[72] *Id.* at 101:9 to 101:22.

[73] September 25, 2023 Hearing Transcript, at 60:13 to 60:23.

light of the questions Hawk was raising and the enormous amount of capital to be infused into Stream under the proposed transaction, the Court finds it incredible that Mr. Rajan would not (a) dig deeper into why Zhongsheng would was not able to negotiate the transaction in August 2023, whether in Boston or otherwise, and (b) at least request that a representative of Zhongsheng or ZEG testify at Trial in support of the transaction.[74]

- WeChat messages were the only documentation Mr. Rajan had supporting his claim that William Wang and Tea Lee, as purported employees of ZEG, were nonetheless authorized to negotiate a $300 million deal on behalf of Zhongsheng.[75]

- Mr. Rajan confirmed his testimony given on direct examination that Zhongsheng's preferred method of communication was WeChat, but when pressed as to why no WeChat messages were produced evidencing those communications, Mr. Rajan hedged, testifying that he "[didn't] know if it was WeChat or if it was photographs and those various programs."[76]

- When asked whether he had received any financial information from Zhongsheng, Mr. Rajan responded that he wasn't sure and would have to "go back and check," but acknowledged that as of his deposition on August 14 he had not received any financial information from Zhongsheng, did not know its gross revenues, did not

---

[74] The Debtors gave no reason why a purported $300 million transaction could only be negotiated in-person in Boston and only at some uncertain date in the future, nor why it would be too much to ask a Zhongsheng or ZEG representative to travel to the United States to testify.

[75] Presumably these are the same WeChat messages attached to his Zhongsheng Declaration.

[76] September 25, 2023 Heating Transcript, at 74:21 to 75:17.

know how many auto dealerships it operated, or even what make of car it sold.[77]

- Mr. Rajan was pressed on his statements in the Zhongsheng Declaration that the privately-held Zhongsheng entity that signed the Term Sheet is distinct from the publicly-traded Zhongsheng entity.  When asked for an explanation as to why the same address in Dalian, China was given by both the publicly-traded entity in its 2021 Annual Report[78] for its corporate headquarters and by the privately-held entity in the Zhongsheng Term Sheet for its principal place of business, Mr. Rajan provided a convoluted response that provided no explanation at all.[79]

- Notwithstanding the enormity of the proposed transaction, which would infuse $300 million of funding into Stream for a 35% stake in the company, Mr. Rajan disclaimed its importance to the Debtors, testifying in September that funding is now not needed to implement the Debtors' proposed plan because Stream was receiving financing from VSI instead.[80]

The Court finds the entire picture that Mr. Rajan painted of the Zhongsheng transaction to be not credible.  The Court finds the almost complete lack of documentation and communications related to a purported $300 million transaction to be most damning and suggests

---

[77] *Id.* at 70:2 to 72:9.

[78] *See* CR-254 (page 2).

[79] September 25, 2023 Hearing Transcript, 146:14 to 147:8 ("The way it works in China is if you want to do business in China, you need a company in China where you do all your operations.  And what Stream TV believes from its understanding, is some of the shares from the China company were put into a Hong Kong company, traded on the Hong Kong Exchange.  The Hong Kong Exchange company is just a holding company, and Zhongsheng has shares and investments in the private company and no liquidity because they don't have no shares in the Hong Kong company.  They wanted shares in Stream TV, because we have all these POs, on the hope that we could eventually get Zhongsheng some liquidity. They're two separate companies.").  The Court finds this response to be non-responsive and, in the context of the question asked, largely nonsensical.

[80] September 25, 2023 Hearing Transcript, at 191:22 to 192:2.

that the transaction was not real.  In light of that lack of documentation, and Hawk putting the

Debtors on notice in the Motion to Compel (if not earlier) that it questioned the existence of an

actual deal with Zhongsheng, it was incumbent upon the Debtors to substantiate the transaction's

existence and legitimacy.  Moreover, if the Zhongsheng transaction was both legitimate and

intended, even as an alternate source of funding, the Court concludes that the Debtors would or

should have viewed it as being of the utmost importance to have someone other than Mr. Rajan,

whether an individual from Zhongsheng, Mr. Shammah, or someone else, testify in support of its

authenticity.  They did not, and the Court finds Mr. Rajan's testimony was not believable and

was instead suggestive that the transaction was never real to begin with.[81]

The Court views this as an enormous problem for the Debtors.  Particularly in a case

where funding for the Debtors has been a stated concern from the outset, the Court's trust in the

Debtors' management was severely undermined both by their failure to satisfactorily substantiate

the Zhongsheng transaction after submitting it to the Court, and their willingness to walk away

from it after its bona fides came into doubt.[82]

> **b.    The Debtors' Self-Imposed April Funding Crisis Nearly Left
> SCBV's Payroll Unfunded**

Early in these cases, the Debtors' management created a funding fiasco that greatly

---

[81] The Court notes, anecdotally, that despite the authenticity of the Zhongsheng transaction being the
subject of motion practice, hearings, and a significant portion of Mr. Rajan's trial testimony, the Debtors'
Post-Trial Brief does not address the transaction at all, let alone why the evidence supports a finding that
it was legitimate.

[82] On this, the Court agrees with Hawk's point in its Reply Brief that the logic of the alternative funding
from VSI under the Debtors' proposed plan is difficult to square if the Zhongsheng transaction was real:
"In other words, instead of waiting a few weeks for an investor to allegedly provide a $300 million
investment for only a 35% share of the company, Mr. Rajan has opted to pursue an investment from his
other company, VSI of $25 million (*i.e.,* nearly 1/10[th] that amount) for a 90% share of the company (*i.e.,*
nearly three times the equity share).  In other words, if the Zhongsheng Term Sheet is genuine, Mr. Rajan
has robbed these Debtors and their estates of $736.4 million in order to ensure that his other company,
VSI, obtains voting control over the Debtors."  Hawk Post-Trial Reply Brief, at §B.5.

diminished the Court's confidence in Mr. Rajan's ability to guide the Debtors successfully in bankruptcy, and as importantly, in his ability to do so given his interest in and role with VSI.

Stream's Schedule A/B disclosed $2,362.50 in cash on hand as of the date its Petition was filed.[83]  The Debtors did not file a financing motion at the time their Petitions were filed, nor in the weeks thereafter.  The issue of how the Debtors were funding their cases was raised from an early stage by Hawk, and by no later than April 14, the Court raised the issue with the Debtors in light of the fact that April payroll was coming due for SCBV by the end of the month.[84]  At that time, the Court was advised that the Debtors had the means to fund their estates at a rate of at least $250,000 per month with cash from VSI, and that they would "have the appropriate documentation on file when we know how much money we actually need to do it."[85]  The Court advised the Debtors, given that §364(b) requires a motion and a hearing for debtor-in-possession financing, that "somebody needs to do something" to obtain funding for April payroll.[86]

On April 21, *i.e.,* one week after the Court raised its concerns as to case funding, the Debtors filed the expedited Stock Sale Motion.  The motion sought, among other things, authority to engage in what the Debtors asserted was the ordinary course sale of unissued Stream stock to VSI on an as-needed basis to fund their business operations.  In connection with that request for authority, the Debtors also sought authority to enter into a stock purchase agreement with VSI for the sale of up to $10 million in Stream stock.  According to the Debtors, they routinely sold shares of stock pre-petition to fund operations, and therefore did not need authority from the Court to do so post-petition, but did so "out of an abundance of caution to

---

[83] *See* Bankr. Docket No. 52.

[84] *See* April 14, 2023 Hearing Transcript, at 145:9 to 145:15; 163:2 to 163:6.

[85] *Id.* at 164:12 to 166:5.

[86] *Id.* at 173:5 to 173:10.

ensure their ability to continue selling and issuing new shares in Stream consistent with its pre-bankruptcy practices in order to bring valuable and necessary funds into these chapter 11 cases."[87]

Given what it understood to be a funding crisis with respect to payroll obligations at the SCBV level due on April 25, the Court heard the Stock Sale Motion on an emergency basis on April 24. It was clear to the Court from the outset, as the Court advised the Debtors on the record at the hearing, that the circumstances creating a funding crisis with respect to the SCBV payroll was a self-created emergency, was foreseeable at the time the Petitions were filed, and should have been the subject of a first-day motion, rather than a motion filed days before payroll was coming due and packaged with a request for expedited approval of matters entirely irrelevant to funding SCBV and independent contracor payroll.[88] Moreover, as the Court expressed at the hearing, the Debtors were only advising the Court for the first time on an emergency basis that they were proposing to sell shares to VSI to fund their post-petition operations, which the Court was not going to approve on an expedited basis.[89]

At that point in the April 24 hearing, the Debtors pivoted on-the-fly, seeking approval for emergency debtor-in-possession financing from VSI.[90] It was unclear, however, whether VSI even had sufficient funds to cover the payroll-related amounts.[91] Meanwhile, SeeCubic advised the Court that it was willing to fund the SCBV payroll under a pre-petition facility used to fund

---

[87] Stock Sale Motion, at ¶56.

[88] See April 24, 2023 Hearing Transcript, 6:19 to 6:25; 22:16 to 23:6.

[89] *Id.* at 38:23 to 39:3; 40:1 to 40:7.

[90] This was done only after the Debtors suggested the payroll be funded with money they were holding from pre-petition subscription agreements, which upon the Court's inquiry, was revealed to be funds not reported in the Debtors' filed Schedules. *Id.* at 43:5 to 44:5.

[91] *Id.* at 55:19 to 56:1; 57:11 to 57:16.

SCBV while the Receiver was in place.[92]  The Court concluded that it was not going to choose

between the two alternatives without evidence, and expressed concern over whether the Debtors

were even the entity that had an obligation to fund SCBV's payroll in the first place.[93]  The

Court therefore required the Debtors to file a financing motion by the end of the day with the

proposed terms, and allowed SeeCubic to file a proposed alternative financing, both of which

would be considered at an emergency evidentiary hearing the following day.

     The Debtors filed their financing motion the following morning (the "Debtor DIP

Motion"),[94] and SeeCubic filed its motion for approval of alternative funding (the "Seecubic

Alternative Funding Motion").[95]  The Debtor DIP Motion sought authority either for (a) the

Debtors to borrow approximately €872,000 from VSI on an unsecured basis to fund SCBV

payroll obligations or, alternatively, (b) VSI's issuance of one or more unsecured senior

promissory notes to SCBV directly, with either option being in exchange for Stream's entry into

the Distribution Agreement with VSI, whereby VSI would accept orders and make delivery of

Stream's products to customers and retain a 10% margin.  The SeeCubic Alternative Funding

Motion proposed to fund SCBV's payroll obligations with a loan directly to SCBV under the

pre-existing unsecured facility with SeeCubic, or alternatively, with an unsecured loan to the

Debtors for the purpose of funding the SCBV payroll obligations.

     The Court held a lengthy emergency evidentiary hearing on the alternative proposals later

that day, at which Mr. Rajan testified on behalf of the Debtors and Mr. Stastney testified on

behalf of SeeCubic.  Indicative of the Court's chief concern with the Debtors' proposal to obtain

---

[92] *Id.* at 66:18 to 67:13.

[93] *Id.* at 80:23 to 81:2.

[94] Bankr. Docket No. 156.

[95] Bankr. Docket No. 155.

financing from VSI, Mr. Rajan was also purporting to testify on behalf of VSI.[96]  Although the
Debtors ultimately withdrew Mr. Rajan as a representative of VSI when the Court questioned
how that could be, Mr. Rajan's dual role was indicative of the Court's trouble with the Debtors'
emergency financing proposal:  the evidence at the hearing made clear to the Court that the
proposal to have the Debtors incur $1 million in post-petition administrative debt to VSI was not
only unnecessary given the availability of approximately €700,000 in funding directly from
SeeCubic to non-debtor SCBV, but was also fatally flawed because Mr. Rajan was on both sides
of the proposed transaction.[97]  As such, the Court denied the Debtor DIP Motion.  With respect
to the SeeCubic Alternative Funding Motion, because SCBV was a non-debtor foreign company,
the Court held that it could not direct SCBV to borrow from SeeCubic, but also would not
approve an alternative debt financing from SeeCubic to the Debtors to fund payroll because the
incurrence of such debt by the estates was unnecessary given the availability of the existing
SeeCubic facility directly with SCBV.  The Court made clear to Mr. Rajan, however, that his
fiduciary duties to the Debtors, their estates, and SCBV were implicated by the funding crisis,
and recommended that he act consistent with them in approving SCBV's borrowing from
SeeCubic under the pre-existing facility.[98]

   The funding crisis in April was entirely of Debtors' management's own making.  As the
Court observed on multiple occasions during the April 24 and 25 hearings, the Debtors knew
when they filed their petitions that SCBV payroll would need to be funded in April.  They did
not file a traditional financing motion at any point in the first month the cases were pending, and

---

[96] April 25, 2023 Hearing Transcript, at 52:14 to 54:9.

[97] *Id.* at 248:12 to 248:25.

[98] *Id.* at 253:15-17.

inexplicably waited until just days before the SCBV payroll was coming due to seek authority for what they asserted was the ordinary course sale of $10 million in Stream shares to an entity owned by Mr. Rajan, while also seeking other relief that was entirely unrelated to the funding crisis.  When the Court made clear that no such transaction would be approved absent a full opportunity for all parties and the Court to vet it, the Debtors proposed an insider financing transaction with no notice to other parties in interest.  This necessitated an eleventh hour, full-day hearing, only for the Court to conclude that there was no need for the financing at all.  Particularly given the Debtors' acknowledgement in seeking such relief of the value SCBV holds and the calamitous effect its employees leaving would have, this funding crisis is further evidence that the Debtors' management, and specifically Mr. Rajan, cannot be entrusted with the management of the Debtors' estates.

> **c.    The Debtors Have Financed their Post-Petition Operations by the Transfer of Stream Shares to VSI Without Adequate Disclosure or Court Permission**

At the April 24 hearing on the Stock Sale Motion, given that the Debtors proposed to fund their cases through the sale of Stream shares to VSI, the Court expressly asked whether the Debtors had done so post-petition.  The Court was advised that they had not, and were waiting for Court permission to do so.[99]  In fact, counsel for the Debtors acknowledged that "[W]e're coming to you because we know that there are grave consequences to not getting permission from the court.  So even when things are in the ordinary course people come to get permission, and that's what we did."[100]  As discussed *supra,* the Court did not give that permission.

---

[99] See April 24, 2023 Hearing Transcript, at 28:10 to 28:15.

[100] *Id.* at 31:22 to 32:1.

Without approval of the Stock Sale Motion, and with no revenue and no financing, how the Debtors were funding their cases and operations remained opaque to the Court.  It became more clear, however, with Mr. Rajan's testimony at Trial.  Mr. Rajan testified that VSI had been paying all expenses of the Debtors since the inception of their bankruptcy cases, in exchange for shares in Stream.[101]  According to Mr. Rajan, Stream had been issuing shares to VSI every week or two since the Debtors' Petitions were filed.[102]  In connection therewith, the Debtors had pre-petition subscription agreements with VSI, but also had entered into new, post-petition agreements.[103]  Mr. Rajan was not sure how many Stream shares had been issued to VSI since the filings, but believed all were pursuant to pre-petition, rather than post-petition, subscription agreements.[104]  Mr. Rajan was aware there was a motion pending by which the Debtors were seeking approval of post-petition subscription agreements the Debtors had already entered into with VSI, but claimed to not be sure if the post-petition subscription agreements were related to VSI's proposed role as plan sponsor or were the agreements proposed pursuant to the pending motion.[105]

As of Mr. Rajan's testimony in August, neither VSI's funding of the Debtors' post-petition operations nor the post-petition issuance of shares to VSI, whether pursuant to pre- or post-petition subscription agreements, had been disclosed in the Stream's monthly operating reports or otherwise.[106]  Mr. Rajan claimed that the failure to make these disclosures was an

---

[101] August 17, 2023 Hearing Transcript, at 205:21 to 206:1.

[102] *Id.* at 212:25 to 213:3.

[103] *Id.* at 206:2 to 206:8.

[104] *Id.* at 206:12 to 207:1.

[105] *Id.* at 246:19 to 247:2.

[106] *See* Bankr. Docket Nos. 224, 253, 300 (April, May, and June 2023 Monthly Operating Reports); August 17, 2023 Hearing Transcript, at 219:9 to 219:24; 224:6 to 224:13.

oversight due to his hospitalization, and would be corrected promptly, but as of his testimony at Trial in late September, no such corrections had been made.[107]

The Court found Mr. Rajan's testimony regarding the Debtors' post-petition issuance of shares to VSI to be evasive, and as a result, untrustworthy.[108]   Mr. Rajan was pressed on whether VSI had been issued shares pursuant to post-petition subscription agreements,  and was shown his deposition testimony stating that Stream was issuing new shares to VSI every two weeks or so pursuant to post-petition subscription agreements.[109]   In response, Mr. Rajan asserted he was talking about pre-petition subscription agreements.[110]   This is not believable and is belied by his testimony.  Mr. Rajan admitted he attended the April hearing where representations were made to the Court that Stream shares were not being issued to VSI post-petition, but he nonetheless allowed Stream to do so.  Mr. Rajan cannot fall back on a supposed belief that all shares issued were pursuant to pre-petition subscription agreements, because even if that was authorized or did not require authorization, he could not say with certainty that this is, in fact, what had happened. Moreover, his failure to promptly amend the Debtors' monthly operating reports to reflect both VSI's post-petition funding of the Debtors' operations and the issuance of shares to VSI is unacceptable and was without any legitimate excuse.[111]   This casual approach to what was clearly a highlighted concern of the Court at the outset of the case is further evidence that Mr. Rajan has administered these estates with an eye towards what he personally wants to

---

[107] See September 25, 2023 Hearing Transcript, at 14:12 to 15:12.

[108] *See, e.g.,* August 17, 2023 Hearing Transcript, at 252:4 to 252:11; 253:23 to 254:4.

[109] *See* CR-231, at 140:10 to 141:13.

[110] August 17, 2023 Hearing Transcript, at 254:6 to 254:17.

[111] Given the Debtors' proposed retention of Mr. Park dating back to May 2023, Mr. Rajan's hospitalization in June and July cannot serve as a basis for failing to amend the Debtors' schedules by late September.

accomplish and disclose, rather than acting consistent with his obligations to the Court and the

estates' creditors.

><br>
>**d.**     **The Debtors Have Proposed Certain Major Transactions in these Cases Benefitting VSI without Clear Benefit to the Debtors or the Estates**

The Court has had concerns nearly from the inception of these cases about the

relationship between the Debtors and VSI, given Mr. Rajan's overlapping roles.  Certain

transactions the Debtors have proposed have only reinforced that concern.  As discussed *supra,*

the proposed funding transaction with VSI in April would have unnecessarily either issued

Stream equity to VSI or created $1 million of administrative debt to VSI.  It was therefore

denied.  The unauthorized post-petition issuance of shares in Stream to VSI also raises serious

questions about the administration of these cases for the benefit of VSI.  These, however, were

not the only instances where the Court's trust in the Debtor's management has deteriorated in

light of transactions the Debtors have proposed either at the eleventh hour or under cover of

more innocuous requests for relief that seem to benefit VSI without justification.

><br>
>**i.**     **The Distribution Agreement**

A central feature of the Stock Sale Motion, and subsequently the Debtor DIP Motion, that

created serious questions about how and for whose benefit these cases are being administered

was the request for approval of the Distribution Agreement to be given to VSI, purportedly in

exchange for its financial support in funding the Debtors' product development and supply chain.

As stated in the Stock Sale Motion, under the agreement, VSI "will accept orders from and make

delivery to third-party customers … VSI will then issue back-to-back purchase orders to Stream

for 90% of the value of those third-party orders, retaining a 10% margin for funding technical,

business, and sales development.  In essence, VSI will act as a distributor for Stream to these

customers."[112]  This was not the first time, however, that the Court was hearing about the

proposed Distribution Agreement.  In a declaration filed in support of the Debtors' Stay

Enforcement Motion, filed on April 13 (the "Stay Enforcement Declaration"),[113] Mr. Rajan

disclosed VSI's willingness to fund the Debtors' post-petition operations in exchange for the

Distribution Agreement.[114]  At a hearing on April 14 on the Stay Enforcement Motion, the Court

questioned why the Debtors need a distributor for their product.  However, the Distribution

Agreement was not the focus of that hearing, which, as discussed *supra,* was largely the urgent

need for the Debtors' to fund their cases.

 In response to the Court's admonition at that hearing to the Debtors that funding needed

to be procured, the Debtors filed the Stock Sale Motion a week later, and it was there that they

sought (on an expedited basis) approval of the Distribution Agreement.  The agreement was then

the subject of Mr. Rajan's testimony at the hearing on the Debtor DIP Motion on April 25.  Mr.

Rajan was asked directly whether the Distribution Agreement was part of the compensation VSI

was to receive for providing post-petition funding to the Debtors.[115]  Mr. Rajan evaded,

responding that the Distribution Agreement "is an aspirational hope.  The Court has to – we

submitted it for approval to the Court."[116]  Only upon the Court's inquiry did Mr. Rajan affirm

that the Distribution Agreement was part of VSI's proposed compensation to fund the Debtors.

---

[112] See Stock Sale Motion at ¶¶25, 26 (internal paragraph numbering omitted).  The motion goes on to represent that "In addition to financial support, VSI will assist Debtors with productization of electronics, an area in which Stream needs support.  VSI will also assist Debtors with translating computer software and hardware code, designing chips for use in end-user products, and supporting Debtors' customers with integration of those chips into end-user products."  *Id.* at ¶27.

[113] Bankr. Docket No. 114-1.

[114] Bankr. Docket No. 114-1, at ¶12.

[115] April 25, 2023 Hearing Transcript, at 93:11 to 93:13.

[116] *Id.* at 93:14 to 93:16.

Notwithstanding that the Debtors ultimately filed the motion seeking approval of the Distribution Agreement, the Court found the way it was done disconcerting. The agreement was disclosed in a declaration from Mr. Rajan in support of the Stay Enforcement Motion, wholly unrelated to the Debtors' funding proposal. Only when the Court questioned its necessity was the Stock Sale Motion filed, which sought the agreement's approval on an expedited basis. When that relief was denied, the Debtors pivoted to include it in the Debtor DIP Motion. At no point during Mr. Rajan's testimony in connection with that motion did the Debtors present a cogent business justification for VSI acting as a distributor of the Debtors' product for a 10% share of the sales. In the end, the Court was left with the distinct impression that the Debtors sought to enter into the Distribution Agreement while attracting little attention to it, and once attention was drawn, failed to have a compelling reason for allowing VSI to benefit from the Debtors' product sales. The Debtors argue that the Distribution Agreement is "beneficial to the Estates because VSI can provide support to the Debtors in terms of funding, customer contracts, technical know-how in the areas of electronic productization, translating computer software and hardware code, designing chips for use in end-user products, and integration of those chips into end-user products."[117] They cite to a portion of Mr. Rajan's Trial testimony that does not touch on any of those supposed benefits, but even if it did, the Court is troubled by (a) the Debtors' failure to explain why VSI's proposed financing was not subject to a note with market-rate interest, rather than a significant cut of the Debtors' product sales, and (b) the Debtors seeking approval of the agreement on an expedited basis and in a landscape where other emergencies the Debtors had created were the focus of the Court and other interested parties.

---

[117] Debtors' Post-Trial Brief, at ¶27.

### ii.    The Licensing Covenant

The Court also has concerns regarding the Debtors' post-petition Licensing Covenant with Rembrandt, entered into post-petition in August.[118]  Pursuant to the Licensing Covenant, Rembrandt agreed that it would not issue a license to the Rembrandt IP (a defined term) to Hawk, SeeCubic, Mr. Stastney, or a host of related entities and parties.  The Court understands the Debtors' desire for such an agreement, given those parties' adversarial relationship with the Debtors' and their competing interests.  Importantly, however, it also bars the licensing of the Rembrandt IP to any current or former subsidiary of Stream as well.[119]  In exchange, Stream and VSI[120] agreed to pay Rembrandt $3.6 million, payable in several installments.[121]  The Licensing Covenant addressed Stream and VSI's motivation to enter into it: "[T]he VSI Parties want the plan for reorganization to have an optimal chance of success and to ensure that it is clear that the VSI Parties will have the sole right to commercialize the technology and products developed by Stream among the lenders, creditors and shareholders of Stream … [T]he VSI Parties would like to enter into a Licensing Covenant with Rembrandt to prevent certain lenders, creditors, and shareholders of Stream [from] attempting to commercialize the technology and products developed by Stream."[122]

---

[118] CR-222.

[119] Licensing Covenant, at §B.2.

[120] Reinforcing their lock-step alliance under the Licensing Covenant and the interrelationship between them, Stream and VSI are defined together under the agreement as the VSI Parties.

[121] *Id.* at §C.2.  Those installments were to commence on September 1, 2023.  At Trial, Mr. Rajan confirmed that Stream and VSI are jointly and severally liable for the payments under the Licensing Covenant.  Stream and VSI also agreed to an increase in the number of units Rembrandt can obtain.  *Id.* at §D.1 to D.3.

[122] *Id.* at fifth, sixth Whereas clauses.

The Court recognizes VSI's proposed role as plan sponsor, and as Mr. Rajan acknowledged during his testimony, if the Debtors' proposed plan is confirmed VSI will own 90% of Stream's equity.[123]  The Court is nonetheless alarmed about the propriety and motivations of Stream entering into a post-petition transaction that is intended, at least in large part, to protect VSI's interest in Stream's technology and products, while at the same time expressly barring Rembrandt from issuing a license to any of Stream's subsidiaries.  The Licensing Agreement completely aligns Stream and VSI with respect to licensing the technology of Rembrandt, to the exclusion of, *inter alia,* Stream's subsidiaries.  While Mr. Rajan may assert that the purpose of the Licensing Covenant is "stopping the use of our technology by companies who do not own our technology, specifically SeeCubic of Delaware, to stop the use of our technology to compete against us,"[124] the Licensing Covenant goes beyond that, precluding the issuance of a license to any Stream subsidiary notwithstanding the possibility that there may be a business reason for doing so at some point in the future.[125]  Rather than simply preventing SeeCubic from competing with the Debtors, the Licensing Covenant benefits a non-debtor insider third-party while requiring the Debtors to make significant post-petition payments to Rembrandt.  Moreover, not only did Mr. Rajan confirm that Stream is jointly and severally liable for the payments under the Licensing Covenant,[126] but as Hawk notes, the obligation to make payments under the Licensing Covenant is not conditioned on confirmation of the proposed plan, and in fact the agreement contemplates its effectiveness even if a plan is not confirmed.[127]

---

[123] September 25, 2023 Hearing Transcript, at 51:10 to 51:12.

[124] *Id.* at 51:1 to 51:5.

[125] As Hawk argues, the Licensing Covenant limits the potential avenues to capitalize on the Debtors' assets by foreclosing the issuance of a license to a downstream subsidiary.  Hawk Post-Trial Brief, at 50.

[126] *Id.* at 41:8 to 41:10.

[127] Licensing Covenant, at §C.5.

Each of these transactions have had the taint of benefit to VSI without clear benefit to the

Debtors and their estates.  Where Mr. Rajan stands on both sides of those transactions, they only

add to the Court's conclusion that he has breached his fiduciary duties in proposing them without

being able to articulate how they are a reasonable exercise of his business judgment.

> **e.      There Has Been Little to Substantiate Mr. Rajan's Claims of Hundreds of Millions of Dollars in Nascent Purchase Orders Coming to Stream**

From the outset, Mr. Rajan has been touting the numerous deals and purchase orders the

Debtors are on the verge of obtaining.  Like the Zhongsheng transaction, however, there has been

precious little evidence, other than Mr. Rajan's self-serving testimony, offered to verify the

existence of these deals, or even the negotiation of such deals.  After listening to Mr. Rajan's

testimony, and having almost no other evidence against which to measure the veracity of his

claims, the Court was left with the firm impression that Mr. Rajan was engaging in hyperbole at

best, or fabrication at worst, in testifying regarding Stream being on the verge of obtaining

customer commitments worth hundreds of millions of dollars.

> **i.      The VSI Purchase Orders Were Not Substantiated by Anything Other than Mr. Rajan's Testimony**

On April 13, the Debtors filed Mr. Rajan's Stay Enforcement Declaration, in which he

represented that Stream had secured two post-petition purchase orders totaling $138,600,000 in

gross revenues, and attached the purchase orders as exhibits.[128]  The securing of those purchase

orders was given as a primary reason the Debtors needed to repossess the Bonding Equipment as

soon as possible.  Both orders are from VSI, the first dated March 20, 2023, in the amount of

$12,600,000 ("VSI Purchase Order #1"), and the second dated April 11, 2023, in the amount of

---

[128] Stay Violation Declaration, at ¶8. Mr. Rajan stated his opinion that revenues to be derived from these two purchase orders will allow the Debtors to successfully reorganize. *Id.* at ¶15.

$126,000,000 ("VSI Purchase Order #2" and together with the VSI Purchase Order #1, the "VSI Purchase Orders"). Joseph Corso ("Mr. Corso"), under limited power of attorney, executed the VSI Purchase Order #1 on behalf of VSI, and Mr. Savarese, under limited power of attorney, executed the VSI Purchase Order #2 on behalf of VSI.

During the Trial, Mr. Rajan testified that the VSI Purchase Order #1 is for Cystar International Limited ("Cystar") as the third-party customer.[129]  A purchase order from Cystar to VSI was issued on the same date as VSI Purchase Order #1, which Mr. Rajan testified he negotiated on behalf of VSI.[130] Mr. Rajan testified that the VSI Purchase Order #2 is for Southern Telecom as the third-party customer.[131]

Mr. Rajan also testified at Trial about the role an entity he referred to as BOE had in the VSI Purchase Orders. According to Mr. Rajan, BOE is the "number 1 panel company in the world," and BOE introduced Stream to a number of BOE's customers, "and those customers have become customers of Stream TV."[132] Two of those customers, according to Mr. Rajan, are Cystar and Southern Telecom.[133] Mr. Rajan testified that under an August 2018 agreement between Stream and BOE's factory entity by the name of Hefei Xinsheng Optoelectronics Technology Co. Ltd. ("BOE"),[134] BOE agreed to introduce Stream to customers, vendors, and suppliers, as well as providing purchase order financing to Stream.[135] Mr. Rajan testified that the

---

[129] August 17, 2023 Hearing Transcript, 47:7 to 47:16; Exhibit D-18. As noted *supra*, Mr. Rajan also disclosed in his Stay Violation Declaration the Distribution Agreement with VSI. The VSI Purchase Orders were made in connection with this Distribution Agreement. *See* Stay Violation Declaration, at ¶12.

[130] August 17, 2023 Hearing Transcript, 53:6 to 53:11.

[131] *Id.* at 63:23 to 65:14; Exhibit D-19; Exhibit D-21.

[132] August 15, 2023 Hearing Transcript at 201:3 to 201:7.

[133] *Id.* at 201:9; 205:24 to 206:1.

[134] Exhibit D-3.

[135] August 15, 2023 Hearing Transcript, 205:8 to 206:2; September 25, 2023 Hearing Transcript, 154:8 to

2018 agreement is still in effect, and that Stream "has calls with BOE at least three to four times a week [and] meetings, at least once to twice a week, either in China or the United States."[136] According to Mr. Rajan, BOE "help[s] us with customers.  They help us with vendors.  They're helping us with supply chain finance.  They're ramping up more introductions and they're also working on their own sales activities."[137]

The VSI Purchase Orders are, on their face, clearly for a considerable sum and require considerable production from Stream.[138]  The Debtors have repeatedly stated that the importance of these purported deals to the Debtors' reorganization and success going forward is fundamental, but it is beyond dispute that the VSI Purchase Orders are not traditional contracts with the panoply of provisions governing performance of the parties' agreement.  They also do not provide for any further commitment by Cystar and Southern Telecom.  At Trial, however, Mr. Rajan testified that Cystar wants to increase its order from the 10,000 units under the VSI Purchase Order #1 to "about 75 to 100,000 once he gets the bonding machine, which is about $140 million in revenue if he goes up to 100,000."[139]  Likewise, Mr. Rajan testified that Southern

---

155:15.  Mr. Rajan pointed to Articles 4 and 5 of the BOE agreement as binding them to provide purchase order financing.  August 17, 2023 Hearing Transcript, at 189:2 to 192:2.

[136] August 15, 2023 Hearing Transcript, at 208:25 to 209:6.

[137] *Id.* at 209:4 to 209:10.

[138] Mr. Rajan testified that, without the Bonding Equipment, it had made arrangements with an entity called Fuji-Prem to provide the bonding services needed to meet the production requirement under the VSI Purchase Orders and "for most of our customers."  August 15, 2023 Hearing Transcript, at 193:6 to 193:19; August 17, 2023 Hearing Transcript, at 28:21 to 28:23.

[139] August 15, 2023 Hearing Transcript, 201:15 to 201:17.  Consistent with the Court's concern regarding Mr. Rajan's tendency to be loose with the purported sales he expects, he later testified that Cystar's "plan, once they receive the bonding machine is to increase their order to 75 to 100,000 units, which is over 100 million in revenue."  *See* September 25, 2023 Hearing Transcript, at 31:2 to 31:6.  He also testified that the VSI Purchase Order #1 was for "14 million, but Stream TV believes it's going to be increased to about 75 million."  *Id.,* at 156:1 to 156:3.

Telecom wants to increase its order from the 100,000 units under the VSI Purchase Order #2 to "about 300,000 TVs."[140]

SeeCubic signaled almost immediately that it questioned the legitimacy of the VSI Purchase Orders.[141]  Beyond Mr. Rajan's testimony, however, the Debtors did nothing to establish their bona fides.  It seemingly would have been both very easy and very urgent for the Debtors, given the consequences if Hawk is successful in obtaining dismissal, conversion, or appointment of a trustee, to provide witness testimony from Cystar, Southern Telecom, and/or BOE to substantiate, at the very least, the VSI Purchase Orders, if not the asserted interest of Cystar and Southern Telecom in greatly increasing purchases going forward.  This is particularly true with respect to Southern Telecom, as Mr. Rajan testified that it is a "big supporter" of Stream, and in addition to allegedly placing an order for 100,000 units, is interested in a merger or acquisition as well as cross-marketing activity.[142]  Despite that level of purported support and interest in Stream, however, the Debtors did not bring anyone from Southern Telecom to substantiate the VSI Purchase Order #2.  At a bare minimum, the Court would have expected the Debtors to put on the testimony of Mr. Corso and/or Mr. Savarese, each of whom purportedly bound VSI, to establish that the VSI Purchase Orders are legitimate.[143]  The Debtors instead

---

[140] *Id.* at 202:1 to 202:10; *see also id.* at 194:3 to 194:6 ("Southern Telecom has indicated that they are going to increase their order from 100,000 TVs, which is $140 million in revenues to about 300,000, which would push us to 400 million in revenue.").

[141] April 14, 2023 Hearing Transcript, 64:23 to 66:17.

[142] August 15, 2023 Hearing Transcript, 202:12 to 203:8.

[143] In their post-trial reply brief, *see* Bankr. Docket No. 437, the Debtors argue that it is disingenuous for Hawk to point out that VSI did not appear at Trial to provide supporting testimony.  *Id.* at 19.  It is true that the Debtors attempted, at the eleventh hour, to add Tom Sego, a purported independent board member of VSI, and Bud Robertson, a current VSI employee, to their witness list in advance of the resumption of the Trial on August 15.  *See* Bankr. Docket No. 334.  It is also true that Hawk requested that neither witness be permitted to testify given the late notice and extremely limited windows of time the Debtors were proposing to make Mr. Sego and Mr. Robertson available for depositions.  *See* Bankr. Docket No. 327.  After a hearing the Court barred both Mr. Sego and Mr. Robertson from testifying.

relied only Mr. Rajan, whose credibility with this Court has been greatly diminished.  While the
Debtors may have had their reasons for doing so, that gap in substantiation left the Court with the
unanswered questions regarding the veracity of the VSI Purchase Orders and Mr. Rajan's claims
that Cystar and Southern Telecom intend to exponentially increase the amount of product
purchased from Stream.  Unfortunately, in the context of so many other instances where the
Court has concerns regarding Mr. Rajan's truthfulness, this is just another example.

ii.    **The Debtors Offered No Supporting Evidence for the
Other Potential Customers and Deals Mr. Rajan Touted
During Trial**

Mr. Rajan testified at Trial regarding a host of other deals and partnerships on which he
alleged the Debtors were working and/or were imminent:

- Mr. Rajan testified at Trial on August 15 that there are "eight or nine" other
customers interested in the same unit that Cystar is ordering, including Google,
and that a company from Thailand would be making an offer that morning.[144]

- Mr. Rajan alluded to other deals with "Hisense and some other brands, like
Chunghwa Telecom, which will be ordering once we get the samples from [Fuji-
Prem]."[145]  Mr. Rajan subsequently testified that Chunghwa Telecom wants to
purchase 60,000 units.[146]

---

Bankr. Docket No. 343.  Even if the Court had permitted their testimony, however, neither VSI witness
was proposed to testify regarding the legitimacy of the VSI Purchase Orders.  *See* Bankr. Docket No. 327-
1 (Exhibit A).

[144] *Id.* at 201:18 to 201:24.

[145] *Id.* at 203:5 to 203:8.

[146] *Id.* at 217:6 to 217:12.

- Mr. Rajan testified that the Debtors were in negotiations with Lenovo, Sony, and Samsung, and had just received a request for a price quotation from LG.[147]  Mr. Rajan subsequently testified that he was in negotiations with LG for the sale of 5,000,000 units.[148]

- Mr. Rajan also named other potential customers Skyworth, Highsense, Huawei, and Vizio.[149]  According to Mr. Rajan, Skyworth is "expected to order TVs in the two to three million unit range."[150]

- Mr. Rajan testified that Stream was in discussions with Bosch, with which it had a pre-petition deal for an automotive-based product that allegedly fell apart once SeeCubic took control of Stream's assets under the Omnibus Agreement.[151]  Mr. Rajan acknowledged, however, that Bosch is not a current customer of Stream.[152]

- Mr. Rajan testified that in addition to Bosch, Stream was in discussions with other potential customers for an automotive-based product, including Geely, Honda, Nissan, and Toyota.

- Mr. Rajan testified about certain other expressions of interest Stream has received for its product from Cystar, IQH3D, BBack Inc., and Sunny Hill Technology Ltd. ("Sunny Hill"), and the Debtor introduced into evidence letters from each of those

---

[147] *Id.* at 203:22 to 204:6.

[148] *Id.* at 219:8 to 219:10.

[149] *Id.* at 217:15 to 217:24.

[150] August 17, 2023 Hearing Transcript, at 30:7 to 30:13.

[151] August 15, 2023 Hearing Transcript, at 219:21 to 220:12.  The pre-petition agreement with Bosch was admitted as Exhibit D-4.

[152] August 17, 2023 Hearing Transcript, at 25:6 to 25:14.

companies purportedly expressing such interest.[153]  Three of four of these letters, however, were issued pre-petition, and the fourth, from Sunny Hill, was dated only days after the Debtors filed for bankruptcy.[154]

- Mr. Rajan testified that he understood, based on a February 2023 discussion with Google, that once Stream provides Google with a lens sample Google had ordered pre-petition but that was never provided, Google would be interested in resuming discussions on acquisition of various sizes of Stream's units, which Mr. Rajan stated are both "very high margin type" and "very easy to do, very easy to make, and it's a very easy project."[155]

- Mr. Rajan testified regarding his post-petition negotiations with "various large content companies and sports leagues" on cross-marketing deals, but asserted he was subject to a strict non-disclosure agreement and could not reveal the names of the sports leagues.[156]

- Mr. Rajan testified that he had "probably 100 customer meetings" since the Debtors' Petitions were filed, but provided no additional detail.[157]

After listening to Mr. Rajan's testimony regarding these purported customers and relationships, the Court found his testimony not credible.  Rather, it appeared to the Court that Mr. Rajan was "name-dropping" large players in the television and panel space, but had nothing to verify that Stream has had any post-petition discussions or negotiations with these parties, let

---

[153] *Id.* at 68:25 to 77:3

[154] Exhibits D-44 to D-47s D-44 to D-47.

[155] August 15, 2023 Hearing Transcript, 214:7 to 217:1.

[156] August 17, 2023 Hearing Transcript, at 120:1 to 120:22.

[157] *Id.* at 121:6 to 121:10.

alone is on the precipice of transactions with them.  Rather, on cross-examination, despite having

referred to many of these parties as customers of Stream, Mr. Rajan acknowledged that Stream

was not "at a contract stage yet" with respect to any of the parties about which he testified.[158]

Moreover, although the Debtors have repeatedly stressed the need to regain the Bonding

Equipment so that they may begin meeting production requirements. Mr. Rajan testified that

alternative bonding arrangements had been made with Fuji-Prem to meet production needs, and

therefore that the yet-unresolved dispute over the Bonding Equipment would not seem to be an

impediment to at least some of these purported deals having come to fruition.[159]  Particularly

where Mr. Rajan represented that the deals in the works would result in hundreds of millions, if

not billions, of dollars of revenue for the Debtors, the Court is confounded that the Debtors did

not produce *any* potential contract-counterparty to corroborate Mr. Rajan's claims.  In that void,

the Court was left with only Mr. Rajan's assertions, which the Court found not credible.

>    **f.      The Net Effect of the Debtors' Conduct in These Cases, By and
>    Through Mr. Rajan, Is That the Court Has No Faith in the
>    Debtors' Ability to Effectively Manage These Bankruptcy
>    Cases**

The Court's discussion of the general procedural history of these cases, specific events

that have transpired, and representations the Debtors, and specifically Mr. Rajan, have made, is

intended to illustrate the cloud of mistrust and mystery that has hung over these cases virtually

from the beginning.  In arguing that Mr. Rajan has engaged in gross mismanagement of the

estates, Hawk points to much of the same conduct and actions by the Debtors during these cases

that the Court has cited above, including (a) the Debtors' proposed entry into the Distribution

---

[158] August 17, 2023 Hearing Transcript at 164:13 to 165:11.

[159] The Court notes that the Debtors did not provide any agreement or other documentary evidence of an agreement with Fuji-Prem.

Agreement with VSI, (b) the VSI Purchase Orders using VSI as an intermediary with customers

for a 10% fee, (c) the transfer of Stream shares to VSI in exchange for funding the Debtors' post-

petition operations without Court approval, (d) the entry into the Rembrandt License Covenant

for the purpose of steering licensed intellectual property from Rembrandt to VSI, and (e) the

failure to file accurate monthly operating reports, and the failure to timely correct them.[160]  Hawk

asserts that Mr. Rajan has administered these cases for the benefit of VSI, rather than creditors,

and that this blatant breach of fiduciary duty, together with failing to disclose proposed

agreements and transactions until the eleventh hour, and in the case of the Zhongsheng Term

Sheet, fabricating the transaction entirely, constitutes gross mismanagement of the Debtors'

estates warranting conversion or dismissal.

  The already-discussed transactions and requested relief that appear to be primarily for the

benefit of VSI are reason enough to find that Mr. Rajan has engaged in gross mismanagement of

the Debtors' estates.  Another glaring example, however, is the Debtors' failure to revise

knowingly false monthly operating reports, on which the Court and all interested parties rely in

assessing the Debtors' post-petition performance and prospects, until December, months after the

initial MORs were filed.  Furthermore, as discussed *infra*, the Revised MORs (as defined herein)

appear to represent facts regarding payments VSI has made on behalf of Stream that contradicts

Mr. Rajan's testimony at Trial, leaving the Court and interested parties unclear as to the Debtors'

post-petition operations and finances.  A debtor-in-possession's fiduciary duties include the duty

to keep the Court and creditors informed about the status and condition of its business.  *See In re

Gateway Access Solutions, Inc.,* 374 B.R. 556, 565 (Bankr. M.D. Pa. 2007).  Monthly operating

reports are "the lifeblood of Chapter 11, enabling creditors to keep tabs on the debtor's post-

---

[160] Hawk Post-Trial Brief, at 49-56.

petition operations." *In re Kholyakva,* 2008 WL 3887653, at *4 (Bankr. E.D. Pa. 2008). They are designed to allow the U.S. Trustee and creditors to monitor business operations during chapter 11 and to avoid continued business operations that generate losses and administrative insolvency. *In re Domiano,* 442 B.R. 97, 106 (Bankr. M.D. Pa. 2010). Importantly in the context of these cases, the failure of a debtor to properly report income and expenses constitutes evidence of gross mismanagement under §1112(b)(4)(B). In *Domiano,* the court found the debtor's monthly operating reports had been completed in cursory, if not casual fashion, omitted significant information, and were completed "in such a summary fashion that creditors are left to guess as to much of the Debtors' operations and financial results … The MORs have not been completed in a fashion consistent with the Debtors' fiduciary duties." *Id.* The *Domiano* court found that this was grounds for conversion due to the debtor's gross mismanagement of the estate.

Mr. Rajan's flippant explanation for why VSI's millions of dollars in payments on behalf of Stream in exchange for Stream shares was not disclosed on its MORs is unacceptable. The Court does not attribute any credibility to Mr. Rajan's explanation that this lack of disclosure was due to an oversight or attributable to his hospitalization. There is no reason that Mr. Park, as the nominal CFO of the Debtors, or someone else with knowledge of the Debtors' operations and finances should not have ensured the disclosure of the funding arrangement with VSI in the MORs. The fact that it was not done, that it became clear only at Trial, and that the Debtors did not file the Revised MORs until *December* is a breach of the Debtors' fiduciary duties to the estates' creditors and its disclosure obligations to the Court. The Court simply does not believe Mr. Rajan that the lack of disclosure was an oversight.[161]

---

[161] On September 28, 2023, the U.S. Trustee submitted a proposed Rule 2004 consent order (the "Rule 2004 Order"), providing for, *inter alia,* authorization to examine the Debtors regarding post-petition

In sum, apart from this fundamental breach of the Debtors' disclosure obligations and the Court's overall concerns regarding Mr. Rajan's trustworthiness, the history of these cases has been littered with questions about the role and involvement of VSI, the Debtors' ability to operate independently of VSI, and whether Mr. Rajan is able to differentiate his role with the Debtors from his role with VSI.  Alarmingly, the interrelationship between VSI, Stream, and Mr. Rajan's overlapping interests and roles in each is so entrenched that Mr. Rajan's testimony at Trial was at times rendered unintelligible, or alternatively, intentionally deceptive, by his inability or unwillingness to draw distinction between the entities and his roles with each.[162]  It has consistently appeared that he cannot, and the Debtors' transactions and requested relief outlined herein are indicative of his inherent conflict of interest.  The result has been delay, confusion, mistrust, and unending acrimony that has led to the Court's assessment that, even if the Debtors have a reasonable likelihood of rehabilitation, they have made little progress to date in attaining it under Mr. Rajan's stewardship.

Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court and creditors rises to the level of gross mismanagement of the estates, even when viewed against the high standard of glaring and inexcusable badness.  *See In re 210 West Liberty Holdings, LLC,*

---

payments made by or on behalf of the Debtors, the issuance of shares from Stream and/or Technovative to VSI, and any post-petition agreement between the Debtors and VSI for VSI to fund the Debtors' subsidiaries, including SCBV.  Bankr. Docket No. 428.  On October 3, 2023, the Court entered the Rule 2004 Order.  Bankr. Docket No. 433.  On December 29, 2023, the U.S. Trustee filed a motion to dismiss the Debtors' bankruptcy cases (the "UST Dismissal Motion"), based on their failure to file timely and complete monthly operating reports and other required reports, failure to provide accurate information in the initial MORs or the Revised MORs, and failure to comply with the Rule 2004 Order's terms regarding document production and appearing for examination.  *See* Bankr. Docket No. 534.  While the Debtors have not yet had opportunity to respond to the UST Dismissal Motion, and the Court has not yet held a hearing on it, its filing in and of itself is further evidence of the lack of cooperation and conflict that has permeated these cases, and only reinforces the Court's conclusion that Mr. Rajan cannot serve as a productive and responsible steward of the Debtors' bankruptcy estates.

[162] *See, e.g.,* August 17, 2023 Hearing Transcript, at 151:14 to 153:25.

61

2009 WL 1522047, at *5.  The nearly ten months since the Debtors filed their Petitions have

been marred by delay, conflict, suspect proposals, lack of transparency, and lack of candor.

While the delay has been the result of numerous circumstances, the Court will not permit this to

continue under Mr. Rajan's watch.  The only question for the Court is whether the Debtors' cases

should be dismissed, converted, or a trustee should be appointed to determine what value the

Debtors' operations hold, and what claims, if any, should be pursued, and how the cases move

expeditiously to reorganization or liquidation.  As discussed *infra*, notwithstanding current

management's gross mismanagement of the Debtors' estates, the Court believes conversion or

dismissal is not in the best interests of creditors at this time.

### 3.    It Has Not Been Established by a Preponderance of Evidence That There is Both Substantial or Continuing Loss to the Debtors' Estates and No Reasonable Likelihood of Rehabilitation

Section 1112(b)(4)(A) of the Bankruptcy Code provides that cause for conversion or

dismissal exists where there is substantial or continuing loss to or diminution of the estate **and**

the absence of a reasonable likelihood of rehabilitation.  It is written in the conjunctive, and

therefore both components must be shown.  *See, e.g., In re 1121 Pier Village LLC,* 635 B.R. 127,

137 n.14 (Bankr. E.D. Pa. 2022); *In re Northeast Family Eyecare, P.C.,* 2002 WL 1836307, at *3

(Bankr. E.D. Pa. July 22, 2002) (stating that the subsection codifies a "two-prong test"); *In re*

*Route 202 Corp.,* 37 B.R. 367, 372 (Bankr. E.D. Pa. 1984).

In determining whether a loss to, or diminution of, the estate exists, a court must make a

full evaluation of the present condition of the estate, not merely look at the debtor's financial

statements.  *In re Plasterer*, 2023 WL 6217801, at *6 (Bankr. E.D.N.Y. Sept. 25, 2023) (stating

that even where a debtor shows positive cash flow, continuing loss to or diminution of the estate

can also be established by an actual depreciation in the value of property of the estate).

Importantly, §1112(b)(4)(A) requires not only a consideration of whether a debtor is suffering continuing losses but whether the debtor's business prospects justify continuing the chapter 11 case. *In re EnCap Golf Holdings, LLC,* 2008 WL 4200324, at *9 (D.N.J. Sept. 4, 2008); *see also In re Andover Covered Bridge, LLC,* 553 B.R. 162, 175 (B.A.P. 1st 2016) ("'Rehabilitation' in this context means whether the debtor will be able to reestablish its business.").

Hawk argues that the Debtors have no operations, no expenses, and no sources of financing, and the Debtors' own filings prove the estates are suffering catastrophic losses during these cases based on over $7 million in administrative expenses incurred.[163] Hawk further argues that to the extent there are any operations, they are at the VSI level, and without operations the Debtors cannot establish a business plan based on future operations, and therefore are *per se* unable to rehabilitate.[164]

The Court agrees with Hawk that, based on the Debtors' originally-filed monthly operating reports (the "MORs") from March through June, it would appear that Stream has no expenses, employees, or financing. Stream's originally-filed April, May, and June MORs reflect little cash on hand, no full-time employees, no receipts, very little in disbursements, and no disbursements made by a third party for the benefit of the estate.[165] Mr. Rajan had his explanation for that at Trial. With respect to employees, Mr. Rajan testified in August that the Debtors had retained independent contractors through VSI to work on its projects.[166] Mr. Rajan

---

[163] Hawk Post-Trial Brief, at 45-46 (citing $750,000 in legal fees incurred, approximately $75,000 in salary for Mr. Park, and $6 million in post-petition obligations to Rembrandt under the Licensing Covenant and related subscription agreement).

[164] *Id.* at 46.

[165] Bankr. Docket Nos. 224, 253, 300; August 17, 2023 Hearing Transcript, at 196:20 to 200:3.

[166] August 17, 2023 Hearing Transcript, at 202:18 to 205:2. While the Court cannot verify that based only on Mr. Rajan's testimony, it is consistent with representations made in the Employee Obligation Motion.

alleged that the failure to make this clarification in the MORs was "an oversight" that would be revised by the following week.[167]  With respect to expenses and financing, Mr. Rajan testified, as discussed *supra,* that VSI was paying all expenses of Stream since its bankruptcy was filed, in exchange for Stream shares.[168]  Mr. Rajan acknowledged, however, that none of the $1.5 to $2 million in expenses that VSI had allegedly paid on behalf of Stream were disclosed in the April, May, or June MORs.[169]  Mr. Rajan again claimed that this was an oversight that would be corrected the following week.[170]

On December 8, 2023, the Debtors *finally* filed revised Stream MORs for March, April, May, and June 2023 (the "Revised MORs").[171]  Those Revised MORs still reflect no full-time employees, as do subsequent MORs.  Attached to the Revised MORs, however, are letters from a Daniel Rink, Director of VSI, to Mr. Park, asserting the expenses VSI paid on behalf of Stream during the months of March, April, May, and June.  According to those letters,[172] and as reflected in the Revised MORs, VSI paid expenses, and asserted it was entitled to Stream Class A shares, in the following amounts: (a) $85,161.53 in expenses for March, in exchange for 56,774 Stream shares; (b) $331,134.30 in expenses for April, in exchange for 220,756 Stream

---

[167] No amended or corrected MORs had been filed as of late September, which Mr. Rajan attributed to "going back and forth with the trustee."  September 25, 2023 Hearing Transcript, 14:24 to 15:12.

[168] *Id.* at 205:21 to 206:4.

[169] *Id.* at 214:14 to 219:14.

[170] Mr. Rajan seemed to claim that the reason for this oversight was his three-month hospitalization, but also acknowledged that he was not the only individual involved with the Debtors that was aware of the expenses being paid by VSI.  *Id.* at 219:22 to 219:24.  The Court therefore attributes very little weight to Mr. Rajan's explanation.

[171] Bankr. Docket Nos. 502, 503, 505, 512.

[172] Each of the letters is dated December 7, 2023, the day before the Revised MORs were filed and months after the expenses were purportedly paid.  No explanation is provided for why the letters were not issued substantially contemporaneously with the end of each month, particularly where the subject of the letters has been a hot-button issue in the case since Trial.

shares; (c) $200,910.46 in expenses for May, in exchange for 133,940 Stream shares; and (d) $243,871.98 in expense for June, in exchange for 162,581 Stream shares. This totals approximately $861,078 in expenses purportedly paid by VSI, which is the cumulative total Stream discloses in its Revised June MOR for disbursements made by a third party. Attached to each letter is a breakdown of the general categories of expenses purportedly paid.

The July MOR, filed after Mr. Rajan's August testimony, reflects approximately $750,000 in July third-party disbursements.[173] No letter from VSI is attached to the July MOR. Furthermore, the July MOR confusingly disclosed roughly the same figure for a cumulative total, seemingly in contradiction to Mr. Rajan's testimony in August that VSI had paid $1.5 to $2 million in expenses on behalf of Stream, and certainly in contradiction to the Revised MORs that represent over $861,000 in third-party disbursements for the three-and-a-half months prior to July. In September, Mr. Rajan testified that the cumulative total as of the end of July being the same as the figure for July alone could be harmonized because disbursements through the end of July had been approximately $750,000, whereas by the time he testified in mid-August the disbursements had apparently grown to $1.5 to $3 million.[174] This testimony is clearly contradicted by the Revised MORs, and is just another example of what the Court perceives as Mr. Rajan's propensity to come up with justifications or explanations on-the-fly when confronted with facts or information that seemed to contradict his prior statements. The August MOR discloses only $556 in third-party payments,[175] while the September MOR discloses approximately $104,000 in third-party payments.[176]

---

[173] Bankr. Docket No. 399.

[174] September 25, 2023 Hearing Transcript, at 31:3 to 32:16.

[175] Bankr. Docket No. 459.

[176] Bankr. Docket No. 460. Perhaps even more confusingly, the Debtors separately filed a supplement (the "MOR Supplement") to the August and September MORs, which among other things, attached

Hawk's point is well-taken that Stream's original MORs for April, May, and June,

reflecting no employees, no post-petition receipts, and little cash on hand, are indicative of a

non-operating entity.[177]  Moreover, the Court agrees with Hawk that the Debtors' estates have

continued to incur significant administrative expenses, not the least of which are asserted counsel

fees, while the MORs reflect no post-petition revenue.  However, notwithstanding that it is being

done without having first obtained the Court's permission, the unrefuted testimony from Mr.

Rajan is that the Debtors' post-petition operating expenses are being paid by VSI in exchange for

Stream shares rather than debt.  Moreover, Mr. Rajan testified as to the nature of the $750,000 in

disbursements VSI made on behalf of the estate in August: "That's money for payroll.  That's

money for electronics to get ready for production.  Also, we had to get a backup [bonding] deal

put in place so we can get the production started on the TVs.  So it's mainly operational expenses

to get things started."[178]  Mr. Rajan also testified that the purported work is being done by

independent contractors rather than Stream employees, and the letters from VSI attached to the

Revised MORs purport to identify consultant payroll expenses totaling approximately $434,000.

Hawk cites to no rule prohibiting a debtor from executing its business model with independent

contractors, rather than full-time employees.

---

letters from VSI to Mr. Park stating that VSI had identified $2,000 and $219,000 in transfers from VSI to
Stream in August and September, respectively, pursuant to a stock purchase agreement dated July 10,
2023, and as a result directed Stream to issue 1,333 and 146,000 shares of Stream Class A shares to VSI.
Bankr. Docket No. 463.  The MOR Supplement also includes a statement that payments were made by
VSI on Stream's behalf in August that were not included in the August MOR, that shares were issued to
VSI in November in exchange for those payments, and that such payments will be reflected in the
November MOR.  No explanation was given as to why they would not be reflected in an amended August
MOR.

[177] In its Post-Trial Brief Hawk also argues that Stream is a non-operating entity based on the First Day
Declaration and the Debtors' corporate organizational chart reflecting that Stream owns 99.9% of
Technovative shares.  Hawk Post-Trial Brief at 2.  This fact alone does not establish that Stream is not an
operating entity.

[178] September 25, 2023 Hearing Transcript, 162:22 to 163:2; *see also id.* at 173:18 to 174:3.

Therefore, with some indication of operational activity and financing by Stream, the Court cannot conclude that the Debtors are *per se* unable to rehabilitate.  The Court is keenly aware of the fact that the Revised MORs, on which the Court places some reliance in arriving at this conclusion, were filed two-and-a-half months *after* the Trial concluded and appear to conflict with Mr. Rajan's testimony at Trial.  Hawk has had no opportunity to probe the veracity of the representations made in the Revised MORs, which represents a considerable handicap in Hawk being able to meet its evidentiary burden.  However, as discussed *infra*, the timing of the Revised MORs and their seeming contradiction to Mr. Rajan's testimony is simply more grounds for the Court's determination that Mr. Rajan cannot continue to administer these estates.  While the Court found not credible Mr. Rajan's testimony regarding the Debtors' current and prospective deals, where the Court is required to evaluate both the present condition of the estates and the Debtors' business prospects going forward, it simply does not believe there has been sufficient and transparent information from the Debtors' management to determine at this stage that there is no reasonable likelihood of rehabilitation.

### 4.    It Has Not Been Established by a Preponderance of the Evidence that the Debtors' Petitions Were Filed in Bad Faith

As a general matter, Hawk's argument is that the Debtors filed their bankruptcy cases on the eve of trial in the Section 225 Action with no other impetus for filing, but rather simply as a litigation tactic to stay what Hawk believes will be an adverse ruling from the Delaware Chancery Court.  Hawk asserts that not only is this *per se* bad faith, but that under the Third Circuit's fourteen-factor analysis for bad faith filings, twelve of the factors support a finding of lack of good faith here.[179]

---

[179] Hawk Post-Trial Brief, at 59-60.

It is beyond dispute that the Debtors filed their Petitions with trial in the Section 225 Action imminent.  Hawk goes too far, however, in arguing that Mr. Rajan "confirmed the 225 Action was the reason for filing," citing to his First Day Declaration[180] as evidence.  That declaration explained, from Mr. Rajan's perspective, the history of the Omnibus Agreement, its invalidation by the Delaware Supreme Court, the failure of Hawk and SeeCubic to comply with the return of the Debtors' assets, and the events leading to the Section 225 Action.  When Mr. Rajan states in his First Day Declaration that "[t]he irreparable harm" of this chain of events necessitated the Debtors' bankruptcy filings, he did not confirm that the Section 225 Action was the reason for filing.[181]  He clearly was referencing a broader series of events, of which the Section 225 Action was only the most recent.  As such, there is no grounds for a finding of *per se* bad faith based on the timing of the Debtors' Petitions alone.

The Court also disagrees that Hawk has established by a preponderance of the evidence that a majority of the factors used in the Third Circuit to analyze whether a filing was in bad faith are present here.  Clearly the Debtors have previously filed for bankruptcy.  The Delaware Bankruptcy Court's reasoning in dismissing those prior cases, however, is not a matter of record in these proceedings.  Furthermore, while the current cases were filed on the eve of trial in the Section 225 Action and imposed a stay on that proceeding, the Court cannot conclude that the Debtors filed these cases solely to evade a Chancery Court order that would wrest control of Technovative from the Debtors.  The Debtors have significant creditors other than Hawk, SeeCubic, and SLS,[182] and as Hawk and SeeCubic have noted a number of times during these

---

[180] *See* Bankr. Docket No. 48 (the "First Day Declaration").

[181] *Id.* at ¶¶90 to 94.

[182] Although the claims of Hawk, SeeCubic, and SLS, as well as Rembrandt's asserted claim of over $1.2 billion, dominate the claims register, other claims of sizeable amounts have also been filed.  Moreover, as discussed above, Stream's Petition was accompanied by Official Form 204, representing that Stream's

cases, Stream had virtually no funds of its own at the time of its Petition with which to satisfy

claims.  Mr. Rajan testified regarding the Stream assets to be used in obtaining and fulfilling

potential post-petition product orders,[183] as well as the Debtors' need to regain possession of the

Bonding Equipment.[184]  Together these reflect a need for the breathing spell afforded debtors and

an intention to use bankruptcy for a purpose other than avoiding an adverse judgment in the

Section 225 Action.  Moreover, although Hawk argues that the Section 225 Action the Debtors

seek to avoid will determine who can control Technovative and the operating subsidiaries, and

therefore the majority of the value of the enterprise, Mr. Rajan asserts that the Debtors do not

need SCBV to execute the Debtors' business plan because they have their own electronics and

bonding arrangements.[185]  Therefore, assuming that is accurate, an adverse ruling in the 225

Action would not necessarily torpedo the Debtors' ability to reorganize.  Finally, as discussed

herein, the Court is not prepared at this stage, based on the evidence before it and the history of

these cases, to conclude that there is no possibility of reorganization.  The lack of clarity the

Debtors' management has created regarding the Debtors' operations, future prospects, and

sources of funding leaves this Court unable to determine whether the Debtors have the assets and

operations to successfully reorganize, but the Court will not foreclose that possibility at this

stage.

     Based on the evidence and in consideration of the factors used to determine whether a

case has been filed in bad faith, the Court finds Hawk has not established by a preponderance of

the evidence that the Debtors lacked good faith in filing their Petitions.

---

unsecured creditors held over $14 million is asserted claims.

[183] August 17, 2023 Hearing Transcript, at 128:6 to 129:23.

[184] *Id.* at 191:6 to 191:20.

[185] August 17, 2023 Hearing Transcript, 138:25 to 138:6.

5.       **The Court Will Not Dismiss or Convert the Debtors' Chapter 11
Cases at this Stage Because a Chapter 11 Trustee is Needed to
Administer the Debtors' Cases**

Having found that the Debtors' have grossly mismanaged the estates, cause exists to

convert or dismiss the cases under §1112(b) of the Bankruptcy Code.  As discussed *supra,*

however, that provision requires conversion or dismissal unless the Court determines the

appointment of a trustee is in the best interests of the estate under §1104(a).  Section 1104(a) of

the Bankruptcy Code governs the appointment of a trustee in chapter 11 cases, providing that the

court **shall** order the appointment of a trustee:

(1)       For cause, including fraud, dishonesty, incompetence, or gross mismanagement of
the affairs of the debtor by current management, either before or after the
commencement of the case, or similar cause … or

(2)       If such appointment is in the interests of creditors, any equity security holders,
and other interests of the estate….

11 U.S.C. §1104(a) (emphasis added).  The appointment of a trustee is an extraordinary remedy,

representing a rare exception to the rule that the debtor remains in possession throughout its

reorganization because current management "is generally best suited to orchestrate the process of

rehabilitation for the benefit of creditors and other interests in the estate."  *In re Marvel

Entertainment Group, Inc.,* 140 F.3d 463, 471 (3d Cir. 2004).  As such, the party moving for

appointment of a trustee under §1104(a) must overcome that presumption by clear and

convincing evidence, and the determination is made on a case-by-case basis.  *BELFOR USA

Grp., Inc. v. Salem Consumer Square OH LLC (In re Salem Consumer Square OH LLC),* 629

B.R. 562, 575 (Bankr. W.D. Pa. 2021).  Once the movant establishes cause for the appointment

of a trustee, however, the burden shifts to the debtor to establish an exception under §1112(b)(2)

of the Bankruptcy Code.[186]

---

[186] Under §1112(b)(2), the court may not convert or dismiss a case if the court finds and identifies unusual

That said, a chapter 11 debtor's invocation of the protections afforded under the

Bankruptcy Code comes with a trade-off: "in exchange for the authority to continue to manage

the affairs of a company, a debtor-in-possession owes fiduciary duties to its creditors and the

estate, including the duty of care to safeguard assets, the duty of loyalty, and the duty of

impartiality." *In re Morningstar Marketplace, Ltd.,* 544 B.R. 297, 303 (Bankr. W.D. Pa. 2016)

(citing *Marvel Entertainment*).  And because the rights of a debtor to manage the reorganization

process are not absolute, they may be forfeited if these fiduciary duties are neglected.  *Id.* (citing

*In re Eurospark Industries, Inc.,* 424 B.R. 621 (Bankr. E.D.N.Y. 2010)).  The willingness of

courts to leave debtors in possession is premised upon an assurance that the officers and

managing employees can be depended upon to carry out the fiduciary responsibilities of a

trustee, and where a debtor-in-possession is unwilling or unable to do so, it is necessary to

appoint an independent trustee who will.  *See, e.g., In re Vascular Access Centers, L.P.,* 611 B.R.

742, 764 (Bankr. E.D. Pa. 2020) (citing *Fifth Third Bank v. Circulatory Ctrs. of Am., LLC (In re

Circulatory Ctrs. of Am., LLC*, 579 B.R. 752 (Bankr. W.D. Pa. 2017) and *Marvel

Entertainment*).

The list of situations in §1104(a)(1) is not an exclusive list of what constitutes cause to

appoint a trustee, and situations that have been found to support a finding of cause for the

appointment of a trustee include conflicts of interest, misuse of assets and funds, inadequate

recordkeeping and reporting, failure to file required documents, lack of adequate disclosure, lack

circumstances establishing that converting or dismissing the case is not in the best interests of creditors
and the estate and the debtor or a party in interest establishes (1) there is a reasonable likelihood a plan
will be confirmed within the timeframes established in sections 1121(e) and 1129(e) or, if not applicable,
within a reasonable period and (2) the grounds for converting or dismissing the case include an act or
omission of the debtor other than under paragraph (4)(A) for which there exists a reasonable justification
for the act or omission; and that will be cured within a reasonable period of time fixed by the court.  The
Debtors have not established any such unusual circumstances, although as discussed *infra,* the Court
concludes that the appointment of a trustee, rather than conversion or dismissal, is proper at this stage.

of appropriate cost controls, transgressions related to taxes, failure to make required payments,

lack of credibility and creditor confidence, and breaches of fiduciary duty. *Id.*; *see also*

*Morningstar Marketplace,* 544 B.R. at 303; *Marvel Entertainment,* 140 F.3d at 471 (finding the

district court did not err in appointing trustee where the debtor's management was unable to

resolve conflicts with estate creditors). Appointment of a trustee is mandatory if cause is found

under §1104(a)(1), but a bankruptcy court has wide discretion to determine what specific

conduct establishes cause. *Morningstar Marketplace,* 544 B.R. at 303. By contrast, §1104(a)(2)

envisions a flexible standard giving discretion to appoint a trustee when doing so would serve the

estate's and parties' interests. *Vascular Access Centers,* 611 B.R. at 765 (*citing Marvel*

*Entertainment*). Among the factors which may be considered in appointing a trustee under

§1104(a)(2) are (a) the untrustworthiness of the debtor, (b) the debtor-in-possession's past and

present performance and prospects for rehabilitation, (c) the confidence – or lack thereof – of the

business community and of creditors in present management, and (d) the benefits derived from

the appointment of a trustee balanced against the cost of the appointment. *Id.; see also*

*Morningstar Marketplace,* at 304 (citing *In re Sharon Steel Corp.,* 871 F.2d 1217, 1225 (3d Cir.

1989)).

      Without needing to address whether the Debtors mismanaged their affairs pre-petition, as

Hawk asserts, clear and convincing evidence of the Debtors' gross mismanagement of their

estates, through Mr. Rajan, has resulted in a situation where the Court has no faith in Mr. Rajan

administering the Debtors' estates consistent with his fiduciary duties and obligations to this

Court. Simply put, based on the history of these cases outlined above, the conflicted role of Mr.

Rajan with both the Debtors and VSI, and the Court's assessment of Mr. Rajan's credibility

throughout this case, the Court does not trust Mr. Rajan's interest in or ability to maintain the

integrity of these bankruptcy proceedings.  Months into the case, the Court lacks confidence that it has been given transparent information regarding what the Debtors are actually doing, who is doing it, at what stage those efforts are, and how that is being accomplished, and the evidence the Court has that the Debtors are operating is Mr. Rajan's testimony and the Revised MORs and July MOR, themselves in conflict, representing that VSI funded certain unspecified Stream expenses in the first months of the case, none of which instills confidence in the Court.  While the Court is not ready to wholly discount these meager signs of a path toward reorganization, it has reached the point where it needs more clarity and more progress, far more quickly, and does not believe this is possible with Mr. Rajan in charge of the estates.  Therefore the appointment of a trustee pursuant to both §§1104(a)(1) and (a)(2) is warranted.  *See Vascular Access Centers,,* 611 B.R. at 769 (finding appointment of trustee was appropriate under both §§1104(a)(1) and (a)(2) based on the Court's determination that the debtor's principal and manager lacked credibility and trustworthiness and had engaged in self-serving conduct both before and during the debtor's bankruptcy case).

The Court is not convinced conversion or dismissal is appropriate at this stage.  Because of the dearth of information, transparency, and relief sought by the Debtors to date, the Court remains unclear what assets and potential value the Debtors' operations hold.  The replacement of Mr. Rajan at the helm of the Debtors' estates and the appointment of a trustee to evaluate the Debtors' assets, potential deals, potential claims, etc. is needed.  It is clear there needs to be a neutral, unconflicted party to deal with VSI at arms-length, including determining if there are pre- or post-petition claims that lie against VSI.  A trustee is also needed to evaluate, resolve, and/or litigate the claims of Hawk, SLS, SeeCubic, Rembrandt, and others.  If these cases have any chance of succeeding, it will be because there is transparency to the Court and creditors and

an impartial third-party evaluating assets, claims, and the Debtors' reorganizational prospects.  A

trustee will obviously come with a cost, but the Court believes the value of an unconflicted,

third-party neutral to assess the state of the Debtors' operations, potential transactions, and

claims, and efficiently determine whether and how the Debtors can achieve reorganization, more

than offsets these costs.  *See Vascular Access Centers,* 611 B.R. at 769 (finding that the cost of

appointment of a chapter 11 trustee would be greatly outweighed by the benefits derived from

such appointment and would result in a more efficient reorganization while ensuring the integrity

of the process).

Although cause exists under §1112(b)(4)(B) to convert or dismiss the Debtors' cases, the

Court believes the appointment of a trustee to evaluate the Debtors' operations, prospects, and

ability to successfully reorganize, and to implement such reorganization if possible, is in the best

interests of creditors and the estate at this time.  The Court will therefore exercise the

extraordinary remedy of appointing a chapter 11 trustee pursuant to §1104(a) of the Bankruptcy

Code.

### B.     Cause Exists to Grant Hawk Relief from Stay to Allow the Section 225 Action to Resolve Certain Issues Critical to the Debtors' Bankruptcy Cases

The Court may grant relief from the stay under §362(d)(1) for cause, including the lack of

adequate protection of an interest in property. 11 U.S.C. § 362(d)(1).  Cause is an intentionally

broad and flexible concept which must be determined on a case-by-case basis.  *In re Brown*, 311

B.R. 409, 412-413 (E.D. Pa. 2004) (citing *In re Marchant,* 256 B.R. 572, 576 (Bankr. W.D. Pa.

2000)).  As such, the test to be applied is a totality of the circumstances test based upon the

particular facts of the case.  *Buncher Co. v. Flaberg Solar US Corp. (In re Flaberg Solar US

Corp.)*, 499 B.R. 475, 482-83 (Bankr. W.D. Pa. 2013) (citing *O'Neal Steel, Inc. v. Chatkin (In re

Chatkin)*, 465 B.R. 54, 59 (Bankr. W.D. Pa. 2012)).  In applying the test, courts in this district

have employed a variety of factors to determine whether cause exists to permit a non-debtor

party to proceed with litigation in another forum:

> Given the broad discretion accorded to the bankruptcy court as described in *Brown,* it is therefore, not surprising that some courts have designed lists of "factors" to be considered in determining whether "cause" exists under §362(d)(1). For example, in *In re Granati,* the court identified four (4) factors to be considered:
>
> (1)     whether only issues of state law are involved;
>
> (2)     whether judicial economy will be promoted;
>
> (3)     whether the litigation will interfere with the bankruptcy case; and
>
> (4)     whether the estate can be protected by requiring that any judgment obtained be enforced only through the bankruptcy court.
>
> 271 B.R. 89, 93 (Bankr.E.D.Va. 2001) (citing *In re Robbins,* 964 F.2d 342 (4th Cir.1992)).
>
> Other courts have developed a checklist of twelve (12) factors to be considered:
>
> (1)     Whether the relief will result in a partial or complete resolution of the issues.
>
> (2)     The lack of any connection with or interference with the bankruptcy case.
>
> (3)     Whether the non-bankruptcy proceeding involves the debtor as a fiduciary.
>
> (4)     Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases.
>
> (5)     Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation.
>
> (6)     Whether the action primarily involves third parties.
>
> (7)     Whether litigation in another forum would prejudice the interests of other creditors, the creditors' committee or other interested parties.

(8)     Whether the judgment claim arising from the foreign action is
        subject to equitable subordination under Section 510(c).

(9)     Whether movant's success in the foreign proceeding would result
        in a judicial lien avoidable by the debtor under Section 522(f).

(10)    The interest of judicial economy and the expeditious and
        economical determination of litigation for the parties.

(11)    Whether the non-bankruptcy proceedings have progressed to the
        point where the parties are prepared for trial.

(12)    The impact of the stay on the parties and the "balance of hurt."

*See In re Sonnax Industries, Inc.,* 907 F.2d 1280 (2d Cir.1990); *In re
Curtis,* 40 B.R. 795, 800 (Bankr. D. Utah 1984) (citations omitted). *See
also In re Brown,* 311 B.R. at 413 (approving bankruptcy court's use of
factors set forth in *Sonnax* in ruling on § 362(d) motion).

The relevance and weight of the various overlapping factors outlined
above will depend upon the circumstances of the particular bankruptcy
case involved. Not all of the factors may be relevant in a particular case;
the factors that are relevant may not be entitled to equal weight. Thus, the
decision whether to grant relief from the automatic stay to an unsecured
creditor is not a mechanical or mathematical exercise.

*In re Chan*, 355 B.R. 494, 499–500 (Bankr. E.D. Pa. 2006).[187]

---

[187] The Debtors have cited to *In re Tribune Co.,* 418 B.R. 116, 126 (Bankr. D. Del. 2009) for the
following three-prong test for determining whether cause exists to lift the stay to continue litigation: (1)
whether any great prejudice to either the bankruptcy estate or the debtor will result from continuation of
the civil suit; (2) whether the hardship to the non-bankrupt party by maintenance of the stay considerably
outweighs the hardship to the debtor, and (3) whether the creditor has a probability of prevailing on the
merits.  The *Tribune* decision cited the test as being generally relied upon in that district. *Id.*  A
"balancing of the harms" analysis has been recognized in this district as well.  *See In re Cinelli,* 2014 WL
4106030, at *2 (E.D. Pa. Aug. 21, 2014) ("The first step to consider is whether there will be prejudice to
either the estate or the debtor if the stay is lifted on the one hand and hardship to the movant if the stay
continues on the other hand.  Then, these two potential harms are weighed.  The decision to lift the stay
depends on where the scale tips."); *In re Glunk,* 342 B.R. 717 (Bankr. E.D. Pa. 2006) (recognizing the
"balancing of the harms" analysis used by courts).  The *Chan* decision recognized that underlying
guidepost, but employed the "different, more multi-faceted" approach for determining whether cause
exists that looks to multiple factors.  355 B.R. at 499.  That approach has been cited by decisions rendered
since *Chan* was decided*, see, e.g., In re Schaffer,* 597 B.R. 777, 791, n.18 (Bankr. E.D. Pa. 2019), and it
is the approach this Court takes as well.

Hawk filed the Stay Relief Motion at the outset of the case, but the Court determined it needed an evidentiary record to resolve it. The path to obtaining that record has been tortured at times, but the circumstances that Hawk argued warranted stay relief early in the case have not changed – the Section 225 Action is ripe to be heard. It will resolve the Technovative Director Issue and the Debt Conversion Issue, two issues critical to these bankruptcy cases going forward but governed by Delaware law for which the Delaware Chancery Court, while not a specialized tribunal *per se,* certainly has unique and established expertise. If Hawk were successful with respect to both of those issues, it has acknowledged that it will still need to return to this Court for permission to proceed with an Article 9 Sale of its collateral under the Notes. As such, resolution of the Technovative Director Issue and the Debt Conversion Issue will not prejudice the interests of other estate creditors by allowing Hawk to foreclose on Technovative assets without this Court's authority. On the other hand, resolution of those will greatly advance resolution of the Debtors' bankruptcy cases by providing clarity regarding the status of the Technovative filing and whether, and to what extent, Hawk is a secured creditor of the Debtors.

As such, based on consideration of the factors used to determine whether causes exists to permit non-bankruptcy litigation to proceed, the Court finds Hawk has established, and the Debtors have not rebutted, that allowing the Section 225 Action to proceed to resolution with respect to the Technovative Director Issue and the Debt Conversion Issue will aid in administration of the Debtors' bankruptcy cases. Relief from stay will therefore be granted to permit the parties to proceed before the Delaware Chancery Court on those two issues.

## IV.  CONCLUSION

For the reasons discussed above, the Court will (i) grant the Section 1112/1104 Motion to the extent it seeks the appointment of a trustee to administer the Debtors' chapter 11 bankruptcy

77

cases, and (ii) grant the Hawk Stay Relief Motion to permit the Section 225 Action to proceed

solely with respect to the Technovative Director Issue and the Debt Conversion Issue.  The U.S.

Trustee will be directed to immediately begin the process for appointing a chapter 11 trustee, and

in the interim, Mr. Rajan is no longer authorized to take any action on behalf of the Debtors'

estates.  To the extent the Debtors must take any urgent action, the Debtors shall identify any

such actions needed to the U.S. Trustee, who may confer with Mr. Rajan in addressing such

matters but who is not obligated to act in conformity with Mr. Rajan's instruction or desired

outcome.

     An Order consistent with this Memorandum shall be entered.

Dated:  January 5, 2024

_____
MAGDELINE D. COLEMAN
CHIEF U.S. BANKRUPTCY JUDGE