## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,  (Stream)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc.,  (Technovative)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |

**REMBRANDT 3D HOLDING LTD.'S OBJECTION TO PROOFS OF CLAIM NO. 6 FILED BY HAWK INVESTMENT HOLDINGS LTD., "AS COLLATERAL AGENT," NO. 9 FILED BY SLS HOLDINGS VI, LLC, AND NO. 14 FILED BY SEECUBIC, INC.**

Rembrandt 3D Holding Ltd. ("Rembrandt") objects to Proofs of Claim No. 6 filed by Hawk Investment Holdings Ltd. as "Collateral Agent," No. 9 filed by SLS Holdings VI, LLC, and No. 14 filed by SeeCubic, Inc., by and through its counsel, and file this objection seeking entry of the proposed order attached hereto as Exhibit 1 (the "Proposed Order"), disallowing the claims.  In further support of this Objection, Rembrandt respectfully state as follows:

**<u>Jurisdiction and Venue</u>**

1.     The United States Bankruptcy Court for the Eastern District of Pennsylvania has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory bases for the relief requested herein are sections 105(a) and 502 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 3007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 3007-1 of the United States

Bankruptcy Court of the Eastern District of Pennsylvania Local Bankruptcy Rules (the "Local Rules").

## Relief Requested

4.       By this Objection, Rembrandt object to Proofs of Claim No. 6 filed by Hawk Investment Holdings Ltd. as "Collateral Agent," No. 9 filed by SLS Holdings VI, LLC, and No. 14 filed by SeeCubic, Inc., for the reasons described below, and seek entry of the Proposed Order, pursuant to section 502 of the Bankruptcy Code, Bankruptcy Rules 3007 and 9014, and Local Rule 3007-1, disallowing and expunging the claims as set forth below.

## Background

### A.       The Bankruptcy Filing

5.       On March 15, 2023 (the "Petition Date"), Debtors filed voluntary petitions for relief with the Court under chapter 11 of title 11 of the Bankruptcy Code. Debtors filed in the Eastern District of Pennsylvania because that is the location of their principal place of business. D.I.. 48 at ¶ 2.

6.       Since the Petition Date, Debtors have been operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.       As of the date of the filing of this Motion, no official committees have been appointed or designated.  William A. Homony accepted his appointment as the chapter 11 trustee on January 15, 2024.

### B.       Overview of Debtors & Technology

8.       Debtors were founded in 2009 by Raja Rajan and Mathu Rajan as "new media" companies to pursue new technologies that enhance user entertainment and communications experiences.  Debtors are incorporated in Delaware and have a principal executive office located in Philadelphia, Pennsylvania.

2

9.      Technovative Media, Inc. is a wholly owned subsidiary of Stream TV Networks, Inc.

10.      The technology that Debtors are currently seeking to manufacture and sell converts two dimensional devices into three dimensional without the need for viewing glasses.

11.      A detailed description of Debtors and their businesses, including facts and circumstances giving rise to these Chapter 11 Cases and supporting this Motion, is set forth in the *Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Chapter 11 Petition, Supporting Emergency Relief, and First Day Motions* [ECF No. 48], which is incorporated herein by reference.

12.      In 2005, Philips offered a Glasses-Free three-dimensional (3D) autostereoscopic display ("3DASD") solution known as the WOWvx Platform for converting and generating 3D content from two-dimensional (2D) media content for rendering on Philips's 3DASD monitors. The WOWvx Platform uses mathematical algorithms to add depth and stereoscopic information to 2D content (i.e., 2D+Depth) thereby creating 3DASD content.

13.      Philips's 3DASD solution suffered from significant image quality issues because the 3DASD content generated by the WOWvx Platform contained numerous artifacts such as ghosting and required weeks of manual post-processing to correct.

14.      Rembrandt's predecessor, 3DFusion Corp (3DFusion) licensed the WOWvx Platform from Philips. From 2007 to 2009 working with Philips licensed tools, Stephen Blumenthal developed a novel methodology to correct the image quality issues or artifacts in the 3DASD content generated by the Philips's WOWvx Platform and protected the innovations through patents and maintaining certain elements as trade secrets.

15. In August 2009, 3DFusion started contracting and working with a team of engineers in Eindhoven, (the "Eindhoven Team") and registered a dutch B.V. with the Dutch Chamber of Commerce named, 3DFusionEU B.V. a wholly owned Dutch subsidiary of 3DFusion.

16. 3DFusionEU started working with The Eindhoven Team for the purpose of integrating 3DFusion's adjustability solution into the 2D+Depth 3DASD platform.

17. While 3DFusion had included some of the information and improvements in its patents, many other improvements were held as trade secrets and were disclosed and developed under non-disclosure agreements with the Eindhoven Team and 3DFusionEU.

18. This technology and 3DFusion's business plans were eventually disclosed to Mathu Rajan, Raja Rajan, and Stream under non-disclosure agreements.

19. Stephen Blumenthal and 3DFusion developed trades secrets and filed for its own patents far before either ever met any engineers from the Eindhoven Team, Stream or the Rajans.

20. 3DFusion has since dissolved and all of its rights to intellectual property and technology have been assigned to Rembrandt.

21. In June of 2010, Stephen Blumenthal met Mathu Rajan and Raja Rajan when they came to the 3DFusion Wall Street showroom offices for a demonstration of our 3D glasses free platform.

22. The Rajans immediately signed NDAs to be able to review details of 3DFusion's technology and business plans.

23. At the time of this original June 9, 2010 NDA between Stream and 3D Fusion, (now owned by Rembrandt), Stream had no technology of its own.

24. In June of 2010, all rights were held by 3D Fusion and therefore all improvements to that technology made after the June 9, 2010 NDA were owned by 3D Fusion. The NDA reads:

4

> *"2.3.3 all inventions, improvements, copyrightable works and designs, relating to business plans, marketing plans, technology, machines, methods, compositions, or products of Disclosing Party directly resulting from or relating to the Confidential Information and the right to market, use, license and franchise the Confidential Information or the ideas, concepts, methods or practices embodied therein shall be the exclusive property of the Disclosing Party, and the Recipient has no right or title thereto."*

25.    The original Stream and 3DFusion term sheet was negotiated and signed on September 28, 2010 by the Rajans.  Walther Roelen, the head of 3DFusion's Eindhoven team, betrayed his fiduciary duty and orchestrated the transfer of key 3DFusion assets and the Eindhoven Team to Stream in January of 2011. This is the same Eindhoven Team that was working with Stream, then SeeCubic, Inc..

26.    The original technology developed by Stephen Blumenthal and 3DFusion was disclosed to Stream and is the basis for the improvements over the old Philips technology. Philips owned all the rights to the original 2D+Depth intellectual property and Rembrandt owns all the rights to its improvements to the technology.  The Philips technology and Rembrandt advancements are fully integrated into all the Stream technology and products.  Specifically, Rembrandt has identified with particularity how all the products sold by Stream have included Rembrandt technology and infringe Rembrandt patents.

27.    These events and agreements were the basis for the Rembrandt lawsuit filed against Stream, Mathu Rajan, and Raja Rajan. Rembrandt, Stream, Rembrandt-Holding filed a complaint in the New York State Supreme Court in January 2017 against Stream TV Network, Inc. ("Stream"), Raja Rajan, and Mathu Rajan among others (Stream, Raja Rajan, and Mathu Rajan, collectively referred to as the "Defendants"). Defendants removed the state action to the United States District Court for the Southern District Of New York. Defendants were served with the FAC on June 23, 2017 (*Rembrandt 3D Holding, Ltd. v. Stream TV Network, Inc. et al*, No. 17-CV-882-RA, D.I. 1-1)).

28.     Mathu Rajan, and Raja Rajan fully executed a settlement agreement on May 23, 2021 that included the same list of Rembrandt patents and trade secrets used in the settlement term sheet negotiated in a mediation before Magistrate Parker with Shadron Stastney representing Stream as its CFO. The April 12, 2019 term sheet was signed by all parties including Judge Parker at the close of the mediation conference and is materially identical to the current May 21, 2021 Settlement Agreement signed by the Rajans

29.     The May 23, 2021 settlement agreement with Stream carries a substantial value to both companies. Rembrandt's agreement provided Stream a complete resolution of the litigation through a license to the technology and an expectation of large purchases from Rembrandt-Holding.

30.     Stream agreed to pay Rembrandt-Holding $5,840,000 in cash, 2,000,000 warrants to purchase Stream stock, 100 4K TVs for no charge, 8 8K prototypes at no charge, and the right to purchase 3,015,000 8K 3DASD LCD units at cost.  Based on Shad Stastney's statements, Rembrandt estimated Stream's margin was approximately $400/unit so the ability to purchase 3,015,000 units at cost was worth approximately $400/unit x 3,015,000 units = $1,206,000,000.

31.     While Stream started with no technology of its own, it entered into a license with Philips and utilized Rembrandt's technology to develop its own glasses-free 3D display technology launched under the trade name Ultra-D™ ("Ultra-D"). Ultra-D is a proprietary combination of hardware and software which creates a natural, comfortable and immersive Glasses-Free 3D viewing experience.  Ultra-D solves the two biggest limitations of the market's current 3D technology: the need to wear special glasses and the scarcity of 3D content because it can convert 2D content to 3D content in real time.

32.     Rembrandt has closely evaluated the quality of the Stream products and even in the midst of its controversies with Stream purchased early versions of Stream's TVs and Stream provided additional units during the Rembrandt – Stream SDNY litigation.  The quality of the product has improved over time.  Rembrandt was impressed with Ultra-D and decided to structure a settlement in such a way that the primary value of the settlement was a supply of Ultra-D units.

33.     On June 27, 2023, Shadron Stastney testified:

The underlying technology was originally developed by Philips in the Netherlands starting in the early 2000s. [. . .]  The team in the Netherlands wanted to continue to develop the technology and so they went looking for funding effectively to do so. Stream TV Networks had started doing other things, as you can tell by the name Stream TV Networks, none of which is really applicable to what they do now. And they were looking also for a new business line and determined that they would be able to raise money to provide a facility and working capital for the team in the Netherlands. [. . .] SLS is the one that provided the funding so that facility in the Netherlands could be set up and so that the initial license with Philips of the patent portfolio on which the technology is based could be obtained.

D.I. 303 at 57:24-25; 58:3-11; 58:14-17.  Rembrandt agrees that Stream had no technology of its own until Rembrandt's predecessor, 3D Fusion Corp., introduced Stream to the Eindhoven team and Stream licensed technology from Philips (Koninklijke Philips Electronics N.V., a Netherlands corporation).  The very reason for the original SLS investment was to obtain the license from Philips.

34.     Prior to the Rembrandt – Stream SDNY litigation, Stream reported a recent valuation at over $400,000,000 ($4/share with over a 1,000,000 shares and warrants outstanding prior to Rembrandt litigation).

35.     After Rembrandt initiated its litigation to enforce contracts including and NDA and term sheet the provided for Rembrandt to get 60-80% of Stream in exchanging for providing its technology, Stream's shares dropped to $1.50/share by the time Rembrandt negotiated its

settlement term sheet on April 12, 2019 with Shadron Stastney acting as Stream's CFO at the time. The share price had dropped by 62.5% and Stream had lost $250,000,000 in valuation.

36.    At the request of Stream, in July 2019, Rembrandt's executive team met with Shadron Stastney, Mark Coleman (Stream board member) and litigation counsel to amend the settlement terms to allow greater flexibility in timing of proving the units promised by Stream. The was agreeable to Rembrandt.

37.    At this point, Stream had all the necessary licenses it needed to relaunch its Ultra-D products with the additional volume that Rembrandt's purchase orders would provide.  Stream was poised to not only recapture the $250 million in lost valuation, but to become extremely valuable beyond its 2018 valuation.

38.    While SLS, Hawk, and SeeCubic allege that the entities are owed in excess of $178,000,000, the only thing better than receiving $178,000,000 in alleged principal and interest, is getting all the technology from a company that was recently valued at over $400,000,000 ($4/share with over a 1,000,000 shares and warrants outstanding prior to Rembrandt litigation).

39.    Shadron Stastney left Stream and formed SeeCubic, Inc. and sought to take control of all of Stream's assets colluding with SLS, Hawk, and other shareholders and directors of Stream. SLS and Hawk did not pursue any rights under their actual agreements with Stream, but rather took inappropriate actions and compensated directors of Stream in an attempt to push through a new agreement (the "Omnibus Agreement") that was latter invalidated.  *See Stream TV Networks, Inc. v. Seecubic, Inc.*, No. 360, 2021, p. 3 (Del. June 15, 2022) (Holding that "a majority vote of Class B stockholders is required under Stream's charter" to "transfer pledged assets to secured

creditors in connection with what was, in essence, a privately structured foreclosure transaction").[1] In holding that its corporate charter had been violated, the Delaware Supreme Court noted that Stream's charter was "unambiguous" and, ergo, "enforcing the unambiguous [c]harter provision [requiring Class B stockholders be allowed to vote on the asset transfer] is consistent with our policy of seeking to promote stability and predictability in our corporate laws. . . ." *Id.* at pp. 53-54.

40.    After using this invalidated agreement to take control of Stream assets, SeeCubic proceeded to destroy value of those assets by breaching both the Philips and Rembrandt license agreements, damaging production equipment, and promulgating a business plan based on infringing intellectual property and attempting to license out technology belonging to Philips and Rembrandt when both licenses specifically prohibited such sublicensing efforts thereby creating massive liabilities for infringement at Stream's subsidiary companies and specifically at Technovative.

41.    Upon learning of SeeCubic's malfeasance and reviewing its website and attempts to license out Rembrandt's technology through its control of Technovative and subsidiaries of Technovative, Rembrandt  filed a Complaint For Injunctive Relief And Misappropriation Of Trade Secrets (the "Delaware Complaint") in the United States District Court For The District Of

---

[1] The Delaware Supreme Court also held that the "agreement authorizing the secured creditors to transfer Stream's pledged assets . . . is invalid because Stream's unambiguous certificate of incorporation required the approval of Stream's Class B stockholders" and there was no "Board Only insolvency exception" to Section 271 of the DGCL, and even if there had been a board-only insolvency exception to Section 271, it had been superseded. *Id.* at p. 34.  The Delaware Supreme Court's opinion definitively established that there had been an improper transfer of assets, in violation of Debtor's corporate charter.  *Id.* at p. 53 n. 180 ("We note that Section 271 presents no barrier to the parties' foreclosure proceedings in Superior Court (which are presently stayed pending this appeal), and no party has argued that judicial foreclosure proceedings implicate Section 271").

Delaware against Technovative Media, Inc ("Technovative"), Hawk Investment Holdings Ltd. ("Hawk"), and SeeCubic, Inc.("SeeCubic"), and a true copy along with the exhibits was attached as Exhibit A to the Declaration re: of Christopher A. Michaels in Opposition of Hawk Emergency Motion for Relief from the Automatic Stay [ECF No. 69], which is incorporated herein by reference.

42.    Shadron Stastney, the CEO of SeeCubic, Inc., was the individual that negotiated the term sheet with Rembrandt acting as Stream's CFO and agreed to the terms before Magistrate Parker agreeing to pay over $5 million in cash and to provide millions of units of TVs at cost. Clearly he had every reason to expect that Rembrandt would enforce its intellectual property against Technovative if he used his position to infringe Rembrandt's right thus incurring massive liabilities for Technovative both for expensive legal fees and damages.

43.    At the time, the express intent was to transfer all the assets of Stream over to SeeCubic, Inc and allow all the "innocent" shareholders (i.e. not the Rajans) to exchange their shares Stream for shares in SeeCubic, Inc.  D.I. 303 at 106:23-108:14.

**Debtors' Debt Structure**

44.    Since 2009, the Debtor has raised approximately $150 million from third party investors. D.I.. 48 at ¶ 25.  The investments have taken the forms of both debt and equity. *Id*. The Debtor's senior secured creditor is SLS Holdings VI, LLC ("SLS"). *Id.* Between 2011 and 2012, SLS loaned $6 million to the Debtor through a series of notes (the "SLS Insider Notes"). *Id.* The Debtor pledged substantially all of its assets and the assets of its wholly owned subsidiaries as security for the SLS Insider Notes. *Id.* The Debtor executed a security agreement in connection with the SLS Insider Notes. *Id.*

45.     The Debtor's junior secured creditor is Hawk Investment Holdings Limited ("Hawk"). D.I.. 48 at ¶ 26.  Between 2014 and 2020, Hawk loaned more than £50 million to the Debtor, plus another $1.336 million, through a series of junior secured notes (the "Hawk Notes"). *Id*. Subject to the security interest held by SLS, the Debtor pledged substantially all of its assets as security for the Hawk Notes. *Id*. The Debtor executed a security agreement in connection with the Hawk Notes. *Id*.

46.     In 2018, the Debtor entered into an agreement with Hawk which provided that the Hawk Notes would convert into equity if and when the Debtor raised additional equity capital (the "Hawk Conversion Agreement") (D.I., 48 at Exhibit F). D.I.. 48 at ¶ 28.  The Debtor and SLS contemporaneously entered into a parallel agreement governing the SLS Insider Notes (the "SLS Conversion Agreement" (D.I., 48 at Exhibit G). *Id*. Per the Conversion Agreements, conversion of debt to equity is at the discretion of the Debtor. *Id*.

**Formation of SeeCubic**

47.     On September 18, 2013, Shadron L. Stastney ("Stastney"), principal of debtholder SLS, was ordered by the United States Securities and Exchange Commission ("SEC") to pay nearly $3 million in disgorgement, penalties, and interest for willfully violating Sections 206(2) and 206(3) of the Advisers Act2[2]. D.I. 48 at ¶ 32.  The SEC determined that Stastney breached his fiduciary duty by failing to disclose a material conflict of interest and engaging in an undisclosed principal transaction with Vicis Capital, for whom he was the Chief Operating Officer and Head of Research. *Id*. In addition to the monetary penalty, Stastney was "(i) barred from association with any investment adviser, broker, dealer, municipal securities dealer, or transfer

---

[2] The SEC settlement is public record. In the Matter of Shadron L. Stastney, United States Security and Exchange Comm. Admin. File No. 3-15500, Release Nos. 3671, 30689 (Sep. 18, 2013), published at https://www.sec.gov/litigation/admin/2013/ia-3671.pdf.

agent, and (ii) prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter." (*Id.* citing D.I.. 48 at Exhibit H).

48.    SLS and Hawk formed SeeCubic, Inc. ("SeeCubic") as a Delaware corporation in 2020 to seize the Debtor's assets pursuant to the Omnibus Agreement described below. SeeCubic and Hawk were held in contempt by the Delaware Court of Chancery in October 2022 for their orchestrated efforts to seize control of the Debtor's subsidiary, TechnoVative USA. D.I.. 48 at ¶ 35.  In Paragraph 3 of his October 3, 2022 Opinion, Vice Chancellor Laster wrote: "This decision holds that SeeCubic and Hawk engaged in contumacious conduct. Shad L. Stastney was the puppet master who pulled the strings. He controls SeeCubic and Technovative, and he also controls SLS Holdings VI, LLC ("SLS"), Stream's only secured creditor other than Hawk." *Id.* (citing D.I., 48 at Exhibit K).

**Omnibus Agreement and Letter Agreement**

49.    After issuing a Notice of Default to the Debtor, SLS filed a complaint on March 23, 2020, in the Superior Court of the State of Delaware in and for New Castle County ("Superior Court") against the Debtor and its subsidiaries TechnoVative USA, Technology Holdings, and Media Holdings. D.I.. 48 at ¶ 53.  The complaint sought money damages on the Debtor's alleged obligations due to SLS and replevin of collateral. *Id.*

50.    In a May 4, 2020 meeting of the Debtor's Board of Directors, Gola, Gollop, and Kabacinski proposed and passed a resolution to establish a debt-resolution committee with Gola and Gollop solely authorized to negotiate a settlement on the Debtor's behalf. D.I.. 48 at ¶ 57. Mathu Rajan and Raja Rajan, the two founding directors, abstained but were outvoted by the three

new directors. *Id.* Hodgson was not present during the vote, which was planned by the other new directors to coincide with his absence so that they'd have a majority. *Id.*

51.    Two days later, on May 6, 2020, a lengthy debt resolution (the "Omnibus Agreement") was signed by Gola and Gollop, purporting to commit the Debtor to a resolution whereby all its assets would be transferred to SLS and Hawk. D.I.. 48 at ¶ 58 (citing D.I., 48 at Exhibit O). The Omnibus Agreement was a proposed settlement that benefitted the very investors responsible for creating the problem by failing to honor the Conversion Agreements. D.I.. 48 at ¶ 58.

52.    Executed simultaneously with the Omnibus Agreement was a secret side letter (the "Letter Agreement") in which the beneficiaries of the Omnibus Agreement detailed structure of their newco, SeeCubic (D.I., 48 at Exhibit P). D.I.. 48 at ¶ 59. The Letter Agreement was a critical component of the settlement, stating: "the parties hereto wish to agree among themselves to certain additional matters related to the Omnibus Agreement, and on which their execution of the Omnibus Agreement is conditioned..." *Id.* Also detailed in the Letter Agreement were equity distributions for SLS, Hawk, and certain of the Debtor's investors who had supported the hostile takeover. Despite the fact that no representative of the Debtor signed the Letter Agreement, it required the Debtor to issue 48 million shares of Debtor's common stock: 40 million shares to Hawk, 4 million shares to SLS, and 4 million shares to certain other investors. *Id.* The Debtor never issued such additional equity. *Id.*

53.    The Debtor immediately challenged the validity of the Omnibus Agreement, as it violated a key clause of the company's charter, which required approval of the Class B shareholders for any transaction that transferred all or substantially all of the company's assets (D.I.. 48 at ¶ 61 (citing D.I.. 48 at Exhibit R at IV(D)(2)(d)). Within days of the attempted hostile

takeover, the Debtor formally removed new directors Gola, Gollop, and Kabacinski through a written resolution of the stockholders in lieu of a meeting.  D.I.. 48 at ¶ 61.

54.    Despite being removed from their directorships in May 2020, Gola and Gollop purported to represent the Debtor. D.I.. 48 at ¶ 62. On August 24, 2020, using the Debtor's letterhead, they signed a Delegation of Authority Letter which gave a third-party power of attorney to represent some of the Debtor's subsidiaries for the purpose of assuming the facility lease where the MPL was stored, taking possession MPL, and moving the equipment from the Debtor's reach *Id*. (citing D.I., 48 at Exhibit S).

55.    Despite being removed from his directorship in May 2020, Kabacinski used the Debtor's letterhead and, claiming to be the Debtor's Director and "acting executive," made demands and threats to the Debtor's executive vice president, who also served as CEO of SCBV. D.I.. 48 at ¶ 63. The letter and following email correspondence contained slanderous accusations and threatened legal consequences. *Id.* (citing D.I., 48 at Exhibit T).

56.    Using the Omnibus Agreement as a foundation, SLS and Hawk began seizing the Debtor's assets through their new business entity, SeeCubic, even though no court had yet ruled on the validity of the Omnibus Agreement. On the title page of its June 2, 2020 private placement memorandum, SeeCubic declared itself "Owner of the brand Ultra-D." D.I.. 48 at ¶ 64.

57.    This seizure of assets included the technology provided by Philips and Rembrandt even though both licenses prohibited assignment of the licenses and prohibited an sublicensing. By transferring technology to SeeCubic, Inc, Technovative and its subsidiaries infringed and misappropriated the intellectual property of both Philips and Rembrandt. The Philips license is held by a Technovative subsidiary, UltraD Ventures but has a change of control provision that terminates the license upon change of control. The Rembrandt license is directly with Stream and

assignment is not authorized.   As such, SeeCubic caused breaches of both agreements and Technovative and its subsidiaries to be liable for various claims of copyright and patent infringement as well as trade secret misappropriation.

## Chancery Court Litigation – The Preliminary Injunction Order

58.    In September 2020, Stream filed a plenary action in the Delaware Chancery Court in which it sought a declaration that the Omnibus Agreement was invalid and an injunction against SeeCubic trying to enforce it. D.I.. 48 at ¶ 68 (citing *Stream TV Networks, Inc. v. SeeCubic, Inc.*, C.A. No. 2020-0766-JTL (the "Omnibus Agreement Litigation"). SeeCubic filed counterclaims which sought a declaration that the Omnibus Agreement was valid and an injunction against anyone trying to interfere with it.   *Id.*

59.    In December 2020, the Chancery Court issued an Order (the "PI Order") and accompanying Opinion (the "PI Opinion") in the Omnibus Agreement Litigation that rejected Stream's challenges to the Omnibus Agreement. D.I.. 48 at ¶ 69. The court ruled that it was reasonably probable that the Omnibus Agreement was a valid and enforceable agreement, and the court issued an injunction barring Stream from failing to comply with the agreement. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016 (Del. Ch. 2020) (the "Injunction Decision") (subsequent history omitted).

## Delaware Bankruptcy Court

60.    Pursuant to the PI Order in the Delaware Court of Chancery, Stastney/SLS and Hawk/Morton seized most of the Debtor's assets and transferred them to their new entity, SeeCubic. D.I.. 48 at ¶ 71.  They did not, however, accept any of the Debtor's liabilities.  *Id.*

61.      Left with no assets, significant debt, and only a Delaware Supreme Court appeal to put its hopes in, the Debtor filed for chapter 11 protection in the District of Delaware and arranged initial debtor-in-possession financing for its planned reorganization. D.I.. 48 at ¶ 72.

62.      SeeCubic, SLS, Hawk, and Stastney filed motions to dismiss the bankruptcy, claiming that the Debtor had made a bad-faith filing in order to escape a state court ruling it disagreed with. The Debtor counterclaimed that the Omnibus Agreement was an executory contract since SeeCubic had failed to issue 1,000,000 shares of its common stock to the Debtor in exchange for the Debtor's assets, and that the Debtor had not yet transferred all of its assets, including the multi-million-dollar MPL bonding equipment.  D.I.. 48 at ¶ 73.

63.      Despite the executory nature of the Omnibus Agreement, and despite the fact that the case in the Court of Chancery had only had a preliminary ruling, the Bankruptcy Court determined that the Omnibus Agreement was likely to be confirmed by the Chancery Court and thus dismissed the Debtor's petition for bankruptcy. D.I.. 48 at ¶ 74.

**Chancery Court Litigation – The Partial Summary Judgment**

64.      In September 2021, the Chancery Court granted SeeCubic's motion for summary judgment in the Omnibus Agreement Litigation ("Summary Judgment Order"). *See* D.I.. 48 at ¶ 79.  The resulting decision declared the Omnibus Agreement to be valid and entered a permanent injunction barring Stream from interfering with it. *Id.* On November 10, 2021, the Chancery Court entered a partial final judgment in favor of SeeCubic. D.I.. 48 at ¶ 80*; Omnibus Agreement Litigation, D.I.. 204 (the "First Partial Final Judgment").

**Delaware Supreme Court Appeal**

65.      Stream appealed the First Partial Final Judgment.  D.I.. 48 at ¶ 81.

66.    On June 15, 2022, in a unanimous 5-0 en banc opinion, the Delaware Supreme Court vacated the First Partial Final Judgment and held that the Omnibus Agreement could not have become effective without the approval of Stream's Class B stockholders. *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323 (Del. 2022) (the "Supreme Court Decision").

67.    On July 1, 2022, the Delaware Supreme Court issued a mandate (the "Mandate") that the PI Order was "hereby VACATED, REVERSED and REMANDED. D.I.. 48 at ¶ 83 (citing D.I., 48 at Exhibit Z).

### Mandate to Chancery Court

68.    The same day the Mandate was issued, the Debtor filed a Motion for Entry of Final Order and Judgment Consistent with the Mandate. D.I.. 48 at ¶ 84.

69.    Despite the Delaware Supreme Court reversal, SeeCubic failed to return the Debtor's assets. D.I.. 48 at ¶ 85. On July 5, 2022, SeeCubic filed Supplemental Counterclaims in an attempt to block the assets from being returned to the Debtor. *Id.*

70.    On July 31, 2022, SeeCubic informed the Debtor that it intended to take legal title to the Debtor's assets pursuant to Article 9 of the UCC, enforcing creditor rights held by SLS. D.I.. 48 at ¶ 86. Furthermore, SeeCubic intended to sell the Debtor's assets. *Id.*

71.    On August 1, 2022, the Debtor requested a Temporary Restraining Order against SeeCubic to prevent the sale of its assets. D.I.. 48 at ¶ 87.

72.    On August 9, 2022, nearly 8 weeks after the Delaware Supreme Court opinion, the Chancery Court issued a TRO against SeeCubic. D.I.. 48 at ¶ 88. Vice Chancellor Laster specifically stated his expectations: "SeeCubic will restore Stream's assets to Stream in accordance with the Rule 54(b) order. Once this has occurred, SeeCubic may seek to exercise any creditor's rights it possesses against Stream. SeeCubic must do so based on a status quo where Stream has

title to and possession of its assets, not a status quo in which SeeCubic acquired possession based on a decision that the Delaware Supreme Court has held is erroneous." *Id.* (citing D.I., 48 at Exhibit AA).

73.     On August 10, 2022, the Delaware Chancery Court entered a partial final judgment which determined that the Omnibus Agreement was "without legal effect." D.I.. 48 at ¶ 89; Omnibus Agreement Litigation, D.I.. 477 ¶ 2 (the "Second Partial Final Judgment").

74.     The Second Partial Final Judgment specifically determined that "the Omnibus Agreement did not validly transfer legal title to any [of the Legacy Stream Assets] from Stream to SeeCubic." Omnibus Agreement Litigation, D.I.. 477 ¶ 3. The Second Partial Final Judgment thus rescinded the transactions between SeeCubic and Stream. The court directed the parties to cooperate to effectuate the Second Partial Final Judgment, including "by causing SeeCubic to transfer legal title to the [Legacy Stream Assets] from SeeCubic to Stream as expeditiously as possible." *Id.* ¶ 4.

75.     No one appealed the Second Partial Final Judgment.

76.     The court then issued an order declaring Stream to be the sole owner of the Company's equity. *See* Omnibus Agreement Litigation, D.I.. 569 ¶¶ 1–2.

## Chancery Court - Section 225 Action

77.     Thereafter, Hawk purported to exercise its rights under the Hawk Pledge Agreements by voting the shares of the Company to remove Mathu Rajan as sole director and replace him with Shad Stastney, the principal of SLS Holdings VI, LLC and formerly Stream's Chief Financial Officer and vice chair of the board of directors.

78.     On October 17, 2022, Hawk filed in Chancery Court, seeking an Order pursuant to 8 Del. C. § 225 ("Section 225") confirming that Hawk's purported removal of Mathu Rajan

and appointment of Stastney constituted a validly elected board of directors of TechnoVative USA D.I.. 48 at ¶ 91 (citing D.I., 48 at Exhibit CC). With control of TechnoVative USA, Morton and Stastney would control Ultra-D. D.I.. 48 at ¶ 91.

79.      On October 20, 2022, the Chancery Court issued a Status Quo Order in which SeeCubic was allowed to retain possession of the Debtor's assets pending adjudication of the Section 225 action by Hawk. D.I.. 48 at ¶ 92. Further, the Court appointed Ian Liston of the firm Wilson, Sonsini, Goodrich & Rosati P.C. as receiver pendante lite (the "Receiver") to oversee the operations of TechnoVative USA. *Id.* (citing D.I., 48 at Exhibit DD).

80.      In response to Hawk's complaint, Stream filed a motion to dismiss pursuant to Del. Ch. Ct. R. 12(b)(6) and 17. *Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et. al.*, Case No. 2022-0930-JTL D.I.. 109.   In addition, Hawk filed a motion for partial summary judgment. *Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et. al.*, Case No. 2022-0930-JTL D.I.. 104.   In its "Collateral Estoppel Opinion," the Chancery Court denied Stream's motion to dismiss and granted Hawk's motion for partial summary judgment.   (*Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et. al.*, Case No. 2022-0930-JTL D.I.. 160).

## The Claims Process

81.      On March 27, 2023, the Court issued a Notice, which established May 24, 2023 as the last date for all creditors other than governmental units holding a "claim" (as such term is defined in section 101(5) of the Bankruptcy Code against Stream TV Networks, Inc.).

82.      In the ordinary course of business, the Debtors maintain books and records (the "Books and Records") that reflect, among other things, the Debtors' liabilities and the amounts thereof owed to their creditors.

83.    The Debtors' register of claims (the "Claims Register"), was prepared and maintained by the Debtors' claims agent BMS Group.

84.    On May 19, 2023, Hawk Investment Holdings Ltd., ("Hawk") as "Collateral Agent," filed Proof of Claim No. 6.

85.    On May 23, 2023, SLS Holdings VI, LLC ("SLS") filed Proof of Claim No. 9.

86.    On May 23, 2023, SeeCubic, Inc. ("SeeCubic") filed Proof of Claim No. 14.

**Objections**

87.    As a preliminary matter, the Debtors have filed an adversary proceeding, case number 23-00057, on August 18, 2023, which objects to the POCs ("Adversary").  The Objection, detailed in the Adversary, objects to the POCs because of the takeover scheme, which persists to this day, created by Alastair Crawford (and over 50 other shareholders), SLS, and Hawk.  The hallmark of this scheme is to take the valuable assets of the Debtors, obstruct their ability to make payment on their debts, obstruct the ability to raise the money needed to go to production and convert the secured debt to equity, and to avoid paying $20 million in unsecured claims and instead pay Mr. Crawford and other shareholders who participated in the scheme in violation of the absolute priority scheme.

88.    Rembrandt incorporates the arguments and facts in the Adversary by reference as if fully restated herein.

**Hawk's Secured Debt is Subject to Conversion**

89.    In the Proof of Claim, Hawk fails to mention the existence of the Conversion Agreement and Amendment thereto.  In addition, none of the exhibits Hawk submitted to the Court contain the Conversion Agreement or Amendment thereto.

90.     A debt-to-conversion agreement was executed by Hawk on May 2, 2018 with an effective date of January 29, 2018. (D.I., 48 at Exhibit F).

91.     During the June 26 trial, Judge Coleman asked if the Hawk debt was still convertible and Hawk's counsel agreed that debt if fully convertible:

*From June 26 trial transcript -*

*THE COURT: ... the only issue I was trying to figure out is did they ultimately have the right to convert?*

*MR. ALEXANDER: Your Honor, I believe that the collateral estoppel order that they've referenced, has a provision in there that indicates that the Hawk debt is convertible.*

*MR. CAPONI: The Hawk debt is convertible, Your Honor.*

92.     Hawk's debt is convertible and either has already been converted due to prior investment in Stream or is presently convertible by new investment into Stream.

93.     As Hawk's counsel has acknowledged, conversion of the Hawk debt is not collaterally estopped by the prior Delaware Chancery Court's rulings with respect to conversion of debt to equity because there was no final judgment on the merits.

94.     Collateral estoppel operates to preclude a later-filed claim where:

1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the pleas is asserted was a party or in privity with a party to the prior adjudication, 4) the party against whom it asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

*Shaffer v. Smith*, 543 Pa. 526, 529, 673 A.2d 872, 874 (1996).

95.     While the Delaware Chancery Court made certain factual findings in the Injunction Decision, issued the Summary Judgment Order, and entered the First Partial Final Judgment based on the Summary Judgment Order, the Supreme Court Decision reversed the

Chancery Court's legal determination that the Omnibus Agreement was valid.  Therefore, the Chancery Court's factual findings do not constitute a "final judgment on the merits."

96.     Two other collateral estoppel opinions issued under these operative facts bracket the Collateral Estoppel Opinion. Both the Third Circuit Court of Appeals in Mathu Rajan v. Crawford, 2022 U.S. App. LEXIS 30505 (3d. Cir. Nov. 03, 2022) and the Court of Common Pleas of Philadelphia County, Pennsylvania in Raja Rajan v. Crawford et al., No. 269 (Phil. Cnty Ct. Com. Pl. April 19, 2023) found that collateral estoppel based in the Chancery Court's Omnibus Litigation Injunction Decision is inapposite.

97.     In fact, the Court of Common Pleas of Philadelphia County recently stated that collateral estoppel does not apply to the Delaware Chancery Court's prior ruling because "[t]he Delaware Chancery Court's ruling was vacated in part and reversed in part by the Delaware Supreme Court.  For that reason, it cannot constitute a final judgment on the merits."

98.     The Court of Common Pleas of Philadelphia County further stated that:

> *Defendants argue that the Vice Chancellor's findings of fact were not reversed by the Supreme Court, and in fact that the Supreme Court relied upon them in its ruling.  This Court cannot agree.  The injunction issued by the Chancery Court, which prohibited Plaintiff from attacking the validity of the Omnibus Agreement, was vacated.  There is no final judgment that currently exists, even though the Supreme Court did not address those findings of fact.*

99.     Moreover, even if this Court agrees with the "Collateral Estoppel Opinion," Stream is not collaterally estopped from raising money and converting Hawk's secured debt to equity.  The Delaware Chancery Court did not find otherwise.  Hawk acknowledges that in the "Collateral Estoppel Opinion," the court found that "the doctrine of collateral estoppel prevents Stream from relitigating the following issues:

• Hawk holds secured debt in Stream;
• Stream defaulted on that debt;
• Hawk has valid creditor rights;

• Stream cannot convert that secured debt to equity without raising additional capital; and
• as of November 10, 2021, Stream had not converted the secured debt."

*Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et al.*, C.A. No. 2022-0930-JTL

(Del. Ch.), D.I.. 160 (Collateral Estoppel Op.) at 31.

100.   Notably, the Chancery Court used a different analysis to evaluate collateral

estoppel than the Third Circuit did in its decision concluding the opposite about the same legal

issue a month earlier. The Chancery Court pulled its test from the Superior Court of Delaware's

decision in City of Newark v. Unemployment Ins. Appeal Bd., 802 A.2d 318, 324 (Del. Super.

2002), while the Third Circuit pulled its test from the Delaware Supreme Court's decision in

M.G. Bancorporation, Inc. v. Le Beau, 737 A.2d 513, 520 (Del. 1999).  It is obvious that the

Delaware Supreme Court is the controlling precedent regarding state law and that the Third

Circuit is controlling precedent, or if the decision is not precedential, it is highly persuasive and

an indication of how the Third Circuit will rule again regarding the same facts and

circumstances.

101.   The Third Circuit Court of Appeals concluded that collateral estoppel under

Delaware State law (i.e. the rendering forum) would not bar litigation of the circumstances

underlying the formation of the Omnibus Agreement (which would include the manufacture of

defaults under the loan agreements of SLS Holdings VI and Hawk). Mathu Rajan, 2022 U.S.

App. LEXIS at 7. The Third Circuit held that collateral estoppel could not be based in the

Chancery Court's now-vacated, reversed and remanded Omnibus Litigation Injunction Decision.

Mathu Rajan, 2022 U.S. App. LEXIS at 6 – 7.

102.   The Third Circuit held that reversal of the Omnibus Litigation Injunction

Decision deprived Appellees of a valid and final judgment to support collateral estoppel against

Mathu Rajan's claims for tortious interference and civil conspiracy in his Eastern District of

Pennsylvania lawsuit. Mathu Rajan, 2022 U.S. App. LEXIS at 6. The court vacated the

underlying dismissal of Mathu Rajan's tortious interference and civil conspiracy claims and

remanded the matter for further proceedings in the district court. Id. at 7. Applying Delaware

law, the Third Circuit noted that "[a] bedrock principle of preclusion law has been that a reversed

judgment cannot support preclusion; … an initial reliance on preclusion must be reversed once

the underlying judgment is reversed." Id. at 6 (citations omitted).

103.    Hawk is unable to cite anywhere in the opinion that bars Stream from converting

Hawk's secured debit to equity by raising additional capital or from converting Hawk's secured

debt after November 10, 2021.  No such support exists.  Rather the court plainly stated that:

> *Collateral estoppel does not bar Stream from litigating about events that may
> have happened after November 10, 2021. Stream cannot dispute the court's
> now-final ruling that Stream must raise new equity financing before gaining
> the right to convert the Hawk Notes into equity, **but Stream may seek to prove
> that it did so after the entry of the First Partial Final Judgment.***

*Hawk Investment Holdings Ltd. v. Stream TV Networks, Inc., et al.*, C.A. No. 2022-0930-JTL

(Del. Ch.), D.I.. 160 (Collateral Estoppel Op.) at 35-36 (emphasis added).

104.    In a prior opinion, the Chancery Court stated "those [creditor] rights, again, as I

understand it, are of a magnitude where, at least in theory, Stream could raise money to satisfy

that debt and then go on free of that claim." *In re Stream TV Networks, Inc*., Case No. 2020-

0766-JTL (Del. Ch. Ct.), D.I.. 475 at Exhibit 1 (July 20, 2022 Hearing Tr.) at 28:15-23).

105.    The Chancery Court further stated "I'm not going to enter any orders that prevent

Stream from raising capital through stock issuances or debt issuances, or things of that sort,

because I do think Stream has the ability to try to raise money to payoff this debt." *In re Stream

TV Networks, Inc*., Case No. 2020-0766-JTL (Del. Ch. Ct.), D.I.. 475 at Exhibit 1 (July 20, 2022

Hearing Tr.) at 33:6-10).

106.    Rembrandt 3D Corp has made an independent proposal to the Trustee (attached as

Exhibit 2) to fund a reorganization plan through new investment in Stream that would include

$39 million invested in a preferred share that would clearly convert the Hawk Debt assuming

their debt is not disallowed entirely or equitably subordinated due to their malfeasance in causing

harm to the Debtors.  Because Stream will not be legally liable with respect to Hawk's secured

debt, the debt secured by the Hawk Notes should be disallowed.

### Rent Regarding the Bonding Equipment

107.    SeeCubic claims that it paid $917,171.00 in February 2022 for rent relating to

storage of the Bonding Equipment.

108.    SeeCubic argues that "the Bonding Equipment is not property of the Debtors'

estates. However, out of an abundance of caution, in the event that the Court determines the

Bonding Equipment is property of the Debtors' estates, SeeCubic asserts a claim for the

$917,171.00 it paid to avoid a sale of the Bonding Equipment."

109.    The Bonding Equipment is an asset of the Debtors.  There has been no evidence

of any ownership by SeeCubic of the Bonding Equipment. SeeCubic took possession of the

Bonding Equipment pursuant to the Omnibus Agreement, did not return it in defiance of the

Delaware Supreme Court mandate, and then has stored it in a warehouse space without climate

controls thereby causing significant damage to this precision equipment.

110.    Stream and Visual Semiconductor, Inc. have testified in Court and discussed with

Judge Mayer in mediation with Hawk and Seecubic that an arrangement has been reached with

Cystar, one of the customers who have a pending purchase order to house the bonding equipment

rent free and have made arrangements for the engineers who manufactured the bonding

equipment to repair and calibrate the bonding equipment and to allow initial production within

Cystar's facility.  However, SeeCubic has refused to allow such a transfer and has concealed the whereabouts and made several attempts to seize the equipment in violation of the automatic stay in Stream's first chapter 11.  Until the Bonding Equipment is returned, and without damage, SeeCubic can recover nothing under 11 U.S.C. 502(d) and is also subject to setoff for the value of the damages as well as the lost productivity and related lost profits from refusing to return the Bonding Equipment.   If the equipment is lost or destroyed, SeeCubic's entire claim will be setoff as the value of the equipment as modified exceeds the full value of their claims against the estate.

### Claims Regarding Intellectual Property

111.    In its Proof of Claim, SeeCubic claims "[a]s part of its operation of the underlying business, SeeCubic devoted significant additional resources by funding the operations of the non-Debtor subsidiaries, investing in the business's technology, maintaining the requisite patents, and renewing software licenses, among other things."

112.    As of December 2022, the Debtor's subsidiary has been granted 128 patents. These patents are held by Debtor's subsidiary Ultra-D Coöperatief U.A., a Uitsluiting van Aansprakelijkheid under the laws of the Netherlands.

113.    SeeCubic is unable to point to any agreement providing an interest in these patents in exchange for payment of maintenance fees because no such agreement exists.

114.    "It is well recognized that 'a corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary.'" *Williams v. McGreevey (Touch Am. Holdings, Inc.)*, 401 B.R. 107, 126 (Bankr. D. Del. 2009) (finding that parent's status as a holding company who owned all the shares of its subsidiaries

did not create a right to the subsidiaries' assets) (quoting *Dole Food Co. v. Patrickson*, 538 U.S.

468, 475, 123 S.Ct. 1655, 1660, 155 L.Ed.2d 643 (2003)).

115.    Furthermore, there is a "the well-established rule that 'parent and subsidiary

corporations are separate entities, having separate assets and liabilities. . . . [H]ence, the

parent's  creditors have no claim to the subsidiary's assets, and vice versa.'" *Official Comm. of*

*Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC*, 590 B.R. 211,

256-57 (Bankr. D. Del. 2018) (quoting *In re Regency Holdings (Cayman), Inc*., 216 B.R. 371,

375 (Bankr. S.D.N.Y. 1998)).  "It is only the exceptional case where a court will disregard the

corporate form." *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990); *see*

*also Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 49 (Del. Ch. 2012).

116.    Therefore, because these patents are not the property of Debtors' estates and

creditors have made no attempt at demonstrating an exceptional case, SLS, Hawk, and SeeCubic

have no claim to the assets of Ultra-D Coöperatief U.A. and should not be allowed to seek a

claim against this alleged collateral.

### SLS, Hawk, and SeeCubic Seek Double and/or Triple Recovery

117.    SLS, Hawk, and SeeCubic have submitted claims that appear to be duplicative.

Double and triple recovery should be disallowed.

118.    For example, both SLS and SeeCubic have asserted the same liability against

Stream in the same amount and priority as that filed by Hawk as "Collateral Agent."

119.     According to the Collateral Estoppel Opinion,  "Hawk and SLS transferred their

rights as creditors to SeeCubic, thereby consolidating those rights within a single entity."  *Hawk*

*Investment Holdings Ltd. v. Stream TV Networks, Inc., et. al*., Case No. 2022-0930-JTL D.I.. 160

at 8.  In addition, "[u]nder the Note Purchase Agreement, SeeCubic issued notes with a face

value of $117,875,781.64 to various purchasers, including notes to Hawk with a face value of

$56,293,255.13 and notes to SLS with a face value of $6,514,023. In exchange, the noteholders

received a first-priority security interest in all of SeeCubic's assets, including the Legacy Stream

Assets." *Id.* at 7-8. In addition to the Assignment Agreement and the Note Purchase Agreement,

according to the Collateral Estoppel Opinion, SeeCubic entered into a Guarantee and Collateral

Agreement with Hawk. *Id.* at 8.

120. With respect to the Guarantee and Collateral Agreement, the Chancery Court

stated:

> Under that agreement, SeeCubic granted Hawk a security interest
> in all of its assets, including all of its contract rights. *Id.* §§ 3,
> 3.1(h), 4.1. If an event of default occurred under the Note Purchase
> Agreement, the Collateral Agreement empowered Hawk to act as
> the "Collateral Agent" to levy on SeeCubic's assets and enforce its
> contract rights, including the rights SeeCubic received under the
> Assignment Agreement. *See id.* art. 7. The issuance of a decision
> invalidating the Omnibus Agreement constituted an event of
> default under the Note Purchase Agreement.

*Id.*

121. In its Collateral Estoppel Opinion, the Chancery Court also stated:

> The Collateral Agreement appointed Hawk as Collateral Agent
> with the authority following an event of default under the Note
> Purchase Agreement to assert any rights that the note purchasers
> possessed under the Note Purchase Agreement or in the Collateral
> Agreement. Those rights included a security interest in all of
> SeeCubic's assets, which encompassed to "all General Intangibles
> (including all contract rights)." Collateral Agreement § 3.1(h). The
> security interest thus extended to the enforcement rights that
> SeeCubic received under the Assignment Agreement, which in
> turn included SeeCubic's right to enforce the Hawk Pledge
> Agreements.

*Id.* at 22-23.

122.    Since Hawk is acting as "Collateral Agent," SLS and SeeCubic's respective claims should be barred to the extent they duplicate the claim filed by Hawk.

**Basis for Relief**

123.    When asserting a proof of claim against a bankrupt estate, a claimant must allege facts that, if true, would support a finding that the debtor is legally liable to the claimant. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992); *In re Int'l Match Corp.*, 69 F. 2d 73, 76 (2d Cir. 1934) (finding that a proof of claim should at least allege facts from which legal liability can be seen to exist). Where the claimant alleges sufficient facts to support its claim, its claim is accorded *prima facie* validity. *In re Allegheny Int'l, Inc.*, 954 F.2d at 173.

124.    A party wishing to dispute such a claim must produce evidence in sufficient force to negate the claim's *prima facie* validity. *Id*. In practice, the objecting party must produce evidence that would refute at least one of the allegations essential to the claim's legal sufficiency. *Id*. Once the objecting party produces such evidence, the burden shifts back to the claimant to prove the validity of his or her claim by a preponderance of the evidence. Id. The burden of persuasion is always on the claimant. *Id.*

125.    For the reasons discussed in the preceding section, the claims of SLS, Hawk, and SeeCubic do not meet the standards for *prima facie* validity and should be disallowed as requested.

126.    It is undisputed that SLS, Hawk, and SeeCubic did not rely on their existing agreements to collect on any debt obligation owed to them, but rather sought to gain unfair advantage and severely harm the Debtor's by putting forth the invalid "Omnibus Agreement." This act was already determined to be unlawful by the Delaware Supreme Court.

29

127.     The scheme to create the Omnibus Agreement was inequitable conduct that

conferred an unfair advantage to the secured creditors far beyond what they would have been

entitled to if they had merely relied on their existing debt agreements.

128.     The entire purpose of this scheme was to transfer the value of Stream and

Technovative to SeeCubic in favor of SLS, Hawk, and the directors and shareholder of Stream

that colluded with SeeCubic in this scheme.  This plan was at the direct expense of the unsecured

creditors of Stream and Technovative, and specifically, harmed Rembrandt.

129.     It is undisputed that SLS, Hawk, and SeeCubic do not have a license from Philips

or Rembrandt.

130.     By taking possession of technology and entities that had access to Philips and

Rembrandt technology, SLS, Hawk, and SeeCubic caused a breach of the agreements with

Philips and Rembrandt and caused infringement by Technovative of the intellectual property of

both Philips and Rembrandt.

131.     It is undisputed that Shadron Stastney was the CFO of Stream and an insider with

access to internal and proprietary information of Stream, including but not limited to, the status

of the resolution of Rembrandt's claims with Stream.

132.     SLS, Hawk, and SeeCubic engaged in inequitable conduct that resulted in injury

to creditors and conferred an unfair advantage on the claimant such that equitable subordination

of the claim or its disallowance, whether based on its conduct or simple setoff, is consistent with

the provisions of the Bankruptcy Code and the most appropriate remedy for the inequitable

conduct. SLS, Hawk, and SeeCubic did not merely aggressively enforce any contract rights they

may have had, but instead engaged in an illegal takeover scheme and have asserted years of

penalties and interest while they have robbed the Debtors' and their estates of their ability to

operate.  They have disrupted progress towards commercialization at a crucial point where electronics had been perfected, ruined business relationships, scattered employees, and have persisted in their scheme to rob the assets, this time through a war of attrition that is simply an extension and reimagining of their takeover scheme.  They ignored Rembrandt's offer to fund the cost of the production line restart to fulfill Stream's obligation to Rembrandt.  To this day, they are blocking Stream from fulfilling the Cystar and Southern Telecom purchase orders.  Instead of allowing purchase orders to move forward and $150 million to come into the estate, which if their claims are allowed would result in their payment, they persist in sabotage, vexatious litigation, and infringement of trade secrets and other intellectual property.

### **Reservation of Rights**

133.    Rembrandt hereby reserve the right to object in the future to any of the Proofs of Claim listed in this Objection or on the exhibits attached hereto on any ground, and to amend, modify or supplement this Objection, including, without limitation, to object to amended or newly-filed Claims. Separate notice and hearing will be scheduled for any such objection.

134.    Notwithstanding anything contained in this Objection or the attached exhibits, nothing herein shall be construed as a waiver of any rights that Rembrandt may have: (a) to bring avoidance actions under the applicable sections of the Bankruptcy Code against the holders of Claims subject to the Objection; or (b) to exercise their rights of setoff against the holders of such Claims relating to such avoidance actions.

### **Notice**

37.    Rembrandt have provided notice of this Objection via first class mail to: (a) the Office of the United States Trustee for the Eastern District of Pennsylvania; (b) counsel for the agents for the Debtors' prepetition secured and unsecured lenders; (c) any persons who have

filed a request for notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002; and (e) parties whose Claims have been objected to in this Objection. In light of the nature of the relief requested, Rembrandt respectfully submit that no further notice is necessary.

### Compliance With Local Rule 3007-1

38. To the best of Rembrandt' knowledge and belief, this Objection and all exhibits to the Proposed Order comply with Local Rule 3007-1 and the Rule 3007(c) General Order. To the extent that this Objection does not comply in all respects with the requirements of Local Rule 3007-1, the undersigned believes such deviations are not material and respectfully requests that any such requirement be waived.

Dated: May 2, 2024

*/s/ Andrew DeMarco*
Andrew DeMarco, Esq. (PA Bar No. 326294)
ademarco@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251

*Attorneys for Rembrandt 3D Holding Ltd.*