# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| | : Bankruptcy No. 23-10763 (AMC) |
| **Stream TV Networks, Inc.,** *et al.* | : (Jointly Administered)[1] |
| | : |
| Debtors. | : Hearing Date: June 26, 2024 |
| | : Hearing Time: 12:30 p.m. |
| | : Hearing Place: Courtroom #4 |

**MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR ENTRY OF AN ORDER APPROVING A SETTLEMENT AGREEMENT AND MUTUAL RELEASE WITH HAWK INVESTMENT HOLDINGS, LTD., AS COLLATERAL AGENT FOR THE SECURED NOTEHOLDERS OF SEECUBIC, INC., PURSUANT TO FED. R. BANKR. P. 9019(a) AND 11 U.S.C. § 105(a)**

William A. Homony (the "Trustee"), in his capacity as Chapter 11 trustee of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative" when referred to with Stream, the "Debtors"), by and through his counsel, Obermayer Rebmann Maxwell & Hippel LLP, files this Motion for Entry of an Order Approving a Settlement Agreement and Mutual Release (the "Agreement") with Hawk Investment Holdings, Ltd. ("Hawk"), as Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SeeCubic" or in conjunction with the Trustee, Hawk and SeeCubic may be generally referred to as "Party" or collectively as the "Parties") and SeeCubic pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a) (the "Motion"), and in support thereof, respectfully avers as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion under 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A),

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

4875-7966-5596 v1
318450713.5

(B), (K) and (O).

3.  The statutory basis for the relief requested herein is Fed. R. Bankr. P. 9019 and 11 U.S.C. § 105(a).

## BACKGROUND

**A.  Bankruptcy Procedural Background.**

4.  On March 15, 2023, (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

5.  On March 20, 2023, Hawk filed a motion for relief from the automatic stay (the "Hawk Stay Relief Motion") to proceed with an action against the Debtors (D.I. #16) in the Delaware Court of Chancery (the "Delaware Chancery Court") under § 225 of Title 8 of the Delaware Code (the "225 Action").

6.  On April 5, 2023, the Debtors filed an objection to the Hawk Stay Relief Motion (D.I. #78).

7.  On April 6, 2023, Hawk filed a motion pursuant to sections 1112/1104 of the Bankruptcy Code, seeing dismissal or conversion of the Debtors' cases, or alternatively, the appointment of a Chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code (the "1112/1104 Motion") (D.I. #94).

8.  In the 1112/1104 Motion, Hawk argued that cause existed to appoint a trustee based upon the Debtors' pre- and post-petition history of fraud, dishonesty, incompetence, and gross mismanagement of their businesses.

9.  The Debtors filed an opposition to the 1112/1104 Motion on May 8, 2023 (D.I. #193).

10.  On January 5, 2024, the Court entered an order, which, among other things, (1)

2

granted the 1112/1104 Motion with respect to the appointment of a Chapter 11 trustee, and (2) granted the Hawk Stay Relief Motion to allow the Section 225 Action to proceed (the "Trustee Order") (D.I. #549).

11. The Trustee Order instructed the United States Trustee's Office to immediately begin the process of appointing a Chapter 11 trustee and set a status hearing for January 24, 2024 (the "Status Hearing").

12. On January 9, 2024, the Office of the United States Trustee filed a notice of appointment of William A. Homony to serve as the chapter 11 trustee as well as an application for the entry of an Order approving the appointment of the Trustee. (D.I. #554 and #553, respectively).

13. On January 12, 2024, the Bankruptcy Court entered an Order Approving the Appointment of the Trustee (D.I. #558).

14. On January 17, 2024, the Trustee filed an Application to Employ Miller Coffey Tate LLP as his accountants/advisors (D.I. #566) and that Application was approved on February 15, 2024 (D.I. # 586).

15. On January 17, 2024, the Trustee filed an Application to Employ Obermayer Rebmann Maxwell & Hippel LLP as his counsel (D.I. #564) and that Application was approved on January 29, 2024 (D.I. # 577).

16. On January 31, 2024, the Trustee filed an Application to Employ Steven M. Coren and Coren & Ress, P.C. as his litigation counsel (D.I. # 579) and that Application was approved on February 15, 2024 (D.I. # 587).

**B.**     **The 225 Action and Chancery Court Litigation.**

17.    At the time of the Trustee's appointment, the 225 Action was pending in the Delaware Chancery Court.

18.    Prior to the commencement of the 225 Action, a contingent of the Debtors' secured creditors entered into an Omnibus Agreement (the "Omnibus Agreement"), which the Delaware Court of Chancery upheld as validly effectuating a foreclosure.

19.    In June 2022, the Delaware Supreme Court voided the Omnibus Agreement and reversed the the decision of the Delaware Court of Chancery.

20.    Thereafter, Hawk sought to exercise certain of its rights as a secured creditor of the Debtors through the exercise of proxy rights in pursuit of a foreclosure sale under Article 9 of the UCC.

21.    The Debtors contested that Hawk had validly exercised its proxy rights resulting in Hawk's institution of the 225 Action to determine the proper composition of Technovative's board of directors.

22.    Numerous issues were raised in the 225 Action, including, *inter alia*, whether Hawk's secured position had been converted from debt to equity pursuant to certain conversion agreements.  Hawk alleges that collateral estoppel precludes the Trustee from advancing certain positions, a premise which the Trustee disputes.  The Debtors contest Hawk's positions and allege that the Hawk secured debt was converted to equity.

23.    In any event, but for the settlement (the "Settlement") embodied in the Agreement, the ultimate determination of Hawk's status—and its impact on the Debtors—likely would require extensive and extremely expensive continuing litigation in the Delaware Chancery Court, the Delaware Supreme Court, this Court and perhaps other courts—the outcome of which is

unpredictable.

24. To prevail in the 225 Action, the Debtor must overcome significant factual and legal challenges, and its ability to do so is far from guaranteed.

25. On March 1, 2024, the Trustee filed an expedited motion to reinstate the automatic stay in connection with the 225 Action. On April 1, 2024, the Bankruptcy Court entered a consent order granting the Trustee's motion, thereby affording the Trustee and his advisors additional time to prepare for and defend the 225 Action.

26. If the Agreement is not approved, the trial of the 225 Action likely would commence on July 31, 2024. Hawk will seek relief that, if awarded, may substantially prejudice the Debtors' estates, and perhaps leave nothing for other creditors.

C. **The Pending Adversary/Injunction Proceedings Against Hawk.**

27. After the Petition Date, the Debtors instituted a proceeding in bankruptcy court against Hawk and others (the "Adversary").

28. In the Adversary, the Debtors alleged, *inter alia*, that certain shareholders and their secured lenders (the "Secured Creditors") conspired to and did exert control wrongfully over Debtor property. The Adversary further alleges that the defendants, including the Secured Creditors and SeeCubic, and certain board members interfered with employees and investors, while conspiring to cause the Debtors to breach their loan agreements with the Secured Creditors pursuant to which the Debtors were loaned more than $50,000,000.00 (US).[2]

29. The Debtors also allege that the Omnibus Agreement, which resulted in the transfer of certain assets to SeeCubic and the decision by board members to enter and consummate same, breached fiduciary duties to the Debtors. The Debtors complain that the Secured Creditors used

---

[2] In addition to the Adversary and the 225 Action, the Settlement resolves all Pending Litigation Matters, as that term is defined in the Agreement.

their power and position to shift ownership away from the principals of the Debtors, and to wrongfully secrete, remove and convert assets of the Debtors.

**D.     The Trustee's Efforts to Bring Value into the Estates.**

30.     In the relatively brief period since his appointment, the Trustee and his professionals have: (i) reviewed and analyzed volumes of documents relating to Debtors and their foreign subsidiaries; (ii) reviewed the extensive filings and hearing transcripts in the bankruptcy cases; (iii) investigated and analyzed Debtors' Adversary, (iv) investigated and analyzed the Delaware Chancery Court cases including the 225 Action and the Delaware Supreme Court case, and (v) interviewed Debtors' bankruptcy counsel, Delaware counsel, Netherlands counsel, and other representatives.

31.     Since appointed, the Trustee has been faced with a "melting ice cream cone."

32.     Debtors have no money, faltering operations, and potentially valuable operations held by a foreign subsidiary—an indirect subsidiary of Technovative in the Netherlands known as SeeCubic BV ("SCBV").

33.     Debtors have been unable to fund SCBV, whose expenses have been funded post-petition by the Secured Creditors.

34.     It is widely recognized that the principal value of Debtors' assets resides in SCBV, its employee knowhow and operations, and Debtors' downstream IP.

35.     Unable to secure a DIP loan or to fund SCBV, SCBV employees in the Netherlands were close to leaving, and SCBV recently was on the verge of shutting down—to the substantial detriment of Debtors and their ability to garner value for the benefit of Debtors' bankruptcy estates.

36.     Because of the substantial and unliquidated secured claims and the disputes connected thereto, the Trustee was unable to obtain third-party debtor in possession financing to

4875-7966-5596 v1
318450713.5

begin operations, fund SCBV and/or fund case administration, including prosecution of the 225 Action and the Adversary.

37. It quickly became clear to the Trustee that Debtors' capital stack was in disarray, and that continuing litigation over debt-to-equity conversion and other matters would be risky, costly, and perhaps leave the estates without unencumbered assets to market or sell.

38. As the Trustee investigated the Debtors' cash needs and available resources, it quickly became apparent that Stream was not selling televisions or technology and had no reliable revenue sources to fund operations or the bankruptcy proceedings. Rather, Debtors' principal had been attempting to finance Stream through bootstrap equity raises in a non-debtor company known as Visual Semiconductor, Inc. or "VSI". The Trustee made clear that neither the Debtors' estates nor the Trustee would participate in post-petition equity raises.

39. The Trustee met unsuccessfully with Debtors' principal to explore a viable plan of reorganization.

40. After a presentation of the Debtors' technology and the principal's envisioned future use of the technology, the Trustee awaited both a proposal for Debtor in Possession Financing (a "DIP") and exit plan financing from the Debtors' principal, with proof of financial wherewithal, which would allow the secured claims (if any) to be satisfied once determined and provide a return to unsecured creditors. In the Trustee's business judgment, no such viable proposals were presented.

41. The Trustee also met with Rembrandt 3D Holding Ltd. ("Rembrandt"), who is alleged to be one of the Debtor's largest unsecured creditors and a third party interested in the technology owned by or licensed to the Debtors. No offer to purchase or to provide a DIP was forthcoming, though Rembrandt continues to express interest in Debtors' property.

42. After open and robust discussion and negotiation, the Trustee has entered into the Agreement, and seeks Bankruptcy Court approval under Federal Rule of Bankruptcy Procedure 9019.

E. **The Proposed Settlement With Hawk (as Agent for the Secured Creditors).**

43. The Trustee has interacted and negotiated with interested parties, including Debtors' principal, Rembrandt, and Hawk. From the outset, the Trustee made clear that he would entertain only realistic proposals, coupled with proof of the financial ability to fund.

44. In the Trustee's business judgment, only Hawk made a viable proposal.

45. The Settlement proposal embodied in the Agreement leaves open the possibility that others who have expressed interest, including the Debtors' principal and Rembrandt, will have the opportunity to present a potentially higher or better offer when Debtor property is exposed to sale.

46. The Settlement with Hawk takes into account possible claims against Hawk, the prospect of litigating with Hawk into the future, the risk inherent in litigating with Hawk about the nature and extent of its liens while trying to administer the Bankruptcy Cases, and the importance of achieving a recovery for unsecured creditors in a reasonable time.

47. The Settlement reflects the substantial efforts of the Trustee and his advisors and the advisors of Hawk to achieve a commonsense resolution of the bankruptcy and related proceedings as expeditiously as possible, while minimizing further administrative expenses.

48. In the Trustee's business judgment, the time is right to attempt a full resolution, which results in payments to creditors, rather than continued administration of potentially insolvent bankruptcy estates.

49. Significantly, the Trustee is faced with millions of dollars in administrative

expenses before money can be made available for unsecured creditors.

50. Under the circumstances, the Trustee has determined that the Agreement provides the best alternative for the bankruptcy estates.

51. Accordingly, the Trustee and Hawk seek to settle all claims between Debtors' estates and the Secured Creditors, while the Trustee undertakes a process to market and sell substantially all the Debtors' assets, including the Secured Creditors' collateral[3] under Section 363 of the Bankruptcy Code.

**F.** **The Settlement**

52. A detailed description of the terms of the Settlement and Agreement are set forth below and a copy of the Agreement is attached hereto as Exhibit "A" and incorporated herein.

53. Treatment of Secured Claims:

   a. Upon the entry of the order approving the 9019 Motion, the Hawk Claim shall be deemed an allowed Secured Claim, secured by the Collateral as more fully set forth in Claim No. 6 and the supporting documentation, in the amount of $180 million, subject to increase as set forth in the Agreement (such amount, the "Allowed Secured Claim"). The Trustee waives the right to object to any portion of the Allowed Secured Claim or to seek the conversion or subordination of such claim for so long as the applicable provision of the Agreement remains valid and binding on the Parties.

   b. The Allowed Secured Claim shall increase on a dollar-for-dollar basis for documented and evidenced amounts actually advanced to fund the operations of

---

[3] For the avoidance of doubt, the Secured Creditors' collateral excludes all claims and causes of action against third parties including but not limited to Chapter 5 claims against third parties and causes of action and D&O claims and any resulting proceeds therefrom.

9

SeeCubic, B.V. ("SCBV") between the Trustee's appointment date and the sale Closing in accordance with Section 6 of the Agreement, which advanced amounts shall not constitute administrative expenses of the Debtors' estates and shall only increase the Allowed Secured Claim.

c. Upon the entry of the order approving the 9019 Motion, the proofs of claim of SLS Holdings VI, LLC [Claim No. 9 on the official claims docket of Stream and Claim No. 2 on the official claims docket of TMI] and the proofs of claim of SeeCubic, Inc. [Claim No. 14 on the official claims docket of Stream and Claim No. 3 on the official claims docket of TMI] shall be deemed withdrawn of record with no further order of the Bankruptcy Court necessary to effectuate such withdrawal.

54. Sale of the Debtors' Assets. The Trustee has sought approval of the retention of an investment banker to market the Collateral. The Trustee shall seek entry of the Bidding Procedures Order on an expedited basis to obtain approval thereof concurrently with the entry of the 9019 Order. Subject to documentation satisfactory to Hawk (and drafted in consultation with Hawk), SCI shall serve as the stalking horse bidder for the Collateral, with such bid (the "Stalking Horse Bid") and Asset Purchase Agreement (the "Stalking Horse APA") attached to the Bidding Procedures. Subject to documentation satisfactory to Hawk and the Trustee, the Stalking Horse Bid shall consist of a credit bid of the Allowed Secured Claim in the amount of $150 million. The Secured Creditors waive the right to seek or obtain a "breakup fee" or a "topping fee" or any other bid protections as part of the Stalking Horse Bid.

55. The Bidding Procedures shall specify that in order for any bid other than the Stalking Horse Bid to constitute a "Qualifying Bid" such bid shall include:

    a. A bid deposit in the amount of 10% of the proposed aggregate purchase price (the "Bid Deposit"), and

    b. Evidence satisfactory to the Trustee of its financial wherewithal to consummate a Sale in the amount of the proposed purchase price.

56. The Bidding Procedures shall specify that Qualifying Bids may include both cash and non-cash consideration, subject to the following conditions:

    a. The cash component shall be no less than $120 million,

    b. The non-cash component of the bid shall be backed by a letter of credit or other security, over which Hawk shall have consultation rights as to the sufficiency and form of such security, and

    c. The Bid Deposit shall be 10% of the aggregate purchase price, including both the cash component and the non-cash component of the bid.

57. To the extent the Trustee receives any other Qualified Bids (exclusive of the Stalking Horse Bid which will be deemed a Qualified Bid), SCI may participate in the Auction. Any overbid submitted by SCI in excess of the Stalking Horse Bid at the Auction shall be in cash only. For the avoidance of doubt, SCI cannot utilize any of the remaining Allowed Secured Claim as part of any overbid; however, its overbid may include a credit bid up to $150 million.

58. Trustee/Estate Carve out. With respect to any sale that closes as contemplated by, and in accordance with, the terms of the Agreement, the Secured Creditors will provide a carve-out ("Carve-Out") in the form of cash from the sale proceeds of their collateral, or SeeCubic shall fund the Carve-Out if the Secured Creditors' Stalking Horse Bid or any subsequent overbid is determined to be the winning bid, as follows:

a. $7,500,000.00 and an additional 10% of each dollar in excess of the Stalking Horse Bid for the benefit of the Debtors' estates paid as follows:

   i. $1,000,000.00 paid to the Trustee upon entry of an Order approving the Agreement (ie: the 9019 Motion);

   ii. $1,500,000.00 paid to the Trustee upon approval of the bidding procedures; and

   iii. The Trustee shall receive the balance of the Carve-Out (*i.e.*, the Carve-Out minus the Carve-Out Advance) at Closing:

      1. In the event SCI is the successful bidder, by SCI in cash at Closing.

      2. In the event a third party is the successful bidder, from the cash proceeds of the purchase price.

b. Trustee to retain rights to the $1 million bond posted by the Debtors in the DE Chancery Court.

c. Trustee to retain all claims and cause of action not released against third-parties including but not limited to Chapter 5 claims and causes of action and any claims against the Debtors' directors and officer (collectively "Litigation Claims") and any resulting proceeds from said Litigation Claims.

c. The bankruptcy estates and/or any trustee or disbursing agent retain the right to object to claims against the bankruptcy estates.

d. The Secured Creditors will provide the Trustee with documentation regarding SeeCubic's financial ability to fund the Carve-Out.

e. The Secured Creditors will be allowed a subordinate unsecured deficiency claim subordinated to all other general unsecured creditors (the "Deficiency Claim") to

12

the extent that the Secured Creditor Distribution is not sufficient to satisfy the Allowed Secured Claim in full. The Secured Creditors' Deficiency Claim will be recognized as an impaired unsecured claim which the Secured Creditor shall be entitled to vote on confirmation of any Trustee Plan.

54. Releases.

   a. Included in the Agreement and the 9019 Motion (as defined below), the Trustee, Debtors and the Debtors' estates and the Secured Creditors (released parties to be further defined in the 9019 Motion and agreement, but will include the foregoing as well as any named defendants in any action currently pending initiated by the Debtors who participate by granting releases to the Debtors and Trustee) will exchange customary mutual general releases, effective upon the closing of any sale of the Debtors' assets as contemplated by, and in accordance with, the Agreement (whether such sale is to the Secured Creditors or a third party), including, for the avoidance of doubt, dismissal with prejudice all causes of action and claims currently pending in any other federal or state court (or analogous foreign jurisdiction) currently pending in the United States or abroad, and excluding any obligations created under the Agreement or ultimate asset purchase agreement. The Secured Creditors agree to not file any further pleadings in the Debtors' pending bankruptcy cases subsequent to a sale closing and receipt of any sale proceeds from the Trustee, except to enforce or otherwise seek an interpretation of the Agreement and the sale documents.

**RELIEF REQUESTED**

55. The Trustee respectfully requests entry of an Order approving the Settlement and

13

the Agreement pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 9019.

56. The discussion of the terms contained in the Agreement is intended as a summary only and all parties in interest are encouraged to read the Agreement in its entirety.

57. To the extent that there are discrepancies between the summary contained in the Motion and the terms contained in the Agreement, the terms of the Agreement shall control.

58. Federal Rule of Bankruptcy Procedure 9019(a) provides "on motion by the trustee and after notice and a hearing, the Court may approve a compromise or settlement. The decision to approve or disapprove a settlement is within the sound discretion of the bankruptcy judge." *See*, *In re Martin*, 91 F.3d 389, 393 (3rd Cir. 1996).

59. The Debtors seek approval, pursuant to Bankruptcy Code § 105 and Fed. R. Bankr. P. 9019, of the Settlement of the claims among the Parties as set forth in the Agreement.

60. In *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, *reh'g denied*, 391 U.S. 909 (1968), the Supreme Court instructed as to those factors to be considered in determining whether to approve a settlement. The factors outlined by the Supreme Court in *Anderson* have been uniformly summarized as follows:

    a. the probability of success in the litigation;

    b. the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it;

    c. the difficulties, if any, to be encountered in the matter of collection; and

    d. the paramount interest of the creditors.

*See*, *Martin*, 91 F.3d at 393; *In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998); *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997); *In re Pennsylvania Truck Lines, Inc.*, 150 B.R. 595, 598 (E.D. Pa. 1992), aff'd, 8 F.3d 812 (3d Cir. 1993); *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 390, 395 (Bankr. E.D. Pa. 1987).

61. Bankruptcy Rule 9019 authorizes this Court to approve the settlement entered into by the Debtor. The decision whether to accept or reject a compromise is committed to the sound discretion of the Bankruptcy Court, "which must determine if the compromise is fair, reasonable, and in the interest of the estate." *See*, *Louis's*, 211 B.R. at 801. *See also*, *In re Neshaminy Office Building Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986).

62. The settlement need not be the best that the debtor could have achieved but must only fall "within the reasonable range of litigation possibilities." *See*, *In re Penn Central Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979). In making its determination, a court is not to substitute its own judgment for that of the debtor. *See*, *Neshaminy Office Bldg.*, 63 B.R. at 803. Moreover, it is not necessary for the court to conduct a truncated trial of the facts of the merits underlying the dispute. *See Grant Broadcasting*, 71 B.R. at 396. *See also*, *In re A&C Properties*, 784 F.2d 1377, 1384 (9th Cir.), cert. denied, 479 U.S. 854 (1986). Rather, the court need only "canvass the issues to see whether the settlement fall[s] below the lowest point in the range of reasonableness." *See*, *Neshaminy Office Bldg.*, 62 B.R. at 803 (*quoting*, *In re W.T. Grant Co.*, 4 B.R. 53, 69 (S.D.N.Y. 1977)).

63. Here, the Agreement clearly falls within the range of reasonableness for purposes of satisfying Bankruptcy Rule 9019 criteria.

64. The dispute between the Parties involves numerous, complex issues. The Agreement resolves these matters in a manner which, in the exercise of the Trustee's business judgment, is appropriate and beneficial to the Bankruptcy Estates.

65. Faced with insolvent estates and understanding fully the complex and wasting collateral picture and the challenged capital structure of the Debtors, the Trustee has reasonably elected a path that minimizes additional administrative expenses and avoids the substantial

15

additional expenses to be incurred with continuing a litigation-based path to recovery—a path that is speculative and fraught with peril.

66. If the Agreement is not approved, Debtors' property likely will devalue and waste, rendering it even more likely that creditors will receive nothing.

67. The looming hearing on the 225 Action may further limit the Trustee's options should the proceedings not end in Debtors' favor.

68. Moreover, a further delay in these Bankruptcy Cases will exponentially increase administrative expenses, to the prejudice of creditors.

69. Simply stated, litigation is time-consuming, costly, and uncertain. The Trustee cannot, in his exercise of business judgment, expose creditors to that risk when there is a potential for an assured recovery through settlement, and a chance for others who have shown interest to bid on the assets being put up for sale. The potential for an overbid recovery further enhances creditor's potential opportunities.

70. Without the Agreement, the Trustee will be unable to conduct a realistic sale process, as it would be forced to fight with Hawk over the nature and extent of Hawk's secured claims.

71. If the Agreement is not approved, Debtors' estates will face stiff headwinds, without money to continue operations or fund case administration, and a future of hotly contested litigation whose outcomes are unpredictable.

72. Accordingly, the Trustee believes that the Agreement is in the best interests of the Debtors' estates and requests that it be approved by this Court.

## NOTICE

73. The Trustee's counsel has served this Motion and Notice of Motion, Response

4875-7966-5596 v1
318450713.5

Deadline and Hearing Date upon: (a) the Office of the United States Trustee, (b) counsel to the former debtor in possession, (c) counsel to the signatories to the Agreement, and (d) all parties who have requested notice pursuant to Fed. R. Bankr. P. 2002. The Trustee's counsel has also served the Notice of Motion, Response Deadline and Hearing Date upon all of the Debtor's creditors.

**WHEREFORE**, the Trustee respectfully requests that this Honorable Court enter an Order (i) granting the relief sought in the Motion; (ii) approving the Agreement and the Settlement contained therein; (iii) authorizing the Trustee to move forward with the Agreement and Settlement, and (iv) granting such other and further relief it deems just and proper.

Respectfully submitted,

*/s/ Michael D. Vagnoni*
Edmond M. George, Esquire
Michael D. Vagnoni, Esquire
Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA  19102
Telephone: (215) 665-3066
Facsimile: (215) 665-3165
E-mail addresses:
edmond.george@obertmayer.com
michael.vagnoni@obermayer.com
*Counsel to William Homony, Chapter 11 Trustee*

Dated: May 6, 2024

4875-7966-5596 v1
318450713.5