UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: : <br> : <br> STREAM TV NETWORKS, INC., : <br> : <br> DEBTOR. : <br> : | : <br> : <br> : <br> : <br> : <br> : | CHAPTER 11 <br><br> CASE NO. 23-10763-AMC |
| IN RE: : <br> : <br> TECHNOVATIVE MEDIA, INC., : <br> : <br> DEBTOR. : | : <br> : <br> : <br> : <br> : | CHAPTER 11 <br><br> CASE NO. 23-10764-AMC |

**OBJECTION OF VISUAL SEMICONDUCTOR, INC. TO THE
MOTION OF THE CHAPTER 11 TRUSTEE TO APPROVE
SETTLEMENT AGREEMENT AND MUTUAL RELEASE WITH
HAWK INVESTMENT HOLDINGS, LTD, AS COLLATERAL AGENT FOR
THE SECURED NOTEHOLDERS OF SEECUBIC, INC.,
<u>PURSUANT TO FED.R.BANKR.P. 9109(a) AND 11 U.S.C. § 105</u>**

Visual Semiconductor, Inc. ("**VSI**"), creditor, equity holder and party in interest of the Debtor herein, by and through its counsel, Spector Gadon Rosen Vinci P.C., hereby files an Objection to the Motion of the Chapter 11 Trustee (the "**Trustee**") to Approve Settlement Agreement and Mutual Release with Hawk Investment Holdings, Ltd. ("**Hawk**") as Collateral Agent for the Secured Noteholders of SeeCubic, Inc. (the "**9019 Motion**") , and in support thereof states as follows:

VSI is a creditor, party in interest, and equity holder of the Debtor who has been one of its primary investors since its inception in 2020. From the beginning of this Bankruptcy, it has been actively engaged with the Debtor in the hopes of reviving the business and continuing its pursuits,

3897426v1

which includes the manufacturing and sale of technology that converts 2D content to 3D without the need for viewing glasses.

Unfortunately, and as a detriment to the Estate's creditors, it appears that the Chapter 11 Trustee has fallen prey to the wishes of Hawk, SLS Holdings ("**SLS**"), and SeeCubic, Inc. ("**SeeCubic**"), who are on a warpath to literally steal the Debtor's valuable assets. Aligned with these parties, and with knowledge that Hawk et al. are actively and indisputably violating a TRO entered by this Court, the Trustee is attempting to push through a settlement that drastically favors Hawk and SeeCubic by improperly granting them the right to credit bid in the amount of $150 million as the "stalking horse" bid for a sale of the Debtor's assets. This is clearly a fantastical concept as Hawk, SLS, and SeeCubic do not even hold valid secured claims. And just as concerning, despite repeated requests by various parties for information as to which Estate assets the Trustee wants to sell, the Trustee will not even articulate what those assets are.

It has become clear to VSI that the Trustee is not acting in the best interest of Stream and its business with the 9019 Motion, but rather, has already decided with whom he should be aligned – Hawk, SLS, and SeeCubic – and is actively acting in their favor to the detriment of the bankruptcy Estate. In fact, despite VSI presenting viable proposals that would be more beneficial to the Estate than the Trustee's Settlement, the Trustee has refused to seriously consider them. Instead, he has essentially frozen VSI out without any careful consideration because it is not Hawk, SLS, or SeeCubic.

Based on these facts, VSI posits that the settlement and release proposed by the Trustee in the 9019 Motion (the "**Proposed Settlement**") should not be approved by this Court because: (1) the Trustee has not adequately identified or even properly secured the assets he plans to sell as part of the Proposed Settlement; (2) the Proposed Settlement is not in the best interest of the Estate; (3)

VSI's proposals to the Trustee are more beneficial to Stream and should have been viewed favorably had the proposals been objectively evaluated; (4) the Trustee's 9019 Motion proposes to sell the Estate's assets to parties who are known malfeasors and active breachers of the Court's TRO; and (5) the Trustee is trying to push forth a settlement which, in fact, is a *sub rosa* plan violating the standards set forth in the Bankruptcy Code.

      A.      **The Trustee Has Not Conducted The Appropriate Due Diligence To Maximize The Value Of The Estate**

      1.      Under Section 1106 of the Code, the Trustee's duties include "investigat[ing] the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or the formulation of a plan". 11 U.S.C. § 1106(3). Then, the trustee must file a plan under section 1121 "as soon as practicable" that seeks to <u>maximize</u> the value of the bankruptcy estate. *Id.* at 1106(5).

      2.      Despite this affirmative duty to investigate the Debtor's business to understand what assets exist[1], gather those assets so they can be properly secured, and then maximize the value of those assets[2] (whether through their continued use in the operation of the Debtor's business or in a sale), the Trustee's 9019 Motion fails to adequately explain how he has investigated the

---

[1] VSI and other creditors have made numerous inquiries as to the location of Estate assets and what, if anything, the Trustee has done to safeguard them. VSI has even supplied the Trustee with an extensive list of the assets which it believes belongs to the Estate. The Trustee has repeatedly refused to respond to these inquiries.

[2] It should be explained that the value in the Debtor's Estate derives almost entirely from the rights to the Ultra-D technology that makes 2-D to 3-D content conversion possible. Ultra-D technology is made up of a combination of <u>non-assignable</u> IP rights owned by Rembrandt 3D Holding, Ltd. ("**Rembrandt**"), Koninklijke Philips Electronics N.V. ("**Philips**"), and subsidiaries of Technovative Media, Inc. Rembrandt has already made clear that the sale of any assets of the Estate will likely trigger litigation surrounding the ownership of these IP rights (in addition to the current litigation before this Court regarding the enforcement of the TRO), and thus, the most valuable course of conduct for the Debtor is to maintain their business operations.

3

Debtor's Estate and protected the Estate's value. Nor has he provided a list to any party or the Court of the assets associated with the Proposed Settlement.

3. The Trustee's lack of disclosure as to the identity of the assets and the Debtor's possession thereof is especially alarming because he now is proposing a settlement with parties that have unlawfully taken and are illegally using Estate assets in violation of a TRO entered by this Court.

4. Specifically, VSI has information leading it to believe that Hawk and other secured creditors are using several of the Debtor's assets to produce income for their own benefit rather than for the benefit of the bankruptcy Estate.[3]

5. After receiving this information, VSI questioned the Trustee as to the actions that would be taken to ensure that all Estate assets are secure, properly maintained and not illegally used so as to diminish their value to the Debtor.

6. Moreover, VSI provided the Trustee with a list of the assets it believes belongs to the Debtor – including but not limited to the specialized Bonding Equipment discussed in Footnote 3, Intellectual Property, servers, Ultra-D demonstrator samples, laptops, and software – in the hopes that the Trustee could confirm the Estate still held those valuable assets and they were not being used by the Secured Creditors. *See* Exhibit "A", true and correct copy of the Asset List VSI provided to the Trustee.

---

[3] For example, VSI has advised the Trustee that it has information that SeeCubic, in conjunction with Hawk and SLS, have illegally taken possession of certain Bonding Equipment originally housed in China, which allows for the precise gluing of proprietary 3D lenses on standard 2D video panels to assist with Debtor's Ultra-D technology, and has refused to return this equipment to the Estate in defiance of Trustee requests and Court mandates. It seems the Trustee has improperly sanctioned these events – when questioned by VSI and Rembrandt, he refused to provide any information as to the status of the return of this key equipment.

7. Despite VSI's repeated attempts to ensure that Estate assets are not being improperly used, the Trustee has never once confirmed possession of the key Estate assets or explained the steps he was taking to stop these undisputed illegal actions against the Debtor's Estate.

8. And without any information from the Trustee, there is no possible way to evaluate the Proposed Settlement, which includes a credit bid sale of assets as one of its key terms.

9. Accordingly, until this Court and the parties are provided with a complete list of all the assets proposed to be sold as part of the Proposed Settlement and evidence that the assets are secure and not being used in violation of the TRO, VSI respectfully requests that the Court deny the Trustee's Motion to approve the Proposed Settlement.

**B.    The Proposed Settlement Is Not In The Best Interest Of The Estate**

10. Even if the Trustee had conducted an appropriate investigation of the Debtor's assets and made proper disclosures to the parties, he still cannot escape the fact that the Proposed Settlement is simply <u>not</u> in the best interest of the Estate, and thus, must be rejected in favor of a plan that would continue on with the Debtor's business.

11. In his 9019 Motion, the Trustee makes the repeated assertion that the Proposed Settlement was the only proposal that made sense "[i]n the Trustee's business judgment" and that "the Trustee believes that the [Proposed Settlement] is in the best interests of the Debtor's estates…." *See* 9019 Motion, at p. 8, 15-16.

12. However, he never actually explains the basis for that analysis except for the bald assertion that it will save the Estate time and litigation costs, and even a cursory review of the parties' conduct reveals that his analysis could not be further from the truth – the Proposed Settlement clearly favors Hawk, SLS, and SeeCubic by granting them the right to credit bid the

5

full value of a <u>purported</u> secured claim that has not yet been determined to be secured and that will continue to involve significant litigation regardless of whether the Proposed Settlement is approved or not.

13. Rule 9019 of the Federal Rules of Bankruptcy Procedure authorizes the Court, on motion, and after notice and a hearing, to approve a compromise or settlement. Fed.R.Bankr. 9019. While settlements are favored in the bankruptcy court, the unique nature of the bankruptcy process requires that judges must carefully examine proposed settlements to determine if they are reasonable before approving them. *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d. Cir. 2006).

14. To approve a settlement under Bankruptcy Rule 9019, the Court must balance: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *In re WebSci Technologies, Inc.*, 234 Fed.Appx. 26, 29 (3d Cir. 2007) (*quoting In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996)).

15. Additionally, the Court must determine whether the proposed settlement is fair and equitable, and in the best interests of the estate. *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). "Under the 'fair and equitable' standard, the Court looks to the fairness of the settlement to other persons, i.e., the parties who did not settle." *Nutraquest*, 434 F.3d at 645. The burden is on the proponent to establish that the settlement may be approved. *See In re Grand Prix Associates, Inc.*, 2009 WL 1850966 (Bankr. D.N.J. June 26, 2009).

16. Here, the Proposed Settlement falls woefully short of these standards of being fair, equitable, and in the best interests of the Estate because it is nothing more than a sale of Stream's

6

assets with improper procedures set up for Hawk, SLS, and SeeCubic to swoop in and steal Stream's assets.

17. A key part of the Proposed Settlement is the sale of the Debtor's assets, which begins with a "stalking horse" bid equivalent to the (currently unproven) full value of Hawk's, SLS's, and SeeCubic's alleged secured claims of $150 million. In essence, they will be allowed to credit bid the value of their alleged claims the way a bona fide secured creditor can under Section 363(k) of the Bankruptcy Code. *See* 11 U.S.C. § 363(k).

18. The issue is, however, that the right to credit bid is not a given in every bankruptcy, and that right has been explicitly denied by bankruptcy courts where there is a dispute as to the validity of the secured claims. *See, e.g., In re Diebart Bancroft*, 1993 WL 21423 (E.D. La. Jan. 26, 1993) (denying right to credit bid where there is a bona fide dispute as to the validity of the secured claim).

19. That is precisely what is going on here – there is already a bona fide dispute regarding the validity of the alleged secured claims at issue, as evidenced by several pleadings of record in this case, including Rembrandt 3d Holding Ltd.'s Objection to Proofs of Claim No. 6 Filed by Hawk Investment Holdings, Ltd., "As Collateral Agent," No. 9 Filed by SLS Holdings VI, LLC, and No. 14 Filed by SeeCubic, Inc.[4]

20. Even further, the Trustee himself has admitted multiple times that there is a significant disagreement as to whether Hawk has a secured claim, and specifically adopted, in the past, averments from the August 12, 2023 Complaint against several parties, including Hawk, SLS,

---

[4] It is difficult to understand how a sale can hinge on a disputed secured claim before the Court has even made a ruling on that dispute. Until this Court has made a ruling that Hawk, SLS, and SeeCubic have a secured claim, the Trustee should not be allowed to assume such a claim exists, and thus, any credit bid set forth by any of those parties would be entirely improper.

7

and SeeCubic. Therein, the Debtor explicitly alleged the existence of Conversion Agreements related to the parties' secured claims, as well as the fact that their secured notes had been converted and extinguished:

> 50. Under separate conversion agreements between and amongst Stream, Hawk, and SLS, the SLS Notes and the Hawk Notes would convert to equity under certain circumstances related to Stream's successful raising of additional capital. Mr. Morton personally participated in all the events relevant to the Hawk debt and the conversion agreements, and he negotiated those agreements on Hawk's behalf. **Under each of the conversion agreements, Stream had the sole and unilateral discretion to convert debt to equity**. Stream has met its contractual obligations under the Hawk Conversion Agreement; it raised the required capital, extinguished any purported liens, and sent stock certificates to Hawk on or about August 9, 2023.
>
> 51. Hawk has been informed of the extinguishment of its secured notes multiple times as money was being continuously raised by the Debtors. The Debtors sent notices of the extinguishment in 2018 and 2020 to Hawk, which have been ignored or to which Hawk has responded in bad faith. **Hawk has misrepresented its secured position in filings with several courts, including through its filed proofs of claims, without any explanation that its security is subject to extinguishment through the conversion agreement.** Hawk has a contractual obligation to cooperate with its obligations under the conversion agreement and has breached that contract through its efforts to harm the Company and its operations, both surreptitiously and directly. Hawk is engaged in a continuous breach through its ongoing interference in the Debtors' estate as detailed herein.

*See* Exhibit "B", true and correct excerpts of Debtor's August 12, 2023 Complaint, at ¶ 50-51 (emphasis added).

21. And in his 9019 Motion, the Trustee makes clear that one of the key issues remaining in the currently pending litigation between the parties is "whether Hawk's secured position had been converted from debt to equity pursuant to certain conversion agreements." *See* the 9019 Motion, at p. 4.

8

22. This dispute should preclude Hawk's ability to credit bid as contemplated in the Proposed Settlement, or at a minimum, a determination on the 9019 Motion should be delayed until the Court makes a ruling as to the parties' secured status. *See In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 61 (Bankr. D. Del. 2014) ("The law leaves no doubt that the holder of a lien the validity of which has not been determined, as here, may not bid its lien."); *In re Daufuskie Island Properties, LLC*, 441 B.R. 60, 63-64 (Bankr. D.S.C. 2010) (denying secured creditor the right to credit bid because its mortgage and claim were subject to dispute).

23. Further, to the extent the Proposed Settlement seeks to dispense with the Bankruptcy Code's requirements for the sole purpose of favoring Hawk, SLS, and SeeCubic, that proposal also amounts to a *sub rosa* plan of reorganization that must be flatly rejected by this Court. *See In re Energy Future Holdings, Corp.*, 648 Fed.Appx. 277 (3d Cir. 2016) ("When a transaction or settlement in bankruptcy has the effect of dictating some of the terms of any future reorganization plan, a court deems the transaction impermissible because it short circuits the requirements of Chapter 11 … by establishing the terms of a plan sub rosa in connection with a sale of assets.") (internal quotation marks omitted).

24. Simply put, the Trustee's 9019 Motion seems to be nothing more than a strategy to hijack Stream's assets by proposing a sale of the Debtor's assets that gives Hawk, SLS, and SeeCubic a significant advantage when the Court has not determined they are entitled to it.

    **C.**    **VSI Has Provided The Trustee With Objective Evidence Of A Viable, More Beneficial Proposal For The Estate**

25. Lastly, beyond the fact that the 9019 Motion should be denied on its own merits, it should also be noted that VSI previously forwarded the Trustee a proposal that would have addressed all of the issues raised by his instant 9019 Motion – i.e. lack of funding and desire to

9

remove litigation costs – that included proof of funds to demonstrate VSI could effectuate that proposal.

26.     But for reasons still unclear to VSI, the Trustee summarily rejected VSI's proposal without adequate explanation as to why he was doing so.

27.     VSI's forwarded proposal would have accomplished all of the Trustee's stated goals and would have been a method by which he would have maximized return to all of the creditors. In effect, it was a proposal which would have satisfied all requirements of a proper plan by providing payments to all allowed claimants.

28.     At the recommendation of the Trustee, VSI attaches its latest plan proposal to the Trustee, which will, *inter alia*, (1) provide for full payment of all allowed administrative claims; (2) provide for the full payment of the Trustee's approved professional fees and the approved fees of his Court-approved professionals; (3) provide payment of approximately 50% to unsecured creditors over time; and (4) protect the purported secured creditors to the extent the Court determines that their claims are in fact secured and/or that their secured claims were not converted to equity. *See* Exhibit "C", a true and correct copy of the VSI proposal dated May 19, 2024, along with proof of funds to effectuate the proposal. VSI notes that, should this proposal not be accepted by the Trustee outright, it intends to file the substance of its proposal as a Chapter 11 Plan.

29.     The May 19 proposal to Trustee provides as follows for payment by or on behalf of VSI of a total of **$11 million**:

1. $3.945 million as payment for allowed administrative claims as follows:

    a. $1 million for the Trustee and his counsel to conduct appropriate investigations on issues outstanding in this matter;
    b. $25,000 towards the US Trustee's fees;
    c. Approximately $2.8 million to StreamTV (Lewis Brisbois Bisgaard and Smith LLP);
    d. $120,000 for the BMC Group.

10

2. $1 million towards expenses needed to commence full production to fulfill existing production orders, which total almost $155 million in value;

3. <u>Unsecured Creditor Claims</u>
   a. Payment of $3 million for all allowed unsecured creditors who are deemed to be "critical vendors";
   b. Payment of $1.555 million to all other allowed unsecured creditors.

4. <u>Purchase of Certain Litigation</u>
   a. Payment of $500,000 to the Estate to purchase Stream's claims for damages against the purported Secured Creditors (the estimated cost of the litigation).

5. <u>Chancery Court Bond</u>
   a. A $1 million bond was put up in the Chancery Court litigation on behalf of VSI. If and when that is returned, those funds will be turned over to the Trustee for use at his discretion.

6. <u>Purported Secured Creditors</u>
   a. The proposed Reorganization includes the purchase by VSI of Stream's claims to damages against its alleged secured creditors and their associates (the "Parties"):

      - SeeCubic, Inc. ("SCI");
      - SLS Holdings VI, LLC ("SLS");
      - Hawk Investment Holdings Limited ("Hawk");
      - Shadron Stastney;
      - Arthur "Bob" Morton;
      - Alistair Crawford;
      - Kevin Gollop;
      - Asaf Gola;
      - Krzysztof Kabacinski;
      - Patric Theune;
      - SeeCubic B.V.; and
      - Various other individuals identified as John and Jane Does in the adversary complaint filed in the Eastern District of Pennsylvania or named in a pending matter currently stayed in the District of Delaware.

   b. The claims against the Parties include, but are not limited to, lender liability, breach of contract, negligence, tortious interference, breach of fiduciary duty, fraudulent conveyance, and misappropriation of trade secrets. Remedies pursued shall include turnover and accounting, injunctive relief, disallowance of claims pursuant to 11 U.S.C. § 502(d),

11

      equitable subordination, recharacterization of loan as equity interest, and additional monetary damages.

   c. VSI shall retain any damages derived from the adversary complaint filed by Stream against the Parties in the United Bankruptcy Court for the Eastern District of Pennsylvania: *Stream TV Networks, Inc. v. Shadron L. Stastney, SLS Holdings VI, LLC, Hawk Investment Holdings Limited, Arthur Leonard Robert "Bob" Morton, SeeCubic, Inc., Alastair Crawford, Krzysztof Kabacinski, Kevin Gollop, Asaf Gola, John Doe(s), Jane Doe(s), Delaware and Other Law Firms representing and acting in concert with John Doe(s) and/or Jane Doe(s), Investment Banks employed by John Doe(s) and/or Jane Doe(s), Patric Theune, and SeeCubic B.V.* (Chapter 11 Bky. No. 23-10763-MDC /Dkt. No. 335.

   d. To the extent that the Secured Claims are approved in any amount, it shall be paid from 15 year note(s) with an interest rate of Prime plus 3 percent. The payments due for the first 2 years under such note(s) shall be made in shares of stock of VSI and the balance shall be amortized over the subsequent 13 years. All payments due under the note(s) shall go into an escrow account held by an escrow agent, to be later determined, and all payments due hereunder shall only commence after 6 months after the delivery of all Stream assets by the alleged Secured Creditors, including but not limited to all Glasses-Free 3D demonstrator units of all sizes and resolutions, all Ultra-D patents, and all production equipment wherever located. The principal amount of the Note(s) shall be set at $150 million, subject to being reduced to an amount which a court may later determine as the allowed secured claim, if any.

7. <u>Assets Conveyed by Trustee to VSI</u>
   a. In exchange for this funding plan by VSI, VSI shall get, free and clear of all encumbrances and liens:
      - 100% of the membership interest held by Technovative in Medica Holdings Delaware LLC.
      - 100% of the partnership interest held by Technovative in Ultra-D Ventures C.V.
      - MPL and SPL optical bonding equipment warehoused in China.
      - Stream's customer relationships and good will relating thereto.
      - Stream's purchase orders.
      - Stream's legal claims against all third parties.
      - All assets of SeeCubic, Inc. derived from, or developed through presentations of, Stream's technology, including:
         - 2D to 3D content conversion contracts, as well as customer relationships and customer data related thereto;
         - 65-inch 8k-resolution glasses-free 3D demonstrators;

12

- All other glasses-free 3D demonstrators in other resolutions and sizes; and
- Trademarks, URLs, and social media accounts related to the names SeeCubic and seecubic.com, SeeCube and seecube.com, Ultra-D and Ultra-D.com.

30. In contrast, the Trustee's settlement favors the purported secured creditors, and specifically Hawk, by granting them rights to credit bid the value of claims that will most likely not be found to exist or have not yet been established, and it is based entirely around the sale of assets that still have <u>not</u> been identified, in the hopes that the unsecured creditors may ultimately receive some payment (which is unlikely under the Trustee's Proposed Settlement).

31. The Trustee claims this settlement is the most beneficial because it will clear away all the litigation associated with this case – what he ignores is the fact that his approach in the Proposed Settlement is going to create entirely different, expensive, and prolonged litigation.

32. Indeed, Rembrandt has already made clear that the ultimate value of Stream's assets lies in certain IP licenses held by it and Philips, which are nontransferable and unassignable without explicit permissions from those parties.[5]

33. Accordingly, any sale of the Debtor's assets would likely result in a violation of both sets of IP licenses, which in turn would leave both the Trustee himself and the purchaser of those assets at extreme risk of liability in newly filed litigation by Rembrandt and Philips.

34. On the other hand, VSI's proposal to reorganize, restructure, and continue the Debtor's business operations will avoid the creation of new legal proceedings while taking the current ones out of the Trustee's hands, while also fostering the purposes of the Chapter 11

---

[5] In fact, the Delaware Supreme Court has explicitly held that there had been an improper transfer of assets in violation of the Debtor's corporate charter. *See Stream TV Networks Inc. v. SeeCubic, Inc.*, No. 260, 2021, p. 3 (Del. June 15, 2022) (holding that an "agreement authorizing the secured creditors to transfer Stream's pledged assets … is invalid….").

13

reorganization. Yet despite all its benefits, the Trustee flatly rejected VSI's offers because he claims that in his business judgment, the proposals were not viable.

35. As aforementioned, VSI has already provided proof of funding letters evidencing its ability to follow through with its proposal, and it provided the Trustee with two purchase orders exceeding $154 million in face value as proof that its proposal would bring significant value to the Estate.[6] This documentation should have alleviated the specific concerns of the Trustee, and at a minimum, provided the Trustee with evidence of VSI's synergy with the Debtor and its ability to continue on with the business.

36. Despite this strong evidence in favor of negotiating with VSI, the Trustee did nothing more than ask less than a handful of follow-up questions (which VSI answered) before leaving the topic hanging without seemingly any interest in its value to the Estate.

37. The Trustee has made it abundantly clear that he is making this "deal with the devil", and as a result is sanctioning conduct of parties who have knowingly and willfully violated Court Orders. Further, if the 9019 Motion is approved as opposed to considering VSI's proposal, there will be no real benefit to the Estate and the creditors will be left high and dry.

38. Accordingly, the Trustee's preference for a non-viable arrangement with parties who are actively and flagrantly violating Court Orders provides further evidence that the Proposed

---

[6] After lengthy negotiations that involved overcoming significant hurdles caused by adversarial parties attempting to stymie the deals, VSI was able to secure two significant post-petition purchase orders totally over $150 million in gross revenues. The first purchase order is in the amount of $14 million from Cystar International Ltd. ("**Cystar**"), which is a Taiwan affiliate of Marvel Digital Limited formed to capitalize on the expanding glasses-free 3D market. *See* Exhibit "D", a true and correct copy of the Cystar Purchase Order. The second is from Southern Telecom ("**SoTel**") – the owner of various consumer electronic brands lack Polaroid, Packard Bell, Brookstone, Audio Republic, Art+Sound, etc. – in the amount of $140 million. *See* Exhibit "E", a true and correct copy of the SoTel Purchase Order. SoTel plans to use this purchase order to increase consumer awareness and enthusiasm for its brands by being the first to launch Ultra-D televisions in North America.

14

Settlement should be flatly rejected, and that VSI's proposal should be seriously considered instead.

**WHEREFORE**, VSI respectfully requests that this Court enter an order denying the Trustee's 9019 Motion.

Respectfully submitted,

By: */s/ Leslie Beth Baskin*
Leslie Beth Baskin, Esquire
Spector Gadon Rosen Vinci P.C.
1635 Market Street, Seventh Floor
Philadelphia, PA 19103
Direct Phone: 215-241-8926
Fax: 215-531-9145
*Attorneys for Visual Semiconductor, Inc.*

May 20, 2024

15