## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,  (Stream)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |

| | |
|---|---|
| In re:<br><br>Technovative Media, Inc.,  (Technovative)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |

**REMBRANDT 3D HOLDING LTD.'S OBJECTION TO MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR ENTRY OF AN ORDER APPROVING A SETTLEMENT AGREEMENT AND MUTUAL RELEASE WITH HAWK INVESTMENT HOLDINGS, LTD., AS COLLATERAL AGENT FOR THE SECURED NOTEHOLDERS OF SEECUBIC, INC., PURSUANT TO FED. R. BANKR. P. 9019(a) AND 11 U.S.C. § 105(a)**

Rembrandt 3D Holding Ltd. ("Rembrandt") objects to the motion of William A. Homony in his capacity as chapter 11 trustee for entry of an order approving a settlement agreement and mutual release with Hawk Investment Holdings, Ltd., as collateral agent for the secured noteholders of SeeCubic, Inc., pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a), by and through its counsel, and file this objection seeking entry of the proposed order attached hereto (the "Proposed Order"), denying the motion.  In further support of this Objection, Rembrandt respectfully state as follows:

**Relief Requested**

1.      By this Objection, Rembrandt objects to the motion of William A. Homony in his capacity as chapter 11 trustee for entry of an order approving a settlement agreement and mutual release with Hawk Investment Holdings, Ltd., as collateral agent for the secured noteholders of

1

SeeCubic, Inc., pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a), and for the reasons

described below, and seeks entry of the Proposed Order, denying the motion.

2.      The application should be denied for at least the following reasons: 1) the proposed

transaction will violate both the Philips and Rembrandt licenses such that any purchaser would be

immediately subjected to both contract and intellectual property enforcement claims; 2) all

intellectual property owned by the bankruptcy estate and the Philips license are held by

subsidiaries (or subsidiaries of subsidiaries) of Technovative and Rembrandt is the only creditor

of Technovative; 3) the actions of Technovative that led to the violations of Rembrandt's rights

were conducted entirely at the direction of the secured creditors that were intimately familiar with

Rembrandt's rights and the settlement agreement, yet choose to exert control over Technovative

and its subsidiaries to flagrantly violate Rembrandt's right and incur liability to Rembrandt; 4) the

secured lenders are not allowed to make a credit bid due to the outstanding objection to the proofs

of claim filed by Rembrandt (D.I. 628); 5) the assets of the bankruptcy estate have been obfuscated

and hidden by the secured creditors such that there is nothing of value to sell; and 6) even assuming

the secured creditors win on the objections and adversary proceeding, Hawk's debt is convertible

such that a relatively modest amount of cash investment fully converts the Hawk debt to equity.

### Background

**A.      The Bankruptcy Filing**

3.      On March 15, 2023 (the "Petition Date"), Debtors filed voluntary petitions for relief

with the Court under chapter 11 of title 11 of the Bankruptcy Code.  Debtors filed in the Eastern

District of Pennsylvania because that is the location of their principal place of business.  D.I. 48 at

¶ 2.

4.      Since the Petition Date, Debtors have been operating their businesses as debtors-

in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2

5.      As of the date of the filing of this Motion, no official committees have been appointed or designated.  William A. Homony accepted his appointment as the chapter 11 trustee on January 15, 2024.

**B.      Overview of Debtors & Technology**

6.      Debtors were founded in 2009 by Raja Rajan and Mathu Rajan as "new media" companies to pursue new technologies that enhance user entertainment and communications experiences.  Debtors are incorporated in Delaware and have a principal executive office located in Philadelphia, Pennsylvania.

7.      Stream TV Networks, Inc. holds the license to the Rembrandt technology.  (D.I. 293 at page 34.)

8.      Technovative Media, Inc. is a wholly owned subsidiary of Stream TV Networks, Inc. (D.I. 293 at page 26)

9.      Technovative owns 100% of Media Holdings Delaware LLC.  (D.I. 293 at page 26.)

10.      TechnoVative USA is also a 99.9% general partner in Ultra-D Ventures C.V. (Curacao) ("Ultra-D Ventures"); Media Holdings is a 0.1% limited partner in Ultra-D Ventures. (D.I. 293 at page 26.)

11.      Ultra-D Ventures entered a Technology License Agreement on December 8, 2011 with Koninklijke Philips Electronics N.V. ("Philips") that includes a grant to ULTRA-D and its Affiliates a worldwide, non-exclusive, non-transferable license, without the right to grant sublicense, of the Philips 3D patent portfolio as well as rights to software, know-how, and source code.  (D.I. 293 at page 34.)

12.     Ultra-D Ventures owns 99.9% of Ultra-D Cooperatief U.A. (The Netherlands) ("Ultra-D Cooperatief"); Technology Holdings Delaware, LLC (USA) ("Technology Holdings") owns 0.1% of Ultra-D Cooperatief.  (D.I. 293 at page 26.)

13.     Ultra-D Cooperatief owns 100% of SeeCubic B.V. (The Netherlands) ("SCBV"). (D.I. 293 at page 26.)

14.     The technology that Debtors are currently seeking to manufacture and sell converts two dimensional devices into three dimensional without the need for viewing glasses.

15.     A detailed description of Debtors and their businesses, including facts and circumstances giving rise to these Chapter 11 Cases and supporting this Motion, is set forth in the *Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Chapter 11 Petition, Supporting Emergency Relief, and First Day Motions* [ECF No. 48], which is incorporated herein by reference.

16.     In 2005, Philips offered a Glasses-Free three-dimensional (3D) autostereoscopic display ("3DASD") solution known as the WOWvx Platform for converting and generating 3D content from two-dimensional (2D) media content for rendering on Philips's 3DASD monitors. The WOWvx Platform uses mathematical algorithms to add depth and stereoscopic information to 2D content (i.e., 2D+Depth) thereby creating 3DASD content.

17.     Philips's 3DASD solution suffered from significant image quality issues because the 3DASD content generated by the WOWvx Platform contained numerous artifacts such as ghosting and required weeks of manual post-processing to correct.

18.     Rembrandt's predecessor, 3DFusion Corp (3DFusion), licensed the WOWvx Platform from Philips.  From 2007 to 2009 working with Philips licensed tools, Stephen Blumenthal developed a novel methodology to correct the image quality issues or artifacts in the

3DASD content generated by the Philips's WOWvx Platform and protected the innovations through patents and maintaining certain elements as trade secrets.

19.     In August 2009, 3DFusion started contracting and working with a team of engineers in Eindhoven (the "Eindhoven Team") and registered a Dutch B.V. with the Dutch Chamber of Commerce named, 3DFusionEU B.V. a wholly owned Dutch subsidiary of 3DFusion.

20.     3DFusionEU started working with The Eindhoven Team for the purpose of integrating 3DFusion's adjustability solution into the 2D+Depth 3DASD platform.

21.     While 3DFusion had included some of the information and improvements in its patents, many other improvements were held as trade secrets and were disclosed and developed under non-disclosure agreements with The Eindhoven Team and 3DFusionEU.

22.     This technology and 3DFusion's business plans were eventually disclosed to Mathu Rajan, Raja Rajan, and Stream under non-disclosure agreements.

23.     Stephen Blumenthal and 3DFusion developed trades secrets and filed for its own patents far before either ever met any engineers from The Eindhoven Team, Stream or the Rajans.

24.     3DFusion has since dissolved and all of its rights to intellectual property and technology have been assigned to Rembrandt.

25.     In June of 2010, Stephen Blumenthal met Mathu Rajan and Raja Rajan when they came to the 3DFusion Wall Street showroom offices for a demonstration of our 3D glasses free platform.

26.     The Rajans immediately signed NDAs to be able to review details of 3DFusion's technology and business plans.

27.     At the time of this original June 9, 2010 NDA between Stream and 3D Fusion, (now owned by Rembrandt), Stream had no technology of its own.

28.    In June of 2010, all rights were held by 3D Fusion and therefore all improvements to that technology made after the June 9, 2010 NDA were owned by 3D Fusion.  The NDA reads:

*"2.3.3 all inventions, improvements, copyrightable works and designs, relating to business plans, marketing plans, technology, machines, methods, compositions, or products of Disclosing Party directly resulting from or relating to the Confidential Information and the right to market, use, license and franchise the Confidential Information or the ideas, concepts, methods or practices embodied therein shall be the exclusive property of the Disclosing Party, and the Recipient has no right or title thereto."*

29.    The original Stream and 3DFusion term sheet was negotiated and signed on September 28, 2010 by the Rajans.  Walther Roelen, the head of 3DFusion's Eindhoven team, betrayed his fiduciary duty and orchestrated the transfer of key 3DFusion assets and The Eindhoven Team to Stream in January of 2011.  This is the same Eindhoven Team that was working with Stream, then SeeCubic, Inc.

30.    The original technology developed by Stephen Blumenthal and 3DFusion was disclosed to Stream and is the basis for the improvements over the old Philips technology.  Philips owned all the rights to the original 2D+Depth intellectual property and Rembrandt owns all the rights to its improvements to the technology.  The Philips technology and Rembrandt advancements are fully integrated into all the Stream technology and products.  Specifically, Rembrandt has identified with particularity how all the products sold by Stream have included Rembrandt technology and infringe Rembrandt patents.

31.    These events and agreements were the basis for the Rembrandt lawsuit filed against Stream, Mathu Rajan, and Raja Rajan.  Rembrandt, Stream, Rembrandt-Holding filed a complaint in the New York State Supreme Court in January 2017 against Stream TV Network, Inc. ("Stream"), Raja Rajan, and Mathu Rajan among others (Stream, Raja Rajan, and Mathu Rajan, collectively referred to as the "Defendants").  Defendants removed the state action to the United States District

Court for the Southern District of New York.  Defendants were served with the FAC on June 23, 2017 (*Rembrandt 3D Holding, Ltd. v. Stream TV Network, Inc. et al.*, No. 17-CV-882-RA, D.I. 1-1)).

32.    Mathu Rajan and Raja Rajan fully executed a settlement agreement on May 23, 2021 that included the same list of Rembrandt patents and trade secrets used in the settlement term sheet negotiated in a mediation before Magistrate Parker with Shadron Stastney representing Stream as its CFO.  The April 12, 2019 term sheet was signed by all parties including Judge Parker at the close of the mediation conference and is materially identical to the current May 21, 2021 Settlement Agreement signed by the Rajans

33.    The May 23, 2021 settlement agreement with Stream carries a substantial value to both companies.  Rembrandt's agreement provided Stream a complete resolution of the litigation through a license to the technology and an expectation of large purchases from Rembrandt-Holding.

34.    Stream agreed to pay Rembrandt-Holding $5,840,000 in cash, 2,000,000 warrants to purchase Stream stock, 100 4K TVs for no charge, 8 8K prototypes at no charge, and the right to purchase 3,015,000 8K 3DASD LCD units at cost.  Based on Shad Stastney's statements, Rembrandt estimated Stream's margin was approximately $400/unit so the ability to purchase 3,015,000 units at cost was worth approximately $400/unit x 3,015,000 units = $1,206,000,000.

35.    While Stream started with no technology of its own, it entered into a license with Philips and utilized Rembrandt's technology to develop its own glasses-free 3D display technology launched under the trade name Ultra-D™ ("Ultra-D").  Ultra-D is a proprietary combination of hardware and software which creates a natural, comfortable and immersive Glasses-Free 3D viewing experience.  Ultra-D solves the two biggest limitations of the market's current 3D technology: the need to wear special glasses and the scarcity of 3D content because it can convert 2D content to 3D content in real time.

36.    Rembrandt has closely evaluated the quality of the Stream products and even in the midst of its controversies with Stream purchased early versions of Stream's TVs and Stream provided additional units during the Rembrandt – Stream SDNY litigation.  The quality of the product has improved over time.  Rembrandt was impressed with Ultra-D and decided to structure a settlement in such a way that the primary value of the settlement was a supply of Ultra-D units.

37.    On June 27, 2023, Shadron Stastney testified:

> The underlying technology was originally developed by Philips in the Netherlands starting in the early 2000s. [. . .]  The team in the Netherlands wanted to continue to develop the technology and so they went looking for funding effectively to do so. Stream TV Networks had started doing other things, as you can tell by the name Stream TV Networks, none of which is really applicable to what they do now. And they were looking also for a new business line and determined that they would be able to raise money to provide a facility and working capital for the team in the Netherlands. [. . .] SLS is the one that provided the funding so that facility in the Netherlands could be set up and so that the initial license with Philips of the patent portfolio on which the technology is based could be obtained.

D.I. 303 at 57:24-25; 58:3-11; 58:14-17.  Rembrandt agrees that Stream had no technology of its own until Rembrandt's predecessor, 3D Fusion Corp., introduced Stream to The Eindhoven Team and Stream licensed technology from Philips (Koninklijke Philips Electronics N.V., a Netherlands corporation) through Ultra-D Ventures.  The very reason for the original SLS investment was to obtain the license from Philips.

38.    Importantly, the Philips license is held by Ultra-D Ventures, a subsidiary of Technovative, and all of the patents related to Ultra-D are held by Ultra-D Cooperatief which is owned by Ultra-D Ventures.

39.    Rembrandt is the only creditor of Technovative and the secured creditors do not hold a security interest in the assets of Technovative, the Philips license, the Rembrandt license, or any of the patents, copyrights, source code, or software of Technovative or Technovative's

subsidiaries. If assets of Technovative are to be sold to pay creditors of Technovative, Rembrandt would receive the value of that sale, not secured creditors of Stream.

40.    When Hawk announced an intended UCC-9 sale of the Debtors' assets in complete disregard for Rembrandt's IP, Rembrandt filed suit in the U.S. District Court for the District of Delaware against parties using the Ultra-D technology without a Rembrandt license. It sued TechnoVative USA, which was under the direction of the Chancery Court-appointed Receiver, Hawk, and SeeCubic for trade secret violations and injunctive relief to prevent the sale of Stream's assets (*Rembrandt 3D Holding Ltd. v. Technovative Media, Inc., Hawk Investment Holdings Ltd. and SeeCubic, Inc.* ).

41.    Rembrandt disputes that anyone has the right to transfer the Ultra-D technology, as all Stream demonstrators, products and even the core Ultra-D technology itself contains Rembrandt IP. The only entity authorized by Rembrandt to use the Ultra-D technology or sell Ultra-D enabled products is Stream and the Rembrandt license is not assignable.

42.    Like the Rembrandt license, the Philips license provides the rights to all Software provided by Philips is licensed not sold and that all derivative works are owned by Philips:

> 2.7    It is expressly acknowledged and agreed that the Licensed Software is licensed to ULTRA-D and not sold. It is further acknowledged and agreed that Philips owns and shall continue to own all rights, title and interest in the Licensed Software, as well as all derivative works of each of the foregoing that were created by Philips, or by any third party for the benefit of Philips, except as expressly set forth otherwise in this Agreement. It is expressly understood that derivative work or Improvements of the Licensed Software, created by ULTRA-D or its Affiliates are the sole property of ULTRA-D and/or its Affiliates. ULTRA-D shall take all reasonable measures to protect Philips' (intellectual) property rights in at least the same way as ULTRA-D protects its own rights, but shall have no obligation whatsoever to take any affirmative action or enforce any intellectual property and/or related rights granted thereto under this agreement. In the event ULTRA-D becomes aware of any

43.    Therefore, all of the derivative works made by the Debtors and subsidiaries are expressly still owned by Philips and the Debtors have no right to attempt to sell ownership of that software.

44.    The value of the debtor estate is in the rights to Ultra-D technology which is a combination of intellectual property owned by Philips, Rembrandt, and the Technovative subsidiaries.  Any sale of the Stream assets does not include the intellectual property owned by Philips or Rembrandt, nor the intellectual property owned by the Technovative subsidiaries.  Even if the sale of the Technovative assets is contemplated, the value from the sale must first go to its only creditor, Rembrandt, first before any proceeds are paid into the Stream estate.

45.    However, such a sale would still not include the Rembrandt license (unless Rembrandt authorized the assignment).

46.    It is the combination of that intellectual property owned by Philips, Rembrandt, and the Stream and Technovative related companies that forms the Ultra-D Technology.  Attempting to rip apart the intellectual property and software that currently forms Ultra-D is a massive undertaking involving patent attorneys and engineers to parse what code is a derivative work of Philips software and/or includes a Rembrandt trade secret.

47.    To terminate the Philips license, any source code, know-how, or software prior to must be removed from the Ultra-D technology and Ultra-D Ventures must make a specific showing to Philips that the full license has been paid and  the products proposed by Ultra-D do not infringe any of their patents that are still in force (*see* section 5.5 (d) of the Philips license.

d)    ULTRA-D has paid the total amount of EUR 2,500,000 (two million and five hundred thousand Euros) as set forth in Section 4.1. and demonstrates to Philips' reasonable satisfaction that ULTRA-D does not use any of the Licensed Patents in any of the Licensed Products developed, manufactured, produced, imported, exported, sold, leased, operated, licensed, otherwise made available or otherwise disposed of by ULTRA-D or any of its Affiliates.

48.    Section 5.4(d) of the Philips license allows Philips to terminate the license upon a change of control of Ultra-D Ventures.

49.     Until the Philips software has been removed from the Ultra-D code and the showing with respect to the roughly 1,500 Philips patents has been made, it is not possible to ascertain what if any of the Ultra-D technology can be sold.

50.     Even assuming this massive undertaking was completed with respect to the Philips technology, the same process would be necessary with respect to the Rembrandt trade secrets and patents.

51.     Therefore, any attempted sale of the assets of the bankruptcy estate likely renders the estate worthless because it would destroy the collective value of combining the Philips and Rembrandt technology and intellectual property into the Ultra-D Technology.

52.     The way to preserve this value is to allow Stream and Technovative to undergo a reorganization that maintains the intellectual property as a whole.

53.     Prior to the Rembrandt – Stream SDNY litigation, Stream reported a recent valuation at over $400,000,000 ($4/share with over a 1,000,000 shares and warrants outstanding prior to Rembrandt litigation).

54.     After Rembrandt initiated its litigation to enforce contracts including an NDA and term sheet the provided for Rembrandt to get 60-80% of Stream in exchanging for providing its technology, Stream's shares dropped to $1.50/share by the time Rembrandt negotiated its settlement term sheet on April 12, 2019 with Shadron Stastney acting as Stream's CFO at the time. The share price had dropped by 62.5% and Stream had lost $250,000,000 in valuation.  (*See* Michaels Declaration attached as Exhibit A.)

55.     At the request of Stream, in July 2019, Rembrandt's executive team met with Shadron Stastney, Mark Coleman (Stream board member) and litigation counsel to amend the

settlement terms to allow greater flexibility in timing of proving the units promised by Stream.
The was agreeable to Rembrandt.  (*See* Michaels Declaration attached as Exhibit A.)

56.    At this point, Stream had all the necessary licenses it needed to relaunch its Ultra-D products with the additional volume that Rembrandt's purchase orders would provide.  Stream was poised to not only recapture the $250 million in lost valuation, but to become extremely valuable beyond its 2018 valuation.

57.    While SLS, Hawk, and SeeCubic allege that the entities are owed in excess of $178,000,000, the only thing better than receiving $178,000,000 in alleged principal and interest, is getting all the technology from a company that was recently valued at over $400,000,000 ($4/share with over a 1,000,000 shares and warrants outstanding prior to Rembrandt litigation).

58.    Shadron Stastney left Stream and formed SeeCubic, Inc. and sought to take control of all of Stream's assets colluding with SLS, Hawk, and other shareholders and directors of Stream. SLS and Hawk did not pursue any rights under their actual agreements with Stream, but rather took inappropriate actions and compensated directors of Stream in an attempt to push through a new agreement (the "Omnibus Agreement") that was latter invalidated.  *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, No. 360, 2021, p. 3 (Del. June 15, 2022) (Holding that "a majority vote of Class B stockholders is required under Stream's charter" to "transfer pledged assets to secured creditors in connection with what was, in essence, a privately structured foreclosure transaction").[1]

---

[1] The Delaware Supreme Court also held that the "agreement authorizing the secured creditors to transfer Stream's pledged assets . . . is invalid because Stream's unambiguous certificate of incorporation required the approval of Stream's Class B stockholders" and there was no "Board Only insolvency exception" to Section 271 of the DGCL, and even if there had been a board-only insolvency exception to Section 271, it had been superseded. *Id.*. at p. 34.  The Delaware Supreme Court's opinion definitively established that there had been an improper transfer of assets, in violation of Debtor's corporate charter. *Id*. at p. 53 n. 180 ("We note that Section 271 presents no barrier to the parties' foreclosure proceedings in Superior Court (which are presently stayed

In holding that its corporate charter had been violated, the Delaware Supreme Court noted that Stream's charter was "unambiguous" and, ergo, "enforcing the unambiguous [c]harter provision [requiring Class B stockholders be allowed to vote on the asset transfer] is consistent with our policy of seeking to promote stability and predictability in our corporate laws. . . ." *Id*. at pp. 53-54.

59.     After using this invalidated agreement to take control of Stream assets, SeeCubic proceeded to destroy value of those assets by breaching both the Philips and Rembrandt license agreements, damaging production equipment, and promulgating a business plan based on infringing intellectual property and attempting to license out technology belonging to Philips and Rembrandt when both licenses specifically prohibited such sublicensing efforts thereby creating massive liabilities for infringement at Stream's subsidiary companies and specifically at Technovative.

60.     Upon learning of SeeCubic's malfeasance and reviewing its website and attempts to license out Rembrandt's technology through its control of Technovative and subsidiaries of Technovative, Rembrandt filed a Complaint for Injunctive Relief and Misappropriation of Trade Secrets (the "Delaware Complaint") in the United States District Court for the District of Delaware against Technovative Media, Inc ("Technovative"), Hawk Investment Holdings Ltd. ("Hawk"), and SeeCubic, Inc.("SeeCubic"), and a true copy along with the exhibits was attached as Exhibit A to the Declaration re: of Christopher A. Michaels in Opposition of Hawk's Emergency Motion for Relief from the Automatic Stay [ECF No. 69], which is incorporated herein by reference.

---

pending this appeal), and no party has argued that judicial foreclosure proceedings implicate Section 271").

61.    Shadron Stastney, the CEO of SeeCubic, Inc., was the individual that negotiated the term sheet with Rembrandt acting as Stream's CFO and agreed to the terms before Magistrate Parker agreeing to pay over $5 million in cash and to provide millions of units of TVs at cost. Clearly he had every reason to expect that Rembrandt would enforce its intellectual property against Technovative if he used his position to infringe Rembrandt's right thus incurring massive liabilities for Technovative both for expensive legal fees and damages.

62.    At the time, the express intent was to transfer all the assets of Stream over to SeeCubic, Inc and allow all the "innocent" shareholders (i.e. not the Rajans) to exchange their shares Stream for shares in SeeCubic, Inc.  D.I. 303 at 106:23-108:14.

63.    With the return of Stream's assets delayed month after month, Rembrandt sought to intervene in the Chancery Court but was denied.  Rembrandt was forced to sit on the sidelines as Hawk attempted to seize control of TechnoVative USA through its Section 225 action in October 2022.  Rembrandt watched as Stastney's new company SeeCubic brazenly used Rembrandt's technology without license or payment (Stastney refused to engage Rembrandt in even a courtesy discussion though Stastney had been personally involved in acknowledging Rembrandt IP being incorporated into Ultra-D).  When Hawk announced an intended UCC-9 sale of the Debtors' assets in complete disregard for Rembrandt's IP, the situation reached a breaking point.  On February 21, 2023, Rembrandt filed suit in the U.S. District Court for the District of Delaware against parties using the Ultra-D technology without a Rembrandt license.  It sued TechnoVative USA, which was under the direction of the Chancery Court-appointed Receiver, Hawk, and SeeCubic for trade secret violations and injunctive relief to prevent the sale of Stream's assets (*Rembrandt 3D Holding Ltd v Technovative Media, Inc., Hawk Investment Holdings Ltd. and SeeCubic, Inc.*).

64.     Stream TV Networks, Inc. had entered into a settlement agreement and license with Rembrandt on May 23, 2021 that included Rembrandt patents and trade secrets and such license rights may not be sublicensed or assigned, however, when this license did not protect Technovative or its subsidiaries when they were not owned by Stream.

65.     SeeCubic and Shadron Stastney took control of Technovative and caused it to use Rembrandt trade secrets despite intimate familiarity with Rembrandt's rights while Stastney served as Stream's CFO and primary negotiator during the final mediation sessions with Rembrandt.

66.     Stastney could have requested an assignment of the Rembrandt license to SeeCubic or Technovative but did not.

67.     It also appears that Stream has just made payments to Philips for royalties (*see* D.I. 626, page 14) yet there is no associated revenue or expenses of manufacturing, so it seems a reasonable conjecture that this payment was for products made or sold while SeeCubic had taken control of Technovative and its subsidiaries.

68.     Every product known to Rembrandt that has been made by Stream has needed both a license from Philips and Rembrandt.  It appears that the trustee decided that some royalty was due to Philps but, for reasons unknown, has not paid the license fee due to Rembrandt.  Given that Shadron Stastney and Mathu Rajan both saw fit to sign a term sheet or license to Rembrandt's technology, it seems unlikely that the trustee performed a technical or legal evaluation to decide that paying the Philips license was appropriate, but did not pay the Rembrandt license.  The only reasonable explanation is that the trustee paid royalties on the Philips license for activities undertaken by Technovative during the time it was controlled by SeeCubic and was not the beneficiary under the Rembrandt license.

69.    Therefore, it is clear that the trustee has uncovered activities by Technovative supporting Rembrandt's claim against the Technovative estate that are not covered by Stream's license.  This liability of the Technovative was directly caused the SeeCubic taking direct actions to violate Rembrandt's rights.

**Debtors' Debt Structure**

70.    Since 2009, the Debtor has raised approximately $150 million from third party investors.  D.I. 48 at ¶ 25.  The investments have taken the forms of both debt and equity.  *Id*.  The Debtor's senior secured creditor is SLS Holdings VI, LLC ("SLS").  *Id*.  Between 2011 and 2012, SLS loaned $6 million to the Debtor through a series of notes (the "SLS Insider Notes").  *Id*.  The Debtor pledged substantially all of its assets and the assets of its wholly owned subsidiaries as security for the SLS Insider Notes.  *Id*.  The Debtor executed a security agreement in connection with the SLS Insider Notes.  *Id*.

71.    The Debtor's junior secured creditor is Hawk Investment Holdings Limited ("Hawk").  D.I. 48 at ¶ 26.  Between 2014 and 2020, Hawk loaned more than £50 million to the Debtor, plus another $1.336 million, through a series of junior secured notes (the "Hawk Notes"). *Id*.  Subject to the security interest held by SLS, the Debtor pledged substantially all of its assets as security for the Hawk Notes.  *Id*.  The Debtor executed a security agreement in connection with the Hawk Notes.  *Id*.

72.    In 2018, the Debtor entered into an agreement with Hawk which provided that the Hawk Notes would convert into equity if and when the Debtor raised additional equity capital (the "Hawk Conversion Agreement") (D.I., 48 at Exhibit F).  D.I. 48 at ¶ 28.  The Debtor and SLS contemporaneously entered into a parallel agreement governing the SLS Insider Notes (the "SLS

Conversion Agreement" (D.I. 48 at Exhibit G).  *Id*.  Per the Conversion Agreements, conversion

of debt to equity is at the discretion of the Debtor.  *Id*.

**Objection to Proof of Claim and Adversary Proceeding**

73.     Rembrandt filed Objections to the Proofs of Claim No. 6, filed by Hawk Investment

Holdings Ltd., "as collateral agent," No. 9 filed by SLS Holdings VI, LLC, and No. 14 filed by

SeeCubic, Inc. on May 2, 2024 (D.I. 628) and Rembrandt incorporates the arguments and facts in

the objection by reference as if fully restated herein..

74.     Rembrandt filed Objections to the Proofs of Claim No. 1, filed by Hawk Investment

Holdings Ltd., "as collateral agent," No. 2 filed by SLS Holdings VI, LLC, and No. 3 filed by

SeeCubic, Inc. on May 20, 2024 (D.I. 628) and Rembrandt incorporates the arguments and facts

in the objection by reference as if fully restated herein..

75.     The Debtors have filed an adversary proceeding, case number 23-00057, on August

18, 2023, which objects to the POCs ("Adversary").  The Objection, detailed in the Adversary,

objects to the POCs because of the takeover scheme, which persists to this day, created by Alastair

Crawford (and over 50 other shareholders), SLS, and Hawk.  The hallmark of this scheme is to

take the valuable assets of the Debtors, obstruct their ability to make payment on their debts,

obstruct the ability to raise the money needed to go to production and convert the secured debt to

equity, and to avoid paying $20 million in unsecured claims and instead pay Mr. Crawford and

other shareholders who participated in the scheme in violation of the absolute priority scheme.

Rembrandt incorporates the arguments and facts in the Adversary by reference as if fully restated

herein.

76.     The secured debt holders should not be allowed to credit bid until the value of their

security interest can be determined.

77.    As stated above, the secured parties do not have any security interest in Philips intellectual property, Rembrandt intellectual property, or the property of the Technovative subsidiaries.  As such, their credit bid should be limited to the value of their secured property which would be the shares in Technovative and any property of Stream.

78.    All the value is the combined intellectual property of other companies.

**Hawk's Secured Debt is Subject to Conversion**

79.    A debt-to-conversion agreement was executed by Hawk on May 2, 2018 with an effective date of January 29, 2018.  (D.I. 48 at Exhibit F.)

80.    During the June 26 trial, Judge Coleman asked if the Hawk debt was still convertible and Hawk's counsel agreed that debt if fully convertible:

*From June 26 trial transcript -*

*THE COURT: ... the only issue I was trying to figure out is did they ultimately have the right to convert?*

*MR. ALEXANDER: Your Honor, I believe that the collateral estoppel order that they've referenced, has a provision in there that indicates that the Hawk debt is convertible.*

*MR. CAPONI: The Hawk debt is convertible, Your Honor.*

81.    Hawk's debt is convertible and either has already been converted due to prior investment in Stream or is presently convertible by new investment into Stream.

82.    As Hawk's counsel has acknowledged, conversion of the Hawk debt is not collaterally estopped by the prior Delaware Chancery Court's rulings with respect to conversion of debt to equity because there was no final judgment on the merits.

83.    Collateral estoppel operates to preclude a later-filed claim where:

1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on

18

the merits, 3) the party against whom the pleas is asserted was a party or in privity with a party to the prior adjudication, 4) the party against whom it asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

*Shaffer v. Smith*, 543 Pa. 526, 529, 673 A.2d 872, 874 (1996).

84.     At any time, the Hawk debt can be converted to equity for $39 million according to the terms of the conversion agreement such that any cash investment into Stream during a reorganization in the form of a preferred share, would fully convert all Hawk debt into equity leaving $39 million to pay all remaining secured debt of $18 million, administrative claims, and roughly 50% of unsecured claims, plus some operating capital for the resulting entity.

85.     Further, the reorganized entity would have fully intact licenses from Philips and Rembrandt, and be free of all debt and liabilities.

86.     It seems that any investment banker would find it easier to raise over $39,000,000 in investment than the proposed $120,000,000 put forth as a minimum bid for a 363 sale proposed by the trustee.

87.     Mr. Michaels sent this exact proposal to the trustee along with a letter from counsel to investors on February 19, 2024 all to no avail.  As opposed to executing an NDA so Rembrandt could disclose the investors or provide even basic information about the status of the assets, the trustee pursued a settlement placing hundreds of millions of dollars of value on secured creditors rights that by Hawk's own admission can be converted to equity for $39,000,000.

88.     Rembrandt 3D Corp has made an independent proposal to the Trustee (attached as Exhibit 2) to fund a reorganization plan through new investment in Stream that would include $39 million invested in a preferred share that would clearly convert the Hawk Debt assuming their debt is not disallowed entirely or equitably subordinated due to their malfeasance in causing harm to the Debtors.

89.     While Rembrandt has made a proposal to the trustee, any potential investor could make a similar proposal if the exclusivity period is lifted.

90.     In addition, any investor putting $39,000,000 into an investment would not need a settlement with either SLS, Hawk, or SeeCubic as the secured debt would be paid in full in accordance with the existing contracts with the secured creditors.

91.     Rembrandt is currently suing Technovative, SeeCubic, and Hawk.  Any purchaser under the proposed settlement and plan for a 363 sale would have to invest $120 million in cash and be walking into an almost immediate claim from Rembrandt, Philips, and Leia.

92.     The proposed settlement requires any purchase to post 3x the amount of cash and get far less while subjecting themselves to IP infringement claims from three companies that own intellectual property rights that the Debtors have valid licenses to up through the point of attempting to transfer the technology out of the companies that hold those licenses.

93.     The proposed settlement is flawed because it proposes far more cash to be paid than is necessary to fully convert Hawk.  That extra $81,000,000 in cash that is required to be paid to Hawk is far beyond the total value of the unsecured claims.

94.     If the trustee wishes to employ investment bankers, the objective should be to find investors willing to invest $39,000,000 for a fully intact estate that obtains a substantial recovery for the unsecured claims rather than a flawed process that both destroys value and almost completely wipes out the unsecured claims.

### The Bonding Equipment

95.     SeeCubic claims that it paid $917,171.00 in February 2022 for rent relating to storage of the Bonding Equipment.

96.    SeeCubic argues that "the Bonding Equipment is not property of the Debtors'

estates.  However, out of an abundance of caution, in the event that the Court determines the

Bonding Equipment is property of the Debtors' estates, SeeCubic asserts a claim for the

$917,171.00 it paid to avoid a sale of the Bonding Equipment."

97.    The Bonding Equipment is an asset of the Debtors.  There has been no evidence of

any ownership by SeeCubic of the Bonding Equipment.  SeeCubic took possession of the Bonding

Equipment pursuant to the Omnibus Agreement, did not return it in defiance of the Delaware

Supreme Court mandate, and then has stored it in a warehouse space without climate controls

thereby causing significant damage to this precision equipment.

98.    Stream and Visual Semiconductor, Inc. have testified in Court and discussed with

Judge Mayer in mediation with Hawk and SeeCubic that an arrangement has been reached with

Cystar, one of the customers who have a pending purchase order to house the bonding equipment

rent free and have made arrangements for the engineers who manufactured the bonding equipment

to repair and calibrate the bonding equipment and to allow initial production within Cystar's

facility.  However, SeeCubic has refused to allow such a transfer and has concealed the

whereabouts and made several attempts to seize the equipment in violation of the automatic stay

in Stream's first chapter 11.  Until the Bonding Equipment is returned, and without damage,

SeeCubic can recover nothing under 11 U.S.C. 502(d) and is also subject to setoff for the value of

the damages as well as the lost productivity and related lost profits from refusing to return the

Bonding Equipment.  If the equipment is lost or destroyed, SeeCubic's entire claim will be setoff

as the value of the equipment as modified exceeds the full value of their claims against the estate.

99.    The bonding equipment that is being held by SeeCubic is likely worth far in excess

of the entire SLS claim (see Claim 2 of Technovative case).  Rembrandt 3D Corp. estimates that

to fully build a new line that is operational at a cost of roughly $20,000,000 (*see* Michaels Declaration attached as Exhibit A).  Rembrandt 3D Corp. estimates less than two months to refurbish the existing bonding equipment to be operational at a cost of $1-2,000,000 depending on the amount of damage to the equipment.  (*See* Michaels Declaration attached as Exhibit A.)

100.    This six month difference means that the existing equipment could be ready six months earlier than ordering new equipment.  Conservatively estimating monthly production at 13,000 units per month, this means that an additional 78,000 units could be produced with the existing equipment before new equipment could be operational.  (*See* Michaels Declaration attached as Exhibit A.)

101.    Assuming, $400/unit of profit margin, means that the ready access to the existing bonding equipment is worth approximately $31,200,000 in profit potential and $18,000,000 in cost savings for a total of $49,200,000 in value relative to allowing SeeCubic to retain control of the existing equipment.  (*See* Michaels Declaration attached as Exhibit A.)

102.    Any investment banker that would sell the assets of Stream would want to include the bonding equipment worth tens of millions of dollars, yet the secured creditors are blocking access to the equipment and devaluing the estate.

103.    The scheme to create the Omnibus Agreement was inequitable conduct that conferred an unfair advantage to the secured creditors far beyond what they would have been entitled to if they had merely relied on their existing debt agreements.

104.    The entire purpose of this scheme was to transfer the value of Stream and Technovative to SeeCubic in favor of SLS, Hawk, and the directors and shareholder of Stream that colluded with SeeCubic in this scheme.  This plan was at the direct expense of the unsecured creditors of Stream and Technovative, and specifically, harmed Rembrandt.

105.    It is undisputed that SLS, Hawk, and SeeCubic do not have a license from Philips or Rembrandt.

106.    By taking possession of technology and entities that had access to Philips and Rembrandt technology, SLS, Hawk, and SeeCubic caused a breach of the agreements with Philips and Rembrandt and caused infringement by Technovative of the intellectual property of both Philips and Rembrandt.

107.    It is undisputed that Shadron Stastney was the CFO of Stream and an insider with access to internal and proprietary information of Stream, including but not limited to, the status of the resolution of Rembrandt's claims with Stream.

108.    SLS, Hawk, and SeeCubic engaged in inequitable conduct that resulted in injury to creditors and conferred an unfair advantage on the claimant such that equitable subordination of the claim or its disallowance, whether based on its conduct or simple setoff, is consistent with the provisions of the Bankruptcy Code and the most appropriate remedy for the inequitable conduct. SLS, Hawk, and SeeCubic did not merely aggressively enforce any contract rights they may have had, but instead engaged in an illegal takeover scheme and have asserted years of penalties and interest while they have robbed the Debtors' and their estates of their ability to operate.

109.    They have disrupted progress towards commercialization at a crucial point where electronics had been perfected, ruined business relationships, scattered employees, and have persisted in their scheme to rob the assets, this time through a war of attrition that is simply an extension and reimagining of their takeover scheme.

110.    They ignored Rembrandt's offer to fund the cost of the production line restart to fulfill Stream's obligation to Rembrandt.  To this day, they are blocking Stream from fulfilling the Cystar and Southern Telecom purchase orders.  Instead of allowing purchase orders to move

forward and $150 million to come into the estate, which if their claims are allowed would result in their payment, they persist in sabotage, vexatious litigation, and infringement of trade secrets and other intellectual property.

### Reservation of Rights

111.    Rembrandt hereby reserve the right to object in the future to any of the Proofs of Claim listed in this Objection or on the exhibits attached hereto on any ground, and to amend, modify or supplement this Objection, including, without limitation, to object to amended or newly-filed Claims. Separate notice and hearing will be scheduled for any such objection.

112.    Notwithstanding anything contained in this Objection or the attached exhibits, nothing herein shall be construed as a waiver of any rights that Rembrandt may have: (a) to bring avoidance actions under the applicable sections of the Bankruptcy Code against the holders of Claims subject to the Objection; or (b) to exercise their rights of setoff against the holders of such Claims relating to such avoidance actions.

Dated: May 20, 2024

/s/ Andrew DeMarco
Andrew DeMarco, Esq. (PA Bar No. 326294)
ademarco@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251

*Attorneys for Rembrandt 3D Holding Ltd.*