**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc., (Stream)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |
| In re:<br><br>Technovative Media, Inc., (Technovative)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |

**DECLARATION OF CHRISTOPHER A. MICHAELS IN SUPPORT OF REMBRANDT 3D HOLDING LTD.'S OBJECTION TO MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR ENTRY OF AN ORDER APPROVING A SETTLEMENT AGREEMENT AND MUTUAL RELEASE WITH HAWK INVESTMENT HOLDINGS, LTD., AS COLLATERAL AGENT FOR THE SECURED NOTEHOLDERS OF SEECUBIC, INC., PURSUANT TO FED. R. BANKR. P. 9019(a) AND 11 U.S.C. § 105(a)**

I, Christopher A. Michaels, of full age, hereby declares pursuant to 28 U.S.C. §1746:

1. I previously provided a declaration related to this case on April 3, 2023 (D.I. 69).

2. Rembrandt has filed a Complaint for Injunctive Relief and Misappropriation of Trade Secrets (the "Delaware Complaint") in the United States District Court for the District of Delaware against Technovative Media, Inc ("Technovative"), Hawk Investment Holdings Ltd. ("Hawk"), and SeeCubic, Inc.("SeeCubic"), and a true copy along with the exhibits is attached as Exhibit A to my prior declaration (D.I. 69).

3. My name is Christopher Michaels. I am the President/CEO of Brown & Michaels, PC and represent Rembrandt 3D Holding Ltd. ("Rembrandt") a Nevis corporation. I also represent Rembrandt 3D Corp. ("Rembrandt – Delaware") a Delaware corporation and Stephen Blumenthal personally.

4. I am the Chief Financial Officer of Rembrandt and the Chief Financial Officer of Rembrandt – Delaware.

5.  Rembrandt is a holding company that owns the rights to intellectual property developed by Stephen Blumenthal and the predecessor company, 3DFusion Corp (3DFusion) and licensed this technology to Stream.

6.  Stephen Blumenthal currently owns 100% of the shares of Rembrandt.

7.  Rembrandt-Delaware is an operating company that sells products and services related to 3D media content.

8.  Rembrandt-Delaware currently has shareholders other than Stephen Blumenthal and upon closing of the final phase of a multi-phase fund raising, Mr. Blumenthal will be a minority shareholder with the new investors have majority control of Rembrandt-Delaware.

9.  Rembrandt is a creditor of both Stream and Technovative, whereas Rembrandt-Delaware is not a creditor of either company.

10. Rembrandt is NOT the entity that has made a proposal for funding a reorganization plan.

11. Rembrandt-Delaware has made a proposal to the trustee which was attached as Exhibit 2 in Rembrandt's Objection to Proof of Claim (D.I. 628).  As part of the proposal, Rembrandt-Delaware included a copy of a letter of investor's counsel (Exhibit 2, D.I. 628).

12. Rembrandt-Delaware provided a list of due diligence items that we would need to as part of a proposal for funding a plan of reorganization (Exhibit 2, D.I. 628)

13. In my follow-up communication with the trustee's counsel, I repeatedly requested confirmation that the trustee had acquired access to the software development system and I have attached copies of that correspondence as Exhibit 1.

14. Modern software development is almost always completed using version control systems (https://en.wikipedia.org/wiki/Version_control) and the engineers at SCBV confirmed this was true of the development of UltraD.

15. As such, the majority of the value of Stream and Technovative estates related to the software for UltraD can be secured and obtained with the administrative username and password to the software developer system.

16. In my April 26, 2024 email to the trustee's counsel, I stated: "I emailed you the following our call with the Eindhoven team on March 22: '… *they confirmed something very critical – the software development has been managed through a professional tool that maintains versions for the last 13 years of work. That is the value of SCBV. If the trustee gets access to that server, the value in SCBV is largely preserved. Likewise, if it slips out the back door, there is zero value and lots of liabilities in SCBV.*'"

17. As can be seen from the correspondence history, Rembrandt has repeatedly offered to provide the name and direct contact with the investor under an NDA and confirmation that the critical access to the development system had been secured, but to date the trustee has never provided an NDA that would protect Rembrandt-Delaware's information or confirmed that the trustee has any access whatsoever to the system that houses all the value of the UltraD software.

18. Any purchaser of assets of the Debtors is going to want to know that the upon acquisition, the purchaser will have access to the most valuable asset of the company, namely the UltraD technology.

19. At present, I understand that only the former executives of Stream have access to this source code and software. While the former CEO and CFO of Stream are in opposite camps fighting for the ability to walk away with everything of value held by the Debtors, at present both former officers have exclusive access to the source code, software, and know-how related to UltraD.

20. If SeeCubic has not returned the assets after multiple court orders in Stream's favor, what hope does a purchaser have of obtaining the intellectual property after a sale?

21. At a bare minimum, the trustee should obtain access to the developer system and copies of all code and plans from both of the former officers of the company to bring estate assets back into the estate.

22. The bonding equipment that is being held by SeeCubic is likely worth far in excess of the entire SLS claim (*see* Claim 2 of Technovative case).

23. While Rembrandt-Delaware is planning to build additional product lines almost immediately if it is successful in a reorganization plan, we estimate eight months to fully build a new line that is operational at a cost of roughly $20,000,000

24. In contrast, we estimate less than two months to refurbish the existing bonding equipment to be operational at a cost of $1-2,000,000 depending on the amount of damage to the equipment.

25. This six month difference means that the existing equipment could be ready six months earlier than ordering new equipment.

26. Conservatively estimating monthly production at 13,000 units per month, this means that an additional 78,000 units could be produced with the existing equipment before new equipment could be operational.

27. Assuming, $400/unit of profit margin, means that the ready access to the existing bonding equipment is worth approximately $31,200,000 in profit potential and $18,000,000 in cost savings for a total of $49,200,000 in value relative to allowing SeeCubic to retain control of the existing equipment.

28. It is worth noting that both the production capacity and profit margin listed above is information provided by Shadron Stastney to Rembrandt on July 8, 2019 when he was negotiating as CFO and on behalf of Stream in the mediation with Rembrandt to settle Rembrandt's claim.

29. These were material representations made by Mr. Stastney to Rembrandt to induce Rembrandt to enter into settlement agreement with Stream and I contemporaneously typed the information into a spreadsheet that I was using to estimate the net present value of the changes Mr. Stastney was requesting to the agreement reached before Magistrate Parker.

30. Also present at this meeting were: Marc Coleman (Former Stream board member), John Wellschlager (DLA Piper – counsel to Stream); Neal Kronley (DLA Piper – counsel to Stream), Neil Wallace (counsel to Rembrandt), Chi Eng (counsel to Rembrandt), and Stephen Blumenthal (CEO of Rembrandt).

31. I note Exhibit 26 to the Delaware Complaint my prior e-mail to Mr. Caponi, acting as attorney for Hawk, dated August 29, 2022 summarizing Rembrandt's position with respect to protecting Rembrandt's IP and proposing a number of ways that Hawk and Rembrandt could work together. I have attached a copy of the email to Mr. Caponi as Exhibit 2 to this declaration.

32. Upon any fair reading of my email directly to Mr. Caponi, I think it is difficult to understand how Mr. Caponi alleges that Rembrandt is "Mr. Rajan's new mouthpiece" (Hawk Response D.I. 639 at paragraph 2) or is "Rembrandt has acted as Mr. Rajan's "lap dog" for years" (Hawk Response D.I. 639 at paragraph 3).

33. Rembrandt has been stating its position with respect to its intellectual property consistently for more than a decade. In my email to Mr. Caponi, I predicted that the Rajans were likely to adopt Rembrandt's position going forward.:

> *"Basically, everyone that was around in 2009 and 2010 amounted to Steve, the Rajans, and a bunch of foreign nationals that were likely to refuse to show up or take the 5th. At some point, the Rajans are going to realize that their best interests are served by having as much technology as possible be owned by Rembrandt.* ***My guess is they will suddenly agree that all of Rembrandt's allegations are true and therefore all IP is owned by Rembrandt and licensed to Stream in a way that is not subject to foreclosure. It is our expectation that 100% of the people that are willing to testify and all documentation will show all original IP was Rembrandt's.***

> ...
>
> *There is a clear path for your client to acquire rights to the technology in the right way. It is the same path my client took back in 2009 – license the rights from the owner to the technology. While many years, late, Stream has done so, but as best we can tell, your client, SLS, and SeeCubic seem intent on proceeding without a license from Rembrandt or Philips.*
>
> ....
>
> *The current situation is that SLS/Hawk have a security interest in Stream's technology, but not technology owned by Rembrandt and licensed to Stream.* ***If I was representing Stream in defending the foreclosure action, I would highly support Rembrandt's claims of IP ownership and in particular the contractual ownership of all improvements to the technology. That way none of the technology would be subject to foreclosure. Sure SLS/Hawk can take the server, but ownership and all source code and patents should be assigned to Rembrandt pursuant to the terms of the agreement I previously sent you. Basically, taking that position would leave the secured creditors with almost nothing of value and Stream would have its license from Rembrandt.***
>
> *Even assuming that your team argued some of the technology was unrelated to what Mr. Blumenthal's team developed originally, those incremental pieces are unnecessary to have a high end 3D display. The Rembrandt Delaware based operating company has been putting out product for many years without need of any of them. You can go see one of our installations at the Frank Lloyd Wright museum or the Pittsburgh airport. Point being, a saleable product or technology package by Stream or SeeCubic needs Rembrandt's IP, but Rembrandt does not need any technology from Stream. Rembrandt is in a position to provide IP to either party that allows it to operate without need to any of the technology from Stream.*
>
> ***Again, hypothetically placing myself into Stream's counsel's shoes, I would argue that the value of the technology provided in the foreclosure more than covers the debt owed. I believe all parties have taken positions that the technology is worth hundreds of millions of dollars. If a public sale without a license from Rembrandt only generated a portion of that value, I think we should expect that Stream would argue that any lowering of value in the public sale was due to the lenders' failure to take the proper license for Rembrandt allowing a clean sale. Therefore, a foreclosure action by SLS/Hawk may actually relieve Stream of all of its debt and leave Stream with the ability to sell a capable 3D product.***
>
> *Obviously, taking a license from Rembrandt directly or pursuing assignment of the settlement agreement provides your client with freedom of action to sell an intact technology portfolio, however, Rembrandt is free to issue Stream another license to the technology as the settlement agreement is non-exclusive.* ***It is in the Rajans' and Stream's interest to argue that all technology developed by Stream were improvements to Rembrandt's technology and Rembrandt is free to license it back to them.***

34.     Basically, Mr. Caponi is confirming that my predictions back in the Summer of 2022 were accurate. However, it is not Rembrandt that has modified its position, but rather to their credit, Mathu Rajan and VSI are agreeing that the Rembrandt technology and Philips are

essential licenses to the UltraD technology and proposing a plan that keeps the intellectual property intact.

35.  SLS, Hawk, and SeeCubic allege that they are secured lenders and seek to be repaid principal and interest by selling assets pledged as security. However, even assuming that all their rights are valid with respect to the Debtors, they is no instrument that gives them rights of Rembrandt's or Philips's intellectual property.

36.  While, there is a dispute regarding whether Hawk's debt has already been converted to equity thereby completely removing it as a creditor, there is no dispute that a new investment of $39,000,000 would fully convert Hawk's debt to equity.

37.  While Rembrandt-Delaware made a proposal to the trustee which was attached as Exhibit 2 in Rembrandt's Objection to Proof of Claim (D.I. 628) that included a $39,000,000 investment in a preferred share, the immediate issue is whether the proposed settlement is reasonable.

38.  Any potential purchaser could make the same proposal outlined by Rembrandt and for $39,000,000 pay the SLS debt, fully convert the Hawk secured debt, pay all administrative claims, and provide cash to pay at least some of the unsecured claims. In addition, such a purchaser would have an intact intellectual property estate by keeping both the Philips and Rembrandt licenses intact.

39.  In addition, any investor putting $39,000,000 into an investment would not need a settlement with either SLS, Hawk, or SeeCubic as the secured debt would be paid in full in accordance with the existing contracts with the secured creditors.

40.  Rembrandt is currently suing Technovative, SeeCubic, and Hawk. Any purchaser under the proposed settlement and plan for a 363 sale would have to invest $120 million in cash and be walking into an almost immediate claim from Rembrandt, Philips, and Leia.

41. The proposed settlement requires any purchase to post 3x the amount of cash and get far less while subjecting themselves to IP infringement claims from three companies that own intellectual property rights that the Debtors have valid licenses to up through the point of attempting to transfer the technology out of the companies that hold those licenses.

42. It appears that this potential destruction of value is purposeful. While Hawk alleges that it is owed a large amount of money, the only thing better than receiving $160,000,000 in alleged principal and interest, is getting all the technology from a company that was recently valued at over $400,000,000 ($4/share with over a 1,000,000 shares and warrants outstanding prior to Rembrandt litigation).

43. After Rembrandt initiated its litigation to enforce contracts including an NDA and term sheet they provided for Rembrandt to get 60-80% of Stream in exchanging for providing its technology, Stream's shares dropped to $1.50/share by the time Rembrandt negotiated its settlement term sheet on April 12, 2019 with Shad Stastney acting as Stream's CFO at the time (*see* Exhibit 5 to the Delaware Complaint). The share price had dropped by 62.5% and Stream had lost $250,000,000 in valuation.

44. Rembrandt has closely evaluated the quality of the Stream products and even in the midst of its controversies with Stream purchased early versions of Stream's TVs and Stream provided additional units during and post-bankruptcy. The quality of the product has improved over time so the loss in value is not due to the underlying value of the combined Philips/Rembrandt/Stream technology.

45. If Stream and Technovative were unable to create a viable going concern, a bankruptcy proceeding would have the possibility of a sale of assets that included an assignment of the Rembrandt-Stream settlement agreement with any technology owned by Stream and

Technovative thereby maximizing the value of the technology that was being sold thereby paying any and all debt owed to Hawk and other creditors to Stream.

Executed under penalty of perjury this 20th day of May, 2024.

/Christopher A. Michaels/
Christopher A. Michaels (NY Bar No. 2597375)

>*/s/ Andrew DeMarco*
>Andrew DeMarco, Esq.
>DEVLIN LAW FIRM LLC
>1526 Gilpin Avenue
>Wilmington, DE 19806
>Telephone: (302) 449-9010
>Facsimile: (302) 353-4251
>ademarco@devlinlawfirm.com
>
>*Attorneys for Rembrandt 3D Holding Ltd.*

## CERTIFICATE OF SERVICE

I certify that on May 20, 2024, I caused the attached Declaration to be electronically filed with the Clerk, United States Bankruptcy Court, Eastern District of Pennsylvania, by ECF and one copy of the aforementioned document by way of first class mail or ECF to those persons listed on the attached service list. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me is willfully false, I am subject to punishment.

>*/s/ Andrew DeMarco*
>Andrew DeMarco, Esq.

**SERVICE LIST**

<u>Attorneys for Hawk Investment Holdings Ltd.</u>
Steven L. Caponi (No. 91881)
K&L GATES LLP
600 King Street, Suite 901
Wilmington, DE 19801
Telephone: (302) 416-7000
steven.caponi@klgates.com
VIA ECF

<u>Attorneys for Debtor</u>
Rafael X. Zahralddin-Aravena
Asher A. Block
LEWIS BRISBOIS BISGAARD & SMITH, LLP
550 E. Swedesford Road, Suite 270
Wayne, PA 19087
Rafael.Zahralddin@lewisbrisbois.com
Asher.Block@lewisbrisbois.com
Via ECF

Vincent F. Alexander (*pro hac vice* pending)
LEWIS BRISBOIS BISGAARD & SMITH, LLP
110 SE 6th Street, Suite 2600
Fort Lauderdale, FL 33301
Vincent.alexander@lewisbrisbois.com
VIA ECF

<u>US Trustee</u>
KEVIN P. CALLAHAN
DOJ-UST
JOHN HENRY SCHANNE
DOJ-UST
Office of The United States Trustee
Robert N.C. Nix Federal Building
900 Market Street Ste. 320
Philadelphia, PA 19107
Kevin.p.callahan@usdoj.gov
John.Schanne@usdoj.gov
VIA ECF

<u>Debtors</u>
Technovative Media, Inc.
2009 Chestnut Street, 3rd Floor
Philadelphia, PA 19103
VIA FEDERAL EXPRESS