## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al*.[1] | Bky Case No. 23-10763 (AMC) |
| The Debtors. | (Jointly Administered) |

## OBJECTION OF VISUAL SEMICONDUCTOR, INC. TO
## THE MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY
## AS CHAPTER 11 TRUSTEE FOR ENTRY OF AN ORDER
## ENFORCING THE AUTOMATIC STAY AND
## COMPELLING TURNOVER OF ESTATE PROPERTY

Visual Semiconductor, Inc. ("**VSI**") hereby files its Objection to the Motion of the Chapter 11 Trustee (the "**Trustee**") for Entry of an Order Enforcing the Automatic Stay and Compelling Turnover of Estate Property (the "**Motion**"), and in support thereof, states as follows:

## PRELIMINARY STATEMENT

The Trustee claims in the Motion [2] that Mathu Rajan and VSI are violating the automatic stay and interfering with the Trustee's exclusive control over the Debtors and their property. These allegations are categorically false. Nothing is more illustrative of the Motion's weaknesses than an examination of its own words.  In a particularly audacious example of chutzpah, the Trustee asserts that "VSI stunningly admits to directing and 'funding' certain undisclosed contract employees" of the debtor…*without any authority* and *unbeknownst to the Trustee*…." (emphasis added)[3], notwithstanding the Trustee's knowledge, authorization, and direction of the VSI payments to

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015).  The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

[2] D.I. #646 (Bky Case 23-10763-AMC)

[3] Motion at ¶ 31.

76870289;1

contract employees. Indeed, the Trustee paid those contract employees on January 17, 2024, February 8, 2024, and February 22, 2024, knowingly using funds received by Stream from VSI, and as more thoroughly outlined below, the email correspondence between the Trustee and VSI representatives makes the Trustee's knowledge and authorization clear. These are demonstrable facts, and they completely belie the Trustee's baldfaced assertions and misrepresentations of fact. Frankly, such baseless assertions would be humorous if they were not so antithetical to the truth, disparaging to VSI, and disrespectful to this Court and the bankruptcy process. While it has become obvious that the Trustee has adopted the self-serving narratives of other parties in this proceeding bent upon sullying the reputation of Mr. Rajan and VSI, in light of demonstrable falsehoods like the one outlined above, objective observers must ask just how many of the Motion's assertions are to be believed.

VSI was created in 2022 for the purpose of helping the Debtors emerge from insolvency. VSI's purpose was and is two-fold: to fund the operations of the employees of the Debtors, which funding was not only known, but encouraged by the Trustee, and to procure orders for the Debtors to fulfill. None of VSI's activities involve the taking or using of property of the estate or trigger the automatic stay notwithstanding the Trustee's tortured attempts to malign the completely innocuous and known activities of VSI. These attempts also heavily rely on out-of-context statements, as opposed to anything new that has actually happened since the Trustee's appointment.

Through its distribution agreement with Debtor Stream TV Networks, Inc. ("**Stream**"), VSI has secured more than $138 million in customer purchase orders for the benefit of Stream. Since its founding in 2022, VSI has paid Stream's contractor employees to maintain valuable business relationships for the benefit of Stream with customers, manufacturers, critical vendors, original equipment manufacturers, and other strategic partners. The value of the purchase orders,

2

keeping employees paid, and maintaining the status quo of the Debtor's business relationships have all provided considerable value to the estate. Nothing was taken; to the contrary, value was added.

From the date of the Trustee's appointment on January 12, 2024, Mr. Rajan and VSI have been fully supportive of the Trustee in managing the Debtors' estates and worked hard to provide the Trustee with as much information as possible. Stream contractor employees — whose invoices VSI has been paying (at the direction of the Trustee) — were directed to fully cooperate with the Trustee, and they have done so. Significant effort has been made by the Stream contract employees, Mr. Rajan, and VSI to provide assistance and hundreds of pages of information to the Trustee to facilitate his administration of the Debtors' estates. Neither VSI nor Mr. Rajan are interfering with the Trustee's independent administration of the Debtors' estates, nor are they using Debtors' tangible property to raise funds for VSI as alleged. Indeed, as explained in detail below, VSI neither violated the stay by using any email address or refused to turnover property of the estate. And to the extent the Trustee believes an email address is property of the estate or that VSI is refusing to turnover any property of the estate, VSI is happy to comply with the Trustee's specific, reasonable, and legally-grounded demands. Had the Trustee simply conferred with VSI prior to filing the Motion, it is likely that Court intervention would have been unnecessary. This simple fact makes the Trustee's demands for attorney's fees and costs preposterous and, frankly, disingenuous.

76870289;1

# BACKGROUND

**A.      VSI has supported the Debtors since VSI was founded in 2022**

1.      VSI is a party in interest, equity holder of the Debtor, a proposed plan sponsor of the Debtors (originally), and financier and distributor of the Debtor's Glasses-Free 3D technology. VSI has invested millions of dollars in Stream since VSI's inception in 2022.

2.      VSI was formed in April 2022 when it became clear to Mr. Rajan that Stream would prevail in its Delaware Supreme Court appeal of the Delaware Court of Chancery ruling which validated a settlement agreement (the "**Omnibus Agreement**") that transferred Stream's assets to SeeCubic, Inc. ("**SCI**") on behalf of Stream's alleged secured creditors, SLS Holdings VI, LLC ("**SLS**") and Hawk Investment Holdings Limited ("**Hawk**"). Prior to the Delaware Supreme Court opinion of June 15, 2022, which did indeed find that the Omnibus Agreement was void *ab initio*, Stream was unable to use its own name or maintain any bank account. VSI was formed to retain key Stream personnel so that they could maintain relationships with customers and strategic partners, thus preserving critical human resources for the benefit of Stream.

3.      After the Chancery Court ruling was VACATED and REVERSED, VSI entered into three pre-petition stock purchase agreements with Stream to provide more than $3.7 million in critical funding for Stream's operations. The first stock purchase agreement, dated February 27, 2023, was in the amount of $1,427,355. The second stock purchase agreement, also dated February 27, 2023, was in the amount of $1,525,275. The third stock purchase agreement, dated March 10, 2023, was in the amount of $750,000. VSI made the stock purchase payments by paying Stream's expenses (e.g. vendors, contractor employees, etc.) on behalf of Stream rather than paying Stream directly. Such payments were reported to Stream, which issued shares of its Common Stock to VSI and adjusted its capitalization table accordingly. None of this is being challenged by the Trustee.

4.      Though Stream was able to resume business development and sales activities under its own name again, it struggled financially because SCI, Hawk, and those acting in concert with them refused to return key assets to Stream, including operational control of its Netherlands R&D subsidiary, SeeCubic B.V. ("**SCBV**") and an $8 million optical bonding machine (the "**Bonding Equipment**") critical to fulfilling customer purchase orders.

5.      In February 2023, VSI and Stream began negotiations for a deeper strategic relationship in which VSI would become the exclusive distributor of Stream's technology in exchange for securing purchase order financing for end customers, providing product development financing, coordinating delivery of end products, and providing customer service as necessary. For these services, VSI would receive a ten percent (10%) fee, taking the customer purchase orders directly and issuing "back-to-back" purchase orders to Stream in amounts equal to ninety percent (90%) of the gross customer orders. An initial draft agreement was prepared and agreed on March 9, 2023, a final agreement was executed on March 31, 2023 (the "**Distribution Agreement**") (*See* **Exhibit A**).

6.      As distributor for Stream, VSI worked with Stream's contractor employees to secure two major customer purchase orders in April 2023. Cystar International Limited ("**Cystar**") committed to purchasing 10,000 units of 65-inch 4K-resolution digital signage displays at a total purchase price of $14 million. VSI issued a purchase order to Stream in the amount of $12.6 million pursuant to the Distribution Agreement. Southern Telecom ("**SoTel**") committed to purchasing 100,000 units of 65-inch 8K-resolution televisions at a total purchase price of $140 million. VSI issued a purchase order to Stream in the amount of $126 million pursuant to the Distribution Agreement.

7.      Despite having purchase orders in hand, Stream was unable to realize revenue because its Bonding Equipment had still not been returned by SCI and SCBV, over which SCI exercised control through Shadron L. Stastney's directorship.[4] VSI agreed to make additional purchases of Stream Common Stock to provide another $2 million in continued operational funding for Stream. The fourth stock purchase agreement, dated July 10, 2023, was in the amount of $2,000,000. As before, VSI funded the stock purchase by paying Stream's expenses rather than paying Stream directly, and Stream issued shares of its Common Stock to VSI and adjusted its capitalization table accordingly. Payments made on behalf of Stream during the pendency of Stream's bankruptcy case were reflected in Stream's monthly operating reports, as amended. Through the four stock purchase agreements, VSI provided more than $5.7 million in critical operational funding for Stream.

8.      Most recently, VSI entered into two additional stock purchase agreements with Stream, both on September 11, 2023 and each in the amount of $5,000,000 to provide an additional $10 million in funding for Stream operations and commencement of production.

**B.      Mathu Rajan, VSI, and the Stream contractor employees provided support to the Trustee to enable his efficient administration of the Debtors' estates**

9.      On January 9, 2024, William A. Homony was appointed as the chapter 11 trustee in this case.

10.      On January 16, 2024, Stream contract employee Nicole Maneen emailed the Trustee copies of the Hawk debt-to-conversion agreement and amendment thereto. The next day,

---

[4] Shadron L. Stastney is the Chairman and CEO of SCI. During the time that the Omnibus Agreement was in effect, Mr. Stastney assumed the role of director of Stream's Netherlands R&D subsidiary, See Cubic B.V. However, when the Delaware Supreme Court mandated a reversal of the assets transfer, Mr. Stastney refused to relinquish his directorship of SCBV, challenged the authority of Mathu Rajan as the legitimately registered director, and continued to direct SCBV employees for the benefit of SCI and to the detriment of Stream.

she set up a Box cloud folder to hold those contracts and related documentation, giving the Trustee and his team easy access to the information (*See* **Exhibit B**). On January 17, 2024, the Trustee sent an email to Mrs. Maneen requesting "documents and other information that supports Stream's position that the debt was in fact converted to equity." The conversion notices sent by Stream to Hawk were provided as additional documentation, but on February 8, 2024, Edmond George, as counsel to the Trustee, sent an email that stated "we are reviewing and analyzing the documents you have sent us on the conversion issue for Hawk. We are going to need to see proof of deposits of the funds referenced in your documentations…" (*See* **Exhibit C**).

11.     Anticipating the need for documentation with greater and greater detail, Mr. Rajan arranged for the preparation and delivery of several hundred pages of financial information for the Trustee, including (i) stock purchase agreements to verify the source and amount of all new capital raised as well as the equity offered for such new investments, (ii) annotated bank statements confirming receipt of new capital funds, (iii) summary reports showing how such new capital funds satisfied specific promissory note extinguishments, (iv) invoices and receipts for Stream expenses paid by VSI on behalf of Stream, and (v) annotated bank statements showing that the Stream expenses had, in fact, been paid. Satisfying the Trustee request required great transparency of VSI's books and records as well as considerable human resources to prepare and deliver audit-ready documentation. All documents were uploaded to the Box cloud folder for the Trustee's review and analysis.

12.     In a meeting with Mr. Rajan and Mrs. Maneen on March 7, 2024, the Trustee and his counsel discussed the status of Stream, among other things. One of the Trustee's mandates is to marshal the Debtors' assets, and he asked for a definitive list of assets that had not yet been returned to Stream following invalidation of the Omnibus Agreement. The Stream contractor

7

employees prepared a comprehensive list, which was emailed to the Trustee by Nicole Maneen on March 10, 2024 (*See* **Exhibit D**).

13.     Though the Trustee has no authority to manage the business of VSI and no entitlement to review VSI's sensitive business information, he requested access to significant VSI business data as part of his due diligence in evaluating the Stream-VSI relationship. Nonetheless, VSI provided access to the Trustee. Further, VSI gathered the information in a central cloud location on Box.com and granted access to the Trustee.  VSI has been completely transparent with the Trustee.

**C.      The Trustee knew that the Stream contractor employees were working for the benefit of Stream, directed them, and authorized VSI to pay them**

14.     Under the management of Mr. Rajan, Stream began paying the Stream contractor employees directly in January 2024, making the first such payment on January 4, 2024. The Trustee's appointment was confirmed by Court order on January 12, 2024, and all subsequent accounting for the Debtors was overseen by him.

15.     Upon appointment of the Trustee, VSI informed him that Stream contractor employees in the United States and Asia had been paid for many months by VSI to conduct business development and sales activities on behalf of Stream. He was further informed that Stream had established a debtor-in-possession bank account and had only recently paid those same contractor employees directly. For the next six weeks, Mr. Rajan and Mrs. Maneen provided contract employee data to the Trustee to make him aware of ongoing obligations. The Trustee facilitated Stream's direct payment of those contractor employees, issuing payments on or about January 17, 2024, February 8, 2024, and February 22, 2024, using funds received by Stream from VSI pursuant to the additional stock purchase agreements not yet fulfilled.

16.      Having authorized and facilitated payment to the Stream contractor employees, the Trustee was fully aware that they were engaged for the benefit of Stream. As administrator of Stream's estate, he had the ability and duty to direct them, and he did. He requested their assistance in educating him about the Glasses-Free 3D business as well as Stream's legal and financial history. He directed them to gather detailed information about the Hawk debt-to-equity conversion and assets of the Stream estate to be located and marshaled. He directed them to obtain updated confirmations that customer purchase orders issued in 2023 were still valid. Nothing in the Motion contradicts any of this.

17.      Stream contractor employees responsible for reporting product sales and making related royalty payments pursuant to an irreplaceable technology license from Koninklijke Philips Electronics ("**Philips**") informed the Trustee on January 25, 2024 that they had been unsuccessful in obtaining sales data from SCBV and Mr. Stastney for the quarter ending December 31, 2023. The Trustee's office requested previous royalty reporting, which Mrs. Maneen obtained from the Stream contractor managing the Philips account and provided the requested documentation to the Trustee. Once informed of the royalty reporting procedure and recent history, the Trustee obtained the necessary sales data from SCBV (via Mr. Stastney) and provided it to Mrs. Maneen via email on January 29, 2024 so that the Philips royalty reporting could be made by the appropriate Stream contract employee prior to the January 31, 2024 deadline (*See* **Exhibit E**).

18.      The sales data from Mr. Stastney confirmed that SCBV had sold multiple samples in three different sizes in the 4th quarter of 2023: 10 units of 12.3" displays, 10 units of 15.6" displays, and 6 units of 27" displays. None of these sales were for the benefit of the Debtors; they benefitted only SCBV and SCI, which were cultivating customer relationships of their own using technology owned by the Debtors and built on third-party licenses they did not control. VSI is

9

unaware of any action the Trustee has taken to prevent this continued customer development at Stream's expense, even though the Trustee knew that SCBV, SCI, and Mr. Stastney (among others) are enjoined by a TRO issued by the Court long before the Trustee received this sales data (and prior to the appointment of the Trustee himself). Instead, the Trustee is going after VSI for generating millions of dollars in purchase orders for the benefit of the Debtors, which VSI has always acknowledged, are the true owners of the relevant display technology.

19.    When Stream depleted the funds on hand from VSI in early March 2024, VSI sent additional funds pursuant to its stock purchase agreement with Stream. On March 8, 2024, Mrs. Maneen sent an email to the Trustee and stated: "Please see attached the pay list for payroll. The wire [transfer payment] is headed your way." The Trustee responded: "I apologize I thought it was communicated that absent an order from the bankruptcy court that I was not going to accept any additional money from VSI. *I will return the wire and ask that VSI directly pay these contractors until further notice.*" Mrs. Maneen responded: "That's not a problem, VSI can pay them. We thought it had to go through you and didn't want to break any rules. I misunderstood [Trustee's counsel]'s email and thought he meant nothing without your permission, which at the time, we were coordinating with you. I will pass it on [to VSI] that VSI needs to pay." (*See* **Exhibit F** (emphasis added)).

20.    As requested by the Trustee, VSI resumed making direct payments to the Stream contractor employees and has continued to do so as of the date hereof to preserve the human resources value to the Stream estate. The Trustee continued to direct those contractors after VSI resumed paying them on behalf of Stream, clearly evidencing his understanding and authorization of their engagements.

**D.      The Trustee had full knowledge of the optical bonding strategic partnership with Cystar and authorized Stream contractor employees to arrange transportation of the Bonding Equipment**

21.      After meeting with Mr. Rajan and Mrs. Maneen in person on March 7, 2024, the Trustee engaged Mrs. Maneen to assist with the return of assets to the Debtors' estates. The Trustee was informed that the Bonding Equipment was critical to cost-effective fulfillment of existing customer orders without engaging a third-party bonding vendor which would dramatically reduce the profit margin to the Debtor.

22.      On March 10, 2024, Mrs. Maneen sent an email to the Trustee informing him of details related to a strategic manufacturing partnership that the Stream contractor employees and Mr. Rajan had arranged with Cystar, which had not only issued a purchase order for 10,000 units but had also offered to provide a manufacturing facility, labor, and overhead to expedite order fulfillment. The email from Mrs. Maneen provided the Trustee with a copy of the Cystar contractual agreement for the proposed strategic partnership as well as the address where the Bonding Equipment is currently warehoused (*See* **Exhibit G**).

23.      In a March 11, 2024 follow-up email to the Trustee, Mrs. Maneen stated: "To clarify further, Patric [Theune] has some assets and the bonding machine. Shad [Stastney] controls the assets in the other location offices (London, N[ew] Y[ork], Florida, etc.)." Mr. Theune provides operational management for SCBV (*See* **Exhibit H**).

24.      The Trustee sent a March 11, 2024 email to Mrs. Maneen in which he stated: "Nicole, I'm going to put you in contact with Patric Theune to discuss logistics of moving the bonding equipment and return of other Stream assets." (*See* **Exhibit I**). That same day, the Trustee sent an email to Mr. Theune, stating: "Hello Patric, as reflected in my prior email from earlier today, I am directing the relocation of Stream's bonding equipment as well as the return of assets

identified on the attached itemized list. I've copied Nicole on this email who will be coordinating with you on the logistics." (*See* **Exhibit J**).

25.     Mrs. Maneen sent an email to Mr. Theune on March 11, 2024, with the Trustee copied, in which she stated: "As per [the Trustee]'s instruction below, I will be your contact for asset return." She provided the shipping address for the Bonding Equipment so that it could be made available to satisfy the Cystar strategic manufacturing agreement and the Cystar purchase order (*See* **Exhibit K**).

26.     On March 12, 2024, Mr. Theune sent an email to both the Trustee and Mrs. Maneen in which he stated: "I wish to draw your attention to the fact that I am an employee at SeeCubic B.V., meaning I am not its director. From a Dutch legal perspective I cannot simply ignore Shad [Stastney] and take your instructions instead without his acknowledgement." In that same email, Mr. Theune, wrote: "I note that-if Shad agrees with your request-we are happy to comply." Other than brief deflection of the Trustee's direction to Mr. Stastney, Mr. Theune focused the balance of the email on a request for operational funds, stating: "your request to send products to the U[nited] S[tates] cannot be handled without funding." (*See* **Exhibit L**).

27.     On March 14, 2024, Mr. Theune sent an email to the Trustee and Mrs. Maneen in which he outlined a multi-step process required to move the Bonding Equipment. Rather than facilitate direct communication between the Stream contractor employees and the Chinese warehouse landlord and the Bonding Equipment original manufacturer so that VSI could make the necessary payments on Stream's behalf, Mr. Theune kept himself as the conduit for all such coordination, delaying the process and eliminating any chance of a timely and satisfactory response to the Trustee's demand for turnover of equipment.

28.     Although the Trustee was copied on all communication related to moving the Bonding Equipment to a new facility where it could generate revenue for the Debtors' estates, and although the Trustee was initially supportive of the equipment move and the strategic partnership with Cystar as both a manufacturing partner and a bona fide customer, he ultimately instructed both the Stream contractor employees and Mr. Theune to leave the Bonding Equipment under SCBV control rather than pursuing the return of a major asset to the Debtor.,

29.     It is disingenuous for the Trustee to assert that VSI was attempting to seize that asset for its own purposes. Even more disingenuous is the Trustee's fabrication that (i) the Stream contractor employees were "undisclosed" (payroll details were provided to the Trustee, who directly approved payroll for a period of six weeks and instructed VSI to make such future payments "until further notice"); (ii) the attempt to recover the Bonding Equipment was "unbeknownst to the Trustee" (he was copied on all communication and was the one who initiated direct communication between Mrs. Maneen and Mr. Theune); and (iii) the Bonding Equipment would be delivered to "an undisclosed party" (Mrs. Maneen provided the Cystar strategic manufacturing agreement and address to the Trustee before the Trustee instructed Mr. Theune to cooperate with Mrs. Maneen in moving the Bonding Equipment on the Debtor's behalf).

### E.    VSI and Mathu Rajan are not competing with the Debtors

30.     The Trustee Turnover Motion alleges that "VSI and Rajan are competing with the Debtors, in brazen and blatant violation of Rajan's fiduciary duty of loyalty as a director of the Debtors" (D.I. #646 ¶ 18). As proof, the motion cites VSI's website, which uses the same marketing language that Stream uses. Although VSI does not deny the Trustee's observation, it refutes his conclusion. VSI's use of Stream's marketing phrase is not coincidental or nefarious as the motion implies; per the Distribution Agreement, VSI's mandate is to secure customers *on*

*behalf of Stream*, thereby generating revenue for Stream. Consistent messaging between a supplier and a distributor is mere common sense. The Trustee has not sought to reject the Distribution Agreement granting VSI the ability to advertise on behalf of the Debtors or deal with it in this case, but rather seeks to take actions taken by VSI pursuant to this agreement out of context, to, on purpose, paint VSI in a negative light because VSI disagrees with the Trustee's attempts to settle with the secured creditors.

31.    A distributor is not a competitor of the company whose products and services it sells. It is precisely this distribution relationship between VSI and Stream that led to securing $138 million in customer purchase orders *for the benefit of Stream* the benefit of which the Trustee has not and cannot refute.

32.    There is no doubt that Stream lacks the capital resources to adequately market its technology, commence production, finance its supply chain, or fulfill customer purchase orders. Accordingly, a distributor willing to fund those requirements of revenue generation, taking equity in exchange for what is in essence Debtor-in-Possession financing,  is invaluable to these estates.

33.    Shortly after accepting his position in January 2024, the Trustee requested that VSI provide updated confirmation letters that the SoTel and Cystar purchase orders issued in April 2023 were still valid. Even though VSI had secured such letters only two months before, in November 2023, VSI nonetheless accommodated the Trustee's request and provided renewed commitment letters from both customers. Additionally, VSI offered to arrange meetings between the Trustee and executives from each of the customer companies in furtherance of confirming the veracity of the orders. Customer contacts and the VSI relationships with them were made very transparent to the Trustee, something that would not be the case if VSI were indeed competing with the Debtor.

**F.**    **Neither VSI nor Mathu Rajan are taking action that obligates the Debtors without authority or Bankruptcy Court approval**

34.    Despite minimal direction from the Trustee to the Stream contractor employees, they have continued to work with VSI to (i) identify assets and assist in restoring them to the Debtors' estates; (ii) preserve valuable business relationships with customers and strategic partners; (iii) cultivate new business relationships; (iv) generate sales for the benefit of both the Debtors and VSI through the global distribution agreement; and (v) explore options for accelerated and efficient manufacturing for order fulfilment.

35.    Since the January 5, 2024 Bankruptcy Court order restricting his authority, Mr. Rajan has not taken any action, nor allowed or directed VSI or any Stream contract employee to take any action, that would obligate the Debtors in any way without authority or Court approval. No agreements have been signed and no new purchase orders have been accepted. All business and customer development efforts have been strictly exploratory while the Trustee has been evaluating the Debtors' businesses, and the Trustee cites no specific evidence that makes him "justifiably concerned" with regard to this matter.

**G.**    **Mathu Rajan has not usurped the Trustee's exclusive control over the Debtors' estates**

36.    The Trustee's Motion captions the private Gmail account used by Mathu Rajan as a "Sham Email Account," using a deliberately inflammatory and prejudicial label to imply meaning where there is none (D.I. #646 ¶ 25). Mr. Rajan has used that email from time to time for several years to communicate with interested parties seeking clarification about the maneuverings of various parties engaged in the acrimonious litigation that has been ongoing since 2020.

37.    Mr. Rajan sent the referenced email with links to relevant articles discussing legal precedent as it might impact the settlement agreement with Hawk (the "**Settlement Agreement**").

The information was intended to educate the recipients about potential timelines and outcomes, and although Mr. Rajan offered his opinion on certain aspects as an individual, *not as a Stream representative*, he made it quite clear that his suppositions were only opinions and invited the recipients to draw their own conclusions. The email simply shared  publicly available information and was not an attempt to interfere with the Trustee's control over the Debtors' estates.

38.    The Motion speculates that Mr. Rajan has used and plans to continue using the private Gmail account "to improperly raise money for the sole benefit of VSI…" (D.I. #646 ¶ 27). Nowhere in the referenced email is there any mention of VSI or fundraising. Nowhere in the referenced email does Mr. Rajan indicate he is writing on behalf of Stream. Concern about the potential for impropriety is stated without any evidence or even the rationale behind the concern.

39.    The Motion further speculates, again without evidence, that Mr. Rajan might use the private Gmail account "to delay and derail the Court's consideration of the Trustee's 9019 Motion and the Capstone Application via extrajudicial means…" The idea that any communication – unless sent to and embraced by the Court itself – would impact judicial consideration is ridiculous.

40.    The same is true for the speculation that Mr. Rajan would use the personal Gmail account to interfere with "the Trustee's efforts to maximize the value of the Debtors' assets via a fair sale process." Nothing in Mr. Rajan's communication remotely referenced the concept of asset valuation, which will be determined by an independent third party when and if a sale is approved. To the extent parties in interest oppose relief sought by the Trustee, such free exercise of those parties' business judgment to participate or not in this case however they are legally entitled to, is up to them and not a violation of anything.

41.    However, if the Court finds that the private Gmail account is somehow the property of the Debtor or should be discontinued because of its potential to create confusion for mail recipients, Mr. Rajan is willing to close the email account without objection. There is no intent on his part to speak for Stream or to usurp the Trustee's authority. Had the Trustee conferred with VSI prior to filing the Motion, this matter likely could have been resolved without Court intervention.

**H.    VSI believed it had developed a bona fide relationship with Capstone and did not file its objection to delay the bankruptcy proceedings or interfere with the Trustee's sale efforts**

42.    In September 2022, after the Delaware Supreme Court invalidated the Omnibus Agreement and the Delaware Court of Chancery ordered the return of Stream's assets, investment banker Marc Dannenberg introduced VSI and Stream to Joe Malloy, a former sports executive. VSI's intent was to help Stream reorganize outside of bankruptcy while Stream worked to reclaim its assets and secure customer orders. Mr. Malloy made a subsequent introduction to Capstone Capital Markets LLC ("**Capstone**") and invited Capstone executive Peter Bailey to see Stream's technology.

43.    On September 26, 2022, VSI attended a Zoom meeting with Capstone and discussed the possibility of Capstone raising money for VSI so that VSI could help with Stream's reorganization. During the meeting, VSI made extensive efforts to educate Capstone about the Glasses-Free 3D market, about which it knew very little. After the meeting, VSI provided information about both Stream and VSI for consideration, as well as an update about possible interest from The Masters in seeing a technology demonstration in Augusta. Mr. Bailey seemed enthusiastic about the Glasses-Free 3D market opportunity, the Stream technology, and potential customer/partner interest.

44.     On November 9, 2022, VSI attended a follow up Zoom meeting with Mr. Bailey to update him on certain business developments, and on December 19, 2022, VSI sent an email update to Mr. Bailey with summaries of significant strategic partner meetings that had occurred as well as an overview of plans for upcoming trips to Korea and Japan to solicit customer and manufacturing support. VSI released this information because of the enthusiastic feedback it was receiving from Capstone, and because it believed an engagement letter was imminent.

45.     An engagement letter was not signed at that time, however, because Capstone was not willing to split commissions with Mr. Dannenberg; the relationship between VSI and Capstone was mutually put on hold until and unless VSI's situation changed. By April 2024, Mr. Dannenberg was no longer engaged by VSI and was no longer entitled to fees, and VSI desired to reconnect.

46.     Unaware that the Trustee had filed its motion to employ Capstone (the "**Capstone Motion**") the day before, on May 3, 2024, Mr. Rajan reached out to Capstone to explore a renewed relationship. There was no "nefarious intention" as the Trustee's Motion alleges. Mr. Rajan had simply not imagined that the Trustee would consider Capstone a potential investment banking partner because (i) a conflict check by Capstone should have revealed the VSI history, and (ii) even if Capstone's conflict check revealed no red flag, the Trustee had been given complete access to VSI's cloud-based business records and would have been able to see the extent of VSI' communication and sharing of its business information with Capstone. Nothing was hidden from the Trustee.

47.     On May 8, 2024, VSI attended a follow-up Zoom meeting with Capstone. Based on that meeting, VSI believed that Capstone was once again interested in raising capital for VSI. On May 9, 2024, VSI filed its objection to the Capstone Motion (the "**Capstone Objection**")

because it truthfully believed that its 20-month business development efforts with Capstone were sufficiently advanced to warrant the exclusion. Unfortunately, miscommunication between VSI and its counsel led to an incorrect statement in the Capstone Objection that a non-disclosure agreement had been executed between VSI and Capstone.

48.     Although execution of non-disclosure documents has historically been standard procedure before sharing business information, VSI completed a definitive search of its business records and determined that no Capstone NDA exists. Additionally, the declaration of Jamie Lisac, managing director of Capstone, made it clear that Capstone's interest in VSI is not as great as VSI believed it to be. On June 6, 2024, VSI's former counsel notified counsel to the Trustee as well as the United States Trustee that it intended to withdraw the Capstone Objection and, indeed, VSI did so after retaining new counsel.

I.    **VSI does not "wrongfully possess" any assets of the Debtors and is not using them "to solicit and raise money for VSI**

49.     Following the Delaware Court of Chancery's order that SeeCubic, Inc. return assets wrongfully seized from Stream pursuant to the invalidated Omnibus Agreement, a limited number of assets were, in fact, returned. Stream contractor employees have possession of those few assets in furtherance of the services they are providing *on Stream's behalf*. Such services have included (i) customer service for previously delivered products, (ii) sales presentations in association with VSI as distributor, and (iii) technology demonstrations in association with VSI to maintain and develop strategic partnerships for supply chain support, logistics, and manufacturing.

50.     The Motion states, without any substantiation, that "VSI currently possesses equipment that incorporates the Debtors' Ultra-D technology and is actively using it to demonstrate the Debtors' technology to potential investors" (D.I. #646 ¶ 23). The Trustee offers no evidence because there is none. VSI is not in possession of any assets of the Debtors and has

76870289;1

made no presentations of the Debtors' technology for the purpose of raising capital. All presentations of the Debtors' technology by VSI have been made in association with one or more Stream contractor employees for the purpose of maintaining customer relationships, obtaining new purchase orders, developing strategic partnerships, securing supply chain partners, and similar activities that *directly benefit the Debtors*.

51.     Any assets of the Debtor that are held by Stream contractor employees for the benefit of the Debtor may be collected by the Trustee by simple request since those contractor employees have been and remain willing to take direction from him at any time. The Trustee has made no such request. Once again, had the Trustee conferred with VSI prior to filing the Motion, this matter could have been resolved without Court intervention.

52.     The Trustee's Motion alleges that VSI circulated an investment memorandum (the "**VSI IM**") which represents that the Debtors' Ultra-D technology "belongs to VSI." (D.I. #646 ¶ 21). The motion attaches what it claims is a "true and correct copy" of the VSI IM. However, the motion does not state where the document was obtained, when it was allegedly circulated, or confirm its authenticity in any way.

53.     Irrespective of the document's authenticity, the Motion's supposition that VSI claims ownership of the Debtors' technology is simply false. The Motion states that the VSI IM contains "no less than twenty-one" references to the Ultra-D technology and it cites 10 pages as evidence. On its surface, the number of pages seems to be significant evidence, but a quick review of those pages reveals the claim to be baseless, particularly because of VSI's relationship with Stream *as a distributor*:

> a. Page 8 – this page consists solely of press testimonials declaring the quality of Ultra-D as a technology – any distributor would want to use material like this for marketing purposes. VSI does not claim ownership, only that it can distribute a world-class solution.

b.  Page 15 – this page merely states that Ultra-D will be helpful to 2D panel makers looking to increase their sales. Again, this describes market appetite and the potential to generate revenue as a distributor.

c.  Page 16 – this page merely illustrates at a simple level how the Ultra-D optics work to create an excellent viewing experience, a selling point for a distributor looking to capture market share for its technology supplier. There is no implication of ownership.

d.  Page 17 – similar to page 16, this page merely gives additional illustration to how the Ultra-D technology creates the experience. There is no implication of ownership.

e.  Page 18 – similar to page 15, this page merely underscores the benefit of Ultra-D to panel makers, increasing the market opportunity for both distributor and technology supplier.

f.  Page 34 – this page merely references success achieved by a previous Ultra-D customer as an illustration of potential market interest. IQH3D, LLC purchased dozens of products from Stream and from SeeCubic, Inc. while it had control of the Ultra-D technology following the improvident Chancery Court ruling. Referencing Ultra-D installations by IQH3D and potential interest generated by IQH3D does not imply ownership by VSI, it merely showcases activity in the Glasses-Free 3D market by an active Ultra-D customer.

g.  Page 35 – similar to page 34, this page merely showcases additional activity and success of IQH3D in the medical field as an illustration of market interest. Showing viability in alternative markets is beneficial to both the distributor and the technology provider. Again, there is no implication of technology ownership.

h.  Page 36 – as above, this page merely showcases the installation of Ultra-D products *by an existing Stream customer* in yet another viable market, video gaming. The page further presents the potential to generate revenue through content creation. As with every other page cited, there is no implication of technology ownership.

i.  Page 37 – similar to pages 34 and 35, this page merely showcases IQH3D activity generating interest from the theme park and hospitality industries. Success by one customer can drive interest with others and is "Marketing 101" for any distributor. There is no claim of technology ownership here either.

j.  Page 53 – this page merely quotes highlights of an industry analyst's opinion that Ultra-D is a great value proposition for the digital signage industry. Again, this showcases another market to generate revenue for both distributor and technology provider. And again, there is no implication of technology ownership by VSI.

54.  References to a second VSI document in the Trustee 's Motion are even more selectively misleading. The two-page teaser, attached as Exhibit B to the Motion, described both

76870289;1

the Debtors' Ultra-D technology as well as a completely unrelated hologram technology. The document does indeed state that "[c]ornerstone solutions in [VSI's] portfolio include Ultra-D glasses-free 3D," but the portfolio referenced includes the Distribution Agreement by which the technology can be marketed and sold. There is no explicit mention of ownership, and any incorrect impression by a reader would be quickly dispelled by either a simple inquiry or a detailed reading of the relevant documents.

55.     Worse still, the Trustee's Motion blatantly misquotes the teaser document by claiming that the VSI document stated "that VSI 'can bring to market'" the Debtor's technology. A quick review of the teaser document reveals that the "bring to market" quote was in reference to the hologram technology, not the Debtors' Ultra-D technology. Even if this misquote was inadvertent, it's impact is clearly intended to prejudice the Court's perception of VSI's conduct.

56.     Lastly, the Trustee's Motion claims that VSI stated it has "deployed" the Debtors' technology in locations throughout the world. That single word taken out of context is misleading. The full quote in the teaser is "Ultra-D displays have been *deployed* in airports, train stations, museums, movie theaters, automotive dealerships, shopping malls, and a variety of other high-visibility locations." VSI does not claim that it made such deployments; it merely references them as an indication of minimal visibility across a variety of markets and geographies.

57.     VSI has not used, and does not use, the Debtors' technology – either physically or through implied ownership – to raise funds as alleged in the Trustee Turnover Motion.

**J.      It is SeeCubic, Inc., Hawk Investment Holdings Limited, Shadron Stastney, and SeeCubic B.V. that have violated the turnover requirement and are wrongfully using the Debtor's assets to raise capital in violation of a TRO**

58.     On January 4, 2024, following months of evidentiary hearings, this Court issued a Temporary Restraining Order (the "**TRO**") against SCI, Hawk, SCBV, Mr. Stastney, and those

acting in concert with them (the "**Enjoined Parties**") to protect the Debtors, their estates, their creditors, and their shareholders from irreparable harm. The TRO has been in effect continuously since the date of issue and has been extended several times, most recently on June 5, 2024 to remain in effect until July 31, 2024. The enjoined parties are prohibited from "any external or publicly disseminated form of communication" that would

> **describe, reference, display or portray the technology, or any improvements thereon**, or **make any representations with respect to ownership or development of such technology**, purported to be owned and/or developed by Stream and/or its subsidiaries. (*TRO* ¶ 9(b)(ii), emphasis added)

59.     At the request of the Trustee in January 2024, the Stream contractor employees compiled a list of the Debtors' assets to be marshaled from various global locations, including the SCBV R&D facility in the Netherlands, Mr. Stastney's private residence, SCI's offices in New York and London, and Hawk's office in the United Kingdom. Despite the Chancery Court order to return Stream's assets, they retained and continue to retain the Debtors' assets for use in fundraising and sales in direct competition with the Debtors, unlike VSI, who relies on the Debtor's ownership of the technology as per the Distribution Agreement.

60.     Worse still, SCI and Mr. Stastney engaged SCBV to create new demonstrator units that even the Debtors do not have. Based on information and belief, a new Glasses-Free 3D demonstrator featuring a 15" OLED display was created to capitalize on state-of-the-art panel technology. Regardless of any innovations made by SCBV, the technology is still protected and any "reference, display, or portrayal" of the technology through such samples is explicitly restricted by the TRO, which prohibits the Enjoined Parties from using "the technology, *or any improvements thereon*" (*TRO* at ¶ 9(b)(ii), emphasis added). The 15" technology sample was demonstrated by Mr. Stastney to the Trustee in March 2024. Despite acknowledging that the

76870289;1

display features the Debtors' technology and is therefore subject to turnover, SCI retained possession of the display and continues to use it for investor presentations in violation of the TRO. Based on information and belief, such presentations accelerated after the Trustee entered into the Settlement Agreement because SCI must now quickly raise $7.5 million to satisfy the settlement conditions.

61.    Why the Trustee chose to file the Motion against VSI, an entity that has injected millions upon millions of dollars into keeping the Debtors alive and working to ensure its future success, and not various other parties, is unknown to VSI. But VSI should be allowed to compete in any sale process on an equal-playing field, and not be unfairly harassed. VSI's participation in the sale process (as opposed to defending bogus motion practice) will only enhance the Trustee's chances of achieving the highest and best price for the Debtors' assets.

## LEGAL ARGUMENT

**A.    Performance by VSI pursuant to the Distribution Agreement cannot be a stay violation**

62.    The automatic stay protects property of the bankruptcy estate and provides for a broad stay of litigation, lien enforcement and other actions, judicial or otherwise, that are attempts to enforce or collect prepetition claims. It also stays a wide range of actions that would affect or interfere with property of the estate, property of the debtor or property in the custody of the estate. 11 U.S.C. § 362(a); 3–362 Collier on Bankruptcy ¶ 362.03, (Alan N. Resnick & Henry J. Sommer eds. 16th ed.). The Motion is intentionally vague on what actions VSI or Mr. Rajan took in violation of the automatic stay, because neither took any actions in violation of the automatic stay, interfered with the Trustee's administration of the Debtors or their property, or really did anything other than fund this case, generate assets and opportunities for the Debtors, and express

an opinion as to a motion filed by the Trustee - something that each and every party in interest, including  Mr. Rajan, is entitled to do.

63.    Although the Trustee offers numerous unfounded allegations and unsubstantiated factual inferences, the Trustee has not (and cannot) plead any specific facts to negate the fact that VSI is a party to a valid and binding contracts with a Debtor, which contract, to date, has not been rejected. As such, VSI continues to be authorized and entitled to perform under the Distribution Agreement until such time as the agreement is rejected by the Trustee. *See, In re Whitcomb & Kelly Mortgage*, 715 F.2d 375 (7th Cir. 1983) (the contract is generally thought of as remaining "in effect," and the non-debtor parties are bound to honor it and perform); *cf. In re Continental Airlines*, 981 F.2d 1450, 1459-60 (5th Cir. 1993) (court's discussion shows that contract continues to exist post-petition, reasoning that, "[a]n agreement cannot 'exist' for one purpose yet take on a 'nonexistent' quality which works to the advantage of one party or the other."); *In re Modern Textile, Inc.*, 900 F.2d 1184, 1191 (8th Cir. 1990) (executory contracts are "an existing and continuing legal obligation of the debtor," subject to the debtor's right to reject); *In re Thomas Co., Inc.*, 166 B.R. 677 (Bankr. C.D. Ill. 1994) (executory contract remains in existence until rejected; *In re Leslie Fay Companies, Inc.*, 166 B.R. 802, 808 (Bankr. S.D.N.Y. 1994); *In re Consumer Health Servs. of Am.*, 171 B.R. 917, 924 (Bankr. D.C. 1994) (overturned on other grounds by *United States v. Consumer Health Servs. of Am., Inc.,* 108 F.3d 390 (D.C. Cir. 1997) ("[A]n unassumed executory contract continues in effect and remains enforceable by the debtor").

64.    VSI and Mr. Rajan are in compliance with the Distribution Agreement and the automatic stay under section 362, as there is no estate property being used or retained by VSI. VSI is only generating assets for the Debtors' estates at no cost to them because both VSI and Mr. Rajan believe so deeply in the Debtors' technology.

B.    **Turnover claims require an adversary proceeding**

65.    The Debtors cannot seek turnover pursuant to a motion. Turnover requires an adversary proceeding under Bankruptcy Rule 7001(1) . *See, e.g., In re Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990); *In re Wheeler Technology, Inc*., 139 B.R. 235, 240 (B.A.P. 9th Cir. 1992); *In re Ferguson*, 67 B.R. 246, 250 (D. Kan. 1986); *In re Chapman*, 269 B.R. 201 (Bankr. N.D. Ill. 2001); *In re Mayex II Corp*., 178 B.R. 464, 467 (Bankr. W.D. Mo. 1995); *In re Dillon*, 148 B.R. 852, 853 (Bankr. E.D. Tenn. 1992); *In re Realty Southwest Assocs*., 140 B.R. 360, 365 (Bankr. S.D.N.Y. 1992); *In re Interpictures, Inc*., 86 B.R. 24, 29 (Bankr. E.D.N.Y. 1988). A turnover proceeding commenced by motion instead of complaint is due to be dismissed, and any turnover order entered in an action commenced by a motion shall be vacated. *Perkins*, 902 F.2d at 1258; *Dillon*, 148 B.R. at 852-53; *In re Camdenton United Super, Inc*., 140 B.R. 523, 526 (Bankr. W.D. Mo. 1992); *In re Ace Industries, Inc*., 65 B.R. 199, 200 (Bankr. W.D. Mich. 1986).

66.    Moreover, section 542 does not apply to "any property in which the estate claims an interest." Rather, the debtor-in-possession's right of turnover is limited to property the debtor "may use, sell or lease under section 363" of the Bankruptcy Code. To satisfy a claim for turnover, therefore, the Trustee bears the burden of proving that the estates have the right to use, sell or lease the subject property, which property, other than an email address[5], is not identified. *In re Moore*, 312 B.R. 902, 909 (Bankr. N.D. Ala. 2004); *In re Barfield*, 261 B.R. 793, 797-98 (Bankr. M.D. Fla. 2002). The Trustee ultimately fails to allege estate property that VSI is depriving the Trustee or that is capable of being turned over, notwithstanding the fatal technical deficiency in which this turnover claim was brought before the Court.

---

[5] Notably, aside from conjecture and innuendo, nothing in the Trustee's Motion establishes that the allegedly offensive email address is, in fact, property of the Stream estate.

67.     State law governs the Debtors' property rights under the Bankruptcy Code. *See Butner v. United States*, 440 U.S. 48, 54-55 (1979). Under the terms of the Distribution Agreement, VSI has the present right to continue obtaining customers on behalf of Stream. Because this contractual right is fully enforceable under state law. VSI is not violating any state law property right of the Debtors protected by the Bankruptcy Code. To the contrary, VSI is acting with the sole purpose of increasing the Debtors' assets. Accordingly, the Motion fails to state a claim under section 542. The Trustee  has not alleged, and cannot prove, what specific Debtor property (i) VSI is not entitled to use, (ii) has been taken, (iii) affected, or (iv) is otherwise subject to turnover.

## **CONCLUSION**

VSI and Mr. Rajan's actions were contractually-sanctioned under an existing contract with the Debtor. Thus, VSI's actions did not, and do not,  violate the automatic stay. Additionally, the Trustee had full knowledge of VSI's actions.  While VSI is happy to turnover any of the Debtors' property, formal turnover relief requires an adversary proceeding.  Finally, notwithstanding lines of communication opened by Mr. Rajan and VSI upon his appointment in January 2024, the Trustee failed to confer VSI and Mr. Rajan and could have resolved many, if not all, matters raised in the Motion.   Accordingly, the consequential motion practice was totally within the control of the Trustee, and thus the Trustee's request for fees and costs should be denied.

*[Remainder of page intentionally left blank]*

76870289;1

Dated: June 18, 2024

Respectfully submitted,

AKERMAN LLP

 */s/ Donald N. David*

Donald N. David, SBN: 304846
1251 Avenue of the Americas
37th Floor
New York, NY 10020
Telephone: (212) 880-3800
Facsimile: (212) 880-8965
Email: donald.david@akerman.com

-and-

R. Adam Swick (*pro hac vice pending*)
AKERMAN LLP
500 West 5th Street, Suite 1210
Austin, TX 78701
Telephone: (737) 999-7103
Facsimile:  (512) 623-6701
Email: adam.swick@akerman.com

-and-

John H. Thompson *(pro hac vice pending)*
AKERMAN LLP
750 Ninth Street, N.W. 750
Washington, D.C. 20001
Telephone: (202) 824-1760
Facsimile:  (202) 393-5959
Email: john.thompson@akerman.com

*Attorneys for Visual Semiconductor, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the United States Bankruptcy Court for the Eastern District of Pennsylvania on June 18, 2024, with notice sent electronically to all parties receiving electronic notices in this case pursuant to local rules of this Court, and that no further notice or service is necessary.

<u> */s/ Donald David* </u>
<u>Donald David</u>

76870289;1