# EXCLUSIVE DISTRIBUTION AGREEMENT

**AGREEMENT** (the "Agreement") dated March 31st, 2023 between **VSI Semiconductor, Inc.**, having an office at 1105 William Penn Drive, Bensalem, PA 19020 (the "Distributor"), and **Stream TV Networks, Inc.**, a Delaware Corporation, having an office at 2009 Chestnut Street, Third Floor, Philadelphia, PA 19103 (the "Company").

W I T N E S S E T H:

WHEREAS, the Company produces and sells certain Products (as hereinafter defined), and wishes to sell such Products to the Distributor and to engage the Distributor as its exclusive distributor for the sale of Products in the Territory as hereinafter defined; and

WHEREAS, the Distributor wishes to purchase the Products and to act as such exclusive distributor and/or reseller of such Products under the terms and conditions herein.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and obligations contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

ARTICLE I
DEFINITIONS

As used herein, the terms set forth below shall have the meanings given to them there.

**1.1 "Products"** shall mean those products listed in Exhibit A which Exhibit may be modified from time to time by mutual written agreement of the parties.

**1.2 "Territory"** shall have the meaning described in Exhibit B.

**1.3 "Patents"** shall mean patents, pending patents, claims of patent, design patents, pending design patents, or claims of design patent owned by the Company and/or its Affiliates relating to the Products and in effect in the Territory.

**1.4 (a) "Know-How"** shall mean all production procedures, all design, engineering, production, manufacturing and other technical data, information, specifications, designs,

methods, processes, systems, test reports, guidelines and trade secrets relating to the manufacture, use and sale of the Products, which either the Company or the Distributor has separately acquired or may acquire from time to time and reasonably considers confidential, which are not generally known, and which are of material commercial value.

      **(b) "Shared Know-How"** shall mean Know-How that is reasonably required to assist the Distributor in the marketing, sales, and support of the Product.

**1.5 "Trademarks" and "Trade Names"** shall mean the trade names and trademarks associated with the Products as set forth in Exhibit A, attached hereto and made a part hereof, which Exhibit may be modified from time to time by mutual written agreement of the parties. The Company agrees to follow reasonable Distributor's requirements regarding Distributor's trademarks which are listed on Exhibit A or as may be added to Exhibit A from time to time by mutual agreement.

**1.6 "Confidential Information"** shall mean Know-How and other confidential or proprietary information regarding the Company's or the Distributor's business or any aspect of this Agreement, including, without limitation, customer lists and financial, marketing and other information which either party has acquired or may acquire from time to time from the other party with the understanding that such information and/or data are confidential. Notwithstanding the above, "Confidential Information" shall not include information: i) which the receiving party can demonstrate was in its possession at the time of disclosure and was not acquired by the receiving party directly or indirectly from disclosing party on a confidential basis, ii) which becomes available to the receiving party on a non-confidential basis from a source other than the disclosing party (whether directly or indirectly), and which source to the best of the receiving party's knowledge did not acquire the information on a confidential basis, or iii) which is approved for release or use without restriction by written authorization of an officer of the Party owning the Confidential Information. If Confidential Information is required to be disclosed by any federal or state law, rule or regulation or by any applicable judgment, order or decree of any court or governmental body or agency having jurisdiction the Party required to disclose the Confidential Information will give the Party owning the Confidential Information notice, to the extent reasonably practicable, of the proposed disclosure so as to afford the Party owning the Confidential Information an opportunity to seek prevention of its disclosure. The parties hereto

agree to keep Confidential Information confidential and to continue to be bound by the terms and conditions of any Confidentiality Agreement then in place between the Parties.

**1.7 "Affiliate"** shall mean any other entity (a) that directly or indirectly controls, is under common control with, or is controlled by one of the Parties or (b) is at least 50% beneficially owned by one of the Parties. As used in this definition, "control" (including with its correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, (whether through ownership of securities or partnership or other ownership interests, by contract, or otherwise).

# ARTICLE II
# GENERAL APPOINTMENT

**2.1 Appointment.** The Company hereby appoints the Distributor as its exclusive, distributor for the sale, purchase and resale of the Products in the Territory subject to the terms and conditions of this Agreement. The Distributor accepts the appointment and agrees to purchase the Products from the Company under the terms and conditions of this Agreement and according to specific future Product contracts as may be agreed between the parties on a case-by-case basis.

**2.2 Relationship of the Parties.** The relationship between the Company and the Distributor is that of independent contractor and not that of employer-employee or principal-agent. The Distributor shall not be the agent or legal representative of the Company, nor shall the Company be the agent or legal representative of the Distributor. Neither the Company nor the Distributor shall have the right, power, or authority to assume or undertake any obligation whatsoever or make any representation on behalf of the other unless authorized to do so in writing.

# ARTICLE III
# GENERAL TERMS OF DISTRIBUTORSHIP

**3.1 Best Efforts.** the Distributor agrees to use its best efforts to promote the sale of, and to solicit and secure orders for, the Products in the Territory and, subject to the provisions of Section 4.4 below, to purchase the Products from the Company. The Company agrees to sell the

Products to the Distributor as the Company's -exclusive distributor of the Products in the Territory.

**3.2 Promotion and Advertising.** The company shall, at its own expense, supply the Distributor with up-to-date samples, Shared Know-How and technical data, promotional material, and service information as appropriate in order for the Distributor to conduct laboratory and market tests and to promote and develop sales of the Products. The Distributor agrees not to use any such provided material, including Share Know-How, for any purpose other than in furtherance of its obligations and undertakings as set forth in this Agreement.

**3.3 Compliance.** The Company shall, at its own expense, provide the Distributor with all relevant technical information known to the Company as a result of industry standard due diligence and necessary to comply with all statutes, rules and regulations relating to the sale of the Products in the Territory.

**3.4 Promotion and Publicity.** (a) All promotions and advertising of the Products shall be formulated and implemented by the Distributor at its own cost. The Distributor agrees to consult with the Company before implementing any such promotion or advertising campaign and to make any reasonable changes suggested by the Company, provided that the Company agrees to share the costs of any such revisions. All such promotional material shall be accurate and shall be consistent with promotional material used by the Company in its own advertising and promotional campaigns. The Company shall provide the Distributor with its publicity and promotional material with respect to the Products, which the Distributor shall use its best efforts to include in its promotions and advertising; provided, however, that such material shall not be changed in any material respect without the prior written consent of the Company. The Distributor will not materially alter the packaging of the Products without the prior consent of the Company, and each party will cause the labeling of Products sold hereunder to comply with all applicable regulations governing such labeling from time to time; provided, however, the Distributor may add any labeling that it determines is required under applicable law, or otherwise necessary to meet legal or customer requirements.

(b) The Company shall use its best efforts to provide the Distributor and/or its customers with all such information, and technical assistance with respect to the application of the Products as they reasonably request.

**3.5 Non-Infringement.** The Distributor shall not advertise, promote, or sell any Product which infringes any Patent, Trademark, or copyright, or which violates any trade secret of the Company. The provisions of clause 3.5 shall not apply until such time as the Distributor has knowledge, or reasonably should have knowledge, that a Patent, Trademark, copyright, or trade secret is being violated in the manufacture or use of a particular Product.

ARTICLE IV
PRICE, PAYMENT AND DELIVERY TERMS

**4.1 General Terms.** The Company agrees to sell the Products to the Distributor and the Distributor agrees to purchase the Products from the Company on the terms and conditions set forth in this Agreement.

**4.2 Price.** The Distributor shall purchase the Products for its own account from the Company at the prices in effect, as reflected in Exhibit A at the time the Company chooses to accept the Distributor's order. Initial prices for the Products are listed in Exhibit A. Prices may be changed at any time by the Company on ninety (90) days' prior written notice to the Distributor. Exhibit A may be revised as necessary to reflect the implementation of mutually agreed upon price changes and addition of or changes to the Products. All pricing is required to provide the Distributor at least a ten percent (10%) markup.

**4.3 Payment.** Invoices for sales of Products hereunder shall be prepared by the Company and presented to the Distributor at the time of shipment. The Distributor shall pay each invoice in U.S. dollars within thirty (30) days after receipt of the Products by (i) the Distributor, or (ii) its warehouse, or (iii) its customer, whichever occurs first.

**4.4 Placement of Orders and Shipping.** The Company shall ship the Products within thirty (30) days of receipt of written orders therefore from the Distributor. If the Company is

unable to ship within such period, it will promptly notify the Distributor of the Company's anticipated shipping date.

**4.5 Delivery.** Delivery of the Products to the Distributor shall be FOB the Distributor's warehouse, transportation prepaid by the Company. Title to and risk of loss of Products shall pass from the Company to the Distributor upon delivery to the Distributor, its warehouse or its customer, whichever occurs first.

**4.6 Product Modification.** Any modification in chemical components, raw materials, manufacturing sources, manufacturing locations, manufacturing facilities, and/or processes must be reported to and reasonably agreed to by the Distributor prior to implementation. Any changes to the specification of any Product must be notified to the Distributor and reasonably agreed to by the Distributor before any dispatch of any modified Product and a new specification and safety data sheet must be drafted for any such modified Product. All raw materials and/or supplies shall in all material respects be chemically consistent, both in nature and concentration, with the original raw materials and/or supplies used in the Products. All raw materials and/or supplies shall in all material respects meet the original specifications therein.

**ARTICLE V**
**WARRANTIES, INDEMNIFICATION AND RETURNS**

**5.1 Warranty.** the Company warrants to the Distributor that the Products sold to the Distributor under this Agreement (including all replacement or modified Products) shall be fit and sufficient for the purpose intended, merchantable, of good material and workmanship, free from defect, and in accordance with the Company's specifications shown in Exhibit C. The Distributor shall notify the Company in writing of any claims of defect or non-conformity noticeable upon ordinary inspection within two (2) months or the applicable statute of limitation, whichever is shorter, after a customer's receipt of the Product. The Distributor shall notify the Company in writing of any hidden defect or non-conformity with the specification shown on Exhibit C within two (2) months or the applicable statute of limitation, whichever is shorter, after the Distributor or the customer becomes aware of the hidden defect or non-conformity, but in any event within the statute of limitations for such claims. If the Company does receive timely notice, the Company shall arrange for and bear the cost of shipping the defective Product back to

the Company and upon receipt of the Product and upon reasonable confirmation of the existence of such defect or non-conformity, shall, at its election either deliver at its own expense a replacement product to the Distributor or return to the Distributor the purchase price thereof. All costs of disposal of non-conforming or defective Products shall be borne by the Company, provided the Company is notified of such defect or non-conformity within the time periods set forth in this paragraph 5.1.

**THE FOREGOING WARRANTIES ARE THE ONLY WARRANTIES PROVIDED BY THE COMPANY WITH RESPECT TO THE PRODUCTS SOLD BY THE COMPANY TO THE DISTRIBUTOR. THE PROVISIONS OF THE UCC DEALING WITH WARRANTIES ARE EXPRESSLY DISCLAIMED.**

**5.2 Indemnification.** (a) The Company hereby agrees to indemnify the Distributor and hold it harmless from and against all claims, suits, damages, judgments, losses, amounts paid in settlement thereof, and all costs and expenses (including reasonable attorneys' fees and expenses) based upon, relating to, or arising out of (i) non-compliance by the Company with its obligations hereunder or a material breach of any provision herein; (ii) the Company's negligence or willful misconduct; (iii) any personal injury, property damage or product liability claim or third-party claim; and/or (iv) a claim of any Intellectual Property infringement, including, but not limited to Trademark, Patent or Copyright infringement brought against the Distributor based upon the Distributor's promotion or sales of the Product or any other requirements of this Agreement.

(b) Notwithstanding the provisions of paragraph 5.2, the Company shall not be responsible for those damages, claims, or losses which the Distributor or third parties may suffer which are a direct result of modifications to the Product or Trademark without the Company's written consent.

(c) The Distributor hereby agrees to indemnify the Company and hold it harmless from and against all claims, suits, damages, judgments, losses, amounts paid in settlement thereof, and all costs and expenses (including reasonable attorneys' fees and expenses) based upon, relating to, or arising out of (i) non-compliance by the Distributor with its obligations hereunder or breach of any provision herein; (ii) the Distributor's negligence or willful misconduct; (iii) any personal injury, property damage or product liability claim and/or (iv) any third-party claim caused

directly as a result of modifications to the Products by the Distributor or its employees or agents.

**5.3 Customer Returns.** It is the policy of the Distributor to accept the return of any product sold to its customers. The Distributor therefore expects its suppliers to cooperate with the Distributor to effect customer returns quickly, efficiently and safely. Attached hereto as Exhibit D is the Distributor's Customer Return Goods Policy (the "Return Policy"). The Company agrees to cooperate with the Distributor on customer returns of the Product in accordance with the Return Policy.

**ARTICLE VI**
**TRADEMARK, TRADE NAMES, PATENTS, KNOW-HOW**

**6.1 Ownership; No Infringement.** Except as provided in the schedule attached as Exhibit E, the Company represents and warrants to the Distributor that the Trademarks, Trade Names, and Patents are owned by the Company or an Affiliate free and clear of all liens, encumbrances, or claims; that the Company is free to make use of the Trademarks, Trade Names, and Patents; and that the Company knows of no (a) infringement thereof by others, or (b) infringement (or claims of infringement) by the Company of any of the trademarks, trade names, patents, or the intellectual property rights of others.

**6.2 Use of Trademarks and Trade Names.** In connection with the Distributor's appointment as the Company's distributor, the Company and/or its Affiliates grant to the Distributor an exclusive, non-transferable right, without the right to sublicense, to use the Trademarks in the Territory for the limited purpose of marketing and selling the Products. The Distributor may place the Trademarks and Trade Names on its stationery, catalogues, promotional literature, advertising material and signs, but only in connection with the promotion and sale of the Products in the Territory. Any other use of the Trademarks and Trade Names by the Distributor shall be subject to prior written approval by the Company, except that the Distributor may be identified as the distributor of the Products on all labels and promotional materials without any such prior approval. The Distributor agrees to submit samples of proposed marketing materials or trademark usage to the Company for its review and approval, such

approval not to be unreasonably withheld. Any actual usage of such Trademarks in marketing materials, labeling, and otherwise will be consistent with the samples received by the Company. Subject to the foregoing, the Distributor further agrees:

 (a) Not to remove the Trademarks or Trade Names from the Products or packages containing the Products;

 (b) Not to alter the Trademarks or Trade Names in any way;

 (c) Not to apply any Trademarks or Trade Names or any labels, signs or markings of any kind other than additional labeling required by customers or governmental or regulatory authorities to the Products or use the same in connection with the Products, without prior written approval of the Company;

 (d) To employ any symbol or notice with the Trademark which may be necessary to identify and protect the interests of the Company in the Trademark;

 (e) Not to register or record as a trademark or domain name, or cause to be registered or recorded as a trademark or domain name, any the Company Trademark or Trade Name, in any country;

 (f) That any and all goodwill created in any Trademark or Trade Name of the Company belongs to, and is the property of, the Company in every country; and

 (g) Indicate that the Trademarks and Trade Names are owned by the Company or its Affiliates as applicable.

**6.3 Infringement.** Should the Distributor discover any infringement of any of the Company's Trademarks, Trade Names, Patents, Copyrights or Trade Secrets, or should the Distributor become aware of any claims of infringement relating thereto, the Distributor shall promptly notify the Company, and the Company shall decide, in its sole discretion, whether to take any action.

ARTICLE VII

TERM AND TERMINATION

**7.1 Term; Termination by Either Party.** This Agreement shall commence on the date hereof and terminate six (6) months after either party gives written notice of termination to the other at any time, with or without cause. This Agreement may also be terminated by an aggrieved party immediately upon written notice to the other ("Defaulting Party") in the event that the Defaulting Party:

(a) commits a breach or default under this Agreement, which breach or default is not remedied within thirty (30) days after written notice of the facts surrounding such breach is delivered to the Defaulting Party; or

(b) is unable to meet its debts as they fall due or enters into liquidation or dissolution or becomes bankrupt or insolvent, or if a trustee or receiver is appointed for such party, whether by voluntary act or otherwise, or if any proceeding is instituted by or against such party under the provisions of any bankruptcy act or amendment thereto which results in the entry of any order for relief against it which is not stayed or remains active for a period of sixty (60) days, or if it enters into a voluntary arrangement with its creditors.

**7.2 Cessation of Deliveries.** Upon termination of this Agreement, the Company may restrict or stop deliveries of the Products to the Distributor, other than deliveries on orders already received at the time of the notice of termination; provided, however, that in the event of termination without cause by the Company pursuant to the first sentence of Section 7.1 above, the Company shall make the Products available to the Distributor in order to enable the Distributor to maintain its normal delivery commitments to third parties for up to six (6) months after termination, provided the Distributor so requests within forty-five (45) days of notice of termination and provided further that at all times during the post-termination period the Distributor is current on its uncontested payment obligations to the Company.

**7.3 Disposition of Inventory Upon Termination.** Upon termination of this Agreement, except to the extent otherwise required for continued deliveries pursuant to Section 7.2 above, (a) all of the Distributor's rights with respect to the Trademarks, Trade Names, Shared Know-How, Confidential Information and Patents shall immediately cease, (b) provided the termination is not

based on the Distributor's default, the Company shall i) purchase from the Distributor all advertising and printed matter relating to the Products, and ii) shall repurchase all of the Distributor's inventory of Products. The cost for said advertising, printed matter and inventory shall be the price originally paid by the Distributor including any freight, insurance during shipping, sales tax and import duties.

**7.4 Limitation of Damages.** If either party hereto shall terminate this Agreement in accordance with its terms, the non-terminating party shall have no claim or cause of action by reason of such termination, whether for loss of anticipated profits, loss of good will, or otherwise.

**ARTICLE VIII**
**MISCELLANEOUS PROVISIONS**

**8.1 Entire Agreement.** This Agreement (including Exhibits A through E attached hereto and incorporated herein) constitutes the entire agreement between the parties relating to the distribution of Products in the Territory; it supersedes all prior agreements and understandings between the parties relating to that subject, either oral or written, all of which are hereby expressly terminated; and this Agreement cannot be modified, except in a writing signed by both parties hereto.

**ALL PURCHASE ORDERS AND ACKNOWLEDGMENTS THAT MAY BE USED BY THE PARTIES HERETO TO ORDER OR ACKNOWLEDGE ORDERS FOR PRODUCTS HEREUNDER SHALL BE FOR RECORD PURPOSES ONLY. IN THE EVENT OF ANY DISCREPANCY OR CONFLICT BETWEEN THE TERMS THEREOF AND OF THIS AGREEMENT, THE TERMS OF THIS AGREEMENT SHALL PREVAIL.**

**8.2 Assignment.** This Agreement may not be assigned by either party without the prior written consent of the other party hereto, except that either party may assign this Agreement to a wholly-owned subsidiary or Affiliate without first obtaining the written consent of the other party.

**8.3 No Waiver of Terms.** Neither the failure of either party hereto to require the performance of any term of this Agreement, nor the waiver by either party of any breach under

this Agreement, shall prevent a subsequent enforcement of any such term or be deemed a waiver of any subsequent breach.

**8.4 Headings.** The headings set forth herein are for convenience of reference only and shall not be considered to limit or amplify the terms and provisions hereof, nor shall they be examined or referred to in construing or interpreting this Agreement.

**8.5 Severability.** In the event any one or more of the agreements, provisions or terms contained herein shall be declared invalid, illegal, or unenforceable in any respect, such agreement, provision, or term shall be enforced to the extent permitted by law and the validity of the remaining agreements, provisions, or terms contained herein shall be in no way affected, prejudiced, or disturbed thereby.

**8.6 Force Majeure.** Neither of the parties hereto shall be responsible for or liable to the other party for any damage or loss of any kind, directly or indirectly, resulting from fire, flood, explosion, riot, rebellion, revolution, war, pandemic, labor trouble (whether or not the fault of either party hereto), requirements or acts of any government or subdivision thereof, or any other similar cause beyond the reasonable control of the party. The occurrence and the termination of any such event shall be promptly communicated to the other party.  If after sixty (60) days, Force Majeure events cause default of obligations hereunder by a party, the non-defaulting party may immediately terminate after providing the defaulting party with notice.

**8.7 Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without regard to conflict of law principles of such Commonwealth.

**8.8 Arbitration.** Any and all claims, disputes, controversies, or differences arising out of or in connection with this Agreement, which cannot be settled satisfactorily by means of negotiation between the parties, shall be submitted to arbitration in accordance with the Commercial Arbitration Rules (the "Rules") of the American Arbitration Association; provided, however, that this clause shall not be construed to preclude either party from bringing any action in any court of competent jurisdiction for injunctive or provisional relief, as necessary or appropriate. The arbitration proceeding shall take place in Philadelphia. The parties shall, in accordance with the Rules, appoint a mutually-agreed-upon arbitrator. The decision of such

arbitrator shall be final and binding upon the parties; judgment thereon may be entered in any court having jurisdiction or application may be made to such court for judicial acceptance of the award or order of enforcement.

**8.9 Notices.** All notices, requests, demands, and other communications made hereunder shall be in writing and shall be deemed duly given on the date of receipt if delivered electronically or in person, or five days after mailing if sent by mail, postage prepaid, to the addresses set forth below or to such other address or person as either party may designate by notice to the other party hereunder:

If to the Distributor, to:

> Visual Semiconductor, Inc.
> 1105 William Penn Drive
> Bensalem, PA 19020
> Attention: President

If to Company, to:

> Stream TV Networks, Inc.
> 2009 Chestnut Street
> Third Floor
> Philadelphia, PA 19103
> Attention: CEO

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK –*
*SIGNATURE PAGE FOLLOWS]*

**8.10 Counterparts.** This Agreement may be executed in separate counterparts with the same effect as if both parties had executed the same document. All such counterparts shall be construed together and shall constitute one agreement.

**IN WITNESS WHEREOF,** the parties have caused the due execution of this Agreement on the day first above written.

VISUAL SEMICONDUCTOR, INC.

*/s/ Joseph Corso*

By: Joseph Corso

Title: Under Limited Power of Attorney Dated November 30, 2022

STREAM TV NETWORKS, INC.

*/s/ Mathu Rajan*

By: Mathu Rajan

Title: President and CEO

# EXHIBIT A

# PRODUCTS

Descriptions of specific Products shall be detailed in an amended Exhibit A as available:

1. BONDED OPTICS – consisting of a video panel, a 3D lens, optical glue, and other elements for use in manufacturing glasses-free 3D phones, mobile gaming devices, tablet computers, laptop computers, computer monitors, televisions, large screen monitors, and other devices.

2. 3D COMPUTER CHIPS – for glasses-free 3D rendering and conversion of content from 2D to glasses-free 3D for use in manufacturing glasses-free 3D phones, mobile gaming devices, tablet computers, laptop computers, computer monitors, televisions, large screen monitors, and other devices.

# EXHIBIT B

# TERRITORY

Regarding that certain Distribution Agreement between Company and Distributor, the Territory shall be defined as:

Worldwide

## EXHIBIT C

## SPECIFICATIONS

Regarding that certain Distribution Agreement between Company and Distributor, the Product Specifications shall be defined as:

1. Bonded Optics – specifications TBD
2. 3D Computer Chips – specifications TBD

## EXHIBIT D

## DISTRIBUTOR'S CUSTOMER RETURN GOODS POLICY

TBD

# EXHIBIT E

## EXCEPTIONS PURSUANT TO SECTION 6.1

TBD