## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| **Stream TV Networks, Inc.**, *et al*. | : Bankruptcy No. 23-10763 (AMC) |
| | : |
| Debtors. | : (Jointly Administered)[1] |
| | : |

**MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR (I) AN ORDER (A) APPROVING THE BIDDING PROCEDURES AND FORM OF ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS INCLUDING APPROVAL OF PROVISIONS FOR DESIGNATION OF A STALKING HORSE, (B) ESTABLISHING THE NOTICE PROCEDURES AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND SCHEDULING AN AUCTION, (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) SCHEDULING A SALE HEARING, (E) GRANTING EXPEDITED CONSIDERATION PURSUANT TO LOCAL RULE OF BANKRUPTCY PROCEDURE 5070-1(g); AND (F) GRANTING RELATED RELIEF, AND (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING RELATED RELIEF**

William A. Homony, in his capacity as Chapter 11 trustee (the "**Trustee**") of the bankruptcy estates of Stream TV Networks, Inc. ("**Stream**") and Technovative Media Inc. ("**Technovative**", or collectively with Stream the "**Debtors**"), hereby files this motion (the "**Motion**") (A) for entry an Order, substantially in the form attached hereto as **Exhibit A** (the "**Bidding Procedures Order**")[2], authorizing and approving (i) the proposed bidding procedures for soliciting bids for the Debtors' Assets (the "**Bidding Procedures**") in the form attached to the Bidding Procedures Order as **Exhibit 1**, including provisions authorizing and approving, but not

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).
[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures or Bidding Procedures Order.

directing Debtors' selection and designation of, a stalking horse bidder (the "**Stalking Horse**"), and (ii) the form of Asset Purchase Agreement attached hereto as **Exhibit B** (the "**Asset Purchase Agreement**"), (iii) establishing notice procedures and approving the form of notice and manner of all procedures in connection with the proposed sale of the Debtors' Assets (the "**Sale**"), scheduling an auction (the "**Auction**") (iv) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases, (v) scheduling a hearing (the "**Sale Hearing**") to approve the Sale, (vi) granting Expedited Consideration shortened time and limited notice pursuant to Local Rule of Bankruptcy procedure 5070-1(g), and (vii) granting related relief. In addition, by this Motion, the Trustee ultimately seeks entry of an order, substantially in the form attached hereto as **Exhibit C** (the "**Sale Order**"), (i) authorizing and approving, but not directing, the sale of the Assets, in each case with such Sale being free and clear of any and all liens, claims, encumbrances and interests, (ii) and the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale, and (iii) granting related relief.

In support of this Motion, the Trustee relies upon and incorporates by reference (i) the *Declaration of William A. Homony in Support of the Sale Motion* filed contemporaneously herewith (the "**Homony Declaration**"). In further support of the Motion, the Trustee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.    As more fully described below, the Trustee intends to conduct a Sale of substantially all of the Debtors' assets (the "**Assets**") (as defined herein) for the benefit of the Debtors' estates and their creditors.

2

2.      The Trustee spent significant time evaluating the Debtors' options, and, with the absence of any real operations or revenue, has determined that a sale of the Debtors' Assets best serves the interests of all stakeholders in the Debtors' Cases.

3.      The Sale is necessary to maximize the value of the Debtors' Assets by exposing them to market. By this Motion, the Trustee seeks to establish procedures related to the marketing, bidding and sale process for the Debtors' Assets.

## **RELIEF REQUESTED**

4.      Pursuant to sections 105, 363, 365, and 503 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 6004-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Local Bankruptcy Rules**"), the Trustee first seeks entry of the Bidding Procedures Order, which will authorize and approve, but do not direct, among other things: (a) the proposed Bidding Procedures; (b) the provisions approving a Stalking Horse Bidder, without bid protections; (c) the notice procedures and the form of notice and manner of all procedures in connection with the auction (the "**Auction**") and the Sale; (d) the procedures for the assumption and assignment of certain executory contracts and/or unexpired leases; (e) the scheduling of the Sale Hearing to approve the Sale; and (f) related relief. Second, at the Sale Hearing, the Trustee will seek entry of the Sale Order that will approve the sale of the Assets to the Successful Bidder, the assumption and assignment of certain executory contracts and unexpired leases and grant related relief.

5.      For the reasons set forth below and as follow, the Trustee submits that the relief requested herein is in the best interest of the Debtors, their jointly-administered but not

substantively consolidated bankruptcy estates, creditors, stakeholders, and all other parties-in-interest. The Trustee respectfully asserts that the Motion, therefore, should be granted.

## JURISDICTION AND VENUE

6.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) the *Standing Order of Reference to the Bankruptcy Court Under Title 11* of the United States District Court for the Eastern District of Pennsylvania, dated July 25, 1984, and as amended (Luongo, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

7.       The factual and procedural background of this case are well known to this Court and to the extent not stated herein, the Trustee incorporates the factual and procedural background contained in the Court's Memorandum and Opinion filed on January 5, 2024 (the "**Trustee Opinion**") (D.I. #548).

8.       On March 15, 2023, (the "**Petition Date**"), the Debtors filed their voluntary petitions for relief under Chapter 11 of Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania (the "**Bankruptcy Court**").

9.       On March 20, 2023, Hawk Investment Holdings Ltd. ("**Hawk**") filed a motion for relief from the automatic stay (the "**Hawk Stay Relief Motion**") seeking relief from the automatic stay in order to proceed with an action in the Delaware Court of Chancery (the "**Delaware Chancery Court**") which, in turn sought relief pursuant to § 225 of Title 8 of the Delaware Code (the "**Section 225 Action**") against the Debtors. (D.I. #16).

10.       On April 5, 2023, the Debtors filed an objection to the Hawk Stay Relief Motion. (D.I. #78).

11.     Thereafter, on April 6, 2023, Hawk filed a motion pursuant to sections 1112/1104 of the Bankruptcy Code, seeing dismissal or conversion of the Debtors' cases, or alternatively, the appointment of a Chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code (the "**1112/1104 Motion**"). (D.I. #94).

12.     In the 1112/1104 Motion, Hawk argued that cause existed to appoint a trustee based upon the Debtors' pre- and post-petition history of fraud, dishonesty, incompetence, and gross mismanagement of their businesses.

13.     The Debtors filed an opposition to the 1112/1104 Motion on May 8, 2023. (D.I. #193).

14.     On January 5, 2024, the Court entered an order, which, among other things, granted 1112/1104 Motion with respect to the appointment of a Chapter 11 trustee, and (2) granted the Hawk Stay Relief Motion allowing the Section 225 Action to proceed (the "**Trustee Order**"). (D.I. #549).

15.     On January 9, 2024, the Office of the United States Trustee filed a notice of appointment of William A. Homony to serve as the chapter 11 trustee (the "**Appointment Date**") as well as an Application for the entry of an Order approving the appointment of the Trustee. (D.I. #554 and #553 respectively).

16.     On January 12, 2024, the Bankruptcy Court entered an Order granting the Application to appoint the Trustee.

17.     On January 17, 2024, the Trustee filed an Application to Employ Obermayer Rebmann Maxwell & Hippel LLP as his counsel (D.I. #564) and that Application was approved on January 29, 2024 (D.I. # 577).

18.     On January 17, 2024, the Trustee filed an Application to Employ Miller Coffey Tate LLP as his accountants/advisors (D.I. #566) and that Application was approved on February 15, 2024 (D.I. # 586).

19.     On August 14, 2024, the Trustee filed an Application to Employ SSG Advisors, LLC ("**SSG**") (D.I. #715) and on September  6, 2024 the Trustee filed an amended Application to employ SSG (D.I. #732) to provide investment banking services to the Trustee with respect to the marketing and sale of the Debtors' Assets.  That amended Application was approved on September 20, 2024 (D.I. #741).

20.     Since the Appointment Date, the Trustee and his professionals have reviewed and analyzed *inter alia*, the Debtors' respective Schedules of Assets and Liabilities and the Statement of Financial Affairs ("**Schedules and Statements**"), volumes of documents from the various dockets in connection with the Debtors' Cases, the Adversary Proceeding filed by the Debtors, the Delaware Chancery Court cases, the Delaware Supreme Court case, the Debtors' Monthly Operating Reports, and the volumes of documents supplied by the Debtors and contained in the Debtors' books and records provided by the Debtors, in order for the Trustee to fulfil his obligations under the Trustee Order.

21.     After substantial consultations with his professionals, and certain of the professionals retained by the Debtors' to defend the Delaware proceedings, the Trustee has determined that the sale of the Debtors' Assets pursuant to this Motion is in the best interest of the Debtors' creditors and stakeholders.

22.     Through the Trustee's substantial efforts, and having reached a settlement with Hawk, as collateral agent for the secured creditors (collectively, the "**Secured Creditors**") resolving objections to the secured claims against the Debtors' estates (the "**Hawk Settlement**"),

4880-0354-5067 v1

the Trustee seeks to move forward with his obligations under the Code and the Hawk Settlement

for approval of the procedures for sale of the Debtors' Assets, and ultimately approval of the Sale

at Auction.

23.      Information regarding the Debtors' Assets, capital structure, and the circumstances

its operations, is set forth in the Debtors' filed Schedules and Statements on file with the clerk of

the Bankruptcy Court.

## II.      The Debtors' Assets.

24.      The Trustee is seeking authorization and approval of Bid Procedures in connection

with the sale of substantially all of the Debtors' Assets.[3]  The Sale will be on an "as is", "where is"

basis, without any warranty of any kind, express or implied.

25.      Stream was founded to develop and commercialize a proprietary technology for

viewing three-dimensional content without the need for 3D glasses or goggles ("**Ultra-D**"). Stream

created Technovative, a wholly owned subsidiary, which in turn directly or indirectly owns various

subsidiaries, including SeeCubic B.V. ("**SCBV**"), an entity formed under the laws of the

Netherlands and which functions as the primary research and development engine for the business.

Together, these subsidiaries own and hold rights in technology including Ultra-D.

26.      Stream's Ultra-D technology was developed, in part, based on certain intellectual

property, including a portfolio of glasses-free 3D patents licensed from Koninklijke Philips

Electronics. Stream also has an alleged technology license (the "**Rembrandt License**") from

Rembrandt 3d Holding LTD ("**Rembrandt**").

---

[3] Bidders will have access to a data room to be set up for the Sale where relevant information regarding the Debtor's
Assets will be maintain during the Sale process.  The Trustee makes no warranties as to the accuracy of the Debtors'
filed Schedules and Statements and urges each potential bidder to perform their due diligence before bidding.

4880-0354-5067 v1

27.     The Trustee does not intend to sell or assign the Rembrandt License and believes there may be claims against Rembrandt that the Trustee is retaining and may pursue in the future.

28.     In certain instances, the Trustee may be asked to sell equity interests in certain downstream entities from the Debtor.

### III.     The Hawk Settlement, the Sale Process, and the Stalking Horse Bid.

29.     On June 5, 2024, the Bankruptcy Court approved the Hawk Settlement.  Pursuant to the Hawk Settlement the Trustee is permitted to expose the Debtors' Assets to sale by Auction, with the Allowed Secured Claims of the Secured Creditors serving as the Stalking Horse bidder for the Assets.

30.     The Salient terms of the Hawk Settlement are as follows:

### I.    Treatment of Secured Claims:

   a.  Upon the entry of the order approving the 9019 Motion, the Secured Creditors' claims shall be deemed to have not been converted and the Secured Creditors shall be deemed to have an allowed secured claim against the Debtors' estates in the amount of $180 million plus any additional funds the Secured Creditors advance to SCBV subsequent to the Trustee's appointment ("**Allowed Secured Claim**").

   b.  A portion of the Allowed Secured Claim in the amount of $150 million will serve as a stalking horse bid (the "**Stalking Horse Bid**"), subject to approval of the Bankruptcy Court, as part of a Trustee motion for auction bid procedures.  The Stalking Horse Bid will not receive any traditional bid protections, including but not limited to, a break-up fee or expense reimbursement.

   c.  The Secured Creditors may participate at any auction but any overbid by the Secured Creditors in excess of the Stalking Horse Bid must be in cash but only to the extent the bid exceeds the amount of the Stalking Horse Bid.

   d.  The Secured Creditors through SeeCubic shall continue to fund all costs and expenses of SCBV (incurred in the ordinary course and consistent with SCBV's operations during the pendency of these chapter 11 cases and including any employee claims arising therefrom) for so long as the parties pursue a sale of the Debtors' assets as contemplated by, and in accordance with, the  Agreement, not to exceed 90 days, which advanced amounts will increase the Allowed Secured Claim in accordance with 1(a) above and shall not constitute administrative expense claims against the Debtors' bankruptcy estates.

## II.      Sale of the Debtors' Assets.

Subject to documentation satisfactory to Hawk (and drafted in consultation with Hawk), SCI shall serve as the stalking horse bidder for the Collateral, with such bid (the "**Stalking Horse Bid**") and Asset Purchase Agreement (the "**Stalking Horse APA**") attached to the Bidding Procedures.

   a.   Subject to documentation satisfactory to Hawk and the Trustee, the Stalking Horse Bid shall consist of a credit bid of the Allowed Secured Claim in the amount of $150 million.

   b.   The Secured Creditors waive the right to seek or obtain a "breakup fee" or a "topping fee" or any other bid protections as part of the Stalking Horse Bid.  The Bidding Procedures shall specify that in order for a bid to constitute a "Qualifying Bid" such bid shall include:

   c.   A bid deposit in the amount of 10% of the proposed aggregate purchase price (the "Bid Deposit"), and

   d.   Evidence satisfactory to the Trustee of its financial wherewithal to consummate a Sale in the amount of the proposed purchase price.

## III.     The Bidding Procedures.

The Bid Procedures shall specify that Qualifying Bids may include both cash and non-cash consideration, subject to the following conditions:

   a.   The cash component shall be no less than $120 million,

   b.   The non-cash component of the bid shall be backed by a letter of credit or other security, over which Hawk shall have consultation rights as to the sufficiency and form of such security, and

   c.   The Bid Deposit shall be 10% of the aggregate purchase price, including both the cash component and the non-cash component of the bid.

   d.   To the extent the Trustee receives any other Qualified Bids (exclusive of the Stalking Horse Bid which will be deemed a Qualified Bid), SCI may participate in the Auction.  Any overbid submitted by SCI in excess of the Stalking Horse Bid at the Auction shall be in cash only.  For the avoidance of doubt, SCI cannot utilize any of the remaining Allowed Secured Claim as part of any overbid; however, its overbid may include a credit bid up to $150 million.

## IV.     Trustee/Estate Carve out.

With respect to any sale that closes as contemplated by, and in accordance with, the terms of the Agreement, the Secured Creditors will provide a carve-out ("Carve-Out") in the form of cash from the sale proceeds of their collateral at Closing, or SeeCubic shall fund the Carve-Out if the Secured Creditors' Stalking Horse Bid or any subsequent overbid is determined to be the winning bid, as follows:

   a.   $7,500,000.00 and an additional 10% of each dollar in excess of the Stalking Horse Bid for the benefit of the Debtors' estates paid as follows:

      i.   $1,000,000.00 paid to the Trustee upon entry of an Order approving the

Agreement (i.e.: the 9019 Motion);

    ii.  $1,500,000.00 paid to the Trustee upon approval of the bidding procedures; and the balance paid at closing.

    iii.  The Trustee shall receive the balance of the Carve-Out (*i.e.*, the Carve-Out minus the Carve-Out Advance) at Closing:

        1.  In the event SCI is the successful bidder, by SCI in cash at Closing.

        2.  In the event a third party is the successful bidder, from the cash proceeds of the purchase price.

b.  Trustee to retain rights to the $1 million bond posted by the Debtors in the DE Chancery Court.

c.  Trustee to retain all claims and cause of action not released against third-parties including but not limited to Chapter 5 claims and causes of action and any claims against the Debtors' directors and officer (collectively "Litigation Claims") and any resulting proceeds from said Litigation Claims.

d.  The bankruptcy estates and/or any trustee or disbursing agent retain the right to object to claims against the bankruptcy estates.

e.  The Secured Creditors will provide the Trustee with documentation regarding SeeCubic's financial ability to fund the Carve-Out.

f.  The Secured Creditors will be allowed a subordinate unsecured deficiency claim subordinated to all other general unsecured creditors (the "Deficiency Claim") to the extent that the Secured Creditor Distribution is not sufficient to satisfy the Allowed Secured Claim in full.  The Secured Creditors' Deficiency Claim will be recognized as an impaired unsecured claim which the Secured Creditor shall be entitled to vote on confirmation of any Trustee Plan.

31.    Since its retention, SSG has begun marketing the Debtors' Assets for sale to potential purchasers in order to solicit the highest and best bid to maximize the value to the Debtors' estates.

32.    SSG will continue to actively market the Assets, to a wide spectrum of interested parties, including potential financial and strategic buyers.

33.    SSG will, with the Trustee's assistance, set up an electronic data room that will be made available for potential bidders subject to their entry into NDAs, and shall prepare and distribute presentations and confidential information memoranda regarding the Assets.

34.    SSG will continue its marketing process, which will afford the Trustee the best opportunity to maximize value for the sale of the Assets at the Auction.

35.     Subject to the Bidding Procedures the Trustee retains the right to pursue any transaction or restructuring strategy that, in the Trustee's business judgment, will maximize the value of the Debtors' estates.

36.     If the Trustee receives multiple offers for the Assets, the Trustee intends to conduct the Auction to determine the highest or best offer for the Assets.

37.      Accordingly, the Trustee believes that the sale of the Debtors' Assets will maximize the value of the Debtors' estates for the benefit of all their creditors, stakeholders, and other parties-in-interest.

**IV.    The Stalking Horse Provisions.**

38.     The Hawk Settlement provides for the Secured Creditors to act as the Stalking Horse Bidder for the sale of the Debtors' Assets.

39.     By this Motion, the Trustee seeks to approve the selection of the Secured Creditors as the Stalking Horse Bidder.

40.     The Stalking Horse is being selected based upon the Trustee's determination that the proposal from the Secured Creditors at this juncture represents the highest and best non-contingent offer for the Debtors' Assets to date.

41.     The Stalking Horse Bidder's offer would constitute the initial Qualified Bid (as defined in the Bidding Procedures).

42.     The Trustee, on behalf of the Debtors has entered into an Asset Purchase Agreement with the Secured Creditors (the "**Stalking Horse APA**").  Attached as Exhibit "B" is a true and correct copy of the Stalking Horse APA between the Debtors and the Secured Creditors.[4]

---

[4] Bidders should expect changes to material terms of the Stalking Horse APA in that the Stalking Horse APA contemplates a credit bid by the Secured Creditors. However, all other material terms of the APA will remain unchanged.

4880-0354-5067 v1

43.     The Trustee seeks approval of the Stalking Horse APA as a template for any Asset purchase with any third party other than the Secured Creditors or for an Alternate Transaction (the "**Modified APA**").

## V.     Bidding Procedures.

44.     By this Motion, the Trustee seeks approval of the Bidding Procedures. The Bidding Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly sale process consistent with the timeline available to the Trustee, based upon timelines in the Stalking Horse APA.

45.     The Bidding Procedures describe, among other things, the procedures for interested parties to access due diligence, the manner in which bidders become Qualified Bidders and bids become Qualified Bids (each as defined in the Bidding Procedures), the receipt and negotiation of bids received, the conduct of the Auction, the selection and approval of any ultimately successful bidders, and the deadlines with respect to accomplishing the foregoing.

46.     The Trustee believes that the Bidding Procedures afford the Trustee a sufficient and reasonable opportunity to maximize the value of a sale of the Assets for the benefit of the estates.

47.     The Trustee is hopeful that the absence of any bid protections, like a Topping Fee or Break Up Fee, will encourage and perhaps stimulate additional bids.

48.     The Bidding Procedures establish the following key dates:

a.      **Hearing on Bid Procedures: October XX, 2024**

b.      **Bid Deadline**: To participate in the bidding, each Potential Bidder, must deliver to the notice parties enumerated in the Bidding Procedures a written offer, so as to be received by no later than November 15, 2024 at 4:00 (EST) (the "Bid Deadline").

c.      **Auction**: If the Trustee receives two or more Qualified Bids, the Trustee will conduct the Auction of the Assets. If the Auction is held, it shall take place on November 18, 2024 at 10:00 a.m. (EST) at the offices of Obermayer Rebmann Maxwell & Hippel LLP, Suite 3400, 1500 Market Street, Philadelphia, PA 19103 or such other place and time as determined by the Trustee. At the Auction, only those parties that have been designated by the Trustee as Qualified Bidders shall be entitled to attend and participate in the Auction.

d.      **Sale Hearing**: The hearing to approve the sale of the Assets to the Successful Bidder (as defined in the Bidding Procedures) is scheduled to take place on November 22, 2024 at 10:00 a.m. (EST) before the Honorable Ashely M. Chan, Bankruptcy Judge, either telephonically through Court Solutions or at the Courtroom 4 at the United States Bankruptcy Court for the Eastern District of Pennsylvania, Robert N.C. Nix Sr. Federal Courthouse, 900 Market Street, Philadelphia, PA 19107, or at such time thereafter as counsel may be heard.

49.      Key terms of the Bidding Procedures are highlighted below:

a.      **Due Diligence Materials**: Any party that submits to the Trustee an executed confidentiality agreement in such form reasonably satisfactory to the Trustee may be granted access to diligence materials.

b.      **Form and Content of Qualified Bids**: A Qualified Bid is a written offer to purchase the Assets, including but not limited to the Debtors' interests in intellectual property ("IP") in any combinations, submitted to the Trustee and his advisors, so as to be received by the Bid Deadline that satisfies each of the following conditions:

c.      **Good Faith Offer**: Each Bid must constitute a good faith, bona fide, non-contingent offer to purchase substantially all or certain of the Assets or other assets. The offers

may include a proposal to pay amounts due to the Secured Creditors over time if any Qualified Bid contains an upfront cash payment of at least $120,000,000.00.

   d. **Good Faith Deposit**: Each Bid must be accompanied by a deposit in the amount of 10% of the proposed total purchase price which will be held in a non-interest bearing escrow account.

   e. **Executed Agreement**: Each Bid must include an executed Modified APA substantially in the form of the Stalking Horse APA as set forth in Exhibit "B" as modified pursuant to which the potential bidder proposes to effectuate the acquisition of the Debtors' Assets, and any necessary transaction documents, signed by an authorized representative of such bidder.

   f. Each Bid must also include a copy of the Modified APA **marked against the Stalking Horse APA attached as Exhibit B hereto, to show all changes requested by the Potential Bidder** (including those related to the assumption and assignment of executory contracts and unexpired leases, and other material terms such that the Trustee may determine how such Bid compares to the terms of the Asset Purchase Agreement and competing Bids) and if less than all Assets indicate clearly which of the Assets are being bid upon. Each Modified APA must provide a commitment to close within five (5) business days after all closing conditions are met.  The Trustee reserves the right to reject any bid that is accompanied by a Modified APA that does not reasonably meet the terms of the Stalking Horse APA or exceed the Stalking Horse Bid.

   g. **Purchase Price**: Each Bid must clearly identify the purchase price to be paid (the "Purchase Price").

   h. **Cash Requirements**: Each Bid must provide evidence of the ability to pay the cash portion of any Purchase Price contained in any Bid, and the Initial Increment (as defined below), in full, in order to be a Qualified Bid.

14

i.      **Designation of Assigned Contracts and Leases**: Each Bid must identify any and all executory contracts and unexpired leases of the Debtors that the potential bidder wishes to be assumed pursuant to a Sale (the "**Assigned Contracts**"). A Bid must specify whether the Trustee or the potential bidder will be responsible for any cure costs associated with such assumption, and include a good faith estimate of such cure costs.

j.      **Designation of Assumed Liabilities**: Each Bid must identify all liabilities which the potential bidder proposes to assume as part of the Sale.

k.      **Corporate Authority**: Each Bid must include written evidence reasonably acceptable to the Trustee demonstrating appropriate corporate authorization to consummate the Sale; provided that, if the potential bidder is an entity specially formed for the purpose of effectuating the Sale, then the potential bidder must furnish written evidence reasonably acceptable to the Trustee of the approval of the Sale by the equity or interest holder(s) of such potential bidder in order to satisfy the potential bidder's obligations under the Modified APA.

l.      **Disclosure of Identity of Potential Bidder**: A Bid must fully disclose the identity of each entity that will be bidding on the Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation.

m.      **Disclosure of Connections**: A Bid must fully disclose any connections or agreements with the Debtors or its affiliates, including any relationships, connections, agreements, arrangements or understandings with the Debtors, Trustee, the Debtors' existing shareholders, members, officers, director, managers or principals, or any other known, potential, prospective bidder, or potential bidder.

n.      **Proof of Financial Ability to Perform**: A Bid must include written evidence reasonably satisfactory to the Trustee in his sole judgment, may reasonably conclude, in

consultation with his advisors, that demonstrates that the Potential Bidder has the necessary financial ability to timely consummate a Sale including any Overbids necessary at the Auction and must further contain information that can be publicly filed and/or disseminated providing adequate assurance of future performance of all executory contracts and unexpired leases to be assumed and assigned in such Sale.

o.    **Contingencies**: Except as otherwise provided in the Stalking Horse APA, a Bid must not be subject to material conditions or contingencies to closing, including without limitation, obtaining financing, internal approvals or further due diligence.

p.    **Bid Irrevocable**: A Bid must provide that it is irrevocable until two (2) business days after the Closing of the Sale. Each potential bidder further agrees that its Bid, if not chosen as the Successful Bid (as defined in the Bid Procedures), shall serve, without modification, as a Backup Bid (as defined in the Bid Procedures) as may be designated by the Trustee at the Sale Hearing, in the event the Successful Bidder (as defined in the Bid Procedures) fails to close as provided in the Successful Bidder's APA and the Sale Order.[5]

q.    **As-Is, Where-Is**: A Bid must include the following disclaimer: EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY ANCILLARY DOCUMENT DELIVERED BY THE TRUSTEE PURSUANT TO THIS AGREEMENT (I) THE TRUSTEE MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, RELATING TO THE ASSETS, OR THE ASSUMED LIABILITIES, INCLUDING ANY REPRESENTATION OR WARRANTY AS TO VALUE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR FOR ORDINARY PURPOSES, OR ANY

---

[5] Pursuant to the Bidding Procedures, the Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the Backup Bidder's final and best Overbid) open and irrevocable until two (2) business days after the closing of the Sale (the "Outside Backup Date").

OTHER MATTER, (II) THE TRUSTEE MAKES NO, AND HEREBY DISCLAIMS ANY, OTHER REPRESENTATION OR WARRANTY REGARDING THE ASSETS OR THE ASSUMED LIABILITIES, AND (III) THE ASSETS AND THE ASSUMED LIABILITIES ARE CONVEYED ON AN "AS IS, WHERE IS" BASIS AS OF THE CLOSING, AND THE BUYER SHALL RELY ONLY UPON ITS OWN EXAMINATION THEREOF. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY ANCILLARY DOCUMENT DELIVERED BY THE TRUSTEE PURSUANT TO THIS AGREEMENT, THE TRUSTEE MAKES NO REPRESENTATION OR WARRANTY REGARDING ANY ASSET, AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY.

r.      **Time Frame for Closing**: A Qualified Bid by a potential bidder must be reasonably likely to be consummated, if selected as the Successful Bid, within a timeframe acceptable to the Trustee, or by November 29, 2024.

s.      **Consent to Jurisdiction**: Each Potential Bidder must (i) submit to the jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, the Trustee, the Bidding Procedures, the Auction, any Modified APA, or the construction and enforcement of documents relating to any Sale, (ii) waive any right to a jury trial in connection with any disputes relating to the Trustee, the Bidding Procedures, the Auction, any Modified APA, or the construction and enforcement of documents relating to any Sale, and (iii) commit to the entry of a final order or judgment in any way related to the Trustee, the Bidding Procedures, the Auction, any Modified APA, or the construction and enforcement of documents relating to any Sale if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

17

t.      **No Bid Protections**: The Stalking Horse bidder shall receive no bid protections.

u.      **Auction and Auction Procedures**: At the Auction, all Qualified Bidders may submit Overbids (as defined in the Bidding Procedures); provided, however, such Overbid shall be made in increments of not less than $250,000.00 ("**Initial Overbid Increment**") above the prior bid (with respect to bids other than the Stalking Horse Bid, the Overbid must exceed the Stalking Horse Bid, plus the Initial Overbid Increment). The Auction shall continue until there is one Qualified Bid that the Trustee determines, in his reasonable business judgment is the highest or otherwise best Qualified Bid at the Auction (the "**Successful Bid**," and the Qualified Bidder submitting such Successful Bid, the "**Successful Bidder**"), which shall be subject to approval by the Bankruptcy Court. In selecting the Successful Bid, the Trustee may consider any factors relevant to the value and viability of the Qualified Bid, including the amount and nature of the consideration, including any assumed liabilities, the timing for Closing, the nature, number and type of changes to the Stalking Horse APA contained in the Modified APA, if any, the extent to which such modifications are likely to delay or impede the Closing of the Sale, the total consideration to be received by the Debtors, the likelihood of each Qualified Bidder's ability to close a transaction and the timing thereof, and the net benefit to the Debtors' estates. Promptly following the Trustee's selection of the Successful Bid and the conclusion of the Auction, the Trustee shall announce the Successful Bid and Successful Bidder at the close of the Auction and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

v.      **Reservation of Rights**: Except as otherwise provided in the Bidding Procedures or the Bidding Procedures Order, the Trustee reserves the right as he may reasonably determine to be in the best interest of the Debtors' estates and in the exercise of his fiduciary duties

to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtors and the estates; (e) impose additional terms and conditions with respect to all potential bidders; (f) extend the deadlines set forth herein without consent; and (g) increase subsequent bid increments following the Overbid; or (h) remove any Asset from the auction, or continue or cancel the Auction and/or Sale Hearing in open court without further notice. Notwithstanding anything to the contrary contained in the Bidding Procedures or the Bidding Procedures Order, nothing in the Bidding Procedures will prevent the Trustee from considering any and all transactions. Notwithstanding anything to the contrary contained in the Bidding Procedures or the Bidding Procedures Order, nothing in the Bidding Procedures will prevent the Trustee from exercising his fiduciary duties under applicable law to maximize the value to be obtained for the Assets.

50.     The Bidding Procedures expressly recognize the Trustee's fiduciary obligations to maximize value. Accordingly, the Bidding Procedures preserve the Trustee's right to announce additional procedural rules for conducting the Auction as necessary or appropriate to maximize value for the Debtors' estates and does not impair the Trustee's ability to consider any and all Qualified Bids.

**VI.     Form and Manner of Sale Notice.**

51.     Within three (3) business days after the entry of the Bidding Procedures Order, or as soon thereafter as practicable (the "**Mailing Date**"), the Trustee will cause the notice, substantially in the form attached hereto as **Exhibit D** (the "**Sale Notice**"), to be served on (a) any

party that has filed a notice of appearance in these Chapter 11 cases; (b) any entity on the Master Service List; (c) any parties known or reasonably believed to have expressed interest in the Assets or any portion thereof; (d) all entities known or reasonably believed to have asserted a lien, encumbrance, claim, or other interest in the Assets; (e) all parties to executory contracts and unexpired leases to be assumed and assigned, as part of the Sale; (f) all applicable state and local taxing authorities; and (g) any governmental agency that has a reasonably known interest with respect to the Sale and transactions proposed thereunder (the "**Notice Parties**").

52.    Additionally, on the Mailing Date or as soon as reasonably practicable thereafter, the Trustee proposes to publish the Sale Notice (as may be modified for publication purposes, the "**Publication Notice**"), on one occasion, in a paper of general circulation chosen in consultation with SSG. The Trustee believes that the Publication Notice is sufficient and proper notice of the Sale to any other interested parties whose identities are unknown to the Trustee.

53.    The Trustee avers that the Sale Notice and Publication Notice are reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction; (ii) the Bidding Procedures and certain dates and deadlines related thereto; (iii) the objection deadline for the Motion and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the Assets for the Sale; (v) instructions for obtaining a copy of the Asset Purchase Agreement; (vi) representations describing the Sale as being free and clear of any and all liens, claims, encumbrances, and other interests, with all such liens, claims, encumbrances, and other interests attaching to the sale proceeds with the same validity and priority; and (vii) notice of the proposed assumption and assignment of the Assigned Contracts to the Successful Bidder arising from the Auction, if any, and the procedures and deadlines for objecting thereto, and no other or further notice of the Sale shall be required.

4880-0354-5067 v1

## VII.    Assumption Procedures.

54.    The Trustee also seeks approval of the procedures for assuming and assigning executory contracts and unexpired leases (the "**Assumption Procedures**") to facilitate the fair and orderly assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale. The key provisions of the Assumption Procedures are:

a.    **Contract Assumption Notice**: No less than seven (7) days prior to the Sale Objection Deadline (the "**Assumption and Assignment Service Deadline**"), the Trustee shall serve a notice of contract assumption in substantially the form attached hereto as **Exhibit E** (the "Contract Assumption Notice") via overnight delivery on all counterparties to all potential Assigned Contracts and provide a copy of the same to the Secured Creditors. The Contract Assumption Notice shall inform each recipient of the timing and procedures relating to such assumption and assignment, and, to the extent applicable, (i) the title of the executory contract or unexpired lease, as applicable, (ii) the name of the counterparty to the executory contract or unexpired lease, as applicable, (iii) the Trustee's good faith estimates of the Cure Payments required in connection with the executory contract or unexpired lease, as applicable, and (iv) the Sale Objection Deadline; provided, however, that service of a Contract Assumption Notice does not constitute an admission that any contract is an executory contract or unexpired lease, as applicable, or that the stated Cure Payment related to any executory contract or unexpired lease constitutes a claim against the Debtors. Further, the inclusion of an executory contract or unexpired lease, as applicable, on the Contract Assumption Notice is not a guarantee that such executory contract or unexpired lease, as applicable, will ultimately be assumed and assigned.

b.    **Cure Payments and Adequate Assurance of Future Performance**: The payment of the applicable Cure Payments by Successful Bidder, the provision of adequate

21

assurance by the Successful Bidder(s), that they will promptly cure any non-monetary defaults existing prior to the Closing under the Assigned Contracts, and the provision of adequate assurance of future performance by the Successful Bidder(s) under the Assigned Contracts shall (i) effect a cure of all defaults existing thereunder, and (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default.

    c.  Assumption Notices will include the same information with respect to listed Assigned Contracts as was included in the Contract Assumption Notice.

    d.  **Objections**: Objections, if any, to the proposed assumption and assignment or the Cure Payment proposed with respect thereto, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules and the Local Bankruptcy Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed amount of the Cure Payment, the correct cure amount alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon, so as to be actually received by counsel to the Trustee on or before fourteen (14) days after service of the Contract Assumption Notice (the "**Cure Objection Deadline**"). The deadline to object to assumption and assignment solely with respect to the adequate assurance of future performance from the Successful Bidder, however, is the date that is two days after the conclusion of the Auction, but any such objection must be received before the start of the Sale Hearing, or such deadline set forth in the Supplemental Assumption Notice.

    55.  Any party failing to timely file an objection to the cure amount, the proposed assumption and assignment of an Assigned Contract or Additional Assigned Contract listed on the Contract Assumption Notice or Supplemental Assumption Notice, or the Sale is deemed to have consented to (a) such Cure Payment, (b) the assumption and assignment of such Assigned Contract

or Additional Assigned Contract (including the adequate assurance of future performance), (c) the relief requested in the Motion, and (d) the Sale. Such party shall forever be barred and estopped from objecting to the Cure Payments, the assumption and assignment of the Assigned Contract, or Additional Assigned Contract, adequate assurance of future performance, the relief requested in the Motion, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to the Successful Bidder, for purposes of section 365(c)(1) of the Bankruptcy Code and from asserting any additional cure or other amounts against the Trustee and the Successful Bidder, as applicable, with respect to such party's Assigned Contract or Additional Assigned Contract.

## BASIS FOR RELIEF REQUESTED

56.     The Trustee submits that the Sale requested by this Sale Motion is authorized under section 363(b) of the Bankruptcy Code governing sales outside of the ordinary course of a debtor's business.

57.     Section 363(b) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

58.     This Court's power under section 363 is augmented by section 105(a), which provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. As set forth below, the Trustee submits he has satisfied the requirements of sections 105, 363, and 365 of the Bankruptcy Code.

4880-0354-5067 v1

**VIII.    The Bidding Procedures Are Fair and Designed to Maximize Value for the Assets.**

59.    The Trustee submits that the Bidding Procedures as proposed herein, are appropriate under sections 105 and 363 of the Bankruptcy Code, in that they are tailored to ensure that bidding is fair and reasonable and will yield the maximum value for the Debtors' Assets, for the benefit of their respective estates, their creditors, stakeholders, and other parties-in-interest.

60.    The Bidding Procedures proposed herein are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids.

61.    The Bidding Procedures provide potential bidders with sufficient notice and an opportunity to acquire or obtain information necessary to submit a timely and informed bid. Accordingly, the Trustee and all parties-in-interest can be assured that the consideration obtained for the Assets will be fair and reasonable and will achieve the highest or best value. At the same time, the Bidding Procedures provide the Trustee with the opportunity to consider all competing offers and to select, in his discretion, the highest and best offer for the Assets.

62.    Accordingly, the Trustee believes and therefore prays the Court should approve the Bidding Procedures, including the selection of the Stalking Horse as a Qualified Bidder and the Stalking Horse Bid as the initial Qualified Bid.

**IX.    Approval of the Sale is Warranted Under Section 363(b) of the Bankruptcy Code Because a Sound Business Justification Exists.**

63.    Although the Bankruptcy Code does not articulate the standard for approving a sale of assets (other than requiring notice and a hearing), the United States Court of Appeals for the Third Circuit in the seminal case of *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986) interpreted Section 363(b)(i) to require a finding by the Bankruptcy Court that the

acquirer of a debtor's assets be a good faith purchaser. The Third Circuit construed the "good faith purchaser" standard to mean one who purchases "in good faith" and for "value." Id. at 147.

64.    As the court in *Abbotts Dairies* opined:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*Id.* at 147 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

65.    Traditionally, courts have held that "fair and valuable consideration is given in a bankruptcy sale when the purchaser pays 75% percent of the appraised value of the assets." *Abbotts Dairies*, 788 F.2d at 149; *In re Karpe*, 84 B.R. 926, 933 (Bankr. M.D. Pa. 1988).

66.    Respectfully, the sale of the Assets in accordance with the Bidding Procedures satisfies the *Abbotts Dairies* test. First, the Trustee has fully disclosed and requested the Court's approval of the Bidding Procedures and all the terms and conditions of the Sale and proposed Auction and intends to provide comprehensive notice of the sale as discussed above. *See In re Colony Hill Assoc.*, 111 F.3d 269 (2d Cir. 1997) (determination of "good faith" is based on traditional equitable principles, including whether there has been full disclosure to the Bankruptcy Court). The Bid Procedures are specifically tailored to maximize the value to be obtained for the Assets.

67.    In addition, the Trustee intends to continue to market the Sale of the Assets. The Trustee and his Advisors at SSG are hopeful that as a result of their intended notice of the Sale to all potentially interested parties, and ensuing efforts to find other bidders, and the marketing of the Assets, interested purchasers will be encouraged to submit bids, attend the Auction and generate a spirited and robust Auction process.

4880-0354-5067 v1

68.     Courts typically require a sound business purpose to sell assets outside of a plan of reorganization. *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).

69.     Courts consider the following non-exhaustive list of factors in determining whether a sound business purpose exists: (a) sound business reason for the sale; (b) accurate and reasonable notice; (c) proportionate value of the asset to the estate as a whole (fair and reasonable); (d) the amount of elapsed time since the filing; (e) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (f) the effect of the proposed disposition on the future plan; (g) the amount of proceeds to be obtained from the sale versus the appraised value of the property sold; and (h) whether the asset is decreasing or increasing in value. See *Lionel Corp.*, 722 F.2d at 1071; *Del. & Hudson Ry.*, 124 B.R. at 176; *In re Weatherly Frozen Food Grp., Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992). A debtor is "simply required to justify the proposed disposition with sound business reason." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

70.     Consideration of the above factors here unequivocally establishes that the Sale should be approved. As discussed above, the Trustee will continue his marketing efforts for the Assets and will solicit proposals for the purchase of the Assets before the proposed bid deadline and, based on the Trustee's and SSG's marketing efforts, the Trustee will have, under the circumstances, amply marketed the Assets before the proposed date of the Sale Hearing.

71.     The Trustee has proposed Bidding Procedures designed to maximize the purchase price for the Debtors' Assets.  The Procedures allow for sale of all or part of the Debtors' Assets to various purchasers. The proposed Bidding Procedures and the form and manner of notice of the

26

Sale have been submitted for approval to the Court and will ensure that any and all interested parties will receive adequate notice of the Auction to allow for a competitive Sale process.

72.     Further, based upon the Hawk Settlement a distribution to unsecured creditors is assured.  An Auction process  provides a mechanism that may yield additional recoveries.

73.     For all these reasons, the Trustee respectfully submits that the Sale of the Assets is supported by sound business reasons and is in the best interests of the Debtors and their respective estates. Accordingly, the Trustee requests approval of the Sale pursuant to Section 363(b) of the Bankruptcy Code.

## X.     The Sale Satisfies the Requirements of Section 363(f) for a Sale Free and Clear of All Liens, Claims, Encumbrances and Interests.

74.     Section 363(f) permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable non-bankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. See 11 U.S.C. § 363(f). Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale. *See In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) is written in the disjunctive, authorizing a trustee or debtor-in-possession to sell property of the estate free and clear of all liens "if any of the five conditions of § 363(f) are met"); *Scherer v. Fed. Nat'l Mortg. Ass'n (In re Terrace Chalet Apts., Ltd.)*, 159 B.R. 821, 825 (N.D. Ill. 1993) (sale extinguishes liens under section 363(f) as long as one of the five specified exceptions applies).

75.     In this case, the Assets are subject to the claims of the Allowed Secured Claims.

76.     Here, the Trustee avers that sections 363(f)(2) and (5) are satisfied with respect to Allowed Secured Claims. Further, all parties known to have asserted a lien or other encumbrance on the Assets will receive notice of the Sale. To the extent they have not objected to the Sale by the Sale Objection Deadline, they will be deemed to have consented to the Sale free and clear of all liens, claims, encumbrances and interests (other than Assumed Liabilities).

77.     The Trustee proposes to sell the Assets in a commercially reasonable manner and expects that the value of the proceeds from such sale will adequately reflect the value of the property sold.  The Auction will result in proceeds (or a credit bid) paying or satisfying all Allowed Secured Claims.  Second, the Trustee further proposes that upon the Closing, any party with a valid and enforceable lien or other encumbrance shall have a corresponding security interest in the proceeds of the Sale, as such liens and encumbrances will attach to the proceeds of the Sale with the same validity, priority, and force and effect as such lien or encumbrance had immediately prior to the closing of the Sale. In addition, all such persons could be compelled to accept money satisfaction for their security interests. As such, the requirements of section 363(f) of the Bankruptcy Code would be satisfied for the sale of the Assets, free and clear of all liens, claims and encumbrances (other than the Assumed Liabilities).

78.     The Trustee also submits that it is appropriate to sell the Assets free and clear of successor liability relating to the Assets. Such limitations on successor liability ensure that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to the Debtors' estates. If such relief is not granted, the purpose of an Order purporting to authorize the transfer of assets free and clear of encumbrances (other than the Assumed Liabilities) would be thwarted by the potential for holders of claims to

thereafter use the transfer as a basis to assert claims against a buyer arising from the Debtors' conduct.

79.     Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business. *See, e.g., In Matter of Motors Liquidation Co.*, No. 15-2844-BK(L), 2016 WL 3766237 (2d Cir. July 13, 2016) *12, *13 ("We agree that successor liability claims can be `interests' when they flow from a debtor's ownership of transferred assets" and holding that "a bankruptcy court may approve a § 363 sale `free and clear' of successor liability claims if those claims flow from the debtor's ownership of the sold assets. Such a claim must arise from a (1) right to payment (2) that arose before the filing of the petition or resulted from pre-petition conduct fairly giving rise to the claim"); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[I]n personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale."); *Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 50 (S.D.N.Y. 2005), *rev'd in part on other grounds*, 600 F.3d 231 (2d Cir. 2010) ("Where . . . a sale is to be free and clear of existing liens and interests other than those of the estate, one or more of the criteria specified in section 363(f) of the statute must also be met.").

80.     For these reasons, the Successful Bidder should not be liable under any theory of successor liability relating to the Assets, but instead, should receive the Assets free and clear of claims (other than the Assumed Liabilities) including successor liability claims, and the Sale Order so provides.

XI.     **A Successful Bidder Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code and the Sale Does Not Violate Section 363(n).**

81.     Section 363(m) of the Bankruptcy Code provides in relevant part that the reversal or modification on appeal of an authorization under section 363(b) of a sale or lease of property does not affect the validity of a sale or lease under such authorization to a buyer who bought or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. 11 U.S.C. § 363(m).

82.     "Although the Bankruptcy Code does not define the meaning of `good-faith buyer,' . . . most courts have adopted a traditional equitable definition: `one who purchases the assets for value, in good faith and without notice of adverse claims.'" *Licensing by Paolo v. Sinatra (In Re Gucci)*, 126 F.3d 380, 392 (2d Cir. 1997)). The "good faith component of the test under § 363(m) speaks `to the equity of [the bidder's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978).

83.     As will be demonstrated at the Sale Hearing, the Trustee's conduct of the sale process, and the selection of a Successful Bid, shall have been conducted in good faith and at arm's-length in accordance with the Bid Procedures. Accordingly, the Trustee requests that the Sale Order include a provision that the Successful Bidder for the Assets is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code. The Trustee believes that providing the Successful Bidder with such protection will ensure that the maximum price will be achieved for the Assets.

84.     Furthermore, as will be demonstrated at the Sale Hearing, neither the Trustee nor the Successful Bidder, once selected, shall have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code. The Trustee will have negotiated the Asset Purchase Agreement in good faith and at arms' length. Moreover, the Bidding Procedures are designed to prevent the Trustee or the Successful Bidder from engaging in any conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy Code.

## XII.     The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.

85.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). A trustee or debtor's decision to assume or reject an executory contract or unexpired lease is governed by the business judgment standard. *See Cinicola v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (section 365 of the Bankruptcy Code "permits the trustee or debtor in possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide whether ones it would be beneficial to adhere to and which ones it would be beneficial to reject"). Once the debtor (or trustee) states a valid business justification, "[t]he business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

86.     Further, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor or trustee to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1). Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2).

87.     The meaning of "adequate assurance of future performance" is dependent on the facts and circumstances of each case. Adequate assurances may be provided, for example, by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Fleming Cos.*, 499 F.3d 300 (3d Cir. 2007) (quoting *Cinicola*, 248 F.3d at 120 n. 10 (3d Cir. 2001).

88.     The Trustee requests approval under section 365 of the Bankruptcy Code of the Trustee's assumption and assignment of certain executory contracts and unexpired leases to the Successful Bidder. The Trustee further requests that the Sale Order provide that the Assigned Contracts will be transferred to and remain in full force and effect for the benefit of the Successful Bidder notwithstanding any provisions in such contracts or leases, including those described in sections 365(b)(2), (f)(1) and (f)(3) of the Bankruptcy Code that prohibit such assignment.

89.     To the extent necessary, the Trustee will present facts at the Sale Hearing to demonstrate the financial wherewithal, willingness, and ability of the Successful Bidder to perform under the Assumed Contracts.

4880-0354-5067 v1

90. The Sale Hearing will afford the Court and other interested parties the opportunity to evaluate the ability of the Successful Bidder to provide adequate performance under the Assumed Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

91. Further, the Trustee will give notice to all parties to the potentially Assigned Contracts in substantially the form attached hereto as **Exhibit E**. The Contract Assumption Notice will include the amounts the Trustee believes are necessary to cure any defaults in accordance with section 365(b) of the Bankruptcy Code.

92. Accordingly, the Trustee submits that implementation of the proposed contract assumption procedures is appropriate and should be approved by this Court.

## XIII. The Stalking Horse Will Not Receive Expense Reimbursement or a Breakup Fee.

93. Pursuant to the Bidding Procedures, the Trustee will not pay the Stalking Horse a Breakup Fee and/or Expense Reimbursement (i.e., the Bid Protections). In the exercise of his judgment, the Trustee, and the Secured Creditors have agreed, that the Stalking Horse Bidder will not receive any Bid Protections.

## IMMEDIATE RELIEF IS NECESSARY/WAIVER OF STAY

94. The Court may grant the relief requested in this Motion immediately if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. In explicating the standards governing preliminary injunctions, courts have instructed that irreparable harm "'is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which `money damages cannot provide adequate compensation.'" *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002). Further, the "harm must be shown to be actual and imminent, not remote or speculative." The Trustee submits that, for the reasons already set forth herein, the relief requested

in this Motion is necessary to avoid immediate and irreparable harm. In that regard the Trustee

will be seeking expedited consideration the Sale Motion and Bid Procedures.

95. The Trustee also requests that the Court waive the stay imposed by Bankruptcy

Rule 6004(h), which provides that an order authorizing the use, sale, or lease of property other

than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise." Fed. R. Bankr. P. 6004(h).

96. Accordingly, the Trustee respectfully requests that the Court waive the 14-day stay

imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies

immediate relief.

## **REQUEST FOR EXPEDITED CONSDIERATION PURSUANT TO LOCAL RULE OF BANKRUPTCY PROCEDURE 5070-1(g)**

97. In accordance with L.B.R. 5070-1(f), and 9014-1, the Trustee seeks Expedited

Consideration of the instant Motion and further requests approval of the request for expedited

consideration pursuant to L.B.R. 9014-2.

98. Pursuant to L.B.R. 5070-1(f)(3), this request for expedited consideration may be

stated as part of the Motion.

99. The Trustee respectfully submits that expedited consideration of the Motion is

required to permit the immediate and timely marketing of the Assets and ensure a Closing by the

end of November 2024 as agreed upon with the Secured Creditors.

100. The Trustee further believes that expedited consideration will not prejudice the

Debtors or any of the Debtors' creditors or stakeholders when balanced against the Trustee's need

to expeditiously bring the Assets to market.

101. The undersigned has contacted the office of the United States Trustee and counsel

to the Secured Creditors as required by L.B.R. 5070-1(f)(1). The United States Trustee and the

Secured Creditors have consented to the Motion being heard on an expedited basis consistent with the Court's calendar.

102.    Furthermore, The Trustee also requests (a) that this Court permit notice of the hearings to be served by overnight mail, facsimile transmission, or by electronic means upon (i) the Office of the United States Trustee, (ii) the Debtors' top 20 unsecured creditors, (iii) the Secured Creditors, (iii) the Debtors; and (iv) all parties who have timely filed requests for notice under Bankruptcy Rule 2002, and (b) that this Court limit the notice period accordingly. The Trustee believes that such notice is sufficient under the circumstances for the expedited hearing.

103.    Reduction of the time periods in question is not prohibited under Fed. R. Bankr. P. 9006(c)(2) and the rules listed therein.

## RESERVATION OF RIGHTS

104.    Nothing in this Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation of the Trustee's ability to contest same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim; or (d) granting third-party-beneficiary status or bestowing any additional rights on any third party.

## NOTICE

105.    Notice of this Motion will be given to: (i) the Office of the United States Trustee for Region 3; (ii) the Secured Creditors, (iii) the holders of the twenty (20) largest unsecured claims against the Debtors; and (v) all parties entitled to notice pursuant to Local Bankruptcy Rule 9014-3. The Trustee submits that no other or further notice is required.

4880-0354-5067 v1

## NO PRIOR REQUEST

106.    No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

The Trustee respectfully request that this Court enter the Bidding Procedures Order, approve the authority of the Trustee to select a Stalking Horse Bidder, and, after the Sale Hearing, the Sale Order, substantially in the forms annexed hereto, granting the relief requested herein and such other and further relief as may be just and proper.

Respectfully Submitted,

Dated: September 30, 2024       By: */s/ Michael D. Vagnoni*
                                Edmond M. George, Esquire
                                Michael D. Vagnoni, Esquire
                                OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                                Centre Square West
                                1500 Market Street, Suite 3400
                                Philadelphia, PA 19102
                                Telephone: (215) 665-3066
                                Facsimile: (215) 665-3165
                                E-mail:  edmond.george@obermayer.com
                                        michael.vagnoni@obermayer.com

                                *Counsel to William A. Homony Chapter 11 Trustee*