UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re:<br><br>Stream TV Networks, Inc., *et al*.[1]<br><br>The Debtors. | Chapter 11<br><br>Bankr. Case No. 23-10763 (AMC)<br>(Jointly Administered) |

**VISUAL SEMICONDUCTOR, INC.'S OBJECTION TO MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR (I) AN ORDER (A) APPROVING BIDDING PROCEDURES AND FORM OF ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS INCLUDING APPROVAL OF THE PROVISIONS FOR DESIGNATION OF A STALKING HORSE, (B) ESTABLISHING THE NOTICE PROCEDURES AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND SCHEDULING AND AUCTION, (C)APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) SCHEDULING A SALE HEARING, (E) GRANTING EXPEDITED CONSIDERATION PURSUANT TO LOCAL RULE OF BANKRUPTCY PROCEDURE 5070-1(g); AND (F) GRANTING RELATED RELIEF, AND (II) AN ORDER APPROVING (A) THE SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO AND (C) <u>GRANTING RELATED RELIEF</u>**

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ...................................................................... 1

II.   BACKGROUND ......................................................................................... 5

    A.    Procedural History Relevant to This Motion ........................................ 5

    B.    VSI Negotiates in Good Faith with the Trustee Only to be Stonewalled .............. 8

        i.    July and August 2024 Communications ................................... 8

        ii.   September 2024 Communications ........................................... 11

    C.    The Trustee's Bidding Procedures are Inherently Flawed................... 12

        i.    SeeCubic is an Inappropriate Stalking Horse Bidder, Especially Since the Trustee Retained SSG as the Debtors' Investment Advisor ...................................................... 12

        ii.   The Trustee has Allowed the Hawk Parties to Violate the Bankruptcy TRO and has Produced Nothing to Show that the Debtors' Assets have been preserved or Returned from the Hawk Parties.................................................... 16

    D.    The Solicitation and Due Diligence Materials Offered by the Trustee and SSG are Misleading and Woefully Inadequate .................................. 20

        i.    The SSG Solicitation "Teaser" Misled Potential Bidders........................ 21

        ii.   The Data Room Prepared by the Trustee and SSG for Consideration and Due Diligence of Potential Bidders Lacks Meaningful Information ............................................. 21

III.  ARGUMENT ........................................................................................... 26

    A.    The Trustee may not sell the Debtors' property unless that property constitutes property of the Debtors' estates and, before approving a sale, the Court must first determine whether such property constitutes property of the estates. .......................................................... 26

    B.    The 9019 Agreement and Bidding Procedures Motion taken together constitute an improper *sub rosa* plan of reorganization that cannot be approved by this Court. ............................................. 29

    C.    The Bidding Procedures are Neither Fair nor Reasonable and are Fatally Flawed in Numerous Ways Such that the Court Should Not Approve Them. ............................................................... 31

    D.    The Proposed Sale Process is Neither Fair nor Reasonable and is Subject to a Heightened Scrutiny Standard................................ 32

    E.    The Proposed Sale Timeline is Not Adequately Supported.................. 34

    F.    Credit Bid Rights Should Not Be Approved........................................ 36

    G.    There Should Be No Finding of Good Faith as to the Insider Stalking Horse Bidder.............................................................. 37

i

H.      There Should Be No Waiver of Bankruptcy Rules 6004(h) and 6006(d)............. 38

IV.    RESERVATION OF RIGHTS ........................................................................................ 39

V.     CONCLUSION............................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Conine (In re Robertson),*
203 F.3d 855 (5th Cir. 2000) ...............................................28

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.),*
211 B.R. 813 (W.D. Pa. 1997), aff'd, 160 F.3d 982 (3d Cir. 1998) ....................................1, 34

*Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC),*
415 B.R. 86 (Bankr. D. Del. 2009) ...............................................34

*Darby v. Zimmerman (In re Popp),*
323 B.R. 260 (B.A.P. 9th Cir.2005)...............................................28

*Energy Future Holdings Corp. v. Del. Tr. Co.,*
648 F. App'x 277 (3d Cir. 2016) ...............................................30

*First Fid. Bank v. McAteer,*
985 F.2d 114 (3d Cir. 1993)...............................................27

*Fresh Prepared Foods, Inc. v. Farm Ridge Foods LLC,*
2013 WL 4804816 (D.N.J. Sept. 9, 2013) ...............................................28

*In re Abbotts Dairies of Pa., Inc.,*
788 F.2d 143 (3d Cir. 1986)...............................................32, 38, 39

*In re Aloha Airlines, Inc.,*
2009 WL 1371950 (Bankr. D. Hawaii 2009) ...............................................37

*In re American Safety Razor Co., LLC,*
Case No. 10-12351 (MFW) (Bankr. D. Del. Sept. 30, 2010) ...............................................33

*In re Bidermann Indus. U.S.A.,*
203 B.R. 547 (Bankr. S.D.N.Y. 1997)...............................................34, 35

*In re Blixseth,*
No. 09-60452, 2010 Bankr. LEXIS 585 (Bankr. D. Mont. Feb. 23, 2010) ...............................................34

*In re Braniff Airways, Inc.,*
700 F.2d 935 (5th Cir. 1983) ...............................................30, 31

*In re Coburn,*
250 B.R. 401 (Bankr. M.D. Fla. 1999) ...............................................28

*In re Crowthers McCall Pattern, Inc.*,
   114 B.R. 877 (Bankr. S.D.N.Y. 1990) ...................................................................30

*In re Daufuskie Island Properties, LLC*,
   441 B.R. 60 (Bankr. D.S.C. 2010) .........................................................................38

*In re Edwards*,
   228 B.R. 552 (Bankr. E.D. Pa. 1998) .....................................................................32

*In re Fisker Automotive Holdings., Inc.*,
   510 B.R. 55 (Bankr. D. Del. 2014) ...................................................................37, 38

*In re Food Barn Stores, Inc.*,
   107 F.3d 558 (8th Cir. 1997) .................................................................................32

*In re Free Lance-Star Publishing Co.*,
   512 B.R. 798 (Bankr. E.D. Va. 2014) ....................................................................37

*In re The Free-Lance Star Publishing Co*.,
   2014 WL 2505627 (Bankr. E.D. Va. 2014) ...........................................................37

*In re Innkeepers USA Trust*,
   442 B.R. 227 (Bankr. S.D.N.Y. 2010) ...................................................................35

*In re Interiors of Yesterday, LLC*,
   Case No. 02-30356 (LMW), 2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007)...................28

*In re Philadelphia Newspapers, LLC*,
   599 F.3d 298 (3d Cir. 2010)...................................................................................37

*In re PSINet, Inc*.,
   268 B.R. 358 (Bankr. S.D.N.Y. 2001) ...................................................................39

*In re Stream TV Networks, Inc. Omnibus Agreement Litig*.,
   Memorandum Opinion, Case No. 2020-0766-JTL *(*Del. Ch. Sept. 28, 2022).............13, 15, 16

*In re Summit Global Logistics, Inc.*,
   2008 Bankr. LEXIS 896 (Bankr. D.N.J. Mar. 26, 2008) ........................................34

*In re Theroux*,
   169 B.R. 498 (Bankr. D.R.I. 1994).........................................................................37

*In re Univ. Heights Ass'n*,
   2007 Bankr. LEXIS 1200 (Bankr. N.D.N.Y. Jan. 22, 2007) ..................................34

*In re Westpoint Stevens Inc.*,
   333 B.R. 30 (S.D.N.Y. 2005)............................................................................31, 32

iv

*In re Whitehall Jewelers Holdings, Inc.*,
  Case No. 08-11261 (KG), 2008 WL 2951974 (Bankr. D. Del. July 28, 2008) ................28, 29

*In re Williamson*,
  327 B.R. 578 (Bankr. E.D. Va. 2005) ....................................................................................33

*In re Worcester Country Club Acres, LLC*,
  655 B.R. 41 (Bankr. D. Mass. 2023) ....................................................................................28

*Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*,
  780 F.2d 1223 (5th Cir. 1986) ............................................................................................31

*Jones v. GE Capital Mortgage Co. (In re Jones)*,
  179 B.R. 450 (Bankr. E.D. Pa. 1995) ....................................................................................27

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
  139 S. Ct. 1652, 203 L. Ed. 2d 876 (2019) ............................................................................27

*Moldo v. Clark (In re Clark)*,
  266 B.R. 163 (9th Cir. B.A.P. 2001) ....................................................................................28

*Moody v. Amoco Oil Co.*,
  734 F.2d 1200 (7th Cir. 1984), cert denied, 469 U.S. 982 (1984) ..........................................27

*Motorola Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan Chase (In re Iridium Operating LLC)*,
  478 F.3d 452 (2d Cir. 2007) ........................................................................................30, 32

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*,
  330 F.3d 548 (3d Cir. 2003) ................................................................................................32

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey (In re Cajun Elec. Power Coop.)*,
  119 F.3d 349 (5th Cir. 1997) ................................................................................................30

re *NJ Affordable Homes Corp.*,
  No. 05-60442 (DHS), 2006 WL 2128624 (Bankr. D.N.J. June 29, 2006) ..............................37

*Ross v. A V Car & Home, LLC (In re Brown)*,
  Case No. 16-00466, A.P. No. 18-10026, 2019 Bankr. LEXIS 286, 2019 WL 413625 (Bankr. D.C. Jan. 30, 2019) ............................................................................................................29

*Stream TV Networks, Inc. v. SeeCubic, Inc.*,
  No. 360, 2021 (Del. June 15, 2022) ..................................................................................1, 13

v

*Warnick v. Yassian (In re Rodeo Canon Dev. Corp.)*,
    362 F.3d 603 (9th Cir. 2004), withdrawn and modified by 126 Fed. App'x 353 (9th Cir.
    2005)
    ...................................................................................................................................29

**Statutes**

11 U.S.C.S. § 363(b) ..................................................................................28, 29, 30, 31

11 U.S.C. 363(k) ................................................................................................................37

Chapter 11 of Title 11 of the United States Code ................................................. passim

§ 363 of the Bankruptcy Code ........................................................................2, 28, 32, 38

§ 363(m) of the Bankruptcy Code ............................................................................38, 39

**Rules**

Bankruptcy Rule 6004(h)............................................................................................39, 40

Bankruptcy Rule 6006(d).............................................................................................39, 40

Fed R. Bankr. P. 6004(d) ..................................................................................................39

Fed. R. Bankr. P. 9019(a) .................................................................................................30

Local Bankruptcy Rule 7050-1 .......................................................................................13

Local Rule of Bankruptcy Procedure 5070-1(g)...............................................................1

Rule 54(b) ..........................................................................................................................14

Rules 6004 and 6006.........................................................................................................39

78262979;5

Visual Semiconductor, Inc. ("VSI") hereby files its objection (the "Objection") to the *Motion for (I) an Order (A) Approving Bidding Procedures and Form Asset Purchase Agreement for the Sale of Substantially all of the Debtor's Assets Including Approval of the Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and scheduling and Auction, (C) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (D) Scheduling a Sale Hearing, and (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(g); and (F) Granting Related Relief and (II) an Order Approving (A) the Sale of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief* [ECF No. 750] (the "Bidding Procedures Motion") filed by the Court-appointed chapter 11 trustee (the "Trustee").

## I.    PRELIMINARY STATEMENT

1.    VSI is generally not opposed to a sale of the Debtors' businesses and operating assets through a fair and robust process that would maximize value. However, the sale process as proposed by the Trustee is legally impermissible and has been nefariously orchestrated to provide outsized returns for the benefit of one creditor over all others. This high-speed and flawed sale process should not be entertained – and it certainly should not be approved - by this Court.

2.    On June 7, 2024, this Court entered an order approving the Trustee's Settlement (the "9019 Agreement") with Hawk Investment Holdings, Ltd. ("Hawk"), in its capacity as Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SeeCubic"), SLS Holdings VI, LLC ("SLS"), and various individuals, including Robert Morton, Arthur Leonard, Shadron L. Stastney ("Stastney"), Alastair Crawford, Asaf Gola, Kevin Gollop, Patrick Miles, Patric Theune, and Krzysztof Kabacinski (collectively, the "Hawk Parties"). Among other things, the 9019

1

Agreement outlined the terms of a sale of the Debtors' assets under section 363 of the Bankruptcy Code ("363 Sale") [ECF No. 653].

3.       Nearly *four* months later, on September 30, 2024, the Trustee filed the Bidding Procedures Motion on an expedited basis asking this Court to approve an auction process on an extremely aggressive timeline. The sale process proposed by the Trustee is fundamentally flawed for several reasons, including but not limited to the unreasonably expedited timeline proposed for the auction process. Such an accelerated schedule is not conducive to maximizing value for the Debtors' estates and risks undermining the very purpose of the sale process: to achieve the highest and best return for creditors. The Debtors, Trustee, stakeholders, and potential bidders require adequate time to conduct due diligence, marshal and assess the assets including ownership of applicable intellectual property (IP) rights, and submit and review competitive bids. Rushing this critical process compromises the integrity of the sale, depriving the estates of the opportunity to realize their full value, which is contrary to the best interests and fair treatment of all parties involved and to the Bankruptcy Code's mandate to maximize estate assets.

4.       Additionally, the process contemplated by the Bidding Procedures Motion is structured to disproportionately benefit the Hawk Parties at the expense of all other stakeholders. This approach contravenes the fundamental principles of fairness and equity that govern the bankruptcy process. The motion distorts the competitive bidding landscape and undermines the fiduciary duty to maximize value for the Debtors' estates as a whole. The Bankruptcy Code mandates that all creditors be treated fairly and equitably, yet the proposed procedures, if adopted, would result in an unjust distribution of the Debtors' assets, contrary to the core goal of maximizing creditor recoveries.

5.      Further, the data room compiled by the Trustee and SSG Advisors LLC ("SSG") to satisfy the due diligence of potential bidders in the proposed 363 Sale is woefully incomplete, and SSG solicitation materials are misleading at best. This lack of meaningful documentation provided by SSG and the Trustee on behalf of the Debtors' estates does not and cannot instill confidence in bidders expected to offer a minimum of $120 million in cash for estate assets; there is only a single strategic partner agreement furnished even though there are other strategic partners relevant to the sale;, there is no information about specific customers, there is no information regarding third-party technologies which underlay or are embedded in the Debtors' technology, and there is no information regarding legal action outside the bankruptcy that is not settled by the 9019 Agreement [ECF Nos. 630, 653] that may well impact the ultimate value of the assets being sold.

6.      So what's really going on here? Here is a simple breakdown. The Trustee chose "the Secured Creditors," *a.k.a.,* the Hawk Parties, as the proposed stalking horse bidder and agreed to give them an allowed claim of $180 million (Bidding Procedures Motion ¶ 30(I)(a)), $150 million of which is a secured claim and can be used as a credit bid (Bidding Procedures Motion ¶ 30(I)(b)), notwithstanding the dubious nature and amount of the Hawk Parties' claims and the Trustee's to investigate the conversion of the Hawk Parties' notes.

7.      As an initial matter, the Trustee's deal with the Hawk Parties is disturbing based solely on the identity of the proposed stalking horse bidder: the primary principal of the Hawk Parties, Robert Morton, was the subject of an English Cold Shoulder Order issued by the United Kingdom's Financial Conduct Authority (FCA) for especially egregious conduct involving securities. In fact, only 13 Cold Shoulder Orders have ever been entered by the FCA. Under the Cold Shoulder, Robert Morton was not allowed to work with investment bankers or solicit investments.

8.      Beyond Mr. Morton's individually checkered past, the Hawk Parties' involvement with the Debtors has been egregiously improper and ultimately detrimental to the Debtors' businesses. As detailed in *VSI's Limited Objection of VSI to the Application of the Chapter 11 Trustee to Employ SSG Advisors, LLC as Investment Banker* [ECF No. 717] ("VSI's Objection to Retention of SSG"), the Hawk Parties, including Mr. Morton, have a long history of improperly exercising control over the Debtors' property. Indeed, to this day, the Hawk Parties are using and possessing the Debtors' property contrary to this and other court's orders, including but not limited to the Partial Final Judgment issued by the Delaware Chancery Court on August 10, 2022.

9.      The circumstances are made all the more troubling by the Trustee's apparent disregard for this contemptuous behavior. In fact, the Trustee has time and time again turned a blind eye to the Hawk Parties' conduct, even when that conduct results in material damage to the Debtors' estates. The Trustee (i) failed to regain control from the Hawk Parties (or apparently even attempted to regain control) of millions of dollars of the Debtors' property; (ii) failed to enforce the temporary restraining order issued by this court (the "Bankruptcy TRO"); and (iii) hired SSG, a dubious decision in light of the fact that SSG was previously retained by the Hawk Parties as investment banker to sell the Debtors' assets out from under the Debtors for the benefit of the Hawk Parties and was stopped only by temporary restraining and status quo orders issued by the Delaware Court of Chancery.

10.      These acts and omissions demonstrate a pattern and practice of misconduct and negligence, which combine with a final flagrant offense: the proposed sale purports to sell the Debtors' assets on an "as-is, where-is" basis.  But it is clear from the record that neither the Trustee nor his agents actually know what the Debtors' assets are, let alone how those assets work or may be encumbered.  *See* 6/5/2024 Hearing Transcript 70:9-78:21. And so it's a pretty safe bet that the

Trustee does not know (i) where a significant portion of the Debtors' assets are located, (ii) which of the Debtors' trade secrets the Hawk Parties have used, (iii) if the Hawk Parties will turn over the Debtors' property to a successful bidder other than the stalking horse, and (iv) if the Hawk Parties will stop using the trade secrets once a sale to a third-party has been completed. There is no reason to believe that the Hawk Parties will stop pursuing mindless litigation even after a sale process has been completed. Put simply, under these conditions, why would any third-party participate in this process and bid hundreds of millions of dollars for assets that the Trustee neither understands nor is capable of delivering free and clear of claims or encumbrances?

11.    The Trustee has failed to perform his mandate to manage the Debtors' estates in a way that maximizes the recovery to creditors while ensuring a fair and transparent process. VSI would like the Trustee to meet his mandate and fulfill his duties by recovering the Debtors' assets from the Hawk Parties. VSI has emphasized repeatedly that it knows where to locate the Debtors' missing property and has repeatedly offered to assist the Trustee in doing so. VSI has further offered to provide post-petition financing to enable the Trustee to more effectively perform these essential tasks.

12.    As discussed in Section III.B below, the 9019 Agreement and Bidding Procedures Motion taken together constitute an improper *sub rosa* plan of reorganization that cannot be approved by this Court. The bidding procedures described in the Bidding Procedures Motion (the "Bidding Procedures") are neither fair nor reasonable and are fatally flawed in numerous ways such that the Court should not approve the Bidding Procedures.

## II.    BACKGROUND

### A.    Procedural History Relevant to This Motion

13.     On March 15, 2023 (the "<u>Petition Date</u>"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). On January 9, 2024, the Bankruptcy Court entered an order appointing the Trustee.

14.     On May 30, 2024, the Trustee filed a Motion for Turnover of Property and Entry of an Order Enforcing the Automatic Stay [ECF No. 647] (the "<u>Motion for Turnover</u>").

15.     On June 6, 2024, this Court entered an order approving the 9019 Agreement between the Trustee and the Hawk Parties, which included, amongst others, the following deal terms:

- Hawk received a $180 million secured claim, $150 million of which can be credit bid in a sale of the Debtors' assets;

- A $7.5 million carve out to pay administrative and general unsecured creditors;

- The Trustee will make SeeCubic the proposed stalking horse in a 363 Sale of the Debtors' assets;

- Qualified bids in the sale process must include a minimum $120 million cash component; and

- If a bid is accepted over the stalking horse bid, only 10% of that overbid goes to administrative or unsecured creditors until the Hawk Parties' asserted $180 million claim is paid in full.

16.     The 9019 Agreement all but guarantees that unsecured creditors and perhaps even administrative expenses receive only a pittance.

17.     On June 16, 2024, Akerman LLP filed a Notice of Appearance as counsel for VSI and promptly filed an Objection to the Motion for Turnover [ECF No. 672]  (the "<u>Objection to Turnover</u>") and a Motion to Reconsider the order granting the 9019 Agreement [ECF No. 686] (the "<u>Motion to Reconsider</u>"). The Motion to Reconsider was filed for multiple reasons, but chief among them was that the 9019 Agreement did not contain a fiduciary out and VSI strongly believed it (or a third-party) could provide the Debtors' with a much better offer.

18.     On July 26, 2024, VSI filed and served a Notice of Deposition Duces Tecum on the Trustee concerning the issues raised in the Objection to Turnover and Motion to Reconsider (the "Original Discovery Requests").  Based upon its strong but ultimately unsupported allegations regarding "VSI's conduct," it appears that the Motion for Turnover was originally intended as an offensive litigation cudgel against VSI in retaliation for identifying the Hawk Parties' TRO violations and the Trustee's inaction with respect to the same. Among other things, the Original Discovery Requests sought information regarding exhibits to the Trustee's Motion for Turnover that were clearly altered and representations that were demonstrably false and misleading.  Rather than account for the altered exhibit documents and misleading statements in his Motion for Turnover, the Trustee moved to quash the Original Discovery Requests, sought entry of a protective order, and moved to withdraw the offensive Motion for Turnover without prejudice [see ECF No. 724].

19.     In furtherance of the sale actions contemplated by the 9019 Agreement, on August 14, 2024, the Trustee filed an Application to Employ SSG as the investment banker to market the Debtors' assets on behalf of the Trustee for the benefit of the Debtors' estates [ECF No. 715] (the "SSG Application").

20.     The Trustee's decision to hire SSG was (and is) questionable. SSG was previously hired by the Hawk Parties in furtherance of contemptuous conduct whereby the Hawk Parties, prior to the Petition Date, attempted to unlawfully retain and sell the Debtors' assets for the Hawk Parties' exclusive benefit to the direct detriment of the Debtors. These actions are detailed in VSI's Objection to Retention of SSG and are incorporated herein by reference. It is fairly safe to assume that selecting the Hawk Parties/SeeCubic as the proposed stalking horse bidder and then hiring its former investment banker to market the assets chills bidding. Any other bidder, including third

7

parties as well as VSI and its investors, would reasonably view the sale process to be orchestrated to assure that only the proposed stalking horse bidder will prevail.

21.     On August 27, 2024, VSI amended its Original Discovery Requests to include discovery concerning the issues raised in VSI's Objection to Retention of SSG.

**B.     VSI Negotiates in Good Faith with the Trustee Only to be Stonewalled**

      **i.     July and August 2024 Communications**

22.     As described herein, throughout these chapter 11 cases, VSI has tried vigorously to engage with the Trustee, including with respect to productive avenues by which VSI might participate on a level playing field with the Hawk Parties in either a 363 Sale process or a pure plan process.

23.     To that end, on July 25, 2024, VSI sent $170 million proof of funds documentation (the "Proof of Funds") along with (i) a request for certain due diligence materials within the Trustee's custody, possession, or control, and (ii) a request to discuss the pleadings then pending and discovery timelines (including the Trustee's Motion for Turnover).

24.     On July 29, 2024, only after prompting by VSI, did the Trustee acknowledge receipt of the Proof of Funds. In that same correspondence, the Trustee's counsel represented that the Trustee was exploring hearing dates in mid-September or early October for adjournment and consolidation of the pending motions and specifically noted that, "[o]n your notice of deposition, the Trustee is not available on August 9 and considering that we are adjourning the hearings, we will look at dates later in August and let you know his availability." *See* Exhibit 1 to the Declaration of John Thompson (the "Thompson Declaration"), attached hereto as **Exhibit A**. In light of the foregoing exchanges, the parties agreed to adjourn the pending motions and postpone the Trustee's deposition in order to negotiate in good faith.

25. On August 2, 2024, VSI's counsel sent Trustee's counsel an email indicating that VSI would be making a formal proposal and clarifying his prior (July 29, 2024) diligence request, limiting the request to two very simple and straightforward items regarding confirmation of Stream's IP assets and engineering. *See* Exhibit 2 to the Thompson Declaration.

26. Counsel to VSI did not receive an immediate response regarding the diligence requests and thus followed up multiple times by email and voicemail. After several additional follow-up emails, the parties agreed to a videoconference call to be held on August 7, 2024. Among other topics covered on that call, Trustee's counsel expressed the need for the Trustee to receive a concrete proposal in the form of a term sheet.

27. Counsel to VSI expressed the desire to conduct the Trustee's deposition within the last week to ten (10) days in the month of August, to which Trustee's counsel assented. *See* Exhibit 3 to Thompson Declaration. Following the meeting, VSI's counsel delivered more unanswered correspondence regarding the need for VSI to receive responses from the Trustee to its limited diligence request.

28. Finally, on August 12, 2024, Trustee's counsel stated that VSI's diligence requests were being looked into, and they requested a copy of VSI's non-disclosure agreement with the Trustee. Exhibit 3 to Thompson Declaration. VSI's counsel provided such document the very same day. Exhibit 4 to Thompson Declaration. Later that day, VSI sent over a binding term sheet via DocuSign for an all-cash offer of $115 million. *See* Exhibit 5 to the Thompson Declaration.

29. The next day, Trustee's counsel responded with hostility, stating "the Trustee isn't signing anything until he can digest the terms of this proposal, and determine if it presents something better than what is on the table. *So we are clear, we are not reviewing a Docusign document*." *See* Exhibit 6 to the Thompson Declaration (emphasis added).

9

30.     VSI's counsel responded, explaining that VSI was "working diligently to provide the Trustee with an actionable proposal that is unequivocally better than what is currently on the table from [the Hawk Parties] and time is of the essence," in addition to requesting availability for a call. *See* Exhibit 7 to the Thompson Declaration. Over the following days, VSI continued to follow-up with the Trustee, without any response. On August 14, 2024, VSI's counsel followed up with Trustee's counsel, asking why VSI's communications had been ignored and once again, asking for the Trustee's availability. *See* Exhibit 7 to the Thompson Declaration. A week later, on August 21, 2024, with still no response from the Trustee, VSI's counsel wrote again, formally requesting that the Trustee make himself available for deposition testimony before the end of month of August. *See* Exhibit 8 to the Thompson Declaration. On August 24, 2024, with yet still no response from the Trustee, VSI's counsel wrote again, attaching an amended examination notice and associated subpoena setting the Trustee's deposition for September 3, 2024 with documents to be produced by August 30, 2024. *See* Exhibit 9 to the Thompson Declaration. Later that day, VSI requested SSG's counsel's information to confer regarding discovery. *See* Exhibit 9 to the Thompson Declaration.

31.     Finally, a response was received, albeit an incomplete one; on August 26, 2024, the Trustee's counsel responded solely with regard to SSG, specifically that Trustee's counsel were in contact with SSG about VSI's objection and the need to conduct discovery. *See* Exhibit 10 to the Thompson Declaration. VSI's counsel responded, summarizing its outstanding requests, including production of documents relevant to the open motions practice and the timing of same and setting the Trustee's deposition in connection with that same motions practice (including with respect to retention of SSG). In addition, VSI requested the date for the hearing regarding the engagement of SSG as investment banker and the name of SSG's counsel. *See* Exhibit 10 to the Thompson

78262979;5

Declaration. The Trustee responded with hostility, showing no intention of cooperating on the diligence requests or responding to VSI's offer backed by the $170 Million Proof of Funds, stating "I am not responding to those other issues you raise, which have nothing to do with the SSG application, but are part of your and your client's efforts to delay and drive-up fees." *See* Exhibit 10 to the Thompson Declaration. That same day, VSI's counsel responded with suggested dates for depositions and production. *Id.*

32.     On August 26, 2024, the Trustee's counsel responded that they needed to meet with VSI regarding its offer and discovery. VSI's counsel responded immediately and said they would fly to Philadelphia to meet with the Trustee's counsel immediately. Nonetheless, three days later (the day before discovery was due), the Trustee decided not to pursue the Motion for Turnover (with its apparently manufactured documents in support) in an attempt to avoid any discovery whatsoever—and on August 29, 2024, the Trustee filed the *Motion of William A. Homony in his Capacity as Chapter 11 Trustee for Entry of an Order: (I) Granting Expedited Consideration, Shortened Time and Limited Notice; (II) Quashing Subpoena; (III) Entering a Protective Order; and (IV) Granting Related Relief* [ECF No. 724] (the "Motion to Quash"). The Trustee also filed the *Motion for Entry of an Order: (I) Granting Expedited Consideration, Shortened Time, and Limited Notice; and (II) for Authority to Withdraw the Trustee's Motion for Entry of an Order Enforcing the Automatic Stay and Compelling Turnover of Estate Property without Prejudice* [ECF No. 725] (the "Motion to Withdraw"). This Court denied the expedited request and set a hearing on the Motion to Quash and the Motion to Withdraw on September 18, 2024.

33.     In response, VSI filed its *Motion to Compel and Objections to the Motions to Quash and Withdraw* [ECF No. 728] (the "Motion to Compel").

**ii.     September 2024 Communications**

11

34.    In September of 2024, VSI informed the Trustee that it intended to submit a near-full payment plan of reorganization. Finally, the Trustee finally started communicating with VSI again and, by mid to late September, the Trustee provided the simple due diligence VSI originally requested nearly two months prior on August 2, 2024. On September 18, 2024, VSI agreed that it would withdraw its Objection to SSG to allow for two weeks of good faith negotiation with the Trustee, who agreed to delay the hearing on the Motion to Withdraw, Motion to Quash, and Motion for Turnover to November 7, 2024.

35.    The good faith negotiation promised by the Trustee never happened, and as soon as the two-week period elapsed, the Trustee immediately filed (*without* conferring with VSI as required by Local Bankruptcy Rule 7050-1), the Bidding Procedures Motion, seeking an expedited hearing to complete the sale by November 15, 2024.

36.    It certainly appears that the Trustee was never serious about his intent to negotiate with VSI since just mere days after getting VSI to delay the hearing on the Motion to Withdraw, Motion to Quash, and Motion for Turnover, and after getting VSI to withdraw its objection to the engagement of SSG in the spirit of cooperation to facilitate good faith negotiation, the Trustee sought to have a hearing on its Bidding Procedures Motion well before November 7, 2024.

37.    VSI filed an objection to the expedited relief sought in the Bidding Procedures Motion, noting the Trustee's behavior. The Court denied the Trustee's requested relief on October 4, 2024.

**C.    The Trustee's Bidding Procedures are Inherently Flawed**

38.    Beyond the legal infirmaries that will be discussed in Section III below, the Bidding Procedures are inherently flawed based exclusively on the facts of this case.

**i.    SeeCubic is an Inappropriate Stalking Horse Bidder, Especially Since the Trustee Retained SSG as the Debtors' Investment Advisor**

12

39.     The history of the Hawk Parties' interference with the Debtors' property is convoluted, complicated, and several years in the making. Nonetheless, some of the history is important; directly relevant to the current situation with the Bidding Procedures Motion in light of the Hawk Parties' repeated course of conduct in this case, and thus merits review. Below is a summary of that relevant history:[2]

a. On June 15, 2022, the Delaware Supreme Court issued a unanimous *en banc* decision *Stream TV Networks, Inc. v. SeeCubic, Inc.*, No. 360, 2021 (Del. June 15, 2022) (the "Supreme Court Decision") reversing and vacating the Chancery Court's November 10, 2021 order confirming the validity of what the parties in this case uniformly refer to as the "Omnibus Agreement." Pursuant to the Omnibus Agreement, the Hawk Parties seized control of Stream away from the controlling shareholders. The Delaware Supreme Court clearly and unequivocally (a) found that the conditions precedent to the Omnibus Agreement were never satisfied (rendering it *void ab initio* under Delaware law), (b) restored control of Stream to its shareholders, and (c) remanded the matter to the Chancery Court with instructions to complete further proceedings *consistent with* the Supreme Court's Decision. A copy of the Supreme Court Decision is attached as Exhibit B.

b. Despite the Supreme Court Decision, the Hawk Parties refused to return Stream's assets to Stream.

c. On July 14, 2022, the Delaware Chancery Court entered a letter ruling, attached as Exhibit C, ordering a telephonic hearing for July 20, 2022 (the "7/20/22 Hearing"). In the letter, the Court stated:

> It is also not clear to me why Seecubic would not agree to restore Stream's assets in light of the Delaware Supreme Court's decision, subject to any separate relief that Seecubic might seek here or in the foreclosure action. It is thus not clear to me that a mandatory injunction is necessary. It rather seems to me that the appropriate step is to enter a partial final judgment as to the declaratory relief that flows from the Delaware Supreme Court mandate. If Seecubic fails to respect the implications of the declaratory relief, then an application for mandatory injunctive relief would be a logical next step.

d. At the 7/20/22 Hearing, the Delaware Chancery Court made clear that the assets that SeeCubic retained should be returned to Stream notwithstanding SeeCubic's assertions of some rights to the assets. A copy of the 7/20/22 Delaware Chancery Court hearing transcript attached as Exhibit D.

---

[2] This timeline is taken mostly directly from VSI's Original Objection. Quotes from the Amended SSG Declaration are added in italics and underlined.

    o   "I think, technically, title to the assets never left Stream, and I think, at this point, equitable title to the assets has to be viewed as at Stream." (Tr. 26:20-27:4.)

    o   "…the reality is, based on the Delaware Supreme Court decision, SeeCubic, right now, shouldn't have the assets." (*Id*. at 28:11-13.)

    o   "I don't think that there's any basis for any type of relief that would leave these assets in SeeCubic's hands." (*Id*. at p. 28:15-29:8.)

    o   "I want the parties to try to move forward with some type of Rule 54(b) order that implements the Delaware Supreme Court's decision. I think that order needs to result in these assets being moved back to Stream." (*Id*. at 35:1-5.)

e.   Despite the Delaware Chancery Court's clear statements on the record at the 7/20/22 Hearing, SeeCubic sought to engage SSG as an investment banker to sell the very assets that the Delaware Chancery Court had ordered the Hawk Parties to return to Stream.

f.   On July 31, 2022, the Hawk Parties' counsel notified Stream's counsel that the Hawk Parties were hiring an investment banker to sell Stream's assets in an Article 9 foreclosure sale, notwithstanding the Chancery Court's orders to the contrary.

g.   Once again, in clear defiance of the Delaware Chancery Court's comments at the 7/20/22 hearing, SSG pressed on with the engagement.

h.   On August 9, 2022 and based upon Stream's emergency motion, the Delaware Chancery Court issued a temporary restraining order (the "8/9/22 TRO"), attached as <u>Exhibit E</u>, enjoining SeeCubic from selling Stream's assets: "Effective immediately and until further order from this Court, SeeCubic, Inc. ('<u>SeeCubic</u>'), ***including all those acting in concert with SeeCubic***,[3] is hereby ENJOINED from taking any action to sell Stream's Assets . . ." 8/9/22 TRO ¶ 2. (emphasis added).

i.   On September 28, 2022, after the Hawk Parties *again* refused to return Stream assets, the Delaware Chancery Court *again* emphasized that the assets must be returned:

> Hawk and SeeCubic have argued that SeeCubic holds some assets that are Disputed Assets, either because they are not Legacy Stream Assets, or because they are not easily segregated from Legacy Stream Assets. SeeCubic's claims on this point seem somewhat exaggerated. In any event, in light of the [Delaware Supreme Court] ***Mandate***, the more important consideration is to require SeeCubic to return Stream's assets expeditiously.

*In re Stream TV Networks, Inc. Omnibus Agreement Litig*., Memorandum Opinion, Case No. 2020-0766-JTL *(*Del. Ch. Sept. 28, 2022). (emphasis added), attached as <u>Exhibit F</u>.

---

[3] This certainly appears to VSI that this would include SSG.

j.  On September 30, 2022, the Delaware Chancery Court issued a mandatory injunction order (the "Mandatory Injunction Order", attached as Exhibit G.) requiring the Hawk Parties to return certain assets to Stream:[4]

    o  "SeeCubic shall return the Sample Displays to Stream with ten days." ¶ 2

    o  "SeeCubic shall return the Bonding Equipment to Stream within ten days." ¶ 3

k.  Following the Mandatory Injunction Order, the Hawk Parties transferred the shares of Technovative stock to Stream, returning ownership of all the subsidiaries to Stream. But simultaneously, the Hawk Parties issued a notice informing Stream that the Hawk Parties had (i) taken control of Technovative using their Proxy rights and (ii) appointed Stastney, Chairman and CEO of SeeCubic, as director of Technovative and all other Stream subsidiaries.

l.  On September 30, 2022, Stream was forced to file yet another motion seeking injunctive relief.

m.  On October 3, 2022 the Delaware Chancery Court issued an order finding Stastney and the Hawk Parties in contempt (the "Contempt Order" attached hereto as Exhibit H) and holding, among other things, the following:[5]

> This decision holds that SeeCubic and Hawk engaged in contemptuous conduct. Shad L. Stastney was the puppet master who pulled the strings. He controls SeeCubic and Technovative, and he also controls SLS Holdings VI, LLC ("SLS"), Stream's only secured creditor other than Hawk. Stastney caused SeeCubic to notify Hawk that the transfer was coming. To effectuate the transfer, Stastney gave instructions to SeeCubic's counsel to give instructions to himself (this time in his capacity as an officer and director of Technovative) to title the Shares in Stream's name. As planned, Hawk immediately asserted its rights to the Shares, at which point Stastney transferred title to the Shares into Hawk's name. Stastney and SLS benefitted, because SLS's rights as a secured creditor are senior to Hawk's. (*Id.* at 1-2.).

> SeeCubic and Hawk planned a series of coordinated acts in which SeeCubic would transfer the Shares to Stream in a manner that would enable Hawk to seize them by acting before Stream could respond. The Shares would end up in the hands of Hawk, just as SeeCubic and Hawk wanted." (*Id* at 6.)

> Rather than complying with the Transfer Obligation and the Post-Remand Injunction, SeeCubic, Hawk, and Stastney acted in concert to evade those

---

[4] *In re Stream TV Networks, Inc. Omnibus Agreement Litig.*, Order Regarding Motion for Mandatory Injunction, Case No. 2020-0766-JTL (Del. Ch. Sept. 28, 2022).
[5] *In re Stream TV Networks, Inc. Omnibus Agreement Litig.*, Opinion, Case No. 2020-0766-JTL (Del. Ch. Oct. 3, 2022).

obligations. For months, SeeCubic failed to comply [with] the Transfer Obligation. (*Id* at 13-14.)

40.     On January 4, 2024, this Court issued the Bankruptcy TRO, enjoining the Hawk Parties from using Stream's technology for ***any purpose***, including but not limited to raising money for the Hawk Parties' use. *See* ECF No. 119, Adv. Case No. 23-00057. This injunction has been extended several times, most recently through November 12, 2024. *See* ECF No. 150, Adv. Case No. 23-00057.

41.     Upon information and belief, despite all the hearings, admonishments, directives, and orders from the Delaware Supreme Court, the Delaware Chancery Court, and this Bankruptcy Court, the *Hawk Parties returned nothing of real significance (including without limitation, the bonding equipment, lenses, and technology demonstrators, and associated intellectual property) to the Debtors.*

42.     Added on top of all of the above conduct, the effective head of the Hawk Parties, Robert Morton, as the dubious honor of being an infamous recipient of a United Kingdom "Cold Shoulder" Order, attached as Exhibit I.  Upon information and belief, only 13 of such orders have ever been issued because of their severe nature.  Put simply, Robert Morton was prohibited from seeking investments and all parties were prohibited from working with him.  Indeed, Mr. Morton remained subject to the limitations under the Cold Shoulder Order through the commencement of these bankruptcy cases.

**ii.     The Trustee has Allowed the Hawk Parties to Violate the Bankruptcy TRO and has Produced Nothing to Show that the Debtors' Assets have been preserved or Returned from the Hawk Parties**

43.     On April 13, 2024, VSI's counsel sent an email to the Trustee's counsel, stating: "We were just told by reputable contacts from the Netherlands group that they have been making samples and getting them to SeeCubic at SeeCubic's request. We believe that this is in violation

16

of the Bankruptcy TRO and the licenses." The email further stated: "You should also know that the representatives of SeeCubic are calling Stream shareholders to try to get investment money and as previously stated, using the 3D technology in which they have no rights. … As aforestated, they should not be making samples, or making representations, or talking to companies about this 3D technology as if they own the rights. If true, and based upon what has been presented to us, we believe this is impairing the Estate to which you have a fiduciary duty to protect." *See* Exhibit J. VSI is unaware of any actions the Trustee took to investigate the allegation.

44.    On May 6, 2024, the Trustee and his counsel were advised that, upon information and belief, the Hawk Parties had conducted demonstrations of the Debtors' technology in London in violation of the Bankruptcy TRO and that the enjoined parties had scheduled additional violative demonstrations in Jersey, UK on May 7, 2024, the following day. *See* Exhibit K. The Trustee and his counsel failed to acknowledge the email or respond in any way. However, counsel for Hawk responded on May 9, 2024: "It is up to the Debtors to determine whether they believe a violation occurred or needs to be addressed. The Debtors have not taken any action or voiced any concerns." Rembrandt 3D Holding Ltd ("Rembrandt"), whose technology is specifically mentioned in the Bankruptcy TRO and who filed a memorandum in support of the Debtors' Bankruptcy TRO motion [ECF No. 44, Adv. Case No. 23-00057], sent an email to Hawk counsel on May 12, 2024, stating:

> You have certainly had ample time to deny that such a meeting occurred or that Stream and Rembrandt technology was shown. You have failed to provide or offer any form of declaration or statement denying the substantive issue. That silence certainly speaks volumes.
>
> You seem to suggest that the trustee authorized the meeting and use of Stream assets for the meeting. I am not aware of any power granted to the trustee that would allow him to revoke or modify the TRO to authorize any of the defendants to violate an order from the judge. Are you suggesting the trustee participated in the meeting or consented to use of Stream technology at the meeting?  Even if the trustee was able to allow use of Stream's property, I am sure that the trustee has no authority to

have granted permission to use Rembrandt technology outside the license. If Rembrandt's technology was utilized by the estate pursuant to the Rembrandt license then payment of the royalties should be made pursuant to Section 365(n)(2)(B).

45.    Approximately two weeks later, on May 30, 2024, VSI's counsel once again sent an email to the Trustee's counsel, informing them that the Hawk Parties had conducted and recorded a global Zoom meeting on May 28, 2024. The Trustee was encouraged to request a copy of the recording from SeeCubic to explore whether TRO violations had occurred. Based on information and belief, VSI counsel related certain meeting details to the Trustee:

- Stastney stated that there had been improvements in both the technology and the business. Per the TRO, he is not allowed to reference the technology at all.

- Stastney stated that SeeCubic had several running projects and specified two that were particularly exciting: one with Hyundai and one with Dell (for Dell, Stastney announced that they will be showing a human anatomy project at the Consumer Electronics Show in Las Vegas in January 2025). SeeCubic is actively utilizing Stream's technology to secure customers, another flagrant violation of the TRO.

- Stastney invited the Zoom meeting participants to invest in SeeCubic and offered 2 investment options to mitigate dilution. Representing the Ultra-D technology for fundraising purposes is one of the specifically restricted activities.

- Stastney invited the Zoom meeting participants to contact him and schedule an in-person meeting to see demonstrations of the latest technology samples. Displaying the Ultra-D technology is one of the specifically restricted activities.

- Stastney stated that SeeCubic expects new demonstrator units to be assembled by SeeCubic BV and distributed to potential customers for additional upcoming projects. Commissioning SeeCubic B.V. ("SCBV"), which is also enjoined, to create and distribute samples featuring the protected technology is simply unacceptable. The action damages the Debtors and all their stakeholders.

- Patric Theune, manager of SCBV, was on the call to support Stastney from a technology perspective even though Theune is listed personally as one of the enjoined parties.

VSI is unaware of any effort the Trustee made to obtain the Zoom recording or otherwise investigate these likely serious Bankruptcy TRO violations.

46.    The reason for the Trustee's unwillingness to investigate alleged Bankruptcy TRO violations became clear months later, in September 2024. When the Trustee failed to report first and second quarter 2024 sales data to Koninklijke Philips N.V. ("Philips") as required under the Philips technology license held by the Debtors' Curaçao subsidiary, triggering a default notice from Philips, contract employees to the Debtor pressed the Trustee for the information necessary to file the royalty reports as required. Despite the fact that this Court has continuously extended the Bankruptcy TRO, most recently until November 12, 2024 as noted above, the Trustee responded via email to Bud Robertson on September 10, 2024:

> "Bud, **the TRO is no longer in effect. I settled that issue**. During Q1 no displays were delivered. As a result, the reporting is empty. During Q2 two (2) 12.3-inch display demonstrators were delivered to a customer."

> *See* Exhibit_L (emphasis added)

With his email, the Trustee attached completed royalty reports for submission to Philips by the Debtors' contract employees via the Philips customer portal. In his email and attached royalty reports, the Trustee acknowledged that the enjoined parties had manufactured and sold products in violation of the Bankruptcy TRO. However, from the dismissive opening comment in his email to Robertson, the Trustee has done little or nothing to protect the estate or the third-party licenses of Philips and Rembrandt from infringement by the stalking horse and other enjoined parties.

47.    The ongoing violations by the Hawk Parties continue to damage the Debtor's estates and all parties in interest by (i) poaching investors from the Debtors for their own benefit, (ii) poaching customers from the Debtors for their own benefit, (iii) putting the irreplaceable Philips license at risk since the Debtor, not the Hawk Parties, is the Philips licensee, and (iv) creating additional exposure for damages claims by Rembrandt, who have recently filed a new claim against Technovative in this bankruptcy case.

48.     In addition to allowing or excusing the abovementioned Bankruptcy TRO violations, the Trustee has failed to secure the return of assets to the estates, whether it be the bonding equipment for use in product manufacturing, technology demonstrators for use in securing strategic partners and investors, or components overdue for customer delivery. The Trustee seems to have adopted a status quo attitude regarding the assets, leaving them scattered across the globe and in the illegal possession and control of the enjoined parties.

49.     Upon information and belief, the Trustee was given a presentation of the Debtors' own technology in March 2024 by Stastney, who demonstrated one of the latest samples made by the Debtors' Netherlands R&D engineers. Rather than confiscate the demonstrator sample as estate property since it contained the Debtors' proprietary technology, the Trustee allowed Stastney, a party specifically enjoined by the Bankruptcy TRO, to maintain possession of the unit for use in competition with the Debtors.

50.     There should be an immediate surrender of all Glasses-Free 3D demonstrators by the Hawk Parties to the Trustee on behalf of the Debtors, an action that should have occurred following the Delaware Supreme Court's 5-0 en banc decision of June 15, 2022. That decision found the Omnibus Agreement, which purported to transfer the Debtors' assets SeeCubic, to be invalid and ordered the decision granting SeeCubic ownership and possession of the Debtors' assets to be REVERSED and VACATED.

51.     The assets have never been returned to the Debtor or to the Trustee by the Hawk Parties and those working in concert with them. As a result, they have continued to represent the Debtors' technology for their own benefit, to the detriment of the Debtors, their estates, and other parties in interest.

**D.     The Solicitation and Due Diligence Materials Offered by the Trustee and SSG are Misleading and Woefully Inadequate**

52.    The Trustee has proposed a 363 Sale of the Debtors' assets to maximize recovery for all creditors. To achieve the best outcome in such a sale, the assets must be presented as transparently and completely as possible to secure meaningful bids. However, the solicitation document from SSG does not contain enough support for the value it purports to offer, while the data room omits key value that is likely to exist as well as liabilities that might have meaningful impact. The Trustee and SSG may hope that an "as-is, where-is" sale obviates the need for meaningful disclosure, but VSI believes they have an obligation to provide accurate, relevant documentation known to exist.

### i.    The SSG Solicitation "Teaser" Misled Potential Bidders

53.    In early October 2024, SSG distributed a one-page flyer to solicit interest from potential bidders in the proposed 363 Sale. The flyer stated, "[t]he technology **can be licensed** and embedded into partner hardware, enabling devices to display both native 2D content and immersive 3D content." *See* <u>Exhibit M</u> (emphasis added). The flyer fails to  mention the Philips or Rembrandt technologies, and the sub-licensing restrictions from both companies that would block a successful 363 Sale bidder from actually being able to license the technology for integration into partner hardware as promised. While this misstatement in the solicitation document *might* have been mitigated by disclosure in the data room, no such disclosure was made.

### ii.    The Data Room Prepared by the Trustee and SSG for Consideration and Due Diligence of Potential Bidders Lacks Meaningful Information

54.    If the data room is meant to show potential value in the Debtors' technology, it completely fails to do so. There are no customer contracts, communications, or purchase orders disclosed. There isn't even an overview describing "proof of concept" projects that are either in process or being considered by potential customers.

78262979;5

55.     As presented to this Court previously, Stream secured two purchase orders valued at more than $138 million from VSI in 2023 [ECF Nos. 114-2 and 114-3]. The validity of the VSI purchase orders was backed by purchase orders obtained by VSI from end customers: Cystar International Ltd. ("Cystar") and Southern Telecom, Inc. ("STI"). Both end customer purchase orders were also presented to the Court [ECF No. 642, Exhibits D and E] and were reconfirmed at the request of the Trustee shortly after his appointment in January 2024. Although VSI offered to arrange direct communication between the Trustee and the VSI end customers supporting the "back-to-back" purchase orders issued by VSI to Stream, the Trustee never availed himself of the opportunity to do so. Why wouldn't the Trustee, on behalf of the Debtors' estates, seek to establish personal contact with significant customers? To encourage maximum value of the estates, those purchase orders should be disclosed to potential bidders, and if the Trustee opts to disregard evidence that the purchase orders remain valid as claimed by VSI, the Trustee could and should provide his own disclaimer. Not revealing the existence of $138 million in potential revenue downplays the value of the estates and reduces bidder interest, likely leading to a lower bid for the assets than is warranted. The Trustee's solicitation should be aimed at maximizing value, not undervaluing the assets.

56.     VSI purchase orders aside, there is virtually no other documentation indicating any customer interest, despite clear evidence to the contrary. The single document specifying interest in the Debtors' technology is essentially a strategic partner agreement executed on February 28, 2024 by Stastney on behalf of SCBV. The agreement contemplates an arrangement whereby components featuring the Debtors' technology will be provided to a third party for manufacture and integration into products for sale. This agreement was entered into by two parties specifically enjoined by the Bankruptcy TRO from using the Debtors' technology: Stastney, personally, and

78262979;5

SCBV. As this agreement was executed after issuance of the Bankruptcy TRO and well before the 9019 Agreement was executed or approved by the Court, there can be no justification for the Trustee's knowledge and acceptance of this Bankruptcy TRO violative agreement.

57.     Bankruptcy TRO violations aside, there are no other documents reflecting actual customer interest or activity, evidence of which would be critical for asset valuation purposes by potential bidders and which are clearly known to the Trustee. Most obvious of these is the customer relationship with Hyundai Mobis ("Hyundai"). When questioned in Court on October 6, 2023 about contracts that SCBV had executed with customers, Stastney testified that there were two. "One is Hyundai. That's already been made publicly available." *See* Exhibit N, 10/6/23 Hearing Transcript at p.178:6-7. The data room does not mention Hyundai, even though Stastney confirmed that an executed agreement exists, and the Trustee filed a royalty report with Philips on September 10, 2024 declaring that two units of "12.3[inch] Instrument Cluster Display demonstrator" had been sold to a customer. Instrument clusters are a strictly automotive component, perfectly suited to satisfy a customer like Hyundai.

58.     When questioned about customer projects, Stastney testified, as director of SCBV, the Debtors' R&D subsidiary, that "SCBV currently has three projects." *See* 10/6/23 Hearing Transcript at p.93:21. If Hyundai is assumed to be one of those projects, there are two other projects using the Debtors' technology for the benefit of customers, neither of which is disclosed in the data room.

59.     It has been more than a year since Stastney confirmed those projects in Court. Upon information and belief, many more projects have begun since then. In a September 23, 2024 email from Stastney to various stakeholders (including shareholders of Stream, SeeCubic, and VSI), Stastney confirmed "we have successfully delivered the Hyundai Mobis 'concept car' screens"

and further boasted "we have a pipeline of 28 projects across 25 customers, all of whom are moving through some stage of the [proof of concept] intake process." If the pipeline has expanded from three customers to twenty-five customers, where is the evidence of that value to the Debtors' estates for consideration by potential bidders? Either Stastney has failed to disclose project development to the Trustee, or the Trustee has failed to monitor or even inquire about the status of customer development for the benefit of the estates. VSI is concerned that those relationships were developed in defiance of the Bankruptcy TRO and are being kept as secret value for the stalking horse only, as SeeCubic will be the only one to benefit from customers not disclosed to potential bidders.

60.    Besides failing to include significant actual and potential customer information in the data room, SSG fails to mention – let alone include any meaningful documentation regarding – the third-party technology licenses from Philips and Rembrandt.

61.    Stream entered into a license agreement with Philips on December 8, 2011, and an amendment on December 8, 2014. See Exhibit P. These agreements specify the conditions under which the Philips intellectual property was licensed to the Debtors, restricted how it could be used, and the royalty reporting and payment requirements related thereto. As the Philips technology constitutes the foundation upon which the Debtors' technology was founded, the Philips license has material impact on the value of the estates. The Trustee and SSG have not provided the Philips license for potential bidder review, nor have they disclosed that the license exists, nor even that the Philips foundational technology is a factor for consideration.

62.    The data room is also completely silent on the issue of intellectual property claims by Rembrandt. While the Trustee (and therefore SSG as his agent) may dispute the Rembrandt claims, there is nonetheless a fully executed pre-petition settlement agreement dated May 23, 2021

between Stream and Rembrandt which grants Stream the **non-transferable right** to incorporate Rembrandt technology into the Debtors' technology (the "Rembrandt Settlement"), attached as Exhibit P. The terms of the 2021 Rembrandt Settlement were initially negotiated as a settlement term sheet in 2019 by Stastney, Chairman and CEO of the stalking horse, who at the time was an officer and director of Stream. The stalking horse, VSI, and the Trustee are all aware of the Rembrandt Settlement (and a subsequent Amendment dated August 12, 2023), but the data room does not include those executed agreements, nor is there any mention at all of Rembrandt and its claims. Worse still, there is no documentation or disclosure that Rembrandt filed suit against Debtor Technovative, stalking horse SeeCubic, and Stream creditor Hawk in the U.S. District Court for the District of Delaware, seeking injunctive relief for misappropriation of trade secrets[6]. *See* Exhibit Q.

63.    Additionally, there is a general lack of disclosure overall with regard to legal filings that might have relevance to potential bidders. Indeed, there is only a single document of this type in the data room: this Court's memorandum granting the Hawk Parties' request for appointment of a chapter 11 trustee [ECF No. 548]. There is no mention of the Bankruptcy TRO enjoining the stalking horse, no mention of the 9019 Agreement, and no mention of any non-bankruptcy litigation that might impact a successful bidder's use of estate assets after consummation of the 363 Sale. While these omissions may not be dispositive, they refute any notion of transparency and cause further suspicion about the Trustee's intent and ability to conduct a fair and open sale process for the benefit of creditors other than the stalking horse.

64.    Finally, other than 17 detailed job descriptions for personnel at the Debtors' R&D entity in the Netherlands, there is virtually no disclosure regarding the operational needs of this

---

[6] C.A. No. 1:23-cv-00193-GBW

critical subsidiary which would be acquired through the 363 Sale process. A spreadsheet purporting to inform bidders of the "number of employees" contains only 2 entries for total number of people and full-time engineers, without any insight into the financial requirements to support them. The operations spreadsheet includes only 13 lines of data for key expenses and ignores any expense less than Ten Thousand Euros. What are the actual expenses required to operate SCBV as a technology center after acquisition? It's impossible to tell from the available data, and only the stalking horse knows through its appointment of Stastney as director there. The effort at transparency is mere "lip service" at best and offers potential bidders no meaningful data to evaluate.

65.      Given the absence of known customer contracts and other information related to ongoing customer projects confirmed by Stastney as director of the Debtors' R&D subsidiary, given the lack of disclosure of liabilities related to third-party IP, given the lack of financial information related to operating and managing the Debtors' technology center following acquisition of estate assets, and given the Trustee's apparent unwillingness to explore and prosecute Bankruptcy TRO violations by the stalking horse, it appears there has not been a bona fide, good faith effort by the Trustee and SSG to prepare the assets for sale or market them adequately. Without appropriate effort to satisfy a potential bidder's due diligence, no meaningful sale can occur, damaging every creditor but the stalking horse.

### III.    ARGUMENT

**A.    The Trustee may not sell the Debtors' property unless that property constitutes property of the Debtors' estates and, before approving a sale, the Court must first determine whether such property constitutes property of the estates.**

66.      It is widely accepted, in addition to being firmly intuitive, that the Bankruptcy Code does not expand a debtor's interests in property beyond what such interests were at the petition date. *Jones v. GE Capital Mortgage Co. (In re Jones)*, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995)

78262979;5

("[T]he owner of an insurance policy cannot obtain greater rights to the proceeds of that policy

than he would have under state law by merely filing a bankruptcy petition") (*citing First Fid. Bank

v. McAteer*, 985 F.2d 114, 117 (3d Cir. 1993)); *See also Moody v. Amoco Oil Co.*, 734 F.2d 1200,

1213 (7th Cir. 1984) ("[W]hatever rights a debtor has in property at the commencement of the case

continue in bankruptcy -- no more, no less."), cert denied, 469 U.S. 982 (1984); *Mission Prod.

Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663, 203 L. Ed. 2d 876 (2019) (recognizing

the "general bankruptcy rule [that] the estate cannot possess anything more than the debtor itself

did outside bankruptcy" and that "[a] debtor's property does not shrink by happenstance of

bankruptcy, but it does not expand, either.").

67.    A debtor (or in this case, the Trustee), may not sell property unless that property

constitutes property of the debtor's bankruptcy estate and, before approving a sale, the bankruptcy

court must determine whether the property the debtor proposes to sell constitutes property of the

estate. *In re Whitehall Jewelers Holdings, Inc.*, Case No. 08-11261 (KG), 2008 WL 2951974, at

*9 (Bankr. D. Del. July 28, 2008) (citing *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 172 (9th Cir.

B.A.P. 2001)). Bankruptcy courts have consistently made this finding. *See also Anderson v.

Conine (In re Robertson)*, 203 F.3d 855 (5th Cir. 2000) (holding that Section 363(f) does not allow

a trustee to sell property that is not property of the estate); *In re Worcester Country Club Acres,

LLC*, 655 B.R. 41, 47 (Bankr. D. Mass. 2023) (holding that because the ownership of the land was

disputed, it "must be adjudicated in order to determine if they are property of the Debtor's

bankruptcy estate, they cannot be sold under § 363(b) or (c) and pursuant to § 363(f)(4) prior to a

resolution of those issues."); *In re Coburn*, 250 B.R. 401, 403 (Bankr. M.D. Fla. 1999) (it was

necessary to determine whether an asset was property of the estate in order to then decide whether

the trustee was entitled to sell the asset pursuant to Section 363(f))); *Darby v. Zimmerman (In re*

27

*Popp)*, 323 B.R. 260, 266 (B.A.P. 9th Cir.2005); *Fresh Prepared Foods, Inc. v. Farm Ridge Foods LLC*, 2013 WL 4804816, at *3 (D.N.J. Sept. 9, 2013) ("it is well-settled that a 'bankruptcy court may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property"). A sale under Section 363 "cannot be had when there is an unresolved issue of whether the subject property is 'property of the estate' . . . ." *In re Interiors of Yesterday, LLC*, Case No. 02-30356 (LMW) , 2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007). *See also Warnick v. Yassian (In re Rodeo Canon Dev. Corp.)*, 362 F.3d 603, 605–06 (9th Cir. 2004), withdrawn and modified by 126 Fed. App'x 353 (9th Cir. 2005) (this Court "may not allow the sale of property as 'property of the estate' without first determining whether the debtor in fact owned the property."); *Ross v. A V Car & Home, LLC (In re Brown)*, Case No. 16-00466, A.P. No. 18-10026, 2019 Bankr. LEXIS 286, 2019 WL 413625, at *3 (Bankr. D.C. Jan. 30, 2019) (court may not authorize sale of property where ownership of a portion of the property is in dispute).

68.     It is the trustee who bears the burden of establishing that the property to be sold is property of the estate under Section 363(b). *See, e.g., In re Whitehall Jewelers Holdings, Inc.*, 2008 WL 2951974, at *17 (Bankr. D. Del. July 28, 2008) (holding that the debtors failed to meet their burden of establishing that the assets were property of the estate, and therefore were not permitted to sell the goods under Section 363(f)(4)). Here, the Trustee clearly has not met that burden. In fact, it is evident that, as described herein, the trustee is attempting to sell the assets on an "as-is, where-is" basis, without understanding (i) where a significant portion of the Debtors' assets are located, (ii) which of the Debtors' trade secrets the Hawk Parties have used, (iii) if the Hawk Parties will turn over the Debtors' property to a successful bidder other than the stalking horse, and (iv) if the Hawk Parties will stop using the trade secrets once a sale to a third-party has been completed.

28

78262979;5

**B.      The 9019 Agreement and Bidding Procedures Motion taken together constitute an improper *sub rosa* plan of reorganization that cannot be approved by this Court.**

69.      Separate and apart from the many infirmities in the Bidding Procedures themselves, which are discussed below, the Bidding Procedures Motion should be denied because it seeks approval of a sale that cannot be approved under the Bankruptcy Code. In short, the Court should not permit a patently illegal sales process to go forward. Among other things, the sale process proposed by the Trustee constitutes an impermissible *sub rosa* plan of reorganization that strips the Debtors' creditors of the protections of the Bankruptcy Code and improperly attempts to extinguish their rights without their consent. It is well known that a bankruptcy court has the authority to approve a compromise or settlement of a claim after notice to the debtor, trustee, and creditors and a hearing on the compromise. Fed. R. Bankr. P. 9019(a). It is also accepted knowledge that under 11 U.S.C.S. § 363(b), a debtor may use estate property outside the ordinary course of business, upon notice and a hearing, to settle claims with the approval of the bankruptcy court.

70.      However, when a sale process and/or settlement in bankruptcy has the ultimate effect of dictating the terms of any future reorganization plan, the bankruptcy court must deem the transaction impermissible because it short circuits the requirements of Chapter 11 by establishing the terms of the plan *sub rosa* in connection with a sale of assets. "The hallmark of such a plan is that it dictates the terms of a reorganization plan." E*nergy Future Holdings Corp. v. Del. Tr. Co*., 648 F. App'x 277 (3d Cir. 2016). This is because it "short circuits" the requirements of Chapter 11 by establishing the terms of the plan *sub rosa* in connection with a sale of assets. *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983).

71.      Thus, *sub rosa* plans are prohibited because they violate the requirements of the Chapter 11 process. *Motorola Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan*

*Chase (In re Iridium Operating LLC),* 478 F.3d 452, 466 (2d Cir. 2007); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 887 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted."). Where a settlement circumvents creditors' rights to vote on key provisions, that settlement can be said to dictate the terms of a plan. *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 355 (5th Cir. 1997).

72.     This is precisely the circumstance of this case. The terms of the proposed sale process, as outlined in the 9019 Agreement and in the Bidding Procedures Motion, clearly constitute a *sub rosa* plan of reorganization. Among other things, the sale seeks to improperly channel consideration to specific creditor groups – as discussed herein, the Trustee has selected the Hawk Parties as the stalking horse and agreed to give them an allowed secured claim of $180 million, $150 million of which may be used as a credit bid. This is blatantly at the expense of the Debtors' other creditors – pursuant to the 9019 Agreement, $7,500,000 would be carved out to pay administrative and general unsecured creditors. Notably, if a bid is accepted over the stalking horse bid, only 10% of that overbid goes to administrative or unsecured creditors until Hawk's $180 million claim is paid in full. As such, it essentially ensures that the Debtors' unsecured creditors, and perhaps even administrative expense claimants, receive pennies on the dollar. Such a restructuring of creditors' rights and diversion of value is impermissible in the context of a 363 sale. *See PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets.").

78262979;5

73.    Further, the Debtors impermissibly seek to use the 363 Sale to bind the Debtors'

creditors to a treatment of their claims without having that proposed treatment tested by the

standards of the Bankruptcy Code. Such a proposed sale cannot proceed. See, e.g., *In re Westpoint*

*Stevens Inc.,* 333 B.R. 30, 52 (S.D.N.Y. 2005) ("Where it is clear that the terms of a section 363(b)

sale would preempt or dictate the terms of a Chapter 11 plan, the proposed sale is beyond the scope

of section 363(b) and should not be approved[.]"); *Institutional Creditors of Cont'l Air Lines, Inc.*

*v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.),* 780 F.2d 1223, 1226-28 (5th Cir. 1986)

(same).

74.    Quite simply, a 363 sale is not a substitute for a plan of reorganization. *See*

*Westpoint Stevens Inc*., 333 B.R. at 52 (noting when a proposed transaction specifies terms for a

reorganization plan, the parties and the court "must scale the hurdles erected in Chapter 11")

(citation omitted); *see also In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (The

"trustee is prohibited from such use, sale or lease if it would amount to a *sub rosa* plan of

reorganization."); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986) (finding that

section 363 does not permit a debtor to abrogate the protections afforded creditors by section 1129

and the plan confirmation process).

75.    The Debtors bear the burden to prove that the proposed sale is fair, equitable, in the

interest of the estates, and not unfair to the creditors. The proposed sale fails each of these

requirements.

**C.    The Bidding Procedures are Neither Fair nor Reasonable and are Fatally Flawed in
Numerous Ways Such that the Court Should Not Approve Them.**

76.    Beyond the simple fact that the Bidding Procedures Motion is part of an improper

*sub rosa* plan of reorganization that cannot be approved, the Bidding Procedures themselves are

inherently impermissible for a number of reasons, chief among them that they are not fair nor

reasonable. One of the primary purposes of the Bankruptcy Code is to maximize the value of the bankruptcy estate for the benefit of creditors. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003). To further this purpose, sale procedures must seek to "facilitate an open and fair public sale designed to maximize value for the estate." *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-66 (8th Cir. 1997) (bankruptcy courts are given discretion and latitude in order to facilitate a fair and open public sale focused on maximizing value); *see also In re Williamson*, 327 B.R. 578, 581 (Bankr. E.D. Va. 2005) ("This is accomplished, in part, by assuring that the marketing is full, fair and complete and that all prospective purchasers have a fair opportunity to participate in the process.")

77.    In this regard, the Court must assess the fairness and reasonableness of the proposed bidding procedures. *See In re American Safety Razor Co., LLC*, Case No. 10-12351 (MFW) (Bankr. D. Del. Sept. 30, 2010) Tr. at 132-33 ("I don't think . . . that my consideration of bid procedures is based on the business judgment rule . . . The Bankruptcy Code and Rules and the process under the Bankruptcy Code are all that matters . . . for the Court's determination as to what is fair and reasonable. In fact, I think that's my only role in this case; to determine what is fair for all the parties.")

**D.    The Proposed Sale Process is Neither Fair nor Reasonable and is Subject to a Heightened Scrutiny Standard.**

78.    There is nothing fair about the proposed "process" sought to be approved by the Bidding Procedures Motion. In fact, the process (if it even can be called that) succeeds in handing the Debtors' most valuable assets to SeeCubic, an insider with a long history of improperly

possessing and controlling the Debtors' property, as Stalking Horse Bidder pursuant to an improper credit bid.

79.    And make no mistake, SeeCubic is certainly an insider with respect to the Debtors. Indeed, SeeCubic has exerted an inordinate amount of control over the Debtors' assets and sale process, and has time and time again violated the automatic stay and the Bankruptcy TRO in place.Control of SeeCubic rests with Stastney, who was both Vice Chairman of the Board of Directors and Chief Financial Officer of Debtor Stream shortly before he orchestrated an asset takeover with the Hawk Parties through the invalidated Omnibus Agreement. Stastney had access to the Debtors' financials, sensitive customer information, investor database, and other critical data. He siphoned key personnel from the Debtors and ultimately used the Dutch court system to install himself as director of the Debtors' R&D subsidiary, a position he uses today to exert control over the Debtors' engineering development activities.

80.    Transactions involving insiders are subject to a heightened level of scrutiny. *See Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) (holding that "[t]he sale process will be under the close scrutiny of the Court as required where the stalking horse is an insider"); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997), aff'd, 160 F.3d 982 (3d Cir. 1998) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein."); *In re Bidermann Indus. U.S.A.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (sales to insiders "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse") (internal quotations omitted); *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS

896, 26-29 (Bankr. D.N.J. Mar. 26, 2008) (recognizing "the heightened scrutiny required for insider transactions"); *In re Univ. Heights Ass'n*, 2007 Bankr. LEXIS 1200, at *13 (Bankr. N.D.N.Y. Jan. 22, 2007) ("[B]ecause we are dealing with potential insiders . . . the proposed sale is subject to heightened scrutiny.").

81.    This heightened scrutiny also applies to a sale proposed by a trustee, rather than a debtor in possession. *In re Blixseth*, No. 09-60452, 2010 Bankr. LEXIS 585 (Bankr. D. Mont. Feb. 23, 2010). In *Blixseth*, the court refused to approve a sale of property as proposed by the trustee to a secured creditor credit-bid. The court found that the creditor had "very close ties to the debtor" and refused to apply the standard applicable to non-insider sales or to give deference to the trustee's business judgment. Instead, the court applied the more rigorous *Bidermann* standard for evaluating insider transactions. As such, the court denied the  bidding procedures proposed by the trustee. In applying heightened scrutiny, courts are concerned with "the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

82.    This transaction would not withstand heightened scrutiny. As in *Bidermann*, SeeCubic and the Hawk Parties clearly have "very close ties" to the Trustee. As detailed herein and in the SSG Objection, the Hawk Parties have a long history of improperly possessing the Debtors' property. Indeed, to this day, the Hawk Parties are using and possessing the Debtors' property contrary to this Court's orders, specifically including the TRO that remains in effect through November 12, 2024.

**E.    The Proposed Sale Timeline is Not Adequately Supported.**

83.    The Trustee seeks approval of an accelerated sale process: a November 15, 2024 bid deadline, with a sale hearing to occur on November 22, 2024. Said differently, this means that

34

any potential bidder would need to enter into a confidentiality agreement, perform diligence, draft an asset purchase agreement, and designate assigned contracts and leases as well as assumed liabilities, all within 46 days of the filing of the Motion. *See Bidding Procedures Motion* ⁋ 49(a)-(j). This seems onerous on its face and is made even more difficult to accomplish in the context of a "bid irrevocable" and "as-is, where-is" sale. This is simply untenable and results in a situation where third-party potential bidders are left with no time to seek, obtain, or review due diligence materials, let alone submit a bid. All parties will agree that the nature of the Debtors' businesses is complicated. The consequence of compressed timing is that only a bidder with an extensive working knowledge of the relevant information regarding the Debtors and their businesses, ongoing litigation, restructuring, capitalization, transactions and governance, could have adequate time to formulate a remotely reasoned bid for the assets.

84.    Additionally, the Trustee's marketing process does not appear to have been sufficiently robust enough to justify the proposed compressed sale timeline. As described herein and in the SSG Objection, the Trustee filed the SSG Application on August 14, 2024. The Bidding Procedures Motion contains very little information about the extent of the marketing process conducted by SSG thus far; it contains no information about the number of parties who have entered into confidentiality agreements or the number of parties that have submitted indications of interest. The Bidding Procedures Motion simply says "Since its retention, SSG has begun marketing the Debtors' Assets for sale to potential purchasers in order to solicit the highest and best bid to maximize the value to the Debtors' estates. SSG will continue to actively market the Assets, to a wide spectrum of interested parties, including potential financial and strategic buyers." *Bidding Procedures Motion* ⁋ 31-32. In fact, the Bidding Procedures Motion itself acknowledged

that, as of the date of its filing, no electronic data room had yet been set up. *Bidding Procedures Motion* ⁋ 33. This is all but an admission that no serious marketing process has been underway.

85.    The Bidding Procedures Motion does not provide adequate support for the proposed timeline. Rather, it simply asserts that the short timeline is needed. The proposed break-neck pace sought by the Debtors would achieve nothing other than delivering the Debtors' assets to Hawk for grossly inadequate consideration. There is simply no legitimate justification for the process proposed here.

**F.    Credit Bid Rights Should Not Be Approved.**

86.    Whether cause exists to allow for a credit bid under 11 U.S.C. 363(k) is a determination to be made on a case-by-case basis. *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006) (limiting credit bid rights "for cause" is a flexible concept to be considered on a case-by-case basis); See *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, at n.14 (3d Cir. 2010) ("A court may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment.")

87.    As a more general matter, courts have held that the desire to foster a competitive bidding environment might constitute cause sufficient to limit credit bidding rights. *See In re Fisker Automotive Holdings., Inc.*, 510 B.R. 55 (Bankr. D. Del. 2014) (stopping a right to credit bid where "to do otherwise would freeze bidding."); *In re Free Lance-Star Publishing Co.*, 512 B.R. 798 (Bankr. E.D. Va. 2014) (eliminating the secured creditor's right to credit bid where the creditor had engaged in inequitable conduct, and "limiting the amount of the credit bid in this case will restore enthusiasm for the sale and foster a robust bidding process.")

88.    Further, courts have also denied credit bids for cause where there is inequitable conduct harming the debtor or its estate. *See In re Aloha Airlines, Inc.*, 2009 WL 1371950 (Bankr.

D. Hawaii 2009) (denying right to credit bid where creditor had engaged in inequitable conduct harming the debtor); *In re The Free-Lance Star Publishing Co.*, 2014 WL 2505627 at *7 (Bankr. E.D. Va. 2014) (denying secured lender the right to credit bid because it leveraged its position as a secured lender to acquire additional collateral prior to the bankruptcy filing for the purpose of purchasing assets with credit in a bankruptcy case); *and In re Theroux*, 169 B.R. 498 (Bankr. D.R.I. 1994) (denying credit bid where the sale price grossly undervalued the assets). Nothing is more applicable and on-the-nose than this line of cases.

89.    Courts have found cause to deny credit bidding when a sufficient dispute exists regarding the validity of the claim forming the basis for the credit bid. *In re Fisker Automotive Holdings, Inc.*, 510 B.R. at 61 ("The law leaves no doubt that the holder of a lien the validity of which has not been determined, as here, may not bid its lien."); *In re Daufuskie Island Properties, LLC*, 441 B.R. 60, 63-64 (Bankr. D.S.C. 2010) (denying secured creditor the right to credit bid because its mortgage and claim were subject to dispute).

90.    As such, no credit bidding should be permitted absent further order of the Court. The Insider Stalking Horse should not be permitted to credit bid given the facts and circumstances of this case. This is wholly inequitable to the legitimate creditors and constitutes "cause" to deny credit bidding rights.

## G.    There Should Be No Finding of Good Faith as to the Insider Stalking Horse Bidder.

91.    Section 363(m) articulates the "good faith" requirement of a Section 363 asset sale. *Abbotts Dairies*, 788 F.2d at 149–50. A court may not find good faith if fraud, collusion or unfair advantages are determined. *Id.* at 147. A good faith purchaser under the Bankruptcy Code is one who purchases assets for value, in good faith, and without notice of adverse claims. *Abbotts Dairies*, 788 F.2d at 147. In determining whether an asset purchaser is entitled to such protections, courts examine "the integrity of his conduct in the course of the sale proceedings." *Abbotts Dairies*,

788 F.2d at 148. In assessing the good faith of a purchaser, courts have considered factors such as: (1) whether the sale was negotiated at arm's length; (2) whether any officer or director of the debtor holds any interest in or is otherwise related to the potential purchaser; and (3) whether fraud or collusion exists among the prospective purchaser, any other bidders or the trustee. See Abbotts Dairies, 788 F.2d at 147-48.  Ironically, the Bidding Procedures Motion relies heavily on *Abbott Dairies* and cites the types of misconduct that would destroy a purchaser's good faith status. *Bidding Procedures Motion* ₱ 64. SeeCubic and the Hawk Parties would fail this test at every level: (1) the sale was not negotiated at arm's length, made particularly evident by SGG's historical relationship with Hawk; (2) Stastney, as chief executive of the SeeCubic as the Stalking Horse Bidder is also the sole director of the Debtors' R&D subsidiary; and (3) as discussed throughout this Objection, there has been collusion between the Trustee and the proposed Stalking Horse Bidder throughout this process.

92.     For the reasons already discussed herein, any acquisition of the Debtors' assets by SeeCubic and Hawk is not in good faith and should not be afforded the protections of section 363(m) of the Bankruptcy Code.

**H.     There Should Be No Waiver of Bankruptcy Rules 6004(h) and 6006(d).**

93.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before an order can be implemented. *Fed R. Bankr. P. 6004(d) advisory committee's note*. The stay pursuant to Bankruptcy Rule 6004(h) may be waived to allow a sale to close immediately "where there has been no objection to the procedure." Collier on Bankruptcy ¶ 6004.11 (16th ed. 2016). Courts may waive the stays under rules 6004 and 6006 upon an "evidentiary showing of a business exigency requiring a closing within 10 days of an approval order." *In re PSINet, Inc.*, 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001).

78262979;5

94.     Here, the Trustee has not made a showing of any business exigency constituting cause to waive the fourteen-day stay period. To the contrary, waiving such period could seriously prejudice the Debtors' other creditors, as it could allow this sale to proceed prior to any remotely reasonable investigation of the assets being sold. Since no exigency exists, the fourteen-day stays under Rules 6004(h) and 6006(d) should not be waived.

### IV.    RESERVATION OF RIGHTS

95.     VSI reserves the right to supplement this Objection or to raise additional or further objections to the Bidding Procedures Motion, the order and/or exhibits thereto, including any form term sheets or asset purchase agreements, at or prior to the hearing on the Bidding Procedures Motion, Sale Hearing, or any other relevant hearing.

### V.    CONCLUSION

WHEREFORE, for the reasons stated above, VSI respectfully requests that the Court deny the Bidding Procedures Motion as submitted and grant such other and further relief as this Court deems just and proper.


Dated November 6, 2024                    Respectfully submitted,

                                          AKERMAN LLP

                                          */s/ R. Adam Swick*
                                          Donald N. David, SBN: 304846
                                          Mark Lichtenstein *(pro hac vice to be filed)*
                                          1251 Avenue of the Americas
                                          37th Floor
                                          New York, NY 10020
                                          Telephone: (212) 880-3800
                                          Facsimile: (212) 880-8965
                                          Email: donald.david@akerman.com
                                                 mark.lichtenstein@akerman.com

                                          -and-

R. Adam Swick (*pro hac vice*)
AKERMAN LLP
500 West 5th Street, Suite 1210
Austin, TX 78701
Telephone: (737) 999-7103
Facsimile:   (512) 623-6701
Email: adam.swick@akerman.com

-and-

John H. Thompson *(pro hac vice)*
AKERMAN LLP
750 Ninth Street, N.W. 750
Washington, D.C. 20001
Telephone: (202) 824-1760
Facsimile:   (202) 393-5959
Email: john.thompson@akerman.com

-and-

Leif M. Clark
Leif M Clark Consulting PLLC
1105 Bonner
Houston, TX 77007
Telephone: (210) 663-5183
Email: lmclark@leifmclark.com

*Attorneys for Visual Semiconductor, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the United States Bankruptcy Court for the Eastern District of Pennsylvania on November 6, 2024 with notice sent electronically to all parties receiving electronic notices in this case pursuant to local rules of this Court, and that no further notice or service is necessary.


_/s/ John Thompson_
John Thompson

78262979;5