# THE TAKEOVER PANEL

## HEARINGS COMMITTEE

**ARTHUR LEONARD ROBERT MORTON ("MR MORTON")**

**AND**

**JOHN BENJAMIN GARNER ("MR GARNER")**

**RULING OF THE HEARINGS COMMITTEE ("THE COMMITTEE")**

Introduction

1.  These proceedings were initiated by the Executive of the Takeover Panel ("the Executive") against Mr Morton and Mr Garner for breach of section 9(a) of the Introduction to The City Code on Takeovers and Mergers ("the Code"). The preamble to section 9 of the Introduction to the Code says that the section "sets out the rules according to which persons dealing with the Panel must provide information and assistance to the Panel". Section 9(a) then provides as follows:

    > "The Panel expects any person dealing with it to do so in an open and co-operative way. It also expects prompt co-operation and assistance from persons dealing with it and those to whom enquiries and other requests are directed. In dealing with the Panel, a person must disclose to the Panel any information known to them and relevant to the matter being considered by the Panel (and correct or update that information if it changes). A person dealing with the Panel or to whom enquiries or requests are directed must take all reasonable care not to provide incorrect, incomplete or misleading information to the Panel…".

2.  The Executive's case against Messrs Morton and Garner is that they systematically provided to the Executive information which they knew to be false in the course of an investigation by the Executive into a potential breach by Mr Morton of an obligation to announce a mandatory offer under Rule 9 of the Code. According to the Executive, the false information provided to it by Messrs Morton and Garner was intended to deceive the Executive into believing that a purchase of shares in Hubco

**EXHIBIT I**

Investments plc ("Hubco") by a company owned by the trustees of a Morton family trust had actually been made on behalf of Mr Garner as beneficiary pursuant to a prior agreement between Mr Morton and Mr Garner under which Mr Garner undertook to pay for the shares as and when he came into the funds to do so. According to the Executive, Messrs Morton and Garner invented the agreement in order to avert a perceived risk that the purchase had had the effect of increasing to more than 30% of Hubco's issued share capital the holdings of companies either owned by trustees of Morton family trusts or by Mr and Mrs Morton directly, thereby exposing Mr Morton to an obligation to extend an offer under Rule 9 of the Code to the other Hubco shareholders.

3.     The Executive submitted to the Committee that the attempted deception of the Executive in the course of its investigation was so serious and so prolonged as to merit "cold-shouldering" of Messrs Morton and Garner for periods of six years and four years respectively.

4.     Messrs Morton and Garner denied any intention to provide incorrect or false information to the Executive. They admitted that certain information which they provided to the Executive in the course of its investigation was incorrect. They accepted in particular that a promissory note, which they told the Executive had been signed and dated by Mr Garner at the time of the alleged agreement in order to acknowledge his debt, had in fact been created some 20 months later and only after Mr Morton had been made aware of the possible adverse implications of the purchase of the Hubco shares. However, both Mr Morton and Mr Garner denied that they had knowingly provided false information regarding the date and provenance of the promissory note. Messrs Morton and Garner also continued to maintain that they had indeed reached an agreement shortly before the purchase of the Hubco shares to the effect that the shares would be purchased for Mr Garner as beneficiary and held on his behalf by the purchasing company as nominee until such time as Mr Garner came into funds to pay for them and they could be transferred into his name.

The hearing before the Committee

5.     The members of the Committee listed in the Appendix hereto heard this matter on 14 December 2016. The Executive was represented by Messrs Slaughter and May

who instructed Mr Edmund Nourse QC of counsel. Mr Morton was represented by Messrs Corker Binning who instructed Mr Christopher Coltart QC of counsel and Mr Garner was represented by Messrs Hickman and Rose who instructed Mr Jason Mansell of counsel. In response to enquiries before the hearing from the Secretary to the Committee, it became apparent that no party to the proceedings intended to call witnesses and that neither Mr Morton nor Mr Garner intended to attend in person. Mr Morton is now in very poor health and this was cited as the reason for his non-attendance and for his inability to take an active part in the proceedings. The Committee returns to this later.

6.    The legal teams of Mr Morton and Mr Garner indicated that they did not propose to attend or to participate in that part of the hearing which was directed to determining questions of breach of section 9(a) of the Introduction to the Code. They proposed that there should be a separate hearing on sanctions if the Executive were to prove its case on breach of the Code.

7.    In light of these developments, the hearing was set down on the basis that questions relating to breach of the Code would be heard and determined during the morning of 14 December with a view to hearing matters relating to sanctions during the afternoon if the Executive were to succeed in proving its case on breach to the satisfaction of the Committee. Messrs Morton and Garner's legal teams were invited to attend the morning session, even if they had no intention of actively participating, as the evidence relating to breach and the Committee's view of it could be expected to be relevant to questions of sanctions if such questions were to arise. In the event, Mr Garner's legal team attended the morning hearing as observers but Mr Morton's legal team chose to await the outcome of that hearing before attending the sanctions hearing.

8.    Having heard the Executive present its case on breach of the Code during the morning of 14 December and having considered the evidence adduced by the Executive, the Committee found the case proved to its satisfaction. The Committee then announced its broad factual findings in summary form to enable the various legal teams to address questions of sanctions on the basis of those findings. In summary, for reasons which are explained in detail below, the Committee found that:

(i) the agreement alleged to have been entered into between Messrs Morton and Garner before purchase of the Hubco shares was a fiction – no such agreement had been entered into;

(ii) both Mr Morton and Mr Garner had repeatedly attempted to mislead the Executive into believing that there had been such an agreement when they knew such a claim to be false;

(iii) Mr Morton deliberately attempted to mislead the Executive by falsely claiming that the alleged agreement between himself and Mr Garner had been evidenced by a promissory note signed at the time by Mr Garner. When he made such claims, Mr Morton knew them to be untrue;

(iv) for his part, Mr Garner deliberately attempted to mislead the Executive by providing it with a promissory note which he had signed and back-dated to the date of the alleged agreement and which he incorrectly and repeatedly claimed to have been signed and entered into on the date inscribed on the promissory note. When he made such claims, Mr Garner knew them to be untrue; and

(v) in breach of section 9(a) of the Introduction to the Code, Mr Garner and Mr Morton separately and on repeated occasions provided information to the Executive which they knew to be incorrect and misleading.

9. In the event, Mr Garner attended the afternoon hearing along with his legal team and addressed the Committee briefly in addition to the submissions of Mr Mansell. In Mr Morton's absence submissions on the issue of sanctions were made on his behalf by Mr Coltart QC.

<u>Breach of the Code – the facts</u>

10. Having considered carefully the evidence adduced by the Executive, the Committee finds the facts to be as follows.

11. Mr Morton is 74 years old and is a resident of Jersey. After an initial career in accountancy he branched out into commerce and became an extremely successful

businessman and investor. Mr Morton is habitually known as Bob Morton, not to be confused with one of his sons, Robert Morton.

12.  Mr Garner is another resident of Jersey. He is 35 years old and a friend of Mr Morton's son, Robert. After obtaining a degree in Economics from Durham University he worked for about five years for a Swiss-based private equity firm before setting up with friends Alethia Capital, a private equity vehicle. He moved to Jersey in 2011 and in 2014, after Alethia had been disbanded and its assets liquidated, Mr Garner set up ATD Capital, a holding company of which he is the sole owner. During the last few years Mr Garner has set up and developed an online retail company in which, throughout the period relevant to these proceedings, Mr Morton or his family companies have been substantial investors.

13.  Mr Morton or the trustees of his family trusts own and control various companies. They comprise or include:

(i)  Hawk Investment Holdings Limited ("Hawk"), a Guernsey company which is wholly owned by Mr Morton and his wife;

(ii)  Seraffina Holdings Limited ("Seraffina"), a BVI company which is owned by Morton PTC Limited ("Morton PTC") as trustee for The Charles Trust – a trust for the benefit of Mr Morton's son, Charles; and

(iii)  Groundlinks Limited ("Groundlinks"), a BVI company owned by Morton PTC as trustee for The Andrew Trust  - a trust for the benefit of Mr Morton's son, Andrew.

14.  Albany Trustee Company Limited ("Albany") is a company incorporated and based in Guernsey. Its employees include Anthony Holt ("Mr Holt") and Nicky Chippendale ("Ms Chippendale").  Albany administers and manages the Morton family trusts and the companies owned by the trusts or by Mr and Mrs Morton personally. In this capacity its acts as administrator for Morton PTC, Hawk, Seraffina and Groundlinks.

15.     Hubco was incorporated in England and Wales on 14 November 2011. It was admitted to trading on PLUS (now ISDX) on 31 January 2012. At admission, 28.32% of the issued share capital of Hubco was placed with Seraffina. On 27 November 2012, Seraffina transferred to Hawk approximately half of its shares representing 14.12% of Hubco's share capital. Accordingly, Morton family companies owned just under 30% of the issued share capital of Hubco along with their attendant voting rights, that being the percentage of voting rights relevant for triggering Rule 9 mandatory offers. Hubco's placing agent was Hub Capital Partners Limited ("Hub Capital"), a corporate finance advisory firm and itself the holder of shares of Hubco.

16.     On 17 July 2013 on Mr Morton's direction, Groundlinks purchased 300,000 shares of Hubco, representing 3.38% of Hubco's issued share capital. This purchase took the holdings of Groundlinks and other Morton family companies with which it stood to be seen as acting in concert to more than 30% of Hubco's issued share capital. As these are the shares that are now alleged to have been purchased on behalf of Mr Garner pursuant to an agreement reached between Messrs Morton and Garner shortly before the purchase, it is relevant to ascertain whether there was any suggestion at the time or whether there was other contemporary evidence that the shares were purchased by Groundlinks as nominee or bare trustee on behalf of Mr Garner.

17.     There is no such evidence. On the contrary, the contemporary documents indicate that the transaction involved a straightforward purchase by Groundlinks of shares owned by Hargreave Hale Limited ("Hargreave"), another major shareholder in Hubco. There is no contemporary reference (whether in the documents or transcripts of telephone calls) to the alleged agreement between Messrs Morton and Garner or to any trust or indebtedness which are now said to have been the result of such agreement. As explained below, the contemporary evidence indicates that, on the instructions of Mr Morton, Groundlinks purchased the shares outright and not on trust for Mr Garner.

18.     At the beginning of July 2013, Hargreave told Richard Feigen ("Mr Feigen"), a director of Hub Capital, that Hargreave wanted to dispose of 1.15 million shares of Hubco. It appears that Mr Feigen then spoke to Mr Morton and suggested that he purchase Hargreave's shares. On 17 July 2013 Giles Hargreave telephoned Tom

Davies ("Mr Davies"), an investment manager at Investec Wealth & Investment Limited ("Investec"), and told him that Hargreave was now only looking to sell 300,000 shares of Hubco. Investec acted as broker for Mr Morton and his family companies. Mr Davies then emailed Mr Morton, telling him that Hargreave now only needed to sell 300,000 shares rather than the 1.15 million discussed previously and was offering the price of 8p per share. Mr Davies ended his email by asking Mr Morton *"Can you please let me know what you would like to do and which a/c we would be booking these to"*. Accordingly, on 17 July there was a very substantial change in the number of shares on offer: this is significant given that Messrs Morton and Garner later represented to the Executive that their agreement to purchase the Hubco shares on Mr Garner's behalf had been concluded six days earlier, namely on 11 July. About an hour after Mr Davies had sent his email, Mr Morton telephoned Mr Davies and agreed to purchase the Hubco shares through Groundlinks. The relevant part of the conversation went as follows:

> *"DAVIES: 300,000 and he would do that at 8p.*
>
> *MORTON: 300,000 at 8p, so it's 24 grand.*
>
> *DAVIES: 24 grand that's all. But if you wanted to buy any more he'd be interested in, he would certainly discuss that.*
>
> *MORTON: No.*
>
> *DAVIES: But he has to sell 300,000 today.*
>
> *MORTON: Well, we would do the 300 and... ummm... I suggest you put that into, ummm, Groundlinks.*
>
> *DAVIES: Ok, perfect.".*

19.    Shortly after this call Mr Davies made a file note of his conversation with Mr Morton and copied that by email to his colleague, Mr Hollier (who was Mr Morton's principal point of contact at Investec).  The email stated that *"He said he was happy to buy the 300k at 8p for Groundlinks..."*. Investec duly executed the purchase on 17 July on behalf of Groundlinks. Mr Davies then emailed Ms Chippendale, copying in Mr Holt at Albany who, as administrators of the Morton family trusts, needed to know that a company owned by the trustees of one of the family trusts had made the purchase. Mr Davies's email said *"30,000 [sic] Hubco Investments were purchased*

*for Groundlinks today at a price of 8p per share …"*. It is evident that Albany, the trust managers, were not told by Investec that a trust company had purchased these shares on behalf of Mr Garner, who was not a beneficiary. There was no apparent justification for Morton PTC (which owned Groundlinks as trustee of The Andrew Trust) spending trust money for Mr Garner's benefit.

20.   It is also apparent that Mr Morton said nothing to the trustees or to the family beneficiaries to suggest that the Hubco shares had been purchased on behalf of Mr Garner. Thus on 18 July 2013 the Morton PTC investment committee met at St. Peter Port, Guernsey. Mr Morton and his wife, their four sons and Mr Holt and Ms Chippendale from Albany were all present. The minutes of the meeting record the following:

> *"**Hubco Investments Plc**
> Seraffina Holdings Limited: 1,250,000 shares (cost £125,128)
> Hawk Investments Holdings Limited: 1,250,000 shares (cost £125,128)
> Groundlinks Limited: 300,000 shares (cost £24,245)*
>
> *BM noted that the Hubco shares had been split equally between Seraffina and Hawk but that Groundlinks had invested in 300,000 shares yesterday.*
>
> *This is a cash shell for reverse takeovers."*.

The minutes of meetings of the Morton PTC investment committee on 11 February 2014 and 1 December 2014 were the same in material respects. Had there been an agreement between Messrs Morton and Garner for the Hubco shares to be purchased on behalf of Mr Garner, Mr Morton would undoubtedly have been obliged to obtain the consent of the trustees. At the very least, he would have mentioned it.

21.   Nothing of note then happened until 23 February 2015, some 18 months after the Hubco shares had been purchased, when the Takeover Panel announced Mr Morton's public statement of censure for a failure to make an offer under Rule 9 of the Code (Panel Statement 2015/3). That matter concerned the acquisition of 39.1% of the voting rights of Armour Plc ("Armour") by a group described in the Takeover Panel Statement as "the Morton Concert Party". The acquisition arose from a placing of new Armour shares and was "whitewashed" under Note 1 of the Notes on Dispensations from Rule 9. The whitewash circular described the Morton Concert

Party as comprising, amongst others, Seraffina, Hawk and Groundlinks in addition to Mr Morton and his wife. Each of the three companies was described as owned by the trustees of trusts for one or other of Mr Morton's sons.

22. Additional shares of Armour then became available at attractive prices and Mr Morton told the Panel that he was asked if he would like to buy them. Mr Morton told the Executive that he declined the offer because he knew that to accept it would trigger an obligation under Rule 9.1(b) to extend an offer for all the issued shares of Armour not owned by the Morton Concert Party. Instead, however, during August 2011 Mr Morton arranged for these shares to be purchased in the names of his four sons, taking the view that they were not members of the Morton Concert Party. Mr Morton then made gifts to each of his sons in sums of money equal to the purchase price of the shares. Separately, in June 2011, Mr Charles Morton had also purchased some Armour shares on his own account. Mr Morton disclosed none of this to the Executive. Under Rule 9.1(b) the effect of these purchases was to increase the shareholding of the Morton Concert Party within the 30% to 50% range of Armour's issued share capital and to trigger an obligation to extend an offer to other shareholders under Rule 9.1(b) of the Code. Mr Morton attempted to avoid this obligation by the devices described.

23. Before this statement of public censure, Mr Morton had twice been privately censured by the Panel. On one such occasion the misconduct in question had amounted to a breach of section 9(a) of the Introduction to the Code, the terms of which had then been drawn to his attention.

24. The Panel's public statement of censure of Mr Morton on 23 February 2015 caused Investec to undertake a review of previous transactions in which they had acted for Mr Morton. On 25 February 2015 Mr Hollier telephoned Mr Morton to tell him that the July 2013 purchase of Hubco shares had taken the interests of the Morton family to 31.6% of the Hubco issued share capital. The material part of that telephone conversation was as follows:

*"EH: It looks like that took the percentage from about 28.2 to 31.6.*

*RM: [Snort]*

*EH: Yeah.  So my compliance department have asked if you could seek advice
on that now you are aware and if you could notify the Takeover Panel and get
their...*

*RM: [Incredulous laughter]*

*EH: ... opinion on where you stand.*

*RM: Oh dear.*

*EH: Sorry to be the bearer of bad news.*

*RM: Shit. That's the one that's... where's that listed on?*

*EH: It's listed on the ISDX Market which used to be ...*

*RM: ISDX.*

*EH: ... which used to be Plus Markets. I don't know if it was Plus Markets when
the trades were done. So I'm not sure.*

*RM: [Sigh]. Right, right, right, right, right, right, right, right, right. Oh fuck.*

*EH: So, I'm guessing you weren't aware of that and I wasn't aware of that and
obviously having everything analysed has brought that up.*

*RM: Christ, I wasn't aware of it either. Just a cash shell sitting there.*

*EH: I know, so obviously, I've been asked to call you to notify you as obviously
we found out this morning and I think the Firm's position is we need to notify
you as soon as we realise that there's an issue there and obviously they've asked
if you can notify the Takeover Panel and obviously seek their..."*.

25.	The recording of this conversation was played back to the Committee at the hearing.
Mr Morton's reaction to the news suggests that he believed that the Groundlinks
purchase of Hubco shares had, or could have, triggered a Rule 9 obligation. It was
also evident that the advice of Investec's compliance department was that he consult
the Takeover Panel. What is conspicuous by its absence from this conversation was
any suggestion by Mr Morton that Groundlinks had purchased, and now held, the
Hubco shares on behalf of Mr Garner.

26.	Mr Morton evidently contacted his solicitor, Colin Maltby ("Mr Maltby"), who on
26 February 2015 emailed Ms Chippendale at Albany saying *"Please could you send
me details of the acquisition made by Groundlinks of around £40,000 [sic] worth of
Hubco stock in 2013? ... "*.

27.   During the morning of 27 February 2015 Mr Morton again spoke on the phone to
Mr Hollier. During this conversation Mr Morton claimed for the first time that the
Hubco shares were being held on trust, the alleged reason for that being that Mr
Morton had, at the time of purchase, been alive to the need to avoid acquiring an
interest of 30%. The material part of that conversation went as follows:

> *"RM: And I've been researching that other matter that you mentioned to me.*
>
> *EH: OK.*
>
> *RM: And it appears that Groundlinks is holding the shares that it has got in trust
> so in terms of transferring them to the beneficiary should we put that through
> the market through you or should we do it off market or what?*
>
> *….*
>
> *RM: So what I did after you, you know, said all that I sort of did a bit of digging
> and research to find out, sort of, what the hell happened because I know when
> we, sort of, did it all in the first place that we were restricted to 29.9 and we
> could not go over that in any shape or form whatsoever.*
>
> *EH: OK. So they were bought on behalf of someone else?*
>
> *RM: Yep. OK."*.

28.   It is relevant to note that Mr Morton did not identify the third party beneficiary on
whose behalf the Hubco shares were allegedly held. It is also difficult to understand
what "research" Mr Morton could have done since talking to Mr Hollier a few days
earlier as there were no documents at all that evidenced either the trust to which he
referred or any other arrangement with a third party. In an email sent to Mr Morton
at 17:21 on 27 February 2015 (and copied to Mr Holt and Ms Chippendale at Albany)
Mr Hollier said that he had discussed the matter with his compliance department
who could not advise on whether Mr Morton had breached any Takeover Panel rules
and advised that he speak to the Takeover Panel to clarify the situation.

29.   At 08:46 GMT on 28 February 2015 Mr Garner telephoned Mr Morton from Austria
where he was on a skiing holiday. This conversation was not recorded but they spoke
for over 23 minutes. At 09:33 on the same day (about 23 minutes after the phone call
concluded) Mr Garner emailed Mr Morton as follows:

*"Dear Mr Morton,*

*I apologise for the delay in sending this email but I am now in a position to pay for the 300,000 shares in HubCo Investments PLC which you very kindly bought on my behalf and which you are holding for me.*

*I will inform my broker first thing on Monday morning and that he should expect a call from Investec with the bargain being 300,000 shares in Hubco at 8p per share.*

*His details are:*

*[address of Richard Davies at Redmayne Bentley, Mr Garner's brokers]*

*Again – thank you for doing this for me, and I hope the delay in payment hasn't caused you any embarrassment.*

*Thanks,*

*John".*

30.   Mr Morton persistently claimed to the Executive that this email from Mr Garner was spontaneous and unprompted. The Committee does not accept this: it believes that Mr Garner's email was a response to a request from Mr Morton that Mr Garner confirm in writing an arrangement of the sort that Mr Morton had described on the previous day to Investec.  There is no record of any other conversation between Messrs Morton and Garner in the period from 25 to 28 February 2015 and the probability is (although this will never be known for certain) that it was during the call on the morning of 28 February that Mr Morton suggested to Mr Garner that he send to him an email along the lines of that sent soon afterwards at 09:33.

31.   On 2 March 2015 the Groundlinks shares of Hubco were sold and transferred to Mr Garner.

32.   On 23 March 2015 Hawk purchased 8,360 of Mr Garner's shares of his online retail company for a price of £25,990.60. By this means Mr Garner was effectively reimbursed for his purchase of Groundlinks' Hubco shares, albeit his own shareholding in the online retail company was reduced as a result.

33.   Mr Garner's email to Mr Morton of 28 February was forwarded later on the same day to Mr Hollier of Investec and to Mr Holt and Ms Chippendale of Albany. By this means, they came to know for the first time the identity of the third party on whose behalf Groundlinks was alleged to have purchased and held the Hubco shares.

On the previous day Ms Chippendale had emailed Mr Morton's solicitor, Mr Maltby, asking for details of the transaction and how it was to be ratified. She said:

> "*Mr Morton has indicated that Groundlinks are holding these shares for a third party which we were not aware of until now. Are you able to provide relevant details and rationale etc? As you will appreciate, had we been aware, we would also have required due diligence on the third party and put an agreement in place.*
>
> *Once you provide details, we can agree how to ratify this*".

Mr Maltby replied on 1 March saying that they would need *"a simple Declaration of Trust and Promissory Note effective from the date of purchase"*.

34.   No declaration of trust was ever drawn up, but on 19 March 2015 Mr Maltby drafted a promissory note (hereinafter, the "Promissory Note"). By the Promissory Note, Mr Garner as borrower promised to pay Groundlinks as lender the sum of £24,245 on demand along with interest thereon, payable monthly with effect from 17 July 2013 at the rate of 1.5% above National Westminster Bank base rate. The Promissory Note was undated.

35.   On 23 March 2015 Mr Maltby emailed Mr Garner attaching the Promissory Note and asking him to sign it.  On 27 April Mr Maltby emailed Mr Garner asking whether he had *"Any news on that date?"*.  In response to that enquiry Mr Garner apologised for the delay and said:

> "*Here is a scan of the original that I dug out. I signed it on the 17th July 2013. I have the original here in my office...*".

The document attached to Mr Garner's email appears to be an exact copy of the Promissory Note drafted by Mr Maltby on 19 March save that it had been signed by Mr Garner and dated in manuscript *"17/7/2013"*.

13

Investigation by the Executive

36.     Meanwhile, on 16 April 2015 Investec had reported the Groundlinks purchase of
        Hubco shares to the Executive, it having become clear by then that Mr Morton was
        not going to report the matter himself despite Investec's advice that he should do so.

37.     On 21 April 2015 the Executive spoke to Mr Morton on the telephone. A note of that
        conversation records Mr Morton as saying that he did not think a bid obligation had
        been triggered as the shares had been transferred to the beneficial owner. Mr Morton
        explained that Mr Garner was a friend of his son, Robert. Mr Morton said that Mr
        Garner had been short of money in July 2013 so that the purchase of the Hubco
        shares had been funded by him (Mr Morton) by way of a promissory note. Mr Garner
        had since raised funds by selling shares in another business and that had enabled him
        to purchase the shares from Mr Morton.

38.     On 22 April 2015, at Mr Morton's request, Mr Maltby emailed the Executive,
        attaching the undated Promissory Note and confirming on behalf of his client that
        the Hubco shares had been purchased by Groundlinks as nominee for Mr Garner
        who was "*unable to afford to pay for same and who entered into the attached
        Promissory Note*".

39.     On 7 May 2015, in response to a list of questions emailed by the Executive to Mr
        Morton, Mr Morton confirmed by email that:

        "*...3. The terms of the bare trust were that we would loan John Garner the funds
        to acquire the shares pending his realisation of sufficient funds to pay for them, in
        the meantime we would hold them as nominee and vote according to his wish.*

        *4. This was a verbal arrangement supported by the promissory note and the
        shares...*".

40.     On 8 May 2015 there was a lengthy telephone interview of Mr Morton by the
        Executive which was recorded in full. In the course of that interview Mr Morton
        maintained that it was his awareness of the Rule 9 implications if his family group's
        shareholding in Hubco were to reach 30% that prompted the purchase of the shares
        on trust for Mr Garner. He told the Executive that once the Promissory Note had
        been signed it had been held by Mr Maltby. He also maintained that in December
        2014 Mr Garner had phoned him to say that he had received enquiries from potential

investors in his online retail company and he had agreed to sell some of the shares in order to raise cash. Mr Morton said to the Executive that he had then told Mr Garner that he thought that to be *"a great idea because it means you can take up the Hubco shares as well and we can clear this promissory note out the way…"*.

41.     There is no doubt, therefore, that Mr Morton attempted to mislead the Executive into believing that the Promissory Note had been produced and signed at about the time of the July 2013 purchase and that it had recorded an existing debt at the time when Mr Garner spoke of his plans for clearing it in December 2014. None of this was true: on 28 August 2015, at a late stage of the investigation, Mr Maltby told the Executive that he had drafted the Promissory Note on 19 March 2015.

42.     On 27 May 2015, when the provenance of the Promissory Note was still unknown to the Executive, the Executive interviewed Mr Garner. This interview was recorded in full. He told the Executive that Mr Morton had offered to lend him the money on a promissory note until such time as he could pay for the shares. He said that the arrangement between him and Mr Morton had been discussed and agreed over dinner at the end of June or beginning of July 2013. According to Mr Garner, Mr Maltby had then sent through the paperwork. Mr Garner maintained that he had dug through his folders and found the copy of the Promissory Note which he had signed. He then went on to tell the Executive that he had signed the Promissory Note on 17 July 2013 and he knew that to be the case because that was the date on the document and his practice was to date a document on the date he signed it. On the following day, Mr Garner emailed the Executive attaching, amongst other documents, the signed and dated Promissory Note. All this was a lie: Mr Garner had been sent the Promissory Note on 23 March 2015 as an attachment to an email from Mr Maltby with a request that he sign it.

43.     On 8 June 2015 Mr Garner wrote a detailed formal letter to the Executive saying that he had been unused to the "questioning style" of interview to which he had been subjected and was now taking the opportunity to "answer factually and accurately the points raised". Unfortunately, Mr Garner's letter did nothing of the sort: he proceeded to embroider the story which he had previously given to the Executive. He said in the letter that the share purchase agreement had been made over dinner

with Mr Morton at the Corbiere Phare restaurant in Jersey in July 2013. He went on to say that Mr Morton told him that some shares in Hubco might be available and offered to lend him the money on the basis that he would repay it at the end of the year, by when Mr Garner envisaged being in funds. Mr Morton said he would get his lawyer, Mr Maltby, to send a promissory note: this, Mr Garner claimed, had been duly sent to him and he had executed it and sent a copy to Groundlinks at the postal address on the promissory note. He went on to say *"You have a copy of this document"*. The document referred to was a copy of the Promissory Note sent to Mr Garner on 23 March 2015 which he had subsequently signed and dated 17 July 2013 and which had since been provided to the Executive as an attachment to an email from Mr Garner sent on 28 May 2015. Mr Garner confirmed this story in substance when he was interviewed in person by the Executive on 11 August 2015.

44.   Mr Morton was interviewed again by the Executive on 14 August 2015. During this interview, which was conducted by phone, he told the Executive that the agreement to purchase the Hubco shares on behalf of Mr Garner had been reached over dinner at the Corbiere Phare restaurant on 11 July 2013. He claimed to have instructed Mr Maltby to draft a promissory note and send it to Mr Garner and the Promissory Note had been signed by Mr Garner at about the time the shares had been purchased on 17 July 2013.

45.   The story about the Promissory Note then began to unravel. On 14 August 2015 the Executive emailed Mr Morton with various demands, including that he instruct Mr Maltby to make himself available to answer the Executive's questions and that he instruct him to provide copies of all his documents relating to the July 2013 purchase of the shares in Hubco, the arrangement with Mr Garner and the Promissory Note. Mr Morton was also asked to produce his mobile telephone records. Mr Morton was also directed to instruct the relevant employees of Albany to produce their documents and to make themselves available to answer the Executive's questions.

46.   On 23 August 2015 Mr Morton emailed the Executive saying that he had spoken to Albany and to Mr Maltby and that:

*"Many of the assumptions which I have made in our telephone discussions appear to be mistaken now that I have managed to obtain firm evidence and I apologise for these obvious memory failures, which are now a daily occurrence and hastening my retirement".*

47.   On 28 August 2015 at 13:40 Mr Garner emailed the Executive referring to an earlier email and saying:

*"I have been concerned about my assumptions surrounding the promissory note. I have spoken to Colin Maltby and he has advised me that I sent a signed copy of the note to him on 23rd March 2015…".*

Mr Garner went on to apologise for the incorrect information he had previously provided regarding the Promissory Note. He said that he now had consulted with Mr Morton in an effort to jog both of their memories as to the circumstances surrounding the Promissory Note.

48.   As mentioned previously, on 28 August 2015 Mr Maltby told the Executive that he had drafted the Promissory Note on 19 March 2015. This was said during a phone call with the Executive during the afternoon of 28 August and confirmed soon afterwards in an email timed at 15:05.

49.   It is clear, therefore, that Messrs Morton and Garner only retracted their previous stories regarding the Promissory Note and its provenance when it became apparent to them that the true position was about to be revealed as a result of the Executive's insistence that Mr Maltby and Albany produce their relevant documents and answer questions. The Committee has no hesitation in rejecting the claims, made by Mr Morton and Mr Garner severally, that the untruths previously told to the Executive had been the result of wrong "assumptions" innocently made. The Committee has concluded that Mr Morton and Mr Garner both lied systematically about the date on which the Promissory Note was produced and signed and the circumstances in which it came to be created. When these lies were told, the events in question were very recent. Subsequently, in July 2016, Mr Morton suffered an acute episode of illness and he has experienced severe chronic health problems ever since, but at the material

times his health and age afforded no conceivable excuse for the dishonest misrepresentations made systematically to the Executive. For his part, Mr Garner's participation in this dishonest story was as sustained and enthusiastic as Mr Morton's.

50. It is also to be noted that when telephone records were produced during August 2015 they revealed what had hitherto been denied, namely that Messrs Morton and Garner did speak to each other before Mr Garner sent his email of 28 February 2015.

51. Hitherto the Executive had been investigating a potential breach of the mandatory offer obligation set out in Rule 9 of the Code. The investigation, however, now took a curious turn. On 23 September 2015 the Executive obtained a copy of the Hubco share register. This showed that by July 2013, when Groundlinks purchased 300,000 shares of Hubco, Mr Morton and persons or parties with whom he or his family companies had apparently acted in concert already owned in aggregate more than 50% of Hubco's issued share capital. This more extensive Morton concert party included employees or directors of Hubco and Hub Capital. The result (subject to a possible complicating factor which had been removed when Groundlinks' shares in Hubco were sold to Mr Garner) was that under Rule 9 the more extensive Morton concert party had been free all along to purchase additional shares of Hubco without triggering an obligation to extend an offer for the remaining shares.

52. This discovery prompted the Executive to interview both of Messrs Morton and Garner again. They were interviewed separately and in person on different dates in October 2015.   During these interviews the Executive explained in detail the development referred to in paragraph 51 above and that, as a result, neither Mr Morton nor Mr Garner were any longer being investigated for breach of the mandatory offer obligations in Rule 9 of the Code. Both Mr Morton and Mr Garner were told, however, that the Executive was very concerned by the manner in which they had conducted themselves towards the Executive and by the untrue information that had been provided to date. The attention of both men was drawn to the obligations on those dealing with the Takeover Panel or to whom enquiries are directed under section 9(a) of the Introduction to the Code. Both men were asked whether they still contended that Groundlinks had purchased the Hubco shares in

July 2013 pursuant to an arrangement between Messrs Morton and Garner that they would be purchased and held on behalf of Mr Garner. Mr Morton and Mr Garner both confirmed their previous evidence that there had been such an arrangement. By now both Mr Morton and Mr Garner claimed that the relevant agreement had been made, not over dinner at Corbiere Phare on 11 July 2013 (it transpired that Mr Garner had left Jersey by the evening of 11 July), but over breakfast on the same day at a restaurant called El Tico.

53.    As previously stated, the Committee has concluded that there never was any such agreement. Purchasing the Hubco shares through Groundlinks (a company which the Executive had previously found to be a member of the Morton concert party) and holding those shares as nominee for Mr Garner made no sense when, as Mr Morton claimed, a driving factor in concluding the arrangement was to avoid acquiring 30% or more of Hubco's issued share capital. It would have made more sense simply to lend Mr Garner the money to enable him to purchase the shares in his own name while executing a promissory note. Mr Morton suggested that purchasing the shares in the name of Groundlinks afforded some form of security, albeit he claimed to have trusted Mr Garner to honour the debt.   In the Committee's view, the question of security was introduced by Mr Morton in an attempt to justify an arrangement which had no apparent commercial rationale. But be that as it may, one would have expected some agreement to have been reached regarding interest on the debt, even if it was simply an agreement to waive the payment of interest. But interest was not discussed at all until the subject was raised during March 2015 in the course of exchanges between Mr Maltby and Albany.

54.    Furthermore, there was absolutely no contemporary documentary record of the agreement – not even a brief email from Mr Garner expressing his thanks for the favour done to him. The fact that Messrs Morton and Garner later collaborated to produce a dishonestly back-dated promissory note in an attempt to claim that the debt had been acknowledged at the time, casts further doubt on the existence of the agreement. The content of Mr Morton's telephone conversation with Investec on 17 July 2013 is also inconsistent with an agreement to purchase the Hubco shares on trust for Mr Garner. Investec, who had to execute and record the transaction, were given the impression that this was a straightforward purchase on behalf of one of the

Morton family trust companies. And the minutes of the Morton PTC investment committee meeting on the following day would undoubtedly have recorded a purchase by a company owned by the trustee of The Andrew Trust on behalf of a non-beneficiary had there been such a transaction. Mr Holt and Ms Chippendale of Albany both attended this meeting but were told nothing. Just as significant is the fact that the minutes of the Morton PTC investment committee meeting on 2 March 2015 did, for the first time, record that Groundlinks' shares in Hubco *"were held as nominee for John Garner"*.

55.   In the meantime, having been alerted to the Rule 9 problem by Investec on 25 February 2015, it was not until 27 February 2015 that Mr Morton told Investec (after doing some "research") that the Hubco shares had been purchased on behalf of a third party. But even then, and notwithstanding his "research", Mr Morton did not identify the third party. It was not until 28 February, following a phone call with and email from Mr Garner, that Mr Morton identified the beneficiary. The truth is, in the Committee's judgment, that Mr Garner's email of 28 February 2015 was a put-up job purporting to recognise in retrospect an agreement which had never existed.

56.   It should be noted that there were other features of the claim to have reached an agreement on 11 July 2013 that led the Committee to reject it. Thus the alleged date, time and place of agreement tended to change under the pressure of scrutiny. Furthermore, the number of Hargreave shares offered for sale changed very substantially on the day that Groundlinks made the purchase without causing Mr Morton to revert to Mr Garner for confirmation that he still wished to proceed. Finally, Mr Morton and his family companies were and are very substantial investors in Mr Garner's online retail company: this was the case by February 2015 and the Morton family investments subsequently increased considerably. This was disclosed to the Executive. What was not disclosed to the Executive (and what became apparent only at an advanced stage of its investigation) was Hawk's purchase on 23 March 2015 of shares of Mr Garner in his online retail company for an amount more or less equal to that which Mr Garner had paid three weeks previously for the transfer to him of Groundlinks' shares in Hubco.

<u>Sanctions</u>

57.   The most serious disciplinary power exercisable by the Takeover Panel is to cold-shoulder an offender by declaring the offender to be a person who in the opinion of the Panel is not likely to comply with the Code. Such a declaration triggers the consequence described in section 11(b)(v) of the Introduction to the Code, namely that, while the sanction remains effective, under the rules of the FCA and certain professional bodies, their members become obliged in certain circumstances not to act for the person in question in a transaction subject to the Code. The seriousness of this sanction is evident from the fact that it has only been used twice before during the Takeover Panel's history.

   <u>(1) Mr Morton</u>

58.   Notwithstanding the exceptional nature of this sanction, in light of the findings of fact made by the Committee in this case it is inevitable that it should declare Mr Morton to be an offender who in the Committee's opinion is not likely to comply with the Code. Mr Morton's counsel realistically recognised in addressing the Committee that cold-shouldering was inevitable in his client's case and that the sole issue was the duration of the sanction.

59.   It was submitted on Mr Morton's behalf that six years, the period sought by the Executive, was too long a period having regard in particular to three matters:

   (i)   in contrast to the only two previous cases in which offenders had been cold-shouldered, there was in this case no underlying breach of a Rule 9 obligation to make a mandatory offer and, consequently, no damage to other shareholders through failing to make an offer;

   (ii)   in *Principle Capital Investment Trust* ("PCIT") (Takeover Appeal Board Statement 2010/1), the sole case of cold-shouldering to have occurred since time limits had been attached to the sanction, the period upheld on appeal to the Takeover Appeal Board was three years – and it was submitted that that was a worse case than Mr Morton's; and

(iii) it was said that Mr Morton's ill health and age and the fact that he was now in the twilight of a successful business career ought to be taken into account in his favour.

60.  The Committee has considered carefully each of these points and the personal position of Mr Morton generally. It is true that it transpired that there was no breach of an obligation to make a mandatory offer pursuant to Rule 9 in this case and that this feature distinguishes it from both previous cases in which offenders have been cold-shouldered. However, detriment to other persons, including shareholders, is only one of many criteria which the Takeover Panel may take into account in exercising its disciplinary powers. The Panel cannot effectively perform its statutory duty to enforce the Code and regulate the conduct of takeovers unless those who deal with it and to whom it directs enquiries take care to ensure that the information they provide to the Panel is correct, complete and not misleading. That such persons should at least act honestly and in good faith in their dealings with the Panel goes without saying and is vital to the efficacy of the regulatory regime. These obligations underpin the Code and compliance with them is essential if the Executive is to function effectively.

61.  Mr Morton's conduct in systematically lying to the Executive and in inventing an agreement to purchase Hubco's shares on trust for Mr Garner is no less serious because it later transpired that the whole matter could have been sorted out satisfactorily had he acted honestly and reported the facts to the Executive as he was advised to do at the outset. The particularly egregious misconduct in this case was Mr Morton's collaboration with Mr Garner in providing to the Executive the dishonestly back-dated Promissory Note which purported to acknowledge a fictitious transaction. That dishonesty was no less considered or culpable because it turned out to be unnecessary.

62.  It is also true that in PCIT the Takeover Appeal Board rejected a cross-appeal by the Executive seeking cold-shouldering for five years and upheld the sanction imposed by the Committee that the offenders should be cold-shouldered for three years. The Committee also acknowledges that PCIT was a case in which an attempt was made to mislead the Panel into believing that the share purchase in question had not

triggered a Rule 9 obligation because it had been made coincidentally by an independent party unconnected with those who were acting in concert. However, it is relevant to note that in rejecting the cross-appeal the Takeover Appeal Board observed that, had it *"had to consider the matter entirely afresh, it may very well have been minded to impose a period of five years"*. The persons cold-shouldered in the PCIT case had no previous record of Code contraventions.

63. In the Committee's judgment Mr Morton's dishonesty in his dealings with the Executive was particularly sustained and serious. It must also have regard to the fact that, by the time this matter was reported to the Executive, Mr Morton had been disciplined on three previous occasions for breaches of the Code. On one such occasion he had been warned of the importance of taking care to provide correct and complete information to the Executive and on another he had been publicly censured for attempting to conceal an obligation to make a Rule 9 mandatory offer. Finally, Mr Morton not only misled the Executive himself, he involved Mr Garner in the enterprise, a friend of his son who had reason to be grateful to Mr Morton for his support for his online retail company and who is now facing a heavy price for having been induced to support him in putting forward an untrue, concocted story. It is right to note that Mr Morton bitterly regrets the damage which he has done to Mr Garner and the Committee accepts this expression of regret as genuine.

64. Mr Morton is unfortunately in very poor health. At the hearing before the Committee it was common ground that his health problems were accurately summarised in a letter dated 30 November 2016 from his solicitors, Corker Binning, to the Secretary to the Committee. The Executive invited the Committee to draw an adverse inference from Mr Morton's failure to attend the hearing, but it declines to do so. What is significant, however, is that neither Mr Morton nor Mr Garner instructed their legal teams to challenge the Executive's case on breach of the Code or to test by cross-examination any aspect of the evidence. The Committee concludes that the position taken was realistic and simply recognised that the evidence produced by the Executive was irrefutable. While Mr Morton's ill health affords a good reason for his non-attendance at the hearing, it provides no excuse for his conduct during the Executive's investigation, all of which pre-dated the onset of his current problems.

65.     Having considered carefully all the circumstances, the Committee declares in
        accordance with section 11(b)(v) of the Introduction to the Code that in its opinion
        Mr Morton is someone who is not likely to comply with the Code. This sanction and
        the cold-shouldering which it triggers will remain effective for six years from the
        date of this Ruling, that being 21 December 2016.

(2) Mr Garner

66.     Mr Garner presents a more difficult case. Unlike Mr Morton, he has no previous
        record of contravening the Code. Furthermore, it is to be inferred from the
        Committee's findings of fact that Mr Garner was initially brought into all this by Mr
        Morton to back up his story and that this probably occurred sometime between 25
        and 28 February 2015. When he agreed to support Mr Morton's fictitious story of an
        agreement to purchase shares on his behalf, Mr Garner probably did not foresee the
        extent to which it would involve systematically lying to a statutory regulator,
        although he must from the outset have appreciated that (as was the case) the purpose
        of inventing the story was to save Mr Morton having to make a mandatory offer
        under the Code for the remaining shares of Hubco – otherwise the fictitious
        agreement could have made no sense at all.

67.     The Committee also received a number of character references for Mr Garner from
        distinguished referees praising his work with the online retail company and stating
        that his misconduct in this case was out of character. In addition, the submissions
        made by Mr Coltart in relation to the exceptional nature of cold-shouldering as a
        sanction and the conclusions to be drawn from PCIT as a "comparable" were also
        made by Mr Mansell on behalf of Mr Garner. Mr Mansell also submitted that, since
        Mr Garner's business career is at a relatively early stage of development, cold-
        shouldering would have a greater adverse impact on him than on Mr Morton who
        was in the twilight of his career. This too, it was submitted, the Committee should
        take into account.

68.     In these circumstances, the Committee gave anxious consideration to whether,
        consistent with its duty of enforcing the Code and the system of regulation that it
        promulgates, it could accede to the plea to impose some sanction on Mr Garner other

than cold-shouldering. The Committee was driven to the conclusion that it could not accede to this course. Having become involved in promoting the fictitious story of an agreement to purchase Hubco shares on trust for himself, Mr Garner's role in misleading the Executive was at least as prominent and sustained as that of Mr Morton. Two aspects of Mr Garner's conduct tell particularly badly against him. He actually signed and dishonestly misdated the Promissory Note and then provided it to the Executive in an attempt to mislead the Executive into believing that the document did what it purported to do, namely acknowledge a debt incurred by Mr Garner in July 2013. Dishonestly misdating, and then proffering, a document in order to deceive a statutory regulator into believing that it was a contemporary acknowledgement of a debt can only merit the most serious sanction open to the Panel – particularly given that the debt itself was fictitious. In addition, Mr Garner then compounded the position by taking the opportunity to write a lengthy and considered letter to the Executive on 8 June 2015, ostensibly in order to put the record straight but in fact to lie in a more detailed, and what he hoped would be a more convincing, fashion.  Mr Garner's age and level of experience afford no excuse. At the time he had been in business for about 10 years, much of that time spent in the financial industry.

69.    The Committee has come to the conclusion that Mr Garner should be cold-shouldered, not for four years as the Executive submits, but for a period of two years. Accordingly the Committee declares in accordance with section 11(b)(v) of the Introduction to the Code that in its opinion Mr Garner is someone who is not likely to comply with the Code. This sanction and the cold-shouldering which it triggers will remain effective for two years from the date of this Ruling, that being 21 December 2016.

70.    Pursuant to Rule 7.1 of its own Rules of Procedure the Committee extended the time for lodging a Notice of Appeal to the Takeover Appeal Board until 16:30 on Friday 6 January 2017. No appeal was lodged within that time.


10 January 2017

# APPENDIX
## HEARINGS COMMITTEE MEMBERS

The members of the Hearings Committee who constituted the Committee for the purpose of the hearing were:

| **Present:** | Michael Crane QC | Chairman |
|---|---|---|
| | David Challen | Deputy Chairman |
| | Lord Morris of Handsworth | |
| **The Association of Financial Markets in Europe** | Mark Warham | Rothschild |
| **The Association of Financial Markets in Europe (Corporate Finance Committee)** | Charles Wilkinson | Deutsche Bank |
| **The Confederation of British Industry** | Peter Swabey | ICSA |
| **The Quoted Companies Alliance** | Tim Ward | QCA |
| | | |
| **Secretary to the Hearings Committee** | Charles Penney | Addleshaw Goddard |