Case 23-10763-amc   Doc 437-14   Filed 10/20/23   Entered 10/20/23 29:50:57   Desc
Exhibit K. Stream October 2023 Hearing Transcript   Page 1 of 184

1

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| | : |
| IN RE: | : Case No.  23-10763 |
| | : |
| STREAM TV NETWORKS, INC.   CH: 11 | : ADV. No.  23-00057 |
| | : |
| Stream Tv Networks, Inc. Vs | : Philadelphia, Pennsylvania |
| Shadron L Stastney | : October 6, 2023 |
| | : 11:14 a.m. |
| Motion For Preliminary Injunction | : |
| Request For Temporary Restraining | : |
| Order Filed By Alastair Crawford, | : |
| Delaware And Other Law Firms | : |
| Representing And Acting In | : |
| Concert With John Doe(S) And/Or | : |
| Jane Doe(S), Jane Doe(S), John | : |
| Doe(S), Asaf Gola, Kevin Gollop, | : |
| Hawk Investment Holdings Limited, | : |
| Investment Banks Employed By John | : |
| Doe(S) And/Or Jane Doe(S), | : |
| Krzysztof Kabacinski, Arthur | : |
| Leonard Robert "Bob" Morton, | : |
| Seecubic B.V., Sls Holdings Vi, | : |
| Llc, Shadron L Stastney, | : |
| Seecubic, Inc., Patric Theune | : |
| Represented By Rafael X. | : |
| Zahralddin | : |

. . . . . . . . . . . . . . . . . .

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                     Keith Kodosky, Esq.
                                    Lewis Brisbois Bisgaard & Smith
                                    600 Peachtree Street NE
                                    Suite 4700
                                    Atlanta, GA 30308
                                    404-991-2183

                                    Kevin F. Shaw
                                    Lewis Brisbois Bisgaard & Smith
                                    500 Delaware Avenue, Suite 700
                                    Wilmington, DE 19801
                                    302-295-9436

<u>APPEARANCES</u>:

| | |
|---|---|
| For Hawk Investment Holdings Ltd: | Steven Caponi, Esq.<br>K&L Gates<br>600 N. King Street, Suite 901<br>Wilmington, DE 19801<br>302-416-7080 |
| For SeeCubic, Inc.: | Eben P. Colby, Esq.<br>Marley Anne Brumme, Esq.<br>Skadden Arps Slate Meagher & Flom, LLP<br>500 Boylston Street, 23rd Floor<br>Boston, MA 021116<br>617-573-4800 |
| For Shadron Stastney: | Terence M. Grugan, Esq.<br>Emilia McKee-Vassallo, Esq.<br>1735 Market Street<br>51st Floor<br>Ballard Spahr<br>Philadelphia, PA 19103<br>215-864-8320 |
| For SLS Holdings VI, LLC: | Davis Lee Wright, Esq.<br>Robinson Cole, LLP<br>1201 North Market Street<br>Wilmington, DE 19801<br>302-516-1703 |
| For Rembrandt: | Andrew Peter Demarco<br>Devlin Law Firm, LLC<br>1526 Gilpin Avenue<br>Wilmington, DE 19806<br>302-449-9010 |

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

Case 23-10763-amc    Doc 487-14    Filed 10/00/23    Entered 10/00/23 29:50:50    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 3 of 184

3

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES:

Shadron Stastney
  (By Mr. Kodosky)          86                166
  (By Mr. Colby)                   148
  (By Mr. Caponi)                  164

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 19:50:57   Desc
Exhibit K. Stream October 2023 Hearing Transcript   Page 4 of 184

4

```
 1   OCTOBER 6, 2023                              11:14 A.M.

 2              THE BAILIFF:  All rise.

 3              THE COURT:  Good morning.

 4              MR. KODOSKY:  Good morning.

 5              MR. CAPONI:  Good morning.

 6              THE COURT:  Please be seated.  All right.  All right.

 7              What happened to all the binders?  Did you move them?

 8   All the binders, I looked and they're all gone.  They're in my

 9   office, right?

10              THE BAILIFF:  Yeah.

11              THE COURT:  Oh, I don't need them.  I was just --

12              THE BAILIFF:  Yeah.  I was going to say, that's not

13   for this, right?

14              THE COURT:  No, no, no, no, no, no, no.  We don't

15   need the binder.  All right, counsel.  This is Stream TV Media

16   bankruptcy, and this is a hearing on a request for a temporary

17   restraining order preliminary injunction filed by the Debtors.

18              Counsel for the Debtor -- and counsel, before we

19   begin, I will just say, you're going to have to bear with me

20   because I'm recovering from the flu.  I'm already three days

21   into Tamiflu, so I should not be contagious, but I just want to

22   warn you, should I get a little tired, we may have to take a

23   break, okay?  All right.  Hold on one second.  Okay.  Okay.

24              Counsel for the Debtors?

25              MR. KODOSKY:  May I appease the Court, Your Honor?
```

Case 23-10763-amc   Doc 787-14   Filed 10/00/23   Entered 10/00/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 5 of 184

5

1              THE COURT:  Yes.

2              MR. KODOSKY:  My name is Keith Kodosky.  I'm a

3    partner with the Atlanta office of Lewis Brisbois.

4              THE COURT:  And could you spell that for me, Counsel?

5              MR. KODOSKY:  Yes, Your Honor.  It's K-O-D-O-S-K-Y.

6              THE COURT:  Okay.  And you --

7              MR. KODOSKY:  I'm joined here today --

8              THE COURT:  Um-hum.

9              MR. KODOSKY:  -- with Mr. Matthew Rajan and Mr.

10   Charles Roberts.

11             MR. ROBERTSON:  Robertson.

12             MR. KODOSKY:  Robertson.

13             THE COURT:  And they're both --

14             MR. KODOSKY:  With the Debtors.

15             THE COURT:  But they're not counsel?  They're just

16   witnesses?

17             MR. KODOSKY:  Correct.  I am joined by Kevin Shaw and

18   Andrew Trinowsky.

19             THE COURT:  Counsel?  Yes, Counsel for the Debtors?

20             MR. KODOSKY:  Yes, Your Honor.

21             THE COURT:  Okay.  So there's Kevin?

22             MR. KODOSKY:  Shaw, Your Honor.  Sierra, Hotel,

23   Alpha, Whiskey.

24             THE COURT:  Okay.  And your counsel for Debtors.

25             You've been here before, correct, Mr. Shaw?

Case 23-10763-amc    Doc 787-14    Filed 10/09/23    Entered 10/09/23 19:50:37    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 6 of 184

6

 1          MR. SHAW:  Yes, Your Honor.

 2          THE COURT:  Okay.  And who is the other co-counsel?

 3          MR. KODOSKY:  Andrew --

 4          MR. ROBERTSON:  I'm just a law clerk.

 5          THE COURT:  Oh, okay.  Well, I upgraded you.

 6          MR. KODOSKY:  Your Honor, we're very pleased to

 7  announced that he passed the Bar yesterday.

 8          THE COURT:  For Delaware?

 9          MR. ROBERTSON:  Yes, ma'am.  Delaware.

10          THE COURT:  Oh.  I remember when I was going -- do

11  they still make you kind of scroll through for your number to

12  see if you -- when you want to confirm that you've been

13  admitted, they have it listed by number and you have to go

14  through and see if your number is on there?

15          MR. ROBERTSON:  Oh, it's by name.  It's actual name.

16          THE COURT:  Oh, well hmm.  Well, that's great,

17  because when I did it, you had to scroll through and look for

18  your number.

19          MR. ROBERTSON:  Oh, wow.

20          THE COURT:  And I thought I knew what my number was,

21  but I wasn't sure.  It was on there.

22          MR. ROBERTSON:  Thank you, Your Honor.

23          MR. KODOSKY:  It's like a closing.

24          THE COURT:  What?

25          MR. KODOSKY:  It's like a school closing, except for

Case 23-10763-amc    Doc 487-14    Filed 10/08/24    Entered 10/08/24 19:50:50    Desc
Exhibit K. Stream October 2023 Hearing Transcript    Page 7 of 184

7

```
 1   a number.
 2           THE COURT:  Right.  I was going through and I was
 3   like looking and just kind of slowly, but at least now you know
 4   to look for your name.  Well, my daughter gets hers today.
 5           MR. ROBERTSON:  Oh, wow.  Thank you, Your Honor.  I
 6   appreciate it.
 7           THE COURT:  Thank you.  Congratulations.  So now we
 8   can say he's more than a law clerk.
 9           MR. ROBERTSON:  Yes, yes.
10           THE COURT:  He just hasn't been formally admitted.
11           Did you do the list -- do they still make you do that
12   list of tasks?
13           MR. ROBERTSON:  Oh, yeah.  Definitely.
14           THE COURT:  Oh, yeah.  Well, have fun with that.
15   Okay.  That is not a good process, but, you know, it's -- I
16   think it's just hazing, but in any event, I can say that.
17           All right.  I'm sorry, Counsel.  Go ahead.
18           MR. KODOSKY:  No worries, Your Honor.  As our first
19   witness, we have, in compliance with the Court's direction,
20   filed this morning, witness and exhibit lists.
21           THE COURT:  Um-hum.
22           MR. KODOSKY:  As our first witness, we would call Mr.
23   -- I apologize if I'm --
24           THE COURT:  We're not there.  What I'm going to do
25   right now is I'm going to get appearances from each side.
```

Case 23-10763-amc   Doc 487-14   Filed 10/00/23   Entered 10/00/23 29:50:50   Desc
Exhibit K. Stream October 2025 Hearing Transcript   Page 8 of 184

8

1                    MR. KODOSKY:  Okay.

2                    THE COURT:  And then we're going to have an initial

3    hearing as to why this is an emergency.

4                    MR. KODOSKY:  Okay.

5                    THE COURT:  Because I have some questions.

6                    MR. KODOSKY:  Okay.

7                    THE COURT:  I have a whole list of questions.

8                    MR. KODOSKY:  Okay.

9                    THE COURT:  So we may get to, you know -- this may

10   not -- well, assuming my questions are answered, then we may

11   need some evidence.  If they're not, I may be able to, based on

12   the record that I have before me, make a ruling.  I don't know

13   yet.

14                   MR. KODOSKY:  Okay.

15                   THE COURT:  But that's where I am, okay?

16                   All right.  Let me see who's here for the opposing

17   party.

18                   MR. KODOSKY:  Thank you, Your Honor.

19                   THE COURT:  Um-hum.

20                   MR. COLBY:  Good morning, Your Honor.  Eben Colby and

21   Marley Brumme from Skadden Arps on behalf of SeeCubic.  Also

22   joined by one of our paralegals, Melissa Lau, L-A-U.

23                   THE COURT:  Okay, paralegal.

24                   MR. COLBY:  And finally, from SeeCubic, Shad

25   Stastney, Mr. Stastney has been here before.

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 9 of 184

9

 1          THE COURT:  And who are you here for, Mr. Colby,

 2   again?

 3          MR. COLBY:  SeeCubic, Inc.

 4          THE COURT:  Okay.  Anybody else entering their

 5   appearance in this matter?

 6          MR. COLBY:  Yeah.  There's some new faces here today,

 7   Your Honor.

 8          THE COURT:  Okay.

 9          MR. GRUGAN:  Good morning, Your Honor.  Terence

10   Grugan from Ballard Spahr.

11          THE COURT:  Terence?  What's your name again?  Last

12   name, sir?

13          MR. GRUGAN:  Grugan, Your Honor.  G-R-U-G-A-N.

14          THE COURT:  And you're from Ballard.  And who do you

15   represent?

16          MR. GRUGAN:  I represent Mr. Stastney in his personal

17   capacity.

18          THE COURT:  Now, are you involved with representing

19   Mr. Stastney?  I know that tentatively that there's this

20   adversary against lots of people.  I don't look at those things

21   until I have to, but I know they exist.  Are you representing

22   him in that matter or solely for today?

23          MR. GRUGAN:  In the adversary matter.  I would enter

24   my appearance on behalf of Mr. Stastney individually.

25          THE COURT:  All right.

Case 23-10763-amc    Doc 787-14    Filed 10/09/23    Entered 10/09/23 19:50:57    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 10 of 184

10

1          MR. GRUGAN:  Yep.

2          THE COURT:  As I say, I don't go perusing the dockets

3   and creating trouble for myself.

4          MR. KODOSKY:  Yeah.  And Your Honor, just to clarify,

5   I believe the motion was filed in the adversary proceeding.

6          THE COURT:  Right.  I know that, but --

7          MR. KODOSKY:  Okay.

8          THE COURT:  -- I wasn't sure that whether an

9   appearance had been entered yet for Mr. Stastney.  Again, I

10  don't -- I would not get that information until some matter

11  came, either a motion to dismiss or an answer was filed.  And

12  once an answer is filed, I issue a scheduling order.  I'm

13  nowhere near that, so I don't even know, to be perfectly

14  honest, who the Defendants are, other than what's in the title.

15  Okay.  All right.

16          And you are here, sir?

17          MR. WRIGHT:  Good morning, Your Honor.  Davis Wright

18  from Robinson & Cole. I'm here on behalf of SLS Holdings VI,

19  LLC.

20          THE COURT:  SLS Holdings VI, LLC?

21          MR. WRIGHT:  LLC, Your Honor.  Yes.

22          THE COURT:  And I'm sorry.  Your last name, again,

23  Counsel?

24          MR. WRIGHT:  Wright, W-R-I-G-H-T.

25          THE COURT:  Okay.

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 11 of 184

11

```
 1              MR. WRIGHT:  Thank you.

 2              THE COURT:  Thank you. Mister --

 3              MR. CAPONI:  Your Honor, good morning, again.  Steve

 4   L. Caponi from K&L Gates on behalf of Hawk.

 5              THE COURT:  And is Hawk a Defendant in the adversary?

 6              MR. CAPONI:  There are no other Defendants at this

 7   point in time, Your Honor.

 8              THE COURT:  Okay.  Again, I don't know who -- other

 9   than, you know, the original just looking at the caption, I

10   have no clue who's the Defendant.  I know there's a lot of

11   names.  Okay.  Anybody else who -- oh, okay.

12              MR. DEMARCO:  Yes, Your Honor.  Andrew DeMarco from

13   Devlin Law Firm, here for Rembrandt.

14              THE COURT:  Rembrandt.  Okay. Anybody else?  I think

15   that covers everyone in the courtroom.  All right.

16              MR. KODOSKY:  Your Honor --

17              THE COURT:  Um-hum.

18              MR. KODOSKY:  -- just while we're on the issue of

19   appearances, I would note for the record that the adversary

20   proceeding was filed against a number of other individuals and

21   a company.  They are also, supposedly, subject of the TRO

22   motion, but they're not here.  They don't have counsel here.

23   Based on our view, it doesn't look like they've been properly

24   served.  It's a little hard to see how we could proceed on a

25   TRO motion against them where they haven't been properly
```

Case 23-10763-amc   Doc 483-14   Filed 10/00/23   Entered 10/00/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 12 of 184

12

1   served.  I'll just make that notation for the record, but so

2   that would --

3          THE COURT:  Well, that's their burden.  They have to

4   show that --

5          MR. KODOSKY:  You took the words right out of my

6   mouth, Your Honor.

7          THE COURT:  That's on them, so I mean, I've read your

8   pleadings.  And again, that's what took a bit, because unlike

9   law firms, I don't have 10 associates to research issues and go

10  through.  So it's, you know -- so it took us a bit,

11  particularly since, you know, I'm a little under the weather.

12  So that's my story as to why we're starting a little later than

13  I anticipated. Oh, can you not hear me?  Can you hear me now?

14  Okay.  I apologize.  Again, and counsel, I will, again,

15  reiterate that if I start to feel unwell, I am going to take a

16  little time out, okay?  All right.

17         So Mr. Kodosky, you've heard my -- the initial, I

18  guess, inquiry would be, is who are we proceeding against

19  today, and what's the emergency with respect to -- I'm assuming

20  each one of these named Defendants, which is -- hold on.  Let

21  me -- I do have a pleading binder.  It's not going to have --

22  let's see what we have in ours, which is going to be the

23  original complaint.  So I have the original complaint that was

24  filed, and it names a number of -- I mean, my original, if I

25  just look at it on my docket sheet, it's just going to say

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 19:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 13 of 184

13

1   Stream TV and Technovative versus Stastney, SLS, et al.  So I

2   do have a copy of the original complaint that lists all of the

3   Defendants.

4          So let's start with who is the Debtor seeking a TRO

5   against?

6          MR. KODOSKY:  The TRO was filed against all of the

7   Defendants, Your Honor.

8          THE COURT:  Um-hum.

9          MR. KODOSKY:  But admittedly, we are still in the

10  process of serving some of the overseas individuals and

11  entities.  We have before us with the Court today, Mr. Stastney

12  and Hawk and SLS and SCI.

13         THE COURT:  Wait.  I thought Hawk wasn't a Defendant

14  in this matter.

15         Did I miss something, Mr. Caponi?

16         MR. CAPONI:  I believe Hawk is a Defendant.

17         THE COURT:  I thought you said Hawk -- Hawk is

18  named --

19         MR. KODOSKY:  Hawk is here.

20         MR. CAPONI:  Hawk is named.

21         THE COURT:  Yeah.  You said they weren't a Defendant

22  -- to your knowledge, they weren't a Defendant yet, but

23  apparently, Hawk Investment Holdings -- is that -- you know you

24  guys have different names for these companies, so I don't know.

25  Is this the one that's your client?  Is this something

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 14 of 184

14

 1   different?  I don't know, but I thought you said they were not

 2   a Defendant yet.

 3        MR. CAPONI:  Hawk Investment Holdings Limited, Your

 4   Honor?

 5        THE COURT:  Yes.  Is that something different than

 6   the Hawk we've been talking about?

 7        MR. CAPONI:  No.  That's who I represent in this

 8   proceeding.

 9        THE COURT:  Okay.  So they are a named Defendant?

10        MR. CAPONI:  They are a named Defendant, Your Honor,

11   and they have filed a proof of claim in this case.  And I know

12   that there have been questions raised or at least eluded to

13   about, you know, jurisdiction.  Our position is, is that, for

14   example, Hawk or SLS or SCI, they've filed proofs of claim,

15   they're here, there shouldn't be a question of jurisdiction.  I

16   believe the Court's bigger concern is why now, the urgency

17   question.

18        THE COURT:  Well, before we get to the urgency, what

19   about these other people who have -- I haven't heard anyone

20   say.  So Mister -- I gave you another name, counsel.

21        MR. CAPONI:  Sorry?

22        THE COURT:  I made up a different name for you.  I

23   made you Steven Kobe [phonetic].  I'm like, who is that.  For

24   Hawk's.

25        MR. CAPONI:  Hawk, yes.

Case 23-10763-amc   Doc 737-14   Filed 10/20/23   Entered 10/20/23 19:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 15 of 184

15

```
 1                 THE COURT:  Yes.  That --

 2                 MR. CAPONI:  Yes.

 3                 THE COURT:  I'm sorry, Mr. Caponi.

 4                 MR. CAPONI:  All right.

 5                 THE COURT:  I know I wrote Kobe.  I don't know why.

 6    Between Kobe and DeMarco, those seem to be our favorite last

 7    names for this hearing.  All right.

 8                 So Mr. Caponi, Hawk is a named Defendant in the

 9    matter.  I had written that --

10                 MR. CAPONI:  Correct, Your Honor.

11                 THE COURT:  -- they weren't, and you said to your

12    knowledge they weren't, but apparently they are named.  All

13    right.

14                 So what about Arthur Leonard "Bob" Morton?

15                 MR. KODOSKY:  Overseas Defendant, Your Honor.  We are

16    still in the process of serving him and the other individuals

17    overseas, which is not critical for today's purposes.

18                 THE COURT:  So you're not looking for relief against

19    Mr. Morton?

20                 MR. KODOSKY:  The most important thing, Your Honor,

21    is we're asking for relief against Mr. Stastney and the

22    companies that he's in charge of, and he's actually --

23                 THE COURT:  Well, let's identify specifically who

24    we're talking about.  So you're seeking relief against Mr.

25    Stastney individually, correct?
```

Case 23-10763-amc   Doc 787-14   Filed 10/20/23   Entered 10/20/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 16 of 184

16

```
 1                    MR. KODOSKY:  Correct.

 2                    THE COURT:  And which companies?  Which we believe is

 3   SeeCubic what?

 4                    MR. KODOSKY:  I'm sorry.  SLS Holdings VI, LLC.

 5                    THE COURT:  Hold on.  SLS VI Holdings, LLC, who is

 6   represented by Mr. Wright here, correct?

 7                    MR. KODOSKY:  Correct.

 8                    MR. WRIGHT:  Yes, Your Honor.

 9                    THE COURT:  All right.  Who else?

10                    MR. KODOSKY:  SeeCubic, Inc.

11                    THE COURT:  Represented by Mr. Colby.  And Stastney

12   is represented by Mr. Grugan from Ballard.

13                    Did I pronounce your last name right?

14                    MR. GRUGAN:  Grugan.  That's it, Your Honor.

15                    THE COURT:  All right.  Okay, because I'm a little

16   off.  I'm spelling names probably not correctly, but just bear

17   with me.

18                    All right.  Who else are we asking for relief for?

19                    MR. KODOSKY:  Hawk Investment Holdings Limited.

20                    THE COURT:  And that's Mr. Caponi's client.

21   Investment Limited.  Okay.

22                    And who else?

23                    MR. KODOSKY:  Any agents of any of the above, Your

24   Honor.  Servants, employees, attorneys, others acting on their

25   behalf.
```

Case 23-10763-amc   Doc 737-14   Filed 10/20/23   Entered 10/20/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 17 of 184

17

```
 1                  THE COURT:  All right.  Now, what about -- who is

 2     Patric Theune?

 3                  MR. KODOSKY:  He is --

 4                  THE COURT:  Is he here?  Is he --

 5                  MR. KODOSKY:  Overseas.

 6                  THE COURT:  -- represented?

 7                  MR. KODOSKY:  Overseas.

 8                  THE COURT:  Okay.  And you're looking for some relief

 9     against him?

10                  MR. KODOSKY:  Once he's served.  If --

11                  THE COURT:  Well, I can't do anything with them

12     today.

13                  Now, what about SeeCubic B.V.?  Is somebody here for

14     them?  Because I heard Mr. Colby say SeeCubic, Inc.

15                  MR. KODOSKY:  Correct.  SeeCubic, Inc. is the

16     Delaware entity --

17                  THE COURT:  Um-hum.

18                  MR. KODOSKY:  -- that is involved --

19                  THE COURT:  Um-hum.

20                  MR. KODOSKY:  -- formed by the secured creditor.

21     SeeCubic B.V. is one of the Dutch entities --

22                  THE COURT:  Oh.

23                  MR. KODOSKY:  -- that's the R&D entity that we've

24     been talking about for some months that's in the Netherlands.

25                  THE COURT:  So who is representing them?
```

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 18 of 184

18

1          MR. KODOSKY:  They have not been served, Your Honor.

2          THE COURT:  Okay.  So they haven't served.  And I

3    don't know how that is -- is that service required by the Hague

4    Convention?  Is service required -- I don't know.  I'm assuming

5    if they are a signatory to the Hague Convention that they are

6    going to have to be served in accordance with whatever that is,

7    which is translated and all those other different steps you

8    have to -- so right now, we do not have SeeCubic B.V., we do

9    not have Patric Theune, and we don't have the name -- all these

10   named individuals, Mr. Morton, Mr. Crawford, Mr. Kabacinski,

11   Mr. Gollop, ASAF Gola, and obviously all these other -- Jane

12   Doe(s) of Delaware.  What's Delaware?  Delaware, another law

13   firm?  What does that mean?  John Doe(s), Jane Doe(s) Delaware.

14   So John and Jane Doe(s) of Delaware, or is Delaware just the

15   State of Delaware?  I don't know.

16          Again, I have not -- I guess, you know, that would've

17   required me to go through the complaint and see who the parties

18   are and how they're identified.  Oh, okay.  Preliminary

19   statement, jurisdiction and venue.  Oh, okay.  They're under

20   Defendants, they're all identified in the parties, and let's

21   see who we see in this.  Miscellaneous.  Jane Doe(s),

22   Defendant, John Doe(s), law firms employed by John Doe(s) and

23   Jane Doe(s).  Defendant law firms are operating -- oh, on the

24   Delaware law employed.  Okay, I get it.

25          All right.  So it seems to me right now, today, all

1   we have is Mr. Stastney individually, SLS VI Holdings, LLC,

2   SeeCubic, Inc, and Hawk Investments Limited.  Those are the

3   only parties that are here and you acknowledge have been

4   properly served?

5           MR. KODOSKY:  Correct, Your Honor.

6           THE COURT:  Okay.  I'm sorry.  Can you hear me now?

7           MR. KODOSKY:  Yes.

8           THE COURT:  I'll endeavor to get it as close to

9   possible to the mic.  Is that okay, John?

10          UNIDENTIFIED SPEAKER:  It's better.

11          THE COURT:  All right.

12          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

13          THE COURT:  It's a little closer.  All right.

14          So you agree that those are the only four of the

15  Defendants are presently before this Court --

16          MR. KODOSKY:  With the only caveat, Your Honor -- you

17  mentioned SeeCubic B.V.

18          THE COURT:  Um-hum.

19          MR. KODOSKY:  Mr. Stastney has, as I believe the

20  Court is aware, has been appointed director as of essentially

21  two weeks ago of that entity, over in the Netherlands.

22          THE COURT:  Okay.

23          MR. KODOSKY:  So whether or not they're here today by

24  virtue of his appearing in the courtroom today, obviously we're

25  still working through service issues and so forth, but I

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 20 of 184

20

1   just --

2            THE COURT:  But it's not without notice.

3            MR. KODOSKY:  I just at least for the --

4            THE COURT:  Right.  I mean, it's not like these other

5   people who may be unaware of any of this stuff --

6            MR. KODOSKY:  Correct, Your Honor.

7            THE COURT:  -- or anything, that while they may not

8   have been formally served, it's not without notice to at least

9   a director.

10            MR. KODOSKY:  Correct.

11            THE COURT:  No.  I mean, they don't have to appear.

12   I mean, it's like anything else.  It's like, you know,

13   bankruptcy, I might know of it, but if you don't serve me or

14   give me the proper information, I don't really have to

15   participate, but I get it.  I get what you're saying.

16            All right.  So that's number one.  So I don't see how

17   I can issue any ruling.  I mean, actually, you can issue a TRO,

18   ex parte, without notice to anybody --

19            MR. KODOSKY:  Right.

20            THE COURT:  -- with an order that the hearing be held

21   within its designated time period, but nobody asked for ex

22   parte relief.  They asked for a hearing, which is what I went

23   from the very beginning, when I looked at that, it says, what

24   kind of relief were you looking for, and it says TRO/injunctive

25   relief.  So I wasn't quite sure if you were trying to do just a

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 19:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 21 of 184

21

```
 1  TRO or a combined hearing, or exactly what the Plaintiffs were

 2  asking for.  So can you tell me exactly what you are asking

 3  this Court to do and in what context?

 4          MR. KODOSKY:  Absolutely, Your Honor.  We have asked

 5  for a temporary restraining order to be entered for a period of

 6  14 days, as allowed under Bankruptcy Rule 7065 and Federal Rule

 7  of Civil Procedure 65, and then following the 14 day period, we

 8  would ask the preliminary injunction and permanent injunction

 9  be entered pending the final adjudication of this matter.

10          THE COURT:  Okay.  And then the preliminary

11  injunction, what is that, 28 days?

12          MR. KODOSKY:  I'm sorry?

13          THE COURT:  What's that, 28 days for a preliminary

14  injunction?

15          MR. KODOSKY:  I didn't hear you, Your Honor.

16          THE COURT:  Oh.

17          MR. KODOSKY:  I'm sorry.

18          THE COURT:  And the preliminary injunction is also

19  limited in time, is it not?

20          MR. KODOSKY:  We would ask for the preliminary

21  injunction to last until the final order in this case, Your

22  Honor.  The final judgment.

23          THE COURT:  I don't know.

24          MR. KODOSKY:  The Court has the discretion to enter a

25  preliminary injunction for a lesser time period, but we are
```

Case 23-10763-amc   Doc 787-14   Filed 10/09/24   Entered 10/09/24 29:50:57   Desc
Exhibit K. Stream October 2023 Hearing Transcript   Page 22 of 184

22

 1  asking, given the nature of the relief that we're seeking, for

 2  it be entered until final judgment in this case.

 3       THE COURT:  Hmm, okay.  Again, because of the way it

 4  was titled, I wasn't quite sure exactly.  I knew it was an ex

 5  parte relief.  That was the one thing I was certain of.

 6       Okay.  And you believe, and while an evidentiary

 7  hearing is not required for a TRO, it makes sense when there's

 8  disputed facts for the Court to make an -- to have an

 9  evidentiary basis upon which to make its decision, if the Court

10  finds that that record needs to be made.

11       And so that's the first thing I'm sort of trying to

12  figure out before we get into all of this testimony, is -- and

13  I don't think I need testimony to tell me what the Debtor

14  believes was the basis for the -- why we needed to do this TRO

15  and why it was an emergency.  I'm not understanding what is the

16  emergency.  I've read both party's pleadings and I'm walking

17  away confused.

18       So counsel, why don't you just, in the initial

19  matter, tell me why you believe that this was, you know -- what

20  is the emergency?  I'm not understanding.

21       MR. KODOSKY:  Well, there's several bases for that,

22  Your Honor.  First of which is that we've recently been

23  informed and -- permission to approach, Your Honor?  We've been

24  informed --

25       THE COURT:  Well, no.  Just tell me because I'm not

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 23 of 184

23

1  looking at evidence right now.

2         MR. KODOSKY:  We've been informed by Philips that

3  they're not giving out anymore licenses, and they also are in

4  the process of selling a big chunk of the patents, and we're at

5  a very real risk, Your Honor, of losing our license from

6  Philips, based on the conduct of these Defendants.  The fox is

7  in charge of the hen house, Your Honor, as of two weeks ago.

8  Mr. Stastney is in charge of -- he's been appointed a director

9  of SCBV, which is new information.  If --

10        THE COURT:  Well, I get that's new.  That's new from

11  two weeks ago, correct?

12        MR. KODOSKY:  Correct.

13        THE COURT:  All right.  That I get is new, but I'm

14  not quite sure how that translates into an emergency, but

15  you're going to have to tell me.  At least tell me.  I'm not

16  looking at evidence, no.  I'm just trying to get a feel for

17  whether this is something that I even need to have a hearing

18  on, or something that based on the pleadings that I've seen,

19  putting aside whatever the parties are disputing, whether I can

20  issue a ruling without, and then setting -- issue a TRO, and

21  then a hearing on a preliminary injunction.

22        Because the first thing I have to figure out is, is

23  this an emergency, and if it is, whether I even need to say,

24  I'm not giving a TRO because there's not an emergency and just

25  do a regularly scheduled hearing on a preliminary injunction.

Case 23-10763-amc   Doc 487-14   Filed 10/20/23   Entered 10/20/23 19:56:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 24 of 184

24

1  You know, they're the same standard, by the way, but it's just

2  that the TRO is more of an emergency as opposed to the

3  preliminary injunction, which is not on an emergency basis --

4  typically not on an emergency basis.

5         All right.  Not giving out anymore licenses.  Okay.

6  Now, Stream has one, right?  No, or Rembrandt has one?  Who has

7  a Philips license, your understanding?  That's all I'm asking.

8         MR. KODOSKY:  Correct, Your Honor.  The license is

9  held by Ultra D Ventures, and its affiliates, which includes

10  the Debtors.

11         THE COURT:  Ultra D?  Ultra D who?

12         MR. KODOSKY:  Ultra D Ventures, which is one of the

13  Stream subsidiaries.  I know Your Honor is --

14         THE COURT:  Oh, no.  I have my little handy -- no, I

15  came prepared today.

16         MR. KODOSKY:  We provided the --

17         THE COURT:  Thanks to my law clerks, I am prepared,

18  at least as prepared as I think I need to be.

19         MR. KODOSKY:  I believe --

20         THE COURT:  Okay.  Ultra D Ventures?

21         MR. KODOSKY:  Yes.  Yes, Your Honor.

22         THE COURT:  CV Corasaw [phonetic]?

23         MR. KODOSKY:  Yes, Your Honor.

24         THE COURT:  They hold licenses?

25         MR. KODOSKY:  Correct.

Case 23-10763-amc   Doc 787-14   Filed 10/00/23   Entered 10/00/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 25 of 184

25

1          THE COURT:  Okay.  Somebody gave me this.  This is --

2  somebody -- it may have actually been entered into evidence.  I

3  don't know.  I'm sure somebody talked about it.

4          Mr. Colby?

5          MR. COLBY:  Yeah.  We submitted it in connection with

6  our brief, but it also was used in the hearing on the Hawk

7  motions.

8          THE COURT:  Okay.  I'm like, I didn't just pull this

9  out of somewhere.

10         MR. COLBY:  It is in evidence in that.

11         THE COURT:  All right.  So I see this Ultra D.  Okay,

12  okay.  Hmm.  And Ultra D is 99 percent -- according to this

13  chart, apparently is 99 percent owned by Stream TV Networks.

14         MR. KODOSKY:  Correct, Your Honor.

15         THE COURT:  Okay.

16         MR. KODOSKY:  And importantly, as I believe the Court

17  is aware, the Philips license expressly provides that there are

18  to be no sub-licenses.  And so by virtue of the Defendants

19  running around to potential clients and customers, sub-

20  licensing the technology from Philips, they're breaching the

21  Philips license, putting our license at risk.

22         THE COURT:  Well, they -- I mean, if I read their

23  response, they have their own direct license from Philips.

24  That's what they say.

25         MR. KODOSKY:  And that's certainly something that

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 26 of 184

26

 1  we're going to be asking Mr. Stastney about, because there has

 2  been no license granted from Philips to SCI or to Mr. Stastney.

 3          THE COURT:  Well, that's a dispute.  That's a

 4  dispute, I get that.  Okay.  So you believe that once Mr.

 5  Stastney was appointed on September --

 6          MR. KODOSKY:  September 20th.

 7          THE COURT:  Why did I have September 13th?  What's

 8  September 13th?

 9          MR. KODOSKY:  September 12th, Your Honor, is the date

10  that their attorneys --

11          THE COURT:  Oh, it was a hearing.  It was a hearing

12  on the 12th or the 13th?

13          MR. KODOSKY:  The 12th was whenever their attorneys

14  submitted a new claim asking that Mr. Stastney be appointed

15  director.

16          THE COURT:  Oh, okay.

17          MR. KODOSKY:  The 13th and 14th, I believe, were the

18  dates of the hearing.

19          THE COURT:  And then there was an order entered on

20  the 20th?

21          MR. KODOSKY:  And the order was entered on the 20th.

22  And if you look -- and I know that you have, Your Honor, but --

23          THE COURT:  Well, I wouldn't be so sure, but go

24  ahead.

25          MR. KODOSKY:  I've read your transcript from the

Case 23-10763-amc    Doc 437-14    Filed 10/09/23    Entered 10/09/23 19:56:50    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 27 of 184

27

1    April 14th hearing where you specifically said, I don't want

2    anybody going to the Netherlands and telling the Netherlands

3    court.  That claim belongs here.  And then you came back at the

4    June 29th hearing and you said, you went back and you read the

5    April 14th transcript and you said, there's going to be serious

6    consequences if anybody over in the Netherlands is trying to

7    essentially take over any of the assets, and that's exactly

8    what they did.

9            THE COURT:  I don't know if they did or they didn't,

10   but I will reiterate for the record that as far as this Court

11   is concerned, to the extent the Debtor contains this is assets

12   of the Debtor's estate and there's a dispute regarding that --

13   now, this belongs here.  Now, where I've sent it to, do I -- am

14   I some expert on IP?  I'm not.  Would I send it somewhere else?

15   But it's not going to be somewhere other than in this Court or

16   courts affiliated with this Court, which means the District

17   Court.

18           MR. KODOSKY:  Yes, Your Honor.

19           THE COURT:  So that's clear, and I'm not quite sure

20   if what you're saying is that the by-appointment of Mr.

21   Stastney, that court somehow is exercising control over the

22   licenses.  I'm not sure if -- unless there was some order

23   saying they could do something with it or they proposed --

24   because I will say to everyone here, to the extent anyone is

25   trying to sell, use, or do anything that belongs to the Debtor

Case 23-10763-amc   Doc 487-14   Filed 10/09/23   Entered 10/09/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 28 of 184

28

1   contents, belongs in this estate, I have told everybody and I'm

2   going to reiterate, you proceed at your own risk.

3          MR. KODOSKY:  Right.

4          THE COURT:  Because I am pretty sure and I'm pretty

5   certain that if this is the Debtor's assets, no one can do

6   anything.  I don't know if it's the Debtor's assets.  That's

7   number one.  I don't know if it is or it isn't, but when the

8   Debtor asserts that it is and someone decides that they're

9   going to do something with it, proceed if you want, there's

10   going to be consequences for that.  But I have -- just because

11   he's appointed a director doesn't mean that he's doing

12   anything.  "He" meaning the company that he's been appointed as

13   director for.  So I need to talk -- how is that an emergency?

14          MR. KODOSKY:  Well, and Your Honor, one of the

15   exhibits that we attached to our motion was this subscription

16   agreement.  They are out there raising money, essentially lying

17   to investors.  There's no mention of this litigation, there's

18   no mention of any kind of question about the IP rights.

19   They're raising money to compete against us and to fund

20   litigation against us.

21          THE COURT:  Well, that's all well and good.  They can

22   go raise whatever money they want, but I've read their reply

23   and they said that they're telling potential purchasers of

24   subscription that this stuff is in dispute.

25          MR. KODOSKY:  And Your Honor, I picked up on that

Case 23-10763-amc   Doc 737-14   Filed 10/20/23   Entered 10/20/23 19:50:50   Desc
Exhibit K. Stream October 2022 Appeal Trial Transcript   Page 29 of 184

29

1  line in their response, as well, and if you note, there's no --

2  they're not citing to anything after that sentence.

3          THE COURT:  Well, presumably, they're going to give

4  me a copy of the subscription.

5          MR. KODOSKY:  We've provided a copy of the

6  subscription, Your Honor.

7          THE COURT:  Well, that's their defense, and so it

8  seems to me that notwithstanding what I thought I could just --

9  you know, I thought I could proceed in a certain manner, which

10  is look, okay, maybe this is an emergency, and given what I've

11  seen in the pleadings, there is -- now there's a dispute.

12  There's a -- the Debtors are saying Mr. Stastney, through

13  SeeCubic B.V., is doing certain things that are basically the

14  Debtor's assets, and that Mr. Stastney, individually, is doing

15  action with respect to the Debtor's assets, and we need to stop

16  him and SeeCubic B.V.

17          MR. KODOSKY:  And SeeCubic, Inc.

18          THE COURT:  And what are they -- what's their

19  relationship?  Are they out there doing things, too?

20          MR. KODOSKY:  They are marketing and selling to

21  potential clients the technology -- I've got Mr. Stastney's

22  testimony where he describes it as, we are marketing and

23  selling -- I can read you his --

24          THE COURT:  Well, no, no.  So you believe that Mr.

25  Stastney is trying to -- well, not Mr. Stastney -- SeeCubic,

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 19:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 30 of 184

30

1    Inc. --

2              MR. KODOSKY:  SeeCubic, Inc.  Correct.

3              THE COURT:  -- is trying to sell the license that

4    belongs to the Debtor?

5              MR. KODOSKY:  Absolutely.

6              THE COURT:  And their position is, well, we haven't

7    used anything that technically could be the Debtor's since

8    2020.

9              MR. KODOSKY:  Mr. Stastney, on June 23rd, at his

10   deposition, stated, "SeeCubic, Inc. sells or markets the

11   technology to potential clients on behalf of SeeCubic B.V."  So

12   SeeCubic, Inc. is working with SeeCubic B.V.  They call it

13   SeeCubic T.V., and together, they are --

14             THE COURT:  Now we've got another player?  Like I

15   can't keep these names straight.  SeeCubic B.V., SeeCubic,

16   Inc., now we have SeeCubic T.V.?

17             MR. KODOSKY:  And that's -- I don't even know that

18   that's a real organization, Your Honor, but he described it at

19   the June 29th hearing as SeeCubic B.V. and SeeCubic, Inc.

20   working together to sell this licensing -- to sell the Philips

21   Technology, essentially.

22             THE COURT:  But this is what -- in my mind how this

23   is working, and Mr. Colby, you'll be able to answer, too.

24   Originally, and this is how I see it, which is why I don't know

25   if I need any evidence because I may have enough to say what I

Case 23-10763-amc    Doc 737-14    Filed 10/09/23    Entered 10/09/23 29:50:50    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 31 of 184

31

 1   need to say.  But originally as I see this, there was --

 2   somehow, there was -- Stream TV, Stream, started to develop

 3   this technology with engineers that came from Rembrandt.  I

 4   have my own thoughts about that, but that's neither here nor

 5   there.  And somehow, Rembrandt found out and they said, no,

 6   this is ours, and so they sort of fought it out and came to

 7   some agreement.

 8          In the meantime, Stream, because it's Stream and

 9   whatever, they work out some agreement.  And in the meantime,

10   Stream's subs are authorized to use the license -- or I don't

11   know how they got the license, because nobody has ever said to

12   me where the license is from Stream to these other people.  I

13   haven't seen anything.  All I recall from Mr. Stastney is

14   that's how it's always been, but that doesn't help me.  Doesn't

15   help me to follow the flow of how the license flowed.

16          MR. KODOSKY:  Your Honor --

17          THE COURT:  I don't know, and nobody has given me any

18   written documents, other than what I have from Rembrandt and

19   Stream, nothing telling me how it got to these other people,

20   other than that's how we always did it.  That's not going to

21   help me one bit, but nevertheless, getting that, you know, so

22   one of -- according to this structure here, Ultra D Ventures is

23   holding the license and they're 99.9 percent owned by Stream

24   TV.  Okay.  And what Ultra D did with it, I don't know, and how

25   they were able to do it, I don't know because I don't know what

Case 23-10763-amc   Doc 487-14   Filed 10/09/23   Entered 10/09/23 29:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 32 of 184

32

1   license they had and how they got to hold a license, and what

2   license they're holding.

3          I don't know.  Nobody has put that into evidence.  I

4   haven't seen that.  Now, if they have, I may have forgotten,

5   and I could have, but I just never -- all I know is that's how

6   we always did.  Did what?  I do not know.

7          Okay.  So that's number one is trying to figure out,

8   you know, that just because the Debtor comes in here and says,

9   this is ours doesn't mean that I get to say, oh, well nobody

10  can do anything, but it's disputed.  It's disputed who this

11  belongs to and until it's determined and the Debtor says it's

12  ours, I don't know what to tell people.

13         Now, the other issue is, and I've heard -- you know,

14  I've read their responses, and I was trying to come up with an

15  analogy with my law clerks, should I use the house or not.

16  It's complicated, but it seems to me -- and maybe I'm not --

17  maybe I'm simple-minded, I don't know.  I look at things very

18  simply.  You're building a house.  You put a foundation in.

19  The foundation uses Philips and Rembrandt.  And Stream, from

20  the testimony that I recall, Mr. Michaels said, from Rembrandt

21  -- I think his name was Michaels -- that they fixed all --

22  "they" meaning Stream -- fixed all the problems and improved

23  the product, right?

24         So now you've got floor number one.  So we've built

25  up on floor number one.  And then here comes more parties,

Case 23-10763-amc   Doc 437-14   Filed 10/20/23   Entered 10/20/23 19:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 33 of 184

33

1   which is, I'm assuming, SeeCubic B.V. in the Netherlands, who

2   then builds on top of that and starts putting their information

3   in, and says, well now we've built our own floor number two,

4   and so floor number two is ours.  We haven't used floor number

5   one, so this belongs to us and goodbye.  Well, this is a whole

6   house and so now I have to figure out who the heck owns this,

7   and you can't -- the same way Stream can't tell Rembrandt and

8   Philips, go away because they built on their foundation, I

9   don't see how these other parties, absent some agreement that

10  somebody is going to give to me, says that we've got to build

11  on top of your house, and you agreed that we didn't owe you

12  anything and we can go do whatever we want with it.

13          That's how I see this.  I don't care what you guys

14  can complicate it with this, that and whatever.  It is that

15  simple for this Court, okay?  And so what I am looking at is

16  what does that mean in terms of a TRO?  What is somebody doing

17  with respect to floor number one?  If they're not doing

18  anything with floor number one, then why are we here?  And if

19  floor number two involves floor number one, which is the

20  Debtor, I know why we're here.  And do I have to say to the

21  people who built floor number two, whoa, stop, you're using

22  floor number one, you don't just get to go out there and do

23  whatever you want.  You've got to recognize floor number one,

24  which is why I don't understand why you guys aren't -- never

25  mind.  Because it's very simple.

Case 23-10763-amc   Doc 487-14   Filed 10/20/23   Entered 10/20/23 19:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 34 of 184

34

1               And Mr. Colby, I will give you an opportunity.

2               I'm just trying to say to him, what's the emergency.

3    Is floor number two about to cave in?  Is floor number one

4    about to cave in because floor number two is taking stuff and

5    not recognizing floor number one?  What is the emergency?  And

6    that is what I'm trying to figure out.  That's number one.

7               MR. KODOSKY:  The concern is, Your Honor, is that

8    having been appointed the director of SCBV, they are out

9    approaching customers, putting the license completely at risk.

10   If Philips essentially were to find out what they were doing,

11   they could revoke our license and then every -- our business --

12              THE COURT:  And the foundation crumbles and they

13   all --

14              MR. KODOSKY:  The foundation is gone at that point,

15   Your Honor.

16              THE COURT:  And everything crumbles.

17              MR. KODOSKY:  And these are bankruptcy assets that he

18   has -- with the fox in charge of the hen house over there, he

19   has no right to be putting our license with Philips --

20              THE COURT:  Well --

21              MR. KODOSKY:  -- at risk.

22              THE COURT:  -- let's put it this way.  Whether it was

23   Mr. Stastney who was the director or any -- it doesn't matter

24   to me.  I get you want to use the fox and the hen house because

25   Mr. Stastney and Mr. Rajan are rivals.  I get it.  I get

Case 23-10763-amc    Doc 787-14    Filed 10/09/23    Entered 10/09/23 29:50:57    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 35 of 184

35

1    exactly what happened.  I know what happens, and I have my

2    thoughts about both of them, okay?  But that's neither here nor

3    there, but they will be in whatever I have to write up, so you

4    guys can rest assured I'm not saying anything that I'm not

5    willing to put in writing, okay?

6          You know, but the bottom line is, you know, the

7    bottom line is whether it's Mr. Stastney, whether it's a third-

8    party, it doesn't matter to the Court who it is.  The question

9    is, are actions being taken that involves property of the

10   estate, jeopardizes property of the estate, and I need to stop

11   that from happening.  Unless that is what's occurring, I don't

12   see how I do a TRO.  That's what I'm trying to figure out from

13   the initial inquiry that I have to make, okay.

14         All right.  Mr. Colby, you heard what my questions

15   were, you tell me.

16         MR. COLBY:  Thank you, Your Honor.  I've got a couple

17   of things for sure.  First, in response to the question you

18   just ended with, is this property of the estate?  A couple of

19   points of clarification.  The Phillips' license and -- yeah,

20   the Phillips' license, so the biggest part of the foundation,

21   if you will, is not property of the estate.  It is with the

22   Dutch entities.  They --

23         THE COURT:  How did it get to them?

24         MR. COLBY:  They are multiple levels down.

25         THE COURT:  And do they have a license?

Case 23-10763-amc   Doc 487-14   Filed 10/06/23   Entered 10/06/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 36 of 184

36

1            MR. COLBY:  I'm sorry?

2            THE COURT:  Do they have a license with Phillips?

3            MR. COLBY:  Yes.

4            THE COURT:  And when did they get that license?

5            MR. COLBY:  That is the license that we've been

6  talking about all along.  Stream TV, the Debtor, has no license

7  with Phillips.

8            THE COURT:  Okay.  So who has a license with

9  Phillips?

10            MR. COLBY:  The license with Phillips is with what

11  we've been referring to as Co-op.

12            THE COURT:  Okay.

13            MR. COLBY:  I'm sorry, Ventures, which is if you look

14  at the chart, it's the top of the right side of the page

15  entity.

16            THE COURT:  And who is the majority holder of

17  Ventures?

18            MR. COLBY:  It is held by, I believe, Technovative

19  and Media Holdings Company.

20            THE COURT:  So I thought it was -- the way this chart

21  is looking, it's not looking like it's going to Technovative.

22  Looks like --

23            MR. COLBY:  Yeah.  That line, that 99.9 percent line

24  is a bit unclear.  We didn't put this chart together.  We're

25  just relying on it but --

Case 23-10763-amc    Doc 487-14    Filed 10/20/23    Entered 10/20/23 19:50:57    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 37 of 184

37

1          THE COURT:  So if it's by Technovative and

2   Technovative is a Debtor -- they're a Debtor here, are they

3   not?

4          MR. KODOSKY:  Yes, Your Honor.

5          MR. COLBY:  Correct.

6          THE COURT:  Okay.

7          MR. COLBY:  So Ultra D Ventures has that Phillips'

8   license.

9          THE COURT:  Okay.

10         MR. COLBY:  Okay.  The -- just to address the house

11  analogy, which I think is useful.

12         THE COURT:  Oh, thank you.  Because I struggle to

13  come up with one that I thought was going to give me a --

14         MR. COLBY:  Well, I think it's rough -- it's useful

15  -- it's a useful structure and it's roughly right.  Except I

16  think some of the -- in the way you laid it out, some of the

17  floors are reversed.

18         THE COURT:  Okay.

19         MR. COLBY:  So the important thing here, and this has

20  been the subject of a lot of testimony in this court, is that

21  the Phillips' license and then the other sort of big important

22  piece of the IP at issue are the various pattens.  Those exist

23  in the Dutch entities.  So at Ventures and below.  In fact,

24  most of the pattens are additional levels below.

25         THE COURT:  So pattens -- who's -- they own the

1    pattens or pattens from someone else?

2            MR. COLBY:  They own the pattens.  Ultra D

3    Cooperative, which is --

4            THE COURT:  Owns the pattens.

5            MR. COLBY:  Owns the pattens, correct.

6            THE COURT:  Okay.  But Ultra D is a 99 percent

7    subsidiary of Technovative?

8            MR. COLBY:  Of -- there are multiple Ultra D's.  So

9    if you notice --

10           THE COURT:  I'm saying Tech -- Ultra D Ventures, the

11   holder of the license?

12           MR. COLBY:  Right.  Ultra D -- I'm sorry, Your Honor.

13   Yeah, is the holder of the license.  Ultra D Cooperative holds

14   the pattens.  And it's actually written right in the box there.

15           THE COURT:  Holds a new patten created by SeeCubic?

16           MR. COLBY:  Right.

17           THE COURT:  Okay.

18           MR. COLBY:  And just to be clear, because again, this

19   is a historical document.  Not something we created.  But the

20   SeeCubic there is referring to the SeeCubic B.V., so the Dutch

21   RND Research and Development entity.

22           THE COURT:  Okay.  Well, it seems to me that Ultra

23   sold all of these companies, which is why I'm not understanding

24   why everybody is fighting over Technovative.  Is that Ultra D

25   Ventures is the license that was given by -- you're saying

Case 23-10763-amc   Doc 487-14   Filed 10/06/23   Entered 10/06/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 39 of 184

39

1   whole license.  What license?  The Phillips' license?

2          MR. COLBY:  The Phillips' license is executed with

3   Ultra D Ventures.

4          THE COURT:  Okay.  And the Phillips' license and that

5   you're saying the pattens, they didn't include anything from

6   Rembrandt?

7          MR. COLBY:  So if I could just --

8          THE COURT:  Go ahead.  I'm sorry.

9          MR. COLBY:  Yeah.  And I'll get to Rembrandt.  The

10  Ultra D Cooperative holds the pattens.  So -- and the pattens

11  were sort of created by the research and development at

12  SeeCubic B.V.

13         THE COURT:  Okay.

14         MR. COLBY:  Okay.  So that's sort of that right hand

15  side of the chart that you're looking at.

16         THE COURT:  But they created it based on the license

17  held by Ultra D Ventures?

18         MR. COLBY:  Yeah.  So they took that Phillips

19  Technology and then they've built on it and they have their own

20  pattens.   So the point I wanted to get to there is if Phillips

21  is the foundation, the first floor wasn't made by Stream TV

22  Networks, Inc., the U.S. entity that is a Debtor.  The first

23  floor was made by the engineers in the Research and Development

24  Group in the Netherlands.

25         THE COURT:  Yes.  But with companies that were at

Case 23-10763-amc   Doc 787-14   Filed 10/20/23   Entered 10/20/23 29:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 40 of 184

40

1  least 99 percent owned by these Debtors?

2          MR. COLBY:  Yes.  Multiple levels down by the time

3  you get to them.

4          THE COURT:  But they are subs of the Debtors.

5          MR. COLBY:  Yeah.  Correct.

6          THE COURT:  Okay.  But somehow -- okay, so you're

7  saying neither Stream TV nor Technovative had any kind of --

8  which, you know, listen.  Apparently from the testimony I've

9  heard is that this was developed with engineers from Rembrandt.

10 Are you telling me it wasn't?

11         MR. COLBY:  So --

12         THE COURT:  Yes?  No?

13         MR. COLBY:  I think it's a more specific answer than

14 that.  I think the situation with Rembrandt is that they had

15 contributed certain components that had historically been used

16 in the Ultra D technology.  I think Mr. Michaels testified

17 about a bordering issue.  He referred to the shadow.  He talked

18 about liveliness of the image.

19         THE COURT:  Counsel.

20         MR. COLBY:  Yes?

21         THE COURT:  Did the engineers, whatever company they

22 were at, come from Rembrandt?

23         MR. COLBY:  The Dutch engineers were predominately

24 from the Phillips organization.

25         THE COURT:  So the testimony then that they -- so the

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 19:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 41 of 184

41

```
 1   testimony that I've heard was that they came from Rembrandt and

 2   that they brought it is not correct is what you're telling me.

 3           MR. COLBY:  I think --

 4           THE COURT:  I'm just trying to figure that out.

 5           MR. COLBY:  They're the majority of the technology

 6   here was Phillips developed Phillips engineers.  Rembrandt

 7   claims that it made certain contributions either by licensing

 8   its technology and there may have been some people in common

 9   there where there was an NDA.

10           THE COURT:  Counsel, I understood to be more than

11   some people in common.  But that's neither here nor there.  Go

12   ahead.

13           MR. COLBY:  Yeah.

14           THE COURT:  So you believe that this is totally

15   Phillips license that was held by Ultra D that then Ultra D

16   Cooperative improved upon and created -- and holds a patten,

17   correct?

18           MR. COLBY:  Correct.

19           THE COURT:  Okay.  That is the bulk of the

20   terminology.  I would also say we're not -- in terms of the

21   urgency here just to address a couple of things that came up to

22   Mr. Kodosky's comments.

23           The -- he referred to just having learned that

24   Phillips isn't giving out anymore licenses.  And in terms of

25   whether or not that is new information, and this is -- I'll
```

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 19:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 42 of 184

42

1   just make a proffer.  I know it's not in evidence yet.  That's

2   something that their claim is based on.  A communication that

3   they received in the middle of August and we're now in October,

4   so that undermines the immediacy and urgency of this.

5          But perhaps more importantly, if it ends up coming

6   into evidence, the substance of the communication is -- doesn't

7   contain whatso ever any threat of losing the license.  In fact,

8   it states that the existing license will not change.

9          THE COURT:  Okay.  And they sent that to who by the

10  way?

11         MR. COLBY:  To Mr. Robertson.

12         THE COURT:  Who's Mr. Robinson (sic)?

13         MR. KODOSKY:  He's --

14         MR. COLBY:  So and then --

15         THE COURT:  Okay.  So you believe there's no

16  immediate threat?

17         MR. COLBY:  Yeah.  And so -- actually, there are a

18  number of other reasons if I might take a couple more minutes

19  of your time, Your Honor, for why there's --

20         THE COURT:  I'm the one asking the questions --

21         MR. COLBY:  Yeah.

22         THE COURT:  -- and I kind of steer you off.  So I'm

23  going to let you try it.  I'm sure you have a little -- you

24  know, you have your own roadmap, so go right ahead.

25         MR. COLBY:  Thank you.  The idea that a TRO is

Case 23-10763-amc   Doc 787-14   Filed 10/20/23   Entered 10/20/23 19:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 43 of 184

43

1   necessary because the Debtors just learnt of ongoing business

2   development activities that are taking place at the Dutch

3   entities is undermined by the fact that those issues that are

4   raised in this TRO motion have been addressed in this -- in the

5   bankruptcy proceeding since day one.  Mr. Rajin and his first

6   day declaration, which is filed on the docket, said exactly

7   that.  That was in March.  The Debtors filed multiple motions

8   regarding the return of assets and other things in the early

9   days of the bankruptcy.  The same things that they're here

10  complaining about now trying to seek a TRO.

11          THE COURT:  Okay.  Now, let me ask you because you

12  know I'm going to interrupt you.

13          MR. COLBY:  Yeah?

14          THE COURT:  In the Rajan declaration or any of the

15  pleadings did they mention that the -- either SeeCubic, Inc.,

16  or SeeCubic B.V. or any of these -- or Mr. Stastney, were

17  trying to obtain subscriptions or license or sublicense this

18  technology?  Was that mentioned?

19          MR. KODOSKY:  He says, Your Honor --

20          MR. COLBY:  It directly -- he says that --

21          THE COURT:  And where is he saying this?  Just tell

22  me.

23          MR. COLBY:  This is -- I'm looking at paragraph --

24          THE COURT:  I mean, this is already in the record.

25  These are already in the record.

Case 23-10763-amc   Doc 787-14   Filed 10/20/23   Entered 10/20/23 19:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 44 of 184

44

 1              MR. COLBY:  Yeah, that's right.

 2              THE COURT:  It's not anything you guys -- but I can

 3  take judicial notice of what's filed.

 4              MR. COLBY:  Right.

 5              THE COURT:  Okay.  Hold on.

 6              MR. KODOSKY:  And I'm sorry, Your Honor.  I didn't

 7  catch what document is being read from.

 8              MR. COLBY:  This is Mr. Rajan's first day

 9  declaration.

10              THE COURT:  Hold on.

11              MR. COLBY:  We resubmitted it as part of our filing

12  today, but it's also on the docket historically.

13              THE COURT:  Counsel, just hold one second.

14              MR. COLBY:  Sure.

15              THE COURT:  All right.  So you -- you're saying that

16  on the docket at docket entry what?

17              MR. COLBY:  Let's see, 48 in the bankruptcy.

18              THE COURT:  I'm trying to figure out why I can't get

19  on there, and I have no clue why not.

20              MR. COLBY:  I'm happy to hand up a copy as well, Your

21  Honor.

22              THE COURT:  Would you and counsel share that with

23  opposing counsel and then hand it up so we all are sure that I

24  have the --

25              MR. KODOSKY:  Where are you reading from?

Case 23-10763-amc   Doc 787-14   Filed 10/20/23   Entered 10/20/23 19:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 45 of 184

45

 1          MR. COLBY:  I was about to go to paragraph 93.

 2          THE COURT:  Hold on.  Hold on.  I don't have it and

 3  I'm just going to give up.

 4          MR. COLBY:  93.

 5          MR. KODOSKY:  We don't need this marked, right?  You

 6  just want a copy?

 7          THE COURT:  No.  He's just -- is there any --

 8  counsel, give us one second.

 9          MR. COLBY:  Sure.

10          THE COURT:  All right, counsel.  We had a little bit

11  of technology.

12          MR. COLBY:  No worries.

13          THE COURT:  All right.  So what page do you want me

14  to go to?

15          MR. COLBY:  I'm looking at paragraph 93, which is

16  page 25 of 31 of the ECF page numbers at the top.  I guess it's

17  25 on both.

18          THE COURT:  25 of 31 you said?

19          MR. COLBY:  Yeah.

20          THE COURT:  I'm there.

21          MR. COLBY:  Okay.  And there Mr. Rajin says that,

22          "The Receiver has allowed SeeCubic to retain and even

23          take possession of certain assets, even after

24          issuance of the chancery court status quo order.

25          He's allowed SeeCubic to use and demonstrate the

Case 23-10763-amc   Doc 487-14   Filed 10/09/23   Entered 10/09/23 29:50:57   Desc
Exhibit K. Stream October 2022 Page 46 of 184 Transcript   Page 46 of 184

46

1              Debtor's technology for its own benefit, even though

2              the Debtor has legal title to the intellectual

3              property and has not given license to SeeCubic, any

4              license to SeeCubic, that would allow it to do so."

5         That is absolutely the same allegation.  That is the

6    core of the issue.

7         THE COURT:  Well, no.  It says to use and

8    demonstrate.  I understood there was -- like they were going to

9    license it to people.  And then Mr. Stastney said at that

10   hearing, I'm going to -- we going to license it to people.  And

11   this isn't showing and demonstrating it.  There was some

12   subscriptions.  My question is, where does it say that he said

13   that they were trying to issue subscriptions or to sublicenses?

14   Is that anywhere in here?

15        UNIDENTIFIED SPEAKER:  It's not, Your Honor.

16        THE COURT:  No.  That was my specific question.  Tell

17   me where does it say subscriptions and sublicense?

18        MR. KODOSKY:  It doesn't specifically reference

19   subscriptions.

20        THE COURT:  Does it --

21        MR. KODOSKY:  There's --

22        THE COURT:  Does he say anything about sublicensing?

23   He says to use and demonstrate, demonstrate, use and

24   demonstrate.  I'm not sure use and demonstrate equal

25   sublicense.

Case 23-10763-amc    Doc 737-14    Filed 10/20/23    Entered 10/20/23 19:50:50    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 47 of 184

47

```
 1              MR. COLBY:  There's also a motion that was filed --

 2              THE COURT:  Okay.

 3              MR. COLBY:  -- on the docket.  It is docket number

 4   76.

 5              THE COURT:  Can you hold one second, counsel?

 6              MR. COLBY:  Sure.

 7              THE COURT:  This -- can I take a five -- just a two-

 8   minute recess?

 9              MR. COLBY:  Yeah, of course.

10              THE COURT:  This is my grandson's school.  Court is

11   in recess.

12         (Recess taken)

13              THE BAILIFF:  All rise.

14              THE COURT:  Please be seated.  Okay.  I'm sorry.  Go

15   ahead.

16              MR. COLBY:  Absolutely, Your Honor.  So I think where

17   we left off, as you were asking whether or not the Debtors had

18   previously identified this potential issue that's now the basis

19   of their TRO motion, and specifically whether or not the

20   potential SeeCubic licensing of, or sub licensing of Phillips

21   had ever been mentioned before.  And so I've got a few

22   examples.

23              I started to refer to one and I'll finish the thought

24   on that, although there's an even better one.  The one I was

25   discussing when we took the break was Docket Number 76, which
```

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 48 of 184

48

1 | we've -- it's on the docket, but we've also just emailed it to

2 | debtors counsel, in which debtors stated in a motion addressing

3 | a claimed stay violation.

4 |      They said,

5 |      "Mr. Colby further indicated he was advising his

6 |      clients to continue to violate the stay, arguing a

7 |      novel theory that his client had created enhanced

8 |      products, and they were entitled to keep those,

9 |      despite having no license from the Debtors for such

10 |      technology, and in violation of two existing licenses

11 |      to the Debtors; one from Phillips and the other from

12 |      Rembrandt 3D Holdings, Ltd. for underlying technology

13 |      upon which Streams technology is based."

14 |      So that's one example.  Your Honor, Mister --

15 |      THE COURT:  The Debtor -- they were encouraging --

16 | you lost me.

17 |      MR. COLBY:  Sure.

18 |      THE COURT:  Go back to the beginning of that.

19 |      MR. COLBY:  Sure.  They claimed -- and this is a

20 | statement that I'm reading, but obviously don't agree with --

21 |      MR. KODOSKY:  I'm sorry.  What page are you reading

22 | from?

23 |      MR. COLBY:  I'm reading from page 18.  "Mr. Colby

24 | further indicated he was advising his client to continue to

25 | violate the stay, arguing a novel theory that his client had

1   created enhanced products.  And they were entitled to keep

2   those, despite having no license from the Debtors for such

3   technology.  And in violation of two existing licenses to the

4   Debtors; one from Phillips and the other from Rembrandt 3D

5   Holdings, Ltd. for underlying technology upon which Streams

6   Technology is based."  So same claim they're making here now in

7   support of the TRO they made in --

8              THE COURT:  And their claim is --

9              MR. COLBY:  April.

10             THE COURT:  This is what I'm boiling the claim down

11  to.  I see the claim that what the emergency is, is that Mr.

12  Stastney testified at some hearing in September, that one, he

13  was going to -- that he, meaning BV, was going to sublicense,

14  and two, there was something about some subscription.

15             MR. COLBY:  Right.

16             THE COURT:  Those are the only two things that I see

17  as a basis.

18             MR. COLBY:  Okay.  And I can address that issue.

19  There is no -- that is not new.

20             THE COURT:  What's not new, the subscription or the

21  sub license?

22             MR. COLBY:  The sub license is not new.

23             THE COURT:  Okay.

24             MR. COLBY:  It's not new at all.

25             THE COURT:  Okay.

Case 23-10763-amc    Doc 787-14    Filed 10/20/23    Entered 10/20/23 29:50:57    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 50 of 184

50

1          MR. COLBY:  The June 29th hearing.  So June 29th, at

2     page 20.  Mr. Alexander asked Mr. Stastney, "And SeeCubic

3     Inc.'s business plan is premised on being able to license the

4     Phillips tech?"  "Answer:  Yes."

5          THE COURT:  Okay.

6          MR. COLBY:  And then he went on to ask about and Mr.

7     Stastney testified about NDAs with potential clients who are

8     interested in that technology.  So the idea that that was a

9     long-term business plan, and that there were some initial steps

10    being taken is not new.

11         THE COURT:  Well, is it new that he's actually doing

12    it?  That's the question.  The question --

13         MR. COLBY:  No, Your Honor.

14         THE COURT:  And that's what there's -- that's what

15    I'm saying.

16         MR. COLBY:  I understand.

17         THE COURT:  Is he actually -- the fact that he says

18    he's going to, who cares what somebody's going to?  And that's

19    all I want to know from Mr. Stastney.

20         MR. COLBY:  Exactly, Your Honor.  And that's why the

21    follow-up question is important, because it asked about whether

22    or not there were existing nondisclosure agreements with

23    potential customers who are interested in that technology?  In

24    other words, is it happening now?  Is this happening now?

25         THE COURT:  And did he say yes or no?

Case 23-10763-amc   Doc 737-14   Filed 10/20/23   Entered 10/20/23 19:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 51 of 184

51

1              MR. COLBY:  He said yes.

2              THE COURT:  Okay.

3              MR. COLBY:  That was in June.

4              THE COURT:  Okay.

5              MR. KODOSKY:  May I address that, Your Honor?

6              THE COURT:  No.

7              MR. KODOSKY:  Okay.

8              THE COURT:  You'll get your turn.

9              MR. COLBY:  The PPM, the private placement memo, the

10  fundraising memo, it's from 2022.

11             THE COURT:  Okay.

12             MR. COLBY:  2022.  And there's no argument it was

13  recently discovered.

14             THE COURT:  Well, are they --

15             MR. COLBY:  Because it was --

16             THE COURT:  -- doing anything with it?

17             MR. COLBY:  It's the basis of the TRO claim, Your

18  Honor.

19             THE COURT:  Counsel.

20             MR. COLBY:  It is not new.

21             THE COURT:  New.  The fact that I may tell you I'm

22  going to do something may not be new.  The fact that you

23  actually --

24             MR. COLBY:  Right.

25             THE COURT:  -- did it is what I -- and that's what I

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 52 of 184

52

```
 1  need to hear.

 2          MR. COLBY:  Right.

 3          THE COURT:  Did they actually do it?  Did they or did

 4  they not?  And that's what -- that's what I'm saying.  And it

 5  may be that they did.

 6          MR. COLBY:  Understand.

 7          THE COURT:  And that's why I'm saying the bottom line

 8  is they're saying Mr. Stastney went to this hearing, and he

 9  says, I'm doing it.

10          MR. COLBY:  Right.  So --

11          THE COURT:  And that's all I need to hear.

12          MR. COLBY:  Okay.  So the June 29th transcript, the

13  question and answer between Mr. Alexander and Mr. Stastney,

14  that addresses that.  That's not new.

15          THE COURT:  Okay.

16          MR. COLBY:  That's not new.

17          THE COURT:  Okay.

18          MR. COLBY:  As to your perhaps more substantive

19  question, right.  Putting aside that exigent circumstances

20  element, is it happening?  Is it something that you need to

21  worry about?  Well, that's where the decision of the Dutch

22  court is important.

23          So the decision of the Dutch court initially put an

24  independent director in the -- so first of all, just backing

25  way up.  There was also testimony, I believe that when the
```

Case 23-10763-amc   Doc 787-14   Filed 10/00/23   Entered 10/00/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 53 of 184

53

1   receiver under the Chancery courts auspices was in place, that

2   his job was to, among other things -- and I don't have to cite

3   for this, we can pull it up, but I believe there was testimony

4   that his job was to sort of traffic cop projects.  And he did.

5   And that was --

6        THE COURT:  And when he traffic cop he consulted with

7   Stream and he consulted --

8        MR. COLBY:  Correct.

9        THE COURT:  -- with BMV.  So I get that.

10       MR. COLBY:  So yes, it's happening.  And they've

11   known it's happening back to the receiver days.

12       THE COURT:  So who's the traffic cop now?

13       MR. COLBY:  Okay.  Good question.  So in the Dutch

14   proceedings, initially there was an independent director

15   appointed.

16       THE COURT:  And he resigned.  I know.

17       MR. COLBY:  He resigned.  You've got that, right?

18       THE COURT:  Uh-huh.

19       MR. COLBY:  And so now the Dutch court weighing the

20   remaining two options, Mr. Stastney or Mr. Rajan felt that the

21   -- I'm sorry, Mr. Park was put up, not Mr. Rajan -- felt that

22   the better choice that was in the best interest of the Dutch

23   entities and preserving the value of the Dutch entities, was

24   Mr. Rajan.  And here's the important --

25       THE COURT:  You're not Mr. Rajan.

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 19:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 54 of 184

54

1           MR. COLBY:  I'm sorry.  Mr. Stastney.

2           THE COURT:  I know.

3           MR. COLBY:  Of all the people to confuse.  Was Mr.

4   Stastney.

5           THE COURT:  Maybe from your point, but never mind.

6   Again, I digress.  I need to stop.  Go ahead.

7           MR. COLBY:  Okay.  And what's important about that

8   decision is it also has a protocol in place for how to fulfill

9   the responsibilities of that director position.  And it --

10          THE COURT:  What does it say?  Do I have that?  Are

11   you going to -- is that --

12          MR. COLBY:  We submitted it.  It's --

13          THE COURT:  Because, you know, I'm trying not to, you

14   know --

15          MR. COLBY:  I understand.  And I think that this

16   falls clearly within what the Court can take judicial notice

17   of.  This is the decision of the Dutch court also references in

18   orders that the protocol be followed.  They're two separate

19   documents, but it's all part of the same decision.

20          And it says,

21          "First, the independent director is impartial and

22          acting under the supervision of the Dutch court.  The

23          court is supervising us.  Second, the independent

24          director acts in the interest of the Dutch companies.

25          The continuity of its business, taking into account

Case 23-10763-amc   Doc 787-14   Filed 10/20/23   Entered 10/20/23 19:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 55 of 184

55

1           the interests of all the stakeholders."

2           And I'm only reading the highlights, not the entire

3   thing word for word.

4           "The companies allocate their human resources and R&D

5           facilities on internal projects, building blocks,

6           external projects, proof of concepts and in due

7           course support and purchase orders, support in

8           business development and strategic discussion partner

9           on the go to market strategy and customer

10          fulfillment.

11          "The companies will continue pending internal

12          projects and external projects and take on new

13          external projects proposed by any of the parties, if

14          considered to be in the interest of the companies.

15          The companies have to be the beneficiaries of all

16          projects."

17          So that alone completely undermines the argument that

18  there could be some irreparable harm here absent a TRO from

19  this Court.  It says, "And under the supervision of the court

20  that any projects, any work involving those technologies needs

21  to be done for the benefit of those Dutch entities, those Dutch

22  entities are the property of the estate multiple levels down."

23  And so there is no potential harm from this arrangement to the

24  estate, to the Debtors.

25          THE COURT:  That's assuming counsel, because it says

Case 23-10763-amc   Doc 737-14   Filed 10/20/23   Entered 10/20/23 29:56:37   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 56 of 184

56

1   interest of everyone involved.  What is it that they're

2   proposing to do that -- and I need to hear that.  What is it

3   that everybody claims they're going to do?

4            MR. COLBY:  Right.

5            THE COURT:  And if what their claim they're going to

6   do involves the interest of the Debtor, that's property of the

7   Debtor's estate, which you said is -- right now, right now on

8   the books and records of both -- of at least Technovative the

9   owners are who they are, okay.  Until something's done

10  otherwise, we are where we are today.  And so what I'm hearing

11  and I am -- I hope you guys probably understand what I'm

12  saying, I just want to hear, because you -- somebody told me

13  this was Mr. Stastney saying it at a hearing.

14           MR. COLBY:  Yeah.

15           THE COURT:  Do we have a transcript from the hearing?

16  And if we don't have the transcript, Mr. Stastney needs to come

17  over here and tell me exactly what his intentions are --

18           MR. COLBY:  Right.

19           THE COURT:  --  for me to determine whether this is -

20  - a TRO is warranted?  And if I find that it's not, it's not,

21  but it'll be pretty clear that I want him to tell me what he's

22  going to -- that's all I need.

23           MR. COLBY:  Understood.  And I appreciate that, Your

24  Honor.  I think, you know, I submit -- we submit, as you know,

25  that the Court can actually decide this on a number of basis

Case 23-10763-amc   Doc 787-14   Filed 10/00/23   Entered 10/00/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 57 of 184

57

1  without even getting to evidence.  But if you feel that you

2  have to know exactly what the projects are, we can put on that

3  evidence.

4              THE COURT:  No.  I don't want to know what the

5  projects are.

6              MR. COLBY:  Okay.

7              THE COURT:  What they have posited is that the basis

8  for the TRO is based on what Mr. Stastney --

9              MR. COLBY:  Right.

10             THE COURT:  -- told the court he was going to do.

11             MR. COLBY:  Right.

12             THE COURT:  And presumably, nobody's given me a

13 transcript, because you're saying that's not what he said.  And

14 they're saying that's what -- I don't know what he said.

15             MR. COLBY:  Interestingly, and I was surprised to

16 hear this, I suspect the Court may be as well.  They don't do

17 transcripts of the court proceedings in the Netherlands.

18             THE COURT:  Well, is it recordings or something?

19 Nobody writes anything?

20             MR. COLBY:  You can request a summary of it, but it's

21 not transcribed.

22             THE COURT:  So then how am I supposed to know what

23 Mr. Stastney said?

24             MR. COLBY:  Well, that may mean that you need to hear

25 it firsthand.  But I think for the reasons that I just

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 58 of 184

58

1  identified, I think that there's ample basis to deny the

2  request for a --

3          THE COURT:  No, it's not.  Because they have said, he

4  went and told the Dutch court he was going to proceed in a

5  specific fashion.  And unless somebody tells me that that court

6  said, oh, that's fine, you can do it.  I need to figure out if

7  what he intends to do in any way will be -- cause irreparable

8  harm to the estate, and it may be that it doesn't.

9          MR. COLBY:  Sure.

10         THE COURT:  But I don't know that.

11         MR. COLBY:  So Your Honor, I think that the fact that

12 the Debtor has the burden here --

13         THE COURT:  Then

14         MR. COLBY:  -- plays into the --

15         THE COURT:  Then they need to -- they were about to

16 call Mr. Stastney when I said, whoa, we have to have some

17 discussion.  So let's cut -- we don't need all this other well,

18 he said, she said, and they're the -- and Phillips says this

19 and Phillips -- just tell me what he plans to do.  And what did

20 he say?  Presumably he's going to tell me the same thing he

21 told them.  And I don't know if he is, I would assume he is.  I

22 have no basis to believe he wouldn't.

23         MR. COLBY:  Right.  Well --

24         THE COURT:  And then I can tell from that.

25         MR. COLBY:  Okay.  I can make a proffer and, like,

Case 23-10763-amc   Doc 437-14   Filed 10/20/23   Entered 10/20/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 59 of 184

59

1  Your Honor, you may have to hear it for yourself.  But you

2  know, we submitted a declaration for Mr. Stastney.  And he says

3  SeeCubic has not sublicensed any Ultra D technology, including

4  but not limited to any technology covered by Phillips'

5  intellectual property rights to any third party.  SeeCubic

6  itself does not intend to sublicense -- does not currently

7  intend to sublicense any Ultra D technology.

8          THE COURT:  Current.  That's the word currently.

9          MR. COLBY:  Right.

10          THE COURT:  Okay.

11          MR. COLBY:  That's all you can get a TRO for.

12          THE COURT:  Right.

13          MR. COLBY:  You can't get a TRO for something

14  somebody might think they want to do in the future.

15          THE COURT:  Exactly.

16          MR. COLBY:  Right.  You know, SeeCubic itself does

17  not currently intend to sublicense any Ultra D technology,

18  including but not limited to any technology covered by

19  Phillips' intellectual property rights to any third party.

20  So --

21          THE COURT:  We have Phillips -- counsel, see this is

22  this is what I'm not understanding.  Phillips had what it had.

23  Everybody took the Phillips license and they developed it.

24  They added things to it.  We had Mr. Michael say that they --

25  from Rembrandt saying that the people from Stream from BVD

Case 23-10763-amc    Doc 787-14    Filed 10/09/23    Entered 10/09/23 29:50:30    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 60 of 184

60

```
 1   whoever it is SeeCubic, whoever the entities were.  They took

 2   the Phillips basic license and improved it.  So of course

 3   Phillips that -- that's not my question.

 4            Are they going to license sublicense the improved

 5   Phillips license?  Because what Phillips gave people was the

 6   ability.  So that's different in my mind.  That's different in

 7   my mind, Counsel, because there is no doubt that the Phillips

 8   license is not what is existing today, the Phillips original

 9   license.  And so I need to know what the intentions are with

10   respect to the improved Phillips license.

11            MR. COLBY:  Okay.

12            THE COURT:  And that's what I want to know.  So this

13   semantics about the -- nah, no, no, no.  That's not what I want

14   to hear.  I want to know what the intentions are with respect

15   to the license that currently exist.

16            MR. COLBY:  Your Honor, and I will apologize in

17   advance because I'm not an intellectual property attorney.

18            THE COURT:  Well, neither am I.

19            MR. COLBY:  But I think -- but I think that two

20   things; one, the reason why we reference the Phillips license

21   is because that is front and center in the purported bases for

22   the TRO.  We're responding to what they say the exigent

23   circumstances are.  I'm not playing semantics.  We're

24   responding to the Debtor's claim, right.  Mr. Kodosky stood up

25   here and said this is a threat to the Phillips license.
```

Case 23-10763-amc   Doc 737-14   Filed 10/20/23   Entered 10/20/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 61 of 184

61

1              THE COURT:  Well --

2              MR. COLBY:  They can't sublicense.  Now, they're

3  wrong about that.

4              THE COURT:  I don't know about that.  I have --

5              MR. COLBY:  But that's facts.

6              THE COURT:  Now, I don't know how that has any -- the

7  fact that Phillips -- and I will say this.  What the fact that

8  Phillips not want to sublicense have to do anything with the

9  Debtor?

10             MR. COLBY:  So

11             THE COURT:  Or anybody?

12             MR. COLBY:  So and I think this is where perhaps my

13  not being an intellectual property lawyer may come into play.

14  But I think if you're going to license the technology as it

15  currently exists, you may be licensing your own intellectual

16  property that you layered on top, right.

17             THE COURT:  Uh-huh.

18             MR. COLBY:  But I think you also need to sublicense

19  the underlying technology developed by Phillips.

20             THE COURT:  I get that.

21             MR. COLBY:  Okay.

22             THE COURT:  But that's not my concern.

23             MR. COLBY:  Okay.  Now, I --

24             THE COURT:  My concern --

25             MR. COLBY:  I apologize, because I'm misunderstanding

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 62 of 184

62

1    your concern.

2            THE COURT:  No.  My concern is, I don't care about

3    the Phillips license.

4            MR. COLBY:  Okay.

5            THE COURT:  Because the Debtor doesn't own the

6    Phillips license.  Phillips owns the Phillips license.  Would

7    the dispute from my point of view --

8            MR. COLBY:  Yep.

9            THE COURT:  -- is there has been improvements to the

10   Phillips license, and the dispute is who owns --

11           MR. COLBY:  Got it.

12           THE COURT:  -- the improved license?

13           MR. COLBY:  Okay.  Well, I --

14           THE COURT:  And so that's why I just need to know.

15           MR. COLBY:  Got it.  I will -- so there's two types

16   of intellectual property at play.  You have the license, which

17   is the agreement -- you know, the agreement to use somebody

18   else's technology, but then you have -- there is -- I'm not

19   sure there's such thing as an improved license.  I think you

20   have the license, and then you have your stuff, right.  That's

21   a very technical term, but you have your --

22           THE COURT:  Yeah.  Your stuff.

23           MR. COLBY:  -- intellectual property and if your

24   question is, do we -- does SeeCubic intend to license the Dutch

25   entities stuff, right?  Their improvements, their patents or

Case 23-10763-amc   Doc 787-14   Filed 10/00/23   Entered 10/00/23 29:50:57   Desc
Exhibit K. Stream October 2022 Exhibit K Hearing Transcript   Page 63 of 184   Page 63 of 184

63

1   whatever, then I will reread that sentence with a different

2   emphasis.

3            THE COURT:  Okay.

4            MR. COLBY:  SeeCubic has not sublicensed any Ultra D

5   technology.

6            THE COURT:  Okay.

7            MR. COLBY:  Including the Phillips license.

8            THE COURT:  Okay.

9            MR. COLBY:  SeeCubic itself does not currently intend

10  to sublicense any Ultra D technology.  Okay.

11           THE COURT:  Okay.

12           MR. COLBY:  Including the Phillips license.  Now,

13  there are these ongoing, you know, business developmental

14  efforts that I talked to you about before.  That is Ultra D.

15  And Ultra D, in the -- and that is the SeeCubic BV.  And in the

16  course of those ongoing projects, you know, they may -- and

17  these are developmental projects, this is not selling things

18  out into the market.  This is proof of concept stuff.  You

19  know, they may need to give user licenses or things like that

20  to others, but they're not licensing the technology for

21  somebody else to go out and manufacture a product that includes

22  the --

23           THE COURT:  And when you say user license, user

24  license for what?

25           MR. COLBY:  It's sort of like, if you buy -- I think

Case 23-10763-amc    Doc 787-14    Filed 10/20/23    Entered 10/20/23 29:50:50    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 64 of 184

64

1   we made this analogy.  It's like, if you buy a copy of

2   Microsoft Word, it just allows you as a user to use it.  So for

3   -- there was actually lots of testimony about this earlier in

4   the summer.  For a product, you know, a demo model, like Mr.

5   Michaels gave us a little tutorial about this.  For a demo

6   model of something, you know, you give it to somebody to try

7   out.  You have to give them one of those user licenses so they

8   can test it out.

9          THE COURT:  Well, that's limited for that -- only to

10  test it for a better word.

11         MR. COLBY:  Correct.  There's no right now nobody is

12  at a stage, I think this has been part of our point all along,

13  where they can just start manufacturing products for the

14  commercial market that includes all this technology.  That's

15  just off in the distance.  You might have potential partners

16  who might want to do that someday that are trying to figure out

17  if it works.  So there are no exigent circumstances.  That's

18  the lay of the land.

19         THE COURT:  Now what about the subscriptions?  What

20  is it that they're telling people in the subscriptions?

21         MR. COLBY:  Oh, the PPMs.  Yeah.  So that's what I

22  was referring to before.  That is broadly speaking.  As you've

23  heard, there are a couple of different visions for how this

24  technology might be brought to market, right.  You've heard all

25  summer from the Debtors about the plan to manufacture, you

Case 23-10763-amc   Doc 487-14   Filed 10/20/23   Entered 10/20/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 65 of 184

65

 1   know, many millions of TVs.  And you heard from Mr. Stastney in

 2   June, that they felt that couldn't be economically done.  And

 3   so the idea was to eventually license the technology to people

 4   who are actually good at manufacturing TVs, right, rather than

 5   try to compete against LG by making your own TVs.

 6          THE COURT:  I don't remember him saying that, but go

 7   ahead.

 8          MR. COLBY:  He did.

 9          THE COURT:  Okay.

10          MR. COLBY:  And that sort of brings me back to the

11   subscription agreements and those sorts of things.  There's

12   nothing new there.  That broad concept of how the business, you

13   know, that vision for the business has been out there.  The

14   subscription agreements that they refer to are from 2022.

15   2022.

16          THE COURT:  So there are -- so this is what I want to

17   know.  What was said at the hearing that made whatever -- I

18   don't know, because I don't know what Mr. Stastney said --

19          MR. COLBY:  Correct.  Correct.

20          THE COURT:  -- at the hearing that made those

21   potentials actuals.  And that's what they're saying to me.

22          MR. COLBY:  Yeah.

23          THE COURT:  He said he's actually going to do this,

24   or he's actually doing it.

25          MR. COLBY:  So there may be two things at play here.

Case 23-10763-amc   Doc 487-14   Filed 10/09/23   Entered 10/09/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 66 of 184

66

 1  One, I don't believe that the recitation of what Mr. Stastney

 2  said at the hearing, as it's recited in the declarations from

 3  Mr. Rajan and Mr. Robertson.  I just don't think those are

 4  accurate.

 5          THE COURT:  Okay.

 6          MR. COLBY:  Okay.

 7          THE COURT:  But we don't know if they are or aren't

 8  because we don't have a recording.  And if they were there,

 9  that's a whole different story.  Because if they said they

10  personally heard it, then it's going to be their word versus

11  Stastney's word and I got to figure out who's telling what.

12          MR. COLBY:  Right.

13          THE COURT:  And it's not even who's telling what,

14  it's that, you know, you -- I hate to say this, because this is

15  just so cliche.  It's like the elephant.  You standing in the

16  back, it's his tail.  You standing in the front, it's his ears.

17          MR. COLBY:  Right.

18          THE COURT:  But nobody is not telling me who is the

19  whole elephant.  And I've got to figure out who the whole

20  elephant is, because I see the elephant.

21          MR. COLBY:  Sure.

22          THE COURT:  I don't see the parts.

23          MR. COLBY:  And there may be like, Your Honor, you

24  asked about the subscription agreements, and there may be kind

25  of a compression of time here.  So and I don't think it's not

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 67 of 184

67

1  any secret because Mr. Stastney testified about these kind of

2  long term visions for the project here in this court.  Okay.

3  But that long-term plan that doesn't warrant a TRO.

4          THE COURT:  Unless he's actually implementing the

5  long-term plan.

6          MR. COLBY:  And that's where the current projects,

7  that's the state of play.  They are on that step of that long-

8  term plan.  That step is, let's figure out if we can build this

9  thing and it works and the customer is like, right.

10         THE COURT:  I get that.

11         MR. COLBY:  Like a potential partnership.  You know,

12  you bring your whatever to the table, we bring ours and see if

13  we can make something good.  Right.  So that's where that is.

14  That's it.  That's all.

15         THE COURT:  So they're -- so what you're saying is

16  nobody's out here saying give us money, and we'll give you some

17  entry, because I'm assuming that's what the subscription is.

18  Because then I will tell you if that's what they're doing, and

19  not disclosing that this is a disputed ownership, I would be

20  concerned because -- for two reasons.  If you're telling people

21  it's disputed, you're telling them.

22         MR. COLBY:  Right.

23         THE COURT:  But if you're not and the Debtor knows

24  and they don't say anything, and eventually as the Debtors, I

25  don't want anybody coming back here with a claim against the

Case 23-10763-amc   Doc 737-14   Filed 10/09/23   Entered 10/09/23 19:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 68 of 184

68

1  Debtor.  So that's where I'm at.

2          MR. COLBY:  Okay.

3          THE COURT:  And it may be easy to address if that's

4  what they're actually doing with very limited, this is what you

5  need to do.

6          MR. COLBY:  So --

7          THE COURT:  Okay.

8          MR. COLBY:  -- the subscription agreement, right.

9  For example, again, no surprise.  It's from 2022.  Okay.

10  Incidentally, it was from a period of time when --

11          THE COURT:  But you know what, let's just get some

12  testimony in.  Because you're telling me I have already said --

13          MR. COLBY:  Well, Your Honor --

14          THE COURT:  -- that I need some evidence.  Now you

15  guys can argue all you want.  We're going to get to the

16  evidence so you can talk or you can put the evidence in, or you

17  can allow them to put the evidence in and you cross examine.

18          But I am telling you, I cannot make a decision

19  without first getting evidence.  You're saying look at -- and I

20  -- and every time you tell me something I said well, I need to

21  know.  I need to see.

22          MR. COLBY:  Sure.

23          THE COURT:  And without evidence I can't do that.  So

24  I get your point.  You can make all the arguments you want.

25  But at the end of the day, I need some evidence.  So you guys

1   can do what you want, you can waste your time.  I'm telling

2   you, you only getting -- you know, I'm going to have a certain

3   time I'm going to start not being able to function here.

4          MR. COLBY:  Understand, Your Honor.  So maybe I'll

5   just finish up then by -- just to finish the thought on the --

6          THE COURT:  Subscription.

7          MR. COLBY:  -- subscription.

8          THE COURT:  This is from 19 -- from 2022.

9          MR. COLBY:  '22.  And it is in fact, it was admitted

10  in the hearing on the Hawk motions.  It is at ECF 264.  I

11  believe the actual -- I'm sorry, 264 is the list.

12         THE COURT:  Okay.  You said ECF --

13         MR. COLBY:  Yes.

14         THE COURT:  -- 264.

15         MR. COLBY:  Yes.

16         THE COURT:  So the actual subscription is part of

17  that is listed there, or is it actually --

18         MR. COLBY:  So yeah.  So there's two points.  In the

19  this is not news category.  It was on the Debtor's exhibit list

20  at 264 in June.

21         THE COURT:  Uh-huh.

22         MR. COLBY:  Okay.  And then, secondly, it was among

23  the documents that the parties have agreed could be admitted

24  into evidence.

25         THE COURT:  Okay.  And that's fine and well, but the

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 70 of 184

70

 1   question is, what's going on with it now?  I don't care what

 2   it's dated.  I want to know what's going on now?

 3          MR. COLBY:  It describes the sort of long-term goal

 4   for the technology.

 5          THE COURT:  I get it.

 6          MR. COLBY:  And that's still what's going on now.

 7          THE COURT:  But my question --

 8          MR. COLBY:  Yeah.

 9          THE COURT:  -- Mr. Colby, is are they selling

10   subscriptions?  I don't care what it said.  If it was in the

11   court yesterday.

12          MR. COLBY:  Just to be clear --

13          THE COURT:  The question is what are they doing, if

14   anything?

15          MR. COLBY:  Just to be clear what we're talking about

16   in terms of subscription agreements.  Because I hear it and I

17   think, technology, but it's -- this is --

18          THE COURT:  No, no.

19          MR. COLBY:  Yeah.  This is --

20          THE COURT:  That's not what I think.

21          MR. COLBY:  -- investors.

22          THE COURT:  I think an investment.

23          MR. COLBY:  Right.  Yeah.  Exactly.  Yeah.

24          THE COURT:  That we're selling investment interest to

25   third parties.

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 71 of 184

71

```
 1              MR. COLBY:  Yeah.

 2              THE COURT:  Or outsiders.

 3              MR. COLBY:  Just that's investment interest in

 4   SeeCubic Inc.  In my client.

 5              THE COURT:  I get it.

 6              MR. COLBY:  Okay.  Not to any -- okay.

 7              THE COURT:  But counsel, they are -- I would think

 8   that Mr. Stastney would know better than to go try to sell

 9   interest in any one of the two debtors.

10              MR. COLBY:  Right.

11              THE COURT:  My question is, is when the subscriptions

12   are being -- if they're being sold, what is it that the parties

13   believe -- what is it that the parties believe they are

14   investing in?

15              MR. COLBY:  Oh, sure.

16              THE COURT:  What's the representations that are --

17   because this is my concern.

18              MR. COLBY:  Yeah.

19              THE COURT:  If there's a subscription out there that

20   says we're selling and we believe you should invest because we

21   have --

22              MR. COLBY:  Got it.

23              THE COURT:  -- this technology, and it's ours, and

24   this is all that we're doing.  And the Debtor knows about it,

25   or anybody who has an interest and says -- doesn't say
```

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 72 of 184

72

1  anything, let these people come in and invest.

2         MR. COLBY:  Yeah.

3         THE COURT:  And later it turns out it belongs to the

4  Debtor or some other party.  I'm an investor.  I'm going to

5  have a claim against everybody, including the ultimate owner,

6  because you knew they were selling me this stuff, and you

7  didn't tell me or you didn't put me on notice.  You acquiesced.

8         MR. COLBY:  Sure.  Your Honor, actually, I'm not -- I

9  don't think that's not what's going on.  And I don't think

10  that's true, because what's going on -- and this has been

11  discussed in this court, this was part of that record earlier.

12  You know, what SeeCubic is, is a vehicle to hold those rights

13  of the secured creditors.  So what people are investing in is

14  whatever rights the secured creditors have to ultimately

15  foreclose.  They're not directing -- they're not investing

16  directly in the technology, or in Stream or in anything like

17  that --

18         THE COURT:  But that's -- but whether you're saying

19  this directly or not, the basis for the investment that is

20  being disclosed to parties is that we are developing this and

21  we want you to invest in it.  It's not about -- so to say it's

22  -- no, that's what it is.

23         MR. COLBY:  No.

24         THE COURT:  And so again, I need to hear from --

25  somebody call Mr. Stastney.  He can tell me what he told the

Case 23-10763-amc   Doc 787-14   Filed 10/00/23   Entered 10/00/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 73 of 184

73

1    court.  And if somebody else was there, they can tell me.  And

2    then I got to figure out, was this an emergency or not?  Plain

3    and simple.  So that's where I am.

4              MR. COLBY:  Okay.  All right.  And then I guess just

5    one last, you know, there's also this sort of element of the

6    basis for the TRO that is based on Rembrandt's technology.  I

7    would just remind the Court that Rembrandt has its own IP case.

8    There's no irreparable harm to Rembrandt here.  Rembrandt has

9    its own IP case.

10             THE COURT:  Well, I'm not -- my --

11             MR. COLBY:  Rembrandt's --

12             THE COURT:  Any decision I make is not going to be

13   based on any irreparable harm to Rembrandt.

14             MR. COLBY:  Okay.

15             THE COURT:  Because first of all, Rembrandt and the

16   Debtors have two separate claims here.  One is your -- this is

17   mine and you're using it.  And it's property of the estate, and

18   I didn't tell you, you could use it.  And irreparable harm may

19   be if you go out and use my asset and sell it, I don't have it

20   anymore.  Rembrandt's claim is you're using my assets and

21   you're not paying me.  And I want you to pay, which is why the

22   district court says you can get monetary damages.  Apples and

23   oranges from my perspective.  Okay.  So I'm not even

24   considering whether there's some sort of harm to Rembrandt.

25             Rembrandt has to take that up in the district court

```
 1   who again, who has already decided to the extent that they're

 2   correct, that these parties are using their assets or their

 3   license without properly compensating them or even without

 4   their authority.  They can get money for that.  That's not what

 5   the Debtor is asking for.  So that's not even on the table for

 6   me.  Okay.  All right.

 7              MR. COLBY:  Glad to hear.  Okay.  So I think if we're

 8   going to jump to testimony, I know we just had a little break,

 9   but it may make sense for the parties to --

10              THE COURT:  That's fine, Counsel.

11              MR. COLBY:  -- take a lunch break and then --

12              THE COURT:  Right.  That's fine.

13              MR. COLBY:  Yield the floor when we come back.

14              THE COURT:  Right.  Yes.  We definitely don't want to

15   be where I was last time where I was lightheaded because I

16   hadn't eaten or that I was hangry and Mr. Caponi had to be the

17   recipient of my hangry.  So let's take a break.

18              MR. COLBY:  I don't even remember it.

19              THE COURT:  I said Mr. Caponi.

20              MR. COLBY:  Oh, okay.

21              THE COURT:  I didn't say you.  I was looking at -- or

22   maybe I said the wrong name.  But I said Mr. Caponi.

23              MR. COLBY:  Oh, right.

24              THE COURT:  All right.  So how long do you guys want

25   for lunch?
```

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 19:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 75 of 184

75

```
 1                    MR. COLBY:  2:00?

 2                    THE COURT:  2:00.  That's fine.  It gives me time to

 3     eat my little soup.  All right.  Court is in recess --

 4                    MR. COLBY:  Thank you.

 5                    THE COURT:  -- until 2:00.  Thank you, counsel.

 6           (Recess taken)

 7                    THE COURT:  Okay.  I think where we left off was that

 8     debtor, I think you wanted to respond whether you think you

 9     wanted to respond to a -- oh, yeah, I'm sorry.  Can you hear

10     me?  All right.  I thought I made it clear that I thought the

11     best way to proceed and the best use of our time was just to

12     proceed with the evidence, unless you think there's a little

13     preference or is there something else you want to add in

14     response or what you're going to present to what Mr. Colby has

15     outlined?

16                    MR. KODOSKY:  Yeah.  I think we're ready to call our

17     first witness, Your Honor.

18                    THE COURT:  Okay.  Well, let's back off.  How many

19     witnesses you think you need to call?

20                    MR. KODOSKY:  Well, Mr. Stastney.  These two

21     gentlemen both heard what he said in connection with the

22     Amsterdam court.

23                    THE COURT:  They were there.

24                    MR. KODOSKY:  They were there.

25                    THE COURT:  Okay.  Then that's fine.  That's --
```

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 19:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 76 of 184

76

1    MR. KODOSKY:  And Your Honor actually, and I do a

2   want to step back for a second.  You know, we received his --

3   Mr. Stastney's declaration last night in which He basically

4   says --

5              THE COURT:  Okay.  Uh-huh.

6              MR. KODOSKY:  -- I wanted to move to exclude that,

7   because it's hearsay.  Those -- the statements in there about

8   what he's personally said over in Amsterdam --

9              THE COURT:  Uh-huh.

10             MR. KODOSKY:  -- are hearsay.  We were able to offer

11  testimony because it's a party admission.  Whereas Mr.

12  Stastney, he can't testify as to what he personally testified

13  to.  He's here to give testimony.  We can ask him questions

14  here in court today about what his -- what he's doing over

15  there.  But for him to submit a declaration containing

16  statements that he said, that's hearsay.  No exception applies.

17             THE COURT:  Why -- okay.  Well, I had a little --

18  here's my evidence book.  All right.  You believe it's hearsay

19  on the what -- on the -- because what?  It's an out of court --

20  what?  The truth of the matter that's being asserted?

21             MR. KODOSKY:  Correct.

22             THE COURT:  And that it doesn't meet any of the

23  hearsay exceptions?

24             MR. KODOSKY:  Correct.

25             THE COURT:  Okay.

```
 1              Mr. Colby, I'm sure you're prepared to address that.
 2   Hey, we have a new person.
 3              MR. COLBY:  Yeah.
 4              THE COURT:  Welcome.  Behind you.
 5              MS. MCKEE-VASSALLO:  Good afternoon, Your Honor.
 6   Emilia McKee-Vassallo on behalf of Mr. Stastney from Ballard
 7   Spahr.
 8              THE COURT:  Oh, you replacing Mister -- okay.  And
 9   your name again, ma'am?
10              MS. MCKEE-VASSALLO:  Emilia, E-M-I-L-I-A --
11              THE COURT:  Hold on, hold on.  Let me get her.
12   That's a good advantage of being in here.  I can see everybody.
13   And okay, we have Mr. Terrence Grogan from -- for Mr. Stastney.
14   And your name is Camilla.
15              MS. MCKEE-VASSALLO:  Emilia with an E.  McKee-
16   Vassallo.  Yes, Your Honor.
17              THE COURT:  Okay.  You know why -- you already
18   answered before I asked.  What's your last name?
19              MS. MCKEE-VASSALLO:  McKee-Vassallo.
20              THE COURT:  Could you spell your last name?  The
21   second?
22              MS. MCKEE-VASSALLO:  Vassallo.  V as in Victor, A-S-
23   S-A-L-L-O.
24              THE COURT:  Okay.
25              MS. MCKEE-VASSALLO:  Thank you, Your Honor.
```

Case 23-10763-amc   Doc 787-14   Filed 10/00/23   Entered 10/00/23 29:50:57   Desc
Exhibit K. Stream October 6 2022 Hearing Transcript   Page 78 of 184

78

1              THE COURT:  Thank you.  All right.

2              MR. KODOSKY:  And if I may, Your Honor, one other

3       point.  Just a minor point.

4              THE COURT:  Hold on.  I have to start taking notes.

5              MR. KODOSKY:  Sorry.

6              THE COURT:  Hold on.  So far, I have not seen a lot

7       of my hearings that are pretty -- I don't want to use the word

8       contentious, but have the breadth of the issues are pretty

9       large.  I often have people from the -- not like in Delaware,

10      obviously.  But we have people from the media.  So that's why I

11      asked because I wasn't sure if that's who she was.  Okay.  All

12      right.  October 6.  Okay.  What was the second point, counsel?

13             MR. KODOSKY:  The second point was going to be I

14      heard Mr. Colby talk about the June 29th hearing testimony

15      given by Mr. Stastney.

16             THE COURT:  Uh-huh.

17             MR. KODOSKY:  I just wanted to remind the Court that

18      June 28th Mr. Rajan, my client, was the director of the

19      subsidiaries.  He was removed on the 29th that day, and in his

20      place was appointed an independent director.  And so with an

21      independent director in place, there is in theory, someone, a

22      neutral, a policeman that's not going to be doing what it

23      shouldn't be done in terms of licensing the Phillips -- any of

24      the technology.

25             THE COURT:  Step back.  Step back.  Mr. Stastney

Case 23-10763-amc   Doc 437-14   Filed 10/09/23   Entered 10/09/23 29:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 79 of 184

79

1   testified when?

2          MR. KODOSKY:  The 29th.

3          THE COURT:  Okay.  On June 29 he -- that's when --

4          MR. KODOSKY:  Yes, Your Honor.

5          THE COURT:  And Mr. Rajan was removed the same day?

6          MR. KODOSKY:  Yes.  If Your Honor goes back and looks

7   at the transcript.  The very -- the transcript begins by them

8   showing up that day and saying late breaking news, Your Honor,

9   Mr. Rajan was just removed this morning by the Amsterdam court.

10  And during the course of that transcript, Your Honor said

11  what's going on over there?  And these attorneys all stood up

12  and said, we don't know.  We're not involved over the

13  Netherlands, we'll find out let you know.  They didn't.  The

14  independent --

15         THE COURT:  I don't -- okay.

16         MR. KODOSKY:  The independent director was appointed.

17  And then after Rembrandt said, wait a minute.  Mr. Jones Day

18  attorney, Mr. independent director, you're not able to license

19  this technology that contains Rembrandt technology built into

20  it.  He resigned.  And then after that is whenever they filed a

21  new petition

22         THE COURT:  They who?

23         MR. KODOSKY:  -- over in the Netherlands courts.

24         THE COURT:  They who?

25         MR. KODOSKY:  The Defendants.  Mr. Stastney on behalf

Case 23-10763-amc    Doc 487-14    Filed 10/09/23    Entered 10/09/23 19:50:57    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 80 of 184

80

1    of the Dutch subsidiaries.  If the Court looks at the petition

2    that was filed over in Amsterdam, it wasn't the Amsterdam

3    courts doing all this on their own initiative.  It was Mr.

4    Stastney, purportedly on behalf of each of the different Dutch

5    subsidiaries, which you know, our position was not appropriate

6    for him to be doing.  Because what happened was, was they

7    successfully had Mr. Rajan removed in favor of an independent

8    director who resigned.

9            THE COURT:  Well, the independent I get it.  The

10   parties are at loggerheads.

11           MR. COLBY:  And then replay on September 12th is

12   whenever they filed the amended petition saying to the

13   Amsterdam court, Mr. Rajan has been removed.  The independent

14   director has resigned, we asked that Mr. Stastney be appointed.

15           THE COURT:  Well, couldn't -- why wasn't another

16   independent -- the court only does what they're asked.

17           MR. KODOSKY:  And the last thing that I want --

18           THE COURT:  I don't know -- you don't know the answer

19   to that, and I don't need to know.  They filed the petition and

20   the court granted the request.

21           MR. KODOSKY:  The last point that I want to make on

22   that, Your Honor, is the Amsterdam court didn't say Mr.

23   Stastney is appointed director of these Dutch subsidiaries

24   forever.  It said until a judge, a U.S. judge orders otherwise.

25   And so --

Case 23-10763-amc   Doc 787-14   Filed 10/20/23   Entered 10/20/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 81 of 184

Exhibit K   Page 80 of 184

81

```
 1                    THE COURT:  It says that?

 2                    MR. KODOSKY:  We've attached the order to our --

 3                    THE COURT:  Counsel, I don't go through all those.  I

 4   just read what you like.  Okay.  And I figured I'm going to get

 5   a record, because I did not think that I had sufficient

 6   information to rule on the papers.  That's why I scheduled a

 7   hearing.

 8                    MR. KODOSKY:  It's attached as Exhibit --

 9                    THE COURT:  Well, I'm sure they were probably talking

10   about the Delaware and not me.

11                    MR. KODOSKY:  Well, no.  Well --

12                    THE COURT:  I don't have anything to do with that.

13   Anyway.  Well, I'm not going to speculate without seeing the

14   order.  Without knowing what was put before that judge.  I

15   don't know what that court knew or didn't know.

16                    MR. KODOSKY:  I would just refer the court to Exhibit

17   G to our --

18                    THE COURT:  Well, are you going to put it in the

19   record?  Okay.

20                    MR. KODOSKY:  Yes.

21                    THE COURT:  Because as I said, if I could rule on the

22   papers I would have, and I didn't feel that I could, so we need

23   to have an evidentiary record.  Okay.  So defendant -- and

24   appointed -- and was appointed.  Okay.  So but the bigger

25   question is, is that you believe that Mr. Stastney's
```

Case 23-10763-amc    Doc 487-14    Filed 10/20/23    Entered 10/20/23 29:50:50    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 82 of 184

82

1    declaration is inadmissible because it's hearsay.

2         MR. KODOSKY:  The portions that talk about his

3    testimony over in Amsterdam, Your Honor.  The portions of his

4    declaration that say these guys, Mr. Rajan and Mr. Robertson

5    are wrong about what I said over there.  I said this.  I said

6    that.  The I said this and I said that part is hearsay.

7         THE COURT:  Well, can't you ask him what he said?

8         MR. KODOSKY:  The point, Your Honor, is the

9    declaration -- and we can and we will, but the declaration that

10   he submitted yesterday, we moved to exclude the portions in

11   there that concern his Amsterdam testimony.  And we would just

12   ask that if the Court does take a look back at that, that it

13   not include that in connection with its ruling.  He's here.

14   We're able to ask him our questions.  And there's no exception

15   to the hearsay that's contained in the declaration.

16        THE COURT:  And is that in his individual capacity or

17   is that in his capacity as a representative of SeeCubic Inc.?

18   Because that's who -- or SeeCubic -- who's here today?  Let me

19   back up a little bit here.  SeeCubic Inc. is the party that is

20   here today.  So is he -- who's the -- who's the declaration

21   submitted on behalf of SeeCubic, Inc.?  Or was it submitted on

22   behalf of himself?

23        MR. KODOSKY:  I believe it was submitted on behalf of

24   himself.  But all the defendants, the ones that are here today

25   have joined in in connection with each other's responses.

Case 23-10763-amc   Doc 787-14   Filed 10/00/23   Entered 10/00/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 83 of 184

83

1           THE COURT:  Well, if it's on behalf of himself, then

2     doesn't that mean -- then counsel for Mr. Stastney, what's your

3     position?  Because he's saying to the extent that he's

4     supporting his -- he's offering his declaration in support of

5     his -- Mr. Stastney as an individual that that should not --

6     that anything that he said in the court, which we don't have --

7     apparently there's no transcript.

8           Apparently, according to Mr. Colby, they don't do

9     transcripts.  So they're saying that that is -- should be

10    stricken as a hearsay which is an out of court statement of

11    truth of which he wants me to take -- to accept.  But I guess

12    the question is -- anyway, that's his position.  What's was

13    your response with respect only as his -- to the extent.

14          MR. KODOSKY:  The Amsterdam --

15          THE COURT:  How about we get -- how about we call Mr.

16    Stastney?

17          MR. KODOSKY:  Works for me, Your Honor.

18          THE COURT:  And we get it in and we figure it out.

19          MR. KODOSKY:  Yeah.  Works for me.

20          THE COURT:  Because I don't have it.  And I'm like,

21    just operating in a vacuum here.  But Ms. McKee-Vassallo?  I'm

22    butchering your name, Counsel.

23          MS. MCKEE-VASSALLO:  That's it, Your Honor.

24          THE COURT:  Okay.  We may -- you should be prepared

25    to -- because he's asserting it in two capacities.  Okay.

```
 1  Because one may be okay in his capacity as the representative

 2  of the party, but in his individual it may not.  I don't know.

 3  I don't know the answer, because I didn't see that -- I didn't.

 4  I looked at it.  Well, first of all, we was filed.

 5            MR. KODOSKY:  Right.

 6            THE COURT:  So we were doing our best as again, we

 7  don't have ten associates to do research for us all night.

 8            MR. COLBY:  Your Honor, so both parties submitted

 9  declarations.  I think, in the event that the Court was able to

10  decide on the papers by looking at the, you know, competing --

11  as one does, the competing declarations.  I think since we're

12  here doing live testimony, we're perfectly fine putting on the

13  substance of those paragraphs through live testimony.

14            THE COURT:  That's what I'm asking.  Can't you ask

15  him about it?

16            MR. COLBY:  Yes.

17            THE COURT:  They're not -- and nobody's saying here's

18  his declaration.  And that's the same reason why I couldn't

19  rule because you're saying it said one thing, he's saying he's

20  saying another.  It's disputed facts.  Okay.  All right.  Call

21  your -- yes, Counsel.

22            MR. WRIGHT:  Your Honor, Davis Wright on behalf of

23  SLS.  I just want to make clear to the extent that declaration

24  comes in in any shape or form.  SLS did not sign on to that.

25  In fact, the declaration says it's Mr. Stastney on behalf of
```

 1  SeeCubic.  So I take issue with counsel's representation that

 2  all of the defendants signed on to that declaration.  And I'll

 3  make more of that when we get to legal argument later, Your

 4  Honor.

 5          THE COURT:  Okay.  So you didn't file anything.  You

 6  meaning SLS did not file anything in support of that.

 7          MR. WRIGHT:  SLS filed an objection to the TRO.

 8          THE COURT:  Okay.

 9          MR. WRIGHT:  But we did not reference Mr. Stastney's

10  declaration as part of that.

11          THE COURT:  Okay.  All right.

12          All right.  Counsel, call your witness.

13          MR. KODOSKY:  Thank you, Your Honor.  We call Mr.

14  Stastney.

15              SHADRON STASTNEY, DEFENDANT, SWORN

16          THE CLERK:  Would you please state and spell your

17  name for the record?

18          THE WITNESS:  Shadron, S-H-A-D-R-O-N, Stastney, S-T-

19  A-S-T-N-E-Y.

20          THE CLERK:  And if you would please state your

21  address?

22          THE WITNESS:  392 Taylor Mills Road, Marlboro, New

23  Jersey 07747.

24          MR. KODOSKY:  Permission to proceed, Your Honor.

25          THE COURT:  Yes.  And I messed up all of those

1  spelling, but that's okay.  You may proceed, Counsel.

2                          DIRECT EXAMINATION

3  BY MR. KODOSKY:

4  Q    Good afternoon, Mr. Stastney.

5  A    Afternoon.

6  Q    Mr. Stastney, you're the chief executive officer and

7  chairman of SeeCubic of Delaware, correct?

8  A    That is correct.

9  Q    And you were present in the courtroom earlier before lunch

10 and heard counsel for I believe that SeeCubic did testify or

11 that had stated the PPM or I'm sorry, the subscription

12 agreement was from 2022.  Did you not?

13 A    I don't recall that.

14 Q    All right.  When was the subscription agreement issued?

15 A    I don't know what you're talking -- which subscription

16 agreement you're talking about?

17           MR. KODOSKY:  Permission to approach, Your Honor?

18           THE COURT:  Well, just -- are we marking it or you

19 want to just -- you want to --

20           MR. KODOSKY:  We're marking it.  Yes.

21           THE COURT:  Okay.  Mark it as Debtor 1.  I mean,

22 because this is not going to be followed up by -- you know, we

23 starting new numbers all over again.  Because when I came -- I

24 forgot when I came and my desk was -- my -- it was clear with

25 no binders.  I was almost shocked and I forgot we're done with

Case 23-10763-amc    Doc 487-14    Filed 10/09/23    Entered 10/09/23 29:56:57    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 87 of 184

87

```
 1   that portion.  And all of this has been exchanged?

 2            MR. KODOSKY:  Yes, Your Honor.

 3            THE COURT:  Okay.  And all of the list was filed and

 4   on the record this morning, right?

 5            MR. KODOSKY:  Yes, Your Honor.  And this --

 6            THE COURT:  Is it in this binder?

 7            THE CLERK:  It's the list.

 8            MR. COLBY:  It's attached to our motion.  It's

 9   Exhibit I.

10            MR. KODOSKY:  Did you have them already printed out,

11   you said?

12            THE COURT:  No.  I have the list printed out from

13   this morning.  Not those.  Yes.  If you have a copy for me,

14   that's fine.  All right.  Now, we -- did we print out all the

15   exhibits to the -- hold on.  I have a binder that has

16   everything.  Because my one equivalent associate doing the work

17   of ten of yours.

18       (Court and counsel confer)

19            THE COURT:  Okay.  All right.  So I do not have any

20   of the exhibits attached.  I have the list, but it would have

21   been three binders had we printed them out.  And we weren't

22   trying to kill any trees.  Yes, I can pull them up on -- now

23   that I'm able to access the -- okay, but it's probably better

24   that I get a copy so that I have exactly the exhibit that

25   everybody is referring to when you -- the parties want to mark.
```

```
 1    Okay.  This is D-1.

 2    BY MR. KODOSKY:

 3    Q    Mr. Stastney, you've been handed what's been marked as

 4    Exhibit D-1?

 5    A    Yes.

 6    Q    If you'll take a moment to look at that.

 7    A    Okay.

 8    Q    Do you recognize that document, sir?

 9    A    I do.

10    Q    What is it?

11    A    It is a subscription agreement for debt of SeeCubic Inc.

12    of Delaware.

13    Q    And it's not from 2022, correct?

14    A    This is not.

15    Q    This is from last week?

16    A    This is from October 1st, 2023.

17    Q    All right.  And so this is SeeCubic Inc. raising money,

18    correct?

19    A    Correct.

20    Q    If you'll turn with me, please, sir, to page, bottom

21    right-hand corner of page 7 of 17.  Actually, before I ask you

22    any questions about page 7 of 17, did SeeCubic, Inc. disclose

23    to potential investors or to investors that it has been sued by

24    the Debtors in this case?

25    A    Yes.
```

Case 23-10763-amc   Doc 487-14   Filed 10/09/23   Entered 10/09/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 89 of 184

89

```
 1   Q    It discloses that within its subscription agreements?

 2   A    No.  Not within the subscription agreement.

 3   Q    Where does SeeCubic, Inc. disclose that it's been sued by

 4   the Debtors who allege, among other things, that SeeCubic, Inc.

 5   and yourself and others have misappropriated the Debtors trade

 6   secrets?

 7   A    We don't disclose that because we don't believe that to be

 8   true, but -- number one.  Number two, the investors in this

 9   round are all existing investors, actually a very small number

10   of them, who have been investors with SeeCubic, Inc. for years

11   and are kept regularly up to date on all the -- on all the

12   developments in both the business and the legal.  There is no

13   new investor.  There has been no new investor in SeeCubic, Inc.

14   in quite some time.

15   Q    With due respect, Mr. Stastney, my question was, where

16   does SeeCubic, Inc. disclose to investors or potential

17   investors that it's wrapped up in litigation over allegedly

18   misappropriated trade secrets involving the Debtors?

19   A    We have those -- we have those conversations directly with

20   investors regularly.

21   Q    If you'll take a look at page 7 of 17 of Exhibit D-1,

22   what's been marked as Exhibit D-1.  And I direct your attention

23   to subparagraph F at the top of the page.  Please let me know

24   when you're there.

25   A    I am.
```

Case 23-10763-amc   Doc 487-14   Filed 10/08/23   Entered 10/08/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 90 of 184

90

```
1              THE COURT:  Wait a minute, where are we at?

2              MR. KODOSKY:  Page 7 of 17, Your Honor.  Subparagraph

3   or five subparagraph F.

4              THE COURT:  Okay.

5              MR. KODOSKY:  Top of the page.

6              THE COURT:  So we're on -- wait a minute.  Oh, at the

7   bottom page 7 of 17.

8              MR. KODOSKY:  8 of 18.  Yes, Your Honor.  For --

9              THE COURT:  And at the top 8 of 18.  At the -- where

10  it says documented.  Well, never mind.

11             MR. KODOSKY:  Yes, Your Honor.

12             THE COURT:  Okay.  Page 7 of 17 on the bottom.  Okay,

13  because I will be looking for this.  And that is 5-F, correct?

14             MR. KODOSKY:  That is correct, Your Honor.

15             THE COURT:  Paragraph 5-F.  Okay.

16  BY MR. KODOSKY:

17  Q    There is no disclosure in subparagraph 5-F that SeeCubic,

18  Inc. is wrapped up in trade secret litigation involving

19  debtors.  Will you agree with me on that?

20  A    There's no -- there's no disclosure of any kind here.

21  Q    In the middle of the paragraph, Do you see where it says,

22  there is potential,

23             "There is no potentially interfering patent or patent

24             application of any other party, and to the knowledge

25             of the company, no product of the company infringes
```

Case 23-10763-amc    Doc 787-14    Filed 10/20/23    Entered 10/20/23 29:56:57    Desc
Exhibit K. Stream October 2022 Deposition Transcript    Page 91 of 184

91

1                     in any respect any license, permit, franchise

2                     authorization, patent copyright, proprietary

3                     software, service mark, trademark, trade name, or

4                     other right owned by any other person, except as

5                     would not reasonably be expected to have a material

6                     adverse effect."

7             Do you see where I'm reading from?

8    A    I do.

9    Q    And it also states at the beginning of paragraph F that

10   there's,

11                    "No action, suit, proceeding, claim, or investigation

12                    before or by any court, public board, governmental

13                    agency, self-regulatory organization or body pending

14                    or to the best of the knowledge of the company

15                    threatened against the company, or involving any of

16                    its respective assets, or to the best knowledge of

17                    the company involving any of their respective

18                    officers or directors that would be expected to have

19                    a materially adverse effect."

20           Do you see that?

21   A    I do.

22   Q    Who crafted that language?

23   A    I don't know.

24   Q    You're the chief executive officer of SeeCubic, Inc. that

25   is raising money by virtue of this subscription agreement and

Case 23-10763-amc    Doc 787-14    Filed 10/09/23    Entered 10/09/23 19:50:57    Desc
Exhibit K. Stream October 2022 Deposition Transcript    Page 92 of 184

92

1   you don't know who drafted this language?

2   A    This language has existed in our subscription agreements

3   for some time.  I don't recall exactly who drafted it.

4   Q    How long has SeeCubic, Inc. been raising money with

5   subscription agreements that did not disclose trademark

6   misappropriation litigation?

7   A    Subscription agreements never disclose those things.  It's

8   the PPM's or the discussions that go with the subscription

9   agreements that disclose those things.

10  Q    Who is SeeCubic TV, sir?  You offered testimony in a prior

11  hearing about SeeCubic TV.  Do you recall that?

12  A    No.  There is no such thing as SeeCubic TV.  I never

13  offered that testimony.

14  Q    Have you reviewed the declaration submitted by Mr.

15  Robertson in this case?

16  A    I have not.

17  Q    You were involved in the day-to-day work at the

18  Netherlands level during the pendency of this bankruptcy?

19  A    I'm not involved in the day-to-day work.  No.

20  Q    And you're not aware that any work being done over the

21  Netherlands is being done with SeeCubic, Inc. and SeeCubic BV

22  doing business with clients at SeeCubic TV?  You don't recall

23  giving that testimony at the June 27th, 2000 hearing?

24  A    I do not.

25  Q    In this litigation?

Case 23-10763-amc    Doc 787-14    Filed 10/09/23    Entered 10/09/23 19:50:50    Desc
Exhibit K. Stream October 2021 Deposition Transcript    Page 93 of 184

93

1   A     I do not recall that.  No.

2   Q     You have a sublicense business model?

3   A     Yes.

4   Q     SeeCubic, Inc. sells and markets the Ultra D technology to

5   potential clients on behalf of SeeCubic BV?

6   A     That's correct.

7   Q     What type of revenue do you expect to generate in the next

8   three years?

9   A     Very difficult to predict.  Depends on how the existing

10  proof of concept projects with customers pan out.  But we're

11  optimistic that we in that time frame will be able to start a

12  commercial project.

13  Q     You've heard or you've seen the declaration submitted by

14  Mr. Rajan and Mr. Robertson about your testimony over in

15  Amsterdam, that you all have 11 or 12 client projects,

16  including Hyundai?

17  A     I did not see that testimony.

18  Q     Do you have 11 or 12 projects including Hyundai?

19  A     No.

20  Q     How many projects do you have?

21  A     We currently have SCBV currently has three projects.

22  Q     Who are the three projects with?

23  A     Those are subject to NDA and I can't disclose them.

24  Q     Well, you're not willing to disclose to my client who you

25  are potentially going to be sublicensing the technology to?

Case 23-10763-amc   Doc 737-14   Filed 10/00/23   Entered 10/00/23 29:50:30   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 94 of 184

94

1   A    I don't understand that question.  I'm sorry.

2          MR. KODOSKY:  Your Honor, we would ask that this

3   portion of the transcript, if necessary, be kept under seal.

4   But we believe that we're entitled to know who the projects

5   that they are potentially breaching the Phillips licensing

6   agreement with, instead of being told that it's subject to a

7   nondisclosure agreement, and not having any way of knowing or

8   protecting our license agreement with Phillips.

9          THE COURT:  Okay.  Right now you are cross-examining

10  Mr. Stastney as the representative of SeeCubic, Inc., correct?

11         MR. KODOSKY:  As well as the director of SeeCubic BV.

12         THE COURT:  Okay.

13         MR. KODOSKY:  One of our subsidiaries.

14         THE COURT:  And for which, Mister -- I haven't seen

15  the order, but that he is supposed to act in the interest of

16  all parties as the independent director.

17         MR. KODOSKY:  Exactly, Your Honor.

18         THE COURT:  I don't know what I do with that.

19         Mr. Colby, what you think I do with that?

20         MR. COLBY:  I think those very same fiduciary duties

21  would counsel Mr. Rajan -- I'm sorry, Mr. Stastney, to maintain

22  the confidentiality of those projects pursuant to the NDA, not

23  only from the public generally, but I think, given the somewhat

24  contentious nature of the business relationship between the

25  parties here, it would be prudent for him to adhere to the

Case 23-10763-amc   Doc 437-14   Filed 10/20/23   Entered 10/20/23 29:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 95 of 184

95

1   protocol that had been established way back under the receiver

2   where the projects were on a sort of a no names basis, where

3   the side parties weren't disclosing each others --

4            THE COURT:  Well, that's not in the -- I don't know

5   what the procedure was with the --

6            MR. COLBY:  I also think that there have been a

7   number of times over the course of the testimony that's come in

8   over the summer, where the shoe was on the other foot.  Mr.

9   Rajan had customer relationships or things that he did not want

10  to disclose.  We respected that.  So I think given the -- sort

11  of the course of conduct between the parties, there is no basis

12  to upset that applecart now.

13           There's concerns about the -- legitimate concerns

14  about interfering with those projects that we have.  And so we

15  think they should be maintained confidential.  In fact, if it's

16  in the best interest of the projects to do so, and we think it

17  is, then Mr. Stastney is bound by his fiduciary obligations to

18  maintain the confidentiality of those projects.

19           THE COURT:  Well, let me ask you this, because you're

20  referencing and it's not in the record.  I can only tell what

21  you guys are saying is that the neutral party, the court

22  appointed receiver was given the information and the three

23  parties were working together.  Are you telling me during that

24  process, that information was not given to the receiver?

25           MR. COLBY:  Correct.  No, it was given to the

1   receiver.  It was not given to the other party.  So the

2   identity of any customers that SeeCubic brought to the table

3   was not given to Stream, and vice versa.

4          THE COURT:  Okay.  So that information technically

5   could be given just to me.

6          MR. COLBY:  Just to you, but not --

7          THE COURT:  And then not to them.  And then I could

8   compare that to what they've told me their customers are.  And

9   then I can figure out whether there is some potential issue

10   here.  So I mean, because this is what the issue is, is that

11   you are using our assets to go in and do -- they're not selling

12   anything, but they're giving what I understand both of these

13   parties are giving to -- what was the word that you used?

14          They're assigning -- they're giving them information

15   for a demo, I'm going to call them demos.  And they're

16   assigning -- I'm not going to use them.  And so I don't know

17   who's giving -- and it may not be a matter of who they're

18   giving it to.  It may matter to this Court what they're giving

19   them.  That's all.

20          MR. COLBY:  Your Honor.  So first of all, Mr.

21   Stastney, as I read earlier, and I think if they -- if he gets

22   asked the question will testify that these unnamed parties,

23   customers are not being given licenses.

24          THE COURT:  No.  But they've been given information

25   regarding the license.  Whether they're being given one or not

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 19:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 97 of 184

97

1  they're being -- the information is being shared.  The same way

2  they're sharing information.

3          MR. COLBY:  Secondarily.

4          THE COURT:  Uh-huh.

5          MR. COLBY:  The, again, there's no -- that the

6  identity of the customers is not relevant to the issue of

7  irreparable harm.

8          THE COURT:  It may be if it's the same -- if it's

9  their customers also.

10         MR. COLBY:  No.  Your Honor, I think, again, I

11  proffered earlier and Mr. Stastney will address these projects

12  are being done at the SeeCubic BV level.

13         THE COURT:  I get -- Counsel --

14         MR. COLBY:  That are with SeeCubic BV.  So it's not

15  their customers, our customers.  It's all happening in these

16  entities.

17         THE COURT:  But the underlying issue is that whoever

18  SeeCubic -- first of all, it's SeeCubic, Inc. that we're

19  talking about.

20         MR. COLBY:  Correct.

21         THE COURT:  Okay.  And SeeCubic, Inc. isn't the one

22  who is doing this?  Is it not?  Isn't the one who's giving the

23  -- I'm using the word demos to potential customers?  Is it not?

24         MR. COLBY:  No.  SeeCubic BV.

25         THE COURT:  I know.  I know the answer.

Case 23-10763-amc   Doc 747-14   Filed 10/09/23   Entered 10/09/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 98 of 184

98

 1                   MR. COLBY:  Yeah.

 2                   THE COURT:  So I'm not -- he's here as -- who's he

 3    testifying for?

 4                   MR. COLBY:  Well, Mr. Stastney now has two

 5    capacities.

 6                   THE COURT:  Uh-huh.

 7                   MR. COLBY:  He is the chairman and CEO of SeeCubic,

 8    Inc. of Delaware.

 9                   THE COURT:  Uh-huh.

10                   MR. COLBY:  And by virtue of the Netherlands court, a

11    director of or the director of SeeCubic BV.

12                   THE COURT:  Okay.  And it's -- and we're talking

13    about that -- well, we were talking about some subscriptions.

14    Now, we're talking and he said, are you involved in the day to

15    day of SeeCubic BV.  He says no, he's not.

16                   So I'm assuming he's now shifted to Mr. Stastney's

17    role as the independent court-appointed independent director

18    for SeeCubic BV.  Correct, Mr. Counsel?  You asking him

19    questions as in his capacity as the officer, the director,

20    independent, I guess equivalent to the receiver in -- for

21    SeeCubic BV?

22                   MR. KODOSKY:  We're asking him questions in

23    connection with his role individually and as chairman and CEO

24    of SeeCubic, Inc. and as director of SeeCubic BV.

25                   THE COURT:  Okay.  I think when you ask him

Case 23-10763-amc   Doc 787-14   Filed 10/09/24   Entered 10/09/24 19:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 99 of 184

99

1   questions, it would be helpful if you ask him and you would

2   identify in what capacity you're asking the question.  Unless

3   you think they're all one and the same, which I don't know.

4   Maybe so, maybe not.  But it would make sense.

5           I thought you were asking him as the -- you

6   originally started for SeeCubic, Inc. asking him questions on

7   the subscription.  And then you changed and started asking him

8   regarding SeeCubic BV, which then I understood and I'm not sure

9   if that's what you meant, but I understood it was in his

10  capacity as the independent director.  Where -- is that what

11  you were doing?

12          MR. KODOSKY:  My specific question was relating to

13  who is -- who is this -- who is this technology being licensed

14  to and by whom?  And he won't tell us.

15          THE COURT:  Well, he says -- well, wait a minute.

16  Let's start back.  How about is it being licensed?  I

17  understand it's being given as a demo -- I'm using the word

18  demos.  I don't know if that's the correct terminology.  But

19  this is being shared with in a proof of concept.  I got proof

20  of proof.  I know it's not that.

21          MR. KODOSKY:  Correct.

22          THE COURT:  Some sort of proof of concept with three

23  projects they're working on.  Okay.  And those three projects

24  are with parties that they have NDA with, correct?  That's what

25  he's saying.  And so -- and that he's not at liberty to

Case 23-10763-amc    Doc 787-14    Filed 10/09/23    Entered 10/09/23 29:50:57    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 100 of 184

Exhibit K. Stream October 2022 Hearing Transcript    Page 100 of 184

100

 1  disclose.  And so that clearly to me, is in his capacity as the

 2  direct independent director because it can't be as his SeeCubic

 3  Inc. because what do they have to do in terms of the projects?

 4          MR. KODOSKY:  And I believe, Your Honor, that

 5  SeeCubic, Inc. is involved.  And may have permission to

 6  approach with the June 29th hearing transcript which I'm going

 7  to mark as Defendant's Exhibit Number 2 where --

 8          THE COURT:  Wait a minute.  Number 2, and then you

 9  can ask him to read it or you can read it and -- I don't know.

10  What do you want to do with it?

11      (Counsel confer)

12          MR. KODOSKY:  Your Honor, we don't have a copy of the

13  27th hearing transcript.  I'm going to move on.

14          THE COURT:  Okay.

15  BY MR. KODOSKY:

16  Q    Mr. Stastney, you're familiar with Stream TVs business

17  model, are you not?

18  A    I am.

19  Q    Stream sales modules which is chips and 3D film?

20  A    They aspire to.  Yes.

21  Q    Sometimes actual products?

22  A    Rarely.

23  Q    SeeCubic Delaware put into its subscription agreements

24  and/or its PPM's that it had a sublicensing model of the

25  technology, correct?

Case 23-10763-amc   Doc 487-14   Filed 10/09/23   Entered 10/09/23 29:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 101 of 184

101

```
 1   A     That's correct.

 2   Q     SeeCubic Delaware mentioned in the subscription agreements

 3   and/or the PPM's sublicensing the optical stack, correct?

 4   A     I don't recall that.

 5   Q     SeeCubic Delaware mentioned in the subscription agreements

 6   and/or the PPM sublicensing the IP cores, correct?

 7   A     No.

 8             MR. KODOSKY:  Permission to approach, Your Honor.

 9             THE COURT:  You can just hand it to the ESR.  You can

10   hand it to him and then he'll mark it.  It's already marked?

11             MR. KODOSKY:  It is.

12             THE COURT:  All right.  And you shared with opposing

13   counsel?

14             MR. KODOSKY:  It's on their list as well.

15             THE COURT:  All right.  And if you have a copy for

16   the Court, that would be well.

17             MR. KODOSKY:  Thank you.

18             THE COURT:  Okay.

19             MR. KODOSKY:  Thank you, Your Honor.

20             THE COURT:  Thank you, counsel.  Okay.  Well, we're

21   going to mark that.  And hand that to the witness.

22             THE WITNESS:  Thank you.

23             THE COURT:  Okay.  You may proceed, counsel.

24   BY MR. KODOSKY:

25   Q     Thank you, Your Honor.  Mr. Stastney, do you recognize
```

Case 23-10763-amc   Doc 787-14   Filed 10/00/23   Entered 10/00/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 102 of 184

102

1  what has been marked for identification as Defendant's Exhibit

2  Number 2?

3  A    I do.

4  Q    What is it?

5  A    It is an investment memorandum from Q2 of 2022 of

6  SeeCubic, Inc.

7  Q    This -- if you'll please turn to page 13, bottom right

8  here.

9        THE COURT:  Wait a minute.  Counsel, hold on.  I'm

10  trying to take notes here and I'm just starting another page.

11  So this is D2, and this a prior replacement memorandum of this

12  PPM you guys have been referring to?

13        MR. KODOSKY:  Yes.

14        THE WITNESS:  From Q2 of 2022, so it's in a little --

15        THE COURT:  Oh, SeeCubic, Inc., right?

16        THE WITNESS:  Uh-huh.

17        THE COURT:  Okay.

18  BY MR. KODOSKY:

19  Q    Mr. Stastney, if you'll turn to bottom right hand corner,

20  page 13?

21  A    Sure.

22  Q    Let me know when you're there please.

23  A    Uh-huh.  I am.

24  Q    Do you see on page 13 where SeeCubic, Inc.'s business

25  model is described?

 1   A    I do.

 2   Q    The first line of that section where it states SeeCubic

 3   will focus on licensing its technology, both the device and the

 4   content?

 5   A    I do.

 6   Q    And on the next page under revenue where it states the

 7   company intends to generate revenue by licensing its technology

 8   to brand partners, such as consumer electronics brands --

 9          THE COURT:  Wait.  Where are we counsel?  This is the

10   business one.

11          MR. KODOSKY:  I'm sorry, page 14 under revenue.

12          THE COURT:  Uh-huh.

13   BY MR. KODOSKY:

14   Q    Where it states that the company intends to generate

15   revenue by licensing its technology to brand partners such as

16   consumer electronics brands, automotive brands, where there are

17   tier one suppliers, mobile device manufacturers, et cetera, and

18   licensing its technology to content owners or producers for

19   creation of content.  Do you see where I'm reading from?

20   A    I do.

21   Q    What gives SeeCubic, Inc. the right to license any

22   technology that includes the Phillips technology?

23   A    Well, at the time of this PPM, which was Q2 of 2022,

24   SeeCubic, Inc. owned all of the subsidiaries.  This was during

25   the pendency of the omnibus agreement.  So at this time, the

Case 23-10763-amc   Doc 787-14   Filed 10/06/23   Entered 10/06/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 104 of 184

104

1   company referred to SeeCubic, Inc. and its subsidiaries, which

2   included SeeCubic B.V. and Ultra D Ventures, and that gave it

3   the right to do so.

4   Q    And that was ultimately declared void by the Delaware

5   Supreme Court, correct?

6   A    The -- yes.  The omnibus agreement was after this declared

7   void.

8   Q    SeeCubic, Inc.'s business model hasn't changed as a result

9   of the Delaware Supreme Court invalidating the omnibus

10  agreement, has it?

11  A    It has.

12  Q    It has or it has not?

13  A    It has.

14  Q    Is SeeCubic, Inc. now going to manufacture its own

15  products?

16  A    No. But SeeCubic, Inc. is not licensing anything any

17  longer.  Ever since the Receiver was put in place and

18  subsequently under the independent director.  And subsequently

19  now, SeeCubic B.V. enters directly into transactions with any

20  customers only.  And it is the one that licenses the technology

21  to the extent necessary.

22  Q    What -- how does SeeCubic, Inc. have the right to license

23  any technology when the Phillips agreement specifically says

24  that it cannot be licensed?

25  A    The Phillips agreement specifically does not say that.

Case 23-10763-amc    Doc 787-14    Filed 10/20/23    Entered 10/20/23 19:50:57    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 105 of 184

105

```
 1   You refer only to the 2011 agreement.  You did not refer to the
 2   2014 amendment also enacted by Stream, which specifically
 3   contemplates sublicensing because Stream has also realized that
 4   there may be situations where it would need the sublicense.
 5   Q    And we'll look at the Phillips license agreement and the
 6   2014 amendment.  Our client has quite a different understanding
 7   of what that agreement entails.  How does SeeCubic, Inc. make
 8   money if it's not manufacturing products and it's not licensing
 9   any technology, how does SeeCubic, Inc. get paid for anything?
10   A    At this point, SeeCubic, Inc. doesn't get paid for
11   anything.  It's a startup company that's investing in
12   technology development.
13   Q    Do you see where it states below in that revenue section
14   where it says for consumer electronic brands, automotive
15   brands, et cetera, the company will license both an optical
16   stack design customized for each new type of panel based on
17   panel configuration and a customized set of software to drive
18   that panel?
19   A    I do.
20   Q    Does SeeCubic, Inc., no longer intend to do that?
21   A    SeeCubic, Inc. does not intend to do that for the time
22   being.  SeeCubic B.V. must do that now.
23   Q    And so, everything that is stated in this revenue section
24   about how SeeCubic, Inc. planned to move forward and actually
25   make money you're saying is now no longer valid?
```

1    A     Essentially, it's SeeCubic B.V., which is the one that --

2    to the extent that there are any commercial contracts that

3    would arise during the period of the legal dispute, SeeCubic

4    B.V. would be the one to earn that money.  That was what was

5    put in place by the Receiver, continued by the independent

6    director, and is continued now under the order of the Dutch

7    court.

8    Q     And how many customers has SC B.V. licenses technology

9    too?

10   A     None.

11   Q     Has SeeCubic, Inc. raised any money through the

12   subscription agreement that we looked at?

13   A     It has.

14   Q     How much money has it raised?

15   A     Approximately $2.5 million dollars.

16   Q     Without any disclosure of this litigation?

17   A     That's incorrect.

18         MR. COLBY:  Objection.

19         THE WITNESS:  The litigation was disclosed.  It was

20   not disclosed in the subscription agreement where it never

21   would have been.  The investors in this round include Hawk and

22   include the investors who were most familiar with the company's

23   situation.

24   BY MR. KODOSKY:

25   Q     How many investors have contributed towards that two-and-

Case 23-10763-amc    Doc 787-14    Filed 10/20/23    Entered 10/20/23 29:56:57    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 107 of 184

107

1  a-half million dollars that's been raised?

2  A    Eight.

3  Q    Who are they?

4        MR. COLBY:  Objection, Your Honor.  Again,

5  confidential.  No need for it in this context.

6        THE WITNESS:  Well, he didn't say it was

7  confidential --

8        MR. COLBY:  Not relevant.

9        THE COURT:  You said they were.

10       MR. COLBY:  Yes, that's the --

11       THE COURT:  Did he say it was confidential?  Come on,

12  Mr. Colby.  Now, I'm giving everybody leeway.

13       THE WITNESS:  I am under GPDR, which is the European

14  data privacy rule.  I am not allowed to disclose that

15  information.

16  BY MR. KODOSKY:

17  Q    So you won't tell us about any projects.  You won't tell

18  us who's invested in the company.  You won't tell us

19  essentially anything that would allow us to understand what

20  risks are Phillips license agreement is under by virtue of what

21  you all are doing over in the Netherlands?

22  A    The investors in SeeCubic, Inc. have no claim on the

23  Phillips license beyond the assets of SeeCubic, Inc., which is

24  a secured debt.  The only assets of SeeCubic, Inc. currently,

25  other than those that we've developed separately, are is the

 1   debt of the secured creditors?  The secured creditors will

 2   either get assets or cash or nothing for that secured debt.

 3   All of that is perfectly well understood by the investors.  So

 4   I'm happy to disclose to the Court anything the Court would

 5   like to know that's provided for in those rules.  But I can't

 6   disclose it beyond that.

 7   Q    What does the two-and-a-half million dollars that's been

 8   raised being used for?

 9   A    To continue the operations of SeeCubic B.V. and SeeCubic,

10   Inc.

11   Q    Your Honor, we would request -- you mentioned what was it

12   GEVR that provides -- that prohibits you from identifying who

13   the investors are?

14   A    I believe it's GPDR.

15          MR. COLBY:  GDPR.

16          THE WITNESS:  Is it GDPR?

17          THE COURT:  What is it?  G what?

18          THE WITNESS:  GDPR, Mr. Colby said.  I thought it was

19   GPDR, but I could be wrong.

20          THE COURT:  And what does GDPR to your knowledge?

21          THE WITNESS:  It is the --

22          MR. COLBY:  Your Honor, it's the European Union Data

23   Privacy Law.

24          THE WITNESS:  The investors are from the European

25   Union.

1          THE COURT:  Well, I'm assuming you have it since you

2     guys were going to rely on it that you would be -- going to

3     hand it up to me.

4          MR. COLBY:  Your Honor, it is extensive and

5     extraordinarily complicated.

6          THE COURT:  Well --

7          MR. COLBY:  I'd be happy to --

8          THE COURT:  -- I can figure out complicated.

9          MR. COLBY:  No, I understand.  My point is only that

10    I don't carry a copy around with me.

11         THE COURT:  Well, let me just say this counsel.  To

12    the extent that you were going to rely on that law, and you

13    were going to cite it to this Court, it is pretty clear that I

14    don't have it either and that you were going to, Mr. Stastney

15    -- because I'm pretty sure he didn't -- well, maybe he did.

16    Maybe he told you about it.  It doesn't matter.  You guys want

17    to assert it as a basis for not disclosing, you need to be

18    prepared to give it to me.  You have it?

19         MR. COLBY:  I understand, Your Honor.  I didn't --

20    I'm not offering this testimony and I didn't anticipate that

21    this issue would come up.

22         THE COURT:  Well, you stood up and said he cannot.

23    He's prohibited.  He didn't even say he couldn't.  So you

24    interjected and before he even said I cannot, I'm barred, and

25    you obviously knew the basis as to why because you just gave

Case 23-10763-amc   Doc 487-14   Filed 10/09/23   Entered 10/09/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing of Transcript   Page 110 of 184

110

1  him the correct acronym.

2       MR. COLBY:  Actually, Your Honor, I'm familiar with

3  the acronym because I was required to do some law firm training

4  on it.  I stood up to object because I thought that the

5  investors were subject -- that that was subject to its own

6  confidentiality agreement.  That was my thought.  I either was

7  mistaken or Mr. Stastney had a different basis in mind.  But

8  we're not --

9       THE COURT:  Well, he didn't.  So I'm telling you to

10 the extent that he's excerpting it, somebody needs to give me

11 the law because how am I supposed to rule on whether in fact it

12 is precluded?  I'm supposed to do that in a vacuum?  He's

13 asserting it.  He's the representative.  And I think he was

14 saying he's doing it in the capacity as SeeCubic, Inc., who is

15 your client.  So somebody needs to give this to me.

16      MR. COLBY:  Happy to work on that.

17      THE COURT:  All right.  I don't know how I'm supposed

18 to rule if I don't know something about, you know -- as you

19 said, it's pretty thick.  It's difficult to read.  I don't know

20 about it.

21      MR. COLBY:  I think it's -- I also think that the

22 questions are not relevant.  Who invested in SeeCubic is not

23 relevant to whether -- to the issue here today, whether or not

24 there is some risk of imminent harm to the Debtors.

25      THE COURT:  Well, my understanding that the risk of

Case 23-10763-amc   Doc 437-14   Filed 10/20/23   Entered 10/20/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 111 of 184

111

1   imminent harm to the Debtor is that they are out -- they

2   meaning I don't know if it's SeeCubic -- presumably SeeCubic,

3   Inc., because I have not heard SeeCubic B.V. is selling

4   subscriptions that would allow some interested -- some

5   purchaser to assert some interest in the license.  What I've

6   heard him say is we're not doing that, okay.  And the other

7   issue is that they are -- they meaning either SeeCubic, Inc.,

8   or SeeCubic B.V., or Mr. Stastney individually are licensing to

9   other third-parties information that is property of the

10  Debtor's estate.  That's all I am --

11          MR. COLBY:  Understand.  None of which have to do

12  with who made with who may be investing in SeeCubic, Inc.  None

13  of those issues have anything to do with who may be investing

14  in SeeCubic, Inc.

15          THE COURT:  Well it may be --

16          MR. COLBY:  They're investing -- I'm sorry.  They're

17  investing in the right -- I'm sorry.  I didn't mean to cut you

18  off.

19          THE COURT:  Go ahead.

20          MR. COLBY:  I wasn't quite done.  They're investing

21  in the right that Hawk and SLS have as secured creditors.

22          THE COURT:  Well, but counsel, the document that we

23  were looking at doesn't say that.  So he's questioning him, and

24  Mr. Stastney is, well, we're not doing that anymore.  So

25  that's --

 1          MR. COLBY:  Sure.  The document we're looking at,

 2   Your Honor, is from 2022.  The state of the world was very

 3   different.

 4          THE COURT:  I get what is, counsel.  He's free to ask

 5   him about it.  He's free to say who were they and what's going

 6   on.  I'm going to allow it for that to see if it relates.

 7          MR. COLBY:  The question was about current investors.

 8   So we'll work on the GDPR issue and figure out whether that can

 9   be disclosed.

10          THE COURT:  Well -- right, but let's be clear.

11          MR. COLBY:  But I don't think it's relevant.

12          THE COURT:  Well, it's relevant to the extent he said

13   he raised $2.5 million.  When did he raise it?  Was it recent?

14   Was it all in '22?  Let him ask the questions.

15          MR. COLBY:  Well, I understand.  Look, he testified

16   that it was recent.  But this 2022 PPM doesn't make current

17   fundraising relevant to the harm.  The current fundraising is

18   investing in rights as secured creditors.

19          THE COURT:  But counsel --

20          MR. COLBY:  There's no connection between that and

21   whether or not they're going to suffer irreparable harm.

22          THE COURT:  I don't know that.  They need to make

23   their record and that's what he's doing.  Either he's going to

24   make it or he's not.

25          MR. COLBY:  Well, I'm merely suggesting that there's

Case 23-10763-amc   Doc 787-14   Filed 10/20/23   Entered 10/20/23 29:50:57   Desc
Exhibit K. Stream October 2023 Hearing Transcript   Page 113 of 184

113

```
 1   some -- there are some outrebounds of what's relevant to the

 2   immediate issue of the supposed irreparable harm and I think

 3   we've reached those outrebounds.

 4           THE COURT:  Counsel, he's saying that this is

 5   irrelevant because you have gone beyond the bonds because this

 6   is from quart Q22, and it has nothing to do with today or what

 7   happened on the 13th.

 8           MR. KODOSKY:  I was actually asking about the two-

 9   and-a-half million dollars that he said that was just raised.

10   Well, he didn't really say when it was raised.  I asked in

11   connection with the subscription agreement, how much was

12   raised?  And he said two-and-a-half million dollars.  And I

13   said how many investors?  He said eight.  I asked who the

14   investors were, and he said I'm not answering that.

15           THE COURT:  No.  He said I'm not allowed to answer

16   it --

17           MR. KODOSKY:  I'm sorry, Your Honor.

18           THE COURT:  -- because of because of QDPR.  He did

19   say -- he did mention Hawks.

20           MR. KODOSKY:  He did mention Hawk.

21           THE COURT:  Right.

22           MR. KODOSKY:  Who apparently is one of the eight that

23   contributed towards the two-and-a-half million dollars.

24           MR. CAPONI:  If I could be heard, Your Honor?

25           THE COURT:  Yes you may, Mister -- I'm not going to
```

1  call you Mr. Colby.

2            MR. CAPONI:  Caponi, Your Honor.  Thank you.

3            THE COURT:  Caponi.

4            MR. CAPONI:  Your Honor, the disclosure of Hawk is no

5  violations as I'm sitting here.  But the issue Your Honor I

6  have goes to relevance.  The investors in SeeCubic, Inc., the

7  Delaware entity, Weber's investing in that entity is not

8  engaged at the SC B.V. level.  It is not engaged in any

9  licensing.  It is not engaged in any day-to-day operations, so

10  I don't see that there's any relevance.

11            Secondarily, throughout the course of this dispute,

12  there has been aggressive activity on behalf of Mr. Rajan and

13  those associated with Mr. Rajan to go after any sources of

14  liquidity.  So one of the ways that this war has been fought in

15  addition to being fought in the Netherlands, in this court,

16  it's if you can scare away investors, then the company lacks

17  resources to pursue its interest and you can win.  So my

18  client --

19            THE COURT:  Which company?  Which company lacks

20  resources?

21            MR. CAPONI:  Excuse me, Your Honor?

22            THE COURT:  You're saying which company lacks

23  resources?

24            MR. CAPONI:  The one.  I mean, what has been

25  happening over the course since I've been involved in the last

1   year-and-a-half is that the -- when they are able to identify

2   the identity of investors in SeeCubic, Inc., there is a --

3   campaign to harass these individuals to dissuade them from

4   investing in the future.  Given that, there's -- I don't see

5   any connection whatsoever between who invested in SeeCubic,

6   Inc. and the TRO.  I don't see the relevance.  And I'm

7   informing the Court that that information from my client's

8   perspective is very sensitive because it's being -- every time

9   it's disclosed its weaponized and I --

10          THE COURT:  Weaponized against your client?

11          MR. CAPONI:  Yes.  My client -- my client is a

12   substantial investor.

13          THE COURT:  Oh, I already know that.

14          MR. CAPONI:  Right.  So, Your Honor, if my -- if this

15   investment goes down because others run away, my client is

16   going to be the one that's hurt the most and my client has a

17   substantial interest in not having the pool of investors

18   further harassed any more than they've already been harassed.

19          THE COURT:  Well, from what I'm understanding from

20   Mr. Stastney, the eight investors are the same people who have

21   been investing.  So I'm not quite sure what -- that is already

22   know, so I don't know what the point is from anybody.

23          MR. CAPONI:  And that has not been disclosed.  I

24   mean, Hawk's investment is well known.

25          THE COURT:  No.  You just said they were the same

Case 23-10763-amc   Doc 487-14   Filed 10/00/23   Entered 10/00/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 116 of 184

116

 1   people.   There was nobody new.

 2          MR. CAPONI:  I'm just telling Your Honor --

 3          MR. COLBY:  He did that say, Your Honor.  But I don't

 4   think Mr. Stastney said that was previously expressly disclosed

 5   to Stream TV.  He did not say that.

 6          THE COURT:  Well then if it wasn't previously

 7   disclosed, how they harassing anybody?

 8          MR. COLBY:  Because --

 9          MR. CAPONI:  They've been harassing my client.  And

10   every time they --

11          THE COURT:  You and -- listen.

12          MR. CAPONI:  They suspect that there's someone

13   investing.  Your Honor, let me just -- if I can for one second,

14   Your Honor.  The investors in SeeCubic -- in Stream and then

15   SeeCubic, Inc. for the most part are very wealthy European

16   individuals.  These aren't corporations.  And they are familiar

17   with one another.  That's kind of how this works.  I made an

18   investment.  You may want to get in on this.  So Mr. Rajan was

19   exposed to this circle through my client Hawk.  And when he

20   believes that someone of those wealthy individuals may be

21   investing --

22          THE COURT:  You mean representative of Hawk because

23   Hawk's an entity; is it not?

24          MR. CAPONI:  Excuse me, Your Honor?

25          THE COURT:  When you say was introduced by your

Case 23-10763-amc   Doc 737-14   Filed 10/20/23   Entered 10/20/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 117 of 184

Exhibit K. Stream October 2022 Hearing Transcript   Page 117 of 184

117

 1   client, do you mean a representative of Hawk or --

 2          MR. CAPONI:  Of Hawk.  Yes, Your Honor.

 3          THE COURT:  Okay.

 4          MR. CAPONI:  And so, when Mr. Rajan believes that

 5   someone in that circle may be investing, the get barraged and

 6   harassed and then my client hears about it whether they're

 7   investors or not and it's sort of along the lines of thank you

 8   very much for making your problem my problem, and it scares

 9   these people away.  So Mr. Rajan to date does not know how the

10   eight investors are.  We don't want him to know because once he

11   finds out, rather than attacking 30 people, he's going to

12   attack eight.  And given that it has no relevance to this

13   proceeding, I don't know why we're talking about it.

14          THE COURT:  Okay.

15          MR. CAPONI:  Thank you, Your Honor.

16          THE COURT:  Counsel, response?  Oh, yes?  He said

17   it's irrelevant.

18          MR. COLBY:  Yeah.

19          THE COURT:  Irrelevant.  Why is this relevant?  What

20   does this have to do with the issue as I see it is what I

21   thought was that certain facts or certain things transpired at

22   the hearing in the Netherlands.  And then based on what

23   transpired at that time, there was a need to get a temporary

24   restraining order and then at some point either a preliminary

25   or permanent injunction, prohibiting whatever happened or was

1   said to be happening at that hearing.

2           How is who is investing in SeeCubic, Inc. relevant to

3   that issue before me?

4           MR. CAPONI:  Your Honor, my clients are going to

5   testify that over in Amsterdam, they heard Mr. Stastney say

6   that he was involved -- they had 11 or 12 clients lined up,

7   including Hyundai.  Within a week after that testimony was

8   given this subscription agreement went out seeking to raise

9   money.  We don't know -- I haven't had a chance to ask him yet

10  how many people this subscription agreement was sent to.  We

11  know that there's been eight total investors.  We don't know

12  who those investors are.  The subscript --

13          THE COURT:  I got my own information on GDPR.  Okay,

14  hold on.  Let me take a little look at that.  Boy, for someone

15  without ten associates, we're doing pretty good.

16          Well, for one thing, the GDPR only applies to

17  processing data of a natural person.  This is all says natural

18  person, that or relating to institutional investors is not

19  covered.  Although information relating to their employees or

20  individual plan participants might be.  So I'm not quite sure.

21  Just a quick -- I'll figure that out.  But just a quick review

22  says it applies to natural persons?

23          MR. KODOSKY:  I'm sorry, natural persons?

24          THE COURT:  Natural persons.  So presumably these

25  investors must be natural persons, although Hawk isn't one.

 1          MR. KODOSKY:  Hawk is not one.  There are other non-

 2  individuals, let's call them that, that have invested towards

 3  that two-and-a-half million dollars that's been raised.

 4          THE COURT:  You're still arguing on relevance?

 5          MR. COLBY:  No, Your Honor.  I was just going to make

 6  the point that because of the complexity of GDPR, I think Mr.

 7  Stastney can answer that question, are there other entities?

 8  But before we go further, we would appreciate the opportunity

 9  to just nail down this issue a little bit further for the

10  Court's benefit.

11          THE COURT:  Counsel, without disclosing any attorney-

12  client privilege, I'm presumed that you prepped Mr. Stastney

13  for his testimony today, did you not?

14          MR. COLBY:  That we -- I'm sorry, I couldn't hear.

15          THE COURT:  You prepped him.  You prepared him?

16          MR. COLBY:  Briefly, Your Honor.

17          THE COURT:  Yeah, well I would -- okay.  I'm getting

18  more confident, but tell me briefly, Mr. Colby.  I'm sure you

19  did a good job.  You didn't briefly do it.

20          MR. COLBY:  You might be surprised at how briefly.

21          THE COURT:  Oh.  Well, okay.  But in any event, just

22  a cursory review of this suggest that it only applies to

23  natural persons.  So I think he can just say how many natural

24  persons.  And then we'll figure out later whether that --

25  assuming it's relevant.

Case 23-10763-amc   Doc 737-14   Filed 10/08/23   Entered 10/08/23 29:56:57   Desc
Exhibit K. Stream October 2023 Hearing Transcript   Page 120 of 184

120

1          MR. COLBY:  Yeah, I'm fine with that.

2          THE COURT:  Assume how many nonnatural -- when we're

3    nonnatural we mean like not a person of those eight investors?

4          THE WITNESS:  I'm going to say roughly four.  Our

5    through entities and four are directly in individual capacity.

6          THE COURT:  So four are entities and four are

7    persons?

8          THE WITNESS:  Uh-huh.

9          THE COURT:  A natural.  What did they call them?

10         THE WITNESS:  A natural person.

11         THE COURT:  Natural persons, okay.  Now, back counsel

12   to the issue of relevancy.  Counsel have both argued that this

13   is irrelevant to your, you're the Debtor's request for a TRO

14   because what does that have to do with whatever it is that you

15   believe of the Debtor is being harmed and will -- and the

16   Debtor will suffer irreparable harm.  What does the fact that

17   SeeCubic, Inc. is getting investors in SeeCubic, Inc., which

18   Mr. Stastney says is going to be used to invest in both

19   SeeCubic B.V. and SeeCubic, Inc.?  What is the relevance to

20   this matter today?

21         MR. KODOSKY:  Your Honor, the relevance is that

22   they're out there raising money based on these subscriptions

23   that contain absolutely no discussion of this trade secret

24   litigation where we allege that our crown jewel, the Phillips

25   license is at risk.  If Phillips finds out what these guys are

Case 23-10763-amc    Doc 787-14    Filed 10/09/23    Entered 10/09/23 29:50:57    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 121 of 184

121

 1  doing over in the Netherlands, we're done.

 2          THE COURT:  Well, I don't know.  Listen.  There's a

 3  dispute over who owns the Phillips license.  And from what I

 4  can gather, the Phillips license, and I'm not expert on IP, but

 5  based on the testimony, Phillips licenses and people or people,

 6  entities, whoever it is that they license it to, the licensees,

 7  are free to take that technology and develop it further and do

 8  whatever they heck they do with it and pay Phillips some sort

 9  of royalty or whatever it is that it's called that they're

10  paying.

11          So I'm trying to figure out how -- I get what part of

12  the Debtor's argument is, is that what is being licensed that

13  are potentially licensed because Mr. Stastney is saying they're

14  not licensed in anything.  What is potentially being licensed

15  is a -- I'm not sure what the proper word for it, but the

16  technology that is being licensed is the base.  I'm going to go

17  back to my little building example.  Is the foundation is the

18  Phillips license.  Rembrandt did something to it, so they built

19  on it.  And then Stream or the entities or somebody, they then

20  said -- Rembrandt says you're using my license.  You're using

21  my technology.  You guys -- you meaning Stream and all their

22  little subsidiaries.

23          They then agreed, okay, this new -- it's not -- I use

24  the word improve, but it's now a different then what it was

25  originally.  Because originally it was Phillips, and Phillips

```
 1   couldn't figure out -- from my understanding, they couldn't

 2   figure out how to get the bugs out.  Rembrandt tried.  They

 3   couldn't get -- they got some of it done and then their

 4   information, they alleged, was taken to Stream or Stream

 5   subsidiaries because its engineers went over there and there's

 6   no testimony to the contrary that they didn't.

 7           And Rembrandt and then said, okay, you took -- you

 8   built upon -- you know, we had a foundation.  We built a floor.

 9   You went and built floor number two.  And then we built floor

10   number -- we built floor number one Phillips.  We built floor

11   number one.  And then you, you, I don't know who you is, but

12   they cut a deal with Stream saying you built something, and you

13   owe us some money because you took what we built on.

14           And then these other parties are saying the exact

15   same thing.  Well, we only used what you had, and we built our

16   own.  And the Debtor is saying, well, this was ours that you

17   used.  And the same thing that Rembrandt said to Stream, Stream

18   is saying to these other people, namely the SeeCubic B.V. that

19   you can't do that because it's ours and you took ours and built

20   whatever you have.  And so, this building doesn't belong to

21   you, and you can't license it.  You can't do anything with it.

22           And my question is, is what -- I'm assuming is that

23   the Debtor is saying this is our asset and now you're taking

24   it.  And I don't care what you put on top of it, it's ours.

25   And you can't use it to go sell the license to somebody else.
```

Case 23-10763-amc    Doc 487-14    Filed 10/20/23    Entered 10/20/23 29:56:57    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 123 of 184

123

```
 1   And my question is what is the imminent date -- the imminent

 2   harm or what is it that it's doing that is going to cause some

 3   harm?  And you're saying they're going out and licensing it to

 4   people.  They're trying to sell it.  They're trying to -- I

 5   don't know what they're doing with it.

 6           And that's my question is what -- I'm trying to

 7   figure out what is it that triggered this.  And so, they're

 8   saying whoever invested is -- now you're saying they use it for

 9   subscription agreements.  Okay, we can talk about that.  You're

10   saying that they're using it to license.  And Mr. Stastney is

11   saying we're not selling anything.  At least not with respect

12   to these licenses because that's different now.  And we're not

13   licensing anybody.  We're just giving them proof of --

14           THE WITNESS:  Concept.

15           THE COURT:  -- concept, so --

16           MR. KODOSKY:  And, Your Honor, our position is that

17   the SC B.V. has no rights under the Phillips license agreement

18   to be sublicensing this technology to anybody.  When the

19   independent director that was appointed, Mr. Jasper Burkenbosch

20   (phonetic) received the complaint or the notice from Rembrandt

21   in August, he resigned.

22           THE COURT:  Okay, I got that.  I got that.  So what

23   are these people doing now?  When I say these people, I mean

24   all of the Defendants that you want me to issue a TRO.  What

25   are they doing now that is different then when the -- the first
```

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 124 of 184

124

```
 1   independent director, he resigned because he -- whatever he --

 2   for whatever reason.  I don't know.  It's not in the -- I mean,

 3   we all can speculate unless he put something in writing.  We

 4   all can -- you can say, well, we believe he did this and we --

 5   I don't know why he did it unless you have something in

 6   writing, I don't know what to tell you.

 7           So again, my question is, what is it that you -- that

 8   Mister -- because we need to just stick to what did you say?

 9   What did you mean?  And then I get to hear from Mr. Stastney

10   what he says he said.  And then I'll hear from the other two

11   people that tell me this is what he said.  And then it's a

12   credibility issue because if he -- if they say he said I am

13   doing this now and I find that this is implicating the Debtor's

14   assets, we got a problem.  And if I don't find that he did any

15   of those things, then I don't know what the emergency is.  So

16   can we just kind of focus on that?

17           MR. KODOSKY:  I'll try, Your Honor.

18           THE COURT:  Okay.  So I will sustain the -- your

19   objection as to relevancy and we're going four outside of --

20   there's like a little box here that I think we need to stay

21   within.  And I'm not quite sure who -- it's relevant as to when

22   they investments may have happened.  What they told people they

23   were going to give them.  As to whether this involves the

24   Debtor's assets that they're trying to get people to invest in.

25   I get that.
```

1          But we need to tell me what happened September 13th

2    and what they're doing you believe that they -- the record will

3    show that they were doing.  They meaning Mr. Stastney,

4    SeeCubic, Inc.  Who else is on here?  Hawk.  I don't know what

5    Hawk did.  Maybe by investing.  I have no clue.  Okay.  But at

6    least the four people, four entities, and one person who you

7    believe I should issue Stastney individually.  I get it.  SLS

8    VI Holdings, SeeCubic, Inc., that's Mr. Stastney, and Hawk

9    investments.  And you need to tell me why I wouldn't -- what is

10   it that they're doing that I need to enjoin, okay.

11   BY MR. KODOSKY:

12   Q    Who were you shopping at -- are you shopping the

13   technology?

14   A    I don't know what that means.

15   Q    Are you -- meaning with potential clients offering to

16   license the source code and optical design stack, and other

17   pieces of technology?

18   A    No.  We are not meeting with clients and offering to

19   license them the technology.

20   Q    When you say we, does that include both S -- SeeCubic,

21   Inc. and SeeCubic B.V.?

22   A    Yes.

23   Q    So neither is SeeCubic, Inc. nor SeeCubic B.V., it's your

24   testimony here today, you all are not offering to potential

25   clients to license the technology to those clients?

```
 1   A    At this point, all we are doing is offering to complete a

 2   proof-of-concept project with them.

 3   Q    What do you mean by a proof-of-concept project?

 4   A    We take their specifications and create a product.

 5   Q    SC B.V. is creating the products?

 6   A    SC B.V. is creating the products.

 7   Q    For sale?

 8   A    No.  For proof of concept for those clients to see if the

 9   technology is something that they may want to license in the

10   future.  But none of that is happening now.

11   Q    And so, if my client is correct that SC B.V. does not have

12   the right to license technology that has Phillips technology

13   embedded in it or Rembrandt technology embedded in it, would

14   you agree, sir, that you are putting those agreements in

15   jeopardy by building products, protocol projects for these

16   potential clients using that technology embedded in it?

17   A    No.  Phillips is specifically aware of exactly what we

18   were doing because we have discussed with Phillips exactly what

19   we are doing.  Phillips was aware of that when Mr. Rajan was

20   still at SC B.V. in the discussions with Bosch.  Phillips is

21   still aware of that.  They are fully aware of our business

22   model, and they have no objections to it.

23   Q    What basis --

24   A    Rembrandt on the other hand, does not have any protectable

25   IP in this situation.  The analogy that's been used is somewhat
```

 1  incorrect in that regard.

 2  Q    Who at Phillips has signed off on what you all are doing?

 3  A    The responsible party at Phillips for the license.

 4  Q    Who is that?

 5  A    His name is Alexander Damveld (phonetic).

 6  Q    The same Alexander Damveld that said there are no licenses

 7  available at this point?

 8  A    I don't know what you're referring to.

 9  Q    Are you aware that that gentlemen has informed my client

10  within the last month that there are no additional licenses

11  being made?

12          MR. COLBY:  Objection, Your Honor, just to the extent

13  that that's a proffer of evidence.  That would be hearsay.  I

14  think if the question could be --

15          THE COURT:  Rephrased.

16          MR. COLBY:  -- rephrased.

17  BY MR. KODOSKY:

18  Q    Have you personally had conversations with Mr. Damveld?

19  A    Yes.

20  Q    When?

21  A    2021.

22  Q    Okay.  So you have not spoken with Mr. Damveld in 2023?

23  A    I have not.

24  Q    So if you've not spoken with Mr. Damveld in 2023, how does

25  he know what you all were doing over there right now?

1   A    Because our business model hasn't changed.

2   Q    Well, I thought that you said that your business model has

3   changed from 2022 whenever in the product placement with the

4   astronaut on the front you talked about your business model

5   included sublicensing the technology?

6   A    And I said the way in which it changed, which was the

7   party doing the sublicensing is not SeeCubic, Inc. any longer.

8   It's SeeCubic B.V.  But otherwise, I confirmed for you that the

9   business model was the same.

10  Q    And the only reason that SC B.V. is the party that's now

11  offering the sublicensing as opposed to SeeCubic, Inc. is

12  because you've been named within the last two weeks the

13  director of SC B.V., correct?

14  A    That is 100 percent inaccurate.  The reason that SC B.V.

15  is doing it is because the Receiver in October of 2022 decided

16  that it would be in every party's best interest if SC B.V. did

17  the agreements with customers.  That exact protocol was adopted

18  by the independent director, and that is the protocol that I'm

19  bound to follow by the court under the court's most recent

20  ruling.

21  Q    Mr. Stastney, you referred to the Receiver.  The Receiver

22  was in place before the Delaware Supreme Court ruled, correct?

23  A    Incorrect.  The Receiver was in place well after the

24  Delaware Supreme Court ruled.

25  Q    Okay.

Case 23-10763-amc    Doc 487-14    Filed 10/00/23    Entered 10/00/23 29:50:50    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 129 of 184

129

1    A      The Delaware Supreme Court ruled in June of 2022, and the

2    Receiver was put in place by the chancery court in October of

3    2022.

4    Q      All right.  And so, you're saying that the Receiver

5    allowed SC B.V. to sublicense the technology to clients?

6    A      The Receiver allowed SC B.V. to do exactly what it has

7    been doing since 2018, which is develop proof of concept

8    projects to potentially entice customers to license the

9    technology to include in their offerings.

10   Q      The independent director did not agree to continue with

11   your all's business model, correct?

12   A      Incorrect.

13   Q      He resigned?

14   A      I said incorrect.  He did agree to continue it and that's

15   exactly what the protocol provided.

16   Q      Well, he resigned correct?

17   A      Those are two different questions.

18   Q      It's one question.  He resigned, correct?

19   A      The independent director resigned, right.

20   Q      And with you as a director and making the decisions

21   essentially at this point for SC B.V., who's to police your

22   conduct?

23   A      The court.  Specifically, the Amsterdam court.  I am to

24   abide by a protocol and provide regular reports to the

25   Amsterdam court.

Case 23-10763-amc   Doc 487-14   Filed 10/09/23   Entered 10/09/23 19:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 130 of 184

130

```
 1   Q     How often do you have to  provide reports?

 2   A     It does not say specifically.  It says regularly.

 3   Q     Have you provided any reports to the Amsterdam court to

 4   this point?

 5   A     No.  Not since September 20th.  No, I have not.

 6   Q     All right.  So in the two, three weeks, you have not

 7   accounted at all to the Amsterdam court in terms of what you

 8   all are doing over there?

 9   A     That's correct.

10   Q     Are there any scheduled communications with the Amsterdam

11   court as to what is going on with the henhouse?  You heard my

12   fox in charge of the henhouse characterization earlier.  Is

13   there any further hearings scheduled with the Amsterdam court

14   regarding these matters?

15   A     No hearings.  I'll rely on my Dutch counsel to tell me as

16   and when I should be updating the court.

17   Q     Is there any order saying what a schedule would be for you

18   to notify the court over there as to what's going on?

19   A     I believe I answered that already.

20           THE COURT:  That's --

21           THE WITNESS:  I said no.  There's no schedule.  It's

22   to be --

23   BY MR. KODOSKY:

24   Q     So you're essentially self-policing yourself, correct?

25   A     Incorrect.
```

Case 23-10763-amc   Doc 783-14   Filed 10/09/23   Entered 10/09/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 131 of 184

131

1   Q     How am I incorrect?

2   A     Because I'm overseen by a court with a specific protocol

3   to follow.

4   Q     How many customers have you spoken with about potentially

5   developing these protocol projects?

6   A     I apologize.  Who am I in this regard and you mean proof

7   of concept projects?

8   Q     Correct.

9   A     When you say you, in what role?

10  Q     Start with SeeCubic, Inc.

11  A     SeeCubic, Inc., not me personally.  But SeeCubic, Inc. has

12  probably talked to 50, 100.

13  Q     A hundred customers?

14  A     Potential customers.

15  Q     And what have those conversations concerned?  Putting the

16  technology in automobiles, for example?

17  A     Some have been with automobile companies or tier one

18  suppliers.

19  Q     And televisions?

20  A     Some of them regarding televisions.

21  Q     And have you personally been the one having these

22  conversations?

23  A     I have had some and our SCI staff has had others.

24  Q     When you say SCI staff, who is that?

25  A     Those are our employees who have relationships with the

```
 1  various companies or are building relationships with the

 2  companies to explain to them what we do and assess whether

 3  they're interested.  They're salespeople.

 4  Q    So SeeCubic, Inc., has salespeople?

 5  A    Yes.

 6  Q    How many?

 7  A    Well, I'll say five sort of full time and a lot of people

 8  help out.

 9  Q    And they're offering the services of SCBV to these

10  clients?

11  A    Yes.

12  Q    Is SCBV speaking with clients about licensing the

13  technology to those clients?

14  A    No.

15  Q    Are you individually speaking with potential clients?

16  A    At times, yes.

17  Q    How many?

18  A    I don't know the answer to that.  But many.

19  Q    More than --

20  A    I mean, I've certainly spoken with 20 or 25.

21  Q    All right.  And if you've spoken with 20 or 25 and

22  SeeCubic, Inc. has salespeople out there that have spoken with

23  you said 100, maybe 100 or more?

24  A    Fifty to a hundred, probably.

25  Q    And if our client's position is correct that that's
```

```
 1   jeopardizing the Phillips licensing agreement, your answer is,

 2   is that there's somebody at Phillips who you haven't spoken

 3   with since 2021 that's fine with what you all are doing?

 4   A    Yes.

 5   Q    Mr. Stastney, you were barred by FINRA in 2013; is that

 6   correct?

 7   A    I don't recall whether I was barred by FINRA, but I

 8   entered into an SEC -- a settlement with the SEC in 2013.

 9   That's correct.

10   Q    And that was for roughly $2.8 million?

11   A    That's correct.

12   Q    You were fined?

13   A    That's correct.

14   Q    And that was for an undisclosed profit that you had made

15   in connection with a purchase transaction?

16   A    That was for an undisclosed principal transaction.

17   Q    Right.  And that bar has not been lifted in the past 10

18   years, correct?

19   A    I have never reapplied.

20   Q    Is the Amsterdam court aware of that?

21   A    I believe that was briefed by your clients, yes.

22           MR. KODOSKY:  May I have a minute, Your Honor?

23           THE COURT:  Sure.

24       (Counsel confer)

25   BY MR. KODOSKY:
```

```
 1   Q    Mr. Stastney, were you offering sublicensing to the

 2   potential customers that you all have been meeting with?

 3   A    No.

 4   Q    No sublicensing at all?

 5   A    All we've been offering to clients at this point is proof

 6   of concept projects.

 7   Q    But if the proof of concept is successful -- has the proof

 8   of concept actually worked with any client to this point?

 9   A    No.

10   Q    So nobody has decided to do any business with you all

11   after these projects have been built?

12   A    We haven't completed any of them yet.

13   Q    How long have you all been working on these projects?

14   A    In terms of actually working on them, the first one

15   started earlier this year.

16   Q    In 2023?

17   A    Uh-huh.

18   Q    After the Supreme Court invalidated the omnibus agreement

19   is when the projects first started?

20   A    The conversations were happening before that, but that's

21   when the actual projects commenced based on the contracts.

22   Yeah.

23   Q    And has the work been completed at this point?

24   A    The work has not been completed.

25   Q    When do you anticipate the work is going to be completed?
```

1   A    Somewhere between around the end of the year or after.

2   Q    Is the bonding equipment being used in connection with

3   those projects?

4   A    It is not.

5   Q    Where is the bonding equipment these days?

6   A    It's in a warehouse in China.

7   Q    Have you had any conversations with the landlord about the

8   bonding equipment in that warehouse?

9   A    No.  I have not.

10  Q    And you deny telling the landlord not to release it to my

11  clients?

12  A    I deny telling the landlord not to release the equipment

13  to your clients.  Yes.

14  Q    Have you spoken with clients in the past about

15  sublicensing?

16  A    That's what I assumed your question was previously and the

17  answer is no.

18  Q    Okay.  And so these client discussions you're having, you

19  said you've personally had more than 25 of them.  If you're not

20  discussing sublicensing, what's the purpose of having a

21  protocol built if the end result is not to sublicense the

22  technology to them?

23  A    The purpose is to take the first step, which is does our

24  technology work within their build, within their -- with their

25  chosen equipment.  And until that's done and completed, there's

Case 23-10763-amc    Doc 487-14    Filed 10/09/23    Entered 10/09/23 29:50:57    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 136 of 184

136

Exhibit K Doc 202 Page 136 of 184

```
 1   really nothing to discuss on the sublicensing terms.  We've

 2   never gotten to that point.

 3   Q    When do you expect to get to that point?

 4   A    At some point after when they've gotten the proof of

 5   concept project completed and have had a chance to assess

 6   whether they want to move forward with a commercial

 7   application.

 8   Q    And I guess my question to you, sir, is when do you expect

 9   the first proof of concept project to be completed?

10   A    I think I've answered that also.  But that was the end of

11   the year or early next year.

12   Q    I didn't hear the answer earlier to that.  So before the

13   end of 2023 or beginning of 2024, you all expect to have the

14   first of these proof of concept projects completed?

15   A    That's correct.

16   Q    And then at that point, do you anticipate having

17   sublicensing discussions with the potential clients?

18   A    Only if they decide to move forward with the commercial

19   application.  After some period of evaluating the proof of

20   concept project.

21   Q    And if they do want to move forward, then you all would

22   sublicense the technology to them?

23   A    That's a bridge we'll have to cross when we get there.

24   Q    Well, maybe.  The Court is going to have some say in that

25   in terms of whether or not you all are able to move forward
```

Case 23-10763-amc   Doc 737-14   Filed 10/09/23   Entered 10/09/23 19:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 137 of 184

137

1  with sublicensing technology despite what the terms of the

2  agreement say.  But I just want to make sure that I'm clear

3  that that's your intention, is to get these proof of concept

4  projects completed and then move forward with the sublicensing,

5  correct?

6  A    My intention is to complete the proof of concept projects

7  and then hope that the clients approve of them and want to move

8  forward.

9  Q    And the sublicensing would be done not by SeeCubic, Inc.,

10  but instead by SCBV?

11  A    That's correct.

12  Q    An affiliate, a subsidiary of the Debtors in this case?

13  A    That's correct.

14  Q    And so if by moving forward with those projects and

15  potentially sublicensing the technology, any of the licensing

16  agreements with Rembrandt or with Phillips are jeopardized,

17  that's not a concern of yours?

18  A    That's not my understanding of what actually is the case.

19  Q    You're not concerned at all about the Phillips agreement?

20  A    Based on everything I'm saying that we're doing or propose

21  to do, I have no concerns about the Phillips agreement.

22  Q    Have you personally disclosed what you're doing to the

23  Phillips people?

24  A    Yes.

25  Q    In 2023?

```
 1   A     No.

 2   Q     Have you had any discussions with the Phillips people

 3   since the Delaware Supreme Court said that you all don't own

 4   the assets?

 5   A     I have not.

 6   Q     Have you asked any strategic companies for money, three to

 7   five million dollars each?

 8   A     Yes.

 9   Q     Who?

10         THE COURT:  Who's asking the --

11         MR. KODOSKY:  I'm sorry?

12         THE COURT:  Who said who?

13         MR. KODOSKY:  I did.

14         THE COURT:  Oh.  Okay.  All right.  I might be

15   getting a little delirious.  So the question was did you ask

16   any strategic?

17         MR. KODOSKY:  Companies.

18         THE COURT:  And presumably, he knew what you meant by

19   strategic because he answered.

20         THE WITNESS:  We have NDAs with each of those

21   strategic companies.

22   BY MR. KODOSKY:

23   Q     With who?

24   A     We have NDAs with each of those strategic companies?

25   Q     How many?
```

```
 1   A      Four.

 2   Q      What is the money being given for?

 3   A      The money is not being given yet.  We're only discussing.

 4          THE COURT:  And can we be clear for the record who's

 5   we?

 6          THE WITNESS:  I'm sorry?

 7          THE COURT:  Who is we?  We is?

 8          THE WITNESS:  SeeCubic, Inc.

 9          THE COURT:  Okay.

10          MR. KODOSKY:  SeeCubic, Inc.  This is SeeCubic, Inc.,

11   in this case.  I have no further questions at this point, Your

12   Honor.

13          THE COURT:  Okay.  I'm guessing -- well, I'm assuming

14   he called him over cross.  So you're going to have to examine

15   him, Mr. Colby.  Are you going to examine?  You have some

16   questions?

17          MR. COLBY:  Yes, Your Honor.  If now is a good time

18   for a short break, I'd just confer with co-counsel.

19          THE COURT:  Right.

20          MR. COLBY:  We've been going for an hour or two.

21          THE COURT:  And counsel, does anybody think we're

22   going to finish today?

23          MR. COLBY:  Well, I think we could finish right now

24   because I don't think the Debtors have come close to carrying

25   their burden.
```

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 140 of 184

140

```
 1                    THE COURT:  Well, they haven't called all their

 2   witnesses, counsel.

 3                    MR. COLBY:  Where I was going is I think the rest of

 4   the answer is better directed to them and not to me because I

 5   don't know how long it's going to take them to put on their

 6   case.

 7                    THE COURT:  Well, let's back off.  That was directed

 8   to everyone.  I actually just happened to be looking at you,

 9   Mr. Colby, because I was turned this direction.

10                    MR. COLBY:  Okay.

11                    THE COURT:  We have one witness that we have not even

12   finished. There are two more witnesses, Mr. Rajan and Mister --

13                    MR. KODOSKY:  Robertson.

14                    THE COURT:  -- Robertson.  I don't know how long --

15   presumably, let's say they each take a half an hour for cross

16   -- direct, half an hour for cross.  Or maybe you have 10

17   minutes.  I don't know.

18                    MR. COLBY:  Yeah.

19                    THE COURT:  But that's still two -- we're talking

20   about, I don't know, how long do you think for Mr. Stastney

21   here?  Maybe 20 minutes for you?  That still takes us to

22   4:00-something.  And then, these two gentlemen, I would love

23   to -- I'm not doing an all-nighter like I've done before.  And

24   either they're going to carry their case or they won't.  The

25   question is, I'm not sure that we're going to get through it
```

 1  before 5:30, 6:00 tonight and I'm not inclined to do that,

 2  given where I am.

 3          MR. COLBY:  Understand.  I think probably all of our

 4  predominant concern is if you're not feeling well, we'll finish

 5  whenever you like.  I think also, in addition to the time

 6  allocations that you just referenced, there's the possibility

 7  if not likelihood that after Mr. Rajan and Mr. Roberson, we

 8  would want a rebuttal witness.  Might be Mr. Stastney or

 9  somebody else.

10          THE COURT:  Yes.  There we go.

11          MR. COLBY:  And I'd be delighted of opposing counsel

12  let us have the last word, but they probably would have some

13  follow-up questions.  So you'll probably --

14          THE COURT:  So I'm just saying for timing.  And I

15  would love to say we can continue on Monday, but I don't think

16  so.  That's a holiday. I would come, but I think the court's --

17          MR. KODOSKY:  I would, Your Honor.

18          THE COURT:  Well, the court is closed.  I don't think

19  my staff is coming.

20          MR. KODOSKY:  Sorry.

21          THE COURT:  I don't think -- because I actually

22  realize I didn't have any trials.  And now that the judicial

23  council has mandated that all evidentiary hearings be in

24  person, you know, all of those trials that I was having during

25  COVID when people could do Zoom trials are suddenly settling.

 1  So I have lots of openings on my calendar.  I think my calendar

 2  is opening up -- don't I have a trial -- oh, was it a trial

 3  today that I gave to them?  Okay.

 4       And my trial on Tuesday is -- anyway, I'm saying that

 5  only because, I will be honest, my medication is wearing off.

 6  And notwithstanding my doctor's orders that I take the week

 7  off, I did not.  So I wanted to get this done.  But there's

 8  only so much that I can physically do, so.

 9       MR. DEMARCO:  Would Tuesday work for Your Honor?

10       THE COURT:  I'm trying to pull up my calendar.  Do

11  you know what's on our calendar?  What?  It should be -- I

12  don't and I purposely had -- doing COVID and Zoom trials, I

13  often had my phone with me because that was the way I

14  communicated with my staff.  And so I kind of got accustomed to

15  doing that.  But it looked while we were in court that I'm not

16  paying attention or that I'm on my phone.  So I have purposely

17  left my phone in my chambers so that I now have to go back to

18  looking at my laptop for information, to communicate with my

19  staff in chambers and to communicate -- Eileen, are you on?

20       THE CLERK:  Yes, Judge, I am.

21       THE COURT:  All right.

22       THE CLERK:  Yes, Judge.  We did set a trial on

23  Tuesday, but that's been rescheduled to November.  And that was

24  to start at 12:30.

25       THE COURT:  Okay.

```
 1              THE CLERK:  So we have that spot open.

 2              THE COURT:  Again, as I said, everybody trying to

 3   settle now because they don't want to come and see me.  So we

 4   do have Tuesday if we have to.  I will go as late as I can, but

 5   I will be honest, I'm not -- I'm starting to not feel well.

 6              MR. KODOSKY:  Sure.

 7              THE COURT:  Yes, counsel?

 8              MR. DEMARCO:  Your Honor, I apologize.  I just wanted

 9   to jump in real quick.  I'm traveling for business next Tuesday

10   through Friday.  I would have the following Monday and Tuesday

11   available, which is I believe 16th and the 17th.  But I've

12   already committed on another business trip for next week.

13              THE COURT:  Okay.  So you're not available at all?

14              MR. DEMARCO:  I'm not available on Tuesday.  I have a

15   flight at 8:00 Tuesday morning.

16              THE COURT:  Okay.  Because I was wondering, and I

17   don't know the answer.  I have to reach out to someone in the

18   administrative office to find out what in-court means.  Does it

19   mean only I have to be here?  Does it mean everybody has to be

20   here?  I don't know.  Because some counsel may want to

21   participate by Zoom, which I think -- which we were prepared to

22   do today with me being in another courtroom if I was still

23   contagious.  But I'm not, so I'm in here. So I don't know what

24   that means.  If that means for people who say we can

25   participate but we can't get here, but you can't be here at
```

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 19:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 144 of 184

144

```
 1    all.  So that's irrelevant.
 2              MR. DEMARCO:  I mean, I maybe could try Zoom later in
 3    the week, Your Honor.  I'd have to really juggle that.
 4              THE COURT:  No.
 5              MR. DEMARCO:  But certainly Tuesday, I'll be on a
 6    plane traveling.
 7              THE COURT:  Okay.  Eileen, what do we have?
 8              THE CLERK:  For what day, Judge?  For the following
 9    week?
10              THE COURT:  Yes.
11              THE CLERK:  We have the 16th available.
12              THE COURT:  What day of the week is that?
13              THE CLERK:  Monday.  October 16th is a Monday.
14              THE COURT:  And we have nothing that day?
15              THE CLERK:  We did have a case, TH Properties.  Hold
16    on one second, let me just make sure.
17              THE COURT:  That got continued to file an amended --
18    they're going to file an amended disclosure statement and --
19    amended disclosure statement and a continued hearing on their
20    motion for relief, correct?
21              THE CLERK:  Yes.  That's correct.  And that's not
22    until November 8th.
23              THE COURT:  Right.  So --
24              THE CLERK:  So we have October 16th available.
25              THE COURT:  And counsel, you said when will you be
```

Case 23-10763-amc   Doc 787-14   Filed 10/09/23   Entered 10/09/23 19:56:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 145 of 184

145

1    available?

2         THE CLERK:  I am available on Monday, the 16th, and

3    Tuesday, the 17th.

4         THE COURT:  What do we have on the 17th, Eileen?

5         THE CLERK:  17th, we have just our normal 10:30,

6    which we're available after 11:30.

7         THE COURT:  And counsel, on those days, assuming I'm

8    fine, we can go late.  I mean, as late as the -- as long as the

9    marshals don't -- or the CSOs don't kick us out, we can go as

10   late as necessary.  It's unfortunate today's just not one of

11   those days that I can do that.

12        MR. WRIGHT:  Your Honor, from my personal

13   perspective, I will rearrange things to block out that day for

14   Your Honor.

15        THE COURT:  For the 16th?

16        MR. WRIGHT:  Either day.

17        THE COURT:  16th or 17th?

18        MR. WRIGHT:  Whichever day, I can --

19        THE COURT:  The 16th would be all day.  I don't have

20   anything.  We'd start at 10:30 and we can go as late.  And I'll

21   check with the CSOs, but we probably can go as late as 8:00.

22   And hopefully, we can finish up today.  It's 4:00. Let me, you

23   know, you wanted to take a little break.  I can go.  I need to

24   take some more medication and then we'll see how long I can go.

25        MR. COLBY:  It's also a logical breaking point before

Case 23-10763-amc   Doc 788-14   Filed 10/09/23   Entered 10/09/23 29:50:50   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 146 of 184

146

1   I start up again.

2          THE COURT:  Right.  Because you're going to cross --

3   well, examine Mr. Stastney.

4          MR. COLBY:  Examine, correct.

5          THE COURT:  And then, we'll stop there.

6          MR. COLBY:  Yep.

7          THE COURT:  And then, you can start at the next

8   hearing with your two other witnesses.  And then hopefully, if

9   you have a rebuttal witness, we can get that all done within

10  eight or ten or however many hours.

11         MR. COLBY:  Well, no.  I was saying given that it's

12  almost 4:00, I could start today.  I don't know -- we don't

13  know how long we're going to go, but I don't know that I would

14  finish.

15         THE COURT:  Well, we can go until at least -- let me

16  just figure out how -- I mean, typically, I go until 6:00,

17  6:30, even though, you know, it's a little over.  I just don't

18  know if today, I can go that --

19         MR. COLBY:  Okay.  And the other consideration, and

20  I'm raising it, Mr. Kodosky could raise it himself.  It doesn't

21  look like it's going to happen.  We were trying to finish up

22  before flights had to be met.

23         THE COURT:  Oh, what time are your flights?

24         MR. COLBY:  Which is not me, but I think they have

25  some 7:00 flights.

1          MR. KODOSKY:  And that's the other thing I was going

2  to mention, Your Honor, is one of the two gentlemen, Mr.

3  Robertson, he's here from Nevada.  And so I don't know if the

4  Court would be inclined at all to maybe permit him to be

5  examined by Zoom as opposed to in court on the 17th?  But the

6  16th, if necessary, he could do.  But he was on a red-eye

7  flight this morning, Your Honor, that left Nevada at, like,

8  midnight and got into --

9          THE COURT:  Right.  So we aren't going to --

10          MR. KODOSKY:  -- morning early.

11          THE COURT:  So he's not even going to get on the

12  stand today.

13          MR. KODOSKY:  Right.

14          THE COURT:  So I think maybe we figure out -- what

15  I'll do is I'll take a break, come back, and I hate when I go

16  back because I end up starting talking to my law clerks about

17  things and we go a little over.  So let's come back at 4:15.

18  That gives you like 25 minutes.  So you guys sort of -- maybe

19  you can between, among yourselves figure out what timing works

20  for everybody.

21          MR. KODOSKY:  Okay.

22          THE COURT:  Because he's got to leave anyway.

23          MR. KODOSKY:  We've both got -- he's got a flight --

24  I'm up from Atlanta, Georgia.  My flight is at 7:00-something,

25  his is at 7:00-something.

```
 1                    THE COURT:  Counsel, you need to be at the airport by

 2    5:30.

 3                    MR. CAPONI:  Your Honor, I was going to suggest that

 4    since courtroom time is scarce, if we could -- we could always

 5    deal with scheduling tomorrow when we come back, get the

 6    witnesses up and down, and then deal with the lawyer stuff when

 7    we're not burdening Your Honor and --

 8                    THE COURT:  Well, that's fine with me.  That's why

 9    they pay me that huge salary, so I can come here and listen to

10    this.  That's my favorite line.  I'm sorry.  We're going to be

11    in recess until 4:15.

12        (Recess taken)

13                    THE BAILIFF:  All rise.

14                    THE COURT:  Please be seated.  You may proceed.

15                    MR. COLBY:  Thank you.

16                              CROSS-EXAMINATION

17    BY MR. COLBY:

18    Q    Mr. Stastney, do you recall Mr. Kodosky asked you a

19    question about whether or not you were involved in the day-to-

20    day work at SeeCubic BV?

21    A    Yes.

22    Q    Okay.  I have a different question.  My question is, do

23    you have an understanding of what the day-to-day work is that's

24    going on at SeeCubic BV?

25    A    Yes.
```

1   Q    There was testimony before the break about conversations

2   with customers.  And I want to focus in particular on -- did

3   you testify in the hearing in the Netherlands about ongoing

4   conversations with potential customers?

5   A    I believe we may have discussed that there were some.

6   Yes.

7   Q    Okay.  All right.  Did you provide an approximate number?

8   A    I don't recall doing that.

9   Q    All right.  You also testified before the break about

10  conversations with approximately 50 to 100 potential customers.

11  Do you remember using that number?

12  A    I do.

13  Q    Over what period of time did those conversations take

14  place?

15  A    Over three years.

16  Q    Three years.  Okay.  Have you had any conversations with

17  potential customers in the last, I guess it would be three

18  weeks since the decision on the -- in the case in the

19  Netherlands?

20  A    No.

21  Q    There were some questions about your obligations to report

22  to the court in the Netherlands.  Do you recall that?

23  A    I do.

24  Q    In the hearing in the Netherlands proceeding, did you

25  describe for the court there the projects that were ongoing at

1   SeeCubic BV?

2   A    I did not.

3   Q    I'm sorry?

4   A    I did not.

5   Q    Okay.  In terms of that reporting, is Mr. Rajan a party to

6   that proceeding?

7   A    He was.

8   Q    Okay.  And is proceeding ongoing in any way?

9   A    The court's oversight continues.

10  Q    Okay.  And if anybody has an issue with either your -- if

11  anybody has an issue with your conduct as the director of SCBV,

12  is there an opportunity to raise that with the court?

13  A    My understanding is that there is.

14  Q    Okay.  And if there's an issue with the frequency or

15  substance of your reporting to the court, is there an

16  opportunity for that to be raised with the court?

17  A    I wouldn't expect that there is.

18  Q    Okay.  Do you have an understanding as to whether or not

19  Mr. Rajan or anybody else from Stream could raise any issues

20  they see with your fulfilment of those duties with the court?

21  A    My understanding is that they could.

22  Q    I want to talk -- you made some references about the

23  Phillips license.

24  A    Yes.

25  Q    And what's your understanding of what the Phillips license

Case 23-10763-amc    Doc 787-14    Filed 10/09/23    Entered 10/09/23 19:56:57    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 151 of 184

Exhibit D 2022 Page 150 of 184

151

1   allows the licensee to do?

2   A    So the Phillips license as amended, allows the licensee to

3   incorporate or utilize the know-how and software that was

4   developed by Phillips to the extent that there is any.  And

5   also to include features which rely on the patents that were

6   developed by Phillips in producing and selling technology.

7           MR. COLBY:  Okay.  So let's take a look at it, if I

8   might, Your Honor, the Phillips license.

9           THE COURT:  The what?

10          MR. COLBY:  The Phillips license.

11          THE COURT:  Okay.

12          MR. COLBY:  So these will be SC-1 and SC-2 license

13  and the amendment.  You guys have copies, right?  Okay.

14  BY MR. COLBY:

15  Q    Can you take a look at SC-1, Mr. Stastney.

16  A    Yes.

17  Q    Do you recognize that document?

18  A    Yes, I do.

19  Q    What is it?

20  A    This is the original 2011 technology license agreement

21  between Phillips and Ulta D Cooperative.

22  Q    Okay.  And does this appear to be a true and correct copy

23  of that license?

24  A    It does.

25  Q    It does.  Okay.

```
 1              MR. COLBY:  Any objection to moving into evidence?

 2              MR. KODOSKY:  No.  No objection to moving it into

 3   evidence.

 4              THE COURT:  Okay.  Admitted.

 5         (Debtor's Exhibit SC-1 admitted into evidence)

 6   BY MR. COLBY:

 7   Q    And while we're taking care of housekeeping, Mr. Stastney,

 8   if you could look at SC-2.

 9   A    Okay.

10   Q    Do you recognize that -- take your time, but the question

11   is, do you recognize that document?

12   A    Yes, I do.

13   Q    What is it?

14   A    It is the 2014 amendment to the original 2011 technology

15   license agreement between Phillips and Ulta D Cooperative?

16   Q    And does it appear to be a true and correct copy of that

17   document?

18   A    It does.

19              MR. COLBY:  I'd like to move that into evidence as

20   well.

21              THE COURT:  Any objection?  Admitted.

22         (Debtor's Exhibit SC-2 admitted into evidence)

23              MR. COLBY:  Thank you.

24   BY MR. COLBY:

25   Q    Okay.  So Mr. Stastney, there's been a lot of testimony
```

 1  about sublicensing and the Phillips amendment.  What's your

 2  understanding as to -- I'm sorry, in the Phillips license.

 3  What's your understanding as to whether or not sublicensing

 4  would be permitted under the Phillips agreements?

 5  A    My understanding is that it would.

 6  Q    What's that based on?

 7  A    That's based on particularly the 2014 amendment to the

 8  technology license agreement, which was put in place primarily

 9  for that purpose.

10  Q    Are you referring to anything in particular in the 2014

11  amendment, SC-2?

12  A    Yes.  The addition of Clause 2.15, which was added to

13  essentially the operative sections of the agreement by the

14  technology license amendment.

15  Q    Okay.  And what's your understanding of provision 2.15?

16  A    2.15 is an agreement between Phillips and Ultra D, such

17  that Phillips agrees to offer licenses, essentially sublicenses

18  to third party users on reasonable conditions to enable Ultra D

19  in this case and its affiliates to incorporate their technology

20  in third party units.

21       MR. COLBY:  Okay.  And how does that relate to the --

22  I'll strike that.

23  BY MR. COLBY:

24  Q    Okay.  Moving on, Mr. Stastney.

25  A    Sure.

1  Q    Do you recall when you were here testifying in June,

2  testifying about a license that SeeCubic, Inc. has?

3  A    Yes.

4  Q    Okay.  What is that license?

5  A    That is an end user license that allows SeeCubic, Inc. to

6  possess demo units and essentially use them.

7  Q    Okay.  Is that the same as a sublicense in the way we've

8  been talking about it here today?

9  A    It is not.

10  Q    How are they different?

11  A    A sublicense is something that would allow a manufacturer

12  of product to incorporate the technology in a broad number of

13  products for sale.  An end-user license is essentially, what

14  each of the buyers of those products would need to have through

15  their manufacturer that enables you to own it, to have it, and

16  use it.

17  Q    Okay.  And do you have an understanding as to whether or

18  not that end-user license is permitted under the Phillips

19  agreements?

20  A    My understanding is that it is.

21  Q    And what's that understanding based on?

22  A    It is a product that was made by Stream TV effectively and

23  delivered pursuant to the license.

24  Q    Just want to ask briefly about the proceeding in the

25  Netherlands.  Were you present?

 1   A    I was physically present.  Yes.

 2   Q    In the courtroom?

 3   A    I was.

 4   Q    Was it a in-person hearing?

 5   A    It was an in-person hearing.

 6   Q    Was Mr. Rajan present?

 7   A    He was not physically present.

 8   Q    Did he appear?

 9   A    He appeared via Zoom.

10   Q    Was Mr. Robertson present?

11   A    He was not physically present.

12   Q    Did he appear?

13   A    He appeared via Zoom.

14   Q    Were the proceedings -- what language were the proceedings

15   conducted in?

16   A    Primarily Dutch.

17   Q    Okay.  And were there translators --

18   A    Yes.

19   Q    -- or interpreters present?

20   A    Yes.  Both on the Zoom call and in the courtroom.

21   Q    How would you describe the quality of your recollection of

22   your testimony in the Netherlands proceedings?

23   A    Quite good.  It was very brief.  It was less than three

24   minutes.

25   Q    And is your testimony here today consistent with the

```
 1   testimony that you offered in the Netherlands proceeding?

 2   A    It is.

 3            MR. COLBY:  I'm going to hand up what will be Exhibit

 4   SC-3.  It's the protocol.

 5            MR. KODOSKY:  I'm sorry?

 6            MR. COLBY:  The protocol.

 7            MR. KODOSKY:  I don't have a copy.

 8   BY MR. COLBY:

 9   Q    Do you have SC-3 three in front of you, Mr. Stastney?

10   A    I do.

11   Q    Do you recognize this document?

12   A    Yes, I do.

13   Q    What is it?

14   A    This is the protocol that the independent director

15   circulated for his resignation.

16   Q    Okay.  And does it have any application to you?

17   A    Yes.  The court in the Netherlands specifically asked if

18   we would be willing to abide by this.  The answer was yes.  And

19   then made abiding by this a part of its order.

20   Q    Is this a true and correct copy of the protocol?

21   A    It appears to be.  Yes.

22            MR. COLBY:  Okay.  Any objection?

23            MR. KODOSKY:  No.

24            MR. COLBY:  I'd like to move it into evidence, Your

25   Honor.
```

1        THE COURT:  No objections, counsel?

2        MR. KODOSKY:  None, Your Honor.

3        THE COURT:  Admitted.

4     (Debtor's Exhibit SC-3 admitted into evidence)

5  BY MR. COLBY:

6  Q    Mr. Stastney, what's your understanding of how this

7  protocol applies to you?

8  A    According to the court's decision in Amsterdam, I am bound

9  to abide by this during my time as director of the Netherlands

10 entities and until a qualifying event occurs, which would

11 remove this from the court's jurisdiction.

12 Q    Okay.  And what does it require you to do or not do?

13 A    Quite a bit.  Generally speaking, to continue to operate

14 the business in the best interests of the Dutch entities.  To

15 continue operating generally in the ordinary course.  To

16 continue to work to fund the entities sufficiently.  To conduct

17 all relationships between any of the parties only at arm's

18 length.  To treat both stakeholders of Stream and SeeCubic

19 equally in terms of access to the human resources of SeeCubic

20 BV based on the merit of the projects proposed.  And to

21 entertain projects from both entities and assess them based on

22 merit to determine how to allocate those human resources.

23 Q    And do you intend to abide by that protocol?

24 A    Yes, I do.

25        MR. COLBY:  I'd like to mark Exhibit SC-4.

```
 1                    MR. KODOSKY:  What is it?

 2                    MR. COLBY:  It's the opinion.

 3                    MR. KODOSKY:  Okay.

 4                    MR. COLBY:  Thank you.

 5    BY MR. COLBY:

 6    Q    Mr. Stastney, do you recognize Exhibit SC-4?

 7    A    Yes, I do.

 8    Q    What is it?

 9    A    It appears to be a translation of the Court's decision as

10    of the 20th of September.

11    Q    Okay.  And flip through the whole thing.  Is -- is there a

12    Dutch version as well?

13    A    Yes, sorry.  At the end -- at the end of the Dutch

14    version, yep.

15    Q    All right.  And are -- how are you familiar with this

16    document?

17    A    I received it from our Dutch counsel after it was issued.

18    Q    Does this appear to be a true and correct copy of the

19    opinion and the machine translation?

20    A    It does.

21                    MR. COLBY:  Move to admit this document into

22    evidence, Your Honor.

23                    THE COURT:  Counsel, any objection?

24                    MR. KODOSKY:  No objection, Your Honor.

25                    THE COURT:  Admitted.
```

```
 1          (Debtor's Exhibit CR-4 admitted into evidence)

 2              MR. COLBY:  Thank you.

 3   BY MR. COLBY:

 4   Q    What's your understanding, Mr. Stastney of for how long

 5   you are appointed as the independent director of SeeCubic BV?

 6   A    I believe that's until a final decision has been issued

 7   with regard to the party that is entitled to name the director

 8   and the final decision in the U.S.

 9   Q    Okay.  Do you have an understanding as to where that

10   decision will come from?

11   A    I don't believe it was specific in the --

12   Q    Got it.  Okay.  I don't have any other questions about

13   that.

14   A    Yep.

15   Q    You were asked earlier, Mr. Stastney about a 2023

16   subscription agreement.  Do you recall that?

17   A    I do.

18   Q    And that, I believe, was marked as D-1, Exhibit Debtor 1.

19   What's the function of this document?

20   A    To specify the terms on which investors will invest and to

21   gather their information so that we have the appropriate

22   records of who invested.

23   Q    Got it.  And Mr. Kodosky asked you about paragraph 5-F on

24   page 8, at the top of the page, page 7 on the bottom of the

25   page.  Do you recall those questions?
```

```
 1   A     I do.

 2   Q     And so let's take a look at F, please.  And there is a --

 3   the first sentence of paragraph F references action suit

 4   proceedings.  Do you see that long sentence?

 5   A     I do.

 6   Q     Okay.  And it was read for the Court earlier.  I won't --

 7   I won't reread it.  But what's your understanding of what that

 8   sentence communicates?

 9   A     It communicates that there are no types -- none of these

10   things, the long list, which I won't reread, which would be

11   expected to have a materially adverse effect to SeeCubic Inc.

12   Q     Okay.  And SeeCubic Inc is involved in litigation,

13   correct?

14   A     It is.

15   Q     All right.  How do you reconcile, if -- if you do, the

16   statement in the first sentence of paragraph F with the

17   existence of the various litigations that SeeCubic is involved

18   in?

19   A     Well, I -- again, I think that the critical thing is that

20   last clause which is expected to have a material adverse

21   effect.

22   Q     Yeah.

23   A     The -- the lawsuits, all of them, essentially involve the

24   same fact situation, which is what we're here to talk about.

25   And the position of SeeCubic Inc is as an owner of the secured
```

Case 23-10763-amc    Doc 737-14    Filed 10/09/23    Entered 10/09/23 29:50:57    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 161 of 184

161

```
 1   creditor's claims.  And as such, it has a fairly protected

 2   position.  If the bankruptcy continues, the secured creditors

 3   continue to have their claims against the estate, against the

 4   debtors, and we'll either be repaid or will receive the assets,

 5   presumably, at the end of the day. If through some other method

 6   the asset collection takes place, again, either they will be

 7   repaid or receive the assets.  All -- none of that would result

 8   in a material adverse effect.  And just based on the

 9   probabilities of those outcomes versus other outcomes, we don't

10   expect that any of those things would have a material adverse

11   effect.

12   Q    Okay.  If it was suggested that this is incomplete or

13   misleading to a reader, how would you respond to that?

14   A    I think this is entirely accurate as written.

15   Q    The second sentence references potentially interfering

16   patent or patent application, and it goes on.  I won't subject

17   us all to a full rereading.  What's your understanding of what

18   that sentence means?

19   A    The same thing.  It's once again qualified by expected to

20   have a materially adverse effect.  So number one, SeeCubic Inc

21   doesn't have any patents or patent applications itself.  If

22   this is referring to the patent or patent applications of

23   SeeCubic BV, then based on the analysis that we've done and the

24   license with Phillips particularly, we feel that this is a

25   perfectly accurate statement.
```

```
 1   Q     Okay.

 2           MR. COLBY:  Just one minute, Your Honor.

 3           THE COURT:  Uh-huh.

 4   BY MR. COLBY:

 5   Q   Mr. Stastney, what's your understanding of whether or not

 6   either of the Debtors here own any of the intellectual property

 7   associated with the Ultra D technology?

 8   A    I believe the only intellectual property that they may own

 9   is a trademark or two.  Other than that, all of the

10   intellectual property sits with either the Curacao subsidiary

11   or the Dutch subsidiaries.

12   Q     Okay.  And in that response when you say the intellectual

13   property, what intellectual property are you referring to?

14   A     The patents, the know-how, the software, predominantly.

15   Q     Okay.  And which entities hold that intellectual property?

16   A     I believe the patents are held by Ultra D Ventures.  Any

17   new patents that get created in SeeCubic BV get transferred

18   there as created.  SeeCubic BV through the employees and the

19   operations has the know-how, and SeeCubic BV also has the

20   software.

21   Q     Okay.  Our Exhibit SE-5.  Take a minute to -- oh, you

22   don't even have it yet.  Mr. Stastney, have you had a chance to

23   review SE-5?

24   A     Yes.

25   Q     What is it?
```

1    A    It appears to be a list of patents owned by Ultra D

2    Cooperative originally, as of 19 December 2022.

3    Q    Okay.  Do you recognize this document?

4    A    I do.

5    Q    Does it appear to be a true and correct copy of the list

6    you just described?

7    A    As of 19 December 2022, it does.

8    Q    Okay.

9         MR. COLBY:  I'd like to move it into evidence, Your

10   Honor.  SE-5.

11        THE COURT:  Counsel?

12        MR. KODOSKY:  No objection, Your Honor.

13        THE COURT:  Admitted.

14     (Debtor's Exhibit SE-5 admitted into evidence)

15        MR. COLBY:  Yep.

16   BY MR. COLBY:

17   Q    Mr. Stastney, does this -- does SE-5 reflect where and

18   what entity those patents are held?

19   A    Yes, it does.

20   Q    Okay.  And what -- what entity is that?

21   A    Ultra D Cooperative.

22   Q    Is that consistent with your understanding?

23   A    Yes, it is.

24        MR. COLBY:  Your Honor, those are the only questions

25   I have at this time.  I believe Mr. Caponi may have a couple,

```
 1   but.

 2               THE COURT:  Okay.

 3               MR. CAPONI:  Good afternoon, Your Honor.

 4               THE COURT:  Okay.

 5                           CROSS-EXAMINATION

 6   BY MR. CAPONI:

 7   Q    Good afternoon, Mr. Stastney.

 8   A    Good afternoon.

 9   Q    Just a few questions for you.  With regard to Hawk

10   Investment Holdings Limited, what if any role does that entity

11   have in the day-to-day operations of SeeCubic BV?

12   A    None.

13   Q    And the same question as it pertains to Bob Morton.

14   A    He has no role in the day-to-day operations.

15               THE COURT:  To who?

16               MR. CAPONI:  Bob Morton.  He's one of the Defendants

17   listed in the --

18               THE COURT:  Okay.

19               MR. CAPONI:  TRO.  Robert Morton is his correct name

20   in the caption.

21   BY MR. CAPONI:

22   Q    And then the same with regard to Alastair Crawford.  What,

23   if any, role does he have in the day-to-day operations of

24   SeeCubic BV?

25   A    He has no role in the day-to-day operations.
```

1    Q    I want to now focus on SeeCubic, Inc, the Delaware entity.

2    What role, if any, does Hawk Investments Holdings Limited have

3    in the operations of SeeCubic, Inc?

4    A    None.

5    Q    And same question with respect to Robert Morton.  What

6    role, if any, does he have in the operations of SeeCubic, Inc?

7    A    None.

8    Q    Okay.  And lastly, does Alastair Crawford have any role in

9    the operations of SeeCubic, Inc?

10   A    None.

11   Q    So to the extent that SeeCubic BV is engaging in any

12   activity worthy of an injunction, would Hawk Investments, is

13   your understanding, have any role in encouraging or directing

14   that activity?

15   A    It would not.

16   Q    How about with respect to Bob Morton?

17   A    He would not.

18   Q    And the same question as with Mr. Crawford?

19   A    He would not.

20   Q    Okay.  And if we go back -- if lastly, we go to SeeCubic,

21   Inc, the Delaware entity.  If it -- the Court determines that

22   it's engaged in some conduct that's worthy of an injunction,

23   would Hawk Investments have any role in directing that

24   activity?

25   A    They do not.

1  Q    And how about with respect to Robert Morton?

2  A    He does not.

3  Q    And the same thing, lastly, with Mr. Crawford?

4  A    He does not.

5  Q    Thank you.

6         THE COURT:  Anything further on cross-examine -- I'm

7  calling it cross-examination because that's what it is.

8         MR. CAPONI:  I have no further questions, Your Honor.

9         THE COURT:  All right.  Any redirect, counsel?

10        MR. KODOSKY:  A few, Your Honor.

11                    REDIRECT EXAMINATION

12  BY MR. KODOSKY:

13  Q    Mr. Stastney, you were asked some questions about -- if

14  you still have in front of you, I believe it was SC-1,

15  technology license agreement?

16  A    Yes.

17  Q    Do you have any involvement in negotiating the terms of

18  the technology license agreement between Phillips and Ultra D

19  Cooperative back in 2011?

20  A    Hold on, let me get the right one.  I was a director of

21  the company at the time.  And the funding that paid the initial

22  license fee came from SLS.  Other than that, no.

23  Q    So you had no involvement with negotiating the terms of

24  the agreement, correct?

25  A    Correct.

Case 23-10763-amc    Doc 787-14    Filed 10/00/23    Entered 10/00/23 29:50:57    Desc
Exhibit K. Stream October 2022 Hearing Transcript    Page 167 of 184

167

1    Q    And you're aware that this agreement in 2011 expressly

2    prohibits any sublicensing, correct?

3    A    Yes.

4    Q    You know where in the agreement subleasing -- sublicensing

5    is spoken to?

6    A    I would have to flip through.  I'm sorry.

7    Q    Have you located anything?

8    A    I'm going through page by page to make sure that I get

9    everything that's relevant.

10   Q    Just because a couple of us have flights today, Mr.

11   Stastney, if I can point you to section 2.2.

12   A    Sure.

13   Q    On page 7 of 69.

14   A    Uh-huh.

15   Q    Do you see where I'm at?

16   A    I do.

17   Q    Do you see where it says subject to full and unconditional

18   compliance by Ultra D and its affiliates, and you would agree

19   that Stream is an affiliate of Ultra D, correct?

20   A    I would.

21          THE COURT:  Okay.  Section 2 point what, counsel?

22          MR. KODOSKY:  I'm sorry, Your Honor.  2.2.

23          THE COURT:  Uh-huh.

24   BY MR. KODOSKY:

25   Q    Where it states, "Subject to full and unconditional

1   compliance by Ultra D and its affiliates."  And you just stated

2   you agree that Stream is an affiliate of Ultra D?

3   A    Yep.  Both Stream and SeeCubic BV are.

4   Q    With its obligations under this agreement, it goes on to

5   say, "Phillips hereby grants to Ultra D and its affiliates a

6   worldwide, nonexclusive, nontransferable license," -- what's

7   your understanding of nontransferable license, sir?

8   A    That it can't be transferred.

9   Q    "-- under the licensed software without the," and it goes

10  on to state, "without the right to grant sublicenses."  Do you

11  see that?

12  A    I do.

13  Q    Is this the provision or are there other provisions in

14  here that expressly prohibit sublicenses?

15  A    Well, this is a -- I believe this is the provision.  But

16  this is the grant of rights, and it carves out from that the

17  right to grant sublicenses.

18  Q    All right.  So you'd agree with me that based on that

19  provision, those sublicenses were permitted, correct?

20  A    That's correct, based on that provision.

21  Q    Let's take a look a SC-2, I believe it was, which was the

22  2014 amendment.  Do you still have that in front of you?

23  A    I do.

24  Q    Did you have any involvement in 2014 with negotiating the

25  terms of the amendment to technology license agreement?

```
 1   A    I did not.

 2   Q    Who at Stream would have negotiated this amendment?

 3   A    I believe it was signed by Raja Rajan.  I don't know who

 4   negotiated it.

 5   Q    Is Mr. Raja Rajan in court with us today?

 6   A    Is who?

 7   Q    Do you know Mr. Rajan?  Raja?

 8   A    I do.

 9   Q    Okay.  Is he here with us today?

10   A    Raja Rajan is not here with us today, no.

11   Q    Is he related to Mathu Rajan?

12   A    I believe he's Mathu's brother.

13   Q    Okay.  So Mathu's brother is the individual that

14   negotiated the amendment to the Phillips license agreement in

15   -- it looks like it's got a date of December 8th, 2014,

16   correct?

17   A    I don't know who negotiated it.  I know that he signed it.

18   Q    Do you know why it was negotiated?

19   A    Yes, I do.

20   Q    Why?

21   A    In order to provide the additional parallel licensing

22   agreements and accomplish a couple of other things, one of

23   which was to add additional intellectual property that had been

24   developed into the technology license, and one was to move the

25   license from Ultra D Cooperative to Ultra D Ventures.
```

1    Q    What's your understanding based on in terms of the

2    reasoning for this amendment?

3    A    The way this amendment was described to me when I was a

4    board member and investor of Stream TV.

5    Q    By whom?

6    A    By Mathu Rajan.

7    Q    By Mathu or Roger --

8    A    Raja?

9    Q    Or Raja.

10   A    By Mathu.

11   Q    Okay.  If you take a look at the second page of SC-2, the

12   first full paragraph beginning with the word "subsequently."

13   A    Uh-huh.

14           THE COURT:  Wait, where are we?

15           MR. KODOSKY:  On page 2 of SC-2, the amendment -- the

16   December 8th, 2014, amendment.

17           THE COURT:  Uh-huh.

18   BY MR. KODOSKY:

19   Q    You've seen this agreement before today, Mr. Stastney?

20   A    I have.

21   Q    Do you have a copy of this agreement in your files?

22   A    I probably do.

23   Q    From the time that you were employed by Stream?

24   A    I believe from the time after when -- during the period of

25   the omnibus agreement.

1   Q    Okay.  So your -- your testimony is that after the omnibus

2   agreement -- omnibus agreement, that's whenever you would have

3   received a copy of this agreement for your files?

4   A    I don't remember exactly, but certainly at that point.

5   Q    Have you read this agreement before today?

6   A    I have.

7   Q    Tell me where in this agreement, this amendment,

8   sublicensing is permitted.

9   A    This is -- this is essentially what sublicensing is.  So

10  basically the parties both acknowledge that for certain

11  applications and uses of 3D technology, third party users may

12  need to obtain a license under the intellectual property rights

13  related to 3D display technology, conversion, and rendering

14  technology, and 3D format.  The parties both confirm their

15  willingness to offer licenses under said respective

16  intellectual property rights with respect to such applications

17  and uses to third party users on reasonable conditions.

18  Q    All right.  And it goes on in the next paragraph to state,

19  that in the event that Ultra D becomes engaged in negotiation

20  with any third party regarding a license --

21          THE COURT:  Where -- where are we at, counsel?

22          MR. KODOSKY:  On page 1, Your Honor.

23          THE COURT:  Oh, okay.  I'm on page -- okay.

24          MR. KODOSKY:  The paragraph that begins "In the event

25  that Ultra D becomes engaged in negotiation --"

1          THE COURT:  Uh-huh.

2          MR. KODOSKY:  "-- with any third party regarding a

3  license in respect of such applications and uses, and it

4  believes that the third party may also be using Phillips

5  technology, it will notify Phillips in writing about such third

6  party."

7  BY MR. KODOSKY:

8  Q    Do you see where I'm reading from, sir?

9  A    I do.

10 Q    As SeeCubic Inc or SC BV to your knowledge ever notified

11 Phillips in writing about any third-party using Phillips'

12 technology?

13 A    I don't know if SeeCubic BV notified Phillips regarding

14 the Bosch POC.  But none of the POCs that we're working on have

15 gotten to the point where we're actually engaged in

16 negotiations regarding a license in respect to such

17 applications.

18 Q    You've never had any negotiations with any customer or

19 potential customer regarding licensing?

20 A    Other than Bosch that I'm aware of, no.  And when you say

21 we, I'm speaking on behalf of SeeCubic Inc and SeeCubic BV.

22 Q    And it goes on to state, "Phillips may give its consent

23 which consent will not be unreasonably withheld to Ultra D to

24 point out to such third party that Phillips also holds

25 intellectual property rights relevant for such applications and

1    uses."  Do you see that?

2    A    I do.

3    Q    There's nothing in this agreement that says that if Ultra

4    D builds upon the Phillips technology that they don't have to

5    all of a sudden obtain permission from Phillips anymore,

6    correct?

7    A    Correct.

8    Q    And on page 2 of this agreement, in the paragraph that

9    begins with the word "subsequently," I'm looking at the line 1,

10   2, 3, 4 -- third line down where it says,

11           "Ultra D shall treat Phillips's license terms and

12           conditions as confidential information and Ultra D

13           represents that the perspective licensee shall do the

14           same.  In the event the perspective licensee wishes

15           to conclude parallel license arrangements with both

16           Ultra D and Phillips, Ultra D and Phillips shall both

17           negotiate a separate license with such third party."

18           Do you see that?

19   A    I do.

20   Q    What's your understanding of that provision?

21   A    That to the extent that there's a party who is interested

22   in utilizing technology which uses both Ultra D and Phillips

23   IP, that Ultra D is allowed to show the standard Phillips terms

24   under confidentiality, must be under a NDA.  But Phillips

25   ultimately will negotiate the terms of that sublicense with any

Case 23-10763-amc   Doc 487-14   Filed 10/09/23   Entered 10/09/23 19:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 174 of 184

Exhibit K. Stream October 2022 Hearing Transcript   Page 174 of 184

174

1  third party directly.

2  Q    And it says, "For the voidance of doubt, all licenses

3  under the Phillips technology will be negotiated between

4  Phillips and the prospective licensee", correct?

5  A    I believe that's what I just said, yeah.

6  Q    It doesn't say Ultra D will negotiate any licenses.

7  A    I believe it does in the sentence right above.  "In the

8  event the prospective licensee wishes to conclude parallel

9  license arrangements with both Ultra D and Phillips, Ultra D

10  and Phillips shall both negotiate a separate license with such

11  third party."

12  Q    But then the next sentence that says, "For the avoidance

13  of doubt, all licenses under the Phillips technology will be

14  negotiated between Phillips and the prospective licensee,"

15  correct?

16  A    Correct.

17  Q    So in other words, SC BV does not have the right to

18  license Phillips' technology to anybody.  Only Phillips has the

19  right under this amendment to do that, correct?

20  A    That's correct.  And it has agreed to do so under

21  reasonable terms and conditions.

22  Q    And to this point, Phillips has never been contacted as

23  far as you're aware other than you mentioned Bosch, regarding

24  any negotiations regarding the licensing of its technology,

25  correct?

1   A    That's correct because there have not been any.

2   Q    But there hasn't been any to this point, but that's what

3   you're all working towards, correct?  By working on these

4   protocol projects?

5   A    Yes.  This entire agreement, this Phillips license and the

6   economics under the Phillips license contemplate that

7   ultimately the technology will be commercialized.

8   Q    Okay.

9   A    And that's the point in which Phillips actually gets money

10  for its license.  So yes, this entire license structure was put

11  in place contemplating that at some point we would have a

12  commercial customer who would get pay -- who would pay the

13  Phillips license.

14  Q    And you'll acknowledge, sir, that to this point, nobody

15  has negotiated with Phillips regarding any licenses, correct?

16  A    So far there have been no licenses to negotiate.

17  Q    And as far as -- do you know whether or not Phillips is

18  even -- actually, let me ask you.  Were you aware that Phillips

19  is in the process or has sold patents and is no longer making

20  any licenses available?

21  A    I'm aware that there have been negotiating and may have

22  sold their patent portfolio.  I do not know whether they're no

23  longer making any licenses available.

24  Q    Right.

25  A    Since they have an obligation to do so under this

1   agreement.

2   Q    Let me ask you a few questions, sir, about this protocol.

3   Were you involved in this protocol -- negotiating the terms of

4   this protocol?

5   A    It was not negotiated.  The independent director asked

6   both myself and Mathu, I believe proposed a protocol.  Asked

7   for feedback from both S -- SeeCubic Inc and from Stream, and

8   then disseminated the protocol.

9   Q    This was sometime here in the summer of 2023?

10  A    That's correct.

11  Q    After Mr. Rajan was removed on June 29th?

12  A    That's correct.

13  Q    And before the independent director resigned?

14  A    That's correct.

15  Q    There's -- there's certain provisions in here, for

16  example, I believe this is the exhibit marked SE-3.

17  A    Okay.

18  Q    At the top of the first page there, Roman Numeral -- or

19  subparagraph V where it says all payments to be approved by

20  independent director, and then in parenthesis, remove SEI.  You

21  understand SEI to mean SeeCubic Inc, correct?

22  A    I do.

23  Q    Remove SEI related persons from bank register.  Do you see

24  that?

25  A    I do.

1   Q    Have you removed all SEI related persons from the bank

2   register?

3   A    Yes.  No SEI people can approve payments.

4   Q    On -- let me ask you, on page 2 of this, the understanding

5   is, in paragraph number one, in subparagraph two, it's talking

6   about each project requires a budget showing sufficient

7   proceeds for the companies to cover at least all direct and

8   indirect costs.  Do you see that?

9   A    I do.

10  Q    Have there been any budgets -- written budgets prepared to

11  this point?

12  A    Yes.

13  Q    And it goes on to say, the purchase contract between the

14  companies and the relevant party, including confidentiality and

15  protection of trade secrets.  Do you see that?

16  A    I do.

17  Q    Have there been purchase contracts that have been entered

18  between -- who -- who is the companies in reference to that

19  sentence?

20  A    I believe the Dutch entities.

21  Q    Have there been any purchase contracts that have been

22  executed to this point including confidentiality and protection

23  of trade secret provisions?

24  A    Yes.

25  Q    How many?

1   A     Two have been entered so far.

2   Q     I'm sorry?

3   A     Two have been entered so far.

4   Q     And am I correct that you would refuse to identify who

5   those contracts have been entered into?

6   A     One is Hyundai.  That's already been made publicly

7   available.  The other one, yes, I would refuse.

8   Q     Who is the one with?

9   A     Hyundai Mobis.

10  Q     I'm sorry?

11  A     Hyundai Mobis, the one who you mentioned earlier.

12  Q     Okay.  In reference to paragraph five on page two, do you

13  see where it states that the independent director will use its

14  best efforts to keep information which he receives from either

15  party confidential.  Do you see that?

16  A     I do.

17  Q     Am I correct that if SCI or SeeCubic of Delaware or I

18  guess it would be SeeCubic of Delaware, has projects that it

19  wants to propose, that would be to you, correct?

20  A     Correct.

21  Q     And if the Debtors have projects that they want to

22  propose, then they would have to propose those to you, correct?

23  A     Or as directed by me, and -- and the process that we've

24  planned to put in place and we'll seek approval from the Dutch

25  court for that, is that they'll go to the employees, to the

1   extent that a name is needed, it will be given only to the

2   staff of the BV, and I won't receive that name.  I'll receive

3   the details and the analysis of the project to determine its

4   feasibility, but not the name.

5   Q    Where does it state that in this protocol?

6   A    It doesn't.

7   Q    What's that based on then?

8   A    That's based on -- this protocol was set up for the

9   independent director.  That's based on Dutch counsel's advice

10  on how best to effectuate the spirit of the protocol,

11  understanding that I am with one of the parties.

12  Q    Right.  And so I guess my question to you, or my point was

13  that this protocol to the extent that -- would you agree that

14  there were certain provisions in this protocol that made more

15  sense whenever there was an independent director involved as

16  opposed to essentially the chairman and CEO of one of the two

17  parties?

18  A    Yeah.  There are certain provisions that have to be

19  modified to effectuate the spirit, and we're in the process of

20  doing that.

21  Q    Where in the process have you been doing that?

22  A    In discussions with Dutch counsel about what's going to be

23  sufficient for the Court, and then we'll propose it to the

24  Court.

25  Q    So the independent -- or so the middleman, the policeman,

Case 23-10763-amc   Doc 787-14   Filed 10/00/23   Entered 10/00/23 29:50:57   Desc
Exhibit K. Stream October 2022 Hearing Transcript   Page 180 of 184

180

```
 1   essentially you, are speaking to -- when you say Dutch counsel,

 2   are you speaking with Dutch counsel for, for example, the

 3   Debtors?

 4   A    No, we're speaking with our Dutch counsel.

 5   Q    When you say our Dutch counsel, who's "our" in that

 6   sentence?

 7   A    Both -- both the Dutch entities and SeeCubic Inc.

 8   Q    So you're -- you're speaking with counsel for nobody from

 9   the Debtors, but you're speaking with counsel for the Dutch

10   entities and SeeCubic Inc.  Is that understood to be correct?

11   A    In terms of formulating an approach, which they will then

12   propose to the Court for the Court's approval per the mandate.

13   Q    Where is that referenced in this protocol anywhere?  In

14   fact, were any reference about what the court approval of what

15   you all are doing is listed?

16   A    That is in the decision, not in the protocol.

17   Q    The decision that was shown to you and marked as, I

18   believe, SC Exhibit 5 -- D -- I'm sorry, SC-5, was it?

19            THE COURT:  Four.

20            MR. KODOSKY:  Four.

21   BY MR. KODOSKY:

22   Q    And I don't have a lot of questions about that decision.

23   You're referring to the September 20th, 2023, decision that put

24   you in charge, correct?

25   A    That made me the director, yes.
```

1   Q    I would ask you to take a look at page 14, section 5.21.

2   Please let me know when you're there.

3   A    Okay.  Yes.

4   Q    Do you see where it states that the provisions to be made

5   regarding the management of the companies will apply for the

6   same period as stipulated in the judgment, namely -- and then

7   below, A and B, it says or until a judge decides otherwise.  Do

8   you see that?

9   A    I do.

10  Q    Doesn't say a Netherlands judge or an Amsterdam judge, it

11  says a judge, correct?

12  A    In the English translation, yes.

13  Q    Could be a bankruptcy court judge, correct?

14  A    I don't know.

15           MR. KODOSKY:  No further questions, Your Honor.

16           THE COURT:  Recross?

17           MR. COLBY:  I was pausing because I was thinking if

18  it's technically a recross.  But I have no questions of any

19  nature at this time.  Thank you.

20           THE COURT:  Counsel?

21           MR. CAPONI:  No further questions, Your Honor, sorry.

22           THE COURT:  Are you -- have any further questions for

23  this -- or may I release this witness?

24           MR. KODOSKY:  We may excuse the witness.

25           THE COURT:  All right.  You're excused, Mr. Stastney.

```
 1              THE WITNESS:  Thank you, Your Honor.

 2              THE COURT:  All right.  I think this would be a good

 3   time to sort of pause the hearing and continue it to another

 4   date, and at which time you'll call -- you meaning the Debtors,

 5   will call -- will call their other two witnesses, and then Mr.

 6   Kodosky, you will call your other two witnesses.  If there's

 7   any rebuttal, we'll do that, and hopefully by that point I'll

 8   be able to issue -- make a decision on, one, whether there's a

 9   need for a TRO and if there isn't then, no.  But -- and then

10   we'll go from there.

11              I expect to be able to rule.  I know that if I do

12   grant one, that's a lot of work I have to do to justify that.

13   Either way, lots of things, but you know.  So anything else

14   other than setting a date for the future -- for the continued

15   hearing?  Is there anything for today with respect to the

16   testimony of evidence?

17              MR. KODOSKY:  None from our -- none from our

18   standpoint, Your Honor.

19              THE COURT:  All right.  Have the parties during the

20   break had an opportunity to discuss a new date?

21              MR. COLBY:  We did not, Your Honor.  I think our

22   side, however, is generally okay with that date of the 16th.

23              THE COURT:  The 16th.  16 works for everybody?

24              MR. KODOSKY:  I think so, Your Honor.

25              THE COURT:  Okay.  And that -- let's aim for 10:00.
```

Case 23-10763-amc   Doc 437-14   Filed 10/20/23   Entered 10/20/23 19:56:57   Desc
Exhibit K. Stream October 2023 Hearing Transcript   Page 183 of 184

183

1   10:00 on the -- well, you know what, I don't know if my -- does

2   that work for you guys, because I don't know if you're going to

3   be in another -- you're not necessarily assisting in another

4   courtroom on that date, right?  Because sometimes I know you

5   have to cover a little bit?  Okay.

6         All right.  Let's aim for 10:00 on the 16yh and we'll

7   go from 10:00 to 6:00, 7:00, unless the CSOs kick us out before

8   then, okay.

9         MR. KODOSKY:  Thank you, Your Honor.

10        THE COURT:  All right.  Thank you, counsel.  So I

11   think court is adjourned until Tuesday at 10:30.

12        Thank you and everyone have a good weekend.

13        MR. CAPONI:  You too, Your Honor.  Thank you.

14        MR. KODOSKY:  Hope you feel better.

15     (Proceedings adjourned at 5:21 p.m.)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

   I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*John Buckley*
_____
John Buckley, CET-623
Digital Court Proofreader