**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE:<br><br>STREAM TV NETWORKS, INC.,<br><br>Debtor, | CHAPTER 11<br><br>CASE NO.: 23-10763 MDC |
| IN RE:<br><br>TECHNOVATIVE MEDIA, INC.,<br><br>Debtor. | CHAPTER 11<br><br>CASE NO.: 23-10764 MDC<br><br>(Jointly Administered) |

**HAWK INVESTMENT HOLDINGS LTD.'S (1) REPLY IN SUPPORT OF MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR (I) AN ORDER (A) APPROVING THE BIDDING PROCEDURES AND FORM OF ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS INCLUDING APPROVAL OF PROVISIONS FOR DESIGNATION OF A STALKING HORSE, (B) ESTABLISHING THE NOTICE PROCEDURES AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND SCHEDULING AN AUCTION, (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) SCHEDULING A SALE HEARING, (E) GRANTING EXPEDITED CONSIDERATION PURSUANT TO LOCAL RULE OF BANKRUPTCY PROCEDURE 5070-1(G), AND (F) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND (C) GRANTING RELATED RELIEF AND (2) RESPONDING TO RELATED PLEADINGS**

Hawk Investment Holdings Ltd. ("Hawk"), as Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SeeCubic"), a secured creditor of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative" and, together with Stream, the "Debtors") in the above-captioned chapter 11 cases (together, the "Chapter 11 Cases"), by and through its undersigned counsel, K&L Gates LLP, respectfully submits this reply in support

1

(this "Reply")[1] of *Motion of William A. Homony in His Capacity as Chapter 11 Trustee for (I) an Order (A) Approving the Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Substantially All of the Debtors' Assets Including Approval of Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling an Auction, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale Hearing, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(g), and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [ECF NO. 750] (the "Bidding Procedures Motion") filed by William A. Homony, in his capacity as chapter 11 trustee (the "Trustee"), and joint response to the objections to the Bidding Procedures Motion filed by (a) Visual Semiconductor, Inc. ("VSI") [ECF No. 788] (the "VSI Objection") and Rembrandt 3D Holding Ltd. ("Rembrandt" and, together with VSI, the "Objectors") [ECF No. 789] (the "Rembrandt Objection" and, together with the VSI Objection, the "Objections") as well as the Delay Motion (as defined below). In further support of the Bidding Procedures Motion, Hawk respectfully submits as follows:

**PRELIMINARY STATEMENT**

1.  For over three years Mathu Rajan and his surrogates have done everything in their power to thwart the rights of the Debtors' secured creditors (collectively, the "Secured Creditors")

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Memorandum Opinion*, dated January 5, 2024 [ECF No. 548], available at *In re Stream TV Networks, Inc.*, No. 23-10763 (MDC), 2024 WL 87639 (Bankr. E. D. Pa. Jan. 5, 2024) [hereafter, the "Trustee Opinion"].

2

and improperly obtain control of the assets for themselves at the expense of the Debtors' other interestholders. The Objections simply continue this trend. They are not good faith objections to the Bidding Procedures Motion or proposed sale process (the "Sale Process"), but instead represent Mr. Rajan's final attempt to frustrate the Secured Creditors' efforts to collect the amounts lawfully owed—whether by acquisition of the assets in exchange for a credit bid or the proceeds of a third-party sale thereof.

2.     Indeed, the Objectors would rather see these Chapter 11 Cases crater than subject the assets to the Sale Process designed to ensure the highest and best value is received for the benefit of the estates. This is because Mr. Rajan and the Objectors know there is no interest in the Debtors' assets, so the proposed Stalking Horse Bid (as defined in the Bidding Procedures Motion) is, in fact, likely to be the highest and best offer available. Over the course of these Chapter 11 Cases and the extensive prepetition litigation, no other party has appeared to support the Debtors' efforts, legal strategies, or proposals—no customers, no investors, no financiers, no strategic partners, no licensors of intellectual property, no other creditors, ***no one***. With this understanding, Mr. Rajan, with his sidekick Rembrandt, is pursuing a strategy of mutually assured destruction, so if he cannot have the assets, no one can.

3.     This Court understood Mr. Rajan's improper motives and chaotic influence, resulting his removal as debtor-in-possession and the appointment of the Trustee as an independent third-party decisionmaker. With the Trustee at the helm, the cases have finally begun to progress toward an ultimate conclusion. As the Trustee has explained, the transaction embodied in the Bidding Procedures Motion (the "Sale Transaction") is the only viable path to a resolution, to ensure a recovery to stakeholders in these cases, and to bring down the curtain on Mr. Rajan once and for all.

# ARGUMENT

4. The true nature of the Objections is laid bare by (a) Mr. Rajan's use of his alter ego, VSI, and business partner, Rembrandt, each of which have acted only to further Mr. Rajan's personal interests for years, including after his removal as debtor-in-possession in these Chapter 11 Cases; (b) the Objectors' continued reliance on specious arguments that are either moot or are otherwise made in bad faith as a continuation of Mr. Rajan's prior litigation strategies; and (c) the lack of viable alternatives proposed by either of the Objectors, when the Sale Transaction is clearly the only viable path forward. Each of these points is discussed in detail below.

### A. The Court Should Not Allow Mr. Rajan to Continue Exercising Control and Influence Over the Direction of these Chapter 11 Cases via the Objectors

5. As this Court is aware, Mr. Rajan previously served as debtor-in-possession in these Chapter 11 Cases, thereby controlling the direction and progress (or lack thereof) of the Debtors' reorganization efforts. After nearly a year of hard-fought litigation, this Court entered the thorough and well-reasoned Trustee Opinion, removing Mr. Rajan from this position and appointing the Trustee. *See* Trustee Opinion, at \*\*13–28. In doing so, the Court noted Mr. Rajan was untrustworthy and self-interested, rendering him unable to properly exercise his fiduciary duties to the estates and the estates' creditors. *See id.* \*33 ("[T]he Court has no faith in Mr. Rajan administering the Debtors' estates consistent with his fiduciary duties and obligations to this Court. Simply put, based on the history of these cases outlined above, the conflicted role of Mr. Rajan with both the Debtors and VSI, and the Court's assessment of Mr. Rajan's credibility throughout this case, the Court does not trust Mr. Rajan's interest in or ability to maintain the integrity of these bankruptcy proceedings.").

6. Of vital importance to the outcome of the Trustee Opinion was Mr. Rajan's relationships and concealed dealings with both VSI and Rembrandt. Specifically, the Court

4

expressly found that as debtor-in-possession Mr. Rajan pursued "transactions and requested relief that appear to be primarily for the benefit of VSI…." *See id.* at 27. For example, Mr. Rajan caused the Debtors to engage in an unauthorized postpetition financing arrangement with VSI. *See id.* at *8. And, as compensation for this financing arrangement, the Debtors executed an unauthorized postpetition exclusive distribution agreement with VSI (the "Distribution Agreement"),[2] which purported to funnel all of the Debtors' business operations through VSI for 10% of the proceeds. *See id.* at *8. Mr. Rajan not only is the controlling shareholder of both the Debtors and VSI (*see id.* at *3), but he also sought to testify on behalf of each of the Debtors and VSI at the hearing seeking approval of these arrangements. *See id.* at *20. The Court declined to authorize either the financing arrangement or the Distribution Agreement. *See id.* at *21. The Debtors, however, ignored the Court's ruling and proceeded with both anyway. *See id.*

7.  Though VSI is not a creditor of the Debtors, it has sought to frustrate the Trustee's actions since his appointment by continuously filing objections and pleadings for which it has dubious standing. Mr. Rajan, through VSI, has (a) objected to the Trustee's motion to approve the now-operative settlement between Hawk and the Trustee (the "Settlement") [ECF No. 642], (b) objected to the Trustee's proposed retention of two separate investment bankers (including by Mr. Rajan attempting to manufacture a conflict by contacting one such banker and lying about the extent of the relationship to the Court) [ECF Nos. 633 & 717], (c) moved to reconsider approval

---

[2] More than simply being "unauthorized," the financing arrangement and execution of the Distribution Agreement were expressly ***denied*** by the Court prior to the Debtors actually purportedly engaging in the activities thereunder. *See id.* at *20 (noting that the court did not approve the Debtors' request to sell stock to VSI to finance the cases).

Nevertheless, it appears that Mr. Rajan has continued to ignore the Court's directives, as VSI has recently stated that it has continued to operate under the terms of the Distribution Agreement even after Mr. Rajan's removal as debtor-in-possession. *See Objection of Visual Semiconductor, Inc. to the Motion of William A. Homony in His Capacity as Chapter 11 Trustee for Entry of an Order Enforcing the Automatic Stay and Compelling Turnover of Estate Property* [ECF No. 678], at ¶ 34 ("Despite minimal direction from the Trustee to the Stream contractor employees, they have continued to work with VSI to … (iv) generate sales for the benefit of both the Debtors and VSI through the global distribution agreement ….").

of the 9019 Motion [ECF No. 686], (d) demanded overly-broad and unnecessary discovery from the Trustee and several other parties [ECF Nos. 712, 718, & 761–65], (e) objected to expedited consideration of the Bidding Procedures Motion [ECF No. 752], and (f) filed the VSI Objection to the Bidding Procedures Motion. In other words, VSI has provided Mr. Rajan the vehicle to continue attempting to direct the Chapter 11 Cases back toward Mr. Rajan's personal interests in direct contravention of the Trustee Opinion.

8.  Seeking to create an air of legitimacy, Mr. Rajan has been colluding with Rembrandt *__for years__*. Rembrandt first appeared as one of the three unsecured creditors that filed the involuntary petition to initiate Stream's second bad faith bankruptcy filing, which the Delaware Bankruptcy Court dismissed only days after dismissing Stream's first bad faith bankruptcy filing.[3] *See id.* at *3. Rembrandt has never established the basis for its purported claim against the Debtors, which it asserts arises from a settlement agreement dated the same day as it filed the involuntary petition. It has, however, continued to use a purported unsecured claim as a basis for interjecting itself periodically on Mr. Rajan's behalf throughout these Chapter 11 Cases and the parties' other litigation.[4]

9.  Throughout these cases, Rembrandt has been joined at the hip and in complete lockstep with Mr. Rajan (in his capacity as debtor-in-possession or head of VSI)—an incredible feat for a creditor purportedly holding a claim valued at over $1.2 billion. *See*, *e.g.*, ECF No 69

---

[3] Moreover, understanding that the involuntary bankruptcy petition by Rembrandt was actually a ploy by Stream to initiate another bad faith bankruptcy, the Delaware Bankruptcy Court barred Stream from filing for bankruptcy for twelve months. *See id.* at *3.

[4] Interestingly, though the basis for Rembrandt's claim appears to be the same as it was during the involuntary bankruptcy case, the amount thereof has increased from approximately $1.5 million to over $1.2 billion now. *Compare* Involuntary Petition Against a Non-Individual, *In re Stream TV Networks, Inc.*, No. 21-10848, at § 13 (Bankr. D. Del. May 23, 2021) [ECF No 1] (showing Rembrandt's claim as $1,528,000, based on a "Settlement Agreement"), *with* Proof of Claim by Rembrandt [Claim No. 26-1] (asserting a claim in the amount of $1,212,407,000 based upon a "May 23, 2021 settlement agreement with Stream"—*i.e.*, the same date as the involuntary bankruptcy petition's filing).

6

(opposing Hawk's motion for relief from stay); ECF Nos. 101 & 102 (joining the Debtors' objection to Hawk's motion for relief from stay); ECF No. 193 (objecting to Hawk's motion to dismiss, convert, or appoint a trustee); ECF No. 293 (signing onto the restructuring support agreement attached to the Disclosure Statement that would result in VSI owning the Debtors); ECF No. 336 (responding to Hawk's motion *in limine* to preclude testimony of VSI); ECF No. 628 (objecting to Hawk's proof of claim); ECF No. 635 (objecting to the Trustee's motion to employ an investment banker); ECF No. 643 (objecting to approval of the Settlement); ECF No. 685 (appealing approval of the Settlement); ECF No. 789 (objecting to the Bidding Procedures). In fact, as Hawk was preparing to file this Reply, Rembrandt filed yet another "motion" (actually a letter) to continue the hearing on the Bidding Procedures Motion, rehashing each of the arguments that Mr. Rajan has made (and Rembrandt has echoed) in the past, and seeking to delay any resolution of these Chapter 11 Cases. *See Motion to Continue Hearing on Motion to Reconsider* [ECF No. 797] (the "Delay Motion"). Simply put, whenever Mr. Rajan needed to add a veneer of third-party support for his strategy, Rembrandt was there.

10.     Moreover, like VSI, Rembrandt also executed an unauthorized postpetition agreement with Mr. Rajan during the pendency of these Chapter 11 Cases (the "<u>Licensing Covenant</u>") to benefit Mr. Rajan personally through VSI. *See* Trustee Opinion, at *23. By the Licensing Covenant, Rembrandt agreed not to license its intellectual property to several parties, including the Debtors' secured creditors and Stream's subsidiaries, which the Court concluded was designed to "***protect VSI's interest*** in Stream's technology and products." *See id.* at *24 (emphasis added). In other words, Rembrandt was an active participant in Mr. Rajan's scheme to funnel the Debtors' assets into VSI, which scheme resulted in the Court ousting Mr. Rajan as debtor-in-possession.

7

11. Mr. Rajan's use of VSI and Rembrandt (as well as other alter egos and personas) is well known and documented over the course of these cases.[5] Nevertheless, aside from the Secured Creditors and Mr. Rajan's surrogates, no other parties have actually expressed any interest in these cases. Mr. Rajan has used the Objectors as a means to create the illusion of participation from disinterested parties in order to sow confusion and frustrate the Secured Creditors' rights in furtherance of his own interests. By the Trustee Opinion, the Court determined that Mr. Rajan was too dangerous to remain involved in the day-to-day management of the Debtors' business operations. It should do so again here.

### B. The Objections are Specious and Made in Bad Faith

12. The fact the Objectors are merely doing Mr. Rajan's bidding and continuing his bad faith efforts to abscond with the Debtors' assets is evident when considering the arguments raised in the Objections. Few of the arguments target the actual process proposed by the Bidding Procedures Motion, and, instead, either relitigate Mr. Rajan's prior arguments that are now moot or are rooted in his conspiratorial delusions. For the arguments that do relate to the actual process included in the Bidding Procedures Motion, the objections and issues are easily (if not already) remedied by additional information filed on the docket or to be provided during the hearing on the Bidding Procedures Motion.

13. Any arguments related to the extent or sufficiency of the Secured Creditors' claims or the propriety of the Trustee's judgment in pursing a Sale Transaction are mooted in their entirety by the Settlement. For example, Rembrandt argues the Sale Transaction is improper, because the Secured Creditors' claims remain subject to conversion. *See* Rembrandt Objection, at ¶¶ 89–101.

---

[5] These include VSI, Glasses-Free Technologies, Inc., Visual Technology Innovations, Inc., and Joseph Corso, among others.

8

This argument has been a favorite of Mr. Rajan's for the past several years, dating back to the Section 225 Action and litigation over the Omnibus Agreement. The Settlement directly addresses this issue by granting the Secured Creditors an allowed secured claim. Rembrandt is not privy to any lending arrangement or conversion agreement between the Secured Creditors and the Debtors and has no knowledge of the underlying facts or negotiations relevant to this question. Indeed, Rembrandt has not been involved in any of the pending litigation over these questions, as its attempts to intervene in the 225 Action were summarily denied by the Delaware Court of Chancery. As such, there is no reason for Rembrandt to proffer this argument aside from Mr. Rajan's corrupting influence and their continued attempts to do his bidding.

14. Similarly, VSI's arguments related to its past negotiation with the Trustee, the Trustee's retention of SSG Advisors LLC ("SSG") as its investment banker,[6] and the use of SeeCubic as stalking horse bidder[7] are either mooted or wholly unrelated to the Bidding Procedures Motion. *See* VSI Objection, at §§ II.B & II.C.1. In addition to irrelevance, these arguments are also directly out of Mr. Rajan's playbook. Specifically, each of these arguments is rooted in Mr. Rajan's delusions that independent third parties and the legal system writ large (and, indeed, reality in general) are "out to get" him. Mr. Rajan has made this argument before and about every court and legal proceeding in which he has been involved, including the Delaware

---

[6] SSG is already retained as investment banker, and VSI consensually withdrew its objection to such retention. *See order Granting Amended Application of the Chapter 11 Trustee to Employ SSG Advisors, LLC as Investment Banker* [ECF No. 741] & *Notice of Withdrawal* [ECF No. 739] (withdrawing the *Limited Objection to the Application of the Chapter 11 Trustee to Employ SSG Advisors LLC as Investment Banker* [ECF No. 717]).

[7] The Court approved SeeCubic's serving as stalking horse bidder as part of the Order approving the Settlement Agreement [ECF No. 653], and the Bidding Procedures Motion is entirely aligned with the terms thereof.

9

Court of Chancery,[8] the Delaware Bankruptcy Court,[9] and even this Court.[10] He is now making the same argument (through VSI) about the Trustee.

15. Moreover, even the arguments lodged in the Objections that relate to the Bidding Procedures Motion and proposed Sale Transaction are unfounded and specious. For example, in the VSI Objection, VSI highlights SSG's lack of inclusion of the purported "$138 million" in purchase orders in the dataroom as an example of the inadequacy of the Sale Process. *See* VSI Objection, at ¶ 55. Mr. Rajan has been touting the "VSI Purchase Orders" (because they are between the Debtors and VSI pursuant to the unauthorized Distribution Agreement) for over a year. This Court has already determined that "Mr. Rajan was engaging in hyperbole at best, or fabrication at worst, in testifying regarding Stream being on the verge of obtaining customer commitments worth hundreds of millions of dollars." Trustee Opinion, at *24. In fact, after months of testimony, the Court expressly found:

> Beyond Mr. Rajan's testimony, however, the Debtors did nothing to establish [the VSI Purchase Orders'] bona fides. It seemingly would have been both very easy and very urgent for the Debtors, given the consequences if Hawk is successful in obtaining dismissal, conversion, or appointment of a trustee, to provide witness testimony from [purported purchasers] to substantiate, at the very least, the VSI Purchase Orders, if not the asserted interest … in greatly increasing purchases going forward…. Despite the level of purported support and interest in Stream, however, the Debtors did not bring anyone from [a purported purchaser] to substantiate the VSI Purchase Order [therewith]…. At a bare minimum, the Court would have expected the Debtors to put on testimony of Mr. Corso and/or Mr. Savarese, each of whom purportedly bound VSI, to

---

[8] *See Declaration of Mathu Rajan in Support of Stream TV Networks, Inc. and Technovative Media, Inc. Chapter 11 petition, Supporting Emergency Relief, and First Day Motions*, at ¶ 94 [ECF No. 48] (accusing the Delaware Chancery Court of allowing the Secured Creditors "to unlawfully seize, retain, and use the Debtors' assets" which necessitated the filing of the Chapter 11 Cases)

[9] *See id.* at ¶ 74 (accusing the Delaware Bankruptcy Court of dismissing Stream's first bankruptcy "[d]espite the executory nature of the omnibus agreement, and despite the fact that the case in the Court of Chancery had only had a preliminary ruling").

[10] *See* Motion of Debtors for Withdrawal of Reference, *Stream v. Stastney*, Adv. No. 23-00057 (Aug. 30, 2023) [ECF No. 4] (attempting to remove the adversary proceeding from the oversight of the Court).

10

> establish that the VSI Purchase Orders are legitimate. The Debtors
> instead relied only on Mr. Rajan, whose credibility with this Court
> has been greatly diminished.

*See id*. It is absolutely proper and appropriate for SSG to exclude information about the VSI Purchase Orders from the dataroom, considering this Court's prior determination and the Trustee's further assessment that there is no credible evidence they exist. It is also not surprising that VSI (which is Mr. Rajan's alter ego) continues peddling his lies and fantasies as if they are reality and that VSI acts dumfounded when no one accepts them at face value.

16. Finally, all other arguments included in the Objections are easily explained or remedied. Specifically, both of the Objectors' assertions that the Trustee cannot sell assets that are not property of the estates is easily remedied. *See*, *e.g.*, VSI Objection, at § III.A; Rembrandt Objection, at pp. 30–33.[11] In fact, the parties have filed an amendment to the Bidding Procedures Motion that includes the proposed Stalking Horse APA (as defined in the Bidding Procedures Motion), which specifies that the assets to be sold are only those owned by the estates and that property with respect to which Rembrandt has an interest is expressly excluded from the assets to be sold.

17. Accordingly, all of the arguments included in the Objections are either mooted, irrelevant, unfounded, or have been/will be resolved in due course. As such, the Objections should be overruled.

### C. The Bidding Procedures Motion and Sale Transaction Are the Only Viable Path Forward in these Chapter 11 Cases, and the Objectors Have Proposed No Alternative Options

18. The Bidding Procedures Motion and proposed Sale Transaction are the only viable options for any recovery to the stakeholders of the Debtors. At the prior hearing approving the

---

[11] Citations to the Rembrandt Objection change from paragraphs to page numbers after the fact section, as the Rembrandt Objection no longer includes paragraph numbers thereafter.

11

Settlement, the Trustee testified that he assessed all options and alternatives, including those proposed by VSI and Rembrandt, and the Settlement with the Secured Creditors was the only viable option available for the estates. The Trustee's business judgment and assessment as an independent third party is paramount in determining the veracity and trustworthiness of the Objectors' proposals outlined in the Objections. Considering the respective parties' history and record of trustworthiness (or lack thereof, with respect to Mr. Rajan, VSI, and Rembrandt), it is unsurprising that the Trustee has opted to pursue the Settlement and Sale Transaction with the Secured Creditors.

19.     Moreover, at the hearing on the Bidding Procedures Motion, SSG will testify as to the robustness and sufficiency of the marketing process to date. Since early June when the Court approved the Settlement, it has been clear that the Trustee would be pursuing a Sale Transaction, and, although the Objectors caused delays in retaining an investment banker, SSG has been soliciting interest in the Debtors' assets for several weeks now. It is Hawk's understanding these efforts have been largely fruitless, and no parties have expressed interest in participating in the process—including VSI and Rembrandt, each of whom have indicated they will not submit bids notwithstanding the purported $200 million they allegedly possess between them.

20.     The reality is that neither of the Objectors are participating in the Sale Process, because neither of them have any ability to do so. The same concerns that resulted in the Trustee disclaiming their proposals prior to entering into the Settlement with the Secured Creditors remain today—the Objectors have not (and are not able to) propose any true alternatives. Instead, the Objectors are perfectly content to cause delays and confusion in order to destroy the remaining value in the estates so long as they ensure the Secured Creditors are not able to obtain ownership of the assets.

21. The Bidding Procedures Motion and Sale Transaction are the best—and only—option to salvage value from the assets and to ensure a distribution to the Debtors' stakeholders. As such, the Court should ignore the Objectors' bad faith efforts to cause further delay, approve the Bidding Procedures Motion, and authorize the Sale Transaction to the extent SSG receives no other qualified bids.

## CONCLUSION

As discussed above, the Bidding Procedures Motion is the only way these cases will ever reach a conclusion. Without a formal process to solicit bids, hold an auction, and conclude a sale, Mr. Rajan—through his surrogates like VSI and Rembrandt—will continue doing everything in their power to delay matters and ensure that these cases never end. It is in the best interests of the estates and their creditors that the Court approve the Bidding Procedures Motion and authorize the sale of the estates' assets as soon as reasonably possible.

Dated:  November 12, 2024  **K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi, Esq. (No. 91881)
K&L Gates LLP
600 King Street, Suite 901
Wilmington, DE 19801
Telephone: (302) 416-7000
Facsimile: (302) 416-7020
Email: Steven.caponi@klgates.com

- and -

Margaret R. Westbrook, Esq.
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Telephone:  (704) 331-7400
Email: margaret.westbrook@klgates.com

- and -

Aaron S. Rothman, Esq.
Jonathan N. Edel, Esq.
K&L Gates LLP
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Telephone: (704) 331-7400
Email: aaron.rothman@klgates.com
       jon.edel@klgates.com

- and -

Thomas A. Warns, Esq.
K&L Gates LLP
599 Lexington Aenue
New York, NY 10022
Telephone: (212) 536-3900
Email: jon.edel@klgates.com

*Attorneys for Hawk Investment Holdings Ltd.*

**CERTIFICATE OF SERVICE**

I, Steven L. Caponi, certify that on November 12, 2024, I caused a copy of the forgoing *Hawk Investment Holdings Ltd.'s (1) Reply in Support of Motion of William A. Homony in His Capacity as Chapter 11 Trustee for (I) an Order (A) Approving the Bidding Procedures and Form of Asset Purchase Agreement for the Sale of Substantially All of the Debtors' Assets Including Approval of Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and Scheduling an Auction, (C) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Scheduling a Sale HEARING, (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(g), and (F) Granting Related Relief; and (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief and (2) Responding to Related Pleadings* to be served on those persons receiving notice through CM/ECF.

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 91881)
