**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)[1]** |
| | : | |

**OBJECTION OF WILLIAM A. HOMONY, CHAPTER 11 TRUSTEE, TO THE SIXTH
REQUEST FOR PAYMENT ON ACCOUNT FOR COMPENSATION AND
REIMBURSEMENT OF EXPENSES OF LEWIS BRISBOIS BISGAARD & SMITH LLP,
FOR THE PERIODS DECEMBER 1, 2023, THROUGH DECEMBER 31, 2023, AND
JANUARY 1, 2024, THROUGH JANUARY 15, 2024, AND THE FINAL APPLICATION
OF LBBS FOR ALLOWANCE AND PAYMENT OF COMPENSATION AND
REIMBURSEMENT OF EXPENSES FOR THE PERIOD FROM
<u>MARCH 15, 2023, THROUGH JANUARY 15, 2024</u>**

William A. Homony, in his capacity as Chapter 11 Trustee (the "Trustee") of the

bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc.

("Technovative", or collectively with Stream, the "Debtors"), by and through his counsel, Coren

& Ress, P.C., and Obermayer Rebmann Maxwell & Hippel LLP, files this objection ("Objection")

to the Sixth Request for Payment on Account for Compensation and Reimbursement of Expenses

of Lewis Brisbois Bisgaard & Smith LLP, ("LBBS"), for the Periods December 1, 2023 through

December 31, 2023 and January 1, 2024 through January 15, 2024 (D.I. #722), and the Final

Application of LBBS for Allowance and Payment of Compensation and Reimbursement of

Expenses for the Period from March 15, 2023, through January 15, 2024 (D.I. #723) (collectively,

the "Final Fee Application").

In support thereof, the Trustee respectfully represents as follows:

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-
captioned case and *In re Technovative Media, Inc.* Case No. 23-10764 (AMC) (D.I. #81).

## I.    <u>JURISDICTION AND VENUE</u>

1.      The Court has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(B), and 157(b)(2)(O).

2.      Venue of this proceeding and this Objection is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought herein are 11 U.S.C. § 330, Fed. R. Bankr. P. 2016, and Rule 2016 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Pennsylvania ("Local Rules").

## II.    <u>BACKGROUND</u>

4.      On March 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

5.      On January 5, 2024, this Court entered a Memorandum and Order which, among other things, appointed a Chapter 11 trustee (the "Trustee Order" and "Trustee Memorandum") (D.I. #549 and #548, respectively).

6.      This Court found, *inter alia*, that: (i) the Debtors, under the watch of Mathu Rajan and counsel LBBS, breached their fiduciary duties to creditors and disclosure obligations to the Court in failing to disclose that Visual Semiconductor, Inc. ("VSI") had made millions of dollars of payments on behalf of the Debtors in return for Debtor stock; (ii) Debtors' management, specifically Rajan, improperly acted as a fiduciary of the Debtors and VSI; (iii) "Alarmingly, the interrelationship between VSI, Stream, and Mr. Rajan's overlapping interests and roles in each is so entrenched that Mr. Rajan's testimony at trial was at times rendered unintelligible, or alternatively, intentionally

2

4859-4514-4572 v3

deceptive, by his inability or unwillingness to draw distinctions between the Debtors and VSI and his roles with each"; and (iv) "Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court and creditors rises to the level of gross mismanagement of the estates, even when viewed against the high standard of glaring and inexcusable badness." Trustee Memorandum at 60-61.

7.      On January 9, 2024, the Office of the United States Trustee filed a Notice of Appointment of William A. Homony to serve as the Chapter 11 Trustee as well as an Application for the Entry of an Order approving the appointment of the Trustee (D.I. #554 and #553, respectively), and, on January 12, 2024, the Bankruptcy Court entered an Order approving the appointment of the Trustee (D.I. #558).

8.      The Trustee's Special Counsel, Steven M. Coren, Esquire of Coren & Ress, P.C., has been tasked with reviewing the conduct of insiders, including LBBS; his review of LBBS includes its conduct, its representation of the Debtors, and its fee applications.

9.      To facilitate his investigation, the Trustee's Special Counsel requested that LBBS produce all files and electronic communications related to its representation of the Debtors.

10.     LBBS's production was delayed for personal reasons impacting the Debtors' counsel at LBBS.  Two months after the request was made, LBBS produced approximately 11,271 documents totaling 196,967 pages.

11.     Additionally, VSI and others made a massive volume of documents available, containing more than 28,000 files.

12.     On August 28, 2024, LBBS filed the Final Fee Application, which seeks compensation and reimbursement of expenses totaling $2,977,958.10.

4859-4514-4572 v3

13.     The Trustee requested, and LBBS stipulated to, an extension of the deadline for the Response to the Final Fee Application (the "Response Deadline"). The Response Deadline is now November 18, 2024.

14.     While the Trustee's investigation as it relates to LBBS fee applications is ongoing, and the Trustee intends to take depositions of Debtor counsel at LBBS, Mr. Rajan, VSI, and others, the Trustee's record review to date, in consultation with counsel, reveals sordid and conflicted relationships between LBBS, VSI, and Rembrandt, untimely and inadequate disclosures by LBBS in connection therewith, and breaches of fiduciary duty and other wrongdoing on the part of LBBS which support the disallowance in full of or, at a minimum, a substantial reduction of the fees and expense reimbursement sought by LBBS.

## III.    <u>APPLICABLE LEGAL STANDARDS</u>

15.     LBBS bears the burden of proof in support of the Final Fee Application, and it is subject to scrutiny by the Court.

16.     The statutory authority governing LBBS's fee requests is contained in Sections 330 and 331 of the Bankruptcy Code, as well as Federal Rule of Bankruptcy Procedure 2016(a).

17.     The Third Circuit has provided further guidance to the Bankruptcy Court as to the factors to be considered in determining whether requested compensation is reasonable. *See In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833, 849 (3d Cir. 1994) (discussing the five factors enumerated in Section 330(a) of the Bankruptcy Code: nature, extent, value of services, cost of comparable services, and time spent on services).

18.     Finally, the Bankruptcy Court for the Eastern District of Pennsylvania has adopted guidelines to be considered by the Court. L.B.R. 2016.

4859-4514-4572 v3

19. Section 330(a) of the Bankruptcy Code articulates the basic standards for compensation of professional fees and reimbursement of expenses in a bankruptcy case.

20. More specifically, Section 330(a)(1) permits the Court to award "reasonable compensation for actual, necessary services rendered" and to reimburse the applicant for "actual and necessary expenses" incurred. *See* 11 U.S.C § 330(a)(1)(A).

21. Of course, the Court retains discretion to award "less than the amount of compensation that is requested." *Id.* at § 330(a)(2).

22. Moreover, Section 330(a)(4)(A) makes clear that "the court shall not allow compensation" for:

    (i)  unnecessary duplication of services; or

    (ii)  services that were not –

        (I)    reasonably likely to benefit the debtor's estate; or

        (II)    necessary to the administration of the case.

11 U.S.C. § 330(a)(4)(A).

23. "The trustee has a fiduciary obligation to review professional fee applications and to object when appropriate." U.S. Dep't of Justice, Chapter 11 Trustee Handbook 70 (May 2004) (available at https://www.justice.gov/ust/file/ch11handbook-200405.pdf/dl).

24. Further, a Chapter 11 trustee "is required to make diligent inquiry into any professional's eligibility to be employed and compensated by the estate pursuant to § 326(d); protect monies of the estate in accordance with the provisions of§ 345… In addition, the court may expand the duties of the trustee… In short, a chapter 11 trustee is a fiduciary charged with protecting the interests in the bankruptcy estate of all parties, including all classes of creditors and the debtor. The trustee must protect and preserve estate assets." *Id*. at 19; *see also In re Ceresota Mill Ltd. P'ship*, 211 B.R. 315, 317-18 (B.A.P. 8th Cir. 1997) ("Rule 9006(b) permits the court to

enlarge the time for an act to be done upon a showing of cause . . . [t]he court may act with or without motion or notice if the request is made before the expiration of the period originally prescribed . . . .").

## IV.    OBJECTION

25.    LBBS's request for fees should be denied in full because, as set forth herein and will be proved at a hearing: LBBS was conflicted; LBBS colluded with and advanced the interests of VSI, Rajan, and Rembrandt, rather than those of the Debtors and their creditors; LBBS violated its duty of candor to the Court; LBBS's retention-related disclosures were untimely and inadequate; LBBS billed massive amounts for unnecessary services which accomplished little; and LBBS's services resulted in the appointment of a Chapter 11 trustee to manage an estate that was out of control on LBBS's watch.

### A.  LBBS's Fee Request Should Be Denied; Its Actions Were Designed to Benefit VSI, Rajan, and Rembrandt, Not the Debtors or Their Creditors

26.    In granting the request to appoint a trustee, the Court painted a bleak but accurate picture of the estate administration to date and the utterly conflicted manner in which the Debtors-in-Possession and their counsel had LBBS mismanaged the case.

27.    In this regard, the Court held, among other things, that:

- "Rather than moving expeditiously toward confirmation of a reorganizational plan that addresses creditor claims and formulates the Debtor's operations moving forward, these cases have stalled at virtually every turn."

- "[T]he evidence at Trial on the pending motions crystalized the Court's primary and urgent concern with the administration of the Debtor's cases to date, *i.e.*, the plans, trustworthiness, and motivations of Mr. Rajan in his role as, for all intents and purposes, the singular figure in the Debtors' management."

- "There are many examples, large and small, that highlight . . . the Court's lack of faith in Mr. Rajan's ability or willingness to act consistent with the fiduciary duties

the Debtors owe their creditors and the Court . . . [and] the relatively directionless nature of these cases to date . . . ."

Trustee Memorandum at 31.

28.    Of particular concern was the fact that the "Debtors have proposed certain major transactions in these cases benefitting VSI without clear benefit to the Debtors or the Estates":

> The Court has had concerns nearly from the inception of these cases about the relationship between the Debtors and VSI, given Mr. Rajan's overlapping roles.  Certain transactions the Debtors have proposed have only reinforced that concern.  As discussed *supra*, the proposed funding transaction with VSI in April would have unnecessarily either issued Stream equity to VSI or created $1 million of administrative debt to VSI.  It was therefore denied.  The unauthorized post-petition issuance of shares in Stream to VSI also raises serious questions about the administration of these cases for the benefit of VSI. These, however, were not the only instances where the Court's trust in the Debtor's management has deteriorated in light of transactions the Debtors have proposed either at the eleventh hour or under cover of more innocuous requests for relief that seem to benefit VSI without justification.

Trustee Memorandum at 46 (formatting altered).

29.    The Court detailed how the Debtors' proposals "created serious questions about how and for whose benefit these cases are being administered," and the evasive way the Debtors presented that request to the Court.  *See id.* at 46-48 ("In the end, the Court was left with the distinct impression that the Debtors sought to enter into the Distribution Agreement while attracting little attention to it, and once attention was drawn, failed to have a compelling reason for allowing VSI to benefit from the Debtors' product sales."); *id*. at 50 (detailing concern with a Debtor-proposed licensing covenant which was "intended, at least in large part, to protect VSI's interest in Stream's technology and products, while at the same time expressly barring Rembrandt from issuing a license to any of Stream's subsidiaries.  The Licensing Agreement completely aligns Stream and

4859-4514-4572 v3

VSI with respect to licensing the technology of Rembrandt, to the exclusion of, *inter alia*, Stream's subsidiaries.").

30.     As the Court held, "[e]ach of these transactions have had the taint of benefit to VSI without clear benefit to the Debtors and their estates. Where Mr. Rajan stands on both sides of those transactions, they only add to the Court's conclusion that he has breached his fiduciary duties in proposing them without being able to articulate how they are a reasonable exercise of his business judgment."  Trustee Memorandum at 51.

31.     A bankruptcy court has an independent duty to review all fee requests of professionals retained in a chapter 11 case to assure that the services rendered were necessary and appropriate and that the fees requested are reasonable.  *See, e.g.*, *In re Busy Beaver Bldg. Ctrs.*, 19 F.3d at 844 (the court "must protect the estate, lest overreaching attorneys or other professionals drain it of wealth which by right should inure to the benefit of . . . creditors").

32.     Under Section 330(a)(4)(A), "the court should not allow compensation for (i) unnecessary duplication of services; or (ii) services that were not (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case." The applicant bears the burden of proving that the fees and expenses sought are reasonable and necessary.  *See, e.g.*, *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 253, 260 (3d Cir. 1995).

33.     LBBS, as counsel representing the Debtors-in-Possession during the time frame addressed in the Court's Trustee Memorandum, had a fiduciary responsibility to the Debtors' estates and to the bankruptcy court.  *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 840 (Bankr. C.D. Cal. 1991) ("In a Chapter 11 proceeding, the attorney for debtor in possession, as an officer of the court charged to perform duties in the administration of the case, has a high fiduciary duty to the estate represented.") (internal citations and quotations omitted); *id.* ("[C]ounsel for a

4859-4514-4572 v3

corporate Chapter 11 debtor in possession owes a fiduciary duty to the corporate entity estate—the client—and represents *its* interests, not those of the entity's principals."); *Brown v. Gerdes*, 321 U.S. 178, 182 (1944) ("In all [reorganization] cases persons who seek compensation for services or reimbursement for expenses are held to fiduciary standards."); *In re T & D Tool, Inc.*, 125 B.R. 116, 120 (E.D. Pa. 1991) ("A debtor-in-possession and counsel who represent it are fiduciaries for the creditors in the highest sense of the term fiduciary.") (internal citations and quotations omitted).

34.    Here, it is readily apparent that LBBS breached its fiduciary duties by devoting an inordinate amount of time advancing positions which, as described in detail above, this Court found were designed to benefit VSI, Rajan, and Rembrandt.

35.    LBBS actively facilitated – and thus bears substantial responsibility for – the judicially-determined "gross mismanagement of the Debtors' estates" and therefore should not profit at the expense of those estates and their creditors. Trustee Memorandum at 59.

36.    Review of LBBS emails confirms that both Rajan and LBBS actively advanced the interests of VSI and Rajan at the expense of the Debtors and their estates.

37.    For example, on July 8, 2023, LBBS Attorney Zahralddin emailed VSI's attorneys at Akerman LLP attaching template documents for formulation of a Chapter 11 plan and related agreements, which LBBS aptly described as "really VSI's deal."  *See* Exh. "A" attached hereto.

38.    VSI's control over LBBS's representation included VSI's Akerman attorneys issuing instructions to LBBS concerning an adversary proceeding filed by the Debtors against certain of the Debtors' secured creditors and equity holders.  *See* Exh. "B" attached hereto. (July 2023 email chain between LBBS attorneys and attorneys at Akerman in which an Akerman attorney states that delay in drafting the complaint "is ridiculous.  Client [i.e., VSI,] wants i[t] filed

tomorrow"); *see also, e.g.*, Exh. "C" attached hereto (8/4/23 email from LBBS Attorney Zahralddin to various Debtor principals, VSI principals, LBBS attorneys, and Akerman attorneys stating that "Mathu and Bud tell me that VSI wants to have relief ASAP on several fronts – we need to get that list and make sure we are asking for injunctive relief").

39.     LBBS's performance of services at VSI's direction, which ran primarily to the benefit of VSI and contrary to the best interests of the Debtors and their creditors, justifies denying any compensation to LBBS, as it destroyed the required disinterestedness. *See, e.g.*, *U.S. Tr. v. Price Waterhouse*, 19 F.3d 138, 142 (3d Cir. 1994) ("[I]f a non-'disinterested' professional person is improperly employed, or if a professional person ceases to be 'disinterested' 'at any time during such professional person's employment,' the court may deny compensation and reimbursement.").

40.     Moreover, the services rendered by LBBS, which were found by the Court to run to the benefit of VSI, posed no reasonable likelihood of benefit to the Debtors' estate and should not be paid from estate funds. S*ee, e.g.*, *In re Channel Master Holdings, Inc.*, 309 B.R. 855, 861-62 (Bankr. D. Del. 2004) ("[C]hapter 11 is [not] a license to perform services and generate fees in a vacuum without considering the possibilities of recovery for the professional's constituents. The Court must conduct an objective inquiry based upon what services a reasonable professional would have performed in the same circumstances.") (internal quotations and citations omitted); *In re Sandra Cotton, Inc.*, 91 B.R. 657, 659 (W.D.N.Y. 1988) (no benefit where the services rendered actually impeded the administration of the estate); *In re By-Rite Oil Co.*, 87 B.R. 905, 915 (Bankr. E.D. Mich. 1988) (services rendered by properly retained counsel for chapter 11 debtor in connection with aborted sale of debtor's assets are not compensable where counsel for chapter 11 debtor pursued sale for benefit of principal and his company and not for benefit of debtor's estate or creditors); *In re Zweig*, 35 B.R. 37, 38 (Bankr. N.D. Ga. 1983) (properly retained debtor's

counsel was denied fees for services which produced benefit to the debtor but not to the estate); *In re Clayton Grain Elevator, Inc.*, 30 B.R. 760, 762 (Bankr. W.D. La. 1983) (properly retained corporate debtor's counsel was denied fees for services which benefited controlling shareholders but had only secondary effect on debtor).

41.      While a granular review of LBBS's time entries is difficult due to the vagueness of the time descriptions, it appears from counsel's review of LBBS's billing that a substantial amount of time was devoted to tasks that benefitted VSI, Rajan, and Rembrandt and did not benefit the Debtors or their creditors.

**B.  LBBS's Fee Application Should Be Denied Because It Failed to Disclose Actual Conflicts of Interest**

42.      Prior to an applicant's approval as counsel to the debtor, the Federal Rules of Bankruptcy Procedure require the applicant to "state . . . any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [applicant's] connections with the debtor, creditors, [and] any other party in interest . . . ." Fed. R. Bankr. P. 2014(a).  The purpose of this requirement is for parties in interest and the bankruptcy court to confirm that the applicant qualifies as a "disinterested person" for the purposes of the Bankruptcy Code.  *See* 11 U.S.C. § 327(a) ("Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys . . . that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.").

43.      The Third Circuit has held that "[u]nder [Rule 2014(a)], all facts that *may* be pertinent to a court's determination of whether an attorney is disinterested or holds an adverse interest to the estate must be disclosed."  *In re Jade Mgmt. Servs.*, 386 F. App'x 145, 150 (3d Cir. 2010) (emphasis in original; internal quotation marks and citations omitted); *In re Vascular Access*

11

*Cntrs., L.P.*, 613 B.R. 613, 625 (Bankr. E.D. Pa. 2020) (citing *Jade Mgmt. Servs.*, 386 F. App'x at 145).

44.     "These disclosures are not discretionary and lawyers cannot pick and choose which connections are irrelevant or trivial." *Vascular Access*, 613 B.R. at 625 (quotation marks, alteration marks, and citations omitted). "Furthermore, it is not the obligation of the bankruptcy court to search the record for possible conflicts of interest.  Instead, that obligation belongs to the party who seeks employment by the estate." *Id.*

45.     "[N]egligence does not excuse the failure to disclose a possible conflict of interests." *In re BH & P , Inc.*, 949 F.2d 1300, 1318 (3d Cir. 1991).  "Accordingly, an attorney's subjective good faith efforts are not the measure of the duty of disclosure under Rule 2014(a) and are irrelevant." *Vascular Access*, 613 B.R. at 625 (citing *In re BH & P, Inc.*, 949 F.2d at 1318).

46.     "Courts have held that professionals who do not proceed carefully under the requirements of Rule 2014(a) do so at their own risk." *Id.* (internal quotations, alterations, and citations omitted).  "Violation of Rule 2014(a) alone is enough to disqualify a professional and deny compensation, regardless of whether the undisclosed connection or fee arrangements were materially adverse to the interests of the estate or were *de minimis*." *Id.*

47.     On April 3, 2023, the Debtors filed an Application Pursuant to 11 U.S.C. § 327(a) of the Bankruptcy Code for Authority to Employ LBBS (the "Application," D.I. # 70).  The Application was accompanied by a declaration from Attorney Zahralddin in which he swore that "[n]either LBBS nor any attorneys of LBBS represent[] any entity other than Debtors in, or in connection with, Debtors' chapter 11 cases" and that "LBBS is a 'disinterested person' as that term is defined in section 101(14) of the Bankruptcy Code" Id. at D.I. # 70-1, ¶¶ 1-2.

48.     Attorney Zahralddin further represented that, "Before filing these cases, Visual Semiconductor, Inc. ('VSI'), an investor in the Debtor, paid a flat non-refundable fee payment on behalf of the Debtors in the amount of $50,000.00 in preparation for filing the Chapter 11 bankruptcies. VSI has been advancing payments for Stream TV Networks, Inc's [sic] expenses in exchange for equity in Stream TV Networks, Inc." *Id.* at ¶ 8.   Attorney Zahralddin further represented that "Rafael X. Zahralddin . . . represented a special purpose vehicle which was to facilitate financing for Stream TV in a bankruptcy filed in Delaware while a lawyer at Armstrong Teasdale in 2020.   These prior representations do not pose any material adverse interest." *Id.* at Exhibit A, ¶ 1.

49.     Attorney Zahralddin's declaration was incomplete and misleading as to Debtor's prior bankruptcy cases, his role in those bankruptcies, and the fact that his true loyalties lay with Rajan and VSI, and his declaration that his "prior representations do not pose any material adverse interest" is false.

50.     It is unclear as to which "bankruptcy filed in Delaware" Attorney Zahralddin was referring, as he was involved in two prior bankruptcy cases involving Stream, the first being a Chapter 11 case initiated by the Stream TV Debtor on February 24, 2021, and docketed at *In re: Stream TV Networks, Inc.*, Bankr. D. Del. No. 21-10433-KBO (the "Delaware Voluntary Bankruptcy Case") and the second being an involuntary Chapter 7 case initiated on May 23, 2021, by, *inter alia*, purported creditor Rembrandt 3D Holding Ltd. ("Rembrandt"), docketed at *In re Stream TV Networks, Inc.*, Bankr. D. Del. 21-10848 (the "Delaware Involuntary Bankruptcy Case").

51.     LBBS's retention application intentionally minimizes the role of Attorney Zahralddin in these prior bankruptcy proceedings, as well as the outcome of those proceedings.

13

52.     Had the truth been told as to the Delaware bankruptcy proceedings—especially in tandem with the fact that VTI successor VSI was the funding source for the payment of LBBS's fees—that required disclosure would have thoroughly debunked the notion that LBBS was a "disinterested person" for purposes of the instant bankruptcy.

53.     While Attorney Zahralddin's declaration cleverly mischaracterized his involvement as simply representing "a special purpose vehicle which was to facilitate financing for Stream TV," full disclosure would have revealed that the entity he represented in the Delaware Voluntary Bankruptcy Case – Visual Technology Innovations, Inc. ("VTI") – played the same conflicted role as that played by VSI in the instant bankruptcy case.

54.     As this Court held in the Trustee Memorandum with respect to VSI, the Delaware Bankruptcy Court explicitly found that VTI existed for the purpose of wrongfully usurping the resources of the Debtor for the benefit of Mr. Rajan.

55.     As a result, the Delaware Bankruptcy Court dismissed the Delaware Voluntary Bankruptcy Case as having been filed in bad faith:

> Mr. Rajan established VTI of which he is the controlling shareholder, president, and until recently the sole director. Using VTI he began to fundraise using Stream's assets despite the injunction.
>
> It is clear, through documentary evidence, that Mr. Rajan intended to use a Stream bankruptcy as a mechanism by which he could, via Stream, regain the Ultra-D assets from the secured lenders and then through VTI obtain them at a fraction of what he believed was the assets' value.

Delaware Voluntary Bankruptcy Case at D.I. 200, 14:20-15:4; *id.* at D.I. 198 (order dismissing bankruptcy).

56.     The Delaware Voluntary Bankruptcy Case was dismissed on May 17, 2021. *Id.*

14

57.    On May 23, 2021, just six days later, the Stream TV Debtor, Rajan, Rajan's brother Raja, and Rembrandt 3D Holding Ltd. executed a collusive settlement agreement (the "Rembrandt Agreement") to grant Rembrandt creditor status in a ruse to circumvent the dismissal of the Delaware Voluntary Bankruptcy Case. *See* Exh. "D" attached hereto. (Rembrandt Agreement).

58.    On May 23, 2021, the same day that Mr. Rajan executed the Rembrandt Agreement on his own behalf and on behalf of the Debtor, Rembrandt, as one of three petitioning creditors, filed the Delaware Involuntary Bankruptcy Case against the Stream TV Debtor, with the timing of the filing substantiating the concern that the Rembrandt Agreement was a sham concocted by Mr. Rajan and Rembrandt to fix a contrived claim for Rembrandt to end-run the Delaware Bankruptcy Court's dismissal of the Delaware Voluntary Bankruptcy Case.

59.    Attorney Zahralddin represented VTI in the Delaware Involuntary Bankruptcy Case, filing a joinder to Rembrandt's opposition to a motion to dismiss the case. Delaware Involuntary Bankruptcy Case at D.I. 26.

60.    The Delaware Bankruptcy Court again dismissed Stream's Delaware bankruptcy proceeding, holding that "it's clear to me that this proceeding was filed as another attempt by the parties to circumvent my dismissal order" and agreeing with the conclusion that VTI was seeking relief which "would not be beneficial to the creditor body."  Delaware Involuntary Bankruptcy Case at D.I. 37, 63:18-64:18.

61.    The Delaware Bankruptcy Court's findings concerning the misbehavior of the Debtor, VTI, and Rembrandt resulted in the dismissal of the involuntary case and a bar order "prohibiting the commencement of future chapter 11 or chapter 7 cases of Stream until one year from the date of this Order."  Dismissed Involuntary at D.I. 36.

62.    VSI (the vehicle created by Mr. Rajan to serve as the successor to VTI), Rembrandt

– Attorney Zahralddin and VTI's ally in the Delaware Involuntary Bankruptcy Case – and Stream

engaged in similar trickery under LBBS's direction in this bankruptcy case.

63.    Specifically, as this Court held in its decision appointing a Chapter 11 trustee,

the Debtors, under LBBS's guidance, executed an unauthorized post-petition agreement with

Rembrandt, which benefitted VSI and Rembrandt at the expense of the Debtors and their creditors:

> The Court also has concerns regarding the Debtors' post-petition
> Licensing Covenant with Rembrandt, entered into post-petition in
> August. . . . The Court is . . . alarmed about the propriety and
> motivations of Stream entering into a post-petition transaction that
> is intended, at least in large part, to protect VSI's interest in Stream's
> technology and products, while at the same time expressly barring
> Rembrandt from issuing a license to any of Stream's subsidiaries.
> The Licensing Agreement completely aligns Stream and VSI with
> respect to licensing the technology of Rembrandt, to the exclusion
> of, inter alia, Stream's subsidiaries. . . . Rather than simply
> preventing SeeCubic from competing with the Debtors, the
> Licensing Covenant benefits a non-debtor insider third-party while
> requiring the Debtors to make significant post-petition payments to
> Rembrandt.

*See* Trustee Memorandum at 49-51; *see also* Exh. "E" attached hereto (8/14/23 Licensing

Covenant among Debtor Stream TV and VSI – acting together and referred to as the "VSI Parties"

– on the one hand, and Rembrandt on the other, prohibiting Rembrandt from issuing a license to

"[a]ny current or former subsidiary of Stream").

64.    Moreover, as established with respect to VSI above, a review of LBBS emails

demonstrates the firm's entanglement with Rembrandt to the detriment of the Debtors.

65.    In April 2023, counsel for Rembrandt emailed Attorney Zahralddin concerning the

"Plan for Rembrandt," leading to the following exchange:

> [Rembrandt Attorney:]  We have read Stream's latest motion papers
> and note that Stream was asking to have a number of employees and
> vendors paid to allow production to start but did not include any

16

payment to Rembrandt. While I understand the list of vendors will not be paid, we expected to be included in the list of vendors that needed to be paid to restart production. Coupled with Stream's failure to list Rembrandt as either a creditor or as having an executory contract with Stream, we are having a hard time reconciling your filings with your statements that Rembrandt will both be paid and treated as an administrative claim. If VSI has $10,000,000 to invest in Stream, there are funds to pay Rembrandt, but we see no plan to do so. . . .

Attorney Zahralddin:  We have to update the schedules.

Right now we are trying to deal with the secured lenders.

Do your funding sources want to supply a DIP?

Might be better optics.

VSI isn't putting in $10 million - the purchase orders plus investors are the source of those funds.

Exh. "F" attached hereto.

66.    The Rembrandt Agreement serves as the basis for Rembrandt's phony $1.2 billion proofs of claim it filed in the instant bankruptcy cases which are troubling on a number of levels, as set forth below. *See* Claims 2-1 and 26-1 filed in the Stream bankruptcy case.

67.    The parasitic nature of the relationship between the Debtors and Rembrandt can be detected at the earliest stages of the Debtors' bankruptcy cases. On the Petition Date, Technovative filed its List of Creditors Who have the 20 Largest Unsecured Claims and are not Insiders (the "Top 20 List"), and scheduled Rembrandt as its only creditor having a claim for "breach of contract" in the amount of $10 million (+) and listed the claim as contingent, unliquidated and disputed [Technovative bankruptcy docket no. 1] and thus, not an allowed claim.

68.    Mysteriously and without explanation, when Technovative filed its Schedules of Assets and Liabilities (the "Schedules") a mere two weeks later, Rembrandt's claim had ballooned to $100 million dollars, more than ten times the original amount and this time was listed as

**undisputed, noncontingent and liquidated** and therefore, an "allowed" claim for "goods and services." The Top 20 List and the Technovative Schedule E/F are attached hereto as Exh. "G" and Exh. "H" respectively.  Both the Top 20 List and the Schedules were prepared by LBBS and signed under penalty of perjury by Mr. Rajan as Director of Technovative.

69.    How Technovative, a holding company whose only assets are the interests in Media Holdings Co. LLC and Ultra D Ventures C.V. valued at $2,000.00 as of the petition date, incurred $100 million of undisputed, noncontingent and unliquidated debt without explanation and with nothing to show for it reported on its Schedules defies comprehension, and reeks of collusion. *In re Technovative Media, Inc.* Case No. 23-10764 (AMC) (D.I. #47).

70.    The Trustee is in the process of investigating the Rembrandt proofs of claim.  It is significant to note that Stream, which Rembrandt alleges is the counterparty to the Rembrandt Agreement, failed to even include a claim for Rembrandt and initially did not identify the collusive Rembrandt Agreement as an executory contract in its Schedules (the Stream Schedule G was ultimately amended to include the Rembrandt Agreement).

71.    Furthermore, less than a month prior to the Petition Date, Rembrandt filed a complaint in the Delaware District Court against, *inter alia*, Technovative in which the only count asserted against Technovative was a request for injunctive relief.  Despite the fact that no monetary damages were sought against Technovative in that complaint, Mr. Rajan listed Rembrandt as having an undisputed, non-contingent and liquidated claim of $100 million in its Schedules.

72.    On October 10, 2014, the Trustee filed an amendment to the Technovative Schedules to list the Rembrandt claim in the correct amount: $0.

73.    In response, Rembrandt falsely filed a nearly identical proof of claim against Technovative to the claim it filed again Stream, for $1.2 billion based on the Rembrandt

Agreement, to which Technovative is not even a party.  A copy of Rembrandt's Claim No. 26-1 filed against Technovative in the Stream bankruptcy case is attached as Exh. "I" hereto.

74.    Full disclosure by LBBS of Attorney Zahralddin's prior representation of VTI and the outcome of the prior Delaware bankruptcies would have revealed that LBBS was not a disinterested party due to its allegiances with and ties to VTI (which, like VSI, is a mere façade serving Mr. Rajan's interest in acquiring control over the Debtors' assets) and Rembrandt.

75.    While LBBS submitted a supplemental declaration through Attorney Zahralddin revealing his prior representation of VTI, D.I. 180 – only after pressure from Hawk and the United States Trustee – "a professional's belated disclosure, as a result of a United States Trustee's objections, cannot overcome a professional's violation of Rule 2014(a)."  *Vascular Access*, 613 B.R. at 625.

76.    Attorney Zahralddin is well aware that subsequent disclosures by proposed counsel after concerns about them are expressed are not sufficient to cure original deficiencies.  *See In re Universal Building Prods.*, 486 B.R. 650, 664 (Bankr. D. Del. 2010)*; Rome v. Braunstein*, 19 F.3d 54, 59 (1st Cir. 1994) (warning that "[a]bsent the spontaneous, timely and complete disclosure required by section 327(a) and Fed. R. Bankr. P. 2014(a), court-appointed counsel proceed *at their own risk*.") (emphasis in original).

77.    In any event, Attorney Zahralddin's supplemental declaration is incomplete as it continues to maintain that LBBS is a disinterested person and fails to reveal the outcome of the Debtor's prior bankruptcy proceedings, *i.e.*, that they were dismissed in no small part due to the court's finding that they represented an improper attempt on the part of Mr. Rajan to use VTI and Rembrandt to improperly gain control of the Debtor's assets.  This information, combined with

the fact that VSI paid LBBS's initial fee for its representation of the Debtors in the instant
bankruptcy, raises red flags precluding LBBS's initial or continued retention as Debtors' counsel.

78.     LBBS's reactionary supplemental disclosures, filed only after its incomplete initial
disclosures were discovered by other parties, do not circumvent the disclosure requirements set
forth in the Bankruptcy Code and Bankruptcy Rules.

79.     The disclosure process is meant to be full, frank, and timely.  It is not designed to
be used as a shield in defense of a retention objection.  LBBS was aware of the connections of its
counsel before its application to be employed was filed yet chose to avoid fully disclosing those
relationships.

80.     LBBS also failed to disclose that VSI – which paid its initial $50,000.00 fee,
ostensibly on behalf of the Debtors – was funding the Debtors' operations post-petition pursuant
to an agreement for which the Debtors never obtained court approval.

81.     Indeed, at an April 24, 2023, hearing concerning the Debtors' motion to obtain
approval to fund their cases through the sale of Stream shares to VSI, LBBS advised the Court that
the Debtors had not funded their cases through VSI, with Attorney Zahralddin expressly
acknowledging that "there are grave consequences to not getting permission."  *See* Trustee
Memorandum at 43.  However, as Mr. Rajan was later forced to admit to the Court, "Stream had
been issuing shares to VSI every week or two since the Debtors' Petitions were filed," with VSI
funding the Debtors-in-Possession in return.  *Id.* at 44.

82.     Attorney Zahralddin's representations to this Court were knowingly false, as
established by his email to counsel for the United States Trustee on April 13, 2023.

83.     In response to questions concerning VSI's payment of LBBS's $50,000.00 initial
fee, Attorney Zahralddin acknowledged that VSI "has been the source of operating funds for the

Stream entities, on as needed basis" and "has purchased shares with the funds advanced." Exh. Ex. "J" attached hereto.

84. With VSI having paid LBBS's initial fee, and with VSI funding the Debtors post-petition subject to an unauthorized stock sale arrangement, VSI represented the only possible source of funds to pay LBBS going forward, and thereby obliterated LBBS's status as a "disinterested" person.

85. Knowing that a challenge to its "disinterested person" status would preclude LBBS's representation, Attorney Zahralddin misled this Court about VSI's role in funding the Debtors post-petition and paying LBBS's substantial fees.

86. The unauthorized post-petition grant of a Rembrandt license in which the Debtor and VSI acted together as the "VSI Parties" and which denied licensing rights to Debtor subsidiaries further establishes that LBBS was not disinterested from the start of its representation, and that its continued representation of the Debtors without disclosure of its interested person status is more than sufficient to deny the LBBS Final Fee Application or any fees whatsoever. *See, e.g.*, *U.S. Tr. v. Price Waterhouse*, 19 F.3d 138, 142 (3d Cir. 1994) ("[W]e interpret Section 328(c) to mean that if a non-'disinterested' professional person is improperly employed, or if a professional person ceases to be 'disinterested' 'at any time during such professional person's employment,' the court may deny compensation and reimbursement.").

87. Incredibly, LBBS continued to act on VSI's behalf even after issuance of the Court's Trustee Memorandum, directly advocating on VSI's behalf during negotiations with the Trustee, including at a March 7, 2024, demonstration of the Debtors' technology conducted by VSI.

4859-4514-4572 v3

### C. LBBS's Fee Application Should Be Denied Because It Violated Its Duty to Present Accurate and Timely Information Concerning the Debtors' Operations

88.    LBBS failed spectacularly in its duty to present accurate and timely information concerning the Debtors' operations to the Court.

89. As this Court held:

> The already-discussed transactions and requested relief that appear to be primarily for the benefit of VSI are reason enough to find that Mr. Rajan has engaged in gross mismanagement of the Debtors' estates.  Another glaring example, however, is the Debtors' failure to revise knowingly false monthly operating reports, on which the Court and all interested parties rely in assessing the Debtors' post-petition performance and prospects, until December, months after the initial MORs were filed.  Furthermore, as discussed *infra*, the Revised MORs … appear to represent facts regarding payments VSI has made on behalf of Stream that contradicts Mr. Rajan's testimony at Trial, leaving the Court and interested parties unclear as to the Debtors' post-petition operations and finances. . . .  Importantly in the context of these cases, the failure of a debtor to properly report income and expenses constitutes evidence of gross mismanagement under §1112(b)(4)(B). . . .

> Mr. Rajan's flippant explanation for why VSI's millions of dollars in payments on behalf of Stream in exchange for Stream shares was not disclosed on its MORs is unacceptable.  The Court does not attribute any credibility to Mr. Rajan's explanation that this lack of disclosure was due to an oversight or attributable to his hospitalization. There is no reason that Mr. Park, as the nominal CFO of the Debtors, or someone else with knowledge of the Debtors' operations and finances should not have ensured the disclosure of the funding arrangement with VSI in the MORs. The fact that it was not done, that it became clear only at Trial, and that the Debtors did not file the Revised MORs until December is a breach of the Debtors' fiduciary duties to the estates' creditors and its disclosure obligations to the Court. The Court simply does not believe Mr. Rajan that the lack of disclosure was an oversight.

Trustee Memorandum at 59-60.

90.    Certainly, Debtors' counsel is responsible for ensuring the timeliness and the accuracy of Debtor filings.

4859-4514-4572 v3

91.    LLBS's shortcomings in that regard are detailed in the December 29, 2023 Motion of the United States Trustee to Dismiss Debtors' Cases for Cause (D.I. 534, the "U.S. Trustee Motion"), which alleged that the Debtors' "chapter 11 cases should be dismissed because of the Debtors' (i) failure to timely file accurate and complete reports, (ii) failure to provide information requested by the U.S. Trustee, and (iii) failure to comply with the Rule 2004 Order of the Court, including a failure to attend the oral examination with a witness competent to testify and make a complete production of Court ordered documents":

- "The Debtors have consistently filed reports late, if at all, and have engaged in serial amendments thereto, calling into question whether any of the information of record and signed under penalty of perjury is accurate or merely a placeholder for yet more amendments to come," U.S. Trustee Motion at ¶ 3;

- "The Debtors have not provided information to the U.S. Trustee sufficient to corroborate the information contained in their filed reports. Indeed, the incomplete information that has been provided to the U.S. Trustee indicates that the filed reporting is inaccurate," *id.* at ¶ 4;

- "[T]he Debtors were required to file the first [Bankruptcy Rule 2015.3] Periodic Report [concerning the Debtors' interests in foreign entities] by April 28, 2023, and the next report was due not later than six (6) months thereafter. The Debtors have not filed any Periodic Report, the first of which is now more than eight (8) months overdue and the second of which is two (2) months overdue," *id.* at ¶ 26;

- "Because the Debtors failed to produce a person prepared and qualified to testify about the topics and the information set forth in the Subpoena, the U.S. Trustee was unable to proceed with the Court ordered [Rule 2004] Examination. This notwithstanding that the Examination was scheduled by the Rule 2004 Order to be held on November 13, 2023, and had been adjourned for more than a month due to the Debtors' failure to produce the documents that had been required by October 25. . . . The documents submitted by the Debtors in response to the Subpoena remain inadequate and fail to provide a complete, accurate, and transparent picture of the financial condition of the Debtors. The Debtors have failed to make complete production of underlying supporting documents, including, without limitation, business ledgers, including income, expense, and payroll statements; accounts payable and receivable journals; and all statements, invoices, and receipts for expenses," *id.* at ¶¶ 36-37;

- "Bankruptcy Code sections 1106 and 1107(a) require a debtor in possession to file the financial reports required by section 704(a)(8). Rule 2015(a) of the Federal Rules

of Bankruptcy Procedure also imposes these reporting requirements upon the debtor. Local Bankruptcy Rule 2015-1 requires the debtor to file a copy of the MORs on the docket.  The UST Guidelines explain the reporting requirements and were provided to and discussed with the Debtors. Nevertheless, the Debtors have not filed the MORs on a timely basis. Even more troubling, the Debtors filed MORs and amended MORs that contain inaccurate, contradictory information that demonstrates a failure of transparency with respect to their financial condition. In addition to the issues identified with the untimely and inaccurate MORs, the Debtors have simply failed to file the required Periodic Reports," *id.* at ¶ 44;

- "The Debtors have repeatedly filed untimely MORs throughout the entirety of these bankruptcy cases. Untimely filing of monthly operating reports constitutes 'cause' for dismissal or conversion under Bankruptcy Code section 112(b)(4)(F)," *id.* at ¶ 46;

- "Additionally, the MORs that have been filed have contained numerous contradictory and inconsistent entries that have necessitated multiple rounds of amendments.  Even still, the figures reported in the filed MORs do not match the financial records supplied to the U.S. Trustee pursuant to the production of documents set forth in the Subpoena.  The rolling, incomplete, and incorrect disclosures, on the docket and to the U.S. Trustee, additionally constitute cause for conversion or dismissal," *id.* at ¶ 47;

- Relatedly, simply filing the correct form on time is insufficient to comply with section 1112(b)(4)(F) when the timely filed document contains grossly erroneous material information. 'Filing a piece of paper is meaningless if the content is inaccurate, misleading, or wrong, thus the content of these documents is . . . relevant [under § 1112(b)(4)(F)],'" *id.* at ¶ 48 (*quoting In re Tucker*, 411 B.R. 530, 532 (Bankr. S.D. Ga. 2009)); and

- The Debtors' continued failure to provide complete, accurate and transparent disclosures; to comply with the provisions of the Bankruptcy Code, the Federal and Local Bankruptcy Rules, and the UST Guidelines requiring timely filing of the MORs and Periodic Reports; and the failure to comply with the Rule 2004 Order, all as set forth above, demonstrates that the Debtors are unable and unwilling to serve as a fiduciary. By failing to comply with their duty to make spontaneous, full, complete, and timely disclosure in the reporting of their financial matters, the Debtors have failed to comport with their responsibilities as fiduciaries of their estates.  Against that factual backdrop, the Debtors cannot satisfy their burden of demonstrating that the bankruptcy filings are filed and operated in good faith," *id.* at ¶ 58.

4859-4514-4572 v3

92.     The Debtors' above-described failures with respect to their MORs, other required filings, and this Court's orders support the Trustee's Objection and compel the denial of compensation to LBBS.

93.     While a granular review of LBBS' time entries is difficult due to the vagueness of the time descriptions, it appears from counsel's review of LBBS' billing that a substantial amount of time was devoted to the preparation and filing of the contradictory, inconsistent, and untimely monthly operating reports.

94.     As Debtors' counsel, LBBS "was responsible for supervising [its] client's conduct and instructing [it] to ensure compliance with the Bankruptcy Code." *In re Grasso*, 586 B.R. 110, 157 (Bankr. E.D. Pa. 2018) (citing *Zeisler & Zeisler, P.C. v. Prudential Ins. Co. of Am. (In re JLM, Inc.)*, 210 B.R. 19, 26 (2d Cir. BAP 1997) ("The debtor's attorney, while not a trustee, nevertheless is charged with the duty of counseling the debtor in possession to comply with its duties and obligations under the law."); *In re Food Management Group, LLC*, 380 B.R. 677, 708 (Bankr. S.D.N.Y. 2008) (recognizing that an attorney "cannot simply close his or her eyes to matters having an adverse legal and practical consequence for the estate and creditors").

95.     Here, the Court's findings concerning the Debtors' egregious behavior with respect to the accuracy and timely filing of its MORs justifies denial of fees to LBBS, as they demonstrate that LBBS "either negligently or willfully failed to implement sufficient client control to ensure that the Debtor complied with the Bankruptcy Rules and Code[.]" *In re Grasso*, 586 B.R. at 157 (quoting *In re Zagara's Fresh Markets, LLC*, 2006 WL 4452980, *3 (Bankr. D.N.J. Apr. 13, 2006) (recognizing the obligation of the debtor's attorney "to supervise clients' conduct for compliance with the Bankruptcy Code" and "instruct the debtor on the appropriate conduct and must develop client control"); *In re Berg*, 268 B.R. 250, 262 (Bankr. D. Mont. 2001) (recognizing that debtor's

attorney "must instruct the debtor on appropriate conduct and must develop client control"); *In re Whitney Place Partners*, 147 B.R. 619, 620-21 (Bankr. N.D. Ga. 1992) ("[T]he debtor's attorney must take conceptual control of the case and provide guidance for management of the debtor, not only to discern what measures are necessary to achieve a successful reorganization, but to assure that, in so doing, compliance with the Bankruptcy Code and Rules is sought rather than avoided.").

96.    The above-described gamesmanship and utter disregard of the Rules and this Court's Orders demonstrate misconduct so extensive as to preclude mere negligence; the Debtors' failures while under LBBS's active stewardship could have been nothing but intentional and warrants denial of LBBS's fee application in its entirety.  *See In re Grasso*, 586 B.R. at 145 (denying fee application of Chapter 11 debtor's attorney fee due to his failure to provide competent legal representation to debtor in bankruptcy case, which rendered his services valueless to the estate); *In re APW Enclosure Sys., Inc.*, No. 06-11378(MFW), 2007 WL 3112414, at *4 (Bankr. D. Del. Oct. 23, 2007) ("Courts have consistently reduced attorneys' fees for failure to meet the quality of representation expected of competent counsel.").

97.    Additionally, with respect to the reasonableness of the fees sought considering circumstances which caused this Court to appoint the Trustee, LBBS, within less than a year:

- Billed over 2,200 hours ($1,013,820.00) on "Litigation" and over 650 hours ($440,746.50) on "Other Contested Matters" – two (2) categories that, by LBBS's own definitions, are nearly identical and often overlap (D.I. # 723 at 6-12);

- Billed nearly 200 hours ($79,495.00) on "Employment/ Fee Applications" alone (D.I. # 723 at 6); and

- Billed nearly 200 hours ($134,860.50) on "Financing/Cash Collections" (D.I. # 723 at 6).

98.     The Debtors' estates should not bear the cost of overstaffing and excessive billing.
*See In re Green Valley Beer*, 281 B.R. 253, 258 (Bankr. W.D. Pa. 2002); see also Jan Ostrovsky,

Doin' Time . . . And Getting Paid for It: A Report on the Enron Fee Examination Process, 25-1

AM. BANKR. INST. J. 32 (2006) (fee committee concluded proper staffing of a case is key in

determining reasonableness of fees).

99.     Similarly, a fee applicant's bills must be clear for a court to comply with its duties

under § 330 to closely examine an application submitted for approval.

100.     In the instant case, many of LBBS' time entries are vague, which prevents a

meaningful analysis by the Court. *In re Burival*, 2009 Bankr. LEXIS 2203, at *6 (Bankr. D. Neb.

July 21, 2009) ("Vague fee applications that 'camouflage' the amount of time spent on each task

and hinder the court's scrutiny of the reasonableness of the time expended can lead to reduced fee

awards.").

101.     While a granular review of LBBS's time entries is difficult due to the vagueness of

the time descriptions, it appears from counsel's review of LBBS's billing that a substantial amount

of time was devoted to tasks that did not provide a benefit to the Debtors' estates.

102.     Given the above challenges, LBBS's fee requests should be denied in their entirety,

or drastically reduced.

**V.    <u>RESERVATION OF RIGHTS</u>**

103.     The Trustee reserves the right to supplement and/or amend this Objection on any

grounds based upon information discovered from the Debtors, LBBS, VSI, or any other source.

VI.      **CONCLUSION**

WHEREFORE, the Trustee requests that this Court enter an order in the form attached

denying LBBS's Sixth Request for Payment and its Final Fee Application and providing such other

and further relief as the court deems just and equitable.

Respectfully submitted,

Dated: November 18, 2024                 By: */s/ Steven M. Coren*
                                         Steven M. Coren, Esquire
                                         COREN & RESS, P.C.
                                         Two Commerce Square, Suite 3900
                                         2001 Market Street
                                         Philadelphia, PA 19103
                                         Telephone: (215) 735-8700

                                              and

                                         By: */s/ Michael D. Vagnoni*
                                         Michael D. Vagnoni, Esquire
                                         Edmond M. George, Esquire
                                         OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                                         Centre Square West
                                         1500 Market Street, Suite 3400
                                         Philadelphia, PA 19102
                                         Telephone: (215) 665-3066

                                         *Counsel to the Trustee*

4859-4514-4572 v3

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| **Stream TV Networks, Inc.**, *et al.* | : Bankruptcy No. 23-10763 (AMC) |
| | : |
| Debtors. | : (Jointly Administered)[1] |
| | : |

**ORDER SUSTAINING OBJECTION OF WILLIAM A. HOMONY, CHAPTER 11
TRUSTEE, TO THE SIXTH REQUEST FOR PAYMENT ON ACCOUNT FOR
COMPENSATION AND REIMBURSEMENT OF EXPENSES OF LEWIS BRISBOIS
BISGAARD & SMITH LLP, FOR THE PERIODS DECEMBER 1, 2023, THROUGH
DECEMBER 31, 2023, AND JANUARY 1, 2024, THROUGH JANUARY 15, 2024, AND
THE FINAL APPLICATION OF LBBS FOR ALLOWANCE AND PAYMENT OF
COMPENSATION AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD
FROM MARCH 15, 2023, THROUGH JANUARY 15, 2024**

**AND NOW**, upon consideration of the Sixth Request for Payment on Account for Compensation and Reimbursement of Expenses of Lewis Brisbois Bisgaard & Smith LLP, ("LBBS"), for the Periods December 1, 2023 through December 31, 2023 and January 1, 2024 through January 15, 2024 (D.I. #722) and the Final Application of LBBS for Allowance and Payment of Compensation and Reimbursement of Expenses for the Period from March 15, 2023 through January 15, 2024 (D.I. #723) (collectively, the "Final Fee Application"), and the objection of William A. Homony, in his capacity as Chapter 11 Trustee (the "Trustee") of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative", or collectively with Stream the "Debtors") (the "Objection")[2], it is hereby:

**ORDERED, ADJUDGED AND DECREED THAT:**

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.* Case No. 23-10764 (AMC) (D.I. #81).

[2] Capitalized terms used herein, but not otherwise defined, take on the same meaning here as given in the Objection.

4859-4514-4572 v3

**1.**      The Objection is **SUSTAINED**.

**2.**      The Final Fee Application is **DENIED.**

**3.**      LBBS is **DENIED** compensation and the reimbursement of expenses.

Dated: _____

_____

Ashely M. Chan,
Chief Bankruptcy Judge

4859-4514-4572 v3