## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al*.[1] | Bankr. Case No. 23-10763 (AMC) |
| The Debtors. | (Jointly Administered) |

## VISUAL SEMICONDUCTOR, INC.'S OBJECTION TO MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR AN ORDER APPROVING (A) THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO AND (C) GRANTING RELATED RELIEF

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

78828072;4

# <u>TABLE OF CONTENTS</u>

I.    PRELIMINARY STATEMENT ...................................................................................... 1

II.   BACKGROUND ......................................................................................................... 10

    A.   Procedural History Relevant to This Motion ...................................................... 10

    B.   Bidding Procedures ............................................................................................ 12

III.  ARGUMENT .............................................................................................................. 14

    A.   SeeCubic is an Inappropriate Purchaser, Based on, Among Other Things,
Its Continued Conduct Throughout These Bankruptcy Cases .............................. 14

    B.   The Solicitation and Due Diligence Materials Offered by the Trustee and
SSG are Misleading and Woefully Inadequate ..................................................... 16

    C.   The Trustee may not sell the Debtors' property unless that property
constitutes property of the Debtors' estates and, before approving a sale, the
Court must first determine whether such property constitutes property of the
estates. ................................................................................................................. 22

    D.   The 9019 Agreement and Sale Motion taken together constitute an improper
*sub rosa* plan of reorganization that cannot be approved by this Court. .............. 24

    E.   The Proposed Sale Process is Neither Fair nor Reasonable and is Subject to
a Heightened Scrutiny Standard ........................................................................... 27

    F.   There Should Be No Finding of Good Faith as to the Insider Stalking Horse
Bidder ................................................................................................................... 29

IV.   RESERVATION OF RIGHTS ..................................................................................... 30

V.    CONCLUSION ........................................................................................................... 30

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Conine (In re Robertson)*,
203 F.3d 855 (5th Cir. 2000) ..................................................................................20

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re
Papercraft Corp.)*,
211 B.R. 813 (W.D. Pa. 1997), aff'd, 160 F.3d 982 (3d Cir. 1998) ..............................1, 10, 25

*Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*,
415 B.R. 86 (Bankr. D. Del. 2009) ...........................................................................25

*Darby v. Zimmerman (In re Popp)*,
323 B.R. 260 (B.A.P. 9th Cir.2005)...........................................................................20

*of the Debtor's Assets Including Approval of the Provisions for Designation of a Stalking Horse,
(B) Establishing the Notice Procedures and Approving the Form and Manner of Notice
Thereof* ..............................................................................................................10

*Energy Future Holdings Corp. v. Del. Tr. Co.*,
648 F. App'x 277 (3d Cir. 2016) ..............................................................................22

*First Fid. Bank v. McAteer*,
985 F.2d 114 (3d Cir. 1993)....................................................................................19

*Fresh Prepared Foods, Inc. v. Farm Ridge Foods LLC*,
2013 WL 4804816 (D.N.J. Sept. 9, 2013) .................................................................21

*In re Abbotts Dairies of Pa., Inc.*,
788 F.2d 143 (3d Cir. 1986)................................................................................24, 27

*In re Aloha Airlines, Inc.*,
2009 WL 1371950 (Bankr. D. Hawaii 2009) ...............................................................4

*In re Bidermann Indus. U.S.A.*,
203 B.R. 547 (Bankr. S.D.N.Y. 1997).......................................................................26

*In re Blixseth*,
No. 09-60452, 2010 Bankr. LEXIS 585 (Bankr. D. Mont. Feb. 23, 2010) ..........................26

*In re Braniff Airways, Inc.*,
700 F.2d 935 (5th Cir. 1983) .............................................................................22, 23

*In re Coburn*,
250 B.R. 401 (Bankr. M.D. Fla. 1999) ......................................................................20

*In re Crowthers McCall Pattern, Inc.*,
114 B.R. 877 (Bankr. S.D.N.Y. 1990) ...................................................................23

*In re Fisker Automotive Holdings, Inc.*,
510 B.R. ................................................................................................................4

*In re The Free-Lance Star Publishing Co*.,
2014 WL 2505627 (Bankr. E.D. Va. 2014) .............................................................4

*In re Innkeepers USA Trust*,
442 B.R. 227 (Bankr. S.D.N.Y. 2010) ...................................................................26

*In re Interiors of Yesterday, LLC*,
Case No. 02-30356 (LMW), 2007 WL 419646 (Bankr. D. Conn. Feb. 2, 2007)...................21

*In re Summit Global Logistics, Inc.*,
2008 Bankr. LEXIS 896 (Bankr. D.N.J. Mar. 26, 2008) ......................................26

*In re Univ. Heights Ass'n*,
2007 Bankr. LEXIS 1200 (Bankr. N.D.N.Y. Jan. 22, 2007) .................................26

*In re Westpoint Stevens Inc.*,
333 B.R. 30 (S.D.N.Y. 2005)................................................................................24

*In re Whitehall Jewelers Holdings, Inc.*,
Case No. 08-11261 (KG), 2008 WL 2951974 (Bankr. D. Del. July 28, 2008) ................20, 21

*In re Worcester Country Club Acres, LLC*,
655 B.R. 41 (Bankr. D. Mass. 2023) ....................................................................20

*Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*,
780 F.2d 1223 (5th Cir. 1986) ..............................................................................24

*Jones v. GE Capital Mortgage Co. (In re Jones)*,
179 B.R. 450 (Bankr. E.D. Pa. 1995) ...................................................................19

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
139 S. Ct. 1652, 203 L. Ed. 2d 876 (2019) ...........................................................20

*Moldo v. Clark (In re Clark)*,
266 B.R. 163 (9th Cir. B.A.P. 2001).....................................................................20

*Moody v. Amoco Oil Co.*,
734 F.2d 1200 (7th Cir. 1984), cert denied, 469 U.S. 982 (1984)..........................19

78828072;4

*Motorola Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan Chase (In re Iridium Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007) ............................................................................22, 24

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey (In re Cajun Elec. Power Coop.)*,
    119 F.3d 349 (5th Cir. 1997) .............................................................................23

*In re NJ Affordable Homes Corp.*,
    No. 05-60442 (DHS), 2006 WL 2128624 (Bankr. D.N.J. June 29, 2006) ...............................4

*Ross v. A V Car & Home, LLC (In re Brown)*,
    Case No. 16-00466, A.P. No. 18-10026, 2019 Bankr. LEXIS 286, 2019 WL 413625 (Bankr. D.C. Jan. 30, 2019) ...............................................................................21

*SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)*,
    2008 WL 2498048(3d Cir. June 24, 2008) ...........................................................20

*Warnick v. Yassian (In re Rodeo Canon Dev. Corp.)*,
    362 F.3d 603 (9th Cir. 2004), withdrawn and modified by 126 Fed. App'x 353 (9th Cir. 2005)
    ....................................................................................................21

## Statutes

11 U.S.C.S. § 363(b) ........................................................................20, 21, 22, 24

11 U.S.C. 363(k) .......................................................................................4

Chapter 11 of Title 11 of the United States Code ................................................ passim

§ 363 of the Bankruptcy Code ..................................................................2, 21, 24, 27

§ 363(m) of the Bankruptcy Code ....................................................................27, 28

## Rules

Fed. R. Bankr. P. 9019(a) ............................................................................22

Local Rule of Bankruptcy Procedure 5070-1(g).......................................................1, 10

iv

Visual Semiconductor, Inc. ("VSI") hereby files its objection (the "Objection") to the *Motion for (I) an Order (A) Approving Bidding Procedures and Form Asset Purchase Agreement for the Sale of Substantially all of the Debtor's Assets Including Approval of the Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and scheduling and Auction, (C) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (D) Scheduling a Sale Hearing, and (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(g); and (F) Granting Related Relief and (II) an Order Approving (A) the Sale of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief* [ECF No. 750] (the "Sale Motion") filed by the Court-appointed chapter 11 trustee (the "Trustee").

Contemporaneously herewith, VSI has filed, and incorporates by reference, the *Declaration of Charles M. Robertson in Support of Visual Semiconductor, Inc.'s Objection to Motion of William A. Homony in His Capacity as Chapter 11 Trustee for an Order Approving (A) the Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief* and all exhibits and attachments thereto (the "Robertson Declaration").

## I.    PRELIMINARY STATEMENT

1.    VSI has been vocal throughout these cases in its opposition to the conduct of the Trustee as well as the Hawk Parties (as defined below) and hopes that this Court has not become desensitized to the points that VSI has repeatedly attempted to make – particularly after being denied the ability to make a proper evidentiary record.

2.      This sale, and the underlying sale process is legally impermissible and has been nefariously orchestrated to provide outsized returns for the benefit of one creditor over all others. This sale should not be entertained – and it certainly should not be approved.

3.      On June 7, 2024, this Court entered an order approving the Trustee's Settlement (the "9019 Agreement") with Hawk Investment Holdings, Ltd. ("Hawk"), in its capacity as Collateral Agent for the secured noteholders of SeeCubic, Inc. ("SeeCubic"), SLS Holdings VI, LLC ("SLS"), and various individuals who received releases, including Arthur Leonard, Robert Morton, Shadron L. Stastney ("Stastney"), Alastair Crawford, Asaf Gola, Kevin Gollop, Patrick Miles, Patric Theune, and Krzysztof Kabacinski (collectively, the "Hawk Parties"). Among other things, the 9019 Agreement outlined the terms of a sale of the Debtors' assets under section 363 of the Bankruptcy Code ("363 Sale") [ECF No. 653].

4.      Nearly four months later, on September 30, 2024, the Trustee filed the Sale Motion. The process contemplated by the Sale Motion disproportionately benefits the Hawk Parties at the expense of all other stakeholders.

5.      As anticipated, the sales process produced no bids beyond that of SeeCubic as proposed stalking horse bidder. In fact, according to testimony at the November 13, 2024 hearing, no other party has expressed any interest whatsoever. Indeed, as the Court heard from the Trustee and his advisors at the November 13th hearing, after the Trustee's marketing efforts, no prospective bidder was sufficiently interested in the Debtors' assets to sign a simple NDA to access the sale data room. Only VSI signed an NDA, but the Trustee's investment banker did not even bother sending VSI the teaser used to market the Debtors' assets.   Given the glaring issues and legal defects regarding the sale, the likelihood of VSI placing a bid is practically non-existent, and no other party can reasonably be expected to submit a bid under the circumstances. The Trustee has

failed to properly assess or disclose what is being sold and does not even know what he is actually

selling. In contravention of his duties to inventory and marshal the estates' assets, the Trustee

refused to recover millions of dollars in the Debtors' property from the Hawk Parties or wrest

control of high-value assets from SeeCubic, Inc. and its principal, Mr. Shadron Stastney.

Meanwhile, the Trustee willfully ignores the conduct and conflicts of interest presented by Mr.

Stastney occupying both sides of the Trustee's purported "363 sale" transaction – actively

controlling SeeCubic, B.V. and its assets (as sole director) while serving as "stalking horse bidder"

for assets already in his possession, custody, or control. Even if a third party were to purchase the

assets, the Trustee has failed to obtain any assurance that the Hawk Parties will relinquish the

Debtors' property or cease their unauthorized use of the Debtors' intellectual property. In open

defiance of multiple court orders, the Hawk Parties have refused to turn over the Debtors' assets

for years, further undermining the viability of the sale.

6.      As proposed by the Trustee, this sale contravenes the fundamental principles of

fairness and equity that govern the bankruptcy process. The motion distorts the competitive

bidding landscape and betrays the fiduciary's duty to maximize value for the Debtors' estates as a

whole. The Bankruptcy Code mandates that all creditors be treated fairly and equitably. Yet, the

proposed Sale Motion results in the Debtors' assets being unjustly distributed to the Hawk Parties,

in blatant contravention of the primary goal of maximizing recoveries for all creditors.

7.      The Trustee chose "the Secured Creditors," *a.k.a.,* the Hawk Parties, as the

proposed stalking horse bidder and acquiesced to allowing their claim of $180 million (Sale

Motion ⸮ 30(I)(a)), $150 million to be used as a credit bid (Sale Motion ⸮ 30(I)(b)), despite the

dubious nature and amount of the Hawk Parties' claims and the Trustee's failure to investigate the

conversion of the Hawk Parties' notes pursuant to a debt-to-equity conversion agreement the Trustee was well aware of.

8.      The Trustee attempts to legitimize his treatment of the Secured Creditors claim by categorizing $30 million as "subordinated."  Had the Trustee properly investigated the conversion of the Hawk Parties' notes, he would have to acknowledge that he did not subordinate part of their claim, but in fact prioritized some and granted a super-priority to most of what should be substantially, if not entirely, appropriately labelled an "equity interest".

9.      VSI has repeatedly emphasized that allowing such credit bid was inappropriate on its face. The insider stalking horse bidder should not have been permitted to credit bid given the facts and circumstances of these cases and the disputes surrounding the legitimacy of its claims. This is wholly inequitable to legitimate creditors and constitutes "cause" to deny credit bidding rights. Additionally, in these Chapter 11 cases, the credit bid also inevitably chilled bidding, rather than providing any value to the estates, which Courts have found to be cause enough to deny the right to credit bid.[2]

10.     If for no other reason, the Trustee's dubious arrangement with the Hawk Parties is deeply disturbing based solely on the identity and questionable business backgrounds of their principals.  The Hawk Parties and proposed stalking horse bidder in these cases consist of two entities: (i) Hawk Investment, Ltd., the primary principal of which is Robert Morton, and (ii)

---

[2] Whether cause exists to allow for a credit bid under 11 U.S.C. 363(k) is a determination to be made on a case-by-case basis. *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006). Courts have also denied credit bids for cause where there is inequitable conduct harming the debtor or its estate. *See In re Aloha Airlines, Inc.*, 2009 WL 1371950 (Bankr. D. Hawaii 2009) (denying right to credit bid where creditor had engaged in inequitable conduct harming the debtor); *In re The Free-Lance Star Publishing Co.*, 2014 WL 2505627 at *7 (Bankr. E.D. Va. 2014) (denying secured lender the right to credit bid because it leveraged its position as a secured lender to acquire additional collateral prior to the bankruptcy filing for the purpose of purchasing assets with credit in a bankruptcy case). Courts have found cause to deny credit bidding when a sufficient dispute exists regarding the validity of the claim forming the basis for the credit bid. *In re Fisker Automotive Holdings, Inc.*, 510 B.R. at 61 ("The law leaves no doubt that the holder of a lien the validity of which has not been determined, as here, may not bid its lien.").

78828072;4

SeeCubic, Inc., whose primary principal is Shadron Stastney. Robert Morton, was the subject of an English Cold Shoulder Order issued by the United Kingdom's Financial Conduct Authority (FCA) for especially egregious conduct involving securities. In fact, only 13 Cold Shoulder Orders have ever been entered by the FCA. Under the Cold Shoulder, Robert Morton was prohibited from working with investment bankers or soliciting investments between December 21, 2016 through December 21 2022. For his part, Shadron Stastney was sanctioned by the United States Securities and Exchange Commission for Breach of Fiduciary Duty related to an undisclosed insider transaction[3]. Mr. Stastney was the subject of a cease and desist and sanctions order imposing nearly $3 millon in disgorgement, prejudgment interest, and civil penalties. He was also "barred from association with any investment adviser, broker, dealer, municipal securities dealer, or transfer agent, and (ii) prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter, with the right to apply for reentry after eighteen (18) months." (see www.sec.gov/files/litigation/admin/2013/ia-3671.pdf). Throughout the pendency of these cases, representatives for Mr. Morton's Hawk Investments, Mr. Stastney's SeeCubic, Inc., and the Trustee have gone to great lengths to impugn the integrity of VSI and its principal, Mr. Mathu Rajan, but it is important to note that only two (2) individuals associated with this matter have been sanctioned by their nations' leading financial regulatory authorities – and both are the leaders of the stalking

---

[3] The SEC found that "Stastney willfully violated Section 206(2) of the Advisers Act which provides that it is unlawful for an investment adviser to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client.'" The SEC further found that "Stastney willfully violated Section 206(3) of the Advisers Act which provides that it is unlawful for an investment adviser, 'acting as principal for his own account, knowingly to sell any security to or purchase any security from a client . . . without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction.'"

horse bidders with whom this Trustee is fully committed to serving through this "sub-rosa plan" sale.

11.     Beyond Mr. Morton's past, the Hawk Parties' involvement with the Debtors has been egregiously improper and ultimately detrimental to the Debtors' businesses. As detailed in *VSI's Limited Objection of VSI to the Application of the Chapter 11 Trustee to Employ SSG Advisors, LLC as Investment Banker* [ECF No. 717] ("VSI's Objection to Retention of SSG"), the Hawk Parties, including Mr. Morton, have a long history of improperly exercising control over the Debtors' property. Indeed, to this day, the Hawk Parties are using and possessing the Debtors' property contrary to this and other courts' orders, including but not limited to the Partial Final Judgment issued by the Delaware Chancery Court on August 10, 2022. Among other things, Mr. Stastney (i) seized control of Silicon Valley servers, (ii) misappropriated the SeeCubic trademark, (iii) misappropriated and did not return Stream business laptops, (iv) papered the theft of the bonding machine, and (v) took display units in order to raise investment funds to pay the $7.5 million cash price at the proposed 363 sale. *Robertson Declaration* ¶¶ 7, 15, 23-33, 58-60.

12.     Mr. Stastney has repeatedly exercised self-help with regard to the Debtors' assets despite having no valid legal position and/or in flagrant disregard to orders of various courts. His actions include, but are not limited to, (i) seizing control of Stream's Silicon Valley servers by misrepresenting Stream's foreclosure status; (ii) misappropriating the SeeCubic trademark and attempting to register it in the name of SeeCubic during the pendency of these Bankruptcy Cases, filing a fraudulent document with the U.S. Patent and Trademark Office; (iii) failing to return Stream's business and content creation laptops; (iv) papering the theft of the bonding machine; (v) misappropriating Stream's technology and customer relationships to develop "28 projects across 25 customers" for the benefit of SeeCubic; and (vi) commissioning the creation of 3D

technology samples and using them to raise investment funds to pay the $7.5 million carve-out required for the 363 sale.

13.    The circumstances are made all the more troubling by the Trustee's apparent disregard for this contemptuous behavior. In fact, the Trustee has repeatedly turned a blind eye to the Hawk Parties' conduct, even when such conduct materially damages the Debtors' estates. The Trustee (i) failed to regain control from the Hawk Parties (or apparently even attempted to regain control) of millions of dollars of the Debtors' property; (ii) ignored and failed to enforce the temporary restraining order issued by this court (the "Bankruptcy TRO"); and (iii) hired SSG Advisors, LLC ("SSG"), the investment bankers previously retained by the Hawk Parties in 2022 to sell the Debtors' assets out from under the Debtors for the benefit of the Hawk Parties, a sale that was stopped only by temporary restraining and status quo orders issued by the Delaware Court of Chancery.

14.    These acts and omissions demonstrate a pattern and practice of misconduct and negligence which combine with a final flagrant offense: the proposed sale purports to sell the Debtors' assets on an "as-is, where-is" basis.  But it is clear from the record that neither the Trustee nor his agents actually know what the Debtors' assets are, let alone how those assets work or may be encumbered.  *See* 6/5/2024 Hearing Transcript 70:9-78:21. And based upon the record made at the November 13th hearing, it is safe to say that the Trustee does not know (i) where a significant portion of the Debtors' assets are located, (ii) which of the Debtors' trade secrets the Hawk Parties have misappropriated, (iii) if the Hawk Parties will turn over the Debtors' property to a successful bidder other than the stalking horse, and (iv) if the Hawk Parties will stop using the trade secrets once a sale to a third-party has been completed. There is no reason to believe that the Hawk Parties will stop pursuing mindless litigation even after a sale process has been completed. Put simply,

under these conditions, why would any third-party participate in this process and bid hundreds of millions of dollars for assets that the Trustee neither understands nor is capable of delivering free and clear of claims or encumbrances?

15.     The Trustee has abrogated his duty and failed to deploy reasonable efforts to execute his mandate of managing the Debtors' estates in a way that maximizes the recovery to creditors while ensuring a fair and transparent process. VSI has emphasized repeatedly that it knows where to locate the Debtors' missing property and has repeatedly offered to assist the Trustee in doing so through cooperative talks and then, by necessity, motion practice and discovery.  The Trustee refused to meaningfully cooperate, and even sought sanctions against VSI by using fraudulent documents.  VSI tried multiple times to seek simple discovery regarding those documents and the Trustee's ability to properly sell the Debtors' assets, only to be rejected by this Court.

16.     Further, notwithstanding representations made on the record at the November 13th hearing, the data room compiled by the Trustee and SSG to satisfy the due diligence of potential bidders in the proposed 363 Sale is woefully incomplete, and SSG solicitation materials are misleading at best. This lack of meaningful documentation provided by SSG and the Trustee on behalf of the Debtors' estates does not and cannot instill confidence in bidders expected to offer a minimum of $120 million in cash for estate assets; there is: (i) only a single strategic partner agreement furnished despite there being other strategic partners relevant to the sale; (ii) no information about specific customers, (iii) little information regarding third-party technologies which underlay or are embedded in the Debtors' technology, and (iv) no information regarding legal action outside the bankruptcy that is not settled by the 9019 Agreement [ECF Nos. 630, 653] that may well impact the assets' ultimate value.

17.     At the Bidding Procedures Hearing (defined below), the Court instructed the Trustee to prepare detailed schedules specifically enumerating and describing the assets to be sold. On November 14, 2024, the Trustee provided the amended Schedules (defined below) to VSI and Rembrandt, to whom the Court had instructed to include footnotes flagging their concerns. VSI and Rembrandt responded accordingly, and the Trustee filed the amended Schedules with footnotes on November 19, 2024. *See* Schedules footnotes 1-18. [ECF No. 810].  Among other things, VSI noted the following shortcomings to the Schedules:

- Section 3 adds no clarification whatsoever to the assets being sold. "Identified and unidentified" is a catchall term that defines nothing, particularly as it includes "unidentified" assets that are "identified" in the Stalking Horse Purchase Agreement. Further, the Stalking Horse Purchase Agreement includes a broad disclaimer that assets are "being sold on an "as is/where is" basis with **no warranty or guaranty of possession…"** Ultimately, there is no guarantee that any asset will actually be delivered to the buyer.

- Sections 1-3 identify assets of Stream or Technovative to be sold. There is no mention of Stream owned business equipment, which includes high-end content creation laptop computers and business laptop computers previously used by Stream's executive vice president, its VP of Finance, and its executive assistants. All business equipment was surrendered to the Stalking Horse pursuant to an improvident injunction and never returned. Likewise, there is no mention of Stream-owned computer servers in Silicon Valley and the computer source code stored on them.

- There is no mention of the Debtors' website domains, under which it has conducted business and built industry recognition. Domains that should be included for sale include: streamtvnetworks.com, streamtvinternational.com, streamtvinternational.nl, streamtvinternational.eu, stvi.eu, ultra-d.com, and seecubic.com, (all such domains were the property of the Debtors prior to the improvident injunction which wrongly conferred them to the Stalking Horse, which still uses some of them to claim ownership of the Debtors' Ultra-D technology.

*See Schedules* Pages 2-3.  Most importantly, the Court's instructions to have VSI and Rembrandt annotate and provide footnotes to the Trustee's last minute "listing of assets for sale from the StreamTV and Technovative" estates did nothing to remedy the profound defects and paucity of information in the Trustee's proposed APA, list of assets for sale, or the data room.

18.    As discussed below, the 9019 Agreement and Sale Motion taken together constitute an improper *sub rosa* plan of reorganization that cannot be approved by this Court. The sale process contemplated in the Sale Motion is neither fair nor reasonable and is fatally flawed in numerous ways. In the interest of justice, adherence to statutory text, and observation of common law principles, the Court should deny the Sale Motion.

## II.    BACKGROUND

### A.    Procedural History Relevant to This Motion

19.    On March 15, 2023 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On January 9, 2024, the Bankruptcy Court entered an order appointing the Trustee.

20.    On May 30, 2024, the Trustee filed a Motion for Turnover of Property and Entry of an Order Enforcing the Automatic Stay as against VSI [ECF No. 647] (the "Motion for Turnover").

21.    On June 6, 2024, this Court entered an order approving the 9019 Agreement between the Trustee and the Hawk Parties, which included, amongst others, the following deal terms:

- Hawk received a $180 million claim, $150 million of which was categorized as "secured" and eligible for credit bidding in a sale of the Debtors' assets;

- A $7.5 million carve out to pay administrative and general unsecured creditors;

- The Trustee will make SeeCubic the proposed stalking horse in a 363 Sale of the Debtors' assets;

- Qualified bids in the sale process must include a minimum $120 million cash component; and

- If a bid is accepted over the stalking horse bid, only 10% of that overbid goes to administrative or unsecured creditors until the Hawk Parties' asserted $180 million claim is paid in full.

22.     The 9019 Agreement all but guaranteed that unsecured creditors and perhaps even administrative expenses receive only a pittance, granting a dubious equity claim and a super-priority vis-à-vis all other creditors.

23.     On June 16, 2024, Akerman LLP filed a Notice of Appearance as counsel for VSI and promptly filed an Objection to the Motion for Turnover [ECF No. 672] (the "Objection to Turnover") and a Motion to Reconsider the order granting the 9019 Agreement [ECF No. 686] (the "Motion to Reconsider"). The Motion to Reconsider was filed for multiple reasons, but chief among them was that the 9019 Agreement did not contain a fiduciary out and VSI strongly believed it (or a third-party) could provide the Debtors with a much better offer.

24.     On July 26, 2024, VSI filed and served a Notice of Deposition Duces Tecum on the Trustee concerning the issues raised in the Objection to Turnover and Motion to Reconsider (the "Original Discovery Requests").  Based upon its strong but ultimately unsupported allegations regarding "VSI's conduct," it appears that the Motion for Turnover was originally intended as an offensive litigation cudgel against VSI in retaliation for identifying the Hawk Parties' TRO violations and the Trustee's inaction with respect to the same. Among other things, the Original Discovery Requests sought information regarding exhibits to the Trustee's Motion for Turnover that were clearly altered and representations that were demonstrably false and misleading.  Rather than account for the altered exhibit documents and misleading statements in his Motion for Turnover, the Trustee moved to quash the Original Discovery Requests, sought entry of a protective order, and moved to withdraw the offensive Motion for Turnover without prejudice [see ECF No. 724].  On September 30, 2024, this Court entered the *Order Granting Motion to Withdraw Turnover Action* [ECF No. 776]. The same day, this Court entered the *Order Granting Motion to Quash* [ECF No. 777].  More recently, at the hearing on November 14, 2024, this Court entered

11

an order [ECF No. 805] denying the reconsideration motion and granting the motion to quash remaining discovery, including discovery relating to the sale process. Effectively, taken together, these orders have completely denied VSI any form of discovery, including with respect to the sale process.

25.     In furtherance of the sale actions contemplated by the 9019 Agreement, on August 14, 2024, the Trustee filed an Application to Employ SSG as the investment banker to market the Debtors' assets on behalf of the Trustee purportedly for the benefit of the Debtors' estates [ECF No. 715] (the "SSG Application").

26.     The Trustee's decision to hire SSG was (and is) questionable. SSG was previously hired by the Hawk Parties in furtherance of contemptuous conduct whereby the Hawk Parties, prior to the Petition Date, attempted to unlawfully retain and sell the Debtors' assets for the Hawk Parties' exclusive benefit and to the Debtors' direct detriment. These actions are detailed in VSI's Objection to Retention of SSG and are incorporated herein by reference. It is fairly safe to assume that selecting the Hawk Parties/SeeCubic as the proposed stalking horse bidder and then hiring its former investment banker to market the assets chills bidding. Any other bidder, including third parties as well as VSI and its investors, would reasonably view the sale process as being orchestrated to assure that only the proposed stalking horse bidder will prevail.

27.     On August 27, 2024, VSI amended its Original Discovery Requests to include discovery concerning the issues raised in VSI's Objection to Retention of SSG.

**B.     Bidding Procedures**

28.     On November 13, 2024, a hearing was head on bidding procedures contained in the *Motion for (I) an Order (A) Approving Bidding Procedures and Form Asset Purchase Agreement for the Sale of Substantially all of the Debtor's Assets Including Approval of the Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form*

*and Manner of Notice Thereof and scheduling and Auction, (C) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (D) Scheduling a Sale Hearing, and (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(g); and (F) Granting Related Relief and (II) an Order Approving (A) the Sale of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief* [ECF No. 750] (the "Bidding Procedures Hearing").

29.     At the close of the Bidding Procedures Hearing, this Court rejected the Trustee's proposed timeline, acknowledging the dearth of information that any potential bidder would need to make an informed decision: "so the bid deadline right now you're suggesting is the 18th, but that's in like five days and we don't even have the schedules. We don't have them. . . . but you know, we should still put it out there for at least a couple weeks to see if you're going to generate any  bids, okay." *See Transcript of Bidding Procedures Hearing* 79:2-9. At such hearing, this Court also instructed objecting parties to prepare fulsome objections by November 22, 2024.

30.     On November 19, 2024 the Debtors filed their revised bidding procedures order [ECF No. 809] (the "Proposed Bidding Procedures Order").  In addition, pursuant to this Court's instructions, the Trustee filed the support document asset list of schedules to the asset purchase agreement [ECF No. 810] (the "Schedules"). The Schedules, as discussed above, contained footnotes contributed by VSI and Rembrandt, which commented on the missing/inaccurate information contained therein and concerns related thereto.

13

## III.   <u>ARGUMENT</u>

**A.    SeeCubic is an Inappropriate Purchaser, Based on, Among Other Things, Its Continued Conduct Throughout These Bankruptcy Cases**

31.     As an initial matter, the proposed Sale Process is biased and inherently flawed based exclusively on the facts of this case. The history of the Hawk Parties' interference with the Debtors' property is convoluted, complicated, and several years in the making, and VSI incorporates the facts contained in its previously filed objection to the Bidding Procedures Motion herein.

32.     VSI has emphasized continuously, but feels the need to do so again, SeeCubic's relationship with the Hawk Parties. The Hawk Parties consists of SLS Holdings VI, LLC, SeeCubic, Inc., Shadron L. Stastney, and Arthur Leonard Robert "Bob" Morton.  As such, when VSI references bad acts undertaken by the Hawk Parties, these acts were also committed by SeeCubic, Inc., the Trustee's proposed stalking horse bidder. *Robertson Declaration* ¶¶ 9, 31, 33, 35, 38, 55.

33.     In short, SeeCubic, as a repeat bad-actor in these Chapter 11 Cases, is clearly an inappropriate choice for a stalking horse bidder.

34.     On January 4, 2024, this Court issued the Bankruptcy TRO, enjoining the Hawk Parties from using Stream's technology for **any purpose**, including but not limited to raising money for the Hawk Parties' use. *See* ECF No. 119, Adv. Case No. 23-00057. This injunction has been extended several times, most recently through December 9, 2024. See ECF No. 152, Adv. Case No. 23-00057.

35.     Despite all the hearings, admonishments, directives, and orders from the Delaware Supreme Court, the Delaware Chancery Court, and this Bankruptcy Court, the Hawk Parties (again, including SeeCubic) returned nothing of real significance (including without limitation, the

bonding equipment, lenses, and technology demonstrators, and associated intellectual property) to the Debtors. *Robertson Declaration* ¶¶ 7, 15, 23-33, 58-60, 70.

36.    The Hawk Parties (including SeeCubic), have repeatedly violated the Bankruptcy TRO and have produced nothing to show that the Debtors' Assets have been preserved or returned. In addition to the enumerated violations contained in VSI's objection to the Bidding Procedures Motion, the Robertson Declaration contains additional examples of these flagrant violations. *Robertson Declaration* ¶¶ 64-70, 107.

37.    The ongoing violations by the Hawk Parties continue to damage the Debtor's estates and all parties in interest by (i) poaching investors from the Debtors for their own benefit, (ii) poaching customers from the Debtors for their own benefit, (iii) putting the irreplaceable Philips license at risk since the Debtor, not the Hawk Parties, is the Philips licensee, and (iv) creating additional exposure for damages claims by Rembrandt, who have recently filed a new claim against Technovative in this bankruptcy case. *Robertson Declaration* ¶¶ 7, 15, 23-33, 58-60, 70.

38.    In addition to allowing or excusing the abovementioned Bankruptcy TRO violations, the Trustee has failed to secure the return of assets to the estates, whether it be the bonding equipment for use in product manufacturing, technology demonstrators for use in securing strategic partners and investors, or components overdue for customer delivery. The Trustee seems to have adopted a status quo attitude regarding the assets, leaving them scattered across the globe and in the illegal possession and control of the enjoined parties.

39.    The assets have never been returned to the Debtor or to the Trustee by the Hawk Parties and those working in concert with them. *Robertson Declaration* ¶¶ 7, 15, 23-33, 58-60.  As

15

a result, they have continued to represent the Debtors' technology for their own benefit, to the detriment of the Debtors, their estates, and other parties in interest.

40.     SeeCubic, as part of the offending Hawk Parties, is thus not fit to serve as the Stalking Horse Bidder, let alone the Purchaser, of the Assets in these Chapter 11 Cases.

## B.   The Solicitation and Due Diligence Materials Offered by the Trustee and SSG are Misleading and Woefully Inadequate

41.     The Trustee has proposed a 363 Sale of the Debtors' assets to maximize recovery for all creditors. To achieve the best outcome in such a sale, the assets must be presented as transparently and completely as possible to secure meaningful bids. However, the solicitation document from SSG does not contain enough support for the value it purports to offer, while the data room omits key assets that are known to exist, as well as liabilities that might have meaningful impact, rendering the putative buyer's assessment impractical if not impossible. The Trustee and SSG may hope that an "as-is, where-is" sale obviates the need for meaningful disclosure, but the Trustee and SSG have an obligation to provide accurate, relevant documentation known to exist.

42.     This Court has acknowledged this shortfall: In fact, at the November 13, 2024 Bidding Procedures Hearing, the Court struggled to understand what exactly was being sold in this 363 Sale, and instructed the Trustee to prepare schedules in light of these incomplete disclosures. *See Transcript of Bidding Procedures Hearing* 79:2-9.

43.     Further, the SSG Solicitation "Teaser" misled potential bidders. In early October 2024, SSG distributed a one-page flyer to solicit interest from potential bidders in the proposed 363 Sale. Notably, VSI was not even included in this first distribution.  The flyer stated, "[t]he technology **can be licensed** and embedded into partner hardware, enabling devices to display both native 2D content and immersive 3D content." *See* ECF 788, Exhibit M (emphasis added). The flyer fails to  mention the Philips or Rembrandt technologies, and the sub-licensing restrictions

from both companies that would block a successful 363 Sale bidder from actually being able to license the technology for integration into partner hardware as promised. While this misstatement in the solicitation document *might* have been mitigated by disclosure in the data room, no such disclosure was made.

44.      In addition, the Data Room Prepared by the Trustee and SSG for consideration and due diligence of potential bidders lacks meaningful information. The data room is meant to show potential value in the Debtors' technology. It completely fails to do so. There are no customer contracts, communications, or purchase orders disclosed. There isn't even an overview describing "proof of concept" projects that are either in process or being considered by potential customers.

45.      As presented to this Court previously, Stream secured two purchase orders valued at more than $138 million from VSI in 2023 [ECF Nos. 114-2 and 114-3]. The validity of the VSI purchase orders was backed by purchase orders obtained by VSI from end customers: Cystar International Ltd. ("Cystar") and Southern Telecom, Inc. ("STI"). Both end customer purchase orders were also presented to the Court [ECF No. 642, Exhibits D and E] and were reconfirmed at the request of the Trustee shortly after his appointment in January 2024. Although VSI offered to arrange direct communication between the Trustee and the VSI end customers supporting the "back-to-back" purchase orders issued by VSI to Stream, the Trustee never availed himself of the opportunity to do so. Why wouldn't the Trustee, on behalf of the Debtors' estates, seek to establish personal contact with significant customers? To encourage maximum value of the estates, those purchase orders should be disclosed to potential bidders, and if the Trustee opts to disregard evidence that the purchase orders remain valid as claimed by VSI, the Trustee could and should provide his own disclaimer. Not revealing the existence of $138 million in potential revenue downplays the value of the estates and reduces bidder interest, likely leading to a lower bid for the

17

assets than is warranted. The Trustee's solicitation should be aimed at maximizing value, not undervaluing the assets.

46.     VSI purchase orders aside, there is virtually no other documentation indicating any customer interest, despite clear evidence to the contrary. The single document specifying interest in the Debtors' technology is essentially a strategic partner agreement executed on February 28, 2024 by Stastney on behalf of SCBV. The agreement contemplates an arrangement whereby components featuring the Debtors' technology will be provided to a third party for manufacture and integration into products for sale. This agreement was entered into by two parties specifically enjoined by the Bankruptcy TRO from using the Debtors' technology: Stastney, personally, and SCBV. As this agreement was executed after issuance of the Bankruptcy TRO and well before the 9019 Agreement was executed or approved by the Court, there can be no justification for the Trustee's knowledge and acceptance of this Bankruptcy TRO violative agreement.

47.     There are no other documents reflecting actual customer interest or activity, evidence of which would be critical for asset valuation purposes by potential bidders and which are clearly known to the Trustee. Most obvious of these is the customer relationship with Hyundai Mobis ("Hyundai"). When questioned in Court on October 6, 2023 about contracts that SCBV had executed with customers, Stastney testified that there were two. "One is Hyundai. That's already been made publicly available." *See* ECF 788 Exhibit N, 10/6/23 Hearing Transcript at p.178:6-7. The data room does not mention Hyundai, even though Stastney confirmed that an executed agreement exists, and the Trustee filed a royalty report with Philips on September 10, 2024 declaring that two units of "12.3[inch] Instrument Cluster Display demonstrator" had been sold to a customer. Instrument clusters are a strictly automotive component, perfectly suited to satisfy a customer like Hyundai.

18

48.     When questioned about customer projects, Stastney testified, as director of SCBV, the Debtors' R&D subsidiary, that "SCBV currently has three projects." *See* 10/6/23 Hearing Transcript at p.93:21. If Hyundai is assumed to be one of those projects, there are two other projects using the Debtors' technology for the benefit of customers, neither of which is disclosed in the data room.

49.     It has been more than a year since Stastney confirmed those projects in Court. Upon information and belief, many more projects have begun since then. In a September 23, 2024 email from Stastney to various stakeholders (including shareholders of Stream, SeeCubic, and VSI), Stastney confirmed "we have successfully delivered the Hyundai Mobis 'concept car' screens" and further boasted "we have a pipeline of 28 projects across 25 customers, all of whom are moving through some stage of the [proof of concept] intake process." If the pipeline has expanded from three customers to twenty-five customers, where is the evidence of that value to the Debtors' estates for consideration by potential bidders? Either Stastney has failed to disclose project development to the Trustee, or the Trustee has failed to monitor or even inquire about the status of customer development for the benefit of the estates. VSI is concerned that those relationships were developed in defiance of the Bankruptcy TRO and are being kept as secret value for the stalking horse only, as SeeCubic will be the only one to benefit from customers not disclosed to potential bidders.

50.     Besides failing to include significant actual and potential customer information in the data room, SSG fails to mention – let alone include any meaningful documentation regarding – the third-party technology licenses from Philips and Rembrandt.

51.     Stream entered into a license agreement with Philips on December 8, 2011, and an amendment on December 8, 2014. See ECF 788, Exhibit P. These agreements specify the

conditions under which the Philips intellectual property was licensed to the Debtors, restricted how it could be used, and the royalty reporting and payment requirements related thereto. As the Philips technology constitutes the foundation upon which the Debtors' technology was founded, the Philips license has material impact on the value of the estates. The Trustee and SSG have not provided the Philips license for potential bidder review, nor have they disclosed that the license exists, nor even that the Philips foundational technology is a factor for consideration.

52.      The data room is also completely silent on the issue of intellectual property claims by Rembrandt. While the Trustee (and therefore SSG as his agent) may dispute the Rembrandt claims, there is nonetheless a fully executed pre-petition settlement agreement dated May 23, 2021 between Stream and Rembrandt which grants Stream the **non-transferable right** to incorporate Rembrandt technology into the Debtors' technology (the "<u>Rembrandt Settlement</u>"), attached as ECF 788, Exhibit P. The terms of the 2021 Rembrandt Settlement were initially negotiated as a settlement term sheet in 2019 by Stastney, Chairman and CEO of the stalking horse, who at the time was an officer and director of Stream. The stalking horse, VSI, and the Trustee are all aware of the Rembrandt Settlement (and a subsequent Amendment dated August 12, 2023), but the data room does not include those executed agreements, nor is there any mention at all of Rembrandt and its claims. Worse still, there is no documentation or disclosure that Rembrandt filed suit against Debtor Technovative, stalking horse SeeCubic, and Stream creditor Hawk in the U.S. District Court for the District of Delaware, seeking injunctive relief for misappropriation of trade secrets[4]. *See* ECF 788, Exhibit Q.

53.      Additionally, there is a general lack of disclosure overall with regard to legal filings that might have relevance to potential bidders. Indeed, there is only a single document of this type

---

[4] C.A. No. 1:23-cv-00193-GBW

in the data room: this Court's memorandum granting the Hawk Parties' request for appointment of a chapter 11 trustee [ECF No. 548]. There is no mention of the Bankruptcy TRO enjoining the stalking horse, no mention of the 9019 Agreement, and no mention of any non-bankruptcy litigation that might impact a successful bidder's use of estate assets after consummation of the 363 Sale. While these omissions may not be dispositive, they refute any notion of transparency and cause further suspicion about the Trustee's intent and ability to conduct a fair and open sale process for the benefit of creditors other than the stalking horse.

54.    Finally, other than 17 detailed job descriptions for personnel at the Debtors' R&D entity in the Netherlands, there is virtually no disclosure regarding the operational needs of this critical subsidiary which would be acquired through the 363 Sale process. A spreadsheet purporting to inform bidders of the "number of employees" contains only 2 entries for total number of people and full-time engineers, without any insight into the financial requirements to support them. The operations spreadsheet includes only 13 lines of data for key expenses and ignores any expense less than Ten Thousand Euros. What are the actual expenses required to operate SCBV as a technology center after acquisition? It's impossible to tell from the available data, and only the stalking horse knows through its appointment of Stastney as director there. The effort at transparency is mere "lip service" at best and offers potential bidders no meaningful data to evaluate.

55.    Given the absence of known customer contracts and other information related to ongoing customer projects confirmed by Stastney as director of the Debtors' R&D subsidiary, given the lack of disclosure of liabilities related to third-party IP, given the lack of financial information related to operating and managing the Debtors' technology center following acquisition of estate assets, and given the Trustee's apparent unwillingness to explore and

prosecute Bankruptcy TRO violations by the stalking horse, it appears there has not been a bona fide, good faith effort by the Trustee and SSG to prepare the assets for sale or market them adequately. Without appropriate effort to satisfy a potential bidder's due diligence, no meaningful sale can occur, damaging every creditor but the stalking horse.

**C.    The Trustee may not sell the Debtors' property unless that property constitutes property of the Debtors' estates and, before approving a sale, the Court must first determine whether such property constitutes property of the estates.**

56.    It is widely accepted, in addition to being firmly intuitive, that the Bankruptcy Code does not expand a debtor's interests in property beyond what such interests were at the petition date. *Jones v. GE Capital Mortgage Co. (In re Jones)*, 179 B.R. 450, 455 (Bankr. E.D. Pa. 1995) ("[T]he owner of an insurance policy cannot obtain greater rights to the proceeds of that policy than he would have under state law by merely filing a bankruptcy petition") (*citing First Fid. Bank v. McAteer*, 985 F.2d 114, 117 (3d Cir. 1993)); *See also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) ("[W]hatever rights a debtor has in property at the commencement of the case continue in bankruptcy -- no more, no less."), cert denied, 469 U.S. 982 (1984); *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1663, 203 L. Ed. 2d 876 (2019) (recognizing the "general bankruptcy rule [that] the estate cannot possess anything more than the debtor itself did outside bankruptcy" and that "[a] debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either.").

57.    A debtor (or in this case, the Trustee), may not sell property unless that property constitutes property of the debtor's bankruptcy estate and, before approving a sale, the bankruptcy court must determine whether the property the debtor proposes to sell constitutes property of the estate. *In re Whitehall Jewelers Holdings, Inc.*, Case No. 08-11261 (KG), 2008 WL 2951974, at *9 (Bankr. D. Del. July 28, 2008) (citing *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 172 (9th Cir. B.A.P. 2001)).

58.     This is Third Circuit law.[5] Bankruptcy courts have consistently made this finding.

*See also Anderson v. Conine (In re Robertson)*, 203 F.3d 855 (5th Cir. 2000) (holding that Section

363(f) does not allow a trustee to sell property that is not property of the estate); *In re Worcester*

*Country Club Acres, LLC*, 655 B.R. 41, 47 (Bankr. D. Mass. 2023) (holding that because the

ownership of the land was disputed, it "must be adjudicated in order to determine if they are

property of the Debtor's bankruptcy estate, they cannot be sold under § 363(b) or (c) and pursuant

to § 363(f)(4) prior to a resolution of those issues."); *In re Coburn*, 250 B.R. 401, 403 (Bankr.

M.D. Fla. 1999) (it was necessary to determine whether an asset was property of the estate in order

to then decide whether the trustee was entitled to sell the asset pursuant to Section 363(f))); *Darby*

*v. Zimmerman (In re Popp)*, 323 B.R. 260, 266 (B.A.P. 9th Cir.2005); *Fresh Prepared Foods, Inc.*

*v. Farm Ridge Foods LLC*, 2013 WL 4804816, at *3 (D.N.J. Sept. 9, 2013) ("it is well-settled that

a 'bankruptcy court may not allow the sale of property as 'property of the estate' without first

determining whether the debtor in fact owned the property"). A sale under Section 363 "cannot be

had when there is an unresolved issue of whether the subject property is 'property of the estate' . .

. ." *In re Interiors of Yesterday, LLC*, Case No. 02-30356 (LMW) , 2007 WL 419646 (Bankr. D.

Conn. Feb. 2, 2007). *See also Warnick v. Yassian (In re Rodeo Canon Dev. Corp.)*, 362 F.3d 603,

605–06 (9th Cir. 2004), withdrawn and modified by 126 Fed. App'x 353 (9th Cir. 2005) (this

Court "may not allow the sale of property as 'property of the estate' without first determining

whether the debtor in fact owned the property."); *Ross v. A V Car & Home, LLC (In re Brown)*,

Case No. 16-00466, A.P. No. 18-10026, 2019 Bankr. LEXIS 286, 2019 WL 413625, at *3 (Bankr.

---

[5] *SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin),* 2008 WL 2498048(3d Cir. June 24, 2008) at *1.
In *SLW Capital,* a debtor included a provision in the confirmed plan which invalidated a mortgage assignee's claim
for a secured interest. The Third Circuit held that lien invalidation can occur only through litigation in an adversary
proceeding which provides greater procedural protection and, therefore "the adversary proceeding Rule at issue here
is mandatory and establishes a right to specific process that must be afforded. Its mandatory nature is grounded in
principles of due process that trump `finality.'" *Id.* at *6.

78828072;4

D.C. Jan. 30, 2019) (court may not authorize sale of property where ownership of a portion of the property is in dispute).

59.     It is the trustee who bears the burden of establishing that the property to be sold is property of the estate under Section 363(b). *See, e.g., In re Whitehall Jewelers Holdings, Inc.*, 2008 WL 2951974, at *17 (Bankr. D. Del. July 28, 2008) (holding that the debtors failed to meet their burden of establishing that the assets were property of the estate, and therefore were not permitted to sell the goods under Section 363(f)(4)). Here, the Trustee clearly has not met that burden. In fact, it is evident that, as described herein, the trustee is attempting to sell the assets on an "as-is, where-is" basis, without understanding (i) where a significant portion of the Debtors' assets are located, (ii) which of the Debtors' trade secrets the Hawk Parties have used, (iii) if the Hawk Parties will turn over the Debtors' property to a successful bidder other than the stalking horse, and (iv) if the Hawk Parties will stop using the trade secrets once a sale to a third-party has been completed. The Trustee mischaracterizes "*as is, where is*" to absolve himself of his obligations to the estate. "As is, where is" describes the assets condition, not the estate's title or the Trustee's authority to convey.

**D.     The 9019 Agreement and Sale Motion taken together constitute an improper *sub rosa* plan of reorganization that cannot be approved by this Court.**

60.     The Sale Motion should be denied because it seeks approval of a sale that cannot be approved under the Bankruptcy Code. In short, the Court should not permit a patently illegal sales process to go forward. Among other things, the sale process proposed by the Trustee constitutes an impermissible *sub rosa* plan of reorganization that strips the Debtors' creditors of the protections of the Bankruptcy Code and improperly attempts to extinguish their rights without their consent. It is well known that a bankruptcy court has the authority to approve a compromise or settlement of a claim after notice to the debtor, trustee, and creditors and a hearing on the

compromise. Fed. R. Bankr. P. 9019(a). It is also accepted knowledge that under 11 U.S.C.S. § 363(b), a debtor may use estate property outside the ordinary course of business, upon notice and a hearing, to settle claims with the approval of the bankruptcy court.

61.     However, when a sale process and/or settlement in bankruptcy has the ultimate effect of dictating the terms of any future reorganization plan, the bankruptcy court must deem the transaction impermissible because it short circuits the requirements of Chapter 11 by establishing the terms of the plan *sub rosa* in connection with a sale of assets. "The hallmark of such a plan is that it dictates the terms of a reorganization plan." E*nergy Future Holdings Corp. v. Del. Tr. Co*., 648 F. App'x 277 (3d Cir. 2016). This is because it "short circuits" the requirements of Chapter 11 by establishing the terms of the plan *sub rosa* in connection with a sale of assets. *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983).

62.     Thus, *sub rosa* plans are prohibited because they violate the requirements of the Chapter 11 process. *Motorola Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan Chase (In re Iridium Operating LLC),* 478 F.3d 452, 466 (2d Cir. 2007); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 887 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted."). Where a settlement circumvents creditors' rights to vote on key provisions, that settlement can be said to dictate the terms of a plan. *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & Through Mabey (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 355 (5th Cir. 1997).

63.     This is precisely the circumstance of this case. The terms of the proposed sale process, as outlined in the 9019 Agreement and in the Sale Motion, clearly constitute a *sub rosa* plan of reorganization. Among other things, the sale seeks to improperly channel consideration to specific creditor groups – as discussed herein, the Trustee has selected the Hawk Parties as the

stalking horse and agreed to give them an allowed claim of $180 million, $150 million of which may be used as a credit bid. This is blatantly at the expense of the Debtors' other creditors – pursuant to the 9019 Agreement, $7,500,000 would be carved out to pay administrative and general unsecured creditors. Notably, if a bid is accepted over the stalking horse bid, only 10% of that overbid goes to administrative or unsecured creditors until Hawk's $180 million claim is paid in full. As such, it essentially ensures that the Debtors' unsecured creditors, and perhaps even administrative expense claimants, receive pennies on the dollar. Such a restructuring of creditors' rights and diversion of value is impermissible in the context of a 363 sale. *See PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets.").

64.    Further, the Debtors impermissibly seek to use the 363 Sale to bind the Debtors' creditors to a treatment of their claims without having that proposed treatment tested by the standards of the Bankruptcy Code. Such a proposed sale cannot proceed. See, e.g., *In re Westpoint Stevens Inc.,* 333 B.R. 30, 52 (S.D.N.Y. 2005) ("Where it is clear that the terms of a section 363(b) sale would preempt or dictate the terms of a Chapter 11 plan, the proposed sale is beyond the scope of section 363(b) and should not be approved[.]"); *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.),* 780 F.2d 1223, 1226-28 (5th Cir. 1986) (same).

65.    Quite simply, a 363 sale is not a substitute for a plan of reorganization. *See Westpoint Stevens Inc*., 333 B.R. at 52 (noting when a proposed transaction specifies terms for a reorganization plan, the parties and the court "must scale the hurdles erected in Chapter 11")

26

(citation omitted); *see also In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (The "trustee is prohibited from such use, sale or lease if it would amount to a *sub rosa* plan of reorganization."); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986) (finding that section 363 does not permit a debtor to abrogate the protections afforded creditors by section 1129 and the plan confirmation process).

66.    The Debtors bear the burden to prove that the proposed sale is fair, equitable, in the interest of the estates, and not unfair to the creditors. The proposed sale fails each of these requirements.

**E.    The Proposed Sale Process is Neither Fair nor Reasonable and is Subject to a Heightened Scrutiny Standard.**

67.    VSI has been repeatedly criticized in these Chapter 11 Cases for allegedly "making noise", yet this characterization fails to acknowledge the underlying frustration borne from a sense of being ignored regarding clearly fatal flaws in this sale process. The proposed buyer is an insider with a well-documented history of misconduct relating to the assets proposed to be sold.

68.    There is nothing fair about the proposed "process" sought to be approved by the Sale Motion. In fact, the process (if it even can be called that) succeeds in handing the Debtors' most valuable assets to SeeCubic, an insider with a long history of improperly possessing and controlling the Debtors' property, as Stalking Horse Bidder pursuant to an improper credit bid.

69.    And make no mistake, SeeCubic is certainly an insider with respect to the Debtors. Indeed, SeeCubic has exerted an inordinate amount of control over the Debtors' assets and sale process, and has time and time again violated the automatic stay and the Bankruptcy TRO in place. Control of SeeCubic rests with Stastney, who was both Vice Chairman of the Board of Directors and Chief Financial Officer of Debtor Stream shortly before he orchestrated an asset takeover with the Hawk Parties through the invalidated Omnibus Agreement. Stastney had access to the Debtors'

financials, sensitive customer information, investor database, and other critical data. He siphoned key personnel from the Debtors and ultimately used the Dutch court system to install himself as director of the Debtors' R&D subsidiary, a position he uses today to exert control over the Debtors' engineering development activities. *Robertson Declaration* ⁋⁋ 7, 33, 54.

70.     Transactions involving insiders are subject to a heightened level of scrutiny. *See Crown Vill. Farm, LLC v. Arl. L.L.C. (In re Crown Vill. Farm, LLC)*, 415 B.R. 86, 93 (Bankr. D. Del. 2009) (holding that "[t]he sale process will be under the close scrutiny of the Court as required where the stalking horse is an insider"); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997), aff'd, 160 F.3d 982 (3d Cir. 1998) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein."); *In re Bidermann Indus. U.S.A.*, 203 B.R. 547, 551 (Bankr. S.D.N.Y. 1997) (sales to insiders "are necessarily subjected to heightened scrutiny because they are rife with the possibility of abuse") (internal quotations omitted); *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, 26-29 (Bankr. D.N.J. Mar. 26, 2008) (recognizing "the heightened scrutiny required for insider transactions"); *In re Univ. Heights Ass'n*, 2007 Bankr. LEXIS 1200, at *13 (Bankr. N.D.N.Y. Jan. 22, 2007) ("[B]ecause we are dealing with potential insiders . . . the proposed sale is subject to heightened scrutiny.").

71.     This heightened scrutiny also applies to a sale proposed by a trustee, rather than a debtor in possession. *In re Blixseth*, No. 09-60452, 2010 Bankr. LEXIS 585 (Bankr. D. Mont. Feb. 23, 2010). In *Blixseth*, the court refused to approve a sale of property as proposed by the trustee to a secured creditor credit-bid. The court found that the creditor had "very close ties to the debtor"

and refused to apply the standard applicable to non-insider sales or to give deference to the trustee's business judgment. Instead, the court applied the more rigorous *Bidermann* standard for evaluating insider transactions. As such, the court denied the bidding procedures proposed by the trustee. In applying heightened scrutiny, courts are concerned with "the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010).

72.     This transaction would not withstand heightened scrutiny. As in *Bidermann*, SeeCubic and the Hawk Parties clearly have "very close ties" to the Trustee. As detailed herein and in the SSG Objection, the Hawk Parties have a long history of improperly possessing the Debtors' property. Indeed, to this day, the Hawk Parties are using and possessing the Debtors' property contrary to this Court's orders, specifically including the TRO that in effect through November 12, 2024.  If this Court were to examine "the integrity and entire fairness of the transaction at issue" it could not reasonably conclude that this transaction was acceptable.

**F.     There Should Be No Finding of Good Faith as to the Insider Stalking Horse Bidder.**

73.     Section 363(m) articulates the "good faith" requirement of a Section 363 asset sale. *Abbotts Dairies*, 788 F.2d at 149–50. A court may not find good faith if fraud, collusion or unfair advantages are determined. *Id.* at 147. A good faith purchaser under the Bankruptcy Code is one who purchases assets for value, in good faith, and without notice of adverse claims. *Abbotts Dairies*, 788 F.2d at 147. In determining whether an asset purchaser is entitled to such protections, courts examine "the integrity of his conduct in the course of the sale proceedings." *Abbotts Dairies*, 788 F.2d at 148. In assessing the good faith of a purchaser, courts have considered factors such as: (1) whether the sale was negotiated at arm's length; (2) whether any officer or director of the debtor holds any interest in or is otherwise related to the potential purchaser; and (3) whether fraud or

78828072;4

collusion exists among the prospective purchaser, any other bidders or the trustee. See Abbotts

Dairies, 788 F.2d at 147-48.  Ironically, the Sale Motion relies heavily on *Abbott Dairies* and cites

the types of misconduct that would destroy a purchaser's good faith status. *Sale Motion* ¶ 64.

74.    The Stalking Horse Bidder, with the Trustee's blessing, has misappropriated the

estates assets, availed itself of material nonpublic information, denied prospective bidders material

information necessary to make an informed assessment and decision regarding the assets vale, and

improperly suppressed the assets value; and intentionally chilled the market and bidding for the

Debtors' assets.

75.    SeeCubic and the Hawk Parties would fail this test at every level: (1) the sale was

not negotiated at arm's length, made particularly evident by SGG's historical relationship with

Hawk; (2) Stastney, as chief executive of the SeeCubic as the Stalking Horse Bidder is also the

sole director of the Debtors' R&D subsidiary; and (3) as discussed throughout the Declaration and

this Objection, there has been collusion between the Trustee and the proposed Stalking Horse

Bidder throughout this process.

76.    For the reasons already discussed herein, any acquisition of the Debtors' assets by

SeeCubic and Hawk is not in good faith and should not be afforded the protections of section

363(m) of the Bankruptcy Code.

## IV.    <u>RESERVATION OF RIGHTS</u>

77.    VSI reserves the right to supplement this Objection or to raise additional or further

objections to the Sale Motion, the order and/or exhibits thereto, including any form term sheets or

asset purchase agreements, at or prior to the Sale Hearing or any other relevant hearing.

## V.    <u>CONCLUSION</u>

78828072;4

WHEREFORE, for the reasons stated above, VSI respectfully requests that the Court deny the Sale Motion as submitted and grant such other and further relief as this Court deems just and proper.

Dated November 22, 2024                    Respectfully submitted,

                                           AKERMAN LLP

                                           */s/ R. Adam Swick*
                                           Donald N. David, SBN: 304846
                                           Mark Lichtenstein *(pro hac vice to be filed)*
                                           1251 Avenue of the Americas
                                           37th Floor
                                           New York, NY 10020
                                           Telephone: (212) 880-3800
                                           Facsimile: (212) 880-8965
                                           Email: donald.david@akerman.com
                                                  mark.lichtenstein@akerman.com

                                           -and-

                                           R. Adam Swick (*pro hac vice*)
                                           AKERMAN LLP
                                           500 West 5th Street, Suite 1210
                                           Austin, TX 78701
                                           Telephone: (737) 999-7103
                                           Facsimile:  (512) 623-6701
                                           Email: adam.swick@akerman.com

                                           -and-

                                           John H. Thompson *(pro hac vice)*
                                           AKERMAN LLP
                                           750 Ninth Street, N.W. 750
                                           Washington, D.C. 20001
                                           Telephone: (202) 824-1760
                                           Facsimile:  (202) 393-5959
                                           Email: john.thompson@akerman.com

                                           -and-

31

Leif M. Clark
Leif M Clark Consulting PLLC
1105 Bonner
Houston, TX 77007
Telephone: (210) 663-5183
Email: lmclark@leifmclark.com

*Attorneys for Visual Semiconductor, Inc.*

32

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the United States Bankruptcy Court for the Eastern District of Pennsylvania on November 22, 2024 with notice sent electronically to all parties receiving electronic notices in this case pursuant to local rules of this Court, and that no further notice or service is necessary.

 */s/ John Thompson*
John Thompson

78828072;4