# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,  (Stream)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |

| | |
|---|---|
| In re:<br><br>Technovative Media, Inc.,  (Technovative)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |

**DECLARATION OF CHRISTOPHER A. MICHAELS IN SUPPORT OF REMBRANDT 3D HOLDING LTD.'S OBJECTION TO MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR ENTRY OF AN ORDER APPROVING A SETTLEMENT AGREEMENT AND MUTUAL RELEASE WITH HAWK INVESTMENT HOLDINGS, LTD., AS COLLATERAL AGENT FOR THE SECURED NOTEHOLDERS OF SEECUBIC, INC., PURSUANT TO FED. R. BANKR. P. 9019(a) AND 11 U.S.C. § 105(a)**

I, Christopher A. Michaels, of full age, hereby declares pursuant to 28 U.S.C. §1746:

1.      I previously provided a declaration related to this case on April 3, 2023 (D.I. 69).

2.      Rembrandt has filed a Complaint for Injunctive Relief and Misappropriation of Trade Secrets (the "Delaware Complaint") in the United States District Court for the District of Delaware against Technovative Media, Inc ("Technovative"), Hawk Investment Holdings Ltd. ("Hawk"), and SeeCubic, Inc.("SeeCubic"), and a true copy along with the exhibits is attached as Exhibit A to my prior declaration (D.I. 69).

3.      My name is Christopher Michaels. I am the President/CEO of Brown & Michaels, PC and represent Rembrandt 3D Holding Ltd. ("Rembrandt") a Nevis corporation.  I also represent Rembrandt 3D Corp. ("Rembrandt – Delaware") a Delaware corporation and Stephen Blumenthal personally.

4.      I am the Chief Financial Officer of Rembrandt and the Chief Financial Officer of Rembrandt – Delaware.

5.      Rembrandt is a holding company that owns the rights to intellectual property developed by Stephen Blumenthal and the predecessor company, 3DFusion Corp (3DFusion) and licensed this technology to Stream.

6.      Stephen Blumenthal currently owns 100% of the shares of Rembrandt.

7.      Rembrandt-Delaware is an operating company that sells products and services related to 3D media content.

8.      Rembrandt-Delaware currently has shareholders other than Stephen Blumenthal and upon closing of the final phase of a multi-phase fund raising, Mr. Blumenthal will be a minority shareholder with the new investors have majority control of Rembrandt-Delaware.

9.      Rembrandt is a creditor of both Stream and Technovative, whereas Rembrandt-Delaware is not a creditor of either company.

10.     Rembrandt is NOT the entity that has made a proposal for funding a reorganization plan.

11.     Rembrandt-Delaware has made a proposal to the trustee which was attached as Exhibit 2 in Rembrandt's Objection to Proof of Claim (D.I. 628).  As part of the proposal, Rembrandt-Delaware included a copy of a letter of investor's counsel (Exhibit 2, D.I. 628).

12.     Rembrandt-Delaware provided a list of due diligence items that we would need to as part of a proposal for funding a plan of reorganization (Exhibit 2, D.I. 628)

13.     In my follow-up communication with the trustee's counsel, I repeatedly requested confirmation that the trustee had acquired access to the software development system and I have attached copies of that correspondence as Exhibit 1.

14.     Modern software development is almost always completed using version control systems (https://en.wikipedia.org/wiki/Version_control) and the engineers at SCBV confirmed this was true of the development of UltraD.

15.    As such, the majority of the value of Stream and Technovative estates related to the software for UltraD can be secured and obtained with the administrative username and password to the software developer system.

16.    In my April 26, 2024 email to the trustee's counsel, I stated: "I emailed you the following our call with the Eindhoven team on March 22: '… *they confirmed something very critical – the software development has been managed through a professional tool that maintains versions for the last 13 years of work.  That is the value of SCBV.  If the trustee gets access to that server, the value in SCBV is largely preserved.  Likewise, if it slips out the back door, there is zero value and lots of liabilities in SCBV.* '"

17.    As can be seen from the correspondence history, Rembrandt has repeatedly offered to provide the name and direct contact with the investor under an NDA and confirmation that the critical access to the development system had been secured, but to date the trustee has never provided an NDA that would protect Rembrandt-Delaware's information or confirmed that the trustee has any access whatsoever to the system that houses all the value of the UltraD software.

18.    Any purchaser of assets of the Debtors is going to want to know that the upon acquisition, the purchaser will have access to the most valuable asset of the company, namely the UltraD technology.

19.    At present, I understand that only the former executives of Stream have access to this source code and software.  While the former CEO and CFO of Stream are in opposite camps fighting for the ability to walk away with everything of value held by the Debtors, at present both former officers have exclusive access to the source code, software, and know-how related to UltraD.

20.    If SeeCubic has not returned the assets after multiple court orders in Stream's favor, what hope does a purchaser have of obtaining the intellectual property after a sale?

21.     At a bare minimum, the trustee should obtain access to the developer system and copies of all code and plans from both of the former officers of the company to bring estate assets back into the estate.

22.     The bonding equipment that is being held by SeeCubic is likely worth far in excess of the entire SLS claim (*see* Claim 2 of Technovative case).

23.     While Rembrandt-Delaware is planning to build additional product lines almost immediately if it is successful in a reorganization plan, we estimate eight months to fully build a new line that is operational at a cost of roughly $20,000,000

24.     In contrast, we estimate less than two months to refurbish the existing bonding equipment to be operational at a cost of $1-2,000,000 depending on the amount of damage to the equipment.

25.     This six month difference means that the existing equipment could be ready six months earlier than ordering new equipment.

26.     Conservatively estimating monthly production at 13,000 units per month, this means that an additional 78,000 units could be produced with the existing equipment before new equipment could be operational.

27.     Assuming, $400/unit of profit margin, means that the ready access to the existing bonding equipment is worth approximately $31,200,000 in profit potential and $18,000,000 in cost savings for a total of $49,200,000 in value relative to allowing SeeCubic to retain control of the existing equipment.

28.     It is worth noting that both the production capacity and profit margin listed above is information provided by Shadron Stastney to Rembrandt on July 8, 2019 when he was negotiating as CFO and on behalf of Stream in the mediation with Rembrandt to settle Rembrandt's claim.

29.     These were material representations made by Mr. Stastney to Rembrandt to induce Rembrandt to enter into settlement agreement with Stream and I contemporaneously typed the information into a spreadsheet that I was using to estimate the net present value of the changes Mr. Stastney was requesting to the agreement reached before Magistrate Parker.

30.     Also present at this meeting were: Marc Coleman (Former Stream board member), John Wellschlager (DLA Piper – counsel to Stream); Neal Kronley (DLA Piper – counsel to Stream), Neil Wallace (counsel to Rembrandt), Chi Eng (counsel to Rembrandt), and Stephen Blumenthal (CEO of Rembrandt).

31.     I note Exhibit 26 to the Delaware Complaint my prior e-mail to Mr. Caponi, acting as attorney for Hawk, dated August 29, 2022 summarizing Rembrandt's position with respect to protecting Rembrandt's IP and proposing a number of ways that Hawk and Rembrandt could work together.  I have attached a copy of the email to Mr. Caponi as Exhibit 2 to this declaration.

32.     Upon any fair reading of my email directly to Mr. Caponi, I think it is difficult to understand how Mr. Caponi alleges that Rembrandt is "Mr. Rajan's new mouthpiece" (Hawk Response D.I. 639 at paragraph 2) or is "Rembrandt has acted as Mr. Rajan's "lap dog" for years" (Hawk Response D.I. 639 at paragraph 3).

33.     Rembrandt has been stating its position with respect to its intellectual property consistently for more than a decade.  In my email to Mr. Caponi, I predicted that the Rajans were likely to adopt Rembrandt's position going forward.:

> *"Basically, everyone that was around in 2009 and 2010 amounted to Steve, the Rajans, and a bunch of foreign nationals that were likely to refuse to show up or take the 5th.  At some point, the Rajans are going to realize that their best interests are served by having as much technology as possible be owned by Rembrandt.* ***My guess is they will suddenly agree that all of Rembrandt's allegations are true and therefore all IP is owned by Rembrandt and licensed to Stream in a way that is not subject to foreclosure. It is our expectation that 100% of the people that are willing to testify and all documentation will show all original IP was Rembrandt's.***

...

*There is a clear path for your client to acquire rights to the technology in the right way. It is the same path my client took back in 2009 – license the rights from the owner to the technology. While many years, late, Stream has done so, but as best we can tell, your client, SLS, and SeeCubic seem intent on proceeding without a license from Rembrandt or Philips.*

....

*The current situation is that SLS/Hawk have a security interest in Stream's technology, but not technology owned by Rembrandt and licensed to Stream.* **If I was representing Stream in defending the foreclosure action, I would highly support Rembrandt's claims of IP ownership and in particular the contractual ownership of all improvements to the technology. That way none of the technology would be subject to foreclosure. Sure SLS/Hawk can take the server, but ownership and all source code and patents should be assigned to Rembrandt pursuant to the terms of the agreement I previously sent you. Basically, taking that position would leave the secured creditors with almost nothing of value and Stream would have its license from Rembrandt.**

*Even assuming that your team argued some of the technology was unrelated to what Mr. Blumenthal's team developed originally, those incremental pieces are unnecessary to have a high end 3D display. The Rembrandt Delaware based operating company has been putting out product for many years without need of any of them. You can go see one of our installations at the Frank Lloyd Wright museum or the Pittsburgh airport. Point being, a saleable product or technology package by Stream or SeeCubic needs Rembrandt's IP, but Rembrandt does not need any technology from Stream. Rembrandt is in a position to provide IP to either party that allows it to operate without need to any of the technology from Stream.*

***Again, hypothetically placing myself into Stream's counsel's shoes, I would argue that the value of the technology provided in the foreclosure more than covers the debt owed. I believe all parties have taken positions that the technology is worth hundreds of millions of dollars. If a public sale without a license from Rembrandt only generated a portion of that value, I think we should expect that Stream would argue that any lowering of value in the public sale was due to the lenders' failure to take the proper license for Rembrandt allowing a clean sale. Therefore, a foreclosure action by SLS/Hawk may actually relieve Stream of all of its debt and leave Stream with the ability to sell a capable 3D product.***

*Obviously, taking a license from Rembrandt directly or pursuing assignment of the settlement agreement provides your client with freedom of action to sell an intact technology portfolio, however, Rembrandt is free to issue Stream another license to the technology as the settlement agreement is non-exclusive.* **It is in the Rajans' and Stream's interest to argue that all technology developed by Stream were improvements to Rembrandt's technology and Rembrandt is free to license it back to them.**

34.    Basically, Mr. Caponi is confirming that my predictions back in the Summer of 2022 were accurate. However, it is not Rembrandt that has modified its position, but rather to their credit, Mathu Rajan and VSI are agreeing that the Rembrandt technology and Philips are

essential licenses to the UltraD technology and proposing a plan that keeps the intellectual property intact.

35.    SLS, Hawk, and SeeCubic allege that they are secured lenders and seek to be repaid principal and interest by selling assets pledged as security.  However, even assuming that all their rights are valid with respect to the Debtors, they is no instrument that gives them rights of Rembrandt's or Philips's intellectual property.

36.    While, there is a dispute regarding whether Hawk's debt has already been converted to equity thereby completely removing it as a creditor, there is no dispute that a new investment of $39,000,000 would fully convert Hawk's debt to equity.

37.    While Rembrandt-Delaware made a proposal to the trustee which was attached as Exhibit 2 in Rembrandt's Objection to Proof of Claim (D.I. 628) that included a $39,000,000 investment in a preferred share, the immediate issue is whether the proposed settlement is reasonable.

38.    Any potential purchaser could make the same proposal outlined by Rembrandt and for $39,000,000 pay the SLS debt, fully convert the Hawk secured debt, pay all administrative claims, and provide cash to pay at least some of the unsecured claims.  In addition, such a purchaser would have an intact intellectual property estate by keeping both the Philips and Rembrandt licenses intact.

39.    In addition, any investor putting $39,000,000 into an investment would not need a settlement with either SLS, Hawk, or SeeCubic as the secured debt would be paid in full in accordance with the existing contracts with the secured creditors.

40.    Rembrandt is currently suing Technovative, SeeCubic, and Hawk.  Any purchaser under the proposed settlement and plan for a 363 sale would have to invest $120 million in cash and be walking into an almost immediate claim from Rembrandt, Philips, and Leia.

41.     The proposed settlement requires any purchase to post 3x the amount of cash and get far less while subjecting themselves to IP infringement claims from three companies that own intellectual property rights that the Debtors have valid licenses to up through the point of attempting to transfer the technology out of the companies that hold those licenses.

42.     It appears that this potential destruction of value is purposeful.  While Hawk alleges that it is owed a large amount of money, the only thing better than receiving $160,000,000 in alleged principal and interest, is getting all the technology from a company that was recently valued at over $400,000,000 ($4/share with over a 1,000,000 shares and warrants outstanding prior to Rembrandt litigation).

43.     After Rembrandt initiated its litigation to enforce contracts including an NDA and term sheet they provided for Rembrandt to get 60-80% of Stream in exchanging for providing its technology, Stream's shares dropped to $1.50/share by the time Rembrandt negotiated its settlement term sheet on April 12, 2019 with Shad Stastney acting as Stream's CFO at the time (*see* Exhibit 5 to the Delaware Complaint).  The share price had dropped by 62.5% and Stream had lost $250,000,000 in valuation.

44.     Rembrandt has closely evaluated the quality of the Stream products and even in the midst of its controversies with Stream purchased early versions of Stream's TVs and Stream provided additional units during and post-bankruptcy.  The quality of the product has improved over time so the loss in value is not due to the underlying value of the combined Philips/Rembrandt/Stream technology.

45.     If Stream and Technovative were unable to create a viable going concern, a bankruptcy proceeding would have the possibility of a sale of assets that included an assignment of the Rembrandt-Stream settlement agreement with any technology owned by Stream and

Technovative thereby maximizing the value of the technology that was being sold thereby paying

any and all debt owed to Hawk and other creditors to Stream.


Executed under penalty of perjury this 20th day of May, 2024.


_/Christopher A. Michaels/_
Christopher A. Michaels (NY Bar No. 2597375)

/s/ Andrew DeMarco
Andrew DeMarco, Esq.
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251
ademarco@devlinlawfirm.com

*Attorneys for Rembrandt 3D Holding Ltd.*

## CERTIFICATE OF SERVICE

I certify that on May 20, 2024, I caused the attached Declaration to be electronically filed with the Clerk, United States Bankruptcy Court, Eastern District of Pennsylvania, by ECF and one copy of the aforementioned document by way of first class mail or ECF to those persons listed on the attached service list. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me is willfully false, I am subject to punishment.

/s/ Andrew DeMarco
Andrew DeMarco, Esq.

# SERVICE LIST

<u>Attorneys for Hawk Investment Holdings Ltd.</u>
Steven L. Caponi (No. 91881)
K&L GATES LLP
600 King Street, Suite 901
Wilmington, DE 19801
Telephone:  (302) 416-7000
steven.caponi@klgates.com
VIA ECF

<u>Attorneys for Debtor</u>
Rafael X. Zahralddin-Aravena
Asher A. Block
LEWIS BRISBOIS BISGAARD & SMITH, LLP
550 E. Swedesford Road, Suite 270
Wayne, PA 19087
Rafael.Zahralddin@lewisbrisbois.com
Asher.Block@lewisbrisbois.com
Via ECF

Vincent F. Alexander (*pro hac vice* pending)
LEWIS BRISBOIS BISGAARD & SMITH, LLP
110 SE 6th Street, Suite 2600
Fort Lauderdale, FL 33301
Vincent.alexander@lewisbrisbois.com
VIA ECF

<u>US Trustee</u>
KEVIN P. CALLAHAN
DOJ-UST
JOHN HENRY SCHANNE
DOJ-UST
Office of The United States Trustee
Robert N.C. Nix Federal Building
900 Market Street Ste. 320
Philadelphia, PA 19107
Kevin.p.callahan@usdoj.gov
John.Schanne@usdoj.gov
VIA ECF

<u>Debtors</u>
Technovative Media, Inc.
2009 Chestnut Street, 3rd Floor
Philadelphia, PA 19103
VIA FEDERAL EXPRESS

# EXHIBIT 1

| | |
|---|---|
| **From:** | Christopher Michaels <michaels@bpmlegal.com> |
| **Sent:** | Friday, April 26, 2024 2:45 PM |
| **To:** | Vagnoni, Michael |
| **Cc:** | George, Edmond; Andrew DeMarco; ntwallace@aol.com; steve@rembrandt3d.com |
| **Subject:** | RE: Stream |

Michael:

It has been over three weeks since we have heard from you.  Are you going to send an NDA so we can share investor information with you?

Basically, the entire value of the Stream and Technovative estates boil down to the IP related to the UltraD improvement.  We believe that practical value of this asset is found in the software development management system.  Our belief is that the former officers of the company got in a spat and one went to form SeeCubic, Inc and the other VSI.  As best as we understand, both insiders have access to this system and source code, software, and firmware design that forms the UltraD technology.  The only asset that the trustee needed to marshal and protect was the username and password for the software development system that was referenced in our call with the software engineers.  Basically, the former officers have created a situation where they are the only two entities that can garner any value from Stream unless the trustee acted to secure this essential asset.

I emailed you the following our call with the Eindhoven team on March 22: "*... they confirmed something very critical – the software development has been managed through a professional tool that maintains versions for the last 13 years of work.  That is the value of SCBV. If the trustee gets access to that server, the value in SCBV is largely preserved.  Likewise, if it slips out the back door, there is zero value and lots of liabilities in SCBV.*"

While we have many follow-on issues to resolve, did you and/or the trustee obtain access to the server and the software development tools that form the value of this estate?   This is a threshold issue before any investor will start funding any costs related to a reorganization plan.


Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email: michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Christopher Michaels
**Sent:** Thursday, April 4, 2024 11:44 AM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>

1

**Cc:** George, Edmond <Edmond.George@obermayer.com>; ademarco@devlinlawfirm.com; ntwallace@aol.com;
steve@rembrandt3d.com
**Subject:** RE: Stream

Michael:

We heard you represent to the judge that the trustee has control of the servers.

We understand you don't have staff that are capable of reviewing the software and IP stored on the servers, but can you please confirm that you have possession and access to the developer system where the source code is stored both from SCBV and the work done by Stream and their vendors?

We have a meeting with our investors this afternoon to discuss next steps.  Any insight you can provide would be appreciated.

Chris.

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email: michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Christopher Michaels
**Sent:** Wednesday, April 3, 2024 1:49 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>; ademarco@devlinlawfirm.com; ntwallace@aol.com;
steve@rembrandt3d.com
**Subject:** RE: Stream

Michael:

You keep asking for proof of our funding and/or identification of our investors.  We offered to provide you this information in confidence under an NDA when we first spoke with you regarding the funding.  To date, you have only sent the one way NDA that requires us to keep Stream and Technovative information confidential, but does not protect our information.  We do not want other parties contacting our investors.  Both sides have a number of individuals that have routinely reached out aggressively, even going so far as to contact family members of investors.

During our collective call with the SCBV employees, it did not sound to us that they are capable of doing current software or hardware prototype development.  Our opinion is that the value of the enterprises are in the historic code.  We would not continue to fund the payroll in SCBV.

We believe the entirety of the value is in the work they have done in the past which they told us is housed in a professional, developer code management system.  As such, obtaining access to that system preserves 100% of the

value they have created. That is as simple as an email username and password. We expect that the trustee is marshalling that asset for the benefit of Stream/Technovative creditors.

We reviewed your funding proposal and it seems the funding is predominantly allocated to funding the trustee. I do not see how Rembrandt 3D Corp would be paid back if the secured lenders succeed in a credit bid, or VSI completes its reorganization plan. Neither a credit bid or VSI's plan provides sufficient funding. Our investors have zero interest in funding a DIP loan if they are not funding the full reorganization plan. We reached out to VSI and it is our understanding that they are planning to provide their own proof of funding. If VSI has funding lined up, our team will likely step back. If VSI does not have funding, our investors will fund our plan for reorganization, if and only if, the IP assets have been secured.

I appreciate that the details are incredibly complex, but we feel that at its heart this situation really boils down to:
      1) Is the intellectual property in the form of software, know-how, copyright, patents, and licenses intact?; and
      2) Where is the cash coming for the reorganization, i.e. can VSI show proof of funding?

If VSI has the funding, we are in a different universe and they currently have the exclusive right to put forward a plan. If VSI does not have funding, our investors are interested in submitting a reorganization plan, but we have the critical issue of ascertaining whether the IP is intact. We have spoken to the current patent owners for Philips license directly, but the unknown for us is the software and know-how. There is an information asymmetry with regard to the IP in that both VSI and SeeCubic likely have inside knowledge of where the IP is stored such that a 3rd party investor may not have a reasonable ability to fund a reorganization plan that results in a viable entity.

We want to work cooperatively. If you can provide an NDA that protects our investor information, we will share that with you. We intend to raise the above two issues in the status conference tomorrow.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

Email: michaels@bpmlegal.com
Direct Dial:  607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Tuesday, March 26, 2024 5:20 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>
**Subject:** RE: Stream

Chris:

We are getting increased pressure to finance the Netherlands. We have not heard from your bankruptcy counsel or received any proof of financing from you and time has just about run out. If you have anything concrete to show us, now is the time to do it.

Michael



  

**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com



---

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Friday, March 22, 2024 3:59 PM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>
**Subject:** RE: Stream

Michael:

We are working on proof of funding and we understand the need for it.

That said, I am working in parallel on how to accomplish this assuming funding is approved by our investors.  My immediate question is whether Stream can fund SCBV considering Judge Coleman's rulings at DE 222 and DE 231?

At first blush, it appears that her orders prohibit Stream from funding the foreign subsidiaries.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email: michaels@bpmlegal.com*
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Friday, March 22, 2024 1:58 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>

**Cc:** George, Edmond <Edmond.George@obermayer.com>
**Subject:** RE: Stream

Chris:

First and foremost – we need a commitment to fund the initial $1MM, including a proof that you have those funds in the bank, so that we can file the Motion for Interim and Final Approval of DIP Financing on an unsecured administrative claim basis. The items you are looking for can be pursued (and I believe will be much easier to procure) as well as the conversation with Cystar and Southern Telecom after we file the Motion and show SCBV that Rembrandt is for real. If we don't have that commitment very soon, we will be turning our attention elsewhere. To that end, have you been alle to retain bankruptcy counsel yet? I have not heard from Janice Gruben.

I have attached a proposed term sheet that summarizes the general terms the Trustee is willing to work with. The details and numbers are fluid at this point, but that gives you the framework. Again, if that is not something Rembrant is willing to work with, or if we are not shown proof of funds very shortly, as SCBV said yesterday, there will be nothing to talk about.

The NDA you mention must be between Rembrandt and SCBV – they won't accept anything signed by the Trustee of the parent company – at least that is what I heard yesterday.

Please let me know your client's position as soon as possible.

Michael



  

**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com



---

**From:** Christopher Michaels <michaels@bpmlegal.com>
**Sent:** Friday, March 22, 2024 11:17 AM
**To:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>
**Subject:** RE: Stream

**WARNING:** This email originated from an external sender. Exercise caution before clicking links or opening attachments. When in doubt, contact the IT department.

Michael:

I haven't seen a proposed NDA from SCBV. Happy to review a package when available.

I have attached a list of preliminary items we would like from SCBV. I have broken them into two categories: 1) to be provided to Rembrandt under NDA; and 2) to be provided to the trustee only prior to funding.

That said, they confirmed something very critical – the software development has been managed through a professional tool that maintains versions for the last 13 years of work. That is the value of SCBV. If the trustee gets access to that server, the value in SCBV is largely preserved. Likewise, if it slips out the back door, there is zero value and lots of liabilities in SCBV.

I have researched employment law in the Netherlands and they owed large severance and notice if their jobs are terminated UNLESS they are fired for cause/start stealing assets. In other words, they have a strong incentive to supply this list to the trustee when asked or risk waiving a massive payout.

While I get there is an urgency to keep them funded, none of them seemed particularly worried about losing their jobs or funding running out. The idea that in two weeks SCBV folds yet they want to hold on to information as so proprietary they won't even share it with a prospective buyer seemed odd. I am not sure what they are trying to accomplish, but to us it seems like they want SCBV to not get funding so they can cut some other deal with SeeCubic, Inc./Hawk. Making sure the trustee gets access to the servers and software development system seems the best way to shut down such a plan.

Can we set up a quick call to discuss?

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

Email: michaels@bpmlegal.com
Direct Dial:  607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

**From:** Vagnoni, Michael <Michael.vagnoni@obermayer.com>
**Sent:** Thursday, March 21, 2024 9:39 AM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>
**Subject:** RE: Stream

Chris:

I didn't see the redline – can you send that so I know exactly what you changed.

SCBV is available at 10:00 this morning – who do you want me to send the invite to on your side?

Michael



**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com








---

**From:** Vagnoni, Michael
**Sent:** Wednesday, March 20, 2024 8:34 PM
**To:** Christopher Michaels <michaels@bpmlegal.com>
**Cc:** George, Edmond <Edmond.George@obermayer.com>
**Subject:** Stream

Attached is a draft NDA – please let me know if you propose any changes.  We will let you know what we hear from SCBV about a call.

Michael



**Michael D. Vagnoni**
Partner

**Obermayer Rebmann Maxwell & Hippel LLP**
Centre Square West
1500 Market Street | Suite 3400
Philadelphia, PA 19102-2101
215.665.3066 tel | 215.665.3165 fax
michael.vagnoni@obermayer.com | www.obermayer.com







# EXHIBIT 2

**From:** Christopher Michaels
**Sent:** Monday, August 29, 2022 3:24 PM
**To:** steven.caponi@klgates.com
**Cc:** stephen3d@mac.com; ntwallace@aol.com; 'Chi Eng' <chi@englawfirm.com>
**Subject:** Discussion with Hawk and Rembrandt

Steve:

I am writing to request a meeting with principals and counsel for Hawk and Rembrandt.

I want to thank you for time to discuss our respective positions with respect to Rembrandt's technology.  We prefer a voluntary resolution and continued reasonable and informed discussions is the best way to get to a resolution that works for all parties.

During our call, you asked what Rembrandt's course of action would be if we don't reach agreement.  While the details might vary, put simply, Rembrandt is first working to prevent further inappropriate transfer of our IP and will then work on enforcing its rights if necessary.

I see from your latest filing that you are arguing that Hawk should have received the higher voting shares and your client would be in a position to control Stream.  If your client intends to control Stream as an operating business, our settlement agreement provides Stream a license so long as the payments are made and units provided at cost.  In short, we would need do nothing at that point other than ensure the settlement agreement was honored.  Our concern arises if your client intends to further a transfer or our IP outside of Stream.

To be blunt, I think Rembrandt has done all that it needs to do to shut down an effective sale of assets unless your team plans to attempt to hide or fail to disclose our claims to the potential purchaser. We have put you on notice of our rights.  Any reasonable investigation will show that Stream had no technology prior to taking Rembrandt's IP.  All of Stream's technology was built on our IP and by contract all those improvements are owned by Rembrandt and licensed to Stream through a non-exclusive license. While it is theoretically possible that you could make such a sale without including the settlement agreement, the discount to the valuation would be enormous.  As we have pointed out previously, the practical cost of honoring our settlement agreement is far lower than the cost of not doing so.

However, if you want to continue to discuss what Rembrandt's next steps would be if Hawk proceeded with an attempt to transfer our technology out of Stream, we would ask the court to specifically exclude our technology from the transfer of assets under any foreclosure.  I can see the court doing one of several things with such a request: 1) ignore us and merely state that SeeCubic/SLS/Hawk are entitled to Stream's assets and if Rembrandt wants to allege their assets are included, Rembrandt and law enforcement can enforce independently against the individuals and companies involved in any misappropriation; 2) appointing a special master to assist in excluding Rembrandt technology from the sale; or 3) ordering anyone taking the technology assets from Stream to take them with our settlement agreement.  How do any of those results put your client in a good position? Ironically, the third outcome is the best situation for your client and is the one you seem to want to avoid.

There is little question that SLS, Hawk, SeeCubic, and their principals are not directly parties to Rembrandt's settlement agreement.  If you take the position in the foreclosure that you are not taking our settlement agreement as part of Stream's assets, your team does not take on the specific obligations but it also does not have the license either.  That means the entities and all people facilitating any unauthorized transfer are immediately subject to suit and nothing binds Rembrandt to the original relatively modest financial terms of the settlement agreement.

1

Are you hoping that our settlement demand will be lower for SeeCubic or for Hawk? Stream was planning to make and sell its own products and had things to offer Rembrandt beyond cash. Your client just wants to sell the technology to the highest bidder. It is our understanding that many of the individuals and companies have far more assets than Stream or the Rajans.

While I understand that your client is confident about the negative allegations made by the Rajans and Stream, we are not similar actors. When Philips shut down its 3D team, 3D Fusion/Steve Blumenthal when to Philips and licensed their technology. The Eindhoven team went from working with Philips to working with 3D Fusion and 3D Fusion developed the 3D technology for many months prior to cutting their deal with the Rajans and Stream. Stream had zero technology and then took all of the IP we showed them. We have years of interactions, documents, patents, designs, emails, etc. to support our claim and every allegation we have made has been supported by such documents. We have not waivered or changed our position in 12 years. To my knowledge, in the entirety of those 12 years, no one has accused Steve Blumenthal of stealing any technology and all documents to date prove our allegations. I have challenged Stream to provide even a single page of development documents or an email that prove otherwise. I have done so in front of Magistrate Parker, their legal counsel, all the Stream officers, and the Stream board. The only effort that Stream made to contest our proof was to allege their engineers did not sign NDAs with 3D Fusion and promptly thereafter, we provided copies of the executed NDAs. So not only did we have the documents to support our claims, Stream and their engineers got caught in an immediate lie. I doubt that DLA Piper was suborning perjury. I am guessing that their client was lying to them and they were quickly caught. As you can imagine, we made quite an issue about whether there were any documents DLA Piper relied upon to support their declarations and defenses and it was clear during negotiations that they had nothing to contest our mountain of documents supporting our claims and had relied on mere oral statements by employees of Stream.

Basically, everyone that was around in 2009 and 2010 amounted to Steve, the Rajans, and a bunch of foreign nationals that were likely to refuse to show up or take the 5th. At some point, the Rajans are going to realize that their best interests are served by having as much technology as possible be owned by Rembrandt. My guess is they will suddenly agree that all of Rembrandt's allegations are true and therefore all IP is owned by Rembrandt and licensed to Stream in a way that is not subject to foreclosure. It is our expectation that 100% of the people that are willing to testify and all documentation will show all original IP was Rembrandt's.

We have ensured that you and your client are fully on notice of our rights and provided a clear path to honor those rights going forward. I read your complaint against Stream and noted that while you do take time to allege that Stream was developing 3D technology, you fail to mention anything about the Phiips license, the 3D Fusion agreements, the Rembrandt litigation, or the claim that Rembrandt owns the underlying technology. While I am unsure of what justification you could provide for ignoring Rembrandt's rights, it seems even more egregious that you failed to mention that anybody taking the technology through foreclosure would need a license from Philips.

3D Fusion had a license from Philips and so did Stream. I don't believe the Stream license from Philips is assignable and Shad testified previously that SeeCubic had not paid for a license from Philips. While Philips can enforce its own IP rights, it would be a very hard case for Hawk to defend given the fact that I have sent you copies of the Philips license 3D Fusion took and unlike your complaint, Rembrandt made sure to inform the court from the outset of other IP rights in play. It seems that Hawk is intent on involving itself in misappropriation of a lot of intellectual property owned by multiple parties.

There is a clear path for your client to acquire rights to the technology in the right way. It is the same path my client took back in 2009 – license the rights from the owner to the technology. While many years, late, Stream has done so, but as best we can tell, your client, SLS, and SeeCubic seem intent on proceeding without a license from Rembrandt or Philips.

Rembrandt's team is working on contingency. We are not going to inefficiently initiate litigation in a wide variety of forums that have little impact on the actual transfer of our technology to new people. We did pop our heads into the bankruptcy action, but have let the fights between SeeCubic and Stream play out because as best we can tell, no one new is being told about our technology as it appears to be the same engineering team. We have engaged with you again now that we see someone trying to actually transfer our technology again. Our successful litigation against Stream confirms that we are prepared to litigate if necessary, but it is reasonable for you to expect us to do so efficiently and when it will have the greatest practical impact. However, I am reasonably confident that no further litigation by Rembrandt will be necessary as our claim

has such a deleterious impact on any attempt to sell the assets that at some point your team will have to disclose Rembrandt's claim. By that time,

I understand that your team will want to maintain some semblance of a position for having the right to sell off Stream assets without needing a license from Rembrandt, it is just not a practical business position. We are not demanding that your team accept our legal position or apologize.  We are proposing business solutions to move all of our clients forward.

The current situation is that SLS/Hawk have a security interest in Stream's technology, but not technology owned by Rembrandt and licensed to Stream.  If I was representing Stream in defending the foreclosure action, I would highly support Rembrandt's claims of IP ownership and in particular the contractual ownership of all improvements to the technology.  That way none of the technology would be subject to foreclosure.  Sure SLS/Hawk can take the server, but ownership and all source code and patents should be assigned to Rembrandt pursuant to the terms of the agreement I previously sent you.  Basically, taking that position would leave the secured creditors with almost nothing of value and Stream would have its license from Rembrandt.

Even assuming that your team argued some of the technology was unrelated to what Mr. Blumenthal's team developed originally, those incremental pieces are unnecessary to have a high end 3D display.  The Rembrandt Delaware based operating company has been putting out product for many years without need of any of them.  You can go see one of our installations at the Frank Lloyd Wright museum or the Pittsburg airport.  Point being, a saleable product or technology package by Stream or SeeCubic needs Rembrandt's IP, but Rembrandt does not need any technology from Stream.  Rembrandt is in a position to provide IP to either party that allows it to operate without need to any of the technology from Stream.

Again, hypothetically placing myself into Stream's counsel's shoes, I would argue that the value of the technology provided in the foreclosure more than covers the debt owed.  I believe all parties have taken positions that the technology is worth hundreds of millions of dollars.  If a public sale without a license from Rembrandt only generated a portion of that value, I think we should expect that Stream would argue that any lowering of value in the public sale was due to the lenders' failure to take the proper license for Rembrandt allowing a clean sale.  Therefore, a foreclosure action by SLS/Hawk may actually relieve Stream of all of its debt.and leave Stream with the ability to sell a capable 3D product.

Obviously, taking a license from Rembrandt directly or pursuing assignment of the settlement agreement provides your client with freedom of action to sell an intact technology portfolio, however, Rembrandt is free to issue Stream another license to the technology as the settlement agreement is non-exclusive.  It is in the Rajans' and Stream's interest to argue that all technology developed by Stream were improvements to Rembrandt's technology and Rembrandt is free to license it back to them.

We have discussed the sale of Rembrandt Holding (subject to a license to Rembrandt Delaware).  This is a solution which eliminates any issues with the IP and gives your client a clear path to achieving its goals. And we may also be able to give you the ability to end all litigation with Stream. You said that Stream owes SeeCubic enough money. That may be, but so far the Rajans individually owe nothing, whereas they have signed our settlement agreement owing just under $6 million in payments.  Rembrandt Holding has the ability to sue for collection directly against the Rajans and seize their shares in Stream (and associated entities) and acquire control of Stream. Hawk could pursue transfer to the settlement agreement to SeeCubic and block further licenses back to Stream.  Further, owning Rembrandt Holding would allow you to cancel the license as Stream has not paid us for it.

It should also be noted that the shares in Rembrandt Holding could be sold to anyone else, including Stream, the Rajans, or third party. We have not been shy about our interest in commercializing and generating revenue from Rembrandt's IP.

If the assets are returned to Stream and they are able to pay the SLS debt, it would seem that would end SLS/SeeCubic rights going forward. We are unclear whether Hawk's debt has been converted now that the omnibus agreement is void.  I imagine more litigation is contemplated on all those fronts and we would intend to stay out of those disputes, but that you might make different decisions if you owned Rembrandt Holdings.  Owning the Rembrandt patents, original technology, and the rights to enforce or terminate the license would give you far more control going forward.

While I understand that you will want to leave the portion open for Rembrandt's claims, we believe that we have moved past the time for the initial dance around liabilities and need to move towards closing a deal if one is to be had.

I think you'll find our position more than reasonable given the benefits we can provide. I want to stress that the value of the developing rights to the Philips, Stream, and Rembrandt IP IP will be worth substantially more than attempting to just take rights actually owned by Stream because Stream owns relatively little compared to the technology they licensed from Philips and Rembrandt.

We propose setting up a phone or video conference with our team, you, and your client to discuss a business resolution.

I look forward to speaking with you.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

Email: michaels@bpmlegal.com
Direct Dial:  607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc.,  (Stream)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10763 (MDC) |

| | |
|---|---|
| In re:<br><br>Technovative Media, Inc.,  (Technovative)<br><br>Debtor. | Chapter 11<br><br>Bky. No. 23-10764 (MDC)<br><br>(Jointly Administered) |

**ORDER DENYING MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR ENTRY OF AN ORDER APPROVING A SETTLEMENT AGREEMENT AND MUTUAL RELEASE WITH HAWK INVESTMENT HOLDINGS, LTD., AS COLLATERAL AGENT FOR THE SECURED NOTEHOLDERS OF SEECUBIC, INC., PURSUANT TO FED. R. BANKR. P. 9019(a) AND 11 U.S.C. § 105(a)**

Upon the Objection of Rembrandt 3D Holding Ltd. ("Rembrandt"), pursuant to sections 105(a) and 502 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 3007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 3007-1 of the United States Bankruptcy Court of the Eastern District of Pennsylvania Local Bankruptcy Rules (the "Local Rules"), seeking entry of an order (the "Order") denying the motion of William A. Homony, in his capacity as chapter 11 trustee, for entry of an order approving a settlement agreement and mutual release with Hawk Investment Holdings, Ltd., as collateral agent for the secured noteholders of SeeCubic, Inc., pursuant to Fed. R. Bankr. P. 9019(a) and 11 U.S.C. § 105(a).

NOW, THEREFORE, it is hereby ORDERED that:

1. The Motion is denied to the extent set forth herein.

2. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

3.      The Clerk of the Court is authorized to take all steps necessary or appropriate

to effectuate the relief granted pursuant to this Order.

4.      The Bankruptcy Court retains jurisdiction with respect to all matters arising

from or related to the implementation, interpretation, and enforcement of this Order.


Dated:                                      _____
                                            The Honorable Ashely M. Chan
                                            United States Bankruptcy Judge