**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., (Stream) | Bky. No. 23-10763 (MDC) |
| Debtor. | |

| | |
|---|---|
| In re: | Chapter 11 |
| Technovative Media, Inc., (Technovative) | Bky. No. 23-10764 (MDC) |
| Debtor. | (Jointly Administered) |

| | |
|---|---|
| STREAM TV NETWORKS, INC. and TECHNOVATIVE MEDIA, INC. | |
| Plaintiffs, | |
| -v. | Adversary No. 23-00057 |
| SHADRON L. STASTNEY, *et al.,* | |
| Defendants. | |

**REMBRANDT 3D HOLDING LTD.'S MOTION SEEKING (I) ENFORCEMENT OF THE TEMPORARY RESTRAINING ORDER, (II) SANCTIONS AGAINST PARTIES WHO VIOLATED THE TEMPORARY RESTRAINING ORDER, AND (III) INJUNCTIVE RELIEF**

Rembrandt 3D Holding Ltd. ("**Rembrandt**"), by and through its undersigned counsel,

hereby file this Motion seeking (1) enforcement of the Temporary Restraining Order (the "**TRO**")

78937522;5

issued January 4, 2024[1] and extended through December 9, 2024[2]; (2) sanctions against parties who have violated the TRO or were complicit in such violations; and (3) injunctive relief preventing the sale of the assets held by Stream TV Networks, Inc. ("**Stream**") and Technovative Media, Inc. ("**Technovative**," and with Stream, the "**Debtors**") which include the intellectual property of Rembrandt.

## PRELIMINARY STATEMENT

1.      This is a motion to compel the secured creditors, Hawk Investment Holdings Ltd ("**Hawk**") and SeeCubic, Inc. ("**SeeCubic**") to comply with the existing TRO, cease all current actions violating same, order the Trustee to prevent such violations, and grant Rembrandt the right to discovery of Hawk, SeeCubic, the Trustee and the investment bank (SSG) to determine the extent of the violations, and specifically how a subsidiary of Stream, SeeCubic, B.V. was providing demo units including Rembrandt intellectual property to SeeCubic in violation of Rembrandt's license to Stream (See Exhibit A to the Declaration of Christopher Michaels, attached to this motion as Exhibit 1) and subjecting Stream and SeeCubic, BV to damages for patent infringement under 35 U.S.C. § 271 and for trade secret misappropriation under 18 U.S.C. § 1832.

2.      The UltraD technology is a combination of technology owned by Koninklijke Philips Electronics ("**Philips**"), Rembrandt, and Stream (and its subsidiaries) and that once that technology package is broken, the Debtor cannot fix it later.  (See testimony of Christopher Michaels at the hearing on September 22, 2023 at pages 38 and 39; "*I think the primary issue that we will all benefit from in this proceeding is to accurately understand what Stream needs  in order to have a going concern value and to create the most value in the bankruptcy estate. The concept*

---

[1] Adversary Case 23-00057-amc, docket no. 119
[2] Adversary Case 23-00057-amc, docket no. 152

78937522;5

of taking a portfolio of technology developed partly at Philips, partly at Rembrandt, partly at Stream, and then starting to carve it up and sell it off piecemeal is like taking a Ferrari and deciding to go at it with a blowtorch and start trying to cut out the engine that is Philips, and the transmission that was Rembrandt, and saying hey, we got this pretty red car, right? Pay me $250,000 for it and you've probably got $200 worth of scrap metal. That's what's about to happen. This company has value in the technology portfolio that it has created. The licenses from Philips and Rembrandt connected with their own technology that is worth far more collectively in its whole than any of the individual parts. And it's not even clear that you could put the parts back together. Somebody would have to go reacquire a license from Philips, a license, you know, the technology rights to Stream, and a license from Rembrandt. And we don't have to give that license. I mean, we can decide whether, you know, we may have our own desires and needs at that point and we wouldn't have to grant that license, which would effectively render the technology worthless. A Chapter 7 sale of assets, the only bidder, I mean, that would have the right to come in and buy these assets is Rembrandt. I mean, good for us, but not likely to create much value in the bankruptcy estate. I mean, we would be the only one to walk 1 away with clear technology rights going forward."*)

3.    Judge Coleman found that "*the Debtors have shown that there is risk of immediate irreparable injury to Stream's alleged intellectual property in the form of possible permanent loss of Stream's rights in the Philips and Rembrandt licenses.*" (D.I. 119 at page 5)

4.    The TRO specifically protected Rembrandt's intellectual property and license to Stream as follows: "*No Defendant shall, prior to the conclusion of the Final Hearing, take any action to sublicense, transfer, assign, or otherwise dispose of or affect any license or technology*

*held or purported to be held by the Debtors' estates, including but not limited to the UltraD technology, and the Philips or Rembrandt licenses.*" (D.I. 119 at page 6)

5.      During the hearing before the court on November 17, 2024, Rembrandt raised the issue that it believed SeeCubic had demonstrated a display that is an asset of Stream including Rembrandt technology to the Trustee. However, Ms. Brumee representing, SeeCubic, stood and reported that in actuality "*The demo units were developed and built by SeeCubic B.V. in the Netherlands, which is five entities down in the corporate structure. Any demo unit that has been produced and especially one that Mr. Homony has seen would be from SeeCubic B.V.*" (Transcript from November 17, 2024 hearing at page 45)

6.      Both SeeCubic, Inc. and SeeCubic, BV are Defendants covered by the protective order and Ms. Brumee confirmed that those two defendants flagrantly violated the temporary restraining order by delivering demos using both Philips and Rembrandt technology violating both the Rembrandt and Philips licenses.

7.      Neither SeeCubic, Inc. or SeeCubic, BV have a license from Rembrandt or Philips. In both cases it is the parents of SeeCubic, BV that hold a license that allows SeeCubic, BV to manufacture product and use the licensed technology make TVs for the license holder (Stream).

8.      SeeCubic does not have a license from Rembrandt and SeeCubic, BV's use of Rembrandt intellectual property to provide demo units to any entity other than Stream is an interference of Rembrandt's license to Stream.

9.      SeeCubic, Inc. and SeeCubic, BV are using Rembrandt's IP in support of an effort to acquire the property as well as to market the assets, including Rembrandt's technology, in an effort to commercialize the technology. This conduct violates the TRO issued by this Court and injures both Rembrandt and the Debtor.

10.    Neither Hawk or SeeCubic own any technology related to no glasses 3D TV outside of the technology provided by the Debtors, Rembrandt, and Philips. They have no authority to demonstrate it or misrepresent their ownership.

11.    Despite the TRO, SeeCubic has continued to act as their acquisition is assured and that they have the right to all the underlying technology, including Rembrandt's and Philip's intellectual property, neither of which should be included in any 363 Sale as neither agreement is assignable and the Philips Agreement terminates upon change of control (See Sections 1.9 and 5.4(d) of the Philips license.

12.    To terminate the Philips license, any source code, know-how, or software prior to must be removed from the Ultra-D technology and Ultra-D Ventures must make a specific showing to Philips that the full license has been paid and  the products proposed by Ultra-D do not infringe any of their patents that are still in force (see section 5.5 (d) of the Philips license.

13.    Until the Philips software has been removed from the Ultra-D code and the showing with respect to the roughly 1,500 Philips patents has been made, it is not possible to ascertain what if any of the Ultra-D technology can be sold.

14.    Basically, the Stalking Horse bidder wants the value of the combined Philips, Rembrandt, and Stream technology but the Debtors do not own the Philips and Rembrandt technology and transferring the Philips and Rembrandt technology violates both agreements.

15.    Interfering with the Philips and Rembrandt agreements is specifically prohibited by the TRO, but that is precisely what the Defendants are doing which not only damages Rembrandt but shows a disdain for this Court and its authority.

16.    This Court should make clear its Orders are to be obeyed and that the deliberate violation of its Orders cannot and will not be tolerated. This Court should make clear the TRO will

78937522;5

be enforced, these parties are enjoined from any future violations and those violating it should be sanctioned.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Standing Order of Reference to the Bankruptcy Court Under Title 11 of the United States District Court for the Eastern District of Pennsylvania, dated July 25, 1984, and as amended (Luongo, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1409 and 1409.

## BACKGROUND

**A.      Rembrandt Develops Glasses-Free 3D Innovations Consisting of Technology Patents and Trade Secrets, which it Licenses to Stream Through a Settlement Agreement.**

18.     Rembrandt is the successor to, and current owner of technology developed by, 3D Fusion Corp. ("**3DFusion**"). From 2007 through early 2011, 3DFusion developed innovations for use in glasses-free 3D products. A chronology of events and an overview of the patents, know-how, and trade secrets of Rembrandt (the "**Rembrandt IP**") are detailed in Rembrandt's objection to the *Motion Of William A.Homony In His Capacity As Chapter 11 Trustee for (I) an Order (A) Approving Bidding Procedures and Form Asset Purchase Agreement for the Sale of Substantially all of the Debtor'sAssets Including Approval of the Provisions for Designation of a Stalking Horse, (B) Establishing the Notice Procedures and Approving the Form and Manner of Notice Thereof and scheduling and Auction, (C) Approving Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (D) Scheduling a Sale Hearing, and (E) Granting Expedited Consideration Pursuant to Local Rule of Bankruptcy Procedure 5070-1(g); and (F) Granting Related Relief and (II) an Order Approving (A) the Sale of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption*

*and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief* ("**Trustee's Bid Procedures & Sale Motion**") filed on November 6, 2024 [Docket No. 789], which is incorporated herein by reference (the "**Bid Procedures Objection**") (*Bid Procedures Objection* at ¶¶ 15-29).

19.    Following years of litigation and a Settlement Term Sheet negotiated and signed by Shadron Stastney on behalf of Stream[3], Rembrandt and Stream finally executed a Settlement Agreement on May 23, 2021 as detailed in the Bid Procedures Objection (*id* at ¶¶ 30-44). (Stastney is now the CEO of SeeCubic, Inc.). In the agreement, Stream agreed to make cash payments and provide certain product considerations in exchange for the right to use the Rembrandt IP (the "**Rembrandt License**"). The Rembrandt License explicitly gave Stream—and its subsidiaries—the right to use the Rembrandt IP, *solely for the benefit of Stream*. Any use by Stream's subsidiaries like SeeCubic, BV for the benefit of other parties, including itself and SeeCubic, Inc., is not permitted and constitutes a violation of the license and infringement and misappropriation of the Rembrandt IP.  This is commonly referred to as a "have made" sublicense right and is similar to the rights provided in the license with Philips that allows Stream or UltraD Ventures to allow other entities to make products for the license holder.  However, the subsidiary (SeeCubic, BV) is not authorized to start making products for other entities.

**B.    Rembrandt Files a Complaint Against SeeCubic, Inc. and Others After SeeCubic, Inc. Seizes the Stream Assets, Refuses to Obtain a Rembrandt License, and Refuses to Return the Assets to Stream.**

---

[3] The Settlement Term Sheet was executed in a mediation conference under the supervision of Magistrate Judge Parker in the U.S. District Court for the Southern District of New York on April 9, 2019 (*Rembrandt 3D Holding, Ltd. v. Stream TV Network, Inc. et al*., No. 17-CV-882-RA). The terms of the Settlement Term Sheet are substantially the same as those contained in the Settlement Agreement executed between Rembrandt and Stream on May 23, 2021.

78937522;5

20.     SeeCubic, Inc. seized Stream's assets, including the Ultra-D technology (the "**Stream Assets**"), pursuant to an Omnibus Agreement that purported to transfer title and possession of the Stream Assets to a "newco" (SeeCubic, Inc.[4]) as settlement of unpaid secured debt and ongoing litigation. As detailed in the Bid Procedures Objection, the Omnibus Agreement was initially validated by the Delaware Court of Chancery in December 2020 before being invalidated by the Delaware Supreme Court in June 2022. (*id* at ¶¶ 45-48).

21.     After months of failed arguments on why it should be entitled to retain possession of the Stream assets following the Delaware Supreme Court mandate, SeeCubic, Inc. was explicitly ordered by the Chancery Court on September 30, 2022 to return the shares of Technovative stock to Stream, thereby transferring legal title to all subsidiaries (and interest in the assets held by them) back to Stream. In response, Stastney executed a carefully choreographed maneuver whereby the Technovative shares were transferred by SeeCubic, Inc. but immediately seized by Hawk through purported "proxy rights" that Hawk claimed allowed it to appoint Stastney as director of Technovative and all other subsidiaries. Vice Chancellor Laster recognized the scheme for what it was and found Stastney, SeeCubic, Inc., and Hawk in contempt[5], stating: "This

---

[4] SeeCubic, Inc. was incorporated in the state of Delaware on May 20, 2020 by Shadron Stastney, who named it "SeeCubic, Inc." for the specific purpose of misleading StreamTV's customers and other market participants to believe that SeeCubic, Inc. was either an affiliate of StreamTV or Stream's subsidiary, SeeCubic, BV, or both. See *10/30/23 Hearing Transcript* at 117:7-13.  Mr. Stastney misappropriated the SeeCubic trademark (property of the StreamTV estate) through a fraudulent trademark registration with the Patent and Trademark Office, purporting to "authenticate" his ownership and control of the mark by filing, and not correcting, a Delaware Chancery Court decision that had been reversed at the time his registration by a unanimous en-banc decision by the Delaware Supreme Court.  See *11/27/23 Hearing Transcript* at 53:1-79:15. Moreover, Stastney and SeeCubic, Inc. continued to operate a website under the Debtor-owned URL "SeeCubic.com," which SeeCubic, Inc. and Stastney refused to return to the Debtors but nonetheless filled with misleading content, technology, and accomplishments that were actually attributable to StreamTV. See *11/27/23 Hearing Transcript* at 229:3-234:9.
[5] C.A. No. 2020-0766-JTL, *Opinion* dated October 3, 2022.

decision holds that SeeCubic [Inc.] and Hawk engaged in contemptuous conduct. Shad L. Stastney was the puppet master who pulled the strings." Despite the reproach, SeeCubic, Inc. has never fully returned possession, custody, and control of the Stream assets to Stream. Indeed, as set forth in greater detail below, Mr. Stastney, SeeCubic, Inc., and Hawk maintained this pattern and practice of misappropriation and contempt for court orders through to the present proceedings before this Court. After using the invalidated Omnibus Agreement to take control of the Stream assets, SeeCubic, Inc. proceeded to destroy the value of those assets by breaching both the Philips and Rembrandt license agreements and promulgating a business plan based on infringing intellectual property. Specifically, Stastney and SeeCubic, Inc. sought to license out technology belonging to Philips and Rembrandt notwithstanding the fact that both licenses specifically prohibit such sublicensing efforts, thereby creating massive liabilities for infringement at Stream's subsidiary companies and specifically at Technovative.

22.     Upon learning of SeeCubic, Inc.'s malfeasance and reviewing its website and attempts to license out Rembrandt's technology through its control of Technovative and subsidiaries of Technovative, Rembrandt filed a *Complaint for Injunctive Relief and Misappropriation of Trade Secrets* (the "**Delaware Complaint**") in the United States District Court for the District of Delaware against Technovative, Hawk, and SeeCubic, Inc.[6] The Delaware Complaint is incorporated herein by reference. That case against Technovative is currently stayed due to these Bankruptcy Cases, but it remains active against defendants Hawk and SeeCubic, Inc.

## C.     Rembrandt Learns SeeCubic, B.V. Intends to Sell Products With Rembrandt Technology

---

[6] C.A. No. 23-193-GBW

78937522;5

23. Stastney, Hawk, and SeeCubic, Inc. initiated legal proceedings in the Amsterdam Court and succeeded in installing Stastney as the interim director of the Debtors' three Dutch subsidiaries which own and control the Debtors' small-run manufacturing equipment, mass production optical bonding equipment, technology patent portfolio, research and development operations, computer source code, and other intellectual property.[7]

24. The Dutch Court appointed an attorney from Jones Day, Mr. Berkenbosch, as an independent director.[8]

25. Rembrandt was informed by the Debtor's counsel that SeeCubic, BV was planning to work in concert with SeeCubic, Inc. to sell products outside of Stream and therefore SeeCubic, BV would be in violation of Rembrandt's license that allowed SeeCubic, BV to be in possession of Rembrandt's trade secrets.

26. Rembrandt corresponded with Mr. Berkenbosch and other attorneys at Jones Day and Mr. Michaels final email to the attorneys at Jones Day on August 7, 2023 reads as follows (see full email history attached as Exhibit 2):

> *Mr. Suurmond, Mr. Berkenbosch, and Mr. Shumaker:*
> *Over the course of my career I have had numerous positive interactions and have recommended your firm for IP litigation a number of times. Frankly, I am stunned by your lack of response and determination to actively misappropriate Rembrandt's technology in your role as director of Seecubic BV.*
>
> *While you have admittedly not reviewed our claims, other highly reputable firms have. Our settlement agreement and license with Stream was reviewed and prepared by Stream's attorneys, DLA Piper, at the direction of Shad Stastney. Shad signed the term sheet along with our client in front of a federal magistrate*

---

[7] Notably, the Dutch Court's order installing Stastney as director of SeeCubic, BV made it clear that the appointment was made "on an interim basis" pending direction and an order from a court of competent jurisdiction – which this Court certainly has the capacity to do upon the Trustee's motion. See Amsterdam Court's Summary Judgment of September 20, 2023 (attached hereto as Exhibit 4). Curiously, despite the indisputable value at SeeCubic, BV, the Trustee has made no motion to take control over these assets or to appoint himself or his deputy as director of SeeCubic, BV.

[8] See Amsterdam Court's Summary Judgment of June 29, 2023 (attached hereto as Exhibit.3).

78937522;5

*judge. Stream executed the final agreement on the same commercial terms and the agreement was reviewed by a number of law firms including Armstrong Teasdale, representing Stream. Further, the agreement has most recently been reviewed by Steam's counsel, Lewis Brisbois, prior to their choosing to accept or reject it as an executory contract in the bankruptcy. They reviewed our claims, and again decided a license was in the best interest of Stream..*

*In view of the years of litigation that have preceeded this situation, a settlement agreement reached, and all the officers and attorneys of the current corporate parent of Seecubic BV stating that a license from Rembrandt is necessary for Seecubic BV to proceed, it is extremely surprising to me that you would knowingly misappropriate Rembrandt's technology. Your actions are completely outside all of my prior experience with your firm. It is extremely difficult for me to believe that any of the numerous IP attorneys at Jones Day would recommend your course of action.*

*I have not heard from you in response to my email, but I was provided a copy of your emails with Stream's counsel and Ben Schladweiler provided copies of your email to Shad at the oral argument last week.*

*As I understand the current situation, you are proposing that you, and Jones Day, acting as a director will be the sole person to act and authorize the misappropriation and use of Rembrandt technology to fulfil contracts for commercial purposes to generate revenue for Seecubic BV. We have put you on notice or Rembrandt's trade secrets and you appear to be willfully engaging in use of Rembrandt's technology. To use your own words, "[You] have only been involved in the IP discussion since last week, it is very complicated, going on already for years, BV employees have a different view."*

*While it has been going on for years, it was settled some time ago with a settlement agreement and license valued at over $1.2 billion. Notably, the financial terms, IP ownership, and lack of right to sublicense were negotiated with Shad Stastney and later approved by Mathu Rajan. We all agreed that a license was necessary from Rembrandt for the UltraD system. In the case of Shad, his ascent was before Magistrate Parker. Now you are proposing the dramatic action of misappropriating the technology all over again at Seecubic BV. What possible basis/defense do you have for doing so?*

*While we are not sure of all of the employees at Seecubic BV that have had access to Rembrandt trade secrets, we do know that Dr. Bart Barenbrug had access to many documents, emails, and was on most group phone calls and helped 3DFusion deliver 30+ projects related to no glasses 3D displays and content. Have you or others at your firm reviewed those emails and documents that Dr. Barenbrug exchanged with my client? Have your evaluated whether the trade secrets and developments made at the time are included in the UltraD technology that you are authorizing to be supplied to third parties?*

*I am guessing that he has shared precisely zero documents. His zero documents will be compared to thousands of pages of evidence that I have sitting on our servers that I have reviewed. Those documents will be compared to the technology in UltraD. I have three massive binders with our work product and analysis of the misappropriation and infringement. We have shared pieces of that evidence in confidence to Stream's various counsels to get to settlement and acceptanceof that sett lement in the Stream plan. Each successive law firm looked at the information and recommended Stream enter the settlement agreement.*

*It is worth noting that DLA Piper started off strongly advocating that Stream did not need a license. They even filed a motion to dismiss with a declaration from Dr. Barenbrug that claimed among other things that he did not sing an NDA. When Rembrandt quickly provided evidence contradicting his testimony, we pressed DLA Piper attorneys on whether they knowingly suborned perjury by filing the false declarations. They told the judge that they wrote the declarations based on what they had been told by Dr. Barenbrug. We have provided Stream's various counsel further evidence during mediations that led to the settlement agreement and inclusion in Stream's bankruptcy plan.*

*We are pursuing an injunction against Seecubic, Inc. the judge ruled that because a license was possible, monetary damages would suffice and that an independent director was appointed in the Netherlands. The value of the license is between $1.2-1.5 billion US. This is not a trivial value and no rationale company takes on a $1.2 billion obligation if they could avoid doing so. While I appreciate that you may not have had time to review the thousands of pages that Stephen Blumenthal and Bart Barenbrug shared many years ago, I don't think your failure to properly investigate the matter provides much cover from liability for Jones Day for our license fee if you knowingly engage in using Rembrandt technology without a license. I am not aware of any assets within Seecubic BV that would come close to covering this license fee, so Jones Day will be left paying the license fee.*

*I don't think there is any dispute Seecubic BV does not have a license from Rembrandt. As I understand your comments in your emails, you have not evaluated this situation other than to ask some Seecubic BV employees that are likely implicated in the misappropriation. I previously suggested that you consult with some of the numerous IP attorneys at Jones Day and that we set up a call to review the situation. Your firm is very well regarded for intellectual property work in the US. You have a very large number of attorneys with expert knowledge in trade secrets and patents. In addition, those experts can advise you on the liability of directors for misappropriation and infringement but I have attached an article on the topic: (chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.wsgr.com/PDFSearch/IP_RESPONSIBILTY.pdf)*

*I am guessing you are being encouraged by employees at Seecubic BV and/or Seecubic, Inc to take such actions. You and Jones Day will be liable for the*

*damages of your misappropriation. Have you asked Shadron Stastney, Bob Morton, Bart Barenbrug, Seecubic, Hawk, SLS or any person/entity that is encouraging you to take such action to indemnify you and Jones Day if it turns out Rembrandt's claims are valid? You and Jones Day are taking on immense liability at the encouragement of people that are showing up in court and arguing that it isn't them conducting the misappropriation but rather the director in the Netherlands and the judge even noted it his decision. SLS/Seecubic and Hawk have filed claims in excess of $175,000,000 in the Stream bankruptcy. Have you asked them to pledge those assets to cover liability to Jones Day if they are wrong in what they are encouraging your firm to do? While those assets are a small fraction of the license fee Jones Day will owe, at least you will find out in a hurry just how confident they are in their position when asked to take a small fraction of the risk Jones Day is taking on by your actions as director.*

*To be clear, I am hereby putting you personally and Jones Day on notice of Rembrandt's claim and that use of Rembrandt technology will trigger at a minimum the value of the license with Stream. This amount was calculated based on representations made by Shadron Stastney to Rembrandt while he was the CFO at Stream that the profit margin on Stream TVs would be $400/unit, but Mathu Rajan testified that he expects profit margins to be $500/unit, which would potentially make Rembrandt's claim even higher such that the value of the license is $1.2-1.5 billion. The judge felt there was no imminent harm because a monetary license was possible, but I pointed out the there is no way Seecubic BV could pay the license fee. The judge has pointed to the independent director. Our license fee is roughly ½ of your firm's annual revenue and Seecubic, BV has almost no assets or revenue, so as a practical matter your firm is the only entity that can afford to pay the license fee.*

*In addition, I am requesting your cooperation prior to adding Jones Day to any pending litigation for the following pre-litigation investigation:*

*1. Please clarify if Jones Day has authorized delivery of any prototype, content, display, or other implementation of UltraD technology after my email to you;*

*2. Please identify the employees at Seecubic BV that you were referring to as having a different view in your email; and*

*3. If you provided such authorization, please identify any opinions of counsel you relied upon in providing such authorization.*

*We are also considering petitioning for a FRCP Rule 27 pre-litigation deposition of Jones Day, we are making this request prior to fi ling a petition or adding Jones Day, and/or other Seecubic BV employees to the pending Delaware action or toa new action in the Southern District of New York where the original litigation was filed in hopes that you will facilitate our investigation.*

*I still remain hopeful that a discussion with a US based IP attorney at Jones Day will help us resolve this issue. I remain ready to participate in a conference call.*

*Chris*

27.     After receiving Rembrandt's email, the independent director resigned on August 9, 2023.[9]

28.     While Rembrandt hoped that the resignation of the independent director would stop SeeCubic's and SeeCubic, BV's continued efforts to interfere with the Rembrandt license to Stream the attempted misappropriation continued.

**D.     The Debtors File for Chapter 11 Protection, Continue to Endure the Denial of their Assets, and Obtain a TRO to enjoin SeeCubic, Inc., Hawk, Stastney, SeeCubic, BV and Others from Using the Debtors' Technology**

29.     On March 15, 2023, the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). Despite filing a Motion for Turnover of estate assets[10], Stream has not received assets still in the possession and under the control of SeeCubic, Inc. and those working in concert with it. All of this was ordered to be turned over to Stream, but thus far Stastney and the entity he controls, SeeCubic, Inc., have refused.

30.     On April 14, 2023, this Court held an emergency hearing regarding Mr. Stastney's and SeeCubic, Inc.'s activities with respect to Debtor-owned entities and assets in the Netherlands and the turnover of estate property.   Judge Coleman was unequivocal in her admonitions to Stastney, SeeCubic, Inc., Hawk and their respective counsel:

"Now, I don't appreciate people going to another jurisdiction and to get another court to decide that they own it and that nothing should happen and no direction should be made with respect to the turnover or release of that equipment.  Because that's exactly what

---

[9] See Translation of Summary Judgement Decision in Amsterdam Court dated September 20, 2023 at paragraph 2.26 attached as Exhibit 4.
[10] Case No. 23-10763 (AMC), Docket No. 76

78937522;5

you guys have asked for. I'm reading it and I don't appreciate that. That's not going to happen."[11]

"I want the matters in the Netherlands, which is scheduled for next week to just hold on a minute, because I'm concerned that this is going to have some impact on what I'm doing. It's going to have some impact on whether the Debtor believes to have their rights here in this Court, and it belongs to them here. And I need to protect those rights with respect to their ability to control these things."[12]

When later informed that Stastney, SeeCubic, Inc., and Hawk moved forward with their court action in the Netherlands in flagrant disregard for her explicit directions at the April 14 hearing, Judge Coleman expressed her displeasure in no uncertain terms:

"I'm hoping it was just the [Amsterdam] Court on its own decided to do that. And I want everybody to know that, if it was not, **there are going to be some serious consequences**. Because I was clear that nothing was to go before that [Court]…" (emphasis added).[13]

Notably, the Amsterdam Court did not decide to do anything "on its own." Rather, the Amsterdam Court acted upon the motion of Stastney, SeeCubic, Inc., and Hawk, while all three continued to ignore prior court orders and the automatic stay.

31.     On September 30, 2023, ten days after Stastney staged his coup to seize operational control of the Debtors' Netherlands subsidiaries, Stream filed a motion seeking injunctive relief to prevent Stastney, SeeCubic, Inc., Hawk, and SeeCubic, BV (at the direction of Stastney) from using the Debtors' technology to compete with the Debtors.[14] Rembrandt filed a memorandum in support, and after months of hearings as detailed in the Bid Procedures Objection, this Court granted a TRO (*Bid Procedures Objection* at ¶¶ 61-64).

**E.     The Enjoined Parties Repeatedly Violated the TRO, and the Trustee Allowed Those Continued TRO Violations.**

---

[11]  See *4/14/23 Hearing Transcript* at 117:7-13.
[12] *Id*. at 181:7-13.
[13] See 6/29/23 *Hearing Transcript* at p.177:19-22.
[14] Docket No. 29

78937522;5

32.     Despite this Court's issuance of the TRO, Stastney, SeeCubic, Inc., Hawk, SeeCubic, BV, and others working in concert with them have continued to use the Debtors' technology (and therefore, the Rembrandt IP) for their own benefit, and to the detriment of the Debtors and other parties in interest. Upon information and belief, SeeCubic, Inc. has used and continues to use the Debtors' assets to raise capital necessary to fulfill its obligation to provide an additional $6.5 million to fund the 363 Sale Carve-Out as required by the Motion if SeeCubic, Inc. prevails as the Stalking Horse Bidder.

33.     On May 6, 2024, Rembrandt notified counsel for SeeCubic, Inc. and Hawk that it had become aware of a planned May 7, 2024 meeting to be held by their clients in violation of the TRO. Counsel for SeeCubic, Inc. failed to acknowledge Rembrandt's email at all. Hawk's counsel eventually responded, but only two days after the alleged meeting had occurred. The email response from Hawk's counsel was revealing in its overly-defensive tone and counsel's presumption to speak for "the Debtors" (i.e. the Trustee):

> It is up to the Debtors to determine whether they believe a violation occurred or needs to be addressed. The Debtors have not taken any action or voiced any concerns. The e-mails also suggest Rembrandt believes its technology may have been improperly used. But there is no pending motion or order defining or dealing with the use of Rembrandt's technology.

34.     The position of Hawk's counsel is untenable because the TRO specifically references the Rembrandt technology and prohibits the Enjoined Parties from:

> Tak[ing] any action to sublicense, transfer, assign, or otherwise dispose of or **affect** any license or technology held or purported to be held by the Debtors' estates, including but not limited to the Ultra-D technology, and the Philips or **Rembrandt licenses**. (*TRO* ¶ 9(a), emphasis added)

35.     Rembrandt need not file a separate motion in this Court to protect its intellectual property, as it is clearly covered by the Court's existing TRO. Indeed, a protected party's access to immediate relief is the *whole point* of obtaining a TRO. And of course, unauthorized use and/or

78937522;5

distribution of its technology does affect the value of Rembrandt's license. Misappropriation of trade secrets constitutes irreparable harm. See *Bimbo Bakeries USA, Inc. v Botticella* 613 F.3d 102 (3d Cir. 2010). In *Bimbo Bakeries,* the court enjoined a former executive from joining a competitor due to the risk of disclosure of valuable trade secrets, and the possibility of such disclose constituted irreparable harm because it would put the former company at a competitive disadvantage that money couldn't remedy. See *Id.* Here, we are past the "possibility of disclosure." SeeCubic, Inc. has possession of the Ultra-D technology that incorporates Rembrandt's protected technology within Ultra-D's physical and digital structure. And SeeCubic, Inc. is actively attempting to commercialize it without the needed Rembrandt license and the Trustee is allowing this malfeasance. This clearly constitutes irreparable harm.

36.    As indicated in the September 2024 Monthly Operating Report filed by the Trustee, a royalty payment was made to Philips pursuant to the Philips license agreement. This confirms that the Debtors' subsidiaries, under the direction of Stastney, have sold products containing the Debtors' technology, the Philips technology, and thus the Rembrandt technology.

37.    Upon information and belief, the Trustee has now filed a royalty report with Philips for the third quarter of 2024, acknowledging that a minimum of 10 technology samples (i.e. 3D panel displays) were sold during a period clearly covered under extensions of the TRO. The intellectual property infringement is ongoing, and the evidence demonstrates that the Trustee has direct knowledge of the infringement.

38.    If the Trustee is aware of violative actions—as he should be, as custodian of estate assets like the Debtors' intellectual property—he must take action to enforce the TRO. Indeed, he is duty-bound to do so. Due to a failure to monitor the actions of parties as to whether SeeCubic, Inc. and Hawk are violating the TRO, the Trustee is failing to secure the Debtor's assets, giving

an unfair advantage to the Enjoined Parties, and negatively impacting all other parties in interest and allowing SeeCubic, Inc. and Hawk to violate this Court's Order with impunity.

39.     Rembrandt sought discovery to investigate by sending notices of depositions on Hawk, SeeCubic, Arthur Morton, and Shadron Stastney, and the court effectively quashed the discovery at the hearing on June 5, 2024, and its order following the next day.

40.     Rembrandt is aware that on multiple occasions[15], commencing from July 26, 2024, Visual Semiconductor, Inc. ("VSI") sought discovery from the Trustee on the issue of likely TRO violations. Such discovery would have yielded critical information for Rembrandt as well. Unwilling to cooperate, the Trustee and filed a Motion to Quash the discovery[16], which begs the question: What does the Trustee have to hide? The nature of his position requires transparency, but his fight to avoid answering questions and producing documents is dubious and calls into question whether the Trustee may have been complicit in the TRO violations. At the very least, the Trustee failed to exercise the reasonable skill and care required of a statutory fiduciary in his position. VSI filed a Motion to Compel discovery on September 4, 2024 seeking assistance from the Court to obtain reasonable discovery. On October 30, 2024, this Court granted the Trustee's Motion to Quash discovery on the issue of TRO violations.[17] As a result, Rembrandt and all other parties in interest have less access, confidence, and visibility into a process that is designed by Congress to be open, fair, and transparent.

41.     Rembrandt notes that VSI has also served discovery requests on Hawk and certain key representatives of Hawk[18]. Rembrandt hopes discovery will be granted to confirm or

---

[15] Case No. 23-10763 (AMC), Docket Nos. 712, 718, and 761
[16] Case No. 23-10763 (AMC), Docket No. 724
[17] Case No. 23-10763 (AMC), Docket No. 777
[18] Case No. 23-10763 (AMC), Docket Nos. 762, 763, 764, and 765

78937522;5

definitively refute any TRO violations committed by Hawk, as collateral agent for SeeCubic, Inc., which holds most if not all of the Debtors' secured debt and serves as the proposed Stalking Horse Bidder. The truth will only be known with transparency on the part of all parties in interest.

42. Rembrandt filed its Sale Objection, in part, because discovery to confirm the extent of the TRO violations—and the Trustee's knowledge of and potential complicity—was quashed. Actions of the enjoined parties in contravention of the TRO affect the Rembrandt IP and must be verified or refuted, not concealed.

43. At any time, the Trustee could have worked with Rembrandt to remove Rembrandt's IP from the assets from the assets being transferred or provided adequate descriptions of the assets so that it was clear that Rembrandt's technology was not included in the sale.

44. The Trustee has failed to meet his duty to identify the assets of the estate and violated his duty to enforce the TRO despite direct knowledge of the violation.

45. While further discovery is appropriate in this matter more generally, discovery is unnecessary to know definitively that both SeeCubic, Inc. and SeeCubic, BV have violated the TRO based on the statement of SeeCubic, Inc.'s counsel during the hearing before the court on November 17, 2024. While representing SeeCubic, Inc., Ms. Brumee rose to rebut prior argument and report that, in actuality, "*The demo units were developed and built by SeeCubic B.V. in the Netherlands, which is five entities down in the corporate structure. Any demo unit that has been produced and especially one that Mr. Homony has seen would be from SeeCubic B.V.*" (Transcript from November 17, 2024 hearing at page 45).

46. The Trustee was not appointed until after the TRO was issued, so Ms. Brumee is clearly admitting that the meeting with demo units provided by SeeCubic, BV to SeeCubic, Inc. occurred after the TRO was in place prohibiting this conduct.

78937522;5

47.     There is no reasonable dispute Mr. Stastney[19], SeeCubic, Inc. and SeeCubic, BV violated the TRO and that the Trustee witnessed the violation during its meeting with SeeCubic presenting demo units provided by SeeCubic, BV in violation of the TRO.

## ARGUMENT

48.     "Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice..." *Voice Sys. and Servs., Inc. v. VMX, Inc.*, citing 28 U.S.C. § 959(a).  In *VMX*, the court granted a preliminary injunction that prevented the debtor from continuing the alleged infringement.[20]

A.     **The Temporary Restraining Order Must Be Enforced**

49.     The TRO must be enforced against any and all parties violating that order, and against the Trustee himself, to the extent to Trustee is allowing, facilitating, or turning a blind eye to such violations. Here, the Trustee's duties and responsibilities are clear, and they run to the Debtors' estates and all parties in the case – not just Hawk and SeeCubic, Inc. and their insider

---

[19] Mr. Stastney demonstrated a StreamTV "demo unit" to Trustee Homony sometime between the Trustee's appointment in January 2024 and their entry into the 9019 Settlement Agreement in May 2024.

[20] "None of this implies that debtors in bankruptcy may violate federal law with impunity, selling patented products or, say, going into the cocaine distribution business. Cf. Douglas G. Baird, *The Elements of Bankruptcy* 194-98 (1992). Damages for wrongs done during the bankruptcy proceeding are administrative claims, and thus paid in full most of the time. The bankruptcy judge may enjoin ongoing wrongs, or release the automatic stay to allow another court to consider claims that debtors are violating the law." *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969, 977 (N.D. Ill. 1992) (Judge Easterbrook sitting by designation); see also *Lancaster Composite, Inc. v. Hardcore Composites Operations, LLC*, No. Civ. 04-1414-SLR, 2005 WL 121794, at *977 (D. Del. Jan. 14, 2005)

78937522;5

principals.[21] The Trustee is aware of the TRO violative actions of the enjoined parties. He was notified by Rembrandt in May 2024 of such activity but took no action to investigate or enforce. The Trustee has filed royalty reports with Philips confirming the manufacture, sale, and distribution of technology demonstrator samples by the enjoined parties.

B. **Parties who have violated the Temporary Restraining Order should be sanctioned**

50.     "Federal courts possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Haeger*, 581 U.S. at 107 (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962)). Among these powers is the ability to sanction "conduct which abuses the judicial process." *Id.* (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991)).

51.     The purpose of a compensatory fine is to restore the injured party to the position he would have held had the contemnor complied with the injunction. *Robin Woods, Inc., v. Woods*, 28 F.3d 396, 400 (3d Cir. 1994). Compensatory sanctions may include the reasonable costs of prosecuting the contempt, including attorneys' fees. *Id.* ("[T]he cost of bringing the violation to the attention of the court is part of the damages suffered by the prevailing party") (quoting *Cook v. Ochsner Found. Hosp.,* 559 F.2d 270, 272 (5th Cir. 1977)). The court has "wide, but not unlimited, discretion in fashioning appropriate compensatory sanctions." *Id.* at 401. *See also In re Linerboard Antitrust Litig.*, 361 F. App'x 392, 399 (3d Cir. 2010). Civil contempt may be employed by a court in order to coerce the defendant into compliance with a court's order and to compensate for losses or damages sustained as a result of disobedience and noncompliance with a court order. *McDonald's Corp. v. Victory Investments*, 727 F.2d 82, 87 (3rd Cir. 1984).

---

[21] See United States Department of Justice Chapter 11 Trustee Handbook, Chapter 2, B, May 4, 2004 ("The trustee is an independent third party who 'steps into the shoes' of the debtor's management and becomes a fiduciary with an obligation of fairness to all parties in the case.")

78937522;5

52.     To support a civil contempt sanction, the movant must demonstrate, by clear and convincing evidence, that the defendants knew of and disobeyed a valid order. *FTC v. Lane Labs-USA, Inc.*, 624 F.3d 575, 582 (3d Cir. 2010) (citations omitted). Ambiguities are resolved in favor of the nonmovant. *Id.* (quoting *John T. v. Del. Cnty. Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003)); *see also New Penn Fin., LLC v. Giglio*, No. 16-1827, 2016 U.S. Dist. LEXIS 101595, at *5-6 (E.D. Pa. Aug. 3, 2016). Here, the evidence is clear and convincing that (1) the TRO is valid; (2) Defendants had knowledge of the TRO; and (3) SeeCubic, Inc., Hawk, Stastney, SeeCubic, BV and others violated the TRO and the Trustee had actual knowledge of such TRO violations.

53.     The TRO is most certainly valid: On August 9, 2022 and based upon Stream's emergency motion, the Delaware Chancery Court issued a temporary restraining order enjoining SeeCubic, Inc. from selling Stream's assets. 8/9/22 TRO ¶ 2. On January 4, 2024, this Court issued the Bankruptcy TRO, enjoining the Hawk Parties from using Stream's technology for ***any purpose***, including but not limited to raising money for the Hawk Parties' use. *See* ECF No. 119, Adv. Case No. 23-00057. This injunction has been extended several times, most recently through December 9, 2024. *See* ECF No. 150, Adv. Case No. 23-00057.

54.     And, SeeCubic, Inc., Hawk, Stastney, SeeCubic, BV and others are clearly aware of the TRO: there have been a series of hearings, admonishments, directives, and orders from the Delaware Supreme Court, the Delaware Chancery Court, and this Bankruptcy Court that make any argument to the contrary an impossibility.

55.     Finally, despite their awareness of the valid TRO, TRO violations continue to occur because the enjoined parties have been permitted to maintain possession and control of estate assets, notwithstanding the Trustee's fiduciary and statutory duties to marshal and recover estate assets. Despite all direction, SeeCubic, Inc., Hawk, Stastney, SeeCubic, BV and others have

returned nothing of real significance (including without limitation, the bonding equipment, lenses, and technology demonstrators, and associated intellectual property) to the Debtors. Notwithstanding this Court's prior directives, Stastney has been allowed to insert himself as and remain the sole director of SeeCubic, BV, Stream's Netherlands R&D subsidiary and one of the enjoined parties. From that insider position, he retains the ability to direct SeeCubic, BV employees to manufacture, sell, and distribute technology samples that violate the Rembrandt license with Stream as well as the TRO itself.

## RELIEF REQUESTED

**A.     The Temporary Restraining Order Must Be Enforced.**

56. After months of testimony in late 2023, this Court reached the conclusion that the Debtors' estates faced irreparable harm should its licenses with Philips and Rembrandt be cancelled, and it issued the TRO enjoining the defendants from activities affecting the licenses of Philips and Rembrandt. Rembrandt was specifically identified in the TRO, and the Rembrandt IP deserves protection thereunder.

57.     Even though the Court has extended the TRO on multiple occasions (most recently through December 9, 2024), TRO violations continue to occur because the Trustee has permitted the enjoined parties to maintain possession and control of estate assets – including but not limited to estate assets that implicate Rembrandt's IP. For example, at the Trustee's sole discretion, Stastney has been allowed to remain the sole director of SeeCubic, BV, facilitating Stastney's manipulation of the bankruptcy and sale process in a manner that violates the Rembrandt license and risks further destruction of estate value and creditor recoveries.

**B.**     Once a temporary restraining order is issued and becomes effective, it is the duty of the court to ensure its immediate and full enforcement. Per Federal Rule of Civil Procedure 65(b), a temporary restraining order expires at the time set by the court, unless extended for good cause or by consent of the adverse party. This rule inherently implies that the

TRO is effective immediately upon issuance and remains so until its expiration or extension. Accordingly, once in effect, the TRO must be enforced without delay to uphold the integrity of the judicial process and ensure the protection of the affected party's legal interests. **Parties who have violated the Temporary Restraining Order should be sanctioned.**

58.     SeeCubic, Inc., Hawk, Stastney (as Chairman and CEO of SeeCubic, Inc., Director of SeeCubic, BV, and Managing Member of SLS) have repeatedly violated the TRO since its issuance in January 2024. These enjoined parties engaged in possession, control, and use of the Debtors' assets for greater than four years., after seizing them in an improvident injunction in December 2020.  Thereafter, they continued to use and control Stream's assets despite clear mandates from the Delaware Supreme Court in June 2022 and several orders from the Delaware Court of Chancery from July to October 2022 that the assets be returned to the Debtors. Throughout this entire period, Stastney, SeeCubic, Inc., Hawk and SeeCubic, BV inflicted profound and protracted damage upon Rembrandt's IP with little or no consequence, notwithstanding court protections designed to protect Rembrandt and the technology made available to the Stream debtors through its license.

59.     Ignoring state court mandates and the Bankruptcy Code's automatic stay should result in meaningful repercussions. Flaunting this Court's order should have serious consequences. The benefits of legal process, bankruptcy sales, free and clear orders, and good faith purchaser determinations should be reserved for those who respect the rule of law all the time - not just when it is convenient. The enjoined parties' antipathy and cynicism for this Court's TRO are manifest, and they should not be ignored any longer. Accordingly, SeeCubic, Inc. should be prohibited from service as the Stalking Horse bidder. Indeed, in light of their inequitable conduct and abuse of their insider status, both Stastney and SeeCubic, Inc. should not be barred from participation in these Bankruptcy Cases beyond facilitating the return of the Debtors' assets to the estate.

78937522;5

60.     Further, SeeCubic, Inc., Hawk, and SLS should have their claims disallowed or equitably subordinated. They have not acted in good faith as legitimate creditors, but rather as insiders maintaining unauthorized dominion and control of estate assets and using those assets in violation of the Court's TRO and other directives and without respecting the necessary Rembrandt license.

61.     SeeCubic, Inc., Hawk, and Stastney have harmed the estate through their wrongful representations that the Debtors' technology can be licensed to customers; as stated *supra*, both the Philips License and the Rembrandt License strictly and explicitly prohibit sub-licensing. Representations by the enjoined parties to the contrary damage the estate by (i) creating market expectations that cannot be met, resulting in damage to customer relationships that will take much time and effort to repair, and (ii) causing potential risk to the Debtors by putting their licenses with Philips and Rembrandt in jeopardy. Rembrandt views the actions of SeeCubic, BV, SeeCubic, Inc., and Stastney to be in direct violation of the terms of the license it granted to Stream, which is liable for damages to Rembrandt for actions of its subsidiary, SeeCubic, BV.

62.     Facilitating the flaunting of this Court's TRO should also carry consequences. The Trustee is aware of the TRO violative actions of the enjoined parties. He was notified by Rembrandt in May 2024 of such activity but took no action to investigate the violations or enforce the TRO. Upon information and belief, counsel for VSI also notified the Trustee of ongoing TRO violations, but he took no action and failed to respond to the request for intervention. The Trustee has filed royalty reports with Philips confirming the manufacture, sale, and distribution of technology demonstrator samples by the enjoined parties. The Trustee, therefore, has given tacit approval of the TRO violations at best and been complicit in those violations at worst. Either way,

the Trustee should be sanctioned and compelled by this Court to perform the duties he is obligated by law to perform.

**C.      The Court Should Issue an Injunction Halting the Sale Process**

63.      Rembrandt respectfully requests that the Court issue an injunction halting the proposed sale under Section 363 of the Bankruptcy Code. The current circumstances warrant such relief because, if the sale proceeds, it will exacerbate ongoing violations of the TRO (as discussed herein) potentially leading to further and irreversible harm.

64.      Rembrandt has provided the Trustee numerous opportunities to remove any concerns about Rembrandt IP by cooperating in a process to remove Rembrandt intellectual property from the estate assets.  This is a common and typical practice that the Trustee has chosen not to do prior to sell the assets in a 363 sale.

65.      It was also possible for the Trustee to have reviewed the assets and described the assets being sold with sufficient clarity to have removed made clear that Rembrandt's intellectual property.  For example, many of Rembrandt's trade secrets are dependent on various components of the Philips technology. From the very communications with the Trustee, Rembrandt asked about the status of those Philips technology components. (see D.I. 789 – Exhibit C – Email from Michaels to Vagnoni – 2024-02-19)

66.      If the Trustee had responded to that request for information, Rembrandt would have been able to determine the efforts the Trustee has made to remove Rembrandt's trade secrets from the assets of the estate. It is telling that all the information and detail the Trustee has provided on the most valuable assets of the estate is "Source code held on a secure server."  (D.I. 810 at page 4) Basically, the Trustee's silence in the face of reasonable inquiry speaks volumes.

78937522;5

67.     The TRO was designed to prevent the improper dissemination and use of Rembrandt's trade secrets and intellectual property, yet violations continue unabated. Allowing the sale to move forward under these circumstances will facilitate the very harm the TRO was intended to prevent, namely the further loss of proprietary information and intellectual property. Courts have held that where a sale process could cause misappropriation of intellectual property, an injunction is an appropriate remedy. *See Carnival Corp. v. DeCurtis Holdings LLC (In re DeCurtis Holdings LLC),* Nos. 23-10548 (JKS), 23-50413 (JKS), 2023 Bankr. LEXIS 1973, at *1 (Bankr. D. Del. Aug. 9, 2023) (On a debtor's motion to sell assets pursuant to section 363 of the Bankruptcy Code, a permanent injunction was found to be appropriate to prohibit the debtor's sale, disclosure, or use of the  information incorporated into the assets because misappropriation of confidential business information could cause irreparable harm, as could violation of a restrictive covenant, loss of control over reputation, and loss of goodwill.)

68.     As it stands, the Defendants are in clear violation of the TRO, for all of the reasons discussed herein. There is extensive evidence that sensitive materials have already been disclosed, misappropriated, or otherwise mishandled. The continued disregard for the TRO demonstrates a failure to respect the Court's authority and to safeguard the Plaintiff's interests. Without immediate intervention, it is likely that the ongoing violations will only worsen if the proposed sale is permitted to proceed.

69.     Permitting the sale process to proceed risks further irreparable harm.  The nature of the intellectual property at issue—trade secrets and proprietary business information—cannot be easily quantified in monetary terms. Once disclosed or transferred to third parties without consent, these assets lose their competitive value irreparably. If the Section 363 sale goes forward, it could result in the sale or unauthorized transfer of the intellectual property to third parties who are not

bound by the TRO and who may lack the necessary controls to prevent further misuse. The very purpose of the TRO is to ensure that proprietary information is preserved during these proceedings, and allowing the sale to proceed would undermine that goal. C*arnival Corp. v. DeCurtis Holdings LLC (In re DeCurtis Holdings LLC)*, Nos. 23-10548 (JKS), 23-50413 (JKS), 2023 Bankr. LEXIS 1973, at *1 (Bankr. D. Del. Aug. 9, 2023) (Holding that misuse of highly sensitive, confidential, and competitively valuable information impairs a company's competitive position, and therefore qualifies as irreparable.)

70.     Further, the balance of harms clearly favors Rembrandt. The Trustee could have resolved Rembrandt's issues back in February but choose to do nothing (see D.I. 789 – Exhibit C – Email from Michaels to Vagnoni – 2024-02-19) and to this date has not provided any specificity on the source code being transferred.  The harm to Rembrandt from the continued violation of the TRO and the potential further loss outweighs any potential harm stemming from delaying the sale. By halting the sale, the Court will preserve the status quo and prevent further irreparable harm to Plaintiff's business interests, while still allowing the bankruptcy process to continue in a manner that respects the Rembrandt's legal rights.

71.     Finally, the public interest strongly favors the issuance of an injunction. Courts must ensure that their orders are respected and enforced, particularly when violations of those orders threaten the integrity of confidential business information and trade secrets. The public interest in preserving fair competition and protecting intellectual property rights is well-recognized, and permitting further violations of the TRO will undermine both the specific protections afforded to the Plaintiff and the broader policy goals of intellectual property law.  *See Boggs Contracting, Inc. v. Freismuth*, No. 6:21-CV-2088-CEM-EJK, 2021 U.S. Dist. LEXIS 252335, 2021 WL 6755466, at *5.  Courts have found that there is a public interest in

protecting against unethical business behavior, including the misappropriation of confidential information. *See Frankel*, No. 8:18-CV-2869-CEH-CPT, 2023 U.S. Dist. LEXIS 534, 2023 WL 23805 at * 19 (citations omitted).

For these reasons, Plaintiff respectfully submits that the Court should issue an injunction to halt the Section 363 sale, ensuring that the TRO is fully enforced and that no further harm comes to Rembrandt's trade secrets or intellectual property. This relief is necessary to preserve the integrity of the bankruptcy process and to protect Rembrandt's valuable and irreplaceable assets.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons stated above, Rembrandt respectfully requests that the Court grant the relief requested herein and such other and further relief as this Court deems just and proper.

Dated: November 27, 2024

*/s/ Andrew DeMarco*
Andrew DeMarco, Esq. (PA Bar No. 326294)
ademarco@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
Telephone: (302) 449-9010
Facsimile: (302) 353-4251

*Attorneys for Rembrandt 3D Holding Ltd.*

78937522;5

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the United States Bankruptcy Court for the Eastern District of Pennsylvania on November 27, 2024 with notice sent electronically to all parties receiving electronic notices in this case pursuant to local rules of this Court, and that no further notice or service is necessary.

*/s/ Andrew DeMarco*
Andrew DeMarco, Esq. (PA Bar No. 326294)

78937522;5