# EXHIBIT 2

 Outlook

## RE: [EXT] FW: HM project

| | |
|---|---|
| **From** | Christopher Michaels <michaels@bpmlegal.com> |
| **Date** | Mon 8/7/2023 2:34 AM |
| **To** | rsuurmond@jonesday.com <rsuurmond@jonesday.com>; jberkenbosch@jonesday.com <jberkenbosch@jonesday.com>; gshumaker@jonesday.com <gshumaker@jonesday.com> |
| **Cc** | bud@streamacquisitiongroup.com <bud@streamacquisitiongroup.com>; mathu@streamacquisitiongroup.com <mathu@streamacquisitiongroup.com>; Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; 'Timo Jansen' <t.jansen@lexence.com>; j.van.hemel@lexence.com <j.van.hemel@lexence.com>; 'Mukesh Hoeba' <m.hoeba@lexence.com>; stephen3d@mac.com <stephen3d@mac.com>; ntwallace@aol.com <ntwallace@aol.com>; ademarco@devlinlawfirm.com <ademarco@devlinlawfirm.com>; Renee.Delcollo@gtlaw.com <Renee.Delcollo@gtlaw.com>; schladweilerb@gtlaw.com <schladweilerb@gtlaw.com> |

 1 attachment (338 KB)
Correspondence between Stream and Seecubic BV director.pdf;

Mr. Suurmond, Mr. Berkenbosch, and Mr. Shumaker:

Over the course of my career I have had numerous positive interactions and have recommended your firm for IP litigation a number of times. Frankly, I am stunned by your lack of response and determination to actively misappropriate Rembrandt's technology in your role as director of Seecubic BV.

While you have admittedly not reviewed our claims, other highly reputable firms have. Our settlement agreement and license with Stream was reviewed and prepared by Stream's attorneys, DLA Piper, at the direction of Shad Stastney. Shad signed the term sheet along with our client in front of a federal magistrate judge. Stream executed the final agreement on the same commercial terms and the agreement was reviewed by a number of law firms including Armstrong Teasdale, representing Stream. Further, the agreement has most recently been reviewed by Steam's counsel, Lewis Brisbois, prior to their choosing to accept or reject it as an executory contract in the bankruptcy. They reviewed our claims, and again decided a license was in the best interest of Stream..

In view of the years of litigation that have preceeded this situation, a settlement agreement reached, and all the officers and attorneys of the current corporate parent of Seecubic BV stating that a license from Rembrandt is necessary for Seecubic BV to proceed, it is extremely surprising to me that you would knowingly misappropriate Rembrandt's technology. Your actions are completely outside all of my prior experience with your firm. It is extremely difficult for me to believe that any of the numerous IP attorneys at Jones Day would recommend your course of action

I have not heard from you in response to my email, but I was provided a copy of your emails with Stream's counsel and Ben Schladweilier provided copies of your email to Shad at the oral argument last week.

As I understand the current situation, you are proposing that you, and Jones Day, acting as a director will be the sole person to act and authorize the misappropriation and use of Rembrandt technology to fulfil contracts for commercial purposes to generate revenue for Seecubic BV. We have put you on notice or Rembrandt's trade secrets and you appear to be willfully engaging in use of Rembrandt's technology. To use your own words, "[You] have only been involved in the IP discussion since last week, it is very complicated, going on already for years, BV employees have a different view."

While it has been going on for years, it was settled some time ago with a settlement agreement and license valued at over $1.2 billion. Notably, the financial terms, IP ownership, and lack of right to sublicense were negotiated with Shad Stastney and later approved by Mathu Rajan. We all agreed that a license was necessary from Rembrandt for the UltraD

system. In the case of Shad, his ascent was before Magistrate Parker. Now you are proposing the dramatic action of misappropriating the technology all over again at Seecubic BV. What possible basis/defense do you have for doing so?

While we are not sure of all of the employees at Seecubic BV that have had access to Rembrandt trade secrets, we do know that Dr. Bart Barenbrug had access to many documents, emails, and was on most group phone calls and helped 3D Fusion deliver 30+ projects related to no glasses 3D displays and content. Have you or others at your firm reviewed those emails and documents that Dr. Barenbrug exchanged with my client? Have your evaluated whether the trade secrets and developments made at the time are included in the UltraD technology that your are authorizing to be supplied to third parties?

I am guessing that he has shared precisely zero documents. His zero documents will be compared to thousands of pages of evidence that I have siting on our servers that I have reviewed. Those documents will be compared to the technology in UltraD. I have three massive binders with our work product and analysis of the misappropriation and infringement. We have shared pieces of that evidence in confidence to Stream's various counsels to get to settlement and acceptance of that settlement in the Stream plan. Each successive law firm looked at the information and recommended Stream enter the settlement agreement.

It is worth noting that DLA Piper started off strongly advocating that Stream did not need a license. They even flied a motion to dismiss with a declaration from Dr. Barenbrug that claimed among other things that he did not sing an NDA. When Rembrandt quickly provided evidence contradicting his testimony, we pressed DLA Piper attorneys on whether they knowingly suborned perjury by filing the false declarations. They told the judge that they wrote the declarations based on what they had been told by Dr. Barenbrug. We have provided Stream's various counsel further evidence during mediations that led to the settlement agreement and inclusion in Stream's bankruptcy plan.

We are pursuing an injunction against Seecubic, Inc. the judge ruled that because a license was possible, monetary damages would suffice and that an independent director was appointed in the Netherlands. The value of the license is between $1.2-1.5 billion US. This is not a trivial value and no rationale company takes on a $1.2 billion obligation if they could avoid doing so. While I appreciate that you may not have had time to review the thousands of pages that Stephen Blumenthal and Bart Barenbrug shared many years ago, I don't think your failure to properly investigate the matter provides much cover from liability for Jones Day for our license fee if you knowingly engage in using Rembrandt technology without a license. I am not aware of any assets within Seecubic BV that would come close to covering this license fee, so Jones Day will be left paying the license fee.

I don't think there is any dispute Seecubic BC does not have a license from Rembrandt. As I understand your comments in your emails, you have not evaluated this situation other than to ask some Seecubic BV employees that are likely implicated in the misappropriation. I previously suggested that you consult with some of the numerous IP attorneys at Jones Day and that we set up a call to review the situation. Your firm is very well regarded for intellectual property work in the US. You have a very large number of attorneys with expert knowledge in trade secrets and patents. In addition, those experts can advise you on the liability of directors for misappropriation and infringement but I have attached an article on the topic: . (chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.wsgr.com/PDFSearch/IP_RESPONSIBILTY.pdf)

I am guessing you are being encouraged by employees at Seecubic BV and/or Seecubic, Inc to take such actions. You and Jones Day will be liable for the damages of your misappropriation. Have you asked Shadron Stastney, Bob Morton, Bart Barenbrug, Seecubic, Hawk, SLS or any person/entity that is encouraging you to take such action to indemnify you and Jones Day if it turns out Rembrandt's claims are valid? You and Jones Day are taking on immense liability at the encouuagement of people that are showing up in court and arguing that it isn't them conducting the misappropriation but rather the director in the Netherlands and the judge even noted it his decision. SLS/Seecubic and Hawk have flied claims in excess of $175,000,000 in the Stream bankruptcyave you asked them to pledge those assets to cover liability to Jones Day if they are wrong in what they are encouraging your to do? While those assets are a small fraction of the license fee Jones Day will owe, at least you will find out in a hurry just how confident they are in their position when asked to take a small fraction of the risk Jones Day is taking on by your actions as director.

To be clear, I am hereby putting you personally and Jones Day on notice of Rembrandt's claim and that use of Rembrandt technology will trigger at a minimum the value of the license with Stream. This amount was calculated based on representations made by Shadron Stastney to Rembrandt while he was the CFO at Stream that the profit margin on Stream TVs would be $400/unit, but Mathu Rajan testified that he expects profit margins to be $500/unit,

which would potentially make Rembrandt's claim even higher such that the value of the license is $1.2-1.5 billion. The judge felt there was no imminent harm because a monetary license was possible, but I pointed out the there is no way Seecubic BV could pay the license fee. The judge has poinedt to the independent director. Our license fee is roughly ½ of your firm's annual revenue and Seecubic, BV has almost no assets or revenue, so as a practical matter your firm is the only entity that can afford to pay the license fee.

In addition, I am requesting your cooperation prior to adding Jones Day to any pending litigation for the following pre-litigation investigation:

1. Please clarify if Jones Day has authorized delivery of any prototype, content, display, or other implementation of UltraD technology after my email to you;
2. Please identify the employees at Seecubic BV that you were referring to as having a different view in your email; and
3. If you provided such authorization, please identify any opinions of counsel you relied upon in providing such authorization.

We are also considering petitioning for a FRCP Rule 27 pre-litigation deposition of Jones Day, we are making this request prior to filing a petition or adding Jones Day, and/or other Seecubic BV employees to the pending Delaware action or to a new action in the Southern District of New York where the original litigation was filed in hopes that you will facilitate our investigation.

I still remain hopeful that a discussion with a US based IP attorney at Jones Day will help us resolve this issue. I remain ready to participate in a conference call.

Chris



From: "Suurmond, Roos" <rsuurmond@jonesday.com>
Subject: RE: TMC payment plan
Date: August 1, 2023 at 7:27:37 AM EDT
To: "Shadron Stastney" <shadron.stastney@seecubic.com>
Cc: "Berkenbosch, Jasper" <jberkenbosch@jonesday.com>

Dear Shad,

This is not the conduct we would have expected, we will follow up on this with Stream. Thank you for alerting us.

As you know, we will make an assessment based on the outcome of the court procedure tomorrow whether SCBV is in a position to sign the HM contract. In any case, I need to guarantee that we operate at arm's length and preferably stay within the bounds of the alleged license agreement between Stream and Rembrandt. To achieve this, I included some conditions in the prelude to the protocol:

"To comply with the Protocol and create an at arms' length operation I invite Stream and SCI to support the following actions:

(i) regarding pending and new projects the necessary information mentioned in Annex below;
(ii) no SCI or Stream personnel on the premises of the companies in Eindhoven without prior consent from court appointed director and only re specific projects;
(iii) protect IT systems (e.g. mail, teams, documents) of companies from SCI or Stream by splitting if feasible or disable access etc.;
(iv) all contracts of the companies to be approved by independent director;
(v) all payments to be approved by independent director (remove SCI related persons from bank register)."

Taking into account these conditions, I want to ask you to confirm the following:

a. SCBV signs the contract and will be the only counterparty of HM and the only party receiving payment for the project;

a. no SCI involvement as long as I am involved (or any other court appointed director), i.e. in the following months all communication with HM or representatives (PWC) will be done by SCBV employees only;

c. SCI meanwhile cannot enter into discussions with HM re making products or any follow up contracts.

Kind regards,

Roos Suurmond
Associate | Advocaat
**JONES DAY® - One Firm Worldwide®**
Concertgebouwplein 20
1071 LN Amsterdam
Office +31.20.305.4531
Mobile +316.230.213.89

Jones Day is a global law firm with 42 offices across the world, organized as a US partnership. The Amsterdam Office of Jones Day is registered with the Trade Register of the Dutch Chamber of Commerce under number 57062587.



**ORAL ORDER IN Delaware Case: Plaintiff's Preliminary Injunction Motion seeks an injunction enjoining the defendants and all persons acting on their behalf from disposing, selling, transferring, licensing or marketing the technology which Rembrandt asserts is owned by Rembrandt, pending entry by the Court of a final judgment in this action. (D.I 13). Plaintiff's request for a temporary restraining order ("TRO") was withdrawn. See D.I. 19; D.I. 20; D.I. 22. "To obtain a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits, (2) a likelihood that [it] will suffer irreparable harm, (3) that the balance of equities weighs in [it]'s favor, and (4) that injunctive relief is in the public interest. If the moving party has established the first two most critical factors, the district court then performs a balancing of the factors to determine whether the prongs, taken together, balance in favor of granting the requested preliminary relief." Osorio-Martinez v. Att'y Gen. United States of Am., 893 F.3d 153, 178 (3d Cir. 2018) (cleaned up). "To show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 262 (3d Cir. 2020) (cleaned up). Thus, harm is only irreparable if "'compensation in money cannot**

**atone for it.'" Golden Fortune Imp. & Exp. Corp. v. Mei-Xin Ltd., 2022 WL 3536494, at \*5 (3d Cir. Aug. 5, 2022) (citation omitted). The Court held oral argument on August 2, 2023 to hear argument on Plaintiff's Motion (D.I. 13) as well as Defendant SeeCubic's Cross-Motion to Dismiss (D.I. 16). In their papers and during argument, Plaintiff noted that Defendants' purchase of a license would be a potential remedy. (D.I. 14 at 7). The parties also represented to the Court that an Order has been entered by the Court in the litigation in the Netherlands appointing an independent contractor to run Stream's subsidiary companies. Thus, this Court finds that Plaintiff has not met its burden to show irreparable harm (D.I. 13). Next, the Court will turn to the Defendant SeeCubic's Cross-Motion to Dismiss Counts III-IV (D.I. 16). To state a claim on which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief...." FED. R. CIV. P. 8(a)(2). Such a claim must plausibly suggest "facts sufficient to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Doe v. Princeton Univ., 30 F.4th 335, 342 (3d Cir. 2022) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)). "A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Klotz v. Celentano Stadtmauer & Walentowicz LLP, 991 F.3d 458, 462 (3d Cir. 2021) (quoting Iqbal, 556 U.S. at 678). After reviewing the briefing (D.I. 17; D.I. 19; D.I. 21), the Complaint (D.I. 1) and hearing argument, the Court finds that Plaintiff adequately described the alleged trade secrets with enough specificity to survive a motion to dismiss. Oakwood Lab'ys LLC v. Thanoo, 999 F.3d 892, 906 (3d Cir. 2021) ("But a plaintiff need not spell out the details of the trade secret to avoid dismissal." (internal quotations omitted)). Defendant SeeCubic next raises an issue as to whether the trade secrets were sufficiently maintained. After drawing all references in favor of the Plaintiff, the Court finds that Plaintiff has sufficiently plead that it maintained its trade secrets. (See, e.g., D.I. 1 52, 65, 67-69). Moreover, based on the record before it, the Court cannot find that the claims are time-barred by the Delaware Uniform Trade Secrets Act ("DUTSA") three-year statute of limitations. Progressive Sterilization, LLC v. Turbett Surgical LLC, C.A. No. 19-627-CFC, 2020 WL 1849709, at \*5 (D. Del. Apr. 13, 2020), report and recommendation adopted, C.A. No. 19-627-CFC, 2020 WL 3071951 (D. Del. June 10, 2020). For all these reasons, IT IS HEREBY ORDERED that Plaintiff's Motion for Preliminary Injunction (D.I. 13) is DENIED, and Defendant SeeCubic's Cross-Motion to Dismiss (D.I. 16) is DENIED. ORDERED by Judge Gregory B. Williams on 8/4/23. (ntl)**

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



Email: michaels@bpmlegal.com
Direct Dial: 607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

**From:** Christopher Michaels
**Sent:** Thursday, July 27, 2023 2:08 AM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>; rsuurmond@jonesday.com; jberkenbosch@jonesday.com
**Cc:** bud@streamacquisitiongroup.com; mathu@streamacquisitiongroup.com; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; 'Timo Jansen' <t.jansen@lexence.com>; j.van.hemel@lexence.com; 'Mukesh Hoeba' <m.hoeba@lexence.com>; stephen3d@mac.com; ntwallace@aol.com; ademarco@devlinlawfirm.com
**Subject:** RE: [EXT] FW: HM project

Mr. Suurmond and Mr. Berkenbosch:

I represent Rembrandt 3D Holding, Ltd (Nevis Corporation – owns Rembrandt IP rights) and Rembrandt 3D Corp. (Delaware, US Corporation – operating entity) and I collectively refer to them as R3D or Rembrandt.

As a wholly owned subsidiary of Stream, Seecubic BV would have a right to supply/distribute product for the benefit of Stream or Rembrandt under the terms of the license granted to Stream by Rembrandt. However, Technovative and Seecubic BV have no rights to the technology independent of Stream and cannot sublicense the technology to Hawk or SeeCubic, Inc. nor would it have any right to use the technology for the benefit of any party other than Rembrandt or Stream without authorization from Rembrandt. Ian Liston had no authority at any time to grant licenses to Rembrandt technology. If Stream is selling a product with Rembrandt technology, it has a license. If Seecubic BV is making a product for Stream, this is authorized under the Rembrandt license to Stream. However, if Seecubic BV is selling a product with Rembrandt technology directly to a third party, this is not authorized because neither Seecubic BV nor the customer have a license to the Rembrandt technology.

While this may seem a tedious distinction, it is not and I think you will find this replicated in both Philips license and Rembrandt's license. In practical terms to Rembrandt, we do not benefit if Seecubic BV generates a lot of cash from a sale and distributes those funds to Seecubic BV employees, directors, and attorneys. If on the hand, Stream makes a sale and generates cash, that cash is available to pay creditors of Stream (including Rembrandt). Understandably, Rembrandt wants the revenue from sales of products utilizing its technology to go to the company that is paying Rembrandt.

With respect to general claims from Seecubic personnel that they are not using Rembrandt technology, I highly doubt that is the case and I doubt that any reasonable IP attorney at Jones Day would find Seecubic's position reasonable.

I personally sat across the table from Shadron Stastney while he was CFO of Stream and negotiated the settlement agreement that licensed our technology to Stream. That license includes millions in cash payments and over a billion dollars in value of TVs. This was not a nuisance value settlement and was reached because Rembrandt demonstrated convincingly that every UltraD TV created by Stream included Rembrandt technology.

Stream was represented by the DLA Piper and we were in mediation before Magistrate Parker in the Southern District of New York litigating whether Rembrandt's trade secrets had been incorporated into Stream's products. We provided numerous documents and evidence showing that it had. This information is summarized in the complaint above, but by no means, is the complaint exhaustive of the thousands of pages of documents that we have supporting our position. Notably, in 2017 three engineers in the Eindhoven team filed declarations that they did not sign NDAs with 3D Fusion. We promptly filed copies of the signed NDAs by each of the engineers and Stream quickly proposed that we enter mediation. You can guess that the difference between the claims and statements of the Eindhoven team versus the documents, emails, and evidence we showed from Rembrandt was a frequent discussion among counsel and officers of Stream and Rembrandt. At each mediation session and communication position, I stated that Rembrandt would significantly lower its settlement demand if Stream (Seecubic, BV or any other party of engineer that had worked with 3D Fusion (predecessor to Rembrandt's rights) could provide a single email, document, or any evidence whatsoever that contradicted the vast amounts of proof that Rembrandt had proving its trade secret and patent rights. In the numerous interactions with counsel and specifically with Shad, not a single page of evidence was provided to lower Rembrandt's claim. Rembrandt proposed numerous times that Stream could just stop using the Rembrandt technology and pay for just past infringement. However, Stream opted to pay handsomely for a license precisely because the Rembrandt technology was and is inextricably linked into the value of the UltraD technology. Put differently, removing the

Rembrandt technology would render UltraD almost worthless. In April 2019, Shad signed the billion plus dollar settlement term sheet in front of Magistrate Parker on behalf of Stream.

I appreciate that Seecubic personnel may make general statements that they are not using Rembrandt technology but they already were caught in false statements in their declarations in the prior case. If they are willing to enter false statements under oath in a legal proceeding, I don't think it is reasonable for you to rely on their statements here. As a simple test, I propose that you turn on one of the UltraD TVs and see if they have on screen controls for Borders and Liveliness. Shad agreed that this technology belonged to Rembrandt when he was CFO of Stream. If the UltraD TVs no longer have that functionality, we have something to discuss re whether Seecubic has made other changes to avoid Rembrandt IP. However, all UltraD TVs made to date have such controls.

Shad and Seecubic seem to be suggesting that when Shad was CFO of Stream it made sense to enter into a billion plus license with Rembrandt, but a short number of months later Seecubic has figured out a way to avoid using the Rembrandt technology. Such an improvement would be worth over a billion dollars just in its ability to avoid the need for a Rembrandt license. Seecubic had access to the technology in 2020 and would presumably have filed applications for patents that would have been published by now. We have searched and we see no evidence of any new technology patent filings describing some new improved no glasses 3D technology that avoids Rembrandt's technology. When testifying in the US cases, Shad testified that the technology currently in use by Seecubic is based on the UltraD technology Stream developed and that Seecubic was still using the Philips 2D + depth technology. The Seecubic, Inc. private placement memo was entered into evidence during the hearing in the US bankruptcy case and makes no mention of any dramatic new technology that obviated the need for billion dollar license from Rembrandt. Notably the PPM avoids any mention of Rembrandt, Rembrandt IP, the Rembrandt settlement term sheet Shad signed, or the claim of infringement we sent to Shad directly, or any my conversations with Shad regarding Rembrandt's claims against the company. Given that Shad signed a settlement term sheet worth over a billion dollars a short time before sending out a PPM for Seecubic explaining the value for the UltraD technology, but makes no mention at all of Rembrandt's claims, it seems far more likely that Seecubic is just hoping to infringe Rembrandt's IP and fail to disclose material adverse claims against Seecubic to its investors than Seecubic has developed some marvelous new technology that avoids the Rembrandt IP. Seecubic would have to have invented technology that is worth over a billion dollars to avoid Rembrandt technology but then expects us to believe that Seecubic choose to tell no one about it and takes no steps to protect it? That is either not true or the grossest act of corporate waste and negligence anyone has seen in a long time.

Assuming for the moment that Seecubic figured out a way to avoid Rembrandt's trade secrets and patents, did Seecubic also figure out a way to avoid the need a license from Philips? Shad just testified a few weeks ago that all the technology was based on the Philips 2D plus depth technology. 3D Fusion had a license from Philips (copy attached). It is our understanding that UltraD was developed using the Philips technology and software. Our license from Philips was extremely strict in prohibiting sublicensing of the software. We were allowed to sell hardware that included runtime applications of the software, but not the actual code. The Stream technical team can weigh in here, but I believe that the UltraD implementation is heavily reliant on software that was originally provided from Philips. While Philips is more than capable of enforcing its own IP rights, does Seecubic BV have a license from Philips to sell products based on that original software? If not, transferring technology without an express license from Philips is creating a massive liability for Seecubic BV.

I don't know if Seecubic BV has a license from Philips, but I do know that Seecubic BV does not have a license from Rembrandt to sell products to anyone other than Stream or Rembrandt. Any transfer or sale of information or a product including Rembrandt technology will cause significant harm to Rembrandt. The going rate for a license from Rembrandt as negotiated with Shadron Stastney is millions in cash and over a billion dollars in product that Rembrandt sells at a markup of many multiples with services many times the value of the hardware. If Seecubic BV can not provide products for Rembrandt to sell, it would have to pay for the license fully in cash. Any transfer of information or product with Seecubic BV would incur that as a minimum fee. Is the revenue to be generated from any product sales Seecubic BV would make worth the potential liability to Rembrandt? Rembrandt has litigated its IP rights and claims in six different courts to date. Is the value from any sales by Seecubic BV reasonable in view of the cost to defend an infringement/misappropriation action by Rembrandt? Does Seecubic BV have a reasonable defense to Rembrandt's claims that it can articulate?

I personally opened our negotiations with Shad when he was acting as CFO of Stream making this exact point in front of the magistrate and DLA Piper (representing Stream). I asked them repeatedly to identify which elements they were not using in our patent claims and they failed to identify any. Rembrandt asserted its patents seven years ago, however, to

date no one at Stream, Seecubic, DLA Piper, KL Gates, Skadden, Greenberg Traurig, or any of the other local counsel have identified a single element of any of Rembrandt's patent claims that is not being used in an UltraD device. I have been a patent attorney for a number of decades now and I have never had a party accused of patent infringement claim that they were not infringing a patent without citing some invalidating prior art or pointing out an element of a claim they do not infringe.  Either all of these IP firms are incredibly negligent or Seecubic has no defense to the infringement claim.

Rembrandt is in the middle of negotiations with potential investors.  Part of the reason that I am delayed in responding to this email exchange is that I was in negotiations all day yesterday with our investors.  We will certainly be asked to describe any active infringement of our IP.  We have already made the investors aware of the Delaware litigation and bankruptcy case, but I am just learning that you are proposing to have Seecubic BV actively infringe our technology. Seecubic's infringement could impact our investors and a deal for tens of millions in capital.  We will hold Seecubic BV responsible for any damages caused by the infringement and/or misappropriation.

Rembrandt's primary objective entering mediation years ago was to be one of Stream's largest customers and the most important aspect of the deal was the right to purchase products. Nothing has changed in that regard. Rembrandt is interested in seeing the terms of its settlement agreement fulfilled and purchasing TV's in volumes that would make any on-going manufacturing operations for product going to Rembrandt solvent.  Our first preference is to purchase displays from a reliable vendor and make our profits from selling that hardware coupled with our services.  However, if faced with having no vendor producing TVs, Rembrandt has stated that it would consider participating in a rights offering, filing its own plan, or putting together a consortium to enter a bid again depending on the terms. No other bidder for the technology will have a license to Rembrandt's technology, such that it is highly likely that Rembrandt will be the highest bidder and quite possible the only bidder.  We have discussed all possibilities with our investors.  If Stream is successful in having its plan adopted in the US bankruptcy, we intend to purchase TVs from them.  However, if the plan fails for any reason we are working on our own plan and/or purchase of assets which would include Seecubic BV and we expect the directors of Seecubic BV to take reasonable actions that preserve the value of Seecubic BV and avoid massive liabilities.

If any member at Seecubic still believes that they have somehow avoided using Rembrandt IP, we propose a discussion between our IP attorneys and IP attorneys at Jones Day to review the situation.  We respectfully ask that you agree that Seecubic BV will not transfer any Rembrandt IP and that no product will be made using Rembrandt IP other than for Stream or Rembrandt.  We ask that you provide confirmation of your agreement in writing.  Further, we expect that all revenue from sales of any product or services that include Rembrandt IP go to the entity that is paying Rembrandt. More specifically, we do not agree to the use of Rembrandt technology to generate revenue to benefit employees, directors, attorneys of Seecubic BV rather than paying Rembrandt for use of its technology.

Chris


**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

Email: michaels@bpmlegal.com
Direct Dial:  607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Tuesday, July 25, 2023 5:20 PM

**To:** rsuurmond@jonesday.com; jberkenbosch@jonesday.com
**Cc:** bud@streamacquisitiongroup.com; mathu@streamacquisitiongroup.com; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; 'Timo Jansen' <t.jansen@lexence.com>; j.van.hemel@lexence.com; 'Mukesh Hoeba' <m.hoeba@lexence.com>; Christopher Michaels <michaels@bpmlegal.com>
**Subject:** RE: [EXT] FW: HM project

I have attached the Rembrandt Complaint for your reference. You can access the exhibits by contacting Mr. Michaels.



**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**



This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** Tuesday, July 25, 2023 5:18 PM
**To:** rsuurmond@jonesday.com; jberkenbosch@jonesday.com
**Cc:** bud@streamacquisitiongroup.com; mathu@streamacquisitiongroup.com; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; 'Timo Jansen' <t.jansen@lexence.com>; j.van.hemel@lexence.com; 'Mukesh Hoeba' <m.hoeba@lexence.com>; Christopher Michaels <michaels@bpmlegal.com>
**Subject:** RE: [EXT] FW: HM project

Dear Roos and Jasper,

Your email appears not to have been sent to me.

My response is as follows. The Receiver's position on any of these issues is irrelevant in terms of authority to do anything in regard to the SCBV. It is irrelevant if he put any conditions on any course of conduct. He has filed papers to that effect seeking an order for payment in the bankruptcy case as his duties were complete upon filing. The Bankruptcy Court and the Debtor-in-Possession has replaced the Receiver by virtue of the filing of the bankruptcy case in Federal Court.

So, there is no authority to say that only SCBV can sign an agreement.

We only reference the Receiver because he has confirmed he did not engage in any action that would infringe the Rembrandt or Phillips licenses and as an intellectual property lawyer he understands the ramifications of violating the licenses in question.

The issue we highlighted is an infringement issue. Rembrandt's case against the Stream entities has been settled. The result is a license agreement which is non-exclusive and which cannot be used by any other entity.

Rembrandt has also asserted trade secret violations and other misuse of its confidential business information as part of its case filed in Delaware Federal District Court and there is a pending hearing on that matter in early August. It is the very use of Rembrandt's intellectual property in all forms by SeeCubic of Delaware through prior interference in the Netherlands that is the basis of its case against Hawk, Mr. Stastney, SeeCubic of Delaware, and SLS.

Their complaint states: "The trade secrets licensed by R3D to Stream are embedded in the technology Stream included in its products and are known to the engineers that used to work with 3DFusion, then Stream, and now SeeCubic."

Furthermore, "[A subsidiary] would only have rights to manufacture and/or distribute the Stream product for benefit of Stream and R3D only pursuant to the license agreement between Stream and R3D."

I have copied counsel to Rembrandt to this email so he knows we are doing everything in our power to make sure that their intellectual property is protected.

Nothing in your emails gives any comfort that the license agreement is being honored. Your email(s) note the exact opposite, that the SCBV continues to dispute that Rembrandt's technology is being used – in contravention of the agreement. Furthermore, you seem to indicate that because funds will go to a Stream subsidiary, that somehow cleanses the infringement. It does not. SCBV cannot use Rembrandt's technology outside of the license that has been given.

There are no procedures in the United States that will change the fact that there is a valid license and you are contemplating continuing a pattern of infringement.

SCBV should have informed Hyundai of the intellectual property issues.

We can speak to Hyundai and that way there will be no loss of any contract, but certainly SCBV signing contracts in violation of IP rights is not a proper path forward for our subsidiary.

It is imperative that we sign any contract with Hyundai for these reasons.



**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**



This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** bud@streamacquisitiongroup.com <bud@streamacquisitiongroup.com>
**Sent:** Tuesday, July 25, 2023 12:08 PM
**To:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Subject:** [EXT] FW: HM project

**From:** Suurmond, Roos <rsuurmond@jonesday.com>
**Sent:** Tuesday, July 25, 2023 4:42 AM
**Cc:** mathu@streamacquisitiongroup.com; bud@streamacquisitiongroup.com; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; 'Timo Jansen' <t.jansen@lexence.com>; j.van.hemel@lexence.com; 'Mukesh Hoeba' <m.hoeba@lexence.com>; Berkenbosch, Jasper <jberkenbosch@jonesday.com>
**Subject:** FW: HM project

Dear Rafael,

Hereby the response to your e-mail on behalf of mr. Berkenbosch.

Nice to make your acquaintance as well.

I received the e-mail attached reflecting the Receivers' approval of the initiation of the project. Since the contract was only finalized recently, I think it is correct to say that he was not presented with this specific contract. However, the initiation of the project itself (the proof of concept) seems to have been approved by the Receiver as also seems to follow from the e-mail you presented below. The Receiver also made a condition that all contracts needed to be entered into by SCBV, which would be the case.

The draft agreement with HM lists only SCBV as the contractual party. SeeCubic Inc/SCI are not part of the agreement. As SCBV is a subsidiary of Stream, and your client expects to take control on short notice, the project will be to the benefit of Stream since all the funds will flow to its subsidiary. It is hard for me to understand how this would violate the

terms. Stream cannot be the contractual party at this point in time (we need to await US procedures) and not signing the agreement, will result in a big loss of funds for SCBV and a potential client.

Furthermore, I was advised by the company that the IP which Rembrandt claims to have a patent on, is not used in this product. I think we need to work together to preserve the value of SCBV until the court cases in the US have been finalized and signing this contract would, in my opinion, be a great contribution. If your client ends up winning the court cases, the development for HM can continue without involvement from SCI.

In light of the information above, we ask your client to reconsider its position. We look forward to your response.

Kind regards,

Roos Suurmond
Associate | Advocaat
**[JONES DAY® - One Firm Worldwide®](#)**
Concertgebouwplein 20
1071 LN Amsterdam
Office +31.20.305.4531
Mobile +316.230.213.89

Jones Day is a global law firm with 42 offices across the world, organized as a US partnership. The Amsterdam Office of Jones Day is registered with the Trade Register of the Dutch Chamber of Commerce under number 57062587.

---

**From:** Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
**Sent:** dinsdag 25 juli 2023 03:35
**To:** Berkenbosch, Jasper <jberkenbosch@jonesday.com>
**Cc:** mathu@streamacquisitiongroup.com; bud@streamacquisitiongroup.com; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; 'Timo Jansen' <t.jansen@lexence.com>; j.van.hemel@lexence.com; 'Mukesh Hoeba' <m.hoeba@lexence.com>; Suurmond, Roos <rsuurmond@jonesday.com>
**Subject:** HM project

---

Dear Jasper:

My name is Rafael Zahralddin and I am Debtors' counsel for Stream in the pending chapter 11 bankruptcy matter. It is very nice to make your acquaintance.

My understanding is that you have been advised by both Mathu Rajan, CEO and director of Stream TV Networks, Inc. ("Stream"), and Lexence, Dutch counsel to Stream, that SeeCubic B.V. ("SCBV") is violating third-party intellectual property licenses by representing Stream's Ultra-D™ technology to parties where such presentations are not for the benefit of Stream.

Your intent to enter into a contractual agreement on behalf of SCBV with an automotive customer identified as "HM" constitutes a breach of those third-party licenses.

Please do not sign an agreement with HM or any other third party. SCBV does not have the authority to enter into such agreements and this exposes the bankruptcy estate to harm, and the estate represents all the stakeholders in the case, by creating liability for Stream which reduces recovery for the estate.

In your July 24, 2023 email to Stream, you noted that the HM project was "started under and previously approved by the Receiver as he deemed the project in the interest of the BV and both parties."

We have been in communications with counsel for the Receiver today and **_the Receiver, through counsel, categorically denies that the Receiver ever approved such an arrangement_**.  We have proof in writing that the Receiver did not

approve such an arrangement.

> From: Fay, Erin <EFAY@wsgr.com>
> Sent: Monday, July 24, 2023 3:47 PM
> To: Zahralddin, Rafael <Rafael.Zahralddin@lewisbrisbois.com>
> Cc: Lyons, Catherine <clyons@wsgr.com>; Alexander, Vincent <Vincent.Alexander@lewisbrisbois.com>; Fisher, Bennett <Bennett.Fisher@lewisbrisbois.com>; Brennecke, Sean <Sean.Brennecke@lewisbrisbois.com>; Shecter, Sean <Sean.Shecter@lewisbrisbois.com>
> Subject: [EXT] RE: Informal Discovery from the Receiver
>
> We deny that the Receiver approved any actions by SCBV that, to the best of the Receiver's knowledge, would have violated any IP rights of third parties. The Receiver is aware that an NDA existed between Hyundai Mobis and SeeCubic, Inc. and that SCBV and Hyundai Mobis engaged in proof of concept work around December 2022 to January 2023, and that they were considering a Statement of Work when the bankruptcy was commenced. The Receiver was not presented with this SOW and did not approve it.
>
> Erin Fay (she/her) | Partner | Wilson Sonsini Goodrich & Rosati
> direct: 302.502.8404 | mobile: 302.290.2521 | efay@wsgr.com

The Receiver had no authority to approve the project. Actions such as those contemplated and being conducted by the SCBV are why, in large part, Technovative Media, Inc., the company the Receiver was charged with overseeing, has now been sued by Rembrandt 3D Holding Ltd. in U.S. Federal Court for IP violations along with Mr. Stastney, SeeCubic of Delaware, SLS, and Hawk Investments.

If you proceed in signing the HM agreement, it is likely that SCBV and you personally in your capacity as director will be named as defendants as well.

Stream has an obligation to take any actions necessary to preserve the value of its estate for the benefit of its creditors.

Instead of approaching the issue with a litigation response, I have a proposal to avoid the litigation consequences and will do what we can to discuss the issue with Rembrandt with whom Stream has a license.

While Stream's position regarding SCBV's lack of authority to enter into the HM agreement is clear, Stream is willing to enter into the HM agreement directly and execute a contemporaneous agreement with SCBV whereby SCBV receives 100% of the revenue associated with the samples being delivered for this particular transaction. This will avoid a violation of the licenses.

It is therefore in the best interest of SCBV to enter into an agreement with Stream while having Stream enter into the HM agreement. This arrangement will not violate the third-party licenses and avoid litigation in the US and against SCBV.

Please let me know if you have any questions and hopefully this avoids the consequences related to infringement. Hopefully you see this as a gesture of goodwill as well. Look forward to working with you.



**Rafael Zahralddin**
**Partner**
Rafael.Zahralddin@lewisbrisbois.com

**T: 302.985.6004 F: 302.985.6001 M: 302.545.2888**

500 Delaware Avenue, Suite 700, Wilmington, DE 19801 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**



This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***