# EXHIBIT 4



### the Judiciary

Rechtban k Amsterdam

Mr. A.W. van der Veen  
P.O. Box 75505  
1070 AM AMSTERDAM

Private law department

team summary

proceedings

Visiting address  
Parnassusweg 280  
Amsterdam

correspondence address  
P.O. Box 84500  
1080 BN Amsterdam

t (088) 361 7000

www.rechtspraak.nl

When replying, please mention the date and our reference. Would you like to cover only one case in your letter.

| | |
|---|---|
| date | Sept. 20, 2023 |
| contact phone number | Mrs. J.A.L. Bartels-Wapperom 088-3611408 |
| email | kortgedingciviel.rb-amsrri^rechtsnraak.nl |
| our reference | C/13/738449 / KG ZA 23/772 regarding Ultra-D Coop. UA cs/Ultra-D Coop UA cs |
| your reference | various |
| attachment(s) | statement |
| subject | |

Dear Sir, Madam,

In the above-mentioned case, the court has issued a ruling, which you find herewith. I will also send it to you by mail.

Sincerely,

the griffhe.

*[signature]*

Your personal data and, if applicable, those of your client will be processed in a court registration system to the extent necessary for the purpose of due process

# vonnis



## AMSTERDAM COURT

Private law department, preliminary injunction judge civil

Case number / role number: C/13/738449 / KG ZA 23-772 VVV/EB

**Summary judgment of Sept. 20, 2023**

in the matter of

1.      the cooperative
**ULTRA-D COOPERATIVE U.A.,**
based in Amsterdam, with its office in Eindhoven,
2.      the private limited liability company
**STREAM TV INTERNATIONAL E.G,**
based in Amsterdam, with its office in Eindhoven,
3.      the private limited liability company
**SEECUBIC B.V.,**
based in Eindhoven,
4.      the legal person under foreign law
**SEECUBIC INC,**
based in Wilmington, Delaware, United States of America,
5.      the legal person under foreign law
**HAWK INVESTMENT HOLDINGS LI NIITE** D,
based at St. Peter Port, Grternsey, Channel Islands,
6.      the legal entity incorporated under
foreign law SLS **HOLDINGS VI LLC,**
based in Wilmington, Delaware, United States of America,
**7.      SHADRON LEE STASTNEY,**
residing in Marlboro, United States of America,
plaintiffs by identical subpoenas dated August 31, 2023, attorney at
law Mr. E.R. Meerdink of Amsterdam,

at

1.      the cooperative
**ULTRA-D COOPERATIVE U.A.,**
based in Amsterdam, with its office in Eindhoven,
2.      the private limited liability company
**STREAM TV INTERNATIONAL** B.V.,
based in Amsterdam, with its office in Eindhoven,
3.      the private limited liability company
**SEECUBIC B.V.,**

C/1/738449 / KG ZA 23-772 2
Sept. 20, 2023

---

based in Eindhoven,
lawyers Mr. M.H.C. Sinninghe Damsté and Mr. E. Di Pangrazio in Amsterdam,

and

**4.     MATHU RAJAN,**
residing in Bensalem, Pennsylvania, United States of America,
Advocates A.W. van der Veen, A.R.T. Kroon, T.J.A. Zuijderland and K. van Boekel of Amsterdam,
defendants.

The parties will hereinafter be referred to as Hawk et al., Rajan and the Companies. Separately, plaintiffs l to 3, also defendants 1 to 3 Ultra-D, Stream TV International BV and SeeCubic BV will be referred to separately. The remaining plaintiffs will be separately named SeeCubic Inc., Hawk, SLS and Stastney.

## 1.     The procedure

At the hearing on September 13, 2023, Hawk et al. presented the claims as described in the summons and the bill of claim. Rajan and the Dutch companies put forward defenses, Rajan partly by means of a pre-filed statement of reply. All parties submitted exhibits and explained their positions by means of pleading notes, which have been added to the file.

Present at the hearing on the side of Hawk c.s. were S.L. Stastney, assisted by Ms. Wezenbeek and Ms. Hof(English interpreters), P.C. Theune (Head of Technology of SeeCitbic BV), L. Luijks (employee of SeeCubic BV), Mr. M.K. Tiemensma (attorney for SeeCubic BV), Mr. Meerdink and his office colleagues Mr. R.G. Kloppenburg, Mr. S. Vlassak and Mr. D. van der Nat.

Present on the Companies' side via video link was T.J.H. Park (appointed as a director by - in short - Rajan), assisted by M. Steur (English interpreter), with Mr. Sinninghe Damsté and Mr. Di Pangrazio.

Present on Rajan's side were Rajan and C. Robertson (executive vice president of Stream TV Networks, Inc. and former CFO of SeeCubic TV Inc.), both via video link and assisted by M. Steur (English interpreter), Mr. Van der Veen, Mr. Kroon, Mr. Zuijderland and Mr. Van Boekel in Amsterdam.

Judgment was set for today.

C/13/738449 / KG ZA 23-772  3
Sept. 20, 2023

## 2. The facts

2.1. Rajan is one of the founders of the Stream group. Within the Stream group the research and development takes place for the development of (among others) screens on which 3D images can be shown without the need for 3D glasses, the so-called Ultra-D technology. The patents are in Ultra-D, its subsidiaries Stream TV International BV and SeeCubic BV are operating companies (hereafter together: the Companies).

2.2. The interests in the Companies are held through a Curapaose limited partnership and two intermediate holding companies by TechnoVative Media Inc. ("TechnoVative"), whose shares are again held by Stream TV Networks, Inc.

2.3. Hawk and SLS (hereinafter referred to as the Financiers) together loaned tens of millions of US Dollars and other currencies to Stream and received security interests against it including on the shares in TechnoVative.

2.4. From March 2020, a dispute arose between the Financiers and Rajan as the Financiers sought to enforce security interests based on default under the financings.

2.5. In May 2020, the so-called Omnibus Agreement was concluded between Stream and the group of Financiers. Under that agreement, Stream's debts would be settled in exchange for the transfer of its shares in TechnoVative to SeeCubic Inc. This special purpose company is held by SLS, Hawk and other parties that financed Stream. Stream would still receive shares in SeeCubic Inc.

2.6. In December 2020, Rajan was removed as a director of the Companies by the Financiers and replaced by Stastney.

2.7. There have been and are several court proceedings in the United States concerning the Lenders' enforcement of security interests. In one of these, Rajan challenged the Omnibus Agreement. The Omnibus Agreement was initially upheld in two instances, but on June 16, 2022
overturned by the Delaware Supreme Court.

2.8. On October 3, 2022, Stastney was removed as a director of the Companies and Rajan was reappointed as a director. The parties mutually dispute the validity of those resignations and appointments.

2.9. A so-called Section 225 proceeding is now pending in the United States, in which the Delaware Court must determine whether Hawk may exercise its security interests and whether, as a result of exercising those

C/13/738449 / KG ZA 23-772     4
Sept. 20, 2023

security interests will gain control of TechnoVative and thus be able to validly appoint the directors of TechnoVative and the Companies. As its primary defense in those proceedings, Stream argues that Hawk's claims have been converted into shares and therefore Hawk is no longer a secured creditor.

2.10. On October 20, 2022, a so-called "status quo order" for TechnoVative was issued by way of *interim ruling* in the Section 225 proceedings, maintaining the status quo as it then stood. This stipulated, among other things, that during the Section 225 proceedings (i) a so-called **Receiver** (an independent officer) will be appointed, who will acquire control of TechnoVative and (ii) TechnoVative may only be managed in the ordinary course of business, (iii) no changes may be made in the management of TechnoVative's subsidiaries and (iv) TechnoVative may not file for bankruptcy.

2.11. On March 15, 2023, Stream filed for bankruptcy of itself and TechnoVative (the so-called Chapter 11 proceedings). As a result, the pending proceedings were suspended and Rajan regained control as a director in Stream.

2.12. On October 5, 2022, Rajan asked various parties to surrender assets - more specifically, an expensive bonding machine that was (had been) in use by SeeCiibic BV - to Stream, and on October 10, 2022, Rajan informed the management team of the Companies that all their assets belong to Stream.

2.13. On l4 October 2022, the local management of the Companies alerted Rajan of their acute financial distress and concern about the payment of salaries in that month. This request for attention, in the absence of response to Oct. 18, 2022 repeated.

2.14. On February 21, 2023, Rembrandt 3D Holding. Ltd (hereafter Rembrandt) issued a subpoena in the United States against Hawk et al., TechnoVative and SeeCubic Inc. seeking the cessation of Rembrandt's use of intellectual property rights. Briefly, Rembrandt is the legal successor to 3DFusion Corp. which company previously partnered with three engineers who then went on to work for the Stream group, including B. Barenbrug, about whom more below. Rembrandt had previously, in 2017, filed a lawsuit against Stream and the three engineers for intellectual property infringement. Those proceedings had culminated in a settlement (the non-binding term sheet) on April 9, 2019. In it, Stream acknowledged that technology from Rembrandt was incorporated into its Ultra-D technology, agreed to pay Rembrandt USD
1 million in a lump sum, USD 20,000.00 monthly for the use of the technology and two million warrants (options) of a total value of USD 3 million.

C/l 3/738449 / KG ZA 23-772            5
Sept. 20, 2023

In addition, it would undertake to supply Ultra-D products at cost to Rembrandt's distribution business. In exchange, Rembrandt provided Stream with a perpetual license of its technology. Stastley, then CFO and vice chairman of Stream TV's board, was involved in the negotiation and approval of this settlement. On May 23, 2021, Stream and Rembrandt entered into the settlement agreement (VSO) under which Rembrandt granted Stream a license to use its technology. That VSO includes the following provisions, among others:

"(...)

| | |
|---|---|
| 14. Sub-license | Either Party may sublicense their rights to other parties for the purpose of having products distributed by the Party. |
| (...) | |
| 22. Binding Effect | This Agreement shall be binding on, and shall be enforceable against, and shall inure to the benefit of the Parties to this Agreement and their respective past and present officers, directors, affiliates, member firms, subsidiaries, parents, successors, shareholders, members, partners, general partners, limited partners, principals, participating principals, managing members or other agents, management personnel, attorneys, servants, employees, representatives of any other kind (and any officers, director, members or shareholders of any of the foregoing which are not natural persons), spouses, estates, executors, estate administrators, heirs, and assigns. (...)" |

The parties in this interlocutory appeal differ as to whether the Companies are also permitted to use Rembrandt's intellectual property under Article 22 under the license granted by Rembrandt, or whether such use is permitted under Article 14 only when products are distribted by Stream; they interpret the VSO differently on that point. Infringement proceedings in the United States are ongoing.

2.15.     On March 29, 2023, Rajan, by his own admission acting as a director of both Stream and SeeCubic BV, asked the lessor of the storage facility in China where the *bonding mcichine* mentioned in 2.12 was located, to surrender that machine to him.

2.16.     When Rajan rejoined the Companies as their director in March 2023, local management asked for a solution to the plight of these three companies' financial position.

2.17.     On April 3, 2023, on behalf of the management of the Companies, a letter was sent to Rajan asking him to diiify whether he intended to provide financing for the known debts of the Companies. In the meantime, management was reluctant to cooperate with the

C/13/738449 / KG ZA 23-772                                                                             6
Sept. 20, 2023

---

remittance of assets such as a bonding machine. Meanwhile, Rajan pressured associates of the Partnerships to hand over the bonding machine to him.

2.18.   In mid-April 2023, the Companies management asked Rajan how provision would be made for payment of salaries in that month, but received no response, but did receive requests to cooperate in issuing the bonding machine.

2.19.   On April 15, 2023, Rajan sent a message to an employee of SeeCubic BV saying that Stream had won in *"court"* the day before and that the judge demanded that the bonding machine be surrendered to Stream immediately, when in fact the judge at the hearing the previous day had said that no one should start transferring assets or nicking technology.

2.20.   In May 2023, during discussions with associates of the Partnerships, Rajan said that financing would be arranged, but he did not get specific and financing failed to materialize.

2.21.   On May 26, 2023, Stream and SeeCubic Inc were urgently requested on behalf of the Companies' staff to find a solution to the financing partly in view of the salary payments to the employees in June 2023. In response, SeeCubic Inc made an offer of increase in the existing financing. No solution was offered by Rajan.

2.22.   Meanwhile, Hawk et al. had already commenced preliminary relief proceedings before this Court. By judgment of June 29, 2023 (hereinafter: the Judgment), the Court in preliminary relief proceedings - in brief - suspended Rajan as director A of the Companies and appointed Mr. J.R. Berkenbosch (attorney at law at Jones Day in Amsterdam) as director A of those companies. It is stipulated (in r.o. 5.5 of the Judgment) that these provisions apply until the sale and transfer of the shares in TechnoVative has taken place on the basis of either a security right of SLS or Hawk or as a result of the U.S. bankruptcy proceedings, and (indirectly) by new owners at least one director has been appointed at each of the Companies, or if as a result of the U.S. bankruptcy proceedings the shares in TechnoVative are retained by Stream and the security rights on the shares in TechnoVative have expired. This judgment further prohibited Ultra-D from suspending, dismissing and appointing directors while Berkenbosch's appointment is in effect.

2.23.   After the Judgment was rendered, the Companies wanted to come to completion on a project in which SeeCiibic BV would collaborate with Hyundai Mobis (hereinafter: HM). That project had been underway for a long time and involved significant revenues. The cooperation required that SeeCubic

BV would send a prototype to HM. The agreement was ready to be signed, but it did not come to that.

2.24. By e-mail dated July 25, 2023, Stream's U.S. attorney in the Chapter 11 proceedings addressed the independent director, asking him not to enter into an agreement with HM or with any other party if it violated third-party rights. He sent that e-mail in cc to Rembrandt's attorney, among others.

2.25. Two days later, Rembrandt turned to the independent director with a warning not to violate its intellectual property rights, later followed by a threat of liability from Jones Day.

2.26. On August 9, 2023, the independent director requested the preliminary injunction court to remove him from office and appoint another independent director. The request included the following passages:
"(...)
5. After finalizing the Protocol (to arrive at an *at arms length* working method), we entered into discussions with SCI on the ongoing projects. For these projects, work had started some time ago (under the reign of the U.S. *receiver)* but no signed contractual framework (yet). The most advanced negotiations are ongoing with a Hyundai entity. SeeCubic BV employees have been working since December 2022 on a prototype for this Hyundai entity which is now ready in Eindhoven. This would receive a significant payment upon entering into the contract. In anticipation of the contract, the prototype has not yet been sent to the Hyundai entity. The signing of this contract was presented to SCI and Stream, but is now encountering great resistance from Stream and Rembrandt.
6. Rembrandt is a third party of whom I (and my office when I sought internal approval (for his appointment as an independent director, vzr.) was not aware that there was a dispute between Rembrandt and the Companies with that. Rembrandt now claims that the technology it developed is used in the products of SeeCubic B.V. In 2021, Stream is said to have signed a *settlement agreement* with Rembrandt whereby Stream's group is allowed to use this technology for a fee. In contrast, SeeCubic B.V. (and prior to signing the settlement *agreement* also Stream) has always disputed that it uses this technology. Complying with Rembrandt's and Stream's request not to work on SCI projects would significantly affect SeeCubic B.V.'s operational management. Indeed, SeeCubic B.V. would then not be allowed to work in any way on SCI's projects, while those are the only projects that have been worked on in the past year, and while Stream has not submitted any projects as yet.
7. SCI, in turn, has indicated that it will no longer provide financing if its projects are not worked on. As a result, no projects can be implemented, no expenses of my office have been paid so far and we cannot meet other essential payments of the Companies in the short term. We have requested SCI several times to pay the costs of my office and the

C/1/738449 / KG ZA 23-772  8
Sept. 20, 2023

Companies to pay, and more specifically the requested *retainer* (...), but so far without success.
8.     Meanwhile, this dispute has been brought to the attention of Jones Day's U.S. management by Rembrandt and Stream, and Rembrandt has threatened to hold Jones Day liable for an amount of USD 1.2-1.5 billion if certain projects (which are necessary to obtain financing) are continued and threatened with actions against individual employees of SeeCubic B.V. (...)"

2.27.   On Aug. 11, 2023, the preliminary injunction judge removed the independent director from office without appointing another.

2.28.   On Aug. 20, 2023, Park was appointed by Rajan as a director of Ultra-D. On Aug. 21, 2023, Park was also appointed as a director of SeeCubic BV and Stream BV.

2.29.   A written statement by P. Theune (Head of Technology of SeeCubic BV and B. Barenbrug (Principal Engineer) dated Sept. 12, 2023 states, among other things, the following about Rembrandt's alleged infringement of intellectual property rights:
"(...) We, as management of SCBV (SeeCubic BV, vzr.) state that we are not using techniques from Rembrandt 3D. Below the arguments are listed:
1. In 2011 SCBV started as a subsidiary of STVN (Stream, vzr.). Only starting in 2017, Rembrandt 3D (...) alleged that our US parent TechnoVative infringed their patents. This was dismissed in US court. The patent analysis performed by the SCBV team showed that these patents already have prior art.
2. I (Patric Theune) have worked at both Philips 3D Solutions and started in the early phase of SCBV (2013) as engineer and for me there is no indication of change in the technology in between that time, except for the natural (already foreseen) improvement that we already had in both the technology and use of it.
3. (...)
4. Rembrandt 3D does not (or should not) have access to SCBV internal information, and even STVN doesn't have any detailed information since December 2020, since they have effectively not operated SCBV since then, so they cannot know what is being used or not, and in which customer offerings. We do not understand the accusation of using trade secrets without more details. (...)"

**3.     The dispute**

3.1.   Hawk et al. claim, after increasing their claim, in summary:
   (a) During the period of 5.5. of the Judgment:
       primarily
       i.     To appoint an independent third party to be designated by the Provisional Court as Director A of the Companies;
       alternatively
       ii.    To appoint Stastney as Director A of the Companies;
   (b) suspend the resolutions appointing Park as a director A of the Companies, and to suspend Park as a director,

C/1/738449 / KG ZA 23-772      9
Sept. 20, 2023

---

    (c) Rajan to area:
        a. To disclose to Stastney what (legal) acts have been performed by or on behalf of Rajan that directly or indirectly affect the Companies; and
        b. on the instruction of Stastney or the director to be appointed by the xoorvisions judge to cooperate in undoing all such (legal) acts, under penalty of forfeiture;
    (d) prohibit Ultra-D from suspending, dismissing and appointing directors in SeeCubic BV and Stream TV and disposing of, encumbering or encumbering the shares in SeeCubic BV or Stream TV during the term of 5.5. of the Judgment;
    (e) directing the Companies to register Stastney or any other independent director appointed by the Interim Injunction Judge in the Commercial Register to the extent necessary and to record any other necessary changes therein; and
    (f) Order Rajan to pay the litigation costs and the post-litigation expenses, plus interest.

3.2.     Rajan and the Companies are defending.

**4.     The views of parties**

4.1.     In short, Hawk et al.'s position is that Rajan is doing everything possible to frustrate the Financiers' exercise of their security rights. They see Berkenbosch's departure as a result of yet another trick from Rajan's magic box. They argue that Stream, in coordination with Rembrandt, fabricated an IP claim for the sole purpose of attracting the relationship with HM to itself. Indeed, Stream was willing to do business with HM if it itself became HM's contracting party.

4.2.     There is no reason to intervene in the governance of the Companies, according to Rajan, any more than there was in the previous summary proceedings.
In summary, his defense is as follows. The right of appointment for the management of the Companies belongs to (ultimately) Stream; Hawk et al. are no more than putative creditors at the American level. Using the power of appointment, Park was appointed to avoid a board vacuum following the departure of the independent director. There is no question of wrongful withdrawals from the Companies. Stream is only trying to regain control of the Companies it had lost through the coifp of Hawk et al (the Omnibus Agreement). VSI was not formed for the sole purpose of housing assets of the Companies at the expense of Stream's creditors. VSI is an investor of Stream and will provide it with the necessary financial resources to help it put its affairs in order.

C/13/738449 / KG ZA 23-772     10
Sept. 20, 2023

---

business within the Companies. Rajan disputes that the Rembrandt claim is fabricated.

4.3. The Companies argue that Park was appointed in accordance with the legal and statutory requirements and that he is aware that he will have to focus on the interests of the Companies in his role as a director. According to them, there is no reason to suppose that he will not do so. He does not have a long history with Stream, so he has a "fresh perspective. There is no basis in objective law to appoint an independent director in summary proceedings at the request of a funder. Moreover, the appointment of a new independent director will not resolve the issue.

4.4. On the parties' contentions, to the extent relevant, further details are given below entered.

**5. The review**

5.1. The case has an international character because several of the plaintiffs are domiciled in the United States. Because the Companies are domiciled in the Netherlands, the Dutch court has international jurisdiction to hear the case. Rajan is not domiciled in the Netherlands, but the claims against him cannot be separated from those against the Companies.

5.2. As long as the battle for control of TechnoVative continues, the status quo within the Companies should be maintained as much as possible. This is also the purpose of the Status Quo order entered by the US court (see section 2.10). The Companies must be prevented from collapsing or having their assets taken outside the Stream group (and thus Hawk et al.'s recourse).

5.3. Rajan has argued at length that the power to appoint the Companies' directors lies with Stream. However, that power of appointment was breached with the previous judgment. That decision, with the restraint offered in the context of a proper division of labor between the Undememployment Chamber and the Provisional Judge, was thought necessary. With that same restraint, the granting of a provision is now again deemed necessary There is a dire situation that still calls for immediate intervention. The struggle for control of the operating companies continues unabated and the company (a start-up) is suffering as a result. The Companies are on the verge of bankruptcy due to the struggle over control. The funds they needlg to pay basic expenses such as rent and payroll are failing to materialize. And yet the Companies' operations must be viable - why else would they be fought over so fiercely and have so much money invested in them? This immediately gives the urgency of Hawk et al.

C/13/738449 / KG ZA 23-772     11
Sept. 20, 2023

---

5.4. Appointing a new independent director does not seem to make sense for the time being, as he or she is expected to run into the same issues and massive claim for damages from Rembrandt. The primary claim will therefore be rejected.

5.5. The only remaining possibility then is that one of the parties (in the person of Park or Stastney) temporarily manages the Companies. This should then be the party with whom there is the greatest chance of maintaining the status quo.

5.6. The Companies face the following problems:
(i) a lack of liquidity, (ii) the Rembrandt issue, and (iii) withdrawals from assets.

   *(i)    Cash*

5.7. Both Hawk et al. and Rajan argue that they can provide such financing directly, but are willing to do so only if they themselves control the companies. For the time being, however, only Hawk et al. are likely to be able to do so. The financing of the Companies in the past period has been provided by Hawk c.s. on the basis of a *Note* approved by the *receiver* (see 2.10). The situation is different with Rajan. He claims that VSI will provide the necessary financing, but no document has been produced showing a binding agreement to that effect, or even that VSI is capable of financing. That would have been obvious at this stage, also in light of the earlier summary proceedings, in which the question of financing played a central role, and the assertions of Hawk et al. that VSI is not capable of financing. An offer to still provide information about VSI's role and capabilities as a financier, made at the hearing at dtipliek, was made too late. For the time being, it is rtit assumed that Hawk c.s. will be able and willing to provide the necessary financing and Rajan will not.

5.8. It did appear that the independent director has not yet been paid for his services. At the hearing, Hawk et al. agreed to pay the invoices for the work of (the office of) the independent director, insofar as they are in line with his assignment.

   *(ii)    The Lvestie Rembrcindt*

5.9. The parties differ on whether the Partnerships infringe Rembrandt's intellectual property rights. Hawk et al. dispute that there is infringement and this has been confirmed by Theune when asked. As Head of Technology, his testimony weighs heavily. He has stated that while Rembrandt's technology (the "borders" and liveliness" functions) used to be used in SeeCubic BV's technology, they were taken out in 2020. There was also no building on Rembrandt's technology, according to Theune. The functions of Rembrandt are not vital, according to Theune

| | |
|---|---:|
| C/l 3/738449 / KG ZA 23-772<br>Sept. 20, 2023 | 12 |

for the technology offered by SeeCubic BV. Nor does it only provide technology for TVs, Theune said.

5.10. Against this statement, the assertion of Rembrandt's attorney that all Ultra D TVs to this day have the two aforementioned functions (production 17 to summons, its e-mail of July 27, 2023, the last sentence of the second paragraph on page 2) does not carry sufficient weight. After all, Stream/Rembrandt knows nothing about developments within the Companies since 2020 and the current state of affairs; that is precisely what it complains about. And Stastney, involved in negotiations with Rembrandt on behalf of Stream in 2017, also sees no threat of i.e. infringement. Hawk et al. argue that as a director, Stastney will be able to continue the Companies' operations without violating Rembrandt's rights. He is willing to take on the role of a director of the Companies and - if appointed - will have to weigh for himself in that role whether the risk of liability is acceptable.

5.1 l. If Stream gains control of the Companies (for the time being), the income from the deal with HM will flow to Stream instead of to SeeCubic BV Companies. Indeed, Stream makes it a condition of entering into that deal that it itself becomes HM's contracting party, because it believes that is the only way to exploit the technology used by the Companies in accordance with the settlement agreement with Rembrandt. This is due to her interpretation of the settlement agreement and an op
August 14, 2023 agreed supplement, the existence of which was not disputed and which provided (in brief) that only Stream would be entitled to use Rembrandt's license and provided that no sub-licensing of the Rembrandt technology should ever be granted to the Companies. The Companies would receive from Stream a fee to be determined.
And because SeeCubic BV uses the same technology in all applications it offers, future agreements would also be made in Stream's name. The risk of i.e. infringement of Rembrandt's rights does not occur in that scenario, but that course of action is contrary to the intent to maintain the status quo.

5.12. In preliminary judgment, the status quo is better preserved if Stastney is allowed to run the Companies for the time being.

   *(iii)   Withdrawals ann the Companies*

5.1. According to Hawk et al. Rajan seeks to unlawfully divest the Companies of assets, including the bonding machine. According to Rajan, all assets belong to Stream and there are no wrongful withdrawals. That all the assets knit and developed by the Companies belong to Stream, the indirect parent company, is not obvious. Whatever that may be, it is not in dispute that the bonding machine was in use by SeeCubic BV, irrespective of the question

who owns them. The same applies to other assets used and developed by the Companies. It should remain so for the time being. The question of ownership is less important at this time. What matters is that the Companies remain able to conduct their business.

5.14. When Rajan gains control of the Companies, there is a threat that assets will be taken out of the control of SeeCubic BV. Indeed, Rajan has insisted on handing over the machine and other assets to him. He wants to transfer the assets to VSI, a company that is a Stream shareholder in which Rajan has a 70% interest and control. According to Rajan, VSI was formed during the period when Hawk et al. controlled TechnoVative and its subsidiaries, for the purpose of supporting Stream in its fight against Hawk et al. and to finance its reorganization plans. According to Rajan, VSI has made several investments in Stream. In addition, according to Rajan, VSI will act as a distributor for Stream and will support Stream in electronics product development and translation of computer software and hardware code, designing chips for use in products and supporting Stream's customers in integrating those chips into end-user products.

5.15. If the Companies' assets are transferred to VSI or the business is restructured in such a way that the Companies cannot operate without the support of VSI, the current situation is not maintained. On the contrary then value is extracted from the Companies. Rajan has also given no good reason for transferring the assets to VSI now. He wants to transfer the assets to a "clean" entity that is in quiet waters and not involved in legal disputes. However, there is no need to do that now and it would also be very detrimental to the recourse of Hawk et al. As creditors, they have an interest in keeping the assets within the group.

5.16. To the extent that Hawk et al. might seek enforcement of its security interests in any of the United States proceedings, that does not deprive it of its right to seek injunctive relief in this interlocutory appeal to prevent the transfer of assets to VSI.

*Intentions Rcrjan*

5.17. Added to this is the fact that Stream, under Rajan's direction, entered into a supplement to the agreement with Rembrandt on August 14, 2023, which (assuming the Companies use technology belonging to Rembrandt) would mean that the Companies could not operate other than for the benefit of distribution by Stream without a demonstration of the need for that restriction. Apparently, Rajan still wants to attract the operations of the Companies to himself and has no intention of maintaining the current situation for the time being.

C/I 3/738449 / KG ZA 23-772             14
Sept. 20, 2023

5.18. In the light of all Rajan's attempts to attract the assets and activities to Stream and/or VSI, his disinterest in the (financing of) the Dutch Companies and his refusal to want to take the protocol drawn up by the independent director as a starting point, it requires too much naivety to expect that the director Park appointed by him will take as a starting point to maintain the status quo as much as possible. The mere assurance by his attorney that he will conform to the standards of Dutch (corporate) law is too little for that. Mr. Park's unilateral appointment was also not in line with the purport of the Judgment.

*Conclusion*

5.19. The situation that there is a risk of assets being withdrawn from the Companies at Rajan's instigation as found in the Judgment remains unchanged. The facts then underlying that judgment are substantially unchanged.

5.20. Based on the foregoing, an order under which Park will be suspended as a director Stastney is provisionally appointed as a director of the Companies is appropriate and necessary. In the circumstances now prevailing, his appointment is the only option available to maintain the status quo as far as possible until such time as it will ultimately be determined in the proceedings pending in the United States who will obtain control of the Companies. That means that until then, or until a court decides otherwise, Stastney will be appointed director of those entities, to the exclusion of Park and Rajan. The claims made thereon will be granted. It will be stipulated that Stastney must comply with the protocol established by the independent director. In view of edge number 62 of the summons, which states that the court may impose conditions on the governance by Stastney, the subsidiary claim under c (ii) of the petition will also be understood in that sense. At the hearing, Hawk et al. expressed their view that they would have no problem if Stastney was bound by that protocol.

5.21. The provisions to be made regarding the management of the Companies will apply for the same period as stipulated in the Judgment, namely:

(a) in the event of the sale of the shares in TechnoVative either on the basis of a security interest of SLS or Hawk, or as a result of U.S. bankruptcy proceedings: until the new owners of the shares in TechnoVative have appointed at least one director at each of the Companies; or
(b) until the U.S. bankruptcy proceedings determined that the shares in TechnoVative remained the property of Stream and the security interests in those shares expired;

or until a judge decides otherwise.

C/1/738449 / KG ZA 23-772                                                                    15
Sept. 20, 2023

_____

5.22.   The motion to enjoin the Companies from enrolling Stastney, to the extent necessary, in the Commercial Register, as well as any other necessary amendments, will be denied. Stastney can arrange that registration itself using this judgment, and "any other necessary amendments" is too indefinite to qualify for award.

5.23.   The claim to order Rajan to (i) provide insight into all actions taken by or on behalf of him that directly or indirectly affect the Companies and (ii) cooperate in the undoing of those actions will be dismissed for the same reasons.

5.24.   As the (mainly) unsuccessful party, Rajan will be ordered to pay the costs of the proceedings. The costs on the part of Hawk et al. will be estimated at:

- subpoena            C      106,73
- court fee                  676,00
- salary lawyer              _____
Total                        1.079.00 C
                             1.861,73

5.25.   Subsequent costs and statutory interest will also be awarded.

**6.     The decision**

The preliminary injunction judge

6.1.    appoints Stastney as director A of Ultra-D Coöperatief U.A., Stream TV International B.V. and SeeCubic B.V., for the period as set forth under 5.21, whereby Stastney must dog himself to the protocol prepared by Mr. Berkenbosch and submitted as production 9 to the summons,

6.2.    Suspends T.J.H. Park as bestittirder A of the companies listed under 6.1. for the period mentioned under 5.21,

6.3.    prohibits Ultra-D Coöperatief U.A., during the period mentioned under 5.21 suspend, dismiss or appoint directors in SeeCubic B.V. and Stream TV International B.V., or perform acts that have the effect of disposing of or encumbering the shares in SeeCubic B.V. or Stream TV International B.V,

6.4.    Order Rajan to pay the costs of the proceedings, assessed on the part of Hawk et al. to date at £1,861.73, plus statutory interest thereon from fourteen days after the date of judgment until the day of payment in full,

6.5.    order Rajan to pay the costs incurred by Hawk et al. following this judgment, estimated at C 173.00 for attorney's fees, to be increased by £90.00 and the costs of the

C/1/738449 / KG ZA 23-772 16
Sept. 20, 2023

---

serving notice in the event that service of this judgment is made, to be increased by the statutory interest thereon from fourteen days after service of this judgment until the day of full payment,

6.6. Declares this judgment provisionally enforceable to this extent,

6.7. Dismisses the more or less claimed.

This judgment was rendered by Mr. T.H. van Voorst Vader, interim relief judge, assisted by Mr. E. van Bennekom, registrar, and publicly pronounced on September 20, 2023.

jjy OEGEYE OR GROSSE
EN VOOR
The griffier van the
rechtbanh A star
dam

type: EB
coll: BPWB