**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>Stream TV Networks, Inc., *et al.*[1]<br><br>The Debtors. | Chapter 11<br><br>Bky Case No. 23-10763 (AMC)<br>(Jointly Administered) |

**VISUAL SEMICONDUCTOR INC. 'S JOINDER TO REMBRANDT 3D HOLDING LTD.'S MOTION SEEKING ENFORCEMENT OF THE TEMPORARY RESTRAINING ORDER, SANCTIONS AGAINST PARTIES WHO VIOLATED THE TEMPORARY RESTRAINING ORDER, AND INJUNCTIVE RELIEF**

Visual Semiconductor, Inc. ("VSI"), by and through undersigned counsel, hereby joins Rembrandt 3D Holding LTD's *Motion Seeking Enforcement of the Temporary Restraining Order, Sanctions Against Parties Who Violated the Temporary Restraining Order, and Injunctive Relief* (ECF No. 824) (the "Motion to Enforce TRO") and in support of this Joinder states as follows:

**PRELIMINARY STATEMENT**

1. On January 4, 2024 the Debtor, in Adv. Case No 23-00057-AMC, obtained a Temporary Restraining Order ("Bankruptcy TRO") (Adv. No. 119) preventing Shadron Stastney ("Stastney"), SeeCubic, Inc. and other Defendants/affiliates ("SeeCubic", together with Stastney and the other Defendants/affiliates, the "Hawk Parties") from using the Debtors' technology to compete with the Debtors as set forth in more detail in the Motion to Enforce TRO. Prior to even the entry of the Bankruptcy TRO, prepetition on August 9, 2022 , the Delaware Chancery Court had already issued a temporary restraining order enjoining SeeCubic, Inc. from selling Stream's assets, which assets the Hawk Parties have been unlawfully in their possession since then. (the "Delaware TRO"

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

78919927;3

together with the Bankruptcy TRO, the "TROs").

2.    As the Court is aware and the record reflects, the Hawk Parties' efforts to take control of the Debtors' property preceded and precipitated the filing of the Bankruptcy Petitions, continued throughout this case in violation of the automatic stay, and continued after entry of the Bankruptcy TRO, and in violation of both TROs.

3.    Since entry of the TROs, the Debtors, Rembrandt, and VSI have, at various points throughout the case sought to enforce the automatic stay and the TROs against the *ultra vires* actions of the Hawk Parties to take control of the Debtors assets, which efforts, once a Chapter 11 Trustee was appointed, shifted to utilizing the Trustee to take control of those assets. Notwithstanding the Hawk Parties' constant violations of the automatic stay and the TROs, the Court has yet to sanction or prevent the Hawk Parties from continuously violating the automatic stay and the TROs through their unlawful possession of estate assets, which possession persists to today. While the Trustee's Settlement with the Hawk Parties ignores all of the Hawk Parties' violations of the automatic stay throughout the case, this Settlement, and the Trustee's proposed sale, cannot overcome Rembrandt's property interests or the fact that the sale, because it infringes on Rembrandt's property interests, if completed would itself be violation of the TRO and, if consummated as proposed, will destroy all the value in the estate by rendering the Debtors' IP unusable and the StreamTV Debtors' hopelessly unable to reorganize.  In short, unless halted by the Trustee and this Court, the TRO transgressors will achieve the precise purpose of their transgressions – transfer and assignment of title to the assets they have misappropriated, controlled, and/or sought to possess since the commencement of these cases – all under the "color of law" and with the imprimatur of this Court and its appointed fiduciary.

I.    **Violations of the Automatic Stay and the TROs by the Hawk Parties**

A. **Delaware Courts Ultimately Rule in Favor of the Debtors Prepetition**

4. The Hawk Parties prepetition, sought to take control of the Debtors and their IP, which efforts, while at first successful, were ultimately undone by the Delaware Supreme Court.

5. SeeCubic was explicitly ordered by the Delaware Chancery Court on September 30, 2022 to return the shares of Technovative stock to Stream, thereby transferring legal title to all subsidiaries (and interest in the assets held by them) back to Stream. In response, Stastney immediately seized those shares through Hawk and appointed himself as director of Technovative and all other subsidiaries. Afterward the Chancery Court found Stastney, SeeCubic, Inc., and Hawk in contempt, which contempt was ignored by the Hawk Parties as they never returned any of the estate assets in their possession even after the filing of the bankruptcy petitions. Orders, rulings, and admonitions in open Court meant a nothing to the Hawk Parties, who continued their adverse possession of the Debtors, which forced the Debtors, on March 15, 2023, to file for bankruptcy.

B. **The Bonding Equipment**

6. On March 12, 2015, Stream entered into a purchase agreement for bonding equipment (the "Bonding Equipment") which equipment, after purchase, was eventually warehoused in China. Upon the filing of these Chapter 11 cases, the Debtors attempted to get control of the Bonding Equipment, but were prevented from doing so by the Hawk Parties.

7. On March 28, 2023 the Debtors filed an Emergency Motion for Sanctions for Violation of the Automatic Stay (ECF No. 49) (the "Stay Violation Motion") seeking relief against SeeCubic and Stastney for preventing the Debtors from taking possession of Bonding Equipment belonging to the Debtors' estates. Photos of the equipment and the agreement with Debtor Stream for the purchase of the Bonding Equipment were provided to the Court (Exhibits A and B to the Stay Violation Motion).

8.  Notwithstanding months of briefing afterward and numerous hearings which stretched into 2024, the Court never ruled on the Stay Violation Motion and the Bonding Equipment was never released or returned to the Debtors.

C. **Other Estate Assets in the Possession of the Hawk Parties and the Parallel Proceedings in Amsterdam**

9.  After the Debtors filed the Stay Violation Motion, rather than let this Court resolve the automatic stay issues which only this Court can rule upon, the Hawk Parties initiated proceedings in the Netherlands, in the Courts of Amsterdam, to have that forum adjudicate what is property of the Debtors estate. The Debtors, in response, on April 5, 2023 filed an Amended Stay Violation Motion (ECF No. 76), to include Ultra-D demonstrator samples, engineering assets, Stream business laptops, Stream's intellectual property and software, and Stream business records (together the "Other Assets") in the unlawful possession of the Hawk Parties, requesting turnover of those assets, and asking that the Hawk Parties be enjoined from continuing to exert control over estate assets in violation of the stay.

10. At the April 14, 2023 hearing on the Amended Stay Violation Motion, the Court expressed its frustration with the Hawk Parties' attempts to circumvent this Court and the fact that hearings in the Amsterdam District Court were held even after the Court admonished the Hawk Parties from seeking that relief. See *4/14/23 Hearing Transcript* at 117:7-13. Notwithstanding months of briefing and evidence afterward and numerous hearings which stretched into 2024, the Court never ruled on the Amended Stay Violation Motion. The Other Assets have yet to be released or returned to the Debtors. Together Hawks' possession and control over the Bonding Assets and the Other Assets rendered the Debtors unable to proceed in these bankruptcy cases, which eventually led to the appointment of a Chapter 11 Trustee, which appointment in essence rewarded the Hawk Parties' constant violations of the automatic stay, and the TRO after it was entered.

11. On April 18, 2023 the Debtors filed a Motion for Withdrawal of Writ of Summons and Evidentiary Hearing for Monetary Damages (ECF No. 125) again asking the Court to enforce the automatic stay to bar the Hawk Parties' parallel efforts through the Amsterdam Courts to continue in possession of estate assets in violation of the automatic stay, which motion was never ruled on despite numerous hearings and briefings.

D. **The Adversary Proceeding and Entry of the TRO**

12. On September 30, 2023 the Debtor filed a Complaint initiating Adv Case No 23-00057-AMC, (the "Adversary") asking the Court to enter a TRO against the Hawk Parties, which TRO was ultimately entered on January 4, 2024 (ECF No. 119). Rembrandt actively participated in the Adversary since, as it argues in its own Motion to Enforce TRO, the "Rembrandt License explicitly gave Stream—and its subsidiaries—the right to use the Rembrandt IP, *solely for the benefit of Stream,* "rendering any other use prohibited and any discussion involving the Debtors' IP, a conversation about Rembrandt's IP. Any attempt by the Trustee and the Hawk Parties to use Rembrandt's license in violation of the prepetition agreement between the Debtors and Rembrandt, including via the proposed sale, will render the IP unusable and destroy the value of the IP to the Debtors' estates.

13. On November 6, 2023 the Debtor filed a supplement in support of the Amended Stay Violation Motion (ECF No. 458) introducing myriad more evidence into the record of the Hawk Parties continuous violations of the automatic stay. This evidence included:

- Snapshots of SeeCubic's website touting the Debtors/Rembrandt's IP and the Debtors' employees. (Exhibit D to ECF No. 458)

- SeeCubic's Trademark Filing over the Debtors' technology (Exhibit E to ECF No. 458)

- A copy of the Dutch Order appointing Stastney over the Debtor subsidiaries in the Netherlands in violation of the automatic stay (Exhibit F to ECF No. 458).

14. On December 14, 2023 the Court entered a Stipulated Order Restating and Enforcing the Worldwide Automatic Stay (ECF No. 517) yet never sanctioned nor even mentioned any of the Hawk Parties notwithstanding that the entry of this order could only have been done in response to what the Hawk Parties were doing in the Netherlands.

15. On May 30, 2024 the Trustee filed a Motion for Entry of an Order Enforcing the Automatic Stay and Compelling Turnover of Estate Property Without Prejudice from VSI (ECF No. 646) which motion the Trustee withdrew when he actually faced the prospect of defending it and the record before this Court which makes it clear the Hawk Parties are the only ones responsible for all the automatic stay and TRO violations in these cases (ECF No. 725).

## BACKGROUND

A. **Procedural History**

16. On May 20, 2024, VSI filed their *Objection of Visual Semiconductor, Inc. to the Motion of the Chapter 11 Trustee to Approve Settlement Agreement and Mutual Release with Hawk Investment Holdings, Ltd, as Collateral Agent for the Secured Noteholders of SeeCubic, Inc., Pursuant to Fed.R.Bankr.P. 9109(A) And 11 U.S.C. § 105* (ECF No. 642), objecting to the *Motion of William A. Homony in His Capacity as Chapter 11 Trustee for Entry of an Order Approving a Settlement Agreement and Mutual Release with Hawk Investment Holdings, Ltd., as Collateral Agent for the Secured Noteholders of Seecubic, Inc., Pursuant to Fed. R. Bankr. P. 9019(A) and 11 U.S.C. § 105(A)* (the "Settlement Motion") (ECF No. 630). On June 5, 2024, the Court entered an order granting the Settlement Motion and approving the settlement contained therein (the "Settlement").

17. On June 20, 2024, VSI filed a motion to reconsider the order approving the Settlement (the "Reconsideration Motion") (ECF No. 686).

18. Further, on July 26, 2024, VSI filed a notice of its intention to take the Trustee's deposition and requested the Trustee's production of documents in advance thereof, which notice was amended on August 24, 2024[9] and again on October 25, 2024[10] (the "VSI Discovery Requests"). In response, on August 29, 2024, the Trustee filed an expedited motion to quash the VSI Discovery Requests and for a protective order (the "Motion to Quash") (ECF No. 724).

19. On September 4, 2024, VSI filed an objection to the Motion to Quash (the "VSI Quash Objection") combined with a motion to compel the Trustee to respond to the VSI Discovery Requests (the "Motion to Compel") (ECF No. 728).

20. On October 30, 2024, the Court held a hearing on the Motion to Quash, the VSI Quash Objection, and the Motion to Compel, following which it entered an order (the "First Quash Order") (a) quashing the VSI Discovery Requests with respect to Deposition Topics 1 through 6 and Document Requests 1 through 18 (the "Quashed Discovery Requests"), (b) suspending a ruling on the Additional Deposition Topics and Additional Document Requests (the "Remaining VSI Discovery Requests") pending resolution of the Reconsideration Motion, and (c) denying the Motion to Compel with respect to the Quashed Discovery Requests (ECF No. 728).

21. On November 7, 2024, the Court held a hearing on the Reconsideration Motion, the Reconsideration Objection, and the Remaining VSI Discovery Requests (the "Reconsideration Hearing"). Following the hearing, the Court entered an order denying the Reconsideration Motion, granting the Motion to Quash with respect to the remaining VSI Discovery Requests, and denying the Motion to Compel with respect to the remaining Discovery Requests (ECF No. 805).

B. **The Hawk Parties' Interference with the Debtors' Assets**

22. As a result of the Delaware Supreme Court Opinion of June 15, 2022 and its corresponding Mandate of July 1, 2022, the Delaware Court of Chancery decision validating a

settlement agreement (the "Omnibus Agreement") which purported to transfer of all the assets of Debtor Stream to SeeCubic was REVERSED and VACATED. The case was REMANDED to the Chancery Court so that assets wrongfully seized by or transferred to SeeCubic could be returned to Stream[2]. The same day the Delaware Supreme Court Mandate was issued, Stream filed a Motion for Entry of Final Order and Judgment Consistent with the Mandate in Chancery Court[3].

23. On multiple occasions, the Chancery Court ordered that SeeCubic return the assets to Stream, but SeeCubic instead (a) argued that it should not be compelled to do so, (b) returned few assets, none of which had material value to Stream's business, (c) engaged an investment banker – the same banker engaged by the chapter 11 trustee (the "Trustee") – to sell the assets, and (d) engaged in contumacious behavior to exert control over assets immediately upon their return[4].

24. Found in contempt of court on October 3, 2022 and forced to return ownership of Stream's global subsidiaries to Stream, SeeCubic commenced its next assault on Stream's entitlement to **own, possess, and use** its assets, thereby negatively impacting Stream's efforts to generate revenue and extinguish its debt. On October 17, 2022, Hawk Investment Holdings Limited ("Hawk"), acting as collateral agent for SeeCubic, filed a complaint in Chancery Court against the Debtors pursuant to Section 225 of the General Corporation Law of the State of Delaware, 8 Del. C. § 225 (the "225 Action"), seeking confirmation that it had the right to appoint Stastney as director of Debtor Technovative Media, Inc. ("Technovative"), thus exerting control over the Debtors' assets, which it intended once again to sell in a UCC Article 9 sale.[5]

---

[2] *See* ECF 48, Exhibits Y and Z.
[3] *See* the *Declaration of Charles M. Robertson in Support of Visual Semiconductor, Inc.'s Objection to Motion of William A. Homony in His Capacity as Chapter 11 Trustee for an Order Approving (A) the Sale of the Debtors' Assets Free and Clear Of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto and (C) Granting Related Relief* (Exhibit 1 to ECF No. 815, and attached hereto as **Exhibit 1** (the "Robertson Declaration") at ¶22.
[4] *See* Robertson Declaration at ¶¶ 23-33, 86, 92, 102, 107-110, 116-117 and ECF 48, Exhibits K, AA and BB.
[5] *See* Robertson Declaration at ¶¶ 35, 37, 93 and ECF 48, Exhibit CC.

25. Upon the filing of Hawk's 225 Action, the Chancery Court issued a Status Quo Order which (a) enabled SeeCubic to maintain wrongful possession of Stream's assets, (b) prevented Stream from pursuing the return of its assets as mandated by the Delaware Supreme Court and the Chancery Court's own previous orders, and (c) appointed a Receiver *Pendante Lite* (the "Receiver") to manage the operations of Technovative[6].

26. SeeCubic and Stastney encouraged the Receiver to proceed with projects initiated by, and for the benefit of, SeeCubic during its wrongful possession of Stream's assets. When the Receiver complied with the wishes of SeeCubic, Rembrandt 3D Holding Ltd. filed suit against SeeCubic, Hawk, and Technovative in Delaware District Court, alleging misappropriation of trade secrets and seeking injunctive relief[7].

27. After Stream and Technovative filed their chapter 11 petitions on March 15, 2023, the Debtors sought return of their assets with an initial motion on April 5, 2023[8]. The Court acknowledged on October 30, 2023 that the motion had remained on the docket unresolved for nearly 7 months[9]. As stated below, the Debtors filed several additional motions during the ensuing months seeking enforcement of the worldwide stay and turnover of estate assets.

28. Despite the worldwide stay afforded to the Debtors in chapter 11 bankruptcy, Stastney continued to interfere with their ability to manage their own assets. The Hawk Parties (as defined below) engaged a law firm in the Netherlands to (a) challenge Stream's registration of Mathu Rajan as director of the Debtors' three Dutch subsidiaries and (b) communicate to the Debtors' R&D operating company, SeeCubic B.V. ("SCBV"), that Stastney was still the acting

---

[6] *See* Robertson Declaration at ¶¶ 37 and ECF 48, Exhibit DD.
[7] *See* Robertson Declaration at ¶¶ 38-39.
[8] *See* ECF 76 and 10/30/23 Hearing Transcript at 240:25-241:25.
[9] *See* 10/30/23 Hearing Transcript at 245:9-246:3.

director and that SCBV personnel should not recognize the authority of Mathu Rajan[10].

29. Seeking to control the Debtors' overseas assets, Hawk, SeeCubic, Stastney, and SLS Holdings VI, LLC ("SLS" – an investment vehicle managed by Stastney – and collectively with Hawk, SeeCubic, and Stastney, the "Hawk Parties") filed a Writ of Summons in Amsterdam Court (the "Amsterdam Action") seeking to remove Mathu Rajan as director of the Debtors' three Netherlands subsidiaries which own and control the Debtors' R&D operations, engineering personnel, patent portfolio, and manufacturing equipment. Although forced to withdraw the Amsterdam Action in October 2022 due to the Chancery Court's Status Quo Order, the Hawk Parties renewed the action shortly after the Debtors filed their chapter 11 petitions, and on June 29, 2023, they succeeded in having the Debtors' CEO removed as director of the Debtors' three Dutch subsidiaries, including SCBV[11].

30. On July 1, 2023, the Debtors informed this Court of the Amsterdam Action taken in spite of the worldwide stay[12]. In the filing, the Debtors detailed multiple previous requests for enforcement of the automatic stay and turnover of estate assets[13] as well as two occasions that this Court had held those motions in abeyance[14]. On multiple occasions, this Court expressed irritation that the Amsterdam Action had proceeded, including the October 2023 comment: "…nobody was supposed to go over there and do anything."[15]

31. Like the Chancery Court Receiver before him, the independent director appointed by the Amsterdam Court was encouraged by Stastney to proceed with projects for the benefit of SeeCubic. Not long after his appointment, the independent director resigned upon learning that the

---

[10] *See* Robertson Declaration at ¶¶ 42-43.
[11] *See* Robertson Declaration at ¶¶ 36-37 and 45.
[12] *See* ECF 283.
[13] *See* ECF 49, ECF 76, ECF 90, ECF 113, and ECF 114.
[14] *See* ECF 122 and ECF 146
[15] *See* Robertson Declaration at ¶¶ 47-50 and 10/30/23 Hearing Transcript at 255:5-16.

projects promoted by SeeCubic and actively worked on by SCBV violated the intellectual property rights of Rembrandt[16].

32. A week after the independent director resigned, the Hawk Parties filed their third Writ of Summons in Amsterdam Court and pursued appointment of Stastney as director of the Debtors' Dutch subsidiaries. They succeeded on September 20, 2023, and Stastney has exerted dominion and control over the Dutch subsidiaries, which constitute the majority of the Debtors' assets, ever since[17].

33. During the pendency of these Bankruptcy Cases, SeeCubic published a corporate website claiming the Debtors' Netherlands R&D facility and employees[18], financial achievements[19], and industry accolades[20] as its own. This Court expressed concern about the misleading representations[21] and ultimately enjoined the Hawk Parties from such public representations.

34. On October 18, 2023, during the Bankruptcy TRO hearings, and despite the Debtors' prior registration of a substantially similar trademark, Stastney attempted to register a trademark for SeeCubic™ on behalf of SeeCubic.[22] Months earlier, on May 26, 2023, Stastney had filed a trademark registration for SeeCubic Labs™, also for the benefit of SeeCubic[23]. Further, the Debtors' trademarks for SeeCube™ and Ultra-D™ had been transferred to SeeCubic on February 16, 2022 by Stastney, citing the Omnibus Agreement as supporting evidence. Those two trademarks

---

[16] *See* Robertson Declaration at ¶¶ 51-52. *See also* 11/27/23 Hearing Transcript at 41:5-21 and 46:7-15.
[17] *See* Robertson Declaration at ¶¶ 54, 87, and 103.
[18] *See* 10/16/23 Hearing Transcript at 36:17-23, 198:21-201:13, 202:24-204:17, and 205:6-207:16.
[19] *See* 10/30/23 Hearing Transcript at 218:14-23 and 219:10-13.
[20] *See* 10/30/23 Hearing Transcript at 219:18-225:12, 226:23-227:12, 231:13-23, 235:2-10, and 236:9-239:11.
[21] *See* 11/15/23 Hearing Transcript at ¶ 44:20-45:1. *See also* 12/14/23 Hearing Transcript at 7:10-8:12.
[22] *See* 11/27/23 Hearing Transcript at 53:1-57:18, 58:25-60:3, and 60:9-19. *See also* 10/30/23 Hearing Transcript at 218:23-219:9 and 219:14-17. *See also* 11/15/23 Hearing Transcript at 44:7-16 and 45:8-20.
[23] *See* 11/27/23 Hearing Transcript at 73:7-23.

were clearly proven to be initially registered and owned by the Debtors[24]. However, when the Omnibus Agreement was invalidated by the Delaware Supreme Court four months later, Stastney made no effort to reverse the transfer[25]. On June 15, 2022, the same day the Omnibus Agreement was invalidated, security interests in both the SeeCube™ and Ultra-D™ trademarks were transferred by SeeCubic to Hawk, and those transfers were never reversed by SeeCubic following invalidation of the Omnibus Agreement[26]. All trademark registrations and transfers clearly conflicted with trademarks and trade names owned by the Debtors, causing this Court concern[27].

35. After months of hearings, this Court announced its intention to issue a temporary restraining order and was quite clear when it stated that the enjoined parties should take no action "to assert any ownership, alleged ownership, **anything to do with these assets**."[28] A temporary restraining order was issued on January 4, 2024 against the Hawk Parties (the "Bankruptcy TRO")[29] and has been extended six times, remaining effective today[30] despite a representation by the Trustee that "the TRO is no longer in effect. I settled that issue."[31]

36. The Hawk Parties have consistently operated in disregard for the Bankruptcy TRO. SeeCubic currently maintains six URL domains that direct visitors to a public web page claiming that the Debtors' assets are the property of SeeCubic despite the Bankruptcy TRO specifically enjoining it from doing so – a practice that continues as of the date of this filing[32].

37. In violation of the Bankruptcy TRO, SCBV (under the direction of Stastney and for the benefit of SeeCubic) has produced and sold demonstrator samples featuring the Debtors'

---

[24] *See* 11/27/23 Hearing Transcript at 81:18-82:16.
[25] *See* 11/27/23 Hearing Transcript at 74:8-76:16.
[26] *See* 11/27/23 Hearing Transcript at 76:25-77:17 and 78:17-79:10.
[27] *See* 12/14/23 Hearing Transcript at 8:13-24.
[28] *See* 12/14/23 Hearing Transcript at 12:21-23 (emphasis added).
[29] *See* Adversary Case No. 23-00057, ECF 119.
[30] *See* Adversary Case No. 23-00057, ECF 133, ECF 137, ECF 144, ECF 148, ECF 150, and ECF 152.
[31] *See* Robertson Declaration at ¶ 66.
[32] *See* Robertson Declaration at ¶ 107.

technology. Such sales were documented in royalty reports prepared by the Trustee and submitted to Koninklijke Philips N.V. ("Philips") for the second and third quarters of 2024 pursuant to third-party license requirements. At least one of the Debtors' monthly operating reports further confirms the royalty payment to Philips[33]. The samples sold during that 6-month period are likely only a small portion of the "28 projects across 25 customers" engaged in proof-of-concept projects that Stastney reported in an email update to SeeCubic stakeholders[34].

38. Since the issuance of the Bankruptcy TRO, SeeCubic, Stastney, and other enjoined parties have continuously used the Debtors' technology to raise capital, solicit strategic partnerships, and secure customers. Counsel for Hawk and SeeCubic – and the Trustee himself – have been notified by Rembrandt and/or VSI of such violations, but there has been no effort to protect estate assets.[35]

39. This Court stated: "I will say for the record, if you use the debtor's asset, I don't care what you believe you had a right to do. You're using it without permission or without relief from the stay, [there will be] consequences."[36] To date, there have been no consequences, and the enjoined parties continue to violate the Bankruptcy TRO with impunity.

## ARGUMENT

A. **The Temporary Restraining Order Must Be Enforced**

40. Because the Hawk Parties took actions clearly prohibited by the TRO, the Court should hold the Hawk Parties in contempt for violating an order of this Court, and (1) grant the motion to enforce the TRO; (2) sanction the Hawk Parties; and (3) order the Debtors' and Rembrandt's property returned to their rightful owners.

---

[33] *See* Robertson Declaration at ¶¶ 64-66 and 68.
[34] *See* Robertson Declaration at ¶ 61.
[35] *See* Robertson Declaration at ¶¶ 62-63.
[36] *See* 11/27/23 Hearing Transcript at 135:15-18.

41. As a general principle guiding the legal processes in the United States, courts are expected to uphold and enforce their lawful orders to maintain the integrity of the judicial process through legal mechanisms. Thus, if a TRO is validly issued and properly served (which is not contested, in these cases), courts are expected to enforce compliance through appropriate legal mechanisms.

B. **Parties who have violated the Temporary Restraining Order should be held in civil contempt and sanctioned.**

42. Courts have inherent power to enforce compliance with their lawful orders through civil contempt. *See Spallone v. United States,* 493 U.S. 265 (1990); *Shillitani v. United States,* 384 U.S. 364, 369 (1966). As the Supreme Court stated in *Ex parte Robinson,* 86 U.S. 505, 510 (1874), "the power to punish for contempt is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts and, consequently, to the due administration of justice."

43. The power to impose civil contempt sanctions clearly applies in the bankruptcy court as well. Indeed, it is well established that bankruptcy courts have power to enter civil contempt orders. *In re MarketXT Holdings Corp.,* Case No. 04-12078, 2006 WL 408317, at *1 (Bankr. S.D.N.Y. Jan. 27, 2006) ("It is well accepted, in light of the 2001 amendments to Rule 9020, that bankruptcy courts have power to enter civil contempt orders."); *see also In re World Parts, LLC*, 291 B.R. 248, 253 (Bankr. W.D.N.Y. 2003) ("Bankruptcy courts possess the power to impose sanctions for acts of civil contempt.") (citing *In re Chateaugay Corp.*, 920 F.2d 183, 187 (2d Cir. 1990)).

44. Civil contempt may be employed by a court in order to coerce the defendant into compliance with a court's order and to compensate for losses or damages sustained as a result of disobedience and noncompliance with a court order. *McDonald's Corp. v. Victory Investments*, 727

F.2d 82, 87 (3rd Cir. 1984). The purpose of civil contempt is to compel a reluctant party to do what a court requires of him. *See Badgley v. Santacroce,* 800 F.2d 33, 36 (2d Cir. 1986); *see also Shillitani,* 384 U.S. at 368 (stating that the act of disobedience consisted solely "in refusing to do what had been ordered" and the judgments imposed conditional imprisonment for the purpose of compelling the witnesses to obey the orders to testify). Civil contempt sanctions may also compensate for any harm that previously resulted. *See Nat'l Org. for Women v. Terry,* 159 F.3d 86, 93 (2d Cir. 1998); *Weitzman v. Stein,* 98 F.3d 717, 719 (2d Cir. 1996) (stating that sanctions for civil contempt serve two purposes: to coerce future compliance and to remedy any harm past noncompliance caused the other party).

45. Compensatory sanctions may include the reasonable costs of prosecuting the contempt, including attorneys' fees. *Id.* ("[T]he cost of bringing the violation to the attention of the court is part of the damages suffered by the prevailing party") (quoting *Cook v. Ochsner Found. Hosp.,* 559 F.2d 270, 272 (5th Cir. 1977)). The court has "wide, but not unlimited, discretion in fashioning appropriate compensatory sanctions." *Id.* at 401. *See also In re Linerboard Antitrust Litig.*, 361 F. App'x 392, 399 (3d Cir. 2010).

46. To support a civil contempt sanction, the movant must demonstrate, by clear and convincing evidence, that the defendants knew of and disobeyed a valid order. *FTC v. Lane Labs-USA, Inc.*, 624 F.3d 575, 582 (3d Cir. 2010) (citations omitted). Ambiguities are resolved in favor of the nonmovant. *Id.* (quoting *John T. v. Del. Cnty. Intermediate Unit*, 318 F.3d 545, 552 (3d Cir. 2003)); *see also New Penn Fin., LLC v. Giglio*, No. 16-1827, 2016 U.S. Dist. LEXIS 101595, at *5-6 (E.D. Pa. Aug. 3, 2016).

47. Here, these factors are clearly met, as described in the Rembrandt Motion. The TRO was certainly valid, as well as clear and unambiguous. The TRO as entered by the Court fully

satisfied the requirements of Fed. R. Civ. P. 65 and has not been challenged or overruled. Fed. R. Civ. P. 65(d) requires injunctions and restraining orders to describe the enjoined conduct in reasonable detail without merely referencing the complaint or other documents. The TRO is clear and unambiguous in compliance with Rule 65(d).

48. Proof of the Hawk Parties knowing noncompliance is also certainly clear and convincing. The evidentiary record in this case is substantial; as described throughout this joinder, the affidavits, pleadings, and hearing transcripts demonstrate that the Hawk Parties' engaged in knowing noncompliance of the TRO. The details of this noncompliance are detailed above.

49. Finally, for good measure, the Hawk Parties have clearly not attempted to comply with the Temporary Restraining Order. Despite the Hawk Parties' numerous proclamations to the contrary, the evidentiary record is clear that the they have flouted the proscriptions of the TRO. If the Hawk Parties had actually intended to comply with the TRO, they would not have engaged in the various flagrant violations described herein.

C. **The Court Should Issue an Injunction Halting the Sale Process**

50. Allowing the sale process to go forward would be devastating to the Debtors and Rembrandt. Although Section 363 of the Bankruptcy Code allows a debtor to sell its bankruptcy assets free and clear of liens and interests, that privilege exists only if certain circumstances are met. In a case with facts similar to those at bar, *In re DeCurtis Holdings LLC,* the United States Bankruptcy Court for the District of Delaware ultimately enjoined the sale and use of the assets by the debtor, finding that the sale would result in irreparable harm to the objecting entity and money damages would not compensate for the harm. *In re DeCurtis Holdings*, 2023 WL 5153645, at *22;

11 U.S.C. § 363 (f) (providing "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest").

51. Injury that "cannot be undone through monetary remedies" is irreparable. *Boggs Contracting, Inc. v. Freismuth*, 2021 U.S. Dist. LEXIS 252335, at *9 (M.D. Fla. Dec. 27, 2021). Here, the Hawk Parties' conduct caused and continues to cause several "hard-to-measure harms, such as impaired goodwill and competitive position, that can justify injunctions." *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1331 (Fed. Cir. 2018).

52. As a primary matter, an owner's "loss of control over its intellectual property rights" is a prototypical form of irreparable harm. *E.g., Lead Creation Inc. v. P'ships & Unincorporated Ass'ns Identified on Schedule A*, 2023 U.S. Dist. LEXIS 25025, at *12 (M.D. Fla. Feb. 14, 2023). "The right to exclude competitors from using one's property rights is important," and "the need to protect this exclusivity" warrants an injunction. *E.g., Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 642 (Fed. Cir. 2015); *accord News Am. Mktg. In-Store, LLC v. Emmel*, 429 F. App'x 851, 853 (11th Cir. 2011) (unpublished) (permanent injunction barring defendant from any further disclosures of confidential information); *Marine Turbo Eng'g, Ltd. v. Turbocharger Servs. Worldwide, LLC*, 2012 U.S. Dist. LEXIS 200492, at *31-32 (S.D. Fla. 2012) ("some form of permanent injunction is appropriate with regard to [defendant's] use of Plaintiffs' Confidential Information").

53. Further, the injury to competitiveness caused by misappropriation of valuable confidential information is a classic form of irreparable harm, as such injury cannot be reversed or repaired. *G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 418 (2022) ("lost opportunity to compete on a level playing field" found sufficient to prove irreparable harm).

54. VSI incorporates Rembrandt's arguments in favor of an injunction, and restates that

for all the reasons described in the Rembrandt Motion, the balance of hardships clearly weighs against the Hawk Parties and in favor of the Debtors and Rembrandt. Absent an injunction, the Debtors and Rembrandt will suffer further irreparable harm, in addition to the substantial irreparable harm it has already had to endure.

WHEREFORE, based on the constant and pervasive violations by the Hawk Parties of both the automatic stay and the TRO, the Court should grant the Motion to Enforce TRO, sanction the Hawk Parties, and order the Debtors' and Rembrandt's property returned.

Dated: November 27, 2024						Respectfully submitted,

**AKERMAN LLP**

 */s/ Donald N. David*
Donald N. David (SBN # 304846)
1251 Avenue of the Americas
37th Floor
New York, NY 10020
Telephone: (212) 880-3856
Facsimile: (212) 880-8965
Email: donald.david@akerman.com

-and-

R. Adam Swick (*Admitted Pro Hac Vice*)
500 W. 5th Street, Suite 1210
Austin, TX 78701
Telephone:  (737) 999-7100
Facsimile:   (512) 623-6701
Email: adam.swick@akerman.com

-and-

John H. Thompson (*Admitted Pro Hac Vice*)
750 Ninth Street, N.W., Suite 750
Washington, D.C. 20001
Telephone: (202) 393-6222
Facsimile: (202) 393-5959
Email: john.thompson@akerman.com

*Attorneys for Visual Semiconductor Inc.*

- 19 -

## CERTIFICATE OF SERVICE

I certify that on November 27, 2024, I caused this Joinder to be electronically filed with the Clerk, United States Bankruptcy Court, Eastern District of Pennsylvania, and to be served electronically the Court's CM/ECF and/or by First Class Mail, upon all parties that have requested service.

                                                */s/ R. Adam Swick*
                                                R. Adam Swick