## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc., *et al.*[1] | Bky. Case No. 23-10763 (AMC) (Jointly Administered) |
| The Debtors. | |

**DECLARATION OF CHARLES M. ROBERTSON IN SUPPORT OF VISUAL SEMICONDUCTOR, INC.'S OBJECTION TO MOTION OF WILLIAM A. HOMONY IN HIS CAPACITY AS CHAPTER 11 TRUSTEE FOR AN ORDER APPROVING (A) THE SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO AND (C) GRANTING RELATED RELIEF**

I, Charles M. Robertson, hereby declare under penalty of perjury:

1.     My legal name is Charles M. Robertson, but professionally I am known by the nickname Bud Robertson. I was employed by Stream TV Networks, Inc. ("Stream"), a debtor in the above captioned Chapter 11 bankruptcy case, as Vice President of Business Development from shortly after its formation in 2009. From approximately May 2018 through December 2020, I served as Executive Vice President and was closely involved with Stream's global operations and business development. From January 2021 through December 2023, I provided full-time executive consulting services to Stream as an independent contractor, and from the appointment of William A. Homony in his capacity as chapter 11 trustee for Stream (the "Trustee") in January 2024 until the present, I have provided contract services to Stream on an occasional basis.

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

2.      From May 2018 until December 2020, I also served as Chief Executive Officer of Stream's R&D subsidiary in the Netherlands, SeeCubic, B.V. ("SCBV"). I resigned that position shortly after ownership of SCBV was ceded to SeeCubic, Inc. ("SeeCubic") pursuant to an improvident injunction issued by the Delaware Court of Chancery. During that time, I became quite familiar with all operational aspects of SCBV.

3.      For most of 2024, I have provided executive consulting services to Visual Semiconductor, Inc. ("VSI"), assisting in its efforts to develop a Plan of Reorganization that will enable Stream to successfully reorganize and exit the bankruptcy.

4.      Except as otherwise indicated, all facts set forth herein are based upon my personal knowledge of the Debtors, personal experiences and interactions, and information learned from my review of relevant documents.  If called upon, I can and will testify competently to the facts set forth herein.

5.      I submit this declaration in connection with *Visual Semiconductor Inc.'s Objection to Motion of William A. Homony in his Capacity as Chapter 11 Trustee for an Order Approving (A) the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief*.

### Preliminary Statement

6.      I have been intimately involved with virtually all aspects of litigation and operations involving Stream from the time a settlement agreement (the "Omnibus Agreement")[2] purported to transfer Stream's assets (the "Assets") to SeeCubic in May 2020 until the appointment of the Trustee in January 2024. Since the time of the Trustee's appointment, I have closely followed

---

[2] ECF 48, Exhibit O

all filings and hearings in this Bankruptcy Case, I have testified in the Adversary Case, and I have been intimately involved with VSI's efforts to develop a Bankruptcy Plan of Reorganization for the benefit of Stream and all its creditors.

7.      From May 2020 to the present, SeeCubic has (a) obtained Stream's assets pursuant to an improvident preliminary injunction; (b) retained possession of Stream's assets despite numerous court orders mandating their return; (c) taken post-petition legal action in the Netherlands to seize control of Stream's Dutch subsidiaries which conduct Stream's R&D activities and own its intellectual property; and (d) used the Assets for its own benefit despite a Bankruptcy Court Temporary Restraining Order enjoining it from doing so.

8.      What follows is a detailed chronology of how the Assets were stripped from the Debtors, wrongfully retained by SeeCubic (the Stalking Horse in the proposed 363 Sale), and used by SeeCubic in violation of the standing TRO.

### General Pre-Petition Timeline Pertaining to the Debtors' Assets

9.      As of January 2020, Stream owed $6 million plus interest to its senior secured lender, SLS Holdings VI, LLC ("SLS") whose managing member is Shadron L. Stastney ("Stastney"). As a benefit afforded to him because of the convertible loans provided by SLS (the "SLS Convertible Notes"), Stastney served on Stream's Board of Directors. Elevated to Vice Chairman of the Board and appointed Chief Financial Officer in 2018, Stastney was a true insider of Stream.

10.     On January 30, 2020, Stastney resigned his positions at Stream and announced his intention to serve a default notice to Stream and pursue a foreclosure action on the Assets, which had been pledged by Stream as security for the SLS Convertible Notes. The Assets included 100%

of the stock shares of Technovative Media, Inc. ("Technovative"), which directly or indirectly owned all of Stream's subsidiary entities.

11.     Stastney filed a foreclosure action in the Delaware Superior Court on March 23, 2020[3]. Stream subsequently filed its answer, affirmative defenses, and counterclaims. The Superior Court set a preliminary hearing for June 2021, approximately 14 months later.

12.     Although the foreclosure action in Superior Court had not yet been adjudicated, Stastney began an immediate campaign of declaring that Stream was in foreclosure and that the Assets belonged to SLS. One target of his misinformation campaign was MotivIT, a vendor that housed Stream's computer servers and the intellectual property stored on them (the Ultra-D™ technology, or "Ultra-D"). Instructed by Stastney to hold the servers for the benefit of SLS[4] and take direction only from SLS, MotivIT subsequently blocked Stream's rightful access to its own hardware and computer source code.

13.     In a meeting on May 4, 2020, Stream's newly expanded board of directors voted to establish a Resolution Committee consisting solely of two new directors – Kevin Gollop ("Gollop") and Asaf Gola ("Gola") – to settle Stream's debt with SLS and its junior secured lender, Hawk Investment Holdings Limited ("Hawk"). Two days later, on May 6, 2020, Gollop and Gola signed the Omnibus Agreement, which purported to transfer all Assets to a "newco" (SeeCubic) as satisfaction of the debts and settlement of ongoing litigation.

14.     Stream management immediately challenged the validity of the Omnibus Agreement, which had been signed by directors but not ratified by Class B Voting Shareholders as required by Stream's charter. Stream took subsequent corporate action to discharge the directors who had formed the Resolution Committee and executed the Omnibus Agreement.

---

[3] C.A. No. N20C-03-225 MMJ CCLD
[4] Stastney email of March 12, 2020 to MotivIT

15.    SeeCubic was founded as a Delaware corporation on May 20, 2020 to receive the Assets. Despite Stream's objections to the validity of the Omnibus Agreement, SeeCubic began seizing Stream assets wherever and however possible. On the title page of its June 2, 2020 private placement memorandum, SeeCubic declared itself "Owner of the brand Ultra-D."[5]

16.    Despite being removed from their directorships in May 2020, Gola and Gollop continued to represent themselves as directors of Stream. On August 24, 2020, using Stream's letterhead, they signed a Delegation of Authority Letter[6] which purported to give a third-party power of attorney to represent some of Stream's subsidiaries for the purpose of assuming the facility lease and taking possession of Stream's valuable, proprietary optical bonding equipment (the "Bonding Equipment").

17.    Upon learning that SeeCubic representatives were attempting to seize its multi-million-dollar Bonding Equipment in China, Stream filed for injunctive relief in the Delaware Court of Chancery on September 8, 2020[7]. SeeCubic filed a counterclaim a week later, seeking validation and enforcement of the Omnibus Agreement.

18.    After 3 months of discovery, briefings, and hearings, the Chancery Court issued an improvident[8] Preliminary Injunction on December 8, 2020 which awarded all of Stream's assets to SeeCubic pending final adjudication of the competing motions. Stream was ordered to surrender its ownership of all subsidiaries, its intellectual property, its Bonding Equipment, its trademarks, its business computers and data (including email), its bank accounts, and even the right to conduct business under the Stream name.

---

[5] ECF 48, Exhibit Q
[6] ECF 48, Exhibit S
[7] C.A. No. 2020-0766-JTL
[8] The Preliminary Injunction (ECF 48, Exhibits U and V) and the Partial Final Judgment (ECF 48, Exhibit X) which followed were subsequently overturned by the Delaware Supreme Court on June 15, 2022 (ECF 48, Exhibit Y).

19.     With more than $18 million in unsecured debt and few remaining assets with which to service that debt, Stream filed for chapter 11 Bankruptcy protection on February 24, 2021[9]. Stream sought turnover of estate property and rejection of the Omnibus Agreement as an executory contract since the Assets had not yet been fully transferred and since SeeCubic had not yet made payment to Stream through issuance of SeeCubic stock shares. However, the Bankruptcy Court gave deference to the Chancery Court injunction (even though it was preliminary) and dismissed Stream's Bankruptcy case as a bad faith filing on May 17, 2021.

20.     On November 10, 2021, the Chancery Court issued a Partial Final Judgment[10] finding the Omnibus Agreement valid and the Asset transfers to SeeCubic justified.

21.     On December 21, 2021, Stream appealed the Chancery Court ruling to the Delaware Supreme Court[11]. The case was heard on April 6, 2022, and on June 15, 2022, the high court – sitting *en banc* – issued a unanimous 5-0 Opinion[12] that REVERSED and VACATED the lower court ruling and REMANDED the case to the Chancery Court to unwind the damage that had been done to Stream. On July 1, 2022, the Delaware Supreme Court issued its corresponding Mandate[13] to the Chancery Court.

22.     The same day the Mandate was issued, Stream filed a Motion for Entry of Final Order and Judgment Consistent with the Mandate. After suffering for two years from the hostile takeover and improvident injunction, Stream simply wanted control and possession of the Assets once again so it could resume business.

---

[9] U.S. Bankruptcy Court for the District of Delaware, Case No. 21-10433 (KBO)
[10] ECF 48, Exhibit X
[11] Delaware Supreme Court, No. 360, 2021
[12] ECF 48, Exhibit Y
[13] ECF 48, Exhibit Z

23.     Despite the Delaware Supreme Court ruling, SeeCubic failed to return the Assets.

On July 31, 2022, SeeCubic informed Stream that (a) it intended to sell the Assets rather than

return them as mandated and (b) it was in the process of engaging an investment banker (later

identified as SSG Advisors, LLC ("SSG")) to market and sell the Assets on behalf of Hawk, which

was acting as collateral agent for SeeCubic.

24.     On August 1, 2022, Stream requested a Temporary Restraining Order against Hawk

and SeeCubic to prevent the sale of the Assets. On August 9, 2022, nearly 8 weeks after the

Delaware Supreme Court Opinion, the Chancery Court issued a TRO enjoining SeeCubic[14]. Vice

Chancellor Laster specifically stated his expectations:

> SeeCubic will restore Stream's assets to Stream in accordance with the Rule 54(b)
> order. Once this has occurred, SeeCubic may seek to exercise any creditor's rights
> it possesses against Stream. **SeeCubic must do so based on a status quo where
> Stream has title to and possession of its assets, not a status quo in which
> SeeCubic acquired possession based on a decision that the Delaware Supreme
> Court has held is erroneous**.

25.     On August 10, 2022, the Chancery Court issued an Order Granting Partial Final

Judgment[15] in favor of Stream. The order stated:

> Pending transfer of the Assets from SeeCubic to Stream, **SeeCubic and all those
> acting in concert with it shall not use, impair, encumber, or transfer the Assets**,
> except as necessary to maintain the Assets in the ordinary course of business and
> preserve their value pending transfer to Stream.

26.     Following the Partial Final Judgment Order of the Chancery Court, SeeCubic

finally began returning limited assets, most of which had little value to Stream's business: outdated

demonstrators with expired credentials, certain website domains (but not all), select email archives

(but not all), a copy of computer source code but not the servers and master code itself, and some

inventory of 4K-resolution Ultra-D displays manufactured in 2016-2017. Stream repeatedly

---

[14] ECF 48, Exhibit AA (emphasis added)
[15] ECF 48, Exhibit BB (emphasis added)

provided a significant list of unreturned assets to SeeCubic, but these efforts were futile. A non-comprehensive list of assets withheld by SeeCubic includes:

a.  8K-resolution and other advanced Ultra-D technology demonstrators
b.  Optical bonding equipment for mass production
c.  Silicon Valley computer servers and source code/intellectual property
d.  Business computers, business data, and email archives
e.  Administrative control of key business websites

27.    Notably, SeeCubic argued that it had paid the balance due on Stream's Silicon Valley computer servers, and thus, the hardware belonged to them. Vice Chancellor Laster allowed SeeCubic to maintain possession of the servers (and the intellectual property stored on them), ordering only that SeeCubic allow Stream to make a copy of the computer code. The Court did not require SeeCubic to delete the data or provide proof thereof; it simply allowed SeeCubic to maintain possession of Stream's IP in contravention of the Delaware Supreme Court Mandate.

28.    While returning assets of marginal value such as 6-year-old inventory and outdated desktop computers with expired software, SeeCubic continued to argue that other key assets had been "improved" while under SeeCubic control and therefore should not have to be returned to Stream. It also argued that sorting "legacy" assets from "improved" assets would be a difficult or impossible task. The Chancery Court considered these arguments and issued an Opinion on September 28, 2022[16] which stated:

> Hawk and SeeCubic have argued that SeeCubic holds some assets that are Disputed Assets, either because they are not Legacy Stream Assets, or because they are not easily segregated from Legacy Stream Assets. SeeCubic's claims on this point seem somewhat exaggerated. In any event, **in light of the Mandate, the more important consideration is to require SeeCubic to return Stream's assets expeditiously**. (*9/28/22 Opinion* at p. 7)
>
> As a result of the Mandate, Stream has equitable title to the Legacy Stream Assets. **With that equitable ownership interest comes the right to use the Legacy Stream Assets to conduct business and make efforts to satisfy the claims of**

---

[16] 9/28/22 Chancery Court Opinion (*See* Exhibit A, emphasis added)

**Hawk and Stream's other creditors**. If Stream does not get the Legacy Stream Assets back, Stream will lose that opportunity forever. Stream therefore faces a threat of irreparable harm. (*id* at p. 8)

SeeCubic also faces a degree of harm because it has been running a business using the Legacy Stream Assets for the past eighteen months. As a result of the Supreme Court Decision, however, **SeeCubic currently has no equitable right to carry on that business**. SeeCubic's interests currently are derivative of Hawk's, and Hawk's only interest is that of a creditor. (*id* at pp 8-9)

29.     The Chancery Court recognized that the most expeditious way for SeeCubic to return the bulk of the Assets would be through the transfer of Technovative stock shares:

The parties' submissions make clear that there is a comparatively easy means of transferring the vast bulk of the Legacy Stream Assets from SeeCubic to Stream. That outcome can be achieved by causing SeeCubic to transfer to Stream the equity in what had been Stream's principal operating subsidiary, Technovative Media, Inc. SeeCubic exercised its rights under the Omnibus Agreement through a similar transfer, and it makes sense to unwind that action by reversing that transfer. There will be follow-on issues to resolve, but the transfer offers a means of substantially implementing the Mandate in a single step. (*id* at p. 7)

30.     Finally, on September 30, 2022, the Chancery Court issued a Mandatory Injunction Order[17] in which SeeCubic was enjoined from the following:

- SeeCubic may not use the Server Information [Stream's proprietary computer code] for any purpose other than pursuing a claim, including for any business purpose.

- SeeCubic may not use information relating to the Sample Displays for any other purpose, including for any business purpose.

- SeeCubic may not use information relating to the Bonding Equipment for any other purpose, including for any business purpose.

- SeeCubic may not use the documentation relating to the [3D] Lenses for any other purpose, including for any business purpose.

- As an adjunct to the mandatory relief set forth in this order, SeeCubic and any persons acting in concert with it are prohibited from taking any steps to interfere with Stream's ability to recover the Sample Displays, the Bonding Equipment, the Server Information, or the Lenses...

The 9/30/22 Injunction Order further stated:

---

[17] 9/30/22 Chancery Court Mandatory Injunction Order (*See* Exhibit B)

- SeeCubic appears to contend that the Bonding Equipment is a Disputed Asset because SeeCubic satisfied Stream's debt to the landlord who owned the premises where the bonding equipment was housed after Stream abandoned the premises and failed to pay rent. SeeCubic can seek to recover the Bonding Equipment or the incremental value that SeeCubic conferred through its general claim for unjust enrichment or through a specific claim based on the Bonding Equipment. In light of the Mandate, the first priority is to return the Bonding Equipment to Stream.

- SeeCubic shall return the Bonding Equipment to Stream within ten days.

31.    On September 30, 2022, SeeCubic transferred the Technovative shares to Stream but coordinated with Hawk for a simultaneous execution of proxy rights that Hawk purported to have as a creditor. Hawk issued asset marshalling orders and appointed Stastney as the sole director of Technovative in furtherance of its goal to sell the Assets.

32.    In response to Stream's Emergency Motion for Post-Judgment Enforcement, on October 3, 2022, the Chancery Court issued an Order mandating the surrender of Technovative shares to Stream and an Opinion[18] finding Stastney, SeeCubic, and Hawk in contempt:

> **This decision holds that SeeCubic and Hawk engaged in contumacious conduct. Shad L. Stastney was the puppet master who pulled the strings.** He controls SeeCubic and Technovative, and he also controls SLS Holdings VI, LLC ("SLS"), Stream's only secured creditor other than Hawk. Stastney caused SeeCubic to notify Hawk that the transfer was coming. To effectuate the transfer, Stastney gave instructions to SeeCubic's counsel to give instructions to himself (this time in his capacity as an officer and director of Technovative) to title the Shares in Stream's name. As planned, Hawk immediately asserted its rights to the Shares, at which point Stastney transferred title to the Shares into Hawk's name. Stastney and SLS benefitted, because SLS's rights as a secured creditor are senior to Hawk's. (*10/3/22 Opinion* at pp. 1-2, emphasis added)

Despite finding Stastney, SeeCubic, and Hawk in contempt, the Vice Chancellor imposed no sanction on them other than ordering the Technovative shares to be immediately vested with Stream and requiring Hawk to refrain from any action against Stream for 10 business days. On September 28, 2022, the Vice Chancellor had stated that Stream had "the right to use the Legacy

---

[18] ECF 48, Exhibit K

Stream Assets to conduct business and make efforts to satisfy the claims of Hawk and Stream's other creditors," but less than a week later, he only afforded Stream two weeks to possess its assets unmolested.

33.     Although title to the Technovative shares was transferred to Stream, no physical assets were transferred. The return of assets through the transfer of stock shares was largely symbolic and of no practical effect, as SeeCubic maintained control over assets it possessed solely through the improvident injunction. Stastney maintained dominion and control of the company's technology through his directorships of SCBV, which conducts R&D operations, and Ultra-D Cooperatief ("UDC"), which owns the Debtors' patent portfolio.

34.     With Technovative ownership finally returned to Stream, Mathu Rajan executed various corporate resolutions and conducted board meetings from October 3, 2022 through October 11, 2023 to restore his position as director of Stream's subsidiaries, including the three Dutch entities. These steps returned legal control of the foreign assets to Stream, although there was no transfer of possession. Stream explored options to retain Dutch legal counsel to register the changes of directorship with the Netherlands Chamber of Commerce but was unable to complete the process before Hawk commenced its next action.

35.     On October 17, 2022, after waiting 10 business days as instructed by the Chancery Court, Hawk once again asserted its purported proxy rights, issued asset marshalling orders, and appointed Stastney as the sole director of Technovative in furtherance of its goal to sell the Assets in a UCC Article 9 sale. Knowing that Stream had served Hawk debt conversion notices and would challenge Hawk's rights as a creditor, Hawk simultaneously filed an action in the Chancery Court to determine the validity of Stastney as a disputed director of Technovative (the "225 Action")[19].

---

[19] ECF 48, Exhibit CC

36.     Aware that Stream had executed corporate resolutions restoring Mathu Rajan as director of Stream's subsidiaries, Stastney, SLS, SeeCubic, and Hawk – through Dutch counsel De Brauw Blackstone Westbroak N.V. ("De Brauw") – filed a Writ of Summons on October 20, 2022 in the Amsterdam Court seeking to have Mathu Rajan's appointment invalidated and Stastney confirmed as director of Stream's three Dutch subsidiaries (the "Amsterdam Action"). Notably, Stastney included those same Dutch subsidiaries as plaintiffs in the action.

37.     In response, the Chancery Court issued a Status Quo Order[20] and appointed a Receiver *Pendante Lite* (the "Receiver") to oversee the operations of Technovative. The Status Quo Order required Stastney, SeeCubic, Hawk, and SLS to withdraw their Amsterdam Action, but it also froze all Assets, which remained out of Stream's reach despite the Mandate of the Delaware Supreme Court more than four months previous and several subsequent Opinions and Orders of the Chancery Court.

38.     Over the next few months, Stastney – who remained registered as director in the Netherlands Chamber of Commerce – directed the operations of SCBV and pushed SeeCubic business development projects forward with the Receiver by representing them as projects owned by, and for the benefit of, SCBV. The Receiver allowed the projects to proceed.

39.     On February 21, 2023, Rembrandt 3D Holding Ltd ("Rembrandt") filed suit against Technovative, Hawk, and SeeCubic in the U.S. District Court for the District of Delaware[21] alleging misappropriation of trade secrets and seeking injunctive relief. The complaint asserted that rights to Rembrandt IP had been licensed to Stream but could not be used by Stream's subsidiaries **except for the express benefit of Stream**. Since the projects being authorized by Technovative were for the benefit of SeeCubic and Hawk – or for the benefit of SCBV at the very

---

[20] ECF 48, Exhibit DD
[21] C.A. No. 23-193-GBW

least – the projects violated Rembrandts IP rights. I understand that the case against Technovative is currently stayed due to this Bankruptcy but is still proceeding against SeeCubic and Hawk.

40.    Still without access to its Assets nine months following the Delaware Supreme Court Opinion, Stream filed for chapter 11 bankruptcy protection on March 15, 2023. The Receiver resigned his position and returned management of Technovative to Stream.

41.    On March 30, 2023, Mathu Rajan was registered at the Netherlands Chamber of Commerce as director of Stream's three Dutch subsidiaries based on corporate resolutions previously executed in October 2022. I personally worked with a Dutch notary, who analyzed the documents, confirmed both their validity and appropriateness for the purpose, and facilitated the registration changes. Stastney was deregistered in the process. Accordingly, Stream once again had dominion and control of its overseas assets, if not actual possession.

42.    Despite the worldwide stay afforded Stream in bankruptcy, on April 2, 2023, Stastney, SLS, SeeCubic, and Hawk – through De Brauw – sent a letter to Stream's Dutch notary demanding documentary evidence supporting the Netherlands registration changes and requesting the notary to "inform us as soon as possible what steps you deem appropriate in mitigating the consequences of the Director Changes, including options for undoing these filings."[22]

43.    Simultaneously, De Brauw notified management of SCBV that Mathu Rajan's appointment was invalid, and that the Notary was "being questioned." Counsel for SCBV manager Patric Theune ("Theune") sent a letter to Stream on April 3, 2023[23] stating, in part, that (a) SCBV had doubts about the legitimacy of Mathu Rajan's status as director and (b) Theune would not relinquish possession of the Bonding Equipment to Stream.

---

[22] ECF 76, Exhibit D
[23] ECF 76, Exhibit E

44.     On April 5, 2023, Stream filed an *Amended Emergency Motion for Entry of an Order: (1) Enforcing the Automatic Stay; (2) Directing the Turnover of Property of Debtors' Estate; and (3 ) Imposing Sanctions for Willful Stay Violations* (the "Turnover Motion")[24], providing details about the Bonding Equipment and other key assets that SeeCubic had willfully failed to return[25]. In conjunction with the filing, Stream also filed a *Motion for Expedited Hearing on Emergency Motion Directing the Turnover of Property of Debtor's Estate*[26].

45.     The same day, on April 5, 2023, DeBrauw filed a Writ of Summons in the Netherlands[27], renewing the Amsterdam Action it had withdrawn in October 2022. Once again, Stastney, SeeCubic, SLS, and Hawk were attempting to remove Mathu Rajan as director of Stream's Dutch subsidiaries and appoint Stastney in his place. The Writ also attempted to block Mathu Rajan's efforts to secure the return of the Bonding Equipment to Stream.

46.     On April 7, 2023, Stream filed a Supplement[28] to its amended motion for an expedited hearing, informing the Bankruptcy Court of the actions by Stastney and his associates to interfere with assets of the Debtors' estates.

47.     On April 14, 2023, the Bankruptcy Court held an emergency hearing. Judge Coleman stated:

> Now, I don't appreciate people going to another jurisdiction and to get another court to decide that they own it and that nothing should happen and no direction should be made with respect to the turnover or release of that equipment.  Because that's exactly what you guys have asked for. I'm reading it and I don't appreciate that. That's not going to happen. (*4/14/23 Hearing Transcript* at 117:7-13)

> I want the matters in the Netherlands, which is scheduled for next week to just hold on a minute, because I'm concerned that this is going to have some impact on what I'm doing. It's going to have some impact on whether the Debtor believes to

---

[24] ECF 76
[25] ECF 76, Exhibit C
[26] ECF 77
[27] ECF 90, Exhibit A
[28] ECF 90

> have their rights here in this Court, and it belongs to them here. And I need to protect those rights with respect to their ability to control these things. (*Id*. at 181:7-13)

48.    Despite instructions to refrain from pursuing the Amsterdam Action, Stastney and his associates pushed forward. The case was briefed over the next two months and resulted in a hearing in Amsterdam Court on June 28, 2023. I testified as a witness on behalf of Stream in that hearing and observed the entire proceeding.

49.    Based in part on testimony from Theune, who refused to acknowledge Mathu Rajan's authority, and on SeeCubic's assertion that it would continue to provide funding to SCBV through a promissory note while U.S. litigation was pending, the Amsterdam judge issued a ruling on June 29, 2023. The Summary Judgment appointed Jasper Berkenbosch ("Berkenbosch") as an "independent" interim director of all three Stream Dutch subsidiaries, with Berkenbosch serving in such capacity until a U.S. court determined whether Hawk or Stream had the legal right to appoint a director. Stastney had succeeded in removing control of the Debtors' subsidiaries from the Debtors.

50.    When informed by Stream's counsel that the Amsterdam Action had proceeded, Judge Coleman expressed her displeasure[29]:

> I'm hoping it was just the [Amsterdam] Court on its own decided to do that. And I want everybody to know that, if it was not, **there are going to be some serious consequences**. Because I was clear that nothing was to go before that [Court]…

Despite the Court's admonition that there would be consequences for the affirmative actions of Stastney, SeeCubic, SLS, and Hawk in the Amsterdam Court, there were none. Their ongoing pattern of ignoring Court orders and instructions produced no repercussions once again.

---

[29]June 29, 2023 *Hearing Transcript* at p.177:19-22

51.     Berkenbosch communicated to Stream that SCBV intended to continue its work on SeeCubic projects and enter into a contract with Hyundai Mobis as the next step in an ongoing SeeCubic automotive project. Stream informed Berkenbosch that the Hyundai project would violate certain third-party licenses, including Stream's license with Rembrandt. Berkenbosch indicated that SCBV management and employees were strongly encouraging him to proceed, and that SeeCubic had threatened to withhold funding guaranteed by the promissory note if SCBV did not sign the Hyundai agreement.

52.     Berkenbosch did not serve long as the interim director of Stream's Dutch subsidiaries. Upon learning of the Hyundai project, on August 6, 2023, Rembrandt sent Berkenbosch a cease and desist letter which detailed the license terms it had reached with Stream, the infringement SCBV was committing by engaging with SeeCubic as a non-licensee, and the consequences faced by SCBV, Berkenbosch, and Berkenbosch's firm, Jones Day, for trade secret violations. Faced with potential claims that could equal the $1.2 billion value of Rembrandt's license with Stream, Berkenbosch resigned.

53.     On August 12, 2023, Stream filed an Adversary Complaint[30] against Stastney, SLS, Hawk, Arthur Leonard Robert Morton ("Morton," principal of Hawk), SeeCubic, Gollop, Gola, SCBV, Theune, and other parties named and unnamed working in concert with them. The complaint (a) detailed the status of Stastney, Gollop, and Gola as a true insiders of the Debtors[31]; (b) detailed the seizure and retention of the Debtors' Assets by SeeCubic; (c) provided a list of assets wrongfully retained by SeeCubic and the other defendants[32]; (d) detailed the ongoing use of those assets to the detriment of the Debtors[33]; (e) alleged breach of contract, breach of fiduciary

---

[30] Adversary Case 23-00057-amc, ECF 01
[31] Adversary Case 23-00057-amc, ECF 01 at ¶¶ 55-81
[32] Adversary Case 23-00057-amc, ECF 01 at ¶ 128
[33] Adversary Case 23-00057-amc, ECF 01 at ¶¶ 126-127

duty, negligence, fraudulent conveyance, and tortious interference; (f) sought injunctive relief and turnover of assets; and (g) sought to have the SeeCubic, SLS, and Hawk bankruptcy claims subject to equitable subordination, disallowance, recharacterized as equity interests, or subject to right to set off under 11 U.S.C. § 558.

54.     After Berkenbosch's resignation on August 18, 2023, the Amsterdam Action resumed with additional briefings by the parties. On September 13, 2023, during a second hearing held in Amsterdam Court, Stastney testified about 12 or 13 projects he had developed for the benefit of SCBV, which qualified him to serve as a beneficial director of the Stream Dutch entities. Faced with (a) a lack of independent director options due to the Rembrandt IP claim and (b) Stastney's willingness to serve as a director with revenue-generating projects in hand, the Amsterdam judge issued a new ruling on September 20, 2023. The new Summary Judgment appointed Stastney as interim director, a position he has now held for more than a year. Accordingly, Stastney continues to exercise dominion and control over the Debtors' R&D operations, its technology, its intellectual property, its trademarks, its websites, its business data, and its position in the global market as developer of industry-leading glasses-free 3D.

55.     On September 30, 2023, Stream filed a *Motion for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction* [34] to prevent Stastney, in his newly restored position of power as director of Stream's Dutch subsidiaries, from using estate assets for the benefit of SeeCubic as he had done previously. That commenced a series of hearings in Bankruptcy Court on October 6, 2024, October 16, 2024 and October 30, 2024, with more to follow in November and December.

---

[34] Adversary Case 23-00057-amc, ECF 27

56.     On November 6, 2023, Stream filed an *Additional Supplement to Debtors'*
*Emergency Motion for Entry of an Order: (1) Enforcing the Automatic Stay; (2) Directing the*
*Turnover of Property of Debtors' Estate; and (3) Imposing Sanctions for Willful Stay Violations*[35],
once again documenting assets that SeeCubic had failed to return and was using as a direct
competitor to Stream.

57.     Due to motions practice that received higher priority (*i.e.* SeeCubic's Motion to
Dismiss, Stream's Adversary Complaint and Motion for TRO), Stream's Turnover Motion of April
5, 2023 was put in abeyance and ignored for many months, even when Stream counsel pressed the
matter at the end of October 2023[36]. The Turnover Motion remains in limbo to this date, more than
a year and a half after being filed.

58.     Shortly after the Trustee was appointed, Stream contract employee Nicole Maneen
worked diligently to educate the Trustee about Stream's technology, its business prospects, its
history, and other material facts that might enable him to carry out the Court's mandate
successfully. On March 7, 2023, Mrs. Maneen provided a list of assets that had never been returned
to Stream[37], with the expectation that the Trustee would marshal them and secure their return for
the benefit of the Debtors' estates.

59.     On March 11, 2023, the Trustee made initial efforts to secure the return of Stream's
assets, writing to Theune at SCBV. The Trustee stated, "I am directing the relocation of Stream's

---

[35] ECF 458
[36] Stream Counsel: I'd like to clarify the record if I may. We did file an emergency motion for enforcement of the stay
against all activity regarding the debtor's estate. Everything, not just the bonding equipment. It was filed. It was
vociferously objected to. We decided -- Your Honor said hey, you guys need to stop bringing things on an emergency
basis. You put it into abeyance. It's been sitting in abeyance, and it was finally, through discussions with your
chambers, set for November 15th. But to say that this is a brand-new issue. It's not our fault that the motion went into
abeyance and there were intervening issues with both yourself and with Mr. Rajan. But to say that we didn't think this
was a problem, we did. We filed it.
Judge Coleman: All right. And is the one that never -- never mind. So for some reason, the clerks all -- no. I'm not
going to throw anybody under the bus. (*10/30/23 Hearing Transcript* at 100:23-101:13)
[37] Attachment to Maneen email of March 7, 2024 (*See* Exhibit C)

bonding equipment as well as the return of the assets identified on the attached itemized list. I've copied Nicole [Maneen] on this email who will be coordinating with you on the logistics."[38] Theune responded on March 12, 2024, "I cannot simply ignore Shad [Stastney] and take your instructions instead without his acknowledgement. … I thus have copied Shad in this e-mail, and kindly request him for guidance on what's happening and how to deal with this."[39] To my knowledge, there was no response from Stastney, who remained silent on the matter. Two days later, on March 14, 2023, Theune proposed a plan to return the Bonding Equipment, requesting significant funds and time for inspections and other unnecessary steps.[40]

60.     VSI offered to provide funds necessary to release the Bonding Equipment from the warehouse and ship it to a location where the equipment could be used by a strategic partner to begin generating revenue for the Debtors. However, on March 26, 2023, the Trustee sent an email to Mrs. Maneen stating, "I'm not directing anyone in the Netherlands to do anything without funding. … **The DIP needs to be advanced in the amount of at least $5 million** without any commitment to following VSI's proposed path forward."[41] From that point forward, it appears the Trustee gave up any pursuit of marshalling estate assets.

61.     With most of its activity overseas, SeeCubic operates beyond the view of the Bankruptcy Court, where it can violate the TRO with impunity. I have been privy to communications from individuals who have invested in both SeeCubic and VSI. These investors have shared direct communications from Stastney in which he updated SeeCubic stakeholders about activity in this Bankruptcy case, progress with "28 projects across 25 customers" (who were all engaged in proof-of-concept stages of negotiations with SeeCubic and SCBV, which is under

---

[38] Trustee email of March 11, 2023 (*See* Exhibit D)
[39] Theune email of March 12, 2023 (*See* Exhibit E)
[40] Theune email of March 14, 2023 (*See* Exhibit F)
[41] Trustee email of March 26, 2023 (*See* Exhibit G, emphasis added)

Stastney's control as sole director), and investment opportunities to finance the Stalking Horse carve-out required for the 363 Sale. Meeting dates, participating individuals like Stastney and Theune, and other details have been shared with VSI by investors concerned about the ongoing TRO violations.

62.     On May 6, 2024, Rembrandt notified counsel for SeeCubic and Hawk that it had become aware of a planned May 7, 2024 meeting to be held by their clients in violation of the TRO. Counsel for SeeCubic failed to acknowledge Rembrandt's email at all. Hawk's counsel eventually responded, but only two days after the alleged meeting had occurred. Hawk's counsel stated:

> It is up to the Debtors to determine whether they believe a violation occurred or needs to be addressed. The Debtors have not taken any action or voiced any concerns. The e-mails also suggest Rembrandt believes its technology may have been improperly used. But there is no pending motion or order defining or dealing with the use of Rembrandt's technology.

63.     On multiple occasions, VSI informed the Trustee that it believed violations were being committed by Stastney, SeeCubic, Hawk, SCBV, and Theune. The Trustee was notified about fundraising meetings conducted in April 2024 and May 2024, including a global Zoom teleconference on May 28, 2024 that was recorded by both SeeCubic and the investor who reported the meeting to VSI. VSI specifically encouraged the Trustee to contact Stastney and request a copy of the Zoom recording as an easy step to confirm whether or not a violation had occurred. To my knowledge, the Trustee made no effort to investigate the alleged violations.

64.     I am personally aware of TRO violations that have occurred, as confirmed by the Trustee via email to me (though he offered an explanation in an attempt to allay my concerns). Pursuant to the IP license between Stream's non-debtor Curacao subsidiary, Ultra-D Ventures C.V. ("UDV"), and Koninklijke Philips N.V. ("Philips"), UDV is obligated to file quarterly royalty

reports in the Philips customer portal. As UDV is a non-debtor subsidiary with Mathu Rajan registered as the sole director, reporting requirements are the responsibility of Stream consultants like Suby Joseph and me. Mr. Joseph made repeated requests to the Trustee for Q1 2024 sales data, to no avail. Mr. Joseph made repeated requests to the Trustee for Q2 2024 sales data, also to no avail. When the reporting obligations became seriously overdue, Philips issued a default notice to Mr. Joseph. That's when I got personally involved.

65.    On September 10, 2024, I sent an email to the Trustee[42] and informed him of the seriousness of failing to report sales as required. The consequence could have been cancellation of the Philips license, which would have made the Debtors' estate assets virtually worthless. In my email, I stated:

> Accurate sales information required for the Philips royalty reporting can only be provided by SeeCubic B.V., which is currently under the direction of Shad Stastney. You are aware of this, as you obtained such information for Q4 2023 on January 29, 2024 – just in time to provide it to Suby for posting in the Philips licensee portal as required per contract. Either Mr. Stastney has refused to provide such information for the first two quarters of 2024, or you have not yet requested it. Regardless, Ultra-D Ventures is in breach, and Stream faces irreparable harm if the license is terminated.
>
> It is of particular significance that SeeCubic B.V. has been enjoined by TRO since January 4, 2024 and SHOULD, therefore, have no sales to report. However, the royalty report MUST be accurate. If SeeCubic B.V. has, in fact, sold any units (even demonstrator samples), those sales must be reported to Philips. The license fees for such sales are minimal, as you saw from the Philips Q4 2023 invoice. Termination of the license becomes much more likely if a fraudulent royalty report is filed. It is up to you to obtain true and accurate sales data and authorize the royalty reporting immediately.

66.    On September 10, 2024, the Trustee sent an email to me[43], stating:

> **Bud, the TRO is no longer in effect.  I settled that issue.**
> During Q1 no displays were delivered. As a result, the reporting is empty.
> During Q2 two (2) 12.3-inch display demonstrators were delivered to a customer. Please have Suby submit the appropriate reports through the Philips portal. Once

---

[42] See Exhibit H
[43] See Exhibit H (emphasis added)

the reporting is remitted, I will be adding myself as the primary licensee contact in the database.

The Trustee's email included two attachments, one for Q1 2024 and one for Q2 2024. The Q2 2024 report[44] clearly documented the sale of technology demonstrator units by SCBV and the Trustee's knowledge and approval of it. This is further confirmed by the September 2024 Monthly Operating Report[45], which indicates a royalty payment made to Philips pursuant to the Philips license agreement. This confirms that the Debtors' subsidiaries, under the direction of Stastney, have sold products containing the Debtors' technology in violation of the TRO.

67.     The Trustee's statement to me that "the TRO is no longer in effect.  I settled that issue" seemed odd to me. It is my understanding that only the Court can lift a restraining order. If the 9019 Settlement between Stream and its secured creditors had indeed "settled" the issue when the Court approved the 9019 Settlement on June 7, 2024, why was the TRO subsequently extended by the Court three more times on July 30, 2024[46], September 27, 2024[47], and November 7, 2024[48]?

68.     On November 8, 2024, Mr. Joseph received an invoice via email from Philips related to Q3 2024 data reported to Philips by the Trustee. The invoice[49] showed a balance due of € 25.00, indicating that more technology samples had been sold in Q3 2024. The royalty report filed by the Trustee[50] shows sales of 10 units of 15.6" 3D center console demonstrator displays for the automotive market were sold during the reporting period.

69.     As detailed in the October 31, 2024 SCBV Balance Sheet[51] provided by SSG in response to VSI's due diligence requests, SCBV has accepted € 29,347,375 (approximately $30.8

---

[44] Q2 2024 Philips Royalty Report (*see* Exhibit I)
[45] ECF 769-1
[46] Adversary Case 23-00057-amc, ECF 148
[47] Adversary Case 23-00057-amc, ECF 150
[48] Adversary Case 23-00057-amc, ECF 152
[49] Q3 2024 Philips Royalty Invoice (see Exhibit J)
[50] Q3 2024 Philips Royalty Report (*see* Exhibit K)
[51] SCBV Balance Sheet (*see* Exhibit L)

million) in funding from SeeCubic since SeeCubic took control of Stream's subsidiary in December 2020. In exchange for such funding, SCBV has continued to engage in projects at the direction of Stastney for the benefit of SeeCubic, despite clear instructions from Stream that SeeCubic has no such authority and is operating as a direct competitor to the Debtors. Worse still, management of Stream informed Theune and other SCBV employees that SeeCubic projects infringe third-party technology licenses obtained by Stream, and that such infringement puts the Debtors at significant risk. SCBV continues to work on SeeCubic projects to the exclusion of any of the Debtors' projects, with one SCBV executive commenting: "Our boss is whoever pays us."

70.    To date, SeeCubic maintains dominion and control over significant estate assets that have neither been returned to the Trustee nor even identified by SeeCubic. The proposed 363 Sale, with its catchall terminology, appears to be an attempt to use the bankruptcy process to "cleanse" title to all assets, wherever located, without them ever needing to be disclosed or physically transferred.

## **The Bonding Equipment**

71.    On March 12, 2015, Stream entered into an agreement with Iinuma Gauge Manufacturing Co. ("Iinuma") for the manufacture and purchase of Small Production Line ("SPL") and Mass Production Line ("MPL") optical bonding equipment (together, the Bonding Equipment)[52]. The sales agreement clearly specified that Stream, not its subsidiary SCBV, was the purchaser.

72.    A few months later, the SPL was delivered by Iinuma and installed at the manufacturing facility of Stream's Original Equipment Manufacturer, Pegatron, in Suzhou, China.

---

[52] ECF 49-1

In early 2016, the MPL was delivered by Iinuma and also installed at the Pegatron facility in Suzhou.

73.     In 2016 and 2017, the Bonding Equipment was used to manufacture thousands of glasses-free 3D displays, achieving a 96% yield and confirming viability for mass production. I personally observed the Bonding Equipment in operation at Pegatron.

74.     Dissatisfied with the economic terms of the Pegatron OEM relationship, Stream elected to remove its Bonding Equipment from the Pegatron facility and signed a lease to rent a warehouse in Suzhou from Hold Jumper (Suzhou) Packing Company ("HJPC") on December 12, 2018. Iinuma assisted with the disassembly, packing, and transportation of the Bonding Equipment to the HJPC warehouse.

75.     From 2018-2020, Stream paid HJPC more than $1.2 million for warehouse rent. However, as the Covid-19 pandemic impacted Stream's ability to showcase its must-see Ultra-D technology, raise capital, and secure customers, Stream fell behind in its payments and worked out a repayment plan with to HJPC to satisfy its obligations.

76.     In May 2020, Mathu and Raja Rajan executed a Stockholder Consent that removed Gola, Gollop, and Krzysztof Kabacinski as directors of Stream. Though the Consent was dated May 6, Vice Chancellor Laster concluded that "[i]t was not until May 9 that the Rajan brothers informed Gola and Kabacinski that they had been removed as directors. It was not until May 11 that Stream notified Gollop of his removal." (Chancery Court *PI Opinion* at p.12). Vice Chancellor Laster did not challenge the validity of the Stockholder Consent, just the timing as it related to execution of the Omnibus Agreement. This will become important in August 2020.

77.     Stream sold a lot of screens in mid-2020 to one of its primary customers, Marvel Digital ("MD"). The top executive at MD offered to pay the overhead for a cooperative optical

bonding operation beneficial to both Stream and MD, and the companies began exploring logistical plans for strategic collaboration.

78.     In parallel with its negotiations with MD, Stream also negotiated with Chinese government officials in Hefei and Beijing. Both cities wanted "bragging rights" to have Stream's technology headquartered in their cities and prepared proposals to pay warehouse space and other operating costs if Stream moved its cutting-edge equipment from Suzhou.

79.     In short, Stream had several options available for resolving its Bonding Equipment warehouse needs and open balance with HJPC. MD made arrangements with Stream to pay the outstanding balance with HJPC in exchange for a the mutually beneficial bonding operation contemplated between the companies.

80.     In July and August 2020, SeeCubic discovered that Stream was selling its inventory of 65" glasses-free displays and was exploring options to reassemble the Bonding Equipment in a new location to enable a restart of production. SeeCubic sought to take control of the Bonding Equipment, preventing Stream from realizing revenue that could be used to retire the secured debt.

81.     Despite the fact that Gola and Gollop were removed as directors of Stream in May 2020, they signed a Delegation of Authority Letter[53] as directors, on Stream letterhead, on August 24, 2020, empowering a Delegate of their choice to "represent [Stream] and all its subsidiaries…in liaising with commercial landlords…including negotiating arrear repayment plans and agreements, renegotiation of lease conditions." The Letter further stated:

> The Delegate may represent [Stream] in performing viewings and inspections, including inspections of all Company equipment and other assets stored or transported to its premises, including industrial real estate locations least from companies in China. He may also arrange transportation of goods and machinery in and out of such facilities.

---

[53] ECF 48, Exhibit S

Purporting to act with authority from, and on behalf of Stream, Gola and Gollop empowered a third party to seize Stream's Bonding Equipment.

82.    Shortly after Stream filed for a Temporary Restraining Order with the Delaware Chancery Court on September 8, 2020 to prevent SeeCubic from continuing to seize the Assets, Vice Chancellor Laster issued a Status Quo Order on September 23, 2020.

83.    The Status Quo Order had two significant negative impacts on Stream: (a) it scared off MD from making payments to HJPC in cooperation with Stream for the planned optical bonding joint venture, and (b) it prohibited Stream from raising new capital, so Stream's overall debt and the balance owed to HJPC continued to grow.

84.    April 23, 2021 – a settlement agreement with HJPC was entered into and signed by the then-director of Stream's China subsidiary. The balance due per that settlement agreement was approximately $900K. However, with the dismissal of Stream's initial bankruptcy case in May 2021, the provisions of the Chancery Court Preliminary Injunction were once again in effect, and Stream was unable to consummate its settlement with respect to the Bonding Equipment.

85.    SeeCubic subsequently paid the warehouse balance on behalf of Stream's China subsidiary and claimed title to the Bonding Equipment, which remained in the HJPC warehouse.

86.    Upon issuance of the Delaware Supreme Court Mandate and the Chancery Court's subsequent order that SeeCubic return the Bonding Equipment to Stream, SeeCubic elected to transfer the equipment to SCBV and argued that returning the asset to Stream's subsidiary was as good as returning it to Stream. Although no Bill of Sale or other change of title paperwork has ever been produced, SeeCubic and SCBV both claim that SCBV is now the owner of the Bonding Equipment. As such, SCBV has refused to release the Bonding Equipment to Stream despite many requests by Stream.

87.    Now that Stastney is the sole director of SCBV, he once again exerts dominion and control over Stream's Bonding Equipment, which has remained out of reach and unavailable for Stream to initiate its optical bonding co-venture with Cystar International ("Cystar," an affiliate of MD). Stastney refusal to enable the return of the Bonding Equipment is one aspect of Stream's Adversary Case in which is alleges tortious interference.

**Technovative Stock Shares**

88.    As stated above, upon execution of the Omnibus Agreement, SeeCubic made every effort at self-help to seize Stream's assets. Primary of these were the stock certificates of Technovative, the top-level entity which owns all the downstream subsidiaries as previously described.

89.    In September 2020, prior to the commencement of the Chancery Court litigation, and long before there was any adjudication of the validity of the Omnibus Agreement, Stastney gained entry into Stream's corporate offices while no Stream personnel were on site, using an office key he had retained from his time as an employee 9 months earlier. Entering without permission, he searched Stream's office for the Technovative stock certificates.

90.    Unable to find the stock certificates, on September 4, 2020, Stastney created documentation declaring the certificates officially lost, used power of attorney granted to him through the Omnibus Agreement, and created new stock certificates which I believe were registered with the State of Delaware. Simultaneously, he executed new corporate documents establishing himself as the sole director of Technovative, with the power to direct all of the downstream subsidiaries.

91.     Stastney and SeeCubic retained title and control of the Technovative shares until the Chancery Court issued its Mandatory Injunction on September 30, 2022 and demanded the return of the shares to Stream.

92.     As stated above, Stastney coordinated a scheme with Hawk whereby Stastney signed the stock certificates back to Stream but had Hawk exercise purported proxy rights to vote the shares as a secured creditor and appoint Stastney as the director. The maneuver was executed over the course of "an extended lunch hour" as observed by Vice Chancellor Laster, who found Stastney, SeeCubic, and Hawk in contempt for their obvious attempt to thwart the order of the Court.

93.     After a two-week delay imposed by the Chancery Court, Hawk once again attempted to exercise its proxy rights and filed the 225 Action so that the Vice Chancellor would determine whether Hawk or Stream had the right to appoint the Technovative director(s). The 225 Action did not dispute that Stream owned the Technovative shares, only that Stream did not have the right to appoint the Technovative director. Hawk's stated purpose for appointing Stastney as director of Technovative was to further its plan to arrange a UCC Article 9 sale of the Assets for the benefit of Hawk (as collateral agent for SeeCubic).

94.     The 225 Action was stayed by this Bankruptcy Case. Stream remains in control of Technovative, and this Court has appointed the Trustee to serve as the interim managing director of Technovative.

## Computer Servers and Intellectual Property

95.     Stream's Ultra-D technology and other intellectual property was developed at SCBV, its R&D facility in the Netherlands. Computer code and other non-tangible IP has been stored on SCBV servers since the formation of SCBV in 2011 and was the only storage location

of the company's intellectual property until 2019. Although a secondary engineering team was established in Germany in 2018, the Netherlands servers were the primary repository of all the computer code.

96.    In 2019, Stream engaged a product engineering team in Silicon Valley, USA to facilitate translation of development computer code into computer code more suited for mass production. Stream established an engineering office in Fremont, California, leased servers from Dell, and engaged a third-party vendor, MotivIT, to provide server storage facilities and IT support.

97.    Stream's Silicon Valley engineering team worked to productize the Ultra-D computer code for most of 2019 and the early part of 2020. As the global pandemic hit and Stream was faced with fundraising challenges, Stream fell approximately $50,000 behind on its payments to MotivIT. In March 2020, I personally engaged in negotiations with Derrick Bowker, a MotivIT executive who agreed to a 3-installment payment plan that would bring the Stream account current[54]. Stream made the first of the agreed payments on March 11, 2020 in the amount of $17,475, with the understanding that Mr. Bowker would obtain the necessary approvals to fully execute the agreement.

98.    Despite several attempts I made to get a signed settlement agreement so that subsequent installment payments could be made, MotivIT went radio silent and failed to respond to my emails. I was unaware at the time, and would not learn until documents were produced in discovery during the Chancery Court litigation later in the year, that MotivIT's retreat from settlement with Stream was prompted by Stastney.

99.    On March 12, 2020, the day after MotivIT agreed in principle to settlement terms with me on behalf of Stream, Stastney sent an email to MotivIT declaring that Stream was in

---

[54] The MotivIT Settlement Agreement was agreed to in principal but never signed (see Exhibit M)

foreclosure and that all Assets were now the property of SLS. He instructed Mr. Bowker to hold

the servers for the benefit of SLS and to take direction only from SLS. MotivIT subsequently

blocked Stream's rightful access to its own hardware and computer source code.

100.    Stream management became consumed with the May 6, 2020 Omnibus Agreement

asset transfer and related actions related to the dispute thereof. With the pandemic causing a global

shutdown of operations, Stream furloughed its Silicon Valley engineers. The Silicon Valley servers

were not needed for any development work, and Stream focused its energy on other critical issues.

101.    On September 9, 2020, however, Mathu Rajan emailed a letter to MotivIT to re-

establish control of the servers. Mr. Bowker responded via email on September 10, 2020, stating:

> In view of a court order you received from the new company, we have received
> payment from them and technically the new company is the owner of the
> equipment.  You must secure a court order against the new company that these
> equipment are owned by Stream TV if wish to reclaim them.

When asked to produce the "court order" upon which MotivIT had decided to transfer Stream's

servers to Stastney, Mr. Bowker emailed a copy of the SLS Superior Court complaint of March 23,

2020, a foreclosure action that had not been litigated, let alone become and order of the court.

Stastney had sent MotivIT his court filing and misrepresented it as a court order, leading MotivIT

to believe that Stastney was the new owner and the servers should be surrendered to him. SeeCubic

subsequently paid the past due balance and claimed ownership of the server hardware in Chancery

Court when it came time to return the Assets to Stream as mandated by the Delaware Supreme

Court.

102.    When Vice Chancellor Laster ordered the return of certain assets to Stream, he

accepted SeeCubic's argument that it had paid for the Silicon Valley servers and should therefore

not be required to surrender them to Stream. Instead, he ordered that Stream be allowed to copy

the data only; SeeCubic was allowed to retain the servers and all the data on them even though it

was no longer entitled to possess Stream's intellectual property. To this date, SeeCubic maintains dominion and control of Stream's Silicon Valley servers and the computer data stored on them.

103.    A greater number of computer servers, and a wider range of computer code and intellectual property, resides with SCBV in the Netherlands. SeeCubic seized control of SCBV at the time of the improvident injunction of the Chancery Court on December 8, 2020. As stated above, Stastney has never relinquished his position as director of SCBV except for the brief period that Berkenbosch was appointed interim director by the Amsterdam Court. Stastney has had operational control of SCBV since September 20, 2023, and through his position, he can and does direct the employees of SCBV and exercise control over all of Stream's intellectual property situated in the Netherlands: the patent portfolio, engineering source code, trade secrets, know-how, specialized equipment, and more.

## Websites, Email, and Business Data

104.    For more than a decade, Stream owned and maintained several website domains that included www.ultra-d.com, www.streamtvnetworks.com, www.seecubic.com, www.streamtvinternational.com, several other domains, and various extensions thereof. All website hosting was implemented through SCBV, which also handled global IT for Stream. Stream's email servers were hosted on local servers at the SCBV facility, which also hosted storage for data sharing through software like SharePoint. SCBV also provided BitLocker global encryption for Stream's business computers.

105.    When the Chancery Court issued the preliminary injunction on December 8, 2020, Stastney seized control of SCBV and directed the IT manager to (a) change the BitLocker passwords to all of Stream's business computers, making them inaccessible to users; (b) change the email passwords so that Stream could no longer access mail archives (unless stored locally) or

receive send and receive new email; (c) provide Stastney with administrative access to all of Stream's email (including attorney-client privileged communication related to the Chancery Court litigation which was still ongoing); and (d) revoke access by Stream to all data stored on SCBV servers, which included business, financial, personnel, and legal data.

106.    SeeCubic immediately seized the SCBV domain (www.seecubic.com) as its own to replace the www.seecubic.co domain it had been using upon the company's formation. The personnel page of the website was updated to include both SeeCubic manage and staff as well as SCBV engineers. Stream's historical achievements (fundraising, testimonials, etc.) were ascribed to SeeCubic.

107.    All other domains were populated with a single landing page that announced the takeover of Ultra-D by SeeCubic:

> **Stream TV Networks, along with all subsidiaries and all associated assets, has been acquired by SeeCubic, Inc.** The groundbreaking glasses-free 3D technology, UltraD, was developed by SeeCubic BV in the Netherlands and is now the cornerstone of a new & innovative international company, SeeCubic, Inc. A new and invigorated management team has been created with industry leading senior executives who have merged their vision with the technology from the core engineers who developed this revolutionary product.

Notably, this acquisition and ownership announcement by SeeCubic still remains active for six domains[55] in violation of the TRO which specifically states that SeeCubic "shall not on any website … make any representations with respect to ownership or development of such technology, purported to be owned and/or developed by Stream and/or its subsidiaries." (*TRO* at 9(b)(ii)).

108.    Following the Delaware Supreme Court Mandate and Chancery Court order to return Stream's assets, Stastney caused SCBV to provide Stream with mid-level access to the

---

[55] 5 domains (www.stvinternational.com, www.stvinternational.eu, www.stvinternational.nl, www.streamtvinternational.eu, and www.stvi.eu) all have "pointers" that redirect to www.streamtvinternational.nl, which publishes language in violation of the TRO.

following domains: www.streamtvnetworks.com (and .net), www.streamtvinternational.com,
www.ultra-d.com. However, despite several requests, Stream has never been given full
administrator access to Amazon Web Services necessary to migrate the sites to a hosting service
under Stream's control. As a result, Stream has been forced to register new domains for
www.streamtvnetworks.tech and www.ultra-d.tech, which it does control, and place redirect
pointers on its historical domains.

109.    Stastney directed SCBV to create archive files of Stream email existing prior to
December 8, 2020 and return those archival files to Stream, but only for personnel currently or
recently engaged by Stream. SCBV retained all historical mail for personnel that abandoned
Stream for SeeCubic in 2020, even though email communication is the property of the company,
not the employees. Email data from Stream's VP of Sales, with valuable contact information and
business leads, was retained by Stastney through SCBV because Stream's former sales team,
including Leo Riley, Duncan Humpreys, and Simon Ford, are now employees of SeeCubic. The
same is true for email archives for Franklin Rodgers and Bill Hennessey, Stream's former
accounting team. Archives for engineers are also missing. And of course, Stastney refused to
surrender his own business emails that were generated using Stream's domain while Stastney was
an officer and director. What does Stastney have to hide, and why has SeeCubic been allowed to
retain business data that it is not entitled to? All told there are 14 business email accounts that have
not been returned.

110.    Similarly, Stream was never granted access to the business, financial, and customer
data stored on SCBV servers. SCBV had always been the global hub for data management, but
once Stream was severed, it was never restored. SCBV initially argued that after almost two years
of Stastney's control through SeeCubic, it was too difficult to sort the data, and Stream must be

restricted from accidentally accessing anything it was not entitled to. Suggestions to sort data by file date and segregate anything more recent than December 8, 2020 were met with silence, and Stream has been forced to operate without any meaningful historical data that was not backed up on local drives.

111.    SCBV also exerted its IT muscle remotely. As directed by Stastney immediately following the Chancery Court preliminary injunction, SCBV changed the BitLocker encryption passwords on all Stream business computer systems. As a result, Stream was left with non-functioning equipment and no access to critical information required to operate in any meaningful capacity. The lockout turned my laptop computer into a paperweight.

112.    Shortly after the Chancery Court preliminary injunction, SeeCubic contacted me and demanded that I surrender my business laptop, technology demonstrator units, and any other assets of Stream I might have in my possession. On December 14, 2020, I provided Stastney with a rough inventory of assets in my possession or under my control[56], which included a U-Haul storage locker in Los Angeles that housed primarily outdated equipment.

113.    I helped coordinate the surrender of assets from Sara Brewer, one of Stream's content creators who also lives and works in Henderson, Nevada. Mrs. Brewer had only a high-end content creation laptop computer, two 65" 3D screens for previewing her work, some business equipment and marketing materials.

114.    On January 29, 2021, SeeCubic arranged pickup of my business laptop, a 5.5" 3D technology demonstrator [phone] panel, two 27" 3D technology demonstrators with player PCs, and more as detailed in the inventory list I supplied to Stastney. SeeCubic picked up all assets from Mrs. Brewer and me via a local courier, who delivered them to a storage facility in San Ramon.

---

[56] Robertson email of December 14, 2020 to SeeCubic (see Exhibit O)

The freight company made a reasonably detailed list of assets Mrs. Brewer and I surrendered to SeeCubic, notating equipment serial numbers where available.[57]

115.    In July 2021, after receiving notices from U-Haul about past-due storage fees, I informed SeeCubic that the contents of the locker were due to be sold at auction for non-payment. SeeCubic responded that there was no interest in the items stored there and they were willing to let the locker contents be sold. Those items were obviously unavailable for return to Stream, as SeeCubic allowed them to be lost.

116.    Following the Delaware Supreme Court invalidation of the Omnibus Agreement and the Chancery Court's order that assets should be returned to Stream, on October 12, 2022, SeeCubic arranged for me to access the San Ramon storage locker where the assets from Mrs. Brewer and me had been shipped almost two years earlier. I traveled from Nevada to Northern California and accessed the storage facility with a driver who would truck the assets back to Nevada for me. I was greatly disheartened to see how few assets were located there for pickup. There were no laptop computers, no 65" 3D displays. The case for the 5.5" demonstrator was there, but the box was empty. Any asset of reasonable value was missing. I photographed the locker and all its contents before returning all assets to Nevada for storage.

117.    Suby Joseph surrendered the laptop computer he used as VP of Finance directly to Stastney's home. Amanda Gonzalez and Nicole Maneen surrendered the laptop computers they used as executive assistants to Stastney. Grazina Seskeviciute, Stream's VP of Content Creation stationed in the Netherlands and employed through SCBV, surrendered her high-end content creation laptop computer to the receptionist at SCBV at Stastney's request. None of these business computers were ever returned to Stream, despite multiple requests and court filings.

---

[57] Addendum to Robertson email of December 14, 2020 to SeeCubic (see Exhibit O)

## Conclusion

118.    From May 2020 through the present, Stream had its assets seized or was forced to surrender them to SeeCubic, first pursuant to the Omnibus Agreement, then through lack of turnover enforcement by the Chancery Court, then through litigation in the Netherlands that empowered Stastney to exercise dominion and control of the Debtors' most valuable assets.

119.    Nobody but the Stalking Horse SeeCubic – not Stream's former management or the Trustee himself – has a reasonably accurate idea of just what the estate assets are, where they are located, what condition they are in, or what their value is. Conducting a 363 Sale of the assets as-is/where-is does a great disservice to all parties in interest.

Date: November 22, 2024

Charles M. Robertson