Case 23-10763-amc Doc 847-3 Filed 10/29/23 Entered 10/29/23 23:50:50 Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23 Page 1 Page 1 of 275

1

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| IN RE: | : | Case No. 23-10763 |
| | : | |
| STREAM TV NETWORKS, INC. CH: 11 | : | ADV. No. 23-00057 |
| | : | |
| Stream Tv Networks, Inc. Vs | : | Philadelphia, Pennsylvania |
| Shadron L Stastney | : | October 16, 2023 |
| | : | 10:32 a.m. |
| Motion For Preliminary Injunction | : | |
| Request For Temporary Restraining | : | |
| Order Filed By Alastair Crawford, | : | |
| Delaware And Other Law Firms | : | |
| Representing And Acting In | : | |
| Concert With John Doe(S) And/Or | : | |
| Jane Doe(S), Jane Doe(S), John | : | |
| Doe(S), Asaf Gola, Kevin Gollop, | : | |
| Hawk Investment Holdings Limited, | : | |
| Investment Banks Employed By John | : | |
| Doe(S) And/Or Jane Doe(S), | : | |
| Krzysztof Kabacinski, Arthur | : | |
| Leonard Robert "Bob" Morton, | : | |
| Seecubic B.V., Sls Holdings Vi, | : | |
| Llc, Shadron L Stastney, | : | |
| Seecubic, Inc., Patric Theune | : | |
| Represented By Rafael X. | : | |
| Zahralddin | : | |

. . . . . . . . . . . . . . . . .

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtor:
Keith Kodosky, Esq.
Lewis Brisbois Bisgaard & Smith
600 Peachtree Street NE
Suite 4700
Atlanta, GA 30308
404-991-2183

Rafael X. Zahralddin
Lewis Brisbois Bisgaard & Smith
500 Delaware Avenue, Suite 700
Wilmington, DE 19801
302-985-6004

APPEARANCES:

| | |
|---|---|
| For Hawk Investment Holdings Ltd: | Steven Caponi, Esq. |
| | K&L Gates |
| | 600 N. King Street, Suite 901 |
| | Wilmington, DE 19801 |
| | 302-416-7080 |
| | |
| For SeeCubic, Inc.: | Eben P. Colby, Esq. |
| | Skadden Arps Slate Meagher & Flom, LLP |
| | 500 Boylston Street, 23rd Floor |
| | Boston, MA 021116 |
| | 617-573-4800 |
| | |
| | Emilia McKee-Vassallo, Esq. |
| For Shadron Stastney: | 1735 Market Street |
| | 51st Floor |
| | Ballard Spahr |
| | Philadelphia, PA 19103 |
| | 215-864-8320 |
| | |
| For SLS Holdings VI, LLC: | Davis Lee Wright, Esq. |
| | Robinson Cole, LLP |
| | 1201 North Market Street |
| | Wilmington, DE 19801 |
| | 302-516-1703 |
| For Rembrandt: | |
| | Andrew Peter Demarco |
| | Devlin Law Firm, LLC |
| | 1526 Gilpin Avenue |
| | Wilmington, DE 19806 |
| | 302-449-9010 |

Proceedings recorded by electronic sound recording; transcript produced by TheRecordXchange.

Case 23-10763-amc    Doc 848-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23    Page 3    Page 3 of 275

3

```
                             INDEX

                       Direct    Cross    Redirect    Recross

WITNESSES:

Charles M. Robertson
   (By Mr. Zahralddin)      77                 83
   (By Mr. Colby)                  80                     90
Mathu Rajan
   (By Mr. Kodosky)         91
```

Case 23-10763-amc    Doc 827-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript p0-18 23 4 Page 4 of 275

4

```
 1  OCTOBER 16, 2023                              10:32 A.M.

 2            THE COURT:  Good morning.

 3            MR. CAPONI:  Good morning.

 4            MR. COLBY:  Good morning, Your Honor.

 5            THE COURT:  Please be seated.

 6            All right, Counsel.  Before we begin, I think there's

 7  a little housekeeping matters I'd probably like to address.  So

 8  let's have the entry of appearance for all of the relevant

 9  parties, starting with first -- turn on the right page -- the

10  debtors.  Whos' here for the debtors?

11            MR. KODOSKY:  Good morning, Your Honor.  Keith

12  Kodosky joined by --

13            MR. ZAHRALDDIN:  Rafael Zahralddin, Your Honor, and

14  Beau Strickland (phonetic).  That's better than Mr. Kodosky

15  having to pronounce my last name.

16            THE COURT:  Zahralddin?

17            MR. ZAHRALDDIN:  See, you've known me a long time.

18            THE COURT:  Well, no, I've heard it enough.  I was

19  not good at the beginning either.  Okay.  Mr. Kodosky, I was

20  not pronouncing it correctly on the last hearing, so now I had

21  it.

22            MR. KODOSKY:  Thank you, Your Honor.

23            THE COURT:  Okay.  And who's here for the

24  Respondents?

25            MR. COLBY:  Good morning, Your Honor.  Evan Colby and
```

Case 23-10763-amc    Doc 842-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-19-23    Page 5 of 275

5

```
 1   Marley Brumme from Skadden Arps on behalf of SeeCubic, also

 2   joined by Melissa Lao, a legal assistant from our office.

 3            THE COURT:  Okay.  And we have probably for -- I'm

 4   sorry, again Mr. Colby.  You represent?

 5            MR. COLBY:  SeeCubic, Inc. of Delaware.

 6            THE COURT:  SeeCubic, Inc. of Delaware.  Okay.  Yes.

 7            MS. VASSALO:  Good morning, Your Honor.  Camilia

 8   McKee Vassalo on behalf of Mr. Stastney.

 9            THE COURT:  Stastney.

10            MR. WRIGHT:  Good morning, Your Honor.  Davis Wright

11   of Robinson and Holt on behalf of SLS Holdings VI, LLC.

12            THE COURT:  And, Counsel, could you say that again

13   because unfortunately I did not hear the first -- your name.  I

14   heard SLS Holdings VI, I think you said.

15            MR. WRIGHT:  Yes, Your Honor.  Davis, D-A-V-I-S,

16   Wright, W-R-I-G-H-T.

17            THE COURT:  Okay.

18            MR. CAPONI:  Good morning, Your Honor.  Steven Caponi

19   from K&L Gates on behalf of Hawk Investments.

20            THE COURT:  Anyone else?

21            MR. DEMARCO:  Your Honor, Andrew Demarco with Devlin

22   Law Firm here for Rembrandt.

23            THE COURT:  Anyone else?  Okay.  Before we begin, as

24   I said, there's a couple of housekeeping matters that I think I

25   need to deal with.
```

Case 23-10763-amc   Doc 847-3   Filed 10/29/23   Entered 10/29/23 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 6 of 275

6

1              With respect to the debtors, on Saturday evening,

2    9:30, I think, you filed a 40 page brief.  I'm not quite sure

3    -- this is a TRO -- why you filed that.  And again, which now

4    necessitated the Court, opposing counsel, the Court to expend

5    time, because I wanted to start at 10:00, but that wasn't going

6    to happen reviewing a 40 page with voluminous attachments and

7    which seemed to set forth different -- because we were forced

8    to do a comparison between the initial TRO that was filed, the

9    brief that was filed.

10              And they seemed to make different arguments that the

11   Court now had to figure out how to address those.  So I'm not

12   quite sure.  You know, this isn't a situation where we have,

13   you know, a summary judgment or a motion where, you know, the

14   Court is expecting briefing.  This is a TRO that is supposed to

15   be an emergency.  And so this would not have happened except

16   that we continued the hearing that apparently the debtor took

17   the opportunity to file supplemental briefing.

18              My rules typically in an -- overall do not allow for

19   supplemental without prior Court approval.  But all that did

20   was make things unnecessarily complicated and then delayed the

21   start of this hearing.  And, Counsel, I would tell you if this

22   is an emergency, I'm not quite sure how filing a 40 page

23   supplemental brief is going to move the dime in one bit other

24   than causing additional work for opposing counsel and

25   additional issues that the Court was not originally -- as,

Case 23-10763-amc   Doc 847-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 7 of 275

7

1  again, when we did a comparison, there seems to be there's

2  different arguments.  We'll have to figure that out during the

3  course of this hearing today.

4        The second matter that I'm concerned with, apparently

5  there is an outstanding renewed motion, I think it's called, to

6  force the parties to comply with the 26(f) requirements, which

7  of course I went and I reviewed the rules and I'm not quite

8  sure what the parties' positions are and how they get there.

9  The rules specifically set forth some deadlines that need to be

10 adhered to.  And 16(b), Rule 26(f) refers to 16(b), which says

11 that the Court shall issue an order within 60 days of either

12 the entry of appearance of a party and another deadline, but

13 for my purposes, it's within 60 days of an entry of appearance

14 of a party.  And unless the Court orders otherwise, the parties

15 have to comply.

16        I don't understand if the Defendants don't want to

17 comply with 26(f) how they get to say we're not going to

18 comply.  Absent court order, you have to come and ask me to

19 extend the deadline.  Nobody did that except I got a motion

20 from the debtors, Plaintiff debtors, saying force them to

21 comply.  I don't know what the issue is between the parties,

22 and frankly, you guys keep that outside of my courtroom.  But I

23 will tell you I expect everyone to comply with the rules.

24 26(f) says this is how you do it.  There is no motion before

25 this Court asking to extend the 26(f) deadlines.  That is all

Case 23-10763-amc    Doc 843-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-19-23   Page 8 of 275

8

1    I'm going to say.

2            There is an outstanding motion to force you to

3    comply.  I suggest at the end of this hearing that you guys get

4    together and figure it out because you don't want me addressing

5    it when there has been no request for an extension.  And unless

6    somebody can tell me how it works otherwise, unless I have a

7    missed understanding of what the rules require, I don't want to

8    see this stuff.  I think it is unnecessary.  It's not how I

9    expect attorneys appearing before m to behave.  Follow the

10   rules.  Do not burden the Court with unnecessary issues that I

11   should not have before me.  Again, I am not finding that cause

12   may not exist to extend the deadlines, but that hasn't been

13   requested.  And until it is, follow the rules.

14           Now, that's the only two things I needed to address

15   for today.  And I think -- I hope -- that I don't have to say

16   any of this again because I had thought that we'd reach a point

17   in these proceedings where everybody, for lack of a better

18   word, was playing nice.  Okay?

19           Now, where did we leave off at the last hearing?

20           MR. COLBY:  Sorry, Your Honor.  If I might, I did

21   wish to have an opportunity to address the middle of the night

22   Saturday filing.

23           THE COURT:  Uh-huh.

24           MR. COLBY:  A minute ago, the Court said we'll have

25   to work that out over the course of the day, which I

Case 23-10763-amc    Doc 822-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 9 of 275

9

1  appreciate.  I don't fully understand how we're going to do

2  that or what that might mean, but we would submit that this, in

3  a TRO and an expedited context, where the debtor has already

4  sat on this issue for an extended period of time before

5  bringing it to the Court in a purported emergency context and

6  where during the intervening week we get this, you know, the

7  day before, the middle of the night before we're going to be

8  here to continue the hearing, we get a brief that raises new

9  legal arguments, new factual issues and factual arguments, and

10  submits 2,000 pages of new exhibits that completely changes the

11  thrust of the basis for the TRO.

12        That that's just simply too late and shouldn't be

13  considered as part of today's proceedings, which should be

14  designed around completing the process of addressing the TRO

15  motion as it was actually filed and as it was made.  For

16  example, there are arguments in the new brief that relate to

17  confidential -- supposed confidential information that Mr.

18  Stastney had access to in 2018.  Debtors had an opportunity to

19  question Mr. Stastney and didn't raise this issue whatsoever.

20  That's just one example.  There's also this new theory of

21  lender liability.

22        THE COURT:  Well, frankly, I'm not quite sure how

23  that has anything to do with a TRO.  You have a lender

24  liability claim, you go file it.  I don't get it.

25        MR. COLBY:  I'm comforted to hear the Court say that

Case 23-10763-amc   Doc 843-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-18-23   Page 10 of 275

10

1    because we don't think it does either.

2         THE COURT:  Well, I'm not -- I'm just saying I don't

3    understand.  They're going to get to tell me how, but just in

4    reading it.  In addition, I also forgot to mention that during

5    that time period the debtors took the opportunity to also seek

6    discovery within 48 hours, necessitating the Court, again --

7    and let me just say because there was another thing I wanted to

8    say.  I don't know how any of you think that we're even going

9    to get to the briefs that you submitted in connection with the

10   other hearing because all of our time has now been devoted to

11   issues, emergencies regarding discovery, a TRO.

12        So I just want you to understand if anybody was

13   expecting and we were hoping to get that done quickly, this is

14   not helping.  This is not helping at all.  And it is what it

15   is.  I'm just telling you I will try my best to get to what I

16   can get to, but, you know, a lot of the times that we should

17   have been devoting to try to get to the briefs and all those

18   other things, we are now devoting to discovery disputes, TROs.

19   I don't know what to tell you.

20        MR. COLBY:  Your Honor, I think that's a fundamental

21   concern for the secured creditors as well.  And, in fact, the

22   overall conduct of the bankruptcy proceeding so far has

23   suggested a primary strategy of attempting to avoid dealing

24   with the substantive issues raised by the bankruptcy filing.

25   It is a continuation of a pattern that we have seen of

Case 23-10763-amc    Doc 843-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 11 of 275

11

1   attempting to get out from under impending judgments by courts.

2   It's part of the reason, we submit, why we're here because of

3   the near conclusion of the 225 action in the court of chancery.

4          It's what we've seen as we got close to the end of

5   the hearing on the various Hawk motions.  There was this motion

6   to withdraw the reference and effectively move substantial

7   portions of this dispute to the district court here filed by

8   the debtor.

9          THE COURT:  Has that been ruled on?

10          MR. COLBY:  I'm sorry.

11          THE COURT:  Has that been ruled on?

12          MR. COLBY:  It has not been ruled on.  And now we're

13   seeing it in this Court with the serial raising of new issues

14   and new motions.  And I think to state what the secured

15   creditors submit is obvious, this all speaks in favor of a

16   compelling need to put a responsible party in charge of the

17   debtors in the form of a trustee that will bring some semblance

18   of order to these proceedings and permit the Court and the

19   parties to focus on actually getting to the important work of

20   the bankruptcy filing and of the restructuring, whatever form

21   that takes, because otherwise the pattern has been repeated

22   forum shopping, shifting of issues, moving targets for us to

23   try to advance the ball.  And it's making it very, very

24   difficult to make forward progress here.

25          THE COURT:  Uh-huh.

Case 23-10763-amc   Doc 843-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 12 of 275

12

1          MR. COLBY:  And the way this has played out suggests

2     that that's not a byproduct of the strategy.  That is the

3     strategy.

4          THE COURT:  Well, Counsel, I'm not going to say

5     whether it's a strategy or not, and I'm not sure what weight if

6     any -- I'm not saying I wouldn't -- to the fact that this was

7     filed when the 225 litigation was in place.  Parties often file

8     bankruptcy when there is litigation when they are in financial

9     strait.  You know, I get you guys have come to this court with

10    a history that is not a history here.  I get it.  So my goal is

11    to have you guys leave that at the door.

12         It doesn't mean that it's completely -- I'm not going

13    to completely ignore it, but for my purposes, again, I -- and

14    the debtor will need to tell me this.  And when I said we

15    figure out how we deal with that.  Again, we're trying to just

16    sift through and spend time, you know, a couple of hours that

17    we are trying to -- you know, did I read this on Saturday

18    night?  No.  I don't even get notices that this is filed.  You

19    know, only thing I get notices of is if an appeal is filed or a

20    new bankruptcy case is filed.

21         I do not get -- and as I have said, I don't go

22    perusing the dockets looking for information.  In this case, we

23    know come Monday morning, my law clerks and I know we better go

24    -- and my courtroom deputy, the first question I'll have, did

25    they file anything.  At least the last hearing, I was happy to

Case 23-10763-amc   Doc 823-3   Filed 10/29/24   Entered 10/29/24 23:50:54   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 13 of 275

13

 1  say that nothing was filed and instead, like, yes, there's a 40

 2  with ha zip drive.

 3          So again, you know, that's not how I want this to go.

 4  And then when I said I have to figure out where this -- where

 5  we go with this new filing.  Do I even consider it at all?  Is

 6  it something that really relates to what was originally before

 7  me or was this just an expansion because we had to continue the

 8  hearing?

 9          And the debtors are going to have to tell me that,

10  which means now instead of starting the hearing at 10:00 with

11  evidence we're going to spend God knows how much time trying to

12  sift through all these issues because, again, we have spent two

13  and a half hours this morning trying to figure out what the

14  heck this -- the new filings are, which means we didn't start

15  when I anticipated, and now we can't start because now I have

16  to issue that.  And, you know, the 26(f), you guys are going to

17  figure that out, so we're not talking about that anymore.

18  We're only going to talk about this.  And I get your point, Mr.

19  Colby, of what -- because they were mine.  Not saying that I

20  agree, but they were issues that were raised for the Court.

21          MR. COLBY:  Yeah.

22          THE COURT:  Okay.

23          MR. COLBY:  So, I mean, the initial motion barely

24  devoted any time or space whatsoever to an important element on

25  a TRO, which is likelihood of success on the merits.  It was so

Case 23-10763-amc    Doc 847-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 14 of 275

14

1  bereft of any analysis that on our side it wasn't clear to us

2  what we were even responding to, what, of the 19 causes of

3  action in the -- supposed causes of action because some of them

4  aren't actual causes of action, but of the 19 supposed causes

5  of action in the adversary proceeding, which one was this TRO

6  about.  It can't really be about all of them, and so we had to

7  guess.  And we pointed out in our brief the absence of any

8  analysis on that very important element of a TRO.

9          And now, all of the sudden, after all of our

10  preparation, after a substantial portion of the hearing is

11  complete, in the middle of the night the weekend before we

12  resume supposedly to finish up, all of the sudden there's this

13  new focus on some supposed cause of action, one of which still

14  isn't actually a cause of action and it should fail on that

15  basis.  But it has created certainly some prejudice.  It

16  certainly speaks to the utter failure of the motion as it was

17  initially framed to carry the debtor's burden.  It is a tacit,

18  if not express admission, borderline express admission,

19  whatever, however we want to characterize it, that the basis

20  for the motion utterly failed after day one.

21          They didn't satisfy the elements of what one needs to

22  show in order to obtain injunctive relief, temporary injunctive

23  relief.  As a legal matter, it didn't make any arguments about

24  a particular likelihood of success on the merits on a

25  particular claim.  And secondly, we spent the whole day when we

Case 23-10763-amc   Doc 847-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 15 of 275

15

1  were here a week ago talking about the Phillips license and

2  sublicenses and all those things.  Not at all a component, a

3  significant component, of this new brief.  The issues, the

4  basis for the TRO has completely changed all of the sudden in a

5  way that shows the fatal flaws in the initial motion and which

6  is highly prejudicial for us to proceed on those basis if

7  that's going to be part of what we're, you know, litigating

8  here today in the evidence.

9          THE COURT:  Well --

10         MR. COLBY:  So, I think I made my point.

11         THE COURT:  Right.  And I will say this, Counsel,

12  with respect to the issue of success on the merit.  I mean,

13  that's sort of a low threshold.  I mean, I've looked at the

14  case law.  It's not very high.  But the biggest thing in a TRO

15  is irreparable harm.

16         MR. COLBY:  Sure.

17         THE COURT:  And what I've tried to figure out and

18  I've tried to decipher is what is that standard.  Is it a

19  preponderance of the evidence?  Is it some high, you know, more

20  than likely than not?  You know, and so that's sort of what I

21  was focusing on for these hearings.  And now, again, I have

22  something new and I have to first, one, decide, do we even

23  address those things.

24         MR. COLBY:  Right.

25         THE COURT:  And again, it necessitating, and

Case 23-10763-amc    Doc 827-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 16 of 275

16

1   somewhere in my notes I have a comparison of what was in the

2   original motion as to what is in the new motion.  And to be

3   perfectly honest, my view of TROs, yes, success on the merit.

4   But if you look at the case laws and the cases out of the Third

5   Circuit, it's sort of a low threshold.

6            MR. COLBY:  Well, Your Honor --

7            THE COURT:  It's really irreparable harm.

8            MR. COLBY:  We could spend a lot of time talking

9   about it.

10           THE COURT:  But we're not going to talk about that

11  because --

12           MR. COLBY:  Yeah.  I was going to say --

13           THE COURT:  We're not going to talk about that

14  because I need to know what I needed.  I needed to know what it

15  is from the Court's perspective, where we needed to go, what

16  the standard is, what the elements I have, and be in a position

17  to make a ruling.  So I'm just simply saying this is how I

18  looked at it.

19           MR. COLBY:  Understood.

20           THE COURT:  And that was it.  I get what you're

21  saying, which is you believe this is a new basis.  It wasn't in

22  the original.  You're prejudiced because you weren't prepared

23  to address that and that wasn't the issue brought to the Court.

24           MR. COLBY:  Yeah.  And the showing, we could probably

25  have an interesting discussion of exactly what the --

Case 23-10763-amc    Doc 843-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 17 of 275

17

1            THE COURT:  The legal thresholds are?

2            MR. COLBY:  The required, the legal threshold is, but

3    what I think is abundantly clear is that the showing made by

4    the debtors was, you know, zero or barely above that, and so.

5            THE COURT:  But we're not there yet.  You're arguing,

6    you know, you're making closing arguments as to -- but I'm not

7    there.

8            MR. COLBY:  Understood.

9            THE COURT:  All I'm trying to address right now is

10   where as we with the evidentiary record that needs to be made

11   for this Court to get where I need to get.

12           MR. COLBY:  Understood.  I think I raised it only

13   because the failure to make any initial, you know, meaningful

14   initial argument on success on the merits or the failure to

15   make a meaningfully factual showing on irreparable harm or the

16   imminent component of irreparable harm, which I think we

17   addressed by showing these supposed concerns have been around

18   for months and months.  All of that also speaks to why now all

19   of a sudden we've got a new TRO effectively on midnight on

20   Saturday before resuming our hearings.

21           It was -- you know, I know we're not done.  I think

22   we should close out the record on that motion as it was

23   originally framed.  We'll see if the debtors can do any better.

24   But I think -- you know, I think the fact that we're now trying

25   to litigate some completely different TRO and have apparently

Case 23-10763-amc   Doc 828-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 18 of 275

18

1  abandoned the way it's initially framed speaks to the fact that

2  it really, you know, should be denied.  So I understand we're

3  going to finish the process.

4          THE COURT:  Right.  I'm not sure, you know.

5          MR. COLBY:  But --

6          THE COURT:  I'm not going to make a decision because,

7  first of all, I don't have a complete record.  I get your

8  arguments.  I'm going to -- you know, I see counsel are all

9  standing, so I'm not sure if they want to contribute or add to

10  what you wanted, what you said, and then I'll hear from the

11  debtor.  Let's see how this works.

12          Okay, Mr. Caponi.  I see you're walking up to the

13  podium.  What's your position?

14          MR. COLBY:  Never turn on --

15          THE COURT:  And please -- right.

16          MR. COLBY:  Yeah.  So, sorry, Your Honor.  Just to

17  conclude the thought so I can sleep better at night.  I think

18  it speaks to the need to not allow the debtors to suddenly turn

19  today into a proceeding on a motion, effectively what is a new

20  motion with entirely new basis that was filed in the middle of

21  the night on Saturday.  We haven't had a chance to respond to

22  it.  We've barely had a chance to analyze it.  We got 2,000 new

23  documents, 2,000 pages of new exhibits.  I don't think that's

24  what today should be about.  That's all.  Thank you, Your

25  Honor.

Case 23-10763-amc    Doc 842-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-18-23    Page 19 of 275

19

1          THE COURT:  All right, Mr. Caponi.  And I get that

2     you were going to add to what Mr. Caponi says?

3          MR. CAPONI:  Your Honor, I'm not going to add to Mr.

4     Colby's presentation.  I think he said it admirably.  I just

5     want to address one point, which is as Your Honor started out,

6     the -- and maybe Mr. Colby started out -- the notion, you know,

7     the debtors filed these cases and they repeatedly say in their

8     filings we filed the bankruptcy in order to provide the debtor

9     breathing room.

10          The Court is entitled to breathing room to address

11     the gating issue as to whether or not a trustee should be

12     appointed or these cases were properly filed because who runs

13     these estates if these estates continue to exist is fundamental

14     to whether these adversary proceedings should be followed,

15     whether there's a need for a TRO.  There's a tremendous amount

16     of money being spent and --

17          THE COURT:  Oh, we commented about how much money is

18     being racked up in attorney fees.  That was one of the first

19     thing I said.  How much is this stuff costing?  And from the

20     Court's perspective, I mean, no offense to the creditors, you

21     spend what you spend.  But from the debtor's perspective, every

22     dime spent on attorney fees is less money for creditors.  So,

23     from my perspective, I have a concern.

24          MR. CAPONI:  And it's shared, Your Honor.  And, you

25     know, once we put the -- the record was closed on the prior

Case 23-10763-amc   Doc 843-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 20 of 275

20

1  motions, our goal was to give the Court breathing room.  We

2  were required to file a motion to extend the time and respond

3  to the adversary proceedings because the debtors wouldn't agree

4  to the TRO, the Rule 26(f).  I mean, the Court's on the

5  receiving end is a lot.  We're getting on the receiving end

6  even more.  It's like shotgun, you know, making us dance.

7          I'm not making an application, Your Honor, because

8  there is no such application as -- all I am is encouraging the

9  Court do the best it can to separate the wheat from the shaft

10  and focus on the prior motions and ignore the debtor's efforts,

11  to the extent the Court can within the rules, to distract

12  because those gating issues, I can't stress enough.  They are

13  gating issues because if a Chapter 11 trustee is appointed of a

14  7 trustee where these cases are kicked, this TRO, the adversary

15  proceedings, are all going to be handled, not handled or

16  handled in a completely different way.  So anything that we can

17  do --

18          THE COURT:  Well, we don't know in a different way.

19  You would hope --

20          MR. CAPONI:  Well, I don't know, but it could be.

21          THE COURT:  Right.  Right.

22          MR. CAPONI:  I'm not saying this from my client's

23  perspective as a secured creditor that advanced those motions,

24  whatever we can do to give the Court breathing room.  I heard

25  you about the 26(f).  Take it to heart.  And I would just --

1  again, I'm just pleading my case that we've got to not let the

2  distractions take us away from the primary motions.  That's all

3  I wanted to add, Your Honor.  Thank you.

4          THE COURT:  All right.  Thank you, Mr. Caponi.

5          Yes, Counsel.

6          MS. VASSALO:  Thank you, Your Honor.  And I will be

7  brief because I do understand that we have taken a lot of time

8  trying to address these preliminary issues when Your Honor is

9  expecting to hear evidence this morning.

10          THE COURT:  Right.

11          MS. VASSALO:  We spent a lot of time over a week ago

12  hearing evidence on one motion that was premised almost

13  entirely on whether or not SeeCubic could utilize sublicenses

14  and whether or not that was permissible or whether or not that

15  was going to result in imminent, irreparable injury to Stream.

16          Now, on Saturday night, I opened a document that all

17  of a sudden turns on whether or not a 2018 employment agreement

18  was somehow breached by my client, Mr. Stastney, in 2023, and

19  that is somehow irreparable, imminent, irreparable injury that,

20  you know, weighs in favor of a TRO now that was never raised

21  during that hearing.

22          THE COURT:  Well, at least a TRO with respect to your

23  client.

24          MS. VASSALO:  Right.

25          THE COURT:  Because this doesn't relate to -- well, I

1   didn't see it and the debtor is going to have to tell me how

2   that related to these other people, other defendants.

3       MS. VASSALO:  But my point is we spent a lot of time

4   that Friday and not once did that employment agreement come up.

5   In fact, the employment agreement wasn't even attached to the

6   adversary complaint.  The first time it was presented to this

7   Court was Friday or Saturday night.  And buried among those

8   additional 2,000 pages is a settlement agreement with my

9   client, which if you look at the settlement agreement, contains

10  a waiver of claims which if you examine it will actually

11  demonstrate to the Court that many of the claims contained in

12  the adversary complaint are actually barred.  So there are

13  serious legal issues here that I need to have the opportunity

14  to brief on behalf of my client and not just with 48 hours'

15  notice.

16      THE COURT:  Well, I will --

17      MS. VASSALO:  The prejudice here is --

18      THE COURT:  All right.

19      MS. VASSALO:  -- extraordinary.

20      THE COURT:  Well, I will tell you we did not look at

21  the exhibits.  I was not opening a zip drive that was how many

22  pages.  So, to the extent there is a settlement agreement or

23  whether one was attached or not attached, I wouldn't know.

24      MS. VASSALO:  And that's my concern, Your Honor, is

25  the prejudice to my client if we proceed today on some new form

Case 23-10763-amc   Doc 847-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 23 of 275

23

1   of liability, new form of immediate emergency relief where

2   frankly, Your Honor, when we stood here at the end of the

3   hearing on Friday.  You said, "Is there anything else?"

4   Debtors could have said, "You know, we would like to submit

5   additional briefing."  And we likely would have said we don't

6   want to do that.

7           THE COURT:  You would have said no, but.

8           MS. VASSALO:  But if we're going to do that, let's at

9   least have some order because we've all practiced for a long

10  period of time and we just want to have a little bit more order

11  to these proceedings, as does Your Honor, right?

12          THE COURT:  Well, as I pointed out initially, my

13  rules, my chamber rules talk about what you can and can't file.

14  And one of the things that I don't allow is supplemental

15  briefing without prior notice or approval from the Court simply

16  because I don't want to have endless filings where this party

17  files and then there's a response and we never get to where

18  we're trying to get because there's too many new issues, new

19  things that come that were not part of the original motion, the

20  original whatever it is that the Court is addressing.

21          So that -- I would also encourage people to look at

22  my chamber rules before you file anything.  I thought I said

23  that -- and you weren't here.  I thought I said that months

24  ago, that that was important.  But I get your point that this

25  is highly -- you believe it's highly prejudicial to your

1   client, Mr. Stastney, and that if we're going to proceed today,

2   that we don't consider any of the things that are not -- other

3   than what has been previously mentioned in the motion to the

4   extent it's different, that you believe that that should not be

5   addressed today.  Any evidence regarding that should not come

6   in.

7          MS. VASSALO:  Yes, Your Honor.  And to the extent

8   that the Court is inclined to consider any evidence that's

9   outside of those motions -- the motion that was filed

10  originally and heard on, I believe, it's October 6th was when we

11  were first here, I would ask that we would adjourn today's

12  proceedings and allow me the time to actually respond before.

13  But I just say that so that you understand the prejudice that I

14  am feeling at this moment and the feeling of --

15         THE COURT:  Right.  How do you -- right.  And, you

16  know, this is a TRO.  And I'm not quite sure.  You know, it's

17  been a long time since I've done one, but in my prior life, I

18  did them routinely.  And I don't recall them being extended

19  like this.  We go in half a day, maybe a day, done.

20         I don't recall any discovery ever happening because

21  it's a TRO.  So, again, this was many moons, many years ago, so

22  maybe the practice has changed.  Maybe things are different.

23  But from my recollection, this is unusual from my own

24  experience.  Again, I don't know what, you know, everybody

25  else's experience.  I don't know what people do now.  You know,

Case 23-10763-amc    Doc 843-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript Page 25 of 275

25

1   that was 14 years, almost 14 years ago, so things have clearly

2   changed.  So, I get your point and I will consider that --

3          MS. VASSALO:  Thank you, Your Honor.

4          THE COURT:  -- in figuring out how we proceed.

5          Counsel.

6          MR. WRIGHT:  Good morning, Your Honor.  Davis Wright

7   again on behalf of SLS Holdings VI, Inc.  Your Honor, I don't

8   want to belabor the point, but I have to echo that, the very

9   last argument.  In connection with SLS, we have now been

10  identified with these lender liability claims in the

11  supplemental briefing.  That was not something in the original

12  motion.  It's not something my client briefed in response to

13  the original TRO motion.

14         THE COURT:  Well, I'm not quite sure how a TRO

15  relates to that.

16         MR. WRIGHT:  Your Honor --

17         THE COURT:  I don't know.  Debtors are going to tell

18  me.  I don't know.

19         MR. WRIGHT:  Your Honor, I understand what you're

20  saying that debtor is going to tell you.  I'm going to suggest,

21  Your Honor, that even if the debtor somehow makes a suggestion

22  as to how a legal claim for lender liability requires a TRO,

23  I'm going to ask Your Honor at the end of today to continue

24  that so that my client may actually brief that legal argument

25  and address whatever evidence comes up today that was not

 1   available ten days ago.

 2           THE COURT:  Okay.

 3           MR. WRIGHT:  Thank you, Your Honor.

 4           THE COURT:  Okay.  Anybody else from this side?

 5           All right.  Mr. Zahralddin, explain to me.

 6           MR. ZAHRALDDIN:  Thank you, Your Honor.

 7           THE COURT:  Okay.

 8           MR. ZAHRALDDIN:  I'm going to try not to denigrate

 9   counsel on the other side in any way because I just sat through

10   weak arguments, didn't do this.  I mean, they did closing

11   argument and that's, I think, a problem.  But let's just talk a

12   little bit about the case so we can put this into context.

13           We filed this case and then immediately were hit

14   without any sort of breathing spell because we were hit with a

15   motion to dismiss.  We were hit for motions to displace the

16   management of the debtor.  And this is after having had the

17   entire company taken away and then supposedly given back to us

18   about eight months ago.  And then the reason that this

19   bankruptcy filing was filed was not to just avoid a 225 action.

20   A 225 action is a secured creditor's action.  It has nothing to

21   do with determining whether there's a valid director.  It has

22   to do with whether you can exercise a pledge agreement in a

23   loan document.  So it's no different from any time somebody is

24   trying to file an action, a secured lender, and the debtor says

25   I can do better somewhere else.

Case 23-10763-amc   Doc 823-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 27 of 275

27

1          And key to why we can do better here is because we

2     are going to pay the unsecured creditors in the case and we

3     will pay the other creditors if they have allowed claims.  And

4     central to everything that's happened in this last few years is

5     key on the lender liability, which is not a cause of action, as

6     Mr. Colby said.  It is a series of causes of action that focus

7     on whether or not there's dominion and control over a debtor or

8     assets of the debtor, in this case.

9          And everyone says, well, why is it that we come up

10    now?  Well, we come up now, Your Honor, because we said this

11    was happening in the very beginning.  We filed a motion to

12    enforce the stay and said we were going down the pathway of

13    there trying to be control over these subsidiaries where we

14    have stock that is an asset of the estate and we also have

15    obligations.

16          THE COURT:  What are the assets?  That's something

17    I've been struggling to figure out.

18          MR. ZAHRALDDIN:  Well, Your Honor, it's -- I have --

19    I ran through it last night just to give myself some

20    perspective on whether I was completely displaced in time and

21    space or whether it was actually just the circumstances of this

22    case.  You look through any cash management motion, any DIP

23    motion, you can pull up 50 to 100 different references to money

24    flowing through non-debtor subsidiaries, non-debtor foreign

25    subsidiaries.  This is not an uncommon structure.  And

1  particularly with a tech company, this is not an uncommon

2  structure to have a tax group over in Europe.

3        But what's important is that the licenses that are

4  involved here and the trade secrets, even though they're in

5  different subsidiaries, there are still obligations of the

6  debtor that have to be adhered to.  If you have trade secrets

7  and they're sitting in the subsidiary in the Netherlands, they

8  have to protect those trade secrets.  The only reason --

9        THE COURT:  They who?  Who has to protect the trade

10 secrets?

11       MR. ZAHRALDDIN:  The, well, number one, it would be

12 the folks in the subsidiary that are managing it.  A gentleman

13 like Mr. Patrick Thune, Mr. Bart Barenthol (phonetic), those

14 folks who are in the Netherlands.  And then now if Mr. Stastney

15 has been appointed as an interim director, there is a similar

16 obligation to protect those trade secrets and to adhere to the

17 licenses, the two things that are probably, I would say top

18 three that are probably most important to a tech company is the

19 protection of the trade secrets because they do not stay trade

20 secrets unless they are protected and kept secret, and number

21 two, adherence to the license as the licensor believes it is,

22 not some other interpretation --

23       THE COURT:  Well --

24       MR. ZAHRALDDIN:  -- which I believe we heard last

25 Friday during testimony.

Case 23-10763-amc   Doc 823-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-18-23   Page 29 of 275

29

```
1              THE COURT:  All right.  Well, what I'm trying to

2    figure out, and I will be perfectly honest.  I kept trying to

3    figure out who owns these license?  Are they property?  Because

4    the first time I ever saw the license was just -- I was

5    surprised.  I didn't see them in the numerous days of

6    litigation with the motions.  All I heard was license this,

7    license that.  Well, I still haven't figured out who owns the -

8    - at least, I'm confused as to who actually owns these

9    licenses.  Debtor says they own them.  Somebody else says they

10   own them.

11             MR. ZAHRALDDIN:  Well, the debtor owns, as of today

12   during the bankruptcy, no 225 action or any other, the debtor

13   owns those.  The debtor is Technovative.  The debtor owns

14   everything.  And that's why we -- we haven't had our breathing

15   spell, Your Honor, because it's been extended --

16             THE COURT:  Wait a minute.  So when I look at -- and

17   I briefly looked at the licenses and the -- well, I looked at

18   the Phillips license.  I'm a little confused.  I mean, there's

19   patents.  I heard references to patents.  I still don't' know

20   who owns this stuff.

21             MR. ZAHRALDDIN:  The license is licensed out by

22   Phillips.  We also had new information that came in that

23   Phillips is making no more licenses.

24             THE COURT:  I get all that, but that still --

25             MR. ZAHRALDDIN:  Yeah.
```

Case 23-10763-amc   Doc 842-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript   Page 30 of 275

30

1          THE COURT:  -- doesn't answer the question for me.

2          MR. ZAHRALDDIN:  Well, the license itself says that

3    it's owned by the subsidiary and it's -- and the use of it is

4    all of its affiliates, of which Stream TV and Technovative are

5    affiliates.  It was written that way so that this subsidiary

6    structure, this tax group, some of which had R&D, most of the

7    production capability is here in the United States with Stream,

8    but that way it all worked out and it was done for business

9    purposes.  There were tax reasons at one point which have no

10   become obsolete, but that's the way the business was set up.

11   And it does clearly say that affiliates are there.

12          But the trade secrets are on loan.  They are being

13   used by the R&D.  They are owned by Stream.  And that's why

14   Stream has to protect them.  They have to make sure they're not

15   exposed to other people, whether it's through another business

16   model or whether it's just through negligence or inadvertence,

17   but right now, what we have heard is that it's through a

18   business model, one which is unacceptable and contrary to the

19   license itself, the license, which is irreplaceable and also

20   will lead to irreparable harm if it's damaged.

21          THE COURT:  Okay.

22          MR. ZAHRALDDIN:  And, Your Honor, look, we know that

23   you were ill.  Mr. Rajan was ill.  It's not as if we didn't say

24   this is happening.  We had a quite protracted and long and

25   lengthy trial over the motions that were filed.  And I wish we

Case 23-10763-amc   Doc 847-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23 Page 31 of 275

31

1  didn't have to do any of those because they did take away money

2  from the estate, but the debtor has to defend itself.  And if

3  there are gating issues that cost the estate something, then we

4  have to defend ourselves.

5          THE COURT:  Okay.

6          MR. ZAHRALDDIN:  And we have put up -- and I will let

7  Mr. Kodosky explain where he's going to go with the evidence,

8  but I had to rise and tell you that aside from finding out

9  there are not going to be any more licenses, aside from finding

10 out who the license, the only other license went to or the

11 portfolio went to, which were key pieces of information that

12 came in, Mr. Stastney was made an interim director.  And he

13 said he's going to be -- and if you read the protocol -- he's

14 going to be vetoing any R&D work that we need done.  He's going

15 to continue to hold on to assets that the subsidiary said that

16 they're refusing to give to us until you rule because of what

17 happened in the Amsterdam court.  And most troubling, Your

18 Honor --

19         THE COURT:  Wait a minute.  Wait a minute.

20         MR. ZAHRALDDIN:  Okay.  Sure.

21         THE COURT:  Wait a minute.  I'm a little -- I mean,

22 there's so many layers to what you're saying.  You know, you're

23 saying that Mr. -- and I don't -- and this is colloquy because

24 --

25         MR. ZAHRALDDIN:  I understand, Your Honor.

Case 23-10763-amc    Doc 847-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-24 Hearing Transcript    Page 32 of 275

32

1          THE COURT:  -- that Mr. Stastney is going to veto any

2     research that's related to Stream, correct?

3          MR. ZAHRALDDIN:  Yes.  And that was what was

4     happening with the prior independent director.  And Mr.

5     Stastney has indicated that he's a competitor and let the best

6     company win.  That's his position.  And that's who is our

7     interim director now looking over our trade secrets and

8     managing our --

9          THE COURT:  So I'm a little confused.

10          MR. ZAHRALDDIN:  Okay.

11          THE COURT:  The Dutch court, the court in the

12     Netherlands, has appointed Mr. Stastney and presumably he has

13     some independent obligations.  He has all these other things

14     that he has to adhere to because he's supposed to be -- I'm

15     sure the Court is expecting him to be a neutral party.

16          MR. ZAHRALDDIN:  I don't --

17          THE COURT:  They appointed him.

18          MR. ZAHRALDDIN:  I'll tell you why.  I'll tell you

19     why in a second, please.

20          THE COURT:  Well, I don't -- I mean, I'm trying --

21     there's, again, these conflicts between, you know, I'm assuming

22     Mr. Stastney has rules and regulations that are guiding his

23     position as the independent director.

24          MR. ZAHRALDDIN:  He does.

25          THE COURT:  For whatever reason that court decided he

1  was independent has nothing to do with me.

2          MR. ZAHRALDDIN:  He's not independent, Your Honor.

3  He's the interim director until such time as a court -- also

4  including you -- gives an indication of where we should go on

5  this.

6          THE COURT:  So somehow I'm supposed to tell SeeCubic

7  B.V. over there in the Netherlands how they're supposed to

8  proceed?

9          MR. ZAHRALDDIN:  They are waiting to see if the

10 automatic stay will be enforced.  And the automatic stay,

11 according to Congress, is extraterritorial.  It is not -- Your

12 Honor, it does not say -- it says in any other court, so it is

13 clear to us that you do have that power.  And again, the stay

14 is extraterritorial and we've been asking for enforcement of

15 it, which was put into abeyance, and now it's come to a head.

16 This is a very crucial point.

17         THE COURT:  Wait a minute.  And there's been so many

18 filings in this Court.  You're telling me that you actually

19 filed -- and I'm not saying you didn't because the focus has

20 been on the motion to dismiss, the motion for a trustee, the

21 motion to convert.  All of those things have been to the

22 forefront of this matter and whether the parties get to go back

23 to the chancery court and all of those other issues.  I don't

24 recall -- and maybe you did, maybe you didn't -- addressing the

25 issue of imposing the stay on the subsidiary.

```
 1              MR. ZAHRALDDIN:  Yes, ma'am.  It was a motion to ask

 2    for a -- you usually get it as a comfort order so you can give

 3    it to a foreign court.  And we did say that it was an emergency

 4    motion to enforce the stay.  Mr. Maza (phonetic), you know,

 5    directly told you that nothing was happening, that there's no

 6    reason for this, that they were never going to move on the

 7    assets in the subsidiaries.  And here we sit today and Mr.

 8    Stastney is now the interim director.

 9              THE COURT:  But again, I get that Mr. Stastney may be

10    the interim -- I'm going to call him independent because that's

11    what he's supposed to be.

12              MR. ZAHRALDDIN:  That's not what the order says, Your

13    Honor.  It says interim.

14              THE COURT:  Well, I haven't seen the order.  I mean,

15    I don't know.  I mean, that's the whole point.  There's no

16    transcript.  There's none of the -- what am I supposed to do?

17    Just sort of --

18              MR. ZAHRALDDIN:  Oh, I think we may have.  I'll have

19    to double check.

20              THE COURT:  Well, I understood from --

21              MR. ZAHRALDDIN:  We can introduce the order from

22    Amsterdam, Your Honor.

23              THE COURT:  Okay.

24              MR. ZAHRALDDIN:  And it's got the protocols attached

25    to it.  And they give wide latitude, which is what concerns us.
```

1    THE COURT:  Okay.  But why aren't you in Dutch court

2  telling them you need to reign Mister -- make sure that Mr.

3  Stastney complies?

4    MR. ZAHRALDDIN:  Because they're looking to the

5  United States to give them guidance, Your Honor.

6    THE COURT:  Oh, so they're looking to me for

7  guidance?  Oh, okay.

8    MR. ZAHRALDDIN:  Yes, ma'am.

9    THE COURT:  All right.  All right.  And again, I

10  understood there was no transcript of what occurred at that

11  hearing.

12    MR. ZAHRALDDIN:  There's no transcript of the

13  hearing, but there is the order afterwards and there are the

14  reference to the protocols and the protocols were also put into

15  evidence, if I'm not mistaken.

16    THE COURT:  Okay.  Hold on.  Do we know what exhibit

17  number that is?

18    UNIDENTIFIED SPEAKER:  24.

19    MR. ZAHRALDDIN:  24.

20    UNIDENTIFIED SPEAKER:  3 and 4.

21    THE COURT:  Okay.  But right.

22    UNIDENTIFIED SPEAKER:  I see 3 and 4.  They were

23  introduced last time.

24    THE COURT:  So we're going kind of afore right now.

25  You know, we're talking.  This is more almost like closing

Case 23-10763-amc   Doc 843-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-18-23   Page 36 of 275

36

1   arguments.  I don't want to go there.  I want to know for

2   today's purposes respond to the argument that this last minute

3   filing -- because that's what it was -- is somehow different

4   than what was originally before the Court and that this

5   basically is a new motion with new grounds because, again,

6   Counsel.  Maybe you can tell me because, again, I know what I

7   read, but as I always say, what I read and what people intend

8   or what -- may not be what is necessarily the --

9          MR. ZAHRALDDIN:  Your Honor, I apologize, but I

10  believe in looking through it, it is simply an amendment to the

11  original motion.  It is an amendment because we were able to

12  review the transcript from Mr. Stastney's testimony.  We also

13  were able to get more information from Phillips.  And most

14  alarmingly, we then were reviewing things and we found that

15  four -- was it four of our employees in the Netherlands?

16          UNIDENTIFIED SPEAKER:  Yeah.

17          MR. ZAHRALDDIN:  Four of our employees in the

18  Netherlands are now listed on the website for SeeCubic of

19  Delaware as part of their team -- four.  The head of

20  technology, head of finance.  Several people are now listed as

21  part of SeeCubic's team.  How is it that somehow our

22  subsidiaries employees and the head of technology is now

23  employed by and part of the team at SeeCubic of Delaware?  I

24  feel like Cassandra in a sense, Your Honor.  The sky is

25  falling.  It may have already fallen if these secrets get out.

```
 1   And that's our concern and that's the reason this is an

 2   emergency.

 3          THE COURT:  Well, I get that, but what I'm trying to

 4   figure out is that your -- a lot of what it's now Mr. Stastney

 5   has trade secrets and you want to stop him from using them.

 6   And we need a TRO.  I get the argument against Mr. Stastney.  I

 7   get the argument against SeeCubic Delaware.  I don't get it

 8   against these other people because I'm not quite sure how they

 9   relate.  But my concern is is this just an amendment or is this

10   new grounds?

11          MR. ZAHRALDDIN:  We --

12          THE COURT:  Of course, their position is new grounds.

13   Again, I looked at the original, sort of said, okay.  You know,

14   what is -- how does that relate?  And I'm asking you to tell me

15   because now we have, you know, a lot of what may, in fact, be

16   closing arguments that you've now put into this supplemental.

17   I'm not quite sure how -- I mean, I guess part of it is I'm

18   trying to make sure that when we do this evidentiary record

19   that it remains within some framework.  And is that what you

20   filed on Saturday within that framework or is something

21   different?  You're saying it's not different.  We just

22   expanded.  They're saying, no, this is different because at no

23   time did you reference Mr. Stastney.  I don't know what you

24   said about Stastney without -- again, we were trying to do as

25   deep a dive as we could within the time period that we had.
```

1          MR. ZAHRALDDIN:  Your Honor, it boils down to this.

2    Mr. Stastney and Hawk and SLS and SeeCubic and Mr. Stastney are

3    all related.  They have contracts which tie them together as

4    secured creditors.  They have not denied that.  They have filed

5    essentially duplicative proofs of claim with one exception and

6    being SeeCubic is now saying that Stream TV owes them $37

7    million because they've been paying for this subsidiary, which

8    again argues for the fact that why are we going to be paying

9    $37 million of estate money if this isn't our subsidiary?  I

10   mean, the whole thing has such a circular argument to it.  But

11   it can all be boiled down to this.  They took our company.

12   They then held it.

13          THE COURT:  They who?

14          MR. ZAHRALDDIN:  Well, it was Hawk who was part of

15   the omnibus agreement, Alister Crawford, SLS, and then Mr.

16   Stastney may have not been in his personal capacity, but he

17   certainly received -- he received remuneration out of that

18   contract as well as being the CEO of SeeCubic and a former CFO

19   and vice-chair of the board of Stream.

20          So they all put together this omnibus agreement.

21   They took over the company.  They took positions in this new

22   company, SeeCubic of Delaware, which by the way, we have the

23   trademark on SeeCubic because of the issues of SeeCubic of the

24   Netherlands having had it first and I think we're also

25   registered otherwise.  But let's get to that by --

Case 23-10763-amc    Doc 823-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 39 of 275

39

```
 1              THE COURT:  Who's we?  We who?

 2              MR. ZAHRALDDIN:  Stream.

 3              THE COURT:  Stream has -- who has the trademark for

 4  the name?

 5              MR. ZAHRALDDIN:  Stream owns the name, SeeCubic, we

 6  believe, and we're in the middle of trying to run that down

 7  too.  But the fac tis they took the company and then they

 8  didn't give it back to us and certainly not in one piece.  And

 9  so all of this is a product of them not returning everything.

10  They've had novel arguments which have been pushed aside about

11  how they improved the technology.  In other words, they seem to

12  think that they have already won all these things.  We have

13  heard that from them before.

14              They're treating this -- and that's the problem and

15  that's the focus of the lender liability.  They're treating it

16  as if they already have the debtor.  And they're going every

17  which way they can.  They're utilizing self-help.  They're

18  going behind everyone's back here by going to the Netherlands

19  and getting the subsidiary.  This is what they've been doing

20  since the very beginning.  And only the Stellar (phonetic)

21  Supreme Court was able to say guys, you didn't do this the

22  right way.  And they vacated the prior orders.

23              THE COURT:  I get that, but how does that in any way

24  help me with -- I get everybody wants to argue their closing

25  arguments.
```

1          MR. ZAHRALDDIN:  I know, Your Honor.

2          THE COURT:  I get it.  That is not going to move the

3    dime one bit for me.  What I need to figure out is in

4    connection with today's hearing, what kind of evidence I will

5    allow or should be introduced into the record to allow this

6    court to decide whether a TRO is appropriate.  What I have

7    heard from the opposing parties is that what they were prepared

8    to defend is different than what was in the amendment.  And

9    therefore, I should do one of two things.  I should either

10   limit the evidence to support the specific claims that were in

11   the original not amended TRO or if I allow evidence on the

12   amended TRO that I keep the record open so that they are

13   allowed to defend against what they are asserting are new

14   claims.

15          So tell me how these in your calling supplemental,

16   but referring to it as amended.  This is supplemental brief,

17   but how does that relate to the original motion that would have

18   put the parties on notice?  Because they have to be placed on

19   notice as to what it is the claims are and what they are

20   expected to respond to.  How?  I have to do one of two things.

21   I either have to say, no, a supplement is a supplement.  It

22   wasn't what you originally moved on.  I'm not hearing it.  Or

23   it's an amendment that is inclusive or expansion of what you

24   originally pled, and therefore, the other parties get an

25   opportunity to defend.  Tell me which one.  You believe it's an

1   amendment.  Why is it an amendment as opposed to a new basis

2   for the relief being sought?

3           MR. ZAHRALDDIN:  Well, Your Honor, the adversary,

4   underlying adversary complaint is pretty all-encompassing

5   because lender liability is pretty all-encompassing.  It can be

6   tortious, it can be contractual, et cetera.  But at the end of

7   the day, the question, the reason that the lender liability

8   cases were put into place is because there is a question or

9   some confusions, Your Honor, as to Mr. Stastney, his duty,

10  whether he's independent, whether he is just an interim, what

11  controls him.  And those were brought up.

12          We introduced the protocol as well as the order on

13  Friday.  And it appeared that there is some confusion as to

14  what or how he's going to handle this.  We do not believe there

15  is any way, shape, or form that he is going to be unbiased.  He

16  has a company which is trying to use the same technology as us.

17  Whether he uses that technology or whether he stops us from

18  using the technology, it's the same thing.  He's the definition

19  of biased when it comes to that.

20          THE COURT:  Well --

21          MR. ZAHRALDDIN:  And I don't believe that anything

22  that we're going to be introducing, a lot of that will go to

23  that issue, to explain and clarify that issue.  Secondly, we do

24  have some cases in there, Your Honor, that are directly on

25  point from the Western District and I believe the Eastern

1    District.

2            THE COURT:  Well, let's back up.

3            MR. ZAHRALDDIN:  Yes.

4            THE COURT:  This lender, what exactly a TRO is going

5    to do with a lender liability?  I'm going to issue a TRO saying

6    what?

7            MR. ZAHRALDDIN:  No.  No.

8            THE COURT:  Because lender -- I'm not understanding

9    that.

10           MR. ZAHRALDDIN:  Your Honor, when there's dominion

11   and control over a lender or a lender's business, right, then

12   there is a heightened standard -- it's a fiduciary standard

13   that's put into place.

14           THE COURT:  Okay.

15           MR. ZAHRALDDIN:  It doesn't eliminate the regular

16   standard that you just -- you know, you can't commit torts and

17   breach contracts.  But if you're going to be a lender and start

18   exercising that kind of control, then there has to be a higher

19   fiduciary standard because you are there to make sure that you

20   don't get benefitted from the technology in this case, but that

21   the debtor and its creditors, all the other unsecureds, are not

22   impeded, so.

23           THE COURT:  So what would you envision a TRO saying

24   with respect to the lenders?

25           MR. ZAHRALDDIN:  I would envision, as we put in our

1    revised order, Your Honor, that we would ask for a separate

2    independent director be put into place perhaps --

3            THE COURT:  That I would appoint?

4            MR. ZAHRALDDIN:  Perhaps like Judge Carey or someone

5    else and let them -- someone who's a judge here who we know the

6    parties will respect and allow them --

7            THE COURT:  So you don't respect the court in the

8    Netherlands?

9            MR. ZAHRALDDIN:  Well, no, Your Honor.

10           THE COURT:  I don't see --

11           MR. ZAHRALDDIN:  The Court in the Netherlands has a

12   limited scope as to what they wish to do and they have

13   indicated they're waiting for the U.S. court.  So no disrespect

14   to the court in the Netherlands, but that's what they have

15   basically said.  They've done it the last two times and they

16   were hopeful that there would be some sort of resolution, but I

17   don't believe -- they've been looking for guidance from the

18   Court here.

19           THE COURT:  Okay.  And you believe that I need to --

20   because Mr. Stastney is now in charge, he's biased, for lack of

21   a better word, and that this court needs to do something to

22   protect the assets of the debtors because you believe Mr.

23   Stastney and SeeCubic Delaware because he is, from my

24   understanding, and my recollection of some of these facts are

25   -- you know, it's been some time, I mean, even from the hearing

Case 23-10763-amc   Doc 843-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript   Page 44 of 275

44

1   on the 6th I have some dates a little confused -- that he does.

2   He has some role.  I can't recall what it is, but he has some

3   role in SeeCubic Delaware.

4           MR. ZAHRALDDIN:  He's the CEO, Your Honor.

5           THE COURT:  Okay.

6           MR. ZAHRALDDIN:  Unless I'm mistaken.

7           THE COURT:  That he does have some position and that

8   SeeCubic Delaware is adverse to the debtor, for lack of a

9   better word.  And if I recall, SeeCubic Delaware, is that a

10  combination of Hawk and SLS or it's some --

11          MR. ZAHRALDDIN:  Well, they have interests in there,

12  Your Honor, and that's one of the things we need some discovery

13  on, but SeeCubic of --

14          THE COURT:  Well, that has nothing to do with this

15  TRO.

16          MR. ZAHRALDDIN:  Right.  Right.  But SeeCubic --

17  well, we're just not sure from the proofs of claim and from

18  what we've seen.  But SeeCubic of Delaware only existed to take

19  the assets of Stream after the -- it didn't exist beforehand.

20          THE COURT:  I know.  It was formed --

21          MR. ZAHRALDDIN:  Yeah.

22          THE COURT:  -- after the omnibus and then, you know,

23  if I recall from Mr. Stastney's testimony on the 6th, that

24  they're not doing certain things.  They're only doing this.  I

25  can't recall off the top of my head, but they're not selling

1   anything.  They're kind of just I guess working with SeeCubic

2   in B.V., in the Netherlands.  But what I -- for my purposes, I

3   need to figure out exactly what it is.  I get you want a TRO.

4            MR. ZAHRALDDIN:  Uh-huh.

5            THE COURT:  But what the basis for that is, whether

6   those basis have been pled properly and the parties have been

7   given notice and an opportunity to defend, and whether you meet

8   -- you know, I've already said I've looked at the cases.  I

9   know what, you know, at least what I believe is the appropriate

10  stand, and then what really, really, really is the most

11  typically the driving force is, you know, harm.  I mean, that's

12  what a TRO is supposed to do.  It's supposed to sort of put a

13  standstill so that the status quo remains and that the party

14  who is allegedly doing certain action may cause irreparable

15  harm.  That's what this is all about.

16           MR. ZAHRALDDIN:  Yes, Your Honor.

17           THE COURT:  And instead, what I'm getting is, you

18  know, this person did this.  This person said that.  And, you

19  know, this person's a bad person.  This person has bad motives.

20  Let's keep that all outside.

21           MR. ZAHRALDDIN:  Your Honor, that's not what I'm

22  trying to do.  We --

23           THE COURT:  I'm not --

24           MR. ZAHRALDDIN:  Yeah.

25           THE COURT:  I'm simply saying because you started off

1  with that I'm not going to impugn, disparage, whatever the word

2  is that you used, and when somebody starts off with that,

3  they're about to do exactly what they said they're not going

4  to --

5        MR. ZAHRALDDIN:  But I actually -- but I actually

6  kept my word.

7        THE COURT:  You kept --

8        MR. ZAHRALDDIN:  I kept my word.

9        THE COURT:  Yes, you did with respect to the

10  attorneys anyway.

11        MR. ZAHRALDDIN:  Yeah.

12        THE COURT:  Not with respect to Mr. Stastney.

13        MR. ZAHRALDDIN:  Oh, no, no.  Mr. Stastney is running

14  his business trying to pursue his commercial interest.  The

15  issue is that's in conflict with paying off the creditors in

16  this case and the debtors.  And we're in a bankruptcy and

17  that's all I'm asking.

18        THE COURT:  And so what I am trying to -- and I'd

19  hoped the parties had focused on without all of this extraneous

20  he said, she said, they're bad, they're good, all of this.

21  There is clearly animosity between not the attorneys -- and,

22  you know, sometimes attorneys take things too personal and I

23  try to impose that they need to step back because, you know,

24  sometimes they get righteous indignation that, you know, the

25  other party is just terrible.  And everybody sort of comes to

```
 1   the table and I hope people become a little dispassionate and

 2   say, okay, what are the real issues here?

 3          I get the clients are going to be added.  That's just

 4   because otherwise we wouldn't be here.  They would have worked

 5   something out and we'd have a resolution.  That does not exist.

 6   So what I had said, and I said from the very beginning, keep

 7   this -- keep your personal feelings out, attorneys.  Bring to

 8   the Court the issues.  Let me see them in an orderly fashion.

 9   Do them appropriately and properly.  And I will do my best to

10   make what I think is the appropriate decision.

11          Now, people might not agree, but I'm going to do my

12   best to make sure my decision is well reasoned and based on the

13   law.  I try very much to be dispassionate, but I know you guys

14   have seen me when I was angry, that I was a bit not

15   dispassionate.  But, again, back to the germane issue here is

16   what exactly is it that you have put before the Court as the

17   basis for the relief that you're seeking and what you filed on

18   Saturday, did it go beyond that?  Is it something new?  And if

19   it's something new, I'm clearly not going to allow testimony or

20   evidence with respect to that, or is it an expansion because

21   people often file motions and they're bare bone, and you say

22   this is just the meat that were putting on the bones.  Is that

23   what this is or is this, you know, something different?  And

24   what I'm hearing from opposing parties is it's different.  It's

25   not meat on the bones.
```

1          MR. ZAHRALDDIN:  For example, Your Honor, counsel for

2    Mr. Stastney stood up and was asking why is this employment

3    agreement that they believe has a release in it, why is it

4    appropriate.  Well, it is appropriate because while it does

5    release certain things, and while there is a limitation on the

6    noncompete, and while there may be some arguments that that

7    should be extended because he was certainly competing during

8    the time he held the company, aside from that, there is a

9    requirement to keep confidential all the -- and that survives

10   out there infinitum.

11         THE COURT:  I get that point, but that's not the --

12   it's -- more focused point is was that the basis for your

13   request for relief, and are you now asserting a different basis

14   or are you just adding me to the original?

15         MR. ZAHRALDDIN:  We're adding meet to the original

16   concern about who's going to be, and I think -- I've read the

17   transcript -- who's going to be in the henhouse watching eggs

18   and the hens, right, and what motivations do they have.  Or

19   quite honestly, what restrictions do they have as it seems to

20   me Mr. Stastney's lawyer argued that he doesn't have any --

21   they're all gone, right?  So we just wanted to make sure that

22   it was before the Court that there are some things out there,

23   and we're trying to get to a solution.  That's one of the

24   reasons that we asked for perhaps there being appointed an

25   independent director here, which can be done because --

Case 23-10763-amc    Doc 843-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 49 of 275

49

```
 1              THE COURT:  Well, wait, is that in the TRO or is this

 2   something you're now bringing?

 3              MR. ZAHRALDDIN:  It's in the revised order that we

 4   put in, Your Honor, yes.

 5              THE COURT:  Okay, which I clearly did not look at

 6   because again, we're just trying to wade through the --

 7              MR. ZAHRALDDIN:  I understand, Your Honor.

 8              THE COURT:  -- thousands of pages.

 9              MR. ZAHRALDDIN:  We also wanted to make sure that

10   since you -- that you had the benefit of some of the research

11   that we had found, particularly dealing with trade secrets and

12   the ones that were here.

13              THE COURT:  I get that, Counsel, but I'm trying to

14   figure out where the original motion the issue was trade

15   secrets.  I may have missed it.  Again, I've read so many

16   different pleadings.

17              MR. ZAHRALDDIN:  Well, Your Honor, it's in the

18   original motion.

19              THE COURT:  Okay.  So if it's in the original motion

20   that you are alleging that they would were using trade secrets

21   -- and I think I may recall that, but I don't think --

22              MR. ZAHRALDDIN:  They're taking the trade secrets,

23   Your Honor, and showing them to customers -- not our customers

24   -- allegedly SeeCubic of the Netherlands' customers.  But then

25   we find a website where SeeCubic of Netherlands and Delaware
```

Case 23-10763-amc    Doc 847-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-18-23    Page 50 of 275

50

1    seem to be the same entity or have the same team.  All of that

2    sells off a million alarm bells for us.

3            THE COURT:  Okay.  All right.  So you believe that

4    this evidence that you want to bring in with respect to the

5    trade secrets, it was something that you had alleged in the

6    motion and that you want to submit in support of that.

7            MR. ZAHRALDDIN:  Yes, ma'am.

8            THE COURT:  And what I'm hearing from opposing party

9    is -- well, you didn't mention specifically Mr. Stastney's I

10   guess, agreements, settlement agreements.  That's all new, and

11   therefore because you didn't put it in the original motion, it

12   shouldn't be allowed to come in now.

13           MR. ZAHRALDDIN:  That is their argument.  Our

14   argument would be that it does go towards how Mr. Stastney is

15   going to act here, what rules are going to be governed, and

16   whether he is going to follow them or whether he's going to

17   continue to pursue his own business interests.

18           And again, if he's pursuing his own business

19   interests in a vacuum, there's nothing illegal or in tort about

20   that.  But if he's being put in the position as an interim

21   director of the debtor's asset, we have serious concerns about

22   that, particularly since he said he's out there marketing.  If

23   you go to the marketing materials and what they do there --

24           THE COURT:  Which I would never do but go ahead.

25           MR. ZAHRALDDIN:  Oh, no, but they're in evidence.  We

1   have private placement memorandum that we put into evidence.

2          THE COURT:  Well, I saw the -- but that was pretty,

3   if I recall Mr. Stastney's testimony, that that was an old

4   private placement, and he wasn't using that anymore.

5          MR. ZAHRALDDIN:  Well, there was another one that was

6   dated starting October the 1st that we put into evidence, Your

7   Honor.  So --

8          THE COURT:  Okay.

9          MR. ZAHRALDDIN:  -- those, of course, it's been

10  consistent over the entire time and also right now.

11         THE COURT:  Okay.  So --

12         MR. ZAHRALDDIN:  It was beginning October 1.

13         THE COURT:  So this is where we are.  A hearing that

14  was supposed to start at 10 -- it's almost 12:00.  And I to

15  figure out before everybody rises where I'm at is I have to

16  figure out whether I'm going to allow evidence, which was the

17  Debtor saying it's just meat on the bones, and the opponents

18  are saying, no, this is something new -- this was not what you

19  pled in your original motion.  It wasn't what was contemplated,

20  and it wasn't what the parties were prepared to defend against,

21  which means I have to figure that out first.

22         MR. ZAHRALDDIN:  And Your Honor, I will say that had

23  the district court not put this up on the docket when we --

24         THE COURT:  Put what up on a docket?

25         MR. ZAHRALDDIN:  -- filed up there.  We filed it

Case 23-10763-amc   Doc 842-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 52 of 275

52

1   there because we weren't sure if this was -- if it related to

2   normal proceedings going forward.  So the district court said,

3   no, send it back down.  You have to hear it in front of Judge

4   Coleman, so we refiled it in front of you.

5            THE COURT:  Well --

6            MR. ZAHRALDDIN:  But --

7            THE COURT:  -- I have a different view as to where it

8   should have been filed originally, but it is what it is.

9            MR. ZAHRALDDIN:  Your Honor, that's what we were told

10  to do.  So with a TRO, as Your Honor knows, they are ex parte

11  sometimes.  And in a --

12           THE COURT:  Oh, I know, but you didn't ask for ex

13  parte relief.

14           MR. ZAHRALDDIN:  Well, we didn't get a chance to

15  because we filed it in the district court and --

16           THE COURT:  Did you ask for ex parte relief there?

17           MR. ZAHRALDDIN:  We spoke to the clerk's office about

18  that, yes, Your Honor.  I think --

19           THE COURT:  Which clerk?  Not my clerk.

20           MR. ZAHRALDDIN:  Not your clerk -- not your clerk.

21           THE COURT:  No, no.

22           MR. ZAHRALDDIN:  No, not your clerk.

23           THE COURT:  Yeah, I know, I heard.  I knew -- I mean,

24  I didn't see --

25           MR. ZAHRALDDIN:  Yeah.

1              THE COURT:  -- the filing, but I heard all about it

2    because -- I heard about it.  And I was not surprised to see

3    that it was coming, you know, I'm, like, I'm not involved, but

4    I knew it was coming --

5              MR. ZAHRALDDIN:  Yeah.

6              THE COURT:  -- because it is what it is.  It's -- it

7    is what it is.  I don't know what the Court's going to do with

8    the reference to the extent the matters involved court

9    proceedings.  You know, typically in my experience, district

10   court is not withdrawing the reference.

11             MR. ZAHRALDDIN:  Right.

12             THE COURT:  They just don't.  And this court, with

13   respect to non-core matters, functions almost like a

14   magistrate.

15             MR. ZAHRALDDIN:  Exactly.  Exactly, Your Honor.

16             THE COURT:  We make report and recommendation and

17   then, here you go.

18             MR. ZAHRALDDIN:  Right and exactly.

19             THE COURT:  You do whatever you want with it.

20             MR. ZAHRALDDIN:  And if there's a jury trial, because

21   if I'm not mistaken, you guys haven't been trained in doing

22   jury trials, and so that goes up.

23             THE COURT:  That doesn't mean anything.  We've had

24   jury trials here.

25             MR. ZAHRALDDIN:  Okay, well, that's fine.

Case 23-10763-amc    Doc 827-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 54 of 275

54

```
1              THE COURT:  Let me just say --

2              MR. ZAHRALDDIN:  Yeah.

3              THE COURT:  Not that I want a jury trial, not that

4    I'm telling anybody to ask me to do a jury trial.  If I have

5    to, I'll figure it out.

6              MR. ZAHRALDDIN:  Right.

7              THE COURT:  But typically, core matters remain here.

8              MR. ZAHRALDDIN:  Right.

9              THE COURT:  I decide them.  I, as the bankruptcy

10   court.  And then, so what I'm saying is that while all this is

11   in a motion to withdraw the reference, until the reference is

12   withdrawn, we're going forward.

13             MR. ZAHRALDDIN:  Right.

14             THE COURT:  So --

15             MR. ZAHRALDDIN:  And Your Honor, I understand that.

16   I wasn't forum shopping when we suggested go up there.  We

17   needed to sort out the core and non-core issues, and that's the

18   way you do it.

19             THE COURT:  Right.  And if it's core, non-core, and

20   it's a combo, typically the court will say, Judge, you rule on

21   what you can and give me a report and recommendation, and I'll

22   figure it out.  And I love when I give report and

23   recommendations because then I'm done.  I'm done, and it's

24   gone.

25             But this is a little more complicated than my typical
```

Case 23-10763-amc    Doc 823-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-18-23    Page 55 of 275

55

1    I'm withdrawing the reference because somebody's brought a

2    matter that, for instance, it's a fraudulent transfer claim

3    under the state law is not necessarily a core matter, and you

4    may have a preference which is a core matter, and you have all

5    those different things, and I'll take it, or they'll tell me to

6    basically function as a magistrate, send it to me, and I'll

7    figure it out.

8            MR. ZAHRALDDIN:  Right.

9            THE COURT:  So but that -- we're going a little

10    astray.  What I need to figure out is what am I allowing today,

11    and I've seen counsel for Mr. Stastney stand up a couple of

12    times.

13            And you want to respond briefly when he's done?

14            MR. ZAHRALDDIN:  I concede.  I concede.

15            THE COURT:  All right.  Yes, Counsel?

16            UNIDENTIFIED SPEAKER:  No --

17            THE COURT:  No, that's okay.

18            MS. VASSALO:  Just briefly, Your Honor.  While I

19    appreciate opposing counsel's representation that this is

20    merely meat on the bones, I would contend that this amendment

21    is a new matter because if it weren't a new matter, right, if

22    it were just meat on the bones, why is the first time that the

23    Court's seeing the employment agreement in the middle of the

24    night over the weekend?

25            Opposing counsel also said that the confidentiality

1  provision survives out there in infinitum, right?  This is the

2  concrete example of how we would've litigated this differently

3  had we known this is at issue.

4           THE COURT:  Okay.

5           MS. VASSALO:  I would have briefed this issue for

6  Your Honor.  What is the scope of that confidentiality

7  agreement?  When does it apply?  How far does it apply?  How

8  long does it apply?  These are all issues that we weren't aware

9  were even before the Court at this time until this weekend.

10 And now, we're on her heels trying to figure out we're going to

11 defend against these claims because the goalposts have shifted.

12           And so while I appreciate that they are making their

13 arguments, and I hear the Court's, you know, admonition to the

14 parties that none of this is personal -- none of it is

15 personal.  It's all about --

16           THE COURT:  Well, I'm not suggest -- Counsel --

17           MS. VASSALO:  Right.

18           THE COURT:  -- you only got here.

19           MS. VASSALO:  I did, and I would like to leave.  No,

20 I'm just kidding.  But --

21           THE COURT:  So I will say from my perspective, at

22 times, this was personal between the attorney -- personal not

23 for their clients, but personal for other reasons.  You know,

24 you play, you know, you're playing basketball, and guys play a

25 certain way on the court.  You know, their -- I don't want to

1  use the word, but I'm probably going to use it anyway.  Their

2  egos get involved and so they play the game a certain way.  But

3  when they're off the court, they're all fine.

4        But so that's what I'm saying.  Don't bring your egos

5  in here.  I'm the only one allowed to have an ego, and I try

6  not to even bring that in here because it doesn't do any good.

7  So --

8        MS. VASSALO:  And so all I am asking for, Your Honor,

9  is for an equal playing field in order to be able to advance

10  our clients' interests, right.  We all want to be able to brief

11  these issues to be able to argue our positions so that we're

12  able to fairly present the issues to the court so that you can

13  make a decision on the legal issues and on the merits.  I can't

14  make those arguments I don't have notice of them.

15        THE COURT:  Right.

16        MS. VASSALO:  And this is not meat on the bones.

17  It's an amendment that provides a new argument to the Court,

18  and I'll rest on that.  Thank you.

19        THE COURT:  Right.  And so that's again why I have to

20  figure out, one, if it's new, and if it is, I'm not hearing it.

21  Or if it's meat on the bones, which everybody gets to respond

22  to.

23        Mr. Zahralddin, I'll let you say one thing, and I

24  have to figure out what I'm going to do.

25        MR. ZAHRALDDIN:  Absolutely.

```
 1              THE COURT:  And that's it.  I think I've heard

 2   enough.  I've heard from everybody.

 3              MR. ZAHRALDDIN:  Absolutely.

 4              THE COURT:  And we'll --

 5              MR. ZAHRALDDIN:  So they're saying that there's Count

 6   IV of our -- sorry, Count V of our original motion is breach of

 7   contract.  So --

 8              THE COURT:  Breach of contract against you?

 9              MR. ZAHRALDDIN:  Well, Stastney.

10              UNIDENTIFIED SPEAKER:  That's the employment

11   agreement.

12              MR. ZAHRALDDIN:  Yes.

13              UNIDENTIFIED SPEAKER:  Of the complaint, Mister --

14              MR. ZAHRALDDIN:  Yes, of the complaint.

15              UNIDENTIFIED SPEAKER:  It --

16              MR. ZAHRALDDIN:  Sorry, my fault.

17              UNIDENTIFIED SPEAKER:  And lender liability's claim

18   19.

19              MR. ZAHRALDDIN:  And lender's liability claim 19.

20              THE COURT:  I get all that.  But in your motion, did

21   you say -- I think what their position is, when you filed your

22   motion for the TRO, what did you say you were going to assert

23   as the basis for the relief you were seeking?  Did you put them

24   on notice that you were going to say Mr. Stastney breached his

25   contract?  I get the trade secrets -- I've heard that.  But I
```

1   think that's what their position is, is that you never

2   identified that as the basis for the relief you were seeking.

3   And now you've added it, and they never had notice that that's

4   the basis on which you were proceeding.

5           MR. ZAHRALDDIN:  Your Honor, in the cases that we

6   originally cited and the cases afterwards, it is a fairly

7   common fact pattern that when someone is breaching trade

8   secrets, when they're misusing them, misappropriating them,

9   they were a former employee and had an employment contract,

10  which restricted them or provided convenance and then there's

11  convenience that survive going forward, plus the --

12          THE COURT:  But I'm not --

13          MR. ZAHRALDDIN:  -- statutory and common law.

14          THE COURT:  -- getting to the merits of who did what

15  or what employ -- what I am strictly trying to focus on is that

16  a get you said all these things in the complaint.  What I am

17  trying to figure out is when you came and asked for a TRO, the

18  basis for that.  You didn't -- did you say it's based on every

19  count we have in the complaint --

20          MR. ZAHRALDDIN:  Yes.

21          THE COURT:  -- or did you specifically limit it to --

22          MR. ZAHRALDDIN:  Yes, Your Honnor.

23          THE COURT:  -- so I have to go back and do those

24  things.

25          MR. ZAHRALDDIN:  Okay.

```
 1                THE COURT:  That's it.  So where I am right now is

 2    I'm going to have to go back.  So I don't know how much time

 3    you guys thought was going to be devoted to evidence today.

 4    How many witnesses are we supposed to have -- two?

 5                MR. ZAHRALDDIN:  We believe two, Your Honor, yes.

 6                THE COURT:  And then maybe your rebuttal from the

 7    Respondents, correct, Mr. Colby?

 8                MR. COLBY:  Potentially, Your Honor.

 9                THE COURT:  Right.  I know you said -- I said

10    perhaps --

11                MR. COLBY:  Part of that depends on the outcome of

12    your thinking..

13                THE COURT:  Well, you were going to have one -- even

14    if they had not filed supplement, amendment, whatever words you

15    want to use, I understood that you may call Mr. Stastney as a

16    rebuttal, putting in all this other stuff aside --

17                MR. COLBY:  Right.

18                THE COURT:  -- that he may have been a rebuttal

19    witness notwithstanding the issues for today.

20                MR. COLBY:  Right.  We might have, I think based upon

21    the record as it stood when we finished on Friday.  Frankly, I

22    didn't think it was going to be necessary because I felt that

23    the Debtors had, to that point, fallen well short of their

24    burden.  We have to see what happens after Mr. Rajan and Mr.

25    Robertson --
```

Case 23-10763-amc   Doc 847-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 61 of 275

61

 1          THE COURT:  Right.

 2          MR. COLBY:  -- testify to fully --

 3          THE COURT:  So what I'm going to do right now -- it's

 4  12:00, and as usual, I haven't eaten today, so I don't want to

 5  be hangry.  Mr. Caponi is smiling because he's been the

 6  recipient of that hangry.  My, you know.  So what we'll do is

 7  we'll come back.  I need to continue the -- I need to do a deep

 8  dive, not a surface now, saying, you know, pretty much what I'm

 9  going to do is, this is a motion, this is the supplement, and

10  figure out how we proceed.

11          MR. COLBY:  Yeah.

12          THE COURT:  If I find that I believe it's new, and I

13  don't know yet, we're not hearing any of that.  If it is, then

14  I figure out how to give the parties an opportunity to respond.

15          MR. COLBY:  Your Honor --

16          THE COURT:  Uh-huh.

17          MR. COLBY:  -- if I might, I think that the relief

18  that Mr. Zahralddin is requesting is instructive.  And I

19  believe Your Honor touched on this in some of your questions.

20  And that is, is -- and this is what I think we understood to be

21  the core issue up until Saturday.  Is a -- so Debtors came in

22  and said, the Netherlands court has appointed Mr. Stastney as

23  director of SCB.V..  We need a TRO to remedy what we say is

24  going to prevent what we say is going to be irreparable harm

25  that comes from that.

Case 23-10763-amc   Doc 823-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript   Page 62 of 275

62

1          So that's the question.  Have they been made a

2    record.  And they say the reason why is because they're going

3    to be issuing these sublicenses, which is going to cause

4    Phillips to cancel the license.  We spent all day on Friday on

5    sublicenses, okay?  Sublicenses are literally but a footnote in

6    the new filing.  It's only mentioned once in the new filing,

7    and it's in a footnote.  But the question is, does Mr.

8    Stastney's appointment require this Court to put injunctive

9    relief around what he or SeeCubic, Inc. can or can't do.

10          And the reason why we submit that that's completely

11   unnecessary, and it's already in the record, one, Mr. Stastney

12   testified, and there's been no evidence yet to the contrary --

13          THE COURT:  Yet.

14          MR. COLBY:  -- that there are no sublicenses that are

15   going to be eminently a given.  It's a potential in the future,

16   but right now --

17          THE COURT:  But he also testified about these

18   protocol --

19          MR. COLBY:  The proof of concept.

20          THE COURT:  Proof of concept --

21          MR. COLBY:  Correct.

22          THE COURT:  -- so okay.

23          MR. COLBY:  So very, very early development project.

24   Second, that's not harm to the Debtor because Mr. Stastney

25   testified that the contracts and the work are taking place

1   within SeeCubic B.V., and so any benefits of them will inure to

2   SeeCubic B.V. --

3         THE COURT:  Uh-huh.

4         MR.  COLBY:  -- and ultimately Stream or the Debtors,

5   depending upon the outcome of questions that aren't at issue on

6   the TRO --

7         THE COURT:  Right.

8         MR. COLBY:  -- right?

9         THE COURT:  Counsel, I would be -- I'm not sure how

10  the Netherlands court got to where they did, but I'm not quite

11  -- you know, these parties are all at loggerhead.

12        MR. COLBY:  Yes.

13        THE COURT:  And now one party, who is taking a

14  position that -- Mr. Stastney is in several roles.  And so I

15  don't know how that plays out.

16        MR. COLBY:  Well --

17        THE COURT:  I'm assuming he would do what he supposed

18  to do, but I don't know.

19        MR. COLBY:  Right.  And that brings me, I think, to

20  the third point and then probably a break is appropriate.  But

21  the third point is that the current relief sought is at -- so

22  there are multiple levels of constraints and controls around

23  what Mr. Stastney can do in that role.  First, subject to

24  fairly rigorous fiduciary duties under Dutch law; second,

25  subject to the protocol that was incorporated into the court's

Case 23-10763-amc   Doc 823-3   Filed 10/29/23   Entered 10/29/23 23:50:50   Desc
Exhibit Exhibit 10-17-23 Hearing Transcript 10-18-23   Page 64 of 275

64

1  order, which is in evidence, and we talked about it with Mr.

2  Stastney last Friday; third, subject to the Court's

3  supervision.  And the Court has heard all kinds of evidence and

4  applied to --

5          THE COURT:  To the Dutch court.

6          MR. COLBY:  Dutch court.  And the Court has heard all

7  kinds of evidence and arguments about what would be best for

8  SeeCubic B.V., the Dutch entity, and has concluded that at

9  least for now, subject to those various controls, Mr. Stastney

10  was the better option than the one put forth by Mr. Rajan,

11  which was Mr. Park.

12          THE COURT:  Uh-huh.

13          MR. COLBY:  And so what the request is here is to

14  issue a TRO that completely overrides that determination by the

15  Dutch court for Dutch entity under Dutch law.

16          THE COURT:  Is it --

17          MR. COLBY:  For example --

18          THE COURT:  -- is it overriding, or --

19          MR. COLBY:  Yes.

20          THE COURT:  -- is it saying, Mr. Stastney, we can't

21  trust you to exercise your fiduciary obligations and don't do

22  anything that is in violation of that.

23          MR. COLBY:  It --

24          THE COURT:  I don't know -- is unnecessary?

25          MR. COLBY:  It's an override.  It's not necessary

 1  because the -- we'll call it the do the right thing mandate --

 2  is both part of the Dutch order, part of the protocol, and

 3  subject to the ongoing supervision of the court.  What they're

 4  asking for here are things like, for example, enjoining the

 5  Defendants, which includes SeeCubic B.V., from directing or

 6  otherwise contacting employees of Stream or Stream's

 7  Netherlands subsidiaries, which includes SeeCubic B.V..

 8          THE COURT:  Okay.

 9          MR. COLBY:  How does that even work?

10          THE COURT:  I don't know.  But I did hear Mr.

11  Zahralddin say that there's a website, and I'm presuming I'll

12  get some evidence, where the companies are combined.

13          MR. COLBY:  We can deal with that --

14          THE COURT:  Oh, yeah, were going to deal with that.

15          MR. COLBY:  The website -- look --

16          THE COURT:  No, no, no, no.  We are going to deal

17  with that because that's --

18          MR. COLBY:  That's a 2021 website.

19          THE COURT:  -- a concern for me.

20          MR. COLBY:  It's not combining companies, Your Honor.

21          THE COURT:  I don't know what it is, Counsel, but

22  you're going to give me some evidence.

23          MR. COLBY:  That's fine.

24          THE COURT:  And so, Counsel, I already said I have to

25  go back and figure out.  Now, unless you're going to tell me

1   how this amendment is not in the original, I think I've heard

2   enough, and I --

3         MR. ZAHRALDDIN:  I just have one thing, Your Honor.

4   I promise you it will be short.

5         THE COURT:  Wait, wait, I'm going to let Mr. Colby --

6   you get one more thing, Mr. Colby.  That's it.  What is it --

7   okay.

8         MR. COLBY:  With respect to that, I won't address the

9   whole theory of the employment agreement because it's already

10  been addressed by Mr. Stastney's counsel, this whole theory of

11  lender liability.  I mean, that's really what Plaintiff's

12  Debtor say is the ultimate issue in the case.

13        THE COURT:  Well, you guys will go there -- I don't

14  go deal with that in the case.

15        MR. COLBY:  It doesn't appear anywhere in the initial

16  motion.  The question is simply should the relief that they've

17  requested, which are severe restrictions on SeeCubic, Inc. and

18  SeeCubic of The Netherlands, SeeCubic B.V., and Mr. Stastney,

19  in his position, subject to the court's jurisdiction, should

20  you overwrite what the Dutch court has done.

21        THE COURT:  Well, what I'm hearing is not override

22  that, that court is asking me to do something.  And I don't

23  know what they said, and if they are, that's a whole different

24  issue.  I don't know if they are or they aren't, or whether I

25  should or I shouldn't.

Case 23-10763-amc   Doc 823-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 67 of 275

67

 1          MR. COLBY:  All the court has said -- it doesn't

 2    relate at all to the issues on the TRO.  All the court has said

 3    is that this is an interim order, putting Mr. Stastney in that

 4    director seat until the issue -- the ultimate issue in the

 5    bankruptcy decided who owns the Technovative share.

 6          THE COURT:  Well, is that really going to be decided

 7    here?

 8          MR. COLBY:  Not on a TRO.

 9          THE COURT:  Well, not even on not a TRO.  I thought

10    that was going to go in the 225.  So is that the court they are

11    referring to?

12          MR. COLBY:  Yes.  It says -- no, it refers to the

13    bankruptcy court because it refers -- remember the issue in the

14    225 has to do with the ability to vote the shares.

15          THE COURT:  I know what it is and whether, right, but

16    what is this -- what is the Netherlands thinking I'm supposed

17    to do?

18          MR. COLBY:  It simply says that it is in -- Mr.

19    Stastney is appointed until the issue -- and I'll paraphrase,

20    but it's on page 14 of Exhibit --

21          THE COURT:  I have it, page 14.

22          MR. COLBY:  Okay, yeah, 5.21.

23          THE COURT:  Uh-huh, and B, Section B, that's Exhibit

24    G.  It says until the U.S. bankruptcy proceedings determine

25    that the shares in Technovative -- they spell a little

Case 23-10763-amc    Doc 843-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 68 of 275

68

1  different -- remained the property of Stream, the security

2  entries in --

3          MR. COLBY:  Right.

4          THE COURT:  -- those shares expire or until a judge

5  decides otherwise.  What's that supposed to mean?

6          MR. COLBY:  Right.

7          MR. ZAHRALDDIN:  It seems like it's a blank check,

8  Your Honor.  But it's --

9          THE COURT:  Well, no, it says until a judge.  What

10  Judge?  I don't know.  In reference to me all the shares remain

11  the property of Stream, which, like, I don't -- okay.

12          MR. ZAHRALDDIN:  And that's ultimately, really the

13  issue there, it is, you know, essentially the outcome of the

14  bankruptcy.  Can the secured lenders effectively, through the

15  bankruptcy process, foreclose my debt or not.  That's really, I

16  think, all that -- we submit all that that's saying.

17          THE COURT:  Well then, it says in 5.20, that means

18  until then, until a court -- what court -- decides otherwise,

19  Stastney will be appointed director of those entities to the

20  exclusion of Park and Rajan.  So is this court thinking that I

21  can order otherwise he will be appointed director?  That's what

22  it seems like.

23          MR. ZAHRALDDIN:  Yes, ma'am.

24          THE COURT:  Oh my.  Okay.  I mean, listen, guys, I

25  looked at this.  Did I go through it try to figure it out

1   because I figured I get to that, you know, go through the

2   evidence to make a rational decision.  I think I need to figure

3   out where we're going.  I think I've heard enough.

4            Mr. Zahralddin, you get one thing.

5            MR. ZAHRALDDIN:  Yeah.  I just wanted to point out

6   that Mr. Colby even crystallized this.  All of that is put into

7   place to protect the subsidiary, not to protect the entire

8   group, the Debtors and the Creditors.  So that's why we're

9   asking for this relief.

10           THE COURT:  Well, he says that anything that they do

11  inures to the benefit of the Debtor and the Creditor.  So

12  then --

13           MR. ZAHRALDDIN:  But it doesn't, Your Honor, when --

14           THE COURT:  All right.

15           MR. ZAHRALDDIN:  -- you'll see.  You'll see.

16           THE COURT:  Let me figure this threshold matter is

17  what I'm going to do with the supplement, whether the hearing

18  that -- the evidence I hear today goes towards what is the

19  Debtor's position is just what we said and just building our

20  case for a TRO, or what the Respondents are saying is huh-uh,

21  this is something new, and we're not prepared to defend.  This

22  is basically trial by ambush, is lack of a better word, is what

23  I'm hearing.

24           So we're going to be in recess.  I'm going to say

25  let's come back in 45 minutes because I'm going to need a

 1  little bit of time to get through -- I'm not looking at the

 2  exhibits.  I typically don't look at exhibits until they're put

 3  in the record, I can tell you that, because I try not you.

 4          MR. COLBY:  But you'll see in the revised order

 5  there's only --

 6          THE COURT:  I'm not looking at --

 7          MR. COLBY:  -- two things that were different.

 8  That's it.

 9          THE COURT:  Okay.

10          Mr. Caponi?

11          MR. CAPONI:  Your Honor, if we're going to take a

12  break, factor in a couple extra minutes so we can eat.  Then if

13  we go forward in the afternoon, we don't have to take a second

14  break, that probably would --

15          THE COURT:  That would make -- that works.  That's

16  why I said 12:45. That gives you guys -- you need more time.  I

17  don't know -- there's nowhere to eat around here.  So maybe you

18  might come back at 1:00.  Okay.

19          We're in recess until 1.

20          MR. COLBY:  Thank you, Your Honor.

21          THE COURT:  Thank you.

22      (Recess taken)

23          THE COURT:  Okay, please be seated.  Okay.  I had an

24  opportunity to review the original motion and the supplement

25  amendments.  And based on my reading of the original motion,

Case 23-10763-amc    Doc 843-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 71 of 275

71

1    the Debtors were seeking relief in the form of a temporary

2    restraining order based upon SeeCubic B.V., and I guess

3    SeeCubic Delaware's intention, alleged intention, to license

4    the technology that's in dispute.

5         The Debtors also alleged that they were doing this by

6    using trade secrets that would lead to harm -- let's see

7    exactly what I tabbed here -- that would result in -- here we

8    go -- because that there would -- that there was more likely

9    than not that they would suffer irreparable harm because that

10   Stream was intended to sell, and that the Defendants were

11   intending to license the technology.  And that activity was an

12   interference with the Phillips and the Rembrandt license.

13        And it was those -- that interference would result in

14   losing the benefits of the license and that they could possibly

15   lose their license from Phillips, lose their license from

16   Rembrandts, and that the industry quote is a competitive one.

17   And as a result, their trade secrets are being used, that the

18   license could be -- license to the technology, license to other

19   parties, which was prohibited, and that it would cheapen the

20   value of the technology.

21        And so the new allegations are that now the basis for

22   the temporary restraining order with at least with respect to

23   Mr. Stastney is that because he is somehow violating an

24   employment contract and with respect to the lenders, there's

25   some sort of lender liability claim.

Case 23-10763-amc    Doc 842-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 72 of 275

72

```
 1              Now, while all of that may have been pled in the

 2    complaint, they are nowhere referenced in the motion.  And so

 3    the only thing that is before this Court is what is in the

 4    original motion, which is that you wanted me to issue a TRO

 5    prohibiting the parties from licensing the agreement and taking

 6    other actions that would include using trade secrets.

 7              This issue about employment contract -- new issue at

 8    least with respect to the TRO.  It might be in the complaint --

 9    that's all fine and well.  But that and the lender liability,

10    that was never asserted as a basis for the TRO.  You can't do

11    it now.  It's a new -- two new claims.  And more importantly, I

12    don't even know why it would even be, at least with respect to

13    the employment contract, there's an allegation that you're

14    using trade secrets.  I don't know why you would even need the

15    issue of the employment contract.  Either they are or they

16    aren't.

17              So I'm not going to have any testimony or evidence

18    with respect to the employment contract or any evidence with

19    respect to the lender liability.  The evidence regarding the

20    use of trade secrets, that was pled.  That evidence can be

21    placed on the record with respect to that.

22              Now, the problem we have is -- how many witnesses do

23    we have today?  Two?  The marshals have informed me that there

24    is going to be a protest starting at 4 p.m.  I don't know if

25    they're telling me that because they want me to end by 4 p.m.
```

```
1    or why the purpose of telling me -- telling us that.

2              Didn't they tell -- what time did they tell us?

3              Starting at 4 and heading down to Market to Sixth

4    Street.  So what does that mean for us?  Are we supposed to

5    stop -- I mean, they didn't tell us that just to tell me.

6              Did they say what they wanted us to do?

7              Okay.  So that may mean if we go past, you know, if

8    they're starting at City Hall, I don't think it's going to get

9    them an hour to get down here, and it's a very difficult -- I

10   got stuck in that on Friday night -- couldn't get out of here,

11   couldn't get in the court, including anything at 5:00 on

12   Friday.  See you don't want to be in that.  I don't think

13   anybody's driving -- hopefully you're not parked around here

14   because if you are, you need to get out of here well before

15   5:00.  If you're walking, I guess you can walk up Market Street

16   if you're just in a hotel or you're marking [sic].  But if you

17   are parked anywhere near here, be prepared to not be able to

18   get out until 8:00 -- at least that's what time I was able to

19   get out.  So I just want to tell you guys that.

20             With that being said, do people think, I mean it's

21   1:30.  Are we going to go past?  I mean, if that's not a

22   problem we can go to 5:00.  I just don't know what that means

23   for the marshals if they're worked that that means -- or the

24   CSOs -- that's heightened security for them, you know,

25        (Court and clerk confer)
```

| 1 | THE COURT: All right. So I'm just letting you now. |
| 2 | MR. COLBY: Depending on the nature of the protest, |
| 3 | Your Honor, I -- |
| 4 | THE COURT: What do you mean the nature of the |
| 5 | protest? |
| 6 | MR. COLBY: Well, we're fine doing whatever the |
| 7 | others want to do. |
| 8 | THE COURT: Well, I'm just trying to figure out, you |
| 9 | know, they told us for a specific reason. Whether it was just |
| 10 | an FYI or whether -- |
| 11 | MR. COLBY: Right. |
| 12 | THE COURT: -- they didn't specifically say. I |
| 13 | understand it's either pro-Israel or pro -- |
| 14 | MR. COLBY: Okay. |
| 15 | THE COURT: -- pro -- pro or pro against. Pro- |
| 16 | Israel, okay. Pro-Israel march that's -- |
| 17 | MR. COLBY: Got it. |
| 18 | THE COURT: -- going to start at City Hall. I mean, |
| 19 | the other one on Friday was peaceful. I didn't, you know, |
| 20 | there was a lot of please, a lot of, you know, more -- I think |
| 21 | there was more buses and police than people. But you do have |
| 22 | some traffic issues. You do have some issues been able to get |
| 23 | from the courthouse to where you're going. |
| 24 | MR. COLBY: Yep, understood. |
| 25 | THE COURT: I mean, if it's not a problem I'll keep, |

```
 1   I mean, well, wait a minute, I would like to be able to get

 2   home.

 3        (Court addresses unrelated matters)

 4             MR. COLBY:  Personally, I think for us, we defer to

 5   the judgment of the Court and the court security officers, and

 6   we're fine.

 7             THE COURT:  Mr. Zahralddin?

 8             MR. ZAHRALDDIN:  We're fine, too.  The only issue

 9   that I have is Mr. Robertson I'd like to put on first because I

10   believe he flies away to Africa, and we can have him miss that

11   flight.  Not today, but I think tomorrow.

12             THE COURT:  Okay.

13             MR. ZAHRALDDIN:  So and he won't be that long, so

14   that's the only person on our side that's really --

15             THE COURT:  Right.  I was just -- because the

16   marshals told me they thought it was important, and I wasn't

17   quite sure given, I don't know people, if you parked in that

18   parking lot, forget it -- you're not getting out of here.  So

19   that's all I'm telling people why -- I mean, maybe you just

20   want to stay, go have dinner, and then move your car later.  I

21   don't know.  Okay, all right.

22             So with that being said, I think we understand what

23   the parameters are with respect to the evidence that's going to

24   be allowed.  All right.  So then we can proceed with the

25   evidence.
```

Case 23-10763-amc Doc 823-3 Filed 10/29/24 Entered 10/29/24 23:50:50 Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23 Page 76 of 275

76

 1              I think we've talked enough with colloquy for today.

 2   I think we just need to get to the evidence, okay?

 3              MR. ZAHRALDDIN:  Okay, Your Honor, then I'd like to

 4   call up Mr. Robertson --

 5              THE COURT:  Okay.

 6              MR. ZAHRALDDIN:  -- to the stand.

 7              THE COURT:  All right.  Stop right here.

 8              THE CLERK:  Oh, Judge, actually I'm guessing in front

 9   of the microphone.

10              THE COURT:  Oh, okay.

11              THE CLERK:  Sorry.

12              THE COURT:  All right, all right.  I didn't know you

13   change the rules on here.

14              THE CLERK:  Just for this transfer of people.

15              THE COURT:  Okay, all right.

16         CHARLES M. ROBERTSON, PLAINTIFF'S WITNESS, SWORN

17              THE CLERK:  Would you please state and spell your

18   name for the record?

19              THE WITNESS:  Charles M. Robertson.  That's C-H-A-R-

20   L-E-S M like Michael, Robertson, R-O-B-E-R-T-S-O-N.

21              THE CLERK:  Could you please state your address for

22   the record?

23              THE WITNESS:  10 Via Visione, Unit 201, Henderson,

24   Nevada, 89011.

25              THE COURT:  Hold on one second.

Case 23-10763-amc    Doc 827-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-18-23    Page 77 of 275

77

 1                    THE WITNESS:  Do you need a spelling on Via Visione?

 2                    THE COURT:  All right.  Well, we're not being

 3     directed to leave at 4 -- they just want us to know.

 4                    Okay.  I'm sorry.  I heard unit 201 -- where?

 5                    THE WITNESS:  Henderson, Nevada 89011.

 6                    THE COURT:  Okay.  All right.

 7                    You may proceed.

 8                            DIRECT EXAMINATION

 9     BY MR. ZAHRALDDIN:

10     Q    Mr. Robertson, can you please tell us where you're

11     currently employed?

12     A    I am working for Stream TV Networks, Inc.

13     Q    And did you have any prior positions within Stream or any

14     of its subsidiaries?

15     A    Yes.  I have been employed with Stream TV Networks as an

16     employee from 2009 until the preliminary injunction order came

17     out in December of 2020.  And in parallel with that, from May

18     of 2018 until that same date in December 2020, I was also the

19     chief executive officer of SeeCubic B.V. in the Netherlands.

20     Q    Thank you.  And in your role as CEO of SeeCubic B.V., did

21     you have any compliance responsibility?

22     A    Well, yeah, general compliance.  That was the R&D

23     facility.  SeeCubic B.V. or SCB.V. was the R&D development

24     group for the overall technology.  So the employees all had

25     nondisclosures.  We practiced a variety of -- we implemented a

1  variety of practices, I should say, to protect the technology.

2  So there was encryption on the code, there was encryption on

3  the content files that were sent out with that.

4          In fact, part of our investor portfolio talked about

5  how do we protect the IP because there was some concern --

6  well, you're dealing with a lot of customers in China and there

7  have historically been some issues about the protection there.

8  So we did a number of things like, for example, in planning the

9  chips, right, the -- our business model is to sell chips and to

10  sell the optical films.

11          So the chips we would use a major foundry like TSMC

12  in Taiwan.  We would get a major chip company like Morningstar

13  that already makes television chips that are accepted in the

14  industry.  TSMC would then build the chip for Morningstar, and

15  they would put a little partition in there to keep our

16  technology separate from the Morningstar technology.  That way,

17  customers can get the benefit of a Stream TV-enabled chip

18  without us risking our IP for the 3D rendering, putting it with

19  the -- with the Chinese chip company, for example.

20          On the optical design side, we had a similar

21  situation.  We designed the optics.  We would have a third

22  party manufacturer make those films for us.  We wouldn't share

23  those designs with anyone.  Then, those films would be

24  manufactured and delivered to us.  Those films will be glued on

25  to a regular 2D video panel, and those glued together modules

1  would be delivered to the customers.  So the customers who

2  might be making a television or making a phone or a tablet,

3  they would never see the optical design that went into it.  So

4  we compartmentalized the different parts of the technology so

5  that it didn't reside in any one place, so we had some security

6  through separation.

7  Q    And Mr. Robertson, with these -- with all of these

8  techniques in place, what was the -- what do you think the

9  consequences would be would any of that breakdown, as the

10 compliance officer and CEO?

11 A    Well, it's a pretty broad question, but it's pretty

12 significant in that it's a very competitive industry as it's

13 been acknowledged in the court here.  There's not a lot of

14 players and the glasses-free 3D space.  I've watched this

15 technology from its infancy when we first licensed the

16 foundation from Phillips, and I saw a very, very rough

17 technology that could maybe become something.  And over the

18 course of many years, we built it into something.  And we've

19 done head-to-head shootouts with our competitors where

20 prospective customers said, oh, we might like Demanco

21 (phonetic).  What -- we want to see how that compares with

22 Stream.  Every contest that we did our technology was perceived

23 as being better.  So although we have not been to market with a

24 mass production meaningful number, empirically and subjectively

25 in the presentations I've seen, we have, by far, the better

Case 23-10763-amc   Doc 843-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 80 of 275

80

```
1   performing technology.  And if the secrets on how, you know,

2   what we built on top of Phillips, if those secrets get out,

3   then anybody can do what we did, and we lose that market

4   advantage.

5          MR. ZAHRALDDIN:  Your Honor, I have no further

6   questions for this witness.

7          THE COURT:  Okay.

8          Cross-examination, Mr. Colby?

9                        CROSS-EXAMINATION

10  BY MR. COLBY:

11  Q    Mr. Robertson, you stated that you are working for Stream

12  TV, Incorporated.  Are you an employee of Stream TV?

13  A    I am a -- excuse me -- I'm a contract employee.

14  Q    So that's a no, you're not an employee of Stream TV?

15  A    I am an independent contractor for Stream TV.

16  Q    Do you consider that to be an employee of Stream TV or

17  something different?

18         MR. ZAHRALDDIN:  Objection, Your Honor.  Asked and

19  answered.

20         THE COURT:  Response?  He's objecting.  Ask him --

21         MR. COLBY:  I don't believe he's answer the question.

22         THE COURT:  And the question that you were going to

23  ask him to --

24         MR. COLBY:  The question was whether he considers

25  independent contractor to be an employee of Stream TV or
```

Case 23-10763-amc    Doc 843-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 81 of 275

81

```
 1   something different.
 2              MR. ZAHRALDDIN:  Your Honor, we've stated in court
 3   before that there is only one employee right now -- two
 4   actually --
 5              THE COURT:  All right.
 6              MR. ZAHRALDDIN:  -- Mr. Park and Mr. Rajan.
 7              THE COURT:  Overruled.
 8              Answer the question.
 9              THE WITNESS:  I am an independent contractor of
10   Stream TV.
11   BY MR. COLBY:
12   Q    Who is your employer?
13   A    I don't -- I'm -- I would be self-employed, I guess, if I
14   am an independent contractor.
15   Q    Are you familiar with an entity named VSI?
16   A    I am.
17   Q    Is VSI who pays your compensation?
18   A    Not currently, no.
19   Q    Who pays your compensation?
20   A    Currently?
21   Q    Yes.
22   A    Stream TV Networks.
23   Q    When did that begin to occur?
24   A    When Stream TV got its DIP bank account open,
25   approximately month ago, I think.
```

Case 23-10763-amc   Doc 847-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 82 of 275

82

1   Q    You're also involved in VSI's business, correct?

2   A    Peripherally.

3   Q    That's a yes?

4   A    Yes.

5   Q    Mr. Robertson, you described various protections on chips,

6   optical and optical design a minute ago.  Do you recall the

7   testimony?

8   A    I do.

9   Q    Would a party be able to copy the chip or optical lens

10  designed just by seeing a demo of the Ultra-D Glasses-Free 3D

11  technology?

12  A    By seeing a demo, no -- by having a demo, potentially.  I

13  should correct that -- having it demo unit in -- in their

14  possession.

15  Q    You were here on Friday before last when Mr. Stastney

16  testified, correct?

17  A    Yes.

18  Q    And you heard him describe ongoing developmental projects

19  with respect to the technology at issue, correct?

20  A    Yes, I heard his testimony, yes.

21  Q    Okay.  You have no first-hand knowledge regarding what

22  protections are being put in place around the technology in the

23  course of those developmental projects, correct?

24  A    Presently, correct.

25            MR. COLBY:  No further questions at this time, Your

Case 23-10763-amc   Doc 823-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 83 of 275

83

```
 1    Honor.

 2              THE COURT:  Any redirect?

 3              MR. ZAHRALDDIN:  Yes, Your Honor, briefly.

 4                         REDIRECT EXAMINATION

 5    BY MR. ZAHRALDDIN:

 6    Q    Mr. Robertson, Mr. Colby asked you if you have any present

 7    knowledge.  I'm going to ask you a question.  When the Dutch

 8    court appointed the independent director, did you have occasion

 9    to visit the Netherlands and SeeCubic B.V.?

10    A    I did, yes.

11    Q    When you were there with the SeeCubic B.V., did you make

12    inquiries into the protection of trade secrets and what was

13    going on, projects and that type of thing?

14    A    I did.

15    Q    And Mr. Robertson, can you tell me who you spoke with when

16    you were there?

17    A    I spoke with the independent director and spoke with Bart

18    Barenbrug.

19              THE COURT:  Who?

20              THE WITNESS:  Bart Barenbrug, B-A-R-E-N-B-R-U-G.

21    He's a senior software engineer.

22              THE COURT:  Spell that again.

23              THE WITNESS:  B-A-R-T --

24              THE COURT:  Uh-huh.

25              THE WITNESS:  -- last name, Barenbrug, B-A-R-E-N-B-R-
```

Case 23-10763-amc    Doc 843-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 84 of 275

84

```
 1   U-G.

 2          THE COURT:  Okay.  Barenbrug.  Okay, all right.

 3   BY MR. ZAHRALDDIN:

 4   Q    Any others?

 5   A    And I spoke with Bram Riemens, that's B-R-A-M R-I-E-M-E-N-

 6   S and Patric Theune via Zoom, P-A-T-R-I-C T-H-E-U-N-E.

 7   Q    And Mr. Robertson, can you tell us what they told -- what

 8   they told you in regard to the protections?

 9          MR. COLBY:  Objection, Your Honor.  Hearsay.

10          THE COURT:  Response?

11          MR. ZAHRALDDIN:  Your Honor, we're trying to

12   ascertain what projections were still being -- Mr. Colby opened

13   the door by asking whether or not Mr. Robertson had personal,

14   first-hand knowledge.  Mr. Robertson has testified he went to

15   the Netherlands, he went and spoke to the people who would be

16   in charge of these protections, and I simply want to know what

17   they told him.

18          THE COURT:  All right.  And it's a hearsay exception

19   because it is an out-of-court statement.  Don't give me any

20   exceptions otherwise I'm going to have to sustain the

21   objection.  What's the basis for which I would allow a hearsay

22   statement?  What are you saying that was the basis --

23          MR. ZAHRALDDIN:  Well, the B.V. is a defendant, so

24   these are party admissions.

25          MR. COLBY:  Your Honor, B.V. is a party that's not
```

Case 23-10763-amc   Doc 823-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-18-23   Page 85 of 275

85

1  present here because they haven't been served yet.  If it's

2  being offered against B.V., it's inappropriate.  If it's being

3  offered against SeeCubic, it's not a statement by a party.

4           THE COURT:  Okay.  They haven't been served with the

5  TRO motion?

6           MR. ZAHRALDDIN:  Excuse me, Your Honor?

7           MR. COLBY:  They've been served with the complaint.

8           THE COURT:  Well, have they been served with this

9  TRO?  They might have not been served with the complaint.  My

10  question is, have they been served with the TRO motion.

11           MR. ZAHRALDDIN:  No, Your Honor.  We did not serve

12  them yet with the TRO motion.

13           THE COURT:  So their position is it can't be a party

14  admission because they're not here.  They haven't been served.

15  BY MR. ZAHRALDDIN:

16  Q    Mr. Robertson, do that there are adequate protections at

17  this point in time regarding the trade secrets and the licenses

18  after your visit to the Netherlands?

19           MR. COLBY:  Objection, Your Honor.  The witness

20  testified he has no first-hand knowledge of what those

21  protections may or may not be.

22           MR. ZAHRALDDIN:  I don't believe he testified to

23  that.

24           MR. COLBY:  He was direct questioned to -- response

25  to my question.

Case 23-10763-amc    Doc 843-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-18-23    Page 86 of 275

86

1          THE COURT:  All right.  So you're asking him based on

2     his understanding, what does he believe it is?

3          MR. ZAHRALDDIN:  Yes.  Well, yes.  And this is

4     redirect, and so I'm coming to clarify because we've

5     established that he visited the Netherlands.  We established

6     that he is a contract employee assisting the Debtors who want

7     to the Netherlands for specific reasons like --

8          THE COURT:  And he said he visited the operations?

9          MR. ZAHRALDDIN:  Yes, he did.

10          THE COURT:  His understanding, based on his visit and

11     whatever information -- can you tell me what they told him.

12          MR. COLBY:  Right.  With no first-hand knowledge, the

13     understanding is based solely on the conversation with these

14     individuals.

15          THE COURT:  No, he said he visited the operations.

16          MR. COLBY:  Your Honor, he said he had no first-hand

17     knowledge --

18          THE COURT:  Counsel --

19          MR. COLBY:  -- of the confidentiality protections.

20          THE COURT:  -- he said he visited the operations, and

21     he spoke with the independent director, which assumably is Mr.

22     Stastney, Bart B., spoke with Bram R., and spoke with Patric

23     Theun.  And that the question -- I will allow his answer -- is

24     his understanding based on his visit and discussions.  It's

25     just his understanding.  I'll allow it for what it's worth.

 1  Answer the question.

 2  BY MR. ZAHRALDDIN:

 3  Q    You can answer the question, Mr. Robertson.

 4  A    So my understanding Is that the new 8K samples didn't have

 5  the security in place and could not be sent out and left

 6  unescorted because the standard protections that had been put

 7  in place previously were not there with those units.

 8  Q    And Mr. Robertson, where the folks in the Netherlands

 9  forthcoming with any other information?

10  A    Very little.

11  Q    Mr. Robertson, can you tell me why they were not

12  forthcoming?

13  A    They --

14        MR. COLBY:  Objection, Your Honor.  That calls for

15  speculation about someone else's state of mind.

16        MR. ZAHRALDDIN:  I'd like our witness to answer

17  because I believe he was told why.

18        THE COURT:  No, no, no.

19        MR. ZAHRALDDIN:  He was told why.

20        THE COURT:  Okay.  He's objecting on the basis that

21  that calls for speculation as to somebody else's state of mind

22  as to why they would not, I guess, give him information.  I

23  don't know.

24        MR. ZAHRALDDIN:  And Your Honor, I'm not saying it's

25  not speculation.  I'm saying that they gave him a reason, so --

```
 1  well, if they did, I'd like him to tell the Court.

 2           THE COURT:  Wait a minute, he can't tell me what they

 3  told him.  He can say based on his understanding, he believes.

 4           MR. ZAHRALDDIN:  Okay, that's fine.

 5           THE COURT:  Based on your understanding and belief,

 6  why weren't they forthcoming?  Your understanding.  You can't

 7  tell me anything anybody said.  It's based on your observation.

 8  That's all he can tell me is what he observed.

 9           So based on your observation, why do you think they

10  weren't forthcoming?  Don't tell me anything they said.

11           THE WITNESS:  So that's really a, for me, it's a two-

12  part answer because my understanding evolved.  So my

13  understanding from March through June was that there was

14  confusion on their part about who was a legitimate director,

15  and they presented to me --

16           THE COURT:  You can't tell me what they told you.

17           THE WITNESS:  There was confusion about whether Mr.

18  Stastney or Mr. Rajan was director.  And until that was

19  clarified, they wouldn't provide any information.  And then

20  after June 29th, the situation --

21           THE COURT:  June 29th what year

22           THE WITNESS:  Sorry, June 29, 2023.  The situation

23  did not improve because the independent director, and Your

24  Honor, I was referring to Jasper Berkenbosch, not Mr. Stastney

25  as the --
```

1          THE COURT:  Oh, okay.  Jasper who?

2          THE WITNESS:  B-E-R-K-E-N-B-O-S-C-H.  Mr. Berkenbosch

3   was appointed by the Amsterdam court.

4          THE COURT:  Okay, so that independent director?

5          THE WITNESS:  Correct.  I met with him --

6          THE COURT:  Okay.

7          THE WITNESS:  -- the day after the -- the hearing in

8   the Netherlands to discuss -- I'm digressing there.  But as far

9   as my understanding about the lack of cooperation and sharing

10  of information, including the projects that were being worked

11  on, it was largely -- they were lacking direction who they were

12  entitled to discuss anything with and that change from the

13  dispute between Rajan and Stastney to Mr. Berkenbosch having

14  been appointed.  He would be the one who could disseminate any

15  information.

16  BY MR. ZAHRALDDIN:

17  Q    I'll ask one final question then.  Do you believe that

18  that is an ideal situation for protecting trade secrets?

19  A    Can you clarify the question?

20  Q    Do you believe that the current situation, as you

21  understand it, is an ideal situation for protecting the

22  Debtor's trade secrets?

23  A    From the debtor's perspective, no, not at all.

24  Q    And you have a similar -- do you have an opinion on how

25  the situation in the Netherlands is affecting the protection of

1    the licenses?

2            MR. COLBY:  Objection, Your Honor, to the extent it

3    calls for the witness' opinion as opposed to facts.

4            MR. ZAHRALDDIN:  The --

5            MR. COLBY:  Also, outside the scope of the cross,

6    which didn't address licenses because the director didn't

7    address licenses.

8            MR. ZAHRALDDIN:  The licenses and trade secrets are

9    rolled up into one, but I'll withdraw the question.

10            MR. COLBY:  They're very different things.

11            MR. ZAHRALDDIN:  I'll withdraw the question.  I'm

12    sure we'll have plenty to talk about later, Your Honor.

13            THE COURT:  Anything further?

14            MR. ZAHRALDDIN:  No, Your Honor.

15            THE COURT:  Redirect (sic).

16            MR. COLBY:  Yeah, just briefly.

17            THE COURT:  Okay.

18                           RECROSS EXAMINATION

19    BY MR. COLBY:

20    Q    The understanding that you just testified to, Mr.

21    Robertson, concerning what protections may or may not be in

22    place around the technology, that's based on your conversations

23    with the individuals you identified, correct?

24    A    Correct.

25    Q    You did not, yourself, see with your own eyes, what

1   protections may or not be in place, correct?

2   A    Those are not visible -- it's computer code.

3   Q    Okay, thank you.

4         MR. ZAHRALDDIN:  Your Honor, we can excuse the

5   witness if it's okay with you.

6         THE COURT:  Okay.

7         You may be excused, Mr. Robertson.

8         THE WITNESS:  Thank you, Your Honor.

9         THE COURT:  Okay.  All right.

10        Counsel, are you going to call the next witness?

11        MR. KODOSKY:  Your Honor, we call Mr. Mathu Rajan.

12          MATHU RAJAN, PLAINTIFF'S WITNESS, SWORN

13        THE CLERK:  Would you please state and spell your

14  name for the record?

15        THE WITNESS:  Mathu Rajan, M-A-T-H-U is the first

16  name.  Last name is Rajan, R-A-J-A-N.

17        THE CLERK:  Would you please state your address?

18        THE WITNESS:  1105 William Penn Drive, Bensalem,

19  Pennsylvania 19020.

20                    DIRECT EXAMINATION

21  BY MR. KODOSKY:

22  Q    Mr. Rajan, what relationship do you have with the Debtor,

23  stream TV?

24  A    I'm the founder and CEO, and board member.

25  Q    Who makes litigation decisions for Stream?

Case 23-10763-amc    Doc 847-3    Filed 10/29/24    Entered 10/29/24 23:50:54    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 92 of 275

92

1   A     I do.

2   Q     Stream TV filed an adversary complaint against the

3   Defendants with request for injunctive relief over 60 days ago.

4         THE COURT:  Counsel, can you hold just one second?  I

5   need to take a five-minute break.

6         MR. KODOSKY:  I'm sorry, Your Honor.

7         THE COURT:  All right.  We'll be in recess for five

8   minutes.  Thank you.

9      (Recess taken)

10        THE BAILIFF:  All rise.

11        THE COURT:  Sorry for that interruption.  Please be

12  seated.  Okay.  You can continue, counsel.

13  BY MR. KODOSKY:

14  Q     Mr. Rajan, Stream TV had filed an adversary complaint

15  against the Defendants with a request for injunctive relief

16  over 60 days ago, correct?

17  A     Correct.

18  Q     And then within the last two weeks, Stream TV has filed a

19  request for a temporary restraining order; is that correct?

20  A     Correct.

21  Q     What caused Stream TV to file a motion for a temporary

22  restraining order now?

23  A     That happened for about four different reasons, what

24  caused the emergency as to why we went from just an injunction

25  to a TRO.  The first one was I had travelled to the Netherlands

Case 23-10763-amc    Doc 843-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-18-23    Page 93 of 275

93

1   at least two times this year, and in my -- at that time I was

2   the CEO and the director of the Netherlands, and in that

3   process we found that they were, SeeCubic of Delaware and the

4   B.V. on instructions from SeeCubic of Delaware, were violating

5   trade secrets, unfortunately landed up in the hospital, and

6   then when I got out we filed a -- the adversary complaint.

7   There was widespread trade secret violation.

8            Then the other reason was we -- there was hearings in

9   Amsterdam where Mr. Stastney testified and I was on the Zoom

10  call, unfortunately then, I'd just gotten out of the hospital

11  again or else I would have been there in person, but we were on

12  a video camera on the Zoom call where he testified under oath

13  that Stream TV has one business model, we sell components or

14  chips or devices, and you know, that chipped in the film, and

15  SeeCubic of Delaware has a sublicense model.

16           He said very clearly that SeeCubic of Delaware is

17  competing against Stream TV.  He made the statement like that

18  let the two companies compete, whoever is the best company can

19  win.  He indicated in his testimony that there was widespread

20  discussions with companies around the industry on a sublicense

21  model which would have caused us to lose our Phillips license.

22  I had already known they were violating the Rembrandt license

23  with the trade secret violations and a number of other things.

24           Then, and we were at grave risk of losing our

25  Phillips license at any moment with the behavior of SeeCubic of

Case 23-10763-amc   Doc 823-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 94 of 275

94

```
 1   Delaware.  Then, then it went further.  He wanted to become --

 2   when I went into the hospital I was a director, when I got out

 3   of the hospital I was removed.  I was out.

 4          So he wanted to become the director of the

 5   Netherlands where he would have access to all of our

 6   specifications, and he would have access to our designs, he

 7   would be reviewing resource requirements, and he's basically

 8   working for a competitor, and it was clear he was exercising a

 9   huge amount of dominion and control over a company that is in

10   bankruptcy.

11   Q    Who's the competitor?

12   A    SeeCubic of Delaware, Hawk In, SLS, all of them.

13   Q    And what is his position with any of those entities?

14   A    He's the CEO and chairman of SeeCubic of Delaware, and

15   he's also, I believe, the managing director of SLS, and Hawk is

16   now reporting to him on this particular matter.

17   Q    You were present at the hearing that was held in this

18   matter on October 6th?

19   A    What did you say?

20   Q    Were you present for the hearing that was held in this

21   matter on October 6th?

22   A    Yeah, in this court, yes, correct.

23   Q    Were you present for Mr. Stastney's testimony?

24   A    Yes, I was.

25   Q    What did you hear Mr. Stastney say with regard to
```

Case 23-10763-amc    Doc 843-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-18-23    Page 95 of 275

95

1  SeeCubic's discussions with customers and potential customers

2  here in court?

3  A     What he said was here, he had three running projects, he

4  testified in -- here in Philadelphia, that he has three running

5  projects in the Netherlands for technology demonstrators which

6  are demo units, and in Amsterdam he said it was 11 to 12.  Then

7  he furthermore said that they have spoken to a hundred

8  companies regarding -- regarding the technology.  Then he had

9  four companies that he asked for $5 million from, and he said

10  he asked them for $5 million each for an investment into

11  SeeCubic.

12  Q     What are the implications for the debtors and the debtors

13  estate based upon Mr. Stastney's testimony?

14  A     Well, one for the trade secrets, you know, it's causing

15  horrible damage to Stream TV and to the debtor and to the --

16  and Technovative, and the debtor's assets on the fact that he

17  had told hundreds of investors also about a sublicensing model,

18  and is at least 300 people, possible more, know about it which

19  is in direct violation of our relationship with Phillips,

20  Stream TV could lose its license at any moment which is

21  absolutely irreparable damage.  There's also a huge problem now

22  with the Rembrandt license because now there's trade secret

23  leakage which involves one of the Rembrandt claims.

24        Then on top of it he's going to have access to our

25  engineering designs, engineering specifications, and he's going

1  to decide if the Netherlands people are going to work on Stream

2  TV and Technovative projects which is a direct interference in

3  the debtor and the debtors estate, and it's going to cause us

4  irreparable damage, one because our customers and their

5  specifications, their information is going to go to a

6  competitor, and all -- and now his sublicense model's basically

7  dead because Phillips has sold the patents and said no more

8  licensing, so now he's going to learn about our chips and our

9  films and how we're doing everything to sort of resuscitate his

10  company, and so he's going to learn all of that in his role as

11  a director.

12         And then the other big issue is basically telling

13  everybody about sublicenses, and Phillips is very clear,

14  there's no more licenses, sublicensing is dead, so they have

15  every right to cancel our license as we speak, and Rembrandt

16  has a massive claim because of all the trade secret violations.

17  Q   And what trade secret violations are you referring to?

18  A   When I went to the Netherlands in my role as director of

19  the Netherlands and CEO of the Netherlands, first question that

20  I asked, what is happening with the trade secrets so I had an

21  investigation.  The rumors flying all over the industry and

22  that the protocols between SeeCubic of Delaware and the

23  Netherlands changed between the protocols of Stream TV and the

24  Netherlands.  We encrypted all the code inside the chips and we

25  crypted all the content, meaning Stream TV and Technovative.

1            And we also put additional protections in to protect

2       the technology demonstration units.  There were three major

3       trade secret violations just on the surface level

4       investigation, didn't even get into the other aspects of it.  I

5       saw an automotive device that was not as good as the one that

6       Stream TV made, the quality wasn't good, and in my work with

7       the engineers there, the content was not locked.  So anybody

8       could go in, grab the content, and figure out how we make

9       content, which is one of our trade secrets, and one of the

10      claims of Rembrandt.

11            The they had an 8K TV.  The quality of the 8K TV was

12      not as good as the Stream TV 4K, 8K like that Stream TV had,

13      and apparently what was happening was they were working with

14      content companies, their India team, and they're basically

15      mapping to the device, and as it's sharing a whole bunch of

16      trade secrets to compensate for some of the quality issues.

17            Stream TV's doing content deals right now.  We have

18      major content deals we have worked on.  We share zero of the

19      content.  Everything's encrypted, everything's protected, we

20      don't let people go map into the device.  That's what they were

21      doing.  So the Hyundai sample put Stream TV and Technovative

22      and the debtors estate at risk.  So did the 8K TV's.

23            Then I was even more shocked to learn that they have

24      unlocked the gaming protocols for gaming companies.  So

25      basically now you're going to have gaming companies going in

1  and mapping into our device.  That is a major trade secret of

2  Stream TV and Technovative, and SeeCubic of Delaware just

3  opened the whole thing up.

4  Q    You mentioned protections that Stream TV has put in place

5  to protect its trade secrets.  Tell us what protections Stream

6  TV has put into place to protect trade secrets.

7  Q    Well, we had a huge list of all kinds of security and

8  trade secret protections, you know, everything from, you know,

9  camera security system in the Netherlands as well as we had one

10 in --

11 Q    I'm sorry, I missed that.

12 A    I mean, we had a -- a huge list of protections we had put

13 in for trade secret and intellectual properties that --

14 Q    Tell us what those are, please.

15 A    Huh?

16 Q    Tell us what those protections are.

17 A    Yeah, about -- yeah.  So I mean we had everything from

18 security cameras to -- we would have rotation on the codes and

19 things off of the servers, and the servers were encrypted and

20 protected where we had hosted the code.  Employees couldn't

21 leave the code on their laptops.  They were -- they were set up

22 as, like, client servers so people could not take things at

23 home.  Then the devices themselves, the demo units, all of the

24 content were encrypted, the codes were encrypted.  We also put

25 in a security chip that you could get from a military security

1    company.  We had put that into place, as well.

2            And what we did was we had at Stream TV brought in

3    people to handle the electronics, brought in people to handle

4    the security because in the Netherlands, that wasn't one of

5    their strong suits, was the security.  Then we brought in

6    people to also handle, like, manufacturing trade secrets and a

7    number of other things.

8            Those things all reside at Stream TV as well as the

9    knowledge for manufacturing and knowledge for electronics, all

10   those things reside at Stream TV, so all of that was put in

11   place, but I was adamant on day one that not one sample's going

12   to go out unless the content's encrypted, and all the code is

13   encrypted, not one sample.  And here, they were sending samples

14   off to Hyundai and sharing things with studios in Hollywood and

15   opened the whole kimono up to gaming companies.

16   Q    Mr. Rajan, you've mentioned --

17           MR. COLBY:  Sorry.  Sorry.

18           THE COURT:  Yes?

19           MR. COLBY:  I think Mr. Rajan has gone well beyond

20   the bounds of what the original basis for the TRO was.  I

21   understand broadly speaking they used the word "trade secrets"

22   but he put a declaration in this case that mentioned none of

23   the things that he just testified at length about.  If they

24   were as critical as he says they were and he was aware of them

25   after his trip to the Netherlands back in September you'd think

1   they would have been part of this.  All we got here was I was

2   in the hearing in the Netherlands and I heard Mr. Stastney say

3   A, B, and C.

4        So again, this is -- maybe it falls broadly within

5   the legal claim that they identified early on, but as a factual

6   matter this is entirely new.  I'll leave it obviously within

7   your discretion how to deal with it, but just putting something

8   on the record so that I could maybe later request we have a

9   fair opportunity to respond to those facts.  That's all.

10        THE COURT:  Counsel's response?

11        MR. KODOSKY:  Your Honor, our motion for a temporary

12   restraining order clearly referenced the misappropriation of

13   trade secrets.  The case law that I've reviewed that deals with

14   temporary restraining orders and preliminary injunctions being

15   granted or denied often depend upon what is a description of

16   the trade secrets that have been misappropriate, what were the

17   reasonable steps that the company took to protect the

18   confidentiality of the trade secrets, things of that nature.

19        And so to the extent that Mr. Rajan is here to

20   testify live and in person, you know, the declaration that was

21   filed in support of the motion was not all of the evidence that

22   we intended to submit to the Court in support of the motion.

23   Our plan all along was to bring Mr. Rajan here to testify.

24        And so I understand the Court had ruled, has ruled

25   about the employment agreement, and that we're not to bring in

Case 23-10763-amc   Doc 847-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 101 of 275

101

1   the employment agreement that Mr. Stastney has testified to,

2   but my next question was -- to Mr. Rajan was going to be

3   whether or not in addition to the protections he's already

4   mentioned, what agreements, if any, that Stream such as

5   NDA's --

6           THE COURT:  Wait a minute, wait a minute, wait a

7   minute, wait a minute.

8           MR. COLBY:  Yeah.

9           THE COURT:  Okay.

10          MR. COLBY:  Your Honor, I think Mister --

11          THE COURT:  I get it.  I'm going to allow it because

12  they said they were misappropriating trade secrets, and to me,

13  just because you -- I mean, your declaration isn't limited, so

14  I think it's okay for him to testify on how he believed they

15  were misappropriating trade secrets.

16          MR. COLBY:  Well, Your Honor, actually, the -- what

17  Mr. Kodosky just stated was the definition of litigating by

18  ambush.  We intended to bring Mr. Rajan to testify about the

19  security protocols and particular units and this and that, but

20  it was nowhere identified --

21          THE COURT:  Well, the question is --

22          MR. COLBY:  -- in their papers.

23          THE COURT:  -- did you have that in your declaration?

24  Was it required to say if he had just said misappropriation of

25  debt, of trade secrets, what would then have been your response

Case 23-10763-amc    Doc 848-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23    Page 172 of 275

102

```
 1    if you didn't go into detail?

 2            MR. COLBY:  Yeah, certainly.  If there was fair

 3    warning that the issue was going to be about particular

 4    encryption or security protocols or whatever in -- in the

 5    Netherlands, then we would have prepared differently.  What the

 6    -- and when we were here before, the basis for the TRO motion

 7    was the September 13th hearing, the outcome of the September 13th

 8    hearing, what Mr. Rajan just testified had nothing to do with

 9    the hearing, it had to do with some visit other than that.  I

10    would also point out that in his declaration --

11            THE COURT:  Uh-huh.

12            MR. COLBY:  -- every single -- all the paragraphs

13    either identify the issue about customers, talking to customers

14    about sublicensing, or every paragraph, sublicense, sublicense,

15    sublicensing, customer base, Phillips, sublicense.  That's the

16    entire substance of what the purported factual basis for the

17    claim was.  This is an entirely new factual basis for the

18    claim.

19            So look, I understand it fits broadly within the

20    category of trade secrets, but if this was so important, if

21    this was so important that it's the basis for issuing a TRO

22    today, one would think it would have been mentioned in the

23    factual assertions that formed the basis of the motion when

24    they tried to get it ex parte from the district court, or when

25    they tried to get it heard within 24 hours here.  It is another
```

```
 1   moving target.

 2              THE COURT:  Counsel?

 3              MR. KODOSKY:  I think it's a nonsense objection, Your

 4   Honor.  With all due respect, we've -- we've -- clearly have

 5   asked for a temporary restraining order based on

 6   misappropriation of trade secrets.  We're here to ask Mr. Rajan

 7   today what are those trade secrets, what protections were in

 8   place to protect the confidentiality of those trade secrets,

 9   and he is here and has already gone over a long list of

10   protections that the company has in place to protect the

11   confidentiality of the trade secrets.

12              THE COURT:  I'll allow it for what it's worth.

13   Continue.

14              THE WITNESS:  So Stream and Technovative have

15   engineers who could -- who are security experts who can go in

16   and fix this but I was removed as director when I was in the

17   hospital, so right now we can't fix it until we get this

18   somehow resolved immediately.

19   BY MR. KODOSKY:

20   Q    What if any written agreements does Stream TV have with

21   customers or employees with respect to protecting the

22   confidentiality of the trade secrets?

23   A    They signed contracts that have -- and paperwork, they

24   keep all the trade secrets and other materials confidential and

25   they're supposed to protect all of it, but they were operating
```

 1  │ under instructions from SeeCubic of Delaware.

 2  │ Q    Mr. Rajan, we're going to switch subjects.  What did the

 3  │ Delaware Supreme Court rule 15 months ago, in June 2022?

 4  │          MR. COLBY:  Objection, Your Honor.  Relevance.

 5  │          THE COURT:  Counsel, relevance?

 6  │          MR. KODOSKY:  I'm sorry, Your Honor?

 7  │          THE COURT:  He's objecting on relevance.

 8  │          MR. KODOSKY:  To the extent that the Supreme Court

 9  │ had ordered them to turn back over the assets and they have not

10  │ done that to this point, and we have asked as part of our

11  │ motion for a temporary restraining order for that to be done,

12  │ that's the relevance.

13  │          MR. COLBY:  I think we all know what the Supreme

14  │ Court order says.  If that's how we want to spend our time

15  │ today, fine, but I don't think it's relevant to the supposed

16  │ immediate irreparable time that -- that we're supposed to be

17  │ here for, so I'll withdraw my objection.

18  │          THE COURT:  All right.  Proceed.

19  │          MR. COLBY:  I'd like to stay focused.

20  │          THE COURT:  Counsel?

21  │ BY MR. KODOSKY:

22  │ Q    What did the Delaware Supreme Court rule in June of 2022?

23  │ A    The Delaware Supreme Court overturned the Chancery Court's

24  │ decision five-zero thus saying the omnibus transaction was

25  │ legal and vacated the Chancery Court's 82-page opinion so it's

1   not supposed to be used for any legal purpose whatsoever, and

2   then it remanded it to the court to execute this order for

3   Stream TV.

4   Q    And what did the Chancery Court order?

5   A    The Chancery Court ordered all assets to be turned over,

6   including, not just limited to the bonding machine, but the 8K

7   TV's, all -- all of SeeCubic's customer lists, all of

8   SeeCubic's investor lists, all of their projects Stream TV was

9   supposed to inherit, a new and improved company, they could sue

10  us for unjust enrichment, but everything was supposed to be

11  turned over to Stream TV.

12  Q    And was that followed?

13  A    Only about 5 percent, 95 percent of the assets, they just

14  kept on hanging on to it and -- or exercising dominion and

15  control the entire time.

16  Q    Are you able to give me any specifics of what they come on

17  to?

18  A    They -- they never gave the bonding machine, they never

19  gave the company laptops back, they haven't given most of the

20  emails back, they haven't given the servers back, they haven't

21  given phone and tablet samples back, they never gave the 8K

22  samples back, they were interfering with the operations of the

23  customers, I'm sorry, with the -- the subsidiaries.

24       They were talking to over a hundred customers, and

25  asking money from four of them, offering and now supplying

```
 1   samples to customers, diverting revenue and money away from the

 2   debtor and the debtors estate, and moving that all away from

 3   the company.  They've told hundreds of people that they're

 4   going to be sublicensing. Everybody, even though Phillips sold

 5   the patents and is unequivocable, that there's no more Phillips

 6   licenses, they've been saying that to all kinds of people.

 7   Q    What impact does it have on the debtors estate, the fact

 8   that the court order has not been followed?

 9   A    Well, first let me say even though they didn't follow it

10   because there is tremendous value at Stream TV and

11   Technovative, we developed a backup bonding solution which

12   we're now implementing because we didn't get our bonding

13   machine back, our team is doing the electronics, getting us

14   into productions right now, so in spite of all the roadblocks

15   and dominion control that have been thrown up, we have found a

16   way to fulfill our orders and take care of our customers, we're

17   putting our own TV's together.  We had developed all those

18   things at Stream TV independent of the Netherlands.

19           I don't know if they're even aware of it, and so

20   we're going forward, but they have caused hundreds of millions

21   of dollars of damages to Stream TV and the debtor and

22   Technovative, and the debtors estate.  They diverted huge

23   amounts of revenue, huge amounts of investment away from the

24   company, and by not giving these things we've had investors and

25   customers get very upset with us, not only after we won in the
```

1    Supreme Court, but very upset after we've been in the

2    bankruptcy, like, where are the samples, why don't you guys

3    even have, like, your emails back, all kinds of questions we're

4    getting, pounded every single day, why they're not following

5    the court orders.

6    Q    Mr. Rajan, as the CEO of Stream TV, are you familiar with

7    the proofs of claim that have been filed in this matter?

8    A    Yes, ma'am.

9    Q    Which of the Defendants have filed proofs of claim against

10   the debtors?

11   A    SLS is called --

12        MR. COLBY:  Objection, Your Honor.  What's the

13   relevance of that to the TRO issues?  It sounds to me like a

14   lender liability issue which I think we're not doing today

15   but --

16        THE COURT:  Counsel?

17        MR. KODOSKY:  To the extent that SeeCubic claims as

18   part of its proof of claim to have conferred a benefit.

19   They're essentially suing Stream 37 million dollars for money

20   that was given to SeeCubic B.V. in connection with their

21   competition against us, and they're seeking to have that

22   recovered from Stream TV.  My only question was going to be

23   what benefit have we received in connection with that?

24        MR. COLBY:  Again, nothing to do with the supposed

25   immediate irreparable harm to the intellectual property.

 1   That's -- that's an issue, financing issue.  We were in front

 2   of this court on -- in April, really has nothing to do with the

 3   issues presented by the current motion.

 4           THE COURT:  Counsel?

 5           MR. KODOSKY:  I don't know that I have anything else

 6   to add, Your Honor.

 7           THE COURT:  Okay.  No further questions?

 8           MR. KODOSKY:  On?

 9           THE COURT:  On direct?

10           MR. KODOSKY:  No, I do, on the proof of claim I had

11   no further questions.

12           THE COURT:  Oh, proof of claim.  I'm sorry.  No, no,

13   no.  Okay.  I thought we were done.

14           MR. KODOSKY:  Nothing further to add on it.

15           THE COURT:  Okay.  All right.  Go ahead.

16   BY MR. KODOSKY:

17   Q    Have you ever heard the term "CES"?

18   A    Yes, I have.

19   Q    What is CES?

20           THE COURT:  CES?  Okay.

21           THE WITNESS:  It's a consumer electronic show where

22   not only just electronics companies, but content companies,

23   wide-range of companies get together and show new and maybe old

24   products, and they discuss business.  It's held in Las Vegas

25   every year.

1  BY MR. KODOSKY:

2  Q    When is it held?  Is there a --

3  A    It's usually in January.

4  Q    Has Stream TV every exhibited at CES?

5  A    We presented every year up until we lost in the Chancery

6  Court and we won awards a number of years there.

7  Q    What was Stream's involvement at CES after it won in the

8  Delaware Supreme Court?

9  A    We were going to go this year but we didn't because we

10 didn't get our samples back from SeeCubic of Delaware.  We sent

11 some personnel there but we didn't have a booth or anything

12 this year.

13        MR. COLBY:  Objection, Your Honor.  Relevance to the

14 present TRO motion.  That sounds to me like something that

15 happened last January, which was eight months ago and can't

16 possibly reflect any immediate irreparable harm.

17        MR. KODOSKY:  Your Honor, it does go to the immediate

18 irreparable harm to the extent that the next exhibit that I

19 would hope to show this witness is evidence that SeeCubic was

20 at CES, speaking with potential customers regarding the

21 technology that they had misappropriated from Stream TV.

22        THE COURT:  What's SeeCubic?  You guys keep saying

23 SeeCubic?

24        MR. KODOSKY:  SCI, the Mr. Stastney's -- the entity

25 that was --

Case 23-10763-amc    Doc 847-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23    Page 110 of 275

110

 1           THE COURT:  Delaware?

 2           MR. KODOSKY:  -- that was formed to receive the

 3  assets.

 4           THE COURT:  SeeCubic of Delaware, right?

 5           MR. KODOSKY:  Correct.

 6           THE COURT:  Okay.

 7           MR. COLBY:  Objection, Your Honor.  It was in January

 8  so it can't be the basis of the motion which supposedly arose

 9  as a result of a -- developments in the Netherlands in this

10  September.  That was the basis for today's motion.

11           THE COURT:  Counsel?

12           MR. KODOSKY:  We believe that it's evidence that

13  they're out there competing, Your Honor, and to the extent that

14  we have recently learned, based on Mr. Stastney's continue --

15  and the continuing harm that it's causing to the debtors and

16  the debtors estate, that it is certainly relevant.

17           MR. COLBY:  Continuing harm would be something that

18  for the purpose of a TRO would be to prevent some harm that is

19  about to happen, not something that supposedly occurred, like I

20  said, ten months ago in January. They can't enjoin what

21  happened last January.

22           THE COURT:  Well --

23           MR. KODOSKY:  Your Honor, he's stated that he's

24  talked to a hundred people, they've got this PPM, the

25  subscription agreement that's dated October 1st.  It's

Case 23-10763-amc   Doc 842-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 111 of 275

111

```
 1    continuing harm, misappropriation of trade secrets, and the

 2    ongoing competition continues, continues to cause damage to us.

 3            MR. COLBY:  Your Honor, the PPM that references

 4    anything about licensing was years old, and during the period

 5    of time prior to the -- we've been through this, was during the

 6    period of time prior to the reversal of the -- by the Delaware

 7    Supreme Court.  The subscription agreement references nothing

 8    about a sublicensing business plan, and that was the other

 9    document we looked at that makes representations, you know, to

10    investors who are going to be investing, has nothing about the

11    business plan.

12            So I just, again, I'd like to keep moving, like to

13    stay focused on what the TRO is about, but something that

14    happened last January isn't the basis of an immediate

15    irreparable imminent harm.

16            THE COURT:  I'll allow it for what it's worth.  He

17    says that they're using trade secrets, they've been doing it

18    since January, and he said he was doing it again at the

19    hearing.  I'll allow it for that purpose only.

20            Continue, counsel.

21            MR. KODOSKY:  Thank you, Your Honor.

22            MR. COLBY:  What exhibit is this?

23            MR. KODOSKY:  It's 38.

24            MR. COLBY:  And is this one of the ones that was

25    served on Saturday night?
```

1          MS. VASSALO:  Yes.

2          MR. COLBY:  And I'll renew the objection, Your Honor.

3  This is an exhibit that was given to us in the middle of the

4  night on Saturday, along with several thousand other pages of

5  exhibits.  This wasn't part of the original filing.

6          THE COURT:  Well, all right, counsel, respond, saying

7  you didn't give it to him with the original filing.

8          MR. KODOSKY:  Rebuttal, Your Honor.  Our witness

9  exhibit list stated that we reserve the right to rebut, to add

10  to our exhibit list and to our witness list based upon what we

11  heard Mr. Stastney testify to.  He was the very first witness

12  that we called, and to the extent that we've added to our

13  witness exhibit list based upon what we learned and what he

14  admitted or denied.

15          MR. COLBY:  Your Honor, this is apparently an email

16  that relates to something that occurred last January.  There's

17  been no particular citation to something new that arose by

18  virtue of Mr. Stastney's testimony.  There's nothing new about

19  this.  This is something from January 10th, 2023.  There's no

20  reason why it couldn't have been part of the original motion,

21  or if it was responsive to something Mr. Stastney said last

22  Friday, why he needed to wait until the middle of the night

23  this past weekend to be served.

24          THE COURT:  Counsel, response?  His position is that

25  it's from January, I haven't seen it, and that if it was so

1   important, why you didn't confront Mr. Stastney with it in his

2   testimony, and why you waited until Saturday to identify it,

3   because clearly you reserved the right to produce documents in

4   response to Mr. Stastney's testimony.  And so response?

5        MR. KODOSKY:  Response is it's in rebuttal of Mr.

6   Stastney's testimony, Your Honor, from the October 6th hearing.

7   We had reserved the right to amend the exhibit list prior to

8   the hearing.

9        MR. COLBY:  Your Honor, they haven't identified

10  anything in particular in Mr. Stastney's testimony.

11       THE COURT:  Well, you haven't let him.  You already

12  objected.

13       MR. COLBY:  Your Honor, the question that's been

14  posed to debtors counsel multiple times, they've not identified

15  anything, and in fact, if the point is this shows competition,

16  they have up to now complained that Mr. Stastney disclosed in

17  the Netherlands proceedings that there was going to be

18  competition, and that -- I'm taking no position on whether or

19  not that's true because we disagree with that, but according to

20  what they say, if this evidence is competition, they say that

21  was disclosed in the Netherlands hearing, there's no reason why

22  this couldn't have been part of the initial package or why it

23  needed to come in, in the middle of the night on Saturday.

24       THE COURT:  Counsel?

25       MR. COLBY:  Right, and they called Shad, they called

 1  Mr. Stastney to the stand, so this really should have been part

 2  of the initial presentation.

 3          THE COURT:  Counsel?

 4          MR. KODOSKY:  I think that, Your Honor, I've stated

 5  all that I had to say.

 6          THE COURT:  All right.  I'll allow it for what it's

 7  worth.

 8          MR. KODOSKY:  Thank you, Your Honor.

 9          THE COURT:  Go ahead.

10          MR. KODOSKY:  Permission to approach?

11          THE COURT:  You're marking this as what?

12          MR. COLBY:  I'm sorry, if I could just -- I'm done

13  arguing the objection, Your Honor.  I just have a quick point

14  of clarification on mechanics.  We were just given a copy, it

15  says Exhibit 38 without error.  I don't know what that means or

16  if it's different --

17          THE COURT:  Well --

18          MR. COLBY:  -- than what we were served on Saturday,

19  and I try not to directly address opposing counsel, so I'm --

20          THE COURT:  Thank you.

21          MR. COLBY:  -- asking for the clarification from you.

22          THE COURT:  Well, I haven't seen it, so how I'm going

23  to get a clarification?

24          MR. COLBY:  Yeah, I don't know what to do.

25          THE COURT:  You need to show it to me and then ask me

```
 1   something.  I mean, I'm talking in a vacuum here.  What's this?

 2   Mark this Debtors what?

 3           MR. COLBY:  Well, it's not been admitted yet but on

 4   the list it's Exhibit 38.

 5           THE COURT:  But for me to -- for me to do anything

 6   with it, I have to see it.  It doesn't mean if I see --

 7           MR. COLBY:  Okay.

 8           THE COURT:  -- it, it's necessarily admitted.  Lots

 9   of times parties will dispute a document and I either admit it

10   or don't but I have to see it first, so we're marking it as

11   what?

12       (Counsel confer)

13           THE COURT:  All right.  This is D38?  Wait a minute.

14   Before you give it to the witness, hold on, don't give it to

15   him yet because clearly there's some issues with it, so hold on

16   to it.  All right.  You said you were going to object to this

17   without -- before even shown --

18           MR. COLBY:  I'm just --

19           THE COURT:  -- to the witness?

20           MR. COLBY:  Yeah, I'm just requesting clarification.

21   I've got two copies.  One says without error, one says with

22   black box due to error.  I'm just seeking some clarify -- basic

23   document box here.

24           THE COURT:  All right.  I don't have -- I only have

25   one.
```

 1              MR. COLBY:  I'm just curious what the difference is

 2    here, if anything.  What's the --

 3              THE COURT:  Well, which one are we showing the

 4    witness?

 5              MR. KODOSKY:  I'm sorry, Your Honor?

 6              THE COURT:  Which one are we showing to the witness?

 7              MR. KODOSKY:  One with no black box on the two line

 8    of the email, the same one that Your Honor has.

 9              THE COURT:  All right.  He's going to ask him about

10    that one, counsel.

11              MR. COLBY:  Okay.

12              THE COURT:  D38.  I guess you can ask him about

13    whatever.  Okay.  All right.

14    BY MR. KODOSKY:

15    Q    Mr. Rajan, do you -- you've been handed what has been

16    marked for identification as D38; do you recognize this

17    document?

18    A    Yes, I do.

19    Q    What is it?

20    A    This is a letter from SeeCubic of Delaware describing the

21    things that SeeCubic of Delaware is doing in their company.

22    Q    What's the impact on Stream based upon this activity?

23              MR. COLBY:  Objection, Your Honor.  It's not clear to

24    me if we're seeking to -- counsel's seeking to admit this or

25    not, it hasn't been, if so, it hasn't been authenticated, and

```
 1   Mr. Rajan doesn't appear on its face.

 2             THE COURT:  Counsel?

 3   BY MR. KODOSKY:

 4   Q    Where did you receive this document from?

 5   A    We received this document from Stream TV shareholders and

 6   they gave it to Stream TV as part of our recordkeeping and our

 7   books and records.  This is logged into the books and records

 8   at Stream TV.

 9   Q    And so to the extent that -- were you the custodian of the

10   books and records of Stream TV?

11   A    Yes, I am.

12   Q    Are the documents an accurate record of the information,

13   matters, and the events that are referenced?

14   A    Yes, it is.

15   Q    Were the documents made at or near the time of the

16   occurrence of the matters and events set forth in the document?

17   A    Yes, it did.

18   Q    Are the documents made by or from information transmitted

19   by a person with knowledge of those matters and events?

20   A    Yes, it was.

21   Q    Is the document kept and maintained in the course of the

22   regularly conducted activity of Stream?

23   A    Yes, it is.

24   Q    Is it customary practice of Stream to maintain such

25   records?
```

```
 1  A    Yes, it is.

 2            MR. KODOSKY:  We move to admit this document as --

 3  into evidence, Your Honor.

 4            MR. COLBY:  I maintain the objection, Your Honor.

 5  I'm not sure that Mr. Rajan established how an email to

 6  SeeCubic shareholders, of which he is not one, how he could

 7  possibly authenticate this because somebody just handed it to

 8  him to supposedly be logged as he said into the books and

 9  records of Stream TV.  It all seems to strain credulity, but

10  I'll stand on that objection.

11            MR. KODOSKY:  Your Honor, he said that it was sent to

12  Stream TV shareholders if I heard his testimony correct.

13            MR. COLBY:  Yeah, it says dear SeeCubic Inc.

14  shareholders.

15            THE COURT:  Okay.  And his position is how did it get

16  to Stream TV shareholders?

17            MR. KODOSKY:  And I believe that there's --

18  BY MR. KODOSKY:

19  Q    Mr. Rajan?

20  A    The SeeCubic shareholders, most of them are Stream TV

21  shareholders who were improperly moved over to SeeCubic through

22  the Omnibus transaction.  They were ordered back.  That's

23  another thing that wasn't followed.  We were supposed to get

24  all the lists so people could transfer back, and there's

25  hundreds of shareholders trapped in SeeCubic because the orders
```

1    aren't being followed.  They're really Stream shareholders.

2    They call them SeeCubic shareholders, but they're really Stream

3    shareholders, and that those shareholders were ordered back to

4    Stream TV.  That's another order that hasn't been followed.

5            THE COURT:  So the answer is that they share

6    shareholders.

7            MR. COLBY:  Okay.  So in which case this was sent to

8    them in their capacity as SeeCubic shareholders.  If I'm a

9    shareholder of IBM and I get an email I'm also a shareholder of

10   Hewlett Packard, and I get an email from Hewlett Packard, that

11   doesn't make it a record of IBM because I happened to be

12   invested in both.  I think Mr. Rajan just laid out that they're

13   precisely different.

14           Mr. Rajan also testified that the shareholders were

15   ordered to be transferred back.  There's no basis for that.

16   It's also flatly untrue but --

17           THE COURT:  Well, he can testify anything you want.

18   You can ask him on cross-examination, counsel.

19           MR. COLBY:  I -- I understand.

20           THE COURT:  You don't get to give me a -- let's stick

21   to what we have which is he says is a business record because

22   some third party gave it to the debtor.  That is not a business

23   record.

24           MR. KODOSKY:  It's also a party admission, Your

25   Honor.  It's sent by SeeCubic.

 1              THE COURT:  A party admission that is sent by

 2   SeeCubic to its shareholders.  Counsel, now he's saying it's a

 3   party admission.

 4              MR. COLBY:  Okay, well, that's a different case.

 5              THE COURT:  All right.  Let's talk about the -- was

 6   definitely not a business record.  Just because somebody gives

 7   you something that's their business records doesn't make it

 8   your business record.  It wasn't created by the business.  It

 9   has -- never mind.  Objection as to business record is

10   sustained.

11              MR. COLBY:  Thank you, Your Honor.

12              THE COURT:  Now we're talking about -- and you said

13   it's a party -- what did you say?  Admission, party admission?

14              MR. KODOSKY:  Yes, Your Honor.

15              THE COURT:  All right.  Let's see that one, party

16   admission, that's -- what's the basis for that?  Your response,

17   counsel?  He's saying party admission.

18              MR. COLBY:  It -- correct, it is a statement by

19   SeeCubic.  I don't believe then that it has been or could be by

20   Mr. Rajan properly authenticated, but I'll stand on that

21   objection.  That's all I have to say about it.

22              MR. KODOSKY:  Mr. Stastney's going to be called, it

23   sounds like, Your Honor, if you would rather us ask him and --

24              THE COURT:  You're going to recall him?  Well, he was

25   your witness.

1          MR. KODOSKY:  He's --

2          THE COURT:  And I don't know, can you recall him?

3   Mm.

4          MR. COLBY:  Either way, Your Honor, it's an email

5   dated January 10th, 2023, so it certainly could have been the

6   subject of questioning when they called him the first time.

7          THE COURT:  Counsel?  I'll allow it for what it's

8   worth.  You guys want to --

9      (Debtor's Exhibit 38 admitted into evidence)

10         MR. COLBY:  Thank you, Your Honor.

11         THE COURT:  For what it's worth.

12         MR. COLBY:  It's another example of a moving target

13  here but I will --

14         THE COURT:  Well, counsel, you know.  They reserved

15  the right to bring in information and call a witness to counter

16  Mr. Stastney's testimony, and if they said we were doing this

17  based on what he testified, I'm not quite sure, and they'll

18  have to, you know, I'll -- I'll allow it for what it's worth.

19  Okay?

20         MR. COLBY:  Thank you, Your Honor.

21         THE COURT:  Go ahead, counsel.

22  BY MR. KODOSKY:

23  Q    What impact, Mr. Rajan, does SeeCubic of Delaware

24  attending CES, the major trade show in the industry, speaking

25  with potential customers, have on the debtors and the debtors

Case 23-10763-amc    Doc 847-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23    Page 122 of 275

122

1  estate?

2  A    They are taking revenue and investment away from -- from

3  Stream TV and Technovative, the debtors estate, they're causing

4  mass confusion in the market because Stream TV had won in the

5  Supreme Court, and these things all ordered back, and were

6  not given.  Then also, the information regarding these

7  customers and vendors and other relationships regarding CES and

8  our success at CES, some of the things in there were trade

9  secrets and business secrets that we kept inside the company,

10  and SeeCubic was recruiting Stream TV employees over to

11  SeeCubic, and Mr. Stastney is a former Stream TV employee, so

12  he learned a lot of these things at Stream TV and was using it

13  against Stream TV.

14          MR. COLBY:  Objection, Your Honor.  That was

15  precluded.

16          THE COURT:  Counsel?

17          MR. KODOSKY:  I'm ready to move on, Your Honor.

18          THE COURT:  Move to strike.

19          MR. COLBY:  Yup.

20          MS. VASSALO:  I move to strike, Your Honor.

21          THE COURT:  Strike.

22          MR. COLBY:  Thank you.

23          THE COURT:  That's stricken from the record.

24  BY MR. KODOSKY:

25  Q    Mr. Rajan, what's your reaction to in Amsterdam, Mr.

Case 23-10763-amc   Doc 847-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-15-23   Page 125 of 275

123

1  Stastney saying that 12 companies wanted it but here, he said

2  that only three companies want it?

3  A    He said in Amsterdam that there was 11 to 12 running

4  projects in the Netherlands, then when he testified here he

5  said there was only three running projects in the -- in the

6  Netherlands.

7  Q    What's your reaction at such a low conversion rate of

8  companies wanting the demo units?

9  A    I don't know how that's possible that, you know, he's --

10 he testified that they did meetings with over a hundred

11 companies, but only anywhere from 10 percent, 3 percent only

12 want demo units, that's not even remotely our experience, so

13 clearly, those companies in their communications, which are

14 supposed to be Stream TV customers, the debtor, and the debtors

15 estate, they're being communicated something that isn't working

16 to have such a terrible conversion rate.

17 Q    Well, what's the problem with Stastney offering demo

18 units?

19 A    The demo units, in and of itself is a violation of the

20 trade secrets because in my investigation those demo units, the

21 contents were not secure for the automotive units, and it's

22 also one of the claims by Rembrandt, the content.  Then the

23 content was not secured for 8K TV's, and the mapping was being

24 available to a number of content companies.  Then the gaming

25 was going to be --

Case 23-10763-amc    Doc 847-3    Filed 10/29/23    Entered 10/29/23 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23    Page 124 of 275

124

1          THE COURT:  Just one second.  Are we saying AK, 8K?

2          THE WITNESS:  8K.

3          MR. KODOSKY:  8K.

4          THE COURT:  Eight?

5          THE WITNESS:  Eight.

6          MR. KODOSKY:  The number eight.

7          THE COURT:  Oh, okay.

8          MR. KODOSKY:  That has to do with the resolution.

9          THE COURT:  Right, I had AK, but I didn't know if he

10   was saying 8K.  Okay.  8K TV's.  Okay.  I'm sorry.  Continue.

11   BY MR. KODOSKY:

12   Q    Have you finished your answer?

13   A    No, I think I was in the middle -- what was the -- you

14   wanted to know all the things that -- they were open?

15   Q    What is the problem with Stastney offering demo units.

16   A    Yeah, the problem was with the gaming, it wasn't going to

17   be secured, the content.  The 8K TV's, the content was not

18   secured, and they were opening up the mapping to a number of

19   companies in violation of the Rembrandt license.  The

20   automotive, the content was open in direct violation of the

21   Rembrandt licenses, and that's the procedure they were

22   following.

23   Q    What was the problem with the Netherlands people and the

24   demo units?

25   A    The Netherlands people know how to -- they do just simple

 1  sort of like technology demo units, and some people call it

 2  proof of concept, they're just very simple units.  They're like

 3  show and tell type units.  That's what they were able to do,

 4  you know, that -- and they had issues with, you know, security.

 5  That was not one of their strong suits.  It's something that,

 6  you know, they had struggled with for years, and then there was

 7  a business decision from SeeCubic of Delaware, let's just open

 8  it open it up on the content side for certain applications, and

 9  that made the situation even worse.

10  Q    What is the proper division of labor between the

11  Netherlands and the U.S.?

12  A    In the U.S., first of all, in 2018 we had put our foot

13  down and said technology demonstrators or proof of concepts

14  needed to stop, and in 2018 Stream TV started to take the lead

15  on -- even -- or before that, on the productization of the

16  technology.  So the Netherlands people did the original

17  formulas, so to speak, but turning it into a product with --

18  working with the customers, the lead was taken by Stream TV, so

19  all of the bonding, the mechanicals, the backlight, the 97

20  percent yield rate, which is certified for mass production,

21  that was all led and executed by Stream TV, lens designs for

22  some of the applications, the actual lenses themselves were

23  handled by Stream TV.

24         Then on the electronics, in taking all of the

25  original formulas and converting them for mass production which

Case 23-10763-amc   Doc 827-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 126 of 275

126

1    was done in 2018, 2019, was all led by Stream TV, and that work

2    is done at Stream TV and Technovative, and that's what's

3    ongoing now, and were going to production.

4         When Stream went down because the projects were

5    stopped, VSI financed the continuation of that work because we

6    knew at some point we'd be reunited with the technology.  We

7    knew we were going to win in the Supreme Court, so we knew we'd

8    have to go to market --

9         MR. COLBY:  Objection, Your Honor.

10        THE WITNESS:  -- and we've been working on it

11   nonstop.

12        THE COURT:  Objection.

13        MR. COLBY:  Objection.  Relevance.  Not responsive.

14   Not relevant to the TRO issues.

15        THE COURT:  Counsel?

16        MR. KODOSKY:  I'm ready to move on to the next

17   question, Your Honor.

18        THE COURT:  Well, I'll strike that. Going to move to

19   strike, counsel?

20        MR. COLBY:  Yes, please, Your Honor.

21        THE COURT:  As nonresponsive and irrelevant.  Strike.

22   Next?

23   BY MR. KODOSKY:

24   Q    Is Hawk involved in the TRO?

25        THE COURT:  Who?

```
 1   BY MR. KODOSKY:

 2   Q     Hawk?

 3   A     Yes, Hawk is involved in the TRO.

 4   Q     How?

 5   A     Hawk has some of our TV's, they're raising money for

 6   investors, telling people about sublicensing.  Bob Morton

 7   himself --

 8              MR. CAPONI:  Objection.

 9              THE WITNESS:  -- is doing it and --

10              THE COURT:  All right.  Objection.

11              MR. CAPONI:  I'm not -- I think it's hearsay.  I'm

12   not sure who Mr. Rajan's referring to as Hawk.  Hawk is -- if

13   there's an individual he would like to speak about, I mean,

14   that's one thing, but he's just generally attributing

15   statements to --

16              THE COURT:  Well, I guess you need to object to the

17   question because he said it's Hawk, and you should have

18   objected saying define Hawk.  Is that your objection?

19              MR. CAPONI:  That's my objection, Your Honor.

20              THE COURT:  Because he's responding to the question.

21   All right.  Objection, because there are various entities,

22   persons; who are you referring to when you say Hawk?  He said

23   it's broad.

24              Right, Mr. Caponi?

25              MR. CAPONI:  Yes, Your Honor.
```

Case 23-10763-amc   Doc 848-3   Filed 10/29/24   Entered 10/29/24 23:50:54   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 128 of 275

128

1          THE COURT:  All right.  Response?

2   BY MR. KODOSKY:

3   Q    Who are you referring to, Mr. Rajan?

4   A    Hawk Holdings, and also Bob Morton, whose money is Hawk

5   Holdings, and was in the Hawk officers with TV's, raising

6   money, and taking money into --

7          MR. CAPONI:  Objection, Your Honor.

8          THE COURT:  Okay.  Objection.

9          MR. CAPONI:  Your Honor, I'm sorry, I think Mr. --

10  one, I think the witness finished answering the question, but

11  to the extent he's going to go on, Mr. Morton is not present

12  here today, he has not been served, and he's not a party

13  against whom any statements made by him can be admitted.

14         THE COURT:  Okay.  Response?

15         MR. KODOSKY:  Who is Mister -- Mr. Caponi has asked

16  for an extension for Mr. Morton to answer the complaint in this

17  case and which would qualify as an appearance in our view, Your

18  Honor.

19         MR. ZAHRALDDIN:  And, Your Honor, you did grant that.

20  They did ask for Mr. Morton.  You did grant it so --

21         THE COURT:  I did because --

22         MR. CAPONI:  I did not ask for an extension for Mr.

23  Morton.  If you look at the footnote I was very clear that he

24  has not been served, he is not a party.

25         THE COURT:  So who did you ask for the -- I --

1    hopefully, I didn't say all defendants --

2            MR. CAPONI:  Well, you said --

3            THE COURT:  -- when I issued my order.

4            MR. CAPONI:  I don't recall what your order said,

5    Your Honor, I know my request was we asked that because the

6    debtor was cherry-picking defendants, that the extension, that

7    all answers be set at the same date, so we did say all

8    defendants, and made it very clear in a footnote, Mr. Morton

9    has not been served, they admit he hasn't been served, and I've

10   never entered an appearance in his behalf.

11           THE COURT:  All right.  I guess I better go look at

12   my order because I was clear that I was granting an extension

13   based on my review of where the parties were, and I don't know

14   if I defined the word "defendants" in my order.

15           MR. CAPONI:  I said I don't have it memorized, Your

16   Honor.

17           THE COURT:  That's all right.  Can we -- give me a

18   copy?

19           MR. CAPONI:  But I do know that because I'm very --

20   one thing I've been very careful about is --

21           THE COURT:  Oh, I know you -- you sought, and I saw

22   footnotes.

23           MR. CAPONI:  -- I did not enter an appearance on

24   behalf of Mr. Morton.

25           THE COURT:  I think I was most focused on the basis

1    for the request and my authority to grant it.

2            MR. KODOSKY:  Sure, Your Honor.

3            THE COURT:  And that was what I focused on.  Can you

4    pull up -- I think it was pretty recent, last week, in the

5    midst of all the various motions, including the motions

6    apparently somebody filed and never gave -- in the clerks -- I

7    don't want to throw the clerk's office under the bus, but never

8    forwarded it to us.  I think we addressed it.  I can't even

9    remember at this point which motion it was, there have been so

10   many, but there was one that was filed, and that we never --

11   yeah, for whatever reason I can't get on again.

12           John, I don't know, it's probably because it should

13   say ADU and not -- I don't know.  I can't get on.

14           Okay.  My modem -- says Defendant Hawk Investments

15   Holding L, Limited, and together with all other defendants in

16   the above-captioned adversary proceeding, the defendants filed

17   a motion, the extension motion, whereby Hawk seeks on behalf of

18   all defendants an extension of the deadline to respond to the

19   complaint.

20           I have a little footnote.  Defendants SL (sic)

21   Holdings VI, LLC, Shadron Stastney, and SeeCubic Inc., filed,

22   joined to the extension motion collectively enjoinder.  All

23   right.  How do I -- oh, wait, I used to -- and upon

24   consideration of the extension motion, the response and the

25   joinders, that the response deadline for all defendants is

Case 23-10763-amc   Doc 828-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 131 of 275

131

1   extended.  Okay.  I guess I used the word "all defendants",

2   notwithstanding that your original motion only referred to

3   certain defendants, correct?

4         MR. CAPONI:  That my motion was filed on behalf of

5   Hawk.

6         THE COURT:  Uh-huh.

7         MR. CAPONI:  And we specifically note it in our

8   motion that Mr. -- that we did not represent Mr. Morton, he has

9   not -- the debtors admit they haven't served him, and he's

10  under no obligation to show up.

11        THE COURT:  And that request was not for him?

12        MR. CAPONI:  Excuse me?

13        THE COURT:  And the request that you were making did

14  not relate to any unserved party that you may or may not --

15        MR. CAPONI:  Correct, Your Honor.  And, you know,

16  Your Honor, I'm sure the next argument we're going to hear, Mr.

17  Rajan tried to bring in, Mr. Morton has no role whatsoever with

18  Hawk Investments.  Hawk Investments is overseen by a company in

19  the Jersey Isles named Albanese (phonetic), and there's no role

20  by Mr. Morton.

21        MR. ZAHRALDDIN:  Your Honor, that's not before us

22  today.

23        THE COURT:  Hold on, hold on.  Let me read this.

24  Hold on.  All right.  I'm not -- this is -- is that the

25  response?  Motion to enlarge time.  Okay, Mr. Caponi, this is

1    what you said in the footnote.  Which one now was it?

2            It says moreover, the motion for default and proposed

3    orders specifically include Mr. Aurthur Leonard, Robert Bob

4    Morton as a named defendant against whom plaintiffs have sought

5    this spot fault, despite Mr. Morton having obtained an

6    extension to respond to the complaint.  This matter was raised

7    with plaintiff's counsel who indicated it would be corrected,

8    but to date, no such correction has been issued.

9            So in your footnote, you apparently say, Mr. Caponi,

10    that Mr. Morton has obtained an extension to respond to the

11    complaint.

12            MR. CAPONI:  There was an original extension granted

13    by the Court, yes, Your Honor, but I never, in that original

14    request which Your Honor memorized and subsequent never entered

15    an appearance on behalf of Mr. Morton.

16            THE COURT:  Well, you asked for a further extension,

17    so it is what it is, you said what you said, I'm not going to

18    debate right now.  Well, I guess I have to figure it out

19    because you said you didn't get -- he wasn't served, but in

20    your original response, was that the response to -- what was

21    that for?

22            UNIDENFIED SPEAKER:  That was the --

23            THE COURT:  Original motion?

24            UNIDENFIED SPEAKER:  No, that's -- was the second

25    entry into the account.

```
 1              THE COURT:  Right.  So it was a second motion, so

 2    you're saying that the second motion didn't seek an extension

 3    of the response deadline that had already been afforded to Mr.

 4    Morton?  Because it said that he'd already been granted an

 5    extension, and there was some discussion with the plaintiffs

 6    about something and why that had not been corrected.

 7              So I guess I must have read that to say these are all

 8    the people who are going to get an extension because I'm not

 9    sure why that was in the footnote if he never entered his

10    appearance and he wasn't served, why would he even need an

11    extension in the first place?

12              MR. CAPONI:  Because the debtors moved for a default

13    judgment even though they acknowledged they hadn't served him,

14    and the debtors to this day still haven't withdrawn the default

15    judgment.

16              THE COURT:  I got that but it specifically says that

17    he had been granted an extension, and if he hadn't been served

18    I don't know why he would need an extension.  I don't know.

19    What do you -- what's your response?

20              MR. ZAHRALDDIN:  Your Honor, I'm the one who dealt

21    with trying to sort this out.  Yes, there was an error on the

22    motion for default judgment because certain of these

23    defendants, a motion for default judgment was filed because

24    they were served.  Mr. Morton was inadvertently included in

25    that.
```

1          THE COURT:  Okay.

2          MR. ZAHRALDDIN:  Okay.  So when the district court

3    said we're going to deny this without prejudice, please file it

4    in the bankruptcy court, which is what they did.

5          THE COURT:  You mean the TRO or the --

6          MR. ZAHRALDDIN:  No, no, no, the motion for default

7    judgment because we have three parties that are subject to that

8    and are defendants.

9          THE COURT:  Wait a minute.

10         MR. ZAHRALDDIN:  So a motion for default --

11         THE COURT:  Why did you take the default judgment in

12   connection with what?

13         MR. ZAHRALDDIN:  With this complaint, not with the

14   TRO, with the complaint.

15         THE COURT:  So the complaint was filed where?

16         MR. ZAHRALDDIN:  In the district court.

17         THE COURT:  Okay.  So you guys have a district court

18   action.

19         MR. KODOSKY:  That was filed here, Your Honor.

20         MR. ZAHRALDDIN:  No, well, we withdraw --

21         MR. CAPONI:  They moved -- they moved to withdraw the

22   reference on the file.

23         MR. ZAHRALDDIN:  We withdrew the reference on the

24   complaint and so --

25         THE COURT:  Well, that don't mean anything.  You keep

Case 23-10763-amc    Doc 847-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 135 of 275

135

```
 1   coming -- I don't understand why you would --

 2            MR. ZAHRALDDIN:  I understand that Your Honor, be --

 3            THE COURT:  -- take a default in the district court

 4   for a matter that's pending here.

 5            MR. ZAHRALDDIN:  Well, that's because it's -- and the

 6   judge said denied without prejudice and refile in bankruptcy.

 7   I haven't filed it yet because we had other things to do.

 8            THE COURT:  Well, it should have never been.

 9   Counsel, I will tell you.

10            MR. ZAHRALDDIN:  Okay.

11            THE COURT:  Until the reference is withdrawn,

12   everything continues in bankruptcy.  I will not stop because

13   the first thing the district court is going to say, well, why

14   did you stop?

15            MR. ZAHRALDDIN:  Understood, Your Honor.

16            THE COURT:  Because we may or may not -- and more

17   importantly, if they don't withdraw the reference, I now have a

18   case that's sitting in limbo with nothing happening.

19            MR. ZAHRALDDIN:  I understand that.

20            THE COURT:  Okay.

21            MR. ZAHRALDDIN:  My point is this, very simple.

22            THE COURT:  What's your point?

23            MR. ZAHRALDDIN:  My point is this, we filed the

24   motion for a default judgment against three people that had

25   been served.
```

```
 1                    THE COURT:  Okay.

 2                    MR. ZAHRALDDIN:  Mr. Morton was inadvertently left on

 3   that.

 4                    THE COURT:  Okay.

 5                    MR. ZAHRALDDIN:  I am not going to include him on the

 6   motion, which I told counsel when we refiled the motion for

 7   default.

 8                    THE COURT:  I -- that's all fine and well, but in

 9   that footnote it said Mr. Morton had granted an extension --

10                    MR. ZAHRALDDIN:  Extension.

11                    THE COURT:  -- and time to respond.

12                    MR. ZAHRALDDIN:  Yes, ma'am, that is absolutely

13   correct.

14                    THE COURT:  And counsel is now saying well, he wasn't

15   served, so he doesn't have anything to do with this, but I'm

16   not quite sure why it was in the footnote when -- you know

17   what?  Can I see the entire motion because --

18                    MR. ZAHRALDDIN:  Because the counsel asked for a --

19   he asked for a extension.

20                    THE COURT:  Well, he said it himself that he got an

21   extension for Mr. Morton.

22                    MR. ZAHRALDDIN:  I know.

23                    THE COURT:  I don't know why Mr. Morton would need an

24   extension if he wasn't served.

25                    MR. CAPONI:  Your Honor, whether -- I think the point
```

1  is whether the extension was granted or not, Mr. Morton, no one

2  has entered an appearance in this or any other -- in this court

3  or the district court for Mr. Morton.  He is not --

4          THE COURT:  Well, who gave him --

5          MR. CAPONI:  -- and is not present here today.

6          THE COURT:  Well, whether somebody gave him --

7  entered their appearance or not, they surely negotiated an

8  extension of time to respond for him.  I don't know what that

9  would be in, what authority he would be able to do that.

10          MR. CAPONI:  Your Honor?

11          THE COURT:  I don't know.

12          MR. CAPONI:  As we -- as Your Honor has pointed out,

13  the debtor has proceeded with a somewhat blunderbuss approach

14  of filing issues in different courts when they shouldn't,

15  moving for default even when they acknowledge they have no

16  basis to it --

17          THE COURT:  Well, I like that word "blunderbuss".

18          MR. CAPONI:  -- causing people to respond and -- but

19  in our response, because we had no -- we're reacting to chaos,

20  but we were always very clear to never enter an appearance on

21  behalf of Mr. Morton --

22          THE COURT:  Well, why -- well, who --

23          MR. CAPONI:  -- and no one can point to me on the

24  docket where anyone has entered an appearance.

25          THE COURT:  Well, it doesn't -- counsel?  You --

1   somebody negotiated something from him, and whether you put

2   your name on the docket or not, there had to have been some

3   basis for you to negotiate, because you said that as he's

4   obtained an extension to respond to the complaint.  What

5   authority would somebody have to do that?  Now maybe in the

6   second one you said I don't care what I did in the past, I'm

7   only asking for these people, so this matter was raised,

8   meaning having obtained an extension.

9           MR. CAPONI:  Your Honor, I have represented Mr.

10  Morton in the state court and the Court of Chancery, and I

11  represent lots of clients.  Every client I represent, unless I

12  enter an appearance in matter, they're not present, or they're

13  served and they fail to respond, they're not present in the

14  matter.  They want to introduce --

15          THE COURT:  Well, then -- but counsel, if you, the

16  fact that you may not have entered on the record, what

17  authority would you have had to obtain an extension from Mr.

18  Morton if you weren't representing him?  That's all I'm trying

19  to figure out.

20          MR. CAPONI:  What authority?  I was simply passing

21  along a request, acting as a intermediary facilitator.  I

22  didn't sign any document, an attorney of record, or as counsel

23  of record for Mr. Morton, and if the debtors wanted that they

24  could have asked for something and maybe we'd be in a different

25  position, but they did not.  The same, Your Honor, I would just

 1  mention the same way if I had an issue with Mr. Rajan's

 2  brother, Roger Rajan, I would speak to debtors counsel because

 3  they facilitate that, but unless they enter an appearance on

 4  his behalf.

 5       THE COURT:  Well, they may also say, well, we don't

 6  have the authority and what basis would we do anything because

 7  we don't represent him, so why would we be -- if they ask you

 8  for something, wouldn't you -- never mind.  I'm just reading

 9  this.

10       MR. CAPONI:  Guess they were overly courteous.

11       THE COURT:  Okay.  Hold on.  Yes, and that's why we

12  did what we did.  Mr. Caponi, your second motion says,

13            "The undersigned counsel here filed this motion to

14            extend time to file and answer pursuant to Rule

15            9006(b)(1) requesting this Court to extend the

16            deadline to respond to the complaint for all

17            defendants for a second time pursuant to Federal Rule

18            of Bankruptcy Procedure 9000."

19       Okay.  You said all -- that's probably why my order

20  said what it said.

21       MR. CAPONI:  Your Honor, I absolutely said all

22  defendants.  And as we explained in the motion, because debtors

23  were cherry-picking and creating litigation chaos, we were

24  asking that the Court -- I did not -- I asked on behalf of all

25  defendants.  I did not have any authority for SLS.  I had no

1   authority --

2         THE COURT:  Well, then why did you file if you didn't

3   have the authority to ask all the defendants?

4         MR. CAPONI:  Because I -- well, I was -- as we argued

5   in the motion, from a judicial efficiency standpoint, in order

6   to stop the chaos, we wanted the Court to set a date whereby

7   all defendants were extended in order to prevent debtors from

8   stopping this games of asking for discovery from certain, Rule

9   26 from a different, motion to default from this one, motion to

10  default parties that they know that have no basis for default.

11        So in order to stop the chaos, as I explained in

12  detail, we wanted to level set the proceeding to where all

13  people.  That's why the other parties filed joinders, because I

14  was not representing them or speaking on their behalf.

15        THE COURT:  They're not -- Counsel, let me just tell

16  you.  Do not file anything asking for all defendants if you do

17  not represent all defendants.  Because when I read this, it

18  said all defendants.

19        MR. CAPONI:  I apologize, Your Honor, if --

20        THE COURT:  And nowhere did you drop a footnote

21  saying that -- you talked about, in your first paragraph,

22  they're filing a request of the extension of the response

23  deadline for all defendants to respond to the complaint in

24  order to end, as the Delaware Supreme Court, the plaintiffs'

25  litigation chaos.  Nowhere did you advise the Court when you

1   made that request that you said, I don't represent the other

2   defendant -- at least I don't see it in here.  Maybe you said

3   it somewhere else.

4          MR. CAPONI:  Your Honor, I think I would have relied

5   upon the -- you know, my fault if it wasn't clear, the title of

6   the motion as well as my signature block, but I take the

7   Court -- and the substance of the motion I thought conveyed

8   that message.  But if it wasn't clear, that's my fault.

9          THE COURT:  Well, Counsel, I don't go by titles.

10  Titles mean nothing to the Court.  You people mistitle motions

11  all the time.  I look at the content.  And that is likely why

12  my order was written the way that it was, was because I -- and

13  I couldn't understand why I would say that if you dropped a

14  footnote saying that it didn't apply to Mr. Morton, I would

15  wonder why I would do something like that, but apparently I

16  gave you exactly what you asked for, which an extension for all

17  defendants, and not once did you say, I don't have the

18  authority to ask that for everybody because I don't represent

19  them.  The other two parties joined in.

20         And again, I do not rely on titles.  I don't -- even

21  if the signature block says one thing, I look at what you asked

22  for.  And I believed what you said was correct, that we needed

23  to put some deadlines for everybody in here so that we could

24  have this litigation move smoothly.

25         Now, all of this goes back to whether Mr. Morton --

1    he says Mr. Morton is not here.  Mr. Morton is not a party and

2    he's not represented.  I guess Mr. Colby could have made that

3    argument, I guess.  Counsel for Mr. Stastney, anybody, could

4    have made it, but I'm not quite sure why they would if they're

5    not representing him.  But that's neither here nor there.

6           The question -- and we went off -- we all went

7    off -- at least I went off on a tangent having to do with

8    whether he can ask him questions about Mr. Morton given that

9    Mr. Morton is not here, hasn't -- well, no appearance has been

10   entered on his behalf.  Maybe he'll represent his self.  I

11   don't know.

12          MR. ZAHRALDDIN:  Well, Your Honor, the -- my

13   understanding and what I've read in the Chancery Court docket

14   below is that Mr. Caponi tried this before in front of Judge

15   Laster and said that Mr. Morton isn't involved in this, he's no

16   longer there, and that there was a decision that said, no, Mr.

17   Morton was definitely involved.  He did all these things.  Now,

18   I don't --

19          THE COURT:  Well, that's all fine and well but what

20   does that have to do with me?

21          MR. ZAHRALDDIN:  Let me --

22          MR. CAPONI:  Categorically false, Your Honor.

23   Categorically false.

24          THE COURT:  All right.  I don't --

25          MR. ZAHRALDDIN:  Okay.

```
 1              THE COURT:  The whole -- I don't know the context.

 2   Doesn't have anything to do with me.  I don't know what the

 3   judge was basing his decision on.  Unless you're telling me

 4   he's saying, I didn't represent Mr. Morton, he's not in here,

 5   and the Court says, Well, you're doing something, I'm going to

 6   find you representing him.  That's the only issue.  Because Mr.

 7   Caponi is taking the position, I don't represent him, I was a

 8   facilitator.  Now, that's a new one.

 9              I also like the word "blunderbuss."  Is that what you

10   said?

11              MR. ZAHRALDDIN:  Yes, he did.

12              THE COURT:  I thought that was nice.

13              MR. ZAHRALDDIN:  He did.  It's Mister -- Hawk

14   Investments, Mister -- I mean Mr. Caponi can disagree, I think

15   it would be insane if he did, but Hawk Investments Holding

16   Limited, the holding company, is the family office for Mr.

17   Morton's family.  So you can separate this out.  You can say

18   maybe --

19              THE COURT:  Who -- who's the officer of -- is there

20   an office --

21              MR. CAPONI:  Yes, Your Honor.

22              THE COURT:  Is it a family trust?

23              MR. CAPONI:  Hawk Investments Holdings is equivalent,

24   in the Jersey Isles, what you would consider to be a trust

25   here.  It is not a family office.  It is --
```

Case 23-10763-amc   Doc 828-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 145 of 275

144

```
 1              THE COURT:  It's a -- you said New Jersey?

 2              MR. CAPONI:  Jersey Isles.  The Isles of Jersey off

 3  of Britain.

 4              THE COURT:  Oh, in Britain?

 5              MR. CAPONI:  In Britain.  Yes.

 6              THE COURT:  Okay.  So in --

 7              MR. CAPONI:  Jersey, I think, technically.

 8              THE COURT:  I don't even know where that is --

 9              MR. CAPONI:  Yeah.

10              THE COURT:  -- but if you tell me it's in Britain,

11  off the Isles, it's fine.

12              MR. CAPONI:  And there is a professional trust

13  company -- this was all -- debtors explored this in detail in

14  the Court of Chancery.  And there's a company called Albanese,

15  which is a professional trust company.

16              THE COURT:  Can you spell that?

17              MR. CAPONI:  How do I spell Albanese?

18              THE COURT:  Like Albany with an I-E-S?

19              MR. CAPONI:  What?

20              UNIDENTIFIED SPEAKER:  Like Albany, New York.

21              MR. CAPONI:  Like Albany, New York, yes.

22              THE COURT:  With an I-E-S?  You said Albanese or

23  Albany' --

24              MR. CAPONI:  Albanese, S-E at the end.

25              THE COURT:  Okay.  I have A-L-B-A-N-I-E-S.  Is that
```

```
 1   close?

 2            MR. CAPONI:  Yes.  I think that's close.

 3            THE COURT:  Okay.

 4            MR. CAPONI:  And that is a professional trust

 5   company.  And they manage these assets.

 6            THE COURT:  They manage --

 7            MR. CAPONI:  All decisions.

 8            THE COURT:  For Hawks?

 9            MR. CAPONI:  For Hawk.  They make all decisions for

10   Hawk.  They're the only party -- and, again, debtors deposed

11   the individuals from Albanese in the Court of Chancery below

12   who testified at length, and Vice Chancellor Laster found that

13   was correct.  So Mr. Morton has -- he's a --

14            THE COURT:  Is he a beneficiary --

15            MR. CAPONI:  -- 80-some-year-old individual.

16            THE COURT:  -- of the trust?

17            MR. CAPONI:  No, he's not.

18            THE COURT:  What's his relationship, if any?

19            MR. CAPONI:  His money, many decades ago --

20            THE COURT:  He's the -- he's the --

21            MR. CAPONI:  -- founded the trust.

22            THE COURT:  -- settler -- he's the --

23            MR. CAPONI:  But he's not part of it.

24            THE COURT:  He's the one who --

25            MR. CAPONI:  Settler.
```

1              THE COURT:  Settler of the trust.  He's the one who

2    established the trust?

3              MR. CAPONI:  Technically, he didn't settle the trust.

4    I think he --

5              THE COURT:  Well, isn't the person who

6    establishes -- I'm not sure if I'm using the right word,

7    settler.

8              MR. CAPONI:  There was --

9              THE COURT:  The person who creates it.

10             MR. CAPONI:  He was -- his -- it's very technical.

11   Ultimately, his money went into vehicles, went into vehicles

12   that got put into the trust, different voting structures

13   between his wife and other trusts and whatnot.

14             THE COURT:  Okay.

15             MR. CAPONI:  Very complex.

16             THE COURT:  So who created the trust?  Somebody had

17   to create the trust and put in the trust the assets.

18             MR. CAPONI:  I think it was a prior marital trust

19   between him and his wife that ultimately resulted in Hawk, but

20   it was -- you know, if you want to go -- the genesis was

21   Mr. Morton's money --

22             THE COURT:  Okay.

23             MR. CAPONI:  -- that he raised over years.

24             THE COURT:  That's all fine and well, Mister -- it

25   might have created the entities, but somebody had to create the

 1   trust, and into the trust put in the assets and named the

 2   beneficiaries.  And you're saying at some point some entity,

 3   that Mr. Morton may or may not have funded or created, created

 4   the trust and all of these different assets were placed into

 5   the trust and there's beneficiaries and the trust is managed by

 6   Albanese.

 7           MR. CAPONI:  The trust is managed by Albanese.

 8   Mr. Morton is not a beneficiary.  And the Stream asset, I

 9   believe, was not put into the trust but was an acquisition made

10   by Albanese as part of their trustee duties.

11           THE COURT:  Okay.  So Albanese was the vehicle by all

12   the -- not the vehicle.

13           MR. CAPONI:  The trustee, effectively.

14           THE COURT:  The trustee who decided to invest and put

15   this in the trust.

16           MR. CAPONI:  Yes.  And Albanese to this day is the

17   sole decisionmaker.  Mr. Morton has zero say in what happens

18   in -- with the Hawk Investment Limited because it's all done by

19   Albanese.

20           THE COURT:  Okay.

21           MR. ZAHRALDDIN:  Your Honor, Your Honor.

22           THE COURT:  Yes.

23           MR. ZAHRALDDIN:  I apologize.  Mr. Morton signed the

24   omnibus agreement himself.  Not Albanese, not the trust.  So

25   whatever he's put in the way of this or whatever the deal, I

1    mean, Mr. -- to say Mr. Morton is not involved here -- and

2    we're going way afield.  Because we were talking about --

3         THE COURT:  This all boils down to is this a

4    statement by a party in interest, which Mr. Caponi said it is

5    not because he hasn't been served, he hasn't been -- entered

6    his appearance.  I get a document that says he's got an

7    extension.

8         So by some way, I don't know who got it, who didn't,

9    he somehow has gotten some kind of extension which -- so

10   typically when you say people aren't involved, they haven't

11   served, they don't know anything, I'm not quite sure, if you

12   reach out and ask for an extension, to say, well, you can

13   argue, you can file a motion to dismiss for improper service or

14   all sorts of reasons other than an answer, but I'm not quite

15   sure what to do with -- this is a new one where someone gets an

16   extension and then say, I haven't subjected myself to the Court

17   because I haven't formally entered my appearance.

18        And maybe that's correct.  I don't know.  I have

19   never had to address that.  But the whole issue that we've gone

20   down this rabbit hole on is whether Mr. Morton's statements or

21   alleged statements or actions, you know, if it's something he

22   -- observed on his own, I don't care who Mr. Morton is.  If Mr.

23   Rajan said, I saw Mr. Morton doing these things, then, fine.

24   But the whole point is I don't know how this is a statement

25   against interest, unless it's something written by Mr. Morton,

1   he can't tell me what somebody -- I mean, the whole thing is

2   how does he even know this?

3           MR. CAPONI:  Well, Your Honor, point of

4   clarification.  Opposing counsel was wrong.  Mr. Morton did not

5   sign the omnibus agreement.  Again, overstating his role.

6           THE COURT:  All right.  Listen, Counsel --

7           MR. CAPONI:  I just want to be clear on the record

8   about that.

9           THE COURT:  Okay.

10          MR. CAPONI:  He did sign the omnibus agreement.  And,

11  two --

12          MR. ZAHRALDDIN:  Which one?

13          MR. CAPONI:  Again, I don't know why we're going down

14  this rabbit hole.  Mr. Morton is not here.  If he --

15          THE COURT:  Well, even if he wasn't here, Counsel, if

16  he testified, I observed --

17          MR. CAPONI:  I agree with that.

18          THE COURT:  But we don't know.  He just said he was

19  in his office.

20          So how about the objection be basis for that

21  statement, whether Mr. Morton is here or not.  If it's

22  something somebody else told him, pretty easy.  Hearsay.

23  Either he saw him -- because even if someone is not here and

24  you actually see and say, I saw him doing this --

25          MR. CAPONI:  Your Honor, respectfully, I think if I

 1   see -- I don't see someone speak, I hear someone speak, and

 2   that's the definition of hearsay.  An out-of-court statement

 3   offered for the truth of the matter asserted when the declarant

 4   is not available to defend or rebut when it's not a party

 5   opponent.  So Mr. Rajan, if he sees something, he's only

 6   speculating as to what he's seeing.  If he hears it and

 7   regurgitates it in court, that's hearsay.

 8           THE COURT:  Well, let's --

 9           MR. CAPONI:  That's my position.  I understand the

10   Court has to make a ruling.

11           THE COURT:  Right.  So with respect to the party,

12   I'm -- I'm troubled by the fact that he got an extension and

13   now you say, Well, I did it as a courtesy.  Well, then I'm not

14   quite sure that people can always play the game, I didn't

15   formally enter.  I restate to counsel, he gave me an extension,

16   I didn't -- what if I had denied the extension knowing that

17   Mr. Morton had already gotten an extension but hadn't been

18   served?  Did he waive service by getting an extension?  I don't

19   know all that.  Now you're creating all sorts of problems for

20   me.

21           MR. CAPONI:  Honestly, Your Honor, I'll tell you

22   there's no problem because I was very meticulous about this

23   along the way and --

24           THE COURT:  Except you weren't in that motion you

25   filed.

1          MR. CAPONI:  And if Mr. Morton is ever served the

2     first motion I'll be filing is a motion for lack of personal

3     jurisdiction but we're not there yet, and I've made sure not to

4     waive anything.

5          THE COURT:  And I don't know whether you'll win that

6     or not.  I have -- I have a very lengthy, I think 80-page

7     opinion on personal jurisdiction over parties that were in

8     Canada and their actions here in the U.S., or inaction, because

9     some people I found were, some people I found were not.  Might

10    want to take a little look at that.

11         MR. CAPONI:  I will, Your Honor.  Absolutely.

12         THE COURT:  I don't remember the name of the case but

13    it was one that I took a lot of time having to --

14         MR. CAPONI:  Understood.

15         THE COURT:  You know, at the time it was great

16    because my daughter was studying for the bar and now we had to

17    talk about personal interest so she -- we both learned a lot on

18    personal jurisdiction.

19         MR. CAPONI:  You assuredly will.

20         THE COURT:  Refresher.  Anyway, so, Counsel, the

21    question to Mister -- back to the question at hand to Mr. Rajan

22    was something about Hawk and then you said Hawk has -- well,

23    actually that was -- was Hawk involved in the TRO, and then you

24    asked the question, Who's Hawk?  And then so you asked Mr.

25    Rajan who's Hawk, and he said Hawk was, I guess, the company

Case 23-10763-amc   Doc 843-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 152 of 275

152

1   and Mr. Bob Morton.  Okay.

2          And you're objecting.  That's his -- that's his

3   understanding.  You can, I guess, ask him questions.  You don't

4   like his answer but that's his understanding of who it is.

5          MR. CAPONI:  Understood.  But to the extent he wants

6   to say Hawk did something --

7          THE COURT:  Right.  Now the next --

8          MR. CAPONI:  -- he has to identify who said it.

9          THE COURT:  -- question -- no.  The next thing was

10  Bob Morton was in his office showing off the TVs, and that's

11  what your objection was, Mr. Morton is not here, he's not a

12  party, and -- said it was a party -- a statement of a party in

13  interest, and you're, like, no, it's not because he's not here.

14         MR. CAPONI:  Correct.

15         THE COURT:  Okay.  And I had to figure out, based on

16  they said, yes, he is here because he got an extension to

17  answer.  And then I looked at the motion and it didn't said he

18  got an extension, and the question for me is:  Well, what does

19  that mean?  Are you -- have you appeared by requesting or do

20  you have to formally enter your appearance?  What does all that

21  mean?

22         And your position, Mr. Caponi, is I can ask for all

23  the extensions I want.  If I don't answer, I haven't entered my

24  appearance and I'm not -- I haven't subjected myself to this

25  Court's jurisdiction because I haven't done anything yet.

 1  Correct?

 2          MR. CAPONI:  Correct.

 3          THE COURT:  Counsel, your response to that?  All of

 4  that to get to this.

 5          MR. CAPONI:  Yes, Your Honor.

 6          THE COURT:  Par for the course in this case.

 7          Counsel, your response to Mr. Caponi's position that

 8  just because Mr. Morton may have gotten an extension, he is

 9  still not subject to this Court's jurisdiction and any

10  statement of a party in interest does not apply because he

11  hasn't formally submitted his self to this Court's

12  jurisdiction.

13          MR. KODOSKY:  I don't know that he needs to be

14  present for Mr. Rajan to be able to answer the question about

15  how is Hawk involved with the TRO motion.

16          THE COURT:  Well, he said Hawk and more -- I guess

17  about Hawk, yes, because Hawk is already in here.  The question

18  went to Mr. Morton.  Because he started talking about

19  Mr. Morton and some TVs and showing it to people.

20          MR. CAPONI:  Yes, Your Honor.  So to be -- put a

21  finer point on it, if someone were to say Albanese said on

22  behalf of Hawk, that would be conceivably an admission by a

23  party opponent.  But as I've explained, Mr. Morton is not

24  a -- not affiliated with Hawk so his statements are not

25  attributable to Hawk, which is here.  They're only attributable

1    to him.  And so --

2            THE COURT:  And he --

3            MR. CAPONI:  -- the debtors admitted -- I mean, it's

4    a fact.  The debtor admitted last Friday it has not even served

5    Hawk.  So it's not like I'm -- I was cute in responding.

6            THE COURT:  You mean Mr. Morton.

7            MR. CAPONI:  Mr. Morton.  Sorry.  The debtor's

8    admitted it has not even served Mr. Morton.  So, you know, I

9    don't know how the debtor can say, I've even served a party but

10   yet they're deemed present and I get to admit their

11   out-of-court statements.

12           THE COURT:  Because they got an extension.  That's

13   what they said.  Well, they got an extension to answer the

14   complaint; therefore, they're in here.

15           MR. CAPONI:  Yes, Your Honor.  And to that point, my

16   client should not be punished for my good -- for my being a

17   good lawyer and getting an extension without entering an

18   appearance.

19           THE COURT:  Well, the question is can you even --

20   that was the question, whether you're a good lawyer, bad

21   lawyer, lawyer any -- any kind of lawyer.  The fact that you

22   reached out to opposing counsel and asked for an extension,

23   does that then mean that you're subject to my jurisdiction?

24           MR. CAPONI:  I think not, Your Honor.

25           THE COURT:  You think not, and that's my question.

1           MR. KODOSKY:  I think so.

2           THE COURT:  On what basis?  Somebody tell me

3    something.

4           MR. KODOSKY:  I haven't --

5           THE COURT:  On what basis you believe asking for an

6    extension subjects you to my jurisdiction and means you're now

7    a party to the matter?

8           MR. ZAHRALDDIN:  Your Honor, if someone reaches out

9    to me, which they did, and we have folks that are overseas, and

10   several people did reach out to me, not through Mr. Caponi,

11   etcetera, and they asked for an extension, and I was glad to

12   give an extension.  I never said no to an extension, if they

13   put in the motion that I filed.  I've simply asked for an

14   accompanying motion in lieu of answer schedule and I asked for

15   a Rule 26(f).  That's it.  Instead of getting a response, they

16   fired off the motions.  But I did give --

17          THE COURT:  Who -- oh, the motion --

18          MR. ZAHRALDDIN:  The motion to extend.  But when

19   someone calls me up in the middle of -- when people are

20   overseas and they haven't lawyered up and different people have

21   gone to different folks, I did take it as that I was giving an

22   extension because I was being asked by someone who is an

23   official representative.  If that was my mistake, that's fine.

24          My only regret is the last 25, 30 minutes of

25   discussing this.  Because I'd rather us get to the evidence

Case 23-10763-amc    Doc 828-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 156 of 275

156

1    here.  But, yes, I believe that when someone represents, hey,

2    can you give an extension to somebody, that they have then

3    decided they're going to enter the case, if I was mistaken,

4    then we'll figure out how to get Mr. Morton in later.

5              THE COURT:  Okay.  Okay.

6              MR. CAPONI:  I don't know if that was a withdrawal of

7    the question, I'll sit down, or if I -- if we're still going on

8    about this.

9              THE COURT:  What are we doing, Mr. Kodosky?  Are you

10   going with the -- the issue regarding Mr. Bob Morton or are you

11   only going to concentrate on Hawk?

12             MR. KODOSKY:  My next question was going to be about

13   Google.

14             THE COURT:  All right.  So you're withdrawing the

15   question, or what?

16             MR. KODOSKY:  He's answered my question, I believe.

17             THE COURT:  Well, they want to strike his answer with

18   respect to --

19             MR. CAPONI:  Yes, Your Honor.  I mean, if he's not

20   withdrawing -- if he's withdrawing --

21             THE COURT:  -- Mr. Morton showing the TV in his

22   office.

23             MR. CAPONI:  Correct.

24             MR. KODOSKY:  Just as to Mr. Morton but not Hawk,

25   Your Honor.

*TheRecordXchange*
www.trxchange.com · (800) 406-1290

```
 1                THE COURT:  All right.  Agree to strike the answer as
 2   to Mr. Morton but not as to Hawk.
 3                MR. CAPONI:  No.  Because if the only person showing
 4   a TV or doing whatever was Mr. Morton, he is not Hawk.  They
 5   have nobody -- they need to establish somebody from Hawk --
 6                THE COURT:  Counsel --
 7                MR. CAPONI:  -- did something, someone with
 8   authority.
 9                THE COURT:  -- he's agreeing that that testimony can
10   be stricken.
11                MR. CAPONI:  Yes, Your Honor.
12                THE COURT:  So why are we talking about it?
13                MR. CAPONI:  He said he wants it not stricken as to
14   Hawk.  It has to be stricken as to both.
15                THE COURT:  No.  He said -- I understood he said his
16   testimony regarding Hawk and Hawk being involved in the TRO
17   being -- is that what you were saying?  Or you're only
18   withdrawing it -- which one?
19                MR. KODOSKY:  The way you characterized it the first
20   time, Your Honor.
21                THE COURT:  Which is?
22                MR. KODOSKY:  As to Hawk, not as to Mister -- as
23   to -- as to Mr. Morton but not as to Hawk.
24                THE COURT:  And so the testimony relates to Hawk how?
25   I misunderstood what he was -- what he was --
```

| | |
|---|---|
| 1 | MR. CAPONI:  Yeah.  Sorry, Your Honor.  Yeah, I |
| 2 | understood what he just said. |
| 3 | THE COURT:  I -- obviously I'm out of the loop here. |
| 4 | So you want that testimony to be stricken as to Mr. Morton but |
| 5 | not stricken with respect to looking at the TVs.  Is that what |
| 6 | we're talking about, that testimony? |
| 7 | MR. KODOSKY:  Yes.  Yes, Your Honor.  About the TVs? |
| 8 | THE COURT:  Yes. |
| 9 | MR. KODOSKY:  The TVs that Mr. Morton had stolen -- |
| 10 | THE COURT:  You guys with the stealing, the this -- I |
| 11 | had enough of that.  I had enough from somebody.  These the bad |
| 12 | guys, you're the bad guys, you're stealing, you're doing this. |
| 13 | Please leave that out.  That really doesn't help me, and |
| 14 | actually it sort of irritates me when people start attributing |
| 15 | bad facts and bad things to different parties.  And you're both |
| 16 | doing it.  Okay?  You're both doing it.  Please stop.  It |
| 17 | doesn't move the ball one iota for me, and it actually makes me |
| 18 | a little jaded when I have to look at this.  So let's leave the |
| 19 | descriptions out.  They don't help me.  Okay? |
| 20 | MR. KODOSKY:  Yes, Your Honor. |
| 21 | THE COURT:  So to the issue at hand, you want the |
| 22 | statement regarding Mr. Morton allegedly showing TVs in his |
| 23 | office, or somebody's office, you want that to remain of record |
| 24 | and attributed to Hawk? |
| 25 | MR. KODOSKY:  Yes. |

```
 1              THE COURT:  Mr. Caponi, you're objecting on the basis

 2   that?

 3              MR. CAPONI:  Mr. Morton has no affiliation with Hawk

 4   and, therefore, Mr. Morton's statements are not a statement by

 5   Hawk.

 6              THE COURT:  Or they have failed to establish the

 7   relationship?

 8              MR. CAPONI:  Excuse me, Your Honor?

 9              THE COURT:  He has failed to establish --

10              MR. CAPONI:  Yes, he's failed to establish a

11   connection between Mr. Morton and Hawk.

12              THE COURT:  All right.  Counsel, I sustain that you

13   have to -- to establish a relationship between Mr. Morton and

14   Hawk so that I can find that those statements or actions or

15   whatever could be attributable to Hawk.

16   BY MR. KODOSKY:

17   Q    Mr. Rajan, apart from what you described earlier, are

18   there any other complaints that we have not spoken to regarding

19   Hawk?

20              THE COURT:  Okay.  So we're withdrawing that question

21   with respect to the TVs and Hawk, which is what I thought we

22   were doing.  Yes?  No?

23              MR. KODOSKY:  Yes, Your Honor.

24              THE COURT:  You withdrawing that?

25              MR. KODOSKY:  Yes.
```

```
 1              THE COURT:  All right.  See, I had it right, Mr.

 2   Caponi.  Mr. Caponi, come on.

 3              All right.  Go ahead, next question.

 4   BY MR. KODOSKY:

 5   Q    Any other issues with Hawk, other than what you've

 6   described?

 7   A    Yeah.  Hawk has a history of interfering with the -- the

 8   technology and the trade secrets of Stream TV for a number of

 9   years now.  There's been -- even when the loans were in good

10   standing, Hawk went and blocked the company software from a

11   number of our engineers unbeknownst to the company, went and

12   blocked the software.  So they have a long history of doing

13   this.

14              THE COURT:  All right.  Is it being blocked now?

15              MR. CAPONI:  Yeah, objection, Your Honor.  Not

16   relevant to the present motion for a TRO.

17              THE COURT:  I mean, I did see in the motion that

18   there was some issue about somebody, I guess Hawk, not

19   returning some websites and -- where did I read that?

20              MR. CAPONI:  Yeah.  That was not Hawk.  I think the

21   allegation there is SeeCubic, but that certainly is nothing to

22   do with -- control over a domain has nothing to do with this

23   new supposed interference with blocking licenses from years ago

24   that Mr. Rajan just stated.  Whatever that was certainly has

25   nothing to do with the present, Your Honor.
```

```
 1              THE COURT:  Counsel, objection on the basis of

 2   relevance and what else, Counsel?

 3              MR. CAPONI:  Not relevant.

 4              THE COURT:  Okay.  Counsel.

 5              MR. KODOSKY:  I'm ready to move on, Your Honor.

 6              THE COURT:  All right.  Withdrawn?

 7              MR. KODOSKY:  Yes.

 8              THE COURT:  Withdrawn.  Move on.

 9   BY MR. KODOSKY:

10   Q    Mr. Rajan, did Stream have a project with Google?

11   A    Yes.  Stream was working with Google and Stream was an

12   approved vendor by Google.

13              MR. KODOSKY:  Permission to approach, Your Honor?

14              THE COURT:  Okay.  You have an exhibit that you want

15   to introduce?  Because it's surely not to refresh his

16   recollection.

17              MR. KODOSKY:  Yes, Your Honor.

18              THE COURT:  Okay.  Hand that to --

19              MR. KODOSKY:  D-28.

20              UNIDENTIFIED SPEAKER:  28?

21              MR. KODOSKY:  Yes.  Can I ask one quick question

22   while it's being done, Your Honor?

23              THE COURT:  Sure.  Go ahead.

24   BY MR. KODOSKY:

25   Q    Mr. Rajan, why do you think --
```

```
1              THE COURT:  Don't hold -- you said one before that.

2    Go ahead.

3              MR. KODOSKY:  And the question that I have doesn't

4    relate to this document, Your Honor, but --

5              THE COURT:  So don't hand it to him yet, John.

6    BY MR. KODOSKY:

7    Q    Mr. Rajan, why do you believe Mr. Morton is Hawk?

8    A    Bob Morton, all of his money went into -- Hawk money is

9    Bob Morton's money.  He negotiated all the deals with Stream

10   TV, the conversion agreements.  He was involved in the omnibus.

11   And he was ordered to testify in the Chancery Court.

12             MR. CAPONI:  Objection.  Objection, Your Honor.

13   Mischaracterizes the order of the Court of Chancery.

14             THE COURT:  Okay.  But what with respect to that he

15   negotiated all the agreements with Stream?

16             MR. CAPONI:  Sorry, Your Honor, I didn't hear that.

17             THE COURT:  His testimony was that Mr. Morton

18   negotiated all the agreements with Stream and he also was

19   ordered to testify in --

20             MR. CAPONI:  Mr. Rajan testified that the Court of

21   Chancery ordered --

22             THE COURT:  I got that part.  I was asking about the

23   other part.

24             MR. CAPONI:  I'm not -- I'm not taking issue with the

25   prior.
```

Case 23-10763-amc   Doc 823-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 163 of 275

163

1          THE COURT:  Okay.

2          MR. CAPONI:  Just the last piece.

3          THE COURT:  Okay.  And you object on the basis --

4          MR. CAPONI:  A, it's hearsay, and B, it's incorrect.

5          THE COURT:  Counsel, only with respect to the issue

6   of Mr. Morton being ordered to testify by the Chancery Court

7   and the Chancery Court -- presumably, the Chancery Court

8   litigation.

9          MR. CAPONI:  Yes, Your Honor?

10         THE COURT:  Presumably, in the Chancery Court

11  litigation?

12         MR. CAPONI:  Yes.

13         THE COURT:  Okay.

14         MR. CAPONI:  In the 225 proceeding.

15         THE COURT:  Okay.  Well, there's been a lot of

16  proceedings; right?

17         MR. CAPONI:  Yes, Your Honor.

18         THE COURT:  So I don't know which one of them it is.

19  Okay.  Response.

20         MR. KODOSKY:  To the objection, Your Honor?

21         THE COURT:  Yes.  Only with respect to Mr. Morton

22  being ordered by the Chancery Court to testify in the 225

23  litigation.

24         MR. KODOSKY:  To the extent that he was ordered, I

25  guess we could ask that he be -- that the Court take judicial

Case 23-10763-amc   Doc 843-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 164 of 275

164

1    notice of that.

2         THE COURT:  Where?  Is there something on the docket

3    that says that?

4         MR. CAPONI:  It -- it was, in fact, not ordered.  So

5    I'm happy with the Court to take judicial notice of the fact

6    that the debtor requested -- or the prepetition debtor

7    requested and their request was denied, if they would like that

8    entered into the record, I'm okay with that.  That would be

9    accurate.

10        MR. KODOSKY:  I believe Mr. Rajan can elaborate.

11        THE WITNESS:  Yeah, he would --

12        THE COURT:  Whoa, whoa, whoa.  He's asking me to take

13   judicial notice of an order entered on the docket.  The only

14   thing my -- and, Counsel, I think based on my last order

15   regarding judicial notice, I can only take judicial notice of

16   what an order says, not a rationale or any of that sort

17   of -- the Court -- if there's an order that says

18   Mr. Morton -- the debtor's request to compel Mr. Morton to

19   testify is denied --

20        MR. CAPONI:  Your Honor, I'll make it easy on you.

21   They can admit that whole order and the whole transcript

22   related to it --

23        THE COURT:  I don't want -- but --

24        MR. CAPONI:  -- if they want to.  I won't object.

25        THE COURT:  They can object -- you can admit it all

 1 | you want.  Third Circuit says I can't read that transcript.

 2 |         MR. CAPONI:  No.  I just have our issue with Mr.

 3 | Rajan trying to admit it.

 4 |         THE COURT:  Okay.

 5 |         MR. CAPONI:  If they're willing to bring the document

 6 | for its -- on its own, bring it out and let's take a look at

 7 | it.

 8 |         THE COURT:  All right.  Counsel.

 9 |         MR. CAPONI:  Because it will be accurate.  I'm okay

10 | with accuracy.

11 |         MR. KODOSKY:  I'll withdraw that --

12 |         THE COURT:  So, Counsel, he's objecting on the basis

13 | that it's, one, I guess he would have to ask him what's his

14 | understanding, what's his basis, all of those things.  Because

15 | he's failed to establish how Mr. Rajan would know that he was

16 | ordered.  I mean, maybe you think otherwise, but he could still

17 | try to --

18 |         MR. CAPONI:  I agree.  I'm not going to stand on an

19 | objection I know the answer to.  Mr. Rajan participated in

20 | these proceedings.  But Mr. Rajan trying to speak for the Court

21 | of Chancery is hearsay.

22 |         If they'd like to enter the order, I'm okay with that

23 | because it will then be accurate and my -- the reason why we

24 | don't let hearsay in, because Vice Chancellor isn't here to be

25 | called to say Mr. Rajan got it wrong.  Enter the order, pull it

Case 23-10763-amc   Doc 828-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 166 of 275

166

1 out.  It's on the docket.  It's public record.  I'll have no

2 issue with that at all.

3          THE COURT:  Counsel.

4          MR. KODOSKY:  The portion where he said that he was

5 ordered, Your Honor, we'll withdraw that.  But the rest of

6 the -- the rest of the answer stands.

7          THE COURT:  Okay.  But he wasn't objecting to the

8 other answer.

9          MR. KODOSKY:  Correct.

10          THE COURT:  We'll strike -- move to strike.

11          MR. CAPONI:  Move to strike, Your Honor.

12          THE COURT:  We'll strike that portion.  All right.

13 Next.

14 BY MR. KODOSKY:

15 Q    Mr. Rajan, you've been handed what has been marked for

16 identification as D-28.  Do you recognize this document?

17 A    Correct.

18 Q    What is it?

19 A    We had one of our suppliers ship components to SeeCubic of

20 the Netherlands for the Google project.

21          MR. COLBY:  Your Honor, I object to the relevance of

22 this document on the grounds that it is from 2020 and 2019.

23 We're going even farther back in time, apparently, for this

24 line of inquiry.  It's got no bearing on whether or not there's

25 a basis for a TRO now because of immediate, imminent

```
 1  irreparable harm.

 2          MR. KODOSKY:  Let me get there, Your Honor.  I

 3  believe that his testimony is going to be that Mr. Stastney is

 4  hiding the assets necessary to fulfill the order.

 5          THE COURT:  All right.  Counsel, I'll allow him to

 6  try to make a foundation.  Go ahead.  He says he can prove the

 7  relevance.  Okay.  Go ahead.

 8          MR. KODOSKY:  Move for the admission of this --

 9          THE COURT:  Wait a minute.  What did he say it was?

10  Did we even identify it?

11          MR. COLBY:  No, no.  I don't believe appropriate

12  foundation has been laid.

13          THE COURT:  All right.  We need a foundation.

14  BY MR. KODOSKY:

15  Q    Mr. Rajan, are you the custodian of this record at Stream

16  TV?

17  A    Yes.

18  Q    Is this a document that is an accurate record of the --

19          MR. KODOSKY:  Actually, Your Honor, this is a verbal

20  act.  This is --

21          THE COURT:  This is what?

22          MR. KODOSKY:  I'm starting to lay the foundation for

23  a business record, but to the extent that this is not hearsay

24  but, instead, would qualify as a verbal act --

25          THE COURT:  A verbal act?
```

```
 1                 MR. KODOSKY:  Purchase order.

 2                 THE COURT:  Oh, a purchase order is a --

 3                 MR. KODOSKY:  Like a contract.

 4                 THE COURT:  That's a new one.  So it's an exception

 5   under what hearsay rule?

 6                 MR. KODOSKY:  801.  It's not -- it's not actually

 7   hearsay.  It's not being offered to prove the truth of the

 8   matter asserted.

 9                 THE COURT:  Okay.  Rule 801.  All right.

10                 MR. KODOSKY:  Establishes the legal obligations and

11   rights of the parties.

12                 THE COURT:  Okay.  Hold on.  801, what?  I got my

13   little handbooks.

14                 MR. KODOSKY:  You know --

15                 THE COURT:  Okay.  Definitions that -- okay.  So a

16   hearsay means a statement that the declarant does not make,

17   while testifying at the current trial, or hearing, and a party

18   offers in evidence to prove the truth of the matter asserted in

19   the statement.  A statement that is not hearsay is which one?

20   You're saying a declarant?  No, it's not a prior statement.  An

21   opposing party statement, okay.  So, which one?  What are we

22   going on, the 801 what?

23                 MR. KODOSKY:  For verbal acts, Your Honor.

24                 THE COURT:  Where is it?

25                 MR. KODOSKY:  Verbal act is not defined in the rule,
```

1    this is not a --

2          THE COURT:  Oh.  A statement means a person's oral

3    assertion, written assertion, or nonverbal conduct, if the

4    person intended it as an assertion.  So you say this is a

5    verbal conduct so it doesn't meet the statement.

6          MR. KODOSKY:  It's legally operative language

7    accomplishing something through words rather than making an

8    assertion.

9          THE COURT:  Huh.  Counsel?

10          MR. COLBY:  Well, I guess I wasn't making precisely a

11    hearsay objection, it was a relevance objection.

12          THE COURT:  Okay.

13          MR. COLBY:  I would also note that this document is

14    SeeCubic B.V.  The question attempting to lay the foundation

15    had to do with Stream TV, a different entity multiple levels up

16    in the organization, and I'd also note that it's unsigned.  So

17    I don't think that there has been an appropriate foundation

18    laid for the admission or authenticity of this document.

19          THE COURT:  Okay.  Counsel?

20          MR. COLBY:  I'm still unclear for what purpose it's

21    going to be used.  So I'll reserve I guess potential further

22    objections based on what the questions are, but just on the

23    face of the document those are apparent issues with it.

24          THE COURT:  Okay.

25    BY MR. KODOSKY:

```
 1   Q    Let me step back from that, Mr. Rajan, what was the Google

 2   project, and what was the implication for Stream TV?

 3   A    We were -- Stream TV was working with Google to make a 65

 4   inch 3-D video conference unit.  We had shipped components over

 5   to -- from our stream vendors to the Netherlands for assembly,

 6   When unfortunately, we lost in the Chancery Court.  The

 7   implication for Stream TV is, as you know, they were, when we

 8   got to Phase 3, it was going to be $20 million in orders, and

 9   also Google is looking at a possible investment in Stream TV,

10   which we entered into the Bankruptcy Court.  The letter from

11   Google, the immediacy is now that Stastney is the Director at

12   the Netherlands, which just happened.  We may -- we don't know

13   when and if we'll ever get our Google stuff back.

14   Q    Where is the lens for the Google project?

15   A    It's being kept in the -- the Netherlands.

16   Q    So has the lens been delivered to Google?

17   A    No.  The -- the Netherlands are holding everything, the

18   Google stuff in the Netherlands and Stream TV's understanding

19   is it's on order from SeeCubic to hold it.

20   Q    Where is the Ultra D phone and tablet?

21        MR. COLBY:  Sorry.  Objection.

22        THE WITNESS:  It's being held in --

23        MR. COLBY:  I'm sorry.

24        THE COURT:  Wait a minute, hold on.  There's an

25   objection. Whoa.
```

```
 1              MR. COLBY:  Sorry.  Object, and move to strike the

 2   witness' testimony regarding the Google project, not relevant

 3   to the TRO, which has to do with potential present-day issues.

 4   The witness himself previously testified when he was here

 5   before that the Google project, which goes all the way back to

 6   2018, has been canceled, and so it's therefore irrelevant to

 7   whatever the purported imminent harm is now.

 8              THE COURT:  Okay.

 9              MR. KODOSKY:  It's ongoing harm to the Debtor, Your

10   Honor.

11              THE COURT:  Okay.

12              MR. COLBY:  Past harm, reparable --

13              THE COURT:  Wait a minute.

14              MR. COLBY:  -- he put a dollar down.

15              THE COURT:  Wait minute, wait a minute.

16              MR. COLBY:  It doesn't over relate to irreparable.  -

17              THE COURT:  Where's the product?

18              MR. COLBY:  I'm sorry.

19              THE COURT:  Where are the products that everybody

20   wants, this fighting over?

21              MR. KODOSKY:  That's what he said that it is being

22   hidden by Stastney, over in the Netherlands.

23              THE COURT:  Okay.  Well, I don't know about Stastney,

24   but he's saying that the SeeCubic B.V. has it, and hasn't

25   turned it over.  That's what my own question is.
```

 1              THE WITNESS:  Who had -- it is being held in the

 2   Netherlands, and I testified earlier in the bankruptcy, we had

 3   a meeting right before the bankruptcy with Google, we are to

 4   turn the unit over, which has not happened since the filing of

 5   the bankruptcy because --

 6              THE COURT:  Who's we?

 7              THE WITNESS:  Stream TV is to turn over the Google

 8   Unit.  There was a meeting right before the bankruptcy, and the

 9   Google Unit has been held since the bankruptcy in the

10   Netherlands, and in my role at the time of SeeCubic B.V., CEO,

11   my understanding was, is being held on instruction by SeeCubic

12   of Delaware.

13              THE COURT:  Okay.

14   BY MR. KODOSKY:

15   Q    Okay.  Where is the Ultra D phone and tablet?

16   A    They're being held in -- in the SeeCubic Netherlands.

17   Q    Where are the AK-TVs?

18   A    They're being held in SeeCubic of the Netherlands, as well

19   as in the Jersey Island and Hawk's Office.  It's being held in

20   New York and London, and some other locations of SeeCubic of

21   Delaware.

22   Q    Did Stream TV have customers who were supposed to see the

23   phone and the tablet?

24   A    Post-bankruptcy, yes.  We had customers who were supposed

25   to see the phone and the tablet.

Case 23-10763-amc   Doc 843-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 173 of 275

173

1    Q    Do have customers who wanted to see the AKTV?

2    A    Stream TV and technically we have customers who requested

3    to see the AKTV.

4    Q    How many customers after the Delaware Supreme Court ruling

5    were you supposed to show the phone tablet and AKTVs to, and

6    never did because SeeCubic was holding it?

7    A    At least 50 possibly more --

8         MR. COLBY:  Objection, Your Honor.  That misstates

9    the testimony.  At least for many of those devices, Mr. Rajan

10   testified that they were at SeeCubic B.V, not SeeCubic, Inc.

11   The questions was --

12        THE COURT:  He said SeeCubic B.V.

13        MR. COLBY:  The most recent question said, SeeCubic

14   without identifying, which.

15        THE COURT:  Well, then objection, please clarify,

16   which SeeCubic?

17        MR. COLBY:  Vague.

18        THE COURT:  Okay.  Which SeeCubic?

19        THE WITNESS:  The phone and tablet are at the B.V.,

20   is my understanding, and I think one phone is at SeeCubic,

21   London.  Then the AKTVs are in the Netherlands, and also

22   they're also in the Jersey Island and Hawk's offices as well as

23   New York and London, and I believe India, some of other

24   SeeCubic Delaware's offices.

25   BY MR. KODOSKY:

1    Q    Was BOE one of the customers that -- you mentioned there

2    were over 50 customers that wanted to see --

3    A    Yes.  BOE is one of the customers who was, and also our

4    supply chain financer, who was supposed to see the AK -- AKTV,

5    but we were not able to present it because it's not being

6    turned over.

7    Q    Do you have investors who are supposed to see the phone

8    and the tablet?

9    A    Yes, we do.

10   Q    Do you have investors who wanted to see the AKTV?

11   A    Stream TV does have investors who want to see the AKTV.

12   Correct.

13   Q    Did any investors quit because you didn't show them the

14   phone, tablet and AKTV?

15   A    Yes.  Some investors quit because the AKTVs and the phone

16   and tablets were not turned over as expected.

17   Q    How much hard cash did Stream TV get from VSI, and

18   companies VSI was working with, since you lost in Chancery

19   Court?

20            MR. COLBY:  Objection, Your Honor.  That --

21            THE WITNESS:  Ten million hard cash.

22            THE COURT:  Wait a minute.  Objection.

23            MR. COLBY:  I don't know the relevance.  I mean, I

24   know this is an issue we've addressed in the context of the

25   Hawk motions, but what is the relevance to the TRO?

1              THE COURT:  Counsel, relevance to the TRO?

2              MR. KODOSKY:  To the extent that -- it goes to

3     damages, Your Honor, the amount of money coming in, our

4     loss.

5              THE COURT: Counsel, are you relying on the cases that

6     say that potential damages and loss can be a basis for a TRO?

7     Is that -- is that what we're talking about?

8              MR. KODOSKY:  Yes, Your Honor.

9              MR. COLBY:  Your Honor, I think if they can quantify

10    the supposed damages by the amount of money from VSI, then it's

11    not irreparable harm, it's reputable by payment of damages.

12             THE COURT:  No Counsel, the cases say that when there

13    are damages and you can save, well, the damages, perhaps, it's

14    not that you can recover those specific, they're cases that

15    talk about how you establish that.  And you're right, if

16    damages, if it's money, you can do by money, right?  That's not

17    a TRO, that's a money -- that's a money proposition.  They are

18    cases that talk about something different, that's what I was

19    referring to.

20             I'll allow it for what it's worth, because counsel,

21    what they're saying is that the way I read the cases, was that

22    I have suffered damages, and they'll continue in the -- if you

23    continue to violate, and they're usually in trademark patent

24    cases where we've suffered this and we're going to continue in

25    the future, we don't know how much, but we are going to, and

```
 1   it's proof that we're going to be injured, not proof of

 2   specific dollar numbers.  I think that's what he's trying to

 3   do.  I'll allow it for that purpose.

 4        MR. KODOSKY:  Thank you, Your Honor.

 5   BY MR. KODOSKY:

 6   Q    How much hard cash did Stream TV spend since the

 7   bankruptcy?

 8   A    So far we've spent over 2 million and we're going to have

 9   to spend a million in short order for the production, an

10   additional million for the production right now.

11   Q    What's the current situation in the Netherlands for

12   resources?

13   A    Currently right now the Netherlands is in very bad

14   financial shape.  The money that they requested, the B.V.

15   requested, even though was not given to them, and they've got a

16   huge amount of unpaid payroll taxes, they've also defaulted on

17   almost $60 million of debt to Stream TV.

18        Stream TV has a loan into the B.V., which we need to

19   get repaid.  That loan is in default over $60 million, which

20   we're collecting because we're trying to maximize the Debtor's

21   estate, and that's another immediate concern.  Now that

22   Stastney is the Director, we don't know what's going to happen

23   with the collection of our $60 million.

24        MR. KODOSKY:  Permission to approach, Your Honor?

25        (Counsel confer)
```

```
 1              MR. KODOSKY:  Permission to approach, Your Honor?

 2              THE COURT:  He shared.  Hand it to the -- he'll mark

 3    them and we'll hand them out to the witness.

 4              MR. KODOSKY:  This is D-42.

 5              THE COURT:  Okay.

 6              MR. KODOSKY:  Thank you.

 7    BY MR. KODOSKY:

 8    Q    Mr. Rajan, you've been handed what's been marked for

 9    identification as Exhibit D-42.  Do you recognize this

10    document?

11    A    Yes, I do.

12    Q    What is it?  It is SeeCubic of Delaware, their website.

13              MR. COLBY:  Your Honor, I, we'll see where this goes.

14    I think based on the Court's, court's prior rulings regarding

15    website's authentication may be an issue, and don't think

16    that --

17              THE COURT:  Right.

18              MR. COLBY:  -- based upon --

19              THE COURT:  I remember going through an exhaustive --

20              MR. COLBY:  Yeah.

21              THE COURT:  -- review of what websites.  I think

22    there was a Third Circuit case that I relied on, or maybe it

23    was a District Court, Third Circuit case that talked about the

24    reliability of websites, and there was a four-part test, I

25    think.  I've looked at so many issues, I think there was a
```

1   four-part test that I needed to look at and figure out.

2          I think that that issue, I'd said we weren't going to

3   -- I think it might've been the Chinese website with respect to

4   their location --

5          MR. COLBY:  Right.

6          THE COURT:  -- with respect to their address.  I

7   think that based on the issues given where it was, that it

8   could not be -- reliability was an issue.  I'll listen to the

9   questions and I'll apply the same test.

10          MR. COLBY:  That that's all we're seeking.

11          THE COURT:  Right.  Which I don't -- as I said, I

12   don't recall the name of the case, but I know I looked at it

13   and read it --

14          MR. COLBY:  Yeah.

15          THE COURT:  And came to some conclusion.

16          MR. COLBY:  I don't think it hinged on whether it was

17   a domestic or a Chinese would say.

18          THE COURT:  No.  But one of the thing was

19   reliability.

20          MR. COLBY:  Right.

21          THE COURT:  And one of the things that factored into

22   my issue of reliability was in China.

23          MR. COLBY:  Right.  So, and I'm not saying that there

24   isn't a witness who exists who couldn't authenticate this.  I

25   think, based upon your prior rulings, I would object that

 1 | Mr. Rajan could, but we'll --

 2 |         THE COURT:  Right.

 3 |         MR. COLBY:  -- see where it goes.

 4 |         THE COURT:  Well, we will see where it goes.  Okay.

 5 | Let's go, Mr. Dombroski (sic), let's see what we have.

 6 | BY MR. KODOSKY:

 7 | Q    Mr. Rajan, I was going to ask you to direct your

 8 | attention to the executive profiles --

 9 | A    Yes.

10 | Q    -- portion of this, and whether or not there are any

11 | SeeCubic B.V. employees that are, that you are able to

12 | identify.

13 |         MR. COLBY:  Objection, Your Honor, we've --

14 | BY MR. KODOSKY:

15 | Q    There are several.

16 |         MR. COLBY:  Objection, Your Honor, we've --

17 | objection, Your Honor, we've now jumped right to apparently the

18 | substance of what Mr. Kodosky wants to ask about without

19 | clearing any of those initial hurdles that the Court laid out

20 | when we previously addressed this issue.

21 |         THE COURT:  All right.  So he's saying that before

22 | you can even ask him questions about this document, you have to

23 | meet, I guess authenticity, or you have to do something with

24 | the document to either authenticate it, get it in under some

25 | exception, because this is hearsay.  This is something that you

Case 23-10763-amc   Doc 843-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 180 of 275

180

 1  want to admit for the truth of the matter, and it's an out of

 2  court, but namely, it's a website; and so how do you get that

 3  in?

 4         And I don't recall -- what was the name of the case?

 5  Can you look that name up?  I know I -- it was -- we took a

 6  break and I know that I spent some time researching that issue,

 7  because it was a rather important issue with respect to, I

 8  think it was Hawks.  I think -- well, I don't know if it was

 9  you, Mr. Colby or Mr. Caponi who was trying to introduce it; I

10  don't remember.

11         All right.  So Counsel, he says, you need to lay a

12  foundation to get this in and on what basis, because it's

13  hearsay.

14         MR. KODOSKY:  It's a statement by a party opponent,

15  Your Honor, this is their website.  This is the SeeCubic, Inc.

16  SeeCubic of Delaware website.

17         MR. COLBY:  A couple of things, Your Honor, appears

18  to have been modified with some text added to the bottom of the

19  page.  But more importantly --

20         THE COURT:  What text was added to what?  That

21  circled portion?

22         MR. COLBY:  No, this www.seecubic.com website, page

23  one.

24         MR. KODOSKY:  We just printed it, Your Honor.  We

25  didn't --

Case 23-10763-amc    Doc 923-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 181 of 275

181

1          MR. COLBY:  Okay.

2          MR. KODOSKY:  We didn't add any text.

3          MR. COLBY:  I just -- this is why authenticity is an

4    issue, and -- and so this isn't a hill I'm going to die on, I

5    think there is a witness who could talk about this.  I don't

6    think it's Mr. Rajan, but also, I don't think that this -- the

7    objection I'm making now isn't purely a hearsay objection, it's

8    just -- it's an authentication question.  And that's what --

9    those were the hoops that we were forced to jump through --

10          THE COURT:  Right.

11          MR. COLBY:  -- previously.

12          THE COURT:  And then how do you -- well, the question

13   is --

14          MR. COLBY:  It may have been --

15          THE COURT:  Wait a minute.

16          MR. COLBY:  Sorry, Your Honor.

17          THE COURT:  You may try to authenticate it, I don't

18   even know who printed it for you, Mr. Colby, you just said,

19   here it is.  I had no testimony as to how -- if somebody said,

20   I went on the website, I searched, this is what I got.  This

21   is, I didn't have any of that from you, all I had was here it

22   is.  So I think they can lay a foundation to tell me what they

23   did, how they got it.  I don't know if that meets through

24   hoops, but it was a little bit different than what you're --

25          MR. COLBY:  And that -- but that's why I'm objecting.

```
 1   Mr. Kodosky just went to asking about all that.

 2               THE COURT:  Oh, I get it.  I get it.  He has to lay a

 3   foundation first, like any other document.

 4   BY MR. KODOSKY:

 5   Q    Mr. Rajan did you have any involvement with print out of

 6   this document?

 7   A    Yes.  Yes.  I was involved in the printout.

 8   Q    Tell me where -- tell us where you've -- where you

 9   obtained this document?

10   A    When the -- it happened in two parts.  One was when the

11   Delaware Court receiver resigned when we filed bankruptcy and

12   turned things over to me.  In that transition it was clear, you

13   know, my new role that the SeeCubic B.V. people were heavily

14   involved in SeeCubic of Delaware, and then in my role as the

15   CEO in the Netherlands, and as Director, they were integrated

16   into SeeCubic of Delaware, and several of the employees of the

17   Netherlands were being promoted to investors and customers as

18   employees of the Delaware, almost as one company.

19               MR. COLBY:  Your Honor.  Sorry to be a stickler for

20   detail, but --

21               THE COURT:  That didn't answer the foundation.

22               MR. COLBY:  It didn't answer the foundation question.

23   We also, we just pulled up the website and if you hit print and

24   you get the image of what the printed out page is going to look

25   like, it doesn't have this seecubic.com website, page one.
```

1 I've never seen anything like that.

2          The pagination doesn't match, the actual pages that

3 are also on the document, which say 1 of 2, 2 of 2, and then 1

4 of 2, 2 of 2, it appears to be a compilation of several sub-

5 pages from that domain.  There's just a lot of questions here

6 that Mr. Rajan didn't answer.

7          THE COURT:  Okay.  Counsel --

8          MR. COLBY:  Counsel said they didn't add that, but it

9 doesn't -- it doesn't make sense.

10          THE COURT:  Well, the whole point of the matter is he

11 didn't answer how he got it.

12          MR. COLBY:  Right.

13          THE COURT:  He just talked about what it, what -- the

14 employees and who they were.  He went straight to the testimony

15 that you were objecting to, that he was relying on the document

16 and testifying from his own memory.

17          MR. KODOSKY:  Right.

18          THE COURT:  All right.

19 BY MR. KODOSKY:

20 Q    How did you get the --

21          MR. KODOSKY:  Can I ask a follow up question, Your

22 Honor?

23          THE COURT:  Sure.

24 BY MR. KODOSKY:

25 Q    Where did you -- how did you get this particular document?

1    A     You type in www.seecubic.com and then you print it on the

2    computer.

3    Q     Thank you.

4          MR. KODOSKY:  Move for the admission of this

5    document, Your Honor?

6          THE COURT:  So that he went in, he put in SeeCubic

7    and then this is what he got, and he printed it out?  So it

8    says,

9          "Printout for a website do not bear the indicia of

10         reliability demanded from other self-authenticating

11         documents.  To be authenticated some statement, or

12         affidavits from someone with knowledge is required."

13         So what does that mean?  So it says -- so how do you

14   properly authenticate? I think that was what it says, and then

15   I think it told me how you did that.

16         MR. COLBY:  Facially, Your Honor, not only does the

17   pagination not match what to our eye appears to have been added

18   on the bottom, but if you notice at the top there are date and

19   timestamps that come from different times --

20         THE COURT:  Well, it would be --

21         MR. COLBY:  -- 10:00, 12:00, 5:25 --

22         THE COURT:  -- when you print it -- well, Counsel, if

23   I go and print from my office, it's going to tell me at the top

24   when I printed it.

25         MR. COLBY:  Yeah.

1          THE COURT:  It's not going to tell me -- because this

2    says, look, who's talking about us HuffPost, Yahoo Finance, and

3    then down at the bottom is H -- you know, the typical, I don't

4    know what the stuff at the W, the page, the website, page 1, 2,

5    3, 4, 5.  I don't know if somebody added that.

6          MR. COLBY:  Yeah.  And also at the --

7          THE COURT:  Or I don't know --

8          MR. COLBY:  -- the timestamps at the top are at 5:25,

9    2:13, so they're out of chronological order from when they were

10   well printed.

11         THE COURT:  Well, one says -- well, no it's --

12         MR. COLBY:  5:30.

13         THE COURT:  -- 5:25, 5:25, 5:27 of -- and then

14   another one, which is a different page is on 2:13, 2:13 and

15   5:30, and then 5:30.  So apparently some of this was printed on

16   different days at different times.

17         MR. COLBY:  The same day, I think, but different

18   times by a couple of hours.  And again, it doesn't explain

19   this --

20         THE COURT:  Well, this was 10/12, at 5:23, 10/12 --

21         MR. COLBY:  It's all 10/12.

22         THE COURT:  Yeah.  They're all on 10/12, and they

23   were printed at different times.  Okay.  And you're saying that

24   this isn't -- they're not self-authenticating, so somebody has

25   to authenticate them.  And I think what I went through is how

Case 23-10763-amc    Doc 843-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 186 of 275

186

1    did you authenticate them?

2         MR. COLBY:  Yeah.  And this thing on the bottom

3    doesn't appear to be original to the website.

4         THE COURT:  I don't know if it is or isn't.  You're

5    going to have to tell me why it isn't, because You're going to

6    say, here it is.  Here's what it is.  How do I know?  And just

7    because you say it doesn't -- none of what you guys say,

8    because you -- my favorite line to my kids, just because you

9    say it doesn't make it so; I love that line.  So --

10         MR. COLBY:  Well, I guess that's the fundamental

11    basis of our objection.  What we heard from Mr. Rajan is, yeah,

12    yeah, I printed it out, and there's unanswered questions that

13    that don't seem to be --

14         THE COURT:  Okay.  So let's see what it says.  How do

15    you -- because the issue there was not even, it had to do with

16    a non-compete.  The issue that, the case in question, which is

17    <u>Victaulic Company v. Tieman</u>, and actually it wasn't -- it was

18    out of the -- it's 499 F.3d 227, 2007, and it's an opinion from

19    Judge Ambro.  It's a classic case of jumping the gun, and it

20    was a covenant not to compete, but that's a whole different

21    issue.

22         But in any event a court talked about -- and

23    significant for me was the issue of the website and how you

24    authenticate it, because it's not a self-authenticating

25    document under the exceptions to, I guess, self-authenticating

1    documents aren't hearsay.

2          So it says in that case, the question was -- and in

3    that case, they were asking the Court to take judicial notice.

4    This is a little bit different, because they're not asking me

5    to take judicial notice for something to be admitted, and it

6    had to do with, and I think that's what you guys were -- we

7    were focusing on, is whether it can be self-authenticated, such

8    that I could take judicial notice.  It didn't tell me.

9          It says in order for me to take judicial notice,

10   there was some additional steps that needed to be taken,

11   because they weren't self-authenticating.  So my question is,

12   we are, we're in a different process now.  They're not trying

13   to ask me to take judicial notice, and they're not arguing

14   self-authentication.

15         So how do we -- this is a document.  So you have to

16   meet the regular rules for how do you get this document in

17   here?  And I don't know, they didn't create it, you need to

18   tell me how --

19         MR. COLBY:  How, I really --

20         THE COURT:  -- how it gets in you.

21         MR. COLBY:  I really -- I don't mean to make a

22   mountain out of a mole hill, I just want to make sure we're

23   respecting the same evidentiary rigors that we were subjected

24   to a few weeks ago.

25         THE COURT:  Well, what -- but what I'm saying is that

Case 23-10763-amc   Doc 843-3   Filed 10/29/24   Entered 10/29/24 23:50:54   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript p-15-23   Page 188 of 275

188

1   the rigors that you went through is because you asked me to

2   take judicial notice of it.  That's a whole different -- a

3   different standard that I have to look at.  And it was a --

4   whether it was judicial notice, it has to be self-

5   authenticating.

6           MR. COLBY:  Uh-huh.

7           THE COURT:  And they're saying websites are not, you

8   need to authenticate it in a different way.  My point today is

9   that no one's asking me to do judicial notice.  They're asking

10  me -- he wants to ask him to authenticate this.  So I think at

11  this point, it's the same regular rules as how do you

12  authenticate the document?

13          So that's why I'm glad I looked at this case because

14  that was judicial notice.  This is, how does he authenticate

15  it, and I don't know if he can.

16          MR. COLBY:  All we ask is that they make an effort.

17  Thank you.

18          THE COURT:  Right.  All right.  How do -- you need to

19  authenticate this document; how do you do that?  Because it's

20  not judicial notice, I can't take that.

21          MR. KODOSKY:  It's not judicial notice, but it's a

22  statement by a party opponent.  It's an admission, it's their

23  website.

24          THE COURT:  Well, that question is, how do you now

25  it's our website?

```
 1              MR. KODOSKY:  And it's also not hearsay.  It's not

 2    being offered to prove the truth of the matter asserted.

 3              THE COURT:  Well, you just thought it did by asking

 4    them something about the employees being the same.  That would

 5    definitely be for the truth of the matter.  I mean, you can

 6    probably get there without this dang-gon document, but I can't

 7    tell you, and I'm, you know, sometimes when I get a little

 8    frustrated, I tend to take over and that's not my role.

 9              All right.  Go ahead.  With respect to how do you --

10    you're going to need to lay a foundation for this document?

11    BY MR. KODOSKY:

12    Q    Did you have any involvement in printing this document out

13    from the internet?

14    A    Yes.  I printed it out, and I printed it out, and I also

15    did due diligence earlier on the involvement of the B.V.

16    employees vis-a-vis the --

17              THE COURT:  Wait a minute --

18              THE WITNESS:  -- website.

19              THE COURT:  Wait a minute.  Let's just stick right

20    now to the document itself.  We're trying to authenticate the

21    document, and what do you need to do?  We don't need to hear

22    about all the other people.  He can testify about that without

23    this website.  But right now we need to focus on authenticating

24    the document that you want to introduce into evidence.

25              And it's the same as any other document when you need
```

1    to authenticate it.  You need to do something, lay a

2    foundation, something, to get it into the record.  You said

3    that he printed it out and the process that he went through to

4    get it to print out, what did he do?

5        THE WITNESS:  I typed in seecubic.com into the

6    computer, and the website is the same website that is on other

7    documents that we have received for SeeCubic, where they have

8    referred to the URL as their website, and printed it out.  And

9    they've mentioned the website in numerous documents that we've

10   received and had numerous dealings with SeeCubic for the last

11   few years.  So we are -- we've confirmed numerous times that

12   this is their website, and we're also the owner of this URL,

13   Seecubic.com.  Stream TV is.

14        THE COURT:  So --

15        MR. COLBY:  Your Honor, I don't believe Mr. Rajan has

16   established that SeeCubic, Inc. of Delaware controls this

17   domain as opposed to SeeCubic B.V.  And I think he also, I'm

18   not sure it could be used as a statement by a party opponent if

19   he just said they own the domain.

20        THE COURT:  Well, he said they owned it.  So I need

21   some -- this says SeeCubic Company, and I don't know what

22   SeeCubic Company this is.  Okay.  Do you want to ask him some

23   further questions, Counsel?

24        (Counsel confer)

25   BY MR. KODOSKY:

1    Q    Mr. Rajan, do you know if -- are you familiar with

2    SeeCubic's LinkedIn page?

3    A    Yes, I am.

4         THE COURT:  What SeeCubic are we talking about?  We

5    need to be precise.  Because, I mean, I'm about to ask the

6    questions myself and I hate doing that because then that's not

7    my job, but I'm getting a little frustrated here.

8    BY MR. KODOSKY:

9    Q    SeeCubic of Delaware?

10   A    Yes.  I'm familiar with SeeCubic Delaware's LinkedIn page

11   and their website.

12   Q    Are you familiar with a button on the LinkedIn page that

13   takes you to this website?

14   A    Yes, I am.

15   Q    And you've got personal knowledge of that?

16   A    Yes, I have.  Yes.  I have that because they're -- some of

17   their employees are on my LinkedIn page, and they still wish me

18   happy birthday and stuff like that.

19        MR. KODOSKY:  Your Honor, we move the admission of

20   Exhibit D.

21        MR. COLBY:  Objection, Your Honor.  They've laid no

22   foundation as to who or what controls a SeeCubic LinkedIn page.

23   It's the same issue with respect to this document, but one step

24   removed.

25        THE COURT:  Okay.

 1          MR. COLBY:  And whether or not it links doesn't

 2    establish the control issues that I raised a minute ago with

 3    respect to this document, it can link to anything.

 4          MR. KODOSKY:  Again, Your Honor, this isn't a

 5    judicial notice question.  We're moving to have this admitted

 6    as a statement, or an admission by a party opponent.

 7          THE COURT:  Which party?  Because it says SeeCubic.

 8    I don't know which SeeCubic we're talking about.

 9          MR. KODOSKY:  SeeCubic, Inc., Your Honor.

10          THE COURT:  What is this seecubic.com.  Okay.  Does

11    it just says SeeCubic --

12          MR. KODOSKY:  Mr. Stastney, their leadership team is

13    described here.  Executive profile, CEO, Chairman of the Board,

14    Chad Stastney.  The first picture you see they're smiling at us

15    under executive profiles.

16          THE COURT:  Okay.

17          MR. KODOSKY:  Mr. Rajan's picture isn't on here.

18          THE COURT:  Wait a minute.  Wait a minute.  Wait a

19    minute.  And I get his picture's not on there.  Okay.  So what

20    he's saying to me, Mr. Colby, is, Mr. Rajan did research, went

21    on the internet, put in SeeCubic, Inc.  SeeCubic, I don't know

22    if he put in Inc. or what, and this is what came up for

23    SeeCubic and on -- and this was part and parcel of what's on

24    the website.

25          And so the question -- and he printed out what he saw

Case 23-10763-amc   Doc 827-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 193 of 275

193

1   on the website, and based on that they believe that that is

2   sufficient information to have this document authenticated as

3   to what he printed out from the SeeCubic website. which

4   SeeCubic.  I don't know.

5          MR. COLBY:  Correct, Your Honor.  And Mr. Rajan just

6   testified that Stream TV owns this domain.  So --

7          THE COURT:  Well, then if they own the domain, he can

8   testify his domain, I went in there and I printed -- you don't

9   want to go down that road.

10          MR. COLBY:  Well, then --

11          THE COURT:  You don't want to go down there --

12          MR. COLBY:  -- it's not a statement by a party --

13          THE COURT:  No, then it's his records.

14          MR. COLBY:  Sure. I mean --

15          THE COURT:  Then now we're going down the road of

16   it's his records, we on the website, I went on there and I

17   printed it out.

18          MR. COLBY:  Well, then, if it's his records, Your

19   Honor, then it doesn't shed much light on --

20          THE COURT:  Maybe it does, maybe it doesn't, I don't

21   know.

22          MR. COLBY:  On, you know, the TRO issues.

23          THE COURT:  Oh, okay.  Here we go.

24          MR. COLBY:  So --

25          THE COURT:  Let me see how we authenticate a website.

```
 1   Boy, I don't have 50 associates at my hand, but I have some

 2   good law clerks.  Okay.  Oh, look at that.  It says,

 3            "Few courts have considered how a website printout or

 4            block posting may be authenticated.  Those that have

 5            considered the issues have found that website

 6            printouts are sufficiently authenticated, where the

 7            proponent declared that they were true and correct

 8            copies of the page on the internet, and that the

 9            printouts included their page URL address and the

10            dates printed."

11            And they said the exhibits in that case -- and this

12   is a case of Randazza vs. Cox, which is out of the District of

13   Nevada.  Now none of that is obviously binding on me.  This is

14   another one, In re Terrorist Attack on September 11, 2001, and

15   this one says, and this one is out of the Southern District of

16   New York.  And it says,

17            "A finding that a printout of a website was more

18            likely to be authenticated where it remains

19            accessible to the public website as of the writing of

20            the opinion as the Court has verified."

21            Okay.  And none of the cases undermine that.  So

22   apparently to authenticate a website the person has to be able

23   to say that, and you're telling me that it remains Mr. Colby,

24   because you just went on there, and said that there's a

25   website.  What's the URL website that you were on?  Is it
```

Case 23-10763-amc   Doc 848-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 195 of 275

195

1    different from this one?

2              MR. COLBY:  No, it's the seecubic.com, but it doesn't

3    have --

4              THE COURT:  But, Counsel --

5              MR. COLBY:  -- this note on there, so --

6              THE COURT:  Okay.  But then all the person has to

7    tell me is that that they -- let's see.  It says all they have

8    to contain -- the printout has to have URL, and that it was you

9    know, they printed, it's on the, it's on the internet.  It has

10   the URL on it, and that's sufficient.

11             So I'm not quite sure how it doesn't -- at least

12   according to these cases, meets the requirements for

13   authentication.  You are saying that the printout, if you go on

14   the website, doesn't have website page one?  I'm pretty sure it

15   probably doesn't, but do we know if you print it out --

16             MR. COLBY:  Yes, you --

17             THE COURT:  Does it have that?  At the bottom it says

18   HTPCS www.seecubicinc.com Company. So we have a URL, and if you

19   put that -- take aside from this other, like striking the

20   little page numbers, everything else has a URL on it, and it

21   was printed, seems to me the date printed was 10/12/25 -- 23 of

22   5/25.  So these different pages meet the requirement, at least

23   with respect to the date printed, and the URL number.  You

24   know, I don't know what this other -- if that was because of

25   what came out when it was printed.

1          But with respect to the -- everything in between

2     there, in between the date and the URL, seems to me the

3     definitions at least from, you know, I guess this is like no

4     circuit court, because they're saying few courts have addressed

5     it.  And so actually I have three cases.  I have, wait, one

6     from Delaware, one from Nevada, one from Southern District of

7     New York.  And let me see, hold on.  Oh, that's my other --

8     that's my judicial notice case.

9          So it seems to me, based on these two courts'

10    discussion on how you authenticate, they've met that by saying,

11    I went on the website, I printed it out, that's the URL and

12    this is the date.  Counsel I get -- I don't know how the

13    printout and you, I can't say that when it prints out it

14    doesn't tell you website page one.  I don't know.  But

15    Mr. Rajan's testimony is that that's how it came out when he

16    printed it?

17          MR. COLBY:  Yeah.  I don't -- I don't know that he

18    was specifically asked about that footer, but I think I've

19    stated my objection.  I understand the Court's --

20          THE COURT:  Overruled.

21          MR. COLBY:  -- likely to rule --

22          THE COURT:  Because, Counsel the guidance that I'm --

23    as again, I don't have a circuit court, I don't even have a

24    district court here, and this is more persuasive.  I, you know,

25    if there's another court who's addressed the issue, I am not

```
 1   about to try to go and write an opinion on that.  I will take

 2   what those courts have said.  So counsel, I believe you've

 3   authenticated --

 4           MR. KODOSKY:  Thank you.

 5           THE COURT:  -- the website.

 6           MR. KODOSKY:  Thank you, Your Honor.

 7   BY MR. KODOSKY:

 8   Q    Mr. Rajan there's a few things on this printout that I'm

 9   going to ask you about, including, I want to direct your

10   attention to page 10, offices and contact information?

11   A    Correct.

12   Q    Whose offices and contact information are listed here?

13   A    These are the offices of SeeCubic of Delaware in New York

14   and London, and they're claiming the Eindhoven --

15           THE COURT:  Okay.  Where are we at?

16           THE WITNESS:  I'm sorry, Your Honor, page 10.

17           MR. KODOSKY:  Page 10.

18           THE COURT:  Wait a minute, I have --

19           MR. KODOSKY:  Website page 10 at the bottom.

20           THE COURT:  I only have 8 pages.

21           MR. KODOSKY:  Your Honor, this --

22           THE COURT:  I don't have -- I only have eight pages.

23   How many pages do you have, Mr. Colby?

24           MR. COLBY:  Well, according to what I believe to be

25   the added page numbers, we have 10.
```

```
 1              THE COURT:  Counsel, okay.  Page 7 --

 2              MR. COLBY:  Sorry, take that back we have 11.

 3              THE COURT:  Well, I have 8.

 4              MR. COLBY:  Right.

 5              THE COURT:  The last page I have says, Dr. Bart

 6  Barenbrug, Ph.D.

 7              MR. KODOSKY:  I can -- I can swap.

 8              THE COURT:  All right.  Make sure Mr. Colby has the

 9  same thing.  All right.

10              MR. KODOSKY:  It's 11 pages.

11              THE COURT:  All right.  Can somebody give me the

12  correct -- here, John, take this back.  All right.  Does the

13  one Mr. Rajan have 11 pages?

14              MR. KODOSKY:  I does, Your Honor.

15              THE WITNESS:  Yeah.  Yes, it does.

16              THE COURT:  Okay.  So we go on to page 10?

17              MR. KODOSKY:  Yes, Your Honor.

18              THE COURT:  All right.  Page 10.  Hold on.  Page 10,

19  Exhibit 42.  Okay.  All right.

20  BY MR. KODOSKY:

21  Q    Whose offices and contact information is shown on page 10?

22  A    These are the offices of SeeCubic of Delaware and New York

23  and London, and they're claiming the Eindhoven SeeCubic B.V. as

24  one of their offices.

25  Q    I'm sorry, I missed that last --
```

1  A     The Eindhoven one is in the Netherlands.  They're claiming

2  the SeeCubic B.V. as one of SeeCubic Delaware's offices.

3  Q     They're mixing up the SeeCubic --

4  A     They're -- they're, they're saying it's integrated.  Yeah.

5  They're basically inferring that it's integrated.

6  Q     And same questions with respect to the leaders, the

7  executive profiles that began on page 4.

8  A     Yes.

9  Q     First question.  Do you recognize any former Stream TV

10 employees that are shown amongst the executive profiles for

11 SeeCubic, Inc.?

12 A     There are a number of former Stream TV employees and

13 number of current Stream TV employees on this website.  The

14 people in the Netherlands are listed on the website of

15 SeeCubic, a Delaware.  If you go here on page 4, down at the

16 bottom where it has Sheeba Rajesh, Dr. Bart Barenbru,

17 Andy James is a Netherlands employee, and so is Bram Riemens,

18 and then Patrick Theune --

19        THE COURT:  Wait a minute, one at a time.

20        THE WITNESS:  Sorry.

21        THE COURT:  The first one you said was Sheeba Rajesh.

22        THE WITNESS: Rajesh, right here.

23        THE COURT:  Okay.  What is she, what's --

24        THE WITNESS:  She is listed as a Senior Vice

25 President of Science --

Case 23-10763-amc   Doc 843-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 205 of 275

200

```
 1              THE COURT:  And she is --

 2              THE WITNESS:  -- for SeeCubic of Delaware. She has

 3  a --

 4              THE COURT:  And she has what, with respect to some

 5  other company?

 6              THE WITNESS:  She works in the Netherlands for a

 7  stream subsidiary called SeeCubic B.V.

 8              THE COURT:  Okay.  So she works for SeeCubic B.V.

 9  All right.

10              THE WITNESS:  But she's being listed in SeeCubic --

11              THE COURT:  I get it Mr. Rajan.  Next?

12              THE WITNESS:  Then they're listing Patrick Theune as

13  the head of technology for all of SeeCubic of Delaware.  He

14  works in SeeCubic B.V. in the Netherlands, a Stream TV

15  subsidiary.  Then Dr. Bart Barenbrug is listed as a Senior Vice

16  President of Research and Development at SeeCubic of Delaware,

17  but he works in SeeCubic B.V., which is a Stream TV subsidiary.

18              Then Andy James is listed as Vice President of

19  Industrialization Manufacturing, on page 5.  He is a SeeCubic

20  of the Netherland's employee, and he's listed on SeeCubic of

21  Delaware as their Vice President of industrialization.

22              Then Bram Riemens is a Senior Executive Advisor,

23  system architecture listed.  He works in the Netherlands for

24  Stream, you know, Stream TV subsidiary, but he's being listed

25  as that title in SeeCubic of Delaware.
```

1  BY MR. KODOSKY:

2  Q    What effect is this having by co-mingling the Stream, the

3  SCVB employees with the SeeCubic employees on the SeeCubic

4  website; what impact is that having on the marketplace?

5  A    Well, it's having two major impacts.  When I did my due

6  diligence on this, they're shifting -- SeeCubic of Delaware is

7  shifting customers and investment to -- away from the Debtor to

8  another company, because the Debtor and the Debtor's assets are

9  in the process of reorganizing right now.  And money is being

10  spent on the B.V., which Stream TV has to pay back, putting a

11  burden on the Debtor's Estate, and this is continuing every

12  day, and they're pulling things away and it's causing confusion

13  in the marketplace.

14  Q    Confusion in the marketplace is the thing that I was going

15  to ask you about with respect to -- if you'll turn to page 6.

16  A    Yes.

17  Q    Would this, in your opinion, cause a reader of the website

18  to believe that Patrick Theune, am I pronouncing that name

19  correctly?

20  A    Yes.

21  Q    Has been -- well, it looks like it's got his bio there

22  stating that he's been working, experience from working in

23  research and development.  Would this cause a reader to believe

24  that this head of technology was an employee of SeeCubic, Inc.?

25           MR. COLBY:  Objection.  Objection, Your Honor, as for

```
 1   Mr. Rajan to speculate about what a generic unidentified reader

 2   may think.

 3            THE COURT:  Counsel.

 4   BY MR. KODOSKY:

 5   Q    What does it cause you to think?

 6   A    At, in my role, both at Stream TV, and I was the head of

 7   SeeCubic Netherlands, in my discussions with them, I asked

 8   them, where are you working, are you working in the

 9   Netherlands, or are you working for Delaware, and you're being

10   integrated as an employee of the Delaware --

11            MR. COLBY:  Move to strike.

12            THE WITNESS:  And that's the way --

13            MR. COLBY:  -- Your Honor.

14            THE COURT:  All right.

15            MR. COLBY:  I was trying not to interrupt.

16            THE COURT:  All right.  The question is, what did it

17   cause you to think?  We don't need to know about your

18   discussions with people outside of court?  What, looking at

19   this, what did it cause you to think?

20            THE WITNESS:  My first -- my first reaction was they

21   left our subsidiary and went to work for a competitor.

22            THE COURT:  Okay.

23   BY MR. KODOSKY:

24   Q    Page 7.  Do you see the bio for Dr. Sheeba, am I

25   pronouncing her name correctly, Rajesh?
```

1   A      Rajesh.

2   Q      Rajesh, Ph.D.?

3   A      Correct.

4   Q      Is she employed by SeeCubic, Inc.

5   A      No.

6   Q      SeeCubic of Delaware?

7   A      No.

8   Q      Who is she employed by?

9   A      SeeCubic of the Netherlands.

10   Q      Which is a Stream subsidiary?

11   A      It is a Stream subsidiary.

12   Q      And this bio is saying, do you see where it says

13   responsible for all the optics division activities of the

14   company?

15   A      Correct.

16   Q      In the field of autostereoscopic display technology.  Am I

17   reading that correctly?

18   A      That is correct.

19   Q      Does SeeCubic, Inc., or SeeCubic of Delaware even have an

20   optics division?

21   A      No.

22   Q      Does SeeCubic, Inc., or SeeCubic of Delaware employ any

23   physicists with specialization in optics and photonics?

24   A      No.

25   Q      As a competitor to Stream TV, how is this impacting Stream

Case 23-10763-amc   Doc 847-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 204 of 275

204

1  TV?

2  A    It's causing a huge problem for both customers and

3  investors, and also both new investors and people who have

4  given money here for the bankruptcy, as to why our employees

5  are being promoted to investors and companies, after we filed

6  the bankruptcy, and after we won in the Supreme Court.

7  Q    And this bio goes on to state that she's keen to interact

8  with customers, suppliers, and partners.  If Dr. Sheeba Rajesh,

9  Senior Vice President of Science for SCBV is being held out on

10  SeeCubic Inc.'s website as being part of the leadership, I'm

11  sorry, the executive leadership team for SeeCubic, Inc., how is

12  that impacting Stream TV?

13  A    It's having a massive impact for both customers and

14  investors, and you know, and we have you know, we have

15  contracts in place with all the various parties and, you know,

16  it's -- it's, it's a gigantic problem and it continues every

17  day, right now.

18  Q    If you turn to page 8, just briefly, the bio for Dr. Bart

19  Barenbrug, Ph.D.

20        THE COURT:  Wait a minute, counsel, I got to get

21  another page.

22        THE WITNESS:  Yeah.

23  BY MR. KODOSKY:

24  Q    Do you see where Doctor --

25        THE COURT:  Wait a minute, Counsel.

Case 23-10763-amc    Doc 848-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 205 of 275

205

```
 1                    MR. KODOSKY:  I'm sorry, Your Honor.

 2                    THE COURT:  I'm not there yet.

 3                    MR. KODOSKY:  Sorry.

 4                    THE COURT:  Go ahead.

 5   BY MR. KODOSKY:

 6   Q    Do you see on page 8, the bio for Dr. Bart Barenbrug,

 7   Ph.D.?

 8   A    Yes, I do.

 9   Q    And he's described as Senior Vice President, Research and

10   Development?

11   A    Yes.

12   Q    Again, does SeeCubic, Inc. have any research and

13   development employees?

14   A    No.

15                    THE COURT:  Which SeeCubic?

16                    THE WITNESS:  SeeCubic at Delaware.

17                    MR. KODOSKY:  Inc., of Delaware.

18                    THE COURT:  Any what what, research and development

19   you asked?

20                    MR. KODOSKY:  This describes him as being a Senior

21   Vice President Research and Development.

22                    THE COURT:  Okay.

23   BY MR. KODOSKY:

24   Q    Halfway through that bio, do you see where it states that,

25            "Culminating in the founding of SeeCubic and
```

Case 23-10763-amc   Doc 827-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-15-23 Page 206 of 275

206

1          Eindhoven in 2011, where he has worked since, leading

2          a software team that works on a variety of topics

3          ranging from content tools, conversion and rendering

4          algorithms, implementing the latter for a variety of

5          platforms."

6          Do you see that discussion?

7    A    Yes.

8    Q    And that's actually, truth be told, the work that he's

9    done for Stream subsidiary SCVB, correct?

10   A    Yes.  This one is the most damaging because he's the

11   inventor of the original formula.  Stream TV has turned it into

12   electronics, they did in software, we did it in hardware.  But

13   he's the original inventor of the formula.  He was heavily

14   involved with me at Stream TV.  He's gone to investor meetings.

15   We've flown in to meet with customers.  Stream TV since we've

16   been reorganizing the customers and some of the investors who

17   are previously looking at the company, I've been asking him to

18   get on the phone, but we have a huge problem because he's been

19   co-opted by SeeCubic of Delaware.

20          THE COURT:  All right.  Leave the -- Mr. Rajan, just

21   say he now works for them.

22          THE WITNESS:  Okay.

23          THE COURT:  Again, I'm trying, everybody, to just

24   keep it generic.

25          THE WITNESS:  Okay.

Case 23-10763-amc   Doc 847-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 207 of 275

207

1           THE COURT:  I get, I get it, but it doesn't advance

2    the cause.  Okay.

3    BY MR. KODOSKY:

4    Q    The fourth line from the bottom of his bio where it states

5    "In that work, he closely collaborates with mainly the optics

6    and firmware teams to optimize the technology across the

7    different parts of the solution."  Does SeeCubic, Inc., or

8    SeeCubic of Delaware, does it have an optics and firmware

9    teams?

10   A    No.  He works with Sheeba Rajesh and Bram Riemens on the

11   optics in the firmware, that work in the Netherlands.

12   Q    And the next line, it says he has several patents to his

13   name, both from the time at Philips and at SeeCubic.  Do you

14   see where I'm reading from?

15   A    Yeah.  His name I think is on all the patents that Stream

16   TV paid for.  I believe so.

17   Q    Is this essentially leading the reader to believe that

18   SeeCubic has patents, SeeCubic, Inc., or SeeCubic of Delaware

19   have patents that they do not?

20           MR. COLBY:  Objection, Your Honor --

21           THE WITNESS:  Yes, it is.

22           MR. COLBY:  -- to the extent of it is asking what

23   the, -- I think the way the question was phrased, is it leading

24   a reader to believe?

25           THE COURT:  A reader to believe.

```
1              MR. COLBY:  It's either about a reader, not Mr.

2    Rajan.  So it's inappropriate in that way, or it's asking

3    some --

4              THE COURT:  What is --

5              MR. COLBY:  -- sort of intent question?

6              THE COURT:  Or what does he -- what it leads him --

7    once he reads this, what does he thinks it means?

8              MR. COLBY:  Right.  Thank you.

9    BY MR. KODOSKY:

10   Q    What's your -- what's your --

11   A    My impression that he's left our subsidiary and is working

12   for another company, and may have -- the patents may have gone

13   out of our company.

14   Q    What impact does that have on Debtors and Debtors' estate?

15   A    It has a dramatic impact on customers, and investors, and

16   shareholders, and vendors, and suppliers, and also all the

17   people that Bart has met with through Stream TV.

18   Q    Why did you not give the specs earlier to the Netherlands?

19   A    Because we were -- I was concerned that it was going to be

20   shared with Shad Stastney and SeeCubic of Delaware by one of

21   the employees.  And some of the employees would've kept it

22   confidential, but they were feeling extreme -- you know. in my

23   role as CEO of the Netherlands, there was tremendous

24   awkwardness because of you know, what was happening with

25   SeeCubic of Delaware.
```

Case 23-10763-amc   Doc 827-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 209 of 275

209

1   Q    What is the cost of the Netherlands per month?

2   A    Currently they are spending 750,000 euros a month, and

3   they've been doing that for quite a while.

4   Q    Is that because they're working on SeeCubic, Inc., or

5   SeeCubic of Delaware projects?

6   A    They are working on SeeCubic of Delaware projects, no

7   Stream TV projects.

8   Q    What is the proper cost of the Netherlands per month?

9   A    Stream TV believes that the proper cost is only about a

10  hundred thousand euros a month.

11         THE COURT:  It's how much?

12         THE WITNESS:  A hundred thousand Euros a month.  And

13  our concern is that that differential could have gone to the

14  unsecured, it's now in the form of a loan that Stream TV has to

15  pay back, which is a burden on tech, innovative and Stream TV's

16  estate.

17         MR. KODOSKY:  Permission to approach, Your Honor.

18         THE COURT:  Sure.

19         MR. KODOSKY:  This has previously been marked for

20  identification as D-2.

21         THE COURT:  We won't do it now.  Hold on one second.

22  Okay.  All right.  Counsel, go ahead.

23         MR. KODOSKY:  And, Your Honor, I don't know if this

24  has been moved.  If we moved this into evidence.  We had asked

25  Mr. Stastney about this document, he recognized that.

1          THE COURT:  Can you see John, if D-2 was admitted --

2          THE CLERK:  Sure

3          MR. COLBY:  It's already been admitted, I believe,

4     correct?

5          MR. KODOSKY:  That's what I'm not clear about.

6          THE CLERK:  I have it on our list, but not circled.

7     So I don't remember --

8          MR. COLBY:  Oh.

9          THE CLERK:  -- if it what's totally admitted or not.

10          MR. COLBY:  Yeah.  I guess he introduced it and

11    discussed it, but it wasn't admitted.

12          MR. KODOSKY:  Any objection?

13          MR. COLBY:  I mean, if he'd authenticate it.

14          MR. KODOSKY:  Mr. Stastney has already stated that he

15    recognized it, whenever we ask some questions about it.

16          MR. COLBY:  I'll state it for the record, Your Honor,

17    I'll state a relevance objection, because it's from Q2, 2022.

18    We're back to that.  But I'll state that objection for the

19    record and sit down.

20          THE COURT:  Okay.  All right.  Go ahead Mr. Rajan --

21          MR. KODOSKY:  Thank you, Your Honor.

22    BY MR. KODOSKY:

23    Q    Mr. Rajan, have you ever seen this PPM before?  Yes, I

24    have.  When did -- where did you see the PPM and when?

25    A    I was -- this is the second time I was invited to a

Case 23-10763-amc    Doc 848-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23    Page 211 of 275

211

1  meeting in New York to see if I wanted to personally invest in

2  SeeCubic of Delaware.  And this was handed to me by people

3  representing SeeCubic of Delaware.

4  Q    What did you do when you saw the PPM?

5  A    Well one, I was surprised what was in it.  It was in the

6  winter of 2022 well after the SeeCubic -- I'm sorry, the

7  supreme court ruling, and they were talking about sublicensing.

8  They were talking about our employees.  I immediately called

9  the CEO of Rembrandt to let him know that they were clearly

10  soliciting people saying that they're sublicensing, and they

11  were planning to sublicense the technology, which puts us in

12  risk with our IP licenses.

13  Q    What action did Rembrandt take?

14  A    Rembrandt filed a lawsuit against Technovative because

15  there was a Receiver in at that time and they also sued

16  SeeCubic and Shad Stastney.  I did prevent them from filing a

17  lawsuit against the Receiver for trade secret and IP and

18  license violations.

19  Q    I'm sorry you said SeeCubic.  Are you referring to

20  SeeCubic of Delaware?

21  A    SeeCubic of Delaware and they sued Technovative.  Sued

22  Technovative.  They sued Technovative because Technovative has

23  control of the subsidiaries and Stream TV does.

24  Q    What was the problem with Stream TV to cause this action?

25  A    The problem was is that SeeCubic was, through this

```
 1  document, soliciting investors saying that they were using a

 2  sublicense model, and this is the time when it was, you know,

 3  it was known to people in the industry that Phillips was

 4  beginning to sell their Patent's.  And Rembrandt was dead set

 5  against sublicensing.  And also, the technology was being

 6  misappropriated it appeared.  And Stream TV employees were

 7  being passed off as SeeCubic employees and they were openly

 8  talking about licensing a number of items in here that violate

 9  the Rembrandt claims.

10        You know, if you go here to the sublicensing, when it

11  goes to the revenue, it talks about the SeeCubic pros, the

12  SeeCubic coder, the optical stack, and also, you know, the IP

13  course.  So we informed Rembrandt what was happening.

14  Q    Where was Rembrandt's technology used?

15  A    Rembrandt had four claims.  One claim had to do with

16  content that in all the devices, the automotive and the TV's

17  and the gaming had to do with content.  And that is what is at

18  risk with these demo units such as the AK and the automotive,

19  the trade secret.  That is one of the Rembrandt claims is being

20  leaked out because it's not secure.

21        Then in the TV's, there's three other claims that

22  have to do with real time conversion and how to protect being

23  able to see things like menus and others that's inside the TV

24  product, which is in these various offices and being shown to

25  various companies.  You know, as my role it has the
```

 1  Netherlands, it's a security risk having -- leaving the TV's

 2  behind.  But they're being left behind in a wide range of

 3  locations.

 4          MR. KODOSKY:  Permission to approach, Your Honor?

 5          THE COURT:  You may.

 6          MR. KODOSKY:  If we didn't move this into evidence --

 7          MR. COLBY:  Can I see that again?  That looks

 8  different.

 9          MR. KODOSKY:  -- at the last hearing, Your Honor.  We

10  would do so now.

11          MR. COLBY:  Well, this is different then the one.  It

12  just doesn't have the address on the top.  It's just a

13  different document.  Is this another Saturday night?  This is

14  another Saturday night document?

15          MR. KODOSKY:  This is number six on our exhibit list.

16          THE COURT:  Let's refrain from the Saturday night.

17  This was D1 from the last hearing?

18          MR. COLBY:  No.  The document I have as D1 is

19  different.  The one I have as D1 it says on top valid October

20  1, 2023 and it starts with issuer and size.

21          THE COURT:  Well, that's what I have.

22          MR. COLBY:  Yeah.  This is -- what I was just shown

23  was a different document.

24          THE COURT:  Well, this is proposed terms for bridge

25  loan valid October 1, 2023.

Case 23-10763-amc    Doc 827-3    Filed 10/29/23    Entered 10/29/23 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23    Page 214 of 275

214

```
 1              MR. COLBY:  Yeah.  That's not what I was just shown.

 2              THE COURT:  Oh.  Well, that's what I have.  He must

 3   have gave you the wrong copy.

 4              MR. COLBY:  Well, I don't know which one we're

 5   talking about.

 6              THE COURT:  Are we talking D1 or D4?

 7              MR. KODOSKY:  This is D4, Your Honor.

 8              THE COURT:  Well, I have D1.

 9              MR. KODOSKY:  You have --

10              THE COURT:  Dated October 1st, 2023.  SeeCubic up to

11   $5 million.

12              MR. KODOSKY:  Let me take this back.

13              THE COURT:  Take it back and I don't know what we're

14   doing.

15              MR. COLBY:  Okay.  I've got a bunch of pages.  Some

16   look the same.  Some don't.  The pagination doesn't make sense.

17              THE COURT:  Why don't we take a little bit of break

18   because I'm starting to get a little queasy here.  I need to

19   get some medicine.  All right.  We need a ten-minute break.

20   We'll come back at 5:00.

21              I mean, are we going to -- I want to try to finish

22   tonight.  And I'm sure by the time we finish the good old

23   demonstration will be over and we go until 7:00.  I don't want

24   to go past 7:00.  I don't know if I can.  I'm going to go see

25   if I can.  But can we wrap this up by 7:00?  I don't want to
```

Case 23-10763-amc    Doc 843-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 215 of 275

215

1   have to come back here because then we're going to have to have

2   everybody's schedule.  And, I mean, it's up to you.  I would

3   like to get it done today, and I thought we would if we didn't

4   waste -- on issues.  But how much longer do you think you have

5   for Mister --

6           MR. KODOSKY:  I'd say 30 to 45 minutes, Your Honor.

7           THE COURT:  And Mister -- you probably need an hour,

8   hour-and-a --

9           MR. COLBY:  Yeah.  I've got some cross obviously.

10  And then there's a good chance we'll have to recall Mr.

11  Stastney.  You know my position that there's a whole bunch of

12  new facts that --

13          THE COURT:  So we're going to be past 7:00?  So

14  counsel, I think what we may have to do is wrap up Mr. Rajan's

15  direct and then get another date.  There's no way we're going

16  to finish this by 7:00 o'clock.  There's just no way.  And I

17  don't want to stay here past then.  I mean, I have been known

18  to go to 10:00-11:00.  But this, I'm not doing that.  Not

19  today.  So how about we take a recess, come back at 5:00

20  o'clock?  You can get your exhibits together and I can go get

21  something for my nausea.  So court is in recess until 5:00

22  o'clock.

23          MR. KODOSKY:  Thank you, Your Honor.

24      (Recess taken)

25          THE BAILIFF:  All rise.

Case 23-10763-amc   Doc 843-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 216 of 275

216

```
 1                    THE COURT:  Please be seated.  Counsel, you may

 2   proceed.

 3                    MR. KODOSKY:  Mr. Rajan, you've been handed what has

 4   previously been marked as Exhibit D1, which we move into

 5   evidence, Your Honor.  Do you have any objection?

 6                    MR. COLBY:  No objection, Your Honor.

 7                    THE COURT:  All right.  Admitted.  Okay.

 8        (Plaintiff's Exhibit D1 admitted into evidence)

 9   BY MR. KODOSKY:

10   Q    Mr. Rajan, have you ever seen this document before?

11   A    Yes, I have.

12   Q    What is it?

13   A    This is a subscription agreement that SeeCubic used to

14   raise money just to -- like two weeks ago.

15   Q    Where and when did you see this subscription agreement?

16   A     It was given to me by Stream TV shareholders had given it

17   to me and we put it into the records at Stream TV.

18   Q    I'd like to direct your attention to page 7 of 17,

19   subparagraph F.

20   A    Page 17?

21   Q    Seven of 17.

22   A    Okay.  Yes.

23   Q    Part of the paragraph there in paragraph F where it states

24   that there is no lawsuits against the company.  Against --

25   involving any of their respective officers or directors that
```

```
 1    would be expected to have a materially adverse effect.  Do you

 2    see that language?

 3    A    Yes.

 4    Q    What's your response or what's your reaction to that

 5    language?

 6    A    Right now there is between Stream TV and Rembrandt $2

 7    billion dollars' worth of active lawsuits against SeeCubic of

 8    Delaware.  And they are in fact IP claims and trade secret and

 9    offset claims, and you know, we're not supposed to mention

10    lender liability, but other types of claims against SeeCubic of

11    Delaware.  So it's a ludicrous statement.

12    Q    I'm sorry.  Did you say $2 million or $2 billion?

13    A    Two billion dollars in active lawsuits.  This is one of

14    the lawsuits against SeeCubic of Delaware.  This statement is

15    ludicrous.

16    Q    What's your understanding of who approved this

17    subscription agreement?

18    A    My understanding is --

19              MR. COLBY:  Objection, Your Honor.  Foundation.

20              THE COURT:  How does he know anything about this?

21              THE WITNESS:  By --

22              THE COURT:  You don't answer.  He's got to respond.

23              MR. KODOSKY:  I can ask a follow up question, Your

24    Honor.

25              THE COURT:  Yes.  Rephrase this question.
```

Case 23-10763-amc    Doc 847-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23    Page 218 of 275

218

1   BY MR. KODOSKY:

2   Q    What understanding do you have of who approved this

3   subscription agreement?

4   A    I know because they've approached me twice for investment.

5   So the brokers didn't know who I was.

6           THE COURT:  Tell us how you understand.  You said

7   they've approached you.  Who is they?

8           THE WITNESS:  The brokers and brokers and other

9   people who have put money into SeeCubic told me.  That I was

10  invited to meetings and phone -- telephone calls to make an

11  investment at SeeCubic.  They didn't realize who I was.  So the

12  shareholder knew who I was.  And they told me what was

13  happening, so I know how it was approved.

14  BY MR. KODOSKY:

15  Q    And what is your understanding of who approved the

16  subscription agreement?

17          MR. COLBY:  Objection, Your Honor.  Hearsay.  Mr.

18  Rajan just said they told me what was happening.

19          THE COURT:  Okay.

20  BY MR. KODOSKY:

21  Q    Told by agents of party opponents?

22  A    Agents of SeeCubic.  I was told and my due diligence is --

23          MR. COLBY:  Objection, Your Honor.

24          THE COURT:  Well, he's saying it was an agent of a

25  party.

1          MR. COLBY:  Right.  He initially said shareholders.

2   Now he's identified these -- mainly identified brokers.  I

3   don't know who he's talking about.

4          THE COURT:  Well, he said brokers.  He said he was

5   approached by brokers and others to invest.  And his understand

6   was more than just a share.  He was talking about, at least

7   from my notes, brokers, and other representatives of --

8          MR. COLBY:  I think that's almost self-provingly

9   (sic) unreliable in the sense that --

10         THE COURT:  Well, I don't know what to tell you.

11         MR. COLBY:  He's proposing the somewhat unreasonable

12  scenario where these statements can be held against, for

13  example, SeeCubic because they're a statement of an agent.

14         THE COURT:  Well, why don't we ask him who the agents

15  are?

16         MR. COLBY:  And it's unreasonable to think that

17  SeeCubic -- that those agents were acting at SeeCubic's

18  direction to try to raise money for Mr. Rajan when he just

19  testified there's $2 billion dollars' worth of litigation

20  between the two companies.

21         THE COURT:  Well, he also testified they didn't know

22  who he was.  So let's ask him who these agent -- he said

23  brokers didn't know who he was.  Ask him who the agents were.

24  BY MR. KODOSKY:

25  Q     Who were the agents?

1   A    There were several.  One -- the first time it happened it

2   was Mark Danenberg (phonetic) and the second time it happened

3   it was a friend of a Asaf Gola, who's on their board.

4              THE COURT:  Who?

5              THE WITNESS:  Asaf Gola who is a member of the board

6   and one of the Defendants in the lawsuit.

7              THE COURT:  What's his name?

8              THE WITNESS:  The broker's name is Jonathan --

9              MR. COLBY:  Objection.  I think Mr. Rajan -- are you

10  looking something up in your phone?

11             THE WITNESS:  Yeah.  I'm trying to find Jonathan's

12  last name.  Sorry.

13             MR. COLBY:  He can't be looking up stuff in his

14  phone.

15             THE COURT:  You can't look at any documents.  Just

16  tell us -- you said it was Mark Denenberg.  Who is he?

17             THE WITNESS:  He's one -- he was their broker at the

18  time.

19             THE COURT:  Broker for --

20             THE WITNESS:  SeeCubic of Delaware.

21             THE COURT:  Broker for SeeCubic.  And then you say

22  another guy.  What was his name?

23             THE WITNESS:  First name was Jonathan.  I can't

24  pronounce  his name.  It's a very long Jewish name.  He's

25  friends with Asaf Gola who's on the board of directors.

```
 1                THE COURT:  He's friends with who?

 2                THE WITNESS:  Asaf Gola who is on their board of

 3    directors.

 4                THE COURT:  Could you spell that for me, Asaf Gola?

 5          (Phone ringing)

 6                THE WITNESS:  A-S-F --

 7                THE COURT:  Who's phone is that?

 8                THE WITNESS:  That's mine.  I turned it off.  Sorry.

 9                THE COURT:  No.  Hand that phone to John.

10                THE WITNESS:  All right.  No problem.

11                THE COURT:  Make sure to tell these people don't come

12    here with phones.

13                MR. KODOSKY:  I think Asaf Gola is on the Defendant

14    list, I think.

15                THE COURT:  Okay.  Okay.  I see A-S-A-F Gola.

16                THE WITNESS:  Yeah.

17                THE COURT:  Asaf Gola.  He's a friend of Asaf Gola

18    and he was a broker too?

19                THE WITNESS:  Yeah, in New York.

20                THE COURT:  Okay.  And they approached you about?

21                THE WITNESS:  Yeah.  The approached me for

22    investment.  And the other one came through SeeCubic

23    shareholders via Kevin Gallop, who's also a board member and a

24    Defendant in the lawsuit.

25                THE COURT:  Okay.
```

1          MR. COLBY:  So, Your Honor, I would maintain the

2   objection in the face of that answer.  A shareholder who knows

3   Mr. Gallop is not an agent.  A friend of Mr. Gola is not an

4   agent.  And Mr. Rajan identified Mr. Danenberg.  Mr. Danenberg

5   has appeared in this case in the sense that we've seen some

6   emails and documents from 2023 when he was raising money for

7   Stream, not SeeCubic.  He most certainly is not an agent of

8   SeeCubic during any period of time related to this October 1,

9   2023 document.  He is not an agent, and he has not established

10  any foundation that he was.

11         THE COURT:  Okay.  Well counsel, you can cross-

12  examine him on that.  But I -- just because you stand up and

13  say he wasn't.  You can say he believed he was an agent when he

14  dealt with it.  I can't --

15         MR. COLBY:  He hasn't established --

16         THE COURT:  Well, he said that --

17         MR. KODOSKY:  He said it -- sorry.

18         MR. COLBY:  The purported basis is --

19         THE COURT:  He testified that he dealt with a broker

20  who test or approached him.  And that broker was Mr. Danenberg.

21  Now, you can cross-examine him against that.  But you just

22  can't stand up and say it's not true.

23         MR. COLBY:  Well, Your Honor, but the purported basis

24  for at least two of the three was that they were a friend of so

25  and so or a shareholder who came through.

```
 1              THE COURT:  Well, I get to them.  Those I get.

 2              MR. COLBY:  That's insufficient.

 3              THE COURT:  Okay.  But we were talking about Mr. --

 4   and I said Broker.

 5              MR. COLBY:  Danenberg.

 6              THE COURT:  Mr. Danenberg, okay.  And he said

 7   Jonathan was a broker who was a friend.  I thought he said

 8   Jonathan from New York.  I don't know his last name.  Who was a

 9   friend of Asaf Gola was a broker.  I don't know if he was just

10   a friend.  I thought he said two brokers.  One Mark Denenberg,

11   Jonathan from New York who was a friend of Asaf Gola.  And

12   Jonathan had a name he couldn't pronounce.  I'm not going to

13   comment the rest.  And that the third person is was Kevin

14   Gollop, who was a shareholder.

15              MR. COLBY:  I'm sorry, Your Honor.  He testified a

16   shareholder who knows Mr. Gollop who's a SeeCubic board member.

17   And the Gola friend is not a broker.  He said the Gola friend

18   is a Gola friend and Gola is on the board.  So he's trying to

19   create the implication that they're agents because they're

20   friends with or known to board members.  That's insufficient to

21   establish an agency relationship.

22              THE COURT:  I got that, but that wasn't my -- I guess

23   I had a different -- my notes reflect he said something

24   different.  So except with Danenberg that I'm clear he said was

25   a broker, I thought he said the other broker was Jonathan, I
```

 1  can't remember his name.

 2          MR. COLBY:  Yeah.  He said he's a friend of Mr. Gola,

 3  not a broker.

 4          THE COURT:  I don't know.  Okay.  So with respect to

 5  the shareholder -- unless they had some authority, can't be an

 6  agent for the company.  I don't know what his role was and know

 7  his -- was it somebody who could buy the company and represent?

 8  I don't know.  I don't know what Mr. Gollop's role was.

 9  Because just because you're a shareholder doesn't mean that you

10  may not be able to act in a capacity as an agent, as a

11  representative of the Debtor.  I don't know.  That's why I'm

12  saying, I can't just conclude -- you just can't say approached

13  by a shareholder.  That's insufficient.

14          MR. COLBY:  Or we submit a friend of Mr. Gollop.

15          THE COURT:  Again, I have different interpretation

16  what he said about Mr. -- who Mr. Gollop's friend was.  I

17  thought he said he was a broker.  You said he just said he was

18  a friend of Mr. Gollop.  The record will reflect what he said.

19          MR. COLBY:  Okay.

20          THE COURT:  Okay.  But with respect to Mr. Denenberg,

21  his testimony is that he met Mr. Broker, I mean Mr. Denenberg

22  as a broker, and that he offered him some participation in his

23  offering.

24          MR. COLBY:  Happy to address Mr. Denenberg either on

25  cross or redirect.

1          THE COURT:  Yeah, on cross.  But you can't just say,

2   well, he's not and I take your word for it.  What evidence do I

3   have?  You get to put your evidence the same way they get to

4   put theirs in.  All right.  Counsel, you may continue with

5   respect to how Mr. Rajan knew about who authorized this offer.

6   BY MR. KODOSKY:

7   Q    What is your understanding of who approved the

8   subscription agreement?

9   A    My understanding is the subscription that warranty was

10  approved by the two Skadden lawyers in the courtroom.

11         THE COURT:  Okay.  That's his understanding.

12  Approved by who?

13         MR. COLBY:  I'm exercising all of my self-restraint,

14  Your Honor.

15         THE COURT:  Okay.  Well, maybe he means approved the

16  language.

17         THE WITNESS:  Language.

18         THE COURT:  All right.

19         MR. COLBY:  I --

20         THE COURT:  Counsel, that's his understanding, okay.

21         MR. COLBY:  I hope clients have better sense then to

22  ask me to approve language like that.

23  BY MR. KODOSKY:

24  Q    Mr. Rajan, have you ever had meetings --

25         THE COURT:  Well, I don't know.  Wait a minute.

 1  You're a litigator.  I'm not sure you'd be on the front end of

 2  this anyway.

 3          MR. COLBY:  That's what I mean.  Yeah, they shouldn't

 4  be ask --

 5          THE COURT:  Right.  The corporate section handling

 6  this and then you would be telling them don't put that in

 7  there, which is what my ruling was.  Was no, you can't do that.

 8  We were always the doom and gloom.  And the front-end people

 9  were always let's put anything we want in here.  Okay.

10  BY MR. KODOSKY:

11  Q    Mr. Rajan, have you ever had meetings with the electronics

12  companies?

13  A    Yes, we have.

14  Q    Did you ever have meetings with the electronic companies

15  where use of the technology through either sublicensing or the

16  self-components such as chip and film or devices was not

17  discussed?

18  A    We've had over -- we've had hundreds of meetings.  It was

19  always discussed; what was the method that they would get the

20  technologies if it was as a chip and film, or they were going

21  to get a sublicense?  It was always discussed in every single

22  meeting.

23  Q    Mr. Stastney said at the hearing last week that he had

24  meetings with over -- that they had meetings with over 100

25  companies and how the technology was going to be used by the

Case 23-10763-amc   Doc 847-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 227 of 275

227

1   companies was never discussed.  Did you hear that testimony?

2   A     Yes, I did.

3           THE COURT:  Wait a minute.  What was the testimony?

4           MR. KODOSKY:  How the technology was going to be used

5   by the companies was never discussed.

6           THE WITNESS:  According to Mr. Stastney, not us.

7   BY MR. KODOSKY:

8   Q     And you also heard Mr. Stastney state how the technology

9   -- that the three companies getting the samples never discussed

10  how the technology was going to be used, correct?

11  A     Yeah.  He testified that they never discussed if it was

12  going to be a sublicense or if they were going to receive

13  components.

14  Q     And he also said that the four companies that are

15  supposedly imminently investing $5 million dollars each, never

16  discussed how the technology was going to be used; did you hear

17  him?

18  A     That was Mr. Stastney's testimony, correct.

19  Q     What's your reaction to that statement?

20  A     That's ludicrous.

21  Q     Why?

22  A     What's the point of having a meeting?  I mean, what's the

23  point?  Everybody is a -- wants to know how they're going to

24  get the technology.  Are they going to get chips and

25  components?  Are they going to get -- are they going to get a

1    sublicense?  They're not just coming to a meeting for

2    entertainment.

3    Q    All right.  Now you -- are you familiar with the Phillips

4    licensing agreement?

5    A    Yes, I am.

6    Q    And are you also familiar with the 2014 amendment to the

7    Phillips licensing agreement?

8    A    Sure.

9    Q    You heard Mr. Stastney's testimony regarding the

10   amendment, correct?

11   A    Yes.

12   Q    What did you understand him to be saying about the

13   amendment?

14   A    First of all, the main document says no sublicensing.  The

15   amendment is parallel licensing.  He was trying to say that

16   that's actually a light -- an understanding to go ahead and

17   sublicense.  Parallel licensing and sublicensing are completely

18   different.  You know, like when you have an apartment, if

19   you're allowed to, you can sublet it and you just take it and

20   you cut a deal with somebody.  Parallel licensing is just like

21   I go get a referral card to my landlord and you go get your own

22   apartment.  Phillips was controlling all discussions regarding

23   their technology between them and the companies.  And now it's

24   a moot point because the Paton's are sold and there's --

25   they've made it very clear there's no more licensing.  So

1   sublicensing is dead.

2   Q    And what is SeeCubic of Delaware doing based on the

3   information that's been gathered?

4              MR. COLBY:  Objection.  I don't understand the

5   question.

6              THE COURT:  Hold on.  Hold on.  I'm still back trying

7   to write what he said previously.  Okay.  So counsel, he's

8   objecting to the question.  And can you rephrase it because I

9   forgot what it was?

10  BY MR. KODOSKY:

11  Q    How does the Phillips license work?

12             MR. COLBY:  Sorry, Your Honor.  I would also move to

13  strike Mr. Rajan's previous answer as either lack of foundation

14  or hearsay.  There's no basis for what Phillips is or isn't

15  going to do in any evidence he's offered so far.

16             THE COURT:  Mr. Stastney testified regarding that?

17             MR. COLBY:  Well, I mean, we -- with Mr. Stastney we

18  looked at the licensing agreement.  But what Mr. Rajan just

19  said is there's no new Paton's.  Sublicensing is dead.

20             THE COURT:  Hold on.

21             MR. COLBY:  No new license -- sorry.  No new

22  licensing from Phillips.

23             THE COURT:  And did Stastney testify anything about

24  the issue about no new licensing being allowed by Phillips?

25             MR. COLBY:  Yes.

Case 23-10763-amc    Doc 847-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23    Page 230 of 275

230

 1            THE COURT:  I thought somebody asked him about that.

 2            MR. COLBY:  Yes.  He testified about his

 3   understanding of the 2014 amendment.

 4            THE COURT:  Okay.  And I thought he also testified or

 5   maybe I -- somebody talked about no more licensing being issued

 6   by Phillips.

 7            MR. COLBY:  Those were cross-examination questions

 8   based upon the sale of the Phillips Patent portfolio.  I think

 9   what concerned me about Mr. Rajan's previous answer is he

10   seemed to be saying that Phillips isn't going to do anymore

11   license, any sublicense, any parallel licenses, anything like

12   that.  He lack any foundation for that testimony.

13            THE COURT:  Well, I thought -- wait a minute.  I

14   thought Mr. Stastney testified to that.  And if that's what he

15   said, he would be basing it on what Stastney said.

16            MR. COLBY:  No.  Mr. --

17            THE COURT:  I mean, I don't know.  I can't -- I have

18   the -- it's not like I can scan -- I mean --

19            MR. COLBY:  My recollection is that Mr. Stastney

20   testified that the 2014 -- to his understanding of the 2014

21   amendment, which was that additional licenses by Phillips could

22   not be unreasonably withheld, which is the language of the

23   document.

24            Again, just going back to Mr. Rajan's answer.  He

25   seems to be making the statement that Phillips is not going to

Case 23-10763-amc   Doc 847-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript   Page 231 of 275

231

1   do any new licenses or anything like that.  There's no

2   foundation for Mr. Rajan's knowledge about what Phillips is or

3   is not going to do.

4           THE COURT:  Unless it was testified to here in open

5   court.  I don't know.  I'm trying to figure out -- somebody

6   said it.  Maybe it was in colloquy with counsel.  I don't know.

7           MR. COLBY:  Yeah.  So previously the question that

8   Mr. Stastney was --

9           THE COURT:  Where we at?

10          MR. COLBY:  I'm looking at page 127 of the October

11  6th transcript.

12          THE COURT:  127, okay.  And we're talking about --

13  okay.

14          MR. COLBY:  So he says -- his name is Alexnder

15  Damveld.  The same Alexander -- the question is, "The same

16  Alexander Damveld that said there are no licenses available at

17  this point?  Answer:  "I don't know what you're referring to."

18          THE COURT:  Okay.

19          MR. COLBY:  Question: "Are you aware the gentlemen

20  has informed my client within the last month, dada, dada, da."

21  And then the question was rephrased because that was -- I

22  objected.  That was not a proffer of evidence and that would be

23  hearsay.  And then Mr. Kodosky moved on to ask if Mr. Stastney

24  had personal conversations with Mr. Damveld.

25          THE COURT:  Right.

Exhibit Exhibit 10-16-23 Hearing Transcript D-16-23   Page 232 of 275

```
 1              MR. COLBY:  So what I'm saying is just a minute ago,

 2   Mr. --

 3              THE COURT:  And there was no foundation.  Sustained.

 4              MR. COLBY:  Yeah.  No foundation.

 5              THE COURT:  Lay a foundation.

 6              MR. COLBY:  And to the extent there was to be

 7   hearsay.

 8              THE COURT:  Because again, I don't know if I heard

 9   this with colloquy between counsel.

10              MR. COLBY:  That's right.  I think it was.

11              THE COURT:  I know I heard it.  But I thought it

12   might have been Mr. Stastney's testimony, and clearly it

13   wasn't.  It was from colloquy with counsel.  All right,

14   counsel.

15              MR. KODOSKY:  Permission to approach, Your Honor?

16              THE COURT:  Sure.

17   BY MR. KODOSKY:

18   Q    Mr. Rajan, you've been handed what's been marked for

19   identification as D40.  Do you recognize this document?

20   A    Yes, I do.

21   Q    What is it?

22   A    It's a letter from Phillips.

23   Q    Letter or an email?

24   A    Email.  Email, I'm sorry.  An email.

25   Q    Who is Alexander Damveld?
```

1   A     He's in charge of the licenses at Phillips.

2   Q     And who is this email sent to you?

3   A     Bud Robertson (phonetic), myself, and Dan Renk (phonetic).

4   Q     Is Bud Robertson Charles Robertson?

5   A     Yes.  That's who testified earlier.

6         MR. KODOSKY:  Move the admission of this document,

7   Your Honor.

8         MR. COLBY:  Objection, Your Honor.  The -- if I

9   understand correctly, there are going to be questions about

10  this top email from Mr. Damveld to Mr. Robertson.  That is

11  hearsay.  Even if the email itself is a business record, that

12  is hearsay within hearsay.  Hearsay within hearsay is only

13  admissible if each part of the combined statement conforms with

14  an exception to the rule.  And there is no exception to the

15  rule that applies to this email from Mr. Damveld.

16        MR. KODOSKY:  Counsel doesn't seem to have a grasp on

17  the hearsay rules, Your Honor.  This is not --

18        THE COURT:  All right, cut it out.

19        MR. KODOSKY:  I'm sorry.  That was -- I apologize for

20  that.  This is not being offered to prove the truth of the

21  matter asserted.  But instead is a verbal act that I am

22  referring to earlier.  Operative, legally operative language

23  affecting the rights of the -- and obligations of the parties.

24  It's not hearsay pursuant to Rule 801.

25        MR. COLBY:  It is in no way a document that embodies

1    the legal rights of the parties.  It is a statement by Mr.

2    Damveld about two other documents, which are in evidence.  The

3    license and the 2014 amendment.  But this is not a verbal act.

4    This is not a document that sets forth or establishes legal

5    rights of parties.

6         MR. KODOSKY:  Your Honor, I'd say it's right there.

7    "But if it will be finalized, please know that you're existing

8    license will not change and the license will remain with

9    Phillips."

10        MR. COLBY:  Correct.  So the existing license is the

11   document that establishes the legal rights of the parties.

12   This statement about it, about something that may or may not

13   change in the future is not an act that alters those rights.

14   This is -- we couldn't come into court somewhere and say this

15   document gives us a license or doesn't give us a license.  It's

16   simply an observation or prediction by Mr. Damveld.

17        Now, substantively is this -- does this even remotely

18   help the Debtors with their TRO?  No.  Their claim is that the

19   TRO -- that Phillips is going to take away the license.  What

20   this says is your license isn't going to change, but --

21        THE COURT:  Well, no.  It says your license will

22   remain with Phillips.  It didn't say it's not going to change.

23        MR. COLBY:  Yeah.  That's referring to the sale.  It

24   undermines their argument in another instance.  The Debtors

25   have argued that the sale of the Patent portfolio is somehow

```
 1   going to change the landscape here.  What they're saying is --
 2           THE COURT:  No, no, no.
 3           MR. COLBY:  -- Phillips still controls the licensing.
 4           THE COURT:  Their license.  I think his testimony is
 5   a little bit different.  His testimony is that based on some
 6   basis, Phillips is not going to be licensing to anyone else.
 7   That's what his testimony is about.  I'm not quite sure how
 8   this helps me to figure out how he came to that understanding,
 9   which is what you objected to.
10           MR. COLBY:  Correct, Your Honor.  But it's also
11   hearsay that is inadmissible.
12           THE COURT:  Okay.  The reason it's hearsay because
13   the email in question is from Mr. Alexander Damveld.  And it
14   was cc'd to Mister --
15           MR. KODOSKY:  Mr. Rajan.
16           THE COURT:  -- Rajan, Dan, and that was it.  It was
17   sent to the person who was before -- testified earlier.
18           MR. COLBY:  Yeah.
19           THE COURT:  Mr. Robinson.
20           MR. COLBY:  And a verbal act, Your Honor, is a
21   statement that has legal significance or brings about a legal
22   consequence simply by its existence.
23           MR. KODOSKY:  What are you referring from?
24           MR. COLBY:  This -- I'm referring to a case
25   Transportes Aereos Pegaso, S.A. the C.V. vs. Bell Helicopter
```

Case 23-10763-amc    Doc 847-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23    Page 236 of 275

236

<u>Textron</u>, District of Delaware 2009, 623 F.Supp.2d 518.

      THE COURT:  Okay.  And so, you believe that for the verbal which because it's -- I mean, yeah.  Because it's nonverbal, that it's subject to the hearsay.  At the beginning, it talks about what the statement is in the hearsay rule on 80 -- what did I do with my rule book?  801 --

      MR. COLBY:  Right.

      THE COURT:  801 says, "A state means a person's oral assertion, written assertion, or nonverbal conduct with the person intended if the person intended it as an insertion."  So it's implicit in there if it's a verbal -- I don't know how you would call it.  I guess you could -- verbal conduct is not a statement.  And you're saying that based on that Delaware court?

      MR. COLBY:  No.  I'm sorry, Your Honor.  I don't read that the same way that you do.  And it's an out of --

      THE COURT:  It's nonverbal.

      MR. COLBY:  It's an out-of-court statement that is either -- let me find the language so I'm not --

      THE COURT:  A statement, right.  It's an out-of-court statement --

      MR. COLBY:  Means can oral assertion, a written assertion, or nonverbal conduct that's intended to communicate to an assertion.

      THE COURT:  Right.

 1          MR. COLBY:  Right.  So that's just saying if you nod

 2   your head or shake your head or something like that.  So that

 3   doesn't apply to this, okay.  This is a written communication.

 4   And then --

 5          THE COURT:  Okay.  I get that.

 6          MR. COLBY:  Yeah.  And it's being offered for the

 7   truth of the matter.  They're saying Phillips isn't going to do

 8   any additional licenses.  And the reason why it's not a verbal

 9   act in the sense like an act that has legal consequences is

10   because the licenses, the future -- the parties can disagree

11   about whether the 2014 amendment requires Phillips to grant

12   additional licenses or not unreasonably withhold or whatever.

13          But the simple fact is that the 2014 amendment, the

14   2010 original license, those are the terms that established the

15   contractual rights of the parties with respect to this issue of

16   licensing and sublicensing.  This email does not.  It is not a

17   verbal act.

18          THE COURT:  Counsel, I thought the whole line of

19   questioning went to the issue of the Debtors -- at least Mr.

20   Rajan is a Debtor's representative, of his understanding that

21   Phillips would not be issuing any more sublicense, anymore

22   licenses.  That was the issue.  I don't see anywhere in here

23   first of all where it says anything about us not issuing

24   anymore licensing.  I think that's what the whole issue was

25   when you objected and said there's no foundation upon which we

Case 23-10763-amc    Doc 823-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 238 of 275

238

1   can -- Mister -- lay the foundation how Mr. Rajan acquired that

2   knowledge.  Isn't that what this was about?

3        All right.  I guess -- I mean, I'm not reading it

4   because I'm not supposed to really be --

5        MR. COLBY:  Right.  So for example, Mr. Rajan could

6   testify what his understanding is of the 2014 amendment, and he

7   did, right?  That's his understanding.  But to the extent he's

8   going to say my understanding is based on the fact that

9   Phillips told me they weren't doing any sublicenses, that's

10  hearsay.  And they can't -- whether it's him saying they told

11  me or whether it's him trying to introduce this email into

12  evidence, it's the same problem.  It's hearsay.  It's

13  inadmissible.

14       THE COURT:  Hold on, counsel.  All right.

15       MR. COLBY:  And to finish the thought, Your Honor, on

16  a verbal act.  Like a verbal act is something that, for

17  example, a verbal act that makes a contract.  So all of a

18  sudden, you know, it has a very direct legal consequence or to

19  make a threat.  Those are things that the third circuit has

20  identified as being verbal acts because the threat has a legal

21  consequence of a criminal act or something like that.

22       So it's a legally operative statement.  Read in an

23  email about what you may or may not do in the future is not a

24  legally operative statement.

25       MR. KODOSKY:  Your Honor, I don't know what Third

```
 1   Circuit case he's referring to.

 2           THE COURT:  All right.  Well, that case is -- don't

 3   talk to him.  Talk to me.

 4           MR. KODOSKY:  Sorry.  I'm holding in front of me the

 5   notes of advisory committee on the rules.  It states that the

 6   effect is to exclude from hearsay the entire category of quote-

 7   on-quote verbal acts and verbal parts of an act in which the

 8   statement itself affects the legal rights of the parties or is

 9   a circumstance bearing on conduct affecting their rights.

10           MR. COLBY:  Yeah.  This expressly --

11           MR. KODOSKY:  That's straight out of the -- excuse

12   me.  Straight out of the advisor comments.  But I'll also point

13   out, Your Honor, the Rule 803-15, statements, and documents

14   that affect an interest in property would seem to apply.  We

15   don't -- I don't believe that this is hearsay.  But I think

16   that it's a verbal act.  But even if it was hearsay, it would

17   seem like 803-15 would seem to apply.

18           THE COURT:  Hold on.  Let me -- statement affecting a

19   -- this statement is admissible -- tells me  how you're

20   supposed to do this.

21           "The statement is containing a document purporting to

22           establish or affect an interest in property.  The

23           matter stated was relevant to the purpose of the

24           document and dealings with the property since the

25           document was made had not been inconsistent with the
```

Case 23-10763-amc    Doc 847-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-15-23    Page 245 of 275

240

1          truth of the statement or the purpose of the

2          document."

3       Okay.

4          MR. COLBY:  So, Your Honor, to the -- what this email

5    says is the existing license will not change.

6          THE COURT:  It also says some other stuff at the top.

7          MR. COLBY:  Yeah.  It's about again -- and that's

8    not, certainly not a verbal act.  It says, "I understand your

9    request.  The discussions regarding the patent sale of

10   advance."  That's just information.

11         THE COURT:  That is not.  It says, "when you're in a

12   phase that is not feasible to create new contracts or amend,

13   withstand, change, existing anymore."

14         MR. COLBY:  Again, so this is not a document that

15   creates, amends, or changes a legal right.  It expressly says

16   it's not doing that.  Now, so what are the legally --

17         THE COURT:  It also says it's not feasible to create

18   new contracts.

19         MR. COLBY:  Correct. And so what that leaves are the

20   existing contracts.  And the existing contracts -- so first of

21   all, that makes it by definition.  Not a verbal act.  Not a

22   statement in documents that affect the interest in property

23   because it's expressly saying it's not changing anything.  It's

24   not giving any new rights.  It is on its face --

25         THE COURT:  Well, does it have to change?

```
 1                    MR. COLBY:  It doesn't --

 2                    THE COURT:  Does 803-15 say it has to change rights

 3    or what does it say?  Let me go back to 803.

 4                    MR. COLBY:  It says establish or affect an interest

 5    in property.  It's like the equivalent --

 6                    THE COURT:  Establish or affect?  What does it mean?

 7                    MR. COLBY:  Like a deed.

 8                    THE COURT:  I'll write you and say that it doesn't

 9    affect -- that that doesn't mean affect?

10                    MR. COLBY:  It's  like a deed or a transfer in

11    property just like a verbal act is the formation of a contract.

12    This is by definition on its face none of those things.

13                    THE COURT:  It's a written document you're saying?

14                    MR. COLBY:  It's just -- it's words on a page.  It

15    does not --

16                    THE COURT:  It's not a word, counsel. It's an email.

17    There was someone wrote and sent to someone else.

18                    MR. COLBY:  Right.

19                    THE COURT:  It's not just pages.  So it's an out-of-

20    court statement.

21                    MR. COLBY:  Correct.

22                    THE COURT:  That's being offered to establish that

23    Phillips is not granting anymore license.

24                    MR. COLBY:  And that the -- this is the important

25    point, Your Honor.  That the current license will not change.
```

```
 1   And the current license says that Phillips will not

 2   unreasonably withhold --

 3            THE COURT:  Counsel --

 4            MR. COLBY:  -- additional licenses.

 5            THE COURT:  -- I get that you're going to the next

 6   step.  But all he -- you objected on the basis that Mr. Rajan

 7   said Phillips is not granting anymore licenses, okay.  You

 8   objected and said, well, what's the basis for that?  How does

 9   he know that?  Where does he get it from?  And so -- and he

10   hands him this document that says he wants to have introduced

11   into evidence as the basis for saying why he came to that

12   conclusion.  How did he come to that conclusion and what was

13   the basis for that?

14            So are we saying that he's offering it to say this is

15   how he came to the basis for that information or are you

16   objecting because you're saying something -- and I think you're

17   going to object a step further to say that he can't use this

18   document as a basis as to how he came to his understanding that

19   they will not be issuing more licenses.

20            MR. COLBY:  So, Your Honor, what I'm actually

21   objecting to now -- so I made the previous objection.  And then

22   in response to it, Mr. Kodosky moved on to additional

23   questioning and attempted to introduce this into evidence.  In

24   order for it to be introduced into evidence, it can't be

25   hearsay, or it needs to fall into one of the exceptions, and it
```

Case 23-10763-amc    Doc 827-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 243 of 275

243

1    doesn't.

2         So what we're talking about now is whether or not

3    this document should be admitted into evidence.  And it is

4    plainly hearsay and is plainly not a verbal act or a statement

5    in documents that affect an interest in property.  It's just --

6         THE COURT:  I'll sustain that.  I don't think it's a

7    verbal act nor do I think it's 801-15 or 803-15.

8         Okay.  Now, that leaves the issue of whether it

9    serves as a basis.  And maybe it doesn't have to be admitted.

10   But he shows that to him and maybe that's how he came to the --

11   because you're saying he doesn't know how he -- he just made a

12   conclusion.

13        MR. COLBY:  Well, if Mr. Kodosky wants to ask and Mr.

14   Rajan wants to testify how he -- what is, you know, his

15   understanding --

16        THE COURT:  I thought that's what this was for.

17        MR. COLBY:  I think the Court -- well, but not

18   putting it into evidence, Your Honor.

19        THE COURT:  At that, counsel.

20        MR. COLBY:  Okay.  Then maybe, but if the answer is

21   well I was told, whether it's in an email or directly, then

22   that's inadmissible.

23        THE COURT:  I get that.

24        MR. COLBY:  So I'm happy to go back to --

25        THE COURT:  Which is how did he come to his

1   understanding?  And you're objecting because you're saying this

2   document cannot be used as a foundation to say -- he could have

3   just said, here's the document.  Did you refresh your

4   recollect?  Give it back to me.  Does this refresh your

5   recollection on how you came to that conclusion?

6            MR. COLBY:  Well, I don't think that Mister --

7            THE COURT:  Well, he said --

8            MR. COLBY:  -- Mr. Rajan testified that he had --

9            THE COURT:  Forgot.  I know.

10           MR. COLBY:  -- forgotten anything.

11           THE COURT:  Well, he just -- but he said do you

12   remember?  Do you recall?  You're absolutely right.  He could

13   have done it some other way.  So I'm going to sustain the

14   objection.  I don't think this is admissible because it doesn't

15   meet the hearsay exception.  So, okay.  Counsel, you can

16   continue with your questioning of Mr. Rajan.  We're fast

17   approaching 6:00.  Go ahead.

18           MR. KODOSKY:  Permission to approach, Your Honor?

19           THE COURT:  Okay.  Got to make sure not admitted,

20   okay.  I'm writing on here.  Give it to John.

21           THE BAILIFF:  Mister -- has not admitted 40.

22           THE COURT:  40, I just ruled on that.  I know I

23   shouldn't be but.

24   BY MR. KODOSKY:

25   Q    Mr. Rajan, do you recognize this document?

```
 1  A     Yes, I do.

 2  Q     What is it?

 3  A     It's an email from Phillips.

 4  Q     And what is Phillips conveying through this email to you

 5  all?

 6         MR. COLBY:  Objection, Your Honor.  Hearsay.  It's

 7  effectively the same document that we just -- same substance,

 8  same issue that we just addressed.

 9         THE COURT:  Counsel?

10         MR. KODOSKY:  I think it's a verbal act, Your Honor.

11  I think that it affects property rights.  Relates to --

12         THE COURT:  Objection sustained.  Let's move on.

13  It's the same document.  I don't know how to rule differently.

14  BY MR. KODOSKY:

15  Q    Mr. Rajan, you were present for Mr. Stastney's testimony

16  when he stated that he will be revealing the specs of Stream TV

17  proposed projects?

18  A     Yeah.  He said that in his testimony in his role of

19  director, he will review the specifications and also will

20  decide if the Netherlands will work on Stream TV projects

21  because of the resource demand if it was warranted.  So we have

22  a situation where Stream TV subsidiary is being run by the CEO

23  of a competitor and the competitor is going to see all of our

24  specifications and decide whether or not our subsidiary is

25  going to work on Stream TV and Technovative projects, the
```

Case 23-10763-amc   Doc 843-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 246 of 275

246

1    Debtor, and the Debtor's estate.

2         MR. COLBY:  Objection, Your Honor.  Move to strike

3    the portion of the answer where Mr. Rajan is merely relaying

4    testimony that took place already in this court.  There's no

5    reason for Mr. Rajan to sit here and say, back on October 6th,

6    Mr. Stastney said this.  Mr. Stastney says that.  That record

7    exists.  That was also incorrect.  Mr. Stastney testified that

8    he would put an independent party in place to review Stream's

9    projects.

10        So it's not consistent with the actual testimony.

11   And I think that shows why it's bad evidence.  It's just Mr.

12   Rajan sitting here saying Mr. Stastney testified about this or

13   that.  He's here to give his testimony.  Not to recast and

14   recharacterize what Mr. Stastney said.  That's written down in

15   black and white.  That's the evidence the Court should

16   consider.

17        THE COURT:  Counsel?

18        MR. KODOSKY:  At this rate, Your Honor, I think that

19   Mr. Rajan accurately described Mr. Stastney's testimony when he

20   said that the engineers would be reviewing the specs that would

21   ultimately be brought to him to approve.  And to the extent

22   that that is directly impacting the Debtor's, the estate, and

23   our ability to compete, to do business.

24        THE COURT:  I get that's argument at this point.  But

25   what you're saying is that counsel was objecting on the basis

```
 1   is that the testimony is already in the record.  He doesn't

 2   need to repeat it.  And that it's a mischaracterization of the

 3   testimony.  Okay.  So let's deal first with he said, you know,

 4   he said he would be reviewing the specs for projects.  And that

 5   I get that he's a competitor of Stream.  And Stream's position

 6   is that he will be determining what projects will go forward

 7   with respect to Stream.

 8            And counsel has objected to it has a

 9   mischaracterization of the record.  And what Mr. Stastney

10   testified to, Mr. Kodosky.  That's what he's saying.

11            MR. KODOSKY:  Page 178, line 21.

12            THE COURT:  178, line 21.  Okay, line what?

13            MR. KODOSKY:  I believe it's line 21.

14            THE COURT:  "And if the Debtors have projects that

15   they want to propose, then they would have to propose those to

16   you, correct?  Or as directed by me and the process we plan to

17   put in place and will seek approval from the Court is that

18   they'll go to the employees to the extent that a name is needed

19   and will be given only to the staff.  And I won't receive the

20   name.  I'll receive the details of the analysis of the project

21   to determine its feasibility, but not the name."  And the

22   question is, where is that in the protocol?  And it states that

23   it doesn't.

24            Yeah, it says there -- and then you go further down,

25   and he says there are -- yes, he admitted that there were
```

1  provisions that have to be modified to affect the spirit and

2  we're in the process of doing that because of the protocols

3  were made when there was an independent director involved as

4  opposed to essentially the chairman and CEO of one of the two

5  parties.  Okay.  So it says he's going to change the process.

6         MR. COLBY:  Right.  So my only point is, Your Honor,

7  is Mr. Rajan can testify what his testimony is about that, but

8  he's not here to try to recast or reshape what Mr. Stastney

9  said.  The Court has that.  It's in black and white.  It's

10  written on the page.  I think the best use of our time would be

11  to focus on not having an argument about what Mr. Stastney said

12  a week ago.

13         THE COURT:  Or what is his understanding of what the

14  consequences of that.  He can tell me that.

15         MR. COLBY:  Yeah, but --

16         THE COURT:  You heard what Mr. Stastney said.  What

17  do you think that impact is, if any, on Stream and it's future

18  projects?

19         MR. COLBY:  And there were a handful of similar

20  questions about what Mr. Stastney said earlier.  I didn't

21  object, but I'm trying to -- at a certain point we've got to

22  move on and just focus on what Mr. Rajan is here to testify

23  about.

24         THE COURT:  All right.  Counsel, I'm going to sustain

25  the objection.  Just -- I already know what Mr. Stastney said.

1    You need to ask him -- you know, were you here?  Did you hear

2    what he testify?  What impact, if any, you believe this is

3    going to have?

4          MR. KODOSKY:  That was my next question, Your Honor.

5    BY MR. KODOSKY:

6    Q    What are the implications for the Debtor and the Debtor's

7    estate based upon Mr. Stastney's testimony?

8    A    It would be like the CEO of Pepsi is in charge of the

9    subsidiary of Coke and is going to see Coke's specifications

10   and decide the subsidiaries.  Is going to work on Coca-Cola's

11   projects.  That is -- they're already shifting business away

12   from the company.  They're shifting investment away from the

13   Debtor and the Debtor's estate.  And now they're in charge of

14   also the assets, which didn't come back.  And when we were in

15   Amsterdam, there was difficulty finding an independent director

16   because of all the IP litigation.  And so, that's why we

17   suggested an independent director here from Philadelphia that

18   can work with Rembrandt and bring the project forward without

19   hurting the Debtor and the Debtor's estate.

20   Q    Who is it that you would propose be the independent

21   director?

22   A    The Amsterdam court said twice that they needed guidance

23   from the U.S. court.  So we suggested a retired judge

24   preferably from Philadelphia so they're familiar with the

25   eastern district or a Philadelphia lawyer who would serve as

Case 23-10763-amc    Doc 843-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23    Page 250 of 275

250

 1  the independent director of the Netherland's company because

 2  they're be familiar with, you know, who the procedures work in

 3  front of the judge and everything.

 4  Q    Is that Judge Carey, former Judge Carey?

 5  A    Yes.

 6  Q    What size purchase orders would you look to Judge Carey to

 7  help get the assets back that you contend never been

 8  returned?

 9  A    We have over 140 -- I'm sorry, $160 million dollars of

10  purchase orders.  There's a number of Stream TV assets that are

11  being housed in the Netherlands like a warehouse.  So we would

12  want to work with the -- Judge Carey to also get the assets as

13  well as get a couple of the key Netherlands people to work with

14  our team in Silicon Valley to help with not only our purchase

15  orders, but other customers who are issuing PO's.  And some of

16  them have even been involved in investment.

17  Q    You mentioned that you all have $160 million dollars in

18  purchase orders.  Who's financing the purchase orders?

19  A    We have BOE and also a company in Florida, Evol Capital

20  (phonetic).  They're giving supply chain finance.

21  Q    And who's doing the electronics?

22  A    Our Silicon Valley team that stayed with me after the

23  Chancery Court ruling that did stay with me.  About 60 percent

24  of the team stayed.  And they've been doing the electronics.

25  Q    Who's doing the bonding?

1  A    Fuji Pream (phonetic).  They have bonding machines, and

2  they can scale into the millions of units per year when we're

3  working with them on the production to get -- begin shipping

4  units.

5  Q    How much money have you spent since you lost in Chancery

6  Court?

7  A    Over $10 million Stream TV has spent.

8  Q    Who's financing the reorganization of Stream?

9  A    VSI.

10  Q    How are you paying off liabilities?

11  A    Well, we're doing it with a combination of both investor

12  money and some of it's the PO.  But we have investors that are

13  financing the bankruptcy and are anxious to take care of the

14  unsecured and any allowable claims.

15  Q    Who gave the PO's?

16  A    It was a company called Psystar who bought 3,000 TV's from

17  Stream TV as well as Southern Telecom.  They're a company that

18  owns like the Brookstone brand, Sharper Image, Polaroid,

19  Westinghouse, and they sell like to Walmart and Target and a

20  number of other stores.

21  Q    Last question, Mr. Rajan.  If you could in summary discuss

22  the -- what the TRO is for?

23  A    There's two parts to the TRO.  One is, which I stated in

24  my testimony, Stream TV's position is the Phillips patents are

25  sold.  You can't sublicense something that is sold.  And

1  hundreds of people have been told about the sublicensing and it

2  continues to happen even though the Phillips patents have been

3  sold.  And investors have been told we need a letter that's

4  approved by the Court that tells everybody the Phillips patents

5  are sold and there's no more Phillips licenses available right

6  now.  And if they want the technology they need to buy

7  components or they need to buy devices.  If we don't, we run

8  the risk of having our license cancelled immediately.  The

9  second thing is just recently, Mr. Stastney became the director

10  of Stream TV and Technovative's subsidiary where he is going to

11  see our specifications, our customer's specifications.  And

12  he's going to be vetoing our products and they've already been

13  shifting sales and investment to another company.  Telling

14  people that they're sublicensing.  So we need immediate action

15  because we're at great risk right now.  It's irrespirable

16  damage if we lose our licenses, also our trade secrets are --

17  have been exposed.  They're continuing to be exposed.  And they

18  need to be protected and we, you know, we're spending money

19  every day in the bankruptcy.  We're getting geared up for

20  production.  We can't now have a competitor seeing our trade

21  secrets and specifications and then, canceling our projects

22  when we're reorganizing and settling the debts.  So we need

23  immediate help from the Court.

24  Q    Thank you.

25          MR. KODOSKY:  No further questions.

1          MR. COLBY:  I would just move to strike the portions

2   of the answer about what investors told Mr. Rajan or Phillips

3   not issuing new licenses.  He's got no foundation, to the

4   extent he does, it's hearsay.

5          MR. KODOSKY:  No legal note says --

6          THE COURT:  Counsel.

7          MR. KODOSKY:  -- its own independent significance --

8          THE COURT:  Counsel.

9          MR. KODOSKY:  -- it --

10         THE COURT:  Counsel.

11         MR. KODOSKY:  I'm sorry.

12         THE COURT:  Mr. Colby has moved to strike with

13  respect to Mr. Rajan testimony regarding the cancellation or

14  the no -- Phillips no longer issuing licenses.  No basis for

15  that testimony.  And the testimony about what other --

16         MR. COLBY:  That investors told Mr. Rajan that they

17  want a letter or something about the Phillips license.

18         THE COURT:  No, I believe he can --

19         MR. COLBY:  He said investors told us.

20         THE COURT:  Well, Stastney hearings --

21         MR. KODOSKY:  I think what Mr. Rajan was saying was

22  that Mr. Stastney has communicated with over a hundred

23  companies and the hundred companies need to be sent a letter

24  saying that -- is that what you were --

25         THE COURT:  Yeah, I think he was saying that he

 1   wanted a letter, I guess from the Court.  That's how I

 2   understood it, though.

 3           THE WITNESS:  No --

 4           MR. KODOSKY:  Approved by the Court, Your Honor.

 5           THE COURT:  Oh --

 6           MR. KODOSKY:  It's part of the restraining order.

 7           THE COURT:  -- something to having to do with me --

 8           MR. COLBY:  Right.

 9           THE COURT:  -- with respect to this letter.

10           MR. COLBY:  There was a portion of the answer,

11   though, in which he said investors told --

12           THE WITNESS:  No, I didn't say that.

13           MR. COLBY:  -- us.  And so, that's the portion.

14           THE COURT:  All right.  To the extent that he made

15   some references, some out of court statement is stricken.  I

16   don't recall specifically what he said.  But that they needed

17   to -- there was a letter that need -- because hundreds of

18   investors were being told about this sublicensing and that

19   there need to be something to protect the debtor's interest to

20   be sent to the 100 potentials or hundreds of potential

21   purchasers that they can't get a sublicense.  Or the issue of

22   whether they can get a sublicense is in dispute.  I don't know

23   if they can or can't.

24           Okay.  Anything further with respect to the Mr.

25   Rajan's direct testimony, counsel?

1          MR. ZAHRALDDIN:  Your Honor, I just want to address

2    the question of the independent legal significance of the

3    notice, the letters, or the discussion.  There's independent --

4    when you get notice pursuant to a contract, that has

5    independent legal significance.  There's a provision in the

6    Phillips license that says, "If the license -- if the patents

7    are going to be sold, you will be advised in writing."  The E-

8    sign, which is a federal law, makes all emails writing.

9          That's how they're held up as contracts, et cetera.

10   I don't think that's any different from legal notice coming

11   from someone at Phillips to Mr. Rajan, that way Mr. Rajan knows

12   might -- there are some things that are changing and there are

13   some things that are not changing.  But --

14         THE COURT:  So you're saying this was legal notice to

15   a -- who was -- but he was sending this to Mr. Robertson.

16         MR. ZAHRALDDIN:  Yeah, Mr. Robertson --

17         THE COURT:  Because I didn't admit them.  That wasn't

18   an argument.  It was sent to Mr. Robertson at Stream

19   Acquisition.  I don't know who the heck they are.

20         MR. ZAHRALDDIN:  Yes, Your Honor.  So Mr. Robertson

21   is here in court with us and he has testified before that he is

22   a contract employee, a 1099, not a W2.  And that he has had

23   responsibilities and continues with responsibilities that go

24   with the license.  He was there when they first did it and he

25   was also the CEO of the Netherlands.

Case 23-10763-amc   Doc 923-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 256 of 275

256

 1              THE COURT:  So you're saying that this -- these

 2    emails constitute notice to the holder of the license of what's

 3    going on with the license?

 4              MR. ZAHRALDDIN:  Yes, that's exactly correct, Your

 5    Honor.

 6              THE COURT:  It's kind of late to argue that that's

 7    already said not admitted.

 8              MR. ZAHRALDDIN:  Well, I understand that, Your Honor.

 9    But we're talking now about -- and it's not that much later,

10    Your Honor.  I mean, I know we're held --

11              THE COURT:  Well --

12              MR. ZAHRALDDIN:  -- I know you want us to do things

13    promptly, but that was only about 15 minutes ago that we talked

14    about the --

15              THE COURT:  I thought he was objecting to Mr. Rajan's

16    testimony regarding no longer issue.

17              MR. COLBY:  Something completely different, yeah.

18              MR. ZAHRALDDIN:  No, the Phillips license.

19              THE COURT:  Well, he said no longer issuing licenses

20    and --

21              MR. ZAHRALDDIN:  Yes.

22              THE COURT:  -- you want me to strike that.  And he's

23    saying wait a minute, don't strike it because those previous

24    documents that you say we're not admitting were simply just

25    notice from the notice --

Case 23-10763-amc    Doc 847-3    Filed 10/29/23    Entered 10/29/23 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript - Page 257 Page 257 of 275

257

```
 1              MR. ZAHRALDDIN:  Licensor.

 2              THE COURT:  -- from the licensor --

 3              MR. ZAHRALDDIN:  Yes.

 4              THE COURT:  -- to the licensee about what's going on

 5   with the license and that this serves as a notice because it

 6   was sent to the representative because we already had Mr.

 7   Robertson testify what his relationship with, you know, maybe

 8   he might have been the better party to ask about these, but

 9   they weren't.  You know, I can't tell people how to run their

10   cases, but I get what he's saying.  I don't know.  Can I --

11   because now they're offering another basis --

12              MR. COLBY:  Right.

13              THE COURT:  -- for a document I already said could

14   not be admitted.

15              MR. COLBY:  It -- but the document that they're

16   reportedly relying on says that the existing license will not

17   change.  So terms --

18              THE COURT:  But that's not what he's --

19              MR. COLBY:  -- whatever those terms --

20              THE COURT:  Right.

21              MR. COLBY:  -- may be.  I understand what Mr.

22   Zahralddin is saying.  But whatever those terms may be, as they

23   exist in the current license --

24              THE COURT:  But that's --

25              MR. COLBY:  -- they're not changing.
```

```
 1              THE COURT:  But that's not what we're talking about.
 2   You objected to Mr. Rajan's testimony, that no -- that Phillips
 3   will not be issuing other licenses, having nothing to do with
 4   the debt.  That's a separate issue.  The separate issue may go
 5   to your argument that I don't know what they're talking about,
 6   this is not going to have any -- because their position is,
 7   it's going to impact the license.  You believe that this
 8   doesn't do that.  But this went to whether -- what the basis
 9   for Mr. Rajan's testimony that Phillips would not be issuing
10   more licenses.
11              MR. COLBY:  Right.  I'm -- I think with the -- with
12   respect to the last piece of testimony, that Mr. Rajan offered
13   that he said, you know, Phillips is not going to do anymore
14   licenses.  I'm content to rest on the record as it is and where
15   we will go when we revisit it with respect to the 2014
16   amendment and all those other things.  I'll withdraw the motion
17   to strike that particular piece of --
18              THE COURT:  Right.  And that's simply --
19              MR. COLBY:  -- testimony.  I understand --
20              THE COURT:  Counsel.
21              MR. COLBY:  -- for what it's worth.
22              THE COURT:  That's just his understanding of what
23   they're going to do with future --
24              MR. COLBY:  Right.
25              THE COURT:  -- licenses.  I didn't take this -- and
```

 1  that's why I kept trying to figure out, are we talking about --

 2  I get your position, is that you're going to a different issue.

 3  You're going to the issue that they're claiming that it's

 4  somehow going to affect their license and it says in here it's

 5  not.  But that isn't what his testimony and your original

 6  objection, which is what I sustained, was because they said it

 7  was a verbal exception and it was 803(50) and it didn't meet

 8  any of that.

 9        That's why I sustained, because it didn't meet that

10  exception.  But now they're saying this is just notice from the

11  lessor or the licensor rather as to what's going on with your

12  license and using it for the portion that says they're selling

13  -- and I understand based on that, that they're not going to

14  license to anybody else.

15        MR. COLBY:  Right.

16        THE COURT:  But --

17        MR. COLBY:  So the document is still hearsay.  It's

18  still inadmissible.  Mr. Rajan's testimony -- his

19  understanding, I think, I'll withdraw the motion to strike Mr.

20  Rajan's understanding.

21        THE COURT:  Okay.

22        Counsel?

23        MR. KODOSKY:  Your Honor, I think that's fine.  We do

24  reserve right for rebuttal and --

25        THE COURT:  Right.  Which is why I don't know why we

Case 23-10763-amc    Doc 848-3    Filed 10/29/23    Entered 10/29/23 23:50:30    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23    Page 260 of 275

260

1    were making a big argument --

2            MR. KODOSKY:  I --

3            THE COURT:  -- because this was his understanding and

4    I thought that's what I kept trying to --

5            MR. KODOSKY:  I just didn't want my witness --

6            THE COURT:  All right.  I get it.  So not going to

7    strike the issue -- the -- his testimony as to his

8    understanding of what Phillips' intentions were to future

9    license.

10            With respect to what -- he said what other people

11    told him, clearly, that's hearsay.  He can't -- anything that

12    somebody else told him that he's serving as a basis for why he

13    believes he needs some relief, I'm going to strike that because

14    that's hearsay.  Unless it was a statement with some other

15    exception either -- or statement of a party in interest or some

16    other exception to the hearsay.

17            And counsel, what's your response?  That he wants to

18    strike anything that Mr. Rajan said based on what someone told

19    him why we needed the relief?  Or what he believed was based on

20    what someone else told him?

21            MR. KODOSKY:  Sorry, I missed that last part, Your

22    Honor.

23            THE COURT:  He's objecting because Mr. Rajan

24    testified that one of the -- they needed this letter, I think

25    it was, because people told him that they needed something with

Case 23-10763-amc    Doc 847-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23    Page 261 of 275

261

1    respect to the understanding of what was going on with the

2    license or the sub -- they needed a letter based on his

3    understanding or discussions with other people.

4              MR. KODOSKY:  Yeah, it's -- I think there's some --

5    maybe some confusion going on, Your Honor.  He didn't testify

6    that it was based on anybody saying that to him.  Instead, it's

7    -- we believe that based on Mr. Stastney's testimony that he

8    had dealt with over a hundred companies, that the letter needs

9    to be sent to those companies.

10             Mr. Rajan?

11             THE WITNESS:  Yeah.

12             THE COURT:  Okay.  No, no, no, no.

13             MR. COLBY:  There's no --

14             THE COURT:  All right.

15             MR. COLBY:  -- hand signals.

16             THE COURT:  So -- all right.  Counsel.

17             MR. COLBY:  No question pending.

18             THE COURT:  To the extent that he said that anything

19   is based on something somebody told him, I'm striking it.

20   Okay.  If he didn't, he didn't.  If he did, it's stricken.

21             Anything else with respect to this direct testimony?

22   Counsel?

23             MR. KODOSKY:  No, Your Honor.

24             THE COURT:  All right.  Mr. Kodosky that's your

25   direct.  You're not -- it's 6 -- almost 6:30.  You're

```
 1   definitely not going to start with cross-examination of Mr.

 2   Rajan right now, because I think we now have cross-examination.

 3   Mr. Colby, I expect your cross is probably going to take just

 4   as long or maybe with -- equal to his direct.  It typically is,

 5   but I don't know.

 6           MR. COLBY:  That's as good as guess as mine would be.

 7           THE COURT:  All right.  And then, you guys may have a

 8   rebuttal by calling Mr. Stastney --

 9           MR. COLBY:  Stastney.

10           THE COURT:  -- as a rebuttal witness?  Okay.  So

11   we're talking about another four or five hours?  Another day?

12   I don't know.

13           MR. COLBY:  Well, we've gotten closer.

14           THE COURT:  I thought this would be it, but

15   apparently not.

16           MR. COLBY:  Yeah, yeah.  It's a--

17           THE COURT:  Have the parties discussed some dates?

18   We have some dates for you.

19           MR. COLBY:  We did discuss some dates.  We don't have

20   Mr. Caponi here any longer.  I can't speak for him.  But we

21   discussed with John also some dates but --

22           THE COURT:  Okay.  Good.  Because those dates that

23   were given to me by my courtroom deputy told me --

24           MR. COLBY:  But my understanding is he may not have

25   had complete information, so I don't want to speak for him.
```

```
 1                THE COURT:  All right.  So I know tomorrow was one of

 2   the dates that was on the table.  I know Friday we have a

 3   trial, but she was trying to ascertain whether that was going

 4   forward or not.  So that was one -- wait a minute.

 5                Mr. Rajan can step down?  We're done, right, for now

 6   with respect to his direct testimony.

 7                You may step down, Mr. Rajan.  You cannot discuss

 8   your testimony with your counsel, because you have to be cross-

 9   examined.  And the first question I'm going to ask you when you

10   come back is have you discussed your testimony with your

11   counsel.  That's just how this works.  And you may step down.

12                All right.  Let me see if I can pull up my calendar.

13   I don't even know what's on.  I don't really know because --

14                UNIDENTIFIED SPEAKER:  Yeah, I think we're going to

15   have to contact Eileen, because everyone's not available

16   Tuesday, Wednesday, or Thursday afternoon this week.  I

17   already --

18                THE COURT:  For what?

19                UNIDENTIFIED SPEAKER:  -- asked about this week.

20                THE COURT:  To do what?

21                UNIDENTIFIED SPEAKER:  For this, if we were going

22   to --

23                THE COURT:  Oh --

24                UNIDENTIFIED SPEAKER:  -- because we had the

25   afternoons possibly open.
```

Case 23-10763-amc    Doc 847-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23    Page 264 of 275

264

```
1              THE COURT:  Okay.  And who's not available?

2              UNIDENTIFIED SPEAKER:  Mr. Wright was --

3              THE COURT:  Oh, okay.  You mean the counsel?  Yes.

4              UNIDENTIFIED SPEAKER:  Yes, that's what I'm saying.

5              THE COURT:  Oh, yeah, yeah.  I thought you meant for

6  -- and I just --

7              UNIDENTIFIED SPEAKER:  No, I'm saying this week's

8  probably not going to work.

9              THE COURT:  How do you transfer -- change the ADU

10 because this is just not working here.  Because the domain has

11 to change with more choices.

12             UNIDENTIFIED SPEAKER:  Yeah.

13             THE COURT:  I want -- yes.

14             UNIDENTIFIED SPEAKER:  Yeah.

15             THE COURT:  No, it's just giving me -- well, wait a

16 minute.  Because this is -- no.  Anyways, never mind.  I don't

17 have my calendar.

18             What dates did you discuss with the parties?

19             UNIDENTIFIED SPEAKER:  Basically, every afternoon

20 this week.

21             THE COURT:  Okay.

22             UNIDENTIFIED SPEAKER:  Except Friday.  We didn't talk

23 about Friday.

24             THE COURT:  Friday --

25             UNIDENTIFIED SPEAKER:  But I don't know.
```

```
 1                    THE COURT:  -- maybe the -- maybe we won't know until

 2   tomorrow whether the entire day of Friday is available.

 3                    MR. COLBY:  I believe Mr. Stastney is unavailable on

 4   Friday.  I'm definitely unavailable on Friday, Your Honor.  I

 5   apologize.

 6                    THE COURT:  Okay.  Well, Friday's off the table.

 7                    MR. COLBY:  If it's something I could move, I would.

 8                    THE COURT:  Okay.

 9                    UNIDENTIFIED SPEAKER:  Thursday is off the table.

10                    MR. COLBY:  Yeah, Thursday I'm -- Thursday and Friday

11   I'm --

12                    THE COURT:  Well, what's the date?

13                    UNIDENTIFIED SPEAKER:  Today's Monday.

14                    MR. KODOSKY:  Today's Monday.

15                    THE COURT:  So we have Tuesday and Wednesday are we

16   talking about?

17                    UNIDENTIFIED SPEAKER:  Somebody's not available for

18   most of Wednesday.

19                    THE COURT:  So no day this week?

20                    UNIDENTIFIED SPEAKER:  No, that's what I'm saying.

21   This week is no good.

22                    THE COURT:  Okay.  What about next week?

23                    UNIDENTIFIED SPEAKER:  You'd have to talk to Miss --

24   to Eileen probably, because Mr. Caponi is not here either.

25   Anyway --
```

Case 23-10763-amc    Doc 823-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-15-23    Page 266 of 275

266

1          THE COURT:  Okay.  And I don't have -- I made a

2  effort not to bring my phone because I don't need to talk to

3  Michael.  I can talk to him on Teams.

4          UNIDENTIFIED SPEAKER:  Uh-huh.

5          THE COURT:  So -- and I can't figure out how to get

6  into my -- because something's missing on here.  I can't get

7  into my calendar.  I have no idea.  I need to have somebody

8  come, because Eileen used to set this up for me every morning

9  and made --

10          UNIDENTIFIED SPEAKER:  Yeah.

11          THE COURT:  -- sure I was in the right domain.

12          UNIDENTIFIED SPEAKER:  I mean, is it normally there

13  if you're signed in properly?

14          THE COURT:  Yeah, if I sign in properly -- hold on.

15  Let me see if I can get out real quick and look.  Hold on for a

16  minute.  So the next week is the week of the 22nd.  Okay.  The

17  23rd I have nothing on my calendar.  No trials on the 24th.  The

18  25th -- I don't have any trials on my calendar and Eileen is out

19  that week.

20          UNIDENTIFIED SPEAKER:  That's probably why.

21          THE COURT:  That's why I don't have any trials.

22          UNIDENTIFIED SPEAKER:  So that's next week?

23          THE COURT:  We can function I think okay without

24  Eileen.  Barely, but we can make it.

25          Then that takes us to the week of the 29th where we

1   have a trial on the 3rd of November.  I don't see anything,

2   except the 1st is out.  I have a longstanding appointment.

3          All right.  So --

4          UNIDENTIFIED SPEAKER:  So what do we have on the 23rd

5   or the 27th?  Do you have anything?

6          THE COURT:  I see nothing on the 23rd and nothing on

7   the 27th.  Those two whole days are available.  Unless we

8   didn't put it in -- Eileen's been putting everything on my

9   calendar, you know, Carol --

10         UNIDENTIFIED SPEAKER:  Uh-huh.

11         THE COURT:  Yes, counsel?

12         MR. KODOSKY:  Your Honor, I hate to ask this, but I

13  figured I'd ask because we've got a little bit of a situation.

14  If we were going to try to get those two emails in as notice,

15  and since they're addressed to Mr. Robertson, he's not back

16  from Africa until November the 3rd.

17         So I don't know if you want me to recall him now for

18  that brief issue, or we can also speak to Phillips and get

19  notice since they -- we have a press release that went out that

20  said that we -- not we, but they had, Alaya (phonetic), I think

21  who they sold the patent portfolio to had a press release that

22  went out.  So obviously between that and the emails, we would

23  be inquiring on notice under this license anyway.  But I don't

24  know what you prefer us to do.

25         THE COURT:  Have Mr. Colby -- I mean, otherwise, he

Case 23-10763-amc    Doc 843-3    Filed 10/29/23    Entered 10/29/23 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript    Page 268 of 275

268

1  says he's going to call him and --

2          MR. COLBY:  Yeah.  No, we would object to recalling

3  Mr. Robertson.  Debtors have had these documents since August,

4  at least one of them since August.  Mr. Robertson was here.  He

5  testified they didn't do it.  That was their choice.  So I

6  think that ship has sailed, Your Honor.

7          This notice theory is something that could have been

8  addressed.

9          THE COURT:  Well, they can address it, but they may

10  not be able to get Mr. Robertson to address it.  They may do it

11  by some other method, but not by Mr. Robertson because they've

12  already called him.  And typically, he's not a rebuttal

13  witness, what is he?  I mean, you can't call a witness.  You

14  don't get the evidence out and then say recall.  That's not how

15  that works.

16          And so, I'm going to have to agree, you cannot recall

17  him, unless you're calling him to rebut something.  He's not a

18  recall witness.  You get one bite at it in terms of your direct

19  and then, ask him.  I don't think we can do that.  You can

20  confer with Mr. Colby, but we're definitely not doing it right

21  now.

22          And you can figure out and you can figure out how to

23  get the announcements in.  There's nothing stopping you from

24  trying to do it that way.  I just don't think you can do it

25  because you already released Mister -- because I asked you, you

1  know, you're done.  He was released as a witness.  And the only

2  way he can come back is as a rebuttal, and I'm not quite sure

3  how that's going to work.  But you can ask Mr. Anthony about

4  it.  I don't know.

5          Okay.  So you guys figure that out.

6          We still need to come up with a date.  So November

7  3rd is not an issue.  But I can tell you guys, just because we

8  continue this hearing, presumably, you know, we're carrying

9  this out, I -- we're going to be moving forward on the Motions.

10 I'm not going to just stand still.  And whether this would have

11 an effect on it or not, I don't know.

12         MR. COLBY:  Your Honor, we would also -- in light of

13 what happened this past weekend, we would also request that at

14 least the record of written submissions on this TRO Motion be

15 closed and that we not be faced with another Saturday night

16 special with a bunch of new briefs and new exhibits and, you

17 know, new things like that.

18         I think in that case, we're up against, yet again,

19 another sort of moving target and I think if that were to

20 happen, we might be doing this, you know, in perpetuity.  And

21 we also -- I also have a question for the Court regarding

22 whether -- I know that that new filing was not part of what the

23 evidence was going to be today.

24         But if it's part of the written record on this

25 Motion, the Supplemental submission that was made on late

1    Saturday night, early Sunday, you know, we haven't had an

2    opportunity to respond to it.  If it's excluded, it's not being

3    considered, fine, we'll leave it alone.

4          THE COURT:  Well, counsel, what I said was that I was

5    not going to allow any evidence that was different from what

6    was in the original Motion.  To the extent that the

7    Supplemental Motion talked about trade secrets, that was in the

8    original Motion.  To the extent that it had something to do

9    with Mr. Stastney's employment contract, the liability.

10          MR. COLBY:  Okay.

11          THE COURT:  None of that.

12          MR. COLBY:  Well then, Your Honor, I guess since this

13    was a Supplemental brief without the Court's permission and

14    outside of the Court's procedures and we haven't had an

15    opportunity to respond to these new legal arguments apparently

16    that are being made about trade secrets, because previously,

17    the trade secrets were referenced in the initial Motion.

18          But again, we didn't know what we were responding to.

19    It was very nonspecific.  It was very vague.  We would ask that

20    we at least be allowed to respond to the portions of that

21    Supplemental submission that addressed trade secrets, because

22    it was not part of the Court's procedures.  It was dropped on

23    us at the last minute.  We should have an opportunity to

24    respond.

25          MR. ZAHRALDDIN:  We have no objection to Mr. Colby

 1   responding to those portions.  I'm all for schedules, but when

 2   I try to talk to Mr. Colby and others, no one gives me a

 3   schedule.  They file Motions.  So more than happy to do that,

 4   Your Honor.

 5           THE COURT:  All right. I'm going to say this for the

 6   last time.  Guys, I get that you're all invested in this, in

 7   terms of what you're doing.  But it does not move the ball one

 8   bit by filing, not cooperating.  I thought things were going a

 9   little smoother and that we were just kind of moving along.  We

10   had some different players who were running this.

11           We seem to be playing pretty well together and that

12   we would be able to move, you know, pretty expeditiously

13   through this without a lot of complications.  So with that

14   being said, to the extent you believe that there are some

15   things in the Supplement that was not -- because putting aside

16   the issue of whether the Supplement was even filed, you have

17   said that they talked about trade secrets, but they weren't

18   specific.

19           Had they not filed that and obviously, no discovery,

20   because after the TRO, you just sort of respond to what you

21   think it is, that's what would have happened.  And you could

22   have said, well, it was vague, so we really need a little more

23   time to respond.  That's how I'm treating that.

24           MR. COLBY:  Right.

25           THE COURT:  So that is a different issue.  Anything

Case 23-10763-amc    Doc 923-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Sheila 10-16-23 Hearing Transcript 0-15 Page 272 of 275

272

 1  else, I don't -- I'm not addressing.  You may want to -- I know

 2  there was a whole lot of new cases cited.  You know, you may

 3  want to give me some legal -- but only to the extent I think I

 4  read -- and I'm not even going to, because I read so much, that

 5  it may just be cases relating to the standard, what it is,

 6  trade secrets, how you determine whether trade secrets are

 7  something that needs to be protected.  You can respond to all

 8  of that, because I would have wanted that anyway.  That is

 9  something new.

10        MR. COLBY:  Appreciate that, Your Honor.  That's all

11  I'm asking.

12        THE COURT:  Okay.  How much time do you need for --

13  because that will dictate when you're going to have a hearing?

14        MR. COLBY:  Oh, I think if we can -- I think

15  scheduling the hearing with all the various parties' schedules

16  is the more difficult part.  So we should do that and we'll --

17        THE COURT:  You'll work from backwards --

18        MR. COLBY:  I mean, we'll --

19        THE COURT:  -- from there?

20        MR. COLBY:  -- get it -- yeah, we'll get it done.

21        THE COURT:  All right.  So the week of the 23rd --

22  hold on.  Week of the 23rd.  I -- again, have Monday and Friday

23  and the afternoon of Tuesday, the afternoon of Wednesday.  But

24  that -- you know, I think we need more days.  So we have the

25  23rd and the 27th and then we have the 30th and we have a trial

Case 23-10763-amc   Doc 848-3   Filed 10/29/24   Entered 10/29/24 23:50:50   Desc
Exhibit Exhibit 10-16/23 Hearing Transcript 10-16-23   Page 273 of 275

273

1  in -- on the 1st -- on the 3rd.  So right now, we're looking at

2  23rd, 27th, 30.  For entire days.

3          MR. COLBY:  Yep.  So speaking for most of the folks

4  on this side of the room, but not Mr. Caponi.  It looks like we

5  could do the 23rd.  We can't do the 27th. We could do the 30th.

6          THE COURT:  Okay.  So the 23rd or the 30th, correct?

7          MR. COLBY:  Correct.

8          THE COURT:  All right.  Mr. Kodosky or Mr.

9  Zahralddin, what are we talking about from your side?

10          MR. ZAHRALDDIN:  I'm not that important, Your Honor.

11  But Mr. Kodosky says he clear, so -- and I'll move things

12  around if I need to.

13          THE COURT:  Okay.  The 23rd or the 30th are the two

14  days.  Subject to confirmation with Mr. Caponi, correct?

15          MR. COLBY:  I'd hate to think we leave him out so --

16          THE COURT:  I'm not even going to comment on that.

17          Mr. Alexander isn't here and Mr. Caponi, the two of

18  them, you know, I think they have one of those sports

19  relationships, where we're on the court, we're on the field is

20  all out war.

21          MR. COLBY:  They're, like, brothers, Your Honor.

22  They just --

23          THE COURT:  It's all-out war --

24          MR. COLBY:  -- you know, they fight like brothers.

25          THE COURT:  -- while we're on the field or in the

Case 23-10763-amc    Doc 822-3    Filed 10/29/24    Entered 10/29/24 23:50:50    Desc
Exhibit Exhibit 10-16-23 Hearing Transcript 10-16-23   Page 274 of 275

274

```
 1   Court or on the big -- wherever you are.  And then, afterwards,

 2   we're all, let's go get a drink together.  I see -- that's a --

 3   never mind.  But in any event, that's where we are.  I will

 4   hold the 23rd and the 30th open until you call and confirm

 5   which one of those work.

 6           MR. KODOSKY:  Okay.  I will speak with Mr. Colby and

 7   include other folks on email and hopefully we'll get

 8   something --

 9           THE COURT:  All right.

10           MR. KODOSKY:  -- done.

11           THE COURT:  All right.  That concludes the matters

12   that are scheduled before the Court today.

13           The Court is adjourned until tomorrow at 10:30.

14           UNIDENTIFIED SPEAKER:  Uh-huh.

15           THE COURT:  10:30. Thank you, counsel.  And hopefully

16   that you will be able to get out the courtroom and whatever was

17   going on is over.  If not, there are lots of restaurants on

18   Locus Street.  There's hotels, restaurants, Chinatown, if you

19   want to go get food so you can get out, okay?  Thank you.

20           MR. COLBY:  Thank you, Your Honor.

21           MR. KODOSKY:  Thank you, Your Honor.

22           MR. ZAHRALDDIN:  Thank you, Your Honor.

23           THE COURT:  All right.

24       (Proceedings adjourned)

25
```

# C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*John Buckley*
John Buckley, CET-623
Digital Court Proofreader