Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 1 of 294

1

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| IN RE: | : | Case No.  23-10763 |
| | : | |
| STREAM TV NETWORKS, INC.   CH: 11 | : | ADV. No.  23-00057 |
| | : | |
| Stream Tv Networks, Inc. Vs | : | Philadelphia, Pennsylvania |
| Shadron L Stastney | : | October 30, 2023 |
| | : | 11:09 a.m. |
| Motion For Preliminary Injunction | : | |
| Request For Temporary Restraining | : | |
| Order Filed By Alastair Crawford, | : | |
| Delaware And Other Law Firms | : | |
| Representing And Acting In | : | |
| Concert With John Doe(S) And/Or | : | |
| Jane Doe(S), Jane Doe(S), John | : | |
| Doe(S), Asaf Gola, Kevin Gollop, | : | |
| Hawk Investment Holdings Limited, | : | |
| Investment Banks Employed By John | : | |
| Doe(S) And/Or Jane Doe(S), | : | |
| Krzysztof Kabacinski, Arthur | : | |
| Leonard Robert "Bob" Morton, | : | |
| Seecubic B.V., Sls Holdings Vi, | : | |
| Llc, Shadron L Stastney, | : | |
| Seecubic, Inc., Patric Theune | : | |
| Represented By Rafael X. | : | |
| Zahralddin | : | |

. . . . . . . . . . . . . . . . . .

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

For the Debtor:                    Keith Kodosky, Esq.
                                   Lewis Brisbois Bisgaard & Smith
                                   600 Peachtree Street NE
                                   Suite 4700
                                   Atlanta, GA 30308
                                   404-991-2183

                                   Rafael X. Zahralddin
                                   Lewis Brisbois Bisgaard & Smith
                                   500 Delaware Avenue, Suite 700
                                   Wilmington, DE 19801
                                   302-985-6004

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 2 of 294

2

APPEARANCES:

For Hawk Investment Holdings     Steven Caponi, Esq.
Ltd:                             K&L Gates
                                 600 N. King Street, Suite 901
                                 Wilmington, DE 19801
                                 302-416-7080


For SeeCubic, Inc.:              Eben P. Colby, Esq.
                                 Skadden Arps Slate Meagher &
                                 Flom, LLP
                                 500 Boylston Street, 23rd Floor
                                 Boston, MA 021116
                                 617-573-4800


For SLS Holdings VI, LLC:        Davis Lee Wright, Esq.
                                 Robinson Cole, LLP
                                 1201 North Market Street
                                 Wilmington, DE 19801
                                 302-516-1703

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 3 of 294

3

INDEX

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

WITNESSES:

Mathu Rajan
   (By Mr. Kodosky) ..... 201/280
   (By Mr. Colby) ..... 56 ..... 269

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 4 of 294

4

```
 1   OCTOBER 30, 2023                              11:09 A.M.

 2            THE COURT:  Good morning.

 3            MR. ZAHRALDDIN:  Good morning, Your Honor.

 4            MR. CAPONI:  Good morning, Your Honor.

 5            THE COURT:  Please be seated.

 6            MR. COLBY:  Good morning, Your Honor.

 7            THE COURT:  Good morning.  Counsel, again, we had

 8   some filings on Friday and Ms. Godfrey wasn't here, so we

 9   didn't get them until 8:00, which she forwarded to us this

10   morning.  And I will check with the Clerk's office because

11   they're supposed to come directly to me, filings in certain

12   matters, and to my law clerks.  We're not getting them, so

13   hence we're starting late because we had to look at the

14   filings.  Even though it was 9:45 on Friday, we didn't see them

15   until this morning.  So, again, we've lost a half an hour, 40

16   minutes, trying to go over the pleadings.

17            All right.  This is the continued hearing on the

18   debtor's request for a temporary restraining order preliminary

19   injunction.

20            MR. ZAHRALDDIN:  Good morning, Your Honor.  Rafael

21   Zahralddin from Lewis Brisbois on behalf of the debtor.

22            Your Honor, I just wanted to start.  I spoke to Mr.

23   Caponi and Mr. Colby a second ago before you came out.  There

24   was an issue in regard to whether or not Hawk or Mr. Morton are

25   subject.  I believe Hawk is subject because they have a proof
```

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 5 of 294

5

 1   of claim in the case and, of course, Mr. Morton as well, or

 2   really anyone outside of the United States, whether this TRO

 3   would be subject to them.  And I do have a copy of the

 4   transcript that Mr. Caponi invited us to submit.  It has some

 5   highlighting in it for ease of reference.  If you'd like, I can

 6   hand that up to you.

 7           THE COURT:  Well, wait a minute before we -- let's

 8   get everybody's appearance on the record --

 9           MR. ZAHRALDDIN:  Sure.  Sure.

10           THE COURT:  -- before we move into the substantive

11   matters.  So Mr. Zahralddin is here for the debtor.  Who else

12   is here today?

13           MR. KODOSKY:  Keith Kodosky, Your Honor.

14           THE COURT:  For the debtor.  All right.  Who else is

15   here for the debtor?

16           MR. ZAHRALDDIN:  Mr. Rajan is here as a witness.  Mr.

17   Michaels is also here as a witness, but he is I believe pulling

18   into a parking garage after a terrible accident up in New York

19   on the way down from --

20           THE COURT:  There is always --

21           MR. ZAHRALDDIN:  -- upstate New York.

22           THE COURT:  What's his name again?

23           MR. ZAHRALDDIN:  Christopher Michaels.

24           THE COURT:  Okay.  He testified already, right?

25           MR. ZAHRALDDIN:  He is from Rembrandt, but he is also

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 6 of 294

6

1    one of our listed witnesses.

2         THE COURT:  Rembrandt.

3         MR. ZAHRALDDIN:  And I also have Mr. Kevin Shaw, who

4    I believe has been pro hac'd into the case, as well as Mr.

5    Andrew Czezekowski, who is our law clerk, but as we've

6    discussed before, soon to be member of the bar, who is also

7    here in Court.  And I believe that's everyone from the debtor's

8    side.

9         THE COURT:  Okay.  And who's here for the

10   Respondents?

11        MR. COLBY:  Good morning, Your Honor.  Evan Colby

12   from Skadden Arps on behalf of SeeCubic.  Also, Marley Brumme

13   and Rebecca Ritchie from Skadden Arps and a legal assistant,

14   Melissa Lau.

15        THE COURT:  Wait a minute.  You went way too fast.  I

16   see Ms. Brumme.  You have a new person today?

17        MR. COLBY:  A new person, Rebecca Ritchie.

18        THE COURT:  Okay.  Welcome.  I don't know how

19   enjoyable it's going to be.

20        MR. COLBY:  She felt left out, so --

21        THE COURT:  Oh, you're not -- never mind.  And who do

22   we have as the law clerk, you said?

23        MR. COLBY:  Melissa Lau, L-A-U.

24        THE COURT:  And Mr. Stastney is here, I see.

25        MR. COLBY:  Correct.  On behalf of SeeCubic.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 7 of 294

7

1          THE COURT:  Okay.  And Counsel?

2          MR. GRUGAN:  Your Honor, good morning.  Terence

3    Grugan with Ballard Spahr here on behalf of Mr. Stastney in his

4    personal capacity.

5          THE COURT:  Okay.

6          MR. WRIGHT:  Good morning, Your Honor.  Davis Wright

7    from Robinson and Cole on behalf of SLS Holdings VI, LLC.

8          MR. CAPONI:  Good morning, Your Honor.  Steve Caponi

9    from K&L Gates on behalf of Hawk Investment Holdings, LTD.

10          THE COURT:  Is that everyone?  Okay.  All right.  You

11    may proceed, Mr. Zahralddin.

12          MR. ZAHRALDDIN:  Your Honor, may I approach?

13          THE COURT:  Does anybody have any issue with me

14    looking at this, that he wants to hand off?  Mr. Colby, Mr.

15    Caponi.

16          MR. CAPONI:  I'm not sure why it's being handed up.

17          THE COURT:  All right.  What is it, Mr. --

18          MR. CAPONI:  A transcript from another proceeding

19    would be hearsay.  And I would also, if the Court wants to read

20    the transcript, I think all the highlighting would be

21    unnecessary, so just clean up.

22          THE COURT:  Well, what is it for?

23          MR. ZAHRALDDIN:  Well, Your Honor, Mr. Caponi stood

24    up and immediately said that Mr. Morton and also Hawk were not

25    subject to this TRO.  I believe that that's incorrect.  I

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 8 of 294

8

1   believe that the automatic stay applies to assets of the estate

2   wherever they are located.  I do not believe that you can come

3   into this Court seeking redress through a proof of claim and

4   hide behind a trust.  And Vice-Chancellor Lassiter also said

5   the same thing in the lower court before and he asked for them

6   to product a 30(b)(6) witness or Mr. Morton or whoever would be

7   appropriate.  Mr. Morton did end up testifying.

8          THE COURT:  On behalf of who?

9          MR. ZAHRALDDIN:  On behalf of Hawk as its principal.

10         THE COURT:  So you want to address Mr. Caponi's

11  position that who's not subject to this TRO?

12         MR. ZAHRALDDIN:  Mr. Morton.

13         THE COURT:  Mr. Morton.

14         MR. ZAHRALDDIN:  Yes.  Mr. Morton.

15         THE COURT:  But not Hawk, right?

16         MR. ZAHRALDDIN:  Well, I would think that Hawk would

17  be a stretch since they have filed a proof of claim for quite

18  some amount of money here.  And that is -- I don't understand

19  how they could avoid jurisdiction once they've filed a proof of

20  claim.

21         THE COURT:  Well, is Hawk -- I mean, I -- and I've

22  been having this discussion in chambers trying to figure out

23  who's who.  Is the Hawk you're talking about different from

24  some other Hawk?

25         MR. ZAHRALDDIN:  No.  No, ma'am.  And we -- actually

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 9 of 294

9

1   though, it's not before you.  We have filed a 2019 motion, a

2   motion to compel compliance with 2019 for exactly these issues

3   and the issues that have popped up.

4           THE COURT:  Okay.

5           MR. ZAHRALDDIN:  That's not to be heard until the end

6   of the month, but I know that, you know, you would like to be

7   alerted when we filed something, but we did that in --

8           THE COURT:  Yeah.  It helps.

9           MR. ZAHRALDDIN:  -- our regular time.

10          THE COURT:  It helps.

11          MR. ZAHRALDDIN:  Regular time and it will be heard at

12  the end of the month with the date we were given.  But yes.

13  That is a little bit concerning to us.  And again, it goes to

14  the heart of if you're coming into this Court seeking large

15  sums from the estate, shouldn't you --

16          THE COURT:  Well, if you file a proof of claim, the

17  rules say what they say.

18          MR. ZAHRALDDIN:  Uh-huh.

19          THE COURT:  Okay.  That's proof of claims.  I don't

20  think Mister -- is it Mr. Morton?  Is that his name?

21          MR. ZAHRALDDIN:  Mr. Morton, yes.

22          THE COURT:  M-O-R-T-O-N?

23          MR. ZAHRALDDIN:  M-O-R-T-O-N, Yes.

24          THE COURT:  Yes.  So Mr. Caponi's position is he's

25  not subject to this Court's jurisdiction because he hasn't

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 10 of 294

10

1   filed a proof of claim and he's somewhere else in another

2   country.

3             MR. ZAHRALDDIN:  Oh, but -- but, Your Honor, here's

4   the funny thing.  The local rules say you make an appearance

5   when you file a stipulation.  When a party is party to a

6   stipulation under our local rules here in the Eastern District,

7   you have made an appearance by virtue of the local rule.

8             THE COURT:  Well, you can make a limited appearance,

9   can you not, say --

10            MR. ZAHRALDDIN:  Well, I don't -- well, certainly --

11            THE COURT:  But you can say -- I mean, and look.

12   Some rules have changed.  It's been a while since I litigated.

13            MR. ZAHRALDDIN:  Yeah.

14            THE COURT:  So who knows?  But you can say I'm

15   entering a limited appearance for the purpose of this only and

16   not --

17            MR. ZAHRALDDIN:  Correct.  And I do not believe that

18   that stipulation which was entered to extend Mr. Morton's time

19   had any such saving language and I still would say that you can

20   reserve your rights, but that's still going to be up to you,

21   Your Honor.

22            THE COURT:  All right.

23            MR. ZAHRALDDIN:  And I think that there are some

24   issues that, again, I'm only bringing this up because Mr.

25   Caponi invited us to submit this.  We were there to clarify it

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 11 of 294

11

1   on the record because he stood up to -- I don't know if you

2   want to call it impeach or disagree with Mr. Rajan's testimony

3   about Mr. Morton and the applicability of these proceedings to

4   him, so.

5            THE COURT:  Well, how would I get to -- he's saying

6   they're here.  Are we talking -- how would I get to see these?

7            MR. ZAHRALDDIN:  Well, he asked us to bring it last

8   time.

9            THE COURT:  Well, just because he asked you doesn't

10  mean that he's now consenting to you giving them to me unless,

11  you know, you're saying he invited me and this is what he said.

12  I don't know.  Did we --

13           MR. ZAHRALDDIN:  Again, Your Honor --

14           THE COURT:  -- get a transcript already?  Do we have

15  a transcript?

16           MR. ZAHRALDDIN:  Yes.  I believe we have a copy of it

17  too, Your Honor, I think.

18           THE COURT:  We have so many.  Which one is it?

19  Transcript from October 16th.  This is the one?

20           All right.  So you're asking me to look at this for

21  the purpose of determining that should I enter -- should --

22           MR. ZAHRALDDIN:  Correct.

23           THE COURT:  I don't know if I am.  Should I issue a

24  TRO or preliminary?  I guess at this point we've had enough

25  hearings that we -- this really is just a preliminary

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 12 of 294

12

1   injunction, but I guess we have to figure out if this is an

2   initial hearing or if this is -- we'll figure it out.  But you

3   believe that Mr. Caponi invited you, you, the debtors, to

4   submit the finding from Vice-Chancellor -- what's his name

5   again?  Lassiter.  Who found that Mr. Morton had subjected

6   himself to that Court's jurisdiction.  I don't know if that

7   means the same thing here.

8            MR. ZAHRALDDIN:  It may not, Your Honor.  It may not,

9   but certainly the logic follows if you're trying to seek

10  redress you shouldn't be allowed to hide behind a trust.

11           THE COURT:  Well, is Mr. Morton trying to -- seeking

12  redress or is the trust?  I don't know.

13           MR. ZAHRALDDIN:  Well, I guess we'll find out at the

14  end of the month, Your Honor, when you'll hear the 2019 motion

15  because it will require them to respond.

16           THE COURT:  Well, I don't think I'm going to wait

17  until the end of the month to rule on this TRO.

18           MR. ZAHRALDDIN:  No, no.

19           THE COURT:  it's going to be long before that.  And I

20  don't know where I am on this, but to the extent that I do --

21  if I did issue one, presumably, I'd have to see who it extends

22  to.  And I suppose you guys would have to address that at some

23  point to tell me who -- Mr. Caponi's position is not Mr.

24  Morton.  I'm not sure if he said, well, Hawk's investment,

25  there's only one Hawk's entity or is there two?  There's two.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 13 of 294

13

1        MR. ZAHRALDDIN:  The only one that we're aware of is

2   the one who's filed the proof of claim in this case.

3        THE COURT:  Right.  So I don't know what that means

4   when you do -- well, it means a lot when you file a proof of

5   claim, but that's the trust, correct?  I mean, the entity, not

6   Mr. Morton.

7        MR. ZAHRALDDIN:  That, yes.  At this point in time,

8   the only appearance we believe he's made is by asking for an

9   extension for his answer through Mr. Caponi, which again, we

10  detail --

11        THE COURT:  Well, I mean, do I really need Vice-

12  Chancellor Lassiter's decision?  Because what you're saying to

13  me is putting that aside, that may be, here, we want to give

14  you this for legal support because that's what it is you're

15  arguing in a similar case involving similar parties.  This

16  Court found for its jurisdiction that Mr. Morton was subject to

17  that Court's jurisdiction.  And that's a whole different issue.

18  I don't know what happened over there.

19        MR. ZAHRALDDIN:  Uh-huh.

20        THE COURT:  Leave that in the Chancery Court.  But

21  for my purposes, what you're also arguing is that by entering

22  into the stipulation, Mr. Morton subjected himself to this

23  Court's jurisdiction.  I don't need to know what Vice-

24  Chancellor Lassiter said.  I can go look at, and I'm pretty

25  sure we can address the argument whether, in fact, he is

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 14 of 294

14

1  subject because while again, Vice-Chancellor Lassiter can file

2  in whatever he wants, it has to do with what happened during

3  the course of that hearing, that matter.  And Mr. Morton, as

4  far as I can see, I don't know what he did, you know.

5         MR. ZAHRALDDIN:  He filed the 225 action is what he

6  did.

7         THE COURT:  But that's there.

8         MR. ZAHRALDDIN:  Yeah.  Yes.  Exactly.

9         THE COURT:  He hasn't done anything here.

10        MR. ZAHRALDDIN:  Correct.  Not other than the

11  stipulation, yes.

12        THE COURT:  Right.  So I'm not quite sure how Judge

13  Lassiter's decision is in any way going to help me.

14        MR. ZAHRALDDIN:  Well, to the extent that it was an

15  attack on my client's credibility because my client did say Mr.

16  Morton had been subjected to the jurisdiction there and eh was

17  subjected there because he was a principle.  I've spoken to the

18  counsel in the Chancery Court.  They also believe it's because

19  he was a director.

20        THE COURT:  So you want it for that purpose?

21        MR. ZAHRALDDIN:  Yes.  For that purpose.  Yes.

22        THE COURT:  For that purpose only?

23        MR. ZAHRALDDIN:  To clarify the record on that issue.

24        THE COURT:  And on what basis?  Judicial notice?

25  What?  How would I get it?

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 15 of 294

15

1          MR. ZAHRALDDIN:  Again, I was invited to provide this

2    to the Court.

3          THE COURT:  Well, Mr. Caponi might have invited you,

4    but he's now withdrawing that invitation.  He's now saying

5    you've got to get it in here and you need to prove how you get

6    it in here.

7          MR. ZAHRALDDIN:  Well, I can certainly put Mr. Rajan

8    back up and then rehabilitate him based on that issue.

9          THE COURT:  Well, then you can do that after we

10   cross-examine.

11         MR. ZAHRALDDIN:  Absolutely.

12         THE COURT:  You can redirect.

13         MR. ZAHRALDDIN:  Okay.  Then that's what we will --

14         THE COURT:  Okay.  So you can do it then, okay?

15         MR. ZAHRALDDIN:  That's fine with me.  I just wanted

16   to bring that to your attention because we had the invitation.

17   Now it's been withdrawn, so.

18         THE COURT:  Well, you can redirect, Counsel.  You can

19   do it on redirect.

20         MR. ZAHRALDDIN:  Okay.

21         THE COURT:  Again, whatever happens -- whatever

22   happens in Vegas stays -- whatever happened in Chancery Court

23   stays over there unless it has some direct impact on me, okay?

24   All right, Counsel.  I think where we --

25         MR. ZAHRALDDIN:  Thank you, Your Honor.

1          THE COURT:  -- left off was Mr. Rajan was going to be

2    cross-examined.

3          MR. ZAHRALDDIN:  I believe that is correct.  I will

4    cede the podium to Mr. Colby.

5          THE COURT:  Yes.  Mr. Caponi.

6          MR. CAPONI:  Just because my name was invoked

7    multiple times, I just want to make it very clear.  I'm here

8    only today and have only ever been in this Court on behalf of

9    Hawk.  To the extent Mister -- or my opposing counsel wants to

10   take issue with Bob Morton, it doesn't involve me.  Thank you.

11         THE COURT:  Right.  Well, to the extent that he is

12   alleging that by signing a stipulation seeking the extension of

13   time to respond that Mr. Morton has now become subject to this

14   Court's jurisdiction, it does involve you because you signed

15   the stipulation.

16         MR. CAPONI:  But I don't -- I'm not authorized --

17         THE COURT:  I get it.  I get it.

18         MR. CAPONI:  -- to represent Mr. Morton.

19         THE COURT:  Right.  But you signed for him.  And

20   whether --

21         MR. CAPONI:  Yeah.

22         THE COURT:  -- that subjects him, I don't know the

23   answer.

24         MR. CAPONI:  I agree.  All I'm saying is I just want

25   to make it clear that my lack of counterargument is because I

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 17 of 294

17

 1   don't represent Mr. Morton.

 2            THE COURT:  You've made that quite clear --

 3            MR. CAPONI:  So I'm not here.

 4            THE COURT:  -- on the record that you're only here

 5   for Hawk.

 6            MR. CAPONI:  Correct.  Thank you, Your Honor.

 7            THE COURT:  I'm clear on that.

 8            MR. KODOSKY:  Your Honor, may I be heard?

 9            THE COURT:  Yes, you may, Mr. --

10            MR. KODOSKY:  Thank you, Your Honor.

11            THE COURT:  -- Kodosky.

12            MR. KODOSKY:  A couple of other housekeeping matters.

13   As the Court would recall, before the last hearing was held on

14   October 16th, the debtors had filed the supplemental brief in

15   support of the motion.

16            THE COURT:  Uh-huh.

17            MR. KODOSKY:  The defendants objected to our filing

18   of the supplemental brief and over lunch that day the Court

19   went back into chambers and reviewed the brief and came back

20   out and said that it was only going to consider the first

21   essentially five pages of the brief, which dealt with

22   misappropriation of trade secrets.  And the Court indicated

23   that it was not going to consider the rest of the supplemental

24   brief to the extent that the rest of the brief concerned such

25   issues as lender liability and so forth.  Is --

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 18 of 294

18

1          THE COURT:  Now, I think there were a couple of other

2     things other than lender -- it was anything that was outside

3     the scope of the original motion.

4          MR. KODOSKY:  We had also included references to

5     prior transcript from where the Court indicated that it did not

6     want the -- anybody doing anything over in the Netherlands

7     while these proceedings were playing out.  The reason why I'm

8     bringing this up, Your Honor, is as the Court has already noted

9     on Friday that SeeCubic of Delaware filed I believe it was a 32

10    page response.

11         THE COURT:  I thought it was 40 page.

12         MR. KODOSKY:  To our -- to essentially our five page

13    brief.

14         THE COURT:  Uh-huh.

15         MR. KODOSKY:  And it chalk full of hearsay amongst

16    other objectionable items.  And so I just wanted to point out

17    that we do object to the length of the response, the hearsay

18    that's contained in there, including comments purportedly made

19    by the Amsterdam court.  I don't know if the court would be

20    inclined to give us an opportunity to reply, but I at least

21    wanted to raise that as an initial housekeeping matter.

22         THE COURT:  I thought I made it quite clear that I

23    really didn't want all these extra filings.  They just delay.

24    We've already delayed today because I had to look at that.  I

25    also had, I think, something else.  The debtor filed for a

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 19 of 294

19

1   scheduling order motion.  I don't even know if that was on for

2   today, but I know it got filed.  And so now we're going to have

3   to now -- what exactly is it that you're looking for with

4   respect to this, which I just had in my hand, or did I leave it

5   in there?

6           MR. ZAHRALDDIN:  And, Your Honor, as to that

7   scheduling order, it's not up for today.

8           THE COURT:  I know.  I just knew what you filed.

9           MR. ZAHRALDDIN:  Okay.

10          THE COURT:  Yeah.  That's not for today, but I think

11  I took the scheduling order and not the supplemental brief.  I

12  think -- did I hand that back to you?

13          THE CLERK:  This is my copy.

14          THE COURT:  Right.  And then there was one with --

15          THE CLERK:  No.

16          THE COURT:  What did I do with that?

17          THE CLERK:  It should be right there.

18          THE COURT:  Uh-uh.  I think I left it.  Uh-uh.  This

19  is -- this is for my prior trial.  I don't know.  I think I set

20  it down in the --

21          THE CLERK:  Okay.

22          THE COURT:  Will you check?  Again, we're going to

23  rectify why we're not getting these filings.  I should have

24  seen this on Friday and I would have been in a better

25  position.  For whatever reason, I'm not getting it.  Law clerks

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 20 of 294

20

1    aren't getting.  My ESR -- I mean, my courtroom deputy is, but

2    she was on vacation, so we're -- we'll figure it out.

3              So what exactly is it that you want me to do?

4              MR. KODOSKY:  I just want --

5              THE COURT:  What portions of it that you believe

6    should -- I should not consider?  Because that's what I'm

7    hearing is that to the extent that supplemental brief addressed

8    the five page -- what did I do with it?

9              THE CLERK:  I don't know.

10             THE COURT:  Yeah.  Thank you.  Okay.  I don't think I

11   took it.  Anyway, that it goes beyond what I allowed in your --

12   the debtor's supplemental brief you want stricken.

13             MR. KODOSKY:  Correct.  I just wanted to lodge the

14   objection, Your Honor.  Obviously I --

15             THE COURT:  Well, what portion?  I mean, I'm supposed

16   to figure out what sections you want not in --

17             MR. KODOSKY:  We can --

18             THE COURT:  -- not to consider?  I mean, okay.

19             MR. KODOSKY:  Certainly --

20             THE COURT:  It says that -- in their preliminary

21   statement it said that the supplemental memo made three changes

22   to the debtor's motion.  And I -- and I allowed which one of

23   these alleged three changes I said that I would consider, if

24   any?

25             MR. KODOSKY:  And perhaps, Your Honor, maybe what I

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 21 of 294

21

1  can do is over the lunch break today is come back with specific

2  references.  I am prepared to at least identify for the Court

3  an example of what I'm referring to right now.

4          THE COURT:  Okay.

5          MR. KODOSKY:  For example, on page 23, there's a

6  reference to See Dutch Court opinion ECF 47-18.  And it goes on

7  to quote, "In the light of all Rajan's attempts to attract the

8  assets and activities to Stream."

9          THE COURT:  Wait, wait.  Where are we at?  I'm on

10 page 23.

11         MR. KODOSKY:  At the top of page 23 of 39.

12         THE COURT:  Oh.

13         MR. KODOSKY:  I'm sorry, Your Honor.

14         THE COURT:  I'm on page number 23, but you're on 23

15 right about debtors cannot identify how based on alleged

16 reputational injury or, oh, see Dutch opinion.

17         MR. KODOSKY:  Yes.  And the Court has obviously made

18 it very clear that when it came to judicial notice of other

19 court filings that it would take notice of the fact that it

20 existed and any rulings, but it would not consider, for

21 example, findings of fact that are included.

22         THE COURT:  Or rationale because the Third --

23         MR. KODOSKY:  And so forth.

24         THE COURT:  -- Circuit says I can't do that.

25         MR. KODOSKY:  And so I did want to make sure that the

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 22 of 294

22

1    record was clear that we do object to their making reference to

2    Dutch court findings that are not part of any rulings and so

3    forth.  But I can, over the lunch break if it's okay with the

4    Court, I can come back with any specific, other specific

5    examples, but.

6              THE COURT:  Right.  And then Mr. Colby, you're

7    standing up because you --

8              MR. COLBY:  When Mr. Kodosky is done, I have a

9    response.

10             THE COURT:  Right.  Well, okay.  So you're going to

11   look at it.  I'm going to let you at least this one and then I

12   would suggest --

13             MR. COLBY:  Yeah.  It's actually quite simple, Your

14   Honor.

15             THE COURT:  Right.  Uh-huh.

16             MR. COLBY:  That Dutch court opinion was submitted by

17   the debtors to the Court as part of their TRO papers as an

18   exhibit.  We also think it's an important part of the record

19   here for the reason that that court's decision is supposedly

20   the thing that created some clear and present danger to the

21   assets in the Netherlands that precipitated bringing this TRO.

22             Further, in the hearing, the first day of the hearing

23   on this, we submitted Exhibit SC4, which is the opinion of the

24   Dutch court.  I moved to admit it into evidence and Mr. Kodosky

25   said no objection, Your Honor, and the Court ruled admitted.

1          MR. KODOSKY:  Your Honor --

2          MR. COLBY:  It's been admitted into evidence without

3   objection.  It was put forth by the debtors in connection with

4   their papers and it was admitted into evidence without

5   objection.

6          THE COURT:  Okay.

7          MR. KODOSKY:  And just to respond to that, Your

8   Honor, we did submit it obviously with our motion for the

9   rulings that were included within that order, not for any

10  findings of fact or any jabs at the Rajans that the answer in

11  court may have taken.  And so certainly it has been admitted

12  into evidence, but we have not waived any objection to hearsay.

13  They just filed the brief on Friday, so.

14         THE COURT:  All right.  All right.  You guys, what

15  you're going to do, you're going to -- I guess when we --

16  assuming we get a lunch break because we started later than we

17  wanted to, that you're going to identify.  Then you're going to

18  tell Mr. Colby so that you guys can, you know, at the end.

19  You're not doing this in the middle of the hearing.  At the end

20  of the hearing, presumably we're going to finish today.  We

21  only have Mr. Rajan and then do you have another witness?

22         MR. KODOSKY:  Mr. Michaels.

23         THE COURT:  Oh, okay.  We'll do that and then

24  presumably you're going to put Mr. Stastney on as a rebuttal

25  witness.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 24 of 294

24

1          MR. COLBY:  Correct, Your Honor.

2          THE COURT:  Okay.  Well, maybe we finish today.

3    Maybe we don't.  But these arguments, I want it to end when

4    we're done with all the evidence.

5          MR. COLBY:  Understood.

6          THE COURT:  We're not taking up time that we could be

7    getting the witnesses in, okay?  And that means that we do it,

8    you know, that we don't finish today.  Are we scheduled to

9    continue tomorrow?

10         THE CLERK:  Uh-uh.

11         THE COURT:  Today is the only day?  I thought --

12         MR. ZAHRALDDIN:  Yes.  Today's the only day, Your

13   Honor.

14         THE COURT:  Oh, Jesus.  Okay.  Well, it is what it

15   is.  Hopefully, I would love for us to try to get this done

16   today and then at the end, if we cannot get to the arguments,

17   we can do that by -- because it's just legal arguments.

18         MR. ZAHRALDDIN:  Okay.  Yep.

19         THE COURT:  We can do that by either Zoom or by

20   telephone because as long as it's not evidence, I can do those

21   either way.  So let's reserve that.

22         MR. ZAHRALDDIN:  Great.

23         THE CLERK:  You have something unrelated scheduled

24   for Wednesday afternoon that was asked --

25         THE COURT:  Unrelated -- we have something in this

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 25 of 294

25

1 matter scheduled for Wednesday afternoon?

2            THE CLERK:  Yeah.  He called me the other day about

3 continuing it, so.

4            MR. ZAHRALDDIN:  We actually agreed to continue those

5 through November 15th.

6            THE COURT:  All right.

7            MR. ZAHRALDDIN:  So we did have a slot on Wednesday

8 afternoon that was maybe open now, Your Honor.

9            THE COURT:  Oh, okay.  But that's only for argument.

10 That is not -- if we don't finish, I don't know what everybody

11 else's schedule is because Wednesday is the what?  The 1st?

12            MR. ZAHRALDDIN:  I believe so, yes.

13            MR. COLBY:  Yes, Your Honor.

14            THE COURT:  So I have a 4:30 appointment that I've

15 had for six months.  I'm not -- no.  So that is not going to --

16 you can get here and start, but it will be a hard stop at 3:30,

17 so that's where we are.  Okay.  But we can always make that

18 argument and I want to try to move this.  We're actually

19 working on trying to get through the motions and getting an

20 opinion out on that ASAP, so I hope we could do the same for

21 this pending matter.  Okay.

22            MR. KODOSKY:  Two other quick housekeeping items,

23 Your Honor.

24            THE COURT:  Uh-huh.

25            MR. KODOSKY:  And I take it from the Court's comments

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 26 of 294

26

1   that it would want to hear arguments about things at the end

2   rather than before the witness testimony.  I did want to

3   address, there was two documents the last hearing that were

4   excluded by the Court on hearsay grounds.  At the end of the

5   hearing the Court, in response to my partner's argument

6   regarding notice, that the Court had asked us essentially to

7   address.  I am prepared to address that.  If the Court would

8   rather hear argument later on that --

9           THE COURT:  Let's hear argument later and try to get

10  through the evidence because we have more leeway in being able

11  to how we can get --

12          MR. KODOSKY:  Understood.

13          THE COURT:  We don't have to have everybody in here.

14  We could do Zoom.  We can do it telephonically.  Evidence has

15  to be here, so I would prefer we get through the evidence and

16  then we could reserve for a later time argument on legal

17  issues.

18          MR. KODOSKY:  Understood.

19          THE COURT:  Okay.

20          MR. KODOSKY:  But the final housekeeping item, Your

21  Honor, as we've noted, Mr. Chris Michaels did drive down from

22  Upstate New York today.  I had advised counsel on -- opposing

23  counsel on Friday that given his long drive to the Court and I

24  wasn't sure where exactly we would be at the end of the day.  I

25  ask if there would be any objection if before starting today

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 27 of 294

27

1  with cross-exam -- I understand that when we last left the

2  Court on the 16th that Mr. Colby was at the podium and ready to

3  begin Mr. Rajan's cross-examination testimony.  I had

4  requested, given Mr. Michaels' drive here today, whether or not

5  there would be any objection to taking him up first before

6  starting with the cross-examination of Mr. Rajan.  I don't know

7  if that would even be acceptable to the Court or if opposing

8  counsel has any objection, but Mr. Michaels is present here and

9  available.

10           THE COURT:  Well, I don't think the issue of out of

11  order is a problem.  I think there may be some objection to

12  calling him or recalling him as a witness.

13           MR. KODOSKY:  He has not been called before, Your

14  Honor.

15           MR. COLBY:  Yeah.  He has not been --

16           THE COURT:  Oh, way.  Ms. --

17           MR. COLBY:  The gentleman with the beard.

18           THE COURT:  Oh, okay.  There was --

19           MR. COLBY:  He was a witness in the other hearing.

20           THE COURT:  Okay.  But you did have another witness

21  we had on.

22           MR. KODOSKY:  Mr. Robertson.

23           THE COURT:  Mister -- that was the party that you

24  were objecting to coming back on because he --

25           MR. COLBY:  After he had finished --

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 28 of 294

28

1              THE COURT:  Right.

2              MR. COLBY:  -- because the documents didn't work out

3    the way they hoped.

4              THE COURT:  Okay.  All right.

5              MR. COLBY:  We do have an objection to Mr. Michaels.

6    In the conference on Friday, Mr. Kodosky mentioned that he

7    would be testifying as an expert.

8              MR. KODOSKY:  Potentially, Your Honor.

9              MR. COLBY:  And there has been wildly insufficient

10   disclosure for an expert testimony in this TRO.  And I'll be

11   prepared to address that if and when the Court is inclined.

12   The --

13             THE COURT:  Requested to qualify him as an expert?

14             MR. COLBY:  I got no disclosure that -- other than he

15   was going to be, as a member of the patent bar, be proffered as

16   an expert on licensing.  Other than that, I don't know.

17             MR. COLBY:  So yes, we have an objection to that.  If

18   the Court's --

19             THE COURT:  But that's not --

20             MR. COLBY:  -- inclined to let Mr. Michaels go out of

21   order, then we should probably deal with the objection to --

22             THE COURT:  Well --

23             MR. COLBY:  -- his testifying as an expert but --

24             THE COURT:  Well, has he even sought to do -- I mean,

25   like, is he going -- are you going to offer him as an expert?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 29 of 294

29

 1          MR. KODOSKY:  He's certainly a fact witness, Your

 2  Honor.  And to the extent that he has any expert opinions, in

 3  the injunctive relief stage, I would refer the Court to Third

 4  Circuit.

 5          THE COURT:  What case is that?

 6          MR. KODOSKY:  Case of Kos Pharmaceuticals Inc v.

 7  Andrx Corporation, 369 F.3d 700.  As well to the case from June

 8  9th, 2022, Western District of Pennsylvania.  The case is

 9  called Not an LLC Doing Business as JSD Supply v. Bureau of

10  Alcohol, Tobacco, Firearms, and Explosives.

11          Not dealing specifically with expert testimony in

12  those cases, Your Honor.  But both of those cases stand for the

13  proposition that because of the nature of injunctive relief

14  hearings that the normal evidentiary rules are relaxed

15  essentially.

16          And so, certainly, we can provide the Court with case

17  citations that allow for expert testimony coming in at either a

18  TRO hearing or a preliminary injunction.  We have not filed a

19  brief on that point, Your Honor.  But we can certainly provide

20  the Court with case citations along those lines.

21          So I understand that they're objecting to Mr.

22  Michaels being called now as opposed to --

23          THE COURT:  Are you objecting to him coming out of

24  order?

25          MR. COLBY:  Well, yes.  Not because I'm inconsiderate

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 30 of 294

30

1   of Mr. Michaels travel considerations, although we've all

2   traveled here quite a bit.  But because if he's going to go out

3   of order, it means we're going to have to deal with whether or

4   not he's a permissible expert witness.

5          Which means, we're going to have to have some

6   argument about all of this, which is going to push back the

7   testimony that we know we need to do, which is Mr. Rojan and

8   Mr. Stastney.

9          THE COURT:  Well, counsel, do I -- do -- I mean, I

10  guess in the course of an ordinary hearing on a TRO preliminary

11  injunction, and someone wants to bring an expert in,

12  presumably, you know, this is done on an emergency basis.  So

13  nobody's going to have any discovery.  Nobody's going to have

14  anything.

15         I would then have to figure out what the rules say,

16  right?  With respect to whether I would allow him to testify as

17  an expert.  We're not there, because this isn't -- we're having

18  a hearing the next day and you asked for it yesterday.

19         So what are the rules with respect to identifying

20  experts?  What are the rules with respect to --

21         MR. COLBY:  Right.

22         THE COURT:  -- and that would only be the rules as to

23  identifying and offering.  The other issues, which to

24  qualifying as an expert, that's just regular, you know,

25  evidentiary rules on how you get qualified.

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 31 of 294

31

1        MR. COLBY:  Correct, Your Honor.

2        THE COURT:  So the only issue that you see is that he

3   hasn't been identified as an expert.

4        MR. COLBY:  Well, I mean --

5        THE COURT:  Is that the issue?

6        MR. COLBY:  Yeah.  So it's not clear to me what Mr.

7   Michaels relevance is, given that -- first of all, given that

8   Rembrandt has its own trade secret case and sought its own TRO

9   in the District of Delaware.

10       THE COURT:  Well, yeah, because --

11       MR. COLBY:  Secondly --

12       THE COURT:  -- that court decided there was monetary

13   -- that you could --

14       MR. COLBY:  Correct.

15       THE COURT:  -- quantify by monetary damages.

16       MR. COLBY:  Right.

17       THE COURT:  I'm not quite sure.  That's a whole

18   different scenario then where we are today.

19       MR. COLBY:  Correct.  Secondly, Your Honor, so I

20   don't know what he's here to testify about, I have questions

21   about its relevance.

22       Secondly, the lack of disclosure, I think, precludes

23   him from being offered as an expert.  The Federal Rules of

24   Bankruptcy Procedure, 7026, says that FRCP 26 applies in

25   adversary proceedings.

1              And adversary proceeding is defined in Federal

2    Bankruptcy Procedure 7001, to include, one, this TRO was filed

3    in an adversary proceeding.  Secondly, adversary proceeding is

4    also defined to include a proceeding to obtain an injunction or

5    other equitable relief.

6              And so, if FRCP 26 applies --

7              THE COURT:  Uh-huh.

8              MR. COLBY:  -- to this scenario, then the debtors had

9    to have followed the mandatory disclosure requirements,

10   including those pertaining to the disclosure of expert

11   testimony.  That --

12             THE COURT:  But counsel, we're talking about a TRO.

13   If this had just gone on a regular, I want a TRO, the Court

14   schedule it in one day.  I'm not quite sure that that rule

15   would say you can't bring an expert because you didn't tell us.

16             MR. COLBY:  It --

17             THE COURT:  So you -- that's all in context.  It's

18   all in context of how --

19             MR. COLBY:  But the --

20             THE COURT:  -- we do it.  I get it.

21             MR. COLBY:  I understand.  But in fact, we've been

22   litigating this for a month.

23             THE COURT:  I get that, counsel.

24             MR. COLBY:  And so, there was ample --

25             THE COURT:  That -- counsel.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 33 of 294

33

1          MR. COLBY:  -- opportunity to make some disclosure.

2          THE COURT:  That's what I just said.  This wasn't

3   like they asked me yesterday and we're having a hearing today.

4          MR. COLBY:  Right.

5          THE COURT:  And therefore, the issue of whether you

6   disclose an expert or not would be a different -- where as

7   opposed to when was this motion filed?

8          THE COURT REPORTER:  September 30th.

9          MR. COLBY:  It --

10         THE COURT:  This Motion.

11         MR. COLBY:  It was filed here on September 30th and

12  then it was actually previously filed in the --

13         THE COURT:  Right.  So when --

14         MR. COLBY:  -- district court.

15         THE COURT:  Right.  When did I get it?  Because

16  whatever happened over there, happened over there.

17         MR. COLBY:  September 30th.

18         THE COURT:  All right.  So it's 30 days.  Hmm.  Okay.

19  All right.  I can't believe 30 days for -- never mind.

20         MR. COLBY:  Yeah.  A court, I think, as the

21  discretion to shorten the typical notice requirement.  But

22  there are also certain disclosures that we would be required to

23  get, which would include things like the opinions that are

24  going to be rendered.  The facts upon which the opinion is

25  based on.  And all those sorts of customary expert disclosures

1   is --

2           MR. KODOSKY:  If I --

3           MR. COLBY:  -- referenced to a written --

4           THE COURT:  In a minute.

5           MR. COLBY:  -- report.  So we are where we are.  I

6   think it's entirely too late to be trying to proffer an expert

7   witness for today.

8           THE COURT:  Okay.

9           MR. KODOSKY:  If I may?

10          THE COURT:  Yes, counsel.

11          MR. KODOSKY:  If I may --

12          THE COURT:  Uh-huh.

13          MR. KODOSKY:  -- Your Honor.  I would just remind the

14  Court that this is in response to Mr. Stastney's testimony

15  during the earlier hearing.  And if I -- would the Court be

16  interested in my passing up copies of the opinions that I had

17  cited?

18          THE COURT:  We'll look at them.  My -- I'm pretty

19  sure my law clerk in the -- in chambers has probably pulled

20  those up already.

21          MR. KODOSKY:  Okay.

22          THE COURT:  And I'll --

23          MR. COLBY:  And Mr. Stastney testified on October

24  6th.

25          THE COURT:  Okay.  It is what it is.  We are where we

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 35 of 294

35

1    are.  The question is, you know, the question is, do we let him

2    testify out of order?  And if he does, do I have to qualify him

3    as an expert before he can testify, or do I say okay -- I mean,

4    the rules are pretty -- they're not as strict as they should

5    be.

6           But can he testify and then I say -- you know, I'm

7    not going to -- I'm not going to allow any of this, because

8    it's -- he wasn't disclosed or he's not qualified or do I have

9    to say yes, you're qualified?  I would think you do.  I do have

10   to make that finding before he can testify.  I don't think I

11   can say, well, I'll -- you know, I'll let him testify and then

12   decide later.

13          MR. COLBY:  Right.  And I would submit, Your Honor,

14   that that's also -- we don't have a lot of time to get through

15   the testimony that we know we need to do, Mr. Rajan and Mr.

16   Stastney.  So I would submit we should do that first and get

17   through it.  Rather than doing contingent testimony that may or

18   may not be admissible.

19          MR. KODOSKY:  And again, Your Honor, he is a fact

20   witness in this case and he made a long drive to get here.

21          THE COURT:  Well, and if he's going to testify as a

22   fact witness, that's a different store.

23          MR. KODOSKY:  It is.

24          THE COURT:  Now -- but you're saying you're offering

25   him as an expert, too.  Which one is it?

1          MR. KODOSKY:  Your Honor, it's tricky, because he

2     does have the fact witness background and we do want to have

3     him comment on -- he listened to Mr. Stastney's testimony in

4     this case and has views as to inaccuracies that Mr. Stastney

5     testified to.

6          THE COURT:  But that's -- but that's as a fact

7     witness?  That's as an expert?  I mean, as you know that, for

8     instance, Mr. Stastney said that the sky is green and he knows

9     the sky is blue, and he's going to say Mr. Stastney was wrong.

10    The sky is blue.  That's not an expert.  That's just I saw the

11    -- we were both outside and I saw it was blue.

12         MR. KODOSKY:  In fairness, Your Honor, we do need him

13    as an expert, but when we notified opposing counsel that he --

14    he obviously is on our witness list.  He's one of four

15    witnesses on our witness list.  And --

16         THE COURT:  When did you notify them that he would

17    also be a expert?

18         MR. KODOSKY:  I said potentially on Friday during our

19    Rule 26F conference.

20         THE COURT:  Okay.  But you put him on your list when?

21         MR. KODOSKY:  He's been on the list in connection --

22    before the first hearing.

23         THE COURT:  Okay.  And what was his intended

24    testimony at that time?  Fact?  Expert?  What?  Maybe because

25    you listed him as a witness and you intended him to be an

1  expert when you first listed him, it would seem to me you

2  should have said at that time, we're bringing him as to both

3  the fact and an expert.

4         Or did you just suddenly decide he was going to be an

5  expert?  To the extent he wants to be a fact witness, I don't

6  see anything wrong with that.  But the issue of him testifying

7  as a expert, when -- if you knew at the time you disclosed him

8  as a witness back on whenever that was filed, more than, you

9  know, less than 30, but more than two or three weeks ago, I

10  don't know how we get around that.

11         THE COURT:  That seems --

12         MR. ZAHRALDDIN:  Your Honor, we're going to use him

13  just as a fact witness.  We're not going to use him as an

14  expert.  Mr. Stastney testified --

15         THE COURT:  Said some things --

16         MR. ZAHRALDDIN:  -- he testified some things about

17  licensing and contracts.  We'll establish a foundation with Mr.

18  Michaels experience as a lawyer and a patent lawyer and then he

19  will talk about what he knows as facts, and we'll keep --

20         MR. COLBY:  That sounds a lot like --

21         THE COURT:  Facts in this case?

22         MR. COLBY:  That sounds -- Your Honor, that sounds an

23  awful lot like expert testimony.

24         THE COURT:  Well --

25         MR. ZAHRALDDIN:  Then he should be a --

1          MR. COLBY:  He's going to come in and testify about

2   how --

3          MR. ZAHRALDDIN:  Then --

4          MR. COLBY:  -- licensing works and patents work and

5   all those sorts of things.

6          MR. ZAHRALDDIN:  Then he should be allowed as a

7   rebuttal witness, and I don't know, Your Honor, how you're

8   supposed to -- when you have someone who's -- an expert can

9   provide information that's helpful to the Trier of Fact.  You

10  have discretion to hear him.  If we believe that this is useful

11  and we can put him up there and we qualify him as being a

12  member of the patent bar, etc., for that limited purpose, I

13  don't believe we need to have reports.

14          THE COURT:  For limited purpose of telling me how

15  things work?

16          MR. ZAHRALDDIN:  Well, we didn't get an expert report

17  from Mr. Stastney when he was describing what he believed were

18  licensing agreements.  So I simply believe we have the right to

19  have someone else come up, who's got many more years of

20  experience in this area, and simply opine it.

21          THE COURT:  So Mister -- so you're saying Mr.

22  Stastney opined about how licenses and --

23          MR. ZAHRALDDIN:  He did testify as to how they worked

24  and there was this whole parallel licensing -- as matter of

25  fact, Mr. Colby also testified in the sense and discussed and

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 39 of 294

39

1    argued how licensing works in this case.

2            So we want to clear the record that --

3            THE COURT:  And you want to offer somebody who else -

4    - who says that Mr. -- contrary to Mr. Stastney's testimony on

5    how it worked, this is how it worked?

6            MR. ZAHRALDDIN:  Yes, ma'am.  And if this were a

7    regular TRO or again, if -- even an extended TRO like this, we

8    would have all come in and we would have had our witnesses, and

9    you would have made a decision on it.

10           MR. CAPONI:  Your Honor, could I be heard?

11           THE COURT:  Yes.

12           MR. COLBY:  Sorry.  Sorry.  Sorry.

13           I think that was an important concession by Mr.

14   Zahralddin.  That sounded precisely like expert testimony.  The

15   difference between what Mr. Stastney testified about and what

16   we understand Mr. Michaels is going to testify about, is that

17   Mr. Stastney was -- what debtors have put at issue here, is

18   what are their future business plans.  Are they talking about

19   potential sublicensing or parallel licensing or whatever you

20   want to call it.

21           That is a factual issue for Mr. Stastney to testify

22   about.  To have Mr. Michaels come in, who's at a completely

23   different company and say that's not how licensing works.  This

24   isn't going to work.  That's a bad business model.  That's

25   going to violate the Phillips License.  That is a subject

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 40 of 294

40

1   matter of expert testimony that is being proffered supposedly

2   to assist the Trier of Fact.  And that's where they have failed

3   to abide by the disclosure --

4            THE COURT:  Wait.

5            MR. COLBY:  -- requirements.

6            THE COURT:  You'll get your turn.

7            Well, but then, should I discount Mr. Stastney's

8   testimony because he is telling me to the extent he did, I

9   haven't looked at the transcript, that this is how licenses

10  work and this is all -- and he's not an expert either.  So what

11  should I do with his testimony?

12           MR. COLBY:  Well, he testified as the person who is

13  involved in this business and this --

14           THE COURT:  Okay.

15           MR. COLBY:  -- potential business practice that has

16  been put at issue, potential future business practice.  He

17  testified as to what his understanding was for -- about that

18  business practice.  How they intended to do it.

19           THE COURT:  Well, more -- he told me than how they

20  intended to do it.  He gave me some testimony on how these

21  things work.

22           MR. COLBY:  Right.

23           THE COURT:  And so, if he gave me testimony on how

24  these things work, and they're saying well, he's telling --

25  what he told you was wrong.  They don't work that way.  How am

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 41 of 294

41

1   I supposed to figure out how they -- and is it even relevant to

2   me?  That's number one.  Does it really matter --

3         MR. COLBY:  Well --

4         THE COURT:  -- how this works?

5         MR. COLBY:  -- Your Honor, I have a lot to say about

6   that.  But I've been saving it for the closing argument.  But I

7   think what this has devolved into, contrary to the initial

8   filing.  The initial filing was supposedly there is imminent

9   risk that Phillips has --

10         THE COURT:  You know how much time is -- it's almost

11   12:00, guys.

12         MR. COLBY:  -- cancel -- Phillips is going to cancel

13   a license any minute.  And now, we're talking about the

14   viability of long-term business plans.  That is not the subject

15   of --

16         THE COURT:  Well, let me --

17         MR. COLBY:  -- the TRO.

18         THE COURT:  -- just tell you.  You guys can argue.

19   You can put all these -- this is what I'm looking at.

20         I'm looking at -- first of all, I still haven't

21   figured out who owns this Ultra D.  I don't even -- anybody.

22   And, you know, I will tell you, we sit in chambers and I'm,

23   like, can somebody tell me who owns this stuff?  Can you guys

24   through the record, because I can't figure it out.  Who the --

25   I have not.  You guys are going to have to tell me that.

1             But to the extent the debtor, at least Stream or

2   Technovative as some interest and they -- that license belongs

3   to them, or they have some interest in that.  My only concern

4   is something happening that I need to stop that would

5   interfere, reduce, take -- whatever words you want to use, with

6   that asset.  That is what the purpose of this hearing is.

7             MR. COLBY:  Understood.

8             THE COURT:  Is there some imminent danger to an asset

9   that belongs to the -- a state of these debtors?  And if there

10  is, we -- what is it?  And if it is, what, if anything, I need

11  to do about it.  That's what I'm -- you guys can argue and go

12  all around in circles and file all these different documents.

13  That is what I'm looking at.  You can overcomplicate it and do

14  all these other things, over litigate.

15            MR. COLBY:  And --

16            THE COURT:  I'm simply going to look at that.  So I

17  don't know what to tell you guys.

18            MR. COLBY:  I submit, Your Honor, that's precisely

19  what's happening here.  It's an attempt to -- the factual

20  record is that as Mr. Stastney testified, there are three proof

21  of concept projects going on.  They are months, if not longer,

22  from being completed.  At that point and time, potential

23  customers can talk about whether they want to continue to

24  further develop the technology.  That may need some additional

25  licenses.  There is no immediate --

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 43 of 294

43

```
 1              THE COURT:  But the whole issue, counsel, is they're

 2    doing that now.  What I have to figure out is what their -- and

 3    I'm not saying I got there yet.  I --

 4              MR. COLBY:  Right.

 5              THE COURT:  -- I'm telling you my through processes

 6    and I hope that will give you guys some guidance on how to get

 7    this to me, is what they're doing now.  Asset of the debtor, to

 8    which they are using, and to which there is some imminent

 9    danger that requires me to say stop.

10              MR. COLBY:  Right.

11              THE COURT:  And I don't know because, you know, I've

12    seen the license, what do you do?  I don't know what they're

13    doing.  I have no clue.  And frankly, I've already said what I

14    feel about the -- never mind.  Never mind.

15              MR. COLBY:  I would like -- no, Your Honor.  I

16    would --

17              THE COURT:  Never mind.

18              MR. COLBY:  We would --

19              THE COURT:  Never mind.

20              MR. COLBY:  -- like to focus on that as well, because

21    we think the factual record, not all the noise around it, is

22    that there is no imminent --

23              THE COURT:  I don't know, because --

24              MR. COLBY:  -- potential harm.

25              THE COURT:  -- I haven't -- that's your position.
```

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 44 of 294

44

1   That's their position.  I've heard from Mr. Stastney.  I've

2   seen documents.  I'll be perfectly honest, I kind of have an

3   idea where this is going and where I'm going.  But I don't know

4   yet, because sometimes I see things and I'm, like, oh, well,

5   that makes sense.  And then I see something else and I'm, like,

6   whoa, what was I thinking over here?

7          So I don't think without a complete record, I am in a

8   position to make any kind of decision and I would prefer to

9   make my decision on the issues that are relevant to this

10  matter.  Asset in danger?  Yes, no -- yes, I do something.  No,

11  I don't.  That's all I need to know.  All this other stuff --

12          MR. CAPONI:  Your Honor?

13          THE COURT:  Yes.

14          MR. CAPONI:  So at the last hearing, Your Honor

15  pointed out you didn't appreciate the debtor filing a brief and

16  sort of sandbagging and I made a number of statements about,

17  you know, order.  We have a big thick, you know, book called

18  The Federal Rules of Civil Procedure, the bankruptcy, he can

19  add to that.

20          The Debtor continuing to manage this estate and

21  litigates with chaos should not be tolerated.  We have a

22  witness who was on the stand who needs to be cross-examined.

23  You don't get to -- or you should not be permitted to walk in

24  Monday morning, in the middle of what should be -- we're

25  prepared to cross-examine, and then say, oh, we now want to

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 45 of 294

45

1  take witnesses out of order that we didn't disclose.  They may

2  or may not be an expert.

3          THE COURT:  Well, he did disclose him.  He didn't

4  disclose him as a --

5          MR. CAPONI:  They didn't disclose -- they wanted him

6  out of order until Friday.

7          THE COURT:  No, no, no, no.  He disclosed him as a

8  witness.

9          MR. CAPONI:  I'm not saying disclose a witness.  They

10  disclose that they want to interrupt the cross-examination --

11          THE COURT:  Uh-huh.

12          MR. CAPONI:  -- until Friday in passing.  And then

13  it's, maybe as an expert, not as an expert.  In all due

14  respect, the debtor should figure that out before they stand up

15  this morning.

16          Once again, at the Court noted, we blow through the

17  first half of our day dealing with chaos.  Let's cross-examine

18  our witness.  If they want to put Mr. Michaels up, we can cross

19  that bridge when we get to it.  But, you know, we spent this

20  morning arguing over whether Mr. Morton, who's not here and not

21  represented and --

22          THE COURT:  Well, that was pretty brief.

23          MR. CAPONI:  Right.  And -- but it's every day,

24  right?  Your Honor, it has practical implications.  Aside from

25  ruining the flow of a case, you've got one, two, three, four

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 46 of 294

46

1   lawyers billing this estate at I don't know how much money.  If

2   you add up all the hours we've spent on this kind of stuff,

3   it's a lot.

4           And then you add how much it's costing us to sit here

5   and listen to it, it's costing a lot more.

6           THE COURT:  Oh, yeah, because your rates are higher?

7           MR. CAPONI:  So there should be --

8           THE COURT:  You said a lot more, why, because your

9   rates are higher?

10          MR. CAPONI:  I think more of us.  But Mr. Colby is

11  better than I am.  But there's --

12          THE COURT:  Well, there's only one, two, three, four

13  attorneys.

14          MR. CAPONI:  One, two, three, four, five, six, seven

15  now on our side.

16          THE COURT:  Well, wait, attorneys.

17          MR. CAPONI:  The --

18          THE COURT:  And you have your paralegals.  So they

19  have one, two, three.

20          MR. CAPONI:  Yeah.

21          THE COURT:  Well, they don't have as many.

22          MR. CAPONI:  They don't have as many.  But --

23          THE COURT:  Yeah.

24          MR. CAPONI:  -- the thing is, the estate is paying

25  for this.  And --

1             THE COURT:  Presumably.

2             MR. CAPONI:  Presumably.

3             THE COURT:  Because if they have no money, they're

4    not getting paid.

5             MR. CAPONI:  Well, Your Honor, you know --

6             THE COURT:  If they want to work for free, that's on

7    them.

8             MR. CAPONI:  Let's --

9             THE COURT:  I tell people that all the time.

10            MR. CAPONI:  This debtor has not filed a monthly

11   operating report in many months.

12            THE COURT:  We're not going all --

13            MR. CAPONI:  I'm just saying --

14            THE COURT:  No, no, no, no.  We're not talking all

15   about that.

16            MR. CAPONI:  Let's stop the chaos and stick -- this

17   debtor needs to be, like, a child.  Turn the tv off and --

18            THE COURT:  Mister --

19            MR. CAPONI:  -- until your homework gets done.

20            THE COURT:  Mr. Caponi.

21            MR. CAPONI:  Let's get our homework done.

22            THE COURT:  Now you're doing what I don't -- we're

23   not rearguing the Motion.

24            MR. CAPONI:  I'm not.

25            THE COURT:  Yes, you are, because they need to be

1    told to do this.  They're not filing --

2            MR. CAPONI:  I'm --

3            THE COURT:  What does monthly operating reports have

4    to do with this?  Nothing.  Let's keep -- you're doing --

5            MR. CAPONI:  Well, what I --

6            THE COURT:  You guys are all doing the same thing and

7    I'm --

8            MR. CAPONI:  I understand, Your Honor.  I'm not

9    arguing to tell them about the operating reports.  I'm arguing

10    we got to stop managing the estate through chaos and there's

11    order -- the rules prescribe things to provide order because

12    it's been tried and true.  Those rules get implemented after

13    ungodly amounts of hours to keep things on a efficient --

14            THE COURT:  And they're totally not efficient at this

15    point because --

16            MR. CAPONI:  Well, but --

17            THE COURT:  The issue with us not seeing things,

18    that's not the party's fault.  Why -- I have to figure out why

19    we're not getting them.  But the last-minute filing by

20    everybody.  Now, you guys did it on Friday, early Friday

21    morning.  So that wouldn't -- not you, Mr. -- that would have

22    been enough time, but we didn't get it.

23            MR. CAPONI:  No.

24            THE COURT:  But we have --

25            MR. COLBY:  Your Honor, sorry, but I wanted to file

1   it on Thursday and I just --

2          THE COURT:  It doesn't matter.

3          MR. COLBY:  -- something came up.

4          THE COURT:  We didn't get it.  If we had gotten it,

5   we would have looked at it on Friday.

6          MR. COLBY:  And we also --

7          THE COURT:  And you sent it to Mis -- you did

8   everything --

9          MR. COLBY:  Yeah.

10          THE COURT:  -- I asked you to do.

11          MR. COLBY:  Okay.

12          THE COURT:  I'm not -- I'm just saying that it's not

13   your -- this one is not anybody's fault because something

14   happened in our system that I didn't get it in time.

15          MR. COLBY:  In an ideal world, it wouldn't have even

16   been Friday, it would have been Thursday.  So I apologize.

17          THE COURT:  Yeah, but it was Friday.  I go on what I

18   have.  What -- where's my favorite saying?  See, I had all

19   these things when I first went on the bench.  Do not say it.

20   Don't raise your voice.  Don't argue.  It is what it is.

21          They're all gone.  I need to raise them -- put them

22   back up, so I can see them.  But my favorite saying has always

23   been, I don't say it that much anymore.  It is what it is.  I

24   always said that.  That was, like, my -- everybody knew me for

25   that phrase.

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 50 of 294

50

1          MR. COLBY:  It is what it is, Your Honor.  Mr. Rajan

2   needs to be cross-examined and Mr. Stastney needs to be put up,

3   because that was the order we all agreed upon and I say we get

4   to it.

5          THE COURT:  Well, you agreed that we do the cross-

6   examine and then they get to call their other witnesses, then

7   you do rebuttal.

8          MR. COLBY:  Right.  If they would -- and then we -- I

9   suggest we cross Mr. Michaels bridge when we get there.  Let's

10  get Mr. Rajan up and down, because we know we need that.  And

11  that's, you know, we're --

12         THE COURT:  All right.

13         MR. COLBY:  -- burning through daylight.

14         THE COURT:  So this is where I am.  We're going to --

15  go ahead Mister --

16         MR. ZAHRALDDIN:  Your Honor.

17         THE COURT:  -- Zahralddin.

18         MR. ZAHRALDDIN:  This -- I think the hearing makes me

19  as weary as it makes you sometimes.  I just sat there and heard

20  us be referred to as children.  I just -- I mean, they attacked

21  our fees again, et cetera.  Let's make it very simple.

22         Mr. Michaels is a planned proponent.  Without the

23  settlement of the Rembrandt licensing issue, nothing goes

24  forward.  Our plan is to go to operations to make payment,

25  right?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 51 of 294

51

1          THE COURT:  All right.  I don't want -- need to hear

2     about the plan.

3          MR. ZAHRALDDIN:  No, no, I'm just saying.  If there

4     is a relevance as to Mr. Michaels in response to Mr. Colby's

5     comments, it is because he is a planned proponent.  He knows

6     how this all works, and all of this is about making sure that

7     we don't end up sinking the plan because someone loses our

8     licenses or violates or trade secrets.  It's essential to

9     production to have those complete.  So --

10          THE COURT:  Right.  And the question for me is

11     whether in fact what is going on in the Netherlands is

12     jeopardizing an asset of the estate.  That's all that is

13     supposed to be for me.  All this -- the problem is, you guys

14     have a long history between the parties, and you bring that --

15     it's, like, a relationship.  You have brought your relationship

16     -- it's a divorce.

17          It's clearly a divorce between Mr. Rajan and Mr.

18     Stastney.  At one time, they were best buds.  Okay.  I'm -- I

19     call it like I see it.  They were best buds.  They have a

20     falling out.  They got a divorce now.  And now, we're figuring

21     out who gets what in the divorce.

22          MR. ZAHRALDDIN:  And I'm trying to --

23          THE COURT:  And because there is all this animosity

24     between the two prior best buds, you guys are litigating and

25     bringing all this stuff.  I have asked from the beginning, and

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 52 of 294

52

1  it's very hard to do that, it's very -- which is why we call

2  this person is -- you know, he's a cheat or he's a this and

3  he's stealing and they're babies.  I don't want to hear all

4  that.

5          MR. ZAHRALDDIN:  But Your Honor, that's --

6          THE COURT:  I don't want to hear all that.

7          MR. ZAHRALDDIN:  That's exactly what -- that's my

8  point.  My point is, I'm in charge and I've told my client very

9  sternly, we're here to protect the children in this divorce,

10 which is the unsecured creditors.  I can't get to a plan

11 without these trade secrets.  I can't get to making sure

12 they're not being hurt in some way without this TRO.

13         That's where I stand and that's why we need Mr.

14 Michaels.

15         THE COURT:  All right.  But -- you might need Mr.

16 Michaels, but we're going to call Mr. Rajan on cross-examine

17 and then we'll do what we -- let's get through that process.

18         MR. ZAHRALDDIN:  Absolutely.

19         THE COURT:  And then you can call your next

20 witnesses.  If that's Mr. Michaels, then we'll figure that out.

21 But I will say that Mr. Stastney has given me how he thinks

22 this works.  I would really like to know how it really works,

23 because it may have some impact on how I get to my decision.

24         MR. ZAHRALDDIN:  That was the only thing we were

25 discussing, Your Honor.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 53 of 294

53

1          THE COURT:  And you guys need to -- you know, I don't

2    know the last minute not sharing, I don't know.  I mean, I

3    guess I must be an old-fashioned lawyer, because when I cracked

4    this -- you know, it is what it is.  I'm not going to --

5          MR. ZAHRALDDIN:  Your Honor --

6          THE COURT:  -- chastise people.  I'm not going to

7    tell people how to run their cases.  But I can tell you, it

8    does no one any favor with the Court by not doing this as

9    efficiently, as offices of the Court cooperating with each

10   other.

11         I don't make my decision based on who I think is the

12   bad guy or who I think cannot maneuver.  And I used to say

13   this, and no offense to litigators.  You know, litigators play

14   a lot of games, and that's why I hated litigating.  Because it

15   was hide the ball, let's be mean, let's do all that other

16   stuff, when it just should be, here's the facts, somebody

17   decide.  I'm not a jury.  I can cut through the BS and get

18   where I need to go.

19         That said, I think you guys need to kind of focus on

20   what I need to do and not -- you know, last minute, unless

21   there's a real last minute.  I would expect everyone to act as

22   officers of the Court, who -- and I'm not saying that you guys

23   aren't, but I think there's, on both sides, more -- a more

24   efficient way to do this.

25         And I would appreciate it if you guys would keep your

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 54 of 294

54

1   eye on the ball, which is getting to the Court what I need to

2   make my decision.  All that other stuff, all that does is serve

3   to clog up the system, cause unnecessary fights, and frankly,

4   irritate the Court.

5          Now, I will tell you irritation is not how I'm going

6   to make my decision.  Whether I feel somebody's irritating me -

7   - let me just say and it's probably irrelevant.  I had seven

8   kids that I raised, and they were all mine.  I know the BS.

9   And I'm pretty good at dealing with it.

10          So I'm not saying you're children, but I just want

11  you to know for the record, I don't -- I won't -- all this

12  other stuff does nothing.

13          MR. ZAHRALDDIN:  That's where we're --

14          THE COURT:  Okay?

15          MR. ZAHRALDDIN:  -- trying to get, Your Honor.

16          THE COURT:  All right.  Well, let's stop accusing one

17  another of doing all, this one does this, and you know, no

18  offense, that's what I heard from, you know, kids and I don't

19  want to hear it.

20          So let's call Mr. Rajan and get him going.  Okay?

21          MR. COLBY:  Your Honor, as one of eight children,

22  that's a speech I've heard before.

23          THE COURT:  Oh, you've heard?  Okay.  Okay.  Well,

24  let me just say, I'm the oldest of 12.

25          MR. COLBY:  I'm at the younger end, so I got off

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 55 of 294

55

1    easy.

2             THE COURT:  Oh, you got all the benefits.

3             MR. COLBY:  Yeah.

4             THE COURT:  At least according to the --

5             MR. COLBY:  Yeah.

6             THE COURT:  -- older ones.

7             MR. COLBY:  Yeah.

8             THE COURT:  You got treated better.  You got more

9    things so --

10             MR. COLBY:  Just for the Court's benefit and maybe to

11   make the Court's Clerk's life a little easier, the site to --

12             THE COURT:  Hold on, hold on.  Do we need to swear

13   him back in?  I think -- oh, we're swearing him on the witness

14   stand, right?

15             MR. COLBY:  He still should be under oath.

16             THE COURT:  Well, did we release him?  Oh, okay.  All

17   right.

18             Then sit -- so what do you want to do before we start

19   to --

20             MR. COLBY:  Oh --

21             THE COURT:  -- cross-examine?

22             MR. COLBY:  -- just give the site to where the Dutch

23   court decision was admitted without objection.  It's the --

24             THE COURT:  All right.  We'll get to that.

25             MR. COLBY:  Yeah, it's --

1                    THE COURT:  We're not talking about it.

2                    MR. COLBY:  -- 157 through 159.

3                    THE COURT:  We're not talking about that now.  Let's

4     leave all of that for the --

5                    MR. COLBY:  Okay.

6                    THE COURT:  Okay.  Let's go.

7                              CROSS-EXAMINATION

8     BY MR. COLBY:

9     Q    Good afternoon, Mr. Rajan.

10    A    Hi.

11    Q    Steam -- Mr. Rajan, Stream itself does not --

12                   THE COURT:  Hold on, hold on, hold on.  He said we

13    didn't release him -- he was still under oath.  But if we want

14    to make it clear for the record, let's just re-swear him in so

15    there's no ambiguity.

16               MATHU RAJAN, PLAINTIFF'S WITNESS, SWORN

17                   THE CLERK:  Would you please again state and spell

18    your name for the record?

19                   THE WITNESS:  Mathu Rajan, M-A-T-H-U R-A-J-A-N.  Oh,

20    sorry.  M-A-T-H-U R-A-J-A-N.

21                   THE CLERK:  And could you please state your address,

22    please?

23                   THE WITNESS:  1105 William Penn Drive, Bensalem, PA

24    19020.

25                   THE CLERK:  Thank you.

1  BY MR. COLBY:

2  Q    Mr. Rajan, since you were last year testifying, did you

3  speak about your testimony with anyone?

4  A    No.

5  Q    Mr. Rajan, Stream itself does not own any patents,

6  correct?

7  A    I -- I'd have to double check on that one.  I'm not sure.

8  Q    Okay.  Well, when you were here on August 17th, were you

9  asked, the Debtor, Stream TV and the other Debtor,

10  Technovative, did not hold any patents, answer, they do not

11  have any patents, no.  Do you recall that testimony?

12  A    Yeah, but I -- I need to double check that for you.  It --

13  it may not own patents, but I need to double check that.

14  Q    What would you need to double check?

15  A    I've got to check with some of our team members because

16  things have been -- there's a lot of activity going on and

17  what's been filed and what the status is and everything.

18  Q    Are you changing your previous testimony that Stream TV

19  and Technovative did not own any patents?

20  A    Not until I verify it because we're getting ready for

21  production, and a lot of things are happening right now.

22  Q    Technoviative, the other debtor, doesn't own any patents,

23  correct, Mr. Rajan?

24  A    I -- I have to double check.  Right now, we're getting

25  geared up for production.  There's a lot of activity.  I -- I

1   have to find out.  Things are moving very quickly now, so I

2   have to double check all that.

3   Q    Is it your testimony, Mr. Rajan, that Stream TV or

4   Technovative have filed and received patents in the last --

5   since August 17th?

6   A    It may have.  That's what I have to double check.  I have

7   to find out.  I have to find out from the --

8   Q    And where specifically --

9   A    -- engineers --

10  Q    -- would you check?

11  A    I have to call our engineers and talk to our people on the

12  phone.  They're busy doing a lot of work right now.

13  Q    When the Debtors filed these bankruptcy cases, they were

14  required to file a statement listing their assets, correct?

15  A    Correct.

16  Q    And you filed that statement on the docket?

17  A    Yeah, we filed statements, correct.

18  Q    Did you review that statement before it was filed?

19  A    That was the period where I went -- got sick and went into

20  the hospital, so I didn't quite review it as closely as I

21  should have because I was in the hospital.

22  Q    Did you review it, Mr. Rajan?

23  A    Some of them I did not.

24          MR. COLBY:  I think, Your Honor, for today's exam, we

25  would think it'll be more efficient to hand out the binder,

1   similar to what we've done in the past --

2           THE COURT:  Okay.

3           MR. COLBY:  -- if that's okay.  We might as well get

4   that out of the way now.  So we've got one for the Court and

5   one for the witness.  May I?

6           THE COURT:  Yes, unless someone objects.

7           MR. KODOSKY:  Is there a binder for us?

8           MR. COLBY:  Yes.  And these were on our disclosures,

9   and we previously provided you documents.

10          THE COURT:  All right.  Hand that to --

11          MR. COLBY:  There will be a few documents that we

12  have loose copies of, but a lot of them will be in the binders.

13          THE COURT:  Okay.

14  BY MR. COLBY:

15  Q    So Mr. Rajan, if you would turn to tab 45, please.  Let me

16  know when you're there, Mr. Rajan.

17  A    Yeah, I'm here.

18  Q    Okay.  Mr. Rajan, this is a document that the Debtor,

19  Stream TV, filed in the bankruptcy proceeding, correct?

20  A    Correct.

21  Q    And it is filed at ECF 52, and it is the Global Notes to

22  Schedules and Statement of Financial Affairs of Debtors, Stream

23  TV Networks, Inc., case number 2310763 NDC and Technovative

24  Media, Inc., cause number 10764.  Do you see that?

25  A    Yes.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 60 of 294

60

1  Q    And this is a schedule of the Debtor's assets at the time

2  that it filed the bankruptcy, correct.

3  A    Correct.

4  Q    And this was filed in March of 2023, correct?

5  A    Correct.

6  Q    This was filed prior to the illness that required your

7  hospitalization, correct.

8  A    Before I went into the hospital, yes.

9  Q    Right.  You were hospitalized in May?

10 A    Correct.

11 Q    Okay.  Did you review this document before it was filed,

12 Mr. Rajan?

13 A    Not as closely as I would have liked to, no.  I was at --

14 out of the country and stuff like that.

15 Q    Did you authorize its filing?

16 A    Yes, I did.

17 Q    Did you believe that the statements made herein were true

18 and correct for the benefit of the court in which it was being

19 filed?

20 A    I believe so.

21 Q    Okay.  Well, let's take a look, if you would. at part 10,

22 question 59 on page 5.  And the page numbers I'm referring to

23 are in the bottom right of the page.  Let me know when you're

24 there, Mr. Rajan.

25         THE COURT:  Where are we at, Counsel?

1          MR. COLBY:  I'm at page 5, using the page -- well,

2   I'll take that back.  The ECF page 8.

3          THE COURT:  The ECF page 8.

4          MR. COLBY:  Yep, that is easier.  And it's part 10.

5          THE COURT:  8030?

6          MR. COLBY:  Yep.  Part 10 at the bottom of the page.

7   BY MR. COLBY:

8   Q    Intangibles and intellectual property.  Do you see that,

9   Mr. Rajan?

10  A    Correct.

11  Q    Question 59 says, "Does the Debtor have any interest in

12  intangibles or intellectual property?  Answer, the box that's

13  checked is no.  Do you see that?

14  A    Yes.

15  Q    That's the statement that the Debtors made to this court

16  in March when it filed this bankruptcy, correct?

17  A    Yeah, that was March.

18         MR. COLBY:  Your Honor, this is filed on the docket,

19  but I would move to admit this document into evidence as SC6.

20         THE COURT:  Counsel?

21         MR. KODOSKY:  No objection.

22         THE COURT:  Okay.  SC6?

23         MR. COLBY:  Correct.

24         THE COURT:  So tab 45, SC6, okay, admitted.

25      (Exhibit SC6 admitted into evidence)

1    BY MR. COLBY:

2    Q    Okay.  Mr. Rajan, if you could keep that binder and go to

3    the next tab, tab 46.  Mr. Rajan, do you see this is document

4    47 on the docket, and it is the Global Notes to the Schedules

5    and Statement and Financial Affairs of Debtors, Stream TV

6    Networks and Technovative Media.  And if you look on page 4 at

7    the very top, you'll see that this is the form for

8    Technovative; do you see that?

9    A    Correct.

10   Q    Okay.  I didn't point it out, but the previous one was the

11   form for Stream TV.  But this one is for Technovative.  And

12   let's go take a look, if you would, at part 10, question 59

13   which is on page 8.  Let me know when you're there, please.

14   A    Yeah, I'm here.

15   Q    Okay.  And question 59 is the same.  Does the Debtor have

16   any interest or intangibles or intellectual property.  And

17   Technovative checked the box no.  Do you see that?

18   A    Yeah, I see it.

19   Q    And that was a true statement when this form was filed

20   with the court in March of 2023, correct?

21   A    Correct.

22   Q    Mr. Rajan, there's been a fair amount of discussion about

23   a license with Phillips.  Are you familiar with the license

24   that I'm talking about?

25   A    Yes, I am.

1    Q    The counter party to the Phillips license is an entity

2    called Ultra-d Ventures, correct?

3    A    Ultra-d Ventures in Curacao, correct.

4    Q    Okay.  And you said in Curacao.  It's a corporation that's

5    domiciled in --

6    A    In the island of Curacao, correct.

7    Q    Okay.  If you would just permit me to finish the question

8    before you start answering, we'll have a cleaner record, and

9    I'll also try not to talk over you.  Is that okay?

10    A    Sure.

11    Q    Okay.  So the Phillips license counter party is not Stream

12    TV, one of the debtors here, correct?

13    A    Correct.

14    Q    And the Phillips license counter party is not

15    Technovative, the other debtor here, correct?

16    A    Correct.

17    Q    All right.  Mr. Rajan, you're taking the position in this

18    proceeding that the Debtors should obtain a temporary

19    restraining order because you claim that SeeCubic of Delaware,

20    SeeCubic Inc., intends to issue sublicenses to its customers.

21    That's your claim here, correct?

22    A    We have a much broader claim than that.  That's not --

23    that's not an accurate description.

24    Q    Is that a basis for your request for a TRO?

25    A    It's not the central basis.  That's -- that's not correct.

1  It's a mischaracterization.

2  Q    Is it a basis or is it not?  I'm not asking if it's the

3  central basis.  Is it a basis for your claim that you need a

4  TRO?

5  A    There's three reasons why we need a TRO.

6           THE COURT:  Mr. Rajan --

7           THE WITNESS:  I -- I don't --

8           THE COURT:  -- he asked you is it 1 -- 1 of 5, 1 of

9  3, 1 of 20.

10          THE WITNESS:  One of maybe 10.

11          THE COURT:  Okay.  So he's saying yes, it's one of

12  several.  Okay.

13          MR. COLBY:  Okay.

14 BY MR. COLBY:

15 Q    And a basis for your -- strike that.  Mr. Rajan, you don't

16 claim to have worked at SeeCubic of Delaware, Incorporated, do

17 you?

18 A    I don't claim that I worked at SeeCubic Delaware, no.

19 Q    Okay.  You don't claim to be a director of SeeCubic of

20 Delaware?

21 A    No, I'm not a director of SeeCubic of Delaware.

22 Q    You don't claim to be working as a consultant to SeeCubic

23 of Delaware?

24 A    No, I'm not a consultant to SeeCubic of Delaware.

25 Q    You don't claim to have any role or affiliation with

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 65 of 294

65

1  SeeCubic of Delaware?

2  A    I don't know what you mean by affiliation.  They're using

3  our technology.

4  Q    I'm asking if you, Mr. Rajan, have a role of any type at

5  SeeCubic of Delaware.

6  A    I don't have any role at SeeCubic of Delaware.

7  Q    You don't claim to have direct firsthand knowledge of the

8  inner operations of SeeCubic of Delaware, do you?

9  A    I have firsthand knowledge of some of the operations at

10  SeeCubic of Delaware, yes, I do.

11  Q    Mr. Rajan, you don't work there, you don't have a role

12  there, you're not a director, you're not a consultant.

13  A    No.

14  Q    You don't have direct, firsthand knowledge of their inner

15  operations, correct?

16  A    No.  I have some firsthand knowledge of their inner

17  operations.

18  Q    What --

19  A    They have used our technology.  They have met with our

20  customers; they're using our employees.  There's been massive

21  interaction even after we won in the Delaware Supreme Court and

22  filed the bankruptcy.

23  Q    Mr. Rajan, I'm asking about your direct firsthand

24  knowledge.

25  A    Yeah, I was directly involved.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 66 of 294

66

1   Q    You described some external activities.  I'm asking if you

2   have direct firsthand knowledge of their internal business

3   operations.

4   A    Yeah, I have knowledge on it.

5   Q    Okay.  And the basis of that knowledge is the use of what

6   you say is your technology?

7   A    The -- I couldn't hear you.  What did you say?  I couldn't

8   hear you.

9   Q    Oh, I'm sorry.  And the basis of your knowledge is what

10  you just articulated in the previous answer --

11  A    The basis of the knowledge is --

12  Q    And if I could finish the question, please?

13  A    Okay, go ahead.

14  Q    I'll withdraw -- I'll withdraw the question.

15       You heard Mr. Stastney testify about the proof of concept

16  projects that are underway at SeeCubic BV, correct?

17  A    Yes, I heard it both in Amsterdam and also in this court.

18  Q    And you're not personally or directly involved in those

19  projects, correct?

20  A    Hang on a second.  We're not involved on the SeeCubic side

21  of the project, no.  There is overlap with our customers.

22  Q    I'm asking you, Mr. Rajan, whether or not you are

23  personally and directly involved in those proof of concept

24  projects.

25  A    I'm aware of it through the customers.

1  Q    I'm asking whether or not you, Mr. Rajan, are personally

2  involved in -- personally and directly involved in those

3  projects.

4  A    I -- I -- I don't understand.  If -- if the customer comes

5  and tells me, and I have discussions with customers that

6  overlap things that SeeCubic of Delaware is working on them

7  with, I'm involved.

8  Q    I'm asking, Mr. Rajan, whether you, and I would appreciate

9  a direct answer to what I hope --

10 A    I -- I --

11 Q    -- is a direct question.  If something is unclear about

12 the question, you can ask me to clarify it, and I'll endeavor

13 to do so.  But I'm asking a direct question, Mr. Rajan, and I

14 appreciate a direct answer.  Are you personally and directly

15 involved in those proof of concept projects?

16 A    Yes, I am.

17 Q    How so?

18 A    Because I've interacted with the customers, I've

19 interacted with the people that have been --

20        THE COURT:  Counsel, asked and answered.  We're going

21 to just sit here.  He asked, he answered.  You don't like his

22 answer, you asked him the question twice, he gave you the same

23 -- three times now.  Ask, answered, move.

24        MR. COLBY:  Well --

25        THE COURT:  Counsel, you need to say something.

1              MR. COLBY:  I appreciate that, Your Honor.  I will --

2    I will --

3              THE COURT:  Move on.  I'm sorry.  I hate to try to

4    tell people how to do their cases, but I'm getting a little

5    irritated here.

6              MR. COLBY:  I understood, Your Honor.  I'm just

7    struggling with what I feel like is a lack of direct

8    responsiveness.

9              THE COURT:  Well, you didn't define what you meant by

10   direct involvement.  He gave you his interpretation.  So you

11   didn't like it.  It was an answer.  Next time, maybe you

12   explain what you mean by what you said and then you'll get a

13   better answer that you want.  All right, let's move.  Sorry.

14   I hope I didn't throw you off your stride.

15             MR. COLBY:  No, no, no problem.

16             THE COURT:  Go ahead.

17   BY MR. COLBY:

18   Q    Mr. Rajan, Stream's position on this is TRO is that

19   potential sub-licensing of the Phillips technology makes it

20   possible that Phillips will revoke its license to the Ultra-D

21   technology, correct?

22   A    No, that's not what I said.

23   Q    It's not what you said?

24   A    No.  What I said was that SeeCubic has told the whole

25   world that they are going to have sub-license.  They have told

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 69 of 294

69

1  their shareholders on page 28 of their PPM that there's license

2  agreements with, in place, with manufacturers to receive

3  payments per unit and per content, and they took money from

4  investors based on that statement.  That is their words in

5  their document, and they've told the whole planet that.  And

6  based on their behavior, and we have a meeting scheduled --

7       THE COURT:  Oh --

8       THE WITNESS:  -- with Phillips.

9       THE COURT:  Do something.

10      MR. COLBY:  Yeah.  I --

11      THE COURT:  I'm sorry.  I'm getting a little

12  frustrated here.

13      MR. COLBY:  Some witnesses exceed my ability to

14  control them, Your Honor, despite my best efforts.

15      THE COURT:  Well, yeah, but you can say, move to

16  strike, and then, I can say stop.

17      MR. COLBY:  I was trying not to interrupt.

18      THE COURT:  But some -- well, counsel, it's a fine

19  line.  You have to figure out --

20      MR. COLBY:  Okay.

21      THE COURT:  -- I'm not trying to tell people how to

22  do these cases, but --

23      MR. COLBY:  I would move to strike that answer as

24  non-responsive, but --

25      THE COURT:  Wait.  Mr. Kodosky, he's moving to strike

1  as non-responsive.  Your response?

2          MR. KODOSKY:  I think that it is responsive, Your

3  Honor.

4          THE COURT:  Sustained.

5          MR. COLBY:  Okay.

6  BY MR. COLBY:

7  Q    Mr. Rajan, I'm just trying to be clear about the basis of

8  your claim for a TRO.  Is it your position, is it the Debtor's

9  position that SeeCubic of Delaware, talking about sub-licensing

10 the Phillips technology, will lead to possibly the cancellation

11 of that Phillips license?

12 A    Yes.  The statements that they have made regarding sub-

13 licensing will lead to the cancellation of Phillips.  They've

14 also done other things like trade secrets and a whole list of

15 other issues regarding the TRO, but their past behavior

16 regarding statements on sub-licensing will lead to the

17 cancellation of our license with Phillips.  And we have a

18 meeting at Phillips' request with Stream TV, and we're hoping

19 to have the TRO, so we don't lose our license in that meeting.

20 Q    Mr. Rajan, let's take a look at that license.  It's

21 already been submitted as Exhibit 3, SC3 -- sorry, it's been

22 submitted SC1.  It's tab 3 in your binder, Mr. Rajan.

23         THE COURT:  Oh, it's tab 3.  Exhibit what, Counsel?

24         MR. COLBY:  It was marked as SC1.  So the ones that

25 you put in the binder don't have the actual numbers on them?  I

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 71 of 294

71

1    guess I'm looking at 3, and I don't see a --

2          MR. COLBY:  Yeah.

3          THE COURT:  -- exhibit number on it.  It's Exhibit 3

4    you said?

5          MR. COLBY:  It's tab 3.  It was marked as SC1 --

6          THE COURT:  Oh, SC1.

7          MR. COLBY:  -- for Secured Creditors 1.

8          THE COURT:  Okay, it's not marked as such in the

9    binder.

10         MR. COLBY:  Right.

11         THE COURT:  Okay.

12         MR. COLBY:  We try not to throw out the big stack of

13   paper and start over every time we --

14         THE COURT:  Well, the first page would've been fine.

15         MR. COLBY:  -- admit exhibits.

16         THE COURT:  It is what it is.

17         MR. COLBY:  Fair point, Your Honor -- fair point.

18   Okay.

19   BY MR. COLBY:

20   Q    So Mr. Rajan, is this the license that you were just

21   discussing?

22   A    Yes.

23   Q    Okay.  Let's take a look at paragraph 5.2, please.  And

24   the page 11, 12 -- it looks like page 13 using the ECF page

25   numbers.  Let me know when you're there, please.

1   A     Yeah, I'm here.

2   Q     Okay.  Mr. Rajan, paragraph 5.2 says,

3         "Without prejudice to Sections 5.3 and 5.4 a party

4         may terminate this agreement at any time by means of

5         written notice to the other party in the event that

6         the other party breaches or otherwise fails to

7         perform any of its obligations under this agreement,

8         provided that such breach or failure is not remedied

9         within 30 calendar days after receipt of a notice,

10        specifying the nature of such failure and requiring

11        it to be remedied."

12        Did I read that correctly?

13  A     Correct.

14  Q     Stream has not received a written notice from Phillips

15  stating that it intends to terminate the agreement, correct.

16  A     We received a notice for a meeting immediately with Stream

17  TV and Ultra-d Ventures, which has the license with Phillips,

18  and we have to discuss this topic and we're praying we have the

19  TRO before that meeting, so we don't receive a notice in the

20  meeting.

21  Q     The notice that you just described, Mr. Rajan, does not

22  state that Phillips intends to cancel the license, correct?

23  A     The notice is to discuss the behavior of the license.

24  That's what it is, and we have to give an explanation before

25  they give us the notice.

1                    THE COURT:  Okay.

2    BY MR. COLBY:

3    Q    Is it correct that that notice does not state an intent to

4    cancel the license?

5                    MR. KODOSKY:  Object.  Asked and answered, Your

6    Honor.

7                    MR. COLBY:  It's a yes or no.

8                    THE COURT:  Counsel, you asked -- you didn't like his

9    answer.

10                   MR. COLBY:  Well, no.  It's not that I don't like it,

11   Your Honor.  It's that it's not responsive, but I think we can

12   all infer that it's a no, and I'll move on.  But you know, I

13   would appreciate a direct answer to a direct, very simple

14   question.

15                   THE COURT:  Okay.

16   BY MR. COLBY:

17   Q    Mr. Rajan, pursuant to this paragraph 5.2, if a notice of

18   an intent to cancel the license is received from Phillips, then

19   the counter party has an opportunity to remedy the breach or

20   failure within 30 calendar days, correct?

21   A    They can try to remedy the breach.  But obviously, we're

22   now in a legal situation where Phillips may not agree to the

23   remedy.

24                   MR. COLBY:  I move to strike.  I think speculation

25   about what Phillips may do is not relevant.  The question was

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 74 of 294

74

1    about whether or not he understands that there's a right to

2    remedy.  The answer is yes.  I think that's all that should be

3    allowed.

4              THE COURT:  So he's moving to strike anything beyond

5    yes or no on what it states in the license --

6              MR. COLBY:  Yeah, he's --

7              THE COURT:  -- which is you have a right to remedy.

8              MR. COLBY:  Yes.

9              THE COURT:  He wants to strike beyond the portion,

10   but Phillips may not.

11             MR. KODOSKY:  Your Honor, I think he should have an

12   opportunity to respond to the question that was presented.

13             THE COURT:  Well, the question is, do they have --

14   sustained.  The questions was do they have a 30-day right to

15   remedy.  That's a yes or no.  And you can redirect on -- if you

16   think something else with respect to that.

17             MR. KODOSKY:  Thank you, Your Honor.

18             THE COURT:  All right.

19   BY MR. COLBY:

20   Q    Is it the Debtor's position in this TRO proceeding, Mr.

21   Rajan, that if Phillips were to find out what SeeCubic was

22   doing, it could revoke the license?

23   A    That's not what I said.

24   Q    I'm asking if it's your position in the case.

25   A    That's not an accurate description.

1              THE COURT:  Wait a minute, that's not -- can you

2    clarify what SeeCubic you're talking about?

3              MR. COLBY:  SeeCubic of Delaware.

4              THE COURT:  Okay, all right.  All right.

5              MR. COLBY:  Thank you, Your Honor.  We sometimes

6    refer to it as SeeCubic, Inc.  I'm going to try to go with

7    SeeCubic of Delaware because it makes it even clearer --

8              THE COURT:  Right.

9              MR. COLBY:  -- which one we're talking about.

10             THE COURT:  Right because you just said SeeCubic, and

11   I'm not as smart as everybody in here.  I'll go back and look

12   at this and say who's he talking about.  Okay.

13   BY MR. COLBY:

14   Q    Mr. Rajan, you were here in court on October 6th, correct?

15   A    Yeah, I was here.

16   Q    And do you recall Debtor's counsel, Mr. Kodosky saying,

17   "If Phillips essentially were to find out what they were doing,

18   they could revoke our license."  Do you recall Mr. Kodosky

19   saying that?

20   A    I do recall that, correct?

21   Q    Okay.  Do you recall Mr. Kodosky saying, "If Phillips

22   finds out what these guys are doing over in the Netherlands,

23   we're done."  Do you recall Mr. Kodosky saying that?

24   A    Yes.

25   Q    And so is it Debtor's position that Phillips is unaware of

1   SeeCubic of Delaware's talk about potential sub-licensing?

2   A    There is a concern of what SeeCubic has done, what

3   SeeCubic has put in writing, what SeeCubic is doing, and that

4   is the basis of a meeting between Phillips and Stream TV that

5   is coming up, where if we don't give a good answer, meaning

6   Stream TV, Technovative, it is our expectation we'll lose the

7   license.

8            MR. COLBY:  I would move to strike the portion of the

9   answer that speculates about what Phillps may or may not do,

10  depending upon the outcome of an upcoming meeting.

11           MR. KODOSKY:  Your Honor, he was asked his opinion

12  about whether or not Phillips knows what's going on over in the

13  Netherlands, and he said that they've got a meeting that if

14  they don't have a good answer, that folks are going to cancel

15  the license.

16           MR. COLBY:  So I was -- so there's a lot wrong with

17  that testimony, including purporting to testify about Phillips'

18  state of mind coming into a meeting that hasn't happened yet.

19  But really what I was asking is about the basis for the TRO and

20  if there is a basis for the TRO that Phillips is unaware of,

21  this talk about sublicensing, and if they learn about it, as

22  Mr. Kodosky said, we're done.  Is that a basis for the TRO.

23  That's all I'm asking.

24           THE WITNESS:  I don't understand your question again.

25  Can you repeat it?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 77 of 294

77

1   BY MR. COLBY:

2   Q    The question is, are you seeking the TRO because Debtor's

3   position is that Phillips is unaware of this sublicensing talk,

4   and if they find out about it, they're going to cancel the

5   license.

6   A    My understanding and Stream TV's understanding as this

7   moment at time, Phillips is aware now of what they've done.

8   Q    Okay.  In fact, you've testified Mr. Rajan, that SeeCubic

9   of Delaware was telling the industry about its plans for the

10  Phillips license for years, right?

11  A    That is my contention based on what Mr. Stastney said in

12  his testimony.  That's in the transcript.

13  Q    Mr. Rajan, you previously testified that the other big

14  issue is basically telling everybody about sublicenses.  Do you

15  recall offering that testimony?

16  A    That's one of the issues.

17  Q    Okay.  And you testified on October 16th that SeeCubic of

18  Delaware had told hundreds of people that they're going to be

19  sublicensing.  Do you recall that?

20  A    More than that.  They have said that they have sublicensed

21  in page 28 of their PPM.

22  Q    Do you recall, Mr. Rajan, stating that SeeCubic of

23  Delaware was causing mass confusion in the market?

24  A    Yes, absolutely I remember that --

25  Q    Okay.

1    A     -- because that's what they're doing.

2    Q     And despite the other -- and your testimony is that

3    SeeCubic of Delaware has been doing this for years, right?

4    A     Yeah, they've been doing it since over three years now.

5    Q     Over three years.  And despite SeeCubic of Delaware

6    telling everybody and hundreds of people, and mass confusion

7    created over three years, up to this point in time, Phillips

8    has not issued any notice that it intends to cancel the

9    license, correct?

10   A     Phillips has scheduled a meeting now, correct.

11   Q     They've scheduled a meeting.  And Mr. Kodosky argued when

12   you were here before, Stream TV has this concern that if

13   Phillips finds out about all this sub licensing talk, it's

14   going to cancel the license.  We're dead is what he said.

15   A     Yes, that is correct.

16   Q     That's your concern, right?

17   A     We will lose the Phillips license.

18   Q     And so you have this concern, Mr. Rajan, that if Phillips

19   finds out about this license or this talk of sublicensing,

20   they're going to cancel the license.  And you, or the Debtors,

21   made multiple public filings in this court raising hue and cry

22   about this sublicensing talk, correct?

23   A     Yes.

24   Q     So you're so concerned that if Phillips finds out about

25   this sublicensing talk, they're going to cancel the license

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 79 of 294

79

1    immediately, that you make multiple public filings in this

2    court with affidavits and briefs, making all kinds of noise

3    about the dangers of this sublicensing talk.  That's what you

4    did, correct?

5    A    Yeah.  We're not going to hide what is happening in the

6    marketplace.  If you're -- if you're inferring that we should

7    hide what they're doing from Phillips, yeah, we don't do

8    business that way.

9    Q    Well, Mr. Rajan, if you were concerned about Phillips

10   finding out about this sub licensing talk, could you have

11   requested to make filings to this court under seal?

12   A    I don't know.  That's a question you'll have to ask our

13   lawyers how that's handled.

14   Q    Okay.

15   A    But you're basically saying we should go hide what they're

16   doing and hiding the activity.  Why does it even have to happen

17   in the first place?

18   Q    Mr. Rajan, I'm testing the credibility of your claim to be

19   concerned that Phillips is going to cancel the license.  And so

20   I'm asking you whether or not, if you were so concerned that

21   they would cancel the license immediately when they found out

22   about this sublicensing talk, that you needed a TRO to prevent

23   that from happening, whether or not you could have minimized

24   the chance of that happening.

25            MR. KODOSKY:  Objection, Your Honor.

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 80 of 294

80

1    BY MR. COLBY:

2    Q    If you could have minimized the chance of that happening

3    by simply making your filings under seal.

4                MR. KODOSKY:  Objection, asked and answered.

5                THE COURT:  Response, Counsel?

6                MR. COLBY:  I'll withdraw it.

7                THE COURT:  Okay.  Go ahead.

8    BY MR. COLBY:

9    Q    Mr. Rajan, as a steward of the Debtor, do you have a

10   fiduciary obligation to minimize the risk that Phillips is

11   going to cancel the license?

12   A    Yes, that's why we're asking for the TRO.

13   Q    Okay.  And consistent with that fiduciary obligation, if

14   you were concerned that they would cancel the license

15   immediately upon finding out about the sublicensing talk,

16   shouldn't you have filed your papers here under seal if that

17   was your real concern?

18               MR. KODOSKY:  Objection, Your Honor, to the extent

19   that this calls for questions, legal strategy, filing of

20   documents under seal.  He's already asked about whether or not

21   the documents should have been filed under seal, if that was a

22   concern, and he provided an answer five minutes ago.

23               MR. COLBY:  I'm asking Mr. Rajan, is it consistent

24   with your fiduciary -- I'll withdraw that question.  I'll re-

25   ask it.

1    BY MR. COLBY:

2    Q    Would it have been consistent with your fiduciary duty to

3    minimize risk to the Debtor.

4    A    I'm not going to go --

5    Q    If I could finish the question.  Would it have been

6    consistent with your fiduciary duty to minimize that risk to

7    the Debtor, that risk that you say is imminent and irreparable

8    and fatal, would it have been consistent with your fiduciary

9    duty to minimize that risk by making your filings here in a way

10   that didn't draw as much attention to the issue as you did?

11   A    I'm not going to go defraud Phillips and hide stuff from

12   Phillips and start trying to hide what has happened.  That's

13   not the way to be a good business partner.  Whatever happened,

14   happened.  We -- unfortunately, you know, under the bankruptcy

15   rules, if you look at it, because we're in bankruptcy, they

16   shouldn't be anywhere near the estate.  If you look at Rule 39B

17   and 51B because the Netherlands owes us 60 million.  The

18   bankruptcy court does actually have jurisdiction on the

19   Netherlands.  They shouldn't be anywhere near it.  We'll take

20   responsibility for whatever happened.  It shouldn't have

21   happened, even though it's their actions.  And we will tell

22   Phillips we have TRO, and the problem's been stopped.  But if

23   you're asking me to go defraud Phillips and hide it from the

24   whole industry, yeah, we can't do that because they've told

25   everybody.  Phillips is going to find out anyway and they've

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 82 of 294

82

1   already -- it looks like they've already found out.

2   Q    Mr. Rajan, is it your position that the Phillips license

3   permit Phillips to cancel that license because somebody is

4   talking about potential future sublicensing.  Is that your

5   position?

6   A    Yes.

7   Q    Okay.  And your position is that somewhere in that

8   document, there's a provision that says if you talk about

9   sublicensing in the future, we can cancel this.

10  A    You're offering something to customers you don't have the

11  ability to offer.  There was an opportunity for parallel

12  licensing.  There were supposed to be a name submitted to

13  Phillips that Phillips pre-approved.  And their documentation

14  to SeeCubic says they're going to sublicense the whole

15  industry.  They even have documentation on page 28 of the PPM

16  saying they already have licensing agreements with

17  manufacturers in place to be paid per unit and per content. And

18  in the Amsterdam court, Mr. Stastney was much bolder on what

19  deal -- he said he had deals in place.  He was working with 11

20  to 12 companies.  He was making all kinds of broad statements

21  in that court.

22  Q    Mr. Rajan, I'm trying to get some clarity on your claim

23  here.  I understand you to be saying that if SeeCubic of

24  Delaware were to actually issue a sublicense in contravention

25  of what you say is permissible under the licensing agreement,

1  that would be grounds for cancellation.  Do I understand that

2  as part of your claim here?

3  A    A small piece of it.

4  Q    Okay.  A small piece, okay.  And what I'd also like to

5  understand is whether or not you're claiming Phillips has the

6  right -- let's say none of those sublicensees have happened,

7  and somebody's just talking about sublicensing.  Is it your

8  position that Phillips has the right to cancel the license

9  because somebody's talking about potential future sublicensing.

10  A    Yes, because names were supposed to be submitted for

11  parallel licensing, which is not sublicensing and you're giving

12  mass misrepresentation to the whole industry regarding

13  Phillips' technology that you can offer Phillips technology to

14  a wide range of people that Phillips didn't agree to under

15  terms and conditions they didn't agree to.  So you're precluded

16  from that.  That's not how you do business.

17  Q    I would move to strike everything after the word "yes" as

18  non-responsive to my question.

19          MR. KODOSKY:  Your Honor, he asked is it your

20  position, and he said, yes, it's Plaintiff's position.

21          THE COURT:  I'll allow it.

22          MR. COLBY:  Okay.

23          THE COURT:  It was an open-ended question.  It wasn't

24  a yes or no.  All right, overruled.

25  BY MR. COLBY:

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 84 of 294

84

1   Q    Mr. Rajan, let's take a look at the next tab, tab 4.   And

2   this is the 2014 amendment to the Phillips license agreement

3   that was previously admitted as SC2.   When's your meeting with

4   Phillips, by the way, Mr. Rajan?

5   A    Coming up in -- I've got to go look at my calendar.   I

6   think it's coming up in two -- two and a half, maybe three

7   weeks.

8   Q    Three weeks?

9   A    Two to three weeks, something like that.

10  Q    You don't know though?

11  A    I've got to go back and look.   It's on the calendar

12  somewhere.

13  Q    All right.   So do you recognize this exhibit, SC2, Mr.

14  Rajan?

15  A    Yes.

16  Q    And this is a 2014 amendment between Phillips and Ultra-d

17  Coopertif; do you see that?

18  A    Yes.

19  Q    And this amendment, in connection with SC1, they embody

20  the current terms of the licensing arrangement with Phillips,

21  correct?

22  A    They have adjustments to it.   I don't know if it's a

23  complete embodiment, but there's adjustments to the terms.

24  Q    Right.   The amendment adjusts the slices --

25  A    Some of the terms --

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 85 of 294

85

1   Q   -- that we just looked at.

2   A   -- yes, correct, some of the --

3   Q   Yeah, correct.

4   A   -- terms, correct.

5   Q   Okay.  I just want to make sure we're --

6   A   No, no, no --

7   Q   -- talking about --

8   A   -- that's correct.

9   Q   -- the Phillips license.

10  A   No, that's correct.

11  Q   Okay.  These are the current terms of the Phillips license

12  between these two documents, correct?

13  A   Just some of the terms.

14  Q   Yes.  Who signed this document, Mr. Rajan?

15  A   My brother signed it, and Stream TV paid the fees.

16  Q   Okay.  Your brother, Roger Rajan (phonetic).

17  A   Correct.  He signed the original one, too, and Stream TV

18  paid the fees.

19  Q   2.15A, parallel license arrangements.  Do you see that?

20  A   Yes.

21  Q   And that states, "The parties both acknowledge that for

22  certain applications and uses of 3D technology, third party

23  users may need to obtain a license under the intellectual

24  property rights related to 3D display technology, conversion,

25  and rendering technology, and 3D video format of Ultra-D, which

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 86 of 294

86

1    is defined as Ultra-D technology, and under intellectual

2    property rights related to 3D display technology of Phillips

3    defined as Phillips technology.

4    A    Correct.

5    Q    The parties both confirm their willingness to offer

6    licenses under said respective, intellectual property rights

7    with respect to such applications and uses to third party users

8    on reasonable conditions.

9    A    Correct.

10   Q    And that provision is a current term of the licensing

11   agreement between Phillips and this Ultra-d -- this is one of

12   the Dutch subsidiaries, correct.

13   A    One of the Dutch subsidiaries, but in this agreement it

14   was moved to Curacao.

15   Q    Right.  So that was the other thing, just a matter of

16   housekeeping.  One of the effects of this amendment is it

17   changed the counter party from the Curacao entity we previously

18   discussed.  No, sorry from this Dutch entity, Ultra-d Coopertif

19   to the Curacao entity --

20   A    Correct.

21   Q    -- we previously discussed, right.

22   A    And Curacao and the affiliates are allowed to use the

23   technology.

24   Q    And the Curacao entity, just for the sake of housekeeping,

25   is Ultra-d Ventures, correct?

```
 1   A     Yeah.  That's upstream from the Netherlands companies.

 2   Q     Right.  So now that we've got that entity housekeeping out

 3   of control, this provision, 2.15, parallel license

 4   arrangements, that is the current, that is a current term of

 5   the Phillips license, correct?

 6   A     Correct.

 7   Q     And you previously made a reference to needing to provide

 8   names when talking about licensing or additional licenses.  Do

 9   you recall that testimony a few minutes ago?

10   A     Yeah, it says it one paragraph, two paragraphs below, both

11   parties will agree to a list.

12   Q     Hold on, hold on, let me ask you a question.  Sorry to

13   interrupt.  We're going to the same place.

14            THE COURT:  Wait a minute.

15            MR. COLBY:  We're going to the same place.

16            THE COURT:  Let him ask the question.

17   BY MR. COLBY:

18   Q     Let me ask the question.  Okay.  So I was going to ask,

19   Mr. Rajan, that reference you made to needing to submit names,

20   that is a reference to the subsequent -- let's see, if we go,

21   let's just orient ourselves, okay.  Let's go to the next page.

22   A     That's --

23   Q     Oh, you're going two paragraphs down.

24   A     Yeah, two paragraphs down, 215A --

25   Q     Right.
```

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 88 of 294

88

1    A    -- go down to the bottom of the page.

2    Q    Yep.  And rather than read the whole thing, there is a

3    process here whereby the Ultra-D counter party can identify

4    parties who may need these additional licenses, and they can

5    share terms for those licenses, and Phillips will negotiate

6    those licenses, correct?

7    A    No.

8    Q    Okay.  Well, tell me what this reply is then.

9    A    You have to agree to the names.

10   Q    Yeah.

11   A    Then if you agree to the names, it's parallel licensing.

12   Stream will have its negotiations.  Phillips will have a

13   separate negotiation, and Phillips gave a very broad license to

14   Stream TV, which was unique.  I don't believe any other company

15   got the entire Phillips portfolio.  There was company allowed

16   to look at the portfolio on a subcontracting basis, another

17   Dutch company, but they never gave such a broad license to

18   anybody.  So they may decide they only give partial licenses to

19   people, not the full license.

20   Q    Okay.  But without reading all this language, there's a

21   process by which the Ultra-D counter party can bring third

22   parties to Phillips for the purposes of negotiating these

23   additional licenses, correct?

24        MR. KODOSKY:  Objection, Your Honor.  He's saying

25   without reading all this language, but the language says that

1   it should be done within 30 days after the signing date.

2           MR. COLBY:  I'm just --

3           MR. KODOSKY:  So he's --

4           MR. COLBY:  -- trying to get the witness' --

5           MR. KODOSKY:  -- asking the witness to not read the

6   language and agree to a question that is addressed by the

7   language that he doesn't want to read.

8           MR. COLBY:  I'm not, we can go through -- we can go

9   through --

10          THE WITNESS:  We -- we couldn't get there on the

11  names.

12          MR. COLBY:  I'm asking for Mr. Rajan's --

13          THE COURT:  Wait a minute, wait a minute.

14          MR. COLBY:  -- understanding, and he's entitled to do

15  that.  If Mr. Kodosky wants to do it, he should probably do it

16  in closing argument, but I'm asking Mr. Rajan's understanding.

17          THE COURT:  No, no, no, no.  His objection is that

18  you say without reading all this language --

19          MR. COLBY:  I was, correct.  I was --

20          THE COURT:  -- that --

21          MR. COLBY:  -- trying to avoid reading all those --

22          THE COURT:  -- right.

23          MR. COLBY:  The witness is free to.

24          THE COURT:  Right.

25          MR. COLBY:  I should make that clear.

```
 1              THE COURT:  Right.  So then after reading all of this

 2   language, read it to yourself.

 3              MR. COLBY:  Yeah, yeah, absolutely.

 4              THE COURT:  Then what.  So read it and then let him

 5   read it, and then you ask your question.

 6              MR. COLBY:  Correct, thank you.

 7              THE COURT:  It was the phrase it --

 8              MR. COLBY:  I wasn't intending to suggest the witness

 9   shouldn't read it.

10              THE COURT:  I know, but it came out that way.

11              MR. COLBY:  I was just trying to save myself.

12              THE COURT:  Okay.

13              THE WITNESS:  We -- we couldn't get there on the

14   names, so this provision of parallel licensing is now defunct.

15   We can't parallel license.  Phillips wouldn't agree to any

16   names.  They tried to do it.  There was just too much conflict

17   -- too much risk.  They wanted us to make the chips and the

18   film and have people in the industry buy our chips and films,

19   and they were scared of, like I said in my earlier testimony --

20              THE COURT:  Mr. Rajan, I'm going to cut you off,

21   okay?

22              THE WITNESS:  Yeah.

23              THE COURT:  His question is, after reading these

24   documents, these paragraphs --

25              THE WITNESS:  Correct.
```

1            THE COURT:  -- there was a process by which third

2    parties would be brought to Phillips.  Is that what your

3    question was --

4            MR. COLBY:  Yeah.

5            THE COURT:  -- or am I making up my own question.

6            MR. COLBY:  No, no, that's it.  That's it.

7            THE COURT:  All right.  So after reading this, do you

8    agree that there was a process by which third parties were to

9    be brought to Phillips for this parallel licensing?

10            THE WITNESS:  Ater you agree to the names first?

11    BY MR. COLBY:

12    Q    Okay.  And let's go down to the last paragraph of that

13    2.15A.  So it's right above 2.15B.

14            THE COURT:  Where are we at, Counsel?

15            MR. COLBY:  I'm --

16            THE COURT:  Are you on the next page, or --

17            MR. COLBY:  No, same page.  Right -- the full

18    paragraph right in the middle of the page.

19            THE COURT:  In the event --

20            MR. COLBY:  It's, "The parties acknowledge,"

21            THE COURT:  Oh, wait a minute.  The first paragraph?

22            MR. COLBY:  We're on the next page now, Your Honor,

23    from --

24            THE COURT:  Page number where at the top?  All these

25    pages are --

```
 1              MR. COLBY:  It's all blurred, but you're there.

 2              THE COURT:  Page 43?  No, I don't know.  Yeah, 43 of

 3   269

 4              MR. COLBY:  Mine is all blurry.  Yeah, that' looks

 5   right.  That looks right.

 6              THE COURT:  And the second full paragraph, "The

 7   parties acknowledge,"

 8              MR. COLBY:  The parties acknowledge.

 9              THE COURT:  Okay.

10              MR. COLBY:  All right.

11   BY MR. COLBY:

12   Q    So Mr. Rajan, this one I will read because it's a little

13   shorter.  "The parties acknowledge that third parties are free

14   to approach Phillips concerning a license under the Phillips

15   technology and/or Dolby, concerning a license under the Dolby

16   3D technology directly."  Did I read that correctly?

17   A    Yeah.  They have people approach them all the time.

18   Q    All right.  And that's a current provision of the license

19   agreement between Phillips and Ultra-d Ventures, correct?

20   A    Correct.

21   Q    All right.  So Mr. Rajan, in this TRO proceeding, you

22   claim that Stream is going to suffer imminent harm because

23   SeeCubic of Delaware you claim is unlawfully using the Ultra-D

24   technology; is that correct?

25   A    Yes.
```

1    Q    And that's why you want this immediate urgent relief,

2    correct?

3    A    One of the reasons, correct.

4    Q    Isn't it true, Mr. Rajan, that you have been -- Stream has

5    been making that same claim since 2022?

6    A    That they're unlawfully using our technology?

7    Q    Yes.

8    A    Yeah, correct.

9    Q    So this is an issue.  This is a claim that you've been

10    making since 2022?

11    A    Right.

12    Q    And in the court of chancery proceedings that we've talked

13    about here, in 2022, there was a receiver appointed, correct?

14    A    Correct.

15    Q    And the way the receiver worked was that either Stream or

16    SeeCubic of Delaware could make project proposals for SeeCubic

17    BV to work on, correct?

18    A    No.

19    Q    Your testimony is that the parties weren't allowed to make

20    project proposals to the receiver?

21    A    The receiver said he didn't -- Stream TV's understanding

22    in its due diligence, the receiver approved no projects by

23    SeeCubic of Delaware.  The engineers were allowed to play

24    around with the technology in the office.

25    Q    Okay.

 1             MR. COLBY:  I move to strike that as non-responsive.

 2  BY MR. COLBY:

 3  Q    My question is about the process that was put in place,

 4  Mr. Rajan.

 5             THE COURT:  His response.

 6             MR. COLBY:  Oh, I'm sorry.

 7             THE COURT:  He's moving to strike the answer as non-

 8  responsive.

 9             MR. KODOSKY:  Again, Your Honor, he was asked what

10  the receiver did, and he explained what his understanding of

11  what the receiver had done with regard to projects.

12             MR. COLBY:  I can restate the question if it was

13  imprecise.

14             THE COURT:  Restate the question.  Just --

15  BY MR. COLBY:

16  Q    Mr. Rajan, the way that the receiver process worked was

17  that either Stream or SeeCubic of Delaware could make project

18  proposals for SeeCubic BV to work on correct work on, correct?

19  A    Work on internally, you mean.  I -- I don't know what you

20  mean by work on.  You've got to be more specific.

21  Q    Okay.  By that I mean do things involving the technology

22  to improve it or to develop it or potentially commercialize it,

23  or whatever.  They could do the engineering things that they

24  do.

25  A    No, no, no, you've got to be more specific.  Are you

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 95 of 294

95

```
 1   talking about sending samples out or are you talking about they

 2   were doing experiments in the office?

 3   Q    I'm really actually asking about the process with the

 4   receiver.  Could the parties make proposals to the receiver for

 5   any of those types of things, and the receiver would decide

 6   whether or not it should go forward.  Was that the process?

 7   A    You're mischaracterizing the process -- you're wrong.

 8   Q    I'm asking you a question.

 9         THE COURT:  Okay, he's saying no.

10         THE WITNESS:  The answer's no.

11   BY MR. COLBY:

12   Q    Just say that, okay.

13   A    If you want a yes or no, it's a no.

14   BY MR. COLBY:

15   Q    So your position is that the parties were not permitted to

16   make proposals to the receiver.

17   A    Not SeeCubic of Delaware.

18   Q    Okay.  Let me come back to that, Mr. Rajan.  Your position

19   is that Stream was permitted to make project pitches to the

20   receiver, but SeeCubic of Delaware was not?

21   A    The process with the receiver is much more elaborate than

22   that.  And I'd like to add that Technovative got sued by

23   Rembrandt because the --

24         THE COURT:  All right, whoa --

25         THE WITNESS:  -- process wasn't managed well.
```

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 96 of 294

96

1          THE COURT:  -- whoa.  I think he's already answered

2   that it was Stream, and that SeeCubic couldn't.  Asked and

3   answered.  What's the new question.  Mr. Colby, what's the new

4   question?  How about who else was allowed to submit proposals.

5   He said Stream was.

6          MR. COLBY:  Yeah.

7          THE COURT:  Not SeeCubic, Inc.

8          MR. COLBY:  I guess --

9          THE COURT:  Well, who was?

10          MR. COLBY:  Well, I'll ask the question.

11   BY MR. COLBY:

12   Q    It's not quite where I was going, but who else was allowed

13   to make proposals, Mr. Rajan, to the receiver?

14   A    SeeCubic of Delaware was allowed to make proposals to the

15   extent the engineers in the Netherlands were allowed to do

16   experiment inside their offices.  And the situation got out of

17   hand.  That's why the lawsuits were filed.

18          THE COURT:  All right.  So yes, they were submit.

19   They were allowed.

20   BY MR. COLBY:

21   Q    Okay.  What I'm really getting at, Mr. Rajan, is you were

22   aware back in 2022 that the receiver was allowing SeeCubic to

23   use and demonstrate the debtor's technology for its own

24   benefit, correct?

25   A    No.  That's why there was a lawsuit.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 97 of 294

97

1  Q    Mr. Rajan, you're claiming you need this TRO now in order

2  to stop what you say is an immediate urgent problem.  You were

3  aware that that situation existed, that that conduct that you

4  say is dangerous to the company was taking place in 2022,

5  correct?

6         MR. KODOSKY:  Objection.  Asked and answered, Your

7  Honor.

8         MR. COLBY:  It's a different question.

9         THE COURT:  Okay.  And it's different because?

10        MR. COLBY:  Because I put a lot more drama into it.

11        THE COURT:  Objection sustained.  You already asked

12  him that.  He said yes he was aware.  Yeah, you're getting a

13  little dramatic here.  I'm surprised.

14  BY MR. COLBY:

15  Q    You know, we've been doing this a long time.  Somebody has

16  to.  All right.  Well, you say -- Mr. Rajan, do you recall

17  filing a first day declaration in this case?

18  A    Yes.

19  Q    Let's take a look at tab 39 of the binder in front of you.

20        THE COURT:  Which number, counsel?

21  BY MR. COLBY:

22  Q    Sorry, tab 39.  Mr. Rajan, do you recognize this document?

23  A    Yes.

24  Q    Did you sign it under penalty of perjury?

25  A    Correct.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 98 of 294

98

1    Q     Let's take a look at paragraph 93.

2              THE COURT:  What page number is that, counsel?

3              MR. COLBY:  That is on page 25 of the ECF pagination.

4              THE COURT:  It was 25 of 31?

5              MR. COLBY:  Correct.

6              THE COURT:  All right.  Paragraph what?

7    BY MR. COLBY:

8    Q     Ninety-three.  Mr. Rajan, you stated in that declaration

9    under penalty of perjury,

10             "The receiver has allowed SeeCubic to retain and even

11             take possession of certain debtor assets even after

12             issuance of the chancery court status quo order is

13             allowed SeeCubic to use and demonstrate the debtor's

14             technology for its own benefit even though the debtor

15             has legal title to the intellectual property and has

16             not given any license to SeeCubic that would allow it

17             to do so."

18             Do you see that?

19   A     Yes, I do.

20   Q     And so, this same issue that you're claiming warrants the

21   same concern, the issue that you claim warrants the issuance of

22   an immediate urgent TRO here you were aware of at least in

23   March if not at the prior time period in 2022 that you were

24   describing here, correct?

25   A     I was aware that they were using he samples, and Rembrandt

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 99 of 294

99

1   sued.  We had to because of the new rules of the bankruptcy

2   filing and adversary complaint and the TRO has gone --

3              MR. KODOSKY:  Objection.  Move to strike.

4              THE COURT:  The question is were you aware of -- you

5   phrase the question.  I'm not even going to try to rephrase it.

6   BY MR. COLBY:

7   Q    The same issue, the use of debtor assets that you say

8   warrants this emergency TRO proceeding, you were actually aware

9   of weeks into March if not earlier in 2022 when that conduct

10  was taking place, correct?

11  A    Oh, yeah.  They were doing illegal things back then.

12  Q    And you knew it, correct?

13  A    Yeah.  They were doing illegal things.

14  Q    Okay.  And you didn't seek a TRO when you filed this

15  declaration in March, did you?

16  A    We filed a turnover action.

17  Q    Did you filed a TRO?

18  A    We filed a turnover action because we thought we -- and

19  then we had to file an adversary because the rules have

20  changed.

21  Q    And you filed the turnover action in August, correct?

22  A    No.  We filed back in April.  When did we file the -- we

23  filed turnover back in April.

24  Q    Sufficient to say there was no request for immediate

25  urgent injunctive relief in the form of a TRO back in March

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 100 of 294

100

1    when you made this statement in your first day declaration,

2    correct?

3    A     No.   Our attorney was asking for the turnover of the

4    assets.

5    Q   Now Mr. Rajan, you -- the turnover action that you're

6    referring to is in the adversary proceeding that you filed,

7    correct?

8    A     No.   We filed a turnover, and you asked us to file an

9    adversary because it was changed.

10          MR. KODOSKY:   Your Honor, I think there might be a

11   disconnect here to the extent that he's asking about the

12   emergency motion that was filed by the debtors, that was put

13   into abeyance and there's a hearing scheduled for November

14   15th.   I believe that that's what the witness is referring to

15   as opposed to the adversary complaint that was filed in August.

16          THE COURT:   Okay, so we're talking about -- there was

17   a request to turn over the bonding equipment at some point.

18          THE WITNESS:   It was everything.

19          MR. COLBY:   Simple point, I'll take the witness's

20   answer for what it is.   It was just that there was no TRO

21   action filed in March or during this period in 2022 that's

22   described in the first day declaration that we just discussed.

23          MR. ZAHRALDDIN:   Your Honor, objection.   I'd like to

24   clarify the record if I may.   We did file an emergency motion

25   for enforcement of the stay against all activity regarding the

1   debtor's estate.  Everything, not just the bonding equipment.

2   It was filed.  It was vociferously objected to.  We decided --

3   Your Honor said hey, you guys need to stop bringing things on

4   an emergency basis.  You put it into abeyance.  It's been

5   sitting in abeyance, and it was finally, through discussions

6   with your chambers, set for November 15th.  But to say that

7   this is a brand-new issue.  It's not our fault that the motion

8   went into abeyance and there were intervening issues with both

9   yourself and with Mr. Rajan.  But to say that we didn't think

10  this was a problem, we did.  We filed it.

11         THE COURT:  All right.  And is the one that never --

12  never mind.  So for some reason, the clerks all -- no.  I'm not

13  going to throw anybody under the bus.

14         MR. ZAHRALDDIN:  I think you're correct, Your Honor.

15         THE COURT:  Well, we didn't get it.

16         MR. COLBY:  We're getting lost.

17         THE COURT:  But I understand the point.  The point

18  is that there was some emergency request.

19         MR. ZAHRALDDIN:  Fair enough.

20         THE COURT:  But not in the form of a TRO.

21  BY MR. COLBY:

22  Q    And just to round this out, Mr. Rajan, at the -- you were

23  aware of this ongoing conduct at the time you filed that first

24  day declaration March 28th, correct?

25  A    Yeah.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 102 of 294

102

1    Q    You said it right here, okay.  And you didn't seek a TRO

2    to prevent the receiver from allowing this to happen in the

3    chancery court proceedings, did you?

4    A    Rembrandt sued him.  Rembrandt sued the Technovative and

5    they were going to go after the receiver and because of what

6    was happening illegally.

7    Q    So that's a no.  Stream TV didn't seek to address this

8    conduct that you say the receiver was allowing in the chancery

9    court, correct?

10   A    Stream TV did not sue Technovative, no.

11   Q    Okay, thank you.  But you've known about this SeeCubic use

12   and demonstration of the debtor's technology since at least

13   2022, correct?

14   A    They've been using our technology for a long time, even

15   before 2022.

16   Q    And you've known about it for that long, correct?

17   A    Yes.  The trade secrets, the danger we've now found out.

18   Q    Let's talk about the potential sublicensing.  Mr. Rajan,

19   you've known about the potential sublicensing since 2022,

20   correct?

21   A    2022?  In the fall of 2022, late 2022.

22   Q    Last time you were here you testified that you were

23   approached to invest in SeeCubic of Delaware in the winter of

24   2022 and were provided the PPM.

25   A    In a meeting.

1    Q    I'm sorry.  Let me finish the question please.  You were

2    approached in the winter of 2022, and among other things,

3    provided the PPM that you were talking about?

4    A    Correct.

5    Q    About this potential sublicensing business plan since at

6    least the winter of 2022, correct?

7    A    Correct.

8    Q    And despite your view that this talk of sublicensing could

9    lead to an immediate cancellation of the Phillips' license, you

10   didn't seek a TRO to restrain this sublicensing talk back in

11   2022, correct?

12   A    Yeah.  We didn't sue Technovative.  Rembrandt sued

13   Technovative.

14   Q    I'm not asking about suing Technovative.  I'm asking if

15   the debtor and confirming that the debtor, despite what you say

16   is the imminent harm created by this sublicensing talk --

17   A    The debtor --

18   Q    -- did not seek a TRO when you learned of this

19   sublicensing talk in at least the winter of 2022, correct?

20           MR. KODOSKY:  Objection.  Asked and answered.

21           THE COURT:  Response?  He said objection, asked and

22   answered.

23           MR. COLBY:  Yeah.  I didn't get an answer.  He said

24   Rembrandt -- he -- it was a non-sequitur.  He said Rembrandt

25   sued Technovative.  I'm not asking about Technovative.  I'm not

1   asking about Rembrandt.

2           THE COURT:  Nonresponsive.  He said it was

3   nonresponsive.

4           MR. COLBY:  It was nonresponsive.

5           THE COURT:  All right.  Did you or did you not, you

6   Stream --

7           THE WITNESS:  Technovative.

8           THE COURT:  No.  We're not talking --

9           THE WITNESS:  No.

10          THE COURT:  Did Technovative do anything?

11          THE WITNESS:  Technovative was back then breaking the

12   rules, so Stream would have to sue Technovative, its own

13   company, which we didn't want to do, so somebody else sued

14   Technovative.

15          THE COURT:  So the answer is no you did not?

16          THE WITNESS:  We didn't sue Technovative.

17   Technovative was the one causing the problem.

18          THE COURT:  Okay.  So you didn't do a TRO.  That's

19   the answer?

20          MR. KODOSKY:  That's the answer.

21          THE COURT:  And that somebody else sued?

22          THE WITNESS:  Somebody else sued Technovative,

23   correct.

24   BY MR. COLBY:

25   Q    Mr. Rajan, the hospitalization that you referred to

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 105 of 294

105

1    earlier, that was in May, correct?

2    A    Yeah.

3    Q    And prior to that, a minute ago you referenced the trip to

4    the Netherlands where you discovered the lack of protections

5    around trade secrets.  That was in April, correct?

6    A    There was discussions regarding security and concerns of

7    security when the receiver was there.  Then after bankruptcy,

8    we immediately went to the Netherlands twice and we did

9    inspection regarding the security issue and the devices

10   regarding the content, and it may have been in both March and

11   April.

12   Q    Okay.  So when we were here last on direct examination,

13   you described what you said was an investigation into the

14   supposedly lack of security  procedures around the intellectual

15   property in the Netherlands.  That investigation -- well, first

16   of all, do you recall that testimony?

17   A    That's incorrect what I said.  I said something more

18   specific.

19   Q    Okay.  Tell me -- I just want to make sure we're talking

20   about the same thing, Mr. Rajan.  You referenced an

21   investigation last time.  You can describe that investigation

22   in your own words if you'd like.

23   A    The concern was that the content on the devices and also

24   for some of the contempt companies was not secure.  There was a

25   concerned voiced by the -- to -- from Stream -- for Stream TV

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 106 of 294

106

1   by the receiver and a number of the engineers in the

2   Netherlands.  They were being forced in that position by

3   SeeCubic of Delaware, and --

4   Q    Object to the hearsay.  Sorry to interrupt, but I'm trying

5   to keep us on track.  I'm just trying to --

6   A    Yeah.  I'm trying to describe the investigation.  You

7   asked me to describe the investigation.

8   Q    I think -- I just want to -- what you did.  You went to

9   the Netherlands and you --

10  A    Are you asking me to describe the investigation?  It's not

11  just what I physically did.  It's all the analysis.  That's all

12  part of the investigation.

13  Q    Okay.  So --

14          THE COURT:  So you asked him to describe the

15  investigation.

16  BY MR. COLBY:

17  Q    I did, and I said in your own words, and I will live to

18  regret it for the rest of the day.  But proceed, Mr. Rajan,

19  proceed.

20  A    Yeah.  So the receiver voiced concerns.  The engineers

21  voiced the concerns regarding the context by -- and they were

22  put in that position by the management of SeeCubic of Delaware.

23  So when we went to the Netherlands, we went and inspected the

24  AK Tv's, we inspected their automotive units.  We also had

25  discussions regarding content.  We reviewed all their security

1   protocols regarding specifically on the content what I

2   testified to and was verified both in the Netherlands.

3          If you remember when I brought the TV here, there's

4   security cables put into the devices.  Those -- tech -- the

5   units in the Netherlands for the AK did not have protection for

6   the content.  The gaming content was opened up and also the

7   automotive unit, the content was also opened up.  And that is

8   one of the trade secret claims that Rembrandt has made, the

9   protection -- the ability to make content, pre-converted

10  content.  And we have technology for that.

11         It was exposed on those devices.  The engineers and

12  the receiver said the units are not even safe.  That's why he

13  didn't want it to leave the Netherlands.  And that's where the

14  concerns about the Netherlands, what was happening in the

15  Netherlands, that they're forced to have samples that were

16  trade secrets.  And it was very disturbing that content

17  companies were mapping to the device because the quality of the

18  samples was substandard compared to stream tv.  So they're

19  trying to use the content to fix the devices.

20         So we inspected the units.  The did not have the

21  security protocols that Stream TV implemented.  And they

22  management team of SeeCubic of Delaware, including Mr. Stastny,

23  or maybe it was other people on the team, thought it was a

24  great idea.  And now they have exposed the content --

25         THE COURT:  All right.  I've allowed enough.  So you

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 108 of 294

108

 1  did the inspection.  You came in.  You saw the content wasn't

 2  protected.  No security cable.  No --

 3          THE WITNESS:  Security inscription.

 4          THE COURT:  So things were exposed and that was what

 5  the investigation revealed.

 6          THE WITNESS:  Correct.

 7          THE COURT:  So that was the investigation.

 8  BY MR. COLBY:

 9  Q    Mr. Rajan, this is really all I wanted to establish.  You

10  engaged in that investigation in March and April, correct?

11  A    The  physical inspection, correct.

12  Q    Okay.

13  A    But we were doing work to that prior and afterwards.

14  Q    And you said --

15          THE COURT:  Mr. Rajan, can you limit your answers to

16  the question?  Your counsel will get to redirect.

17          THE WITNESS:  Oh, sorry.

18          THE COURT:  So just ask, did you engage in the fifth

19  -- in that investigation in March and April of 2020 --

20          MR. COLBY:  Three.  This year.

21          THE COURT:  Okay.  Yes or no?

22          THE WITNESS:  The physical portion, correct.

23  BY MR. COLBY:

24  Q    Okay.  And Mr. Rajan, you said we.  Who's the we you were

25  referring to there?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 109 of 294

109

1  A    I did it along -- I had looked at it.  Bud Robertson had

2  looked at it.  And I was conferring with some of our engineers

3  outside the Netherlands regarding what we do to fix this

4  situation.  And then was having discussions with the

5  Netherlands on how to help them fix this situation.

6  Q    No.  I'm just asking you who the we was you're referring

7  to.

8  A    It was also a bunch of our engineers.

9  Q    Okay.

10  A    That are working on the Stream projects right now, not the

11  Netherlands people.

12        THE COURT:  Okay.  So it was Bud Robinson, outside

13  engineers, and SeeCubic B.V. engineers, correct?

14        THE WITNESS:  Yeah.  Outside of the -- well, no.  It

15  was mainly outside of the Netherland engineers.  I was giving

16  the Netherlands people ideas on how to fix it.

17        THE COURT:  Okay.  So Bud Robinson and outside

18  engineers, correct?  Okay.

19  BY MR. COLBY:

20  Q    Okay.  So Mr. Rajan, your claim here is that what you say

21  are a lack of intellectual property protections is a grave

22  concern of yours that you think could lead to imminent harm,

23  correct?

24  A    It's already lead to imminent harm.  It's been leaked.

25        THE COURT:  Yes or no.

1              THE WITNESS:  Yes.  Yes, it's already lead to it.

2    BY MR. COLBY:

3    Q    Okay.  And despite your having this grave concern and

4    conducting this investigation in March and April, you did not

5    come here and seek a TRO related to these supposedly lack of

6    trade secret protections until September, correct?

7    A    We filed an injunction first.  We had an injunction.  It

8    got switched to a TRO.

9    Q    That filing occurred in September, correct?

10   A    Who?

11             THE COURT:  Woah.  He asked you did you file for a

12   TRO in March --

13             MR. COLBY:  In September.

14             THE COURT:  And September.

15             THE WITNESS:  In September it switched to a TRO from

16   an injunction.

17   BY MR. COLBY:

18   Q    Isn't a TRO is what you're seeking an injunction?

19   A    No.  We were asking for a PI originally.

20   Q    Right.  And that's the filing you made in the district

21   court here?

22   A    Eastern district court.

23   Q    Eastern district.  That was also in September, correct?

24   A    No.  I thought it was in August.

25   Q    TRO filing?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 111 of 294

111

1          MR. ZAHRALDDIN:  Objection, Your Honor.  Again, I

2  think the witness is getting the legal, the docket confused and

3  you're asking for legal conclusions.

4          MR. COLBY:  I'm not asking for legal conclusions.

5          THE COURT:  Well, wait a minute.  Wait a minute.  You

6  asked him did he file the TRO in September.

7          MR. COLBY:  Yeah.

8          THE COURT:  And his answer is I thought we filed it

9  in August, an injunction.

10          MR. COLBY:  Correct.  And so, I just want to follow

11  up on that.

12          THE COURT:  Okay.  All right.

13  BY MR. COLBY:

14  Q     Okay.

15  A     In September it became a TRO.

16  Q     Right.  But the injunction that you're referring to was

17  the preliminary injunction that you filed with the Eastern

18  District of Pennsylvania, correct?

19  A     Correct.

20  Q     Okay.  Would it surprise you to learn that that was

21  actually in September and not in August?

22  A     Yeah.  I thought it was filed in August.

23  Q     Okay.  Okay, that's fine.  All right, so whether it was

24  August or whether it was September, despite your grave concern

25  about this lack of intellectual property protections, you

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 112 of 294

112

 1   waited months and months to seek injunctive relief to try to

 2   solve that problem, correct?

 3   A     Yeah.  I was in the hospital for three months.

 4   Q     Okay.  But Mr. Rajan, the simple fact is that you

 5   discovered this issue that you say created this grave imminent

 6   harm in March and April and you didn't seek injunctive relief

 7   about it until August or September, correct?

 8   A     Right because I was in charge of the Netherlands until

 9   June.

10   Q     And Mr. Rajan, you testified -- you said you were in the

11   hospital.  But you testified that you and Mr. Robertson and the

12   SeeCubic engineers were all aware of this issue because it was

13   all part of your big investigation, correct?

14   A     Yeah.  They're aware of it.

15   Q     And so, any one of those people could have gone to

16   debtor's counsel and said, hey, we've got a real problem here.

17   We need to deal with this right away.  And you could have

18   sought injunctive relief far earlier than August or September,

19   correct?

20   A     No.  We're confused.  From April to June, I was in charge

21   of the Netherlands.  I told them this behavior had to stop.

22   That all this had to get shutdown.  And they were under

23   pressure from SeeCubic of Delaware.  Then SeeCubic of Delaware

24   tried to bring in an independent director that allowed these

25   machinations to continue.

1          MR. COLBY:  Objection to the -- move to strike the

2    hearsay.

3          THE COURT:  All right.  So his answer, your answer,

4    your question was he could have brought -- someone could have

5    come in March or April.  Then he said, no.  We were in charge

6    from April to June of '23, and we told them to shut down.

7          THE WITNESS:  Correct.

8    BY MR. COLBY:

9    Q    Okay.  And you could have sought injunctive relief from

10   the court additionally to stop whatever you say SeeCubic of

11   Delaware was doing that was improper, correct?

12         MR. ZAHRALDDIN:  Objection.  Asked and answered, Your

13   Honor.

14         MR. COLBY:  No, it's a different question.

15         MR. ZAHRALDDIN:  Going around and around.

16         THE COURT:  Wait.  I got to rule.  He said asked and

17   answered.  And your question is you're saying it's a different

18   question.

19         MR. COLBY:  Yeah.

20         THE COURT:  And it's a different question where you

21   said that someone else could have done after they learned in

22   March and April.  So you're saying after June?

23         MR. COLBY:  No.  Well, so I'm responding to Mr. --

24   the question is following up on Mr. Rajan's partial answer.

25   When I asked if they could have sought injunctive relief, he

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 114 of 294

114

```
 1  said, no.  We were in charge.  I'm not sure that the logic

 2  follows.

 3          THE COURT:  Well, it followed for me.  He said that

 4  they were in charge from April to June of '23 and they tried to

 5  shut them down.

 6          MR. COLBY:  Correct.

 7          THE COURT:  So is your follow up after June?

 8          MR. COLBY:  No.

 9          THE COURT:  Why didn't you --

10  BY MR. COLBY:

11  Q    My follow up is during that same time period.  If he

12  thought that SeeCubic of Delaware was doing something improper,

13  he could have sought injunctive relief to stop SeeCubic of

14  Delaware from doing whatever that is, correct?

15  A    No.  Hang on a second.  We're confused again.  April, May,

16  and June, I told the employees in the Netherlands to shut it

17  down.  They were getting pressure from SeeCubic of Delaware not

18  to listen.

19          THE COURT:  All right.  So you told them to shut it

20  down.

21          THE WITNESS:  Then in June, an independent guy came

22  in.  He said he was going to shut it down.  He didn't, so

23  Rembrandt tried to sue him.

24  BY MR. COLBY:

25  Q    Okay.  So Mr. Rajan, as part of your stewardship of these
```

1    entities, the debtors, or until June the subsidiaries, you

2    could have come to this court to try to stop any allegedly

3    improper conduct by SeeCubic of Delaware, correct?

4              MR. KODOSKY:  Objection.  Asked and answered.

5              THE WITNESS:  We already did.

6              MR. COLBY:  Okay.

7              THE COURT:  All right.

8              THE WITNESS:  We already did.  In April we filed our

9    turnover action.

10             THE COURT:  All right.

11             MR. COLBY:  And --

12             THE COURT:  He said objection asked and answered.

13   Your response?  When there's an objection, Mr. Rajan --

14             MR. COLBY:  I'll withdraw that question, Your Honor.

15             THE COURT:  Okay, withdrawn.

16   BY MR. COLBY:

17   Q   Mr. Rajan, after June, after June when you were removed

18   from the directorship of SeeCubic B.V., you could have sought

19   injunctive relief, but you waited until August or September to

20   do so, correct?

21   A   No.  We asked for turnover action.  K&L Gates and Skadden

22   told us to file the adversary complaint.  We thought we were

23   going to get a turnover action.  We didn't get the turnover

24   action.  You guys told us, hey, go file an adversary complaint,

25   so we switched it to an adversary complaint.  But we already

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 116 of 294

116

1   filed back in April.

2   Q     Yeah.   The turnover action and the trade secret, this

3   trade secret that you've described, Mr. Rajan, are two

4   different issues, correct?

5   A     If we get the turn over action, you're out of the

6   Netherlands, so we don't have to worry about it.

7   Q     But if you were concerned that this intellectual property

8   was being put out into the world in an unprotected fashion, you

9   could have sought injunctive relief to try to solve that

10  problem after June and prior to August and September, correct?

11         MR. KODOSKY:  Objection.  Asked and answered 15 times

12  at this point.

13         THE COURT:  I'm going to sustain because he said no

14  we couldn't because the independent person said he would.  That

15  was his answer to that question.

16         MR. COLBY:  All right.

17         THE COURT:  So sustained.

18  BY MR. COLBY:

19  Q     How about this one, Mr. Rajan.  You filed this TRO motion

20  on September 30, 2023, correct?

21  A     Correct.

22  Q     And in connection with that, you submitted a declaration,

23  correct?

24  A     Correct.

25  Q     And you wanted the Court to know about all of the imminent

1   irreparable harms that could befall the assets in the

2   Netherlands, correct?

3   A     Well, we gave some of them.  I don't know if I gave all of

4   them, but I gave some of them.

5   Q     Would you have left out from your application for a TRO

6   something that you think was creating an imminent irreparable

7   grave risk to the debtors?

8   A     I thought you were asking about my affidavit.

9   Q     Yes, your affidavit. Would you have left it out?

10  A     It's on my application.  Yeah, I don't know if I covered

11  everything on my affidavit.  We put other things in our

12  application.

13  Q     So Mr. Rajan, I guess this is -- you're saying now that

14  this issue is so important that the Court needs to issue an

15  injunction to prevent this harm from happening.  But maybe you

16  forgot to mention it in your initial declaration where you

17  articulated the basis for your request for TRO?

18          MR. KODOSKY:  Objection.

19          THE WITNESS:  Yeah.  I put stuff --

20          THE COURT:  Woah.  He's objecting to --

21          THE WITNESS:  Oh, sorry.

22          THE COURT:  Woah.  To which word specifically?

23          MR. KODOSKY:  I think this has already been asked and

24  answered as well.

25          THE COURT:  Well, he said did you forget.

1          MR. COLBY:  That was a different question.

2          THE COURT:  But he never said he -- never mind.

3          MR. COLBY:  That's why I'm asking this question.

4          THE COURT:  Never mind.  I'm not counsel.  Okay.

5    Counsel, you said it was already asked and answered.  And he

6    said are you saying did you forget.

7    BY MR. COLBY:

8    Q    Correct.  Did you forget about it?

9    A    Forget about what?

10   Q    This supposed lack of protections around the intellectual

11   property in the Netherlands.

12   A    Am I --

13          MR. ZAHRALDDIN:  Objection.  It's argumentative, Your

14   Honor.  He's just badgering the witness.

15          MR. KODOSKY:  He hasn't even given him an example.

16   He's asking him about why did you leave out stuff that -- and

17   he hasn't even pointed out anything that was left out.

18          THE COURT:  All right, listen.  This is where we are.

19   He never said he forgot.  He said he left -- he doesn't know if

20   he covered everything.

21          MR. COLBY:  Right.

22          THE COURT:  So you need to rephrase that question.

23          MR. COLBY:  Your Honor, he said he didn't cover

24   everything.  I'm asking if that's a reason why.

25          THE COURT:  Not what you said.

1            MR. KODOSKY:  Yeah.  He didn't say that he didn't

2    cover everything, Your Honor.  He said that he's not sure if he

3    covered everything.  He hasn't give him any kind of an example

4    yet.

5            THE COURT:  All right.  I -- counsel, just rephrase

6    it.

7    BY MR. COLBY:

8    Q    Mr. Rajan, in the declaration that you submitted in

9    support of your TRO, you did not describe this investigation or

10   lack of protections around intellectual property in the

11   Netherlands, correct?

12   A    I think I did cover some of it.  I'm not sure.  If it was

13   either in the affidavit or it was in the application.

14   Q    I'm asking about your affidavit.

15           THE COURT:  How about we show them?

16           MR. COLBY:  I will.

17           THE COURT:  Show him that.  I mean, that's easier

18   than as do you recall.  Just have him look at it.  Is it in

19   there?

20           MR. COLBY:  Tab 30.

21           THE COURT:  And has that been an exhibit already,

22   counsel, or it's just --

23           MR. COLBY:  No, and I don't intend to introduce it.

24   I don't think it's admissible evidence, but I'm --

25           THE COURT:  I'm just asking has it been marked

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 120 of 294

120

1   because  a lot of these have been marked.  They've been

2   admitted.  I don't know.

3          MR. COLBY:  It's on the docket.

4          THE COURT:  Well, that doesn't mean -- as I told

5   people, having nothing to do with this hearing, that simply

6   because you attach something to a pleading doesn't make it part

7   of the record or evidence.  Apparently, people seem to think

8   that.  Not you guys, but some people think that.  Okay, so this

9   is tab 30?

10         MR. COLBY:  Tab 30, Your Honor.

11         THE COURT:  Okay, which -- okay.

12         THE WITNESS:  Okay.

13         THE COURT:  All right.  And that is on page 3.  It

14  has his title.  Declaration, okay.

15  BY MR. COLBY:

16  Q    So Mr. Rajan, you just spoke at length when I asked you to

17  use your own words about a detailed investigation that you say

18  you conducted and that you say revealed lots and lots of

19  failures to protect the intellectual property at the Dutch

20  subsidiaries; do you recall that testimony?

21  A    You mean the trade secrets?

22  Q    Yes, the trade secrets.  Do you recall that testimony?

23  A    Yeah.  I testified that, yeah, they didn't protect the

24  content of the trade secrets.

25  Q    Okay.  And when you submitted an application in September

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 121 of 294

121

1   in support of your TRO, you did not describe that investigation

2   or all of those --

3   A    Oh, you mean my declaration?  Sorry.

4   Q    Yeah, sorry.  What did I say?

5   A    You said application.

6   Q    All right, application.  I'll start over again.  Mr.

7   Rajan, that -- when you submitted your declaration in support

8   of the TRO, you did not describe all of those investigations

9   that you conducted and the lack of intellectual property or

10  trade secret controls that you just described here.  You don't

11  describe that in this declaration, do you?

12  A    No.  I describe Mr. Stastney's testimony Amsterdam.

13  Q    Okay.  So you were aware of this issue since March or

14  April.  You say now that it creates this immediate grave risk

15  of irreparable harm.  You made an application to this Court for

16  a TRO after months and months and you didn't mention this lack

17  of protection around the trade secrets?

18          MR. KODOSKY:  Objection.  Asked and answered, Your

19  Honor.

20          THE COURT:  All right.  Counsel, I need to take a

21  five-minute break.

22          MR. COLBY:  Sure.

23          THE COURT:  Hold on one second. Court is in recess.

24      (Recess taken)

25          THE BAILIFF:  All rise.

1          THE COURT:  Please be seated.  Counsel, you may

2    proceed.

3    BY MR. COLBY:

4    Q     Mr. Rajan, during the break, you were still sequestered as

5    a witness, correct?

6    A     Correct.

7    Q     And were you asked not to be on your phone?

8    A     Not to be on my phone?

9    Q     Yes.

10   A     I don't --

11         THE COURT:  I did not instruct him because I didn't

12   think it was going to be that long.  Were you on your phone?

13         THE WITNESS:  Yeah.  I was on the phone.

14         THE COURT:  And what were you looking at on your

15   phone?

16         THE WITNESS:  I had to call an investor.

17         THE COURT:  Okay.

18   BY MR. COLBY:

19   Q     Mr. Rajan, before the break, you referenced an upcoming

20   meeting with Phillips; do you recall that?

21   A     Yeah.

22   Q     Who was that meeting with?

23   A     The managing people at Phillips, Alexander Demvault

24   (phonetic) and some other folks.

25   Q     Anyone else?

1   A    They may have some other people there.  I'm not sure

2   again.

3   Q    And who did you schedule that meeting with, Mr. Demvault?

4   A    Yeah. They contacted, insisted on the meeting.

5   Q    So your testimony is that Phillips contacted you and

6   insisted on a meeting?

7   A    Yeah.

8   Q    Who scheduled the meeting on the Stream side?

9   A    It would have been myself and Bud Robertson.

10  Q    And the contact from Mr. Demvault was by email?

11  A    Yeah.  I believe so.  I think so.

12  Q    And then you set up the meeting by email?

13  A    I think so.  Yes.

14  Q    And in that communication from Phillips setting up the

15  meeting, that email they said that they were concerned about

16  potential violations of the licensing agreement?

17  A    They said -- the topics for discussion are at the meeting.

18  Q    I'm sorry.  Did they say in the communication that they

19  were concerned?

20  A    No.  They said that we have to talk right away.

21  Q    So they didn't identify potential violations of the

22  licensing agreement in the communication?

23  A    No.  Not -- it'll be addressed in the meeting.

24  Q    Did they say in the communication that they were going to

25  address concerns about the -- let me finish.  Did the email say

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 124 of 294

124

1  that the meeting was intended to address concerns about

2  violations of the license?

3         MR. KODOSKY:  Objection, Your Honor, to the extent

4  that this calls for hearsay or it's referring to hearsay.

5         THE COURT:  Response?

6         MR. COLBY:  I'm not asking -- just a simple yes or

7  no.  Did it include communication?  Did the communication

8  include a reference to concerns about the thing.  I'm not

9  offering it about the license.  I'm not offering it for the

10  truth.  I just want to know whether not the communication

11  included that.

12         MR. KODOSKY:  Out of court statement, Your Honor,

13  being referenced.  Communication by Phillips.  When we tried to

14  present something, communication from Phillips, they objected

15  on hearsay grounds, and it was excluded.

16         THE COURT:  All right.

17         MR. COLBY:  I'll withdraw the question, Your Honor.

18         THE COURT:  All right.

19  BY MR. COLBY:

20  Q    Mr. Rajan, Phillips could be here for these hearings about

21  their license, correct?

22  A    We didn't call them as a witness.

23  Q    I understand.  But Phillips could be present here if it

24  chose.  So to your understanding, correct?

25         MR. KODOSKY:  Objection to the extent that they're

1    asking what Phillips could or could not do.  He's not Phillips.

2    BY MR. COLBY:

3    Q    Mr. Rajan -- I'll withdraw that.  Mr. Rajan, are you aware

4    of any reason why Phillips couldn't be here to represent its

5    own interest in protecting its license from this conduct that

6    you say is endangering it?

7            MR. KODOSKY:  Same objection, Your Honor.

8            THE COURT:  Response?

9            MR. COLBY:  Response is I'm asking if Mr. Rajan is

10   aware of any reason why -- if he's aware, of any reason why

11   Phillips couldn't be here to act to protect its interest in its

12   own license.

13           MR. KODOSKY:  Calling for speculation, Your Honor.

14   Whether or not Phillips could choose to be here or not be here,

15   who knows.

16           MR. COLBY:  I'm just asking if he's aware.  If Mr.

17   Rajan is aware of a reason why they couldn't be here.

18           THE COURT:  And he's objecting that it's calling for

19   speculation.

20           MR. COLBY:  Well, either he's aware or he's not.  If

21   he's not aware of any reason then there's no speculation that

22   I'm calling for.  I'm not calling -- I'm not asking for him to

23   speculate as to why they may or may not be here.  I'm asking if

24   he is aware of a reason.  Factual question.  Are you aware of a

25   reason why Phillips can't be here to represent its own

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 126 of 294

126

1   interest?

2        MR. KODOSKY:  Again, Your Honor, it's calling for a

3   reasons of why a third-party is here or not here.

4        THE COURT:  I'm going to sustain.  His assumption

5   that they can and cannot be here.  I'm going to sustain the

6   objection.  Go ahead.

7   BY MR. COLBY:

8   Q    In response to some questions I asked you earlier, Mr.

9   Rajan, about why Stream had not earlier filed the TRO, your

10  response included a reference to the fact that Rembrandt had

11  taken various legal steps; do you recall that testimony?

12  A    I think so.  You're talking about the TRO before the

13  bankruptcy?

14  Q    Yes.

15  A    Yeah.  Before the bankruptcy, correct.

16  Q    Yes.  So you recall that testimony.  I asked you why

17  didn't you bring a TRO and you well Rembrandt sued, correct?

18  A    Yeah, before the bankruptcy.

19  Q    Did you communicate with Rembrandt about the fact that

20  they were going to bring those claims prior to it doing so?

21  A    Yeah. I recall my testimony.  What I said was when I was

22  invited to that meeting and I saw the PPM, I called the CEO of

23  Rembrandt.

24  Q    Did you suggest to Rembrandt that they should bring those

25  claims that you identified?

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 127 of 294

127

1    A    You mean the Rembrandt claims against SeeCubic?

2    Q    Yes.

3    A    I told them that they're sublicensing.  Stream TV informed

4    Rembrandt about the document saying sublicensing.  It had all

5    these.  And it said they even had agreements for -- with

6    manufacturers and it had controversial things inside their

7    documents.  And Rembrandt CEO informed me that they were

8    already in process of suing Technovative.  They tried to enter

9    the chancery court and were blocked out, Rembrandt, and they

10    were already in process of taking legal action.

11    Q    Did you encourage Rembrandt to take that legal action?

12    A    I didn't tell them, hey, go sue them.  No.  I didn't say

13    that.  I said this is what's happening because it impacted

14    their licenses and a --

15            THE COURT:  So that's a no.

16            THE WITNESS:  That's a no.

17            THE COURT:  Okay.

18    BY MR. COLBY:

19    Q    And Stream could have brought its own action to protect

20    its interests at that point in time as well, correct?

21    A    I don't know if it was logistically possible for Stream TV

22    to sue Technovative when we were in the chancery court for

23    Technovative.  I'm not sure how to do all that logistically.

24    Q    So because you thought there was a possibility that Stream

25    couldn't sue its own subsidiary, you put Rembrandt up to do it

1    instead, correct?

2    A    I didn't put them up.  No.

3    Q    Okay.  Mr. Rajan, on October 16th, I believe when we were

4    last here, you testified that part of the basis for why you're

5    seeking a TRO is that SeeCubic was, SeeCubic of Delaware, was

6    creating massive confusion in the marketplace because they are

7    marketing the Ultra-d technology not under Stream's name,

8    correct?

9    A    One of the reasons, correct.

10   Q    Okay.  And as a basis for that, you pointed to the

11   SeeCubic of Delaware participation in the consumer electronics

12   show in January of 2023, correct?

13   A    That's not exactly what I said.  That's a

14   mischaracterization of what I said.

15   Q    Well, is it your testimony now that SeeCubic of Delaware's

16   participation in the consumer electronic show created confusion

17   in the marketplace around who was going to be developing this

18   Ultra-d technology?

19   A    What I said was SeeCubic, in the consumer electronic show

20   and sent out an email saying they had already reached a deal

21   with companies to invest in SeeCubic of Delaware and had deals

22   with different manufacturers and had all kinds of projects

23   going on.  And the testimony from Mr. Stastney was they were

24   having discussions -- they were having meetings with people but

25   no discussion.  But the email indicated they had deals.  That's

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 129 of 294

129

1   what I said, and that was causing confusion in the marketplace.

2   Q    Mr. Rajan, VSI, Visual Semiconductor, Inc., is another

3   company that you control, correct?

4   A    That I founded, correct.

5   Q    And does VSI have a license to use and demonstrate the

6   Ultra-d technology that is the subject of the Phillips'

7   license?

8   A    Yeah.  VSI has a contract with Stream TV to be a

9   distributor for Stream TV.

10  Q    And does VSI have a license from Phillips to use and

11  demonstrate the Ultra-d technology?

12  A    Hang on a second.  VSI is not using the Phillips'

13  technology.

14  Q    VSI is not using Phillips' technology.  VSI -- It's not in

15  mine.

16  A    It's a distributor.

17  Q    Mr. Rajan, isn't it true that VSI demonstrated the Ultra-d

18  technology at a trade show known as Touch Taiwan in April of

19  this year?

20  A    Yeah.  VSI and Stream TV demonstrated at Touch Taiwan.

21  Q    And, in fact, the display of the Ultra-d technology had a

22  label on it that said Visual Semiconductor, Inc., but no label

23  that identified Stream TV, correct?

24  A    No, it did.  It had an Ultra-d label, which is Stream TV

25  next to the devices.

1   Q    Doesn't say Stream TV.  Ultra-d is Phillips' technology,

2   right?

3   A    No.  Ultra-d is Stream TV.

4   Q    The licensing agreement that we just looked at talks about

5   the Phillips' technology as the Ultra-d technology, correct?

6   A    No.  Ultra-d is Stream TV.

7   Q    And the Ultra-d technology incorporates the Phillips'

8   technology, correct?

9   A    Correct.

10  Q    And VSI does not have a license with Phillips, correct?

11  A    The Phillips' technology, the issue is access to the code

12  or trade secrets that produced the output.  It is not about

13  doing a demo for somebody.

14  Q    So --

15  A    That's a user agreement.  That has nothing to do with

16  access to the code or access to the derivatives that get you to

17  the trade secrets.  That has nothing to do with it.

18  Q    So using a demo, using a demo of the technology isn't a

19  violation of the Phillips' license?

20  A    Using a demo is not a violation of the Phillips' license,

21  and all of the Stream products are encrypted for the content.

22  These people were doing demos, SeeCubic of Delaware, the things

23  that they don't own.

24  Q    Mr. Rajan --

25  A    They don't have a contract with Stream TV --

1             THE COURT:  Wait a minute.  Wait a minute.  Wait a

2    minute.  Rephrase the -- mister -- the question is, is using a

3    demo using the license of Phillips' technology?

4             MR. COLBY:  Yeah.  I asked whether -- and I think Mr.

5    Rajan answered it and then he went on.

6             THE COURT:  All right.  So the answer is yes or no?

7    BY MR. COLBY:

8    Q    The answer is no I believe.  Using a demo was not a

9    violation of license technology.  Is that correct, Mr. Rajan?

10   A    As long as you don't expose the trade secrets.

11   Q    Okay.  And so, Mr. Rajan, at the Visual Semiconductor,

12   Inc., VSI your other company, was demoing Phillips' technology

13   under the VSI label at the Touch Taiwan expo, correct?

14   A    VSI and Stream TV were, correct.

15   Q    But the technology didn't say Stream TV anywhere on it.

16   It said Ultra-d, correct?

17   A    It said Ultra-d, correct.

18   Q    Right.  It didn't say Stream TV anywhere?

19   A    When you booted up some of the content it may have said

20   Stream TV.

21   Q    And again, there's no -- just to be clear, VSI does not

22   have a license with Phillips, correct?

23   A    VSI does not have a license with Phillips, no.

24   Q    Now, you claim here as a basis for your TRO, Mr. Rajan,

25   that there is massive confusion in the marketplace about who

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 132 of 294

132

1   owns this technology or the plans for this technology and

2   that's impairing Stream TV's business, correct?

3   A    There's -- that's not -- there's massive confusion in the

4   industry because Stream TV owns it.  VSI is financing Stream

5   TV.  But SeeCubic of Delaware is running around with the

6   technology and making statements to a wide range of people.

7   Q    My question was a little different.  You claim that the

8   confusion that you just described is preventing Stream TV from

9   getting various business opportunities, correct?

10  A    They are interfering with Stream TV business

11  opportunities.

12  Q    Okay.  Isn't it true that -- now, those business

13  opportunities, it's VSI that's interfacing with the customers

14  on those business opportunities, correct?

15  A    No.

16  Q    Well, so there was a lot of testimony previous times we

17  were here about purchase orders; do you recall that?

18  A    Correct.

19  Q    And those purchase orders, there's two sets.  There's a

20  purchase order between Stream TV and VSI and then there's a

21  purchase order between VSI and a customer, correct?

22  A    Correct.  VSI and Stream TV were working together.

23  Q    And your testimony is that VSI is reselling or is a

24  distributor of Stream TV products, correct?

25  A    Correct.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 133 of 294

133

1    Q    And so, VSI is entering into the actual contracts with the

2    end customers, correct?

3    A    For some of them, yes.

4    Q    Okay.  And when we were here, you testified that VSI has a

5    purchase order from Southern Telecom for 100,000 units, right?

6    A    Right.

7    Q    And you testified in August that Southern Telecom has

8    indicated they're going to increase their order to 300,000

9    units, correct?

10   A    Yeah.  They'd like to increase, correct.

11   Q    And you testified that a company called Skyworth is going

12   to place an order for 2 million TV's, correct?

13   A    Yeah.  They'd like to place an order.

14   Q    And you testified that a company called Size Star

15   (phonetic) placed an order with VSI for 10,000 units; do you

16   recall that?

17   A    Correct.

18   Q    And you testified that Size Star is going to increase

19   their order to 75 to 100,000 units; do you see that?

20   A    They would like to increase it, correct.

21   Q    And you testified that the value of all of these deals is

22   worth hundreds of millions of dollars, correct?

23   A    Correct.

24   Q    And these customers are signing these contracts

25   notwithstanding or intends to enter into these agreements

1  notwithstanding what you say is this confusion in the

2  marketplace, this massive confusion in the marketplace around

3  the Ultra-d technology?

4  A    Yeah.  That's correct.  They signed with us anyway.

5  Q    Yeah.  That's -- according to you, that's a lot of good

6  business that's happening, right?

7  A    Correct.

8  Q    Notwithstanding what you say is this massive confusion,

9  correct?

10  A    Yeah, no.  We're doing business.

11  Q    Okay.  All right.  Now, one of the precipitating events

12  that caused Stream TV to come to this court seeking a TRO was

13  the Dutch court decision appointing Mr. Stastney as a director

14  of SeeCubic B.V., correct?

15  A    It was Mr. Stastney's testimony and the fact that he

16  wanted to become director, correct.

17  Q    Right.  And the fact that he became director you argue is

18  putting the fox in charge of the henhouse, correct?

19  A    It's probably even worse than that, but yeah.  It's more

20  like the CEO of Coca-Cola is in charge of Pepsi's subsidiary

21  and looking at Pepsi's projects and deciding resources for

22  Pepsi's projects for Pepsi subsidiaries.  So I'd say it's worse

23  than the fox and the henhouse.  You have a competitor who's

24  also a lender controlling a subsidiary.

25  Q    And in that proceeding, Stream TV proposed that Mr. Park

1   should be the director, correct?

2   A    Correct.

3   Q    And SeeCubic of Delaware proposed that the director should

4   be an independent person, or in the alternative if that didn't

5   work Mr. Stastney, correct?

6   A    Correct.  An independent director, or in the alternative

7   if that didn't work Mr. Stastney.  That's correct.

8   Q    Okay.  And Stream TV opposed the appointment of an

9   independent director, correct?

10  A    Correct because they said they can't find one because

11  they're going to get sued.

12  Q    And ultimately, the Court concluded that, or the decision

13  that was rendered was that Mr. Stastney would better protect

14  the assets in the Netherlands than your nominee Mr. Park,

15  correct?

16        MR. KODOSKY:  Objection, Your Honor.  Calls for

17  hearsay.  To the extent that he's getting into findings as

18  opposed to what the ruling was.

19        MR. COLBY:  Your Honor, we've previously had a lot of

20  discussion in this court about judicial notice where we were

21  arguing regarding the admission of another court's decision.

22  What happened in this instance is very different.  We proffered

23  this decision, and it was admitted with no objection by

24  debtors.  That's at page 157 through 159 of the October 6th

25  hearing.  The first transcript from these proceedings.  It was

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 136 of 294

136

1    admitted full stop.  This is not a judicial notice question.

2             THE COURT:  Was it admitted?  Well, how was it

3    admitted?

4             MR. COLBY:  I offered it as an exhibit.

5             THE COURT:  As is what?

6             MR. COLBY:  As an exhibit.

7             THE COURT:  As an exhibit under what exception?  You

8    just offered it?

9             MR. COLBY:  Yes, and there was no objection.  And in

10   an instance where defendants waive an objection to a document

11   and state they have no objection, it's in. They can't later --

12            THE COURT:  Yes, it's in.  But what's in?

13            MR. COLBY:  The opinion.

14            THE COURT:  What's -- you offered -- counsel, you

15   offered it in under what -- you just said I offered this

16   document, and they didn't respond so it came in.  Is that your

17   position?

18            MR. COLBY:  Correct.  There was no objection.  There

19   was no hearsay objection so it's in.

20            MR. KODOSKY:  Your Honor, to the extent that that

21   order as its ruling appointed -- put the fox in charge of the

22   henhouse or the Coke CEO in charge of the Pepsi sub, we believe

23   that it should be in evidence.  But that's not to say that all

24   the findings -- we've got an objection to the findings.

25            THE COURT:  Wait a minute.  You offered it into

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 137 of 294

137

1    evidence as what?  What did you say?

2          MR. COLBY:  I said -- so I asked Mr. Stastney if he

3    was familiar with the document.  Does it appear to be a true

4    and correct copy of the opinion?  And it's a machine

5    translation of the opinion.  He said it does.  I said I move to

6    admit this document into evidence, Your Honor.

7          THE COURT:  Under what theory?

8          MR. COLBY:  No theory, Your Honor.  I just moved to

9    admit it.  I don't need to articulate a specific basis for it

10   unless the other side objects and then we have an argument

11   about it.   They made no hearsay objection.

12          THE COURT:  Okay.

13          MR. COLBY:  It's not on me to identify what their

14   objection might be and then preemptively explain why I get it

15   in anyway.

16          THE COURT:  I didn't say that, counsel.  I just asked

17   how you sought to introduce it.

18          MR. COLBY:  The Court said, counsel, any objection?

19   Mr. Kodosky said no objection, Your Honor.  And you said

20   admitted.

21          THE COURT:  All right, so it's admitted.  Okay.  Mr.

22   Kodosky it's admitted.  He said I can look at everything now.

23          MR. KODOSKY:  It's admitted, Your Honor.  But if

24   there's hearsay portions within the document that doesn't make

25   the -- that doesn't waive the hearsay objections.  We don't

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 138 of 294

138

1 have an opportunity to object to the hearsay portion of it

2 until he tries to ask questions about the hearsay portion of

3 it.  We believe that it should be in evidence as well because

4 of the ruling that --

5          THE COURT:  Well, he's saying that you should have

6 objected and said it's admissible, but the hearsay portion

7 should not be admitted.  You didn't do it at the time, so it's

8 all admitted.  Correct, Mr. Colby?

9          MR. COLBY:  Correct.

10          THE COURT:  What's your response?

11          THE WITNESS:  Can I talk now?

12          THE COURT:  No.  You can't say anything.

13          MR. COLBY:  And I've got a --

14          THE COURT:  Go ahead.

15          MR. COLBY:  -- cite if it's helpful.  Middle District

16 of Pennsylvania cite.

17          THE COURT:  Give me the cite.

18          MR. COLBY:  It's 2008 Westlaw 489 0030 Feeser's, Inc.

19          THE COURT:  You're going too fast.

20          MR. COLBY:  Sorry.

21          THE COURT:  2008 Westlaw 489.

22          MR. COLBY:  0030, and it's the Middle District of

23 Pennsylvania, November 12th, 2008.

24          THE COURT:  Okay.

25          MR. COLBY:  The quote is Defendant's stated --

1              THE COURT:  Wait, what's the name?

2              MR. COLBY:  Oh, Feeser's, F-E-E-S-E-R apostrophe S,

3    Inc. v. Michael Foods.

4              THE COURT:  And what did that case stand for?

5              MR. COLBY:  The Court says, "Defendant stated that

6    they had no objection when it was offered by plaintiff.

7    Instead, defendants waited until after the exhibits and

8    testimony were entered into evidence.  It was too late at that

9    point for them to raise a new objection."

10             THE COURT:  Okay.  And what was the -- and what was

11   admitted and what was the objection that was now being -- never

12   mind.  I'll read the case.

13             MR. COLBY:  Yeah.  I don't know that the objection

14   was the same as the one being offered here.  It's more a matter

15   of procedure.

16             MR. ZAHRALDDIN:  Your Honor, can --

17             THE COURT:  Hold on.  All right.

18             MR. ZAHRALDDIN:  Your Honor, can I ask --

19             MR. COLBY:  It was a hearsay objection.

20             THE COURT:  Wait a minute.

21             MR. COLBY:  Oh, sorry.

22             THE COURT:  Okay.  So it was a hearsay objection that

23   a document that had already been admitted should -- was being

24   referenced and objected to on the basis that it was hearsay.

25   And the Court --

1                MR. COLBY:  I'll retract that.  Looking at a

2    different case.  I don't know what the objection --

3                THE COURT:  Well, I'm going to just tell you guys,

4    I'm going to reserve on this.  I'm not going to do this on the

5    fly.  That means that I'm going -- it was such a technical

6    term.  But I'm not going to do this without looking at the

7    cases, so I'm going to reserve on that.  If I find that it's

8    admissible, then the entire point is.  And if it's not, then

9    it's not.  So I'll allow you to question him about it and I'll

10   figure out what to do with it.

11               MR. COLBY:  Okay.

12               THE COURT:  Because I don't know the answer off the

13   top of my head.

14               MR. COLBY:  Okay.

15               MR. ZAHRALDDIN:  Honor.

16               THE COURT:  Is there another case you --

17               MR. ZAHRALDDIN:  Can I ask one question, Your Honor?

18               THE COURT:  Uh-huh.

19               MR. ZAHRALDDIN:  I think the debtors are relying upon

20   your prior discussions in regard to judicial notice where you

21   indicated that you would only be looking at a document.  And

22   again, this would be law of the case in a sense.  You would

23   only be looking at a document for the holdings and not for the

24   findings of fact within there.  So we have been relying upon

25   that premise in our objections.  So can you clarify that?  If

1    it's not the case, maybe we were rereading this incorrectly and

2    we want to be able to go forward in a proper manner.

3              THE COURT:  The Third Circuit has said what the Third

4    Circuit has said with respect to judicial notice of decisions

5    from other courts.  That I can rely on the ruling.  I cannot

6    look at the explanation, the discussion, okay.  So if counsel

7    was going to -- if you were saying that you didn't object

8    because you assumed that I was looking at it and going to admit

9    it on the basis of my prior ruling --

10             MR. ZAHRALDDIN:  Yes, ma'am.  That's exactly it, Your

11   Honor.

12             THE COURT:  Okay.  I think that you should have said

13   something because now we're all assuming all sorts of things

14   and now --

15             MR. COLBY:  Yeah.  The differences is in those

16   instances, one part or the other, because we did this multiple

17   times, sought to admit a document.  There was an objection.

18   The Court asked what's the basis?  We went back and forth about

19   the objection and the basis.  Often one of the bases was

20   judicial notice.  And in those instances, the Court made a

21   ruling because it was clear that it was a judicial notice

22   issue.  Here, none of that took place.  There was no objection.

23             THE COURT:  Counsel, I get that.  But what their

24   explanation is is to why they didn't object is because they

25   assumed it was judicial notice and -- counsel, let me finish.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 142 of 294

142

1          MR. COLBY:  Yeah.  I am.

2          THE COURT:  And what I'm saying is that I'm not quite

3    sure by just assuming that and not putting on the record that

4    you assume that it was being admitted on the same basis that I

5    admitted other out of court decisions.  I'm not quite sure

6    whether you may have waived that by not saying we don't object,

7    Your Honor, as long as it's judicial notice and we believe your

8    ruling applies.  You didn't tell me.  You didn't tell opposing

9    counsel.  I didn't get to rule.  And so, now you're saying,

10   well, this is why we object.  I don't know if I get to go back

11   and hear your explanation as to why you didn't object.  I don't

12   know.  I'm going to reserve on this.  What was the other case

13   that you wanted to cite, counsel?

14         MR. COLBY:  Yeah.  It's a case called U.S. v.

15   Iglesias, 535 F.3d 150.

16         THE COURT:  Wait, F.3d 150 --

17         MR. COLBY:  And it's Third Circuit, 2008, page 158.

18   And Your Honor, I would say we've pulled these up here on the

19   spur of the moment because there was no notice that they

20   objected to the admission of this document, so --

21         THE COURT:  Other than on the basis that they assumed

22   that it was judicial law, and it was being adm -- counsel --

23         MR. COLBY:  I don't think it's incumbent upon me

24   to --

25         THE COURT:  Counsel, it wasn't incumbent upon you to

1   say anything.  I'm saying if they weren't objecting and the

2   basis for their not objecting was that they believed it was

3   being admitted under my prior decisions regarding judicial

4   notice where we're admitting it, but not the reasoning, it may

5   have been incumbent upon them to say we don't object as long as

6   it's being admitted under judicial notice with this exception.

7           MR. COLBY:  Yep.

8           THE COURT:  And they didn't say that, so that's the

9   question.

10          MR. COLBY:  Okay, yep.

11          THE COURT:  Would they waive it by not -- no matter

12  what their assumption was, was it incumbent upon them to put it

13  on the record?

14          MR. COLBY:  We submit it was.

15          THE COURT:  Okay.

16          MR. COLBY:  And I also submit I would be better

17  prepared to make additional arguments or cite additional cases

18  had it not been incumbent upon us to guess that they were now

19  going to say we object to something that previously they didn't

20  object to almost a month ago, so --

21          MR. ZAHRALDDIN:  Your Honor, just one -- I don't know

22  if that kind of follows.  We would need to hear if it was going

23  beyond the scope of just the ruling before we raise an

24  objection.  I'm not just going to object every time something

25  comes up when it doesn't go out.  We have to hear his question.

1   If the question stuck with the ruling, why would I further

2   object?  That's just adding more and more time to this -- to

3   this proceeding?

4           THE COURT:  All right, Mr. Caponi.  I'm not quite

5   sure what you're going to add because this is Mr. Colby's

6   thing.

7           MR. CAPONI:  I was going to mention something to Mr.

8   Colby, but that's --

9           THE COURT:  Oh.

10          MR. CAPONI:  -- I was going to talk, Your Honor.

11          THE COURT:  You can go tell him something.

12      (Counsel confer)

13          MR. COLBY:  Mr. Caponi's point is a good one.  It's

14   consistent with what we've been saying.  It's that, you know,

15   when we say admitted, it means admitted for all purposes.  That

16   way we have a clear record as to what something was admitted

17   for and why it wasn't.  You can't go up on appeal or later in a

18   trial, say, oh, well, we assumed or --

19          THE COURT:  Counsel --

20          MR. COLBY:  -- we had a secret objection that we

21   didn't raise.

22          THE COURT:  Or it is what it is --

23          MR. COLBY:  Right.

24          THE COURT:  -- even if it wasn't a secret.  And maybe

25   they made certain assumptions.  Was it required that they

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 145 of 294

145

 1   stayed on the record?  We don't object, judicial notice as you

 2   previously ruled, it can be admitted.  And that's all I'm

 3   saying.  I don't know if they did, didn't.  I'm going to

 4   reserve on that --

 5           MR. COLBY:  Okay.

 6           THE COURT:  -- because I don't know right now whether

 7   you can say I relied on your previous decision regarding

 8   similar documents, and that -- understood that that could be

 9   admitted for that purpose.  I don't know.

10           MR. COLBY:  Okay.

11           THE COURT:  Now, with that being said, you were

12   asking Mr. Rajan some questions regarding what the Court

13   decided, correct?

14           MR. COLBY:  Correct.

15           THE COURT:  And again, I'll allow it.  If I find that

16   it shouldn't have been, I will not consider it.  And if I find

17   that it was allowable, then I'll consider it because I don't

18   know what my ruling is right now.

19           MR. COLBY:  Okay.  I would, just for the sake of,

20   since we're talking about needing to preserve objections and

21   those sort of things, I would note that I'll proceed on the

22   basis that it was admitted because that I believe is --

23           THE COURT:  Right.

24           MR. COLBY:  -- the record.  If the Court were to

25   conclude otherwise, there is -- I might ask all of these

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 146 of 294

146

1    questions in a different way.  And so it does put me at a

2    little bit of a disadvantage.  I'm happy to proceed in this

3    way, but I may need to, after a ruling, ask the Court to --

4              THE COURT:  Well, how about we just don't do that

5    right now until I can make a ruling.

6              MR. COLBY:  I --

7              THE COURT:  And you continue with something else, and

8    I'll go back and look at it.

9              MR. COLBY:  Yeah, I'd be fine with that.

10             THE COURT:  That might make better sense, a better

11   use of time for me to make a definitive ruling.  And then that

12   way, you can make the specific questions depending on what I

13   rule --

14             MR. COLBY:  Fair enough.

15             THE COURT:  -- okay?

16             MR. COLBY:  Okay.

17             THE COURT:  All right.

18             MR. COLBY:  Okay.  Well, let me skip ahead then.

19   BY MR. COLBY:

20   Q    Mr. Rajan, one of the bases that you have for seeking a

21   TRO here is because you claim to be concerned that Mr. Stastney

22   will take assets out of the Dutch entities, correct?

23   A    You mean -- you mean the trade secrets --

24   Q    The --

25   A    -- the trade secrets already -- already -- you already

1  opened up the trade secrets.  You already did it.

2  Q    Okay.  Mr. Rajan, do you remember in the telephone hearing

3  that we had in this case on April 14th when the court said,

4  nobody is to transfer assets, and nobody is to take technology

5  with reference to the entities in the Netherlands.  Do you

6  recall that?

7  A    Nobody's to transfer their assets --

8  Q    Correct.

9  A    -- the BV's assets.

10  Q    And right.

11  A    Correct, the BV's assets, yes.

12  Q    Okay.  And isn't it true that the very next day, you sent

13  a text message to one of the Dutch employees that said, "Stream

14  TV won yesterday in a court.  The judge is demanding the

15  bonding machine be given to Stream TV immediately."  Did you

16  write that text to one of the Dutch employees?

17  A    Yes.  That was in reference to the statement that Patrick

18  Theune, by the court, may have violated the automatic stay.

19  Q    So your position is that in the April 14th hearing in this

20  case, this court said Stream TV won and this court demanded

21  that the bonding machine be given to Stream TV immediately?

22  A    It's my contention that in that hearing, the Netherlands'

23  assets were not to be moved, but the Stream TV assets that were

24  being used as a warehouse in the Netherlands needed to be

25  returned immediately.  That is my contention.

1    Q    Okay.  Last time you were here testifying, Mr. Rajan, you

2    said that SeeCubic has only lined up three contracts for the

3    Dutch entities and that that low yield was hurting the

4    business.  Do you recall that testimony?

5    A    No, I didn't say that.  What I said was Mr. Stastney said

6    in Amsterdam it was 11 to 12, and this Court he says it's 3,

7    and I said that out of -- he says he had 100 meetings.  If they

8    only got 11 to 3, that sounds an abnormally low conversion rate

9    -- something has gone wrong, and I was referring to SeeCubic --

10   Q    Right.

11   A    -- if that is true.

12   Q    And Mr. Rajan, right now, there are zero contracts at the

13   Dutch entities that the Debtors are responsible for, correct?

14   A    I don't understand your question.

15   Q    So SeeCubic of Delaware has arranged for three different

16   demonstration projects to be worked on at SeeCubic BV, correct?

17   A    Correct.

18   Q    And those are contracts to do some work and --

19   A    That's what they're saying, yes.

20   Q    Yeah, okay.  And my question to you is to confirm that

21   right now, Stream TV has brought zero projects like that to the

22   Dutch entities.

23   A    No, that's not true.

24   Q    You have zero contracts.  You've arranged for zero

25   contracts --

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 149 of 294

149

1    A    It's completely false.

2    Q    -- between SeeCubic BV and a customer, correct?

3    A    That's completely false.

4    Q    What contract --

5    A    That's completely false.  We are in discussions with over

6    50 companies.  We have numerous projects.  We have contracts

7    and purchase orders, and the BV said they are too busy to work

8    on our projects because Mr. Stastney has everybody tied up.  We

9    have to hire 20 new employees to work on our projects on top of

10   the 31 people who don't have enough work to do.

11   Q    Okay.  So I understand you may have an explanation for it,

12   but --

13   A    No, we have contracts they can't work on it.  They've

14   declined to work on it.

15   Q    So zero contracts with the Dutch entities?

16   A    No, that's not true.

17   Q    And since the Supreme Court opinion all the way back in

18   2022, there have been zero contracts signed by the Dutch

19   entities that the debtors are responsible for bringing in those

20   companies.

21   A    The Dutch entities don't sign the contracts.  Stream TV

22   does.  NVSI do with Stream TV.  The Dutch entities don't sign

23   contracts with the customers.  This is all, look in your

24   papers, you've diverted stuff in the Debtor's estate to another

25   company, and that's never been the practice.  They don't go

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 150 of 294

150

1   sign contracts with people like Lenovo and all that.

2   Q    It's somebody else's fault, Mr. Rajan, that's what you're

3   testifying?

4   A    No --

5   Q    There's no contracts at the Debtor's entity, but it's

6   someone else's fault?

7   A    It's SeeCubic of Delaware's fault, yes.

8         THE COURT:  Wait.  His testimony is that the Dutch

9   entities do not sign contracts.   That was his response to zero

10  contracts signed, okay?  So quit the bickering.

11        MR. COLBY:  But Your Honor, I understand that's his

12  testimony.

13        THE COURT:  That's not --

14        MR. COLBY:  The additional -- I got it.  And the

15  additional testimony in this case is that BV does sign

16  contracts, but I guess we can deal with that later.

17        THE WITNESS:  The BV does not sign contracts with the

18  customers -- with Stream TV.

19        THE COURT:  Okay, that's testimony.  You can put

20  something -- but just leave the commentary about somebody

21  else's fault.  Let's just stick to what I need.  I don't need

22  all of that fault, who's fault.  I just need to know --

23  BY MR. COLBY:

24  Q    Mr. Rajan before we took a break, you testified that

25  Stream -- let me take you back in time to when the receiver was

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 151 of 294

151

1   appointed in 2022.  Recall that period of time?

2   A    Yes.

3   Q    Okay.  And you testified before the break that when the

4   receiver in place, Stream TV could have brought proposals for

5   projects to the receiver for approval and to get work on them,

6   correct?

7   A    Yeah, we did.

8   Q    And there were zero contracts that were proposed and

9   approved by the receiver that were brought by Stream TV,

10  correct?

11  A    Absolutely not.  That's wrong again.

12  Q    So your testimony is, and this is, your testimony is that

13  the receiver did approve contracts?

14  A    The receiver was working with Stream TV on a broad deal

15  with CyStar.  And in that conversation, that's when it came up.

16  I think it was the second time it happened that the BV is too

17  busy to work on our projects.  They have to hire 20 people or

18  something, even though the 31 people don't have enough work to

19  do to work on our projects.  There was huge discussions with

20  the receiver and CyStar and some other projects.

21  Q    So your testimony is that you tried to get a contract

22  approved, but the independent receiver denied it?

23  A    Okay, let -- let me explain it again.  The customer

24  projects, the contracts, are with Strean TV in combination

25  working with VSI to finance it.  The issue was getting the

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 152 of 294

152

1   engineers over there to pitch in and help out our other

2   engineers outside of the Netherlands.  And the response that

3   came back was, they're too busy working on SeeCubic of

4   Delaware's projects to work on Stream TV's projects.  That was

5   the answer.  The BV does not sign contracts on Stream TV and

6   VSI projects.

7           THE COURT:  So the answer for my summary is they made

8   proposals, they weren't approved for whatever reason.  Your

9   question was the two questions -- that you didn't propose, and

10  you didn't approve.  And he said we did propose -- they weren't

11  approved.  Okay, so that's what I got out of all of that.

12  Okay, let's move on.

13          MR. COLBY:  Okay.

14  BY MR. COLBY:

15  Q   Mr. Rajan, you agree that there is -- well, let me start

16  that over again.  Mr. Rajan, there's a lot of value in the

17  Dutch entities, correct?

18  A   Yeah, there's value there.

19  Q   In your view, SeeCubic BV is worth hundreds of millions of

20  dollars?

21  A   No.  I said the Dutch entities -- there's three of them

22  over there.

23  Q   Okay.

24  A   And I was talking enterprise value, not forced

25  liquidation.

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 153 of 294

153

1    Q    Okay.  So the Dutch entities are worth hundreds of

2    millions of dollars?

3    A    Yeah, enterprise value, not forced liquidation.

4    Q    Right.  But there's, suffice to say, there's a lot of

5    value that you perceive to be in these Dutch entities, correct?

6    A    Correct.

7    Q    And you also believe that they have operational value,

8    correct?

9    A    They have operational value, but the expenses are

10   substantially too high.

11   Q    The engineers there have a long history with this

12   technology, correct?

13   A    Some of them do, yes.

14   Q    And some of them came from Phillip, where it was

15   originally developed, correct.

16   A    A couple of them came, yes.

17   Q    And some of them helped develop the original algorithm?

18   A    The original ones, yes.

19   Q    And they can do lens design, correct?

20   A    Some of them can, yes.

21   Q    And they can modify or help to modify the stack of code

22   for particular products, correct?

23   A    Not really anymore, no.

24   Q    Okay.  But the employees have technical expertise about

25   this Glasses-Free 3D technology, correct?

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 154 of 294

154

1    A    They -- they can help with 3D, yes, these issues -- the

2    manufacturing and the electronics.

3    Q    And if SeeCubic BV is not funded, Mr. Rajan, the engineers

4    who work there would leave the company, correct?

5    A    Hang on a second.  SeeCubic BV's cost structure is

6    unacceptable.

7    Q    My question to you is do you understand that if SeeCubic

8    BV was not funded, that the engineers who work on the 3D

9    technology would leave the company?

10   A    Yes, some of them could leave.

11   Q    Right.  In fact, you, when we were here -- we actually

12   weren't here, we were doing it remotely, but when we had a

13   hearing in April about funding issues, you testified if

14   SeeCubic BV is not funded, then the engineers who work on the

15   3D, well, one, they would leave the company.  So we would not

16   have use of their, you know, their ability to help us with

17   doing consulting work for the electronics and then the bonding.

18   That was your testimony, correct?

19   A    Correct.

20   Q    Okay.  Since the receiver was appointed in October of

21   2022, that's right, October of 2022, Stream has contributed

22   zero dollars to funding SeeCubic BV, correct?

23   A    Yeah, Stream TV was not allowed to give money to the BV.

24   Q    Right.  Not allowed by who?

25   A    The court.

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 155 of 294

155

1    Q    And prior to the filing of the bankruptcy, when the

2    receiver was appointed -- from the point in time when the

3    receiver was appointed in October of 2022, since that time,

4    Stream has contributed zero dollars to funding SeeCubic BV,

5    correct?

6    A    Correct.  Stream TV did not give funding to the BV.

7    Q    Even though failure to fund could lead to the loss of the

8    technical expertise of those employees, correct?

9    A    Correct.

10   Q    And after, I'm sorry, in the hearing that we had on April

11   25th about funding, you claim this court prevented you --

12   prevented Stream TV from providing funding, correct?

13   A    They prevented Stream TV, but they asked me to go out and

14   get funding, correct.

15   Q    Right.  In fact, the question on the table then was

16   whether or not SeeCubic BV could draw on a note that would

17   provide funding from SeeCubic of Delaware, correct, and whether

18   or not that note could be increased, correct?

19   A    I don't understand.  Your question is what again?

20   Q    The issue on the table there was whether or not SeeCubic

21   BV could increase the amount of a note that was being used to

22   fund its operations with the money being provided by SeeCubic

23   of Delaware; do you recall that?

24   A    No, that's incorrect.

25   Q    Okay, what was the issue then?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 156 of 294

156

1    A    They were allowed -- there was some unused portion of the

2    note.  They were allowed to take that unused portion of the

3    note.  Then, I was arranging funding for the BV, and I told the

4    employees the trade secret violations, the license agreement

5    violations have to stop.  And if they have equipment that they

6    don't have title to that came from somebody else and property

7    they don't have title to, it's got to go back.  We are not

8    going to put money into an illegal operation.

9    Q    Mr. Rajan, the question -- at that point in time, you

10   claimed to be the director of SeeCubic BV, correct?

11   A    I was the director and CEO of the BV, correct.

12   Q    And as a director and CEO, in order to receive funding on

13   that note and prevent employees from walking out the door, you

14   needed to sign off on further drawdown of that note, correct?

15   A    Correct.

16   Q    And it was in the company's best interest to do that so

17   that the employees' payroll would be funded, and they wouldn't

18   leave, correct?

19   A    No, because when I went there to the Netherlands, I saw

20   illegal activity happening in the Netherlands.

21          THE COURT:  No, no, no, no.  The question is, as the

22   director and CEO of SeeCubic BV, was it in the company's best

23   interest for you to sign off on the draw on the note.

24          THE WITNESS:  No.  After I saw what happened there,

25   no.

1    BY MR. COLBY:

2    Q    Okay.  And in that hearing, the court stated, I will put

3    this on the record, Mr. Rajan has a fiduciary obligation to the

4    company, and I would recommend that he exercise it correct?

5    A    Correct.  That was before my second trip.

6    Q    And that was -- that was a very urgent funding crisis at

7    that point in time, correct?

8    A    Yeah, that was a funding crisis.

9    Q    And notwithstanding the urgency, notwithstanding the fact

10   that the employees could leave, and notwithstanding the advice

11   from the court, you never signed that note, did you?

12   A    No.

13   Q    Now, shifting ahead in time, when we were here on October

14   16th, Mr. Rajan, you claim that Stream has spent $2 million on

15   operations in this bank while this bankruptcy has been pending;

16   do you recall that?

17   A    Correct.

18   Q    And how much of that money has gone to fund SeeCubic BV?

19   A    None of it.

20   Q    None of it.  All right, switch topics.  Mr. Rajan, you

21   have testified that since June 2022, SeeCubic has failed to

22   return Stream assets, correct?

23   A    Yes.  They failed to return Stream assets.

24   Q    All right.  And one of the assets that you say wasn't

25   returned was the contents of servers that were housed I think

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 158 of 294

158

1    somewhere on the West Coast, right?

2    A    No.

3    Q    So the information on the servers has been returned?

4    A    What -- the information on the server in California was

5    returned, but the server was not returned.

6    Q    Okay.  So you have the data off of the server in

7    California and you're not making that part of your claim here,

8    correct?

9    A    No, we gave a list of all the items that SeeCubic has not

10   returned yet.

11   Q    Okay.  So when you were here last time and you referenced

12   servers, that problem's been solved --

13   A    No.

14   Q    -- you have the contact of the server?

15   A    No, we were talking about the company server that has all

16   the company records for Stream TV.  SeeCubic of Delaware's

17   controlling it.

18   Q    Well, SeeCubic of Delaware has returned control of the

19   internet domains, www.streamtvnetworks.com and www.ultrad.com,

20   correct?

21   A    I don't know if they gave ultrad.com.  We have 20 domains.

22   I think we only got one.  I didn't know -- I don't know how

23   many were missing, but it's a big chunk of the domains.

24   Q    All right.  So Mr. Rajan, it's true that SeeCubic of

25   Delaware has returned control over a long list of internet

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 159 of 294

159

1   domains that you say are Stream TV's property, correct?

2   A   I'm not aware of that.

3   Q   You're not aware of that?

4   A   No.

5   Q   You're saying that didn't happen?

6   A   The vast majority of domains have not been turned over.  I

7   think it's almost 70, 80 percent of the domains have not been

8   turned over.

9   Q   Let's take a look at page 26 -- I'm sorry, tab 26 of the

10  binder in front of you.  Mr. Rajan, who's Brian Lemon

11  (phonetic)?  Well, take a look at the document and let me know

12  when you're ready to answer questions about it.

13  A   Yeah, that's one of our attorneys.

14  Q   Okay.  Who's Andrew Dupree (phonetic)?

15  A   That's one of Stream TV's attorneys.

16  Q   And who's Stephanie Dallaire (phonetic)?

17  A   One of Stream TV's attorneys.

18  Q   Okay.  So Mr. Rajan, do you see in this email chain, in

19  particular, on page 2 --

20          MR. ZAHRALDDIN:  Objection, Your Honor.  He's being

21  asked questions regarding a document that has not been admitted

22  into evidence at this point.  It looks like we would object to

23  this document on hearsay grounds.

24          MR. COLBY:  Well, so two things, Your Honor.  It's

25  impeachment.   He says that the control of domains hasn't been

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 160 of 294

160

1  returned, and this shows that it has been.  Two, I would think

2  that if there's some miscommunication here, and in fact, the

3  Debtor is somehow under the impression that they don't have

4  control of these domains, and they actually do, they would want

5  to know that.

6          THE COURT:  Well, you said impeachment.

7          MR. COLBY:  Yes.

8          THE COURT:  Impeachment of what -- a document?

9          MR. COLBY:  He's testified that he doesn't think that

10  the control of the domains was turned over and --

11          THE COURT:  Okay, and you want to impeach him with

12  emails from other people?

13          MR. COLBY:  An email to his counsel --

14          THE COURT:  Okay.

15          MR. COLBY:  -- that says his agent -- that says here

16  are the domains and here's the control.

17          MR. ZAHRALDDIN:  He's not even copied on this email,

18  Your Honor.  You know, how is he trying to impeach him on using

19  a document that there hasn't even been any testimony that he's

20  ever seen this document before.

21          MR. COLBY:  He said that SeeCubic hasn't turned over

22  the --

23          THE COURT:  No, no, no, let's stop.  The question is,

24  can you impeach him with these emails.  Let's stick with that.

25  I know what his testimony is.  He's objecting saying that you

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 161 of 294

161

1    can't impeach him with a document that he hasn't even seen --

2          MR. COLBY:  Yeah.

3          THE COURT:  -- or been asked about. Any -- I don't --

4          MR. COLBY:  I can.  I think the ability to impeach is

5    quite broad.  And certainly, if Mr. Rajan is claiming we didn't

6    get back control of these websites, and there's a communication

7    to his lawyer that gives the name and the password to the

8    websites to give up control, that's, I think, well within the

9    bounds of ordinary impeachment.  He says they didn't give it

10   back.  Here's a communication to his lawyer that says, here's

11   control of those websites.

12         THE COURT:  That's still -- my question is, you're

13   saying that you can use those emails for impeachment.

14         Counsel, why can't he?

15         MR. ZAHRALDDIN:  Your Honor, it appears to be a

16   conversation between counsel, and they're disputing -- they're

17   going back and forth in a dispute.  I don't know how you can

18   possibly impeach one of the counsel sitting here in this room

19   and saying essentially, that they're disagreeing with giving

20   seecubic.com back, even though seecubic.com is the debtor's

21   property, because -- and they believe it will cause some sort

22   of confusion.  They're having a --

23         THE COURT:  Well, what I'm saying while Stream

24   maintains that MIR is insufficient, please provide access.  How

25   many is this?

1         MR. KODOSKY:  So that's a separate issue I was going

2    to get to, Your Honor, that --

3         THE COURT:  Because they're saying that you didn't

4    give it -- well, never mind.

5         MR. KODOSKY:  That regards -- no, that regard --

6         THE COURT:  Well, that doesn't answer my question.

7         MR. KODOSKY:  That's about email too.  That's a

8    completely different issue.  I was going to get to that.

9         THE COURT:  Okay.  Well, I'm just looking at it.  I'm

10   trying to figure out can you use for impeachment purposes.  I'm

11   going to go to my little rule here.  All right.  Let's see what

12   rule are you relying on, counsel, because you know there's a

13   rule for everything.

14        MR. KODOSKY:  I know.

15        THE COURT:  Who may -- 607 it says, who may impeach a

16   -- impeachment by evidence of -- well, we can't do 6.  So you

17   believe as long as it's not under these having to do with

18   impeachment, it's admissible?  Oh, wait.  This isn't criminal,

19   so we're not looking at 609.  What are we looking at?  Somebody

20   tell me.

21        MR. COLBY:  So the way the structure the rules works

22   to my understanding, Your Honor.

23        THE COURT:  Uh-huh.

24        MR. COLBY:  It addresses who can impeach a witness.

25        THE COURT:  Uh-huh.

1          MR. COLBY:  And then it talks about certain

2    categories of things that aren't permissible impeachment.

3          THE COURT:  Right.  And that's why I was saying is it

4    only was not listed, as long as it's not precluded you can use

5    it.

6          MR. COLBY:  That's right.  It's not precluded, so we

7    can use it.

8          THE COURT:  So you can impeach someone with something

9    that is hearsay?

10         MR. COLBY:  Yes.

11         THE COURT:  And you believe that you can do that

12   because 609 or 608?  Right.  608 and 609 that talks about what

13   you can't as to truthfulness, and you're not impeaching him

14   about his truthfulness, correct?

15         MR. COLBY:  I am, because Mr. Rajan is testifying

16   that email archives ability to control email and server domains

17   were not returned.

18         THE COURT:  But you're not saying that he -- you're

19   saying the truthfulness of it.

20         MR. COLBY:  Yes.

21         THE COURT:  If he believes it has it.  You're saying

22   either you don't know and/or your counsel didn't tell you or

23   you're saying that he knows and he's not telling the truth.

24   Which one?

25         MR. COLBY:  Yeah.  Either one.  It gets at his

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 164 of 294

164

1    credibility.  Either he's making claims in this Court that

2    something wasn't returned when in fact it was, which is a

3    credibility issue.

4              THE COURT:  Okay.

5              MR. COLBY:  He's going to say under oath, this was

6    not returned.  And in fact, it was, or he's aware it was

7    returned.  And --

8              THE COURT:  He's been untruthful.

9              MR. COLBY:  He's being untruthful about it.

10             THE COURT:  Okay.

11             MR. COLBY:  Right.  I'm making no secret, Your Honor,

12   about the fact that I think a lot of the basis for this TRO is

13   pretextual.  And I think this goes to the -- in part to the

14   heart of that.

15             MR. ZAHRALDDIN:  Your Honor, the document in question

16   doesn't answer any of those questions.  The document in

17   question simply, it's -- as a matter of fact, it raises more,

18   because it's a going back and forth between counsel where

19   counsel for the debtor pre-bankruptcy, already basically is

20   disputing that anything's been turned back over.

21             They're going back and forth saying, yes, I gave it

22   back.  No, I didn't.  We're only going to get some of it.  Not

23   all of it.  That's completely consistent with what Mr. Rajan

24   said.  He is not aware that they have everything back.  And I'm

25   not so sure that there's even been a foundation established as

1   to what you would need to do you have your emails back.  Just

2   giving me the password doesn't do it.

3           And even in this document, they're saying they're not

4   going to give everything back because they don't feel like it,

5   because it's going to be prejudicial to SeeCubic.  That's -- I

6   don't see how that's probative at all here, and certainly

7   doesn't impeach him.  And doesn't -- and it certainly doesn't

8   go to his truthfulness, or even his competency.  So I don't

9   think it's -- I don't think it's proper impeachment.  That's

10  our position.

11          THE COURT:  Okay.  They -- so their responses is it's

12  not proper impeachment, because it doesn't go to the

13  truthfulness of it, that he's saying that I don't believe this.

14  And you're saying he's being untruthful that he did, because

15  his counsel got these emails.  And the other issue is that

16  you're saying that you can impeach him?  What was the other

17  basis, counsel?

18          MR. COLBY:  Well, he's either unaware of the fact

19  that these have been returned and is testifying to the

20  contrary.  Or is aware --

21          THE COURT:  So is that impeachment?

22          MR. COLBY:  ---- and is testifying -- yes.

23          THE COURT:  Is that --

24          MR. COLBY:  It goes to his --

25          THE COURT:  -- impeachment because you're unaware?

1          MR. COLBY:  Yeah.  It goes to his credibility, his

2    ability to speak as to the -- his ability to speak on that.

3    His factual testimony, if it's shown to be incorrect, that goes

4    to his credibility.

5          MR. ZAHRALDDIN:  And again, Your Honor --

6          MR. COLBY:  Say under oath something is true and it's

7    not.

8          MR. ZAHRALDDIN:  And again, Your Honor, it's --

9          THE COURT:  Well, wait a minute.  Wait a minute.

10   Saying something's truthful under oath, and it not being

11   truthful, and you're not being truthful is two different

12   things.  And one is, you know and you're not telling the truth.

13         MR. ZAHRALDDIN:  Right.

14         THE COURT:  Or you think you know, but there's

15   something to the contrary that contradicts what you're saying?

16         MR. COLBY:  Yeah.  And both of those goes -- true.

17   And I'm putting out two possibilities.

18         THE COURT:  Right.

19         MR. COLBY:  I don't know which is which, but both of

20   them go to the credibility of the witness.

21         MR. ZAHRALDDIN:  And that's why we're objecting

22   because this does not show that either Mr. Rajan is being

23   untruthful or that he is not competent to address these issues.

24   This is a email where two lawyers are in dispute over this.

25   Mr. Rajan clearly said he believes that some things may have

1    come, but not in full, and certainly not what we're supposed to

2    get.  And even this email confirmed that.

3           MR. COLBY:  Well, I mean, it says, "We're in the

4    process of compiling the data.  We'll send that over on a

5    rolling basis, including the ones below."  And there is a list

6    of --

7           THE COURT:  Okay.  And I guess --

8           MR. COLBY:  -- websites.  And it describes the

9    columns, including left to right; site, comments, active,

10   username, and password.  That's handing over --

11          MR. ZAHRALDDIN:  And that rolling basis, I can

12   guarantee you stopped rolling at some point, because there's

13   nothing that's come back.  And again, it still says that

14   they're planning on keeping seecubic.com because they feel like

15   it, not because it should be turned back over pursuant to the

16   state court order.

17          THE COURT:  All right.  Wait a minute, wait a minute.

18   You want to impeach him because he has said that they do not --

19   he does not believe that all of it has come back.  And you

20   believe that this document will establish that all of them has

21   come back.  And that you will impeach his testimony that all of

22   them have -- his testimony that it hasn't, that these in this

23   email is going to impeach that testimony, because it's going to

24   show that all of it came back, correct?

25          MR. COLBY:  It's going to show that a large number of

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 168 of 294

168

1    them were turned over.  And then there were others as to which

2    says that SeeCubic doesn't have access in the first place.

3    That's the second table that appears in here.

4              THE COURT:  Uh-huh.

5              MR. COLBY:  And then there are three as to which a

6    dispute continued.

7              THE COURT:  And that's what he said that I don't

8    believe they came back.

9              MR. COLBY:  Okay.  I just want to be clear, because

10   when Mr. Rajan was here last time he testified they haven't

11   turned over our websites.  And so --

12             THE COURT:  Okay.  And now his testimony is that

13   they --

14             MR. COLBY:  That's not true.

15             THE COURT:  -- have returned some, and his opinion --

16   and his belief is that a substantial amount remains unreturned.

17             MR. COLBY:  Okay.

18             THE COURT:  So is that going to contradict what he

19   says is going to impeach him his testimony that he's agreed

20   that some has returned.  That's just -- I don't care what he

21   said at the last hearing.  What he's saying today is they have

22   been.  So what is it that you want to impeach him for saying?

23             MR. COLBY:  If the testimony is that they have been

24   returned then there can't be a basis --

25             THE COURT:  Some of them.  And you -- but your own

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 169 of 294

169

1  you say they -- even these are going to say some of them, and

2  there's a dispute.  And I don't even know if this is going to

3  impeach because he's already said that he doesn't believe that

4  this represents the universe.  Is this going to impeach that it

5  doesn't -- that it does represent the universe?

6          MR. COLBY:  Well, that wasn't the specific testimony

7  that I was seeking to impeach.  I was seeking to impeach what

8  he said before, which was that he didn't have access to the

9  website.  So if --

10          THE COURT:  But he did just -- but that was --

11          MR. COLBY:  -- his testimony now is he has access --

12          THE COURT:  But that was his testimony.  I don't care

13  what he said the last time.

14          MR. COLBY:  Okay.

15          THE COURT:  Are you going to impeach him for what he

16  said today or what he said the last hearing?  I mean, you can

17  point it out, but he said --

18          MR. COLBY:  I think I can impeach him for either,

19  but --

20          THE COURT:  Well, that's not his testimony today.

21  BY MR. COLBY:

22  Q    Mr. Rajan, have you changed your testimony since the last

23  time?

24  A    What's the question again?

25          MR. COLBY:  Never mind.  I withdraw it.

1          THE COURT:  Counsel, move on.  I got the drift.

2          MR. COLBY:  Okay.

3          THE COURT:  Okay.  I understand what's going on.

4   BY MR. COLBY:

5   Q    Mr. Rajan, isn't it the case that control of the Stream TV

6   website gives control over those -- of the Stream TV domain

7   gives control over the Stream TV email addresses?

8   A    No.

9   Q    That's your testimony is that that's not true?

10  A    I don't believe that's the case.  There's a huge number of

11  Stream TV emails that your side is releasing.  And we've sent

12  numerous emails after that email.  We haven't gotten them.

13  Q    Mr. Rajan, isn't it the case that your lawyers at McCarter

14  & English were given the password to access the company's

15  historical email archives?

16  A    No.  There's been numerous conversations post that email

17  that what you guys gave was barely usable.  It wasn't done

18  properly.  There's a huge number of emails we can't access and

19  we can't access at all.  And your site has been unresponsive

20  since that email you just tried to enter in.  And it's a huge,

21  huge amount of data.  We can't access it.  We can't access the

22  company information on the servers.

23  Q    Mr. Rajan, is it your testimony, that access to the email

24  was not given to Amanda Gonzalez at an email address of

25  amanda@streamacquisitiongroup.com?

1   A    It was only usable after a whole bunch of hoops and

2   hurdles had to go -- we had to go through and only for a small

3   portion of this Stream emails.  We have sent numerous emails to

4   your side, and they're not helping at all.

5   Q    Okay.  So you do have access, but there's too many hoops

6   and hurdles.  That's your testimony now?

7   A    No.  There's two problems.  What you gave is not wasn't --

8   what you gave was not done properly.  And there's a huge number

9   of emails.  You didn't give anything.

10  Q    Okay.  I want to move on, Mr. Rajan.  This back and forth

11  about access to emails, that took place in 2022, correct?

12  A    Yes.

13  Q    Okay.  And it wasn't until you brought this TRO that you

14  felt that your inability to get through the hoops and hurdles

15  warranted immediate injunctive relief, correct?

16  A    No, we filed a turnover action.

17  Q    Uh-huh.  Okay.  So from October, you filed the turnover

18  action at some point in the summer of 2023, correct?

19  A    No, soon as he filed the bankruptcy.

20  Q    Okay.  And you filed the bankruptcy in March of 2023?

21  A    Yeah.

22  Q    And this back and forth of the emails was in October of

23  2022?

24  A    There was -- there has been back and forth since we won in

25  the Supreme Court over the assets to now.

1  Q    Yes.  This is October 2022.

2  A    Yeah.  So this is --

3  Q    This is since you won the Supreme Court, correct?

4  A    There's a constant back and forth.

5  Q    Okay.  But you haven't followed up since October 2022?

6  A    Yeah, we did.  We followed up just like a few weeks ago.

7  Q    Right.  When you filed the TRO.

8  A    No.  Even before the TRO.

9  Q    Okay.

10  A    We've been following up.  There's no help.  We followed up

11  on the emails just a few weeks ago.

12  Q    You followed up a few weeks ago on the issue that arose in

13  October of 2022, correct?

14  A    We've been following up constantly.

15  Q    All right.  Mr. Rajan, are you making a claim here that

16  you need injunctive relief because demo units that were housed

17  in London have not been returned?

18  A    That's one of the claims that -- yes, there's a whole

19  bunch of assets that are to be returned to Stream TV.  And

20  that's part of it.

21  Q    I'm asking whether or not you're making a claim here that

22  demo units in London have not been returned?

23  A    Yes.  There are demo units in London that have not been

24  returned.

25  Q    Okay.  Let's take a look at Tab 22.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 173 of 294

173

1          MR. KODOSKY:  Looks like we're about to have that

2    same issue, Your Honor, more emails back and forth between

3    counsel that this witness doesn't appear to be copied on.

4          MR. COLBY:  This one is different, Your Honor.

5          THE COURT:  Okay.

6          MR. COLBY:  And consistent with a ruling you made

7    earlier in this case.  There is a statement from Brian Lemon

8    (phonetic), who Mr. Rajan has agreed is the debtor's attorney

9    or was the debtor's attorney.  And in that email from Mr.

10   Lemon, which is a statement by a party and not hearsay, he

11   says, "We will have someone pick up the London units tomorrow

12   10/13 at 2 p.m. UK time."

13         THE COURT:  Okay.  "Please provide us with a name and

14   number."

15         MR. COLBY:  Correct.

16         THE COURT:  Okay.  Does he --

17         MR. COLBY:  I don't know.  But certainly we made them

18   available.  And he said they intended to.

19         THE COURT:  Okay.  And?

20         MR. COLBY:  And so --

21         THE WITNESS:  What's the question?

22         MR. COLBY:  -- if the claim is we haven't turned them

23   over, this admissible communication states that we made them

24   available.

25         THE WITNESS:  What's your question?

1          MR. COLBY:  Did --

2          THE COURT:  Stop.  Listen, this is getting out of

3   hand.  So you may -- he said that demo units have not been

4   returned and you're saying that they've been offered to come

5   pick them up.  And that will show that they at least have

6   been --

7          MR. COLBY:  Not just offered.  Mr. Lemon, Stream's

8   attorney says we will have someone pick them up tomorrow.

9          THE COURT:  Okay.  And what happened after that?  Do

10  I know they showed up and nobody let them in?  I mean, come on.

11         MR. COLBY:  And well, there's a response.  "Mr.

12  Lemon, we've confirmed the London units can be picked up."

13         THE COURT:  Okay.

14  BY MR. COLBY:

15  Q    I mean, Mr. Rajan, who's Glenn Knight-Davis (phonetic)?

16  A    Wait.  What's your question?

17  Q    Who's Glenn Knight-Davis?

18  A    He is somebody who has been helping us in London.

19  Q    Right.  And Mr. Glenn Knight-Davis went and picked up

20  these units in London in October of 2022, correct?

21  A    He picked up a portion of the units in London.  You have

22  the balance in your UK office.  Mr. Morton has it in his UK

23  office.  You're still holding on to a bunch of the London

24  units.

25  Q    And so to the extent that that's true, if you say that

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 175 of 294

175

 1   that's true, that's an issue that you were aware of in October

 2   of 2022, correct?

 3   A    Correct.

 4   Q    So you say there happened --

 5          THE COURT:  When were they picked up?

 6          MR. COLBY:  October of 2022.

 7          THE COURT:  All right.  Okay.  Okay.

 8   BY MR. COLBY:

 9   Q    Isn't it the case also, Mr. Rajan, that SeeCubic made

10   units available to be picked up in New York in October of 2022?

11   A    In October of 2022, we picked up a small portion of the

12   units in New York.  And you held on to a big percentage.

13   Q    Okay.  And if you say that SeeCubic improperly held on to,

14   "a big percentage," that's an issue you've been aware of since

15   October 2022, correct?

16   A    Correct.

17   Q    And Mr. Rajan, there were other -- there was other Stream

18   TV equipment in a storage unit in San Ramon, California,

19   correct?

20   A    Yes, there was.

21   Q    And SeeCubic gave Stream TV access to that unit to go pick

22   up whatever it wanted out of there, correct?

23   A    Yes.  Stream TV went and picked it up.  And we informed

24   you that a big percentage is missing.  And you personally said

25   you were going to go find them, which you never did.

1   Q    Mr. Robertson went and picked up the equipment that was in

2   the San Ramon storage unit, correct?

3   A    Correct.

4   Q    Mr. Rajan, you claim that SeeCubic didn't return Stream

5   TV's books and records.  Do you recall that?

6   A    Correct.

7   Q    Isn't it the case that in October 2022, the books and

8   records of Technovative media was -- sorry.  The complaint is

9   about the Technovative books and records, right, because that's

10  what SeeCubic was operating while the chancery courts --

11  A    No.  No, you took you took Stream TV's books and records.

12  You've never returned it.

13  Q    And -- okay Mr. Rajan.

14  A    You personally took it.

15  Q    All right.

16  A    You took it in December of 2020 and you never returned it.

17  Q    Mr. Rajan, in October of 2022, didn't -- are you aware

18  that my colleague, former colleague, gave access to your

19  lawyers at McCarter & English to an FTP site that contained the

20  books and records of Technovative Media.  Are you aware of

21  that?

22  A    Technovative -- okay.  They gave some access to

23  Technovative things.  The way you guys were providing access,

24  they work poorly.  And again, there was a large percentage of

25  the books and records from Stream TV and Technovative, which

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 177 of 294

177

1   has not been made available to this day.

2   Q    So Mr. Rajan, I'm sorry, are you denying that we sent an

3   email to your counsel at McCarter & English with a link to an

4   FTP site and a username and a password that -- and that that

5   FTP site containing the books and records of Technovative

6   Media.  Are you denying that?

7   A    You sent it.  It was not effective.

8   Q    It was not effective.  That was in -- so we did turn it

9   over, but you're saying you couldn't access it?

10  A    Yes.  It didn't operate well.

11  Q    That was in October of 2022.

12  A    Yes.

13  Q    And --

14  A    And we communicated with you numerous times since then and

15  you've turned nothing over.

16  Q    Okay.  Mr. Rajan, isn't it the case that the request from

17  Mr. Dupree was for the books and records of Technovative Media?

18  A    He requested Technovative Media on that particular email.

19  We've asked you numerous times for Stream TV.  Since the -- we

20  won in the Supreme Court, we've asked for things post-

21  bankruptcy.  We've gotten nothing.  Almost nothing.

22  Q    And your inability to access the FTP site with the

23  password and the username that we provided, that was an issue

24  you weren't aware of in October of 2022, correct?

25  A    Correct.  Normally, this isn't how people turn things

1  over.  That's why that's a problem.

2  Q    Mr. Rajan, let's take a look at Tab 20.  Do you recognize

3  this document?

4  A    Correct.

5  Q    It's a letter from your lawyer.

6  A    Uh-huh.

7  Q    And on the last page, paragraph 11 is a request for books

8  and records of Technovative Media, Inc.  Do you see that?

9         THE COURT:  What page are we on, counsel?

10        MR. COLBY:  It's the very last page.  Page 10.

11        THE COURT:  I didn't even know how many there was?

12  Let's get to page 10.  Okay.

13  BY MR. COLBY:

14  Q    That's a request for the books and records of Technovative

15  Media, Inc., correct?

16  A    Correct.

17  Q    That's what your lawyer asked for in 2022.

18  A    On that particular day, yes.  There's been requests for

19  access to the company servers, which you've never given for

20  Stream TV.

21        MR. COLBY:  Your Honor, I think the only thing I have

22  left subject to second guessing and other backseat driving from

23  my fellow defense counsel here is the issue with respect to the

24  Netherlands court opinion.

25        THE COURT:  Okay.

1           MR. COLBY:  So happy to take a break, and you can

2    look at that or --

3           THE COURT:  Well, let's --

4           MR. COLBY:  -- charge right into it, or however you

5    want to do it.

6           THE COURT:  No.  Let me take -- I am going to

7    endeavor not to make it a long time.  I just don't know what

8    I'm going to get.  Have we started looking at -- I'm sure we

9    started looking at that, right?  All right.  Let's come back.

10   I'm going to give myself 15 minutes.  If I need a little

11   longer, we'll come out and let you know.  Okay.  And then once

12   you do that, that's going to be the end of your cross for Mr.

13   Rajan?

14          MR. COLBY:  Correct.

15          THE COURT:  And then they're going to redirect.  And

16   then we're going to have -- yes?

17          MR. CAPONI:  I may have some questions before.

18          THE COURT:  Okay.  All right.  So then we may have

19   some questions from Mr. --

20          MR. CAPONI:  Caponi.

21          THE COURT:  Caponi.  I'm drawing a blank.  Mr.

22   Caponi.  And then we'll have redirect and then we may have a

23   rebuttal.  Well, they still want to have a witness on a factual

24   basis, then I guess I should research that.  That's going to

25   take me longer than 15 minutes.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 180 of 294

180

1          MR. COLBY:  Yeah.  And I don't know if you want to --

2          THE COURT:  What's the latest everyone can go

3   tonight?

4          MR. COLBY:  I have flights tomorrow morning, Your

5   Honor.  So --

6          THE COURT:  You guys going by train, plane,

7   automobile?

8          MR. COLBY:  It's a bit of a long train ride back to

9   Boston.

10          THE COURT:  Okay.

11          MR. COLBY:  So I was planning on flying.  I can only

12   speak for myself.  I don't know everybody else's travel plans.

13   I can be flexible this evening.  I can't speak for everybody

14   else.

15          MR. CAPONI:  I'm on a flight out this evening to

16   Miami a week.  Work.

17          THE COURT:  Work?  I was going to say vacation?

18          MR. CAPONI:  I'm not that lucky.

19          THE COURT:  Well, you can -- no matter where you are

20   work is work.  Doesn't matter whether it's Miami, Cancun,

21   London.  If it's work, it's work.  I will try -- what time do

22   you have to leave?

23          MR. CAPONI:  A little after 4:30, something like

24   that.

25          THE COURT:  Okay.  Well, I don't even know if you're

1    going to get to cross-examine Mister --

2            MR. CAPONI:  I may not.  I may have to --

3            THE COURT:  All right.

4            MR. CAPONI:  ---- write my questions down.

5            THE COURT:  All right.  Let's come back at 4:15.  I'm

6    going to try to go as late as I can but, you know, again, we're

7    going to need another day, which I thought we reserved two -- I

8    thought we did Monday and Wednesday for this.  But Wednesday

9    was actually for something else.  Because I said, Oh, I have

10   two days of Stream trial this week.  I guess I was wrong.  Yes,

11   counsel?

12           MR. GRUGAN:  I wasn't standing.

13           THE COURT:  Oh, okay.  You're in Philadelphia, right?

14           MR. GRUGAN:  I am.  I can be here whenever you want,

15   Your Honor.

16           THE COURT:  Well, we have gone as late as 11.  I'm

17   never doing that again.  But I was home.

18           MR. COLBY:  I was in Miami for that one, Your Honor.

19           THE COURT:  We were on Zoom.

20           MR. COLBY:  I know.

21           THE COURT:  So we didn't -- I didn't -- we didn't

22   have the marshals.  We didn't have the --

23           MR. COLBY:  Yeah.

24           THE COURT:  We didn't have to worry.  But I can't do

25   that, because I have some responsibilities that will not allow

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 182 of 294

182

1  me to go that late.  All right.  So we're in recess until 4:15

2  on the issue of the admissibility of the decision from the

3  Dutch court that was recently issued, which is document -- what

4  was the document number?  Exhibit number --

5              MR. ZAHRALDDIN:  SC-4.

6              THE COURT:  SC-4.  All right.  Thank you, counsel.

7              MR. COLBY:  Your Honor, before you leave, I'm sorry.

8  We just want to make sure that we can handle any Rule 103

9  issues on preservation of anything for appeal.  At the end, I

10 don't want it -- I don't want anyone telling me we waive

11 something again.  And since we have to not assume things, I

12 wanted to at least state that.

13             THE COURT:  Okay.

14             MR. COLBY:  And I thought that would be helpful to

15 not tie things up now.  We can do it later.

16             THE COURT:  Okay.  And it's SC -- John, can you pull

17 that up?

18             MR. COLBY:  SC-4.

19             THE COURT:  Right.  I don't necessarily have any of

20 that up here.

21             MR. COLBY:  Oh, it's binder --

22             THE COURT:  Is there a binder?

23             MR. COLBY:   Tab.  Tab 18 in the binder.

24             THE COURT:  In this binder?

25             MR. COLBY:  In that binder.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 183 of 294

183

1          THE COURT:  Okay.  That's fine.  All right.

2          MR. COLBY:  And the transcript cite is 157 through

3    159.  From October 6th.

4          THE COURT:  7159, and it's SC --

5          MR. COLBY:  4.

6          THE COURT:  But it's 18 in this binder.

7          MR. COLBY:  18 in the binder.  Yes, Your Honor.

8          THE COURT:  Okay.  All right.  Thank you, counsel.

9          MR. COLBY:  Thank you, Your Honor.

10     (Recess taken)

11          THE COURT:  Okay.  I've had an opportunity to look at

12   the cases that you cited, counsel, and some other cases.  One

13   actually pretty old from the Third Circuit that serves and was

14   cited in Iglesias and the -- and it's the case called Harden v.

15   Montgomery Ward.  It's 120 F.2d 500.  I mean, it's an 1941

16   case, it's pretty old, but what it stands for the proposition

17   that your specific objections have to be placed on the record.

18   You cannot say if you're going to object to a document, you

19   have to put it on the record and state what it is.

20          In this case, there was no specific statement made as

21   to why you would not object -- that you didn't object.  And you

22   didn't say, we don't object as long as it is admitted for the

23   limited purpose of the ruling.  That was never stated.  And the

24   fact that I may have ruled on some other matters, and said that

25   this is admissible, because it's as long as it's for the -- as

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 184 of 294

184

1    long as it's for the ruling and not the explanation.  That

2    should have been stated on the record.  And then I would have

3    ruled or Mr. Colby would have responded.

4           There was nothing on the record that suggested that

5    this was being -- that the admission of that document was being

6    objected to for any basis.  And so because there was no

7    limitation, nothing cited, Mr. Colby just said, I want it

8    admitted.  No objection filed, nothing stated.

9           And the fact that I may have ruled in the past,

10   doesn't mean I would have ruled again -- rule on the same basis

11   and said, only the rationale will come in.  But you didn't do

12   any of that.  And you can't now, after the fact said, oh, well,

13   I made some assumption.  Doesn't -- I don't read minds, Mr.

14   Colby.  I don't know, maybe you can.  But all I know is that

15   you didn't put it on the record, and because you didn't put it

16   on the record, you waived it.  And because it's waived, it

17   comes in all without any limitations.  All right, Mr. Colby.

18           MR. ZAHRALDDIN:  Your Honor, can I raise one point?

19           THE COURT:  Sure you can if you want.  I've already

20   ruled, but go ahead.

21           MR. ZAHRALDDIN:  Well, under Rule 403, you can still

22   exclude the evidence if it's prejudicial.  And you have a

23   machine written order, which has, from what I can tell a very

24   different procedural due process standard in the Netherlands.

25   And I'm not sure where the judge is getting this.  I don't know

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 185 of 294

185

1  if he was taking it whole cloth from the filings with the other

2  party.  But I still would think that we would need to object to

3  raise the objection, that it is extremely prejudicial under

4  Rule 403 and should be excluded without regard to a prior lack

5  of waiver.

6           THE COURT:  Counsel, the time to object as it being

7  prejudicial was at the time it was offered.  If objections

8  weren't raised, and then later when the document is offered,

9  now you want to object.  You have to raise the objection at the

10  time.  No objection having been raised, you don't get to raise

11  it later in the proceedings.

12           MR. ZAHRALDDIN:  Understood, Your Honor.

13           THE COURT:  One of these cases say that somewhere in

14  here.  I don't know specifically, which one.

15           MR. ZAHRALDDIN:  Understood, Your Honor.

16           THE COURT:  Therefore your objection to the use of

17  the complete opinion is overruled.

18           MR. ZAHRALDDIN:  Thank you, Your Honor.

19           THE COURT:  I left my binder in my chambers.  That's

20  why I went --

21           MR. COLBY:  We probably have another copy.

22           THE COURT:  That's all right.  My law clerk --

23           MR. COLBY:  But if you've become attached to that

24  one, we'll --

25           THE COURT:  is you know, pretty good and has gotten

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 186 of 294

186

1  pretty good at understanding before his limited -- he just

2  started in August.  He's gotten pretty good at figuring out

3  what happened.  All right.

4          MR. COLBY:  Okay.

5  BY MR. COLBY:

6  Q    Mr. Rajan, when was the last time you were physically in

7  Hawk's office?

8  A    Physically in Hawk's office, would have been 20 -- either

9  2019 or 2020.

10 Q    Okay.  When was the last time you were physically in Mr.

11 Morton's office?

12 A    It was either 2019 or 2020.

13 Q    Thank you.  All right.  So you testified earlier that the

14 issue in front of the Dutch court was as to who would be

15 director of SeeCubic BV, correct?

16 A    Yeah.  They were objecting to our choice of director.

17 SeeCubic was objecting to our choice of director.

18 Q    Right.  You sought to install Mr. Park as director.

19 SeeCubic sought to install an independent director or in the

20 alternative Mr. Stastny, correct?

21 A    Correct.

22 Q    All right.  And ultimately, the court concluded that Mr.

23 Stastny should be the director of SeeCubic BV, correct?

24 A    I don't think that's accurate.

25          MR. COLBY:  Mister -- I'll withdraw it and rephrase

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 187 of 294

187

1    it.

2    BY MR. COLBY:

3    Q    Mr. Rajan, the court appointed Mr. Stastny director of --

4    A    Yeah.  As default.

5    Q    -- SeeCubic BV, correct?

6    A    Yeah.  As default.  Yes.

7    Q    As what?

8    A    As default.  They couldn't find an independent director.

9    Q    And in fact, Stream TV objected to the appointment of an

10   independent director, correct?

11   A    No.  Yeah, we didn't think it was necessary at that time.

12   No.

13   Q    All right.  Now, in its opinion, Mr. -- I'm sorry, in its

14   opinion, the Dutch court cited to multiple instances where it

15   stated that the management of the Dutch entities had asked you

16   for a solution to their persistent funding crisis, correct?

17   A    Yeah, that is correct.

18   Q    So do you have a tab 18 in front of you, Mr. Rajan?

19   A    Yeah.

20   Q    And this is SC-4.  Page -- I'll use the ECF pages.  Page 6

21   of the document.  Section 213.  On October 14th, 2022, the

22   local management --

23   A    Well, wait, wait, wait.  Slow down.

24   Q    Oh, yeah.  Sorry.  Let me know when you're there.

25   A    Yes.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 188 of 294

188

1  Q    The court stated on October 14th, 2022, "The local

2  management of the companies alerted Rajan to their acute

3  financial distress and concern about the payment of salaries in

4  that month.  This request for attention in the absence of

5  response to October 18, 2022 repeated."  Do you see that?

6  A    Yes.

7  Q    Flip to the next page, Mr. Rajan.

8  A    Yeah.

9  Q    Paragraph 216.  "When Rajan rejoined the companies as

10 their director in March 2023, local management asked for a

11 solution to the plight of these three companies financial

12 position." That's what the court stated, correct?

13 A    Which one are you on?

14 Q    2-1-6.

15 A    Oh, okay.  Yes, I see it.

16 Q    I'll reread it.  "When Rajan rejoined the companies as

17 their director in March 2023, local management asked for a

18 solution to the plight of these three companies financial

19 position."  That's what the court said, correct?

20 A    Correct.

21 Q    The next paragraph.  "On April 3rd, 2023, a letter on

22 behalf of the management of the companies asked Rajan to

23 clarify whether he intended to provide financing for the known

24 debts of the companies."

25 A    Correct.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 189 of 294

189

1    Q    Correct?  "In the meantime, management was reluctant to

2    cooperate with the remittance of assets, such as a bonding

3    machine.  Meanwhile, Mr. Rajan pressured associates of the

4    partnerships to hand over the bonding machine to him."  Do you

5    see that?

6    A    I see where it says that.  That's not correct.

7    Q    That's what the court stated though, correct?

8    A    That's what the court stated, but it's not correct.

9    Q    In 2.18, the next paragraph.  "In mid-April 2023, the

10   partnerships management asked Rajan how provision would be made

11   for payment of salaries in that month."

12            THE COURT:  Wait a minute.  Where are we at?

13            MR. COLBY:  2-1-8.

14            THE COURT:  Okay.

15            MR. COLBY:  Top of page 8.

16            THE COURT:  Uh-huh.

17   BY MR. COLBY:

18   Q    "In mid-April 2023, the partnerships management asked

19   Rajan how provision would be made for payment of salaries in

20   that month, but received no response."

21   A    No, that's incorrect.

22   Q    That's what this -- the court --

23   A    That's what the court said, but that's incorrect.

24   Q    Okay.  I wasn't done.  The sentence concludes, "but did

25   receive requests to cooperate in issuing --

1    A    Yeah.  That's incorrect.

2    Q    But that's what the court said, correct?

3    A    That's what the court said, but the court's incorrect.

4    Q    In paragraph 2.20, two down, the court stated, "In May

5    2023 during discussions with associates of the partnerships,

6    Rajan said that financing would be arranged, but he did not get

7    specific and financing failed to materialize."  That's what the

8    court stated, correct?

9    A    I don't know what associates of partnerships means.

10   Q    Right.  That's the --

11   A    What is that?

12   Q    The Dutch -- employees of the Dutch entities.  Correct,

13   Mr. Rajan?

14   A    Yeah, that's incorrect.

15   Q    You disagree with that statement, but that's what the

16   court said.

17   A    Yeah.  That statement is incorrect.  Yeah.

18   Q    Okay.  Paragraph 2.21.  "On May 26th, 2023, Stream and

19   SeeCubic, Inc. were urgently requested on behalf of the company

20   staff to find a solution to the financing, partly in view of

21   the salary payments to the employees in June 2023.  In

22   response, SeeCubic, Inc. made an offer of increase in the

23   existing financing.  No solution was offered by Rajan."

24   A    No, that's wrong.

25   Q    That's what the court stated, correct?

1   A    Yeah.  That's completely wrong.  We gave a competing

2   offer.

3   Q    That's what the court stated, correct?

4   A    No, that's wrong.

5   Q    Let's go back and look at -- I'm sorry.  Let's go ahead

6   and look at 5.2.  This is page 12, 5.2.  The court said, "As

7   long as the battle for control of Technovative continues, the

8   status quo within the companies should be maintained as much as

9   possible.  This is also the purpose of the status quo order

10  entered by the U.S. court, see section 2.10.  The companies

11  must be prevented from collapsing or having their assets taken

12  outside of the Stream group.  And thus the recourse of HAM

13  KCS."  I don't know what that last parenthetical refers to.

14  But that's what it says right, Mr. Rajan?

15  A    Yeah.  And that is incorrect.  They are talking about a

16  chancery court ruling a year earlier.

17  Q    The court states here, "That as long as the battle for

18  Technovative continues, the status quo within the company

19  should be maintained as much as possible."  That's what the

20  court stated, correct?

21  A    The courts stated it, and that's incorrect.

22  Q    And in 5.3, down in the sort of middle of the paragraph on

23  the right side, there's a -- what appears to be a sentence that

24  begins with, "There is an acute situation."  Do you see that?

25  A    No.  Where?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 192 of 294

192

1  Q     So 5.3 middle of the paragraph on the --

2            THE COURT:  Sixth line.

3            MR. COLBY:  Sixth line on the right side.

4            Thank you, Your Honor.

5            THE WITNESS:  Oh, sure.

6  BY MR. COLBY:

7  Q     "There is an acute situation that still calls for

8  immediate intervention.  The struggle for control of the

9  operating companies continues unabated, and the company startup

10 is suffering as a result.  The companies are on the verge of

11 bankruptcy due to the struggle over control.  The funds they

12 need to pay basic expenses such as rent and wages remain

13 outstanding."

14 A     Yeah.

15 Q     Do you see that?

16 A     Yeah, and that's incorrect also.

17 Q     5.4 on the next page.  The court stated, "Appointing a new

18 independent director does not seem to make sense for the time

19 being, as he or she is expected to run into the same issues" --

20            THE COURT:  Wait.  Where are we at?  5. --

21            MR. COLBY:  5.4.

22            THE COURT:  I'm on the wrong page.  Hold on.  Okay.

23 BY MR. COLBY:

24 Q     "Appointing a new independent director does not seem to

25 make sense for the time being, as he or she is expected to run

1  into the same issues in massive claim for damages from

2  Rembrandt.  The primary claim will therefore be rejected."  Do

3  you see that?

4  A    Yeah, that is correct.

5  Q    And that was the court rejecting SeeCubic of Delaware's

6  request for an independent trustee, correct?

7  A    They were -- yeah, they couldn't find a director.

8  Q    Right.  The reference to the primary claim is to SeeCubic

9  of Delaware's primary requests to have an independent director

10  appointed, correct?

11  A    Correct.

12  Q    5.5.  "The only remaining possibility then, is that one of

13  the parties in the person of Park or Stastny temporarily

14  manages the companies.  This should then be the party with whom

15  there is the greatest chance of maintaining the status quo."

16  Do you see that?

17  A    Correct.

18  Q    That's what the court stated, correct?

19  A    Correct.

20  Q    5.7.  Just down the page a little bit.  It states,

21        "Both Hawk et al. and Rajan argue that they can

22        provide such financing directly, but are willing to

23        do so only if they themselves control the companies.

24        For the time being, however, only Hawk et al. are

25        likely to be able to do so.  The financing of the

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 194 of 294

194

1          companies in the past period has been provided by

2          Hawk CS on the basis of a note approved by the

3          receiver.  See 2.10.

4          "The situation is different with Rajan.  He claims

5          that VSI will provide the necessary financing, but no

6          document has been produced showing a binding

7          agreement to that effect, or even that VSI is capable

8          of financing.  That would have been obvious at this

9          stage.  Also, in light of the earlier summary

10         proceedings, in which the question of financing

11         played a central role.

12              "And the assertions of Hawk that VSI" is not

13         capable of providing -- "is not capable of financing.

14         An offer to still provide information about VSI's

15         role and capabilities as a financier made at the

16         hearing by rejoinder was made too late.  For the time

17         being it is assumed that Hawk CS will be able and

18         willing to provide the necessary financing and that

19         Rajan will not."

20              Did I read that correctly?

21    A    That's what the court said, but that's inaccurate.

22    Q    Right.  That's what the court said.  5.11, page 14.  "If

23    Stream gains control the companies for now, the revenues from

24    the deal with HM will flow to Stream instead of to SeeCubic BV

25    companies."  That's what the court stated, correct?

1    A    That's incorrect also.

2    Q    That's what the court stated?

3    A    That's what the court stated.

4    Q    And what's HM a reference to in that sentence?  To your

5    understanding?

6    A    That's Hyundai.

7    Q    Hyundai.  That's one of the ongoing projects at SeeCubic

8    BV, correct?

9    A    That's one of the projects that SeeCubic of Delaware

10   brought in, correct.

11   Q    Okay.  The court then states,

12           "Indeed Stream makes it a condition of entering into

13           that deal that it itself becomes HM contracting party

14           because it believes that is the only way to exploit

15           the technology used by the companies in accordance

16           with the settlement agreement with Rembrandt."

17           Did I read that correctly?

18   A    Where are you?

19   Q    It was the next sentence.  That's what the court stated.

20   A    That's what the court said.  It's only part of it, but go

21   ahead.

22   Q    Okay.  And 5.12.  Actually, 5.12 states, "In preliminary

23   judgment, the status quo was better preserved if Staszny is

24   allowed to run the companies for the time being."  Correct?

25   A    That's what the court stated, but that's incorrect.

1  Q    5.14.

2          "When Rajan gains control over the companies, there

3          is a threat that assets will be taken out of the

4          control of SeeCubic BV.  In fact, Rajan has insisted

5          on handing over the machine and other assets to him.

6          He wants to transfer the assets to VSI, a company

7          that Stream is a shareholder in which Rajan has a 70

8          percent interest in control."

9          That's what the court stated, correct?

10  A    That's incorrect.

11  Q    That's what the court stated.

12  A    The court stated, but it's incorrect.

13  Q    5.15.

14          "If the companies assets are transferred to VSI, or

15          the business is restructured in such a way that the

16          companies cannot operate without the support of VSI,

17          then the current situation is not maintained.  On the

18          contrary, then value is extracted from the companies.

19          "Rajan has also given no good reason for

20          transferring the assets to VSI now.  He wants to

21          transfer the assets to a "clean entity," which is in

22          calm waters and not involved in legal disputes.

23          However, there's no need to do that now.  And it

24          would also be very detrimental to the recourse of

25          Hawk, et al. as creditors.  They have an interest in

1              keeping the assets within the group."

2              That's what the court stated, correct?

3  A    That's what the court stated.  It's incorrect.

4  Q    5.17.

5              "Added to this is the fact that Stream, under Rajan's

6              direction, entered into a supplement to the agreement

7              with Rembrandt on August 14th, 2023, which, assuming

8              the companies used technology belonging to Rembrandt

9              would mean that the companies could not operate other

10             than for the benefit of distribution by Stream

11             without a demonstration of the need for that

12             restriction.  Apparently, Rajan still wants to

13             attract the operations of the companies to himself,

14             and has no intention of maintaining the current

15             situation for the time being."

16             That's what the court stated, correct?

17 A    That's what the court stated and it's incorrect again.

18 Q    5.18.

19             "In the light of all of Rajan's attempts to attract

20             the assets and activities to Stream into a VSI, his

21             disinterest in the financing of the Dutch companies,

22             and his refusal to want to take the protocol drawn up

23             by the independent director as a starting point.  It

24             requires too much naivety to expect that the director

25             Park appointed by him will take as a starting point

1              to maintain the status quo as much as possible.

2              "The mere assurance by his attorney that he will

3              conform to the standards of Dutch corporate law is

4              too little for that.  Mr. Park's unilateral

5              appointment was also not in line with the purport of

6              the judgment."

7              That's what the court stated, correct?

8  A    That's what the court stated and it's incorrect.

9  Q    5.19.

10             "The situation that there is a risk of assets being

11             withdrawn from the companies at Rajan instigation as

12             found in the judgment remains unchanged.  The facts

13             then underlying that judgment are substantially

14             unchanged."

15             That's what the court stated, correct?

16  A    That's what the court stated.  It's incorrect.

17  Q    And in 5.20, the court stated that, "Stastny is

18  provisionally appointed as a director of the companies."  And

19  then it says -- and this is in the third line,

20             "In the circumstances now prevailing, his appointment

21             is the only option available to maintain the status

22             quo as far as possible, until such time as it will

23             ultimately determine in the proceedings pending the

24             United States who will obtain control of the

25             companies.  That means that until then, or until the

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 199 of 294

199

1          court decides otherwise, Stastny will be appointed

2          director of those entities to the exclusion of Park

3          and Rajan."

4          That was the court's conclusion, correct?

5    A    That's what the court wrote, and it's correct.

6    Q    Yeah.  And it continued to stipulate that, "Stastny must

7    comply with the protocol established by the independent

8    director."  Correct?

9    A    That is correct.

10   Q    And at 6.1 on the next page, it repeats that Stastny was

11   Director A of ultra de cooperatif Stream TV international BV

12   and SeeCubic BV for the period set forth under 5.21, whereby

13   Stastny is to comply with the protocol prepared by Mr.

14   Birkinbosch (phonetic) and submitted as a production, not as

15   production 9 to the summons.  That's what the court concluded,

16   correct?

17   A    Correct.

18   Q    Now, you've said several times, as we've gone through this

19   opinion, Mr. Rajan, that's what the court said, what the court

20   got was incorrect.  That's your view?

21   A    Yeah.  My view is a court made a number of factual

22   decisions that were incorrect.

23   Q    And the litigation that led to the issuance of this

24   decision is litigation that you actively participated in,

25   correct?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 200 of 294

200

1   A    Yeah.  We participated in the second one, not the first

2   one, because I was in the hospital.

3   Q    And you have -- you made written submissions prior to the

4   court rendering this decision, correct?

5   A    Yeah, we did.

6   Q    You had the opportunity to submit documents, correct?

7   A    Yes, I did.

8   Q    And you testified, correct?

9   A    They asked me one question.  I didn't testify.

10  Q    You were represented by Dutch counsel, correct?

11  A    Yeah.  We had Dutch counsel.

12  Q    And similarly, SeeCubic of Delaware and Hawk were

13  permitted to put on their case on these issues, correct?

14  A    Yes, they did.

15  Q    And the result of that process was the opinion that we

16  just walked through, correct?

17  A    Yeah, they gave an opinion.

18          MR. COLBY:  Just one moment, Your Honor.  I think

19  that's all the cross-examination I have at this time.

20          THE COURT:  Okay.  Mr. -- I am trying to --

21          MR. COLBY:  Capone.

22          THE COURT:  Capone.

23          MR. COLBY:  He went to the airport.

24          THE COURT:  Okay.

25          MR. COLBY:  But he gave me his questions.  That's why

1    I asked those questions about Mr. Warren and Mr. Hawk at the

2    beginning.

3              THE COURT:  Okay.  Oh, about the offices.

4              MR. COLBY:  Yes.

5              THE COURT:  Okay.  All right.

6              Redirect, counsel.

7              MR. KODOSKY:  Thank you, Your Honor.

8                         REDIRECT EXAMINATION

9    BY MR. KODOSKY:

10   Q    Mr. Rajan, let's stay with this Amsterdam court order you

11   were just asked questions regarding.  Before we get into the

12   specifics of the order, a few questions.  How many employees

13   did you have working at SeeCubic BV before it was taken over by

14   SeeCubic of Delaware?

15   A    I believe we were down to 15 or 16.  We were taking it

16   down to eight.

17   Q    You were taking it down to eight?

18   A    We were pushing it down to eight people.

19   Q    Why were those reductions being made?

20   A    Because right now, there's 750,000 Euros a month being

21   spent.  We believe the proper spending should be below 100,000,

22   and there's 650,000 a month being pulled out of the debtor's

23   estate, by this huge expense in the Netherlands.  And their

24   role is mainly to do quality control and help the other

25   engineers on 3D.  And they're wildly overstaffed in a whole

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 202 of 294

202

1  range of areas and they're not helpful for the electronics and

2  the extra people are not helpful for the electronics and the

3  production and they can't do research either.  So it's just

4  wildly overspending.  You know, we've made our feelings known

5  to the court and to the Netherlands people.  Obviously, that

6  was unpopular.  And we have another problem.  There's $60

7  million dollars of defaulted debt by the Netherlands entities

8  to Stream TV and the Curacao and under Bankruptcy Code we're

9  supposed to have control of not only our assets that are

10  sitting there, but their assets.

11  Q    And I was going to ask, it's not like you all have not

12  funded BV in the past, correct?

13  A    We've given $80 million to the BV and we have $60 million

14  and to the whole Netherlands group in defaulted debt to the

15  Netherlands, and we said we can fund the company.  There was

16  going to have to be restructuring.  And we were going to fund

17  the employees, but we said with the trade secrets and they had

18  a number of equipment they didn't have title to, which they got

19  from Stream and some other things and they had to be returned.

20  Their assets, which were in their possession could stay there,

21  but the other assets, they didn't have title to, had to go

22  back.  And we're not the Debtor and the Debtor estate should

23  not be putting -- an investor should not be putting

24  into -- money into a company, where the directors discovered

25  that there's illegal things happening, like trade secrets, and

1  license violations, and holding title to assets -- holding

2  assets they don't title to you.

3  Q    That last point about holding assets that they don't have

4  title to, who has the title to the assets that they're holding?

5  A    Stream TV.  There -- there's -- there's 8K TVs there,

6  phones, and tablets, automotive, the bonding equipment.

7  There's a number of Stream assets sitting in the warehouse.

8  Nobody was saying let's go take the B.V. equipment away or

9  anything like that.  And I said, if you don't have title,

10  you've got to give it back.  I said that is their director and

11  their CEO.  You can't hold somebody else's title -- assets that

12  you don't have title to.

13  Q    Mr. Stastney was a -- was appointed director as of

14  September 20th, correct?

15  A    Correct.

16  Q    What instruction has he given to the B.V. to return those

17  assets to the proper title holder, since becoming director?

18  A    To my knowledge, he has not returned any assets -- Stream

19  assets back.

20  Q    All right.  Now, before -- you just testified that before

21  SeeCubic of Delaware took over the B.V., you all had 15

22  employees and you were intending or planning to reduce that

23  number to, was it about eight or eight?

24  A    About -- about eight, roughly.

25  Q    How many employees are there now?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 204 of 294

204

1    A     My understanding, it's 31 people are working there.

2    Q     Do you believe it is consistent with your fiduciary duties

3    to pay in over bloated payroll at the B.V.?

4    A     No, I don't think it -- no the -- the -- it's -- it's -- I

5    don't think that in the fiduciary role, we should be having an

6    over bloated payroll.  There's 650,000 euros a month being

7    wasted in the B.V., which SeeCubic of Delaware is expecting us

8    to give them the money back.  And that's money that's being

9    taken out of the Debtor's estate that could have gone to

10   Unsecured Creditors.  So if you add it all up, just since the

11   bankruptcy, you could have settled most of the unsecured

12   creditors already.  And there's another 600,000 that I

13   discovered of cash flow being diverted because of content deals

14   away from the Debtor and the Debtor's estate.  There's 1.2

15   million a month being diverted out of the Debtor and the

16   Debtor's estate, since the filing of the bankruptcy.  And if

17   you add it all up, you could have settled the unsecured

18   already.

19   Q     It's being diverted where -- this $1.2 million?

20   A     In SeeCubic's papers, that they filed, their response

21   document, on page 9, it says that SeeCubic of Delaware is

22   sending the contracts to the B.V. because they're worried about

23   the performance of the B.V..  And the problem is the B.V. has a

24   bloated cost structure.  And they're -- they're sending --

25   according to their papers, they're sending the -- the cash

1   flows out of -- out of the Debtor's estate over to the other

2   subsidiaries with a bloated cost structure and they expect us

3   to pay them back.

4   Q     And I was going to ask, are you aware of SeeCubic of

5   Delaware's proof of claim in this case?

6   A     Yeah, they -- they sued us for $36 million in the

7   bankruptcy and they want us to pay them back for all the money

8   they're spending in the Netherlands, but we don't have access

9   to the Netherlands and aren't being allowed to run the

10  Netherlands.

11  Q     So when I -- I was going to ask, what is the amount.  You

12  said it's 36 million?

13  A     36 million, but there -- I think the documents that

14  they're going to increase it.  And they're suing us for -- in

15  the bankruptcy, for all the money that they spent in the

16  Netherlands, even though there's still huge financial problems

17  there.  And we don't have control of the subsidiary and we

18  can't restructure the subsidiary.

19  Q     And what is the -- what do they say that that amount is

20  for?

21  A     In their filing, they said it was for the -- the

22  Netherlands.  And, you know, they want us to pay us -- to pay

23  them back, even though there's IP issues and trade secret

24  issues and license issues.

25  Q     So in other words, they want you to pay back the money

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 206 of 294

206

1    that they spent for B.V. employees working on SeeCubic of

2    Delaware projects?

3    A    SeeCubic of Delaware projects, where the rep -- the

4    revenue is being booked out -- it's actually hard cash now --

5    being booked out to the other subsidiaries with a bloated cost

6    structure.

7    Q    What IP rights, within the glasses-free 3D technology

8    industry, what IP rights does SeeCubic of Delaware have, to

9    your knowledge?

10    A    Absolutely none.  They have no IP license rights, IP

11    rights.  They have no legal right to be using this technology.

12    Q    You were asked questions about VSI and you described VSI

13    having a distributor contract with Stream, correct?

14    A    Correct.

15    Q    To your knowledge, does SeeCubic of Delaware have a

16    distributor agreement with SeeCubic B.V.?

17    A    Mr. Stastney testified they only have a user agreement.

18    And SeeCubic of the Netherlands does not have the right to

19    license any technology out.  They don't have that right through

20    the Phillips agreement or the Rembrandt agreement.  And the

21    Ultra-D technology is actually in another company above the

22    B.V., until Mr. Stastney got involved.  But in their document

23    that they filed on Friday, SeeCubic of Delaware said they've

24    made arrangements for the trade secrets to be used.  So

25    they're -- they've acknowledged that they're using the trade

1  secrets for somebody else.

2  Q    What gives SeeCubic of Delaware the right to use the trade

3  secrets, to your knowledge?

4  A    I don't believe they have any legal right to make

5  arrangements, as they stated in their document.  And they

6  definitely don't have the legal right to sublicense

7  manufacturers, like they said, in their PPM, that they've

8  already done.  And that was also what was indicated in the

9  Amsterdam hearing that it's already been done or something.

10  Q    And Mr. Colby was making a big deal about Stream TV not

11  proposing projects to SeeCubic B.V., whereas, in his view,

12  SeeCubic of Delaware is actively sending projects to the B.V.,

13  correct?

14  A    Yeah, he said that SeeCubic Delaware has sent projects to

15  the B.V. and they've also stated that in their written

16  documents.  And they were saying that we didn't propose

17  projects to the B.V. to work on.  I'm -- I'm not clear what he

18  was trying to say, either work on or that they're going to

19  subsume our contracts from Stream TV and VSI or something.

20  They're going to subsume the contracts.  That's -- I think

21  that's what he was claiming.

22  Q    So if SeeCubic of Delaware doesn't have any IP rights,

23  they don't have any contract with Phillips, or with Rembrandt,

24  they don't even have a contract with SeeCubic of -- SeeCubic

25  B.V., what basis does SeeCubic of Delaware have to even be

1    arranging projects for SeeCubic B.V.?

2    A    I believe that what's occurring here is completely

3    illegal.

4    Q    Now, have you read the response that was filed by SeeCubic

5    of Delaware's counsel this past Friday?

6    A    Yeah, I'm aware of it.

7    Q    Did you read where SeeCubic, in that response, SeeCubic of

8    Delaware makes the assertion that it is not a competitor of

9    Stream.

10   A    Yeah, they made -- they made that statement.  And they are

11   diverting -- they -- they -- they testified that they met with

12   100 companies, have asked four people for 5 million each.  They

13   have projects and they clearly say the documents they're

14   diverting the revenue out of Stream TV and Technovative to

15   subsidiaries with a bloated cost structure.

16   Q    Just so the record is clear, do you view SeeCubic of

17   Delaware as a competitor of Stream?

18   A    They have told the whole planet.  And, yes, we agree that

19   SeeCubic of Delaware is a competitor to Stream TV.  And they're

20   forcing the Netherlands to compete against their beneficial

21   owner.

22   Q    What is your reaction -- you saw in the response that they

23   filed on Friday, where they state that Stream has not

24   identified any trade secrets in these proceedings, correct?

25   A    Yeah, they made that statement, but they -- okay.  First

1   of all, we've identified the trade secrets regarding the

2   protection of the content.  And they've admitted, in their own

3   documents, that they made arrangements for the trade secrets to

4   go to somebody else.  Phillips, Rembrandt, and Ultra-D was in

5   another company.  It's the Ultra-D technology is not inside the

6   B.V..  It's in another company.

7   Q    And they say that Stream has not shown that Defendants

8   have misappropriated any of Stream's trade secrets.  What's

9   your reaction to that?

10  A    They openly admitted, in their documents, that they've

11  moved the trade secrets.

12  Q    And what steps has Stream taken to protect confidentiality

13  of its trade secrets?

14  A    Everything -- all of our content is encrypted.  All the

15  code is encrypted.  There's security chips inside the devices.

16  There's paperwork and things in place that they can't go near

17  our -- our technology.  And we -- we have a wide range of

18  protections for it.  And we've had people, like Rembrandt and

19  others test it and those things.  And we have a wide range of

20  protection, but, you know, our business model is to sell the

21  chip in the film.  So we're in compliance with our IP license

22  contracts.  They have a different business model, which is to

23  sublicense things, like the optical design, and the code,

24  and -- and the code in those things.  So they have a different

25  business model.

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 210 of 294

210

1    Q    So despite the steps that Stream has taken to protect the

2    confidentiality of its trade secrets, how were those measures

3    circumvented here?

4    A    Because the content, which is only one piece of it, but

5    the content was opened up by SeeCubic of Delaware and SeeCubic

6    of the Netherlands was forced to comply.

7    Q    And just so the record is clear, how do you know that?

8    A    I know that because we had -- when -- before even the

9    bankruptcy, we had conversations about the receiver and the

10    engineers.  They voiced concern.  They wanted help.  When I

11    went over there, I physically inspected everything.  And we

12    went -- and we also went and started running into customers and

13    things that were, you know, in Stream sales activities that

14    were telling us all the things that were going on and problems

15    with the prototypes and issues with the content.  And, you

16    know, it's leaked out all over the place.

17    Q    And you discovered that right before Mr. Stastney and his

18    group had you removed as director, correct?

19    A    The physical inspection did not take place until I was

20    removed as director.  That is correct.  It happened during that

21    time period.  Once I went there to the Netherlands, they

22    started -- even though we were told to stay out of the

23    Netherlands, they started pushing their lawsuit in the -- the

24    Netherlands to get me out of there, because I was voicing

25    concerns on the IP licenses, the trade secrets, and them

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 211 of 294

211

1    holding equipment, where they didn't have title to it.

2    Q    And so they were taking this action against you over in

3    the Netherlands during a time, after this court, at the April

4    hearings and the June hearings, it said that nobody should be

5    doing anything over in the Netherlands, correct?

6    A    Correct.  They went and did it anyway.

7    Q    You read in their response where SeeCubic of Delaware

8    states, the Debtors have not identified any harm caused by the

9    Defendants.  What's your reaction to that?

10   A    The -- the loss of the Phillips license and the trade

11   secrets, and we could have issues with Rembrandt, is absolutely

12   irreparable harm.  It is ongoing.  And also, you have customers

13   being diverted to another entity.  You have cash flow, both in

14   the subsidiaries, as well as from the content deals being

15   diverted out of the subsidiaries, so, yes, it's causing

16   irreparable harm.  And now you have Mr. Stastney, who testified

17   that he's going to look at our engineering specs and decide

18   resources for the B.V., if they're even going to work on the

19   Netherlands projects.  And the Netherlands people said, on

20   instruction, that they're too busy to work on our projects. And

21   then on top of it, we're being sued for $36 million plus that

22   we're supposed to pay back for assets we don't have any control

23   of, or say in, or anything.

24   Q    And that ties into the Coke and Pepsi CEO example that you

25   used before?

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 212 of 294

212

1   A     Yeah.  Yes.  They were -- the CEO of Coca-Cola is sitting

2   in a subsidiary of Pepsi and making decisions for Coca-Cola.

3   Q     In the response that SeeCubic of Delaware filed on Friday,

4   they say that the Debtors have not identified any lost

5   customers and business opportunities.  What's your response to

6   that?

7   A     First of all, we do have POs.  We do have projects that

8   are ongoing.  We -- they are in conversation with a wide range

9   of customers, which they testified, they have ongoing

10  conversations that they claim nobody's discussing the business

11  model, even though we've heard contrary to that.  But they have

12  conversations going with 100 companies.  There's four companies

13  trying to buy -- put in five million each.  They have these

14  sample projects.  And they're talking to customers regarding

15  our technology, when we're the ones that are supposed to be

16  talking to the customer and reorganizing.  And, you know, when

17  we filed bankruptcy, you know, my understanding was there's

18  supposed to be an automatic stay in place.  And again, we have

19  60 million or $70 million of defaulted debt by the Netherlands.

20  And my understanding in the bankruptcy code under Rule 501(b),

21  or whatever, if you have defaulted debt in a foreign

22  subsidiary, it's actually the foreign subsidiary assets are

23  under control of the U.S. Bankruptcy Court.  So everything's

24  sort of upside down.

25  Q     Well, and you were here for Mr. Stastney's testimony, when

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 213 of 294

213

1    he was asked about the customers and the investors, that he has

2    NDAs with, correct?

3    A    Yeah.

4    Q    To this day, has Mr. Stastney shared with you or anyone at

5    the parent which customers and investors they're essentially

6    diverting revenues away from the Debtors in this case?

7    A    When -- when we won in the Supreme Court, there was a

8    court order that everything at SeeCubic is supposed to be

9    turned over.  They can sue us for unjust enrichment, which they

10   did in the bankruptcy court.  They've turned nothing over.  It

11   is Stream TV's position that those NDAs and those investor

12   lists, including GDPR, are the property of Stream TV.

13   Q    Have you made demand for this?

14   A    Yeah, we've sent them letters and stuff.  They didn't -- I

15   mean, they haven't even given us our company laptops back.  So

16   we didn't even get to that one.

17   Q    You saw also in the response that was filed on Friday,

18   that SeeCubic of Delaware is asserting that Mr. Stastney's

19   actions, as a director of the -- the Netherlands subs, are

20   benefiting Stream, correct?  You saw that in their response?

21   A    Yeah, I saw that in their response.

22   Q    What benefit has Stream seen, as a result of Mr. Stastney

23   being appointed director of the Netherlands subs?

24   A    Their actions have been completely unhelpful.  They have

25   diverted millions of dollars of business cash flow from -- I'm

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 214 of 294

214

1   talking about hard cash out of the company.  Our trade secrets

2   are exposed.  IP license problems.  We've had -- we have

3   hundreds of millions of dollars of orders right now.  If they

4   would have given us the bonding machine when they were supposed

5   to, they would have already gotten paid by now.  I mean, they

6   have been completely unhelpful.  And there's been, you know --

7   I -- I mean, it's -- it's just a ridiculous statement.

8   Q    Has Stream received so much as a dime, as a result of Mr.

9   Stastney's actions as the director of the Netherlands subs?

10  A    No, we haven't received a dime.  And we -- we have our so-

11  called purported lender competing against us.

12  Q    Who is holding archived emails?  Does the -- is SeeCubic

13  of Delaware still in possession of, for example, your archived

14  emails?

15  A    SeeCubic of Delaware is controlling the Netherlands and

16  it's being kept in the Netherlands and not being sent over --

17  and kept in the Netherlands and those things.  And so one of

18  the complaints we were in the Amsterdam Court is they wanted

19  direction from the US Court on what to do regarding the Stream

20  assets and what to do regarding the running of the subsidiary

21  -- the Netherlands subsidiaries.  They wanted direction from

22  the US Court.  They didn't want to get into a fight with the US

23  Court.  So they just sort of punted.

24  Q    And to this day, are there Stream operations people, such

25  as Amanda -- what is Amanda's last name?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 215 of 294

215

1    A     Gonzalez.

2    Q     And Nicole, what is Nicole's last name?

3    A     Maneen.

4    Q     Are there operations folks, such as Ms. Gonzalez and Ms.

5    Maneen, who have not, to this day, been provided their laptops,

6    for example?

7    A     You know, we have a wide range of employees that have

8    Stream TV laptops that never even got their laptops back and

9    they're still hanging on to all of them; and SeeCubic of

10   Delaware is hanging on to that.

11   Q     How does that affect Stream's ability to operate?

12   A     Stream's company records, such as like financials, bank

13   accounts, historical information, that we need for both court

14   presentations, and to investor presentations, and to customers

15   and vendors, we haven't been able to access it since we won in

16   the Supreme Court 17 months ago, or since we filed in the

17   bankruptcy.  We're just going by things that sort of remained

18   on our phones, when they -- and they also yanked stuff out of

19   our existing devices.  We're just going off of, you know, when

20   you pull email IDs, sometimes some of the remnants, a little

21   bit of it, stays on, like, your phone.  So we're just working

22   off of that.

23   Q     And I apologize for asking what may seem like very basic

24   questions, but how is Stream's ability to operate affected by,

25   for example, the failure to receive back demonstrator units,

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 216 of 294

216

 1  phones, tablets, things of that nature?

 2  A    I mean, we've had invest -- some investors and some

 3  customers quit because they see that we won in the courts, but

 4  they don't see things functioning properly.  And so we've had

 5  some folks pull out because they wanted to see the phone and

 6  the tablet and the EK and they've sort of pulled out,

 7  specifically, because of that.

 8  Q    Shifting gears for a minute.  You were asked a number of

 9  questions about the massive customer confusion that Stream is

10  complaining about in this case.

11          MR. KODOSKY:  Permission to approach, Your Honor?

12          THE COURT:  Okay.  You can hand that to the -- Mr.

13  Barbetta (phonetic), who handled it -- hand it to the witness.

14  BY MR. KODOSKY:

15  Q    Before you're shown what has been marked for

16  identification as Exhibit 61 --

17          THE COURT:  D61 or -- what is it, John?

18          UNIDENTIFIED SPEAKER:  Yeah, I mean the D61.

19          THE COURT:  Okay.  All right.  Before we look at

20  that -- okay.

21  BY MR. KODOSKY:

22  Q    Before I ask you questions about this document and whether

23  or not you recognize it, you were here during the last hearing

24  on October 16th, were you not, Mr. Rajan, when Mr. Stastney was

25  asked questions about the SeeCubic website?

1   A    Yes, I was.

2   Q    And do you recall Mr. Stastney being shown the pages of

3   the SeeCubic website that had employee research and

4   development, personnel pictures, and bios?

5          MR. COLBY:  Objection.  And really just for

6   clarification, Mr. Stastney didn't testify on October 16th.

7          MR. KODOSKY:  I'm sorry.

8          MR. COLBY:  And wasn't shown website.  That was Mr.

9   Rajan.

10         MR. KODOSKY:  I'm sorry.

11  BY MR. KODOSKY:

12  Q    Mr. Rajan, you were asked questions about the SeeCubic

13  website --

14  A    Correct.

15  Q    -- correct?

16  A    Yeah, I was.

17  Q    And you described the SeeCubic B.V. employees, who had

18  their pictures and their bios prominently displayed on the

19  leadership team of the SeeCubic website, correct?

20  A    Correct.

21  Q    Do you recognize what has been marked for identification

22  as Exhibit 61 -- D61?  You recognize this document, sir?

23  A    Yeah.

24  Q    SeeCubic has scrubbed those employees from the website,

25  following the October 16th hearing, correct?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 218 of 294

218

```
 1   A     Yes, they have.

 2   Q     Do you see the date that was printed -- or that appears in

 3   the top left-hand corner of the first page, October 27th, 2023?

 4   A     Yeah.

 5   Q     Is that when this document was printed?

 6   A     Yes.

 7   Q     If you will take a look at the third page of this

 8   document, first of all --

 9   A     Is -- is it this one?

10   Q     Yes, sir.

11   A     Okay.

12   Q     Where it states, "We are SeeCubic"?

13   A     Correct.

14   Q     Do you see where it states, "SeeCubic was" -- fund was --

15   "founded to become a global leader in immersive display

16   technology innovation.  Being a deep tech start up, we have

17   raised over $170 million in multiple rounds of funding, which

18   has been successfully used to bring our breakthrough technology

19   to maturity."  Do you see that?

20   A     Yes, I do.

21   Q     That's not accurate, is it?

22   A     No, Stream TV and I've raised the $170 million for the

23   Ultra-D technology.  We also own these trademarks SeeCubic and

24   SeeCube.

25   Q     And do you see on the bottom paragraph there, where it
```

1  talks about, "Our pioneering spatial display technology allows

2  viewers to be immersed in multidimensional experiences."

3  A     Correct.

4  Q     And then the next to the last line, where it states, "You

5  can see the transformative SeeCube advantage with the naked

6  eye."

7  A     Correct.

8  Q     Who has the trademark for SeeCube?

9  A     Stream TV.

10 Q     And so on this web page, SeeCubic is representing to the

11 world that they raised $170 million, they didn't raise, you

12 raised it, correct?

13 A     Correct.

14 Q     And they're making use of Stream TV's trademark SeeCube,

15 correct?

16 A     Correct.  And they're representing that our technology is

17 their technology.

18 Q     If you will turn two pages past that, the page that in the

19 middle it states, "Look who's talking about us."  Do you see

20 where I'm referring to?

21 A     Yes, I do.

22 Q     And there's a quote there on the SeeCubic website from

23 Mark Henninger, from the AVS Forum.  Do you see that?

24        THE COURT:  What page are we on?

25        MR. KODOSKY:  I'm sorry, Your Honor.  It's --

1          THE COURT:  Oh, look who's talking about us.  Okay.

2          MR. KODOSKY:  -- on the bottom right-hand corner of

3   this page, it says 2/3.

4          THE COURT: -huh.

5   BY MR. KODOSKY:

6   Q    And there's a quote there from a Mark Henninger that

7   states, "They were the best looking glasses-free 3D at the

8   show.  It was hard to believe that 3D conversion could be so

9   seamless and effective."  Do you see that, Mr. Rajan?

10         THE COURT:  Wait.  Where are we at?

11         MR. KODOSKY:  Right next to the word, "Fox Business",

12   there's a quote --

13         THE COURT:  Not -- oh, okay.

14         MR. KODOSKY:  Where there's a quote from a Mark

15   Henninger that says, "They were the best looking glasses-free

16   3D at the show.  It was hard to believe that 3D conversion

17   could be so seamless and effective.

18   BY MR. KODOSKY:

19   Q    Do you see that, Mr. Rajan?

20   A    Yeah, I do.

21   Q    Did that appear, to you, that SeeCubic is representing to

22   the world that this quote is related to SeeCubic's technology?

23   A    Yeah, they're representing that this is a article about

24   SeeCubic of Delaware.

25   Q    Do you have knowledge, as to whether or not, this article

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 221 of 294

221

1   was actually written about SeeCubic?

2   A    This article is not written about SeeCubic of Delaware,

3   no.

4   Q    Who was it written about?

5   A    It was written about Stream TV.

6         MR. KODOSKY:  Permission to approach, Your Honor.

7         THE COURT:  And that was a quote from Mr. Who?

8   Robert --

9         THE WITNESS:  Mark Henninger.

10        THE COURT:  Okay.

11        THE WITNESS:  AVS Forum.

12        THE COURT:  Oh, okay.

13        MR. KODOSKY:  Permission to approach, Your Honor.

14        THE COURT:  Just hand it up.

15  BY MR. KODOSKY:

16  Q    Do you recognize what has been -- this document that has

17  been marked for identification as Exhibit D67?

18  A    Yes, I do.

19  Q    Is this the article from Mark Henninger, from AVS Forum,

20  that is --

21  A    Yeah.

22  Q    -- that is quoted on the SeeCubic website?

23  A    Yes.

24  Q    And do you see the date there on the first page,

25  underneath the Ultra-D glasses free 3D at CES 2014?

1   A      Yes.

2   Q      What's the date?

3   A      2014.

4   Q      Was SeeCubic even in existence in 2014?

5   A      SeeCubic of Delaware was not in existence at that time.

6   Q      And so essentially what SeeCubic has done is taken this

7   article that was written about how good the tech -- how good

8   the Stream technology was and they've placed that quote on

9   their website, without any attribution to Stream at all,

10  correct?

11  A      Yes.  And they made it sound like the article was about

12  them.

13  Q      You can set that document aside and I'm going to ask you a

14  few more questions about Exhibit D61.  We will simply turn to

15  the next page, there's a quote from Robert Ellsberg, from the

16  Huffington Post.  Could you read that quote into the record,

17  please?

18  A      "It's not just", and then it says dot, dot, dot, "it is

19  better than the big boys.  It's that there's no comparison.

20  How they've leaped past the monolith companies is stunning."

21  Q      Who does that appear to be -- who does that quote appear

22  to be referencing?  Whose technology?

23  A      On the SeeCubic.com website, they're giving the

24  impression -- SeeCubic is giving the impression that this is

25  about SeeCubic of Delaware.

1          MR. KODOSKY:  Permission to approach, Your Honor.

2          THE COURT: -huh.

3  BY MR. KODOSKY:

4  Q    Mr. Rajan, you are being handed was been marked for

5  identification as Exhibit D58.

6          THE COURT:  50 or --

7          MR. KODOSKY:  58.  I'm sorry, Your Honor.

8          THE COURT:  60?

9          MR. KODOSKY:  58.

10          THE CLERK:  Five, eight.

11          THE COURT:  Oh, five, eight.  Oh, wow.  Let me -- I

12  can't see --

13  BY MR. KODOSKY:

14  Q    Do you recognize this document, Mr. Rajan?

15  A    Yes, I do.

16  Q    What is the date that appears on the first page?

17  A    2012.  And it was updated in 2017.

18  Q    And SeeCubic wasn't in existence in 2012 or 2017, correct?

19  A    No, it wasn't.

20  Q    Do you recognize this as being the article that is quoted

21  on the SeeCubic website, even as of today, or at least as of

22  October 27th?

23  A    Yes, it is.

24  Q    And I believe that you are -- if you look at page 5 of 10,

25  the bottom paragraph.

1    A      On which page?

2    Q      Page 5 of 10.

3    A      Oh, okay.

4    Q      On the Huffington Post article.

5    A      Yeah.

6    Q      The bottom paragraph, do you see where it states, "The

7    reason I said sort of above is because for the past couple of

8    years I've been writing about a tiny company based in

9    Philadelphia, Stream TV Networks, and inexplicably or

10   miraculously, they've blown away the big guys with their Ultra-

11   D technology."  Do you see where I'm reading from?

12   A      Yes, I do.

13   Q      In your mind, is there any question about this article

14   being -- and on the -- on the next page, 6 of 10, there's

15   reference to Stream TV's trademark SeeCube technology.  Do you

16   see on the page 6 of 10, the paragraph beginning with, "Ultra-

17   D's viewing angle is remarkably wide so most everyone in a room

18   can see the 3D"?

19   A      Yes.

20   Q      And the last sentence of that paragraph says, "And their

21   SeeCube trademark technology converts 2D show to 3D in real

22   time with limited loss of quality."

23   A      Yeah, I do.

24   Q      And the bottom paragraph on that page 6 of 10, where it

25   states, "All this from a tiny unknown company, how they have

1    leaped far past the monolith companies is stunning.  In fact,

2    when I was at their booth, the executives from the big guy

3    companies were coming over to talk with Stream TV Networks CEO

4    Ma Mathu Rajan all day."  And that's you, correct?

5    A    Yeah.  Yes, it is.

6    Q    "Either to figure out what in the world Stream TV Networks

7    is doing or perhaps to license their Ultra-D?"  Do you see

8    that?

9    A    Yes.

10    Q    And on the next page, 7 of 10, the very first sentence

11    states, "I truly don't know how in the world Stream TV Networks

12    leaped so far ahead of the giants."  And he goes on to talk

13    about how we discussed with the Rajan brothers.  And he

14    mentions that your brother Raja is the COO.  Do you see that?

15    A    Yeah, I do.

16              MR. COLBY:  Your Honor, if I might just an

17    object -- I don't object to Mr. Kodosky using this article to

18    establish that it's the one that's referenced on this website,

19    but if it's being offered for the truth of all of these

20    statements that he's reading --

21              MR. KODOSKY:  Not off --

22              MR. COLBY:  -- then I would suggest that it's

23    hearsay.

24              MR. KODOSKY:  And I'm not offering it for the truth

25    of any of those statements, Your honor.  I'm offering it to

1  show that the quotes that are used on the SeeCubic website are

2  actually not about SeeCubic, but instead are about Stream TV.

3          THE COURT:  Mr. Colby.

4          MR. COLBY:  That's fine.

5          THE COURT:  Okay.

6          MR. COLBY:  I just --

7          THE COURT:  Okay.

8          MR. COLBY:  -- I think we went beyond what was

9  necessary to do that, but no objection to it.

10          THE COURT:  Counsel, come on.

11  BY MR. KODOSKY:

12  Q    Next page -- you could set that document aside.  The next

13  page of Exhibit 61, Mr. Rajan.

14  A    Which one?  Which page?

15  Q    61.  The next one.

16          THE COURT:  The blue page and the blue -- you're

17  going back to blue page -- the blue dot -- the first page is

18  blue and it says, "SeeCubic pioneering visual experiences"?

19          THE WITNESS:  Is that it?

20          THE COURT:  This one?  61?  This one, Mr. Kodosky?

21          MR. KODOSKY:  Yes, Your Honor.

22          THE COURT:  All right.  What page are we going to?

23          MR. KODOSKY:  The very next page, where the quote

24  states, "Quite frankly, 3D glasses have never failed to be

25  anything but a headache, inducing a slightly blurry mess for

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 227 of 294

227

1  me.  That might be why a recent demo of a new glasses-free 3D

2  TV, dot, dot, dot, blew me away.  It just works."

3  BY MR. KODOSKY:

4  Q    Do you see that quote, Mr. Rajan?

5  A    Yeah.

6        MR. KODOSKY:  Permission to approach, Your Honor.

7        THE COURT:  Okay.

8  BY MR. KODOSKY:

9  Q    Mr. Rajan, even before I get to you, with what is being

10  marked for identification as Exhibit D59, you know that quote

11  to be about Stream TV and not SeeCubic, correct?

12  A    That is correct.

13        MR. COLBY:  Since we have a pause, I would object to

14  that question as ambiguous.  Mr. Kodosky just referred to

15  SeeCubic.  It's not clear which SeeCubic he's referring to.

16        THE COURT:  Well, this is says SeeCubic up here, so I

17  don't know which is --

18        MR. COLBY:  Right.  And it's not clear whether it's

19  SeeCubic of Delaware or SeeCubic B.V.  He just referred to

20  SeeCubic generically.

21        THE COURT:  Okay.  Which SeeCubic are you talking

22  about, Mr. Kodosky?

23        MR. KODOSKY:  Mr. Rajan -- Your Honor, to answer your

24  question, SeeCubic of Delaware.

25        MR. COLBY:  Thank you.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 228 of 294

228

1          THE COURT:  And all of these were in reference to

2   SeeCubic Delaware, correct?

3          MR. KODOSKY:  Yes, Your Honor.

4          THE COURT:  Because it doesn't say SeeCubic B.V.

5   anywhere in here.

6          MR. COLBY:  It also doesn't say SeeCubic, Inc. or

7   SeeCubic of Delaware --

8          THE COURT:  Well, which SeeCubic --

9          MR. COLBY:  -- Your Honor.

10         THE COURT:  -- is there another SeeCubic company

11  then?

12         MR. COLBY:  Yes.  SeeCubic B.V.

13         THE COURT:  Yes.  It doesn't say SeeCubic -- never

14  mind.

15         MR. COLBY:  It doesn't -- it just says SeeCubic.  It

16  doesn't say Inc. or B.V.

17         THE COURT:  Okay.  And this is from the website for

18  SeeCubic.com.

19         MR. COLBY:  Correct.

20         THE COURT:  Well, I guess when they say who their

21  officers were, we can figure out which SeeCubic it is, won't

22  we?  At least there was another exhibit that said SeeCubic.com

23  and had officers.  It's going to be pretty easy for me to

24  figure out.  I don't know about the rest of you.  And since I'm

25  the one deciding, the record's pretty clear for me.

1          MR. KODOSKY:  And it --

2          THE COURT:  So --

3          MR. KODOSKY:  -- and it -- and it does -- each one of

4   these pages on Exhibit 61 still has the SeeCubic.com URL.

5   BY MR. KODOSKY:

6   Q    Who's operating the SeeCubic.com URL, Mr. Rajan?

7          MR. COLBY:  Objection.  Foundation.

8   BY MR. KODOSKY:

9   Q    Do you -- do you have an understanding, as to who's

10  operating the SeeCubic.com website, as of today?

11  A    Yes, I do.

12  Q    Who is that?

13  A    The website is being operated by SeeCubic of Delaware,

14  being hosted in the Netherlands.

15  Q    And in fact, following the October 16th hearing, when we

16  looked at the SeeCubic website, when it had the SeeCubic B.V.

17  employees on there, those employees have now been removed,

18  correct?

19  A    Correct.  They've been removed.

20         MR. COLBY:  Your Honor, I'm still maintaining my

21  objection.  Mr. Rajan said that the website is being operated

22  by SeeCubic of Delaware.  He didn't state --

23         THE COURT:  How he knew?

24         MR. COLBY:  -- the foundation for how he knows that.

25         THE COURT:  Okay.  Counsel, he's objecting because he

1    said he never offered any basis as to how Mr. Rajan would know

2    that, since I guess he previously testified, he hasn't been in

3    their office.  He doesn't have a position.  He doesn't anything

4    with respect to SeeCubic Inc.

5    BY MR. KODOSKY:

6    Q    Who owns this URL?

7    A    Stream TV owns the URL.  When we requested it from

8    SeeCubic of Delaware, they said they won't give it back to us.

9    Q    So to your knowledge, based on that, based on your request

10   of the Defendant SeeCubic of Delaware that they give you the

11   URL back and their refusal, is that what forms your

12   understanding as to who's operating it today?

13   A    Yeah, they -- they said they won't give it back to our

14   operating or username.

15            MR. COLBY:  Yeah.  So I'll withdraw the objection.

16            THE COURT:  Okay.

17   BY MR. KODOSKY:

18   Q    There's one more article that's quoted on the SeeCubic

19   website that --

20            MR. KODOSKY:  Permission to approach, Your Honor.

21            THE COURT:  Yes.

22   BY MR. KODOSKY:

23   Q    This is the fourth example -- or actually, I'll wait until

24   you finish.

25            THE COURT:  All right.  And that's D what?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 231 of 294

231

```
1              MR. KODOSKY:  57, Your Honor?

2              THE COURT:  Oh, okay.  Did I miss one?

3              THE CLERK:  That's the last one he handed up.  I

4    didn't talk about though.

5              THE COURT:  Oh, 59, we didn't talk about?  Do you

6    want to take it back?

7              THE CLERK:  Do what?

8              THE COURT:  Did we talk about D59?

9              THE CLERK:  No.

10             THE COURT:  All right.  Just hold on to it, he may.

11             All right.  Go ahead, Counsel.

12   BY MR. KODOSKY:

13   Q    Mr. Rajan, do you recognize this document, marked for

14   identification as D57, to be one of the articles?  This one in

15   particular is from a ARStechnica.com that is quoted on the

16   SeeCubic website.

17   A    Yes, it's quoted on the SeeCubic website.

18   Q    All right.  And the -- so we've now -- you've now looked

19   at -- or have been asked to look at four articles -- a total of

20   four articles that are quoted on SeeCubic's website that were

21   actually written about Stream TV, correct?

22   A    Yes.  They've been repurposed to make it look like it's

23   about SeeCubic.

24             MR. KODOSKY:  Move the admission of Exhibits 57, 58,

25   59, and 60, and 61.
```

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 232 of 294

232

1          THE COURT:  We didn't talk about 59.  Did you?

2          MR. KODOSKY:  I thought that we did, Your Honor.  I

3    thought that I had asked him --

4          THE COURT:  You handed it up, but didn't ask him any

5    questions.  At least, I didn't look at it.  This one is CES

6    2012.

7          THE WITNESS:  No, they gave 59.  It's this one.

8          THE COURT:  Yeah.  But did he ask you some questions?

9    Maybe I missed it.

10         MR. KODOSKY:  Just asked him if he recognized it and

11   whether or not it was an article written in 2000 --

12   BY MR. KODOSKY:

13   Q    What is the date?

14   A    2012.

15         THE COURT:  Oh, okay.

16         MR. KODOSKY:  If that is an article written in 2012

17   about Stream TV and its impressive Ultra-D technology, as

18   opposed to being written about SeeCubic.

19         THE COURT:  Okay.

20         MR. COLBY:  Your Honor, no objection to their

21   admission, for the purposes that Mr. Kodosky proffered them,

22   which is to show that they are these articles, but we would

23   object to the contents being admitted for their truth, as

24   hearsay.

25         MR. KODOSKY:  Not offered for the -- for example,

1    Your Honor, not offering to show that the big boys from Sony

2    and Samsung and others spent the day talking with Mr. Rajan, as

3    referenced in the article, but instead are offering them to

4    show that SeeCubic is causing customer and market confusion.

5            THE COURT:  Okay.  I get what you're trying to prove

6    it for, but the issue is he's saying --

7            MR. COLBY:  As an evidentiary matter, Your Honor.

8            THE COURT:  -- he's saying it's hearsay because

9    it's -- why are you saying it's hearsay again?  It's getting --

10           MR. COLBY:  Well, the contents, the statements

11   contained in them are hearsay.  It's an out-of-court statement

12   by the author.  So I don't think they could be admitted for the

13   truth of the matter, but if Mr. Kodosky wants to offer them for

14   the limited purpose of showing that these articles exist, that

15   they have the dates that they have, and that those are the

16   articles that are referenced on this website, I'm fine with

17   that.

18           THE COURT:  I think that's what you're offering

19   them --

20           MR. KODOSKY:  Yes, Your Honor.

21           THE COURT:  Yeah, you're just putting --

22           MR. COLBY:  If I've learned one thing today, it's

23   that I need to clear about those things.

24           THE COURT:  Clear on what your objections are.

25           MR. COLBY:  Right.

1              THE COURT:  Because if you don't tell me, I don't

2    know, and neither does opposing counsel.  So if you're -- he

3    said, no objections, if it is for the limited purpose of

4    showing that it says this on the SeeCubic, and these articles

5    or what was referenced on that -- on the website.  And that's

6    what you're offering them for, right?

7              MR. KODOSKY:  Yes, Your Honor.

8              THE COURT:  Okay.  Admitted for that limited purpose.

9         (Plaintiff's Exhibit 57-61 admitted into evidence)

10   BY MR. KODOSKY:

11   Q    How do you feel --

12             MR. KODOSKY:  Thank you, Your Honor.

13             THE COURT:  Okay.

14   BY MR. KODOSKY:

15   Q    How do you feel, Mr. Rajan, about SeeCubic using these

16   articles written about Stream and representing to the market

17   that they're written about SeeCubic?

18             MR. COLBY:  Objection, Your Honor.  He can't ask

19   about Mr. Rajan's feelings about something.  He's here as a

20   fact witness.  He can be a witness to something, but not how he

21   feels.

22             MR. KODOSKY:  I'll --

23             MR. COLBY:  -- how he feels about --

24             THE COURT:  You can rephrase that.

25             MR. KODOSKY:  I'll rephrase.

1   BY MR. KODOSKY:

2   Q    What damage is being caused to Stream TV, as a result of

3   SeeCubic using these articles that were written, even before

4   SeeCubic was in existence, on its website?

5   A    Well, Stream TV is constantly having to explain to

6   customers, investors, and vendors why these things are

7   happening, even though Stream TV won in the Supreme Court and

8   we're in the bankruptcy court.  We're constantly having to

9   explain this to companies and investors -- all kinds of

10  companies and investors.

11  Q    You can set aside the articles.  I do have a few more

12  questions about Exhibit 61.

13  A    Okay.

14  Q    I would ask you to flip a couple of pages to the page that

15  has a photograph of a young lady standing at a glass-free 3D

16  TV, it looks like booth.  And to the left is the words,

17  "Instantly accessible".

18  A    Correct.

19          THE COURT:  Wait a minute.  Let me get there.  What

20  page are we on?

21          MR. KODOSKY:  I'm sorry, Your Honor.  The bottom

22  right-hand corner says 2 of 2, and it has a --

23          THE COURT:  Well, we got a lot of 2 of 2s, 3 of 2s.

24          MR. KODOSKY:  I'm sorry.

25          THE COURT:  There's some that says -- okay -- display

1   technology evolves.  And then that's the display.  And, oh, I

2   see, "Instantly accessible" --

3            MR. KODOSKY:  With a lady with a skirt?

4            THE COURT:  Yes.  And her -- something in her hand.

5   I don't know what that is.

6            MR. KODOSKY:  Yes.

7            THE COURT:  Look like something.  Okay.

8   BY MR. KODOSKY:

9   Q    Mr. Rajan, do you recognize this as being a picture of a

10  Stream TV unit?

11  A    Yes, that's -- that's a Stream TV unit.

12  Q    And not a SeeCubic product?

13  A    No, that -- that's a Stream TV unit.

14  Q    And who is the female that's standing there?

15  A    That's somebody who works for Hisense, one of our

16  customers.  They have our unit and they were showing it.

17  Q    And where was this being shown?

18  A    It was shown at a trade show.

19  Q    And so the SeeCubic -- just to make sure that I'm being

20  accurate, on the SeeCubic website, they've got a photograph of

21  a Stream TV product, with a Stream TV customer, that is being

22  presented to the market as somehow related to SeeCubic?

23  A    Correct.

24  Q    Does SeeCubic have anything to do with what's being shown

25  in this photograph?

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 237 of 294

237

1    A    No.  SeeCubic of Delaware has nothing to do with this.

2    Q    What is the impact -- or what harm is being caused to

3    Stream TV by SeeCubic including this on their website?

4    A    We -- we have to constantly explain their actions to

5    investors, vendors, and customers, and wide range of people.

6    Q    If you will turn to the next page, where it states,

7    "Interactive content".

8    A    Correct.

9    Q    Again, do you see in the first line of that, where it

10   says, "Among the SeeCubic" -- okay -- "SeeCubic ecosystem

11   offerings available to customers and partners or gaming SPKs,

12   which are integrated directly into the most commonly used game

13   engines, such as Unreal and Unity."  Do you see that?

14   A    Correct.

15   Q    And at the bottom of the page there, it says, "Copyright

16   2023 SeeCubic."  Do you see that?

17   A    Yeah.

18   Q    Do you recognize the product that's being shown in the

19   photograph on this page?

20   A    Yeah.

21   Q    Whose product is that?

22   A    That is the 8K TV that was shown at CES, where SeeCubic

23   sent a letter out, which we talked about in the last testimony

24   about customers and investors that are going to -- customers

25   are putting money into SeeCubic that happened earlier in the

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 238 of 294

238

1    year right before the -- the bankruptcy.

2              THE COURT:  What kind of TV is it again?  I

3              THE WITNESS:  It's -- it's an 8K.

4    It's -- it's -- it's a high --

5              THE COURT:  Eight?

6              THE WITNESS:  -- high resolution.  8K.

7              THE COURT:  Oh, 8 -- 8K.

8              THE WITNESS:  8K.  Yeah, it's a high resolution.

9              THE COURT:  I thought you said AK. 8K TV.  Okay.

10   BY MR. KODOSKY:

11   Q    So am I -- am I accurate in stating that this is an image

12   of Stream TV's technology being passed off as a SeeCubic

13   product?

14   A    Correct.

15   Q    What harm, if any, is Stream TV suffering as a result of

16   SeeCubic Inc. using an image of Stream TV's technology and

17   being passed off as a SeeCubic product?

18   A    The customers and the vendors were constantly calling us

19   on the phone, when SeeCubic was doing demos.  And then we had

20   shareholders and investors freaking out, after they sent an

21   email out, after a CES right before we filed the bankruptcy.

22   Q    If you'll turn to the last page of the -- of this -- or

23   I'm sorry -- the next page of this exhibit, the one that

24   states, "Content you love".

25   A    Correct.

1    Q    Do you recognize that photograph?

2    A    Yes, I do.

3    Q    What is it?

4    A    It's a Stream TV unit that was requested and was installed

5    for the -- the London Museum.  So it's put into the London

6    Museum.

7    Q    What harm, if any, is Stream TV being caused by SeeCubic

8    using on its website a Stream TV sample in a London Museum

9    that's being passed off as a SeeCubic product?

10   A    I mean, again, we're having customers, and vendors, and

11   investors constantly asking us why are these things happening.

12           MR. KODOSKY:  Permission to approach, Your Honor.

13           THE COURT:  Sure.

14   BY MR. KODOSKY:

15   Q    You can set that document aside, Mr. Rajan.

16   A    Yeah.

17   Q    We're finished with it.  Mr. Rajan, before you were asked

18   to recognize whether -- asked whether you recognize what has

19   been marked for identification as Exhibit D72, do you recall

20   earlier when Mr. Colby was asking you questions about why

21   Stream did not take any action to try to shut down what

22   SeeCubic was doing before August or September of 2023?

23   A    Yes.

24   Q    Do you recognize what has been marked as -- for

25   identification as Exhibit D72?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 240 of 294

240

1  A    Yes, I do.

2  Q    What is it?

3  A    It is a request to enforce the automatic stay and turn

4  over property throughout the estate against SeeCubic of the

5  Netherlands, SeeCubic of India.  They have SeeCubic Limited

6  because of the Jersey Islands and Bob Morton's involvement.

7  They -- and SeeCubic of Delaware.  And this lists a number of

8  their employees that are -- and investors, who are running

9  around with our property and violating the Debtor's estate.

10  And, you know, my -- one of -- my understanding of bankruptcy,

11  is you get an automatic stay, when you file.  And then also

12  because there's default to debt in the subsidiaries, even the

13  subsidiary assets are under the control of the bankruptcy

14  court --

15  Q    If you would please --

16  A    -- under Rule 501(c).

17  Q    Thank you.  If you will please take a look at number

18  7 -- page number 7, paragraph 14.  Please let me know when you

19  get there.

20  A    Yes.

21        THE COURT:  Wait a minute.  Page 7?

22        MR. KODOSKY:  Page 7, paragraph 14, Your Honor.

23        THE COURT:  Okay.

24  BY MR. KODOSKY:

25  Q    Do you see, Mr. Rajan, where it states, "In addition to

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 241 of 294

241

1   the bonding equipment, Debtors own other property essential to

2   maintaining the operation of their business.  Such items

3   include, but not limited to, Ultra-D demonstrator samples,

4   engineering assets, Stream business laptops, Stream's

5   intellectual property and software, and Stream business

6   records?

7   A    Correct.  Yeah, I mean there -- there's the Stream assets

8   and even the subsidiary assets, as I understand it under Rule

9   501(c), are under the control of bankruptcy court.

10  Q    And the date of this document, it looks like from the top

11  of each page, where -- do you see where it states, "Filed April

12  5th, 2023"?

13  A    Yeah, it was filed April 5th, right -- right after we

14  filed the bankruptcy.

15  Q    Is this the emergency motion that you were referring to

16  earlier?

17  A    Yeah.

18  Q    In response to Mr. Colby's questions?

19  A    Yeah.  Correct.

20  Q    And so, in your view, does this represent Stream TV

21  attempting, as early as at least April 5th, 2023, to enforce

22  its rights and obtain the return of its assets?

23  A    Yeah, we thought we were going to get everything back and

24  all the things they had, like Hyundai and all that, it was

25  going to get turned over.

1          MR. KODOSKY:  Move for the admission of Exhibit 72,

2     Your Honor.

3          MR. COLBY:  Yeah, Your Honor.  I would object to the

4     admission of a pleading into the record.  It's their own

5     filing.  It's hearsay.  And I also think, to the extent that

6     the court wants to take judicial notice, it could do that

7     because it's filed in the docket, but it shouldn't be admitted

8     for all purposes.

9          MR. ZAHRALDDIN:  Your Honor, I believe it's being

10     admitted to address Mr. Colby's line of questioning that we

11     laid on our rights and did not pursue protection of the trade

12     secrets from a very early point.

13          THE COURT:  I get that, but his objection isn't to

14     what you -- what you want it for.  His objection is that it's

15     inadmissible because it's a pleading.

16          MR. ZAHRALDDIN:  Well, Your Honor, I think -- well,

17     we reserve the right and in the exhibit list to take anything

18     off the docket, as did they.  And I don't believe that it's

19     being put into evidence for the truth of the matter asserted.

20     We're not putting it in there to try to prove up that they have

21     done these things.  We're putting it in there to indicate that

22     the Debtor has not sat on its rights and that has a clear date

23     and a clear time and it refutes what Mr. Colby has been saying.

24          THE COURT:  Okay.  So I don't know it can come in the

25     whole thing --

```
 1                 MR. COLBY:  Right.

 2                 THE COURT:  -- but the paragraphs that the date that

 3      it was -- you know, for -- I can -- I could take judicial

 4      notice of it or I could --

 5                 MR. ZAHRALDDIN:  Okay.

 6                 THE COURT:  Or I could whatever.  It's come in.  He's

 7      just saying, you know, the whole thing doesn't come in, and

 8      maybe it does.  And I can take judicial notice that it was

 9      filed on whatever date it was filed on, April 5th, '23.

10                 MR. COLBY:  Yes.

11                 THE COURT:  And I can take judicial notice of the

12      paragraph 14, that it said what it said.  Now, whether it's

13      truth or not, it said what it said.

14                 MR. COLBY:  I agree with that, Your Honor, yeah.

15                 THE COURT:  Is there anything else in here you want

16      me to take judicial notice of?

17                 MR. ZAHRALDDIN:  Your Honor, it's -- we're simply

18      trying to rehabilitate Mr. Rajan, so.

19                 THE COURT:  I get what you're trying to do, but this

20      is an evidentiary issue.

21                 MR. ZAHRALDDIN:  I believe that just the paragraphs

22      reference directly because there was an actually an earlier

23      filing which mostly focused upon --

24                 THE COURT:  I'm not talking about that.  We're not

25      talking --
```

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 244 of 294

244

1            MR. ZAHRALDDIN:  No, no.  I understand that, Your

2    Honor.  I understand.  Okay.

3            MR. COLBY:  I don't object to the admission on the

4    limited basis that the Court just stated.

5            THE COURT:  Take judicial notice that on April 5th,

6    '23 at 213146, which I don't know what time that means, but

7    somebody was up late at night, filing an emergency motion.  And

8    in there, they ask for in paragraph 14 --

9            MR. ZAHRALDDIN:  Yes, ma'am.

10           THE COURT:  -- which reference Exhibit A.  Am I

11   supposed to -- can I look at Exhibit A too, counsel, because

12   it's referenced in there.

13           MR. COLBY:  Well, it's not attached to this

14   particular document.

15           THE COURT:  Okay.

16           MR. ZAHRALDDIN:  I don't think we need to --

17           THE COURT:  Well, if I take jud -- okay.

18           MR. ZAHRALDDIN:  For this time -- for the purpose of

19   this hearing, Your Honor, we don't need to look at the list of

20   things that are missing.

21           THE COURT:  Okay.  I'll take judicial notice of the

22   filing, the date it was filed.  I don't know if I need to worry

23   about the time it was filed, and that in that filing, paragraph

24   14 sought -- or it said what it said, okay.  So it was

25   admitted.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 245 of 294

245

1          MR. ZAHRALDDIN:  Thank you, Your Honor.

2          MR. KODOSKY:  Thank you, Your Honor.  The only other

3   point about this document that we would ask the witness about,

4   Your Honor, is what --

5          THE COURT:  Yes, go ahead and ask him questions.

6          MR. KODOSKY:  -- is whether or not this is the motion

7   that also --

8   BY MR. KODOSKY:

9   Q    You heard the description earlier about a motion being --

10  the emergency motion being put into abeyance and that a hearing

11  is scheduled for November 15th?

12  A    Yeah.  It's now -- it's being resolved on November 15th.

13  Q    Okay.

14  A    That's my understanding.

15         THE COURT:  And counsel, I have no idea why that

16  motion never came to me.  Because we're pretty good about going

17  through and making -- and the clerk's office is trying to

18  figure out what happened.  But I guess in the -- with all the

19  other things going on, no one brought it to our attention and

20  when you did, we went and looked for it.

21         Okay.  So it's scheduled for November 14th?

22         THE WITNESS:  15th.

23         MR. ZAHRALDDIN:  I believe it's 15th at 11:30, but

24  we're sending out a notice -- I think John was filling in for

25  Ms. Godfrey and gave us a date, but we're now noticing it

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 246 of 294

246

1    tomorrow, because that was on Friday when we spoke.

2           THE COURT:  Okay.  And again, I have no clue why it

3    didn't get to me.

4           All right.

5    BY MR. KODOSKY:

6    Q    You can set that document aside, Mr. Rajan.  You were

7    asked questions by Mr. Colby about the Phillips Amendment and

8    the process that is in place for parallel licensing, correct?

9    A    Correct.

10   Q    Tell us about the 30-day period that was provided for that

11   agreement.

12   A    We were supposed to reach an agreement with Phillips on

13   names during the 30-day period, because they didn't want us

14   coming in randomly with names.  And we couldn't get to --

15   Stream TV could not get to names of Phillips because -- how do

16   I explain.  What they didn't want was replicas of the

17   technology, and I gave my example of, you know, Apple tried to

18   clone the Macintosh and hand out Mac clones and Steve Jobs

19   left, and it was a disaster.  They wanted one, you know,

20   central chip, central lenses, and everybody buys it.  Like as

21   an example, they'd be scared if LG got their hands on it,

22   they'll try to hurt Samsung.  They didn't want that to happen.

23   We just couldn't get there.  We have a very good relationship

24   with Phillips.  We'll find out in two weeks.  But we couldn't

25   get to the name -- we couldn't get to the names.

1  Q    So that 30-day period where the amendment provided that

2  you all were to submit a list of names, that 30-day period

3  began to run from when?  The signing day?

4  A    From the signing date and it was 30 days to reach names.

5  In the 30-day period, we were talking, and Phillips kept saying

6  no, no, no.

7  Q    So essentially that period began back in 2014?

8  A    Yeah, it's over now.

9  Q    So that period -- that 30-day period expired some time in

10  2014?

11  A    Yeah, yeah.  It expired.

12  Q    And so any suggestion that you all could continue to go

13  back to Phillips with names in 2023 is not accurate, correct?

14  A    No, no, wait, wait a second.  That's parallel licensing.

15  Sublicensing means you give me your pricing, I just go cut a

16  deal and I just got to make sure you get paid.  Parallel

17  licensing, it's like if I have an apartment and I sublet it.

18  This is like, hey, I have an apartment in a building.  I'll

19  give you the business card for the front manager, get your own

20  apartment.  It's just a referral.

21  Q    What ability does SeeCubic BV have to do any sublicensing

22  under the Phillips Amendment?

23  A    They're not a signatory to the contract.  It's the

24  Carousell Company.  My brother signed it.  Stream TV paid it,

25  and they are demanding a meeting with Stream TV.  They're not

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 248 of 294

248

 1   signatories to the contract.  They're allowed to use the

 2   technology, but they're not allowed to get into business

 3   relationships and that sort of thing.  It -- the expectation is

 4   essentially managed by Stream TV.

 5   Q    Is VSI -- you were asked questions about VSI.  Is VSI

 6   attempting to do any sublicensing?

 7   A    Absolutely not.  They're just -- they're just financing

 8   Stream TV.  They're helping to get customers for Stream TV.

 9   And it's all on Stream TV.  The assets stay inside Stream TV.

10   All we're trying to do is clean up the subsidiaries and get our

11   unsecure people paid and we have to get these folks

12   straightened out somehow.  You know, we made offers, but

13   they're not interested.

14   Q    Is it your testimony that if S -- if SeeCubic BV signs any

15   contracts, that it's unauthorized?

16   A    Yeah, it's unauthorized.  They're not the appropriate

17   signatory and neither is SeeCubic Delaware.  They're not the

18   right party to sign those things.

19   Q    Do you still have, Mr. Rajan, the Amsterdam court order?

20   A    Yeah.  It's in -- I have it in this book.  You want --

21   which exhibit was it?

22          THE COURT:  It's Exhibit 18. I have 18 and exhibit --

23   I thought it was tab 18.  I didn't write the exhibit.  What's

24   the exhibit?

25          MR. KODOSKY:  SC-4.

1          THE COURT:  SC-4.

2          MR. KODOSKY:  Tab 18.

3          THE COURT:  Tab 18.

4    BY MR. KODOSKY:

5    Q    Do you have the document, Mr. Rajan?

6    A    Yeah.

7    Q    I'll try to be quick, but in response to many of the

8    paragraphs, if not all of the paragraphs that you were being

9    asked about by Mr. Colby, you said incorrect.  The court was

10   incorrect, but there was no follow-up as to why the court was

11   incorrect, and I'd like to be able to give you the opportunity

12   to do that.  I don't intend to spend the next 30 minutes doing

13   it, but I would like to at least give you the opportunity to

14   explain.

15   A    Yeah, I don't need to go on about the whole history.  Just

16   let me make it simple.  The Amsterdam court had two big

17   concerns, which is number one, they want -- they don't want to

18   get -- they said very clearly, they don't want to get into a

19   fight with the U.S. courts.  It's two American companies with

20   American investors fighting over a Netherlands company.  But

21   they want the U.S. court to give guidance on whose -- what to

22   do with the subsidiaries in terms of running it.  Then also

23   regarding -- in the earlier hearing, the Stream assets, and

24   like I said, under Rule 501, what is happening with the

25   Netherlands assets, they want guidance, and they want guidance.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 250 of 294

250

1          And as far as this is concerned, obviously, it's

2   disconcerting to some people that we believe the Netherlands

3   needs to be restructured.  And you know, the IPO licenses and

4   trade secrets, everything has to be brought into compliance

5   immediately.  Obviously, that is disconcerting to a lot of

6   folks.  And you know, when you're reorganizing the company,

7   that means you sometimes have to cut -- you have to cut the

8   expenses and reorganize the company.  That's what

9   reorganizations for and that's disturbing to a lot of folks.

10          So that's -- that's the rub of it.  So they -- I

11  understand it's a Dutch judge, Dutch employees, Dutch company,

12  they wanted to help them out, you know, until this gets

13  straightened out.  But what they're really looking for is

14  guidance on the assets and guidance on the managements of the

15  subs so we can get on with the business of taking care of the

16  liabilities of the debtors.

17          MR. COLBY:  Objection, Your Honor.  I move to strike

18  that answer.  It repeatedly referenced what the Dutch court

19  wants, what people are getting scared about, what the Dutch

20  court is concerned about, et cetera, et cetera.  The document

21  is in evidence.  The opinion is in evidence.  If Mr. Rajan

22  wants to call the Court's attention to particular language in

23  there, like I did, I think he could do that.  But he can't sit

24  here and freestyle about what the court wants and what people

25  are concerned about and all those sorts of things.

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 251 of 294

251

1          I don't know that that -- what was just said made

2    much sense, but the parts that I got out of it consistently

3    reference what other people are thinking or what other people

4    said.  Those should be struck.

5          MR. ZAHRALDDIN:  Your Honor, if I may respond to

6    that.  This is the CEO of the Debtor.

7          THE COURT:  Well, wait a minute.  I know who he is.

8    But the question to him is you were asked questions about the

9    Amsterdam -- Dutch -- I'm sorry, the Dutch -- it's getting

10   late, the Dutch court's decision and you constantly said they

11   were wrong.

12         Mister -- counsel asked him could you tell us what

13   was wrong in the decision.

14         MR. COLBY:  Correct.

15         THE COURT:  And he went off on nothing about what was

16   wrong with the decision.  So for that, it was nonresponsive.

17   How about that.

18         MR. COLBY:  That's also true.

19         THE COURT:  Well, also true.  It all is true.  It was

20   non -- it didn't answer one thing about what he thought was

21   wrong.

22         MR. COLBY:  Right.

23         THE COURT:  Now, if he wants to go down and say,

24   okay, it was wrong about this, wrong about -- but it didn't

25   answer the question.  So I'm going to strike it because it was

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 252 of 294

252

1    nonresponsive.

2              Now, if he could say, you know, it was at the hearing

3    and the -- because we don't have a transcript and they don't

4    have a transcript, can't get one.  He was saying the court said

5    this at the hearing, I don't know how else you get it in

6    because  you can't get a transcript.

7              MR. COLBY:  Yeah.  I'd submit that would be hearsay.

8    We have the written record.  That's what we should go on, not

9    what Mr. Rajan said the court said.

10             THE COURT:  Well, the court -- no, the court said

11   that the court said I have concerns about this.  It's not in

12   here.  Or is he barred from saying because the judge didn't

13   say, and we don't have a transcript?

14             MR. COLBY:  Yeah, I think that would be -- I think

15   that would be hearsay.  I think what we have is the written

16   record of the opinion that contains, you know, that's just --

17             THE COURT:  All right.  We're going on 4:00.  Let's

18   just ask him the questions about why he believes it wrong.  I

19   mean, can you appeal this?  Is it final?  I don't know.  I

20   mean, here, if you appeal it and its not final you can say, I

21   think the judge is wrong for these reasons.  I don't know what

22   this thing means.  We don't even have a transcript.

23             MR. COLBY:  I didn't object to the question.  The

24   question was can you tell us why you think those --

25             THE COURT:  That's what I'm saying.  I just want to

1  be clear.  That's the only thing that, you know, like I don't

2  know the finality of this.  I don't know if this is a final

3  order or not.  Can they appeal?  I don't know.

4           MR. COLBY:  Just --

5           THE COURT:  All right.  All right.  What do you want

6  to ask him?  Who's asking the questions now?  Go ahead.

7           MR. ZAHRALDDIN:  I have to figure that out for one

8  second Your Honor.

9           THE COURT:  Okay.

10          MR. ZAHRALDDIN:  If you'll indulge us.

11          THE COURT:  Uh-huh.

12  BY MR. KODOSKY:

13  Q    Do you understand the ruling to be permanent?

14  A    Yeah, it's not permanent.  He's an interim director

15  waiting for a judge to make a decision and any judge can make

16  the decision.  And it is Stream TV's understanding that the --

17  the court is looking for guidance from the U.S. on operations

18  as well as the Stream assets sitting over there and even the

19  Netherland assets, they're looking for guidance.  We believe

20  that this decision was simply made because it's a Dutch judge

21  trying to help the Dutch employees in a Dutch company because

22  it is unsettling because a reorganization is underway.

23          MR. ZAHRALDDIN:  That answer acceptable, Mr. Colby?

24          THE COURT:  Well, he's saying that's his opinion on

25  what he thinks is wrong with it.

1          MR. COLBY:  That's fine.  I think there was a portion

2    of the answer in which he said they're concerned about, I

3    think, referring to the Dutch court, but other than that --

4          THE COURT:  Well, that's his understanding.

5          MR. COLBY:  Fine.

6          THE COURT:  And as long as it's his understanding,

7    and the court does reference in here of the, you know, we need

8    something from the -- who is in charge of Technovative.

9          MR. COLBY:  Yes.

10         THE COURT:  They're looking for stuff.

11         MR. COLBY:  Yes.

12         THE COURT:  So that is a correct characterization of

13   what it says, I mean, but the document speaks for itself.

14         MR. COLBY:  That's -- probably, I would agree with

15   the later of those two statements rather than it be a correct

16   characterization.

17         THE COURT:  Right.

18         MR. COLBY:  But that's fine.

19         MR. ZAHRALDDIN:  Okay.

20         THE COURT:  All right.

21   BY MR. KODOSKY:

22   Q    Mr. Rajan, I'll ask you one more question about that.  Who

23   brought that action?  Do you know who the plaintiffs were that

24   brought the action against you?

25   A    Yeah.  It was Hawk SLS, SeeCubic of Delaware, Mr. Stastney

1  as an individual, then he also sued on behalf of -- I believe

2  they sued on behalf of the Netherlands subs -- Netherland subs

3  to stop the reorganization process.

4  Q    Okay.

5          THE COURT:  Okay.  Just sort of refresh my

6  recollection here about when somebody walked into court and

7  said Mr. Rajan had been removed and an independent director had

8  been appointed, and I got a little hot under the collar because

9  I said what the heck is going on over there?  I told you guys

10 not to do anything.  And I think that's another matter that

11 should be with all the other stuff.  I don't think we ever got

12 an answer as to how that came to be.

13         MR. COLBY:  Right.

14         THE COURT:  At least I don't recall and maybe

15 something was and we kind of just let it go.  But pretty was

16 clear, nobody was supposed to go over there and do anything.

17         MR. KODOSKY:  If I may, Your Honor, the supplemental

18 brief that we filed before the last hearing, the very end of it

19 quoted Your Honor in saying all that from back in April and

20 back in June.  And you asked these lawyers what was going on

21 over there and they said, we don't know.  We're not involved in

22 it, but we'll find out.

23         THE COURT:  Right.

24         MR. KODOSKY:  But they never came back to you and

25 said Mr. Stastney is suing to remove him from over there.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 256 of 294

256

1          THE COURT:  Wait a minute.  Wait a minute.  Wait a

2  minute.  Who got -- who was sued over there?

3          MR. KODOSKY:  That --

4          THE COURT:  Who was sued?  Was the Debtor sued?

5          MR. COLBY:  No, Your Honor.

6          MR. ZAHRALDDIN:  No, they sued Mr. Rajan instead

7  because they knew that that would absolutely --

8          THE COURT:  Well, I don't know.  What they knew,

9  we're not going to say who knew what.  But I can tell you what,

10  nobody got back to me, and that --

11          MR. KODOSKY:  Your Honor, we did file --

12          THE COURT:  Did you file something?

13          MR. KODOSKY:  We filed a complaint, Your Honor.

14          MR. COLBY:  Well --

15          THE COURT:  Well -- well --

16          MR. KODOSKY:  And we quoted the Court --

17          THE COURT:  Woah, woah, woah.  Did you file

18  something?

19          MR. COLBY:  We absolutely did.

20          THE COURT:  Okay.  And maybe you did and --

21          MR. COLBY:  It was Document 286.

22          THE COURT:  And maybe that's why I forgot about it.

23          MR. COLBY:  Filed on July 7th.

24          THE COURT:  Uh-huh.

25          MR. COLBY:  Absolutely we filed a notice regarding

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 257 of 294

257

1    the proceedings in the Netherlands.

2          THE COURT:  Document what --

3          MR. COLBY:  Now, there have been develop --

4          MR. KODOSKY:  So --

5          MR. COLBY:  I'm sorry.

6          THE COURT:  Okay.

7          MR. COLBY:  There have been developments since then.

8          THE COURT:  Document 286.  And that may be why I let

9    it go because I can't remember -- there's so much in this case.

10   I asked for something and I thought somebody something --

11         MR. ZAHRALDDIN:  Wait, no, no.  Your Honor, we filed

12   it prior to that.  They only filed it after they tried to make

13   it go away.  I'm sorry.  I can't --

14         THE COURT:  No.

15         MR. ZAHRALDDIN:  I cannot --

16         THE COURT:  Ah, ah, ah.

17         MR. ZAHRALDDIN:  I cannot sit there and say that.

18         THE COURT:  Wait a minute.  Wait a minute.  Wait a

19   minute.  Wait a minute.  I've opened a can of worms.  How about

20   we finish with Mr. Rajan.

21         MR. ZAHRALDDIN:  I understand that.  It's just --

22   it's just --

23         THE COURT:  And then I don't need anybody to tell me

24   anything.  I can read the docket myself.

25         MR. ZAHRALDDIN:  Yes, ma'am.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 258 of 294

258

1          THE COURT:  I know I asked for something.  Somehow it

2  -- yeah.  I mean, we talked about it, and I might have said,

3  you know, this isn't good enough.  And -- and I just didn't

4  finish looking at it.  It got -- I know I didn't do a full

5  analysis of whatever was filed.  And it just went on the --

6  went away.  It was on the -- I don't know what I did with it.

7          MR. COLBY:  Your Honor.

8          THE COURT:  I think it wasn't concerning.

9          MR. COLBY:  That's all true.  But I absolutely resent

10  any suggestion that we ran from this issue.  You gave an order.

11          Mr. Zahralddin, that was way out of bounds.

12          You gave an order that the parties needed to file a

13  statement.  The parties filed statements.  I think theirs went

14  in first because it's 283 and ours is 286, but we did it.  We

15  did it quickly.  And we did it consistent with your order.

16          THE COURT:  Right.  And I don't recall if it was

17  satisfactory to what I wanted, but it must have been because I

18  didn't do anything about it.

19          MR. COLBY:  And in fairness, Your Honor, there have

20  been developments since then and we're happy to give you more

21  information about that when we revisit it, but you asked us for

22  a submission, and we made a submission.

23          THE COURT:  Right.  And I think I read it now that I

24  kind of recall, we might have read it and I said, oh, okay, and

25  not -- because I don't -- I don't think I would have just let

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 259 of 294

259

1  it slide.

2          MR. ZAHRALDDIN:  Well, I --

3          MR. COLBY:  Yeah, I think the -- I think --

4          THE COURT:  Okay.  We're not going to talk about it

5  anymore.

6          MR. COLBY:  Yep.  We'll deal with it next time.

7          THE COURT:  And I brought it up because I said wait a

8  minute, did somebody file -- and now that I recall correctly,

9  which is why I don't like to do things off the top of my head

10 because all it does is lead to trouble, is that I do recall

11 reading something and going, hmm, okay for now, and left it at

12 that.  And we'll figure -- and I'll figure it out.  I didn't do

13 a show cause -- because I was ready to do a show cause order.

14 I will tell you right now, I was about to.  And then --

15         MR. ZAHRALDDIN:  I wish you would have, Your Honor,

16 but we filed --

17         THE COURT:  Well, I read something -- woah, woah.  I

18 must have read something that dissuaded me from doing it.  I

19 didn't just off the top of my head decided not to.

20         MR. ZAHRALDDIN:  I don't know the timing, but you

21 also may have gotten into the car accident around that time.  I

22 don't remember.  I'd have to go back.

23         THE COURT:  Could have been.  I don't think so

24 though.  My car accident was August 27th.

25         MR. ZAHRALDDIN:  I can't remember when it was.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 260 of 294

260

1          THE COURT:  That was way before that.  I had to --

2          MR. ZAHRALDDIN:  But we immediately -- we immediately

3  filed the complaint soon after that.

4          THE COURT:  It could have been.  I don't remember.

5          MR. ZAHRALDDIN:  And the complaint did focus on all

6  this.

7          THE COURT:  All right.  All right.  Can we finish

8  with Mr. Rajan.  I'll go back and look, you know.  If I find

9  that it was in -- I think it was sufficient to answer my

10  question at the moment.

11          MR. COLBY:  Yep.

12          THE COURT:  I'm pretty sure it was because I didn't

13  do a show cause.

14          MR. ZAHRALDDIN:  It may have been, Your Honor, that

15  the independent director was the intervening act that made

16  everyone think that everything was going to be okay.

17          THE COURT:  I don't know.  I don't remember.

18          MR. ZAHRALDDIN:  I don't know either.  I'm

19  speculating.

20          THE COURT:  I have to go back.  I'm sure we have -- I

21  have notes.  I have notes on everything, and I'm sure we have

22  notes on once we reviewed this, we have notes as to why I

23  didn't do anything.  Okay.

24          MR. ZAHRALDDIN:  I don't think we have anything else

25  for Mr. Rajan.  I think we've covered the aspects of the case

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 261 of 294

261

1   and the reaction and the effect on a restructuring over there,

2   et cetera.  So if -- I think we can --

3            THE COURT:  So his answer to the -- what did he think

4   was wrong, I don't think I ever heard, but anyway, that's fine.

5   That's fine.

6            MR. ZAHRALDDIN:  Well, if we didn't -- do you need to

7   -- do you need him to repeat it?

8            THE COURT:  No, no.

9            MR. ZAHRALDDIN:  Okay.  All right.

10           THE COURT:  It didn't go on the record.

11           MR. ZAHRALDDIN:  It's a pretty important answer.  I

12   just want to make sure it's not -- we're not waiving anything,

13   so that -- that's the reason, Your Honor.

14           THE COURT:  Well, but your question is what did he

15   think was wrong with it.  I think that was the question, right?

16   He said throughout the litany of questions from Mr. Colby, the

17   judge said that going through all the paragraphs, wrong, wrong,

18   wrong, wrong, wrong.  And Mr. Kodosky asked him what was wrong.

19           THE WITNESS:  Okay, yeah.  So what --

20           THE COURT:  I don't think he answered the question.

21           THE WITNESS:  What's the exhibit number, again?

22   Where's the exhibit number?

23           THE COURT:  It was 18.

24           THE WITNESS:  Okay.  Yeah, let's go to it.  Okay.

25           THE COURT:  He went through all the paragraphs.  He

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 262 of 294

262

1    went through paragraph --

2              MR. COLBY:  Your Honor, there was an answer.  I think

3    the transcript will reflect that there was an answer to the

4    question, but --

5              THE COURT:  That he answered it.  Okay, then.

6              MR. ZAHRALDDIN:  And I thought Mr. Colby said it was

7    fine.

8              MR. COLBY:  It was fine.  There's an answer.

9              THE COURT:  Oh, well, then -- then --

10             MR. ZAHRALDDIN:  I think we're okay then.  That's

11   what I was trying to --

12             THE COURT:  It's getting late.  It's time for us to

13   slow down.

14             MR. ZAHRALDDIN:  No, I was -- I was trying to have

15   Mr. Rajan actually --

16             THE COURT:  Make sure.  I forgot what he's -- listen,

17   we've gone off on too many tangents at this point.  I'm kind of

18   losing focus and I think at this point it's about time that --

19   are you finishing redirect, or do you have some more?

20             MR. KODOSKY:  I would love to be able to -- with

21   having driven down from upstate New York, be able to put Mr.

22   Micheals on the stand.

23             MR. COLBY:  Well, a couple of things, Your Honor.

24   I've got some questions -- a couple of follow-up questions.

25             THE COURT:  Yeah, he's got some recross.

1          MR. COLBY:  Some recross.  And then as noted earlier,

2    we have objections to Mr. Michaels being called as an expert.

3          THE COURT:  As an expert, but not as a fact witness.

4          MR. COLBY:  No, that probably depends on what he's

5    going to testify about.  Will he have relevant --

6          THE COURT:  Right.  I mean, if he's testifying

7    regarding Rembrandt and their relationship with the Debtor and

8    whether they want to terminate their license.  That -- that's

9    perfect -- I don't know if that's his testimony.  But anything

10   about how licensing work and -- I don't even know why I need to

11   know that.  I don't know.

12         MR. KODOSKY:  To rebut Mr. Stastney's testimony, Your

13   Honor.

14         MR. ZAHRALDDIN:  Yeah, to rebut Mr. --

15         THE COURT:  Well, I don't know what he told -- I

16   mean, it is what it is.  He's not an expert either.

17         MR. ZAHRALDDIN:  Well, Mr. Michaels, as I've

18   mentioned before, Your Honor, is a plan proponent.  And a key

19   part of the plans, both the Rembrandt license and the

20   settlement, it also has to do with the security and the other

21   pieces to it.  Because our business model, which is in the plan

22   and which we have the exclusive right to put before the court,

23   and which we're trying to advance with this TRO --

24         THE COURT:  The TRO is simply to prevent all these

25   people you name from taking some action with respect to the

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 264 of 294

264

1    Debtor's assets.  That is all I'm looking at.

2             MR. ZAHRALDDIN:  I understand that, Your Honor.  But

3    the Debtor's assets are key to paying back these extra

4    creditors.

5             THE COURT:  I get all that.

6             MR. ZAHRALDDIN:  Okay.

7             THE COURT:  I get that.  But my focus is the TRO.

8    And if the Debtor -- I get the Debtor needs to protect his

9    assets.  I already understand that.

10            MR. ZAHRALDDIN:  Okay.

11            THE COURT:  I don't know what he's going to tell me.

12   The Debtor needs his assets because it belongs to the Debtor

13   and the Debtor needs it.  I know that.  That's what it is.  I

14   mean, I don't know what else he's going to tell me unless he's

15   telling me something -- I don't know what you anticipated his

16   testimony would be about anyway because you listed him a long

17   time ago.

18            MR. COLBY:  Yeah.  So a couple of things.  I think we

19   should finish with Mr. Rajan --

20            THE COURT:  Uh-huh.

21            MR. COLBY:  -- before we have an argument about Mr.

22   Michaels.  It seems that we're going to have an argument about

23   Mr. Micheals.  If he's going to come testify about the

24   Rembrandt license and the things you listed a minute ago, I

25   mean --

1              THE COURT:  That's facts.

2              MR. COLBY:  That's facts.

3              THE COURT:  It's factual and whether it's formed to

4  them.

5              MR. COLBY:  But to the extent he's being proffered to

6  offer an opinion -- to offer testimony about -- to rebut Mr.

7  Stastney about how licensing works or what the parallel

8  licensing will do or what the amendment allows, he's not a --

9              MR. ZAHRALDDIN:  I --

10             MR. COLBY:  -- he's --

11             THE COURT:  Wait Mister --

12             MR. COLBY:  It's my turn.

13             THE COURT:  It's his turn.

14             MR. ZAHRALDDIN:  I'm waiting.  I'm waiting.

15             MR. COLBY:  It's -- in that case, that's either

16  expert testimony or it's irrelevant because he's not a party to

17  it.  Mr. --

18             THE COURT:  Unless he's testifying how it impacts the

19  license between the Debtor and Rembrandt because apparently it

20  includes the Phillip license.

21             MR. ZAHRALDDIN:  Yes, ma'am.

22             THE COURT:  And if theirs is inclusive of that, he

23  can testify.

24             MR. ZAHRALDDIN:  We will limit it --

25             MR. COLBY:  There's --

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 266 of 294

266

1        MR. ZAHRALDDIN:  We will limit it exactly to those

2   relationships and not licensing in general, but he is going to

3   -- when he did the due diligence to do this work, Your Honor,

4   in order to get to the settlement, he had to look at the

5   Phillips license, he had to look at security, he had to look at

6   all these pieces because he had an active claim for trade

7   secret violation against the Debtor.

8        So those -- we'll limit it to that.  We will not

9   proffer him as an expert.  But you're not -- to say that it is

10  not relevant and not directly on point --

11       THE COURT:  I already said what I had to say what I

12  thought it would -- the relevancy is.

13       MR. COLBY:  Yeah.  This -- the issue is, Your Honor,

14  that Rembrandt does not control the Phillips license.

15  Rembrandt cannot testify that it sits between Phillips and any

16  of the other entities at issue here such that its

17  interpretation of the Phillips license is relevant.

18       THE COURT:  Counsel, I get all that.  All I'm saying

19  is to the extent a Phillip license was a basis or had some

20  impact on whether Rembrandt is going to continue their alleged

21  license it's relevant.  But not -- we looked at it.  We thought

22  they had a license, we did -- but they don't get to say, well,

23  we believe it means this or that.  It's what we did.

24       MR. COLBY:  Okay.

25       THE COURT:  And that's all I'm saying is it's for

1  that purpose.  But it's 6:20, so I don't know what you guys

2  think we're going to do because we now have to finish Mr.

3  Rajan.  Are you done with him on cross?

4           MR. KODOSKY:  Direct?

5           THE COURT:  I mean --

6           MR. KODOSKY:  Or I'm sorry, redirect?

7           THE COURT:  Redirect, geez.  Redirect?

8           MR. ZAHRALDDIN:  Yes, yes, Your Honor.  We're

9  complete.

10           MR. KODOSKY:  Yes, Your Honor.

11           THE COURT:  All right.  Now, Mr. Colby, you get to

12  recross.

13           MR. COLBY:  Yes, Your Honor.

14           THE COURT:  All right.  Let's -- let's -- and for

15  whatever reason, I still cannot get on my laptop.  I've tried

16  to switch to the ADU, and I can't get it.  Can you figure this

17  out?  I'm not the computer tech now.

18           I put my name in there, right?

19           UNIDENTIFIED SPEAKER:  Yeah, did you do the right --

20  why is that blocked?

21           THE COURT:  I don't know.

22           UNIDENTIFIED SPEAKER:  Wait, why can't you type

23  anything?

24           THE COURT:  I don't know.  All right.  It says more

25  choices.  Hit yes, all right.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 268 of 294

268

1          UNIDENTIFIED SPEAKER:  Are you touchscreen?

2          THE COURT:  No.  I keep thinking it is.  It's not.

3          UNIDENTIFIED SPEAKER:  Oh, see, oh, wait.  Don't do

4   that.  You're going to lock yourself out.

5          THE COURT:  Okay.

6          UNIDENTIFIED SPEAKER:  Press that.

7          THE COURT:  All right.  Oh, now.  Okay.  She told me

8   to hit more choices.

9          UNIDENTIFIED SPEAKER:  Oh, yeah.  Because -- oh,

10  yeah.

11         THE COURT:  All right.  I'm on here.  That's fine.

12  Okay.  Now I do this?  Let me finish opening --

13         UNIDENTIFIED SPEAKER:  Okay, yeah.  You're right.

14         THE COURT:  All right.  All right.  Now let's hope

15  this works.  No.  That's all right.  Never mind.  We'll just

16  get through it.  We'll get through it.  So.

17         UNIDENTIFIED SPEAKER:  I mean, just this is what she

18  told me.

19         THE COURT:  All right.  We had one --

20         UNIDENTIFIED SPEAKER:  There you go.  Okay.

21         THE COURT:  Maybe we had the thing going the wrong

22  way.

23         UNIDENTIFIED SPEAKER:  Yeah, that's exactly what it

24  was.

25         THE COURT:  Okay.  All right.  And it goes this way.

1          UNIDENTIFIED SPEAKER:  Wait, no.  Hold on one second.

2   Okay.

3          THE COURT:  Sign me in every day.  You know, just

4   never mind.

5          UNIDENTIFIED SPEAKER:  We think it's the other --

6          THE COURT:  I think it's the other way.

7          UNIDENTIFIED SPEAKER:  Yeah.

8          UNIDENTIFIED SPEAKER:  Yeah, it's like right there.

9   It's falling down.

10         THE COURT:  He's got it.  All right.  Okay.  I think

11  you had it backwards initially.

12         Ridiculous.  I've been trying to get on here.  John,

13  can you just get me on and when you do -- you'll get me on,

14  never mind.  Okay.  Stay sign in.  No, sign in this iPhone that

15  I remember.  Okay. All right.  I forgot why I wanted to get on

16  here.  Oh, I can get in the database.

17         Okay, counsel.  You can recross.

18         MR. COLBY:  Thank you, Your Honor.

19                     RECROSS-EXAMINATION

20  BY MR. COLBY:

21  Q    Mr. Rajan, you testified that the -- the budgets for

22  monthly cost at SeeCubic BV reflects wild overspending; that

23  was your testimony?

24  A    Yeah, they're huge.

25  Q    During the period of time when the receiver was in place,

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 270 of 294

270

1   there were monthly budgets prepared by SeeCubic BV, correct?

2   A    Correct.

3   Q    And you signed off on those budgets, correct?

4   A    We voiced our concerns and signed off as this is

5   unacceptable.  And then the receiver told us in February the

6   Netherlands is going to collapse financially, which is one of

7   the reasons why we went to bankruptcy to save the estate.

8   Q    You signed off on the budgets, the monthly budgets for

9   SeeCubic BV when the receiver was in place, correct?

10  A    We voiced our concerns, but we had no choice.

11           MR. COLBY:  May I approach, Your Honor?

12           THE COURT:  Yes.  Are we going to mark this or do you

13  just want to refresh his recollection?

14           MR. COLBY:  No.  This will be SC-7, I believe.  This

15  one is not in the binder.

16           THE COURT:  Okay.  Okay.  Thank you.

17  BY MR. COLBY:

18  Q    Mr. Rajan, do you recognize this document?

19  A    Yep.

20  Q    What is it?

21  A    This is regarding the advances under a note.

22  Q    Right.  These are -- and these advances and the

23  spreadsheets attached reflect that budget approval process that

24  you just testified about, correct?

25  A    Correct.

1    Q    And you signed off on these budgets, correct?

2    A    We voiced our concerns and then signed off on the budgets.

3    But we voiced our concerns and said this is totally out of

4    control.

5    Q    Thank you.  Mr. Rajan, is it -- we're done with that.

6              THE COURT:  Okay.

7              MR. COLBY:  Oh, sorry.  Move to admit it into

8    evidence if there's no objection.

9              THE COURT:  You mean all of it?

10             MR. COLBY:  Yes.  It's a series of these monthly

11   budgets --

12             THE COURT:  Okay.

13             MR. COLBY:  -- bearing Mr. Rajan's signature.

14             THE COURT:  Okay.  Counsel, are we objecting or are

15   we -- what are we doing with respect to Mr. Colby's request to

16   admit into the evidence the note and the attached budgets?

17             Right, Mr. Colby?

18             MR. COLBY:  Correct.

19             THE COURT:  They're on the docket at 158.

20             MR. COLBY:  And they're signed by Mr. Rajan.

21             THE COURT:  By who?

22             MR. COLBY:  Mr. Rajan.

23             THE COURT:  All right.  I see all these signatures.

24   One by Mr. Rajan.  Some by Mr. -- the receiver, approval.

25   SeeCubic BV.  Somebody signed.  Mr. Stastney.  Director Reed.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 272 of 294

272

1   They both Director Reed.  Okay.

2           MR. ZAHRALDDIN:  Your Honor, I guess we need to

3   understand where he's going with this?

4           MR. COLBY:  That's it.  I'm done with my questions.

5   I just want to move it into evidence.

6           THE COURT:  Because he said it was a while -- they

7   were over budget and he asked him, well, did you sign off on

8   these budgets.

9           MR. ZAHRALDDIN:  I think that's fine, Your Honor.

10  Mr. Rajan responded that he did so with reservation.

11          THE COURT:  Okay.  All right.  Admitted.

12      (Defendant's Exhibit SC-7 admitted into evidence)

13          THE COURT:  Okay.

14          MR. COLBY:  Thank you.

15  BY MR. COLBY:

16  Q    Mr. Rajan, is it your position that SeeCubic BV has no

17  legal right to use the Ultra-D technology?

18  A    Hang on a second.  They do not have the right to use the

19  Ultra-D technology that is in the cooperative without the

20  permission of Stream TV.  Because there's two parts here.

21  There's the Phillips technology, which we gave them the right

22  to use.  We didn't withdraw it from them.  You know, we'll see

23  what happens at our meeting in two weeks.  But the -- and the

24  Ultra-D technology was one company above in the cooperative,

25  and without Stream TV's permission, they should not be using

1    the Ultra-D technology.  That was the discussions we were

2    having with them when we went there in April.

3            THE COURT:  So the answer is they don't have the --

4    yes, they --

5            THE WITNESS:  Without Stream TV's permission, they

6    can't use it.

7    BY MR. COLBY:

8    Q    Mr. Rajan, it is the Dutch entities themselves that

9    actually have the patent that comprise the Ultra-D technology,

10   correct?

11   A    Uh-huh, hang on a second.  Okay.  There's two parts here.

12   That's patents, which is in Ultra-D Cooperative.  Then there is

13   the trade secrets.  There's trade secrets which are not

14   patented and some of them reside in the BV.  Some of them

15   reside in Stream TV, okay.  And Stream TV is the -- and

16   Technovative, is the nominal owner of the Ultra-D Cooperative.

17   And then there's also an issue because we have defaulted debt

18   in the subsidiaries to Stream TV.  So under 501C, the

19   bankruptcy court is in charge.

20           THE COURT:  All right.  So what's the answer?  Does

21   -- who owns the patents to the Ultra-D technology?

22   BY MR. COLBY:

23   Q    Who registered those patents, Mr. Rajan?

24   A    Ultra-D Cooperative registered them.

25   Q    Right.  The Dutch subsidiaries, correct?

1   A    Registered the patents, not --

2   Q    Not Stream TV, correct?

3   A    No, they didn't register those patents, no.

4   Q    In fact, when we were last here, we looked at Exhibit SC-

5   5, which is a list of patents that Debtors filed in this case

6   and all of those patents are registered by some of the Dutch

7   subsidiaries, correct?

8   A    They're registered by the Ultra-D Cooperative, not by the

9   BV, and Stream TV paid for it.

10   Q    Okay.

11          THE COURT:  So they're registered to the Ultra-D

12   Cooperative, you said?

13          THE WITNESS:  Correct.  And Stream TV paid for it and

14   has a loan that is defaulted by the Cooperative, almost --

15          THE COURT:  Okay.  I get all that.  But I just want

16   to know Ultra-D Cooperative, which is separate from --

17          THE WITNESS:  The BV.

18          THE COURT:  SeeCubic BV, right?

19          THE WITNESS:  Correct.  That's separate.

20          THE COURT:  And Ultra-D Cooperative owns SeeCubic?

21   Is the --

22          THE WITNESS:  Owns SeeCubic BV.

23          THE COURT:  Okay.  And who owns Ultra-D Cooperative?

24          THE WITNESS:  Ultra-D Ventures in the Curacao.

25          THE COURT:  Okay.  And who owns those people?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 275 of 294

275

1          THE WITNESS:  Technovative and then Stream TV.

2          THE COURT:  And what percent?

3          THE WITNESS:  A hundred percent.

4          THE COURT:  Who owns a hundred percent?

5          THE WITNESS:  Ultra-D Ventures is owned 99.9 by

6    Technovative.  I've got to grab the company chart.

7          Want to hand me the company chart?

8          THE COURT:  Oh, yeah.  But I couldn't figure it out

9    either, 99 and 1 percent.

10          THE WITNESS:  I think it's 0.1 percent, so sorry.

11          THE COURT:  Yes.  All right.

12   BY MR. COLBY:

13   Q    Mr. Rajan, the turnover action that you testified about

14   with me and with Mr. Kodosky --

15   A    Which exhibit is that?

16   Q    That one is the one we admitted for limited purposes as

17   Exhibit 72.  It's the amended emergency motion.

18   A    Wait, no.  I think it's number 7.  It says 7.

19          THE COURT:  No, that's --

20          MR. COLBY:  Seventy-two.

21          THE WITNESS:  Seventy-two.

22          THE COURT:  Seven is the one that just --

23          THE WITNESS:  Oh, oh, sorry.  Let me grab -- I think

24   you may have taken it back.  Oh, here it is.  Okay.  Got it.

25          THE COURT:  Okay.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 276 of 294

276

1    BY MR. COLBY:

2    Q    And the paragraph that we looked at, it focuses on the

3    bond -- paragraph 14, the beginning of it focuses on the

4    bonding equipment, correct?

5    A    Which page are you on?

6    Q    I'm on page 7, paragraph 14.

7    A    Seven.  Yes, on Exhibit A is the bonding.

8    Q    Right.  We are looking at page 7, paragraph 14.  Are you

9    there?   Yeah, paragraph A.

10   A    Oh, for other Stream assets?

11   Q    Sorry, yes.  Bonding equipment and other Stream assets.

12   Sorry.  My fault.  Paragraph 13 and 14.

13   A    What do you see with this.

14   Q    Thirteen addresses the bonding equipment, correct?

15   A    Okay, yeah.  Exhibit A and B is for bonding and C is for

16   the other?  Is that what you're talking about?

17   Q    I'm just looking the document itself.  I'm not referring

18   to the exhibits.

19            THE COURT:  What page are we on now?

20   BY MR. COLBY:

21   Q    I'm on page 7.

22   A    Seven and eight, right?

23   Q    Seven and eight.

24   A    Seven and eight, okay.

25            THE COURT:  Okay.

1   BY MR. COLBY:

2   Q    Right.  And paragraph 13 addresses bonding equipment,

3   correct?

4   A    Yes.

5   Q    And paragraph 14 addresses other -- what's called other

6   Stream assets, right?

7   A    Correct.

8   Q    And those other Stream assets include Ultra-D demonstrator

9   samples, engineering assets, Stream business laptops, Stream's

10  intellectual property and software, and Stream business

11  records.  Do you see that?

12  A    Correct.

13  Q    And those are the assets that you claimed weren't turned

14  over in the fall of 2022, correct?

15  A    No.  They weren't turned over in July of 2022.

16  Q    Okay.  So your knowledge of that particular issue goes

17  back to July of 2022?

18  A    Yeah.  It started in July of 2022.

19  Q    All right.  And those issues that started in July of 2022,

20  those are the ones that are the subject of this turnover action

21  in April of 2023, correct?

22  A    Hang on a second.  Can you repeat the question?

23  Q    I'll withdraw it.  I'll withdraw.  Okay.  You testified in

24  response to questions from Mr. Kodosky about the Phillips

25  amendment.  Do you recall that testimony?

1  A    Yeah.

2  Q    And you talked about a list of names that are to be

3  provided?

4  A    A list of names to be agreed upon.

5  Q    To be agreed upon, correct.

6  A    Agreed upon.

7  Q    And just trying to find my copy.  Mr. Rajan --

8         THE COURT:  What was that tab?

9         MR. COLBY:  That is -- it's admitted as SC-2, and it

10  is tab 4.

11         THE WITNESS:  Where is it?  On here?

12         MR. COLBY:  Yes.

13         THE WITNESS:  All right.

14         THE COURT:  Okay.

15         THE WITNESS:  Okay.

16  BY MR. COLBY:

17  Q    And the list of names that's to be agreed upon, that's

18  discussed in the paragraph at the bottom of page 1 of this

19  amendment, correct?

20  A    You're on page 2 you mean, on page 2.

21  Q    It begins after sign -- after signing date.

22  A    You're on page 2, you mean.

23         THE COURT:  Page 1.

24  BY MR. COLBY:

25  Q    Page 1.  After signing date, both parties will agree upon

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 279 of 294

279

1  a list of third parties.  Do you see that?

2  A    Will agree upon a list of third parties, correct.

3  Q    Okay.  So I just want to -- no question yet.  Just making

4  sure we're all looking at the same thing.  That process of

5  agreeing upon a list of third parties, that's what you were

6  discussing with Mr. Kodosky, correct?

7  A    Correct.

8  Q    And the very last two words on page 1 say "it is."  Do you

9  see that?

10  A    On page 1?

11  Q    Yep.  The very last two words in that paragraph we were

12  just looking at, "it is."  Do you see that?

13  A    Yeah.

14  Q    Okay.  So there's a sentence that starts -- it's the very

15  last two words on page 1.  "It is intended to agree upon the

16  list within 30 days after signing date."

17  A    Correct.

18  Q    Okay.  That's what you were referring to, correct?

19  A    Yeah.

20  Q    It then says, the list will be added as Schedule A, part 2

21  of this amendment, and may be amended from time to time.  do

22  you see that?

23  A    Correct.

24  Q    That's what the current terms of the license from Phillips

25  state, correct?

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 280 of 294

280

1    A    Correct.  We never got to the original list, though.

2          MR. COLBY:  I don't have any additional questions at

3    this time, Your Honor.

4          THE COURT:  Okay.  All right.

5          MR. ZAHRALDDIN:  Your Honor, I just have two quick

6    questions for Mr. Rajan.

7          THE COURT:  You want to do re-cross, re-redirect?

8          MR. ZAHRALDDIN:  Yes, ma'am.  I just have to ask one

9    question.

10          THE COURT:  All right.  I'll let it -- and that's it.

11          MR. ZAHRALDDIN:  Thank you, Your Honor.

12                    FURTHER REDIRECT EXAMINATION

13    BY MR. ZAHRALDDIN:

14    Q    Mr. Rajan, is -- are Hawk SLS any of the purported secure

15    lenders in this case, are any of them collateralized in the

16    patents in the foreign subsidiaries?

17    A    Absolutely not.

18    Q    Are the collateralized in any of the downstream foreign

19    subsidiaries in any way?

20          MR. COLBY:  Objection, Your Honor.  I thought we had

21    one question.

22          MR. ZAHRALDDIN:  It's the same question, I'm just

23    being specific.

24          THE COURT:  All right.  Not collateralized --

25          MR. ZAHRALDDIN:  I didn't want to make it a compound

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 281 of 294

281

1    question, that's all.  Can the witness answer that, Your Honor?

2         THE COURT:  Yes, I'll allow it for what it's worth.

3    BY MR. ZAHRALDDIN:

4    Q    Okay.

5    A    They're -- they're -- Hawk and SLS, I guess, they're now

6    inside SeeCubic, are in -- are collateralized inside Stream TV.

7    And SeeCubic has an unsecured loan in the BV.  But nothing to

8    do with the patents or anything like that.

9    Q    Or the trade secrets.

10   A    Or the licenses or anything like that, no.

11        MR. ZAHRALDDIN:  Thank you, Your Honor.

12        THE COURT:  SeeCubic, Inc has a --

13        THE WITNESS:  Has an unsecured loan in the BV, but

14   not -- not in the Cooperative where the patents are --

15        THE COURT:  Okay.  Just --

16        THE WITNESS:  -- and not in the Curacao where the

17   licenses are.

18        THE COURT:  -- has -- through the Delaware action,

19   they have an unsecured loan?

20        MR. ZAHRALDDIN:  No, Your Honor, they've been -- I

21   guess it does stem from loans they've been providing in the

22   Delaware action in order to pursue their 225 action.  I think

23   that is accurate.

24        MR. COLBY:  Yeah, Your Honor, I believe -- I don't

25   purport to read Mr. Rajan's mind.  I believe that's a reference

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 282 of 294

282

1 to the loans that have been keeping BV afloat for months and

2 months and months.

3    THE COURT:  Right.  Unsecured loans.

4    MR. ZAHRALDDIN:  Yes.

5    MR. COLBY:  Yes.

6    MR. ZAHRALDDIN:  Which -- yes.

7    THE COURT:  From -- from SeeCubic that was first

8 through the receiver.

9    MR. COLBY:  Yep.

10    THE COURT:  And for which I said I don't know why you

11 guys here.  Go draw on the loan.

12    MR. COLBY:  Correct.

13    THE COURT:  That loan, right?

14    MR. COLBY:  Correct.

15    THE COURT:  But it's unsecured, correct?

16    MR. ZAHRALDDIN:  Yes.  And I -- and there may be a

17 priority loan above it from the Debtor.

18    THE COURT:  60 million from what I gather.

19    MR. ZAHRALDDIN:  And that's also the subject of the

20 proof of claim, that's all.

21    THE WITNESS:  No, that's not -- that 60 million is

22 us.

23    MR. WRIGHT:  Objection, Your Honor.

24    THE COURT:  Who's objecting?

25    MR. WRIGHT:  SLS, Your Honor.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 283 of 294

283

1              THE COURT:  On what basis?

2              MR. WRIGHT:  Your Honor, we're talking about the

3    proofs of claim that you expressly ruled out of order on the

4    supplemental brief at the last hearing.

5              MR. ZAHRALDDIN:  That's incorrect, Your Honor.

6              You did not discuss anything about the proof of claim

7    and how a proof of claim would be out of order in a Debtor's

8    bankruptcy case is crazy.

9              THE COURT:  Hey, hey, don't you talk to him.

10             MR. ZAHRALDDIN:  I'm just saying, Your Honor, it's --

11             THE COURT:  Talk to me.

12             MR. ZAHRALDDIN:  And Your Honor, on top of that we

13   didn't --

14             THE COURT:  All right.  I don't think I said -- what

15   I said --

16             MR. ZAHRALDDIN:  -- we didn't reference SLS.  We

17   referenced SeeCubic's proof of claim which is where the money

18   supposedly comes through.  I guess we'll find out at the end of

19   the month.

20             THE COURT:  That 60 million was SeeCubic and I don't

21   recall any -- he just said, the only thing about SLS was

22   whether they have a -- they have -- whether their collateral

23   includes any liens on the patents or license.

24             MR. ZAHRALDDIN:  Yes, ma'am.

25             MR. WRIGHT:  No -- correct, Your Honor.  But his

Case 23-10763-amc    Doc 828-4    Filed 11/27/24    Entered 11/27/24 21:49:34    Desc
Exhibit 10-30-23 Hearing Transcript    Page 284 of 294

284

1    question, his very last question was very generic about the

2    proofs of claim which Your Honor addressed in connection with

3    the supplemental briefing that was filed by the Debtor on the

4    eve of the October 16th here.

5         THE COURT:  I don't recall proofs of claim being in

6    that.  I know we talked about lender liability.

7         MR. ZAHRALDDIN:  Correct.

8         THE COURT:  And this isn't about lender liability,

9    and he's already testified about the proofs of claims at

10   length, about how they filed a proof of claim for 60 million

11   and they want to include the amounts that they've advanced to

12   the BV or the whoever else.  That's what I assumed he was

13   talking -- were you talking about something else?

14        MR. ZAHRALDDIN:  That is exactly what I was talking

15   about.

16        MR. WRIGHT:  If he is only talking about that proof

17   of claim for the 60 million, then I withdraw my objection.  It

18   was not asked that way, Your Honor.

19        MR. ZAHRALDDIN:  I don't remember any restriction,

20   but yes, it was -- it was --

21        THE COURT:  I don't see anything about proofs of

22   claims.  I thought it was lender liability.

23        MR. ZAHRALDDIN:  Yeah, the only proof of claim that

24   I've referenced here is the one directly at issue with

25   SeeCubic.

1          MR. WRIGHT:  Well, but you --

2          THE COURT:  No, you don't get to -- no, no, no, no.

3          MR. ZAHRALDDIN:  No, you cannot raise your hand and

4  ask me questions.

5          THE COURT:  I say no questions.  All right.

6          MR. ZAHRALDDIN:  Okay.  I --

7          THE COURT:  I -- for the record, I understood the

8  proof of claim in reference was the proof of claim that Mr.

9  Rajan had testified about with respect to the claim that had

10  been asserted by SeeCubic, Inc that was for some certain dollar

11  amount which he said, I thought, was 60 million.  Maybe I got

12  the wrong number because I kept hearing 60 million.  But

13  whatever that amount was, he believed that the debt would be

14  increased by the amounts that were being advanced to the Dutch

15  companies under the -- through the receiver or through the

16  continued advancement of funds, however that's happening.

17  That's what I understood.

18          MR. ZAHRALDDIN:  That's exactly it.

19          THE COURT:  Proof of claim at issue and anything else

20  is not -- I wasn't going to consider or isn't in question.

21          MR. ZAHRALDDIN:  That's exactly --

22          THE COURT:  That answer your question, counsel?

23          MR. ZAHRALDDIN:  Yes, that -- that's my -- that was

24  our scope.

25          THE COURT:  That satisfies your -- I'm sorry.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 286 of 294

286

1          MR. WRIGHT:  Satisfies my question, Your Honor.

2   Thank you.

3          THE COURT:  All right.

4          MR. ZAHRALDDIN:  Thank you, Your Honor.  And with

5   that, I'll -- we can excuse Mr. Rajan.

6          THE COURT:  All right.  All right, Mr. Rajan, you may

7   step down.

8          THE WITNESS:  Thank you.  Bye-bye.

9          THE COURT:  Counsel, it is quarter of 7:00.  I do not

10  think we're going to get to -- is it Mr. Micheals?  Micheals

11  today.  I'm sorry that you drove all the way from northern

12  Jersey, got stuck in traffic with a car accident, but

13  unfortunately, it is quarter of 7:00, and as you can tell, I'm

14  kind of melting down a little bit and I don't -- I want to be

15  able to address this with all my -- everybody.  I think

16  everybody's a little tired and I don't think it advances the

17  cause one bit to try to go when we're tired.

18          So and I was trying to bring up my calendar to see if

19  we can get another date.  I think I'm in, but because the last

20  time we did this, I tried to pull up my calendar and for

21  whatever reason, it said I didn't have any hearings and I have

22  all these hearings apparently scheduled.

23          John, do you have access to my calendar?

24          THE CLERK:  I don't have it here.  I have it in back.

25          THE COURT:  What?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 287 of 294

287

1            THE CLERK:  I have it in back.

2            THE COURT:  I don't usually -- I use a presumably --

3    I can't even find outlook to begin -- oh, here we go.  Here's

4    Outlook.  Eileen (phonetic) typically puts them all on my

5    calendar, but if you have Outlook, you have access, right?  No?

6            You have access to --

7            THE CLERK:  Yes.

8            THE COURT:  All right.  So let's just make sure we

9    can do a double check, by you looking in VCal (phonetic) for

10    dates when I say I'm looking at Outlook.

11            All right, counsel.  Today is the 30th.  I have --

12    okay, what are we looking at for trial?  Oh, I don't know how

13    Higgens can be in trail in person, on Thursday?

14            THE CLERK:  No.

15            THE COURT:  Is that for --

16            THE CLERK:  No.

17            THE COURT:  I see this on my calendar.  They're doing

18    discovery.

19            THE CLERK:  It --

20            THE COURT:  Mr. Colby, does Mr. Capone need to be

21    here?

22            MR. COLBY:  I believe that Hawk's counsel should be

23    here.

24            THE COURT:  All right.  So just -- we're going to

25    pick some dates and then you're going to --

1          MR. COLBY:  And then I can check -- I think we should

2    narrow it down, if we can, and then --

3          THE COURT:  That's what we meant.

4          THE CLERK:  There's a remote witness.

5          THE COURT:  What remote witness?

6          THE CLERK:  In general.

7          THE COURT:  I haven't --

8          THE CLERK:  It'd be for tomorrow's hearing, and it

9    might also --

10         THE COURT:  I don't -- I don't know.  I haven't -- I

11   haven't gotten any clearance from A.O.'s office.  I don't -- I

12   don't know.  I'm not trying to get in trouble.

13         THE CLERK:  Okay.

14         THE COURT:  All right.

15         THE CLERK:  Because that could have played into this

16   situation as well.

17         THE COURT:  Right.  If in fact we were allowed to

18   have remote witnesses that could appear in -- that might help

19   some of this, but I don't know yet.  And I've been instructed

20   in court.  But if it's in -- that's in court for --

21         THE CLERK:  Right.

22         THE COURT:  As far as I'm concerned, it's in court.

23         THE CLERK:  Isn't that the situation tomorrow?

24   Tomorrow with Pack Orsami (phonetic)?

25         THE COURT:  I said no, she could not.  She needed to

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 289 of 294

289

 1  come in.

 2          THE CLERK:  Oh, so -- oh.

 3          THE COURT:  Because they all wanted to do that, and I

 4  said absolutely not.  That was too complicated.

 5          In court, to me, means that anybody who walks into

 6  the court.  That's the whole genesis of this in court is that

 7  it should be open to the public.  The public should be able to

 8  come in and observe any of the trials.  There up on here it

 9  seems to me you can see if you're in court, but I don't make

10  the rules.

11          All right.  So we have -- is Suresh (phonetic)

12  tomorrow or Wednesday?

13          THE CLERK:  Tomorrow.

14          THE COURT:  Oh, Jesus Christ.  I'm going to have a

15  grip --

16          THE CLERK:  Hagan (phonetic) is by phone, Thursday.

17          THE COURT:  No, they have to come in.

18          THE CLERK:  I have it as an oral argument only,

19  Thursday.

20          THE COURT:  It says in person.  It says in person,

21  injunction, she asked for -- I don't know what she asked for.

22  I said no, because then he wanted to do it.  No, we couldn't do

23  that.

24          All right.  So we have the 1st -- oh, Lord.  Is

25  Higgens off on Thursday?

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 290 of 294

290

1          THE CLERK:  You're in trial.

2          THE COURT:  All right.  Let's go to the 6th.  Oh,

3   look at that, Setna (phonetic).  That's in person.  Oh, look a

4   that, the 7th.  Yeah, is that the election day?  Okay.  I don't

5   know anybody here concerned that the 7th is, I don't know,

6   election around the country or just in --

7          (Court and clerk confer)

8          THE COURT:  How much time do you think we need?

9   Because we need Mr. Michaels, and we need Mr. Stastney.  So two

10  witnesses.  Jesus Christ.  The 13th, I have a trial.  The 14th,

11  I have a trial.  The 15th, I have a trial.  And on the 17th,

12  I'm presenting at a seminar.  All right.  The 20th, out of the

13  question.  I have an appointment from -- that I can't get out

14  of.  The 21st, a trial.  And then nobody's coming here on

15  Thanksgiving, are you?  I don't think so.

16         (Court and clerk confer)

17         MR. ZAHRALDDIN:  I had two motions there, Your Honor,

18  that we moved.  The parties asked us to continue them, both

19  parties.

20         THE COURT:  To the 13th?

21         MR. ZAHRALDDIN:  No, no.  We had two on the 13th,

22  that's why they were spaced there.  I believe it was Mr. Parks

23  in exclusivity and Mr. John Edle, I believe, contacted me, and

24  asked if we could move that.  And so we moved those to the -- I

25  want to say 15th.

Case 23-10763-amc   Doc 828-4   Filed 11/27/24   Entered 11/27/24 21:49:34   Desc
Exhibit 10-30-23 Hearing Transcript   Page 291 of 294

291

1          (Court and clerk confer)

2              THE COURT:  Okay, you guys, we have the 13th or we're

3    going to have to -- I don't want people to have to come here

4    consecutive days.  We could do afternoons, but that's not going

5    to get us through anything.  Right now, I'm looking at the

6    13th, right?

7              MR. ZAHRALDDIN:  Yep, the only issue with the 13th,

8    Your Honor, and I don't know if the U.S. Trustee is on.  They

9    were listening in last hearing.  But we have a 2004 examination

10   with the U.S. Trustee.

11             THE COURT:  Well, that's out.

12             MR. ZAHRALDDIN:  That is due on the 13th.

13             THE COURT:  That's out, then.  I mean, I'm not trying

14   to go to December.

15         (Court and clerk confer)

16             THE COURT:  Counsel, how about we just give you guys

17   some dates because we're looking at this.  I can't figure it

18   out.  I thought Higgens was on discovery issues.

19             THE CLERK:  Because the other -- the other --

20             THE COURT:  The criminal stuff?  Okay.  Okay.  It's

21   probably -- no, I'm not talking about anything that's not

22   public record.  Yeah, I think that may be because a criminal

23   matter may need to go.  We may need to do this.  I don't

24   remember.

25             How about I'm going to talk to Ms. Godfrey, we're

1   going to put some dates and send it out.  We're going to see if

2   maybe some of these trials can get moved around.  Some of them,

3   what happens is they settle, of course, the day before.  Like

4   Friday.  We could have used Friday.  They came here and

5   settled.  Wasted a whole day.

6         So we're going to reach out to people who are

7   scheduled for trial and say are you going forward and then try

8   to -- which is what we did for today.  We originally -- I told

9   you the 23rd when it wasn't.  We actually moved stuff around

10  for the 23rd, but you guys weren't available so.

11        Let's -- let me get some dates and then we'll go from

12  there.  Does that work for everybody?

13        MR. COLBY:  Appreciate that, Your Honor.

14        MR. ZAHRALDDIN:  Yes, Your Honor.

15        THE COURT:  And in the meantime, we're going to

16  continue to work on the other matters.  I think there's a

17  matter with that motion for the Rule 26F.  When's that

18  scheduled for?

19        MR. ZAHRALDDIN:  Well, Your Honor, I don't believe

20  it's scheduled for any time.  But we've just submitted two

21  competing orders.  We had the 26F conference on Friday and I

22  think we noted in our filing that we would -- that you should

23  look out for theirs and I think they filed theirs today.  So

24  you have two orders, and you can choose which one you think is

25  best.

1           THE COURT:  Oh, that makes my life easy.  I love

2    that.  When I don't have to -- I can just go say this is what I

3    want and I don't need to explain, unless somebody wants an

4    explanation, why I did what I did and why I picked whatever

5    order.  Or I may not pick either order and make my own.

6           All right.  So court is adjourned until tomorrow at

7    10:30.  And we will provide dates to counsel for continued

8    hearing on the TRO.

9           Anything else from anybody?

10          MR. ZAHRALDDIN:  No, Your Honor.

11          THE COURT:  Thank you.

12          MR. COLBY:  Thank you.

13       (Proceedings adjourned)

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*John Buckley*

John Buckley, CET-623
Digital Court Proofreader