UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| IN RE: | : | Case No.  23-10763 |
| | : | |
| STREAM TV NETWORKS, INC.   CH: 11 | : | ADV. No.  23-00057 |
| | : | |
| A) Motion To Approve Employee | : | Philadelphia, Pennsylvania |
| Obligations Filed By Stream Tv | : | November 15, 2023 |
| Networks Inc., Technovative | : | 12:03 p.m. |
| Media, Inc., Represented By | : | |
| Rafael X. Zahralddin . | : | |
| | : | |
| B) Motion Of The Debtors For | : | |
| Entry Of An Order Authorizing The | : | |
| Debtors To Enter Into An | : | |
| Employment Agreement With Thomas | : | |
| Jung Ho Park As Chief Financial | : | |
| Officer To The Debtors Filed By | : | |
| Stream Tv Networks Inc., | : | |
| Technovative Media, Inc., | : | |
| Represented By Rafael X. | : | |
| Zahralddin . | : | |
| | : | |
| C) Motion To Extend Exclusivity | : | |
| Period For Filing A Chapter 11 | : | |
| Plan And Disclosure Statement | : | |
| Filed By Stream Tv Networks Inc. | : | |
| Represented By Rafael X. | : | |
| Zahralddin . | : | |
| | : | |
| D) Application For Compensation | : | |
| (First Monthly) Compensation And | : | |
| Reimbursement Of Expenses Of | : | |
| Lewis Brisbois Bisgaard And | : | |
| Smith, Llp Counsel For The | : | |
| Debtors For Rafael X. Zahralddin, | : | |
| Debtor'S Attorney, Period: | : | |
| 3/15/2023 To 04/30/2023, Fee | : | |
| $380382.00, Expenses $3476.00. | : | |
| Filed By Rafael X. Zahralddin | : | |
| Represented By Self. | : | |
| | : | |
| E) Application To Employ Thomas | : | |
| Jung Ho Park As Chief Financial | : | |
| Officer Filed By Technovative | : | |
| Media Inc., Stream Tv Networks, | : | |

```
Inc., Represented By Rafael X.      :
Zahralddin .                        :
                                    :
F) Motion For Sanctions For         :
Violation Of The Automatic Stay     :
Filed By Stream Tv Networks, Inc.   :
Represented By Rafael X.            :
Zahralddin .                        :
                                    :
. . . . . . . . . . . . . . .
```

BEFORE THE HONORABLE MAGDELINE D. COLEMAN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

<table>
<tr><td>For the Debtor:</td><td>Rafael X. Zahralddin<br>Lewis Brisbois Bisgaard & Smith<br>500 Delaware Avenue, Suite 700<br>Wilmington, DE 19801<br>302-985-6004</td></tr>
<tr><td>For Hawk Investment Holdings Ltd:</td><td>Steven Caponi, Esq.<br>Margaret Westbrook, Es1.<br>K&L Gates<br>600 N. King Street, Suite 901<br>Wilmington, DE 19801<br>302-416-7080</td></tr>
<tr><td>For SeeCubic, Inc.:</td><td>Eben P. Colby, Esq.<br>Skadden Arps Slate Meagher &<br>Flom, LLP<br>500 Boylston Street, 23rd Floor<br>Boston, MA 021116<br>617-573-4800</td></tr>
</table>

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

| | |
|---|---|
| 1 | NOVEMBER 15, 2023                                    12:03 P.M. |
| 2 | THE BAILIFF:  All rise. |
| 3 | THE COURT:  Good afternoon. |
| 4 | MR. ZAHRALDDIN:  Good afternoon, Your Honor. |
| 5 | THE COURT:  Okay.  Hold on one second, counsel. |
| 6 | MR. ZAHRALDDIN:  Sure. |
| 7 | THE COURT:  All right, counsel, this is the Stream TV |
| 8 | Technovative matter and currently, there are five matters |
| 9 | listed, six matters listed for today. |
| 10 | Counsel for the Debtor? |
| 11 | MR. ZAHRALDDIN:  Morning, Your Honor.  Rafael |
| 12 | Zahralddin from Lewis Brisbois Bisgaard & Smith for the |
| 13 | Debtors.  Can we begin with the disputed fee application, |
| 14 | because I believe that one doesn't require any sort of other |
| 15 | documents, et cetera? |
| 16 | THE COURT:  Is a legal argument or is it -- |
| 17 | MR. ZAHRALDDIN:  Legal argument, yes. |
| 18 | THE COURT:  Well -- |
| 19 | MR. ZAHRALDDIN:  Or would -- I -- we got a call this |
| 20 | morning from your courtroom deputy indicated that you wanted to |
| 21 | just hear legal argument and hand up of documents.  We do |
| 22 | have -- |
| 23 | THE COURT:  Right.  But I guess what sort of -- this |
| 24 | was not listed as a trial matter. |
| 25 | MR. ZAHRALDDIN:  Correct. |

1          THE COURT:  And so, when someone called my courtroom

2    deputy and said, do we have to appear in person, the response

3    is, is if you -- which is her standard response, if you

4    anticipate evidence, then you need to come in.  Okay.  And so,

5    I'm assuming that's why all of you are here was because you

6    anticipate putting some evidence in.

7          MR. ZAHRALDDIN:  When we scheduled this over -- I

8    can't remember how long ago, Ms. Godfrey gave us, we scheduled

9    it with the assumption that we may need witnesses and she asked

10   me at that time.  We actually noticed it that way --

11         THE COURT:  And I don't --

12         MR. ZAHRALDDIN:  -- but which is --

13         THE COURT:  -- why, because I had a trial scheduled

14   at 1:00.  There's no way this would have gone from 11:30 to 1.

15   The Trujillo -- Truji -- yeah.  It settled, but it was

16   scheduled for 1:00.

17         MR. ZAHRALDDIN:  I'm not sure, Your Honor.

18         THE COURT:  So I don't know -- so on my calendar, I

19   didn't even have Stream as a evidentiary matter, when I looked

20   at my calendar, but the answer -- if you guys call and ask

21   her -- and I was discussing it with my staff about the notice

22   that's on the website and it's not clear what that means.  It

23   just says the -- if you -- if you evidence (sic), you have to

24   come in and actually, they're saying all hearings, but my

25   position is, unless it's here -- evidence, you don't have to

```
 1    come in here.  So --
 2              MR. ZAHRALDDIN:  We'll make sure to do that next
 3    time, Your Honor.  We --
 4              THE COURT:  So -- yeah, unless we have an actual
 5    trial, where -- because if we're going to have a trial or we're
 6    going to have -- take evidence, it's always going to be not in
 7    the connection with a -- with my hearing list because there's
 8    no way I can do my hearing list and get evidence in.  And it
 9    also -- if it takes more than 30 minutes, I'm not hearing in
10    any way.
11              MR. ZAHRALDDIN:  I hear you.
12              THE COURT:  So I think there's a lot of just kind of
13    miscuing today and I hate that everybody had to travel here,
14    but unfortunately, I have a hard stop at 1:00.
15              MR. ZAHRALDDIN:  Okay.
16              THE COURT:  So that's not -- I can't even go beyond
17    that.
18              MR. ZAHRALDDIN:  Your Honor, which matters do you
19    have?  Because I think the only matters we have up right now
20    that the Debtors had noticed were the disputed fee application,
21    exclusivity, an employee motion, the retention of Thomas Park
22    as the CFO and then our enforcement of the stay, which I think
23    was the genesis of why we scheduled this hearing because it had
24    been in abeyance for quite some time and you directed us in
25    court to set the hearing for that, which we did.
```

```
 1              MR. ZAHRALDDIN:  So this is what I have.  I have A,

 2   the A matter is the employee motion, where they wanted to pay

 3   some prepetition wages and the B and E matter were the Park

 4   retention motions.  The C matter was the exclusivity motion.

 5   The D matter is the fee application and the F --

 6              MR. ZAHRALDDIN:  Okay.

 7              THE COURT:  -- is the stay violation.

 8              MR. ZAHRALDDIN:  Okay.

 9              THE COURT:  So what I had thought that this -- what I

10   would definitely be able to hear was exclusivity.  That's

11   simply a legal argument.  With respect to the fee application,

12   to the extent there was some objection, there was no way I was

13   going to look at that, if there's objections.  With respect to

14   the -- so let me -- exclusivity, I thought was on the table

15   today.

16              MR. ZAHRALDDIN:  Uh-huh.

17              THE COURT:  The employee motion, I'm not even sure

18   because that seems so old and it -- when I read it, it didn't

19   make any sense to me.  The fee application I didn't think would

20   be on because there is a dispute.  The stay violation I didn't

21   think was on because I was going to have to take some evidence,

22   unless the parties relied on some other record.  And the B and

23   E, Park retention -- so the only thing I thought we might get

24   to today was the exclusivity motion and maybe the Park motion,

25   if it didn't require evidence.
```

1        MR. ZAHRALDDIN:  Well --

2        THE COURT:  If it did, then the employee motion.

3  Those two are only legal arguments.

4        MR. ZAHRALDDIN:  Your Honor, I -- let me see if I can

5  illuminate a little bit on this.  I would like to see the fee

6  application heard.  If Your Honor wishes to have a hearing on

7  the only two line items that were discussed, which were --

8  opposing counsel had an issue with the fact that we prepared a

9  cash management motion, which we discussed with the U.S.

10  Trustee.  And then we also had a second noticing motion, both

11  of which we put aside because we had other things we needed to

12  get done.

13        We wanted to see how many parties filed proofs of

14  claim, how many did -- so those amount to, I think roughly from

15  memory, under $10,000, but I would like to get a determination

16  on the rest of the fee app, which doesn't have a specific

17  objection to it, other than there were broader objections that

18  we believe warrant -- because honestly, there are clear

19  indications on the record of where we're getting paid, the

20  benefit to the estate.

21        I've never had anyone argue that you shouldn't get

22  paid because we don't like the result or we don't believe that

23  you are -- I mean, we're a fiduciary.  We have obligations.  So

24  I would like to at least get something on that.  We've been

25  waiting quite some time past --

```
 1            THE COURT:  When did you file this fee application?

 2            MR. ZAHRALDDIN:  We filed it at least 30 days ago.  I

 3   have to double-check.

 4            THE COURT:  So that's -- so you have a hearing within

 5   30 days and you say you've been waiting long?  You filed this

 6   September -- when Mr. Caponi filed his objection on September

 7   26th.

 8            MR. ZAHRALDDIN:  So it would have been 14 days prior

 9   to that is when we filed it.

10            THE COURT:  Yes, but I wouldn't have scheduled a

11   hearing.  First of all, we wait 14 days for them to respond.  I

12   think a fee application, it may be seven days.  I don't know

13   how long it is.

14            MR. ZAHRALDDIN:  It's 14, Your Honor.

15            THE COURT:  And then -- so we wouldn't have done

16   anything with this for 14 days and once a objection is filed,

17   which is September 26th, I think, Mr. Caponi, you filed your

18   objection.  We would have filed a hearing of first listing on

19   this now, maybe October.  If you did it September, we would

20   have scheduled a hearing 30 days ago.  So --

21            MR. ZAHRALDDIN:  I think that's what we did, but --

22            THE COURT:  Right.  So I don't see how this is --

23   you've been waiting quite some time.  This is only the -- I

24   haven't even had a first hearing on this.

25            MR. ZAHRALDDIN:  Okay.
```

```
1              THE COURT:  Got continued.  Okay.  So --

2              MR. ZAHRALDDIN:  Well, Your Honor, we'll --

3              THE COURT:  -- so if I'm going to hear specific

4  objections and I need some testimony, there's no way I'm doing

5  that today, but I have to hear from Mr. Caponi, who stood up.

6              MR. ZAHRALDDIN:  I'd like to cover the other ones

7  first before Mr. Caponi comes, if you don't mind.

8              THE COURT:  Well, no, let's do one at a time because

9  then I'm a bit confused today.

10             MR. ZAHRALDDIN:  Go ahead. Go ahead.

11             THE COURT:  So Mr. Caponi, what's your position with

12 respect to the fee application?

13             MR. CAPONI:  Your Honor, we filed an emergency motion

14 to hold all of this in abeyance.  I just want to mention that

15 was on the list.

16             THE COURT:  Yeah.  Well, obviously I'm not granting

17 that because I'm saying I'm going forward with -- and I forgot

18 that, that wa -- I apologize.  I -- with respect to holding

19 things in abeyance, there was a reason why I'm not going to do

20 that.  That fee application is going to be addressed no matter

21 what I decide, no matter what I decide, whether I decide to

22 grant your motion, whether I decide to appoint someone,

23 whether -- doesn't matter what I do, the fee application has to

24 be addressed.  So I wasn't going to put that in abeyance.

25             With respect to the exclusivity motion, I may not --
```

Case 23-10763-amc   Doc 448-8   Filed 01/23/24   Entered 01/23/24 21:59:39   Desc Main
Exhibit 11-15 Q Hearing Transcript   Page 10 of 57

Case 23-10763-amc   Doc 428   Filed 01/22/24   Entered 01/22/24 12:14:05   Desc Main
Document   Page 10 of 57

10

```
1    it expired yesterday, by the way.  So I need to figure out --
2    let's at least continue some deadlines.  It doesn't mean
3    anything, because my ruling isn't going to have any effect on
4    that imme -- I mean, until I rule.  So that one, I said, no,
5    I'm going to go forward with that.
6            The Park retention motion, I wasn't quite sure about
7    that because the Debtors are con -- the Debtor, at least with
8    respect to Stream, there's no issue that Stream has the
9    authority to file.  The issue is whether they should be here,
10   whether it's a good faith filing or whether you should just --
11   I should dismiss, convert or whatever.  So to the extent they
12   continue to operate, I need to figure out do they need Mr.
13   Parks.  So that one was on the table.
14           The employee motion, same thing.  I don't know.  Do
15   they need the employees?  Do they even have employees?  So that
16   one I said would stay on the table, so that was the reason why
17   I did not think it made sense.  And with respect to violation
18   of the stay, even if I dismissed their case, the Third Circuit
19   has said you can continue and keep the case open to address
20   violations of the stay.
21           So again, I would ha -- all of these things are
22   things I have with the exception of perhaps the employment
23   motion and the Park retention, no matter what I decide, I have
24   to deal with those.  So that's why I didn't want to stay those.
25           MR. CAPONI:  We're -- look, we're -- obviously prefer
```

1    to stay and all will stay whatever the Court wants to stay and

2    we'll address whatever the court wants to address.

3              THE COURT:  Right.

4              MR. CAPONI:  But there is a -- I don't want to

5    interject, but there are, I think some news I'd like to impart

6    upon the Court that may impact how the Court wants to handle

7    all of this, but I'd like to address that early on, but I

8    don't -- if you want to continue.

9              THE COURT:  Well, no, if you think it emp -- what is

10   it?

11             MR. ZAHRALDDIN:  I have no idea what this news is,

12   because we haven't been told.

13             THE COURT:  Well, did you share it with opposing

14   counsel?

15             MR. CAPONI:  No, I'm sharing it with everybody right

16   now.

17             THE COURT:  Mr. Caponi, come on.

18             MR. CAPONI:  Your Honor, it has nothing to do with

19   you.  I'm not making a motion.  I'm just imparting information.

20             THE COURT:  But don't you think it would make sense

21   to impart it to everybody before you share it with the Court?

22   Because then you catch them off guard.  I don't know how

23   they're going to respond.  I don't care when you tell me.

24             MR. CAPONI:  Okay.  And Your Honor --

25             THE COURT:  Go ahead.  What is the --

1          MR. CAPONI:  Go ahead.

2          THE COURT:  go ahead.

3          MR. CAPONI:  As the Court's been aware, my client --

4    I -- look, I represent Hawk --

5          THE COURT:  Uh-huh.

6          MR. CAPONI:  -- as secured lender, who speaks on

7    behalf of a lot of the investors.  As the Court's aware, those

8    investors have been paying for Stream and its assets long

9    before the bankruptcy for, you know, many years.  The burn rate

10   is substantial.  And you know, the Court -- we've been down

11   that road.  I'm not going to rehash it.

12         THE COURT:  Uh-huh.

13         MR. CAPONI:  The -- when the bankruptcy was filed,

14   the advice we give our clients was bankruptcy provides

15   certainty, transparency, oversight and there are some benefits

16   to being in bankruptcy.

17         THE COURT:  Uh-huh.

18         MR. CAPONI:  We filed our motions, you know, the

19   motions the Court referenced regarding the appointment of a

20   trustee, et cetera, at the beginning of this case.  This case

21   has been pending for -- or those motions for around eight

22   months.  We had hoped that -- and during the pendency of

23   that -- of this proceeding, Your Honor, my client has continued

24   to fund and support SCBV, which is the only thing of value.

25         THE COURT:  Uh-huh.

Case 23-10763-amc    Doc 848-1   Filed 01/23/24   Entered 01/23/24 12:59:39   Desc Main
Exhibit 11-15-23 Hearing Transcript Page 13 of 57

Case 23-10763-amc    Doc 828   Filed 01/23/24   Entered 01/23/24 12:59:39   Desc Main
Document    Page 13 of 57          13

  1          MR. CAPONI:  As Your Honor's noted, Mr. Callahan's

  2   noted, there must be some value here.  People are paying for it

  3   for it.

  4          THE COURT:  They're fighting for it.

  5          MR. CAPONI:  Right.  Absolutely, Your Honor.  The

  6   factoring into our -- now my client's analysis and the

  7   investor's analysis were that the benefits of the bankruptcy,

  8   transparency, oversight, et cetera, would streamline the

  9   process and that the Debtor would act rationally and want to

 10   get these gating issues resolved.  As the Court has noted,

 11   there's been a tremendous expenditure of resources.  The

 12   resources that my clients have been forced to bear to what we

 13   view as a very disorganized estate that has not been focused on

 14   emerging but focused on basically a blood feud by Mr. Rajan.

 15          The resources that we're spending here are resources

 16   that are not available to support the collateral.  And I'm just

 17   make -- you know, because of this issue, my clients are done.

 18   So there's funding that's due towards -- in the next few weeks

 19   of SCBV around $1.2 million.  The secured lenders are no longer

 20   supporting the collateral and wanted to -- in the Sanche court

 21   (phonetic), but because we have been and because I think

 22   everyone has been reliant upon that collateral being preserved

 23   on my client's nickel, since that --

 24          THE COURT:  They're not -- right.

 25          MR. CAPONI:  -- we're going off that cliff, I wanted

1   to make sure that no one said we surprised anybody.

2           THE COURT:  Okay.

3           MR. CAPONI:  But I got the instructions the other

4   day --

5           THE COURT:  Uh-huh.

6           MR. CAPONI:  -- to let everyone know that as long --

7   you know, we're done.  If -- my clients have not authorized me

8   to make, you know, counter proposals or anything.  All I know

9   is as long as Mr. Rajan is in charge of this estate --

10          THE COURT:  Right.

11          MR. CAPONI:  -- we can no longer fund into a

12   blackhole in this abyss with the burn rate that we've been

13   experiencing --

14          THE COURT:  Right.

15          MR. CAPONI:  -- and so the return on investment,

16   whatever value is there --

17          THE COURT:  The ROI is not there.

18          MR. CAPONI:  The ROI is lo -- Elvis has left the

19   building, as you would --

20          THE COURT:  All right.

21          MR. CAPONI:  -- say, Your Honor.

22          THE COURT:  And counsel, what does that mean?  With

23   you saying that, I will be perfectly honest.  We have devoted

24   and have been devoting all of our time to resolving those

25   outstanding motions.

 1          MR. CAPONI:  Yeah.

 2          THE COURT:  Does that mean you guys don't want a

 3   ruling and we can -- are you not --

 4          MR. CAPONI:  No, Your Honor.

 5          THE COURT:  -- you're withdrawing those?

 6          MR. CAPONI:  No, Your Honor.  My clients are going to

 7   continue to vigorously enforce or secure creditor rights.

 8          THE COURT:  Okay.

 9          MR. CAPONI:  If the Debtor can preserve the assets,

10   great, we'll take them at the end using our secured creditor

11   rights.  If they burn to the ground, we'll sift through the

12   ashes for whatever value is left.  I just, again, want to make

13   sure that everyone is aware --

14          THE COURT:  So --

15          MR. CAPONI:  -- that this unofficial, you know, if

16   you want to call it -- Ms. Westbrook's going to stab me -- dip

17   financing, it's not that --

18          THE COURT:  Right.

19          MR. CAPONI:  -- but we've been supporting this of

20   funds in one fashion --

21          THE COURT:  Advancement --

22          MR. CAPONI:  -- other (sic).

23          THE COURT:  -- of funds.

24          MR. CAPONI:  It's been of funds.  And as Your Honor

25   noted, the ROI, these investors given the -- and not -- this is

```
 1  not a knock on the Court.  This is just, you know, had the
 2  Debtor --
 3            THE COURT:  This is how it played out, which --
 4            MR. CAPONI:  Yeah.  It's how it played out --
 5            THE COURT:  -- you know, with us trying to sift
 6  through all of the various motions, which for whatever reason
 7  got heard when they got heard.
 8            MR. CAPONI:  Yeah.  And Your Honor, if -- the money
 9  that was going to us, my clients weren't paying us, they'd be
10  -- it'd be available for the -- this investment, but when you
11  add it all together, the ROI evaporated.  So I just want to
12  impart that on the Court for whatever --
13            THE COURT:  Right.
14            MR. CAPONI:  -- it's worth.
15            THE COURT:  I thought it was some decision somewhere.
16            MR. CAPONI:  No.  No.  It's just, again, because I
17  think --
18            THE COURT:  So when's the next money due and when is
19  it not --
20            MR. CAPONI:  About two weeks.
21            THE COURT:  Two weeks.
22            MR. CAPONI:  $1.2 million and you know, as we've said
23  all along --
24            THE COURT:  So you're telling me I have two weeks to
25  get a decision in here?
```

```
 1              MR. CAPONI:  That's cash, right, that's due, not

 2   promises.  And again, in transparency, I'm not a Dutch lawyer,

 3   but my understanding is because a big chunk of that money or

 4   tax payments, that quickly thereafter, we would expect an

 5   insolvency of SCBV in the Netherlands, not initiated by us, but

 6   we think that's just a natural consequence.

 7              THE COURT:  No, well, that's their -- they operate

 8   different from us.

 9              MR. CAPONI:  Yeah, I mean, I think that's just a

10   natural consequence, but --

11              THE COURT:  Okay.

12              MR. CAPONI:  -- Mr. Colby, did I miss something or

13   say something wrong?

14              THE COURT:  Mr. Colby?

15              MR. COLBY:  No.  If I might, though --

16              THE COURT:  Yes.

17              MR. COLBY:  -- Your Honor, on behalf of SeeCubic,

18   which by virtue of raising money from its investors has been

19   also bearing a significant burden of this ongoing funding.

20   The -- echo everything Mr. Caponi said, particularly with

21   respect to what we told our clients would be potentially the

22   benefits of this --

23              THE COURT:  Which have not come to fruition.

24              MR. COLBY:  -- process.

25              THE COURT:  I get it.
```

1          MR. COLBY:  Yeah.  And I really, really struggled

2    with how to present this to the Court because we didn't want

3    any of it to be perceived as a slight to the Court for this not

4    moving along.  We understand we're all a victim of

5    circumstances.  But the -- you know, absent, starting to see

6    some of those perceived benefits of bankruptcy --

7          THE COURT:  Uh-huh.

8          MR. COLBY:  -- the willingness to continue in an

9    indefinite sort of limbo is -- has faded, and the issue, to be

10   completely candid, is that absent a decision on those dating

11   issues, those early motions, the longer that process played

12   out, the more effectively it became akin to denying the

13   motions, because we're here doing all this other stuff that we

14   think shouldn't be done and has proven to be incredibly costly.

15   The Court, I think, just identified a potential solution.  And

16   as a former clerk, I know how these things tend to trickle

17   down.

18         THE COURT:  Right.  And instead of being in --

19   because I have two law clerks.  One you never see, who's

20   actually working on all of this --

21         MR. COLBY:  Yeah.

22         THE COURT:  -- and one who takes notes and you know,

23   there's like three or four of them working on this --

24         MR. COLBY:  Yeah.

25         THE COURT:  -- and if you're telling me you're done

Case 2:23-10763-amc   Doc 4828-1   Filed 01/23/24   Entered 01/23/24 20:59:39   Desc Main
Exhibit 11-15-23 Hearing Tr. Page 19 of 57

19

1   and this is it and I don't have to decide --

2           MR. COLBY:  No.

3           THE COURT:  -- no, that would be great because we

4   have all -- we have a lot of other matters under advisement

5   that people have gotten pushed back --

6           MR. COLBY:  Yeah.

7           THE COURT:  -- because we're focusing on this.

8           MR. COLBY:  No.  I was -- where I was headed was

9   quite the opposite of that and I was trying to do it as

10  diplomatically as possible.

11          THE COURT:  And say, can you rule as soon as

12  possible, Judge?

13          MR. COLBY:  Yes.  I mean, the -- just the nuts and

14  bolts of it are that there's significant amounts due at the end

15  of the month.  There's no current appetite to do that.

16          THE COURT:  Right.

17          MR. COLBY:  I can't make any promises that we can

18  change minds, but the practicalities of it as a result of the

19  Thanksgiving holiday is ordinarily the process of collecting

20  the money and all -- moving it around and all those things

21  would have to be done by like the 22nd in order to get it done

22  by the end of the month.  These are not like vendor bills,

23  where you can get a couple of days here and there.  It's the

24  tax authorities, it's payroll and the consequences.  So what

25  we've -- that's something that could potentially, you know,

1    unlock this problem.

2            THE COURT:  Counsel, if you're asking me -- you're

3    going to have a decision by the 22nd, no way.

4            MR. COLBY:  Okay.

5            THE COURT:  That's not -- we're not -- because we

6    keep getting stopped for other matters --

7            MR. COLBY:  Right.

8            THE COURT:  -- and that we have to now -- which is

9    why I was not prepared to really do much with these things

10   because now that means that the resources that we are devoting

11   to trying to get out our -- my decision is now being address

12   with -- I mean, I have other matters.  Don't get me wrong.

13           MR. COLBY:  Of course.  Of course.  And --

14           THE COURT:  You know, but my goal, to be perfectly

15   honest was, you know, the middle of December to the end for a

16   decision.  I'm not going into the New Year without this being

17   decided.  I will tell you that.  So my goal was to have this --

18   presumably, unless I have some other, you know, matters that

19   take up the time, that was our ultimate goal was the middle of

20   December, end of the year.

21           MR. COLBY:  That's --

22           THE COURT:  That's where I am.

23           MR. COLBY:  -- helpful.  And I don't know --

24           THE COURT:  Hey, I'm not -- you --

25           MR. COLBY:  -- that that's going to --

 1              THE COURT:  -- your clients can make their own

 2    decision --

 3              MR. COLBY:  Yeah.

 4              THE COURT:  -- based on what they want, but I did not

 5    plan to go into the new year with this as a matter under

 6    advisement.

 7              MR. COLBY:  Yeah.

 8              THE COURT:  Not because I want to start off the new

 9    year without that, but it just made more sense to have a

10    decision by the end of the year.  And I'll be honest, there are

11    attorneys who will tell you I'm notorious on December 31st

12    issuing a decision and so you guys can deal with it next year.

13    So --

14              MR. COLBY:  Oh.

15              THE COURT:  -- and big decisions.  So that was my

16    goal.  I'm -- you know, again, you know, having mini trials and

17    trials, it cuts into our ability --

18              MR. COLBY:  Totally.

19              THE COURT:  -- to rule by that --

20              MR. COLBY:  Totally understand.  It takes up all of

21    our time, right?  So we very much understand the dynamic there.

22    And just, again, in the spirit of being really upfront about

23    this because the consequences are serious.  You know, the fact

24    that we were here today dealing with these motions was somewhat

25    of a precipitating event.  It's this view that we have with the

```
 1   investors of why are we talking about, you know, retaining Park

 2   when we -- you know, we want a decision on whether or not there

 3   should be a trustee or those sorts of things.  So it's a little

 4   beyond our ability as lawyers to control there.

 5            THE COURT:  You have clients.  I -- you know --

 6            MR. COLBY:  Yeah.

 7            THE COURT:  -- I know what it is to have clients, but

 8   the point of the matter is, at least with respect to today,

 9   there really was no need for anybody to come in here.

10            MR. COLBY:  Understood.

11            THE COURT:  And there -- so therefore, this has just

12   been -- be perfect -- at least from the Court's perspective, a

13   big boondoggle for today, because I have a personal matter that

14   is very important to me today.

15            MR. COLBY:  Well, we wanted to --

16            THE COURT:  And I just really don't want to go past a

17   certain time period.

18            MR. COLBY:  That's fine.  We just happened to be here

19   because we wanted to raise this issue anyway and it's probably

20   better raised in person than via a letter or something or --

21            THE COURT:  Or by phone --

22            MR. COLBY:  Something that --

23            THE COURT:  Or by Zoom.

24            MR. COLBY:  Or by phone.  Right.  Just the on the

25   consequences, to be a little more --
```

```
 1              THE COURT:  Uh-huh.

 2              MR. COLBY:  -- specific.  They are serious and they

 3    get at issues we've been spending a lot of time on recently.

 4              THE COURT:  Uh-huh.

 5              MR. COLBY:  So for example, if the employees in the

 6    Netherlands aren't paid -- and I'm definitely not a Dutch

 7    lawyer, but the consequences of that is they can leave, they

 8    can seek employment elsewhere and they're not bound by the

 9    terms by any sort of noncompetition terms.  So, whereas I think

10    there's been a lot of frankly pretextual claims about leakage

11    of trade secrets and things that we've been litigating on a

12    parallel track, this presents potentially a genuine concern

13    about that.

14              And if the employees leave, it may be very hard, if

15    possible at all, to get them back.  Similarly, unpaid employees

16    can, to my understanding, force of bankruptcy.  So we could

17    have a bankruptcy or liquidation or something like that at the

18    Dutch level in the Netherlands very soon.  And then finally, as

19    I think you've heard --

20              THE COURT:  Which may be more beneficial to your

21    clients.  Let's be honest.  Go ahead.

22              THE CLERK:  I --

23              THE COURT:  Go ahead.

24              MR. COLBY:  Yeah.  And then, finally, you know, the

25    the company there has had some longstanding outstanding taxes
```

1  due.  They're on a payment plan, but if the scheduled payments

2  are missed, the Dutch authorities can demand immediate payment

3  of all of it, not just the payment that was missed.  That's

4  like another two million Euros.  And so that is an additional

5  thing that could very quickly tip those entities into an

6  involuntary bankruptcy proceeding.

7  　　　　So the consequences are quite serious.  The decision

8  was not taken lightly, but absent some meaningful, you know,

9  steps forward that I think we've been working towards and in

10  some clarity along the lines of what --

11  　　　　THE COURT:  That's not to say that your client may --

12  I mean, I have not made a decision yet.  I'm still weighing the

13  facts.  Sort of have an idea where I'm going, but I haven't

14  decided, so that's to say maybe your clients may not like my

15  decisions.  Maybe they may love my decision.  I don't know what

16  my decision is yet, so I'm not quite sure whether it's going to

17  make a difference one way or another.

18  　　　　MR. COLBY:  They're not make -- yeah, not making any

19  assumptions in that regard.

20  　　　　THE COURT:  No.  No.  I'm say -- no.  What I'm saying

21  is that they're saying, you know, absent some sort of decision,

22  which we haven't gotten, we have to make this call.

23  　　　　MR. COLBY:  A decision would be -- right.  A decision

24  would give them --

25  　　　　THE COURT:  Better --

 1          MR. COLBY:  -- a view as to how to the next --

 2          THE COURT:  How do you want -- a better view --

 3          MR. COLBY:  -- step of the process.

 4          THE COURT:  Right.

 5          MR. COLBY:  So it would, in fact, be an informed

 6  decision, rather than this, you know, kind of state of

 7  purgatory that they're living in at the moment.  So --

 8          THE COURT:  Okay.

 9          MR. COLBY:  -- it's -- they've just had enough and

10  can't continue to, you know --

11          THE COURT:  I get it.

12          MR. COLBY:  -- write those checks.

13          THE COURT:  I get it.  I get it.  Okay.  So what

14  you're saying is that by December 1st, there will be no

15  money --

16          MR. COLBY:  Correct.

17          THE COURT:  -- with respect to funding the -- because

18  they're not on the Debtor directly.  They're not --

19          MR. COLBY:  Correct.

20          THE COURT:  -- or not -- or technically because

21  really, they're not even at the operational level.  You're down

22  at the operational level of the subs.

23          MR. COLBY:  Of the subs, right.

24          THE COURT:  Who are not in bankruptcy.

25          MR. COLBY:  They are not in bankruptcy.  It's

1   pursuant to that note we talked about back in --

2            THE COURT:  Right.

3            MR. COLBY:  -- April.

4            THE COURT:  Your claims against those and whatever --

5            MR. COLBY:  But it's --

6            THE COURT:  -- get -- maybe you guys can go ha --

7   never mind -- hash all that out in bankruptcy in the

8   Netherlands, but it is what it is.

9            MR. COLBY:  Gotta help us, Your Honor.

10           THE COURT:  I don't think you can avoid --

11           MR. COLBY:  Gotta help us.

12           THE COURT:  I don't think you can avoid, even with a

13  bankruptcy in the Netherlands, ultimately, the ownership issue.

14           MR. COLBY:  Oh, yes.

15           THE COURT:  That has to be resolved some way.

16           MR. COLBY:  Yeah.  I mean, look, our -- the secured

17  creditor status as secured creditors here isn't going to

18  change, but the financing of the entities --

19           THE COURT:  The asset.  The --

20           MR. COLBY:  -- where I think the parties think

21  there's real value, that something that's been happening on

22  sort of an unofficial basis and it just -- there's no appetite

23  for them to continue that right now.

24           THE COURT:  Okay.

25           MR. COLBY:  Thank you.

```
1              THE COURT:  All right,  Mr. Zahralddin, you've heard

2    all that.

3              MR. ZAHRALDDIN:  I did, Your Honor.

4              THE COURT:  Uh-huh.

5              MR. ZAHRALDDIN:  It's never an easy thing.  Your

6    Honor, I would like to address one thing.  Maybe we can deal

7    with the employee motion.  We submitted a revised order --

8              THE COURT:  For which one?

9              MR. ZAHRALDDIN:  For the employee motion.  And --

10             THE COURT:  The employee motion?

11             MR. ZAHRALDDIN:  Yes, ma'am.  We --

12             THE COURT:  Well, I'm a little confused on that one.

13             MR. ZAHRALDDIN:  Well, I'd like to explain it to

14   you --

15             THE COURT:  Uh-huh.

16             MR. ZAHRALDDIN:  -- if you'd like.  So when we first

17   started, we were trying to get our arms around -- we don't have

18   any of the books and records.  Many of them are still kept in

19   the SeeCubic BV servers and also in other servers or in

20   laptops.  There's all kinds of historical data.  So we filed

21   this as a typical motion to try to keep our employees and our

22   independent contractors together.  Since that time, we've been

23   able to parse all that out.

24             And our big issue that remains because Mr. Rajan was

25   the only employee that would have straddled the petition date,
```

1  so he has decided to waive any sort of priority or anything

2  that would have accrued pri -- right before the petition date

3  and then maybe was in transit.  So he's -- we've taken that out

4  of the order.  We really simply need the order, so we can go

5  back and make sure we have authority from the Court to assess

6  and we'll work with the US Trustee.  We've,  you know, briefly

7  discussed these issues with him, assess if there were any

8  issues when the takeover scheme occurred after the omnibus

9  because you know, about 30 percent of the employees went over

10  to SeeCubic, the new co.  The rest were kind of in limbo, ended

11  up with VSI, but there was still probably withholding

12  potentially that was left over, so we want to just be able to

13  go sort that out.

14          THE COURT:  What does that have -- I mean, first of

15  all, employees under the code goes back how far?  So those

16  employees were not -- they would not have a claim as employees

17  because they would be outside of the time period.  So I'm

18  trying to figure out how this is --

19          MR. ZAHRALDDIN:  It's not the claim for the -- they

20  would have a claim to withholding, which is not property of the

21  estate and so we wanted to at least invest --

22          THE COURT:  Well, wouldn't they just have a regular

23  claim?

24          MR. ZAHRALDDIN:  Not for withholding.  It's not

25  property of the estate, so we have to look at the taxing

Case 23-10763-amc   Doc 828-11   Filed 01/23/24   Entered 01/23/24 10:59:39   Desc Main
Exhibit 11-15-23 Hearing Transcript   Page 29 of 57

Case 23-10763-amc   Doc 482   Filed 01/23/24   Entered 01/23/24 12:15:30   Desc Main
Document   Page 29 of 57                29

```
 1   authorities.  We just --

 2           THE COURT:  But it still --

 3           MR. ZAHRALDDIN:  -- wanted authority to handle that.

 4           THE COURT:  -- even if it's, you know, the

 5   withholdings that you took from their paychecks is what you're

 6   talking about.

 7           MR. ZAHRALDDIN:  Well, or that were swept by SeeCubic

 8   when they took all the cash out of the account.

 9           THE COURT:  Well, what is that -- so how does that

10   author -- why am I authorizing you to pay anybody for anything?

11           MR. ZAHRALDDIN:  We're not asking for payment.  We

12   took those provisions out.  We're asking --

13           THE COURT:  Well, what are you asking for?

14           MR. ZAHRALDDIN:  We're asking to investigate and

15   review and if there is property of the estate that -- if

16   there's property of these employees that are not property of

17   the estate, we want to sort that out, work with the US Trustee

18   and get that sorted out.

19           THE COURT:  So what am I --

20           MR. ZAHRALDDIN:  That's a liability.

21           THE COURT:  So -- but this isn't what this order --

22   what this motion was was --

23           MR. ZAHRALDDIN:  We removed any payment of

24   prepetition amounts, other than something that wasn't property

25   the estate and we simply asked for the course comfort order
```

1 piece of it.  That's really all that's in the new order.

2          THE COURT:  Well, that wasn't what was in the motion,

3 so what's before me is something -- what you're asking me --

4          MR. ZAHRALDDIN:  It --

5          THE COURT:  -- for is something that -- did you tell

6 the other si -- when I say the other --

7          MR. ZAHRALDDIN:  Ma'am, it was in the motion.  We

8 defined withholding liabilities as part of it -- it was in the

9 motion.

10          THE COURT:  Where?

11          MR. ZAHRALDDIN:  Yes, ma'am.

12          THE COURT:  Tell me where because I read this motion

13 and according to what I understood, you were asking -- where

14 are my notes?  On this employee motion, you asked for a couple

15 of things.  You asked for a motion to pay the employees of

16 SeeCubic BV, which apparently you're not asking me anymore.

17 The United States -- in the United States, you were seeking to

18 rehire nine Stream employees that purportedly left after the

19 Chancery Court's omnibus decisions and are now employed by VSI.

20          And in connection with rehiring them, you seek to pay

21 those employees approximately 30k in prepetition wages.  I

22 don't even know how that works because they won't even fit in

23 the A4 calculation.  They wanted to pay independent servicers

24 approximately 30K for prepetition amounts.  And then you

25 want -- in ongoing, you wanted 10k per month post-petition.

1          MR. ZAHRALDDIN:  No, Your Honor.  We revised that

2   based upon the passage of time.  We filed the notice with a

3   revised order.  We put a blackline against the order.  That was

4   filed at Docket Number 474.  And we have curtailed and pared

5   down what we're asking for.

6          THE COURT:  But what I told, the Netherlands is out.

7   The stuff for the U.S. is out that.  You had them divided by

8   Taiwan.  You wanted to rehire three employees and that you

9   wanted to pay them post-petition payroll, which that's a

10  different issue.  I'm not quite sure, you know, is this

11  ordinary course.  I don't know.

12         MR. ZAHRALDDIN:  We simply indicate this was the

13  relief we asked for.  Continue to honor and pay all pre-

14  petition employee obligations, the ordinary course of business

15  they come due.  The only employee obligation that remains,

16  because there was only one employee, Mr. Rajan, would be any

17  withholding from prior employees.  That was one of the defined

18  terms that is encompassed by employee obligations.  We asked to

19  honor and continue any programs and practices with respect to

20  employee obligations that were in effect as of the petition

21  date.

22         Those are simply going to be medical.  We want to

23  have continuity in any sort of medical or perhaps there may be

24  a retirement account, et cetera.  We just need to sort that

25  out.  We're not asking to pay prepetition amounts.  We're just

1   saying we'd like an order to move forward on this.  And we --

2          THE COURT:  Move forward on what?

3          MR. ZAHRALDDIN:  We have employees that have been

4   hired and are coming over already and we have existing health

5   plans that we want to integrate them into.

6          THE COURT:  So wouldn't you have to file a motion to

7   assume or continue to the health plans?  I don't see that in

8   here.  I don't even --

9          MR. ZAHRALDDIN:  No.  We had them on prior health

10  plans in VSI.  Now we're opening up new health plans in the

11  ordinary course at Stream.

12         THE COURT:  So what do you need my approval for, for

13  ordinary course?

14         MR. ZAHRALDDIN:  I can take all the ordinary course

15  out and then we want to be able to deal with the issue of

16  investigating and getting the --

17         THE COURT:  Who's -- why do you need my approval to

18  investigate anything?  Aren't you obligated to do that

19  notwithstanding --

20         MR. ZAHRALDDIN:  We are obligated to do that, but

21  again --

22         THE COURT:  So --

23         MR. ZAHRALDDIN:  -- this is what we asked for at the

24  very beginning --

25         THE COURT:  Well --

1    MR. ZAHRALDDIN:  -- because there was more

2  uncertainty.

3    THE COURT:  -- you can -- there's nothing wrong with

4  asking --

5    MR. ZAHRALDDIN:  Okay.

6    THE COURT:  -- but whether I'm giving is a whole

7  different.

8    MR. ZAHRALDDIN:  Your Honor, if -- that's fine.  If

9  you believe these are in the ordinary course, we will withdraw

10  the motion.

11    THE COURT:  Well, no.  I'm asking you do you believe

12  because obviously you asked me, do you thi -- I mean --

13    MR. ZAHRALDDIN:  I do believe that these are in the

14  ordinary course, ma'am.

15    THE COURT:  All right.  That then Mr. Caponi, did you

16  guys file an objection to that?

17    MR. CAPONI:  We did, Your Honor.

18    THE COURT:  And what was your objection?

19    MR. ZAHRALDDIN:  They don't want the case to go

20  forward.  That's all.

21    THE COURT:  Well, we already know that.

22    MR. CAPONI:  We objected to what they filed.  I'm --

23  like what I'm hearing here is like bizarro land.  I'm not sure

24  exactly how to respond, but --

25    THE COURT:  You guys in these -- you guys love to

 1 | like, use these colorful -- you use bizarro.  He uses -- what
 2 | was the word that he said that I think I've heard through the
 3 | pleadings, through the -- I can't think I can't think of the
 4 | word that the Debtor believes that your clients did to them.  I
 5 | don't know what the --
 6 |         MR. CAPONI:  I mean, Your Honor --
 7 |         THE COURT:  -- whatever it is, but you guys love some
 8 | colorful language here.
 9 |         MR. CAPONI:  I'm a colorful person, but we have --
10 | I'm grounded by reality and unfortunately, I view this as
11 | not -- I'm being asked to ignore reality.  The -- Stream did
12 | not exist as a result of the omnibus order.
13 |         THE COURT:  They existed, but they didn't operate.
14 |         MR. CAPONI:  They -- right.  I mean, I mean, no
15 | employees, no operations, no bank accounts.  They immediately
16 | then come into bankruptcy and I'm hearing about we want to
17 | rehire employees because they were owed money.  They last work
18 | for Stream three years ago at the latest.  Health plans would
19 | have been three years ago.  We're bringing stuff over from VSI,
20 | so you want to do something with Mr. Rajan's -- an insider's
21 | controlled entity with no disclosure and we're getting this, I
22 | filed one motion but now on the eve of the hearing, I got a
23 | different order.
24 |         And do I think that starting a health plan for a
25 | company that never had a health plan as ordinary course?  No.

 1  How could it be?  The ordinary course of Stream, before it

 2  filed this bankruptcy, was a piece of paper.  It had no assets

 3  or anything.  And we see from the monthly operating reports, no

 4  employees, no income, no revenue, no contracts.  So that's why

 5  I say bizarre.  I know the Debtor can stand up here and say

 6  we've got this great organization going, but history and the

 7  documents say that's doesn't exist.

 8          THE COURT:  Right.

 9          MR. CAPONI:  So my response is this doesn't make any

10  sense.

11          THE COURT:  Well, I was a little -- not -- I'm not

12  going to use the word does not make a little, but I was

13  confused because if the Debtor didn't have any of these things

14  prepetition, I'm assuming that's why they were asking me to

15  authorize them to start this post petition, because ordinary

16  course means you continue as you operated prepetition, which is

17  why I thought that this is why you filed this because there was

18  no employees, no benefits, no any of those things prepetition.

19          MR. CAPONI:  Yes.

20          THE COURT:  And so you're not continuing on a

21  ordinary course.  You're starting something new.  Now, you may

22  have had it prepetition years ago, but prepetition immediately

23  before the bankruptcy did not exist.  So you now need some

24  ability to say we didn't have this prepetition.  We want to

25  start it now.  And what I'm hearing is you said three years

 1  ago -- I don't know if Mr. Zahralddin agrees with you or not,

 2  but it did not.  There were no employee plans, there were no

 3  employees, there were -- there was nothing at the time the

 4  bankruptcy was filed.

 5          So from my perspective, I thought this is why this

 6  was being filed because you cannot make an ordinary course.  I

 7  mean, you could make that this is what these companies do in

 8  the ordinary course and therefore we want to just do what these

 9  companies do.  But when you start bringing in, we want to

10  continue something that they had, that didn't exist, so how I'm

11  going to continue something that did not exist?

12          MR. CAPONI:  And then the Debtor stands -- counsel

13  stands up and says, you asked, is this ordinary course?  I

14  don't know.  What do you think?  Maybe.  Yeah, we think it's

15  ordinary course.  So you can start a plan.  I mean, it's

16  actually funny, because this morning, my wife called me to say

17  we have to sign up for our health care plan.

18          THE COURT:  Yes.  It started yesterday.

19          MR. CAPONI:  Right.  There's nothing ordinary course

20  about even resigning up for the plan I had last year.  It is

21  like a painful exercise --

22          THE COURT:  Well, if you --

23          MR. CAPONI:  -- let alone if I was inventing a new

24  one.

25          THE COURT:  -- don't sign up, some things are

Case 23-10763-amc   Doc 828-1  Filed 10/23/24   Entered 10/23/24 10:59:39   Desc Main
Exhibit 11-15 Court Hearing Transcript   Page 37 of 57

37

1    automatic.  Some you get terminated.

2             MR. CAPONI:  Yeah.  And --

3             THE COURT:  I've got to do mine, too.

4             MR. CAPONI:  So the Debtor's funding through an

5    insider transaction with no disclosure that they consider that

6    ordinary course.  And that's why I say bizarre.

7             THE COURT:  Well, that's not be -- that's a whole --

8             MR. CAPONI:  No, it's not, but --

9             THE COURT:  -- different issue.

10             MR. CAPONI:  -- the Debtor's --

11             THE COURT:  Right.

12             MR. CAPONI:  -- the Debtor's view of what constitutes

13    ordinary course appears to be whatever we feel like doing.  Mr.

14    Zahralddin just said we're onboarding employees now.  Well, for

15    eight months, they had no employees and now they're onboarding

16    without court approval.  Apparently they think hiring employees

17    is ordinary course.

18             THE COURT:  Well, the whole thing is how does a

19    company operate without employees?  And do you need to come and

20    say we want to hire employees because we want to continue to

21    operate?  I don't think there's anything out of the -- that

22    would say that's not ordinary course to hire employees.  We --

23             MR. CAPONI:  When you never had them, it's not

24    ordinary course.

25             THE COURT:  Well, but they did have them and so --

Case 23-10763-amc   Doc 828-5 Filed 01/23/24   Entered 01/23/24 12:59:39   Desc Main
Exhibit 11-15 - Hearing Transcript   Page 38 of 57

38

1   and it doesn't make any sense to say a company is supposed to

2   operate without employees.  I mean -- and so you look at as a

3   whole.  Is it ordinary course for a company to employ

4   employees?  I think that -- how else you function.  But what I

5   don't think is ordinary course, to say, well, we had this in

6   the past, so now we want to give it to them now.

7           MR. CAPONI:  Well, Your Honor, you hit the point and

8   this is -- you know what -- you're coming at it from the left

9   side or the right side.  We come at it from the right side,

10  which is a Chapter 11 is to reorganize a company.

11          THE COURT:  Uh-huh.

12          MR. CAPONI:  The Debtor comes at it and the Chapter

13  11 is where I get to form and build a company.  And we think

14  the fact that you've never had them is why we filed our motion

15  in the first place.  To ignore that and -- where we -- this is

16  where we just fundamentally disagree with the Debtor.  This is

17  not where you come to raise money for the first time, hire

18  employees.  I don't care what you did ten years ago.  It's what

19  you're doing, you know, what you did prior to the bankruptcy.

20          THE COURT:  Well, but the difference is, and we have

21  to take into consideration why the Debtor did not have

22  employees.  It did not have employees because the Chancery

23  Court made a certain decision and then that decision was

24  reversed.  So I can't ignore that the Debtor now wants to

25  start -- once that decision was overturned or whatever

1  happened, say we want to go back to the status quo.  Is the

2  status quo ante?

3          MR. CAPONI:  Status quo ante.

4          THE COURT:  Oh, look at that, looking at my

5  daughter's study for the Bar.  Because tell me I don't know

6  that off the top of my head.  But so what their -- so I

7  understand from their perspective is, but for that erroneous

8  and in their opinion, erroneous.  I think they used some other

9  word.  I don't think they say stole, but equates to that.  I --

10  whatever.  But putting that in perspective, if that is undone

11  by when the Supreme Court of Delaware said, no, you shouldn't

12  have done that and it shouldn't have been whatever it is.  The

13  Debtor no longer able to be in control and function.

14          I can't say, well, the Debtor, the Debtor is coming

15  into bankruptcy and saying this is what happens.  We want to

16  get back to where we were.  We want an opportunity to build, to

17  save the company and we're saving the company in the context

18  that somebody took everything, when they shouldn't have.  They,

19  meaning the Court made an erroneous decision and so if you go

20  back to where we were without that erroneous decision, we had a

21  company that was operating and we just want to do that again.

22          MR. CAPONI:  Well, Your Honor, except for Mr. Rajan

23  has testified and everyone's acknowledged, Stream was always a

24  holding company and remains a holding company.

25          THE COURT:  Okay.

 1           MR. CAPONI:  Everything that operated was way below

 2  it.  It never had employees.  And the --

 3           THE COURT:  So that's a whole --

 4           MR. CAPONI:  -- Supreme Court of Delaware and the

 5  Court of Chancery -- you know, again, apples or oranges.  It's

 6  like, oh, you took the company from us.  We were harmed.  Well,

 7  only because everyone found and the Supreme Court affirmed you

 8  borrowed money and never repaid.

 9           THE COURT:  Oh --

10           MR. CAPONI:  It's called natural consequences.

11           THE COURT:  Okay.  I get that, but --

12           MR. CAPONI:  I'm not paying your bills.

13           THE COURT:  -- we -- what we're focusing on right now

14  is that what I'm hearing you say is they never had any

15  employees, so why are you going to come and ask me for

16  authority to pay employees?  Either they did or they didn't.

17           MR. CAPONI:  Right.  It was always a holding company.

18  And --

19           THE COURT:  So who are these people that left and

20  didn't work anymore?

21           MR. CAPONI:  It -- it's --

22           THE COURT:  That's what I'm saying.

23           MR. CAPONI:  It's --

24           THE COURT:  Now I'm getting into evidence and I can't

25  do this.

```
 1              Yes, Mr. Zahralddin?

 2              MR. ZAHRALDDIN:  Your Honor, okay, it's almost 1:00.

 3              THE COURT:  Well, we're going to --

 4              MR. ZAHRALDDIN:  I simply asked for -- look, from the

 5   very beginning, we're supposed to have an automatic stay.

 6   There's nothing in Fulton that says that they are allowed to

 7   keep things.  It only says that they're not penalized for

 8   those.  We have plenty of Circuit Court opinions that we've

 9   cited that indicate that not even adequate assurance do we have

10   to wait for.  They have to turn everything over.  We don't have

11   books and records.

12              We don't have anything to go back.  So, yes, we have

13   had independent contractors working.  We filed a plan.  We have

14   investors.  We have orders.  We have all of these things.  I'm

15   asking for a CFO.  I keep getting complaints about we're not

16   filing these things.  We don't have -- we're not getting our

17   monthly operating reports done, et cetera.  It's one person

18   with independent contractors.  I need employees to come in.

19              THE COURT:  So you need --

20              MR. ZAHRALDDIN:  I need a CFO.

21              THE COURT:  So you need me to tell you that in order

22   for this company to operate, you need employees?

23              MR. ZAHRALDDIN:  We --

24              THE COURT:  What I'm struggling is, I'm not --

25   anything that is not.  If they have claims against the estate,
```

1   they assert the claim.  I don't know if they have withholding

2   claims.

3           MR. ZAHRALDDIN:  And --

4           THE COURT:  I'm not entering an order without any

5   evidence, without -- you know, if you believe that this company

6   needs employees to operate, I will say on the record that's

7   ordinary.

8           MR. ZAHRALDDIN:  Okay.

9           THE COURT:  You go employ people.

10          MR. ZAHRALDDIN:  Absolutely.  Thank you, Your Honor.

11  We will move --

12          THE COURT:  But with respect to me approving how much

13  you pay, you know, I don't know.  The Debtor didn't have any

14  employees at the time.  Did they?  Yes, Mr. Caponi?

15          MR. CAPONI:  They -- this is Document 48.  This is

16  the first day declaration filed by the Debtors and counsel

17  here.  Quote,

18          "Stream.  Ashkaya (phonetic), Technovative USA, Media

19          Holdings, Ultra D Ventures, Ultra D Cooperative and

20          Technology Holdings are holding companies.  Stream TV

21          International and SCBV are operating companies."

22          So this is the De -- this is, again, when I say about

23  a little bit of a bizarro land.  The Debtor files a document

24  acknowledging it's a holding company and then starts filing all

25  kinds of motions saying I need to rehire people --

Case 23-10763-amc   Doc 828-5   Filed 01/23/24   Entered 01/23/24 10:59:30   Desc Main
Exhibit 11-15 Hearing Transcript Page 43 of 57                                        43

Case 23-10763-amc   Doc 488   Filed 01/23/24   Entered 01/23/24 10:59:30   Desc Main
Document   Page 43 of 57

1          MR. ZAHRALDDIN:  Your Honor --

2          MR. CAPONI:  -- and contradicting its own first day

3   declaration.

4          MR. ZAHRALDDIN:  -- as Mr. Caponi brings up often,

5   this was done on the eve of a trial.  We received this file

6   more -- no more than ten days beforehand with -- even though

7   I'd been at a prior firm, we were involved for a few weeks, I

8   had no knowledge, nor did anyone at my firm of the voluminous

9   activity that occurred below.  We knew there was an emergency.

10  We filed what we filed, then we struggled and put together

11  books and record -- schedules and statements without books and

12  records.

13         So Mr. Caponi can say all he wants about, you know,

14  things that we said back then.  We have updated our schedules.

15  We're in the process, after working with the US Trustee and

16  continuing to update schedules, MORs, et cetera.  And we have

17  employees we want to bring on.  I can withdraw that motion.  I

18  appreciate what you said on the record.

19         I would like to get Mr. Park put onboard because

20  we've now filed two motions to employ him.  We worked with the

21  US trustee, got him retained as a three -- under three -- or

22  got him an application under 330.  And we would like to bring

23  that to fruition.  We have a -- any concerns that were placed

24  in the original objections about him will be addressed when he

25  gets paid under a fee application process.

1      We need to bring someone else in who can, who can get

2  up to speed and act.  He has been looking at projections and

3  doing work for free this entire time, but he will not get paid

4  one red dime, one red cent, excuse me or one silver dime.

5           THE COURT:  Silver dime.

6           MR. ZAHRALDDIN:  Right.  One silver dime, until you

7  approve it.  So we would like to have that relief.  We now also

8  have a -- Mr. Stastney, right after Mr. Rajan testified that

9  the SeeCubic website and name were of the Debtors and had been

10  taken during the aftermath of the Chancery Court.  He went and

11  filed an application two -- how many days later?

12           UNIDENTIFIED SPEAKER:  Two.

13           MR. ZAHRALDDIN:  With the trademark office and he

14  cited the reason that he had rights to that, the invalidated

15  omnibus agreement, which was also attached to an earlier

16  application.  I --

17           THE COURT:  And all of this, I don't know.  All of

18  this -- all I can tell you is --

19           MR. ZAHRALDDIN:  It's in our papers.

20           THE COURT:  -- I will tell you, I am very concerned

21  about the evidence that I have seen with respect to that

22  website.  I don't know whose client -- Mr. Stastney's counsel

23  isn't here.  At least, I haven't seen him.  I haven't seen

24  anybody here, but if you think I'm not concerned about that,

25  everybody better rethink that situation.  I saw what I saw.

```
 1    That caused me some concern.

 2              MR. ZAHRALDDIN:  And again, Your Honor, it is --

 3    we've talked to our trademark folks.  If you file a falsified

 4    trademark application --

 5              THE COURT:  I don't want to hear any of that.  I

 6    already told you what my concern is --

 7              MR. ZAHRALDDIN:  Okay.  I understand.  Noted.

 8              THE COURT:  -- and I don't know who owns it.  The

 9    Debtor says they own it.  It was -- it trademarked to somebody.

10    I don't know who it was tradmar --

11              MR. ZAHRALDDIN:  Well, the only rationale --

12              THE COURT:  All I'm telling you --

13              MR. ZAHRALDDIN:  Yeah.

14              THE COURT:  -- is if it wasn't trademarked to

15    SeeCubic, Inc, and they -- I saw -- it said what it said.  I'm,

16    and I'm not sure --

17              MR. ZAHRALDDIN:  But what --

18              THE COURT:  -- said what it said.  I'm just telling

19    people, if it doesn't belong to you and you're using it, you

20    got consequences --

21              MR. ZAHRALDDIN:  And those --

22              THE COURT:  I don't know what --

23              MR. ZAHRALDDIN:  And the consequence --

24              THE COURT:  -- they are, but counsel --

25              MR. ZAHRALDDIN:  I hear you.
```

```
 1              THE COURT:  I'm telling you, I have to -- as I said,

 2   I have a very -- a personal matter that is very dear to me --

 3              MR. ZAHRALDDIN:  I understand, Your Honor.

 4              THE COURT:  -- that I have --

 5              MR. ZAHRALDDIN:  I understand.

 6              THE COURT:  -- to -- I have to be at.  And I'm

 7   supposed to be there by 1:00, so I was actually going to start

 8   in there like where are you.  And it's going to take me a

 9   little bit to get to the cemetery, so I really need to --

10              MR. ZAHRALDDIN:  I understand, Your Honor.  Your

11   Honor, I -- can I -- is it possible to talk to Ms. Godfrey and

12   reschedule some of these matters?  I'll withdraw the ones that

13   we believe --

14              THE COURT:  Right.  Withdraw the ones with respect to

15   Mr. Park, reschedule.  We can --

16              MR. ZAHRALDDIN:  You mean withdraw --

17              THE COURT:  I would love to tell you --

18              MR. ZAHRALDDIN:  -- the employees, right?

19              THE COURT:  Right.  And I would love to say we can do

20   this by telephone, but if I'm going to get evidence, if you

21   guys stipulate to some stuff and say, I -- you know, you can --

22   what I have done and I don't know how I could do it on this, is

23   I have -- I'm in the courtroom.  It says it has to be open to

24   the public.

25              MR. ZAHRALDDIN:  Uh-huh.
```

1       THE COURT:  So I'm here because actually when I went

2  to get a permit yesterday, I was talking to the guard and he

3  was like, you know, I said, I work in the cour -- I don't like

4  to tell people.  But anyway, and he's like, you know, anyway,

5  he's trying to do something.  He said, well, can I come in

6  there?  I said it's open to the public.  You can just walk in.

7  That's the idea.  But yesterday I did allow counsel to appear

8  by Zoom, but I don't know how many people we could get on here.

9       Not many right, John?

10      UNIDENTIFIED SPEAKER:  Well, it just starts to get

11 confusing, if they need to see people this way.

12      THE COURT:  Right.

13      UNIDENTIFIED SPEAKER:  But yesterday was convenient,

14 because it was one attorney facing one witness --

15      THE COURT:  Right.

16      UNIDENTIFIED SPEAKER:  -- and you.

17      THE COURT:  So that means if the parties can work it

18 out that only some people come in the courtroom and some are on

19 the Zoom, I'm amenable to that.

20      MR. ZAHRALDDIN:  I have no pro -- for example, if Ms.

21 Westbrook doesn't want to travel from North Carolina or if Mr.

22 Colby doesn't want to travel down.  Mr. Caponi, he's out of

23 luck, since he's here around with us, but --

24      THE COURT:  He's -- you're in New York, right?

25      MR. ZAHRALDDIN:  No, he's --

```
 1              MR. CAPONI:  Wilmington, Your Honor.

 2              MR. ZAHRALDDIN:  Wilmington.

 3              MR. CAPONI:  I'm Delaware.

 4              MR. ZAHRALDDIN:  Yeah.  He's Delaware.

 5              THE COURT:  Oh.  Why did I think you were from New

 6  York?

 7              MR. CAPONI:  Delaware County to Delaware, so I didn't

 8  go very far.

 9              MR. ZAHRALDDIN:  It's his sharp suit that you think

10  is from New York.

11              THE COURT:  I don't -- I -- never mind.  Well, I

12  guess I have to take you out of that perception of New York.

13  Never mind.  So yes, so if you want to appear and we can figure

14  that out, I'm amenable to that.

15              MR. ZAHRALDDIN:  Okay.

16              THE COURT:  So let's reschedule.  Why don't you

17  withdraw what you need to withdraw, reschedule.  I don't know

18  what my ca -- I had a trial schedule at 1:00 today.  They

19  settled.  So I never know even though I have things scheduled,

20  what -- Eileen, what do we have?

21              THE CLERK:  For another hearing in this case, Judge?

22  Let's see --

23              THE COURT:  So why don't we do this?  Why don't you

24  reach out to the parties, because I really do have to -- it's a

25  15 minute drive minimum for me to get where I'm going.  Why
```

 1  don't you get some dates?  Send them to Mr. Zahralddin, Mr.

 2  Caponi, Mr. Colby.

 3          MR. ZAHRALDDIN:  And I can't remember from Alex --

 4  and then Mr. Wright, I think would be the round off the --

 5          THE COURT:  I don't recall.  I know he's not here --

 6          MR. ZAHRALDDIN:  Right.

 7          THE COURT:  -- only because I know the players.  So

 8  why don't you do that and then we'll set a date as soon as

 9  possible.  If the parties can streamline what is in dispute,

10  then you can submit a stipulated -- of undisputed facts and

11  then disputed facts, that will streamline everything.  People

12  don't have to come in from flying from wherever you're flying

13  in from.  Although I'm happy to see you, I think it's a more

14  efficient use of everybody's time.

15          MR. ZAHRALDDIN:  Yes.  And Your Honor --

16          THE CLERK:  Judge?

17          THE COURT:  Yes.

18          MR. ZAHRALDDIN:  Sorry.  Go ahead, Ms. Godfrey.

19          THE CLERK:  We have a hearing on Monday the 27th on

20  the adversary, the motion for preliminary injunction.

21          THE COURT:  A continued hearing on that?

22          MR. ZAHRALDDIN:  Yes, ma'am.

23          THE CLERK:  It's a trial, correct.

24          THE COURT:  And --

25          THE CLERK:  It is actually in -- trial.

```
 1              THE COURT:  Can we do all of those at the same time?

 2   I don't know.

 3              THE CLERK:  I guess that's a question for counsel.

 4   Can we?

 5              THE COURT:  What did you say?

 6       (Court and clerk confer)

 7              THE COURT:  So we have the 27 and the 28 is what

 8   you're saying?

 9              THE CLERK:  I don't know if we have the 28th --

10              THE COURT:  Do we have the 20 --

11              THE CLERK:  We have the 27th.  I don't have them --

12   let me see.  Do I have the 28th?  I don't have them on for the

13   28th, but we could probably put them on in the afternoon at

14   12:30.

15              THE COURT:  All right.  So why don't you guys

16   consult?  I really do have to adjourn for the day.  Okay.  So

17   reach out to Ms. Godfrey.  We'll try to work this out.  I

18   think -- I think we had closed the record on the preliminary.

19   I can't even think right now.  Have we closed the record?

20              THE CLERK:  Yeah.

21              MR. ZAHRALDDIN:  I don't think so.  I think we had --

22              THE CLERK:  Yeah.

23              MR. ZAHRALDDIN:  -- continued cross.  I can't

24   remember on who.  Mr. Colby, do you know?

25              MR. COLBY:  We have rebuttal.
```

```
 1            MR. ZAHRALDDIN:  Yeah.  Mr. Michaels has also not
 2   been put up yet.
 3            MR. COLBY:  Yeah.  So there -- I think a couple of
 4   witnesses left.
 5            THE COURT:  Right.  And hopefully I'll get some
 6   answers on that website in the rebuttal.  I'm looking for that
 7   because it's --
 8            MR. COLBY:  I'm anxious to tell you, but I won't do
 9   it right now.
10            THE COURT:  Right.  I definitely -- as it caused some
11   concern.  I have not concluded anything yet.  Just simply
12   saying it's a cause for concern.
13            MR. ZAHRALDDIN:  Your Honor, I know you have to run.
14   I do have two things I have to quickly address.
15            THE COURT:  Uh-huh.
16            MR. ZAHRALDDIN:  I would like to get some sort of
17   finality on our fee apps.  I'd like you to please, if --
18            THE COURT:  I'm not doing that.  I --
19            MR. ZAHRALDDIN:  No, no, no.  Not today.  Not today.
20   But I need to get some sort of finality because we are happy to
21   address any sort of actual real -- I've never seen an objection
22   like this.  I'd like to have you take care of it, because this
23   type of blanket objection is exactly what the Supreme Court in
24   Sarco said would be a problem.  People would weaponize the fee
25   application process.  We may have a disagreement as to which
```

```
 1  way the case should go, but that should not mean --

 2              THE COURT:  Well, then --

 3              MR. ZAHRALDDIN:  -- denying fees.

 4              THE COURT:  -- guys, give me some briefs on that

 5  issue.  If you believe it's a general objection that doesn't

 6  have any merit and why I shouldn't consider it, then give me

 7  some -- when we have a hearing, maybe a day before, two days

 8  before, some brief on that.

 9              Counsel?

10              MS. WESTBROOK:  Your Honor, Margaret Westbrook.  I

11  disagree that we had general.  We made very specific objections

12  about who's paying the fees and the disclosure of that.

13              THE COURT:  Okay.

14              MR. ZAHRALDDIN:  And we had a response that laid

15  out --

16              THE COURT:  Right.

17              MR. ZAHRALDDIN:  -- everything in the docket that

18  says that.  So we have briefed that issue.

19              THE COURT:  So I think --

20              MS. WESTBROOK:  And it's in contradiction to the

21  supplemental disclosure that the Debtors made with respect to

22  their retention, that no other third party was paying their

23  fees.  So I really don't -- I'm really concerned about the

24  resources entailed in filing a whole nother (sic) brief on that

25  when I feel like --
```

1           THE COURT:  Well, then you just come ar --

2           MS. WESTBROOK:  -- that's pretty well spelled out.

3           THE COURT:  -- you just come argue.  And -- but if

4    the party -- and you know, I will -- I mean, we actually go

5    through all of these and I -- we identify the I -- the issues

6    that we think -- you know, I don't know what people are really

7    going to -- I can only look at what your papers say and try to

8    be prepared, but sometimes I get things that are not even on

9    there.  So if you believe that you're going to come and just

10   argue that we need to argue before we even get to the merits of

11   the time.  So everybody believes it's just legal argument?

12          Mr. Caponi, You stood up --

13          MS. WESTBROOK:  I think it's a legal and disclosure

14   issue.

15          THE COURT:  Okay.

16          MR. ZAHRALDDIN:  Okay.  Your Honor, we have

17   disclosed.  We followed the rules here, right.

18          THE COURT:  All right.  Woah, woah, woah, woah.

19   We're not arguing that today.

20          MS. WESTBROOK:  And a disinterested issue.

21          MR. ZAHRALDDIN:  I --

22          THE COURT:  All right.  So --

23          THE CLERK:  Judge, this is Eileen again.  On the

24   adversary action, there's a couple motions to dismiss that have

25   been filed, but counsel has not filed -- they filed a notice

 1  but did they not schedule it for a hearing.

 2          THE COURT:  All right.  This is what we're going to

 3  do.

 4          MR. ZAHRALDDIN:  We're waiting on your order for

 5  that, Your Honor --

 6          THE COURT:  Right.

 7          MR. ZAHRALDDIN:  -- for the scheduling.

 8          THE COURT:  Because typically we -- you file, we

 9  schedule a hearing date and we give it out.  This is not one

10  that automatically you can call online.

11          MR. ZAHRALDDIN:  We didn't set those.  Those were --

12          THE COURT:  Right.  You can't --

13          MR. ZAHRALDDIN:  Yeah.

14          THE COURT:  -- because it doesn't -- it's not like

15  you can go on the line and get it.

16          MR. ZAHRALDDIN:  Understood.

17          THE COURT:  So this is --

18          MR. ZAHRALDDIN:  We followed that rule.

19          THE COURT:  -- what we're going to do because I

20  really do have to go.  We are going to get some dates and then

21  we'll sort out what we're going to hear.  Okay?  Because some

22  of this, you know, payment of fees and all, I mean, I don't

23  know the rush for that except I guess you want it before the

24  end of the year.  Everybody does.  I get it.  I practiced once.

25  I don't know if I need to get to -- there -- I mean, to be

1  perfectly honest, the fee application was one that I said, I'm

2  not even dealing with today.

3         That was one I'm like, no, that's off the table.  And

4  the only two that I really thought would be on the table was

5  the Mr. Park's and exclusivity.  Those were the only two I

6  thought I was going to get to today, none of which I have.

7  Exclusivity terminated yesterday, but I don't see anybody

8  running around trying to -- or express any interest, except I,

9  think Rembrandt said they might file one.  We are where we are.

10         MS. WESTBROOK:  We agree it's expired as well, Your

11  Honor.

12         THE COURT:  It expired yesterday.

13         MR. ZAHRALDDIN:  We -- Your Honor --

14         THE COURT:  But that --

15         MR. ZAHRALDDIN:  We think it's extended to whenever

16  you continue it to, so we can get a decision, at least.

17         MS. WESTBROOK:  I don't think that's the rule in the

18  Third Circuit, Your Honor.

19         THE COURT:  I -- we looked at that yesterday and from

20  what I determined it, it terminated.  Doesn't mean I can't

21  extend it.

22         MR. ZAHRALDDIN:  Correct.

23         THE COURT:  Or that I can't make it beyond yesterday.

24  It just means that if somebody goes and files before I issue an

25  order, they have the right to do so.  It's not like under 11-

1   29.  With small businesses, it specifically says an order has

2   to be entered prior to the termination of exclusivity.  That

3   rule doesn't apply and it doesn't say that and I think it means

4   something.  So with that said --

5           MR. CAPONI:  If you need to go, Your Honor, we're

6   figure this out amongst ourselves.

7           THE COURT:  You'll figure -- okay.  That concludes

8   that matters that are scheduled before the Court today and

9   court is adjourned until tomorrow at --

10          THE CLERK:  9:30.

11          THE COURT:  -- 9:30.  Okay.  Tomorrow is Thursday.

12          MR. CAPONI:  Thank you for your time, Your Honor.

13          THE COURT: All right.  Yes.  All right.  Thank you.

14  It's the second the second anniversary of my daughter's death,

15  so --

16          MR. CAPONI:  Sorry to hear that, Your Honor.

17          UNIDENTIFIED SPEAKER:  Sorry to hear that.

18          THE COURT:  -- I'm real anxious to get there.  Thank

19  you.

20      (Proceedings adjourned)

21

22

23

24

25

Case 23-10763-amc Doc 828-5 Filed 01/23/24 Entered 01/23/24 10:59:39 Desc Main
Exhibit 11-15 Continued Hearing Page 57 of 57 Page 57 of 57

57

C E R T I F I C A T E


       I hereby certify that the foregoing is a true and
correct transcript from the electronic sound recording of the
proceedings in the above-entitled matter.



*John Buckley*
_____

John Buckley, CET-623
Digital Court Proofreader