## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al.* | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)**[1] |
| | : | |

**OMNIBUS RESPONSE OF WILLIAM A. HOMONY, IN HIS CAPACITY AS CHAPTER 11 TRUSTEE, TO THE OBJECTIONS TO THE TRUSTEE'S MOTION FOR, *INTER ALIA*, AN ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, AND <u>(C) GRANTING RELATED RELIEF</u>**

William A. Homony, in his capacity as Chapter 11 Trustee (the "Trustee") of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative", and collectively with Stream, the "Debtors"), by and through his counsel, Obermayer Rebmann Maxwell & Hippel LLP, files this omnibus response (the "Response") to the Objections of Visual Semiconductor, Inc. ("VSI") (the "VSI Objection") and Rembrandt 3D Holding Ltd. ("Rembrandt") (the "Rembrandt Objection" and, collectively with the VSI Objection, the "Objections") to the Trustee's Motion for, *inter alia*, an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related thereto, and (C) Granting Related Relief (the "Sale Motion") (D.I. #750)[2]. In support thereof, the Trustee respectfully states as follows:

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned case and *In re Technovative Media, Inc.*; Case No. 23-10764 (AMC). (D.I. #81).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Sale Motion.

## I.    <u>PRELIMINARY STATEMENT</u>

1.    As more fully described in the Sale Motion and below, the Trustee intends to conduct a Sale of substantially all of the Debtors' assets consisting of the Stream assets identified in the asset purchase agreement filed in connection with the Sale Motion (the "APA") and the ownership interests of Technovative in its downstream subsidiaries, Technology Holdings Delaware LLC, Media Holdings Co, LLC, and Ultra-D Ventures C.V. (D.I. #791-1) (the "Non-Debtor Subsidiaries", collectively the "Assets") for the benefit of the Debtors' estates and their creditors.

2.    To be clear, the Trustee is not transferring any property owned by the Non-Debtor Subsidiaries, including any intellectual property rights (as those assets are not the property of the Debtors' estates); only Technovative's equity interest in the Non-Debtor Subsidiaries.

3.    The Debtors themselves own no intellectual property rights as is made clear by the Debtors' Schedules of Assets and Liabilities, signed under penalty of perjury by the Debtors' former CEO Mathu Rajan ("Rajan") (now ironically in control of VSI taking completely contrary positions).

4.    Since his appointment, the Trustee and his professionals have spent significant time evaluating the Debtors' options in accordance with his duties under the Bankruptcy Code and the mandate contained in the order appointing him and, with the absence of any real operations or revenue, determined that a settlement of claims against the Debtors' secured creditors and an orderly sale of the Debtors' Assets best serves the interests of all stakeholders in the Debtors' bankruptcy cases.

5.    The Sale and the sale process approved by this Court is necessary to maximize the value of the Debtors' Assets by exposing them to the market.

4889-9066-4446 v5

6.      To that effect, the Court has already approved the procedures related to the marketing, bidding, and sale process for the Debtors' Assets.

7.      Despite this, VSI and Rembrandt filed the Objections as desperate, last-ditch attempts to undermine the Trustee's objective, good faith efforts to bring order to the Debtors' bankruptcy cases and secure funds to make distributions to creditors for the sole purpose of putting the Debtors back in the control of Rajan through VSI. As this Court has already made clear, Rajan has engaged in self-dealing, has grossly mismanaged the Debtors' estates, and has been an impediment to any proposed rehabilitation or reorganization of the Debtors.

8.      The Objections are primarily an attempt to reargue the merits of the Trustee's settlement which gives rise to the sale the Trustee now seeks approval of – a settlement which this Court approved over VSI and Rembrandt's objection, not to mention the denial of VSI's motion to reconsider the approval of that settlement.

9.      Indeed, the integrity of the Objections must also be called into question due to this Court's lengthy findings in the Trustee Opinion, as defined below, which established, and as set forth in greater detail below, that Rajan, VSI, and Rembrandt have engaged in numerous efforts to orchestrate a way, by any means possible, to maintain Rajan's control over the Debtors.  Rajan and VSI have demonstrated over and over that they have a complicated relationship with the truth and are not to be trusted.

10.     In short, the Objections are nothing more than the latest in a long history of concentrated efforts by Rajan, VSI, and Rembrandt to prevent the sale of the Debtors' assets and further drag out the Debtors' cases.

4889-9066-4446 v5

II.    **BACKGROUND**

11.    The factual and procedural background of these cases are well known to this Court, and to the extent not stated herein, the Trustee incorporates the factual and procedural background contained in the Trustee Opinion, as defined below, and the Sale Motion.

A.    **Procedural History**

12.    On March 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").[3]

13.    After almost a year of "acrimony" and "relative lack of progress", on January 5, 2024, this Court entered a Memorandum and Order which, among other things, appointed a Chapter 11 trustee and granted the Debtors' secured creditor Hawk Investment Holdings Limited ("Hawk") relief from the automatic stay to permit litigation against the Debtors pending in the Delaware Court of Chancery under § 225 of Title 8 of the Delaware Code (the "225 Action") to proceed (the "Trustee Order" and "Trustee Opinion") (D.I. #549 and #548, respectively). A true and correct copy of the Trustee Opinion is attached as Exhibit "A" hereto.

14.    As described in further detail below, this Court held, in relevant part, that, due to the gross mismanagement and lack of transparency under Rajan's leadership, (i) a Chapter 11 trustee must be appointed to administer the Debtors' cases, and (ii) Rajan was no longer authorized to act on behalf of the Debtors' estates. (D.I. #548).

---

[3] As set forth in greater detail below, these bankruptcy cases are not Rajan's first attempt to use the Bankruptcy Courts to regain control of the Debtors' assets.  Stream was involved in two prior bankruptcy cases, the first being a Chapter 11 case initiated by the Stream TV Debtor on February 24, 2021 and docketed at In re: Stream TV Networks, Inc., Bankr. D. Del. No. 21-10433-KBO (the "Delaware Voluntary Bankruptcy Case") and the second being an involuntary Chapter 7 case initiated on May 23, 2021 by, inter alia, purported creditor Rembrandt 3D Holding Ltd. ("Rembrandt"), docketed at In re Stream TV Networks, Inc., Bankr. D. Del. 21-10848 (the "Delaware Involuntary Bankruptcy Case").

15.     Despite its concerns with Rajan and the general administration of the Debtors'

cases, the Court opted not to dismiss the Debtors' cases and instead decided to appoint a trustee:

> The Court is not convinced conversion or dismissal is appropriate at
> this stage… The replacement of Mr. Rajan at the helm of the
> Debtors' estates and the appointment of a trustee to evaluate the
> Debtors' assets, potential deals, potential claims, etc., is needed… <u>If
> these cases have any chance of succeeding, it will be because there
> is transparency to the Court and creditors and an impartial third-
> party evaluating assets, claims, and the Debtors' reorganizational
> prospects</u>. A trustee will obviously come with a cost, but the Court
> believes the value of an unconflicted, third-party neutral to assess
> the state of the Debtors' operations, potential transactions, and
> claims and efficiently determine whether and how the Debtors can
> achieve reorganization, more than offsets these costs.

Trustee Opinion, at 73-74 (emphasis added).

16.     On January 9, 2024, the Office of the United States Trustee filed a Notice of

Appointment of William A. Homony to serve as the Chapter 11 trustee (the "Appointment Date")

as well as an Application for the Entry of an Order Approving the Appointment of the Trustee (the

"Application") (D.I. #554 and #553 respectively).

17.     On January 12, 2024, the Bankruptcy Court entered an Order granting the

Application to appoint the Trustee (D.I. #558).

18.     After significant and lengthy investigation and consultations with his professionals,

certain of the Debtors' subsidiaries, Rajan, VSI, Rembrandt, and the Debtors' secured creditors,

and further considering the significant legal and factual challenges involved in the 225 Action, the

risk it posed to the Debtors' assets and any creditor recovery, and the ongoing need to fund the

operations of its research and development subsidiary, SeeCubic BV ("SCBV"), the Trustee

decided that, in his reasonable business judgment, settling the disputes with the Debtors' secured

creditors including, but not limited to, the 225 Action and the adversary proceeding initiated by

the Debtors to, *inter alia*, enjoin the Debtors' secured lenders, individuals associated with the

4889-9066-4446 v5

secured lenders and SCBV (the "Adversary Proceeding") and providing a process to market and sell the Debtors' Assets was in the best interest of the Debtors' creditors and stakeholders.

19.     Through the Trustee's substantial efforts, the Trustee reached a settlement with Hawk, as collateral agent for the secured creditors (collectively, the "Secured Creditors"), resolving several disputes between the parties and providing for carve out valued in the minimum amount of $9,000,000.00 for the Debtors' estates, and a mechanism for the Debtors' Assets to be exposed to a sale process, whereby the true value of the assets could be assessed by exposing them to the market (the "Hawk Settlement").[4]

20.     On May 6, 2024, the Trustee filed a Motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure to approve the Hawk Settlement (the "9019 Motion") (D.I. #630).

21.     This Court conducted an evidentiary hearing on the 9019 Motion on June 5, 2024, during which the Trustee presented evidence that the Hawk Settlement satisfied the *Martin* factors[5], established the facts and reasoning that had informed his decision, making a sound business judgment in entering into the Hawk Settlement and was cross-examined by both VSI and Rembrandt.  Ultimately, this Court approved the Hawk Settlement (the "9019 Order") (D.I. #653) over the objections of VSI and Rembrandt (D.I. #642 and #643, respectively).

22.     Pursuant to the Hawk Settlement, on September 30, 2024, the Trustee filed the Sale Motion with this Court seeking authorization and approval of the Stalking Horse APA and the Bid Procedures in connection with the sale of substantially all of the Debtors' assets on an "as is", "where is" basis, without any warranty of any kind, express or implied.

---

[4] The salient terms of the Hawk Settlement are set forth in the Sale Motion. See Sale Motion at ¶ 30.
[5] *See In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996).

23.    The Sale Motion explicitly stated that the Trustee does not intend to sell or assign the Rembrandt License as a part of the Stalking Horse APA and intends to object to the Rembrandt claims in the Debtors' bankruptcy cases and raise counterclaims in connection therewith.

24.    Thereafter, on November 13, 2024, the Court held a hearing and approved the Bidding Procedures and the Stalking Horse APA with SeeCubic Inc. ("SeeCubic"), once again, over the objections of VSI and Rembrandt (D.I. #788 and #789, respectively).

25.    The order approving the Bidding Procedures was entered on November 20, 2024 (D.I. #811).

26.    The Bidding Procedures Order also set a deadline of November 22, 2024, at 4:00 p.m. (EST) for the filing of objections specifically to the sale of the Debtor's Assets and a deadline of November 29, 2024, for the filing of responses to any objections. (D.I. #811).[6]

27.    On November 22, 2024, VSI and Rembrandt filed the Objections, which incredibly attempt to reargue the merits of the Hawk Settlement and spend an inordinate amount of time attempting to deflect attention from the conspiratorial and collusive actions of Rajan, VSI and Rembrandt, ignoring this Court's observations about Rajan's spectacular failures as a fiduciary as reflected in the Trustee Opinion.

**B.    Rajan, VSI, and Rembrandt's Collusive Actions**

28.    The Objections, along with the statements and arguments contained therein, stand in stark contrast to the Court's findings in the Trustee Opinion and the history of the Debtors' cases, which established that Rajan, VSI, and Rembrandt have a long history of obfuscating the truth and acting in their own interest – not in the interest of the Debtors' bankruptcy estates.

---

[6] Additionally, the Bidding Procedures Order set a deadline of the Sale Hearing, December 4, 2024, for objections, and responses thereto, based solely on the identity of the Successful Bidder at the Auction.

4889-9066-4446 v5

29.     In the Trustee Opinion, this Court found, *inter alia*, that: (i) the Debtors, under the watch and leadership of Rajan, breached their fiduciary duties to creditors and disclosure obligations to the Court in failing to disclose that VSI had made millions of dollars of payments on behalf of the Debtors in return for Debtor stock; (ii) Debtors' management, specifically Rajan, contemporaneously and improperly acted as a fiduciary of the Debtors and VSI; (iii) "Alarmingly, the interrelationship between VSI, Stream, and Mr. Rajan's overlapping interests and roles in each is so entrenched that Mr. Rajan's testimony at trial was at times rendered unintelligible, or alternatively, intentionally deceptive, by his inability or unwillingness to draw distinctions between the Debtors and VSI and his roles with each"; and (iv) "Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court and creditors rises to the level of gross mismanagement of the estates, even when viewed against the high standard of glaring and inexcusable badness." Trustee Opinion at 60-61.

30.     Throughout these cases, there have been particular concerns with the integrity of Rajan's dealings with VSI and Rembrandt:

> [T]he Court's overall concerns regarding Mr. Rajan's trustworthiness, the history of these cases has been littered with questions about the role and involvement of VSI, the Debtors' ability to operate independently of VSI, and whether Mr. Rajan is able to differentiate his role with the Debtors from his role with VSI.

Trustee Opinion at 56 (emphasis added).

31.     The Court explicitly noted that VSI's actions and involvement in the Debtors' cases were a driving force behind appointing the Trustee. Trustee Opinion at 46-51.

32.     Rajan's alignment with VSI and Rembrandt to the detriment of the Debtors has continued, unabated, since the entry of the Trustee Opinion and has been in full display before this Court as VSI and Rembrandt attempt to seize any opportunity to throw roadblocks in the Trustee's

8

path to selling the Assets in order to pay creditors. Simply put, Rajan has continued to engage in the same conduct the Court found so troubling in the Trustee Opinion.

i.    <strong><u>VSI's Control Over the Debtors</u></strong>

33.    It is well established that Rajan served as the controlling force of both VSI and the Debtors.

34.    Despite having control over VSI and the Debtors, Rajan used the Debtors' bankruptcies to avoid the realities of the 225 Action and then to actively advance the interests of VSI at the expense of the real creditors, the Debtors, and their estates.

35.    It is clear from documents produced by the Debtors' bankruptcy counsel that VSI exhibited control over the Debtors even in the early stages of the Debtors' bankruptcy cases.

36.    For example, on July 8, 2023, the Debtors' bankruptcy counsel emailed VSI's attorneys at Akerman LLP attaching template documents for formulation of a Chapter 11 plan and related agreements, which they aptly described as "really VSI's deal."   True and correct copies of the emails are attached as Exhibit "B" hereto.

37.    VSI's control over the Debtors included VSI's Akerman attorneys issuing instructions to the Debtors' counsel concerning an adversary proceeding filed by the Debtors against certain of the Debtors' secured creditors and equity holders.  *See* Exhibit "C" attached hereto. (July 2023 email chain between Debtors' attorneys and VSI's attorneys at Akerman in which an Akerman attorney states that delay in drafting the complaint "is ridiculous.  Client [i.e., VSI,] wants i[t] filed tomorrow"); *see also, e.g.,* Exhibit "D" attached hereto (8/4/23 email from Debtors' attorney to various Debtor principals, VSI principals, Debtor attorneys, and Akerman attorneys stating that "Mathu and Bud tell me that VSI wants to have relief ASAP on several fronts – we need to get that list and make sure we are asking for injunctive relief").

9

38.     Upon information and belief, the "Bud" in the August 8, 2023 e-mail is Charles M. "Bud" Robertson ("Mr. Robertson"), the same individual who submitted the declaration in support of VSI's Objection in which he stated he has served in various roles with Stream, SCBV, and for most of 2024 provided executive consulting services for VSI, while at the same time, from "January 2024 until the present . . . provided contract services to Stream" after the Trustee's appointment.  See Declaration of Charles M. Robinson, D.I #815-1 at pp. 1-2.  It is unknown under what "contract" Mr. Robinson was performing those services or who was paying him for those services.

39.     What Mr. Robinson fails to disclose in his Declaration is that he is currently listed as the Executive Vice President for Visual Technology Innovations, Inc. ("VTI") (see https://vti-global.com/team/), which the Delaware Bankruptcy Court found explicitly existed for the purpose of wrongfully usurping the resources of the Debtor for the benefit of Mr. Rajan.

40.     As a result, the Delaware Bankruptcy Court dismissed the Delaware Voluntary Bankruptcy Case as having been filed in bad faith:

> Mr. Rajan established VTI of which he is the controlling shareholder, president, and until recently the sole director.  Using VTI he began to fundraise using Stream's assets despite the injunction.
>
> It is clear, through documentary evidence, that Mr. Rajan intended to use a Stream bankruptcy as a mechanism by which he could, via Stream, regain the Ultra-D assets from the secured lenders and then through VTI obtain them at a fraction of what he believed was the assets' value.

Delaware Voluntary Bankruptcy Case at D.I. #200, 14:20-15:4; *id.* at D.I. #198 (order dismissing bankruptcy).

41.     The level of control VSI had over the Debtors became explicitly clear when, on April 3, 2023, the Debtors filed an Application Pursuant to 11 U.S.C. § 327(a) of the Bankruptcy

Code for Authority to Employ their prior counsel, which was accompanied by a declaration from counsel in which it was represented that "Before filing these cases, Visual Semiconductor, Inc. ('VSI'), an investor in the Debtor, paid a flat non-refundable fee payment on behalf of the Debtors in the amount of $50,000.00 in preparation for filing the Chapter 11 bankruptcies. VSI has been advancing payments for Stream TV Networks, Inc's [sic] expenses in exchange for equity in Stream TV Networks, Inc." (D.I. #70).

42.    As it turns out, VSI continued funding the Debtors' post-petition operations in exchange for equity in Stream and, through VSI, solicited money from investors pursuant to an agreement for which the Debtors never obtained court approval.

43.    While taking the position that such transfers were not outside Stream's ordinary course of business (and thus did not require prior court approval), in support of the Stock Sale Motion (defined below), the Debtors represented to the Court that they were nonetheless seeking such approval out of an "abundance of caution," had not made any such transfers post-petition, and were awaiting Court permission to do so. Trustee Opinion at 39-40 (citing Stock Sale Motion ¶ 56) and 43 (citing April 24, 2023 Hrg. Tr. at 28:10-15, 31:22-32:1). "[T]he Court did not give that permission." *Id.* At trial, Mr. Rajan's testimony revealed to the Court that Stream – then under his control – had been issuing shares to VSI "every week or two since the Debtors' Petitions were filed." *Id.* at 44 (citing August 17, 2023 Hrg. Tr. at 205:21-206:1, 212:25-213:3).

ii.    **Rembrandt's Suspect Claims**

44.    The collusive and conspiratorial relationship between the Debtors and Rembrandt began well before the Debtors' bankruptcy cases were filed.

45.    On May 23, 2021, Stream, Rajan, Rajan's brother Raja, an attorney, and Rembrandt executed a collusive and self-serving settlement agreement (the "Settlement Agreement") that

11

granted Rembrandt creditor status in a ruse to circumvent the dismissal of the Delaware Voluntary

Bankruptcy Case. A true and correct copy of the Settlement Agreement is attached as Exhibit "E"

hereto.

46.     The **same day** that Stream and Rembrandt entered into the Settlement Agreement,

Rembrandt, as one of three (3) petitioning creditors, filed the Delaware Involuntary Bankruptcy

Case against Stream.

47.     While the filing was ultimately dismissed, the timing of the filing substantiated the

concern that the Settlement Agreement was a sham concocted by Rajan and Rembrandt to

manufacture a contrived claim for Rembrandt to end-run the Delaware Bankruptcy Court's

dismissal of the Delaware Voluntary Bankruptcy Case.

48.     On the Petition Date, Technovative filed its List of Creditors Who have the 20

Largest Unsecured Claims and are not Insiders (the "Top 20 List") and scheduled Rembrandt as

its only creditor having a "breach of contract" claim in the amount of $10 million (+) and listed

the claim as contingent, unliquidated and disputed and thus, not an allowed claim (Technovative

Bankruptcy Docket, D.I. #1 and #3).

49.     Then, mysteriously and without explanation, a mere two (2) weeks later, when

Technovative filed its Schedules of Assets and Liabilities, Rembrandt's claim ballooned to $100

million dollars, more than ten (10) times the original amount, and listed by Rajan as undisputed,

noncontingent, and liquidated and therefore, an "allowed" claim for "goods and services."

(Technovative Bankruptcy Docket, D.I. #50).

50.     To make matters worse, less than a month prior to the Petition Date, Rembrandt

filed a complaint in the Delaware District Court against, *inter alia*, Technovative in which the only

count asserted against Technovative was a request for injunctive relief and no monetary damages;

and yet Rajan listed Rembrandt as having an undisputed, non-contingent and liquidated claim of $100 million in its Schedules, ten times its original claim.

51.    How Technovative, a holding company, whose only assets were the interests in Media Holdings Co. LLC and Ultra D Ventures C.V. valued at $2,000.00 as of the petition date, incurred $100 million of undisputed, noncontingent, and unliquidated debt without explanation and with nothing to show for it reported on its Schedules defies comprehension, and blatantly signals collusion. *In re Technovative Media, Inc.* Case No. 23-10764 (AMC) (D.I. #47).

52.    Emails between counsel for Rembrandt and the Debtors concerning the "Plan for Rembrandt" all but confirm that the schedules were being manipulated:

> [Rembrandt Attorney:]  We have read Stream's latest motion papers and note that Stream was asking to have a number of employees and vendors paid to allow production to start but did not include any payment to Rembrandt. While I understand the list of vendors will not be paid, we expected to be included in the list of vendors that needed to be paid to restart production.  Coupled with Stream's failure to list Rembrandt as either a creditor or as having an executory contract with Stream, we are having a hard time reconciling your filings with your statements that Rembrandt will both be paid and treated as an administrative claim.  If VSI has $10,000,000 to invest in Stream, there are funds to pay Rembrandt, but we see no plan to do so. . . .
>
> [Debtors' Attorney]:   We have to update the schedules.
>
> Right now we are trying to deal with the secured lenders.
>
> Do your funding sources want to supply a DIP?
>
> Might be better optics.
>
> VSI isn't putting in $10 million - the purchase orders plus investors are the source of those funds.

True and correct copies of the emails are attached as Exhibit "F" hereto.

4889-9066-4446 v5

53.     Even more suspect is that Stream, who Rembrandt alleges is the counterparty to the Settlement Agreement, failed to even include a claim for Rembrandt in its Schedules and initially did not identify the collusive Rembrandt Agreement as an executory contract in its Schedules (the Stream Schedule G was ultimately amended to include the Settlement Agreement).

54.     Thereafter, on October 10, 2024, the Trustee filed an amendment to the Technovative Schedules to list the Rembrandt claim in the correct amount: $0.00. In response, Rembrandt falsely filed a nearly identical proof of claim against Technovative to the claim it filed against Stream for $1.2 billion based on the claimed Settlement Agreement, to which Technovative is not even a party.  A copy of Rembrandt's Claim No. 26-1 filed against Technovative in the Stream bankruptcy is attached as Exhibit "G" hereto.

55.     The Trustee is investigating Rembrandt's proofs of claim with the intention of objecting to the Rembrandt claims in the Debtors' bankruptcy cases and raising counterclaims in connection therewith.  The Trustee vehemently disputes the bona fides of this claimed debt.

### iii.     Transactions that Benefitted VSI and Rembrandt

56.     In addition to the transactions detailed above, there are a number of other problematic transactions between the Debtors, VSI, and Rembrandt – all of which have the taint of Rajan's involvement.

57.     Of particular concern were the proposed major transactions benefitting VSI, which this Court has also taken issue with:

> The Court has had concerns nearly from the inception of these cases about the relationship between the Debtors and VSI, given Mr. Rajan's overlapping roles.  Certain transactions the Debtors have proposed have only reinforced that concern.  As discussed *supra*, the proposed funding transaction with VSI in April would have unnecessarily either issued Stream equity to VSI or created $1 million of administrative debt to VSI.  It was, therefore, denied.  The unauthorized post-petition issuance of shares in Stream to VSI also

14

> raises serious questions about the administration of these cases for
> the benefit of VSI. These, however, were not the only instances
> where the Court's trust in the Debtor's management has deteriorated
> in light of transactions the Debtors have proposed either at the
> eleventh hour or under cover of more innocuous requests for relief
> that seem to benefit VSI without justification.

Trustee Opinion at 46.

58.     The proposed funding transactions with VSI that so concerned the Court first took the form of an expedited motion seeking court approval to sell $10 million of unissued Stream shares to VSI in exchange for funding of their post-petition operations. (D.I #135) ("Stock Sale Motion").

59.     The Stock Sale Motion stated that VSI and Stream had entered into an exclusive distribution agreement (the "Distribution Agreement") "as compensation for [VSI's] support" pursuant to which VSI would accept orders from and deliver products to third-party customers. Upon receiving an order, VSI would issue a purchase order to Stream for 90% of the order total and would keep 10% for itself.  *Id*.

60.     While taking the position that such transfers were not outside Stream's ordinary course of business (and thus did not require prior court approval), in support of the Stock Sale Motion, the Debtors represented to the Court that they were nonetheless seeking such approval out of an "abundance of caution", had not made any such transfers post-petition, and were awaiting Court permission to do so. Trustee Opinion at 39-40 (citing Stock Sale Motion ¶ 56) and 43 (citing April 24, 2023 Hrg. Tr. at 28:10-15, 31:22-32:1).

61.     Even more troubling, Mr. Rajan's later testimony revealed to the Court that Stream – then under his control – had been issuing shares to VSI "every week or two since the Debtors' Petitions were filed." *Id.* at 44 (citing August 17, 2023 Hrg. Tr. at 205:21-206:1, 212:25-213:3).

62.     After the Court informed the Debtors that it would not approve the sale of Stream shares to VSI on an expedited basis, the Debtors sought approval of emergency debtor-in-possession financing the following day (D.I #155) ("DIP Financing Motion") in which the Debtors proposed two funding options: a) the Debtors could borrow roughly €872,000.00 from VSI on an unsecured basis to fund SCBV payroll, or b) Stream could enter into the Distribution Agreement with VSI and, in exchange, VSI would issue one or more unsecured SCBV promissory notes directly to SCBV.

63.     Approval of the DIP Financing Motion was also denied, as this Court specifically found that either the Stock Sale Motion or the DIP Financing Motion "would have unnecessarily either issued Stream equity to VSI or created $1 million of administrative debt to VSI." Trustee Opinion at 46.

64.     Transactions, such as the Distribution Agreement with VSI and the Rembrandt License Covenant, appeared to benefit VSI primarily and raised additional concerns about conflicts of interest and Rajan's ability to act in the best interest of the Debtors' estates. Trustee Opinion at pp. 46-51.

65.     The Rembrandt License Covenant, like the Distribution Agreement, is especially of concern, as it was entered into by Rajan without court approval.

66.     The Rembrandt License Covenant clearly prioritized VSI's interests over the interests of the Debtors and their subsidiaries by expressly barring Rembrandt from issuing licenses to any of Stream's subsidiaries. Trustee Opinion at 49-50.

67.     Indeed, the Rembrandt License Covenant was "intended, at least in large part, to protect VSI's interest in Stream's technology and products, while at the same time expressly barring Rembrandt from issuing a license to any of Stream's subsidiaries. The Licensing

16

Agreement completely aligns Stream and VSI with respect to licensing the technology of Rembrandt, to the exclusion of, *inter alia*, Stream's subsidiaries." Trustee Opinion at 50.

68.     The concerns with the Rembrandt License Covenant also apply to the August 12, 2023, Settlement Amendment between Stream and Rembrandt, which was also entered into without the approval of the Court (the "Settlement Amendment").

69.     The Settlement Amendment served to amend the May 23, 2021, Settlement Agreement between Stream and Rembrandt.

70.     Like the Rembrandt License Covenant, the Settlement Amendment served to align Stream and VSI with respect to licensing the technology of Rembrandt, as it contained, *inter alia*, a clause stating that in the event there was a change of control in Stream, Rembrandt would transfer all licenses from Stream to VSI.

71.     This clause was essentially a "poison pill" that served to keep the Rembrandt licenses in Rajan's hands and to cause Stream to implode in the event Rajan was removed from control.

72.     There were also serious concerns with the Distribution Agreement. This Court stated: "In the end, the Court was left with the distinct impression that the Debtors sought to enter into the Distribution Agreement while attracting little attention to it, and once attention was drawn, failed to have a compelling reason for allowing VSI to benefit from the Debtors' product sales." Trustee Opinion at 46-48.

73.     With regard to these transactions, each "had the taint of benefit to VSI without clear benefit to the Debtors and their estates. Where Mr. Rajan stands on both sides of those transactions, they only add to the Court's conclusion that he has breached his fiduciary duties in proposing them

4889-9066-4446 v5

without being able to articulate how they are a reasonable exercise of his business judgment." Trustee Opinion at 51.

### iv.    Rajan's History of Untrustworthiness

74.    Throughout the pendency of these bankruptcy cases, it has been made clear that Rajan and the parties he controls cannot and should not be trusted.

75.    This Court went to great lengths in the Trustee Opinion to stress that it was highly concerned with Rajan's "plans, trustworthiness, and motivations… in his role as, for all intents and purposes, the singular figure in the Debtors' management." Trustee Opinion at p. 31.

76.    There were numerous issues with Rajan's leadership, including, but not limited to (i) his lack of "ability or willingness to act consistent with the fiduciary duties the Debtors owe their creditors and the Court," (ii) "the relatively directionless nature of these cases to date," and (ii) "the entrenched acrimony between the Debtors, Hawk, SLS, and SeeCubic that has permeated the cases and driven nearly all activity to date." Trustee Opinion at p. 31.

77.    In the Trustee Opinion, the Court pointed directly to events that highlighted Rajan's lack of leadership and untrustworthiness, including:

   a.    Rajan's purported deal with Zhongsheng Group Holdings Ltd. ("Zhongsheng"). The Court called its very existence into question and stated it did not believe the deal was real. Trustee Opinion at 35-38.

   b.    The self-imposed funding crisis that nearly left SCBV's payroll unfunded. The Court took significant issue with the foreseeability of the funding crisis, and the Debtors', as managed by Rajan, attempt to solve the crisis by proposing the sale of shares of the Debtors to VSI on an expedited basis. Trustee Opinion at 42-43.

4889-9066-4446 v5

    c.   Rajan's claims that there were "hundreds of millions of dollars" in purchase orders coming to Stream and numerous deals/partnerships in the works. The Court stated it had concerns with the veracity of the alleged purchase orders from VSI, stating there was nothing to substantiate them other than Rajan's meritless testimony. Trustee Opinion at 51-58.

    d.   The Debtors' lack of transparency in post-petition operations and financing while under Rajan's leadership. The Court was alarmed by "the Debtors' failure to revise knowingly false monthly operating reports…" and the fact that the revised monthly operating reports filed by the Debtors revealed that there were payments VSI made on behalf of Stream, a fact that is directly contradicted by Rajan's testimony.

Trustee Opinion at 59-60.

78.    Ultimately, the net result of Rajan's administration of the Debtors was "confusion, mistrust, and unending acrimony that has led to the Court's assessment that, even if the Debtors have a reasonable likelihood of rehabilitation, they have made little progress to date in attaining it under Mr. Rajan's stewardship." Trustee Opinion at 61.

79.    VSI complains that the Trustee ignored better offers made by VSI. The Trustee could not establish that any of VSI's proposals were credible or likely to produce the promised results.

    **C.**    **The Continued, Unapproved Use of the Debtors' Assets**

80.    After his appointment, the Trustee became aware that VSI was acting without his approval and was attempting to raise capital using and/or selling either Stream technology or products incorporating that technology in violation of the Trustee Order.

4889-9066-4446 v5

81.    VSI was acting like and holding itself out to be an affiliate of the Debtors, even though it is not.

82.    Indeed, despite the Court entering the Trustee Opinion and Order, Rajan, through VSI, continued to act on behalf of and exert control over the Debtors' assets by acting without the Court or the Trustee's approval, demonstrating Debtor technology and attempting to raise capital using and/or selling either Stream technology or products incorporating that technology. VSI has explicitly admitted this. *See* Case No. 23-00057-AMC, D.I. #135 at ¶ 10.

83.    VSI even admitted that it was finalizing the plans to take control of Stream's bonding equipment in order to deliver it to an unnamed strategic partner. *See id.* at ¶ 9.

84.    Further, the Trustee has recently been made aware that VSI and Rajan performed a "panel demonstration" on November 8, 2024 in Pennsylvania for a potential investor, Continental Advisory Services, LLC., in order to raise investment funds in an attempt to propose a Plan.

85.    Rajan's actions are part of his pattern to go to any lengths to regain control of the Debtors and is clearly willing to violate not only the Trustee Order and Opinion, but his duty of loyalty and fiduciary duties owed to the Debtors.

**D.    VSI and Rembrandt's Prior "Offers"**

86.    As set forth in detail in the Trustee's Declaration in Support of the Sale Motion, from the outset of the Trustee's appointment, in good faith, the Trustee solicited and entertained proposals from VSI and Rembrandt to fund SCBV's operations, fund a Plan, and/or acquire the Debtors' assets; however, the "offers" presented were illusory at best and without any verified or committed source of funding.

87.    The Trustee and his advisors have been given no reason to believe that VSI's proposals were feasible - VSI has repeatedly failed to show that it has the money or backing to

consummate any proposal, instead relying on purchase orders already dismissed by this Court as hyperbole at best, or fabrication at worst.

88.     Further, VSI's proposals have relied on the same purchase orders the Court previously held were unsubstantiated in the Trustee Opinion. Trustee Opinion at 55. Rajan continues to trot out the purchase orders to show claimed customer interest.

89.     At VSI's request, the Trustee personally met with VSI's alleged principal investor, Mr. Jacob Yahinian ("Yahinian") to discuss the Debtors' status and a potential path forward. Having engaged with Yahinian on numerous subsequent occasions, Yahinian is similarly more interested in renegotiating the terms of the Hawk Settlement than finding a viable path forward with VSI.

90.     Further, Yahinian has make it clear that he sees little value in the Debtors' assets and is troubled by the minimal progress the Debtors' have made despite having raised over $100 million during their history.

91.     Rembrandt's proposals have been even more ethereal than VSI's, as it has never made a true purchase offer.

92.     Indeed, Rembrandt repeatedly failed to present the Trustee with firm terms, commit to hard numbers, or present a valuation of the Debtors' Assets. While Christopher Michaels, Rembrandt's CFO and sometime lawyer ("Michaels"), initially claimed its investors had $70 million to invest in Stream, no offer was ever made by Rembrandt.

93.     Further, despite Rembrandt's allegedly continued interest, it has neither looked at the Assets nor gone into the Debtors' data room.

94.     The Trustee has continually urged VSI and Rembrandt to submit formal proposals and even to meet with Hawk, yet neither has and, to that extent, neither has submitted a bid for the

Debtors' Assets.

## III.  **ARGUMENT**

### A.  **The Objections**

95.     Despite the myriad of holdings by this Court to the contrary, including the Trustee Opinion, VSI and Rembrandt attempt to recast these cases and paint themselves as the aggrieved parties, and wrongfully portray the Trustee as the party acting in bad faith.

96.     As stated earlier, the Objections in large part boil down to attempts to either (i) re-litigate claims already resolved in the Hawk Settlement or reargue the objections to the 9019 Motion, both of which were made final with the entry of the 9019 Order; or (ii) reargue their objections to the Bid Procedures Motion, which have all been overruled by the Court.

97.     Those Objections can be categorized as complaints that (1) the sale process is unfair as it favors insiders and the Hawk Parties; (2) the Trustee has not provided a clear inventory of assets to be sold or resolved ownership issues; (3) insiders have misappropriated assets; (4) conflicts of interest exist among insiders; and (5) the sale is an improper sub rosa plan.

#### i.  **VSI's Objection**

98.     VSI offers the same argument it has used to no avail throughout these Chapter 11 cases: that the sale process was unfair and not contemplated in good faith as the Stalking Horse Bidder, SeeCubic, is an insider, and thus, the sale was not negotiated at arm's length.

99.     The VSI Objection specifically alleges that sale and solicitation materials were incomplete as they omitted alleged purchased orders from VSI, agreements with Phillips and Rembrandt, and financial and operational data for Stream's research and development subsidiary.

100.    Further, VSI alleges that the Trustee failed to establish that all assets included in the sale are part of the Debtor's bankruptcy estates or ensure assets would be transferred free of encumbrances.

101.    All of the above, VSI argues, establishes *de facto* reorganization terms without complying with Chapter 11 requirements under the Bankruptcy Code.

### ii.    Rembrandt's Objection

102.    While the Trustee has filed numerous schedules detailing what exactly is being sold through the sale of the Debtors' Assets, Rembrandt's Objection chooses not to believe them and alleges that certain items are being sold when they are not.

103.    Further, the Rembrandt Objection argues on behalf of Phillips despite Rembrandt having no standing or authority to do so.

104.    Rembrandt's Objection requests the Court deny the approval of the sale of the Assets until the Trustee identifies assets belonging to the bankruptcy estate and removes third-party IP, including Philips' and allegedly Rembrandt's technology, from the Assets.

105.    The entirety of Rembrandt's Objection is centered around its allegation that the sale includes Rembrandt's and Phillip's intellectual property, which the Trustee has no authority to sell.  This allegation is untrue.

106.    Rembrandt's Objection alleges that there are numerous issues with the Sale Motion and the Debtors' cases in general that are harming the value of the Rembrandt and Phillips IP, including: (1) Hawk, SeeCubic, and SCBV violating the TRO; (2) the Trustee's lack of transparency with respect to information regarding estate assets and intellectual property; (3) discovery motions by Rembrandt and others having been quashed – raising questions about

accountability; (4) SeeCubic's alleged history of improper IP use; and (5) the perceived "late" employment of Panitch Schwarze Belisario & Nadel LLP ("Panitch").

107.    Rembrandt argues and threatens that if the sale of the Assets is approved as is, the sale of the Rembrandt and Phillips IP would violate existing licenses, exposing potential buyers to claims of patent infringement and trade secret misappropriation and, consequently, heavy fines and imprisonment.  It is hard to imagine how this threat stimulated interest.  More likely, the opposite is true.

108.    Through the Objection, Rembrandt once again proposes alternatives to the sale of the Assets. However, these alternatives are illusory at best and contain minimal terms.

109.    Indeed, the most the Rembrandt Objection says is that Rembrandt and other investors have a willingness to fund a reorganization rather than pursue a sale. The Trustee is not sure what they are waiting for.

**B.    Approval of the Sale is Warranted Under Section 363(b) of the Bankruptcy Code**

110.    The Trustee submits that the Sale requested by the Sale Motion is authorized under section 363(b) of the Bankruptcy Code governing sales outside of the ordinary course of a debtor's business.

111.    Section 363(b) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

112.    This Court's power under section 363 is augmented by section 105(a), which provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. As set forth below, the

Trustee submits he has satisfied the requirements of sections 105, 363, and 365 of the Bankruptcy Code.

113.    Courts typically require a sound business purpose to sell assets outside of a plan of reorganization. *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991).

114.    Courts consider the following non-exhaustive list of factors in determining whether a sound business purpose exists: (a) sound business reason for the sale; (b) accurate and reasonable notice; (c) proportionate value of the asset to the estate as a whole (fair and reasonable); (d) the amount of elapsed time since the filing; (e) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (f) the effect of the proposed disposition on the future plan; (g) the amount of proceeds to be obtained from the sale versus the appraised value of the property sold; and (h) whether the asset is decreasing or increasing in value. *See Lionel Corp.*, 722 F.2d at 1071; *Del. & Hudson Ry.*, 124 B.R. at 176; *In re Weatherly Frozen Food Grp., Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992). A debtor is "simply required to justify the proposed disposition with sound business reason." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

115.    Consideration of the above factors here unequivocally establishes that the Sale should be approved.  As set forth in greater detail above and in the 9019 Motion, the Trustee has demonstrated sound business reasons for the sale in that after a lengthy investigation and consultation with his professionals, the Trustee concluded that a reorganization of the Debtors was not feasible and after soliciting proposals and negotiating with all of the salient parties in this case, the Hawk Settlement was the only viable option to produce a stalking horse bid.

25

116.    The Trustee, through his investment banker, SSG Capital Advisors ("SSG"), has marketed the Assets since early October and solicited more than 550 potential strategic and financial targets for the purchase of the Assets. Based on the Trustee's and SSG's marketing efforts, the Trustee has amply marketed the Assets.

117.    The approved Bidding Procedures were designed to maximize the purchase price for the Debtors' Assets and allowed for sale of all or part of the Debtors' Assets to various purchasers. The Bidding Procedures and Sale Notice were served in accordance with the Bidding Procedures Order and ensured that all interested parties received adequate notice of the Bid Deadline and Auction.

118.    Further, the Trustee is poised to file a Plan shortly after the closing on the Sale and based upon the Hawk Settlement or any successful bidder who makes a qualified bid in excess of the Stalking Horse Bid. A distribution to unsecured creditors is assured.

119.    For all these reasons, the Trustee respectfully submits that the Sale of the Assets is supported by sound business reasons and is in the best interests of the Debtors and their respective estates. Accordingly, the Trustee requests approval of the Sale pursuant to Section 363(b) of the Bankruptcy Code.

C.    **The Trustee can Sell the Stream Debtor's Assets and the Equity in Technovative's Downstream Entities Under the Bankruptcy Code**

120.    VSI and Rembrandt both devote considerable portions of the Objections incorrectly contending that the Sale Motion seeks to sell property, specifically intellectual property in which the Debtors do not have an interest.  VSI and Rembrandt argue that (i) the Trustee may not sell Debtors' property that is not property of the estate and (ii) before approving a sale, the Court must first determine whether such property constitutes property of the estate.

121.    The Trustee is only selling assets owned directly by the Debtors.  To be clear, the Assets being transferred by the Trustee are limited to the Stream assets identified in the asset purchase agreement filed in connection with the Sale Motion (the "APA") and the ownership interests of Technovative in the Non-Debtor Subsidiaries (D.I. #791-1).  The Trustee is NOT transferring title to any property owned by the Non-Debtor Subsidiaries.

122.    For the reasons set forth herein, the arguments of VSI and Rembrandt fail.

123.    It is axiomatic that the Bankruptcy Code, particularly Section 363, which provides for the sale of estate assets, does not expand the property rights of the estate beyond the parameters of nonbankruptcy law that creates the property right in the first place.

124.    Section 541(a)(1) of the Bankruptcy Code provides that the filing of a voluntary bankruptcy petition creates an estate comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." *See* 11 U.S.C. § 541(a)(1).

125.    Without question, section 541(a)(1) of the Bankruptcy Code is given broad application and includes "all kinds of property, including tangible or intangible property, causes of action . . . and all other forms of property. . . ." *Westmoreland Human Opportunities, Inc. v. Walsh,* 246 F.3d 233, 241 (3d Cir. 2001) (citing *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 n.9, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983)). See also *Burgess v. Sikes (In re Burgess),* 392 F.3d 782, 785 (5th Cir. 2004) (noting that the "'scope of property rights and interests included in a bankruptcy estate is very broad: the conditional, future, speculative or equitable nature of an interest does not prevent it from being property of the bankruptcy estate") (citations omitted); *In re Lock,* 329 B.R. 856, 858 (Bankr. S.D. Ill. 2005) ("The scope of estate property is very broad and includes every conceivable interest held by the debtor in property") (citation omitted).

126.     Section 363(b) of the Bankruptcy Code allows a trustee to sell property of the estate outside the debtor's ordinary course of business after notice and a hearing. 11 U.S.C. 363(b)(1). Implicit within the statutory grant of authority to sell property under section 363, however, is the requirement that the estate actually have an interest in the property to be sold. *Cinicola v. Scharffenberger*, 248 F.3d 110, 121 (3d Cir. 2001) (noting that, before the trustee could sell estate property under section 363(b)(1), the estate was required to have an interest in that property); *Gorka v. Joseph (In re Atl. Gulf Cmtys. Corp.)*, 326 B.R. 294, 299 (Bankr. D. Del. 2005) (under bankruptcy law, even speculative litigation claims are property of the estate) (citations omitted).

127.     Under section 363(f) of the Bankruptcy Code, a trustee can sell property of the estate free and clear of any interest in such property of an entity other than the estate, provided that one of five conditions is met: "(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) **such interest is in bona fide dispute**; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f) (emphasis added); *In re Scimeca Found., Inc.*, 497 B.R. 753, 772  (Bankr. E.D.Pa. 2013).

128.     Section 363(f) is drafted in the disjunctive; that is, the sale free of the claimed interest can occur if any one of the conditions specified in the subsection has been satisfied. *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 Bankr. LEXIS 4498, *37-38 (Bankr. D.N.J. June 29, 2006); *Scimeca Found.*, 497 B.R. at 772 ("[a]s section 363(f) is written in the disjunctive, a bankruptcy trustee can 'sell property free and clear of an interest in the property provided that one or more of the provisions under Section 363(f) is satisfied.'") *quoting In re Messina*, 687 F.3d 74, 77 n.4 (3d Cir. 2012). 3 Collier on Bankruptcy ¶ 363.06 (15th ed. rev. 2005).

129.    Furthermore, section 363(f) permits the bankruptcy court to authorize a sale free of "any interest" that an entity has in property of the estate. 3 Collier on Bankruptcy ¶ 363.06[1] (15th ed. rev. 2005).

130.    The phrase "bona fide dispute" is not defined in the Bankruptcy Code. Nonetheless, courts applying section 363(f)(4) of the Bankruptcy Code have developed a standard for determining whether a "bona fide dispute" exists; that is, courts will inquire "whether there is an objective basis for either a factual or legal dispute as to the validity of the asserted interest." *NJ Affordable Homes*, 2006 Bankr. LEXIS at *41 (citing, *In re Taylor*, 198 B.R. 142, 162 (Bankr. D.S.C. 1996)).

131.    The court in *NJ Affordable Homes Corp.* noted that the evidentiary record required to support a finding of a "bona fide dispute" for purposes of section 363(f)(4) of the Bankruptcy Code depends upon a case-by-case consideration of the following: (i) the procedural posture of the case; (ii) the need to expedite the sale; and (iii) the nature of the basis for determining that a dispute exists. *Id. at* *41-42 (citing *In re Robotic Vision Sys., Inc.*, 322 B.R. 502, 506 (Bankr. D.N.H. 2005).

132.    The purpose behind §363(f)(4) *"is* to allow the sale of property of the estate free and clear of disputed interests so the liquidation of the assets is not unnecessarily delayed while the disputes are being litigated. See, *Robotic Vision*, 322 B.R. at 506 (citing *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 171 (B.A.P. 9th Cir. 2001)). Succinctly, this is the concept behind § 363(f). *NJ Affordable Homes*, 2006 Bankr. LEXIS at *40.

133.    Like the standard for the assumption of executory contracts, the standard for sales of estate property is one of business judgment. *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063 (2d Cir. 1983) (a sale under section 363 requires "some articulated business justification"). Thus, in connection with a Section 363 sale, the central issue

is the reasonableness of the trustee's business judgment to sell property whose ownership may be disputed, and this does not require a definitive determination of ownership rights.

134.    11 U.S.C.S. § 363(f)(4) permits a sale of property of the estate free and clear of a third party's interest therein if the interest is in bona fide dispute. Although § 363(f)(4) is most commonly applied when the entity's "interest" is a lien or security interest, the plain language of the provision would include an ownership "interest." See, *e.g.*, *In re Olympia Holding Corp.*, 129 B.R. 679, 681 (Bankr. M.D. Fla. 1991); *NJ Affordable Homes*, 2006 Bankr. LEXIS 4498. This result is also strongly supported by the wording of *§ 363(h)*, setting forth provisions for the sale of a co-owner's "interest" and using the word "interest" to mean an ownership rather than a lien or security interest. *See In re Spain,* 831 F.2d 236, 240 (11th Cir. 1987).

135.    Although implicit within the statutory grant of authority to sell property under 11 U.S.C.S. § 363 is the requirement that the estate have an interest in the property to be sold, "property of the estate" as defined by 11 U.S.C.S. § 541(a) includes contingent and disputed property interests of a debtor. Thus, an estate can normally convey its ownership interest in property, subject to the claims of a third party. *In re Kane,* 628 F.3d 631, 641 n.7 (3d Cir.  2010); *Gorka v. Joseph (In re Atlantic Gulf Communities, Corp.)*, 326 B.R. 294, 299 (Bankr. D. Del. 2005). Thus, an estate can normally convey its ownership interest in property, subject to the claims of a third party. *See, e.g., Atlantic Gulf Communities*, 326 B.R. 294 (regardless of whether the estate had ownership of the property at issue, the estate did have a claim to ownership, which the trustee could sell outside the ordinary course of business by executing quitclaim deed in sale agreement).

136.    Finally, both VSI and Rembrandt rely heavily in their Objections upon the case of *In re Whitehall Jewelers Holdings, Inc*., Case No. 08-11261 (KG), 2008 WL 2951974, at *9 (Bankr.

D. Del. July 28, 2008) for their central tenet that a debtor or trustee may not sell property through a 363 sale unless that property constitutes property of the debtor's bankruptcy estate and, before approving a sale, the bankruptcy court must determine whether the property the debtor proposes to sell constitutes property of the estate. The Objectors' reliance on *Whitehall* is misplaced based on the underlying facts of this case.

137.    In *Whitehall*, the debtors who were seeking to sell consigned goods did not even attempt to make a *prima facie* showing that the goods to be sold were property of the estate. Id. However, in contrast to facts of *Whitehall,* the Trustee here is not seeking to sell any assets that are not property of the estate. As has been made abundantly clear in the Trustee's Omnibus Response, the APA specifically excludes from the sale the Rembrandt License or any physical assets that contain Rembrandt Intellectual Property. As such, *Whitehall* is distinguishable on its facts and is not an impediment to the approval of the Sale.

138.    First, it is important to note the Trustee is not proposing to sell the intellectual property, contracts or any other assets owned directly by the Non-Debtor Subsidiaries.  To be clear, the Trustee is transferring the Stream assets identified in the asset purchase agreement and the ownership interests of Technovative in the Non-Debtor Subsidiaries (D.I. #791-1).

139.    It is also important to note that the Schedules of Assets and Liabilities filed by both Stream and Technovative under penalty of perjury affirmatively state that neither of the Debtor entities own any intellectual property.  See Stream D.I. #52; Technovative D.I. #47.

140.    Therefore, Rembrandt does not have an "interest" in the Non-Debtor Subsidiaries' property; the only thing that Rembrandt has at this juncture is a "claim" that something owned or controlled by another foreign subsidiary that is indirectly owned by one of the Non-Debtor Subsidiaries contains Rembrandt "know how" or trade secrets (the "Rembrandt Claim").  No

evidence has been provided to show that the Debtors actually received "know how" from Rembrandt or that the Trustee is transferring any assets containing any Rembrandt, technology, "know how" or intellectual property.  In fact, the APA specifically excludes as an asset being transferred the Rembrandt License or any physical assets that contain Rembrandt Intellectual Property.[7]

141.    The Rembrandt Claim is the subject of a bona fide dispute because of the following facts.

142.    The problematic incestuous relationship between Rajan, VSI, and Rembrandt is well documented.  *See* ¶¶ 44 through 55 above.

143.    The Rembrandt Claim is hotly disputed and is the subject of ongoing litigation, currently stayed against Technovative.  The Rembrandt Claim originally arose out of the Settlement Agreement and must be viewed critically, especially in light of the Rembrandt License Covenant and the Settlement Amendment, which Rembrandt and VSI attempted to enter into with Stream post-petition without Court authority and which this Court found so favored Rajan, VSI and Rembrandt. The Trustee believes the Settlement Agreement and any ancillary documents resulting therefrom are fraudulent transfers and will be challenged at the appropriate time by the Trustee.

---

[7] The specific language in section 2.2 (Excluded Assets) of the APA reads:

(j)   any grant of rights or license by Rembrandt 3D Holding Ltd. ("Rembrandt") or affiliates to Stream, including but not limited to the Rembrandt Grant of Rights in the Settlement Agreement and Mutual Release between Rembrandt and Stream dated May 23, 2021, any amendment thereto, and the Licensing Covenant between Rembrandt, Stream, and Visual Semiconductor, Inc. dated August 14, 2023, each to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction;

(k)   any physical assets that contain or include Rembrandt Intellectual Property, to the extent valid, existing and enforceable as determined by a final, non-appealable order from a court of competent jurisdiction

4889-9066-4446 v5

144.    In fact, less than a month prior to the Petition Date, Rembrandt filed a complaint in the Delaware District Court against Hawk, SeeCubic and Technovative, docketed as *Rembrandt 3D Holding Ltd v. Technovative Media, Inc. et al.*, C.A. No. 1:23-cv-00193-JLH (D. Del.), in which the only count asserted against Technovative was a request for injunctive relief (the "District Court Case"). The District Court Case is in its very early stages and is stayed as to Technovative, therefore, Rembrandt's "claims," while far from being proven, will ultimately be determined in the District Court Case.

145.    In addition, under the APA, SeeCubic or any Successful Purchaser "assumes any liability to the extent that there is any claim or cause of action alleging that any Intellectual Property of any third party, including but not limited to the Rembrandt Intellectual Property, has been improperly transferred or sold to the Buyer (or any Designated Buyer) as part of the Transferred Assets at Closing through the sale pursuant to this Agreement." (D.I. #795, Section 2.3).

146.    Upon information and belief, the Settlement Agreement is a contrivance that was "dead on arrival" and entered into to manufacture a claim so Rembrandt could serve as a petitioning creditor in Stream's second Delaware bankruptcy proceeding found to have been filed in bad faith. Stream never paid the initial $1,528,000.00 **due on execution, the same date as the involuntary petition was filed,** Stream never provided Warrants, which is a condition to the effectiveness of the Settlement Agreement. **Stream never paid a single monthly fee** (originally at $28,000.00 per month), and more importantly at the time of execution, Stream had no ability to do so. Stream never produced a single TV for Rembrandt under the Settlement Agreement, or provided a prototype for Rembrandt. Importantly, nowhere in the initial Settlement Agreement is there any admission that Stream violated Rembrandt's rights.

147.    Rajan conspired with Rembrandt to allow it to become a non-contingent creditor for $100,000,000.00 against the Technovative bankruptcy estate without any indication as to how Mr. Rajan arrived at that contrived and phony claim.

148.    Michaels has, however, continued to allege rights created under the Settlement Agreement and to threaten the Trustee, his professional, and potential purchasers with "imprisonment" for violation of patent laws when the Trustee is not conveying finished televisions or any property containing Rembrandt's alleged intellectual property.

149.    Even though there was no compliance by the Debtor with any of the monetary or production obligations under Rembrandt Settlement Agreement, there was no effort by Rembrandt for over two years to (a) enforce the Rembrandt Settlement; (b) collect on the monetary obligations under the Rembrandt Settlement; (c) cancel the alleged license issued under the Rembrandt Settlement; or (c) regain whatever technology it asserts it transferred under and pursuant to the Rembrandt Settlement.  How valuable were the obligations under the Rembrandt Settlement Agreement if Rembrandt did nothing to enforce them for over two (2) years?

150.    The Settlement Amendment fails to reflect the missed payments, and includes other additional terms to coincide with agreements between Rembrandt and Rajan contained in the Debtors' proposed plan of reorganization filed July 13, 2023.  The Settlement Amendment contains another "poison pill" providing that the alleged Rembrandt IP may be used solely for the benefit of Stream.

151.    The License Covenant entered in the same time period, also cut out the Stream subsidiaries from any use of any license purportedly granted to Stream.  How this freeze out served the Debtors' interest is impossible to understand.  Clearly the prohibition, which extends not only

to Hawk and SLS, but to all of the Stream Debtor's downstream subsidiaries provides no benefit to Stream.

152.    This court has already opined on the nature of the Licensing Covenant in the Trustee Opinion:

> The Licensing Agreement completely aligns Stream and VSI with respect to licensing the technology of Rembrandt, **to the exclusion of,** *inter alia*, **Stream's subsidiaries.**  While Mr. Rajan may assert that the purpose of the Licensing Covenant is "stopping the use of our technology of Rembrandt by companies who do not own our technology, specifically See Cubic of Delaware, to stop the use of our technology to compete against us," the Licensing Covenant goes beyond that, **precluding the issuance of a license to any Stream subsidiaries. . . . Each of these transactions have had the taint of benefit to VSI without clear benefit to the Debtors and their estates.**

Trustee Opinion at 50.

153.    Furthermore, a sale is clearly necessary considering that the outside closing date is December 10, 2024, under the APA and that the Trustee has only secured funding of SCBV (which holds substantial value) thru that date, not to mention that this case will have been pending for two years this coming March 2025 and the marketing campaign undertaken by the Trustee has, to date, not produced any other interested parties, let alone potential Purchasers.

154.    Similarly, the VSI and Rembrandt make seem to be under the impression that the Trustee is selling the Philips License, which is not accurate.  The Philips License is property of one the Debtors' downstream subsidiaries, whose assets are not being transferred.

155.    The Trustee has clearly demonstrated that he is only transferring property that belongs to the Debtors, including Technovative's interest in the Non-Debtor Subsidiaries, none of which include Rembrandt's alleged technology.

156.    Under the circumstances, for all of the reasons set forth above, of this case, the Trustee has met his burden of setting forth sufficient evidence demonstrating that a "bona fide dispute" for the purposes of section 363(f)(4) of the Bankruptcy Code, therefore to the extent that there is any question as to whether any Rembrandt property is in some way implicated in the sale, the Trustee can still transfer the assets free and clear to SeeCubic.

### D.     Rembrandt's Interests, if any, Are Adequately Protected

157.    To be clear, through this sale process, the Trustee is transferring Technovative's equity interests in the Non-Debtor Subsidiaries that has its own intellectual property, namely the 3d technology and source code.  Rembrandt has alleged a "claim" that some know how it provided was incorporated in part into the source code; a position that is subject to dispute in the Delaware Litigation, and if far from established fact.

158.    No court had ever determined that Rembrandt had an "interest" in the the Non-Debtor Subsidiaries' assets.  In fact, Rembrandt has known since at least the time of the filing of the 9019 Motion that it was the intention of the Trustee to sell the Debtors' assets and until very recently, Rembrandt has chosen to do nothing to protect its alleged rights.

159.    Rembrandt could have filed an adversary proceeding or affirmatively moved before this Court to attempt to establish its "claim" or other rights, instead it chose to appeal the 9019 Order, failed to request any stay of these proceedings and allowed the appeal to languish by missing the date to file its appellate brief by over three (3) months.

160.    Moreover, even the collusive and contrived Settlement Agreement does not in any way concede that the Debtors in fact used or received any know how or other Rembrandt technology.  In fact, the Settlement Agreement specifically provides for no admission of liability.

161.    In this case, the Trustee is transferring Technovative's equity ownership interests in the Non-Debtor Subsidiaries, in which Rembrandt has NO interest.  It has not established legal or equitable ownership or even an interest in any assets being sold by the Trustee pursuant to the Sale Motion.

162.    Rembrandt merely has an outstanding litigation claims against Technovative in which it claims it's "know how" or trade secrets were incorporated into SCBV's source Code; a position the Trustee vehemently disputes.

163.    As set forth above, section 363(f)(4) of the Bankruptcy Code specifically provides for the transfer of property free of any alleged "interest", include the alleged interest of Rembrandt which is subject to a bona fide dispute.

164.    Rembrandt attempts to confuse the Court by claiming that the Debtor is transferring Rembrandt's property.  The alleged property amounts to nothing more than a disputed "claim" in the downstream entities' source code which is not in the Debtor's possession to sell.

165.    However, the Trustee can sell the equity interests the Non-Debtor Subsidiaries over the disputed "claim" or interest of Rembrandt, if any, in the <u>assets</u> of the downstream subsidiary, provided that the "interests" are the subject of a bona fide dispute and are adequately protected. Rembrandt is entitled to adequate protection only to the extent its interest would be extinguished by virtue of the Sale Order.  That is not the case.

166.    Section 361 of the Bankruptcy Code provides for "adequate protection" to be provided to a party whose property is being used sold, used or leased.  Assuming an interest entitled to adequate protection exists in favor of Rembrandt, that interest is adequately protected.

167.    Section 361 provides in relevant part that: "[w]hen adequate protection is required under section [363] of this title . . . such adequate protection may be provided by . . . (2) providing

to *such entity* an additional or replacement lien to the extent that such [sale] results in a decrease in the value of such entity's interest in such property; or (3) granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." [Emphasis added].   Paragraph (3) of 361 allows this court to have flexibility in fashioning the provision of adequate protection.

168.   Here, Rembrandt's interest is not in the nature of a security interest, but in the nature of an unliquidated, disputed unsecured claim.

169.   It is respectfully submitted that Rembrandt's interests, whatever they may ultimately be determined to be, are adequately protected in a number of ways.

170.   First, any claim alleged by Rembrandt that its IP is in some way transferred as a part of the sale which the Trustee disputes, is an assumed liability by SeeCubic, who Rembrandt is already suing in the Delaware Action.  See Section 2.3 of the APA.

171.   Second, any rights of Rembrandt to pursue the nonbankrupt Debtor subsidiary SCBV is preserved.  Following the Closing, Rembrandt is free to pursue its state court litigation against both Hawk and See Cubic BV to attempt to have determined its interest in the source code of the downstream entity.

172.   Also, the APA specifically excludes as an asset being transferred the Rembrandt License or any physical assets that contain Rembrandt Intellectual Property.

173.   In fact, Rembrandt's ability to protect its rights will not be altered in any way.

174.   It may in fact be determined in the District Court Case court that Rembrandt has no interest in the downstream Debtor's source code.  However, all of those rights are fully preserved as adequate protection of any claimed interest in the assets being transferred pursuant to the Sale Motion.

4889-9066-4446 v5

175.    The transfer of the equity interests in the Non-Debtor Subsidiaries will not alter in any way Rembrandt's litigation rights against SCBV or SeeCubic. Nothing in the Sale Motion attempts to deprive Rembrandt of its alleged "interests" which are limited to the ability to assert its claims that the source code in SCBV incorporates its claimed know how.

**D.    SeeCubic is an Appropriate Purchaser and has Acted in Good Faith During the Course of the Sale Proceeding**

176.    VSI goes to great lengths to detail its lengthy history with SeeCubic, which can only be characterized as complicated by persistent disputes over the Secured Creditors' efforts to exercise their rights to over their collateral, whether the secured debt had been converted and the Rajan's efforts to retain or regain control over the Debtors – efforts that continue to this day through is control over VSI.

177.    VSI's argument that SeeCubic is an inappropriate purchaser because of its bad acts ultimately fails because, under Third Circuit Law, the good faith of a purchaser is measured by the purchaser's conduct during the course of the sale proceedings.

178.    VSI also fails to cite to a single case in support of this argument because applicable case law supports SeeCubic as a good faith purchaser.

179.    The Bankruptcy Code does not define "good faith;" however, the Court of Appeals for the Third Circuit has held that the requirement that a purchaser act in good faith … speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders. *In re Abbotts Dairies*, 788 F.2d 143, 147 (3d Cir. 1986).

4889-9066-4446 v5

180.    Neither VSI nor Rembrandt point to a single instance where SeeCubic or the Trustee have engaged in fraud or collusion with other bidders during the sale process, again because no such conduct took place.

181.    Here, rather than attempt to take gross advantage of other bidders, the credit bid of SeeCubic was approved by this Court as the Stalking Horse Bid as part of the Hawk Settlement after notice and a hearing and over VSI and Rembrandt's objection.

182.    The objections over whether SeeCubic was an appropriate stalking horse bidder either were or should have been raised in the objections to the 9019 Motion, wherein the Trustee sought to have SeeCubic approved as the stalking horse bidder, which the 9019 Order ultimately accomplished.

183.    All of the bad conduct complained of in Mr. Robertson's declaration occurred pre-petition during the course of years long litigation between the Debtors, Rajan, and the Secured Creditors or are vague allegations that SeeCubic failed to return assets  - allegations that are unsupported except by Mr. Robertson, who freely admits in his declaration that he has a conflict of interest, even after the Trustee's appointment, when he worked for both VSI and the Debtors without the Trustee's knowledge or consent.

184.    As to the allegations that the Trustee did not secure the return of assets of the Debtors, it is important to consider the years prior to the Trustee's appointment, both pre and post-petition, that the Debtors and Rajan, who were in a far better position to know where those assets were kept, were unable to accomplish the very thing they complain the Trustee did not do.

185.    Upon his appointment, the Trustee inherited bankruptcy estates that Rajan left in complete disarray with no money, no operations, and in active and unstayed litigation with Hawk. To expect the Trustee, with almost no resources to secure the return of alleged assets such as the

Bonding Equipment, the Trustee would have had to first locate the assets in places as far away as China and the Netherlands, pay storage costs or landlord liens for the release of the assets, and safely package, ship and again store those assets – feats Rajan had been unable to achieve over a period of years, including with the protection of three separate bankruptcy proceedings.

186.    Rather than attempt to spend money he did not have in pursuing VSI and Rembrandt's proposed quixotic quest, the Trustee solicited proposals from VSI, Rembrandt and the Secured Creditors to purchase the Debtors' assets or fund a Plan, and in an exercise of his business judgment approved by this Court, entered into the Hawk Settlement which included exposing the Assets to the open market and permitting interested parties, including VSI and Rembrandt, to bid on those Assets.  Rather than do so, VSI and Rembrandt chose to use carefully coordinated efforts to block the sale by filing expedited motions and taking unsupportable, bad faith positions, filing multiple appeals that were either left to languish or filed in the eleventh hour, or attempting to relitigate issues already decided by this Court. These last-ditch efforts are solely to scuttle the Trustee's attempt to bring order to the chaos of these bankruptcy cases.

187.    The trustee has fulfilled his duties under the Bankruptcy Code and the mandates of the Trustee Order and Opinion.

188.    For the reasons set forth herein, in the 9019 Motion and the Procedures Motion, SeeCubic is an appropriate purchaser and it or such other qualified bidder that is selected as the Successful Bidder by the Trustee, should be approved by this Court along with the sale of the Assets to that Successful Bidder.

E.    **The Solicitation and Due Diligence Materials Offered by the Trustee and SSG are Not Misleading or Inadequate**

189.    In its objection, VSI attempts to reargue, as it did in its objection to the Procedures Motion, that the solicitation and due diligence materials offered by the Trustee and SSG are misleading and inadequate.

190.    VSI specifically complains that the Trustee was not transparent in his disclosure of the Assets being sold.

191.    Again, nothing could be farther from the truth.

192.    As is typical in a Chapter 11 sale process, SSG sent a one (1) page "Teaser" including a description of the Assets to more than 550 prospective strategic and financial targets, inviting interested parties to contact SSG to get access to its data room only after signing a nondisclosure agreement ("NDA").  The data room set up by SSG contains detailed information about the assets owned by Stream and Technovative and the assets, liabilities and financial condition of the Non-Debtor Subsidiaries and their foreign subsidiaries.

193.    Thus far, the only entity that contacted SSG to access the data room is VSI.

194.    This Court has already heard, considered, and dismissed VSI's arguments about the data room and Teaser and in so doing, directed the Trustee, in addition to the Assets being sold pursuant to the APA, to prepare and send to VSI and Rembrandt, a list of assets owned by the subsidiaries whose equity was being sold pursuant to the APA.

195.    The Trustee readily complied with the Court's direction and, on November 14, 2024, provided a list of the assets housed in downstream subsidiaries for VSI and Rembrandt to review and comment on.  To be clear, the list forwarded to VSI and Rembrandt included assets not owned by the Debtors and not being transferred pursuant to the APA.  By Rembrandt and VSI's

42

own arguments, the Trustee cannot transfer the assets in the downstream subsidiaries because the Debtors do not own those assets.

196.    Rembrandt and VSI annotated the list of assets prepared by the Trustee, including various admonitions and overt threats that any purchaser of the Assets would be subject to the continued wrath of VSI and Rembrandt, despite the fact that the APA specifically excludes as an asset being transferred the Rembrandt License or any physical assets that contain Rembrandt Intellectual Property.

197.    Despite the fact that such language would clearly have the effect of chilling any interest in the acquisition of the Assets, the Trustee filed the list on the docket as directed by the Court as supplied by VSI and Rembrandt and without change (D.I #810).

198.    Ironically, even if the data room was in some way deficient, which the Trustee and SSG continue to dispute, it couldn't have any effect on the sale process because no one signed an NDA or accessed the data room to obtain more information except for VSI who has affirmatively stated that it does not intend to submit a qualified bid for the Assets.

199.    In many cases, interested parties that engage in any level of diligence have questions and inquiries, often asking for additional documents, support, and the ability to discuss issues with parties that have firsthand knowledge of the assets.  This was no different.  VSI requested, and Rembrandt, prior to the Hawk Settlement, requested and was provided direct access to SCBV personnel, including the Head of Technology and engineers involved in the development of the underlying 3D technology.

200.    Instead, VSI clearly visited the data room in an effort to gather information it could use in yet another attempt to manufacture reasons the sale should not be approved and not participate in the process in good faith.

F. **The Proposed Sale Does Not Constitute an Improper Sub Rosa Plan of Reorganization and Should be Approved**

201.    VSI argues that the Sale Motion should be denied because the 9019 Agreement and proposed sale process constitute an impermissible sub rosa plan that strips the Debtors' creditors of the protections of the Bankruptcy Code and improperly attempts to extinguish their rights without their consent. (D.I. #815, ¶60).

202.    VSI alleges that the sale process, here, "short circuits" the requirements of Chapter 11 by dictating the terms of the plan sub rosa in connection with a sale of assets. VSI Objection to Sale Motion, D.I. #815, ¶61. VSI argues that the Trustee's sale process seeks to improperly channel consideration to specific creditor groups, is blatantly at the expense of the Debtors' other creditors, and will somehow "essentially ensure" that general unsecured creditors and perhaps administrative claimants will receive "only pennies on the dollar." (D.I. #815, ¶63).

203.    VSI erroneously asserts that the proposed sale is a sub rosa plan intended to bypass the confirmation requirements of the Bankruptcy Code. Courts have consistently acknowledged that assets of an estate can be sold prior to the confirmation or filing of a plan. *See In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 653 (S.D.N.Y. 1995) (citing *In re Chateaugay Corp.*, 973 F.2d 141, 145 (2d Cir. 1992)); *In re Equity Mgt. Sys.*, 149 B.R. 120, 124 (Bankr. S.D. Iowa 1993); *In re Naron & Wagner Chartered*, 88 B.R. 85, 87-88 (Bankr. D. Md. 1988); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, *25 (D. Del. May 20, 2002).

204.    A bankruptcy trustee is authorized by statute to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). However, Section 363(b) does not authorize the trustee to enter a settlement or engage in a sale if the result amounts to a sub rosa plan of reorganization.

205.    A transaction amounts to a sub rosa plan of reorganization if it: 1) specifies the terms of any future reorganization plan; 2) restructures creditors' rights; and 3) requires that all parties release claims against the Debtor, its officers and directors, and its secured creditors. *Matter of Cajun Elec. Power CO-OP., Inc.*, 119 F.3d 349, 354 (5th Cir. 1997) (citing *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)).

206.    When a transaction or settlement in bankruptcy has the effect of "dictating some of the terms of any future reorganization plan," a court deems the transaction impermissible because it "short circuits the requirements of Chapter 11 . . . by establishing the terms of the plan sub rosa in connection with a sale of assets." *In re Jevic Holding Corp.*, 787 F.3d 173, 187 (3d Cir. 2015) (Scirica, J., concurring in part and dissenting in part) (quoting *Braniff*, 700 F.2d at 940). The "hallmark of such a plan is that it dictates the terms of a reorganization plan." *Id.* at 188.

207.    To be found to dictate the terms of a plan, the settlement must either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote. *Cajun Elec.*, 119 F.3d at 354-55 (finding that the instant settlement is not a sub rosa reorganization of the type disapproved in *Braniff* in that it does not dispose of all claims against the debtor, does not restrict creditors' right to vote as they deem fit on a proposed reorganization plan and does not dispose of virtually all of the debtor's assets, leaving "little prospect or occasion for further reorganization"). See also, *In re Chrysler LLC*, 405 B.R. 84, 106 (Bankr. S.D.N.Y. 2009) (holding that the sale did not constitute a sub rosa plan of reorganization because, following the sale, the debtors would continue to administer their estates and seek to confirm a plan that would provide for the distribution of the value of remaining assets).

208.    A settlement agreement, which is a "necessary step toward, or building block of, a

plan of reorganization," does not constitute an improper sub rosa plan. *In re Nortel Networks, Inc.*,

522 B.R. 491, 508 (Bankr. D. Del. 2014); *see also Cajun Elec.,* 119 F.3d at 355; *In re Tower

Automotive Inc.*, 241 F.R.D. 162, 169-70 (S.D.N.Y. 2006).

209.    Courts have approved even large and important settlements prior to confirmation

of a plan, notwithstanding a "sub rosa plan" objection, where the settlements did not dispose of all

of the debtor's assets, restrict creditors' rights to vote as they deem fit on a plan of reorganization

or dictate the terms of a plan of reorganization. *Tower Automotive*, 241 F.R.D. at 169 (internal

citations omitted).

210.    A pre-confirmation approval of a settlement does not amount to a sub rosa plan

where it does not deprive any party of critical protections in a Chapter 11 confirmation process as

the settlement could have been proposed in the context of a Chapter 11 plan process, and the

confirmation hearing would have been conducted (and the settlement would have been considered)

in exactly the same manner as it was at the sale hearing. *In re Capmark Fin. Group Inc.*, 438 B.R.

471, 514 (Bankr. D. Del. 2012).

211.    Even releases contained in a settlement do not transform it into a sub rosa plan as

releases are a necessary and expected term in a settlement agreement. The point of settlement is to

finally and fully resolve outstanding disputes between the parties, and without such releases, a

settlement would be ineffective. This is especially true where the settlement neither releases direct

claims held by any third parties nor any claims held by the debtors against their officers and

directors. *Capmark*, 438 B.R. at 514.

212.    An objector arguing that a proposed sale constitutes a sub rosa plan must clearly

articulate the rights and benefits the unsecured creditor is being deprived of through the sale that

Case 23-10763-amc   Doc 835   Filed 11/29/24   Entered 11/29/24 15:51:38   Desc Main
Document     Page 47 of 51

it would gain through a Chapter 11 plan. *In re Summit Global Logistics, Inc.*, 2008 Bankr. LEXIS 896, *42 (Bankr. D.N.J. Mar. 26, 2008).

213. Here, VSI's inability to establish its detriment through the sale and the Trustee's satisfaction of the sound business judgment and good faith requirements given the current demonstrated need to sell the Debtors' Assets mandate a finding that the proposed asset sale does not constitute a sub rosa plan.

214. The factors that led the Fifth Circuit in *Braniff* to conclude that the transaction was a sub rosa plan simply do not exist here. The Court in *Braniff* reasoned that the proposed transaction encroached upon the plan confirmation process because it (a) "changed the composition of Braniff's assets," with the practical effect of dictating some of the terms of any future reorganization plan, (b) dictated that the secured creditors vote their deficiency claim in favor of any proposed plan approved by a majority of the unsecured creditors' committee, effectively placing restrictions on creditors' plan voting rights, and (c) would grant the debtor, its officers, its directors and the secured creditors a release of all claims by all parties, thereby altering creditors' rights. *Braniff*, 700 F.2d at 939-40.

215. The settlement and sale process here do not constitute a sub rosa plan. There is no indication, and VSI has provided no evidence showing, that any other creditor's recovery is adversely impacted by the settlement, or that any requirement of Chapter 11 is subverted by the plan. Because the settlement neither subverts the bankruptcy process nor impermissibly dictates the outcome to other creditors, the Sale it is not a sub rosa plan.

**G.** **VSI Lacks Standing to Object to the Sale as its "Equity" is out of the Money.**

216. VSI's only interest in the Debtors' cases is as an investor or equity holder.  VSI holds no monetary claims against either of the Debtor estates. *See Stream TV Networks, Inc.*, Case No. 23-10763-amc, Claims No. 1-26; *Technovative Media, Inc.*, Case No. 23-10764-amc, Claims

4889-9066-4446 v5

No.   1-4;   *see   also*,   Stream   TV   Networks,   Inc.   Advanced   Claims   Search,
https://www.bmcgroup.com/restructuring/Claims.aspx?ClientID=496 (last visited Nov. 26, 2024).

217.    Bankruptcy courts have historically used a "person aggrieved" standard in
determining standing; however, in recent years, courts have been requiring constitutional or Article
III standing.  *See Varma v. Quorum Health Corp. (In re Quorum Health Corp.)*, 2023 Bankr.
LEXIS 62, at *11-15 (Bankr. D. Del. Jan. 12, 2023) (granting a reorganized debtor's motion to
dismiss an amended complaint as it failed to establish cognizable harm to, or the personal stakes
of, the plaintiff; and therefore, lacked constitutional standing under Article III).

218.    The issue of constitutional standing was also addressed in *In re Diocese of Camden*,
Case No. 20-21257 (JNP), 2022 Bankr. LEXIS 814 at *26-27 (Bankr. D. N.J. Mar. 24, 2022).  In
the *Diocese* case, the New Jersey Bankruptcy Court refined the requirements for constitutional
standing.

219.    The *Diocese* court held that to have standing in bankruptcy court, a party must meet
three requirements: (1) Article III's Constitutional requirements; (2) federal court prudential
standing requirements; and (3) the "party in interest" requirements under Bankruptcy Code section
1109(b). *In re Old Carco LLC*, 500 B.R. 683, 690 (Bankr. S.D.N.Y. 2013) (citing *Motor Vehicle
Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.*), 677 F.3d 869, 884 (9th Cir.
2012)); *In re Saratoga & N. Creek Ry., LLC*, 635 B.R. 581, 602-03 (Bankr. D. Colo. 2022). A
party seeking constitutional standing must demonstrate an "injury in fact" that is "concrete,"
"distinct and palpable," and "actual or imminent," and that such injury "fairly can be traced to the
challenged action and is likely to be redressed by a favorable decision." *In re Glob. Indus. Techs.,
Inc.,* 645 F.3d at 210 (citing Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S. Ct. 1717, 109 L.

Ed. 2d 135 (1990)).  *In re Diocese of Camden*, Case No. 20-21257 (JNP), 2022 Bankr. LEXIS 814 at *9.

220.    Here, VSI's equity in Stream has no value.  With over $180 million in allowed secured debt and over $1.2 billion in alleged claims under the Bankruptcy Code's priority scheme, VSI's alleged equity value does not exist.  While section 1109(b) of the Bankruptcy Code has been construed broadly to encourage participation in Chapter 11 cases, the Plaintiff must still demonstrate sufficient constitutional standing. See *Varma,* 2023 Bankr. LEXIS at *12 (section 1109(b) construed broadly to encourage participation in Chapter 11 cases; however, plaintiff must demonstrate sufficient constitutional standing to bring the amended complaint).  Therefore, any harm claimed by VSI to its equity in the Debtors' bankruptcy cases is illusory.

221.    Though clearly a party in interest for purposes of section 1109 of the Bankruptcy Code, the definition is not constitutional and requires the court to determine if constitutional or prudential standing exists.

222.    VSI cannot claim that it has suffered an injury in fact, because its equity was worthless on the Petition Date and with the secured claims and unsecured claims, there is no value for the VSI claimed equity interests.

223.    Moreover, VSI has no interest in the transfer of the Assets as contemplated in the Sale Motion, as the Sale does not in any way change the value of VSI's alleged equity in the Debtors.

224.    Further VSI fails to show how those equity interests will be impacted by the sale. The interests were valueless at the Petition Date, and they continue to be.

225.    More importantly, it is unknown whether the equity interests belong to VSI or investors in VSI.  Considering it was Rajan who filed the Schedules during a time when he held

competing dual roles with both VSI and Stream, this Court should be skeptical of his statements, even under oath, based upon his history of self-dealing and untruths. *See* Trustee Opinion at p. 31 (Court expressed concern with Rajan's "plans, trustworthiness, and motivations… in his role as, for all intents and purposes, the singular figure in the Debtors' management."); 56 ("the Court's overall concerns regarding Mr. Rajan's trustworthiness, the history of these cases has been littered with questions about the role and involvement of VSI, the Debtors' ability to operate independently of VSI, and whether Mr. Rajan is able to differentiate his role with the Debtors from his role with VSI."); and 60-61("Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court and creditors rises to the level of gross mismanagement of the estates, even when viewed against the high standard of glaring and inexcusable badness.").

226.    Likewise, even if VSI's equity in Stream did have any value, the unauthorized transfer of equity in Stream to VSI or its investors is avoidable pursuant to Section 549 of the Bankruptcy Code.

## **RESERVATION OF RIGHTS**

227.    Nothing in this Response should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation of the Trustee's ability to contest same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise to pay any claim; or (d) granting third-party-beneficiary status or bestowing any additional rights on any third party.

## IV.    **CONCLUSION**

The Trustee respectfully requests that this Court: (i) order the Objections overruled; (ii) approve the sale of the Debtors' Assets free and clear of all liens, claims, encumbrances, and other interests; (iii) approve the assumption and assignment of certain executory contracts and unexpired

4889-9066-4446 v5

leases related thereto; and (iv) grant such other relief requested in the Sale Motion and such other and further relief as may be just and proper.

Respectfully Submitted,

Dated: November 29, 2024        By: */s/ Michael D. Vagnoni*
                                Edmond M. George, Esquire
                                Michael D. Vagnoni, Esquire
                                OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                                Centre Square West
                                1500 Market Street, Suite 3400
                                Philadelphia, PA 19102
                                Telephone: (215) 665-3066
                                Facsimile: (215) 665-3165
                                E-mail:  edmond.george@obermayer.com
                                          michael.vagnoni@obermayer.com

                                *Counsel to William A. Homony Chapter 11 Trustee*

4889-9066-4446 v5