# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| REMBRANDT 3D HOLDING LTD | § | |
| Plaintiff, | § | C.A. No. No. 17-CV-882 (RA) |
| v. | § | |
| STREAM TV NETWORKS, INC., | § | **First Amended Complaint** |
| MATHU RAJAN, and | § | |
| RAJA RAJAN | § | **1. Patent Infringement** |
| Defendants. | § | **2. Breach of Contract** |
| | § | **3. Promissory Estoppel** |
| | | **4. Unjust Enrichment** |

**Jury Trial Demanded**

## FIRST AMENDED COMPLAINT

Plaintiff Rembrandt 3D Holding Ltd ("R3D" or "Plaintiff"), by and through their counsel and for their Complaint against Stream TV Networks, Inc. ("Stream"), Mathu Rajan, and Raja Rajan (collectively, "Defendants"), hereby allege as follows:

## PARTIES

1.      Plaintiff is a corporation organized and existing under the laws of the Island of Nevis with its principal office at 128 Bull Hill Road, Newfield, NY and a registered address at Suites 5 & 6 Horsfords Business Centre, Long Point Road, Charlestown, Nevis, West Indies.  Plaintiff is the owner of all or substantially all of the assets including all causes of actions of 3DFusion Corp. ("3DFusion"), a Delaware corporation formed on March 26, 2007 with its principal office at 110 Wall Street, New York, NY, and its wholly owned Dutch subsidiaries 3DFusion Holding B.V. ("3DFusion Holding") and 3DFusion EU B.V. ("3DFusion EU") in Eindhoven, Netherlands.

2.      Upon information and belief, Defendant Stream TV Networks, Inc. ("Stream") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2009 Chestnut Street, Philadelphia, PA 19103.

3.      Upon information and belief, Defendant Mathu Rajan is the Chief Executive Officer of Stream and a citizen of Pennsylvania.

4.      Upon information and belief, Defendant Raja Rajan is the General Counsel and Chief Operations Officer of Stream and a citizen of Pennsylvania.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over R3D's claims for patent
infringement under the patent laws of the United States, Title 35 of the United States Code,
and 28 U.S.C. §§ 1331 and 1338(a), diversity jurisdiction under 28 U.S.C. §1332, and
supplemental jurisdiction over state law claims alleged in this Complaint under 28 U.S.C.
§1367.

6.      This Court has diversity jurisdiction under 28 U.S.C. §1332 because complete
diversity of citizenship exists in the parties and the matter in controversy exceeds the sum
or value of $75,000.00.

7.      This Court has personal jurisdiction over Defendant Stream because, among
other reasons, Defendant Stream expressly consented to the jurisdiction of the state and
federal courts located in the City of New York under an agreement with Plaintiff's
predecessor-in-interest, 3DFusion, dated June 9, 2010.

8.      This Court has specific jurisdiction over Defendants Mathu Rajan and Raja
Rajan under NYCPLR §302 (a)(1) because they transacted business within the State of
New York, and the exercise of jurisdiction over Defendants Mathu Rajan and Raja Rajan
would not offend traditional notions of fair play and substantial justice because of their
numerous business trips and meetings at 3DFusion's New York City office as described in
greater details below.

9.      Venue is proper in this District under 28 U.S.C. §§ 1391 (b)-(c) because Defendants are subject to personal jurisdiction in this district.

## INTRODUCTION

10.      This is an action for (i) patent infringement relating to glasses-free 3D display technology, also known as 3D autostereoscopic display (3DASD) technology, and (ii) breach of express and/or implied contracts relating to merger/acquisition and unauthorized use of confidential and proprietary information of Plaintiff's predecessor in interest, 3DFusion Corp. ("3DFusion"), a pioneer startup on 3DASD technology. Plaintiff believes Defendants' breach of express and/or implied contractual obligations through their misappropriation of proprietary technology, expertise, and assets from 3DFusion, unjustly enriched Defendants Stream TV Networks, Inc. ("Stream"), Mathu Rajan, and Raja Rajan. Under the guise of a proposed merger/acquisition, Stream, which had no assets or expertise in 3DASD technology prior to its contractual relationships with 3DFusion, misappropriated 3DFusion's confidential and proprietary information during the due diligence process, and thereby avoided the risk, time, and expense of developing its own 3DASD technology. Stream's calculated and willful breach of promises and obligations unfairly benefitted Stream, which became a market leader on 3DASD technology within a year of its notice of termination of contractual relationship with 3DFusion, to the detriment of 3DFusion.

11.      3DFusion, a Delaware corporation with its principal office at 110 Wall St., New York, NY, was co-founded by Mr. Stephen Blumenthal ("Blumenthal") and Mr. Ilya

Sorokin ("Sorokin") in 2007, to create and sell 3D video content that can be viewed without 3D glasses. Philips offered a Glasses-Free three-dimensional (3D) autostereoscopic display ("3DASD") solution known as the WOWvx Platform for converting and generating 3D content from two-dimensional (2D) media content for rendering on Philips's 3DASD monitors. The WOWvx Platform uses mathematical algorithms to add depth and stereoscopic information to 2D content (i.e., 2D+Depth) thereby creating 3DASD content. However, Philips's 3DASD solution suffered from significant image quality issues because the 3DASD content generated by the WOWvx Platform contained numerous artifacts such as ghosting and required weeks of manual post-processing to correct. Nonetheless, 3DFusion licensed the WOWvx Platform from Philips.

12.    Through extensive experimentation and research comprising more than 3000 hours of 2D-to-3D-depth-map rotoscoping, Blumenthal developed a novel and non-obvious methodology to correct the image quality issues or artifacts in the 3DASD content generated by the Philips's WOWvx Platform. Blumenthal assigned to 3DFusion ownership of his solution to heretofore unsolved problems of Philips's incomplete 3DASD technology, and filed a patent application in 2008 for the technical breakthrough, from which US patents issued as described below.

**The Patents**

13.     Plaintiff is the owner by assignment of U.S. Patent No. 8,558,830 ("the '830

patent"), U.S. Patent No. 9,521,390 ("the '390 patent"), U.S. Patent No. 9,681,114 ("the '114

patent"), and other tangible and intangible assets of 3DFusion.

14.     The '830 patent is entitled "System and Method For Adaptive Scalable

Dynamic Conversion, Quality and Processing Optimization, Enhancement, Correction,

Mastering, And Other Advantageous Processing of Three Dimensional Media Content," filed

on December 18, 2009 claiming a priority date of December 18, 2008, and issued on

October 15, 2013.  A true and correct copy of the '830 patent is attached hereto as Exhibit

A.

15.     The '390 patent is entitled "System and Method For Adaptive Scalable

Dynamic Conversion, Quality and Processing Optimization, Enhancement, Correction,

Mastering, And Other Advantageous Processing of Three Dimensional Media Content," filed

on October 15, 2013 claiming a priority date of December 18, 2008, and issued on

December 13, 2016. A true and correct copy of the '390 patent is attached hereto as Exhibit

B.

16.     The '114 patent is entitled "System and Method For Adaptive Scalable

Dynamic Conversion, Quality and Processing Optimization, Enhancement, Correction,

Mastering, And Other Advantageous Processing of Three Dimensional Media Content," filed

on December 2, 2016 claiming a priority date of December 18, 2008, and to be issued on

June 17, 2017. It is a continuation of the '390 patent.  A copy of the '114 patent is attached
hereto as Exhibit C.

17.     Display technologies for 3D content media have evolved from the earliest
offerings requiring the audience to wear flimsy "glasses" having a different (red or blue) lens
for each eye, to more advanced electronic "stereoscopic 3D" glasses equipped with
remotely triggered liquid crystal display (LCD)-based lenses (acting as individually
alternating "shutters"), which provided its wearers with an engaging and quality '3D
experience," given properly prepared 3D content media and appropriate playback and
display technologies.  However, this approach for providing a "3D experience" is quite
cumbersome and very expensive to use and maintain, and has thus been of very limited
commercial success, primarily being relegated to special entertainment venues, such as
IMAX theaters and high-end amusement parks.  See 1:39-63 of U.S. Patent No. 8,558,830;
1:64-2:22 of U.S. Patent No. 9,521,390.

18.     At the time the inventions in U.S. Patent Nos. 8,558,830 ("the '830 patent"),
9,521,390 ("the '390 patent"), and 9,681,114 ("the '114 patent") were conceived, there were
a number of companies that developed and offered flat panel displays of varying sizes
capable of creating a virtual 3D experience for the viewer without the need for the viewer to
wear electronic or other types glasses or similar devices.  However, the quality and impact
of the 3D experience delivered by the available stand-alone 3D (SA-3D) solutions is lower

than that of conventional high-end glasses-based stereoscopic 3D offerings. See 2:5-19 of

the '830 patent; 2:31-46 of the '390 patent.

19. To solve the aforementioned problems associated with glasses-free 3D

systems, each of the '830 patent and the '390 patent discloses embodiments that

"advantageously enable automatic, semi-automatic or user-controlled selective performance

of 3D content processing and/or settings/parameter configuration at one or more

components of the infrastructure (from 3D content capture, to 3D content processing (and/or

2D to 3D content conversion), and to 3D content media display), and in at least one

embodiment thereof, the inventive system and method are capable of determining and

implementing selective or optimal storage, transmittal, and application of 3D content

processing/settings/parameter/profile configuration(s) prior to, or during, display of

corresponding 3D content media to one or more viewers thereof." See 3:49-60 of the '830

patent; 4:17-29 of the '390 patent.

## Background

20. Upon information and belief, Koninklijke Philips Electronics N.V. ("Philips"), a

Dutch corporation having its registered office in Eindhoven, Netherlands, through its wholly

owned subsidiary, 3DSolutions ("3DSolutions"), began pursuing the concept of developing

3D glasses free television in the early 2000's, based on the 2D+Depth, 3D autostereoscopic

mathematical encryption technology of the Heinrick Hertz Institute.

21.     Upon information and belief, Philips expended approximately a half a billion dollars for the development of glasses-free 3-dimensional television, otherwise known as 3D Auto Stereoscopic Display (3DASD) No Glasses television platform.

22.     In 2007, 3DFusion became a licensed vendor of Philips Electronics Nederland B.V. for converting 2D video content into 3D Autostereo Display ("3DASD") video content using Philips's tools and products including the WOWvx platform and "Blue Box" hardware and software.  3DFusion paid Philips approximately $7,000.00 per month for this license arrangement.

**Limitations of Philips's 3DASD Technology**

23.     Philips made tremendous progress in the development of three dimensional glasses free (i.e. 3DASD) television; however, their products had some limitations and problems with artifacts, clarity and image quality.

24.     Blumenthal began converting, correcting and optimizing 2D videos into Philips's 3D formatted videos (i.e. 2D+Depth) for 3DASD displays using Phillips's 3DASD content generation tools including its WOWvx platform and the Bluebox.

25.     Blumenthal, through 3DFusion, was one of a very small group of vendors allowed to work with the Philips products and tools.

26.     At that point in the Philips development effort, Philips did not provide an efficient solution to the problem of artifacts in the converted 2D+Depth video created by the Philips tools, which would enable users to, for example, adjust, correct, or optimize different

9

subsets of 3D images of the video.  Rather, Philips tools could only provide fixed or preset

parameters for the entire video.

27.    Consequently, the 2D+Depth video (i.e., 3DTV No Glasses), as displayed on

the Philips 3DASD TV, demonstrated the same ghosting, eye strain, dizzying artifacts that

plagued the 3DTV with Glasses consumer market.

28.    At the same time that Philips was working on 3DASD television technology,

others in the industry working on this technology also experienced the same problems of

ghosting, eye strain, and dizzying artifacts.

29.    Philips's 2D to 3D conversion and playback process was a prohibitively

expensive, slow, complicated, and highly labor intensive effort to get to a usable 3DASD

video content.

### 3DFusion's Improved 3DASD Technology

30.    Over thousands of hours of creating 2D+Depth videos using Philips's tools

and products, Blumenthal recognized that certain subsets of images had to be adjusted to

achieve appropriate broadcast quality 3D images.  Blumenthal discovered a methodology

for efficiently converting, correcting and optimizing a 2D+Depth video that overcame the

problems of the preset manual process associated with the Philips tools. Blumenthal's

discovery was treated as a proprietary technology of 3DFusion, and which includes trade

secrets and patentable inventions.  Great efforts were taken to protect the proprietary

technology and to ensure nondisclosure of such technology.

31.     In 2008, Stephen Blumenthal filed a U.S. Provisional Patent Application and

in 2009 filed a regular utility U.S. Patent Application, which issued in October 2013 as the

'830 patent. The '830 patent and the later issued patents including the '390 patent sit at a

key junction of the Philips 3DASD hardware and software 2D+Depth platform and elevate

the flawed Philips platform to a previously unachievable standard for 3DTV broadcast

quality. This development enabled or otherwise positioned the Philips 3DTV to be utilized as

a seamless replacement for all 2D video commercial applications and markets. Moreover,

the techniques and advancements created by Blumenthal are applicable across the industry

where these issues have been plaguing the advancement of the technology.

### Philips Discontinued Its 3DASD Manufacturing and Support

32.     In August of 2009, Philips notified 3DFusion that it was in the process of

winding down its incubator 3DSolutions because it was unable to solve the aforementioned

3D image artifacts.  However 3DFusion could continue to use the previously licensed

hardware and software under its arrangement with 3DSolutions because Philips recognized

that 3DFusion, through its proprietary technology, could continue to advance Philips's

products and tools including the WOWvx platform.  .

33.     In or about September 2009, upon the shutdown of 3DSolutions, which

manufactured the 3DASD monitors and developer of the supporting software (e.g. the

WOWvx platform), Blumenthal, acting on behalf of 3DFusion, immediately contacted the

former 3DSolutions' key technology experts (the "Team") to join 3DFusion as part of an

effort to re-establish support for the WOWvx platform that had been provided by the now

defunct 3DSolutions, and to engage the Team in Eindhoven, Netherlands, through a wholly

owned Dutch subsidiary of 3DFusion.  The Team included Walther Roelen ("Roelen") a

former 3DSolutions 3DTV lens designer and Bart Barenbrug ("Barenbrug") a former

3DSolutions senior software engineer, both of whom are Dutch residents.

34.    For convenience sake, the Dutch subsidiary was named "C3D" prior to its

corporate formation.  The name "C3D" was later changed to "3DFusion EU" as indicated in

an email dated March 15, 2010 from Walther Roelen.

35.    In or about September 2009, Blumenthal requested a number of documents

from Barenbrug and Roelen relating to the software technology, manufacturing

infrastructure, and real estate required for starting up the Dutch subsidiary.  Towards that

end, 3DFusion gave Roelen a power of attorney to execute the requisite legal documents

for the contemplated transactions.

36.    Accordingly, Barenbrug, under Blumenthal's guidance and instructions,

drafted confidential technical documents for purposes of identifying intellectual property

critical for the contemplated license from Philips.  Roelen also drafted documents for the

startup infrastructure.

### 3DFusion Recruited Philips's 3DASD Technical Team

37.    In December 2009, Blumenthal arrived at Eindhoven, Netherlands to

negotiate a license with Philips to manufacture the Philips WOWvx platform and to use the

Case 1:11-cv-00882-RA   Document 26   Filed 06/22/12   Page 13 of 51

800+ patents, and to upgrade the Philips products and tools.  At that time, Blumenthal also

demonstrated 3DFusion's proprietary technology to the Team including Roelen and

Barenbrug, all of whom orally agreed to keep 3DFusion's proprietary technology

confidential.  After the demonstration, one of the members of the Team, Ms. Grazina

Seskeciuite, stated that "it took two guys from New York to come to Philips to show us how

to fix our TV."

38.     Later in this same month, 3DFusion engaged the Team, including Roelen and

Barenbrug as independent contractors to support 3DFusion's efforts to restart

manufacturing of Philips's 3DASD monitors and the WOWvx platform.

39.     In January 2010, Blumenthal and the Team commenced bi-weekly

teleconferences for starting up the new Dutch subsidiary, with meeting minutes (the

"Minutes") recorded by Ms. Ann-Marie van Ham, a member of the Team.  The meeting

minutes show the various technical and administrative issues addressed by the Team

including licensing issues with Philips and Blumenthal's proposed lens design for joint

development with Corning Glass, all of which are deemed confidential and proprietary

information of 3DFusion.  See, e.g., Minutes of February 17, 2010,

40.     Members of the Team understood the confidential nature of their relationship

with 3DFusion, as illustrated by the Minutes, and by a series of emails in March 2010

between Roelen, van Ham, Seskeciutie and Blumenthal, reflecting their obligations to

getting the 3DFusion NDA's signed by all Team members.  The signing of the NDA's was

completed by a number of Team members, according to Ms. van Ham, but the signed NDAs were not collected or returned to Blumenthal until October 2010.

41. The Team acknowledged in numerous communications and as shown in the Minutes that they were working on behalf of 3DFusion to advance the 3DASD and the supporting software technology and marketability that Blumenthal had made possible through his breakthrough discoveries.

42. As a result of 3DFusion's proprietary technology, 3DFusion received the endorsement of the former 3DSolutions' senior technical team, who presented 3DFusion to Philips's Intellectual Property and Standards Division, (IP&S) and persuaded IP&S to accept 3DFusion's license application for the Philips's intellectual property relating to the WOWvx platform.

### 3DFusion Licensed Philips's 3DASD Technology For Over $5M

43. In December of 2009, 3DFusion entered into negotiations to acquire comprehensive archive of Philips's intellectual property for the 3DTV No Glasses/3DASD/2D+Depth technology platform. Blumenthal immediately entered into negotiations to license the $500 million dollar, Philips's 3DASD technology platform, which is referred to by the Defendant Stream TV as "video+depth".

44. 3DFusion was successful in formulating a deal with Philips giving 3DFusion the right to the nonexclusive use of Philips technology.

14

45.    In May 1, 2010, Philips and 3DFusion entered into a license agreement ("License Agreement") for the WOWvx platform and became the first developer to be granted unprecedented rights to, among other things, use, sell or offer to sell various licensed products and to make *derivative works* of the licensed software and to license and distribute licensed technology including Philips's 2D+Depth technology, 800 Approved 3DTV Patents, source code, and associated hardware and software platform. See Section 2 of the License Agreement, Exhibit D.

46.    Under the License Agreement, 3DFusion was obligated to pay (i) $5M for delivery of Philips's Know-How and Licensed Software, of which 50% was payable within 45 days of execution of the License Agreement, with the remaining 50% due in 2011 and (ii) a minimum royalty of 100,000 Euros per year. See Exhibit D, Section 4 of the License Agreement.

## 3DFusion Sought Funding for the Dutch Team, the New Business Model and the Costly Philips License

47.    Having secured Philips's intellectual property and key technology experts, 3DFusion proceeded to seek funding and/or financing for its expanded operations and liabilities required by the new business model.

48.    In June of 2010, Raja and Mathu Rajan, as officers of Stream TV were introduced (hereinafter collectively "the Rajans") to 3DFusion as potential investors.

15

49.    On June 9 of 2010, Raja Rajan and Mathu Rajan, principals of Stream TV

Networks, Inc., came to 3DFusion's offices at 110 Wall Street, New York, NY to view a

demonstration of 3DFusion's 3DASD technology.  Raja Rajan was the general counsel and

COO of Stream and his brother, Mathu Rajan, a technologist and the CEO of Stream.  Upon

information and belief, they were in communication with 3DSolutions, and had one of their

screens.  They were extremely frustrated with the 3D images as they were plagued with the

same artifacts and ghosting issues that were prevalent in all of the Philips 3DTV's.  When

they saw the 3D content on 3DFusion 3DASD display, which was identical to theirs, they

became instant believers.

50.    At the initial June 9, 2010 meeting, the Rajans stated that they had purchased

a Philips 3D TV platform and experienced the same 3D image quality failure as noted

above. Upon viewing the 3DFusion's improved 3DASD tools and content on the same

model of the Philips WOWvx platform that they owned, they became immediately convinced

of the significance of the 3DFusion solution to the Philips 3DASD problem.

51.    They indicated that the 3DFusion technology solved what was previously

believed to be an unsolvable problem, and that this development would therefore provide

them with a commercially viable 3D television product.

52.    Based on this demonstration, the Rajans became very excited and

immediately signed a Mutual Non-Disclosure and Confidentiality Agreement on June 9,

2010, and began equity funding negotiations, with the promise to provide $20 million in

funding.  At this time, Stream, with no 3DASD technology of their own, was trying (as yet

unsuccessfully) to develop a marketable glasses free 3D product. They realized that 3D

Fusion's technology would make that possible.

53.     The Rajans, acting as agents for Stream executed Non-Disclosure

Agreements in June of 2010 (Exhibit E) and a MOU Term Sheet Agreement in September

of 2010 (Exhibit F).  In reliance of these agreements, 3DFusion provided Stream with

information regarding all of the Confidential Information that had been developed by

Blumenthal and the Team, including both the pathway to automation of the 3D content

generation process, and the 3D playback optimization and correction process that had, prior

to Blumenthal's ground breaking work, been impossible to solve. Blumenthal also disclosed,

at Stream's insistence, relevant information about the Team and their roles and contact

information.

54.     Over the ensuing months, the parties, Blumenthal, the Rajans, Roelen, and

Barenbrug, under the leadership and supervision of Blumenthal, all worked collaboratively

towards the goal of pursuing glasses free 3D television technology.

55.     In June 2010, 3DFusion and Defendant Stream TV Networks, Inc. entered

into a Mutual Non-Disclosure and Confidentiality Agreement dated June 9, 2010 and an

Addendum to Agreement dated June 11, 2010 for purposes of due diligence investigation

and equity funding of 3DFusion (collectively referred to as the "Confidentiality Agreement")

(Exhibit E).  Thereafter, over a period of about four months, Raja Rajan and Mathu Rajan,

on behalf of Stream and/or on their individual capacities, held about six (6) to ten (10) face-to-face meetings with Blumenthal and Sorokin, and upon information and belief, about nine (9) more meetings with Sorokin, at 3DFusion's New York City office (i.e., at 110 Wall St.) relating to 3DFusion's Confidential Information and potential financing for 3DFusion.

### 3DFusion Formed and Began Operation of Dutch Subsidiaries

56.     On September 17, 2010, 3D Fusion Corp. received registrations of two wholly owned Dutch subsidiaries. Specifically, 3DFusion Corp., the parent, owns 100% of 3D Fusion Holding B.V., a Dutch limited liability company, which in turn owns 100% of 3D Fusion EU B.V. a Dutch limited liability company (hereinafter collectively "the Corporate Entities"). In September Roelen was hired as the General Director (CEO) of the 3DFusion EU. BV., the Dutch subsidiary, and paid a Salary, with back pay to July 2010.  Once the Dutch BV was established employment contracts were initiated.

57.     3DFusion established and funded bank accounts for its Dutch subsidiaries 3DFusion Holding B.V. and 3DFusion EU B.V. W. Roelen withdrew certain funds from both of these bank accounts ostensibly for salary payments for the Team from about June 2010 through February 2011 including the period prior to his appointment as Director at 3D Fusion EU B.V in September 2010, even though Roelen was not an officer of 3DFusion Holding B.V.  Barenbrug attended various trade shows on behalf of 3D Fusion EU B.V. which paid for his trade shows related expenses and his equipment.

58.     In October 2010, under Roelen's directions, 3DFusion EU hired its first full

time employee, Ms. Grazina Seskeciuite, who was a graphic arts engineer and software

developer, who had worked closely with Barenbrug at the former 3DSolutions, Roelen as

the General Director with overall managerial responsibilities of the company, handled all

confidential documents, had approved the Team's employment contracts template and was

the Senior team organizer to whom the team looked to for guidance.

### 3DFusion Relied on Promises in a Term Sheet

59.     On September 28, 2010, after about 4 months of negotiations, a Term Sheet

(collectively, the "Term Sheet") was executed by Mathu Rajan (CEO of Stream) on behalf of

Stream and in his individual capacity, by Raja Rajan (General Counsel and COO of Stream)

in his individual capacity, by Sorokin on behalf of 3DFusion and in his individual capacity

and Blumenthal, in his individual capacity.  The Term Sheet memorialized their agreement

for a contemplated 20 million dollar equity funding transaction.  See Exhibit F.

60.     Upon information and belief, the Term Sheet was prepared and drafted by

Raja Rajan.

61.     The Term Sheet states:

> The Parties agree, in full consideration of the time and expense that
> shall be expended by each party, to be bound by the transaction
> outlined in this Agreement and attachments hereto (hereinafter, the
> "Transaction") *upon execution of definitive agreements* comprising
> customary terms and conditions including the material terms and

conditions in this Agreement and attachments thereto. (emphasis added)

62.     Notably, no definitive agreements, as contemplated by the Term Sheet, were

executed by the parties.  Thus, by its terms, the Term Sheet is not a valid or enforceable

contract.

63.     Pursuant to the "Capitalization Strategy" section thereof:

Stream intends to become an operating subsidiary of a holding company ("HoldCo") that may be newly-formed. It is understood that all the rights and obligations herein granted to Stream shall be fully assignable to and assumable by Holdco. It is intended that [3D]Fusion (or all its assets in a newly-formed entity) shall become a separate subsidiary of HoldCo jointly owned by HoldCo and the current owners of [3D]Fusion ("3D Sub"). [3D]Fusion shall have representation at HoldCo Board Level if the Strategic Option below is exercised.

Stream agrees that it will keep [3D]Fusion informed of the capitalization efforts as the process commences.

64.     Pursuant to "Ownership Structure" section thereof:

The 3D Sub shall commence with 100% of it being owned by Fusion Founders. HoldCo may provide funds to commence operations within the 3D Sub ("Start Up Funds") up to $5,000,000 in total. The Start Up funds may be in tranches if mutually agreed upon in writing when the Parties complete their financial projections.

Subsequently, HoldCo shall have the right at its discretion to contribute funds earmarked for growth in 3D Sub or any mutually agreed upon spin off company designed to commercialize an opportunity developed by 3D Sub ("Growth Funds").

65.     Pursuant to "Duration Restrictions" section thereof:

*The Parties agree that they shall fully cooperate with each other and provide best efforts in working towards a closing of the transaction described herein.*  For all the good and valuable consideration

described herein and the costs and expenses that have been and will be incurred by each party, the Parties agree they shall not shop for or seek any alternative financing or capitalization except for that which is described herein *for a period of ninety days from completion of the Closing Deliverables (defined below)and consent to the final Definitive Agreements (mentioned above). If a closing has not occurred within that time period then the obligations herein expire except for those relating to confidentiality*. (emphasis added)

66.    Thus, the Term Sheet does not expire or terminate unless these conditions are satisfied:  (1) completion of the Closing Deliverables and (2) consent to the final Definitive Agreements.

67.    Thereafter, parties to the Term Sheet conducted due diligence and, as a result, Stream, Mathu Rajan, and Raja Rajan gained valuable insight into the operations, business plans, financial goals, trade secrets, technical know-how, patent applications, licensed software and hardware from Philips, the confidential terms and conditions of the Philips License Agreement, and the identities of the members of the Team (including Roelen and Barenbrug) in Eindhoven, Netherlands, all of which constitute Confidential Information of 3DFusion.

68.    On October 8, 2010, Blumenthal visited Stream's office in Philadelphia, Pennsylvania during which meeting he answered questions from Raja Rajan and Mathu Rajan and other employees of Stream (including Mr. Suby Joseph, the CFO of Stream) about 3DFusion's business plans and startup strategy and demonstrated 3DFusion's proprietary technology using 3DFusion's equipment loaded with 3DFusion's proprietary software.  Blumenthal went through all aspects of the workflow, of conversion, of

optimization and correction of the artifacts in the 3DASD video content. Blumenthal also

explained how the lens design for the 3DASD monitors was critical to matching the content

to, and went over the 2d switchable technology. This meeting lasted about 9 hours and

Stream videotaped the entire 8-hour work session.  At the end of the meeting, Mathu Rajan

said to Blumenthal "Now I can do what you do.  What do I need you for?"

69.    On October 27, 2010, at a 3D Technology conference (i.e., the Kagan 3D

Technology Conference) at Waldorf Astoria hotel in New York City, Blumenthal was seated

on the same panel as Mr. Jeffrey Katzenberg of DreamWorks, Mr. John Landau of Lucas

Films, and other video pioneers discussing 3DASD technology.  After the panel discussion,

Mathu Rajan walked up to Blumenthal and Sorkin and said that he's not sure if Philips's and

3DFusion's technology is worthwhile.

**Stream and Rajans Deemed the Term Sheet Enforceable And Termination Is Effective
Only Upon Execution of a Mutual Termination Agreement**

70.    Even though the Term Sheet is not valid or effective as a contract by its

terms, 3DFusion justifiably relied on the promises made in the Term Sheet because the

parties deemed the promises in the Term Sheet enforceable or otherwise binding.

71.    Indeed, on or about January 5, 2011, 3DFusion received a "Termination

Agreement" dated January 5, 2011 and signed by Mathu Rajan on behalf of Stream and in

his individual capacity, and Raja Rajan in his individual capacity contending that the Term

Sheet is binding and that 3DFusion breached a clause in the Term Sheet.  See Exhibit F.

72.    The "Termination Agreement" contended that 3DFusion breached the Term Sheet by "enter[ing] into a relationship with a third party whereby they have obtained capital to further their business" "but any continuing express obligations that may exist under the NDAs shall continue as provided in those documents."  See Section 1 of proposed "Termination Agreement," Exhibit G.  The alleged breach referred to 3DFusion's borrowing of $350K (the "Note") from a lender (the "Lender") to pay the Philips License fee due in December 2010, which liability was expressly acknowledged in the Term Sheet.  3DFusion would not have needed to borrow from a third party but for Stream's failure to "fully cooperate" with 3DFusion and to use "best efforts" to complete the transaction contemplated in the Term Sheet to provide the promised funding to 3DFusion to pay for Philip's license fees and the Team's salaries.  Rather, Stream would require 3DFusion to default on the Philips license and lose one of its valuable assets.

73.    The "Termination Agreement" proposed by Stream/Rajans further included a mutual general release relating to "any oral or written discussion by each member of Parties including but not limited to Prior Agreements."  See Section 3 of "Termination Agreement", Exhibit G.

74.    In any event, neither Sorokin nor Blumenthal signed the "Termination Agreement."

75.    3DFusion did not breach the Term Sheet because it timely provided the "Closing Deliverables" to Stream.  On the other hand, Stream, Mathu Rajan, and Raja Rajan

23

have yet to discharge all of its contractual obligations in the Term Sheet including the
formation of HoldCo and the drafting of the Definitive Agreements referenced in the Term
Sheet.  Importantly, Stream, Mathu Rajan, and Raja Rajan did not "fully cooperate with each
other and provide best efforts in working towards a closing of the transaction described [in
the Term Sheet]."

76.    Plaintiff, as successor in interest of 3DFusion Corp., remains ready, willing,
and able to complete the transaction contemplated in the Term Sheet.

77.    In 2016, Blumenthal acquired all of the assets and interests including all
causes of action of 3DFusion and its subsidiaries and in 2017, Blumenthal assigned such
interests and causes of action to Rembrandt 3D Holding, Ltd, which is the plaintiff in this
action, and wholly owned by Blumenthal.

**Roelen's Betrayal and Conspiracy with Stream/Rajans**

78.    In or about the end of September 2010, Stream requested permission to
speak with the Team.  Roelen communicated 3DFusion's proprietary information to agents
or affiliates of Stream.

79.    Upon information and belief, Roelen and Stream's agents or affiliates
misused and/or misappropriated 3DFusion's proprietary information and conspired with to
the detriment of 3DFusion in breach of his fiduciary duties to 3DFusion.  Roelen, as the

Director of 3DFusion EU, had the overall responsibility of getting the Team to sign

employment contracts since June 2010.  Notwithstanding Bart Barenbrug, a key technical

team member, already approved his employment agreement in July 2010, Roelen continued

to stall the process by making up excuses to repeatedly revise his employment agreement

through November and December 2010.  As a result, 3DFusion never received any signed

employment agreement from the Team, and by the end of December 2010, the Team

notified 3DFusion that the Team will not execute the employment agreements.

80.     Upon information and belief, Raja Rajan and/or Mathu Rajan conspired with

Roelen to stall the due diligence process in violation of his promise to "fully cooperate with

each other and to provide best efforts in working towards a closing of the transactions

described" in the Term Sheet.  For example, on November 3, 2010, Raja Rajan emailed

Blumenthal and Sorokin requesting financial information that Stream already received in

August 2010 and acknowledged in the Term Sheet (dated September 28, 2010), and

employment contracts for Blumenthal and Sorokin that Stream already promised will draft to

incorporate terms specified in the Term Sheet.

81.     In any event, each of the Team members executed Non-Disclosure and Non-

Circumvention Agreements ("NDA") with 3DFusion on or about October 4-6, 2010.

82.     But Roelen inserted a clause in his NDA stating that the NDA "will be

terminated if on January first of 2011 there is no employment contract or other similar

agreement between any of the 3DFsuion [sic] companies and recipient."  Only one other

member of the Team, Mr. Hans Zuidema inserted a similar clause in his NDA.  Mr. Hans

Zuidema is presently, the Chief Technology Officer and General Manager of SeeCubic,

Stream's European subsidiary.

83.    Even though it was Roelen's responsibility to have the Team execute the

employment agreements since June 2010, Roelen failed to disclose to Sorokin or

Blumenthal why he and Zuidema alone require their NDAs to expire by the end of

December 2010, when the other team members did not.

84.    Soon after Roelen's and Zuidema's NDAs were terminated upon their

expiration dates, Stream emailed 3DFusion the proposed "Termination Agreement."

## Confidential Information

85.    Blumenthal treated the License agreement with Philips and the information

acquired thereunder including, without limitation, derivative works as protected proprietary

and/or confidential information, which he had worked very hard to develop and only

disclosed the licensing terms and protected information on a need-to-know basis, and only

under protection of nondisclosure agreements.

86.    The research and development effort by Blumenthal and the Team produced

valuable confidential and proprietary information ("Confidential Information") including the

derivative works developed under the Philips Technology License trade secrets, patents

and patent applications, and copyrights, which became the essential technology

components for an improved and commercially marketable WOWvx platform.

26

87.     The Confidential Information was disclosed to Stream pursuant to the

Confidentiality Agreement signed June 9, 2010 and June 11, 2010 and the Term Sheet

signed September 28, 2010.

88.     Blumenthal through the 3DFusion corporate entities and the Team continued

the process of developing bridge software programs (e.g. derivative works of the Philips

licensed software) and technology that would allow for the Philips platform to be

successfully commercialized with an automatic conversion process, and a playback

optimization and correction process.

89.     The following documents further demonstrate that Roelen was working on

behalf of 3D Fusion and that all technology developed was the property of 3D Fusion:

Minutes of 3D Fusion team meetings such as, for example those dated January 26, 2010,

February 3, 2010, February 10, 2010, February 17, 2010, February 24, 2010, March 13,

2010, March 18, March 25, April 7, April 14, April 21, April 28, May 12, June 2, June 9 show

Walther Roelen at these meetings in which the business progress and technology work

were discussed and Roelen had "action points" that he was responsible to accomplish.

90.     Email dated November 26, 2010 sent to Blumenthal from W. Roelen, with

Barenbrug and Zuidema copies to which is attached a seventeen page memo listing thirty

3DFusion client projects, which had been transferred to 3DFusion EU from 3DFusion Corp.

for the Team's development.

27

91.     Email dated October 4, 2010 from W. Roelen stating that he is the head of 3D Fusion EU. He signed the email as Walther Roelen, CEO.

92.     Under their NDAs Roelen and Barenbrug agree, among other things, that their obligations relating to Confidential Information shall survive termination and that the NDA shall be governed by the applicable laws of the State of New York, excluding its conflict of law provisions.

93.     Notably, under their NDAs, Roelen and Barenbrug agree that the use of Confidential Information in the manufacture of any products and the filing of any patent applications containing the Confidential Information without the prior express written authorization of 3DFusion are specifically prohibited.

94.     In addition to the Philips technology for which Blumenthal developed the bridge concepts, there were also lens design aspects of the 3D lenticular lens, which Blumenthal had been working on with Corning Incorporated based in Corning, New York, which were believed to be essential to the proper implementation of the product.

95.     In late August, 2010, Blumenthal set a meeting for him and Roelen to meet with Corning Glass scientist and technical team on September 3, 2010, at the Corning, N.Y. headquarters.

96.     Roelen arrived and stayed at a hotel in Trumansburg, NY from September 2 through September 4 during which period Blumenthal and Roelen discussed confidential

and proprietary information relating to 3DFusion and the formation and operation of the Dutch subsidiaries of 3DFusion.

97.    An objective of the September 3 meeting at Corning was to share 3DFusion Intellectual Property and Trade Secret concepts with Corning and to explore Corning's ability to make certain improvements in the 2D switchable lens design and manufacturing. During the course of this meeting Blumenthal and Corning disclosed substantial Confidential Information to Roelen.

98.    Upon and information and belief, subsequent to this meeting with Corning Glass, Roelen in violation of his agreement with and/or obligations owed to 3DFusion disclosed the Confidential Information to Stream who then utilized and /or incorporated the Confidential Information in their products and technology.

99.    At this meeting Corning required Blumenthal to sign a Nondisclosure agreement on behalf of 3D Fusion and its officers, employees and representatives, which inured to the benefit of 3D Fusion and Corning.

100.    At this meeting Roelen confirmed to Corning that he was the CEO of 3D Fusion EU, a wholly owned subsidiary of 3D Fusion.

101.    After this initial Corning Glass meeting, Roelen had subsequent meetings to discuss this technology after he terminated his employment with 3D Fusion EU without the knowledge of Blumenthal in violation of the NDAs that Roelen was subject to. Roelen's

subsequent meetings in Corning, NY were a necessary and purposeful activity specifically related to Roelen's breach of confidentiality obligations owed to 3D Fusion.

## Stream Had No Prior Knowledge or Expertise in 3DASD

102.    Upon information and belief, the Rajans individually and through corporate entities, were players in the Bollywood, India movie industry, and had no 3DASD technology of their own.

103.    Upon information and belief, Stream and the Rajans extracted the maximum amount of useful information and misappropriated Confidential Information from 3DFusion during the due diligence process including proprietary information obtained from the October 10, 2010 meeting in which Stream videotaped the Blumenthal's demonstration of 3DFusion's proprietary technology.

104.    While Stream and the Rajans conducted their due diligence process, W. Roelen continued to act as the CEO of 3DFusion EU.

105.    As a result of the due diligence process, Stream and Rajans gained valuable insight and knowledge of 3DFusion's proprietary and confidential information, which Defendant Stream used and continues to use in violation of the Confidentiality Agreement with 3DFusion.

106.    3DFusion placed their trust and confidence in Stream and Rajans by providing its proprietary equipment in order that they can demonstrate its proprietary technology to other potential investors.

107.    Upon information and belief, Stream and Rajans used 3DFusion's proprietary equipment to attract and defraud investors by claiming the 3DFusion's technology as their own.  Stream refused to return 3DFusion's proprietary equipment until April 2011, more than three months after Raja Rajan sent 3DFusion the "Termination Agreement" dated January 5 2011.

### Discovery of Roelen's Betrayal, and Theft of 3DFusion's Proprietary Information By Stream and Rajans

108.    3DFusion subsequently learned that Director Roelen was acting to the detriment of 3DFusion EU and 3DFusion, in violation of his fiduciary and contractual duties to his employer 3DFusion and his confidentiality obligations under his NDA. Roelen understood that the information provided to him, or that was developed as derivative works of Philips's license technology, were all protected intellectual property and information of 3DFusion.

109.    Upon information and belief, Roelen accepted an employment offer directly from Stream soon after the expiration of his NDA with 3DFusion, i.e., in or about January 2011.

110.    Roelen continued to access and withdraw funds from 3DFusion Holding B.V. and 3DFusion EU B.V. until 3DFusion terminated his position of Director at 3DFusion EU B.V. in or about May 2011.

111.    In or about January 2012, to his dismay, Blumenthal learned for the first time that Stream, Rajans, and W. Roelen had benefited from their violation of their NDAs and breach of their fiduciary responsibilities and contractual obligations to 3DFusion. While attending the Consumer Electronics Show ("CES") at Las Vegas, Nevada in January 2012, Blumenthal observed W. Roelen working at Stream's exhibit booth and representing himself as an employee of Stream, along with other former members of the 3DFusion EU technical team. The technology exhibited by Stream, Rajans, and W. Roelen at the CES show belonged to 3DFusion.

112.    Upon information and belief, Walther Roelen is now the Technologist Strategist of SeeCubic B.V., the wholly owned Dutch subsidiary of Defendant Stream.

113.    In or about January 2014, Raja Rajan on behalf of Stream, offered to sell and sold a 3DASD monitor to Blumenthal, which incorporates 3DFusion's confidential and proprietary technology.

114.    Blumenthal also learned in or about 2017 that Roelen and Barenbrug filed a US patent application (Ser. No. 14/428,866) entitled "Depth Adjustment of an Image Overlay in a 3D Image" on March 17, 2015 claiming priority to a Dutch patent application (Ser. No. 2009616) with a filing date of Oct. 11, 2012, which applications disclose the Confidential Information in violation of their NDAs such as, for example, the border-blending and depth-smoothing functions or features described in at least paragraphs [0076], [0077], [0081], and

[0082] of the 14/428,866 application.  See Exhibit H, U.S. Patent Application Publication No. US 2015/0249817 A1.

115.    Upon information and belief, U.S. patent application 14/428,866 is owned by Stream's wholly owned subsidiary Ultra-D Coöperatief U.A. in Einhoven, Netherlands.

### 3DFusion – the Aftermath

116.    In 2011, after the Team ended its relationship with 3DFusion, Blumenthal continued to guide 3DFusion and developed a new 3DASD media player, a derivate work developed under the Philips license.  The 3DASD media player has been deployed and currently in commercial use.

117.    In January 2012, Blumenthal resigned from 3DFusion due to lack of funding.

118.    On Oct. 31, 2014, 3DFusion defaulted on the Note.

119.    In or about February 2016, Blumenthal purchased all of the assets, tangible and intangible, from the Lender.

120.    In or about December 2016, Blumenthal assigned all of the assets of 3DFusion to his newly formed holding company, Rembrandt 3D Holding, Ltd, i.e. the Plaintiff.

121.    With this action, Plaintiff seeks to vindicate its rights, prevent any further infringement of its patents, preclude any further misuse of its confidential, proprietary, and trade secret information, and obtain compensation for damages suffered by 3DFusion and for Defendants' unjust enrichment resulting from their unlawful conduct.

## Count I
## Infringement of U.S. Patent No. 8,558,830
### (Against Stream)

122.    Plaintiff restates and realleges each of the allegations set forth above and incorporates them herein.

123.    Upon information and belief, Defendant Stream makes, uses, sells, and/or offers for sale in the United States products and/or services for a system and method for selectively performing 3D content processing and/or settings/parameter configuration at one or more components of the system from 3D content capture to 3D content media display, including, for example, Defendant's Ultra-D technology (http://www.ultra-d.com/technology/) and Ultra-D enabled Monitor (http://www.ultra-d.com/televisions-and-more/) (collectively referred herein as the "Ultra-D System").

124.    Defendant Stream discloses on its website (http://www.ultra-d.com/) that its "Ultra-D [system] is the only glasses-free 3D technology that delivers both a comfortable 'real life' viewing experience and content conversion capability."

125.    According to Defendant Stream's white paper (http://www.ultra-d.com/wp-content/uploads/sites/2/2014/06/Ultra-D-technology-white-paper_07062013.pdf), the "Ultra-D technology for 3D displays has been developed to result in a natural 3D perception, where glasses are no longer needed. The Ultra-D technology generates a light-field addressing human depth perception in a way close to seeing the real three-dimensional

world. The Ultra-D optical solution addresses two important depth cues; stereopsis and

(partial) motion parallax, resulting in a more natural 3D experience."

126.    SeeCubic, a subsidiary of Defendant Stream(http://www.seecubic.com/rdi-

center/) that "develops the hardware and services of the glasses-free 3D display technology

called Ultra-D," discloses that the Ultra-D "technology can be applied in flat panel displays

based products.  Ranging from small displays as 4 inch to the largest mass-produced

displays of 84 inch TVs. Components of the Ultra-D monitor and the seeCube™ convertor

box are shown in the sketch [ ]. Rendering board, optical stack and optical glue are the parts

produced by SeeCubic." (http://www.seecubic.com/technology/implementations/)

127.    The "sketch" shown on SeeCubic's webpage

(http://www.seecubic.com/technology/implementations/) shows that an Ultra-D Enabled

Monitor ("UDEM") includes the following components:  a power supply, an "Ultra-D

rendering board," an audio board, an "Ultra-D conversion board," and a "3-D Module"

comprising a "Tcon," a "2D open cell," and an "Ultra-D optical stack."

128.    Upon information and belief, Defendant Stream discloses that "Ultra-D

converts all content (even non-3D) in stunning detail, alleviating complaints of motion

sickness, limited viewing angles and the need to be in a 'sweet spot' to see images in 3D.

And Ultra-D puts viewers in control, with the ability to adjust 3D "pop" and depth to their

liking. A room full of people can simultaneously experience Ultra-D's vibrant no-glasses-

required 3D." (See http://www.ultra-d.com/)

129.   Upon information and belief, "[t]he Ultra-D Format includes a separate depth signal next to the regular video signal extended with meta-data.  Therefore, it is an 'image+depth-based' 3D format.  Main characteristics: [a] The format is built upon widely available video coding and distribution standards. Therefore, the format leverages standard content distribution infrastructure, both at the broadcaster and at the receiver end. Hence, investments in existing infrastructure are retained. [b] The format is independent of particular 3D optics and other display properties. In other words: the format is display-agnostic, which decouples the content from display characteristics and hardware generation. Therefore, the format is suitable for content creation, distribution and conversion at the end-user. [c] The format requires very limited additional bandwidth compared to regular 2D signals. Therefore, the Ultra-D format is suitable as distribution format against minimal additional cost. [d] The format enables adjusting of depth range by the end-user, so it is adaptable to personal preferences. [e] The format can be generated from many difference sources, so it facilitates use of legacy 2D video formats, '3D' stereoscopic formats, etc." (http://www.seecubic.com/technology/ultra-d-format/)

130.   Based on the Defendant Stream's above disclosures, the Ultra-D System is a data processing system for improving the efficiency, quality, viewing comfort and/or visual impact of a 3D experience capable of being provided to at least one viewer of a 3D content media comprising a plurality of content sections, in conjunction with the use of at least a

portion of a plurality of predetermined 3d content modification techniques as recited in Claim 1 of the '830 patent.

131.    Upon information and belief, Defendant Stream licenses its technology to a third party, IZON TV Technologies, LLC ("IZON") having an office at 2005 Tree Fork Ln Unit 109, Longwood, FL 32750.

132.    Defendant Stream publishes a press release on its website movebeyond3d.com disclosing "IZON a Florida-based display and content services provider, has been collaborating and working closely with Stream TV Networks to develop a superior visual experience for the commercial signage market and future products for consumers." (See press release at http://movebeyond3d.com/izon-tv-begins-pre-orders-for-glasses-free-3d-product-launch/)

133.    Upon information and belief, IZON sells commercial displays and mobile devices incorporating the Ultra-D technology through its e-commerce website.  (See, e.g., http://www.izontv.com/category-s/100.htm and http://www.izontv.com/category-s/101.htm)

134.    Upon information and belief, the Ultra-D technology incorporated in the UDEM or other display devices directly infringes at least Claim 1 of the '830 patent by performing all of the steps of the claimed method.

135.    Upon information and belief, the UDEM provides an on-screen-display (OSD) menu that allows an operator to identify a content section comprising a 3D media element and to select one or more 3D content modification techniques such as "3D Factor," "3D

Offset" and "Borders" tools for the operator to improve the 3D media element thereby meeting the limitations of step (a) of Claim 1.

136.    Upon information and belief, the UDEM OSD allows the operator to apply the selected 3D content modification technique to improve the 3D media element thereby meeting the limitations of step (b) of Claim 1.

137.    Upon information and belief, the UDEM OSD allows the operator to determine a setting for at least one parameter (e.g. 62%) of the selected 3D content modification technique ("Borders") optimal for the 3D media element in future application frames thereby meeting the limitations of step (c) of Claim 1.

138.    Upon information and belief, the UDEM OSD allows the operator to associate a reference to the selected 3D content modification technique (e.g. "Borders") and the determined setting (e.g. 62%) with the 3D media element in future application frames thereby meeting the limitations of step (d) of Claim 1.

139.    Upon information and belief, the UDEM OSD allows the operator to selectively repeat the above steps for an additional section of the 3D content media.

140.    Upon information and belief, the UDEM OSD allows the operator to view in real time results of the above steps and to: selectively cancel at least one result of at least one operation of the previously performed steps and/or selectively change at least one operation previously performed at the above steps to an alternate operation.

141.    Upon information and belief, the UDEM, after the above steps, generates a file configured for playback to a viewer and applies the selected 3D content modification technique to the 3D media element using the optimal parameter, and further configured to store for each 3D media element, the selected 3D content modification technique applied to each 3D media element and the associated reference to the future 3D content modification technique and the optimal parameter.  The UDEM performs this step by, for example, including a separate depth signal next to the regular video signal extended with meta-data.

142.    Upon information and belief, UDEM processes "all [media] content (even non-3D)."  Accordingly, it meets all of the limitations of Claims 2 - 5.  (See http://www.ultra-d.com/ and http://www.seecubic.com/technology/ultra-d-format/)

143.    Upon information and belief, the UDEM meets all of the limitations of Claim 6 by including an OSD that allows manual control of one or more steps of Claim 1 by an operator.

144.    Upon information and belief, Defendant Stream intended to induce patent infringement by third party vendors (e.g., IZON), customers and/or users of devices incorporating Ultra-D technology and had knowledge through Messrs. Mathu Rajan and Raja Rajan and other employees/officers of Defendant at least as early as of September 2010 that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement of the subject matter of the '830 patent as disclosed and claimed in its parent application filed in 2009.  Defendant Stream specifically

intended and was aware that the normal and customary use of the accused products (e.g.

UDEMs offered for sale by IZON) would infringe the subject matter of the '830 patent as

disclosed and claimed in its parent application filed in 2009.  Defendant performed the acts

that constitute induced infringement, and would induce actual infringement, with the

knowledge of the subject matter of the '830 patent as disclosed and claimed in its parent

application filed in 2009 and with the knowledge, that the induced acts would constitute

infringement.

145.    Upon information and belief, Defendant Stream willfully infringed the '830

patent because it had knowledge of the subject matter of the '830 patent (as disclosed and

claimed in its parent application filed in 2009) as early as 2010 and has continued to infringe

the '830 patent to date.  Defendant Stream's infringement constitutes egregious conduct

because Defendant Stream engaged in infringing acts after terminating a confidential

discussion to obtain a technology license in 2010 for the technology disclosed and claimed

by the parent application of the '830 patent and misappropriating confidential and

proprietary information received during the confidential discussion in 2010.

**Count II**
**Infringement of U.S. Patent No. 9,521,390**
**(Against Stream)**

146.    R3D restates and realleges each of the allegations set forth above and

incorporates them herein.

147.    Upon information and belief, the Ultra-D technology incorporated in the
UDEM or other display devices directly infringes at least Claim 1 of the '390 patent by
performing all of the steps of the claimed method.

148.    Upon information and belief, the UDEM provides an on-screen-display (OSD)
menu that allows an operator to identify a content section comprising a 3D media element
and to select one or more 3D content modification techniques such as "3D Factor," "3D
Offset" and "Borders" tools for the operator to improve the 3D media element thereby
meeting the limitations of step (a) of Claim 1.

149.    Upon information and belief, the UDEM OSD allows the operator to apply the
selected 3D content modification technique to improve the 3D media element thereby
meeting the limitations of step (b) of Claim 1.

150.    Upon information and belief, the UDEM OSD allows the operator to determine
a setting for at least one parameter (e.g. 62%) of the selected 3D content modification
technique ("Borders") optimal for the 3D media element in future application frames thereby
meeting the limitations of step (c) of Claim 1.

151.    Upon information and belief, the UDEM OSD allows the operator to associate
a reference to the selected 3D content modification technique (e.g. "Borders") and the
determined setting (e.g. 62%) with the 3D media element in future application frames
thereby meeting the limitations of step (d) of Claim 1.

152.    Upon information and belief, the UDEM OSD allows the operator to selectively repeat the above steps for an additional section of the 3D content media.

153.    Upon information and belief, the UDEM OSD allows the operator to view in real time results of the above steps and to: selectively cancel at least one result of at least one operation of the previously performed steps and/or selectively change at least one operation previously performed at the above steps to an alternate operation.

154.    Upon information and belief, the UDEM, after the above steps, generates a file configured for playback to a viewer and applies the selected 3D content modification technique to the 3D media element using the optimal parameter, and further configured to store for each 3D media element, the selected 3D content modification technique applied to each 3D media element and the associated reference to the future 3D content modification technique and the optimal parameter.  The UDEM performs this step by, for example, including a separate depth signal next to the regular video signal extended with meta-data.

155.    Upon information and belief, UDEM processes "all [media] content (even non-3D)."  Accordingly, it meets all of the limitations of Claims 2 - 5.  (See http://www.ultra-d.com/ and http://www.seecubic.com/technology/ultra-d-format/)

156.    Upon information and belief, the UDEM meets all of the limitations of Claim 6 by including an OSD that allows manual control of one or more steps of Claim 1 by an operator.

157.    Upon information and belief, Defendant Stream intended to induce patent infringement by third party vendors (e.g., IZON), customers and/or users of devices incorporating Ultra-D technology and had knowledge through Messrs. Mathu Rajan, Raja Rajan and other employees/officers of Defendant at least as early as of September 2010 that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement of the subject matter of the '390 patent (as disclosed and claimed in its parent application filed in 2009).  Defendant specifically intended and was aware that the normal and customary use of the accused products (e.g. UDEMs offered for sale by IZON) would infringe the subject matter of the '390 patent (as disclosed and claimed in its parent application filed in 2009). Defendant performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the subject matter of the '390 patent (as disclosed and claimed in its parent application filed in 2009) and with the knowledge, that the induced acts would constitute infringement.

158.    Upon information and belief, Defendant Stream willfully infringed the '390 patent because it had knowledge of the subject matter of the '390 patent (as disclosed and claimed in its parent application filed in 2009) as early as 2010 and has continued to infringe the '390 patent to date.  Defendant Stream's infringement constitutes egregious conduct because Defendant Stream engaged in infringing acts after terminating a confidential discussion to obtain a technology license in 2010 for technology disclosed and claimed by

the parent application of the '390 patent and misappropriating confidential and proprietary

information received during the confidential discussion in 2010.

## Count III
## Infringement of U.S. Patent No. 9,681,114
### (Against Stream)

159.   R3D restates and realleges each of the allegations set forth above and

incorporates them herein.

160.   Upon information and belief, the Ultra-D technology incorporated in the

UDEM or other display devices directly infringes at least Claim 20 of the '114 patent by

performing all of the steps of the claimed method.

161.   Upon information and belief, the UDEM provides an on-screen-display (OSD)

menu that allows an operator to identify a content section comprising a 3D media element

and to select one or more 3D content modification techniques such as "3D Factor," "3D

Offset" and "Borders" tools for the operator to improve the 3D media element thereby

meeting the limitations of step (a) of Claim 20.

162.   Upon information and belief, the UDEM OSD allows the operator to apply the

selected 3D content modification technique to improve the 3D media element thereby

meeting the limitations of step (b) of Claim 20.

163.   Upon information and belief, the UDEM OSD allows the operator to determine

a setting for at least one parameter (e.g. 62%) of the selected 3D content modification

technique ("Borders") optimal for the 3D media element in future application frames thereby meeting the limitations of step (c) of Claim 20.

164.    Upon information and belief, the UDEM OSD allows the operator to associate a reference to the selected 3D content modification technique (e.g. "Borders") and the determined setting (e.g. 62%) with the 3D media element in future application frames thereby meeting the limitations of step (d) of Claim 20.

165.    Upon information and belief, the UDEM OSD allows the operator to selectively repeat the above steps for an additional section of the 3D content media.

166.    Upon information and belief, the UDEM OSD allows the operator to view in real time results of the above steps and to: selectively cancel at least one result of at least one operation of the previously performed steps and/or selectively change at least one operation previously performed at the above steps to an alternate operation.

167.    Upon information and belief, the UDEM, after the above steps, generates a file configured for playback to a viewer and applies the selected 3D content modification technique to the 3D media element using the optimal parameter, and further configured to store for each 3D media element, the selected 3D content modification technique applied to each 3D media element and the associated reference to the future 3D content modification technique and the optimal parameter.  The UDEM performs this step by, for example, including a separate depth signal next to the regular video signal extended with meta-data.

168.    Upon information and belief, UDEM processes "all [media] content (even non-3D)."  Accordingly, it meets all of the limitations of Claims 2 - 5.  (See http://www.ultra-d.com/ and http://www.seecubic.com/technology/ultra-d-format/)

169.    Upon information and belief, the UDEM meets all of the limitations of Claim 6 by including an OSD that allows manual control of one or more steps of Claim 20 by an operator.

170.    Upon information and belief, Defendant Stream intended to induce patent infringement by third party vendors (e.g., IZON), customers and/or users of devices incorporating Ultra-D technology and had knowledge through Messrs. Mathu Rajan, Raja Rajan and other employees/officers of Defendant at least as early as of September 2010 that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement of the subject matter of the '114 patent (as disclosed and claimed in its parent application filed in 2009).  Defendant specifically intended and was aware that the normal and customary use of the accused products (e.g. UDEMs offered for sale by IZON) would infringe the subject matter of the '114 patent (as disclosed and claimed in its parent application filed in 2009). Defendant performed the acts that constitute induced infringement, and would induce actual infringement, with the knowledge of the subject matter of the '114 patent (as disclosed and claimed in its parent application filed in 2009) and with the knowledge, that the induced acts would constitute infringement.

171.    Upon information and belief, Defendant Stream willfully infringed the '114 patent because it had knowledge of the subject matter of the '114 patent (as disclosed and claimed in its parent application filed in 2009) as early as 2010 and has continued to infringe the '114 patent to date.  Defendant Stream's infringement constitutes egregious conduct because Defendant Stream engaged in infringing acts after terminating a confidential discussion to obtain a technology license in 2010 for technology disclosed and claimed by the parent application of the '114 patent and misappropriating confidential and proprietary information received during the confidential discussion in 2010.

## Count IV
## Breach of Confidentiality Agreement
### (Against Stream)

172.    Plaintiff restates and realleges each of the allegations set forth above and incorporates them herein.

173.    Defendant Stream has breached and continues to breach the Confidentiality Agreement by offering to sell and/or selling 3DASD related products and services incorporating 3DFusion's confidential and proprietary information.

174.    Defendant Stream also breached the Confidentiality Agreement by disclosing 3DFusion's confidential and proprietary information in U.S. Patent Application Publication No. US 2015/0249817 A1 owned by Stream's wholly owned subsidiary Ultra-D Coöperatief U.A. (See Exhibit H)

175.    Defendant Stream's breach of the Confidentiality Agreement is willful.

47

176.    Plaintiff has been damaged as a consequence of Defendant Stream's breach
of the Confidentiality Agreement in excess of $20 million, to be determined at trial.

## Count V
## Promissory Estoppel
### (Against All Defendants)

177.    Plaintiff restates and realleges each of the allegations set forth above and
incorporates them herein.

178.    Defendants induced 3DFusion to disclose all of their confidential and
proprietary information by promising 3DFusion certain funding as described in the Term
Sheet.

179.    To its significant detriment, 3DFusion reasonably relied on Defendants'
promises of funding as enforceable or binding as evidenced by Defendants' attempt to
terminate the Term Sheet by requiring 3DFusion, Sorokin, and Blumenthal to sign the
Termination Agreement.

180.    As a consequence of 3DFusion's reasonable reliance on Defendants'
promises, 3DFusion has been damaged in an amount in excess of $20 million, to be
determined at trial.

## Count VI
## Unjust Enrichment
### (Against All Defendants)

181.    Plaintiff restates and realleges each of the allegations set forth above and
incorporates them herein.

182.    Defendants have been unjustly enriched by their misappropriation of
3DFusion's confidential and proprietary information and improper interference with
3DFusion's employment and economic relations with the Team in order to become a leader
in 3DASD technology in less than year, without incurring the risks and costs of a startup, at
the expense of 3DFusion.

183.    Defendants in equity and in good conscience should pay to Plaintiff as a
result of Defendants' unjust enrichment an amount in excess of $20 million, to be
determined at trial.

## DEMAND FOR TRIAL BY JURY

Plaintiff R3D demands a jury trial on all issues so triable, pursuant to Rule 38 of the
Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff R3D prays for the following relief:

1.    A declaration that Defendant Stream has infringed and are infringing one or
more claims of each of U.S. Patent Nos. 8,558,830; 9,521,390; and 9,681,114 patents, and
are liable to R3D for infringement under 35 USC §271(a);

2.      A declaration that Defendant Stream's infringement of one or more claims of each of the '830, the '390, and the '114 patents has been willful;

3.      A declaration that Defendant Stream has induced others to infringe one or more claims of each of the '830, the '390, and the '114 patents under 35 USC §271(b);

4.      An order enjoining Defendant Stream from infringing one or more of claims of each of the '830, the '390, and the '114 patents;

5.      If a permanent injunction is not granted, a judicial determination of the conditions for future infringement such as a royalty bearing compulsory license or such other relief as the Court deems appropriate;

6.      An award of damages, including pre-judgment and post-judgment interest, in an amount adequate to compensate R3D for Defendant Stream's infringement of one or more claims of each of the'830 patent, the '390, and the '114 patents, and that the damages be trebled pursuant to 35 U.S.C. § 284;

7.      A finding that this case is exceptional and an award of attorneys' fees pursuant to 35 U.S.C. § 285;

8.      Award Plaintiff any and all damages sustained by 3DFusion, its predecessor-in-interest as a result of Stream's breach of Confidentiality Agreement described in Count IV;

50

9.      Award Plaintiff any and all damages sustained by 3DFusion, its precedessor-in-interest, as a result of Defendants' inequitable conduct described in Counts V and VI.

10.     A construct trust for the benefit of Plaintiff should be imposed on Defendants with regard to the confidential and proprietary information entrusted to Defendants by 3DFusion, in order to prevent unjust enrichment.

11.     An award of attorney's fees, costs, expenses, and disbursements; and

12.     Such other and further relief as the Court deems Plaintiff may be entitled to in law and equity.

Dated: June 23, 2017                    Respectfully submitted,
                                        /s/ Chi Eng
                                        Chi Eng
                                        New Jersey Bar No. 0055961 (admitted SDNY)
                                        chi@englawfirm.com
                                        ENG LAW FIRM
                                        One Gateway Center, Suite 2600
                                        Newark, NJ 07102
                                        Telephone: 646.770.2347
                                        Facsimile: 646.568.7231

                                        **Counsel for REMBRANDT 3D HOLDING LTD**