# EXHIBIT 17



# AGREEMENT

On this 28th day of September, 2010, Stream TV Networks, Inc. ("Stream), and 3D Fusion, Inc. ("Fusion) and its founders Ilya Sorokin and Steve Blumenthal ("Fusion Founders"), (all parties collectively "Parties") desire to enter into a multi-party agreement as described herein ("Agreement").

**WHEREAS,** Stream and Fusion have executed a confidentiality and non-disclosure agreement dated on or about June 9, 2010 and an addendum/amendment to ensure confidentiality of additional information dated on or about June 11, 2010 (both documents collectively "NDA") to explore an investment or strategic partner relationship; and

**WHEREAS,** the Parties have reached an understanding and wish to memorialize the primary terms thereof.

**NOW THEREFORE,** the Parties, intending to be legally bound hereby, agree as follows:

1.   Confidentiality of Transaction Discussions: Fusion and Fusion Founders agree that the instant Agreement including Exhibit A and all discussions around same including but not limited to the fact the discussion are taking place shall be deemed confidential and fully covered and part of the NDA .

2.   Binding Nature. The Parties agree, in full consideration of the time and expense that shall be expended by each party, to be bound by the transaction outlined in this Agreement and attachments hereto (hereinafter, the "Transaction") upon execution of definitive agreements comprising customary terms and conditions including the material terms and conditions in this Agreement and attachments thereto.

**IN WITNESS WHEREOF,** the Parties, by their duly authorized representatives, have executed this Agreement on the date first written above.

3D Fusion, Inc.                                   Stream TV Networks, Inc.

_____                           _____
Ilya Sorokin                                      Mathu Rajan
CEO, 3D Fusion, Inc.      <Seal.>                 CEO, Stream TV Networks, Inc. <Seal>

_____                           _____
Ilya Sorokin, individually                        Mathu Rajan, Individually

_____                           _____
Steve Blumenthal, individually                    Raja Rajan, Individually

1

## Attachment A

**Capitalization Strategy**

Stream is attempting to raise capital for its own business strategies and intends to allocate funds towards the development and commercialization of Fusion's 3D-related business opportunities. Under the terms herein, Fusion agrees to provide complete support to Stream to fulfill its capitalization strategy.

Stream agrees that it will keep Fusion informed of the capitalization efforts as the process commences.

**Post-Capitalization Structure**

Stream intends to become an operating subsidiary of a holding company ("HoldCo") that may be newly-formed. It is understood that all the rights and obligations herein granted to Stream shall be fully assignable to and assumable by Holdco. It is intended that Fusion (or all its assets in a newly-formed entity) shall become a separate subsidiary of HoldCo jointly owned by HoldCo and the current owners of Fusion ("3D Sub"). Fusion shall have representation at HoldCo Board Level if the Strategic Option below is exercised.

**3D Fusion Restructure**

The Parties understand that the 3D Sub may either be the current Fusion entity or a newly-formed entity that purchases 100% of the assets of Fusion and only assumes agreed-upon liabilities after which the current Fusion entity shall be wound down and closed. In the event that the 3D Sub is a restructure of Fusion the assets that shall be included in the asset purchase at a minimum shall be all intellectual property, know how, and trade secrets whether patent applications have been filed or not, all equipment and samples, all sales orders, contracts and opportunities, all employees hired and to be hired under contract and not, all subsidiaries including but not limited to the Dutch subsidiary for the Eindhoven based employees and facilities. All liabilities assumed by 3D Sub shall be identified and approved as part of the closing documents. One of the assumed liabilities shall be the inventor royalties already recorded with US Patent and Trademark offices with regard to the currently pending filings; however, it is understood that financial arrangement for employment contracts for the 3D Sub for founders shall take into account the possible



2

|  |  |
|---|---|
|  | remuneration for these royalties when salaries are to be negotiated hereunder. |
| **Employment** | Mr. Sorokin and Mr. Blumenthal ("Fusion Founders") shall be employed by the 3D Sub to lead that entity's operations. Employment agreements for their employment shall include customary terms and conditions including non-competition clauses and shall each have duration terms of three years in length. The contracts shall also provide that terminations without cause will result in accelerated payment to each Fusion Founder of their full salary that would be payable during the remaining term and vesting of options including any prior "unpaid salary difference" (see below). The employment agreements shall include a well-defined bonus structure and shall specify mutually acceptable current salaries, and also specify the full agreed-upon base salaries, that will be reached as 3D Sub has sufficient funding until then the unpaid salary difference will be carried as the debt on the books of the 3DSub. In addition to the definition of the bonus structure, it is agreed that 5% of the monthly profits be allocated to Fusion Founders to be applied against such debt, until the agreed upon full salary levels are reached. The employment agreements shall be part of the definitive documents for the closing of the investment described herein. |
| **Board of Directors** | The board of directors of the 3D Sub, upon the first tranche of the Start Up Funds, shall commence with the HoldCo having one seat with one observer seat with two seats for Fusion Founders. Upon HoldCo investing the total Start Up Funds it shall be entitled to two seats equal to the two seats of Fusion Founders. If the complete funding goals of HoldCo specified below are not met thereafter, HoldCo agrees that is shall give up half of its seats on the board as required to make room for alternative investors who do provide the funding. Additional members shall be added by mutual consent. Holdco agrees that it shall regularly report at the 3D Sub board meetings its own strategic decisions and business directions, as well as on its financial and business performance. 3D Sub agrees it shall provide customary reports and financial information to HoldCo as required as part of its investments in 3D Sub. |

*[handwritten initials in left margin]*

**Investor Rights Agreement**

The 3D Sub shall not (i) liquidate, dissolve or wind up the affairs of the 3D Sub; (ii) amend, alter, or repeal any provision of the formation documents of the 3D Sub; (iii) purchase or redeem or make any distribution on any equity interest in the 3D Sub, other than as defined in this document; (iv) increase or decrease the size of the Board, (v) make any loan or advance to, or own any stock or other securities of, any subsidiary or other limited liability company, corporation, partnership, or other entity unless it is wholly-owned by the 3D Sub (vi) make any loan or advance to any person, including, any employee or director, except advances and similar expenditures in the ordinary course of business or under the terms of a employee incentive plan approved by the Board; (vii) make any investment other than investments in prime commercial paper, money market funds, certificates of deposit in any United States bank having a net worth in excess of $1,000,000,000, or obligations issued or guaranteed by the United States of America, in each case having a maturity not in excess of two years; (viii) incur any aggregate indebtedness in excess of $100,000 that is not already included in a Board-approved budget, other than trade credit incurred in the ordinary course of business; (ix) enter into or be a party to any transaction with any director, officer or employee of the 3D Sub or any "associate" (as defined in Rule 12b-2 promulgated under the Securities Exchange Act of 1934) of any such person; (x) change the principal business of the 3D Sub enter new lines of business, or exit the current line of business; (xi) sell, transfer, license, sublicense, pledge or encumber technology or intellectual property; or (xii) sell or dispose of all of its assets or equity without the consent of one of the two Fusion Founders and the consent of the authorized representative of HoldCo for such decisions. Such required consent shall exist for HoldCo so long as it owns or otherwise has rights to (by convertible debt or other equity right) 19% and for Fusion Founders while they collectively own more than 19% of 3DSub.

For purposed of clarity, HoldCo shall not use its investor rights to prevent 3DSub from raising additional funds alternative to HoldCo as long as such third party investment will not in HoldCo's opinion impair funds already invested.

**Ownership**

4

| | |
|---|---|
| **Structure** | The 3D Sub shall commence with 100% of it being owned by Fusion Founders. HoldCo may provide funds to commence operations within the 3D Sub ("Start Up Funds") up to $5,000,000 in total. The Start Up funds may be in tranches if mutually agreed upon in writing when the Parties complete their financial projections.<br><br>Subsequently, HoldCo shall have the right at its discretion to contribute funds earmarked for growth in 3D Sub or any mutually agreed upon spin off company designed to commercialize an opportunity developed by 3D Sub ("Growth Funds"). |
| **Start Up Funds** | The Start Up Funds shall be issued as Senior Lien Convertible Debt, that accrues interest at 18% per annum with a 24 month Maturity that shall have ability to convert into 29% of the 3D Sub if not paid in full with accrued interest and costs, if any. As the Start Up funds are provided, cashless/nominal conversion Warrants shall be issued to HoldCo equal to 20% of the 3D Sub fully diluted equity for the entire Start Up Funds. All mutually agreed tranches less than the entire $5,000,000 shall be pro-rated for purposes of the warrants and shares for conversion. For the avoidance of doubt, if the entire Start Up Funds are provided and the debt is converted in such case HoldCo shall own 49% of the 3D Sub before any of the performance events mentioned below are met. Monies spent towards securing the Philips license shall be counted towards the Start Up Funds even if it doesn't flow through 3D Sub initially but, it is understood that the Parties still need to resolve as closing condition how to provide HoldCo sufficient protections for monies advanced towards the Philips license if placed into the 3D Sub before it reaches financial stability and while it remains a minority shareholder but not impair 3D Subs ability to raise alternative capital if HoldCo does not complete financing of the Start Up Funds. |
| **Growth Funds** | The Growth Funds shall purchase equity of the Company equal to an additional 21% of the 3D Sub for $20,000,000 if exercised by HoldCo. The Growth Funds may only be invested by HoldCo as a single tranche unless mutually agreed otherwise and only upon the end of the term of the convertible debt from Start Up Funds or earlier if the convertible debt is paid in full. |
| **3rd Party Investment and Prepayment** | After HoldCo's investment of the first tranche, in an amount to be agreed upon, in the Start Up Funds, the balance of the tranches of Start Up Funds should be identified as part of the financial |



5

forecasts for the 3D Sub as part of the Closing Conditions. In the event they are not identified in such plan by mutual agreement, then HoldCo shall only have 90 days from request of the 3D Sub to invest additional funds under the terms provided in this Agreement. If HoldCo is unable to meet an agreed tranch payment or separate request for funds from 3D Sub, 3D Sub then may obtain 3rd Party funding immediately and HoldCo waives the right of first refusal for any 3rd Party offer obtained but HoldCo shall maintain its preemption rights to maintain its pro-rata share. Until Maturity, the 3D Sub shall have an option to prepay the debt at anytime the HoldCo does not provide additional funding as identified herein. Obtaining 3rd Party Funds alone in such manner shall not trigger an acceleration of the convertible debt. Additionally, HoldCo exercising its right of first refusal on the post StartUp 3rd Party investment offer also shall not accelerate the maturity of the convertible debt.

**Conversion and Acceleration of Debt**       HoldCo may but is not required to accelerate and convert the debt into equity as provided above under any of the following conditions: a) HoldCo invests the Growth Funds into the 3D Sub before Maturity at 3D Sub's request; b) the debt Matures and is not repaid by 3D Sub; c) there is an exit event before Maturity. The debt shall contain customary protections and terms including those relating to acceleration of all amounts due in the event of conditions that may affect the 3D Subs ability to repay the obligations.

**Anti-Dilution**       The Warrants issued to HoldCo shall have full ratchet anti-dilution so that all equity or equity rights issued by the 3D Sub shall allow the amount of the Warrants to be adjusted to maintain the 20% ownership of the 3D Sub. The anti-dilution right for the Warrants expire if and when the 3D Sub pays off all amounts due on the convertible debt before Maturity and has an additional cash on its balance sheet sufficient to cover necessary company expenses for six months. Similarly, the amount of equity that the debt may be converted (29%) into equity of the 3D Sub shall also maintain the same anti-dilution rights except such rights expire on repayment of the debt if repaid before Maturity.

HoldCo shall have a right, as qualified below, provide additional capital to obtain an additional 21 % of 3D Sub for $20 million , paid in a single tranche as part of the Growth Funds. (An example

of the ownership structure including the options described below is contained in <u>Exhibit A</u>) .

It is agreed that additional investments from any party, option grants for employees and advisors shall all be dilutive of the ownership configurations specified herein.

**License**   The 3D Sub shall grant Stream/HoldCo:

a) an exclusive worldwide license to all its technologies (including software and/or middleware and any auto conversion functions) to enable sale of devices with displays smaller than 20" for all consumer-related applications, for which Stream has product offerings (Stream is not requesting any manually driven blue box content conversion tools or devices). It is also understood that the exclusive license herein shall be limited to consumers as the end user (not medical or commercial applications for example) All Stream products should clearly identify 3DSub as the source of technology. HoldCo agrees that it shall in good faith consider and negotiate alterations of the exclusive license as opportunities may arise for the 3D Sub for devices identified in this subsection.
b) a non-exclusive worldwide license to all its technologies (including software and/or middleware and any auto conversion functions) to enable sale of all devices for all consumer related applications under the condition that for these goods Stream will obtain the consent of the 3D Sub, which shall not be unreasonably withheld, based on the terms and conditions acceptable to 3DSub which it shall use good faith efforts to provide. Such terms and conditions shall include reaching agreement on both a) intended pricing and product bundling by HoldCo so 3D Subs sales efforts are not likely to be cannibalized; and b) that 3D Sub is additionally compensated for consumer markets that it develops without HoldCo but which it is willing to forego to HoldCo for such additional compensation.

It is agreed that Stream will pay the 3D sub the royalty rate for each piece for a) the amount that the 3D sub pays Philips as part of the license (as if 3D sub sold the product itself) and b) the equivalent amount per piece for the 3D sub as royalty for its technology, unless different amounts are mutually agreed upon otherwise. It is agreed that if and when 3D Sub is able to demonstrate from 3rd party market demand in market of HoldCo/Stream that their royalty rate should be increased then such adjustment shall occur with 90 days notice and the royalty being at a 30% discount to such increased price. Similarly, if HoldCo is able to



demonstrate that the royalty being paid is too high due to lack of issued patents or otherwise, then the royalty shall be adjusted downward with 90 days notice.

For the non-exclusive license, if the manufacturing rights are granted, 3D Sub will provide guidance and full support in developing those products under the licenses herein for additional consulting fee and travel expenses, if required which shall be negotiated in good faith in consideration of market prices and HoldCo's discounted investment in 3D Sub; however, if the 3D sub is required to manufacture any of the actual devices that are part of the licenses then additional compensation for the goods must be mutually agreed upon.
All non-automatic content work is to be provided exclusively by 3DSub for all licensed products.

**Fusion Founder**
**Options**            Fusion Founders shall be granted options/restricted stock in number so that upon vesting shall allow Fusion Founders total fully diluted ownership (with only the issuances identified herein and any additional issuances would be dilutive) to equal total 60% of the 3D Sub (more if the convertible debt is paid off as provided). Vesting of these options/restricted stock shall occur upon: 1) the 3D Sub attaining a pattern of financial stability before the one year anniversary of receipt of the Start Up Funds (the definition of financial stability is to be agreed upon by the Parties for the definitive documents upon agreeing upon a financial plan) ; 2) upon obtaining the validation of a mutually selected independent third party expert/firm  that the currently filed patent and provisional patent applications in (listed on <u>Exhibit B</u> hereto ) a) are likely to issue in the future, with any changes or modifications and b) upon issuance  with such changes if any, would protect and block the technologies and techniques to largely eliminate the viewing angle issues and overall viewing experience limitations of the Philips patents and technologies (in essence the approved patents would become indispensable for  the Philips technologies and patents  to be  commercialized) ("Performance B") The amount of options to vest for Performance A and B (whatever takes place first) is identified on Exhibit A hereto.

**Duration**
**Restrictions**        The Parties agree that they shall fully cooperate with each other and provide best efforts in working towards a closing of the

|  |  |
|---|---|
|  | transaction described herein. For all the good and valuable consideration described herein and the costs and expenses that have been and will be incurred by each party, the Parties agree they shall not shop for or seek any alternative financing or capitalization except for that which is described herein for a period of ninety days from completion of the Closing Deliverables (defined below)and consent to the final Definitive Agreements (mentioned above). If a closing has not occurred within that time period then the obligations herein expire except for those relating to confidentiality. |
| **Closing Deliverables** | The "Closing Deliverables, at a minimum, that shall be provided by Fusion are:<br><br>a. Eindhoven employees ready to execute approved contracts;<br>b. Preliminary plans for Eindhoven facilities,<br>c. Current patent applications and IP strategy call with 3DF patent counsel;<br>d. Detailed liability description of all liabilities and assets that are to be part of the 3D sub.<br>e. Mutually agreed upon detailed financial projections of the 3D sub operations through 2011 including projected P/L, Balance Sheet, and Cash Flow. |
| **Choice of Law** | The Parties agree they shall try to resolve all their disputes amicably and directly in the event that a conflict arises. In the event that amicable resolution is not reached, then the Commonwealth of Pennsylvania and the county of Philadelphia shall be the exclusive choice of law and jurisdiction regardless of conflict of law principles. |
| **Expenses** | The Parties agree that they shall bear their own costs of this transaction which shall include legal costs, financial services costs, other professional services, travel, etc. |



9

## Exhibit A
## (Ownership Example)

New One 8-27-2010
Example

**If Convertible Debt Not Repaid**

| Who | Event | Issuance | Cumu | 3D F Cumu | 3DF % | HoldCo Cu | HoldCo % |
|---|---|---|---|---|---|---|---|
| 3DF | Start | 5,000 | 5,000 | 5,000 | 100% | 0 | 0% |
| HoldCo | $5m^ | 4,900 | 9,900 | 5,000 | 51% |  | 49% |
| 3DF | Perfm A* | 4,000 | 13,900 | 9,000 | 65% | 4,900 | 35% |
| HoldCo | $5m | 1,700 | 15,600 | 9,000 | 58% |  | 42% |
| HoldCo | $20m | 4,900 | 20,500 | 9,000 | 44% |  | 56% |
| 3DF | Perf B* | 8,000 | 28,500 | 17,000 | 60% | 11,500 | 40% |

\* vests (not new issue)
^ warrants + stock

**If Convertible Debt Repaid-Only Start Up Funds from Holdco**

| Who | Event | Issuance | Cumu | 3D F Cumu | 3DF % | HoldCo Cu | HoldCo % |
|---|---|---|---|---|---|---|---|
| 3DF | Start | 5,000 | 5,000 | 5,000 | 100% | 0 | 0% |
| HoldCo | $5m^ | 1,250 | 6,250 | 5,000 | 80% |  | 20% |
| 3DF | Perfm A* | 2,500 | 8,750 | 7,500 | 86% | 1,250 | 14% |
| 3DF | Perf B* | 8,000 | 16,750 | 15,500 | 93% | 1,250 | 7% |

\* vests (not new issue)
^ warrants not stock



10

**Exhibit B**
**(Current Patent and Provisional Applications)**