# EXHIBIT 23

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 7 |
| Stream TV Networks, Inc. | ) |
| | ) Case No.  21-10848 (KBO) |
| | ) |
| | ) **Related to D.I. 22** |
| Alleged Debtor | ) |
| | ) |

**DECLARATION OF CHRISTOPHER MICHAELS
IN SUPPORT OF THE OBJECTION OF THE PETITIONING CREDITORS
TO THE EMERGENCY MOTION TO DISMISS**

1) My name is Christopher Michaels. I am the President/CEO of Brown & Michaels, PC and represent Rembrandt 3D Holding Ltd. ("Rembrandt - Holding") a Nevis corporation.  I also represent Rembrandt 3D Corp. ("Rembrandt – Delaware") a Delaware corporation and Stephen Blumenthal personally.

2) The following facts are within my personal knowledge, except as noted, and are true and correct. I file this Declaration under 28 U.S.C. § 1746.

3) I am a patent attorney with years of experience in the TV and video display industry.

4) For many years, I was the managing attorney for our representation of Lucent and their patent work arising out of Bell Labs (arguably where TV was invented - https://www.earlytelevision.org/bell_labs.html).  I have worked for a number of companies and inventors in the display industry.  I written many patents for new types of displays, methods of making displays, and the materials used in those displays.  I took on an officer role first as VP of Business Development, and then CEO of a client, Nupix, LLC, a novel display developer.

5) I am familiar with typical licensing terms in numerous industries, but in particular, I have written and negotiated many license and development agreements in the display

industry.  As both attorney and officer, I negotiated licenses and joint development

agreements with Corning, eInks, Gyricon (subsidiary of Xerox), and Kent Displays.

6) I have also worked with a number of private equity fund clients that ask me to review

and advise them on intellectual property strategy for their portfolio companies.

7) I am a founding member and was on the original management team of a seed stage

venture capital/investment club fund, WEMBA 38 Investment Club LLC.

8) While I prosecuted many patent applications over the years, my current focus is

mostly in business consulting, technology strategy and licensing.

9) I studied inventory and production control at Stanford Engineering before deciding to

go to the Wharton School to earn a master's in business administration with

concentrations in finance and operations and information management.

10) I still take on officer roles for a number of clients and typically serve as CEO, CFO,

or as VP of Business Development.  I only take on such roles for developing

technology based companies.

11) I have been involved in a number of patent enforcement actions, but I do not work

with my clients as litigation counsel.  My role is limited to strategic analysis of

intellectual property issues and valuation of the technology.

12) I have taken courses in mediation and recommend mediation as a dispute resolution

practice to many of my clients.

13) I have known Stephen Blumenthal since approximately 1990.  He contacted me and

asked me to assist to assist Rembrandt-Holding in an upcoming mediation with

Stream TV Network, Inc. ("Stream").

14) While I had no part in preparing the original or first amended complaint (attached as

Exhibit 1), I reviewed the first amended complaint, all exhibits, and the license

agreement between 3D Fusion and Philips (Exhibit 7) in preparation for attending the in person mediation.  I also reviewed as much as I could regarding the Stream products, their patents, and their website.

15) Of the documents useful to establishing a reasonable royalty, the Philips agreement (Exhibit 7) was the best example of a third party arm's length license to serve as a benchmark.

16) Philips is well known to own a large portfolio of intellectual property rights and to be experts in licensing that technology.  Their 2019 annual report states the following:

*"Royal Philips' total IP portfolio currently consists of 64,500 patent rights, 39,000 trademarks, 88,500 design rights and 3,200 domain names. Philips filed 1,015 new patents in 2019, with a strong focus on the growth areas in health technology services and solutions. Philips earns substantial annual income from license fees and royalties. These are mostly earned on the basis of usage or fixed fees, recognized over the term of the contract or at a point in time."*

17) Philips had a large portfolio of patents in the glasses free 3D market and marketed products under its WOWvx platform, but ultimately decided to exit the business itself in 2009.  It was willing to license its technology and spun out a company with a license, Dimenco https://www.dimenco.eu/about-us.

18) While the promise of the technology was exciting, the technology in the hands for Philips had a number of problems.  Licensing a technology that did not work completely and was developed in a business unit that a well-funded patent owner chooses to abandon, can lead to a significantly lower valuation than licensing a working technology.

19) I attended an in person settlement conference on July 18, 2018 (the "First Mediation

Conference"). [Dkt# 58] Raja Rajan attended the First Mediation Conference with Mr. Neal Kronley of DLA Piper (former counsel to Defendants). I was accompanied by Stephen Blumenthal, the sole director and officer of Rembrandt-Holding, and litigation counsel Chi Eng.

20) At the First Mediation Conference, Mr. Blumenthal demonstrated the Rembrandt-Holding technology using what he identified as the original 3DFusion equipment share with Stream in 2010. This identical equipment looked identical to the equipment shown in in a news article dated January 25, 2011 published by The Flying Kite Media, a Philadelphia based online magazine (the "2011 News Article"), wherein Defendants showcased 3DFusion's laptop and video content. (Ex. 1, 2011 News Article entitled "how philly is leading the glasses-free 3d revolution").

21) Having such published photographic evidence of a defendant company claiming credit for the plaintiff's technology is rare and was a compelling beginning to the mediation. Collectively, the Rembrandt-Holding team took the unwavering position that every Stream TV incorporated the Rembrandt-Holding know-how, trade secrets, and needed a license to the Rembrandt-Holding patents. Our primary purpose was to discuss a business resolution, but at times it was helpful to pull out additional documentation and evidence demonstrating that the technology had been developed by Mr. Blumenthal prior to meeting the Rajans or Stream.

22) Eventually, negotiations progressed to the point where Stream started to take several actions to build good will.

23) After a compelling showing that U.S. patent application 14/428,866 included technology invented by Mr. Blumenthal, Stream had its wholly owned subsidiary Ultra-D Coöperatief U.A. in Einhoven, Netherlands abandon the patent application.

24) In my experience as a patent attorney, abandoning a pending application during such
negotiations is a rare action and the fact that Stream did so, built good will to proceed
with settlement negotiations.

25) Stream also provided several of their 4K TVs by sending them to various locations
across the country for consultants to Rembrandt-Holding to evaluate at no charge
which also paved the way for further settlement discussions.

26) Stephen Blumenthal reports that he worked with the original Philips WOWvx
technology and got it working.  Mr. Blumenthal demonstrated the old technology and
hardware Philips had developed and the hardware/software demonstrated by
Rembrandt 3D Corp and the difference is remarkable.  I have also seen the Stream 4K
television unit shipped during settlement negotiations and compared it to the other 3D
technologies demonstrated by Mr. Blumenthal.

27) Working with the content tools and hardware that Mr. Blumenthal had developed
with 3D Fusion, Mr. Blumenthal was able to demonstrate that he was able to create
content optimized for a 3D display to obtain 3D effects to make images appear with
depth inward from the face of the screen ("screen back") and outward from the face
of the screen ("forward pop") on multiple displays not made by Stream.   We
measured the image effects on TVs made by companies other than Stream relative to
the diagonal size of the display against the Stream TV provided for evaluation.

28) Mr. Blumenthal was able to create images that provided further screen back and
greater forward pop with other TVs but it required use of his technology to avoid
artifacts and always looked best when Mr. Blumenthal optimized the content.  In
other words, the Philips TV technology and other manufacturer's glasses free 3D
displays all had issues until Mr. Blumenthal applied his technology to correct those

defects.  However, the Stream TV was able to convert a wide variety of content and looked very good.  Our assessment was that the Stream TV was a very good implementation of the Rembrandt-Holding technology that Mr. Blumenthal had disclosed years earlier.

29) We compared the patent claims element by element to the Steam TV and it was clear that use of the Stream TV infringed the Rembrandt-Holding patents.

30) From a strategic and valuation perspective, it was clear that: 1) Rembrandt-Holding and Rembrandt-Delaware did not require access to the Stream TV or UltraD technology to provide excellent quality 3D displays; and 2) Stream made a very good product that was a good enough implementation of the Rembrandt-Holding technology for many circumstances.  In other words, Stream needed a license from Rembrandt-Holding to sell any product, but Rembrandt-Holding and Rembrandt-Delaware were not dependent on Stream.  However, Stream's product was impressive enough that it made sense to work a purchase of future products into a settlement. These strategic considerations drove the mediation and negotiation process.

31) I recommended that Rembrandt-Holding negotiate for some cash, but that a right to purchase product on favorable terms would provide excellent value to Rembrandt-Holding because Rembrandt-Holding and Rembrandt-Delaware could include them in their products.

32) For the following six months, the parties corresponded settlement terms via email and conducted several in-person settlement conferences at Stream offices in Philadelphia with Mr. Blumenthal and me representing the Rembrandt-Holding, and Raja Rajan representing the Defendants. The parties did not resolve their differences.

33) On January 11, 2019, Magistrate Judge Parker ordered the parties to attend a second

settlement conference in person with counsel on April 9, 2019 (the "Second

Mediation Conference"). [Dkt# 67]

34) At the Second Mediation Conference, Stream was represented by its Chief Financial

Officer, Shad Stastney, and its counsel Neil Kronley and John Wellschlager.

35) During the Second Mediation Conference, the parties reached the terms of an

agreement and a term sheet was prepared by Stream's counsel that was initialed by

Shad Stastney, Stephen Blumenthal, and Magistrate Parker and I have attached a copy

of this term sheet initialed by Shad Stastney as Exhibit 2.

36) This term sheet provided for Stream to license Rembrandt-Holding's:

    a.  "*Knowhow and trade secrets related to methodology for:*

        i.  *efficiently converting, correcting and optimizing a 2D+Depth video for playback on a 3D autostereoscopic associated with the Philips technology*

        ii.  *utilizing the Philips 2d Switchable Lens technology for refractive and detractive lens switching for the creation of the 'lightfield' and 3d content artefact correction.*

        iii.  *utilizing the On Screen Display functions of Borders and "Liveliness."*

    b.  *Trademarks*

    c.  *the patents asserted in Rembrandt's First Amended Complaint, and dismissed by the Court on March 28, 2018 (ECF No. 47}"* (See Schedule A of the April 9, 2019 term sheet – Exhibit 2)

37) Schedule A was prepared with care and while short, identified the specific technology

that was provided by Mr. Blumenthal and incorporated into Stream's products.

Having evaluated the Stream TV directly, it was and is my opinion that every TV sold

by Stream incorporated the enumerated know-how and trade secrets and but for the license, infringed the patents referenced in the term sheet.  This settlement was essential for Stream to continue selling product free of infringement allegations.

38) Stream agreed to pay Rembrandt-Holding $5,840,000 in cash, 2,000,000 warrants to purchase Stream stock, 100 4K TVs for no charge, 8 8K prototypes at no charge, and the right to purchase 3,015,000 units at cost.

39) At each mediation, Mr. Blumenthal emphasized that he wanted his companies to be one of Stream's largest customers and that the most important aspect of the deal was the right to purchase products.  That said, he knew that Philips charged at least $5,000,000 for a license with royalty minimums and that seemed like a reasonable floor for the cash component of the deal.

40) Rembrandt-Delaware previously purchased a Stream TV for $5,250, so we estimated the value of the no charge TVs and the 8K prototypes to be about $567,000.

41) We assessed that Stream was either going to fail rendering the warrants worthless or succeed making many billions in profit such that the value of the warrants would likely be worth tens of millions of dollars.  Offering warrants made sense for Stream as it was a cashless component of the deal at the time, but also provided Rembrandt-Holding a strong incentive to support Stream's success.

42) We estimated Stream's margin was approximately $400/unit so the ability to purchase 3,015,000 units at cost was worth approximately $400/unit x 3,015,000 units = $1,206,000,000.

43) In other words, the total value of the settlement agreement between Stream and Rembrandt-Holding is far greater than all the secured and unsecured Stream creditors' claims combined.  In addition, if Rembrandt-Holding was to fully capture the value of

its negotiated settlement, it would need to find a market for millions of Stream's

products.

44) To my knowledge, no other company has as many working installations of glasses

free 3D displays as Rembrandt-Delaware.  To have the leading company in glasses

free 3D displays supporting Stream and the sale of its products is a major asset to

Stream that has long last value.

45) During negotiations, I built a simple spreadsheet model to calculate the relative value

of each component of the settlement and we were able to compare various offers

proposed by each side.

46) As we were attempting to finalize the documents for settlement, we were contacted

by counsel for Stream and asked to meet in person to make adjustments to the April 9,

2019 term sheet but promised that Stream intended to maintain the net present value

of the April 9, 2019 terms.

47) We met with Shad Stastney, Mark Colemen (director of Stream), Neil Kronley, and

John Welschlager on July 8, 2019.  I attended with Stephen Blumenthal and counsel,

Chi Eng and Neil Wallace.

48) During our meeting, Mr. Stastney explained that Stream's production was delayed

and he requested flexibility on timing of payments and shipments of products.  We

asked a number of questions over the day, but I asked Mr. Stastney a series of specific

questions about the expected production costs, production capacity, and the expected

margin.  As Mr. Stastney answered, I typed the answers into a computer and was

using it to work with my valuation model.  The fact that I was entering the data into

my computer was obvious to everyone in the room. I later reviewed the spreadsheet

model with Mr. Blumenthal and we evaluated how the proposed modifications to the

April 9, 2019 term sheet so we could assess whether the new proposals matched the net present value of the April 9, 2019 term sheet.  Over the course of the day, I used my model to explain to everyone in the room that a particular proposal did not maintain the net present value and we would modify the terms until Mr. Blumenthal was satisfied that we were making reasonable modifications that preserved the value or the April 9, 2019 term sheet.

49) I specifically asked Mr. Stastney about the margins for Stream's products and Mr. Stastney told us that it would be about $400/unit during early commercial scale production and then drop to as low as $120/unit during very high volume production in later years.

50) While our settlement agreement provides a right to purchase products at cost, I specifically discussed with Stream's various representatives that increasing Stream's volume of production would allow Stream to lower its production costs across all products such that Stream could command higher margins from other customer sales.

51) At all times, Mr. Stastney proceeded with the expectation that sales to other customers of Stream would far exceed sales to Rembrandt-Holding.  At various times, he stated that he did not expect sales to Rembrandt-Holding to exceed 5-10% of the total capacity of Stream.

52) While 5-10% of Stream's production capacity would still make Rembrandt-Holding one of the largest customers, the profits that Stream would be able to make by fully using the technology licensed by Rembrandt-Holding is 10-20 times the cost of obtaining the license from Rembrandt-Holding.  If the value of the settlement agreement to Rembrandt-Holding is hundreds of millions of dollars, the value of having the license to Stream is billions of dollars.

53) I make these statements employing a high level of academic training in production forecasting and accounting as well as practical experience as an officer of technology companies and one called upon to advise private equity companies on valuing technology portfolios, but frankly, one does not need my level of expertise or training to follow the valuation.

54) The settlement agreement terms are clear on their face and provide significant value to Rembrandt-Holding in both defined amounts of revenue and product purchase rights.  No reasonable company or person, pays more for a technology license than it can generate in profit from that license and in almost all cases, licensees hope to make very large multiples of the amounts paid for a license in profit from implementing the business contemplated by the license.

55) Shad Stastney is a well-educated CFO and experienced in financial markets.  Unless he was purposefully looking to destroy Stream, he reasonably knew that the value of Stream would increase dramatically with the execution of a license to the Rembrandt-Holding technology.  More specifically, any reasonable business decision maker would have expected the value of Stream to increase by hundreds of millions to billions of dollars after agreeing to the terms on April 9, 2019.

56) I knew that our settlement agreement with Stream was advantageous to both sides and dramatically increasing Stream's production would help Stream achieve a positive cash flow much faster while creating significant value for Rembrandt-Holding and based on our conversations over two days of in-person negotiations largely focused on these issues, I believe that Shad Stastney shared the same opinion when we reached agreement.

57) I confirmed directly with Mr. Stastney that the value the ability to purchase units at

cost was $400/unit at the beginning trending to $120/unit at high volumes such that
the value to Rembrandt-Holding of the right to purchase at cost products was
approximately $360,000,000 to $1,206,000,000.

58) At some point after our July 8, 2019 meeting, Stream's management and board of
directors went through turn over and Stream fired DLA Piper as its litigation counsel.
It was very challenging to get anyone to respond to our requests to complete the
settlement, so Rembrandt-Holding eventually filed a motion to enforce the April 9,
2019 term sheet.

59) I reached out to Shad Stastney after he left Stream because I knew that he ran the fund
that was Stream's first position lender.  Mr. Stastney took my call and it was cordial,
but he quickly told me that things were happening that he could not disclose and
asked if he could call me in a few weeks after they resolved.  He never called me
back.

60) I also reached out to representatives of Hawk, the second position secured lender, and
received a similar response.

61) I learned that a group of shareholders were suing Stream and were represented by
Eben Colby.  I spoke to Mr. Colby on February 18, 2020 and explained the
Rembrandt-Holding litigation with Stream.  He indicated that he would discuss the
matter with his internal patent attorney partners and get back to me.  He never called
me back.

62) I later spoke to Mr. Stastney after I became aware of the Omnibus Agreement and
asked about SeeCubic's plan to obtain a license to the Rembrandt-Holding
technology.  He explained that he felt the obligation to pay for any license rested with
Stream and that SeeCubic had rights to all the technology of Stream.  I pointed out

that Stream had no power to transfer our license to SeeCubic.  He stated that

SeeCubic did not plan to manufacture anything, but rather just license out rights to

Ultra-D.  I pointed out that both the Rembrandt-Holding agreement with Stream and

the Philips license prohibited both assignment and sublicensing.  He seemed surprised

by this information and ended the call claiming that he did not feel that was a

problem.

63) As an expert in intellectual property licensing, I don't think Mr. Stastney's stated

business plan for merely licensing technology rather than manufacturing is a viable

strategy and is likely completely prohibited by both the Philips license and the

Rembrandt-Holding technology rights.

64) It does not appear SeeCubic's business plans and the fact that they are just not

permitted by the various underlying technology rights of Philips or Rembrandt-

Holding were understood by the various parties to the Omnibus Agreement of the

litigations in the prior bankruptcy proceeding or Delaware Chancery court action.

65) I spoke with Mr. Stastney, Hawk's representative, and Even Colby all well prior to

any of them signing the Omnibus Agreement.  They all knew about Rembrandt-

Holding and its claims regarding the technology.

66) Mr. Stastney specifically knew that he had negotiated to a term sheet before a

Magistrate Parker indicating the technology was worth millions in cash payments and

a right to purchase TVs and provided the information that shows such a right was

worth up to $1.2 billion dollars.

67) However, neither SLS, SeeCubic, Hawk, Mr. Stastney or Mr. Colby made the court

aware that the Stream technology used in its TVs incorporated technology owned by

Rembrandt-Holding and that transferring such technology to SeeCubic would further

misappropriate Rembrandt-Holding technology or that SeeCubic's business plans are prohibited under the terms of the Philips license.

68) At a bare minimum, Mr. Colby and Mr. Stastney could be under no reasonable delusion that Rembrandt-Holding was going to sit idly by and let SeeCubic use its technology without further litigation, yet they made no mention of it to the Chancery court or in the Stream Chapter 11 bankruptcy motion to dismiss.

69) I do not know if Mr. Colby explained to his representative shareholder clients that their rights in SeeCubic could be severely compromised by Rembrandt-Holding's claim prior to their entering the Omnibus Agreement, but it seems highly unlikely that they would have agreed to it if he had.

70) I don't know if counsel to the creditors were informed of Rembrandt-Holding's claim or the limitations of the Philips agreement when they agreed to be paid from SeeCubic, but it also seems highly unlikely that any reasonable creditor would voluntarily choose to work with SeeCubic knowing that it has no rights to license technology or execute its stated business plan.

71) I do not know if Mr. Stastney discussed the Rembrandt-Holding claim with potential investors in SeeCubic despite his intimate knowledge of both the claims and the value of the April 9, 2019 settlement term sheet he negotiated, but it seems unlikely that any informed investor would make any investment in SeeCubic if they knew of the Rembrandt-Holding claim or limitations of the Philips license.

72) Clearly, the settlement terms were covered by the protective order, but the Rembrandt-Holding complaint against Stream was publicly available on PACER and could have freely have been shared with all parties and the Chancery court but does not appear to have even been mentioned.

73) The motion to enforce was still pending when I learned that Stream had filed for bankruptcy. Chi Eng was asked to attempt to contact litigation counsel for Stream regarding informing the district court about the bankruptcy and stay, but received no response, so Chi Eng notified the court of the pending bankruptcy and the automatic stay. The court extended the response time on the motion.

74) I sent emails to Stream's bankruptcy counsel (Exhibit 3), the counsel for creditors (Exhibit 4,) and the counsel for SeeCubic (Exhibit 5) on April 20, 2021 to make sure they all knew about our claim and to invite resolution. Only Stream's counsel responded to my communications.

75) Despite having communicated with all represented parties' counsels in the Stream Chapter 11 prior bankruptcy proceeding, Rembrandt-Holding has not been provided any notice of any motions in any proceeding in the bankruptcy court or Delaware Chancery court.

76) Rembrandt-Holding was not a party to the Omnibus Agreement, yet Shad Stastney, Eben Coffer, Stream, and the Rajans were all well aware of our allegations that all Stream technology infringed the rights held by Rembrandt-Holding. They all knew that Stream had no right to transfer any rights to Rembrandt-Holding technology to SeeCubic.

77) It appears that Shad Stastney decided not to disclose to either the Chancery Court or the Bankruptcy Court that he personally represented Stream in our settlement negotiations and initialed the April 9, 2019 term sheet providing Rembrandt-Holding the settlement terms including over $6,400,000 in cash and free TVs, 2,000,000 warrants, plus the right to purchase new TVs at a collective discount of $1.2 billion.

78) After the bankruptcy case was dismissed, we were able to complete the settlement

agreement between Stream and Rembrandt-Holding on May 23, 2021 (Exhibit 6) and the litigation in the Southern District ended.  The terms of the May 23, 2021 settlement agreement are basically the same terms negotiated with Mr. Stastney on April 9, 2019 (Exhibit 2) except we provided flexibility on the timing of delivery of the TVs and some of the payments which are similar to the changes Mr. Stastney requested on Stream's behalf in our July 8, 2019 meeting.

79) The May 23, 2021 settlement agreement with Stream carries a substantial value to both companies.

80) Stream now has a full license to use the Rembrandt-Holding technology, SeeCubic does not.

81) However, until SeeCubic has such a license, it can fully expect that Rembrandt-Holding will seek to fully enforce its rights in the various forums seeking injunctions and to have their products held at the border.  Mr. Stastney clearly knows SeeCubic, and/or its customers and vendors, need a license from Rembrandt-Holding to actually make and sell products but has failed to disclose that to date or to make any attempt to obtain the needed license from Rembrandt-Holding.

82) The assets SeeCubic is hoping to take are actually highly compromised in SeeCubic's hands because SeeCubic lacks the license from Rembrandt-Holding.  To my knowledge, SeeCubic is not actually making anything yet, but it appears that SeeCubic is attempting to transfer source code and servers that include Rembrandt-Holding technology.

83) Clearly, one does not need a license to do nothing (assuming that they are not copying any of technology from Stream's servers).  If SeeCubic does not take possession of anything that includes a Rembrandt-Holding technology, Rembrandt-Holding is not

affected by the Omnibus Agreement.

84) Rembrandt-Holding is not a party to the Omnibus Agreement and the Chancery court does not have subject matter jurisdiction to evaluate patent infringement, copyright infringement or other matters that are exclusively the jurisdiction of federal courts.  It seems likely that the Chancery court had no knowledge of Rembrandt-Holding's rights in the technology when issuing the preliminary injunction, but even if the Chancery court did know of Rembrandt-Holding's rights, it had no authority to transfer Rembrandt-Holding's technology to SeeCubic.

85) Put simply, SeeCubic has either misappropriated or is about to misappropriate Rembrandt-Holding's rights and if SeeCubic ever successfully made, used, sold, offered for sale, imported or exported a TV covered by a Rembrandt-Holding patent, it will be sued for patent infringement along with any individuals that knowingly committed such acts of misappropriation and/or infringement.

86) Certainly Dr. Barenbrug and Mr. Stastney are both well aware of the Rembrandt-Holding rights and I expect that other individuals will have knowledge of the misappropriation that will be discovered after further investigation.

87) I have no idea what Mr. Stastney could possibly argue to avoid a willful infringement claim, given that while CFO for Stream he felt the Rembrandt-Holding claim was worth millions, but now in the hands of SeeCubic using the exact same technology he somehow believes SeeCubic does not require a license.

88) Either Mr. Stastney knowingly committed Stream to millions of dollars of payments for worthless claims by Rembrandt-Holding or he is flagrantly intending to infringe the rights he reasonably valued on April 9, 2019 now that he is managing SeeCubic.

89) SeeCubic is not entitled to an assignment of the settlement and license between

Rembrandt-Holding and Stream because there is an express prohibition of such an assignment.  In fact, Stream's counsel wrote in a change of control provision to the April 9, 2019 term sheet that accelerates all cash payments if Stream goes through a change of controlling ownership (except in the event of an IPO).

90) If SeeCubic believes that it acquired all rights to Rembrandt-Holding technology under the settlement agreement, it needed to cut Rembrandt-Holding a check for $5,840,000 immediately.  SeeCubic has not paid or offered to pay Rembrandt-Holding any money.

91) Mr. Stastney agreed that the list of IP rights was valid and appropriate to include in the April 9, 2019 term sheet that was prepared by DLA Piper attorneys and modifications were written in DLA Piper attorney's hand writing.  The document was initialed by all parties and by Magistrate Parker.

92) Assuming that Mr. Stastney is not taking a different position today than he did before all of us in the room on April 9, 2019, including Magistrate Parker, SeeCubic should not object to removing all functionality covered by the Rembrandt-Holding technology since he is unwilling to have SeeCubic take a license.

93) The bankruptcy court does not need to reevaluate the merits of the Omnibus Agreement, for the current Stream bankruptcy, it merely needs to make sure that Stream does not transfer access to any of the Rembrandt-Holding technology that Stream did not have the right to transfer to SeeCubic.

94) If SeeCubic found keys in the Stream offices with a large "Hertz" tag on the key chain and found that the keys worked for a car in a nearby parking lot, it would be completely unreasonable to conclude that the Omnibus Agreement somehow gave SeeCubic title to a car belonging to Hertz.

95) Similarly, the Rembrandt-Holding technology is not an asset of Stream and it
certainly cannot be transferred to SeeCubic.

96) While it would be easiest to leave all software and technology with Stream, it would
be possible to have someone remove all of the Rembrandt-Holding know-how and
trade secrets from the software to be transferred from Stream to SeeCubic.

97) As long as the software and technology transferred removed all functionality that
included the enumerated intellectual property rights, SeeCubic could take possession
of the remaining technology and property of Stream under the Omnibus Agreement.

98) The rights of Rembrandt-Holding can be protected in the current bankruptcy to
prevent further misappropriation of Rembrandt-Holding technology by preventing
Stream from breaching its settlement agreement by allowing SeeCubic to gain access
to the technology of Rembrandt-Holding.

99) Stream was capable of working with vendors to build an excellent TV in the past and
even if 100% of all assets of Stream are transferred to SeeCubic, the team of people at
Stream are likely capable of working with the same or similar vendors to build a high
quality 3D TV.  While Ultra-D is nice, Rembrandt-Holding owns the technology that
was developed many years before Ultra-D.  Rembrandt-Delaware is a world leader in
glasses free 3D displays and has never used Ultra-D in its products.

100)    By working with Rembrandt-Holding's technology, Stream is a viable business
entity even without any of the assets SeeCubic purports to now own, whereas,
SeeCubic is not a viable business without a license to Rembrandt-Holding's
technology.

101)    Any reasonable and informed valuation of Stream (after executing the
settlement agreement (Exhibit 6) with Rembrandt-Holding) is far in excess of all

claims of secured and unsecured creditors and this determination importantly flows

from the information provided to me directly by Shad Stastney while he was CFO of

Stream and the April 9, 2019 term sheet he negotiated (Exhibit 2).

102)    The best way to protect all parties is to proceed with the bankruptcy process to

ensure that an optimal result is achieved for all the secured and unsecured creditors.

Pursuant to 28 U.S.C. section 1746, I declare under penalty of perjury of the laws of the

United States of America that the foregoing is true and correct.

*/s/ Christopher Michaels*

Dated: ***June 8, 2021***    _____

Christopher Michaels
Patent attorney for Rembrandt 3D Holding Ltd.

Exhibit List (To Be Filed Separately):

Exhibit 1    First Amended Complaint and exhibits
Exhibit 2    April 9, 2019 Term Sheet initialed by Shad Stastney
Exhibit 3    Mr. Michaels email to Stream's bankruptcy counsel on April 20, 2021
Exhibit 4    Mr. Michaels email to the counsel for creditors of Stream on April 20, 2021
Exhibit 5    Mr. Michaels email to the counsel for SeeCubic on April 20, 2021
Exhibit 6    Settlement agreement between Stream and Rembrandt-Holding on May 23, 2021
Exhibit 7    Philips license to 3D Fusion.