## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| STREAM TV NETWORKS, INC.[1] | : | Chapter 11 |
| | : | Bankr. No. 23-10763 (MDC) |
| Debtor | : | |
| | : | Chapter 11 |
| TECHNOVATIVE MEDIA, INC. | : | Bankr. No. 23-10764 (MDC) |
| | : | |
| Debtor | : | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR
## VISUAL SEMICONDUCTOR, INC.'S CHAPTER 11 PLAN OF REORGANIZATION OF STREAM TV NETWORKS, INC. AND  TECHNOVATIVE MEDIA, INC.

---

**THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE PLAN SPONSOR RESERVES THE RIGHT TO AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT, IN ACCORDANCE WITH THE RESTRUCTURING SUPPORT AGREEMENT, PRIOR AND UP TO THE DISCLOSURE STATEMENT HEARING.**

---

**THE DEADLINE TO VOTE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M., PREVAILING EASTERN TIME, ON FEBRUARY 24, 2025, UNLESS EXTENDED.**

**THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS JANUARY 27, 2025 (THE "VOTING RECORD DATE").**

---

[1] The Debtors, together with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015).  The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

78171590;8

**THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAWS.**

**BENEFICIAL HOLDERS THAT HOLD THEIR CLAIMS THROUGH VOTING NOMINEES MUST RETURN SUCH BENEFICIAL HOLDER BALLOTS TO THEIR RESPECTIVE VOTING NOMINEES AS SOON AS POSSIBLE TO ALLOW SUFFICIENT TIME FOR VOTING NOMINEES TO VALIDATE AND INCLUDE THEIR VOTES ON A MASTER BALLOT AND RETURN SUCH MASTER BALLOTS TO THE VOTING AND CLAIMS AGENT ON OR BEFORE THE VOTING DEADLINE.**

**FOR YOUR VOTE TO BE COUNTED, THE MASTER BALLOT SUBMITTED ON YOUR BEHALF MUST BE ACTUALLY RECEIVED BY THE VOTING AND CLAIMS AGENT ON OR BEFORE THE VOTING DEADLINE.**

**IF YOU HOLD YOUR CLAIMS DIRECTLY, YOU MUST RETURN YOUR COMPLETED BALLOT TO THE VOTING AND CLAIMS AGENT ON OR BEFORE THE VOTING DEADLINE.**

**THE PLAN SPONSOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING ALL ATTACHED EXHIBITS AND DOCUMENTS INCORPORATED INTO THIS DISCLOSURE STATEMENT, AS WELL AS THE RISK FACTORS DESCRIBED IN ARTICLE XIII OF THIS DISCLOSURE STATEMENT.**

**UPON CONFIRMATION OF THE PLAN, THE NEW SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR APPLICABLE STATE SECURITIES LAWS IN RELIANCE ON THE EXEMPTIONS FROM REGISTRATION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(a)(2) OF THE SECURITIES ACT AND/OR REGULATION D PROMULGATED THEREUNDER, AND/OR ANY OTHER AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT.**

**THE NEW SECURITIES TO BE ISSUED PURSUANT TO THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES AUTHORITY OR ANY OTHER PUBLIC, REGULATORY AUTHORITY. NEITHER THE SEC NOR**

78171590;8

**ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE ISSUANCE OF THE NEW SECURITIES PURSUANT TO THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. NEITHER THIS SOLICITATION NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.**

**THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS." SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. THE PLAN SPONSOR CONSIDERS ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.**

**THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE PRESENTED IN SUCH FORWARD-LOOKING STATEMENTS, INCLUDING, BUT NOT LIMITED TO, RISKS AND UNCERTAINTIES RELATING TO:**

- any future effects as a result of the pendency of the Chapter 11 Cases;

- the Debtors' liquidity and financial outlook;

- the effects of and changes in economic conditions (such as volatility in the financial markets, inflation, increasing interest rates, monetary conditions and foreign currency fluctuations, tariffs, foreign currency controls, and/or government- mandated pricing controls, as well as in trade, monetary, fiscal, and tax policies in international markets), political conditions (such as military actions and terrorist activities), and natural disasters;

- disruptions to the supply chain;

- the ability to execute the Debtors' business plan (the "Business Plan") or to achieve the upside opportunities contained therein;

- reductions in the Debtors' revenue from market pressures, increased competition, or otherwise;

- the Debtors' ability to attract, motivate, and/or retain employees necessary to operate competitively in the Debtors' industry;

3

- the Debtors' ability to maintain successful relationships with key customers;

- unexpected significant impacts on the Company (as defined below) from changes in interest rates or foreign exchange rates;

- difficulties, delays, or the inability of the Company to efficiently manage its cash and working capital;

- the Debtors' ability to effectively manage costs;

- the Debtors' ability to drive and manage growth;

- changing consumer tastes;

- industry conditions, including existing competition and future competition;

- the impact of general economic and political conditions in the United States or in specific markets in which the Debtors currently do business;

- the Debtors' ability to generate revenues from new sources;

- the impact of regulatory rules or proceedings that may affect the Debtors' businesses from time to time;

- disruptions or security breaches of the Debtors' information technology infrastructure;

- unanticipated adverse effects on the Company's business, prospects, results of operations, financial condition, and/or cash flows as a result of unexpected developments with respect to the Company's legal proceedings, including alleged litigation claims that might not be discharged by the Plan;

- the Debtors' ability to generate sufficient cash flows to service or refinance debt and other obligations post-emergence;

- the implementation of the Restructuring Transactions; and

- the Company's success at managing the foregoing risks.

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE PLAN SPONSOR UNDERTAKES NO OBLIGATION TO UPDATE THE PROJECTIONS OR VALUATIONS MADE HEREIN, EXCEPT AS MAY BE REQUIRED BY APPLICABLE LAW. THE ANALYSIS, PROJECTIONS,**

**AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO (COLLECTIVELY, THE "FORWARD-LOOKING FINANCIAL INFORMATION") ARE ESTIMATES ONLY, AND THE VALUE OF THE PROPERTY DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY FORWARD-LOOKING FINANCIAL INFORMATION MAY OR MAY NOT TURN OUT TO BE ACCURATE. FURTHERMORE, THE FORWARD-LOOKING FINANCIAL INFORMATION IS BASED ON VARIOUS ASSUMPTIONS WHICH ARE DESCRIBED IN MORE DETAIL THEREIN, AND TO THE EXTENT THAT ACTUAL FACTS AND CIRCUMSTANCES DIFFER FROM SUCH ASSUMPTIONS, ACTUAL RESULTS COULD DIFFER IN MATERIAL RESPECTS FROM THOSE SET FORTH THEREIN. FOR MORE INFORMATION REGARDING THE FACTORS THAT MAY CAUSE ACTUAL RESULTS TO DIFFER FROM THOSE PRESENTED IN THE FORWARD-LOOKING STATEMENTS, PLEASE REFER TO ARTICLE XIII – CERTAIN RISK FACTORS OF THIS DISCLOSURE STATEMENT TO BE CONSIDERED. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.**

**THE PLAN SPONSOR AND THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY NEW SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.**

**NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE PLAN SPONSOR AND THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN OR A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE OR THAT MAY BE FILED LATER WITH THE PLAN SUPPLEMENT. ALTHOUGH THE PLAN SPONSOR BELIEVES THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO**

78171590;8

**NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES. EXCEPT AS OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT. THE PLAN SPONSOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.**

**FURTHERMORE, READERS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE FORWARD-LOOKING FINANCIAL INFORMATION. SUCH INFORMATION CONSTITUTES "FORWARD-LOOKING STATEMENTS," WHICH ARE SUBJECT TO THE RISKS AND UNCERTAINTIES AND CAUTIONARY STATEMENTS SET FORTH IN AND REFERENCED IN THE DISCUSSION OF FORWARD-LOOKING STATEMENTS ABOVE. SUCH FORWARD-LOOKING FINANCIAL INFORMATION HAS BEEN PREPARED BASED ON VARIOUS ASSUMPTIONS, WHICH ARE DESCRIBED IN MORE DETAIL THEREIN, AND TO THE EXTENT THAT ACTUAL FACTS AND CIRCUMSTANCES DIFFER FROM SUCH ASSUMPTIONS, ACTUAL RESULTS COULD DIFFER IN MATERIAL RESPECTS FROM THOSE SET FORTH THEREIN. THE PLAN SPONSOR UNDERTAKES NO DUTY TO UPDATE SUCH FORWARD-LOOKING FINANCIAL INFORMATION UNLESS REQUIRED TO BY APPLICABLE LAW.**

**NONE OF THIS DISCLOSURE STATEMENT, THE PLAN, THE CONFIRMATION ORDER, OR THE PLAN SUPPLEMENT WAIVES ANY RIGHTS OF THE PLAN SPONSOR OR DEBTORS WITH RESPECT TO THE HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE. RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO POTENTIAL CONTESTED MATTERS, POTENTIAL ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.**

**NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS OR IS NOT IDENTIFIED IN THIS DISCLOSURE STATEMENT. EXCEPT AS PROVIDED UNDER THE PLAN, THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND CAUSES OF ACTION AND MAY OBJECT TO CLAIMS AFTER CONFIRMATION OR THE EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS ON THE TERMS SPECIFIED IN THE PLAN.**

78171590;8

**UNLESS OTHERWISE EXPRESSLY NOTED, THE PLAN SPONSOR AND DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE PETITION DATE WHERE FEASIBLE. ALTHOUGH THE PLAN SPONSOR OR DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE PLAN SPONSOR OR DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, EXCEPT AS MAY BE REQUIRED BY APPLICABLE LAW. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS SENT. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE PLAN SPONSOR RESERVES THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, BUT HAVE NO DUTY OR OBLIGATION TO DO SO.**

**THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE COMPANY AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO.**

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.**

**THE EFFECTIVENESS OF THE PLAN IS SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR, IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO BECOME EFFECTIVE WILL BE SATISFIED (OR WAIVED).**

78171590;8

**ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN AND ALL SUMMARIES OF SUCH EXHIBITS IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE EXHIBITS.**

**ONLY HOLDERS OF ADMINISTRATIVE CLAIMS AND GENERAL UNSECURED CLAIMS (CLASS III) ARE ENTITLED TO VOTE ON THE PLAN AND ARE BEING SOLICITED TO VOTE UNDER THIS DISCLOSURE STATEMENT.**

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| I. | | **INTRODUCTION** | 12 |
| | A. | **Overview** | 12 |
| | B. | **Who is Entitled to Vote** | 17 |
| | C. | **Estimated Recoveries under the Plan** | 18 |
| II. | | **OVERVIEW OF THE COMPANY'S OPERATIONS** | 22 |
| | A. | **Overview** | 22 |
| | B. | **Stream's History** | 22 |
| | C. | **Stream's Operations** | 23 |
| | D. | **Corporate Structure** | 25 |
| III. | | **PRE-PETITION CAPITAL STRUCTURE** | 27 |
| | A. | **Conversion Agreements** | 27 |
| IV. | | **PREPETITION ORGANIZATIONAL CHART OF DEBTORS** | 31 |
| V. | | **KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES** | 31 |
| | A. | **Stream Incurs Secured Debt From Lenders** | 31 |
| | B. | **Seizure of Stream's Assets** | 32 |
| | C. | **Litigation and Settlement with Rembrandt** | 34 |
| VI. | | **EVENTS DURING CHAPTER 11 CASES** | 35 |
| | A. | **Commencement of the Chapter 11 Cases** | 35 |
| | B. | **Fundraising** | 36 |
| | C. | **Operational Pleadings** | 38 |
| | E. | **Section 341 Meeting and Schedules and Statements** | 41 |
| | F. | **Appointment of Committee** | 42 |
| | G. | **Certain Post-petition Efforts to Stabilize and Improve Operations** | 42 |

78171590;8

**VII.    PLAN SETTLEMENT** ........................................................................................42

    **A.    Evaluation of the Plan Settlement under Section 1123 and Rule 9019** ....43

**VIII.    SUMMARY OF CHAPTER 11 PLAN** .................................................................44

    **A.    Administrative Claims, Priority Claims, and Statutory Fees** ...................44

    **B.    Classification of Claims and Interests** ........................................................48

    **C.    Means for Implementation of the Plan** .......................................................53

    **D.    Provisions Governing Distributions** ...........................................................66

    **E.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims** ...........................................................................................................72

    **F.    Settlement, Release, Injunction, and Relation Provisions** ........................75

    **G.    Conditions Precedent to Consummation of the Plan** .................................82

    **H.    Modification, Revocation, or Withdrawal of the Plan** ..............................83

    **I.    Retention of Jurisdiction** .............................................................................84

    **J.    Miscellaneous Provisions** .............................................................................87

**IX.    VALUATION OF THE DEBTORS** ...................................................................91

**X.    TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS** .............................................................................................91

    **A.    Bankruptcy Code Exemptions from Securities Act Registration Requirements** ................................................................................................92

    **B.    Private Placement Exemption from Securities Act Registration Requirements** ................................................................................................94

**XI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ....................................................................................................................96

    **A.    Certain U.S. Federal Income Tax Considerations for the U.S. Debtors and the Reorganized Holdings** ....................................................................98

    **B.    Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Certain Allowed Claims** .........................................................................103

    **C.    U.S. Federal Income Tax Consequences of Ownership and Disposition of Senior Secured Notes and Unsecured Notes** ...........................................107

    **D.    Certain U.S. Federal Income Tax Consequences to Certain Non-U.S.**

78171590;8

Holders of Allowed Claims.........................................................................109

E.      Information Reporting and Back-Up Withholding .................................112

XII.    CERTAIN RISK FACTORS TO BE CONSIDERED...........................................112

A.      Certain Restructuring Law Considerations ...............................................112

B.      Risks Relating to the Debtors' and Reorganized Debtors' Businesses...116

C.      Additional Factors ......................................................................................118

D.      Voting Instructions and Release Opt-Out or Opt-In Elections ..............119

E.      Voting Record Date ....................................................................................120

F.      Voting Deadline...........................................................................................120

G.      Ballots Not Counted ...................................................................................120

XIII.   CONFIRMATION OF PLAN ..................................................................................120

A.      Confirmation Hearing ................................................................................120

B.      Objections to Confirmation .......................................................................120

C.      Requirements for Confirmation of Plan ...................................................122

XIV.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN.........................................................................................................................125

A.      Alternative Plan of Reorganization...........................................................125

B.      Sale under Section 363 of the Bankruptcy Code......................................125

C.      Liquidation under Chapter 7 or Applicable Non-Bankruptcy Law ......126

XV.     CONCLUSION AND RECOMMENDATION .......................................................127

78171590;8

## I.    <u>INTRODUCTION</u>

### A.    <u>Overview</u>

You have received this document and the accompanying materials (collectively the "***Disclosure Statement***") because you may be a Holder of a Claim or Interest whose rights may be affected by *Visual Semiconductor Inc.'s Plan of Reorganization of StreamTV Networks Inc. and Technovative Media, Inc. Pursuant to Chapter 11 of the Bankruptcy Code*, dated December 3, 2024, as the same may be amended from time to time (the "***Plan***") of StreamTV Networks Inc. ("***Stream***") and Technovative Media, Inc. ("***Technovative***"), as debtors and debtors in possession in the above-captioned cases (collectively, the "***Debtors***" and together with their non- debtor affiliates, the "***Company***"). The Plan is attached hereto as **<u>Exhibit A</u>**.[2]

The purpose of this Disclosure Statement is to provide Holders of Claims or Interests, who are entitled to vote on the Plan, with adequate information regarding the (i) Debtors' history, businesses, and these Chapter 11 Cases, (ii) Plan, (iii) Plan settlements, (iv) rights of interested parties pursuant to the Plan, and (v) other information necessary to enable Holders entitled to vote on the Plan to make an informed judgment as to whether to vote to accept or reject, and how to make elections with respect to the Plan.

Since the filing of the Chapter 11 Cases, the Debtors and their advisors, the Debtors' key stakeholders, and various financing sources have engaged regarding various possible restructuring alternatives to effectuate a value-maximizing restructuring transaction and create a sustainable capital structure to position the Debtors for long-term success.

The Debtors' chapter 11 filings sought to neutralize a takeover scheme by a group of shareholders, some of whom held or hold convertible secured debt (the "***Voided Takeover Attempt***"). The takeover scheme consisted of a private foreclosure[3] which the Delaware Supreme Court held was invalid because it was not authorized under Stream's corporate charter as required by long standing Delaware corporate law. Despite a clear directive by the Delaware Supreme Court to unwind any transactions that were part of the takeover scheme, the case on remand languished for over nine months without even the basic return of assets.

The invalidated takeover scheme was executed through an unauthorized settlement agreement that moved all the assets of Stream into a "NewCo" named SeeCubic, Inc. a Delaware corporation, and left all liabilities at Stream with no ability to repay its unsecured[4] creditors. The takeover scheme also discriminated against certain Stream shareholders.

---

[2] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

[3] The private foreclosure was enshrined in a settlement agreement reached between certain Stream board members and certain secured creditors entitled the "Omnibus Agreement."

[4] At various times, the secured creditors, particularly SLS, have made arguments that even under the Omnibus Agreement, which transferred all assets of the Debtors to a new shell company called SeeCubic, Inc. that liabilities remained owed by Stream to SLS. Notably, during the 18 months that the Omnibus Agreement was in effect before being invalidated by the Delaware Supreme Court, SLS did not withdraw its foreclosure action against Stream in Delaware Superior Court (C.A. No. N20C-03-225 MMJ CCLD).

Delaware law does not permit discrimination in treatment within classes of creditors or shareholders in settlement agreements.

The Debtors' businesses has been negatively impacted by the cloud of litigation initiated and prolonged by purported secured creditors and the resulting attendant delays in their compliance with the Delaware Supreme Court mandate to return assets to the Debtors and cease using the assets of the Debtors.

Recently, the Debtors have generated renewed customer confidence which has resulted in two significant purchase orders with Visual Semiconductor, Inc. ("**VSI**") in the amounts of $12,600,000 and $126,000,000.

Regarding VSI's $12,600,000 purchase order, VSI has an underlying purchase commitment from Cystar International Limited ("**Cystar**") for 10,000 units of 65" 4K-resolution digital signage displays for the commercial advertising market. Cystar is located in Taiwan and – through its affiliate Marvel Digital (www.marveldigital.com) – was a prior customer of Stream until the relationship soured when the Omnibus Agreement deprived Stream of its Ultra-D technology. VSI has solicited the renewed interest of Cystar in the Stream technology and developed a collaborative business relationship with Cystar that can benefit Stream in several ways: (1) Cystar has issued a purchase order to VSI, of which 90% will be paid to Stream through the related VSI - Stream purchase order; (2) Cystar has a high volume of pending product orders to fill and, consequently, has offered to provide rent-free manufacturing space and labor to operate Stream's Bonding Equipment; (3) Cystar has offered to pay a per-unit fee to Stream for the use of the Bonding Equipment for non-Ultra-D products; and (4) Cystar has offered to provide manufacturing financing for Ultra-D products, easing initial cash flow requirements for Stream.

With respect to VSI's $126,000,000 purchase order, VSI has an underlying purchase commitment from Southern Telecom Inc. ("**STI**") for 100,000 units of 65" 8K-resolution televisions for the consumer electronics market. STI is a conglomerate that has acquired and licensed top brands like Brookstone, Polaroid, and Packard Bell that specialize in the sale of unique, high-technology consumer products (www.southerntelecom.com). The company is very enthusiastic about being the first to bring Stream's Ultra-D technology to the consumer market in North America. Headquartered in Brooklyn, New York, STI also maintains a strategic office in Bentonville, Arkansas, which it uses to maintain its relationship with Walmart's sales and marketing divisions. STI has issued a $140,000,000 purchase order to VSI, of which 90% will be paid to Stream through the related VSI-Stream purchase order.

The Debtors' chapter 11 filings have also facilitated and encouraged multiple financing sources to provide resources to the Debtors to finance the bankruptcy cases and to finance exit facilities and go- forward funding. Financing sources emerged which committed funding to pay off first lien debt,[5] funding for production, and to fund a recovery for unsecured creditors and

---

[5] The Debtors' discussions with Hawk Investment Holdings, Ltd. ("**Hawk**") a Stream shareholder with secured notes subject to conversion to equity, both on behalf of itself and certain other litigation parties, including but not limited to SLS Holdings VI, LLC ("**SLS**"), SeeCubic, Inc. ("SeeCubic"), Shadron L. Stastney ("**Stastney**"), and Arthur Leonard Robert "Bob" Morton ("**Morton**" collectively with SLS, SeeCubic, and Stastney, the "**Hawk Parties**") sought to find a pathway to a global settlement

key executory contract holders essential to production and fulfilling pending purchase orders. Discussions with these financiers and stakeholders essential to go forward operations were ultimately successful.

The Debtors have also resolved a dispute with Rembrandt 3D Holdings Ltd. ("***Rembrandt***") regarding the Debtors' technology with respect to allegations of intellectual property violations committed by the Hawk Parties at a time when they (the Hawk Parties) were in control of the Debtors' assets and which violations continue to the present day. Rembrandt filed a claim against Hawk and SeeCubic in the United States District Court for the District of Delaware[6] for violation of its intellectual property rights. Stream was previously a defendant in litigation brought by Rembrandt in the Southern District of New York. *See Rembrandt 3D Holding Ltd. v. Stream TV Networks, Inc. et al.* (17-CV-881 RA SDNY)..  The litigation was resolved through a Settlement Agreement and Mutual Release, dated May 23, 2021 (the "***Rembrandt Agreement***"), which included a license of Rembrandt's intellectual property to Stream.  Ultimately, the ensuing negotiations reduced the claims in the bankruptcy by over $1 billion.

After extensive negotiations, on July 13, 2023, the Debtors, Visual Semiconductor Inc., Cystar Limited, Southern Telecom, and Rembrandt,  agreed to the terms of the restructuring set forth in the originally filed plan of organization [Docket No. 293] to support the financing of the Debtors' bankruptcy, the plan restructuring, the completion of purchase orders totaling $138,600,000 and plan sponsorship to assist in payment of claims and exit financing (the "***Original Plan***").

The Debtors were unable to promote the Original Plan or pursue its confirmation because the Court's attention and the Debtors' resources were consumed with ongoing motions practice and several months of hearings (no less than twelve separate hearing dates from August to December 2023) related to (i) the Hawk Parties' attempt to have the Bankruptcy Cases dismissed or assigned to a chapter 11 trustee, and (ii) the Debtors' motion for a temporary restraining order against the Hawk Parties after they seized control of the Debtors' overseas subsidiaries which held valuable personnel and intellectual property. Shortly after the TRO was issued by the Court in January 2024, the Trustee was appointed to oversee the Debtors, and he has made no effort to promote the Original Plan or explore its feasibility.

Since the filing of the Original Plan, there have been substantial developments in the status of these Chapter 11 Cases. On January 12, 2024, the Bankruptcy Court entered an order

---

with the Hawk Parties but were not successful.  The refusal and failure of the Hawk Parties to reach a settlement with the Debtors eliminated certain sources of financing for the Debtor which had indicated that they were amenable to negotiating and financing some form of settlement with Hawk for payment from ongoing revenue. SLS is the Debtors' first lien creditor whose secured debt was subject to conversion to equity (the Debtors reserve all rights to contest the SLS claims, including amendments to its loan documents which allegedly eliminated the right to convert SLS).  Hawk is the second lien creditor whose debt is subject to conversion to equity upon Stream raising $39 million per binding conversion agreements signed between Hawk and Stream. Mr. Stastney is a former director and officer (CFO) of Stream who managed SLS and manages SeeCubic.  SeeCubic is the entity created by the Hawk Parties

[6] *Rembrandt 3D Holding Ltd v Technovative Media, Inc., Hawk Investment Holdings Ltd. and SeeCubic, Inc.* (23-CV-00193 UNA U.S. District Court District of DE)

appointing the Chapter 11 Trustee [Docket No. 558], which appointment was accepted by the Trustee as of the same day [Docket No. 562].

On May 30, 2024, the Trustee filed a Motion for Turnover of Property and Entry of an Order Enforcing the Automatic Stay [Docket No. 647] ("**Motion for Turnover**").

On June 6, 2024, the Court entered an order approving the Trustee's Settlement (the "**9019 Agreement**") with the Hawk Parties, which included, amongst others, the following deal terms: (i) Hawk received a $180 million secured claim, $150 million of which can be credit bid in a sale of the Debtors' assets; (ii) a $7,500,000 carve out to pay administrative and general unsecured creditors; (iii) the Trustee will make SeeCubic a stalking horse in the sale of the Debtors' assets; (iv) qualified bids in that sales process must include a minimum $120 million cash component; and (v) if a bid is accepted over the stalking horse bid only 10% of that overbid goes to administrative or unsecured creditors until Hawk's $180 million claim is paid in full. Notably, the 9019 Agreement all but guarantees that unsecured creditors and perhaps even administrative expenses receive only a pittance.

On June 16, 2024, Akerman LLP filed an Objection to the Motion for Turnover [Docket No. 672] ("**Objection to Turnover**") and a Motion to Reconsider the order granting the 9019 Agreement [Docket No. 686] ("**Motion to  Reconsider**"). VSI filed the Motion to Reconsider for multiple reasons, but specifically because it did not contain a fiduciary out and VSI strongly believed it (or another party) could provide a much better offer. On July 26, 2024, VSI filed and served a Notice of Deposition Duces Tecum on the Trustee concerning the issues raised in the Objection to Turnover and Motion to Reconsider ("**Original Discovery Requests**").

In furtherance of the sale actions discussed in the 9019 Agreement, on August 14, 2024, the Trustee filed an Application to Employ SSG Advisors, LLC ("**SSG**") as the investment banker to market the Debtors' assets on behalf of the Trustee for the benefit of the Debtors' estates [Docket No. 715] ("**SSG Application**"). Subsequently, on August 21, 2024, in light of SSG's prior employment by the Hawk Parties in furtherance of contemptuous conduct, VSI filed a Limited Objection to the SSG Application [Docket No. 717].

Throughout the summer of 2024, VSI attempted to engage with the Trustee regarding the Debtors' chapter 11 cases, culminating in the Court's August 30, 2024 order that the Trustee must discuss the $115 million cash offer sent by VSI on August 12, 2024 [Docket No. 726].

On September 4, 2024, VSI filed the *Motion to Compel and Objection to Trustee's (A) Motion for Entry of Orders: (I) Granting Expedited Consideration, Shortened Time and Limited Notice; (II) Quashing Subpoena; (III) Entering a Protective Order; and (IV) Granting Related Relief; and (B) Trustee's Motion for Entry of an Order; and (B) Motion for Entry of Orders: (I) Granting Expedited Consideration, Shortened Time and Limited Notice; and (II) for Authority to Withdraw the Trustee's Motion for Entry of an Order Enforcing the Automatic Stay and Compelling Turnover of Estate Property Without Prejudice* [Docket No. 728] (the "**Motion to Compel**").

On September 30, 2024, the Trustee filed the *Expedited Motion to Approve (I) the Proposed Bidding Procedures for Soliciting Bids for the Debtors' Assets, (II) the Form of Asset*

*Purchase Agreement, (III) Establishing Notice Procedures, (IV) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (V) Scheduling a Hearing to Approve the Sale, (VI) Granting Expedited Consideration, and (VII) Granting Related Relief* [Docket No. 750] (the "***Bidding Procedures Motion***").

In response to the Bidding Procedures Motion, VSI and Rembrandt filed objections [Docket Nos. 788, 799, respectively]. A hearing was held on November 13, 2024, to consider the Bidding Procedures Motion. Following the hearing, the Court ordered the Trustee to submit revised bidding procedures, which were to include more detailed schedules, amongst other things. The revised bidding procedures were submitted November 19, 2024 at Docket No. 809 (the "***Revised Bidding Procedures***").

On November 14, 2024, the Court entered an order (i) denying the Motion to Reconsider with respect to VSI's discovery requests; (ii) granting the Trustee's motion to quash VSI's discovery requests; and (iii) denying the Motion to Compel with respect to the discovery requests [Docket No. 805].

On November 20, 2024, the Court entered an order approving the Revised Bidding Procedures [Docket No. 811].

Now, the Plan Sponsor has proposed the Plan as an alternative to the Trustee's anticipated Plan of Liquidation expected to be proposed by the Trustee in furtherance of the 9019 Settlement, and subsequent sale of the Debtors' assets under Section 363 of the US Bankruptcy Code.

The Plan Sponsor believes that the restructuring reflected in the Plan is the best available option for the Debtors' stakeholders, Estates, and go-forward businesses. The Plan will position the Company for success in the very competitive new media industry and to finally realize the incredible potential of its groundbreaking technology which has been hampered for more than four years by litigation and a now voided and illegitimate attempt to take over the company, the business, and its key intellectual property. The Plan results in appropriate leverage and liquidity to enable the Company to execute on its Business Plan and capture new market opportunities on a go-forward basis. The financial and operational restructuring provided for in the Plan affords the Company a "fresh start" and provides a foundation for the long-term health of its business.

The Plan Sponsor enjoys the support of Canam Private Equity Inc. ("***CAPE***").[7]  CAPE has committed to invest directly or through one or more of its affiliates up to the total principal amount of $300 million upon confirmation of the Plan.

---

[7] CAPE has a combined experience of over 50 years in business finance, investment banking, growth and ownership, consulting and senior management advisory in a variety of industries, including biomedical health services, real estate, construction, renewable energy, oil and gas, bio fuels, tech and bio tech, among others. With an original partnership stemming back to 2012, Canam started as a firm in Delaware, US from two partners with investment banking, private equity and banking backgrounds. Since then, the firm has evolved into an increasingly international company with far reaches beyond the North American borders, with primary headquarters in Edmonton, Alberta, Canada. Since inception, CAPE has raised more than $6 billion worldwide for individuals and

78171590;8

On the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transactions and shall take any actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including to establish Reorganized Holdings and, if applicable, to transfer assets of the Debtors to Reorganized Holdings or a subsidiary thereof. The applicable Debtors or the Reorganized Debtors will take any actions as may be necessary or advisable to effect a corporate restructuring of the overall corporate structure of the Debtors, in the Description of Transaction Steps, or in the Definitive Documents, including the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, in each case, subject to the consent of the Plan Sponsor and, solely to the extent required under the Restructuring Agreements.

The Plan Sponsor strongly believes that the Plan is in the best interests of the Debtors' Estates, represents the Debtors' best available alternative, and provides for a value-maximizing transaction.

**B.    Who is Entitled to Vote**

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on the plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of bankruptcy events) and reinstates the maturity of such claim or interest as it existed before the default.

The creditor groups entitled to vote on the Plan whose acceptances of the Plan are being solicited are General Unsecured Claims (Class III).

**THE PLAN PROVIDES THAT THE FOLLOWING HOLDERS OF CLAIMS AND INTERESTS WILL GRANT THE RELEASES IN THE PLAN:**

- All Holders of Claims that are deemed Unimpaired are presumed to accept the Plan and do not elect to opt-out of the Third-Party Releases;

- all Holders of Claims entitled to vote on the Plan that vote to accept the Plan;

- all Holders of Claims entitled to vote on the Plan that abstain from voting on the Plan and do not elect on their Ballot to opt-out of the Third-Party Releases;

---

companies seeking financing or transactional advisory services.

78171590;8

- all Holders of Claims entitled to vote on the Plan who vote to reject the Plan but do not elect on their Ballot to opt-out of the Third-Party Releases;

- all other Holders of Claims and Interests that are deemed to reject the Plan and do not elect to opt-out of the Third-Party Releases; and

- all Holders of Interests that elect to opt-in to the Third-Party Releases contained in the Plan.

Third-Party Releases are justified in light of the facts and circumstances of these Chapter 11 Cases. Excluded Parties are not granted the Third-Party Releases. "Excluded Parties" consist of, collectively, all Entities that are liable for damages related to the Voided Takeover Attempt[8], other than the Debtors and any current or former officer, director, authorized agent, or employee of the Debtors not involved or implicated in the Voided Takeover Attempt. For the avoidance of doubt, any former officer, director, shareholder, lawyer, investment banker, consultant, or other agent involved in the Voided Takeover Attempt that may be liable for damages to the Debtors and its non-debtor Affiliates are Excluded Parties.

## C.    Estimated Recoveries under the Plan

The table below summarizes: (i) the treatment of Claims and Interests under the Plan; (ii) which Classes are Impaired by the Plan; (iii) which Classes are entitled to vote on the Plan; and (iv) the estimated recoveries for Holders of Claims and Interests. The table is qualified in its entirety by reference to the full text of the Plan. A more detailed summary of the terms and provisions of the Plan is provided in Article VIII of this Disclosure Statement.

**FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE PLAN.**

| Class No. | Type of Claim | Treatment | Estimated Amount of Allowed Claims | Impairment/ Voting |
|---|---|---|---|---|
| | Administrative Claims | On the later of the Effective Date, the date such Administrative Claim is Allowed, or the date such Allowed Administrative Claim becomes due and payable in the ordinary course, or as soon as | ~$4 million – $7 million | |

---

[8] Through a series of deceptive actions spanning the course of several months, Stream creditors, Hawk and SLS, took control of Stream's assets and created a separate company, SeeCubic, Inc., to receive those assets. Stream filed for a preliminary injunction on September 8, 2020, and after nearly two years of protracted litigation, Stream obtained a Delaware Supreme Court reversal and was granted a Partial Final Judgment on August 10, 2022, ordering SeeCubic, Inc. to restore Stream's assets. Despite the order, SeeCubic, Inc. continued to exercise control over Stream's assets until obtaining a status quo order from the Court, allowing SeeCubic, Inc. to retain possession of the assets pending adjudication of the litigation. Predictably, SeeCubic, Inc. has abused its authority over the assets and used them at its disposal with no license to do so.

| | | | | |
|---|---|---|---|---|
| | | reasonably practicable thereafter, except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted  agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim, other than an Allowed Professional Compensation Claim, shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, payment in full in cash. | | |
| I | Secured Or Partially Secured Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Secured or Partially Secured Claim and the Debtor against which such Allowed Secured or Partially Secured Claim is asserted, agree to less favorable treatment for such Holder, each Holder of an Allowed Secured or Partially Secured Claim shall receive, at the option of the Debtor against which such Allowed Secured or Partially Secured Claim is asserted (with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Plan Sponsor), in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, either:<br><br>i.  payment in full of its Secured Claim, in an amount equal to the Allowed Secured Claim, with any under-secured Claim treated as a Class III General Unsecured Claim; or | $0-$152 million | Unimpaired; Not Entitled to Vote |

78171590;8

| | | | | |
|---|---|---|---|---|
| | | ii.     such other treatment rendering such Allowed Secured or Partially Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | | |
| **II** | Priority Claims | Except to the extent that a Holder of an Allowed Priority Claim and the Debtor against which such Allowed Priority Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Priority Claim shall receive, at the option of the Debtor against which such Allowed Priority Claim is asserted (with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Plan Sponsor), in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, either:<br><br>i.     payment in full on the Effective Date; or<br><br>ii.     such other treatment rendering such Allowed Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | ~$1 million | Unimpaired; Presumed to Accept |
| **III** | General Unsecured Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Unsecured Claim and the Debtor against which such Allowed Unsecured Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Unsecured Claim shall receive, at the option of the Debtor against which such General Unsecured | ~$20 million | Impaired; Entitled to Vote |

| | | | | |
|---|---|---|---|---|
| | | Claim is asserted (with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Plan Sponsor), in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, either:<br><br>i. its *pro rata* share of $18,000,000 allocated to all General Unsecured Claims; or<br><br>ii. such other treatment rendering such Allowed General Unsecured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | | |
| IV | Subordinated Unsecured Claims | Holders of Subordinated Unsecured Claims shall receive no recovery or distribution on account of such Subordinated Unsecured Claim. On the Effective Date, all Subordinated Unsecured Claims and the corresponding underlying instruments evidencing such Claims or interest shall be canceled, released, extinguished, and discharged, and of no further force or effect. | ~$30 million | Impaired; Presumed to Reject |
| V | Equity Security Claims | Holders of Equity Security Claims shall receive no recovery or distribution on account of such Equity Security Claim. On the Effective Date, all Equity Security Claims and the corresponding underlying securities evidencing such Claims or interest shall be canceled, released, extinguished, and discharged, and will be of no further force or effect. | N/A | Impaired; Entitled to Vote |

21

II.    **OVERVIEW OF THE COMPANY'S OPERATIONS**

A.    **Overview**

Stream is a new media company founded in 2009 with a mission to advance the evolution of display technology from a flat 2D world to an immersive world of 3D where viewers need not wear special glasses or goggles. Technovative, a wholly-owned subsidiary of Stream, is a holding company that owns directly or indirectly all the remaining entities in the Stream global group.

B.    **Stream's History**

Between 2009 and 2020, Stream raised approximately $160 million through equity investments, unsecured convertible debt and direct loans. Through its global engineering teams, Stream developed breakthrough glasses-free 3D display technology launched under the trade name Ultra-D™ ("*Ultra-D*"). Ultra-D is a proprietary combination of hardware and software that creates a natural, comfortable and immersive glasses-free 3D viewing experience. Resulting from years of research and development in the field of 3D optics, multi-view rendering and content development solutions, Ultra-D solves the two biggest limitations of the market's current 3D technology: the need to wear special glasses and the scarcity of 3D content.

Stream made its first public showing of Ultra-D demonstration samples in January 2012 at the Consumer Electronics Shows in Las Vegas, NV, USA. Based on initial interest in the fledgling technology, Stream continued to use investor capital to further develop its technology by supporting enhanced image resolution, increasing the size of the displays, improving multi-view optics, improving real-time conversion of content from 2D/3D to the Ultra-D glasses-free 3D format, creating content creation software tools, and moving core algorithms from software to hardware, thus reducing production cost and making the technology compatible with most devices in the industry.

During this period, Stream also perfected its mass production optical bonding process—the precise gluing of proprietary 3D lenses to standard 2D video panels with sub-pixel accuracy—which major competitors such as Philips and Dolby Laboratories had not been able to achieve. Stream commissioned the manufacture of specialized optical bonding equipment to meet its unique requirements, a Small Production Line ("*SPL*") and a Mass Production Line (the "*MPL*", and together with the SPL, the "*Bonding Equipment*"). Both machines were installed at the facility of contract manufacturer Pegatron in Suzhou, China for bonding of 55" and 65" 3D panels. The MPL, with its greater automation, achieved milestone efficiency with a 96% yield rate during production of 4,000 units of 65" glasses-free 3D advertising displays. The Bonding Equipment is an asset of Stream.

Stream grew to over 100 employees and consultants worldwide and focused its efforts on readying its technology for implementation into the devices of major industry brands selling TVs, tablets, laptops, and mobile phones. The Company added product engineering teams in Silicon Valley, USA, Dusseldorf, Germany and Beijing, China while simultaneously putting significant effort into business development and customer acquisition.

Concurrent with its engineering development activities, Stream engaged in a global business development effort to introduce Ultra-D to commercial and consumer brands interested in integrating the new technology into their various products. Stream solidified a strategic business relationship with BOE Technology Group Co., Ltd. ("**BOE**"), the world's largest manufacturer of video display panels. The companies entered into a joint marketing agreement in August 2018 and, in November 2018, held a joint press conference in Beijing where BOE expressed its intention to include Stream's technology on their entire series of product lines going forward. Over the course of 2018 and 2019, BOE introduced Stream to several of its significant customers.

In September 2019, Stream was engaged by Google to develop prototypes for its yet-to-be-announced Project Starline. Negotiations began in early 2020 for an initial order of 10,000 units, with the $20 million order being subject to satisfactory delivery and testing of Stream's prototypes. In March 2020, Stream secured a $3 million contract with Robert Bosch GmbH ("**Bosch**") for co-development of an Ultra-D instrument cluster for the automotive market. Subsequent negotiations began with Lenovo Group Limited ("**Lenovo**") for development of an 8K-resolution consumer gaming laptop and with both Skyworth Group Co., Ltd. ("**Skyworth**") and Chunghwa Telecom ("**Chunghwa**") for 8K-resolution consumer televisions. By August 2020, Stream had sold all the 65" glasses-free 3D advertising displays that had been manufactured in its initial production runs. Its major customers included Marvel Digital Limited ("**Marvel**"), IQH3D, LLC ("**IQH3D**"), and BBack, Inc. ("**BBack**").

Despite delays and legal hardships, discussed below, Stream has maintained interest from top brands in many global markets and seeks reorganization through chapter 11 to consummate deals with the customers it has spent years courting. Lenovo, Skyworth, and Chunghwa remain interested in developing products that integrate the Ultra-D technology. IQH3D and BBack have issued letters of intent to purchase additional Ultra-D products when available. Marvel, through its affiliate Cystar, has issued a purchase order.

## C.    <u>Stream's Operations</u>

Stream intends to generate revenue by providing 3D components to final market assemblers (such as TV manufacturers and tablet makers). Stream views its approach as similar to the way in which major computer manufacturers use processors in their products and note their products as such.

Stream intends to generate revenue by producing and selling two primary 3D components for integration by device makers into their final products: (1) a bonded optical stack consisting of a 2D video panel and a 3D lens, and (2) a computer chip with 3D rendering algorithms. All Ultra-D devices require both a 3D optical stack and a 3D rendering chip. Stream's 3D optical stack design and production processes are now well established, and countless demonstrator samples have been shown to customers. Stream's 4K resolution 3D rendering is also well established, as it was incorporated into thousands of units produced from 2015-2017. Stream is now offering 4K 65-inch components to a variety of commercial and consumer customers, following up on relationships developed over many years.

23

1.    <u>Customer Contracts and Development</u>

Stream has secured two significant post-petition purchase orders totaling $138,600,000 in gross revenues. Order #1, dated March 20, 2023, is a purchase commitment for 10,000 4K-resolution 65-inch units at a unit cost of $1,260 for a total of $12,600,000. Order #2, dated April 11, 2023, is a purchase commitment for 100,000 8K-resolution 65-inch units at a unit cost of $1,260 for a total of $126,000,000. Both orders were reconfirmed by the Plan Sponsor prior to the filing of the Plan.

Both orders are from Visual Semiconductor, Inc. ("***VSI***" or "***Plan Sponsor***"), a company founded by Mathu Rajan and funded by dozens of investors who remain committed to bringing the Ultra-D technology to a global market. VSI and Stream entered into a distribution agreement – subject to court approval and considered an essential part of Stream's reorganization plan – whereby VSI accepts orders from and makes delivery to third-party customers. VSI issues "back-to-back" purchase orders to Stream for 90% of the value of those third-party orders, retaining a 10% margin for providing supply chain financing as well as funding technical, business, and sales development.

Stream has already engaged VSI in this distribution capacity. Order #1 described above represents 90% of a third-party order totaling $14,000,000 secured by VSI from Cystar International Ltd. ("***Cystar***"). Based in Taiwan, Cystar is a Taiwan affiliate of Marvel Digital Limited, Stream's biggest customer to date. Cystar was formed to capitalize on the expanding glasses-free 3D market and has issued its purchase order to VSI to take advantage of supply chain financing available from VSI that Stream cannot presently provide.

Order #2 described above represents 90% of a third-party order totaling $140,000,000 secured by VSI from Southern Telecom ("***STI***"). Owner of various consumer electronics brands – Polaroid, Packard Bell, Brookstone, Audio Republic, Art+Sound, and many others – STI intends to increase consumer awareness and enthusiasm for its brands by being the first to launch Ultra-D televisions in North America. Even though there is considerable engineering work to be completed for a high-resolution television product, STI made its purchase commitment to guarantee a primary position as the glasses-free source for early adopters. STI will also benefit from the supply chain financing provided by VSI.

In addition to securing the purchase orders described above, Stream has continued its business development with significant customers and strategic partners. In the consumer device market, Stream has maintained the interest of Lenovo in developing Ultra-D enabled laptop computers. Ranked as the 4th largest laptop brand in the world, with annual revenue of $62 billion, Lenovo makes a great launch partner in the personal computing space. In late 2019, Stream created a technology demonstrator sample at Lenovo's request, using Lenovo's state-of-the-art motherboard. The demonstrator was evaluated internally by Lenovo executives and shown publicly at an electronics trade show. Since regaining control of its Ultra-D technology in late 2022, Stream re-engaged with Lenovo, which remains committed to adding a glasses-

free 3D laptop to its product line and is prepared to engage in product negotiations once Stream has available engineers it can dedicate to the Lenovo project.

Stream has also developed and maintained its business relationship with Skyworth over the course of many years. Ranked as the 7th largest television brand in the world, with annual revenue of $7.6 billion, Skyworth is expected to be both a brand customer and a strategic partner. Skyworth has specifically expressed its interest in developing 8K-resolution Ultra-D televisions in both 65-inch and 75-inch sizes and is prepared to kick off product development once its executives see satisfactory demonstrator samples. Additionally, Skyworth has offered services that will benefit Stream in two key areas: (i) Skyworth is willing to act as a "white label" manufacturer for other Stream customers that do not have their own in-house manufacturing, and (ii) design and manufacture key components like back light units, bezels, and mechanical chassis. Skyworth previously provided a custom back light and mechanical chassis for Stream's project with Google, so the working relationship has already been established.

Another key business relationship that Stream has developed and maintained for several years is one with communications giant, Chunghwa Telecom. The Chinese conglomerate has annual revenues in excess of $7 billion. To help Chunghwa publicize the rollout of its 5G service in 2019, Stream created special demonstration tools to showcase the potential of streaming Ultra-D content over a 5G network to a 65-inch glasses free display. The special event was attended by high-level executives, including the president of Taiwan, and confirmed interest from virtually every business sector. Since regaining control of its Ultra-D technology in late 2022, Stream re-engaged with Chunghwa, which has expressed interest in developing an 8K-resolution 65-inch Ultra-D television that it can offer as an incentive for 5G customer subscription commitments. Skyworth could make an excellent white label manufacturer to fulfill a future Chunghwa order when the product engineering is complete.

### D.    Corporate Structure

1.    The Debtors' Corporate Structure

The corporate structure of the Debtors is as follows:

i.    Akshaya Holding, LLC ("*Akshaya*") and Mathu Rajan together own approximately 19.27 million shares of Stream's Class B Voting Stock (71.5%). Akshaya, Mathu Rajan, and Raja Rajan collectively own approximately 7.54 million shares of the Class A Common Stock of Stream (8.8%), providing for an overall 37.2% voting control of Stream.

ii.    The Rajan Family together owns 100% of Akshaya. In particular, Mathu Rajan owns 40% of Akshaya's economic stock and has 100% of its voting control.

iii.    Visual Semiconductor, Inc., the Plan Sponsor, owns approximately 2.2 million shares of Stream's Class A Common Stock (2.5%) and 4.5

million shares of Stream's Class C Voting Stock (100%), providing for an overall 33.8% voting control of Stream.

iv.　Investors and/or individuals other than Akshaya and the Plan Sponsor own approximately 7.69 million shares (28.5%) of the Class B Voting Shares of Stream and the remaining 79.2 million shares of Class A Common Stock of Stream (88.7%), providing for an overall total of 29% voting rights in Stream. No other investor or individual owns 25% or more of Stream's Class A Common Stock, Class B Voting Stock, or Class C Voting Stock.

v.　Stream owns 100% of Technovative.

vi.　Technovative owns 100% of Media Holdings Delaware LLC (USA) ("***Media Holdings***").

vii.　Technovative is also a 99.9% general partner in Ultra-D Ventures C.V. (Curacao) ("***Ultra-D Ventures***"); Media Holdings is a 0.1% limited partner in Ultra-D Ventures.

viii.　Ultra-D Ventures owns 100% of Technology Holdings Delaware, LLC (USA) ("***Technology Holdings***").

ix.　Ultra-D Ventures owns 99.9% of Ultra-D Cooperatief U.A. (The Netherlands) ("***Ultra-D Cooperatief***"); Technology Holdings owns 0.1% of Ultra-D Cooperatief.

x.　Ultra-D Cooperatief owns 100% of Stream TV International B.V. (The Netherlands) ("***Stream TV International***") and 100% of SeeCubic B.V. (The Netherlands) ("***SCBV***").

xi.　Stream TV International owns 100% of Stream TV International B.V. (Taiwan-Rep Office), 100% of Stream TV 3D Technology (Suzhou) Co., Ltd. (China), and 100% of Shanghai Ruishi Technology Co., Ltd. (China).

78171590;8

**Board, Directors, and Officers**

  1.  <u>Board and Committees</u>.

  Mathu Rajan currently serves as the sole director of each of the Debtors.  As part of this restructuring process, the Debtors may expand their boards of directors and various committees.

  2.  <u>Executive Officers</u>.

  The following table sets forth the names of Stream's principal executive officers and their current positions:

| Name | Position |
|------|----------|
| Mathu Rajan | President/Chief Executive Officer |
| Thomas Park | Chief Financial Officer |

  The following table sets forth the names of Technovative's principal executive officers and their current positions:

| Name | Position |
|------|----------|
| Mathu Rajan | President/Chief Executive Officer |

## III. <u>PRE-PETITION CAPITAL STRUCTURE</u>

  The following chart summarizes Stream's outstanding secured debt obligations as of the Petition Date.

| Instrument / Facility | Approx. Principal Outstanding as of the Petition Date |
|------------------------|------------------------------------------------------|
| Intrinsyc Technologies Corporation of Canada Notes | $0 |
| SLS Insider Notes | $6,000,000 |
| Hawk notes | $0[9] |
| **Total Indebtedness** | $6,000,000 |

### A.  <u>Conversion Agreements</u>

  In early 2018, prospective investors expressed concern about the amount of Stream's debt, and it became clear to Stream's management that executing debt-to-equity conversion agreements would be in the best interest of the Company and its shareholders. To facilitate new investment and growth of the Company, and to strengthen the Stream balance sheet, the three primary holders of the Company's debt signed conversion agreements—*i.e.*, the Hawk

---

[9] The Hawk Secured notes totaling £50,600,000 British pounds, €183,601 euros, and USD $1,152,757 were converted to equity pursuant to the Hawk Conversion Agreement prior to the Petition Date.  Hawk disputes that its debt was converted.

Investment Conversion Agreement, the SLS Conversion Agreement, and the Intrinsyc Conversion Agreement—with such conversions to be made at Stream's sole discretion.

### 1.    Intrinsyc Technologies Corporation of Canada

During the early stages of productizing its Ultra-D solution, the Debtor engaged the engineering services of Intrinsyc Technologies Corporation of Canada ("***Intrinsyc***"). The companies worked closely together on multiple projects spanning several years at a cost of several million dollars. In October 2014, Intrinsyc made a loan in the amount of $1.5 million to Stream in exchange for Stream's commitment to place purchase orders with Intrinsyc for guaranteed future work. From 2015 to 2018, the maturity date of the debt was extended multiple times in exchange for Stream warrants. In May 2018, knowing that similar conversion agreements were being negotiated with SLS and Hawk, Intrinsyc executed a conversion agreement (the "***Intrinsyc Conversion Agreement***").

In May 2018, Intrinsyc honored its Conversion Agreement and accepted equity in Stream. The accrued value of the debt was $1,661,384 at the time of conversion. It was converted on May 2, 2018, to 415,346 common shares of Stream stock.

### 2.    SLS Insider Notes

Stream's senior secured creditor is SLS Holdings VI, LLC ("***SLS***"). Between 2011 and 2012, SLS loaned $6 million to the Debtor through a series of notes (the "***SLS Insider Notes***"). Stream pledged substantially all of its assets, including its 100% stock ownership in Technovative, as security for the SLS Insider Notes. Stream executed a security agreement in connection with the SLS Insider Notes.

In 2018, Stream entered into an agreement with SLS which provided that the SLS Insider Notes would convert into equity if and when Stream raised additional equity capital (the "***SLS Conversion Agreement***"). Per the SLS Conversion Agreement, conversion of debt to equity was at the discretion of Stream.  SLS' equity pursuant to the SLS Conversion Agreement were as follows:

- Pledgor Stream TV Networks, Inc.; Issuer TechnoVative Media, Inc.; Common Stock; Certificate No(s). 01; No. of Shares Pledged or Percentage of Equity Pledged:  1000; Percentage of Issuer's Securities Pledged: 100%

- Pledgor TechnoVative Media, Inc.; Issuer Media Holdings Delaware, LLC; Membership Interest; Percentage of Issuer's Membership Interest Pledged: 100%

- Pledgor Ultra-D Ventures, C.V.; Issuer Technology Holdings Delaware, LLC; Membership Interest; Percentage of Issuer's Membership Interest Pledged: 100%

- Pledgor TechnoVative Media, Inc.; Issuer Ultra-D Ventures, C.V.; Percentage of Issuer's Partnership Interest Pledged: 65% of the interests held by Pledgor

- Pledgor Ultra-D Ventures, C.V.; Issuer Ultra-D Cooperative, U.A; Percentage of Issuer's Cooperative Interests Pledged: 65%

- Pledgor Ultra-D Cooperatief, U.A.; Issuer Stream TV International, B.V. (formerly TechnoVative Ventures, B.V.); Percentage of Issuer's Securities Pledged: 65%

- Pledgor Ultra-D Cooperatief, U.A.; Issuer SeeCubic B.V.; Percentage of Issuer's Securities Pledged: 65%

Pursuant to the SLS Agreement:

"the principal amount and accrued interest thereon of all of the SLS Notes shall be converted and extinguished ("Extinguishment") into securities of the company ("New Shares"), on a "first in first out" basis, according to the chronological dates of such SLS Notes, pro rata with the Extinguishment and Conversion of all Hawk Notes (as defined in the Hawk Conversion Agreement). The principal amount and accrued interest of all of the SLS Notes totals $ 8,565,180.25 through February 1, 2019, and such amount will continue to accrue under the terms of the relevant SLS Notes until extinguished in full (such value at any time, the "Total Accrued Value"). The conversion into New Shares shall be at a price per share equal to the price per share of the concurrent pro-rated Hawk Conversion and on the same terms for the price per share, cumulative dividend rate, drag rights, conversion rights and any other economic rights as the same class of stock, and otherwise on the same terms as the concurrent pro-rated Hawk Conversion."

3.    **Hawk Notes**

Stream's junior secured creditor is Hawk Investment Holdings Limited ("**Hawk**"). Between 2014 and 2020, Hawk loaned more than £50 million pounds to Stream, plus another €183,601 euros and $1,152,757 U.S. dollars, through a series of junior secured notes (the "**Hawk Notes**"). Subject to the security interest held by SLS, Stream pledged substantially all of its assets as security for the Hawk Notes. Stream executed a security agreement in connection with the Hawk Notes.

In 2018, Stream entered into an agreement with Hawk which provided that the Hawk Notes would convert into equity if and when Stream raised additional equity capital (the "***Hawk Conversion Agreement***"). Per the Hawk Conversion Agreement, conversion of debt to equity is at the discretion of Stream. Stream has served conversion notifications to Hawk on multiple occasions. Hawk has admitted that its Conversion Agreement is still active, its debt is convertible, and that the new capital raised by Stream required to trigger conversion is equal to the amount of the Actual Cash Received by Stream. Despite agreement between the parties on all these points, Hawk has failed to acknowledge the validity of Stream's conversion notices.

78171590;8

Hawk signed two conversion agreements: the first on May 2, 2018 with an effective date of January 29, 2018 and an amendment on April 17, 2019. The language of the Conversion Agreements is consistent.  The Hawk Conversion Agreement states:

"Hawk agrees to the extinguishment of each of the Hawk Notes by conversion on a 'first in first out' basis, according to the chronological dates set forth in the above table, of all principal and interest then outstanding (each an "Extinguishment") (including all the prepaid interest, arrangement fees and accrued interest to the date of conversion ("Interest and Fees") (such principal, Interest and Fees together the "Total Value in GBP (£)") under each such Note into shares of the Company's stock ("Conversion") as stated herein. The Conversion into equity shall be at a price per share equal to the price per share of the relevant fundraising and on the same terms for the price per share, cumulative dividend rate, drag rights, conversion rights and any other economic rights as the same class of stock ("New Money Stock"), but junior and subordinate to such New Money Stock, on the terms set by the new money, issued to new investors under such fundraising ("New Money"), including the value of all and any bonus warrants issued to new investors, deducting any commissions or other related costs agreed by Hawk and payable to third party fundraisers. Notwithstanding anything to the contrary in any document, when there is a legal closing or closings of New Money equal to the ACR (£) amounts, cleared, certified and evidenced by the Company to Hawk, at the time of each Extinguishment and/or Conversion, each Total Value in GBP (£) reference relating to the specific Hawk Note or Notes will be converted to USD ($) by the closing USD/GBP exchange rate published by the Wall Street Journal five (5) business days before legal closing. The Company's charter shall specify the rights and preferences of all Company stock, provided that it specifies that the stock issued to Hawk in connection with each Extinguishment and/or Conversion is equivalent, from an economic perspective, to the terms and conditions set forth in the term sheet provided by the Company to Hawk relating to the Company's preferred stock to be issued to new investors. Hawk shall acknowledge in writing in advance that it has verified the economic equivalency of the New Money Stock to the Hawk Extinguishment and/or Conversion, after which Hawk shall not contest such economic equivalency."

The Conversion Agreements for Hawk required $39,000,000 to be raised by Stream.

The allegation as to whether the SLS and Hawk Notes were converted to equity is an allegation that appears to have been resolved by the 9019 Agreement, although that is currently the subject of the *Motion to Reconsider and/or Clarify Order Approving Settlement Agreement Between Chapter 11 Trustee and Hawk Investment Holdings, Ltd.* [Docket No. 686] (the "***Motion for Reconsideration***") and an appeal filed by Rembrandt.  A hearing on the Motion for Reconsideration was held on November 7, 2024.  The Plan will resolve this issue with finality if the affected Holder votes in favor of the Plan.  Otherwise, the Claims of such Holders will be subject to investigation, reconsideration, recharacterization, subordination, reduction, and/or disallowance.

30

## IV.    PREPETITION ORGANIZATIONAL CHART OF DEBTORS



## V.    KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

### A.    Stream Incurs Secured Debt From Lenders

As discussed above, Stream accepted investment in the form of secured debt from SLS and Hawk. In early 2018, prospective investors expressed concern about the amount of Stream's shareholder debt, and the Debtors determined that executing debt-to-equity conversion agreements would be in the best interest of the company and all its shareholders. To facilitate new investment and growth of the company, the three primary holders of the company's debt (Hawk, SLS and Intrinsyc) signed Conversion Agreements, with such conversions to be made at Stream's discretion. More than 100 investors subsequently invested in Stream with those Conversion Agreements factored into their investment decisions.

In late 2018, Shadron L. Stastney ("*Stastney*"), the principal of SLS, was appointed Vice Chairman of the Board of Directors of Stream and Chief Financial Officer, with the mutual understanding that Stastney would help Stream raise additional capital, prepare the company for strategic investment from institutional partners, and prepare the company for a potential public offering or acquisition.

The Debtors alleged that Stastney colluded with Arthur Leonard Robert Morton ("*Morton*") and others to destroy Stream from the inside, to cause default events on their debt instruments, and thereafter to use those manufactured default events as a pretext for the coconspirators to sign over all assets of Stream to a shell company, SeeCubic, Inc. ("*SeeCubic*"), controlled by the conspirators, for zero dollars, through an Omnibus Agreement.

In early 2020, Stastney resigned as Vice Chairman of the Board and Chief Financial Officer, and on March 1, 2020, Stastney informed Stream's employees, investors, strategic partners and others that SLS would be issuing a Notice of Default to Stream and would then immediately take possession of Stream's assets. This sparked a flurry of activity among Stream's investors, and upon Morton's suggestion, Stream expanded its Board of Directors to satisfy shareholder demand for greater managerial input. Directorships were offered to Frank Hodgson, Asaf Gola ("**Gola**"), Kevin Gollop ("**Gollop**"), and Krzystof Kabacinski ("**Kabacinski**"). Unbeknownst to Stream, the latter three were acting as agents for the benefit of SLS and Hawk who had promised them lavish compensation within a future investment vehicle – now known as SeeCubic.

## B.     Seizure of Stream's Assets

After issuing a Notice of Default to Stream, SLS filed a complaint on March 23, 2020, in the Superior Court of the State of Delaware ("**Superior Court**") against Stream and its subsidiaries (Technovative, Technology Holdings, and Media Holdings). The complaint sought, among other things, the transfer of collateral subject to SLS's loan agreements. Despite SLS's request for expedited relief and an injunction, the Superior Court did not order the immediate transfer of Stream's assets to SLS. Rather, the Superior Court set a trial date for June 7, 2021, 14 months later. Faced with this delay in seizing control of Stream's assets, Stastney explored other ways to take possession of Stream's valuable technology and its customers.

As part of his scheme, Stastney colluded with Morton and certain other Stream shareholders to commence a hostile takeover. In a May 2020 meeting of Stream's Board of Directors, Gola, Gollop and Kabacinski proposed and passed a resolution establishing a debt-resolution committee that consisted solely of Gola and Gollop. Two days later, this newly formed committee signed a lengthy debt resolution (the "**Omnibus Agreement**") purporting to commit Stream to a global settlement of pending litigation whereby all its assets would be transferred to a "Newco" established and controlled by SLS and Hawk. This Newco was SeeCubic.

By its terms, the Omnibus Agreement transferred all of Stream's assets to SeeCubic in lieu of SLS and Hawk foreclosing on Stream's loans.  In this way, the Defendants thwarted the rights of Stream's Class A and Class B shareholders entitled to vote on this transaction under the company's Charter, and illegally claimed ownership of all of Stream's assets.

Stream immediately challenged the validity of the Omnibus Agreement, and within days of the attempted hostile takeover, Stream formally removed Gola, Gollop, and Kabacinski from its board of directors. Despite the disputed validity of the Omnibus Agreement, SeeCubic began seizing control of Stream's assets almost immediately.

Challenging the legality of these actions, Stream filed a motion for preliminary injunction in the Chancery Court on September 8, 2020.  SeeCubic responded by filing a petition to block Stream from using its own technology, name, and even directing its own employees. On December 8, 2020, the Chancery Court sided with SeeCubic, allowing it to

continue to seize Stream's assets without accepting any of Stream's liabilities. That preliminary decision was formalized by a Partial Final Judgment on November 10, 2021. Stream appealed to the Delaware Supreme Court, which reversed the Chancery Court's decision on June 15, 2022 and held that the Omnibus Agreement was void *ab initio*. The high court decision made it clear that Stream is now and was always the lawful owner of its own assets and intellectual property. The hostile takeover scheme had been declared unlawful. On the same day this ruling was issued, Stream filed suit for the return of the assets.

In response, SeeCubic delayed its return of the assets and threatened to sell the assets by enforcing creditor rights held by SLS. After months of protracted litigation, the Chancery Court issued a temporary restraining order (TRO) on August 9, 2022, mandating that SeeCubic restore the assets to Stream. The next day, on August 10, 2022, the Chancery Court issued a new Partial Final Judgment ordering the return of Stream's assets to Stream.

With their Omnibus Agreement scheme now dead and the SLS foreclosure action in Superior Court on indefinite hold, Stastney and Morton came up with a new gambit. Knowing that all of Stream's assets were held in its primary subsidiary, Technovative, SeeCubic returned the shares of stock to Stream as mandated by the Chancery Court, then had Hawk take control minutes later via carefully coordinated legal and corporate documents. The Chancery Court saw this maneuver for what it was, a clear attempt to circumvent the Court's order, and found SeeCubic, Hawk, and Stastney to be in contempt.

On October 17, 2022, Hawk issued notice to Stream that it was exercising its proxy right to vote the shares of Technovative. Pursuant to that right, Hawk notified Stream that it had appointed Stastney as sole director of Technovative so that it could conduct a sale of Stream's assets under Article 9 of the Uniform Commercial Code. Stream disputed Hawk's right to appoint a new director to Technovative, claiming that it had converted Hawk's debt to equity as permitted under the Hawk Conversion Agreement.

Hawk filed in Chancery Court, seeking an Order pursuant to 8 Del. C. § 225 ("***Section 225***") confirming that Hawk's purported removal of Mathu Rajan and appointment of Stastney constituted a validly elected board of directors of Technovative. With control of Technovative, Morton and Stastney would control Ultra-D. In response, the Chancery Court issued a Status Quo Order on October 20, 2022, in which SeeCubic was allowed to retain possession of the Debtor's assets pending adjudication of the Section 225 action by Hawk. Further, the Court appointed Ian Liston of the firm Wilson, Sonsini, Goodrich & Rosati P.C. as *receiver pendente lite* (the "***Receiver***") to oversee the operations of Technovative.

Shortly after the Petition Date, the Receiver turned over all books and records of Technovative in its possession to the Debtors' estate and relinquished his duties over the Debtors' foreign subsidiaries. On May 17, 2023, the Receiver filed *Receiver's Motion, Pursuant to 11 §§ U.S.C. 105(a) and 543(b) and Bankruptcy Rule 6002, for Entry of an Order (A) Approving the Receiver's Final Report, (B) Granting Post-Petition Discharge of the Receiver and the Receiver Professionals, (C) Finding that the Receiver Complied with 11 U.S.C. § 543, (D) Approving and Directing Payment of the Prepetition Fees and Expenses of*

*the Receiver and the Receiver Professionals, and (E) Granting Related Relief.* [Docket No. 201] seeking approval of a final report and discharge from any further obligations.

Stream has suffered significant damage by being deprived of its assets by the Hawk Parties. This harm, and the inability of the remand process to effectuate the clear Delaware Supreme Court mandate to return assets in both title and possession to the Debtors has necessitated Stream and its primary subsidiary, Technovative, to seek Chapter 11 relief.

### C.    Litigation and Settlement with Rembrandt

On January 6, 2017, Rembrandt 3D Holding Ltd. ("***Rembrandt***"), a Nevis corporation, filed suit against Stream in the Supreme Court of New York, New York County, later removing the case to the Southern District of New York (*Rembrandt 3D Holding Ltd v. Stream Networks, Inc. et al.* (17-CV-882 RA SDNY). In that litigation, Rembrandt alleged that some of its intellectual property had been incorporated into the Debtors' Ultra-D technology. Certain Stream engineers had once worked with Rembrandt's executive officer, and Rembrandt alleged that those engineers developed Stream's technology on ideas first conceived while at Rembrandt, which was known as 3D Fusion at the time.

On April 9, 2019, Stream agreed to the principal terms of a settlement with Rembrandt through mediation held in the judge's chambers, with Stastney representing Stream as its Chief Financial Officer and Vice Chairman of the Board of Directors. Stastney signed the term sheet, which (i) acknowledged Rembrandt's claim that at least some of Rembrandt's intellectual property was incorporated in the Debtors' Ultra-D solution, (ii) granted a license for Stream to use Rembrandt's IP as part of Stream's product offerings, and (iii) offered Rembrandt compensation in the form of money, future Ultra-D products at cost, and preferred distribution terms. As representative of Stream in the negotiation, and as the individual who signed the settlement term sheet, Stastney was intimately aware of Rembrandt's intellectual property claim and the necessity to have a license.

Due to financial hardships faced by Stream in late 2019 and early 2020 as described above, it was unable to honor the cash payment terms of the April 2019 settlement. On April 20, 2020, Rembrandt sought to enforce the settlement, which had been memorialized only as a term sheet with handwritten notes and additions made in the judge's chambers. Rembrandt's motion to enforce was stayed when Stream filed for chapter 11 reorganization with the United States Bankruptcy Court for the District of Delaware on February 24, 2021. The proposed reorganization included planned cooperation between Stream and Rembrandt, and the parties developed good communication and restored a good-faith relationship while Stream's bankruptcy was being challenged by SeeCubic, Stastney, and Hawk. On May 23, 2021, less than a week after the Bankruptcy Court dismissed Stream's petition, the Debtor resolved its remaining issues with Rembrandt and Mathu Rajan signed a long-form settlement agreement with terms nearly identical to the term sheet that Stastney had signed on behalf of Stream in 2019. Rembrandt remained aligned with the Debtor during Debtor's appeal to the Delaware Supreme Court and during the months immediately following, with the expectation that Stream would be granted possession of the assets it had lost because of the improvident Chancery Court ruling.

With the return of Stream's assets delayed month after month, Rembrandt sought to intervene in the Chancery Court but was denied.

Rembrandt was forced to sit on the sidelines as Hawk attempted to seize control of Technovative through its Section 225 action in October 2022. Rembrandt watched as Stastney's new company, SeeCubic, brazenly used Rembrandt's technology without license or payment (Stastney refused to engage Rembrandt in even a courtesy discussion, though Stastney had been personally involved in acknowledging Rembrandt IP being incorporated into Ultra-D). When Hawk announced an intended UCC-9 sale of the Debtors' assets in complete disregard for Rembrandt's IP, the situation reached a breaking point.

On February 21, 2023, Rembrandt filed suit in the U.S. District Court for the District of Delaware against parties using the Ultra-D technology without a Rembrandt license. It sued Technovative, which was under the direction of the Chancery Court-appointed Receiver, Hawk, and SeeCubic for trade secret violations and injunctive relief to prevent the sale of Stream's assets (*Rembrandt 3D Holding Ltd v Technovative Media, Inc., Hawk Investment Holdings Ltd. and SeeCubic, Inc.*) (C.A. No. 1:23-cv-00193-GBW).

Rembrandt disputes that anyone has the right to transfer the Debtors' assets, as all Stream demonstrators, products and even the core Ultra-D technology itself contains Rembrandt IP. The only entity authorized by Rembrandt to use the Ultra-D technology or sell Ultra-D enabled products is Stream.

## VI.   EVENTS DURING CHAPTER 11 CASES

The Debtors have been, and intend to continue, operating their businesses during the Chapter 11 Cases, subject to the supervision of the Bankruptcy Court and the U.S. Trustee. Since the filing, litigation has been stayed causing old investors to return and new investors to join. Upon commencing the Chapter 11 cases, the Debtors have been fundraising and have filed various motions and pleadings with the Bankruptcy Court in order to begin the process of rebuilding the company's production capabilities, recover misappropriated assets, and fund its subsidiaries.

### A.   Commencement of the Chapter 11 Cases

The Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on March 15, 2023, i.e., the Petition Date. The filing of the petitions commenced the Chapter 11 Cases, at which time the Debtors were afforded the benefits, and became subject to the limitations of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to

operate their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.    Fundraising

Following the Petition Date, the Debtors approached William Wang, representative of Beijing ToJoy Shared International Consulting Co. Ltd. ("***ToJoy***") which had executed a $50 million strategic cooperation agreement with Stream in March 2020. That planned investment was derailed by the Omnibus Agreement and subsequent enforcement attempts by Stream's secured creditors in mid-2020. In reconnecting with Mr. Wang during the pendency of the bankruptcy, the Debtors learned that he no longer represented ToJoy but remained highly enthusiastic about Stream's Ultra-D technology. Mr. Wang had become associated with Chinese conglomerate Zhongsheng Group Holdings Ltd. ("***ZGH***"), and he began renewed due diligence on behalf of ZGH. Seeing the opportunity to sponsor the Debtors' Plan and shepherd the Debtors through and out of bankruptcy, ZGH executed a term sheet on June 6, 2023 for a contemplated $300 million investment. A motion to approve the sale of equity – initially in Stream and subsequently in the reorganized Stream – was filed with the Bankruptcy Court on June 23, 2023 and remains pending.

In parallel, the Debtors contacted two of Stream's significant shareholders about investor prospects they knew in the United Arab Emirates. In coordination with Stream management, these Stream shareholders began an outreach to four significant potential investors that included one sovereign fund. Technology demonstrations were conducted to generate interest, particularly from one strategic investor whose holdings include at least one business that could benefit greatly from the integration of Stream's technology. With the appointment of the Trustee, investment discussions in the UAE are now on hold.

In addition to exploring equity investment, which would not burden the Debtors' estates with more debt, Stream also pursued traditional DIP finance options. Thomas Park, Stream's interim Chief Financial Officer, contacted ten capital funds that he was familiar with from past bankruptcy cases, including Blackrock, Blackstone, Sandton Capital Partners, Rockefeller Capital Management, Avenue Capital Group, Golden Tree Asset Management, Porter Capital Group, Covenant Venture Capital, and others. These funds were either unwilling to provide funding due to the Debtors' historical data or lack of physical assets, they wanted to wait until the Debtors emerge from bankruptcy, or they presented financial terms that were less attractive than those being offered by ZGH and VSI. Consequently, negotiations with DIP lenders and the pursuit of debt financing were terminated.

The Debtors also renewed discussions with certain entities that had previously indicated interest and ability to finance purchase orders, manufacturing, and overall expansion. Two such groups are Chinese municipalities seeking to compete with Shenzhen as the new "Silicon Valley" of China. The city of Hangzhou, with its mandate to attract high-tech industry partners, indicated that it has ample funding available and may be willing to provide tax incentives, low- or no-cost facility space, low-cost labor, and supply chain financing in exchange for

manufacturing commitments by the Debtors and some profit participation. Negotiations for manufacturing economic support are ongoing.

Stream management also made presentations to VSI shareholders in an effort to gain support for investments by VSI into Stream. Initial response was good, and VSI made several strategic prepetition investments into Stream to fund certain Stream's expenses following its successful appeal in the Delaware Supreme Court to void the Omnibus Agreement and reverse its effects. After the Petition Date, Stream initiated negotiations with VSI to provide additional debtor-in-possession financing during the bankruptcy and to sponsor the Debtors' proposed plan of reorganization which was filed in the Bankruptcy Court with a corresponding disclosure statement on July 13, 2023 (Docket No. 293).

Unfortunately, the Original Plan did not receive proper attention from the Bankruptcy Court due to ongoing motions practice by the Hawk Parties, which were seeking dismissal of the Bankruptcy Cases or appointment of a chapter 11 trustee. As detailed further below, the Debtors responded by filing an Adversary Complaint against the Hawk Parties on August 12, 2023, alleging a variety of claims including tortious interference, fraudulent conveyance, and breach of fiduciary duty.

At the same time, the Hawk Parties were also pursuing legal action in the Amsterdam Court of the Netherlands to seize control of the Debtors' Dutch subsidiaries through appointment of Stastney as sole director of SeeCubic B.V. ("**SCBV**"), the Debtors' R&D subsidiary and repository of computer source code and other key intellectual property, as well as Ultra-D Coöperatief U.A. ("**Ultra-D Coop**"), registered owner of Stream's patent portfolio.

The Hawk Parties succeeded in getting the Amsterdam Court judge to appoint Stastney as interim director of the Stream Dutch subsidiaries on September 20, 2023. Days later, on September 30, 2023, the Debtors were forced to seek injunctive relief from the Bankruptcy Court to prevent Stastney from exercising dominion and control over their estate assets overseas (Adversary Case Docket No. 29).

While the Original Plan sat on the docket, the Debtors' and their counsel were completely consumed with motions practice and preparation for concurrent cases related to the Hawk Parties' motion to dismiss the bankruptcies and the Debtors' motion seeking a temporary restraining order ("**TRO**"). Those cases played out over several months, with in-court hearings held on twelve different days from August through December 2023 to accommodate the schedules of the Court, counsel for the Debtors, and four separate law firms representing different clients in the Hawk Parties collective. With the Court's focus on these critical issues, the Original Plan remained unaddressed.

After the final TRO hearing on December 14, 2023, the Court adjourned for the holidays but returned in early January to issue its rulings. First, on January 4, 2024, the Court issued a TRO enjoining the Hawk Parties, SCBV, and those working in concert with them, from using the Debtors' technology. Then, on January 5, 2024, the Court appointed a chapter 11 Trustee to oversee the Debtors. The Trustee has made no effort to promote the Original Plan or explore its feasibility and appears to have no intention to do so, preferring to abandon the Original Plan in favor of a 363 Sale of the Debtors' assets.

### C.    Operational Pleadings

Beginning on the Petition Date, the Debtors both acted in the ordinary course and filed various motions and pleadings with the Bankruptcy Court in order to begin the process of rebuilding the company's production capabilities, reconnecting with its supply chain, reconnecting with distributors, and recovering assets which continue to be misappropriated and held hostage by the Hawk Parties and their proxies, all in an effort to facilitate the Debtors' transition into chapter 11. Sadly, the Hawk Parties continued to push forward a litigation agenda which included various stay relief requests and a challenge to the authority to file the Technovative chapter 11.

The Debtors had been stripped of all their assets pursuant to orders from the Delaware Court of Chancery that approved the Omnibus Agreement. Despite a clear mandate from the Delaware Supreme Court to void the Omnibus Agreement and vacate all prior orders of the Delaware Court of Chancery, assets have still not been returned.

After the Chancery Court entered orders approving the Omnibus Agreement, the practical effect of the ongoing disputes with the Hawk Parties was two-fold.

First, these actions created impending chaos in terms of continuity of the Debtors' businesses and a complete upheaval of years of work to establish relationships with vendors and customers, refine technology and production processes, and build distribution networks and supply chains during and after the pandemic.

Second, besides causing damage to these critical business relationships, the takeover scheme has also potentially imperiled the technology which consists of trade secrets and scientific know-how in addition to patents and copyrights.

Faced with the dismantling of Stream's operations, Stream's management created new entities to (i) raise investment, (ii) purchase alternative and complementary technologies, (iii) preserve its business relationships (sourcing, production, and distribution), (iv) preserve and protect its technologies, and (v) preserve its labor force.

Mathu Rajan formed VSI as a vehicle to raise new capital to support Stream. VSI is a semiconductor design firm. Funded by dozens of investors who remain committed to bringing the Ultra-D technology to a global market, VSI made strategic investments into Stream and engaged key Stream employees rather than lose them to competitors.

To solidify the cooperation between the companies, Stream entered into an Exclusive Distribution Agreement (the "***Distribution Agreement***") with VSI enabling VSI to accept orders from and make delivery to third-party customers. Under the agreement, VSI issues "back-to-back" purchase orders to Stream for 90% of the value of those third-party orders, retaining a 10% margin for funding technical, business, and sales development. In essence, VSI acts as a distributor for Stream to these customers. To date, VSI has obtained purchase orders from two customers for a gross sale of $154 million, of which $138.6 million will benefit Stream.

78171590;8

In addition to the financial support, VSI will assist Debtors with productization of electronics, an area in which Stream needs support.  VSI will also assist the Debtors with translating computer software and hardware code, designing chips for use in end-user products, and supporting Debtors' customers with integration of those chips into end-user products. Accordingly, Debtors requested the Court authorize Debtors to issue shares in Stream and enter into a stock purchase agreement with VSI for the sale of Stream's equity to VSI.  [Docket No. 135]. That motion is still pending but will be moot if the Plan is approved.

Despite the Automatic Stay granted to Stream under the Bankruptcy Code, Stastney, SLS, Hawk and SCI commenced a joint legal action (the "***Writ of Summons***") in the Amsterdam Court of the Netherlands to remove Mathu Rajan as director and CEO of the Stream Dutch Entities (the "***Amsterdam Action***"), the granting of which would give Stastney control over Debtors' overseas assets including all intellectual property and the Bonding Equipment.

The Debtors sought an order requiring SCI, SLS, Stastney, Hawk and Arthur Leonard Robert Morton (the "***Hawk/SLS/SCI Parties***") to withdraw their Writ of Summons from the Amsterdam Court in the Netherlands (the "***Writ***") and commencing an evidentiary hearing regarding the imposition of monetary damages.  [Docket No. 125].

Instead, despite the instruction of this court to not pursue any action that would interfere with management or control of the Debtors' subsidiaries [*See* Docket No. 123, Transcript Apr. 14, 2023 at 116:20-117:13], the Hawk/SLS/SCI Parties continued their litigation in the Netherlands, further interfering with the Debtors' ability to reorganize with its existing assets, including the Bonding Equipment necessary for the production of 3D television units and which are required to fulfill purchase orders.  On September 20, 2023, the Amsterdam Court appointed Stastney as interim director of the Stream Dutch Entities pending a U.S. Court ruling resolving the Technovative control issue. Since that time, Stastney has had operational and legal control of Stream's R&D subsidiary and its intellectual property.

While the Amsterdam Action was proceeding in the Netherlands, Stream filed an adversary complaint in Bankruptcy Court on August 12, 2023 (the "***Adversary Complaint***") (Adversary No. 23-00057-mdc) against Stastney, Hawk, SLS, SeeCubic, and others. The complaint sought injunctive relief, turnover and accounting, and damages including disallowance of creditor claims, equitable subordination, or monetary compensation for breach of contract, negligence, tortious interference, fraudulent conveyance, breach of fiduciary duty, and misappropriation of trade secrets.

On September 30, 2023, after Stastney seized control of the Stream Dutch Subsidiaries, the Debtors filed a motion seeking a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction against Stastney, Hawk, SeeCubic, Stream's R&D subsidiary ("***SCBV***") under the control of Stastney, and other parties named in the Adversary Complaint (Adv. Docket No. 29). A series of hearings were held in November and December 2023, in which testimony was proffered by multiple parties. On January 4, 2024, the Bankruptcy Court issued a Temporary Restraining Order against Stastney et al as requested. That restraining order

has been extended multiple times by the Bankruptcy Court and remains in effect until November 12, 2024 as of the date of this filing.

On January 12, 2024, the Bankruptcy Court issued an order appointing William Homony as chapter 11 trustee to oversee the Debtors in the Bankruptcy Case. (Docket No. 558).

On May 6, 2024, the Trustee executed a settlement agreement pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "*9019 Settlement*") which, among other things, (i) acknowledged the claim of Stream's secured creditors (Hawk as collateral agent for SeeCubic, to whom the SLS and Hawk claims had been transferred) in an amount of $180 million despite the fact Stream had claimed repeatedly that such debt had been converted to equity pursuant to the Hawk Conversion Agreement; (ii) defined SeeCubic as the "stalking horse" bidder entitled to use $150 million of the Hawk debt as a credit bid in a 363 Bankruptcy Sale of the Debtors' assets (the "*363 Sale*"); (iii) defined the broad parameters of how the 363 Sale bidding process would work; and (iv) resolved a variety of pending litigation, including the Adversary Complaint. On June 7, 2024, the Bankruptcy Court approved the 9019 Settlement.

On September 30, 2024, the Trustee submitted a motion to approve the bidding procedures for the proposed 363 Sale. Notably, the Debtors' estate would receive only $7.5 million if no buyer other than SeeCubic placed a bid to compete with SeeCubic, whose stalking horse bid consists of $150 million in credit forgiveness plus $7.5 million in cash. Of the cash received in this minimum bid scenario, $500,00 would go to investment banker SSG Advisors, LLC which brokered the sale, leaving the Debtors estates with only $7 million to pay administrative claims which already total several million dollars, unknown priority claims, and unsecured creditors. In this scenario, the Plan Sponsor estimates that the unsecured creditors would see a recovery of mere pennies on the dollar.

The bidding procedures proposed by the Trustee further favor the secured creditors in the event that any other buyer attempts to outbid SeeCubic. Ninety percent (90%) of any overbid goes directly to Hawk as additional satisfaction of the secured debt, and only ten percent (10%) of any overbid actually goes to the Debtors' estate, providing very little additional recovery to the unsecured creditors. For this reason, among others, the Plan Sponsor objects to the proposed 363 Sale and presents this Plan for consideration.

### 10.   Milestones for Chapter 11 Cases

The Disclosure Statement motion and the Plan includes certain milestones that relate to the occurrence of key events in the Chapter 11 Cases.  The chart below contains such milestones.

| # | Milestone | Applicable Date |
|---|---|---|
| 1. | Plan and Disclosure Statement Filed | December 3, 2024 |

| # | Milestone | Applicable Date |
|---|-----------|-----------------|
| 2. | Deadline to Object to Disclosure Statement | January 20, 2025 |
| 3. | Voting Record Date | January 27, 2025 |
| 4. | Disclosure Statement Hearing | January 27, 2025 |
| 5. | Debtors Commence Solicitation | No later than January 31, 2025 |
| 6. | Plan Voting Deadline | February 24, 2025 |
| 7. | Deadline to Object to Plan | February 24, 2025 |
| 8. | Confirmation Hearing | March 3, 2025 |

### D.      Procedural and Administrative Motions

To facilitate the smooth administration of the Chapter 11 Cases, the Debtors sought, and the Bankruptcy Court granted, the following procedural and administrative orders: *Statement of Qualification as Complex Chapter 11 Case* [Docket No. 2] and *Debtors' Application for Entry of an Order Authorizing Employment and Retention of BMC Group, Inc. as Claims Noticing Agent Nunc Pro Tunc to the Petition Date* [Docket No. 84].  The cases for Debtors are being jointly administered.

1. Retention Applications. The Debtors filed the following applications to retain certain professionals:

- Thomas Jung Ho Park as Chief Financial Officer [Docket No. 234]

- Lewis Brisbois Bisgaard & Smith LLP [Docket Nos. 70, 185]

- SSG Advisors, LLC [Docket No. 715]

2. Exclusivity Extension Motion. With the Debtors' statutory exclusive 120-day period to file a chapter 11 plan set to expire on July 13, 2023, the Debtors filed a motion requesting an order extending their exclusive right to file a chapter 11 plan by 120 days through and including November 13, 2023 and to solicit votes thereon by 120 days through and including January 9, 2024 [Docket No. 292].

### E.      Section 341 Meeting and Schedules and Statements

On March 29, 2023, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs [Docket Nos. 51, 52, 53, 54, 55, 56, 57]. The Debtors filed an

78171590;8

amended Schedule of Executory Contracts and Unexpired Leases May 4, 2023 [Docket No. 187].

On May 5, 2023, the Debtors attended a meeting of their creditors pursuant to section 341 of the Bankruptcy Code and addressed inquiries from the U.S. Trustee and certain creditors regarding, among other topics, the Debtors' operations and finances, and other issues related to these Chapter 11 Cases.

### F.      Appointment of Committee

On March 23, 2023, Andrew R. Vara, United States Trustee for Region 3, solicited for membership of an Official Committee of Unsecured Creditors pursuant to section 1102(a) of the Bankruptcy Code.  On April 12, 2023, the United States Trustee filed a notice that there was not enough interest to form a creditors' committee [Docket No. 100].

### G.      Certain Post-petition Efforts to Stabilize and Improve Operations

As discussed above, at the outset of these Chapter 11 Cases, the Debtors requested certain operational relief continue operating their businesses in the ordinary course. The Debtors negotiated a distribution agreement with VSI, which in turn engaged with Cystar to provide rent-free manufacturing facility space, labor, and additional revenue sources, and with Southern Telecom to provide product design expertise and world-class Original Equipment Manufacturing relationships. In the months since the Petition Date, the Debtors successfully reached commercial agreements with several individual suppliers to extend average trade credit from 0 days on the Petition Date, to approximately 30 days as of the date hereof. Together with other operational efforts, these agreements will assist the Debtors in re-establishing their supply chain and substantially improve their trade credit and liquidity position. Vendor negotiations remain ongoing.

As of the Petition Date, the Debtors were also parties to numerous executory contracts and unexpired leases. As part of their restructuring efforts, the Debtors, in consultation with the Plan Sponsor, will undertake a review of such executory contracts and unexpired leases for potential rejection, renegotiation, or assumption.

Finally, in connection with the process to develop and negotiate the Plan, the Plan Sponsor, in consultation with the Debtors' management, developed a long-term Business Plan that identifies several opportunities to increase revenues and/or reduce costs on a go-forward basis.

## VII.   PLAN SETTLEMENT

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith global and integrated compromise and settlement (the "*Plan Settlement*") of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that any Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of

such Allowed Claim or Interest, as well as any and all actual and potential disputes between and among the Company Entities (including, for clarity, between and among the Stream Entities, on the one hand, and the Non-Stream Entities on the other and including, with respect to each Debtor, such Debtor's Estate), and the Consenting Parties and all other disputes that might impact creditor recoveries, including any and all issues relating to (1) any and all disputes that might be raised impacting the allocation of value among the Debtors and their respective assets; and (2) any and all other Settled Claims.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlement as well as a finding by the Bankruptcy Court that the Plan Settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.

The Plan Settlement is binding upon all creditors and all other parties in interest pursuant to section 1141(a) of the Bankruptcy Code. In accordance with the provisions of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

### A.    <u>Evaluation of the Plan Settlement under Section 1123 and Rule 9019</u>

The Plan Settlement is a key element of the Plan. Under Federal Rule of Bankruptcy Procedure 9019, any settlement of claims of or against the Debtors is subject to approval by the Bankruptcy Court. Further, because the Plan Settlement is an essential element of the Plan, approval of the Plan Settlement by the Bankruptcy Court is a necessary precondition to Confirmation and Consummation of the Plan. In *TMT Trailer Ferry*, the U.S. Supreme Court outlined the standards for courts to use in evaluating proposed settlements by debtors in bankruptcy. The key function of courts in that circumstance, the Court explained, is "to compare the terms of the compromise with the likely rewards of litigation." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 425 (1968). Following the Supreme Court's decision in *TMT Trailer Ferry*, the Second Circuit outlined certain factors to be considered by courts evaluating whether to approve settlements proposed by a debtor in bankruptcy proceedings:

- The balance between the litigation's possibility of success and the settlement's future benefits;

- The likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgement;

- "[T]he paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement";

- Whether other parties in interest support the settlement;

- The "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement;

- "[T]he nature and breadth of releases to be obtained by officers and directors"; and

- "[T]he extent to which the settlement is the product of arm's length bargaining."

*In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007).

The Plan Sponsor believes the benefits of the Plan Settlement are significant. Accordingly, the Plan Settlement should be approved pursuant to section 1123 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedures Rule 9019, including for the reasons to be set forth in the Debtors' brief in connection with Confirmation of the Plan, which shall be filed on the Bankruptcy Court's docket prior to the Confirmation Hearing.

## VIII.  SUMMARY OF CHAPTER 11 PLAN

THE FOLLOWING SUMMARIZES SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.

### A.    Administrative Claims, Priority Claims, and Statutory Fees

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

#### 1.    Administrative Claims

Except with respect to Administrative Claims that are Professional Compensation Claims, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted (with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Plan Sponsor) agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim, other than an Allowed Professional Compensation Claim, shall be paid in full in Cash as full and final satisfaction, compromise, settlement, release, and discharge of such Administrative Claim on (a) the later of: (i) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (ii) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; (iii) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable or (b) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court, as applicable; provided, however, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business (or as otherwise approved by the Bankruptcy Court) in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

78171590;8

A notice setting forth the Administrative Claims Bar Date will be Filed on the Bankruptcy Court's docket and served with the notice of entry of the Confirmation Order and shall be available by downloading such notice from the website of the Debtors' claims and noticing agent at https://cases.creditorinfo.com/streamtv/documents/docket or the Bankruptcy Court's website at https://www.paeb.uscourts.gov/. No other notice of the Administrative Claims Bar Date will be provided. Except as otherwise provided in Article II.A and Article II.B of the Plan, requests for payment of Administrative Claims that accrued on or before the Effective Date (other than Professional Compensation Claims) must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. **Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors or their respective property or Estates and such Administrative Claims shall be deemed discharged as of the Effective Date. If for any reason any such Administrative Claim is incapable of being forever barred and discharged, then the Holder of such Claim shall not have recourse to any property of the Reorganized Debtors to be distributed pursuant to the Plan.** Objections to such requests for payment of an Administrative Claim, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than the Claims Objection Deadline

2.      Professional Compensation Claims

(a)      *Professional Fee Escrow Account*

As soon as reasonably practicable after the Confirmation Date, the Debtors shall (i) establish the Professional Fee Escrow and (ii) fund, but not before the Effective Date, the Professional Fee Escrow with Cash in the amount of the aggregate Professional Fee Escrow Amount. The Professional Fee Escrow shall be maintained in trust for the Professionals and for no other Entities until all Allowed Professional Compensation Claims, other than the Claims of LBBS, have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, Claims, or interests shall encumber the Professional Fee Escrow or Cash held on account of the Professional Fee Escrow in any way. Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors, subject to the release of Cash to the Reorganized Debtors from the Professional Fee Escrow in accordance with Article II.B.2 of the Plan; provided, however, that the Reorganized Debtors shall have a reversionary interest in the excess, if any, of the amount of the Professional Fee Escrow over the aggregate amount of Allowed Professional Compensation Claims of the Professionals to be paid from the Professional Fee Escrow. When such Allowed Professional Compensation Claims have been paid in full, any remaining amount in the Professional Fee Escrow shall promptly be paid to the Reorganized Debtors without any further action or Order of the Bankruptcy Court.

Allowed Professional Compensation Claims are expected to include (i) the LBBS Claim of $2,977,958.10; (ii) a Claim by BMC Group, estimated to be as much as $200,000.00; (iii) a Claim by SSG Capital Advisors, LLC, estimated to be as much as $750,000.00; and (iv) other

Claims by Obermayer Rebmann Maxwell & Hippel LLP and Coren & Ress, P.C.

> (b)  *Final Fee Applications and Payment of Professional Compensation Claims*

All final requests for payment of Professional Compensation Claims shall be Filed no later than the day that is the first Business Day that is forty-five (45) calendar days after the Effective Date. Such requests shall be Filed with the Bankruptcy Court and served as required by the Interim Compensation Rules, as applicable. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any applicable Bankruptcy Court orders, the Allowed amounts of such Professional Compensation Claims shall be determined by the Bankruptcy Court. Except for the Claims of LBBS, which shall be paid in accordance with Section II.B.2 of the Plan, the Allowed amount of Professional Compensation Claims owing to the Professionals, after taking into account any prior payments to and retainers held by such Professionals, shall be paid in full in Cash to such Professionals from funds held in the Professional Fee Escrow as soon as reasonably practicable following the date when such Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Escrow are unable to satisfy the Allowed amount of Professional Compensation Claims owing to the Professionals, each Professional shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied by the Reorganized Debtors in the ordinary course of business in accordance with Article II.B.2 of the Plan and notwithstanding any obligation to File Proofs of Claim or requests for payment on or before the Administrative Claims Bar Date. After all Professional Compensation Claims have been paid in full, the escrow agent shall promptly return any excess amounts held in the Professional Fee Escrow, if any, to the Reorganized Debtors, without any further action or Order of the Bankruptcy Court.

> (c)  *Professional Fee Escrow Amount*

The Professionals shall estimate their Professional Compensation Claims before and as of the Effective Date, taking into account any prior payments, and shall deliver such estimate to the Debtors no later than five (5) Business Days prior to the anticipated Effective Date; provided, however, that such estimate shall not be considered an admission or representation with respect to the fees and expenses of such Professional that are the subject of a Professional's final request for payment of Professional Compensation Claims Filed with the Bankruptcy Court and such Professionals are not bound to any extent by such estimates. If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional that are the subject of a Professional's final request for payment of Professional Compensation Claims Filed with the Bankruptcy Court and such Professionals are not bound to any extent by such estimates. The total amount so estimated *less* the amount of the Professional Fee Note shall be utilized by the Debtors to determine the Professional Fee Escrow Amount.

> (d)  *Professional Fee Note*

In lieu of participating in the Professional Fee Escrow, the firm of LBBS, Debtors' prior

counsel, has agreed to accept the Professional Fee Note. On the Effective Date, the Reorganized Debtor shall issue the Professional Fee Note.

(e)    *Post-Confirmation Date Fees and Expenses*

From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the legal, professional, or other fees and expenses of Professionals that have been formally retained in accordance with sections 327, 363, or 1103 of the Bankruptcy Code before the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Rules in seeking retention for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Priority Tax Claims

On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted (with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Plan Sponsor) agree to less favorable treatment for such Holder, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, in the discretion of the applicable Debtor (with the consent (not to be unreasonably withheld, conditioned or delayed) of the Plan Sponsor) or Reorganized Debtor, one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable non-bankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code, payable on or as soon as practicable following the Effective Date; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, plus interest at the rate determined under applicable non-bankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such Holder and the Debtors, or otherwise determined by an order of the Bankruptcy Court.

4.    Statutory Fees

Notwithstanding anything to the contrary contained herein, on the Effective Date, the Debtors shall pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation. Thereafter, subject to the Plan, each applicable Reorganized Debtor shall pay all U.S. Trustee fees due and owing under section 1930 of the Judicial Code in the ordinary course until the earlier of (1) the entry of a final decree closing the applicable Reorganized Debtor's Chapter 11 Case, or (2) the Bankruptcy Court enters an order converting or dismissing the applicable Reorganized Debtor's Chapter 11 Case. Any deadline for filing Administrative Claims or Professional Compensation Claims shall not apply to U.S. Trustee fees.

78171590;8

**B.** **Classification of Claims and Interests**

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. All Claims and Interests, except for Claims addressed in Article II of the Plan, are classified in the Classes set forth in Article III of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim against a Debtor also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.

1.    Summary of Classifications

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth in the Plan shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth in Article III of the Plan. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.H of the Plan.

The following chart summarizes the classification of Claims and Interests pursuant to the Plan:[10]

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| I | Secured or Partially Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| II | Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| III | Unsecured Claims | Impaired | Entitled to Vote |
| IV | Subordinated Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| V | Equity Security Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

[10] The information in the table is provided in summary form and is qualified in its entirety by Article III.C of the Plan.

78171590;8

2.      <u>Treatment of Claims and Interests</u>

Subject to Article VIII of the Plan, to the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below as full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.

1.      Class I – Secured or Partially Secured Claims

(a)      *Classification*: Class I consists of all Secured or Partially Secured Claims.

(b)      *Treatment:* On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Secured or Partially Secured Claim and the Debtor against which such Allowed Secured or Partially Secured Claim is asserted, agree to less favorable treatment for such Holder, each Holder of an Allowed Secured or Partially Secured Claim shall receive, at the option of the Debtor against which such Allowed Secured or Partially Secured Claim is asserted (with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Plan Sponsor), in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, either:

(i)      payment in full of its Secured Claim , in an amount equal to the Allowed Secured Claim, with any under-secured Claim treated as a Class III General Unsecured Claim; or

(ii)      such other treatment rendering such Allowed Secured or Partially Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting:* Class I is Unimpaired under the Plan. Therefore, each Holder of a Class I Secured or Partially Secured Claim is not entitled to vote to accept or reject the Plan and is deemed to accept the Plan.

2.      Class II – Priority Claims

(a)      *Classification:* Class II consists of all Priority Claims, other than Tax Priority Claims.

(b)      *Treatment:* Except to the extent that a Holder of an Allowed Priority Claim and the Debtor against which such Allowed Priority Claim is asserted to agree to less favorable treatment for such Holder, each Holder of an Allowed Priority Claim shall receive, at the option of the Debtor against which such Allowed Priority Claim is asserted (with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Plan Sponsor), in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, either:

(i)      payment in full on the Effective Date; or

49

        (ii)      such other treatment rendering such Allowed Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting:* Class II is Unimpaired under the Plan. Therefore, each Holder of a Class II Priority Claim is not entitled to vote to accept or reject the Plan and is deemed to accept the Plan.

3.      Class III – General Unsecured Claims

(a)      *Classification:* Class III consists of all General Unsecured Claims.

(b)      *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Unsecured Claim and the Debtor against which such Allowed Unsecured Claim is asserted to agree to less favorable treatment for such Holder, each Holder of an Allowed Unsecured Claim shall receive, at the option of the Debtor against which such Allowed General Unsecured Claim is asserted (with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Plan Sponsor), in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, either:

        (i)      its Pro Rata share of Eighteen Million U.S. Dollars (USD $18,000,000) allocated to all Unsecured Claims (Class III); or

        (ii)      such other treatment rendering such Allowed General Unsecured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting:* Class III is Impaired under the Plan. Therefore, each Holder of a Class III Unsecured Claim is entitled to vote to accept or reject the Plan.

6.      Class V – Subordinated Unsecured Claims

(a)      *Classification:* Class V consists of all Subordinated Unsecured Claims.

(b)      *Treatment*: Holders of Subordinated Unsecured Claims shall receive no recovery or distribution on account of such Subordinated Unsecured Claim. On the Effective Date, all Subordinated Unsecured Claims and the corresponding underlying instruments evidencing such Claims or interest shall be canceled, released, extinguished, and discharged, and of no further force or effect.

(c)      *Voting:* Class V is Impaired under the Plan. Class V is Impaired under the Plan. Each Holder of a Class V Equity Security Claim is conclusively presumed to have rejected the Plan pursuant to 1126(g) of the Bankruptcy Code. Therefore, each Holder of a Class V Equity Security Claim is not entitled to vote to accept or reject the Plan.

7.      Class VI – Equity Security Claims

(a)      *Classification:* Class V consists of all Equity Security Claims.

(b)    *Treatment:* Holders of Equity Security Claims shall receive no recovery or distribution on account of such Equity Security Claim. On the Effective Date, all Equity Security Claims and the corresponding underlying securities evidencing such Claims or interest shall be canceled, released, extinguished, and discharged, and will be of no further force or effect.

(c)    *Voting:* Class V is Impaired under the Plan. Each Holder of a Class V Equity Security Claim is conclusively presumed to have rejected the Plan pursuant to 1126(g) of the Bankruptcy Code. Therefore, each Holder of a Class V Equity Security Claim is not entitled to vote to accept or reject the Plan.

3.    Voting of Claims

Each Holder of a Claim in an Impaired Class that is entitled to vote on the Plan as of the record date for voting on the Plan pursuant to Article III of the Plan shall be entitled to vote to accept or reject the Plan as provided in the Disclosure Statement Order or any other order of the Bankruptcy Court.

4.    No Substantive Consolidation

Although the Plan is presented as a joint plan of reorganization, the Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason. Except as expressly provided herein, nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any or all of the Debtors is subject to or liable for any Claims against any other Debtor. A Claim against multiple Debtors will be treated as a separate Claim against each applicable Debtor's Estate for all purposes, including voting and distribution; provided, however, that no Claim will receive value in excess of one hundred percent (100.0%) of the Allowed amount of such Claim or Interest under the Plans for all such Debtors.

5.    Acceptance by Impaired Classes

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if Holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of such Class entitled to vote that actually vote on the Plan have voted to accept the Plan. Unsecured Claims (Class III) are Impaired, and the votes of Holders of Claims in such Classes will be solicited. If a Class contains Holders of Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

6.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

51

7.    Elimination of Vacant Classes

Any Class of Claims or Interests that, with respect to either Debtor, does not have a Holder of an Allowed Claim or Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court solely for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan with respect to such Debtor for purposes of (1) voting to accept or reject the Plan and (2) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

8.    Consensual Confirmation

The Plan shall be deemed a separate chapter 11 plan for each Debtor. To the extent that there is no rejecting Class of Claims in the chapter 11 plan of either Debtor, such Debtor shall seek Confirmation of its plan pursuant to section 1129(a) of the Bankruptcy Code.

9.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims

10.    Controversy Concerning Impairment or Classification

If a controversy arises as to whether any Claims or Interests or any Class of Claims or Interests is Impaired or is properly classified under the Plan, the Bankruptcy Court shall, after notice and a hearing, resolve such controversy at the Confirmation Hearing.

11.    Subordinated Claims

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise, and any other rights impacting relative lien priority and/or priority in right of payment, and any such rights shall be released pursuant to the Plan, including, as applicable, pursuant to the Plan Settlement. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors, subject to the reasonable consent of the Plan Sponsor, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

12.    Intercompany Interests

Intercompany Interests, to the extent Reinstated, are being Reinstated to maintain the existing corporate structure of the Debtors. For the avoidance of doubt, any Interest in non-

Debtor Affiliates owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

### C.   Means for Implementation of the Plan

#### 1.   Sources of Consideration for Plan Distributions

The Reorganized Debtors shall fund distributions under the Plan, as applicable with: (1) the proceeds from the Plan Sponsor Subscription; and (2) Cash on hand.

Each distribution and issuance referred to in Article III of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance; provided that, to the extent that a term of the Plan conflicts with the term of any such instruments or other documents, the terms of the Plan shall govern.

##### a.   Issuance and Distribution of New Common Stock

On the Effective Date, Reorganized Holdings shall receive $185,500,000.00 from the Plan Sponsor in consideration for the shares of New Common Stock to be issued pursuant to the Plan Sponsor Subscription Agreement, in accordance with the Description of Transaction Steps pursuant to, and in accordance with, the Plan. Consideration for the New Common Stock consists of (i) the immediate release from escrow of the Escrow Funds; and (ii) the balance in good and readily available funds.

All of the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the New Organizational Documents and other instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Holder receiving such distribution or issuance. For the avoidance of doubt, the acceptance of New Common Stock by any Holder shall be deemed as such Holder's agreement to the applicable New Organizational Documents, as may be amended or modified from time to time following the Effective Date in accordance with their terms.

To the extent practicable, as determined in good faith by the Plan Sponsor, the Reorganized Debtors shall: (a) emerge from these Chapter 11 Cases as non-publicly reporting companies on the Effective Date and not be subject to SEC reporting requirements under Sections 12 or 15 of the Exchange Act, or otherwise; (b) not be voluntarily subjected to any reporting requirements promulgated by the SEC; except, in each case, as otherwise may be required pursuant to the New Organizational Documents, the Plan Sponsor Equity Subscription Agreement or applicable law; (c) not be required to list the New Common Stock on a U.S. stock exchange; (d) timely file or otherwise provide all required filings and documentation to allow for the termination and/or suspension of registration with respect to SEC reporting requirements under the Exchange Act prior to the Effective Date; and (e) make good faith efforts to ensure

78171590;8

DTC eligibility of securities issued in connection with the Plan (other than any securities required by the terms of any agreement to be held on the books of an agent and not in DTC), including but not limited to the New Common Stock.

### b.   Cash on Hand

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand, as available, to fund (i) distributions to certain Holders of Claims, and (ii) the Reorganized Debtors' operating capital needs.

### 2. Use of Plan Proceeds

### a.   Authorization

Entry of the Confirmation Order shall constitute Bankruptcy Court approval of the Plan Sponsor Equity Subscription Agreement (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by Reorganized Holdings in connection therewith). On the Effective Date, as provided in the Description of Transaction Steps, the Debtors' rights and obligations thereto shall vest in the Reorganized Debtors, as applicable.

The Cash proceeds of the Plan Sponsor Equity Subscription Agreement shall be used by the Debtors or Reorganized Debtors, as applicable, to (a) make distributions pursuant to the Plan, (b) fund working capital, and (c) fund general corporate purposes.

### b.   Creditor Recovery

On the Effective Date, Reorganized Holdings shall (i) release up to the Professional Fee Escrow Amount from the Professional Fee Escrow to the Holders of Allowed  Administrative Claims, in Pro Rata amounts relative to the amounts of such Claims, in accordance with the Description of Transaction Steps, and in accordance with, the Plan; and (ii) issue the Professional Fee Note in the amount of Two Million Nine Hundred Seventy-Seven Thousand Nine Hundred Fifty-Eight Dollars and Ten Cents ($2,977,958.10) to LBBS, in accordance with the Description of Transaction Steps, and in accordance with, the Plan.

On the Effective Date, Reorganized Holdings shall remit up to One Million Dollars ($1,000,000) to the Holders of Priority Claims, in *Pro Rata* amounts relative to the amounts of such Claims, in accordance with the Description of Transaction Steps, and in accordance with, the Plan.

On the Effective Date, Reorganized Holdings shall remit One Hundred Fifty-Two Million Dollars ($152,000,0000), or such lesser amount as may be equal to the full Allowed Class I Claims to the Holder of Allowed Class I Claims, in accordance with the Description of Transaction Steps, and in accordance with, the Plan.

On the Effective Date, Reorganized Holdings shall remit the aggregate amount of Eighteen Million Dollars ($18,000,0000) for the benefit of the Holders of Allowed Class III

Claims, in Pro Rata amounts relative to the amounts of such Claims, in accordance with the Description of Transaction Steps, and in accordance with, the Plan.

On the Effective Date, Reorganized Holdings shall contribute Seven Million Five Hundred Thousand Dollars ($7,500,000) of the proceeds from Reorganized Stream's issuance of the New Shares to SCBV, a non-debtor subsidiary, to refinance, retire and otherwise liquidate certain senior unsecured notes issued by SCBV to SeeCubic prior to and during the pendency of this Bankruptcy Proceeding.

### 3. Restructuring Transactions

On the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transactions and shall take any actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including to establish Reorganized Holdings and, *if applicable*, to transfer assets of the Debtors to Reorganized Holdings or a subsidiary thereof. The applicable Debtors or the Reorganized Debtors will take any actions as may be necessary or advisable to effect a corporate restructuring of the overall corporate structure of the Debtors, in the Description of Transaction Steps, or in the Definitive Documents, including the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, in each case, subject to the consent of the Plan Sponsor and, solely to the extent required under the Restructuring Agreements.

The actions to implement the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of the New Organizational Documents and any appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable law; (4) the execution and delivery of the Plan Sponsor Equity Subscription Agreement; (5) if applicable, all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Holdings, which purchase, if applicable, may be structured as a taxable transaction for United States federal income tax purposes; (6) the settlement, reconciliation, repayment, cancellation, discharge, and/or release, as applicable, of Intercompany Claims consistent with the Plan; and (7) all other actions that the Debtors or the Reorganized Debtors determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.

For purposes of consummating the Plan and the Restructuring Transactions, none of the transactions contemplated in Article IV.C of the Plan shall constitute a change of control under any of the Debtors' agreements, contracts, or documents.

### 4. Corporate Existence

Except as otherwise provided in the Plan, the Description of Transaction Steps, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a Reorganized Debtor and as a separate corporation, with all the powers of a corporation, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation or governing documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation or governing documents) are amended by the Plan or otherwise amended in accordance with applicable law. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, federal, or foreign law).

### 5. Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, the Plan Supplement or the Confirmation Order, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property (including all interests, rights, and privileges related thereto) in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan, including Interests held by the Debtors in any non-Debtor Affiliates, shall vest in the applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, encumbrances, or other interests, unless expressly provided otherwise by the Plan or Confirmation Order, subject to and in accordance with the Plan, including the Description of Transaction Steps. On and after the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Confirmation Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court, but subject in all respect to the Plan.

### 6. Cancellation of Existing Indebtedness and Securities

Except as otherwise expressly provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions, on the Effective Date, (1) all notes, bonds, indentures, certificates, securities, shares, equity securities, purchase rights, options, warrants, convertible securities or instruments, credit agreements, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing,

78171590;8

creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, or giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors (except with respect to such agreements, certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that is specifically Reinstated, amended and Reinstated, or entered into pursuant to the Plan), including any facility under Proof of Claim No. 6 filed in Case 23-10763-mdc by Hawk as "Collateral Agent" on May 19, 2023 with respect to Stream, Proof of Claim No. 9 filed in Case 23-10763-mdc by SLS on May 23, 2023 with respect to Stream, Proof of Claim No. 1 filed in Case 23-10763-mdc by SeeCubic on May 23, 2023 with respect to Stream, Proof of Claim No. 1 filed in Case 23-10764-mdc by Hawk as "Collateral Agent" on May 19, 2023 with respect to Technovative, Proof of Claim No. 2 filed in Case 23-10764-mdc by SLS on May 23, 2023 with respect to Technovative, and Proof of Claim No. 3 filed in Case 23-10764-mdc by SeeCubic on May 23, 2023 with respect to Technovative (collectively, the "***Hawk POCs***") shall be canceled without any need for a Holder to take further action with respect thereto, and the duties and obligations of all parties thereto, including the Debtors or the Reorganized Debtors, as applicable, and any non-Debtor Affiliates, thereunder or in any way related thereto shall be deemed satisfied in full, canceled, released, discharged, and of no force or effect and (2) the obligations of the Debtors or Reorganized Debtors, as applicable, pursuant, relating, or pertaining to any agreements, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the notes, bonds, indentures, certificates, securities, shares, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or Interests in the Debtors (except with respect to such agreements, certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that is specifically Reinstated, amended and Reinstated, or entered into pursuant to the Plan), including any facility under the Hawk POCs shall be released and discharged in exchange for the consideration provided hereunder; provided that notwithstanding Confirmation or the occurrence of the Effective Date, any such document or instrument that governs the rights, claims, or remedies of the Holder of a Claim or Interest, shall continue in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein, and allowing each of the applicable agents and indenture trustees to make or direct the distributions in accordance with the Plan as provided herein. On the Effective Date, each holder of a certificate or instrument evidencing a Claim that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture or agreement that governs the rights of such holder of such Claim. Such surrendered certificate or instrument shall be deemed canceled as set forth in, and subject to the exceptions set forth in Article IV.F of the Plan.

Additional debt satisfied, liquidated and otherwise cancelled pursuant to the Plan includes those certain promissory notes issued by SCBV to SeeCubic in the amount of EUR €3,500,000 dated November 14, 2022 and USD $3,000,000 executed on or about June 30, 2023.

7. Corporate Action

On the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including:

(1) execution and entry into the Plan Sponsor Equity Subscription Agreement; (2) approval of and entry into the New Organizational Documents; (3) issuance and distribution of the New Securities; (4) selection of the directors and officers for the Reorganized Debtors; (5) implementation of the Restructuring Transactions contemplated by the Plan; (6) adoption or assumption, if and as applicable, of the Employment Obligations; (7) the formation or dissolution of any Entities pursuant to and the implementation of the Restructuring Transactions and performance of all actions and transactions contemplated by the Plan, including the Description of Transaction Steps; (8) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (9) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for herein involving the corporate structure of the Debtors or the Reorganized Debtors, or any corporate, limited liability company, or related action required by the Debtors or the Reorganized Debtors in connection herewith shall be deemed to have occurred and shall be in effect in accordance with the Plan, including the Description of Transaction Steps, without any requirement of further action by the shareholders, members, directors, or managers of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the shareholders, members, directors, managers, or officers, as applicable, of the Debtors or Reorganized Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors. The authorizations and approvals contemplated by Article IV.G of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 8. New Organizational Documents

On or promptly after the Effective Date, the Reorganized Debtors shall file their applicable New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states or jurisdictions of incorporation or formation in accordance with the corporate laws of such respective states or jurisdictions of incorporation or formation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents shall prohibit the issuance of non-voting equity securities of Reorganized Holdings. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents or otherwise restructure their legal Entity forms, without supervision or approval by the Bankruptcy Court and in accordance with applicable non-bankruptcy law.

### 9. Directors and Officers of the Reorganized Debtors

As of the Effective Date, the term of the current members of the boards of directors of each Debtor shall expire, and the New Boards shall be appointed in accordance with the New Organizational Documents of each Reorganized Debtor.

The members of the Reorganized Holdings Board and New Subsidiary Boards immediately following the Effective Date shall be determined and selected by the Plan Sponsor.

Except as otherwise provided in the Plan, the Confirmation Order, the Plan Supplement, or the New Organizational Documents, the officers of the Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of the Reorganized Debtors on the Effective Date.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on the initial Reorganized Holdings Board and New Subsidiary Boards, to the extent known at the time of Filing, as well as those Persons that will serve as an officer of Reorganized Holdings or other Reorganized Debtor. To the extent any such director or officer is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and may be replaced or removed in accordance with such New Organizational Documents.

10.     Employment Obligations

Except as otherwise expressly provided in the Plan or the Plan Supplement, the Reorganized Debtors shall honor the Employment Obligations (1) existing and effective as of the Petition Date, (2) that were incurred or entered into in the ordinary course of business prior to the Effective Date, or (3) as otherwise agreed to by the Plan Sponsor on or prior to the Effective Date.

11.     Effectuating Documents; Further Transactions

On, before, or after (as applicable) the Effective Date, the Reorganized Debtors, the officers of the Reorganized Debtors, and members of the New Boards are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the New Organizational Documents, the Plan Sponsor Equity Subscription Agreement, and the securities issued pursuant to the Plan, including the New Securities, and any and all other agreements, documents, securities, filings, and instruments relating to the foregoing in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan. The authorizations and approvals contemplated by Article IV of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

12.     Exemption from Certain Taxes and Fees

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property pursuant to the Plan shall not be subject to any stamp tax, document recording tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or

local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies to (1) the creation, modification, consolidation, or recording of any mortgage, deed of trust, Lien, or other security interest, or the securing of additional indebtedness by such or other means, (2) the making or assignment of any lease or sublease, (3) any Restructuring Transaction authorized by the Plan, and (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan; or (f) the other Definitive Documents.

13.     Indemnification Provisions

On and as of the Effective Date, consistent with applicable law, the Indemnification Provisions in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed by the Reorganized Debtors (and any such Indemnification Provisions in place as to any Debtors that are to be liquidated under the Plan shall be assigned to and assumed by an applicable Reorganized Debtor), deemed irrevocable, and will remain in full force and effect and survive the effectiveness of the Plan unimpaired and unaffected, and each of the Reorganized Debtors' New Organizational Documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, agents, managers, attorneys, and other professionals, at least to the same extent as such documents of each of the respective Debtors on the Petition Date but in no event greater than as permitted by law, against any Causes of Action. Neither of the Reorganized Debtors shall amend and/or restate its respective New Organizational Documents, on or after the Effective Date to terminate, reduce, discharge, impair or adversely affect in any way (1) any of the Reorganized Debtors' obligations referred to in the immediately preceding sentence or (2) the rights of such current and former directors, officers, employees, agents, managers, attorneys, and other professionals.

14.     Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, any and all Causes of Action, except for Retained Preference Actions, whether arising before or after the Petition Date, including but not limited to any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Debtors shall retain and may enforce all rights to commence and pursue any Retained Preference

Actions, and the Debtors' rights to commence, prosecute, or settle such Retained Preference Actions shall be preserved notwithstanding the occurrence of the Effective Date. For the avoidance of doubt, the preservation of Retained Causes of Action described in the preceding sentence includes, but is not limited to, the Debtors' rights, as applicable, to (1) assert any and all counterclaims, crossclaims, claims for contribution defenses, and similar claims in response to such or Causes of Action, (2) object to Administrative Claims, (3) object to other Claims, and (4) subordinate Claims, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.

The Reorganized Debtors, as applicable, may pursue such Retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors, as applicable, in their respective discretion. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Retained Causes of Action. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Retained Causes of Action against any Entity.** Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors, as applicable, expressly reserve all and shall retain the applicable Retained Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all Retained Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action except as otherwise expressly provided in the Plan and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### b.    Treatment of Executory Contracts and Unexpired Leases

#### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed assumed as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) previously were rejected by the Debtors; (2) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; or (3) are the subject of a motion to reject such Executory Contracts or Unexpired Leases, as applicable, that is pending on the Effective Date, regardless of whether the requested effective date of such rejection is on or after the Effective Date. The assumption or rejection of all executory contracts

61

and unexpired leases in the Chapter 11 Cases or in the Plan shall be determined by the Debtors, with the consent of the Plan Sponsor. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions or assumptions and assignments, and rejection of the Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date or such later date as provided in Article V.A of the Plan, shall revest in and be fully enforceable by the Debtors or the Reorganized Debtors, as applicable, in accordance with such Executory Contract and/or Unexpired Lease's terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases, including by way of adding or removing a particular Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases, at any time through and including sixty (60) Business Days after the Effective Date.

2.      Claims Based on Rejection of Executory Contracts or Unexpired Leases

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court or the Voting and Claims Agent and served on the Debtors or Reorganized Debtors, as applicable, by the later of (1) the applicable Claims Bar Date, or (2) thirty (30) calendar days after notice of such rejection is served on the applicable claimant. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be automatically Disallowed and forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, including any Claims against any Debtor listed on the Schedules as unliquidated, contingent or disputed. Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Other General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any cure amount has been fully paid or for which the cure amount is $0 pursuant to Article V of the Plan, shall be deemed Disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

### 3.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any Cure Claims shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date or as soon as reasonably practicable thereafter, with such Cure Claim being $0.00 if no amount is listed in the Cure Notice, subject to the limitations described below, or on such other terms as the party to such Executory Contract or Unexpired Lease may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, if required, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall only be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or by mutual agreement between the Debtors or the Reorganized Debtors, as applicable, and the applicable counterparty, with the reasonable consent of the Plan Sponsor.

At least fourteen (14) calendar days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices and proposed amounts of Cure Claims to the applicable Executory Contract or Unexpired Lease counterparties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors at least seven (7) calendar days before the Confirmation Hearing. Any such objection to the assumption of an Executory Contract or Unexpired Lease shall be heard by the Bankruptcy Court on or before the Effective Date, unless a later date is agreed to between the Debtors or the Reorganized Debtors, on the one hand, and the counterparty to the Executory Contract or Unexpired Lease, on the other hand, or by order of the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount shall be deemed to have assented to such assumption and/or cure amount; provided, however, that, subject to Article X.A of the Plan, the Debtors or the Reorganized Debtors, as applicable, shall have the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases, as applicable, as identified in the Plan Supplement, through and including forty-five (45) calendar days after the Effective Date.

The Debtors or Reorganized Debtors, as applicable, reserve the right to reject any Executory Contract or Unexpired Lease in resolution of any cure disputes. Notwithstanding anything to the contrary in the Plan, if at any time the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right, at such time, to add such Executory Contract or Unexpired Lease

to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease shall be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults, whether monetary or nonmonetary, including defaults of provisions restricting a change in control or any bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors or Reorganized Debtors assume such Executory Contract or Unexpired Lease; provided that nothing herein shall prevent the Reorganized Debtors from (a) paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim or (b) settling any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court, in each case in clauses (a) or (b), with the consent (not to be unreasonably withheld, conditioned or delayed) of the Plan Sponsor. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and cured shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

4.    Pre-existing Obligations to the Debtors under Executory Contracts and Unexpired Leases

Notwithstanding any non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts and Unexpired Leases. For the avoidance of doubt, the rejection of any Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such Executory Contracts and Unexpired Leases.

5.    Insurance Policies

Subject in all respects to Articles VI.K.3 and VIII.L of the Plan, all of the Debtors' insurance policies, including any directors' and officers' insurance policies (including any "tail policies"), and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto. In addition, on and after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce, limit or restrict the coverage under any of the directors' and officers' insurance policies, if any, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such directors' and officers' insurance policy (including any "tail policies") for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date. Notwithstanding anything to the contrary in Article VIII.D and Article VIII.E of the Plan,

all of the Debtors' current and former officers' and directors' rights as beneficiaries of such insurance policies are preserved to the extent set forth in the Plan.

6.      Indemnification Provisions

Except as otherwise provided in the Plan, on and as of the Effective Date, any of the Debtors' indemnification rights with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by the Chapter 11 Cases.

7.      Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, each Executory Contract or Unexpired Lease that is assumed shall include (1) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affect such Executory Contract or Unexpired Lease, and (2) all Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant to an order of the Bankruptcy Court or under the Plan.

Except as otherwise provided by the Plan or by separate order of the Bankruptcy Court, modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases and actions taken in accordance therewith (1) shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims against any Debtor that may arise in connection therewith, (2) are not and do not create postpetition contracts or leases, (3) do not elevate to administrative expense priority any Claims of the counterparties to such Executory Contracts and Unexpired Leases against any of the Debtors, and (4) do not entitle any Entity to a Claim against any of the Debtors under any section of the Bankruptcy Code on account of the difference between the terms of any prepetition Executory Contracts or Unexpired Leases and subsequent modifications, amendments, supplements or restatements.

8.      Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If, prior to the Effective Date, there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or Reorganized Debtors, as applicable, shall have forty-five (45) calendar days following entry of a Final Order resolving such dispute to alter their treatment of

65

such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

9.      <u>Nonoccurrence of Effective Date</u>

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

10.      <u>Contracts and Leases Entered Into After the Petition Date</u>

Contracts and leases entered into after the Petition Date by either Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that had not been rejected as of the date of Confirmation will survive and remain obligations of the applicable Reorganized Debtor.

**D.**      **<u>Provisions Governing Distributions</u>**

1.      <u>Timing and Calculation of Amounts to Be Distributed</u>

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim), each Holder of an Allowed Claim shall be entitled to receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims (which will only be made if and when they become Allowed Claims) shall be made pursuant to the provisions set forth in Article VI of the Plan. Except as otherwise expressly provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. The Debtors shall have no obligation to recognize any transfer of Claims against either Debtor or privately held Interests occurring on or after the Distribution Record Date. Distributions to Holders of Claims or Interests related to public Securities shall be made to such Holders in exchange for such Securities, which shall be deemed canceled as of the Effective Date.

2.      <u>Disbursing Agent</u>

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on the Effective Date or as soon as reasonably practicable thereafter. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

3.      <u>Rights and Powers of Disbursing Agent</u>

     *a.*      *Powers of the Disbursing Agent*

The Disbursing Agent shall be empowered to: (1) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (2) make all distributions contemplated hereby; (3) employ professionals to represent it with respect to its responsibilities; and (4) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### b.    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes other than any income taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable and documented attorneys' fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

### 4.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

### a.    Delivery of Distributions

#### (i)    Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims or Interests shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or the applicable Disbursing Agent: (A) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (B) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors after the date of any related Proof of Claim; (C) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address; or (D) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. The Debtors and the Reorganized Debtors shall not incur any liability whatsoever on account of any distributions under the Plan, except in the event of gross negligence or willful misconduct, as determined by a Final Order of a court of competent jurisdiction. Subject to Article VI of the Plan, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan, except in the event of actual fraud, gross negligence, or willful misconduct, as determined by a Final Order of a court of competent jurisdiction.

### b.    Record Date of Distributions

As of the close of business on the Distribution Record Date, the various transfer registers for each Class of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims.

The Disbursing Agent shall have no obligation to recognize any transfer of Claims occurring on or after the Distribution Record Date. In addition, with respect to payment of any cure amounts or disputes over any cure amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Cure Claim.

c.      *Special Rules for Distributions to Holders of Disputed Claims*

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim, on the other hand, or as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all of the Disputed Claim has become an Allowed Claim or has otherwise been resolved by settlement or Final Order; provided that, if the Reorganized Debtors do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim, the Disbursing Agent may make a partial distribution on account of that portion of such Claim that is not Disputed at the time and in the manner that the Disbursing Agent makes distributions to similarly situated Holders of Allowed Claims pursuant to the Plan. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

d.      *Minimum Distributions*

No partial distributions or payments of fractions of New Securities shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim or Interest, as applicable, would otherwise result in the issuance of a number of New Securities that is not a whole number, the actual distribution of New Securities shall be rounded as follows: (i) fractions of greater than one- half (1/2) shall be rounded to the next higher whole number and (ii) fractions of one-half (1/2) or less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Securities to be distributed pursuant to the Plan may (at the Debtors' discretion) be adjusted as necessary to account for the foregoing rounding.

Notwithstanding any other provision of the Plan, no Cash payment valued at less than $100.00, in the reasonable discretion of the Disbursing Agent and the Reorganized Debtors, shall be made to a Holder of an Allowed Claim on account of such Allowed Claim. Such Allowed Claims to which this limitation applies shall be discharged and its Holder forever barred from asserting that Claim against the Reorganized Debtors or their property.

e.      *Undeliverable Distributions and Unclaimed Property*

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the later of (a) the Effective Date and (b) the date of the distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, state, or other jurisdiction escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) calendar days from and after the date of issuance thereof. Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the Holder of the relevant Allowed Claim within the 180-calendar day period. After such date, the relevant Allowed Claim (and any Claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to the Reorganized Debtors (notwithstanding any applicable federal, provincial, state, or other jurisdiction escheat, abandoned, or unclaimed property laws to the contrary).

A distribution shall be deemed unclaimed if a Holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

5.    Manner of Payment

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, or credit card, or as otherwise required or provided in applicable agreements.

6.    Exemption From Registration

The New Securities are or may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

The offer, issuance, and distribution of the New Securities by Reorganized Holdings as contemplated by the Plan (including the issuance of New Common Stock upon exercise of the Equity Subscription Rights) is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution or sale of Securities. The New Securities issued by Reorganized Holdings (1) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (2) are freely tradable and transferable by any initial recipient

thereof that (a) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within ninety (90) calendar days of such transfer, (c) has not acquired the New Securities from an "affiliate" within one year of such transfer and (d) is not an entity that is an "underwriter" as defined in section Section 2(a)(11) of the Securities Act; provided that transfer of the New Securities may be restricted by the New Organizational Documents.

7.      <u>Compliance with Tax Requirements</u>

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information, documentation, and certifications necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable or appropriate. All Persons holding Claims against any Debtor shall be required to provide any information necessary for the Reorganized Debtors to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit. The Reorganized Debtors reserve the right to allocate any distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit on account of such distribution.

8.      <u>No Postpetition or Default Interest on Claims</u>

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, post-petition interest shall not accrue or be paid on any Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim for purposes of distributions under the Plan.

9.      <u>Allocations</u>

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remaining portion of such Allowed Claim, if any.

10.     <u>Setoffs and Recoupment</u>

The Debtors or the Reorganized Debtors may, but shall not be required to, setoff against or recoup any Allowed Claim and the distributions to be made pursuant to the Plan on account

of such Allowed Claim, any claims, rights, and Causes of Action of any nature whatsoever that the Debtors or the Reorganized Debtors, as applicable, may have against the Holder of such Allowed Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law, to the extent that such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (pursuant to the Plan or otherwise); provided, however, that the failure of the Debtors or the Reorganized Debtors, as applicable, to do so shall not constitute a waiver, abandonment or release by the Debtors or the Reorganized Debtors of any such Claim they may have against the Holder of such Claim.

11.    <u>Claims Paid or Payable by Third Parties</u>

a.    *Claims Paid by Third Parties*

The Debtors or the Reorganized Debtors, as applicable, shall reduce a Claim against any Debtor, and such Claim (or portion thereof) shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor, as applicable. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and also receives payment from a party that is not a Debtor or a Reorganized Debtor, as applicable, on account of such Claim, such Holder shall, within fourteen (14) days of receipt of such payment, repay or return the distribution to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

b.    *Claims Payable by Third Parties*

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim against any Debtor, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

c.    *Applicability of Insurance Policies*

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Reorganized Debtors, or any Person or Entity may hold against any other Entity, including insurers, under any policies of insurance, nor shall anything contained herein

71

constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

12.    Foreign Current Exchange Rate

As of the Effective Date, any Claim asserted in a currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate on the Petition Date, as quoted at 4:00 p.m. (prevailing Eastern time), midrange spot rate of exchange for the applicable currency as published in the Wall Street Journal, National Edition, on the day after the Petition Date.

**E.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims**

1.    Resolution of Disputed Claims

a.    *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors, with respect to General Unsecured Claims, shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim against any Debtor shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

b.    *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors (or any authorized agent or assignee thereof) shall have the sole authority to: (i) File, withdraw, or litigate to judgment objections to Claims against any of the Debtors; (ii) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses held by the Debtor immediately prior to the Effective Date with respect to any Disputed Claim or Interest.

c.    *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Reorganized Debtors may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain

78171590;8

jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim against any Debtor that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed, contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim; provided, however, that such limitation shall not apply to Claims against any of the Debtors requested by the Debtors to be estimated for voting purposes only.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen (14) calendar days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims against any of the Debtors may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### d.    *Adjustment to Claims Without Objection*

Any duplicate Claim or Interest, any Claim against any Debtor that has been paid or satisfied, or any Claim against any Debtor that has been amended or superseded, canceled, or otherwise expunged (including pursuant to the Plan), may, in accordance with the Bankruptcy Code and Bankruptcy Rules, be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court. Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

*e.        Time to File Objections to Claims*

Any objections to Claims against any of the Debtors shall be Filed on or before the Claims Objection Deadline.

*f.        Resolution of Claims Characterization Dispute*

If the Hawk Parties vote in favor of the Plan, the Plan Sponsor shall withdraw its objection to the Debtors' 9019 Settlement and waive the Claim Characterization Dispute, paving the way for the Hawk Parties' Claims to be Allowed.

2.        Disallowance of Claims

Any Claims against any of the Debtors held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. Subject in all respects to Article IV.P of the Plan, all Proofs of Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as provided in the Plan or otherwise agreed to by the Debtors or the Reorganized Debtors, any and all Proofs of Claim filed after the applicable Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Filed Claim has been deemed timely Filed by a Final Order.

3.        Amendments to Proofs of Claim

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors  and any such new or amended Proof of Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court; provided, however, that the foregoing shall not apply to Administrative Claims or Professional Compensation Claims.

4.        No Distributions Pending Allowance

Notwithstanding anything to the contrary in the Plan, if any portion of a Claim against any Debtor is Disputed, or if an objection to a Claim against any Debtor or portion thereof is

Filed as set forth in Article VII of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

### 5. Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Allowed Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Allowed Claim, without any interest, dividends, or accruals to be paid on account of such Allowed Claim unless required under applicable bankruptcy law.

### 6. No Interest

Unless otherwise expressly provided by section 506(b) of the Bankruptcy Code or as specifically provided for in the Plan or by order of the Bankruptcy Court, post-petition interest shall not accrue or be paid on Claims against either of the Debtors, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim; provided, however, that nothing in Article IX.F of the Plan shall limit any rights of any Governmental Unit to interest under sections 503, 506(b), 1129(a)(9)(A) or 1129(a)(9)(C) of the Bankruptcy Code or as otherwise provided for under applicable law.

### F. Settlement, Release, Injunction, and Relation Provisions

### 1. Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith global and integrated compromise and settlement (the "*Plan Settlement*") of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that any Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest, as well as any and all actual and potential disputes between and among the Company Entities (including, for clarity, between and among the Stream Entities, on the one hand, and the Non-Stream Entities on the other and including, with respect to each Debtor, such Debtor's Estate), and the Consenting Parties and all other disputes that might impact creditor recoveries, including any and all issues relating to (1) any and all disputes that might be raised impacting the allocation of value among the Debtors and their respective assets; and (2) any and all other Settled Claims. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlement as well as a finding by the

Bankruptcy Court that the Plan Settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The Plan Settlement is binding upon all creditors and all other parties in interest pursuant to section 1141(a) of the Bankruptcy Code. In accordance with the provisions of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

### 2.     Discharge of Claims and Termination of Interests

To the extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing). The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

### 3.     Release of Liens

Except as otherwise specifically provided in the Plan, or any other Definitive Document, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.

### 4.     Releases by the Debtors

78171590;8

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, as of the Effective Date, each of the Released Parties is unconditionally, irrevocably, generally, individually, and collectively, released, acquitted, and discharged by the Debtors, the Reorganized Debtors, and each of their Estates from any and all Causes of Action, including any derivative Causes of Action asserted or assertable by or on behalf of a Debtor, Reorganized Debtor, or any of their Estates, any Causes of Action that any Debtor, Reorganized Debtors, or any of their Estates would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor or other Entity, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that the Debtors, the Reorganized Debtors, or their Estates (whether individually or collectively) ever had, now has, or thereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part: (1) the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the purchase, sale, or rescission of any security of the Debtors, the Plan Settlement, the Settled Claims, the formulation, preparation, dissemination, negotiation, or filing of the Definitive Documents, the New Common Stock, the Plan Sponsor Equity Subscription Agreement, the Disclosure Statement, or the Plan, including the Plan Supplement; (2) any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Definitive Documents, the New Common Stock, the Plan Sponsor Equity Subscription Agreement, the Disclosure Statement, or the Plan, including the Plan Supplement; (3) the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, or the restructuring of Claims and Interests before or during the Chapter 11 Cases; (4) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan; (5) the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; (6) the Settled Claims; or (7) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date arising from or relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above shall not release (1) to the extent that any Causes of Action against the Debtors are not released or discharged pursuant to the Plan, any rights of the Debtors to assert any and all counterclaims, crossclaims, claims for contribution, defenses, and similar claims in response to such Causes of Action, (2) any Causes of Action set forth in the Schedule of Retained Causes of Action, including any Retained Preference Action, (3) any Cause of Action against any Excluded Party, (4) any commercial Cause of Action arising in the ordinary course of business, such as accounts receivable and accounts payable on account of goods and services being performed, (5) any Cause of Action against a Holder of a

Disputed Claim, to the extent such Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, or (6) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, any Definitive Document (including those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) essential to the Confirmation of the Plan; (2) an exercise of the Debtors' business judgment; (3) in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (4) a good faith settlement and compromise of the Causes of Action released by the Debtor Release; (5) in the best interests of the Debtors and all Holders of Claims and Interests; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Debtors, the Reorganized Debtors, and the Estates asserting any Cause of Action released pursuant to the Debtor Release.

5.    <u>Releases by the Releasing Parties</u>

As of the Effective Date, each of the Releasing Parties other than the Debtors is deemed to have expressly, absolutely, unconditionally, irrevocably, generally, individually, and collectively, released, acquitted, and discharged each of the Released Parties from any and all Causes of Action, including any derivative Causes of Action asserted or assertable by or on behalf of a Debtor, Reorganized Debtor, or any of their Estates, and any Causes of Action asserted or assertable by or on behalf of the Holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that the Releasing Parties (whether individually or collectively) ever had, now have, or thereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part: (1) the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the purchase, sale, or rescission of any security of the Debtors, the Plan Settlement, the Settled Claims, the formulation, preparation, dissemination, negotiation, or filing of the Definitive Documents, the New Common Stock, the Plan Sponsor Equity Subscription Agreement, the Disclosure Statement, or the Plan, including the Plan Supplement; (2) any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Definitive Documents, the New Common Stock, the Plan Sponsor Equity Subscription Agreement, the Disclosure Statement, or the Plan, including the Plan Supplement; (3) the business or contractual arrangements between any Debtor and any Releasing Party, whether before or during the Debtors' restructuring, or the restructuring of Claims and Interests before or during the

Chapter 11 Cases; (4) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan; (5) the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; (6) the Settled Claims; or (7) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date arising from or relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above shall not release (a) to the extent that any Causes of Action against any Releasing Party are not released or discharged pursuant to the Plan, any rights of such Releasing Party to assert any and all counterclaims, crossclaims, claims for contribution, defenses, and similar claims in response to such Causes of Action (provided that no such third-party claims or claims for contribution or similar claims may be asserted against the Debtors or the Reorganized Debtors to the extent such claims have been released or discharged pursuant to the Plan), (b) any Cause of Action against a Released Party other than the Debtors unknown to such Releasing Party as of the Effective Date arising out of actual fraud, gross negligence, or willful misconduct of such Released Party, (c) any Cause of Action against any Excluded Party, or (d) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any Definitive Document (including those set forth in the Plan Supplement), or other document, instrument or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) essential to the Confirmation of the Plan; (b) given in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (c) a good faith settlement and compromise of the Claims released by the Third-Party Release; (d) in the best interests of the Debtors and their Estates; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; and (g) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third- Party Release.

6.    Regulatory Activities

Notwithstanding anything to the contrary in the Plan, nothing in the Plan or Confirmation Order is intended to affect the police or regulatory activities of Governmental Units or other governmental agencies.

7.    Exculpation

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur any liability to any person or Entity for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action related to

any act or omission in connection with, relating to, or arising out of, the Debtors' restructuring efforts, the Chapter 11 Cases, preparation for the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Settled Claims, the formulation, preparation, dissemination, negotiation, filing, or termination of the Disclosure Statement, the Plan (including any term sheets related thereto), the Plan Supplement, the Plan Sponsor Equity Subscription Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with any of the foregoing, the funding of the Plan, the occurrence of the Effective Date, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the Definitive Documents, the issuance of securities pursuant to the Plan, the issuance of the New Common Stock pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, gross negligence, or willful misconduct; provided that the foregoing shall not be deemed to release, affect, or limit any post-Effective Date rights or obligations of the Exculpated Parties under the Plan, the Plan Sponsor Equity Subscription Agreement, any Restructuring Transaction, or any Definitive Document (including those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

8.    <u>Injunction</u>

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to Article VIII.D or Article VIII.E of the Plan or discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, shall be permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of

any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has, on or before the Effective Date, asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

9.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

10.    Recoupment

In no event shall any Holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

11.    Protection Against Discriminatory Treatment

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against any Reorganized Debtor, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

12.    Direct Insurance Claims

Nothing contained in the Plan shall impair or otherwise affect any right of a Holder of a Claim under applicable law, if any, to assert direct claims solely under any applicable insurance policy of the Debtors or solely against any applicable provider of such policies, if any.

78171590;8

## G.    Conditions Precedent to Consummation of the Plan

### 1.    Conditions Precedent to the Effective Date

It is a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.B of the Plan:

i.    Confirmation and all conditions precedent thereto shall have occurred;

ii.    The Bankruptcy Court shall have entered the Confirmation Order which shall be a Final Order and in form and substance acceptable to the Plan Sponsor;

iii.    The Debtors shall have obtained all authorizations, consents, regulatory approvals, or rulings that are necessary to implement and effectuate the Plan;

iv.    The final version of the Plan, including all schedules, supplements, and exhibits thereto, including in the Plan Supplement (and all documents contained therein), shall be in form and substance acceptable to the Plan Sponsor;

v.    All Definitive Documents shall have been (or shall, contemporaneously with the occurrence of the Effective Date, be) executed and in full force and effect, and all conditions precedent contained in the Definitive Documents shall have been satisfied or waived in accordance with the terms thereof, except with respect to such conditions that by their terms shall be satisfied substantially contemporaneously with or after Consummation of the Plan;

vi.    All professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow in accordance with Article II.B pending the Bankruptcy Court's approval of such fees and expenses;

vii.    All Restructuring Expenses incurred and invoiced as of the Effective Date shall have been paid in full in Cash;

viii.    The Restructuring Transactions shall have been (or shall, contemporaneously with the occurrence of the Effective Date, be) implemented in a manner consistent in all material respects with the Plan;

ix.    The Debtors or the Reorganized Debtors, as applicable, shall have obtained directors' and officers' insurance policies and entered into indemnification agreements or similar arrangements for the Reorganized Holdings Board, which shall be, in each case, effective on or by the Effective Date; and

x.    The Debtors shall have recovered title and possession of all Estate Assets.

xi.    The Bankruptcy Court shall have entered the Protective Order

78171590;8

2.      Waiver of Conditions

The conditions to Consummation set forth in Article IX.A of the Plan may be waived by the Debtors, the Plan Sponsor, and, with respect to conditions related to the Professional Fee Escrow, the beneficiaries of the Professional Fee Escrow, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. The Plan Sponsor's failure to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

3.      Effect of Failure of Conditions

If Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims, Causes of Action, or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, any Person, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, any Person, or any other Entity.

**H.      Modification, Revocation, or Withdrawal of the Plan**

1.      Modification and Amendments

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Plan Sponsor reserves the right to modify the Plan (including the Plan Supplement), without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. After the Confirmation Date and before substantial consummation of the Plan, the Plan Sponsor may initiate proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and intent of the Plan.

After the Confirmation Date, but before the Effective Date, the Plan Sponsor, with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Reorganized Debtors may make appropriate technical adjustments and modifications to the Plan (including the Plan Supplement) without further order or approval of the Bankruptcy Court; provided that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests.

2.      Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

78171590;8

3.      Revocation or Withdrawal of Plan

The Plan Sponsor reserves the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization. If the Plan Sponsor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then, absent further order of the Bankruptcy Court: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Classes of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, any Person, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, any Person, or any other Entity.

## I.      **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, except as set forth in the Plan, the Bankruptcy Court shall retain exclusive jurisdiction, to the fullest extent permissible under law, over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable, and to hear, determine and, if necessary, liquidate, any Claims against any of the Debtors arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated.

4.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

5.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

6.      adjudicate, decide, or resolve: (a) any motions, adversary proceedings, applications, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor, or the Estates that may be pending on the Effective Date or that, pursuant to the Plan, may be commenced after the Effective Date, including, but not limited to, the Retained Preference Actions; (b) any and all matters related to Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan; and (c) any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to construe, execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Confirmation Order, the Plan, the Plan Supplement, or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity or Person with Consummation or enforcement of the Plan;

11.      hear and resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.K.1 of the Plan;

13.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.      determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the New Organizational Documents, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement; provided that the Bankruptcy Court shall not retain jurisdiction over disputes concerning

documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

15.    adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

16.    consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in the Plan, the Disclosure Statement, or any Bankruptcy Court order, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

17.    determine requests for the payment of Claims against any of the Debtors entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order or any transactions or payments contemplated hereby or thereby, including disputes arising in connection with the implementation of the agreements, documents, or instruments executed in connection with the Plan;

19.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, 511, and 1146 of the Bankruptcy Code;

20.    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Person or Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Person or Entity's rights arising from or obligations incurred in connection with the Plan;

21.    hear and determine any other matter not inconsistent with the Bankruptcy Code;

22.    enter an order or final decree concluding or closing either of the Chapter 11 Cases;

23.    hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code and section 4(a)(2) of, and Regulation D under, the Securities Act;

24.    hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan; and

25.    hear and resolve any cases, controversies, suits, disputes, contested matters, or Causes of Action with respect to the Settled Claims and any objections to proofs of claim in connection therewith.

Nothing in the Plan limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article XI of the Plan, the provisions of Article XI of the Plan shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided in the Plan or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against the Debtors that arose prior to the Effective Date.

### J.      Miscellaneous Provisions

#### 1.      Immediate Binding Effect

Subject to Article XII.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the final versions of the documents contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors and each of their respective heirs executors, administrators, successors, and assigns.

#### 2.      Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

#### 3.      Further Assurances

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

4.      <u>Statutory Committee and Cessation of Fee and Expense Payment</u>

On the Effective Date, any statutory committee that may be appointed in the Chapter 11 Cases, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, and the Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred thereby on and after the Effective Date.

5.      <u>Reservation of Rights</u>

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by either Debtor or any other Entity with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of either Debtor or other Entity before the Effective Date.

6.      <u>Successors and Assigns</u>

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, receiver, trustee, successor, assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of such Entity.

7.      <u>Notices</u>

Any pleading, notice, or other document required by the Plan or the Confirmation Order to be served or delivered shall be served by first-class or overnight mail:

(a)     <u>The Debtors at</u>:

        Stream TV Networks, Inc.
        2009 Chestnut Street, 3rd Floor
        Philadelphia, PA 19103
        Attention:      William Homony, Trustee
        E-mail:         bhomony@mctllp.com

(b)     <u>Office of the U.S. Trustee at</u>:

        Andrew R. Vara
        United States Trustee
        Robert N.C. Nix Federal Building
        900 Market Street, Suite 320
        Philadelphia, PA 19107
        Attention:      Kevin P. Callahan
                        John Henry Schanne
        E-mail:         Kevin.P.Callahan@usdoj.gov

John.Schanne@usdoj.gov

(c)    Counsel to the Debtors at:

Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street,| Suite 3400
Philadelphia, PA 19102-2101
Attention:    Michael Vagnoni
              Edmond George
Email:        Michael.Vagnoni@obermayer.com
              Edmond.George@obermayer.com

(d)    The Plan Sponsor at:

Visual Semiconductor, Inc.
1105 William Penn Drive
Bensalem, PA 19120
Attention:    Mathu Rajan
E-mail:       Mathu.Rajan@visualsemi.com

(e)    Counsel to the Plan Sponsor:

Akerman, LLP
500 West 5th Street, Suite 1210,
Austin, TX 78701
Attention     Adam Swick
              John Thompsons
Emails:       Adam.Swick@Akerman.com
              John.Thompson@Akerman.com

After the Effective Date, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, an Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

8.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

9.     Entire Agreement

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

10.     Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Debtors' claims and noticing agent at https://cases.creditorinfo.com/streamtv or the Bankruptcy Court's website at https://www.paeb.uscourts.gov.

11.     Severability of Plan Provisions

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Plan Sponsor, with the consent of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

12.     Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and other applicable law, and pursuant to sections 1125(e), 1125, and 1126 of the Bankruptcy Code, and the Debtors, the Consenting Parties, and each of their respective Affiliates, and each of their and their Affiliates' agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys, in each case solely in their respective capacities as such, shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of New Securities offered and sold under the Plan and any previous plan and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the New Securities offered and sold under the Plan or any previous plan.

13.     Closing of Chapter 11 Cases

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to (a) close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case, and (b) change the name of the remaining Debtor and case caption of the remaining open Chapter 11 Case as desired, in the Reorganized Debtors' sole discretion.

14.     Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

15.     Deemed Acts

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party by virtue of the Plan and the Confirmation Order.

## IX.    **VALUATION OF THE DEBTORS**

In conjunction with formulating the Plan, the Company determined that it was necessary to estimate the Company's consolidated value on a going-concern basis (the "*Valuation Analysis*") and then allocate value among the Company's various subsidiaries.

## X.    **TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS**

No registration statement will be filed under the Securities Act or pursuant to any state securities laws with respect to the offer and distribution of New Common Stock under or in connection with the Plan. The Plan Sponsor believes that the provisions of sections 1145(a)(1) of the Bankruptcy Code and/or Section 4(a)(2) of, or Regulation D under, the Securities Act will exempt the offer, issuance and distribution of the New Securities (including New Common Stock issuable upon exercise or conversion thereof) issued under or in connection with the Plan on account of Allowed Claims from federal and state securities registration requirements. The offer (to the extent applicable) and sale of the New Common Stock shall be exempt from registration under the Securities Act pursuant to Section 4(a)(2) thereof and/or Regulation D thereunder. To the extent issued and distributed in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder, the New Common Stock will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law. Persons to whom the New Securities are issued are also subject to

78171590;8

restrictions on resale to the extent they are deemed an "issuer," an "underwriter," or a "dealer" with respect to such New Common Stock, as further described below. In addition to the restrictions referred to below, holders of restricted stock will also be subject to the transfer restrictions contained in the terms thereof.

### A.  **Bankruptcy Code Exemptions from Securities Act Registration Requirements**

1.  Securities Issued in Reliance on Section 1145 of the Bankruptcy Code.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied:

- *first*, the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan;

- *second,* the recipients of the securities must each hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and

- *third,* the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or such affiliate, or principally in such exchange and partly for cash or other property.

The exemptions provided for in section 1145 of the Bankruptcy Code do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code. Section 1145(b) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":

- purchases a claim against, an interest in, or a claim for administrative expense against, the debtor, with a view to distributing any security received in exchange for such a claim or interest ("accumulators");

- offers to sell securities offered under a plan for the holders of such securities ("distributors");

- offers to buy securities from the holders of such securities, if the offer to buy is (i) with a view to distributing such securities and (ii) made under a distribution agreement; or

- is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act, which includes affiliates of the issuer, defined as persons who are in a relationship of "control" with the issuer.

78171590;8

Persons who are not deemed "underwriters" may generally resell the securities they receive that comply with the requirements of section 1145(a)(1) of the Bankruptcy Code without registration under the Securities Act or other applicable law. Persons deemed "underwriters" may sell such securities without Securities Act registration only pursuant to exemptions from registration under the Securities Act and other applicable law.

2.   Subsequent Transfers of New Securities Issued under Section 1145 of the Bankruptcy Code.

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to section 1145(a)(1) of the Bankruptcy Code are deemed to have been issued in a public offering. In general, therefore, resales of, and subsequent transactions in, the New Securities issued under section 1145(a)(1) of the Bankruptcy Code will be exempt from registration under the Securities Act pursuant to section 4(a)(1) of the Securities Act, unless the holder thereof is deemed to be an "issuer," an "underwriter," or a "dealer" with respect to such securities. For these purposes, an "issuer" includes any "affiliate" of the issuer, defined as a person directly or indirectly controlling, controlled by, or under common control with the issuer. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

A "dealer," as defined in section 2(a)(12) of the Securities Act, is any person who engages either for all or part of his or her time, directly or indirectly, as agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person. Whether or not any particular person would be deemed to be an "issuer" (including an "affiliate") of the Company or an "underwriter" or a "dealer" with respect to any New Securities will depend upon various facts and circumstances applicable to that person.

The New Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of those states. However, the availability of such state exemptions depends on the securities laws of each state, and holders of Claims may wish to consult with their own legal advisors regarding the availability of these exemptions in their particular circumstances.

3.   Subsequent Transfers of New Securities Issued under Section 1145 of the Bankruptcy Code to Affiliates.

Any New Securities issued under section 1145 of the Bankruptcy Code to affiliates of the Debtors will be subject to restrictions on resale. Affiliates of the Debtors for these purposes will generally include their directors and officers and their controlling stockholders. While there is no precise definition of a "controlling" stockholder, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" of the debtor.

The SEC's staff has indicated that a "safe harbor" under Rule 144 under the Securities Act is available for the immediate resale of securities issued under a plan of reorganization to

affiliates of the issuing debtor that would otherwise be unrestricted under the Securities Act. The Rule 144 safe harbor should therefore be available for resales of the New Common Stock issued to affiliates under the Plan. The availability of the Rule 144 safe harbor is conditioned on the public availability of certain information concerning the issuer and imposes on selling stockholders certain volume limitations and certain manner of sale and notice requirements.

**GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, ISSUER, AFFILIATE, OR DEALER, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO OR IN CONNECTION WITH THE PLAN. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

**B.**    **Private Placement Exemption from Securities Act Registration Requirements**

1.    Issuance of Securities in a Private Placement under Section 4(a)(2) of the Securities Act

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under Section 5 of the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under the Securities Act. The New Common Stock  will be issued in a transaction exempt from registration under Section 5 of the Securities Act pursuant to Section 4(a)(2) and/or Regulation D thereunder.

The New Common Stock will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, as described below.

2.    Subsequent Transfers of Securities issued in a Private Placement under Section 4(a)(2) of the Securities Act

The New Common Stock will be deemed "restricted securities" (as defined by Rule 144 of the Securities Act) that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available. If in the future a Holder of New Common Stock decides to offer, resell, pledge or otherwise transfer any New Common Stock, such New Common Stock may be offered, resold, pledged or otherwise transferred only (i) in the United States to a person whom the seller reasonably believes is a QIB in a transaction meeting the requirements of Rule 144A, (ii) outside the United States in a transaction complying with the provisions of Rule 904 under the Securities Act, (iii) pursuant to an exemption from registration under the Securities Act (including the exemption provided by Rule 144) (to the extent the exemption is available), or (iv) pursuant to an effective registration statement under the Securities Act, in each of cases (i) through (iv) in accordance with any applicable securities

laws of any state of the United States. Such Holder will, and each subsequent Holder is required to, notify any subsequent acquiror of the New Common Stock from it of the resale restrictions referred to above.

Rule 144 provides a limited safe harbor for the public resale of restricted securities (such that the seller is not deemed an "underwriter") if certain conditions are met. These conditions vary depending on whether the seller of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

The Debtors expect that, after the Effective Date, the issuer of the New Securities will not be subject to the reporting requirements under Section 13 or 15(d) of the Exchange Act. A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the ninety (90) days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144). Third, if the amount of securities sold under Rule 144 in any three month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

As a result, the Plan Sponsor believes that the Rule 144 exemption will not be available with respect to any New Common Stock (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, non-affiliate Holders of New Common Stock will be required to hold their New Common Stock for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to the an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

78171590;8

Each certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any New Common Stock shall, upon issuance, be stamped or otherwise imprinted with a restrictive legend consistent with the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Reorganized Debtors reserve the right to require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the New Common Stock. The Reorganized Debtors also reserve the right to stop the transfer of any New Common Stock if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive New Common Stock will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any New Common Stock except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the New Common Stock will be subject to the other restrictions described above.

Any Persons receiving restricted securities under the Plan (including the New Common Stock) should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE NEW COMMON STOCK. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE NEW COMMON STOCK CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH NEW COMMON STOCK.**

## XI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "***Tax Code***"), the U.S. Treasury regulations promulgated thereunder ("***Treasury Regulations***") and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible

retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been sought or obtained with respect to the tax consequences of the Plan described herein. The Debtors have not requested, and do not intend to request, any ruling or determination from the U.S. Internal Revenue Service ("**IRS**") or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a Holder of an Allowed Claim in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, real estate investment trusts, retirement plans, individual retirement and other tax-deferred accounts, small business investment companies, regulated investment companies, tax- exempt entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, partnerships or other entities treated as pass-through vehicles for U.S. federal income tax purposes, controlled foreign corporations, passive foreign investment companies, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, persons who received their Claims as compensation, non-U.S. Holders (as defined below) that own, actually or constructively, ten percent or more of the total combined voting power of all classes of stock of Debtors, dealers in securities or foreign currencies, U.S. expatriates, persons who hold Claims or who will hold the Senior Secured Notes or Unsecured Notes as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy and Holders that prepare an "applicable financial statement" (as defined in section 451 of the Tax Code).

Additionally, this discussion does not address the implications of the alternative minimum tax, the base erosion and anti-abuse tax, or the "Medicare" tax on net investment income. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors, the Reorganized Holdings or Holders of Allowed Claims based upon their particular circumstances. This summary does not discuss any tax consequences of the Plan that may arise under any laws other than U.S. federal income tax law, including under state, local, or non-U.S. tax law. Furthermore, this summary does not discuss any actions that a Holder may undertake with respect to its Allowed Claims, other than voting such Allowed Claim and receiving the consideration provided under the Plan, or with respect to any actions undertaken by a Holder subsequent to receiving any consideration under the Plan.

Furthermore, this summary assumes that a Holder of an Allowed Claim holds a Claim only as a "capital asset" (other than an Allowed Trade Claim,  an Allowed Non-Qualified Pension Claim or an Allowed Other General Unsecured Claim) (within the meaning of section 1221 of the Tax Code). This summary also assumes that (i) the various debt and other arrangements to which any of the Debtors or the Reorganized Holdings are a party will be respected for U.S. federal income tax purposes in accordance with their form, (ii) none of the

Allowed Claims, Senior Secured Notes or Unsecured Notes are "traded on an established securities market" within the meaning of Section 1273 of the Tax Code, and (iii) none of the Unsecured Claims are "contingent payment debt instruments" within the meaning of Treasury Regulations Section 1.1275-4. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes. This summary does not address the U.S. federal income tax consequences to Holders (i) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (ii) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of a Claim that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (1) if a court within the United States is able to exercise primary supervision over the trust's administration and one or more U.S. persons have authority to control all substantial decisions of the trust or (2) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any beneficial owner of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a beneficial owner of a Claim, the tax treatment of a partner (or other owner) of such entity generally will depend upon the status of the partner (or other owner) and the activities of the entity. Partners (or other owners) of partnerships (or other pass-through entities) that are beneficial owners of a Claim are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES APPLICABLE UNDER THE PLAN, INCLUDING THE IMPACT OF TAX LEGISLATION.

A.    **Certain U.S. Federal Income Tax Considerations for the U.S. Debtors and the Reorganized Holdings**

(i)    (i)    General.

Each of the Debtors organized in the United States (each such Debtor a "***U.S. Debtor***" and collectively, the "***U.S. Debtors***") is a member of an affiliated group of corporations that files consolidated federal income tax returns with Stream as the common parent (such consolidated group, the "***Stream Tax Group***") or an entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are

reflected on the consolidated U.S. federal income tax returns of the Stream Tax Group. The non-U.S. Debtors are not currently directly subject to U.S. federal income tax, and the Debtors expect that such non-U.S. Debtors will not be subject to U.S. federal income tax immediately following the Restructuring Transactions. The U.S. Debtors estimate that, as of the filing date of the tax returns for the year ended **December 31, 2018**, the Stream Tax Group had consolidated net operating loss carryforwards ("***NOL***") of approximately $118.5 million, among other tax attributes (including tax basis in assets), and approximately $[_] of disallowed business interest expense carryforwards. However, the amount of Stream Tax Group NOLs and other tax attributes, as well as the application of any limitations thereon, remains subject to review and adjustment, including by the IRS. As discussed below, the U.S. Debtors' NOLs and certain other tax attributes are expected to be significantly reduced or eliminated entirely upon implementation of the Plan.

The tax consequences of the implementation of the Plan to the U.S. Debtors will differ depending on how the Restructuring Transactions are structured for applicable tax purposes including as a taxable sale of the U.S. Debtors' assets and/or stock to an indirect subsidiary of a newly formed Reorganized Holdings (a "***Newco Acquisition***") or as an exchange of restructured interests in Reorganized Debtors for Claims (a "***Restructuring in Place***"). The U.S. Debtors have not yet determined whether they intend to structure the Restructuring Transactions as a Newco Acquisition, a Restructuring in Place or in another manner. Such decision will depend on, among other things, the magnitude of any anticipated cash tax liability arising from a Newco Acquisition, the fair market value of any tax basis arising in connection with the same, and the anticipated cash tax profile of the U.S. Debtors following implementation of the Plan.

a.      *Newco Acquisition*

If the transaction undertaken pursuant to the Plan is structured as a Newco Acquisition, the U.S. Debtors would recognize gain or loss upon the transfer in an amount equal to the difference between (i) the sum of (x) any cash received and the "issue price" of the Senior Secured Notes and Unsecured Notes and (y) the amount of any other liabilities directly or indirectly assumed by the acquirer and (ii) the U.S. Debtors' tax basis in the assets or stock transferred (including any assets deemed transferred, such as by reason of an election to treat a stock transfer as an asset transfer for U.S. federal income tax purposes (via one or more elections pursuant to Tax Code sections 338(g), 338(h)(10) or 336(e)) or the transfer of the membership interests in a wholly-owned limited liability company that is disregarded for U.S. federal income tax purposes). In connection with such transaction U.S. Debtors (or subsidiaries thereof) will be deemed to or will actually liquidate for U.S. federal income tax purposes in a taxable transaction and the U.S. Debtors may recognize additional gain or loss in respect of such liquidations (e.g. in respect of insolvent subsidiaries). Depending on the projected enterprise value relative to the existing tax basis of the assets that would be transferred, the amount of any gain or loss on such liquidations and the availability of NOLs or other tax attributes to offset any gain on the transfer or liquidations, the U.S. Debtors could be subject to material U.S. federal, state or local income tax liability, which amount cannot be determined at this time. Reorganized Holdings (and its subsidiaries) would not succeed to any U.S. federal income tax attributes of the U.S. Debtors (such as NOLs, tax credits or tax basis in assets). It is

likely the U.S. Debtors will also recognize COD Income (defined below) with respect to certain Claims, which would be excluded under the Bankruptcy Exception (defined below) as discussed in "Cancellation of Indebtedness Income and Reduction of Tax Attributes" below.

If an indirect subsidiary of a newly-formed Reorganized Holdings (the "***Newco Entities***") purchases assets or stock of the U.S. Debtors pursuant to a Newco Acquisition, such entity will generally take a fair market value basis in the transferred assets or stock. However, if a Newco Acquisition involves a purchase of stock of a U.S. Debtor, such Debtor will retain its basis in its assets unless the parties make an election pursuant to Tax Code sections 338(g), 338(h)(10) or 336(e) to treat the stock purchase as the purchase of assets. There is no authority directly on point with respect to a transaction structured as a Newco Acquisition and there is no guaranty that the IRS would not take a position contrary to the U.S. Debtors' reporting of such Newco Acquisition, which position may ultimately be sustained by a court.

Although the U.S. Debtors expect a transfer of the stock or assets of the U.S. Debtors to an indirect subsidiary of a newly formed Reorganized Holdings to be treated as a taxable asset acquisition, there is no assurance that the IRS would not take a contrary position and assert that such transaction is instead a tax-free reorganization. Moreover, it is possible, although not currently anticipated, that Reorganized Holdings may, after emergence, make (or cause its subsidiaries to make) certain elections to cause such transaction to be treated as a tax-free reorganization. If the transfer of the U.S. Debtors' stock or assets to an indirect subsidiary of a newly formed Reorganized Holdings were treated as a tax-free reorganization, Reorganized Holdings and its subsidiaries would carry over the tax attributes of the Stream Tax Group (including tax basis in assets), subject to the required attribute reduction attributable to the substantial COD Income incurred in connection with emergence and other applicable limitations (as discussed below). If the Restructuring Transactions were treated as a tax-free reorganization, the impact of the associated Restructuring Transactions to the U.S. Debtors could be materially different from the consequences described herein. The remainder of this disclosure assumes that any sale of the U.S. Debtors' assets and/or stock to a subsidiary of Reorganized Holdings in connection with the Restructuring Transaction will be a taxable sale as described above under "—a. "Newco Acquisition".

    *b.*      *Restructuring in Place*

    (i)      <u>Cancellation of Indebtedness Income and Reduction of Tax Attributes</u>.

In general, absent an exception, a debtor will realize and recognize "cancellation of indebtedness income" ("***COD Income***") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income incurred is, generally, the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor (or, if the consideration is in the form of new debt of the issuer, the issue price of such new debt).

Under section 108 of the Tax Code, a debtor is not required to include COD Income in gross income if the debtor is under the jurisdiction of a court in a case under the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence

of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108(a) of the Tax Code. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryforwards; (c) minimum tax credit carryforwards; (d) capital loss carryforwards; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryforwards; and (g) foreign tax credit carryforwards. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the U.S. Debtors expect to realize significant COD Income. The exact amount of any COD Income that will be realized by the U.S. Debtors will not be determinable until the consummation of the Plan. However, the U.S. Debtors expect that the amount of such COD Income will significantly reduce or eliminate their NOLs and tax credits allocable to periods prior to the Effective Date, and may significantly reduce the U.S. Debtors' tax basis in their assets.

Any reduction in tax attributes attributable to the COD Income incurred does not occur until the end of the taxable year in which the Plan goes effective. As a result, in the case of a Newco Acquisition, the U.S. Debtors do not expect the resulting attribute reduction to adversely affect the U.S. federal income tax treatment of the Newco Acquisition (as described above), including the computation of gain or loss on the sale.

(ii)    Other Income

The U.S. Debtors may incur other income for U.S. federal income tax purposes in connection with a Restructuring in Place that, unlike COD Income, generally will not be excluded from the U.S. Debtors' U.S. federal taxable income. For example, if appreciated assets are transferred by the U.S. Debtors in satisfaction of a Claim that is treated as "recourse" for applicable tax purposes, the U.S. Debtors would expect to realize gain in connection with such transfer. In addition, the U.S. federal income tax considerations relating to the Plan are complex and subject to uncertainties. No assurance can be given that the IRS will agree with the U.S. Debtors' interpretations of the tax rules applicable to, or tax positions taken with respect to, the transactions undertaken to effect the Plan. If the IRS were to successfully challenge any such interpretation or position, the Debtors may recognize additional taxable income for U.S. federal income tax purposes, and the Debtors may not have sufficient deductions, losses or other attributes for U.S. federal income tax purposes to fully offset such income.

(iii)    Limitation of NOL Carryforwards and Other Tax Attributes.

Under the Tax Code, any NOL carryforwards and certain other tax attributes, including carryforward of disallowed interest and certain "built-in" losses, of a corporation remaining after attribute reduction (collectively, "***Pre-Change Losses***") may be subject to an annual limitation if the corporation undergoes an "ownership change" within the meaning of section 382 of the Tax Code. These limitations apply in addition to, and not in lieu of, the attribute reduction that may result from the COD Income arising in connection with the Plan.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change" and does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its Pre-Change Losses that may be utilized to offset future taxable income is subject to an annual limitation. In general, the amount of the annual limitation to which a corporation that undergoes an ownership change would be subject is equal to the product of (a) the fair market value of the stock of the loss corporation immediately before the ownership change (with certain adjustments) multiplied by (b) the "long- term tax-exempt rate" in effect for the month in which the ownership change occurs (currently, 3.29% for an ownership change occurring in December 2022). The annual limitation under section 382 represents the amount of pre-change NOLs, as well as certain built-in losses recognized within the five year period following the ownership change and, subject to modifications, the amount of capital loss carryforwards and tax credits, that may be used each year to offset income. The section 382 limitation may be increased, up to the amount of the net unrealized built-in gain (if any) at the time of the ownership change, to the extent that the U.S. Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.

In the case of a Restructuring in Place, the U.S. Debtors anticipate that the Stream Tax Group will experience an "ownership change" (within the meaning of section 382 of the Tax Code) on the Effective Date. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits, and, as a result, the Stream Tax Group's ability to use its Pre-Change Losses is expected to be similarly limited. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

An exception to the foregoing annual limitation rules generally applies when former shareholders and so called "qualified creditors" of a corporation under the jurisdiction of a court in a case under the Bankruptcy Code receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also under the jurisdiction of a court in a case under the Bankruptcy Code) pursuant to a confirmed Chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date, and during the part of the taxable year prior to and including the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another ownership change within two years after Consummation of the Plan, then the Reorganized Debtors' section 382 annual limitation will generally be reduced to zero, which would effectively preclude utilization of Pre-Change Losses.

Where the 382(l)(5) Exception is not applicable (either because the debtor company does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). When the 382(l)(6) Exception applies, a corporation under the jurisdiction of a court in a case under the Bankruptcy Code that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or

cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the Reorganized Debtors would not be required to reduce their Pre-Change Losses by the amount of any interest deductions claimed by the U.S. Debtors within the prior three-year period and the Reorganized Debtors may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.

A Restructuring in Place may qualify for the 382(l)(5) Exception, although analysis is ongoing. Even if the Restructuring in Place is eligible for the 382(l)(5) Exception, the U.S. Debtors have not yet decided whether they would elect out of its application. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if another ownership change were to occur after the Effective Date.

**B.**     **Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Certain Allowed Claims**

    (i)     Consequences to U.S. Holders of Allowed Secured Claims or Partially Secured Claims and Allowed Other Secured Claims or Other Partially Secured Claims

Pursuant to the Plan, in full satisfaction and discharge of Allowed Secured Claims or Partially Secured Claims and Allowed Other Secured Claims and Other Partially Secured Claims (each, a "***Class I Secured Claim***", and collectively, the "***Class I Secured Claims***") U.S. Holders will receive the Senior Secured Notes.

    a.     *Tax Treatment of Exchange Class I Secured Claims for the Senior Secured Notes-Generally.*

Except as discussed under "Recapitalization", below, a U.S. Holder of a Class I Secured Claim should be treated as exchanging their Class I Secured Claim for the Senior Secured Notes in a fully taxable exchange under section 1001 of the Tax Code. A U.S. Holder of a Class I Secured Claim should realize gain or loss equal to the difference between (a) the "issue price" (depending on the issuer) or fair market value (depending on the issuer) of the Senior Secured Notes received in exchange for its Claim (subject to the discussion of "Distributions Attributable to Accrued Interest (and OID)" below) and (b) the U.S. Holder's adjusted tax basis in its Claim.

    b.     *Recapitalization-Generally.*

The extent to which U.S. Holders of Class I Secured Claims will recognize gain or loss in connection with the Restructuring Transactions will depend upon whether the receipt of the Senior Secured Notes in exchange for the Class I Secured Claims qualifies as a recapitalization within the meaning of Section 368(a)(1)(E) of the Tax Code. Whether the exchange of Class I Secured Claims for the Senior Secured Notes will constitute a "recapitalization" within the

meaning of Section 368(a)(1)(E) of the Tax Code will depend on whether the Restructuring Transactions are structured as a Restructure in Place and whether the Class I Secured Claims and the Senior Secured Notes constitutes a "security" for U.S. federal income tax purposes.

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, whether such instrument is deemed to be in exchange for another debt instrument and whether such payments are made on a current basis or accrued. Holders of such Claims are urged to consult their own tax advisors as to the tax consequences of such treatment.

        *c.*      *Tax Consequences to U.S. Holders of Exchange of Class I Secured Claims for Senior Secured Notes in a Newco Acquisition or a Restructuring in Place Transaction that does not Qualify as a Recapitalization.*

If the Restructuring Transactions are structured as a Newco Acquisition, or if the Restructuring Transactions are structured as a Restructuring in Place that is not treated as a "recapitalization" under Section 368(a)(1)(E) of the Tax Code, then the exchange of Class I Secured Claims for Senior Secured Notes will be treated as a fully taxable exchange under section 1001 of the Tax Code. As a result, a U.S. Holder of a Class I Secured Claim should, in each case, recognize gain or loss equal to the difference between (a) the "issue price" (depending on the issuer) or fair market value (depending on the issuer) of the Senior Secured Notes received in exchange for its Class I Secured Claim (subject to the discussion of "Distributions Attributable to Accrued Interest (and OID)" below) and (b) the U.S. Holder's adjusted tax basis in its Class I Secured Claim reduced, in the case of a U.S. Holder of a Class I Secured Claim treated as contingent payment debt instruments under applicable Treasury Regulations, by any negative adjustment carryforward of such Holder in respect of such Claims pursuant to Treasury Regulations Section 1.1275-4(b)(6)(iii)(C).  A U.S. Holder's tax basis in Senior Secured Notes should be equal to the "issue price" the "issue price" (depending on the issuer) or fair market value (depending on the issuer) (determined as discussed below). A U.S. Holder's holding period for the Senior Secured Notes received on the Effective Date should begin on the day following the Effective Date. The rules governing "contingent payment debt instruments" are complex and Holders of Claims that are treated as "contingent payment debt instruments" are encouraged to discuss the consequences of the Plan under Treasury Regulations governing "contingent payment debt instruments" with their own tax advisors.

> d.      *Tax Consequences to U.S. Holders of Exchange of Class I Secured Claims for Senior Secured Notes in a Restructuring in Place Transaction that Qualifies as a Recapitalization*

If the Restructuring Transactions are structured as a Restructuring in Place Transaction and the Class I Secured Claims and Senior Secured Notes constitute "securities" for U.S. federal income tax purposes, the U.S. Debtors would expect a U.S. Holder's exchange of their Class I Secured Claims for Senior Secured Notes to qualify as a "recapitalization" within the meaning of Section 368(a)(1)(E) of the Tax Code. In such case, a U.S. Holder will generally not recognize gain or loss on the exchange except to the extent of any boot received in connection with the exchange, subject to the discussion of the "Distributions Attributable to Accrued Interest (and OID)" below in which Senior Secured Notes are treated as received in satisfaction of accrued but unpaid interest would, in each case, carry over to the Senior Secured Notes (see "Market Discount" discussion below). A U.S. Holder's aggregate tax basis in its Senior Secured Notes should be equal to its aggregate tax basis in the surrendered Class I Secured Claims plus any gain recognized on the exchange. A U.S. Holder's holding period for its Senior Secured Notes should include the holding period for the Class I Secured Claims exchanged therefor.

> (ii)      <u>Tax Consequences to U.S. Holders of Allowed Class III Claims</u>

Pursuant to the Plan, in full satisfaction and discharge of a U.S. Holders' of Allowed Class III Claims each U.S. Holder of an Allowed Class IV Claim will receive their pro rata share of the Unsecured Notes.

> a.      *Tax Consequences to U.S. Holders of Exchange of Allowed Class III Claims for Unsecured Notes in a Newco Acquisition or a Restructuring in Place Transaction that is not treated as a "recapitalization" under Section 368(a)(1)(E).*

If the Restructuring Transactions are structured as a Newco Acquisition, or if the Restructuring Transactions are structured as a Restructuring in Place that is not treated as a "recapitalization" under Section 368(a)(1)(E) of the Tax Code, then the exchange of Allowed Class III Claims for Unsecured Notes will be treated as a fully taxable exchange under section 1001 of the Tax Code. As a result, a U.S. Holder of a Allowed Class III Claim should, in each case, recognize gain or loss equal to the difference between (a) the "issue price" (depending on the issuer) or fair market value (depending on the issuer) of the Unsecured Notes received in exchange for its Allowed Class III Claim (subject to the discussion of "Distributions Attributable to Accrued Interest (and OID)" below) and (b) the U.S. Holder's adjusted tax basis in its Allowed Class III Claim. A U.S. Holder's tax basis in Unsecured Notes should be equal to the "issue price" (if the Allowed Class III Claims and Unsecured Notes are not publicly traded) or fair market value (if any of the Allowed Class III Claims or Unsecured Notes are publicly traded) (determined as discussed below). A U.S. Holder's holding period for the Unsecured Notes received on the Effective Date should begin on the day following the Effective Date.

> (iii)      <u>Character of Gain or Loss</u>.

The character of any recognized gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Allowed Claim. In addition, gain recognized with respect to any Allowed Claim that is treated as a contingent payment debt instrument under applicable Treasury Regulations is expected to be characterized as ordinary income, and any loss may be characterized, in whole or in part, as ordinary loss. If the gain on the exchange is treated as a capital gain, it generally would be long-term capital gain if the U.S. Holder held its Allowed Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations as discussed below. To the extent that a portion of the consideration received in exchange for its Allowed Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. See the discussions of "Accrued Interest," "Market Discount" and "Limitations on Use of Capital Losses" below.

(iv)     Distributions Attributable to Accrued Interest (and OID).

A portion of the consideration received by U.S. Holders of Allowed Claims may be attributable to accrued but untaxed interest (or original issue discount ("*OID*")) on such Claims. If any amount is attributable to such accrued interest (or OID), then such amount should be taxable to that U.S. Holder as interest income if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Allowed Claims should be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims (as determined for United States federal income tax purposes), with any excess allocated to the remaining portion of such Claims, if any. There is no assurance that the IRS will respect such allocation.

U.S. Holders are urged to consult their own tax advisors regarding the allocation of consideration received under the plan, as well as the deductibility of accrued but unpaid interest and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for U.S. federal income tax purposes.

(v)     Market Discount.

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges a Claim on the Effective Date may be treated as ordinary income (instead of capital gain) to the extent of the amount of accrued "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the holder's adjusted tax basis in the debt instrument is less than

106

(i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in certain tax-free transactions for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the exchanged debt instrument. To date, specific Treasury Regulations implementing this rule have not been issued. U.S. Holders of Allowed Claims who acquired the notes underlying their Claims with market discount are urged to consult with their own tax advisors as to the appropriate treatment of any such market discount and the timing of the recognition thereof.

(vi)     Limitation on Use of Capital Losses.

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non- corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, capital losses may only be used to offset capital gains. A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

**C.      U.S. Federal Income Tax Consequences of Ownership and Disposition of Senior Secured Notes and Unsecured Notes**

(i)      Characterization of Senior Secured Notes and Unsecured Notes

A debt instrument that provides for one or more contingent payments may implicate the provisions of the Treasury Regulations relating to "contingent payment debt obligations," in which case the timing and amount of income inclusions and the character of income recognized may be different from the consequences described herein. Under such Treasury Regulations, however, one or more contingencies will not cause a debt instrument to be treated as a contingent payment debt instrument if, as of the issue date, such contingencies in the aggregate are considered "remote" or "incidental."

In addition, the Treasury Regulations contain exceptions from the characterization as contingent payment debt obligations for a number of categories of debt instruments, including "variable rate debt instruments." A debt instrument qualifies as a "variable rate debt instrument" if (a) the issue price does not exceed the total non-contingent principal payments due under the debt instrument by more than a specified de minimis amount and (b) the debt instrument provides for stated interest, paid or compounded at least annually, at current values of a single fixed rate and one or more qualified floating rates. A "qualified floating rate" is any variable rate where variations in the value of such rate can reasonably be expected to measure contemporaneous variations in the cost of newly borrowed funds in the currency in which the debt instrument is denominated.

The Debtors currently intend to treat the Senior Secured Notes, as variable rate debt instruments and not as contingent payment debt instruments. However, Reorganized Holdings' treatment of Senior Secured Notes ultimately will be based on the final terms and conditions as between the Debtors and other relevant stakeholders. Such treatment will be binding on a U.S. Holder, unless the U.S. Holder explicitly discloses to the IRS on its tax return for the year during which such U.S. Holder acquires an interest in Senior Secured Notes that it is taking a different position. Our position will not be binding on the IRS. Each U.S. Holder should consult its own tax advisor regarding our determination.

> (ii)    <u>Qualified Stated Interest</u>.

A U.S. Holder of claims in Senior Secured Notes and Unsecured Notes will be required to include stated interest that accrues on Senior Secured Notes and Unsecured Notes, if any, in income in accordance with the U.S. Holder's regular method of accounting to the extent such stated interest is "qualified stated interest." Stated interest is generally "qualified stated interest" if it is unconditionally payable in cash or property at least annually at a single fixed rate or, subject to certain conditions, based on one or more interest indices. If any interest payment (or portion thereof) is payable in additional debt instruments of the issuer, such interest payment (or portion thereof) will not be treated as qualified stated interest.

> (iii)    <u>Original Issue Discount</u>.

A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a de minimis amount (generally 0.25% of the product of the stated redemption price at maturity and the number of complete years to maturity from the issue date). With respect to debt instruments that are not traded on an established securities market, the issue price will generally be the principal amount of the debt instrument if the stated interest rate is at least equal to the applicable federal rate in effect at the time the debt instrument is issued.  If the debt instrument does not have a stated interest rate, then the issue price will be less than the stated redemption price at maturity and the debt instrument will have OID unless the amount of OID is de minimis.  Because the Unsecured Notes will be issued without stated interest it is expected that the Unsecured Notes will be issued with OID.

A U.S. Holder (whether a cash or accrual method taxpayer) generally will be required to include the OID in gross income (as ordinary interest income) as the OID accrues (on a constant yield to maturity basis), in advance of the Holder's receipt of cash payments

attributable to this OID. In general, the amount of OID includible in the gross income of a U.S. Holder will be equal to a ratable amount of OID with respect to the debt instrument for each day in an accrual period during the taxable year or portion of the taxable year on which a U.S. Holder held the debt instrument. An accrual period may be of any length and the accrual periods may vary in length over the term of the debt instrument, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the final day of an accrual period or on the first day of an accrual period. The amount of OID allocable to any accrual period is an amount equal to the excess, if any, of (i) the product of the debt instrument's adjusted issue price at the beginning of such accrual period and its yield to maturity, determined on the basis of a compounding assumption that reflects the length of the accrual period over (ii) the qualified stated interest payments on the debt instruments allocable to the accrual period. The adjusted issue price of a debt instrument at the beginning of any accrual period generally equals the issue price of the debt instrument increased by the amount of all previously accrued OID and decreased by any cash payments previously made on the debt instrument other than payments of qualified stated interest.

Under applicable Treasury Regulations, in order to determine the amount of qualified stated interest and OID in respect of a variable rate debt instrument for which not all interest is qualified stated interest, an "equivalent fixed rate debt instrument" must be constructed. The "equivalent fixed rate debt instrument" is a hypothetical instrument that has terms that are identical to the debt instrument, except that the equivalent fixed rate debt instrument provides for a fixed rate substitute for each qualified floating rate in lieu of each actual rate on the debt instrument. A fixed rate substitute for each qualified floating rate on the debt instrument is the value of such rate as of its issue date.

Once the equivalent fixed rate debt instrument has been constructed pursuant to the foregoing rules, the amount of OID and qualified stated interest, if any, are determined for the equivalent fixed rate debt instrument by applying the general OID rules to the equivalent fixed rate debt instrument and a U.S. Holder of Senior Secured Notes and Unsecured Notes will account for such OID and qualified stated interest as if the U.S. Holder held the equivalent fixed rate debt instrument. For each accrual period, appropriate adjustments will be made to the amount of qualified stated interest or OID assumed to have been accrued or paid with respect to the "equivalent" fixed rate debt instrument in the event that such amounts differ from the actual amount of interest accrued or paid on the debt instrument during the accrual period. The stated redemption price at maturity of a debt instrument is the sum of all payments provided by the debt instrument other than payments of qualified stated interest.

**THE APPLICATION OF THE OID RULES IS HIGHLY COMPLEX. U.S. HOLDERS OF SENIOR SECURED NOTES AND UNSECURED NOTES ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF ANY OID ON SUCH NOTES.**

**D.      Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Allowed Claims**

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan and the ownership and disposition of the Senior Secured Notes and Unsecured Notes.

(i)       A non-U.S. Holder generally will not be subject to U.S. federal income tax or withholding tax on gain recognized on the sale, exchange, redemption, retirement or other disposition of a Senior Secured Note or Unsecured Note so long as (i) the gain is not effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (or, if a tax treaty applies, the gain is not attributable to a U.S. permanent establishment maintained by such non-U.S. Holder) and (ii) in the case of a non-U.S. Holder who is an individual, such non-U.S. Holder is not present in the United States for 183 days or more in the taxable year of disposition or certain other requirements are not met. Any amounts received in respect of accrued and unpaid interest will generally be treated as described in "—Payments of Interest (Including Accrued Interest on Claims)" below. A non-U.S. Holder who is an individual and does not meet an exemption should consult his or her tax advisor regarding the potential liability for U.S. federal income tax on such holder's gain realized on a Senior Secured Note or Unsecured Note.

(ii)      <u>Payments of Interest (Including Accrued Interest on Claims).</u>

Subject to the discussion of FATCA and backup withholding below, payments to a non-U.S. Holder that are attributable to (x) interest on (or OID accruals with respect to) the Class III and Class V and (y) amounts received pursuant to the Plan in respect of accrued but untaxed interest generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of the Debtors' stock (in the case of interest payments received pursuant to the Plan) or Reorganized Holdings' stock (in the case of interest payments with respect to Class III and Class V) entitled to vote;

- the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors (in the case of interest payments received pursuant to the Plan) or Reorganized Holdings' stock (in the case of interest payments with respect to the Class III and Class V) (each, within the meaning of the Tax Code);

- the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

- such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States.

A non-U.S. Holder described in the first three bullets above generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on (x) interest on (or OID accruals with respect to) Senior Secured Notes and Unsecured Notes and (y) amounts received pursuant to the Plan in respect of accrued but untaxed interest.

A non-U.S. Holder described in the fourth bullet above generally will not be subject to withholding tax if it provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, but will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. As described above in more detail under the heading "Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Claims— Accrued Interest," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Non-U.S. Holders who participate in Class III in connection with the Restructuring Transactions are urged to consult a U.S. tax advisor with respect to the U.S. tax consequences applicable to their acquisition, holding and disposition the Senior Secured Notes and Unsecured Notes.

(v)    FATCA.

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income (including interest on the Senior Secured Notes and Unsecured Notes). Pursuant to proposed Treasury Regulations on which taxpayers are permitted to rely pending their finalization, this withholding obligation would not apply to gross proceeds from the sale or disposition of property such as the Senior Secured Notes and Unsecured Notes. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

**EACH NON-U.S. HOLDER IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH NON-U.S. HOLDER'S OWNERSHIP OF SENIOR SECURED NOTES OR UNSECURED NOTES.**

78171590;8

### E.      Information Reporting and Back-Up Withholding

All distributions to Holders of Claims under the Plan are subject to any applicable tax withholding, including (as applicable) employment tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the holder fails to furnish its social security number or other taxpayer identification number (a "TIN"), furnishes an incorrect TIN, fails properly to report interest or dividends, or under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF TAX LEGISLATION AND ANY OTHER CHANGE IN APPLICABLE TAX LAWS.**

## XII.    CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement and the attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation. Documents filed with the SEC may contain important risk factors that differ from those discussed below. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov.

### A.      Certain Restructuring Law Considerations

1.      Effect of Chapter 11 Cases. Although the Plan is intended to effectuate a coordinated financial restructuring of the Debtors, and enjoys support from the Plan Sponsor, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, court proceedings to confirm the Plan could have an adverse effect on the Debtors' businesses. The proceedings also involve additional expense and may divert some of the attention of Debtors' management away from business operations.

2.      The Plan Sponsor May Not Be Able to Confirm the Plan. Although the Plan Sponsor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation, or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all voting Classes vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court, which may exercise its substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions holders of Claims ultimately would receive on account of their Claims under a subsequent plan of reorganization (or liquidation).

3.      Non-Consensual Confirmation. In the event that any Impaired Class of Claims does not accept or is deemed not to accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtors' request if at least one Impaired Class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Classes. While the Plan Sponsor believes that the Plan satisfies these requirements, should any Class reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes.

4.      Risk of Timing or Non-Occurrence of Effective Date. There can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan do not occur or are not waived as set forth in Article X of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all Holders of Claims and Interests would be restored to the status quo ante as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged. Notably, the conditions precedent include the requirement that the Debtors obtain all governmental and material third-party approvals necessary to effectuate the Restructuring Transactions. Moreover, absent an extension, the Restructuring Agreements may be terminated by Plan Sponsor (as defined in the Restructuring Agreements) if the Effective Date does not occur by a date certain. The Debtors cannot assure that the conditions precedent to the Plan's effectiveness will occur or be waived by such date.

5.      Conversion into Chapter 7 Cases. If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of

78171590;8

Holders of Claims, the Chapter 11 Cases may be converted to cases under Chapter 7, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. See Article XIV.C hereof, for a discussion of the effects that a Chapter 7 liquidation would have on the recoveries to Holders of Claims.

6.    <u>Impact of the Chapter 11 Cases on the Debtors</u>. The Chapter 11 Cases may affect the Debtors' relationships, and their ability to negotiate favorable terms, with creditors, customers, vendors, employees, and other personnel and counterparties. While the Debtors expect to continue normal operations, public perception of their continued viability may affect, among other things, the desire of new and existing customers, vendors, landlords, employees, or other parties to enter into or continue their agreements or arrangements with the Debtors. The failure to maintain any of these important relationships could adversely affect the Debtors' businesses, financial condition, and results of operations.

Because of the public disclosure of the Chapter 11 Cases and concerns certain vendors may have about the Debtors' liquidity, the Debtors' ability to maintain normal credit terms with vendors may be impaired. Also, the Debtors' transactions that are outside of the ordinary course of business are generally subject to the approval of the Bankruptcy Court, which may limit the Debtors' ability to respond on a timely basis to certain events or take advantage of certain opportunities. As a result, the effect that the Chapter 11 Cases will have on the Debtors' businesses, financial conditions, and results of operations cannot be accurately predicted or quantified at this time.

7.    <u>The Plan Is Based upon Assumptions the Debtors Developed That May Prove Incorrect and Could Render the Plan Unsuccessful</u>. The Plan and the Restructuring Transactions contemplated thereby reflect assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, management's plans, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances. The feasibility of the Plan for confirmation purposes under the Bankruptcy Code relies on all cash payments after the Effective Date.

Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including, but not limited to: (i) the ability to maintain customers' confidence in the Company's viability as a continuing entity and to attract and retain sufficient business from them; (ii) the ability to retain key employees; and (iii) the overall strength and stability of general economic conditions in the United States and in the specific markets in which the Debtors currently do business. The failure of any of these factors could not only vitiate the projections and analyses that informed the Plan, but also otherwise materially adversely affect the successful reorganization of the Debtors' businesses.

The Company expects that its actual financial condition and results of operations may differ, perhaps materially, from what was anticipated. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization the Debtors may implement will occur or, even if they do occur, that they will have the anticipated effects on the

Debtors and their respective subsidiaries or their businesses or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the Plan.

8.      Projections, Estimates, and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary. Certain of the information contained in this Disclosure Statement is, by its nature, forward-looking, and contains estimates and assumptions that might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates— including estimated recoveries by holders of Allowed Claims—and such projections and estimates should not be considered assurances or guarantees of the amount of assets that will ultimately be available for distribution on the Effective Date or the amount of Claims in the various Classes that might be Allowed.

9.      The Allowed Amount of Claims May Differ from Current Estimates. There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated in this Disclosure Statement. Furthermore, although the Claims Bar Date has passed, the Bankruptcy Court may allow additional Claims to be filed.

10.     Parties-in-Interest May Object to the Debtors' Classification of Claims and Interests. Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Plan Sponsor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

11.     Releases, Injunctions, and Exculpations Provisions May Not Be Approved. Article XI of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and causes of action that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties and may not be approved. If the releases, injunctions, and exculpations are not approved, certain Released Parties may withdraw their support for the Plan. The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganization efforts and have agreed to make further contributions, including by agreeing to convert certain of their Claims against the Debtors' Estates into equity in Reorganized Holdings, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an

inextricable component of the Restructuring Agreements and the significant deleveraging and financial benefits embodied in the Plan.

12.    **The Plan Sponsor May Seek to Amend, Waive, Modify, or Withdraw the Plan at Any Time Before Confirmation**. the Plan Sponsor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All Holders of Claims and Interests will receive notice of such amendments or waivers required by applicable Law and the Bankruptcy Court. If the Debtors seek to modify the Plan after receiving sufficient acceptances but before the Bankruptcy Court's entry of an order confirming the Plan, the previously solicited acceptances will be valid only if (i) all Classes of adversely affected Holders accept the modification in writing or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification was de minimis or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims or Interests, or is otherwise permitted by the Bankruptcy Code.

### B.    Risks Relating to the Debtors' and Reorganized Debtors' Businesses

1.    **Post-Effective Date Indebtedness**. On the Effective Date, on a consolidated basis, it is expected that the Reorganized Debtors will have secured outstanding indebtedness. This level of expected indebtedness and the funds required to service such debt could, among other things, make it difficult for the Reorganized Debtors to satisfy their obligations under such indebtedness, increasing the risk that they may default on such debt obligations.

The Reorganized Debtors' earnings and cash flow may vary significantly from year to year. Additionally, the Reorganized Debtors' future cash flow may be insufficient to meet their debt obligations and commitments. Any insufficiency could negatively impact the Reorganized Debtors' businesses. A range of economic, competitive, business, and industry factors will affect the Reorganized Debtors' future financial performance and, as a result, their ability to generate cash flow from operations and to pay their debt. Many of these factors are beyond the Reorganized Debtors' control.

If the Reorganized Debtors do not generate enough cash flow from operations to satisfy their debt obligations, they may have to undertake alternative financing plans, such as:

- refinancing or restructuring debt;

- selling assets;

- reducing or delaying capital investments; or

- seeking to raise additional capital.

116

It cannot be assured, however, that undertaking alternative financing plans, if necessary, would be possible on commercially reasonable terms, or at all, and allow the Reorganized Debtors to meet their debt obligations. An inability to generate sufficient cash flow to satisfy their debt obligations or to obtain alternative financing could materially and adversely affect the Reorganized Debtors' ability to make payments, as well as the Reorganized Debtors' businesses, financial condition, results of operations, and prospects.

2.    Risks Associated with the Debtors' Businesses and Industry. The risks associated with the Debtors' businesses and industry include, but are not limited to, the following:

- any future effects as a result of the pendency of the Chapter 11 Cases;

- the Debtors' liquidity and financial outlook;

- disruptions to the supply chain;

- the impact of inflation on the Debtors' costs;

- the Debtors' ability to adjust prices to reflect inflation;

- reductions in the Debtors' revenue from market pressures, increased competition, or otherwise;

- the Debtors' ability to attract, motivate, and/or retain their employees necessary to operate competitively in the Debtors' industry;

- the Debtors' ability to maintain successful relationships with key customers;

- changes in interest rates;

- exposure to foreign currency;

- the Debtors' ability to effectively manage costs;

- the Debtors' ability to drive and manage growth;

- changing consumer tastes;

- industry conditions;

- the impact of general economic and political conditions in the United States or in specific markets in which the Debtors currently conduct business;

- the Debtors' ability to generate revenues from new sources;

- the impact of regulatory rules or proceedings that may affect the Debtors' businesses from time to time;

- disruptions or security breaches of the Debtors' information technology infrastructure;

- the Debtors' ability to generate sufficient cash flows to service or refinance debt and other obligations post-emergence; and

- the Debtors' success at managing the foregoing risks.

### C.     **Additional Factors**

1.     The Plan Sponsor Has No Duty to Update. The statements contained in this Disclosure Statement are made by the Plan Sponsor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Plan Sponsor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2.     No Representations Outside This Disclosure Statement Are Authorized. No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan. You should promptly report unauthorized representations or inducements to the counsel to the Plan Sponsor and the U.S. Trustee.

3.     No Legal or Tax Advice Is Provided by this Disclosure Statement. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim is urged to consult its own legal counsel and accountant as to legal, tax, and other matters concerning its Claim. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

4.     No Representation Made. Nothing contained herein or in the Plan shall constitute evidence of, or a representation of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims.

5.     Certain Tax Consequences. The tax consequences of the Restructuring Transactions to the Reorganized Holdings may materially differ depending on how the Restructuring Transactions are structured. If the Restructuring Transactions are structured such that the Reorganized Holdings would be treated as purchasing certain of the assets of the Debtors for U.S. federal income tax purposes then the Reorganized Holdings would have an increased tax basis in those assets and increased future tax deductions that can be used to reduce the Reorganized Holdings' tax liability. The Debtors have not yet determined whether it will be practicable to structure the Restructuring Transactions in this manner. For a discussion of

certain tax considerations to the Debtors and certain Holders of Claims in connection with the implementation of the Plan as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan, see Article XII hereof.

SOLICITATION AND VOTING PROCEDURES

The procedures and instructions for voting and/or making elections and related deadlines are set forth in the Disclosure Statement Order. ***The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement.***

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY. PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER FOR A MORE COMPREHENSIVE DESCRIPTION OF THE PROCEDURES GOVERNING THE SOLICITATION, VOTING, AND TABULATION PROCESS. TO THE EXTENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE DISCLOSURE STATEMENT ORDER, THE DISCLOSURE STATEMENT ORDER GOVERNS.**

### D.    Voting Instructions and Release Opt-Out or Opt-In Elections

Only Holders of Hawk Parties' Secured or Partially Secured Claims, Other Secured or Partially Secured Claims, and General Unsecured Claims are entitled to vote to accept or reject the Plan (the "***Voting Holders***"). The Plan Sponsor is providing Ballots and other materials, including, among other things, the Confirmation Hearing notice, and the Disclosure Statement Order (collectively, the "***Solicitation Materials***") to the Voting Holders, along with instructions to access the Plan and Disclosure Statement on the Debtors' Case Information Website. Each Ballot will provide Holders the option to elect to not grant the release in Article XI of the Plan (the "***Opt-Out Election***"), except that no Holder that votes to accept the Plan will be entitled to select the Opt-Out Election.

The Plan Sponsor is not required to provide a copy of the Solicitation Materials to certain Holders of Claims and Interests who: (i) are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code; (ii) are not entitled to vote because they are Unimpaired and deemed to accept the Plan under section 1126(f) of the Bankruptcy Code; or (iii) are not entitled to vote because they are deemed to reject the plan under section 1126(g) of the Bankruptcy Code.

Holders of Priority Claims, Subordinated Unsecured Claims, and Equity Secured Claims (the "***Non-Voting Holders***") will receive notices of non-voting status on account of such Claims and Interests, along with related disclosures.

Each Ballot, Opt-Out Form, and Opt-In Form contains detailed instructions for completion and submission, as well as disclosures regarding, among other things, the voting record date (the "***Voting Record Date***") and the Voting Deadline, and the applicable standards for tabulating Ballots.

119

78171590;8

### E.     Voting Record Date

The Voting Record Date is [●], 2024. The Voting Record Date is the record date for determining which entities are entitled to vote on the Plan and receive Solicitation Materials.

### F.     Voting Deadline

The Voting Deadline is February 24, 2025 at 4:00 p.m., prevailing Eastern Time. For a vote or opt-out or opt-in election to count, (i) each Voting Holder or Voting Nominee must properly complete, execute, and deliver its respective Ballot or Master Ballot in accordance with the applicable instructions on the Ballot, master Ballot, or beneficial holder Ballot, and (ii) each Non-Voting Holder must properly complete, execute, and deliver its respective Opt-Out or Opt-In Form, as applicable, in accordance with the instructions set forth on such form, in each case to be actually received by the Voting and Claims Agent on or before the Voting Deadline.

### G.     Ballots Not Counted

Any Ballot may not be counted toward Confirmation if, among other things, it: (i) partially rejects and partially accepts the Plan; (ii) both accepts and rejects the Plan; (iii) is sent to the Debtors, the Debtors' agents (other than the Voting and Claims Agent), any indenture trustee, or the Debtors' financial or legal advisors; (iv) is sent by facsimile or any electronic means other than via the online balloting portal; (v) is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (vi) is cast by an Entity that does not hold a Claim in the Class specified in the Ballot; (vii) is submitted by a Holder not entitled to vote pursuant to the Plan; (viii) is unsigned; (ix) is not marked to accept or reject the Plan; (x) is received after the Voting Deadline (unless otherwise ordered by the Bankruptcy Court).

## XIII.   CONFIRMATION OF PLAN

### A.     Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. Notice of the Confirmation Hearing will be provided to all known creditors or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases. With authorization of the Bankruptcy Court, the Debtors have scheduled the Confirmation Hearing beginning on **March 3, 2025 at [[_] a.m./p.m.]**, prevailing Eastern Time, to consider confirmation of the Plan.

### B.     Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must: (i) be in writing;

(ii) conform to the Bankruptcy Rules, the Local Rules for the United States Bankruptcy Court for the Eastern District of Pennsylvania, and any orders of the Bankruptcy Court; (iii) set forth the name of the objector, and the nature and amount of Claims held or asserted by the objector against the Debtors' Estates or properties; (iv) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (v) be filed with the Bankruptcy Court (contemporaneously with a proof of service) and served upon the following parties so as to be **actually received** on or before February 24, 2025 at 4:00 p.m., prevailing Eastern Time:

(a)    The Debtors at:

Stream TV Networks, Inc.
2009 Chestnut Street, 3rd Floor
Philadelphia, PA 19103
Attention:      William Homony, Trustee
E-mail:         bhomony@mctllp.com

(b)    Office of the U.S. Trustee at:

Andrew R. Vara
United States Trustee
Robert N.C. Nix Federal Building
900 Market Street, Suite 320
Philadelphia, PA 19107
Attention:    Kevin P. Callahan
              John Henry Schanne
E-mail:       Kevin.P.Callahan@usdoj.gov
              John.Schanne@usdoj.gov

(c)    Counsel to the Debtors at:

Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street,| Suite 3400
Philadelphia, PA 19102-2101
Attention:    Michael Vagnoni
              Edmond George
Email:        Michael.Vagnoni@obermayer.com
              Edmond.George@obermayer.com

(d)    The Plan Sponsor at:

Visual Semiconductor, Inc.
1105 William Penn Drive
Bensalem, PA 19120
Attention:      Mathu Rajan

E-mail:    Mathu.Rajan@visualsemi.com

(e)    Counsel to the Plan Sponsor:

Akerman, LLP
500 West 5th Street, Suite 1210,
Austin, TX 78701
Attention    Adam Swick
John Thompsons
Emails:    Adam.Swick@Akerman.com
John.Thompson@Akerman.com

**Objections must also be served on those parties that have formally appeared and requested service in these cases pursuant to Bankruptcy Rule 2002 and any other parties required to be served pursuant to the Case Management Procedures in these Chapter 11 Cases.**

C.    **Requirements for Confirmation of Plan**

1.    Requirements of Section 1129(a) of the Bankruptcy Code.

(a)    General Requirements. At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

i.    the Plan complies with the applicable provisions of the Bankruptcy Code;

ii.    the Debtors have complied with the applicable provisions of the Bankruptcy Code;

iii.    the Plan has been proposed in good faith and not by any means forbidden by law;

iv.    any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

v.    the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the

122

Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

vi.     with respect to each Class of Claims or Interests, each Holder of an Impaired Claim has either accepted the Plan or will receive or retain under the Plan, on account of such Holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under Chapter 7;

vii.    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not Impaired under the Plan;

viii.   except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than priority tax Claims, will be paid in full on the Effective Date, and that priority tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

ix.     at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

x.      confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

xi.     all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

(b)     <u>Best Interests Test</u>. As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of

the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under Chapter 7. This requirement is referred to as the "best interests test." The "best interests test" is modified with respect to any class of creditors that makes an 1111(b) Election. If the 1111(b) election is made by a class, the test is satisfied if each holder of a claim in that class votes to accept the plan or receives property of a value on account of its claim, as of the effective date of a plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claim. The Valuation Analysis contains information concerning the value of the collateral securing the Debtors' funded debt.

Absent an 1111(b) election, this test requires a court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under Chapter 7. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

(c)     Feasibility. Pursuant to section 1129(a)(11) of the Bankruptcy Code, among other things, the Bankruptcy Court must determine that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan. This confirmation condition is referred to as the "feasibility" of the Plan. The Plan Sponsor believes that the Plan satisfies this requirement. Based upon the Financial Projections, the Plan Sponsor believes that the Reorganized Debtors will be able to make all payments required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. The Plan Sponsor also believes that the Debtors will be able to repay or refinance on commercially reasonable terms any and all of the indebtedness under the Plan at or prior to the maturity of such indebtedness. Accordingly, the Plan Sponsor believes that the Plan is feasible.

(d)     Equitable Distribution of Voting Power. On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtors shall be amended as necessary to satisfy the provisions of the Bankruptcy Code and shall include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

2.     Additional Requirements for Non-Consensual Confirmation. In the event that any Impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each Impaired Class of Claims or Interests that has not accepted or is deemed to reject the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code. Both of these

requirements are in addition to other requirements established by case law interpreting the statutory requirements.

(a)      Unfair Discrimination Test. The "no unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. This test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The Plan Sponsor believes the Plan satisfies the "unfair discrimination" test.

(b)      Fair and Equitable Test. The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Plan Sponsor submits that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. The Plan Sponsor believes that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XIV.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan Sponsor has evaluated several alternatives to the Plan. After studying these alternatives, it has concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under Chapter 7.

### A.      Alternative Plan of Reorganization

If the Plan is not confirmed, the Plan Sponsor could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of the Debtors' assets. The Plan Sponsor, however, submits that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B.      Sale under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Trustee for the Debtors will pursue his intention to sell the Debtors' assets under section 363 of the Bankruptcy Code. Holders of Secured Claims will

be entitled to credit bid on such assets pursuant to the 9019 Settlement Agreement and subsequent 363 Sale bidding procedures when and if approved by the Bankruptcy Court. Upon analysis and consideration of this alternative, the Plan Sponsor does not believe a sale of the Debtors assets under section 363 of the Bankruptcy Code will yield a higher recovery for Holders of Claims than the Plan.

### C.      Liquidation under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under Chapter 7 in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.

The Plan Sponsor believes that liquidation under Chapter 7 would result in lower distributions to creditors than those provided for under the Plan. Among other things, the value that the Debtors expect to obtain from their assets in a Chapter 7 liquidation, instead of continuing as a going concern as provided in the Plan, would be materially less. A Chapter 7 liquidation would also generate more unsecured claims against the Debtors' Estates from, among other things, damages related to rejected contracts and the failure to satisfy post-liquidation obligations. In addition, a Chapter 7 liquidation would result in a delay from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, who would be required to become familiar with the many legal and factual issues in the Debtors' Chapter 11 Cases.

*[Remainder of page intentionally left blank.]*

## XV.    <u>CONCLUSION AND RECOMMENDATION</u>

The Plan Sponsor believes the Plan is in the best interests of all stakeholders and urges the Holders of Voting Classes to vote in favor thereof.

Dated:  December 3, 2024                    Visual Semiconductor, Inc.
Philadelphia, Pennsylvania                  (as Plan Sponsor)


                                 /s/ *Mathu Rajan*
                                 Chief Executive Officer of Stream TV Networks, Inc.,
                                 and Technovative Media, Inc.

**Exhibit A**

**Plan of Reorganization**

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| Stream TV Networks, Inc.,[1] | Bky. No. 23-10763 (AMC) |
| Debtor. | |

| | |
|---|---|
| In re: | Chapter 11 |
| Technovative Media, Inc., | Bky. No. 23-10764 (AMC) |
| Debtor. | (Jointly Administered) |

## VISUAL SEMICONDUCTOR INC.'S PLAN OF REORGANIZATION OF STREAM TV NETWORKS, INC. AND TECHNOVATIVE MEDIA, INC. PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**THIS PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THE PLAN IS SUBJECT TO CHANGE. THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY SECURITIES.**

---

[1] The Debtors, along with the last four digits of the Debtors' federal tax identification numbers, are Stream TV Networks, Inc. (4092) and Technovative Media, Inc. (5015). The location of the Debtors' service address is: 2009 Chestnut Street, 3rd Floor, Philadelphia, PA 19103.

# TABLE OF CONTENTS

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION OF TIME, AND GOVERNING LAW** ........................................................................... 1

    A.      Defined Terms .................................................................................... 1

    B.      Rules of Interpretation ..................................................................... 13

    C.      Computation of Time ....................................................................... 14

    D.      Governing Law ................................................................................ 14

    E.      Reference to Monetary Figures........................................................ 14

    F.      Reference to the Debtors or the Reorganized Debtors..................... 14

    G.      Controlling Document ..................................................................... 14

**ARTICLE II. ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS** ............... 15

    A.      Administrative Claims ..................................................................... 15

    B.      Professional Compensation Claims .................................................. 15

    C.      Priority Tax Claims.......................................................................... 17

    D.      Statutory Fees .................................................................................. 17

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** .......... 18

    A.      Classification of Claims and Interests............................................. 18

    B.      Summary of Classifications ............................................................. 18

    C.      Treatment of Claims and Interests .................................................. 19

    D.      Voting of Claims.............................................................................. 21

    E.      No Substantive Consolidation.......................................................... 21

    F.      Acceptance by Impaired Classes ..................................................... 21

    G.      Special Provision Governing Unimpaired Claims ........................... 21

    H.      Elimination of Vacant Classes......................................................... 21

    I.      Consensual Confirmation ................................................................ 22

J.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ........................................................................................................ 22

K.      Controversy Concerning Impairment or Classification ..................................... 22

L.      Subordinated Claims ......................................................................................... 22

M.      Intercompany Interests ...................................................................................... 22

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ............................................. **22**

A.      Sources of Consideration for Plan Distributions ............................................... 22

B.      Use of Plan Proceeds ........................................................................................ 23

C.      Restructuring Transactions ............................................................................... 24

D.      Corporate Existence .......................................................................................... 25

E.      Vesting of Assets in the Reorganized Debtors .................................................. 25

F.      Cancellation of Existing Indebtedness and Securities ...................................... 26

G.      Corporate Action ............................................................................................... 26

H.      New Organizational Documents ........................................................................ 27

I.      Directors and Officers of the Reorganized Debtors ........................................... 27

J.      Employment Obligations ................................................................................... 28

K.      Effectuating Documents; Further Transactions ................................................. 28

L.      Exemption from Certain Taxes and Fees ........................................................... 28

M.      Indemnification Provisions ................................................................................ 29

N.      Preservation of Causes of Action ...................................................................... 29

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................................................................................................................. **30**

A.      Assumption and Rejection of Executory Contracts and Unexpired Leases ...................... 30

B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases ...................... 30

C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ................... 31

D.      Pre-existing Obligations to the Debtors under Executory Contracts and Unexpired Leases ....................................................................................... 32

E.    Insurance Policies ..................................................................................... 32

F.    Indemnification Provisions ....................................................................... 32

G.    Modifications, Amendments, Supplements, Restatements, or Other Agreements .......... 33

H.    Reservation of Rights ............................................................................... 33

I.    Nonoccurrence of Effective Date .............................................................. 33

J.    Contracts and Leases Entered Into After the Petition Date ........................... 33

**ARTICLE IV. PROVISIONS GOVERNING DISTRIBUTIONS ........................................ 34**

A.    Timing and Calculation of Amounts to Be Distributed ................................ 34

B.    Disbursing Agent ..................................................................................... 34

C.    Rights and Powers of Disbursing Agent ..................................................... 34

D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ...... 34

E.    Manner of Payment .................................................................................. 36

F.    Exemption from Registration ..................................................................... 37

G.    Compliance with Tax Requirements ........................................................... 37

H.    No Post-petition or Default Interest on Claims ........................................... 37

I.    Allocations .............................................................................................. 38

J.    Setoffs and Recoupment ........................................................................... 38

K.    Claims Paid or Payable by Third Parties .................................................... 38

L.    Foreign Current Exchange Rate ................................................................. 39

**ARTICLE VII. PROCEDURES FOR RESOLVING  CONTINGENT, UNLIQUIDATED,
AND DISPUTED CLAIMS .............................................................................. 39**

A.    Resolution of Disputed Claims .................................................................. 39

B.    Disallowance of Claims ............................................................................ 40

C.    Amendments to Proofs of Claim ................................................................ 41

D.    No Distributions Pending Allowance ......................................................... 41

E.    Distributions After Allowance ................................................................... 41

F.      No Interest..................................................................................................................41

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
PROVISIONS..................................................................................................41**

A.      Compromise and Settlement of Claims, Interests, and Controversies.............................42

B.      Discharge of Claims and Termination of Interests ........................................................42

C.      Release of Liens...........................................................................................................42

D.      Releases by the Debtors................................................................................................43

E.      Releases by the Releasing Parties .................................................................................44

F.      Regulatory Activities....................................................................................................45

G.      Exculpation ..................................................................................................................45

H.      Injunction .....................................................................................................................46

I.      Term of Injunctions or Stays.........................................................................................46

J.      Recoupment ..................................................................................................................46

K.      Protection Against Discriminatory Treatment ...............................................................46

L.      Direct Insurance Claims................................................................................................47

**ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN .................47**

A.      Conditions Precedent to the Effective Date ...................................................................47

B.      Waiver of Conditions....................................................................................................48

C.      Effect of Failure of Conditions .....................................................................................48

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN..............48**

A.      Modification and Amendments......................................................................................48

B.      Effect of Confirmation on Modifications .......................................................................48

C.      Revocation or Withdrawal of Plan.................................................................................48

**ARTICLE XI. RETENTION OF JURISDICTION ........................................................................49**

**ARTICLE XII. MISCELLANEOUS PROVISIONS .......................................................................51**

A.      Immediate Binding Effect.............................................................................................51

B.    Substantial Consummation ............................................................................. 52

C.    Further Assurances ......................................................................................... 52

D.    Statutory Committee and Cessation of Fee and Expense Payment.................. 52

E.    Reservation of Rights...................................................................................... 52

F.    Successors and Assigns .................................................................................. 52

G.    Notices ........................................................................................................... 52

H.    Term of Injunctions or Stays........................................................................... 54

I.    Entire Agreement............................................................................................ 54

J.    Exhibits .......................................................................................................... 54

K.    Severability of Plan Provisions....................................................................... 54

L.    Votes Solicited in Good Faith......................................................................... 54

M.    Closing of Chapter 11 Cases .......................................................................... 55

N.    Waiver or Estoppel ......................................................................................... 55

O.    Deemed Acts................................................................................................... 55

## **INTRODUCTION**

VISUAL SEMICONDUCTOR, INC., a Wyoming corporation (the "***Plan Sponsor***"), proposes this joint plan of reorganization (this "***Plan***") for the resolution of the Claims against and Interests in STREAM TV NETWORKS, INC., a Delaware corporation ("***Stream***") and TECHNOVATIVE MEDIA, INC., a Delaware corporation ("***Technovative***"), the above-captioned debtors ("***Debtors***"), pursuant to chapter 11 of the Bankruptcy Code. Although proposed as a joint plan for administrative purposes, the Plan constitutes a separate plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Article I.A.

The Plan Sponsor proposes this Plan as an alternative to the Trustee's anticipated Plan of Liquidation expected to be proposed by the Trustee in furtherance of the 9019 Settlement, and subsequent sale of the Debtors' assets under Section 363 of the US Bankruptcy Code. THIS PLAN'S TREATMENT OF THE HAWK PARTIES' CLAIMS CONSISTENT WITH THE 9019 SETTLEMENT IS NOT, MAY NOT, AND SHALL NOT BE DEEMED AN ADMISSION AGAINST INTEREST, CONCESSION, OR WAIVER OF ANY OF THE PLAN SPONSOR'S OBJECTIONS TO THE HAWK PARTIES' CLAIMS OR THEIR TREATMENT AS ANY PARTICULAR CLASS OF CLAIM.

Holders of Claims and Interests may refer to the Disclosure Statement for a description of the Debtors' history, business, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan and the Restructuring Transactions contemplated hereby. No Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS, AS APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## **ARTICLE I.**
## **DEFINED TERMS, RULES OF INTERPRETATION,**
## **COMPUTATION OF TIME, AND GOVERNING LAW**

A.    Defined Terms

Capitalized terms used in the Plan have the following meanings.

1.    "9019 Settlement" means that certain settlement agreement by and between the Trustee and the Hawk Parties, as approved by this Court on June 7, 2024 (ECF #653).

2.    "Administrative Claim" means any Claim incurred by the Debtors on or after the Petition Date and before the Effective Date for the costs and expenses of administration of the Estates pursuant to section 503(b) (including Claims arising under section 503(b)(9) of the Bankruptcy Code), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Compensation Claims; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

3.    "Administrative Claims Bar Date" means the date that is thirty (30) calendar days after the Effective Date, unless otherwise ordered by the Bankruptcy Court, and except with respect to Professional Compensation Claims, which shall be subject to the provisions of Article II.B hereof.

4.    "Affiliate" means, with respect to a specified Entity, any other Entity that would fall within

the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such specified Entity was a debtor in a case under the Bankruptcy Code.

5.      "Allowed" means, with respect to any Claim or Interest, except to the extent the Plan provides otherwise, any portion thereof (a) that is allowed under the Plan, by Final Order, or pursuant to a settlement, (b) that is evidenced by a Proof of Claim or Interest, as applicable, timely filed by the applicable Claims Bar Date or that is not required to be evidenced by a filed Proof of Claim or Interest, as applicable, under the Plan or a Final Order, or (c) that is scheduled by the Debtors as not disputed, contingent, or unliquidated, and as for which no Proof of Claim or Interest, as applicable, has been timely filed; provided that with respect to a Claim or Interest described in clauses (b) and (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest (i) no objection to the allowance thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest has been Allowed by a Final Order except as otherwise specified in the Plan or any Final Order; and (ii) the Claim Characterization Dispute has been resolved and a Final Order pertaining thereto has been issued or otherwise settled, waived, or resolved and such resolution is binding on and enforceable by the Plan Sponsor. The amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date. No Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.

6.      "Alternative Restructuring Proposal" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, capital structure inconsistent with the Plan, or similar transaction involving either or both of the Debtors, or any material portion of any of their assets, in each case in whole or in part, or the debt, equity, or other interests in either or both of the Debtors other than in accordance with or in furtherance of one or more of the Restructuring Transactions.

7.      "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

8.      "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Pennsylvania, or any other court having jurisdiction over the Chapter 11 Cases, including to the extent of any withdrawal of the reference under section 157(d) of the Judicial Code, the United States District Court for the Eastern District of Pennsylvania.

9.      "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

10.      "Business Day" means any day, other than a Saturday, Sunday, or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

11.      "Cash" means the legal tender of the United States of America and equivalents thereof, including bank deposits and checks.

12.      "Cause of Action" means, without limitation, any Claim, Interest, damage, remedy, cause of action, controversy, demand, right, right of setoff, action, cross claim, counterclaim, recoupment, claim

for breach of duty imposed by law or in equity, Lien, indemnity, contribution, reimbursement, guaranty, debt, suit, class action, third-party claim, obligation, liability, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, direct or indirect, choate or inchoate, liquidated or unliquidated, suspected or unsuspected, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, under the Bankruptcy Code or applicable non-bankruptcy law, or pursuant to any other theory of law. For the avoidance of doubt, Causes of Action include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code or similar non-U.S. or state law; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

13.     "Chapter 11 Cases" means the jointly administered chapter 11 cases Filed for the Debtors in the Bankruptcy Court and currently styled *In re Stream TV Networks, Inc.* Bankr. No. 23-10763 (AMC) and *Technovative Media, Inc.*, Bankr. No. 23-10764 (AMC)(Jointly Administered).

14.     "Claim" means any "claim," as defined in section 101(5) of the Bankruptcy Code, against a Debtor.

15.     "Claim Characterization Dispute" means with regard to the Hawk Parties' Claims, the claimants' characterization as a Class I Claim, due to, *inter alia,* the automatic conversion of substantially all of the underlying debt instruments into equity interests, requiring that (i) all or substantially all of the Hawk Parties' Class I and IV claims be recharacterized as Class V Equity Security Claims, and (ii) the alleged "subordination" of the Hawk Parties' claims pursuant to the Debtor's 9019 Settlement be recognized as an improper prioritization of the Hawk Parties' claims.

16.     "Claims Bar Date" means May 24, 2023, or such other date established by the Plan or by order of the Bankruptcy Court by which Proofs of Claim must be filed with respect to Claims.

17.     "Claims Objection Deadline" means the deadline for objecting to a Claim asserted against a Debtor, which shall be on the date that is the later of: (a)(i) with respect to Administrative Claims (other than Professional Compensation Claims), 60 days after the Administrative Claims Bar Date or (ii) with respect to all other Claims (other than Professional Compensation Claims), 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to such Claims.

18.     "Claims Register" means the official register of Claims against the Debtors maintained by the Voting and Claims Agent.

19.     "Class" means a category of Claims or Interests classified together as set forth in Article III hereof pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

20.     "Company Entities" means Stream and its directly- and indirectly- owned subsidiaries, including Technovative.

21.     "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

22.    "Confirmation Date" means the date upon which Confirmation occurs.

23.    "Confirmation Hearing" means the confirmation hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

24.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the transactions contemplated thereby, which shall be in form and substance acceptable to the Plan Sponsor.

25.    "Consenting Parties" means Rembrandt and the Hawk Parties.

26.    "Consummation" means the occurrence of the Effective Date.

27.    "Contract Rejection Claim" means a Claim arising from the rejection of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

28.    "Cure Claim" means a Claim against any Debtor based upon such Debtor's monetary default under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed or assumed and assigned by such Debtor or Reorganized Debtor, as applicable, pursuant to section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

29.    "Cure Notice" means a notice of a proposed amount of Cash to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed, or assumed and assigned, under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include the amount of Cure Claim (if any) to be paid in connection therewith.

30.    "Debtor Release" means the releases set forth in Article VIII.D of the Plan.

31.    "Definitive Documents" means the Plan (including, for the avoidance of doubt, all exhibits, annexes, amendments, schedules, and supplements related thereto, including the Plan Supplement), the Confirmation Order, the Solicitation Materials, including the Disclosure Statement, the Disclosure Statement Order, the Exit Facilities Documents, the New Organizational Documents, the documentation setting the distribution record date and means of distribution under the Plan and the procedures for designating the recipients of distributions under the Plan, all other documents, motions, pleadings, briefs, applications, orders, agreements, supplements, and other filings, including any summaries or term sheets in respect thereof, that are directly related to any of the foregoing or as may be reasonably necessary or advisable to implement the Restructuring Transactions.

32.    "Description of Transaction Steps" means a document, to be included in the Plan Supplement, which shall be in form and substance acceptable to the Plan Sponsor, that sets forth the material components of the Restructuring Transactions and a description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan, including the reorganization of the Debtors and the issuance of New Common Stock, and the other distributions under the Plan, through the Chapter 11 Cases, the Plan, or any Definitive Documents, and the intended tax treatment of such steps.

33.    "Disallowed" means, with respect to any Claim or Interest, a portion thereof that (a) is disallowed under the Plan by Final Order, or pursuant to a settlement, (b) is scheduled by the Debtors at zero dollars ($0) or as contingent, disputed, or unliquidated and as to which a Claims Bar Date has been established but no Proof of Claim was timely filed or deemed timely filed pursuant to either the

4

Bankruptcy Code or any Final Order of the Bankruptcy Court, including the order approving the Claims Bar Date, or otherwise deemed timely filed under applicable law, or (c) is not scheduled by the Debtors and as to which a Claims Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

34.   "Disbursing Agent" means the Reorganized Debtors or the Entity or Entities selected by the Reorganized Debtors to make or facilitate distributions contemplated under the Plan.

35.   "Disclosure Statement" means the disclosure statement (as it may be amended, supplemented, or modified from time to time) for the Plan, including all exhibits and schedules thereto and references therein, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the Plan Sponsor.

36.   "Disclosure Statement Order" means the order entered by the Bankruptcy Court approving the Disclosure Statement as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code and solicitation procedures related thereto, which shall be in form and substance acceptable to the Plan Sponsor.

37.   "Disputed" means, with respect to any Claim or Interest, a Claim or Interest that is not yet Allowed or Disallowed. Disputed Claims remain subject to investigation, reconsideration, recharacterization, reduction, setoff, and Disallowance,

38.   "Distribution Record Date" means, except with respect to holders of public securities, the date for determining which Holders of Allowed Claims and Interests are eligible to receive distributions pursuant to the Plan, which date shall be the Confirmation Date or such other date that is selected by the Debtors with the consent of the Plan Sponsor. The Distribution Record Date shall not apply to any holders of public securities, who shall receive a distribution in accordance with Article VIII.D of the Plan and the customary procedures of the Depository Trust Company ("DTC"), as applicable.

39.   "Effective Date" means (a) the date that is the first Business Day on which all conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.A and Article IX.B or (b) such later date as agreed to by the Debtors and the Plan Sponsor.

40.   "Employment Obligations" means all, if any, contracts, agreements, arrangements, policies, programs, and plans for, among other things, compensation, bonuses, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, including, in the event of a change of control after the Effective Date, retirement benefits, retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), welfare benefits, relocation programs, life insurance, and accidental death and dismemberment insurance, including contracts, agreements, arrangements, policies, programs, and plans for bonuses and other incentives or compensation for the Debtors' current and former employees, directors, officers, consultants, and managers, including executive compensation programs and existing compensation arrangements provided that Employment Obligations shall not include Non-Qualified Pension Claims.

41.   "Entity" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

42.   "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

43.    "Escrow Funds" means FIFTY MILLION U.S. DOLLARS (USD $50,000,000), deposited by the Plan Sponsor into the Plan Escrow Account on the earlier of (i) January 31, 2024, or (ii) Plan Confirmation; to be released to the Debtor upon Plan Confirmation.

44.    "Estate" means, with respect to any Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of its Chapter 11 Case.

45.    "Estate Assets" means Assets of any and every kind whatsoever that are (a) owned, controlled or held by or for the benefit of any of the Debtors or the Debtors' non-Debtor Subsidiaries, in whole or in part; (b) in the actual or constructive possession of any of the Debtors or the Debtors' non-Debtor Subsidiaries, or other individual or entity acting in concert with any of the Debtors or the Debtors' non-Debtor Subsidiaries; (c) held by an agent of any of the Debtors or the Debtors' non-Debtor Subsidiaries, including as a retainer for the agent's provision of services; (d) owned, controlled or held by, or in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, trust, or other entity directly or indirectly owned or controlled in whole or in part by any of the Debtors or the Debtors' non-Debtor Subsidiaries, including assets that have been transferred to other Persons but as to which Assets such Persons do not have a legitimate claim; or (e) are based on, modifications to, upgrades of, or otherwise a derivative of or integral to (a) through (d) above.

46.    "Estate Cause of Action" means any Cause of Action that either Debtor may have or be entitled to assert on behalf of its Estate or itself, whether or not asserted.

47.    "Exchange Act" means the U.S. Securities Exchange Act of 1934 (as amended).

48.    "Exculpated Parties" means, collectively, and in each case in its capacity as such (a) Plan Sponsor (b) each Debtor and Reorganized Debtor; and (c) with respect to each of the Entities in the foregoing clauses (a) through (b), each such Entity's current and former Affiliates (regardless of whether such interests are held directly or indirectly); (d) with respect to each of the Entities in the foregoing clauses (a) through (c), each such Entity's current and former predecessors, successors, subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; and (e) with respect to each of the Entities in the foregoing clauses (a) through (d), each such Entity's current and former directors, officers, managers, members, principals, partners, employees, independent contractors, agents, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), consultants, financial advisors, attorneys, accountants, investment bankers, and other professionals.

49.    "Executory Contract" means a contract to which one or both of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

50.    "Exit Facilities Documents" means, collectively, the Plan Sponsor Equity Subscription Agreement, the Professional Fee Note and any supporting documents, agreements, or instruments executed in conjunction therewith.

51.    "Federal Judgment Rate" means the interest rate provided under section 1961 of the Judicial Code, calculated as of the Petition Date.

52.    "File," "Filed," or "Filing" means file, filed, or filing with the Bankruptcy Court, the Clerk of the Bankruptcy Court, or any of its or their authorized designees in the Chapter 11 Cases, including, with respect to a Proof of Claim, the Voting and Claims Agent.

53.    "<u>Final Order</u>" means an order, ruling, or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court), which has not been reversed, stayed, modified, amended, or vacated, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing has been timely taken or is pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order or judgment was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules.

54.    "<u>General Unsecured Claim</u>" means any Claim other than an Administrative Claim (including any Professional Compensation Claims), a Priority Claim, a Secured Claim, or Equity Security Holders.

55.    ""<u>Governmental Unit</u>" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

56.    "<u>Hawk</u>" means Hawk Investment Holdings Limited, an entity formed under the laws of Guernsey of the United Kingdom Channel Island.

57.    "<u>Hawk Parties</u>" means Hawk, SLS, SeeCubic, and their respective shareholders, members, principals, officers, directors, managers, employees, agents and representatives.

58.    "<u>Holder</u>" means an Entity holding a Claim or Interest, as applicable.

59.    "<u>Indemnification Provisions</u>" means each of the Debtors' indemnification provisions in place as of the Petition Date, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, or in the contracts of the current and former directors, officers, managers, employees, attorneys, other professionals, and agents of the Debtors.

60.    "<u>Impaired</u>" means, with respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

61.    "<u>Intercompany Claim</u>" means any Claim held by a Debtor or a direct or indirect subsidiary of a Debtor.

62.    "<u>Intercompany Interest</u>" means an Interest held by a Debtor or a Debtor Affiliate.

63.    "<u>Interest</u>" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Debtor, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

64.    "<u>Interim Compensation Rules</u>" means L.B.F. 2016-5 Payment on Account to Professionals

7

in Complex Chapter 11 Case.

65.     "IRC" means the Internal Revenue Code of 1986, as amended.

66.     "Judicial Code" means title 28 of the United States Code, 28 U.S.C. §§ 1-5001.

67.     "LBBS" means Lewis Brisbois Bisgaard & Smith LLP, a limited liability partnership.

68.     "Lien" means a lien as defined in section 101(37) of the Bankruptcy Code.

69.     "New Boards" means, collectively, the Reorganized Holdings Board and the New Subsidiary Boards, as initially established on the Effective Date in accordance with the terms of the Plan and the applicable New Organizational Documents.

70.     "New Common Stock" means the equity interests in Reorganized Holdings to be issued on or after the Effective Date, which may be issued in one or more series of common or preferred stock as determined by the Plan Sponsor to be necessary or appropriate to effectuate the Plan Sponsor Subscription Agreement.

71.     "New Organizational Documents" means the organizational and governance documents for the Reorganized Debtors, including, as applicable, the certificates of incorporation, certificates of conversion, stockholder or shareholder agreements, bylaws, indemnification agreements, and any registration rights agreements (or equivalent governing documents of any of the foregoing), in each case in form and substance acceptable to the Plan Sponsor and consistent with section 1123(a)(6) of the Bankruptcy Code.

72.     "New Securities" means, together, the New Common Stock and the Professional Fee Notes.

73.     "New Subsidiary Boards" means, with respect to each of the Reorganized Debtors other than Reorganized Holdings, the initial board of directors, board of managers, or member, as the case may be, of each such Reorganized Debtor.

74.     "Non-Qualified Pension Claim" means any Claim held by a former employee, if any, of the Debtors arising from any of the Debtors' nonqualified supplemental income plans or agreements.

75.     "Other Secured or Partially Secured Claims" means all Secured Claims, other than those held by one or more of the Hawk Parties.

76.     "Person" means a person as such term is defined in section 101(41) of the Bankruptcy Code.

77.     "Petition Date" means March 15, 2023.

78.     "Plan" means this joint chapter 11 plan and all exhibits, supplements, appendices, and schedules hereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, including the Plan Supplement (as altered, amended, supplemented, or otherwise modified from time to time), which is incorporated herein by reference and made part of the Plan as if set forth herein and which shall be in form and substance acceptable to the Plan Sponsor

79.     "Plan Escrow Account" means a dedicated account established by the Plan Sponsor in furtherance of the Plan for the benefit of the Reorganized Debtor, the corpus of which is not accessible to

the Debtor before the Effective Date without Bankruptcy Court approval.

80.    "Plan Objection Deadline" means the plan objection deadline approved by the Bankruptcy Court pursuant to the Disclosure Statement Order or as otherwise set by the Bankruptcy Court.

81.    "Plan Settlement" shall have the meaning set forth in Article VIII.A.

82.    "Plan Sponsor Equity Subscription Agreement" shall mean that certain Subscription Agreement by and between the Plan Sponsor and Reorganized Holdings pursuant to which the Plan Sponsor shall acquire all of the New Common Stock, representing 100% of the Reorganized Holdings outstanding equity at a purchase price of ONE HUNDRED EIGHTY-FIVE MILLION FIVE HUNDRED THOUSAND U.S. DOLLARS (USD $185,500,000).

83.    "Plan Supplement" means the compilation of documents, term sheets setting forth the material terms of documents, and forms of documents, agreements, schedules, and exhibits to the Plan, , to be Filed by the Plan Sponsor no later than seven (7) days prior to the Plan Objection Deadline or such later date as may be approved by the Bankruptcy Court, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, as may be amended, modified, or supplemented from time to time. The Plan Supplement may include the following, or the material terms of the following, as applicable: (a) Reorganized Holdings' New Organizational Documents; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) the Schedule of Retained Causes of Action; (d) the identity of the initial members of the Reorganized Holdings Board; and (e) the Description of Transaction Steps. Plan Sponsor may amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, and the Reorganized Debtors may amend the documents contained in, and exhibits to, the Plan Supplement in accordance with applicable law.

84.    "Priority Tax Claim" means any Claim of a Governmental Unit of the type described in section 507(a)(8) of the Bankruptcy Code.

85.    "Priority Claims" means any Claim afforded special status by Section 507 of the Bankruptcy Code.

86.    "Pro Rata" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of the Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests, as applicable, in such Class.

87.    "Professional" means an Entity (a) employed pursuant to a Final Order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

88.    "Professional Compensation Claims" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred from the Petition Date through and including the date of Confirmation under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

89.    "Professional Fee Escrow" means an account, which may be interest-bearing, funded by the Debtors with Cash prior to the Effective Date in an amount equal to the Professional Fee Escrow Amount.

90.    "Professional Fee Escrow Amount" means (i) the aggregate amount of Professional

Compensation Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of the Plan, *less* (ii) the principal amount of the Professional Fee Note; which (iii) shall not exceed FOUR MILLION U.S. DOLLARS (USD $4,000,000).

91.     "Professional Fee Note" means a note (i) issued by Reorganized Holdings in favor of LBBS in the original principal amount of TWO MILLION NINE HUNDRED SEVENTY-SEVEN THOUSAND NINE HUNDRED FIFTY-EIGHT U.S. DOLLARS AND TEN CENTS (USD $2,977,958.10) evidencing the amount of their Claim for Professional Fees as Debtors counsel, (ii) bearing no interest, (iii) with principal due monthly, in arears, based on a one-year amortization schedule; and (iv) a maturity date of December 31, 2025.

92.     "Proof of Claim" means a written proof of Claim Filed against either of the Debtors in the Chapter 11 Cases.

93.     "Protective Order" means an order to be entered by the Bankruptcy Court enjoining all who are aware or become aware of such order and anyone acting in concert with them, other than by or on behalf of the Reorganized Debtors, from: (i) using, deploying or otherwise exploiting Estate Assets, including, in competition with the Reorganized Debtors, their successors, assigns, licensees, distributors, representatives or commercial agents; (ii) taking any action to sublicense, transfer, assign, or otherwise dispose of or affect any license or technology held or purported to be held by the Debtors' estates, including but not limited to the Ultra- D technology, and the Philips or Rembrandt licenses; (iii) identifying any SCBV employee as SeeCubic's; (iv) describing, referencing, displaying or portraying the technology, or any improvements thereon, or making any representations with respect to ownership or development of such technology, owned and/or developed by Debtors or their subsidiaries; (v) portraying the Ultra-D technology as having been developed by SeeCubic; and applying for or prosecuting the "SeeCubic" mark with the U.S. Patent Trademark Office.

94.     "Qualified Pension Plans" means the Debtors' qualified defined benefit plans covered by Title IV of ERISA.

95.     "Reinstate," "Reinstated," or "Reinstatement," means, with respect to any Claims or Interest, that such Claim or Interest shall be rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

96.     "Released Party" means, collectively, the Releasing Parties; provided that no Excluded Party shall be a Released Party; provided, further, that, in each case, an Entity shall not be a Released Party if it: (a) elects to opt out of the releases, if permitted to opt out; (b) does not elect to opt into the releases, if permitted to opt in; (c) files with the Bankruptcy Court an objection to the Plan, including the releases, that is not consensually resolved before Confirmation or supports any such objection or objector; or (d) proposes or supports an Alternative Restructuring Proposal without the Debtors' consent.

97.     "Releasing Parties" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each non-Debtor Affiliate; (d) each of the Consenting Parties; (e) each Holder of Claims or Interests that is deemed to accept the Plan and does not elect to opt out of the releases contained in the Plan; (f) each Holder of Claims or Interests that is entitled to vote on the Plan and either (i) votes to accept the Plan, (ii) abstains from voting on the Plan and does not elect to opt out of the releases contained in the Plan, or (iii) votes to reject the Plan and does not elect to opt out of the releases contained in the Plan; (g) each Holder of Claims that is deemed to reject the Plan but does not

elect to opt out of the releases contained in the Plan; (h) with respect to each of the Entities in the foregoing clauses (a) through (g), each such Entity's current and former Affiliates (regardless of whether such interests are held directly or indirectly); (i) with respect to each of the Entities in the foregoing clauses (a) through (h), each such Entity's current and former predecessors, successors, subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; and (j) with respect to each of the Entities in the foregoing clauses (a) through (i), each such Entity's current and former directors, officers, managers, members, principals, partners, employees, independent contractors, agents, representatives, managed accounts or funds, management companies, fund advisors, investment advisors, advisory board members, financial advisors, partners (including both general and limited partners), consultants, financial advisors, attorneys, accountants, investment bankers, and other professionals; *provided that* no Holder that votes to accept the Plan shall be entitled to opt out of, and each such Holder shall be deemed to opt into, the releases; *provided, further that*, with respect to any Holder of a Claim or Interest that does not elect to opt out of the releases contained in the Plan or that opts into the releases contained in the Plan in any capacity, such Holder and each Affiliate of such Holder that is also a Holder of a Claim or Interest shall be deemed to opt into the Third-Party Releases in all capacities.

98.    "Rembrandt" means REMBRANDT 3D HOLDINGS LTD ("Rembrandt"), the largest unsecured creditor in these Chapter 11 Cases and the licensor of key technology to the Debtors.

99.    "Reorganized Debtors" means (a) the Debtors, or any successor or assignee thereto, by merger, consolidation, reorganization, or otherwise, on or after the Effective Date and (b) to the extent not already encompassed by clause (a), Reorganized Holdings and any newly formed subsidiaries thereof, on or after the Effective Date, including the Entity or Entities in which the assets of the Debtors' Estates are vested as of the Effective Date.

100.    "Reorganized Holdings" means either, as determined by the Debtors, with the reasonable consent of the Plan Sponsor, and set forth in the Description of Transaction Steps, (a) Stream, as reorganized pursuant to and under the Plan, or any successor or assign thereto by merger, consolidation, reorganization, or otherwise, (b) a new Entity that may be formed or caused to be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or equity of the Debtors and issue the New Common Stock to be distributed pursuant to the Plan.

101.    "Reorganized Holdings Board" means the initial board of directors of Reorganized Holdings on and after the Effective Date, the members of which shall be set forth in the Plan Supplement.

102.    "Restructuring Transactions" means the transactions described in Article IV.C of the Plan.

103.    "Retained Causes of Action" means any and all Causes of Action that are not released, waived, or transferred by the Debtors pursuant to the Plan, including the Retained Preference Actions, and the claims and Causes of Action set forth in the Schedule of Retained Causes of Action.

104.    "Retained Preference Action" means any Estate Cause of Action arising under section 547 of the Bankruptcy Code, and any recovery action related thereto under section 550 of the Bankruptcy Code, against a vendor of the Debtors (other than any critical vendor reasonably designated by the Debtors or the Reorganized Debtors).

105.    "SCBV" means SeeCubic B.V., a limited liability company and a non-Debtor subsidiary formed under the laws of the Netherlands.

106.  "Schedule of Assumed Executory Contracts and Unexpired Leases" means the schedule (as may be amended) of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) (with proposed cure amounts) that will be assumed by the Debtors and which may be included in the Plan Supplement, and which shall be in form and substance acceptable to the Plan Sponsor.

107.  "Schedule of Rejected Executory Contracts and Unexpired Leases" means the schedule (as may be amended) of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be rejected by the Debtors pursuant to the provisions of Article V of the Plan, and which shall be included in the Plan Supplement, and which shall be in form and substance acceptable to the Plan Sponsor.

108.  "Schedule of Retained Causes of Action" means a schedule of Causes of Action of the Debtors to be retained under the Plan, which shall be included in the Plan Supplement, and which shall be in form and substance acceptable to the Plan Sponsor.

109.  "Schedules" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as may be amended, modified, or supplemented from time to time.

110.  "SEC" means the Securities and Exchange Commission.

111.  "Secured" means, with respect to a Claim, (a) secured by a Lien on property in which either of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Bankruptcy Court, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the interest of the Holder of such Claim in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) and any other applicable provision of the Bankruptcy Code, or (b) Allowed, pursuant to the Plan or a Final Order of the Bankruptcy Court, as a secured Claim.

112.  "Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder.

113.  "SeeCubic" means SeeCubic, Inc., a privately held U.S. corporation organized pursuant to the laws of Delaware.

114.  "Settled Claims" means those certain Causes of Action to be settled in accordance with the Plan, and to be released pursuant to the Plan, which Causes of Action shall include any and all Causes of Action, whether direct or derivative, related to, arising from, or asserted or assertable in the Settled Litigation. For the avoidance of doubt, Settled Claims shall not include any Intercompany Claims or Intercompany Interests that the Debtors elect to Reinstate in accordance with the Plan.

115.  "Settled Litigation" means settlement of (a) any challenge to the amount, validity, perfection, enforceability, priority, or extent of, or seeking avoidance, disallowance, subordination, or recharacterization of, any portion of any Claim of, or security interest or continuing lien granted to or for the benefit of, any Holder any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests, or defenses against any Holder; and (b) any other challenge against any Holder.

12

116.  "SLS" means SLS Holdings VI, LLC, a U.S. limited liability company organized pursuant to the laws of Delaware.

117.  "Solicitation Materials" means all documents, forms, and other materials distributed in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code, including, the Disclosure Statement, the forms of ballots with respect to votes on the Plan, and the opt-out and opt-in forms with respect to the Third-Party Releases, as applicable, which, in each case, shall be in form and substance reasonably acceptable to the Plan Sponsor.

118.  "Subordinated Claim" means any Claim against any Debtor that is subordinated under section 510 of the Bankruptcy Code.

119.  "Third-Party Releases" means the releases provided by the Releasing Parties, other than the Debtors and Reorganized Debtors, set forth in Article VIII.E of the Plan.

120.  "Trade Claim" means any Claim for the provision of goods and services to the Debtors held by a trade creditor, service provider, or other vendor, but excluding any Contract Rejection Claims.

121.  "Unexpired Lease" means a lease to which either or both of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

122.  "Unimpaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

123.  "Unsecured" means, with respect to a Claim, a Claim or any portion thereof that is not Secured.

124.  "U.S. Trustee" means the United States Trustee for the Eastern District of Pennsylvania.

125.  "Voting and Claims Agent" means BMC Group, Inc. in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

B.    Rules of Interpretation

For purposes of the Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof; (6) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (7) any effectuating provisions may be interpreted by the Reorganized Debtors in a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order, subject to the reasonable consent of the Plan Sponsor and such interpretation shall be binding; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

(9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (11) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (12) any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (13) unless otherwise specified herein, whenever the words "include," "includes," or "including" are used in the Plan, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import; (14) unless otherwise specified herein, references from or through any date mean from and including or through and including; and (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If any payment, distribution, act, or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state or jurisdiction of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

E.    Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.    Reference to the Debtors or the Reorganized Debtors

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.    Controlling Document

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan (without reference to the Plan Supplement) and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In

the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

# ARTICLE II.
## ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.    Administrative Claims

Except with respect to Administrative Claims that are Professional Compensation Claims, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted (with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Plan Sponsor) agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim, other than an Allowed Professional Compensation Claim, shall be paid in full in Cash as full and final satisfaction, compromise, settlement, release, and discharge of such Administrative Claim on (a) the later of: (i) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (ii) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; (iii) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is practicable or (b) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court, as applicable; provided, however, that Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in the ordinary course of business (or as otherwise approved by the Bankruptcy Court) in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

A notice setting forth the Administrative Claims Bar Date will be Filed on the Bankruptcy Court's docket and served with the notice of entry of the Confirmation Order and shall be available by downloading such notice from the website of the Debtors' claims and noticing agent at https://cases.creditorinfo.com/streamtv/documents/docket or the Bankruptcy Court's website at http://www.paeb.uscourts.gov. No other notice of the Administrative Claims Bar Date will be provided. Except as otherwise provided in this Article II.A and Article II.B of the Plan, requests for payment of Administrative Claims that accrued on or before the Effective Date (other than Professional Compensation Claims) must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors or their respective property or Estates and such Administrative Claims shall be deemed discharged as of the Effective Date. If for any reason any such Administrative Claim is incapable of being forever barred and discharged, then the Holder of such Claim shall not have recourse to any property of the Reorganized Debtors to be distributed pursuant to the Plan. Objections to such requests for payment of an Administrative Claim, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than the Claims Objection Deadline.

B.    Professional Compensation Claims

77960764;15

1.      Professional Fee Escrow Account

As soon as reasonably practicable after the Confirmation Date, the Debtors shall (i) establish the Professional Fee Escrow and (ii) fund, but not before the Effective Date, the Professional Fee Escrow with Cash in the amount of the aggregate Professional Fee Escrow Amount. The Professional Fee Escrow shall be maintained in trust for the Professionals and for no other Entities until all Allowed Professional Compensation Claims, other than the Claims of LBBS, have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, Claims, or interests shall encumber the Professional Fee Escrow or Cash held on account of the Professional Fee Escrow in any way. Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors, subject to the release of Cash to the Reorganized Debtors from the Professional Fee Escrow in accordance with Article II.B.2 herein; provided, however, that the Reorganized Debtors shall have a reversionary interest in the excess, if any, of the amount of the Professional Fee Escrow over the aggregate amount of Allowed Professional Compensation Claims of the Professionals to be paid from the Professional Fee Escrow. When such Allowed Professional Compensation Claims have been paid in full, any remaining amount in the Professional Fee Escrow shall promptly be paid to the Reorganized Debtors without any further action or Order of the Bankruptcy Court.

Allowed Professional Compensation Claims are expected to include (i) the LBBS Claim of $2,977,958.10; (ii) a Claim by BMC Group, estimated to be as much as $200,000.00; (iii) a Claim by SSG Capital Advisors, LLC, estimated to be as much as $750,000.00; and (iv) other Claims by Obermayer Rebmann Maxwell & Hippel LLP and Coren & Ress, P.C.

2.      Final Fee Applications and Payment of Professional Compensation Claims

All final requests for payment of Professional Compensation Claims shall be Filed no later than the day that is the first Business Day that is forty-five (45) calendar days after the Effective Date. Such requests shall be Filed with the Bankruptcy Court and served as required by the Interim Compensation Rules as applicable. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any applicable Bankruptcy Court orders, the Allowed amounts of such Professional Compensation Claims shall be determined by the Bankruptcy Court. Except for the Claims of LBBS, which shall be paid in accordance with Section II.B.2.; the Allowed amount of Professional Compensation Claims owing to the Professionals, after taking into account any prior payments to and retainers held by such Professionals, shall be paid in full in Cash to such Professionals from funds held in the Professional Fee Escrow as soon as reasonably practicable following the date when such Claims are Allowed by a Final Order. To the extent that funds held in the Professional Fee Escrow are unable to satisfy the Allowed amount of Professional Compensation Claims owing to the Professionals, each Professional shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied by the Reorganized Debtors in the ordinary course of business in accordance with Article II.B.2 of the Plan and notwithstanding any obligation to File Proofs of Claim or requests for payment on or before the Administrative Claims Bar Date. After all Professional Compensation Claims have been paid in full, the escrow agent shall promptly return any excess amounts held in the Professional Fee Escrow, if any, to the Reorganized Debtors, without any further action or Order of the Bankruptcy Court.

3.      Professional Fee Escrow Amount

The Professionals shall estimate their Professional Compensation Claims before and as of the Effective Date, taking into account any prior payments, and shall deliver such estimate to the Debtors no later than five (5) Business Days prior to the anticipated Effective Date; provided, however, that such estimate shall not be considered an admission or representation with respect to the fees and expenses of

16

such Professional that are the subject of a Professional's final request for payment of Professional Compensation Claims Filed with the Bankruptcy Court and such Professionals are not bound to any extent by such estimates. If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional that are the subject of a Professional's final request for payment of Professional Compensation Claims Filed with the Bankruptcy Court and such Professionals are not bound to any extent by such estimates. The total amount so estimated *less* the amount of the Professional Fee Note shall be utilized by the Debtors to determine the Professional Fee Escrow Amount.

4.      Professional Fee Note

In lieu of participating in the Professional Fee Escrow, the firm of LBBS, Debtors' prior counsel, has agreed to accept the Professional Fee Note. On the effective Date, the Reorganized Debtor shall issue the Professional Fee Note.

5.      Post-Confirmation Date Fees and Expenses

From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the legal, professional, or other fees and expenses of Professionals that have been formally retained in accordance with sections 327, 363, or 1103 of the Bankruptcy Code before the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Rules in seeking retention for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      <u>Priority Tax Claims</u>

On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted (with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Plan Sponsor) agree to less favorable treatment for such Holder, in exchange for and in full and final satisfaction, compromise, settlement, release, and discharge of each Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, in the discretion of the applicable Debtor (with the consent (not to be unreasonably withheld, conditioned or delayed) of the Plan Sponsor) or Reorganized Debtor, one of the following treatments: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus interest at the rate determined under applicable non-bankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code, payable on or as soon as practicable following the Effective Date; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, plus interest at the rate determined under applicable non-bankruptcy law and to the extent provided for by section 511 of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such Holder and the Debtors, or otherwise determined by an order of the Bankruptcy Court.

D.      <u>Statutory Fees</u>

Notwithstanding anything to the contrary contained herein, on the Effective Date, the Debtors shall

17

pay, in full in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation. Thereafter, subject to the Plan, each applicable Reorganized Debtor shall pay all U.S. Trustee fees due and owing under section 1930 of the Judicial Code in the ordinary course until the earlier of (1) the entry of a final decree closing the applicable Reorganized Debtor's Chapter 11 Case, or (2) the Bankruptcy Court enters an order converting or dismissing the applicable Reorganized Debtor's Chapter 11 Case. Any deadline for filing Administrative Claims or Professional Compensation Claims shall not apply to U.S. Trustee fees.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    <u>Classification of Claims and Interests</u>

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Interests. All Claims and Interests, except for Claims addressed in Article II of the Plan, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim against a Debtor also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.

B.    <u>Summary of Classifications</u>

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.H hereof.

The following chart summarizes the classification of Claims and Interests pursuant to the Plan:[2]

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| I | Secured or Partially Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
|  |  |  |  |
| II | Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| III | Unsecured Claims | Impaired | Entitled to Vote |

---

[2]   The information in the table is provided in summary form and is qualified in its entirety by Article III.C hereof.

| IV | Subordinated Unsecured Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| V | Equity Security Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

C.    <u>Treatment of Claims and Interests</u>

Subject to Article VIII of the Plan, to the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below as full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.

1.    Class I –Secured or Partially Secured Claims

(a)    *Classification*: Class I consists of all Secured or Partially Secured Claims.

(b)    *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Secured or Partially Secured Claim and the Debtor against which such Allowed Secured or Partially Secured Claim is asserted, agree to less favorable treatment for such Holder, each Holder of an Allowed Secured or Partially Secured Claim shall receive, at the option of the Debtor against which such Allowed Secured or Partially Secured Claim is asserted (with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Plan Sponsor), in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, either:

(i)    payment in full of its Secured Claim , in an amount equal to the Allowed Secured Claim, with any under-secured Claim treated as a Class III General Unsecured Claim; or

(ii)    such other treatment rendering such Allowed Secured or Partially Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting:* Class I is Unimpaired under the Plan. Therefore, each Holder of a Class I Secured or Partially Secured Claim is not entitled to vote to accept or reject the Plan and is deemed to accept the Plan..

3.    Class II – Priority Claims

(a)    *Classification:* Class II consists of all Priority Claims, other than Tax Priority Claims.

(b)    *Treatment:* Except to the extent that a Holder of an Allowed Priority Claim and the Debtor against which such Allowed Priority Claim is asserted to agree to less favorable treatment for such Holder, each Holder of an Allowed Priority Claim

19

shall receive, at the option of the Debtor against which such Allowed Priority Claim is asserted (with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Plan Sponsor), in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, either:

(i)     payment in full on the Effective Date; or

(ii)    such other treatment rendering such Allowed Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting:* Class II is Unimpaired under the Plan. Therefore, each Holder of a Class II Priority Claim is not entitled to vote to accept or reject the Plan and is deemed to accept the Plan.

4.    Class III – General Unsecured Claims

(a)    *Classification:* Class III consists of all General Unsecured Claims.

(b)    *Treatment*: On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Unsecured Claim and the Debtor against which such Allowed Unsecured Claim is asserted to agree to less favorable treatment for such Holder, each Holder of an Allowed Unsecured Claim shall receive, at the option of the Debtor against which such Allowed Unsecured Claim is asserted (with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Plan Sponsor), in full and final satisfaction, compromise, settlement, release, and discharge of such Claim, either:

(i)     its Pro Rata share of EIGHTEEN MILLION U.S. DOLLARS (USD $18,000,000) allocated to all Unsecured Claims (Class III); or

(ii)    such other treatment rendering such Allowed Secured or Partially Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)    *Voting:* Class III is Impaired under the Plan. Therefore, each Holder of a Class III Unsecured Claim is entitled to vote to accept or reject the Plan.

5.    Class IV – Subordinated Unsecured Claims

(a)    *Classification:* Class IV consists of all Subordinated Unsecured Claims.

(b)    *Treatment*: Holders of Subordinated Unsecured Claims shall receive no recovery or distribution on account of such Subordinated Unsecured Claim. On the Effective Date, all Subordinated Unsecured Claims and the corresponding underlying instruments evidencing such Claims or interest shall be canceled, released, extinguished, and discharged, and of no further force or effect.

(c)    *Voting:* Class IV is Impaired under the Plan. Each Holder of a Class IV Subordinated Unsecured Claim is conclusively presumed to have rejected the Plan pursuant to 1126(g) of the Bankruptcy Code. Therefore, each Holder of a Class IV Subordinated Unsecured Claim is not entitled to vote to accept or reject the Plan.

20

6.    Class V – Equity Security Claims

(a)    *Classification:* Class V consists of all Equity Security Claims.

(b)    *Treatment:* Holders of Equity Security Claims shall receive no recovery or distribution on account of such Equity Security Claim. On the Effective Date, all Equity Security Claims and the corresponding underlying securities evidencing such Claims or interest shall be canceled, released, extinguished, and discharged, and will be of no further force or effect.

(c)    *Voting:* Class V is Impaired under the Plan. Each Holder of a Class V Equity Security Claim is conclusively presumed to have rejected the Plan pursuant to 1126(g) of the Bankruptcy Code. Therefore, each Holder of a Class V Equity Security Claim is not entitled to vote to accept or reject the Plan.

D.    Voting of Claims

Each Holder of a Claim in an Impaired Class that is entitled to vote on the Plan as of the record date for voting on the Plan pursuant to Article III hereof shall be entitled to vote to accept or reject the Plan as provided in the Disclosure Statement Order or any other order of the Bankruptcy Court.

E.    No Substantive Consolidation

Although the Plan is presented as a joint plan of reorganization, the Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason. Except as expressly provided herein, nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that either or both of the Debtors is subject to or liable for any Claims against the other Debtor. A Claim against multiple Debtors will be treated as a separate Claim against each applicable Debtor's Estate for all purposes, including voting and distribution; provided, however, that no Claim will receive value in excess of one hundred percent (100.0%) of the Allowed amount of such Claim or Interest under the Plans for all such Debtors.

F.    Acceptance by Impaired Classes

Pursuant to section 1126(c) of the Bankruptcy Code, and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if Holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of such Class entitled to vote that actually vote on the Plan have voted to accept the Plan. Unsecured Claims (Class III) are Impaired, and the votes of Holders of Claims in such Classes will be solicited. If a Class contains Holders of Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims in such Class.

G.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claims, including, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

H.    Elimination of Vacant Classes

21

Any Class of Claims or Interests that, with respect to either Debtor, does not have a Holder of an Allowed Claim or Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court solely for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan with respect to such Debtor for purposes of (1) voting to accept or reject the Plan and (2) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

I.      Consensual Confirmation

The Plan shall be deemed a separate chapter 11 plan for each Debtor. To the extent that there is no rejecting Class of Claims in the chapter 11 plan of either Debtor, such Debtor shall seek Confirmation of its plan pursuant to section 1129(a) of the Bankruptcy Code.

J.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims. The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims.

K.      Controversy Concerning Impairment or Classification

If a controversy arises as to whether any Claims or Interests or any Class of Claims or Interests is Impaired or is properly classified under the Plan, the Bankruptcy Court shall, after notice and a hearing, resolve such controversy at the Confirmation Hearing.

L.      Subordinated Claims

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise, and any other rights impacting relative lien priority and/or priority in right of payment, and any such rights shall be released pursuant to the Plan, including, as applicable, pursuant to the Plan Settlement. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors, subject to the reasonable consent of the Plan Sponsor, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

M.      Intercompany Interests

Intercompany Interests, to the extent Reinstated, are being Reinstated to maintain the existing corporate structure of the Debtors. For the avoidance of doubt, any Interest in non-Debtor Affiliates owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      Sources of Consideration for Plan Distributions

The Reorganized Debtors shall fund distributions under the Plan, as applicable with: (1) the proceeds from the Plan Sponsor Subscription; and (2) Cash on hand.

22

Each distribution and issuance referred to in Article III of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance; provided that, to the extent that a term of the Plan conflicts with the term of any such instruments or other documents, the terms of the Plan shall govern.

1.      Issuance and Distribution of New Common Stock

On the Effective Date, Reorganized Holdings shall receive $185,500,000.00 from the Plan Sponsor in consideration for the shares of New Common Stock to be issued pursuant to the Plan Sponsor Subscription Agreement, in accordance with the Description of Transaction Steps pursuant to, and in accordance with, the Plan. Consideration for the New Common Stock consists of (i) the immediate release from escrow of the Escrow Funds; and (ii) the balance in good and readily available funds.

All of the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Stock under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the New Organizational Documents and other instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Holder receiving such distribution or issuance. For the avoidance of doubt, the acceptance of New Common Stock by any Holder shall be deemed as such Holder's agreement to the applicable New Organizational Documents, as may be amended or modified from time to time following the Effective Date in accordance with their terms.

To the extent practicable, as determined in good faith by the Plan Sponsor, the Reorganized Debtors shall: (a) emerge from these Chapter 11 Cases as non-publicly reporting companies on the Effective Date and not be subject to SEC reporting requirements under Sections 12 or 15 of the Exchange Act, or otherwise; (b) not be voluntarily subjected to any reporting requirements promulgated by the SEC; except, in each case, as otherwise may be required pursuant to the New Organizational Documents, the Exit Facilities Documents or applicable law; (c) not be required to list the New Common Stock on a U.S. stock exchange; (d) timely file or otherwise provide all required filings and documentation to allow for the termination and/or suspension of registration with respect to SEC reporting requirements under the Exchange Act prior to the Effective Date; and (e) make good faith efforts to ensure DTC eligibility of securities issued in connection with the Plan (other than any securities required by the terms of any agreement to be held on the books of an agent and not in DTC), including but not limited to the New Common Stock.

2.      Cash on Hand

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand, as available, to fund (i) distributions to certain Holders of Claims, and (ii) the Reorganized Debtors' operating capital needs.

B.      Use of Plan Proceeds

1.      Authorization

Entry of the Confirmation Order shall constitute Bankruptcy Court approval of the Exit Facility (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by Reorganized Holdings in connection therewith). On the Effective Date, as provided in the Description of Transaction Steps, the Debtors' rights and obligations thereto shall vest

23

in the Reorganized Debtors, as applicable.

The Cash proceeds of the Exit Facility shall be used by the Debtors or Reorganized Debtors, as applicable, to (a) make distributions pursuant to the Plan, (b) fund working capital, and (c) fund general corporate purposes.

2.      Creditor Recovery

On the Effective Date, Reorganized Holdings shall (i) release up to the Professional Fee Escrow Amount from the Professional Fee Escrow to the Holders of Allowed Administrative Claims, in Pro Rata amounts relative to the amounts of such Claims, in accordance with the Description of Transaction Steps, and in accordance with, the Plan; and (ii) issue the Professional Fee Note in the amount of TWO MILLION NINE HUNDRED SEVENTY-SEVEN THOUSAND NINE HUNDRED FIFTY-EIGHT DOLLARS AND TEN CENTS ($2,977,958.10) to LBBS, in accordance with the Description of Transaction Steps, and in accordance with, the Plan.

On the Effective Date, Reorganized Holdings shall remit up to ONE MILLION DOLLARS ($1,000,000) to the Holders of Priority Claims, in Pro Rata amounts relative to the amounts of such Claims, in accordance with the Description of Transaction Steps, and in accordance with, the Plan.

On the Effective Date, Reorganized Holdings shall remit ONE HUNDRED FIFTY-TWO MILLION DOLLARS ($152,000,0000), or such lesser amount as may be equal to the full Allowed Class I Claims to the Holder of Allowed Class I Claims, in accordance with the Description of Transaction Steps, and in accordance with, the Plan.

On the Effective Date, Reorganized Holdings shall remit the aggregate amount of EIGHTEEN MILLION DOLLARS ($18,000,0000) for the benefit of the Holders of Allowed Class III Claims, in Pro Rata amounts relative to the amounts of such Claims, in accordance with the Description of Transaction Steps, and in accordance with, the Plan.

On the Effective Date, Reorganized Holdings shall contribute SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS ($7,500,000) of the proceeds from Reorganized Stream's issuance of the New Shares to SCBV, a non-debtor subsidiary, to refinance, retire and otherwise liquidate certain senior unsecured notes issued by SCBV to SeeCubic prior to and during the pendency of this Bankruptcy Proceeding.

C.      Restructuring Transactions

On the Effective Date, the applicable Debtors or the Reorganized Debtors shall enter into any transactions and shall take any actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including to establish Reorganized Holdings and, *if applicable*, to transfer assets of the Debtors to Reorganized Holdings or a subsidiary thereof. The applicable Debtors or the Reorganized Debtors will take any actions as may be necessary or advisable to effect a corporate restructuring of the overall corporate structure of the Debtors, in the Description of Transaction Steps, or in the Definitive Documents, including the issuance of all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, in each case, subject to the consent of the Plan Sponsor and, solely to the extent required under the Restructuring Agreements.

The actions to implement the Restructuring Transactions may include: (1) the execution and

24

delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable parties may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of the New Organizational Documents and any appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable law; (4) the execution and delivery of the Exit Facilities Documents and any documentation related to the Subscription Agreements; (5) if applicable, all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Holdings, which purchase, if applicable, may be structured as a taxable transaction for United States federal income tax purposes; (6) the settlement, reconciliation, repayment, cancellation, discharge, and/or release, as applicable, of Intercompany Claims consistent with the Plan; and (7) all other actions that the Debtors or the Reorganized Debtors determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan.

For purposes of consummating the Plan and the Restructuring Transactions, none of the transactions contemplated in this Article IV.C shall constitute a change of control under any of the Debtors' agreements, contracts, or documents.

D.      Corporate Existence

Except as otherwise provided in the Plan, the Description of Transaction Steps, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a Reorganized Debtor and as a separate corporation, with all the powers of a corporation, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation or governing documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation or governing documents) are amended by the Plan or otherwise amended in accordance with applicable law. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, federal, or foreign law).

E.      Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, the Plan Supplement or the Confirmation Order, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property (including all interests, rights, and privileges related thereto) in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan, including Interests held by the Debtors in any non-Debtor Affiliates, shall vest in the applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, encumbrances, or other interests, unless expressly provided otherwise by the Plan or Confirmation Order, subject to and in accordance with the Plan, including the Description of Transaction Steps. On and after the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. Without limiting the foregoing, the Reorganized Debtors

may pay the charges that they incur on or after the Confirmation Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court, but subject in all respect to the Plan.

F.       Cancellation of Existing Indebtedness and Securities

Except as otherwise expressly provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan or the Restructuring Transactions, on the Effective Date, (1) all notes, bonds, indentures, certificates, securities, shares, equity securities, purchase rights, options, warrants, convertible securities or instruments, credit agreements, collateral agreements, subordination agreements, intercreditor agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any indebtedness or obligations of, or ownership interest in, the Debtors, or giving rise to any Claims against or Interests in the Debtors or to any rights or obligations relating to any Claims against or Interests in the Debtors (except with respect to such agreements, certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that is specifically Reinstated, amended and Reinstated, or entered into pursuant to the Plan), including any facility under Proof of Claim No. 6 filed in Case 23-10763-mdc by Hawk as "Collateral Agent" on May 19, 2023 with respect to Stream, Proof of Claim No. 9 filed in Case 23-10763-mdc by SLS on May 23, 2023 with respect to Stream, Proof of Claim No. 1 filed in Case 23-10763-mdc by SeeCubic on May 23, 2023 with respect to Stream, Proof of Claim No. 1 filed in Case 23-10764-mdc by Hawk as "Collateral Agent" on May 19, 2023 with respect to Technovative, Proof of Claim No. 2 filed in Case 23-10764-mdc by SLS on May 23, 2023 with respect to Technovative, and Proof of Claim No. 3 filed in Case 23-10764-mdc by SeeCubic on May 23, 2023 with respect to Technovative (collectively, the "*Hawk POCs*") shall be canceled without any need for a Holder to take further action with respect thereto, and the duties and obligations of all parties thereto, including the Debtors or the Reorganized Debtors, as applicable, and any non-Debtor Affiliates, thereunder or in any way related thereto shall be deemed satisfied in full, canceled, released, discharged, and of no force or effect and (2) the obligations of the Debtors or Reorganized Debtors, as applicable, pursuant, relating, or pertaining to any agreements, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the notes, bonds, indentures, certificates, securities, shares, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or Interests in the Debtors (except with respect to such agreements, certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that is specifically Reinstated, amended and Reinstated, or entered into pursuant to the Plan), including any facility under the Hawk POCs shall be released and discharged in exchange for the consideration provided hereunder; provided that notwithstanding Confirmation or the occurrence of the Effective Date, any such document or instrument that governs the rights, claims, or remedies of the Holder of a Claim or Interest, shall continue in effect solely for purposes of enabling Holders of Allowed Claims to receive distributions under the Plan as provided herein, and allowing each of the applicable agents and indenture trustees to make or direct the distributions in accordance with the Plan as provided herein. On the Effective Date, each holder of a certificate or instrument evidencing a Claim that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument in accordance with the applicable indenture or agreement that governs the rights of such holder of such Claim. Such surrendered certificate or instrument shall be deemed canceled as set forth in, and subject to the exceptions set forth in Article IV.F of the Plan.

Additional debt satisfied, liquidated and otherwise cancelled pursuant to the Plan includes those certain promissory notes issued by SCBV to SeeCubic in the amount of EUR €3,500,000 dated November 14, 2022 and USD $3,000,000 executed on or about June 30, 2023.

G.       Corporate Action

On the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including: (1) execution and entry into the Plan Sponsor Equity Subscription Agreement; (2) approval of and entry into the New Organizational Documents; (3) issuance and distribution of the New Securities; (4) selection of the directors and officers for the Reorganized Debtors; (5) implementation of the Restructuring Transactions contemplated by the Plan; (6) adoption or assumption, if and as applicable, of the Employment Obligations; (7) the formation or dissolution of any Entities pursuant to and the implementation of the Restructuring Transactions and performance of all actions and transactions contemplated by the Plan, including the Description of Transaction Steps; (8) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (9) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).

All matters provided for herein involving the corporate structure of the Debtors or the Reorganized Debtors, or any corporate, limited liability company, or related action required by the Debtors or the Reorganized Debtors in connection herewith shall be deemed to have occurred and shall be in effect in accordance with the Plan, including the Description of Transaction Steps, without any requirement of further action by the shareholders, members, directors, or managers of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the shareholders, members, directors, managers, or officers, as applicable, of the Debtors or Reorganized Debtors. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors. The authorizations and approvals contemplated by this Article IV.G shall be effective notwithstanding any requirements under non-bankruptcy law.

H.    New Organizational Documents

On or promptly after the Effective Date, the Reorganized Debtors shall file their applicable New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states or jurisdictions of incorporation or formation in accordance with the corporate laws of such respective states or jurisdictions of incorporation or formation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents shall prohibit the issuance of non-voting equity securities of Reorganized Holdings. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents or otherwise restructure their legal Entity forms, without supervision or approval by the Bankruptcy Court and in accordance with applicable non-bankruptcy law.

I.    Directors and Officers of the Reorganized Debtors

As of the Effective Date, the term of the current members of the boards of directors of each Debtor shall expire, and the New Boards shall be appointed in accordance with the New Organizational Documents of each Reorganized Debtor.

The members of the Reorganized Holdings Board and New Subsidiary Boards immediately following the Effective Date shall be determined and selected by the Plan Sponsor.

Except as otherwise provided in the Plan, the Confirmation Order, the Plan Supplement, or the New Organizational Documents, the officers of the Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of the Reorganized Debtors on the Effective Date.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on the initial Reorganized Holdings Board and New Subsidiary Boards, to the extent known at the time of Filing, as well as those Persons that will serve as an officer of Reorganized Holdings or other Reorganized Debtor. To the extent any such director or officer is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and may be replaced or removed in accordance with such New Organizational Documents.

J.      Employment Obligations

Except as otherwise expressly provided in the Plan or the Plan Supplement, the Reorganized Debtors shall honor the Employment Obligations (1) existing and effective as of the Petition Date, (2) that were incurred or entered into in the ordinary course of business prior to the Effective Date, or (3) as otherwise agreed to by the Plan Sponsor on or prior to the Effective Date.

K.      Effectuating Documents; Further Transactions

On, before, or after (as applicable) the Effective Date, the Reorganized Debtors, the officers of the Reorganized Debtors, and members of the New Boards are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the New Organizational Documents, the Exit Facilities Documents, and the securities issued pursuant to the Plan, including the New Securities, and any and all other agreements, documents, securities, filings, and instruments relating to the foregoing in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan. The authorizations and approvals contemplated by this Article IV shall be effective notwithstanding any requirements under non- bankruptcy law.

L.      Exemption from Certain Taxes and Fees

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property pursuant to the Plan shall not be subject to any stamp tax, document recording tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies to (1) the creation, modification, consolidation, or recording of any mortgage, deed of trust, Lien, or other security interest, or the securing of additional indebtedness by such or other means, (2) the making or assignment of any lease or sublease, (3) any Restructuring Transaction authorized by the Plan, and (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; (d) bills of sale; (e) assignments executed in connection with any Restructuring Transaction occurring under the Plan; or (f) the other Definitive Documents.

M.    Indemnification Provisions

On and as of the Effective Date, consistent with applicable law, the Indemnification Provisions in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organized documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed by the Reorganized Debtors (and any such Indemnification Provisions in place as to any Debtors that are to be liquidated under the Plan shall be assigned to and assumed by an applicable Reorganized Debtor), deemed irrevocable, and will remain in full force and effect and survive the effectiveness of the Plan unimpaired and unaffected, and each of the Reorganized Debtors' New Organizational Documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, agents, managers, attorneys, and other professionals, at least to the same extent as such documents of each of the respective Debtors on the Petition Date but in no event greater than as permitted by law, against any Causes of Action. Neither of the Reorganized Debtors shall amend and/or restate its respective New Organizational Documents, on or after the Effective Date to terminate, reduce, discharge, impair or adversely affect in any way (1) any of the Reorganized Debtors' obligations referred to in the immediately preceding sentence or (2) the rights of such current and former directors, officers, employees, agents, managers, attorneys, and other professionals.

N.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, any and all Causes of Action, except for Retained Preference Actions, whether arising before or after the Petition Date, including but not limited to any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Debtors shall retain and may enforce all rights to commence and pursue any Retained Preference Actions, and the Debtors' rights to commence, prosecute, or settle such Retained Preference Actions shall be preserved notwithstanding the occurrence of the Effective Date. For the avoidance of doubt, the preservation of Retained Causes of Action described in the preceding sentence includes, but is not limited to, the Debtors' rights, as applicable, to (1) assert any and all counterclaims, crossclaims, claims for contribution defenses, and similar claims in response to such or Causes of Action, (2) object to Administrative Claims, (3) object to other Claims, and (4) subordinate Claims, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.

The Reorganized Debtors as applicable, may pursue such Retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors, as applicable, in their respective discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Retained Causes of Action. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Retained Causes of Action against any Entity. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors, as applicable, expressly reserve all and shall retain the applicable Retained Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or

otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all Retained Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action except as otherwise expressly provided in the Plan and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>

Except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed assumed as of the Effective Date, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that: (1) previously were rejected by the Debtors; (2) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; or (3) are the subject of a motion to reject such Executory Contracts or Unexpired Leases, as applicable, that is pending on the Effective Date, regardless of whether the requested effective date of such rejection is on or after the Effective Date. The assumption or rejection of all executory contracts and unexpired leases in the Chapter 11 Cases or in the Plan shall be determined by the Debtors, with the consent of the Plan Sponsor. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions or assumptions and assignments, and rejection of the Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date or such later date as provided in this Article V.A, shall revest in and be fully enforceable by the Debtors or the Reorganized Debtors, as applicable, in accordance with such Executory Contract and/or Unexpired Lease's terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases, including by way of adding or removing a particular Executory Contract or Unexpired Lease from the Schedule of Rejected Executory Contracts and Unexpired Leases, at any time through and including sixty (60) Business Days after the Effective Date.

B.    <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases</u>

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court or the Voting and Claims Agent and served on the Debtors or Reorganized Debtors, as applicable, by the later of (1) the applicable Claims Bar Date, or (2) thirty (30) calendar days after notice of such rejection is served on the applicable claimant. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be automatically Disallowed and forever barred from assertion and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, including any Claims against any Debtor listed on the Schedules as unliquidated, contingent or disputed. Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Other General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any cure amount has been fully paid or for which the cure amount is $0 pursuant to this Article V, shall be deemed Disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any Cure Claims shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date or as soon as reasonably practicable thereafter, with such Cure Claim being $0.00 if no amount is listed in the Cure Notice, subject to the limitations described below, or on such other terms as the party to such Executory Contract or Unexpired Lease may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, if required, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall only be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or by mutual agreement between the Debtors or the Reorganized Debtors, as applicable, and the applicable counterparty, with the reasonable consent of the Plan Sponsor.

At least fourteen (14) calendar days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices and proposed amounts of Cure Claims to the applicable Executory Contract or Unexpired Lease counterparties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors at least seven (7) calendar days before the Confirmation Hearing. Any such objection to the assumption of an Executory Contract or Unexpired Lease shall be heard by the Bankruptcy Court on or before the Effective Date, unless a later date is agreed to between the Debtors or the Reorganized Debtors, on the one hand, and the counterparty to the Executory Contract or Unexpired Lease, on the other hand, or by order of the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount shall be deemed to have assented to such assumption and/or cure amount; provided, however, that, subject to Article X.A, the Debtors or the Reorganized Debtors, as applicable, shall have the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases, as applicable, as identified in the Plan Supplement, through and including forty-five (45) calendar days after the Effective

Date.

The Debtors or Reorganized Debtors, as applicable, reserve the right to reject any Executory Contract or Unexpired Lease in resolution of any cure disputes. Notwithstanding anything to the contrary herein, if at any time the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right, at such time, to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease shall be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults, whether monetary or nonmonetary, including defaults of provisions restricting a change in control or any bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors or Reorganized Debtors assume such Executory Contract or Unexpired Lease; provided that nothing herein shall prevent the Reorganized Debtors from (a) paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim or (b) settling any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court, in each case in clauses (a) or (b), with the consent (not to be unreasonably withheld, conditioned or delayed) of the Plan Sponsor. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and cured shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.      Pre-existing Obligations to the Debtors under Executory Contracts and Unexpired Leases

Notwithstanding any non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased, or services previously received, by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts and Unexpired Leases. For the avoidance of doubt, the rejection of any Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors under such Executory Contracts and Unexpired Leases.

E.      Insurance Policies

Subject in all respects to Articles VI.K.3 and VIII.L, all of the Debtors' insurance policies, including any directors' and officers' insurance policies (including any "tail policies"), and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto. In addition, on and after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce, limit or restrict the coverage under any of the directors' and officers' insurance policies, if any, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such directors' and officers' insurance policy (including any "tail policies") for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date. Notwithstanding anything to the contrary in Article VIII.D and Article VIII.E, all of the Debtors' current and former officers' and directors' rights as beneficiaries of such insurance policies are preserved to the extent set forth herein.

F.      Indemnification Provisions

32

Except as otherwise provided in the Plan, on and as of the Effective Date, any of the Debtors' indemnification rights with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by the Chapter 11 Cases.

G.      Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, each Executory Contract or Unexpired Lease that is assumed shall include (1) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affect such Executory Contract or Unexpired Lease, and (2) all Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated pursuant to an order of the Bankruptcy Court or under the Plan.

Except as otherwise provided by the Plan or by separate order of the Bankruptcy Court, modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases and actions taken in accordance therewith (1) shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims against any Debtor that may arise in connection therewith, (2) are not and do not create post-petition contracts or leases, (3) do not elevate to administrative expense priority any Claims of the counterparties to such Executory Contracts and Unexpired Leases against any of the Debtors, and (4) do not entitle any Entity to a Claim against any of the Debtors under any section of the Bankruptcy Code on account of the difference between the terms of any prepetition Executory Contracts or Unexpired Leases and subsequent modifications, amendments, supplements, or restatements.

H.      Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If, prior to the Effective Date, there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or Reorganized Debtors, as applicable, shall have forty-five (45) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.

I.      Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

J.      Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by either Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or

33

Reorganized Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that had not been rejected as of the date of Confirmation will survive and remain obligations of the applicable Reorganized Debtor.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim), each Holder of an Allowed Claim shall be entitled to receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims (which will only be made if and when they become Allowed Claims) shall be made pursuant to the provisions set forth in Article VI of the Plan. Except as otherwise expressly provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. The Debtors shall have no obligation to recognize any transfer of Claims against either Debtor or privately held Interests occurring on or after the Distribution Record Date. Distributions to Holders of Claims or Interests related to public Securities shall be made to such Holders in exchange for such Securities, which shall be deemed canceled as of the Effective Date.

B.    Disbursing Agent

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on the Effective Date or as soon as reasonably practicable thereafter. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.    Rights and Powers of Disbursing Agent

1.    Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes other than any income taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable and documented attorneys' fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

1.      Delivery of Distributions

(a)      Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims or Interests shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors or the applicable Disbursing Agent: (i) to the signatory set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (ii) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors after the date of any related Proof of Claim; (iii) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address; or (iv) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. The Debtors and the Reorganized Debtors shall not incur any liability whatsoever on account of any distributions under the Plan, except in the event of gross negligence or willful misconduct, as determined by a Final Order of a court of competent jurisdiction. Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan, except in the event of actual fraud, gross negligence, or willful misconduct, as determined by a Final Order of a court of competent jurisdiction.

2.      Record Date of Distributions

As of the close of business on the Distribution Record Date, the various transfer registers for each Class of Claims as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims. The Disbursing Agent shall have no obligation to recognize any transfer of Claims occurring on or after the Distribution Record Date. In addition, with respect to payment of any cure amounts or disputes over any cure amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Cure Claim.

3.      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim, on the other hand, or as set forth in a Final Order, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all of the Disputed Claim has become an Allowed Claim or has otherwise been resolved by settlement or Final Order; provided that, if the Reorganized Debtors do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim, the Disbursing Agent may make a partial distribution on account of that portion of such Claim that is not Disputed at the time and in the manner that the Disbursing Agent makes distributions to similarly situated Holders of Allowed Claims pursuant to the Plan. Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

35

4.        Minimum Distributions

No partial distributions or payments of fractions of New Securities shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim or Interest, as applicable, would otherwise result in the issuance of a number of New Securities that is not a whole number, the actual distribution of New Securities shall be rounded as follows: (a) fractions of greater than one-half (1/2) shall be rounded to the next higher whole number and (b) fractions of one-half (1/2) or less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Securities to be distributed pursuant to the Plan may (at the Debtors' discretion) be adjusted as necessary to account for the foregoing rounding.

Notwithstanding any other provision of the Plan, no Cash payment valued at less than $100.00, in the reasonable discretion of the Disbursing Agent and the Reorganized Debtors, shall be made to a Holder of an Allowed Claim on account of such Allowed Claim. Such Allowed Claims to which this limitation applies shall be discharged and its Holder forever barred from asserting that Claim against the Reorganized Debtors or their property.

5.        Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the later of (a) the Effective Date and (b) the date of the distribution. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, state, or other jurisdiction escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) calendar days from and after the date of issuance thereof. Requests for reissuance of any check must be made directly and in writing to the Disbursing Agent by the Holder of the relevant Allowed Claim within the 180-calendar day period. After such date, the relevant Allowed Claim (and any Claim for reissuance of the original check) shall be automatically discharged and forever barred, and such funds shall revert to the Reorganized Debtors (notwithstanding any applicable federal, provincial, state or other jurisdiction escheat, abandoned, or unclaimed property laws to the contrary).

A distribution shall be deemed unclaimed if a Holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

E.        Manner of Payment

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by

check, wire transfer, automated clearing house, or credit card, or as otherwise required or provided in applicable agreements.

F.      <u>Exemption from Registration</u>

      The New Securities are or may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

      The offer, issuance, and distribution of the New Securities by Reorganized Holdings as contemplated by the Plan (including the issuance of New Common Stock upon exercise of the Equity Subscription Rights) is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution or sale of Securities. The New Securities issued by Reorganized Holdings (1) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (2) are freely tradable and transferable by any initial recipient thereof that (a) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within ninety (90) calendar days of such transfer, (c) has not acquired the New Securities from an "affiliate" within one year of such transfer and (d) is not an entity that is an "underwriter" as defined in section Section 2(a)(11) of the Securities Act; provided that transfer of the New Securities may be restricted by the New Organizational Documents.

G.      <u>Compliance with Tax Requirements</u>

      In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information, documentation, and certifications necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable or appropriate. All Persons holding Claims against any Debtor shall be required to provide any information necessary for the Reorganized Debtors to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit. The Reorganized Debtors reserve the right to allocate any distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

      Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit on account of such distribution.

H.      <u>No Post-petition or Default Interest on Claims</u>

      Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, post-petition interest shall not accrue or be paid on any Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim for purposes of distributions under the Plan.

I.      Allocations

        Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remaining portion of such Allowed Claim, if any.

J.      Setoffs and Recoupment

        The Debtors or the Reorganized Debtors may, but shall not be required to, setoff against or recoup any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims, rights, and Causes of Action of any nature whatsoever that the Debtors or the Reorganized Debtors, as applicable, may have against the Holder of such Allowed Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law, to the extent that such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (pursuant to the Plan or otherwise); provided, however, that the failure of the Debtors or the Reorganized Debtors, as applicable, to do so shall not constitute a waiver, abandonment or release by the Debtors or the Reorganized Debtors of any such Claim they may have against the Holder of such Claim.

K.      Claims Paid or Payable by Third Parties

        1.      Claims Paid by Third Parties

        The Debtors or the Reorganized Debtors, as applicable, shall reduce a Claim against any Debtor, and such Claim (or portion thereof) shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives a payment on account of such Claim from a party that is not a Debtor or a Reorganized Debtor, as applicable. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and also receives payment from a party that is not a Debtor or a Reorganized Debtor, as applicable, on account of such Claim, such Holder shall, within fourteen (14) days of receipt of such payment, repay or return the distribution to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

        2.      Claims Payable by Third Parties

        No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim against any Debtor, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

        3.      Applicability of Insurance Policies

        Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Reorganized Debtors, or any

Person or Entity may hold against any other Entity, including insurers, under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

L.      Foreign Current Exchange Rate

As of the Effective Date, any Claim asserted in a currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate on the Petition Date, as quoted at 4:00 p.m. (prevailing Eastern time), midrange spot rate of exchange for the applicable currency as published in the Wall Street Journal, National Edition, on the day after the Petition Date.

# ARTICLE VII.
## PROCEDURES FOR RESOLVING
## CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      Resolution of Disputed Claims

1.      Allowance of Claims

After the Effective Date, each of the Reorganized Debtors, with respect to General Unsecured Claims, shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim against any Debtor shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

2.      Claims and Interests Administration Responsibilities

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors (or any authorized agent or assignee thereof) shall have the sole authority to: (a) File, withdraw, or litigate to judgment objections to Claims against either of the Debtors; (b) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses held by the Debtor immediately prior to the Effective Date with respect to any Disputed Claim or Interest.

3.      Estimation of Claims

Before or after the Effective Date, the Debtors or the Reorganized Debtors may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim against either Debtor that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to

be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Disputed, contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim; provided, however, that such limitation shall not apply to Claims against any of the Debtors requested by the Debtors to be estimated for voting purposes only.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen (14) calendar days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims against any of the Debtors may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.      Adjustment to Claims Without Objection

Any duplicate Claim or Interest, any Claim against either Debtor that has been paid or satisfied, or any Claim against either Debtor that has been amended or superseded, canceled, or otherwise expunged (including pursuant to the Plan), may, in accordance with the Bankruptcy Code and Bankruptcy Rules, be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court. Additionally, any Claim or Interest that is duplicative or redundant with another Claim or Interest against the same Debtor may be adjusted or expunged on the Claims Register at the direction of the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

5.      Time to File Objections to Claims

Any objections to Claims against any of the Debtors shall be Filed on or before the Claims Objection Deadline.

6.      Resolution of Claims Characterization Dispute

If the Hawk Parties vote in favor of the Plan, the Plan Sponsor shall withdraw its objection to the Debtors' 9019 Settlement and waive the Claim Characterization Dispute, paving the way for the Hawk Parties' Claims to be Allowed.

B.      Disallowance of Claims

Any Claims against either of the Debtors held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. Subject in all respects to Article IV.P, all Proofs of Claim Filed on account of an indemnification obligation to a director,

40

officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as provided herein or otherwise agreed to by the Debtors or the Reorganized Debtors, any and all Proofs of Claim filed after the applicable Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Filed Claim has been deemed timely Filed by a Final Order.

C.      Amendments to Proofs of Claim

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Proof of Claim or Interest may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors and any such new or amended Proof of Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court; provided, however, that the foregoing shall not apply to Administrative Claims or Professional Compensation Claims.

D.      No Distributions Pending Allowance

Notwithstanding anything to the contrary herein, if any portion of a Claim against either Debtor is Disputed, or if an objection to a Claim against any Debtor or portion thereof is Filed as set forth in this Article VII, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

E.      Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Allowed Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Allowed Claim, without any interest, dividends, or accruals to be paid on account of such Allowed Claim unless required under applicable bankruptcy law.

F.      No Interest

Unless otherwise expressly provided by section 506(b) of the Bankruptcy Code or as specifically provided for herein or by order of the Bankruptcy Court, post-petition interest shall not accrue or be paid on Claims against either of the Debtors, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim; provided, however, that nothing in this Article VII.F shall limit any rights of any Governmental Unit to interest under sections 503, 506(b), 1129(a)(9)(A) or 1129(a)(9)(C) of the Bankruptcy Code or as otherwise provided for under applicable law.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

41

A.      Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith global and integrated compromise and settlement (the "*Plan Settlement*") of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that any Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest, as well as any and all actual and potential disputes between and among the Company Entities (including, for clarity, between and among the Stream Entities, on the one hand, and the Non-Stream Entities on the other and including, with respect to each Debtor, such Debtor's Estate), and the Consenting Parties and all other disputes that might impact creditor recoveries, including any and all issues relating to (1) any and all disputes that might be raised impacting the allocation of value among the Debtors and their respective assets; and (2) any and all other Settled Claims. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Plan Settlement as well as a finding by the Bankruptcy Court that the Plan Settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable. The Plan Settlement is binding upon all creditors and all other parties in interest pursuant to section 1141(a) of the Bankruptcy Code. In accordance with the provisions of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.      Discharge of Claims and Termination of Interests

To the extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing). The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.      Release of Liens

Except as otherwise specifically provided in the Plan, or any other Definitive Document, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, discharged, and compromised, and all of the right, title, and interest of any holder

of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.

D.    Releases by the Debtors

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, as of the Effective Date, each of the Released Parties is unconditionally, irrevocably, generally, individually, and collectively, released, acquitted, and discharged by the Debtors, the Reorganized Debtors, and each of their Estates from any and all Causes of Action, including any derivative Causes of Action asserted or assertable by or on behalf of a Debtor, Reorganized Debtor, or any of their Estates, any Causes of Action that any Debtor, Reorganized Debtors, or any of their Estates would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor or other Entity, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that the Debtors, the Reorganized Debtors, or their Estates (whether individually or collectively) ever had, now has, or thereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part: (1) the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the purchase, sale, or rescission of any security of the Debtors, the Plan Settlement, the Settled Claims, the formulation, preparation, dissemination, negotiation, or filing of the Definitive Documents, the New Common Stock, the Plan Sponsor Equity Subscription Agreement, the Disclosure Statement, or the Plan, including the Plan Supplement; (2) any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Definitive Documents, the New Common Stock, the Plan Sponsor Equity Subscription Agreement, the Disclosure Statement, or the Plan, including the Plan Supplement; (3) the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' restructuring, or the restructuring of Claims and Interests before or during the Chapter 11 Cases; (4) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan; (5) the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; (6) the Settled Claims; or (7) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date arising from or relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above shall not release (1) to the extent that any Causes of Action against the Debtors are not released or discharged pursuant to the Plan, any rights of the Debtors to assert any and all counterclaims, crossclaims, claims for contribution, defenses, and similar claims in response to such Causes of Action, (2) any Causes of Action set forth in the Schedule of Retained Causes of Action, including any Retained Preference Action, (3) any Cause of Action against any Excluded Party, (4) any commercial Cause of Action arising in the ordinary course of business, such as accounts receivable and accounts payable on account of goods and services being performed, (5) any Cause of Action against a Holder of a Disputed Claim, to the extent such Cause of Action is necessary for the administration and resolution of such Claim solely in accordance with the Plan, or (6) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, any Definitive Document (including those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement the Plan.

77960764;15

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) essential to the Confirmation of the Plan; (2) an exercise of the Debtors' business judgment; (3) in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (4) a good faith settlement and compromise of the Causes of Action released by the Debtor Release; (5) in the best interests of the Debtors and all Holders of Claims and Interests; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Debtors, the Reorganized Debtors, and the Estates asserting any Cause of Action released pursuant to the Debtor Release.

E.      <u>Releases by the Releasing Parties</u>

As of the Effective Date, each of the Releasing Parties other than the Debtors is deemed to have expressly, absolutely, unconditionally, irrevocably, generally, individually, and collectively, released, acquitted, and discharged each of the Released Parties from any and all Causes of Action, including any derivative Causes of Action asserted or assertable by or on behalf of a Debtor, Reorganized Debtor, or any of their Estates, and any Causes of Action asserted or assertable by or on behalf of the Holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that the Releasing Parties (whether individually or collectively) ever had, now have, or thereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part: (1) the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the purchase, sale, or rescission of any security of the Debtors, the Plan Settlement, the Settled Claims, the formulation, preparation, dissemination, negotiation, or filing of the Definitive Documents, the New Common Stock, the Plan Sponsor Equity Subscription Agreement, the Disclosure Statement, or the Plan, including the Plan Supplement; (2) any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Definitive Documents, the New Common Stock, the Plan Sponsor Equity Subscription Agreement, the Disclosure Statement, or the Plan, including the Plan Supplement; (3) the business or contractual arrangements between any Debtor and any Releasing Party, whether before or during the Debtors' restructuring, or the restructuring of Claims and Interests before or during the Chapter 11 Cases; (4) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan; (5) the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; (6) the Settled Claims; or (7) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date arising from or relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above shall not release (1) to the extent that any Causes of Action against any Releasing Party are not released or discharged pursuant to the Plan, any rights of such Releasing Party to assert any and all counterclaims, crossclaims, claims for contribution, defenses, and similar claims in response to such Causes of Action (provided that no such third-party claims or claims for contribution or similar claims may be asserted against the Debtors or the Reorganized Debtors to the extent such claims have been released or discharged pursuant to the Plan), (2) any Cause of Action against a Released Party other than the Debtors unknown to such Releasing Party as of the Effective Date arising out of actual fraud, gross negligence, or willful misconduct of such Released Party, (3) any Cause of Action against any Excluded Party, or (4) any post-Effective Date obligations of

any party or Entity under the Plan, any Restructuring Transaction, or any Definitive Document (including those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) essential to the Confirmation of the Plan; (2) given in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (3) a good faith settlement and compromise of the Claims released by the Third-Party Release; (4) in the best interests of the Debtors and their Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

F.      Regulatory Activities

Notwithstanding anything to the contrary herein, nothing in the Plan or Confirmation Order is intended to affect the police or regulatory activities of Governmental Units or other governmental agencies.

G.      Exculpation

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur any liability to any person or Entity for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Debtors' restructuring efforts, the Chapter 11 Cases, preparation for the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Settled Claims, the formulation, preparation, dissemination, negotiation, filing, or termination of the Disclosure Statement, the Plan (including any term sheets related thereto), the Plan Supplement, the Plan Sponsor Equity Subscription Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with any of the foregoing, the funding of the Plan, the occurrence of the Effective Date, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the Definitive Documents, the issuance of securities pursuant to the Plan, the issuance of the New Common Stock pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, gross negligence, or willful misconduct; provided that the foregoing shall not be deemed to release, affect, or limit any post-Effective Date rights or obligations of the Exculpated Parties under the Plan, the Plan Sponsor Equity Subscription Agreement, any Restructuring Transaction, or any Definitive Document (including those set forth in the Plan Supplement), or other document, instrument, or agreement executed to implement the Plan.

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

H.      <u>Injunction</u>

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to Article VIII.D or Article VIII.E of the Plan or discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, shall be permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has, on or before the Effective Date, asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

I.      <u>Term of Injunctions or Stays</u>

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.      <u>Recoupment</u>

In no event shall any Holder of a Claim be entitled to recoup such Claim against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.      <u>Protection Against Discriminatory Treatment</u>

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against any Reorganized Debtor, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the

Chapter 11 Cases.

L.     Direct Insurance Claims

Nothing contained in the Plan shall impair or otherwise affect any right of a Holder of a Claim under applicable law, if any, to assert direct claims solely under any applicable insurance policy of the Debtors or solely against any applicable provider of such policies, if any.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

A.     Conditions Precedent to the Effective Date

It is a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.B:

1.     Confirmation and all conditions precedent thereto shall have occurred;

2.     The Bankruptcy Court shall have entered the Confirmation Order which shall be a Final Order and in form and substance acceptable to the Plan Sponsor;

3.     The Debtors shall have obtained all authorizations, consents, regulatory approvals, or rulings that are necessary to implement and effectuate the Plan;

4.     The final version of the Plan, including all schedules, supplements, and exhibits thereto, including the Plan Supplement (and all documents contained therein), shall be in form and substance acceptable to the Plan Sponsor;

5.     All Definitive Documents shall have been (or shall, contemporaneously with the occurrence of the Effective Date, be) executed and in full force and effect, and all conditions precedent contained in the Definitive Documents shall have been satisfied or waived in accordance with the terms thereof, except with respect to such conditions that by their terms shall be satisfied substantially contemporaneously with or after Consummation of the Plan;

6.     All professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow in accordance with Article II.B pending the Bankruptcy Court's approval of such fees and expenses;

7.     All Restructuring Expenses incurred and invoiced as of the Effective Date shall have been paid in full in Cash;

8.     The Restructuring Transactions shall have been (or shall, contemporaneously with the occurrence of the Effective Date, be) implemented in a manner consistent in all material respects with the Plan;

9.     The Debtors or the Reorganized Debtors, as applicable, shall have obtained directors' and officers' insurance policies and entered into indemnification agreements or similar arrangements for the Reorganized Holdings Board, which shall be, in each case, effective on or by the Effective Date; and

10.     The Debtors shall have recovered title and possession of all Estate Assets.

11.     The Bankruptcy Court shall have entered the Protective Order.

B.      Waiver of Conditions

The conditions to Consummation set forth in Article IX.A may be waived by the Plan Sponsor, and, with respect to conditions related to the Professional Fee Escrow, the beneficiaries of the Professional Fee Escrow, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. Plan Sponsor's failure to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

C.      Effect of Failure of Conditions

If Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Causes of Action, or Interests; (2) prejudice in any manner the rights of such Debtor, any Holder, any Person, or any other Entity; or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, any Person, or any other Entity.


# ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      Modification and Amendments

Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Plan Sponsor reserves the right to modify the Plan (including the Plan Supplement), without additional disclosure pursuant to section 1125 of the Bankruptcy Code prior to the Confirmation Date and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. After the Confirmation Date and before substantial consummation of the Plan, the Plan Sponsor may initiate proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order, relating to such matters as may be necessary to carry out the purposes and intent of the Plan.

After the Confirmation Date, but before the Effective Date, the Plan Sponsor, with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Reorganized Debtors may make appropriate technical adjustments and modifications to the Plan (including the Plan Supplement) without further order or approval of the Bankruptcy Court; provided that such adjustments and modifications do not materially and adversely affect the treatment of Holders of Claims or Interests.

B.      Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      Revocation or Withdrawal of Plan

77960764;15

The Plan Sponsor reserves the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans of reorganization. If the Plan Sponsor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then, absent further order of the Bankruptcy Court: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise not previously approved by Final Order of the Bankruptcy Court embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Classes of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, any Person, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, any Person, or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, except as set forth in the Plan, the Bankruptcy Court shall retain exclusive jurisdiction, to the fullest extent permissible under law, over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable, and to hear, determine and, if necessary, liquidate, any Claims against any of the Debtors arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

5.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

6.      adjudicate, decide, or resolve: (a) any motions, adversary proceedings, applications, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor, or the Estates that may be pending on the Effective Date or that, pursuant to the Plan, may be commenced after the Effective Date, including, but not limited to, the Retained Preference Actions; (b) any and all

matters related to Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan; and (c) any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to construe, execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Confirmation Order, the Plan, the Plan Supplement, or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity or Person with Consummation or enforcement of the Plan;

11.      hear and resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.K.1;

13.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.      determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the New Organizational Documents, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement; provided that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a different court;

15.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

16.      consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in the Plan, the Disclosure Statement, or any Bankruptcy Court order, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

17.      determine requests for the payment of Claims against any of the Debtors entitled to priority pursuant to section 507 of the Bankruptcy Code;

18.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order or any transactions or payments contemplated hereby

77960764;15

or thereby, including disputes arising in connection with the implementation of the agreements, documents, or instruments executed in connection with the Plan;

19.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, 511, and 1146 of the Bankruptcy Code;

20.     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases with respect to any Person or Entity, and resolve any cases, controversies, suits, or disputes that may arise in connection with any Person or Entity's rights arising from or obligations incurred in connection with the Plan;

22.     hear and determine any other matter not inconsistent with the Bankruptcy Code;

23.     enter an order or final decree concluding or closing either of the Chapter 11 Cases;

24.     hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code and section 4(a)(2) of, and Regulation D under, the Securities Act;

25.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan; and

26.     hear and resolve any cases, controversies, suits, disputes, contested matters, or Causes of Action with respect to the Settled Claims and any objections to proofs of claim in connection therewith.

Nothing herein limits the jurisdiction of the Bankruptcy Court to interpret and enforce the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement, without regard to whether the controversy with respect to which such interpretation or enforcement relates may be pending in any state or other federal court of competent jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in this Article XI, the provisions of this Article XI shall have no effect on and shall not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

Unless otherwise specifically provided herein or in a prior order of the Bankruptcy Court, the Bankruptcy Court shall have exclusive jurisdiction to hear and determine disputes concerning Claims against the Debtors that arose prior to the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     <u>Immediate Binding Effect</u>

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the final versions of the documents contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective

of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors and each of their respective heirs executors, administrators, successors, and assigns.

B.     Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

C.     Further Assurances

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

D.     Statutory Committee and Cessation of Fee and Expense Payment

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, and the Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred thereby on and after the Effective Date.

E.     Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by either Debtor or any other Entity with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of either Debtor or other Entity before the Effective Date.

F.     Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, receiver, trustee, successor, assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of such Entity.

G.     Notices

Any pleading, notice, or other document required by the Plan or the Confirmation Order to be served or delivered shall be served by first-class or overnight mail:

1.     The Debtors at:

Stream TV Networks, Inc.
2009 Chestnut Street, 3rd Floor

Philadelphia, PA 19103
Attention:        William Homony, Trustee
E-mail:        bhomony@mctllp.com


2.        Office of the U.S. Trustee at:

Andrew R. Vara
United States Trustee
Robert N.C. Nix Federal Building
900 Market Street, Suite 320
Philadelphia, PA 19107
Attention:        Kevin P. Callahan
        John Henry Schanne
E-mail:        Kevin.P.Callahan@usdoj.gov
        John.Schanne@usdoj.gov


3.        Counsel to the Debtors at:

Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street,| Suite 3400
Philadelphia, PA 19102-2101
Attention:        Michael Vagnoni
        Edmond George
Email:        Michael.Vagnoni@obermayer.com
        Edmond.George@obermayer.com

4.        The Plan Sponsor at:

Visual Semiconductor, Inc.
1105 William Penn Drive
Bensalem, PA 19120
Attention:        Mathu Rajan
E-mail:        Mathu.Rajan@visualsemi.com

5.        Counsel to the Plan Sponsor:

Akerman, LLP
500 West 5th Street, Suite 1210,
Austin, TX 78701
Attention        Adam Swick
        John Thompsons
Emails:        Adam.Swick@Akerman.com
        John.Thompson@Akerman.com


        After the Effective Date, in order to continue to receive documents pursuant to Bankruptcy Rule
2002, an Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After
the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents

77960764;15

pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.    Entire Agreement

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.    Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Debtors' claims and noticing agent at https://cases.creditorinfo.com/streamtv    or    the    Bankruptcy    Court's    website    at https://www.paeb.uscourts.gov.

K.    Severability of Plan Provisions

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Plan Sponsor, with the consent of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

L.    Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and other applicable law, and pursuant to sections 1125(e), 1125, and 1126 of the Bankruptcy Code, and the Debtors, the Consenting Parties, and each of their respective Affiliates, and each of their and their Affiliates' agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys, in each case solely in their respective capacities as such, shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of New Securities offered and sold under the

Plan and any previous plan and, therefore, no such parties, individuals, or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the New Securities offered and sold under the Plan or any previous plan.

M.    Closing of Chapter 11 Cases

Upon the occurrence of the Effective Date, the Reorganized Debtors shall be permitted to (a) close all of the Chapter 11 Cases except for one of the Chapter 11 Cases as determined by the Reorganized Debtors, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in such Chapter 11 Case, and (b) change the name of the remaining Debtor and case caption of the remaining open Chapter 11 Case as desired, in the Reorganized Debtors' sole discretion.

N.    Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed prior to the Confirmation Date.

O.    Deemed Acts

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party by virtue of the Plan and the Confirmation Order.

*[Remainder of page intentionally left blank]*

77960764;15

Dated: December 3, 2024

On Behalf of the Plan Sponsor


/s/ Mathu Rajan
  Mathu Rajan
  Chief Executive Officer
Visual Semiconductor, Inc.

77960764;15