## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al*. | : | **Bankruptcy No. 23-10763 (AMC)** |
| | : | |
| Debtors. | : | **(Jointly Administered)**[1] |
| | : | |

**DECLARATION OF J. SCOTT VICTOR IN SUPPORT OF CHAPTER 11 TRUSTEE'S MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND APPROVING, BUT NOT DIRECTING, THE SALE OF THE ASSETS, IN EACH CASE WITH SUCH SALE BEING FREE AND CLEAR OF ANY AND ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE, AND (III) GRANTING RELATED RELIEF.**

Pursuant to 28 U.S.C. § 1746, I, J. Scott Victor, do hereby declare, under penalty of perjury, the following to the best of my information, knowledge, and belief:

1. I am a founding partner and Managing Director at SSG Advisors, LLC ("SSG"), an investment banking firm that maintains offices at Five Tower Bridge, Suite 420, 300 Barr Harbor Drive, West Conshohocken, PA 19428, and I am duly authorized to make this declaration on behalf of SSG. I have over 40 years of experience in the restructuring industry and extensive experience: (i) marketing companies or their assets for sale, including experience marketing companies in distress and debtors in bankruptcy cases; (ii) raising capital for special situation transactions; and (iii) restructuring companies' balance sheets both in court and out of court. SSG was engaged by the Chapter 11 Trustee to aid in the effectuation of a marketing and sale process. Together with my team at SSG, I have served as investment banker to the Trustee since September of 2024.

---

[1] On April 11, 2023, the Court entered an order directing joint administration of the above-captioned cases. (D.I. #81).

1

2.  I am authorized to submit this declaration (the "Declaration") in support of the Motion of William A. Homony, in his capacity as Chapter 11 Trustee (the "Trustee") of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative", or collectively with Stream, the "Debtors"), for Entry of an Order (i) authorizing and approving, but not directing, the sale of the assets, in each case with such Sale being free and clear of any and all liens, claims, encumbrances and interests, (ii) and the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale, and (iii) granting related relief (the "Motion")[2] and in response to the Objections of Visual Semiconductor, Inc. ("VSI") and Rembrandt 3D Holding Ltd. ("Rembrandt") (collectively, the "Objections").

3.  Unless otherwise indicated herein, the statements in this Declaration are based on my personal knowledge or my opinion based on my experience, on information that I received from the Debtors, on information that I received from the Trustee, on information that I have received from my colleagues at SSG working directly with me or under my supervision, direction, or control, or on my review of relevant documents including public filings. If called upon to testify, I would testify competently to the facts and opinions set forth herein.

**Professional Background and Qualifications**

4.  I founded SSG in 2001. Prior to joining SSG, I was a partner and a senior member of the bankruptcy and restructuring group at Saul Ewing LLP.

5.  I hold a BA from the University of Pennsylvania, and a JD from the University of Miami School of Law. I have more than 40 years of restructuring experience, 17 years as a

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

bankruptcy attorney and 24 years as a special situation investment banker.  I am authorized to execute this declaration on behalf of SSG.

6. SSG is an independent boutique investment banking firm that assists middle-market companies and their stakeholders in completing special situation transactions. SSG provides its clients with comprehensive investment banking services in the areas of mergers and acquisitions, private placements, financial restructurings, valuations, litigation, and strategic advisory.  Since its inception, SSG has completed over 450 investment banking assignments in North America and Europe and is a leader in the industry.

7. SSG's professionals have extensive experience working with financially distressed companies in and out of Chapter 11, including section 363 sales and plans of reorganization.

**The SSG Appointment**

8. On January 9, 2024, the Office of the United States Trustee filed a Notice of Appointment of William A. Homony to serve as the Chapter 11 trustee (the "Appointment Date") as well as an Application for the Entry of an Order Approving the Appointment of the Trustee (the "Application") (D.I. #554 and #553 respectively).

9. The Trustee contacted me following the decision by Capstone Advisors LLC not to proceed with its retention based in part on objections filed by the United States Trustee to its retention.

10. Initially, VSI objected to my retention.

11. I met with VSI representatives who, after an extensive discussion of SSG's approach to marketing the Debtors' assets, were satisfied that I could perform the services of an investment banker fully and without conflicts.  VSI withdrew its objections to SSG's retention.

12. SSG has been engaged as the investment banker to the Trustee and members of my

3

team and I have been working closely with the Trustee and his advisors on this engagement since September 20, 2024 (the "SSG Appointment Date") (D.I. #741).

13. Since the Appointment Date, SSG has become highly familiar with the Debtors' corporate and capital structure, management, and assets.

14. The Debtors had not been operating for a substantial period of time and had been through two (2) previous bankruptcy proceedings, as well as years of litigation in the Delaware Chancery Court and Delaware Supreme Court. SSG relied on the review of substantial pre and post-petition litigation pleadings, and discussions with the management and engineering teams at SeeCubic BV ("SCBV") in the Netherlands to try to fully understand the asset picture for the Debtors and its subsidiaries, and to determine the assets for sale.

15. As of the Appointment Date, the Debtors had no operations, no factories, no workers, no inventory, no raw materials. The Debtors and its subsidiaries have a bonding machine warehoused on pallets in China.

**The Marketing of the Assets**

16. SSG began marketing the Debtors' assets in October of 2024.

17. The Court-approved Hawk Settlement provided for a credit bid in the amount of $150 million that served as the floor for an alternate purchaser to submit a bid and participate in a sale process to be set forth in bidding procedures, which were subsequently approved by the Court.

18. As part of this process, among other things, SSG drafted and circulated a "Teaser" containing relevant information about the Debtors, and also organized a virtual data room ("VDR").

19. A Teaser is a one-page overview intended to attract interest, not to detail every issue related to the assets being sold. The Teaser draws people to the data room, and potentially further discussion with SSG and management.

20. Since the start of the marketing process, SSG has reached out to approximately 550 prospective buyers around the world. SSG's contact with potential buyers included taking steps necessary to enable such parties to conduct due diligence through the execution of a non-disclosure agreement.

21. The worldwide parties SSG contacted included both operational and strategic parties, as well as financial buyers who may have been interested in acquiring the Debtors' assets, as set forth in the Stalking Horse APA.

22. Two (2) parties executed the non-disclosure agreement required to access confidential information in the VDR. Those parties were VSI and Continental Advisory Services, LLC ("Continental"). VSI identified the principal of Continental as a VSI investor and a committed capital source for a potential Stream transaction.

23. Continental was the alleged new investor to VSI. Though the VSI team had indicated the VSI "investor was prepared to move forward," that never happened.

24. Continental reviewed the VDR materials and participated in multiple calls and emails with SSG, as well as a call with SSG and the engineers at SCBV to discuss the opportunity. Subsequent to that discussion, Continental made it clear to SSG that they were not moving forward with an investment in VSI and spent the majority of their time questioning the Hawk Settlement and the Hawk secured claim.

25. Continental never provided any indication that it or VSI was actually prepared to bid for the Debtors' assets.

26. SSG was responsible for complying with the Court's directive to prepare a full list of assets available in the sale process, including intellectual property owned by the Debtors' subsidiaries, and to allow VSI and Rembrandt to add additional information to the list of assets. The list, inclusive of the VSI and Rembrandt comments, was filed with the Court and on the Docket.

27. Thereafter, SSG again reached out to all of the potential buyers previously contacted, stating that the list of assets for sale had been filed on the Docket and was available for review. SSG also provided confirmation of the bid deadline and sale hearing dates. No party responded.

28. It is important to note that the Trustee and SSG never offered the assets of the Debtors' subsidiaries to anyone free and clear of any interests, as those assets do not constitute property of the Debtors' estates.

29. Rather, the equity interests in the downstream entities are assets of the Debtors' estates and are being sold as part of this sale process.

30. Any rights Rembrandt may have as to its alleged intellectual property are preserved against the proposed Stalking Horse Bidder; and further, Rembrandt has a suit pending in Delaware, where those issues are currently being litigated against the Stalking Horse Bidder.

31. Based upon my experience, the Stalking Horse Bid represents the highest and best bid for the Debtors' assets.

32. Further, based on my efforts and those of my team at SSG, the sale process was fair, honest, and generated the highest and best value that could be obtained for the Debtors' assets under the circumstances.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury the above to be true and correct.

Dated: December 3, 2024

J. Scott Victor
Managing Director
SSG Capital Advisors, LLC

7