# EXHIBIT 4

EFiled: Oct 20 2022 04:42PM EDT
Transaction ID 68284086
Case No. 2022-0930-JTL

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

HAWK INVESTMENT HOLDINGS
LTD.,

                Plaintiff,

     v.

STREAM TV NETWORKS, INC. and
TECHNOVATIVE MEDIA INC.,

          Defendants.

C.A. No. 2022-0930-JTL

**PUBLIC VERSION FILED
OCTOBER 20, 2022**

### VERIFIED COMPLAINT FOR DECLARATORY RELIEF AND PURSUANT TO 8 *DEL. C.* § 225

Plaintiff Hawk Investment Holdings Limited ("Hawk" or "Plaintiff") by and through its undersigned counsel, brings this action for declaratory relief and pursuant to Section 225 of the General Corporation Law of the State of Delaware, 8 *Del. C.* § 225 ("Section 225").

### NATURE OF THE ACTION[1]

1.    Plaintiff brings this action against Stream TV Networks, Inc. ("Stream") and Technovative Media Inc. ("Technovative" and, together with Stream, the "Defendants") having been adjudicated a secured creditor of Stream that possesses a wide array of secured creditor rights that may be invoked as a result of numerous uncured defaults by Stream and Stream's failure to meet its repayment

---

[1] Unless otherwise noted, capitalized terms have the meaning defined in the Fact Section of the Complaint.

obligations.  Through this action, Hawk seeks a declaration confirming Defendants must comply with and not obstruct Hawk's secured creditor rights, including, but not limited to, the Marshaling Right, the Proxy Right, and the right to conduct a sale of the Collateral pursuant to Article 9 of the Uniform Commercial Code ("Article 9 Sale").  Hawk further seeks an Order from this Court pursuant to Section 225 confirming Hawk's nominee constitutes the validly elected board of directors of Technovative.

2.      From 2014 to 2020, Hawk and Stream executed a series of Notes, which provided Stream with loans worth tens of millions of dollars, which with interest are now valued in excess of $142,000,000.  In exchange for the loans and pursuant to several Security Agreements and Pledge Agreements, Stream granted Hawk security interests in substantially all of its assets, which are defined under the operative documents as the "Collateral."

3.      Upon an "Event of Default" as defined in the Notes, the secured creditor rights granted to Hawk included, but were not limited to, the right to: (i) order Stream to assemble and marshal the Collateral in anticipation of an Article 9 Sale; (ii) sell the Collateral pursuant to an Article 9 Sale; and (iii) exercise Hawk's Proxy Rights with respect to the Pledged Interests in order to exert control over the Collateral by controlling various operating subsidiaries of Stream (collectively the "Secured Creditor Rights").

4.      To date, Stream has refused to—or been unable to—meet its repayment obligations under the Notes and has defaulted on the Notes for various independent reasons, which defaults cannot be cured.  Both the Court of Chancery and the Delaware Supreme Court have held that Hawk is a secured creditor and Stream is in default under the Notes.

5.      On October 17, 2022, Hawk validly exercised its Secured Creditor Rights by delivering a Proxy Notice to Technovative (the "October Proxy Notice"). Pursuant to the October Proxy Notice, Hawk instructed Technovative to update its share ledger/register (the "Register") to reflect that Hawk is the sole nominal shareholder of Technovative, with legal title remaining with Stream pending an Article 9 Sale.[2]

6.      Also on October 17, 2022, as sole nominal shareholder of Technovative, Hawk then delivered a Shareholder Consent to Technovative (the "October Shareholder Consent").  The October Shareholder Consent reconstituted the Technovative Board with Mr. Stastney as the sole director and validly amended and restated the Technovative by-laws (the "By-Laws").[3]

7.      Also on October 17, 2022, Hawk delivered to Defendants a letter (the "October Marshaling Directive") formally exercising its Marshaling Rights

---

[2] The October Proxy Notice is attached as **Exhibit A**.
[3] The October Shareholder Consent is attached as **Exhibit B**.

(defined below) and directing Defendants to marshal and turn over possession of the Collateral to its designee SeeCubic, Inc. ("SeeCubic").[4]

8.     By enforcing its Secured Creditor Rights, Hawk intends to exercise its Proxy Rights to vote the equity interests of Technovative (the "Technovative Interests") in a manner that ensures Technovative faithfully supports the effort to marshal and preserve Hawk's Collateral, as it prepares to conduct a commercially reasonable Article 9 Sale.

9.     On October 17, 2022, despite the prior findings of the Delaware Supreme Court and Court of Chancery, and having no valid justification for doing so, Stream repudiated Hawk's status as a secured creditor and Defendant's obligations to comply with Hawk's exercise of the Secured Creditor Rights, including the October Marshaling Directive.  Defendants have also wrongfully denied the validity of the October Proxy Notice, the October Shareholder Consent, and that Mr. Stastney is the sole director of the Technovative board.  Stream and Technovative refuse to update the Register pursuant to the October Proxy Notice and assert that Mr. Mathu Rajan is the sole member of the Technovative board.

10.     As a result of Stream's judicially determined defaults and rejection of its obligations under the Notes, Hawk is entitled to a declaration confirming Hawk is a secured creditor, affirming Hawk's exercise of the Secured Creditor Rights and

---

[4] The October Marshaling Directive is attached as **Exhibit C**.

requiring Defendants to honor all of their contractual obligations under the Loan
Documents.

11.    Hawk is further entitled to an order pursuant to Section 225 that the
October Proxy Notice is valid, that Hawk is the sole nominal shareholder of record
of Technovative, that Technovative's board has been validly reconstituted with Mr.
Shadron Stastney as the sole director, and that the By-Laws were validly amended.

### PARTIES

12.    Plaintiff Hawk Investment Holdings Ltd. is a holding company
organized and existing under the laws of Guernsey with its registered office at
St. Peter Port, Guernsey, Channel Islands.  Plaintiff is both a shareholder and secured
creditor of Stream.

13.    Defendant, Stream TV Networks, Inc., is a Delaware corporation
founded in 2009 with a principal place of business in Philadelphia, Pennsylvania.
Stream is a holding company with its main assets being the equity in its direct and
indirect subsidiaries.

14.    Defendant Technovative Media Inc. is a Delaware corporation, and a
wholly-owned, direct subsidiary of Stream.  Technovative is an intermediate holding
company between Stream and several operating subsidiaries within the Stream
corporate family that hold a bulk of the Collateral (Technovative's direct and indirect
subsidiaries, collectively, the "Operating Subsidiaries").

## FACTS

**A.     Stream History and Capitalization**

15.     Stream was founded in 2009 to pursue new technologies that would enhance users' entertainment experiences by allowing television and tablet manufacturers to convert two-dimensional devices into three-dimensional experiences without the need for specialized viewing glasses.

16.     Between March 26, 2014, and February 26, 2020, Hawk lent Stream funds in the aggregate principal amount of approximately £50,600,000.00, €183,601.19, and $1,152,757.14 pursuant to seventeen separate promissory notes (collectively, as may have been amended from time to time, the "Notes").

17.     As of July 15, 2022, the total amount due and owing under the Notes, including accrued interest thereon, was approximately £125,389,667.03, €252,073.38, and $1,692,022.38.

18.     The material and relevant economic terms of each of the Notes are substantially similar.[5]  Section 12 or 13 of each Note defines an "Event of Default," in relevant part, as having occurred if: (a) Stream failed to pay any principal amount when due; (c) Stream filed for bankruptcy; (d) Stream breached any of the terms of

---

[5] The Notes are collectively attached as **Exhibit D**. Due to their similarity and for convenience, when citing a provision of any Note, this Complaint will merely cite to "Notes" with a reference to the relevant provision(s).

the Notes or Security Agreements (as defined below); and/or (e) one of Stream's

subsidiaries defaulted on and failed to cure any funding arrangement to which it is a

party.[6]

19.    Contemporaneously with the execution of each of the Notes, Stream

and Hawk executed a separate Security Agreement (collectively, as may have been

amended from time to time, the "Security Agreements"),[7] with each Security

Agreement dated on or about the same date as each related Note.

20.    The Security Agreements granted Hawk a security interest in Stream

collateral.  Specifically, the Security Agreements provide that "[Stream] hereby

grants to Hawk a security interest in all of [Stream]'s right, title and interest in and

to the Collateral."[8]

21.    As more fully set forth in section 1.2, each Security Agreement defines

"Collateral" to include, among other things, (a) Inventory, (b) Accounts,

(c) equipment/fixtures, (d) general intangibles, (e) deposit accounts, and

(f) investment property, including after-acquired property and additions and

---

[6] *See* Notes, at § 12/13(a), (c), (d), (e).
[7] The Security Agreements are collectively attached as **Exhibit E**.  The Security
Agreements include essentially identical operative provisions.  As such, and for
convenience, when citing a provision of any Security Agreement, this Complaint
will merely cite to "Security Agreements" with a reference to the relevant provision.
[8] *See* Security Agreements, § 2.1.

accretions to each of the foregoing.[9]  The Collateral is broadly defined in the Loan

Documents so as to include substantially all of the assets of Stream.

22.    Under the terms of the Security Agreements, upon the occurrence of an

Event of Default, Hawk is empowered to "require [Stream] to assemble the

Collateral at a place designated by Hawk, which is reasonably convenient for the

parties [and to] take physical possession of Inventory and other tangible Collateral

and of [Stream]'s records pertaining to all Collateral that are necessary to properly

administer and control the Collateral …." (the "Marshaling Right").[10]  Thereafter,

Hawk may "sell, lease or otherwise dispose of the Collateral in whole or in part, at

public or private sale, on or off the premises of [Stream]," including pursuant to an

Article 9 Sale.[11]

23.    The Security Agreements also appointed Hawk as Stream's "█████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[9] Security Agreements, § 1.2.
[10] Security Agreements, § 4.1(a), (b).
[11] Security Agreements, § 4.1(b).

███████████████████████████████████████████████

██████████████████████████████████████" (the "POA").[12]

24.    Hawk's security interests are properly perfected on the subject
Collateral pursuant to timely filed and updated financing statements, the most recent
continuation of which was filed as of February 20, 2020.

25.    With regard to most of the Notes, on or about the same date each of the
Notes was executed, Hawk, on the one hand, and Stream and its direct and indirect
subsidiaries Technovative, Ultra-D Ventures, CV ("Ultra-D Ventures"), and Ultra-
D Coöperatief, U.A. ("Ultra-D Coop"), on the other, also executed a Pledge
Agreement (collectively, as may have been amended from time to time, the "Pledge
Agreements" and, together with the Notes and the Security Agreements, the "Loan
Documents").[13]

26.    The Pledge Agreements pledge to Hawk the "Pledged Interests," which
are defined as "the membership interests, shares of capital stock or other equity
interests listed on Schedule 1 [t]hereto."[14]  Included on Schedule 1, listing the
"Pledged Interests," were the Technovative Interests as pledged to Hawk by Stream,

---

[12] *See* Security Agreements, § 4.2.

[13] The Pledge Agreements are collectively attached as **Exhibit F**.  The Pledge
Agreements include essentially identical operative provisions.  As such, and for
convenience, when citing a provision of any Pledge Agreement herein, this Motion
will merely cite to "Pledge Agreements" with a reference to the relevant provision.

[14] Pledge Agreements, §§ 1, 2.

as well as the interests of the Operating Subsidiaries, including Media Holdings Delaware, LLC ("MHD"), Ultra-Ventures, Technology Holdings Delaware, LLC ("THD"), Ultra-D Coop, Stream TV International B.V., and SeeCubic B.V.

27.    Each of the Pledge Agreements provides that upon the occurrence of an Event of Default, Hawk is authorized and empowered to have the Pledged Interests registered in its name and to vote such interests as if Hawk is the owner (the "Proxy Rights").  Specifically, Section 6 of the Pledge Agreements provides:  "Hawk shall have the right to have any or all shares of Pledged Interests registered in its name … and Hawk … may thereafter exercise all voting, related and other rights pertaining to such Pledged Interests at any meeting of members or shareholders of an Issuer or otherwise … as if it were the absolute owner thereof …."[15]

28.    Hawk filed UCC financing statements perfecting its interest in the Pledged Interests on March 17, 2020.

### B.    Stream's Business Struggles and Stream Defaults on the Notes

29.    Eleven years after its founding, Stream was still a pre-revenue, development-stage company, notwithstanding the millions of dollars in support provided by Hawk and other investors.  Stream did not yet have a product and, as a result, had no way to generate revenue.  Financially, Stream's principal means of survival has been its secured debt.

---

[15] Pledge Agreements, § 6.

30.     In early 2020, Stream owed approximately $16 million in trade debt to its customers and suppliers, in addition to the debt owed to secured creditors. Stream was also months behind on payments to vendors.

31.     Stream was in dire financial condition and even missed its payroll obligations on at least one occasion. Stream would have missed its payroll obligations on other occasions if not for additional emergency capital infusions from Hawk, as well as a short-term loan from another investor.

32.     By no later than February 2020, an Event of Default occurred, after Stream failed to make payments under the Notes upon the expiration of each of their maturity dates, which maturity dates had been amended and extended multiple times previously under various amendments to the Notes.

33.     Stream also defaulted on the Notes by filing for bankruptcy on February 25, 2021 and by consenting to an involuntary bankruptcy filed on May 23, 2021.[16] Although both bankruptcy cases were dismissed as having been filed in bad faith, such actions constituted Events of Default under the Notes.

34.     As of the date hereof, Stream is in default under the terms of the Loan Documents, which defaults remain outstanding and not subject to cure.

---

[16] *See In re Stream TV Networks, Inc.*, No. 21-10433 (KBO) (Bankr. D. Del. Feb. 24, 2021); *In re Stream TV Networks, Inc.*, No. 21-10848 (KBO) (Bankr. D. Del. May 23, 2021).

35.    On more than one occasion, the Delaware Supreme Court and/or the Court of Chancery have confirmed that Hawk is a secured creditor of Defendants, Stream is in default of its lending obligations, and Hawk has Secured Creditor Rights that "are strong and may well result in Stream having to transfer the [Collateral] back to SeeCubic in its capacity as Hawk's designee and agent."[17]

36.    Similarly, Stream's President, Mathu Rajan, stated in a sworn declaration in connection with the first Stream bankruptcy that Hawk had issued the Notes to Stream, and that Stream had pledged "substantially [all] of its assets as a security for the Hawk Notes."[18]

37.    As recently as October 12, 2022, Stream and the Rajans acknowledged the value of Hawk's secured debt was in excess of $138,000,000.

38.    Hawk's status as a secured creditor, the contours of its Secured Creditor Rights and Stream's status as a defaulted borrower have been judicially established and are not subject to challenge.  Additionally, Stream is estopped from disputing Hawk's status as a secured creditor and/or the existence of the Events of Defaults under the Loan Documents due to its prior judicial admissions.

---

[17] *See In re Stream TV Networks, Inc., Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL, 2022 WL 4491925, at *4 (Del. Ch. Sept. 28, 2022).

[18] *See* Declaration of Mathu Rajan in Support of First Day Motions, ¶ 24, *In re Stream TV Networks, Inc.*, No. 21-10433 (KBO) (Bankr. D. Del. Mar. 12, 2021), attached as **Exhibit G**.

### C.    The Omnibus Agreement and Related Litigation

39.    In response to Stream's precarious financial situation and the occurrence of the Events of Default, Stream, certain of its shareholders, and its secured creditors executed the "Omnibus Agreement" in May 2020.

40.    Under the Omnibus Agreement, the parties formed SeeCubic as a new entity into which all of the Collateral was deposited pursuant to a "friendly foreclosure" arrangement.  The primary vehicle for transferring ownership of the Collateral to SeeCubic was a transfer of the Technovative Interests to SeeCubic.

41.    Extensive litigation over the validity of the Omnibus Agreement ensued including *In re Stream TV Networks, Inc. Omnibus Agreement Litigation* (the "Omnibus Agreement Litigation").[19]

42.    On June 15, 2022 in the Omnibus Agreement Litigation, the Supreme Court of Delaware found that execution of the Omnibus Agreement was not approved in accordance with Stream's governing documents and was ineffective. The Delaware Supreme Court issued a mandate to the Court of Chancery necessitating the rescission of the transactions occurring under the Omnibus Agreement, effectuating the return of the Collateral to Stream.

---

[19] *In re Stream TV Networks, Inc. Omnibus Agreement Litigation*, C.A. No. 2020-0766-JTL (Del. Ch. 2020) (hereinafter "*Omnibus Agreement Litig.*").

### D.     Hawk Seeks to Exercise Its Secured Creditor Rights

43.     Upon the Delaware Supreme Court's decision nullifying the Omnibus Agreement, Hawk began taking steps to secure the Collateral and pursue an Article 9 Sale for the benefit of all Stream creditors by exercising its Secured Creditor Rights. Hawk worked to engage a reputable and well-known investment banker to conduct the Article 9 Sale process.

44.     In accordance with the Supreme Court's mandate, on August 10, 2022, the Court of Chancery held that the parties were to "caus[e] SeeCubic to transfer legal title to the [Collateral] from SeeCubic to Stream as expeditiously as possible."[20]

45.     Hawk sought an amendment to this ruling so it could continue to exercise its Secured Creditor Rights, which the Court of Chancery denied on September 28, 2022. As part of this denial, the Court of Chancery informed the parties that it considered the most efficient route to effectuate the Supreme Court's mandate being the turnover of the Technovative Interests by SeeCubic to Stream, thereby turning over direct and indirect control of the Operating Subsidiaries and Collateral.

46.     On September 30, 2022, Hawk received notice that SeeCubic had transferred the Technovative Interests back to Stream by order of the Court of

---

[20] Order at ¶ 9, Dkt. No. 266, *Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL (Del. Ch. Aug. 10, 2022).

Chancery. That same day, Hawk exercised its rights under the Pledge Agreements and issued a Proxy Notice (the "September Proxy Notice") to Technovative. Pursuant to the September Proxy Notice, Hawk instructed Technovative to update the Register to reflect that Hawk is the sole nominal shareholder of Technovative, with legal title residing with Stream.[21]

47.    Hawk sent the September Proxy Notice to Mr. Mathu Rajan, President of Stream, and Mr. Shadron Stastney, who, at that time, was Technovative's sole director and officer, in compliance with the provisions of the Pledge Agreements.

48.    Mr. Stastney then completed the registration of the Technovative Interests in accordance with Technovative's contractual obligations under the Pledge Agreements.

49.    Hawk subsequently executed and delivered to Technovative a Shareholder Consent (the "September Shareholder Consent"). The September Shareholder Consent amended and restated the By-Laws, removed all then-serving directors of Technovative, and appointed Mr. Stastney as the sole director.

### E.    The Court Grants an Emergency Motion Compelling Turnover of the Technovative Shares to Stream

50.    On September 30, 2022, after Hawk transmitted the September Proxy Notice and September Shareholder Consent to Technovative and Stream, Stream

---

[21] *See* Pledge Agreements, § 6.

filed an "Emergency Motion for Post-Judgment Enforcement to Vest Shares of Technovative Media, Inc." (the "Emergency Motion") in the Court of Chancery.

51.    The Emergency Motion sought an order vesting all of the Technovative Interests in Stream, and enjoining Hawk from "interfering with [Stream]'s ownership of all shares of [Technovative] until further order of the Court."[22]

52.    The Court granted the Emergency Motion in part.[23]  Pursuant to the Emergency Order, the Court divested Hawk of the Technovative Interests, vested the title thereof in Stream, and ordered that Technovative was to update the Register to reflect the transfer of the Technovative Interests to Stream.

53.    The Emergency Order enjoined SeeCubic, Hawk, and Mr. Stastney "from taking any action that would interfere with either Stream's ownership of the [Technovative Interests] or Stream's exercise of rights associated with the [Technovative Interests]" (the "Injunction").[24]    The Court-ordered Injunction expired on Monday, October 17, 2022, at 9:00 a.m. (the "Injunction Deadline").

---

[22] *See* Emergency Motion for Post-Judgment Enforcement to Vest Shares of Technovative Media, Inc. at ¶ d, Dkt. No. 312, *Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL (Ch. Del. Sept. 30, 2022).  The Emergency Motion is attached as **Exhibit H**.
[23] *See* Order Regarding Emergency Motion to Enforce, Dkt. No. 318, *Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL (Ch. Del. Oct. 3, 2022).  The Emergency Order is attached as **Exhibit I** (the "Emergency Order").
[24] *Id.* at ¶ 4.

### F.     The Injunction Period

54.     In compliance with the Injunction, Hawk ceased enforcement of its Secured Creditor Rights in any manner that could have interfered with Stream's ownership of the Collateral until expiration of the Injunction Deadline.

55.     On October 10, 2022, Hawk formally engaged SSG Advisors, LLC ("SSG") to act as investment banker in connection with the Article 9 Sale. SSG commenced an analysis of Stream's business and affairs related to the Collateral from publicly available information or other information in Hawk's possession as a result of its past relationships with Stream.  SSG was expressly directed—and, indeed, did not—take any actions that may have interfered with Stream's ownership and usage of the Collateral, including by disclosing to any third parties details regarding its engagement.

56.     With respect to Stream, upon information and belief, Defendants did not take any meaningful steps to raise funds to repay the secured debt or cure the Events of Default during the Injunction Period and have no intention of doing so. Instead, upon receipt of the Technovative Interests, Stream immediately began executing a plan to entrench itself as sole shareholder of Technovative and its subsidiaries and to interfere with Hawk's Secured Creditor Rights.

57.     Stream's intention to thwart Hawk's Secured Creditor Rights by any means necessary was laid bare in an October 12, 2022 e-mail from Jeff Shammah,[25] a business partner of the Rajans, to Hawk, who bluntly admitted and threatened:

> Just to let you know, Stream TV has retaken control of the Netherlands, as well as a number of other assets, in the next few hours.  Stream is resuming operations.
>
> *   *   *   *
>
> If Hawk is attempting any type of legal action to take the Netherlands away from Stream, it is going to be a futile effort.  Stream is fully prepared, and already has counter-measures in place.  More importantly, Stream's plan is to bring you to the United States and do due diligence on you and Hawk.  You should be aware that in another venue, the litigation was successful where Alastair Crawford is now being forced to turn over all of his financial information.   This includes bank records, real estate information, family trust information, all of which will be subject to damages claims in the various venues.

58.     While many of the "counter-measures" are unknown to Hawk, Stream has disclosed that it has:

---

[25] The October 12, 2022 email from Mr. Shammah is attached as **Exhibit J**.

a.    executed a written consent (the "Technovative Consent") as sole shareholder of Technovative to remove all directors thereof from their current positions and to name Mr. Mathu Rajan as sole director and sole officer (as Chief Executive Officer) of Technovative.[26]

b.    caused Technovative, as sole shareholder of MHD, to execute a written consent for MHD (the "MHD Consent") to remove all directors thereof from their current positions and to name Mr. Mathu Rajan as sole director and sole officer (as Chief Executive Officer) thereof.  Additionally, Stream caused MHD to resolve that "no party may take any action whatsoever in the name of Media Holdings Delaware LLC except for Mathu Rajan or attorneys from McCarter & English LLP."[27]

c.    caused Technovative and MHD, as partners in Ultra-D Ventures, to execute a resolution (the "Ultra-D Ventures Resolution") to remove all directors thereof from their current positions and to name Mr. Mathu Rajan as sole director thereof.  Additionally, Stream caused Ultra-D Ventures to resolve that "no party may

---

[26] The Technovative Consent is attached as **Exhibit K**.
[27] The MHD Consent is attached as **Exhibit L**.

take any action whatsoever in the name of Ultra-D Coöperatief U.A. [sic] except for Mathu Rajan or attorneys from McCarter & English LLP."[28]

d.  caused Ultra-D Ventures, as sole shareholder of THD, to execute a consent (the "THD Consent") to remove all directors from their current positions and to name Mr. Mathu Rajan as sole director and sole officer (as Chief Executive Officer) thereof. Additionally, Stream caused THD to resolve that "no party may take any action whatsoever in the name of Technology Holdings Delaware LLC except for Mathu Rajan or attorneys from McCarter & English LLP."[29]

e.  caused Ultra-D Ventures (through its general partner MHD) and THD, as members of Ultra-D Coop, to execute a resolution (the "Ultra-D Coop Resolution") to remove all directors from their current positions and to name Mr. Mathu Rajan as sole director thereof.  Additionally, Stream caused Ultra-D Coop to resolve that "no party may take any action whatsoever in the name of

---

[28] The Ultra-D Ventures Resolution is attached as **Exhibit M**.  Hawk assumes the reference to "Ultra-D Coöperatief U.A." rather than "Ultra-D Ventures U.A." was merely an oversight during a hasty exercise of the copy-and-paste function.
[29] The THD Consent is attached as **Exhibit N**.

Ultra-D Coöperatief U.A. except for Mathu Rajan or attorneys from McCarter & English LLP."[30]

f.    caused Stream TV International B.V. and SeeCubic B.V. (via each entity's sole shareholder, Ultra-D Coop) to each issue letters (the "Meeting Letters") to their respective officers and directors providing notice of an "Extraordinary General Meeting" to conduct a vote on the removal of all existing directors and officers and to appoint Mr. Mathu Rajan as sole director and sole officer (as Chief Executive Officer) of each.[31]

59.    At least one other counter-measure has included harassing certain insiders of Hawk through the issuance of frivolous and legally deficient notices of deposition.[32]  Despite the target of the deposition notice residing outside of the United States, Stream and the Rajans have intentionally ignored all legal requirements to obtain proper service thereof, and instead have sent the notice to Hawk's counsel.

60.    Manifestly abusing the Injunction Period imposed by the Court of Chancery, Stream has taken advantage of Hawk's inability to assert its Secured

---

[30] The Ultra-D Coop Resolution is attached as **Exhibit O**.
[31] The Meeting Letters are attached as **Exhibit P** and **Exhibit Q**.
[32] *See* Stream TV Networks, Inc.'s Notice of Deposition of Arthur Leonard Robert Morton, Dkt. No. 321, *Omnibus Agreement Litig.*, No. 2020-0766-JTL (Ch. Del. Oct. 4, 2022), attached as **Exhibit R**.

Creditor Rights to disadvantage Hawk and repudiate Stream's obligations under the Loan Documents.

### G.    Hawk Exercises Its Secured Creditor Rights and Is Rebuffed

61.    As of the Injunction Deadline, Stream failed to satisfy its repayment obligations under the Notes or to otherwise cure its defaults.

62.    Stream remains in default under the Loan Documents, and Hawk is empowered by the Pledge Agreements to secure and preserve the value of the Collateral while pursuing an Article 9 Sale for the benefit of all Stream creditors.

63.    At 9:01 a.m. on October 17, 2022, Hawk issued the October Proxy Notice.  Pursuant to the October Proxy Notice, Hawk instructed Technovative once again to update the Register to reflect that Hawk is the sole nominal shareholder of Technovative, with legal title residing with Stream.[33]

64.    Hawk sent the October Proxy Notice to Mr. Mathu Rajan, as both President of Stream as well as sole director and officer of Technovative, in compliance with the provisions of the Pledge Agreements.

65.    Also on October 17, 2022, Hawk delivered to Technovative the October Shareholder Consent, which amended and restated the By-Laws, removed all then-serving directors of Technovative, and appointed Mr. Stastney as the sole director of Technovative.

---

[33] *See* Pledge Agreements, § 6.

66.     Stream and Technovative refuse to update the Register and refuse to acknowledge Hawk's appointed Board.

67.     Also on October 17, 2022, Hawk sent the October Marshaling Directive to Stream directing Stream to comply with its obligations under the Loan Documents to marshal and deliver the Collateral to Hawk's designee SeeCubic pending the completion of an Article 9 Sale.

68.     Stream previously vowed in the Omnibus Agreement Litigation that it would not comply or acknowledge Hawk's debt or its Secured Creditor Rights. Specifically, Stream's Counsel stated: "[n]o, we are not going to have the bad guys who stole [Technovative] as board members. So, yes, obviously, we will change the board members out."[34]  Stream further disavowed the validity of Hawk's secured debt, the Secured Creditor Rights and Stream's defaults in the Omnibus Agreement Litigation.

69.     Counsel for Stream further disavowed Hawk's ability to exercise the Secured Creditor Rights, stating "[o]n the creditors' rights things, Hawk's creditor rights are terrible.  They're being misrepresented to you.  He is an anti-assignment

---

[34] *See* Transcript of September 21, 2022 Status Conference, at 57:1–4, *Omnibus Agreement Litig.*, C.A. 2020-0766-JTL (Del. Ch. Sept. 21, 2022), attached as **Exhibit S**.

guy who has got convertible debt instruments. He's going to get killed on creditor litigation. His claims are absolutely awful. Awful, awful, awful."[35]

70.    Stream's counsel also confirmed his client is taking the position that even the existence of the outstanding obligations is questionable and could be easily eliminated through a unilateral conversion by Stream: "[a]nd these are -- these are super-good agreements by which you can convert Hawk even after default. We could convert him right now."[36]

71.    Upon enforcement of its Secured Creditor Rights, Hawk intends to ensure Technovative faithfully coordinates and oversees the marshaling and preservation of Hawk's Collateral in preparation for an Article 9 Sale. The successful consummation of an Article 9 Sale is imperative to retaining the value of the Collateral for Hawk, as a secured creditor, as well as other investors in Stream, and it provides the most efficient and certain "off-ramp" for the disputes described above.

**H.    Hawk Is Entitled to Immediate Relief and Will Be Irreparably Harmed Absent Such Relief**

72.    Pursuant to the Emergency Order, Hawk has acquiesced to Stream's control of the Technovative Interests and the Collateral for the last 14 days despite the existence of the Secured Creditor Rights.

---

[35] *Id.* at 24:7–13.
[36] *Id.* at 40:8–10.

73.    Stream and the Rajans previously controlled the Collateral for more than 10 years and oversaw the abject financial failure of the business during that time.  Stream's business was not viable prior to the execution of the Omnibus Agreement, which transferred the Collateral to SeeCubic in 2020.

74.    Since SeeCubic received the Collateral approximately two years ago, it turned the business into a valuable enterprise.  The Court of Chancery acknowledged SeeCubic had improved the financial condition of Stream when it noted that "[a]s a practical matter, Stream will be in a better position, because SeeCubic turned around what had been a failing business, and Stream is getting that business back,"[37] and required in its September 30, 2022 Order Regarding Motion for Mandatory Injunction that Stream post a bond in the amount of $1 million as a pre-condition to the return of assets from SeeCubic.[38]

75.    The Court entered the Emergency Order mandating the Injunction Period specifically to provide Stream with unfettered control of the Collateral so that Stream could seek to satisfy its lending obligations to its secured creditors by repaying the Notes.  Rather than use the Injunction Period for the purpose intended by the Court, Stream has instead engaged in a concerted effort to systematically

---

[37] Order Regarding Emergency Motion to Enforce Partial Final Judgment, Dkt. No. 318, *Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL (Ch. Del. Oct. 3, 2022).
[38] Order Regarding Motion for Mandatory Injunction at ¶ 12, Dkt. No. 308, *Omnibus Agreement Litig.*, C.A. No. 2020-0766-JTL (Ch. Del. Sept. 30, 2022), attached as **Exhibit T**.

violate and frustrate Hawk's Secured Creditor Rights during and after expiration of the Injunction Period. These improper acts include the disclosed and undisclosed "counter-measures."

76.    Any delay in ordering the return of the Technovative Interests from Stream to Hawk creates a significant risk the Collateral will deteriorate and/or disappear, as it did prior to execution of the Omnibus Agreement. This will irreparably damage Hawk's rights as a secured creditor and vitiate many of the Secured Creditor Rights Hawk is contractually entitled to exercise.

77.    There is also a risk the Rajans may siphon the Collateral out of Stream. The Rajans have been willing to take every step possible to retain control over the Collateral—including backdating corporate documents and filing fraudulent bankruptcies to thwart court orders.

78.    The Rajans and parties affiliated with them have a long history of engaging in improper and questionable acts designed to secure the benefits of Stream and the Collateral for their personal benefit and at the direct expense of Stream's Secured Creditors, shareholders and trade creditors. The Rajans' bad acts have been repeatedly noted by various courts that observed:

a.    The Rajans, despite having substantial amounts of secured debt, have ignored all corporate formalities. "During its existence, Stream's corporate governance practices have been virtually

26

nonexistent. Stream has never held annual meeting [sic] of stockholders and has not kept regular minutes of Board meetings. Stream has officers and employees, but their roles are not well defined."[39]

b.  The Rajans back-dated corporate documents, including a purported May 6, 2020 Shareholder Consent in an effort to preempt the Omnibus Agreement and thwart Hawk's Secured Creditors Rights.[40]

c.  In an effort to evade a duly issued injunction and thwart the rights of the secured creditors and SeeCubic, the Court of Chancery noted the Rajans "caused Stream to file for bankruptcy…. The bankruptcy court dismissed the case as a bad faith filing, describing it as an effort 'to gain a tactical litigation advantage that is a part of a continued pattern of effort to nullify, undermine, and/or interfere with the [O]mnibus [A]greement, vitiate the purpose and effect of the Chancery Court's order, and to maintain

---

[39] *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 250 A.3d 1016, 1022–23 (Del. Ch. 2020), vacated, 279 A.3d 323 (Del. 2022).
[40] *See id.* at 1026.

ownership and control over the assets of the debtor for [their] own benefit.'"[41]

d.    The Delaware Bankruptcy Court concluded the Rajans' additional efforts to interfere with the injunction included Mathu Rajan establishing a new company which "began to fundraise using Stream's assets despite the injunction."[42]

e.    The Court of Chancery also held the Rajans and those acting in concert with them pursued a frivolous effort to attack the Court's validly issued injunction noting that:

    i.    "After the bankruptcy stay lifted and litigation in this court resumed, Mathu Rajan filed a pro se letter application claiming that the Injunction Decision was the product of fraud."[43]

    ii.    After Mathu Rajan's filing, the Rajans "filed a formal motion to set aside the Injunction Decision."[44]

---

[41] *See Stream TV Networks, Inc. v. SeeCubic, Inc.*, No. 2020-0766-JTL, 2021 WL 5816820, at *1 (Ch. Del. Dec. 8, 2021), vacated 279 A.3d 323 (Del. 2022).

[42] *See* Transcript of May 17, 2021 Hearing at 14:23–24, *In re Stream TV Networks, Inc.*, No. 21-10433 (KBO) (Bankr. D. Del. May 18, 2021), Dkt. No. 200 (the "Bankruptcy Transcript").

[43] *Stream TV Networks*, 2021 WL 5816820, at *1.

[44] *Id.*

iii. The "Rajans subsequently filed another motion to modify
the preliminary injunction…. Then they had a third party
seek to intervene and file additional motions."[45]

f. The above noted conduct caused the Court of Chancery to find
that the Rajans employed a deliberate strategy to thwart the
Secured Creditor Rights by creating litigation chaos: "[a]long the
way, Stream and the Rajans ran through three different teams of
lawyers from six different law firms, in addition to the times
when Raja Rajan sought to act as Stream's attorney and Mathu
Rajan sought to litigate pro se. Creating litigation chaos seemed
to be one of the Rajans' strategies."[46]

g. The Delaware Bankruptcy Court confirmed that the Rajans
attempted to evade their obligations under the Loan Documents
"through machinations that included trying to change the
management of the debtor's subsidiaries and attempting to
remove prototype technology from a storage facility."[47]

h. The Bankruptcy Court further held "[i]t is clear, through
documentary evidence, that Mr. Rajan intended to use a Stream

---

[45] *Id.*

[46] *Id.*

[47] Bankruptcy Transcript, at 14:12–15.

bankruptcy as a mechanism by which he could, via Stream, regain the Ultra-D assets from the secured lenders and then through [another company] obtain them at a fraction of what he believed was the assets' value."[48]

79.   Stream has openly stated that it does not intend to honor its obligations under the Loan Documents or Hawk's Secured Creditor Rights.  This is consistent with Stream's and the Rajans' long, detailed, and documented history of ignoring their obligations under the Loan Documents, court orders, and generally accepted norms of behavior.  Left to their own devices, the Rajans will do everything within their power—legally and illegally—to acquire the Collateral for their own benefit and at the direct expense of Hawk and Stream's other stakeholders.

### COUNT I
### Declaratory Judgment that Plaintiff Possesses
### and May Exercise Its Secured Creditor Rights

80.   Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

81.   Pursuant to the Loan Documents and the prior findings of the Delaware Supreme Court and Court of Chancery, Hawk is a secured creditor of Stream with valid Secured Creditor Rights.

---

[48] *Id.* at 14:25–15:4.

82.    As a secured creditor of Stream, Hawk validly possesses, may exercise, and/or has exercised the following Secured Creditor Rights (among all other rights granted under the Loan Documents):

      a.    The Marshaling Right (*see* Security Agreements, § 4.1(a)),

      b.    The Proxy Right (*see* Pledge Agreements, § 6), and

      c.    The Right to conduct an Article 9 Sale of the Collateral (*see* Security Agreements, § 4.1(b); Pledge Agreements, § 7).

83.    The Delaware Supreme Court and the Court of Chancery have each determined that Stream is in default under the terms of the Notes.

84.    Hawk is authorized under the Loan Documents to exercise and has exercised its Secured Creditor Rights against the Collateral in order to pursue and ultimately consummate an Article 9 Sale, including by taking control of the Operating Subsidiaries via the Proxy Right and expertise of the POA, marshaling the Collateral, and conducting a commercially reasonable sale.

85.    Stream denies Hawk's ability to enforce its Secured Creditor Rights without any justification and refuses to relinquish control of the Collateral.

86.    There being no legitimate basis to dispute Hawk's entitlement to exercise the Secured Creditor Rights, Hawk is entitled to a Declaration that:

      a.    Hawk is a secured creditor of Stream.

b.    Hawk possesses the Secured Creditor Rights outlined in the Loan Documents and available at law and equity.

c.    Stream has defaulted under the terms of the Loan Documents.

d.    Hawk is justified in exercising all of the Secured Creditor Rights in accordance with the Loan Documents and relevant law and equity.

e.    Stream is obligated to comply with the Pledge Agreements and October Proxy Notice by instructing Technovative to update the Register to reflect that Hawk is the sole nominal shareholder of Technovative, with legal title residing with Stream.

f.    The October Shareholder Consent adopted by Hawk validly amended and restated the By-Laws, removed all then-serving Directors of Technovative, and appointed Mr. Stastney as the sole director of Stream.

g.    Defendants and the Operating Subsidiaries are obligated to comply with the October Marshaling Directive.

h.    Defendants and the Operating Subsidiaries are precluded from voting or enabling or taking any other action to permit the sale, assignment, transfer, exchange, or disposal of, or grant any

32

option with respect to, the Collateral as noted in Section 4(a) of the Pledge Agreements.

i.    Hawk is authorized to pursue a sale of the Collateral, including through an Article 9 Sale process, as noted in Section 7 of the Pledge Agreements.

87.    Plaintiff lacks an adequate remedy at law.

88.    Plaintiff is entitled to the relief requested below, including the declaration specified above.

## COUNT II
### Declaratory Judgment Pursuant to 8 *Del. C.* § 225

89.    Plaintiff repeats and realleges all of the preceding allegations as if fully set forth herein.

90.    Pursuant to Hawk's valid exercise of its rights under the Pledge Agreements and the October Proxy Notice, Technovative is contractually obligated to update the Register to reflect Hawk as the sole beneficial shareholder of the Technovative Interests.

91.    As the sole nominal shareholder of Technovative, Hawk validly executed and delivered the October Shareholder Consent to Technovative.

92.    Under the October Shareholder Consent, Hawk validly caused the former Technovative Director to be removed, and reconstituted the Technovative Board with Mr. Stastney as the sole Director.

93.    Pursuant to the October Shareholder Consent, the By-Laws were also validly amended.

94.    Defendants' refusal to (i) recognize Hawk as the sole nominal shareholder of Technovative, (ii) recognize Mr. Stastney as the sole director of Technovative, and (iii) recognize that the By-Laws were validly amended is improper and unjustified.

95.    Plaintiff validly exercised its power as sole shareholder of Technovative to issue the Shareholder Consent, which removed all directors of Technovative and appointed Mr. Stastney as the sole director of Technovative.

96.    Defendants have wrongfully refused to recognize that Mr. Stastney is the sole director of Technovative.

97.    Section 225(a) of title 8 of the Delaware Code authorizes this Court, upon application of any stockholder or director, to hear and determine the validity of any election of appointment of any director or officer and the right of any person to hold or continue to hold such office, and to that end, the Court may make any order or decree as may be just and proper.

98.    Plaintiff lacks an adequate remedy at law.

99.    Plaintiff is entitled to the relief requested below, including the declaration specified above.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court:

      a.     Enter an order declaring Hawk a valid secured creditor of Stream with rights appurtenant thereto;

      b.     Enter an order declaring Hawk possesses the Secured Creditor Rights, including, but not limited to, the Marshaling Right, the Proxy Right, the POA, and the right to consummate an Article 9 Sale of the Collateral;

      c.     Enter an order declaring Stream in default under the Loan Documents and that such Event(s) of Default may not be cured;

      d.     Enter an order mandating that Stream comply with Hawk's exercise of its Secured Creditor Rights and enjoining it from taking any steps to thwart such exercise;

      e.     Enter an order declaring that effective immediately the October Proxy Notice is effective and Hawk is the sole nominal holder of all Technovative Interests;

      f.     Enter an order declaring that effective immediately the October Shareholder Consent is valid, that Mr. Stastney is the sole director of Technovative, and the By-Laws have been validly amended pursuant to the October Shareholder Consent;

      g.     Order Stream to cease challenging the validity of the October Proxy Notice or the October Shareholder Consent in any way;

h.    Enjoin Defendants from encumbering, transferring, selling, or otherwise conveying the Collateral without the express written consent of Plaintiff;

i.    Award Plaintiff its reasonable costs and expenses, including reasonable attorneys' fees, incurred in connection with this matter; and

j.    Grant such other and further relief the Court deems proper and just.

Dated: October 17, 2022                **K&L GATES LLP**

*/s/ Steven L. Caponi*
Steven L. Caponi (No. 3484)
Matthew B. Goeller (No. 6283)
Megan E. O'Connor (No. 6569)
600 N. King Street, Suite 901
Wilmington, DE 19801
Phone: (302) 416-7000
steven.caponi@klgates.com
matthew.goeller@klgates.com
megan.oconnor@klgates.com

*Attorneys for Plaintiff*