# EXHIBIT 22

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 7 |
| | ) |
| Stream TV Networks, Inc. | ) Case No.  21-10848 (KBO) |
| | ) |
| | ) **Related to D.I. 22** |
| Alleged Debtor | ) |
| | ) |

**DECLARATION OF STEPHEN BLUMENTHAL
IN SUPPORT OF THE OBJECTION OF THE PETITIONING CREDITORS
TO THE EMERGENCY MOTION TO DISMISS**

1)  My name is Stephen Blumenthal. I am the managing member of Rembrandt 3D
    Holding Ltd. ("Rembrandt - Holding") a Nevis corporation.  I am also the President
    and CEO of Rembrandt 3D Corp. ("Rembrandt – Delaware") a Delaware corporation.

2)  The following facts are within my personal knowledge, except as noted, and are true
    and correct. I file this Declaration under 28 U.S.C. § 1746.

3)  I was a co-founder of 3DFusion Corp. ("3DFusion"), the original owner of the
    improved Philip's 3DASD technology (or glasses-free 3D autostereoscopic display
    technology).

4)  Philips offered a Glasses-Free three-dimensional (3D) autostereoscopic display
    ("3DASD") solution known as the WOWvx Platform for converting and generating
    3D content from two-dimensional (2D) media content for rendering on Philips's
    3DASD monitors. The WOWvx Platform uses mathematical algorithms to add depth
    and stereoscopic information to 2D content (i.e., 2D+Depth) thereby creating 3DASD
    content.

5)  However, Philips's 3DASD solution suffered from significant image quality issues

1

because the 3DASD content generated by the WOWvx Platform contained numerous artifacts such as ghosting and required weeks of manual post-processing to correct. Nonetheless, 3DFusion licensed the WOWvx Platform from Philips.

6) Through extensive experimentation and research comprising more than 3000 hours of 2D-to-3D-depth-map rotoscoping, I developed a novel and non-obvious methodology to correct the image quality issues or artifacts in the 3DASD content generated by the Philips's WOWvx Platform.

7) In August of 2009, Philips notified 3DFusion that it was in the process of winding down its incubator 3DSolutions because it was unable to solve the aforementioned 3D image artifacts. However 3DFusion could continue to use the previously licensed hardware and software under its arrangement with 3DSolutions because Philips recognized that 3DFusion,  though a 2-man company, could through its proprietary technology, ~~could~~ continue to advance Philips's products and tools including the WOWvx platform.

8) In or about September 2009, upon the shutdown of 3DSolutions, which manufactured the 3DASD monitors and developer of the supporting software (e.g. the WOWvx platform), I acting on behalf of 3DFusion, immediately contacted the former 3DSolutions' key technology experts (the "Team") to join 3DFusion as part of an effort to re-establish support for the WOWvx platform that had been provided by the now defunct 3DSolutions, and to engage the Team in Eindhoven, Netherlands, through a wholly owned Dutch subsidiary of 3DFusion. The Team included Walther Roelen ("Roelen") a former 3DSolutions 3DTV lens designer and Bart Barenbrug ("Barenbrug") a former 3DSolutions senior software engineer, both of whom are Dutch residents.

2

9) For convenience sake, the Dutch subsidiary was named "C3D" prior to its corporate formation. The name "C3D" was later changed to "3DFusion EU" as indicated in an email dated March 15, 2010 from Walther Roelen.

10) In December 2009, I went to Eindhoven, Netherlands to negotiate a license with Philips to manufacture the Philips WOWvx platform and to use their 800+ patents, which cost Philips close to half a billion dollars in R&D and to upgrade the Philips products and tools.  3DFusion signed the Philips Technology License in April of 2010 At that time, I also demonstrated 3DFusion's proprietary technology to the Team including Roelen and Barenbrug, all of whom orally agreed to keep 3DFusion's proprietary technology confidential. After the demonstration, one of the members of the Team, Ms. Grazina Seskeciuite, stated that "it took two guys from New York to come to Philips to show us how to fix our TV."  My solution took two of the Philips tools which they considered 'constants' and I discovered that they could be used 'dynamically' to adjust and 'dial in the 3d image." Once the former 3DSolutions technical experts, (my Team) saw what their 3DTV could do, what it should look like with my solution, they immediately realized my solution was the first time anyone had seen the WOWvx 2D+Depth 3D image quality achieve a Broadcast Quality industry standard.  Consequently, the senior 3DSolutions engineers went to Philips Intellectual Property and Standards Division and convinced them to provide a license to me.

11) Later in this same month, 3DFusion engaged the Team, including Roelen and Barenbrug as independent contractors to support 3DFusion's efforts to restart manufacturing of Philips's 3DASD monitors and the WOWvx platform.

12) In January 2010, I commenced bi-weekly teleconferences with the Team for starting

up the new Dutch subsidiary, with meeting minutes (the "Minutes") recorded by Ms.

Ann-Marie van Ham, a member of the Team. The meeting minutes show the various

technical and administrative issues addressed by the Team including licensing issues

with Philips and my proposed 3D switchable lens design for joint development with

Corning Glass, all of which are deemed confidential and proprietary information of

3DFusion. See, e.g., Minutes of February 17, 2010.

13) Having secured Philips's intellectual property and key technology experts, 3DFusion

proceeded to seek funding and/or financing for its expanded operations and liabilities

required by the new business model.

14) In June of 2010, Raja and Mathu Rajan, as officers of Stream TV were introduced

(hereinafter collectively "the Rajans") to 3DFusion as potential investors.

15)  On June 9 of 2010, Raja Rajan and Mathu Rajan, principals of Stream TV Networks,

Inc., came to 3DFusion's offices at 110 Wall Street, New York, NY to view a

demonstration of 3DFusion's 3DASD technology. Raja Rajan was the general

counsel and COO of Stream and his brother, Mathu Rajan, a technologist and the

CEO of Stream.

16) At the initial June 9, 2010 meeting, the Rajans stated that they had purchased a 42"

Philips 3DASD TV platform and experienced the same 3D image quality failure as

noted above. Upon viewing the 3DFusion's improved 3DASD tools and content on

the same 42" model of the Philips WOWvx platform that they owned, they became

immediately convinced of the significance of the 3DFusion solution to the Philips

3DASD problem.

17) At this time, Stream, with no 3DASD technology of their own, was trying (as yet

unsuccessfully) to develop a marketable glasses free 3D product. They realized that

4

3D Fusion's technology would make that possible.

18) They indicated that the 3DFusion technology solved what was previously believed to be an unsolvable problem, and that this development would therefore provide them with a commercially viable 3D television product.

19) Based on this demonstration, the Rajans immediately signed a Mutual Non-Disclosure and Confidentiality Agreement on June 9, 2010, and began equity funding negotiations, with the promise to provide $20 million in funding.

20) 3DFusion provided Stream with information regarding all of the Confidential Information that had been developed by me and the Team, including both the pathway to automation of the 3D content generation process, and the 3D playback optimization and correction process that had, prior to my ground breaking work, been impossible to solve.

21) Over the ensuing months, I worked with the Rajans, Roelen, and Barenbrug and the Team.  Under my leadership and supervision, we all worked collaboratively towards the goal of pursuing glasses free 3D television technology.

22) In September I officially hired Roelen as the General Director (CEO) of the 3DFusion EU. BV., the Dutch subsidiary, and paid him a Salary, with back pay to July 2010. Once the Dutch BV was established, employment contracts were initiated.

23) 3DFusion established and funded bank accounts for its Dutch subsidiaries 3DFusion Holding B.V. and 3DFusion EU B.V. W. Roelen withdrew certain funds from both of these bank accounts ostensibly for salary payments for the Team from about June 2010 through February 2011 including the period prior to his appointment as Director at 3D Fusion EU B.V in September 2010, even though Roelen was not an officer of 3DFusion Holding B.V. Barenbrug attended various trade shows on behalf of 3D

5

Fusion EU B.V. which paid for his trade shows related expenses and his equipment.

24) In October 2010, under Roelen's directions, 3DFusion EU hired its first full time employee, Ms. Grazina Seskeciuite, who was a graphic arts engineer and software developer, who had worked closely with Barenbrug at the former 3DSolutions, Roelen as the General Director with overall managerial responsibilities of the company, handled all confidential documents, had approved the Team's employment contracts template and was the Senior team organizer to whom the team looked to for guidance.

25) After 4 months of negotiating with the Rajans, on September 28th we signed our completed Term Sheet for their partnering investment, and I proceeded to provide them with full Due Diligence disclosures.

26) On October 8, 2010, I visited Stream's office in Philadelphia, Pennsylvania during which meeting I answered questions from Raja Rajan and Mathu Rajan and other employees of Stream (including Mr. Suby Joseph, the CFO of Stream) about 3DFusion's business plans and startup strategy and demonstrated 3DFusion's proprietary technology using 3DFusion's equipment loaded with 3DFusion's proprietary software and educated them on my solution. I went through all aspects of the workflow, of conversion, of optimization and correction of the artifacts in the 3DASD video content. I also explained how the lens design for the 3DASD monitors was critical to matching the content to, and went over the 2d switchable technology. This meeting lasted about 9 hours and Stream videotaped the entire 8-hour work session.

27) On October 27, 2010, at a 3D Technology conference (i.e., the Kagan 3D Technology Conference) at Waldorf Astoria hotel in New York City, I was seated on the same

panel as Mr. Jeffrey Katzenberg of DreamWorks, Mr. John Landau of Lucas Films, and other video pioneers discussing 3DASD technology. After the conference I invited them to our Waldorf suite for a full demonstration of the 3DFusion technology. The Waldorf conference and my 3DFusion, "Perfect Picture" broadcast quality 3DASD presentations resulted in our scheduling 3DASD demonstrations for Sony, Dreamworks, Intel, Technicolor, Sony, Pixar, Variety magazine and other west coast media companies, for the coming months.

28) On or about January 5, 2011, 3DFusion received a "Termination Agreement" dated January 5, 2011 and signed by Mathu Rajan on behalf of Stream and in his individual capacity, and Raja Rajan in his individual capacity contending that the Term Sheet is binding and that 3DFusion breached a clause in the Term Sheet.

29) 3DFusion subsequently learned that Director Roelen was acting to the detriment of 3DFusion EU and 3DFusion, in violation of his fiduciary and contractual duties to his employer 3DFusion and his confidentiality obligations under his NDA. Roelen understood that the information provided to him, or that was developed as derivative works of Philips's license technology, were all protected intellectual property and information of 3DFusion.

30) Upon information and belief, Roelen accepted an employment offer directly from Stream soon after the expiration of his NDA with 3DFusion, i.e., in or about January 2011.

31) Roelen continued to access and withdraw funds from 3DFusion Holding B.V. and 3DFusion EU B.V. until 3DFusion terminated his position of Director at 3DFusion EU B.V. in or about May 2011.

32) In or about January 2012, to his dismay, I learned for the first time that Stream,

Rajans, Roelen, and Barenburg had benefited from their violation of their NDAs and breach of their fiduciary responsibilities and contractual obligations to 3DFusion. While attending the Consumer Electronics Show ("CES") at Las Vegas, Nevada in January 2012, I observed W. Roelen working at Stream's exhibit booth and representing himself as an employee of Stream, along with other former members of the 3DFusion EU technical team. The technology exhibited by Stream, Rajans, and W. Roelen at the CES show belonged to 3DFusion.

33) I also learned in or about 2017 that Roelen and Barenbrug filed a US patent application (Ser. No. 14/428,866) entitled "Depth Adjustment of an Image Overlay in a 3D Image" on March 17, 2015 claiming priority to a Dutch patent application (Ser. No. 2009616) with a filing date of Oct. 11, 2012, which applications disclose the Confidential Information in violation of their NDAs such as, for example, the border-blending and depth- smoothing functions or features described in at least paragraphs [0076], [0077], [0081], and [0082] of the 14/428,866 application.

34) U.S. patent application 14/428,866 is owned by Stream's wholly owned subsidiary Ultra-D Coöperatief U.A. in Einhoven, Netherlands and has since abandoned the patent application as part of the settlement agreement between Rembrandt-Holding and Stream.

35) 3DFusion Corp. could not withstand the blow to its finances from the loss of the Eindhoven team and theft of its technology and closed operations.

36) In 2016, I acquired all of the assets and interests including all causes of action of 3DFusion and its subsidiaries and in 2017, I assigned such interests and causes of action to Rembrandt 3D Holding, Ltd, which was the plaintiff in the action against the Rajans and Stream.

37) Rembrandt-Holding is the successor-in- interest to 3DFusion Corp.

38) Rembrandt-Holding filed a complaint in the New York State Supreme Court in January 2017 against Stream TV Network, Inc. ("Stream"), Raja Rajan, and Mathu Rajan among others (Stream, Raja Rajan, and Mathu Rajan, collectively referred to as the "Defendants").

39) Defendants removed the state action to federal court.

40) Rembrandt-Holding subsequently moved to amend its complaint (the First Amended Complaint (FAC)), which was unopposed by Defendants. Defendants were served with the FAC on June 23, 2017 which is attached as Exhibit 1 to this declaration.

41) During a hearing on May 11, 2018, the parties agreed to mediation by a magistrate judge. [Dkt# 56] Subsequently, Magistrate Judge Parker ordered the parties to attend a settlement conference in person with counsel on July 18, 2018 (the "First Mediation Conference"). [Dkt# 58] Raja Rajan attended the First Mediation Conference with Mr. Neal Kronley of DLA Piper (former counsel to Defendants) while I came as the sole director and officer of Rembrandt-Holding, and was represented by my counsel Chi Eng and Christopher Michaels.

42) At the First Mediation Conference, I demonstrated the 3DASD technology using the original 3DFusion equipment  loaned to Stream in 2010. This identical equipment was featured in a news article dated January 25, 2011 published by The Flying Kite Media, a Philadelphia based online magazine (the "2011 News Article"), wherein Defendants showcased 3DFusion's laptop and video content. (Ex. 1, 2011 News Article entitled "how philly is leading the glasses-free 3d revolution").

43) I felt having published photographic evidence of Stream claiming credit for the technology on my computer, using my software, and my content that I had developed

was fairly compelling evidence, but as mediations progressed both me and the attorneys representing Rembrandt-Holding provided additional evidence and argument that everyone of Stream's current products and their intended products included intellectual property owned by Rembrandt-Holding.

44) I made specific mention of the fact that Roelen, Barenburg, and Stream's wholly owned subsidiary Ultra-D Coöperatief U.A. in Einhoven, Netherlands were attempting to patent my technology as their own in U.S. patent application 14/428,866. I provided specific examples of the portions of the patent application that were my inventions.

45) After the First Mediation Conference, Ultra-D Coöperatief U.A. abandoned U.S. patent application 14/428,866 that included my technology as part of our on-going settlement discussions.  This effectively immediately resolved an extremely important issue to me and injected some degree of good will into a difficult situation.

46) During the mediation presided over by Judge Kathleen Parker, Stream also provided several of their 4K TVs for us to evaluate by sending them to our various locations across the country at no charge which also paved the way for further settlement discussions.

47) I was able to compare the Stream 4K TV to the old Philips 3D TVs and TVs made by other manufacturers.  I was able to use my technology to correct image errors on the Philips 3D TVs and compare it to how the Stream 4K TV managed to correct the same content.  I reviewed these comparisons with Christopher Michaels in his offices in Ithaca, NY.

48) For the following six months, the parties corresponded settlement terms via email and conducted several in-person settlement conferences at Stream offices in Philadelphia

with me, Christopher Michaels, and Neil Wallace representing the Rembrandt-Holding, and Raja Rajan representing the Defendants. The parties did not resolve their differences.

49) On January 11, 2019, Magistrate Judge Parker ordered the parties to attend a second settlement conference in person with counsel on April 9, 2019 (the "Second Mediation Conference"). [Dkt# 67]

50) At the Second Mediation Conference, Stream was represented by its Chief Financial Officer, Shad Stastney, and its counsel Neil Kronley and John Wellschlager.

51) During the Second Mediation Conference, the parties reached the terms of an agreement and a term sheet was prepared by Stream's counsel that was initialed by me, Stream CFO Shad Stastney, our respective attorneys, and Magistrate Parker and I have attached a copy of this term sheet initialed by Shad Stastney as Exhibit 2.

52) This term sheet provided for Stream to license Rembrandt-Holding's:

   a. "*Knowhow and trade secrets related to methodology for:*

      i. *efficiently converting, correcting and optimizing a 2D+Depth video for playback on a 3D autostereoscopic associated with the Philips technology*

      ii. *utilizing the Philips 2d Switchable Lens technology for refractive and detractive lens switching for the creation of the 'lightfield' and 3d content artefact correction.*

      iii. *utilizing the On Screen Display functions of Borders and "Liveliness."*

   b. *Trademarks*

   c. *the patents asserted in Rembrandt's First Amended Complaint, and dismissed by the Court on March 28, 2018 (ECF No. 47}*" (See Schedule A of the April

11

9, 2019 term sheet – Exhibit 2)

53) Every TV sold by Stream incorporated the enumerated know-how and trade secrets
and but for the license, infringed the patents referenced in the term sheet, so this
settlement was essential for Stream to continue selling product free of infringement
allegations.

54) Stream agreed to pay Rembrandt-Holding $5,840,000 in cash, 2,000,000 warrants to
purchase Stream stock, 100 4K TVs for no charge, 8 8K prototypes at no charge, and
the right to purchase 3,015,000 8K 3DASD LCD units at cost.

55) At each mediation, I emphasized that I wanted my companies to be one of Stream's
largest customers and that the most important aspect of the deal was the right to
purchase products.  Rembrandt-Delaware previously purchased a Stream TV for
$5,250, so we estimated the value of the no charge TVs and the 8K prototypes to be
about $567,000.

56) Based on Shad Stastney's statements, we estimated at Stream's margin was
approximately $400/unit so the ability to purchase 3,015,000 units at cost was worth
approximately $400/unit x 3,015,000 units = $1,206,000,000.

57) In other words, the total value of the settlement agreement between Stream and
Rembrandt-Holding is far greater than all the secured and unsecured Stream creditors'
claims combined.

58) As we were attempting to finalize the documents for settlement, we were contacted
by counsel for Stream and asked to meet in person to make adjustments to the April 9,
2019 term sheet but promised that Stream intended to maintain the net present value
of the April 9, 2019 terms.

59) We met with Shad Stastney, Mark Colemen (director of Stream), Neil Kronley, and

John Welschlager on July 8, 2019.  I attended with counsel, Chi Eng, Christopher Michaels, and Neil Wallace.

60) During our meeting, Mr. Stastney explained that Stream's production was delayed and he requested flexibility on timing of payments and shipments of products.  We asked a number of questions over the day, but Christopher Michaels asked Mr. Stastney a series of specific questions about the expected production costs, production capacity, and the expected margin.  As Mr. Stastney answered, I saw Mr. Michaels type the answers into a computer and later reviewed the spreadsheet that Mr. Michaels was using to show a financial model that evaluated the various proposals for modifications to the April 9, 2019 term sheet so we could assess whether the new proposals matched the net present value of the April 9, 2019 term sheet.

61) Mr. Michaels specifically asked Mr. Stastney about the margins for Stream's products and Mr. Stastney told us that it would be about $400/unit during early commercial scale production and then drop to as low as $120/unit during very high volume production in later years.

62) While our settlement agreement provides a right to purchase products at cost, we specifically discussed with Stream's various representatives that increasing Stream's volume of production would allow Stream to lower its production costs across all products such that Stream could command higher margins from other customer sales.

63) We confirmed directly with Mr. Stastney that the value the ability to purchase units at cost was $400/unit at the beginning trending to $120/unit at high volumes such that the value to Rembrandt-Holding of the right to purchase at cost products was approximately $360,000,000 to $1,206,000,000.

64) At some point after our July 8, 2019 meeting, Stream's management and board of

13

directors went through turn over and Stream fired DLA Piper as its litigation counsel. It was very challenging to get anyone to respond to our requests to complete the settlement, so Rembrandt-Holding eventually filed a motion to enforce the April 9, 2019 term sheet.

65) The motion to enforce was still pending when I learned that Stream had filed for bankruptcy. I asked Chi Eng to attempt to contact litigation counsel for Stream regarding informing the district court about the bankruptcy and stay, but received no response, so Chi Eng notified the court of the pending bankruptcy and the automatic stay. The court extended the response time on the motion.

66) I asked Mr. Michaels to reach out to Stream's bankruptcy counsel (Exhibit 3), the counsel for creditors (Exhibit 4,) and the counsel for SeeCubic (Exhibit 5) on April 20, 2021 to make sure they all knew about our claim and to invite resolution. Only Stream's counsel responded to our communications.

67) Despite having communicated with all represented party's counsels in the Stream Chapter 11 prior bankruptcy proceeding, neither Rembrandt-Holding or I have ever been provided any notice of any motions in any proceeding in the bankruptcy court or Delaware Chancery court.

68) Rembrandt-Holding was not a party to the Omnibus Agreement, yet Shad Stastney, Eben Coffer, Stream, and the Rajans were all well aware of our allegations that all Stream technology infringed the rights held by Rembrandt-Holding. They all knew that Stream had no right to transfer any rights to Rembrandt-Holding technology to SeeCubic.

69) It appears that Shad Stastney decided not to disclose to either the Chancery Court or the Bankruptcy Court that he personally represented Stream in our settlement

14

negotiations and initialed the April 9, 2019 term sheet providing Rembrandt-Holding the settlement terms including over $6,400,000 in cash and free TVs, 2,000,000 warrants, plus the right to purchase new TVs at a collective discount worth over $1.2 billion.

70) After the bankruptcy case was dismissed, we were able to complete the settlement agreement between Stream and Rembrandt-Holding on May 23, 2021 (Exhibit 6) and the litigation in the Southern District ended.  The terms of the May 23, 2021 settlement agreement are basically the same terms negotiated with Mr. Stastney on April 9, 2019 (Exhibit 2) except we provided flexibility on the timing of delivery of the TVs and some of the payments which are similar to the changes Mr. Stastney requested on Stream's behalf in our July 8, 2019 meeting.

71) The May 23, 2021 settlement agreement with Stream carries a substantial value to both companies.

72) Our agreement provided Stream a complete resolution of the litigation through a license to the technology and an expectation of large purchases from Rembrandt-Holding.

73) It is my belief that ~~through~~ my companies have a market for all the TVs that Stream is obligated to provide.

74) Rembrandt-Delaware has been purchasing 3D hardware from a variety of sources and selling equipment and installations without using any UltraD technology.

75) Rembrandt-Delaware has successfully been selling a number of 3DASD product and projects over the years, including bringing to market a 10" Android, no glasses 3D tablet, which received rave reviews from Huffington Post science writer Robert Elisberg (http://rembrandt3d.com/media-2/rembrandt-3d-10-auto-stereoscopic-no-

glasses-3d-android-tablet/) Rembrandt Delaware 3D tablet has been for sale on Amazon for a number of years, until our entire remaining inventory was purchased by one customer in 2020.

76) In 2015 we joined forces with Ken Love a renowned Frank Lloyd Wright videographer for the production of a 3DASD film on Wright's iconic house, "Fallingwater.  This Rembrandt 3DASD presentation is on display at the Fallingwater site and at the Pittsburgh International Airport Frank Lloyd Wright exhibit. Our website shows our installation regarding the Frank Lloyd Wright Falling Water installation - http://rembrandt3d.com/the-opening-of-the-3d-no-glasses-frank-lloyd-wright-film-fallingwater-in-3d-at-the-pittsburgh-international-airport/.

77) To my knowledge, Rembrandt-Delaware is the only company selling Broadcast Quality, consumer glasses free products in the US and has the only glasses free 3D installations in museums, public forums and other world class locations, which have been operating seven days a week since 2010.

78) Rembrandt-Delaware has multiple vendor options for providing glasses free 3D hardware and is about to expand its product line up and management team.  We would like Stream's 3D products to fit into that business.

79) Our current plans include a continuation of the museum installations.  The ideal project included 3D installations at the museum, installations in travel venues (airports, train stations, etc.) and then travelling exhibits that the museum can use to market the museum at other museums.  Rembrandt-Delaware works closely with the content creators and provides content creation, conversion, and optimization services. So an agreement with one museum can include a sale of 6-12 TVs and a large amount of bundled services running into a total of hundreds of thousands of dollars.  The 3D

TVs are an essential part of that budget, but frankly a relatively small part compared to the budget for services and surrounding installations.

80) The main advantage to Rembrandt-Delaware of these installations is the ability to demonstrate the very high end of the market for 3D content and hardware that acts as an effective marketing tool for Rembrandt-Delaware.

81) Rembrandt-Delaware's primary market will be in-store advertising displays targeting chains, big box independents and department stores.  A single store might want dozens of 3D displays and the retail store can provide advertising of its own products or ads sold to its vendors.  This is already a common practice for 2D displays and a great deal of software, network management, and content services already exist.

82) However, to bring 3D into this market, the 3D display and 3D content must be exceptional and without any artifacts.  My technology allows impressive 3D effects to make images appear with depth from the face of the screen back to the perspective vanishing point and outward from the face of the screen, "forward pop" extending 40% of the screens diagonal measurement.  For advertising, it is possible to work with short 15-120 second clips to match the content to the capabilities of the 3D display.

83) I intend to target chain store retailers with overlapping products for cross pollination of 3D digital signage network advertising between them. I would pick them in five different categories. For example, a 3D ad for a video game could play in a variety of stores, e.g. Walmart-10,526 stores, Game Stop-4,816 stores, Best Buy-977.  Each of these stores, could install a dozen or more TVs.  20,000+ stores targeted for network of dedicated product. Once a particular store that sells video games starts using 3D displays, the competitive retail chains will be under pressure to follow suit.  Likewise,

once one video game is advertised with 3D video content, every other video game

creator will be under pressure to compete with 3D advertising.  Roughly 10,000 new

video game titles are published each year.  With each store or vendor paying for its

own content creation, Rembrandt 3D is able to charge tens of thousands for a simple

2D to 3D ad conversion ~~or millions for novel 3D content creations~~ and can charge a

percentage of the ad revenue for running the ads in the 3D display network.  Just

assuming video game retailers selling 6 3D displays per store over 20,000 locations,

would mean 120,000 3D displays and the potential for 3D ads for thousands of new

titles.

84) While using video games as an example, the same competitive logic exists for

numerous products, e.g. jewelry, make-up, clothing, etc.

85) Such advertising networks are extremely common for 2D video content and given the

number of venues like airports that are municipalities, we have downloaded the

standard contracts used by Clear Channel and others for revenue sharing with the

store.  There are already ad brokers to sell ad time in just about any major mall or

transportation venue in the US. While such networks are available for 2D video and

print displays, they have yet to be created for 3D content ads and Rembrandt-

Delaware intends to enter this market in force.

86) Statistica.com estimates that in 2020 digital out-of-home advertising spending in the

United States was to amount to 2.72 billion U.S. dollars. It is projected to further

grow to 3.84 billion dollars by the end of 2023. To date all of that revenue is for 2D

technology rather than 3D and does not count the charges for content creation and

other services.

87) Rembrandt-Delaware is expanding its management team to include John Endicott,

former Westfield Mall executive, as VP of Retail Sales He was Vice President of Design & Construction, Vice President of Development, Vice President of Partner Relations. His title in London was Executive Vice President of International Development. Mr. Endicott's prior position created relationships with a large number of retail store chains. Mr. Endicott created Westfield's tenant design criteria for new and remodeling of stores and for Westfield's temporary kiosk tenants and the concept for a permanent kiosk where tenants lease the kiosk and immediately commence trading so he is extremely familiar with the necessary construction issues and permits for both small and large 3D TV installations.

88) Rembrandt-Delaware also plans to provide "3D IN A BOX" as turn-key 3D platform that is shipped in an automatic lift, display ATA travel Case on wheels, with remote control operation of the lift mechanism which elevates the 3D display. The package would include a 7-day ship and return, freight paid by buyer, plus a custom quote for content. Effectively, this would a short term lease of the unit and we would retain ownership of the units. We plan to keep permanent housing of the units near typical convention venues to allow companies to use the hardware at their trade shows. If the customers use them frequently enough, we would also offer the units for sale, but the 3D display would be one aspect of the total hardware sold to the customer.

89) Rembrandt-Delaware has a number of other product concepts in the works, but they are less relevant to a specific purchase of 3D displays from Stream.

90) Rembrandt-Delaware can enter these markets with or without Stream or the UltraD technology, but the Rembrandt-Holding and Stream settlement agreement provides a strong incentive to work with Stream products.

91) To be clear, 100% of the products by Stream and all UltraD technology includes my

know-how, trade secrets, and would infringe the patents assigned to Rembrandt-Holding.  All of this technology was licensed to Stream in the settlement agreement, but Stream did not have the right to assign this license or to sub-license others (other to have products made).

92) This is common in the industry and mimics the license that 3D Fusion had with Philips that I have attached as Exhibit 7 (note the confidentiality period has expired) note section 2.1:

*"Philips has the right of termination thereof under Section 5.2, below, Philips hereby grants to 3D Fusion and its Affiliates, during the term of this Agreement, a worldwide non-exclusive, **non-transferable license, without the right to grant sub-licenses**, under the Licensed Patents and the Licensed Know-How to: (a) use, sell, offer to sell, import, export, and otherwise dispose of the Licensed Products, and (b) lease, operate or otherwise make available to customers thereof, the Licensed Products, including the right to utilize any Licensed Products to provide services relating to 3D Content Services to any third party."* (emphasis added)

93) Rembrandt-Holding provided Stream a non-exclusive license to the technology that is embedded in the UltraD technology.  Stream had and has no power to sublicense others.  More specifically, Stream does not have the power to transfer its license or to sublicense SeeCubic.

94) Transferring rights to UltraD and/or Stream's Eindhoven corporations to SeeCubic does not transfer any rights to the technology of Rembrandt-Holding.

95) Further, if those entities or individuals transferred any of the know-how, trade secrets, or technology covered by the patents owed by Rembrandt-Holding, it would violate both the settlement agreement with Rembrandt-Holding.

96) Despite the dispute between the parties, Rembrandt-Delaware had purchased a 4K UltraD TV from Stream in the past.  During settlement negotiations, Stream provided several 4K TVs that included the UltraD technology.  Reviewing the UltraD technology allowed me to assess whether it included the technology I developed through 3D Fusion (later transferred to Rembrandt-Holding).  I found that the Rembrandt-Holding technology was embedded in every Stream TV.  However, I was also able to compare the Stream product to other glasses 3D TVs made by other companies with Philips 3DASD units utilizing my technology, and identify image optimizations in the Stream Ultra-d monitor which utilized my patented methodology

97) I see from SeeCubic's website that Bart Barenbrug is now associated with SeeCubic.  After Dr. Barenbrug ceasing to work with 3D Fusion and then going to Stream and filing a patent application seeking to protect my technology, it is upsetting to see that he is now working with yet another new company once again seeking to sell products using my technology without compensation.

98) While Ultra-D Coöperatief U.A.  did abandon U.S. patent application 14/428,866 that included my technology as part of our on-going settlement discussions, that one act does nothing to address the rest of the technology that was eventually licensed to Stream.

99) Neither Ultra-D Coöperatief U.A. or SeeCubic has a license to my technology.  While the CFO of Stream, Mr. Stastney was willing to have Stream pay many millions in value to obtain a license, he has not offered a single cent for a license from SeeCubic.  It was my genuine impression that Mr. Stastney believed that the agreement we reached on April 9, 2019 was a fair valuation of my technology and we reached reasonable settlement terms.  If he believed it was fair then, I can think of no excuse

that would justify a belief that SeeCubic should not pay a similar amount for a license to the exact same technology to make the exact same product.

100)     I do not see anything that SeeCubic has filed in any of the legal proceedings that lists Rembrandt-Holding as a party that it intends to compensate despite its often stated intention to fully deploy Ultra-D technology.

101)     The Stream TV with UltraD is an impressive product and quite frankly out performs any other currently available 3DASD options in a number of contexts. However, a large part of what makes it so impressive is that it includes much of technology that I have assigned to Rembrandt-Holding.  Rembrandt-Delaware would use the Stream TV for a number of our projects.  However, it is important to understand that as impressive as the Ultra-D technology is, it is not the only option on the market and I can and have deployed my technology in other products.  Therefore, the settlement agreement also provides Stream with a major competitive advantage by strongly encouraging Rembrandt-Holding and Rembrandt-Delaware to purchase products from Stream rather than using other manufacturers.  This increased volume lowers Stream's overall production costs, but also in turn makes it more difficult for competitors to Stream to achieve efficient production volume.

102)     While it is my expectation that Rembrandt-Delaware and Rembrandt-Holding will be large customers of Stream, I would expect that the Stream would have many other customers such that the $1.2 billion in profit margins saved by Rembrandt-Nevis would be matched by many billions in profits from sales by Stream to other major customers, whom they have been grooming for years.

103)     SeeCubic cannot sell any products without walking into the exact same litigation that Shad Stastney agreed should be settled for many millions of dollars and

22

there is not much incentive for Rembrandt-Holding to grant any license.

104)     Before agreeing to settle with Stream, I and others on my team, carefully evaluated the products Stream built.  To my knowledge, SeeCubic has not made any products.

105)     My personal interest, and the interests of Rembrandt-Holding and Rembrandt-Delaware lie in having access to reliable glasses free 3D hardware. I am personally largely indifferent to the company that makes that technology so long as the product is high quality, meets the customer's needs, and has licensed my technology fairly. Though I was certainly concerned about how my technology was used inappropriately, my focus is on bringing 3D TVs to market. ~~not on seeking any form of revenge.~~

106)     I have been in litigation with the Rajans and Stream for many years, yet the resolution contemplated all the way back to the beginning of mediation (and eventually reached with Shad Stastney on April 9, 2019) was for us to resolve the litigation and work together to bring 3D technology to the marketplace.

107)     Stream now has a full license to use the Rembrandt-Holding technology, SeeCubic does not.  After years of litigation, I am happy to be working with Stream to bring TVs to market.

108)     I would be happy to work with SeeCubic if it was able to show that it had a viable plan to manufacture a working 3D TV, given that the Philips License is only for production and sales, not sub-licensing, it is not clear how SeeCubic will actually have a viable business model without manufacturing its own products.  It is my understanding that they intend to license others to use their technology, but any licensee would need an independent license from Philips and Rembrandt-Holding.  I

23

do not see how they can possibly submit a credible plan for compensating creditors and investors without a license from Rembrandt-Holding yet they have taken no action to obtain a license.  However, until SeeCubic has such a license, it can fully expect that Rembrandt-Holding will seek to fully enforce its rights in the various forums seeking injunctions and to have their products held at the border.

109)    Mr. Stastney clearly knows SeeCubic, and/or its customers and vendors, need a license from Rembrandt-Holding to actually make and sell products but has failed to disclose that to date or to make any attempt to obtain the needed license from Rembrandt-Holding.

110)    Frankly, the assets SeeCubic is hoping to take are actually highly compromised in SeeCubic's hands because SeeCubic lacks the license from Rembrandt-Holding. To my knowledge, SeeCubic is not actually making anything yet, but it appears that SeeCubic is attempting to transfer source code and servers that include Rembrandt-Holding technology.

111)    It would be possible to have someone remove all of the Rembrandt-Holding know-how and trade secrets from the software to be transferred from Stream to SeeCubic.  As long as the software and technology transferred removed all functionality that included the enumerated intellectual property rights.

112)    It is important to note that Mr. Stastney agreed that the list of IP rights was valid and appropriate to include in the April 9, 2019 term sheet (Exhibit 2) that was prepared by DLA Piper attorneys and modifications were written in DLA Piper attorney's hand writing.  The document was initialed by all parties and by Magistrate Parker.

113)    Assuming that Mr. Stastney is not taking a different position today than he did

on April 9, 2019 before all of us in the room, including Magistrate Parker, SeeCubic should not object to removing all functionality covered by the Rembrandt-Holding technology since he is unwilling to have SeeCubic take a license.

114)     The Rembrandt-Holding technology is not an asset of Stream and it certainly cannot be transferred to SeeCubic without SeeCubic first obtaining a license from Rembrandt-Nevis.

115)     The primary objective of Rembrandt-Holding in the current bankruptcy is to prevent further misappropriation of our technology by allowing SeeCubic to gain access to the technology of Rembrandt-Holding without a proper license.

116)     Further, Rembrandt-Holding would obviously like to collect the amounts that it is owed under that license to Stream.

117)     Lastly, Stream was capable of working with vendors to build an excellent TV in the past and even if 100% of all assets of Stream are transferred to SeeCubic, the team of people at Stream are likely capable of working with the same or similar vendors to build a high quality 3D TV.  While Ultra-D is nice, Rembrandt-Holding owns the technology that was developed many years before Ultra-D and is frankly all Rembrandt-Delaware has used in the marketplace for years and our 3D displays literally are museum quality.

118)    In sum, Stream is a viable business entity and useful to both of my companies even without any of the assets SeeCubic purports to now own.

Pursuant to 28 U.S.C. section 1746, I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: **June 8, 2021**

*/s/ Stephen Blumenthal*

_____

Stephen Blumenthal
Manager – Rembrandt 3D Holding Ltd.

Exhibit List (To Be Filed Separately):

Exhibit 1    First Amended Complaint and exhibits
Exhibit 2    April 9, 2019 Term Sheet initialed by Shad Stastney
Exhibit 3    Mr. Michaels email to Stream's bankruptcy counsel on April 20, 2021
Exhibit 4    Mr. Michaels email to the counsel for creditors of Stream on April 20, 2021
Exhibit 5    Mr. Michaels email to the counsel for SeeCubic on April 20, 2021
Exhibit 6    Settlement agreement between Stream and Rembrandt-Holding on May 23, 2021
Exhibit 7    Philips license to 3D Fusion.