# EXHIBIT 26

From: stephen blumenthal stephen3d@mac.com 
Subject: CHRIS NOTIECE LETTER Hawk and Rembrandt
Date: February 2, 2023 at 12:31 PM
To: Stephen Blumenthal stephen3d@mac.com

### Christopher A. Michaels
*Registered Patent Attorney*
*Chief Executive Officer*



**BROWN & MICHAELS, PC**
118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

*Email:* michaels@bpmlegal.com
*Direct Dial:  607-203-9470*

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.

---

**From:** Christopher Michaels
**Sent:** Monday, August 29, 2022 3:24 PM
**To:** steven.caponi@klgates.com
**Cc:** stephen3d@mac.com; ntwallace@aol.com; 'Chi Eng' <chi@englawfirm.com>
**Subject:** Discussion with Hawk and Rembrandt

Steve:

I am writing to request a meeting with principals and counsel for Hawk and Rembrandt.

I want to thank you for time to discuss our respective positions with respect to Rembrandt's technology.  We prefer a voluntary resolution and continued reasonable and informed discussions is the best way to get to a resolution that works for all parties.

During our call, you asked what Rembrandt's course of action would be if we don't reach agreement.  While the details might vary, put simply, Rembrandt is first working to prevent further inappropriate transfer of our IP and will then work on enforcing its rights if necessary.

I see from your latest filing that you are arguing that Hawk should have received the higher voting shares and your client would be in a position to control Stream.  If your client intends to control Stream as an operating business, our settlement agreement provides Stream a license so long as the payments are made and units provided at cost.  In short, we would need do nothing at that point other than ensure the settlement agreement was honored.  Our concern arises if your client intends to further a transfer or our IP outside of Stream.

To be blunt, I think Rembrandt has done all that it needs to do to shut down an effective sale of

assets unless your team plans to attempt to hide or fail to disclose our claims to the potential purchaser. We have put you on notice of our rights.  Any reasonable investigation will show that Stream had no technology prior to taking Rembrandt's IP.  All of Stream's technology was built on our IP and by contract all those improvements are owned by Rembrandt and licensed to Stream through a non-exclusive license. While it is theoretically possible that you could make such a sale without including the settlement agreement, the discount to the valuation would be enormous.  As we have pointed out previously, the practical cost of honoring our settlement agreement is far lower than the cost of not doing so.

However, if you want to continue to discuss what Rembrandt's next steps would be if Hawk proceeded with an attempt to transfer our technology out of Stream, we would ask the court to specifically exclude our technology from the transfer of assets under any foreclosure.  I can see the court doing one of several things with such a request: 1) ignore us and merely state that SeeCubic/SLS/Hawk are entitled to Stream's assets and if Rembrandt wants to allege their assets are included, Rembrandt and law enforcement can enforce independently against the individuals and companies involved in any misappropriation; 2) appointing a special master to assist in excluding Rembrandt technology from the sale; or 3) ordering anyone taking the technology assets from Stream to take them with our settlement agreement.  How do any of those results put your client in a good position? Ironically, the third outcome is the best situation for your client and is the one you seem to want to avoid.

There is little question that SLS, Hawk, SeeCubic, and their principals are not directly parties to Rembrandt's settlement agreement.  If you take the position in the foreclosure that you are not taking our settlement agreement as part of Stream's assets, your team does not take on the specific obligations but it also does not have the license either.  That means the entities and all people facilitating any unauthorized transfer are immediately subject to suit and nothing binds Rembrandt to the original relatively modest financial terms of the settlement agreement.

Are you hoping that our settlement demand will be lower for SeeCubic or for Hawk?  Stream was planning to make and sell its own products and had things to offer Rembrandt beyond cash.  Your client just wants to sell the technology to the highest bidder.  It is our understanding that many of the individuals and companies have far more assets than Stream or the Rajans.

While I understand that your client is confident about the negative allegations made by the Rajans and Stream, we are not similar actors.  When Philips shut down its 3D team, 3D Fusion/Steve Blumenthal when to Philips and licensed their technology. The Eindhoven team went from working with Philips to working with 3D Fusion and 3D Fusion developed the 3D technology for many months prior to cutting their deal with the Rajans and Stream.  Stream had zero technology and then took all of the IP we showed them.  We have years of interactions, documents, patents, designs, emails, etc. to support our claim and every allegation we have made has been supported by such documents.  We have not waivered or changed our position in 12 years.  To my knowledge, in the entirety of those 12 years, no one has accused Steve Blumenthal of stealing any technology and all documents to date prove our allegations.  I have challenged Stream to provide even a single page of development documents or an email that prove otherwise.  I have done so in front of Magistrate Parker, their legal counsel, all the Stream officers, and the Stream board.  The only effort that Stream made to contest our proof was to allege their engineers did not sign NDAs with 3D Fusion and promptly thereafter, we provided copies of the executed NDAs.  So not only did we have the documents to support our claims,

copies of the executed NDAs. So not only did we have the documents to support our claims, Stream and their engineers got caught in an immediate lie. I doubt that DLA Piper was suborning perjury. I am guessing that their client was lying to them and they were quickly caught. As you can imagine, we made quite an issue about whether there were any documents DLA Piper relied upon to support their declarations and defenses and it was clear during negotiations that they had nothing to contest our mountain of documents supporting our claims and had relied on mere oral statements by employees of Stream.

Basically, everyone that was around in 2009 and 2010 amounted to Steve, the Rajans, and a bunch of foreign nationals that were likely to refuse to show up or take the 5th. At some point, the Rajans are going to realize that their best interests are served by having as much technology as possible be owned by Rembrandt. My guess is they will suddenly agree that all of Rembrandt's allegations are true and therefore all IP is owned by Rembrandt and licensed to Stream in a way that is not subject to foreclosure. It is our expectation that 100% of the people that are willing to testify and all documentation will show all original IP was Rembrandt's.

We have ensured that you and your client are fully on notice of our rights and provided a clear path to honor those rights going forward. I read your complaint against Stream and noted that while you do take time to allege that Stream was developing 3D technology, you fail to mention anything about the Phiips license, the 3D Fusion agreements, the Rembrandt litigation, or the claim that Rembrandt owns the underlying technology. While I am unsure of what justification you could provide for ignoring Rembrandt's rights, it seems even more egregious that you failed to mention that anybody taking the technology through foreclosure would need a license from Philips.

3D Fusion had a license from Philips and so did Stream. I don't believe the Stream license from Philips is assignable and Shad testified previously that SeeCubic had not paid for a license from Philips. While Philips can enforce its own IP rights, it would be a very hard case for Hawk to defend given the fact that I have sent you copies of the Philips license 3D Fusion took and unlike your complaint, Rembrandt made sure to inform the court from the outset of other IP rights in play. It seems that Hawk is intent on involving itself in misappropriation of a lot of intellectual property owned by multiple parties.

There is a clear path for your client to acquire rights to the technology in the right way. It is the same path my client took back in 2009 – license the rights from the owner to the technology. While many years, late, Stream has done so, but as best we can tell, your client, SLS, and SeeCubic seem intent on proceeding without a license from Rembrandt or Philips.

Rembrandt's team is working on contingency. We are not going to inefficiently initiate litigation in a wide variety of forums that have little impact on the actual transfer of our technology to new people. We did pop our heads into the bankruptcy action, but have let the fights between SeeCubic and Stream play out because as best we can tell, no one new is being told about our technology as it appears to be the same engineering team. We have engaged with you again now that we see someone trying to actually transfer our technology again. Our successful litigation against Stream confirms that we are prepared to litigate if necessary, but it is reasonable for you to expect us to do so efficiently and when it will have the greatest practical impact. However, I am reasonably confident that no further litigation by Rembrandt will be necessary as our claim has such a deleterious impact on any attempt to sell to a capable buyer and at some point your

team will have to disclose Rembrandt's claim. By that time,

I understand that your team will want to maintain some semblance of a position for having the right to sell off Stream assets without needing a license from Rembrandt, it is just not a practical business position. We are not demanding that your team accept our legal position or apologize. We are proposing business solutions to move all of our clients forward.

The current situation is that SLS/Hawk have a security interest in Stream's technology, but not technology owned by Rembrandt and licensed to Stream.  If I was representing Stream in defending the foreclosure action, I would highly support Rembrandt's claims of IP ownership and in particular the contractual ownership of all improvements to the technology.  That way none of the technology would be subject to foreclosure.  Sure SLS/Hawk can take the server, but ownership and all source code and patents should be assigned to Rembrandt pursuant to the terms of the agreement I previously sent you.  Basically, taking that position would leave the secured creditors with almost nothing of value and Stream would have its license from Rembrandt.

Even assuming that your team argued some of the technology was unrelated to what Mr. Blumenthal's team developed originally, those incremental pieces are unnecessary to have a high end 3D display.  The Rembrandt Delaware based operating company has been putting out product for many years without need of any of them.  You can go see one of our installations at the Frank Lloyd Wright museum or the Pittsburg airport.  Point being, a saleable product or technology package by Stream or SeeCubic needs Rembrandt's IP, but Rembrandt does not need any technology from Stream.  Rembrandt is in a position to provide IP to either party that allows it to operate without need to any of the technology from Stream.

Again, hypothetically placing myself into Stream's counsel's shoes, I would argue that the value of the technology provided in the foreclosure more than covers the debt owed.  I believe all parties have taken positions that the technology is worth hundreds of millions of dollars.  If a public sale without a license from Rembrandt only generated a portion of that value, I think we should expect that Stream would argue that any lowering of value in the public sale was due to the lenders' failure to take the proper license for Rembrandt allowing a clean sale.  Therefore, a foreclosure action by SLS/Hawk may actually relieve Stream of all of its debt.and leave Stream with the ability to sell a capable 3D product.

Obviously, taking a license from Rembrandt directly or pursuing assignment of the settlement agreement provides your client with freedom of action to sell an intact technology portfolio, however, Rembrandt is free to issue Stream another license to the technology as the settlement agreement is non-exclusive.  It is in the Rajans' and Stream's interest to argue that all technology developed by Stream were improvements to Rembrandt's technology and Rembrandt is free to license it back to them.

We have discussed the sale of Rembrandt Holding (subject to a license to Rembrandt Delaware). This is a solution which eliminates any issues with the IP and gives your client a clear path to achieving its goals. And we may also be able to give you the ability to end all litigation with Stream. You said that Stream owes SeeCubic enough money. That may be, but so far the Rajans individually owe nothing, whereas they have signed our settlement agreement owing just under $6 million in payments. Rembrandt Holding has the ability to sue for collection directly against

$6 million in payments. Rembrandt Holding has the ability to sue for collection directly against the Rajans and seize their shares in Stream (and associated entities) and acquire control of Stream. Hawk could pursue transfer to the settlement agreement to SeeCubic and block further licenses back to Stream. Further, owning Rembrandt Holding would allow you to cancel the license as Stream has not paid us for it.

It should also be noted that the shares in Rembrandt Holding could be sold to anyone else, including Stream, the Rajans, or third party. We have not been shy about our interest in commercializing and generating revenue from Rembrandt's IP.

If the assets are returned to Stream and they are able to pay the SLS debt, it would seem that would end SLS/SeeCubic rights going forward. We are unclear whether Hawk's debt has been converted now that the omnibus agreement is void. I imagine more litigation is contemplated on all those fronts and we would intend to stay out of those disputes, but that you might make different decisions if you owned Rembrandt Holdings. Owning the Rembrandt patents, original technology, and the rights to enforce or terminate the license would give you far more control going forward.

While I understand that you will want to leave the option open to contest Rembrandt's claims, we believe that we have moved past the time for the initial dance around liabilities and need to move towards closing a deal if one is to be had.

I think you'll find our position more than reasonable given the benefits we can provide. I want to stress that the value of the developing rights to the Philips, Stream, and Rembrandt IP IP will be worth substantially more than attempting to just take rights actually owned by Stream because Stream owns relatively little compared to the technology they licensed from Philips and Rembrandt.

We propose setting up a phone or video conference with our team, you, and your client to discuss a business resolution.

I look forward to speaking with you.

Chris

**Christopher A. Michaels**
*Registered Patent Attorney*
*Chief Executive Officer*



118 N. Tioga Street, Suite 400, Ithaca, New York 14850
Main: 607-256-2000  Fax: 607-256-3628
www.brownandmichaels.com

Email: michaels@bpmlegal.com
Direct Dial:  607-203-9470

Confidentiality Note: This email may contain confidential information that is subject to attorney-client privilege. If you received this email in error, please delete all message content from your system and notify sender.